Exhibit A

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

MARCUS GRAY (p/k/a FLAME);     CASE No. CV 2:15-05642-CAS-JC
EMMANUEL LAMBERT; and
CHICKE OJUKWU

      Plaintiffs,

-v.-

KATHERYN ELIZABETH
HUDSON (p/k/a/ KATY PERRY),
et. al.

      Defendants.

---

## EXPERT WITNESS REPORT OF

## BOB KOHN

## JANUARY 11, 2017

---

## I.  INTRODUCTION

I am an attorney licensed to practice in California and before the Second Circuit Court of Appeals. My expertise includes business practices within the music and music publishing industries, particularly with respect to the acquisition and licensing of rights in musical compositions and sound recordings, and the customs and practices observed within such transactions.  I have an LL.M degree from Columbia Law School, earning highest honors (James Kent Scholar), and where I am currently a Visiting Scholar, conducting academic research and attending classes.

With my late father, I am the co-author of *Kohn on Music Licensing,* a treatise of over 1,800 pages which was first published in 1992, and is now in its fourth edition. Among other things, *Kohn on Music Licensing* addresses various types of publishing and recording agreements both domestically and internationally, and many of the standard forms of music rights and licenses associated with such rights. *Kohn On Music Licensing* was cited by the U.S. Supreme Court in *Eldred v. Ashcroft*, 537 U.S. 186, fn. 21 (2003) for music-industry business practices concerning the assignment of copyrights. It also was quoted at length in in *Bridgeport Music v. Dimension Films*, 410 F.3d 792, fn. 18 (6th Cir. 2005), concerning the use of digital samples of existing sound recordings in new sound recordings. In *Woods v. Bourne Co.*, 60 F.3d 978 (2d Cir. 1995) and *Boosey & Hawkes Music Publishers, Ltd. v. Buena Vista Home Video*, 145 F.3rd 481 (2d Cir. 1988), the book was cited for entertainment industry customs and practices concerning performance rights administered by ASCAP.

Upon graduating from Loyola Law School, Los Angeles in 1981, I became an associate attorney for the Law Offices of Milton A. "Mickey" Rudin, who represented, among others, Frank Sinatra, Liza Minelli, Cher, Steely Dan, Irvin Azoff, Warner Bros. Music, Warner Bros. Publications, 20th Century Fox Studios, and other entertainment industry clients. I also served as an Associate Editor of the Entertainment Law Reporter.

Later, I co-founded eMusic.com., Inc., a digital music company acquired by Universal/Vivendi in 2001, and more recently founded RoyaltyShare, Inc., a provider of revenue and royalty processing services that assists record companies with royalty obligations to recording artists, record producers, and music publishers, as well as music publishers with royalty obligations to songwriters and other music publishers. Further information regarding my background and qualifications is in Appendix A attached hereto.

## II. EXPERT ASSIGNMENT AND SUMMARY OF OPINIONS AND CONCLUSIONS

My assignment in the present report was to help supplement the record with music industry practices concerning the scope of live concert public performances licenses granted by performances rights societies (*e.g.*, ASCAP, BMI) under the authority of their songwriter and music publisher members.

In doing so, I will first explain how a "blanket" public performance license issued by ASCAP or BMI to a concert promoter or venue covers not just the concert promoter or venue, but also every singer, musician, and other performer or technician, responsible for singing, playing or otherwise operating audio or other equipment that contributes to the public performance of copyrighted musical works (hereinafter, "performers") at the concert presented by the licensed concert promoter within the premises covered by the

license—*i.e.*, anyone who would be deemed an infringer of a copyright owner's exclusive right to publicly perform a musical work, but for the blanket performance concert license. These blanket concert licenses apply to all copyrighted musical works written or published by members of the performance rights society (*i.e.*, works that are within the society's "repertory" or "repertoire"). These would include, in this case, Defendant's song *Dark Horse* and Plaintiff's song *Joyful Noise*, both part of the ASCAP repertory.

I have also been asked to opine on the extent to which a copyright owner's claims of infringement against a *songwriter* (for his or her alleged preparation of an unauthorized derivative work)*, who is also a *performer* of the allegedly-infringed musical work, are limited by the terms of the blanket performance licenses granted to concert promoters and venues.

In doing so, I will show that the blanket performance licenses issued by ASCAP permit the *performer* (*i.e.*, the covered singer, musician, sound engineer, and others responsible for the performance) to publicly perform a musical work, *even though that work might be deemed an unauthorized derivative work* of *another copyrighted musical work within the society's repertory*. Each songwriter and music publisher member of ASCAP specifically agreed to this result, a key component of the music industry's blanket license solution, upon becoming a member and including its songs in the ASCAP repertory.

I will also show, that, as a matter of custom and practice, when a *performer* sings, plays or otherwise performs a musical work publicly, he or she is not engaging in the creation or preparation of a derivative work. A derivative work is only created or prepared once, the moment the derivative work is first fixed in a tangible medium of

-3-

expression. The preparation of a derivative work typically occurs in a *private*, not public setting: when the *songwriter* reduces the creation to writing or records a private performance of the song for the first time. Any subsequent *public* performance of the song occurs long after the derivative work was created or prepared.

This expert report and the opinions set forth herein are based on my knowledge of the customs and practices of the music industry, my understanding of business and legal transactions in the music industry, my experience on how certain business "terms of art" are used in connection with common music industry transactions, and my experience in negotiating, in both a business and legal capacity, for rights in musical works and sound recordings, both in acquiring such rights and in agreements to exploit them. As noted below, I reserve the right to supplement this report, and the opinions contained herein, on the basis of further relevant information or testimony.

### III.   PRIMARY OPINIONS, DISCUSSION, AND CONCLUSIONS

My opinions and conclusions are discussed below:

1. **A blanket public performance license issued to a concert promoter or venue authorizes not just the promoter or venue to render a public performance of a musical work, but also the singers, musicians, and other concert participants who actually render (or are otherwise responsible for) the performance. Thus, an individual singer, musician, sound engineer, or other participant responsible for a public performance within the premises covered by a blanket license would not be required to obtain a separate license to publicly perform the musical work.**

The ASCAP Concert and Recitals-Blanket License Agreement grants the licensee— typically the concert promoter or operator of the concert venue—a "license to perform publicly *or caused to be perform publicly*" musical works within the ASCAP repertory

-4-

"presented by *or under the auspices of* the licensee." *See*, *Decl. of R. Reimer*, Dkt. 168-2 at 6 (Exhibit 2) [emphasis added]. ("ASCAP repertory" is defined by the license as "all copyrighted musical compositions written or published by ASCAP members"). *Id.*

This clause is understood by custom and practice in the music industry to mean that, not only is the named licensee authorized to publicly perform the songs in the repertory, but so is every singer, musician, and every other person responsible for performing them under the auspices of the license, either directly (*e.g.*, vocal rendering) or by means of any device or process (*e.g.*, playing a musical instrument or otherwise operating sound production or audio enhancement equipment).

Any other understanding or practice would render the license issued to the promoter or venue superfluous, as each individual performer, musician or other concert personnel would be required to separately obtain the same blanket license to avoid a charge of copyright infringement. Indeed, as ASCAP states on its website: "The law says all who participate in, or are responsible for, performances of music are legally responsible." *See*, *Decl. of V. Chieffo*, Dkt. 157-17 at 6 (Exhibit 11).

But it is *not* the custom and practice of performance rights societies to require any of the individual singers, musicians, and concert personnel to obtain permission for the music performed. That is because those who render or otherwise participate in the musical performance are deemed by ASCAP covered by the promoter's or venue's public performance license.

It has been ASCAP's practice to endeavor to throw the blanket of their public performances licenses over the apex of the performance hierarchy—*e.g.*, at the level of the concert promoter, theatre owner or operator, restaurant owner or operator,

broadcaster, etc.—rather than at the level of performers of music lower in the hierarchy, such as those directly singing or playing the music. The apex method of licensing covers all who fall under the cover of the license provided to the named licensee at the top of the performance hierarchy. This practice has been in place since ASCAP's earliest enforcement efforts.

My treatise cites *Herbert v. Shanley*, 242 U.S. 591 (1917), brought shortly after the formation of ASCAP.[1] Victor Herbert (b. 1859 - d. 1914), a founding member of ASCAP and composer known for some of the most successful operettas of his day,[2] sued to prevent the unauthorized public performance of Herbert's song, *Sweethearts*, by a singer and orchestra while patrons of a restaurant were being served dinner. But rather than suing the singer and orchestra, Herbert sued the Shanley Company, the owner of the *Shanley Cabaret,* the establishment where the music was performed.

Shanley argued in its defense that since no specific charge was made for admission to the premises, the song was not performed "for profit," a requirement of the 1909 Copyright Act. Justice Oliver Wendell Holmes, Jr., in delivering the opinion of the Supreme Court, ruled otherwise and in doing so made it clear that the Shanley Company was itself responsible for the offending public performances, even though the music was directly sung and played by the singer and orchestra. *Id.* (the court specifically referring to the *"defendants' performances"*). And Justice Holmes also provided the reason why the owner of the restaurant was legally responsible for the performance:

> "This [plaintiff's song, *Sweethearts*] the Shanley Company *caused to be sung* by professional singers, upon a stage in its restaurant on Broadway, accompanied by an orchestra" [emphasis added] *Id.*

---

[1] Kohn and Kohn, *Kohn On Music Licensing*, 4th Edition, at 1249 (Wolters Kluwers, 2010)
[2] *Babes in Toyland (1903)*, *Mlle. Modiste* (1905), *The Red Mill* (1906).

It should be no coincidence that the ASCAP blanket concert license mirror's Holmes's language: "ASCAP grants and LICENSEE accepts a license to perform publicly *or cause to be* performed publicly . . ." *Decl. of R. Reimer*, Dkt. 168-2 at 6 (Exhibit 2).

This practice of *apex licensing* (*i.e.*, licensing public performances at the level of the owner, operator, promoter level, blanketing them, *as well as* the actual singers, musicians, and others responsible for rendering the musical work) is consistent with 100 years of industry practice dating back to *Herbert v. Shanley*.

In each precedent-setting case, the ASCAP member enforced its performance rights against the *owner* or *operator* of the place at which, or the facility through which, singers and musicians performed their musical works, and not against the actual singers or musicians rendering those performances. *See, Harms v. Cohen*, 279 F. 276 (1922) (Suit brought against the owner and operator of a motion picture theater who employed an independent contractor as an organist to select and perform songs during the projection of silent motion pictures); *M. Witmark & Sons v. L. Bamberger & Co.*, 291 F. 776 (1923) (Suit against a department store which operated a radio station which broadcast live performances of their songs by singers and musicians); *Witmark & Sons v. Pastime Amusement Co.*, 298 F. 470 (1924) (Suit against owner of a motion picture theater who employed an organist to play music during performance of films); *Jerome H. Remick & Co. v. American Auto. Accessories Co.*, 5 F. 2d 411 (1925) (Suit against manufacturer of radio equipment and operator of a radio station for unauthorized radio broadcast of performances by singers and musicians); *Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co.*, 26 F. 2d 354 (1929) (Suit against owners and operators of a dance hall

-7-

for the public performance of plaintiff's songs by an orchestra). *Buck v. Jewell-LaSalle Reality Co.,* 283 U.S. 191 (1931) (Hotel operator which used a radio receiving set and loudspeakers for the entertainment of hotel guests held responsible for unauthorized public performance of music).

This long-standing industry practice of licensing the apex of the performance hierarchy, covering all performers and potential performers below, is today explained in the "frequently asked questions" (FAQ) section of ASCAP's website, which describes ASCAP's licensing practices with respect to concert venues. *See, Decl. of V. Chieffo,* Dkt. #157-17 at 6 (Exhibit 11). According to the site, those who "assume musicians and entertainers must obtain licenses to perform copyrighted music" are "mistaken." *Id.* "It is the business owner who obtains the license." *Id.* ASCAP considers the owner of the business "where music is performed" as the "ultimate" beneficiary of the performance. *Id.* Thus, when an owner or operator secures a blanket public performance license, the actual singers, musicians, technicians and others responsible for the performance *need not* obtain individual licenses for their performance.

ASCAP's apex licensing approach is reflected in the organization's own definition of "music user," in which the owner or operator level is given prominence:

> "A 'music user' means any person that (i) owns or operates an establishment or enterprise where copyrighted musical compositions are performed publicly or (ii) is otherwise engaged in giving public performances of copyright musical compositions." *ASCAP Compendium* §1.11.1.

This industry practice was confirmed specifically by ASCAP Vice President Richard Reimer in this case:

-8-

"The licenses granted by ASCAP authorized Defendant Perry, as well as the
other performers at the Perry Concerts, to give public performances of works in
the ASCAP Repertory . . .  even though the licensee identified in those licenses
was neither Perry, nor Kitty Purry, Inc., nor any other party to this action." *Decl.
of R. Reimer*, Dkt. #168-1 at §5.

This industry practice is also specifically confirmed by the Vice President and
assistant General Counsel of AEG Live, LLC, the second largest concert promoter in
North America, who serves as the promoter of thousands of artists and concerts,
including Eldon John, Carrie Underwood, and Red Hot Chili Peppers, as well as the
promoter of all of Ms. Perry's concerts in the United States. *See*, *Decl. of Madeline
Schilder* (dated January, 10, 2017) at §7. In her declaration, Ms. Schilder stated:

"It has been the intent and understanding of AEG Live that in each instance
the ASCAP blanket concert license obtained by AEG Live licensed and
authorized the actual musicians to publicly perform at those concerts all
compositions in the ASCAP repertory. At no time has ASCAP ever claimed that
the musicians for those concerts were required to obtain individual performing
rights licenses in addition to the license obtained by AEG Live as the tour/concert
promoter." *Id.* at §8.

Thus, AEG Live stands at the apex of the licensing hierarchy, the blanket license for
which includes Ms. Perry and all others responsible for her public performances of
musical compositions on the premises covered by the ASCAP blanket license granted to
AEG Live. Thus, as Ms. Schilder confirmed, the ASCAP blanket licensed not only her
organization, but also "permitted the musicians (including Perry) to perform any
composition in the ASCAP composition repertory." *Id.* at §6. Accordingly, "neither Perry
nor any of the other performers in the Tour Concerts were obligated by ASCAP to obtain

separate individual public performance licenses from ASACP for their performances during the Tour Concerts." *Id.*

It should thus be clear that, beginning with ASCAP's earliest enforcement activities and though a century of the organization's practices since that time, ASCAP's enforcement and licensing practices were designed to compel the establishments or promoters of public performances of music to obtain licenses rather than require licenses from the individual performers hired to render those performances.

This court pointed out, in its minute order of December 5, 2016, that the ASCAP blanket concert license, at Section 2(b), states that the license is "'strictly limited' to the licensee (*i.e.*, the venue for the concert)." *Minute Order*, Dkt. #215. The section in its entirety reads:

> (b) This license is strictly limited to the LICENSEE and to the premises where each concert was presented, and does not authorize any other performances other than those given at the premises as part of the licensed concerts.

In context, it is correct to interpret this provision as meaning that the blanket license does not inure to the benefit of any concert promoter or venue owner *other* than the named Licensee. And even though the license is granted to the Licensee, the provision makes it clear that the license covers only the Licensee *with respect to the premises "where each concert is presented"*—*i.e.*, not with respect to any *other* premises that may be owned or operated by the Licensee. The remainder of the section clarifies that the license covers only performances that are given at the premises as part of the licensed concerts, not performances given elsewhere or given *not* as part of the licensed concerts.

By the same token, it would be incorrect to interpret section 2(b) to mean that the license only blankets the entity who actually signs the license, and not also those who

actually sing or play the songs. The license specifically states that the Licensee may "*cause to be* performed publicly" songs in the ASCAP repertory at concerts "presented by or *under the auspices* of LICENSEE." This language, at a minimum, suggests that someone else, other than the person or entity identified as "LICENSEE," may be doing the performing or presenting. (If the LICENSEE is a corporation or limited liability company, then the performing or presenting of the song will *always* be by someone else). But by whom? Clearly, the song will be "caused to be sung *by professional singers. . . accompanied by an orchestra.*" *Herbert v. Shanley*, 242 U.S. 591 [emphasis added].

If "cause to be performed" is interpreted as covering only the act of "causing" the performance, and not also the actual performance *by the singers and musicians*, then each singer and musician—and anyone else responsible for the public performance, including sound and lightening technicians, and other facilitators (whether working for the singer, the orchestra, promoter or owner of the venue)—would be required to obtain their own blanket license in order for the performance to legally take place. If this were the industry practice, then obtaining all the licenses necessary to present a concert would be so cumbersome, so economically inefficient, that public performances of live music at concert venues would be practically infeasible.

To begin with, anyone "responsible" for a public performance of music would have to first answer the threshold question: Do I need a license? The singers and musicians obviously would. But what about the sound technicians? The lighting technicians? The ticket takers? Once each person "responsible" for the public performance is identified, then every one of them must obtain a blanket license for the performance to proceed legally under the Copyright Act.

-11-

Modern concert performances require the assistance of numerous people, some who work for the lead performer or band, some who work for the promoter, and some who work for the venue owner or operator. The licensing burden placed on every person responsible for the performance may make it too impractical to present these kinds of concerts. This, in turn, would reduce the value of the blanket license to the concert promoter or venue. Their blanket license would, in effect, be reduced to a mere insurance policy, protecting the promoter or venue from infringement suits arising from the failure of any one of the concert performers to obtain the necessary performance license. This is not the result intended by ASCAP or the concert promoters and venues. *See*, *Decl. of R. Reimer*, Dkt. #168-1 at §5 and *Decl. of Madeline Schilder* (dated January, 10, 2017) at §§ 6, 7, and 8.

The blanket license has been recognized as an effective mechanism to substantially lower the costs of licensing the public performance of musical works. *See*, *Broadcast Music, Inc. v Columbia Broadcasting System, Inc.*, 441 U.S. 1, 21-22 (1979). These lower costs inure not only to the benefit of the copyright holders (*e.g.*, songwriters and music publishers), but also to their *licensees*. Indeed, the U.S. Supreme Court recognized one of the blanket license's "unique" characteristics:

> "It allows the *licensee* immediate use of covered compositions, without the delay of prior individual negotiations, and great flexibility in the choice of musical material." *Id*. [emphasis added].

Interpreting "cause to be performed" as covering only the act of "causing" the performance, and not the actual performance by the singers and musicians, would completely undermine the key benefit to licensees recognized by the Supreme Court. It is the actual performer who requires "great flexibility in the choice of musical material," as

the *performer* is the one doing the choosing, not the operator of the venue. Clearly, the Supreme Court had the *performer* in mind when considering the value of the blanket license obtained by the *venue* or *promoter* (or, in the *Broadcast Music* case, the *broadcaster*).

Indeed, the practice of licensing at the apex, at owner or operator level rather than at performer personnel below, is reflected in the several sample forms of blanket licenses listed in the Appendix to Chapter 18 of my treatise (regarding *Licensing Music in Live and Recorded Performances*).[3] There I list numerous forms of blanket licenses that permit the owners or operators of "eating and drinking" establishments, hotels and motels, conventions and trade shows, athletic clubs and dance classes, colleges and universities, retail stores, radio broadcasters, television broadcasters, corporations who operate websites, and others, to "cause the public performance" of musical works by others. These licenses, and the history of ASCAP's enforcement of their member's rights to require them, fully supports the understanding of the intent and scope of the blanket licenses, which have been to cover both the establishment *and* those singers, musicians, disk jockeys, and others who directly perform the music, either live or by the playing of a recorded performance.

For these reasons, in my view, the only reasonable interpretation of the ASCAP blanket concert license consistent with music industry practice and intent is that when such a license is granted to a promoter or venue, it *also* permits the rendering of musical works by the singers, musicians, and others responsible for the publicly performing the works at the licensed premises. This would include Katy Perry, her accompanying musicians, singers, sound technicians and anyone else in her employ, anyone in the

---

[3] Kohn and Kohn, *Kohn On Music Licensing*, 4th Edition at 1283-85.

employ of her concert promoter and in the employ of each venue, who are responsible for the public performances of music at the concerts. Moreover, the blanket license, by its terms, applies not just to songs written by Katy Perry, but to ASCAP's entire repertory—*i.e.*, "all copyrighted musical compositions written or published by ASCAP members."

**2. Under the terms of the ASCAP blanket concert license, a performer is free to perform any song in ASCAP's repertory, *even though* it may infringe (*i.e.*, constitute an unauthorized derivative work of) another song in ASCAP's repertory. Each songwriter and music publisher member of ASCAP specifically agreed to this result, a key component of the industry's blanket license solution, upon becoming a member and including its songs in the ASCAP repertory.**

Under Section 2(f) of ASCAP's Concert and Recitals-Blanket License Agreement, ASCAP reserves the right to withdraw a song from its repertory, and the operation of the license, for only two reasons: (1) if "ASCAP does not have the right to license the performing rights" in the song, or (2) if the song is subject to a claim that it "infringes a composition ***not*** contained in ASCAP's repertory." *See*, *Decl. of R. Reimer*, Dkt. #168-1 at 7 (Exhibit 2, Sec. 2(f)) [emphasis added]. This means that, even where a song in the ASCAP repertory is alleged to have infringed another song in the society's repertory, ASCAP has *no contractual right to withdraw* it from the blanket license. Accordingly, under the terms of the blanket license, a performer is free to perform any song in ASCAP's repertory, *even though* it may infringe (i.e., constitute an unauthorized derivative work of) another song in ASCAP's repertory.

Any other result would impede one of the key benefits of the blanket performance license. Blanket licensing is a practice adopted by the music publishing industry to address, among other things, the problem of how to economically license public

-14-

performances of music rendered live, and sometimes spontaneously, in thousands of
concert venues, hotel ballrooms, clubs and other places, by tens of thousands of singers,
musicians, and other and performers on a nationwide scale. By covering "all copyrighted
musical compositions written or published" by members of the performance rights
society and authorizing "all who participate in, or are responsible for, the performances
of music" on the licensed premises, the blanket license has been recognized as an
effective mechanism to substantially lower the costs of licensing the public performance
of musical works. *See*, *Broadcast Music,* 441 U.S. 1, 21-22.

As noted, these lower costs inure not only to the benefit of the copyright holders (*e.g.*,
songwriters and music publishers), but also to their *licensees*: to allow performers "great
flexibility" in the choice of musical material and the "immediate use" of covered
compositions without the delay of prior individual negotiations. *Broadcast Music,* 441
U.S. 1, 21-22. These would include delays pending the resolution of infringement
disputes between owners of musical works.

Otherwise, a performer would never be assured whether his or her performance of a
set of ASCAP songs would be legally permissible, even if he or she is the beneficiary of a
valid "blanket" performance license for all of ASCAP's repertory. This point was amply
illustrated by defense counsel before the Magistrate Judge. *See*, *Decl. of V. Chieffo*, Dkt.
#168-4, Exhibit 1 at 20-24, paraphrased as follows: Suppose, rather than Katy Perry,
Madonna had performed the alleged infringing song *Dark Horse* live in concert. If the
court were to accept Plaintiff's argument here against Ms. Perry, then Madonna would
also be liable for infringing Plaintiff's song, *Joyful Noise*, even though Madonna's
concert promoter or venue operator sought and obtained a valid blanket license for the

-15-

performance. Despite being covered by a valid blanket license, Madonna's performance of the unauthorized derivative work would, according to Plaintiffs, expose her to damages for infringement; such damages, they say, would include a portion of the gross revenues or profits arising from ticket sales from Madonna's concert performance. The same result would befall every singer, piano player, and guitarist performing *Dark Horse* in a nightclub, bar, or coffeehouse.

As defense counsel explained to the Magistrate Judge, the ASCAP blanket license allows a singer or musician, under the auspices of the promoter's or venue's license, the "confidence" that he or she can put on a concert, perform—even spontaneously or at the audience's request—any song within ASCAP's repertory, and do so without having to "somehow independently determine if song X that's in the repertoire" may be infringing "the derivative rights of song Y in the ASCAP repertoire." *Decl. of V. Chieffo*, Dkt. #168-4, Exhibit 1 at 21. Nor are the venue operators, the musicians, the sound engineers, lighting personnel, and others responsible for the performance required to make that determination. The blanket covers them, too.

ASCAP's agreement with licensees not to withdraw from the blanket license a song that has been claimed to infringe another song in the ASCAP repertory dovetails with ASCAP's internal rules governing such circumstances. Section 2.8.1 of the *ASCAP Compendium of ASCAP Rules and Regulations, and Policies Supplemental to the Articles of Association* at 7 (September 19, 2014) (hereinafter, "ASCAP Compendium")—which is incorporated by reference in all ASCAP agreements signed by its publisher and writer members—allows the disputed work to remain available under the blanket license while providing a mechanism for withholding performance royalties collected until the dispute

is resolved.[4] Thus, pending the resolution of the dispute between ASCAP members regarding the song, the song remains licensed under all outstanding blanket licenses, *even though* it may constitute an unauthorized derivative work of another song in the ASCAP repertory. It is therefore licensed for the "immediate use" by *anyone* who would, pursuant to the license, publicly perform any song in the ASCAP repertory.[5]

Of course, Plaintiffs could exercise its right to withdraw from ASCAP, thereby withdrawing *Joyful Noise* from ASCAP's repertory. If they then refused to join another performance rights society, effectively withdrawing the song from the market for public performances, then *future* public performances, occurring after the expiration of outstanding blanket licenses, would be infringements of copyright. But, all public performances of either *Dark Horse* or *Joyful Noise* that were permitted under the auspices of the ASCAP license could not have constituted copyright infringement. *See*, *ASCAP Compendium of ASCAP Rules and Regulations, and Policies Supplemental to the Articles of Association* at §1.11.3 (September 19, 2014) ("Any resignation from Membership shall . . . be subject to any rights or obligations existing between ASCAP and its licensees under any 'Licenses-In-Effect' . . ."").

Plaintiffs, in becoming members of ASCAP and granting to ASCAP the right to license public performances of any of their works under the society's terms, have thereby

---

[4] **2.8.1 Disputed Claims Between ASCAP Members.** When one Member of ASCAP claims all or a portion of an interest in a composition or catalog that has been claimed by another Member and ASCAP concludes that there is reasonable basis for the claim, ASCAP may hold royalties attributable to the disputed portion of such interest for as long as ASCAP deems appropriate. If ASCAP does hold such royalties, ASCAP will notify both Members. At ASCAP's sole discretion, ASCAP may determine that an agreement indemnifying ASCAP against claims by either Member, or a suitable bond, can be accepted as a condition to release such royalties. If there is no indemnification agreement, suitable bond or a resolution of the claim between the two Members, ASCAP may, at its sole discretion, either release the royalties being held or seek appropriate legal remedies, which may include initiation of an interpleader action.

[5] ASCAP reserves the right to withdraw from its repertory any musical work for which it no longer has performance rights, but until such time the composition remains a licensed work. *See*, Decl. of R. Reimer, Dkt 168-1 at 7 (Exhibit 2, Sec. 2(f).

specifically agreed to this long-recognized "blanket" solution to the complex problem of public performance licensing, including the effect of disputed claims on the process. The solution was designed not only to reduce Plaintiff's share of ASCAP's costs of collecting, allocating, and distributing public performance fees, but, as the Supreme Court recognized, to allow performers "great flexibility" in their choice of musical works. *Broadcast Music,* 441 U.S. 1, 21-22.

Plaintiff suggests that this confidence afforded to performers by the blanket license would not apply to Katy Perry. But the ASCAP blanket license does not distinguish between performers—whether they are headline acts, chorus singers, sound technicians, or the like. Nor does the blanket license makes *any exception* for those who would write songs that infringe other songs *in ASCAP's repertory*. This is specifically because the members of ASCAP have agreed to an alternative solution, one which allows the song's "immediate use" by any *performer* while performance royalties may be held by ASCAP pending the resolution of the dispute between the respective *songwriters*. *See*, *ASCAP Compendium* at §2.8.1. There is no contractual basis in the blanket license for treating one performer differently, because he or she may also be a party to a dispute governed by Section 2.8.1 of the ASCAP rules. Both parties of the dispute agreed to those rules and they remain in effect for as long as they remain members of ASCAP.

The same would be true if the tables were turned. If any song in the ASCAP repertory be alleged to have infringed a Katy Perry song, the allegedly-infringing song would remain available under the ASCAP blanket license to *all* performers, with no exception, pending the resolution of the dispute between Ms. Perry and the alleged infringer, even if that were Madonna (a member of ASCAP). Madonna, and any other performer would be

-18-

free to perform the song, *even though* it may constitute an unauthorized derivative work of a song written by Ms. Perry.

The confidence and flexibility afforded to all those involved in putting on public performances of musical works—from the star performer to the sound man—is the essence of the blanket license. To expose these entertainers and other concert participants to liability for copyright infringement in these cases would undermine the very scheme developed by music publishers and songwriters designed to facilitate the collection of public performance revenue and protect licensees from charges of infringement.

This is not to say that that the ASCAP license could be interpreted as giving Katy Perry, or anyone else, "free rein" or "carte blanche" to infringe other exclusive rights under copyright in another's copyrighted musical work. ASCAP did not authorize Ms. Perry, or any other songwriter or performer, the right "to create or record an allegedly infringing musical work." *See*, *Decl. of R. Reimer*, Dkt. #168-2 at 3.

But whether Defendants *created* or *recorded* an infringing work is not at issue in this motion. The only issue here is whether, once an infringing work is created, is its performance covered by ASCAP's license? By the terms of the ASCAP blanket license, the answer is yes, *provided that the infringed work is in the ASCAP repertory*.[6]

And when Katy Perry, Madonna, or anyone else publicly *performs Dark Horse*, they are not creating or preparing a derivative work. As noted below, *Dark Horse* was created when it was *first* fixed in a tangible medium of expression, whether it is an infringing derivative work of *Joyful Noise*, or not.

---

[6] Arguably, the result would be the same if the allegedly-infringed work was licensed by BMI or other performance rights society, but this court need not address that question, because such work is in the ASCAP repertory. *Decl. of V. Chieffo*, Dkt. 157-6 at 1.

The only result here consistent with what the Supreme Court recognized as one of the "unique" characteristics of the ASCAP's blanket license—"great flexibility" for licensee/performers—is that the license covers *any* performer, even one accused of infringement, who wants to step on to *any* licensed stage and perform *any* song in the ASCAP repertory, whether it's *Dark Horse*, *Joyful Noise,* or any of number of songs in ASCAP's repertory whose copyright ownership may be in dispute from time to time.

Plaintiffs, as members of ASCAP and other performance right societies, have specifically agreed to this long-recognized "blanket" solution to a complex licensing problem by becoming members of their respective societies and giving their societies the right to license public performances of any of their works under the societies' terms. *Decl. of V. Chieffo*, Dkt. #157-6, 157-7, 157-8.

3.  **When a performer sings, plays or otherwise performs a musical work publicly, he or she is not engaging in the creation or preparation of a derivative work. A derivative work is only created or prepared once, the moment the derivative work is *first* fixed in a tangible medium of expression. Any subsequent public performance of the song occurs long after the derivative work was created or prepared.**

By means of background, under the Copyright Act, a derivative work is a work of authorship and copyright subsists in works of authorship when the work is "fixed" in any tangible medium of expression. 17 U.S.C. §§101, 102(a). Thus, a derivative work, like any work of authorship, is only created or prepared once, the moment the derivative work is *first* fixed in a tangible medium of expression. (Copyrightable *new matter* may be added subsequently as they are fixed, but a copyright subsists when the work, or derivative work, is first fixed).

-20-

As a matter of music industry practice, this fixing of a musical work typically occurs in a *private*, not public setting: when, for example, a *songwriter* reduces his or her song to writing or records (on tape or digital media) a private performance of the song for the first time. Any subsequent *public* performance of the song occurs long after the derivative work was created or prepared. Thus, when a performer sings, plays or otherwise performs a musical work publicly, he or she is not engaging in the creation or preparation of a derivative work.

Accordingly, it should be clear that the mere act of publicly performing a musical work, while invoking the copyright owner's exclusive right of public performance, does not invoke any of the owner's other exclusive rights, such as the exclusive right of reproduction, distribution, or adaptation. This divisibility of a copyright owner's various exclusive rights is reflected in the way revenues are earned in the music industry. Thus, public performances of music generate public performance fees.[7] Reproductions of musical works generate "mechanical" license fees from the reproduction of phonorecords,[8] "synchronization" license fees from the synchronization and reproduction of musical works in audiovisual works,[9] and "print" fees from the reproduction of music in sheet music, folios, and the digital reproduction of lyrics and musical notation.[10] (A license to distribute copies licensed to be made under these various reproduction licenses is usually included in the reproduction license). Authorizing the preparation of derivative works may generate fees from the dramatization of the musical work[11] and fees derived

---

[7] Kohn and Kohn, *Kohn On Music Licensing* at 1243-1298 (*Public Performance Licenses*).
[8] Kohn and Kohn, *Kohn On Music Licensing* at 715-1062 (*Mechanical Licenses*).
[9] Kohn and Kohn, *Kohn On Music Licensing* at 1083-1140 (*Synchronization Licenses*)
[10] Kohn and Kohn, *Kohn On Music Licensing* at 665-714 (*Print Licenses*)
[11] Kohn and Kohn, *Kohn On Music Licensing* at 1299-1358 (*Grand Rights*)

from the digital sampling of a song's recording used in the recording of another song.[12] It should be clear that each of these revenue streams flow from the divisible exclusive right under copyright invoked by the particular use.

### PUBLICATIONS AUTHORED WITHIN THE PRECEDING 10 YEARS

The following is a list of all publications authored by me within the preceding 10 years:

- *Kohn On Music Licensing, 4th Edition* (Wolters Kluwer 2010)

### RECENT TESTIMONY AS AN EXPERT WITNESS

In 2015, I testified in discovery as an expert in *Fahmy v. Jay-Z (aka Shawn Carter), et. al, Civil Action No. 2:07-CV-05715 CAS (PJWx),* which involved the interpretation of various music publishing and license agreements relating to the use of a musical work in a sound recording.

In 2009, I testified in discovery as an expert in *Zappa v. Rykodisc, Inc., Civil Action No. 08-CV-00396 (WHP),* a case involving the interpretation of an agreement regarding the sale of sound recordings.

In 2007, I testified in discovery and in court as an expert for ASCAP in the use of musical works on the Internet. *United States v. ASCAP In the Matter of the Applications of America Online, Inc., L, RealNetworks, Inc. and Yahoo!, Inc. for the Determination of Reasonable License Fees, 559 F.Supp.2d 332 (2008).*

---

[12] Kohn and Kohn, *Kohn On Music Licensing* at 1593-1622 (*Digital Sampling*)

## DATA OR OTHER INFORMATION CONSIDERED

## IN FORMING THESE OPINIONS

The data or other information I considered in forming these opinions include:

- Plfs Third Amended Complaint, Dkt #172
- Joint Stipulation re: Plfs Motion to Compel, Dkt #157-1
- Decl. of V. Chieffo (Exhs 1-14), Dkt #157-6
- Plfs Suppl. Memo ISO Motion to Compel, Dkt #159
- Defs Supplemental (Reply) Memo, Dkt #160
- Defs Motion for Rev of Oct 11 Mag Decision, Dkt #168
- Decl. of R. Reimer, Dkt #168-1
- Amended Civil Minutes, Dkt #215
- Compendium of ASCAP Rules and Regulations, and Policies Supplemental to the Articles of Association
- Decl. of M. Schilder dated January 10, 2017

## EXPERT WITNESS FEE

My fees for services rendered as an expert witness in this case is $695.00 per hour.

## INTENDED TRIAL EXHIBITS AND SUPPLEMENTATION

At trial, I reserve the right to use all materials considered in preparing this report, including without limitation the materials set forth in the foregoing sections.

I understand that additional depositions of experts and other witnesses may be conducted in this matter.  I plan on reviewing their deposition transcripts when they become available and reserve the right to supplement or amend this report after such review.

Finally, I reserve the right to supplement or modify this report and the opinions expressed based upon additional facts, documents, or other materials that may be brought to my attention.

-23-

Respectfully submitted,

January 11, 2017
Date

Bob Kohn

-24-

# Appendix A

[Resume of Bob Kohn]

# ROBERT H. KOHN, ESQ.

140 E. 28th Street # 5G
New York, NY 10016

+1-408-602-5646          bob@bobkohn.com

**EXPERIENCE**

| | |
|---|---|
| 2016-date | VISITING SCHOLAR, COLUMBIA LAW SCHOOL, New York, NY |
| 2014-date | ADMITTED, SECOND CIRCUIT FEDERAL COURT OF APPEALS |

2002-2015       EXPERT WITNESS IN MUSIC LICENSING
- o   Testify for various clients as an expert in music licensing
- o   e.g., before the Federal District Court in New York in *In Re Application of AOL, RealNetworks and Yahoo!* (related to *United States v. ASCAP), 559 F.Supp.2d 332* (S.D.N.Y. 2008) (at rate hearing, testified on behalf of ASCAP to instruct judge on how music is transmitted and marketed on the Internet).
- o   e.g. Joined U.S. Chamber of Commerce in 2005 on a trade mission to China to speak in Guangzhou and Nanjing on copyright protection.

2005-2014       ROYALTYSHARE, INC., San Diego, CA
Founder, Chairman & CEO
- o   Provided enterprise services and technology solutions to record labels, music publishers, and book publishers
- o   Largest clients included Sony Music Group, Hachette Book Group, Macmillan, Welk Music Group, Ministry of Sound (U.K.), and Nettwerk (Canada)

2000-2005       BORLAND SOFTWARE CORP., Cupertino, CA
Vice Chairman of the Board
- o   Served as chairman of the Audit, Corporate Governance, and Compensation Committees

1997-2001       EMUSIC.COM, INC., Redwood City, CA
Chairman & Co-founder
- o   First legitimate MP3 music download service
- o   Took public in 1999 (NASDAQ:EMUS); acquired by Universal Music Group in 2001

1996 - 1997     PRETTY GOOD PRIVACY, INC., San Mateo, CA
Vice President, Business Development and General Counsel
- o   Developed and marketed PGP encryption software

| 1987 - 1996 | BORLAND INTERNATIONAL, INC., Scotts Valley, CA |

**BORLAND INTERNATIONAL, INC.**, Scotts Valley, CA
Senior Vice President, Corporate Affairs General Counsel, and Secretary
- o   Developed and marketed Sidekick, Turbo Pascal, Borland C++, Quattro Pro, Paradox, and dBASE
- o   Managed *Lotus v. Borland*, 516 U.S. 233 (1996)

1994 – 1996     MONTEREY COLLEGE OF LAW, Monterey, CA
Adjunct Professor of Law
- o   Taught Corporate Law for three years
- o   Awarded "best professor" by graduating class of 1996

1985 – 1987     CANDLE CORPORATION, Los Angeles, CA
Associate General Counsel
- o   Developed software for mainframe computers

1983 -1985     ASHTON-TATE, Culver City, CA
Corporate Counsel
- o   Developed personal computer software, including dBASE II

1980 -1983     RUDIN, RICHMAN & APPEL, Beverly Hills, CA
Associate Attorney (1982-1983); Law Clerk (1980)
- o   Entertainment industry clients, including Frank Sinatra, Liza Minnelli, Cher, Frontline Management (Irving Azoff), and Warner Bros. Music.

1980 - 1983     ENTERTAINMENT LAW REPORTER, Santa Monica, CA
Advisory Board (1983-2000); Associate Editor (1980-1983)

**EDUCATION**

2016     COLUMBIA LAW SCHOOL
L.LM degree – May, 2016
James Kent Scholar (highest honors)

1981     ADMITTED TO CALIFORNIA BAR, December, 1981
- o   Member in good standing (2016)

1978 -1981     LOYOLA LAW SCHOOL, Los Angeles
J.D. degree - June, 1981

1974-1978     CALIFORNIA STATE UNIVERSITY, NORTHRIDGE
B.S. Degree in Business Administration; Major: Finance; Minor: Economics

**PERSONAL**     Co-author, *Kohn On Music Licensing,* Aspen Law & Business (4th Ed. 2010)
- o   Cited in *Eldred v. Ashcroft* 57 U.S. 186 (2003); *Bridgeport Music v. Dimension Films, 410 F.3d 792* (6th Cir. 2004); *Woods v. Bourne*, 60 F.3d 978 (2d Cir. '95); *Boosey & Hawkes v. Buena Vista Home Video*, 145 F.3d 481 (2d Cir. 1988).

Author, *Mind and Brain: The Genius of Fortune*, winner of essay contest sponsored by the Encyclopedia Britannica (Great Ideas Today 1994).