# EXHIBIT 8

EXHIBIT 8
PAGE 150

RESPONSE OF TODD DECKER TO LAWRENCE FERRARA REPORT DATED
MAY 5, 2017 REGARDING "JOYFUL NOISE" AND "DARK HORSE"[1]

1. **Prof. Ferrara's report fails to deal with the fundamental similarity between "Joyful Noise" and "Dark Horse."**

   a. This similarity rests in the eight-note ostinato figure described in tabular form on page 6 of my report.

   b. As I noted in my report, an ostinato is "a fairly short melodic, rhythmic, or chordal pattern repeated continuously throughout a piece or section" (*Oxford Companion to Music*, 2002).

   c. Ferrara excerpted the definition of *ostinato* from the *Harvard Dictionary of Music* (2003): "A short musical pattern that is repeated persistently throughout a performance or composition or a section of one. Repetition of this type is found in the music of cultures throughout the world..."

   d. The *Harvard Dictionary of Music* definition continues, "and is especially characteristic of the music of Africa, whence its presence in much folk and popular music elsewhere (e.g., rock). ... Although any musical element may figure as an ostinato, the most memorable patterns result when it is a melody, a chord progression, a rhythm, or some combination of these."

   e. The eight-note ostinatos at issue from "Joyful Noise" and "Dark Horse" exhibit identical rhythms and near identical melodies. These similarities account for the clearly audible similarities of these "most memorable patterns."

2. The similarity—and audibly evident borrowing from "Joyful Noise" by the makers of "Dark Horse"—can be clearly heard in several musical parameters described in the summary of my initial report.

   a. Rhythm: The ostinatos in "Joyful Noise" and "Dark Horse" are identical in rhythm. This creates an immediate and pervasive identification between the songs, both of which have a spare, four-square, halting rhythmic affect.

   b. Pitch Content. The ostinatos in "Joyful Noise" and "Dark Horse" are nearly identical in pitch content (understood as scale degrees). Beyond the portion of the

---

[1] In preparing this rebuttal report, I have reviewed some additional materials, including the texts (scholarly and otherwise) cited below.

EXHIBIT 8
PAGE 151

two eight-note ostinatos in question that are actually identical (notes 1-6), a strong similarity manifests in highly similar downward melodic contours in notes 7 and 8.

    c.   <u>Timbre</u>. The timbre (or color) of the sound of the eight-note ostinatos in "Joyful Noise" and "Dark Horse" is substantially similar.

3.  Ferrara's report addresses the above three areas, without undermining my fundamental claims, by attempting to confuse the directly audible similarities between the tracks:

    a.   <u>Rhythm</u>: Ferrara's report attempts to de-emphasize the rhythmic similarity between the two tracks' ostinatos by transcribing the rhythm of the "Joyful Noise" ostinato in a pedantic manner that misrepresents the aural experience of the track. Such misrepresentation by way of transcription choices is endemic in Ferrara's report.

    b.   <u>Pitch Content</u>: Ferrara's report attempts to de-emphasize the similarity in pitch content between the two tracks' ostinatos by transcribing the pitch content of the "Joyful Noise" ostinato in a similarly pedantic fashion that, again, misrepresents the aural experience of the track.

    c.   <u>Timbre</u>: Ferrara's report does not dispute the similar timbres of the two tracks.

        i.   He agrees with my report that respective tracks draw on the "same general family of electronic sounds heard in current popular music."

        ii.   Timbre is significant because of its connection to musical style, creative choices on the part of composers, and compositional method. The similar timbres of the two ostinatos in question points towards their closeness to each other and shared distance from most all of Ferrara's prior art exhibits.

4.  Before moving towards a response to the details of Ferrara's report, another level of musical similarity between the tracks deserves attention: <u>texture</u>.

    a.   The ostinatos in "Joyful Noise" and "Dark Horse" are alike placed in a treble voice.

        i.   Neither functions as a bassline.

        ii.   Both function identically as strongly melodic ideas placed at the front of an otherwise rather empty mix.

2

EXHIBIT 8
PAGE 152

    iii. Both are initially and regularly accompanied only by a repetitive
        syncopated bassline that is suppressed in the mix relative to the melodic
        ostinato.

    iv. Both dominate the texture of the music when they are playing to a marked
        degree.

b. The melodic nature of the ostinatos at issue is especially noteworthy since across
Western music history, ostinatos have most often taken the form of basslines
which organize cyclical harmonic motion.

    i. As found further down in the definition of *ostinato* in the *Oxford*
      *Companion to Music*, "In Western music, ostinato is often a characteristic
      of a more specific compositional procedure, as in the chaconne,
      passacaglia, and ground, and in isorhythm and minimalism. Where it is
      applied to a set bass pattern it is known as a *basso ostinato*."

c. The ostinatos at issue here do not conform to the above conventions of Western
art music. Instead, they work within the paradigms of beat-driven popular music,
a category embracing hip hop, electronic dance music, and much of Top 40
popular music in the twenty-first century and, of course, the two tracks at issue in
this case.

    i. This point is important given that Ferrara's analytical approach comes
      solely from Western art music and is almost entirely based on analysis of
      pitches.

    ii. Mark Butler, Professor of Music Theory and Cognition at Northwestern
      University and the leading music scholar of electronic dance music and
      DJing, noted some sixteen years ago, "[Electronic dance music's] use of
      pitch is typically restricted, with the majority of musical development
      taking place in the realms of rhythm, meter, texture, and timbre.
      Consequently, these areas should be principal concerns for the analyst
      wishing to pursue a close examination of musical sound in this
      repertoire."[2]

---

[2] Mark J. Butler, "Turning the Beat Around: Reinterpretation, Metrical Dissonance, and Asymmetry in Electronic
Dance Music" *Music Theory Online: A Journal of the Society for Music Theory* 7/6 (December 2001).

EXHIBIT 8
PAGE 153

    iii.   What Butler says of electronic dance music and DJing applies equally to the hip-hop and pop with rap repertories at issue here, especially with the steady rise of EDM-inspired popular music in the twenty-first century.

d.  As music historians would agree, not all ostinatos are the same and the ostinato as a musical principle is employed differently in different times, places, and styles.

    i.   While Ferrara selectively quotes the definition of *ostinato* from the *Harvard Dictionary of Music* as "the use of an ostinato in music '…is found in the music of cultures throughout the world'," the great majority of the entry in the *Harvard Dictionary* details several distinct types of ostinato just as found in Western art music.

    ii.   It is a gross oversimplification to lump all ostinatos together as similar. The specifics of how ostinatos operate in different styles and historical periods must be accounted for in any meaningful comparative argument.

e.  The ostinatos at issue here—hailing from the same musical milieu—are identical in their placement in and definition of the texture of the tracks at issue.

f.  It is extremely unusual for a strongly melodic ostinato, such as the similar examples heard in "Joyful Noise" and "Dark Horse," to not function as a bassline and to so entirely dominate the texture with a "spare, four-square, halting rhythmic affect."

g.  Indeed, none of Ferrara's 35 prior art exhibits demonstrate anything close to the spare textural qualities described above that are shared by the melodic ostinatos at issue in "Joyful Noise" and "Dark Horse."

h.  Beat-driven popular musics are generally not as stark in their texture as "Joyful Noise" and "Dark Horse" both are and, furthermore, the two tracks are stark in the exact same ways. Ferrara offers no examples of similar rhythmically square beats in his 35 prior art examples.

i.  When combined with shared material in other musical domains—rhythm, melodic content, timbre—the relationship between these two tracks can only be described as the copying of well-defined musical material from "Joyful Noise" by the makers of "Dark Horse."

4

EXHIBIT 8
PAGE 154

5. **This distinctive simplicity of texture—combined with extremely similar descending, minor-mode, melodic ostinatos using extremely similar electronically-derived timbres, contributes to the ready recognition for the listener of a deep similarity between "Joyful Noise" and "Dark Horse"**

   a. Social media users with digital music knowledge have heard and demonstrated this deep similarity, as I discuss below.

6. In attempting to minimize the directly evident aural similarity between the ostinatos for the two tracks in question, Ferrara's report discusses irrelevant matters which are not at issue in this case. His report consistently attempts to distract from the similarity that *is* at issue: the audible similarity of the eight-note ostinato figures.

7. **First, Ferrara makes many comparisons between the entirety of the two tracks. This is not at issue here.**

   a. There are obvious formal differences between the two tracks typical of the genre differences between a rap and a pop (with rap) track.

      i. These formal differences are not the basis of Plaintiffs' Complaint.

   b. There are obvious differences between the lyrics of the two tracks.

      i. There lyrical differences are, likewise, not at issue.

   c. The ostinato heard throughout "Joyful Noise" and heard during defined portions of "Dark Horse" is at issue in this case.

      i. As my report summarized on page 2, "The similarities between the tracks' underlying musical material and the clear chronological relationship between the two (with Joyful Noise widely released in 2008 and Dark Horse released in 2013) suggests significant borrowing of musical material from Joyful Noise by the creators of Dark Horse."

   d. Ferrara's attempts to make the issue one of track-to-track comparison seeks to confuse the crucial matter: the musical content (rhythm, pitches, timbre, and texture) of the tracks' eight-note ostinatos.

   e. My report raised large-scale issues only in relation to the eight-note ostinato that is the issue.

      i. I address large-scale issues again in the section below assessing Ferrara's prior art exhibits.

5

EXHIBIT 8
PAGE 155

8. **Second, Ferrara argues that musical notation is essential to understanding this case. It is not.**

   a. Popular music is inscribed in sound, not on paper.

   b. My report attempted to guide the listener without putting musical notation in the place of aural experience, which is the sense experience that counts in this case.

   c. The transcription of recordings into musical notation—which Ferrara uses throughout his report—is always an interested and rhetorical act designed to make an argument. Musical scholars have agreed on this for decades (see below). This is especially the case with the popular music styles at issue here, where the musical work is a sound recording and not a notated musical score to be realized in performance.

   d. Ferrara deploys musical notation by way of transcriptions to try to suggest that the clearly audible similarities between the principal ostinato of "Joyful Noise" and his ostinato #2 of "Dark Horse" are, in fact, not evident to the ear.

   e. Ferrara's effort to obscure the audible similarities between the respective ostinatos by way of visual arguments based on transcription are, therefore, entirely specious. As I show below, his shifting strategies for representing the two tracks seek to undermine audible similarities that have been commented upon and demonstrated in sound in YouTube comparisons of the songs.

9. **Third, Ferrara's entire argument against similarity in this case relies on an inappropriate model of compositional process and analysis that is derived from analytical scholarship devoted to a narrow sort of classical music (the Austro-Germanic tradition) and that is fundamentally unsuited to popular music and, indeed, not used for the analysis of popular music by publishing academics in the field of music scholarship.**

   a. Crucial to Ferrara's entire argument is the notion that the musical ideas in "Dark Horse" must be assessed and understood *in the order they are heard on the track*.

   b. On this basis, he argues that the aurally evident similarities between the eight-note ostinatos in "Joyful Noise" and "Dark Horse" are not there because the eight-note ostinato in "Dark Horse" is derived completely and solely from the first notes heard in "Dark Horse" (his ostinato #1).

6

EXHIBIT 8
PAGE 156

c. This erroneous argument is premised on a faulty first principle—that "Dark Horse" should be analyzed in the order of musical ideas on the track—which is deconstructed in detail below.

d. This faulty argument is founded on the organicist notion that a work of art—such as a popular music track—is a closed expressive system that can and should be explained only in reference to itself. In Ferrara's argument, this outmoded approach to aesthetic analysis transparently serves the purpose of deflecting the listener's ear from the clearly audible similarity between these two tracks.

10. **Fourth and finally, in offering evidence of prior art exhibits relating to "Dark Horse" and "Joyful Noise," Ferrara makes multiple flawed comparisons. In the process, his prior art exhibits demonstrate by contrast just how much alike the ostinatos from "Dark Horse" and "Joyful Noise" at issue in this case are.**

a. Among Ferrara's 35 prior art exhibits, only one ("Gangsta's Paradise," Audio Exhibit 1, Track 15) rises to any level of similarity with the matter at issue: the eight-note ostinato in both "Dark Horse" and "Joyful Noise." (Moreover, the ostinato in "Gangsta's Paradise" is distinguishable from the ostinatos at issue from "Dark Horse" and "Joyful Noise" because of its pitch content (understood in scale degrees), its melodic contour, its timbre, and its role in the texture of the track.)

b. All the other prior art exhibits relate to comparisons between "Joyful Noise" and "Dark Horse" that are not germane to the issue of similarity in the narrow but essential domain of the eight-note ostinatos shared by these tracks.

c. Indeed, many of the prior art exhibits Ferrara offers as ostinatos comparable to those at issue in this case are not, in fact, ostinatos at all but instead accompaniment patterns typical of popular music. This pattern of misidentification in Ferrara's report again speaks to his strategy of confusing the issue at hand: the clearly audible similarity between the eight-note ostinatos in "Joyful Noise" and "Dark Horse."

11. Below, I examine Ferrara's report in greater detail along the four larger points noted above.

7

EXHIBIT 8
PAGE 157

12. **The musical matter of this case is the copying of characteristic musical material
from the eight-note ostinato in "Joyful Noise" by the makers of "Dark Horse." I
have defined this ostinato along the musical parameters of rhythm, pitch content,
timbre, and texture.**

    a. Any and all of Ferrara's arguments which draw attention to other aspects of these
tracks—such as lyrics, large-scale form or structure, vocal melodies, the presence
or absence of rapping—are not germane to the issue at hand and simple
distractions from the case.

    b. Especially troubling in his report is the long and needless analysis on pages 15 to
18 comparing the eight-note ostinato from "Joyful Noise" with what Ferrara calls
ostinato #1 from "Dark Horse." Any reasonable listener would hear these two bits
of musical material as plainly dissimilar and yet Ferrara labors over and over to
prove they are different, even to the use of a parallel musical example (Musical
Example 4) and parallel tabular example (page 16). The report's larger goal of
confusing the issue at hand is here captured in less than succinct terms.

13. **Ferrara further attempts to confuse the issue at hand by way of multiple and
obfuscating transcriptions of popular music recordings.**

14. Popular music is inscribed in sound. Any attempt to render popular music recordings as
text—i.e. transcribing a record into musical notation (as Ferrara does throughout his
report)—misses the fundamental quality of popular music and opens the door to
rhetorical and inevitably interested representations of said recording.

    a. Albin Zak, Professor of Musicology at the State University of New York–Albany
and the pre-eminent music scholar in the field of post-rock popular music, has
noted: "We are accustomed to locating a work's identity in a written text. Rock
texts, however, are sounding things, and transporting them into the realm of
iconicity [or musical notation] is tricky. A record's authentic being lies in its
particularity, but musical notation, whose power lies in generalization, offers too
vague a picture on its own to represent this fairly. … It is [to quote Frank Zappa]
the record's sound that tells us 'what the composition *IS*.' … transcriptions
amount to radical reductions of the artistic statement."[3]

---

[3] Albin J. Zak III, "'Edition-ing' Rock" *American Music* [the official journal of the Society for American Music],

EXHIBIT 8
PAGE 158

    b.  What Zak says of rock applies equally to all post-rock popular music genres, in particular to beat-driven, twenty-first-century popular musics, the larger category into which "Joyful Noise" and "Dark Horse" both fall.

15. And yet, contrary to the consensus of music scholars, Ferrara contends that musical notation is essential to understanding this case and offers many transcriptions as evidence. However, scholars of popular music would disagree that transcription can answer the question at issue here.

    a.  Indeed, music scholars noted decades ago that the act of transcription is always an interested one that serves the rhetorical argument of the transcriber.

    b.  As Gabriel Solis, Professor of Ethnomusicology at University of Illinois-Urbana Champlain, has noted, "Already in 1964, it was clear from a 'symposium on transcription and analysis' held at the society's annual meeting and published in *Ethnomusicology* that transcription was by no means an objective undertaking, and that in fact transcriptions bear within them the result of a transcriber's analytical understanding (England et al.1964)."[4]

    c.  The scholarly consensus—for decades now—has been that transcription of recorded music into notation is always an interested act designed to support a particular analysis of a given work or a particular argument.

    d.  The vast majority of popular music scholars do not use transcriptions to make their arguments in published work. Instead, they point the reader towards audio examples and ask them to use their ears.

    e.  Transcription works against such listening, trying to influence the listener's perception by appealing to the eye.

    f.  Ferrara's transcriptions, musical examples, and analyses of "Joyful Noise" and "Dark Horse" are patently designed to cloud the audibly evident similarities between select portions of the tracks (the similar eight-note ostinatos).

**16. Ferrara's transcriptions seek to minimize and confuse the important audible similarities between these tracks.**

---

23/1 (Spring 2005), 96.
[4] Gabriel Solis, "Thoughts on an Interdiscipline: Music Theory, Analysis, and Social Theory in Ethnomusicology" *Ethnomusicology* [the official journal of the Society for Ethnomusiology] 56/3 (Fall 2012), 543.

EXHIBIT 8
PAGE 159

a. Ferrara's Musical Example 1 offers a straightforward example of how he uses transcription to attempt to cloud the clearly audible similarity between the ostinatos at hand.

**Ferrara, Musical Example One with added circles**



b. Ferrara fussily transcribes what the ear hears as eight notes of identical duration (eight eighth notes in this case) into a visually complex.mix of three rhythmic values (eighth notes, dotted-sixteenth notes, and thirty-second notes).

c. The pitches Ferrara notates as thirty-second notes (circled above) would, in the context of notated musics (which hip hop and pop are not), more likely be expressed as ornaments (conventional indications to add small notes according to the player's taste) or by way of a portamento sign (as Ferrara does in the above example to indicate sliding pitches and also in his Musical Example 16).

d. The fundamental problem with Ferrara's transcription of the ostinato from "Joyful Noise" is its realization of ornamental pitches as substantial elements of the ostinato's fundamental shape. This choice is by design, leading towards further visual arguments that distort the heard experience of these tracks.

e. Ferrara's overly literal transcription of the eight-note ostinato from "Joyful Noise" opens the way for a comparative table (on his page 20) responding to my more concise table (on my page 6).

10

EXHIBIT 8
PAGE 160

**Ferrara, table (page 20) with added circles**



**Decker, table (page 6)**

| Beat | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| Joyful Noise | $\hat{3}$ | $\hat{3}$ | $\hat{3}$ | $\hat{3}$ | $\hat{2}$ | $\hat{2}$ | $\hat{2}$ | $\hat{1}/\hat{6}$ |
| Dark Horse | $\hat{3}$ | $\hat{3}$ | $\hat{3}$ | $\hat{3}$ | $\hat{2}$ | $\hat{2}$ | $\hat{1}$ | $\hat{5}$ |

f.   Ferrara puts the ornamental gestures decorating the eight principal notes of the "Joyful Noise" ostinato in bold (circled above) in a transparent attempt to suggest that the fundamental pitch content of the ostinatos at issue is not the same.

g.   In fact, the ear perceives the similarity of the eight-note ostinatos at issue quite clearly. Both ostinatos begin with four iterations of scale degree $\hat{3}$, followed by a half-step descent to scale degree $\hat{2}$ (which is iterated twice in "Dark Horse" and three times in "Joyful Noise").

11

EXHIBIT 8
PAGE 161

       h.  Here, again, Ferrara attempts by way of misleading tabular transcription of the tracks to confuse an issue that even for casual listeners suggests a clear similarity between the ostinatos.

17. Indeed, several individuals have constructed comparative audio analyses of the ostinatos at issue in the form of YouTube mashups.[5]

       a.  These acts of popular musicology express the perception of contemporary listeners, who are themselves deeply conversant with the digital creative methods behind popular music, that the two tracks at issue bear a relationship that can only be described as the latter track, "Dark Horse," taking or copying highly characteristic material from the earlier track, "Joyful Noise.

18. The most perceptive and analytically careful of the YouTube mashups is by the YouTuber Freshplosion! and is included as **Video Example A**.

       a.  This exhibit shows how current, musically- and digitally-literate listeners are hearing these two tracks in a deep relationship with each other.

       b.  Freshplosion! offers a careful breakdown of the relationship between the two, including in his/her video onscreen texts that guide the listener second-by-second through the comparison.

          i.  First, a 25-second excerpt from "Joyful Noise"

         ii.  Then, a 15-second excerpt from "Dark Horse"

            1.  These juxtapositions demonstrate the clearly audible similarity between the two tracks, especially in the matter of texture and the mix.

        iii.  Next, using the time shifting capability of digital music tools, Freshplosion! speeds up the tempo of "Dark Horse" from 66 bpm (beats per minute) to the tempo of "Joyful Noise" at 76 bpm.

            1.  These tempos match the bpm given by both myself and Ferrara.

---

[5] https://www.youtube.com/watch?v=UTTzh8DZkFY
https://www.youtube.com/watch?v=bPP_v6P_q2Q
https://www.youtube.com/watch?v=sW0txpCRFeQ
https://www.youtube.com/watch?v=0XL08xj1cBo

EXHIBIT 8
PAGE 162

    iv.  Then, Fleshplosion! uses the pitch shifting capability of digital music tools to lower "Dark Horse" by one half-step to the key of "Joyful Noise."

       1.  This reflects Ferrara's and my consensus that "Dark Horse" is keyed a half-step higher than "Joyful Noise."

       2.  At this point in Fleshpoint!'s mashup, "Dark Horse" is playing at the same tempo and key as "Joyful Noise." Perry's vocal is hardly distorted at all and her distinctive sound remains recognizable, highlighting just how close in tempo and key the two tracks are to each other.

   v.  Here, at 1:27 of his video, Fleshpoint! fades in the ostinato of "Joyful Noise," demonstrating how it lays easily over both the vocal and ostinato of "Dark Horse."

  vi.  The video ends with four iterations of the eight-note ostinato—two from "Joyful Noise", then two from "Dark Horse" as lowered in tempo and key placed side by side.

 c.  Freshplosion! expresses in compressed form the audible relationship between these two songs.

   i.  He/she focuses entirely on the eight-note ostinatos in both tracks that bear an obvious audible resemblance.

       1.  Ferrara, as noted, spends much time and space on the cascading opening notes of "Dark Horse" that casual listening reveals to be unrelated to the issue at hand of one track copying the other.

   ii.  Fleshplosion! also highlights how Perry's vocal in "Dark Horse" works comfortably above the ostinato from "Joyful Noise" with no change to the character of "Dark Horse" as a darkly, minor-mode, starkly textured track.

  iii.  Indeed, the ostinato for "Joyful Noise" could, without alteration beyond raising tempo and key, have served as the fundamental building block for the ostinato-based sections of "Dark Horse."

  iv.  The contention of this report is that the makers of "Dark Horse" did exactly that—building their track on a musical idea copied to a substantial,

EXHIBIT 8
PAGE 163

meaningful, and audibly obvious extent from distinctive musical materials
from "Joyful Noise."

19. A second YouTube mashup by the YouTuber Seth Mott is included as **Video Example
B**.

    a.  Mott overlays the tracks at issue.

        i.  The tempo is adjusted to 71 bpm, a midpoint between the two tracks.

        ii.  The key of "Joyful Noise" is raised to that of "Dark Horse" (the opposite
adjustment to key from that used by Fleshplosion!).

    b.  By splitting the difference in terms of tempo, Seth Mott allows the listener to hear
"Dark Horse" and Joyful Noise" simultaneously with minimal distortion to the
tempo of either.

    c.  Seth Mott's mashup unfolds as follows:

        i.  He begins with the cascading opening figure of "Dark Horse."

        ii.  At :26, Seth Mott fades in "Joyful Noise"

        iii.  At :41, "Dark Horse" cuts back in and the two tracks are heard
simultaneously.

        iv.  The remainder of the mashup moves freely back and forth between the
two tracks, each alone or together.

    d.  The most revealing moments as to the utter similarity of the respective eight-note
ostinatos at issue come at :41-:54 and 1:58-2:09, where Seth Mott juxtaposes the
vocals from both tracks and shifts between the melodic ostinato accompaniments.

        i.  The way in which either track's eight-note ostinato works to accompany
either track's vocal is revealed to the ear.

        ii.  The similarity of timbres between the two tracks is starkly revealed as
well.

    e.  A telling moment comes at 1:19, when—at the close of the chorus from "Dark
Horse"—a voice from "Joyful Noise" fills the break when, in a memorable
moment from "Dark Horse," a deep voice says the lyric "There's no going back."

        i.  This juxtaposition of the two tracks reveals how "Dark Horse" exploits its
eight-note ostinato in exactly the same way as "Joyful Noise"—by

14

EXHIBIT 8
PAGE 164

creating a break in the texture that is filled with a lone voice, setting up a return of the ever-cycling ostinato figure.

    ii. On page 22 of his report, Ferrara makes much of how the final notes in the eight-note ostinato in "Dark Horse" are rhythmically altered at the end of two sections of the song, creating a momentary break in the rhythmic texture. Seth Mott's mashup highlights a similar strategy taken in "Joyful Noise" by importing the spoken vocal from one track into the other.

20. Freshplosion! and Seth Mott each make a slightly different argument in sound regarding the relationship between the two ostinatos at issue. Their discussion of the two tracks, framed as fundamentally similar, enjoys wide circulation and agreement in social media.

    a. It is also the argument I made in my report using analytical descriptions that made no recourse to musical notation.

21. Ferrara's insistence that musical notation and transcription are essential to this case is a false assertion designed to distract the ear from the very evident, clearly audible relationship between these two ostinatos, a relationship heard by many and demonstrated with skill from several mutually reinforcing strategies in social media.

22. **Ferrara grounds his analysis and conclusions in an organicist, goal-oriented approach to musical form that was developed to describe Austro-Germanic classical music of the eighteenth, nineteenth, and early twentieth centuries. This approach is wholly inappropriate to twenty-first-century popular music, especially beat-driven musics derived from hip hop or electronic dance music (EDM).**

    a. On page 14 of his report, Ferrara states that "Ostinato #2 grows out of and is developed from ostinato #1 based on principles of music theory and thematic development and thematic transformation analysis."

    b. Several analytical and writing missteps are evident in this statement.

    c. Ferrara's statement grants agency to the music rather than the human beings who made choices which produced the music and who are parties to this case.

        i. Music doesn't "grow out of" theoretical "principles."

        ii. Music is composed by individuals who make choices that, in retrospect, the disciplines of music scholarship seek to explain.

15

EXHIBIT 8
PAGE 165

    iii.  Speaking of music as having agency or unfolding according to set principles is a mark of poor musical scholarship.

d.  Moreover, Ferrara imagines that "Dark Horse," a pop-rap track created under specific conditions and within a known expressive milieu, can be explained in sole reference to a set of music theoretical tools and ideologies developed for an entirely different musical repertory, specifically for notated Austro-Germanic classical music from J.S. Bach to Schoenberg.

e.  No scholar publishing in the field of musicology or music theory, to my knowledge, applies "thematic development and thematic transformation analysis" methods to the kind of music at issue here. Indeed, informed scholars would never even think to do so (as suggested by the quote from music theorist Mark Butler on page 3) and would generally understand contemporary popular music to be fundamentally at odds—even in conflict—with the paradigm of music analysis invoked by Ferrara.

    i.  For example, the chapter "The Musical Analysis of Hip-Hop" in *The Cambridge Companion to Hip Hop* (2015) begins by noting that "Hip-hop music resists traditional modes of musical analysis more than almost any other genre." Author Kyle Adams continues, "The reasons for this are directly related to the primary difference between the natures of Western art music and of hip-hop. Music of the eighteenth and nineteenth centuries (and some of the twentieth) is primarily linear: it follows a tonal and emotional trajectory that build up throughout the work. … The music of hip-hop, by contrast, is cyclical. In a typical hip-hop song, a core drum pattern repeats every measure. … Other elements—scratches, sampled sounds, synthesizers, and so forth—might come and go throughout the song, but they are dispensable; the character of the song would remain intact even if they were removed."[6]

---

[6] Kyle Adams, "The Musical Analysis of Hip-Hop" In *The Cambridge Companion to Hip-Hop.* (Cambridge: Cambridge University Press, 2015), 118-119.

EXHIBIT 8
PAGE 166

ii. What Adams says of hip-hop applies equally to all beat-driven, twenty-first-century popular musics, the larger category into which "Dark Horse" falls.

iii. The "typical" material Adams describes as "a core drum pattern [that] repeats every measure" is, in both "Joyful Noise" and much of "Dark Horse," the same strong and rhythmically stark melodic ostinato that is at the heart of this case.

f. The notions of "thematic development and thematic transformation" constantly invoked by Ferrara and underlying his entire musical case are ill-suited to the music at issue here. Indeed, they betray a fundamental misunderstanding of the music in this case.

i. For example, see Ferrara's Musical Examples 6 and 7, which make much of several small changes made to the ostinato in "Dark Horse" that, unsurprisingly, are not found in "Joyful Noise."

ii. These are surface elements that, to quote Adams again, "might come and go throughout the song, but they are dispensable; the character of the song would remain intact even if they were removed."

iii. Ferrara's report seeks throughout to dodge the core issue here: the similarity of the "character" of the eight-note ostinato heard in "Joyful Noise" and borrowed in "Dark Horse."

23. Beyond the fallacious argument as to agency—musical works do not have agency; only musical creators do—Ferrara's statement from page 14 (quoted above), which he repeats again and again and which forms the underlying support for his entire argument, is contrary to the evidence and the way the music at issue here—twenty-first-century popular music—works.

a. Organicist analysis begins at the beginning of a work and traces the variation and development of musical ideas stated at the outset.

b. And so, Ferrara begins with the first four notes of "Dark Horse," an ostinato he calls "Ostinato #1" ("Ostinato Y" in my report).

17

EXHIBIT 8
PAGE 167

c. Then, Ferrara argues that the eight-note "Ostinato #2" (my "Ostinato X and the principal musical material borrowed by the makers of "Dark Horse" from "Joyful Noise") is derived solely from his Ostinato #1.

d. This argument is erroneous. Ferrara's use of the labels #1 and #2 is an effort on his part to give rhetorical force to an unexamined assumption presented as fact.

24. For example, on page 18 Ferrara illustrates the relationship between his ostinatos #1 and #2 in this manner.

**Ferrara, table (page 18)**

| | | | | | |
|---|---|---|---|---|---|
| Ostinato #1: | c | | b | a | e |
| Ostinato #2: | c c c c | b b | a | e | |

a. Ferrara then states that this table shows that ostinato #2 is an "expansion and development of ostinato #1," adding that the relationship between these ostinatos is "organic and empirically verifiable."

b. First, Ferrara's use of pseudo-scientific language ("organic and empirically verifiable") is problematic and would be quickly dismissed by music scholars.

  i. Music analysis is not "empirically verifiable" but is instead an art of argument where music scholars look for the best, most reasonable, most historically grounded, and most logical argument that will convince the community of scholars. Music scholarship is not a natural or social science but is a humanities discipline where all conclusions are recognized to be partially subjective and the product of underlying assumptions made by the scholar.

  ii. Ferrara's claim to some sort of "objective" truth here would be dismissed by music scholars.

18

EXHIBIT 8
PAGE 168

c.  Second, it is evident in comparing the two ostinatos that Ferrara's ostinato #2 presents more complex content in terms of its irregular iteration of given pitches than does Ferrara's ostinato #1.

    i.  The two ostinatos share the same pitches, given here as c, b, a, and e.

    ii.  Ferrara's ostinato #1 sounds each pitch just once.

    iii.  By contrast, Ferrara's ostinato #2 sounds these four pitches in a highly distinct repetition pattern (that, for anyone who has heard "Joyful Noise" is highly likely to bring that earlier work to mind).

        1.  The first pitch (scale degree $\hat{3}$) in Ferrara's ostinato #2 is iterated 4 times.

        2.  The second pitch (scale degree $\hat{2}$), a half-step lower than the previous pitch, is iterated 2 times.

        3.  The third pitch (scale degree $\hat{1}$), a whole-step lower than the previous pitch, is iterated 1 time.

        4.  The fourth pitch (scale degree $\hat{5}$), a perfect fourth lower than the previous pitch, is iterated 1 time.

    iv.  Thus, Ostinato #2 presents a highly specific pattern of a regular rhythmic profile (all even values), 4 pitches, a distinct melodic profile (two downward steps followed by a downward leap of a fourth), and a highly specific series of iterations that can be expressed as 4-2-1-1.

    v.  To briefly grant Ferrara's claim, the move from his ostinato #1 to his ostinato #2 involves many and varied changes, most specifically the doubling of the note values and the distinctive 4-2-1-1 repetition pattern of the pitches in the latter

d.  Consider, now, the ostinato at issue in this case, the eight-note pattern originated in "Joyful Noise" and borrowed without substantial change in portions of "Dark Horse." This eight-note pattern can be described as follows.

    i.  The first pitch (scale degree $\hat{3}$) is iterated 4 times.

    ii.  The second pitch (scale degree $\hat{2}$), a half-step lower than the previous pitch, is iterated 3 times.

EXHIBIT 8
PAGE 169

iii.   The third pitch—iterated one time—alternates with each repetition of the
eight-note ostinato between a whole-step lower than the second pitch
(scale degree $\hat{1}$) and an augmented fourth lower than the second pitch
(scale degree $\hat{6}$).

e.   The principal ostinato at issue in "Joyful Noise" presents a highly specific pattern
of a regular rhythmic profile (all even values), 4 pitches, a distinct melodic profile
(one downward step followed by a downward step or a downward leap of a
fourth), and a highly specific series of iterations that can be expressed as 4-3-1.

25. The principal ostinato at issue in "Joyful Noise" and Ferrara's ostinato #2 from "Dark
Horse" are persuasively similar along several lines of observation:

a.   Identical rhythmic profile: eight even values

b.   Identical descending melodic contour: steps down followed by a leap down

c.   Near identical pitches understood as scale degrees

d.   Near identical iterative pattern for the pitches:

i.   4-2-1-1   in "Dark Horse"

ii.   4-3-1     in "Joyful Noise"

26. As detailed above, the connections between the eight-note ostinatos in "Joyful Noise"
and "Dark Horse" are many and varied.

27. And yet, Ferrara asks us to believe by assertion of so-called "empirically verifiable"
evidence (his unexplicated table on page 18) that the makers of "Dark Horse" had the
following creative process:

a.   That they first composed the opening notes of the track (his ostinato #1)

b.   That they then "developed" the remainder of "Dark Horse" (specifically his
ostinato #2) solely from these initial notes.

c.   And, that they "developed" his ostinato #1 from his ostinato #2 without
knowledge of the principal ostinato from "Joyful Noise," even though the
similarities between his ostinato #1 and his ostinato #2 obtain solely in the matter
of pitches and melodic contour and the similarities between his "Dark Horse"
ostinato #2 and the principal ostinato in "Joyful Noise" obtain in the matter of
pitches, melodic contour, rhythmic profile, and near identical iterative pattern (not
to mention issues of timbre and texture).

20

EXHIBIT 8
PAGE 170

           i.  Again, there is no evidence for Ferrara's claim.

    d.  Indeed, it would be a remarkable and unlikely coincidence for the makers of "Dark Horse" to arrive at a nearly identical rhythmic profile and iterative pattern to that of "Joyful Noise" in their supposed "development" of Ferrara's ostinato #1. (Again, similarities in timbre and texture also connect the two tracks at issue.)

    e.  Furthermore, at the level of larger musical form, Ferrara's ostinato #2 and the principal ostinato from "Joyful Noise" both underpin major structural sections of their respective tracks.

        i.  By contrast, Ferrara's ostinato #1 is more decorative than structural. The cascading quick notes function as a wash of sound above an independent bassline and play no formal or structural role in the track.

        ii.  Ferrara's ostinato #2 and the ostinato from "Joyful Noise" play exactly analogous formal roles in their respective tracks.

28. Ferrara's argument that his ostinato #2 was developed from his ostinato #1 might be supportable if he offered evidence such as composer's sketches or early drafts.

    a.  Such materials are normally part of any such argument.

        i.  I have seen no such materials for "Dark Horse."

        ii.  One assumes if such materials existed to support Ferrara's analysis they would have been presented with the case.[7]

    b.  In my own and my students' work, such evidence is deemed essential in the absence of secure knowledge that a given composer (such as J.S. Bach or Brahms) employed "thematic development" as a matter of course.

        i.  No such argument is made for the makers of "Dark Horse," nor would such compositional practice be considered normative for twenty-first-century popular music.

    c.  Given how the makers of "Dark Horse" work, it is unlikely their songs ever see conventional musical notation that might support an argument founded on notions of thematic development.

---

[7] Plaintiffs' counsel informs me that the Plaintiffs served on all Defendants, including Dr. Luke and Max Martin, a request for production of all documents and things related to the composition of "Dark Horse" and that the defendants objected to that request and have refused to produce any such materials.

EXHIBIT 8
PAGE 171

      i.  Dr. Luke's co-producer Cirkut has noted that part of his job is "translating the doctor's orders into Pro Tools [digital music production software], manipulating the colorful rectangles that represent sonic blocks. Then he hits Playback with a flourish, and they listen."[8]

     ii.  The similarity between the ostinatos at issue in this case is also a matter of listening.

29. While no direct evidence for how the makers of "Dark Horse" created the track has been put forward, it is extremely unlikely and a completely unfounded assertion made by Ferrara that they composed "Dark Horse" in the order we hear it on the finished track. This is quite simply not how popular music is made in the twenty-first century.

    a.  The makers of "Dark Horse" work in the collaborative songwriting model established at Cheiron Studios, founded by Denniz PoP, in Stockholm, Sweden. Max Martin worked extensively at Cherion early in his career.

    b.  As described by John Seabrook in *The Song Machine: Inside the Hit Factory*: "A strong part of Denniz's vision for the studio was that songwriting should be a collaborative effort; no one was supposed to be proprietary about his work. Songwriters would be assigned different parts of a song to work on; choruses would be taken from one song and tried in another; a bridge might be swapped out, or a hook. Songs were written more like television shows, by teams of writers who willingly shared credit with one another."[9]

    c.  This method—sometimes described as the track-and-hook approach—works on the model of DJing. (Dr. Luke has extensive professional experience as a DJ.) Both track-and-hook songwriting and DJing are methods of musical creation that involve the juxtaposition of blocks of material, sometimes of pre-existing materials as in the case of sample-based musics (which, of course, have engendered many lawsuits involving borrowing without permission).

30. Furthermore, shared songwriter credits for "Dark Horse" alone render Ferrara's appeal to organic compositional models moot. So-called organic composition—developing musical

---

[8] Seabrook, *The Song Machine*, 237.
[9] John Seabrook, *The Song Machine: Inside the Hit Factory* (New York: Norton, 2015), 64.

EXHIBIT 8
PAGE 172

ideas in a sustained and concentrated manner—relies on the notion of a singular creative mind working in isolation on controlled musical materials.

    a. Dr. Luke does not work anywhere close to this fashion. As noted by Seabrook, "When he hears something interesting, Dr. Luke wants to work with that person right away."[10]

    b. Katy Perry described the process of making the album *Prism* (which includes "Dark Horse") this way: "Luke and Max came to Santa Barbara and we'd hang out, go to the ocean, have nice dinners. There's this really amazing studio we like to work at called the Secret Garden, and it's in the woods of Montecito. We go there and listen to music, we do a lot of YouTubing; we drink some Chablis. Luke and his protégé Circuit make these little beds of music for me to listen to—not too long, just kind of appetizer-size—and then they'll do the full entrees if I like them."[11]

    c. Dr. Luke also works creatively by listening widely. As Seabrook notes, "Dr. Luke prefers to delay finishing projects for as long as possible, [in the words of Dr. Luke] 'because I might hear something I like over the weekend.'"[12]

    d. None of the above quotes from the makers of "Dark Horse" suggest an approach to musical composition that involves "thematic development and thematic transformation."

**31. For the above reasons, Ferrara's argument that his "Dark Horse" ostinato #2 was developed from ostinato #1—reinforced by the rhetorical strategy of naming the ostinatos #1 and #2—is illogical and without historical support. It would not stand up to scrutiny in the field of music scholarship where peer review upholds the highest standard.**

    a. In my opinion, as someone who frequently does blind peer review of articles for the top music journals and of book manuscripts for the top academic presses, Ferrara's argument would be rejected for publication. If delivered in the context of an academic conference or a graduate-level seminar, it would be subject to the

---

[10] Seabrook, *The Song Machine*, 238.
[11] Seabrook, *The Song Machine*, 240.
[12] Seabrook, *The Song Machine*, 239.

EXHIBIT 8
PAGE 173

most basic and tiresome of questions as to its underlying analytical, historical, and generic assumptions.

32. The known compositional context for the making of "Dark Horse" (and other music) by the Plaintiffs discredits Ferrara's faulty foundational contention that the track was composed in the order in which it is heard: that Ferrara's ostinato #2 was derived solely and completely from Ferrara's ostinato #1.

33. Indeed, the reverse—that Ferrara's ostinato #1 is derived from his ostinato #2—is much more logical.

    a. I suggested this in my report on page 12.

34. Given the creative context for the making of "Dark Horse," Ferrara's ostinato #1 can be heard as Ferrara's ostinato #2 being run through the arpeggiator function of a synthesizer or other digital music tool.

    a. The arpeggiator takes any set of notes, strips them of any reiterative patterns or rhythmic values, and generates exactly the kind of repetitive, cascading pattern heard at the start of "Dark Horse."

    b. For informed listeners, the start of "Dark Horse" sounds like a synthesizer running an arpeggiator function.

    c. Indeed, if run through an arpeggiator the principal ostinato for "Joyful Noise" would yield a substantially similar figure. The arpeggiator would flatten the difference between the changing final notes of the "Joyful Noise" ostinatos alternating versions and yield the pattern (in scale degrees) $\hat{3}, \hat{2}, \hat{1}, \hat{6}$.

        i. Ferrara's "Dark Horse" ostinato #1 has the pattern (in scale degrees) $\hat{3}, \hat{2}, \hat{1}, \hat{5}$.

35. Furthermore, the audible similarity between Ferrara's ostinato #1 and the familiar sound of a synthesizer arpeggiator undercuts four of Ferrara's prior art exhibits.

    a. Visual Exhibit A—Philip Glass' "Choosing Life" from the soundtrack for *The Hours*—derives its pattern from Glass' characteristic compositional style, which treats reiterative patterns to slight adjustments over a long-time span. Nothing in the use of Ferrara's ostinato #1 from "Dark Horse" gives evidence for the sophisticated approach Glass uses or its origin in the notated art music world of

24

EXHIBIT 8
PAGE 174

minimalism from the 1970s within which Glass developed his unique compositional voice.

    i. The same can be said for Audio Exhibits 1.4, 1.5, and 1.6. These three exhibits, which are really only one exhibit as each employs the same theme, are also in a minimalist style as used by composer Clint Mansell in the score for *Requiem for a Dream*.

    b. In addition, there is no precedent in such minimalist music—which begins with figures superficially similar to Ferrara's ostinato #1 from "Dark Horse"—for the sort of "thematic development" Ferrara claims in the case in "Dark Horse."

36. In the above prior art exhibits, Ferrara makes a fundamental and recurring mistake by assuming that superficially similar patterns work similarly at different moments in music history or in different musical styles.

    a. This larger view would be quickly rejected by musicological scholars as naïve. Musical gestures or figures always function within a particular historical and aesthetic context. This full stylistic context must be accounted for in any comparative evaluation of two musical works.

    b. For this reason, Ferrara's Visual Exhibit B (Sergei Rachmaninoff's "Les Larmes" [or "The Tears"]) is likewise without merit. The figure Ferrara identifies as similar to his "Dark Horse" ostinato #1 is doing specific work (representing the falling of tears) in a specific context (rhapsodic piano music of the 1890s). Furthermore, Rachmaninoff's metrical placement of the figure differs from that of "Dark Horse," rendering the effect substantially different. The comparison is, on these grounds alone, without merit.

37. Any argument that draws this case out of its narrow twenty-first-century beat-driven popular music context is merely rhetorical and without substance.

    a. In this context, Ferrara's claim that his ostinato #1 from "Dark Horse" is at all similar to random excerpts from the music of Philip Glass, Clint Mansell, and Sergei Rachmaninoff constitutes a baldly self-interested argument on the part of the defendants which seeks to distract from the issue at hand: the clearly audible similarity between the eight-note ostinatos of the tracks at issue.

25

EXHIBIT 8
PAGE 175

38. Ferrara's 35 prior art exhibits and his discussion of familiar melodies such as "Jolly Old Saint Nicholas" are marked throughout by multiple flawed comparisons—all of which seek to distract the court from the clearly heard audible similarity between the eight-note ostinatos in "Joyful Noise" and "Dark Horse" demonstrated succinctly in my first report, effectively illustrated in sound on YouTube by Fleshplosion! and Seth Mott, and reiterated and expanded upon in this report.

39. Ferrara's contention that "Joyful Noise" has more in common with "Jolly Old Saint Nicholas" than "Dark Horse" is flawed.

    a. Ferrara argues that the first seven notes of the principal ostinato of "Joyful Noise" have more in common with the opening notes of the Chrismas song "Jolly Old Saint Nicholas" than with the eight-note ostinato in "Dark Horse."

    b. In fact, neither the notes, the rhythmic pattern, nor the formal function of the notes from "Jolly Old Saint Nicholas" marked by Ferrara are similar to the principal ostinato of "Joyful Noise."

    c. Instead, the ostinato from "Joyful Noise" contains distinct musical material heard in virtually unchanged form in the eight-note ostinato in "Dark Horse." The two ostinatos, as demonstrated already, share even rhythmic values, similar mode (minor) and pitches (understood as scale degrees), and formal and textural functions within the two tracks.

    d. The seven notes from "Jolly Old Saint Nicholas" that Ferrara's picks out for supposed comparison—and as evidence the ostinato in "Joyful Noise" contains trivial and unremarkable musical material—clearly do not work in this way: they do not constitute an ostinato but are instead part of a larger melody with its own characteristic structure.

        i. Ferrara's misuse of the word *ostinato* is discussed in the final section of this report.

40. As Ferrara carefully notes throughout his report, the first seven notes of "Jolly Old Saint Nicholas" are similar to the initial seven notes of the eight-note ostinato of "Joyful Noise" except that the familiar Christmas song is in the major mode while "Dark Horse" is in minor. This distinction is a substantial one for the listener.

26

EXHIBIT 8
PAGE 176

    a.   The difference between major and minor mode melodies is felt with particular and singular power when scale degree $\hat{3}$ is heard, as it prominently and repeatedly is in "Jolly Old Saint Nicholas" and the eight-note ostinatos from "Joyful Noise" and "Dark Horse."

    b.   The third scale degree in minor is lowered (relative to the major mode) and is the note that gives the minor mode its most characteristic sound.

    c.   Given their similarly insistent and pervasive repetitions of the third scale degree, both "Joyful Noise" and "Dark Horse" are insistently and unambiguously minor. This accounts for the similarly dark and dramatic sound of both tracks.

        i.   Indeed, the insistent minor mode quality of "Dark Horse"—directly derived from borrowed musical material from "Joyful Noise"—can be understood to enable Katy Perry's many staged and costumed performances of "Dark Horse" as a fantasy on ancient Egyptian motifs.

41. "Jolly Old Saint Nicholas" and the eight-note ostinato in "Dark Horse" are fundamentally dissimilar when it comes to their number of notes.

    a.   The section of "Jolly Old Saint Nicholas" highlighted by Ferrara includes 7 notes.

    b.   The principal ostinato of "Joyful Noise" and the eight-note ostinato in "Dark Horse" both contain eight notes and, in context, both unroll in continuous repetition as an ostinato.

        i.   It is meaningless to pick out seven notes in the eight-note "Joyful Noise" ostinato and claim they are similar in any significant way to seven notes in "Jolly Old Saint Nicholas." This argument would, again, be dismissed out of hand by musicologists and music theorists in the classroom or scholarly publication.

    c.   The tune to "Jolly Old Saint Nicholas" is just that: a tune. It has no ostinato-like qualities. Context matters for musical meaning.

    d.   The ostinato from "Joyful Noise" is just that—an ostinato—from which the analyst cannot pick out seven notes to make a point without distorting the nature of the musical unit being analyzed (the eight notes which function as a repeating unit).

EXHIBIT 8
PAGE 177

      i. Obviously, the eight-note ostinato from "Dark Horse" at issue here, like that from "Joyful Noise," has eight notes and can only be sensibly discussed as a unit.

42. "Jolly Old Saint Nicholas" and the principal ostinato of "Joyful Noise" are also fundamentally dissimilar when it comes to rhythmic profile. And, again, the principal ostinato of "Joyful Noise" and Ferrara's "Dark Horse" ostinato #2 are identical.

    a. The tune of "Jolly Old Saint Nicholas" follows a pattern of short-short-short-short-short-short-long, or, ***da-da-da-da-da-da dummm***

    b. Each phrase of "Jolly Old Saint Nicholas" begins with this rhythmic pattern, which emerges quickly as a defining and identifying element of the tune.

    c. The second half of each phrase of "Jolly Old Saint Nicholas" uses a different rhythmic pattern: ***da-da-da-da dummm.***

    d. This yields a consistent rhythmic pattern iterated four times in any complete singing of the tune, as outlined below.

| *da* | *da* | *da* | *da* | *da* | *da* | *dumm* | *da* | *da* | *da* | *da* | *dummm* |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ♩ | ♩ | ♩ | ♩ | ♩ | ♩ | ♩ | ♩ | ♩ | ♩ | ♩ | 𝅝 |
| Jol | -ly | Old | St | Nic | -o | -las | Lean | your | ear | this | Way. |
| Don't | you | tell | a | sin | -gle | soul | What | I'm | going | to | say. |
| Christ | -mas | Eve | is | com | -ing | soon | Now | you | dear | old | man. |
| Whis | -per | what | you'll | bring | to | me | Tell | me | if | you | can. |

    e. Indeed, children studying the Suzuki method learn "Jolly Old Saint Nicholas" and are sometimes tested on their knowledge of the tune by hearing just the rhythm of

EXHIBIT 8
PAGE 178

the first seven notes—*da-da-da-da-da-da dumm*—a pattern which, as shown
above, characterizes every phrase of the song.

43. The rhythmic profile of the eight-note ostinato in "Dark Horse" can be expressed in this
manner: short-short-short-short-short-short-short-short or ***da-da-da-da-da-da-da-da***
[repeat]

44. This is, of course, the exact same rhythmic profile as the ostinato of "Joyful Noise.": ***da-da-da-da-da-da-da-da*** [repeat]

45. The identical pattern of the two ostinatos at issue are evident in the table below, a slight
revision of the table on page 6 of my report.

|  | *da* | *da* | *da* | *da* | *da* | *da* | *da* | *da* |
|---|---|---|---|---|---|---|---|---|
| Joyful Noise | $\hat{3}$ | $\hat{3}$ | $\hat{3}$ | $\hat{3}$ | $\hat{2}$ | $\hat{2}$ | $\hat{2}$ | $\hat{1}$ / $\hat{6}$ |
| Dark Horse | $\hat{3}$ | $\hat{3}$ | $\hat{3}$ | $\hat{3}$ | $\hat{2}$ | $\hat{2}$ | $\hat{1}$ | $\hat{5}$ |

46. Clearly, the seven-note fragment from "Jolly Old Saint Nicholas" that Ferrara posits as
similar to the ostinato in "Joyful Noise" is not only not similar in terms of rhythmic
profile or notes, it is not an ostinato by any definition of the term.

   a. The definition of *ostinato* offered by Ferrara is "a short musical pattern that is
   repeated persistently throughout a performance or composition or a section of
   one." [*Harvard Dictionary of Music*, 2003]

   b. Ferrara's bit of "Jolly Old Saint Nicholas" does not repeat persistently, nor does it
   define the song or even a section of the song. It serves, instead, as a rhythmic
   pattern heard in the first half of each of the tune's four phrases.

   c. In drawing attention to "Jolly Old Saint Nicholas," Ferrara has picked a
   superficially similar seven notes from one song and ignored the matter of
   rhythmic profile or durations and the musical function of the idea as an ostinato.
   This is a fallacious, out-of-context comparison made for the purpose of distraction
   from the issue at hand.

EXHIBIT 8
PAGE 179

47. The above analysis of Ferrara's use of "Jolly Old Saint Nicholas" applies as well to Ferrara's visual exhibit E, the song "Merrily We Roll Along" as it appears in Pearson and Nowlin's *Tradition of Excellence Comprehensive Band Method*. Any connection with Ferrara's "Dark Horse" ostinato #2 or with the matter at issue here concerning the principal ostinato of "Joyful Noise" is specious at best.

    a. The passage Ferrara identifies in "Merrily We Roll Along" includes only six notes.

        i. The ostinatos at issue both use eight notes.

    b. The passage Ferrara identifies is in the major mode.

        i. Both "Dark Horse" and "Joyful Noise" are in the minor mode.

    c. The passage Ferrara identifies is not an ostinato. Nor is it even the beginning of a musical phrase, as in "Jolly Old Saint Nicholas."

    d. Indeed, the six notes Ferrara marks are part of the melodic shape of "Merrily We Roll Along," a tune also sung to the lyrics of "Mary Had a Little Lamb."

        i. In the case of "Mary Had a Little Lamb," the rhythm of the musical passage Ferrara identifies as similar to the principal ostinato of "Joyful Noise" is clearly shaped by the need to fit the lyric "lit-tle lamb it's fleece was."

        ii. In the case of "Merrily We Roll Along," a song perhaps more played than sung, the rhythm of the musical passage Ferrara identifies as similar to the principal ostinato of "Joyful Noise" is not sung in even values but instead scans as *da-da-dumm, da-da*, setting the text "roll a-long, o'er the."

48. Ferrara's use of "Jolly Old Saint Nicholas" and "Merrily We Roll Along" are manipulative of the defining nature of both in an attempt, again, to distract the ear from the clearly audibly evident similarity between the two ostinatos at issue in this case.

49. It is noteworthy that in discussing "Jolly Old Saint Nicholas" and "Merrily We Roll Along," Ferrara tacitly admits that the ostinato in "Joyful Noise" is best understood as eight evenly-valued notes and not as the overly complicated mix of eighth notes, dotted-sixteenth notes, and thirty-second notes he presents early in his report when making comparisons with the eight-note ostinato from "Dark Horse." When it suits his argument, Ferrara asks the listener to hear even values in the "Joyful Noise" ostinato.

EXHIBIT 8

PAGE 180

50. **In short, Ferrara's attempt to characterize the similarities between the eight-note ostinato of "Joyful Noise" and the eight-note ostinato of "Dark Horse" as "minimal, trite, and unremarkable" by comparison with familiar tunes is entirely unfounded. None of the melodies he presents are ostinatos nor do they have the rhythmic profile or durations of the posited similar songs.**

    a. The mere occurrence of similar notes is not nearly enough to argue the "Joyful Noise" ostinato is trivial material. It is the combination of pitches, iterative patterns, rhythmic profile, and formal and textural function that counts in this case.

    b. The clearly audible similarity between the ostinatos which shape "Joyful Noise" and "Dark Horse" remains.

51. **None of Ferrara's 35 prior art exhibits challenge the central contention of my report: that the principal ostinato of "Joyful Noise" and the eight-note ostinato heard in select sections of "Dark Horse" are substantially similar and evidence for copying of "Joyful Noise" by the makers of "Dark Horse."**

    a. To streamline assessment of Ferrara's prior art exhibits, I group them into categories based on eight issues Ferrara identifies in his brief statements about each.

    b. The table below identifies which prior art exhibits bear specific traits as Ferrara identifies them. General conclusions on the relevance of these traits to the case are also given.

52. As my review of all Ferrara's prior art exhibits will show, a substantial number are not even categorizable as ostinatos but are, instead, accompaniment figures expressing harmonies (chords) and designed to support sung melodies or rapping. Several are idiomatically suited to the guitar (which is typically the instrument heard playing them). Others are so fleetingly heard in their respective tracks as to fail to qualify as ostinatos in any meaningful sense.

EXHIBIT 8
PAGE 181

| Traits Ferrara claims are similar to the ostinatos at issue from "Joyful Noise" and "Dark Horse" | Exhibits | Relevance |
|---|---|---|
| Supposed ostinatos which are "wholly 8th notes" | Audio Exhibits 1.8, 1.9, 1.10, 1.11, 1.12, 1.13, 1.14, 1.16, 2.1, 2.5, 2.7, 2.8, 2.10, 2.12, 2.13, 2.14<br>Visual Exhibit B. | Calls into question Ferrara's transcription of the "Joyful Noise" ostinato as not made up of even eighth notes. |
| Supposed ostinatos with "sliding pitches" | Audio Examples 1.9, 1.10 | Calls into question Ferrara's transcription of ornamental notes in the "Joyful Noise" ostinato |
| Supposed ostinatos with "descending melodic contour." | Audio Examples 1.8, 1.9, 1.17, 2.2, 2.3, 2.6, 2.12, 2.14 | None are similar to the insistent downward profile of the ostinatos at issue. Most are not ostinatos properly speaking. |
| Supposed ostinatos with repeated pitches | Audio Examples 1.16, 1.17, 2.4, 2.8 | None suggest the shared iterative pattern found in the ostinatos at issue. |
| Supposed ostinatos with intervallic similarities. | Audio Exhibits 1.15, 1.17, 2.1, 2.4, 2.6, 2.7, 2.9, 2.10. 2.11, 2.12, 2.13, 2.15 | Intervals only carry meaning in the specific context of a given musical passage. Most are not ostinatos. |
| Supposed ostinatos that are more similar to Ferrara's "Dark Horse" ostinato #1 than to the ostinato in "Joyful Noise" | Audio Exhibits 1.3, 1.4, 1.5, 1.6, 1.7, 2.15<br>Visual Example A | Ferrara's ostinato #1 is not germane to the case. |

32

EXHIBIT 8
PAGE 182

| Tracks including a "rap section" | Audio Examples 1.8, 1.9, 1.10, 1.11, 1.12, 1.13, 1.14, 1.15, 2.2, 2.4, 2.14, 2.15 | Large-scale form—such as inclusion of a "rap section"—is not at issue in this case. |
|---|---|---|
| Supposed ostinato "present through the entirety," "present virtually throughout the entirety," or "not present in virtually the entirety" of a track | Audio Examples 1.12, 1.13, 2.1, 2.2, 2.3, 2.5, 2.6, 2.8, 2.9, 2.10, 2.11, 2.12, 2.13, 2.14 | Presence of an ostinato throughout the "entirety" of a track is not at issue in this case. |

53. **Ferrara offers not a single prior art exhibit that combines the similarity of rhythmic profile, pitches, timbre, and formal and textural function of the two ostinatos at issue in this case, which emerge in the context provided by Ferrara's prior art exhibits as unusual and clearly audibly similar.**

54. Ferrara presents 17 prior art exhibits that are "wholly 8th notes" in their rhythmic profile.

    a. The prior art examples are Audio Exhibits 1.8, 1.9, 1.10, 1.11, 1.12, 1.13, 1.14, 1.16, 2.1, 2.5, 2.7, 2.8, 2.10, 2.12, 2.13, 2.14 and Visual Exhibit B.

    b. Not a single one of these employs an eight-note pattern on the phrase-length model shared by "Joyful Noise" and the eight-note ostinato in "Dark Horse."

    c. Many prior art exhibits noted by Ferrara as being "wholly 8th notes" are not, in fact, ostinatos. These are Audio Exhibits 1.8, 1.10, 1.11, 1.12, 2.1, 2.5, 2.7, 2.8, 2.10, and 2.12. I discuss these in detail in a separate section below.

    d. None of Ferrara's "wholly 8th notes" prior art exhibits that are, arguably, ostinatos display the phrase structure of the ostinatos at issue here: eight-notes + eight-notes or 1-bar + 1-bar.

        i. "Back Down" (Audio Exhibit 1.13, Musical Example 20) is better heard as quarter-note motion of a circling kind, with the figure moving up and down in a consistent pattern entirely different from the directed melodic motion of the ostinatos at issue. Ferrara's transcription distorts the aural experience of the track.

33

EXHIBIT 8
PAGE 183

  ii. "Me No Want Miseria" (Audio Exhibit 2.13, Musical Example 38) is also better heard as quarter-note motion. Ferrara's transcription again distorts the aural experience of the track. Even if accepted as eighth-note motion, the figure feels like an arpeggiated accompaniment pattern and takes a full 4-bars to play out.

  iii. The ostinato heard in Audio Exhibit 1.9 ("Go Head (Shawty Got a Ass On Her)") is 32-notes (4-bars) in length, offering an entirely different deployment of eighth-note motion as realized in the eight-note (1-bar) ostinatos at issue.

  iv. The ostinatos heard in Audio Exhibits 1.14 ("My Dad's Gone Crazy") and 1.16 ("Moments in Love") are 16-notes (2-bars) long, offering an entirely different deployment of eighth-note motion than the eight-note (1-bar) ostinatos at issue.

 e. None of the genuine ostinatos offered as prior art by Ferrara show an eight-notes (1-bar) + eight-notes (1-bar) phrasing pattern evident in both "Joyful Noise" and "Dark Horse."

  i. This phrase structure is important to the overall shape of the two tracks.

  ii. As noted both in my initial report (pages 13-14) and in Ferrara's report (pages 6-7), "Joyful Noise" and "Dark Horse" alike have unusual two-bar breaks. In both tracks, these two bars are filled with two iterations of the eight-note ostinato that, in this case, can be understood to influence both tracks' large scale form.

  iii. There is not a single example among all 35 of Ferrara's prior art exhibits of a similar two-bar break between sections that is defined by a strong melodic ostinato.

55. In his analysis of the principal ostinato of "Joyful Noise," Ferrara makes much of several sliding pitches, instances of portamento which would in Western classical music and jazz be notated as ornaments

 a. Only two of Ferrara's prior art exhibits include sliding pitches.

 b. These are Audio Examples 1.9 and 1.10.

34

EXHIBIT 8
PAGE 184

   c. In the case of Audio Example 1.9 as transcribed in Musical Example 16, Ferrara uses a common notational practice (a line between two note heads) to indicate a slide between two pitches. Here, we see evidence for a less invasive, less rhetorical transcription practice on Ferrara's part.

   d. However, in Audio Example 1.10 as transcribed in Musical Example 17, Ferrara opts for the same fussy, over-notated approach used in his Musical Example 1 (which bears the burden of suppressing the audible evenness of the eight notes in the principal ostinato of "Joyful Noise").

   e. There are no examples of sliding pitches in Ferrara's prior art exhibits drawn from the work of the makers of "Dark Horse." This lack suggests that sliding pitches are not characteristic of these composers' work.

      i. Indeed, slides and "bent" notes such as heard in "Joyful Noise" are consistent with African American music across genres, styles, and historical periods. The African American creators of "Joyful Noise" are working in this deep tradition when they embellish their eight-note ostinato with such touches.

      ii. The lack of such bent notes and slides in "Dark Horse" can be heard as a mark of the track's whiteness.

56. Ferrara provides several prior art exhibits which display what he describes as a "descending melodic contour." In fact, none of these are similar to "Joyful Noise" or "Dark Horse."

   a. These are Audio Examples 1.8, 1.9, 1.17, 2.2, 2.3, 2.6, 2.12, and 2.14.

   b. Audio Example 1.8 is a one-bar figure that can only be considered descending if the listener entirely ignores the persistent upper neighbor motion (as Ferrara transcribes the figure in Musical Example 15). This exhibit does not speak to the multileveled similarities of the descending motion in the ostinatos at issue in this case.

      i. Furthermore, the material Ferrara extracts from the track is best understood not as an ostinato but as a layering element of the mix, mostly heard in the introduction and transitional passages.

35

EXHIBIT 8
PAGE 185

c.  Audio Example 1.9 has the flattest descending contour imaginable: the material Ferrara offers in transcription involves a single half-step descent (and that after upper neighbor motion). This is hardly descending motion and so arguably does not meet or barely meets the criteria for this category.

d.  Audio Example 1.17, from "Green Chimneys," is a syncopated figure that descends in two-bar groups. (Here, Ferrara offers the supposed ostinato figure in quarter-note motion, following the published lead sheet for the song). The almost entirely syncopated nature of the "Green Chimneys" figure and its origin in 1960s jazz suggests there is no credible link to "Joyful Noise" or "Dark Horse," both of which spring from the ethos of twenty-first-century hip hop and beat-driven pop.

   i.  Indeed, the formal use to which composer Theolonius Monk puts his idea in "Green Chimneys" speaks only to jazz.

   ii.  The four-bar figure Ferrara transcribes is not an ostinato but is more properly understood as a head motif[13] or riff used to express a set of chord changes designed for jazz improvisation. After six iterations of the head motif at the initial pitch level, Monk offers two iterations of a slightly different, developed version of the same idea (with the melody beginning a third higher and the chord dropping a step). Then, to close the form, Monk ends with two iterations of the original idea.

   iii.  In short, what Ferrara calls an ostinato is anything but. It is simply the melodic motif that lays out Monk's chord changes which open up a space for improvisation. In jazz parlance, the closed musical form Monk offers is known as a "head." This is how jazz players continue to use "Green Chimneys." It bears no resemblance to the works at issue in this case and is little more than a distraction here.

   iv.  To characterize the opening bars of "Green Chimneys" as an ostinato is to misunderstand the stylistic practices of jazz and pretend that superficially similar musical ideas carry the same meaning at different times and places

---

[13] Head motif refers to a characteristic figure that is used in postwar jazz to flesh out a set of chords (or changes) upon which individual players will improvise. Head motifs function as quasi-melodies for jazz played not on familiar songs (or standards) but instead on song-like forms designed specifically for jazz improvisation.

EXHIBIT 8
PAGE 186

in music history. All musical ideas exist within stylistic traditions and
practices. There is no relationship between "Green Chimneys" and the rap
/ pop ostinatos at issue in this case.

e.  Audio Examples 2.2, 2.3, and 2.6 are, again, not ostinatos. Each contains
substantive melodic gestures that are substantially different from the ostinatos at
issue in "Dark Horse" and "Joyful Noise."

    i.  In all three of these exhibits, the short descending melodies Ferrara points
to are substantive melodic gestures that come and go in their respective
tracks as melodies or hooks.

    ii.  The essence of the ostinatos at issue in "Dark Horse" and "Joyful Noise"
is their function as primary accompaniment material that entirely
dominates the texture and against which singers and rappers voice other,
unrelated material. The YouTube audio analyses of the two tracks by
Fleshpoint! and Seth Mott demonstrated how the ostinato in "Joyful
Noise" could easily serve the purposes of accompanying Perry's vocal in
"Dark Horse."

    iii.  The excerpt Ferrara offers from "We We've Got it Goin' On" (Audio
Example 2.2, Musical Example 27) is nothing less than the track's chorus
melody and primary hook. This is not an accompaniment ostinato.

    iv.  The excerpt Ferrara offers from "Everybody (Backstreets Back)" (Audio
Example 2.3, Musical Example 28) is the track's signature chromatic
descending bassline melody, featured again and again as a melodic riff.
This is not an accompaniment ostinato.

    v.  Finally, the excerpt Ferrara offers from "Bombastic Love" (Audio
Example 2.6, Musical Example 31) is a single element of the track's
densely textured beat. Placed deep in a busy mix, it is hard to pick out for
much of the track. This is not a melodic ostinato that dominates the texture
of the track.

    vi.  None of the above three examples are, in fact, accompaniment ostinatos.
And so, they fail to inform the issue at hand and should be dismissed as
inconsequential.

37

EXHIBIT 8
PAGE 187

f.  Audio Example 2.12 is not an ostinato and is discussed in a subsequent section.

g.  Finally, with Audio Example 2.14 Ferrara offers a track with material that functions something like an ostinato.

    i.  The contention, however, that the ostinato from "Love Me or Hate Me" bears any resemblance in its descending melodic motion to those at issue in this case does not hold up.

    ii.  The "Love Me or Hate Me" ostinato covers a huge range, with multiple and repeated octave displacements (where a melodic fragment abruptly jumps up or down by an octave or two). This is nothing like the constrained range of the ostinatos at issue in the case. Indeed, it's difficult to construe the "Love Me or Hate Me" ostinato as having a "descending melodic contour," since while the small four-note motif always descends the iterations of the motif frequently ascend as part of the pattern of octave displacement.

    iii.  And, again, the ostinato in "Love Me or Hate Me" does not dominate the texture of the track in anything close to the manner of the ostinatos at issue in this case.

    iv.  And, finally, the ostinato in "Love Me or Hate Me" contains 32-notes and unfolds over a full four bars. It is fundamentally different from the phrase structure of the ostinatos as issue here.

57. Ferrara identifies repeated pitches in 4 prior art exhibits.

a.  These are Audio Examples 1.16, 1.17, 2.4, and 2.8.

b.  While all of these tracks include repeated pitches, it is not clear why this is germane to the issue here. The issue in this case is the remarkable and multileveled similarity to the repetition pattern—in notes and rhythmic profile, in textural and formal function—of the principal ostinato in "Joyful Noise" and the eight-note ostinato in "Dark Horse."

c.  The mere presence of repeated pitches falls far short of the clearly audible similarity between the repetition patterns in the ostinatos at issue here.

58. Ferrara identifies various sorts of intervallic similarities between the ostinatos at issue and the supposed ostinatos in 12 of his prior art exhibits.

38

EXHIBIT 8
PAGE 188

a. The prior art examples are Audio Exhibits 1.15, 1.17, 2.1, 2.4, 2.6, 2.7, 2.9, 2.10. 2.11, 2.12, 2.13, and 2.15.

b. All music can be described by way of intervallic relationships, which are simply measures of the distance, space, or "intervals" between given notes.

c. What matters is how these intervallic distances are expressed in rhythmic, harmonic, and melodic terms.

d. Again, it is not clear why various intervallic similarities in the supposed ostinatos Ferrara offers as exhibits are germane to the issue here.

e. The issue in this case is the remarkable and multileveled similarity to the repetition pattern—in notes and rhythmic profile, in textural and formal function—of the principal ostinato in "Joyful Noise" and the eight-note ostinato in "Dark Horse."

   i. The meaningful intervals in this instance are:

      1. The descending minor second between the first and second pitches in both the ostinato in "Joyful Noise" and the eight-note ostinato in "Dark Horse."

      2. The descending major second between the second and third pitches in the eight-note ostinato in "Dark Horse" and the second and third pitches in the first version of the "Joyful Noise" ostinato.

      3. The leap downwards of a fourth to the last note in the eight-note ostinato in "Dark Horse" and the similar leap downwards of in the second version of the "Joyful Noise" ostinato.

   ii. These intervallic similarities—which are all part of a multi-leveled similarity tying the eight-note ostinato in "Dark Horse" to the ostinato in "Joyful Noise"—are relevant to the case.

f. In four cases (2.1, 2.7, 2.11, 2.15), Ferrara notes that the range of the entire supposed ostinato is variously similar to the range of the ostinatos at issue in "Joyful Noise" and "Dark Horse."

   i. Overall range is not at issue. Only the close connection at many musical levels of the two ostinatos in question in this case.

39

EXHIBIT 8
PAGE 189

    g.  In eight cases (1.15, 1.17, 2.4, 2.6, 2.9, 2.10, 2.12, 2.13), Ferrara notes the presence of various descending intervals (minor second, perfect fourth, tritone) found in the ostinatos at issue from "Joyful Noise" and "Dark Horse."

        i.  Again, an interval by itself is not significant to argue for trivial or commonplace usage. Only intervals in a specific context matter.

        ii.  The descending minor seconds in the eight-note ostinato in "Dark Horse" and the ostinato in "Joyful Noise" both move on their fifth note to scale degree $\hat{2}$ after four iterations of their first pitch (scale degree $\hat{3}$). The interval of a descending minor second occurs in an identical rhythmic and melodic context in the ostinatos at issue.

        iii.  The same can be said of the leap downwards of a fourth at the close of the respective ostinatos at issue here, whether a perfect fourth as in the eight-note ostinato in "Dark Horse" or an augmented fourth [or tritone] as in the second version of the ostinato for "Joyful Noise." Again, it is the identical rhythmic and formal contexts where this interval occurs that matters and not simply the interval of a fourth which, of course, appears widely in music.

59. None of the supposed ostinatos offered by Ferrara express his supposed intervallic similarities in a manner that calls into question the close and clearly audible similarity between the ostinatos at issue from "Joyful Noise" and "Dark Horse."

60. And, indeed, most of the exhibits offered here are not even best understood as ostinatos in the sense of "Joyful Noise" and "Dark Horse."

    a.  Audio Examples 2.4, 2.6, 2.9, 2.10, 2.12 and 2.13 are bassline rhythmic figures idiomatic to the rhythm guitar and exceedingly common in rock-derived musical textures. None of these have the strong melodic presence and texture-defining quality of the ostinatos at issue in this case. All of these express conventional harmonic motion—as would be expected of a bassline.

    b.  By strong contrast, the ostinato in "Joyful Noise" and the eight-note ostinato in "Dark Horse" are not heard so easily as basslines. Their insistent repetition of scale degree $\hat{3}$ in the minor mode and in the treble register grant both ostinatos a

EXHIBIT 8
PAGE 190

melodic presence that, given the textual sparseness and similar to-the-front mixing of the ostinatos, comes across to the listener as a melody.

   c.  Audio Example 1.15 is discussed in detail below.

**61. Three of Ferrara's analytical categories relating to prior art exhibits bear no relationship to the issue at hand: the similarity between the principal ostinato in "Joyful Noise" and the eight-note ostinato in "Dark Horse."**

   a.  In the first superfluous category, Ferrara offers 7 prior art exhibits that "embody melodic expression that is far more similar to ostinato #1 in 'Dark Horse' than any similarities between ostinato #1 in 'Dark Horse' and the ostinato in 'Joyful Noise'" (page 26). These are irrelevant to the matter at hand which is solely about the similarity between Ferrara's ostinato #2 from "Dark Horse" and the ostinato in "Joyful Noise."

      i.  The prior art examples are Audio Exhibits 1.3, 1.4, 1.5, 1.6, 1.7, 2.15 and Visual Example A.

         1.  However, as Ferrara admits, Audio Exhibits 1.4, 1.5, and 1.6 are essentially the same musical material, a theme heard on three occasions in Clint Mansell's score for *Requiem for a Dream*.

         2.  And so, there are only five substantive examples here. Ferrara is padding his exhibits with needless examples.

      ii.  Regardless, this line of argument and these prior art examples rely on the above discredited notion that Ferrara's "Dark Horse" ostinato #2 is solely derived from Ferrara's "Dark Horse" ostinato #1.

         1.  Ferrara restates this faulty contention before describing these six ostinatos as a group.

      iii.  In fact, the issue at hand is the clearly audible relationship between the principal ostinato of "Joyful Noise" and Ferrara's "Dark Horse" ostinato #2.

      iv.  Hence, these prior art exhibits can be dismissed as not germane to the issue at hand which is the borrowing of the principal ostinato of "Joyful Noise" in the making of the eight-note ostinato in "Dark Horse."

EXHIBIT 8
PAGE 191

    b.  The second completely superfluous category involves Ferrara's references to the presence of a "rap section" in given prior art exhibits.

        i.  These are Audio Examples 1.8, 1.9, 1.10, 1.11, 1.12, 1.13, 1.14, 1.15, 2.2, 2.4, 2.14 and 2.15.

        ii.  Since rap sections in pop songs are unremarkable (including in "Dark Horse") and since several of the prior art exhibits are by rap artists (as is "Joyful Noise"), it is difficult to know why theses tracks are distinguished as such in Ferrara's report.

    c.  The third superfluous category involves the musical idea in a given track which Ferrara identifies as an ostinato being "present through the entirety" of a track or "present virtually throughout the entirety" of a track, or "not present in virtually the entirety" of a track.

        i.  The Audio Examples noted in this category include 1.12, 1.13, 2.1, 2.2, 2.3, 2.5, 2.6, 2.8, 2.9, 2.10, 2.11, 2.12, 2.13 and 2.14.

        ii.  Since the issue at hand is the borrowing by the makers of "Dark Horse" of the principal ostinato of "Joyful Noise," it is difficult to know why the hazily defined presence or absence of the material Ferrara has defined as an ostinato in given tracks is significant.

62. Before discussing the single prior art exhibit that sheds light on this case—Audio Example 1.15, Musical Example 22—Ferrara's underlying contention made about all the prior art exhibits warrants addressing.

    a.  Ferrara purports to offer "OSTINATOS WITH SIMILARITIES TO THE OSTINATOS IN 'JOYFUL NOISE' AND 'DARK HORSE'" (page 30).

    b.  In fact, most of his prior art exhibits are not ostinatos at all.

    c.  I have already noted that several of what Ferrara calls ostinatos are, in fact, prominent melodies (sometimes sung) in their given tracks (Audio Exhibits 2.27 and 2.28).

        i.  These melodies do not repeat "continuously throughout a piece or section" but instead play other roles in their respective tracks.

    d.  Other supposed ostinatos can be better explained in the following specific ways.

EXHIBIT 8
PAGE 192

     i. The material Ferrara calls an ostinato in Audio Exhibits 1.8, 1.10, 1.11,
1.12 is better understood as a figure that comes and goes throughout the
track and is layered into a dense mix. It bears none of the track and
texture-organizing qualities of the ostinatos at issue.

    ii. The material Ferrara calls an ostinato in Audio Exhibit 2.1 is an
arpeggiated figure heard only twice in its entirety in the entire track (at :00
and 3:01). Calling this an ostinato stretches Ferrara's use of the term
beyond credibility.

e. The majority of the items in Audio Exhibits 2—all composed by the makers of
"Dark Horse"—are not ostinatos but rather accompaniment patterns typical of
popular music. Two subgroups are discernible here.

    i. In Audio Exhibits 2.4 and 2.6, Ferrara has selected out strands of the
musical texture that are better understood as elements of complex beat
structures woven across these tracks. They bear no resemblance in their
deployment to the ostinatos at issue in "Joyful Noise" and "Dark Horse,"
both of which entirely dominate the texture.

    ii. Audio Exhibits 2.5, 2.7, 2.8, 2.9, 2.10, 2.12, 2.13, and 2.15 are
straightforward and consistent arpeggiation patterns used as
accompaniment for pop melodies.

        1. Several of these are idiomatic to the guitar, which is the instrument
heard on their respective tracks.

        2. These patterns do not rise to the level of ostinatos.

        3. As noted further on in the definition of the word *ostinato* in the
*Oxford Companion to Music*, "ostinato is not merely repetitive,
like the accompaniment to a Viennese waltz; it also has a structural
or thematic function, or both."

    iii. The ostinatos at issue in this case both have very strong and identically
realized structural functions in their respective tracks.

    iv. They also have very strong and identically realized melodic profiles.

43

EXHIBIT 8
PAGE 193

1. To quote again from the *Oxford Companion to Music*, "Melodic ostinatos almost invariably contain a distinct rhythm as a secondary element."

2. This is the case with the ostinatos at issue from "Joyful Noise" and "Dark Horse," both of which have the same spare, four-square, halting rhythmic affect which entirely dominates the texture of their respective tracks when they are playing.

    f. Thus, the majority of Ferarra's prior art exhibits are not germane to this case at even the most basic level: they are not ostinatos.

63. "Gangsta's Paradise" from 1995 (Audio Example 1.15, Musical Example 22) would superficially seem to hold some promise as an example of prior art similar to the particular notes, durations, and iterative patterns in the ostinatos at issue.

    a. However, close examination of "Gangsta's Paradise" only further supports the close similarity between the ostinatos from "Joyful Noise" and "Dark Horse" at issue in this case.

    b. The "Gangsta's Paradise" ostinato is transcribed by Ferrara as eight even quarter notes.

        i. The first pitch is iterated four times.

        ii. The second pitch, a half-step lower, is iterated twice.

            1. To this point, the ostinato is superficially identical to those at issue in the case.

        iii. However, in a move different from both the principal ostinato in "Joyful Noise" and Ferrara's "Dark Horse" ostinato #2, the third pitch—iterated once—steps back up a half step.

        iv. The final pitch—also iterated once—leaps down a fourth.

    c. To summarize, the "Gangsta's Paradise" ostinato cannot be said to have a downward melodic contour.

    d. The substantive difference from the ostinatos as issue, however, is in scale degrees.

    e. The following table shows how the pitch content of "Gangsta's Paradise" differs fundamentally from that of the ostinatos in "Joyful Noise" and "Dark Horse."

44

EXHIBIT 8
PAGE 194

| Beat | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| Joyful Noise | $\hat{3}$ | $\hat{3}$ | $\hat{3}$ | $\hat{3}$ | $\hat{2}$ | $\hat{2}$ | $\hat{2}$ | $\hat{1}$ / $\hat{6}$ |
| Dark Horse | $\hat{3}$ | $\hat{3}$ | $\hat{3}$ | $\hat{3}$ | $\hat{2}$ | $\hat{2}$ | $\hat{1}$ | $\hat{5}$ |
| Gangsta's Paradise | $\hat{1}$ | $\hat{1}$ | $\hat{1}$ | $\hat{1}$ | ♯$\hat{7}$ | ♯$\hat{7}$ | $\hat{1}$ | $\hat{5}$ |

    f.   "Gangsta's Paradise" begins on scale degree $\hat{1}$, not scale degree $\hat{3}$ as in the tracks at issue here. This is a substantive difference in the harmonic implications of the ostinato melody independent of any harmonization provided by the rest of the track.

        i.   "Gangsta's Paradise" begins with a prominent sustained minor chord in the accompaniment. Only this harmonization tells the ear the track is in the minor mode. The "Gangsta's Paradise" ostinato could easily be reharmonized in the major mode.

    g.   "Joyful Noise" and "Dark Horse" could not be rendered in the major mode without losing their shared dark quality entirely. In both, the melodic ostinato alone declares the minor mode nature of the track, beginning as it does on an insistently iterated lowered scale degree $\hat{3}$ that leads by downward steps to scale degree $\hat{1}$ (the tonic).

64. Review of the ostinato in "Gangsta's Paradise" only serves to heighten the unusual and very similar nature of the ostinatos at issue in this case.

**65. "Joyful Noise" and the ostinato at issue from "Dark Horse" alike put a strongly minor mode melodic figure using the same scale degrees arranged in the same rhythmic and iterative pattern to work defining their respective structures and textures.**

45

EXHIBIT 8
PAGE 195

a.  In their combination of "a melody" and "a rhythm," these ostinatos meet the
    "most memorable patterns" standard suggested by the *Harvard Dictionary of
    Music*'s definition of *ostinato* quoted selectively by Ferrara.

b.  Their similar timbres and textural dominance of the mix in their respective tracks
    also speaks to the clearly audible similarity of these tracks.

c.  Indeed, contemporary popular music listeners have commented upon and
    demonstrated this similarity—understood as "Dark Horse" copying "Joyful
    Noise"—in social media.


Respectfully submitted


Todd Decker

Date: June 9, 2017


46


EXHIBIT 8
PAGE 196

# EXHIBIT 9

EXHIBIT 9
PAGE 197

# Video Exhibits to Decker Rebuttal Report

# (Submitted on CD lodged with the Court)

EXHIBIT 9
PAGE 198

# EXHIBIT 10

EXHIBIT 10
PAGE 199

**LAWRENCE FERRARA, Ph.D.**
**FOR: LAWRENCE FERRARA, INC.**

**REBUTTAL TO THE DECKER REBUTTAL REPORT**

**REGARDING "JOYFUL NOISE" AND "DARK HORSE"**

## I.      INTRODUCTION

1.      After being asked to perform a comparative musicological analysis of the compositions in "Joyful Noise" and "Dark Horse" and to respond to the initial report of Dr. Todd Decker dated April 6, 2017 (hereafter "the initial Decker report"), I prepared and submitted a report dated May 5, 2017 (hereafter "the Ferrara report").

2.      Subsequent to submitting the Ferrara report, I received and reviewed the rebuttal report of Dr. Decker dated June 9, 2017 (hereafter "the Decker rebuttal report"). The Decker rebuttal report has not changed my opinions as presented in the Ferrara report. Thereby, it continues to be my opinion that "Dark Horse" does not share any significant structural, harmonic, rhythmic, melodic, or lyrical similarities, individually or in combination, with "Joyful Noise".  My analysis finds no musicological support for a claim that the creators of "Dark Horse" copied any expression from "Joyful Noise".  It continues to be my opinion that any similarities between "Dark Horse" and "Joyful Noise" are trite and unremarkable musical expression that was in use prior to 2008.  In addition, the substantial differences between "Dark Horse" and "Joyful Noise" far exceed the insignificant similarity between them.  Moreover, songs written or co-written by writers of "Dark Horse" and released prior to 2008 provide very strong musicological evidence that undercut a claim that similarities between "Dark Horse" and "Joyful Noise" are the result of copying, and support a finding that the creation of "Dark Horse" was independent of "Joyful Noise".

3.      It continues to be my opinion that the initial Decker report (dated April 6, 2017) fails because of:

1

EXHIBIT 10
PAGE 200

(a)     The absence of any transcriptions into musical notation by Dr. Decker of any of the expression that he placed in issue;

(b)     The failure to analyze the entire first iteration of ostinato #2 in "Dark Horse" which caused mistakes in Dr. Decker's analysis;

(c)     The failure to acknowledge, let alone analyze, the development of ostinato #2 in "Dark Horse" which caused mistakes in Dr. Decker's analysis;

(d)     The presentation of a table on page 6 of the initial Decker report that does not accurately present the pitches in issue;

(e)     A flawed overall methodology that resulted in the omission of the analysis of significant differences in the harmony, rhythm, and melody in "Dark Horse" and "Joyful Noise";

(f)     Dr. Decker's failure to consider, let alone analyze, any prior art. Prior art establishes similarities between "Dark Horse" and "Joyful Noise" that were already in use and embodied in (1) many songs released prior to "Joyful Noise" and (2) many additional songs co-written by co-writers of "Dark Horse" that were released prior to "Joyful Noise";

(g)     The failure to filter out the elements that were in common use prior to "Joyful Noise"; and

(h)     The research and analysis in the Ferrara report that demonstrate that even as analyzed by Dr. Decker, the purported similarities that Dr. Decker claims to exist are trite and unremarkable.

4.     Further, even if, for the sake of argument, one accepts Dr. Decker's flawed analysis of the ostinatos at issue in his rebuttal report, the similarity he finds is trite and unremarkable.  In addition, the Decker rebuttal report fails because of:

2

EXHIBIT 10
PAGE 201

(a)     The continued absence of any transcriptions into musical notation by Dr. Decker of any of the expression he placed in issue;

(b)     The continued failure to analyze the entire first iteration of ostinato #2 in "Dark Horse" which caused mistakes in analysis;

(c)     The continued failure to acknowledge, let alone analyze, the development of ostinato #2 in "Dark Horse" which caused mistakes in analysis;

(d)     A flawed analysis of the melody (*i.e.*, pitch content and rhythmic durations) and "timbre" in the ostinatos at issue;

(e)     A flawed analysis and presentation of purported similarities in "texture" that do not exist in "Joyful Noise";

(f)     A flawed analysis of similarities between prior art presented in the Ferrara report and the ostinatos in "Joyful Noise" and "Dark Horse";

(g)     Its misrepresentation of scholarly writing on the analysis of popular music which includes the use of transcription into musical notation;

(h)     The continued failure to filter out the elements that Dr. Decker places in issue that were in common use prior to "Joyful Noise"; and

(i)     Its dislocation from music expert analysis in music copyright matters.

## II.     REBUTTAL

5.      In the initial Decker report dated April 6, 2017, Dr. Decker lists purported *three similarities* between the ostinato in "Joyful Noise" and the second ostinato to appear in "Dark Horse" (termed ostinato #2 in the Ferrara report).[1]  In paragraph 2 of his

---

[1]     Ostinato #2 in "Dark Horse" is first heard after 14 iterations of ostinato #1 in "Dark Horse".  In his rebuttal report, Dr. Decker finds that ostinato #1 in "Dark Horse" is

3

EXHIBIT 10
PAGE 202

rebuttal report dated June 9, 2017, Dr. Decker repeats and reaffirms these three
purported similarities as follows:

    a.  "<u>Rhythm:</u> The ostinatos in 'Joyful Noise' and 'Dark Horse' are
identical in rhythm. This creates an immediate and pervasive
identification between the songs, both of which have a spare, four-
square, halting rhythmic affect.

    b.  <u>Pitch Content.</u> The ostinatos in 'Joyful Noise' and 'Dark Horse' are nearly
identical in pitch content (understood as scale degrees). Beyond the
portion of the two eight-note ostinatos in question that are actually identical
(notes 1-6), a strong similarity manifests in highly similar downward
melodic contours in notes 7 and  8.

    c.  <u>Timbre.</u> The timbre (or color) of the sound of the eight-note ostinatos in
'Joyful Noise' and 'Dark Horse' is substantially similar." [paragraph 2, pp. 1-
2, the Decker rebuttal report]

6.    Dr. Decker adds a fourth purported similarity in his rebuttal report that is
not in his initial report, namely "texture", as follows:

"Before moving towards a response to the details of Ferrara's report, another
level of musical similarity between the tracks deserves attention:   <u>texture</u>.

    a.  The ostinatos in 'Joyful Noise' and 'Dark Horse' are alike placed in a
treble voice.

        i.  Neither functions as a bassline.

        ii.  Both function identically as strongly melodic ideas placed at
the front of an otherwise rather empty mix.

        iii.  Both are initially and regularly accompanied only by a
repetitive syncopated bassline that is suppressed in the
mix relative to the melodic ostinato.

---

"plainly dissimilar" from the ostinato in "Joyful Noise".  [Paragraph 12b. on p. 8]  Dr.
Decker does not place ostinato #1 in "Dark Horse" in issue in his rebuttal report.

4

EXHIBIT 10
PAGE 203

iv.  Both dominate the texture of the music when they are playing to a marked degree." [paragraph 4/4a, pp. 2-3, the Decker rebuttal report]

7.      Immediately below, I respond to each of the purported four similarities Dr. Decker finds in the ostinato in "Joyful Noise" and ostinato #2 in "Dark Horse" in his rebuttal report– namely, rhythm, pitch content, timbre, and texture.

## II. A.  DR. DECKER'S FOUR PURPORTED SIMILARITIES

### II. A.  (1. & 2.)  RHYTHM AND PITCH CONTENT

The rhythm and the pitch content, *i.e.*, the melodies, are different in the ostinato in "Joyful Noise" and ostinato #2 in "Dark Horse"

8.      The first two of Dr. Decker's purported three similarities carried over from his initial report into his rebuttal report, purportedly "identical" rhythm and "nearly identical" pitch content, fail the test of proper transcription and musical analysis of melodies[2]. Dr. Decker fails to present any transcription into musical notation of the ostinato in "Joyful Noise" in his initial and rebuttal reports. In his analysis, he omits the rhythms and pitches that are created by "portamento" slides[3] that ascend (on beat 1) or descend (on beat 3 and within beat 4) in each bar of the ostinato in "Joyful Noise".

9.      The purpose of transcription into musical notation of a melody (such as that in the ostinato in "Joyful Noise") in a recorded performance is to accurately represent the pitches and rhythmic durations in the melodic composition embodied in that recorded performance. The ostinato in "Joyful Noise" consists of varied rhythmic

---

[2]      As noted on page 4 of the Ferrara report, "melody" is a single line of music that consists primarily of a succession of *pitches* and the *rhythmic* durations of those pitches within a melodic phrase structure. Pitch is the specific high or low placement of a musical sound, often identified within a musical scale. (*See* "melody" in *The Harvard Dictionary of Music*, Fourth Edition, 2003, p. 499.)

[3]      A "portamento" creates "A continuous movement from one pitch to another through all of the intervening pitches…" that is similar to a slide on a string or wind instrument. (*See* "portamento" in *The Harvard Dictionary of Music*, p. 673.)

5

EXHIBIT 10
PAGE 204

values, not all eighth notes, and an accurate transcription thereof requires the notation of those varied rhythmic values.  (*See* Musical Example 1 and paragraph 30 on pages 11-12 in the Ferrara report.)

10.    When properly transcribed and analyzed, the rhythms in the ostinatos in "Joyful Noise" and "Dark Horse" are not the same, and the pitch content is not "nearly identical".  The disruption of the rhythm and the addition of pitches created by the portamentos is the distinctive melodic feature in the ostinato in "Joyful Noise" and there are no portamentos in ostinato #2 in "Dark Horse".  This is demonstrated in the analysis in paragraphs 46-56 and illustrated in Musical Examples 5, 6, 7 and 8 on pages 18-23 of the Ferrara report and by listening to the opening ostinato in the "Joyful Noise" sound recording attached here as Track 1 on Rebuttal Audio Exhibit 1.

11.    In paragraph 3(a. & b.) on page 2 of his rebuttal report, Dr. Decker finds that my transcription of the ostinato in "Joyful Noise" ostinato in the Ferrara report is "pedantic" and in paragraph 16(b) on page 10 of his rebuttal report he writes "Ferrara fussily transcribes what the ear hears as eight notes of identical duration (eight eighth notes in this case) into a visually complex mix of three rhythmic values (eighth notes, dotted-sixteenth notes, and thirty-second notes)."

12.    However, Dr. Decker does not deny that the portamento slides between pitches exist in the "Joyful Noise" ostinato.  Dr. Decker concedes the presence of these portamento slides in the ostinato in "Joyful Noise" (*see* paragraph 16c., p. 10, paragraph 55 on p. 34, and paragraph 55e on p. 35 of the Decker rebuttal report) and he concedes the absence of any portamento slides in "Dark Horse" (*see* paragraph 55e.ii. on p. 35 of the Decker rebuttal report).  Rather, Dr. Decker finds that my transcription of the rhythms and additional pitches created in the portamento slides in the ostinato in "Joyful Noise" is "pedantic".  However, removing the melodic rhythms created by the portamentos (and thereby reducing it to all even notes in the ostinato in "Joyful Noise") would misrepresent the distinctive rhythms created by the portamentos that are clearly present and heard.

6

EXHIBIT 10
PAGE 205

13.     Why does Dr. Decker object to a detailed and accurate transcription of the portamento slides in the ostinato in "Joyful Noise", portamento slides he concedes are there?  Why does he demand that the rhythms and pitches created by the portamento slides be omitted from the transcription of the ostinato in "Joyful Noise"?  The reason is that ostinato #2 in "Dark Horse" (as well as ostinato #1 in "Dark Horse") does not include any portamento slides and this is a significant *difference* between the ostinato in "Joyful Noise" and the ostinatos in "Dark Horse".  (Once again, Dr. Decker concedes the absence of any portamento slides in "Dark Horse" in paragraph 55e.ii. on p. 35 of the Decker rebuttal report.)

14.     Within the context of Dr. Decker's concessions in his rebuttal report—that portamento slides are present in the ostinato in "Joyful Noise" and not present in the ostinato #2 in "Dark Horse"—Dr. Decker's opinions that the rhythms are "identical" and the pitch content is "nearly identical" are debilitated.  The portamento slides in every bar of the ostinato throughout "Joyful Noise" are a distinctive element of its expression.  The fact that this distinctive and repeating melodic element is undeniably present in the ostinato in "Joyful Noise" and is undeniably absent in the ostinatos in "Dark Horse" undercuts any claim that either of the ostinatos in "Dark Horse" were copied from "Joyful Noise".

<u>The durations and number of notes in the ostinato in "Joyful Noise" and ostinato #2 in "Dark Horse" are different</u>

15.     The ostinato in "Joyful Noise" is 2 bars in duration and consists of 22 notes as transcribed in Musical Example 1 on page 11 of the Ferrara report.  Dr. Decker omits the additional notes created by portamentos, thereby reducing each bar from 11 notes to 8 notes.  Moreover, he conflates the 2-bar ostinato in "Joyful Noise" into a single bar even though as he concedes, the last note of bar 1 is different from the last note of bar 2.

16.     By way of difference, the first full iteration of ostinato #2 in "Dark Horse" is four bars in duration and consists of 32 notes as analyzed in the Ferrara report and transcribed in Musical Example 3 on page 13 therein.  Nowhere in his rebuttal does Dr.

7

EXHIBIT 10
PAGE 206

Decker rebut the accuracy of the transcription of ostinato #2 in "Dark Horse" in the
Ferrara report and nowhere in his rebuttal does Dr. Decker rebut the fact that the first
full iteration of ostinato #2 in "Dark Horse" consists of 32 notes as transcribed in Musical
Example 3 on page 13 of the Ferrara report.  Dr. Decker omits bars 2, 3, and 4 of
ostinato #2 in "Dark Horse" to create a similarity with his manufactured ostinato in
"Joyful Noise" that does not exist.

The rhythms in the ostinato in "Joyful Noise" and ostinato #2 in "Dark Horse" are
different

17.    In paragraph 2(a) of his rebuttal report Dr. Decker writes:

"The ostinatos in 'Joyful Noise' and 'Dark Horse' are identical in rhythm. This
creates an immediate and pervasive identification between the songs, both of
which have a spare, four-square, halting rhythmic affect."

18.    Dr. Decker fails to provide an explanation of his use of the term
"rhythmically square". By "square", Dr. Decker may be pointing to his simplification and
misrepresentation of the rhythm of the ostinato in "Joyful Noise" as all even notes.  In
fact, the ostinato in "Joyful Noise" is distinguished by frequent and regular thirty-second
note punctuations that slide into longer notes creating a rhythm that is absent in the
ostinato in "Dark Horse". These rhythmic disruptions cannot be properly described as
"square".  By way of difference, the rhythm of ostinato #2 in "Dark Horse" consists
largely but not wholly of even notes and is not remotely "identical" in rhythm to the
ostinato in "Joyful Noise" as evidenced in an accurate transcription into musical notation
thereof.  Indeed, there are significant rhythmic differences. Dr. Decker fails to provide
any transcription of his own in his initial report and in his rebuttal report.  (*See*
paragraphs 46-56 including Musical Example 5 in the Ferrara report.)

The structural placements and functions of the ostinato in "Joyful Noise" and ostinato #2
in "Dark Horse" are different

19.    The structural placements and functions of the ostinato in "Joyful Noise"
and ostinato #2 in "Dark Horse" are different. The ostinato in "Joyful Noise" largely

8

EXHIBIT 10
PAGE 207

repeats throughout the song.  By way of difference, ostinato #2 in "Dark Horse" comes
and goes, is absent in the prominent Introduction and three Chorus sections, and is
developed in later iterations.

20.     The structural function of the ostinato in "Joyful Noise" is its constant
reiteration in all sections of the composition.  By way of difference, the structural
function of ostinato #2 in "Dark Horse" is its identification with the Verses (only partially
in the rap Verse) and Break, its absence during the Introduction and Chorus sections,
and its interchange with ostinato #1 which precedes it.

<u>While ostinato #2 in "Dark Horse" is developed, the ostinato in "Joyful Noise" is not</u>

21.     As demonstrated in the Ferrara report, one of the many differences
between the ostinato in "Joyful Noise" and ostinato #2 in "Dark Horse" is that the
ostinato in "Joyful Noise" is essentially without development.  The ostinato in "Joyful
Noise" essentially repeats throughout.  By way of difference, ostinato #2 not only follows
and grows out of ostinato #1 in "Dark Horse"[4], ostinato #2 is further developed later in
"Dark Horse".  Dr. Decker's flawed methodology not only extracts and isolates the first 8
notes of the 32-note first iteration of ostinato #2 in "Dark Horse" (transcribed in Musical
Example 3 on page 13 of the Ferrara report), it misses the development of ostinato #2
in "Dark Horse" (*see* paragraphs 53-55 on pp. 21-23 in the Ferrara report).

22.     As noted in paragraphs 110 and 111 on page 50 of the Ferrara report, at
1(c.iii) on page 5 of his initial April 6, 2017 report Dr. Decker writes: "There is no
syncopation of any kind in either track's ostinato melody".  However, as demonstrated in
Musical Example 6 on page 22 in the Ferrara report, two iterations of ostinato #2 in
"Dark Horse" end with a syncopation (i.e., an interruption of the basic pulse or beat)
respectively starting at 0:30 and 1:35.  Dr. Decker's analytical mistake results from his
failure to analyze the development of ostinato #2 in "Dark Horse".  In addition, the
transformed iteration of ostinato #2 that starts at 2:33 inserts rests and sixteenth notes

---

[4]      *See* the analysis of ostinato #2 being developed from and growing out of ostinato
#1 in the Ferrara report at paragraphs 31-34 (including Musical Examples 2 and 3) on
pages 12-14 and paragraphs 136-138 on pages 59-60.

9

EXHIBIT 10
PAGE 208

as demonstrated in Musical Example 7 on page 22 in the Ferrara report. This iteration of ostinato #2 at 2:33 in "Dark Horse" contradicts Dr. Decker's analysis in 1(c.i) of his initial report, namely, that the ostinatos consist of "even" notes.  Dr. Decker does not dispute this transformed iteration of ostinato #2 in "Dark Horse" in his rebuttal report.

23.     Following the development of a melody at issue is an example of basic music analysis in and outside of popular music, as well as in music copyright issues. Dr. Decker's analysis is debilitated by its failure to do so.

24.     Thus, by way of difference, while ostinato #2 in "Dark Horse" is developed and varied as demonstrated in the Ferrara report and not rebutted by Dr. Decker, the ostinato in "Joyful Noise" (transcribed in Musical Example 1 on page 11 of the Ferrara report) is not remotely developed in any similar way.

<u>Even as analyzed by Dr. Decker, the similarity in rhythm and pitch content between the ostinato in "Joyful Noise" and ostinato #2 in "Dark Horse" is trite and unremarkable</u>

25.     The claimed melodic similarity in pitch content Dr. Decker finds between the ostinato in "Joyful Noise" and ostinato #2 in "Dark Horse" is reflected in his boxed table on page 6 of his initial report and reaffirmed in his rebuttal report.  For argument's sake, even if one accepts the pitch content presented as scale degree numbers in his table as fully accurate, and it is not accurate, the pitch content similarity between ostinato #2 in "Dark Horse" and the ostinato in "Joyful Noise" Dr. Decker finds, a 3 3 3 3 2 2 pitch sequence in an (according to Dr. Decker) even rhythm, is minimal, trite and unremarkable as charted immediately below.

3  3  3  3  2  2

26.     Regarding this similarity of six pitches, in the last sentence of paragraph 1(d.viii.) near the bottom of page 6 in the initial Decker report, Dr. Decker finds that this minimal, trite and unremarkable sequence of six pitches "**is the most specific musical content shared by both tracks**" [emphasis added]. Thus, within the *entirety* of "Joyful Noise" and "Dark Horse", in Dr. Decker's opinion, the "most specific musical content"

10

EXHIBIT 10
PAGE 209

that is shared is six pitches on scale degrees 3 3 3 3 2 2 in an even rhythm.  Moreover, at the opening of his rebuttal report Dr. Decker opines that "**the fundamental similarity between 'Joyful Noise' and 'Dark Horse'**…rests in the eight-note ostinato figure described in tabular form on page 6 of my report".  [Paragraph 1 and 1(a.) emphasis in the Decker rebuttal report]  This "fundamental similarity" in the table on page 6 of his Dr. Decker's initial report is merely the pitch sequence 3 3 3 3 2 2 in purportedly even notes and a downward contour of the remaining but different pitches.

27.     Beginner students on string and wind instruments practice exercises such as 3 3 3 3 2 2 2 2 in descending scales in an even rhythm.  As noted in the Ferrara report, the melody that is set to the title of the traditional 19th century American carol, "Jolly Old St. Nicholas", uses the same scale degrees 3, 3, 3, 3, 2, 2 in a major key (charted immediately below) in an even rhythm.

"Jolly Old Saint Nicholas":  3   3   3   3   2   2

"Joyful Noise":               3   3   3   3   2   2

"Dark Horse":                 3   3   3   3   2   2[5]

28.     The 3 3 3 3 2 2  sequence of scale degrees at the opening of "Jolly Old Saint Nicholas" is set to the title lyrics in the traditional carol as charted immediately below and is also.

3     3   3    3        2       2   (2)
Jol-  ly  old  Saint   Nich-  o-  (las),

29.     Moreover, as demonstrated in the Ferrara report, this 3 3 3 3 2 2 pitch content is found in "Jolly Old Saint Nicholas" in *even notes* in published sheet music of "Jolly Old Saint Nicholas".  Indeed, the 3 3 3 3 2 2 pitch content can also be found in basic, beginner instructional music books such as near the end of the simple melody to

---

[5]     In the Ferrara report, I also noted that the seventh pitch in the opening title melody in "Jolly Old Saint Nicholas" and the ostinato in "Joyful Noise" is on scale degree 2.

11

EXHIBIT 10
PAGE 210

"Merrily We Roll Along" on page 9 of Book 1 in a beginner "Band Method" series (in a major key) as explained in the Ferrara report.

30.     Thus, even if, for the sake of argument, one accepts Dr. Decker's flawed analysis of the pitch content and rhythm, this similarity between the ostinato in "Joyful Noise" and ostinato #2 in "Dark Horse" is minimal, trite and unremarkable.  Indeed, it is elementary.

31.     Dr. Decker's response in paragraph 39(d) on page 26 of his rebuttal report misses the point.  He finds that insofar as the opening notes of the melody set to the title of "Jolly Old Saint Nicholas" do not function as an ostinato, this widely known 19th century melody is not germane to the ostinatos at issue.  However, the 3 3 3 3 2 2 pitch content and (only according to Dr. Decker) even-note rhythmic similarity between the ostinato in "Joyful Noise" and ostinato #2 in "Dark Horse" is embodied in the opening and well-known title melody in the 19th century "Jolly Old Saint Nicholas" in a major key.  Dr. Decker cannot escape from the fact that the 3 3 3 3 2 2 pitch content and even note rhythm that he opines (in his initial report) "is the most specific musical content shared by" "Joyful Noise" and "Dark Horse" and in paragraph 1 of his rebuttal report is the "fundamental similarity" between "Joyful Noise" and "Dark Horse" is the widely known opening title melody in the 19th century "Jolly Old Saint Nicholas".  Moreover, this opening melody is re-iterated at the opening of each 8-bar melodic phrase throughout "Jolly Old Saint Nicholas" and thereby also embodies an important structural function.  (*See* the published sheet music attached as Visual Exhibit C to the Ferrara report.)

32.     On that basis, as analyzed by Dr. Decker in his initial and rebuttal reports, the purported melodic similarity in the rhythm and pitch content of the ostinato in "Joyful Noise" and ostinato #2 in "Dark Horse" is minimal, trite and unremarkable and should be removed away from any purported combination of similarities.

33.     In paragraph 48 on page 30 of his rebuttal report, Dr. Decker misrepresents my analysis of the prior art melodies in "Jolly Old Saint Nicholas" and in the elementary band book example of "Merrily We Roll Along" as cited immediately below:

12

EXHIBIT 10
PAGE 211

"It is noteworthy that in discussing 'Jolly Old Saint Nicholas' and 'Merrily We Roll
Along,' Ferrara tacitly admits that the ostinato in 'Joyful Noise' is best
understood as eight evenly-valued notes and not as the overly complicated mix
of eighth notes, dotted-sixteenth notes, and thirty-second notes he presents
early in his report when making comparisons with the eight-note ostinato from
'Dark Horse.' When it suits his argument, Ferrara asks the listener to hear even
values in the 'Joyful Noise' ostinato."

34.     Dr. Decker's either willfully or mistakenly misrepresents my analysis in
paragraphs 115-121 on pages 52-54 in the Ferrara report.  In paragraph 116 of the
Ferrara report, I write: "…regarding the boxed table on page 6 of the Decker report, for
argument's sake even if one were to accept the **pitch content** (presented as scale
degree numbers in the table) as fully accurate, **and it is not**, the pitch content similarity
between ostinato #2 in 'Dark Horse' and the ostinato in 'Joyful Noise' Dr. Decker finds is
trite and unremarkable."  [emphasis added]

35.     In paragraph 121 of the Ferrara report I further write:

"Thus, even if one accepts the transcription of the pitches in Dr. Decker's boxed
table on page 6 and his analysis, this similarity in the pitches Dr. Decker finds
between the ostinato in 'Joyful Noise' and ostinato #2 in 'Dark Horse' is
elementary and unremarkable."

Within Dr. Decker's (incorrect) "analysis", the pitches in the ostinato in "Joyful Noise"
and "Dark Horse" are **"even notes"**.  As clearly stated in the Ferrara report and clearly
misrepresented in the Decker rebuttal report, for argument's sake even if one were to
accept Dr. Decker's "analysis" regarding "even notes", the same 3 3 3 3 2 2 pitch
sequence (in a major key) in even notes is found in the opening and re-iterating title
melody in "Jolly Old Saint Nicholas" and the elementary band method book example of
"Merrily We Roll Along".

13

EXHIBIT 10
PAGE 212

36.     The purpose of analyzing the well-known opening title melody in the 19th century "Jolly Old St. Nicholas" in the Ferrara report is to establish that similarities in the pitch and rhythmic content between the ostinato in "Joyful Noise" and ostinato #2 in "Dark Horse" that Dr. Decker finds (based on his wrong omission of the portamento notes in the ostinato in "Joyful Noise") are also found in the opening title melody of "Jolly Old St. Nicholas" in a major key.  Thus, even after Dr. Decker omits the notes in the portamentos in every bar of the ostinato in "Joyful Noise" making it more like ostinato #2 in "Dark Horse", the melodic similarities in the ostinato in "Joyful Noise" and ostinato #2 in "Dark Horse" are still minimal, trite and unremarkable.

## II. A. (3.)  TIMBRE

The timbres of the ostinato in "Joyful Noise" and ostinato #2 in "Dark Horse" are different

37.     Now moving to the third purported similarity carried over from Dr. Decker's initial report into his rebuttal report, as cited above, on page 2 of his rebuttal report Dr. Decker writes:  "The timbre (or color) of the sound of the eight-note ostinatos in 'Joyful Noise' and 'Dark Horse' is substantially similar".  As explained in paragraph 5 on page 3 of the Ferrara report, "timbre" or tone color is "…the quality of sound that distinguishes one instrument from another…."[6]  As noted in the Ferrara report, I disagree with Dr. Decker that the timbre of the ostinatos in "Joyful Noise" and "Dark Horse" is "remarkably similar".  The sonic qualities are different.  There is a sharper attack on the notes in the ostinato in "Joyful Noise" than in "Dark Horse" and a "delay" or echo effect on each note in the ostinato in "Joyful Noise" that is absent in the ostinatos in "Dark Horse".  Moreover, the sound of the ostinatos in "Dark Horse" is more breathy and has a more human-like quality than the ostinato in "Joyful Noise".

38.     Notably, Dr. Decker appears to back away from his finding that the ostinatos are "substantially similar" when in his initial report he writes:

---

[6]      *See* "timbre" on page 893 and "tone color "on page 899 in *The Harvard Dictionary of Music* (Fourth Edition, Harvard University Press, 2003) and "timbre" on page 478 and "tone (iii)" on page 599 in *The New Grove Dictionary of Music and Musicians* (Second Edition, Oxford University Press, Vol. 25, 2001).

14

EXHIBIT 10
PAGE 213

"The timbre in Joyful Noise is perhaps more piercing than Dark Horse but they are in the same general family of electronic sounds heard in current popular music". [p. 7, "v."]

39.     Thus, Dr. Decker concedes that the similarity in timbre is merely the result of the fact that the synthesizers on which the ostinatos are played "…are in the same general family of electronic sounds heard in current popular music". The similarity in the timbre of the synthesizers in the ostinatos in "Joyful Noise" as compared with "Dark Horse" is not "remarkable". Rather, in the words of Dr. Decker, the similarity is common to the "same general family of electronic sounds heard in current popular music", and thereby not remotely suggestive of copying in "Dark Horse" from "Joyful Noise".

40.     On that basis, the timbres in the ostinatos at issue are not remotely "substantially similar". First, as cited above, Dr. Decker concedes that the timbre is not the same insofar as one is "more piercing" than the other. Second, as cited above, Dr. Decker concedes that the similarity in timbre results from the fact that they "…are in the same general family of electronic sounds heard in current popular music". Thus, as analyzed by Dr. Decker, the purported similarity in the timbres of the ostinato in "Joyful Noise" and ostinato #2 in "Dark Horse" is not significant, not suggestive of copying, and should be removed from any purported combination of similarities.

The timbres of the ostinato in "Joyful Noise" and "Dark Horse" are different

41.     In paragraph 3(c ) on page 2 of his rebuttal report, Dr. Decker misrepresents the Ferrara report regarding any similarity between the timbres of the ostinato in "Joyful Noise" and "Dark Horse" as follows:

"Timbre: Ferrara's report does not dispute the similar timbres of the two tracks.

i.  He agrees with my report that respective tracks draw on the 'same general family of electronic sounds heard in current popular music'."

15

EXHIBIT 10
PAGE 214

42.     Dr. Decker's misrepresentation is easily exposed.  First, in the Ferrara report I write:

"I disagree with Dr. Decker that the timbre of the ostinatos in 'Joyful Noise' and 'Dark Horse' are 'remarkably similar'.  First, the sonic qualities are different. There is a sharper attack on the notes in the ostinato in 'Joyful Noise' than in 'Dark Horse' and a 'delay' or echo effect on each note in the ostinato in 'Joyful Noise' that is absent in the ostinatos in 'Dark Horse'.  Moreover, the sound of the ostinatos in 'Dark Horse' is more breathy and has a more human-like quality than the ostinato in 'Joyful Noise'. [Paragraph 122 on pages 54-55 of the Ferrara report.]

43.     Second, in the Ferrara report I also write:  "Indeed, what is similar in the timbre is a function of having the ostinatos played on synthesizers; the resulting sounds are similar only in a general way." [Paragraph 123 on page 55 of the Ferrara report.]

44.     Thus, Dr. Decker has either willfully or mistakenly misrepresented what was clearly stated in the Ferrara report regarding timbre.  Dr. Decker concedes that the timbre in the ostinatos at issue in "Joyful Noise" and "Dark Horse" is not the same (one is "more piercing" than the other) and that the similarity in the timbre of the synthesizers in the ostinatos is common to the "same general family of electronic sounds heard in current popular music".  On that basis and within the context of Dr. Decker's own analysis, any similarity in timbre is not significant, not remotely suggestive of copying in "Dark Horse" from "Joyful Noise", and should be removed from any purported combination of similarities.

## II. A.  (4.)  TEXTURE

45.     Now moving to the fourth purported similarity between the ostinatos at issue, as cited above from pages 2-3 of his rebuttal report, Dr. Decker finds the textures are similar because they (1) are in a "treble voice" and do not function as a bassline, (2) are strongly melodic ideas "placed at the front of an otherwise rather empty mix", (3) are "initially and regularly accompanied only by a repetitive syncopated repetitive bassline that is suppressed in the mix relative to the melodic

16

EXHIBIT 10
PAGE 215

ostinato" at issue, and (4) "dominate the texture of the music when they are playing to a marked degree".

46.     However, nowhere in his initial report dated April 6, 2017 does Dr. Decker ever mention "texture"; he missed this purported fourth similarity in his initial analysis and report.  In his rebuttal report he fails to define "texture".  *The New Grove Dictionary of Music and Musicians* explains that texture refers to "…the vertical aspects of a work or passage, for example the way in which individual parts or voices are put together, or to attributes such as tone colour or rhythm, or to characteristics of performance such as articulation and dynamic level." [Second Edition, 2001, Volume 25, p. 323.]  A copy of the full definition of "texture" in *The New Grove Dictionary of Music and Musicians* [Fourth Edition, 2003, pp. 624-625] is attached as Rebuttal Visual Exhibit A (followed by the full definition of "ostinato" in *The Harvard Dictionary of Music*).

47.     A response to each of Dr. Decker's four purported similarities in the "texture" in "Joyful Noise" and "Dark Horse" is presented below.

(1)  A treble voice ostinato is common in rap and popular music

48.     As to the first purported similarity in texture, namely, the ostinatos at issue are in a "treble voice" and do not function as a bassline, ostinatos are commonly in "treble voice" in rap and pop music.  Indeed, as demonstrated in the transcriptions of ostinatos in Musical Examples 9 – 40 in the Ferrara report, of 32 prior art ostinatos, 25 prior art ostinatos are solidly in treble voices.

49.     In jazz and popular music, ostinatos are often called "riffs" and those riffs/ostinatos are often in a "treble voice".  In the opening sentence of the entry on "riff" *The New Grove Dictionary of Music and Musicians* explains: "In jazz, blues and popular music, [a riff is] a short melodic ***ostinato*** which may be repeated either intact or varied to accommodate an underlying harmonic pattern." [Volume 21, p. 375, emphasis added]

17

EXHIBIT 10
PAGE 216

50.    Further, the overall range of "treble" voices is large and the range of the ostinato in "Joyful Noise" is notably higher than the range of both ostinatos in "Dark Horse".  As demonstrated in the Ferrara report and not challenged in the Decker rebuttal, the ostinato in "Joyful Noise" is eleven (11) half steps higher in pitch than the ostinatos in "Dark Horse". (*See* the Ferrara report, paragraph 35, page 14.)  There is a demonstrable and significant difference in the highness and range of the "treble" pitches in the ostinato in "Joyful Noise" as compared with the pitches in the ostinatos in "Dark Horse".

51.    Thus, merely finding that two ostinatos are in a treble voice and do not function as a bassline represents common practices and is unremarkable.

(2)  An ostinato melody "placed at the front of an otherwise empty mix"
refers to the production of the sound recordings and is common

52.    If by "placed at the front of an otherwise rather empty mix" Dr. Decker is opining about the presence of the *sound* of the ostinato melodies at issue at the "front" or "back" of the overall "mix" of *sounds,* he is referring to the production of the *sound recordings.*  Again, I am informed that the Plaintiffs in this case have not asserted any claim of purported infringement of the sound recording of "Joyful Noise".

53.    Dr. Decker fails to explain what he means by "an otherwise rather empty mix". To the extent he is referring to the compositions embodied in the sound recordings in "Joyful Noise" and "Dark Horse", he fails to provide any transcriptions to evidence whether the overall texture is "rather empty" or not.  At best, Dr. Decker's finding of a "rather empty mix" is merely conclusory.  By "rather empty mix", Dr. Decker may be referring to what he calls a "stark" texture in "Joyful Noise" and "Dark Horse" at paragraph 4(h.) on page 4 of his rebuttal report as copied immediately below:

> "Beat-driven popular musics are generally not as stark in their texture as 'Joyful Noise' and 'Dark Horse' both are and, furthermore, the two tracks are stark in the exact same ways."

However, the texture is not "stark" and there is not a "rather empty mix" of sounds in most of "Joyful Noise".  Once the guitar enters during Verse 1 (and the other Verses)

18

EXHIBIT 10
PAGE 217

the texture is not "stark" and the "mix" is not "rather empty" since the 16th note guitar
chords occupy a good deal of sonic space.  Moreover, the Chorus sections in "Joyful
Noise" have an even denser texture due to the guitar and sustained synthesizer parts.
Thus, Dr. Decker's premise of a "stark" or "an otherwise rather empty mix" texture is, in
most of "Joyful Noise", demonstrably wrong.

54.     Indeed, a simple listening to Chorus 3 (starting at 3:32) and the Outro to
the end of "Joyful Noise" at 4:27 as well as Chorus 1 and Chorus 2 evidences that the
ostinato is *not* at the "front of the mix".  Moreover, the texture is not remotely "rather
empty" or "stark" in these Chorus and Outro sections, nor is the texture "rather empty"
or "stark" in the second half of all three Verse sections.

55.     The musical expression embodied in the *compositions* in Verse 1 in
"Joyful Noise" and in Verse 1 in "Dark Horse" is very different and creates different
"textures".  This significant difference in texture in the musical compositions is
evidenced and demonstrated in comparative transcriptions of instrumental parts that are
sounding in the Verse 1 in "Joyful Noise" and "Dark Horse" attached as Rebuttal Visual
Exhibit B.  Therein, I provide comparative transcriptions of "the way in which individual
parts or voices are put together" (*see* the definition of "texture" in *The New Grove
Dictionary of Music and Musicians* attached as Rebuttal Visual Exhibit A).

56.     The comparative transcription in Rebuttal Visual Exhibit B consists of parts
in the last four bars (bars 13-16) in Verse 1 of "Joyful Noise" placed over the last four
bars (bars 5-8) in Verse 1 of "Dark Horse".  In terms of texture, (1) "Joyful Noise" has a
kick drum but "Dark Horse" does not, (2) "Joyful Noise" has a snare drum but "Dark
Horse" does not, (3) "Joyful Noise" has a guitar but "Dark Horse" does not, and (4) there
is a difference in the highness in the ostinato (the ostinato in "Joyful Noise" is eleven
steps higher than the ostinato in "Dark Horse").  These four differences in the
expression in the last four bars of Verse 1 in both compositions create different textures.

57.     The articulations in the rhythm and pitches of the ostinato in "Joyful
Noise" are distinguished by frequent and regular thirty-second note punctuations that
slide into longer notes creating a punctuated texture.  Those sliding portamentos are

19

EXHIBIT 10
PAGE 218

absent in the "Dark Horse" texture. As noted above, Dr. Decker concedes the presence of these sliding portamentos in the ostinato in "Joyful Noise" and the absence in ostinato #2 in "Dark Horse".

58.     Thus, the "mix" is not remotely "empty" in most of "Joyful Noise" and in major sections the ostinato is *not* at the front.  The textures in "Joyful Noise" and "Dark Horse" are demonstrably different and any similarities are common.  On that basis, main elements in this purported textural similarity demonstrably do not exist in "Joyful Noise" and this similarity should be discounted.

<u>(3)  A repetitive syncopated bassline is common, the ostinato in "Joyful Noise" is not regularly accompanied **only** by a repetitive syncopated bassline, and often the bassline is not "suppressed in the mix"</u>

59.     First, repetitive syncopated basslines are common in beat-driven music.

60.     Second, the musical expression in the bassline in "Dark Horse" is significantly different from the bassline in "Joyful Noise" as evidenced and demonstrated in the transcriptions attached in Rebuttal Visual Exhibit B.  Thus, Dr. Decker is merely pointing to the use of one of the most common rhythmic devices and fundamental rhythmic musical building blocks in music, "syncopation" *i.e.*, the interruption of the basic pulse or beat, which is commonly "repetitive" in beat-driven music.

61.     Third, if by "suppressed in the mix" Dr. Decker is merely pointing to what he considers to be a bassline that is softly played, then he is pointing to the *sound recording*.  I am informed that the Plaintiffs in this case have not asserted any claim of purported infringement of the sound recording of "Joyful Noise."  Moreover, Dr. Decker's assertion is wrong.  The bassline is very pronounced and full within the overall sonic mix in the 3 Verses, 3 Choruses and Outro (ending) sections of "Joyful Noise" which occupy 72 out of a total of 84 bars or 85% of the duration of "Joyful Noise".  A simple listening to the Verse and Chorus sections throughout "Joyful Noise" with good ear phones or speakers countervails Dr. Decker's opinion regarding a bassline that is purportedly "suppressed in the mix" in "Joyful Noise".

20

EXHIBIT 10
PAGE 219

62.      Fourth, Dr. Decker is demonstrably wrong in his opinion that the ostinato in "Joyful Noise" is "regularly accompanied **only** by a repetitive syncopated bassline…." Even within the Introduction in "Joyful Noise" (1) at 0:07 an electric guitar is heard, (2) at 0:11 an electronic rim shot playing a sixteenth-note triplet on beat "3&" is heard, and (3) at around 0:13 an electronic hand clap (possibly doubled with a finger snap) occurs on the backbeats (*i.e.*, beats 2 and 4).   Moreover, as noted above and demonstrated on page 2 of Rebuttal Visual Exhibit B, additional instruments including guitar and drums are added in the Verses and any listening to the Choruses and Outro will readily hear much more than the ostinato "accompanied **only** by a repetitive syncopated bassline".

63.      Thus, (1) the musical expression in the bassline in "Dark Horse" is significantly different from the bassline in "Joyful Noise", (2) a repetitive syncopated bass is common, (3) the ostinato in "Joyful Noise" is not accompanied **only** by the bassline, and (4) the bassline in "Joyful Noise" is demonstrably full and pronounced in 85% of the song and not "suppressed".   On that basis, the main elements of this purported textural similarity do not exist in "Joyful Noise" and this similarity should be discounted.

 (4)  The ostinato in "Joyful Noise" does not dominate the texture in most of "Joyful Noise"

64.      Dr. Decker fails to provide any supporting evidence that the ostinato in "Joyful Noise" dominates the texture.   Contrarily, a simple listening to the three Verse and three Chorus sections as well as the Outro section of "Joyful Noise" evidences that the ostinato does not remotely "dominate the texture".   Even in the Verse sections in "Joyful Noise", it is the vocal rap that dominates the texture.

65.      Indeed, in Dr. Decker's initial report he opines: "Almost the entire ["Joyful Noise"] track features rapping and rapping is the primary expressive element."  [lines 19-20, p. 11]  I agree that rapping is the "primary expressive element" in "Joyful Noise" and in my hearing and on the basis of my transcriptions, the rap dominates the texture in the Verses in "Joyful Noise".  (Please listen to Verse 1 starting at 0:25 in "Joyful Noise" attached as Track 1 in Rebuttal Audio Exhibit 1.)

21

EXHIBIT 10
PAGE 220

66.     Further, as transcribed in Rebuttal Visual Exhibit B, by the second half of Verse 1, (1) "Joyful Noise" has a kick drum but "Dark Horse" does not, (2) "Joyful Noise" has a snare drum but "Dark Horse" does not, and (c) "Joyful Noise" has a guitar but "Dark Horse" does not.  The aggregate of these objective differences in simultaneously sounding musical expression not only creates *different* textures, these additional instrumental parts, a pronounced and full bassline, plus the heavy rap vocals undercut Dr. Decker's claim that the ostinato in "Joyful Noise" dominates the texture.

67.     Thus, the ostinato does not dominate the texture in major portions of "Joyful Noise".  This purported textural similarity does not exist in most of "Joyful Noise" and should be discounted.

Three of Dr. Decker's four purported similarities in texture are demonstrably not found in "Joyful Noise"

68.     As analyzed above, when one removes parts of Dr. Decker's purported similarities in texture that are demonstrably not found in "Joyful Noise" the only similarity that remains intact is that the ostinatos in "Joyful Noise" and "Dark Horse" are in a treble voice and neither functions as a bassline, which is unremarkable and common.

A combination of purported textural similarities is found in prior art

69.     As analyzed above, the main elements in three of the four purported textural similarities introduced in the Decker rebuttal report are not in most of "Joyful Noise".  Moreover, portions of four prior art works transcribed and analyzed in the Ferrara report include (1) an ostinato in a treble voice that does not function as a bassline, (2) an ostinato placed "at the front of an otherwise rather empty mix" or "stark" texture; (3) an ostinato over a repetitive syncopated bassline or kick drum rhythm, and (4) an ostinato that dominates the texture.  These four prior art works from the Ferrara report are identified immediately below.

(a)     "3 Kings" by Slim Thug feat T.I. & Bun B (2005) (*see* paragraph 74 on page 30, Musical Example 15 on page 31, and Track 8 of Audio Exhibit 1 in the Ferrara report)

22

EXHIBIT 10
PAGE 221

(b)     "Go Head (Shawty Got a Ass on Her)" by Gucci Mane (2006) (*see*
paragraph 75 and Musical Example 16 on page 31, and Track 9 of Audio
Exhibit 1 in the Ferrara report)

(c)     "I'm Throwed" by Paul Wall feat Jermaine Dupri (2007) (*see* paragraph 76
on pages 31-32, Musical Example 17 on page 32, and Track 10 of Audio
Exhibit 1 in the Ferrara report)

(d)     "No Problem" by Lil Scrappy (2004) (*see* paragraph 78 and Musical
Example 19 on page 33, and Track 12 of Audio Exhibit 1 in the Ferrara
report)

70.     In addition, the ostinatos in each of these four prior art songs embody
similarities to the ostinatos at issue as analyzed and transcribed on pages 31-33 in the
Ferrara report.

71.     Some sections of three additional prior art works not listed in the Ferrara
report also embody this combination of textural similarities.  The ostinatos in these three
prior art works are transcribed in Rebuttal Visual Exhibit C (in the key of A minor) and
attached as audio tracks on Rebuttal Audio Exhibit 1.  The track #, artist, song title, and
release date for each of these three prior art songs are listed below.

Track 2        "Get Ur Freak On" by Missy Elliot (2001)

Track 3        "21 Seconds" by So Solid Crew (2001)

Track 4        "Crank That (Soulja Boy)" by Soulja Boy (2007)

72.     Thus, a combination of Dr. Decker's purported textural similarities is found
in portions of the seven prior art works identified above.

## II. B.  DR. DECKER'S MISREPRESENTATIONS OF MUSIC ANALYSIS AND THE USE OF TRANSCRIPTIONS IN MUSICAL NOTATION

73.     In paragraph 4(c.i.) on page 3 of his rebuttal report Dr. Decker writes:
"…Ferrara's analytical approach comes solely from Western art music and is almost

23

EXHIBIT 10
PAGE 222

entirely based on analysis of pitches."  However, as demonstrated in the Ferrara report,
my methodology includes the analysis of structure, harmony, rhythm, melody (in which
"melody" includes the analysis of pitches, intervals, and melodic rhythm), timbre, and
other elements individually and in combination, within the contexts of the compositions
in their entirety and prior art.  The ostinatos Dr. Decker places in issue are melodies.
Contrary to accepted methodological practices in the analysis of melodies in popular
music, Dr. Decker fails to present any transcription in musical notation he has prepared
of any portion of "Joyful Noise" or "Dark Horse" in his initial report or in his rebuttal
report.

74.    Moreover, Dr. Decker's table on page 6 of his initial report is limited to the
***pitches*** in the ostinatos he places at issue.  His table on page 6 omits melodic rhythm.

Dr. Decker misrepresents the use of transcription into musical notation by scholars of
popular music

75.    Dr. Decker eschews the use of musical notation (*i.e.*, transcription of the
composition embodied in a sound recording into what is commonly called "sheet music"
in music copyright matters) in the analysis of popular music compositions.  In paragraph
14 on page 8 of his rebuttal report he writes:

> "Popular music is inscribed in sound. Any attempt to render popular
> music recordings as text—i.e. transcribing a record into musical
> notation (as Ferrara does throughout his report)—misses the
> fundamental quality of popular music and opens the door to rhetorical
> and inevitably interested representations of said recording."

76.    In addition, earlier in paragraph 8(c) on page 6 of his rebuttal report, Dr.
Decker writes:

> "The transcription of recordings into musical notation—which Ferrara uses
> throughout his report—is always an interested and rhetorical act designed
> to make an argument.  Musical scholars have agreed on this for decades
> (see below).  This is especially the case with the popular music styles at

24

EXHIBIT 10
PAGE 223

issue here, where the musical work is a sound recording and not a notated musical score to be realized in performance".

77.     Dr. Decker fails to provide any evidence of an "agreement" by music scholars that transcription into musical notation or "sheet music" of the musical compositions embodied in sound recordings is not used in music analysis.  In fact, as evidenced below, the transcription into musical notation of the musical compositions in sound recordings of popular music is widely used in published analyses of popular music by scholars and it is indispensible and widely used in the analysis of musical compositions at issue in music copyright cases.

78.     Contrary to Dr. Decker's opinion regarding the transcription into musical notation of the compositions embodied in a sound recording, the article by Mark J. Butler cited by Dr. Decker (at paragraph 4(cii.) on page 3 of the Decker rebuttal report) includes more than a dozen transcriptions into musical notation.

79.     This article by Mark J. Butler is largely directed to the analysis of *rhythmic* elements in Electronic Dance Music (EDM), but neither "Joyful Noise" nor "Dark Horse" are songs within the EDM genre.  At 4(ciii.) on page 3 of his rebuttal report, Dr. Decker attempt to extend the scope of Mark Butler's article as follows:  "What Butler says of electronic dance music and DJing applies equally to the hip hop and pop with rap repertoires at issue here.…".  However, Dr. Decker's attempted extension is conclusory and without foundation.  Dr. Decker fails to provide any support in the Butler article for an extension of Mark Butler's analysis in EDM to hip hop and pop with rap repertoires.

80.     In addition, Dr. Decker's citation from the Butler article suggests that the analysis of "pitch" in EDM (which does not include "Joyful Noise" or "Dark Horse") is overshadowed by the analysis of other elements.  Contrarily, a significant portion of Dr. Decker's initial report is focused on the analysis of *pitches.*

81.     The Butler article is attached as Rebuttal Visual Exhibit E beginning with the musical examples in the article (which are separately downloadable from *Music Theory Online*) followed by the full article.  The same *Music Theory Online* journal published numerous other articles that include analyses of popular music with *transcriptions in*

25

EXHIBIT 10
PAGE 224

*musical notation*, contrary to Dr. Decker's demonstrably wrong opinion regarding the use of transcriptions into musical notation in the scholarly analysis of popular music. Six other articles published by *Music Theory Online* are attached as Rebuttal Visual Exhibits F-K that include analysis of and *transcription into musical notation* of the compositions embodied in sound recordings of the band, Yes, as well as songs such as Dionne Warwick and The Spinners' "Then Came You", The Moody Blues' "Nights in White Satin", Led Zeppelin's "Dancing Days", The Beatles' "A Hard Day's Night", Kenny Rogers' "Love Will Turn You Around", Bob Seger's "Mainstreet", Diana Ross's "Touch Me in the Morning", Elvis Presley's "Hound Dog", the Rolling Stones' "Honky Tonk Women", Creedence Clearwater Revival's "Proud Mary", The Who's "Bargain", Billy Joel's "Just the Way You Are" and other songs.

82.   The seven articles listed above from the journal Dr. Decker cites, *Music Theory Online*, are representative of articles that analyze music in popular styles that include transcriptions into musical notation.

83.   Now moving to another article cited in the Decker rebuttal report, Dr. Decker either willfully or mistakenly misrepresents Albin Zak's article regarding rock music in paragraph 14(a) on page 8 of the Decker rebuttal report.  Dr. Decker cherry picks a citation from the article regarding Professor Zak's views on the transcription of rock music.  However, immediately *preceding* Dr. Decker's citation and contrary to Dr. Decker's position regarding the use of transcription, Albin Zak duly notes that "melody and rhythm" are "elements that our notation system [*i.e.*, transcription into musical notation] handles best".  [Albin Zak, "'Edition-ing' Rock", *American Music*, Spring 2005, pp. 95-96.] This cited portion from Albin Zak's article soundly undercuts Dr. Decker's baseless ban on the use of transcription into musical notation in the analysis of popular music and exposes the misrepresentation of this article in the Decker rebuttal report.

84.   Further contradicting Dr. Decker's position regarding transcription into musical notation, in the same article Albin Zak writes:

> "Musical and verbal notation, at least in the form of lead sheets [*i.e.*, the melody, chord symbols and lyrics], would be helpful in providing another

26

EXHIBIT 10
PAGE 225

point of access to certain aspects of the record's content—words, chords, and melody, that is the song…A score [*i.e.*, a transcription into musical notation] for a rock edition might include important riffs, solos, rhythmic groves, or other elements…."  [Zak, pp. 97-98.]

85.     Finally and further contradicting Dr. Decker's position on transcription and his misrepresentation of this article, Albin Zak provides a transcription of a melodic figure in John Hiatt's song, "Through Your Hands" on page 103 of his article. A copy of Albin Zak's entire article is attached as Rebuttal Visual Exhibit L.

86.     As a last example of misrepresentation of a cited article in his rebuttal report, Dr. Decker either willfully or mistakenly misrepresents an article regarding transcription in ethnomusicology[7] by Gabriel Solis.  Dr. Decker cites the following from the Gabriel Solis article:

"Already in 1964, it was clear…that transcription was by no means an objective undertaking, and that in fact transcriptions bear within them the result of a transcriber's analytical understanding." [paragraph 15(b), p. 9]

87.     However, Dr. Decker omits the sentence immediately preceding and the sentence immediately following his citation fully cited below which contradict Dr. Decker's unfounded opinion regarding notation and which exposes Dr. Decker's misrepresentation of the Solis article.

"Nevertheless, transcription was, **and is**, a common step in coming to a fixed text for analysis. Already in 1964, it was clear from a 'symposium on transcription and analysis' held at the society's annual meeting and published in *Ethnomusicology* that transcription was by no means an objective undertaking, and that in fact transcriptions bear within them the result of a transcriber's analytical understanding

---

[7]     In broad terms, ethnomusicology is "A subdivision of musicology concerned primarily with the comparative study of musics of the world, music as an aspect of culture, and the music of oral tradition." (*See* "ethnomusicology" in *The Harvard Dictionary of Music*, p. 298)

27

EXHIBIT 10
PAGE 226

(England et al.1964).  Moreover, inasmuch as musical transcription, like analysis, *is an important way of interacting with music*, we ought not to ignore *its crucial role in many ethnomusicological studies* as we celebrate the power of new technology to facilitate our studies."  [Gabriel Solis, "Thoughts on an Interdiscipline: Music Theory, Analysis, and Social Theory in Ethnomusicology", *Ethnomusicology*, Fall 2012, p. 543. Emphasis added]

88.     Gabriel Solis's entire article is attached as Rebuttal Visual Exhibit M. Moreover, Laura Risk's article in the same journal, *Ethnomusicology*, regarding a technique in North Atlantic fiddling traditions also includes transcriptions. Attached as Rebuttal Visual Exhibit N are the title page, first page of Laura Risk's article, and a page from the article (p. 448) that includes transcriptions.

89.     Dr. Decker alleges a "consensus-for decades" by music scholars of popular music against the transcription of recorded music into notation in paragraph 15(c) of his rebuttal report.  But in addition to the ten articles cited above, another twenty articles, book chapters, or book contradict Dr. Decker's absurd position regarding transcription of recorded music into musical notation as detailed immediately below.

90.     Two scholarly articles, Jocelyn R. Neal's article "Narrative Paradigms, Musical Signifiers, and Form as Function in Country Music" (Spring 2007, pp. 41-72) and Brett Clement's "A New Lydian Theory for Frank Zappa's Modal Music" (Spring 2014, pp. 146-166) include transcriptions into musical notation of popular music published in *Music Theory Spectrum*, the journal of the Society for Music Theory.

91.     Steve Larson's article, "Swing and Motive in Three Performances by Oscar Peterson" in the *Journal of Music Theory* (Fall 1999, pp. 283 – 314) includes numerous transcriptions into musical notation.

92.     In the book, *Expression in Pop-Rock Music: Critical and Analytical Essays* (Edited by Walter Everett, Routledge, 2008, Second Edition) *nine* out of thirteen scholars of popular music include transcriptions in their analyses of popular music.

28

EXHIBIT 10
PAGE 227

93.     In the book, *Understanding Rock: Essay in Musical Analysis* (Edited by John Covach & Graeme M. Boone, Oxford, 1997) ***all seven*** out of seven scholars of popular music include transcriptions of popular music.

94.     Walter Everett's book, *The Beatles as Musicians: Revolver through the Anthology* (Oxford, 1999) includes numerous transcriptions of music by The Beatles.

95.     In their use of written transcriptions in musical notation, the total of thirty scholarly articles, book chapters, and book cited above soundly contradict Dr. Decker's opinion regarding the use of transcription into musical notation by scholars of popular music.

## II. C.  DR. DECKER IS MISTAKEN REGARDING THE ANALYSIS OF THE DEVELOPMENT OF OSTINATO #1 INTO OSTINATO #2 IN DARK HORSE

96.     In paragraph 9(a.) and 9(b.) on pages 6 - 7 of his rebuttal report, Dr. Decker writes:

> *a.* "Crucial to Ferrara's entire argument is the notion that the musical ideas in 'Dark Horse' must be assessed and understood *in the order they are heard on the track.*
>
> b. On this basis, he argues that the aurally evident similarities between the eight-note ostinatos in 'Joyful Noise' and 'Dark Horse' are not there because the eight-note ostinato in 'Dark Horse' is derived completely and solely from the first notes heard  in 'Dark Horse' (his ostinato #1)."

97.     First, nowhere do I write in the Ferrara report that the trite and unremarkable similarities between the ostinato in "Joyful Noise" and ostinato #2 in "Dark Horse" "are not there" because ostinato #2 is derived from ostinato #1.  This is another example of willful or mistaken misrepresentation by Dr. Decker.  To be clear, regardless of whether ostinato #1 was created first, my conclusion remains the same: namely, that any similarities between "Joyful Noise" and "Dark Horse" are not suggestive of copying and any similarities are trite and unremarkable musical expression created before 2008.

29

EXHIBIT 10
PAGE 228

98.     Second, Dr. Decker concedes that my analysis "is derived from analytical scholarship" in paragraph 9 on page 6 of his report, although he says that "analytical scholarship" is "fundamentally unsuited to popular music".  Dr. Decker fails to provide any evidence that the analysis of the development of the melody in ostinato #2 in "Dark Horse" is "fundamentally unsuited to popular music".

99.     Third, the only element at issue in "Dark Horse" is ostinato #2.  Nowhere in the Ferrara report do I suggest that every section of "Dark Horse" was created in the order in which it occurs in the completed composition.

100.    Fourth, that ostinato #2 grows out of ostinato #1 in "Dark Horse" is empirically verifiable.  The first pitch "c" in ostinato #1 is iterated 4 times in ostinato #2, the second pitch in ostinato #1 "b" is iterated 2 times in ostinato #2, the third pitch "a" in ostinato #1 is iterated one time in ostinato #2 and fourth pitch "e" in ostinato #1 is iterated one time in ostinato #2 in that order as charted on page 18 of the Ferrara report and copied immediately below.

Ostinato #1 in "Dark Horse":     c          b      a    e
Ostinato #2 in "Dark Horse":     c  c  c    b  b    a    e

Clearly, ostinato #2, which appears after 14 iterations of ostinato #1, grows out of and expands ostinato #1 in "Dark Horse". (*See* paragraphs 31-34 on pages 12-14 and paragraphs 137-138 on pages 59-60 in the Ferrara report.)

101.    Fifth, Dr. Decker and I do not know whether or not the creators of "Dark Horse" created ostinato #1 before ostinato #2.  (It is my opinion that, regardless of the order of creation of the ostinatos in "Dark Horse", any similarities between "Dark Horse" and "Joyful Noise" are trite and unremarkable musical expression that were in use prior to 2008, and that there is no musicological support for a claim that the creators of "Dark Horse" copied any expression from "Joyful Noise".)  Instead of analyzing the musical composition embodied in the "Dark Horse" sound recording, Dr. Decker speculates on the creative process and what was in the minds of the writers in "Dark Horse" *specific to the creation of "Dark Horse"*. (For example, *see* pages 22-23 of the Decker rebuttal report.)  On the basis of speculation, he writes that ostinato 2 in "Dark Horse" must have

30

EXHIBIT 10
PAGE 229

been "created" before ostinato #1 (even though 14 iterations of ostinato #1 precede the first entrance of ostinato #2) and therefore ostinato #1 derives from ostinato #2 in "Dark Horse".

102.    The purpose of Dr. Decker's completely unsupported and speculative finding – that ostinato #1 derives from ostinato #2 – is obvious.  In his rebuttal report he concedes that the ostinato in "Joyful Noise" and ostinato #1 in "Dark Horse" are "plainly dissimilar" as follows:

> "Any reasonable listener would hear these two bits of musical material as plainly dissimilar…." [Decker rebuttal report, 12b. on p. 8]

Thus, if, as I find, (1) ostinato #2 in "Dark Horse" derives from ostinato #1 in "Dark Horse (which is supported by an analysis of the composition) and (2) ostinato #1 is "plainly dissimilar" to ostinato #2 in "Dark Horse" as found by Dr. Decker, (3) any similarity between ostinato #2 in "Dark Horse" and the ostinato in "Joyful Noise" is a result of coincidence, not copying.

103.    Dr. Decker presumes, *a priori*, that ostinato #2 in "Dark Horse" was copied from the ostinato in "Joyful Noise".  He merely speculates that ostinato #1 in "Dark Horse" was derived from ostinato #2 in "Dark Horse" to support his *a priori* assumption of copying.

104.    In paragraph 23(d.) on page 18 of his rebuttal report, Dr. Decker writes:

> "Ferrara's use of the labels #1 and #2 is an effort on his part to give rhetorical force to an unexamined assumption presented as fact."

First, the use of the labels #1 and #2 is appropriate because ostinato #1 is heard at the opening of "Dark Horse" and is iterated 14 times prior to the first iteration of ostinato #2. Dr. Decker concedes that ostinato #1 is heard in "Dark Horse's" Introduction (before the first iteration of ostinato #2) at line 7 on page 12 of his initial report.  Thus, it is perfectly logical and appropriate to label ostinato #1 in "Dark Horse" as "#1" because it occurs before and is iterated 14 times before the first iteration of ostinato #2.

31

EXHIBIT 10
PAGE 230

105.    Second, the only "effort…to give rhetorical force to an unexamined assumption presented as fact" is Dr. Decker's labeling of the second ostinato in "Dark Horse" as ostinato X and the first ostinato in "Dark Horse" as ostinato Y.  He concedes that ostinato Y occurs before ostinato X, and yet switches the alphabetical order "to give rhetorical force" to his misrepresentative labels.

106.    Third, contrary to Dr. Decker, labeling ostinato #1 and ostinato #2 in "Dark Horse" is not an "unexamined assumption presented as fact", it is a fact.  Ostinato #1 is heard 14 times before the first iteration of ostinato #2 in "Dark Horse" and therefore it is appropriate to "label" them in that order.

107.    Fourth, Dr. Decker merely speculates that ostinato #2 in "Dark Horse" was derived from ostinato #1 in "Dark Horse", even though ostinato #1 is iterated 14 times prior to the first iteration of ostinato #2 in "Dark Horse".  His speculation defies logic and accepted practices and principles of the analysis of melodies in "art" and popular music.

## II. D.  THE NOTES CREATED BY THE PORTAMENTOS IN THE OSTINATO IN "JOYFUL NOISE" ARE CORRECTLY NOTATED IN THE FERRARA REPORT

108.    On page 10 and elsewhere in his rebuttal report, Dr. Decker concedes the presence of the additional notes (beyond the ones he limits his analysis to) created by the portamentos in the ostinato in "Joyful Noise".  However, he opines (1) that hip hop and pop are not "notated musics" and (2) in the transcription of other music these portamento notes would be notated as "ornamental pitches" (sometimes called "grace notes") as cited immediately below.  (Ornamental or "grace notes" are notated as miniature or small type notes, not full sized notes, in sheet music.)

"c.    The pitches Ferrara notates as thirty-second notes (circled above) would, in the context of notated musics (which hip hop and pop are not), more likely be expressed as ornaments (conventional indications to add small notes according to the player's taste) or by way of a portamento sign (as Ferrara does in the above example to indicate

32

EXHIBIT 10
PAGE 231

sliding pitches and also in his Musical Example 16).

d.      The fundamental problem with Ferrara's transcription of the ostinato from 'Joyful Noise' is its realization of ornamental pitches as substantial elements of the ostinato's fundamental shape. This choice is by design, leading towards further visual arguments that distort the heard experience of these tracks." [The Decker rebuttal report, paragraph 16(c.) and 16(d.), p. 10]

109.    Contrary to Dr. Decker's opinion, notated "sheet music" of countless hip hop and pop songs is published.  For example, the sheet music of the hip hop/rap song "My Shot" from the Broadway show, *Hamilton*, is attached as Rebuttal Visual Exhibit O. The sheet music of the hip hop/rap song "Boom Boom Pow" by The Black Eyed Peas is attached as Rebuttal Visual Exhibit P.[8]  These are only two examples of countless sheet music transcriptions ("notated musics") of hip hop and popular music.

110.    Further and contrary to Dr. Decker's opinion, the notes at the beginning and end of portamentos in popular music are often notated as full notes.  For example, the beginning and ending notes of portamento slides (connected by a slanted line as in Musical Example 1 on page 11 of the Ferrara report) are full size notes in published sheet music (1) in "D'yer Maker" by Led Zeppelin attached as Rebuttal Visual Exhibit Q, (2) in the Coda (ending) section in "Back to December" by Taylor Swift attached as Rebuttal Visual Exhibit R, (3) in the Chorus in "Innocent" by Taylor Swift attached as Rebuttal Visual Exhibit S, (4) in the opening in "Private Investigations" by Dire Straits attached as Rebuttal Visual Exhibit T, (5) in the Introduction and Verse in "I'm Gonna Miss Her" by Brad Paisley attached as Rebuttal Visual Exhibit U, and (6) in the Introduction in "Whiskey Lullaby" by Brad Paisley attached as Rebuttal Visual Exhibit V. Indeed, the beginning and ending notes of portamento slides are full size notes in other

---

[8]      In the music copyright litigation, Batts v. Adams, plaintiff's musicologist and I (as defendants' musicologist) submitted transcriptions of the musical compositions embodied in The Black Eyed Peas' "Boom Boom Pow" sound recording.  [*See Batts v. Adams*, No. CV 10-8123-JFW (RZx), 2011 U.S. Dist. LEXIS 161402, at * 16-17, 17 n. 7 (C.D. Cal. 2011)]

33

EXHIBIT 10
PAGE 232

genres such as in the first page of the clarinet solo part in "Concerto For Clarinet" written by jazz great Artie Shaw attached as Rebuttal Visual Exhibit W, and the first two pages of the solo alto saxophone part in "Sequenza IXb" written by "new music" and experimental composer Luciano Berio, attached as Rebuttal Visual Exhibit X.  I have hand-written circles around portamentos in the attached sheet music of these eight compositions.

111.    These attached examples of musical notation undercut and debilitate Dr. Decker's opinion regarding the notation of portamentos in popular music let alone in music of other genres.

## II. E.  THE MASHUPS IN VIDEO EXAMPLES A AND B IN THE DECKER REBUTTAL REPORT ARE UNINFORMATIVE AND HIDE DIFFERENCES BETWEEN THE OSTINATOS

112.    In paragraphs 17-20 on pages 12-15 of his rebuttal report, Dr. Decker discusses two YouTube "mashups" of "Joyful Noise" and "Dark Horse" and attaches them as Video Examples A and B.  A "mashup" – such as in the YouTube Video Examples A and B attached to the Decker rebuttal report – is created by overlaying and digitally manipulating portions of two sound recordings, often combining the vocal track of one sound recording and (overlaying it on) the instrumental track of another sound recording.

113.    Notably, "mashups" hide differences in otherwise different compositions. For example, the YouTube mashup of Pink Floyd's "Another Brick in the Wall, Part 2" and The BeeGees' "Stayin' Alive" very successfully overlays Pink Floyd's vocals and guitar solo on the instrumental track of "Stayin' Alive" and at times, vocals from both songs at the same time over the instrumental track in "Stayin' Alive".  However, while these two songs are obviously very different, the mashup hides the differences, as in the case of Dr. Decker's Video Examples A and B.  The "Stayin' Alive" / "The Wall" YouTube mashup is attached as Track 5 on Rebuttal Audio Exhibit 1, the un-manipulated commercially released "Stayin' Alive" is attached as Track 6, and the un-

34

EXHIBIT 10
PAGE 233

manipulated commercially released "Another Brick in the Wall" is attached as Track 7. The YouTube link to the mashup is immediately below.

http://youbentmywookie.com/wtf/brilliant-pink-floyd-bee-gees-mashup-of-stayin-alive-in-the-wall-10277

114.    The Pink Floyd/BeeGees mashup demonstrates that mashups such as in Dr. Decker's Video Examples A and B are uninformative with respect to similarities and hide differences between two compositions.  These "mashups" are also a completely unreliable source of information because as Dr. Decker admits, they were created by *manipulating the tracks at issue* by third-party individuals of apparently unknown background and training.  Pointedly, Dr. Decker does not claim to personally know the creators of these "mashups," let alone to have supervised the creation of the "mashups".

115.    Throughout his discussion of "mashups," and elsewhere in the Decker rebuttal report, Dr. Decker attempts to bolster his conclusions regarding his claimed similarities between "Dark Horse" and "Joyful Noise" by invoking the purported responses of lay listeners to the recordings of both works.  Just like the initial Decker report, the Decker rebuttal report fails to provide any evidence that Dr. Decker has completed a proper survey of lay listeners regarding their perceptions of and reactions to any portion of "Dark Horse" or "Joyful Noise".

## II. F.  THE PHRASE LENGTHS OF THE OSTINATOS AT ISSUE ARE DIFFERENT

116.     In paragraph 54 on page 33 of his rebuttal report Dr. Decker concedes that 17 prior art works in the Ferrara report consist wholly of eighth notes.  Indeed, 31 of 32 notes in the first iteration ostinato #2 in "Dark Horse" consist wholly of eighth notes as transcribed in Musical Example 3 on page 13 of the Ferrara report.  However, in paragraph 54(b.) on page 33 of his rebuttal report Dr. Decker opines: "Not a single one of these [prior art ostinatos in the Ferrara report] employs an eight-note pattern on the phrase-length model shared by 'Joyful Noise' and the eight-note ostinato in 'Dark Horse'."  Contrarily, as demonstrated in the Ferrara report, the phrase length of the ostinato in "Joyful Noise" is two bars (*see* Musical Example 11 and paragraph 30 on

35

EXHIBIT 10
PAGE 234

pages 11-12 in the Ferrara report) while the phrase length of ostinato #2 in "Dark Horse" is (twice as long at) four bars (*see* Musical Example 3 and paragraph 32 on page 13 in the Ferrara report).  Dr. Decker does not question or rebut the accuracy of the transcriptions in Musical Examples 3, 6, and 7 which clearly demonstrate that the length of ostinato #2 and its two developments "Dark Horse" is four bars.  Thus, the premise of Dr. Decker's finding regarding phrase lengths and number of notes in the ostinatos at issue and prior art is flawed; the phrase lengths of the ostinato in "Joyful Noise" and ostinato #2 are different.

117.    Contrary to Dr. Decker's finding in paragraph 54(b.) on page 33 of his rebuttal report, as demonstrated in the Ferrara report eleven prior art ostinatos have the same phrase length as the ostinato in "Joyful Noise" (**2 bars**) and an additional eight ostinatos have the same phrase length as ostinato #2 in "Dark Horse" (**4 bars**) identified below.

**Two-ba**r phrase length prior art ostinatos like ostinato #2 in "Joyful Noise"

(a) "I'm Throwed" in Musical Example 17 on page 32 and Track 10 on Audio Exhibit 1 in the Ferrara report;

(b) "Back Down" in Musical Example 20 on page 33 and Track 13 on Audio Exhibit 1 in the Ferrara report (as noted in paragraph 79 on page 33, the ostinato in "Back Down" is two bars in length and thereby, two iterations of the two-bar ostinato in "Back Down" are transcribed in Musical Example 20);

(c) "My Dad's Gone Crazy" in Musical Example 21 on page 34 and Track 14 on Audio Exhibit 1 in the Ferrara report (as noted in paragraph 80 on page 34, the ostinato in "My Dad's Gone Crazy" is two bars in length and thereby, two iterations of the two-bar ostinato in "My Dad's Gone Crazy" are transcribed in Musical Example 21);

(d) "Gangsta's Paradise" in Musical Example 22 on page 34 and Track 15 on Audio Exhibit 1 in the Ferrara report;

(e) "Moments in Love" in Musical Example 23 on page 35 and Track 16 on Audio Exhibit 1 in the Ferrara report (as noted in paragraph 82 on page 35, the ostinato in "Moments in Love" is two bars in length and thereby, two iterations of the two-

36

EXHIBIT 10
PAGE 235

bar ostinato in "Moments in Love" are transcribed in Musical Example 23);

(f)   "Everybody (Backstreet's Back)" in Musical Example 28 on page 39 and Track 3 on Audio Exhibit 2 in the Ferrara report;

(g)   "Slam Dunk (Da Funk)" in Musical Example 29 on page 39 and Track 4 on Audio Exhibit 2 in the Ferrara report;

(h)   "I Want It That Way" in Musical Example 30 on page 40 and Track 5 on Audio Exhibit 2 in the Ferrara report;

(i)   "Bombastic Love" in Musical Example 31 on page 41 and Track 6 on Audio Exhibit 2 in the Ferrara report;

(j)   "Behind These Hazel Eyes" in Musical Example 32 on page 41 and Track 7 on Audio Exhibit 2 in the Ferrara report; and

(k)   "Doe Boy Fresh" in Musical Example 40 on page 46 and Track 15 on Audio Exhibit 2 in the Ferrara report.


   **Four-bar** phrase length prior art ostinatos like the ostinato in "Dark Horse"

(a)   "Go Head (Shawty Got a Ass on Her)" in Musical Example 16 on page 31 and Track 9 on Audio Exhibit 1 in the Ferrara report;

(b)   "Green Chimneys" in Musical Example 24 on page 36 and Track 17 on Audio Exhibit 1 in the Ferrara report;

(c)   "We've Got It Goin' On" in Musical Example 27 on page 38 and Track 2 on Audio Exhibit 2 in the Ferrara report;

(d)   "Since U Been Gone" in Musical Example 33 on page 42 and Track 8 on Audio Exhibit 2 in the Ferrara report;

(e)   "Cuz I Can" in Musical Example 36 on page 44 and Track 11 on Audio Exhibit 2;

(f)   "Feels Like Tonight" in Musical Example 37 on page 44 and Track 12 on Audio Exhibit 2 in the Ferrara report;

(g)   "Me No Want Miseria" in Musical Example 38 on page 45 and Track 13 on Audio Exhibit 2 in the Ferrara report; and

(h)   "Love Me or Hate Me" in Musical Example 39 on page 46 and Track 14 on Audio Exhibit 2.

37

EXHIBIT 10
PAGE 236

118.    In addition, the ostinato in the prior art work "3 Kings" consists of eight eighth notes (*see* Musical Example 15 on page 31 which presents four iterations of the eight-note ostinato and Track 8 on Audio Exhibit 1 in the Ferrara report).

<u>Dr. Decker incorrectly reduces the two-bar ostinato in "Joyful Noise" into a single bar of even notes</u>

119.    An underlying reason for Dr. Decker's flawed analysis of the phrase length in the prior art in the Ferrara report is that Dr. Decker incorrectly reduces the two-bar ostinato in "Joyful Noise" into a single bar of eight (8) even eighth notes (when the meter is based on the "backbeats". *See* paragraph 107 and footnote 21 on pages 48-49 of the Ferrara report.)  Using Dr. Decker's pitch content table on page 6 of his initial report and (only for argument's sake) his flawed analysis (which includes the omission of the notes created by the portamento slides), the ostinato in "Joyful Noise" consists of two bars of eight (8) eighth notes for a total of sixteen (16) notes.  By reducing the two-bar ostinato to one bar, he incorrectly finds that the ostinato in "Joyful Noise" consists of only eight (8) notes.  Thus, having missed the full **four-bar** 32-note ostinato #2 in "Dark Horse" and incorrectly analyzed it as consisting of only eight (8) notes, Dr. Decker mistakenly sought to present the ostinato in "Joyful Noise" as *also* consisting of only eight (8) notes which would result in a similarity that does not exist.

## II.  G.  DR. DECKER'S ANALYSIS IGNORES THE UNDERLYING COMPOSITION

120.    In paragraph 35 on page 24 of his rebuttal report, Dr. Decker conflates the sound recordings at issue with the underlying composition embodied therein.  He writes:

> "Furthermore, the audible similarity between Ferrara's ostinato #1 and the familiar sound of a synthesizer arpeggiator undercuts four of Ferrara's prior art  exhibits."

In Musical Examples 9-14 within paragraphs 65-72 on pages 26-30 of the Ferrara report, six prior art ostinatos are transcribed and analyzed that embody melodic expression that is far more similar to ostinato #1 in "Dark Horse" than any similarities between ostinato #1 in "Dark Horse" and the ostinato in "Joyful Noise".  Indeed, the

38

EXHIBIT 10
PAGE 237

ostinato in the first prior art work, "Brainchild" (1996), is identical to ostinato #1 in "Dark Horse". These six prior art works provide strong musicological evidence that undercuts a claim that similarities between "Joyful Noise" and "Dark Horse" are the result of copying and establish that any similarities between the ostinato in "Joyful Nose" and ostinato #1 in "Dark Horse" were widely available and in use prior to "Joyful Noise".

121. Ignoring this strong prior art evidence, Dr. Decker tries to undercut the significance of the similarities in the compositions in four of the six prior art ostinatos on the basis of the *possibility* that the ostinatos in "Joyful Noise" and "Dark Horse" were created by a commonly used feature on synthesizers, namely an "arpeggiator". [the Decker rebuttal report, paragraphs 34-35, pp. 24-25] First, Dr. Decker is ignoring the *composition* embodied in these four prior art works as transcribed in four musical examples. He does not rebut the accuracy of the notes in the transcriptions. Instead, he opines that insofar as these four ostinatos were not created using an arpeggiator and the ostinatos at issue in "Joyful Noise" and "Dark Horse" *may* have been created using an arpeggiator, the compositions that are identical or very similar in the prior art ostinatos should be disqualified.

122. Moreover, the similarity in sound quality (or timbre) in the ostinatos in "Joyful Noise" and "Dark Horse" is merely the result of the fact that, as Dr. Decker concedes in his initial report, the synthesizers on which the ostinatos are played in "Joyful Noise" and "Dark Horse" "…are in the same general family of electronic sounds heard in current popular music". [The initial Decker Report, p. 7, "v."] Thus, Dr. Decker would discount far greater similarities in the *composition* in prior art solely because they were not produced on "the same general family of electronic sound heard in current popular music" and/or the purported use of a common arpeggiator device.

39

EXHIBIT 10
PAGE 238

## II.  H.  DR. DECKER'S OPINIONS REGARDING OSTINATOS COUNTERVAIL DEFINITIONS OF OSTINATO HE CITES, LACK MUSICOLOGICAL SUPPORT, AND ARE SELF-CONTRADICTORY

Dr. Decker's opinions regarding ostinatos countervail definitions of ostinato he cites

123.   In many places in his rebuttal, Dr. Decker opines that prior art ostinatos in the Ferrara report are not ostinatos at all.  Contrarily, every prior art ostinato in the Ferrara report fits within the definition of ostinato in *The Harvard Dictionary of Music* (*see* the full definition included in Rebuttal Visual Exhibit A) and *The Oxford Companion to Music* (*see* the full definition in Rebuttal Visual Exhibit D), two definitions cited by Dr. Decker in his rebuttal report.

124.   An example of Dr. Decker's opinion countervailing cited definitions of ostinato is in paragraph 10(c.) on page 7 of his rebuttal report in which Dr. Decker opines:

> "Indeed, many of the prior art exhibits Ferrara offers as ostinatos comparable to those at issue in this case **are not**, in fact, **ostinatos at all but instead accompaniment patterns** typical of popular music." [emphasis added]

Continuing this opinion, later in his rebuttal report Dr. Decker also writes:

> "The majority of the items in [the Ferrara report's] Audio Exhibit 2—all composed by the makers of 'Dark Horse'—**are not ostinatos but rather accompaniment patterns** typical of popular music." [The Decker Rebuttal report, paragraph 62(e.), p. 43, emphasis added]

125.   First, whether or not the ostinatos in the prior art works in Audio Exhibit 2 of the Ferrara report are "typical of popular music" does not exclude them from being ostinatos.  Dr. Decker fails to provide any explanation as to what is or is not "typical of popular music", a category that includes countless songs. Moreover, he fails to provide any musicological evidence that if a purported "accompaniment pattern" is typical of popular music" it is disqualified from being an ostinato.

40

EXHIBIT 10
PAGE 239

126.    Second, *The Oxford Companion to Music* definition of "ostinato" includes: "In jazz it [ostinato] is used as an **accompanimental** figure…." [emphasis added]  Thus, contrary to Dr. Decker's opinion, repeating accompanimental figures or patterns fit within the definition of ostinato according to a definition cited by Dr. Decker. (The entire definition of "ostinato" in *The Oxford Companion to Music* is attached as Rebuttal Visual Exhibit D.)

Dr. Decker's opinions regarding ostinatos are self-contradictory

127.    In the two citations from the Decker rebuttal report above Dr. Decker finds that ostinatos that are "accompaniment patterns" are *not* ostinatos.  Dr. Decker seeks to disqualify the majority of ostinatos on Audio Exhibit 2 to the Ferrara report because they are "accompaniment patterns" ostinatos.  However, by way of self-contradiction, Dr. Decker opines:

> "The essence of the ostinatos at issue in 'Dark Horse' and 'Joyful Noise' is their function as primary **accompaniment material**…." [The Decker rebuttal report, paragraph 56e.(ii), p. 37, emphasis added]

Thus, by way of self-contradiction to the two earlier citations from his rebuttal report, Dr. Decker finds that the "essence of the ostinatos at issue in 'Dark Horse' and 'Joyful Noise' is their function as primary accompaniment material".

128.    By way of further self-contradiction, in his rebuttal report Dr. Decker writes that Audio Examples 2, 2, 2.3 and 2.6 (in the Ferrara report) are "not ostinatos" because they are *not* "an accompaniment ostinato".  [the Decker rebuttal report, paragraph 56(e.), p. 37]  Thus, while in the first two citations above Dr. Decker disqualifies many ostinatos in the Ferrara report because they *are* "accompaniment patterns", here Dr. Decker disqualifies three prior art ostinatos because they are *not* "an accompaniment ostinato".  For example, at 56(e.iii.) Dr. Decker opines that the ostinato in "We've Got It Goin' On" does not qualify as an ostinato because "This is not an accompaniment ostinato".  At 56(3.iv.) he rejects the prior art ostinato in "Everybody (Backstreets Back)", because it:

41

EXHIBIT 10
PAGE 240

"…is the track's signature chromatic descending bassline melody, featured again and again as a ***melodic riff***.  This is not an accompaniment ostinato." [emphasis added]

129.    First, the definitions of ostinato cited in the Decker rebuttal report do not state that an ostinato cannot be a "signature" element of a composition.

130.    Second, as to the prior art ostinato being a "melodic riff", Dr. Decker appears to be unaware of the opening sentence of the entry on "riff" in *The New Grove Dictionary of Music and Musicians*: "In jazz, blues and popular music, [a riff is] a short ***melodic ostinato*** which may be repeated either intact or varied to accommodate an underlying harmonic pattern." [Volume 21, p. 375, emphasis added]  Thus, according to *The New Grove Dictionary of Music and Musicians*, a "riff" *is* a melodic ostinato in jazz, blues and popular music.

131.    Third and returning to Dr. Decker's self-contradictory positions on whether "accompaniment ostinatos" are or are not ostinatos and regarding the three prior art ostinatos ("Bombastic Love" is the third prior art ostinato), within the same paragraph cited above, Dr. Decker opines:

> "None of the above three examples are, in fact, accompaniment ostinatos. And so, they fail to inform the issue at hand and should be dismissed as inconsequential." [Decker rebuttal report, At 56(3.vi.), p. 37]

132.    Thus, by way of self-contradiction Dr. Decker disqualifies ostinatos in prior art works in the Ferrara report because they *are* "accompaniment patterns**"** but he disqualifies other ostinatos in prior art works in the Ferrara report because they are *not* "an accompaniment ostinato".

133.    Further examples of Dr. Decker's demonstrably wrong opinions as to what is and what is not an ostinato follow.

134.    In his rebuttal report, Dr. Decker writes:

42

EXHIBIT 10
PAGE 241

"ii.      Audio Exhibits 2.5, 2.7, 2.8, 2.9, 2.10, 2.12, 2.13, and 2.15 are straightforward and consistent *arpeggiation patterns* used as *accompaniment* for pop melodies.

1.  Several of these are *idiomatic to the guitar*, which is the instrument heard on their respective  tracks.

2.  These patterns do not rise to the level of ostinatos.

3.  As noted further on in the definition of the word *ostinato* in the *Oxford Companion to Music,* 'ostinato is not merely repetitive, like the accompaniment to a Viennese waltz; it also has a structural or thematic function, or both'." [Decker rebuttal report, paragraph 62(e.ii.), p. 43, emphasis added]

135.    First, as noted above, by way of self-contradiction, earlier in his rebuttal report Dr. Decker finds that "The essence of the ostinatos at issue in 'Dark Horse' and 'Joyful Noise' is their function as primary **accompaniment material**...." and he disqualifies prior art ostinatos because they are *not* "accompaniment ostinatos". [paragraph 56e.(ii., iii., iv., and vi.), p. 37]  Here, he seeks to disqualify eight prior art ostinatos in the Ferrara report at least in part because they are used as "accompaniment for pop melodies".

136.    Second, Dr. Decker does not provide any musicological evidence that an **arpeggiated pattern** disqualifies it from being an ostinato.  There is certainly no such opinion in the two definitions of ostinato he cites in *The Harvard Dictionary of Music* or *The Oxford Companion to Music,* respectively attached in Rebuttal Visual Exhibits A and D.

137.    Third, Dr. Decker does not provide any musicological evidence that ostinatos that are "idiomatic to the guitar" disqualifies them from being an ostinato. (Indeed, Dr. Decker does not explain why these ostinatos are "idiomatic to the guitar" in the first place.)  Further, there is no such opinion in the two definitions of ostinato he

43

EXHIBIT 10
PAGE 242

cites in his rebuttal report from *The Harvard Dictionary of Music* or *The Oxford Companion to Music*.

138.    Fourth, Dr. Decker provides no comparative analysis or transcriptions of the accompaniment to a Viennese waltz and the prior art ostinatos at issue.  Hence, his statement is unsupported regarding the accompaniment to a Viennese waltz as purportedly compared with any of the prior art ostinatos in the Ferrara report.

Dr. Decker is wrong about the structural functions of the ostinatos at issue

139.    Dr. Decker's opinion that the structural functions of the ostinato in "Joyful Noise" and ostinato #2 in "Dark Horse" are "identically realized" is demonstrably wrong. On page 43 of this rebuttal report he writes:

"The ostinatos at issue in this case both have very strong and identically realized structural functions in their respective tracks. [paragraph 62(e.iii.), p. 43]

140.    In fact, the structural functions of the ostinato in "Joyful Noise" and ostinato #2 in "Dark Horse" are demonstrably different.  The ostinato in "Joyful Noise" essentially repeats throughout the song.  By way of difference, ostinato #2 in "Dark Horse" comes and goes, is **absent** in the prominent Introduction and three Chorus sections, is structurally present mostly during the Verse sections, and is developed in later iterations.

Dr. Decker's opinion regarding prior art ostinatos is premised on his incorrect reduction of the two-bar ostinato in "Joyful Noise"

141.    As noted above, an underlying reason for Dr. Decker's flawed analysis of the "phrase lengths" in the prior art ostinatos in the Ferrara report is that Dr. Decker incorrectly reduces the two-bar ostinato in "Joyful Noise" into a single bar.  Using Dr. Decker's pitch content table on page 6 of his initial report and his flawed analysis which includes the omission of the notes created by the portamento slides (only to illustrate

44

EXHIBIT 10
PAGE 243

this point), the ostinato in "Joyful Noise" would consists of two bars of eight (8) eighth
notes for a total of sixteen (16) notes.

142.    Accepting Dr. Decker's flawed analysis only for the sake of this point, the
error in the reduction of the two-bar, sixteen-note (based on Dr. Decker's omission of
the notes created in the portamentos) ostinato in "Joyful Noise" to a one-bar, eight-note
ostinato (based on Dr. Decker's flawed analysis) is extended to Dr. Decker's analysis of
prior art ostinatos in the Ferrara report.  For example, Dr. Decker extends his mistaken
reduction to the analysis of the ostinatos in "My Dad's Gone Crazy" and "Moments in
Love" as follows:

> "The ostinatos heard in Audio Exhibits 1.14 ('My Dad's Gone Crazy') and
> 1.16 ('Moments in Love') are 16-notes (2-bars) long, offering an
> entirely different deployment of eighth-note motion than the eight-
> note (1-bar) ostinatos at issue." [Decker rebuttal report, paragraph
> 54(d.iv.), p. 34]

143.    But as explained above and in the Ferrara report, the ostinato in "Joyful
Noise" is two bars in duration and the first iteration and subsequent transformations of
ostinato #2 in "Dark Horse" are each four bars in duration.  Thus, Dr. Decker's premise,
that the ostinato in "Joyful Noise" and ostinato #2 in "Dark Horse" are the same duration
is wrong.  Further, the ostinatos in these two prior art works cited above, like the
ostinato in "Joyful Noise", are two bars in duration.

144.    In Track 8 on Rebuttal Audio Exhibit 1, I placed approximately the first 10
seconds of the prior art work "Moments in Love" back-to-back with approximately the
first 10 seconds of "Joyful Noise".  This back-to-back play occurs two times on Track 8.
The similarity is obvious in this back-to-back track and by comparing the transcriptions
of these two ostinatos respectively in Musical Example 1 on page 11 and Musical
Example 23 on page 35 in the Ferrara report.

45

EXHIBIT 10
PAGE 244

<u>Dr. Decker's analysis of the ostinato in "Gangsta's Paradise" lacks musicological support</u>

145.    There are other examples of Dr. Decker's flawed analysis of the prior art ostinatos in the Ferrara report.  For example, in his rebuttal report, Dr. Decker writes:

> "To summarize, the 'Gangsta's Paradise' ostinato cannot be said to have a downward melodic contour." [Decker rebuttal report, paragraph 63(c.), p. 44]

146.    Contrarily, the *overall* melodic contour in the ostinato in "Gangsta's Paradise" is downward.  As transcribed in Musical Example 22 on page 34 of the Ferrara report, the ostinato begins on a repeating "a" pitch and *descends* to a repeating "g-sharp" pitch. A return *upward* to a single iteration of the opening "a" pitch *descends* again by the interval of a perfect 4th to the final "e" pitch.  On that basis the *overall* melodic contour of the ostinato in "Gangsta's Paradise" is demonstrably downward.

147.    Similarly, the downward descending first bar in the ostinato in "Joyful Noise" includes an *upward* return to the opening pitch from the last note in bar 1 to the first note in bar 2 of the two-bar ostinato.  Even with this *upward* return to the opening pitch, the *overall* melodic contour of the ostinato in "Joyful Noise" is downward.

148.   In summary, as demonstrated above, Dr. Decker's opinions regarding the prior art ostinatos in the Ferrara report countervail definitions of ostinato he cites, lack musicological support, and are self-contradictory.

### III.    CONCLUSIONS

149.    On the basis of my musicological analysis and review of the Decker rebuttal report, it continues to be my opinion that "Dark Horse" does not share any significant structural, harmonic, rhythmic, melodic, or lyrical similarities, individually or in combination, with "Joyful Noise".  My analysis finds no musicological support for a claim that the creators of "Dark Horse" copied any expression from "Joyful Noise".  I found that any similarities between "Dark Horse" and "Joyful Noise" are trite and unremarkable

46

EXHIBIT 10
PAGE 245

musical expression that were in use prior to 2008.  In addition, the substantial differences between "Dark Horse" and "Joyful Noise" far exceed the insignificant similarity between them.  Moreover, songs written or co-written by writers of "Dark Horse" and released prior to "Joyful Noise" provide very strong musicological evidence that undercuts a claim that similarities between "Dark Horse" and "Joyful Noise" are the result of copying, and support a finding that the creation of "Dark Horse" was independent of "Joyful Noise".

150.   I continue to find that in their entirety, "Joyful Noise" and "Dark Horse" are very different compositions as analyzed above because:

- The overall structures are different;
- The chord progressions are different;
- The harmonic rhythm is different;
- The rhythms to which lyrics are set in the rap verses are different;
- The melodies in the sung vocal parts are different;
- The melodies and rhythms in the instrumental parts (such as the drums) are different;
- The pitch sequences in the ostinatos are different;
- The intervals between the pitches in the ostinatos are different;
- The range from the highest pitch to the lowest pitch in the ostinatos is different;
- The melodic rhythms in the ostinatos are different;
- The lengths of the ostinatos are different; and
- The overall lyrics are different.

151.  I continue to find that the use of the centuries-old and exceedingly common ostinato idea does not suggest that any elements in "Dark Horse" were copied from "Joyful Noise".  In fact, the idea of the ostinato in "Joyful Noise" and the idea of the two ostinatos in "Dark Horse" are expressed differently as analyzed above.  The similarity between them is not significant and many similarities Dr. Decker claims do not exist in "Joyful Noise".

47

EXHIBIT 10
PAGE 246

152.   I continue to find that the initial Decker report fails because of:

- The absence of any transcriptions into musical notation by Dr. Decker of any of the expression that he placed in issue;
- The failure to analyze the entire first iteration of ostinato #2 in "Dark Horse" which caused mistakes in Dr. Decker's analysis;
- The failure to acknowledge, let alone analyze, the development of ostinato #2 in subsequent portions of "Dark Horse" which caused mistakes in Dr. Decker's analysis;
- The presentation of a table on page 6 of the initial Decker report that does not accurately present the pitches at issue;
- A flawed overall methodology that results in the omission of significant differences in the harmony, rhythm, and melody in "Dark Horse" and "Joyful Noise";
- The failure to consider, let alone analyze, any prior art which, as demonstrated above, establishes that similarities between "Dark Horse" and "Joyful Noise" were already in use and embodied in (1) many songs released prior to "Joyful Noise" and (2) many additional songs co-written by co-writers of "Dark Horse";
- The failure to filter out the elements that were in common use prior to "Joyful Noise"; and
- The research and analysis in the Ferrara report that demonstrate that even the purported similarities that Dr. Decker claims to exist are trite and unremarkable.

153.   Further, even if, for the sake of argument, one accepts Dr. Decker's flawed analysis of the ostinatos at issue in his rebuttal report, the similarity he finds is minimal, trite and unremarkable.  Moreover, the Decker rebuttal report fails because of:

48

EXHIBIT 10
PAGE 247

(a)    The continued absence of any transcriptions into musical notation by Dr. Decker of any of the expression he placed in issue;

(b)    The continued failure to analyze the entire first iteration of ostinato #2 in "Dark Horse" which caused mistakes in Dr. Decker's analysis;

(c)    The continued failure to acknowledge, let alone analyze, the development of ostinato #2 which caused mistakes in Dr. Decker's analysis;

(d)    A flawed analysis of the melody (*i.e.*, the pitch content plus their rhythmic durations) and "timbre" in the ostinatos at issue;

(e)    A flawed analysis and presentation of purported similarities in "texture" that do not exist in "Joyful Noise";

(f)    A flawed analysis of similarities between prior art presented in the Ferrara reort and ostinatos in "Joyful Noise" and "Dark Horse";

(g)    Its misrepresentation of scholarly writing on the analysis of melodies and the use of transcription into musical notation in the analysis of popular music;

(h)    The continued failure to filter out the elements that Dr. Decker places in issue that were in common use prior to "Joyful Noise"; and

(i)    Its dislocation from music expert analysis in music copyright matters.

154.   In summary, on the basis of my analyses presented in the Ferrara report and my review of the initial Decker report and the Decker rebuttal report I find no musicological support for a claim that the creators of "Dark Horse" copied any

49

EXHIBIT 10
PAGE 248

expression from "Joyful Noise".  Rather, there is very strong musicological support for the finding in the Ferrara report that the creation of "Dark Horse" was independent of "Joyful Noise".

Respectfully submitted,

July 31, 2017                                    By:   Lawrence Ferrara, Ph.D.




_____

50

EXHIBIT 10
PAGE 249