# EXHIBIT 12

EXHIBIT 12
PAGE 582

# Audio Exhibits to Ferrara Rebuttal Report

# (Submitted on CD lodged with the Court)

EXHIBIT 12
PAGE 583

# EXHIBIT 13

EXHIBIT 13
PAGE 584

FILED
CLERK, U.S. DISTRICT COURT

November 1, 2016

CENTRAL DISTRICT OF CALIFORNIA
BY: __CMJ_____ DEPUTY

Michael A. Kahn (pro hac vice)
Kahn@capessokol.com
Drey A. Cooley (pro hac vice)
Cooley@capessokol.com
CAPES SOKOL
7701 Forsyth Blvd., 12th Floor
St. Louis, MO 63105
(314) 721-7701

Eric F. Kayira (pro hac vice)
eric.kayira@kayiralaw.com
KAYIRA LAW, LLC
200 S. Hanley Road, Suite 208
Clayton, Missouri 63105
(314) 899-9381

Carole E. Handler (129381)
chandler@eisnerlaw.com
Kathleen Cerniglia (268019)
kcerniglia@eisnerlaw.com
EISNER JAFFE, A PROFESSIONAL CORPORATION
9601 Wilshire Boulevard, Suite 700
Beverly Hills, California 90210
Tel: (310) 855-3200

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCUS GRAY (p/k/a FLAME); EMANUEL LAMBERT; and CHIKE OJUKWU, <br><br> Plaintiffs, <br><br> v. <br><br> KATHERYN ELIZABETH HUDSON (p/k/a KATY PERRY); JORDAN HOUSTON (p/k/a JUICY J); LUKASZ GOTTWALD (p/k/a DR. LUKE); SARAH THERESA HUDSON; KARL MARTIN SANDBERG (p/k/a MAX MARTIN; HENRY RUSSELL WALTER (p/k/a CIRKUT); KASZ MONEY, INC.; CAPITOL RECORDS, LLC; KITTY PURRY, INC., UMG RECORDINGS, INC.; UNIVERSAL MUSIC GROUP, INC.; WB MUSIC CORP; BMG | No. 2:15-cv-05642-CAS-JC <br><br> DEMAND FOR JURY TRIAL <br><br><br><br> **THIRD AMENDED COMPLAINT** <br><br> **FOR COPYRIGHT INFRINGEMENT** |

EXHIBIT 13
PAGE 585

RIGHTS MANAGEMENT (US)
LLC; and KOBALT MUSIC
PUBLISHING AMERICA, INC.,

Defendants.

## **Introduction**

1.      This is an action for injunctive and other relief under the Copyright Act of 1976, as amended, 17 U.S.C. § 101 *et seq.*(the "Copyright Act"), arising out of Defendants' ongoing infringement of Plaintiffs' copyright in their Christian gospel hip hop song entitled *Joyful Noise*. The Court has subject matter jurisdiction under 17 U.S.C. § 501 and 28 U.S.C. §§ 1331 and 1338(a).

2.      By any measure, Defendants' song *Dark Horse* is a mega-hit. Defendant Katy Perry has performed the song on national television, including the Super Bowl XLIX Halftime Show on February 1, 2015, and at sold-out concerts around the nation. *Dark Horse* is one of the bestselling singles of all time, as is the album *Prism* on which it is featured. The music video for *Dark Horse* has now been viewed more than 1.5 **billion** times.

3.      By any measure, the *Dark Horse* song also constitutes an infringement of Plaintiffs' copyright in their Christian gospel song Joyful Noise, released five years before *Dark Horse*. Specifically, Defendants' unauthorized reproduction, distribution, and public performance of Plaintiffs' musical composition constitute infringement of plaintiffs' exclusive rights in their copyright.

2

THIRD AMENDED COMPLAINT

EXHIBIT 13
PAGE 586

4.      And by any measure, the devoutly religious message of Joyful Noise has been irreparably tarnished by its association with the witchcraft, paganism, black magic, and Illuminati imagery evoked by the same music in *Dark Horse*.

**The Plaintiffs**

5.      Plaintiff Marcus Gray is an American Christian hip hop musician and a citizen of Missouri.

6.      Plaintiff Chike Ojukwu is an American Christian hip hop musician and record producer and a citizen of Missouri.

7.      Plaintiff Emanuel Lambert is an American Christian hip hop musician and record producer and a citizen of Pennsylvania.

**The Defendants**

8.      Defendant Katheryn Elizabeth Hudson is a professional singer and songwriter professionally known as Katy Perry ("Katy Perry"). She is a citizen of California and resides within this District.

9.      Defendant WB Music Corp. ("WB Music") is a Delaware corporation that maintains a business office within this District at 10585 Santa Monica Blvd., Los Angeles, California 90025. On information and belief, WB Music is a music licensing company that administers, licenses, and profits from the music rights of "When I'm Rich Your Be My Bitch," a fictitious entity, alias, or d/b/a that is the assignee of Defendant Perry's copyright interest in *Dark Horse*.

3

THIRD AMENDED COMPLAINT

EXHIBIT 13
PAGE 587

10.     Upon information and belief, Defendant Jordan Michael Houston (professionally known as Juicy J) is a citizen of Tennessee and maintains a residence within this District.

11.     Defendant BMG Rights Management (US) LLC ("BMG") is a Delaware limited liability company that maintains a business office within this District at 6100 Wilshire Boulevard, Suite #1600, Los Angeles, California 90048. On information and belief, BMG is a music licensing company that administers, licenses, and profits from the music rights of an entity, alias, or d/b/a known DeeEtta Music, which is the assignee of Defendant Houston's copyright interest in *Dark Horse*.

12.     Upon information and belief, Defendant Lukasz Gottwald (professionally known as Dr. Luke) is a citizen of California and resides within this District.

13.     Upon information and belief, Defendant Karl Martin Sandberg (professionally known as Max Martin) is a citizen of Sweden. A material portion of his work in connection with the creation and recording of the *Dark Horse* song was performed in this District.

14.     Upon information and belief, Defendant Henry Russell Walter (professionally known as Cirkut) is a citizen of Canada who resides in California within this District.

4

15.     Defendant Sarah Theresa Hudson is a citizen of California and resides within this District.

16.     Defendant Kobalt Music Publishing America, Inc. ("Kobalt") is a Delaware corporation that maintains an office within this District at 8201 Beverly Blvd., 4th Floor, Suite 400, Los Angeles, CA 90048. Upon information and belief, Kobalt Songs Music Publishing is a division within or a d/b/a of Kobalt.

17.     Upon information and belief, Kobalt is a music licensing company that administers, licenses, and profits from the music rights of the following four entities, aliases, or d/b/as that are the assignees of the copyright interests of Defendants Gottwald, Sandburg, Walter, and Sarah Hudson in the *Dark Horse* song: Kasz Money Publishing, MXM Music AB, Oneirology Publishing, and Prescription Songs.

18.     Defendant UMG Recordings, Inc. ("UMG") is a Delaware corporation with a principal place of business within this District at 2220 Colorado Avenue, Santa Monica, California 90404. Upon information and belief, UMG, through its Universal Music Enterprises division, handles the licensing and exploitation of the recording of *Dark Horse* and receives profits from that licensing and exploitation.

19.     Defendant Universal Music Group, Inc. ("Universal") is a Delaware corporation with a principal place of business within this District at 2220 Colorado Avenue, Santa Monica, California 90404. Universal describes itself on its website, universalmusic.com, as follows:

5

THIRD AMENDED COMPLAINT

EXHIBIT 13
PAGE 589

> We are the world's leading music company. * * * We own and operate a broad array of businesses engaged in recorded music, music publishing, merchandising, and audiovisual content in more than 60 countries. We identify and develop recording artists and songwriters, and we produce, distribute and promote the most critically acclaimed and commercially successful music to delight and entertain fans around the world.

Upon information and belief, proceeds from the exploitation of the recording of *Dark Horse* are paid to Universal, and not Capitol Records.

20. Defendant Capitol Records, LLC ("Capitol") is a Delaware limited liability with a place of business within this District. Capitol is the record label that released and promotes the *Prism* album and the *Dark Horse* song.

21. Defendant Kitty Purry, Inc. ("Kitty Purry") is a California corporation with a principal place of business at 15260 Ventura Blvd, Suite 2100, Sherman Oaks, California 91403. Upon information and belief, Kitty Purry is owned and/or controlled by Defendant Perry. Among other things, Kitty Purry enters into contracts with various concert venues, the National Football League, and other entities concerning public performances of the *Dark Horse* song by Defendant Perry.

22. Defendant Kasz Money, Inc. is a New York corporation that conducts business within this District, including with respect to the *Dark Horse* song, on a regular and ongoing basis. On information and belief, Kasz Money was the

6

THIRD AMENDED COMPLAINT

EXHIBIT 13
PAGE 590

producer of the *Dark Horse* song and earns royalties from its commercial exploitation.

## Jurisdiction and Venue

23.     The Court has subject matter jurisdiction under Section 501 of the Copyright Act, 17 U.S.C. § 501, and 28 U.S.C. §§ 1331 and 1338(a).

24.     This Court has personal jurisdiction over defendants because all of them are either California citizens, maintain a residence or place of business in California, do business within California on a regular and ongoing basis, or resided in California during a material portion of the creation of the *Dark Horse* song.

25.     Venue is proper in this district under 28 U.S.C. §§ 1391(b), (c) and 1400(a).

## Plaintiffs' Song: "Joyful Noise"

26.     Plaintiffs are the authors and creators of an original musical composition embodied in the sound recording entitled Joyful Noise.

27.     Plaintiffs created Joyful Noise in 2007 and published it in March of 2008.

28.     On June 3, 2014, the United States Copyright Office issued the Certificate of Registration No. PA-1-900-321 for the copyright in Joyful Noise (the "Copyright").

29.     Plaintiffs have been at all relevant times three of the four owners of the Copyright.

7

THIRD AMENDED COMPLAINT

EXHIBIT 13
PAGE 591

30.     After receipt of the Certificate of Registration, LeCrae Moore—the original fourth owner of the Copyright—transferred and assigned all of his ownership interest in the Copyright (including any claims in this action) to the other three original Plaintiffs. Thus, the three current Plaintiffs are the sole owners of all right, title, and interest in the Copyright.

31.     Pursuant to Section 106 of the Copyright Act, 17 U.S.C. § 106, Plaintiffs, as owners of the Copyright in Joyful Noise, are the owners of the exclusive rights to reproduce that song, to distribute copies of that song, to prepare derivative works based upon that song, and to publicly perform that song.

32.      The Joyful Noise song appears on the album entitled *Our World: Redeemed*, which was released in 2008.

33.     The album *Our World: Redeemed* received a Grammy Award nomination for Best Rock or Rap Gospel Album and a Stellar Award nomination for Rap Album of the Year in 2008.

34.     The song Joyful Noise received a 2008 Gospel Music Association Dove Award nomination for the Best Rap/Hip Hop Recorded Song of the Year.

35.     Over 6 million viewers have watched music video versions of Joyful Noise on YouTube.

**Defendants' Song: *Dark Horse***

36.     In September of 2013, Capitol Records released the *Dark Horse* song as the first promotional single from Defendant Perry's studio album, entitled *Prism*.

8

EXHIBIT 13
PAGE 592

THIRD AMENDED COMPLAINT

37.     On information and belief, based in part on U.S. Copyright Registration No. PA0001871672, the six individual Defendants in this action claim to be authors of music composition of *Dark Horse*.

38.     The individual Defendants had access to Joyful Noise prior to their creation of *Dark Horse*.

39.     According to the Copyright Office records, each of the six individual Defendants has transferred his or her copyright ownership interest in the composition of *Dark Horse* to the alias or entity identified above. For example, the Copyright Office records show that Defendant Katy Perry has transferred her copyright interest to a something known as "When I'm Rich You'll Be My Bitch" with an address the same as Defendant WB Music.

40.     On or about October 5, 2013, *Dark Horse* debuted at Number 17 on the Billboard Hot 100 chart.

41.     In October of 2013, Capitol Records released the album *Prism*, and two months later Capital released *Dark Horse* as the album's third official single.

42.     By January of 2014, *Dark Horse* had reached Number 1 on the Billboard Hot Digital Songs chart and the Billboard Hot 100 chart, where it remained for weeks.

9

THIRD AMENDED COMPLAINT

EXHIBIT 13
PAGE 593

### <u>Defendants' Infringement of Plaintiffs' Copyright</u>

43.     Defendants never sought or obtained permission from Plaintiffs to use the Joyful Noise song in creating, reproducing, recording, licensing, distributing, selling, broadcasting, or publicly performing *Dark Horse*.

44.     Plaintiffs never gave any of the Defendants permission, consent, or a license to use Joyful Noise for any purpose, including creation of any derivative work based on Joyful Noise.

45.     As alleged above, Defendants have licensed, copied, sold, performed, broadcast, and otherwise commercially exploited and profited from *Dark Horse* in numerous ways, included but not limited to the following:

    a.     Selling the compact disc-release of *Prism* to the public on numerous websites and through retail stores throughout the nation;

    b.     Duplicating and uploading the digital version of *Dark Horse* to, among other sites, iTunes, Amazon, Google Play, and eMusic for purchase by consumers;

    c.     Licensing the composition and/or publishing rights to others for their exploitation.

46.     In addition, Defendants Perry and Houston publicly performed *Dark Horse* in 2014 at the nationally televised 56th Annual Grammy Awards®, and Defendant Perry has performed *Dark Horse* at various concerts and music festivals to hundreds of thousands of spectators throughout the nation.

10

THIRD AMENDED COMPLAINT

EXHIBIT 13
PAGE 594

47.     In addition, on information and belief, Universal and Capitol Records prepared the music video of *Dark Horse* and, in conjunction with Vevo LLC and one or more of the other defendants, arranged for its commercial syndication and publication on YouTube, Vevo.com, and other commercial sites, which have been viewed by members of the public more than 1.5 billion times, thus generating additional profits for all Defendants.

48.     Defendants' actions, as alleged above, constitute infringement of Plaintiffs' Copyright. Among other things, Defendants' actions violate Plaintiffs' exclusive rights in Joyful Noise under Section 106 of the Copyright Act, 17 U.S.C. § 106.

49.     These Defendants have already infringed Plaintiffs' Copyright and caused damage and irreparable harm through their unauthorized copying, distribution, and public performance of Defendants' Song.

50.     So, too, Defendants unlawful actions have caused irreparable harm to Plaintiffs' reputation and the reputation of the Joyful Noise song within the Christian gospel music community by, among other things, creating a false association between the music of Joyful Noise and the anti-Christian imagery evoked by Defendants' Song, especially in the music video version.

51.     Prior to filing this lawsuit in July of 2014, Plaintiffs gave written notice of the infringement to Defendants or their representatives.

11

THIRD AMENDED COMPLAINT

EXHIBIT 13
PAGE 595

52.     Defendants continued to infringe the Copyright in Joyful Noise after receipt of such written notice of infringement, after the registration of the Copyright, and after the commencement of this lawsuit. For example, on Sunday, February 1, 2015—nearly seven months *after* the filing of this lawsuit and nearly eight months *after* the registration of the copyright in Joyful Noise—Defendant Perry was the headline performer at the Super Bowl XLIX Halftime Show. Beginning at approximately the two-minute mark of the 12½-minute show, Ms. Perry performed the *Dark Horse* song. According to the Nielson ratings, the U.S. television viewing audience for Ms. Perry's performance was 118.5 million viewers, which is the highest number of viewers in the history of Super Bowl Halftime shows.

53.     Defendants' ongoing infringement of the Copyright in Joyful Noise constitutes willful infringement.

54.     If not enjoined, Defendants will continue to cause Plaintiffs irreparable harm.

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and against Defendants as follows:

A.     A permanent injunction enjoining and restraining Defendants, their agents, servants, employees, attorneys, partners, licensees, divisions, affiliates, parent corporation(s), and all others in active concert or participation with any of

12

THIRD AMENDED COMPLAINT

EXHIBIT 13
PAGE 596

them from copying, distributing, publicly displaying, or otherwise making any use of the Joyful Noise or Defendants' Song;

B.    An award of monetary damages sufficient to compensate Plaintiffs for the injuries suffered as a result of Defendants' wrongful conduct;

C.    An award of Defendants' profits and unjust enrichment realized from their infringement and other wrongful conduct;

D.    An award to Plaintiffs of interest, costs and reasonable attorney's fees expended in this action; and

E.    An award of such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff respectfully requests a jury trial.

/s/Michael A. Kahn
Michael A. Kahn (pro hac vice)
kahn@capessokol.com
Drey A. Cooley (pro hac vice)
cooley@capessokol.com
CAPES SOKOL GOODMAN & SARACHAN PC
7701 Forsyth Blvd., 12th Floor
St. Louis, Missouri 63105
Tel:  (314) 721-7701

Eric F. Kayira (pro hac vice)
eric.kayira@kayiralaw.com
KAYIRA LAW, LLC
200 S. Hanley Road, Suite 208
Clayton, Missouri 63105
(314) 899-9381

13

THIRD AMENDED COMPLAINT

EXHIBIT 13
PAGE 597

1

2                              Carole E. Handler (129381)

3                              chandler@eisnerlaw.com
                                Kathleen Cerniglia (268019)

4                              kcerniglia@eisnerlaw.com

5                              EISNER JAFFE, A PROFESSIONAL
                              CORPORATION

6                              9601 Wilshire Boulevard, Suite 700
                              Beverly Hills, California 90210

7                              Tel: (310) 855-3200

8

9                              Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

EXHIBIT 13
PAGE 598

THIRD AMENDED COMPLAINT

# EXHIBIT 14

EXHIBIT 14
PAGE 599

Michael A. Kahn (pro hac vice)
Kahn@capessokol.com
Drey A. Cooley (pro hac vice)
Cooley@capessokol.com
CAPES SOKOL GOODMAN SARACHAN PC
7701 Forsyth Blvd., 12th Floor
St. Louis, MO 63105
(314) 721-7701

Eric F. Kayira (pro hac vice)
eric.kayira@kayiralaw.com
KAYIRA LAW, LLC
200 S. Hanley Road, Suite 208
Clayton, Missouri 63105
(314) 899-9381

Carole E. Handler (129381)
chandler@eisnerlaw.com
Kathleen Cerniglia (268019)
kcerniglia@eisnerlaw.com
EISNER JAFFE, A PROFESSIONAL CORPORATION
9601 Wilshire Boulevard, Suite 700
Beverly Hills, California 90210
Tel: (310) 855-3200

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCUS GRAY (p/k/a FLAME); EMANUEL LAMBERT; and CHIKE OJUKWU, <br><br> Plaintiffs, <br><br> v. <br><br> KATHERYN ELIZABETH HUDSON (p/k/a KATY PERRY); JORDAN HOUSTON (p/k/a JUICY J); LUKASZ GOTTWALD (p/k/a DR. LUKE); SARAH THERESA HUDSON; KARL MARTIN SANDBERG (p/k/a MAX MARTIN; HENRY RUSSELL WALTER (p/k/a CIRKUT); CAPITOL RECORDS, LLC; KITTY PURRY, INC. <br><br> Defendants. | No. 2:15-cv-05642-CAS-JC <br><br><br> **PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO EXTEND DEADLINE FOR AMENDING PLEADINGS AND ADDING PARTIES** <br><br><br><br> **Judge: Hon. Christina A. Snyder** <br> **Hearing Date: September 12, 2016** <br> **Time: 10:00 a.m.** |

EXHIBIT 14
PAGE 600

### A. Defendants' ongoing efforts to prevent Plaintiffs from confirming through discovery the need to add additional parties.

One document.

That is the sum total of the eight Defendants' combined production in response to Plaintiffs' requests for production, which were served over four months ago and, along with interrogatories served that same day, included requests for information about the ownership of the various rights in the Dark Horse song.

Plaintiffs served their written discovery on Defendants on April 21, 2016, less than one month after the issuance of the Scheduling Order in this matter and over three months prior to the July 31, 2016 deadline to amend pleadings and add parties. As of that July 31 deadline, Defendants had produced no documents and objected to and/or not yet provided responsive information concerning licensing and revenue payments to or from third-parties related to the exploitation of the subject song, Dark Horse.[1] The one and only document they did produce was after the July 31 deadline had passed.

Thus it is no exaggeration to describe Defendants' Opposition as without merit. Back in 2014 and 2015, when the case was in St. Louis, Defendants vigorously objected to Plaintiffs' attempts at discovery and to add parties as "premature" (Docs. 66-67, 77). Now, however, they contend that Plaintiffs were not

---

[1] In fact, nonparties aside, Defendants still have yet to provide Plaintiffs with any information concerning how much revenue *they* have received from Dark Horse, though they have promised the same is forthcoming.

EXHIBIT 14
PAGE 601

"diligent" in the very investigation Defendants blocked (Dkt. 151, pp. 7-8). Plaintiffs' inability to amend their pleadings or add parties prior to July 31, 2016 in this matter is a direct result of Defendants' concerted efforts to avoid providing the information Plaintiffs have sought concerning other potential parties.

As this Court probably knows from prior copyright infringement lawsuits, songwriters often do not directly receive checks from, for example, BMI, Apple iTunes, or Amazon for their publishing rights. Instead, other entities (often entities created by the songwriters themselves or their publishing companies) license the song and receive that revenue. Those that license and/or knowingly profit from the infringing work and those that own or, at one time, owned interests in the infringing work are possible defendants in this matter. For example:

Copyright Office Records. The attached Exhibit A shows copyright ownership information for the Dark Horse song. Those Copyright Office records show that the six individual defendants transferred their copyright ownership interests to six other entities. Although Plaintiffs identified each of those entities by name in the current amended complaint (Dkt. 114 at ¶¶ 8-13), they held off adding them as defendants pending confirmation from Defendants by way of discovery.

Sheet Music. The attached Exhibit B contains the license information on the sheet music for the song. As shown at the bottom of that Exhibit, there are various entities listed as copyright owners, including most of the copyright assignees identified in the Copyright Office records. These various entities comprise, to the

EXHIBIT 14
PAGE 602

best of Plaintiffs' knowledge, the list of parties that may need to be added to this lawsuit. Again, Plaintiffs held off seeking leave to add them pending confirmation through discovery.

Defendants have gone to great lengths to avoid providing that confirmation. Among other things, Defendants have objected to and/or not yet provided responses to Plaintiffs' discovery requests seeking this information (*See e.g.*, <u>Exhibit C</u>, Discovery Responses of Defendants Capitol Records, LLC, No. 7, Kitty Purry, Inc., No. 3, Katy Perry, No. 10, and Lukasz Gottwald, No. 10.).[2]

In a separate effort to obtain this information, Plaintiffs served subpoenas on third-party revenue sources (*e.g.*, BMI, ASCAP, Apple, Amazon, Google, etc) seeking revenue numbers and the names of those receiving revenue from the exploitation Dark Horse. After service of those subpoenas, attorneys for Plaintiffs and Defendants conferred upon the scope of the same. While Plaintiffs agreed to limit the scope of the subpoenas (*e.g.*, Plaintiffs agreed to limit the scope to U.S. revenue only, etc.), Plaintiffs did not agree to limit the scope to revenue paid ***only*** to the named Defendants. That would have defeated one of the primary reasons for serving the subpoenas in the first place.

Defendants filed no formal objection with the Court regarding the subpoenas,

---

[2] The remaining individual Defendants' discovery responses mirror the response of Defendant Gottwald, so Plaintiffs have not burdened the court with duplicative responses.

EXHIBIT 14
PAGE 603

nor did they file a Motion for Protective Order or Motion to Quash. Instead, Defendants engaged in a more indirect form of interference: on at least two occasions, Defendants contacted subpoena recipients (ASCAP and BMI) and convinced them not turn over information related to revenue paid to nonparties. *See* Exhibits D and E, email exchanges with ASCAP and BMI, respectively.[3]

In short, Defendants have turned the discovery process into a circular game of Hide the Ball. They objected to discovery requests seeking information concerning the identity of the recipients of Dark Horse revenue and, at the same time, actively attempted to prevent Plaintiffs from obtaining the same information from third-parties on the purported basis that Plaintiffs were not able to identify them and name them as parties in this case. Defendants cannot have it both ways.

Perhaps revealing their Midwestern naiveté, Plaintiffs' counsel hoped that the parties could work together to swiftly move through the written discovery process. We were wrong. At virtually every step of the way, Plaintiffs have been met with misdirection. In short, Plaintiffs' "good cause" for an extension of the deadlines is Defendants' conduct, and in particular its inappropriate obstruction.

**B. Plaintiffs have not unreasonably delayed seeking relief.**

Defendants contend that "Plaintiffs have had two years in which to add

---

[3] This type of interference with Plaintiff's Rule 45 subpoena powers is inappropriate. *See e.g., Price v. Trans Union, L.L.C.*, 847 F. Supp. 2d 788, 794 (E.D. Pa. 2012) (absent moving to quash, interfering with the adversary's Rule 45 powers by advising third-party of "objections" improper and sanctionable).

EXHIBIT 14
PAGE 604

parties." (Opposition, p. 13). That contention is false. This case was filed in the Eastern District of Missouri on July 1, 2014. (Dkt. 1) Every Defendant but Capitol Records, LLC filed a Motion to Dismiss for Lack of Personal Jurisdiction, and all Defendants sought transfer of the matter to this District. (Dkts. 39, 41-41). Nearly a year elapsed before District Judge Autrey ordered the matter transferred here.

Between the filing of the Complaint on July 1, 2014 and the case's transfer on June 9, 2015, there were no Rule 26(f) or Rule 16 conferences, and thus no exchange of initial disclosures or written discovery. During that time, Plaintiffs filed a Motion for Leave to Conduct Third-Party Discovery (Dkt. 65), which Defendants vigorously opposed, arguing that Plaintiffs "have failed to specify any relevant information in the possession of these third-parties—and there is none— which could not be obtained from party discovery." (Dkt. 66, p. 2) Thus, Defendants' position was that discovery was premature and that the information sought could be obtained from Defendants when the time was right. The Court denied Plaintiffs' Motion, and no discovery was allowed during the St. Louis phase of the case. (Dkt. 72).

On June 26, 2015, Plaintiffs filed a Motion for Leave to File a Second Amended Complaint. (Dkt. 73). The parties that Plaintiffs sought to add at that time were, generally speaking, publically known licensees of Dark Horse and others who had exploited Dark Horse (*e.g.,* the National Football League, following Defendant Perry's 2015 Super Bowl halftime performance of the infringing work). Defendants

EXHIBIT 14
PAGE 605

also opposed that motion, arguing that it was "premature for Plaintiffs to try to add new defendants to this action because the Defendants' Motion to Dismiss or Transfer remains pending." (Dkt. 77, p. 2).

In short, Defendants successfully opposed any discovery or amended pleadings during the time the case was in St. Louis on the ground that those efforts were premature.

Then, pivoting 180 degrees, Defendants contend that, following transfer, Plaintiffs "waited seven months before seeking to hold the Rule 26(f) conference." This contention is equally misleading. On January 6, 2016, this Court issued its "Notice to Counsel" that counsel for the parties were to conduct their Rule 26(f) conference no later than 21 days prior to the date of the Rule 16(b) scheduling conference. (Dkt. 136). On January 22, 2016, the Court scheduled that Rule 16 conference for March 14, 2016 (Dkt. 137). Plaintiffs propounded discovery to Defendants on April 21, 2016, less than one month after the issuance of the Scheduling Order.

In short, Plaintiffs served discovery on Defendants three months prior to the subject deadline, the answers to which would have confirmed (or negated) Plaintiffs' belief that they needed to amend the pleadings or add parties. Thus the cause for the requested extension of the deadline has nothing to do with Plaintiffs' lack of diligence and everything to do with Defendants' gamesmanship of the litigation process.

EXHIBIT 14
PAGE 606

**C. There is ample good cause for an extension of the subject deadline; Defendants' arguments are based on false premises.**

Plaintiff's good cause is obvious. Had Defendants complied with simple discovery requests served months prior to the amendment deadline, Plaintiffs would not be seeking this Court's intervention.

Defendants' arguments to the contrary are unavailing. For example, Defendants argue that Plaintiffs have not cited a specific amendment or a specific party they want to add in their request for an extension. Defendants are correct. Plaintiffs are asking for an extension so that they can obtain further confirmation that, for example, the entities listed on that Sheet Music credits (Exhibit B) need to be added to the lawsuit. If Plaintiffs had received that confirmation from Defendants in timely and complete discovery responses, this Motion would have never been filed. This is not a situation where Plaintiffs have not been diligent in asking for the information prior to the deadline; this is a situation where Defendants aggressively prevented Plaintiffs from obtaining that information prior to the deadline. Defendants cannot refuse to give Plaintiffs specific information and then blame Plaintiffs for not citing that specific information in the instant Motion.

Defendants next argue that Plaintiffs are aware of the information they have sought from Defendants, because they are "experienced musicians who have their own recording deals and have released their own music." If that were so, Plaintiffs—Christian gospel musicians who operate in a far different music universe

EXHIBIT 14
PAGE 607

than Defendants—would indeed have moved for leave amend prior to the deadline.

Defendants also argue that Plaintiffs chose not to add the parties it originally sought to add (e.g., the NFL) before the case was transferred. This is irrelevant. While Plaintiffs could have added those parties (all predominantly licensees and those who have further exploited the song), they chose not to do so. Those licensees are not the type of parties Plaintiffs desire to add now, and Plaintiffs can assure the Court that, if the deadline is extended and Plaintiffs do indeed seek to add parties, those are not the parties Plaintiffs will seek to add. Nonetheless, the mere fact that Plaintiffs have made the decision not to add certain entities is not a justification for preventing Plaintiffs from discovering information concerning other possible parties. Defendants do not get to pick and choose, by away of discovery obstruction, who Plaintiffs add to the lawsuit.

Accordingly, for the foregoing reasons and those set forth in our original motion, Plaintiffs respectfully request that the deadline for seeking leave to amend pleadings or to add parties be extended to September 30, 2016

EXHIBIT 14
PAGE 608

Respectfully submitted,

Dated: August 29, 2016      /s/Michael A. Kahn

Michael A. Kahn (pro hac vice)
kahn@capessokol.com
Drey A. Cooley (pro hac vice)
Cooley@capessokol.com

CAPES SOKOL GOODMAN & SARACHAN PC
7701 Forsyth Blvd., 12th Floor
St. Louis, Missouri 63105
Tel:  (314) 721-7701

Eric F. Kayira (pro hac vice)
eric.kayira@kayiralaw.com
KAYIRA LAW, LLC
200 S. Hanley Road, Suite 208
Clayton, Missouri 63105
(314) 899-9381

Carole E. Handler (129381)
chandler@eisnerlaw.com
Kathleen Cerniglia (268019)
kcerniglia@eisnerlaw.com
EISNER JAFFE, A PROFESSIONAL
CORPORATION
9601 Wilshire Boulevard, Suite 700
Beverly Hills, California 90210
Tel: (310) 855-3200

*Attorneys for Plaintiffs*

EXHIBIT 14
PAGE 609

# EXHIBIT 15

EXHIBIT 15
PAGE 610

Michael A. Kahn (pro hac vice)
Kahn@capessokol.com
Drey A. Cooley (pro hac vice)
Cooley@capessokol.com
Capes Sokol Goodman Sarachan PC
7701 Forsyth Blvd., 12th Floor
St. Louis, MO 63105
Telephone:  (314) 721-7701

Eric F. Kayira (pro hac vice)
eric.kayira@kayiralaw.com
Kayira Law, LLC
200 S. Hanley Road, Suite 208
Clayton, Missouri 63105
Telephone:  (314) 899-9381

Carole E. Handler (SBN 129381)
chandler@eisnerlaw.com
Brianna Dahlberg (SBN 280711)
bdahlberg@eisnerlaw.com
EISNER JAFFE
9601 Wilshire Boulevard, Suite 700
Beverly Hills, California  90210
Telephone:  (310) 855-3200
Facsimile:  (310) 855-3201

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCUS GRAY, et al.,<br><br>                              Plaintiffs,<br><br>        v.<br><br>KATHERYN ELIZABETH HUDSON, et al.,<br><br>                              Defendant. | Case No. 2:15-cv-05642-CAS-JC<br><br>Hon. Christina A. Snyder<br><br>_<br><br>**PLAINTIFFS' COMBINED RESPONSES TO DEFENDANTS JORDAN HOUSTON, LUKASZ GOTTWALD, SARAH THERESA HUDSO KARL MARTIN SANDBEKG  AND HENRY RUSSELL WALTER'S FIRST SET OF INTERROGATORIES** |

EXHIBIT 15
PAGE 611

Plaintiffs Marcus Gray, Emanuel Lambert and Chike Ojukwu (collectively, "Plaintiffs") submit this combined response to Defendants' First Set of Interrogatories:

## GENERAL OBJECTIONS

1.  Plaintiffs object to the extent the Interrogatories seek to impose obligations on Plaintiffs that exceed the requirements of the Federal Rules of Civil Procedure or the Local Rules.

2.  Plaintiffs object to the Interrogatories to the extent they are vague, ambiguous, overly broad or unduly burdensome, lack reasonable particularity, seek irrelevant information or information not reasonably calculated to lead to the discovery of admissible evidence, go beyond the subject matter of this action, or call for an interpretation on the part of Plaintiffs.  In order to provide a response in good faith, Plaintiffs have made such interpretations where necessary and has responded accordingly.

3.  Plaintiffs object to the Interrogatories to the extent they call for the disclosure of information protected by the attorney-client privilege, the work product doctrine or any other applicable privilege, immunity or doctrine.

4.  Plaintiffs object to the "Definitions and Instructions" contained in the Interrogatories to the extent that they are overly broad, unduly burdensome or oppressive or seek discovery beyond the scope of Federal Rules of Civil Procedure 26 and 33.

5.  In providing these responses, Plaintiffs do not admit or concede the relevance, materiality, authenticity, or admissibility in evidence of any such responses, information or documents.  All objections to the use, at trial or otherwise, of any information provided in response to the Interrogatories are expressly reserved. All individual responses to the Interrogatories are made on the express reservation of all applicable objections, court rulings, agreements and understandings and are made

EXHIBIT 15
PAGE 612

pursuant to the foregoing General Objections and any specific objections set forth below.

The foregoing General Objections shall be deemed to apply to each and every individual request.

## RESPONSES

INTERROGATORY NO. 1:

Identify all Persons with knowledge regarding the creation of Plaintiffs' Composition, including but not limited to all Persons who were involved in the creation of Plaintiffs' Composition, and/or present during any portion of the creation of Plaintiffs' Composition, describing the specific subject(s) of knowledge for each Person so identified.

Response: The three plaintiffs, LeCrae Moore, and Adam Long are the persons with the most knowledge regarding the subject matter of this interrogatory. Chike Ojukwu was the original creator of the main ostinato. The other two plaintiffs and Mr. Moore contributed to the creation of the Composition. Mr. Long assisted in the mixing and finalizing of the Composition.

INTERROGATORY NO. 2:

Set forth in detail the terms of all Licenses granted to any Person to exploit the Plaintiffs' Composition, or any Recording thereof, in any way, shape or form, including but not limited to any "sample" licenses, mechanical licenses, synchronization licenses, and public performance licenses.

Response: No License granted other than to Cross Movement Records, Inc. for the sound recording of the Composition and the album on which it appears, *Our World Redeemed*, and the music video of the performance of that Composition.

INTERROGATORY NO. 3:

Identify all Recordings created at any time of the Plaintiffs' Composition, including but not limited to any demo recording. For each Recording so identified, set forth the date(s) upon which the Recording was made, the location(s) where the Recording was made, the equipment used to make the Recording, the Person(s) who participated in the creation of the Recording, and the role that each such Person played in the recording process

EXHIBIT 15
PAGE 613

<u>Response</u>: Chike Ojukwu created the Composition and Recording of the instrumental music, including the ostinato at issue here. Marcus Gray and Emanuel Lambert contributed their respective vocal performance Recordings to the Plaintiffs' Composition, in St. Louis, Mo., and Philadelphia, Pa., respectively. LeCrae Moore contributed his vocal performance to the Plaintiff's Composition in Memphis, Tennessee. All of these Recordings were merged and mixed collectively into one singular Recording of Plaintiffs' Composition in St. Louis, Missouri, by music engineer/mixer Adam Long at Phat Buddha Studios

<u>INTERROGATORY NO. 4</u>:

Set forth in detail all facts which support any contention that Defendants purportedly had access to the Plaintiffs' Composition, or any Recording thereof.

<u>Response</u>: Plaintiffs' investigation continues and will include, among other things, discovery from defendants and their agents. Until that investigation is completed, Defendants' access to the Composition and the Recording can be inferred from the widespread dissemination of the Recording and the widespread performance of the Composition. Among other things:

- By at least 18 months before the release of the recording of Defendants' Composition, the Recording of Plaintiffs' Composition had been viewed and/or downloaded from YouTube more than 2.5 million times and had been viewed and/or downloaded from other Internet sites more than 1 million times;

- In addition, tens of thousands of followers of the Myspace.com pages for Plaintiffs and LeCrae Moore had access to the Recording of Plaintiffs' Composition;

EXHIBIT 15
PAGE 614

- From 2008 thru 2012, Plaintiffs performed the Composition in more than approximately 200 concert venues around the nation, including the West Coast, the Midwest, the South and the East Coast;

- During the first half of 2013, Plaintiffs performed the Composition in an additional two dozen concert venues around the nation;

- During 2008 and 2009, LeCrae Moore performed the Composition on his own concert tour around the nation;

- In January of 2009, the album *Our World Redeemed* (which includes Plaintiff's Composition) was a nominee for Rap/Hip Hop Gospel Album of the Year at the Stellar Award Show held at the Grand Ole Opry in Nashville, Tennessee in Nashville, Tennessee;

- In February of 2009, the album *Our World Redeemed* (which includes Plaintiff's Composition) was a nominee for Best Rock or Rap Gospel Album at the 51st Annual Grammy Awards Show in Los Angeles, California, which was televised nationwide;

- Katy Perry performed at that 51st Annual Grammy Awards Show in February of 2009, and, on information and belief, Defendants Gottswald and Sandberg (and perhaps other individual Defendants) were voting members of the Grammy Society that year and thus would have received copies of and/or access to the nominated songs and albums for their review prior to voting.

- In April of 2009, Plaintiffs' Composition was a nominee for the Best Rap/Hip

EXHIBIT 15
PAGE 615

Hop Song of the Year at the 40th GMA Dove Awards, which was televised live

from the Grand Ole Opry in Nashville, Tennessee.

- The Recording of Plaintiffs' Composition was played on radio stations

  throughout the nation and occasionally featured on television interviews of the

  Plaintiffs during their concert tours.

INTERROGATORY NO. 5:

Set forth in detail all facts which support any contention that the writers of Defendants' Composition purportedly had access to the Plaintiffs' Composition, or any Recording thereof.

Response: See Response to Interrogatory No. 4, which Plaintiffs incorporate

here as if fully set forth.

INTERROGATORY NO. 6:

Identify all Persons with knowledge of the facts set forth in your responses to Interrogatory Nos. 4 and 5, describing the specific subject(s) of knowledge for each Person so identified.

Response: Plaintiffs' investigation continues and will include, among other

things, discovery from defendants and their agents. Until that investigation is

completed, the persons with some of that knowledge include the Plaintiffs and Mr.

Moore.

INTERROGATORY NO. 7:

Set forth in detail all similarities which You contend exist between Plaintiffs' Composition and Defendants' Composition.

Response: Plaintiffs object on the grounds that, among other things, this is a

EXHIBIT 15
PAGE 616

contention interrogatory, and thus premature; an interrogatory answer is not an appropriate medium for such answer; and that an answer at this stage of the case would invade the attorney-client privilege and the attorney work-product protection. Without waiving any of these objections, Plaintiffs state that the striking similarities include the main ostinato of the two Compositions, the timing of certain vocal inflections, and certain instrumentations.

INTERROGATORY NO. 8:

Identify all radio and/or television broadcasts of any Recording or performance of Plaintiffs' Composition, including but not limited to the date and time of any such broadcast, a description of the Recording or performance which was broadcasted, and the station(s) which transmitted the broadcast.

Response: Plaintiffs' investigation continues, however, upon preliminary

efforts, Plaintiff's Composition was publicly performed, by transmission and

broadcast, at one or more radio and television stations. Plaintiffs shall seasonably

supplement their responses to this Interrogatory No. 8.

INTERROGATORY NO. 9:

Identify every website through which you have sold or attempted to sell any Recording of Plaintiff s Composition, as alleged in Paragraphs 38(a) and 38(b) of Your SAC and the date on which it was first made available for sale.

Response: These sales were handled by Cross Movement Records, Inc., which

has not provided Plaintiffs with an accounting of those sales. Investigation continues.

INTERROGATORY NO. 10:

Identify every retail store through which you have sold or attempted to sell any

EXHIBIT 15
PAGE 617

Recording of Plaintiff s Composition, as alleged in Paragraph 38(a) of Your SAC and the date on which it was first made available for sale.

Response: These sales were handled by Cross Movement Records, Inc., which has not provided Plaintiffs with an accounting of those sales. Investigation continues.

INTERROGATORY NO. 11:

Identify all online publications or broadcasts of any Recording or performance of Plaintiffs' Composition, including but not limited to the date and time of any such publication or broadcast, a description of the Recording or performance which was published or broadcasted, and the website/url where the Recording or performance can be found.

Response. Excluding concerts and other such performances, the principal Recording and performances of Plaintiffs' Composition include, but are not limited to:

- YouTube page entitled Joyful Noise LYRICS:

  https://www.youtube.com/watch?v=jTLeHuvHXuk

- YouTube page entitled Joyful Noise Official Music Video:

  https://www.youtube.com/watch?v=MllhC0qyEjY

- Myspace page for Flame: https://myspace.com/flame314

- Myspace page for LeCrae Moore: https://myspace.com/lecrae

INTERROGATORY NO. 12:

Describe in detail any alleged Communications between Plaintiff, on one hand, and any of the Defendants, the credited writers of Defendants' Composition, the credited producers of Defendants' Recordings and/or the credited performers of Defendants' Recording, on the other hand.

Response: Plaintiffs are not presently aware of any such communications.

EXHIBIT 15
PAGE 618

INTERROGATORY NO. 13:

Describe in detail all concerts, events, presentations, gatherings, recitals, performances or sessions at which Plaintiffs' Composition was performed, including but not limited to the name(s) of the performer(s), as well as the date, venue and attendance figures for any such performance.

Response: As stated above, Plaintiffs and Mr. Moore have performed Plaintiffs'

Composition at more than 200 venues around the country. Plaintiffs shall provide

Defendants with documents evidencing the information sought by this Interrogatory.

INTERROGATORY NO. 14:

Identify all commercially released products in any format (including but not limited to CDs, cassette tapes, and vinyl records) containing a Recording of Plaintiffs' Composition, including the number of sales.

Response: The only commercially released products containing a Recording of

Plaintiffs' Composition of which Plaintiffs are aware is the CD of the album *Our*

*World Redeemed* released by Cross Movement Records, Inc. Because Cross

Movement Records has never provided Plaintiffs with a proper accounting of the sales

of that CD, Plaintiffs do not know the number of sales. Their investigation continues.

INTERROGATORY NO. 15:

Set forth in detail all facts which support YOUR contention that the religious message of Plaintiffs' Composition has been "tarnished" by association with Defendants' Composition

Response: Plaintiffs' investigation continues. At present, facts supporting

Plaintiffs' contention that the religious message of its Composition has been tarnished

by association with Defendants' Composition including the following:

- Plaintiffs' Composition is a deeply religious Christian gospel song whose lyrics
  convey a blessed message about Plaintiffs' faith, including, for example, the
  hook in the song, which is as follows

EXHIBIT 15
PAGE 619

> Angels surrounding His throne and
> Worthy is the Lamb who was slain
> The whole earth is full of His glory
> All nations bow to His name
> His majesty fills the Heavens
> Our hearts give thunderous praise
> Declare the Lord is forever
> Make a joyful noise in this place

- Around 1:15 into the original music video of Defendants' Composition a man was shown being burned by lightning shot from Ms. Perry's finger. The man was wearing a pendant (also burned) forming the word "Allah," which is the Arabic word for God. Plaintiffs were not alone in finding this misuse of God's name offensive. According to the BBC and other news accountings, more than 60,000 people of all religions around the world signed petitions demanding that the video to be removed because of that blasphemous scene.

- So, too, Defendants' Composition, the music video performance, and Ms. Perry's performance of the Composition at the 2014 Grammy's generated extensive negative publicity concerning the Satanic and Illuminati symbols and references. On such example of the negative publicity is in an article entitled "All the Illuminati References in Katy Perry's 'Dark Horse' Video" from the February 20, 2014 edition of *The Wire* magazine (http://www.thewire.com/-entertainment/2014/02/all-illuminati-references-katy-perrys-dark-horse-video/358345/)

## INTERROGATORY NO. 16:

Identify all Persons with knowledge of the facts set forth in Your responses to Interrogatory No. 12, describing the specific subject(s) of knowledge for each Person so identified.

Response: As stated in the Response to Interrogatory No. 12, Plaintiffs are not aware of any such communications, and thus have not identified in Person.

## INTERROGATORY NO. 17:

Set forth in detail all facts which support YOUR contention that LeCrae Moore transferred and assigned all of his ownership interest in the copyright of

EXHIBIT 15
PAGE 620

Plaintiffs' Composition to Plaintiffs

Response: On July 22, 2014, Mr. Moore signed an instrument entitled Assignment of Copyright in which he assigned all of his rights in the copyright in Plaintiff's Composition to the Plaintiffs.

/s/ Michael A. Kahn
Michael A. Kahn (pro hac vice)
Kahn@capessokol.com
Drey A. Cooley (pro hac vice)
Cooley@capessokol.com
Capes Sokol Goodman Sarachan PC
7701 Forsyth Blvd., 12th Floor
St. Louis, MO 63105
Telephone:  (314) 721-7701

Eric F. Kayira (pro hac vice)
eric.kayira@kayiralaw.com
Kayira Law, LLC
200 S. Hanley Road, Suite 208
Clayton, Missouri 63105
Telephone:  (314) 899-9381

Carole E. Handler (SBN 129381)
chandler@eisnerlaw.com
Brianna Dahlberg (SBN 280711)
bdahlberg@eisnerlaw.com
EISNER JAFFE
9601 Wilshire Boulevard, Suite 700
Beverly Hills, California  90210
Telephone:  (310) 855-3200
Facsimile:  (310) 855-3201

*Attorneys for Plaintiffs*

## PROOF OF SERVICE

I hereby certify that on this 15th day of April, 2016, I caused a copy of the foregoing to be served by electronic mail upon the counsel of record identified in the Service List below. To the best of my knowledge, the transmission was complete and without error.

/s/ Michael A. Kahn

EXHIBIT 15
PAGE 621

SERVICE LIST:

| | |
|---|---|
| Vincent H. Chieffo (SBN 49069)<br>Email: *ChieffoV@gtlaw.com*<br>Alana C. Srour (SBN 271905)<br>Email: *SrourA@gtlaw.com*<br>GREENBERG TRAURIG, LLP<br>1840 Century Park East, Suite 1900<br>Los Angeles, CA 90067-2121<br><br>***Attorneys for Defendants Katheryn Elizabeth Hudson p/k/a Katy Perry and Kitty Purry, Inc*** | Christine Lepera (*pro hac vice*)<br>ctl@msk.com<br>Jeffrey M. Movit (*pro hac vice*)<br>jmm@msk.com<br>MITCHELL SILVERBERG & KNUPP LLP<br>12 East 49th Street, 30th Floor<br>New York, New York 10017-1028<br><br>Aaron M. Wais (SBN 250671)<br>amw@msk.com<br>MITCHELL SILVERBERG & KNUPP LLP<br>11377 West Olympic Boulevard<br>Los Angeles, CA 90064-1683<br><br>***Attorneys for Defendants Capitol Records, Jordan Houston, Lukasz Gottwald, Sarah Therese Hudson, Karl Martin Sandberg and Henry Russell Walter*** |

EXHIBIT 15
PAGE 622

## <u>VERIFICATION</u>

    I certify under penalty of perjury under the laws of the United States that I have read the foregoing answers to interrogatories and that those answers are—subject to any inadvertent or undiscovered errors—true to my knowledge, information and belief.

_____
Marcus Gray

Date:_____

_____
Chike Ojukwu

Date: 4/14/2016

_____
Emanuel Lambert

Date:_____

13

EXHIBIT 15
PAGE 623

## **VERIFICATION**

I certify under penalty of perjury under the laws of the United States that I have read the foregoing answers to interrogatories and that those answers are—subject to any inadvertent or undiscovered errors—true to my knowledge, information and belief.


_____
Marcus Gray

Date:_____



_____
Chike Ojukwu

Date:_____


_____
Emanuel Lambert

Date:_4/13/16_____

---

PLAINTIFFS' RESPONSES TO DEFENDANTS' INTERROGATORIES

EXHIBIT 15
PAGE 624

## <u>VERIFICATION</u>

I certify under penalty of perjury under the laws of the United States that I have read the foregoing answers to interrogatories and that those answers are—subject to any inadvertent or undiscovered errors—true to my knowledge, information and belief.


_____
Marcus Gray

Date:____4/13/16_____


_____
Chike Ojukwu

Date:_____


_____
Emanuel Lambert

Date:_____

13

EXHIBIT 15
PAGE 625

# EXHIBIT 16

EXHIBIT 16
PAGE 626

ANTHONY J WEIBELL, State Bar No. 238850
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:  (650) 493-9300
Facsimile:  (650) 565-5100
Email:  aweibell@wsgr.com

Attorneys for Non-Party
GOOGLE LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| MARCUS GRAY (P/K/A FLAME), et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>KATHERYN ELIZABETH HUDSON (P/K/A KATY PERRY), et al.,<br><br>        Defendants. | CASE NO.:  2:15-cv-05642-CAS-JC<br><br>**DECLARATION OF JOEL TRUHER, DESIGNATED CORPORATE WITNESS FOR NONPARTY GOOGLE LLC** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF NON-PARTY GOOGLE LLC        -1-        CASE NO.: 2:15-cv-05642-CAS-JC

EXHIBIT 16
PAGE 627

I, Joel Truher, declare and state as follows:

1.      I am an Engineering Director at Google LLC ("Google"). I am the designated corporate declarant for Google regarding the matters set forth here, of which I have personal knowledge, and, if called as a witness, I could and would testify competently thereto.

2.      Through its wholly-owned subsidiary YouTube, LLC, Google operates the online video-sharing service located at www.youtube.com ("YouTube") where users can upload, share, and watch videos.

3.      Among the records maintained by Google for each video that is uploaded to YouTube are the total number of "views" of that video. YouTube video views reflect the approximate number of times a video has been played for  actual humans, regardless of how many different people have played the video. For example, a video with one million views could mean that one million people each played the video only once, or it could mean that fewer than one million people played the video, but some watched it more than once. A "view" does not necessarily mean that a human actually watched or listened to the video while it was playing; it only means that the video was played.

4.      Google takes proprietary measures to improve the accuracy of video view counts so that these numbers better reflect "quality views" by actual humans and not computer programs or other means that may be used to artificially inflate a video's view count.  Video views are algorithmically validated using proprietary means. To help verify that views are real and accurate, Google may also temporarily slow down, freeze, or adjust the view count, as well as discard suspect playbacks in its discretion. Because Google is constantly validating views, a view count for a particular video is always subject to being adjusted.

5.      Although Google takes measures to ensure that a video view count reflects only quality views, Google cannot guarantee that all of the views reflected

9594939_1.docx

EXHIBIT 16
PAGE 628

in a video view count are in fact quality views, as the view count may have been improperly inflated by means that were not detected by Google.

6.    It is a violation of the YouTube Terms of Services for users to inflate views through automated means or attempt to force or trick viewers into watching videos. This could include the following, which is not an exhaustive list: (i) Purchasing views from third-party websites (e.g. paying $10 for 10,000 views); (ii) Deceptive layouts on third party websites that trick viewers into playing a video when they click unrelated elements on the page; (iii) Serving pop-unders: A new window that appears under a current window; or (iv) Redirects: When the URL changes and sends the viewer to a new page in the middle of a click.

7.    The following is a chart that lists information from Google's records for the currently recognized view count totals as of certain dates for five videos uploaded to YouTube that have been produced in response to a subpoena to Google in this action:

| Video File Name as Produced by Google | YouTube Video URL | Total views as of Nov. 4, 2010 | Total views as of Mar. 16, 2011 | Total views as of July 26, 2011 | Total views as of Mar. 11, 2012 |
|---|---|---|---|---|---|
| GOOG-FLAME-00000010.mp4 | https://www.youtube.com/watch?v=QCcW-guAs_s | 0 | 31,224 | 119,662 | 293,956 |
| GOOG-FLAME-00000009.mp4 | https://www.youtube.com/watch?v=jTLeHuvHXuk | 114,771 | 197,111 | 290,414 | 483,931 |
| GOOG-FLAME-00000011.mp4 | https://www.youtube.com/watch?v=PwoEOB3Jr8Y | 1,599 | 2,989 | 3,961 | 7,283 |
| GOOG-FLAME-00000008.mp4 | https://www.youtube.com/watch?v=zaUIncoyJ4w | 3,090 | 4,892 | 8,465 | 18,153 |
| GOOG-FLAME-00000012.mp4 | https://www.youtube.com/watch?v=HU3gAGWoKYM | 387,454 | 437,671 | 489,536 | 561,718 |
| | **Total views for all 5 videos (1 - 5) as of listed date** | **506,914** | **673,887** | **912,038** | **1,365,041** |

1      I declare under penalty of perjury that the foregoing is true and correct.

2   Executed on December 7, 2017.

3

4                                                _____

5                                                Joel Truher

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF NON-PARTY GOOGLE LLC      -4-                          9594939_1.docx

EXHIBIT 16
PAGE 630

# EXHIBIT 17

EXHIBIT 17
PAGE 631

ANTHONY J WEIBELL, State Bar No. 238850
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: aweibell@wsgr.com

Attorneys for Non-Party
GOOGLE LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| MARCUS GRAY (P/K/A FLAME), et al.,<br><br>        Plaintiffs,<br><br>        v.<br><br>KATHERYN ELIZABETH HUDSON (P/K/A KATY PERRY), et al.,<br><br>        Defendants. | CASE NO.: 2:15-cv-05642-CAS-JC<br><br>**SUPPLEMENTAL DECLARATION OF JOEL TRUHER, DESIGNATED CORPORATE WITNESS FOR NONPARTY GOOGLE LLC** |

EXHIBIT 17
PAGE 632

I, Joel Truher, declare and state as follows:

1.      I am an Engineering Director at Google LLC ("Google"). I am the designated corporate declarant for Google regarding the matters set forth here, of which I have personal knowledge, and, if called as a witness, I could and would testify competently thereto.

2.      Through its wholly-owned subsidiary YouTube, LLC, Google operates the online video-sharing service located at www.youtube.com ("YouTube") where users can upload, share, and watch videos.

3.      On December 7, 2017, I provided a declaration (the "first declaration") in this matter concerning how many "views" were received by the five specific videos identified therein as of certain dates, specifically November 4, 2010, March 16, 2011, July 26, 2011, and March 11, 2012. In my first declaration, I also discussed what a "view" does and does not mean as that term is used on YouTube.

4.      For further clarification of that declaration, the view counts in my first declaration do not identify any one person in particular as having watched any of the five videos listed therein. Moreover, a "view" does not necessarily mean that a human actually watched or listened to the video while it was playing; it only means that the video was played. In addition, a "view" does not necessarily mean that a video was played in its entirety or was even played for more than a few seconds.

5.      Google is aware of certain instances in the past in which video view counts were improperly inflated by third parties using automated or other improper means in violation of YouTube policy. Although Google has taken steps to correct and prevent such improper view count inflation, Google cannot guarantee that any particular view count currently displayed has not been improperly inflated by means that were not detected by Google.

6.      YouTube has over a billion users - almost one-third of all people on the Internet. In 2010, users were uploading more than 50,000 hours of video content to YouTube each day, and there were more than two billion views of videos each

day on YouTube. By 2012, there were more than 85,000 hours of video content uploaded to YouTube each day and more than four billion views of videos each day on YouTube. Today, there are more than 576,000 hours of video content being uploaded to YouTube each day, and each day those users watch a billion hours of video, generating billions of views.

7.    Among the records and statistics maintained by Google in the ordinary course and scope of its business are the YouTube videos receiving the most "views" globally during a calendar year. The top five YouTube videos receiving the most "views" for the years 2010-2013 are as follows:

| Year | Video ID[1] | Views |
|------|-------------|-------|
| 2010 | kffacxfA7G4 | 425,688,273 |
|      | pRpeEdMmmQ0 | 270,763,562 |
|      | qrO4YZeyl0I | 266,191,920 |
|      | uelHwf8o7_U | 251,890,764 |
|      | CHVhwcOg6y8 | 183,274,415 |
| 2011 | t4H_Zoh7G5A | 464,437,051 |
|      | fNdwqJ9rrgg | 407,888,327 |
|      | KQ6zr6kCPj8 | 339,831,952 |
|      | P-uWZTU_HHk | 313,286,752 |
|      | kffacxfA7G4 | 259,746,426 |
| 2012 | 9bZkp7q19f0 | 1,101,849,272 |
|      | fWNaR-rxAic | 373,789,532 |
|      | hcm55lU9knw | 373,608,879 |
|      | 8UVNT4wvIGY | 331,408,797 |
|      | QJO3ROT-A4E | 271,945,208 |

---

[1] All videos can be viewed by appending the relevant video ID to the url: https://www.youtube.com/watch?v= . For example, the first video is publicly available at the url: https://www.youtube.com/watch?v=kffacxfA7G4.

Supp. Decl. of Non-Party Google LLC        -2-        Case No.: 2:15-cv-05642-CAS-JC

EXHIBIT 17
PAGE 634

| | 9bZkp7q19f0 | 783,446,910 |
|---|---|---|
| | ASO_zypdnsQ | 619,058,370 |
| 2013 | My2FRPA3Gf8 | 461,848,016 |
| | QK8mJJJvaes | 440,889,984 |
| | LrUvu1mlWco | 332,047,880 |

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 23, 2018.

_____
Joel Truher

EXHIBIT 17
PAGE 635

# EXHIBIT 18

EXHIBIT 18
PAGE 636

1   CHRISTINE LEPERA (admitted *pro hac vice*)
    ctl@msk.com
2   JEFFREY M. MOVIT (admitted *pro hac vice*)
    jmm@msk.com
3   MITCHELL SILBERBERG & KNUPP LLP
    12 East 49th Street, 30th Floor
4     New York, New York 10017-1028
    Telephone: (212) 509-3900
5     Facsimile: (212) 509-7239

6   AARON M. WAIS (SBN 250671)
    amw@msk.com
7   MITCHELL SILBERBERG & KNUPP LLP
    11377 West Olympic Boulevard
8     Los Angeles, CA 90064-1683
    Telephone: (310) 312-2000
9     Facsimile: (310) 312-3100

10   Attorneys for Defendants
    Jordan Houston, Lukasz Gottwald, Sarah
11   Theresa Hudson, Karl Martin Sandberg,
    Henry Russell Walter, Capitol Records LLC,
12   Universal Music Group, Inc., UMG
    Recordings, Inc., Kobalt Music Publishing
13   America, Inc., Kasz Money, Inc., and WB
    Music Corp.

14

UNITED STATES DISTRICT COURT

15

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

16

17 | MARCUS GRAY, et al., | CASE NO. 2:15-CV-05642-CAS JCx
18 |     Plaintiffs, | Honorable Christina A. Snyder
19 |   v. | **DECLARATION OF LECRAE MOORE**
20 | KATHERYN ELIZABETH HUDSON, et al., |
21 | |
22 |     Defendants. |

23

24

25

26

27

28

**DECLARATION OF LECRAE MOORE**

EXHIBIT 18
PAGE 637

## DECLARATION OF LECRAE MOORE

I, Lecrae Moore, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am over 18 years of age, and have personal knowledge of the matters set forth herein, and if called upon to do so, could and would competently testify hereto.

2.      I wrote and recorded one rap verse for the song *Joyful Noise*, which appears on the album *Our World: Redeemed* by Marcus Gray, p/k/a Flame.

3.      In or around November, 2007, Flame contacted me and asked if I would perform on a Christian gospel rap song, which was eventually titled *Joyful Noise*. Flame sent me an audio file, via email, which contained the instrumental component of *Joyful Noise*. I recorded my single rap verse over the instrumentals and emailed the audio digital file of my single verse to him. After I sent my verse to Flame, I did not hear the full song complete with my verse and other lyrics until after it was released.

4.      I have no personal knowledge regarding the creation and recording of any portion of *Joyful Noise* other than the rap verse I wrote and recorded. I had no involvement with and was not present for the creation and recording of any portion of the underlying instrumental composition or any of the lyrics (other than the verse I wrote) of *Joyful Noise*. I cannot attest to whether any portion of the instrumental component or any of the lyrics (other than the verse I wrote) of *Joyful Noise* constitute materials that are not commonly used, or that are original to Flame, Chike Ojukwu, or Emanuel Lambert.

5.      I am aware that Flame, Chike Ojukwu, and Emanuel Lambert have sued various defendants alleging that the song *Dark Horse* as it appears on Katy Perry's album, *Prism*, infringes *Joyful Noise*. I am aware that the named defendants are Jordan Houston, Lukasz Gottwald, Sarah Theresa Hudson, Katheryn Elizabeth Hudson, Karl Martin Sandberg, Henry Russell Walter, Capitol

Mitchell
Silberberg &
Knupp LLP

9529116.1

2

EXHIBIT 18
PAGE 638

1 Records LLC, Universal Music Group, Inc., UMG Recordings, Inc., Kobalt Music
2 Publishing America, Inc., Kasz Money, Inc., Kitty Purry, Inc., and WB Music
3 Corp.

4     6.    I was originally named as a plaintiff in this lawsuit. I, however, was
5 not interested in pursuing a lawsuit so, upon learning that the lawsuit had been
6 filed, I demanded to be dismissed as a plaintiff. To the extent that I had any
7 copyright interest in the *Joyful Noise* composition, on July 22, 2014, I transferred
8 and assigned any and all such interest, if any, and other rights in *Joyful Noise* to
9 Flame, Chike Ojukwu, and Emanuel Lambert.

10     7.    Plaintiffs have claimed I have knowledge regarding their allegation
11 that the authors of *Dark Horse* had "access" to *Joyful Noise*, but this is not correct.

12     8.    I have no knowledge that any Defendants had any "access" to *Joyful*
13 *Noise*, either through it being transmitted to them, from hearing any performance
14 of *Joyful Noise*, or from any other exploitation of *Joyful Noise* in any medium or
15 format. I did not supply any individual Defendant or corporate Defendant with any
16 copy of *Joyful Noise* ever. I never played the song *Joyful Noise* for any Defendant
17 or any representative of any corporate Defendant.

18     9.    I do not know and have never met Lukasz Gottwald (p/k/a Dr. Luke),
19 Henry Russell Walter (p/k/a Cirkut), Karl Martin Sandberg (p/k/a Max Martin),
20 Katheryn Elizabeth Hudson (p/k/a Katy Perry), Jordan Houston (p/k/a Juicy J), or
21 Sarah Theresa Hudson.

22     10.    I have no knowledge with respect to how or when the song *Dark*
23 *Horse* was created and/or recorded.

24     ///
25     ///
26     ///
27     ///
28     ///

Mitchell
Silberberg &
Knupp LLP

9529116.1

3

**DECLARATION OF LECRAE MOORE**

EXHIBIT 18
PAGE 639

1    11.    I have no knowledge regarding any manner or quantity of sales or

2    other exploitation, if any, of *Joyful Noise*.

3

4    I declare under penalty of perjury under the laws of the United States of

5    America that the foregoing is true and correct.

6    Executed December 11, 2017, at ___Atlanta___, ___Ga___.

7                                          [city]              [state]

8

9

10                                      Lecrae Moore

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP
9529116.1

4

**DECLARATION OF LECRAE MOORE**

EXHIBIT 18
PAGE 640

# EXHIBIT 19

EXHIBIT 19
PAGE 641



1

2

3

4

5

6

7

8 UNITED STATES DISTRICT COURT

9 CENTRAL DISTRICT OF CALIFORNIA

10 WESTERN DIVISION

11

12 MARCUS GRAY (P/K/A FLAME), et al.,

13                Plaintiffs,

14       v.

15 KATHERYN ELIZABETH HUDSON

16 (P/K/A KATY PERRY), et al.,

17           Defendants.

CASE NO. 2:15-CV-05642-CAS JCx

Honorable Christina A. Snyder

**SUPPLEMENTAL DECLARATION OF CHRISTOPHER MAGILL, DESIGNATED CORPORATE WITNESS FOR NON-PARTY MYSPACE, LLC**

18

19

20

21

22

23

24

25

26

27

28

SUPPLEMENTAL DECLARATION OF CHRISTOPHER MAGILL

EXHIBIT 19
PAGE 642

**<u>DECLARATION OF CHRISTOPHER MAGILL</u>**

I, Christopher Magill, declare and state as follows:

1.      I am the Vice President of Legal Affairs for Viant Technology, LLC, which is the parent company for Myspace LLC ("Myspace"). I am the designated corporate declarant for Myspace LLC regarding the matters set forth here, of which I have personal knowledge, and, if called as a witness, I could and would testify competently thereto.

2.      Myspace LLC operates the social networking website located at www.myspace.com ("Myspace").

3.      On January 30, 2018, I provided a declaration (the "first declaration") in this matter in which I explained how the number of times a particular song has been initiated for playback (hereafter called a "play count") is shown on a particular user's page.

4.      To clarify my first declaration, each "play" does not necessarily mean that a person actually listened to the song while it was playing; it indicates that play of the song was initiated. A "play" also does not necessarily mean that the song was played in its entirety or was even played for more than a few seconds. Nor does a "play count" necessarily reflect the number of unique people who played a song.

5.      Moreover, a play count does not identify any one person in particular as having initiated playback or listened to the song in question.  Myspace LLC has

2

EXHIBIT 19
PAGE 643

1 | no records of and cannot identify whether any one person in particular has played

2 | or listened to a song.

3

4 |     I declare under penalty of perjury under the laws of the United States of

5 | America that the foregoing is true and correct.

6

7 |     Executed this 28th day of March 2018, at Irvine, California.

8

9

10

11 |                                 Christopher Magill

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

**SUPPLEMENTAL DECLARATION OF CHRISTOPHER MAGILL**

EXHIBIT 19
PAGE 644