# EXHIBIT 20

EXHIBIT 20
PAGE 645

1
2
3
4
5
6
7
8
9
10
11
12
13 UNITED STATES DISTRICT COURT

14 CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

15

| | |
|---|---|
| 16 MARCUS GRAY, et al., | CASE NO. 2:15-CV-05642-CAS JCx |
| 17     Plaintiffs, | Honorable Christina A. Snyder |
| 18     v. | **DECLARATION OF ANN MECKELBORG, REPRESENTATIVE OF THE NATIONAL ACADEMY OF RECORDING ARTS & SCIENCES, INC.** |
| 19 KATHERYN ELIZABETH HUDSON, et al., | |
| 20     Defendants. | |
| 21 | |

22
23
24
25
26
27
28

**DECLARATION OF ANN MECKELBORG**

EXHIBIT 20
PAGE 646

## DECLARATION OF ANN MECKELBORG

I, Ann Meckelborg, the undersigned, declare:

1.      I am over 18 years of age and have personal knowledge of the following facts.  If called and sworn as a witness, I could and would competently testify thereto.

2.      I am the Managing Director, Contract Administration & Corporate Secretary for the National Academy of Recording Arts & Sciences, Inc. (the "Recording Academy") and am authorized to make this declaration on behalf of the Recording Academy.

3.      I have been employed by the Recording Academy since 2003, and have held the position of Managing Director since 2015.  In my capacity as Managing Director, I am responsible for, among other things, maintaining the Recording Academy's corporate files and contracts.

4.      I previously provided a declaration in this matter, dated September 27, 2017.  By virtue of my position with the Recording Academy, I have now obtained additional information reflected in the Recording Academy's files, or evident from the absence of information in those files, to prepare this declaration, which amends and expands upon my original declaration.

5.      While I stated accurately in my prior declaration that the records of the Recording Academy reflect that Lukasz Gottwald and Jordan Houston were voting members of the Recording Academy eligible to vote for the 51st Annual GRAMMY Awards, there are no records in the Recording Academy's files to demonstrate whether any eligible voter actually votes, whether any eligible voter votes in a specific category, or whether any eligible voter votes for a specific work (e.g., an album or a song).

6.      Accordingly, there are no records in the Recording Academy's files evidencing whether or not Mr. Gottwald or Mr. Houston voted in the 51st Annual GRAMMY Awards.

1

**DECLARATION OF ANN MECKELBORG**

EXHIBIT 20
PAGE 647

7.      While I also stated, in my prior declaration, that as a matter of practice and policy, all voting members of the Recording Academy were provided with access to all of the musical works nominated for the 51st Annual GRAMMY Awards via a streaming website, I have come to learn that statement was incorrect. While all voting members of the Recording Academy were provided with access to a streaming website, and granted permission to review all works that were <u>actually posted</u> to the website, if the Recording Academy could not obtain permission from all rights holders for all works in a nominated category, none of the works nominated in that category were posted for streaming.  In the ordinary course of its business, the Recording Academy maintains records of what categories were streamed on the website.

8.      The Recording Academy's records for the 51st Annual GRAMMY Awards reflect that the Recording Academy was not able to obtain permission for all of the works nominated in the category of Best Rock or Rap Gospel Album, in which category the album *Our World: Redeemed* was nominated.  As a result, none of the works nominated in the Best Rock or Rap Gospel Album category were made available for streaming on the website maintained by the Recording Academy.

9.      Accordingly, no voting member, including Mr. Gottwald and Mr. Houston, could have heard any music or track from the album *Our World: Redeemed* on the website maintained by the Recording Academy for the 51st Annual GRAMMY Awards.

10.     For the 51st Annual GRAMMY Awards, the website was the only way in which the Recording Academy made nominated works available to voting members.  The Recording Academy did not send copies of nominated works to voting members.

2

**DECLARATION OF ANN MECKELBORG**

EXHIBIT 20
PAGE 648

1      I declare under penalty of perjury under the laws of the United States of

2  America that the foregoing is true and correct.

3      Executed November, 30, 2017, at Santa Monica, _____CA_____.

                                          [city]           [state]

4

5

6                                                  Ann Meckelborg

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

3

**DECLARATION OF ANN MECKELBORG**

5157/53720-003 CURRENT/94430450v2                                      11/28/2017 12:24 PM

EXHIBIT 20
PAGE 649

# EXHIBIT 21

EXHIBIT 21
PAGE 650

Confidential Pursuant to Protective Order

Page 1

1          UNITED STATES DISTRICT COURT
   CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

2

3   MARCUS GRAY (p/k/a FLAME);        )
    EMANUEL LAMBERT; and CHIKE        )          CERTIFIED COPY
4   OJUKWU,                           )
                                      )
5        Plaintiffs,                  )
                                      )
6            vs.                      ) Index No. 2:15-cv-05642-CAS-JCX
                                      )
7   KATHERYN ELIZABETH HUDSON         )
    (p/k/a KATY PERRY); JORDAN        )
8   HOUSTON (p/k/a JUICY J);          )
    LUKASZ GOTTWALD (p/k/a DR.        )
9   LUKE); SARAH THERESA HUDSON;      )
    KARL MARTIN SANDBERG (p/k/a       )
10  MAX MARTIN); HENRY RUSSELL        )
    WALTER (p/k/a CIRKUT); KASZ       )
11  MONEY, INC.; CAPITOL RECORDS,     )
    LLC; KITTY PURRY, INC., UMG       )
12  RECORDINGS, INC.; UNIVERSAL       )
    MUSIC GROUP INC.; WB MUSIC        )
13  CORP LLC; and KOBALT MUSIC        )
    PUBLISHING AMERICA, INC.,         )
14                                    )
         Defendants.                  )
15  ------------------------------)

16

17

18        CONFIDENTIAL VIDEOTAPED DEPOSITION
19                  OF MARCUS GRAY
20             New York, New York
21          Wednesday, November 15, 2017
22

23

24  Reported by:
    MICHELLE COX
25  JOB NO. 133788

EXHIBIT 21
PAGE 651

Confidential Pursuant to Protective Order

Page 19

1   correct?

2   A    Correct.  There was no four-way

3   communication.

4   Q    Is there a reason for that?

5   A    Just different schedules, different states

6   we all live in, mostly.

7   Q    Now, did there come a time when the

8   case -- there was a case filed, correct --

9   A    Correct.

10  Q    -- against my clients by you and -- and

11  actually the four writers of "Joyful Noise,"

12  correct?

13  A    Yes.

14  Q    And there came a time when Mr. Moore asked

15  to be let out; is that correct?

16  A    That is correct.

17  Q    And can you explain the circumstances of

18  that disassociation by him?

19  A    Lecrae mentioned that he was approaching a

20  promotional tour run, and that it would

21  conflict with the promotion of his album.

22  Q    Okay.  Anything further?

23       Did he say anything further?

24  A    No.

25  Q    Okay.  In your view, he had authorized the

Confidential Pursuant to Protective Order

Page 22

1   A    Those were the terms he agreed to.  But

2   all he explained was, this is conflicting with

3   my promotional run.

4   Q    Okay.  All right.  But we'll probably get

5   back to that with the documents.

6        And have you had any conversation with him

7   at all since that event transpired, which I

8   believe was in, roughly, 2014?

9   A    Not regarding the case.

10  Q    Regarding anything.

11       Have you spoken to him at all?

12  A    Well, we're in similar circles.  So we

13  cross paths.  But we haven't talked about the

14  case at all.

15  Q    And when you cross paths with him in these

16  similar circles, do you just talk about other

17  things?

18  A    It's just really in passing, just being in

19  the same location.

20  Q    Okay.  When you say "similar circles,"

21  what do you mean by that?

22  A    We're in the same genre of music.

23  Q    Which is?

24  A    Christian rap.

25  Q    Okay.  And there's a circle of --

EXHIBIT 21
PAGE 653

Confidential Pursuant to Protective Order

Page 23

1    A    Artists.

2    Q    -- folks and artists and writers in that

3    genre of music that sort of encounter each

4    other on a regular basis; is that right?

5    A    Correct.

6    Q    And it's Christian rap folks that gather

7    in that circle?

8         Yes?

9    A    Correct.

10   Q    Let me go back to some of this.

11        Can you just briefly describe your

12   educational background.

13   A    Yes.

14        My most recent degree is a bachelor's

15   degree in biblical counseling.  And I'm

16   currently finishing my master's degree in

17   systematic theology and church history.

18   Q    And do you have any educational training

19   in either music, music theory?

20   A    I do not have any educational training in

21   music theory.

22   Q    Or how about in terms of playing an

23   instrument; did you ever perform on any

24   instrument?

25   A    As a kid I performed on instruments, but

Confidential Pursuant to Protective Order

Page 25

1    A     Definitely, the last time.

2    Q     So as an adult, you've not been engaged in

3    either any instrumental work or learning how to

4    educate yourself with respect to music

5    notation?

6    A     Not at all.

7    Q     Okay.  And you don't believe you're

8    qualified to do that?

9    A     Not at all.

10   Q     Okay.  All right.

11         So there came a point in time when you

12   started rapping, correct?

13   A     Yes.

14   Q     Why don't you give us a little bit of

15   background in how that came about.

16   A     I just started rapping early on, around

17   fifth grade or so.  And just continued to write

18   music all the way throughout the duration of my

19   time here on earth, currently, and still doing

20   the same thing.

21   Q     Okay.  So when you say "music," you mean

22   lyrics, right?

23   A     Yes.

24   Q     Okay.  Because I want to differentiate

25   between those two --

EXHIBIT 21
PAGE 655

Confidential Pursuant to Protective Order

Page 26

1    A    Okay.

2    Q    -- concepts.

3    A    Okay.

4    Q    So did you ever write any type of

5    instrumental music?

6    A    I have not.

7    Q    And so the music, let's say -- let's say,

8    going forward, when we talk about your

9    creations, it's solely in that lane of lyrics,

10   correct?

11   A    Correct.

12   Q    All right.  And how did you come about

13   deciding to pursue a musical career in rap?

14   A    It's a typical aspiration growing up where

15   I grew up.  And something I tried, and it went

16   really well in terms of response, so I

17   continued to pursue it and more opportunities

18   came about.

19   Q    Did you have any other employment in your

20   life besides music, as an adult, and prior to

21   engaging in any sort of religious or spiritual

22   pursuits?

23   A    Yes.

24        So I was in construction work.  I was a

25   bricklayer.  And that kept me busy until the

EXHIBIT 21
PAGE 656

Confidential Pursuant to Protective Order

Page 36

1   Q   -- after the creation Joyful Noise?

2   A   Yes.

3   Q   Okay.  And how about Mr. Moore, had you

4   worked with Mr. Moore prior to Joyful Noise?

5   A   Yes, I did work with Lecrae Moore prior to

6   Joyful Noise.

7   Q   On recordings and compositions?

8   A   Yes, on recordings and compositions.

9   Q   Okay.  On your albums or otherwise?

10   A   Both on my albums and his albums.

11   Q   Okay.  All right.  So now if I'm getting

12   the year right, it was in around 2007 that the

13   Joyful Noise song was created; is that correct?

14   A   Correct.

15   Q   Okay.  Can you tell me how -- the process

16   of how it was created, in your own words?

17   A   So the song was created first through

18   hearing the musical composition that was

19   already constructed on Chike's Myspace page.

20   And then I was encouraged to reach out to Chike

21   and to obtain the musical composition, to which

22   he sent me the music, and I wrote the lyrics,

23   recorded them, and the song was put together

24   that way.

25   Q   Okay.  So the -- let's, if we can, divide

EXHIBIT 21
PAGE 657

Confidential Pursuant to Protective Order

Page 37

1    it between musical bed or sound recording that
2    Chike created, and the lyrics.
3         Who created, to the best of your
4    knowledge, the underlying beat --
5    A    Mm-hmm.
6    Q    -- instrumental track?
7    A    Chike --
8    Q    Exclusively?
9    A    -- created the beat.
10   Q    No one else, to your knowledge, created
11   that beat, correct?
12   A    Correct.
13   Q    Including -- you didn't have any role
14   creating that beat?
15   A    Correct.
16   Q    You didn't have any role in creating --
17   excuse me, Emanuel didn't have any role in
18   creating that beat, correct?
19   A    Correct, he did not.
20   Q    And Mr. Moore did not have any role in
21   creating that beat, correct?
22   A    Correct, he didn't.
23   Q    Okay.  And that beat is the subject of
24   this lawsuit, correct?
25   A    The song is.

Confidential Pursuant to Protective Order

Page 40

1    speculate.

2    A    No.

3         MR. KAHN:   You've heard that advice

4    before.

5    Q    Or guess.

6         You know, a good estimate on things is

7    fine, but not guessing and not speculation.

8         Oh.   Let me ask you this:   So to the best

9    of your knowledge, no one else in the creation

10   of "Joyful Noise," whether yourself,

11   Mr. Lambert, Mr. More, anyone in the studio,

12   Adam Long, none of the performers, Mr. Reilly,

13   none of those individuals had any role in

14   creating the instrumental beat, underlying

15   musical track, to "Joyful Noise," correct?

16   A    Correct.

17   Q    Okay.   So you put your lyrics on first; is

18   that right, to "Joyful Noise," after you got

19   the track from Chike?

20   A    Yes, I put my lyrics on first.

21   Q    Did you buy the track from him or how did

22   you -- strike that.

23        What, if anything, in terms of an

24   agreement did you have with Chike in terms of

25   using that track?

Confidential Pursuant to Protective Order

Page 41

1   A    We recorded the song prior to any

2   agreement.

3   Q    You worked an agreement out later?

4   A    There was Cross Movement Records involved

5   with reaching out to Chike in terms of moving

6   forward with the -- with the actual production.

7   Q    Okay.  So, yes, in terms of the sound

8   recording, the performances of Lecrae, did

9   Lambert provide lyrics on Joyful Noise?

10  A    Yes.

11  Q    So there's three lyricists, yes?

12  A    Yes, three lyricists.

13  Q    Yourself, Mr. Lambert and Mr. Moore, and

14  then Chike for the music, underlying music?

15  A    Correct.

16  Q    Did the four contributors to Joyful Noise

17  all have agreements with Cross Movement

18  Records, to your knowledge?

19  A    I do not recall.  I do not recall that

20  information.

21  Q    Okay.  If they do, or -- obviously you

22  don't represent Mr. Moore.

23       MS. LEPERA:  But to the extent Mr. Lambert

24  or Mr. -- or Chike have any agreements with

25  respect to either their sound recording

Confidential Pursuant to Protective Order

Page 47

1    A    It was one of the tracks on the album,

2    "Our World Redeem."

3    Q    Right.  No -- well, there was never --

4    there was never a single --

5    A    No.

6    Q    -- Joyful Noise put out?

7    A    Correct, there was no single.

8         THE COURT REPORTER:  You said Directful

9    Noise?

10   Q    In any format, correct?

11        There was no single of Joyful Noise put

12   out in any format, correct?

13   A    Correct, there was not.

14   Q    So when you say the album was released,

15   what do you mean by that?

16   A    Every album has a date to which it reaches

17   the general public for the first time, and

18   Joyful Noise was on Our Redeem.

19        MS. LEPERA:  Okay.  Let's take a few

20   minutes.  I'm just want to -- I'm going pretty

21   quickly, actually.  So this is good.

22        MR. KAHN:  Good.

23        MS. LEPERA:  Yeah, I mean, we have a

24   seven-hours -- you know, I don't want to take

25   up seven hours of testimony if we don't have

EXHIBIT 21
PAGE 661

Confidential Pursuant to Protective Order

Page 75

```
1    Q     Of the economics relating to any --

2    A     I do not.

3    Q     -- distribution?

4    A     I do not.

5    Q     No, let me finish.

6    A     Okay.

7          MR. KAHN:  Yeah.

8    Q     Let's just do it again, because I think it

9    got chopped.

10         Do you have any documents, at all, in your

11   possession or control reflecting any sales of

12   the sound recording, "Our World Redeemed"?

13   A     I do not.

14   Q     Okay.  Do you have any documents in your

15   possession or control, custody or control, that

16   reflect any income from any of the performance

17   societies regarding public performances of

18   "Joyful Noise"?

19   A     I do not.

20   Q     Do you have any documents in your

21   possession reflecting any income from any

22   source at all reflecting -- that emanates from

23   "Joyful Noise," the composition?

24   A     I do not.

25   Q     Do you have any documents that reflect the
```

EXHIBIT 21
PAGE 662

Confidential Pursuant to Protective Order

Page 76

1    performance, live performance of Joyful Noise

2    at any concert at any time by anyone?

3    A    I do not.

4    Q    Do you have any videos of any of your

5    concerts or anyone else's concerts at which the

6    song, "Joyful Noise," was performed live?

7    A    I do not.

8    Q    Okay.

9    A    There's a music video for the song --

10   Q    Yes.

11   A    -- and there's YouTube footage --

12   Q    Yes.

13   A    -- of the actual performances, but I don't

14   own, like, a copy of YouTube's catalog.

15   Q    No, no, no.  I'm talking about -- and

16   we'll get into it, at any of the venues where

17   you may have performed or Mr. Moore may have

18   performed or anyone else may have performed,

19   any songs from "Our World Redeemed," if there

20   was a video of the performance reflecting a

21   performance of "Joyful Noise" specifically.

22   A    There -- there is footage of that, but I

23   don't own any personal footage, other than

24   having a copy of the music video.

25   Q    No, I'm not talking about the YouTube

Confidential Pursuant to Protective Order

Page 77

1    video.  I'm talking about live concert

2    performances.

3    A    No, I do not have any footage of it.

4    Q    You say there is footage?

5    A    There is footage via YouTube.

6    Q    No, not YouTube.  I'm talking about, for

7    example, if you're in a venue.

8    A    Mm-hmm.

9    Q    And the YouTube video is a commercial

10   video --

11   A    Mm-hmm.

12   Q    -- not a concert video, correct?

13   A    I'm not sure how that breaks down.

14   Q    Well, if you go and buy a ticket and go to

15   a show, right --

16   A    Yeah.

17   Q    -- some people tape the concert

18   performances.

19   A    Okay.

20   Q    That's what I'm trying to understand.

21   A    Okay.

22   Q    So do you have any tapes of any concert

23   performance or live performance anywhere of

24   "Joyful Noise"?

25   A    I do not.

Confidential Pursuant to Protective Order

1    Q    Do you know anyone that does have any such

2    taping or video of any live performance of

3    "Joyful Noise," ever?

4    A    Other than friends who have been present

5    at concerts, that's the only extent of people I

6    know who would have footage from a live

7    concert.

8    Q    But do they?

9         Do you know someone that specifically has

10   footage of Joyful Noise?

11   A    No, I don't recall anyone --

12   Q    Okay.

13   A    -- who has footage of . . .

14   Q    Okay.  All right.  Do you have any

15   documents reflecting the broadcast of "Joyful

16   Noise" on any radio station, ever?

17   A    I do not have any documents of it.

18   Q    Do you know anyone who has any such

19   documents?

20   A    I don't know, personally, someone who has

21   radio documents.

22   Q    Okay.  Do you know -- do you have any

23   documents reflecting the broadcast of "Joyful

24   Noise" on any television or cable station,

25   ever, worldwide?

EXHIBIT 21
PAGE 665

Confidential Pursuant to Protective Order

Page 79

1    A    Any documents?

2    Q    Yes.

3    A    I don't have any documents of those

4    things, personally.

5    Q    Do you know anyone who does?

6    A    I do not know anyone, personally, who has

7    documents of that.

8    Q    Whether or not you have any of such

9    documents, sitting here today, can you identify

10   having seen any document that reflects either

11   the broadcast of "Joyful Noise" on TV or radio,

12   the -- let's just start -- ask that first.  I

13   don't want it to be too compound.

14        MR. KAHN:  Could you read that back.

15        MS. LEPERA:  I'll do it again.

16   Q    Whether or not you have any documents, can

17   you identify having seen any document, ever,

18   that reflects either the broadcast of "Joyful

19   Noise" on TV or radio?

20   A    I don't have any documents saying such.

21   Q    Have you ever seen one?

22   A    I don't recall seeing --

23   Q    Okay.

24   A    -- specific documents for the song being

25   broadcast.

EXHIBIT 21
PAGE 666

Confidential Pursuant to Protective Order

Page 80

1    Q    On TV?

2    A    On TV or on radio.

3    Q    Okay.  Have you ever seen any document

4    that reflects that "Joyful Noise" was performed

5    at a specific venue?

6    A    I don't -- I don't get documentation of

7    when a song is performed --

8    Q    Right.

9    A    -- personally.

10   Q    Exactly.  I'm just simply asking whether,

11   you know, there's been an article in the

12   newspaper, Oh, it was a great performance of

13   "Joyful Noise" last night.

14        Have you ever seen a document?

15   A    Yeah, I've seen those documents.

16   Q    You've seen them.

17        Now, where and when did you see them?

18   A    I've seen, as you've mentioned, such as

19   the -- The Dove Award that it was nominated

20   for.  The Grammy Award which it was nominated

21   for.

22   Q    Different -- I'm asking a different

23   question.  I am asking whether or not you've

24   seen any document that says, I saw Flame

25   perform "Joyful Noise" last night at X Church

Confidential Pursuant to Protective Order

Page 84

1    Q    In Africa?

2    A    Yeah.

3    Q    Press in Africa?

4    A    In Africa.

5    Q    I'm talking about press in the United

6    States.

7    A    I've seen those things as well.

8    Q    Well, I'm asking if you can recall a

9    specific one where I -- I'll repeat the

10   question, if you need me to.

11        Where there's an identification of that

12   specific song, and "corroboration," for lack of

13   a better word, that someone performed it the

14   night before, something like that?

15   A    Yeah, I can't think of a specific, at this

16   moment.

17   Q    Okay, okay.

18   A    The exact words or . . .

19   Q    Okay.  Or exact time or date or place?

20   A    Not exact time, date or place.

21   Q    I know you said you don't have any

22   documents reflecting any income produced from

23   the song, "Joyful Noise," from any source,

24   right?

25   A    Correct.

EXHIBIT 21
PAGE 668

Confidential Pursuant to Protective Order

Page 85

1    Q     You ever seen any documents reflect --

2    A     I have not --

3    Q     Let me just finish the question.

4          -- reflecting any income --

5    A     Sorry.

6    Q     -- whether it's yours or anybody else's,

7    income from the sale or other exploitation of

8    "Joyful Noise"?

9    A     I have not.

10   Q     Same question, but with respect to the

11   album.

12         Have you seen any documents from any

13   source reflecting anyone's income from the sale

14   or other exploitation of the sound recording,

15   "Our World Redeemed"?

16   A     I have not.

17   Q     Do you have any knowledge or information,

18   from any source, of the number of CDs pressed

19   or manufactured, if any, by anyone?

20   A     I do not have any documentation on that,

21   either.

22   Q     I'm going to, just for a second before we

23   go on, I'm going to ask you to look at -- and

24   this can just be a representation by counsel,

25   if you can't.

Confidential Pursuant to Protective Order

Page 86

1    A     Mm-hmm.

2    Q     But this is Exhibit 12.  And I'll state

3    for the record, these were the documents that

4    were produced by plaintiffs, which are P0000001

5    through 314, the audios that were produced are

6    obviously not in here, but there's the blank

7    page identifying it.

8          So my question is, when you have a

9    moment --

10   A     Can I unravel this package?

11   Q     Yes, you certainly can.  And some of these

12   we've already marked separately.

13   A     Okay.

14   Q     Just so you're aware.

15         Again, these are the documents that

16   plaintiffs have produced.

17         And my question is going back to No. 8,

18   which we looked at a minute ago --

19   A     Mm-hmm.

20   Q     -- was our series of requests; including

21   some of the things I asked you about.

22   A     Mm-hmm.

23   Q     To your knowledge, the best of your

24   knowledge, have the plaintiffs produced

25   everything that they have in their possession,

EXHIBIT 21
PAGE 670

Confidential Pursuant to Protective Order

Page 87

1   custody and control, that responds, other than

2   privileged documents, to our requests?

3   A     I would say so.

4   Q     And you've made an effort to do that,

5   consistent with our requests?

6   A     Correct.

7   Q     So other than these documents that we have

8   here, you're not aware of any other documents,

9   personally, or that the other plaintiffs may

10  have that -- or that are in your possession,

11  custody or control, that would be in response

12  to what we've asked for?

13  A     No, I'm not aware.

14  Q     Okay.  Thank you.  You can put the rubber

15  band back on that, just put that over.

16        Look at 9, if you would.  And 9 is another

17  document that your counsel prepared in

18  connection with this lawsuit.

19  A     Mm-hmm.

20  Q     And if you turn to Page 2, the only other

21  person, other than Mr. Moore we talked about,

22  identified as a potential -- I'll take that

23  back.  There's another one -- withdrawn.

24        You see on Page 2 of Exhibit 9 --

25  A     Mm-hmm.

Confidential Pursuant to Protective Order

Page 93

1    Q    Do you know who is paying, if anyone, the

2    fees and cost to keep it active?

3    A    No, I do not.

4    Q    Okay.  So you're --

5    A    Wait a minute.

6    Q    Pardon me?

7    A    I believe it's inactive.

8    Q    It says "Status:  Active," on the first

9    page.

10   A    Yeah, I don't have any dealings with the

11   LLC currently.

12   Q    All right.  In any event, we can -- the

13   only question I have is:  To your knowledge,

14   this company is not engaging in any kind of

15   music-related business?

16   A    No, it isn't.

17   Q    Turning to 14 and 15, if you would put

18   those two in front of you.

19   A    Oh, here we go.

20   Q    Okay.  Let's start with 14.

21        Do you recognize this document?

22   A    No.

23        What is it?

24   Q    Okay.  Let's go it 15, P46.

25        MS. LEPERA:  You can double check

EXHIBIT 21
PAGE 672

Confidential Pursuant to Protective Order

Page 94

1        obviously, but we think this is from your

2        production, P46.  I just didn't have the

3        Bates-stamp number, copy of the Bates-stamp

4        number is on this particular exhibit.  We can

5        substitute it, if there's any concern.

6             MR. ALBERTSON:  I can explain why this

7        looks like this.

8             P46 was produced as a single page of the

9        document.  But it was a very long list.  So if

10       it were printed as one page, it would be very,

11       very small.  So we broke it up, and that's what

12       you're seeing on this, this exhibit.

13            MS. LEPERA:  Can we mark -- do you have

14       the long one there?

15            MR. ALBERTSON:  No.

16    BY MS. LEPERA:

17       Q    All right.  In any event, whether it's a

18       long list or any portion of this list, do you

19       know where this information came from; is this

20       from your files?

21       A    Can you explain what it is I'm looking at,

22       first.

23       Q    Someone from your side gave it to your

24       lawyer and produced it to us, without any

25       information related to it specifically.

Confidential Pursuant to Protective Order

Page 98

1    Q    Right, there are certain things notated,
2    and there's a lot of blanks.

3    A    Mm-hmm.

4    Q    So if you have other documents for this
5    time frame, reflecting other information or any
6    information that's different than this, we
7    would ask for that, too.

8    A    Okay.  No, I don't have that.

9    Q    Because you say you have them attached to
10   your e-mail.  I do not know what that means.

11   A    No, I do not have -- what you just asked,
12   I do not have.

13   Q    Do you have any documents in your
14   possession, custody or control, that relate to
15   your booking dates that is -- whether it's this
16   format or not, in your e-mails?

17   A    No, this -- this is a sufficient document
18   for this time period.  This is from my booking
19   department, so . . .

20   Q    So you don't have anything that reflects
21   anything different?

22   A    I don't have anything that reflects
23   anything different or in addition.

24   Q    Right.  Okay.  That's what you believe.
25   But in the event that there is something

Confidential Pursuant to Protective Order

Page 99

1          different, we're entitled to see it.  So --

2               MR. KAHN:  We'll look.

3     A     No.

4               MS. LEPERA:  Thank you.  Perfect.

5     BY MS. LEPERA:

6     Q     Okay.  Now, let's go and take a look

7          through Exhibit 15.

8               Am I correct in -- in the fact that all of

9          the documents -- all of the dates from Friday,

10         1/1/10, on this page, down, to 2/7/10, are

11         blank, meaning there was no performance by you.

12              Yes?

13    A     Yes, I'm assuming this.

14    Q     Okay.  So if at any --

15    A     I don't regularly see my schedule in this

16         format, so --

17    Q     That's my question.

18              So if we were to take another one and

19         spend the time doing it, that's why I wanted to

20         get your understanding, generally as to, if a

21         page is blank or the entry for the date is

22         blank, there was no performance, correct?

23    A     Correct.

24    Q     Okay.  So let's turn to the first page

25         that has anything listed, P000265.

EXHIBIT 21
PAGE 675

Confidential Pursuant to Protective Order

Page 100

1      Do you see that?

2  A    Okay, yes, I'm there.

3  Q    You have here on "6/11/10, Calgary AB."

4      What is that?

5      Where is that?

6  A    I'm assuming it's a church venue.

7  Q    Where?  Alabama?

8  A    Yeah, Calgary, Alabama.

9  Q    Have you been to Calgary, Alabama?

10 A    Yeah.

11 Q    Why are you saying you assume it's a

12 church venue?

13 A    Because that's where my venues are,

14 mostly.

15 Q    Your venues are mostly in churches, okay.

16      And what type of church?

17 A    It varies.

18 Q    I mean, different denominations?

19 A    Cross denomination, faiths.  So, yeah.

20 Q    All Christian?

21 A    Mostly, correct.

22 Q    Okay.  Do you do temples or --

23 A    I pretty much go wherever I'm invited,

24 so . . .

25 Q    Okay.  Have you done any -- any temples?

Confidential Pursuant to Protective Order

Page 104

```
 1              THE COURT REPORTER:  There's a --

 2              MS. LEPERA:  Too much overlap.

 3              THE COURT REPORTER:  And so the

 4         transcript --

 5              MR. KAHN:  Let her finish --

 6              THE COURT REPORTER:  -- is going to be

 7         choppy.

 8              THE WITNESS:  Okay.

 9              MR. KAHN:  You're talking over each other.

10              THE WITNESS:  I'm talking over her,

11         mostly.

12         Q    That's all right.  It happens.

13              MS. LEPERA:  Okay.  Thank you, for

14         clarifying that, so we can try to control it.

15    BY MS. LEPERA:

16         Q    Can you take a look through 15 and tell me

17         whether you can identify any performance,

18         specifically on -- any performance that appears

19         to be -- that appears to have happened, from

20         this document, that would be a festival or a

21         non-Christian music venue?

22         A    I don't really remember the specifics of

23         these venues.

24              So, no, I guess, would be the answer.

25         Q    Okay.  So just going through this
```

TSG Reporting - Worldwide    877-702-9580

EXHIBIT 21

PAGE 677

Confidential Pursuant to Protective Order

Page 105

1   particular document -- and, by the way, just to
2   confirm, you don't believe you have any other
3   document that identifies your performances,
4   generally, as an artist, for this time frame,
5   other than this document --
6   A    I do not.
7   Q    -- Exhibit 15, which is from 2000 -- which
8   is Exhibit 15, from 2010 to -- for four years,
9   2010, 2011 -- excuse me, five years, 2010, '11,
10  '12, '13 and '14; to the best of your
11  knowledge, this is a comprehensive list,
12  correct?
13  A    Yes, it appears to be.
14  Q    Okay.  All right.  So then going back, and
15  I want you to take your time, obviously, you
16  can't identify on Exhibit 15, any venue that is
17  either a non-Christian venue or nonreligious
18  venue, including a festival that is
19  non-Christian or religious, correct?
20  A    Correct.
21  Q    Okay.  Just to finish off with this
22  exhibit, and you're looking at each of these
23  entries, nothing on here identifies
24  what -- strike that.  Withdrawn.
25       Nothing on Exhibit 15 identifies who

EXHIBIT 21
PAGE 678

Confidential Pursuant to Protective Order

Page 106

1    performed with you at any of these venues,

2    correct?

3    A    Nothing on these documents.  But I do see

4    school -- I see schools -- "School Begins,"

5    "Weddings."  So these would be non-Christian

6    related events.  But I don't see any names on

7    here.

8    Q    They would be private events, correct?

9         That would be private events, right,

10   weddings?

11   A    Yeah.

12   Q    Okay.

13   A    But I don't see any names of anyone that

14   performed with me.

15   Q    Did you always perform with the same set

16   of musicians at every venue?

17   A    In terms of my team or who's present at

18   the venue performing?

19   Q    In terms of your set.

20   A    In terms of my set, I did not.  So I would

21   have different people with me sometimes.

22   Q    Okay.  So it wouldn't be the same people

23   on every venue --

24   A    Not every venue.

25   Q    -- playing a set with you?

EXHIBIT 21
PAGE 679

Confidential Pursuant to Protective Order

Page 107

1    A      Not every venue.

2    Q      Okay.  And prior to this time you had how

3    many albums out?

4    A      Three albums.

5    Q      Three albums out, okay.

6           There's nothing indicated on any of these

7    routing documents that there was any music

8    being sold at the venues.

9    A      There's nothing on these documents

10   indicating music being sold, correct.

11   Q      Are you aware of any documents indicating

12   any sales of any music of yours at any of the

13   venues?

14   A      That I have in my possession?

15   Q      Correct.

16   A      I don't have those documents in my

17   possession.

18   Q      Does anybody have those documents, if they

19   exist?

20   A      Distribution companies would have

21   documentation, I suppose, of things.  So their

22   venues.

23   Q      Distribution companies of whose?

24   A      Artists, in general.

25   Q      I'm talking about yours.  I'm talking your

Confidential Pursuant to Protective Order

Page 108

1    music.

2    A     I don't have any documentation.

3    Q     No, okay.

4          So you don't have any documentation of any

5    of your music CDs --

6    A     No.

7    Q     -- including "Our World Redeemed" --

8          MR. KAHN:  Let her finish.

9    Q     -- sold at any of these venues --

10   A     No.

11   Q     -- on 2015 -- excuse me, Exhibit 15?

12   A     I do not.

13   Q     And the income that is reflected on the

14   various venues, if any, was income for the live

15   performance; is that right?

16   A     Yes.

17   Q     Not from music sales?

18   A     Yes.

19   Q     Okay.  All right.  And there's no

20   indication on any of the entries for any of the

21   venues as to what set you would be playing that

22   night, correct?

23   A     Correct.

24   Q     And you have no documents indicating what

25   sets you were playing in any of these venues,

EXHIBIT 21
PAGE 681

Confidential Pursuant to Protective Order

Page 109

1  correct?

2  A     Correct.

3  Q     Okay.  Let's now go to Exhibit 11, which

4  is in the pile somewhere there.  And if you

5  would turn to Page 4.

6        MS. LEPERA:  We don't have a verification

7  for this?

8  Q     Okay.

9        MS. LEPERA:  Just check the other one.  We

10  do for this, okay.

11  Q     Okay.  So what we are looking at here is a

12  supplemental answer by the plaintiffs,

13  including yourself, to our written questions,

14  they're called "interrogatories."

15        MS. LEPERA:  And I'll note for the record

16  I don't see a verification on this particular

17  document; although I see one on the prior

18  answer.

19        So I'd ask for that to be supplied, but

20  we'll go through it now anyway.

21  Q     If you look at Page 4, No. 13.

22  A     Mm-hmm.

23  Q     There's a -- what's called a "supplemental

24  response."

25        Do you see that?

EXHIBIT 21

PAGE 682

Confidential Pursuant to Protective Order

Page 111

1  Q    When you say "playing the music,"

2  controlling the music, what do you mean by

3  that?

4  A    In terms of pressing play and queuing

5  songs, and things of that sort.

6  Q    So you would play the track?

7  A    Correct.

8  Q    The instrumental track for "Joyful Noise"?

9  A    Correct.

10  Q    Okay.  And remove the lyrics, or use the

11  old track without the lyrics?

12  A    Correct.

13  Q    But it's the exact same lyric track that

14  was on the recording?

15  A    Correct.

16  Q    I'm sorry, the exact same music bed track

17  that was on the recording?

18  A    Yes.

19  Q    Okay.  All right.  Now, can you identify,

20  which, if any, of these performances included

21  Mr. Lambert?

22  A    I cannot.

23  Q    Can you identify, which, if any, of these

24  performances included Lecrae?

25  A    No, I cannot, from this document.

EXHIBIT 21
PAGE 683

Confidential Pursuant to Protective Order

Page 112

1   Q    Who prepared -- where did these -- what

2   does this information come from, this listing

3   of 2008 to 2010 locations?

4   A    These are dates provided by my wife.

5   Q    Where did she get them -- I'm sorry.

6   A    No, she provided these dates in terms of

7   coordinating with our booking department.  So

8   she's the filter and liaison between our

9   booking department.

10  Q    Okay.  But we had a document that's

11  Exhibit 15 directly from the booking

12  department; it starts 1/1/10.  And we don't

13  have one for 2008 and 2009 from the booking

14  department -- from the booking agent.

15  A    Yeah, I was not with that booking

16  department at the time, 2008.

17  Q    Who was your booking agent in 2008 or

18  2009, if any?

19  A    So this would be -- so my wife was, you

20  know, doing bookings and -- as well as a young

21  lady helping with Cross Movement Records.

22  Q    Okay.  So do you know where, then, the

23  dates -- what document did your wife, if you

24  know, pull these dates from, to insert them

25  into this document?

EXHIBIT 21
PAGE 684

Confidential Pursuant to Protective Order

Page 113

1   A     These would have been derived from her

2   correspondence with the young lady helping,

3   Cross Movement Records, at the time, and via

4   e-mail, and her correspondence, and also her

5   own booking assistants directly to her.

6         MS. LEPERA:  If there are underlying

7   documents that support these, that reflect that

8   these performances occurred, as opposed to a

9   litigation document, we'll call for the

10  production of that.  Because there's obviously

11  a source document from which these were pulled.

12  Q     And similar to the document, Exhibit 15,

13  these other new entries here on the

14  interrogatory do not have any notation with

15  respect to any music being sold at any of these

16  locations, correct?

17  A     Correct.

18  Q     They don't have the other information,

19  i.e., like, specific venue and/or dollar

20  amounts, unlike Exhibit 15, correct?

21  A     Correct.

22  Q     Where, if at all, would that information

23  be found, if you know?

24  A     I'm not sure, no.

25  Q     Okay.  And, again, there's no information

EXHIBIT 21
PAGE 685

Confidential Pursuant to Protective Order

Page 114

1  provided about any particular set or track or

2  song being performed at any of these locations,

3  correct?

4  A    Correct.

5  Q    No documents exist to show what set, if

6  any, was played at any of these venues -- or

7  any of these locations, correct?

8  A    Not on this time period, correct.

9  Q    And similarly to the information we've

10 discussed with respect to Exhibit 15, is it

11 your understanding that these are locations for

12 venues that were either Christian venues or

13 religious venues?

14 A    Mostly, correct.

15 Q    Can you identify any that were not?

16 A    Not at the moment.

17 Q    Okay.  Can you identify the seating

18 capacity for the locations identified on

19 Interrogatory No. 13?

20 A    It would be a similar range, between the

21 hundreds, and say -- yeah, to 80, 90,000.  It

22 would be similar ranges on documents provided

23 on No. 15.

24 Q    I haven't located anything on Exhibit 15

25 that remotely approaches $100,000 in the

Confidential Pursuant to Protective Order

Page 117

1    Q     Okay.  That's fine.  Okay.  Thank you.

     All right.  Let's move on.

3          Okay.  So actually taking a look back

4    at -- by the way, let me ask you this, before I

5    do that.

6          Other than what you have in that

7    interrogatory answer that we just looked at,

8    where there were various locations of what you

9    stated were performances by you --

10   A     Mm-hmm.

11   Q     -- and Exhibit 15, which is another

12   identification of performances --

13   A     Mm-hmm.

14   Q     -- are there any other documents or

15   sources of information that would identify any

16   undocumented, in these documents, performances

17   by you, from 2008 to 2014?

18   A     No.

19   Q     This is the universe, correct?

20   A     Are you saying this is all the information

21   we have?

22   Q     Yes.

23   A     Yes.

24   Q     But do you think that there are other

25   concerts or performances that you, sitting here

EXHIBIT 21
PAGE 687

Confidential Pursuant to Protective Order

Page 118

1    today, can remember not reflected on these

2    documents?

3    A    No.

4    Q    Okay.  All right.  All right.  Now, there

5    are the individual writers of Dark Horse, okay.

6    We have Katy Perry, Max Martin, Juicy J,

7    Henry Walter and Lu Gottwald, and Sarah Hudson,

8    six, that you received.

9        Have you ever met any of them?

10   A    I have not.

11   Q    Okay.  Do you know whether any of the --

12   do you know whether either of the other two

13   plaintiffs ever met any of those six

14   individuals?

15   A    I do not know that information.

16   Q    Okay.  Do you know whether or not

17   Mr. Moore met any of those six individuals at

18   any point in time?

19   A    I do not know that information for sure.

20   Q    Has anyone told you, Mr. Moore, Chike or

21   Lambert, that they had met any of those six

22   people at any point in time?

23   A    No.

24   Q    Okay.  Have you spoken to any of those six

25   people at any point in time?

EXHIBIT 21
PAGE 688

Confidential Pursuant to Protective Order

Page 119

1    A    I have not.

2    Q    Do you know whether Mr. Lambert or Chike

3    have spoken to any of those six people at any

4    point in time?

5    A    No.

6    Q    Have either of those two individuals, the

7    two other plaintiffs, told you that they had

8    spoken to any of those six individuals at any

9    point in time?

10   A    No.

11   Q    Okay.  Do you have any knowledge or

12   information, from any source, of any of those

13   six individuals attending any of the

14   performances of yours identified in Exhibit 15,

15   or Interrogatory No. 13?

16   A    No.

17   Q    By the way, in the interrogatory you

18   indicate that Mr. Moore performed "Joyful

19   Noise" at all -- at his concerts for 2008-2009?

20   A    Correct.

21   Q    Were you present at all of his concerts

22   for 2009 and 2008?

23   A    I was not.

24   Q    Were you present at any of them?

25   A    Yes.

EXHIBIT 21
PAGE 689

Confidential Pursuant to Protective Order

Page 120

1    Q    How many?

2    A    I'm not sure of a particular number.

3    Q    Just give me a rough estimate.

4         More than 12?

5    A    No, it was not more than 12.

6    Q    Less than 12?

7    A    Less than 12.

8    Q    Less than five?

9    A    I don't recall specific -- special range.

10   But I was present at a portion of his concerts,

11   yeah.

12   Q    Can you give me a rougher estimate?

13        Is it somewhere between one and five, more

14   like five or ten?

15   A    Calling me to think back.

16   Q    Yeah, or if you could ever remember which

17   ones you attended, that would be fine, too,

18   locations.

19   A    It's a handful.  A couple of handfuls.

20   Q    Okay.  And you don't remember the

21   locations?

22   A    I do not.

23   Q    Okay.  Do you have any set list from his

24   concerts?

25   A    I do not own set list of Lecrae's

EXHIBIT 21
PAGE 690

Confidential Pursuant to Protective Order

Page 121

1    concerts.

2    Q    All right.  Okay.  All righty.  Let me go

3    back here.

4         Okay.  So with respect to those six

5    individuals that we just mentioned, who wrote

6    Dark Horse, did you personally or through

7    direction, ever send any of those six

8    individuals any of your music?

9    A    I have not.

10   Q    Same question with respect to those six

11   individuals who wrote Dark Horse; did you hear

12   from either of the two plaintiffs that either

13   of them had ever directly or indirectly sent

14   any of those six individuals any of their music

15   which would include "Joyful Noise"?

16   A    No.

17   Q    Do you know of anyone within your circle,

18   your musical circle or otherwise, sending any

19   of your music, including "Joyful Noise", to any

20   of those six individuals at any point in time?

21   A    No.

22   Q    Do you have any knowledge or information

23   that any of those six individuals directly or

24   indirectly purchased or obtained a copy of "Our

25   World Redeemed"?

EXHIBIT 21
PAGE 691

Confidential Pursuant to Protective Order

Page 122

1    A    No.

2    Q    Do you know of anyone from any source

3    having performed "Joyful Noise" for any of

4    these six individuals?

5    A    No.

6    Q    Okay.  So no copy of "Joyful Noise,"

7    either in whole or in part, either the lyrics

8    or the underlying beat, to your knowledge, was

9    provided to any of those six individuals,

10   directly or indirectly through the mail, or any

11   other source of transmission?

12   A    Correct.

13   Q    Okay.  And there's no documentation that

14   you're aware of, or seen, reflecting any

15   acknowledgment that any of those six

16   individuals have or ever had any opportunity to

17   hear "Joyful Noise"?

18   A    Can you repeat the first part of your

19   question, I'm sorry.

20   Q    There's no documentation, that you're

21   aware of, or have seen, reflecting

22   acknowledgment that any of these six

23   individuals have ever had an opportunity to

24   hear "Joyful Noise"?

25   A    No.

Confidential Pursuant to Protective Order

Page 123

1   Q    Okay.  Let me go back.

2        In addition to those six individuals,

3   there are corporate defendants in this case,

4   Capitol Records, Warner Brothers Music,

5   Universal Music Group, UMG Recordings, Kolbalt

6   Music Publishing America, Kasz Money and

7   Kitty Purry, Inc.

8        Did you personally, or through

9   instruction, send any executive at any of those

10  entities a copy of the sound recording of "Our

11  World Redeemed"?

12  A    No.

13  Q    Did you personally or through instruction

14  send any executive or employee at any of those

15  entities any copy or version, in any format, of

16  the recording of "Joyful Noise"?

17  A    No.

18  Q    Are you aware from any source of whether

19  or not either of the other two plaintiffs sent

20  an executive or employee at any of those

21  defendant companies a copy of "Joyful Noise"?

22  A    No, I have not.

23  Q    So you have no knowledge or information

24  that they did that?

25  A    No.

EXHIBIT 21
PAGE 693

Confidential Pursuant to Protective Order

Page 124

1  Q    Okay.  And how about any other person, do

2  you have any knowledge or information that any

3  other third party provided any of those

4  corporate defendants with a copy of "Joyful

5  Noise"?

6  A    No.

7  Q    Same question with respect to performance;

8  do you have any knowledge or information of

9  anyone performing "Joyful Noise" or any part

10 thereof, for any executive or employee of any

11 of the corporate defendants?

12 A    No.

13 Q    All right.  Let me go to --

14     MS. LEPERA:  What time is it?

15     MR. ALBERTSON:  Almost 2:00.

16     MS. LEPERA:  Okay.

17 Q    I'm going to go back to the

18 interrogatories.  It's No. 10.  Well, let me

19 just -- let me just ask -- we'll do this first.

20 We'll do this first.

21     Okay.  So we're going to go to number --

22     MS. LEPERA:  You have too many tabs for

23 me, Jake.  I can't -- I'm kidding.  I'm

24 kidding.  It's great.

25 Q    Interrogatory No. 4, right.  Page 4 of

EXHIBIT 21
PAGE 694

Confidential Pursuant to Protective Order

Page 125

1   this Document 10, yes?

2   A    Mm-hmm.

3   Q    Okay.  The question was:  "Set forth in

4   detail all facts which support any contention

5   that Defendants purportedly had access to the

6   Plaintiffs' Composition, or any recording

7   thereof."

8        Okay.  Then there's a series of answers,

9   the first of which, (As read):  "At least 18

10  months before the release of the recording of

11  Defendants' Composition, Dark Horse, the

12  Recording of Plaintiffs' Composition, "Joyful

13  Noise," had been viewed and/or downloaded from

14  YouTube more than 2.5 million times, and had

15  been viewed and/or downloaded from other

16  Internet sites more than 1 million times."

17       You see that?

18  A    Yes.

19  Q    Okay.  Now, you don't know how YouTube

20  calculates downloads, do you?

21  A    I do not.

22  Q    Or views?

23  A    No.

24  Q    Okay.  And you don't know whether every

25  view is -- can be corroborated to be an

Confidential Pursuant to Protective Order

Page 126

```
 1    individual unique user?
 2    A     No.
 3    Q     You don't know, okay.
 4          And you don't know what individuals, if
 5    any, actually viewed the video, including with
 6    the sound on, correct?
 7    A     I know people who viewed the video.
 8    Q     Okay.  But those are your friends and --
 9    A     No.
10    Q     -- fans?
11    A     Both, and.
12    Q     Pardon?
13    A     Both and.
14    Q     Friends and fans --
15    A     Mm-hmm.
16    Q     -- correct?
17    A     They include those, yeah.
18    Q     Say what?
19    A     It includes both friends and fans.
20    Q     Friends and fans, exactly.
21          But you don't have any knowledge or
22    information of either -- of any of those six
23    individual defendants, or anyone affiliated
24    with them, being one of any particular viewer
25    or downloader on that site, correct?
```

EXHIBIT 21
PAGE 696

Confidential Pursuant to Protective Order

Page 127

1    A    No.

2    Q    And then the next one is:  "In addition,
3    tens of thousands of followers of the
4    Myspace.com pages for Plaintiffs' and
5    Lecrae Moore had access to the recording of
6    Plaintiffs' Composition."
7         Okay.  So when you say "Myspace.com
8    pages," you're talking about four different
9    Myspace pages?
10   A    In terms of who all had one?
11   Q    Yes.
12   A    Yes, all part of this --
13   Q    Lecrae Moore, Chike, you and Emanuel,
14   correct, for what periods of time, do you know?
15   A    I do not.
16   Q    And how do you come up with the tens of
17   thousands?
18   A    In terms of how many followers we had?
19   Q    Correct.
20        Yeah, how did you -- how did you calculate
21   that, or did you calculate that?
22   A    Myspace reports, how many followers you
23   have, just like Instagram, Twitter and
24   Facebook.
25   Q    But it varies from time to time, doesn't

Confidential Pursuant to Protective Order

Page 129

1    would ask for that to be produced.

2         This is now stated as a fact, and I'm

3    asking what the basis is of that fact, of the

4    number.

5         You understand?

6         So sitting here today, can you give me any

7    specific document that reflects that?

8    A    I don't have that document today.

9    Q    Do you know anyone who does?

10   A    I do not.

11   Q    Did anyone tell you that they have, other

12   than counsel?

13        But counsel hasn't produced it, I assume.

14        No?

15   A    No.

16   Q    And, again, so you don't have any

17   knowledge or information of any of the six

18   individual defendants visiting any of the

19   Myspace pages for any of the four, "Joyful

20   Noise" creators, correct?

21   A    Correct.

22   Q    So similarly you would have no knowledge

23   of any of them, any of those six individuals,

24   that they visit -- you don't have any knowledge

25   of them viewing anything from those pages,

EXHIBIT 21
PAGE 698

Confidential Pursuant to Protective Order

Page 130

1   correct?

2   A    Correct.

3   Q    All right.  We're up to number -- we did

4   this already, right.  Okay.

5        So let's go to the same interrogatory, but

6   we're skipping down a little bit.

7        You see where it says "In January of 2009,

8   the album "Our World Redeemed"?

9   A    Page 5?

10  Q    Page 5.  Thank you.

11  A    Yes.

12  Q    "In January 2009, the album "Our World

13  Redeemed" (which includes Plaintiffs'

14  Composition) was a nominee for Rap/Hip Hop

15  Gospel Album of the Year at the Stellar Award

16  show held at the Grand Ole Opry at Nashville,

17  Tennessee in Nashville, Tennessee."

18       Did you -- you see that there?

19  A    Yes.

20  Q    Were you present at that event?

21  A    Yes.

22  Q    And what -- what occurred at that event?

23       Was there -- were there performances?

24  A    There were performances.  I was one of the

25  hosts that year.

EXHIBIT 21
PAGE 699

Confidential Pursuant to Protective Order

Page 131

1   Q    Okay.  Did you perform "Joyful Noise" --

2   A    I did not.

3   Q    -- at this event?

4        Did anyone perform "Joyful Noise" at this

5   event?

6   A    No, it was not performed.

7   Q    So the only thing that occurred at this

8   event was that someone stated it was -- the

9   song, "Joyful Noise" -- excuse me, not "Joyful

10  Noise" -- that "Our World Redeemed" was a

11  nominee for album of the year?

12  A    Correct.

13  Q    Okay.  And how many people were present at

14  the Stellar Award show?

15  A    I'm not sure.  I'm not sure.

16  Q    Grand Ole Opry venue, though, correct?

17  A    Correct.

18  Q    Okay.  So we know where that is.

19       And was it broadcast on any medium, to

20  your knowledge, the show?

21  A    Yes, I'm not sure who with or . . .

22  Q    Okay.  But there was no performance of

23  "Joyful Noise"?

24  A    Correct.

25  Q    Okay.  And you don't have any knowledge or

EXHIBIT 21
PAGE 700

Confidential Pursuant to Protective Order

Page 132

1   information of any of the six individuals who

2   wrote Dark Horse, appearing at the Stellar

3   Award show?

4   A    No.

5   Q    Okay.  Next one.

6        (Discussion off the record.)

7   Q    Okay.  We'll go to the next one.

8        "In February of 2009 -- (As read):  "In

9   February of 2009, the album "Our World

10  Redeemed" (which includes Plaintiffs'

11  Composition) was a nominee for Best Rock or Rap

12  Gospel Album at the 51st Annual Grammy Award

13  show in Los Angeles, California, which was

14  televised nationwide."

15       And it goes on to say Katy Perry performed

16  there and Defendants Gottwald and Sandberg were

17  voting members of the Grammy Society, and thus

18  would have received copies of and/or access to

19  the nominated songs, and asked for their review

20  prior to voting.

21       So did you attend the award show?

22  A    Yes.

23  Q    Okay.  Did you perform the song, "Joyful

24  Noise," at the award show?

25  A    I did not.

EXHIBIT 21
PAGE 701

Confidential Pursuant to Protective Order

Page 133

1   Q    Did anyone perform the show -- song,

2   "Joyful Noise," at this award show?

3   A    No.

4   Q    Okay.  Was it actually identified in a

5   televised broadcast as one of the nomination

6   categories?

7   A    No.

8   Q    Do you know how the Grammy organization

9   determines which nominated songs to post on its

10  website for viewing by awarding members?

11  A    No.

12  Q    Okay.  Do you know whether or not they

13  have a procedure by which, if all the songs in

14  a particular category are not authorized or

15  cleared to be posted, that none of them are

16  posted?

17  A    No, I don't know.

18  Q    Do you know for a fact whether or not the

19  Rap Gospel -- Best Rap or Rock Gospel Album

20  category of nominees was actually posted on the

21  website?

22  A    I'm not sure of that.

23  Q    Where are we now?  Going backyards.

24       Okay.  Next one is stated:  "In April of

25  2009."

EXHIBIT 21
PAGE 702

Confidential Pursuant to Protective Order

Page 134

1      "In April of 2009, Plaintiffs' Composition
2  was a nominee for the Best Rap/Hip Hop Song of
3  the Year at the 40th GMA Dove Awards" -- did I
4  just do this one?
5      No?
6  A    No, that was Stellar Awards.
7  Q    Because I read Ole Opry.
8      -- "which was televised live from the
9  Grand Ole Opry in Nashville, Tennessee."
10 A    Mm-hmm.
11 Q    Okay.  Another Grand Ole Opry.
12     You didn't perform "Joyful Noise" at this
13 award show, did you?
14 A    I did not.
15 Q    Did anyone perform it?
16 A    No.
17 Q    Do you have any recording of any music
18 played there?
19 A    I have a recording of "Joyful Noise,"
20 which was played during the announcement of
21 nominees.
22 Q    That -- do you have that recording when it
23 was played during the announcement of nominees?
24 A    I cannot recall.
25 Q    Okay.  What portion was played?

EXHIBIT 21
PAGE 703

Confidential Pursuant to Protective Order

Page 135

1   A    What portion of the song, "Joyful Noise."

2   Q    Do you know which part?

3   A    I can't recall right now.

4   Q    But you don't have a copy of whatever the

5   clip was, that was played during the nomination

6   announcement?

7   A    I cannot recall right now.

8   Q    And, again, where was that, if anywhere,

9   broadcast, beyond the Grand Ole Opry?

10  A    I'm not sure.

11  Q    You said it was televised live?

12  A    Yeah, I'm not sure of what network or ins

13  and outs of that.

14  Q    Are you sure it was televised live?

15  A    Yeah, it's televised live every year, as

16  well as the Stellar's, Grammys.

17  Q    Okay.  On what station or network?

18  A    I'm not sure.

19  Q    And no one recorded the shows for you, a

20  video of the show from watching the broadcast?

21  A    No, I don't have a copy of that --

22  Q    Okay.

23  A    -- recorded show.

24  Q    Okay.  And, again, you don't have any

25  knowledge or information of any of the six

EXHIBIT 21
PAGE 704

Confidential Pursuant to Protective Order

Page 136

1    individuals who are the defendants in this case

2    attending this Grand Ole Opry award show,

3    right?

4    A    No, I do not.

5    Q    Are there any documents that you can think

6    of that would reflect an attendance listed in

7    any of these award shows?

8    A    No.  I wouldn't be privy to that

9    information.

10   Q    Yeah, okay.

11        Okay.  The next one is -- I believe this

12   one, right.

13        It's in the supplemental one.  It's in

14   No. 11.  It's on Page 3 and 4 at the bottom.

15   It says, "Additionally, the album "Our World

16   Redeemed" (which includes Plaintiffs'

17   Composition) debuted at No. 5 on the Billboard

18   Gospel Chart and reached No. 1 on the Christian

19   Music Trade Association (CMTA) R&B/Hip Hop

20   Chart."

21        Do you see that?

22   A    Yes.

23   Q    Okay.  What year was that, that it had

24   that debut at 5?

25        Was it 2008?

EXHIBIT 21
PAGE 705

Confidential Pursuant to Protective Order

Page 137

1    A    2008.

2    Q    How long did it stay there?

3    A    I'm not sure.

4    Q    Well, where was it in 2009, '10, '11, '12?

5    A    I'm not sure.

6    Q    Do you have any knowledge or information

7    of any of the six defendants, or anyone

8    affiliated with them, or any of the corporate

9    defendants actually looking at this particular

10   chart in 2008, No. 1?

11   A    No.

12   Q    Or pulling anything by virtue of that --

13   A    No.

14   Q    -- number?

15   A    No, I don't.

16   Q    Are you aware of anyone who might have

17   such information or knowledge that would

18   indicate any review by any of the defendants of

19   either the chart, or any information associated

20   with the chart, listing of "Our World

21   Redeemed"?

22   A    The six, no.

23        MS. LEPERA:  Okay.  Can we take a short

24   break.  I'm getting there.

25        THE VIDEOGRAPHER:  The time is 12:12 p.m.

Confidential Pursuant to Protective Order

Page 138

1          and we're off the record.

2                  MR. KAHN:  12:12 p.m.?

3                  THE VIDEOGRAPHER:  2:12.

4                  (Recess taken.)

5                  THE VIDEOGRAPHER:  The time is 2:44 p.m.,

6          and we're back on the record.

7      BY MS. LEPERA:

8          Q    I had asked you previously, Mr. Gray,

9          about whether or not you knew for a fact the

10         Rap Gospel Album nominees were actually posted

11         on the website.

12                 I also want to ask:  Do you know whether

13         or not, as a fact that the nominees' songs,

14         those nominee songs, were actually posted on

15         the website for the 51st Grammy Award?

16         A    I don't know if they posted it on the

17         website.

18         Q    And similarly you do not know, even if

19         they were, you don't know that they were, that

20         any of the six individual defendants viewed or

21         heard the song from that source, correct?

22         A    Correct.

23         Q    And since sitting here today, and I'm

24         obviously taking into consideration your entire

25         testimony, but do you have any knowledge or

EXHIBIT 21
PAGE 707

Confidential Pursuant to Protective Order

Page 139

1    information, from any source or documentary or

2    witness, that could -- that reflects that any

3    of the six defendants either heard or viewed

4    "Joyful Noise" prior to creating Dark Horse?

5    A    No, I do not have any documentation of

6    that.

7    Q    Do you have any knowledge or information

8    as to how Dark Horse was created?

9    A    No.

10   Q    Okay.  Do you know anyone who may have

11   been present or had information regarding the

12   creation process in 2014?

13   A    No, I don't know anyone.

14   Q    You don't know anyone.

15        So you don't know what came first, what

16   portion of the song, or how it was created

17   amongst the six, correct?

18   A    No, I do not, among the six.

19   Q    Okay.  And neither, to your knowledge, do

20   either of the plaintiffs have any such

21   knowledge?

22   A    I'm not sure what knowledge they would

23   have.

24   Q    They didn't tell you that, correct?

25   A    No, they did not tell me that.  No, they

Confidential Pursuant to Protective Order

Page 149

```
1              C E R T I F I C A T E
2    STATE OF NEW YORK        )
3                             :ss
4    COUNTY OF NEW YORK       )
5
6            I, MICHELLE COX, a Notary Public within
7    and for the State of New York, do hereby
8    certify:
9            That MARCUS GRAY, the witness whose
10   deposition is hereinbefore set forth, was duly
11   sworn by me and that such deposition is a true
12   record of the testimony given by the witness.
13           I further certify that I am not related to
14   any of the parties to this action by blood or
15   marriage, and that I am in no way interested in
16   the outcome of this matter.
17           IN WITNESS WHEREOF, I have hereunto set my
18   hand this 30th day of November 2017.
19
20
21
22
23                       Michelle Cox
24                       MICHELLE COX, CLR
25
```

EXHIBIT 21
PAGE 709

Confidential Pursuant to Protective Order

Page 150

```
 1                          INDEX
 2   WITNESS                 EXAMINATION BY        PAGE
 3   MARCUS GRAY             MS. LEPERA            6, 144
 4                           MR. KAHN              141
 5
 6
 7               INFORMATION REQUESTS
 8
 9   REQUESTS:  33, 42, 56, 88, 89, 98, 109, 113, 129
10                      EXHIBITS
11   DEPOSITION EXHIBITS                          FOR ID.
12   Exhibit 1     Document Entitled "Certificate   48
                   of Registration"
13
     Exhibit 2     E-mail dated June 4, 2014,       49
14                 from Copyright Office to Eric
                   Kayira, with Attachment
15
     Exhibit 3     Letter dated June 5, 2014,       49
16                 from Eric Kayira to Chris
                   MacRae
17
     Exhibit 4     Document Entitled "Assignment    49
18                 of Copyright"
19   Exhibit 5     Document Entitled "Song          49
                   Writers' Split Acknowledgment
20
     Exhibit 6     Document Entitled "Assignments   49
21                 of Copyright"
22   Exhibit 7     Document Entitled                55
                   "Certification"
23
24
25
```

Confidential Pursuant to Protective Order

```
                                                    Page 151
 1    DEPOSITION EXHIBITS                        FOR ID.
 2    Exhibit 8      Document Entitled "Plaintiffs'   70
                     Supplemental Combined
 3                   Responses to Defendants Jordan
                     Houston, Lukasz Gottwald,
 4                   Sarah Theresa Hudson, Karl
                     Martin Sandberg, and Henry
 5                   Russell Walter's First
                     Requests for Production of
 6                   Documents"
 7    Exhibit 9      Document Entitled "Plaintiffs'   70
                     Rule 26(a)(1)(A) Initial
 8                   Disclosures"
 9    Exhibit 10     Document Entitled "Plaintiffs'   70
                     Combined Responses to
10                   Defendants Jordan Houston,
                     Lukasz Gottwald, Sarah Theresa
11                   Hudson, Karl Martin Sandberg
                     and Henry Russell Walter's
12                   First Set of Interrogatories
13    Exhibit 11     Document Entitled "Plaintiffs'   71
                     Supplemental Answer to
14                   Interrogation Nos. 4 and 13 of
                     Defendants' First Set of
15                   Interrogatories (Amended)"
16    Exhibit 12     Document Entitled "Assignment    71
                     of Copyright"
17
      Exhibit 13     Document Entitled "Limited       92
18                   Liability Company Details as
                     of 11/14/2017"
19
      Exhibit 14     7-Page Document                  92
20
      Exhibit 15     Document Entitled "Flame -       92
21                   Detailed Routing"
22
23
24
25
```

EXHIBIT 21
PAGE 711

Confidential Pursuant to Protective Order

Page 152

ERRATA SHEET

1

2  Case Name:   Gray et al v. Hudson et al

3  Deposition Date:   November 15, 2017

4  Deponent:  Marcus Gray

5  Pg.   No.  Now Reads         Should Read      Reason

6  __14__  _23_  "the song and the case"  "the song."          Accuracy. Clarified in next sentence.

7  __32__  _23_  "I'm not sure ..."       "No. No rights."     Accuracy. Confused by question.

8  __47__  _13_  "Correct, there was not."  "It was released as   Accuracy. Not released in other
9  ____  ___                                 a single in video    formats but was released in video.
                                             format."

10  __100__  _8_  "Calgary, Alabama"      "Calgary, Alberta"(Canada)  Accuracy. (Perhaps a
11  ____  ___                                                         transcription error?)

12  __103__  _1_  "Gorilla Fest."        "Grizzly Fest."      Transcription error.

13  __145__  _11_  "I dont know how       "More than 12        Accuracy. As I read the
14  ____  ___     many times."            times."             transcript, I recalled that
                                                              ~~Lecrae and I were part of the~~
15  ____  ___                                                  "Don't Waste Your Life" tour
16  ____  ___                                                  in 2009 and performed the song
                                                              together at every concert. Those
17  ____  ___                                                  concerts are included in my
                                                              ~~supplemental answer to Inter-~~
18  ____  ___                                                  rogatory No. 20.

19  ____  ___                                                  _____

20

21                                                _____
                                                  Signature of Deponent

22

23  SUBSCRIBED AND SWORN BEFORE ME
   THIS _5th_ DAY OF _January_, 2018.

24  _Patricia C White_

25  (Notary Public)   MY COMMISSION EXPIRES: _March 30, 2019_

PATRICIA C. WHITE
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Charles County
My Commission Expires: March 30, 2019
Commission Number: 15497880

EXHIBIT 21
PAGE 712

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**
## PA 1-900-321

Effective date of registration:

June 3, 2014

## Title

| | |
|---|---|
| Title of Work: | Joyful Noise |
| Title of Larger Work: | Flame - Our World Redeemed |

## Completion/Publication

| | | | |
|---|---|---|---|
| Year of Completion: | 2007 | | |
| Date of 1st Publication: | March 4, 2008 | Nation of 1st Publication: | United States |

## Author

| | | | |
|---|---|---|---|
| ■ Author: | Chike Ojukwu | | |
| Author Created: | Lyrics and music | | |
| Work made for hire: | No | | |
| Citizen of: | United States | Domiciled in: | United States |
| ■ Author: | Marcus Gray | | |
| Pseudonym: | Flame | | |
| Author Created: | Lyrics and music | | |
| Work made for hire: | No | | |
| Citizen of: | United States | Domiciled in: | United States |
| Year Born: | 1981 | | |
| Pseudonymous: | Yes | | |
| ■ Author: | Lecrae Moore | | |
| Author Created: | Lyrics and music | | |
| Work made for hire: | No | | |
| Citizen of: | United States | Domiciled in: | United States |
| Year Born: | 1979 | | |



Page 1 of 2
P000005

EXHIBIT 21
PAGE 713

- **Author:** Emanuel Lambert
- **Author Created:** Lyrics and music

Work made for hire: No
Citizen of: United States                                 Domiciled in: United States
Year Born: 1977

## Copyright claimant

Copyright Claimant: Chike Ojukwu
200 South Hanley Road, Suite 208, Clayton, MO 63105

Copyright Claimant: Marcus Gray
200 South Hanley Road, Suite 208, Clayton, MO 63105

Copyright Claimant: Lecrae Moore
200 South Hanley Road, Suite 208, Clayton, MO 63105

Copyright Claimant: Emanuel Lambert
200 South Hanley Road, Suite 208, Clayton, MO 63105

## Rights and Permissions

Organization Name: Kayira Law, LLC
Name: Eric Kayira
Email: eric.kayira@kayiralaw.com                     Telephone: 314-899-9381
Address: 200 South Hanley Road, Suite 208
Clayton, MO 63105

## Certification

Name: Eric Kayira
Date: June 3, 2014

Correspondence: Yes

EXHIBIT 21
PAGE 714

# EXHIBIT 22

EXHIBIT 22
PAGE 715

Page 1

1           UNITED STATES DISTRICT COURT

            CENTRAL DISTRICT OF CALIFORNIA

2

3  MARCUS GRAY (p/k/a FLAME);  )

    EMANUEL LAMBERT; and CHIKE  )

4  OJUKWU,              )     **CERTIFIED COPY**

                     )

5     Plaintiffs,     )

                     )

6       vs.         ) Index No. 2:15-cv-05642-CAS-JCX

                     )

7  KATHERYN ELIZABETH HUDSON  )

    (p/k/a KATY PERRY); JORDAN  )

8  HOUSTON (p/k/a JUICY J);   )

    LUKASZ GOTTWALD (p/k/a DR.  )

9  LUKE); SARAH THERESA HUDSON; )

    KARL MARTIN SANDBERG (p/k/a  )

10  MAX MARTIN); HENRY RUSSELL  )

    WALTER (p/k/a CIRKUT); KASZ  )

11  MONEY, INC.; CAPITOL RECORDS, )

    LLC; KITTY PURRY, INC., UMG  )

12  RECORDINGS, INC.; UNIVERSAL  )

    MUSIC GROUP INC.; WB MUSIC   )

13  CORP LLC; and KOBALT MUSIC   )

    PUBLISHING AMERICA, INC.,   )

14                     )

       Defendants.     )

15  -----------------------------)

16

17     CONFIDENTIAL VIDEOTAPED DEPOSITION

18        OF CHIKE OJUKWU

19       New York, New York

20     Friday, November 17, 2017

21

22

23

24  Reported by:

    MICHELLE COX

25  JOB NO. 133793

EXHIBIT 22

PAGE 716

Page 10

1    A    No.

2    Q    Okay.  And what did you -- what type of

3    courses did you take in college?

4    A    Just general.

5    Q    "Just general" meaning English, history --

6    A    Sure, mm-hmm.

7    Q    -- stuff like that?

8         Okay.  And what is your professional

9    background or history?

10   A    I don't really have professional

11   background.

12   Q    Okay.  Business background?

13   A    None.

14   Q    Okay.  What are you -- are you currently

15   employed?

16   A    Yes, I am.

17   Q    What is your employment?

18   A    I work at Spectrum or Charter Spectrum.

19   I'm a trainer there.

20   Q    And how long have you had that position?

21   A    I've had the trainer position for a couple

22   of months.  Before that I was answering calls

23   on the phone.

24   Q    Okay.  What do you do as a trainer?

25   A    As a trainer I help people who come in for

EXHIBIT 22
PAGE 717

Page 11

1       the first time and show them the job,

2       basically.

3       Q    The job of doing what?

4       A    Answering the phones.

5       Q    Okay.  Do you have any technology

6       background?

7       A    No.

8       Q    Do you have any engineering?

9       A    No.

10      Q    Have you ever taken any courses in studio

11      engineering?

12      A    No.

13      Q    Okay.  Have you ever taken any courses

14      in -- in music theory?

15      A    I took one course.

16      Q    What course was that?

17      A    Just like learning piano.

18      Q    Do you play piano?

19      A    Very lightly.

20      Q    Okay.  And other than that one course,

21      have you taken any courses or studies

22      whatsoever in learning how to play an

23      instrument or music theory?

24      A    No.

25              MR. KAHN:  Just a reminder, let --

EXHIBIT 22
PAGE 718

Page 29

```
 1    track --
 2    A    Mm-hmm.
 3    Q    -- but allow someone to incorporate it in
 4    their work, but then you could license it again
 5    or sell it again.
 6    A    I see, okay.
 7    Q    It might be in writing or it might be
 8    oral.
 9    A    I've never done that before, no.
10    Q    Okay.  All right.  How many -- let me ask
11    you this:  So are you currently still creating,
12    can I call them, "beats"?
13    A    Yes.
14    Q    Okay.  When I use the word "beats," we
15    understand each other to mean that that's
16    essentially a musical instrumental bed, where
17    they don't have a synthesizer or a drum
18    machine, or whatever it is, to create a
19    instrumental sound recording, correct?
20    A    Yes.
21    Q    Are you still creating beats?
22    A    Yes.
23    Q    And how much of your time is spent in your
24    day-to-day job versus your music activities?
25    A    I try to find time, maybe on the weekends
```

EXHIBIT 22
PAGE 719

Page 30

1    because, you know, I get really busy during the

2    week.

3    Q    Okay.

4    A    So . . .

5    Q    And when you do create beats, do you do it

6    alone?

7    A    Yes.

8    Q    Okay.  So with respect to all of your

9    beats, including the one that we're going to

10   talk about in this case for "Joyful Noise," no

11   one else is a participant in your creation of

12   that beat, other than yourself?

13   A    Correct.

14   Q    Okay.  And on what type of equipment do

15   you create your beats?

16        And if it varies, you can tell me.

17   A    Sure.

18   Q    Yeah.

19   A    I always create it on a computer or a

20   laptop.

21   Q    Mm-hmm.

22   A    And I'll use software installed on a

23   computer to make that music.

24   Q    What particular software, do you remember?

25   A    I use FL Studio.  I also use Reason, as

EXHIBIT 22
PAGE 720

Page 36

1       terms of the studio programming for their use,

2       do you have that, whether or not for "Joyful

3       Noise," just generally so we can see that?

4       A    I don't.

5       Q    Okay.  Do you know whether the terms of

6       use for those studio platforms are the same now

7       as they were back in 2007?

8       A    I don't.

9       Q    Do you still currently use those two

10      studio programs that you identified?

11      A    I do not use Reason anymore.

12      Q    Okay.

13      A    But I still use FL studio.

14      Q    Is that the only one you currently use?

15      A    Yes.

16      Q    Is that FL Studio's terms of use the same

17      as you remember -- currently the same as you

18      remember from prior?

19      A    I don't remember.

20      Q    All right.  Okay.  All right.

21           Now, FL Studio provides, as you say, a

22      free library of sounds, correct?

23      A    Yes.

24      Q    Which you created pretty much all of your

25      tracks, including "Joyful Noise," correct?

EXHIBIT 22
PAGE 721

Page 37

1    A    Yes.

2    Q    And those library of sounds, whether it be

3    a synth or a drum track or whatever it is,

4    primarily a synth, I would think.

5    A    Mm-hmm.

6    Q    When you actually select that sound, it is

7    on a pitch, right?

8         Sounds are always on pitch, correct?

9    A    Sure.

10   Q    Okay.  And what's the most common pitch,

11   in your experience, do you know?

12   A    I mean, there's many.  I can't --

13   Q    Well, in terms of the scale, what is the

14   most common when you took piano?

15        It's C, right?

16   A    Middle C.

17   Q    Correct.

18        C is the most commonly used pitch, right?

19   A    Mm-hmm.

20   Q    So sitting here today, do you remember

21   when you took the sounds from FL Studio's

22   library to create "Joyful Noise," you used

23   synth first, let's say that; is that correct?

24   A    Mm-hmm.

25   Q    Okay.  Do you remember, what, if any,

EXHIBIT 22
PAGE 722

Page 38

1     alteration you made to sounds that were on the

2     pitches that came from that track -- that

3     library?

4     A    So -- so it was a long time ago.

5     Q    I understand that.

6     A    I know that I used a synth.

7     Q    Mm-hmm.

8     A    With that synth, I dropped it into the

9     program, and I selected the note that I wanted

10    for it to play.

11        So I would play, you know, whatever note

12    that I wanted to hear, you know, for that song.

13    And then, you know, I would be comfortable with

14    that and leave it at that.

15    Q    You only use the synth sounds, right, for

16    "Joyful Noise"?

17    A    I use synth sounds.  I also use drum

18    sounds, as well, for the -- for the -- I guess

19    you would say for the track or for the beat.

20    Q    Mm-hmm.

21        Behind the synth sounds?

22    A    Yes.

23    Q    Just to keep the rhythm --

24    A    Yes.

25    Q    -- of the synth sound --

EXHIBIT 22
PAGE 723

Page 39

1      A     Yes.

2      Q     -- correct?

3            So it was not any different rhythm?

4      A     What do you mean by that?

5      Q     Well, in other words, the synth rhythm,

6      was there a drum rhythm in between the synth

7      beats?

8      A     Yes.

9      Q     On the synth beats and in between?

10     A     So the synth would be, I guess, you would

11     say the music --

12     Q     Yeah.

13     A     -- or, you know and then --

14     Q     The pitches?

15     A     Yes.

16           And then the drums would accompany that.

17     Q     Okay.  On the same rhythm?

18     A     Yes.

19     Q     Okay.  That's what I thought.

20     A     Okay.

21     Q     We're on the same page.

22           So no one was present when you did this

23     beat for "Joyful Noise," correct?

24     A     No.

25     Q     And you were doing it in a home-studio

EXHIBIT 22
PAGE 724

Page 64

1    A    Yes.

2    Q    Okay.  Have you ever received any kind of

3    income royalty stream, either on the record

4    side or the publishing side or the performance

5    side, other than a flat fee for a buyout of the

6    beat --

7    A    I have.

8    Q    -- or a license of the beat?

9    A    I have.

10   Q    Okay.  And approximately how much over ten

11   years has come -- been generated from your

12   music career?

13   A    I don't -- I don't know.

14   Q    Roughly?  Estimate?

15   A    I've never added all the money up to know,

16   over time, how much I've made.

17   Q    Who would pay you royalties for -- what

18   source would pay you royalties for any of your

19   beats incorporated into works that were

20   distributed?

21   A    So I'm initially under ASCAP.  And then

22   the label that I made or the label that I sold

23   the song to --

24   Q    What song?

25   A    I don't remember the name right now.

EXHIBIT 22
PAGE 725

Page 65

1      Q     Okay.

2      A     They basically had me fill out a contract

3      to sell the -- you know, to buy the song

4      outright.  And then they are, basically,

5      giving, you know, paying for that, or paying it

6      through the publishing of the song, I guess.

7      Q     And you don't know what song this is?

8      A     I don't remember.

9      Q     Okay.  So just sitting here today, if we

10     want to ballpark, you know -- and it's

11     approximately a ten-year --

12     A     Yes.

13     Q     -- career?

14     A     Mm-hmm.

15     Q     And how much would you sell an outright

16     beat for, typically?

17     A     It can vary.

18     Q     Is it similar to what we looked at on the

19     other exhibit, 15 to $50, I think it was?

20     A     It could be even more.

21     Q     Well, I'm not asking "could be."  I'm

22     asking you what it was.

23     A     I mean, one time I've sold a beat for

24     $500.

25     Q     Okay.

EXHIBIT 22
PAGE 726

Page 66

1    A    You know.

2    Q    Highest?

3    A    I would say so, yeah.

4    Q    Okay.

5    A    And then -- I mean, I've given beats to

6    people for no cost.

7    Q    Sure.

8         No, I'm just trying to get a -- just a

9    rough sense of -- since it's only the four

10   copyright registrations, and no other

11   indication of other works precisely.  I'm just

12   getting a ballpark of, you know, your source of

13   income with respect to your music career.

14   A    Mm-hmm.

15   Q    And at what level it is.

16   A    Mm-hmm.

17   Q    Is it fair to say your primary source of

18   income is your day job?

19   A    Yes.

20   Q    Okay.  Did you get any money for the

21   "Joyful Noise" beat when Marcus wanted to use

22   it, initially?

23   A    Flame did pay for the beat.

24   Q    What did he pay?

25   A    I don't remember how much, exactly.

EXHIBIT 22
PAGE 727

Page 72

1    A    I don't remember exact conversations about

2    it.

3    Q    Mm-hmm.

4    A    I just know he told me that he was, you

5    know, definitely going to use that song on the

6    album.

7    Q    Okay.  So did you get a copy of the album

8    when it came out?

9    A    Yes.

10   Q    Do you have a copy of the album now?

11   A    I don't.

12   Q    Okay.  Do you know any brick or mortar

13   place that contains copies of these albums --

14   the album, "Our World Redeemed" now?

15   A    I don't.

16   Q    Did you ever know of any place that had a

17   copy of "Our World Redeemed" at any brick or

18   mortar place?

19   A    Yeah, I mean, they were selling it

20   everywhere.

21   Q    Okay.  That really quite doesn't answer

22   the question.

23        Do you know of any brick or mortar --

24   A    Okay.

25   Q    -- name, location, where you actually

EXHIBIT 22
PAGE 728

Page 73

1       personally saw the CD "Our World Redeemed"?

2       A       I mean, I've seen it at a Best Buy.  But I

3       don't even remember the Best Buy I was at.  But

4       I saw it at Best Buy.

5       Q       Okay.  When was that?

6       A       The year it came out, 2008, the release.

7       Q       All right.  How many copies?

8       A       I don't remember.

9       Q       Okay.  And did you ever see any

10      documentation whosoever reflecting sales

11      information for "Our World Redeemed"?

12      A       Can you elaborate?

13      Q       Did you ever see any documentation

14      reflecting sales information for "Our World

15      Redeemed"?

16      A       No.

17              If you're -- I don't know what you mean.

18      Q       Accountings.

19      A       Oh, okay.

20      Q       Checks?

21      A       Okay.

22      Q       People sending money.

23      A       No.

24      Q       Money documents that say, here's X

25      dollars, go have a nice drink?

EXHIBIT 22
PAGE 729

Page 76

1   Q    Okay.  So why did you not do anything if
2   you thought there was --
3   A    Oh, you're saying.  I'm sorry.
4        Okay.  You're saying, did I think about
5   filing a claim.  I did not.
6   Q    Okay.  But you had heard Dark Horse before
7   you spoke to Mr. Kayira?
8   A    Yes.
9   Q    Did Mr. Gray speak to you before you spoke
10  to Mr. Kayira about Dark Horse?
11  A    No.
12  Q    Okay.  What did you think about when you
13  heard Dark Horse before you spoke to
14  Mr. Kayira?
15  A    I thought that it sounded similar to
16  "Joyful Noise"?
17  Q    Okay.  Obviously not the sound recording,
18  correct, there's no sample?
19  A    No.
20  Q    You understand what I mean, right?
21  A    So --
22  Q    Do you understand what I mean by that?
23  A    Could you elaborate.
24  Q    So in other words, you didn't hear your
25  beat, your actual sound files in that song?

EXHIBIT 22
PAGE 730

Page 77

1    A    I didn't hear the sound files.

2    Q    Right.

3    A    No.

4    Q    You heard what you thought were similar

5    notes --

6    A    Notes.

7    Q    Let me finish.

8         MS. LEPERA:  Did you get that?

9    Q    And just on the beat, just with respect to

10   the beat, correct --

11   A    When you say --

12   Q    -- not with respect to lyrics or any of

13   the words or rap?

14   A    So the beats, yeah.

15   Q    Just the beat?

16   A    Mm-hmm.

17   Q    That you created?

18   A    Yes.

19   Q    Okay.  Now, you said you read music a

20   little bit, right, or piano music?

21   A    I don't read music.

22   Q    Okay.  But you can play a piano a little

23   bit?

24   A    I mean, I can -- I've touched a piano

25   before and made music, but not, like, reading.

EXHIBIT 22
PAGE 731

Page 105

1    anyone else contribute anything to the

2    instrumental musical component of "Joyful

3    Noise"?

4    A    No.

5    Q    And just to be clear, you are the only

6    person who contributed, in any way, to the

7    musical bed of "Joyful Noise," right?

8    A    Yes.

9    Q    No one else contributed?

10   A    No.

11   Q    Did you perform, at all, on the master

12   recording of "Joyful Noise"?

13   A    No.

14   Q    Okay.  Have you ever recorded a different

15   version of "Joyful Noise" than what was

16   commercially released?

17   A    No.

18   Q    Did you ever participate in creating any

19   remixes of the song?

20   A    No.

21   Q    Are you aware of anyone else creating a

22   different version of "Joyful Noise," including

23   remixes?

24   A    I've seen people -- things like play the

25   drums to it on YouTube.

EXHIBIT 22
PAGE 732

Page 106

1    Q    Are you aware of anyone commercially

2    selling any other versions of "Joyful Noise,"

3    including remixes?

4    A    No.

5    Q    Have you ever performed "Joyful Noise"

6    publicly?

7    A    No.

8    Q    Have you ever seen "Joyful Noise"

9    performed publicly?

10   A    Yes.

11   Q    How many times?

12   A    I can't remember how many times.  I know

13   that I saw Flame perform it once in St. Louis.

14   Q    When was that?

15   A    Probably when the song came out, in 2008.

16   Q    Okay.  Other than that, did you ever see

17   the song performed publicly?

18   A    Actually, I do.  I remember.  I saw -- I

19   went to a concert and I saw Lacrae perform it.

20   Q    When was that?

21   A    I think that was 2010, maybe.

22   Q    Was the 2008 performance that you saw,

23   what kind of venue was that at?

24   A    Church.

25   Q    What kind of church?

EXHIBIT 22
PAGE 733

Page 107

1       A    I don't know.  A baptist church.

2       Q    So there was a concert at the church?

3       A    Yes.

4       Q    And the 2010 rendition that you saw, what

5       kind of venue was that at?

6       A    It was a church as well.

7       Q    And that was in what city?

8       A    Kansas City.

9       Q    Kansas City, Missouri?

10      A    Yes.

11      Q    Other than those two performances, have

12      you ever seen "Joyful Noise" performed

13      publicly?

14      A    I'm not sure.  I don't remember.

15      Q    You don't recall specifically any other

16      performance?

17      A    No.

18      Q    Okay.  Did you take any video of those

19      performances?

20      A    No.

21      Q    Did you make any notes of what was

22      performed during those concerts?

23      A    No.

24      Q    Are you aware of any preshow advertising

25      related to those concerts?

EXHIBIT 22
PAGE 734

Page 108

1      A      No.

2      Q      And you haven't seen any records of any

3      kind of advertising like that, have you?

4      A      No.

5      Q      Okay.  Again, you weren't on stage for

6      those performances, right?

7      A      No.

8      Q      Did you observe whether any copies of any

9      CD or other vessel containing "Joyful Noise"

10     were sold at those concerts?

11     A      I'm not sure.  I don't know.

12     Q      You don't recall specifically seeing that?

13     A      No.

14     Q      Do you know what the entity called

15     ""Joyful Noise" Music, LLC" is?

16     A      Yes.

17     Q      What is it?

18     A      I mean, I've heard of it.  It was

19     something my lawyer created.  But I don't know

20     exactly -- exactly what it is.

21     Q      When you say "your lawyer," which lawyer

22     is that?

23             THE WITNESS:  Is this something I

24     can . . .

25             MR. KAHN:  Yeah.

EXHIBIT 22
PAGE 735

Page 115

1    whether you owned 50 percent before Mr. Moore

2    assigned his copyright, do you?

3    A    No.

4    Q    Okay.  You don't know whether you owned

5    50 percent before you entered into that

6    document?

7    A    No.

8    Q    Okay.  Are you aware that in this case you

9    have sued six individuals, and their names are:

10   Karl Martin Sandberg, also known as Max Martin;

11   Henry Russell Walter, also known as Cirkuit;

12   Lukasz Gottwald, also known as Dr. Luke;

13   Katheryn Elizabeth Hudson, also known as

14   Katy Perry; Sarah Theresa Hudson, Jordan

15   Houston, also known as Juicy J?

16   A    Yes.

17   Q    Okay.  I'm going to refer to those six as

18   the "individual defendants."

19        Okay?

20   A    Okay.

21   Q    Have you ever met any of the individual

22   defendants?

23   A    No.

24   Q    And you've never spoken to any of the

25   individual defendants, right?

EXHIBIT 22
PAGE 736

Page 116

1    A    No.

2    Q    You've never e-mailed or texted or

3    communicated in any way with them?

4    A    No.

5    Q    And you've never sent any of the

6    individual defendants any of your music,

7    correct?

8    A    Correct.

9    Q    You've never directed anyone to do that,

10   right?

11   A    No.

12   Q    And you're not aware of anyone sending any

13   of your music to any of those individual

14   defendants, right?

15   A    No.

16   Q    And you never specifically sent any of the

17   individual defendants a copy of the song,

18   "Joyful Noise," right?

19   A    No.

20   Q    And you never sent any of the individual

21   defendants a copy of the underlying musical

22   portion of "Joyful Noise" -- that became

23   "Joyful Noise" to any of the defendants, right?

24   A    No.

25   Q    And you never asked or directed anyone to

EXHIBIT 22
PAGE 737

Page 117

1    do so?

2    A    No.

3    Q    And you're not aware of anyone ever

4    sending that --

5    A    No.

6    Q    -- to them?

7         And you have no knowledge of any of those

8    individual defendants purchasing a CD

9    containing "Joyful Noise," right?

10   A    Right.

11   Q    And you have no documents that would show

12   that any of the individual defendants or anyone

13   working for them ever received a copy of

14   "Joyful Noise," right?

15   A    Correct.

16   Q    Okay.  And you're not aware of any such

17   documents?

18   A    No.

19   Q    And you have no documents or other

20   information reflecting that any of the

21   individual defendants ever heard a recording or

22   saw a performance of "Joyful Noise," correct?

23   A    I don't.

24   Q    But those two concerts that you saw,

25   "Joyful Noise" was performed, you didn't see

EXHIBIT 22
PAGE 738

Page 118

1      any of the individual defendants, right?

2      A    I didn't, no.

3      Q    And you have no knowledge from any source

4      that any of the individual defendants attended

5      any performance of "Joyful Noise," correct?

6      A    I don't.

7      Q    And you have no documents showing that

8      they attended such a performance, right?

9      A    I don't.

10     Q    You also, in this case, sued seven

11     corporate entities known as Capitol Records, WB

12     Music Corp., Universal Music Group, UMG

13     Recordings, Kolbalt Music Publishing America,

14     Kasz Money and Kitty Purry.

15          Do you understand that?

16     A    Yes.

17     Q    Okay.  And I'm going to refer to those

18     seven entities as the "corporate defendants."

19          Okay?

20     A    Okay.

21     Q    So you never sent "Joyful Noise" or any

22     copy of "Joyful Noise" to any employee or

23     executive at any of the corporate defendants,

24     correct?

25     A    Correct.

EXHIBIT 22
PAGE 739

Page 119

1      Q     And you also never sent anyone at any of
2      the corporate defendants the underlying musical
3      track of that song, right?
4      A     Correct.
5      Q     And you're not aware of anyone else who
6      sent any copy of "Joyful Noise" or the musical
7      track to anyone at one of the corporate
8      defendant, right?
9      A     Correct.
10     Q     And you have no knowledge of any employee
11     or executive at any of the corporate defendants
12     purchasing a CD containing "Joyful Noise,"
13     correct?
14     A     Correct.
15     Q     And you're not aware of any employee or
16     executive of any of the corporate defendants
17     attending any performance of "Joyful Noise,"
18     correct?
19     A     Correct.
20           THE VIDEOGRAPHER:  Counsel, five minutes.
21           MR. ALBERTSON:  On the tape.
22     Q     And you have no documents showing that any
23     employee or executive at any of the corporate
24     defendants ever received a copy of "Joyful
25     Noise," correct?

EXHIBIT 22
PAGE 740

Page 120

1    A    Correct.

2    Q    You're not aware of any such documents?

3    A    Correct.

4    Q    And you have no documents showing that any

5    employee or executive at the corporate

6    defendants ever heard a recording or saw a

7    performance of "Joyful Noise," correct?

8    A    Correct.

9    Q    And you're not aware of any such document?

10   A    I'm not.

11        MR. ALBERTSON:  Why don't we take a break

12   now and switch the tape.

13        THE VIDEOGRAPHER:  The time is 2:12 p.m.

14   and this completes Tape No. 1 of the videotaped

15   deposition of Mr. Chike Ojukwa.

16        (Recess taken.)

17        (Ojukwu Exhibit 14, Document Entitled

18   "Plaintiffs' Supplemental Answer to

19   Interrogatory Nos. 4 and 13 of Defendants'

20   First Set of Interrogatories (Amended)," marked

21   for identification as of this date.)

22        THE VIDEOGRAPHER:  The time is 2:23 p.m.,

23   and this begins Tape No. 2 of the videotaped

24   deposition of Mr. Chike Ojukwa.

25

EXHIBIT 22
PAGE 741

Page 122

1      Do you see that?

2    A    Yes.

3    Q    Do you recall having participated in the

4    creation of these documents?

5    A    I didn't create them.

6    Q    Okay.  You weren't asked any -- to help

7    answer certain questions with regard to these?

8    A    I would have to look to see.  I don't

9    remember right now.

10   Q    Okay.  I'll just ask you:  Do you have any

11   knowledge or information regarding whether any

12   of the individual defendants viewed or

13   downloaded any video featuring "Joyful Noise"

14   on YouTube or any other Internet site?

15   A    I don't.

16   Q    Okay.  And you have no knowledge that any

17   of the defendants, individual defendants,

18   viewed any video containing "Joyful Noise" on

19   any Myspace page, do you?

20   A    I do not.

21   Q    And you have no knowledge of any of the

22   individual defendants listening to any audio

23   recording of "Joyful Noise" through any

24   Internet source, right?

25   A    I don't.

EXHIBIT 22
PAGE 742

Page 123

1    Q    And you have no knowledge of any of the
2    individual defendants hearing the instrumental
3    portion of "Joyful Noise" or the instrumental
4    track that you created that was eventually part
5    of "Joyful Noise," right?
6    A    Right.
7    Q    Okay.  I may have asked you this already
8    but you're not aware of any of the defendants
9    attending any performance of "Joyful Noise,"
10   right?
11   A    That's correct.
12   Q    And you're not aware of -- are you aware
13   of "Joyful Noise"?ever being on television?
14   A    It would -- yeah, I do.  It was -- I think
15   it was this year or last year.
16   Q    Prior to 2014, do you have any knowledge
17   of "Joyful Noise"?being on television?
18   A    I don't.
19   Q    Prior to 2014, do you have any knowledge
20   of "Joyful Noise"?being on the radio?
21   A    I never heard it, but I know they did play
22   it on the Christian stations.
23   Q    And you have no knowledge of any of the
24   individual defendants hearing the song on any
25   radio station, right?

EXHIBIT 22
PAGE 743

Page 124

1     A     I do not.

2     Q     Just to confirm, you never actually

3     personally heard "Joyful Noise"?being played on

4     the radio, right?

5     A     No.

6     Q     So you have no personal knowledge of it

7     being on the radio?

8     A     No.

9     Q     Have you ever seen any documents

10    reflecting that it was played on any station?

11    A     No.

12    Q     You're not aware of any such documents?

13    A     Correct.

14    Q     Okay.  And you're not aware of anyone else

15    with personal firsthand knowledge of it being

16    played on the radio?

17    A     I'm trying to remember if I -- if I do.  I

18    know people -- I may have heard people say

19    that, that they heard it on the radio.  But I

20    can't, like, remember who they were.

21    Q     You're not aware of anyone with documents

22    reflecting that it was played on the radio?

23    A     No.

24    Q     You're not aware of any of the individual

25    defendants following any kind of song or record

EXHIBIT 22
PAGE 744

Page 125

1     chart listing in the Christian genre, are you?

2     A     No.

3     Q     Did you attend the 51st Annual Grammy

4     Award show?

5     A     I did not.

6     Q     You're not a grammy voter, right?

7     A     No.

8     Q     So you have no knowledge

9     regarding -- strike that.

10          Do you have any documents or other

11    information reflecting the number of sales of

12    "Joyful Noise," whether as a single or as part

13    of an album or any other format?

14    A     I do not.

15    Q     Okay.  Are you aware of any such

16    documents?

17    A     No.

18    Q     Do you have any documents reflecting any

19    revenue earned from sales of "Joyful Noise"?

20    A     I do not.

21    Q     Are you aware of any such documents?

22    A     No.

23    Q     Are you aware of how many copies of

24    "Joyful Noise" were manufactured?

25    A     I do not.

EXHIBIT 22
PAGE 745

Page 126

1     Q   Have you ever seen any documents

2    reflecting the number of copies of "Joyful

3    Noise" manufactured?

4    A   No.

5    Q   And you're not aware of any such

6    documents?

7    A   No.

8    Q   Are you aware of any documents reflecting

9    income earned by anyone from performances of

10   "Joyful Noise"?

11   A   No.

12   Q   So you have no knowledge or information,

13   from any source, reflecting that any of the

14   individual defendants viewed or heard "Joyful

15   Noise" at any time, right?

16   A   I do not.

17   Q   You weren't present during the creation of

18   Dark Horse, were you?

19   A   No.

20   Q   You have no knowledge regarding the

21   process by which Dark Horse was created, right?

22   A   No.

23   Q   And you have no knowledge of when Dark

24   Horse was created, right?

25   A   No.

EXHIBIT 22
PAGE 746

Page 127

1    Q    And you also have no knowledge of -- as

2    between the individual defendants, which person

3    played what role with respect to the creation

4    of that song, right?

5    A    No.

6    Q    Are you aware of any documents reflecting

7    any income that you earned from any

8    exploitation of "Joyful Noise"?

9    A    No.

10   Q    Did anyone ever ask you to preserve

11   documents relating to this lawsuit?

12   A    No.

13   Q    Did anyone ever ask you to search for

14   documents relating to this lawsuit?

15   A    Yes.

16   Q    Okay.  Who asked you that?

17   A    Lawyers.

18   Q    When was that?

19   A    I don't know.  It was when we had our

20   meetings.

21   Q    When did you have your meetings?

22   A    In 2014.

23   Q    Did you search for documents?

24   A    No.

25   Q    And you didn't produce any documents or

EXHIBIT 22
PAGE 747

Page 128

1    provide any documents relating to this case to

2    your counsel, right?

3    A    That is correct.

4         MR. ALBERTSON:   Let's take another

5    two-minute break and come back.

6         THE VIDEOGRAPHER:   The time is 2:34 p.m.

7    We're off the record.

8         (Recess taken.)

9         THE VIDEOGRAPHER:   The time is 2:51 p.m.

10    and we're back on the record.

11    BY MR. ALBERTSON:

12    Q    Mr. Ojukwa, you've never attended any

13    award shows in which "Joyful Noise" or the

14    album "Our World Redeemed" were nominated,

15    right?

16    A    Correct.

17    Q    And you've never seen any such show on

18    television?

19    A    I watched the Grammys, and I saw the

20    result.

21    Q    Of?

22    A    "Joyful Noise."

23    Q    You saw the result of "Joyful Noise"?

24    A    What it won.

25    Q    Oh, you saw evidence that "Joyful Noise"

EXHIBIT 22
PAGE 748

Page 129

1    won a certain award?

2    A    It was nominated, but it didn't win.

3    Q    Which award show?

4    A    The Grammys.

5    Q    Okay.  You didn't attend the Grammys?

6    A    No.

7    Q    And "Joyful Noise" wasn't performed during

8    the Grammys, right?

9    A    Not that I recall.

10   Q    And there was no recording of the --

11   "Joyful Noise" was played during the Grammys,

12   right?

13   A    No.

14   Q    And there were no other award shows that

15   you watched on TV that -- that involved any

16   nomination of "Joyful Noise," right?

17   A    No.

18        MR. ALBERTSON:  Those are all the

19   questions I have.

20        So, you know, obviously there's some

21   outstanding document issues.  So we'll reserve

22   our rights and request to keep the deposition

23   open pending that.

24        So unless your counsel has some questions,

25   I appreciate your time.  Thanks for coming in.

EXHIBIT 22
PAGE 749

Page 131

1    Q    And you're not aware of any paper

2    documents that were requested that you have?

3    A    No.

4    Q    So now we learn today there's a computer

5    file that has the composition and we're going

6    to provide it to the defendants.

7         Why didn't you identify the computer file

8    back then?

9    A    I didn't think of it as a document.   I

10   just thought of it as a computer file.

11        MR. KAHN:   Okay.   I have nothing further.

12        THE VIDEOGRAPHER:   The time is 2:54 p.m.

13   This completes Tape No. 2, as well as the

14   videotaped deposition of Mr. Chike Ojukwa.

15        (Time noted:   2:54 p.m.) -

16

17        _____

          CHIKE OJUKWU

18

19   Subscribed and sworn to before me

20   this _____ day of _____, 2017.

21

22   _____

23

24        C E R T I F I C A T E

25   STATE OF NEW YORK            )

EXHIBIT 22
PAGE 750

Page 132

```
1                              :ss

2    COUNTY OF NEW YORK     )

3

4         I, MICHELLE COX, a Notary Public within

5    and for the State of New York, do hereby

6    certify:

7         That CHIKE OJUKWU, the witness whose

8    deposition is hereinbefore set forth, was duly

9    sworn by me and that such deposition is a true

10   record of the testimony given by the witness.

11        I further certify that I am not related to

12   any of the parties to this action by blood or

13   marriage, and that I am in no way interested in

14   the outcome of this matter.

15        IN WITNESS WHEREOF, I have hereunto set my

16   hand this 2nd day of December 2017.

17

18                           _____

19                           MICHELLE COX, CLR

20

21

22

23

24

25
```

EXHIBIT 22
PAGE 751

Page 133

```
 1                        INDEX
 2   WITNESS              EXAMINATION BY          PAGE
 3   CHIKE OJUKWU         MS. LEPERA              6
 4                        MR. ALBERTSON           96
 5                        MR. KAHN                130
 6
 7
 8                INFORMATION REQUESTS
 9
10   REQUESTS:  35, 55, 61, 67
11                    EXHIBITS
12   DEPOSITION EXHIBITS                       FOR ID.
13   Exhibit 1      Three-Page Document           43
14   Exhibit 2      Document Entitled "Chike       48
                    Ojukwu Video Reel - YouTube"
15
     Exhibit 3      Four-Page Document            48
16
     Exhibit 4      LinkedIn Profile             56
17
     Exhibit 5      CD                           79
18
     Exhibit 6      Excerpt from the Expert Report  82
19                  of Todd Decker
20   Exhibit 7      Document Entitled "A Natural   84
                    Minor Scale"
21
     Exhibit 8      Document Entitled "Certificate  95
22                  of Registration"
23   Exhibit 9      E-mail dated June 4, 2014,     96
                    from Copyright Office to Eric
24                  Kayira
25
```

EXHIBIT 22
PAGE 752

```
                                                      Page 134
 1    DEPOSITION EXHIBITS                         FOR ID.
 2    Exhibit 10    Letter dated June 5, 2014,        96
                    from Eric Kayira to Chris
 3                  MacRae
 4    Exhibit 11    Document Entitled "Assignment     96
                    of Copyright"
 5
      Exhibit 12    Document Entitled "Song           96
 6                  Writers' Split Acknowledgment"
 7    Exhibit 13    Document Entitled "Plaintiffs'    96
                    Combined Responses to
 8                  Defendants Jordan Houston,
                    Lukasz Gottwald, Sarah Theresa
 9                  Hudson, Karl Martin Sandberg
                    and Henry Russell Walter's
10                  First Set of Interrogatories"
11    Exhibit 14    Document Entitled "Plaintiffs'    120
                    Supplemental Answer to
12                  Interrogatory Nos.. 4 and 13
                    of Defendants' First Set of
13                  Interrogatories (Amended)"
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT 22
PAGE 753

Page 135

1   Case Name:  Gray et al. v. Hudson, et al.

2   Dep. Date:  November 17, 2017

3   Deponent:  CHIKE OJUKWU

4   Pg.   Ln.   Now Reads    Should Read    Reason

5   ___   ___   _____   _____   _____

6   ___   ___   _____   _____   _____

7   ___   ___   _____   _____   _____

8   ___   ___   _____   _____   _____

9   ___   ___   _____   _____   _____

10  ___   ___   _____   _____   _____

11  ___   ___   _____   _____   _____

12  ___   ___   _____   _____   _____

13  ___   ___   _____   _____   _____

14  ___   ___   _____   _____   _____

15  ___   ___   _____   _____   _____

16  ___   ___   _____   _____   _____

17

18                        _____

19                        CHIKE OJUKWU

20

21  Subscribed and sworn before me

22  This____ day of _____, 2017.

23

24  _____      _____

25  (Notary Public)       MY COMMISSION EXPIRES:

EXHIBIT 22
PAGE 754

# EXHIBIT 23

EXHIBIT 23
PAGE 755

Confidential

Page 1

1        UNITED STATES DISTRICT COURT
         CENTRAL DISTRICT OF CALIFORNIA
2

3    MARCUS GRAY (p/k/a FLAME);     )      CERTIFIED COPY
     EMANUEL LAMBERT; and CHIKE     )
4    OJUKWU,                        )
                                    )
5        Plaintiffs,                )
                                    )
6          vs.                      )  Index No. 2:15-cv-05642-CAS-JCX
                                    )
7    KATHERYN ELIZABETH HUDSON      )
     (p/k/a KATY PERRY); JORDAN     )
8    HOUSTON (p/k/a JUICY J);       )
     LUKASZ GOTTWALD (p/k/a DR.     )
9    LUKE); SARAH THERESA HUDSON;   )
     KARL MARTIN SANDBERG (p/k/a    )
10   MAX MARTIN); HENRY RUSSELL     )
     WALTER (p/k/a CIRKUT); KASZ    )
11   MONEY, INC.; CAPITOL RECORDS,  )
     LLC; KITTY PURRY, INC., UMG    )
12   RECORDINGS, INC.; UNIVERSAL    )
     MUSIC GROUP INC.; WB MUSIC     )
13   CORP LLC; and KOBALT MUSIC     )
     PUBLISHING AMERICA, INC.,      )
14                                  )
         Defendants.                )
15   ------------------------------)
16

17

18       CONFIDENTIAL VIDEOTAPED DEPOSITION
19            OF EMANUEL LAMBERT
20            New York, New York
21         Thursday, November 16, 2017
22

23

24   Reported by:
     MICHELLE COX
25   JOB NO. 133791

TSG Reporting - Worldwide    (877) 702-9580

EXHIBIT 23
PAGE 756

Confidential

Page 12

1    actually at the concert, and was kind of a fan,

2    more of Cross Movement than me, at that point,

3    because I was still kind of coming up in the

4    ranks as well, but, yeah.

5    Q    Okay.  Well, get to that in a moment.

6         So had you --

7         MR. KAHN:  Can you just make sure he

8    finishes his question before you answer.

9         THE WITNESS:  Yes, sir.

10        MR. KAHN:  Or you'll get in trouble with

11   her.

12        THE WITNESS:  Okay.  I'm sorry.  Okay.

13   BY MR. ALBERTSON:

14   Q    Had you worked with Mr. Gray

15   professionally before the album "Our World

16   Redeemed"?

17   A    Yes.  I believe we -- I believe he did a

18   record before that that I featured on as well.

19   Q    Can you briefly describe the genre or type

20   of music that you do, that Mr. Gray does, if

21   they are the same?

22   A    We would classify it as Christian rap,

23   Christian hip hop.

24   Q    How do you know Chike Ojukwa; do you know

25   him?

EXHIBIT 23
PAGE 757

Confidential

Page 14

1  years ago.  I believe it was called "Still

2  Jesus" or something like that, and I featured

3  on that record, so . . .

4  Q    So all of your collaborations with

5  Mr. Gray, have those been in the Christian rap,

6  Christian hip hop genre?

7  A    Yes, sir.

8  Q    Okay.  So how about Lecrae Moore who was

9  featured on the song, "Joyful Noise," do you

10  know Mr. Moore?

11  A    Yes.

12  Q    How long have you known him?

13  A    Probably about the same length of time.  I

14  think I might have met Lecrae a few years

15  later, if I'm not mistaken.

16  Q    So can you just give me a range?

17  A    So a roundabout.

18       So he featured on my 2005 album, "The

19  Faith," which mean we probably met around 2003.

20  Let's put it at around 2003.

21       And I'm not 100 percent sure, but I think

22  that's right about it.

23  Q    So is Mr. Moore in the same music genre as

24  you and Mr. Gray?

25  A    Yes.

EXHIBIT 23
PAGE 758

Confidential

Page 27

1    groups?

2    Q    Let's start with:  Were you ever part of

3    any group professionally?

4    A    Professionally, no.

5    Q    But you performed with other -- other

6    groups professionally?

7    A    So what I think is, like, when I tour,

8    I've toured with other professional groups.

9    Q    Okay.

10   A    Yes.

11   Q    What groups have you toured with?

12   A    This is a lot.  There's a lot of them.

13   Q    Have you toured with any groups that are

14   not Christian rap groups?

15   A    Yes, but they are gospel artists.

16   Q    Okay.  So you have toured with non-rap

17   gospel artists?

18   A    Yes.

19   Q    But you have never toured with any

20   non-Christian --

21   A    Christian artists --

22   Q    -- artists?

23   A    -- no.

24   Q    Thank you.

25        And at some point did you develop a

TSG Reporting - Worldwide    (877) 702-9580

EXHIBIT 23
PAGE 759

Confidential

Page 37

1    album?

2    A    No.

3    Q    Can you describe, in your own words, the

4    role that you had in the creation of "Joyful

5    Noise"?

6    A    Writing the lyrics to the hook.

7    Q    Did you write lyrics to any of the rap

8    verses?

9    A    No.

10   Q    And you didn't write any of the

11   instrumental portion, did you?

12   A    No.

13   Q    Did someone contact you to be a part of

14   this song, "Joyful Noise"?

15   A    Yes, sir.

16   Q    Who was that?

17   A    Marcus Gray.

18   Q    When did Mr. Gray contact you?

19   A    In 2007.

20        Is that what you mean, what year?

21   Q    Yes.

22        What year?

23   A    Yeah, 2007.

24   Q    Do you remember what month?

25   A    I don't -- I think I remember it being

EXHIBIT 23
PAGE 760

Confidential

Page 50

1           THE VIDEOGRAPHER:   The time is 11:28 a.m.,

2      and we're back on the record.

3  BY MR. ALBERTSON:

4      Q    Welcome back.

5      A    Thank you.

6      Q    So Mr. Lambert, did you ever perform

7      "Joyful Noise" publicly?

8      A    I believe that I performed it with Flame

9      and Lecrae at the Unashamed Conference, if I'm

10     not mistaken, which I believe -- I want to say

11     that was around 2013-2014, something like that.

12     Q    What is the Unashamed Conference?

13     A    It's a conference that reach -- I don't

14     know if it was Reach Records or -- I'm just

15     going to say Reach Records, put together every

16     year for a few years.  Pretty -- actually, a

17     really big conference.

18     Q    What kind of conference?

19     A    Oh, kind of like a music/ -- like a music

20     and arts.  And slash -- I don't know what you

21     would call it, but they would do breakout

22     sessions where you'd be taught, let's just say

23     it was theology or -- and I think -- I want to

24     say, like, basic life stuff, like manhood.  But

25     all of it from a Christian perspective.

EXHIBIT 23
PAGE 761

Confidential

Page 51

1      So whether it's -- the range, I suppose,
2  is from music to manhood, breakout sessions.
3  You know, I think the conference was maybe
4  three days, yeah.
5  Q    And so there was education, but also
6  performances?
7  A    Yeah.
8      And they had performers threaded
9  throughout the entire conference.  And the
10 finale -- I believe, actually, that song was
11 one of the finale songs for the conference.
12 Q    So this is a -- the music played at this,
13 this was primarily gospel and Christian music?
14 A    Yes.
15 Q    All --
16 A    All.
17 Q    -- Christian?
18 A    Yes.
19 Q    The theme of the entire conference was
20 Christian --
21 A    Yes.
22 Q    -- music and education?
23     Yes?
24 A    Yes.  I'm sorry.  I'm saying yes
25 throughout.

EXHIBIT 23
PAGE 762

Confidential

Page 52

1    Q    Don't.

2    A    My apologies.

3    Q    Okay.  Other than the Unashamed

4    Conference, are there any other times where you

5    performed "Joyful Noise" publicly?

6    A    I want to say I performed it with Flame,

7    maybe in 2000 -- the year after it came out,

8    maybe in 2008.  But no more than two times --

9    Q    Do you remember --

10   A    -- that I can recall.

11   Q    Do you recall the 2008 performance, what

12   the venue was?

13   A    No.

14   Q    Do you recall what type of venue it was?

15   A    That was probably a church where the

16   conference was at, the convention center in

17   Atlanta.

18   Q    So was this another Christian-focused

19   conference?

20   A    The first one, I believe, was just a

21   concert, if I'm not mistaken.

22   Q    I see.

23        So the 2008 one was a performance at a

24   church?

25   A    Yes.

EXHIBIT 23
PAGE 763

Confidential

Page 53

1       And then the 2013, '14, whichever one, was

2    at a convention center in Atlanta, yeah.

3    Q    Thank you for clearing that up.

4         I'm going to show you a few documents.

5    Should be in front of you, a document called

6    "Lambert 1," on the bottom.  It has two

7    stickers.  It was previously marked as Gray 8.

8    A    Okay.

9    Q    It's called "Plaintiffs' Supplemental

10   Combined Responses to Defendants" -- and it

11   lists certain defendants -- "First Requests for

12   Production of Documents."

13        Have you seen this document?

14   A    No, sir.

15   Q    You were never shown this document by your

16   attorneys during this litigation?

17   A    No, sir.

18   Q    Did any attorneys ask you to look for

19   documents responsive to requests that the

20   defendants had made of you in this case?

21   A    Can you rephrase the question?

22   Q    Did your attorneys ever ask you to look

23   for any documents that were in your possession

24   or control that were related to this case?

25   A    No.

EXHIBIT 23
PAGE 764

Confidential

Page 62

1   Marcus Gray and I toured together in 2000 -- I

2   want to say Heartbeat was out.  So it had to be

3   about 2014 or '15.  And we did ten dates

4   together.

5        So he would have performed that song every

6   night for those ten dates.  So at least on ten

7   different occasions I have seen him perform the

8   song.

9   Q    So those were all 2014 or after?

10  A    Yes, 2014 or after.

11  Q    Did you ever see Marcus Gray perform

12  "Joyful Noise" before 2014?

13  A    Yes, as aforementioned, he and I performed

14  it around 2008 together.

15  Q    Right.

16       Aside from the times you performed it with

17  him --

18  A    Oh.

19  Q    -- did you ever see him perform the song?

20  A    That's what I was thinking the first time

21  you asked.

22       So, yes.  A few times, yes.  Yes, mm-hmm.

23  Q    And I know you said you don't recall the

24  specific venues, but were those Christian

25  venues?

EXHIBIT 23
PAGE 765

Confidential

Page 63

1   A    The tour that we did, or just any time I

2   had ever seen . . .

3   Q    So setting aside the tour that was 2014 or

4   after, the times that you saw Marcus Gray, that

5   you say was a few times perform the song,

6   "Joyful Noise," without you performing it with

7   him, those were at churches or Christian music

8   festivals or something Christian themed?

9   A    Yes, that's right.

10  Q    Do you have any documents or information

11  that would reflect that "Joyful Noise" was

12  actually performed the times that you have

13  either performed it publicly or seen it

14  performed?

15  A    Say it again.

16  Q    I can be more specific.

17       Do you have any set lists from concerts

18  where you saw Marcus Gray perform it or anyone

19  else perform it, or you performed it that say,

20  "Joyful Noise," is going to be played?

21  A    No.

22  Q    Do you have any set lists that say it was

23  played at those particular concerts?

24  A    No.

25  Q    Do you have any contracts that say "Joyful

TSG Reporting - Worldwide   (877) 702-9580

EXHIBIT 23
PAGE 766

Confidential

Page 64

1    Noise" must be played or was played at those

2    specific concerts?

3    A    But I wouldn't.  It wouldn't make any

4    sense for me to have a set list of any,

5    so . . .

6    Q    Do you know anyone who does have set

7    lists?

8    A    The person who would have a set list would

9    be a DJ.

10   Q    What DJ?

11   A    Marcus Gray's DJ.

12   Q    Who's that?

13   A    I suppose you'd have to ask him that.

14   Q    You don't know him?

15   A    I do know him.  I just don't know if I --

16        THE WITNESS:  Can I answer that question?

17        MR. KAHN:  Yes.

18   A    Okay.  His name is DJ Spec House.

19   Q    Can you spell that?

20   A    S-p-e-c, H-o-u-s-e.

21   Q    Okay.  Your answer might be the same for

22   the rest of these, but I just want to ask, do

23   you have any preshow advertising saying that

24   "Joyful Noise" was going to be played at any

25   concert at all?

EXHIBIT 23
PAGE 767

Confidential

Page 65

1    A    No.

2    Q    Do you have any write-ups or reviews or
3    blog posts saying "Joyful Noise" was played?
4    A    No, sir.
5    Q    Okay.  And you have no recordings of
6    "Joyful Noise" having been played at a
7    particular concert?
8    A    No, sir.

9    Q    Okay.  So a moment ago you mentioned
10   someone named DJ Spec House.
11        Do you know how long he has been working
12   with Marcus Gray?
13   A    Some time.  Some years.
14   Q    So can you -- was it before 2007?
15   A    I'm not 100 percent sure.
16   Q    Can you say with certainty that it was
17   before 2014?
18   A    I cannot.
19   Q    Okay.  One other document in front of you
20   called "Lambert 5," previously marked as
21   Gray 11, do you recognize this document?
22   A    I don't recognize it.  Assuming I signed
23   it.
24   Q    I don't actually know if that's the case.
25   This document is called "Plaintiffs'

EXHIBIT 23
PAGE 768

Confidential

Page 93

```
 1    A     Hello.
 2    Q     Do you know that in this litigation you
 3    have sued six individuals, who I'll call "the
 4    individual defendants." And their names are:
 5    Karl Martin Sandberg, professionally known as
 6    Max Martin, Henry Russell Walter,
 7    professionally known as Cirkut,
 8    Lukasz Gottwald, professionally known as
 9    Dr. Luke, Katheryn Elizabeth Hudson,
10    professionally known as Katy Perry, Sarah
11    Theresa Hudson and Jordan Houston,
12    professionally known as Juicy J.
13          Do you understand that?
14    A     Yes, sir.
15    Q     I'll refer to them as "the individual
16    defendants."
17          Is that okay?
18    A     Yes.
19    Q     Okay.  Have you ever personally met any of
20    these individual defendants?
21    A     No.
22    Q     So you've never spoken to any of these
23    individual defendants; is that right?
24    A     That is right.
25    Q     Okay.  You've never, in person, on the
```

TSG Reporting - Worldwide    (877) 702-9580

EXHIBIT 23
PAGE 769

Confidential

Page 94

1   phone, via text or e-mail, communicated with

2   them?

3   A    No, sir.

4   Q    And you've never sent any of the

5   individual defendants any music, correct?

6   A    That is correct.

7   Q    And you never directed anyone or asked

8   anyone to send those individual defendants any

9   music, right?

10  A    Right.

11  Q    And you have no knowledge of anyone, other

12  than yourself, sending any of your music to any

13  of those individual defendants, right?

14  A    Not to my knowledge.

15  Q    And you've never sent any of the

16  individual defendants any copy, in any formats,

17  the song, "Joyful Noise," right?

18  A    I have not.

19  Q    Okay.  And you've never asked anyone to

20  send it, send any of the individual defendants

21  "Joyful Noise," right?

22  A    Right.

23  Q    Okay.  And you're not aware of anyone

24  sending them that song, right?

25  A    Right.

EXHIBIT 23
PAGE 770

Confidential

Page 95

1    Q     And you have no knowledge of any of those
2    individual defendants buying your CD, "Our
3    World Redeemed," or Flame's CD, "Our World
4    Redeemed," which contained "Joyful Noise,"
5    right?
6    A     I would not have any knowledge of that.
7    Q     And you have no documents showing that
8    anyone working for or with any of those
9    individual defendants ever received a copy of
10   "Joyful Noise" in any format, right?
11   A     Right.
12   Q     And you're not aware of any such documents
13   that would show that, right?
14   A     That's right.
15   Q     Okay.  And you have no documents or other
16   information reflecting that any of the
17   individual defendants ever heard a recording or
18   performance of "Joyful Noise," right?
19   A     I have no documents.
20   Q     And you're not aware of any such
21   documents?
22   A     Not aware.
23   Q     And no one ever told you that they had
24   personal knowledge of any of the individual
25   defendants hearing a recording of "Joyful

EXHIBIT 23
PAGE 771

Confidential

Page 96

1    Noise," right?

2    A    That's right.

3    Q    And you never performed any music

4    personally for any of those individual

5    defendants, to your knowledge, right?

6    A    That's right.

7    Q    And you never performed "Joyful Noise" for

8    any of those individual defendants, right?

9    A    That's right.

10    Q    And you're not aware of anyone, whether it

11    be Marcus Gray, Lecrae, or anyone else

12    performing "Joyful Noise" for any of the

13    individual defendants, right?

14    A    I'm not aware.

15    Q    And earlier we discussed performances that

16    you have done of "Joyful Noise," and

17    performances that you attended where someone

18    else performed "Joyful Noise."

19        You're not aware of any of the individual

20    defendants attending any of those performances,

21    correct?

22    A    Not aware.

23    Q    Okay.  And you never heard from anyone

24    that any of those individual defendants

25    attended any performance of "Joyful Noise,"

EXHIBIT 23
PAGE 772

Confidential

Page 97

1   right?

2   A    No, never heard.

3   Q    So you have no documents or other

4   information reflecting that any of the

5   individual defendants every received, saw, or

6   listened to a performance of the song, "Joyful

7   Noise," correct?

8   A    I am not aware, correct.

9   Q    Okay.  And you have no documents

10   reflecting that?

11   A    No documents, that is correct.

12   Q    Do you understand also that in this case

13   you have sued seven corporate entities, who

14   I'll call "the corporate defendants," and those

15   are Capitol Records, WB Music Corporation,

16   Universal Music Group, UMG Recordings, Kolbalt

17   Music Publishing America, Kasz Money,

18   Kitty Purry, and that's it, those are the

19   corporate defendants.

20       Are you aware that you have sued those

21   corporations?

22   A    That's right.

23   Q    And you've never sent "Joyful Noise," in

24   any form, to any employee or executive at any

25   of those corporate defendants, correct?

EXHIBIT 23
PAGE 773

Confidential

Page 98

1   A     Correct.

2   Q     And that includes -- you have not sent

3   anything by mail, Internet, text or any other

4   means, right?

5   A     Correct.

6   Q     And you're not aware of anyone who has

7   sent "Joyful Noise," in any form, to any

8   employer or executive at any of those corporate

9   defendants, right?

10   A     Right.

11   Q     And you have no knowledge of any employer,

12   executive, at those corporate defendants,

13   buying your -- that CD which contained "Joyful

14   Noise," right?

15   A     Right.

16   Q     Or any CD containing "Joyful Noise,"

17   correct?

18   A     Right.

19   Q     And you're not aware of any employee or

20   executive at any of the corporate defendants,

21   ever attending a performance of "Joyful Noise,"

22   or a performance where "Joyful Noise" was

23   played, right?

24   A     I'm not aware.

25   Q     And you personally never performed "Joyful

EXHIBIT 23
PAGE 774

Confidential

Page 99

1    Noise," to your knowledge, for any

2    employer/executive at a corporate defendant,

3    right?

4    A    Right.

5    Q    And so you have no documents showing that

6    any employee or executive at any of the

7    corporate defendants ever received a copy of

8    "Joyful Noise," right?

9    A    I have no knowledge of that, right.

10   Q    And you're not aware of any such

11   documents?

12   A    Not aware.

13   Q    And you have no documents reflecting that

14   any employee or executive at any of the

15   corporate defendants ever heard a recording or

16   performance of "Joyful Noise," correct?

17   A    Correct.

18   Q    And you're not aware of any such

19   documents?

20   A    Not aware of any such documents.

21   Q    If you could look back at what was

22   previously marked as Lambert No. 4.   It's

23   called "Combined Responses to Interrogatories."

24        Do you have that in front of you?

25   A    Is this it?

TSG Reporting - Worldwide    (877) 702-9580

EXHIBIT 23
PAGE 775

Confidential

Page 104

1    and then closing it after one second?

2    A    That, I don't know.

3    Q    And you don't know whether YouTube counts,

4    or any other site counts whether a viewer

5    watches the video with the sound on or not,

6    right?

7    A    Right.

8    Q    Okay.  And you --

9    A    I assume, though.  If you're watching a

10   music video; it's a music video.

11   Q    You assume that?

12   A    Because it's music, yes.

13   Q    But you don't know?

14   A    I don't know.

15   Q    And you don't have any knowledge any of

16   the individual defendants in this case

17   specifically viewing or downloading any video

18   of "Joyful Noise" on YouTube or any other site,

19   right?

20   A    No knowledge of that.

21   Q    Okay.  The next bullet says "In addition,

22   tens of thousands of followers of the

23   Myspace.com pages for Plaintiffs' and

24   Lecrae Moore, had access to the recording of

25   Plaintiffs' Composition."

EXHIBIT 23
PAGE 776

Confidential

Page 105

1      Do you have a Myspace page?

2   A    Had.

3   Q    When did you have it?

4   A    Oh, my Lord, Myspace.   I cannot recall

5   when Myspace was out.

6   Q    Do you recall when you closed it down?

7   A    Honestly, I never even closed it down, it

8   just faded away.   Myspace faded away.

9   Q    Okay.   Do you know how many followers you

10  had on Myspace.com?

11  A    No.

12  Q    Did anyone ask you for information about

13  how many Myspace followers you had for purposes

14  of creating this document?

15  A    No.

16  Q    Okay.

17  A    But I'm sure -- I mean, I don't know if

18  you can still have access to it or not.   But if

19  you can, you can see.   You can just access it

20  yourself because it's public.

21  Q    Right.

22      As of when you access it, right, you can

23  see how many --

24  A    If you -- yeah, if you access it, you can

25  see it.

EXHIBIT 23
PAGE 777

Confidential

Page 106

1   Q    But what you see would be as of the date
2   that you looked, right?
3   A    Yes.
4   Q    So, for example, you wouldn't be able to
5   see, if you looked today, how many Myspace
6   users you had in 2010?
7   A    That is true, but it wouldn't be but so
8   much more, because Myspace -- the relevance of
9   Myspace faded years before then, so . . .
10  Q    Years before 2010?
11  A    Yeah.
12  Q    Did you post "Joyful Noise" on your
13  Myspace page?
14  A    Not that I can recall.
15       And can I go back to something real quick,
16  though?
17  Q    Sure.
18  A    So I -- so I will say that -- I would say
19  that Myspace became less relevant or irrelevant
20  either around 2010, and -- somewhere around
21  2010, and not before, I'll say that.  It was
22  because it was the -- it was the go-to prior to
23  around 2010.
24  Q    Okay.  Thanks.
25       So but you have no knowledge of any of the

EXHIBIT 23
PAGE 778

Confidential

Page 107

1    individual defendants visiting your Myspace

2    page --

3    A     No knowledge.

4    Q     -- at any time, right?

5    A     That is right.

6    Q     And you have no knowledge of any of the

7    individual defendants visiting any of the other

8    plaintiffs' Myspace pages at any time, right?

9    A     That is right.

10   Q     And you have no knowledge of any of the

11   individual defendants visiting Lecrae Moore's

12   Myspace page at any time, right?

13   A     That is right.

14   Q     So for yourself and the other plaintiffs

15   and Lecrae Moore, for your Myspace pages, you

16   also don't know whether any of the individual

17   defendants viewed "Joyful Noise" on those

18   sites, right?

19   A     That is correct.

20   Q     The next three bullet points on the

21   following page, Page 3.

22   A     Where are we?

23   Q     Page 3.  Sorry 5.

24         The next three bullet points all relate to

25   performances of "Joyful Noise."

EXHIBIT 23
PAGE 779

Confidential

Page 108

```
 1        As we discussed earlier, you have no
 2   knowledge or information regarding whether any
 3   of the individual defendants in this case
 4   attended any of those performances, correct?
 5   A     That's correct.
 6   Q     The fourth bullet point down on Page 5, it
 7   reads:  "In January of 2009, the album "Our
 8   World Redeemed," which includes Plaintiffs'
 9   Composition, was a nominee for Rap/Hip Hop
10   Gospel Album of the Year, at the Stellar Award
11   show held at the Grand Ole Opry in Nashville,
12   Tennessee."  And then it says "Nashville,
13   Tennessee" again.
14        Did you attend this show?
15   A     I did not.
16   Q     Did you watch that show on television?
17   A     I did not.
18   Q     Do you know if it was on television?
19   A     Yes.
20   Q     Was it?
21   A     I'm sorry?
22   Q     It was?
23   A     Yes.
24   Q     Do you know if any of the other plaintiffs
25   attended that concert, that award show?
```

EXHIBIT 23
PAGE 780

Confidential

Page 109

1   A    Aside from Marcus?

2   Q    Any of them.

3   A    I believe Marcus did, but I don't know

4   aside from him.

5   Q    Do you know if anyone performed the song

6   "Joyful Noise" at that award show?

7   A    I do not know.

8   Q    And do you know if any recording of

9   "Joyful Noise" was played during that award

10  show?

11  A    I don't know.

12  Q    Do you know what network that award show

13  was on?

14  A    I don't know.

15  Q    And you have no knowledge of any of the

16  individual defendants attending that award

17  show, right?

18  A    I don't.

19  Q    And you have no knowledge of any of the

20  individual defendants watching that television

21  program, right?

22  A    Right.

23  Q    Okay.  The next bullet -- skip the next

24  bullet and come back to it.

25       But the one below that -- I'm sorry, we're

EXHIBIT 23
PAGE 781

Confidential

Page 110

1   going straight to the next one.  It says, "In

2   February of 2009, the album was a nominee for

3   Best Rock or Rap Gospel Album at the 51st

4   Annual Grammy Award show in Los Angeles, which

5   was televised nationwide."

6        In the next bullet it says "Katy Perry

7   performed at the 51st Annual Grammy Award

8   Show."

9        And it also says, "On information and

10   belief, Defendants Gottwald and Sandberg, and

11   perhaps other individual Defendants were voting

12   members of the Grammy Society that year, and

13   thus would have received copies of and/or

14   access to the nominated songs and albums for

15   their review prior to voting."

16        Do you see that?

17   A    I do.

18   Q    Okay.  Did you attend the Grammy's -- the

19   51st Annual Grammy's show.

20   A    I did not.

21   Q    Do you have any knowledge that "Joyful

22   Noise" was performed during the 51st Annual

23   Grammy Award show?

24   A    I don't know.

25   Q    And you have no knowledge of whether a

EXHIBIT 23
PAGE 782

Confidential

Page 111

1   recording of "Joyful Noise" was played during

2   that show?

3   A      No.

4   Q      You're not a Grammy voter, right?

5   A      As of last year.

6   Q      You are as of last year?

7   A      Yes.

8   Q      Okay.  So as of the 51st Grammy Award show

9   in 2009, you have no knowledge, do you, of

10  whether "Joyful Noise" was posted on the Grammy

11  recording academy website, right?

12  A      I have no knowledge of that.

13  Q      Okay.  And you have no personal knowledge

14  that any of the individual defendants in this

15  case could have been able to hear "Joyful

16  Noise" from that website for the 51st Grammy

17  Awards, right?

18  A      I have no knowledge.

19  Q      And you have no knowledge of any of the

20  individual defendants receiving "Joyful Noise,"

21  a copy of it, or access to a streaming website,

22  including that song, as a result of the

23  nomination, right?

24  A      Can you repeat the question?

25  Q      Yeah, sorry.

EXHIBIT 23
PAGE 783

Confidential

Page 112

1      You have no knowledge of any of the
2  individual defendants receiving "Joyful Noise"
3  as a result of this nomination, right?
4  A     I have no knowledge of that.
5  Q     And you have no knowledge of any of the
6  individual defendants actually listening to
7  "Joyful Noise" as a result of this nomination,
8  right?
9  A     Right.
10  Q     Okay.  The next bullet says that in April
11  of 2009, Plaintiffs' Composition was nominated
12  for a Best Rap/Hip Hop Song of the Year at the
13  40th GMA Dove Awards, which was televised live
14  from the Grand Ole Opry in Nashville,
15  Tennessee."
16      Did you attend the 40th Annual GMA Dove
17  Awards?
18  A     I did not.
19  Q     Did you watch it on television?
20  A     I did not.
21  Q     Did you know what network it was aired on?
22  A     I do not.
23  Q     Do you know whether "Joyful Noise" was
24  performed during that award show?
25  A     I do not.

EXHIBIT 23
PAGE 784

Confidential

Page 113

1    Q     Do you know whether any recording of

2    "Joyful Noise" was played during that award

3    show?

4    A     I don't know.

5    Q     And you have no knowledge, do you, of any

6    of the individual defendants attending that

7    award show, right?

8    A     No knowledge.

9    Q     And you have no knowledge of any of the

10   individual defendants watching the broadcast of

11   that show on television, right?

12   A     Right.

13   Q     Okay.  So if we look back at Lambert

14   Exhibit No. 5, just briefly, it's a -- not the

15   one we're looking at, but --

16   A     Oh, something else?

17   Q     The next one.

18   A     Oh.

19   Q     Okay.  You have 5 in front of you?

20   A     Yes.

21   Q     Plaintiffs' supplemental answer?

22   A     Yes.

23   Q     This, on Pages 3 and 4, there is a

24   supplement to the answer that we just

25   discussed, which included the bullet points

EXHIBIT 23
PAGE 785

Confidential

Page 114

1    of -- that we just went through.

2        If you see on the bottom of Page 3, it

3    says "Supplemental Response."

4    A    Yes.

5    Q    And it says, "Additionally, the album 'Our

6    World Redeemed' debuted at No. 5 on the

7    Billboard Gospel Chart, and reached No. 1 on

8    the Christian Music Trade Association R&B/Hip

9    Hop Chart."

10       Do you see that?

11   A    Yes.

12   Q    You have no knowledge or information

13   reflecting that any of the individual

14   defendants followed or looked at the Billboard

15   Gospel Chart, correct?

16   A    Correct.

17   Q    And same question for the Christian Music

18   Trade Association R&B/Hip Hop Chart, right?

19   A    Right.

20   Q    Okay.

21   A    Are we done with that page?

22   Q    We're done with that page.  We'll go back

23   to L4, Lambert 4.  And on page --

24       MR. KAHN:  Which is?

25       MR. ALBERTSON:  Sorry.  We were just

EXHIBIT 23
PAGE 786

Confidential

Page 115

1    looking at it, it's the interrogatory

2    responses.

3         MR. KAHN:  Oh, okay.

4    A    Oh, wait.

5         Not the combined?

6    Q    Yes.  The one we were looking at a moment

7    ago.

8    A    Combined.

9    Q    If you go to Page 6 of that document.

10        Do you see the bullet that says "The

11   recording of Plaintiffs' Composition was played

12   on radio stations throughout the nation, and

13   occasionally featured on television interviews

14   of the Plaintiffs during their concert tours."

15        Do you see that?

16   A    We're on 6?

17   Q    Page 6.

18   A    And which one is that?

19   Q    The one that says "The recording" --

20   A    Oh, okay.

21   Q    Okay.  Did you ever hear "Joyful Noise"

22   played on the radio?

23   A    No, sir.

24   Q    Do you have any knowledge of any of the

25   individual defendants hearing "Joyful Noise" on

EXHIBIT 23
PAGE 787

Confidential

Page 116

1    the radio?

2    A     No, sir.

3    Q     Do you have any documents showing or

4    reflecting any radio play of "Joyful Noise" at

5    all?

6    A     No, sir.

7    Q     Did you ever see recording or performance

8    of "Joyful Noise" on television?

9    A     I'm not sure.  I'm saying that because a

10   remember seeing Flame perform a couple of times

11   on television.  I just cannot remember what

12   shows.

13   Q     Okay.  You remember what network you saw

14   Flame perform on?

15   A     I saw him performing on BET.

16   Q     But you don't know if he was performing

17   "Joyful Noise"?

18   A     That, I can't remember.

19   Q     And you have no knowledge of any of the

20   individual defendants seeing or hearing "Joyful

21   Noise" on television, right?

22   A     No knowledge.

23   Q     And you have no documents reflecting that

24   "Joyful Noise" was ever on television, right?

25   A     Right.

EXHIBIT 23
PAGE 788

Confidential

Page 117

1   Q   Is it correct that "Joyful Noise" has been

2   sold commercially?

3   A   What do you mean, "commercially"?

4   Q   Have CDs featuring "Joyful Noise" been

5   sold?

6   A   Yes.

7   Q   In the context of the album "Our World

8   Redeemed"; is that right?

9   A   Yes.

10   Q   Okay.  Are you aware of other albums in

11   which "Joyful Noise" has been sold?

12   A   No.

13   Q   Are you aware whether "Joyful Noise" was

14   sold as a single?

15   A   I don't know.

16   Q   Do you have any documents or other

17   information reflecting the number of record

18   sales of "Our World Redeemed" for any year?

19   A   I don't, but I wouldn't.

20   Q   And you have no documents or other

21   information reflecting the number of record

22   sales of "Joyful Noise" in any form, right?

23   A   That is correct.

24   Q   Okay.  When you say you wouldn't, who

25   would have that information?

EXHIBIT 23
PAGE 789

Confidential

Page 118

1    A      That would be a sound scan thing.

2    Q      What is "sound scan"?

3    A      It is how you -- it's the system that

4    traces the amount of records sold.

5    Q      Do you have any documents or information

6    reflecting the amount of revenue that was

7    received from sales of "Joyful Noise"?

8    A      No, sir.

9    Q      And you have no records of sales through

10   any forum, whether it be online or a store or

11   anything, right?

12   A      No, sir.

13   Q      Okay.  Do you have any documents or

14   information reflecting the number of sales of

15   "Joyful Noise" at concerts?

16   A      I don't.

17   Q      Do you know how many copies of "Joyful

18   Noise" were manufactured?

19   A      I do not, but I wouldn't.

20   Q      Do you have documents reflecting how much

21   revenue, if any, you have received from "Joyful

22   Noise"?

23   A      I don't.

24   Q      Do you have documents or information

25   reflecting how much revenue anyone has received

EXHIBIT 23
PAGE 790

Confidential

Page 119

1    from "Joyful Noise"?

2    A    I don't.

3    Q    So other than what we've discussed during

4    this deposition, you have no knowledge or

5    information from any source that reflects that

6    any of the individual defendants viewed or

7    heard "Joyful Noise" at any time, correct?

8    A    That is correct.

9    Q    And you weren't present during the

10   creation of the song, Dark Horse, right?

11   A    Right.

12   Q    Okay.  And you have no knowledge regarding

13   what the process was for the creation of that

14   song, right?

15   A    Right.

16   Q    You have no knowledge regarding when Dark

17   Horse was created, right?

18   A    Right.

19   Q    And you have no knowledge of when it was

20   completed, right?

21   A    Right.

22   Q    And you have no knowledge of, as between

23   the six individual defendants, who had what

24   role in the creation of Dark Horse, if any?

25   A    I don't have any knowledge of that.

EXHIBIT 23
PAGE 791

Confidential

Page 125

```
 1              MR. ALBERTSON:  Nothing for us.
 2              Thank you very much.  Safe travels.
 3              THE WITNESS:  Thank you.
 4              THE VIDEOGRAPHER:  The time is 2:28 p.m.
 5         and this completes Tape No. 2, as well as the
 6         videotaped deposition of Mr. Emanuel Lambert.
 7              (Time noted:  2:29 p.m.)
 8

 9                   _____
                          EMANUEL LAMBERT
10

11    Subscribed and sworn to before me
12    this _____ day of _____, 2017.
13

14    _____
15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 23
PAGE 792

Confidential

```
                                                    Page 126
 1                  C E R T I F I C A T E
 2     STATE OF NEW YORK          )
 3                                  :ss
 4     COUNTY OF NEW YORK       )
 5
 6              I, MICHELLE COX, a Notary Public within
 7     and for the State of New York, do hereby
 8     certify:
 9              That EMANUEL LAMBERT, the witness whose
10     deposition is hereinbefore set forth, was duly
11     sworn by me and that such deposition is a true
12     record of the testimony given by the witness.
13              I further certify that I am not related to
14     any of the parties to this action by blood or
15     marriage, and that I am in no way interested in
16     the outcome of this matter.
17              IN WITNESS WHEREOF, I have hereunto set my
18     hand this 30th day of November 2017.
19
20                              _____
21                              MICHELLE COX, CLR
22
23
24
25
```

EXHIBIT 23
PAGE 793

Confidential

Page 127

```
 1                              INDEX
 2   WITNESS                 EXAMINATION BY           PAGE
 3   EMANUEL LAMBERT         MR. ALBERTSON              6
 4                          MR. KAHN                 121
 5
 6                    INFORMATION REQUESTS
 7
 8   REQUESTS: , 86 , 86
 9                          EXHIBITS
10   DEPOSITION EXHIBITS                            FOR ID.
11   Exhibit 1      Document Entitled "Plaintiffs'    49
                    Supplemental Combined
12                  Responses to Defendants Jordan
                    Houston, Lukasz Gottwald,
13                  Sarah Theresa Hudson, Karl
                    Martin Sandberg, and Henry
14                  Russell Walter's First
                    Requests for Production of
15                  Documents,
16   Exhibit 2      Document Bates-stamped P000046    49
17   Exhibit 3      Seven-Page Document               49
18   Exhibit 4      Document Entitled "Plaintiffs'    49
                    Combined Responses to
19                  Defendants Jordan Houston,
                    Lukasz Gottwald, Sarah Theresa
20                  Hudson, Karl Martin Sandberg
                    and Henry Russell Walter's
21                  First Set of Interrogatories
22   Exhibit 5      Documents Entitled               49
                    "Plaintiffs' Supplemental
23                  Answer to Interrogatory Nos. 4
                    and 13 of Defendants' First
24                  Set of Interrogatories
                    (Amended)
25
```

TSG Reporting - Worldwide    (877) 702-9580

EXHIBIT 23
PAGE 794

Confidential

Page 128

| | DEPOSITION EXHIBITS | | FOR ID. |
|---|---|---|---|
| 1 | | | |
| 2 | Exhibit 6 | Document Entitled "Song | 83 |
| | | Writers' Split | |
| 3 | | Acknowledgment," | |
| 4 | Exhibit 7 | Document Entitled "Certificate | 87 |
| | | of Registration" | |
| 5 | | | |
| | Exhibit 8 | E-mail dated June 4, 2014, | 89 |
| 6 | | from Copyright Office to Eric | |
| | | Kayira, with Attachment | |
| 7 | | | |
| | Exhibit 9 | Letter dated June 5, 2014, | 89 |
| 8 | | from Eric Kayira to Chris | |
| | | MacRae | |
| 9 | | | |
| | Exhibit 10 | Document Entitled "Assignment | 90 |
| 10 | | of Copyright" | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

EXHIBIT 23
PAGE 795

Confidential

Page 129

```
 1    Case Name:  Gray, et al. v. Hudson, et al.

 2    Dep. Date:  November 16, 2017

 3    Deponent:  EMANUEL LAMBERT

 4    Pg.  Ln.  Now Reads      Should Read    Reason

 5    ___  ___  _____   _____   _____

 6    ___  ___  _____   _____   _____

 7    ___  ___  _____   _____   _____

 8    ___  ___  _____   _____   _____

 9    ___  ___  _____   _____   _____

10    ___  ___  _____   _____   _____

11    ___  ___  _____   _____   _____

12    ___  ___  _____   _____   _____

13    ___  ___  _____   _____   _____

14    ___  ___  _____   _____   _____

15    ___  ___  _____   _____   _____

16    ___  ___  _____   _____   _____

17

18                            _____

19                            EMANUEL LAMBERT

20

21    Subscribed and sworn before me

22    This____ day of _____, 2017.

23

24    _____      _____

25    (Notary Public)         MY COMMISSION EXPIRES:
```

TSG Reporting - Worldwide    (877) 702-9580

EXHIBIT 23
PAGE 796