# EXHIBIT 24

EXHIBIT 24
PAGE 797

Page 1

1          UNITED STATES DISTRICT COURT

           CENTRAL DISTRICT OF CALIFORNIA

2                WESTERN DIVISION

3

4    MARCUS GRAY (p/k/a FLAME);    )

     EMANUEL LAMBERT; and CHIKE    )

5    OJUKWU                        )

                    Plaintiffs,    )

6                    vs.           ) Case No.

                                   ) 2:15-CV-05642-CAS-JC

7    KATHERYN ELIZABETH HUDSON     )

     (p/k/a KATY PERRY), et al.,   )

8                    Defendants.   )

9

10

11

12

13

14     VIDEO-RECORDED DEPOSITION OF TODD R. DECKER, PH.D.

15          TAKEN ON BEHALF OF THE DEFENDANTS

16                 JANUARY 22, 2018

17                  St. Louis, MO

18

19

20     (Starting time of the deposition:  9:40 a.m.)

21

22

23

24    Reported by: William L. DeVries

25    Job No. 136273

EXHIBIT 24
PAGE 798

Page 17

1          A.    No.

2          Q.    Okay.  Look at section (2)(B).  It says

3    (quote as read):

4                Witnesses Who Must Provide a Written

5                Report.  Unless stipu -- otherwise

6                stipulated or ordered by the court,

7                this disclosure must be accompanied by

8                a written report prepared and signed by

9                the witness.  If the witness is one

10               retained or specially employed to

11               provide expert testimony in the case or

12               one whose duties as the party's

13               employee regularly involve giving

14               expert testimony.  The report must

15               contain one, a complete statement of

16               all opinions the witness will express

17               and the basis and reasons for them.

18               Do you see that?

19         A.    Yes.

20         Q.    Okay.  Do your two reports in this case

21   constitute a complete statement of all opinions you

22   will express in this case and the basis and reasons

23   for them?

24         A.    Can I --

25               MR. KAHN:  Sure.

EXHIBIT 24
PAGE 799

Page 18

1        Q.   (By Mr. Movit)  There's -- yes or no.
2   There's a question pending.  I don't think it calls
3   for privilege.
4        A.   Yes, except to the extent that as we
5   listen to music again and again we start to hear new
6   things, and so I won't rule out the idea that I will
7   hear something different in the music or come to a
8   different way of describing it.  You never stop
9   listening to the music and you never stop hearing
10  new things.
11       Q.   Okay.  Well, we certainly reserve all
12  rights if there's any new opinions given.  Okay.  If
13  you'd look at section (2)(B), Roman numeral two
14  (quote as read):
15            The -- the report must contain the
16            facts or data considered by the witness
17            in forming them.
18            Do your two opinions in this case, your
19  two reports in this case contain all facts or data
20  considered by you in forming your opinions?
21       A.   Considered by me?
22       Q.   Yes, sir.
23       A.   Yes, to the extent that I did not
24  employ musical notation.  I would reserve, you know,
25  the right to jot down what I thought would be a

EXHIBIT 24
PAGE 800

1   better explanation or a better expression of this

2   music in notation.

3        Q.   So there may be circumstances where

4   there would be a -- possible to make a better

5   explanation or better expression of "Dark Horse" and

6   "Joyful Noise" in musical notation?

7             (Court reporter interruption.)

8        Q.   (By Mr. Movit)  So there are -- let me

9   strike that.  So there are circumstances where

10  musical notation would provide a better explanation

11  or better expression for the music of "Joyful Noise"

12  and "Dark Horse"?

13       A.   I don't know that I would say better.

14  I think in all cases notation expresses an opinion

15  about the music and an argument that's being made

16  about the music, especially when you're dealing with

17  post-rock and roll pop music as we are here.  So

18  yes, I think any notation is always an argument

19  that's being made, and the issue here is the sound

20  of these records.

21       Q.   So are you expressing opinions about

22  the sounds and the recordings of "Dark Horse" and

23  "Joyful Noise"?

24       A.   Right.  And -- and in expressing those

25  opinions there's a variety of ways you could do it.

Page 39

1          MR. KAYIRA:  I'm fine.

2          MR. KAHN:  I've got it here.

3          (WHEREIN, Exhibit 2, Decker response to

4    Ferrara dated 5-5-17, was marked for identification

5    by the Court Reporter.)

6          Q.   (By Mr. Movit)  Dr. Decker, if you

7    would please turn to paragraph 14 on page eight of

8    your rebuttal.  The second sentence in paragraph 14

9    states, quote (quote as read):

10               Any attempt to render popular music

11               recordings as text, i.e. transcribing a

12               record into musical notation, as

13               Ferrara does throughout his report,

14               misses the fundamental quality of

15               popular music and opens the door to

16               rhetorical and inevitably interested

17               representations of said recording.

18          Do you see that, sir?

19     A.   Yes.

20          Q.   Okay.  So you in your rebuttal report

21    criticized Dr. Ferrara for transcribing "Joyful

22    Noise" and "Dark Horse" into musical notation,

23    correct?

24     A.   Yes.

25          Q.   Okay.  And contrasted Dr. Ferrara

EXHIBIT 24
PAGE 802

Page 40

1   having done so with your reports, which are devoid

2   of such transcriptions of "Dark Horse" and "Joyful

3   Noise" into musical notation, correct?

4           A.    Into western musical notation, yes.

5           Q.    Musical notation.  You don't have that

6   qualifier in your report, sir, do you?

7           A.    Suppose not.

8           Q.    Because -- and at the time you wrote

9   this, sir, you had not yet seen Dr. Ferrara's

10  rebuttal report, which attaches transcriptions into

11  musical notation of popular music by the very

12  scholars you cite, correct?

13          A.    Yes, because he hadn't written it yet.

14          MR. MOVIT:  Move to strike everything

15  after the word yes.

16          Q.    (By Mr. Movit)  Dr. Decker, if you'd

17  please look at paragraph 15-D of your rebuttal

18  report on page nine.

19          MR. KAHN:  What are you asking him?

20          MR. MOVIT:  I'm about to.  Don't

21  interrupt, please.

22          Q.    (By Mr. Movit)  So Dr. Decker,

23  please --

24          MR. KAHN:  You said do you have.

25          MR. MOVIT:  Yeah.

Page 49

1          MR. MOVIT:  Move to strike as

2    nonresponsive.

3          Q.   (By Mr. Movit)  Dr. Decker, you wrote a

4    book called Music Makes Me, correct?

5          A.   Music Makes Me: Fred Astaire and Jazz.

6          Q.   Correct?

7          A.   Yes.

8          MR. MOVIT:  Okay.  I'd like to mark

9    Decker Exhibit 3, which is the introductory pages --

10   the cover, introductory pages, and then pages nine

11   and ten of Music Makes Me: Fred Astaire and Jazz.

12          (WHEREIN, Exhibit 3, Excerpts of Music

13   Makes Me: Fred Astaire and Jazz, was marked for

14   identification by the Court Reporter.)

15          Q.   (By Mr. Movit)  Dr. Decker, page ten --

16   this is your book, correct?

17          A.   Yes.

18          Q.   Okay.  Dr. Decker, page ten, example

19   one contains a transcription into musical notation

20   of the bridge of Irving Berlin's "Top Hat, White Hat

21   [sic] and Tails," correct?

22          A.   No.  This is not a transcription.  This

23   is sheet music.  Irving Berlin wrote these notes

24   down and filed them at the Library of Congress.

25   This is not a transcription.  This is sheet music.

Page 58

1   can't remember where, but it was published.

2           Q.   Is "Posin'" a composition in the genre

3   of popular music?

4           A.   Yes.

5           Q.   You included example three in your book

6   in order to compare musical similarities between

7   "The Yam," "Carefree," and "Posin'," correct?

8           A.   I believe it's similarities between

9   "The Yam" and "Posin'," not "Carefree" and "Posin'."

10          Q.   So you included example three to -- in

11  your book to compare similarities between "The Yam"

12  and "Posin'," correct?

13          A.   Yes.

14          Q.   And example three is in western

15  notation, correct, western musical notation,

16  correct?

17          A.   Yes.

18          MR. MOVIT:  Going to mark Decker

19  Exhibit 6.

20          (WHEREIN, Exhibit 6, Page 193 of Music

21  Makes Me: Fred Astaire and Jazz, was marked for

22  identification by the Court Reporter.)

23          Q.   (By Mr. Movit)  Dr. Decker, Exhibit 6

24  is page 193 from your book Music Makes Me: Fred

25  Astaire and Jazz, correct?

EXHIBIT 24
PAGE 805

Page 59

1        A.   Yes.

2        Q.   Okay.  And the title of example four is

3   (quote as read):

4             Borne and Mercer's "Dig It," second

5             chorus, the A phrase as sung and tapped

6             by Astaire on his pop recording.

7             Correct?

8        A.   Yes.

9        Q.   Okay.  "Dig It" is in the genre of

10  popular music, correct?

11       A.   Yes.

12       Q.   Okay.  Example four constitutes an

13  attempt to transcribe a popular music recording into

14  musical notation, correct?

15       A.   Yes.

16       Q.   Example four constitutes an attempt to

17  transcribe a popular music recording into western

18  musical notation, correct?

19       A.   Yes.

20       Q.   Do you know who created the

21  transcription in Exhibit 4?

22       A.   I did.  It's only partly transcription.

23  Only the tap line is transcription.  The upper line

24  is taken from the sheet music.

25       Q.   So the upper line is taken from the

EXHIBIT 24
PAGE 806

Page 60

1    published sheet music?

2         A.    Yes.

3         Q.    Okay.  And you transcribed the second

4    line; is that correct?

5         A.    Yes, and in retrospect I didn't do as

6    good a job as I could have.  I don't think it's a

7    cramp roll at the end of the very -- the very end of

8    the phrase is not -- I would revise that now to not

9    be a cramp roll.  It's a double flap.  Research I've

10   done since then on tap dance set steps would lead me

11   to believe it's not a cramp roll, it's -- it's a

12   double flat.

13             MR. MOVIT:  Move to strike everything

14   after the word yes.  Dr. Decker, I would ask you to

15   please just answer the questions I've asked.  The

16   day will be much shorter that way.

17             MR. KAHN:  Counsel, sometimes the

18   questions you ask can't simply be answered yes or

19   no.

20             MR. MOVIT:  I disagree, particularly

21   that question.  And -- and again, my instruction was

22   to answer the question I'd asked.  My question was

23   not whether Dr. Decker had second thoughts of any

24   portion of his transcription.

25             Q.    (By Mr. Movit)  Dr. Decker, what

EXHIBIT 24
PAGE 807

Page 61

1    methodology was used to create the transcription in

2    example four?

3              A.   Listening to the record.

4              Q.   Okay.  So by listening to the record

5    you were able to create this transcription into

6    western musical notation of the A phrases tapped by

7    Fred Astaire in his popular recording, correct?

8              A.   Sure.

9              Q.   Okay.  Okay.  And that would be a fair

10   description of the methodology you used to create

11   this transcription?

12             A.   That the methodology was listening?

13             Q.   Yes, sir.

14             A.   Well, given that I used the word cramp

15   roll, I could very much have probably worked it out

16   also by checking my work by dancing it.  I also tap

17   dance.

18             MR. MOVIT:  Decker Exhibit 7.

19             (WHEREIN, Exhibit 7, Page 258 of Music

20   Makes Me: Fred Astaire and Jazz, was marked for

21   identification by the Court Reporter.)

22             Q.   (By Mr. Movit)  Dr. Decker, page --

23   Exhibit 7 constitutes page 258 of your book Music

24   Makes Me: Fred Astaire and Jazz, correct?

25             A.   Yes.

Page 66

1          Q.    Okay.   Dr. Decker, is bounce in the --
2    is the first line of Exhibit 4 an attempt to
3    transcribe recorded sound of jazz music into musical
4    notation, yes or no?
5               MR. KAYIRA:   Exhibit 4 or Exhibit 7,
6    Counselor?
7               Q.   (By Mr. Movit)   Dr. Decker, is example
8    six at the top of Exhibit 7 --
9          A.   Yes.
10         Q.   -- an attempt to transcribe the
11   recorded sound of a jazz music performance into
12   musical notation, yes or no?
13              MR. KAHN:   I would object, asked and
14   answered.   You may answer.
15         A.   Yes.
16         Q.   (By Mr. Movit)   Dr. Decker, is the
17   first line of Exhibit 4 -- strike that.
18              Dr. Decker, is the first line of
19   example six in Exhibit 7 an attempt to transcribe
20   the recorded sound of a jazz music performance into
21   western musical notation, yes or no?
22         A.   Yes.
23         Q.   Dr. Decker, is the second line of
24   example six in Exhibit 7 an attempt to transcribe
25   the recorded sound of a jazz music performance into

EXHIBIT 24
PAGE 809

Page 67

1   western musical notation, yes or no?

2           A.   Yes.  I believe you -- yes.

3                MR. MOVIT:  I'm going to mark Decker

4   Exhibit 8.  This is Decker Exhibit 8.

5                (WHEREIN, Exhibit 8, Page 279 of Music

6   Makes Me: Fred Astaire and Jazz, was marked for

7   identification by the Court Reporter.)

8           Q.   (By Mr. Movit)  Actually, before we

9   turn to Exhibit 8 I have a couple more questions

10  about Exhibit 7.

11          A.   Yeah.

12          Q.   Dr. Decker, who created the

13  transcriptions in Exhibit 7?

14          A.   I did.

15          Q.   Okay.  What methodology did you use to

16  create those transcriptions?

17          A.   Listening.

18          Q.   Please turn now to Exhibit 8.  Okay.

19  Is this Exhibit 8 page 279 from your book Music

20  Makes Me: Fred Astaire and Jazz?

21          A.   Yes.

22          Q.   Okay.  Okay.  And at the top of the

23  page it states, does it not (quote as read):

24                Example seven.  Layered introduction to

25                "Slap That Bass," Shall We Dance.  The

```
 1                    texture builds up from the bottom.  At
 2                    start of the number; each new idea
 3                    heard twice before the next entered --
 4                    enters.  Line F, not transcribed here,
 5                    is the only melodic rather than
 6                    rhythmic idea.
 7                    That's what it says, correct?
 8          A.    Yes.
 9          Q.    Okay.  Is "Slap That Bass" a work in
10    the genre of popular music?
11          A.    Yes.
12          Q.    Okay.  Example seven is a transcription
13    of the introduction to "Slap That Bass," correct?
14          A.    Yes.
15          Q.    Okay.  Who created that transcription?
16          A.    I did.
17          Q.    Okay.  How did you create that
18    transcription?
19          A.    Listening.
20          Q.    What did you listen to?
21          A.    The sound track to the film Shall We
22    Dance.
23          Q.    Okay.  So example seven in Exhibit 8
24    constitutes an attempt to transcribe the recorded
25    sound of a pop music performance into western
```

EXHIBIT 24
PAGE 811

Page 69

1    musical notation, correct?

2         A.   Yes.

3         Q.   And in the title of example seven as I

4    read before, it states (quote as read):

5              The texture builds up from the bottom

6              at start of the number; each new idea

7              heard twice before the next enters.

8              Correct?

9         A.   Yes.

10        Q.   Okay.  So example seven constitutes an

11   attempt to convey the texture of the recorded sound

12   of a pop music performance using western musical

13   notation, correct?

14        A.   No.

15        Q.   Don't you state that the texture builds

16   up from the bottom at the start of the number,

17   Dr. Decker?

18        A.   The intent of the transcription is to

19   separate out the layers to get closer to what the

20   individual men singing lines E, D, and B were doing.

21   This section of my book deals with the names of the

22   African American men who were hired for three days

23   at MGM -- at RKO, excuse me, to -- to improvise.

24             They improvised and created this

25   opening track.  That's my -- that's my contention

Page 75

1  Ellington.

2          Q.    Again, my question was have you pub --

3          A.    No.

4          Q.    No.   Thank you.

5          A.    Take that back, I have published on

6  Duke Ellington.  I have an article in Daedalus,

7  "Pioneers of the Concept Album," and I speak about

8  Duke Ellington's album "Blue Rose" from 1958,

9  including matters of growling and timbre.

10         MR. MOVIT:  We're up to Exhibit 10, I

11 believe?

12         MR. KAYIRA:  9.  I have 9.

13         MR. MOVIT:  9, you're correct.

14 Exhibit 9.

15         (WHEREIN, Exhibit 9, Excerpts from

16 Hymns for the Fallen: Combat Movie Music and Sound

17 After Vietnam, was marked for identification by the

18 Court Reporter.)

19         Q.    (By Mr. Movit)  Dr. Decker, Exhibit 9

20 constitutes excerpts from your book Hymns for the

21 Fallen: Combat Movie Music and Sound After Vietnam,

22 correct?

23         A.    Yes.

24         Q.    If you'd please turn to the final page

25 of this exhibit.  Final page of this exhibit is page

EXHIBIT 24
PAGE 813

1   209 of your book Hymns for the Fallen: Combat Movie

2   Music and Sound After Vietnam, correct?

3         A.   Right.

4         Q.   Okay.  At the top of the page it states

5   (quote as read):

6              Musical example 9.1.  Ostinato from

7              "Attack on the Bivouac," the Thin Red

8              Line composed by Hans Zimmer.

9              Correct?

10        A.   Yes.

11        Q.   Okay.  And this is musical example 9.1

12   is the ostinato from "Attack on the Bivouac" in

13   western musical notation, correct?

14        A.   Yes.

15        Q.   Who created this notation?

16        A.   I did.

17        Q.   So this constitutes a transcription of

18   the recording of "Attack on the Bivouac" as heard in

19   the Thin Red Line, correct?

20        A.   Of the sound track, yeah.

21        Q.   Of the sound track.  So in this musical

22   example 9.1 you have set forth a transcription of an

23   ostinato in western notation as contained in a sound

24   recording, correct?

25        A.   Yes.

Page 77

1          Q.   What methodology was used to create

2     this transcription of the ostinato?

3          A.   Listening.

4               MR. MOVIT:   Okay.  I'd like to mark

5     your first report in this case Exhibit 10.

6               (WHEREIN, Exhibit 10, Expert Report of

7     Todd Decker, was marked for identification by the

8     Court Reporter.)

9          Q.   (By Mr. Movit)  If you'd please turn to

10    page three, line 18.  First of all, Dr. Decker,

11    this -- this is your first expert report in this

12    case, correct?

13         A.   Yes.

14         Q.   Okay.  Please turn to page three,

15    line 18.  Okay.  It states (quote as read):

16               My published research has involved

17               identifying popular songs which are

18               demonstrably borrowing from other

19               songs.  For example, in my 2013 book

20               Show Boat: Performing Race in an

21               American Musical published by Oxford

22               University Press, I identified a 1926

23               song that composer Jerome Kern used as

24               a model for his very well-known 1927

25               song "Ol' Man River."  The connections

Page 78

1              I drew in that case are similar to

2              those made in this report about "Joyful

3              Noise" and "Dark Horse," even to the

4              matter of timbre.

5              Do you see that?

6       A.    Yes.

7       Q.    Okay.  I read that correctly, right?

8       A.    Yeah.

9              MR. MOVIT:  Okay.  This is Exhibit 11.

10             (WHEREIN, Exhibit 11, Excerpt from Show

11      Boat: Performing Race in an American Musical, was

12      marked for identification by the Court Reporter.)

13      Q.    (By Mr. Movit)  Dr. Decker, Exhibit 11

14      comprises excerpts from your book Show Boat:

15      Performing Race in an American Musical, correct?

16      A.    Yes.

17      Q.    Okay.  If you please turn to the

18      next-to-last page of this exhibit, it's entitled

19      (quote as read):

20             Example 2.1.  "De Old Clay Road" from

21             Deep River 1926, music by Laurence

22             Stallings, lyrics by Frank Harling,

23             with borrowing by Kern in "Ol' Man

24             River" noted above the vocal line.

25             Do you see that, sir?

EXHIBIT 24
PAGE 816

Page 79

1        A.   Yes.

2        Q.   Is "De Old Clay Road" a work in the

3   genre of popular music?

4        A.   Yes, in its time.

5        Q.   Is "Ol' Man River" a work in the genre

6   of popular music?

7        A.   Yes.

8        Q.   Okay.  Okay.  Who created to your

9   knowledge the musical notation for "De Old Clay

10  Road" that is contained in example 2.1?

11       A.   So this example was created by a

12  graduate student of mine and for "De Old Clay Road"

13  I gave him a copy of the copyright deposit at the

14  Library of Congress.  This song to my knowledge was

15  never published, but there is a copy in the file at

16  the Library of Congress, so that's where I got it.

17       Q.   Okay.  And --

18       A.   So the -- so the "De Old Clay Road"

19  portion of it, the piano part and the vocal line,

20  that's a direct copy from the original sheet music.

21       Q.   Okay.  Created by your graduate

22  student, correct?

23       A.   Right, yeah.

24       Q.   Okay.  And what's the name of that

25  graduate student?

EXHIBIT 24
PAGE 817

Page 80

1      A.    Dan Viggers.

2      Q.    Okay.

3      A.    Sorry.  I've had two work with me over

4  the years.

5      Q.    Is Dan Viggers credited in the book for

6  having --

7      A.    I believe so.  He should be.  If he

8  isn't, then it will be David Chapman.  Those are the

9  two gentlemen that have helped me in that regard.

10     Q.    Okay.  And how is the borrowing by Kern

11  in "Ol' Man River" noted above the vocal line?

12     A.    Two ways.  There's a bracket that you

13  can see above measure two, extending across the bar

14  on either side of measure two in a piano part, but

15  the principal part that's notated is at the bottom

16  of the first page of the example there where we

17  inserted a line of staff or a -- a vocal staff, a

18  treble clef staff and inserted the appropriate

19  section of Kern's "Ol' Man River" taken from the

20  sheet music of that song and transposed into the

21  appropriate key so that it would match with the

22  notated -- the notated pitch level of "De Old Clay

23  Roads."  So it's not a transcription.  Again, this

24  is sheet music.

25     Q.    So Dr. Decker, in example 2.1 you have

Page 81

1    used western musical notation to reflect borrowings

2    from one popular musical work into another popular

3    musical work, correct?

4           A.    Yes.

5           Q.    Dr. Decker, previously you've discussed

6    sheet music during your deposition, correct?

7           A.    Right.  Yes.

8           Q.    Okay.  And sheet music of popular

9    music, correct, or works in the genre of popular

10   music --

11          A.    Right.

12          Q.    -- to be more specific, correct?

13                MR. KAHN:  Be sure to let him finish.

14          Q.    (By Mr. Movit)  Don't -- don't those

15   sheet -- work -- don't those pieces of sheet music

16   that you reference constitute a transcription by

17   someone, whether the author or someone else into

18   western musical notation of the composer's song?

19          A.    No.  Some popular musics begin with

20   sheet music, like the example -- if I can refer back

21   to it, Exhibit 3, Exhibit 4, and Exhibit 5 and the

22   upper line of Exhibit 6.  All of these are examples

23   where the musical notation finds its source in a

24   notated music written down by the composer --

25   composer or his assistant.  So it's not a

Page 85

1    critical additions that are often built on

2    transcriptions, all of those work off of recordings.

3         Q.   So --

4         A.   Serious musical transcriptions is done

5    off of recordings.

6         Q.   Do you have any citation for your

7    position that transcription is limited to

8    recordings?

9         A.   My citation -- my -- I don't have a

10   citation for it.  It's the general practice as

11   reflected in -- in collegiate syllabi.  I could get

12   you the syllabus of my colleague at Washington

13   University and his transcription course.

14              Some ethnomusicologists might need --

15   you know, ethnomusicologists, the essence of what

16   they do in collecting sound is go out and record it

17   and then they bring it back home and they listen to

18   it over and over again.  I could give you the names

19   of colleagues who do that.

20              MR. MOVIT:  I'm going to mark

21   Exhibit 12.

22              (WHEREIN, Exhibit 12, Page 48 from Show

23   Boat: Performing Race in an American Musical, was

24   marked for identification by the Court Reporter.)

25         Q.   (By Mr. Movit)  Dr. Decker, is

EXHIBIT 24
PAGE 820

1    Exhibit 12 page 48 from your book about Show Boat?

2         A.   Yes.

3         Q.   Could you please read the title of

4    example 2.2a at the top of page 48?

5         A.   The Bridge of "Goin' Home," a quasi

6    spiritual popular song adapted from a pseudo-Negro

7    melody From --

8              (Court reporter interruption.)

9         A.   Sorry.  From a pseudo-Negro melody from

10   Antonin Dvorak's new world symphony.

11        Q.   (By Mr. Movit)  Okay.  And can you

12   please read the title of example 2.2b into the

13   record?

14        A.   First half of the bridge of "Ol' Man

15   River."

16        Q.   Okay.  It says here that "Goin' Home"

17   is a quasi-spiritual popular song, correct?

18        A.   Yeah.

19        Q.   Okay.  So "Goin' Home" is a work in the

20   genre of popular music?

21        A.   In its time.

22        Q.   Okay.  Yes?

23        A.   Yes, in its time.

24        Q.   Okay.  And "Ol' Man River" is a work in

25   the genre of popular music, correct?

EXHIBIT 24
PAGE 821

1          A.    Yes.

2          Q.    Okay.  Who created the notation -- and

3     example 2.2a and 2.2b contain western musical

4     notation, correct?

5          A.    Right.

6          Q.    Who created the western musical

7     notation in 2.2a?

8          A.    My assistant or my grad assistant --

9     I'm -- I'm thinking now in my memory that it was

10    probably David Chapman.

11         Q.    And what methodology did David Chapman

12    use to create this?

13         A.    I gave him a manuscript copy that I had

14    copied from the sheet music in both cases of this --

15    of these two songs.  Both of these were -- both of

16    these were published.  They are transposed as to

17    key.

18              Again I don't know that the sheet music

19    is -- for these is in this exact keys, but I

20    transposed them to highlight for the reader that

21    the -- the similarity between the notes being used

22    and the leaps and things like that.

23         Q.    So -- and -- and transposing the key

24    facilitates comparison and similarities, correct?

25         A.    Yeah.  Right.

EXHIBIT 24
PAGE 822

Page 88

1          Q.   Okay.  So on page 48 you've -- in your

2   book you've used western musical notation to compare

3   similarities to two works in the genre of popular

4   music, correct?

5          A.   Yes.

6               MR. KAHN:  The witness needs a

7   restroom.

8               MR. MOVIT:  Oh, of course.  We always

9   facilitate that.

10               VIDEOGRAPHER:  We're going off the

11   record at approximately 11:42 a.m.

12               (WHEREIN, a recess was taken.)

13               VIDEOGRAPHER:  We're back on the record

14   at approximately 11:52 a.m.

15          Q.   (By Mr. Movit)  Okay.  Dr. Decker, did

16   you speak with Mr. Kahn and/or Mr. Kayira about the

17   substance of your testimony during the last break?

18          A.   Yes.

19          Q.   Okay.  What did you talk about?

20               MR. KAHN:  Objection, instruct him not

21   to answer.

22          Q.   (By Mr. Movit)  Okay.  Did you talk

23   about the issue of transcriptions?

24               MR. KAHN:  Same objection.  Same

25   instruction.

1    even have the word transcription in it.  My question

2    was isn't the composer or the composer's assistant

3    reducing to musical notation the elements of the

4    music that's being composed, whether it be played in

5    song or just what's the idea in the composer's head,

6    aren't they reducing into western musical notation

7    the composition, yes or no?

8            A.   I would say no.

9                 MR. MOVIT:  Okay.  Next exhibit,

10   Exhibit 13.

11                (WHEREIN, Exhibit 13, Page 89 of Show

12   Boat: Performing Race in an American Musical, was

13   marked for identification by the Court Reporter.)

14           Q.   (By Mr. Movit)  Exhibit 13, this is

15   page 89 from your book on Show Boat, correct?

16           A.   Yes.

17           Q.   And the title of this example 4.2 at

18   the top of the page is the opening phrase of "You

19   Are Love," compared to Sigmund Romberg's "Some Day"

20   from Cherry Blossoms 1927, correct?

21           A.   Yes.

22           Q.   Okay.  What does the top line in

23   example 4.2 represent of notated music?  What does

24   that line represent?

25           A.   That is a -- what is it, it's eight

Page 99

1    We're going to seek another day of deposition

2    because this is taking up a lot of time, not

3    responding to anything I'm asking.

4            MR. KAHN:  He's trying to respond

5    completely to questions that are not capable of a

6    yes-or-no answer.  We're here.  Continue with the

7    deposition.

8            MR. MOVIT:  My last question was and

9    the bottom line is?  That was my last question.  So

10   the court will be the judge of whether or not these

11   are fair responses.

12       Q.   (By Mr. Movit)  So Exhibit 13

13   constitutes a comparison of similarities between two

14   popular music compositions, correct?

15       A.   Yes.

16       Q.   Okay.  Comparison using western musical

17   notation, correct?

18       A.   Yes.

19           MR. MOVIT:  Okay.  We're going to mark

20   our next exhibit, which is the visual exhibits to

21   Dr. Ferrara's rebuttal report.  And just for the

22   record, it's in a Redweld because of its size and

23   it's not clipped together or anything, so I'd ask

24   everyone to please make sure the pages stay in their

25   correct order.

Page 100

1        (WHEREIN, Exhibit 14, Rebuttal Visual

2    Exhibits, was marked for identification by the Court

3    Reporter.)

4        MR. MOVIT:  If you'd please turn to

5    tab E.

6        MR. KAHN:  Tab what?

7        MR. MOVIT:  E as in elephant.

8        Q.   (By Mr. Movit)  And tab E represents an

9    article by Mark Butler that you cite in your report,

10    Dr. Decker, entitled "Turning the Beat Around:

11    Reinterpretation, Metrical Dissonance, and Asymmetry

12    in Electronic Dance Music," correct?

13        A.   Yes.

14        Q.   And this article, which you have cited

15    by Mark Butler, contains transcriptions in western

16    musical notation of recordings of electronic dance

17    music, correct?

18        A.   Yes.

19        Q.   Okay.  If you turn to Exhibit L,

20    please.  Exhibit L contains an article you cite in

21    your rebuttal report in this case by Albin Zak

22    entitled Edition-ing Rock, correct?

23        A.   Yes.

24        Q.   Please turn to page 103 of this

25    article.  Page 103 of this article, which you have

EXHIBIT 24
PAGE 826

1    cited in your rebuttal report contains a

2    transcription in western musical notation of the

3    introduction of a rock song, correct?

4           A.    Rephrase your -- sorry, say the

5    question again.

6           Q.    Yes.  Page 103 of this article, which

7    you have cited in your rebuttal report, contains a

8    transcription in western musical notation of the

9    introduction of a rock song, correct?

10          A.    No.  All he transcribes, all that Zak

11   transcribes is the basic figure from the

12   introduction.  This is not a transcription of the

13   introduction.  This is just one small element, the

14   basic figure.

15          Q.    Page 103 of this article, which you've

16   cited in your rebuttal report, contains a

17   transcription in western musical notation of a

18   figure from the introduction of a rock song,

19   correct?

20          A.    Well, Zak thinks it's a basic figure.

21   I would have to listen to the rock song to know if

22   that's accurate, so I would -- you need to put the

23   word basic in there as well because that's how he

24   has defined what he's transcribing here.

25          Q.    A basic figure is still a figure,

EXHIBIT 24
PAGE 827

Page 102

1    correct?

2           A.    Sure.

3           Q.    Okay.  Well, then my question is

4    page 103 of this article contains a transcription in

5    western musical notation of a figure from the

6    introduction of a rock song, correct?

7           A.    Sure.

8           Q.    Thank you.  Dr. Decker, are you aware

9    if federal courts apply a legal meaning to the term

10   substantial similarity?

11          A.    I am not aware of the legal definition

12   of that.

13          Q.    Okay.

14          A.    No.

15          Q.    In connection with your work as a

16   musicologist, what definition do you -- do you

17   assign to the term substantially similar?

18          A.    I would need the example in front of

19   me, but I assume that it would be the standard of is

20   there evidence for music -- the phrase that

21   musicologists would use is musical borrowing, and

22   that, you know, is a -- is a standard that is built

23   on argument.  You have to make an argument for it.

24          Q.    So in this case --

25          A.    You know, and --

Page 109

1       A.   Right.  And the two that I discuss in

2   the report are -- were exhibit -- were given as

3   exhibits.  So I downloaded them so that, you know,

4   there would be no ambiguity about what they were.

5       Q.   Okay.  Did you download the other two

6   that you say points to it?

7       A.   I don't recall.

8       MR. MOVIT:  Okay.  Well, just to make

9   clear what they are, just going to attach so that

10  we're all on the same page here.  The first one is

11  by -- what are we up to?

12      MR. KAHN:  15.

13      MR. MOVIT:  14.

14      MR. KAHN:  15, I think.

15      MR. MOVIT:  15.  We're up to 15, right?

16  14 was Dr. Ferrara's exhibits, right?

17      MR. KAHN:  Yeah.

18      THE WITNESS:  Yeah.

19      Q.   (By Mr. Movit)  And of the four posters

20  of the YouTube mashups to which you've, you know,

21  provided links in your footnote five, do you know

22  any of those individuals?

23      A.   No.

24      Q.   Okay.  So you don't know Freshplosion?

25      A.   No.

Page 110

1          Q.   Okay.  You have no idea what person or

2    people constitute Freshplosion, correct?

3          A.   No.  Not to my knowledge, right.  I

4    mean --

5          Q.   Right.  To your knowledge.

6          A.   Right.

7          Q.   That's correct.  And -- and you have no

8    idea who actually created that video, right?

9          A.   No.

10         Q.   Okay.  And you have -- you -- you don't

11   have any personal knowledge as to how the video was

12   created, right?

13         A.   I'm assuming it was done using digital

14   music tools.

15         Q.   Right.  But that's an assumption,

16   right?

17         A.   I don't know how else you would do it

18   and post it.

19         Q.   But you have no personal knowledge of

20   how it was done, right?

21         A.   No.

22         Q.   Okay.  Okay.  And the same thing, you

23   have -- have you ever met Seth Mott?

24         A.   No.

25         Q.   Okay.  Never communicated with Seth

EXHIBIT 24
PAGE 830

Page 111

1   Mott?

2         A.   No.

3         Q.   Okay.  No idea --

4         A.   Not that I know of, like I said.

5         Q.   Not that you know of.

6         A.   Yeah.

7         Q.   No idea who actually created the video

8   posted by Seth Mott, right?

9         A.   No.

10        Q.   Okay.  No idea how that video was

11  created other than an assumption that it was done

12  using digital tools, correct?

13        A.   Right.

14        Q.   Okay.  And the same thing for the other

15  two people, never met them, never communicated with

16  them?

17        A.   Right.  Yes.  To the best of my

18  knowledge.

19        Q.   No idea how those other two videos were

20  created other than to assume it was with digital

21  musical tools and no idea who created those other

22  two videos, right?

23        A.   Right.

24             MR. MOVIT:  Okay.  So going to mark as

25  Exhibit 15, this is Exhibit 15.

Page 135

1   assuming this is the -- I'm assuming Exhibit 20 is

2   the fourth one here, correct?

3          Q.   I don't answer questions.

4          A.   Okay.   The -- the two that I chose were

5   ones that I felt spoke most eloquently and directly

6   in sound to the issue at hand.

7          Q.   Okay.

8          A.   So ...

9          Q.   Each of the mashup videos alters one or

10  both of the sound recordings at issue, correct?

11         A.   Right.

12         Q.   Okay.   And you -- you have no idea of

13  the full extent of the alterations of the sound

14  recordings that -- that were done by the people who

15  made these four YouTube videos, correct?

16         A.   What do you mean by full extent?

17         Q.   You don't know precisely what

18  alternate -- alterations each of these YouTube

19  videos the creators made?

20         A.   Well, I think Freshplosion lays out

21  exactly what they did in text, right, they --

22  with -- with time code analysis which is exactly

23  what I would ask a student to do or what I would do.

24  So there -- now, in that -- okay.   So in that

25  respect Freshplosion articulates it.

Page 136

1              Seth Mott, the second example, Exhibit

2    B in my -- in my rebuttal report, there -- there is

3    no text from the mashup maker explaining what

4    they're doing so I had to extrapolate it and as far

5    as I know it wasn't challenged.

6              Q.   Right.  So you have no idea about the

7    full extent of alterations to the sound recording

8    that Seth Mott made to "Dark Horse" and/or "Joyful

9    Noise," correct?

10             A.   What do you mean by full extent?

11             Q.   You don't know all the alterations

12   necessarily that Seth Mott made to create his mashup

13   to the sound recording of "Joyful Noise" and/or

14   "Dark Horse," correct?

15             A.   Well, how could anyone know that?  I

16   would say no.

17             Q.   By speaking to the creator of the video

18   one could know that, correct?

19             A.   I suppose.

20             Q.   Okay.

21             A.   But I've already -- you know.

22             Q.   And you have no idea if Freshplosion

23   made alterations to the sound recordings other than

24   what is conceded in the text of the video itself,

25   correct?

EXHIBIT 24
PAGE 833

Page 137

1    A.   Tested by my own ear as well.  So you

2  know, I'm lis -- I'm -- I'm listening to the tracks

3  and -- you know what I mean?  So --

4    Q.   But it's possible that Freshplosion

5  made additional alterations to the sound recordings

6  of which you are not aware, correct?

7    A.   I suppose it's possible.

8    Q.   Okay.  And the same would apply for the

9  other -- the makers of the other two videos you

10 cite, correct; you have no idea the full extent of

11 the alterations to the sound recordings at issue

12 that those creators made, correct?

13   A.   Inasmuch as I don't know them, those

14 individuals.

15   Q.   So that would be correct, right?

16   A.   Yeah.

17        MR. MOVIT:  Okay.  Okay.  Exhibit 20.

18 Did you get a copy of that, Mike?

19        MR. KAHN:  Yeah.

20   Q.   (By Mr. Movit)  So this is the fourth

21 video.  It's -- it's -- strike that.

22        This is the -- the third citation in --

23   A.   Right.

24   Q.   -- the footnote five is to Exhibit 20,

25 correct?

Page 140

1    listeners, who are often deeply knowledgeable of

2    music, we all are, especially popular music

3    listeners that are going to go to the trouble to do

4    this, this listener heard a similarity.

5              So yes, I would stake my reputation on

6    the ears of the audience for this music as they

7    declare it whether they understand themselves as an

8    expert or not.

9          Q.   (By Mr. Movit)  Uh-huh.  Uh-huh.  So

10   your -- your opinion, Dr. Decker, is that civilian

11   list -- civilian listeners would find the songs to

12   sound similar?

13         A.   I think this is evidence for that.  I

14   think these YouTube mashups provide evidence for

15   that.

16         Q.   No -- no, I'm asking if that's your

17   opinion in the case.

18         A.   Say it again that --

19         Q.   That civilian listeners would find the

20   songs to be similar?

21         A.   Yes, that has been my experience.

22         Q.   Okay.  Is that your opinion in this

23   case?

24         A.   Yes.

25         Q.   Okay.  Dr. Decker, did you conduct any

EXHIBIT 24
PAGE 835

Page 215

1          A.    Yes.

2          Q.    Okay.  And it says (quote as read):

3                This similarity rests in the eight-note

4                ostinato figure described in tabular

5                form on page six of my report.

6                Do you see that?

7          A.    Yes.

8          Q.    Okay.  So you're stating Dr. Decker,

9    correct, that the fundamental similarity between

10   "Joyful Noise" and "Dark Horse" is an ostinato in

11   each work, correct?

12         A.    Yes.

13         Q.    Okay.  And then similarly if you could

14   please turn to page five.  Okay.  Paragraph 7 d. you

15   state that (quote as read):

16                The crucial matter here is the musical

17                content of the tracks' eight-note

18                ostinatos.

19                Correct?

20         A.    Yes.

21         Q.    Okay.  Dr. Decker, countless musical

22   works predating the creation of "Joyful Noise" have

23   contained ostinatos, correct?

24         A.    Yes.

25         Q.    Dr. Decker, is it correct that your

Page 218

1          A.   I would need -- I can't answer that as

2    a yes or no.

3          Q.   You don't know one way or the other?

4          A.   I do have an opinion, but I can't

5    answer it as a yes or no.

6          Q.   So it's possible that prior countless

7    composers have created songs using -- do you

8    disagree that countless prior composers have created

9    songs --

10          A.   I would need to --

11          Q.   -- using two-bar units of eight beats

12    in length?

13          A.   I would need to see the repertoire --

14    the body of music you're talking about.  I would

15    need to see the repertoire we're talking about here.

16          Q.   Okay.  So you don't -- I'm talking

17    about hip hop music.  Do you know?

18          A.   Hip hop music?

19          Q.   Yes, sir.

20          A.   I would assume that patterns of two-bar

21    units of eight beats to be quite common.

22          Q.   Okay.  Thank you, sir.  And pop music,

23    contemporary pop music?

24          A.   Depends on the genre.

25          Q.   It's a very beat-driven pop music.

EXHIBIT 24
PAGE 837

Page 219

1          A.   More likely than say country, yeah.

2          Q.   So it would be very common, correct, or

3     you don't know?

4          A.   I'm thinking.  Can you phrase -- say

5     the question again, please?

6          Q.   Yeah.  Countless composers of

7     contemporary beat-driven pop music have used two-bar

8     units of eight beats in length, correct?

9          A.   I don't like the word countless, but

10    yes.

11         Q.   A great many composers of contemporary

12    beat-driven pop music?

13         A.   Sure.  Sure.

14         Q.   Okay.  The use of a two-bar phrase is a

15    basical musical -- is a basic musical building

16    block, correct?

17         A.   In what music?

18         Q.   Hip hop.

19         A.   Sure.  Yes.

20         Q.   Two-bar phrases are a basic musical

21    building block in beat-driven pop music, correct?

22         A.   Yes.

23         Q.   Okay.  Four- or eight-bar phrases are a

24    basic musical building block in hip hop or

25    contemporary beat-driven pop, correct?

EXHIBIT 24
PAGE 838

Page 220

1          A.    Say that again.

2          Q.    Four- or eight-bar phrases --

3          A.    Yeah.

4          Q.    Okay.  Certainly not something any

5    composer is entitled to monopolize, correct?

6          A.    It's the part of the structure of the

7    music.  Things happen after -- things happen in

8    groups of four.  Usually groups of four.  Not groups

9    of two, but groups of four.

10         Q.    So that's correct, it's not something

11   anyone is entitled to monopolize, correct?

12              MR. KAHN:  Are you asking for a legal

13   opinion?

14              MR. MOVIT:  I'm asking for his opinion

15   as a music scholar whether anyone should be entitled

16   to monopolize the idea of a two-bar, four-bar or

17   eight-bar phrase.

18         A.    I don't think it would be possible to

19   do such a thing.  Meter is ancient and it's not

20   something you could corner.

21         Q.    (By Mr. Movit)  Duple meter time is

22   commonplace, correct?

23         A.    Yeah.

24         Q.    Okay.  Your opinion, duple meter time

25   is not something any one composer is entitled to

EXHIBIT 24
PAGE 839

Page 221

1   monopolize, correct?

2        A.   Sure.

3        Q.   Okay.  Eight even quarter notes is a

4   very simple rhythm, correct?

5        A.   I never use the word simple lightly

6   with music.  I don't.  Because it implies

7   comparative and -- you know.  So I avoid using the

8   word simple in that way.

9             So I would elect not to answer the

10  question just because -- in my own writing and in my

11  teaching because it -- it implies a sort of facile

12  approach to the question of rhythm and what is

13  simple or complex.  It's just not a word I use.

14       Q.   Dr. Decker, if you'd please look at

15  page five of your initial report.  Paragraph c.,

16  Rhythm.  (Quote as read):

17            The ostinatos in "Joyful Noise" and

18            "Dark Horse" are identical in rhythm.

19            Both use eight even quarter notes in

20            duple meter time.  The relative

21            simplicity of this rhythmic choice,

22            even quarter note motion realized in

23            "Joyful Noise" and "Dark Horse" alike

24            in a stiff and mechanical style is

25            noteworthy.

Page 223

1    this is as I state here a relatively -- is a --

2    the -- evidences a kind of relative simplicity.

3              It's all about musical context.  Four

4    even quarter notes in certain kinds of musical

5    styles can be the climax of the piece.  So -- so

6    that's why I'm careful with the word simple as a

7    music scholar --

8         Q.   (By Mr. Movit)  Okay.  Okay.

9         A.   -- because it assumes a lot.

10        Q.   Professional adults making commercial

11   music in the 21st century, for them eight even

12   quarter notes is a very simple rhythm, is it not?

13        A.   That was my point by saying relative

14   simplicity.

15        Q.   Okay.  So that would be correct, would

16   it not?

17        A.   That would be correct.  I phrase it

18   differently here, yes.

19        Q.   No composer in your opinion is entitled

20   to monopolize the rhythm of eight even quarter

21   notes, correct?

22        A.   No.

23        Q.   That's correct?

24        A.   Yes, that's correct.  No composer is.

25        Q.   Certainly the authors of "Joyful Noise"

EXHIBIT 24
PAGE 841

Page 224

1    are not the first composers in history to use eight

2    even quarter notes in duple meter time, correct?

3         A.   No.

4         Q.   That's correct?

5         A.   That's correct.

6         Q.   Dr. Decker, there are only two types of

7    keys or modes, major and minor, correct?

8         A.   No.

9              (WHEREIN, a discussion was held off the

10   record.)

11             MR. MOVIT:  If it's marked twice, it's

12   marked twice.  I'd rather continue here.

13             MR. CHIEFFO:  Okay.

14             MR. MOVIT:  I don't believe it was.

15             THE WITNESS:  Yes, it is.  Yeah.

16             MR. MOVIT:  Oh, it is?  Okay.  It's

17   been marked twice.

18             THE WITNESS:  Yeah.

19             MR. MOVIT:  It's marked twice.  It's

20   fine.

21             THE WITNESS:  You're right.

22        Q.   (By Mr. Movit)  Okay.  Dr. Decker, do

23   you know if The Harvard Dictionary of Music states

24   if there's two types of modes or keys, major and

25   minor?

Page 230

1    radio a lot?

2            A.    I listen to -- yeah.  I suppose.

3            Q.    Is any composer allowed to monopolize

4    the use of a minor key?

5            A.    No.

6            Q.    Look at your initial report, sir, that

7    you currently have open as Exhibit 33.

8            A.    Yes.

9            Q.    Look at the bottom of page six.  Roman

10   numeral eight near the bottom, do you see that?

11           A.    Yeah.

12           Q.    Okay.  Last sentence you state (quote

13   as read):

14                 The fourfold repetition of scale degree

15                 three followed by the dissent to scale

16                 degree two is the most specific musical

17                 content shared by both tracks.

18                 That's what you wrote, correct?

19           A.    Yes.

20           Q.    Okay.  So another way of saying what

21   you've opined to be the most specific -- specific

22   musical content shared by both tracks would be 3, 3,

23   3, 3, 2, 2, correct?

24           A.    No.

25           Q.    Scale degree three, scale degree three,

EXHIBIT 24
PAGE 843

1   scale degree three, scale degree three, scale degree

2   two, scale degree two?

3          A.   No, 3, 3, 3, 3, 2.  That's what the

4   sentence says.

5          Q.   So scale --

6          A.   The dissent to two, the fourfold

7   repetition of three followed by dissent to two, it's

8   the motion to two.

9          Q.   Okay.  Okay.

10          A.   That is distinctive and that catches

11  the ear.

12          Q.   Okay.  So the -- the most distinctive

13  musical content shared between the tracks is 3, 3,

14  3, 3, 2; is that correct?

15          A.   That's what it says, yes.

16          Q.   Okay.  And that's your opinion,

17  correct?

18          A.   Yes.

19          Q.   Okay.  So another way of saying that

20  would be -- in the solfège system would be mi, mi,

21  mi, mi --

22              (Court Reporter interruption.)

23          Q.   (By Mr. Movit)  -- in the solfège

24  system would be mi, mi, mi, mi, re, correct?

25          A.   Yes.  Yeah, I mean, if you're not going

EXHIBIT 24
PAGE 844

Page 232

1    to do the fancy minor mode stuff.  Yeah.

2           Q.   Mi, mi, mi, mi, re in a minor key,

3    correct?

4           A.   Yeah, mi, mi, mi, mi, re.  Yeah.

5           Q.   Okay.  The composers of "Dark Horse"

6    are not the first people in the world to come up

7    with mi, mi, mi, mi, re, are they?

8           A.   I wouldn't be able to answer that.

9           Q.   You don't know one -- you don't know

10   one way or the other, mi, mi, mi, mi, re?

11          A.   I don't have evidence one way or the

12   other.  Are we just talking the pitches or also the

13   rhythmic realization?

14          Q.   Get to the -- we'll get to the rhythm

15   in a moment, but mi, mi, mi, mi, re?

16          A.   I'm sure that's been used before, but

17   the -- but the point that is made here in this

18   section of my report has to do with the strong

19   rhythmic placement of the half step dissent from

20   three to two.

21               So you could repeat 3, 3, 3, 2 all you

22   want and use that and I'm sure it's been used, but

23   if it's not with a distinctive -- the shared

24   material between these works is that -- is that

25   rhythmic placement.  So it's a combination of

Page 233

1    pitches and rhythmic placement and rhythm.  So --

2              Q.    The rhythmic place --

3              A.    I'm sure other folks have used those

4    notes, but that's not enough --

5              Q.    In that order, correct, mi, mi, mi, mi,

6    re, correct?

7              A.    Mi, mi, mi, mi, re?

8              Q.    Yeah.

9              A.    In minor?

10             Q.    Is that something that -- in minor.

11             A.    Yeah.

12             Q.    Yeah.  Mi, mi, mi, mi, re is not a

13   pitch sequence in any key or any mode that anyone is

14   entitled to monopolize, correct?

15             A.    No -- or correct.  Yes.  Just the pitch

16   sequence, right.

17             Q.    And the "Dark Horse" composers are not

18   the first composers to have used mi, mi, mi, mi, re

19   on even quarter notes, correct?

20             A.    Apparently not, no.

21             Q.    So I'm correct, right?

22             A.    Yes.

23             Q.    Okay.  The -- the timbre as in "Dark

24   Horse" and "Joyful Noise" with respect to the

25   ostinatos are not identical, correct?

EXHIBIT 24
PAGE 846

Page 234

1          A.    Correct.

2          Q.    The use of a pingy, synthesized timbre
3    is not something that any composer is entitled to
4    monopolize, correct?

5          A.    Correct.

6          Q.    Have you ever conducted a survey of the
7    use of frequency of the use of a pingy, synthesized
8    timbre in hip hop and hip hop-influenced popular
9    music?

10         A.    No.

11         Q.    So it's possible that that's common,
12    correct?

13         A.    Yes.  A lot of things are possible.

14         Q.    Dr. Decker, "Mary Had a Little Lamb" is
15    the same composition, whether it's played on a
16    flute, a trumpet or a synthesizer with a pingy
17    timbre, correct?

18         A.    Yes.

19         Q.    Okay.  Dr. Decker, repetitive
20    syncopated bass lines are common in popular music,
21    correct?

22         A.    Yes.

23         Q.    Dr. Decker, isn't it correct that
24    whether an instrument in a sound recording is in the
25    front of the mix or the back of the mix is an aspect

Page 243

1   at approximately 4:17 p.m.

2          Q.    (By Mr. Movit)  Dr. Decker, are you

3   still able to testify to the best of your ability?

4          A.    Yes.

5          Q.    Okay.  As we discussed previously,

6   "Joyful Noise" and "Dark Horse" are in different

7   keys, correct?

8          A.    Yes.

9          Q.    Okay.  The harmony is different in

10  "Joyful Noise" than in "Dark Horse," correct?

11         A.    Yes.

12         Q.    Okay.  The harmonic rhythm is different

13  in "Joyful Noise" than in "Dark Horse," correct?

14         A.    Yes.

15         Q.    The tempo is not the same in "Joyful

16  Noise" and "Dark Horse," correct?

17         A.    Yes.

18         Q.    Okay.  "Joyful Noise" is faster than

19  "Dark Horse," correct?

20         A.    Slightly.

21         Q.    It is faster, correct?

22         A.    Yes.

23         Q.    Okay.  Your reports do not set forth

24  any similarities between the vocal melody in "Dark

25  Horse" and the vocal melody --

EXHIBIT 24
PAGE 848

Page 244

1           (Court reporter interruption.)

2       Q.   (By Mr. Movit)  -- melody in "Dark

3   Horse" and the vocal melody in "Joyful Noise,"

4   correct?

5       A.   Correct.

6       Q.   Your reports do not set forth any

7   similarities between the rhythms of the rap vocals

8   in "Dark Horse" and the rhythms of the rap vocals in

9   "Joyful, Noise," correct?

10      A.   Correct.

11      Q.   The drum rhythms in "Dark Horse" are

12  different from the drum rhythms in "Joyful Noise,"

13  correct?

14      A.   Correct.

15      Q.   There are obvious formal differences

16  between the two tracks at issue, correct?

17      A.   Correct.

18           MR. MOVIT:  Okay.  And those -- strike

19  that.

20           Okay.  We're going to mark the Ferrara

21  rebuttal report as the next exhibit.  We've already

22  marked the exhibits, but not the report itself, I

23  believe.

24           MR. KAYIRA:  Are you referring to the

25  first rebuttal report or the second rebuttal report?

Page 253

1       A.   Yeah.  33 is my original report.

2       Q.   Oh.  My bad.  I want you to look at

3  your rebuttal first.

4       A.   It's two, yeah.

5       Q.   Two.  And if you'd please turn to

6  page 33.

7       A.   Yes.

8       Q.   You see the very top row in the chart

9  on the top of 33?

10       A.   Of 33, yes.

11       Q.   Yes, sir.  So is it fair to say that in

12  your response to Dr. Ferrara's citation of prior art

13  tracks, including a rap section, you responded that

14  (quote as read):

15            Large scale form such as an inclusion

16            of a rap section is not at issue in

17            this case.

18            Right?

19       A.   That's what it says, yes.

20       Q.   Okay.  So it's your opinion that large

21  scale form is not at issue in this case, correct?

22       A.   Yes.

23       Q.   Okay.  Okay.  And then in your initial

24  report, Dr. Decker, would you please turn to

25  page 13?  And on section 3 a. you said -- stated

EXHIBIT 24
PAGE 850

Page 254

1   that similarities in large scale form between

2   "Joyful Noise" and "Dark Horse" are (quote as read):

3              To be expected given the dominance of

4              eight-beat phrases and 16-bar sections

5              in contemporary popular music.

6              Right?

7        A.   Yes.

8        Q.   Please look at page 11 of your initial

9   report, Roman numeral five.

10       A.   Yeah.

11       Q.   You opine that "Dark Horse" and "Joyful

12  Noise" in fact display differences in large scale

13  form, correct?

14       A.   That are arguably products of their

15  different generic identification, yeah.

16       Q.   And as we discussed earlier,

17  Dr. Decker, while the ostinato in "Joyful Noise"

18  repeats throughout the song, ostinato two in "Dark

19  Horse" comes and goes, correct?

20       A.   Yes.

21       Q.   Okay.  And for example, it's absent

22  from the introduction section and the chorus

23  sections, correct?

24       A.   Yes.

25       Q.   And that's another example in

EXHIBIT 24
PAGE 851

Page 255

1  difference in form, large scale form between "Dark

2  Horse" and "Joyful Noise," correct?

3          A.   Yes.

4          Q.   Okay.  And it's -- you would agree it's

5  commonplace in contemporary popular music for a

6  vocal performer to rap over a repetitive

7  instrumental part?

8          A.   Repeat.

9          Q.   It's common in contemporary popular

10 music for a vocal performer to rap over a repetitive

11 instrumental part, correct?

12         A.   Rappers rap.  Singers tend not to.  So

13 vocal perform -- I guess -- are we making a

14 distinction between vocal performers and rappers or

15 people that use their voice?

16         Q.   I -- let me rephrase.  Rap vocal

17 performances over repetitive instrumental parts are

18 common --

19         A.   Yes.  Rap --

20         Q.   -- in contemporary popular music,

21 correct?

22         A.   Yes.

23         Q.   Yes?

24         A.   Yes.

25         Q.   All right.

EXHIBIT 24
PAGE 852

Page 256

1            THE WITNESS:  Sorry.

2            MR. KAHN:  That's okay.  I'm just

3   saying.

4        Q.  (By Mr. Movit)  A great many popular

5   songs feature both singing and rapping, correct?

6        A.   Indeed.

7        Q.  Okay.  In fact, you opined that rap

8   sections of pop songs are unremark -- unremarkable,

9   correct?

10        A.   Yes.

11        Q.  Okay.  And a great many popular songs

12   contain break sections, correct?

13        A.   Defined as?

14        Q.  Well, you -- you opine that there are

15   break sections in both "Dark Horse" and "Joyful

16   Noise," correct?

17        A.   I -- I need -- I need the word break

18   defined here because there's two different -- break

19   can refer to two different musical --

20        Q.  I'm not talking about like drum

21   break -- you know, like a drum break like, you know,

22   as a break beat.  I'm just talking like a break

23   section as you have used it in your report.

24            MR. KAHN:  Is there a sentence you can

25   point to to help him?

EXHIBIT 24
PAGE 853

Page 257

1        Q.   (By Mr. Movit)  Okay.  In your initial

2   report on page 13.

3        A.   Yeah.

4        Q.   You have in your diagram at the bottom

5   of the page you used the -- the letter Z to signify

6   a break section, correct?

7        A.   I don't call it a break.  I call it a

8   sing iteration of the four-bar ostinato.  This is

9   exactly the -- the interesting formal similarity

10  between these tracks that leads my ear to think that

11  this ostinato is best expressed as two repetitions

12  of the eight-note figure.

13       Q.   You opine that there's two Z sections

14  in "Joyful Noise," but only one Z section in "Dark

15  Horse," correct?

16       A.   Yeah, that's in the table.

17       Q.   Okay.  And that's a structural

18  difference between "Dark Horse" and "Joyful Noise,"

19  correct?

20       A.   That there's two Z's in one -- that

21  there's -- that there's two in "Joyful Noise" the

22  pop track and that there's only one in the rap

23  track, yes.

24       Q.   No, there's only one in the pop track

25  and two in the --

Page 263

1   music for "Jolly Old St. Nicholas," correct?

2        A.   Correct.

3        Q.   Okay.  And it contains the pitch

4   sequence scale degree three, scale degree three,

5   scale degree three, scale degree three, four

6   iterations of scale degree three followed by three

7   iterations of scale degree two on even quarter notes

8   in duple time, correct?

9        A.   The third iteration of scale two is a

10  half note.

11        Q.   Okay.  Dr. Decker, "Jolly Old

12  St. Nicholas" sheet music I just provided you has

13  four iterations of scale degree three followed by

14  two iterations of scale degree two in duple time on

15  quarter notes, correct?

16        A.   Correct.

17             MR. MOVIT:  Next exhibit.

18             COURT REPORTER:  39.

19             (WHEREIN, Exhibit 39, Excerpt from

20  Tradition of Excellence, was marked for

21  identification by the Court Reporter.)

22        Q.   (By Mr. Movit)  39.  Dr. Decker, this

23  is the Tradition of Excellence instructional book

24  that was an exhibit to Dr. Ferrara's first report.

25        A.   Yes.

EXHIBIT 24
PAGE 855

Page 264

1    Q.   Okay.  Dr. Decker, "Merrily We Roll

2  Along" in this exhibit contains the pitch sequence

3  of four iterations of scale degree three followed by

4  two iterations of scale degree two, correct?

5    A.   Correct.

6         MR. MOVIT:  Okay.  Thank you.  No

7  further questions about that document.  We'll take a

8  break, get my stuff in order.  We're in the

9  homestretch, though.  Off the record.

10         VIDEOGRAPHER:  We're going off the

11  record at approximately 4:50 p.m.

12         (WHEREIN, a recess was taken.)

13         (WHEREIN, Exhibit 40, CD of audio

14  Exhibit 1 to Dr. Ferrara's initial report, was

15  marked for identification by the Court Reporter.)

16         VIDEOGRAPHER:  We're back on the record

17  at approximately 5:09 p.m.

18    Q.   (By Mr. Movit)  Dr. Decker, you still

19  able to testify to the best of your ability?

20    A.   Yes.

21    Q.   Okay.  I'm now going to play a track

22  from audio -- which we've marked as Exhibit 40, the

23  first CD of audio Exhibit 1 to Dr. Ferrara's initial

24  report.  I'm not referencing any other documents for

25  my questioning coming up now.

1    report, right?

2           A.   Yes.

3           Q.   Okay.  So you had a full and fair

4    opportunity to take those issues with his

5    transcription and you chose not to, correct?

6           A.   In my reply.

7           Q.   Yes, sir.  You criticize the relevance

8    of Dr. Ferrara's prior art for ostinato number one

9    but you don't criticize his transcriptions, do you?

10          A.   I do, and I made -- I misspoke earlier

11   in my table on page 32.  I call into question

12   transcription and -- I call into question the

13   transcriptions of several of these.

14          Q.   You call into question his

15   transcription at "Joyful Noise," not the

16   transcriptions of the prior art, correct?

17          A.   Ah, yes.  Right.  So yes.

18          Q.   Okay.  So you had a full and fair

19   opportunity to criticize Dr. Ferrara's

20   transcriptions and you did not, correct?  Of the

21   prior art?

22          A.   I did have the opportunity to do that.

23          Q.   And you did not, correct?

24          A.   Did not do what?

25          Q.   Challenge the accuracy of his

EXHIBIT 24
PAGE 857

Page 305

1   transcriptions of the prior art.  You challenged the

2   relevance, but not the accuracy, correct?

3        A.   In this case, no.

4        Q.   Yeah.  Correct?

5        A.   Correct.

6             MR. MOVIT:  Okay.  Okay.  We may be

7   finished for the day.  Just give me five minutes off

8   the record.

9             VIDEOGRAPHER:  We're going off the

10  record at approximately 6:35 p.m.

11            (WHEREIN, a recess was taken.)

12            VIDEOGRAPHER:  We're back on the record

13  at approximately 6:43 p.m.

14            MR. MOVIT:  Okay.  So Mr. Kahn and I

15  spoke during the break and Mr. Kahn says he has

16  about five minutes of redirect.  Based upon that

17  representation, and -- and Mr. Kahn's representation

18  that I can do recross after that and won't

19  filibuster out, I'm willing to say that we are done

20  for the day.  Of course, I reserve the right should

21  new evidence come into the case that's pertinent to

22  the witness's opinions to continue the deposition,

23  but with that, I will turn it over to redirect.

24            I will say that both myself and Vince

25  Chieffo on the phone may have objections,

EXHIBIT 24
PAGE 858

Page 310

1   similarities between these tracks -- these songs and

2   the tracks at issue.  Something happens in "Jolly

3   Old St. Nicholas."  It's a half note and the pattern

4   continues differently after that in terms of pitch

5   content and rhythm.

6           And in "Merrily We Roll Along" some --

7   you know, there's a similar different playing out to

8   the rest of these tones -- these tunes.  I just

9   object fundamentally to the idea that you can find

10  six similar pitches, six similar scale degrees, much

11  less in a different mode and say that the similarity

12  that these are -- that this is trite and common

13  material that's just out there floating around in

14  the world.  The genre differences also play into

15  this.  I mean, neither one of these are melodic

16  ostinatos intended to build a pop music or rap track

17  on.

18          Q.   (By Mr. Kahn)  Finally, I'd like you to

19  look at Professor Ferrara's rebuttal report, which

20  is Decker Exhibit 34.

21          A.   Got it.

22          Q.   And in particular to his conclusions

23  which are in paragraph 152 and 153 --

24          A.   Got it.

25          Q.   -- on page 48 and 49 and specifically

EXHIBIT 24
PAGE 859

Page 311

1    to the first item in each one.  For 152 I will read

2    (quote as read):

3                    I continue to find that the initial

4                    Decker report fails because of the

5                    absence of any transcriptions into

6                    musical notation by Dr. Decker of any

7                    of the expression they placed in issue.

8                    Paragraph 153 leads into a series of

9    additional points, moreover, it reads in the second

10   sentence (quote as read):

11                   The Decker rebuttal report fails

12                   because of, (a), the continued absence

13                   of any transcriptions into musical

14                   notation by Dr. Decker of any of the

15                   expressions he placed in issue.

16                   Did you see both of those, sir?

17        A.   Yes.

18        Q.   Do you have a response?

19             MR. MOVIT:  Objection, compound.

20        A.   So the -- the use of musical notation

21   is always a rhetorical one.  The examples from my

22   own work that were included today in the early

23   exhibits, in every single case I was using

24   transcription, which I very rarely use because I was

25   dealing with pre-rock and roll popular music, I was

1    using transcription to point the listener's ear

2    toward a select element of the recording at issue.

3              So it was serving a rhetorical point.

4    It was serving an interested argument.  And in many

5    ways the -- such a musical example, a transcription

6    invites the listener to test the author's ear.  I

7    did not include -- so -- and this -- this is also

8    the case with the examples from the work of Albin

9    Zak and the work of Mark Butler that were also put

10   in exhibit.

11             Sure, these authors both of whom I know

12   personally, Albin Zak was my professor at Wash -- at

13   University of Michigan, both of them use

14   transcriptions, they use them paired -- typically --

15   certainly Mark Butler does in his article as it says

16   on the exhibit, uses transcriptions paired with

17   audio recordings so that you can compare and test

18   his work.

19             So a transcription is always up for

20   testing and the -- if it matches what the ear hears.

21   And much of my report, much of my rebuttal -- my

22   response and my rebuttal to Professor Ferrara's

23   report was saying that I don't hear things -- I

24   didn't hear his transcriptions in that way and I

25   perceived uninterested elements in his

Page 313

1   transcriptions that would try to pull our ear away

2   from the very evident similarities between these two

3   tracks.

4              Similarities that are demonstrated in

5   the two mashups that I put in as exhibits, Exhibits

6   A and B in my response where an argument is made in

7   sound.  And what's crucial about the work of someone

8   like Albin Zak and Mark Butler both is that they

9   believe that this music that we're talking about is

10  understood by the ear.

11             It's made by the ear and it's -- by

12  listening and it's understood by listening.  And any

13  transcription -- and transcription is a -- is a tool

14  to point our listening in a specific direction.  I

15  feel like many -- like Professor Ferrara's

16  transcriptions try to point us -- pull us away from

17  what is extremely evident to the ear.

18             The ear decides in this case, the

19  similarity of these ostinatos, these eight-note

20  ostinatos.  We can debate as long as you want about

21  how to render those in writing.  The point of the

22  matter is that the makers of those songs, of neither

23  one of those tracks felt it necessary to render it

24  in writing.

25             As I understand it the copyright

Page 314

1    deposit materials for both of these tracks are sound

2    recordings.  There's no text we can go to to see

3    what these -- these music-maker, these creators of

4    these tracks how they thought about it in terms of

5    notation, traditional notation.

6              Their areas, rap and -- and pop are not

7    areas that -- where -- where notation is

8    necessary -- it's necessary to know notation.

9    Indeed Mark Butler in his most recent book on DJ'ing

10   doesn't have any musical examples at all.

11             He has left aside musical examples and

12   instead uses the kind of tabular charts that --

13   similar to the one that I used in my first report

14   because it points the ear towards hearing something

15   that was never conceived by way of notation.

16             So to me the case needs -- the

17   similarity between these tracks comes down to

18   something that is audible, that can be heard.  And

19   so I distrust any efforts to use the eye to use

20   printed notation or writing or transcriptions to

21   pull us away from the evident similarity between the

22   two tracks, one that is commonly -- commonly

23   recognized by people that I -- you know, by -- by

24   the ear, I think, to my -- to my hearing.

25             MR. KAHN:  I have nothing further.

Page 316

1                    MR. KAHN:  So how long does a rough
2    draft take?
3                    COURT REPORTER:  End of day today.
4                    MR. KAHN:  I'll do the final.
5                    COURT REPORTER:  Just electronic
6    version?
7                    MR. KAHN:  Great.
8                    COURT REPORTER:  And then Vince, no
9    rough, and you said a full and condensed of the
10   final?
11                   MR. CHIEFFO:  Yeah.  I'd like -- send
12   me a rough.
13                   COURT REPORTER:  Yes, sir.
14                   (WHEREIN, the deposition was concluded
15   at 7:00 p.m.)
16
17
18
19
20
                                    _____
21
                                    Signature of Deponent
22
     SUBSCRIBED AND SWORN BEFORE ME
23   THIS _____ DAY OF _____, 2018.
24   _____
25   (Notary Public)  MY COMMISSION EXPIRES:_____

EXHIBIT 24
PAGE 864

Page 317

```
 1                  CERTIFICATE OF REPORTER

 2

 3           I, William L. DeVries, a Certified

 4  Court Reporter (MO), Registered Diplomate Reporter,

 5  and a Certified Realtime Reporter, do hereby certify

 6  that the witness whose testimony appears in the

 7  foregoing deposition was duly sworn by me pursuant

 8  to Section 492.010 RSMo; that the testimony of said

 9  witness was taken by me to the best of my ability

10  and thereafter reduced to typewriting under my

11  direction; that I am neither counsel for, related

12  to, nor employed by any of the parties to the action

13  in which this deposition was taken, and further that

14  I am not a relative or employee of any attorney or

15  counsel employed by the parties thereto, nor

16  financially or otherwise interested in the outcome

17  of the action.

18  Dated: February 1, 2018

19

20  _____

21           Certified Court Reporter

22       within and for the State of Missouri

23

24

25
```

EXHIBIT 24
PAGE 865

Page 318

1                          ERRATA SHEET

2      Case Name:

3      Deposition Date:

4      Deponent:

5      Pg.   No.  Now Reads        Should Read   Reason

6      ____  ____ _____     _____    _____

7      ____  ____ _____     _____    _____

8      ____  ____ _____     _____    _____

9      ____  ____ _____     _____    _____

10     ____  ____ _____     _____    _____

11     ____  ____ _____     _____    _____

12     ____  ____ _____     _____    _____

13     ____  ____ _____     _____    _____

14     ____  ____ _____     _____    _____

15     ____  ____ _____     _____    _____

16     ____  ____ _____     _____    _____

17     ____  ____ _____     _____    _____

18     ____  ____ _____     _____    _____

19     ____  ____ _____     _____    _____

20

                                    _____

21

                                    Signature of Deponent

22

       SUBSCRIBED AND SWORN BEFORE ME

23     THIS _____ DAY OF _____, 2018.

24     _____

25     (Notary Public)   MY COMMISSION EXPIRES:_____

EXHIBIT 24
PAGE 866

EXAMPLE 4. Borne and Mercer's "Dig It" *(Second Chorus)*; the "A" phrase as sung and tapped by Astaire on his pop recording.



The "I" of Mercer's lyric expresses a willingness to try a new step, even though he's been unsuccessful doing the Conga, mazurka, Charleston, and polka. Mercer's having fun here: no one was dancing the mazurka in 1940. But the other three were fair game. The new step is never defined in the song. The lyric instead expresses the willingness to try a new dance move, which is exactly what Goddard had to do in the film. This is her only dance number. Created for a partner with no experience and little evident aptitude, in a low-budget production context where speed and simplicity were of the essence—Pan even plays a sideline part in the band—"Dig It" is among the easiest dances Astaire and Pan ever made. In that sense, it is doable by the public, although it would have been impossible to catch the steps from watching the film in a theater (more on this below).

The steps of the dance slavishly follow the rhythm of the riffy tune and dance arrangement. Such a sustained coordination between the dance and the top rhythmic level of the arrangement is unusual. Typically Astaire explores a complicated inner rhythm or adds a new rhythm, dancing the stems selectively. Here, Astaire and Goddard stay on the stems almost the whole time. "Dig It" includes a section where the couple hold opposite hands, lean back from each other with legs slightly bent, and travel in a circle, their free hand raised up high. "Dig It" marks the first time Astaire used such a stance in relation to his partner. Swing stances like this are seen very rarely in his work, and their appearance is limited almost entirely to the 1940s. The final use of this stance is in his dances with Betty Hutton in *Let's Dance.* (Immensely popular during World War II, Hutton was billed early in her career as "Public Jitterbug No. 1.")



EXHIBIT
Decker 6
wkd 1-22-18

EXHIBIT 24
PAGE 867

EXAMPLE 6. Drum solo openings of "Bouncin' the Blues" and "Boppin' the Blues."



number decidedly went against the grain at a studio where musical tastes ran toward the "colossally gigantically tremendous," as the record reviewer in *Down Beat* opined of a contemporary MGM score.[15] Still, the brief big band coda in a riff-based swing style doesn't succeed in wiping out the tight, casual, modern sound that dominates the arrangement. After "Bouncin' the Blues" was filmed, the option of altering the soundtrack was discussed. An undated document gives specific instructions to the music department: "Music: Sweeten 'BOUNCIN' THE BLUES' from entrance of Band on."[16] As there are no violins heard in "Bouncin' the Blues" and no record of a second scoring session on the number, efforts to alter the arrangement were apparently scrapped.

Unexpected accents and a discontinuous beat were central aspects of bop drumming. Astaire works this rhythmic sensibility into the abrupt close of the routine. Astaire and Rogers take their time exiting, combining baby steps forward with a cutesy pose as they gradually move toward the edge of the proscenium. On the final bump from the band, Rogers reaches out and yanks the curtain to cover them both. All at once the dance is done. This sharp move falls on count four—that same beat before the downbeat where Carlson kept dropping bombs—shutting the number off in the middle of an eight-count phrase, yet another unexpected aspect of Astaire's bop routine "Bouncin' the Blues."

If "Bouncin' the Blues" explored postwar jazz changes, "Mr. and Mrs. Hoofer at Home" took up the popular music quandary facing Hollywood musicals at the close of the 1940s. The genre of the musical had always drawn on popular music, but with the long dominance of the swing bands clearly over and no trends for the future evident, where was the sound of the present to be found? A genuine irony attending all the musical choices in *Three Little Words* was the setting of this biopic about songwriters Kalmar and Ruby in a historical vacuum, where neither of the World Wars nor the Depression troubles the rise of the team across what can only be assumed to be the first half of the century. For a



EXHIBIT
Decker 7
WLD 1-22-18

EXHIBIT 24
PAGE 868

EXAMPLE 7. Layered introduction to "Slap That Bass" *(Shall We Dance)*. The texture builds up from the bottom at start of the number, each new idea heard twice before the next enters. Line F, not transcribed here, is the only melodic rather than rhythmic idea.



around a specific idea, a common trait of Astaire's best work. Pan remembered the number as inspired by a cement mixer Astaire encountered on the RKO lot.[20] The rhythms of the mixer cued the dance and, reportedly, planted the seeds of the solo. The addition of a black men's chorus fell within established links between modernity and black-derived rhythms. As Joel Dinerstein has pointed out, the connection was seen as vital and forward looking in the 1930s.[21] Ira Gershwin tuned his lyric to this larger theme as well, with rhythm offering "aid" in a chaotic world situation and the use of coded words like "misery" and "milk and honey" putting a mark of blackness into the song text itself.[22]

The tracking crane shot that initiates the viewer into the surprising world of "Slap That Bass" is the most virtuoso single shot in *Shall We Dance* and one of the most complex camera moves in the entire Astaire-Rogers cycle. Director Mark Sandrich used complicated tracking crane shots sparingly. Here, the elaborate shot required the requisition of a small crane and an additional $1,000 to "Narrow ramp, move walls, and raise height of [the] set."[23] The opening of "Slap That Bass" should be read in production context as a special effect.

The vocal texture builds in complexity as the introduction unfolds. As the camera pulls back, more machines and men appear, and as each



EXHIBIT 24
PAGE 869



# HYMNS FOR THE FALLEN

## COMBAT MOVIE MUSIC AND SOUND AFTER VIETNAM

### TODD DECKER ★★★★★★★★★★★★★★



EXHIBIT
Decker 9
WKW 1-22-18
PENGAD 800.631-6989

EXHIBIT 24
PAGE 870

# Hymns for the Fallen

*Combat Movie Music and Sound after Vietnam*

TODD DECKER

University of California Press

EXHIBIT 24
PAGE 871

University of California Press, one of the most distinguished university presses in the United States, enriches lives around the world by advancing scholarship in the humanities, social sciences, and natural sciences. Its activities are supported by the UC Press Foundation and by philanthropic contributions from individuals and institutions. For more information, visit www.ucpress.edu.

University of California Press
Oakland, California

© 2017 by The Regents of the University of California

Excerpts from THE SECOND PLANE: SEPTEMBER 11: TERROR AND BOREDOM by Martin Amis, copyright © 2008 by Martin Amis. Used by permission of Alfred A. Knopf, an imprint of the Knopf Doubleday Publishing Group, a division of Penguin Random House LLC. All rights reserved.

Excerpts from A WALK IN THE SUN by Harry Brown, copyright © 1944, copyright renewed 1972 by Harry Brown. Used by permission of Alfred A. Knopf, an imprint of the Knopf Doubleday Publishing Group, a division of Penguin Random House LLC. All rights reserved.

Excerpt from LISTENING TO WAR: SOUND, MUSIC, TRAUMA, AND SURVIVAL IN WARTIME IRAQ by J. Martin Daughtry (2015). Used by permission of Oxford University Press.

Library of Congress Cataloging-in-Publication Data
Names: Decker, Todd R., author.
Title: Hymns for the fallen : combat movie music and sound after Vietnam / Todd Decker.
Description: Oakland, California : University of California Press, [2017] | Includes bibliographical references and index.
Identifiers: LCCN 2016034599 (print) | LCCN 2016038416 (ebook) | ISBN 9780520282322 (cloth : alk. paper) | ISBN 9780520282339 (pbk. : alk. paper) | ISBN 9780520966543 (ebook)
Subjects: LCSH: Film soundtracks—History and criticism. | Motion picture music—History and criticism. | War films—History and criticism.
Classification: LCC ML2075 .D43 2017 (print) | LCC ML2075 (ebook) | DDC 781.5/420973--dc23
LC record available at https://lccn.loc.gov/2016034599

Manufactured in the United States of America

26   25   24   23   22   21   20   19   18   17
10   9   8   7   6   5   4   3   2   1

EXHIBIT 24
PAGE 872

The ticking accompanies two of the film's most startling voice-overs, neither assigned with any clarity. The first, a conversation between two Americans:

"You seen many dead people?"

"Plenty. They're no different than dead dogs—once you get used to the idea. You're meat, kid."

The second seems to be assigned to a Japanese soldier who is almost completely buried: only his face appears above the soil, like a mask tossed on the ground glimpsed through smoke. The voice-over seems to be the voice of Elias Koteas (not in his role as Captain Staros), although this recognition comes only analytically, when listening to the film with eyes closed. A shot–reverse shot sequence suggests that Witt hears the Japanese soldier's voice, which asks, "Are you righteous? Kind? Does your confidence lie in this? Are you loved by all? Know that I was, too. Do you imagine your sufferings will be less because you loved goodness? Truth?"

As the voice-over ends, a low, slow-moving string line begins. This eleven-measure melody—spelled out in eleven whole notes—will cycle ten times, accompanying the entire battle sequence as an underlying ostinato (see musical example 1). The tune is odd. Its length is strange—most Western-style melodies are eight or perhaps twelve measures long. Its range is constricted—held within an interval of a fifth. Its harmonic implications are modal and therefore vague to the tonally conditioned ear: the second note (the "A") is the prime and the biggest leap is a third, denying any strong bass motion that a leap of a fourth or fifth would bring. A regular if hypnotic movement between adjacent or near-adjacent notes, cycling at an irregular phrase length, this musical underpinning is realized texturally as a grand passacaglia or chaconne—musical works that unfold over many repetitions of an unchanging bass line ostinato—initially mixed with the sounds of weapons, then in a context of diegetic silence and voice-over. Major transitions in the battle action are synced to the end or beginning of the tune. Zimmer's "Attack on the Bivouac" accompanies, or better fundamentally structures, a combat set piece moving at a furious pace with complicated, difficult-to-process shifts of camera angle and POV. Here the image track is organized at the level of the score by a musical structure of transparent simplicity. Given the almost aching beauty of the orchestration—mostly strings—the battle action is aestheticized in the interest of exploring both the American soldiers' and the enemy's response to the extremes of combat.

EXHIBIT 24
PAGE 873

MUSICAL EXAMPLE 9.1.   Ostinato from "Attack on the Bivouac," *The Thin Red Line*, composed by Hans Zimmer



The shape of the battle aligns with the shape of Zimmer's grand ostinato-based cue: as detailed below, film form and musical form are intimately connected.

- Iteration 1 plays in a context of diegetic quiet, with only the sounds of men grabbing ammunition or loading their weapons.

- Iterations 2 and 3 play over American soldiers moving through a fog-filled jungle toward contact with the Japanese (shown prepared for battle at the end of iteration 1). The diegesis remains quiet: no jungle sounds, music dominates. This lyrical interlude is interrupted by the first bullet, which marks the transition between iterations 2 and 3. A soldier hears, indeed seems to watch, the bullet fly past him; the crack of its firing goes unrepresented. Partway through iteration 3, the firing begins with a tremendous crash of guns and very rapid cutting of hand-to-hand combat, including bayoneting. The score does not respond to this increase in the tempo of the action and cutting except to slightly grow in terms of texture and volume.

- At the start of iteration 4, Malick begins to frame the battle in running POV shots that follow individual American soldiers through the bivouac, a space that will never be clearly delineated but remains a dynamic zone of movement. These men run and fire; the camera runs after them, keeping them in the center of the frame, their actions providing a point of reference within the surrounding furious action. The identity of the men we follow is only vaguely suggested, especially for a first-time viewer. Also included is a brief POV from behind a Japanese soldier manning a machine gun in a trench.

- At exactly the start of iteration 5, in the process of following yet another American soldier through the melee, the camera swings right, distracted by the sight of a sick Japanese soldier being

EXHIBIT 24
PAGE 874



EXHIBIT 24
PAGE 875



**BROADWAY LEGACIES**

Geoffrey Block, Series Editor

*Series Board*

| | |
|---|---|
| Stephen Banfield | Jeffrey Magee |
| Tim Carter | Carol Oja |
| Kim Kowalke | Larry Starr |

*"South Pacific": Paradise Rewritten*
Jim Lovensheimer

*Pick Yourself Up: Dorothy Fields and the American Musical*
Charlotte Greenspan

*To Broadway, to Life! The Musical Theater of Bock and Harnick*
Philip Lambert

*Irving Berlin's American Musical Theater*
Jeffrey Magee

*Loverly: The Life and Times of "My Fair Lady"*
Dominic McHugh

*"Show Boat": Performing Race in an American Musical*
Todd Decker

EXHIBIT 24
PAGE 876



# SHOW BOAT

## Performing Race in
## an American Musical

TODD DECKER

OXFORD
UNIVERSITY PRESS

EXHIBIT 24
PAGE 877



OXFORD
UNIVERSITY PRESS

Oxford University Press is a department of the University of Oxford.
It furthers the University's objective of excellence in research,
scholarship, and education by publishing worldwide.

Oxford   New York
Auckland   Cape Town   Dar es Salaam   Hong Kong   Karachi
Kuala Lumpur   Madrid   Melbourne   Mexico City   Nairobi
New Delhi   Shanghai   Taipei   Toronto

With offices in
Argentina   Austria   Brazil   Chile   Czech Republic   France   Greece
Guatemala   Hungary   Italy   Japan   Poland   Portugal   Singapore
South Korea   Switzerland   Thailand   Turkey   Ukraine   Vietnam

Oxford is a registered trade mark of Oxford University Press in the UK and certain other countries.

Published in the United States of America by Oxford University Press
198 Madison Avenue, New York, NY 10016

© Oxford University Press 2013

First issued as an Oxford University Press paperback, 2015

All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted, in any form or by any means, without
the prior permission in writing of Oxford University Press, or as expressly
permitted by law, by license, or under terms agreed with the appropriate
reproduction rights organization. Inquiries concerning reproduction outside the
scope of the above should be sent to the Rights Department, Oxford University Press,
at the address above.

You must not circulate this work in any other form
and you must impose this same condition on any acquirer.

Library of Congress Cataloging-in-Publication Data
Decker, Todd R.
Show boat : performing race in an American musical / Todd Decker.
pages ; cm — (Broadway legacies)
Includes bibliographical references and index.
ISBN 978-0-19-975937-8 (hardcover : alk. paper); 978-0-19-025053-9 (paperback : alk. paper)
1. Kern, Jerome, 1885–1945. Show boat.
2. Ferber, Edna, 1887–1968. Show boat.
3. African Americans in musical theater.
4. Music and race.
5. Musical theater—History—20th century. I. Title.
ML410.K385D43   2012
782.1'4—dc23      2012000392

Publication of this book was supported in part by the
Lloyd Hibberd Endowment of the American Musicological Society.



resonant voice . . . in a spotlight on a darkened stage, with a chorus heard with softened tone and much beauty of effect behind the scenes."[53] Bledsoe simply stood and sang: a formula applied to Joe in every use of "Ol' Man River." Woollcott remembered Bledsoe's performance in *Deep River* in a 1933 letter to Ferber, where he described how Bledsoe "walked forward to the footlights, squared his shoulders, threw back his head, and emitted his song."[54] Woollcott's description applies equally well to most Joes in the history of *Show Boat*. In truth, there is no one to sing "Ol' Man River" to—except the audience watching *Show Boat*. Hammerstein and Kern had a model for this approach in Bledsoe's performance at the opening of *Deep River*, which effectively established time and place while featuring the black male voice in a quasi-spiritual song. The arrangement also demonstrated the effectiveness of a full black chorus singing in support of such a figure. Hammerstein's persistent reference to pin spots in the January draft may also draw upon *Deep River*, the draft libretto for which describes Bledsoe singing "Ashes and Fire" in a "head spot" in front of a black curtain. Head spots and pin spots are identical descriptions of lighting that emphasizes a singer's head, requiring complete physical stillness and forcing the singer to just stand and sing.

Beyond the dramaturgical similarities, Kern knew and borrowed musical material from "De Old Clay Road." Example 2.1 reprints the complete sheet music for the song, with the musical phrase Kern borrowed marked in brackets throughout. Kern's closest approximation of Harling's original is given above the first appearance of the phrase in the vocal part. Kern borrows from Harling in a manner reminiscent of the Baroque composer Georg Frederic Handel's appropriation of musical material from his peers. Like Handel, Kern improves upon his sources, using Harling's gently syncopated rhythmic figure and general melodic direction to create a vastly more satisfying melody that ebbs and flows, only to climax at the close, providing a reliable show piece for singers. Kern's melody rewards the listener and has worked to tremendous advantage for *Show Boat* as a whole over its entire history.[55]

Kern also drew inspiration from well-known black-themed popular songs. As shown in example 2.2a, b, the bridge from "Ol' Man River" uses the identical pitch content as the bridge of "Goin' Home," a popular song adapted from Antonín Dvořák's *New World Symphony*, itself a touchstone of black spiritual topics in classical music. Both passages convey a certain melodic futility reflected in their respective lyrics—penned by whites—expressing a particular view of the black experience.

But creating a one-song role was not enough no matter how good the song nor how many reprises, and Hammerstein arrived at an ingenious way to tap directly into Robeson's recital notoriety. Late in act 2, after the story had

EXHIBIT 24
PAGE 879



Example 2.1 "De Old Clay Road" from Deep River (1926, music by Laurence Stallings, lyrics by Frank Harling), with borrowing by Kern in "Ol' Man River" noted above the vocal line.

EXHIBIT 24
PAGE 880



Example 2.1 (continued)

EXHIBIT 24
PAGE 881

*Example 2.2a The bridge of "Goin' Home," a quasi-spiritual popular song adapted from a pseudo-Negro melody from Antonín Dvořák's* New World Symphony.



*Example 2.2b First half of the bridge of "Ol' Man River."*



arrived in the present, Hammerstein envisioned a dramatically integrated specialty for Robeson. In a scene that works against every fiber of Ferber's tale, Andy (who does not die in the musical) has brought Ravenal (who likewise doesn't disappear for good) back to the *Cotton Blossom*. The two are conversing quietly on deck while listening to Magnolia, now a national star, singing live on the radio from New York. Networks were still new then, and the moment would have been startlingly modern in 1927. Going slightly off topic in a scene chiefly contrived to absolve Ravenal of his abandonment of wife and child, Andy provides a lead in for Robeson's big moment in act 2.

> ANDY: Joe's son—'member him when he was a little pickaninny wouldn't study 'rithmetic wouldn't learn to read but he knew all the river songs, that ever was. Parthy used to have to keep shuttin' him up wel, [*sic*] sir—he's now singin' in concerts all over the country, and makin' good money, too an' you know what he sings? The same dem fool old songs they sung forty years ago on these levees.
>
> (The lights have gradually dimmed to a blackout—Joe's voice continues in the darkness until scene changed—It is timed so at end of refrain the lights iris up revealing PAUL ROBESON in evening clothes in front of a piano, with his accompanist, Lawrence Brown, in a velvet drop, as he appears at his recitals.)
> (SCENE VIII: A PAUL ROBESON RECITAL)

In addition to playing Joe, Robeson was to play himself—a 1920s spiritual singing star—outfitted with a fictional biography as a show boat "pickaninny" who could neither read nor do math. Robeson, of course, had lived a very different life of great, even historic achievement before carving out his singular place on the concert platform. But in *Show Boat*, Robeson as composite



EXHIBIT 24
PAGE 882



*Example 4.2 The opening phrase of "You are Love" compared to Sigmund Romberg's "Some Day" from Cherry Blossoms (1927).*



second high B-flat of the score as part of a predictable melodic formula. The pair holds the final note for an additional few bars while the orchestra plays *appassionato* and *fortissimo* beneath them. The effect is meant to be heart-stirring, passionate, epic. It was so effective Ravenal repeated the big, high, loud ending in act 2 without Magnolia in the reprise of "You Are Love" that replaced the Robeson recital. Three times during the show a high B-flat from Marsh sent *Show Boat* into a scene-changing blackout, a vocal special effect straight from operetta punctuating the show's large-scale form and sustaining audience participation by encouraging applause.

In the almost entirely thru-sung wedding scene that follows "You Are Love," Magnolia sings but Ravenal does not. The decision to keep the leading man silent on his wedding day has a specific history, which speaks to Ravenal's embodiment of a white, male, southern identity. Kern and Hammerstein completed the wedding scene as early as late 1926 so neither Marsh nor Terris were taken into account when it was made. Magnolia sings only one solo line at her wedding in the Broadway version. In the January draft and extant holograph scores she was to sing a second time, just before the curtain descended. The line Terris kept has Magnolia singing "Can't I share some of my happiness, dear friends, with you" as she greets the women of the black chorus, who "come forward enthusiastic, but a trifle diffident" after the white chorus sings their triple-meter tribute, "Happy, the Day." Magnolia's line, difficult to hear in (unmiked) performance, effectively bridged the gap between two contrasting sections, the shift from a generically white waltz chorus to a generically black buck-and-wing. Magnolia ascends by step to the vocal height of the entire role: in soprano terms, a modest high A. The "big levee shuffle dance" follows with the black chorus, Joe, Queenie, and Magnolia all singing "Can't Help Lovin' Dat Man." All scripts are careful to note that only the black characters and Magnolia sing during this public re-creation of the kitchen pantry shuffle.

To this point in all scripts through the October draft, Ravenal had not yet arrived at the wedding. He was absent while Magnolia shared one last song

*A Ziegfeld Soprano and a Shubert Tenor* | 89


EXHIBIT
Decker 13
WKD 1-22-18

EXHIBIT 24
PAGE 883

# EXHIBIT 25

EXHIBIT 25
PAGE 884

```
                                                        Page 1
 1    UNITED STATES DISTRICT COURT
      CENTRAL DISTRICT OF CALIFORNIA
 2    - - - - - - - - - - - - - - - -x
      MARCUS GRAY (p/k/a FLAME);      )
 3    EMANUEL LAMBERT; and CHIKE      )
      OJUKWU,                         )
 4                                    )
               Plaintiffs,            )
 5                                    )
               vs.                    ) Index No.
 6                                    ) 2:15-cv-05642-CAS-JC
      KATHERYN ELIZABETH HUDSON       )
 7    (p/k/a KATY PERRY); JORDAN      )
      HOUSTON (p/k/a JUICY J);        )
 8    LUKASZ GOTTWALD (p/k/a DR.      )
      LUKE); SARAH THERESA HUDSON;    )
 9    KARL MARTIN SANDBERG (p/k/a     )
      MAX MARTIN); HENRY RUSSEL       )
10    WALTER (p/k/a CIRKUT); KASZ     )
      MONEY, INC.; CAPITOL RECORDS,   )
11    LLC; KITTY PURRY, INC, UMG      )
      RECORDINGS, INC.; UNIVERSAL     )
12    MUSIC GROUP INC.; WB MUSIC      )
      CORP LLC; and KOBALT MUSIC      )
13    PUBLISHING AMERICA, INC.,       )
                                      )
14             Defendants.            )
      - - - - - - - - - - - - - - - -x
15
16         DEPOSITION OF LAWRENCE FERRARA, PH.D.
17               New York, New York
18             Thursday, January 25, 2018
19
20
21
22    Reported by:
23    JEFFREY BENZ, CRR, RMR
24    JOB NO. 136204
25
```

1    LAWRENCE FERRARA, Ph.D.,

2         called as a witness, having been duly sworn

3         by a Notary Public, was examined and

4         testified as follows:

5    EXAMINATION BY MR. KAHN:

6         Q.   Dr. Ferrara, could you state your

7    name, full name, please.

8         A.   Yes.  Lawrence Ferrara.

9         Q.   Okay.  At the outset I want to give

10   you a disclosure, which is that my formal music

11   training consisted of playing band -- playing

12   trumpet in my high school concert band and then

13   much later teaching myself to play the harmonica

14   to play bedtime songs for my kids and now for my

15   grandkids.

16         I will probably unintentionally misuse

17   some musical terms today, and you should feel

18   free -- in fact, I request you -- to correct me

19   if I'm asking you a question using the wrong or

20   an inaccurate music term.  I don't want either

21   my questions or your answers to be

22   misinterpreted.  Okay?

23         A.   Yes.

24         Q.   Great.

25              MR. KAHN:  I wanted to start by asking

EXHIBIT 25
PAGE 886

Page 5

1          the court reporter to mark as Ferrara

2          Exhibit 1 your expert report that was dated

3          May 5, 2017 in this case.  And I'd like to

4          show it to you and ask you to identify it.

5               (Dr. Ferrara's expert report was marked

6          Ferrara Exhibit 1 for identification, as of

7          this date.)

8               (Witness reviewing document.)

9               MR. KAHN:  Could you mark this as 2.

10              (Attachments to Dr. Ferrara's expert

11         report were marked Ferrara Exhibit 2 for

12         identification, as of this date.)

13         A.   This appears to be my written report

14    dated May 5, 2017, without any of the

15    attachments.

16         Q.   Thank you, sir.  And I have, in fact,

17    the attachment we'll mark next and give to you.

18              So this report is dated May 5, 2017.

19    Do you recall when you were retained in this

20    case?

21         A.   No, I don't recall when I was

22    retained.

23         Q.   Okay.  Do you recall who retained you?

24         A.   No, I don't recall who retained me.

25         Q.   The lawyers in this case include

1     Hudson, professionally known as Katy Perry.

2          MR. KAHN:   Before you were on the

3     call, Dr. Ferrara identified as Ferrara

4     Exhibit 1 his original report dated May 5,

5     2017, and he identified it as the report

6     itself but without the attached appendices.

7          I've asked the court reporter to mark

8     as Ferrara Exhibit 2 a document entitled

9     Appendix 1, which appears to be -- to me --

10    the appendix that is identified in

11    paragraph 1 of Dr. Ferrara's report, where

12    it states in the last sentence, "My

13    curriculum vitae is attached as Appendix

14    1."

15    Q.    Dr. Ferrara; is that correct?

16    A.    Yes, it is.

17    Q.    So I would like to take a few minutes

18    and kind of walk through that appendix, make

19    sure I understand what's there.

20          On page 2, which is entitled, the top

21    of the page, "Selected Professional Activities,"

22    Entry Number 2, which is New York 2017, states

23    you were invited for a music copyright

24    presentation at Columbia University Law School

25    for a class on federal courts litigation

EXHIBIT 25
PAGE 888

Page 66

1    yeah, but -- and so to answer your -- your

2    question fully, in addition to Fahmy, there may

3    have -- I'm sure there were, you know, at least

4    a few others, but off the top of my head, I -- I

5    can't say.  But certainly.  Sure.

6         Q.   Okay.  Understand.  Fair enough.

7              Simply for purposes of identification,

8    Dr. Ferrara, I want to hand you what the court

9    reporter has marked as Exhibit 3 to your

10   deposition, which I believe is your rebuttal

11   report.  If you could take a moment and review

12   it.

13             (Dr. Ferrara's rebuttal report was

14        marked Ferrara Exhibit 3 for identification,

15        as of this date.)

16        A.   Yes.

17             (Witness reviewing document.)

18        A.   Yes.

19        Q.   And that is the rebuttal report?

20        A.   Without the exhibits.

21        Q.   Without the exhibits.  That was signed

22   by you on July 31, 2017?

23        A.   That is correct.

24        Q.   One more exhibit before we move to the

25   next phase, which has been marked as Exhibit 4.

1          MR. KAHN:  Thank you, Dr. Ferrara.  I

2   have no further questions.

3          THE WITNESS:  Thank you very much.

4          MR. MOVIT:  Nothing on my end.

5          (Time noted: 1:31 p.m.)

6

7

8

9

10

11                        ------------------------

12                        LAWRENCE FERRARA, PH.D.

13               Subscribed and sworn to before me

14               this ___ day of _____, 2018.

15               _____

                 (Notary Public)   MY COMMISSION EXPIRES:_____

16

17

18

19

20

21

22

23

24

25

EXHIBIT 25
PAGE 890

Page 97

```
 1                C E R T I F I C A T E

 2

 3    STATE OF NEW YORK      )

                             )  Ss.:

 4    COUNTY OF NEW YORK     )

 5             I JEFFREY BENZ, a Certified Realtime

 6        Reporter, Registered Merit Reporter and

 7        Notary Public within and for the State of

 8        New York, do hereby certify:

 9             That LAWRENCE FERRARA, PH.D., the

10        witness whose examination is hereinbefore

11        set forth, was duly sworn by me and that

12        this transcript of such examination is a

13        true record of the testimony given by such

14        witness.

15             I further certify that I am not

16        related to any of the parties to this

17        action by blood or marriage; and that I am

18        in no way interested in the outcome of this

19        matter.

20             IN WITNESS WHEREOF, I have hereunto

21        set my hand this 7th of February, 2018.

22

23             ------------------------

24             JEFFREY BENZ, CRR, RMR

25
```

```
                                              Page 98
 1    ----------------------INDEX--------------------
 2   WITNESS                      EXAMINATION BY      PAGE
 3   LAWRENCE FERRARA, Ph.D.   MR. KAHN               4
 4    ---------------------EXHIBITS-------------------
 5   NUMBER          DESCRIPTION              PAGE
 6   Exhibit 1    Dr. Ferrara's expert          5
                  report
 7
     Exhibit 2    Attachments to Dr.            5
 8                Ferrara's expert report
 9   Exhibit 3    Dr. Ferrara's rebuttal       66
                  report
10
     Exhibit 4    Article by Dr. Ferrara       67
11                published in Musical
                  Quarterly in 1984
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

<u>**Errata Sheet**</u>

**Name of Case:**       Gray, et al. v. Hudson, et al.

**Date of Deposition:**  January 25, 2018

**Name of Deponent:**  Lawrence Ferrara, Ph.D.

| Page:Line | Change From | Change To | Reason |
|---|---|---|---|
| 11:18 | artist | artists, | Transcription error |
| 24:2 | grow | Grove | Transcription error |
| 25:11 | Y | X | Recollection refreshed |
| 25:13 | so | it's | Misspoke |
| 25:15 | we | it | Misspoke |
| 27:12 | Z | Y | Recollection refreshed |
| 28:16 | Z | Y | Recollection refreshed |
| 65:15 | Lassin | Lessem | Transcription error |
| 65:17-18 | "Fabolous," not "fabulous" but "Fabolous" | The Game | Recollection refreshed |
| 65:20 | the law firm was | the law firm which took my deposition was | Clarification |
| 74:10 | Z | Y | Recollection refreshed |
| 81:7 | report | deposition | Misspoke |
| 83:20 | 1 | first | Transcription error |

Lawrence Ferrara, Ph.D.

9836186.1

EXHIBIT 25
PAGE 893

# EXHIBIT 26

EXHIBIT 26
PAGE 894

1  Michael A. Kahn (pro hac vice)
   Kahn@capessokol.com
2  Drey A. Cooley (pro hac vice)
   Cooley@capessokol.com
3  Capes Sokol Goodman Sarachan PC
   7701 Forsyth Blvd., 12th Floor
4  St. Louis, MO 63105
   Telephone:  (314) 721-7701
5
   Eric F. Kayira (pro hac vice)
6  eric.kayira@kayiralaw.com
   Kayira Law, LLC
7  200 S. Hanley Road, Suite 208
   Clayton, Missouri 63105
8  Telephone:  (314) 899-9381

9  Carole E. Handler (SBN 129381)
   chandler@eisnerlaw.com
10 Brianna Dahlberg (SBN 280711)
   bdahlberg@eisnerlaw.com
11 EISNER JAFFE
   9601 Wilshire Boulevard, Suite 700
12 Beverly Hills, California  90210
   Telephone:  (310) 855-3200
13 Facsimile:  (310) 855-3201

14 Attorneys for Plaintiffs

15            UNITED STATES DISTRICT COURT

16      FOR THE CENTRAL DISTRICT OF CALIFORNIA

17

18 | MARCUS GRAY, et al.,                | Case No. 2:15-cv-05642-CAS-JC
   |                                     |
19 |                        Plaintiffs,  | Hon. Christina A. Snyder
   |                                     |
20 |         v.                          | _
   |                                     |
21 | KATHERYN ELIZABETH HUDSON,          | **PLAINTIFFS' SUPPLEMENTAL**
   | et al.,                             | **ANSWER TO**
22 |                                     | **INTERROGATORY NOS. 4 AND**
   |                        Defendant.   | **13 OF DEFENDANTS' FIRST**
23 |                                     | **SET OF INTERROGATORIES**

24

25       Plaintiff Marcus Gray, on behalf of all plaintiffs, submits the following

26 supplemental answers to Interrogatory Nos. 4 and 13 of Defendants' First Set of

27 Interrogatories:

28

PLAINTIFFS' RESPONSES TO DEFENDANTS' INTERROGATORIES

EXHIBIT 26
PAGE 895

INTERROGATORY NO. 4:

Set forth in detail all facts which support any contention that Defendants purportedly had access to the Plaintiffs' Composition, or any Recording thereof.

Original Response: Plaintiffs' investigation continues and will include, among other things, discovery from defendants and their agents. Until that investigation is completed, Defendants' access to the Composition and the Recording can be inferred from the widespread dissemination of the Recording and the widespread performance of the Composition. Among other things:

- By at least 18 months before the release of the recording of Defendants' Composition, the Recording of Plaintiffs' Composition had been viewed and/or downloaded from YouTube more than 2.5 million times and had been viewed and/or downloaded from other Internet sites more than 1 million times;

- In addition, tens of thousands of followers of the Myspace.com pages for Plaintiffs and LeCrae Moore had access to the Recording of Plaintiffs' Composition;

- From 2008 thru 2012, Plaintiffs performed the Composition in more than approximately 200 concert venues around the nation, including the West Coast, the Midwest, the South and the East Coast;

- During the first half of 2013, Plaintiffs performed the Composition in an additional two dozen concert venues around the nation;

- During 2008 and 2009, LeCrae Moore performed the Composition on his own concert tour around the nation;

2

PLAINTIFFS' RESPONSES TO DEFENDANTS' INTERROGATORIES

EXHIBIT 26
PAGE 896

- In January of 2009, the album *Our World Redeemed* (which includes Plaintiff's Composition) was a nominee for Rap/Hip Hop Gospel Album of the Year at the Stellar Award Show held at the Grand Ole Opry in Nashville, Tennessee in Nashville, Tennessee;

- In February of 2009, the album *Our World Redeemed* (which includes Plaintiff's Composition) was a nominee for Best Rock or Rap Gospel Album at the 51st Annual Grammy Awards Show in Los Angeles, California, which was televised nationwide;

- Katy Perry performed at that 51st Annual Grammy Awards Show in February of 2009, and, on information and belief, Defendants Gottswald and Sandberg (and perhaps other individual Defendants) were voting members of the Grammy Society that year and thus would have received copies of and/or access to the nominated songs and albums for their review prior to voting.

- In April of 2009, Plaintiffs' Composition was a nominee for the Best Rap/Hip Hop Song of the Year at the 40th GMA Dove Awards, which was televised live from the Grand Ole Opry in Nashville, Tennessee.

- The Recording of Plaintiffs' Composition was played on radio stations throughout the nation and occasionally featured on television interviews of the Plaintiffs during their concert tours.

<u>Supplemental Response</u>: Additionally, the album *Our World Redeemed* (which

3

PLAINTIFFS' RESPONSES TO DEFENDANTS' INTERROGATORIES

EXHIBIT 26
PAGE 897

includes Plaintiff's Composition), debuted at #5 on the Billboard Gospel Chart and

reached #1 on the Christian Music Trade Association (CMTA) R&B/Hip Hop Chart.

<u>INTERROGATORY NO. 13</u>:

Describe in detail all concerts, events, presentations, gatherings, recitals, performances or sessions at which Plaintiffs' Composition was performed, including but not limited to the name(s) of the performer(s), as well as the date, venue and attendance figures for any such performance.

    <u>Original Response</u>: As stated above, Plaintiffs and Mr. Moore have performed Plaintiffs' Composition at more than 200 venues around the country. Plaintiffs shall provide Defendants with documents evidencing the information sought by this Interrogatory.

    <u>Supplemental Response</u>: The documents evidencing Plaintiffs' performances of the Composition prior to 2011 are less comprehensive than the more recent documents. Accordingly, Plaintiffs supplement their prior answer by providing the following dates and venues for their performance of the Composition (along with other songs) for the period 2008 through 2010:

**--2008--**

- March
  - 1: Chillicothe , Ohio
  - 7: St. Louis, MO
  - 15: Toledo , Ohio
  - 22: Pittsburgh, PA
  - 29: Charlotte, NC
- April
  - 26: St. Petersburg, FL
- May
  - 1: Kansas City, MO
  - 24: Providence, RI

4

PLAINTIFFS' RESPONSES TO DEFENDANTS' INTERROGATORIES

EXHIBIT 26
PAGE 898

- June
  - 19: Greenville, TX
  - 28: Tampa, FL

- July
  - 11: Sacramento, CA
  - 17: Sayreville, NJ
  - 18: Cleveland, OH
  - 25: Jacksonville, FL
  - 27: Chicago, IL

- August
  - 1: Mulberry, FL
  - 9: Minneapolis, MN
  - 10: Oakland, CA
  - 14: Chicago, IL
  - 23: Dixon, CA

- September
  - 12: Clinton, MD
  - 29: Williamsburg, KY

- October
  - 17: Virginia Beach, VA
  - 25: Branson, MO
  - 31 Southfield , MI
- November
  - 2: Cave City, KY
  - 7: Greensboro, NC
  - 8: New Orleans, LA

- December
  - 28: Nashville, TN
  - 31: Richardson, TX

**--2009--**
- January
  - 2: San Bernadino, CA
  - 14: Stellar Award show (Nomination for Our World Redeemed): Nashville, TN

- February
  - 7-8: Grammy Awards (Nomination for Our World Redeemed): Los Angeles, CA
  - 13: Orange City, IA
  - 17: Mt. Washington, KY
  - 19: Kingston, Jamaica

- March
  - 21: Danville, KY

- April
  - 10: St. Peters, MO
  - 23: Dove Awards show (Nomination for "Joyful Noise" Best Rap Song of the year): Nashville, TN

5

PLAINTIFFS' RESPONSES TO DEFENDANTS' INTERROGATORIES

EXHIBIT 26
PAGE 899

- o   25: St. Petersburg, FL
- May
  - o   2: Springfield, MO
  - o   29: Memphis, TN
  - o   30: Minneapolis, MN

- June
  - o   5: Manchester, NH
  - o   6: Woodbridge, VA
  - o   11: Lima, OH
  - o   12: Glendale, NY
  - o   13: Detroit, MI
  - o   19: Miami, FL
  - o   20: Orlando, FL
  - o   23: Virginia Beach, VA
  - o   25: Mt. Union, PA
  - o   27: Birmingham, AL
  - o   28: Baton Route, LA

- July
  - o   8: San Antonio, TX
  - o   9: Oklahoma City, OK
  - o   10: Houston, TX
  - o   11: Dallas, TX
  - o   12: Odessa, TX
  - o   13: Albuquerque, NM
  - o   15: Phoenix, AZ
  - o   16: San Bernardino, CA
  - o   18: San Diego, CA
  - o   19: San Leandro, CA
  - o   23: George, WA
  - o   24: Seattle, WA

- August
  - o   2: Greensboro, NC
  - o   7: Louisville, KY
  - o   14: Cleveland, OH.
  - o   16: Minneapolis, MN
  - o   21: Richardson, TX
  - o   22: Parsons, KS
  - o   29: Atlanta, GA

- September
  - o   12 - 13: Longview, TX
  - o   18: Richmond, VA
  - o   19: Springfield, MO

- October
  - o   17: Wilmington, NC –Ampfest
  - o   24: Huntsville, AL.
  - o   30: Orlando, Fl.
  - o   31: Joliet, IL

6

EXHIBIT 26
PAGE 900

- December
  - 31: Lebanon, IL -

**--2010--**

- January
  - 15: Louisville, KY
  - 16: Orlando, FL

- February
  - 5: Huntsville, AL
  - 12: Louisville KY
  - 13: Modesto, CA

- March
  - 6: Kansas City, MO
  - 13: Buffalo, NY
  - 26: Prestonsburg, KY

- April
  - 24: Due West, SC
  - 30: Shelby, NC:

- May
  - 1: Shelby, NC
  - 21: Indianapolis IN

- June
  - 10 - 13: Alberta, Canada-
  - 20 - 27: Maui & Oahu, Hawaii
  - 29: Louisville, KY

- July
  - 11 -12: Central, Florida -
  - 14 -18: Liege, Belgium & Heidelberg, Germany
  - 23: Rochester, NY
  - 29: Chicago, IL
  - 30: Houston, DE-
  - 31: Bridge, CO

- August
  - 5:Detroit, MI
  - 6: Toledo, OH.
  - 7: Kansas City, MO
  - 13: Sacramento, CA
  - 20: Seattle, WA
  - 21: Portland, OR
  - 27: Institute, West Virginia

- September
  - 5: Warrensville, OH
  - 17: Gainesville Fl.

- October
  - 1 - 4: Kingston, Jamaica

7

PLAINTIFFS' RESPONSES TO DEFENDANTS' INTERROGATORIES

EXHIBIT 26
PAGE 901

1               ○  16-17: Wilmington, NC-
              ○  29: Orlando, FL

2

3      •  December
           ○  28: Springfield, IL:

4

5 In addition, LeCrae Moore performed Plaintiffs' Composition on his national tour

6 during the years 2008 and 2009.

7

8

9 Date: May 6, 2016                   /s/ Michael A. Kahn

10                                 Michael A. Kahn (pro hac vice)
Kahn@capessokol.com
Drey A. Cooley (pro hac vice)

11                                 Cooley@capessokol.com
Capes Sokol Goodman Sarachan PC

12                                 7701 Forsyth Blvd., 12th Floor
St. Louis, MO 63105

13                                 Telephone:  (314) 721-7701

14                                 Eric F. Kayira (pro hac vice)
eric.kayira@kayiralaw.com

15                                 Kayira Law, LLC
200 S. Hanley Road, Suite 208

16                                 Clayton, Missouri 63105
Telephone:  (314) 899-9381

17

18                                 Carole E. Handler (SBN 129381)
chandler@eisnerlaw.com
Brianna Dahlberg (SBN 280711)

19                                 bdahlberg@eisnerlaw.com
EISNER JAFFE

20                                 9601 Wilshire Boulevard, Suite 700
Beverly Hills, California  90210

21                                 Telephone:  (310) 855-3200
Facsimile:  (310) 855-3201

22

23                                 ***Attorneys for Plaintiffs***

24

25

26

27

28

8

## **PROOF OF SERVICE**

1

2          I hereby certify that on this 6th day of May, 2016, I caused a copy of the
foregoing to be served by electronic mail upon the counsel of record identified in the
3     Service List below. To the best of my knowledge, the transmission was complete and
without error.

4                                              /s/ Michael A. Kahn

5     SERVICE LIST:

6     | Vincent H. Chieffo (SBN 49069) | Christine Lepera (*pro hac vice*) |
| Email: *ChieffoV@gtlaw.com* | ctl@msk.com |
7     | Alana C. Srour (SBN 271905) | Jeffrey M. Movit (*pro hac vice*) |
| Email: *SrourA@gtlaw.com* | jmm@msk.com |
8     | GREENBERG TRAURIG, LLP | MITCHELL SILVERBERG & KNUPP LLP |
| 1840 Century Park East, Suite 1900 | 12 East 49th Street, 30th Floor |
9     | Los Angeles, CA 90067-2121 | New York, New York 10017-1028 |
| | |
10    | ***Attorneys for Defendants Katheryn*** | Aaron M. Wais (SBN 250671) |
| ***Elizabeth Hudson p/k/a Katy Perry and*** | amw@msk.com |
11    | ***Kitty Purry, Inc*** | MITCHELL SILVERBERG & KNUPP LLP |
| | 11377 West Olympic Boulevard |
12    | | Los Angeles, CA 90064-1683 |
| | |
13    | | ***Attorneys for Defendants Capitol*** |
| | ***Records, Jordan Houston, Lukasz*** |
14    | | ***Gottwald, Sarah Therese Hudson, Karl*** |
| | ***Martin Sandberg and Henry Russell*** |
15    | | ***Walter*** |

16

17

18

19

20

21

22

23

24

25

26

27

28

9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **VERIFICATION**

I certify under penalty of perjury under the laws of the United States that I have read the foregoing supplemental answers to Interrogatory Numbers 4 and 13 and that the supplemental answers are—subject to any inadvertent or undiscovered errors—true to my knowledge, information and belief.

Marcus Gray

Date: 4–28-16

10

EXHIBIT 26
PAGE 904

# EXHIBIT 27

EXHIBIT 27
PAGE 905

Michael A. Kahn (pro hac vice)
Kahn@capessokol.com
Drey A. Cooley (pro hac vice)
Cooley@capessokol.com
Capes Sokol Goodman Sarachan PC
7701 Forsyth Blvd., 12th Floor
St. Louis, MO 63105
Telephone:  (314) 721-7701

Eric F. Kayira (pro hac vice)
eric.kayira@kayiralaw.com
Kayira Law, LLC
200 S. Hanley Road, Suite 208
Clayton, Missouri 63105
Telephone:  (314) 899-9381

Carole E. Handler (SBN 129381)
chandler@eisnerlaw.com
Brianna Dahlberg (SBN 280711)
bdahlberg@eisnerlaw.com
EISNER JAFFE
9601 Wilshire Boulevard, Suite 700
Beverly Hills, California  90210
Telephone:  (310) 855-3200
Facsimile:  (310) 855-3201

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCUS GRAY, et al., | Case No. 2:15-cv-05642-CAS-JC |
| Plaintiffs, | Hon. Christina A. Snyder |
| v. | |
| KATHERYN ELIZABETH HUDSON, et al., | **PLAINTIFFS' SUPPLEMENTAL ANSWER TO INTERROGATORY NOS. 4 AND 13 OF DEFENDANTS' FIRST SET OF INTERROGATORIES (AMENDED)** |
| Defendant. | |

Plaintiff Marcus Gray, on behalf of all plaintiffs, submits the following supplemental answers to Interrogatory Nos. 4 and 13 of Defendants' First Set of Interrogatories (with an amended answer to Interrogatory No. 13):

INTERROGATORY NO. 4:

Set forth in detail all facts which support any contention that Defendants purportedly had access to the Plaintiffs' Composition, or any Recording thereof.

Original Response: Plaintiffs' investigation continues and will include, among other things, discovery from defendants and their agents. Until that investigation is completed, Defendants' access to the Composition and the Recording can be inferred from the widespread dissemination of the Recording and the widespread performance of the Composition. Among other things:

- By at least 18 months before the release of the recording of Defendants' Composition, the Recording of Plaintiffs' Composition had been viewed and/or downloaded from YouTube more than 2.5 million times and had been viewed and/or downloaded from other Internet sites more than 1 million times;

- In addition, tens of thousands of followers of the Myspace.com pages for Plaintiffs and LeCrae Moore had access to the Recording of Plaintiffs' Composition;

- From 2008 thru 2012, Plaintiffs performed the Composition in more than approximately 200 concert venues around the nation, including the West Coast, the Midwest, the South and the East Coast;

- During the first half of 2013, Plaintiffs performed the Composition in an additional two dozen concert venues around the nation;

- During 2008 and 2009, LeCrae Moore performed the Composition on his own concert tour around the nation;

2

PLAINTIFFS' RESPONSES TO DEFENDANTS' INTERROGATORIES

EXHIBIT 27
PAGE 907

- In January of 2009, the album *Our World Redeemed* (which includes Plaintiff's Composition) was a nominee for Rap/Hip Hop Gospel Album of the Year at the Stellar Award Show held at the Grand Ole Opry in Nashville, Tennessee in Nashville, Tennessee;

- In February of 2009, the album *Our World Redeemed* (which includes Plaintiff's Composition) was a nominee for Best Rock or Rap Gospel Album at the 51st Annual Grammy Awards Show in Los Angeles, California, which was televised nationwide;

- Katy Perry performed at that 51st Annual Grammy Awards Show in February of 2009, and, on information and belief, Defendants Gottswald and Sandberg (and perhaps other individual Defendants) were voting members of the Grammy Society that year and thus would have received copies of and/or access to the nominated songs and albums for their review prior to voting.

- In April of 2009, Plaintiffs' Composition was a nominee for the Best Rap/Hip Hop Song of the Year at the 40th GMA Dove Awards, which was televised live from the Grand Ole Opry in Nashville, Tennessee.

- The Recording of Plaintiffs' Composition was played on radio stations throughout the nation and occasionally featured on television interviews of the Plaintiffs during their concert tours.

<u>Supplemental Response</u>: Additionally, the album *Our World Redeemed* (which

3

PLAINTIFFS' RESPONSES TO DEFENDANTS' INTERROGATORIES

EXHIBIT 27
PAGE 908

includes Plaintiff's Composition), debuted at #5 on the Billboard Gospel Chart and reached #1 on the Christian Music Trade Association (CMTA) R&B/Hip Hop Chart.

<u>INTERROGATORY NO. 13</u>:

Describe in detail all concerts, events, presentations, gatherings, recitals, performances or sessions at which Plaintiffs' Composition was performed, including but not limited to the name(s) of the performer(s), as well as the date, venue and attendance figures for any such performance.

<u>Original Response</u>: As stated above, Plaintiffs and Mr. Moore have performed Plaintiffs' Composition at more than 200 venues around the country. Plaintiffs shall provide Defendants with documents evidencing the information sought by this Interrogatory.

<u>Supplemental Response</u>: The documents evidencing Plaintiffs' performances of the Composition prior to 2011 are less comprehensive than the more recent documents. Accordingly, Plaintiffs supplement their prior answer by providing the following dates and venues for their performance of the Composition (along with other songs) for the period 2008 through 2010:

**--2008--**

- March
    - 1: Chillicothe , Ohio
    - 7: St. Louis, MO
    - 15: Toledo , Ohio
    - 22: Pittsburgh, PA
    - 29: Charlotte, NC
- April
    - 26: St. Petersburg, FL
- May
    - 1: Kansas City, MO
    - 24: Providence, RI

4

PLAINTIFFS' RESPONSES TO DEFENDANTS' INTERROGATORIES

EXHIBIT 27
PAGE 909

- June
  - 19: Greenville, TX
  - 28: Tampa, FL

- July
  - 11: Sacramento, CA
  - 17: Sayreville, NJ
  - 18: Cleveland, OH
  - 25: Jacksonville, FL
  - 27: Chicago, IL

- August
  - 1: Mulberry, FL
  - 9: Minneapolis, MN
  - 10: Oakland, CA
  - 14: Chicago, IL
  - 23: Dixon, CA

- September
  - 12: Clinton, MD
  - 29: Williamsburg, KY

- October
  - 17: Virginia Beach, VA
  - 25: Branson, MO
  - 31 Southfield , MI
- November
  - 2: Cave City, KY
  - 7: Greensboro, NC
  - 8: New Orleans, LA

- December
  - 28: Nashville, TN
  - 31: Richardson, TX

**--2009--**
- January
  - 2: San Bernadino, CA
  - 14: Stellar Award show (Nomination for Our World Redeemed): Nashville, TN—NO ACTUAL PERFORMANCE

- February
  - 7-8: Grammy Awards (Nomination for Our World Redeemed): Los Angeles, CA—NO ACTUAL PERFORMANCE
  - 13: Orange City, IA
  - 17: Mt. Washington, KY
  - 19: Kingston, Jamaica

- March
  - 21: Danville, KY

- April
  - 10: St. Peters, MO

5

EXHIBIT 27
PAGE 910

- 23: Dove Awards show (Nomination for "Joyful Noise" Best Rap Song of the year): Nashville, TN—SHORT CLIP OF RECORDING PLAYED BUT NO ACTUAL PERFORMANCE
- 25: St. Petersburg, FL

- May
  - 2: Springfield, MO
  - 29: Memphis, TN
  - 30: Minneapolis, MN

- June
  - 5: Manchester, NH
  - 6: Woodbridge, VA
  - 11: Lima, OH
  - 12: Glendale, NY
  - 13: Detroit, MI
  - 19: Miami, FL
  - 20: Orlando, FL
  - 23: Virginia Beach, VA
  - 25: Mt. Union, PA
  - 27: Birmingham, AL
  - 28: Baton Route, LA

- July
  - 8: San Antonio, TX
  - 9: Oklahoma City, OK
  - 10: Houston, TX
  - 11: Dallas, TX
  - 12: Odessa, TX
  - 13: Albuquerque, NM
  - 15: Phoenix, AZ
  - 16: San Bernardino, CA
  - 18: San Diego, CA
  - 19: San Leandro, CA
  - 23: George, WA
  - 24: Seattle, WA

- August
  - 2: Greensboro, NC
  - 7: Louisville, KY
  - 14: Cleveland, OH.
  - 16: Minneapolis, MN
  - 21: Richardson, TX
  - 22: Parsons, KS
  - 29: Atlanta, GA

- September
  - 12 - 13: Longview, TX
  - 18: Richmond, VA
  - 19: Springfield, MO

- October
  - 17: Wilmington, NC –Ampfest
  - 24: Huntsville, AL.

6

PLAINTIFFS' RESPONSES TO DEFENDANTS' INTERROGATORIES

EXHIBIT 27
PAGE 911

- 30: Orlando, Fl.
- 31: Joliet, IL
- December
  - 31: Lebanon, IL -

**--2010--**

- January
  - 15: Louisville, KY
  - 16: Orlando, FL

- February
  - 5: Huntsville, AL
  - 12: Louisville KY
  - 13: Modesto, CA

- March
  - 6: Kansas City, MO
  - 13: Buffalo, NY
  - 26: Prestonsburg, KY

- April
  - 24: Due West, SC
  - 30: Shelby, NC:

- May
  - 1: Shelby, NC
  - 21: Indianapolis IN

- June
  - 10 - 13: Alberta, Canada-
  - 20 - 27: Maui & Oahu, Hawaii
  - 29: Louisville, KY

- July
  - 11 -12: Central, Florida -
  - 14 -18: Liege, Belgium & Heidelberg, Germany
  - 23: Rochester, NY
  - 29: Chicago, IL
  - 30: Houston, DE-
  - 31: Bridge, CO

- August
  - 5:Detroit, MI
  - 6: Toledo, OH.
  - 7: Kansas City, MO
  - 13: Sacramento, CA
  - 20: Seattle, WA
  - 21: Portland, OR
  - 27: Institute, West Virginia

- September
  - 5: Warrensville, OH
  - 17: Gainesville Fl.

7

- October
  - 1 - 4: Kingston, Jamaica
  - 16-17: Wilmington, NC-
  - 29: Orlando, FL

- December
  - 28: Springfield, IL:

In addition, LeCrae Moore performed Plaintiffs' Composition on his national tour during the years 2008 and 2009.

Date: May 6, 2016

/s/ Michael A. Kahn
Michael A. Kahn (pro hac vice)
Kahn@capessokol.com
Drey A. Cooley (pro hac vice)
Cooley@capessokol.com
Capes Sokol Goodman Sarachan PC
7701 Forsyth Blvd., 12th Floor
St. Louis, MO 63105
Telephone:  (314) 721-7701

Eric F. Kayira (pro hac vice)
eric.kayira@kayiralaw.com
Kayira Law, LLC
200 S. Hanley Road, Suite 208
Clayton, Missouri 63105
Telephone:  (314) 899-9381

Carole E. Handler (SBN 129381)
chandler@eisnerlaw.com
Brianna Dahlberg (SBN 280711)
bdahlberg@eisnerlaw.com
EISNER JAFFE
9601 Wilshire Boulevard, Suite 700
Beverly Hills, California  90210
Telephone:  (310) 855-3200
Facsimile:  (310) 855-3201

*Attorneys for Plaintiffs*

8

PLAINTIFFS' RESPONSES TO DEFENDANTS' INTERROGATORIES

EXHIBIT 27
PAGE 913

1

## **PROOF OF SERVICE**

2        I hereby certify that on this 16th day of December, 2016, I caused a copy of the
foregoing to be served by electronic mail upon the counsel of record identified in the
3 Service List below. To the best of my knowledge, the transmission was complete and
without error.

4

5                                                    /s/ Michael A. Kahn

SERVICE LIST:

6

| Vincent H. Chieffo (SBN 49069)<br>Email: *ChieffoV@gtlaw.com*<br>Alana C. Srour (SBN 271905)<br>Email: *SrourA@gtlaw.com*<br>GREENBERG TRAURIG, LLP<br>1840 Century Park East, Suite 1900<br>Los Angeles, CA 90067-2121<br><br>***Attorneys for Defendants Katheryn Elizabeth Hudson p/k/a Katy Perry and Kitty Purry, Inc*** | Christine Lepera (*pro hac vice*)<br>ctl@msk.com<br>Jeffrey M. Movit (*pro hac vice*)<br>jmm@msk.com<br>MITCHELL SILVERBERG & KNUPP LLP<br>12 East 49th Street, 30th Floor<br>New York, New York 10017-1028<br><br>Aaron M. Wais (SBN 250671)<br>amw@msk.com<br>MITCHELL SILVERBERG & KNUPP LLP<br>11377 West Olympic Boulevard<br>Los Angeles, CA 90064-1683<br><br>***Attorneys for Defendants Capitol Records, Jordan Houston, Lukasz Gottwald, Sarah Therese Hudson, Karl Martin Sandberg and Henry Russell Walter*** |

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9

PLAINTIFFS' RESPONSES TO DEFENDANTS' INTERROGATORIES

EXHIBIT 27
PAGE 914

# EXHIBIT 28

EXHIBIT 28
PAGE 915

1

Michael A. Kahn (pro hac vice)
Kahn@capessokol.com

2

Drey A. Cooley (pro hac vice)
Cooley@capessokol.com

3

Capes Sokol Goodman Sarachan PC
7701 Forsyth Blvd., 12th Floor

4

St. Louis, MO 63105
Telephone:  (314) 721-7701

5

Eric F. Kayira (pro hac vice)

6

eric.kayira@kayiralaw.com
Kayira Law, LLC

7

200 S. Hanley Road, Suite 208
Clayton, Missouri 63105

8

Telephone:  (314) 899-9381

9

Carole E. Handler (SBN 129381)
chandler@eisnerlaw.com

10

Brianna Dahlberg (SBN 280711)
bdahlberg@eisnerlaw.com

11

EISNER JAFFE
9601 Wilshire Boulevard, Suite 700

12

Beverly Hills, California  90210
Telephone:  (310) 855-3200

13

Facsimile:  (310) 855-3201

14

Attorneys for Plaintiffs

15

UNITED STATES DISTRICT COURT

16

FOR THE CENTRAL DISTRICT OF CALIFORNIA

17

18

| MARCUS GRAY, et al., | Case No. 2:15-cv-05642-CAS-JC |
|---|---|
| Plaintiffs, | Hon. Christina A. Snyder |
| v. | |
| KATHERYN ELIZABETH HUDSON, et al., | **PLAINTIFFS' COMBINED RESPONSES TO DEFENDANTS JORDAN HOUSTON, LUKASZ GOTTWALD, SARAH THERESA HUDSO KARL MARTIN SANDBEKG  AND HENRY RUSSELL WALTER'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS** |
| Defendant. | |

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' RESPONSES TO DEFENDANTS' REQUESTS FOR PRODUCTION

EXHIBIT 28
PAGE 916

1    Plaintiffs Marcus Gray, Emanuel Lambert and Chike Ojukwu (collectively,

2    "Plaintiffs") submit this combined response to Defendants' First Request for

3    Production of Documents:

4              **GENERAL OBJECTIONS AND CLARIFICATIONS**

5    1.    Plaintiffs object to the extent the Requests seek to impose obligations on

6    Plaintiffs that exceed the requirements of he Federal Rules of Civil Procedure or the

7    Local Rules.

8    2.    Plaintiffs object to the Requests to the extent they are vague, ambiguous,

9    overly broad or unduly burdensome, lack reasonable particularity, seek irrelevant

10   information or information not reasonably calculated to lead to the discovery of

11   admissible evidence, go beyond the subject matter of this action, or call for an

12   interpretation on the part of Plaintiffs.  In order to provide a response in good faith,

13   Plaintiffs have made such interpretations where necessary and have responded

14   accordingly.

15   3.    Plaintiffs object to the Requests to the extent they call for the disclosure

16   of information protected by the attorney-client privilege, the work product doctrine or

17   any other applicable privilege, immunity or doctrine. Inadvertent disclosure of such

18   documents or information shall not constitute a waiver of any privilege, immunity or

19   doctrine with respect to the subject matter thereof or the information contained therein

20   and shall not waive the right of Plaintiffs to object to the use of any such information

21   or document (or the information contained therein) during any pending or subsequent

22   proceeding.  Any document inadvertently produced should be returned immediately to

23   Plaintiffs upon request.

24   4.    Plaintiffs object to the Requests to the extent they seek documents that

25   are not in their possession, custody or under its control, including documents that are

26   in the possession, custody or control of any other entity or individual.

27

28

2

PLAINTIFFS' RESPONSES TO DEFENDANTS' REQUESTS FOR PRODUCTION

EXHIBIT 28
PAGE 917

5.      Plaintiffs object to the "Definitions and Instructions" contained in the Requests to the extent that they are overly broad, unduly burdensome or oppressive or seek discovery beyond the scope of Federal Rules of Civil Procedure 26 and 34.

6.      Plaintiffs object to the Requests insofar as they call for the production of documents containing trade secrets.  Plaintiffs reserve the right to redact trade secret information from documents produced in response to these Requests.

7.      Plaintiffs object to the Requests to the extent that they call for the production of documents, including electronically stored information, according to technical specifications that exceed or differ from those previously agreed to by the parties.

8.      Plaintiffs object to the Requests to the extent that they call for the production of "all documents" concerning some subject on the ground that Plaintiffs can never be certain that they have located all such documents. Plaintiffs shall make reasonable efforts to define, search for, locate, and produce documents responsive to the request for "all documents" but do not and cannot warrant that they will indeed be able to identify or locate "all" such documents.

9.      In providing these resonses, Plaintiffs do not admit or concede the relevance, materiality, authenticity, or admissibility in evidence of any such responses, information or documents.  All objections to the use, at trial or otherwise, of any information provided in response to the Requests are expressly reserved. All individual responses to the Requests are made on the express reservation of all applicable objections, court rulings, agreements and understandings and are made pursuant to the foregoing General Objections and any specific objections set forth below.

The foregoing General Objections shall be deemed to apply to each and every individual request.

**RESPONSES**

3

EXHIBIT 28
PAGE 918

REQUEST NO. 1:

All documents concerning the creation of Plaintiffs' Composition, including but not limited to any Recording, sheet music or handwritten notes embodying any music or lyrics of that composition.

Response: Subject to the foregoing General Objections and Clarifications, Plaintiffs will produce any non-privileged documents responsive to this Request.

REQUEST NO. 2:

All documents concerning the creation of any Recording of Plaintiffs' Composition at any location, including but not limited to studio logs, recording sessions, invoices, bills, receipts, cancelled checks, and documents refen-ing to the date(s) on which Plaintiffs' Composition was recorded

Response: Subject to the foregoing General Objections and Clarifications, Plaintiffs will produce any non-privileged documents responsive to this Request.

REQUEST NO. 3:

All documents concerning the ownership of Plaintiffs' Composition or any Recording of Plaintiffs' Composition

Response: Subject to the foregoing General Objections and Clarifications, Plaintiffs will produce any non-privileged documents responsive to this Request.

REQUEST NO. 4:

All documents concerning any public performance, broadcast, publication, License, reproduction, sale, distribution or other exploitation in any form or medium of Plaintiffs' Composition at any time

Response: Subject to the foregoing General Objections and Clarifications, Plaintiffs will produce any non-privileged documents responsive to this Request.

REQUEST NO. 5:

All documents concerning any rights or interests of Plaintiff or any other party in and to Plaintiffs' Composition, including but not limited to any alleged assignments of any such rights.

Response: Subject to the foregoing General Objections and Clarifications, Plaintiffs will produce any non-privileged documents responsive to this Request.

4

PLAINTIFFS' RESPONSES TO DEFENDANTS' REQUESTS FOR PRODUCTION

EXHIBIT 28
PAGE 919

REQUEST NO. 6:

All documents concerning any License requested or granted to any person, entity or group to undertake a public performance of Plaintiffs' Composition

    Response: Subject to the foregoing General Objections and Clarifications, Plaintiffs will produce any non-privileged documents responsive to this Request.

REQUEST NO. 7:

All documents concerning live performances of Plaintiffs' Composition.

    Response: Subject to the foregoing General Objections and Clarifications, Plaintiffs will produce any non-privileged documents responsive to this Request.

REQUEST NO. 8:

All documents refening or relating to any distribution, Licenses or any other exploitation of Plaintiffs' Composition or any Recording thereof, including but not limited to all mechanical licenses and/or synchronization licenses issued for Plaintiffs' Composition or any Recording thereof.

    Response: Subject to the foregoing General Objections and Clarifications, Plaintiffs will produce any non-privileged documents responsive to this Request.

REQUEST NO. 9:

All requests for licenses of Plaintiffs' Composition and/or any Recording thereof.

    Response: Subject to the foregoing General Objections and Clarifications, Plaintiffs will produce any non-privileged documents responsive to this Request.

REQUEST NO. 10:

All documents concerning any License of Plaintiffs' Composition..

    Response: Subject to the foregoing General Objections and Clarifications, Plaintiffs will produce any non-privileged documents responsive to this Request.

REQUEST NO. 11:

All documents concerning any License of any Recording of Plaintiffs' Composition, or any "sample" or portion thereof.

PLAINTIFFS' RESPONSES TO DEFENDANTS' REQUESTS FOR PRODUCTION

EXHIBIT 28
PAGE 920

1      <u>Response</u>: Subject to the foregoing General Objections and Clarifications,

2 Plaintiffs will produce any non-privileged documents responsive to this Request.

3 <u>REQUEST NO. 12</u>:

4 A copy of all commercially released products in any fomlat (including but not
limited to CDs, cassette tapes, and vinyl records) containing a Recording of
5 Plaintiffs' Composition Recording, on the other hand.

6
     <u>Response</u>: The only commercially released product was a CD, which Plaintiffs
7
shall produce.
8
<u>REQUEST NO. 13</u>:
9
All documents reflecting any radio or television broadcast of Plaintiffs'
10 Composition (or any Recording thereof).

11
     <u>Response</u>: Subject to the foregoing General Objections and Clarifications,
12
Plaintiffs will produce any non-privileged documents responsive to this Request.
13
<u>REQUEST NO. 14</u>:
14
All documents reflecting any online publication or broadcast of Plaintiffs'
15 Composition or any Recording thereof.

16
     <u>Response</u>: Subject to the foregoing General Objections and Clarifications,
17
Plaintiffs will produce any non-privileged documents responsive to this Request.
18
<u>REQUEST NO. 15</u>:
19
All documents concerning any alleged communications between Plaintiff, on one
20 hand, and any credited writer of Defendants' Composition, on the other hand

21
     <u>Response</u>: Plaintiffs are not aware of any such documents, at least as such
22
document(s) might relate to any issue in this lawsuit.
23
<u>REQUEST NO. 16</u>:
24
All documents concerning any alleged communications between Plaintiff, on one
25 hand, and any credited performer or producer of Defendants' Recording, on the
other hand.
26

27      <u>Response</u>: Plaintiffs are not aware of any such documents, at least as such

28

6

EXHIBIT 28
PAGE 921

document(s) might relate to any issue in this lawsuit.

REQUEST NO. 17:

All documents concerning any alleged communications between Plaintiff, on one hand, and any of the Defendants, on the other hand.

      Response: Plaintiffs are not aware of any such documents, at least as such

document(s) might relate to any issue in this lawsuit.

REQUEST NO. 18:

All documents that support any contention by Plaintiff that any credited writer of Defendants' Composition had access to Plaintiffs' Composition or any Recording thereof.

      Response: Beyond the documents that would evidence the types of access

identified in the Plaintiffs' Combined Responses to Defendants' First Set of

Interrogatories, all of which would be in the possession of either Defendants or third

parties, Plaintiffs are not presently aware of any additional such documents. Their

investigation continues.

REQUEST NO. 19:

All documents that support any contention by Plaintiff that any credited performer or producer of Defendants' Recording had access to Plaintiffs' Composition or any Recording thereof.

      Response: See response to Request No. 18.

REQUEST NO. 20:

All documents that support any contention by Plaintiff that any of the Defendants had access to Plaintiffs' Composition or any Recording thereof.

      Response: See response to Request No. 18.

REQUEST NO. 21:

All documents concerning any communications between Plaintiff and the United States Copyright Office relating to the composition or recording of Plaintiffs' Composition, including but not limited to all documents relating to any application to the United States Copyright Office for a copyright registration in or related to Plaintiffs' Composition, including the copyright registration referenced in Paragraph 21 of the SAC.

7

PLAINTIFFS' RESPONSES TO DEFENDANTS' REQUESTS FOR PRODUCTION

EXHIBIT 28
PAGE 922

**Response**: Subject to the foregoing General Objections and Clarifications,

Plaintiffs will produce any non-privileged documents responsive to this Request.

REQUEST NO. 22:

The deposit copy or copies of Plaintiffs' Composition deposited with the United States Copyright Office. After receipt of the Certificate of Registration, LeCrae Moore-the original fourth owner of the Copyright-transferred and assigned all of his ownership interest in the Copyright (including any claims in this action) to the other three 0liginal Plaintiffs.

**Response**: Subject to the foregoing General Objections and Clarifications and to

the extent that Plaintiffs can interpret what exactly is being requested by the second

sentence of this Request, they will produce any non-privileged documents responsive

to this Request.

REQUEST NO. 23:

All documents concerning LeCrae Moore's transfer and assignment all of his ownership interest in the Copyright (including any claims in this action) to the other three original Plaintiffs.

**Response**: Subject to the foregoing General Objections and Clarifications,

Plaintiffs will produce any non-privileged documents responsive to this Request.

REQUEST NO. 24:

All documents concerning any communications between Plaintiff and the United States Copyright Office relating to the composition or recording of any other of Plaintiffs' compositions or recordings, including but not limited to all documents relating to any application to the United States Copyright Office for a copyright registration in or related to said other compositions or recordings.

**Response**: Plaintiffs object to this Request as beyond the scope of discovery in

this action in that it is not relevant to any party's claim or defense

REQUEST NO. 25:

The deposit copy or copies of Plaintiffs' other compositions or recordings deposited with the United States Copyright Office.

**Response**: Plaintiffs object to this Request as beyond the scope of discovery in

8

PLAINTIFFS' RESPONSES TO DEFENDANTS' REQUESTS FOR PRODUCTION

EXHIBIT 28
PAGE 923

this action in that it is not relevant to any party's claim or defense

REQUEST NO. 26:

All documents relied on, or to be relied on, to support Plaintiffs' allegations in the SAC regarding any alleged infringement of Plaintiffs' Composition.

      Response: Subject to the foregoing General Objections and Clarifications, Plaintiffs will produce any non-privileged documents responsive to this Request.

REQUEST NO. 27:

All documents concerning any alleged damages of Plaintiff asserted in the SAC.

      Response: Subject to the foregoing General Objections and Clarifications, Plaintiffs will produce any non-privileged documents responsive to this Request.

REQUEST NO. 28:

All documents reflecting any income received by Plaintiff as a result of the exploitation of Plaintiffs' Composition or any Recording thereof

      Response: Subject to the foregoing General Objections and Clarifications, Plaintiffs will produce any non-privileged documents responsive to this Request.

REQUEST NO. 29:

All documents reflecting any income received by Plaintiff as a result of the exploitation of any other of Plaintiff s compositions or Recordings.

      Response: Plaintiffs object to this Request as beyond the scope of discovery in this action in that it is not relevant to any party's claim or defense

REQUEST NO. 30:

All documents concerning any alleged similarities between Plaintiffs' Composition and Defendants' Composition

      Response: Subject to the foregoing General Objections and Clarifications, Plaintiffs will produce any non-privileged documents responsive to this Request. Howsever, to the extent that the Requests seeks the analysis or reports of expert

9

EXHIBIT 28
PAGE 924

musicologist, Plaintiffs object that this Request because it is (a) premature and thus improper under the Court's Scheduling Order of March 29, 2016 (Docket # 140), and (b) seeks documents protected from disclosure by the attorney-client privilege and the attorney work product privilege.

REQUEST NO. 31:

All documents refering or relating to Defendants, Defendants' Composition and/or Defendants' Recording.

Response: Subject to the foregoing General Objections and Clarifications, Plaintiffs will produce any non-privileged documents responsive to this Request. Howsever, to the extent that the Requests seeks the analysis or reports of expert musicologist, Plaintiffs object that this Request because it is (a) premature and thus improper under the Court's Scheduling Order of March 29, 2016 (Docket # 140), and (b) seeks documents protected from disclosure by the attorney-client privilege and the attorney work product privilege.

REQUEST NO. 32:

All musicological analyses of Plaintiffs' Composition (or any recording thereof)

Response: Plaintiffs object that this Request because it is (a) premature and thus improper under the Court's Scheduling Order of March 29, 2016 (Docket # 140), and (b) seeks documents protected from disclosure by the attorney-client privilege and the attorney work product privilege.

REQUEST NO. 33:

All musicological analyses of Defendants' Composition and/or Defendants' Recording. Plaintiffs gave written notice of the infringement to Defendants or their representatives.

Response: Plaintiffs object that this Request because it is (a) premature and thus improper under the Court's Scheduling Order of March 29, 2016 (Docket # 140), and (b) seeks documents protected from disclosure by the attorney-client privilege and the

10

PLAINTIFFS' RESPONSES TO DEFENDANTS' REQUESTS FOR PRODUCTION

EXHIBIT 28
PAGE 925

1    attorney work product privilege.

2    REQUEST NO. 34:

3    All documents concerning Plaintiffs giving written notice of the alleged
     infringement to Defendants or their representatives.
4

5          Response: Subject to the foregoing General Objections and Clarifications,

6    Plaintiffs will produce any non-privileged documents responsive to this Request.

7
     REQUEST NO. 35:
8
     Any additional documents not produced in response to the above-categories that
9    Plaintiff intends to or may rely upon in support of any allegation of the SAC.

10
           Response: Subject to the foregoing General Objections and Clarifications,
11
     Plaintiffs will produce any non-privileged documents responsive to this Request.
12

13                                  /s/ Michael A. Kahn
                                    Michael A. Kahn (pro hac vice)
14                                  Kahn@capessokol.com
                                    Drey A. Cooley (pro hac vice)
15                                  Cooley@capessokol.com
                                    Capes Sokol Goodman Sarachan PC
16                                  7701 Forsyth Blvd., 12th Floor
                                    St. Louis, MO 63105
17                                  Telephone:  (314) 721-7701

18                                  Eric F. Kayira (pro hac vice)
                                    eric.kayira@kayiralaw.com
19                                  Kayira Law, LLC
                                    200 S. Hanley Road, Suite 208
20                                  Clayton, Missouri 63105
                                    Telephone:  (314) 899-9381
21
                                    Carole E. Handler (SBN 129381)
22                                  chandler@eisnerlaw.com
                                    Brianna Dahlberg (SBN 280711)
23                                  bdahlberg@eisnerlaw.com
                                    EISNER JAFFE
24                                  9601 Wilshire Boulevard, Suite 700
                                    Beverly Hills, California  90210
25                                  Telephone:  (310) 855-3200
                                    Facsimile:  (310) 855-3201
26                                  *Attorneys for Plaintiffs*

27

28
                                        11
                    PLAINTIFFS' RESPONSES TO DEFENDANTS' REQUESTS FOR PRODUCTION

EXHIBIT 28
PAGE 926

## **PROOF OF SERVICE**

I hereby certify that on this 15th day of April, 2016, I caused a copy of the foregoing to be served by electronic mail upon the counsel of record identified in the Service List below. To the best of my knowledge, the transmission was complete and without error.

/s/ Michael A. Kahn

SERVICE LIST:

| | |
|---|---|
| Vincent H. Chieffo (SBN 49069)<br>Email: *ChieffoV@gtlaw.com*<br>Alana C. Srour (SBN 271905)<br>Email: *SrourA@gtlaw.com*<br>GREENBERG TRAURIG, LLP<br>1840 Century Park East, Suite 1900<br>Los Angeles, CA 90067-2121<br><br>***Attorneys for Defendants Katheryn Elizabeth Hudson p/k/a Katy Perry and Kitty Purry, Inc*** | Christine Lepera (*pro hac vice*)<br>ctl@msk.com<br>Jeffrey M. Movit (*pro hac vice*)<br>jmm@msk.com<br>MITCHELL SILVERBERG & KNUPP LLP<br>12 East 49th Street, 30th Floor<br>New York, New York 10017-1028<br><br>Aaron M. Wais (SBN 250671)<br>amw@msk.com<br>MITCHELL SILVERBERG & KNUPP LLP<br>11377 West Olympic Boulevard<br>Los Angeles, CA 90064-1683<br><br>***Attorneys for Defendants Capitol Records, Jordan Houston, Lukasz Gottwald, Sarah Therese Hudson, Karl Martin Sandberg and Henry Russell Walter*** |

PLAINTIFFS' RESPONSES TO DEFENDANTS' REQUESTS FOR PRODUCTION

EXHIBIT 28
PAGE 927

# EXHIBIT 29

EXHIBIT 29
PAGE 928

Michael A. Kahn (pro hac vice)
Kahn@capessokol.com
Drey A. Cooley (pro hac vice)
Cooley@capessokol.com
Capes Sokol Goodman Sarachan PC
7701 Forsyth Blvd., 12th Floor
St. Louis, MO 63105
Telephone:  (314) 721-7701

Eric F. Kayira (pro hac vice)
eric.kayira@kayiralaw.com
Kayira Law, LLC
200 S. Hanley Road, Suite 208
Clayton, Missouri 63105
Telephone:  (314) 899-9381

Carole E. Handler (SBN 129381)
chandler@eisnerlaw.com
Brianna Dahlberg (SBN 280711)
bdahlberg@eisnerlaw.com
EISNER JAFFE
9601 Wilshire Boulevard, Suite 700
Beverly Hills, California  90210
Telephone:  (310) 855-3200
Facsimile:  (310) 855-3201

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCUS GRAY, et al., | Case No. 2:15-cv-05642-CAS-JC |
| Plaintiffs, | Hon. Christina A. Snyder |
| v. | **PLAINTIFFS' SUPPLEMENTAL COMBINED RESPONSES TO DEFENDANTS  JORDAN HOUSTON,  LUKASZ GOTTWALD, SARAH THERESA HUDSON, KARL MARTIN SANDBEKG  AND HENRY RUSSELL WALTER'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS** |
| KATHERYN ELIZABETH HUDSON, et al., | |
| Defendant. | |

EXHIBIT 29
PAGE 929

Plaintiffs Marcus Gray, Emanuel Lambert and Chike Ojukwu (collectively, "Plaintiffs") submit this combined response to Defendants' First Request for Production of Documents:

## GENERAL OBJECTIONS AND CLARIFICATIONS

1.     Plaintiffs object to the extent the Requests seek to impose obligations on Plaintiffs that exceed the requirements of he Federal Rules of Civil Procedure or the Local Rules.

2.     Plaintiffs object to the Requests to the extent they are vague, ambiguous, overly broad or unduly burdensome, lack reasonable particularity, seek irrelevant information or information not reasonably calculated to lead to the discovery of admissible evidence, go beyond the subject matter of this action, or call for an interpretation on the part of Plaintiffs.  In order to provide a response in good faith, Plaintiffs have made such interpretations where necessary and have responded accordingly, or are disproportionate to the needs of the case .

3.     Plaintiffs object to the Requests to the extent they call for the disclosure of information protected by the attorney-client privilege, the work product doctrine or any other applicable privilege, immunity or doctrine. Inadvertent disclosure of such documents or information shall not constitute a waiver of any privilege, immunity or doctrine with respect to the subject matter thereof or the information contained therein and shall not waive the right of Plaintiffs to object to the use of any such information or document (or the information contained therein) during any pending or subsequent proceeding.  Any document inadvertently produced should be returned immediately to Plaintiffs upon request.

4.     Plaintiffs object to the Requests to the extent they seek documents that are not in their possession, custody or under its control, including documents that are in the possession, custody or control of any other entity or individual.

2

EXHIBIT 29
PAGE 930

5.     Plaintiffs object to the "Definitions and Instructions" contained in the Requests to the extent that they are overly broad, unduly burdensome or oppressive or seek discovery beyond the scope of Federal Rules of Civil Procedure 26 and 34.

6.     Plaintiffs object to the Requests insofar as they call for the production of documents containing trade secrets.  Plaintiffs reserve the right to redact trade secret information from documents produced in response to these Requests.

7.     Plaintiffs object to the Requests to the extent that they call for the production of documents, including electronically stored information, according to technical specifications that exceed or differ from those previously agreed to by the parties.

8.     Plaintiffs object to the Requests to the extent that they call for the production of "all documents" concerning some subject on the ground that Plaintiffs can never be certain that they have located all such documents. Plaintiffs shall make reasonable efforts to define, search for, locate, and produce documents responsive to the request for "all documents" but do not and cannot warrant that they will indeed be able to identify or locate "all" such documents.

9.     In providing these resonses, Plaintiffs do not admit or concede the relevance, materiality, authenticity, or admissibility in evidence of any such responses, information or documents.  All objections to the use, at trial or otherwise, of any information provided in response to the Requests are expressly reserved. All individual responses to the Requests are made on the express reservation of all applicable objections, court rulings, agreements and understandings and are made pursuant to the foregoing General Objections and any specific objections set forth below.

The foregoing General Objections shall be deemed to apply to each and every individual request.

3

EXHIBIT 29
PAGE 931

**RESPONSES**

1
2
REQUEST NO. 1:

3
All documents concerning the creation of Plaintiffs' Composition, including but not limited to any Recording, sheet music or handwritten notes embodying any music or lyrics of that composition.

4

5
      Response: Subject to the foregoing General Objections and Clarifications,

6
Plaintiffs will produce any non-privileged documents responsive to this Request. See

7
documents produced herewith identified as P000107 – P000254.

8
REQUEST NO. 2:

9
All documents concerning the creation of any Recording of Plaintiffs' Composition at any location, including but not limited to studio logs, recording sessions, invoices, bills, receipts, cancelled checks, and documents referencing to the date(s) on which Plaintiffs' Composition was recorded

10

11

12
      Response: Subject to the foregoing General Objections and Clarifications,

13
Plaintiffs will produce any non-privileged documents responsive to this Request. See

14
documents produced herewith identified as P000013 – P000044; P000107 – P000254.

15
REQUEST NO. 3:

16
All documents concerning the ownership of Plaintiffs' Composition or any Recording of Plaintiffs' Composition

17

18
      Response: Subject to the foregoing General Objections and Clarifications,

19
Plaintiffs will produce any non-privileged documents responsive to this Request. See

20
documents produced herewith identified as P000001 – P000054; P000107 – P000254.

21
REQUEST NO. 4:

22
All documents concerning any public performance, broadcast, publication, License, reproduction, sale, distribution or other exploitation in any form or medium of Plaintiffs' Composition at any time

23

24

25
      Response: Subject to the foregoing General Objections and Clarifications,

26
Plaintiffs will produce any non-privileged documents responsive to this Request. See

27
documents produced herewith identified as P000001 – P000054; P000107 – P000254.

28

4

EXHIBIT 29
PAGE 932

1

2
REQUEST NO. 5:

3
All documents concerning any rights or interests of Plaintiff or any other party
in and to Plaintiffs' Composition, including but not limited to any alleged
4
assignments of any such rights.

5
      Response: Subject to the foregoing General Objections and Clarifications,

6

7
Plaintiffs will produce any non-privileged documents responsive to this Request. See

documents produced herewith identified as P000001 – P000012.
8

9
REQUEST NO. 6:

10
All documents concerning any License requested or granted to any person, entity
or group to undertake a public performance of Plaintiffs' Composition
11

12
      Response: Subject to the foregoing General Objections and Clarifications,

13
Plaintiffs will produce any non-privileged documents responsive to this Request.

14

15

16
REQUEST NO. 7:

17
All documents concerning live performances of Plaintiffs' Composition.

18
      Response: Subject to the foregoing General Objections and Clarifications,

19

20
Plaintiffs will produce any non-privileged documents responsive to this Request. See

documents produced herewith identified as P000046.
21

22
REQUEST NO. 8:

23
All documents refening or relating to any distribution, Licenses or any other
exploitation of Plaintiffs' Composition or any Recording thereof, including but
24
not limited to all mechanical licenses and/or synchronization licenses issued for
Plaintiffs' Composition or any Recording thereof.

25

26
      Response: Subject to the foregoing General Objections and Clarifications,

27
Plaintiffs will produce any non-privileged documents responsive to this Request.

28

REQUEST NO. 9:

All requests for licenses of Plaintiffs' Composition and/or any Recording thereof.

     Response: Subject to the foregoing General Objections and Clarifications,

Plaintiffs will produce any non-privileged documents responsive to this Request.

REQUEST NO. 10:

All documents concerning any License of Plaintiffs' Composition..

     Response: Subject to the foregoing General Objections and Clarifications,

Plaintiffs will produce any non-privileged documents responsive to this Request.

REQUEST NO. 11:

All documents concerning any License of any Recording of Plaintiffs'
Composition, or any "sample" or portion thereof.

     Response: Subject to the foregoing General Objections and Clarifications,

Plaintiffs will produce any non-privileged documents responsive to this Request.

REQUEST NO. 12:

A copy of all commercially released products in any fomlat (including but not
limited to CDs, cassette tapes, and vinyl records) containing a Recording of
Plaintiffs' Composition Recording, on the other hand.

     Response: The only commercially released product was a CD, which Plaintiffs

shall produce.

REQUEST NO. 13:

All documents reflecting any radio or television broadcast of Plaintiffs'
Composition (or any Recording thereof).

     Response: Subject to the foregoing General Objections and Clarifications,

Plaintiffs will produce any non-privileged documents responsive to this Request

REQUEST NO. 14:

All documents reflecting any online publication or broadcast of Plaintiffs'

6

PLAINTIFFS' RESPONSES TO DEFENDANTS' REQUESTS FOR PRODUCTION

EXHIBIT 29
PAGE 934

Composition or any Recording thereof.

1

2        Response: Subject to the foregoing General Objections and Clarifications,

3    Plaintiffs will produce any non-privileged documents responsive to this Request. See

4    documents produced herewith identified as P000049 – P000054; P000107 – P000254.

5    REQUEST NO. 15:

6    All documents concerning any alleged communications between Plaintiff, on one
     hand, and any credited writer of Defendants' Composition, on the other hand
7

8        Response: Plaintiffs are not aware of any such documents, at least as such

9    document(s) might relate to any issue in this lawsuit.

10   REQUEST NO. 16:

11   All documents concerning any alleged communications between Plaintiff, on one
     hand, and any credited performer or producer of Defendants' Recording, on the
12   other hand.

13
         Response: Plaintiffs are not aware of any such documents, at least as such
14
     document(s) might relate to any issue in this lawsuit.
15
     REQUEST NO. 17:
16
17   All documents concerning any alleged communications between Plaintiff, on one
     hand, and any of the Defendants, on the other hand.
18
         Response: Plaintiffs are not aware of any such documents, at least as such
19
20   document(s) might relate to any issue in this lawsuit.

21   REQUEST NO. 18:

22   All documents that support any contention by Plaintiff that any credited writer of
     Defendants' Composition had access to Plaintiffs' Composition or any Recording
23   thereof.

24       Response: Beyond the documents that would evidence the types of access

25   identified in the Plaintiffs' Combined Responses to Defendants' First Set of

26   Interrogatories, all of which would be in the possession of either Defendants or third

27   parties, Plaintiffs are not presently aware of any additional such documents. Their

28

                                            7

     PLAINTIFFS' RESPONSES TO DEFENDANTS' REQUESTS FOR PRODUCTION

EXHIBIT 29
PAGE 935

investigation continues. See documents produced herewith identified as P000001 – P000254.

REQUEST NO. 19:

All documents that support any contention by Plaintiff that any credited performer or producer of Defendants' Recording had access to Plaintiffs' Composition or any Recording thereof.

     Response: See response to Request No. 18.

REQUEST NO. 20:

All documents that support any contention by Plaintiff that any of the Defendants had access to Plaintiffs' Composition or any Recording thereof.

     Response: See response to Request No. 18.

REQUEST NO. 21:

All documents concerning any communications between Plaintiff and the United States Copyright Office relating to the composition or recording of Plaintiffs' Composition, including but not limited to all documents relating to any application to the United States Copyright Office for a copyright registration in or related to Plaintiffs' Composition, including the copyright registration referenced in Paragraph 21 of the SAC.

     Response: Subject to the foregoing General Objections and Clarifications, Plaintiffs will produce any non-privileged documents responsive to this Request. See documents produced herewith identified as P000007 – P000012.

REQUEST NO. 22:

The deposit copy or copies of Plaintiffs' Composition deposited with the United States Copyright Office. After receipt of the Certificate of Registration, LeCrae Moore-the original fourth owner of the Copyright-transferred and assigned all of his ownership interest in the Copyright (including any claims in this action) to the other three 0riginal Plaintiffs.

     Response: Subject to the foregoing General Objections and Clarifications and to the extent that Plaintiffs can interpret what exactly is being requested by the second sentence of this Request, they will produce any non-privileged documents responsive to this Request.

8

PLAINTIFFS' RESPONSES TO DEFENDANTS' REQUESTS FOR PRODUCTION

EXHIBIT 29
PAGE 936

REQUEST NO. 23:

All documents concerning LeCrae Moore's transfer and assignment all of his ownership interest in the Copyright (including any claims in this action) to the other three original Plaintiffs.

Response: Subject to the foregoing General Objections and Clarifications, Plaintiffs will produce any non-privileged documents responsive to this Request. See documents produced herewith identified as P000001.

REQUEST NO. 24:

All documents concerning any communications between Plaintiff and the United States Copyright Office relating to the composition or recording of any other of Plaintiffs' compositions or recordings, including but not limited to all documents relating to any application to the United States Copyright Office for a copyright registration in or related to said other compositions or recordings.

Response: Plaintiffs object to this Request as beyond the scope of discovery in this action in that it is not relevant to any party's claim or defense and are not proportionate to the needs of the case.

REQUEST NO. 25:

The deposit copy or copies of Plaintiffs' other compositions or recordings deposited with the United States Copyright Office.

Response: Plaintiffs object to this Request as beyond the scope of discovery in this action in that it is not relevant to any party's claim or defense and are not proportionate to the needs of the case.

REQUEST NO. 26:

All documents relied on, or to be relied on, to support Plaintiffs' allegations in the SAC regarding any alleged infringement of Plaintiffs' Composition.

Response: Subject to the foregoing General Objections and Clarifications, Plaintiffs will produce any non-privileged documents responsive to this Request. See documents produced herewith identified as P000001 – P000254.

REQUEST NO. 27:

9

EXHIBIT 29
PAGE 937

All documents concerning any alleged damages of Plaintiff asserted in the SAC.

      <u>Response</u>: Subject to the foregoing General Objections and Clarifications, Plaintiffs will produce any non-privileged documents responsive to this Request.

<u>REQUEST NO. 28</u>:

All documents reflecting any income received by Plaintiff as a result of the exploitation of Plaintiffs' Composition or any Recording thereof

      <u>Response</u>: Subject to the foregoing General Objections and Clarifications, Plaintiffs will produce any non-privileged documents responsive to this Request.

<u>REQUEST NO. 29</u>:

All documents reflecting any income received by Plaintiff as a result of the exploitation of any other of Plaintiff s compositions or Recordings.

      <u>Response</u>: Plaintiffs object to this Request as beyond the scope of discovery in this action in that it is not relevant to any party's claim or defense

<u>REQUEST NO. 30</u>:

All documents concerning any alleged similarities between Plaintiffs' Composition and Defendants' Composition

      <u>Response</u>: Subject to the foregoing General Objections and Clarifications, Plaintiffs will produce any non-privileged documents responsive to this Request. However, to the extent that the Requests seeks the analysis or reports of expert musicologist, Plaintiffs object that this Request because it is (a) premature and thus improper under the Court's Scheduling Order of March 29, 2016 (Docket # 140), and (b) seeks documents protected from disclosure by the attorney-client privilege and the attorney work product privilege.

<u>REQUEST NO. 31</u>:

All documents refering or relating to Defendants, Defendants' Composition and/or Defendants' Recording.

      <u>Response</u>: Subject to the foregoing General Objections and Clarifications,

10

1  Plaintiffs will produce any non-privileged documents responsive to this Request.

2  However, to the extent that the Requests seeks the analysis or reports of expert

3  musicologist, Plaintiffs object that this Request because it is (a) premature and thus

4  improper under the Court's Scheduling Order of March 29, 2016 (Docket # 140), and

5  (b) seeks documents protected from disclosure by the attorney-client privilege and the

6  attorney work product privilege.

7  REQUEST NO. 32:

8  All musicological analyses of Plaintiffs' Composition (or any recording thereof)

9
   Response: Plaintiffs object that this Request because it is (a) premature and thus
10
   improper under the Court's Scheduling Order of March 29, 2016 (Docket # 140), and
11
   (b) seeks documents protected from disclosure by the attorney-client privilege and the
12
   attorney work product privilege.
13
   REQUEST NO. 33:
14
   All musicological analyses of Defendants' Composition and/or Defendants'
15 Recording.  Plaintiffs gave written notice of the infringement to Defendants or
   their representatives.
16
17  Response: Plaintiffs object that this Request because it is (a) premature and thus

18  improper under the Court's Scheduling Order of March 29, 2016 (Docket # 140), and

19  (b) seeks documents protected from disclosure by the attorney-client privilege and the

20  attorney work product privilege.

21  REQUEST NO. 34:

22  All documents concerning Plaintiffs giving written notice of the alleged
   infringement to Defendants or their representatives.
23
24  Response: Subject to the foregoing General Objections and Clarifications,

25  Plaintiffs will produce any non-privileged documents responsive to this Request. See

26  documents produced herewith identified as P000255 – P000259.

27

28

11

PLAINTIFFS' RESPONSES TO DEFENDANTS' REQUESTS FOR PRODUCTION

EXHIBIT 29
PAGE 939

REQUEST NO. 35:

Any additional documents not produced in response to the above-categories that Plaintiff intends to or may rely upon in support of any allegation of the SAC.

     Response: Subject to the foregoing General Objections and Clarifications,

Plaintiffs will produce any non-privileged documents responsive to this Request.

                           /s/ Drey A. Cooley
                           Michael A. Kahn (pro hac vice)
                           Kahn@capessokol.com
                           Drey A. Cooley (pro hac vice)
                           Cooley@capessokol.com
                           Capes Sokol Goodman Sarachan PC
                           7701 Forsyth Blvd., 12th Floor
                           St. Louis, MO 63105
                           Telephone: (314) 721-7701

                           Eric F. Kayira (pro hac vice)
                           eric.kayira@kayiralaw.com
                           Kayira Law, LLC
                           200 S. Hanley Road, Suite 208
                           Clayton, Missouri 63105
                           Telephone: (314) 899-9381

                           Carole E. Handler (SBN 129381)
                           chandler@eisnerlaw.com
                           Brianna Dahlberg (SBN 280711)
                           bdahlberg@eisnerlaw.com
                           EISNER JAFFE
                           9601 Wilshire Boulevard, Suite 700
                           Beverly Hills, California 90210
                           Telephone: (310) 855-3200
                           Facsimile: (310) 855-3201
                           ***Attorneys for Plaintiffs***

## PROOF OF SERVICE

     I hereby certify that on this 13th day of May, 2016, I caused a copy of the foregoing to be served by electronic mail upon the counsel of record identified in the Service List below. To the best of my knowledge, the transmission was complete and without error.

                           /s/ Drey A. Cooley

12

EXHIBIT 29
PAGE 940

SERVICE LIST:

| | |
|---|---|
| Vincent H. Chieffo (SBN 49069)<br>Email: *ChieffoV@gtlaw.com*<br>Alana C. Srour (SBN 271905)<br>Email: *SrourA@gtlaw.com*<br>GREENBERG TRAURIG, LLP<br>1840 Century Park East, Suite 1900<br>Los Angeles, CA 90067-2121<br><br>***Attorneys for Defendants Katheryn Elizabeth Hudson p/k/a Katy Perry and Kitty Purry, Inc*** | Christine Lepera (*pro hac vice*)<br>ctl@msk.com<br>Jeffrey M. Movit (*pro hac vice*)<br>jmm@msk.com<br>MITCHELL SILVERBERG & KNUPP LLP<br>12 East 49th Street, 30th Floor<br>New York, New York 10017-1028<br><br>Aaron M. Wais (SBN 250671)<br>amw@msk.com<br>MITCHELL SILVERBERG & KNUPP LLP<br>11377 West Olympic Boulevard<br>Los Angeles, CA 90064-1683<br><br>***Attorneys for Defendants Capitol Records, Jordan Houston, Lukasz Gottwald, Sarah Therese Hudson, Karl Martin Sandberg and Henry Russell Walter*** |

13

PLAINTIFFS' RESPONSES TO DEFENDANTS' REQUESTS FOR PRODUCTION

EXHIBIT 29
PAGE 941