Michael A. Kahn (pro hac vice)
Kahn@capessokol.com
Drey A. Cooley (pro hac vice)
cooley@capessokol.com
CAPES SOKOL
7701 Forsyth Blvd. 12th Floor
St. Louis, MO 63015
(314) 721-7701

Eric. F. Kayira (pro hac vice)
eric.kayira@kayiralaw.com
KAYIRA LAW, LLC
200 S. Hanley Road, Suite 208
Clayton, Missouri 63105
(314) 899-9381

Daniel R. Blakey (SBN 143748)
blakey@capessokol.com
CAPES SOKOL
3601 Oak Avenue
Manhattan Beach, CA 90266

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCUS GRAY (p/k/a FLAME), et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>KATHERYN ELIZABETH HUDSON (p/k/a KATY PERRY), et al.,<br><br>　　　　　Defendants. | Case No. 2:15-cv-05642-CAS-JC<br><br>Honorable Christina A. Snyder<br><br>**PLAINITFFS' MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**<br><br>**Hearing Date: August 13, 2018**<br>**Time:　　　10:00 am**<br>**Place:　　　Courtroom 8D – 8th Floor**<br>**　　　　　350 W. First Street**<br>**　　　　　Los Angeles, CA 90012**<br><br>**Date Filed:　July 1, 2014**<br>**Trial Date:　February 26, 2019** |

# Table of Contents

I.   Introduction ........................................................................................1

II.  Plaintiffs' extensive and diverse evidence of widespread dissemination of their song prior to the creation of Dark Horse is more than sufficient to create a genuine issue of material fact as to access. ........................................................2

   A.   Copyright law governing "access" evidence ...................................... 2

   B.   Defendants cannot refute Plaintiffs' evidence of access via widespread dissemination of Joyful Noise. ................................................................ 3

III. Plaintiffs' musicologist expert has provided more than sufficient evidence to permit a trier of fact to find that he has satisfied the "extrinsic" test for substantial similarity. ...........................................................................12

IV. Conclusion ......................................................................................17

ii

# Table of Authorities

**Page(s)**

**Cases**

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,
   722 F.2d 988 (2d. Cir. 1983) ............................................................... 12

*Apps v. Universal Music Grp.*,
   283 F. Supp. 3d 946 (D. Nevada 2017) ............................................ 5, 6

*Arnett v. Jackson*,
   No. 5:16-CV-872-D, 2017 WL 3493606 (E.D. N.C. Aug. 14, 2017) ................... 5

*Arnstein v. Porter*,
   154 F.2d 464 (2d Cir. 1946) ................................................................. 4

*Art Attacks Ink, LLC v. MGA Entm't Inc.*,
   581 F.3d 1138 (9th Cir. 2009) ............................................................. 3

*Batts v. Adams*,
   No. CV-10-8123-JFW, 2011 WL 13217923 (C.D. Cal. Feb. 8,
   2011) ...................................................................................................... 5

*Cornerstone Home Builders, Inc. v. McAllister*,
   303 F. Supp. 2d 1317 (M.D. Fla. 2004) ............................................. 11

*Design Basics, LLC v. Lexington Homes, Inc.*,
   858 F.3d 1093 (7th Cir. 2017) .......................................................... 5, 6

*Enfish, LLC v. Microsoft Corp.*,
   No. 2:12-cv-7360-MRP-MRWx, 2014 WL 12585801 (C.D. Cal.
   Mar. 31, 2014) ...................................................................................... 7

*Granite Music Corp. v. United Artists Corp.*,
   532 F.2d 718 (9th Cir. 1976) .............................................................. 10

*Guzman v. Hacienda Records and Recording Studio, Inc.*,
   808 F.3d 1031 (5th Cir. 2015) ............................................................. 9

*Hayes v. Keys*,
   No. CV 14-6246 PA, 2015 WL 12734010 (C.D. Cal. Jan. 7, 2015) ................... 5

iii

*Hayes v. Minaj*,
   No. 2:12-cv-07972-SVW-SH, 2012 WL 12887393 (C.D. Cal. Dec.
   18, 2012) ................................................................................................ 5

*Jason v. Fonda*,
   526 F. Supp. 774 (C.D. Cal. 1981) ....................................................... 4

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.*,
   676 F.3d 841 (9th Cir. 2012) ..................................................... 2, 3, 4, 9

*Loomis v. Cornish*,
   836 F.3d 991 (9th Cir. 2016) ............................................................. 3, 4

*Loomis v. Cornish*,
   No. CV 12-5525 ................................................................................. 3, 5

*Matthews v. Nat'l Football League Mgmt. Council*,
   688 F.3d 1107 (9th Cir. 2012) .............................................................. 7

*O'Keefe v. Ogilvy & Mather Worldwide, Inc.*,
   590 F.Supp.2d 500 (S.D.N.Y. 2008) ..................................................... 5

*Orloff v. Cleland*,
   708 F.2d 372 (9th Cir.1983) .................................................................. 7

*Rice v. Fox Broadcasting Co.*,
   330 F.3d 1170 (9th Cir. 2003) .................................................. 4, 12, 13

*Shaw v. Lindheim*,
   809 F. Supp. 1393 (C.D. Cal. 1992) .................................................... 10

*Stewart v. Wachowski*,
   574 F. Supp. 2d 1074 (C.D. Cal. 2005) ......................................... 11, 12

*Straughter v. Raymond, IV*,
   No. CV 08-2170 CAS, 2011 WL 13176750 (C.D. Cal Nov. 21,
   2011) ...................................................................................................... 8

*Straughter v. Raymond, IV*,
   No. CV 08-2170 CAS, 2011 WL 3651350 (C.D. Cal Aug. 19,
   2011) ......................................................................................... 2, 8, 9, 12

*Swirsky v. Carey*,
   376 F.3d 841 (9th Cir. 2004) .................................................. 13, 14, 15

iv

*Three Boys Music Corp. v. Bolton*,
    212 F.3d 477 (9th Cir. 2000) ................................................................2, 9, 10, 11

*Watt v. Butler*,
    457 Fed. Appx. 856 (11th Cir. 2012) .................................................................11

*Wible v. Aetna Life Ins. Co.*,
    375 F.Supp.2d 956 (C.D. Cal. 2005)...................................................................7

**Other Authorities**

Fed. R. Evid. 201 .........................................................................................................7

Fed. R. Evid. 902(6) ....................................................................................................7

v

1

2        **I.      Introduction**

3            The parties agree that plaintiffs' copyright claim hinges on proof of two

4        elements, namely, "access" and "substantial similarity." And they agree (1) that

5        plaintiffs' evidence of access focuses on the widespread dissemination of their song

6        *Joyful Noise* and (2) that the "substantial similarity" issue is to be assessed at the

7        summary judgment stage using what the Ninth Circuit has labeled the "extrinsic

8        test." They agree on little else.

9            In their motion papers, defendants gloss over or struggle to defuse disputed (and

10       undisputed) facts fatal to their motion. For example, when confronted by

11       undisputed evidence that *Joyful Noise* had been viewed or heard on YouTube and

12       MySpace almost 4 million times by 2012—numbers that easily exceed the Multiple

13       Platinum Award level of the Recording Industry of America[1]—defendants nitpick

14       that there's no evidence that each viewer listened to the entire song. (Doc. 274 (Def.

15       Mem.) at 22.) But even if we assume arguendo that all of those millions of viewers

16       stopped listening after the first 30 seconds of the song, every single one of them

17       would have heard the *Joyful Noise* ostinato at least ten times.

18           So, too, defendants try to undercut the opinions of Dr. Todd Decker, plaintiff's

19       musicologist expert and the Chair of the Music Department at Washington

20       University in St. Louis, by cherry-picking partial sentences from his reports and

21       testimony to create the false impression that he conceded that the substantial

22       similarities between the two songs "were unprotectible musical elements." (*Id.* at

23       27.) The extent of this cherry-picking is made clear in Plaintiffs' Statement of

24       Genuine Disputes of Material Facts. And while we address this matter head on in

25       Section III, below, we note here that defendants' "unprotectible elements"

26       argument is as hollow as trying to defend the infringer of a sonnet by arguing that

27       no poet can monopolize the idea of a 14-line poem or iambic pentameter or an A-B-

28       _____

         [1] See https://www.riaa.com/gold-platinum/about-awards/

A-B rhyme scheme. All true, but the issue there is whether defendants' sonnet is substantially similar to the ***original expression*** contained within that 14-line iambic pentameter sonnet with the A-B-A-B rhyme. As to that question here, Dr. Decker's answer could not be clearer.

## II.  Plaintiffs' extensive and diverse evidence of widespread dissemination of their song prior to the creation of *Dark Horse* is more than sufficient to create a genuine issue of material fact as to access.

### A.  Copyright law governing "access" evidence

"Proof of copyright infringement is often highly circumstantial, particularly in cases involving music." *Straughter v. Raymond, IV,* No. CV 08-2170 CAS (CWx), 2011 WL 3651350, at *6 (C.D. Cal Aug. 19, 2011) (*citing Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000)). "A copyright plaintiff must prove (1) ownership of the copyright; and (2) infringement—that the defendant copied protected elements of the plaintiff's work." *Three Boys*, 212 F.3d at 481. (internal citation omitted). With respect to the latter, and "[a]bsent direct evidence of copying, proof of infringement involves fact-based showings that the defendant had 'access' to the plaintiff's work and that the two works are 'substantially similar'" *Id.*

To prove access, a plaintiff must show "a reasonable possibility, not merely a bare possibility, that an alleged infringer had the chance to view the protected work." *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 846 (9th Cir. 2012) (internal quotations omitted). At times, however, "distinguishing a bare possibility from a reasonable possibility will present a close question." *Three Boys*, 212 F.3d at 482 (internal quotations omitted). Absent direct evidence of access, circumstantial evidence can be used to prove access either by (1) establishing a chain of events linking the plaintiff's work and the defendant's access, or (2) showing that the plaintiff's work has been widely disseminated." *L.A. Printex*, 676

2

F.3d at 846-47 (internal quotation omitted). Widespread dissemination is the "more successful route to proving access" in music cases. *See id.* (*citing* Paul Goldstein, *Copyright Principles, Law, and Practice* §8.3.1.1., at 91. (1989)). "The evidence required to show widespread dissemination will vary from case to case."[2] *L.A. Printex,* 676 F.3d at 847.

Plaintiffs do not submit evidence of direct copying. Consequently, Plaintiffs must offer evidence of a "reasonable possibility" that Defendants "had the chance to view" *Joyful Noise*. *L.A. Printex Indus.,* 676 F.3d at 846. Plaintiffs do so with evidence of *Joyful Noise's* widespread dissemination.

### B. Defendants cannot refute Plaintiffs' evidence of access via widespread dissemination of *Joyful Noise.*

Over the last two decades, the music industry has changed. Consumers generally no longer travel to record stores to purchase their desired album or single. Instead, they turn on their computer. Music is readily available on the internet (both for purchase and for free[3]), which the Ninth Circuit recognizes can widely disseminate content. *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1145 (9th Cir. 2009) ("we recognize the power of the internet to reach a wide and diverse audience").

Prior to the creation of *Dark Horse*, *Joyful Noise* was posted on two well-known and popular websites: Youtube.com and Myspace.com. (See Plaintiffs'

---

[2] Defendants cite *Loomis v. Cornish*, No. CV 12-5525 RSWL (JEMx), 2013 WL 6044345, at *10 (C.D. Cal. Nov. 13, 2013), which quotes an opinion from the District Court of Colorado, for the proposition that proof of widespread dissemination must be "considerable." Though Plaintiffs' evidence is considerable, Plaintiffs do not believe that this Circuit requires such a showing. *Loomis* was appealed, and nowhere in the Ninth Circuit's opinion did it hold that evidence of widespread dissemination must be "considerable." *Loomis v. Cornish*, 836 F.3d 991 (9th Cir. 2016).

[3] Defendants argue that Plaintiffs offer no evidence of sales of *Joyful Noise*. Plaintiffs are under no obligation to do so. All Plaintiffs must show is that Defendants had an opportunity to view or copy *Joyful Noise*. Whether the copy that was viewed or copied was previously purchased is irrelevant, and Defendants have cited no case law to suggest otherwise.

3

Statement of Additional Material Facts "PSOF" Nos. 32-44 and 51-56). With respect to YouTube, as of March 11, 2012 (prior to the creation of *Dark Horse*), *Joyful Noise* had been "viewed" at least **1,365,041** times.[4] (PSOF Nos. 24-44). Likewise, prior to the creation of *Dark Horse*, *Joyful Noise* had been "played" on Myspace at least **2,465,724** times. (PSOF Nos. 46-56). Thus, prior to the creation of *Dark Horse*, *Joyful Noise* had been viewed/played at least **3,830,765** times by visitors to those websites. The YouTube views and Myspace plays, both individually and collectively, constitute widespread dissemination, and are, thus, affirmative evidence of access. *See Arnstein v. Porter*, 154 F.2d 464, 469 (2d Cir. 1946) (sale of 1,000,000 copies of composition is widespread dissemination); *L.A. Printex*, 676 F.3d at 847-48 (50,000 yards of fabric sold over a four-year period constitutes widespread dissemination); *cf. Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1178 (9th Cir. 2003) (17,000 copies of video sold over 13-year period not widespread dissemination); *Jason v. Fonda*, 526 F. Supp. 774, 776–77 (C.D. Cal. 1981) (200-700 copies of work available for purchase not widespread dissemination).

Faced with this evidence of Multi Platinum numbers, Defendants appear to offer four reasons why *Joyful Noise's* YouTube and Myspace views/plays do not constitute widespread dissemination.[5] First, Defendants argue that the *mere presence* of a song online does not constitute widespread dissemination. Plaintiffs agree. Plaintiffs do not *just* allege *mere presence* of *Joyful Noise* online. Plaintiffs

---

[4] As noted in Joel Truher's Declaration, "YouTube video views reflect the approximate number of times a video has been played for actual humans." (PSOF No. 28). Google, which owns YouTube, determined the number of views for five *Joyful Noise* videos as of various dates, including March 11, 2012. (PSOF Nos. 24-44). It produced each one of those videos and provided the link to where those videos are located on YouTube. (*Id.*). Each one of those videos contains the recording of Joyful Noise, including the infringed ostinato. (*Id.*). These five videos have been lodged with the Court, in conjunction with Plaintiffs' instant opposition. (*Id.*).

[5] Defendants argue that the evidence supporting Myspace plays is inadmissible; yet, Defendants do not suggest why. The Myspace evidence is admissible, and, even if it were not, the YouTube views alone constitute more than sufficient evidence of widespread dissemination to withstand summary judgment.

4

provide undisputed evidence of the ***number*** of times the song was actually viewed/played. No cases cited by Defendants suggests that a plaintiff cannot use the internet to support its claim of widespread dissemination; they simply stand for the proposition that a plaintiff must allege more than *mere posting* of a song on the internet.[6]

*Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1106 (7th Cir. 2017) illustrates this distinction. There, the plaintiff alleged that the subject work was accessible on its website. The Seventh Circuit, however, determined that the plaintiff had not presented sufficient evidence of widespread dissemination, because it "introduced no evidence concerning its web traffic, its web search rankings, or the number of times (if any) that the [work] ha[d] been viewed or downloaded." Likewise, in *Apps v. Universal Music Grp.*, 283 F. Supp. 3d 946, 955 (D. Nevada 2017), the Court concluded that plaintiff's posting of a song on YouTube and another website did not constitute widespread dissemination because the plaintiff provided "no evidence of how many people listened to her song across the various Internet websites." Thus, the key is not whether a song was posted on the internet but whether a plaintiff has evidence of online traffic or views. Plaintiffs have provided that evidence in abundance.

Second, Defendants argue that there are other songs on YouTube that received more views in less time than *Joyful Noise*. This point is irrelevant. What matters is whether Defendants had an opportunity to access the song. The fact that a song was *more* successful or accessible does not mean Defendants *did not* have an opportunity to view or copy *Joyful Noise*. Defendants faulty reasoning would apply equally to sales of music. The fact that there are *Platinum* records, does not mean

---

[6] *See Arnett v. Jackson*, No. 5:16-CV-872-D, 2017 WL 3493606, at *2 (E.D. N.C. Aug. 14, 2017); *Hayes v. Keys*, No. CV 14-6246 PA (JEMx), 2015 WL 12734010, at *2 (C.D. Cal. Jan. 7, 2015); *Loomis*, 2013 WL 6044345, at *12; *Hayes v. Minaj*, No. 2:12-cv-07972-SVW-SH, 2012 WL 12887393, at *3 (C.D. Cal. Dec. 18, 2012) (same); *Batts v. Adams*, No. CV-10-8123-JFW (RZx), 2011 WL 13217923, at *4 (C.D. Cal. Feb. 8, 2011); *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F.Supp.2d 500, 515 (S.D.N.Y. 2008).

1  that *Gold* records were not widely disseminated.

2  Third, Defendants argue that YouTube's "views" and MySpace's "plays" are

3  "inherently meaningless," because they do not prove that someone actually listened

4  to the song. This argument, even if true, ignores the well-settled law that access can

5  be proven circumstantially. Indeed, this is the very type of evidence that Courts

6  require in internet-based widespread dissemination cases. *See Design Basics, LLC*,

7  858 F.3d at 1106; *Apps*, 283 F. Supp. 3d at 955. Moreover, the same tenuous

8  argument could just as easily be made to challenge the validity of record sales,

9  which have long been used to prove widespread dissemination: just because an

10  album sold ten copies, does not mean ten people actually listened to it. And, even if

11  we were speculate that maybe the actual views/plays were, say, just 80% of the

12  total view, that lower number—still more than 2 million—would nevertheless

13  constitute widespread dissemination sufficient to withstand summary judgment.

14  But any such speculation cannot survive the Declaration of Joel Truher of

15  Google (PSOF Nos. 24-44), who declares that YouTube's "views" ***do*** represent a

16  legitimate means of measuring the plays of *Joyful Noise* on YouTube. Google,

17  which owns YouTube, "takes proprietary measures to improve the accuracy of

18  video view counts so that these numbers better reflect 'quality views,'" and

19  "[v]ideo views are algorithmically validated using proprietary means." (PSOF Nos.

20  29-30). Moreover, it is a violation of YouTube's terms of service to manipulate

21  view counts. (PSOF No. 31).

22  Finally, Defendants argue that "they do not search for, much less listen to music

23  within the Christian hip-hop genre, including online." With respect to YouTube,

24  one does not have to *search* for "Christian hip-hop" to retrieve *Joyful Noise*. One

25  can be provided with a direct link to YouTube videos, one can search by title, artist,

26  description or category, and YouTube itself even recommends videos to its users.

27  (PSOF Nos. 24-44).

28  With respect to genre, *Joyful Noise* is not categorized under "Christian hip-hop"

online. As the Court can verify by viewing the YouTube links included within the Truher Declaration (and separately lodged with the Court on a CD), when one clicks on the "show more" link under the five respective *Joyful Noise* videos, they are all categorized as "music"—not Christian Hip Hop.[7] (PSOF No. 45). Likewise, on Amazon.com (https://www.amazon.com/Joyful-Noise/dp/B0013TQMEA),[8] *Joyful Noise* is categorized under "Rap & Hip-Hop"—not Christian Hip-Hop.[9] (PSOF No. 57).

Moreover, there is nothing religious, let alone Christian, about the subject ostinato—the infringed portion of *Joyful Noise*. Plaintiffs are not arguing that Defendants infringed the Christian lyrics in *Joyful Noise*, and, importantly, the infringed ostinato plays immediately (and repeatedly) after the song begins—well prior to any religious lyrics. Even if Defendants do not listen to Christian music, they would hear the ostinato long before discovering the song's religious subject matter.

Finally, the individual Defendants in their Declarations do not say that they never listen to "Christian hip-hop." They cleverly say that doing so is not their "practice." Katy Perry's Declaration is even more diluted. She says that, *since 2002*, it is not her "practice" to listen to or search online for Christian hip-hop music. This, presumably, is because she was, at one time, a Christian artist. *See* https://www.rollingstone.com/music/music-news/flashback-katy-perry-performs-

---

[7] MySpace does not appear to categorize songs at all.

[8] The Court can and should take judicial notice of Amazon's website. *See* Fed. R. Evid. 201; *Matthews v. Nat'l Football League Mgmt. Council*, 688 F.3d 1107, 1113 (9th Cir. 2012) (judicial notice of player statistics on NFL.com website); *Wible v. Aetna Life Ins. Co.*, 375 F.Supp.2d 956, 965-966 (C.D. Cal. 2005) (judicial notice of two Amazon website printouts).

[9] Notably, Defendant Jordan Houston (Juicy J) is a "hip-hop veteran." *See* https://www.nytimes.com/2013/09/01/arts/music/juicy-j-on-ambitions-younger-rappers-and-strip-clubs.html. (PSOF No. 58). Newspapers or periodicals are self-authenticating. Fed. R. Evid. 902(6); *Orloff v. Cleland*, 708 F.2d 372, 378 n. 6 (9th Cir.1983); *Enfish, LLC v. Microsoft Corp.*, No. 2:12-cv-7360-MRP-MRWx, 2014 WL 12585801, at *4 fn 3 (C.D. Cal. Mar. 31, 2014). To the extent the Court deems it necessary, Plaintiffs also hereby request that the Court take judicial notice of this New York Times article under Fed. R. Evid. 201.

search-me-on-christian-tv-45228/. (PSOF Nos. 59-62).[10]

Nonetheless, *Joyful Noise's* YouTube views and MySpace plays are not Plaintiffs' only evidence of widespread dissemination. The album *Our World Redeemed,* which included *Joyful Noise*, debuted at #5 on the Billboard Gospel Chart and reached #1 on the Christian Music Trade Association (CMTA) R&B/Hip Hop Chart. (PSOF Nos. 5-7).[11] While it was the album, and not the song, that debuted on the charts, this Court has previously held that is a distinction without a difference. *Straughter v. Raymond*, *IV*, No. CV 08-2170 CAS (CWx), 2011 WL 13176750, at *3 (C.D. Cal Nov. 21, 2011) ("it is of little consequence that the charts on which the Court relied reflect the position of the Album rather than the position of [the song] itself. This is so because by virtue of appearing on the Album, [the song] was necessarily disseminated at least as widely as the Album.").

Additionally, from 2008 thru 2012, Plaintiff Gray performed *Joyful Noise* at more than approximately 200 concert venues nationwide (PSOF Nos. 4, 14-20), including Southern California where many Defendants reside or maintain offices.[12] During many of his tour stops, Gray was interviewed by local radio and television stations, and *Joyful Noise*—or at least an excerpt from the song—was played during those interviews. (PSOF Nos. 19-20). *See Straughter,* 2011 WL 13176750, at *3 (even "limited radio airplay" suggests more than a "bare possibility" of access). (Gray Decl. and Gray Decl., Ex. A.). In addition to Gray, non-party Lecrae Moore performed *Joyful Noise* at most of his more than seventy nationwide concerts (including in Southern California) from Spring 2009 through 2012. (PSOF Nos. 21-23).

---

[10] As with the article cited in Footnote 9, this periodical is self-authenticating. To the extent the Court deems it necessary, Plaintiffs also request that the Court take judicial notice of the same.
[11] The Court can take, and has previously taken, judicial notice over music charts. *See Straughter,* 2011 WL 3651350, at *12.
[12] *See* PSOF No. 67 (Answers to the Third Amended Complaint (Doc. 172) of Defendants Perry (Doc. 187 ¶8), Gottwald (Doc. 208 ¶ 12), Walter (Doc. 211 ¶ 14), Hudson (Doc. 209 ¶ 15), and Houston (Doc. 207 ¶10)).

8

*Joyful Noise* and *Our World Redeemed* were also nominated for several prestigious awards. *Cf. Guzman v. Hacienda Records and Recording Studio, Inc.*, 808 F.3d 1031, 1038 (5th Cir. 2015) (no widespread dissemination where plaintiff introduced no independent evidence to corroborate popularity song, such as awards or billboard charts). For example, in January 2009, *Our World Redeemed* was a nominee for Rap/Hip Hop Gospel Album of the Year at the Stellar Award Show held at the Grand Ole Opry in Nashville, Tennessee. (PSOF No. 8). In February 2009, it was a nominee for Best Rock or Rap Gospel Album at the 51st Annual Grammy Awards Show—the same Grammy's at which Defendant Perry performed. (PSOF Nos. 9-11).  And in April 2009, *Joyful Noise* was a nominee for the Best Rap/Hip Hop Song of the Year at the 40th GMA Dove Awards, which was televised live from the Grand Ole Opry in Nashville, Tennessee. (PSOF Nos. 12-13).

Defendants argue that Plaintiffs have no evidence to counter their assertions that they had not heard of *Joyful Noise* prior to the creation of *Dark Horse* and that they do not attend Christian hip-hop concerts. If Defendants are suggesting that Plaintiffs do not have the proverbial smoking gun (i.e., a video of one of the Defendants listening to the song), they are correct. But Plaintiffs need not have direct evidence of copying to prove access. As noted above, "[p]roof of copyright infringement is often highly circumstantial, particularly in cases involving music." *Straughter,* 2011 WL 3651350 at *6. (internal citations omitted).

Defendants are rarely going to admit that they listened to a song prior to infringing upon it. Consequently, access may be proven through circumstantial evidence. *L.A. Printex,* 676 F.3d at 846-47. And, even if it were true that Defendants do not recall hearing *Joyful Noise*, this Circuit recognizes the theory of "subconscious copying." *Three Boys*, 212 F.3d at 482-83. ("Everything registers somewhere in our memories, and no one can tell what may evoke it. Once it appears that another has in fact used the copyright as the source of this production,

9

he has invaded the author's rights. It is no excuse that in so doing his memory has played him a trick.").

Relatedly, Defendants appear to take the position that, because their purported evidence of independent creation is "unrebutted," they are entitled to summary judgment. This is both factually and legally untrue. Defendants cite no case from this Circuit indicating that they are entitled to summary judgment merely by offering self-serving statements of independent creation. "[A] copyright infringement action depends upon whether the defendant copied from the plaintiff, or whether he independently created his composition. Any evidence pertaining to the manner in which the defendant created his composition is logically relevant: his training, the subject matter of the art, his access to other works or to the plaintiff's composition." *Granite Music Corp. v. United Artists Corp.*, 532 F.2d 718, 720 (9th Cir. 1976). The factfinder is entitled to weigh Defendants' proclamation of independent creation against, among other things, Defendants' access to the *Joyful Noise*. Where there is evidence of access and substantial similarity, whether a work was independently created is an issue for the jury. *Three Boys*, 212 F.3d at 486. ("The substantial evidence of copying based on access and substantial similarity was such that a reasonable juror could reject [the independent creation] defense."); *Shaw v. Lindheim*, 809 F. Supp. 1393, 1402 (C.D. Cal. 1992) ("independent creation" is merely "an alternative reason" for two songs' similarities).

Moreover, in this matter, aside from the evidence of access noted above and substantial similarity noted below, Plaintiffs' expert also opines that the similarities between *Joyful Noise* and *Dark Horse* suggest that *Dark Horse* was not independently created:

> "In my view, the ostinato in *Dark Horse* clearly borrows a memorable and highly characteristic combination of discrete and specific musical elements heard in *Joyful Noise*. Given the important structural function and expressive use of the ostinato in *Dark Horse*, *Joyful Noise* can be

10

1  said to have provided essential and highly characteristic musical

2  materials for *Dark Horse*."

3  (PSOF No. 64).

4      Thus, even if Defendants truly believed that *Dark Horse* was a product of

5  independent creation, the extensive and varied evidence of widespread

6  dissemination of *Joyful Noise* is more than sufficient to support a jury finding of

7  subconsciously copying. *Three Boys*, 212 F.3d at 482-83, 486.[13]

8      Defendants other precedents are equally inapposite. They cite *Watt v. Butler*,

9  457 Fed. Appx. 856 (11th Cir. 2012), in support of their argument. However, the

10  Ninth Circuit law on this issue is clear, so there is no need look elsewhere.

11  Nonetheless, *Watt* is distinguishable. In *Watt*, unlike here, the evidence of access

12  was "too speculative and conjectural," and was insufficient to create a presumption

13  of access. *Id.* at 859. Thus, because there was no presumption of access to rebut, the

14  defendants evidence of independent creation supported summary judgment. *Id.*

15  Moreover, even in the Eleventh Circuit, evidence of independent creation does not

16  defeat, as a matter of law, probative evidence of access. *See e.g., Cornerstone*

17  *Home Builders, Inc. v. McAllister*, 303 F. Supp. 2d 1317, 1320-21 (M.D. Fla. 2004)

18  (Courts may consider access and substantial similarity when evaluating self-serving

19  statements of independent creation.).

20      So, too, *Stewart v. Wachowski*, 574 F. Supp. 2d 1074 (C.D. Cal. 2005) is also

21  inapt. Nowhere in *Stewart* does the Court hold that evidence of independent

22  creation trumps evidence of access or substantial similarity. There, the defendants

23  offered evidence of independent creation, and the Court determined that, coupled

24  with plaintiffs' admissions regarding lack of access (and lack of any other non-

25  speculative evidence of access), the defendants were entitled to summary judgment.

26

27  _____

[13] Indeed, Defendant Gottwald (p/k/a Dr. Luke) conceded, in an interview Dr. Decker quotes, that

28  he listens widely and prefers to delay finishing projects for as long as possible, "because I might

hear something I like over the weekend." (PSOF No. 66).

11

*Id.* at 1085-98. Here, Plaintiffs do not admit that the Defendants did not have access to Joyful Noise or that Defendants independently created Dark Horse, and Plaintiffs have offered substantial, affirmative and probative evidence of access and substantial similarity.

In short, "drawing all reasonable inferences in the light most favorable to [P]laintiff[s]," there is a "reasonable possibility that [D]efendants had access to" *Joyful Noise*. *Straughter,* 2011 WL 3651350, at *12 (billboard chart numbers alone can constitute a reasonably probably of access). There is nothing "speculative" or "bare" about the number of plays of *Joyful Noise* or its widespread dissemination through concerts, billboard charts, and awards.[14]  The fact that *Joyful Noise* was not as popular as some of today's mega-hits does not mean that defendants did not have an opportunity to view or to copy it.

**III.    Plaintiffs' musicologist expert has provided more than sufficient evidence to permit a trier of fact to find that he has satisfied the "extrinsic" test for substantial similarity.**

As the Ninth Circuit explained in its oft-cited opinion in *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1174 (9th Cir. 2003) (citation omitted)

> To determine whether two works are substantially similar, a two-part analysis — an extrinsic test and an intrinsic test — is applied. "For summary judgment, only the extrinsic test is important." "[A] plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests."

And this extrinsic test, the Court goes on to explain, "is an objective measure of the

---

[14] Defendants contend that Plaintiff must provide evidence that the song has obtained ubiquity. In support of that position, they cite *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988 (2d. Cir. 1983). That case does not support Defendants' position. While the subject song, a George Harrison song, was extremely well-known and popular, nowhere in *ABKCO* does the Court suggest that is a requirement for proving widespread dissemination. The word "ubiquity" is never even used.

articulable similarities" between the protectible elements of the two works. *Id.*

As this Court can tell, the musicologists here disagree on several points. For example, Defendant's expert, Dr. Lawrence Ferrara, criticizes Plaintiffs' expert, Dr. Todd Decker, for his decision to depict the pitch content of the two songs by way of scale degrees instead of musical notations.  In his 46-page Rebuttal Report (Wais Decl. Ex. 10 (Doc 282-1), Dr. Decker criticizes Dr. Ferrara's notation methodology in great detail, explaining, among other things, that Dr. Ferrara's "entire argument against similarity in this case relies on an inappropriate model of compositional process and analysis that is derived from analytical scholarship devoted to a narrow sort of classical music (the Austro-Germanic tradition) and that is fundamentally unsuited to popular music and, indeed, not used for the analysis of popular music by publishing academics in the field of music scholarship." (*Id.* Doc. 282-1 at 7.)

Dr. Decker details numerous flaws and biases in Dr. Ferrara's transcriptions of various other songs—flaws that all flow from what Dr. Decker describes as Dr. Ferrara's "organicist, goal-oriented approach to musical form that was developed to describe Austro-Germanic classical music of the eighteenth, nineteenth, and early twentieth centuries." (*Id.*)

Nevertheless, defendants try to parlay this disagreement, coupled with various cherry-picked partial quotes from Professor Decker's reports and depositions, to support their assertion that "Dr. Decker failed to properly apply the methodology of the extrinsic test." (Doc. 274 at 26.) But defendants' argument ignores the Ninth Circuit's directives in *Swirsky v. Carey*, 376 F.3d 841, 849 (9th Cir. 2004), where that Court emphasized that "[i]n analyzing musical compositions under the extrinsic test, we have never announced a uniform set of factors to be used. We will not do so now." The Court went on to instruct that music "is not capable of ready classification into only five or six constituent elements; music is comprised of a large array of elements, some combination of which is protectible by copyright." (*Id.*)

13

And that is precisely what Dr. Decker has done in his analysis of the ostinatos in the two songs. Specifically, applying the objective extrinsic test, he identified and discussed in detail the following seven substantial similarities between the two songs:

1. <u>Descending ostinato</u>. A descending ostinato (or repeating) figure which serves as the primary formal building block for both songs;

2. <u>Phrase Length</u>.The ostinatos in both songs are identical in phrase length;

3. <u>Rhythm</u>. The ostinatos in both songs are identical in rhythm;

4. <u>Pitch Content</u>. The ostinatos in both songs are nearly identical in pitch content (i.e., scale degrees) and melodic contour (descending in the same pattern);

5. <u>Overlapping Musical Domains</u>. The above overlapping musical domains, which occur in identical combination in both tracks, present substantial and significant similarities;

6. <u>Timbre</u>. The timbre of the upper and primary voice in the ostinatos in both songs is remarkably similar; and

7. <u>Texture</u>. The ostinatos in both songs are placed in a melodic treble voice, i.e., neither functions as a bassline. This melodic nature of the ostinato is especially noteworthy since ostinatos across Western music history most often take the form of basslines which organize cyclical harmonic motion.

(PSOF No. 63)

In their attempt to chip away at these conclusions, defendants try to shift the focus from the actual expression of the music to the underlying components in which that expression was created. For example, defendants' Statement of Fact #100 triumphantly asserts that Dr. Decker "admits that 'patterns of two-bar units of eight beats' are 'quite common'" and "that 'a great many composers of contemporary bean-driven pop music have used two-bar units of eight beats in

14

length." (Doc. 273-1 at 24.) True. While we readily agree with the obvious—e.g., that no composer can monopolize the idea of an 8-note 2-bar phrase—you don't need Dr. Decker's Ph.D. in musicology or his extensive scholarly writings on popular music to grasp that copyright law protects countless 8-note 2-bar ostinatos, including, for example, the simple but distinctive 8-note 2-bar ostinato that opens and repeats throughout the Rolling Stones song "(I Can't Get No) Satisfaction."[15]

The same is true for the distinctive 8-note 2-bar ostinato that opens and repeats throughout *Joyful Noise*. Both ostinatos are original, distinctive, and protected by copyright. Like the iambic pentameter and the A-B-A-B rhyme pattern that no sonnet poet can monopolize, the question of copyrightability hinges upon the ***original expression*** of those components.

Again, as the Ninth Circuit emphasized in *Swirsky v. Carey*, *supra* at 849, after listing more than a dozen different potential components of musical compositions (including all the ones Dr. Decker identified):

> "There is no one magical combination of these factors that will automatically substantiate a musical infringement suit; each allegation of infringement will be unique. So long as the plaintiff can demonstrate, through expert testimony that addresses some or all of these elements and supports its employment of them, that the similarity was "substantial" and to "protected elements" of the copyrighted work, the extrinsic test is satisfied."

Finally, Dr. Decker's Rebuttal Report includes a detailed 21-page analysis and refutation of the purported similarities in Dr. Ferrara's collection of allegedly

---

[15]



(I Can't Get No) Satisfaction
The Rolling Stones

15

similar prior music materials. (Wais Decl. Ex. 8 (Decker Rebuttal Report), Doc. 282-1 at 25-46) Indeed, the only one of all of Dr. Ferrara's collection that, in Dr. Decker's words, "would superficially seem to hold some promise as an example of prior art similar to the particular notes, durations, and iterative patterns in the ostinatos at issue" is *Gangsta's Paradise*. (*Id.* at 45.) He then performs a classic extrinsic analysis of the two songs, including a table comparing the pitch content and scale degrees of that song to *Joyful Noise* and *Dark Horse*. (*Id.* at 45-46.) His expert conclusion: "Review of the ostinato in 'Gangsta's Paradise' only serves to heighten the unusual and very similar nature of the ostinatos at issue in this case." (*Id.* at 46.)

In short, Dr. Decker's 21-page analysis of Dr. Ferrara's examples underscores the originality of the ostinato in *Joyful Noise*. And again, as the Ninth Circuit reminds us in *Swersky*, *supra* at 851 (citations omitted):

> In this circuit, the definition of originality is broad, and originality means "little more than a prohibition of actual copying." All that is needed to satisfy originality is for the author to contribute "something more than a 'merely trivial' variation." [Defendant] argues that the first measure of [plaintiff's] chorus is not original because it is "substantially similar" to the first measure of [the song "For He's a Jolly Good Fellow"]. The two measures may share the same pitch sequence, but they are not identical in meter, tempo, or key. There is, therefore, a triable issue whether there are more than "merely trivial" differences between the two works.

And that is precisely the case here. As Dr. Decker's Rebuttal Report makes clear, there are far more than "merely trivial" differences between *Joyful Noise* and Dr. Ferrara's hodgepodge of purported examples of prior art. Indeed, even Dr. Ferrara admitted that the ostinato in *Joyful Noise* is "distinctive and memorable." (PSOF 65).

16

1  **IV.     Conclusion**

2       Accordingly, Defendants' motion for summary judgment should be denied.

3

4                                    Respectfully submitted

5  Dated: July 16, 2018              /s/Michael A. Kahn
6                                    Michael A. Kahn (pro hac vice)
                                     kahn@capessokol.com
7                                    Drey A. Cooley (pro hac vice)
                                     cooley@capessokol.com
8                                    CAPES SOKOL GOODMAN & SARACHAN PC
9                                    7701 Forsyth Blvd., 12th Floor
                                     St. Louis, Missouri 63105
10                                    Tel:  (314) 721-7701

11

12                                    Eric F. Kayira (pro hac vice)
                                     eric.kayira@kayiralaw.com
13                                    KAYIRA LAW, LLC
                                     200 S. Hanley Road, Suite 208
14                                    Clayton, Missouri 63105
                                     (314) 899-9381
15
                                     Daniel R. Blakey (SBN 143748)
16                                    blakey@capessokol.com
                                     CAPES SOKOL
17                                    3601 Oak Avenue
                                     Manhattan Beach, CA 90266
18

19                                    ***Attorneys for Plaintiff***

20

21

22

23

24

25

26

27

28