CHRISTINE LEPERA (*pro hac vice*)
    ctl@msk.com
JEFFREY M. MOVIT (*pro hac vice*)
    jmm@msk.com
JACOB D. ALBERTSON (*pro hac vice*)
    j1a@msk.com
MITCHELL SILBERBERG & KNUPP LLP
12 East 49th Street, 30th Floor
New York, New York 10017-1028
Telephone: (212) 509-3900
Facsimile: (212) 509-7239

AARON M. WAIS (SBN 250671)
    amw@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA  90064-1683
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Defendants Capitol Records
LLC, Jordan Houston, Lukasz Gottwald,
Sarah Theresa Hudson, Karl Martin Sandberg,
Henry Russell Walter, UMG Recordings, Inc.,
Universal Music Group, Inc., WB Music
Corp., Kobalt Music Publishing America,
Inc., and Kasz Money, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| MARCUS GRAY (p/k/a FLAME), et al., <br><br> Plaintiffs, <br><br> v. <br><br> KATHERYN ELIZABETH HUDSON (p/k/a KATY PERRY), et al., <br><br> Defendants. | CASE NO. 2:15-cv-05642-CAS JCx <br><br> Honorable Christina A. Snyder <br><br> **DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** <br><br> Date:   August 13, 2018 <br> Time:   10:00 a.m. <br> Ctrm:   8D – 8th Fl., First Street <br><br> Filed:   July 1, 2014 <br> Trial:   February 26, 2019 |

# **TABLE OF CONTENTS**

**Page**

I.   PRELIMINARY STATEMENT ....................................................................6

II.  PLAINTIFFS' CLAIM OF COPYRIGHT INFRINGEMENT FAILS AS
     A MATTER OF LAW. ...........................................................................7

     A.   Plaintiffs Have Not Raised A Triable Issue Of Fact On The
          Essential Element Of Access. ........................................................7

          1.   The Access Requirement. ......................................................7

          2.   Plaintiffs Concede That They Have No Evidence Of Direct
               Or Chain Of Events Access. ...................................................8

          3.   Plaintiffs Fail To Present A Triable Issue Of Fact With
               Respect To Widespread Dissemination. ...................................8

               a.   Plaintiffs concede there is no evidence of sales of
                    "Joyful Noise." .............................................................10

               b.   Plaintiffs' purported evidence of radio and television
                    play fails to raise a genuine issue of material fact. ........10

               c.   Plaintiffs' Internet "views" and "plays" do not
                    support a reasonable inference of access. ......................11

               d.   Plaintiffs have failed to raise a material issue of fact
                    as to saturation in a relevant market. .............................15

               e.   Gray and Lecrae's purported concerts do not support
                    a reasonable inference of access. ...................................19

     B.   Plaintiffs Have Not Raised A Triable Issue Of Fact On The
          Essential Element Of Substantial Similarity. ...................................21

          1.   Plaintiffs Fail To Satisfy The Extrinsic Test. ..........................21

               a.   The extrinsic test is concerned only with substantial
                    similarity of protected elements. ...................................21

               b.   Plaintiffs cannot dispute that Dr. Decker did not
                    transcribe the allegedly similar elements of "Joyful
                    Noise" and "Dark Horse." ..............................................22

2

c. Plaintiffs cannot dispute the universe of the alleged similarities identified by Dr. Decker. ............................23

d. Plaintiffs cannot rebut Dr. Decker's admissions that his identified similarities are common. ..........................24

e. Plaintiffs fail to dispute that Dr. Decker failed to filter out these admittedly non-protectable elements. ....26

2. Plaintiffs Cannot Dispute That Dr. Decker Improperly Opined On The Intrinsic Test. ..................................27

3. There Is No "Battle of the Experts" Between Dr. Decker and Dr. Ferrara. ...................................................28

III. CONCLUSION ..............................................30

Mitchell
Silberberg &
Knupp LLP

3

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*Arnstein v. Porter*,
   154 F.2d 464 (2d Cir. 1946) ................................................................. 13

*Batts v. Adams*,
   No. CV 10-8123-JFW, 2011 U.S. Dist. LEXIS 161402 (C.D. Cal.
   Feb. 8, 2011) ................................................................................. 11, 14

*Benay v. Warner Bros. Entm't, Inc.*,
   607 F.3d 620 (9th Cir. 2010) ............................................................... 21

*Cavalier v. Random House*,
   297 F.3d 815 (9th Cir. 2002) .............................................21, 26, 27, 28

*F.T.C. v. Neovi, Inc.*,
   604 F.3d 1150 (9th Cir. 2010) ............................................................. 10

*Gable v. Nat'l Broad. Co.*,
   727 F. Supp. 2d 815 (C.D. Cal. 2010) .............................................. 7, 9

*Grove City Veterinary Serv., LLC v. Charter Practices, Intl., LLC*,
   No. 3:13-cv-2276-AC, 2016 U.S. Dist. LEXIS 52646 (D. Or. Apr.
   19, 2016) ............................................................................................. 23

*Guzman v. Hacienda Records & Rec. Studio, Inc.*,
   No. 6:12-CV-42, 2014 U.S. Dist. LEXIS 169746 (S.D. Tex. Dec.
   9, 2014) ............................................................................................... 20

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.*,
   676 F.3d 841 (9th Cir. 2012) .................................................... 16, 17, 18

*Loomis v. Cornish*,
   836 F.3d 991 (9th Cir. 2016) ......................................................*passim*

*Loomis v. Cornish*,
   No. 12-5525, 2013 U.S. Dist. LEXIS 162607 (C.D. Cal. Nov. 13,
   2013) ........................................................................................ 9, 11, 20

*Repp v. Webber*,
   947 F. Supp. 105 (S.D.N.Y. 1996) ..................................................... 13

DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Rice v. Fox Broadcasting Co.*,
    330 F.3d 1170 (9th Cir. 2008) ........................................................... 13

*Riel v. Warden*,
    No. CIV S-01-0507 LKK KJM, 2010 U.S. Dist. LEXIS 122872
    (E.D. Cal. Nov. 4, 2010) ................................................................... 23

*Straughter v. Raymond*,
    No. CV 08-2170 CAS (CWx), 2011 U.S. Dist. LEXIS 93068 (C.D.
    Cal., Aug. 19, 2011) ............................................................. 16, 17, 18

*Swirsky v. Carey*,
    376 F.3d 841 (9th Cir. 2004) .................................................*passim*

*Three Boys Music Corp. v. Bolton*,
    212 F.3d 477 (9th Cir. 2000) ................................................ 16, 17, 30

*Unicolors, Inc. v. NB Brother Corp.*,
    No. CV 16-02268-MWF (JPRx), 2017 U.S. Dist. LEXIS 163976
    (C.D. Cal. Oct. 3, 2017) .................................................................... 13

*Unicolors, Inc. v. Urban Outfitters, Inc.*,
    No. CV 14-01029 SJO, 2015 U.S. Dist. LEXIS 187585 (C.D. Cal.
    Feb. 17, 2015) .................................................................................. 13

*Watt v. Butler*,
    457 F. App'x 856 (11th Cir. 2012) .................................................... 30

**OTHER AUTHORITIES**

Federal Rules of Civil Procedure
    Rule 26(a)(2)(D)(ii) .......................................................................... 23

Mitchell
Silberberg &
Knupp LLP

## I.      PRELIMINARY STATEMENT

Plaintiffs' Opposition ("Opp.") fails to present any affirmative, admissible evidence raising a triable issue of material fact regarding either of the essential elements of access and substantial similarity.[1]

As to **access**, Plaintiffs come nowhere close to being able to prove a *reasonable possibility* that a Dark Horse Writer heard "Joyful Noise" prior to creating "Dark Horse."  Plaintiffs concede that there is no evidence of direct access or a chain of events leading to access to "Joyful Noise."  Instead, Plaintiffs rely solely on the so-called "widespread dissemination" of "Joyful Noise" to argue that a jury could infer access.  Plaintiffs' theory finds no support in fact.  Plaintiffs rely essentially exclusively on the purported fact that "Joyful Noise" was streamed about 4 million times over four years on the YouTube and Myspace websites (containing an almost infinite number of works), proudly asserting that this number of online "views" make "Joyful Noise" a Recording Industry Association of America ("RIAA") "multi-platinum" song.  That assertion is objectively false.  The RIAA standards Plaintiffs rely on not only contradict this assertion, they establish as an undisputed fact that the RIAA calculates each "stream" as *the equivalent of 1/150 sales*.  Plaintiffs streaming statistics in no way qualify for multi-platinum status.  Instead, under RIAA standards, Plaintiffs' 4 million views are no more than the equivalent of a few thousand sales in the expansive universe of the Internet.  Plaintiffs also can find no support in the law, so they impermissibly try to conflate different access theories to minimize their burden.  For example, Plaintiffs try to equate the circumstances here with cases involving saturation in a niche market in which both plaintiff and defendant participated.  No such comparison can be made as it is undisputed that Plaintiffs and Defendants operated in far different musical universes.  *Infra*, pp. 7-20.

---

[1] Defined terms have the same meaning as stated in Defendants' motion papers.

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

As to **substantial similarity**, Plaintiffs agree that the focus here is the extrinsic test—but they fail to satisfy it as a matter of law.  It is well-settled that the extrinsic test only considers the substantial similarity of *protected elements* of the work in question, but Plaintiffs cannot plausibly rebut that Dr. Decker failed to filter out the unprotected elements of "Joyful Noise."  Indeed, Plaintiffs cannot overcome Dr. Decker's admissions that *all* of his claimed similarities are commonplace elements.  Finally, Plaintiffs do not even attempt to rebut that Dr. Decker improperly applied the intrinsic test in rendering his subjective opinions by comparing the sound of the recordings. *Infra*, pp. 21-30.

In sum, summary judgment should be granted in favor of Defendants.

## II.   PLAINTIFFS' CLAIM OF COPYRIGHT INFRINGEMENT FAILS AS A MATTER OF LAW.

### A.   Plaintiffs Have Not Raised A Triable Issue Of Fact On The Essential Element Of Access.

#### 1.   The Access Requirement.

Plaintiffs agree that it is their burden to bring forth affirmative, admissible proof that the Dark Horse Writers had a reasonable possibility—not merely a bare possibility—of hearing "Joyful Noise" prior to creating "Dark Horse."  Opp., pp. 2-3.  *See also Loomis v. Cornish,* 836 F.3d 991, 994-95 (9th Cir. 2016).  To do so, Plaintiffs must submit "significant, affirmative, and probative evidence supporting [their] claim of access."  *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 824 (C.D. Cal. 2010), *aff'd* 438 F. App'x 587 (9th Cir. 2011).  The access requirement can be satisfied either by proof of direct access or circumstantially "either by (1) establishing a chain of events linking the plaintiff's work and the defendant's access, or (2) showing that the plaintiff's work has been widely disseminated." *Loomis*, 836 F.3d at 995.  As set forth below, Plaintiffs cannot meet their burden of proof as to this requirement.

### 2. Plaintiffs Concede That They Have No Evidence Of Direct Or Chain-Of-Events Access.

In their Motion, Defendants made a *prima facie* showing that Plaintiffs have not alleged and cannot prove direct access or a chain of events leading to access to "Joyful Noise."  In Opposition, Plaintiffs concede, as they must in light of the undisputed evidence, that they have no evidence whatsoever of a Dark Horse Writer having direct access to "Joyful Noise."  Opp., p. 3 ("Plaintiffs do not submit evidence of direct copying."); Defendants Memorandum in Support of Summary Judgment ("Mtn."), pp. 16-17 (summarizing undisputed material facts).  Plaintiffs also tacitly concede, as the undisputed evidence mandates, that they have no evidence of a chain of events by which a reasonable jury could infer access.  Opp., p. 3 (addressing only the purported circumstantial proof of "widespread dissemination"); Mtn., pp. 16-17 (summarizing undisputed material facts).  Critically, Plaintiffs do not dispute that they have not met the Dark Horse Writers, the Dark Horse Writers never received any music from Plaintiffs or Lecrae or attended their concerts, and never heard them being interviewed on television or radio.  Plaintiffs' Statement of Genuine Disputes, Dkt. No. 287 ("Pls. Stmt.") Nos. 45-48, 77-80, 87, 90-91.  They concede that the Dark Horse Writers do not write Christian hip-hop music or follow charts that track that genre of music, do not search for Christian hip-hop on sites such as YouTube and Myspace, and do not watch awards shows dedicated to Christian hip-hop.  *Id.* Nos. 50, 54, 58.  Plaintiffs therefore cannot rely on a direct or chain-of-events theory to prove access.

### 3. Plaintiffs Fail To Present A Triable Issue Of Fact With Respect To Widespread Dissemination.

Plaintiffs' *sole* theory of access is that "Joyful Noise" was so widely disseminated that a jury could reasonably infer access.  Opp., p. 3.  Plaintiffs claim widespread dissemination is provable because (i) "Joyful Noise" garnered a few million "views" or "plays" on YouTube and Myspace between 2008 and March

2012; (ii) Gray and Lecrae supposedly performed "Joyful Noise" in concerts during this same time period; and (iii) "Joyful Noise" and the album on which it appeared, *Our World Redeemed*, received critical acclaim and charted in the Christian hip-hop community.  Plaintiffs are wrong.

Plaintiffs completely ignore the law of this Circuit respecting "widespread dissemination," and try to turn this high standard into a low-level one that can be easily satisfied.  As explained in Defendants' Motion, evidence of "widespread dissemination" does not prove that a defendant did, in fact, hear the plaintiff's musical work but, instead, is used to *infer* there is a "*reasonable* possibility, not merely a barely possibility," that the defendant heard the work.  *Loomis*, 836 F.3d at 995, quoting *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009) (emphasis added). "In most cases, the evidence of widespread dissemination centers on the degree of a work's commercial success and on its distribution through radio, television, and other relevant mediums." *Id*. (collecting cases).  The Ninth Circuit also recognizes a "doctrinal variant that focuses on saturation in a relevant market in which both the plaintiff and the defendant participate."  *Id*. at 997-98 (citing cases).  In all events, "the public dissemination necessary to infer that a defendant might have had access to the work is *considerable*." *Loomis v. Cornish*, No. 12-5525, 2013 U.S. Dist. LEXIS 162607, at *41 (C.D. Cal. Nov. 13, 2013) (emphasis added), *aff'd Loomis*, *supra*, 836 F.3d 991, quoting *McRae v. Smith*, 968 F. Supp. 559, 564 (D. Colo. 1997).[2]

---

[2] Plaintiffs argue that the district court in *Loomis* erred in requiring "considerable" evidence of widespread dissemination, arguing that the Ninth Circuit did not use the word "considerable" to describe plaintiff's burden in affirming the district court's holding. Opp., p. 3, n. 2.  More salient, however, is that the Ninth Circuit affirmed the district court and, in doing so, did not disagree with the district court's recitation of the evidence necessary.  Other courts have also held similarly. *See, e.g.*, *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 824 (C.D. Cal. 2010), *aff'd* 438 F. App'x 587 (9th Cir. 2011) (a plaintiff bears the burden to adduce "'*significant*, affirmative and probative' evidence supporting [its] claim of access") (emphasis added).

### a.    Plaintiffs concede there is no evidence of sales of "Joyful Noise."

In their Opposition papers, Plaintiffs concede that they "have no evidence of any sales of 'Joyful Noise' or the album *Our World Redeemed*" or income therefrom; they "have not licensed the composition" of "Joyful Noise"; and they "do not have any knowledge or information of the number of CDs of *Our World Redeemed* that have been pressed or manufactured." Pls. Stmt. Nos. 17-20. Plaintiffs therefore cannot rely on any purported "widespread distribution" of "Joyful Noise" through the medium of sales.

### b.    Plaintiffs' purported evidence of radio and television play fails to raise a genuine issue of material fact.

In their Motion, Defendants made a *prima facie* case that Plaintiffs had failed to produce admissible, competent evidence of radio or television play. *See* Mtn., p. 19 & n.12 (collecting evidence). In the Opposition, Plaintiffs offered only the conclusory statement of Plaintiff Gray that, during "many" tour stops, Gray was interviewed by local radio or television stations and "Joyful Noise" was played during those interviews. Opp., p. 8. Gray's testimony admittedly provides zero detail as to the specific times, dates, locations, or radio or television stations on which such interviews occurred. Gray's vague and self-serving testimony is insufficient on its own to raise a genuine issue of fact. *F.T.C. v. Neovi, Inc.*, 604 F.3d 1150, 1159 (9th Cir. 2010) ("[a] district court . . . need not find a genuine issue of fact" if it is based on "uncorroborated and self-serving" testimony). Plaintiffs provide no evidence corroborating that Gray was ever interviewed, no less about the alleged scope or nature of any such interviews. Indeed, Plaintiffs provide no evidence corroborating that "Joyful Noise" was ever played during any purported interview. *See* Def. Evid. Obj. No. 10. At best, Gray has proffered vague testimony that "Joyful Noise" was played in the background of interviews an unspecified number of times on local radio and television stations. This does

Mitchell
Silberberg &
Knupp LLP

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

1  not come close to supporting an inference of access through widespread

2  dissemination.  *See Batts v. Adams*, No. CV 10-8123-JFW, 2011 U.S. Dist. LEXIS

3  161402, at *11-12 (C.D. Cal. Feb. 8, 2011) (local radio play over a period of two

4  months, in combination with other forms of distribution, "is hardly 'widespread'

5  and, in fact, is quite limited, and clearly insufficient to support a finding of

6  access"); *Loomis*, 2013 U.S. Dist. LEXIS 162607, at *44-45 ("evidence of small

7  circulation . . . or local air time without other proof of access is generally not

8  enough to demonstrate a reasonable possibility of access") (citations omitted).

9  Additionally, any Gray interviews broadcast on Christian hip-hop networks or

10  stations are have even less evidentiary value because the Dark Horse Writers do

11  not participate in that niche market.  *See Loomis*, 836 F3d at 998 (no widespread

12  dissemination where the defendants "were not participating in the relevant market"

13  in which the plaintiff's song was broadcast).

14              **c.    Plaintiffs' Internet "views" and "plays" do not**

15                      **support a reasonable inference of access.**

16          Recognizing that they have nowhere near the amount of evidence necessary

17  to raise a triable issue of fact as to widespread dissemination based on the

18  traditional media discussed above, Plaintiffs stake their claim of access on the

19  purported fact that "Joyful Noise" had 1.4 million "views" on YouTube between

20  2008 and 2012 and another 2.4 million "plays" on the Myspace[3] pages of Plaintiff

21  Gray and third-party Lecrae.[4]  Opp., pp. 3-4.  Aggregating these "views" and

---

[3] The discussion in this Reply assumes *arguendo* that Plaintiffs could prove that "Joyful Noise" was actually "played" on Myspace.  However, as set forth in Defendants' Evidentiary Objections, Plaintiffs have no admissible evidence of same.

[4] Plaintiffs readily concede that a multitude of cases state that Internet presence is not enough (*see* Mtn., pp. 20-21) but argue that this case is different because they have evidence of how many times "Joyful Noise" was "viewed."  Opp., pp. 4-5. Yet, for the reasons specified below, such evidence does not elevate this case above the long line of precedents cited by Defendants.  Evidence that some unknown number of unknown Christian hip-hop fans actively sought out and listened to "Joyful Noise" online does not raise a reasonable possibility that a Dark Horse Writer had access to "Joyful Noise."

Mitchell
Silberberg &
Knupp LLP

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

1   "plays" together (hereafter "views"), Plaintiffs assert (incorrectly) that these 3.8

2   million views give "Joyful Noise" multi-platinum status with the RIAA. *Id.*, p. 1.

3   Plaintiffs bootstrap that incorrect assertion into the further erroneous assertion that

4   a jury should be allowed to decide whether these millions of "views" of their

5   "multi-platinum" song constitute widespread dissemination sufficient to reasonably

6   infer that one of those listeners was a Dark Horse Writer. *Id.*, pp. 3-4.

7        Plaintiffs fundamentally misunderstand and thus grossly misrepresent what

8   3.8 million YouTube and Myspace views mean in the real world.  As explained in

9   Defendants' Motion, the number of views in the vast medium of the Internet over

10  four years is not remotely equivalent to that number of sales or distribution of a

11  song.  Unlike sales, "views" cannot be taken at face value and do not truly

12  represent the distribution of a song.  Among other things, one person can view a

13  video multiple times; views can be artificially inflated; and just because a person

14  clicks on a video does not mean the person actually watches the video or hears the

15  song.  Mtn., p. 22 (citing evidence).  For these reasons, Plaintiffs fail to and cannot

16  equate 3.8 million "views" to 3.8 million sales.[5]

17       Furthermore, the RIAA certification criteria—upon which Plaintiffs rely as

18  valid, reliable, and authoritative—establish that audio/video song streams are

19  heavily discounted by the RIAA.  Fatal to Plaintiffs' claim of widespread

20  dissemination, the RIAA certification standards explicitly state that "*150 on-

21  demand streams [are] equivalent to one download sale.*"[6]  Thus, applying this

22

---

[5] Plaintiffs' argue that the same "tenuous argument" could be made about sales
(Opp., p. 6), but it is unrealistic to assume that one person bought the same album
multiple times or that someone who purchased an album never listened to it.
Plaintiffs also argue that Google testified that they accurately keep track of video
view counts (Opp., p. 6), but the question is not whether the number of "views"
identified below a video is accurate but what that number means.

[6] Supplemental Declaration of Aaron M. Wais ("Supp. Wais Decl."), ¶¶ 3-4 & Exs.
30-31.  This ratio reflects the reality that a person who *buys* an album or song *once*
might play that album or song a great many times following purchase, but the
purchase would still count as one "unit" for RIAA certification purposes.  If that
same person does not buy, but instead *streams* the song or album many times

(…continued)

1  ratio, Plaintiffs' 3,830,765 views on YouTube and Myspace are the equivalent to

2  only *25,538 sales*, which is a number which Plaintiffs essentially concede is

3  insufficient to establish widespread dissemination as a matter of law.  Opp., p. 4

4  (trying to contrast *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1178 (9th Cir.

5  2008) (17,000 copies sold not widespread dissemination)).[7]

6         There is a sound logic to, and common sense inherent in, this analysis.

7  YouTube has an incomprehensibly vast universe of content. As explained in the

8  Motion, hundreds of thousands of hours of video are uploaded daily and *billions of*

9  *views* are generated *every day*.  Mtn., pp. 21-22.  In other words, 3.8 million

10  views—over four years—is a mere blip in that universe.  Therefore, there is no

11  *reasonable* possibility to infer that a specific person could have come across a

12  single song without having a reason to actively seek it out by name or artist.[8]  The

_____

13  (…continued)

14  online, each stream counts as a "view" on the steaming website, but the song is
   exposed only to one person.  *See* SUF ¶ 25-28.

15  [7] *See also Repp v. Webber*, 947 F. Supp. 105, 110 (S.D.N.Y. 1996) (finding no

16  widespread dissemination where "approximately 40,000 to 45,000 copies of the
   printed sheet music" of the allegedly infringed work had been sold), *aff'd in*

17  *relevant part*, 132 F.3d 882, 892 (2d Cir. 1997); *Unicolors, Inc. v. NB Brother*
   *Corp.*, No. CV 16-02268-MWF (JPRx), 2017 U.S. Dist. LEXIS 163976, at *12

18  (C.D. Cal. Oct. 3, 2017) (finding no widespread dissemination where the plaintiff
   "presented no evidence that 36,000 or 37,000 yards of fabric is a substantial

19  amount in the context of wholesale textile sales"); *Unicolors, Inc. v. Urban*
   *Outfitters, Inc.*, No. CV 14-01029 SJO (VBKx), 2015 U.S. Dist. LEXIS 187585, at

20  *18 (C.D. Cal. Feb. 17, 2015) ("A fabric that sold 20,000 yards over three years
   should not be considered widely disseminated.").  Indeed, when considered in the

21  proper context, it becomes readily apparent that Plaintiffs cannot rely on cases such
   as *Arnstein v. Porter*, 154 F.2d 464 (2d Cir. 1946), in which over 1 million sales of

22  plaintiff's composition supported a reasonable inference of access.

23  [8] While Plaintiffs note that YouTube "recommends videos to its user" (Opp., p. 6),
   they do not present any evidence that YouTube ever recommended "Joyful Noise"

24  to anyone.  Furthermore, the fact that "Joyful Noise" is described as "music" in the
   "show more" link of the videos only means is it is no more easily found in the vast

25  universe of other music videos on YouTube.  Equally apropos of nothing is
   Plaintiffs' argument that Amazon.com categorizes "Joyful Noise" under the

26  generic description of "Rap & Hip-Hop" and that defendant Juicy J is a "hip-hop
   veteran." Opp., p. 7 & n. 9.  Plaintiffs have not presented any evidence that a single

27  person purchased or listened to "Joyful Noise" on Amazon.  Moreover, Juicy J had
   no involvement in creating the musical instrumental track for "Dark Horse" that is

28  claimed to be infringing; he wrote and recorded a rap verse, which was
   subsequently laid over the instrumental track.  SUF ¶¶ 11-12.

Mitchell
Silberberg &
Knupp LLP

13

same is true for Myspace; a person would need to know to go to the specific
Myspace user account in question for there to even be a bare possibility of hearing
a specific song available through that account.  The notion that a Dark Horse
Writer would happen upon "Joyful Noise" on the internet is even more absurd than
the idea that a person—without any knowledge of a work—would simply happen
upon a particular album by an unknown artist in the largest record store in the
world and buy it.  *See, e.g., Loomis*, 836 F.3d at 998 (citing Nimmer, § 13.02[A]
(explaining that "evidence showing that Gloria Estefan was present in a room with
15,000 records, including one containing plaintiff's song" was insufficient to
demonstrate access (citing *Palmieri v. Estefan*, 35 U.S.P.Q.2d 1382, 1383
(S.D.N.Y. 1995))).  That is *not* the test for widespread dissemination.  As one court
aptly observed, "the posting of videos and/or songs on YouTube, Amazon.com,
and iTunes by an unknown singer . . . 'can only be described as the modern day
equivalent of looking for a needle in a haystack—where the alleged seeker does
not know the needle exists, and isn't looking for it.'"  *Batts*, 2011 U.S. Dist.
LEXIS 161402 at *11-12.

   A comparison between "Joyful Noise" and the top-viewed YouTube
videos—songs that are widespread—demonstrates the accurate scale of Plaintiff's
3.8 million views.  Top-viewed videos have *hundreds of millions up to billions* of
views in a single year.  These top-viewed videos *massively* dwarf the view count of
"Joyful Noise."  For example, between 2012 and 2013, "Gangnam Style" was
viewed on YouTube over 1.7 **billion** times—***over one thousand, two hundred
times more*** than the collective YouTube videos of "Joyful Noise" over the course
of four years.  Wais Decl. Ex. 17, ¶ 7 (Dkt. No. 282-4, p. 634-35) (video ID:
9bZkp7q19f0).  Plaintiffs attempt to dismiss the relevance of these videos by
arguing that the fact that other videos were viewed more does not diminish the
reach of "Joyful Noise."  Opp., pp. 5-6.  Again, Plaintiffs' error is in equating
online views to record sales: "[t]he fact there are *Platinum* records, does not mean

1  that *Gold* records were not widely disseminated." *Id.*, p. 6.  Plaintiffs' album was

2  *not* a Gold or Platinum record.  If a court is going to permit evidence of online

3  views to show that a song is so widespread (i.e., *ubiquitous*)[9] that it is reasonable to

4  infer that anyone (and everyone) has heard it, then that situation should be reserved

5  for songs that have truly earned that distinction.  For Plaintiffs to compare the *de*

6  *minimis*-by-comparison online dissemination of "Joyful Noise" to these wildly

7  popular videos is absurd.[10]

8       Based on the above, Plaintiffs' evidence of online views cannot support

9  anything more than pure speculation that a Dark Horse Writer had the opportunity

10  to hear "Joyful Noise" before creating "Dark Horse."

11                **d.    Plaintiffs have failed to raise a material issue of fact**

12                       **as to saturation in a relevant market.**

13       As noted above, widespread dissemination can also be proven if the plaintiff

14  can show that its work was "saturat[ed] in a relevant market in which both the

15  plaintiff and the defendant participate."  *Loomis*, 836 F.3d at 997-98.  As

16  Defendants showed in the Motion, this doctrine is inapplicable here because it is

17  undisputed that Plaintiffs and the Dark Horse Writers operate in far different music

18

19

20  [9] Plaintiffs quibble with Defendants use of the "ubiquity" because the word does
    not appear in the case that Defendants cited as an example, *ABKCO Music*.  This,
21  however, does not change the fact that the decision was based on the fact that
    plaintiff's song was—as Plaintiffs themselves recognize—"extremely well-known
22  and popular." Opp., p. 12, n. 14.  *This is what ubiquity means*. *See* Oxford
    Dictionary, available at https://en.oxforddictionaries.com/definition/ubiquity
23  (ubiquity defined as "the fact of appearing everywhere or of being very common").

24  [10] Returning to the RIAA's standards frequently relied on by Plaintiffs, using the
    150/1 ratio, Gangnam Style sold the equivalent of over 7 million records (7x
25  platinum) in one year and even the lowest viewed top-5 song, Justin Bieber's "One
    Time" in 2010, still sold the equivalent of over 1 million records (platinum) in one
26  year, just based on views on the YouTube site.  Plaintiffs' total views (on Myspace
    and YouTube) are the equivalent of approximately 25,000 sales over four years.
27  Plaintiffs' reliance on the RIAA certification standards continues to disprove their
    own arguments. Wais Decl. Ex. 17, ¶ 7 (Dkt. No. 282-4, p. 634-35) (video ID:
28  9bZkp7q19f0 ("Gangnam Style") and CHVhwcOg6y8 ("One Time")).

Mitchell
Silberberg &
Knupp LLP

15

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

1   universes, and the Dark Horse Writers do not participate in the Christina hip-hop

2   community.  Mtn., pp. 11-12 (citing evidence).

3        Nonetheless, Plaintiffs rely on several cases that involved relevant market

4   saturation—namely, *Three Boys Music Corp. v. Bolton*, 212 F.3d 477 (9th Cir.

5   2000), *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841 (9th Cir. 2012),

6   and *Straughter v. Raymond*[11]—in support of their argument that a jury could infer

7   access based on widespread dissemination.  Opp., pp. 9-10.  But unlike in those

8   cases, the undisputed evidence here is that the Dark Horse Writers did not

9   participate in the same market as Plaintiffs.  Therefore, those cases only reaffirm

10  that there is no *reasonable* possibility of access here.

11       In *Three Boys Music Corp. v. Bolton*, 212 F.3d 477 (9th Cir. 2000), the

12  Ninth Circuit upheld a jury's finding that Michael Bolton's 1991 pop hit "Love Is a

13  Wonderful Thing" infringed on the copyright of the Isley Brothers' 1964 song of

14  the same name.  The Isley Brothers, of course, are "one of this country's most

15  well-known rhythm and blues groups" and "have been inducted into the Rock and

16  Roll Hall of Fame." 212 F.3d at 480.  In affirming the jury's decision, the Ninth

17  Circuit held that sufficient evidence supported finding access by Bolton and his co-

18  writer, Andrew Goldmark, based on a theory of "widespread dissemination and

19  subconscious copying." *Id.* at 483.  To reach this conclusion, the Ninth Circuit

20  relied on the testimony of three disc jockeys that "the Isley Brothers' song was

21  widely disseminated on radio and television stations where Bolton and Goldmark

22  grew up,"[12] but only in conjunction with Bolton's admissions that he "grew up

23  listening to groups such as the Isley Brothers" and was a "huge fan" and "collector

24  _____

25  [11] Case No. CV 08-2170 CAS (CWx).  Plaintiffs cited this Court's orders on
    summary judgment, 2011 U.S. Dist. LEXIS 93068 (C.D. Cal., Aug. 19, 2011), and

26  for reconsideration, 2011 WL 13176750 (C.D. Cal., Nov. 21, 2011).

27  [12] Unlike Plaintiffs' conclusory and inadmissible statements of radio and television
    play (Def. Evid. Obj. No. 10), the disc jockeys testified as to specific television

28  shows and radio stations on which the song aired, as well as how frequently the
    song aired during specific time periods.  *Id.* at 483.

1   of their music." *Id.* at 483-84. Even with this evidence, the Ninth Circuit noted that

2   it was an "attenuated case of reasonable access and subconscious copying" but felt

3   compelled, "[d]espite the weakness of the [] theory of reasonable access," to not

4   disturb the jury's result. *Id.* Here, the evidence comes nowhere close to what

5   existed in *Three Boys* such that a Dark Horse Writer may reasonably be considered

6   to have heard "Joyful Noise" and "subconsciously" copied it. If the theory of

7   access in *Three Boys* was "attenuated" (*id.* at 484), it does not exist here.

8       *L.A. Printex* makes the unreasonableness of Plaintiff's theory even more

9   apparent. As noted by the Ninth Circuit in *Loomis*, access in *L.A. Printex*

10  depended on saturation in a market in which both plaintiff and defendant

11  participated. *Loomis*, 836 F.3d at 997-98. *L.A. Printex* was a fabric design

12  infringement case in which the plaintiff relied on sales of over 50,000 yards of the

13  relevant fabric to fabric converters in the L.A. market to argue that there was a

14  reasonable possibility of access by the defendant. 676 F.3d at 847.[13] The Ninth

15  Circuit agreed, but only because plaintiff and defendant "operate[d] in the same

16  industry in the same Los Angeles area"; it was a "reasonable inference that many

17  or most of these [fabric converter] purchasers were in the Los Angeles area";

18  "[a]pparel vendors like [defendant] purchase fabric from fabric printing companies

19  and fabric converters"; and that the dissemination of plaintiffs' fabric occurred in

20  the period "immediately preceding Defendants' alleged infringement" (plaintiff

21  sold the fabric until May 2006 and the alleged infringement occurred no later than

22  a month later, in June 2006). *Id.* at 848.

23      *Straughter* also involved parties who participated in the same market.

24  There, the plaintiff alleged that the song "Burn" by the popular R&B artist, Usher,

25  infringed his R&B song, "Reasons." 2011 U.S. Dist. LEXIS 93068, *5-7. This

26
27  [13] Unlike Gray and Lecrae's conclusory testimony of concert performances, the *L.A. Printex* plaintiff supported his sales with a printout of "sales by item detail," that listed "invoices" and "for each invoice, the date, invoice number, brief

28  description, customer name, quantity, and dollar amount." *Id.* at 847.

Mitchell
Silberberg &
Knupp LLP

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Court denied summary judgment to defendants in part because there was a material issue of fact as to access.[14]  As to widespread dissemination, this Court concluded that there was "a reasonable possibility that defendants had access to 'Reasons'" because the album on which "Reasons" appeared "reached number 32 on the Billboard Chart [for] the most popular songs in R&B and hip hop—*the same musical genres in which defendants performed*" and defendants testified "that they have heard hundreds of thousands of songs from a variety of artists over the years." *Id*. at *40-41 (emphasis added).  Based on these two factors, the Court reasoned that "given that the Album achieved some level of notoriety *in the R&B genre at the same time defendants were actively creating R&B music*, and defendants' admission that they have heard songs from countless artists, a reasonable jury could conclude that there is more than a 'bare possibility' that defendants had the opportunity to hear 'Reasons.'"  *Id*. at *41 (emphasis added).

Here, in marked difference from the *Straughter* and *L.A. Printex* cases, Plaintiffs admit that they and Defendants operate in far different music universes and the Dark Horse Writers affirmatively and explicitly testify that they do not participate in, follow, search for, or listen to Christian hip-hop.[15]  SUF ¶¶ 2, 50-54 (Dkt. No. 273-1). Plaintiffs have no evidence to rebut the affirmative denials of having ever heard of Plaintiffs, having gone to their concerts, having listened to their music generally, or having ever heard "Joyful Noise." SUF ¶¶ 43-49.  A jury

---

[14] The initial reason that this Court denied summary judgment was because it found that plaintiff presented sufficient evidence to support a chain-of-event theory, specifically, a third-party intermediary (Warren G) had access to "Reasons" and a connection to defendants.  *Id*. at *25-37.  Here, Plaintiffs do not advance a chain-of-events theory of access.

[15] Plaintiffs also try to support an inference of access by arguing that "Joyful Noise" was popular and enjoyed critical success in the Christian hip-hop world.  But even if "Joyful Noise" was well-received in the Christian hip-hop community, that cannot be used to infer a reasonable probability of access because the Dark Horse Writers were not active in that market.  Plaintiffs do not respond to this argument.

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

1   could not *reasonably* conclude that the Dark Horse Writer had the opportunity to

2   hear "Joyful Noise" from such purported evidence.[16]

3           **e.       Gray and Lecrae's purported concerts do not support**

4                       **a reasonable inference of access.**

5           Plaintiffs also try to support an inference of access by arguing that Gray and

6   third-party Lecrae performed "Joyful Noise" in concerts, including concerts in

7   Southern California, Opp., p. 8, but they fail to raise a triable issue of fact.

8   Plaintiffs only offer Gray's identification of dates and cities in his declaration and

9   in an attached spreadsheet. *See* Gray Decl., ¶ 10 & Ex. 1 (Dkt. No. 288).  No

10  documents are proffered to show that he performed in the cities on the dates stated,

11  how he was able to identify these specific dates or cities, or where the information

12  was derived from. *Id.*  Gray also fails to identify a single concert venue or provide

13  any evidence whatsoever as to the size of the venue or the attendance levels for the

14  claimed concerts. *Id.*  Lecrae, in turn, simply states that "to the best of his

15  recollection, an accurate list of *many* of [his] concerts, dates, cities, and venues"

16  are listed in an unexplained and unauthenticated attachment to his declaration. *See*

17  Kahn Decl., ¶ 7, Ex. 9 ("Lecrae Decl."), ¶ 3 (emphasis added) and Ex. A thereto

18  (Dkt. No. 289).  He too fails to provide any evidence whatsoever about venue size

19

20  [16] Because Plaintiffs have no evidence of direct access or widespread distribution,
    they devote significant portions of their Opposition to mixing the theories of access
21  in the hopes that something will stick.  For example, Plaintiffs argue Defendants
    could have found "Joyful Noise" by receiving "a direct link to [the] YouTube
22  videos," or by searching by "title, artist, description or category" (Opp., p. 6) even
    though Defendants testified that they did not know about Plaintiffs, Plaintiffs'
23  music, or "Joyful Noise" itself, and were not interested in Christian hip-hop in
    general.  Similarly, Plaintiffs try to nitpick the declarations of the Dark Horse
24  Writers that it is not their "practice" to listen to Christian hip-hop (Opp., p. 7) or
    that Katy Perry differentiates between pre-2002 (when she sang Christian music)
25  and post-2002 (when she became a mainstream, pop artist).  *Id.*  This is a spurious
    effort to draw a direct access link to insufficient distribution.  Likewise ineffective
26  is Plaintiffs claim that there is nothing religious about the allegedly infringed
    ostinato in "Joyful Noise" and, thus, even if the Dark Horse Writers do not listen to
27  Christian music, "they would hear the ostinato long before discovering the song's
    religious subject matter."  *Id.*  This ignores that the Dark Horse Writers would still
28  have to find the song in the first place, which they plainly did not.

or attendance levels for the claimed concerts. *Id.* Moreover, neither Gray nor Lecrae provide a single document or other nontestimonial evidence corroborating that either ever performed "Joyful Noise" in public, such as set lists, flyers, advertisements, videos, or audio recordings. The Plaintiffs' purported evidence is palpably insufficient to support any theory of access. *See, e.g., Loomis*, 2013 U.S. Dist. LEXIS 162607, at *46-47 (concert performances did not constitute access evidence where the plaintiff "ha[d] not produced any evidence, such as the scope, extent, attendance levels, locations, or number of performances of [the allegedly infringed composition]").

In any event, as explained in Defendants' moving papers, even if Plaintiffs' uncorroborated assertions regarding concert performances of "Joyful Noise" were accepted as proof (and they should not be), those performances cannot be used to *infer* access because the Dark Horse Writers affirmatively and unequivocally testified that they have never seen Gray or Lecrae perform. Nor can it reasonably be inferred that a Dark Horse Writer might have attended a concert because it is undisputed that the Dark Horse Writers were not involved in the Christian hip-hop community, do not listen to that genre of music, and do not attend performances of that genre of music.[17] *See, e.g., Loomis*, 836 F.3d at 998 (saturation of Santa Barbara local music scene did not support access because the writers of the defendants' composition did not participate in that scene); *Guzman v. Hacienda Records & Rec. Studio, Inc.*, No. 6:12-CV-42, 2014 U.S. Dist. LEXIS 169746, at *17 (S.D. Tex. Dec. 9, 2014), *aff'd* 808 F.3d 1031 (5th Cir. 2015) (a song was not "widely disseminated" where it "did not achieve popularity outside of the Tejano music scene"). Plaintiffs do not respond to this argument.

---

[17] Gray testified that most of his venues are churches, and he has not identified any concert that was at a nonreligious venue. Wais Decl. Ex. 21 (Dkt. No. 282-5), pp. 676:3-21, 677:16-678:20.

Mitchell Silberberg & Knupp LLP

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**B.**   **Plaintiffs Have Not Raised A Triable Issue Of Fact On The Essential Element Of Substantial Similarity.**

Plaintiffs bear the burden of proving "substantial similarity," in addition to "access."  To satisfy their burden, Plaintiffs must satisfy both the "extrinsic test" and the "intrinsic test."  *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 624 (9th Cir. 2010).  However, for summary judgment, only the extrinsic test is relevant, while "[t]he intrinsic test is left to the trier of fact." *Id.*

Here, summary judgment must be granted for the independent reason that Plaintiffs have failed to satisfy the Ninth Circuit's extrinsic test, given that Plaintiffs' expert, Dr. Decker: (1) did not objectively transcribe the compositions in performing his analysis; (2) admitted that each of the claimed similarities between "Joyful Noise" and "Dark Horse" are in fact quite common and not subject to monopoly; and (3) failed to extract and disregard the admittedly unprotected elements of "Joyful Noise."  Instead, Dr. Decker conducted a subjective, intrinsic analysis of how recordings of the compositions sound to lay listeners, which Plaintiffs concede is impermissible.  Plaintiffs also attempt to critique the testimony of Defendants' expert, Dr. Ferrara, but their arguments fail as a matter of law and fact.  Indeed, this motion does not depend upon a "battle of the experts"; it is Plaintiffs' burden to present expert testimony as to substantial similarity of protected expression under the extrinsic test.  They have failed to do so.

**1.**   **Plaintiffs Fail To Satisfy The Extrinsic Test.**

**a.**   **The extrinsic test is concerned only with substantial similarity of protected elements.**

Plaintiffs admit that only the extrinsic test is important at this stage (Opp. at 12) but they do not actually seek to apply this test.  Critically, Plaintiffs side-step the fact that the extrinsic test requires that the "non-protectible elements" of a plaintiff's composition must be "filter[ed] out and disregard[ed]," leaving only an inquiry into "whether the protectible elements, standing alone, are substantially

1   similar." *Cavalier v. Random House*, 297 F.3d 815, 822 (9th Cir. 2002) (citation
2   omitted).

3   　　　*Swirsky*, on which Plaintiffs rely heavily, only reaffirms this concept:

4   　　　　　The extrinsic test requires analytical dissection of a work
5   　　　　　and expert testimony. "Analytical dissection" requires
6   　　　　　breaking the works down into their constituent elements,
7   　　　　　and comparing those elements for proof of copying as
8   　　　　　measured by substantial similarity. Because the
9   　　　　　requirement is one of substantial similarity to *protected*
10  　　　　　elements of the copyrighted work, it is essential to
11  　　　　　distinguish between the protected and unprotected
12  　　　　　material in a plaintiff's work.

13  *Swirsky v. Carey*, 376 F.3d 841, 849 (9th Cir. 2004) (citations omitted).

14  　　　Nothing in *Swirsky* (or any other authority) permits an expert to base a
15  musicological comparison on similarities between musical components that are
16  commonplace. *Swirsky*, in fact, confirms the opposite.

17  　　　　　　**b.**　　**Plaintiffs cannot dispute that Dr. Decker did not**
18  　　　　　　　　**transcribe the allegedly similar elements of "Joyful**
19  　　　　　　　　**Noise" and "Dark Horse."**

20  　　　Plaintiffs do not meaningfully challenge that Dr. Decker admittedly failed to
21  transcribe the musical similarities he claims to exist between "Joyful Noise" and
22  "Dark Horse" into musical notation.  Mtn., pp. 26-27.  As factual support for this
23  argument, Defendants cited several passages from Dr. Decker's deposition and his
24  Rebuttal Report.  SUF ¶ 94.  Plaintiffs only response is to argue that Defendants
25  "cherry-picked" portions of Dr. Decker's testimony and Rebuttal Report and that
26  his broader point was to critique Dr. Ferrara's transcriptions.  *See* Pls. Stmt. ¶ 94.
27  But regardless of whether Dr. Decker's stated disavowal of transcription is
28  couched as a critique of Dr. Ferrara's transcriptions, the undisputed evidence

speaks for itself and makes clear that Dr. Decker (a) did not objectively transcribe all of the claimed similarities into musical notation; and (b) defended this decision by focusing instead on the "aural experience" of the songs and the "sound of these records." Pls. Stmt. ¶¶ 94, 114. His opinions therefore fail to meet the objective methodological requirements of the extrinsic test.

### c. Plaintiffs cannot dispute the universe of the alleged similarities identified by Dr. Decker.

In their Motion, Defendants addressed each of the similarities identified by Dr. Decker: (1) "Importance of Ostinatos"; (2) "Phrase Length"; (3) "Rhythm"; (4) "Pitch Content"; and (5) "Timbre." *See* Mtn., pp. 26-28, SUF ¶¶ 95-106. Contrary to Plaintiffs' suggestion, Defendants did not selectively identify only some of Dr. Decker's alleged similarities—rather, Defendants took these similarities directly from Dr. Decker's Report. *See* Wais Decl. Ex. 3, pp. 4-7 (Dkt. No. 282 at 21-24).

Nor can Plaintiffs artificially manufacture a dispute as to which alleged similarities are at issue. In listing the similarities on which Dr. Decker opined, Plaintiffs identify each of the five similarities referenced above and in Dr. Decker's Report. Opp, p. 14. While Plaintiffs now also refer to "Texture" and "Overlapping Musical Domains," Dr. Decker did not reference these so-called elements in his Report. *See generally* Wais Decl. Ex. 3 (Dkt. No. 282 at 18-32); Supp. Wais Decl. ¶ 5, Ex. 32, pp. 215:25-216:2.[18] As such, Plaintiffs cannot rely on these additional elements to claim an issue of fact as to substantial similarity.

---

[18] Indeed, Dr. Decker did not refer to the purported element of "Overlapping Musical Domains" in *any* report in this case or at his deposition. Given that Dr. Decker never provided any opinion regarding "Overlapping Musical Domains," Defendants have no idea what that phrase even means. And while Dr. Decker discussed texture in his *Rebuttal* Report, his failure to address it in his initial Report prevents him from raising it thereafter. The scope of a rebuttal expert report is limited; it is "intended solely to contradict or rebut evidence on the same subject matter" identified in the other party's expert report. Fed. R. Civ. P. 26(a)(2)(D)(ii); *see also Riel v. Warden*, No. CIV S-01-0507 LKK KJM, 2010 US Dist LEXIS 122872, at *13 (E.D. Cal. Nov. 4, 2010) ("rebuttal evidence may be used to challenge the evidence or theory of an opponent—and not to establish a case-in-chief"); *Grove City Veterinary Serv., LLC v. Charter Practices, Intl., LLC*,

(…continued)

### d.   Plaintiffs cannot rebut Dr. Decker's admissions that his identified similarities are common.

Equally unavailing is Plaintiffs' attempt to dispute Dr. Decker's admissions, at deposition, that each of the above alleged similarities was, in fact, common.  To wit, Plaintiffs do not dispute Dr. Decker's admissions that:

- "countless musical works predating the creation of "Joyful Noise" have contained ostinatos" (Pls. Stmt. ¶ 98);

- "patterns of two-bar units of eight beats" are "quite common'"; "a great many composers of contemporary bean-driven pop music" have used two-bar units of eight beats in length; and this is "a basic musical building block" in hip-hop and beat-driven pop music (*id.* ¶ 100);

- no composer can "monopolize the idea of a two-bar, four-bar, or eight bar phrase" (*id.* ¶ 101);

- "[d]uple meter time is commonplace," and is "not something any one composer is entitled to monopolize" (*id.* ¶ 103);

- no composer is "allowed to monopolize the use of a minor key" (*id.* ¶ 105); and

- no composer is entitled to monopolize "[t]he use of a leading voice in pingy, synthesized timbre" (*id.* ¶ 106).

Because Plaintiffs have no contradictory evidence, they attempt to downplay Dr. Decker's admissions.  The primary example is Plaintiffs' response to Dr. Decker's admission regarding phrase length, whereby he cited "two-bar units of eight beats in length" as one of the similarities between the compositions but then admitted it is commonplace in music.  Unable to erase Dr. Decker's admission from the record, Plaintiffs state that it is "obvious" that "no composer can

---

(…continued)
No. 3:13-cv-2276-AC, 2016 U.S. Dist. LEXIS 52646, at *63 (D. Or. Apr. 19, 2016) (same)

monopolize the idea of an 8-note 2-bar phrase," and criticize Defendants for making this "obvious" point.  Opp., p. 15.  But Defendants are not just tilting at windmills; Dr. Decker expressly relied on this obviously commonplace element in support of his opinion that "Joyful Noise" and "Dark Horse" are similar.

With respect to Dr. Decker's other admissions, Plaintiffs again complain that Defendants have mischaracterized Dr. Decker's testimony by "cherry picking" partial quotations and sentences from Dr. Decker's Report.  Plaintiffs are rather obviously trying to walk back Dr. Decker's many admissions.  For example:

- Dr. Decker admitted that the pitch sequence of 3, 3, 3, 3, 2—which he described as the "most specific musical content shared by both tracks"—"is not a pitch sequence in any key or any mode that anyone is entitled to monopolize."  Mtn., pp. 26-27, SUF ¶¶ 95, 97.  While Plaintiffs contend that Defendants have omitted portions of Dr. Decker's testimony regarding "rhythmic placement" (Pls. Stmt. ¶ 97), this does not change the fact of Dr. Decker's admissions regarding the common nature of the pitch sequence.

- Dr. Decker admitted that the use of "two-bar units organized into groups of two, creating four-bar phrases" is "a general characteristic of contemporary beat-driven popular music in many genres."  SUF ¶ 99.  Plaintiffs dispute this admission by referring to Dr. Decker's conclusion that "The Ostinatos in Joyful Noise and Dark Horse are identical in phrase length."  Pls. Stmt. ¶ 99.  But this conclusion obviously is not inconsistent with the admission that such a phrase length is common.

- Dr. Decker admitted that the use of "eight even quarter notes in duple meter time" is a "relative[ly] simple[] . . . rhythmic choice."  SUF ¶ 102.  Plaintiffs complain this is a "partial quotation," but the full quotation changes nothing.  Pls. Stmt. ¶ 102.

- Plaintiffs similarly dispute Dr. Decker's admission that the use of "eight even quarter notes is a very simple rhythm" for "[p]rofessional adults making commercial music in the 21st century," and that no composer "is entitle to monopolize the rhythm of eight even quarter notes." Pls. Stmt. ¶ 104. But their argument that "Dr. Decker is careful to differentiate 'simple' from 'relatively simple'" ignores his testimony that "relatively" meant that it was not a simple choice for everyone, but it *was* simple for "[p]rofessional adults making commercial music in the 21st century."

In sum, there is no genuine dispute that Dr. Decker admitted that *each* alleged similarity between "Joyful Noise" and "Dark Horse" was common.

> e.    **Plaintiffs fail to dispute that Dr. Decker failed to filter out these admittedly non-protectable elements.**

Equally unavailing is Plaintiffs' attempt to dispute that Dr. Decker failed to "filter out and disregard" unprotectible elements, *Cavalier*, 297 F.3d at 822, by not distinguishing between the protected and unprotected material in his Reports. Plaintiffs argue that "Dr. Decker's opinion does not rely upon the substantial similarities of any unprotectable elements," but this is clearly false. Again, Plaintiffs do not dispute that several of the elements he relies on are common. *See* Pls. Stmt. ¶¶ 98, 100, 101, 103, 105, 106; *see also* Opp., p. 15 (it is "obvious" that "no composer can monopolize the idea of an 8-note 2-bar phrase.")

Instead, Plaintiffs quote *Swirsky* for the unremarkable proposition that "no one magical combination of factors…will automatically substantiate a musical infringement suit." Opp., p. 15 (quoting *Swirsky*, 376 F.3d at 849). This is beside

the point; the problem is not that Dr. Decker considered the wrong "factors" but that he failed to extract the unprotected elements from his analysis.[19]

Simply put, after "non-protectible elements" allegedly shared by the works at issue are filtered out, *Cavalier*, 297 F.3d at 822, there remain no objective similarities between "Joyful Noise" and "Dark Horse."  Thus, the works are not substantially similar as a matter of law, and this action should be dismissed.

## 2.   Plaintiffs Cannot Dispute That Dr. Decker Improperly Opined On The Intrinsic Test.

Plaintiffs concede that only the extrinsic test is relevant to a motion for summary judgment and that the intrinsic test is irrelevant.  Yet, it is clear that Dr. Decker did not properly apply the Ninth Circuit's required methodology for the extrinsic test.  Instead, as explained in Defendants' Motion, Dr. Decker disavows the extrinsic test's required objective analysis in favor of a *subjective* analysis of the way the recordings of these songs *sound*.  In opposition, Plaintiffs all but admit this when they accuse Defendants of trying "to shift the focus from the actual expression of the music to the underlying components in which that expression was created."  Opp., p. 14.  This statement, while vague, doubles down on Dr. Decker's disavowal of the required "analytic dissection."  Contrary to Plaintiffs' contention, breaking down a work into its "underlying components" is the essence of the extrinsic test.  By ignoring the "underlying components" of the composition, Dr. Decker failed to apply the extrinsic test.

Instead, Dr. Decker subjectively analyzed the sounds of the recordings, invading the exclusive province of the factfinder.[20]  Dr. Decker went so far as to rely on the subjective impressions of ordinary lay listeners to the sound of the

---

[19] Nor did Dr. Decker attempt to explain how their selection, coordination and arrangement constituted protectable expression, which is his burden.  *See* Mtn. at 25-26 (citing *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003)).

[20] It also bears repeating that Plaintiff's claim in this case is that Defendants infringed the *composition* of "Joyful Noise"; there is no allegation that Defendants infringed the *sound recording* of "Joyful Noise."

Mitchell
Silberberg &
Knupp LLP

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

"Dark Horse" and "Joyful Noise" recordings.  Mtn., pp. 29-30.  Plaintiffs do not dispute this; in fact, they entirely fail to address this in their Opposition.  They do not dispute that Dr. Decker relied on YouTube mashup videos created by YouTube users whom he did not know.  Pls. Stmt. ¶¶ 115-16.  Nor do Plaintiffs even attempt to distinguish the persuasive authorities cited in Defendants' Motion, which hold that a musicological expert may not rely on the aural perception by lay listeners of the songs at issue.  *See* Mtn., pp. 29-31 (citing *Cottrill v. Spears*, No. 02-3646, 2003 U.S. Dist. LEXIS 8823, at *29-30 (E.D. Pa. May 22, 2003); *Copeland v. Bieber*, No. 2:13cv246, 2016 U.S. Dist. LEXIS 178817, at *15, (E.D. Va. Sept. 8, 2016); *Goldberg v. Cameron*, 787 F. Supp. 2d 1013, 1021-1022 (N.D. Cal. 2011)); *cf. Swirsky*, 376 F3d at 845 (reversing the exclusion of an expert where the expert "was *not* testifying, as the intrinsic test would require, as to whether subjectively the 'ordinary, reasonable person would find the total concept and feel of the [two choruses] to be substantially similar'" (emphasis added)).

### 3.      There Is No "Battle of the Experts" Between Dr. Decker and Dr. Ferrara.

Finally, Plaintiffs dedicate a substantial portion of their Opposition to critiquing the analysis of Defendants' musicological expert, Dr. Lawrence Ferrara.  Plaintiffs' critiques of Dr. Ferrara, however, are a side-show.  It is Plaintiffs' burden to prove that "protectable elements, standing alone, are substantially similar." *Cavalier*, 297 F.3d at 822; Mtn., pp. 25-26.  Thus, this Court need not decide whether Dr. Ferrara or Dr. Decker is right.  Rather, the Court must only determine whether the Plaintiffs have satisfied the extrinsic test, which, as discussed above, Plaintiffs have failed to do.

In any event, Plaintiffs' are wrong, as a matter of both law and fact.  First, Plaintiff mistakenly quotes from a section in *Swirsky* considering the argument that the plaintiff's composition "lacks originality as a matter of law."  376 F.3d at 850-51.  This, however, is distinct from the analysis under the extrinsic test, which Dr.

Mitchell Silberberg & Knupp LLP

28

Decker failed to perform.  *Compare id.* at 844-50 (analysis under the heading "Substantial Similarity") with *id.* at 850-53 (analysis of "originality" under the heading "Other Claims of Lack of Copyright Protection").  Even if "Joyful Noise" as a whole is an original work, that says nothing about whether "Dark Horse" is "substantially similar" to "Joyful Noise" in "protected expression."

Second, while Plaintiffs' quote Dr. Ferrara's statement that "the ostinato in Joyful Noise is 'distinctive and memorable,'" this selective quotation is highly misleading and out of context.  What Dr. Ferrara actually said is:

> You asked me whether I think the entirety of that 22-note
> ostinato is in and of itself trite and unremarkable. The
> answer is, no, I do not. I think, as I wrote in my report,
> that there are distinctive parts to it. Those distinctive
> parts are primarily the portamentos. (Singing) Rum pum
> pum pum prum pum pum pum. All of that makes that 22-
> note ostinato distinctive and memorable. *The point is that*
> *what is distinctive and memorable about that*, and that
> also includes ending on that very odd F at the end, *none*
> *of that is in either ostinato in -- in Dark Horse. What is*
> *common to both, even if one accepts Dr. Decker's table,*
> *is 3, 3, 3, 3, 2, 2, that -- in even notes. That, once again,*
> *is unremarkable, and, you know, elementary,*
> *rudimentary, so forth.*

Kahn Decl. Ex. 15, pp. 70:11-71:13 (Dkt. No. 289-10).

Dr. Ferrara could not have been any clearer in his testimony that the only "distinctive and memorable" parts of "Joyful Noise" are simply not at issue in this case.  Dr. Ferrara was not admitting that Dr. Decker's elements of purported similarity were original—quite the opposite, Dr. Ferrara testified that these elements are "unremarkable," "elementary," and "rudimentary."

* * *

Since Dr. Decker failed to apply the Ninth Circuit's extrinsic test, and instead applied an improper intrinsic methodology, his analysis is fundamentally flawed and unreliable. For that reason, Plaintiffs have no requisite proof of substantial similarity under the extrinsic test as they have no admissible expert testimony. *Swirsky*, 376 F.3d at 845.[21]

## III.   CONCLUSION

For the reasons stated in Defendants' motion papers and on reply, Plaintiffs' claim for copyright infringement should be dismissed as a matter of law because there is insufficient evidence to support either of the two requisite elements of their claim—access or substantial similarity.

DATED: AUGUST 6, 2018          MITCHELL SILBERBERG & KNUPP LLP


By: /s/ Aaron M. Wais
   Christine Lepera
   Jeffrey M. Movit
   Aaron M. Wais
   Jacob D. Albertson
   Attorneys for Defendants Identified in
   the Caption

---

[21] Plaintiffs also cannot overcome the unrebutted testimony of the six Dark Horse Writers that "Dark Horse" was independently created without access to "Joyful Noise." Although Plaintiffs contend that if there is evidence of access and substantial similarity, the issue of independent creation must go to the jury, this is not the law. In fact, the case upon which they rely, *Three Boys*, expressly notes the possibility that independent creation alone can support summary judgment, noting: "By establishing reasonable access and substantial similarity, a copyright plaintiff creates a presumption of copying. The burden shifts to the defendant to rebut that presumption through proof of independent creation." 212 F.3d at 486 (citing *Granite Music Corp. v. United Artists Corp.*, 532 F.2d 718, 721 (9th Cir. 1976)). Here, Defendants have provided the affirmative and unrebutted testimony of Walter and Gottwald about their creation of the Instrumental Track, as well as the testimony of each of the other Dark Horse Writers chronicling their contributions to the song through lyrics and vocal melodies. SUF ¶¶ 10-15. Such evidence alone is sufficient to support the entry of summary judgment. *See* Mtn., pp. 23-24 (collecting cases). Plaintiffs attempt to distinguish Defendants' cases by arguing that in each there was insufficient evidence of access. Opp., p. 11-12. However, the courts nevertheless affirmed that independent creation can "negate[]" "a prima facie case of copying based on a showing of access and substantial similarity." *Watt v. Butler*, 457 F. App'x 856, 861 (11th Cir. 2012).