Michael A. Kahn (pro hac vice)
Kahn@capessokol.com
Drey A. Cooley (pro hac vice)
cooley@capessokol.com
CAPES SOKOL
7701 Forsyth Blvd. 12th Floor
St. Louis, MO 63015
(314) 721-7701

Eric. F. Kayira (pro hac vice)
eric.kayira@kayiralaw.com
KAYIRA LAW, LLC
200 S. Hanley Road, Suite 208
Clayton, Missouri 63105
(314) 899-9381

Daniel R. Blakey (SBN 143748)
blakey@capessokol.com
CAPES SOKOL
3601 Oak Avenue
Manhattan Beach, CA 90266

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCUS GRAY (p/k/a FLAME), et al.,<br><br>Plaintiffs,<br><br>v.<br><br>KATHERYN ELIZABETH HUDSON (p/k/a KATY PERRY), et al.,<br><br>Defendants. | Case No. 2:15-cv-05642-CAS-JC<br><br>Honorable Christina A. Snyder<br><br>**PLAINITFFS' MEMORANDUM IN OPPOSITION TO MOTION FOR RECONSIDERATION OF DENIAL OF SUMMARY JUDGMENT**<br><br>Hearing Date: October 15, 2018<br>Time: 10:00 am<br>Place: Courtroom 8D – 8th Floor<br>350 W. First Street<br>Los Angeles, CA 90012<br><br>Date Filed: July 1, 2014<br>Trial Date: February 26, 2019 |

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION FOR RECONSIDERATION

## I. Introduction

The Local Rule governing Defendants' motion ends with the following admonition: "No motion for reconsideration shall in any manner repeat any oral or written argument made in support or opposition to the original motion." C.D. Cal. L.R. 7-18.

Nevertheless, Defendants' motion largely rehashes the same oral and written arguments they made in their summary judgment motion. From their attempt to dismiss the significance of 3.8 million streams of Plaintiffs' song, to their effort to banish Plaintiffs and their song into some purportedly arcane ghetto of evangelical hip hop, they repeat the same arguments presented to and rejected by the Court, as discussed in the Court's opinion denying summary judgment.

Ironically, the one access argument they carefully avoid was sufficiently germane to the summary judgment motion that this Court quoted it verbatim in its opinion, namely, Professor Decker's conclusion that the ostinato in "*Dark Horse* clearly borrows a memorable and highly characteristic combination of discrete and specific musical elements heard in *Joyful Noise*." (Court Order (Doc. 299) at 13). That expert's conclusion qualifies as a "striking similarity" opinion—and, as noted in Defendants' cited authority, *Loomis v. Cornish*, 836 F.3d 991 (9th Cir. 2016), "a 'striking similarity' between the works may give rise to a permissible inference of copying even in the absence of any evidence of access." *Id.* at 995 n.1 (quoting *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir. 1987)). Such is certainly the case at the summary judgment stage and remains so in the face of Defendants' regurgitation of their summary judgment arguments here.

**II.  Defendants' rehashing of their attack on the millions of Internet views of *Joyful Noise* actually undermines their argument and reinforces the Court's findings on the issue.**

As the Court can confirm from the transcript attached as Exhibit 2 to the Declaration of Aaron Wais (Doc. 302-2 at 18-35), Defendant's counsel devoted most of oral argument to an attack on the significance of the 3.8 million views of *Joyful Noise* on YouTube and MySpace. Defendants' current motion papers largely repeat those arguments, which are also the same ones made at pages 8-19 of their summary judgment reply brief. (Doc. 296). Given that the Court has already considered and ruled upon those arguments, Plaintiffs limit their response here to the inaccuracies in Defendants' portrayal of the facts and the law.

Defendants do not dispute the *fact* of 3.8 million views of *Joyful Noise* on YouTube and MySpace. Instead, they dispute its significance, which makes their repeated citations to *Loomis v. Cornish* all the more damaging to their argument. That is because the one access factor absent from that case is any evidence whatsoever of even a single Internet view of the plaintiff's song. In short, the facts in *Loomis* render its access ruling largely irrelevant here—beyond, of course, its acknowledgement in footnote 1 that if the plaintiff in that case had provided evidence of striking similarity, that could have given "rise to a permissible inference of copying."

Plaintiffs understand why Defendants feel compelled to attack the significance of 3.8 million views. Not only is the significance of Internet views not discussed in *Loomis*, but also, Plaintiffs have been unable to find any reported case that has had to address numbers anywhere close. Indeed, even if the *Joyful Noise* views were "only" 1 million, that would still be a significant "access" number.

Unable to find support in *Loomis*, Defendants repeat their prior attempts to undermine the significance of those millions of views. One line of attack—first asserted in their summary judgment reply brief (Doc. 296 at 6, 12) and then again at

oral argument (Doc 302-2 at 24-25)—is that the 3.8 million Internet views would translate, under the financial formulas of Recording Industry Association of America (RIAA), "as the economic equivalent of a mere 25,000 digital download sales." (Doc 302-1 at 12). Perhaps so, but Plaintiffs never contended that the 3.8 million views should be converted into digital download sales under the RIAA economic formula. Instead, in drawing comparisons to other measuring sticks in the music industry, Plaintiffs made a passing reference in their summary judgment memorandum to the numbers of record sales that would qualify for a Gold (500,000 units) or Platinum (1 million units) award. (Doc. 286 at 6). Plaintiffs were not seeking a Multi-Platinum certificate from the RIAA. They were simply pointing out that 3.8 million is a big number.

Defendants also re-argue that it is possible that some of those 3.8 million views were by the same person. Again, if 20% of those views were duplicative, there would still be more than 3 million separate views. Moreover, just as one cannot be sure that less than 3.8 million separate individuals viewed the song, one also cannot be sure that *more* than 3.8 million separate individuals viewed the song. For example, "YouTubing"—a gathering of acquaintances who watch YouTube videos together on a large computer monitor or television screen—is a 21st Century form of entertainment. One relevant explanation is provided by Defendant Katy Perry in an article on Defendant Gottswald in the October 14, 2013 issue of *The New Yorker* entitled "The Doctor Is In."[1] There she describes the process of writing *Dark Horse* and some other songs for her *Prism* album with Defendants Gottwald, Walter (p/k/a Cirkut) and Sandburg (p/k/a Max Martin)—a process that includes YouTubing:

> "Luke [Gottwald] and Max [Martin] came to Santa Barbara, and we'd
> hang out, go to the ocean, have nice dinners. There's this really
> amazing studio we like to work at called the Secret Garden, and it's in

---

[1] The full article is located on the website of *The New Yorker* here: https://www.newyorker.com/magazine/2013/10/14/the-doctor-is-in

3

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION FOR RECONSIDERATION

>the woods of Montecito. We go there and listen to music, we do a lot of YouTubing, we drink some Chablis. Luke and his protégé Cirkut make these little beds of music for me to listen to, not too long, just kind of appetizer-size, and then they'll do the full entrées if I like them."

And thus any "YouTubing" of a song that evening among those four Defendants would each be recorded as a single view even though more than one person would have viewed that song.

Defendants' other attack on the 3.8 million views—again originally asserted at the summary judgment stage in both their written and oral arguments—is that "3.8 million views constitutes a mere 'drop in the bucket' in light of the volume of content available on the Internet." (Doc 302-1 at 12-13). Again, Plaintiffs addressed this contention in their summary judgment papers, and the Court had an opportunity to consider it in reaching its ruling. At the risk of repetitiveness, the fact that there are other songs on YouTube that received more views than *Joyful Noise* is irrelevant here. Yes, if *Joyful Noise* had garnered only, for example, 500 views on YouTube, that might undercut proof of access. But 3.8 million (or even 500,000 to 1 million) is a far cry from 500—and far more views than any other internet access case Plaintiffs have located.

So, too, Defendants again attempt to marginalize Plaintiffs and their song in some gospel hip hop ghetto that Defendants would never deign to visit. False again. For example, it is undisputed that *Joyful Noise* is sold on Amazon.com under the category "Rap & Hip-Hop"—not Christian Hip-Hop. (Doc. 286 at 12.) Not only is Rap the most popular form of pop music, but, as the Court can confirm, Defendants' song *Dark Horse* includes a significant rap segment.

Moreover, when Plaintiffs' album reached Number 5 on Billboard Magazine charts, it did so under the Gospel category (*Id.*). While Defendants may try to dismiss Christian gospel as some minor genre of music, the list of gospel musicians

includes not only Mahalia Jackson and the Winans Family but such "obscure" names as Johnny Cash, Bob Dylan, Patti LaBelle, Whitney Houston, Elvis Presley, and Aretha Franklin.[2]

### III. Undisputed facts refute Defendants "no commercial success" argument.

As Plaintiffs' counsel explained at oral argument—and reiterates here, Plaintiffs have not yet been able to obtain any accounting or other sales information from their record company, who they were forced to sue. While Plaintiffs hope to obtain that information by the time of trial, Defendants are incorrect when they assert once again that "there is no evidence that 'Joyful Noise' had any commercial success." (Doc. 302-1 at 9.)

There is compelling evidence of commercial success. The facts here are a far cry from those in *Loomis*, where there were just 46 sales. Here, among other things, it is undisputed that the album featuring Joyful Noise:

- Spent 35 weeks on the Billboard Magazine chart for Top Gospel Albums; and
- Peaked at Number 5 on that chart.

(Kahn Decl. Ex. 10 (Doc 289-5).[3] Plaintiffs' album also reached #1 on the Christian Music Trade Association (CMTA) R&B/Hip Hop Chart. (Doc 286 at 13.) Those Billboard and CMTA numbers alone establish commercial success.

---

[2] https://en.wikipedia.org/wiki/List_of_gospel_musicians

[3] The Billboard chart rankings are based on album and track sales and downloads and other relevant popularity measurements. (https://www.billboard.com/p/faq). The Court can take, and has previously taken, judicial notice over music charts. *See Straughter v. Raymond, IV,* No. CV 08-2170 CAS, 2011 WL 3651350, at *12 (C.D. Cal Aug. 19, 2011).

5

**IV. In their rehash of prior arguments, Defendants fail to address the impact of "striking similarity" on the question of access.**

Defendants devote so much of their Memorandum to the Ninth Circuit's *Loomis* decision that the page citation to *Loomis* in their Table of Authorities simply reads "passim." But, as noted above, they carefully avoid that Court's reference to the impact of "striking similarity" on the question of access. In *Loomis*, "striking similarity" was not a relevant factor because, as the Court noted, "Loomis had not presented any evidence or argument regarding striking similarly, and Loomis has not advanced that theory on appeal." (*Id.* at 995 n.1.)

Here, by contrast, Plaintiffs *have* presented that evidence and argument in the "substantial similarity" portion of the summary judgment opposition papers, and the Court included in its opinion a portion Professor Todd Decker's conclusion regarding that issue. Professor Decker's conclusion reads, in full, as follows:

> The similarities between *Joyful Noise* and *Dark Horse* are substantial and significant. These similarities are evident in several overlapping musical domains, including, as detailed above, the rhythm, pitch content, melodic contour, and timbre of the ostinatos in both tracks.
>
> In my view, the ostinato in *Dark Horse* clearly borrows a memorable and highly characteristic combination of discrete and specific musical elements heard in *Joyful Noise*. Given the important structural function and expressive use of the ostinato in *Dark Horse*, *Joyful Noise* can be said to have provided essential and highly characteristic musical materials for *Dark Horse*.

(Wais Decl. Ex. 3 (Decker Expert Report) Doc. 282 at 32). Moreover, as discussed in Plaintiffs' Memorandum in Opposition to the Summary Judgment Motion, Professor Decker's Rebuttal Expert Opinion further amplifies this striking similarity between the two works. (Doc. 286 at 15-16).

In short, Defendants' effort to use *Loomis* as the battering ram for repeating their summary judgment arguments trips over footnote 1 in that decision. At least at the summary judgment stage of this case, the striking similarities between *Joyful Noise* and *Dark Horse*, in the words of *Loomis*, "may give rise to a permissible inference of copying even in the absence of any evidence of access."

Here, as discussed above, there is ample additional evidence of access.

## V. Conclusion

Based upon the foregoing, this Court should deny Defendants' motion for reconsideration of its prior ruling denying summary judgment.

Respectfully submitted

Dated: September 24, 2018

/s/Michael A. Kahn
Michael A. Kahn (pro hac vice)
kahn@capessokol.com
Drey A. Cooley (pro hac vice)
cooley@capessokol.com
CAPES SOKOL GOODMAN & SARACHAN PC
7701 Forsyth Blvd., 12th Floor
St. Louis, Missouri 63105
Tel: (314) 721-7701

Eric F. Kayira (pro hac vice)
eric.kayira@kayiralaw.com
KAYIRA LAW, LLC
200 S. Hanley Road, Suite 208
Clayton, Missouri 63105
(314) 899-9381

Daniel R. Blakey (SBN 143748)
blakey@capessokol.com
CAPES SOKOL
3601 Oak Avenue
Manhattan Beach, CA 90266

*Attorneys for Plaintiffs*

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION FOR RECONSIDERATION