CHRISTINE LEPERA (admitted *pro hac vice*)
  ctl@msk.com
JEFFREY M. MOVIT (admitted *pro hac vice*)
  jmm@msk.com
JACOB D. ALBERTSON (admitted *pro hac vice*)
  j1a@msk.com
MITCHELL SILBERBERG & KNUPP LLP
437 Madison Avenue, 25th Floor
New York, New York 10022
Telephone: (212) 509-3900
Facsimile: (212) 509-7239

AARON M. WAIS (SBN 250671)
  amw@msk.com
GABRIELLA A. NOURAFCHAN (SBN 301594)
  gan@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, California  90067
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

GREENBERG TRAURIG, LLP
VINCENT H. CHIEFFO (SBN 49069)
Email:  ChieffoV@gtlaw.com
ALANA C. SROUR (SBN 271905)
Email:  SrourA@gtlaw.com
1840 Century Park East, Suite 1900
Los Angeles, CA 90067-2121
Telephone:  310-586-7700
Facsimile:  310-586-7800

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| MARCUS GRAY, et al., | CASE NO. 2:15-cv-05642-CAS (JCx) |
|     Plaintiffs, | Honorable Christina A. Snyder |
| v. | **DECLARATION OF AARON M. WAIS IN SUPPORT OF DEFENDANTS' MOTION TO PRECLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT MICHAEL EINHORN AT TRIAL** |
| KATHERYN ELIZABETH HUDSON, et al., | |
|     Defendants. | **Final Pretrial Conference** |
| | Date:     July 1, 2019 |
| | Time:     11:00 a.m. |
| | Courtroom:  8D – 8th Fl., First Street |
| | Filed:    July 1, 2014 |
| | Trial:    July 16, 2019 |

**WAIS DECLARATION IN SUPPORT OF DEFENDANTS' MOTION TO PRECLUDE EINHORN TESTIMONY AT TRIAL**

## <u>DECLARATION OF AARON M. WAIS</u>

I, Aaron M. Wais, declare:

1.      I am an attorney at law duly licensed to practice law in the State of California and before this Court.  I am, through my professional corporation, a partner in the law firm of Mitchell Silberberg & Knupp LLP, attorneys of record for Defendants Capitol Records, LLC, Jordan Houston, Lukasz Gottwald, Sarah Theresa Hudson, Karl Martin Sandberg, Henry Russell Walter, UMG Recordings, Inc., Universal Music Group, Inc., WB Music Corp., Kobalt Music Publishing America, Inc., and Kasz Money, Inc.  I have personal knowledge of the following facts, and if called and sworn as a witness, could and would competently testify thereto.

2.      On May 24, 2019 and June 6, 2019, I, along with my colleague Jacob Albertson and counsel for Defendants Katheryn Elizabeth Hudson and Kitty Purry, Inc., Vincent Chieffo, met and conferred with Plaintiffs' counsel, including Michael Kahn and Lauren Cohen, regarding the substance of this motion in limine. The parties were unable to narrow the evidentiary issues in dispute or otherwise come to an agreement that would obviate the need for this motion.

3.      Attached hereto as **Exhibit 1** are true and correct copies of relevant portions of the certified copy of the transcript of the deposition of Steven Drellishak, Defendant Capitol Records' 30(b)(6) corporate representative, taken on February 28, 2019.

4.      Attached hereto as **Exhibit 2** are true and correct copies of relevant portions of the certified copy of the transcript of the deposition of Plaintiff's damages expert, Michael Einhorn, Ph.D. taken May 17, 2019.

5.      Attached hereto as **Exhibit 3** is a true and correct copy of the expert report of Dr. Einhorn dated April 12, 2019.

**WAIS DECLARATION IN SUPPORT OF DEFENDANTS' MOTION TO PRECLUDE EINHORN TESTIMONY AT TRIAL**

6.      Attached hereto as **Exhibit 4** are true and correct copies of relevant portions of the transcript of the deposition of Dr. Einhorn in *Fitness Quest, Inc. v. Universal Music Publishing Group* taken on December 17, 2003.

7.      Attached hereto as **Exhibit 5** are true and correct copies of relevant portions of the transcript of the February 8, 2007 trial testimony of Dr. Einhorn in *Bridgeport Music, Inc. v. Universal Music Group, Inc.*

8.      Attached hereto as **Exhibit 6** are true and correct copies of relevant portions and Exhibit 1 from the certified copy of the transcript of the deposition of Plaintiff Chike Ojukwu taken on November 17, 2017.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of Dr. Einhorn's rebuttal expert report dated May 3, 2019, submitted in rebuttal to the expert report of Defendants' expert, Dr. Lawrence Ferrera.

10.      Attached hereto as **Exhibit 8** is a true and correct copy of this Court's March 1, 2019 Order Re: Joint Stipulation to Modify Case Schedule, Docket No. 322.

11.      Attached hereto as **Exhibit 9** is a true and correct copy of Dr. Einhorn's updated expert damages report served on Defendants on May 14, 2019.

12.      Attached hereto as **Exhibit 10** is a true and correct copy of an electronically generated redlined comparison of Dr. Einhorn's updated damages report served May 14, 2019 against his original expert report served on April 12, 2019.  Exhibit 10 was prepared by my office using Litera Change-Pro.

13.      The deposition of Katheryn Hudson p/k/a Katy Perry was taken in this case on March 13, 2019.  Attached hereto as **Exhibit 11** is a true and correct copy of the March 21, 2019 email from the court reporting agency transmitting the final transcript of Ms. Perry's deposition to counsel for the parties, including Plaintiffs' counsel, Michael Kahn.

14.     Attached hereto as **Exhibit 12** is a true and correct copy of the May 28, 2019 email from Plaintiffs' counsel, Michael Kahn, on which I am copied, serving Dr. Einhorn's second updated expert damages report dated as of May 24, 2019 attached hereto as Exhibit 13.

15.     Attached hereto as **Exhibit 13** is a true and correct copy of Dr. Einhorn's second updated expert damages report, dated as of May 24, 2019, and served on Defendants on May 28, 2019.

16.     Attached hereto as **Exhibit 14** is a true and correct copy of an electronically generated redlined comparison of Dr. Einhorn's *first* updated damages report updated as of May 14, 2019 with his *second* updated expert report updated as of May 24, 2019.  Exhibit 14 was prepared by my office using Litera Change-Pro.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed this 12th day of June, 2019, at Los Angeles, California


        /s/ Aaron M. Wais
          Aaron M. Wais

Mitchell
Silberberg &
Knupp LLP

11127565.2

**WAIS DECLARATION IN SUPPORT OF DEFENDANTS' MOTION TO PRECLUDE EINHORN TESTIMONY AT TRIAL**

# EXHIBIT 1

EXHIBIT 1
PAGE 5

STEVEN DRELLISHAK ***HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*** 2/28/2019

Page 1

```
 1                    UNITED STATES DISTRICT COURT

 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4    MARCUS GRAY (p/k/a FLAME);          )
      EMANUEL LAMBERT; AND CHIKE OJUKWU,)
 5                                        )
                  Plaintiffs,            )
 6                                        )
             vs.                          ) Case No.
 7                                        ) 2:15-cv-05642-CAS-JC
      KATHERYN ELIZABETH HUDSON           )
 8    (p/k/a KATY PERRY), et al.,         )
                                          )
 9                Defendants.            )
      _____)
10

11

12

13

14       ***HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY***

15             DEPOSITION OF STEVEN DRELLISHAK,

16    CAPITAL RECORDS 30(b)(6) CORPORATE REPRESENTATIVE

17                 Los Angeles, California

18               Thursday, February 28, 2019

19

20

21

22    REPORTED BY:

23    JEAN KIM
      CSR NO. 13555, RPR
24

25
```

```
 1                    UNITED STATES DISTRICT COURT

 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4   MARCUS GRAY (p/k/a FLAME);        )
     EMANUEL LAMBERT; AND CHIKE OJUKWU,)
 5                                     )
              Plaintiffs,             )
 6                                     )
          vs.                         ) Case No.
 7                                     ) 2:15-cv-05642-CAS-JC
     KATHERYN ELIZABETH HUDSON        )
 8   (p/k/a KATY PERRY), et al.,       )
                                       )
 9            Defendants.             )
     _____)
10

11       ***HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY***

12       Deposition of STEVEN DRELLISHAK, CAPITAL RECORDS

13   30(b)(6) CORPORATE REPRESENTATIVE, taken on behalf of the

14   Plaintiffs, at 11377 West Olympic Boulevard, Los Angeles,

15   California, commencing at 10:14 a.m., on Thursday,

16   February 28, 2019, before Jean Kim, CSR No. 13555, RPR, a

17   Certified Shorthand Reporter in and for the County of

18   Los Angeles, State of California.

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2

      FOR PLAINTIFFS:
 3        CAPES SOKOL GOODMAN & SARACHAN, PC
          BY:  LAUREN R. COHEN
 4            Attorney at Law
          7701 Forsyth Boulevard
 5        12th Floor
          St. Louis, Missouri  63105
 6        314.721.7701
          lcohen@capessokol.com
 7

 8
      FOR DEFENDANTS CAPITOL RECORDS, JORDAN HOUSTON, LUKASZ
 9    GOTTWALD, SARAH THERESE HUDSON, KARL MARTIN SANDBERG AND
      HENRY RUSSELL WALTER, KASZ MONEY, INC., UMG RECORDINGS,
10    INC., UNIVERSAL MUSIC GROUP, INC., WB MUSIC CORP. AND
      KOBALT MUSIC PUBLISHING AMERICA, INC.:
11        MITCHELL SILBERBERG & KNUPP, LLP
          BY:  AARON M. WAIS
12            Attorney at Law
          2049 Century Park East
13        18th Floor
          Los Angeles, California  90067
14        310.312.2000
          amw@msk.com
15

16
      ALSO PRESENT:
17
          JoAn Cho, Universal Music Group
18

19

20

21

22

23

24

25
```

STEVEN DRELLISHAK ***HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*** 2/28/2019

 1    collection of processes.  It's a very manual process.  So

 2    this is not -- this is not something that existed.  It

 3    had to be created.  And so we used, really, system

 4    queries and pulling documents to prepare this.  It's a

 5    collection of approaches.

 6        **Q    So you used documents -- and what do you mean by**

 7    **"system queries"?**

 8        A    If we have a database of information that holds

 9    the detail we need, we would query the system and

10    generate a report.

11        **Q    Were there any other sources of information that**

12    **went into the creation of this document besides other**

13    **financial records or documents themselves or system**

14    **inquiries?**

15        A    No.

16        **Q    And whether it was documents or, you know,**

17    **databases, system queries, all of the material that forms**

18    **the foundation of this document is maintained in the**

19    **course of Capitol Records's business; is that right?**

20        A    Yes.

21            MS. COHEN:  I'm going to have you turn to Tab 2

22    in your binder, and we'll mark this next document

23    Exhibit 3.

24            (Exhibit 3 was marked for identification by the

25            certified shorthand reporter.)

```
1                    REPORTER'S CERTIFICATE

2

3

4              I, Jean Kim, CSR No. 13555, RPR, a Certified

5    Shorthand Reporter in and for the State of California, do

6    hereby certify:

7              That prior to being examined, the witness

8    named in the foregoing proceedings declared under penalty

9    of perjury to testify to the truth, the whole truth, and

10   nothing but the truth;

11             That said proceedings were taken by me in

12   shorthand at the time and place herein named and was

13   thereafter transcribed into typewriting under my

14   direction, said transcript being a true and correct

15   transcription of my shorthand notes;

16             Pursuant to Federal Rule 30(e), transcript

17   review was not requested;

18             I further certify that I have no interest in

19   the outcome of this action.

20                       March 13, 2019

21

22

23

24             _____
               JEAN KIM
25             CSR No. 13555
```

LUDWIG KLEIN REPORTERS & VIDEO, INC. - 800.540.0681          149

EXHIBIT 1
PAGE 10

# EXHIBIT 2

EXHIBIT 2
PAGE 11

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 1

1        UNITED STATES DISTRICT COURT

2      FOR THE CENTRAL DISTRICT OF CALIFORNIA

3    ----------------------------X

     MARCUS GRAY (p/k/a FLAME),

4    et al.,                    Civil Action

5

                              2:15-cv-05642-CAS-JCx

6

7            Plaintiffs,

8          v.

     KATHERYN ELIZABETH HUDSON

9    (p/k/a KATY PERRY), et al.,

10           Defendants.

     ----------------------------X

11

12   * HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

13          VIDEOTAPED DEPOSITION

14                OF

15       MICHAEL A. EINHORN, PH.D.

16        New York, New York

17        Friday, May 17, 2019

18

19

20

21

22

23   Reported by:

24   ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR

25   JOB NO. 161187

EXHIBIT 2
PAGE 12

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 2

1

2

3

4                  May 17, 2019

5                  10:30 a.m.

6

7          HIGHLY CONFIDENTIAL/ATTORNEYS' EYES

8    ONLY video deposition of MICHAEL A.

9    EINHORN, PH.D., held at the offices of

10   MITCHELL SILBERBERG & KNUPP LLP, 437

11   Madison Avenue, New York, New York

12   pursuant to Notice, before Annette

13   Arlequin, a Certified Court Reporter, a

14   Registered Professional Reporter, a

15   Certified Realtime Reporter, and a

16   Realtime Systems Administrator and a

17   Notary Public of the State of New York

18   and New Jersey.

19

20

21

22

23

24

25

EXHIBIT 2
PAGE 13

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 3

1    A P P E A R A N C E S:

2

3    CAPES, SOKOL, GOODMAN & SARACHAN

4    Attorneys for Plaintiffs

5        Pierre Laclede Center

6        7701 Forsyth Boulevard

7        St. Louis, Missouri 63105

8    BY: MICHAEL KAHN, ESQ.

9

10

11   MITCHELL SILBERBERG & KNUPP

12   Attorneys for Defendants

13       437 Madison Avenue

14       New York, New York 10022

15   BY: JEFFREY MOVIT, ESQ.

16       JACOB ALBERTSON, ESQ.

17           - and -

18       2049 Century Park East

19       Los Angeles, California 90067

20   BY: GABRIELLA NOURAFCHAN, ESQ.

21

22

23

24

25

EXHIBIT 2
PAGE 14

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 4

1    A P P E A R A N C E S(Cont'd.):

2

3    ALSO PRESENT:

4          RODOLFO DURAN, Legal Video Specialist

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 5

1        IT IS HEREBY STIPULATED AND

2   AGREED by and between the attorneys for

3   the respective parties herein, that

4   filing and sealing be and the same are

5   hereby waived;

6        IT IS FURTHER STIPULATED AND

7   AGREED that all objections, except as

8   to the form of the question, shall be

9   reserved to the time of the trial;

10        IT IS FURTHER STIPULATED AND

11   AGREED that the within deposition may

12   be sworn to and signed before any

13   officer authorized to administer an

14   oath, with the same force and effect as

15   if signed and sworn to before the

16   Court.

17

18              - o0o -

19

20

21

22

23

24

25

EXHIBIT 2
PAGE 16

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 58

1       A.    I didn't say it in the sentence

2   you read to me either.

3       Q.    I said defending against the

4   claim.   Sometimes that person is a

5   plaintiff and sometimes the person is a

6   defendant.

7       A.    I'm sorry.   Can you read that

8   sentence back to me?

9       Q.    Let's just have a new question.

10          In the past three years, isn't it

11  correct that all of your professional

12  engagements in copyright cases have been on

13  behalf of the party claiming that its work

14  was infringed?

15      A.    Yes.

16      Q.    Thank you.

17          And is it correct that since the

18  year 2000, the majority of your

19  professional engagements in copyright cases

20  have been on behalf of the party claiming

21  that its work was infringed?

22      A.    Yes.

23      Q.    Thank you, sir.

24          Dr. Einhorn, not counting

25  investment income or pensions, what

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 59

1    percentage of your income comes from work

2    as a testifying expert witness?

3         A.   Oh, 80 to 90.

4              MR. KAHN:  Jeff would you pause

5         for one second?

6              MR. MOVIT:  Yes.

7              MR. KAHN:  We don't need to take

8         a break.  I need to get a pen.

9              MR. MOVIT:  Sure.  No problem.

10   Of course.  Let me know when you're

11   ready.

12             MR. KAHN:  I'm ready.

13   BY MR. MOVIT:

14        Q.   Dr. Einhorn, is it correct that

15   from 1997 to 2000 you worked as a staff

16   economist at Broadcast Music Incorporated?

17        A.   Yes.

18        Q.   Is it correct that this is the

19   only time that you have worked as an

20   employee in the music industry?

21        A.   As an internal employee, yes.

22        Q.   And isn't it correct that this is

23   your only job that you have ever had in the

24   music industry other than being an expert?

25        A.   Yes.

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 63

1      A.   When I was head-hunted, my

2  headhunter told me that there was a bonus

3  that I was going to get after a year or so,

4  and I did not get that in writing.

5            After two years were up, I sent a

6  memorandum around asking for clarification

7  of that issue and what was the status -- I

8  sent a memorandum around to people at BMI.

9            And instead of addressing it

10 forthrightly, Frances Preston, the head of

11 BMI, dismissed me and then gave me a

12 terminating bonus, a terminating

13 arrangement.

14      Q.   Is it correct, Dr. Einhorn, that

15 during your tenure at BMI you were never

16 involved in any negotiations concerning the

17 licenses of any individual composition to a

18 third party?

19            MR. KAHN:  Object.  Asked and

20      answered.  But you can answer.

21      A.   Correct.

22      Q.   Isn't it correct, Dr. Einhorn,

23 that during your tenure at BMI you were

24 never involved in either the licensing or

25 negotiation of a license for the adaptation

EXHIBIT 2
PAGE 19

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 64

1    of a composition?

2         A.    Correct.

3         Q.    Isn't it correct, Dr. Einhorn,

4    that during your tenure at BMI, you were

5    never involved in the licensing or the

6    negotiation of a license to make a

7    derivative work from any single

8    composition?

9         A.    Correct.

10        Q.    Isn't it correct, Dr. Einhorn,

11   that at BMI you were never involved in

12   either the licensing or negotiation of a

13   license to interpolate a composition?

14        A.    Correct.

15        Q.    Dr. Einhorn, is it correct that

16   you are not an expert in music?

17        A.    I'm an expert in music.

18        Q.    Describe your expertise in music.

19        A.    I've worked in the music business

20   for the past 20 years as a professional

21   economist.  I earned a Ph.D. in economics

22   from Yale University in 1981.  I think I'm

23   an expert.

24        Q.    Are you an expert in musicology?

25        A.    No.

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 66

1      A.   Correct.

2      Q.   Is it correct that you have never

3 held any position of employment in which

4 your job duties involved dealing with

5 mechanical licenses?

6      A.   Correct.

7      Q.   Is it correct that you have never

8 worked in radio promotions?

9      A.   Of course, we understand by the

10 word "worked" here, I mean worked as a

11 full-time employee.  All these things I

12 worked as an expert on, including

13 mechanical licenses, of course.  I've don't

14 previous work on this stuff.

15           But as a full-time employee, I'm

16 assuming here all the time full-time

17 employee, the answer is I have never worked

18 for a radio station.

19      Q.   Or as a part-time employee,

20 correct?

21      A.   As a part-time salaried employee,

22 correct.

23      Q.   Any work you have done touching

24 upon mechanical licenses has been as a paid

25 expert, correct?

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 67

1        A.    Yes.

2        Q.    Okay.  And the same would apply

3    for music marketing, correct?

4        A.    Yes.

5        Q.    Is it correct that you have no

6    degree in marketing?

7        A.    Yes.

8        Q.    Is it correct that you have no

9    degree in accounting?

10       A.    Yes.

11       Q.    Is it correct that you had never

12   personally negotiated a licensing split for

13   a musical composition?

14       A.    Yes.

15       Q.    Is it correct that you have never

16   personally negotiated a sample clearance?

17       A.    Yes.

18       Q.    Is it correct that you had never

19   personally negotiated an interpolation

20   license?

21       A.    Yes.

22       Q.    Okay.  Is it correct that you had

23   never personally negotiated any type of

24   license for a single musical composition?

25       A.    Yes.

EXHIBIT 2
PAGE 22

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 85

1    your work at BMI?

2         A.   Yeah.

3         Q.   Okay.  Would you agree that a lot

4    of the definitions of revenues and costs in

5    a P&L statement are really matters of

6    accounting?

7         A.   I don't know.  I'm not an

8    accountant.

9         Q.   Have you ever provided the

10   following testimony:  "A P&L is a profit

11   and loss statement, reports revenues and

12   costs.  A lot of the definitions of

13   revenues and costs are really matters of

14   accounting.  An economist is not qualified

15   to talk about them."

16        A.   Yes.

17        Q.   And that's from the Bridgeport

18   case; is that correct?

19        A.   Yes.

20        Q.   Is it correct that you're unable

21   to testify as to whether or not the profit

22   and loss statement of Capitol Records in

23   this case is accurate or not?  Let me

24   restate that.

25             Is it correct that you cannot

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 87

1    correct?

2         A.    Correct.

3         Q.    And your reports restates some of

4    the -- strike that.

5              And your report sets forth the

6    income data contained on that P&L

7    statement, correct?

8         A.    Correct.

9         Q.    But it does not set forth the

10   expense data contained on that P&L

11   statement, correct?

12        A.    Correct.

13        Q.    Okay.  And you are unable to

14   testify as to whether or not that expense

15   data is accurate, correct?

16        A.    I have not reviewed any data that

17   would confirm whether that expense data is

18   accurate or not.  I have not audited the

19   company.

20        Q.    So my question was:  "And you are

21   unable to testify as to whether or not that

22   expense data is accurate, correct?"

23             So the answer would be yes?

24        A.    Yes.

25        Q.    Thank you.

EXHIBIT 2
PAGE 24

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 110

1          You testified before about your

2     personal experience with licensing

3     negotiations.

4          Have you ever personally

5     negotiated a songwriting split, sir?

6          A.   No.

7          Q.   So you have no personal

8     knowledge, correct?

9          A.   I have no personal experience.

10         Q.   Thank you.

11         Doc, the only time you were

12     exposed to this issue is as an expert,

13     correct?

14         A.   Correct.

15         Q.   Do you have any professional

16     basis to opine -- strike that.

17         Is it your testimony that any of

18     the Dark Horse writers had knowledge of the

19     principal of copyright law that joint

20     authors share equally in profits?

21         A.   I don't know what knowledge they

22     had.

23         Q.   Isn't it correct that under the

24     copyright law Juicy J is also a joint

25     author of the Dark Horse composition?

EXHIBIT 2
PAGE 25

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 159

1    that the parties will shortly stipulate

2    the final numbers.

3        Attorneys' eyes only and without

4    prejudice basis, for the record.

5  BY MR. MOVIT:

6    Q.   Dr. Einhorn, if you would please

7  look at page 14 of Exhibit 2, which is your

8  amended report.

9        (Document review.)

10   Q.   Are you ready, sir?

11   A.   Yes.

12   Q.   Okay.  Do you see that you've

13  taken the publisher royalties number for

14  Juicy J of ███████████████ straight

15  from the first page of Exhibit 5, correct?

16   A.   Yes.

17   Q.   For the line items, it says BMG

18  Chrysalis, correct?

19   A.   Yes.

20   Q.   One would not need to be an

21  expert economist to take this gross income

22  number of ████████ from Exhibit 5 and put

23  it onto page 14 of your report, correct?

24   A.   Correct.

25   Q.   Do you see, sir, on Exhibit 5

EXHIBIT 2

PAGE 26

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 160

1    where there is a gross income line item of

2    ▉▉▉▉▉▉ with the source listed as your

3    former employer BMI, correct?

4         A.   Yes.

5         Q.   And do you see, sir, on

6    Exhibit 14 where there is a line item

7    called performance royalties of ▉▉▉▉▉▉

8              Do you see that, sir?

9         A.   Yes.

10        Q.   And you took that line item from

11   the first page of Exhibit 5, correct?

12        A.   I did.

13        Q.   Okay.  And one would not need to

14   be an expert economist to take this gross

15   income number from BMI and put it onto page

16   14 of your report, correct?

17        A.   No.  To copy one page number to

18   another page number, no.

19        Q.   I know -- so that is correct what

20   I said, right?

21        A.   Yes.

22        Q.   Thank you, sir.

23             And then, sir, you see that you

24   have added up for Juicy J the publisher

25   royalties and performance royalties to a

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 161

1   subtotal of ████████

2              Do you see that, sir?

3       A.    Yes.

4       Q.    And that is a basic arithmetic

5   exercise, correct, dividing up those two

6   numbers; would you agree with that?

7       A.    Yes.

8       Q.    One would not need to be an

9   expert economist to engage in that basic

10  arithmetic excise, correct?

11      A.    No, arithmetic, no.  You could do

12  it.  It's relatively easy.  It's an

13  arithmetic operation.

14      Q.    And similarly, for the income

15  numbers on page 14 and 15, for Dr. Luke,

16  Max Martin, Cirkut, Sarah Hudson, you have

17  similarly taken the revenue numbers from

18  charts produced by defendants which are

19  similar to Exhibit 5, correct?

20      A.    Yes.

21      Q.    And again, one would not need to

22  be an expert economist to take those gross

23  income numbers from defendant's

24  spreadsheets and place them onto page 13

25  and 14 of your report, correct?

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 164

1    income numbers from the plaintiffs'

2    financials -- strike that.

3         You've copied the gross income

4    numbers from the defendant's financial

5    statements in paragraph 5.18 of your report

6    but you have not copied or otherwise

7    accounted for the expense numbers on those

8    same statements, correct?

9         A.   Correct.

10        Q.   So you're accepting the income as

11   true, but not the expenses as true even

12   though they were provided to you in the

13   exact same documents, correct?

14        A.   Yes.   I am going to tell you what

15   I was advised.   I am advised that I carry a

16   plaintiff's burden, prove revenues.   Either

17   you go out and prove them or you accept

18   what they tell you.

19        You have an either/or situation

20   but you have to do one or the other, okay?

21        With expenses, they have the

22   defense burden.   They got to prove them.

23   You wait till they prove them and then you

24   respond.

25        I'm doing the plaintiff's burden

EXHIBIT 2
PAGE 29

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 165

1    here.  Either I can prove different

2    revenues or I use yours, but I have to do

3    one or the other.  That's what we got.

4         Q.   That's a legal assumption you've

5    made that is not a principal of economics,

6    correct?

7         A.   I just told you that.  I just

8    said that I was advised.

9         Q.   But my question is:  That's a

10   legal assumption you've made.  That is not

11   a principal of economics, correct?  Yes or

12   no, correct?

13        A.   Yes.

14        Q.   Thank you.

15             Is it correct that you have made

16   no opinion in this case as to what the net

17   profit is for any defendant with respect to

18   Dark Horse?

19        A.   I can't do that until you prove

20   costs.

21        Q.   So, correct, right?

22        A.   Correct.

23        Q.   So in other words, you accept the

24   financial documents with which you were

25   provided for an issue on which the party

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 171

1    the defendants have not proven their costs,

2    as you said a few moments ago, that's not

3    an opinion you're providing?

4         A.   Okay.   Maybe this is an opinion.

5    The defendants let me say it more clearly.

6              The defendants have not proven

7    costs.   Now you want to argue about the

8    word "opine"?

9         Q.   Isn't it correct that in

10   copyright infringement cases in which you

11   are retained as an expert, you routinely

12   state in your opinions and in your

13   testimony that the allegedly infringing

14   party has not proven costs?

15        A.   Yeah.

16        Q.   You said that in the last same

17   Loussier case?

18        A.   Yes.

19        Q.   And you said in the Led Zeppelin

20   case, right?

21        A.   Yes.

22        Q.   And you said it in the YouTube

23   page, right?

24        A.   Under lawyers advice, yeah.

25        Q.   Okay.   And if you stopped saying

EXHIBIT 2
PAGE 31

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 173

1    And you look at people's -- how people's

2    motivations are affected by economic

3    considerations, correct?

4         A.   Yes.

5         Q.   And attorneys representing

6    parties alleging infringement -- alleging

7    copyright infringement retain you as a

8    testifying expert, correct?

9         A.   Yes.

10        Q.   And as you've stated a few

11   moments ago, you have routinely testified

12   or opined in copyright infringement cases

13   that the allegedly infringing parties have

14   failed to prove costs, correct?

15        A.   Yes.

16        Q.   Okay.  Does providing that

17   testimony and opinion on a regular basis in

18   copyright cases make plaintiffs' lawyers in

19   copyright cases more likely or less likely

20   to retain you as an expert?

21             MR. KAHN:  I'll object.

22   BY MR. MOVIT:

23        Q.   I'm asking for your opinion as an

24   economist.

25             MR. KAHN:  I'll object.  It's

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 198

1   are far more than three markets listed in

2   Exhibit 6?

3        A.   Yes.

4        Q.   Would you agree with me that the

5   table on paragraph 9.7 is wrong?

6        A.   Well, I captured the wrong chart.

7   I reported what was on Capitol 0 -- Capitol

8   0169.

9             MR. KAHN:   1069.

10       A.   1069 and I reported those numbers

11  as they appear.

12       Q.   You misinterpreted the document,

13  correct?

14       A.   And I misinterpreted, and I am

15  more than happy to go out and change these

16  numbers.  That's -- I misinterpreted the

17  document.

18            I thought the numbers at the

19  bottom were summaries and -- because they

20  were the last numbers, and now I realize

21  they are not summaries.  They are just --

22  well, it's a very strange chart because the

23  word "total" in all formats does not appear

24  in bold until you get to 1069.

25       Q.   Correct, sir.

EXHIBIT 2
PAGE 33

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 199

1      A.   That's correct.  So what I did

2  was assume when I see a total in bold that

3  says total and they put it in bold one

4  time, I assumed that was the summary line.

5  I just grabbed that and said that's a

6  summary line.

7      Q.   Without looking at the data --

8      A.   And now that you pointed this

9  out, I can see that I misinterpreted that

10  summary line and, sure, I'll change them.

11  Okay.  It's a summary line and I had a

12  different impression of what it --

13      Q.   Yeah, you looked at the summary

14  line and not the preceding 15 pages,

15  correct?

16      A.   It said to me "total all formats"

17  and listed a bunch of numbers.  This is

18  your document.

19           And I interpreted that to be the

20  total and I just took that number.

21      Q.   You looked at the summary page

22  and not the preceding pages, correct?

23      A.   I looked at the preceding pages,

24  but I interpreted the summary page

25  incorrectly.

EXHIBIT 2
PAGE 34

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 200

1    Q.   You didn't actually add up the

2    total to check them, correct?

3         MR. KAHN:  Don't talk over each

4    other.

5    A.   I interpreted the summary page

6    incorrectly.

7    Q.   Is it your testimony this

8    document, the data on this document was

9    generated by any of the defendants in this

10   case?

11        MR. KAHN:  Which document?

12        MR. MOVIT:  Exhibit 6.

13   A.   I believe they get it from a

14   service, actually.

15   Q.   Yeah, Mediabase, correct?

16   A.   Yes.

17   Q.   Okay.  So it's not data generated

18   by the defendants, right?

19   A.   That's right.  You provided it in

20   discovery.

21   Q.   Per the request of the plaintiff,

22   correct?  Per the request of the plaintiff?

23   A.   Yes.

24   Q.   Okay.  And this time I would

25   respectfully ask the witness not to remove

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 201

1   the paper clip and take the documents out

2   of order because it just runs a risk that

3   we lose pages and/or pages get out of order

4   for Exhibit 7 which we're now marking and

5   going forward.

6            (Defendants' Einhorn 7, Document

7        entitled "Katy Perry Unconditionally by

8        Spins to Date, Bates-stamped

9        CAPITOL01084 through 1098, marked for

10       identification, as of this date.)

11  BY MR. MOVIT:

12       Q.    And for the record, Exhibit 7 is

13  Bates numbers Capitol 1084 through 1098 and

14  was marked confidential.

15            (Document review.)

16       A.    Okay.

17       Q.    For the song Unconditionally,

18  Dr. Einhorn, the number of stations, the

19  number of markets listed in your chart in

20  Section 9.8 is wrong, correct?

21       A.    We have the same problem.

22       Q.    So it's wrong, right?

23       A.    Yes, it's the exact same problem.

24  I misinterpreted the chart.

25            MR. MOVIT:   All right.   Let's

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 203

1      Q.   So just so we have a clear

2  record, Dr. Einhorn, do you agree that the

3  numbers in your chart in Section 9.8 with

4  respect to number of stations and number of

5  markets for the song Birthday is wrong?

6      A.   The whole chart is wrong.  I made

7  a mistake.  I transcribed numbers under

8  one -- one belief and I believe the chart

9  said one thing because it only had one line

10 for totality and that was boldfaced.  And

11 my standard way of thinking is if it says

12 total and I said boldface, that is the end.

13       I was incorrect in that and these

14 numbers will have to be changed.

15     Q.   So the -- just to confirm, the

16 date of first play column is also wrong

17 throughout this chart, correct?  Everything

18 is wrong, right?

19     A.   The chart has to be reinterpreted

20 because I misinterpreted what the chart

21 said.

22     Q.   So I just want to just confirm

23 for the record that the date of first play

24 column is also wrong for this chart, right?

25     A.   Yes, everything, yes.

EXHIBIT 2

PAGE 37

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 207

1    give answers to the witness, and you

2    know that.

3       MR. KAHN:  I can do the cross

4    right now if you like.

5       MR. MOVIT:  You have been doing

6    this for a very long time and you know

7    you cannot do that.

8  BY MR. MOVIT:

9      Q.   Dr. Einhorn, isn't it correct

10  that your date of first play column in

11  table 9.8 is erroneous?

12      A.   I said I misinterpreted the

13  chart.  So everything that I have derived,

14  yes, is erroneous.  I mean I said I mis --

15      Q.   Thank you.

16      A.   I said it five times.

17      Q.   Mr. Kahn objects to me doing it

18  in totality, so I'm going column by column.

19  And I just want a clear record that the

20  date of first play column is erroneous?

21      A.   Yes.

22      Q.   And the number of stations column

23  is erroneous, correct?

24      A.   Yup.

25      Q.   Okay.  And the number of markets

EXHIBIT 2
PAGE 38

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 208

1    column is erroneous, correct?

2          A.    Same mistakes I made every time.

3          Q.    On the chart?

4          A.    Yes.

5          Q.    If you look at paragraph 9

6    point -- actually, before we move that.

7                Dr. Einhorn do you know what the

8    audience column signifies?

9          A.    Yes.

10         Q.    What does it signify, sir?

11         A.    The audience means is they take

12   the population of a market -- it's done for

13   advertising purposes.  They take the

14   population of the market and multiply it

15   times -- that is the measure of the size of

16   the audience.

17               So when you add up the pop- --

18   the total feasible population that can hear

19   a song, that's the measure of the audience.

20   It doesn't mean that everybody really heard

21   it.

22         Q.    Right.  Now, Dr. Einhorn, is your

23   understanding that the media-based data

24   that we've been looking at is just for the

25   United States?  Is that your understanding,

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 210

1      Q.    This column does not represent

2   the number of people in the United States

3   that could have heard the song, correct?

4   That's my question.

5      A.    The audience -- that is not the

6   population of the United States.

7      Q.    Right.  It's many times larger,

8   correct?

9      A.    Yes.

10     Q.    Okay.  So that number cannot

11   represent the potential audience for

12   hearing the song on the radio, correct?

13     A.    Well, as I said, I made a

14   misinterpretation here.  So anything that

15   stems from that chart is incorrect.

16     Q.    Okay.  Including the audience

17   column, right?

18     A.    Yup.

19     Q.    Okay.  Thank you, sir.

20         If you look at paragraph 9.12 of

21   your report, sir, Exhibit 2, the assertions

22   in paragraph 9.12 are erroneous?

23     A.    They're all --

24     Q.    Correct?

25     A.    9.12 is based on the chart.  The

EXHIBIT 2
PAGE 40

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 211

1    error is pervasive.

2        Q.    And 9.11 is also erroneous,

3    correct, because it relies upon the dates

4    of release in your chart in 9.8, correct?

5        A.    Everything that is based on 9.8

6    is still made based on the same

7    misinterpretation I had of these numbers.

8    The interpretation pervades.

9        Q.    The misinterpretation?

10       A.    Misinterpretation.

11       Q.    So we have a clear record here,

12   paragraph 9.10 is erroneous, correct?

13       A.    Yes.

14       Q.    Paragraph 9.11 is erroneous,

15   correct?

16       A.    Everything that is based on 9.8

17   is erroneous.

18       Q.    So 9.11 would be erroneous?

19       A.    Yes.

20       Q.    Okay.  Thank you.

21            And 9.12 is erroneous, correct?

22       A.    Yep.

23       Q.    And 9.13 is erroneous, correct?

24       A.    If it's based on 9.8, it's

25   erroneous.

EXHIBIT 2
PAGE 41

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 212

1    Q.   That's what I'm asking you, sir.

2         Yes or no, is 9.13 erroneous?

3    A.   It looks like it's all based on

4    my misinterpretation of that total.

5    Q.   So that is a yes?

6    A.   Yes.

7    Q.   Okay.  Yes or no, is 9.14

8    erroneous?

9    A.   Yes.

10   Q.   Yes or no, is 9.15 erroneous?

11   A.   Yes.

12   Q.   You certainly can't stand behind

13   9.16 at this time given that it's a summary

14   of preceding paragraphs that are erroneous,

15   correct?

16   A.   These numbers have to be

17   reworked.  That's all there is to it.

18   Q.   And you can't stand behind 9.16,

19   correct?

20   A.   Not based on false numbers, no.

21   Q.   And it was, correct?

22   A.   Yes.  You have to do it right and

23   if you can't do it the first time, you got

24   to do it right the second time.

25        THE REPORTER:  I need a break.

EXHIBIT 2
PAGE 42

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 213

1              MR. MOVIT:  Off the record.

2              THE VIDEOGRAPHER:  The time is

3         4:20 p.m., and we're going off the

4         record.

5              (Recess is taken.)

6              THE VIDEOGRAPHER:  This is the

7         start of media labeled No. 4.  The time

8         is 4:41 p.m., and we are on the record.

9    BY MR. MOVIT:

10        Q.   Back on the record.

11             Dr. Einhorn, if you would please

12   turn to paragraph 6.4 of Exhibit 2.

13             (Witness complies.)

14        Q.   Okay.  Dr. Einhorn, all the

15   revenue numbers in paragraph 6.4 are taken

16   from the Capitol Records P&L statement,

17   correct?

18        A.   Correct.

19        Q.   And one need not be an expert in

20   economics to pull those revenue numbers

21   from the P&L and insert them into paragraph

22   6.4 of your report, correct?

23        A.   As before, you do not need a

24   Ph.D. in economics to take numbers from one

25   page and bring it over to another.

EXHIBIT 2
PAGE 43

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 214

1          Q.    So the answer to my last question

2    would be yes?

3          A.    Correct.

4          Q.    Thank you, sir.

5                Okay.  The line item that says

6    physical albums, (Thirteen tracks)

7    ██████████; is that correct, sir?

8          A.    Yes.

9          Q.    That's the gross revenue number

10   for all tracks on the 13 track

11   configuration of the Prism album?

12         A.    May I see the P&L?  I don't

13   want --

14         Q.    We can mark the P&L, that's fine.

15   I'll mark it is a binder with tabs because

16   it will get us out of here quickly.  I ask

17   the witness to not take it apart or

18   rearrange it.  The court reporter will give

19   you one, Dr. Einhorn.

20               (Defendants' Einhorn 10, Binder

21         containing documents Bates-stamped

22         CAPITOL 01099 through 011197, marked

23         for identification, as of this date.)

24               (Document review.)

25         A.    Okay.

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 215

1      Q.   And my question was, the first

2   line of your chart in Section 6.4 that

3   says, "Physical albums, 13 tracks,

4   ████████████████ ."

5           That's the total gross revenue

6   number for the sale of Prism album in the

7   13-track configuration, correct?

8      A.   Correct.

9      Q.   So that number is not prorated at

10  all?  It's the total amount for sales of

11  that entire album which had both the Dark

12  Horse track and 12 additional tracks that

13  were not Dark Horse, correct?

14     A.   Correct.

15     Q.   Okay.  And my next question is,

16  the second line of your chart in Section

17  6.4 that says, "Physical album, 16-tracks,

18  ████████████ ."

19          That's the total gross revenue

20  number for the sale of the Prism album in

21  the 16-track configuration, correct?

22     A.   Correct.

23     Q.   Okay.  So that number is not

24  prorated at all?  In other words, it's the

25  total amount for sales of that entire album

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 216

1    which had both the Dark Horse track and 15

2    additional tracks that were not Dark Horse,

3    correct?

4         A.    Correct.

5         Q.    Okay.  And the next line says,

6    "Download albums, 13 tracks."

7              And the number is ████████████,

8    correct?

9         A.    Correct.

10        Q.    Okay.  And that's total gross

11   revenue number for the sale of digital

12   download albums of the Prism album in the

13   13-track configuration, correct?

14        A.    Yes.

15        Q.    In other words, that is the total

16   amount of sales for that entire digital

17   album which had both the Dark Horse track

18   and 12 tracks that were not Dark Horse,

19   correct?

20        A.    Correct.

21        Q.    And then the next line says,

22   "Download album, 16 tracks,

23   ██████████████." Correct?

24        A.    Yes.

25        Q.    Okay.  And that is the total

EXHIBIT 2
PAGE 46

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 217

1  gross revenue number for the sale of the

2  Prism albums in this -- digitally in the

3  16-track configuration, correct?

4       A.   Correct.

5       Q.   Okay.  And that's the total

6  amount of sales for the entire album which

7  had both the Dark Horse track and 15

8  additional tracks that were not Dark Horse,

9  correct?

10      A.   Correct.

11      Q.   Okay.  So there's no proration at

12  all in that number, correct?

13      A.   Correct.

14      Q.   Okay.  The next line is barely

15  worth asking about, but it's ███ for a

16  two-track configuration, which another

17  track was not Dark Horse, correct?

18      A.   Correct.

19      Q.   And you added up all the line

20  items in 6.4, your chart in 6.4, and

21  tallied it as ██████████ , correct?

22      A.   Yes.

23      Q.   And one need not be an expert

24  economist to conduct the arithmetic

25  exercise that you performed in Section 6.4,

EXHIBIT 2
PAGE 47

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 218

1  correct?

2       A.   Once again, I have performed

3  arithmetic --

4       Q.   And when --

5       A.   -- a tool that is available to

6  people outside of the economic profession,

7  yes.

8       Q.   Okay.  Thank you.

9            Again, you have the right to

10 answer as you wish, but a yes will get us

11 all out of here sooner.

12      A.   Okay.

13      Q.   And so the ███████████ number

14 in 6.4 encompasses total revenues from

15 albums including tracks other than Dark

16 Horse, correct?

17           MR. KAHN:  Asked and answered.

18      A.   Yes.

19      Q.   Okay.  And that ████████

20 number is a gross revenue number that does

21 not deduct any costs or expenses, correct?

22      A.   Correct.

23      Q.   Okay.  And again you have --

24 would you agree that the P&L statement from

25 which you've taken the gross revenue

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 219

1   numbers in Section 6.4 also sets forth

2   costs and expenses?

3       A.   I'm sorry?

4       Q.   Do you agree that there are costs

5   and expenses stated in the P&L report from

6   which you've taken the gross revenue

7   numbers in Section 6.4?  I'm not asking

8   whether you agree with them.  I'm asking

9   whether there are costs stated there.

10      A.   Yes.

11      Q.   Thank you, sir.

12           So am I correct that you have

13   accepted the defendant's Capitol Records'

14   P&L accounting report for purposes of gross

15   revenue, but have not accepted it for

16   purposes of costs and expenses?

17      A.   Yes.

18      Q.   Thank you, sir.

19           If you would look at Section 6.7

20   of your report.

21           Do you see the sentence that

22   states:  "There are no additional costs of

23   production or distribution for digital

24   product."

25           Do you see that sentence, sir?

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 238

1    strike everything after the phrase, "No, I

2    can't."

3              And, again, stick to the

4    questions, Dr. Einhorn.  We will get out of

5    here more quickly.

6              Let's turn to Section 8 of your

7    report, which is Exhibit 2, please.

8              (Witness complies.)

9        Q.   My question is whether all of the

10   dollar amounts in Section 8 of your report

11   were pulled from the financial reports of

12   the individual defendants that defendants

13   produced to plaintiffs in this case.

14       A.   I believe so.  I'll look at them.

15   The records that I -- I gave you the Bates

16   stamps, KP 239 to 252.

17       Q.   Go on.

18       A.   KP 278 to 279, I believe so.

19       Q.   I'm not disputing that.  I just

20   need that for the record that these were

21   all -- and they appear to me to be, so I

22   just wanted to confirm for the record --

23       A.   Yes.

24       Q.   -- that all of the dollar amounts

25   in Section 8 of your report were pulled

EXHIBIT 2
PAGE 50

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 239

1    from the financial reports of the

2    individual defendants that the defendants

3    produced to plaintiffs in this case?

4        A.   Yes.

5        Q.   Okay.  Thank you.

6             And do you agree that one need

7    not be an expert economist to pull those

8    dollar amounts from the financial reports

9    of the individual defendants and place them

10   in Section 8 of your report?

11       A.   You do not need to be an

12   economist to transcribe numbers.

13       Q.   You did not need to be an expert

14   economist to transcribe these numbers in

15   Section 8, correct?

16       A.   Right.

17       Q.   Thank you.

18            And you do not need to be an

19   expert economist to add up the revenue

20   numbers in Section 8 for each individual

21   defendant, correct?

22       A.   You do not need to be an

23   economist to use arithmetic.

24       Q.   So that would be a yes?

25       A.   Yes.

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 243

1    was appropriately deducted on the amount,

2    per your stipulation.

3           I don't see any stipulation for

4    Juicy J.  And there's no way I'm going to

5    take his accounting at face value, okay?

6    If he wants to come off and prove it or if

7    you guys want to stipulate it, I'm all

8    ears, but I'm not taking off anything from

9    him until I see some more bottom line.

10        Q.   So you have an understanding that

11   there's been a stipulation of costs for Max

12   Martin but not for the other individual

13   defendants; is that your understanding?

14        A.   Precisely.

15        Q.   Okay.  And the fact that you have

16   deducted costs for Mr. Martin or

17   Mr. Sandberg and not for the other

18   individual defendants is based upon that

19   understanding; is that correct?

20        A.   Yes.

21        Q.   Okay.

22        A.   I believe there was a

23   stipulation.

24        Q.   Have you ever promoted a concert

25   tour?

EXHIBIT 2
PAGE 52

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 244

1      A.   No.

2      Q.   Have you ever promoted a record

3   album?

4      A.   No.

5      Q.   Have you ever published a

6   peer-reviewed article regarding the

7   promotion of a record album?

8      A.   No.

9      Q.   Have you ever published a

10  peer-reviewed article about the promotion

11  of a concert tour?

12     A.   No.

13     Q.   What empirical evidence do you

14  have of the statistical correlation --

15  strike that.

16          What empirical evidence do you

17  have that there is a statistical

18  correlation between concert set lists and

19  the contribution of a track in motivating

20  consumers to purchase the album on which

21  the track appears?

22     A.   Because the record label promotes

23  the concert.  They wouldn't do that unless

24  they were making money from it on the

25  album.  Why would a record label go ahead

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 245

1  and promote a concert, have a concert

2  promotion tour and pay all this money to

3  assist the artist and recoup all this money

4  if they didn't think they were going to

5  make it back on the album?

6          This is not a third-party

7  statistical analysis here.  You've got a

8  record label and it's paying out an awful

9  lot of money and there's got to be a reason

10 for it.  And that's what they do.

11     Q.   But that wasn't my question.

12          My question was, what empirical

13 evidence you have that there is a

14 statistical correlation between a track

15 appearing on a concert set list and the

16 contribution of that track in motivating

17 consumers to purchase the album on which

18 the track appears?

19     A.   That one track?

20     Q.   Yes, sir.

21     A.   No, I don't know.

22     Q.   And it's correct that nearly

23 every track on the standard configuration

24 of the Prism album was part of the set list

25 for the Prism world tour, right?

EXHIBIT 2
PAGE 54

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 246

1        A.    Yes.

2        Q.    Okay.   Are you opining that there

3   is a one-to-one ratio between the

4   percentage of radio spins that a track on

5   an album enjoys and the percentage which

6   that track contributed to the success of

7   the album?

8        A.    No.

9        Q.    Do you have any statistical --

10  strike that.

11            Do you have any empirical

12  evidence of a statistical correlation

13  between a radio spins for a track and the

14  contribution of that track in motivating

15  consumers to purchase the album on which

16  the track appears?

17            (Document review.)

18            MR. MOVIT:   For the record, the

19        witness has opened up the P&L statement

20        for Capitol Records that was marked

21        previously.

22            (Document review.)

23  BY MR. MOVIT:

24        Q.   What tab are you looking at,

25  Dr. Einhorn?

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 260

1    worked in the industry, okay.  These

2    academic studies are academic studies.

3            I know in the industry that the

4    promotion of music is related to concerts,

5    video, and all kinds of play on radio and

6    digital.  I know that.

7        Q.   You worked in the industry for a

8    sum total of three years, correct, from

9    1997 to 2000?

10       A.   No.  I worked in the industry

11   from 1997 until now.  I've worked as an

12   expert.

13       Q.   You worked as an expert being

14   paid money to give opinions in cases,

15   correct?

16       A.   Yeah.

17       Q.   But the only actual work on the

18   business side of the industry that you have

19   had, and the industry being the music

20   industry, is a job at BMI from 1997 to

21   2000, correct?

22       A.   Yes.

23       Q.   Thank you.

24            Have you ever met the proprietor

25   of the website ChartMasters?

EXHIBIT 2
PAGE 56

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 261

1      A.   No.

2      Q.   Do you know whether he considers
3  himself -- do you know who the proprietor
4  is?

5      A.   No.

6      Q.   Do you know whether he considers
7  himself a professional or an amateur with
8  respect to his work on the ChartMasters
9  website?

10     A.   No.

11     Q.   Do you know whether the site is
12  run by professionals or by amateur music
13  fans?

14     A.   No.

15     Q.   Do people in the music industry
16  pay money to receive ChartMasters reports?

17     A.   I don't know.

18     Q.   Do you know if ChartMasters
19  solicits donations from pop music fans?

20     A.   I believe they do, but I'm not
21  sure.

22     Q.   Do you stake your professional
23  reputation on the accuracy of ChartMasters?

24     A.   No.

25     Q.   Do you stake your credibility on

EXHIBIT 2
PAGE 57

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 263

1    cares, and some people might say, Well

2    that's an issue.

3         I really don't know.

4         Q.   Will you vouch for the accuracy

5    of ChartMasters?

6         A.   No.  ChartMasters is a different

7    organization.

8         Q.   So for all you know, the numbers

9    in ChartMasters are completely made up?

10        A.   I said I won't vouch for their

11   accuracy.  I'm reporting -- there is only

12   so much that I can report on and that's it.

13   You know, would I vouch for them?  Have I

14   gone in and examined the bowels of

15   ChartMasters, no.

16        Q.   So it is correct that, for all

17   you know, the numbers in ChartMasters are

18   completely made up?

19        A.   For all I know, the numbers in

20   Mediabase are made up, these number are

21   made up.

22        Q.   That wasn't my question.

23        My question is:  For all you

24   know, the numbers in ChartMasters are

25   completely made up, correct?

EXHIBIT 2
PAGE 58

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 264

1        A.    For all I know.

2        Q.    Okay.  But you do know that

3    companies such as entities within the

4    Universal Music Group pay money to receive

5    Mediabase reports, correct?

6        A.    Okay.

7        Q.    But do you know anyone that pays

8    money to receive ChartMasters' reports?

9        A.    No.

10       Q.    Do you know any major record

11   label that relies upon ChartMasters' data?

12       A.    No.

13       Q.    Do you know any major music

14   publisher that relies upon ChartMasters'

15   data?

16       A.    No.  Not to say they don't do it,

17   but I don't know of any.

18       Q.    Do you have any basis -- --

19   strike that.

20            Do you believe that -- is it your

21   professional -- strike that.

22            Is it your professional opinion

23   that ChartMasters' data is reliable?

24       A.    Like I said, I have not gone in

25   and examined the data in ChartMasters or

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 267

1    website that jumped out at you that made

2    you think it was accurate?

3         A.   Yes.

4         Q.   Okay.  Was there anything outside

5    of the website itself that made you think

6    it was accurate?

7         A.   No.

8         Q.   Okay.  Are you aware of any

9    economic studies assessing the reliability

10   of ChartMasters?

11        A.   No.

12        Q.   Okay.  Are you aware of any

13   academic studies in any discipline

14   assessing the reliability of ChartMasters?

15        A.   No.

16        Q.   Have you done anything at all to

17   assess the reliability of ChartMasters

18   other than reading the ChartMasters website

19   itself?

20        A.   No.

21        Q.   You referred to ChartMasters in

22   your report as a, quote, unquote, service.

23            Do you have knowledge of

24   ChartMasters' providing any services to

25   anyone other than posting alleged data on

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 268

1    its own website?

2         A.    That's what I meant by service.

3         Q.    So you have no knowledge of it

4    providing any other services, correct?

5         A.    No.

6         Q.    So you have no knowledge of

7    ChartMasters doing anything with its data

8    other than posting it on its own website,

9    correct?

10        A.    Yes.  That's correct.

11        Q.    The Capitol Records P&L was

12   created in the discipline of accounting,

13   correct?

14        A.    Yes.

15        Q.    And you agree you're not

16   qualified to critique the P&L as a matter

17   of accounting, correct?

18        A.    Correct.

19        Q.    And you agree that you cannot

20   opine on whether the P&L's apportionment

21   methodology is proper within the discipline

22   of accounting, correct?

23        A.    Within the discipline of

24   accounting?

25        Q.    Yes, sir.

EXHIBIT 2
PAGE 61

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 269

 1      A.   No.

 2      Q.   Okay.  All right.  Let's turn

 3 back to your report.

 4           Would you look again at

 5 Exhibit 2, look at paragraph 1.1, please.

 6           (Witness complies.)

 7      Q.   And my question is just about the

 8 very last sentence.

 9           What, if anything, is the basis

10 for your assertion in paragraph 1.1 of your

11 report that Capitol Records is a "Division

12 of Universal Music Group"?

13      A.   If I misused the word "division,"

14 then I misused the word "division."  My

15 understanding is that Capitol Records is an

16 entity in some way controlled by Universal

17 Music Group.

18      Q.   What do you mean by Universal

19 Music Group?

20      A.   The, if you will, holding entity

21 that owns the record label and the

22 manufacturing entity and the distribution

23 entity that are all related to the

24 production of records.

25      Q.   And does this holding entity have

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 275

1      A.    Correct.

2      Q.    Okay.  Thank you, sir.

3            Isn't it true that Capitol

4   Records incurred some amount of expenses in

5   connection with the exploitation of the

6   song Dark Horse in the album Prism?

7      A.    Yes.

8      Q.    Okay.  Isn't it true that it

9   costs money to manufacture and distribute

10  an album?

11     A.    Yes.

12     Q.    Isn't it true that Capitol

13  Records would have to pay someone to

14  manufacture and distribute the album,

15  whether a related corporate entity or an

16  unrelated entity?

17     A.    Correct.

18     Q.    Okay.  And if Capitol Records

19  does pay a related entity to manufacture

20  and distribute the album, isn't it correct

21  that that related entity incurs costs in

22  doing so?

23     A.    Correct.

24     Q.    Okay.  Is it your testimony that

25  Capitol Records should be penalized for

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 276

1    engaging a related entity to manufacture

2    and distribute the product instead of

3    paying an unrelated entity to do so?

4        A.    That is not my testimony.

5        Q.    Okay.  Isn't it true that Capitol

6    Records has to pay royalties for the

7    mechanical license for the Dark Horse

8    composition on each copy of the sound

9    recording that is sold and each time it is

10   streamed?

11       A.    Yes.

12       Q.    Isn't it true that Capitol

13   Records is obligated to pay artist

14   royalties and producer royalties every time

15   the sound recording is sold or streamed?

16       A.    Subject to recoupment

17   arrangements, yes.

18       Q.    And it's correct that it costs

19   money to create the Dark Horse music video?

20       A.    Yes.

21       Q.    And it's correct that it costs

22   money to promote Dark Horse to radio?

23       A.    Yes.

24       Q.    In paragraph 10.6, if you look at

25   it, in Exhibit 2.

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 279

1    Music Group Inc. when you refer to the UMG

2    entity in this sentence?

3         A.   That is what I believe to be the

4    entity here.  Now the only thing, I mean,

5    if it's Universal Music Group, UMG

6    recordings instead, then that's another

7    Inc. that is established and I'm just not

8    fully aware of the legal structure here.

9              Either Universal Music Group Inc.

10   or UMG recordings Inc. is the entity that

11   can -- owns the Logistics.

12        Q.   Do you see in paragraph 10.7 in

13   the next-to-last sentence where you state:

14   "Transfer payments within the UMG

15   organization are not properly deductible."

16             Do you see that?

17        A.   Yes.

18        Q.   Would you agree that whether a

19   cost is properly deductible by a defendant

20   in a copyright case is a legal question?

21        A.   Sure.

22        Q.   Okay.  So is this a legal opinion

23   you were providing in the next-to-last

24   sentence of paragraph 10.7?

25        A.   Yes.

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 280

1      Q.   In paragraph 10.8, in the

2  next-to-last sentence, you write, "If

3  Capitol Records can prove amounts relating

4  to infringing material, costs are

5  deductible."

6           Do you see that?

7      A.   Yes.

8      Q.   And that's a legal opinion as

9  well?

10          (Document review.)

11     A.   Yes.

12     Q.   In paragraph 10.10, would you

13  agree that the first sentence of paragraph

14  10.10 is a legal opinion?

15          MR. KAHN:  I'm sorry, what?

16     Q.   The first sentence of paragraph

17  10.10 is a legal opinion?

18     A.   Sure.  I said, "I'm advised."

19     Q.   Okay.  Okay.

20          MR. MOVIT:  I think I may be

21     done.  I just need to take five and go

22     through my notes.

23          MR. KAHN:  Okay.

24          MR. MOVIT:  Off the record.

25          THE VIDEOGRAPHER:  The time is

* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Page 297

1              C E R T I F I C A T E

2

3    STATE OF NEW YORK          )

4                        : ss.

5    COUNTY OF WESTCHESTER     )

6

7          I, ANNETTE ARLEQUIN, a Notary

8          Public within and for the State of New

9          York, do hereby certify:

10         That MICHAEL EINHORN, PH.D., whose

11         deposition is hereinbefore set forth,

12         was duly sworn by me, and that the

13         transcript of such depositions is a

14         true record of the testimony given by

15         such witness.

16         I further certify that I am not

17         related to any of the parties to this

18         action by blood or marriage; and that I

19         am in no way interested in the outcome

20         of this matter.

21         IN WITNESS WHEREOF, I have hereunto

22         set my hand this 24th day of May, 2019.

23

24    _____

25         ANNETTE ARLEQUIN, CCR, RPR, CRR, RSA

EXHIBIT 2
PAGE 67

# EXHIBIT 3

EXHIBIT 3
PAGE 68

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

*Marcus Gray (p/k/a Flame), et al.*

                    Plaintiffs,

*v.*

*Katheryn Elizabeth Hudson (p/k/a Katy Perry), et al.*

                    Defendants.

Civil Action  2:15-cv-05642-CAS-(JCx)

Judge: Christina A. Snyder

## EXPERT REPORT
## OF MICHAEL A. EINHORN, Ph.D.,
## ON BEHALF OF PLAINTIFFS

*Subject to change as more information becomes available*

**April 12, 2019**

1

EXHIBIT 3
PAGE 69

# 1.  INTRODUCTION

1.1)    I have been asked by the law firm of Capes Sokol, counsel for Plaintiffs Marcus Gray (p/k/a/ Flame), Emanuel Lambert, and Chike Ojukwu, to provide my expert valuation of actual damages and Defendants' profits resulting from a presumed infringement of Plaintiffs' authorship, ownership, and production rights in a musical composition called "Joyful Noise," which they contend was later infringed by the musical composition and recorded track "Dark Horse."  The track "Dark Horse" was imprinted on the *Prism* album that was released by Defendant Capitol Records, a division of Universal Music Group.

1.2)    I am advised that the three Plaintiffs co-wrote the words and melody of "Joyful Noise" in 2007, recorded the work in March of 2008, and was honored in 2008 with nominations at the Grammys and the Gospel Music Association Dove Award.

1.3)    Plaintiffs contend that "Dark Horse" infringes their copyrights in "Joyful Noise."   My report assumes this to be true as I offer no opinion on Defendants' liability.

1.4)    Capitol Records first released the album *Prism* on October 18, 2013. The track "Dark Horse" appeared in physical and digital albums, singles, and related work distributed in the U.S. and elsewhere.  "Dark Horse" earned considerable play on radio, video, digital services, and concert setlists.

2

EXHIBIT 3
PAGE 70

1.5)    Defendants Katheryn Elizabeth Hudson (p/k/a Katy Perry), Jordan Houston (p/k/a Juicy J)   Lukasz Gottwald (p/k/a/ Dr. Luke), Karl Martin Sandberg (p/k/a Max Martin), Henry Russell Walter (p/k/a/ Cirkut), and Sarah Hudson received directly, or through their publishing entities, royalties related to mechanical, digital, performance, and synchronization of the underlying musical composition "Dark Horse*." As copyright holders to the infringed work "Joyful Noise," plaintiffs should have received some share of total royalties paid.*

1.6) Defendant Katy Perry also received artist royalties for her participation as a primary artist in the recorded track "Dark Horse."

1.7)    Defendant Juicy J also received artist royalties for his participation as a featured artist in the recorded track "Dark Horse."

1.8) Defendants Dr. Luke, Max Martin, and Cirkut received producer royalties for engineering the studio recording featured on the album and digital single

1.9) I am an economist with expertise in valuation of damages related to infringement of intellectual property.   My testimony is consistent with the techniques of my profession, in which I earned a Ph.D. in economics.

1.10)  I am paid an hourly rate of $425 for report-writing, and $600 for preparation for, travel to, and appearance at deposition and/or trial.  This rate is consistent with

3

EXHIBIT 3
PAGE 71

my standard professional arrangements for appearance as an expert witness in court.

1.11) I am not related to any of the parties, nor do I have any financial interest in the outcome of this matter.

## 2.  STATEMENT OF QUALIFICATIONS

2.1)   I have worked as a professional economist since I received a Ph.D. in Economics from Yale University in 1981.  Since graduation, I was employed at Bell Telephone Laboratories, Rutgers University, U.S. Department of Justice (Antitrust Division), and Broadcast Music Inc.

2.2)   I have worked since 2001 as a testifying expert in the area of media and intellectual property.  My curriculum vita is attached as Appendix A.   I testified as an expert at deposition and/or trial on cases so identified in my professional resume.

2.3) I have served as a testifying economist in court cases involving the valuation of the intellectual property owned by commercial artists, software designers, writers, publishers, musicians, record labels,  photographers, inventors, celebrities, actors, cartoonists, television producers, cable companies, and radio stations.

2,4)  I have written 38 professional articles in the area of intellectual property in law journals and periodicals.  I have delivered numerous professional lectures or

4

EXHIBIT 3
PAGE 72

CLE seminars related to these topics. I am also the author of the book *Media, Technology, and Copyright: Integrating Law and Economics* (Edward Elgar Publishers).

2.5)  I have never been disqualified from testifying in court or limited in any manner related to the applied standards, concepts, or techniques of the economics profession.


3. **DOCUMENTS REVIEWED**

I reviewed the following documents in connection with my work as an expert witness here:

- Third Amended Complaint for Copyright Infringement,

- UMG Recordings, Inc. Financial Statements,  "Dark Horse", June 2013 – June 2018, CAPITOL-01099-01197

- Royalty Statements, Katy Perry, "Dark Horse",  KP000278-279

- Contract,  Katy Perry,  Kasz Money Inc., August 31, 2013, KP000183-000209

- Contract,  Katy Perry,  Maratone AB., August 31, 2013, KP000210-000238

- *Prismatic World Tour*, License Agreement,  KP000239-000242

- Administration Agreement, BMG Chrysalis, Jordan Houston,  BMG000257-000290

- Broadcast Music Inc., Royalty Report,  Jordan Houston,   May 20, 2016

5

EXHIBIT 3
PAGE 73

- Contract, Capitol Music Group (a division of Capitol Records), Katy Perry, June 20, 2007; amended September 1, 2010, CAPITOL00001-00061

- Royalties, Kobalt Songs Music Publishing,  KOBALT00006-00007

- Royalties, Katy Perry, "Dark Horse", January 23, 2019

- Declaration, Silvio Pietroluongo,  January 14, 2019

- Summaries of revenues and costs provided by  Lukasz Gottwald,  Henry Russell Walker,  Sarah Hudson, Jordan Houston, all dated March 19, 2019

- Joint Stipulation Regarding Defendant Karl Martin Sandberg, July 1, 2014

- Expert Report of Todd Decker, April 6, 2017

- Wikipedia, *Prism* (Katy Perry Album)

- Wikipedia, "Dark Horse" (Katy Perry song)

- Deposition, Steven Drellishak, February 28, 2019

- Radio Play, Five Songs,  CAPITOL01034- 01098

- Chartmasters,  pages  9-12,  16,  https://chartmasters.org/2018/03/cspc-katy-perry-popularity-analysis-2/16,


## 4.  SUMMARY OF CONCLUSIONS


4.1) I am advised that Plaintiffs Marcus Gray, Emanuel Lambert, and Chike Ojukwu may recover from Defendants actual damages that represent an amount that would have been rightfully earned had Plaintiffs' rights in the composition "Joyful Noise" been properly licensed and compensated.  I am advised that

6

EXHIBIT 3
PAGE 74

Defendants are jointly and severally liable for the total amount of these damages that Plaintiffs suffered.

4.2)   Actual damages in this matter result from uncollected royalties owing to Plaintiffs' rights in the musical composition "Joyful Noise."   These rightful amounts include copyright royalties related to mechanical/digital reproductions, performance, and synchronization royalties that would normally be earned by songwriters or publishers.

4.3) As described in Section 5, Plaintiffs lost the opportunity to earn copyright royalties amounting to ███████. ***This amount represents actual damages that can be recovered jointly from all Defendants.***

4.4)   In addition to actual damages, I am advised that Plaintiffs may recover severable profits from each individual Defendant.  I am advised that Plaintiff must first prove Defendant revenues, from which Defendant must prove appropriate deductions.

4.5)   As itemized in Section 5 and 8, Defendants earned from infringing sales, licenses, and royalty payments (writer, artist, and producer) related to "Dark Horse"

| Defendant | Source of Revenues | Revenues |
|---|---|---|
| Capitol Records | Sale and licensing of recorded | ███████ |

EXHIBIT 3
PAGE 75

| Defendant | Source of Revenues | Revenues |
|---|---|---|
|  | track |  |
| Katy Perry | Co-writer and primary artist/performer | ██████ |
| Juicy J | Co-writer and featured artist | ██████ |
| Dr. Luke | Co-writer and co-producer | ██████ |
| Max Martin | Co-writer and co-producer | ██████ |
| Cirkut | Co-writer and co-producer | ██████ |
| Sarah Hudson | Co-writer | ██████ |
| **TOTAL** |  | ██████ |

4.6)  As explained above and in Section 5, a sum of ██████ reflects a royalty that should have been paid to the Plaintiffs for use of their composition "Joyful Noise" in the song and track "Dark Horse".  All Defendants are jointly liable for this amount.

4.7)  Defendants earned revenues of ██████, of which ██████ is unaccounted for in the actual damages identified above. Each defendant is severally liable for any profit amount not otherwise accounted for in the determination of actual damages.

EXHIBIT 3
PAGE 76

## 5.  ACTUAL DAMAGES

5.1) I am advised that Plaintiffs may recover from Defendants a licensing fee for royalties that would have been earned had Plaintiffs' composition "Joyful Noise" that had been used in "Dark Horse," Plaintiffs here would have received some share of the mechanical, digital, performance, and synchronization royalties attributed to "Dark Horse."

5.2) This share of copyright royalties generally is determined in the music industry through arms-length negotiation involving owners of a copyrighted work and engaged licensees of that work.  As a matter of law, the valuation for a lost licensing opportunity should be a transaction amount at which a willing buyer(s) and a willing seller(s) would arrive in a free negotiation.

5.3)  There is no rule for determining an exact amount that would result from a negotiation.  The results of other negotiations involving similar situations are useful benchmarks to inform this analysis.

5.4)  The Plaintiffs' original work, "Joyful Noise," was a musical composition that appeared as a track on the album *Our World: Redeemed (2008)* as well as a download single and stream (2014).  I am advised that copyright to the song is owned by the Plaintiffs in this lawsuit and that Plaintiff and that Plaintiffs would have been rightfully compensated by the record label. .

9

EXHIBIT 3
PAGE 77

5.5)    The album *Our World: Redeemed* was the fourth studio album from American Christian rapper Flame; it was released on March 4, 2008.    The recording label for the album was Cross Movement. The album earned a Grammy Award nomination for Best Rock or Rap Gospel Album, and the label made a video for the lead single "Joyful Noise.  This establishes that the second had a positive market value. "

5.6)  Per the declaration of Silvio Pietroluongo of Billboard (January 14, 2019), the album recording of *Our World: Redeemed* was commercially successful.  The album appeared on the Billboard Top Gospel Albums chart for thirty-five straight weeks. The album also appeared on the Billboard Top Christian Album on March 22, 2008 (#18) and March 29, 2008 (#34). (Declaration of Silvio Pietroluongo at ¶¶ 6,7)

5.7)  The single track *Joyful Noise* was also commercially successful.  The song charted on the Billboard Gospel Digital Songs Sales Chart for thirty-four straight weeks (1/15/2014 – 7/26/2014), Billboard Gospel Streaming Songs on July 19, 2014 (#1) and July 26, 2014 (#10), and the Billboard Christian Streaming Charts on July 19, 2014 (#4).

5.8) Based on a blended formula that takes into account radio airplay, sales data, and streaming,    "Joyful Noise" also appeared on the Billboard Hot Christian

10

EXHIBIT 3
PAGE 78

Songs on July 19, 2014 (#11) and July 26, 2014 (#37)  and the Billboard Hot Gospel Songs on July 19, 2014 (#1)  and July 26, 2014 (#16),  (Declaration of Silvio Pietroluongo at ¶¶ 8-12).

5.9)  As a musical work reproduced on an album track, the musical work "Joyful Noise" was paid, or deserved to have been paid, royalties from its record label Cross Movement.

5.10)  I have read the expert report of musicologist Prof. Todd Decker of Washington University of St. Louis. I am advised that Prof. Decker will testify that the ostinato in "Joyful Noise" is substantially similar to the main ostinato in "Dark Horse."  Prof. Decker opines that the infringing ostinato is repeated throughout "Dark Horse" and is a major component of the work.

5.11)  Per Prof. Decker's opinion, it is also proper for Plaintiffs  to share some royalty share sales and licensing of the latter with regard to reproduction, performance, and video synchronization.

5.12)  I believe that a reasonable outcome for a copyright negotiation for rights in "Joyful Noise" would have granted to Plaintiffs a 15 percent share of copyright royalties (i.e., mechanical, digital, performance, and synchronization) in the musical composition "Dark Horse."

<center>11</center>

EXHIBIT 3
PAGE 79

5.13)  The amount of 15 percent is determined as follows.  There are now five listed primary writers of "Dark Horse" – Katy Perry, Max Martin, Dr. Luke, Cirkut, and Sarah. Together, the five primary writers owned a copyright share of ██ percent of the work.[1] Each of the five writers then received an equal royalty share of ██ percent. ███████

5.14)   As primary writers in "Dark Horse," Perry, Martin, Luke, Cirkut, and Hudson each presumably made a major contribution to the work "Dark Horse".

5.15)  The borrowing from "Joyful Noise" is related to the repeated ostinato that Prof. Decker identified in his expert report. The taking of the ostinato would then represent a sixth contribution to "Dark Horse" that must be assigned some share of royalties paid.

5.16)   If each of five primary shares are equally valued at ██████ percent of royalties paid, each of six would be then be valued at fifteen percent.

5.17)  I shall now assign to the Plaintiffs a prorated share of royalties paid equal to fifteen percent of copyright royalties.

5.18)  I am advised that the defendants have provided summaries that represent the following amounts of copyright royalties paid to the present (infra Section 8).

---

[1] Juicy J is a featured artist on the video who was cut into a smaller writer share of ██ percent.

12

EXHIBIT 3
PAGE 80

Katy Perry

      Publisher Royalties   █████████

      Performance Royalties  █████████

      **Subtotal:**     ████████

*Juicy J*

      Publisher Royalties   ███████

      Performance Royalties  ████████

      **Subtotal**     ███████

*Dr. Luke*

      Publisher Royalties   ████████

      Performance Royalties  ████████

      **Subtotal**     ████████

*Max Martin*

      Publisher  Royalties   ███████

      Performance Royalties  ████████

      **Subtotal**     ████████

13

EXHIBIT 3
PAGE 81

*Cirkut*

    Publisher Royalties     ███████

    Performance Royalties     ███████

    **Subtotal**     ███████

*Sarah Hudson*

    Publisher Royalties     ███████

    Performance Royalties     ███████

    **Subtotal**     ███████

**TOTAL:**   ███████

5.19)    Total copyright royalties are ███████ .  Valued at a fifteen percent share of the total, I estimate that Plaintiffs would have earned a licensing payment of ███████ for their share of "Dark Horse."

5.20) I am advised that Defendants are jointly liable to pay the identified amount of actual damages.

## 6.  LABEL REVENUES FROM "DARK HORSE": *2013-2018*

6.1)  Defendant Capitol Records recorded the track "Dark Horse" as a component of Katy Perry's album, *Prism.* The album was released on October 18, 2013.

14

EXHIBIT 3
PAGE 82

6.2) The "Dark Horse" track was released in many different formats, including album, single, and DVD. (Drellishak Dep. 20:15-18). The standard album release contained thirteen (13) tracks and the deluxe release contained sixteen (16) tracks.

6.3) The "Dark Horse" track was also made available and licensed as a download, ringtone, ringback, digital stream, video use, synchronized work, and compilation work.

6.4)   After returns, net sales of all products bearing the track "Dark Horse," from October 2013 to June 2018, totaled ▬▬▬▬▬.   (CAPITOL00923; CAPITOL1101-1103; CAPITOL01133). This amount is broken down as follows:



Physical albums (Thirteen tracks)

Physical albums (Sixteen tracks)

Download albums (Thirteen tracks)

Download albums (Sixteen tracks)

Download albums (Two tracks)

Single Tracks (Downloads and Streams)

Domestic Licensing Income

Ancillary Income  (Tour)

TOTAL

15

EXHIBIT 3
PAGE 83

6.5) *Capitol Records sells physical albums as follows*.  The artist makes a master recording in the studio from which actual sales units are imprinted by an independent entity (Drellishak Dep. 59:15-17).  Manufacturing is administered by Universal Music Logistics ("UML") (*Id.* 59:1-8), which receives from the label a designated rate card payment per CD.  (*Id.* 67:2-4)     UML pays the actual manufacturer directly (*Id.* 60:4-14).

6.6) after manufacturing, the albums are then moved into inventory through UMG's distribution service (Universal Music Group Distribution) that administers the process of getting it into record stores. (Id.  85: 13-23) A customer then places an order through an EDI transaction to the sales order processing system.     The sales order processing system records the sales in the general ledger (Drellishak Dep. 22:1-7). After distribution, returns of physical product are credited to the buyer (*Id.* 23:15-18).  The label collects all due revenues from physical sales, and distributes royalties and other expenses to the appropriate parties.

6.7) *For sales of digital product*, the label sends the file directly to the digital service provider (e.g., Apple iTunes, Spotify, Amazon).  The service provider makes the track available to users through downloads or streaming. (*Id.* 36:6-10, 37:3-8).  There are no additional costs of production or distribution for digital product...  The service provider pays for the actual download or stream revenues that can be shared with the artist.  Publishers collect copyright royalties from the

16

EXHIBIT 3
PAGE 84

sale of downloads through separate payment arrangements with the digital service provider.

6.8) Capitol Records earned *licensing income* for ringtones, ring backs, digital streams, video uses, synchronized works (uses that integrate the music with scripted video or live background), and compilations (use of the track on different albums) (*Id.* 42:11-15).

6.9) Capitol Records earned *ancillary income* from revenues received for sale of the *Prismatic World Tour* DVD (*Id.* 55:15-18).

6.10)  Unreported to date are the licensing fees for sales to foreign markets. If foreign sales are recoverable, international revenues should be adjusted upward to reflect this licensing total.  I reserve the right to amend this report if additional information on these revenues becomes available.

6.11) To be conservative, I have included only the lower revenue estimates listed above, but reserve the right to include foreign revenues if the Court rules that it is appropriate to include any component of  foreign sales  in the calculation.

6.12) I do believe that each amount itemized above implicates a product or service that in some way involves the use of the infringing musical composition "Dark Horse," as reproduced on a master recording by Capitol Records.

17

EXHIBIT 3
PAGE 85

## 7. ROYALTY PAYMENTS

7.1) Royalties for "Dark Horse" were earned by the lead artist Katy Perry, featured artist Juicy J producers Dr. Luke, Max Martin, and Circuit, and co-writers Katy Perry, Juicy J., Dr. Luke, Max Martin, Circuit, and Sarah Hudson.

*Lead Artist Royalties*

7.2) Recording artist Katy Perry appears as the lead artist on the track "Dark Horse." The track was originally released on September 17, 2013 as the second promotional single (i.e., radio) from the album *Prism* (2013). The album was later released on October 18, 2013. The single was released for general sales on December 17, 2013.

7.3) As the lead artist, Ms. Perry earned *artist royalties* specified in her contract with Capitol Music Group (a division of Capitol Records). (CAPITOL00001-00061). Her contract was first established on June 20, 2007 and amended on December 13, 2012.

7.4) Per the amended agreement, Ms. Perry earned artist royalties for what I believe to her Third Committed Album, *Prism* (Contract, Section 6). Ms. Perry earned a royalty rate of ▮ based on all sales of the album in the U.S. and Canada; while foreign sales in the U.K./Eire and Rest of Territory were respectively valued at ▮ and ▮ of the above specified rate. The royalty for

18

EXHIBIT 3
PAGE 86

net streaming sales was specified at ███ of total revenues received (not including

eligible non-interactive services covered by Sound Exchange (see next).

7.5)  Ms. Perry also earned artist royalties for her share of eligible  transmissions

performed on  non-interactive digital services collected and distributed by Sound

Exchange (per eligibility requirements established by the Digital Performance

Rights in Sound Recording Act of 1996, 17 U.S.C. 114)

7.6)  Ms. Perry also received a flat payment of ██████ as an upfront  payment

for artist rights related to a DVD release of her full Prismatics concert that she

performed in Sydney Australia (KP000239-252), as well as a product royalty of

█████ (CAPITOL01193-7).  The song "Dark Horse" appeared on the playlist of

this concert (Id.).

7.7)  Some amount of Ms. Perry's artist royalties were recouped by the label to

cover its production and marketing costs for her album (Contract, Section 4),  or

paid out to her designated producers per independent contract. (Infra, Producer

Royalties and Section 8)

7.8) Finally, Ms. Perry earned copyright royalties for her share as a writer in the

musical composition  This work is regarded to be a controlled composition because

Ms. Perry is also the lead artist on the album.

7.9)  I have not reviewed any written contracts that Ms. Perry (or any other writer)

may have signed as a copyright owner of the song "Dark Horse."  As a matter of

industry custom and practice, I believe that Ms. Perry received a reproduction rate of ████ per sold track, pro-rated for her respective share of the composition (███ see 7.18) and a possible reduction for her appearance in a controlled composition.

*Featured Artist Royalties*

7.10)  As a featured artist on the track and video, Juicy J earned *artist royalties* specified in a separate contract with Katy Perry. Artist royalties were paid in flat sums for his work on the recorded track and the video.  (BMG000257-BMG000275).

7.11)  Juicy J also earned royalties for some share of royalties for use of the recorded track on Sound Exchange. .

7.12)  Finally, Juicy J earned copyright royalties for his share as a writer in the musical composition

*Producer Royalties*

7.13)  Co-producers of the recorded track "Dark Horse" were Dr. Luke,  Max Martin, and Cirkut who were initially credited with equal shares of producer royalties.  I believe that the co-producers may have arranged additional transfers among themselves.

20

EXHIBIT 3
PAGE 88

7.14) Katy Perry entered into two producer contracts on August 31, 2013 (Dr. Luke, Cirkut; Contract, KP000183-209; Max Martin Contract, KP000210-236). These contracts established that the producers were paid a share of artist royalties otherwise due to Ms. Perry from physical and digital sales.

7.15)  Payments to Dr. Luke and Cirkut for produced tracks on the album *Prism* were established as follows (Contract, Sections 3-4).  The two producers *together* received upfront a non-recoupable payment of ▮▮▮▮ a ▮▮▮ percent royalty based on physical sales valued at the published price to dealers ("PPD") of the album, a ▮▮▮▮ royalty based on digital sales valued at the same PPD, and ▮▮▮ of artist royalties for licensing of video.  All royalty amounts were suitably pro-rated for the number of participating tracks on the album and the producer's royalty relative to the artists.  Dr. Luke and Cirkut were also to have received a share of ▮▮▮▮ of Perry's due artist royalties paid at Sound Exchange, (Contract, Appendix B, KP000204).  Dr. Luke and Cirkut seem to have further divided their due royalties in a manner of which I am not aware.

7.16) Payments to Max Martin for produced tracks on the album *Prism* were as follows (Contract, Sections 3-4).  Max Martin received upfront a non-recoupable payment of ▮▮▮▮, a ▮▮▮▮ percent royalty based on physical sales valued at the PPD of the album, a ▮▮▮▮ royalty based on digital sales valued at the same PPD, and ▮▮▮ of artist royalties for licensing of video.  All royalty amounts were

21

EXHIBIT 3
PAGE 89

suitably pro-rated for the number of participating tracks on the album and the producer's royalty relative to the artists. Max Martin was also to have received a share of ███████ of Ms. Perry's due artist royalties paid by Sound Exchange (Contract, Appendix B, KP000230).

*Songwriter Royalties*

7.17) Co-writers of the musical composition "Dark Horse" are listed as Dr. Luke, Max Martin, Cirkut, and Sarah Hudson, as well as aforementioned artists Katy Perry and Juicy J. I have not reviewed any relevant publisher contracts that Capital Records signed with any writer or his/her publisher entity.

7.18) Based on information made available from the performing rights organization Broadcast Music Inc., I believe that the writer shares of the copyright in the composition "Dark Horse" are as follows:[2]

Katy Perry:          ██████████

Dr. Luke:            ██████████

Max Martin:          ██████████

Cirkut:              ██████████

Sarah Hudson:        ██████████

---

[2]The same numbers appear as writer shares reported on Katy Perry's artist contract with Juicy J (Jordan Houston). See also Email from Harold Papineau to Jermi Thomas, et al., *Re: URGENT: Juicy – Dark Horse Splits,* January 28, 2014.

22

EXHIBIT 3
PAGE 90

Juicy J:   █████

7.19) As a co-writer of the musical composition "Dark Horse," each listed writer earned royalties from the mechanical  and digital reproductions of the song in albums and singles, public performances of the song in broadcast, digital, and general media venues, and third-party licensing of the song.

7.20)  Per industry custom and practice, record labels generally pay songwriter royalties for *reproductions, synchronization, and compilation* uses to each writer through his/her designated publisher.

7.21)  Each publisher designated a separate collection entity to administer the accounting for its incoming royalty payments.  Each royalty administrator is paid a share of collected revenues as payment for its administrative service.

7.22) Distinguished from other writer royalties, *performance royalties* are collected and administered by performing rights organizations (PRO), such as ASCAP (Dr. Luke, Max Martin, Cirkut, Perry, and Sarah Hudson are members) and BMI (Juicy J is an affiliate).  The PRO pays some share (usually 50%) of the royalty amount directly to the songwriter.  The remainder of the royalty is paid to the writer's designated publisher.

7.23) Based on the above, songwriter claims in the copyright of "Dark Horse" are summarized as follows:

23

EXHIBIT 3
PAGE 91

| Writer | Publisher | Administrator | PRO | Share |
|--------|-----------|---------------|-----|-------|
| Katy Perry | When I'm Rich Youll Be My Bitch | Warner Chappell | ASCAP | |
| Dr. Luke | Kasz Money Publishing | Kobalt Songs | ASCAP | |
| Max Martin | Kasz Money Publishing | Kobalt Songs | ASCAP | |
| Cirkut | Kasz Money Publishing | Kobalt Songs | ASCAP | |
| Sarah Hudson | Prescription Songs | Kobalt Songs | ASCAP | |
| Juicy J | DeeEtta Music | BMG Chrysalis | BMI | |

## 8. ROYALTY AMOUNT: 2013-2018

8.1)  Katy Perry, Juicy J, Dr. Luke, Max Martin, Cirkut, and Sarah Hudson earned writer, artist, and/or producer royalties in connection with their contributions to the song and track "Dark Horse.".

*Katy Perry*

8.2)  Defendant Katy Perry was a co-writer and primary artist of "Dark Horse". As described in Section 7, her due collections accrued through her publishing entity When I'm Rich You'll Be My Bitch, (as administered and collected by

24

EXHIBIT 3
PAGE 92

Warner Chappell Music) performing rights organization ASCAP, and artist collecting society Sound Exchange.  She also earned a payment of ███████ for licensing rights to her Prismatics concert performed in Australia

8.3) Based on the most recent records provided to me (KP000239-252, KP000278-279), Ms. Perry received net royalty payment of █████████ broken down as follows.


Publisher Royalties (through Kobalt Songs): ██████ (2013H2 – 2018H1)

Performance Royalties (through ASCAP): ██████  (2014M4 – 2019:M4)

Sound Exchange Royalties: ██████ (2014M3  - 2019M1)

Artist Royalties: ███████ (2013H2 – 2018H1)

Video Royalties: █████

Video Upfront: ██████

**Total:** ██████

EXHIBIT 3
PAGE 93

*Juicy J*

8.4)  Defendant Juicy J was a co-writer and featured artist of "Dark Horse".   As described in Section 7, collected amounts accrued through his publishing entity Dee Etta Music (as administered and collected by BMG Rights Management), performing rights organization BMI, and artist collecting society Sound Exchange.

8.5) Per a direct contract with Katy Perry (KP00032), Juicy J also received directly from Ms. Perry a flat payment of ███████ for his vocal appearance on the recorded track "Dark Horse", and a flat payment of ███████ for his appearance on the video.

8.6) Based on the most recent records provided to me, Juicy J's  total royalties amounted to ███████████ which were broken down as follows:


Publisher  Royalties  (through BMG Chrysalis) ███████ (2014Q2 – 2018Q2)

Performance Royalties (through BMI): ███████ (2013Q3 – 2018Q1)

Sound Exchange Royalties : ███████ (2013Q4 – 2018Q3)

Artist Royalties (through Katy Perry): ███████

**Total** ███████

26

EXHIBIT 3
PAGE 94

*Dr. Luke*

8.7) Defendant Dr. Luke was a co-writer and co-producer of "Dark Horse".   As described in Section 7, collected amounts accrued to his publishing entity Kasz Money Publishing (as administered and collected by Kobalt Songs Music Publishing), production entity Kasz Money, Inc., performing rights organization ASCAP, artist collecting society Sound Exchange, and shared video royalties..

8.8) Based on the most recent records provided to me, Dr. Luke's reported royalties amounted to ███████████, which were broken down as follows:


Publisher Royalties  (through Kobalt Songs): ███████ (2013Q4 – 2018Q2)

Production Royalties  (through Kasz Money): ███████ (2013Q4 – 2018Q2)

Performance Royalties  (through ASCAP): ███████ (2014Q1 – 2018Q3)

Sound Exchange Royalties: ██████ (2015Q2 – 2018Q4)

Video Royalties ██████ (2017Q2 – 2018Q2)

**Total** ███████


*Max Martin*

8.9) Defendant Max Martin was a co-writer and co-producer of "Dark Horse".  As described in Section 7, collected amounts accrued to his publishing entity MXM

27

EXHIBIT 3
PAGE 95

Music, Inc. (as administered and collected through Kobalt Songs Music Publishing), production entity Maratone AB, Inc., performing rights organization ASCAP, and artist collecting society Sound Exchange and shared video royalties.

8.10) Based on the most recent records provided to me, Max Martin's gross royalties amounted to ██████████, which were broken down as follows

Publisher  Royalties  (through Kobalt Songs): ██████████  (2013Q4 – 2018Q2)

Production Royalties  (through Maratone, AB): ██████████  (2013Q4 – 2018Q2):

Performance Royalties  (through ASCAP): ██████████   (2013Q3 – 2017Q4)

Sound Exchange Royalties: ██████████  (2014Q2 – 2018Q3)

Video Royalties: ██████████  (not available)

Gross Royalty ██████████

8.11) I am advised that parties stipulate that ████ of Max Martin's gross royalties were paid to his administrator Kobalt Songs Music Publishing, and an additional ████ was diverted for legal and management costs.  His net royalty was then ██████████[3]

---

[3]Per Stipulation, April 2019, costs include management commission of ████ of gross ██████████) and legal and administrative fees of ████ of gross (██████████).

EXHIBIT 3
PAGE 96

*Cirkut*

8.12) Defendant Cirkut was a co-writer and co-producer of "Dark Horse."   As described in Section 7, collected amounts accrued to his publishing entity Oneiorology, Inc., (as administered and collected through Kobalt Songs Music Publishing), production entity Kasz Money Inc., performing rights organization ASCAP and artist collecting society Sound Exchange.

8.13) Based on the most recent records provided to me, Cirkut's total royalties amounted to ██████████, which were broken down as follows:


Publisher Royalties    (through Kobalt Songs):   ████████  (2013Q4 – 2018Q3)

Production Royalties (through Kasz Money):   ████████   (2013Q4 – 2018Q2)

Performance Royalties   (through ASCAP):   ████████   (2013Q3 – 2018Q1)

Sound Exchange Royalties:   ████████

Video Royalties:   ████████  (2017Q2 – 2018Q2)

**Total**   ████████


*Sarah Hudson*

8.14)  Defendant Sarah Hudson was a co-writer of "Dark Horse". As described in Section 7, collected amounts accrued to her publishing entity Prescription Songs

29

EXHIBIT 3
PAGE 97

(as administered and collected through Kobalt Songs Music Publishing) and performing rights organization ASCAP.

8.15) Based on the most recent records available to me, Ms. Hudson's total royalties amounted to ████████, which were broken down as follows (without dates):

Publisher Royalties  (through Kobalt Songs):        ██████████

Performance Royalties   (through ASCAP): :        █████████

**Total**        █████████

8.16) With the exception of Max Martin, all royalty amounts reported above are gross receipts before deduction for any administrative costs by any entity. Based on the specific data that I may yet review and verify, I reserve the right to amend for any suitable deductions that are proven to be paid to administrators.

8.17)  Copyright royalties may accrue only to a songwriter's share of the work, and not to artists and publishers. In the above charts in this Section, copyright royalties to each of six writers include only his/her publisher royalties and performance royalties.

8.18) Before administration fees, total copyright royalties for the six writers above sum to ███████. This amount can form the basis of a calculation for actual damages that Plaintiffs would have earned had their rights been properly licensed.

30

EXHIBIT 3
PAGE 98

*If Plaintiffs are entitled to 15 percent of the total, actual damages are then*

██████████

## 9. IMPORTANCE OF SONG DARK HORSE

9.1)  The album *Prism* was a leading album that earned over ████████████

████ in sales and licensing for the label Capitol Records.  The song Dark Horse was critically important to the success of this album. This is documented in and demonstrated by the appearance of the song in concert tours, radio promotion, video use, and commercial charts.

*Concert Tours*

9.2)  Record labels generally market new releases by supporting artist tours related to the new album. In the course of her professional career with Capitol Records, I believe that Katy Perry performed in five Concert Tours under the terms specified in her Original Agreement with the label entered in 2007.

9.3) Ms. Perry's most successful tour of the five tours was the *Prismatic World Tour*, which promoted her album release of *Prism.*  The tour ran from May 2014 to October 2015 and visited Europe, North America, Australia, Asia and South America.

9.4) The *Prismatic World Tour* in 2014-2015 grossed more than $204.3 million from 151 shows with a total attendance of 1,984,503.  The Sydney November 28th

31

EXHIBIT 3
PAGE 99

concert was recorded for her second live album: *The Prismatic World Tour Live*, which was released two weeks after the tour ended.  The setlist for the *Prismatic World Tour* contained twenty songs,

1. "Roar"

2. "Part of Me"

3. "Wide Awake"

4. "This Moment" / "Love Me"

5. "Dark Horse"

6. "E.T."

7. "Legendary Lovers"

8. "I Kissed a Girl'

9. "Hot n Cold"

10. "International Smile" / "Vogue"

11. "By the Grace of God"

12. "The One That Got Away" / "Thinking of You"

13. "Unconditionally"

14. "Walking on Air"

15. "It Takes Two"

16. "This Is How We Do" / "Last Friday Night (T.G.I.F.)"

17. "Teenage Dream"

32

EXHIBIT 3
PAGE 100

18. "California Gurls"

19. "Birthday"

20. "Firework"

9.5) Twelve of twenty songs on the setlists for the *Prismatic World* Tour appeared on the *Prism* album: "Roar," "This Moment," "Love Me," "Dark Horse," "Legendary Lovers," "International Smile," "By the Grace of God," "Unconditionally," "Walking on Air," It Takes Two" (*Prism* Deluxe), "This Is How We Do," and "Birthday." "Dark Horse" was one of the twelve songs.

9.6)   Ms. Perry also performed "Dark Horse" for fourteen additional live performances, including the 56th Grammy Awards on January 26, 2014 in Los Angeles.

### *Radio Play*

9.7)   In documents provided by the Defendant Capital Records itself (CAPITOL01034—1098), the label released five promotional singles from *Prism* for radio play before and after the release of the album on October 18, 2013.

9.8) In the order of initial release, the five promotional singles were as follows:

| Song | Date of 1st play | Radio Spins | # of Stations | # of Markets | Audience |
|------|------|------|------|------|------|
| Roar | 8/26/2013 | 770,436 | 3 | 3 | 5.2 billion |
| Dark Horse | 9/22/2013 | 930,186 | 29 | 24 | 6.3 billion |
| Unconditionally | 10/22/2013 | 149,963 | 10 | 10 | 820.4 |

33

EXHIBIT 3
PAGE 101

| Song | Date of 1st play | Radio Spins | # of Stations | # of Markets | Audience |
|---|---|---|---|---|---|
| | | | | | million |
| Birthday | 4/20/2014 | 141,266 | 20 | 19 | 775 million |
| This Is How We Do | 8/05/2014 | 55,024 | 15 | 15 | 262.3 million |

9.9)  The chart is organized as follows.

Column 1:  Name of songs performed on radio.

Column 2:  Date of first airplay

Column 3:  Radio Spins:  Each broadcast play is one recorded radio spin

Column 4:   Stations:  Number of Individual Broadcast Stations

Column 5:  Markets: Number of Unique Geographic Markets (Some markets can have more than one station performing the song

Column 6:  Number of Spins Multiplied by the Market Population

9.10)  Of the five listed songs released for promotional radio play, only two e – Roar and Dark Horse --  -- were released for radio play before  the album was released (October 18, 2013).

9.11) Along with "Unconditionally" (released October 22, 2013), "Roar" and "Dark Horse" have the most important commercial appeal because they were used to promote and generate momentum for the album release of **Prism**...  The two remaining singles "Birthday" and "This is How We Do" were introduced well after the album made its debut, and most album copies were sold.

34

EXHIBIT 3
PAGE 102

9.12) Of the three  most important songs the track "Dark Horse" accounted for 50.2 percent of all radio spins,  69.0 percent of all radio stations,  64.9 percent of all geographic markets,  and 66.6 percent of all audience listens since its first play.

9.13)  From its first release on September 21, 2013, the track "Dark Horse" came to play on twenty-nine stations, twenty-three of which were of the Top 40 format, which has the most  important commercial appeal. Seven of the top ten Top 40 stations were located in Los Angeles (rank 2), Chicago (3), San Francisco (4), Dallas (5), Washington (7), Atlanta (8), and Boston (10).  Geographic locations for other Top 40 stations included Detroit (12), Seattle (13), San Diego (17), and Tampa (19)

9.14) The prereleases for "Roar" and "Unconditionally" were more modest in scope.  From its first play on August 26, 2013, the prerelease "Roar" came to appear on satellite provider Sirius XM (October 11, 2013) and local stations in Washington, DC (alternative format, August 26, 2013) and Montgomery, Alabama (urban format, September 21, 2013).

9.15) The song "Unconditionally" played on ten stations in ten markets (six adult contemporary format, three alternative format, one rhythmic format, and zero Top 40).  As pointed out above, these spins of "Unconditionally" occurred between October 22, 2013 and December 31, 2013 – after the release of the album on October 18, 2013.

EXHIBIT 3
PAGE 103

9.16) From a commercial perspective, the evidence from radio plays demonstrates that "Dark Horse" was a leading promotional song on the album – if not the most important.

### Streams and Videos on Chartmasters

9.17) Chartmasters is a rating service in the record industry that charts the popularity of new albums and tracks among digital audiences.

9.18) Using a special analytic technique,[4]  Chartmasters identified the twelve most popular tracks *ever* released by the recording artist Katy Perry until the present

9.19) The tracks "Dark Horse" (3,660,000 AES) and "Roar" (3,640,000 AES) are the *only listed tracks* from Katy Perry's album *Prism*.  These two tracks share first and second place among the most popular twelve tracks from the artist.  This ranking confirms the commercial importance of the track "Dark Horse".

9.20) Chartmaster confirmed the history of the five promotional singles from *Prism* as they played on digital streaming services, such as Spotify.

---

[4]Chartmasters estimates the importance of tracks by calculating album equivalent sales (AES).  Album equivalent sales are generated from weighted sums of physical single sales, downloads, and streaming

EXHIBIT 3
PAGE 104

| Song | First Digital Stream | Streams |
|---|---|---|
| Roar | 9/5/2013 | 591,660 |
| Unconditionally | 11/20/2013 | 223,360 |
| Dark Horse | 2/20/2014 | 806,512 |
| Birthday | 4/10/2014 | 160,547 |
| This Is How We Do | 7/31/2014 | 257,370 |

9.21) Judged by relative popularity on all streaming services, "Dark Horse" garnered the most listeners (806,512 streams), while "Roar" came in more distant second (591,660).

9.22)  Of all sixteen tracks on Prism, the album hit a total of  2,352,447,000 streams  The share of this total for "Dark Horse" is 34.2 percent of the total

9.23) Chartmaster also confirmed the history of the five promotional singles as they appeared on YouTube videos that were officially released by Capitol Records. :

| Song | First | Views |
|---|---|---|
| Roar | 9/5/2013 | 2,645,384 |
| Unconditionally | 11/20/2013 | 505,833 |
| Dark Horse | 2/20/2014 | 2,369,953 |
| Birthday | 4/10/2014 | 334,755 |
| This Is How We Do | 7/31/2014 | 682,581 |

9.24) Judged by relative popularity on YouTube, "Roar" garnered the most viewers and comments, while "Dark Horse" came in a very close second.

37

EXHIBIT 3
PAGE 105

9.25)   The sixteen tracks from *Prism* together attracted on YouTube a total of 6,610,133,000 video views. The share of this total for "Dark Horse" was 35.9 percent of the total.

9.26)   Based on my review of data from concerts, radio play, streams, and video views, I believe that "Dark Horse" was one of the most important commercial songs on the album Prism, if not the most important. tGiven the demonstrated importance of the song "Dark Horse" to generating sales of the *Prism* album, any method of apportioning album or concert revenues to "Dark Horse" by simply dividing by total sales by the total number of tracks or songs is not an economic means of valuing its relative worth.  I believe that Capital Records has made such a valuation error by the track valuation that it deploys on Prism (CAPITAL1101-3; see also Drellishak passim)

## 10.  COSTS AND APPORTIONMENT

10.1)   As a co-defendant,  Universal Music Group would bear the burden of proving costs and providing an apportionment technique for valuing infringing and non-infringing components of any record release through Capitol Records of the single "Dark Horse" and the album *Prism.*

10.2) Based on documents that UMG provided and the Deposition of Edward Drellishak, I believe that UMG might attempt to deduct from sales and licensing

EXHIBIT 3
PAGE 106

revenues cost all components related to paid royalties, manufacturing costs, distribution costs, marketing costs, and overhead.

10.3) Defendant costs generally are deductible only if they can be directly related to the actual release of the product. Claimed deductions cannot represent some apportionment of a common or historic cost that would have been incurred regardless.

10.4) Publisher royalties for rights in musical compositions can be a legitimate deduction from label revenues that arose from sales and licensing of recorded material bearing the infringing work. Amounts that Capitol Records claims to have paid to copyright owners should correspond to amounts received by writers, publishers, and administrators.

10.5) As the recording artist, Katy Perry also earned from Capitol Records a royalty as a recording artist after the label recovered amounts for production and marketing. From her net royalties, Ms. Perry also directed payments to featured artist Juicy J and co-producers Dr. Luke, Max Martin, and Cirkut. All royalty deductions should correspond with payments received by another beneficiary.

10.6) I believe that Defendant UMG might attempt to deduct from sales revenues received through Capitol Records the manufacturing costs and artwork design for all physical units sold. However, manufacturing costs are not properly deductible if they simply reflect rate card payment to any other internal entity owned by UMG

39

EXHIBIT 3
PAGE 107

itself, such as Universal Music Logistics.   Rather, reported payments to Universal Music Logistics here would simply be transfers within the UMG entity and do not reflect any truly incurred manufacturing expense paid to an outside entity.   There then could be a variance between the standard rate and the actual cost of operation. (Drellishak Dep. 91:14-17).

10.7)   I believe that UMG might also attempt to deduct fees related to amounts paid for *distribution* of its recordings.   However, Capitol Records pays distribution fees to an internal entity, Universal Music Group Distribution, based on a fixed percentage of product revenues that does not reflect any truly incurred expense outside of the Defendant corporation UMG. As explained above, transfer payments within the UMG organization are not properly deductible.   This may also implicate handling, returns processing, refurbishment, and ancillary fees (Drellishak Dep. 70:11-72:18).

10.8) As explained above, record labels market new releases by a recording artist through concert promotion, video production, and radio release.   Radio costs would include amounts spent for promotion of the single through time buys, promotional appearances, advertising, singles & shipping, and payments to independent promoters.   If Capitol Records can prove amounts related to infringing material, costs are deductible. The label may not deduct marketing costs that it later recouped previously from Ms. Perry's artist royalties.

40

EXHIBIT 3
PAGE 108

10.9)  I also believe that UMG might attempt to deduct amounts related to an apportionment of *company overhead and related costs* among units sold, including the infringing recordings. Overhead costs would include the salaries of marketing employees, among other things (*Id.* 115:3-5). The amounts are generally based upon some formulaic assignment of common and/or historic costs, but without any causal relation to the infringing event. Assigned overhead expenses for the album are portioned from total overhead for the first eighteen months of the album (called the *frontline*, *Id.* 121; 19-24; 125:16-23). There is then no necessary relation between apportioned costs and the infringing activity.

10.10)  I am advised that the Defendants then bear the responsibility to identify all deductible costs and to apportion the worth of "Dark Horse" from every sale or licensing transaction on which the song appears, and must then present a credible means of performing both assignments.   I reserve the right to contest any suggested procedure.


## 11.   CONCERT REVENUES

11.1)   Depending on the court's final ruling on the recoverability of concert revenues, I would expect to add to Katy Perry's recoverable revenues a share of her earnings from concerts in the U.S. where "Dark Horse" was performed.  No such information has been provided.

41

EXHIBIT 3
PAGE 109

11.2) Within the appropriate recovery period, the court should compel Ms. Perry to

disclose all U.S. concerts where "Dark Horse" was performed, the composite play

list of each concert, and her payments for each event.


## 12.   CONCLUSION

The above conclusions constitute my personal independent assessment.

These conclusions will form the basis of my testimony should I be called at trial.

Amounts are subject to change as more information becomes available.

_____
Michael A. Einhorn, Ph.D.

April 12, 2019

42

EXHIBIT 3
PAGE 110

# Appendix A

Professional Resume of Michael A. Einhorn

43

EXHIBIT 3
PAGE 111

## Michael A. Einhorn, Ph.D.     973-618-1212

**MEDIA, TECHNOLOGY, COPYRIGHT**



## MICHAEL A. EINHORN

**mae@mediatechcopy.com**

**http://www.mediatechcopy.com**

**Michael A. Einhorn**  is an economic consultant and expert witness in the areas of intellectual property, media, entertainment, technology, trademarks, publicity rights, and product design. He received a B.A. from Dartmouth College,  a Ph. D.  in economics from Yale University, and is the author of **Media, Technology, and Copyright: Integrating Law and Economics** (Edward Elgar Publishers, 2004).  He is also a former professor of economics at Rutgers University and adjunct professor at the Silberman School of Business (Fairleigh Dickinson University), a Senior Research Fellow at the Columbia Institute for Tele-Information, and the author of seventy professional and academic articles related to intellectual property and economic analysis.

Dr. Einhorn has provided valuation services in the following areas as a consultant or expert witness:

**Trademarks, Trade Secrets, and False Advertising:** *Trademarks* (Samsung Electronics, Dish Network,  Madonna/Material Girl,  Jakks Pacific, Kische USA*,* Oprah Winfrey/Harpo Productions, Avon Cosmetics, *The New York Observer,* the Kardashians/BOLDFACE Licensing + Branding, Wazu Holdings),   *trade secrets* (The Weather Channel,  Hasbro), and *advertising*  (J. Walter Thompson/Banco Popular, Kia Motors, Coca Cola, General Automobile Insurance Company).

**Music:** *Recording artists* (Led Zeppelin, U2, Madonna, 50 Cent, Usher, Rascal Flatts, LMFAO,  Aimee Mann, Nappy Roots,  Justin Moore, Xzibit, Nelly Furtado, George Clinton, Notorious B.I.G., D.L. Byron), *record labels* (Sony Music Holdings, Universal Music Group, Disney Music, Atlantic Records, Rhino Entertainment)*,  producers* (P. Diddy, Timbaland), *publishers* (Major Bob Publishing, Universal Music Publishing, Bridgeport Music, Hamstein Music, Chrysalis Music, Kobalt Music), *performing rights organizations* (SESAC), *radio stations* (WPNT in Pittsburgh), *live venues* (World Wrestling Entertainment), and *estates*  (Bill Graham Archives, Tasha Tudor, Bernard Lewis).

EXHIBIT 3
PAGE 112

Video: *Movies* (Paramount/DreamWorks, Bold Films), *cable programs* (NBCUniversal), *musicals* (Zorro Productions) *product placement* (Paxson Productions), *treatments* (Burnett Productions), *soundtrack* (Warner Bros. Entertainment), *TV programs* Televicentro of Puerto Rico), *satellite programming* (Golden Channels Company of Israel), DVD *videos* (Steve Harvey), commercials (Gray Television Group), and *cable operations* (AT&T).

**Design, Apparel, and Art:** *Apparel* (Target Stores, Carol Anderson, .Forever 21, Crew Knitwear, Joyce Leslie, Anthropologie), *architecture* (Sprint PCS, Home Design LLC, Murray Engineering, Turnkey Associates), *medical illustrations* (Pearson Education Services), *photography* (Harris Publications, Neil Zlozower, Dana Ruth Lixenberg), *sculpture* (Marco Domo), *cartoons* (A.V. Phibes, Melissa Flock), *toys* (Jakks Pacific), and *commercial marketing* (Kaufman Global).

**Publicity Rights and Estate Valuations:** *Names and likenesses* (Reese Witherspoon, Steve Harvey, Woody Allen, Rosa Parks, Arnold Schwarzenegger, Sandra Bullock, Cameron Diaz, Diane Keaton, Zooey Deschanel, Yogi Berra), *estate valuations* (Tasha Tudor, Marlon Brando, Bernard Lewis).

**Cyberspace:** *Music services* (Apple iTunes, Napster, MP3.com), *proprietary software* (Centrifugal Force, Frogsware), *open source software* (Jacobsen v. Katzer), *electronic publishing* (Pearson), *video games* (Activision), search *engines* (eUniverse), and *domain names* (eCommerce).

**Patents and Technology:** *Semiconductors* (General Electric v. Kodak, Great Lakes v. Sakar, *cellular* (Cellebrite v. Micro Systemation), *software* (Jacobsen v. Katzer, Centrifugal Force v. Softnet), *medical technology* (Lemper v. Legacy, Graston v. Graham), *clutch components* (Nouis Technologies v. Polaris Industries*), pet topicals (*Nite Glow Industries Inc. v. Central Garden & Pet Company*) and *general patents* (DeCordova v. MCG).

**Antitrust and Commercial Losses**: *Antitrust, breach of contract,* and *commercial injury* in actions (Los Angeles Rams, AT&T, American Home Realty Network, California Scents, Safmor, Inc., Golden Channels Company of Israel, St. Joseph's Regional Hospital (College Station, Texas)).

EXHIBIT 3
PAGE 113

**REPRESENTATIVE CLIENTS**

New York State Attorney General; New York

Fish & Richardson; Boston

Arnold & Porter; Washington

Baker & Hostetler; Cleveland

Palmer & Dodge; Boston

Hunton & Williams; Washington

Blecher & Collins; Los Angeles

Stokes Bartholomew Evans & Petree; Nashville

King & Ballow; Nashville

Frankfurt Kurnit Klein & Selz; New York

Lavely & Singer; Los Angeles

Davis and Gilbert; New York

Cowan DeBaets Abrahams & Sheppard; New York

Taft Stettinius & Hollister; Indianapolis

Sheppard Mullin Hampton & Richter; Los Angeles

Seyfarth Shaw; Los Angeles

Connolly Bove Lodge & Hutz; Wilmington

Blackwell Sanders Peper Martin; St. Louis

Lipsitz Green Faringer Roll Salisbury & Cambria; Buffalo

3

EXHIBIT 3
PAGE 114

**LITIGATION ENGAGEMENTS**

**Media and Entertainment**

*Gray et al. v. Katy Perry et al.   Central District of California,* 2019, consultant, valuation of damages resulting from copyright infringement in **Katy Perry's song *Dark Horse***.

*Dan Marino v. Dante Barton and Will Guice,* Pennsylvania Court of Common Pleas, 2018, report and testimony, valuation of damages resulting from breach of contract among three songwriters claiming rights in **Usher's song *Bad Girl.***

*Robert W. Cabell v. Zorro Productions, Inc., et a*l., Northern District of California, report, estimated commercial damages resulting from infringement of copyright in a **musical adaptation**.

*Gray Television Group, Inc. v. Found Footage Festival, LLC, et al.,* Eastern District of New York, report, estimated commercial damages resulting **from infringement of television programming**

*Richard Dutcher v. Bold Films LLP*, et al., Central District of Utah, 2017, report, estimated commercial damages resulting from copyright infringement of leading screenwriter in the movie *Nightcrawlers.*

*RCN Capital, LLC, et al. v. The Los Angeles Rams, LLC, et al.,* Eastern District of Missouri, 2017, report and deposition, breach of contract regarding use of rights to **sell tickets in secondary markets**.

*Michael Skidmore v. Led Zeppelin, et al.,* Central District of California, 2016, trial testimony, copyright infringement matter against rock group Led Zeppelin regarding **classic song *Stairway to Heaven.***

*Joseph Cooper v. Broderick Steven "Steve" Harvey,* Northern District of Texas, 2016, report and deposition, breach of contract matter regarding recorded films **of comedian/actor Steve Harvey.**

*Sidney Earl Swanson v. MJJ Productions*, Central District of California, 2015, report, copyright infringement matter regarding a musical composition used in a **sound recording *Chicago* by Michael Jackson.**

*Original Appalachian Artworks, Inc. v. Jakks Pacific, Inc.,* International Institute for Conflict Prevention and Resolution,   2015, report and deposition,  matter involving lost sales related to breach of contract for **copyright owners of Cabbage Patch Kids.**

*Alexander Graham-Sult and David Graham v. Bill Graham Archives, LLC, et al.*, Northern District of California, 2015, report and deposition, valuation of copyrights and business  concern resulting from fiduciary breach of the estate of **rock concert producer Bill Graham**.

*William L. Roberts (p/k/a Rick Ross), et al.*, v. Stefan Kendal Gordy, Southern District of Florida, 2015, report, valuation of defendant enrichment resulting from infringement of a musical composition in a **multi-platinum release  (*Party Rock Anthem*) and a Kia automobile commercial.**

EXHIBIT 3
PAGE 115

*Cartagena Enterprises, Inc. v. J. Walter Thompson Co*., et al., American Arbitration Association, 2015, report, valuation of damages resulting from infringement of prominent salsa composition in an advertising message **by the leading advertising agency and the largest bank in Puerto Rico.**

*Digital Satellite Connection v. Dish Network Corporation*, et al., District of Colorado, 2014, report and deposition, valuation of damages resulting from **trademark infringement by national satellite provider.**

*Ron Satija and Heather Lynette Mowder v. General Automobile Insurance Company*, District Court of Northern Ohio, 2014, report, valuation of damages resulting from infringement of **cartoon character *The General* in national advertising campaign.**

*Daniel Moser v. Raymond Ayala (p/k/a Daddy Yankee), et al.,* District Court of Puerto Rico, 2014,  report, valuation of damages resulting from infringing reproduction and performance rights in **Daddy Yankee's multi-platinum song *Rompe.***

*Dan Marino v. Usher Raymond, et al.,* Eastern District of Pennsylvania, 2013, report, valuation of damages resulting from infringing reproduction and performance rights in **Usher's song *Bad Girl.***

*Preston Asevedo v. NBCUniversal Media, et al*.,  Eastern District of Louisiana,  2013, report, estimated damages for commercial artwork used on a **Syfy cable television program *Dream Machines.***

*Ryan Lessem and Douglas Johnson v. Universal Music Group,* Southern District of New York, 2013, report and deposition, valuation of damages involving copyright infringement in **50 Cent's song *How We Do***, recorded by  The Game.

*Montana Connection, et al. v. Justin Moore,* Middle District of Tennessee, 2013, report, estimated damages for infringement in **country hit song *Backwoods*** on Justin Moore's record album and concert performances.

*VMG Salsoul v. Madonna Louise Ciccone, et al*.,  Central District of California, 2013, report, valuation of damages resulting from copyright infringement in **Madonna's song *Vogue.***

5

EXHIBIT 3
PAGE 116

*Interstar Holdings v. Truman Press*, Superior Court of California, 2011, report, matter involving valuation of commercial losses resulting from breach of contract involving **DVD movie *Dawn of the Living Dead*.**

*Lutfu Murat Uckardesler, et al. v. Azteca International Corporation*, et al., Central District of California, 2010, consultant, estimated damages resulting from infringement of treatment on internationally popular **reality television show.**

*Kernel Records Oy v. Timbaland, et al.,* Southern District of Florida, 2010, report, estimated damages resulting from copyright infringement of sound recording on multi-platinum **Nelly Furtado song "Do It."**

*Anthony Lawrence Dash v. World Wrestling Entertainment, Inc.,* District of South Carolina, 2011, report, valuation of damages involving use of a **copyrighted song** in a **highly promoted WrestleMania event.**

*Rafael Vergara Hermosilla v. The Coca Cola Company*, Southern District of Florida, 2010, report and deposition, valuation of defendant profits resulting from infringement of song in **international advertising campaign for the World Cup**.

*Chris Lester v. U2, Apple Computer, and Universal Music Group*, Central District of California, 2009, report and deposition, estimated damages from copyright infringement involving U2's **song *Vertigo*** used in concerts and recordings.

*Serendip LLC, et al. v. Warner Bros. Entertainment, Inc.*, Central District of California, 2009, report and deposition, estimated damages in copyright infringement on released DVD containing the **soundtrack to *A Clockwork Orange.***

*D.L. Byron v. Rascal Flatts and Disney Corp.*, Southern District of New York, 2009, report, estimated copyright damages for settlement involving infringement of classic **Pat Benatar composition "Shadows of the Night" by Rascal Flatts.**

*Evilkid Productions v. DreamWorks LLC & Paramount Pictures*, Southern District of New York, 2009, report, estimated damages and assisted settlement involving the unauthorized use of commercial art in **the hit movie *Transformers*.**

*Victor Lopez v. Daddy Yankee and Universal Music,* Central District of California, 2009, consultant on damages for album track used on **multi-platinum release *Barrio Fino*.**

6

EXHIBIT 3
PAGE 117

*Charles Watt v. Dennis Butler, et al.,* Northern District of Georgia, 2009, report, estimated copyright damages involving **platinum release by rap group D4L**.

*The Jackson Sisters v. Universal Music Group*, Superior Court of the State of California, 2008, consultant, assisted classic recording act for recovery of damages for unfair trade practices in **use of legacy materials in sound recording.**

*MCS Music America, Inc., et al. v. Napster, Inc., et al.,* Central District of California, 2008, consultant to music publishers in copyright infringement matter involving limited downloads and subscription streaming by the **digital music service Napster.**

*Henry Carter v. Independent Productions, Inc.*, et al., Superior Court of Delaware, 2008, consultant, royalty dispute among members of **rock band George Thorogood and the Destroyers.**

*Bridgeport Music, Inc.* v. *Smelzgood Entertainment, et al.,* Middle District of Tennessee,  2007, report and trial testimony, estimated damages for unauthorized use of **George Clinton's classic composition *Atomic Dog*** on later infringing record album.

*TMTV Corp. v. Mass Productions*, **Inc.,** District of Puerto Rico, 2006, report and trial testimony, estimated damages resulting from copyright infringement of **television program** by  producer and comedian Sunshine Logrono.

*Velocity Entertainment Group v. NBC Universal and Donald Trump*, 2006, Los Angeles Superior Court, Los Angeles, California, consultant, valuation of treatment used in popular **reality television show, *The Apprentice*.**

*Bridgeport Music, et al. v. Crited Music.,* Middle District of Tennessee, 2006, report, estimated damages for copyright infringement of **musical composition *You'll Like it Too***.

*Thomas Turino, et al. v. Universal Music, et al.,* Central District of California, 2006, report and deposition, estimated damages resulting from copyright infringement in **Christina Milian's sound recording *Dip It Low*.**

7

EXHIBIT 3
PAGE 118

*Bridgeport Music, et al. v. Universal Music, et al.,* Middle District of Tennessee, 2006, report and trial testimony, estimated damages for unauthorized use of three compositions and sound recordings on **Notorious B.I.G. album produced by P. Diddy.**

*TMTV Corp.* v. *Televicentro de Puerto Rico, Inc.,* District Court of Puerto Rico, 2005, report, estimated damages resulting from infringement of **television program.**

*The Royalty Network, Inc., et al. v. Activision, et al.,* Central District of California, 2005, report, estimated damages for use of music on best-selling **video game *Streets of Los Angeles.***

*Al Howard Productions, Inc. v. Paxson Productions,* Central District of California, 2005, report, estimated commercial damages for breach of contract involving product placements on **prominent game show, *Supermarket Sweeps.***

*Mojo Music, et al., v. Walt Disney Records*, Los Angeles Superior Court, 2004, report, valued synchronization rights in **musical compositions used in *Lion King 2.***

*Willie Woods v. BMG Music/Atlantic Recording Company, et al.,* Eastern District of Missouri, 2004, report, valued damages for unauthorized use of musical compositions in a **Nappy Roots' multi-platinum song "Po Folks".**

*Darryl D. Lassiter, et al., v. Twentieth Century Fox Film Corp*., Central District of California, 2004, consultant, regarding damages due for use of unauthorized **screenplay in the movie *Drumline*.**

*Sharon Haygood, et al. v. Coca-Cola, et al.*, 17th District Court of Tarrant County, Texas, 2004, report and deposition, calculated professional losses for gospel artist who suffered **personal injury in automobile accident.**

*Universal Music Publishing Group v. Fitness Quest, Inc.,* Northern District of Ohio, 2003, report and deposition, estimated damages from copyright infringement of **music soundtrack in an exercise video tape.**

*Brought to Life v. MCA Records, Inc., et al.,* Southern District of New York, 2002, consultant, valued copyright damages in **Mary J. Blige song "Family Affair".**

8

EXHIBIT 3
PAGE 119

*Michael A. Lowe v. Loud Records,* Eastern District of Pennsylvania, 2002, report, valued damages for copyright infringement in **musical track "X" produced by Dr. Dre**.

*Aimee Mann v. UMG Recordings, Inc., et al.,* Central District of California, 2002, consultant, estimated sales displacement and loss of income resulting from the **unauthorized release of compilation album.**

*Jacques Loussier v. UMG Recordings, Inc., et al.*, Southern District of New York, 2002, consultant, surveyed data regarding copyright infringement of improvisational composer **by Eminem in song "Kill You".**

*Hamstein Music Group, et al. v. MP3.com, Inc., et al.,* Central District of California, 2002, consultant, estimated damages for multiple infringements involving **musical compositions**.

*Chrysalis Music v. MP3.com, Inc., et al.*, Central District of California, 2002, consultant, estimated damages for multiple infringements of **musical compositions.**

*Major Bob Music, Inc., et al. v. MP3.com, Inc.,* Southern District of New York, 2001, report, estimated damages for unauthorized use of **Garth Brooks' musical catalog** by digital library service.

**Trademarks, Trade Secrets, and False Advertising**

*Helpful Hound, LLC, v. New Orleans Bldg. Corp., et al.,* Eastern District of Louisiana, 2019, report, damages related to use of an **infringing trademark used in a food market based in New Orleans.**

*Computer Programs and Systems, Inc. et al. v. Wazu Holdings, Inc., et al*., Southern District of Alabama, 2018, report and deposition. damages related to use of an **infringing mark in a software application in medical technology.**

*The Choice is Yours v. The City of Philadelphia, et al,* Eastern District of Pennsylvania, 2018, report, damages related to trademark infringement of **worker training program**

9

EXHIBIT 3
PAGE 120

*Kische USA, LLC v. Ali Simsek and Jane Doe Simsek, et al*., Western District of Washington, 2017, report. damages related to **trademark infringement and unfair competition** from a competing distributor of imported apparel.

*VBS Distribution, Inc. et al. v. Nutrivita Laboratories, Inc., et al.,* Central District of California, report, 2017, **damages related to false advertising and unjust enrichment involving dietary supplements.**

*Mladen Pintur, et al. v. Helen Rogic, et al*., Southern District of New York, report, 2017, **damages related to trademark infringement of business name**

*Baskim Holdings, Inc.  v. Two M, Inc. d/b/a Babe's Cabaret, et al*., District of Nevada, report and deposition, 2017, damages **related to misuse of trademarked name.**

*Healthmate International, Inc., v. Timothy W.T. French*, *et al*., Western District of Missouri, report, 2016, **damages related to false advertising and unfair competition.**

*Elinor Shapiro v. Hasbro, Inc.,* Central District of California, 2016, report and deposition,  **infringement of trade secrets by toy manufacturer Hasbro.**

*Milk Studios v. Samsung Electronics Co., Ltd., et al*., Southern District of New York, 2016, report, **defense of Samsung Electronics in a trademark damage valuation.**

*JMC Restaurant Holdings, Inc., et al.  v. Marcelo Pevida, Inc., et al.,* Eastern District of New York, 2016, report and deposition, defense of **trademark user in international restaurant market.**

*House of Auth, LLC v. 721 Bourbon, Inc.*, District of Connecticut, 2016, report, regarding **damages from trademark infringement of beverage**

*Events Media, Inc.  v. The Weather Channel, Inc.*, District Court of New Jersey, 2015, report and deposition, trade **secret infringement by major cable network *The Weather Channel.***

*KLM & M, LLC, et al. v.  VCP2 Augusta, P.C., et al.,* Southern District of Georgia, 2015, report, valuation of damages related to **trademark infringement by a medical practice.**

10

EXHIBIT 3
PAGE 121

*Simone Kelly-Brown v. Oprah Winfrey and Harpo Productions,*  Southern District of
New York, 2014, report and deposition, valuation of damages resulting from a
**trademark infringement  by Oprah Winfrey and Harpo Productions.**

*Who Dat?, Inc. v.  Who Dat Shoppe, et al.,* Eastern District of Louisiana, 2014,  report,
valuation of damages resulting from infringement of  **trademark of major regional
brand of apparel.**

*Vivid Entertainment, LLC v. Jose Baserva,* Middle District of Florida, 2014,  report,
valuation of damages resulting from infringement of **business name in entertainment
chain**

*Benchmark Young Adult School v. Launchworks Life Services LLC*, Southern District of
California, 2014, report, valuation of damages resulting from infringement of
**plaintiff's   business   name   by   competing   health   care   provider**.

*Kim, Khloe, and Kourtney Kardashian, and BOLDFACE Licensing + Branding v.  By
Lee Tillett, Inc.,* Central District of California, 2013, report, valuation of damages
resulting from trademark infringement in **cosmetics line KROMA by the Kardashian
sisters.**

*Original Gourmet Food Company, Inc. v. Jelly Belly Candy Company*, District of New
Hampshire, 2013, report and deposition, regarding declaratory judgment to enforce
trademark rights for **candy manufacturer.**

*East West LLC v. Caribbean Crescent,  Inc.,* Northern District of Virginia, 2012, report
and deposition, valuation of damages involving use of a trademark and trade name by a
competitor in the **food provision business.**

*Rock and Roll Religion v. Cels Enterprises,* Central District of California, 2012, report,
valuation of damages resulting from infringement of trademark in **women's apparel.**

*PML Clubs v. Gold Suit, Inc., Northern District of Texas, 2012, report and deposition,
valuation of damages* resulting from trademark infringement in the market for **adult
cabaret establishments.**

*Super-Krete International v. Lafarge Group,* 2013, opinion letter, regarding trademark
valuation of a **cement product** for a settlement conference between two parties.

11

EXHIBIT 3
PAGE 122

*Kilter, Inc. v. Avon Corporation,* Southern District of New York, 2011, report and deposition, damage valuation of trademark infringement and misappropriation of intellectual property by **major cosmetics company.**

*L.A. Triumph, Inc. v. Madonna Louise Veronica Ciccone and Material Girl,* Central District of California, 2011, report, valuation of damages from a trademark infringement in **clothing line (Material Girl) owned by Madonna**.

*Miller International, Inc. v. Clinch Gear, Inc., et al.,*   District of Colorado, 2010, report, valuation of damages from a trademark infringement by a designer of **martial arts apparel.**

*Golf Cart World, Inc.  v. Mike's Golf Carts, Inc.*, Middle District of Georgia, 2010, report, estimated damages resulting from a trademark infringement in **golf carts and hunting carts.**

*Doctor's Associates, Inc. v. QIP Holder, LLC  and IFilm, Corp.,* District Court of Connecticut,  2008, consultant,  reviewed expert materials in false advertising matter **involving *Subway* and *Quizno's.***


## Publicity Rights


*Alana Campos, et al. v. Metropolitan Bush Company*, Sup. Ct. of the State of Ariz., 2019, report, valuation of damages resulting from use **of name and images of ten glamour models** by adult nightclub in Arizona..

*Timed Out v. Red Tie Gentlemen' Club,*. No. Dist. of California, 2019, consultant, valuation of damages resulting from use **of name and images of glamour models** by adult nightclub in California.

*Hilary Hepner, et al. v. Déjà vu Services, Inc. et al*., Eastern District of Michigan, 2018, report,  valuation of damages resulting from use **of images of eleven glamour models** by adult nightclubs in Michigan.

*Irina Voronina,  et al. v. Scores Holding Company, et al*,  Southern District of New York, 2018, report,  valuation of damages resulting from use of **images of fifty-one glamour models** by a chain  of adult  clubs in New York City.

12

EXHIBIT 3
PAGE 123

*Jamie Edmondson  et al. v.  Caliente Resorts,  LLC, et al*.  Middle District of Florida, 2016, report and deposition, valuation of damages resulting from use of **images of glamour models** by adult resort in  Florida.

*Reese Witherspoon v. Marketing Advantages International,* Superior  Court of California, 2015, report, valuation of damages involving use of **name and image of  actress Reese Witherspoon** in connection with online retailer.

*Jason Lezak v. Active Network,* Superior  Court of California,  2015, report, valuation of damages involving use of **image of Olympic swimmer Jason Lezak** in connection with online software application

*Sandra Bullock v. ToyWatch USA,* Superior Court of California, 2013, opinion letter, valuation of damages involving use of **image of actress Sandra Bullock** in a commercial website for apparel accessory.

*Zooey Deschanel v. Steve Madden, et al.,* Superior Court of California, 2011, report and deposition, valuation of publicity rights of **actress Zooey Deschanel** used in line of women's shoes.

*Michelle Pfeiffer, et al. v. CompUSA,* Superior Court of California, 2011, report, valuation of **publicity rights of Sandra Bullock, Michelle Pfeiffer, Diane Keaton, Mandy Moore, Cameron Diaz, and Kate Hudson**  in retail advertisements .

*Woody Allen v. American Apparel, Inc.*, Southern District of New York, 2009, consultant in valuation of reasonable damages in publicity rights of **movie director Woody Allen** used on urban billboards .

*Evgeni Petrosyan v. DIRECTV, Inc.,* Eastern District of New York. 2009, consultant regarding damages for infringement of publicity rights of **comedian Evgeni Petrossian** by satellite network.

*Arnold Schwarzenegger and Oak Productions, Inc. v. Recycled Paper Greetings, Inc., et al.,*  Superior Court of California, 2005, report, estimated damages in publicity rights case involving greeting card merchandise bearing **image likeness of Arnold Schwarzenegger.**

13

EXHIBIT 3
PAGE 124

*Lawrence "Yogi" Berra v. Turner Broadcasting System*, Superior Court of New York, 2005, consultant, valued publicity rights case involving the unauthorized use of **personal name Yogi Berra** in citywide advertising campaign.

*Rosa Parks v. BMG Music/Laface Records, et al.,* Eastern District of Michigan, 2004, deposition, valued publicity rights involving use of **celebrity name Rosa Parks** in a BMG album bearing the name and track *Rosa Parks.*

*Melina Kanakaredes v. Ouidad, Inc.*, Eastern District of Ohio, consultant, 2004; publicity rights case involving damages resulting from magazine articles bearing **actress name Melina Kanakaredes. Apparel, Design, Art, and Photography**

*Neil Zlozower and Barry Levine v. Motley Crue, Inc.,* Southern District of New York, 2017, report and deposition, infringement of **copyrighted photographs of famous music group** by touring company and merchandise sellers.

*Dana Ruth Lixenberg v. Bioworld Merchandising, Inc., et al.,* Central District of California, 2017, infringement of photos of Tupac Shakur and Notorious B.I.G. used on **apparel sold in major retail chain**.

*PK Studios, Inc. v. RLR Investments, LLC, et al.,* Middle District of Florida, 2016, report, matter involving **infringement of architectural plans** in residential development.

*Idra Alta Mode, LLC v. D'Lymer, Inc. d/b/a Edwards Lowell, Central* District of California, 2016, report, matter involving **breach of contract in furrier operations.**

*Hansel Oy v. US Department of Health and Human Services, et al.,* 2016, opinion letter, report, valuation of **copyright damages in use of designs** created by a Finnish technology company.

*Glen Craig v. Universal Music Group et al.* Southern District of New York, 2016, report**,** infringement of **copyrighted photographs of legendary artist B.B. King** by parties related to his estate.

*Radix Textile, Inc. v. Anthropologie, Inc., et al*., Central District of California, 2015, report, valuation of damages resulting from **copyright infringement of apparel design** by major clothing chain.

14

EXHIBIT 3
PAGE 125

*Klauber Brothers, Inc. v. Forever 21 Retail, Inc., et al*., Central District of California, 2015, report, valuation of damages resulting from **infringement of copyrighted apparel design** by a major apparel chain.

*Star Fabrics, Inc. v. Joyce Leslie, Inc.,* Central District of California, 2014, report, valuation of damages resulting from **infringement of copyrighted apparel design** by major retail chain.

*Ron Satija and Heather Lynette Mowder v. General Automobile Insurance Company*, District Court of Northern Ohio, 2014, report, valuation of damages resulting from infringement of **cartoon character *The General* in national advertising campaign.**

*NTD Architects v. Baker Nowicki Design Studio,* Southern District of California, 2013, report and deposition, estimated damages resulting from copyright infringement involving **architectural plans**.

*Sheila Lyons, DVM v. Robert Gillette, et al.,* District of Massachusetts, 2013, report, valuation of damages resulting from copyright infringement of **professional training materials**.

*Turnkey Associates v. Steph Weiand*, et al., District of Iowa, 2012, report, estimated damages resulting from copyright infringement of **architectural plans** by severed employee in new professional concern.

*Murray Engineering v. Windermere Properties, et al*., Southern District of New York, 2012, report, estimated damages resulting from copyright infringement of **architectural plans** in New York residential building.

*Home Design, LLC v. Collard Properties*, District of Colorado, 2012, report, valuation of damages and defendant profits in connection with copyright infringement of **architectural plans** in new residential development.

*U.S. Textile Printing v. Crew Knitwear, et al.,* Central District of California, 2010, report and deposition, estimated damages resulting from copyright infringement of **textile design** by retail chain**.**

*Melk Communications v. Pennsylvania Medical Society, et al.*, Eastern District of Pennsylvania, 2010, report, estimated damages resulting from fraud, misappropriation, and copyright infringement of **commercial marketing materials.**

15

EXHIBIT 3
PAGE 126

*Timpco v. Implementation Services*, Southern District of Indiana, 2009, report, valuation of damages resulting from copyright infringement of **commercial marketing materials.**

*Malibu Textiles v. CABI, Inc.*, Southern District of New York, 2008, report and deposition, estimated damages for copyright infringement of **eight apparel designs.**

*Melissa Flock v. State of Florida, Division of Emergency Management*, Northern District of Florida, 2007, report, estimated damages for copyright infringement of **cartoon characters** by the State of Florida.

*Neil Zlozower v. Harris Publications, Inc.,* Southern District of New York, 2006, report and deposition, valuation of lost **photographic slides owned by famous photographer** of rock group *Metallica.*

*Vera Bradley, Inc. v. Target Stores, Inc.,* Northern District of Indiana, 2006, report, valuation of unauthorized **apparel design on swimwear** distributed by Target Stores.

*Command Cinema Corp.* v. *VCA Labs, Inc.,* Southern District of New York, 2006, report, estimated commercial damages resulting from the **destruction of master tapes** bearing releases of two adult movies.

*Impala Lechner v. Marco-Domo Internationales Interieur, et al.*, Southern District of New York, 2004, consultant, estimated damages for copyright infringement of **sculpture designs.**

*Core Group P.C. v. Sprint PCS*, American Arbitration Association, 2004, report and trial testimony, estimated damages for copyright infringement of **architectural plans** used in nationwide redesign of retail space operated by Sprint.

## Technology and Cyberspace

*Nite Glow Industries Inc., et al. v. Central Garden & Pet Company, et al.,* District of New Jersey, 2018, testimony at trial, estimation of damages related to **patent infringement for pet goods products.**

16

EXHIBIT 3
PAGE 127

*Nouis Technologies v. Polaris Industries,* W. D. Wisc., 2015, report, matter involving **patent infringement for clutch components in all-terrain vehicles.**

*Brian Lemper, M.D. v. Legacy IP, LLC,* Superior Court of Nevada, 2015, deposition, matter involving purported breach of contract in procuring **patent application for medical technology.**

*Cellebrite Mobile SyncRonization Ltd. v. Micro Systemation AB,* Northern District of Virginia, 2014, report, estimated damages for **copyright infringement of intelligence software** designed to remove records from suspect cell phones.

*Scott E. D. Skyrm v. Newedge USA, LLC,* FINRA Dispute Resolution #12-02346, 2014, testimony, , valuation of damages resulting from **copyright infringement of data format in online financial newsletter.**

*Munhwa Broadcasting Corporation v. Media Journal, Inc., et al.,* Central District of California, 2014, declaration in support of plaintiff in **anti-circumvention liability**.

*Virtual Studios v. Beaulieu Group, LLC,* Eastern District of Tennessee, 2013, report, valuation of damages involving **copyright infringement of design software** for virtual display of interior designs.

*TVB Holdings (USA), Inc. v. Tai Lake Communication, Inc.,* Central District of California, 2013, report, regarding economic harm created by **circumvention device** that breached access and copyright protection on Asian programming.

*James DeCordova v. MCG Nevada, Inc.*, Central District of California, 2012, report, valuation of damages resulting from **patent infringement for a sleep-enhancing device.**

*BanxCorp. v. Costco Wholesale Corporation, Inc., et al.,* Southern District of New York, 2012, report, valuation of damages resulting from infringing use of **compilation data** in an **online banking service.**

*Robert Jacobsen v. Matthew Katzer*, Northern District of California, 2009, report, estimated damages in landmark copyright case involving **copyright infringement of open source software** created by world-renowned Berkeley professor.

17

EXHIBIT 3
PAGE 128

*Centrifugal Force, Inc. v. Softnet*, et al., Southern District of New York, 2009, report, valuation of damages resulting from copyright infringement of **operations  software.**

*Frogsware,  Ltd. v. Viva Media, et al.,* Southern District of New York, 2009, consultant, assisted video game designer for recovery of damages resulting from a breach of contract and copyright infringement of **video game software.**

*Carpal Therapy, Inc., and David Graston v. Jennifer Graham, Esq.,* Marian County Superior Court of Indiana, 2008, report and deposition, estimated commercial losses for inventor of **medical technology** for loss of rights to intellectual property.

*Great Lakes Intellectual Property,  Ltd. v. Sakar International, Inc.,* Western District of Michigan, 2006, report, valuation of reasonable royalties for patent infringement in a **graphical user interface chip.**

*Frederic H. Martini v. Pearson Education Services,* Northern District of California, 2005, report, estimated damages for website infringements of prominent illustrator by leading **publisher of medical books.**

*Sandi Gray, et al. v. eUniverse, Inc., et al.,* Eastern District of Texas, consultant, 2004; valuation for copyright infringement by **digital provider of shared content.**

*General Electric v. Kodak,* 2002, consultant, assisted General Electric in valuation of **semiconductor portfolio in patent infringement matter.**

*RIAA v. MP3Board*, Southern District of New York, 2001, report and deposition, involving the **economic effects of search engines** that post links to infringing material.

*Universal City Studios.Inc.,et al. v. Eric Corley*, Southern District of New York, 2000, report and trial testimony, regarding economic effects of decrypting protective code established to protect copyrighted digital works.


## Private Valuations of Intellectual Property

*Juarez Foods,* 2015, trademarks now controlled by Wise Foods, Atlanta.

18

EXHIBIT 3
PAGE 129

*Tom Binns Design, LLC,* 2015, **trademarks and copyrights controlled by the international jewelry concern** Tom Binns Design, LLC.

*The Domain Names of eCommerce, IX Web Hosting, and Host Excellence.* 2012, **domain names and websites** owned by *online business.*

*The Estate of Tasha Tudor*, 2009, valued the worth of **publishing royalties due to the estate of renowned author and illustrator**.

*New York Observer.* 2008, **domain name of political blog**.

*Greens Today*, 2006, **trademarks for greens health product.**

*Bernard Lewis*, 2005, future **publishing royalties** due to Princeton professor and writer of twenty four books on politics and history.

*Estate of Marlon Brando.* 2005, consultant, valued worth of the Marlon Brando  **name for estate purposes.**


## Commercial Losses, Wrongful Termination,  and Personal Injury

*Jakks Pacific, Inc.      v. Wicked Cool Toys, LLC     and Jeremy Padawer*, Supreme Court of the State of New York, 2017,  report and deposition, valued commercial losses **resulting from breach of contract and tortious interference.**
 \
*Pansy Harris-Lane, M.D. v. Jersey City Medical Center, et al.,*  Superior Court of New Jersey, 2017, report,    valued **professional damages resulting from disputed termination of mediicaldoctor**

*Hasan Khushaim v. Tullow Inc*. Superior Court of the State of Delaware,   2017, report, valued actual damages resulting from breach of contract regarding software design.

*Anti-Aging Essentials v. Brian T. Must, et al..* Court of Common Pleas of Allegheny County, 2016, report, valued commercial losses resulting from **manufacturing malfeasance.**

19

EXHIBIT 3
PAGE 130

*DeMartino v. Belleville Board of Education,* Superior Court of New Jersey, 2014, consultant, assisted defense counsel for courtroom preparation against plaintiff expert in **wrongful termination case.**

*Deborah Rollins and Luke Randall v. Sunrise Village*, LLC, Superior Court of New Jersey, 2013, report, examined economic losses resulting from **property negligence**.

*Crystal Evans v. Meadowlands Hospital,* Superior Court of New Jersey, 2012, report and testimony, examined economic losses resulting from **medical malpractice.**

*Christine Delurski v. Chester Stone, M.D.,* Superior Court of New Jersey, Morris County Court, 2012, report, estimated economic losses resulting from **wrongful death.**

*Carl Lawson* v. *K2 Sports U.S.A., et al,* Superior Court of New Jersey, Monmouth County Court, 2012, report, estimated economic losses resulting from **personal injury.**

*Peter Piegdon v.  H&S Bakery,* Superior Court of New Jersey, Middlesex County Court, 2007, report and deposition, calculated economic losses from   **automobile accident.**

*Dash Artist Management and Dash Entertainment Management v. Ruben Gomez, et al.,* Southern District of Texas, 2004, report, calculated commercial losses for music manager arising from **breach of contract.**

*Florencia Flores, et al. v. Parkchester Preservation Company, et al.*, New York Superior Court, 2004 report, examined economic losses suffered by domestic worker from **on-the-job injury.**

*Safmor, Inc.  v. Ministers,  Elders, & Deacons of the Reformed Protestant Dutch Church of City of New York,* New York Superior Court, 2005, report and deposition, calculated **commercial losses** for New York business foreclosed from use of its storefront sign.

*Sharon Haygood, et al. v. Coca-Cola, et al.*, 17th District Court of Tarrant County, Texas, 2004, report and deposition, calculated economic losses for gospel artist who suffered from **personal injury.**

20

EXHIBIT 3
PAGE 131

## Antitrust

*American Home Realty Network v. Edina Realty,* District of Minnesota, 2014, report, examined antitrust liability involving **group boycott of an online realty referral service**

*Royal Benson, M.D. v. St. Joseph Regional Health Center*, Central District of Texas, 2006, report and deposition, examined antitrust liability for **vertical restraints in hospital admissions.**

*United Magazine Company, Inc. v. Murdoch Magazine Distribution, Inc., et al.*, Southern District of New York, 2004, report and deposition, examined antitrust damages **in price discrimination matter involving magazine distributors.**

*The Coalition for a Level Playing Field v. Autozone, Inc., et al.*, Eastern District of New York, 2003, report and trial testimony,  examined antitrust damages **in price discrimination matter involving auto part retailers.**

*AT&T Corp. v. Winback and Conserve Program, Inc., et al.*, New Jersey District Court, 2003, consultant, calculated commercial losses suffered by third party telecom provider for **improper termination of AT&T wholesale service.**

*California Scents v. Medo Industries, Inc.,* Central District of California, 2002, report, examined antitrust liability in matter involving the **anticompetitive use of slotting allowances** in retail outlets.

*Prime Communications, Inc. v. AT&T Corp.*, Eastern District of Massachusetts, 2002, report and deposition, examined liability in antitrust lawsuit involving **vertical restraints in access to cable advertising.**

*The Intimate Bookshop, Inc. v. Barnes and Noble, Inc., et al.*, Southern District of New York, 2001, report and deposition, examined economic issues in antitrust suit involving **price discrimination in book retailing.**

*SESAC v. WPNT*, Western District of Pennsylvania, 2001, report and deposition, antitrust case involving the economic consequences of **blanket licensing of musical compositions**.

*Nobody in Particular, Inc. v. Clear Channel, Inc.,*  District of Colorado, 2001, consultant,  antitrust case involving advertising restrictions enforced by a **radio station against a competing concert promoter.**

21

EXHIBIT 3
PAGE 132

*State of Florida, et al. v. BMG Music, et al.,*   District of Maine, 2001, consultant, antitrust case involving the **anti-competitive effects of minimum advertising pricing rules** established by five major record companies.

*Golden Channels Company, et al. v. Director General of the Antitrust Authority*, The Court of Trade Restrictions, Tel Aviv, Israel, 2000, report, case involving **vertical licensing restrictions on content of Sony, Warner, and Paramount.**

## PUBLISHED BOOKS

Media, Technology, and Copyright:Integrating Law and Economics, Edward Elgar, 2004

## ARTICLES AND CHAPTERS

*See also* http://mediatechcopy.com/?page_id=71

Reasonable Royalties in Patent Litigation:  Methods, Evidence, and Experts,  presented at Knowledge Group Webinar, March 22, 2017.

First Sale Rights at SCOTUS: *Kirtsaeng v. John Wiley & Sons*,   Journal of the Copyright Society, Spring, 2016.

Copyright, Causality, and the Courts, Journal of the Copyright Society, Winter, 2015.

The ASCAP and BMI Consent Decrees:  Is Partial Withdrawal Wise?,  Journal of the Copyright Society,  Fall, 2014

Copyright, Causality, and Statutory Reform, Landslide, January-February, 2013-2014.

22

EXHIBIT 3
PAGE 133

Gorillas in our Midst: Searching for King Kong in the Music Jungle, Journal of the Copyright Society, Winter, 2007.

Patent Reform and Infringement Damages:  Some Economic Reasoning  IP Lawyer, December, 2007;  new version at Patents and the Entire Market Value Rule.

Copyright Settlement Strategies from a  Damages Expert, GPSOLO, September, 2008.

Expediting the Settlement:  The Use of an Expert, Entertainment and Sports Lawyer, October, 2007.

How Advertising and Peer to Peer are Transforming Media and Copyright, Journal of the Copyright Society, Spring, 2007.

Copyright at a Crossroads, Again!:  The Copyright Modernization Act, Entertainment, Arts, and Sports Law Journal,  December, 2006.

Swords Into Plowshares:  A Convergence of Interests in P2P, Entertainment and  Sports Lawyer,  Summer, 2006.

Publicity Rights, Merchandise, and Economic Reasoning, Entertainment and Sports Lawyer, March, 2006.

Canadian Quandary:  Digital Rights Management,  Access Protection, and Free Markets, Progress on Point 3:12,  Progress and Freedom Foundation, May, 2006.

"File-Sharing at Madison and Vine: The New Convergence", Century City Lawyer, December, 2005.

"File-Sharing and Market Harm", Entertainment, Arts, and Sports Law Journal, July, 2005.

Transactions Costs and Administered Markets:  The Case of Music Performance Rights, Review of Economic Research in Copyright Issues, 3 (1), 37, 2006.

Grokster v. Sony: The Supreme Court's Real Decision, Entertainment and Sports Lawyer, Summer, 2004.

EXHIBIT 3
PAGE 134

"Peer-to-Peer Networking and Digital Rights Management: How Market Tools Can Solve Copyright Problems" (with Bill Rosenblatt), Journal of the Copyright Society, Winter, 2005.

Music, Mantras, and Markets:  Facts and Myths in the Brave New World, Entertainment, Arts,  and  Sports Law Journal,  Winter, 2004.

"Music in the Crucible: A Year in Review", Entertainment and Sports Lawyer, Summer, 2004.

Digitization and its Discontents: Digital Rights Management,  Access Protection, and Free Markets,  Journal of the Copyright Society,  Spring, 2004.

Whose Song is it Anyway?: Infringement and Damages in Musical Compositions, Entertainment and Sports Lawyer, Spring, 2004;  new version at   Damage Valuation in Music Copyright

Vertical Merger in a High Tech Industry: Synopsis, Avant!, and the FTC, 2 Economics Committee Newsletter of the American Bar Association 2, 2002.

Tying, Patents, and Refusal to Deal:  Economics at the Summit, 2 Economics Committee Newsletter of the American Bar Association 1, 2002.

 Intellectual Property and Antitrust: Music Performance Rights in Broadcasting, Columbia Journal for Law and the Arts, 2002.

"Keep Off My Privacy:  How Sweet the Sound?", Bright Ideas,  2002.

 Purple Beasts and Lewd Tunes:  Economic Reasoning and Copyright, Entertainment, Arts, and Sports Law Journal, 2002.

"How to Cure Performance Anxiety", 13 Entertainment, Arts, and Sports Law Journal, 2 Summer, 2002.

"Traffic Jam on the Music Superhighway: Is it a Reproduction or a Performance?", Journal of the Copyright Society, 2002 (with Lewis Kurlantzick).

Miss Scarlett's License Done Gone: Parody, Satire, and Economic Reasoning, 20 Cardozo Arts and Entertainment Law Journal 4, 2002.

24

EXHIBIT 3
PAGE 135

Copyright, Prevention, and Rational Governance:  File-Sharing and Napster, Columbia Journal for Law and the Arts, 2002.

"Internet Television and Copyright Licensing", 20 Cardozo Arts and Entertainment Law Journal 2, 2002.

Old Friends:  ASCAP and DOJ Reach a New Consent Decree, Entertainment and Sports Lawyer, 2002.

"Digital Rights Management and Access Protection" in Proceedings of the ALAI Congress: June 13-17, 2001, J. Ginsburg, ed., Columbia University, 2002.

Digitalization' and the Arts",  Handbook of Cultural Economics, Ruth Towse, ed., Edward Elgar Publishing Ltd., 2002.

Internet TV and Copyright Licensing: Balancing Cents and Sensibility, Internet Television, ed. D. Gerbarg, E. Noam, J. Groebbel, Lawrence Erlbaum Publishers, Mahwah, NJ, 2002.

"Music Licensing in the Digital Age", Copyright in the Cultural Industries, Ruth Towse, ed., Edward Elgar Publishing Ltd., 2002.

Search and Destroy: How to Tame a Spider, IPL Newsletter 1, 2001.

"Biting the Hand that Feeds", Century City Lawyer, November, 2001, with Duncan Cameron.

"Interpreting Amended ASCAP Consent Decree: More Options to Avoid Blanket Royalties", Entertainment Law and Finance, October, 2001.


## UNPUBLISHED ARTICLES


Reasonable Royalties in Patent Litigation:  Methods, Evidence, and Experts


Trademarks and Financial Remedies:  Standards in the Common Law


Trademark Valuation and Market Analysis


Pharmaceuticals and Compulsory Licensing


25

EXHIBIT 3
PAGE 136

Trademarks, Injunctions, and *eBay v. MercExchange*

Publicity Rights and Rational Valuation

Art as Innovation:  "The Wind Done Gone" Case

Market Imperfection and   Failed Governance:   The Case of   Music   Performance
Rights

Information Transfer in Cyberspace:   Popups,  Keying,  and  Privacy

Copyright Settlement Strategies from a Damages Expert


## OTHER AFFILIATIONS

Columbia Institute for Tele-Information, Senior Research Fellow, Columbia University, New
York,  New York

ecomp Consultants, Special Consultant, Tampa, Florida:

Giant Steps Media,  Affiliate, New York

Contributor to *MusicDish* E-Journal


**March, 2019**

26

EXHIBIT 3
PAGE 137

27

EXHIBIT 3
PAGE 138

# EXHIBIT 4

EXHIBIT 4
PAGE 139

**DEPOSITION OF MICHAEL A. EINHORN**

**FITNESS QUEST, INC. V. UNIVERSAL MUSIC PUBLISHING GROUP**

**December 17, 2003**

**CONDENSED TRANSCRIPT AND KEYWORD INDEX**



**BARKLEY**
**Court Reporters**

| Los Angeles | Orange County | San Francisco | San Diego | Inland Empire | Palm Springs | San Fernando Valley | San Jose |
|---|---|---|---|---|---|---|---|
| (310) 207.8000 | (949) 955.0400 | (415) 433.5777 | (858) 455.5444 | (909) 686.0606 | (760) 322.2240 | (818) 702.0202 | (408) 885.0550 |

EXHIBIT 4
PAGE 140

| | | |
|---|---|---|
| 1 | 11:07 | A   No. |
| 2 | 11:07 | Q   How about 17 cents in profit? |
| 3 | 11:07 | A   I have not -- cannot specify any one |
| 4 | | amount. |
| 5 | 11:07 | Q   Or any amount in profits at all.  Correct? |
| 6 | 11:07 | A   That's correct. |
| 7 | 11:07 | Q   Thank you.  In fact, you cannot say for |
| 8 | | sure that if Fitness Quest had spent more dollars on |
| 9 | | infomercials they might not have lost more money. |
| 10 | | Correct? |
| 11 | | MS. WILCOX:  I'm objecting to the form of your |
| 12 | | question.  It had negatives in there.  I'd like to |
| 13 | | hear it another time before you answer. |
| 14 | | Q   BY MR. MARENBERG:  Based on your |
| 15 | | view of the P&L, you thought Fitness Quest lost |
| 16 | | money on the Zumba project.  Correct? |
| 17 | 11:08 | A   On my view of the P&L, yes. |
| 18 | | Q   Now, you cannot say for sure that if |
| 19 | | Fitness Quest had spent more dollars on infomercials |
| 20 | | they might not have had a greater loss on the Zumba |
| 21 | | project.  Correct? |
| 22 | 11:08 | A   It's possible they could have had a greater |
| 23 | | loss. |
| 24 | 11:08 | Q   Thank you.  What evidence do you know of |
| 25 | | that retail sales are driven by infomercial activity? |

Page 62

| | | |
|---|---|---|
| 1 | 11:09 | A   Information that was -- that I read about |
| 2 | | in Mr. Waters' deposition and came to me from counsel |
| 3 | | concerning this particular company. |
| 4 | 11:09 | Q   Have you done any other research besides |
| 5 | | reading Mr. Waters' deposition and talking to |
| 6 | | counsel? |
| 7 | 11:09 | A   No. |
| 8 | 11:10 | Q   Is it true that you're not providing any |
| 9 | | opinion or testimony as to whether the amounts |
| 10 | | reflected in the Fitness Quest profit and loss |
| 11 | | statements for the Zumba project are correct? |
| 12 | 11:10 | A   I am expressing an opinion about -- I am |
| 13 | | not expressing an opinion whether the specific |
| 14 | | numbers that are reported in the P&L are correct. |
| 15 | 11:10 | Q   Thank you.  Did you review and evaluate the |
| 16 | | profit and loss statements for the Zumba project? |
| 17 | 11:10 | A   I looked at each one. |
| 18 | 11:10 | Q   What does that mean that you looked at each |
| 19 | | one? |
| 20 | 11:10 | A   I looked at each one and pursued what I |
| 21 | | observed in conversations with counsel and Mr. Waters |
| 22 | | in later conversations about these items. |
| 23 | 11:10 | Q   Did you do anything else to verify the |
| 24 | | reliability of the P&L statements? |
| 25 | 11:11 | A   I did not verify the reliability the P&L. |

Page 63

| | | |
|---|---|---|
| 1 | 11:11 | Q   Did you determine what method of accounting |
| 2 | | was used by Fitness Quest to record its revenues and |
| 3 | | costs, that is accrual in cash? |
| 4 | 11:11 | A   No. |
| 5 | 11:11 | Q   Do you have any background in accounting? |
| 6 | 11:11 | A   I do not. |
| 7 | 11:11 | Q   Did you identify any cost amounts in the |
| 8 | | P&L that were based on estimates as opposed to actual |
| 9 | | costs charged by a supplier or vendor? |
| 10 | 11:11 | A   I do not recall -- I do not know which |
| 11 | | costs reported on the P&L were actual and which ones |
| 12 | | were estimated.  I used the numbers in the P&L.  And |
| 13 | | unless specific adjustments were given to me, I used |
| 14 | | them as they were. |
| 15 | 11:12 | Q   And on certain occasions specific |
| 16 | | adjustments were given to you because the numbers in |
| 17 | | the P&L were not accurate? |
| 18 | | MS. WILCOX:  Objection.  Lack of foundation. |
| 19 | | THE WITNESS:  There were a number of adjustments |
| 20 | | given to me.  I don't recall whether they were |
| 21 | | specifically because they were or were not accurate. |
| 22 | | Q   BY MR. MARENBERG:  In other words, |
| 23 | | it is possible that certain adjustments were given |
| 24 | | to you because the P&Ls were not accurate.  Correct? |
| 25 | 11:12 | A   I do not recall one adjustment given to me |

Page 64

| | | |
|---|---|---|
| 1 | | because Fitness Quest said it was inaccurate. |
| 2 | 11:12 | Q   Well, did you find variances between the |
| 3 | | reports that were given to you on certain cost items |
| 4 | | and the numbers that were reported on the P&L? |
| 5 | | MS. WILCOX:  Objection.  It's vague. |
| 6 | | THE WITNESS:  That is not what I recall to be |
| 7 | | the main areas where we adjusted the reports. |
| 8 | | Q   BY MR. MARENBERG:  Well, let me |
| 9 | | ask again my question.  Did you find any areas in |
| 10 | | which you were given reports where those reports |
| 11 | | varied from the numbers that were reported on the |
| 12 | | P&L? |
| 13 | 11:13 | A   I don't recall. |
| 14 | 11:13 | Q   That might have been true.  Correct? |
| 15 | 11:13 | A   Right. |
| 16 | 11:13 | Q   Thank you.  Might have been true for more |
| 17 | | than one occasion?  More than one line item? |
| 18 | 11:13 | A   Yes. |
| 19 | 11:13 | Q   And that's one of the reasons why you're |
| 20 | | not opining as to whether the P&L was accurate or |
| 21 | | not.  Correct? |
| 22 | 11:13 | A   I'm not opining as to whether the P&L was |
| 23 | | accurate. |
| 24 | 11:14 | Q   And one of the reasons you're not voicing |
| 25 | | that opinion is because you've seen evidence of |

Page 65

16 (Pages 62 to 65)

MICHAEL A. EINHORN

EXHIBIT 4
PAGE 141

**Page 66**

1  variances between other reports in the P&L?
2  11:14   A   My reason for not opining is that I'm not
3  an accountant.
4  11:14   Q   In your report you stated that you're
5  advised that Fitness Quest deducted 6 percent for
6  uncollected credit cards and checks.
7  Do you recall that?
8  11:14   A   That's correct. I recall that.
9  11:14   Q   Did you perform any analysis to determine
10  whether the 6 percent for uncollected credit cards
11  and checks was reasonable?
12  11:14   A   I did not.
13  11:14   Q   And that was just an estimate -- correct --
14  the 6 percent?
15  11:14   A   I was advised that was the number.
16  11:14   Q   That was the actual number or an estimate?
17  11:14   A   I don't recall.
18  11:14   Q   In any event, you didn't undertake any
19  analysis to determine whether it was either an
20  accurate number or a reasonable estimate. Correct?
21  11:15   A   That's correct.
22  11:15   Q   You just took the number you were given?
23  11:15   A   That's correct.
24  11:15   Q   Is it fair to say that you assume that the
25  October 2002 financial results are representative of

**Page 67**

1  Fitness Quest's financial performance on the Zumba
2  product?
3  11:15   A   Every -- I assume that every month was
4  representative to the financial performance in that
5  month.
6  11:15   Q   Well, that's a totally if I understand your
7  response correctly. Let me see if I can ask my
8  question again and maybe I wasn't clear and I'll try
9  again.
10  Did you assume that the month of
11  October 2002 financial results were representative of
12  Fitness Quest's financial performance for the Zumba
13  product?
14  11:16   A   In that month.
15  11:16   Q   Well, October 2002 results by definition
16  are representative of October 2002 results. Did you
17  think that October 2002 results were representative
18  of the overall performance of Fitness Quest on the
19  Zumba product?
20  MS. WILCOX: What time frame are you referring
21  to? It's still being sold today.
22  THE WITNESS: I'm having problems with the use
23  of the word overall.
24  Q   BY MR. MARENBERG: Did you
25  believe -- strike that.

**Page 68**

1  Did you assume that the October 2002
2  financial results were representative of a typical
3  monthly performance for Fitness Quest on the Zumba
4  product for the time period between August 2002 and
5  June 2003?
6  MS. WILCOX: Objection. He's already testified
7  that there were different things going on in the
8  different months.
9  THE WITNESS: I'm having a problem with the word
10  typical.
11  Q   BY MR. MARENBERG: Well, did you
12  view the -- strike that.
13  Are the October 2002 financial results
14  representative of anything other than the financial
15  results of October 2002 in you're mind?
16  11:17   A   I assume that there -- a relationship
17  can be inferred based on numbers in 2000 -- in
18  October of 2002.
19  11:17   Q   A relationship to what?
20  11:17   A   A relationship between sales and
21  infomercials.
22  11:17   Q   In what period of time?
23  11:17   A   In -- beginning in October and extending
24  for the next three or four months as would be a
25  standard -- a standard relationship that might exist

**Page 69**

1  but for a Christmas season where we know there could
2  be a surge of retail sales.
3  11:17   Q   But you felt comfortable taking only one
4  month to make those conclusions?
5  11:17   A   I only had one month of retail sales.
6  11:18   Q   Were you comfortable that that is a
7  sufficient dataset to draw those conclusions from?
8  11:18   A   This was my only choice.
9  11:18   Q   Well, are you comfortable that it is --
10  leads to accurate conclusions?
11  MS. WILCOX: Objection to what comfortable
12  means.
13  THE WITNESS: As comfortable as I could be under
14  the circumstances.
15  Q   BY MR. MARENBERG: Is that a no?
16  MS. WILCOX: Objection. He answered it.
17  THE WITNESS: I think I really answered it as
18  precisely as I could.
19  Q   BY MR. MARENBERG: Did you
20  consider using any other months for the bases of
21  your analysis?
22  11:18   A   Yes.
23  11:18   Q   And why did you not use those months?
24  11:18   A   I considered November, December and
25  January. I did not use December and January because

EXHIBIT 4
PAGE 142

# EXHIBIT 5

EXHIBIT 5
PAGE 143

```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF TENNESSEE
                        AT NASHVILLE

      BRIDGEPORT MUSIC, INC.        )
                                    )
      vs.                           )   Case No. 3:01-00780
                                    )
      UNIVERSAL MUSIC GROUP, INC.   )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      BEFORE THE HONORABLE TODD J. CAMPBELL, CHIEF JUDGE

                        TRANSCRIPT

                           OF

                       PROCEEDINGS

                     February 8, 2007

                      Volume III

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -
APPEARANCES:

            For the Plaintiff:   Mr. Richard S. Busch
                                 Ms. Ramona DeSalvo
                                 KING & BALLOW
                                 1100 Union Street Plaza
                                 315 Union Street
                                 Nashville, TN 37201

            For the Defendant:   Mr. Philip Kirkpatrick
                                 STEWART, ESTES & DONNELL
                                 424 Church St., 14th Floor
                                 Nashville, TN 37219

                                 Mr. Jeffrey Goldman
                                 MITCHELL, SILVERBERG & KNUPP
                                 11377 W. Olympic Blvd.
                                 Los Angeles, CA 90064
      PREPARED BY:
                          CATHY B. LEIGH, RDR, CRR
                          Official Court Reporter
                          801 Broadway, Room A839
                          Nashville, TN 37203
                            (615) 726-8697
```

EXHIBIT 5
PAGE 144

582

```
 1  right?
 2  A.    Yes.
 3  Q.    What does that mean?
 4  A.    Five hundred thousand units.
 5  Q.    That's kind of a benchmark of some level of success in
 6  the record industry?
 7  A.    Yes.
 8  Q.    What does going platinum?
 9  A.    Million.
10  Q.    Double platinum?
11  A.    Two.
12  Q.    Did the All Work, No Play album go platinum?
13  A.    Three hundred thousand units sold.
14  Q.    Didn't go close to even going gold?
15  A.    No, it didn't.  Most albums don't come close to going
16  gold.  Three hundred thousand units.  Five hundred thousand
17  dollars (sic) would be gold album.  Not a disaster.
18  Q.    So you have spent some time in this case analyzing and
19  critiquing the P & L, the profit and loss statement that
20  Universal provided, correct?
21  A.    Yes, I did.
22  Q.    But in the Fitness Quest case didn't you decline to
23  offer any opinion on the accuracy of Fitness Quest's P & Ls?
24  A.    Decline?
25  Q.    I can show you if you want, sir.
```

EXHIBIT 5
PAGE 145

583

1  A.   Yes, let me see.

2           MR. BUSCH:  Your Honor, what's the relevance of

3  one P & L versus another and get into all the distinctions

4  between two P & Ls?

5           THE COURT:  Sustained.  We're not going to start

6  comparing those.  Let's wrap this up.  Getting far afield.

7           MR. GOLDMAN:  I just have one more question on

8  this subject, and I am done.

9           THE COURT:  All right.

10           MR. GOLDMAN:  Okay, thank you.

11 BY MR. GOLDMAN:

12 Q.   The Fitness Quest deposition, sir, at page 65, didn't

13 you say I am not opining as to whether the P & L was

14 accurate.  That was your own client's P & L.  And you were

15 then asked by the attorney, Mr. Marenberg --

16           MR. BUSCH:  Your Honor, I object again.  Am I

17 going to have to go back on redirect now and go over all of

18 the elements of this P & L and why?

19           MR. GOLDMAN:  Just one question.

20           THE COURT:  Go ahead and ask your question.

21 BY MR. GOLDMAN:

22 Q.   Question:  And one of the reasons you are not voicing

23 that opinion is because you have seen evidence of variances

24 between other reports and the P & L?

25           Your answer:  My reason for not opining is because

EXHIBIT 5
PAGE 146

584

1   I am not an accountant.

2         Did you say that, sir?

3   A.   Look on a P & L.  A P & L is a profit and loss

4   statement.  Reports revenues and costs.  A lot of the

5   definitions of revenues and costs are really matters of

6   accounting, and an economist is not qualified to talk about

7   them.  I am not talking about everything on those 98 pages of

8   the P & L.  There is a lot of stuff I accepted as is.  I am

9   complaining about one thing on the P & L net sales.  I am

10  saying that that one factor that one thing carries over from

11  one schedule to the next, to the third, to the fourth.

12  Q.   Dr. Einhorn, you are still not an accountant, are you?

13  A.   I am not an accountant, and I said that there may be

14  some accounting reasons why that definition of net sales is a

15  valid accounting practice.  As an economist, I do not believe

16  it makes any sense at all.  It is not consistent with the way

17  my profession views things because enrichment doesn't occur

18  until you finally close the deal.  If you can do it with

19  accounting by identifying different years, that's fine.

20  That's for the accounting profession to worry about.  There

21  are standards that can be used and not used on income

22  statements.  I am saying that the numbers don't reflect real

23  economic reality, nor do they reflect the way this company

24  paid royalties to its artists.  So both from an economic

25  perspective and the artist perspective as well as the company

EXHIBIT 5
PAGE 147

1   attorneys who sign the contracts with the artists, at some

2   point everybody gets the picture that this is just

3   accounting.  These aren't any real notions of economic

4   enrichment.  Why else would they sign contracts with artists

5   that are based on a different standard of enrichment?  They

6   are based on the way I reported things not on net sales.

7   Q.   Thank you, Doctor.  I have nothing further.

8        THE COURT:  Is there any redirect?

9        MR. BUSCH:  I promise to be very brief.

10       THE COURT:  Good idea.

11                   REDIRECT EXAMINATION

12   BY MR. BUSCH:

13   Q.   For the record, Dr. Einhorn.  "Rough and Tumble" is a

14   cartoon I used to watch when I was a kid.  Tough and Rumble

15   was the lawsuit?

16   A.   Yes.

17   Q.   "Rough and Tumble" was an enjoyable cartoon.  I just

18   have a couple of very brief questions.  First, Dr. Einhorn,

19   do I or do I not understand you to say that the record label

20   does not account to its artist or to the publishers until the

21   records are actually sold at the record store to the

22   consumer?

23   A.   That's right.

24   Q.   Okay.  So Bridgeport's damages in this case do I

25   understand correctly are as a result of the sale to the

EXHIBIT 5
PAGE 148

# EXHIBIT 6

EXHIBIT 6
PAGE 149

Page 1

1              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
2

3    MARCUS GRAY (p/k/a FLAME);      )
     EMANUEL LAMBERT; and CHIKE      )
4    OJUKWU,                         )
                                     )
5         Plaintiffs,                )
                                     )
6          vs.                       ) Index No. 2:15-cv-05642-CAS-JCX
                                     )
7    KATHERYN ELIZABETH HUDSON       )
     (p/k/a KATY PERRY); JORDAN      )
8    HOUSTON (p/k/a JUICY J);        )
     LUKASZ GOTTWALD (p/k/a DR.      )
9    LUKE); SARAH THERESA HUDSON;    )
     KARL MARTIN SANDBERG (p/k/a     )
10   MAX MARTIN); HENRY RUSSELL      )
     WALTER (p/k/a CIRKUT); KASZ     )
11   MONEY, INC.; CAPITOL RECORDS,   )
     LLC; KITTY PURRY, INC., UMG     )
12   RECORDINGS, INC.; UNIVERSAL     )
     MUSIC GROUP INC.; WB MUSIC      )
13   CORP LLC; and KOBALT MUSIC      )
     PUBLISHING AMERICA, INC.,       )
14                                   )
          Defendants.                )
15   ----------------------------)
16
17        CONFIDENTIAL VIDEOTAPED DEPOSITION
18             OF CHIKE OJUKWU
19           New York, New York
20         Friday, November 17, 2017
21
22
23
24   Reported by:
     MICHELLE COX
25   JOB NO. 133793

EXHIBIT 6
PAGE 150

Page 2

1

2

3

4                                        November 17, 2017

5                                        10:29 a.m.

6

7          Confidential Videotaped Deposition of

8     CHIKE OJUKWU, held at the offices of Mitchell

9     Silberberg & Knupp, LLP, 12 East 49th Street,

10    New York, New York, pursuant to Notice, before

11    Michelle Cox, a Certified LiveNote Reporter and

12    Notary Public of the State of New York and New

13    Jersey.

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 6
PAGE 151

Page 3

1   A P P E A R A N C E S:

2

3            CAPES SOKOL GOODMAN SARACHAN

4            Attorneys for Plaintiffs

5                 7701 Forsyth Boulevard

6                 St. Louis, Missouri 63105

7            BY:    MICHAEL KAHN, ESQ.

8

9            MITCHELL SILBERBERG & KNUPP

10           Attorneys for Defendants Jordan Houston,

11           Lukasz Gottwald, Sarah Theresa Hudson,

12           Karl Martin Sandberg, Henry Russell

13           Walter, Capitol Records LLC, Universal

14           Music Group, Inc., UMG Recordings, Inc.,

15           Kobalt Music Publishing America, Inc.,

16           Kasz Money, Inc., and WB Music Corp.

17                 12 East 49th Street

18                 New York, New York 10017

19           BY:    CHRISTINE LEPERA, ESQ.

20                  JACOB ALBERTSON, ESQ.

21                  JEFFREY MOVIT, ESQ.

22

23   ALSO PRESENT:  Sha-la Hollis, Videographer

24

25

EXHIBIT 6
PAGE 152

Page 4

1          IT IS HEREBY STIPULATED AND AGREED by and

2      between the attorneys for the respective

3      parties herein, that filing and sealing be and

4      the same are hereby waived.

5          IT IS FURTHER STIPULATED AND AGREED that

6      all objections, except as to the form of the

7      question, shall be reserved to the time of the

8      trial.

9          IT IS FURTHER STIPULATED AND AGREED that

10     the within deposition may be sworn to and

11     signed before any officer authorized to

12     administer an oath, with the same force and

13     effect as if signed and sworn to before the

14     Court.

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 6
PAGE 153

Page 43

1    tried to access it again and I couldn't.

2    Q    Okay.  So what do you currently use in

3    terms of trying to sell your beats publicly,

4    what site?

5    A    I actually don't use a site right now.  I

6    don't have anything on the Internet to sell my

7    beats.

8    Q    Okay.  When was the last time you did

9    that?

10   A    I don't remember.

11   Q    You don't remember.  Okay.

12        I'm just going to show you.

13        MS. LEPERA:  We're going to mark this as

14   Ojukwu 1.

15        (Discussion off the record.)

16   Q    The court reporter's going to give you a

17   document.

18   A    Sure.

19   Q    I'll ask you just to take a moment to look

20   at it.

21   A    Okay.

22   Q    And I'm going to ask you some questions

23   about it.

24        (Ojukwu Exhibit 1, Three-Page Document,

25   marked for identification as of this date.)

EXHIBIT 6
PAGE 154

Page 44

1      A    Okay.

2      Q    Okay.  Have you ever seen this document

3      before that we have identified as Ojukwu 1?

4      A    I have not.

5      Q    You have not.

6           So this is not something that you created?

7      A    I created this, but not this document,

8      so . . .

9      Q    When you say "this," you created "this,"

10     did you create an Internet site which has an

11     "airbid.com/profile/Chike+Beatz" on the bottom?

12     A    I did.

13     Q    Okay.  And is this a reflection of

14     material you put on that site?

15     A    Yes.

16     Q    And with respect to -- and this is -- just

17     represent, this is where we got it from.  We

18     got it on the Internet and we printed it out.

19          So with respect to the second page of this

20     document, you see there's a listing of various

21     beats?

22     A    Yes.

23     Q    Are those beats you created?

24     A    Yes.

25     Q    And are they still currently for sale or

EXHIBIT 6
PAGE 155

Page 45

1       licensed on this website?

2       A    Well, I guess they are.  I didn't know

3       that they were still up.  I don't have access

4       to this anymore.

5       Q    Well, everybody has access to it.  We have

6       access to it.

7       A    I don't have administrative access.

8       Q    To change it?

9       A    Yes.

10      Q    Okay.  So when did you -- did you take

11      some steps to take this down or try to?

12      A    I did not.  I actually forgot about it.

13      Q    Okay.  Do you have copies of these beats,

14      still in your possession, custody or control?

15      A    I'm not sure.

16      Q    Okay.  Do you see on the bottom it says

17      "About me," and there's a description?

18      A    Mm-hmm.

19      Q    Is that something you wrote?

20      A    Yes.

21      Q    Okay.  And you've been doing music, it

22      says, for almost a decade.

23           Is that about right?

24           Is this -- is this fairly recent?

25      A    Yes.

EXHIBIT 6
PAGE 156

Page 48

1          (Deposition Exhibit 2, Document Entitled

2     "Chike Ojukwu Video Reel - YouTube," marked for

3     identification as of this date.)

4          (Ojukwu Exhibit 3, Four-Page Document,

5     marked for identification as of this date.)

6          (Recess taken.)

7          THE VIDEOGRAPHER:  The time is 11:28 a.m.,

8     and we're back on the record.

9     BY MS. LEPERA:

10         Q    Okay.  Can you go back to Exhibit 1, for a

11    moment --

12         A    Yes.

13         Q    -- please, Mr. Ojukwa.

14         On this document, do you see on the bottom

15    there's a word on the left side,

16    "Nonexclusive"?

17         A    Yes.

18         Q    Did you put that there?

19         A    Yes.

20         Q    What does that mean to you?

21         A    Nonexclusive means that that person can

22    use the song, but then they would have to -- I

23    mean, I would still own the rights to it, to

24    have other people use it.

25         Q    So remember we were talking earlier

EXHIBIT 6
PAGE 157

Page 65

1    Q    Okay.

2    A    They basically had me fill out a contract

3    to sell the -- you know, to buy the song

4    outright.  And then they are, basically,

5    giving, you know, paying for that, or paying it

6    through the publishing of the song, I guess.

7    Q    And you don't know what song this is?

8    A    I don't remember.

9    Q    Okay.  So just sitting here today, if we

10   want to ballpark, you know -- and it's

11   approximately a ten-year --

12   A    Yes.

13   Q    -- career?

14   A    Mm-hmm.

15   Q    And how much would you sell an outright

16   beat for, typically?

17   A    It can vary.

18   Q    Is it similar to what we looked at on the

19   other exhibit, 15 to $50, I think it was?

20   A    It could be even more.

21   Q    Well, I'm not asking "could be."  I'm

22   asking you what it was.

23   A    I mean, one time I've sold a beat for

24   $500.

25   Q    Okay.

EXHIBIT 6
PAGE 158

Page 66

1    A    You know.

2    Q    Highest?

3    A    I would say so, yeah.

4    Q    Okay.

5    A    And then -- I mean, I've given beats to

6    people for no cost.

7    Q    Sure.

8         No, I'm just trying to get a -- just a

9    rough sense of -- since it's only the four

10   copyright registrations, and no other

11   indication of other works precisely.  I'm just

12   getting a ballpark of, you know, your source of

13   income with respect to your music career.

14   A    Mm-hmm.

15   Q    And at what level it is.

16   A    Mm-hmm.

17   Q    Is it fair to say your primary source of

18   income is your day job?

19   A    Yes.

20   Q    Okay.  Did you get any money for the

21   "Joyful Noise" beat when Marcus wanted to use

22   it, initially?

23   A    Flame did pay for the beat.

24   Q    What did he pay?

25   A    I don't remember how much, exactly.

EXHIBIT 6
PAGE 159

Page 67

1       Q       Roughly?

2       A       It may have been 300.

3       Q       Do you have any documents that reflect

4       that?

5       A       No.

6       Q       Did he pay by check or cash?

7       A       It was via check.

8               MS. LEPERA:  Okay.  I call for the

9       production of Mr. Gray's check, and any

10      indications of payments to Mr. Ojukwa for any

11      beat.

12      Q       Did you enter into an agreement with him

13      in exchange for that $300, along the lines of

14      what we were talking about earlier, a buyout

15      agreement or nonexclusive license?

16      A       We didn't make any direct agreements.  I

17      didn't even know he was going to pay me for the

18      beat.

19      Q       Mm-hmm.

20      A       And then I received a check in the mail

21      for the song.

22      Q       And what did you understand that to be

23      for?

24      A       For -- so it was for -- actually, that

25      check was for both songs that was on that

EXHIBIT 6
PAGE 160

Page 68

1     album.

2     Q    Okay.

3     A    So it was for "Joyful Noise" and for the

4     other song that we were talking about.

5     Q    Okay.  What did you understand he was

6     paying for?

7     A    To use the song.

8     Q    License?

9          Nonexclusive, so you could sell it again?

10    A    So, no, this was for an exclusive, for him

11    to use it on the album.

12    Q    But then you couldn't sell it again?

13    A    Yes.

14    Q    Okay.  So would that be, then, a buyout

15    fee?

16    A    Yes, yes.

17    Q    Okay.  And there was no written agreement

18    with respect to this?

19    A    No.

20    Q    Is there any indication on the check for

21    what the fee was for?

22    A    I don't remember.

23    Q    All right.  We'll look for that, okay.

24         Did you have any discussions with him

25    about the type of agreement you were -- when

EXHIBIT 6
PAGE 161

Page 69

1    you got the check, what this was for?

2    A    No.

3    Q    Or beforehand?

4    A    No.

5    Q    Okay.  So going back to -- he gets the

6    track off of Myspace, correct?

7    A    Yes.

8    Q    And he sends you a check.

9         What conversation, if any, did you have

10   between the check and him getting the track

11   about the use of the track?

12   A    We didn't have a conversation.

13   Q    There was nothing --

14   A    No.

15   Q    -- going on between you at that point?

16   A    No.

17   Q    So what did you think he was going to do

18   with the track, if anything?

19   A    Well, he did tell me that he was going to

20   use a beat for a song that he was making.

21   Q    Okay.

22   A    So -- but that was pretty much it.

23   Q    That was pretty much it, okay.

24        And then after you delivered this to him,

25   did he send you any versions with lyrics for

EXHIBIT 6
PAGE 162

Page 132

1                                    :ss

2    COUNTY OF NEW YORK      )

3

4         I, MICHELLE COX, a Notary Public within

5    and for the State of New York, do hereby

6    certify:

7         That CHIKE OJUKWU, the witness whose

8    deposition is hereinbefore set forth, was duly

9    sworn by me and that such deposition is a true

10   record of the testimony given by the witness.

11        I further certify that I am not related to

12   any of the parties to this action by blood or

13   marriage, and that I am in no way interested in

14   the outcome of this matter.

15        IN WITNESS WHEREOF, I have hereunto set my

16   hand this 2nd day of December 2017.

17

18                          _____

19                          MICHELLE COX, CLR

20

21

22

23

24

25

EXHIBIT 6
PAGE 163

Chike+Beatz aka Beatzdwn | Airbit

 Chike+Beatz aka Beatzdwn



EXHIBIT 6
PAGE 164

11/16/2017                                          Chike+Beatz aka Beatzdwn | Airbit



☰ MENU                                                    $0.00 (USD)   🛒      💳 Buy Now

Chike+Beatz aka Beatzdwn

Total Beats: 10
Total Plays: 1.6K

🔍 Search...

**Blake Griffin-Trap-Wiz Khalifa Type Beat**
↗ Share    Trap                                          $19.99 - $49.99    +

**Rebel-Trap-Meek Mill Type Beat**
↗ Share    Trap                                          $19.99 - $59.99    +

**Trap Bounce-Hip Hop-Wiz Khalifa Type Beat**
↗ Share    Hip Hop                                       $19.99 - $59.99    +

**The Struggle-Dirty South-Nelly Type Beat**
↗ Share    Dirty South                                   $19.99 - $59.99    +

**Entice-R&B-Teyana Taylor Type Beat**
↗ Share    R&B                                           $19.99 - $59.99    +

**Mafia-Mafioso-MMG Type Beat**
↗ Share    Mafioso                                       $19.99 - $59.99    +

**Drive-Abstract-Nicki Minaj Type Beat**
↗ Share    Abstract                                      $19.99 - $59.99    +

**Ruff Rider-Hip Hop-T.I. Type Beat**
                                                                            ▪

⏪  ▶  ⏩  🔊         0:00                                                0:00

ABOUT ME

Self-described as the "Producer Next Door", Chike Ojukwu has been instrumental to music and has been offering his talents to countless artists for almost a decade. Limitless in any genre, Chike's production is taking music to another level with his style mixing capablities.
Edit

NON-EXCLUSIVE                              SUPER LEASE

EXHIBIT 6
PAGE 165

11/16/2017                              Chike+Beatz aka Beatzdwn | Airbit

| MP3 | ✔ |
|------|----|
| WAV | ✘ |
| Trackout | ✘ |

| MP3 | ✔ |
|------|----|
| WAV | ✔ |
| Trackout | ✘ |

The producer has not specified the additional terms for this license.

The producer has not specified the additional terms for this license.

EXHIBIT 6
PAGE 166

# EXHIBIT 7

EXHIBIT 7
PAGE 167

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

*Marcus Gray (p/k/a Flame), et al.*

               Plaintiffs,

*v.*

*Katheryn Elizabeth Hudson (p/k/a Katy Perry), et al.*

               Defendants.

Civil Action  2:15-cv-05642-CAS-(JCx)

Judge: Christina A. Snyder

**REBUTTAL TO THE FERRARA REPORT OF APRIL 12, 2019**

**BY MICHAEL A. EINHORN, Ph.D.**

*Subject to change as more information becomes available*

**May 3, 2019**

**1. INTRODUCTION**

1.1)    I have been asked by the law firm of Capes Sokol, counsel for Plaintiffs Marcus Gray (p/k/a/ Flame), Emanuel Lambert, and Chike Ojukwu, to review, analyze, and, if appropriate, prepare a rebuttal to the report of Lawrence Ferrara dated April 12, 2019, and offered by Defendants as an expert report on musicological quantitative and qualitive values in the referenced lawsuit before this court.

EXHIBIT 7
PAGE 168

1.2)    Professor Ferrara attempts to meet the Defendant's burden in a copyright case by determining the relative financial worth of infringing and non-infringing elements in the "Dark Horse" song that was released on the Capital Records label owned by UMG.

1.3) I am an economist with expertise in valuation of damages related to infringement of intellectual property.  My testimony is consistent with the techniques of my profession, in which I earned a Ph.D. in economics.

1.4)  I am paid an hourly rate of $425 for report-writing, and $600 for preparation for, travel to, and appearance at deposition and/or trial.  This rate is consistent with my standard professional arrangements for appearance as an expert witness in court.

1.5) I am not related to any of the parties, nor do I have any financial interest in the outcome of this matter.

## 2. STATEMENT OF QUALIFICATIONS

*See* my Original Report, dated April 12, 2019, and my resume attached thereto.

## 3.  DOCUMENTS REVIEWED

*See* my Original Report, dated April 12, 2019. I also reviewed the full score of "Dark Horse" attached to the Ferrara Report as Exhibit 1.

## 4.  ANALYSIS

4.1)    Lawrence Ferrara is a music professor at New York University, where he has researched and taught analysis, methodologies, and other scholarly areas related to the study of music.

2

EXHIBIT 7
PAGE 169

4.2)    I do not believe that Professor Ferrara has any significant experience in the commercial end of the music business in general, or licensing in specific. He also appears to have no background in business, finance, accounting, or economics.

4.3)    In the valuation analysis of the Ferrara Report, the professor first counts the note heads in "Dark Horse" that have infringing material. He concludes that 7.2 percent of the final composition has infringing note heads. Stating that since the infringement only implicates music and not lyrics, Ferrara then deducts a purported valuation for the lyrics, and contends that the quantitative worth of the infringement is 3.6 percent of the song.

4.4)    Professor Ferrara then adjusts this note-by-note valuation for factors that purportedly relate to other qualitative factors in "Dark Horse."

4.5)    Professor Ferrara here sets forth some qualitative factors that he believes would affect the worth of the contribution. These factors may have some plausibility in an academic narrative, but are not appropriately quantified for the needs of this Court. .

4.6)    Based on his qualitative analysis, Professor Ferrara notices that the infringing material is not in the hook of the song. He then suggests that 3.6 percent is too generous a valuation for the infringing material. He does not offer an alternative value.

4.7)    Based on his enumeration of quantitative and qualitative factors, Professor Ferrara then proceeds to assign to the infringement a valuation factor of something less than 3.6 percent. He believes apparently that 3.6 percent (or less) of the song "Dark Horse" is related to the infringed composition "Joyful Noise.".

4.8)    Professor Ferrara presents no evidence that his technique or related valuations has ever appeared in any peer-reviewed paper or formed the foundation for the fees for licensing of music samples in the music business.

3

EXHIBIT 7
PAGE 170

4.9) Professor Ferrara fails to cite any technical literature that can be used to devise or support his apportionment scheme or to identify any necessary data related to that apportionment.

4.10) Due to its lack of specificity, Professor Ferrara's technique cannot be reproduced or verified by a Court or another independent expert in order to verify or dispute his results.

4.11) Professor Ferrara has thus failed to meet the *Daubert* standards specified by this Court in an earlier case involving one of the same defendants (UMG) and its attorneys regarding a similarly flawed analysis by Professor Jason King. *Fahmy v. Jay-Z,* 2015 WL 5680299.(C.D. Cal. Sept. 24. 2015).

4.12) In particular, Professor Ferrara's report's citation of precise percentage figures is likely to mislead the jury; moreover, his report is not the product of reliable principles and methods and does not reliably apply appropriate principles and methods to the facts of the case.

4.13) In summary, Professor Ferrara presents an unsupported and unverifiable opinion on apportionment.

## 5. CONCLUSION

The above conclusions constitute my personal independent assessment. These conclusions will form the basis of my testimony should I be called at trial.

Amounts are subject to change as more information becomes available.

/s/ Michael A. Einhorn
Michael A. Einhorn, Ph.D.
May 3, 2019

# EXHIBIT 8

EXHIBIT 8
PAGE 172

1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

10

11   MARCUS GRAY, et al.,                CASE NO. 2:15-cv-05642-CAS (JCx)

12              Plaintiffs,               Honorable Christina A. Snyder

13        v.                             [PROPOSED] ORDER RE: JOINT
                                         STIPULATION TO MODIFY
14   KATHERYN ELIZABETH HUDSON,          CASE SCHEDULE
     et al.,
15
                Defendants.
16

17

18        The Court has considered the parties' Joint Stipulation to continue the trial

19   date and interim trial schedule and, finding good cause for the same, here hereby

20   modifies the case schedule and issues the following schedule, which shall govern

21   the remainder of the case:

22

| Event | Deadline |
| --- | --- |
| Deadline for Damages Discovery and Potential Pre-Trial Depositions of individual defendants, Google, LLC, Myspace LLC, Billboard, Chike Ojukwu, Lecrae Moore, and Crystal Gray | April 1, 2019 |
| Initial Other Expert Reports | April 12, 2019 |
| Rebuttal Expert Reports | May 3, 2019 |

28

10798280.1

---

[PROPOSED] ORDER

EXHIBIT 8
PAGE 173

| Expert Discovery Cut-off | May 24, 2019 |
|---|---|
| Settlement Completion Cut-off | May 31, 2019 |
| Status Conference re: Settlement | June 10, 2019 at 11:00 a.m. |
| Last Day to File Motions in Limine and Other Trial Motions | June 10, 2019 |
| Pretrial Conference/ Hearing on Motions in Limine | July 8, 2019 at 11:00 a.m. |
| Trial | July 16, 2019 at 9:30 a.m. |

Motions in limine shall be noticed for the same date and time of the Pretrial Conference, and filed 28 days prior thereto. Motions in limine/oppositions shall not exceed five (5) pages in length and no replies will be accepted.

**IT IS SO ORDERED.**

Dated: March 1, 2019           By:_____
                              Honorable Christina A. Snyder
                              Judge of the United States District Court

10798280.1

2
**[PROPOSED] ORDER**

EXHIBIT 8
PAGE 174

# EXHIBIT 9

EXHIBIT 9
PAGE 175

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

*Marcus Gray (p/k/a Flame), et al.*

               Plaintiffs,

*v.*

*Katheryn Elizabeth Hudson (p/k/a Katy Perry), et al.*

             Defendants.

Civil Action  2:15-cv-05642-CAS-(JCx)

Judge: Christina A. Snyder

## EXPERT REPORT
## OF MICHAEL A. EINHORN, Ph.D.,
## ON BEHALF OF PLAINTIFFS
## —UPDATED MAY 14, 2019—

*Subject to change as more information becomes available*

**April 12, 2019**

1

EXHIBIT 9
PAGE 176

# 1.  INTRODUCTION

1.1)    I have been asked by the law firm of Capes Sokol, counsel for Plaintiffs Marcus Gray (p/k/a/ Flame), Emanuel Lambert, and Chike Ojukwu, to provide my expert valuation of actual damages and Defendants' profits resulting from a presumed infringement of Plaintiffs' authorship, ownership, and production rights in a musical composition called "Joyful Noise," which they contend was later infringed by the musical composition and recorded track "Dark Horse."  The track "Dark Horse" was imprinted on the *Prism* album that was released by Defendant Capitol Records, a division of Universal Music Group.

1.2)    I am advised that the three Plaintiffs co-wrote the words and melody of "Joyful Noise" in 2007, recorded the work in March of 2008, and was honored in 2008 with nominations at the Grammys and the Gospel Music Association Dove Award.

1.3)    Plaintiffs contend that "Dark Horse" infringes their copyrights in "Joyful Noise."   My report assumes this to be true as I offer no opinion on Defendants' liability.

1.4)    Capitol Records first released the album *Prism* on October 18, 2013. The track "Dark Horse" appeared in physical and digital albums, singles, and related work distributed in the U.S. and elsewhere.  "Dark Horse" earned considerable play on radio, video, digital services, and concert setlists.

2

EXHIBIT 9
PAGE 177

1.5)     Defendants Katheryn Elizabeth Hudson (p/k/a Katy Perry), Jordan Houston (p/k/a Juicy J)   Lukasz Gottwald (p/k/a/ Dr. Luke), Karl Martin Sandberg (p/k/a Max Martin), Henry Russell Walter (p/k/a/ Cirkut), and Sarah Hudson received directly, or through their publishing entities, royalties related to mechanical, digital, performance, and synchronization of the underlying musical composition "Dark Horse*." As copyright holders to the infringed work "Joyful Noise," plaintiffs should have received some share of total royalties paid.*

1.6) Defendant Katy Perry also received artist royalties for her participation as a primary artist in the recorded track "Dark Horse."

1.7)     Defendant Juicy J also received artist royalties for his participation as a featured artist in the recorded track "Dark Horse."

1.8) Defendants Dr. Luke, Max Martin, and Cirkut received producer royalties for engineering the studio recording featured on the album and digital single

1.9) I am an economist with expertise in valuation of damages related to infringement of intellectual property.   My testimony is consistent with the techniques of my profession, in which I earned a Ph.D. in economics.

1.10)  I am paid an hourly rate of $425 for report-writing, and $600 for preparation for, travel to, and appearance at deposition and/or trial.  This rate is consistent with my standard professional arrangements for appearance as an expert witness in court.

3

EXHIBIT 9
PAGE 178

1.11) I am not related to any of the parties, nor do I have any financial interest in the outcome of this matter.

## 2. STATEMENT OF QUALIFICATIONS

2.1)   I have worked as a professional economist since I received a Ph.D. in Economics from Yale University in 1981.   Since graduation, I was employed at Bell Telephone Laboratories, Rutgers University, U.S. Department of Justice (Antitrust Division), and Broadcast Music Inc.

2.2)   I have worked since 2001 as a testifying expert in the area of media and intellectual property.  My curriculum vita is attached as Appendix A.   I testified as an expert at deposition and/or trial on cases so identified in my professional resume.

2.3) I have served as a testifying economist in court cases involving the valuation of the intellectual property owned by commercial artists, software designers, writers, publishers, musicians, record labels,  photographers, inventors, celebrities, actors, cartoonists, television producers, cable companies, and radio stations.

2,4)  I have written 38 professional articles in the area of intellectual property in law journals and periodicals.  I have delivered numerous professional lectures or CLE seminars related to these topics. I am also the author of the book *Media, Technology, and Copyright: Integrating Law and Economics* (Edward Elgar Publishers).

4

EXHIBIT 9
PAGE 179

2.5)   I have never been disqualified from testifying in court or limited in any manner related to the applied standards, concepts, or techniques of the economics profession.

## 3. DOCUMENTS REVIEWED

I reviewed the following documents in connection with my work as an expert witness here:

- Third Amended Complaint for Copyright Infringement,

- UMG Recordings, Inc. Financial Statements,  "Dark Horse", June 2013 – June 2018, CAPITOL-01099-01197

- Royalty Statements, Katy Perry, "Dark Horse",  KP000278-279

- Contract,  Katy Perry,  Kasz Money Inc., August 31, 2013, KP000183-000209

- Contract,  Katy Perry,  Maratone AB., August 31, 2013, KP000210-000238

- *Prismatic World Tour*, License Agreement,  KP000239-000242

- Administration Agreement, BMG Chrysalis, Jordan Houston,  BMG000257-000290

- Broadcast Music Inc., Royalty Report,  Jordan Houston,   May 20, 2016

- Contract, Capitol Music Group (a division of Capitol Records), Katy Perry, June 20, 2007; amended September 1, 2010, CAPITOL00001-00061

- Royalties, Kobalt Songs Music Publishing,   KOBALT00006-00007

5

EXHIBIT 9
PAGE 180

- Royalties, Katy Perry, "Dark Horse", January 23, 2019

- Declaration, Silvio Pietroluongo,  January 14, 2019

- Summaries of revenues and costs provided by  Lukasz Gottwald,  Henry Russell Walker,  Sarah Hudson, Jordan Houston, all dated March 19, 2019

- Joint Stipulation Regarding Defendant Karl Martin Sandberg, July 1, 2014

- Expert Report of Todd Decker, April 6, 2017

- Wikipedia, *Prism* (Katy Perry Album)

- Wikipedia, "Dark Horse" (Katy Perry song)

- Deposition, Steven Drellishak, February 28, 2019

- Deposition, Katy Perry, March 13, 2019

- Radio Play, Five Songs,  CAPITOL01034- 01098

- Chartmasters,  pages  9-12,  16,  https://chartmasters.org/2018/03/cspc-katy-perry-popularity-analysis-2/16,

## 4.  SUMMARY OF CONCLUSIONS

4.1) I am advised that Plaintiffs Marcus Gray, Emanuel Lambert, and Chike Ojukwu may recover from Defendants actual damages that represent an amount that would have been rightfully earned had Plaintiffs' rights in the composition "Joyful Noise" been properly licensed and compensated.  I am advised that Defendants are jointly and severally liable for the total amount of these damages that Plaintiffs suffered.

6

EXHIBIT 9
PAGE 181

4.2)   Actual damages in this matter result from uncollected royalties owing to Plaintiffs' rights in the musical composition "Joyful Noise."   These rightful amounts include copyright royalties related to mechanical/digital reproductions, performance, and synchronization royalties that would normally be earned by songwriters or publishers.

4.3)  As described in Section 5, Plaintiffs lost the opportunity to earn copyright royalties amounting to ██████  *This amount represents actual damages that can be recovered jointly from all Defendants.*

4.4)   In addition to actual damages, I am advised that Plaintiffs may recover severable profits from each individual Defendant.  I am advised that Plaintiff must first prove Defendant revenues, from which Defendant must prove appropriate deductions.

4.5)   As itemized in Section 5 and 8, Defendants earned from infringing sales, licenses, and royalty payments (writer, artist, and producer) related to "Dark Horse"

| Defendant | Source of Revenues | Revenues |
|---|---|---|
| Capitol Records | Sale and licensing of recorded track | ██████ |
| Katy Perry | Co-writer and primary artist/performer | ██████ |
| Juicy J | Co-writer and featured artist | ██████ |
| Dr. Luke | Co-writer and co-producer | ██████ |
| Max Martin | Co-writer and co-producer | ██████ |

EXHIBIT 9
PAGE 182

| Defendant | Source of Revenues | Revenues |
|---|---|---|
| Cirkut | Co-writer and co-producer | ███████ |
| Sarah Hudson | Co-writer | ███████ |
| **TOTAL** | | ████████ |

4.6)  As explained above and in Section 5, a sum of ██████ reflects a royalty that should have been paid to the Plaintiffs for use of their composition "Joyful Noise" in the song and track "Dark Horse".  All Defendants are jointly liable for this amount.

4.7)  Defendants earned revenues of ████████, of which ██████████ is unaccounted for in the actual damages identified above. Each defendant is severally liable for any profit amount not otherwise accounted for in the determination of actual damages.

## 5.  ACTUAL DAMAGES

5.1) I am advised that Plaintiffs may recover from Defendants a licensing fee for royalties that would have been earned from use of Plaintiffs' composition "Joyful Noise".  Had the composition been licensed, Plaintiffs here would have received some share of the mechanical, digital, performance, and synchronization royalties attributed to the composition of "Dark Horse."

5.2) This share of copyright royalties generally is determined in the music industry through arms-length negotiation involving owners of a copyrighted work and

engaged licensees of that work.  As a matter of law, the valuation for a lost licensing opportunity should be a transaction amount at which a willing buyer(s) and a willing seller(s) would arrive in a free negotiation.

5.3)   That said, there is no scientific or industry rule for determining an exact amount that would result from a negotiation.  The results of other negotiations involving similar situations can sometimes be useful benchmarks to inform this analysis.   The determined valuation will then appear in a *range of outcomes* that can be determined by the market.

5.4) The Plaintiffs' original work, "Joyful Noise," was a musical composition that appeared as a track on the album *Our World: Redeemed (2008)* as well as a download single and stream (2014).  I am advised that copyright to the song is owned by the Plaintiffs in this lawsuit and that Plaintiffs would have been rightfully compensated by the record label.

5.5)   The album *Our World: Redeemed* was the fourth studio album from American Christian rapper Flame. It was released on March 4, 2008.   The recording label for the album was Cross Movement. The album earned a Grammy Award nomination for Best Rock or Rap Gospel Album, and the label made a video for the lead single "Joyful Noise." This establishes that the composition of "Joyful Noise" had a positive market value."

9

EXHIBIT 9
PAGE 184

5.6) Per the Declaration of Silvio Pietroluongo of Billboard (January 14, 2019), the album recording of *Our World: Redeemed* was commercially successful.  The album appeared on the Billboard Top Gospel Albums chart for thirty-five straight weeks. The album also appeared on the Billboard Top Christian Album on March 22, 2008 (#18) and March 29, 2008 (#34). (Declaration of Silvio Pietroluongo at ¶¶ 6,7)

5.7) The single-track *Joyful Noise* was also commercially successful and deserving of a positive market valuation.  The song charted on the Billboard Gospel Digital Songs Sales Chart for thirty-four straight weeks (1/15/2014 – 7/26/2014), Billboard Gospel Streaming Songs on July 19, 2014 (#1) and July 26, 2014 (#10), and the Billboard Christian Streaming Charts on July 19, 2014 (#4).

5.8) Based on a blended formula that takes into account radio airplay, sales data, and streaming, "Joyful Noise" also appeared on the Billboard Hot Christian Songs on July 19, 2014 (#11) and July 26, 2014 (#37)  and the Billboard Hot Gospel Songs on July 19, 2014 (#1)  and July 26, 2014 (#16),  (Declaration of Silvio Pietroluongo at ¶¶ 8-12).

5.9) As a valued musical work reproduced on a track on the album *Our World Redeemed*, the musical work "Joyful Noise" was paid, or deserved to have been paid, royalties from its record label Cross Movement.

10

EXHIBIT 9
PAGE 185

5.10)  I have read the expert report of musicologist Prof. Todd Decker of
Washington University of St. Louis. I am advised that Prof. Decker will testify that
the ostinato in "Joyful Noise" is substantially similar to the main ostinato in "Dark
Horse."  Prof. Decker further opines in his Expert Report that the infringing
ostinato is repeated throughout "Dark Horse." Upon written statement of counsel, I
am also advised that Prof. Decker has determined that the ostinato accounts for  95
seconds of the song (which Defendants' expert Ferrara times at 3:32, or 212
seconds); or 45 percent of the elapsed time in the entire composition.

5.11) Per Prof. Decker's opinion, it is also proper for Plaintiffs to share some
royalty share sales and licensing of the latter with regard to reproduction,
performance, and video synchronization.

5.12)  I believe that a market-based outcome for a copyright negotiation for rights
in "Joyful Noise" would have granted to Plaintiffs a fifteen percent (15%) share of
copyright royalties (i.e., mechanical, digital, performance, and synchronization) in
the musical composition "Dark Horse."

5.13)  I determined the putative share of fifteen percent as follows.  I am advised as
a legal matter that copyright in a joint composition (i.e., a musical work in which
more than one writer participates) vests initially in equal shares for all participants,
regardless of the size of any individual contribution to the work.  Per Katy Perry's
sworn deposition (36-37),  there were five listed primary writers of "Dark Horse" –

11

EXHIBIT 9
PAGE 186

Katy Perry (vocal melody and lyrics, 12:6-9), Sarah Hudson (lyrics), Max Martin (melody, 37:3-4), Dr. Luke (instrumental, 13:1), and Cirkut (instrumental, 13:1)

5.14) I have seen no contract among the writers to justify any other breakdown of the copyright. It then follows that each originally would have controlled a one fifth share of the copyright, or twenty percent (20%).

5.15) The final songwriter in this lawsuit -- Juicy J – was not an original writer of "Dark Horse" and but made a rap contribution to the work after the music, melody and lyrics were composed (Perry Dep.. 36:15-16). For his later efforts, Juicy J apparently received a reduced copyright share of ████████████ which is ███ of ██████. To provide for the share, the five primary writers (supra 5.13) then divided up the remaining ninety percent equally, each receiving an identical royalty share of ████████████████████

5.16) If properly licensed, the taking of the ostinato from "Joyful Noise" would have represented a sixth primary contribution to "Dark Horse" that would have needed to be assigned a copyright share. There is here a pre-existing sale or license agreement in place, and no ill-motive or competitive relationship that would interfere with its reasonable extension. If each of five original writer shares – i.e., Perry, Martin, Luke, Cirkut, and Hudson -- are equally valued at ██████ percent

of royalties paid ███████ each of six would then be valued at fifteen percent ███████[1]

5.17) Based on the adjusted benchmark derived from defendant's own copyright assignments, I shall now assign to the Plaintiffs a prorated share of royalties paid equal to fifteen percent of copyright royalties.   This is consistent with the legal notion (I am advised) that copyright damages must be assigned and discounted to correspond to plaintiff's ownership interests,   and that courts may apportion damages for certain claims  at issue pursuant to previous affirmative agreement of copyright holders as to percentage interest held by each.   I am also advised that courts may order apportionment based on undisputed calculations provided by plaintiffs.

5.18)  I am advised that the defendants have provided summaries that represent the following amounts of copyright royalties paid to the present (infra Section 8).


Katy Perry

      Publisher Royalties      ████████

      Performance Royalties      ████████

      **Subtotal:**      ████████

---

[1]This analysis maintains Juicy J at his original ██ percent copyright share, and I reserve the right to proffer a different estimate if this assumption is challenged.

EXHIBIT 9
PAGE 188

*Juicy J*

Publisher Royalties

Performance Royalties

**Subtotal**

*Dr. Luke*

Publisher Royalties

Performance Royalties

**Subtotal**

*Max Martin*

Publisher  Royalties

Performance Royalties

**Subtotal**

*Cirkut*

Publisher Royalties

Performance Royalties

**Subtotal**

14

EXHIBIT 9
PAGE 189

*Sarah Hudson*

| | |
|---|---|
| Publisher Royalties | ██████████ |
| Performance Royalties : | ██████████ |
| **Subtotal** | ██████████ |

**TOTAL:** ██████████

5.19)    Total copyright royalties are ██████████   Valued at a fifteen percent share of the total, I estimate that Plaintiffs would have earned a licensing payment of ██████████ for their share of "Dark Horse."

5.20) I am advised that Defendants are jointly liable to pay the identified amount of actual damages.

## 6.  LABEL REVENUES FROM "DARK HORSE": *2013-2018*

6.1)  Defendant Capitol Records recorded the track "Dark Horse" as a component of Katy Perry's album, *Prism.* The album was released on October 18, 2013.

6.2) The "Dark Horse" track was released in many different formats, including album, single, and DVD. (Drellishak Dep. 20:15-18). The standard album release contained thirteen (13) tracks and the deluxe release contained sixteen (16) tracks.

EXHIBIT 9
PAGE 190

6.3)  The "Dark Horse" track was also made available and licensed as a download, ringtone, ringback, digital stream, video use, synchronized work, and compilation work.

6.4)   After returns, net sales of all products bearing the track "Dark Horse," from October   2013   to   June   2018,   totaled   ▮▮▮▮▮▮▮▮.   (CAPITOL00923; CAPITOL1101-1103; CAPITOL01133). This amount is broken down as follows:

Physical albums (Thirteen tracks)

Physical albums (Sixteen tracks)

Download albums (Thirteen tracks)

Download albums (Sixteen tracks)

Download albums (Two tracks)

Single Tracks (Downloads and Streams)

Domestic Licensing Income

Ancillary Income  (Tour)

TOTAL



6.5) *Capitol Records sells physical albums as follows*.  The artist makes a master recording in the studio from which actual sales units are imprinted by an independent entity (Drellishak Dep. 59:15-17).  Manufacturing is administered by

16

EXHIBIT 9
PAGE 191

Universal Music Logistics ("UML") (*Id.* 59:1-8), which receives from the label a designated rate card payment per CD.   (*Id.* 67:2-4)      UML pays the actual manufacturer directly (*Id.* 60:4-14).

6.6) after manufacturing, the albums are then moved into inventory through UMG's distribution service (Universal Music Group Distribution) that administers the process of getting it into record stores. (Id.  85: 13-23) A customer then places an order through an EDI transaction to the sales order processing system.      The sales order processing system records the sales in the general ledger (Drellishak Dep. 22:1-7). After distribution, returns of physical product are credited to the buyer (*Id.* 23:15-18).  The label collects all due revenues from physical sales, and distributes royalties and other expenses to the appropriate parties.

6.7) *For sales of digital product*, the label sends the file directly to the digital service provider (e.g., Apple iTunes, Spotify, Amazon).  The service provider makes the track available to users through downloads or streaming. (*Id.* 36:6-10, 37:3-8).  There are no additional costs of production or distribution for digital product. The service provider pays for the actual download or stream revenues that can be shared with the artist.  Publishers collect copyright royalties from the sale of downloads through separate payment arrangements with the digital service provider.

EXHIBIT 9
PAGE 192

6.8) Capitol Records earned *licensing income* for ringtones, ring backs, digital streams, video uses, synchronized works (uses that integrate the music with scripted video or live background), and compilations (use of the track on different albums) (*Id.* 42:11-15).

6.9) Capitol Records earned *ancillary income* from revenues received for sale of the *Prismatic World Tour* DVD (*Id.* 55:15-18).

6.10)  Unreported to date are the licensing fees for sales to foreign markets. If foreign sales are recoverable, international revenues should be adjusted upward to reflect this licensing total.  I reserve the right to amend this report if additional information on these revenues becomes available.

6.11) To be conservative, I have included only the lower revenue estimates listed above, but reserve the right to include foreign revenues if the Court rules that it is appropriate to include any component of  foreign sales  in the calculation.

6.12) I do believe that each amount itemized above implicates a product or service that in some way involves the use of the infringing musical composition "Dark Horse," as reproduced on a master recording by Capitol Records.

18

EXHIBIT 9
PAGE 193

## 7.  ROYALTY PAYMENTS

7.1) Royalties for "Dark Horse" were earned by the lead artist Katy Perry, featured artist Juicy J producers Dr. Luke, Max Martin, and Circuit, and co-writers Katy Perry, Juicy J., Dr. Luke, Max Martin, Circuit, and Sarah Hudson.

*Lead Artist Royalties*

7.2) Recording artist Katy Perry appears as the lead artist on the track "Dark Horse." The track was originally released on September 17, 2013 as the second promotional single (i.e., radio) from the album *Prism* (2013).  The album was later released on October 18, 2013.  The single was released for general sales on December 17, 2013.

7.3)  As the lead artist, Ms. Perry earned *artist royalties* specified in her  contract with  Capitol Music Group (a division of Capitol Records). (CAPITOL00001-00061). Her contract was first established on June 20, 2007 and amended on December 13, 2012.

7.4) Per the amended agreement, Ms. Perry earned artist royalties for what I believe to her Third Committed Album, *Prism* (Contract, Section 6). Ms. Perry earned a royalty rate of ███ based on all sales of the album in the U.S. and Canada; while foreign sales in the U.K./Eire and Rest of Territory were respectively valued at ███ and ███ of the above specified rate.   The royalty for

19

EXHIBIT 9
PAGE 194

net streaming sales was specified at ███ of total revenues received (not including eligible non-interactive services covered by Sound Exchange (see next).

7.5)  Ms. Perry also earned artist royalties for her share of eligible  transmissions performed on  non-interactive digital services collected and distributed by Sound Exchange (per eligibility requirements established by the Digital Performance Rights in Sound Recording Act of 1996, 17 U.S.C. 114)

7.6)  Ms. Perry also received a flat payment of ██████ as an upfront  payment for artist rights related to a DVD release of her full Prismatics concert that she performed in Sydney Australia (KP000239-252), as well as a product royalty of ██████ (CAPITOL01193-7).  The song "Dark Horse" appeared on the playlist of this concert (Id.).

7.7) Some amount of Ms. Perry's artist royalties were recouped by the label to cover its production and marketing costs for her album (Contract, Section 4),  or paid out to her designated producers per independent contract. (Infra, Producer Royalties and Section 8)

7.8) Finally, Ms. Perry earned copyright royalties for her share as a writer in the musical composition  This work is regarded to be a controlled composition because Ms. Perry is also the lead artist on the album.

7.9)  I have not reviewed any written contracts that Ms. Perry (or any other writer) may have signed as a copyright owner of the song "Dark Horse."  As a matter of

20

EXHIBIT 9
PAGE 195

industry custom and practice, I believe that Ms. Perry received a reproduction rate of ███████ per sold track, pro-rated for her respective share of the composition (███, see 7.18) and a possible reduction for her appearance in a controlled composition.

*Featured Artist Royalties*

7.10)   As a featured artist on the track and video, Juicy J earned *artist royalties* specified in a separate contract with Katy Perry. Artist royalties were paid in flat sums for his work on the recorded track and the video.   (BMG000257-BMG000275).

7.11)   Juicy J also earned royalties for some share of royalties for use of the recorded track on Sound Exchange.  .

7.12)   Finally, Juicy J earned copyright royalties for his share as a writer in the musical composition

*Producer Royalties*

7.13)   Co-producers of the recorded track "Dark Horse" were Dr. Luke,  Max Martin, and Cirkut who were initially credited with equal shares of producer royalties.  I believe that the co-producers may have arranged additional transfers among themselves.

21

EXHIBIT 9
PAGE 196

7.14) Katy Perry entered into two producer contracts on August 31, 2013 (Dr. Luke, Cirkut; Contract, KP000183-209; Max Martin Contract, KP000210-236). These contracts established that the producers were paid a share of artist royalties otherwise due to Ms. Perry from physical and digital sales.

7.15)  Payments to Dr. Luke and Cirkut for produced tracks on the album *Prism* were established as follows (Contract, Sections 3-4).  The two producers *together* received upfront a non-recoupable payment of ███████ a ████ percent royalty based on physical sales valued at the published price to dealers ("PPD") of the album, a █████ royalty based on digital sales valued at the same PPD, and ████ of artist royalties for licensing of video.  All royalty amounts were suitably pro-rated for the number of participating tracks on the album and the producer's royalty relative to the artists.  Dr. Luke and Cirkut were also to have received a share of ███████ of Perry's due artist royalties paid at Sound Exchange, (Contract, Appendix B, KP000204).  Dr. Luke and Cirkut seem to have further divided their due royalties in a manner of which I am not aware.

7.16) Payments to Max Martin for produced tracks on the album *Prism* were as follows (Contract, Sections 3-4).  Max Martin received upfront a non-recoupable payment of ███████, a ██████ percent royalty based on physical sales valued at the PPD of the album, a ██████ royalty based on digital sales valued at the same PPD, and ████ of artist royalties for licensing of video.  All royalty amounts were

22

EXHIBIT 9
PAGE 197

suitably pro-rated for the number of participating tracks on the album and the producer's royalty relative to the artists. Max Martin was also to have received a share of ███████ of Ms. Perry's due artist royalties paid by Sound Exchange (Contract, Appendix B, KP000230).

*Songwriter Royalties*

7.17) Co-writers of the musical composition "Dark Horse" are listed as Dr. Luke, Max Martin, Cirkut, and Sarah Hudson, as well as aforementioned artists Katy Perry  and Juicy J.  I have not reviewed any relevant publisher contracts that Capital Records signed with any writer or his/her publisher entity.

7.18) Based on information made available from the performing rights organization Broadcast Music Inc., I believe that the writer shares of the copyright in the composition "Dark Horse" are as follows:[2]

Katy Perry:

Dr. Luke:

Max Martin:

Cirkut:

Sarah Hudson:

Juicy J:

---

[2]The same numbers appear as writer shares reported on Katy Perry's artist contract with Juicy J (Jordan Houston).  See also Email from Harold Papineau to Jermi Thomas, et al., *Re: URGENT: Juicy – Dark Horse Splits,* January 28, 2014.

EXHIBIT 9
PAGE 198

7.19) As a co-writer of the musical composition "Dark Horse," each listed writer earned royalties from the mechanical and digital reproductions of the song in albums and singles, public performances of the song in broadcast, digital, and general media venues, and third-party licensing of the song.

7.20)  Per industry custom and practice, record labels generally pay songwriter royalties for *reproductions, synchronization, and compilation* uses to each writer through his/her designated publisher.

7.21)  Each publisher designated a separate collection entity to administer the accounting for its incoming royalty payments.  Each royalty administrator is paid a share of collected revenues as payment for its administrative service.

7.22) Distinguished from other writer royalties, *performance royalties* are collected and administered by performing rights organizations (PRO), such as ASCAP (Dr. Luke, Max Martin, Cirkut, Perry, and Sarah Hudson are members) and BMI (Juicy J is an affiliate).  The PRO pays some share (usually 50%) of the royalty amount directly to the songwriter.  The remainder of the royalty is paid to the writer's designated publisher.

7.23) Based on the above, songwriter claims in the copyright of "Dark Horse" are summarized as follows:

24

EXHIBIT 9
PAGE 199

| Writer | Publisher | Administrator | PRO | Share |
|---|---|---|---|---|
| Katy Perry | When I'm Rich You'll Be My Bitch | Warner Chappell | ASCAP | ████ |
| Dr. Luke | Kasz Money Publishing | Kobalt Songs | ASCAP | ████ |
| Max Martin | Kasz Money Publishing | Kobalt Songs | ASCAP | ████ |
| Cirkut | Kasz Money Publishing | Kobalt Songs | ASCAP | ████ |
| Sarah Hudson | Prescription Songs | Kobalt Songs | ASCAP | ████ |
| Juicy J | DeeEtta Music | BMG Chrysalis | BMI | ████ |

## 8.  ROYALTY AMOUNT:  2013-2018

8.1)  Katy Perry, Juicy J, Dr. Luke, Max Martin, Cirkut, and Sarah Hudson earned

writer, artist, and/or producer royalties in connection with their contributions to the

song and track "Dark Horse.".

*Katy Perry*

8.2)  Defendant Katy Perry was a co-writer and primary artist of "Dark Horse".

As described in Section 7, her due collections accrued through her publishing

entity When I'm Rich You'll Be My Bitch, (as administered and collected by

Warner Chappell Music) performing rights organization ASCAP, and artist

25

EXHIBIT 9
PAGE 200

collecting society Sound Exchange.  She also earned a payment of ███████ for

licensing rights to her Prismatics concert performed in Australia

8.3) Based on the most recent records provided to me (KP000239-252, KP000278-

279), Ms. Perry received net royalty payment of ███████, broken down as

follows.


Publisher Royalties (through Kobalt Songs):     ██████ (2013H2 – 2018H1)

Performance Royalties (through ASCAP):     ██████ (2014M4 – 2019:M4)

Sound Exchange Royalties:     ██████ (2014M3  - 2019M1)

Artist Royalties:     ██████ (2013H2 – 2018H1)

Video Royalties:     █████

Video Upfront     ██████

**Total:**     ██████


*Juicy J*

8.4)  Defendant Juicy J was a co-writer and featured artist of "Dark Horse".   As

described in Section 7, collected amounts accrued through his publishing entity

Dee Etta Music (as administered and collected by BMG Rights Management),

performing rights organization BMI, and artist collecting society Sound Exchange.

8.5) Per a direct contract with Katy Perry (KP00032), Juicy J also received directly from Ms. Perry a flat payment of ▮▮▮▮ for his vocal appearance on the recorded track "Dark Horse", and a flat payment of ▮▮▮▮ for his appearance on the video.

8.6) Based on the most recent records provided to me, Juicy J's total royalties amounted to ▮▮▮▮, which were broken down as follows:

Publisher  Royalties  (through BMG Chrysalis) ▮▮▮▮   (2014Q2 – 2018Q2)

Performance Royalties (through BMI):   ▮▮▮▮   (2013Q3 – 2018Q1)

Sound Exchange Royalties :   ▮▮▮▮   (2013Q4 – 2018Q3)

Artist Royalties (through Katy Perry):   ▮▮▮▮

**Total**   ▮▮▮▮

*Dr.  Luke*

8.7) Defendant Dr. Luke was a co-writer and co-producer of "Dark Horse".   As described in Section 7, collected amounts accrued to his publishing entity Kasz Money Publishing (as administered and collected by Kobalt Songs Music Publishing), production entity Kasz Money, Inc., performing rights organization ASCAP,  artist collecting society Sound Exchange,  and shared video royalties.

8.8) Based on the most recent records provided to me, Dr. Luke's reported royalties amounted to ▮▮▮▮, which were broken down as follows:

27

EXHIBIT 9
PAGE 202

Publisher Royalties  (through Kobalt Songs): ███████ (2013Q4 – 2018Q2)

Production Royalties  (through Kasz Money): ███████ (2013Q4 – 2018Q2)

Performance Royalties  (through ASCAP): ███████ (2014Q1 – 2018Q3)

Sound Exchange Royalties: ███████ (2015Q2 – 2018Q4)

Video Royalties ███████ (2017Q2 – 2018Q2)

**Total** ███████

*Max Martin*

8.9)  Defendant Max Martin was a co-writer and co-producer of "Dark Horse".  As described in Section 7, collected amounts accrued to his publishing entity MXM Music, Inc. (as administered and collected through Kobalt Songs Music Publishing), production entity Maratone AB, Inc., performing rights organization ASCAP, and artist collecting society Sound Exchange and shared video royalties.

8.10) Based on the most recent records provided to me, Max Martin's gross royalties amounted to ███████, which were broken down as follows

Publisher  Royalties  (through Kobalt Songs): ███████ (2013Q4 – 2018Q2)

Production Royalties  (through Maratone, AB): ███████ (2013Q4 – 2018Q2):

Performance Royalties  (through ASCAP): ███████ (2013Q3 – 2017Q4)

28

EXHIBIT 9
PAGE 203

Sound Exchange Royalties:               ███████   (2014Q2 – 2018Q3)

Video Royalties:                        ███████  (not available)

Gross Royalty                          ███████

8.11) I am advised that parties stipulate that ████ of Max Martin's gross royalties were paid to his administrator Kobalt Songs Music Publishing, and an additional ████ was diverted for legal and management costs.  His net royalty was then ██████████[3]

*Cirkut*

8.12) Defendant Cirkut was a co-writer and co-producer of "Dark Horse."   As described in Section 7, collected amounts accrued to his publishing entity Oneiorology, Inc., (as administered and collected through Kobalt Songs Music Publishing), production entity Kasz Money Inc., performing rights organization ASCAP and artist collecting society Sound Exchange.

8.13) Based on the most recent records provided to me, Cirkut's total royalties amounted to ██████████, which were broken down as follows:

Publisher Royalties   (through Kobalt Songs): ███████   (2013Q4 – 2018Q3)

[3]Per Stipulation, April 2019, costs include management commission of ████ of gross ███████) and legal and administrative fees of ████ of gross (███████).

29

EXHIBIT 9
PAGE 204

Production Royalties (through Kasz Money):   █████████   (2013Q4 – 2018Q2)

Performance Royalties   (through ASCAP):   █████████   (2013Q3 – 2018Q1)

Sound Exchange Royalties:   ████████

Video Royalties:   █████████   (2017Q2 – 2018Q2)

**Total**   ████████

*Sarah Hudson*

8.14)  Defendant Sarah Hudson was a co-writer of "Dark Horse". As described in Section 7, collected amounts accrued to her publishing entity Prescription Songs (as administered and collected through Kobalt Songs Music Publishing) and performing rights organization ASCAP.

8.15) Based on the most recent records available to me, Ms. Hudson's total royalties amounted to ████████, which were broken down as follows (without dates):

Publisher Royalties  (through Kobalt Songs):   █████████

Performance Royalties   (through ASCAP): :   █████████

**Total**   █████████

8.16) With the exception of Max Martin, all royalty amounts reported above are gross receipts before deduction for any administrative costs by any entity. Based

30

EXHIBIT 9
PAGE 205

on the specific data that I may yet review and verify, I reserve the right to amend for any suitable deductions that are proven to be paid to administrators.

8.17)  Copyright royalties may accrue only to a songwriter's share of the work, and not to artists and publishers. In the above charts in this Section, copyright royalties to each of six writers include only his/her publisher royalties and performance royalties.

8.18) Before administration fees, total copyright royalties for the six writers above sum to ██████████. This amount can form the basis of a calculation for actual damages that Plaintiffs would have earned had their rights been properly licensed. *If Plaintiffs are entitled to 15 percent of the total, actual damages are then* ███████.


## 9.  IMPORTANCE OF SONG DARK HORSE

9.1)  The album *Prism* was a leading album that earned over ███████████ ████ in sales and licensing for the label Capitol Records.  The song Dark Horse was critically important to the success of this album. This is documented in and demonstrated by the appearance of the song in concert tours, radio promotion, video use, and commercial charts.


*Concert Tours*

31

EXHIBIT 9
PAGE 206

9.2)  Record labels generally market new releases by supporting artist tours related to the new album. In the course of her professional career with Capitol Records, I believe that Katy Perry performed in five Concert Tours under the terms specified in her Original Agreement with the label entered in 2007.

9.3) Ms. Perry's most successful tour of the five tours was the *Prismatic World Tour*, which promoted her album release of *Prism.*  The tour ran from May 2014 to October 2015 and visited Europe, North America, Australia, Asia and South America.

9.4) The *Prismatic World Tour* in 2014-2015 grossed more than $204.3 million from 151 shows with a total attendance of 1,984,503.  The Sydney November 28th concert was recorded for her second live album: *The Prismatic World Tour Live*, which was released two weeks after the tour ended.  The setlist for the *Prismatic World Tour* contained twenty songs,

    1. "Roar"

    2. "Part of Me"

    3. "Wide Awake"

    4. "This Moment" / "Love Me"

    5. "Dark Horse"

    6. "E.T."

    7. "Legendary Lovers"

EXHIBIT 9
PAGE 207

8. "I Kissed a Girl'

9. "Hot n Cold"

10. "International Smile" / "Vogue"

11. "By the Grace of God"

12. "The One That Got Away" / "Thinking of You"

13. "Unconditionally"

14. "Walking on Air"

15. "It Takes Two"

16. "This Is How We Do" / "Last Friday Night (T.G.I.F.)"

17. "Teenage Dream"

18. "California Gurls"

19. "Birthday"

20. "Firework"

9.5) Twelve of twenty songs on the setlists for the *Prismatic World* Tour appeared on the *Prism* album:   "Roar," "This Moment," "Love Me," "Dark Horse," "Legendary Lovers," "International Smile," "By the Grace of God," "Unconditionally," "Walking on Air," It Takes Two" (*Prism* Deluxe), "This Is How We Do," and "Birthday."  "Dark Horse" was one of the twelve songs.

33

EXHIBIT 9
PAGE 208

9.6)   Ms. Perry also performed "Dark Horse" for fourteen additional live performances, including the 56th Grammy Awards on January 26, 2014 in Los Angeles.

### *Radio Play*

9.7)   In documents provided by the Defendant Capital Records itself (CAPITOL01034—1098), the label released five promotional singles from *Prism* for radio play before and after the release of the album on October 18, 2013.

9.8) In the order of initial release, the five promotional singles were as follows:

| Song | Date of 1st play | Radio Spins | # of Stations | # of Markets | Audience |
|---|---|---|---|---|---|
| Roar | 8/26/2013 | 770,436 | 3 | 3 | 5.2 billion |
| Dark Horse | 9/22/2013 | 930,186 | 29 | 24 | 6.3 billion |
| Unconditionally | 10/22/2013 | 149,963 | 10 | 10 | 820.4 million |
| Birthday | 4/20/2014 | 141,266 | 20 | 19 | 775 million |
| This Is How We Do | 8/05/2014 | 55,024 | 15 | 15 | 262.3 million |

9.9)   The chart is organized as follows.

Column 1:  Name of songs performed on radio.

Column 2:  Date of first airplay

Column 3:  Radio Spins:  Each broadcast play is one recorded radio spin

Column 4:   Stations:  Number of Individual Broadcast Stations

34

EXHIBIT 9
PAGE 209

Column 5:  Markets: Number of Unique Geographic Markets (Some markets can have more than one station performing the song

Column 6:  Number of Spins Multiplied by the Market Population

9.10)  Of the five listed songs released for promotional radio play, only two e – Roar and Dark Horse --  -- were released for radio play before  the album was released (October 18, 2013).

9.11) Along with "Unconditionally" (released October 22, 2013), "Roar" and "Dark Horse" have the most important commercial appeal because they were used to promote and generate momentum for the album release of **Prism**...   The two remaining singles "Birthday" and "This is How We Do" were introduced well after the album made its debut, and most album copies were sold.

9.12) Of the three  most important songs the track "Dark Horse" accounted for 50.2 percent of all radio spins,  69.0 percent of all radio stations,  64.9 percent of all geographic markets,  and 66.6 percent of all audience listens since its first play.

9.13)  From its first release on September 21, 2013, the track "Dark Horse" came to play on twenty-nine stations, twenty-three of which were of the Top 40 format, which has the most  important commercial appeal. Seven of the top ten Top 40 stations were located in Los Angeles (rank 2), Chicago (3), San Francisco (4), Dallas (5), Washington (7), Atlanta (8), and Boston (10).  Geographic locations for other Top 40 stations included Detroit (12), Seattle (13), San Diego (17), and Tampa (19)

35

EXHIBIT 9
PAGE 210

9.14) The prereleases for "Roar" and "Unconditionally" were more modest in scope.  From its first play on August 26, 2013, the prerelease "Roar" came to appear on satellite provider Sirius XM (October 11, 2013) and local stations in Washington, DC (alternative format, August 26, 2013) and Montgomery, Alabama (urban format, September 21, 2013).

9.15) The song "Unconditionally" played on ten stations in ten markets (six adult contemporary format, three alternative format, one rhythmic format, and zero Top 40).  As pointed out above, these spins of "Unconditionally" occurred between October 22, 2013 and December 31, 2013 – after the release of the album on October 18, 2013.

9.16) From a commercial perspective, the evidence from radio plays demonstrates that "Dark Horse" was a leading promotional song on the album – if not the most important.

*Streams and Videos on Chartmasters*

9.17) Chartmasters is a rating service in the record industry that charts the popularity of new albums and tracks among digital audiences.

36

EXHIBIT 9
PAGE 211

9.18) Using a special analytic technique,[4]  Chartmasters identified the twelve most popular tracks *ever* released by the recording artist Katy Perry until the present

9.19) The tracks "Dark Horse" (3,660,000 AES) and "Roar" (3,640,000 AES) are the *only listed tracks* from Katy Perry's album *Prism*.  These two tracks share first and second place among the most popular twelve tracks from the artist.  This ranking confirms the commercial importance of the track "Dark Horse".

9.20) Chartmaster confirmed the history of the five promotional singles from *Prism* as they played on digital streaming services, such as Spotify.

| Song | First Digital Stream | Streams |
|---|---|---|
| Roar | 9/5/2013 | 591,660 |
| Unconditionally | 11/20/2013 | 223,360 |
| Dark Horse | 2/20/2014 | 806,512 |
| Birthday | 4/10/2014 | 160,547 |
| This Is How We Do | 7/31/2014 | 257,370 |

9.21) Judged by relative popularity on all streaming services, "Dark Horse" garnered the most listeners (806,512 streams), while "Roar" came in more distant second (591,660).

---

[4]Chartmasters estimates the importance of tracks by calculating album equivalent sales (AES).  Album equivalent sales are generated from weighted sums of physical single sales, downloads, and streaming

37

EXHIBIT 9
PAGE 212

9.22)  Of all sixteen tracks on Prism, the album hit a total of  2,352,447,000

streams  The share of this total for "Dark Horse" is 34.2 percent of the total

9.23) Chartmaster also confirmed the history of the five promotional singles as

they appeared on YouTube videos that were officially released by Capitol Records,

with the input of Katy Perry and her team (Perry, Dep. 43:22-24, 46:1-2). As Ms.

Perry explains, video tracks are chosen based on the belief (i.e., gamble and

reaction) that the particular song is "bubbling"; i.e., appealing (44:21-25):

| Song | First | Views |
|------|-------|-------|
| Roar | 9/5/2013 | 2,645,384 |
| Unconditionally | 11/20/2013 | 505,833 |
| Dark Horse | 2/20/2014 | 2,369,953 |
| Birthday | 4/10/2014 | 334,755 |
| This Is How We Do | 7/31/2014 | 682,581 |

9.24) Judged by relative popularity on YouTube, "Roar" garnered the most viewers

and comments, while "Dark Horse" came in a very close second.

9.25)  The sixteen tracks from *Prism* together attracted on YouTube a total of

6,610,133,000 video views. The share of this total for "Dark Horse" was 35.9

percent of the total.

9.26)  Based on my review of data from concerts, radio play, streams, and video

views, I believe that "Dark Horse" was one of the most important commercial

songs on the album Prism, if not the most important. Given the demonstrated

38

EXHIBIT 9
PAGE 213

importance of the song "Dark Horse" to generating sales of the *Prism* album, any
method of apportioning album or concert revenues to "Dark Horse" by simply
dividing by total sales by the total number of tracks or songs is not an economic
means of valuing its relative worth.  I believe that Capital Records has made such a
valuation error by the track valuation that it deploys on Prism (CAPITAL1101-3;
see also Drellishak passim)

## 10.  COSTS AND APPORTIONMENT

10.1)   As a co-defendant,   Universal Music Group would bear the burden of
proving costs and providing an apportionment technique for valuing infringing and
non-infringing components of any record release through Capitol Records of the
single "Dark Horse" and the album *Prism.*

10.2) Based on documents that UMG provided and the Deposition of Edward
Drellishak, I believe that UMG might attempt to deduct from sales and licensing
revenues cost all components related to paid royalties, manufacturing costs,
distribution costs, marketing costs, and overhead.

10.3) Defendant costs generally are deductible only if they can be directly related
to the actual release of the product.  Claimed deductions cannot represent some
apportionment of a common or historic cost that would have been incurred
regardless.

39

EXHIBIT 9
PAGE 214

10.4) Publisher royalties for rights in musical compositions can be a legitimate deduction from label revenues that arose from sales and licensing of recorded material bearing the infringing work. Amounts that Capitol Records claims to have paid to copyright owners should correspond to amounts received by writers, publishers, and administrators.

10.5) As the recording artist, Katy Perry also earned from Capitol Records a royalty as a recording artist after the label recovered amounts for production and marketing. From her net royalties, Ms. Perry also directed payments to featured artist Juicy J and co-producers Dr. Luke, Max Martin, and Cirkut.  All royalty deductions should correspond with payments received by another beneficiary.

10.6) I believe that Defendant UMG might attempt to deduct from sales revenues received through Capitol Records the manufacturing costs and artwork design for all physical units sold.  However, manufacturing costs are not properly deductible if they simply reflect rate card payment to any other internal entity owned by UMG itself, such as Universal Music Logistics.   Rather, reported payments to Universal Music Logistics here would simply be transfers within the UMG entity and do not reflect any truly incurred manufacturing expense paid to an outside entity.  There then could be a variance between the standard rate and the actual cost of operation. (Drellishak Dep. 91:14-17).

40

EXHIBIT 9
PAGE 215

10.7)  I believe that UMG might also attempt to deduct fees related to amounts paid for *distribution* of its recordings.  However, Capitol Records pays distribution fees to an internal entity, Universal Music Group Distribution, based on a fixed percentage of product revenues that does not reflect any truly incurred expense outside of the Defendant corporation UMG. As explained above, transfer payments within the UMG organization are not properly deductible.  This may also implicate handling, returns processing, refurbishment, and ancillary fees (Drellishak Dep. 70:11-72:18).

10.8) As explained above, record labels market new releases by a recording artist through concert promotion, video production, and radio release.  Radio costs would include amounts spent for promotion of the single through time buys, promotional appearances, advertising, singles & shipping, and payments to independent promoters.  If Capitol Records can prove amounts related to infringing material, costs are deductible. The label may not deduct marketing costs that it later recouped previously from Ms. Perry's artist royalties.

10.9)  I also believe that UMG might attempt to deduct amounts related to an apportionment of *company overhead and related costs* among units sold, including the infringing recordings. Overhead costs would include the salaries of marketing employees, among other things (*Id.* 115:3-5). The amounts are generally based upon some formulaic assignment of common and/or historic costs, but without any

41

EXHIBIT 9
PAGE 216

causal relation to the infringing event. Assigned overhead expenses for the album are portioned from total overhead for the first eighteen months of the album (called the *frontline*, *Id.* 121; 19-24; 125:16-23). There is then no necessary relation between apportioned costs and the infringing activity.

10.10)  I am advised that the Defendants then bear the responsibility to identify all deductible costs and to apportion the worth of "Dark Horse" from every sale or licensing transaction on which the song appears, and must then present a credible means of performing both assignments.   I reserve the right to contest any suggested procedure.

## 11.   CONCERT REVENUES

11.1)   Depending on the court's final ruling on the recoverability of concert revenues, I would expect to add to Katy Perry's recoverable revenues a share of her earnings from concerts in the U.S. where "Dark Horse" was performed.  No such information has been provided.

11.2) Within the appropriate recovery period, the court should compel Ms. Perry to disclose all U.S. concerts where DARK HORSE was performed, the composite play list of each concert, and her payments for each event.

42

EXHIBIT 9
PAGE 217

## 12.  CONCLUSION

The above conclusions constitute my personal independent assessment.

These conclusions will form the basis of my testimony should I be called at trial.

Amounts are subject to change as more information becomes available.


<u>/s/ Michael A. Einhorn</u>
Michael A. Einhorn, Ph.D.

May 14, 2019

43

EXHIBIT 9
PAGE 218

# Appendix A

Professional Resume of Michael A. Einhorn

44

EXHIBIT 9
PAGE 219

## Michael A. Einhorn, Ph.D.            973-618-1212

**MEDIA, TECHNOLOGY, COPYRIGHT**



### MICHAEL A. EINHORN

**mae@mediatechcopy.com**

**http://www.mediatechcopy.com**

**Michael A. Einhorn**  is an economic consultant and expert witness in the areas of intellectual property, media, entertainment, technology, trademarks, publicity rights, and product design. He received a B.A. from Dartmouth College,  a Ph. D.  in economics from Yale University, and is the author of **Media, Technology, and Copyright: Integrating Law and Economics** (Edward Elgar Publishers, 2004).  He is also a former professor of economics at Rutgers University and adjunct professor at the Silberman School of Business (Fairleigh Dickinson University), a Senior Research Fellow at the Columbia Institute for Tele-Information, and the author of seventy professional and academic articles related to intellectual property and economic analysis.

Dr. Einhorn has provided valuation services in the following areas as a consultant or expert witness:

**Trademarks, Trade Secrets, and False Advertising:** *Trademarks* (Samsung Electronics, Dish Network,  Madonna/Material Girl,  Jakks Pacific, Kische USA*,* Oprah Winfrey/Harpo Productions, Avon Cosmetics, *The New York Observer,* the Kardashians/BOLDFACE Licensing + Branding, Wazu Holdings),   *trade secrets* (The Weather Channel,  Hasbro), and *advertising*  (J. Walter Thompson/Banco Popular, Kia Motors, Coca Cola, General Automobile Insurance Company).

**Music:** *Recording artists* (Led Zeppelin, U2, Madonna, 50 Cent, Usher, Rascal Flatts, LMFAO,  Aimee Mann, Nappy Roots,  Justin Moore, Xzibit, Nelly Furtado, George Clinton, Notorious B.I.G., D.L. Byron), *record labels* (Sony Music Holdings, Universal Music Group, Disney Music, Atlantic Records, Rhino Entertainment)*,  producers* (P. Diddy, Timbaland), *publishers* (Major Bob Publishing, Universal Music Publishing, Bridgeport Music, Hamstein Music, Chrysalis Music, Kobalt Music), *performing rights organizations* (SESAC), *radio stations* (WPNT in Pittsburgh), *live venues* (World Wrestling Entertainment), and *estates*  (Bill Graham Archives, Tasha Tudor, Bernard Lewis).

EXHIBIT 9
PAGE 220

<u>Video</u>: *Movies* (Paramount/DreamWorks, Bold Films), *cable programs* (NBCUniversal), *musicals* (Zorro Productions) *product placement* (Paxson Productions), *treatments* (Burnett Productions), *soundtrack* (Warner Bros. Entertainment), *TV programs* Televicentro of Puerto Rico), *satellite programming* (Golden Channels Company of Israel), DVD *videos* (Steve Harvey), commercials (Gray Television Group), and *cable operations* (AT&T).

**<u>Design, Apparel, and Art</u>**: *Apparel* (Target Stores, Carol Anderson, .Forever 21, Crew Knitwear, Joyce Leslie, Anthropologie), *architecture* (Sprint PCS, Home Design LLC, Murray Engineering, Turnkey Associates), *medical illustrations* (Pearson Education Services), *photography* (Harris Publications, Neil Zlozower, Dana Ruth Lixenberg), *sculpture* (Marco Domo), *cartoons* (A.V. Phibes, Melissa Flock), *toys* (Jakks Pacific), and *commercial marketing* (Kaufman Global).

**<u>Publicity Rights and Estate Valuations</u>**: *Names and likenesses* (Reese Witherspoon, Steve Harvey, Woody Allen, Rosa Parks, Arnold Schwarzenegger, Sandra Bullock, Cameron Diaz, Diane Keaton, Zooey Deschanel, Yogi Berra), *estate valuations* (Tasha Tudor, Marlon Brando, Bernard Lewis).

**<u>Cyberspace</u>**: *Music services* (Apple iTunes, Napster, MP3.com), *proprietary software* (Centrifugal Force, Frogsware), *open source software* (Jacobsen v. Katzer), *electronic publishing* (Pearson), *video games* (Activision), search *engines* (eUniverse), and *domain names* (eCommerce).

**<u>Patents and Technology</u>**: *Semiconductors* (General Electric v. Kodak, Great Lakes v. Sakar, *cellular* (Cellebrite v. Micro Systemation), *software* (Jacobsen v. Katzer, Centrifugal Force v. Softnet), *medical technology* (Lemper v. Legacy, Graston v. Graham), *clutch components* (Nouis Technologies v. Polaris Industries*), pet topicals (*Nite Glow Industries Inc. v. Central Garden & Pet Company*) and *general patents* (DeCordova v. MCG).

**Antitrust and Commercial Losses**: *Antitrust, breach of contract,* and *commercial injury* in actions (Los Angeles Rams, AT&T, American Home Realty Network, California Scents, Safmor, Inc., Golden Channels Company of Israel, St. Joseph's Regional Hospital (College Station, Texas)).

2

EXHIBIT 9
PAGE 221

**REPRESENTATIVE CLIENTS**

New York State Attorney General; New York

Fish & Richardson; Boston

Arnold & Porter; Washington

Baker & Hostetler; Cleveland

Palmer & Dodge; Boston

Hunton & Williams; Washington

Blecher & Collins; Los Angeles

Stokes Bartholomew Evans & Petree; Nashville

King & Ballow; Nashville

Frankfurt Kurnit Klein & Selz; New York

Lavely & Singer; Los Angeles

Davis and Gilbert; New York

Cowan DeBaets Abrahams & Sheppard; New York

Taft Stettinius & Hollister; Indianapolis

Sheppard Mullin Hampton & Richter; Los Angeles

Seyfarth Shaw; Los Angeles

Connolly Bove Lodge & Hutz; Wilmington

Blackwell Sanders Peper Martin; St. Louis

Lipsitz Green Faringer Roll Salisbury & Cambria; Buffalo

3

EXHIBIT 9
PAGE 222

**LITIGATION ENGAGEMENTS**

**Media and Entertainment**

*Gray et al. v. Katy Perry et al.   Central District of California,* 2019, consultant, valuation of damages resulting from copyright infringement in **Katy Perry's song *Dark Horse***.

*Dan Marino v. Dante Barton and Will Guice,* Pennsylvania Court of Common Pleas, 2018, report and testimony, valuation of damages resulting from breach of contract among three songwriters claiming rights in **Usher's song *Bad Girl.***

*Robert W. Cabell v. Zorro Productions, Inc., et a*l., Northern District of California, report, estimated commercial damages resulting from infringement of copyright in a **musical adaptation**.

*Gray Television Group, Inc. v. Found Footage Festival, LLC, et al.*, Eastern District of New York, report, estimated commercial damages resulting **from infringement of television programming**

*Richard Dutcher v. Bold Films LLP*, et al., Central District of Utah, 2017, report, estimated commercial damages resulting from copyright infringement of leading screenwriter in the movie *Nightcrawlers.*

*RCN Capital, LLC, et al. v. The Los Angeles Rams, LLC, et al.,* Eastern District of Missouri, 2017, report and deposition, breach of contract regarding use of rights to **sell tickets in secondary markets**.

*Michael Skidmore v. Led Zeppelin, et al.,* Central District of California, 2016, trial testimony, copyright infringement matter against rock group Led Zeppelin regarding **classic song *Stairway to Heaven.***

*Joseph Cooper v. Broderick Steven "Steve" Harvey,* Northern District of Texas, 2016, report and deposition, breach of contract matter regarding recorded films **of comedian/actor Steve Harvey.**

*Sidney Earl Swanson v. MJJ Productions*, Central District of California, 2015, report, copyright infringement matter regarding a musical composition used in a **sound recording *Chicago* by Michael Jackson.**

*Original Appalachian Artworks, Inc. v. Jakks Pacific, Inc.,* International Institute for Conflict Prevention and Resolution,  2015, report and deposition,  matter involving lost sales related to breach of contract for **copyright owners of Cabbage Patch Kids.**

*Alexander Graham-Sult and David Graham v. Bill Graham Archives, LLC, et al.*, Northern District of California, 2015, report and deposition, valuation of copyrights and business concern resulting from fiduciary breach of the estate of **rock concert producer Bill Graham**.

*William L. Roberts (p/k/a Rick Ross), et al.,* v. *Stefan Kendal Gordy,* Southern District of Florida, 2015, report, valuation of defendant enrichment resulting from infringement of a musical composition in a **multi-platinum release  (*Party Rock Anthem*) and a Kia automobile commercial.**

EXHIBIT 9
PAGE 223

*Cartagena Enterprises, Inc. v. J. Walter Thompson Co*., et al., American Arbitration Association, 2015, report, valuation of damages resulting from infringement of prominent salsa composition in an advertising message **by the leading advertising agency and the largest bank in Puerto Rico.**

*Digital Satellite Connection v. Dish Network Corporation*, et al., District of Colorado, 2014, report and deposition, valuation of damages resulting from **trademark infringement by national satellite provider.**

*Ron Satija and Heather Lynette Mowder v. General Automobile Insurance Company*, District Court of Northern Ohio, 2014, report, valuation of damages resulting from infringement of **cartoon character *The General* in national advertising campaign.**

*Daniel Moser v. Raymond Ayala (p/k/a Daddy Yankee), et al.,* District Court of Puerto Rico, 2014,  report, valuation of damages resulting from infringing reproduction and performance rights in **Daddy Yankee's multi-platinum song *Rompe.***

*Dan Marino v. Usher Raymond, et al.,* Eastern District of Pennsylvania, 2013, report, valuation of damages resulting from infringing reproduction and performance rights in **Usher's song *Bad Girl.***

*Preston Asevedo v. NBCUniversal Media, et al*.,  Eastern District of Louisiana,  2013, report, estimated damages for commercial artwork used on a **Syfy cable television program *Dream Machines.***

*Ryan Lessem and Douglas Johnson v. Universal Music Group,* Southern District of New York, 2013, report and deposition, valuation of damages involving copyright infringement in **50 Cent's song *How We Do***, recorded by  The Game.

*Montana Connection, et al. v. Justin Moore,* Middle District of Tennessee, 2013, report, estimated damages for infringement in **country hit song *Backwoods*** on Justin Moore's record album and concert performances.

*VMG Salsoul v. Madonna Louise Ciccone, et al*.,  Central District of California, 2013, report, valuation of damages resulting from copyright infringement in **Madonna's song *Vogue.***

5

EXHIBIT 9
PAGE 224

*Interstar Holdings v. Truman Press*, Superior Court of California, 2011, report, matter involving valuation of commercial losses resulting from breach of contract involving **DVD movie *Dawn of the Living Dead*.**

*Lutfu Murat Uckardesler, et al. v. Azteca International Corporation*, et al., Central District of California, 2010, consultant, estimated damages resulting from infringement of treatment on internationally popular **reality television show.**

*Kernel Records Oy v. Timbaland, et al.,* Southern District of Florida, 2010, report, estimated damages resulting from copyright infringement of sound recording on multi-platinum **Nelly Furtado song "Do It."**

*Anthony Lawrence Dash v. World Wrestling Entertainment, Inc.,* District of South Carolina, 2011, report, valuation of damages involving use of a **copyrighted song** in a **highly promoted WrestleMania event.**

*Rafael Vergara Hermosilla v. The Coca Cola Company*, Southern District of Florida, 2010, report and deposition, valuation of defendant profits resulting from infringement of song in **international advertising campaign for the World Cup**.

*Chris Lester v. U2, Apple Computer, and Universal Music Group*, Central District of California, 2009, report and deposition, estimated damages from copyright infringement involving U2's **song *Vertigo*** used in concerts and recordings.

*Serendip LLC, et al. v. Warner Bros. Entertainment, Inc.*, Central District of California, 2009, report and deposition, estimated damages in copyright infringement on released DVD containing the **soundtrack to *A Clockwork Orange.***

*D.L. Byron v. Rascal Flatts and Disney Corp.*, Southern District of New York, 2009, report, estimated copyright damages for settlement involving infringement of classic **Pat Benatar composition "Shadows of the Night" by Rascal Flatts.**

*Evilkid Productions v. DreamWorks LLC & Paramount Pictures*, Southern District of New York, 2009, report, estimated damages and assisted settlement involving the unauthorized use of commercial art in **the hit movie *Transformers.***

*Victor Lopez v. Daddy Yankee and Universal Music,* Central District of California, 2009, consultant on damages for album track used on **multi-platinum release *Barrio Fino*.**

6

EXHIBIT 9
PAGE 225

*Charles Watt v.  Dennis Butler, et al.,* Northern District of Georgia, 2009, report, estimated copyright damages involving **platinum release by rap group D4L**.

*The Jackson Sisters v. Universal Music Group*, Superior Court of the State of California, 2008, consultant, assisted classic recording act for recovery of damages for unfair trade practices in **use of legacy materials in sound recording.**

*MCS Music America, Inc., et al. v. Napster, Inc., et al.,* Central District of California, 2008, consultant to music publishers in copyright infringement matter involving limited downloads and subscription streaming by the **digital music service Napster.**

*Henry Carter v. Independent Productions, Inc.*, et al., Superior Court of Delaware, 2008, consultant, royalty dispute among members of **rock band George Thorogood and the Destroyers.**

*Bridgeport Music, Inc.* v. *Smelzgood Entertainment, et al.,* Middle District of Tennessee,   2007, report and trial testimony, estimated damages for unauthorized use of **George Clinton's classic composition *Atomic Dog*** on later infringing record album.

*TMTV Corp. v. Mass Productions*, **Inc.,** District of Puerto Rico, 2006, report and trial testimony, estimated damages resulting from copyright infringement of **television program** by  producer and comedian Sunshine Logrono.

*Velocity Entertainment Group v. NBC Universal and Donald Trump*, 2006, Los Angeles Superior Court, Los Angeles, California, consultant, valuation of treatment used in popular **reality television show, *The Apprentice***.

*Bridgeport Music, et al. v. Crited Music.*, Middle District of Tennessee, 2006, report, estimated damages for copyright infringement of **musical composition *You'll Like it Too***.

*Thomas Turino, et al. v. Universal Music, et al.,* Central District of California, 2006, report and deposition, estimated damages resulting from copyright infringement in **Christina Milian's sound recording *Dip It Low.***

7

EXHIBIT 9
PAGE 226

*Bridgeport Music, et al. v. Universal Music, et al.,* Middle District of Tennessee, 2006, report and trial testimony, estimated damages for unauthorized use of three compositions and sound recordings on **Notorious B.I.G. album produced by P. Diddy.**

*TMTV Corp.* v. *Televicentro de Puerto Rico, Inc.,* District Court of Puerto Rico, 2005, report, estimated damages resulting from infringement of **television program.**

*The Royalty Network, Inc., et al. v.  Activision, et al.,* Central District of California, 2005, report, estimated damages for use of music on best-selling **video game *Streets of Los Angeles.***

*Al Howard Productions, Inc. v. Paxson Productions,* Central District of California, 2005, report, estimated commercial damages for breach of contract involving product placements on **prominent game show, *Supermarket Sweeps.***

*Mojo Music, et al., v. Walt Disney Records*, Los Angeles Superior Court, 2004, report, valued synchronization rights in **musical compositions used in *Lion King 2.***

*Willie Woods v. BMG Music/Atlantic Recording Company, et al.,* Eastern District of Missouri, 2004, report, valued damages for unauthorized use of musical compositions in a **Nappy Roots' multi-platinum song "Po Folks".**

*Darryl D. Lassiter, et al., v. Twentieth Century Fox Film Corp*., Central District of California, 2004, consultant, regarding damages due for use of unauthorized **screenplay in the movie *Drumline*.**

*Sharon Haygood, et al. v. Coca-Cola, et al.*, 17th District Court of Tarrant County, Texas, 2004, report and deposition, calculated professional losses for gospel artist who suffered **personal injury in automobile accident.**

*Universal Music Publishing Group v. Fitness Quest, Inc.,* Northern District of Ohio, 2003, report and deposition, estimated damages from copyright infringement of **music soundtrack in an exercise video tape.**

*Brought to Life v. MCA Records, Inc., et al.,* Southern District of New York, 2002, consultant, valued copyright damages in **Mary J. Blige song "Family Affair".**

EXHIBIT 9
PAGE 227

*Michael A. Lowe v. Loud Records,* Eastern District of Pennsylvania, 2002, report, valued damages for copyright infringement in **musical track "X" produced by Dr. Dre**.

*Aimee Mann v. UMG Recordings, Inc., et al.,* Central District of California, 2002, consultant, estimated sales displacement and loss of income resulting from the **unauthorized release of compilation album.**

*Jacques Loussier v. UMG Recordings, Inc., et al.*, Southern District of New York, 2002, consultant, surveyed data regarding copyright infringement of improvisational composer **by Eminem in song "Kill You".**

*Hamstein Music Group, et al. v. MP3.com, Inc., et al.,* Central District of California, 2002, consultant, estimated damages for multiple infringements involving **musical compositions**.

*Chrysalis Music v. MP3.com, Inc., et al.*, Central District of California, 2002, consultant, estimated damages for multiple infringements of **musical compositions.**

*Major Bob Music, Inc., et al. v. MP3.com, Inc,* Southern District of New York, 2001, report, estimated damages for unauthorized use of **Garth Brooks' musical catalog** by digital library service.


**Trademarks, Trade Secrets, and False Advertising**

*Helpful Hound, LLC, v. New Orleans Bldg. Corp., et al.,* Eastern District of Louisiana, 2019, report, damages related to use of an **infringing trademark used in a food market based in New Orleans.**

*Computer Programs and Systems, Inc. et al. v. Wazu Holdings, Inc., et al*., Southern District of Alabama, 2018, report and deposition. damages related to use of an **infringing mark in a software application in medical technology.**

*The Choice is Yours v. The City of Philadelphia, et al,* Eastern District of Pennsylvania, 2018, report, damages related to trademark infringement of **worker training program**

9

EXHIBIT 9
PAGE 228

*Kische USA, LLC v. Ali Simsek and Jane Doe Simsek, et al.*, Western District of Washington, 2017, report. damages related to **trademark infringement and unfair competition** from a competing distributor of imported apparel.

*VBS Distribution, Inc. et al. v. Nutrivita Laboratories, Inc., et al.,* Central District of California, report, 2017, **damages related to false advertising and unjust enrichment involving dietary supplements.**

*Mladen Pintur, et al. v. Helen Rogic, et al.*, Southern District of New York, report, 2017, **damages related to trademark infringement of business name**

*Baskim Holdings, Inc.  v. Two M, Inc. d/b/a Babe's Cabaret, et al.*, District of Nevada, report and deposition, 2017, damages **related to misuse of trademarked name.**

*Healthmate International, Inc., v. Timothy W.T. French, et al.*, Western District of Missouri, report, 2016, **damages related to false advertising and unfair competition.**

*Elinor Shapiro v. Hasbro, Inc.,* Central District of California, 2016, report and deposition,  **infringement of trade secrets by toy manufacturer Hasbro.**

*Milk Studios v. Samsung Electronics Co., Ltd., et al.*, Southern District of New York, 2016, report, **defense of Samsung Electronics in a trademark damage valuation.**

*JMC Restaurant Holdings, Inc., et al.  v. Marcelo Pevida, Inc., et al.,* Eastern District of New York, 2016, report and deposition, defense of **trademark user in international restaurant market.**

*House of Auth, LLC v. 721 Bourbon, Inc.*, District of Connecticut, 2016, report, regarding **damages from trademark infringement of beverage**

*Events Media, Inc.  v. The Weather Channel, Inc.*, District Court of New Jersey, 2015, report and deposition, trade **secret infringement by major cable network *The Weather Channel.***

*KLM & M, LLC, et al. v.  VCP2 Augusta, P.C., et al.,* Southern District of Georgia, 2015, report, valuation of damages related to **trademark infringement by a medical practice.**

10

EXHIBIT 9
PAGE 229

*Simone Kelly-Brown v. Oprah Winfrey and Harpo Productions,*  Southern District of New York, 2014, report and deposition, valuation of damages resulting from a **trademark infringement  by Oprah Winfrey and Harpo Productions.**

*Who Dat?, Inc. v.  Who Dat Shoppe, et al.,* Eastern District of Louisiana, 2014,  report, valuation of damages resulting from infringement of  **trademark of major regional brand of apparel.**

*Vivid Entertainment, LLC v. Jose Baserva,* Middle District of Florida, 2014,  report, valuation of damages resulting from infringement of **business name in entertainment chain**

*Benchmark Young Adult School v. Launchworks Life Services LLC*, Southern District of California, 2014, report, valuation of damages resulting from infringement of **plaintiff's   business   name   by   competing   health   care   provider**.

*Kim, Khloe, and Kourtney Kardashian, and BOLDFACE Licensing + Branding v.  By Lee Tillett, Inc.,* Central District of California, 2013, report, valuation of damages resulting from trademark infringement in **cosmetics line KROMA by the Kardashian sisters.**

*Original Gourmet Food Company, Inc. v. Jelly Belly Candy Company*, District of New Hampshire, 2013, report and deposition, regarding declaratory judgment to enforce trademark rights for **candy manufacturer.**

*East West LLC v. Caribbean Crescent,  Inc.,* Northern District of Virginia, 2012, report and deposition, valuation of damages involving use of a trademark and trade name by a competitor in the **food provision business.**

*Rock and Roll Religion v. Cels Enterprises,* Central District of California, 2012, report, valuation of damages resulting from infringement of trademark in **women's apparel.**

*PML Clubs v. Gold Suit, Inc., Northern District of Texas, 2012, report and deposition, valuation of damages* resulting from trademark infringement in the market for **adult cabaret establishments.**

*Super-Krete International v. Lafarge Group,* 2013, opinion letter, regarding trademark valuation of a **cement product** for a settlement conference between two parties.

11

EXHIBIT 9
PAGE 230

*Kilter, Inc. v. Avon Corporation,* Southern District of New York, 2011, report and deposition, damage valuation of trademark infringement and misappropriation of intellectual property by **major cosmetics company.**

*L.A. Triumph, Inc. v. Madonna Louise Veronica Ciccone and Material Girl,* Central District of California, 2011, report, valuation of damages from a trademark infringement  in **clothing line (Material Girl) owned by Madonna**.

*Miller International, Inc. v. Clinch Gear, Inc., et al.,*  District of Colorado, 2010, report, valuation of damages from a trademark infringement by a designer of **martial arts apparel.**

*Golf Cart World, Inc.  v. Mike's Golf Carts, Inc.*, Middle District of Georgia, 2010, report, estimated damages resulting from a trademark infringement in **golf carts and hunting carts.**

*Doctor's Associates, Inc. v. QIP Holder, LLC  and IFilm, Corp.,* District Court of Connecticut,  2008, consultant,  reviewed expert materials in false advertising matter **involving *Subway* and *Quizno's.***


## Publicity Rights


*Alana Campos, et al. v. Metropolitan Bush Company*, Sup. Ct. of the State of Ariz., 2019, report, valuation of damages resulting from use **of name and images of ten glamour models** by adult nightclub in Arizona..

*Timed Out v. Red Tie Gentlemen' Club,*. No. Dist. of California, 2019, consultant, valuation of damages resulting from use **of name and images of glamour models** by adult nightclub in California.

*Hilary Hepner, et al. v. Déjà vu Services, Inc. et al*., Eastern District of Michigan, 2018, report,  valuation of damages resulting from use **of images of eleven glamour models** by adult nightclubs in Michigan.

*Irina Voronina,  et al. v. Scores Holding Company, et al*,  Southern District of New York, 2018, report,  valuation of damages resulting from use of **images of fifty-one glamour models** by a chain  of adult  clubs in New York City.

12

EXHIBIT 9
PAGE 231

*Jamie Edmondson  et al. v.  Caliente Resorts,  LLC, et al*.  Middle District of Florida, 2016, report and deposition, valuation of damages resulting from use of **images of glamour models** by adult resort in  Florida.

*Reese Witherspoon v. Marketing Advantages International,* Superior  Court of California, 2015, report, valuation of damages involving use of **name and image of  actress Reese Witherspoon** in connection with online retailer.

*Jason Lezak v. Active Network,*  Superior  Court of California,  2015, report, valuation of damages involving use of **image of Olympic swimmer Jason Lezak** in connection with online software application

*Sandra Bullock v. ToyWatch USA,* Superior Court of California, 2013, opinion letter, valuation of damages involving use of **image of actress Sandra Bullock** in a commercial website for apparel accessory.

*Zooey Deschanel v. Steve Madden, et al.,* Superior Court of California, 2011, report and deposition, valuation of publicity rights of **actress Zooey Deschanel** used in line of women's shoes.

*Michelle Pfeiffer, et al. v. CompUSA,* Superior Court of California, 2011, report, valuation of **publicity rights of Sandra Bullock, Michelle Pfeiffer, Diane Keaton, Mandy Moore, Cameron Diaz, and Kate Hudson** in retail advertisements .

*Woody Allen v. American Apparel, Inc.*, Southern District of New York, 2009, consultant in valuation of reasonable damages in publicity rights of **movie director Woody Allen** used on urban billboards .

*Evgeni Petrosyan v. DIRECTV, Inc.,* Eastern District of New York. 2009, consultant regarding damages for infringement of publicity rights of **comedian Evgeni Petrossian** by satellite network.

*Arnold Schwarzenegger and Oak Productions, Inc. v. Recycled Paper Greetings, Inc., et al.,*  Superior Court of California, 2005, report, estimated damages in publicity rights case involving greeting card merchandise bearing **image likeness of Arnold Schwarzenegger.**

<center>13</center>

EXHIBIT 9
PAGE 232

*Lawrence "Yogi" Berra v. Turner Broadcasting System*, Superior Court of New York, 2005, consultant, valued publicity rights case involving the unauthorized use of **personal name Yogi Berra** in citywide advertising campaign.

*Rosa Parks v. BMG Music/Laface Records, et al.,* Eastern District of Michigan, 2004, deposition, valued publicity rights involving use of **celebrity name Rosa Parks** in a BMG album bearing the name and track *Rosa Parks.*

*Melina Kanakaredes v. Ouidad, Inc.*, Eastern District of Ohio, consultant, 2004; publicity rights case involving damages resulting from magazine articles bearing **actress name Melina Kanakaredes. Apparel, Design, Art, and Photography**

*Neil Zlozower and Barry Levine v. Motley Crue, Inc.,* Southern District of New York, 2017, report and deposition, infringement of **copyrighted photographs of famous music group** by touring company and merchandise sellers.

*Dana Ruth Lixenberg v. Bioworld Merchandising, Inc., et al.,* Central District of California, 2017, infringement of photos of Tupac Shakur and Notorious B.I.G. used on **apparel sold in major retail chain**.

*PK Studios, Inc. v. RLR Investments, LLC, et al.,* Middle District of Florida, 2016, report,    matter involving **infringement of architectural plans** in residential development.

*Idra Alta Mode, LLC v. D'Lymer, Inc. d/b/a Edwards Lowell, Central* District of California, 2016, report, matter involving **breach of contract in furrier operations.**

*Hansel Oy v. US Department of Health and Human Services, et al.,* 2016, opinion letter, report, valuation of **copyright damages in use of designs** created by a Finnish technology company.

*Glen Craig v. Universal Music Group  et al.* Southern District of New York, 2016, report**,** infringement of **copyrighted photographs of legendary artist B.B. King** by parties related to his estate.

*Radix Textile, Inc. v. Anthropologie, Inc., et al*., Central District of California,  2015, report, valuation of damages resulting from **copyright infringement of apparel design** by major clothing chain.

14

EXHIBIT 9
PAGE 233

*Klauber Brothers, Inc. v. Forever 21 Retail, Inc., et al*., Central District of California, 2015, report, valuation of damages resulting from **infringement of copyrighted apparel design** by a major apparel chain.

*Star Fabrics, Inc. v. Joyce Leslie, Inc.,* Central District of California, 2014, report, valuation of damages resulting from **infringement of copyrighted apparel design** by major retail chain.

*Ron Satija and Heather Lynette Mowder v. General Automobile Insurance Company*, District Court of Northern Ohio, 2014, report, valuation of damages resulting from infringement of **cartoon character *The General* in national advertising campaign.**

*NTD Architects v. Baker Nowicki Design Studio,* Southern District of California, 2013, report and deposition, estimated damages resulting from copyright infringement involving **architectural plans**.

*Sheila Lyons, DVM  v. Robert Gillette, et al.,* District of Massachusetts, 2013, report, valuation of  damages resulting from copyright infringement of **professional training materials**.

*Turnkey Associates v. Steph Weiand*, et al., District of Iowa, 2012, report, estimated damages resulting from copyright infringement of **architectural plans** by severed employee in new professional concern.

*Murray Engineering v. Windermere Properties, et al*., Southern District of New York, 2012, report, estimated damages resulting from copyright infringement of **architectural plans** in New York residential building.

*Home Design, LLC v.  Collard Properties*, District of Colorado, 2012, report, valuation of damages and defendant profits in connection with copyright infringement of **architectural plans** in new residential development.

*U.S. Textile Printing v. Crew Knitwear, et al.,* Central District of California, 2010, report and deposition, estimated damages resulting from copyright infringement of **textile design** by retail chain**.**

*Melk Communications v. Pennsylvania Medical Society, et al.*, Eastern District of Pennsylvania, 2010, report, estimated damages resulting from fraud, misappropriation, and  copyright infringement of **commercial marketing materials.**

15

EXHIBIT 9
PAGE 234

*Timpco v. Implementation Services*, Southern District of Indiana, 2009, report, valuation of damages resulting from copyright infringement of **commercial marketing materials.**

*Malibu Textiles v. CABI, Inc.*, Southern District of New York, 2008, report and deposition, estimated damages for copyright infringement of **eight apparel designs.**

*Melissa Flock v. State of Florida, Division of Emergency Management*, Northern District of Florida, 2007, report, estimated damages for copyright infringement of **cartoon characters** by the State of Florida.

*Neil Zlozower v. Harris Publications, Inc.,*  Southern District of New York, 2006, report and deposition, valuation of lost **photographic slides owned by famous photographer** of rock group *Metallica.*

*Vera Bradley, Inc. v. Target Stores, Inc.,*   Northern District of Indiana, 2006, report, valuation of unauthorized **apparel design on swimwear** distributed by Target Stores.

*Command Cinema Corp.* v. *VCA Labs, Inc.,* Southern District of New York, 2006, report, estimated commercial damages resulting from the **destruction of master tapes** bearing releases of two adult movies.

*Impala Lechner v. Marco-Domo Internationales Interieur, et al.*, Southern District of New York, 2004, consultant, estimated damages for copyright infringement of **sculpture designs.**

*Core Group P.C. v. Sprint PCS*,  American Arbitration Association, 2004, report and trial testimony, estimated damages for copyright infringement of **architectural plans** used in nationwide redesign of retail space operated by Sprint.

## Technology and Cyberspace

*Nite Glow Industries Inc., et al. v. Central Garden & Pet Company, et al.,* District of New Jersey, 2018, testimony at trial, estimation of damages related to **patent infringement for pet goods products.**

16

EXHIBIT 9
PAGE 235

*Nouis Technologies v. Polaris Industries,* W. D. Wisc., 2015, report, matter involving **patent infringement for clutch components in all-terrain vehicles.**

*Brian Lemper, M.D. v. Legacy IP, LLC,* Superior Court of Nevada, 2015, deposition, matter involving purported breach of contract in procuring **patent application for medical technology.**

*Cellebrite Mobile SyncRonization Ltd. v. Micro Systemation AB,* Northern District of Virginia, 2014, report, estimated damages for **copyright infringement of intelligence software** designed to remove records from suspect cell phones.

*Scott E. D. Skyrm v. Newedge USA, LLC,* FINRA Dispute Resolution #12-02346, 2014, testimony, , valuation of damages resulting from **copyright infringement of data format in online financial newsletter.**

*Munhwa Broadcasting Corporation v. Media Journal, Inc., et al.,* Central District of California, 2014, declaration in support of plaintiff in **anti-circumvention liability**.

*Virtual Studios v. Beaulieu Group, LLC,* Eastern District of Tennessee, 2013, report, valuation of damages involving **copyright infringement of design software** for virtual display of interior designs.

*TVB Holdings (USA), Inc. v. Tai Lake Communication, Inc.,* Central District of California, 2013, report, regarding economic harm created by **circumvention device** that breached access and copyright protection on Asian programming.

*James DeCordova v. MCG Nevada, Inc.*, Central District of California, 2012, report, valuation of damages resulting from **patent infringement for a sleep-enhancing device.**

*BanxCorp. v. Costco Wholesale Corporation, Inc., et al.,* Southern District of New York, 2012, report, valuation of damages resulting from infringing use of **compilation data** in an **online banking service.**

*Robert Jacobsen v. Matthew Katzer*, Northern District of California, 2009, report, estimated damages in landmark copyright case involving **copyright infringement of open source software** created by world-renowned Berkeley professor.

17

EXHIBIT 9
PAGE 236

*Centrifugal Force, Inc. v. Softnet*, et al., Southern District of New York, 2009, report, valuation of damages resulting from copyright infringement of **operations  software.**

*Frogsware,  Ltd. v. Viva Media, et al.,* Southern District of New York, 2009, consultant, assisted video game designer for recovery of damages resulting from a breach of contract and copyright infringement of **video game software.**

*Carpal Therapy, Inc., and David Graston v. Jennifer Graham, Esq.,* Marian County Superior Court of Indiana, 2008, report and deposition, estimated commercial losses for inventor of **medical technology** for loss of rights to intellectual property.

*Great Lakes Intellectual Property,  Ltd. v. Sakar International, Inc.,* Western District of Michigan, 2006, report, valuation of reasonable royalties for patent infringement in a **graphical user interface chip.**

*Frederic H. Martini v. Pearson Education Services,* Northern District of California, 2005, report, estimated damages for website infringements of prominent illustrator by leading **publisher of medical books.**

*Sandi Gray, et al. v. eUniverse, Inc., et al.,* Eastern District of Texas, consultant, 2004; valuation for copyright infringement by **digital provider of shared content.**

*General Electric v. Kodak,* 2002*,* consultant, assisted General Electric in valuation of **semiconductor portfolio in patent infringement matter.**

*RIAA v. MP3Board*, Southern District of New York, 2001, report and deposition, involving the **economic effects of search engines** that post links to infringing material.

*Universal City Studios.Inc.,et al. v. Eric Corley*, Southern District of New York, 2000, report and trial testimony, regarding economic effects of decrypting protective code established to protect copyrighted digital works.


## Private Valuations of Intellectual Property

*Juarez Foods,* 2015, trademarks now controlled by Wise Foods, Atlanta.

18

EXHIBIT 9
PAGE 237

*Tom Binns Design, LLC,* 2015, **trademarks and copyrights controlled by the international jewelry concern** Tom Binns Design, LLC.

*The Domain Names of eCommerce, IX Web Hosting, and Host Excellence.* 2012, **domain names and websites** owned by *online business.*

*The Estate of Tasha Tudor*, 2009, valued the worth of **publishing royalties due to the estate of renowned author and illustrator**.

*New York Observer.* 2008, **domain name of political blog**.

*Greens Today*, 2006, **trademarks for greens health product.**

*Bernard Lewis*, 2005, future **publishing royalties** due to Princeton professor and writer of twenty four books on politics and history.

*Estate of Marlon Brando.* 2005, consultant, valued worth of the Marlon Brando **name for estate purposes.**


## Commercial Losses, Wrongful Termination,  and Personal Injury

*Jakks Pacific, Inc.      v. Wicked Cool Toys, LLC     and Jeremy Padawer*, Supreme Court of the State of New York, 2017,  report and deposition, valued commercial losses **resulting from breach of contract and tortious interference.**
 \
*Pansy Harris-Lane, M.D. v. Jersey City Medical Center, et al.,*  Superior Court of New Jersey, 2017, report,    valued **professional damages resulting from disputed termination of mediicaldoctor**

*Hasan Khushaim v. Tullow Inc.* Superior Court of the State of Delaware,   2017, report, valued actual damages resulting from breach of contract regarding software design.

*Anti-Aging Essentials v. Brian T. Must. et al..* Court of Common Pleas of Allegheny County, 2016, report, valued commercial losses resulting from **manufacturing malfeasance.**

19

EXHIBIT 9
PAGE 238

*DeMartino v. Belleville Board of Education,* Superior Court of New Jersey, 2014, consultant, assisted defense counsel for courtroom preparation against plaintiff expert in **wrongful termination case.**

*Deborah Rollins and Luke Randall v. Sunrise Village*, LLC, Superior Court of New Jersey, 2013, report, examined economic losses resulting from **property negligence**.

*Crystal Evans v. Meadowlands Hospital,* Superior Court of New Jersey, 2012, report and testimony, examined economic losses resulting from **medical malpractice.**

*Christine Delurski v. Chester Stone, M.D.,* Superior Court of New Jersey, Morris County Court, 2012, report, estimated economic losses resulting from **wrongful death.**

*Carl Lawson* v. *K2 Sports U.S.A., et al,* Superior Court of New Jersey, Monmouth County Court, 2012, report, estimated economic losses resulting from **personal injury.**

*Peter Piegdon v.  H&S Bakery,* Superior Court of New Jersey, Middlesex County Court, 2007, report and deposition, calculated economic losses from  **automobile accident.**

*Dash Artist Management and Dash Entertainment Management v. Ruben Gomez, et al.,* Southern District of Texas, 2004, report, calculated commercial losses for music manager arising from **breach of contract.**

*Florencia Flores, et al. v. Parkchester Preservation Company, et al.*, New York Superior Court, 2004 report, examined economic losses suffered by domestic worker from **on-the-job injury.**

*Safmor, Inc.  v. Ministers,  Elders, & Deacons of the Reformed Protestant Dutch Church of City of New York,* New York Superior Court, 2005, report and deposition, calculated **commercial losses** for New York business foreclosed from use of its storefront sign.

*Sharon Haygood, et al. v. Coca-Cola, et al.*, 17th District Court of Tarrant County, Texas, 2004, report and deposition, calculated economic losses for gospel artist who suffered from **personal injury.**

20

EXHIBIT 9
PAGE 239

## Antitrust

*American Home Realty Network v. Edina Realty,* District of Minnesota, 2014, report, examined antitrust liability involving **group boycott of an online realty referral service**

*Royal Benson, M.D. v. St. Joseph Regional Health Center*, Central District of Texas, 2006, report and deposition, examined antitrust liability for **vertical restraints in hospital admissions.**

*United Magazine Company, Inc. v. Murdoch Magazine Distribution, Inc., et al.*, Southern District of New York, 2004, report and deposition, examined antitrust damages **in price discrimination matter involving magazine distributors.**

*The Coalition for a Level Playing Field v. Autozone, Inc., et al.*, Eastern District of New York, 2003, report and trial testimony, examined antitrust damages **in price discrimination matter involving auto part retailers.**

*AT&T Corp. v. Winback and Conserve Program, Inc., et al.*, New Jersey District Court, 2003, consultant, calculated commercial losses suffered by third party telecom provider for **improper termination of AT&T wholesale service.**

*California Scents v. Medo Industries, Inc.,* Central District of California, 2002, report, examined antitrust liability in matter involving the **anticompetitive use of slotting allowances** in retail outlets.

*Prime Communications, Inc. v. AT&T Corp.*, Eastern District of Massachusetts, 2002, report and deposition, examined liability in antitrust lawsuit involving **vertical restraints in access to cable advertising.**

*The Intimate Bookshop, Inc. v. Barnes and Noble, Inc., et al.*, Southern District of New York, 2001, report and deposition, examined economic issues in antitrust suit involving **price discrimination in book retailing.**

*SESAC v. WPNT*, Western District of Pennsylvania, 2001, report and deposition, antitrust case involving the economic consequences of **blanket licensing of musical compositions**.

*Nobody in Particular, Inc. v. Clear Channel, Inc.,* District of Colorado, 2001, consultant, antitrust case involving advertising restrictions enforced by a **radio station against a competing concert promoter.**

21

EXHIBIT 9
PAGE 240

*State of Florida, et al. v. BMG Music, et al.***,**  District of Maine*, 2001, consultant,
antitrust case involving the **anti-competitive effects of minimum advertising pricing
rules** established by five major record companies.

*Golden Channels Company, et al. v. Director General of the Antitrust Authority*, The
Court of Trade Restrictions, Tel Aviv, Israel, 2000, report, case involving **vertical
licensing restrictions on content of Sony, Warner, and Paramount.**


## PUBLISHED BOOKS


Media, Technology, and Copyright:Integrating Law and Economics, Edward Elgar,
2004


## ARTICLES AND CHAPTERS

*See also* http://mediatechcopy.com/?page_id=71

Reasonable Royalties in Patent Litigation:  Methods, Evidence, and Experts,  presented
at Knowledge Group Webinar, March 22, 2017.

First Sale Rights at SCOTUS: *Kirtsaeng v. John Wiley & Sons*,  Journal of the
Copyright Society, Spring, 2016.

Copyright, Causality, and the Courts, Journal of the Copyright Society, Winter, 2015.

The ASCAP and BMI Consent Decrees:  Is Partial Withdrawal Wise?,  Journal of the
Copyright Society,  Fall, 2014

Copyright, Causality, and Statutory Reform, Landslide, January-February, 2013-2014.

22

EXHIBIT 9
PAGE 241

Gorillas in our Midst: Searching for King Kong in the Music Jungle, Journal of the Copyright Society, Winter, 2007.

 Patent Reform and Infringement Damages:  Some Economic Reasoning  IP Lawyer, December, 2007;  new version at Patents and the Entire Market Value Rule.

Copyright Settlement Strategies from a  Damages Expert, GPSOLO, September, 2008.

Expediting the Settlement:  The Use of an Expert, Entertainment and Sports Lawyer, October, 2007.

 How Advertising and Peer to Peer are Transforming Media and Copyright, Journal of the Copyright Society, Spring, 2007.

 Copyright at a Crossroads, Again!:  The Copyright Modernization Act, Entertainment, Arts, and Sports Law Journal,  December, 2006.

Swords Into Plowshares:  A Convergence of Interests in P2P, Entertainment and  Sports Lawyer,  Summer, 2006.

Publicity Rights, Merchandise, and Economic Reasoning, Entertainment and Sports Lawyer, March, 2006.

Canadian Quandary:  Digital Rights Management, Access Protection, and Free Markets, Progress on Point 3:12,  Progress and Freedom Foundation, May, 2006.

"File-Sharing at Madison and Vine: The New Convergence", Century City Lawyer, December, 2005.

"File-Sharing and Market Harm", Entertainment, Arts, and Sports Law Journal, July, 2005.

 Transactions Costs and Administered Markets:  The Case of Music Performance Rights, Review of Economic Research in Copyright Issues, 3 (1), 37, 2006.

Grokster v. Sony: The Supreme Court's Real Decision, Entertainment and Sports Lawyer, Summer, 2004.

EXHIBIT 9
PAGE 242

"Peer-to-Peer Networking and Digital Rights Management: How Market Tools Can Solve Copyright Problems" (with Bill Rosenblatt), <u>Journal of the Copyright Society</u>, Winter, 2005.

<u>Music, Mantras, and Markets:  Facts and Myths in the Brave New World,</u> <u>Entertainment, Arts,  and  Sports Law Journal</u>,  Winter, 2004.

"Music in the Crucible: A Year in Review", <u>Entertainment and Sports Lawyer</u>, Summer, 2004.

<u>Digitization and its Discontents: Digital Rights Management,  Access Protection, and Free Markets</u>,  <u>Journal of the Copyright Society</u>,  Spring, 2004.

<u>Whose Song is it Anyway?: Infringement and Damages in Musical Compositions</u>, <u>Entertainment and Sports Lawyer</u>, Spring, 2004;  new version at   <u>Damage Valuation in Music Copyright</u>

<u>Vertical Merger in a High Tech Industry: Synopsis, Avant!, and the FTC</u>, 2 <u>Economics Committee Newsletter of the American Bar Association</u> 2, 2002.

<u>Tying, Patents, and Refusal to Deal:  Economics at the Summit</u>, 2 <u>Economics Committee Newsletter of the American Bar Association</u> 1, 2002.

 <u>Intellectual Property and Antitrust: Music Performance Rights in Broadcasting</u>, <u>Columbia Journal for Law and the Arts</u>, 2002.

"Keep Off My Privacy:  How Sweet the Sound?", <u>Bright Ideas</u>,  2002.

 <u>Purple Beasts and Lewd Tunes:  Economic Reasoning and Copyright</u>, <u>Entertainment, Arts, and Sports Law Journal</u>, 2002.

"How to Cure Performance Anxiety", 13 <u>Entertainment, Arts, and Sports Law Journal</u>, 2 Summer, 2002.

"Traffic Jam on the Music Superhighway: Is it a Reproduction or a Performance?", <u>Journal of the Copyright Society</u>, 2002 (with Lewis Kurlantzick).

<u>Miss Scarlett's License Done Gone: Parody, Satire, and Economic Reasoning</u>, 20 <u>Cardozo Arts and Entertainment Law Journal</u> 4, 2002.

24

EXHIBIT 9
PAGE 243

Copyright, Prevention, and Rational Governance:  File-Sharing and Napster, Columbia Journal for Law and the Arts, 2002.

"Internet Television and Copyright Licensing", 20 Cardozo Arts and Entertainment Law Journal 2, 2002.

Old Friends:  ASCAP and DOJ Reach a New Consent Decree, Entertainment and Sports Lawyer, 2002.

"Digital Rights Management and Access Protection" in Proceedings of the ALAI Congress: June 13-17, 2001, J. Ginsburg, ed., Columbia University, 2002.

Digitalization' and the Arts",  Handbook of Cultural Economics, Ruth Towse, ed., Edward Elgar Publishing Ltd., 2002.

Internet TV and Copyright Licensing: Balancing Cents and Sensibility, Internet Television, ed. D. Gerbarg, E. Noam, J. Groebbel, Lawrence Erlbaum Publishers, Mahwah, NJ, 2002.

"Music Licensing in the Digital Age", Copyright in the Cultural Industries, Ruth Towse, ed., Edward Elgar Publishing Ltd., 2002.

Search and  Destroy:  How to Tame a Spider, IPL Newsletter 1, 2001.

"Biting the Hand that Feeds", Century City Lawyer, November, 2001, with Duncan Cameron.

"Interpreting Amended ASCAP Consent Decree: More Options to Avoid Blanket Royalties",  Entertainment Law and Finance,  October, 2001.


# UNPUBLISHED ARTICLES


Reasonable Royalties in Patent Litigation:  Methods, Evidence, and Experts

Trademarks and Financial Remedies:  Standards in the Common Law

Trademark Valuation and Market Analysis

Pharmaceuticals and Compulsory Licensing

25

EXHIBIT 9
PAGE 244

Trademarks, Injunctions, and *eBay v. MercExchange*

Publicity Rights and Rational Valuation

Art as Innovation:  "The Wind Done Gone" Case

Market Imperfection and  Failed Governance:  The Case of  Music  Performance Rights

Information Transfer in Cyberspace:  Popups,  Keying,  and  Privacy

Copyright Settlement Strategies from a Damages Expert

## OTHER AFFILIATIONS

Columbia Institute for Tele-Information, Senior Research Fellow, Columbia University, New York,  New York

ecomp Consultants, Special Consultant, Tampa, Florida:

Giant Steps Media,  Affiliate, New York

Contributor to *MusicDish* E-Journal

**March, 2019**

26

EXHIBIT 9
PAGE 245

# EXHIBIT 10

EXHIBIT 10
PAGE 246

UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Marcus Gray (p/k/a Flame), et al.<br>        Plaintiffs,<br>        v.<br>Katheryn Elizabeth Hudson (p/k/a Katy Perry), et al.<br>        Defendants. | Civil Action 2:15-cv-05642-CAS-(JCx)<br>Judge: Christina A. Snyder<br><br>EXPERT REPORT OF<br>MICHAEL A. EINHORN, Ph.D.,<br>ON BEHALF OF PLAINTIFFS<br>—UPDATED MAY 14, 2019—<br><br>Subject to change as more information becomes available April 12, 2019 |

## 1.    INTRODUCTION

1.1) I have been asked by the law firm of Capes Sokol, counsel for Plaintiffs Marcus Gray (p/k/a/ Flame), Emanuel Lambert, and Chike Ojukwu, to provide my expert valuation of actual damages and Defendants' profits resulting from a presumed infringement of Plaintiffs' authorship, ownership, and production rights in a musical composition called "Joyful Noise," which they contend was later infringed by the musical composition and recorded track "Dark Horse." The track "Dark Horse" was imprinted on the Prism album that was released by Defendant Capitol Records, a division of Universal Music Group.

1.2) I am advised that the three Plaintiffs co-wrote the words and melody of "Joyful Noise" in 2007, recorded the work in March of 2008, and was honored in 2008 with nominations at the Grammys and the Gospel Music Association Dove Award.

1.3) Plaintiffs contend that "Dark Horse" infringes their copyrights in "Joyful Noise." My report assumes this to be true as I offer no opinion on Defendants' liability.

1.4) Capitol Records first released the album Prism on October 18, 2013. The track "Dark Horse" appeared in physical and digital albums, singles, and related work distributed in the U.S. and elsewhere. "Dark Horse" earned considerable play on radio, video, digital services, and concert setlists.

1.5) Defendants Katheryn Elizabeth Hudson (p/k/a Katy Perry), Jordan Houston (p/k/a Juicy J) Lukasz Gottwald (p/k/a/ Dr. Luke), Karl Martin Sandberg (p/k/a Max Martin), Henry Russell Walter (p/k/a/ Cirkut), and Sarah Hudson received directly, or through their publishing entities, royalties related to mechanical, digital, performance, and synchronization of the underlying musical composition "Dark Horse." As copyright holders to the infringed work "Joyful Noise," plaintiffs should have received some share of total royalties paid.

1.6) Defendant Katy Perry also received artist royalties for her participation as a primary artist in the recorded track "Dark Horse."

EXHIBIT 10
PAGE 247

1.7) Defendant Juicy J also received artist royalties for his participation as a featured artist in the recorded track "Dark Horse."

1.8) Defendants Dr. Luke, Max Martin, and Cirkut received producer royalties for engineering the studio recording featured on the album and digital single

1.9) I am an economist with expertise in valuation of damages related to infringement of intellectual property. My testimony is consistent with the techniques of my profession, in which I earned a Ph.D. in economics.

1.10) I am paid an hourly rate of $425 for report-writing, and $600 for preparation for, travel to, and appearance at deposition and/or trial. This rate is consistent with my standard professional arrangements for appearance as an expert witness in court.

1.11) I am not related to any of the parties, nor do I have any financial interest in the outcome of this matter.

2.      STATEMENT OF QUALIFICATIONS

2.1) I have worked as a professional economist since I received a Ph.D. in Economics from Yale University in 1981. Since graduation, I was employed at Bell Telephone Laboratories, Rutgers University, U.S. Department of Justice (Antitrust Division), and Broadcast Music Inc.

2.2) I have worked since 2001 as a testifying expert in the area of media and intellectual property. My curriculum vita is attached as Appendix A. I testified as an expert at deposition and/or trial on cases so identified in my professional resume.

2.3) I have served as a testifying economist in court cases involving the valuation of the intellectual property owned by commercial artists, software designers, writers, publishers, musicians, record labels, photographers, inventors, celebrities, actors, cartoonists, television producers, cable companies, and radio stations.

2,4) I have written 38 professional articles in the area of intellectual property in law journals and periodicals. I have delivered numerous professional lectures or CLE seminars related to these topics. I am also the author of the book Media, Technology, and Copyright: Integrating Law and Economics (Edward Elgar Publishers).

2.5) I have never been disqualified from testifying in court or limited in any manner related to the applied standards, concepts, or techniques of the economics profession.

2

EXHIBIT 10
PAGE 248

3. DOCUMENTS REVIEWED

I reviewed the following documents in connection with my work as an expert witness here:

- Third Amended Complaint for Copyright Infringement,

- UMG Recordings, Inc. Financial Statements, "Dark Horse", June 2013 – June 2018, CAPITOL-01099-01197

- Royalty Statements, Katy Perry, "Dark Horse", KP000278-279

- Contract, Katy Perry, Kasz Money Inc., August 31, 2013, KP000183-000209

- Contract, Katy Perry, Maratone AB., August 31, 2013, KP000210-000238

- Prismatic World Tour, License Agreement, KP000239-000242

- Administration Agreement, BMG Chrysalis, Jordan Houston, BMG000257-000290

- Broadcast Music Inc., Royalty Report, Jordan Houston, May 20, 2016

- Contract, Capitol Music Group (a division of Capitol Records), Katy Perry, June 20, 2007; amended September 1, 2010, CAPITOL00001-00061

- Royalties, Kobalt Songs Music Publishing, KOBALT00006-00007

- Royalties, Katy Perry, "Dark Horse", January 23, 2019

- Declaration, Silvio Pietroluongo, January 14, 2019

- Summaries of revenues and costs provided by Lukasz Gottwald, Henry Russell Walker, Sarah Hudson, Jordan Houston, all dated March 19, 2019

- Joint Stipulation Regarding Defendant Karl Martin Sandberg, July 1, 2014

- Expert Report of Todd Decker, April 6, 2017

- Wikipedia, Prism (Katy Perry Album)

- Wikipedia, "Dark Horse" (Katy Perry song)

- Deposition, Steven Drellishak, February 28, 2019

- Deposition, Katy Perry, March 13, 2019

- Radio Play, Five Songs, CAPITOL01034- 01098

3

EXHIBIT 10
PAGE 249

- Chartmasters, pages 9-12, 16, https://chartmasters.org/2018/03/cspc-katy-perry-popularity-analysis-2/16,

4.      SUMMARY OF CONCLUSIONS

4.1) I am advised that Plaintiffs Marcus Gray, Emanuel Lambert, and Chike Ojukwu may recover from Defendants actual damages that represent an amount that would have been rightfully earned had Plaintiffs' rights in the composition "Joyful Noise" been properly licensed and compensated. I am advised that Defendants are jointly and severally liable for the total amount of these damages that Plaintiffs suffered.

4.2) Actual damages in this matter result from uncollected royalties owing to Plaintiffs' rights in the musical composition "Joyful Noise." These rightful amounts include copyright royalties related to mechanical/digital reproductions, performance, and synchronization royalties that would normally be earned by songwriters or publishers.

4.3) As described in Section 5, Plaintiffs lost the opportunity to earn copyright royalties amounting to ███████. This amount represents actual damages that can be recovered jointly from all Defendants.

4.4) In addition to actual damages, I am advised that Plaintiffs may recover severable profits from each individual Defendant. I am advised that Plaintiff must first prove Defendant revenues, from which Defendant must prove appropriate deductions.

4.5) As itemized in Section 5 and 8, Defendants earned from infringing sales, licenses, and royalty payments (writer, artist, and producer) related to "Dark Horse"

| Defendant | Source of Revenues | Revenues |
|---|---|---|
| Capitol Records | Sale and licensing of recorded track | ██████ |
| Katy Perry | Co-writer and primary artist/performer | ██████ |
| Juicy J | Co-writer and featured artist | █████ |
| Dr. Luke | Co-writer and co-producer | ██████ |
| Max Martin | Co-writer and co-producer | ██████ |
| Cirkut | Co-writer and co-producer | █████ |
| Sarah Hudson | Co-writer | █████ |
| TOTAL | | ██████ |

11051682.1/41770-00011

EXHIBIT 10
PAGE 250

4.6) As explained above and in Section 5, a sum of ███████ reflects a royalty that should have been paid to the Plaintiffs for use of their composition "Joyful Noise" in the song and track "Dark Horse". All Defendants are jointly liable for this amount.

4.7) Defendants earned revenues of ███████, of which ███████ is unaccounted for in the actual damages identified above. Each defendant is severally liable for any profit amount not otherwise accounted for in the determination of actual damages.

5.     ACTUAL DAMAGES

5.1) I am advised that Plaintiffs may recover from Defendants a licensing fee for royalties that would have been earned ~~had~~from use of Plaintiffs' composition "Joyful ~~Noise" that had been used in "Dark Horse," Plaintiffs here would have received some Noise". Had the composition been licensed, Plaintiffs here would have received some~~ share of the mechanical, digital, performance, and synchronization royalties attributed to the composition of "Dark Horse."

5.2) This share of copyright royalties generally is determined in the music industry through arms-length negotiation involving owners of a copyrighted work and engaged licensees of that work. As a matter of law, the valuation for a lost licensing opportunity should be a transaction amount at which a willing buyer(s) and a willing seller(s) would arrive in a free negotiation.

5.3) That said, ~~T~~there is no scientific or industry rule for determining an exact amount that would result from a negotiation. The results of other negotiations involving similar situations ~~are~~can sometimes be useful benchmarks to inform this analysis. The determined valuation will then appear in a range of outcomes that can be determined by the market.

5.4) The Plaintiffs' original work, "Joyful Noise," was a musical composition that appeared as a track on the album Our World: Redeemed (2008) as well as a download single and stream (2014). I am advised that copyright to the song is owned by the Plaintiffs in this lawsuit and that Plaintiffs would ~~owned by the Plaintiffs in this lawsuit and that Plaintiff and that Plaintiffs would~~ have been rightfully compensated by the record label.~~.~~

5.5) The album Our World: Redeemed was the fourth studio album from American Christian rapper Flame~~; it.~~ It was released on March 4, 2008. The recording label for the album was Cross Movement. The album earned a Grammy Award nomination for Best Rock or Rap Gospel Album, and the label made a video for the lead single "Joyful Noise.~~"~~ This establishes that the ~~second~~composition of "Joyful Noise" had a positive market value."

5.6) Per the ~~d~~Declaration of Silvio Pietroluongo of Billboard (January 14, 2019), the album recording of Our World: Redeemed was commercially successful. The album appeared on the Billboard Top Gospel Albums chart for thirty-five straight weeks. The album also appeared on the Billboard Top Christian Album on March 22, 2008 (#18) and March 29, 2008 (#34). (Declaration of Silvio Pietroluongo at ¶¶ 6,7)

11051682.1/41770-00011

EXHIBIT 10
PAGE 251

5.7) The ~~single track~~single-track Joyful Noise was also commercially successful and deserving of a positive market valuation. The song charted on the Billboard Gospel Digital Songs Sales Chart for thirty-four straight weeks (1/15/2014 – 7/26/2014), Billboard Gospel Streaming Songs on July 19, 2014 (#1) and July 26, 2014 (#10), and the Billboard Christian Streaming Charts on July 19, 2014 (#4).

5.8) Based on a blended formula that takes into account radio airplay, sales data, and streaming, "Joyful Noise" also appeared on the Billboard Hot Christian Songs on July 19, 2014 (#11) and July 26, 2014 (#37) and the Billboard Hot Gospel Songs on July 19, 2014 (#1) and July 26, 2014 (#16), (Declaration of Silvio Pietroluongo at ¶¶ 8-12).

5.9) As a valued musical work reproduced on ~~an album~~a track on the album Our World Redeemed, the musical work "Joyful Noise" was paid, or deserved to have been paid, royalties from its record label Cross Movement.

5.10) I have read the expert report of musicologist Prof. Todd Decker of Washington University of St. Louis. I am advised that Prof. Decker will testify that the ostinato in "Joyful Noise" is substantially similar to the main ostinato in "Dark Horse." Prof. Decker further opines in his Expert Report that the infringing ostinato is repeated throughout "Dark Horse~~ and is a major component of the work~~." Upon written statement of counsel, I am also advised that Prof. Decker has determined that the ostinato accounts for 95 seconds of the song (which Defendants' expert Ferrara times at 3:32, or 212 seconds); or 45 percent of the elapsed time in the entire composition.

5.11) Per Prof. Decker's opinion, it is also proper for Plaintiffs to share some royalty share sales and licensing of the latter with regard to reproduction, performance, and video synchronization.

5.12) I believe that a ~~reasonable~~market-based outcome for a copyright negotiation for rights in "Joyful Noise" would have granted to Plaintiffs a ~~15~~fifteen percent (15%) share of copyright royalties (i.e., mechanical, digital, performance, and synchronization) in the musical composition "Dark Horse."

5.13) ~~The amount of 15 percent is~~I determined the putative share of fifteen percent as follows. I am advised as a legal matter that copyright in a joint composition (i.e., a musical work in which more than one writer participates) vests initially in equal shares for all participants, regardless of the size of any individual contribution to the work. Per Katy Perry's sworn deposition (36-37), ~~T~~there ~~are now~~were five listed primary writers of "Dark Horse" ~~– Katy Perry, Max Martin, Dr. Luke, Cirkut, and Sarah. Together, the five primary writers owned a copyright share of~~ ▮▮▮▮▮▮ Katy Perry (vocal melody and lyrics, 12:6-9), Sarah Hudson (lyrics), Max Martin (melody, 37:3-4), Dr. Luke (instrumental, 13:1), and Cirkut (instrumental, 13:1)

5.14) I have seen no contract among the writers to justify any other breakdown of the copyright. It then follows that each originally would have controlled a one fifth share of the copyright, or twenty percent (20%).~~of the work.1 Each of the five writers then~~

5.15) The final songwriter in this lawsuit -- Juicy J – was not an original writer of "Dark Horse" and but made a rap contribution to the work after the music, melody and

EXHIBIT 10
PAGE 252

lyrics were composed (Perry Dep.. 36:15-16). For his later efforts, Juicy J apparently received a reduced copyright share of [REDACTED] which is [REDACTED] of [REDACTED] To provide for the share, the five primary writers (supra 5.13) then divided up the remaining ninety percent equally, each ~~receiving~~ an ~~equal~~identical royalty share of [REDACTED] percent~~.~~ ([REDACTED]

~~5.14) As primary writers in "Dark Horse," Perry, Martin, Luke, Cirkut, and Hudson each presumably made a major contribution to the work "Dark Horse".~~

5.1~~5~~6) ~~The borrowing~~If properly licensed, the taking of the ostinato from "Joyful Noise" ~~is related to the repeated ostinato that Prof. Decker identified in his expert report. The taking of the ostinato would then~~would have represented a sixth primary contribution to "Dark Horse" that ~~must~~would have needed to be assigned ~~some share of royalties paid.~~ a copyright share. There is here a pre-existing sale or license agreement in place, and no ill-motive or competitive relationship that would interfere with its reasonable extension. ~~5.16)~~ If each of five ~~primary shares~~ original writer shares – i.e., Perry, Martin, Luke, Cirkut, and Hudson -- are equally valued at [REDACTED] percent of royalties paid ([REDACTED] each of six would ~~be~~ then be valued at fifteen percent~~.~~ ([REDACTED] 1

5.17) Based on the adjusted benchmark derived from defendant's own copyright assignments, I shall now assign to the Plaintiffs a prorated share of royalties paid equal to fifteen percent of copyright royalties. This is consistent with the legal notion (I am advised) that copyright damages must be assigned and discounted to correspond to plaintiff's ownership interests, and that courts may apportion damages for certain claims at issue pursuant to previous affirmative agreement of copyright holders as to percentage interest held by each. I am also advised that courts may order apportionment based on undisputed calculations provided by plaintiffs.

5.18) I am advised that the defendants have provided summaries that represent the following amounts of copyright royalties paid to the present (infra Section 8).

~~1 Juicy J is a featured artist on the video who was cut into a smaller writer share of [REDACTED] percent.~~

| Katy Perry | |
|---|---|
| Publisher Royalties | [REDACTED] |
| Performance Royalties | [REDACTED] |
| Subtotal: | [REDACTED] |

[1] This analysis maintains Juicy J at his original [REDACTED] percent copyright share, and I reserve the right to proffer a different estimate if this assumption is challenged.

11051682.1/41770-00011

EXHIBIT 10
PAGE 253

| Juicy J | |
|---|---|
| Publisher Royalties | ███████ |
| Performance Royalties | ███████ |
| Subtotal | ███████ |

| Dr. Luke | |
|---|---|
| Publisher Royalties | ███████ |
| Performance Royalties | ███████ |
| Subtotal | ███████ |

| Max Martin | |
|---|---|
| Publisher Royalties | ███████ |
| Performance Royalties | ███████ |
| Subtotal | ███████ |

| Cirkut | |
|---|---|
| Publisher Royalties | ███████ |
| Performance Royalties | ███████ |
| Subtotal | ███████ |

| Sarah Hudson | |
|---|---|
| Publisher Royalties | ███████ |
| Performance Royalties : | ███████ |
| Subtotal | ███████ |

TOTAL: ███████

8

EXHIBIT 10
PAGE 254

5.19) Total copyright royalties are ███████████ Valued at a fifteen percent share of the total, I estimate that Plaintiffs would have earned a licensing payment of ███████████ for their share of "Dark Horse."

5.20) I am advised that Defendants are jointly liable to pay the identified amount of actual damages.

## 6. LABEL REVENUES FROM "DARK HORSE": 2013-2018

6.1) Defendant Capitol Records recorded the track "Dark Horse" as a component of Katy Perry's album, Prism. The album was released on October 18, 2013.

6.2) The "Dark Horse" track was released in many different formats, including album, single, and DVD. (Drellishak Dep. 20:15-18). The standard album release contained thirteen (13) tracks and the deluxe release contained sixteen (16) tracks.

6.3) The "Dark Horse" track was also made available and licensed as a download, ringtone, ringback, digital stream, video use, synchronized work, and compilation work.

6.4) After returns, net sales of all products bearing the track "Dark Horse," from October 2013 to June 2018, totaled $███████████ (CAPITOL00923; CAPITOL1101-1103; CAPITOL01133). This amount is broken down as follows:

| | | |
|---|---|---|
| Physical albums (Thirteen tracks) | $ | ██████████ |
| Physical albums (Sixteen tracks) | $ | ██████████ |
| Download albums (Thirteen tracks) | $ | ██████████ |
| Download albums (Sixteen tracks) | $ | ██████████ |
| Download albums (Two tracks) | $ | ██████████ |
| Single Tracks (Downloads and Streams) | $ | ██████████ |
| Domestic Licensing Income | $ | ██████████ |
| Ancillary Income (Tour) | $ | ██████████ |
| TOTAL | $ | ██████████ |

6.5) Capitol Records sells physical albums as follows. The artist makes a master recording in the studio from which actual sales units are imprinted by an independent entity (Drellishak Dep. 59:15-17). Manufacturing is administered by Universal Music Logistics ("UML") (Id. 59:1-8), which receives from the label a designated rate card payment per CD. (Id. 67:2-4) UML pays the actual manufacturer directly (Id. 60:4-14).

9

EXHIBIT 10
PAGE 255

6.6) after manufacturing, the albums are then moved into inventory through UMG's distribution service (Universal Music Group Distribution) that administers the process of getting it into record stores. (Id. 85: 13-23) A customer then places an order through an EDI transaction to the sales order processing system.  The sales order processing system records the sales in the general ledger (Drellishak Dep. 22:1-7). After distribution, returns of physical product are credited to the buyer (Id. 23:15-18). The label collects all due revenues from physical sales, and distributes royalties and other expenses to the appropriate parties.

6.7) For sales of digital product, the label sends the file directly to the digital service provider (e.g., Apple iTunes, Spotify, Amazon). The service provider makes the track available to users through downloads or streaming. (Id. 36:6-10, 37:3-8). There are no additional costs of production or distribution for digital product. The service provider pays for the actual download or stream revenues that can be shared with the artist. Publishers collect copyright royalties from the sale of downloads through separate payment arrangements with the digital service provider.

6.8) Capitol Records earned licensing income for ringtones, ring backs, digital streams, video uses, synchronized works (uses that integrate the music with scripted video or live background), and compilations (use of the track on different albums) (Id. 42:11-15).

6.9) Capitol Records earned ancillary income from revenues received for sale of the Prismatic World Tour DVD (Id. 55:15-18).

6.10) Unreported to date are the licensing fees for sales to foreign markets. If foreign sales are recoverable, international revenues should be adjusted upward to reflect this licensing total. I reserve the right to amend this report if additional information on these revenues becomes available.

6.11) To be conservative, I have included only the lower revenue estimates listed above, but reserve the right to include foreign revenues if the Court rules that it is appropriate to include any component of foreign sales in the calculation.

6.12) I do believe that each amount itemized above implicates a product or service that in some way involves the use of the infringing musical composition "Dark Horse," as reproduced on a master recording by Capitol Records.

7.      ROYALTY PAYMENTS

7.1) Royalties for "Dark Horse" were earned by the lead artist Katy Perry, featured artist Juicy J producers Dr. Luke, Max Martin, and Circuit, and co-writers Katy Perry, Juicy J., Dr. Luke, Max Martin, Circuit, and Sarah Hudson.

Lead Artist Royalties

7.2) Recording artist Katy Perry appears as the lead artist on the track "Dark Horse." The track was originally released on September 17, 2013 as the second promotional single (i.e., radio) from the album Prism (2013). The album was later

EXHIBIT 10
PAGE 256

released on October 18, 2013. The single was released for general sales on December 17, 2013.

7.3) As the lead artist, Ms. Perry earned artist royalties specified in her contract with Capitol Music Group (a division of Capitol Records). (CAPITOL00001-00061). Her contract was first established on June 20, 2007 and amended on December 13, 2012.

7.4) Per the amended agreement, Ms. Perry earned artist royalties for what I believe to her Third Committed Album, Prism (Contract, Section 6). Ms. Perry earned a royalty rate of ██ based on all sales of the album in the U.S. and Canada; while foreign sales in the U.K./Eire and Rest of Territory were respectively valued at ██ and ██ of the above specified rate. The royalty for net streaming sales was specified at ██ of total revenues received (not including eligible non-interactive services covered by Sound Exchange (see next).

7.5) Ms. Perry also earned artist royalties for her share of eligible transmissions performed on non-interactive digital services collected and distributed by Sound Exchange (per eligibility requirements established by the Digital Performance Rights in Sound Recording Act of 1996, 17 U.S.C. 114)

7.6) Ms. Perry also received a flat payment of ██████ as an upfront payment for artist rights related to a DVD release of her full Prismatics concert that she performed in Sydney Australia (KP000239-252), as well as a product royalty of █████ (CAPITOL01193-7). The song "Dark Horse" appeared on the playlist of this concert (Id.).

7.7) Some amount of Ms. Perry's artist royalties were recouped by the label to cover its production and marketing costs for her album (Contract, Section 4), or paid out to her designated producers per independent contract. (Infra, Producer Royalties and Section 8)

7.8) Finally, Ms. Perry earned copyright royalties for her share as a writer in the musical composition This work is regarded to be a controlled composition because Ms. Perry is also the lead artist on the album.

7.9) I have not reviewed any written contracts that Ms. Perry (or any other writer) may have signed as a copyright owner of the song "Dark Horse." As a matter of industry custom and practice, I believe that Ms. Perry received a reproduction rate of ███████ per sold track, pro-rated for her respective share of the composition (████ see 7.18) and a possible reduction for her appearance in a controlled composition.

Featured Artist Royalties

7.10) As a featured artist on the track and video, Juicy J earned artist royalties specified in a separate contract with Katy Perry. Artist royalties were paid in flat sums for his work on the recorded track and the video. (BMG000257-BMG000275).

7.11) Juicy J also earned royalties for some share of royalties for use of the recorded track on Sound Exchange. .

11

EXHIBIT 10
PAGE 257

7.12) Finally, Juicy J earned copyright royalties for his share as a writer in the musical composition

Producer Royalties

7.13) Co-producers of the recorded track "Dark Horse" were Dr. Luke, Max Martin, and Cirkut who were initially credited with equal shares of producer royalties. I believe that the co-producers may have arranged additional transfers among themselves.

7.14) Katy Perry entered into two producer contracts on August 31, 2013 (Dr. Luke, Cirkut; Contract, KP000183-209; Max Martin Contract, KP000210-236). These contracts established that the producers were paid a share of artist royalties otherwise due to Ms. Perry from physical and digital sales.

7.15) Payments to Dr. Luke and Cirkut for produced tracks on the album Prism were established as follows (Contract, Sections 3-4). The two producers together received upfront a non-recoupable payment of ███████ a ████ percent royalty based on physical sales valued at the published price to dealers ("PPD") of the album, a █████ royalty based on digital sales valued at the same PPD, and ████ of artist royalties for licensing of video. All royalty amounts were suitably pro-rated for the number of participating tracks on the album and the producer's royalty relative to the artists. Dr. Luke and Cirkut were also to have received a share of ██████ of Perry's due artist royalties paid at Sound Exchange, (Contract, Appendix B, KP000204). Dr. Luke and Cirkut seem to have further divided their due royalties in a manner of which I am not aware.

7.16) Payments to Max Martin for produced tracks on the album Prism were as follows (Contract, Sections 3-4). Max Martin received upfront a non-recoupable payment of ██████ a ███ percent royalty based on physical sales valued at the PPD of the album, a ██████ royalty based on digital sales valued at the same PPD, and ████ of artist royalties for licensing of video. All royalty amounts were suitably pro-rated for the number of participating tracks on the album and the producer's royalty relative to the artists. Max Martin was also to have received a share of ██████ of Ms. Perry's due artist royalties paid by Sound Exchange (Contract, Appendix B, KP000230).

Songwriter Royalties

7.17) Co-writers of the musical composition "Dark Horse" are listed as Dr. Luke, Max Martin, Cirkut, and Sarah Hudson, as well as aforementioned artists Katy Perry and Juicy J. I have not reviewed any relevant publisher contracts that Capital Records signed with any writer or his/her publisher entity.

7.18) Based on information made available from the performing rights organization Broadcast Music Inc., I believe that the writer shares of the copyright in the composition "Dark Horse" are as follows:[2]

12

EXHIBIT 10
PAGE 258

| | | |
|---|---|---|
| Katy Perry: | ████ | |
| Dr. Luke: | ████ | |
| Max Martin: | ████ | |
| Cirkut: | ████ | |
| Sarah Hudson: | ████ | |
| Juicy J: | ████ | |

[2] The same numbers appear as writer shares reported on Katy Perry's artist contract with Juicy J (Jordan Houston). See also Email from Harold Papineau to Jermi Thomas, et al., Re: URGENT: Juicy – Dark Horse Splits, January 28, 2014.

7.19) As a co-writer of the musical composition "Dark Horse," each listed writer earned royalties from the mechanical and digital reproductions of the song in albums and singles, public performances of the song in broadcast, digital, and general media venues, and third-party licensing of the song.

7.20) Per industry custom and practice, record labels generally pay songwriter royalties for reproductions, synchronization, and compilation uses to each writer through his/her designated publisher.

7.21) Each publisher designated a separate collection entity to administer the accounting for its incoming royalty payments. Each royalty administrator is paid a share of collected revenues as payment for its administrative service.

7.22) Distinguished from other writer royalties, performance royalties are collected and administered by performing rights organizations (PRO), such as ASCAP (Dr. Luke, Max Martin, Cirkut, Perry, and Sarah Hudson are members) and BMI (Juicy J is an affiliate). The PRO pays some share (usually 50%) of the royalty amount directly to the songwriter. The remainder of the royalty is paid to the writer's designated publisher.

7.23) Based on the above, songwriter claims in the copyright of "Dark Horse" are summarized as follows:

EXHIBIT 10
PAGE 259

| Writer | Publisher | Administrator | PRO | Share | |
|--------|-----------|---------------|-----|-------|---|
| Katy Perry | When I'm Rich You'll Be My Bitch Kasz Money | Warner Chappell | ASCAP | ███ | |
| Dr. Luke | Publishing Kasz Money | Kobalt Songs | ASCAP | ███ | |
| Max Martin | Publishing Kasz Money | Kobalt Songs | ASCAP | ███ | |
| Cirkut | Publishing | Kobalt Songs | ASCAP | ███ | |
| Sarah Hudson | Prescription Songs | Kobalt Songs BMG | ASCAP | ███ | |
| Juicy J | DeeEtta Music | Chrysalis | BMI | ███ | |

8.     ROYALTY AMOUNT: 2013-2018

8.1) Katy Perry, Juicy J, Dr. Luke, Max Martin, Cirkut, and Sarah Hudson earned writer, artist, and/or producer royalties in connection with their contributions to the song and track "Dark Horse.".

Katy Perry

8.2) Defendant Katy Perry was a co-writer and primary artist of "Dark Horse". As described in Section 7, her due collections accrued through her publishing entity When I'm Rich You'll Be My Bitch, (as administered and collected by Warner Chappell Music) performing rights organization ASCAP, and artist collecting society Sound Exchange. She also earned a payment of ████ for licensing rights to her Prismatics concert performed in Australia

8.3) Based on the most recent records provided to me (KP000239-252, KP000278-279), Ms. Perry received net royalty payment of ████, broken down as follows.

14

EXHIBIT 10
PAGE 260

| | | |
|---|---|---|
| Publisher Royalties (through Kobalt Songs): | ███████ | (2013H2 – 2018H1) |
| Performance Royalties (through ASCAP): | ███████ | (2014M4 – 2019M4) |
| Sound Exchange Royalties: | ███████ | (2014M3- 2019M1) |
| Artist Royalties | ████████ | (2013H2- 2018H1) |
| Video Royalties: | ██████ | |
| Video Upfront | ██████ | |
| Total: | ███████ | |
| Juicy J | | |

8.4) Defendant Juicy J was a co-writer and featured artist of "Dark Horse". As described in Section 7, collected amounts accrued through his publishing entity Dee Etta Music (as administered and collected by BMG Rights Management), performing rights organization BMI, and artist collecting society Sound Exchange.

8.5) Per a direct contract with Katy Perry (KP00032), Juicy J also received directly from Ms. Perry a flat payment of ██████ for his vocal appearance on the recorded track "Dark Horse", and a flat payment of ██████ for his appearance on the video.

8.6) Based on the most recent records provided to me, Juicy J's total royalties amounted to ██████, which were broken down as follows:

| | | |
|---|---|---|
| Publisher Royalties (through BMG Chrysalis) | ███████ | (2014Q2 – 2018Q2) |
| Performance Royalties (through BMI): | ███████ | (2013Q3 – 2018Q1) |
| Sound Exchange Royalties : | ████████ | (2013Q4 – 2018Q3) |
| Artist Royalties (through Katy Perry): | █████ | |
| Total | ██████ | |

15

EXHIBIT 10
PAGE 261

Dr. Luke

8.7) Defendant Dr. Luke was a co-writer and co-producer of "Dark Horse". As described in Section 7, collected amounts accrued to his publishing entity Kasz Money Publishing (as administered and collected by Kobalt Songs Music Publishing), production entity Kasz Money, Inc., performing rights organization ASCAP, artist collecting society Sound Exchange, and shared video royalties.

8.8) Based on the most recent records provided to me, Dr. Luke's reported royalties amounted to ███████, which were broken down as follows:



Publisher Royalties (through Kobalt Songs): ██████ (2013Q4 – 2018Q2)

Production Royalties (through Kasz Money): ██████ (2013Q4 – 2018Q2)

Performance Royalties (through ASCAP): ██████ (2014Q1 – 2018Q3)

Sound Exchange Royalties: █████ (2015Q2 – 2018Q4)

Video Royalties █████ (2017Q2 – 2018Q2)

Total ██████

Max Martin

8.9) Defendant Max Martin was a co-writer and co-producer of "Dark Horse". As described in Section 7, collected amounts accrued to his publishing entity MXM Music, Inc. (as administered and collected through Kobalt Songs Music Publishing), production entity Maratone AB, Inc., performing rights organization ASCAP, and artist collecting society Sound Exchange and shared video royalties.

8.10) Based on the most recent records provided to me, Max Martin's gross royalties amounted to ██████, which were broken down as follows

Publisher Royalties (through Kobalt Songs): ██████ (2013Q4 – 2018Q2)

Production Royalties (through Maratone, AB): ██████ (2013Q4 – 2018Q2):

Performance Royalties (through ASCAP): ██████ (2013Q3 – 2017Q4)

Sound Exchange Royalties: █████ (2014Q2 – 2018Q3)

Video Royalties: █████ (not available)

Gross Royalty ██████

16

EXHIBIT 10
PAGE 262

8.11) I am advised that parties stipulate that ███ of Max Martin's gross royalties were paid to his administrator Kobalt Songs Music Publishing, and an additional ███ was diverted for legal and management costs. His net royalty was then ████████[3]

[3] Per Stipulation, April 2019, costs include management commission of ███ of gross ████████) and legal and administrative fees of ███ of gross (████████).

Cirkut

8.12) Defendant Cirkut was a co-writer and co-producer of "Dark Horse." As described in Section 7, collected amounts accrued to his publishing entity Oneiorology, Inc., (as administered and collected through Kobalt Songs Music Publishing), production entity Kasz Money Inc., performing rights organization ASCAP and artist collecting society Sound Exchange.

8.13) Based on the most recent records provided to me, Cirkut's total royalties amounted to ████████ which were broken down as follows:

| | | |
|---|---|---|
| Publisher Royalties     (through Kobalt Songs): | ██████ | (2013Q4 – 2018Q3) |
| Production Royalties    (through Kasz Money): | ██████ | (2013Q4 – 2018Q2) |
| Performance Royalties (through ASCAP): | ██████ | (2013Q3 – 2018Q1) |
| Sound Exchange Royalties: | ██████ | |
| Video Royalties: | ██████ | (2017Q2 – 2018Q2) |
| Total | ██████ | |
| Sarah Hudson | | |

8.14) Defendant Sarah Hudson was a co-writer of "Dark Horse". As described in Section 7, collected amounts accrued to her publishing entity Prescription Songs (as administered and collected through Kobalt Songs Music Publishing) and performing rights organization ASCAP.

8.15) Based on the most recent records available to me, Ms. Hudson's total royalties amounted to ████████, which were broken down as follows (without dates):

Publisher Royalties (through Kobalt Songs): ████████

Performance Royalties (through ASCAP): : ████████

Total ████████

8.16) With the exception of Max Martin, all royalty amounts reported above are gross receipts before deduction for any administrative costs by any entity. Based on the

17

EXHIBIT 10
PAGE 263

specific data that I may yet review and verify, I reserve the right to amend for any suitable deductions that are proven to be paid to administrators.

8.17) Copyright royalties may accrue only to a songwriter's share of the work, and not to artists and publishers. In the above charts in this Section, copyright royalties to each of six writers include only his/her publisher royalties and performance royalties.

8.18) Before administration fees, total copyright royalties for the six writers above sum to ██████████. This amount can form the basis of a calculation for actual damages that Plaintiffs would have earned had their rights been properly licensed.¶ If Plaintiffs are entitled to 15 percent of the total, actual damages are then ████████.

## 9.    IMPORTANCE OF SONG DARK HORSE

9.1) The album Prism was a leading album that earned over ██████████ ████████ in sales and licensing for the label Capitol Records. The song Dark Horse was critically important to the success of this album. This is documented in and demonstrated by the appearance of the song in concert tours, radio promotion, video use, and commercial charts.

Concert Tours

9.2) Record labels generally market new releases by supporting artist tours related to the new album. In the course of her professional career with Capitol Records, I believe that Katy Perry performed in five Concert Tours under the terms specified in her Original Agreement with the label entered in 2007.

9.3) Ms. Perry's most successful tour of the five tours was the Prismatic World Tour, which promoted her album release of Prism. The tour ran from May 2014 to October 2015 and visited Europe, North America, Australia, Asia and South America.

9.4) The Prismatic World Tour in 2014-2015 grossed more than $204.3 million from 151 shows with a total attendance of 1,984,503. The Sydney November 28th concert was recorded for her second live album: The Prismatic World Tour Live, which was released two weeks after the tour ended. The setlist for the Prismatic World Tour contained twenty songs,

18

EXHIBIT 10
PAGE 264

1. "Roar"

2. "Part of Me"

3. "Wide Awake"

4. "This Moment" / "Love Me"

5. "Dark Horse"

6. "E.T."

7. "Legendary Lovers"

8. "I Kissed a Girl'

9. "Hot n Cold"

10. "International Smile" / "Vogue"

11. "By the Grace of God"

12. "The One That Got Away" / "Thinking of You"

13. "Unconditionally"

14. "Walking on Air"

15. "It Takes Two"

16. "This Is How We Do" / "Last Friday Night (T.G.I.F.)"

17. "Teenage Dream"

18. "California Gurls"

19. "Birthday"

20. "Firework"

9.5) Twelve of twenty songs on the setlists for the Prismatic World Tour appeared on the Prism album: "Roar," "This Moment," "Love Me," "Dark Horse," "Legendary Lovers," "International Smile," "By the Grace of God," "Unconditionally," "Walking on Air," It Takes Two" (Prism Deluxe), "This Is How We Do," and "Birthday." "Dark Horse" was one of the twelve songs.

9.6) Ms. Perry also performed "Dark Horse" for fourteen additional live performances, including the 56th Grammy Awards on January 26, 2014 in Los Angeles.

19

EXHIBIT 10
PAGE 265

Radio Play

9.7) In documents provided by the Defendant Capital Records itself (CAPITOL01034—1098), the label released five promotional singles from Prism for radio play before and after the release of the album on October 18, 2013.

9.8) In the order of initial release, the five promotional singles were as follows:

| Song | Date of 1st play | Radio Spins | # of Stations | # of Markets | Audience |
|---|---|---|---|---|---|
| Roar | 8/26/2013 | 770,436 | 3 | 3 | 5.2 billion |
| Dark Horse | 9/22/2013 | 930,186 | 29 | 24 | 6.3 billion |
| Unconditionally | 10/22/2013 | 149,963 | 10 | 10 | 820.4 million |
| Birthday | 4/20/2014 | 141,266 | 20 | 19 | 775 million |
| This Is How We Do | 8/05/2014 | 55,024 | 15 | 15 | 262.3 million |

9.9) The chart is organized as follows.

Column 1: Name of songs performed on radio.

Column 2: Date of first airplay

Column 3: Radio Spins: Each broadcast play is one recorded radio spin

Column 4: Stations: Number of Individual Broadcast Stations

Column 5: Markets: Number of Unique Geographic Markets (Some markets¶ can have more than one station performing the song

Column 6: Number of Spins Multiplied by the Market Population

9.10) Of the five listed songs released for promotional radio play, only two e – Roar and Dark Horse -- -- were released for radio play before the album was released (October 18, 2013).

9.11) Along with "Unconditionally" (released October 22, 2013), "Roar" and "Dark Horse" have the most important commercial appeal because they were used to promote and generate momentum for the album release of Prism... The two remaining singles "Birthday" and "This is How We Do" were introduced well after the album made its debut, and most album copies were sold.

9.12) Of the three most important songs the track "Dark Horse" accounted for 50.2 percent of all radio spins, 69.0 percent of all radio stations, 64.9 percent of all geographic markets, and 66.6 percent of all audience listens since its first play.

20

EXHIBIT 10
PAGE 266

9.13) From its first release on September 21, 2013, the track "Dark Horse" came to play on twenty-nine stations, twenty-three of which were of the Top 40 format, which has the most important commercial appeal. Seven of the top ten Top 40 stations were located in Los Angeles (rank 2), Chicago (3), San Francisco (4), Dallas (5), Washington (7), Atlanta (8), and Boston (10). Geographic locations for other Top 40 stations included Detroit (12), Seattle (13), San Diego (17), and Tampa (19)

9.14) The prereleases for "Roar" and "Unconditionally" were more modest in scope. From its first play on August 26, 2013, the prerelease "Roar" came to appear on satellite provider Sirius XM (October 11, 2013) and local stations in Washington, DC (alternative format, August 26, 2013) and Montgomery, Alabama (urban format, September 21, 2013).

9.15) The song "Unconditionally" played on ten stations in ten markets (six adult contemporary format, three alternative format, one rhythmic format, and zero Top 40). As pointed out above, these spins of "Unconditionally" occurred between October 22, 2013 and December 31, 2013 – after the release of the album on October 18, 2013.

9.16) From a commercial perspective, the evidence from radio plays demonstrates that "Dark Horse" was a leading promotional song on the album – if not the most important.

Streams and Videos on Chartmasters

9.17) Chartmasters is a rating service in the record industry that charts the popularity of new albums and tracks among digital audiences.

9.18) Using a special analytic technique,[4] Chartmasters identified the twelve most popular tracks ever released by the recording artist Katy Perry until the present

9.19) The tracks "Dark Horse" (3,660,000 AES) and "Roar" (3,640,000 AES) are the only listed tracks from Katy Perry's album Prism. These two tracks share first and second place among the most popular twelve tracks from the artist. This ranking confirms the commercial importance of the track "Dark Horse".

9.20) Chartmaster confirmed the history of the five promotional singles from Prism as they played on digital streaming services, such as Spotify.

[4] Chartmasters estimates the importance of tracks by calculating album equivalent sales (AES). Album equivalent sales are generated from weighted sums of physical single sales, downloads, and streaming

21

EXHIBIT 10
PAGE 267

| Song | First Digital Stream | Streams |
|---|---|---|
| Roar | 9/5/2013 | 591,660 |
| Unconditionally | 11/20/2013 | 223,360 |
| Dark Horse | 2/20/2014 | 806,512 |
| Birthday | 4/10/2014 | 160,547 |
| This Is How We Do | 7/31/2014 | 257,370 |

9.21) Judged by relative popularity on all streaming services, "Dark Horse" garnered the most listeners (806,512 streams), while "Roar" came in more distant second (591,660).

9.22) Of all sixteen tracks on Prism, the album hit a total of 2,352,447,000 streams The share of this total for "Dark Horse" is 34.2 percent of the total

9.23) Chartmaster also confirmed the history of the five promotional singles as they appeared on YouTube videos that were officially released by Capitol Records, with the input of Katy Perry and her team (Perry, Dep. 43:22-24, 46:1-2). As Ms. Perry explains, video tracks are chosen based on the belief (i.e., gamble and reaction) that the particular song is "bubbling"; i.e., appealing (44:21-25):

| Song | First | Views |
|---|---|---|
| Roar | 9/5/2013 | 2,645,384 |
| Unconditionally | 11/20/2013 | 505,833 |
| Dark Horse | 2/20/2014 | 2,369,953 |
| Birthday | 4/10/2014 | 334,755 |
| This Is How We Do | 7/31/2014 | 682,581 |

9.24) Judged by relative popularity on YouTube, "Roar" garnered the most viewers and comments, while "Dark Horse" came in a very close second.

9.25) The sixteen tracks from Prism together attracted on YouTube a total of 6,610,133,000 video views. The share of this total for "Dark Horse" was 35.9 percent of the total.

22

EXHIBIT 10
PAGE 268

9.26) Based on my review of data from concerts, radio play, streams, and video views, I believe that "Dark Horse" was one of the most important commercial songs on the album Prism, if not the most important. tGiven the demonstrated importance of the song "Dark Horse" to generating sales of the Prism album, any method of apportioning album or concert revenues to "Dark Horse" by simply dividing by total sales by the total number of tracks or songs is not an economic means of valuing its relative worth. I believe that Capital Records has made such a valuation error by the track valuation that it deploys on Prism (CAPITAL1101-3; see also Drellishak passim)

## 10. COSTS AND APPORTIONMENT

10.1) As a co-defendant, Universal Music Group would bear the burden of proving costs and providing an apportionment technique for valuing infringing and non-infringing components of any record release through Capitol Records of the single "Dark Horse" and the album Prism.

10.2) Based on documents that UMG provided and the Deposition of Edward Drellishak, I believe that UMG might attempt to deduct from sales and licensing revenues cost all components related to paid royalties, manufacturing costs, distribution costs, marketing costs, and overhead.

10.3) Defendant costs generally are deductible only if they can be directly related to the actual release of the product. Claimed deductions cannot represent some apportionment of a common or historic cost that would have been incurred regardless.

10.4) Publisher royalties for rights in musical compositions can be a legitimate deduction from label revenues that arose from sales and licensing of recorded material bearing the infringing work. Amounts that Capitol Records claims to have paid to copyright owners should correspond to amounts received by writers, publishers, and administrators.

10.5) As the recording artist, Katy Perry also earned from Capitol Records a royalty as a recording artist after the label recovered amounts for production and marketing. From her net royalties, Ms. Perry also directed payments to featured artist Juicy J and co-producers Dr. Luke, Max Martin, and Cirkut. All royalty deductions should correspond with payments received by another beneficiary.

10.6) I believe that Defendant UMG might attempt to deduct from sales revenues received through Capitol Records the manufacturing costs and artwork design for all physical units sold. However, manufacturing costs are not properly deductible if they simply reflect rate card payment to any other internal entity owned by UMG itself, such as Universal Music Logistics. Rather, reported payments to Universal Music Logistics here would simply be transfers within the UMG entity and do not reflect any truly incurred manufacturing expense paid to an outside entity. There then could be a variance between the standard rate and the actual cost of operation. (Drellishak Dep. 91:14-17).

10.7) I believe that UMG might also attempt to deduct fees related to amounts paid for distribution of its recordings. However, Capitol Records pays distribution fees to an internal entity, Universal Music Group Distribution, based on a fixed percentage of

23

EXHIBIT 10
PAGE 269

product revenues that does not reflect any truly incurred expense outside of the Defendant corporation UMG. As explained above, transfer payments within the UMG organization are not properly deductible. This may also implicate handling, returns processing, refurbishment, and ancillary fees (Drellishak Dep. 70:11-72:18).

10.8) As explained above, record labels market new releases by a recording artist through concert promotion, video production, and radio release. Radio costs would include amounts spent for promotion of the single through time buys, promotional appearances, advertising, singles & shipping, and payments to independent promoters. If Capitol Records can prove amounts related to infringing material, costs are deductible. The label may not deduct marketing costs that it later recouped previously from Ms. Perry's artist royalties.

10.9) I also believe that UMG might attempt to deduct amounts related to an apportionment of company overhead and related costs among units sold, including the infringing recordings. Overhead costs would include the salaries of marketing employees, among other things (Id. 115:3-5). The amounts are generally based upon some formulaic assignment of common and/or historic costs, but without any causal relation to the infringing event. Assigned overhead expenses for the album are portioned from total overhead for the first eighteen months of the album (called the frontline, Id. 121; 19-24; 125:16-23). There is then no necessary relation between apportioned costs and the infringing activity.

10.10) I am advised that the Defendants then bear the responsibility to identify all deductible costs and to apportion the worth of "Dark Horse" from every sale or licensing transaction on which the song appears, and must then present a credible means of performing both assignments. I reserve the right to contest any suggested procedure.

## 11. CONCERT REVENUES

11.1) Depending on the court's final ruling on the recoverability of concert revenues, I would expect to add to Katy Perry's recoverable revenues a share of her earnings from concerts in the U.S. where "Dark Horse" was performed. No such information has been provided.

11.2) Within the appropriate recovery period, the court should compel Ms. Perry to disclose all U.S. concerts where ~~"Dark Horse"~~ DARK HORSE was performed, the composite play list of each concert, and her payments for each event.

11051682.1/41770-00011

EXHIBIT 10
PAGE 270

12. CONCLUSION

The above conclusions constitute my personal independent assessment. These conclusions will form the basis of my testimony should I be called at trial.

Amounts are subject to change as more information becomes available.

/s/ Michael A. Einhorn

Michael A. Einhorn, Ph.D.

~~April~~May 1~~2~~4, 2019

Appendix A

Professional Resume of Michael A. Einhorn

EXHIBIT 10
PAGE 271

# EXHIBIT 11

EXHIBIT 11
PAGE 272

**Wais, Aaron**

| | |
|---|---|
| **From:** | Emma Wood <ewood@alaris.us> |
| **Sent:** | Thursday, March 21, 2019 11:54 AM |
| **To:** | chieffov@gtlaw.com; kahn@capessokol.com; Wais, Aaron |
| **Subject:** | Deposition of Katheryn Elizabeth Hudson 3/13/2019 |
| **Attachments:** | 68249khudson03132019_Full.pdf; 68249khudson03132019.ptx; |
| | 68249khudson03132019.txt; 68249khudson03132019_Condensed.pdf |

Please find attached to this e-mail an E-Transcript file (ptx) and ASCII file for your use. Any hard copies you have ordered are being produced and will be mailed to you.

If this is the first time you have received a .ptx format transcript, you will need to browse to <http://www.reallegal.com/software.asp> and download the free E-Transcript Viewer.

iPad or iPhone users: the Portable E-Transcript mobile app is now available. You can download it now at the iTunes Store at no charge.

Currently there is no E-Transcript viewer software available for Mac OS X devices. Please let us know if you are a Mac OS X user and we will provide PDF files.

For free technical support visit <http://www.reallegal.com/support.asp>.

**Emma Wood**
**Alaris | Production Assistant**
711 North 11th Street | Saint Louis, Missouri 63101
314-644-2191 Ext 169 | 1-800-280-3376 | alaris.us

1

EXHIBIT 11
PAGE 273

# EXHIBIT 12

EXHIBIT 12
PAGE 274

| From: | Michael A. Kahn |
|---|---|
| To: | Movit, Jeffrey; Lauren R. Cohen; "Eric Kayira" |
| Cc: | Lepera, Christine; Wais, Aaron; Albertson, Jacob; Nourafchan, Gabriella |
| Subject: | RE: Michael Einhorn document |
| Date: | Tuesday, May 28, 2019 10:46:15 AM |
| Attachments: | Decker Declaration re Dark Horse Ostinato times.pdf |
| | Expert Report of Michael A. Einhorn, Ph.D (Updated May 24, 2019).pdf |

Jeff:

In response to your request and a related matter:

- In an otherwise privileged email to Dr. Decker on or about May 7th, I asked him to confirm the total playing time of the ostinato in "Dark Horse," explaining that I had used a stopwatch and timed it at 95 seconds. In a response to that specific question, Dr. Decker wrote: "I also get 95 seconds of the 8-note ostinato." I believe that I forwarded that email sentence to Dr. Einhorn—but I may have simply read it to him over the phone. I have searched my emails and cannot find the forwarded email sentence; it may have been inadvertently deleted.
- In any event, Dr. Einhorn received that information from Dr. Decker via me in connection with his updated report.
- Lest there be any doubt as to the timing, I attach a Declaration from Dr. Decker on that 95 second point.
- Finally, Dr. Einhorn has updated his report in connection with two promises he made to you during his deposition:
  - He has attached an updated resume (which came up at page 49 of his deposition)
  - He has reexamined and corrected the Radio Plays chart on page 34 concerning the 5 promotional singles and explains those corrections.
  That updated report is attached.

Michael A. Kahn
Senior Counsel
Capes Sokol

Pierre Laclede Center
7701 Forsyth Boulevard, Twelfth Floor
St. Louis, Missouri 63105-1818
P: 314.505.5406
C: 314.757.2363
kahn@capessokol.com
blog: http://www.michaelakahn.com/

Capes, Sokol, Goodman & Sarachan, P.C. CONFIDENTIALITY NOTICE:  The materials enclosed with this email transmission are private and confidential. The information contained in the material is privileged and is intended only for the use of the individual(s) or entity(ies) named above. If you are not the intended recipient, be advised that unauthorized use, disclosure, copying, distribution, or the taking of any action in reliance on the contents

EXHIBIT 12
PAGE 275

of this emailed information is strictly prohibited.  If you have received this email transmission in error, please immediately notify us either by telephone or by email to arrange for return of the emailed information to us.

-----Original Message-----
From: Movit, Jeffrey <jmm@msk.com>
Sent: Tuesday, May 28, 2019 11:13 AM
To: Michael A. Kahn <kahn@capessokol.com>; Lauren R. Cohen <lcohen@capessokol.com>; 'Eric Kayira' <eric.kayira@kayiralaw.com>
Cc: Lepera, Christine <ctl@msk.com>; Wais, Aaron <amw@msk.com>; Albertson, Jacob <j1a@msk.com>; Nourafchan, Gabriella <gan@msk.com>
Subject: Michael Einhorn document

Mike, please provide us at this time with the "written statement" that you provided to Dr. Einhorn in early May.  See Einhorn Dep. Tr. at 135:25-136:11.

Thank you.  Please note we continue to reserve all rights regarding this issue.

Jeff

EXHIBIT 12
PAGE 276

# EXHIBIT 13

EXHIBIT 13
PAGE 277

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

*Marcus Gray (p/k/a Flame), et al.*

                    Plaintiffs,

*v.*

*Katheryn Elizabeth Hudson (p/k/a Katy Perry), et al.*

                    Defendants.

Civil Action  2:15-cv-05642-CAS-(JCx)

Judge: Christina A. Snyder

# EXPERT REPORT
# OF MICHAEL A. EINHORN, Ph.D.,
# ON BEHALF OF PLAINTIFFS
# —UPDATED MAY 24, 2019—

*Subject to change as more information becomes available*

**April 12, 2019**

1

EXHIBIT 13
PAGE 278

# 1. INTRODUCTION

1.1)   I have been asked by the law firm of Capes Sokol, counsel for Plaintiffs Marcus Gray (p/k/a/ Flame), Emanuel Lambert, and Chike Ojukwu, to provide my expert valuation of actual damages and Defendants' profits resulting from a presumed infringement of Plaintiffs' authorship, ownership, and production rights in a musical composition called "Joyful Noise," which they contend was later infringed by the musical composition and recorded track "Dark Horse."  The track "Dark Horse" was imprinted on the *Prism* album that was released by Defendant Capitol Records, a division of Universal Music Group.

1.2)   I am advised that the three Plaintiffs co-wrote the words and melody of "Joyful Noise" in 2007, recorded the work in March of 2008, and was honored in 2008 with nominations at the Grammys and the Gospel Music Association Dove Award.

1.3)   Plaintiffs contend that "Dark Horse" infringes their copyrights in "Joyful Noise."   My report assumes this to be true as I offer no opinion on Defendants' liability.

1.4)   Capitol Records first released the album *Prism* on October 18, 2013. The track "Dark Horse" appeared in physical and digital albums, singles, and related work distributed in the U.S. and elsewhere.  "Dark Horse" earned considerable play on radio, video, digital services, and concert setlists.

2

EXHIBIT 13
PAGE 279

1.5)     Defendants Katheryn Elizabeth Hudson (p/k/a Katy Perry), Jordan Houston

(p/k/a Juicy J)   Lukasz Gottwald (p/k/a/ Dr. Luke), Karl Martin Sandberg (p/k/a

Max Martin), Henry Russell Walter (p/k/a/ Cirkut), and Sarah Hudson received

directly, or through their publishing entities, royalties related to mechanical,

digital, performance, and synchronization of the underlying musical composition

"Dark Horse*." As copyright holders to the infringed work "Joyful Noise,"*

*plaintiffs should have received some share of total royalties paid.*

1.6) Defendant Katy Perry also received artist royalties for her participation as a

primary artist in the recorded track "Dark Horse."

1.7)     Defendant Juicy J also received artist royalties for his participation as a

featured artist in the recorded track "Dark Horse."

1.8) Defendants Dr. Luke, Max Martin, and Cirkut received producer royalties for

engineering the studio recording featured on the album and digital single

1.9) I am an economist with expertise in valuation of damages related to

infringement of intellectual property.   My testimony is consistent with the

techniques of my profession, in which I earned a Ph.D. in economics.

1.10)  I am paid an hourly rate of $425 for report-writing, and $600 for preparation

for, travel to, and appearance at deposition and/or trial.  This rate is consistent with

my standard professional arrangements for appearance as an expert witness in

court.

EXHIBIT 13
PAGE 280

1.11) I am not related to any of the parties, nor do I have any financial interest in the outcome of this matter.

## 2. STATEMENT OF QUALIFICATIONS

2.1)   I have worked as a professional economist since I received a Ph.D. in Economics from Yale University in 1981.  Since graduation, I was employed at Bell Telephone Laboratories, Rutgers University, U.S. Department of Justice (Antitrust Division), and Broadcast Music Inc.

2.2)   I have worked since 2001 as a testifying expert in the area of media and intellectual property.  My current curriculum vita is attached as Appendix A.   I testified as an expert at deposition and/or trial on cases so identified in my professional resume.

2.3) I have served as a testifying economist in court cases involving the valuation of the intellectual property owned by commercial artists, software designers, writers, publishers, musicians, record labels,  photographers, inventors, celebrities, actors, cartoonists, television producers, cable companies, and radio stations.

2,4)  I have written 38 professional articles in the area of intellectual property in law journals and periodicals.  I have delivered numerous professional lectures or CLE seminars related to these topics. I am also the author of the book *Media, Technology, and Copyright: Integrating Law and Economics* (Edward Elgar Publishers).

4

EXHIBIT 13
PAGE 281

2.5)  I have never been disqualified from testifying in court or limited in any manner related to the applied standards, concepts, or techniques of the economics profession.


3.  **DOCUMENTS REVIEWED**

I reviewed the following documents in connection with my work as an expert witness here:


- Third Amended Complaint for Copyright Infringement,

- UMG Recordings, Inc. Financial Statements, "Dark Horse", June 2013 – June 2018, CAPITOL-01099-01197

- Royalty Statements, Katy Perry, "Dark Horse", KP000278-279

- Contract, Katy Perry, Kasz Money Inc., August 31, 2013, KP000183-000209

- Contract, Katy Perry, Maratone AB., August 31, 2013, KP000210-000238

- *Prismatic World Tour*, License Agreement, KP000239-000242

- Administration Agreement, BMG Chrysalis, Jordan Houston, BMG000257-000290

- Broadcast Music Inc., Royalty Report, Jordan Houston, May 20, 2016

- Contract, Capitol Music Group (a division of Capitol Records), Katy Perry, June 20, 2007; amended September 1, 2010, CAPITOL00001-00061

- Royalties, Kobalt Songs Music Publishing, KOBALT00006-00007

5

EXHIBIT 13
PAGE 282

- Royalties, Katy Perry, "Dark Horse", January 23, 2019

- Declaration, Silvio Pietroluongo,  January 14, 2019

- Summaries of revenues and costs provided by  Lukasz Gottwald,  Henry Russell Walker,  Sarah Hudson, Jordan Houston, all dated March 19, 2019

- Joint Stipulation Regarding Defendant Karl Martin Sandberg, July 1, 2014

- Expert Report of Todd Decker, April 6, 2017

- Wikipedia, *Prism* (Katy Perry Album)

- Wikipedia, "Dark Horse" (Katy Perry song)

- Deposition, Steven Drellishak, February 28, 2019

- Deposition, Katy Perry, March 13, 2019

- Radio Play, Five Songs,  CAPITOL01034- 01098

- Chartmasters,  pages  9-12,  16,  https://chartmasters.org/2018/03/cspc-katy-perry-popularity-analysis-2/16,

## 4.  SUMMARY OF CONCLUSIONS

4.1) I am advised that Plaintiffs Marcus Gray, Emanuel Lambert, and Chike Ojukwu may recover from Defendants actual damages that represent an amount that would have been rightfully earned had Plaintiffs' rights in the composition "Joyful Noise" been properly licensed and compensated.  I am advised that Defendants are jointly and severally liable for the total amount of these damages that Plaintiffs suffered.

6

EXHIBIT 13
PAGE 283

4.2)   Actual damages in this matter result from uncollected royalties owing to Plaintiffs' rights in the musical composition "Joyful Noise."   These rightful amounts include copyright royalties related to mechanical/digital reproductions, performance, and synchronization royalties that would normally be earned by songwriters or publishers.

4.3)   As described in Section 5, Plaintiffs lost the opportunity to earn copyright royalties amounting to ███████ *This amount represents actual damages that can be recovered jointly from all Defendants.*

4.4)   In addition to actual damages, I am advised that Plaintiffs may recover severable profits from each individual Defendant.  I am advised that Plaintiff must first prove Defendant revenues, from which Defendant must prove appropriate deductions.

4.5)   As itemized in Section 5 and 8, Defendants earned from infringing sales, licenses, and royalty payments (writer, artist, and producer) related to "Dark Horse"

| Defendant | Source of Revenues | Revenues |
|-----------|-------------------|----------|
| Capitol Records | Sale and licensing of recorded track | ███████ |
| Katy Perry | Co-writer and primary artist/performer | ███████ |
| Juicy J | Co-writer and featured artist | ███████ |
| Dr. Luke | Co-writer and co-producer | ███████ |
| Max Martin | Co-writer and co-producer | ███████ |

EXHIBIT 13
PAGE 284

| Defendant | Source of Revenues | Revenues |
|---|---|---|
| Cirkut | Co-writer and co-producer | ███████ |
| Sarah Hudson | Co-writer | ███████ |
| **TOTAL** | | ████████ |

4.6)  As explained above and in Section 5, a sum of ███████ reflects a royalty that should have been paid to the Plaintiffs for use of their composition "Joyful Noise" in the song and track "Dark Horse".  All Defendants are jointly liable for this amount.

4.7)  Defendants earned revenues of ████████, of which █████████ is unaccounted for in the actual damages identified above. Each defendant is severally liable for any profit amount not otherwise accounted for in the determination of actual damages.

## 5.  ACTUAL DAMAGES

5.1) I am advised that Plaintiffs may recover from Defendants a licensing fee for royalties that would have been earned from use of Plaintiffs' composition "Joyful Noise".  Had the composition been licensed, Plaintiffs here would have received some share of the mechanical, digital, performance, and synchronization royalties attributed to the composition of "Dark Horse."

8

EXHIBIT 13
PAGE 285

5.2) This share of copyright royalties generally is determined in the music industry through arms-length negotiation involving owners of a copyrighted work and engaged licensees of that work. As a matter of law, the valuation for a lost licensing opportunity should be a transaction amount at which a willing buyer(s) and a willing seller(s) would arrive in a free negotiation.

5.3)  That said, there is no scientific or industry rule for determining an exact amount that would result from a negotiation. The results of other negotiations involving similar situations can sometimes be useful benchmarks to inform this analysis.   The determined valuation will then appear in a *range of outcomes* that can be determined by the market.

5.4) The Plaintiffs' original work, "Joyful Noise," was a musical composition that appeared as a track on the album *Our World: Redeemed (2008)* as well as a download single and stream (2014). I am advised that copyright to the song is owned by the Plaintiffs in this lawsuit and that Plaintiffs would have been rightfully compensated by the record label.

5.5)  The album *Our World: Redeemed* was the fourth studio album from American Christian rapper Flame. It was released on March 4, 2008.   The recording label for the album was Cross Movement. The album earned a Grammy Award nomination for Best Rock or Rap Gospel Album, and the label made a

EXHIBIT 13
PAGE 286

video for the lead single "Joyful Noise." This establishes that the composition of "Joyful Noise" had a positive market value."

5.6) Per the Declaration of Silvio Pietroluongo of Billboard (January 14, 2019), the album recording of *Our World: Redeemed* was commercially successful.   The album appeared on the Billboard Top Gospel Albums chart for thirty-five straight weeks. The album also appeared on the Billboard Top Christian Album on March 22, 2008 (#18) and March 29, 2008 (#34). (Declaration of Silvio Pietroluongo at ¶¶ 6,7)

5.7) The single-track *Joyful Noise* was also commercially successful and deserving of a positive market valuation.  The song charted on the Billboard Gospel Digital Songs Sales Chart for thirty-four straight weeks (1/15/2014 – 7/26/2014), Billboard Gospel Streaming Songs on July 19, 2014 (#1) and July 26, 2014 (#10), and the Billboard Christian Streaming Charts on July 19, 2014 (#4).

5.8) Based on a blended formula that takes into account radio airplay, sales data, and streaming, "Joyful Noise" also appeared on the Billboard Hot Christian Songs on July 19, 2014 (#11) and July 26, 2014 (#37)  and the Billboard Hot Gospel Songs on July 19, 2014 (#1)  and July 26, 2014 (#16),  (Declaration of Silvio Pietroluongo at ¶¶ 8-12).

10

EXHIBIT 13
PAGE 287

5.9) As a valued musical work reproduced on a track on the album *Our World Redeemed*, the musical work "Joyful Noise" was paid, or deserved to have been paid, royalties from its record label Cross Movement.

5.10)  I have read the expert report of musicologist Prof. Todd Decker of Washington University of St. Louis. I am advised that Prof. Decker will testify that the ostinato in "Joyful Noise" is substantially similar to the main ostinato in "Dark Horse."  Prof. Decker further opines in his Expert Report that the infringing ostinato is repeated throughout "Dark Horse." Upon written statement of counsel, I am also advised that Prof. Decker has determined that the ostinato accounts for  95 seconds of the song (which Defendants' expert Ferrara times at 3:32, or 212 seconds); or 45 percent of the elapsed time in the entire composition.

5.11) Per Prof. Decker's opinion, it is also proper for Plaintiffs to share some royalty share sales and licensing of the latter with regard to reproduction, performance, and video synchronization.

5.12)  I believe that a market-based outcome for a copyright negotiation for rights in "Joyful Noise" would have granted to Plaintiffs a fifteen percent (15%) share of copyright royalties (i.e., mechanical, digital, performance, and synchronization) in the musical composition "Dark Horse."

5.13)  I determined the putative share of fifteen percent as follows.  I am advised as a legal matter that copyright in a joint composition (i.e., a musical work in which

11

EXHIBIT 13
PAGE 288

more than one writer participates) vests initially in equal shares for all participants, regardless of the size of any individual contribution to the work.  Per Katy Perry's sworn deposition (36-37),  there were five listed primary writers of "Dark Horse" – Katy Perry (vocal melody and lyrics, 12:6-9), Sarah Hudson (lyrics), Max Martin (melody, 37:3-4), Dr. Luke (instrumental, 13:1), and Cirkut (instrumental, 13:1)

5.14)  I have seen no contract among the writers to justify any other breakdown of the copyright.  It then follows that each originally would have controlled a one fifth share of the copyright, or twenty percent (20%).

5.15)  The final songwriter in this lawsuit -- Juicy J – was not an original writer of "Dark Horse" and but made a rap contribution to the work after the music, melody and lyrics were composed (Perry Dep.. 36:15-16).   For his later efforts, Juicy J apparently received a reduced copyright share of ███████████ which is ████ of ██████.  To provide for the share, the five primary writers (supra 5.13) then divided up the remaining ████ percent equally, each receiving an identical royalty share of ██████████████████

5.16) If properly licensed, the taking of the ostinato from "Joyful Noise" would have represented a sixth primary contribution to "Dark Horse" that would have needed to be assigned a copyright share. There is here a pre-existing sale or license agreement in place, and no ill-motive or competitive relationship that would interfere with its reasonable extension. If each of five original writer shares – i.e.,

12

EXHIBIT 13
PAGE 289

Perry, Martin, Luke, Cirkut, and Hudson -- are equally valued at █████ percent of royalties paid ███████ each of six would then be valued at fifteen percent █████████[1]

5.17) Based on the adjusted benchmark derived from defendant's own copyright assignments, I shall now assign to the Plaintiffs a prorated share of royalties paid equal to fifteen percent of copyright royalties.  This is consistent with the legal notion (I am advised) that copyright damages must be assigned and discounted to correspond to plaintiff's ownership interests,   and that courts may apportion damages for certain claims  at issue pursuant to previous affirmative agreement of copyright holders as to percentage interest held by each.   I am also advised that courts may order apportionment based on undisputed calculations provided by plaintiffs.

5.18)  I am advised that the defendants have provided summaries that represent the following amounts of copyright royalties paid to the present (infra Section 8).

*Katy Perry*

| | |
|---|---|
| Publisher Royalties | ████████ |
| Performance Royalties | ████████ |
| **Subtotal:** | ████████ |

---

[1]This analysis maintains Juicy J at his original ███ percent copyright share, and I reserve the right to proffer a different estimate if this assumption is challenged.

13

EXHIBIT 13
PAGE 290

*Juicy J*

        Publisher Royalties       █████████

        Performance Royalties   █████████

        **Subtotal**             █████████

*Dr. Luke*

        Publisher Royalties       █████████

        Performance Royalties   █████████

        **Subtotal**             █████████

*Max Martin*

        Publisher  Royalties      █████████

        Performance Royalties   █████████

        **Subtotal**             █████████

*Cirkut*

        Publisher Royalties       █████████

        Performance Royalties   █████████

        **Subtotal**             █████████

14

EXHIBIT 13
PAGE 291

*Sarah Hudson*

| | |
|---|---|
| Publisher Royalties | ██████ |
| Performance Royalties : | ██████ |
| **Subtotal** | ██████ |

**TOTAL:**  ██████

5.19)    Total copyright royalties are ██████.   Valued at a fifteen percent share of the total, I estimate that Plaintiffs would have earned a licensing payment of ██████ for their share of "Dark Horse."

5.20) I am advised that Defendants are jointly liable to pay the identified amount of actual damages.

## 6.  LABEL REVENUES FROM "DARK HORSE":  *2013-2018*

6.1)  Defendant Capitol Records recorded the track "Dark Horse" as a component of Katy Perry's album, *Prism.* The album was released on October 18, 2013.

6.2) The "Dark Horse" track was released in many different formats, including album, single, and DVD. (Drellishak Dep. 20:15-18). The standard album release contained thirteen (13) tracks and the deluxe release contained sixteen (16) tracks.

EXHIBIT 13
PAGE 292

6.3)  The "Dark Horse" track was also made available and licensed as a download, ringtone, ringback, digital stream, video use, synchronized work, and compilation work.

6.4)   After returns, net sales of all products bearing the track "Dark Horse," from October 2013 to June 2018, totaled ██████████.   (CAPITOL00923; CAPITOL1101-1103; CAPITOL01133). This amount is broken down as follows:

Physical albums (Thirteen tracks)

Physical albums (Sixteen tracks)

Download albums (Thirteen tracks)

Download albums (Sixteen tracks)

Download albums (Two tracks)

Single Tracks (Downloads and Streams)

Domestic Licensing Income

Ancillary Income  (Tour)

TOTAL



6.5) *Capitol Records sells physical albums as follows*.  The artist makes a master recording in the studio from which actual sales units are imprinted by an independent entity (Drellishak Dep. 59:15-17).  Manufacturing is administered by

16

EXHIBIT 13
PAGE 293

Universal Music Logistics ("UML") (*Id.* 59:1-8), which receives from the label a designated rate card payment per CD.  (*Id.* 67:2-4)     UML pays the actual manufacturer directly (*Id.* 60:4-14).

6.6) after manufacturing, the albums are then moved into inventory through UMG's distribution service (Universal Music Group Distribution) that administers the process of getting it into record stores. (Id.  85: 13-23) A customer then places an order through an EDI transaction to the sales order processing system.     The sales order processing system records the sales in the general ledger (Drellishak Dep. 22:1-7). After distribution, returns of physical product are credited to the buyer (*Id.* 23:15-18).  The label collects all due revenues from physical sales, and distributes royalties and other expenses to the appropriate parties.

6.7) *For sales of digital product*, the label sends the file directly to the digital service provider (e.g., Apple iTunes, Spotify, Amazon).  The service provider makes the track available to users through downloads or streaming. (*Id.* 36:6-10, 37:3-8).  There are no additional costs of production or distribution for digital product. The service provider pays for the actual download or stream revenues that can be shared with the artist.  Publishers collect copyright royalties from the sale of downloads through separate payment arrangements with the digital service provider.

17

EXHIBIT 13
PAGE 294

6.8) Capitol Records earned *licensing income* for ringtones, ring backs, digital streams, video uses, synchronized works (uses that integrate the music with scripted video or live background), and compilations (use of the track on different albums) (*Id.* 42:11-15).

6.9) Capitol Records earned *ancillary income* from revenues received for sale of the *Prismatic World Tour* DVD (*Id.* 55:15-18).

6.10)   Unreported to date are the licensing fees for sales to foreign markets. If foreign sales are recoverable, international revenues should be adjusted upward to reflect this licensing total.  I reserve the right to amend this report if additional information on these revenues becomes available.

6.11) To be conservative, I have included only the lower revenue estimates listed above, but reserve the right to include foreign revenues if the Court rules that it is appropriate to include any component of  foreign sales  in the calculation.

6.12) I do believe that each amount itemized above implicates a product or service that in some way involves the use of the infringing musical composition "Dark Horse," as reproduced on a master recording by Capitol Records.

18

EXHIBIT 13
PAGE 295

## 7. ROYALTY PAYMENTS

7.1) Royalties for "Dark Horse" were earned by the lead artist Katy Perry, featured artist Juicy J producers Dr. Luke, Max Martin, and Circuit, and co-writers Katy Perry, Juicy J., Dr. Luke, Max Martin, Circuit, and Sarah Hudson.

*Lead Artist Royalties*

7.2) Recording artist Katy Perry appears as the lead artist on the track "Dark Horse." The track was originally released on September 17, 2013 as the second promotional single (i.e., radio) from the album *Prism* (2013).  The album was later released on October 18, 2013.  The single was released for general sales on December 17, 2013.

7.3)  As the lead artist, Ms. Perry earned *artist royalties* specified in her  contract with  Capitol Music Group (a division of Capitol Records). (CAPITOL00001-00061). Her contract was first established on June 20, 2007 and amended on December 13, 2012.

7.4) Per the amended agreement, Ms. Perry earned artist royalties for what I believe to her Third Committed Album, *Prism* (Contract, Section 6). Ms. Perry earned a royalty rate of ███ based on all sales of the album in the U.S. and Canada; while foreign sales in the U.K./Eire and Rest of Territory were respectively valued at ███ and ███ of the above specified rate.   The royalty for

19

EXHIBIT 13
PAGE 296

net streaming sales was specified at ▮ of total revenues received (not including eligible non-interactive services covered by Sound Exchange (see next).

7.5)  Ms. Perry also earned artist royalties for her share of eligible  transmissions performed on  non-interactive digital services collected and distributed by Sound Exchange (per eligibility requirements established by the Digital Performance Rights in Sound Recording Act of 1996, 17 U.S.C. 114)

7.6)  Ms. Perry also received a flat payment of ▮ as an upfront  payment for artist rights related to a DVD release of her full Prismatics concert that she performed in Sydney Australia (KP000239-252), as well as a product royalty of ▮ (CAPITOL01193-7).  The song "Dark Horse" appeared on the playlist of this concert (Id.).

7.7) Some amount of Ms. Perry's artist royalties were recouped by the label to cover its production and marketing costs for her album (Contract, Section 4),  or paid out to her designated producers per independent contract. (Infra, Producer Royalties and Section 8)

7.8) Finally, Ms. Perry earned copyright royalties for her share as a writer in the musical composition  This work is regarded to be a controlled composition because Ms. Perry is also the lead artist on the album.

7.9)  I have not reviewed any written contracts that Ms. Perry (or any other writer) may have signed as a copyright owner of the song "Dark Horse."  As a matter of

20

EXHIBIT 13
PAGE 297

industry custom and practice, I believe that Ms. Perry received a reproduction rate of ███████ per sold track, pro-rated for her respective share of the composition (███, see 7.18) and a possible reduction for her appearance in a controlled composition.

*Featured Artist Royalties*

7.10)  As a featured artist on the track and video, Juicy J earned *artist royalties* specified in a separate contract with Katy Perry. Artist royalties were paid in flat sums for his work on the recorded track and the video.   (BMG000257-BMG000275).

7.11)  Juicy J also earned royalties for some share of royalties for use of the recorded track on Sound Exchange.  .

7.12)  Finally, Juicy J earned copyright royalties for his share as a writer in the musical composition

*Producer Royalties*

7.13)  Co-producers of the recorded track "Dark Horse" were Dr. Luke,  Max Martin, and Cirkut who were initially credited with equal shares of producer royalties.  I believe that the co-producers may have arranged additional transfers among themselves.

EXHIBIT 13
PAGE 298

7.14) Katy Perry entered into two producer contracts on August 31, 2013 (Dr. Luke, Cirkut; Contract, KP000183-209; Max Martin Contract, KP000210-236). These contracts established that the producers were paid a share of artist royalties otherwise due to Ms. Perry from physical and digital sales.

7.15)  Payments to Dr. Luke and Cirkut for produced tracks on the album *Prism* were established as follows (Contract, Sections 3-4).  The two producers *together* received upfront a non-recoupable payment of ▮▮▮▮, a ▮▮▮ percent royalty based on physical sales valued at the published price to dealers ("PPD") of the album, a ▮▮▮▮ royalty based on digital sales valued at the same PPD, and ▮▮▮ of artist royalties for licensing of video.  All royalty amounts were suitably pro-rated for the number of participating tracks on the album and the producer's royalty relative to the artists.  Dr. Luke and Cirkut were also to have received a share of ▮▮▮▮ of Perry's due artist royalties paid at Sound Exchange, (Contract, Appendix B, KP000204).  Dr. Luke and Cirkut seem to have further divided their due royalties in a manner of which I am not aware.

7.16) Payments to Max Martin for produced tracks on the album *Prism* were as follows (Contract, Sections 3-4).  Max Martin received upfront a non-recoupable payment of ▮▮▮▮, a ▮▮▮ percent royalty based on physical sales valued at the PPD of the album, a ▮▮▮ royalty based on digital sales valued at the same PPD, and ▮▮▮ of artist royalties for licensing of video.  All royalty amounts were

22

EXHIBIT 13
PAGE 299

suitably pro-rated for the number of participating tracks on the album and the producer's royalty relative to the artists. Max Martin was also to have received a share of ▮▮▮▮ of Ms. Perry's due artist royalties paid by Sound Exchange (Contract, Appendix B, KP000230).

*Songwriter Royalties*

7.17) Co-writers of the musical composition "Dark Horse" are listed as Dr. Luke, Max Martin, Cirkut, and Sarah Hudson, as well as aforementioned artists Katy Perry and Juicy J. I have not reviewed any relevant publisher contracts that Capital Records signed with any writer or his/her publisher entity.

7.18) Based on information made available from the performing rights organization Broadcast Music Inc., I believe that the writer shares of the copyright in the composition "Dark Horse" are as follows:[2]

Katy Perry:       ▮▮▮
Dr. Luke:         ▮▮▮
Max Martin:       ▮▮▮
Cirkut:           ▮▮▮
Sarah Hudson:     ▮▮▮
Juicy J:          ▮▮▮

---

[2]The same numbers appear as writer shares reported on Katy Perry's artist contract with Juicy J (Jordan Houston). See also Email from Harold Papineau to Jermi Thomas, et al., *Re: URGENT: Juicy – Dark Horse Splits,* January 28, 2014.

EXHIBIT 13
PAGE 300

7.19) As a co-writer of the musical composition "Dark Horse," each listed writer earned royalties from the mechanical and digital reproductions of the song in albums and singles, public performances of the song in broadcast, digital, and general media venues, and third-party licensing of the song.

7.20)  Per industry custom and practice, record labels generally pay songwriter royalties for *reproductions, synchronization, and compilation* uses to each writer through his/her designated publisher.

7.21)  Each publisher designated a separate collection entity to administer the accounting for its incoming royalty payments.  Each royalty administrator is paid a share of collected revenues as payment for its administrative service.

7.22) Distinguished from other writer royalties, *performance royalties* are collected and administered by performing rights organizations (PRO), such as ASCAP (Dr. Luke, Max Martin, Cirkut, Perry, and Sarah Hudson are members) and BMI (Juicy J is an affiliate).  The PRO pays some share (usually 50%) of the royalty amount directly to the songwriter.  The remainder of the royalty is paid to the writer's designated publisher.

7.23) Based on the above, songwriter claims in the copyright of "Dark Horse" are summarized as follows:

EXHIBIT 13
PAGE 301

| Writer | Publisher | Administrator | PRO | Share |
|---|---|---|---|---|
| Katy Perry | When I'm Rich You'll Be My Bitch | Warner Chappell | ASCAP | ■ |
| Dr. Luke | Kasz Money Publishing | Kobalt Songs | ASCAP | ■ |
| Max Martin | Kasz Money Publishing | Kobalt Songs | ASCAP | ■ |
| Cirkut | Kasz Money Publishing | Kobalt Songs | ASCAP | ■ |
| Sarah Hudson | Prescription Songs | Kobalt Songs | ASCAP | ■ |
| Juicy J | DeeEtta Music | BMG Chrysalis | BMI | ■ |

## 8.  ROYALTY AMOUNT:  2013-2018

8.1)  Katy Perry, Juicy J, Dr. Luke, Max Martin, Cirkut, and Sarah Hudson earned writer, artist, and/or producer royalties in connection with their contributions to the song and track "Dark Horse.".

*Katy Perry*

8.2)  Defendant Katy Perry was a co-writer and primary artist of "Dark Horse". As described in Section 7, her due collections accrued through her publishing entity When I'm Rich You'll Be My Bitch, (as administered and collected by Warner Chappell Music) performing rights organization ASCAP, and artist

25

EXHIBIT 13
PAGE 302

collecting society Sound Exchange.  She also earned a payment of █████████ for licensing rights to her Prismatics concert performed in Australia

8.3) Based on the most recent records provided to me (KP000239-252, KP000278-279), Ms. Perry received net royalty payment of ██████████, broken down as follows.

Publisher Royalties (through Kobalt Songs): ████████ (2013H2 – 2018H1)

Performance Royalties (through ASCAP): ████████ (2014M4 – 2019:M4)

Sound Exchange Royalties: ████████ (2014M3  - 2019M1)

Artist Royalties: █████████ (2013H2 – 2018H1)

Video Royalties: ██████

Video Upfront: ███████

**Total:** ████████

*Juicy J*

8.4)  Defendant Juicy J was a co-writer and featured artist of "Dark Horse".   As described in Section 7, collected amounts accrued through his publishing entity Dee Etta Music (as administered and collected by BMG Rights Management), performing rights organization BMI, and artist collecting society Sound Exchange.

26

EXHIBIT 13
PAGE 303

8.5) Per a direct contract with Katy Perry (KP00032), Juicy J also received directly

from Ms. Perry a flat payment of ▮▮▮▮▮ for his vocal appearance on the recorded

track "Dark Horse", and a flat payment of ▮▮▮▮▮ for his appearance on the video.

8.6) Based on the most recent records provided to me, Juicy J's  total royalties

amounted to ▮▮▮▮▮▮ which were broken down as follows:


Publisher  Royalties  (through BMG Chrysalis) ▮▮▮▮▮▮ (2014Q2 – 2018Q2)

Performance Royalties (through BMI):     ▮▮▮▮▮▮ (2013Q3 – 2018Q1)

Sound Exchange Royalties :     ▮▮▮▮▮▮ (2013Q4 – 2018Q3)

Artist Royalties (through Katy Perry):   ▮▮▮▮

**Total**     ▮▮▮▮


*Dr.  Luke*

8.7) Defendant Dr. Luke was a co-writer and co-producer of "Dark Horse".   As

described in Section 7, collected amounts accrued to his publishing entity Kasz

Money Publishing (as administered and collected by Kobalt Songs Music

Publishing), production entity Kasz Money, Inc., performing rights organization

ASCAP,  artist collecting society Sound Exchange,  and shared video royalties.

8.8) Based on the most recent records provided to me, Dr. Luke's reported

royalties amounted to ▮▮▮▮▮▮, which were broken down as follows:

27

EXHIBIT 13
PAGE 304

Publisher Royalties   (through Kobalt Songs):   ██████   (2013Q4 – 2018Q2)

Production Royalties   (through Kasz Money):   ██████   (2013Q4 – 2018Q2)

Performance Royalties   (through ASCAP):   ██████   (2014Q1 – 2018Q3)

Sound Exchange Royalties:   ██████   (2015Q2 – 2018Q4)

Video Royalties   ██████   (2017Q2 – 2018Q2)

**Total**   ██████

*Max Martin*

8.9)  Defendant Max Martin was a co-writer and co-producer of "Dark Horse".  As described in Section 7, collected amounts accrued to his publishing entity MXM Music, Inc. (as administered and collected through Kobalt Songs Music Publishing), production entity Maratone AB, Inc., performing rights organization ASCAP, and artist collecting society Sound Exchange and shared video royalties.

8.10) Based on the most recent records provided to me, Max Martin's gross royalties amounted to ██████ which were broken down as follows

Publisher  Royalties  (through Kobalt Songs):   ██████   (2013Q4 – 2018Q2)

Production Royalties  (through Maratone, AB):   ██████   (2013Q4 – 2018Q2):

Performance Royalties  (through ASCAP):   ██████   (2013Q3 – 2017Q4)

28

EXHIBIT 13
PAGE 305

Sound Exchange Royalties:                ███████   (2014Q2 – 2018Q3)

Video Royalties:                         ██████   (not available)

Gross Royalty                        ██████████

8.11) I am advised that parties stipulate that ████ of Max Martin's gross royalties were paid to his administrator Kobalt Songs Music Publishing, and an additional ████ was diverted for legal and management costs.  His net royalty was then ██████████[3]

*Cirkut*

8.12) Defendant Cirkut was a co-writer and co-producer of "Dark Horse."   As described in Section 7, collected amounts accrued to his publishing entity Oneiorology, Inc., (as administered and collected through Kobalt Songs Music Publishing), production entity Kasz Money Inc., performing rights organization ASCAP and artist collecting society Sound Exchange.

8.13) Based on the most recent records provided to me, Cirkut's total royalties amounted to ██████, which were broken down as follows:

Publisher Royalties   (through Kobalt Songs):   ███████   (2013Q4 – 2018Q3)

---

[3]Per Stipulation, April 2019, costs include management commission of ███ of gross ███████) and legal and administrative fees of ███ of gross ██████.

29

EXHIBIT 13
PAGE 306

Production Royalties (through Kasz Money): ███████ (2013Q4 – 2018Q2)

Performance Royalties  (through ASCAP): ██████ (2013Q3 – 2018Q1)

Sound Exchange Royalties: ██████

Video Royalties: ██████ (2017Q2 – 2018Q2)

**Total** ██████

*Sarah Hudson*

8.14)  Defendant Sarah Hudson was a co-writer of "Dark Horse". As described in Section 7, collected amounts accrued to her publishing entity Prescription Songs (as administered and collected through Kobalt Songs Music Publishing) and performing rights organization ASCAP.

8.15) Based on the most recent records available to me, Ms. Hudson's total royalties amounted to ██████,  which were broken down as follows (without dates):

Publisher Royalties  (through Kobalt Songs): ██████

Performance Royalties  (through ASCAP): : ██████

**Total** ██████

8.16) With the exception of Max Martin, all royalty amounts reported above are gross receipts before deduction for any administrative costs by any entity. Based

30

EXHIBIT 13
PAGE 307

on the specific data that I may yet review and verify, I reserve the right to amend for any suitable deductions that are proven to be paid to administrators.

8.17) Copyright royalties may accrue only to a songwriter's share of the work, and not to artists and publishers. In the above charts in this Section, copyright royalties to each of six writers include only his/her publisher royalties and performance royalties.

8.18) Before administration fees, total copyright royalties for the six writers above sum to ████████. This amount can form the basis of a calculation for actual damages that Plaintiffs would have earned had their rights been properly licensed. *If Plaintiffs are entitled to 15 percent of the total, actual damages are then* ██████.

## 9. IMPORTANCE OF SONG DARK HORSE

9.1) The album *Prism* was a leading album that earned over ████████ ██████ in sales and licensing for the label Capitol Records. The song Dark Horse was critically important to the success of this album. This is documented in and demonstrated by the appearance of the song in concert tours, radio promotion, video use, and commercial charts.

EXHIBIT 13
PAGE 308

*Concert Tours*

9.2)  Record labels generally market new releases by supporting artist tours related to the new album. In the course of her professional career with Capitol Records, I believe that Katy Perry performed in five Concert Tours under the terms specified in her Original Agreement with the label entered in 2007.

9.3) Ms. Perry's most successful tour of the five tours was the *Prismatic World Tour*, which promoted her album release of *Prism*.  The tour ran from May 2014 to October 2015 and visited Europe, North America, Australia, Asia and South America.

9.4) The *Prismatic World Tour* in 2014-2015 grossed more than $204.3 million from 151 shows with a total attendance of 1,984,503.  The Sydney November 28th concert was recorded for her second live album: *The Prismatic World Tour Live*, which was released two weeks after the tour ended.  The setlist for the *Prismatic World Tour* contained twenty songs,

1. "Roar"

2. "Part of Me"

3. "Wide Awake"

4. "This Moment" / "Love Me"

5. "Dark Horse"

6. "E.T."

32

EXHIBIT 13
PAGE 309

7. "Legendary Lovers"

8. "I Kissed a Girl'

9. "Hot n Cold"

10."International Smile" / "Vogue"

11."By the Grace of God"

12."The One That Got Away" / "Thinking of You"

13."Unconditionally"

14."Walking on Air"

15."It Takes Two"

16."This Is How We Do" / "Last Friday Night (T.G.I.F.)"

17."Teenage Dream"

18."California Gurls"

19."Birthday"

20."Firework"

9.5) Twelve of twenty songs on the setlists for the *Prismatic World* Tour appeared on the *Prism* album:  "Roar," "This Moment," "Love Me," "Dark Horse," "Legendary Lovers," "International Smile," "By the Grace of God," "Unconditionally," "Walking on Air," It Takes Two" (*Prism* Deluxe), "This Is How We Do," and "Birthday."  "Dark Horse" was one of the twelve songs.

33

EXHIBIT 13
PAGE 310

9.6)   Ms. Perry also performed "Dark Horse" for fourteen additional live performances, including the 56th Grammy Awards on January 26, 2014 in Los Angeles.

### Radio Play

9.7)   In documents from Media Base that are used by Capital Records itself (CAPITOL01021-1098), the label released five promotional singles from *Prism* for radio play before and after the release of the album on October 18, 2013.

9.8) In the order of initial release, the five promotional singles were as follows:[4]

| Song | Date of 1st play | Radio Spins | # of Stations | # of Markets | Audience Impressions |
|------|------------------|-------------|---------------|--------------|----------------------|
| Roar | 8/10/2013 | 770,436 | 450 | 148 | 5.2 billion |
| Dark Horse | 9/17/2013 | 930,186 | 539 | 148 | 6.3 billion |
| Unconditionally | 10/16/2013 | 149,963 | 370 | 145 | 820.4 million |
| Birthday | 10/22//2013 | 141,266 | 320 | 144 | 775 million |
| This Is How We Do | 10/22/2013 | 55,024 | 285 | 141 | 262.3 million |

---

[4] The aforementioned documents were provided in discovery by the Defendants. The documents were made available to me without the benefits of a previous deposition, and related inquiry thereto. Having achieved more understanding of the documents since the submission of my Original Report on April 12, 2019, I have revised the numbers that appear in the "Date of 1st Play," "# of Stations" and "# of Markets" columns to reflect additional information of which I am now aware. However, I have re-confirmed the two key columns of numbers—namely, Radio Spins and Audience Impressions"—and they remain the same as before.

34

EXHIBIT 13
PAGE 311

9.9)  The chart is organized as follows:

- Column 1:  Name of songs performed on radio.
- Column 2:  Date of first airplay
- Column 3:  Radio Spins:  Each broadcast play on a Radio Station is counted as one recorded radio spin
- Column 4:  Stations:  Number of Individual Broadcast Stations
- Column 5:  Markets: Number of Unique Geographic Markets (Some markets can have more than one station performing the song
- Column 6:  Number of Record Spins (column 3) multiplied by the radio station's Listening Audience (as measured by Nielson Ratings.)

9.10)  Two songs—"Roar" and "Dark Horse"—were the first tracks released for radio play before the album was released (October 18, 2013), These  two tracks accounted for over half of the  radio spins. Based on release date and number of spins,  "Roar" and "Dark Horse" appear then to be the primary instruments to promote and generate momentum for the album release of **Prism**.  The three remaining singles—"Unconditionally,"  "Birthday," and "This is How We Do" — initiated all of their radio play at a later time and nearly all after the  album had made its debut,

9.12)  Of the five listed songs on the album,  the track "Dark Horse" accounted for 45.4 percent of all radio spins,  27.4 percent of all radio stations, and  47.1 percent of all audience listens since  first play.   Although Radio Spins in each station and market varied considerably by song, the total count of markets for each was largely

35

EXHIBIT 13
PAGE 312

the same  (ranging from 141 to 148).  However, only "Dark Horse" and "Roar" appeared in all markets.

9.13)  Based on evidence available from radio plays, "Dark Horse" was a leading promotional song on the album – if not the most important.

### Streams and Videos on Chartmasters

9.14) Chartmasters is a rating service in the record industry that charts the popularity of new albums and tracks among digital audiences.

9.15) Using a special analytic technique,[5]  Chartmasters identified the twelve most popular tracks *ever* released by the recording artist Katy Perry until the present

9.16) The tracks "Dark Horse" (3,660,000 AES) and "Roar" (3,640,000 AES) are the *only listed tracks* from Katy Perry's album *Prism*.  These two tracks share first and second place among the most popular twelve tracks from the artist.  This ranking confirms the commercial importance of the track "Dark Horse".

9.17)  Chartmaster  confirmed  the  history  of  the  five  promotional  singles  from *Prism* as they played on digital streaming services, such as Spotify.

| Song | First Digital Stream | Streams |
|---|---|---|
| Roar | 9/5/2013 | 591,660 |
| Unconditionally | 11/20/2013 | 223,360 |

---

[5]Chartmasters estimates the importance of tracks by calculating album equivalent sales (AES).  Album equivalent sales are generated from weighted sums of physical single sales, downloads, and streaming

EXHIBIT 13
PAGE 313

| Dark Horse | 2/20/2014 | 806,512 |
| Birthday | 4/10/2014 | 160,547 |
| This Is How We Do | 7/31/2014 | 257,370 |

9.18) Judged by relative popularity on all streaming services, "Dark Horse" garnered the most listeners (806,512 streams), while "Roar" came in more distant second (591,660).

9.19)  Of all sixteen tracks on Prism, the album hit a total of  2,352,447,000 streams  The share of this total for "Dark Horse" is 34.2 percent of the total

9.20) Chartmaster also confirmed the history of the five promotional singles as they appeared on YouTube videos that were officially released by Capitol Records, with the input of Katy Perry and her team (Perry, Dep. 43:22-24, 46:1-2). As Ms. Perry explains, video tracks are chosen based on the belief (i.e., gamble and reaction) that the particular song is "bubbling"; i.e., appealing (44:21-25):

| Song | First | Views |
| --- | --- | --- |
| Roar | 9/5/2013 | 2,645,384 |
| Unconditionally | 11/20/2013 | 505,833 |
| Dark Horse | 2/20/2014 | 2,369,953 |
| Birthday | 4/10/2014 | 334,755 |
| This Is How We Do | 7/31/2014 | 682,581 |

9.21) Judged by relative popularity on YouTube, "Roar" garnered the most viewers and comments, while "Dark Horse" came in a very close second.

37

EXHIBIT 13
PAGE 314

9.22)   The sixteen tracks from *Prism* together attracted on YouTube a total of 6,610,133,000 video views. The share of this total for "Dark Horse" was 35.9 percent of the total.

9.23)   Based on my review of data from concerts, radio play, streams, and video views, I believe that "Dark Horse" was one of the most important commercial songs on the album Prism, if not the most important. Given the demonstrated importance of the song "Dark Horse" to generating sales of the *Prism* album, any method of apportioning album or concert revenues to "Dark Horse" by simply dividing by total sales by the total number of tracks or songs is not an economic means of valuing its relative worth.  I believe that Capital Records has made such a valuation error by the track valuation that it deploys on Prism (CAPITAL1101-3; see also Drellishak passim)

## 10.  COSTS AND APPORTIONMENT

10.1)   As a co-defendant,  Universal Music Group would bear the burden of proving costs and providing an apportionment technique for valuing infringing and non-infringing components of any record release through Capitol Records of the single "Dark Horse" and the album *Prism.*

10.2) Based on documents that UMG provided and the Deposition of Edward Drellishak, I believe that UMG might attempt to deduct from sales and licensing

38

EXHIBIT 13
PAGE 315

revenues cost all components related to paid royalties, manufacturing costs, distribution costs, marketing costs, and overhead.

10.3) Defendant costs generally are deductible only if they can be directly related to the actual release of the product. Claimed deductions cannot represent some apportionment of a common or historic cost that would have been incurred regardless.

10.4) Publisher royalties for rights in musical compositions can be a legitimate deduction from label revenues that arose from sales and licensing of recorded material bearing the infringing work. Amounts that Capitol Records claims to have paid to copyright owners should correspond to amounts received by writers, publishers, and administrators.

10.5) As the recording artist, Katy Perry also earned from Capitol Records a royalty as a recording artist after the label recovered amounts for production and marketing. From her net royalties, Ms. Perry also directed payments to featured artist Juicy J and co-producers Dr. Luke, Max Martin, and Cirkut. All royalty deductions should correspond with payments received by another beneficiary.

10.6) I believe that Defendant UMG might attempt to deduct from sales revenues received through Capitol Records the manufacturing costs and artwork design for all physical units sold. However, manufacturing costs are not properly deductible if they simply reflect rate card payment to any other internal entity owned by UMG

EXHIBIT 13
PAGE 316

itself, such as Universal Music Logistics.   Rather, reported payments to Universal Music Logistics here would simply be transfers within the UMG entity and do not reflect any truly incurred manufacturing expense paid to an outside entity.   There then could be a variance between the standard rate and the actual cost of operation. (Drellishak Dep. 91:14-17).

10.7)   I believe that UMG might also attempt to deduct fees related to amounts paid for *distribution* of its recordings.   However, Capitol Records pays distribution fees to an internal entity, Universal Music Group Distribution, based on a fixed percentage of product revenues that does not reflect any truly incurred expense outside of the Defendant corporation UMG. As explained above, transfer payments within the UMG organization are not properly deductible.   This may also implicate handling, returns processing, refurbishment, and ancillary fees (Drellishak Dep. 70:11-72:18).

10.8) As explained above, record labels market new releases by a recording artist through concert promotion, video production, and radio release.   Radio costs would include amounts spent for promotion of the single through time buys, promotional appearances, advertising, singles & shipping, and payments to independent promoters.   If Capitol Records can prove amounts related to infringing material, costs are deductible. The label may not deduct marketing costs that it later recouped previously from Ms. Perry's artist royalties.

40

EXHIBIT 13
PAGE 317

10.9)  I also believe that UMG might attempt to deduct amounts related to an apportionment of *company overhead and related costs* among units sold, including the infringing recordings. Overhead costs would include the salaries of marketing employees, among other things (*Id.* 115:3-5). The amounts are generally based upon some formulaic assignment of common and/or historic costs, but without any causal relation to the infringing event. Assigned overhead expenses for the album are portioned from total overhead for the first eighteen months of the album (called the *frontline*, *Id.* 121; 19-24; 125:16-23). There is then no necessary relation between apportioned costs and the infringing activity.

10.10)  I am advised that the Defendants then bear the responsibility to identify all deductible costs and to apportion the worth of "Dark Horse" from every sale or licensing transaction on which the song appears, and must then present a credible means of performing both assignments.   I reserve the right to contest any suggested procedure.

## 11.   CONCERT REVENUES

11.1)   Depending on the court's final ruling on the recoverability of concert revenues, I would expect to add to Katy Perry's recoverable revenues a share of her earnings from concerts in the U.S. where "Dark Horse" was performed.  No such information has been provided.

41

EXHIBIT 13
PAGE 318

11.2) Within the appropriate recovery period, the court should compel Ms. Perry to disclose all U.S. concerts where DARK HORSE was performed, the composite play list of each concert, and her payments for each event.

## 12. CONCLUSION

The above conclusions constitute my personal independent assessment. These conclusions will form the basis of my testimony should I be called at trial.

Amounts are subject to change as more information becomes available.

_____

Michael A. Einhorn, Ph.D.

May 24, 2019

42

EXHIBIT 13
PAGE 319

# Appendix A

Professional Resume of Michael A. Einhorn

43

EXHIBIT 13
PAGE 320

## Michael A. Einhorn, Ph.D.     973-618-1212

**MEDIA, TECHNOLOGY, COPYRIGHT**



### MICHAEL A. EINHORN

**mae@mediatechcopy.com**

**http://www.mediatechcopy.com**

**Michael A. Einhorn** is an economic consultant and expert witness in the areas of intellectual property, media, entertainment, technology, trademarks, publicity rights, and product design. He received a B.A. from Dartmouth College, a Ph. D. in economics from Yale University, and is the author of **Media, Technology, and Copyright: Integrating Law and Economics** (Edward Elgar Publishers, 2004). He is also a former professor of economics at Rutgers University and adjunct professor at the Silberman School of Business (Fairleigh Dickinson University), a Senior Research Fellow at the Columbia Institute for Tele-Information, and the author of seventy professional and academic articles related to intellectual property and economic analysis.

Dr. Einhorn has provided valuation services in the following areas as a consultant or expert witness:

**Trademarks, Trade Secrets, and False Advertising:** *Trademarks* (Samsung Electronics, Dish Network, Madonna/Material Girl, Jakks Pacific, Kische USA, Oprah Winfrey/Harpo Productions, Avon Cosmetics, *The New York Observer,* the Kardashians/BOLDFACE Licensing + Branding, Wazu Holdings), *trade secrets* (The Weather Channel, Hasbro), and *advertising* (J. Walter Thompson/Banco Popular, Kia Motors, Coca Cola, General Automobile Insurance Company).

**Music:** *Recording artists* (Led Zeppelin, U2, Madonna, 50 Cent, Usher, Rascal Flatts, LMFAO, Aimee Mann, Nappy Roots, Justin Moore, Xzibit, Nelly Furtado, George Clinton, Notorious B.I.G., D.L. Byron), *record labels* (Sony Music Holdings, Universal Music Group, Disney Music, Atlantic Records, Rhino Entertainment)*, producers* (P. Diddy, Timbaland), *publishers* (Major Bob Publishing, Universal Music Publishing, Bridgeport Music, Hamstein Music, Chrysalis Music, Kobalt Music), *performing rights organizations* (SESAC), *radio stations* (WPNT in Pittsburgh), *live venues* (World Wrestling Entertainment), and *estates* (Bill Graham Archives, Tasha Tudor, Bernard Lewis).

EXHIBIT 13
PAGE 321

[Video](): *Movies* (Paramount/DreamWorks, Bold Films), *cable programs* (NBCUniversal), *musicals* (Zorro Productions) *product placement* (Paxson Productions), *treatments* (Burnett Productions), *soundtrack* (Warner Bros. Entertainment), *TV programs* Televicentro of Puerto Rico), *satellite programming* (Golden Channels Company of Israel), DVD *videos* (Steve Harvey), commercials (Gray Television Group), and *cable operations* (AT&T).

**Design, Apparel, and Art:** *Apparel* (Target Stores, Carol Anderson, .Forever 21, Crew Knitwear, Joyce Leslie, Anthropologie), *architecture* (Sprint PCS, Home Design LLC, Murray Engineering, Turnkey Associates), *medical illustrations* (Pearson Education Services), *photography* (Harris Publications, Neil Zlozower, Dana Ruth Lixenberg), *sculpture* (Marco Domo), *cartoons* (A.V. Phibes, Melissa Flock), *toys* (Jakks Pacific), and *commercial marketing* (Kaufman Global).

**Publicity Rights and Estate Valuations:** *Names and likenesses* (Reese Witherspoon, Steve Harvey, Woody Allen, Rosa Parks, Arnold Schwarzenegger, Sandra Bullock, Cameron Diaz, Diane Keaton, Zooey Deschanel, Yogi Berra), *estate valuations* (Tasha Tudor, Marlon Brando, Bernard Lewis).

**Cyberspace:** *Music services* (Apple iTunes, Napster, MP3.com), *proprietary software* (Centrifugal Force, Frogsware), *open source software* (Jacobsen v. Katzer), *electronic publishing* (Pearson), *video games* (Activision), search *engines* (eUniverse), and *domain names* (eCommerce).

**Patents and Technology:** *Semiconductors* (General Electric v. Kodak, Great Lakes v. Sakar, *cellular* (Cellebrite v. Micro Systemation), *software* (Jacobsen v. Katzer, Centrifugal Force v. Softnet), *medical technology* (Lemper v. Legacy, Graston v. Graham), *clutch components* (Nouis Technologies v. Polaris Industries*), pet topicals (*Nite Glow Industries Inc. v. Central Garden & Pet Company*) and *general patents* (DeCordova v. MCG).

**Antitrust and Commercial Losses**: *Antitrust, breach of contract,* and *commercial injury* in actions (Los Angeles Rams, AT&T, American Home Realty Network, California Scents, Safmor, Inc., Golden Channels Company of Israel, St. Joseph's Regional Hospital (College Station, Texas)).

2

EXHIBIT 13
PAGE 322

## REPRESENTATIVE CLIENTS

New York State Attorney General; New York

Fish & Richardson; Boston

Arnold & Porter; Washington

Baker & Hostetler; Cleveland

Palmer & Dodge; Boston

Hunton & Williams; Washington

Blecher & Collins; Los Angeles

Stokes Bartholomew Evans & Petree; Nashville

King & Ballow; Nashville

Frankfurt Kurnit Klein & Selz; New York

Lavely & Singer; Los Angeles

Davis and Gilbert; New York

Cowan DeBaets Abrahams & Sheppard; New York

Taft Stettinius & Hollister; Indianapolis

Sheppard Mullin Hampton & Richter; Los Angeles

Seyfarth Shaw; Los Angeles

Connolly Bove Lodge & Hutz; Wilmington

Blackwell Sanders Peper Martin; St. Louis

Lipsitz Green Faringer Roll Salisbury & Cambria; Buffalo

3

EXHIBIT 13
PAGE 323

PROFESSSIONAL ENGAGEMENTS

**Media and Entertainment**

*Gray et al. v. Katy Perry et al.   Central District of California,* 2019, report,  valuation of damages resulting from copyright infringement in **Katy Perry's song** *Dark Horse.*

*Dan Marino v. Dante Barton and Will Guice,* Pennsylvania Court of Common Pleas, 2018, report and testimony, valuation of damages resulting from breach of contract among three songwriters claiming rights in **Usher's song** *Bad Girl.*

*Robert W. Cabell v. Zorro Productions, Inc., et al.,* Northern District of California, report, estimated commercial damages resulting from infringement of copyright in a **musical adaptation.**

*Gray Television Group, Inc. v. Found Footage Festival, LLC, et al.,* Eastern District of New York, report, estimated commercial damages resulting **from infringement of television programming**

*Richard Dutcher v. Bold Films LLP,* et al., Central District of Utah, 2017, report, estimated commercial damages resulting from copyright infringement of leading screenwriter in the movie *Nightcrawlers.*

*RCN Capital, LLC, et al. v. The Los Angeles Rams, LLC, et al.,* Eastern District of Missouri, 2017, report and deposition, breach of contract regarding use of rights to **sell tickets in secondary markets**.

*Michael Skidmore v. Led Zeppelin, et al.,* Central District of California, 2016, trial testimony, copyright infringement matter against rock group Led Zeppelin regarding **classic song** *Stairway to Heaven.*

*Joseph Cooper v. Broderick Steven "Steve" Harvey,* Northern District of Texas, 2016, report and deposition, breach of contract matter regarding recorded films **of comedian/actor Steve Harvey.**

*Sidney Earl Swanson v. MJJ Productions,* Central District of California, 2015, report, copyright infringement matter regarding a musical composition used in a **sound recording** *Chicago* **by Michael Jackson.**

*Original Appalachian Artworks, Inc. v. Jakks Pacific, Inc.,* International Institute for Conflict Prevention and Resolution,  2015, report and deposition,  matter involving lost sales related to breach of contract for **copyright owners of Cabbage Patch Kids.**

*Alexander Graham-Sult and David Graham v. Bill Graham Archives, LLC, et al.,* Northern District of California, 2015, report and deposition, valuation of copyrights and business concern resulting from fiduciary breach of the estate of **rock concert producer Bill Graham**.

*William L. Roberts (p/k/a Rick Ross), et al. v. Stefan Kendal Gordy,* Southern District of Florida, 2015, report, valuation of defendant enrichment resulting from infringement of a musical composition in a **multi-platinum release  (***Party Rock Anthem***) and a Kia automobile commercial.**

EXHIBIT 13
PAGE 324

*Cartagena Enterprises, Inc. v. J. Walter Thompson Co*., et al., American Arbitration Association, 2015, report, valuation of damages resulting from infringement of prominent salsa composition in an advertising message **by the leading advertising agency and the largest bank in Puerto Rico.**

*Digital Satellite Connection v. Dish Network Corporation*, et al., District of Colorado, 2014, report and deposition, valuation of damages resulting from **trademark infringement by national satellite provider.**

*Ron Satija and Heather Lynette Mowder v. General Automobile Insurance Company*, District Court of Northern Ohio, 2014, report, valuation of damages resulting from infringement of **cartoon character *The General* in national advertising campaign.**

*Daniel Moser v. Raymond Ayala (p/k/a Daddy Yankee), et al.,* District Court of Puerto Rico, 2014, report, valuation of damages resulting from infringing reproduction and performance rights in **Daddy Yankee's multi-platinum song *Rompe.***

*Dan Marino v. Usher Raymond, et al.,* Eastern District of Pennsylvania, 2013, report, valuation of damages resulting from infringing reproduction and performance rights in **Usher's song *Bad Girl.***

*Preston Asevedo v. NBCUniversal Media, et al*.,  Eastern District of Louisiana,  2013, report, estimated damages for commercial artwork used on a **Syfy cable television program *Dream Machines.***

*Ryan Lessem and Douglas Johnson v. Universal Music Group,* Southern District of New York, 2013, report and deposition, valuation of damages involving copyright infringement in **50 Cent's song *How We Do*,** recorded by  The Game.

*Montana Connection, et al. v. Justin Moore,* Middle District of Tennessee, 2013, report, estimated damages for infringement in **country hit song *Backwoods*** on Justin Moore's record album and concert performances.

*VMG Salsoul v. Madonna Louise Ciccone, et al*.,  Central District of California, 2013, report, valuation of damages resulting from copyright infringement in **Madonna's song *Vogue.***

EXHIBIT 13
PAGE 325

*Interstar Holdings v. Truman Press*, Superior Court of California, 2011, report, matter involving valuation of commercial losses resulting from breach of contract involving **DVD movie *Dawn of the Living Dead*.**

*Lutfu Murat Uckardesler, et al. v. Azteca International Corporation*, et al., Central District of California, 2010, consultant, estimated damages resulting from infringement of treatment on internationally popular **reality television show.**

*Kernel Records Oy v. Timbaland, et al.,* Southern District of Florida, 2010, report, estimated damages resulting from copyright infringement of sound recording on multi-platinum **Nelly Furtado song "Do It."**

*Anthony Lawrence Dash v. World Wrestling Entertainment, Inc.,* District of South Carolina, 2011, report, valuation of damages involving use of a **copyrighted song** in a **highly promoted WrestleMania event.**

*Rafael Vergara Hermosilla v. The Coca Cola Company*, Southern District of Florida, 2010, report and deposition, valuation of defendant profits resulting from infringement of song in **international advertising campaign for the World Cup**.

*Chris Lester v. U2, Apple Computer, and Universal Music Group*, Central District of California, 2009, report and deposition, estimated damages from copyright infringement involving U2's **song *Vertigo*** used in concerts and recordings.

*Serendip LLC, et al. v. Warner Bros. Entertainment, Inc.*, Central District of California, 2009, report and deposition, estimated damages in copyright infringement on released DVD containing the **soundtrack to *A Clockwork Orange*.**

*D.L. Byron v. Rascal Flatts and Disney Corp.*, Southern District of New York, 2009, report, estimated copyright damages for settlement involving infringement of classic **Pat Benatar composition "Shadows of the Night" by Rascal Flatts.**

*Evilkid Productions v. DreamWorks LLC & Paramount Pictures*, Southern District of New York, 2009, report, estimated damages and assisted settlement involving the unauthorized use of commercial art in **the hit movie *Transformers*.**

*Victor Lopez v. Daddy Yankee and Universal Music,* Central District of California, 2009, consultant on damages for album track used on **multi-platinum release *Barrio Fino*.**

6

EXHIBIT 13
PAGE 326

*Charles Watt v.  Dennis Butler, et al.,* Northern District of Georgia, 2009, report, estimated copyright damages involving **platinum release by rap group D4L**.

*The Jackson Sisters v. Universal Music Group*, Superior Court of the State of California, 2008, consultant, assisted classic recording act for recovery of damages for unfair trade practices in **use of legacy materials in sound recording.**

*MCS Music America, Inc., et al. v. Napster, Inc., et al.,* Central District of California, 2008, consultant to music publishers in copyright infringement matter involving limited downloads and subscription streaming by the **digital music service Napster.**

*Henry Carter v. Independent Productions, Inc.*, et al., Superior Court of Delaware, 2008, consultant, royalty dispute among members of **rock band George Thorogood and the Destroyers.**

*Bridgeport Music, Inc.* v. *Smelzgood Entertainment, et al.,* Middle District of Tennessee,   2007, report and trial testimony, estimated damages for unauthorized use of **George Clinton's classic composition** *Atomic Dog* on later infringing record album.

*TMTV Corp. v. Mass Productions***, Inc.,** District of Puerto Rico, 2006, report and trial testimony, estimated damages resulting from copyright infringement of **television program** by  producer and comedian Sunshine Logrono.

*Velocity Entertainment Group v. NBC Universal and Donald Trump*, 2006, Los Angeles Superior Court, Los Angeles, California, consultant, valuation of treatment used in popular **reality television show,** *The Apprentice*.

*Bridgeport Music, et al. v. Crited Music.,* Middle District of Tennessee, 2006, report, estimated damages for copyright infringement of **musical composition** *You'll Like it Too*.

*Thomas Turino, et al. v. Universal Music, et al.,* Central District of California, 2006, report and deposition, estimated damages resulting from copyright infringement in **Christina Milian's sound recording** *Dip It Low.*

7

EXHIBIT 13
PAGE 327

*Bridgeport Music, et al. v. Universal Music, et al.,* Middle District of Tennessee, 2006, report and trial testimony, estimated damages for unauthorized use of three compositions and sound recordings on **Notorious B.I.G. album produced by P. Diddy.**

*TMTV Corp.* v. *Televicentro de Puerto Rico, Inc.,* District Court of Puerto Rico, 2005, report, estimated damages resulting from infringement of **television program.**

*The Royalty Network, Inc., et al. v. Activision, et al.,* Central District of California, 2005, report, estimated damages for use of music on best-selling **video game *Streets of Los Angeles.***

*Al Howard Productions, Inc. v. Paxson Productions,* Central District of California, 2005, report, estimated commercial damages for breach of contract involving product placements on **prominent game show, *Supermarket Sweeps.***

*Mojo Music, et al., v. Walt Disney Records*, Los Angeles Superior Court, 2004, report, valued synchronization rights in **musical compositions used in *Lion King 2.***

*Willie Woods v. BMG Music/Atlantic Recording Company, et al.,* Eastern District of Missouri, 2004, report, valued damages for unauthorized use of musical compositions in a **Nappy Roots' multi-platinum song "Po Folks".**

*Darryl D. Lassiter, et al., v. Twentieth Century Fox Film Corp*., Central District of California, 2004, consultant, regarding damages due for use of unauthorized **screenplay in the movie *Drumline*.**

*Sharon Haygood, et al. v. Coca-Cola, et al.*, 17th District Court of Tarrant County, Texas, 2004, report and deposition, calculated professional losses for gospel artist who suffered **personal injury in automobile accident.**

*Universal Music Publishing Group v. Fitness Quest, Inc.,* Northern District of Ohio, 2003, report and deposition, estimated damages from copyright infringement of **music soundtrack in an exercise video tape.**

*Brought to Life v. MCA Records, Inc., et al.,* Southern District of New York, 2002, consultant, valued copyright damages in **Mary J. Blige song "Family Affair".**

8

EXHIBIT 13
PAGE 328

*Michael A. Lowe v. Loud Records,* Eastern District of Pennsylvania, 2002, report, valued damages for copyright infringement in **musical track "X" produced by Dr. Dre**.

*Aimee Mann v. UMG Recordings, Inc., et al.,* Central District of California, 2002, consultant, estimated sales displacement and loss of income resulting from the **unauthorized release of compilation album.**

*Jacques Loussier v. UMG Recordings, Inc., et al.*, Southern District of New York, 2002, consultant, surveyed data regarding copyright infringement of improvisational composer **by Eminem in song "Kill You".**

*Hamstein Music Group, et al. v. MP3.com, Inc., et al.,* Central District of California, 2002, consultant, estimated damages for multiple infringements involving **musical compositions**.

*Chrysalis Music v. MP3.com, Inc., et al.*, Central District of California, 2002, consultant, estimated damages for multiple infringements of **musical compositions.**

*Major Bob Music, Inc., et al. v. MP3.com, Inc.,* Southern District of New York, 2001, report, estimated damages for unauthorized use of **Garth Brooks' musical catalog** by digital library service.

**Trademarks, Trade Secrets, and False Advertising**

*GoDigital Media Group, LLC v. GoDigital Inc.,* Central District of California, report, 2018, liability and damage valuation from infringement **of trademark owned by digital media company**

*Helpful Hound, LLC, v. New Orleans Bldg. Corp., et al.,* Eastern District of Louisiana, 2019, report, damages related to use of an **infringing trademark used in a food market based in New Orleans.**

*Computer Programs and Systems, Inc. et al. v. Wazu Holdings, Inc., et al*., Southern District of Alabama, 2018, report and deposition. damages related to use of an **infringing mark in a software application in medical technology.**

9

EXHIBIT 13
PAGE 329

*The Choice is Yours v. The City of Philadelphia, et al,* Eastern District of Pennsylvania, 2018, report, damages related to trademark infringement of **worker training program**

*Kische USA, LLC v. Ali Simsek and Jane Doe Simsek, et al*., Western District of Washington, 2017, report. damages related to **trademark infringement and unfair competition** from a competing distributor of imported apparel.

*VBS Distribution, Inc. et al. v. Nutrivita Laboratories, Inc., et al.,* Central District of California, report, 2017, **damages related to false advertising and unjust enrichment involving dietary supplements.**

*Mladen Pintur, et al. v. Helen Rogic, et al*., Southern District of New York, report, 2017, **damages related to trademark infringement of business name**

*Baskim Holdings, Inc.  v. Two M, Inc. d/b/a Babe's Cabaret, et al*., District of Nevada, report and deposition, 2017, damages **related to misuse of trademarked name.**

*Healthmate International, Inc., v. Timothy W.T. French*, *et al*., Western District of Missouri, report, 2016, **damages related to false advertising and unfair competition.**

*Elinor Shapiro v. Hasbro, Inc.,* Central District of California, 2016, report and deposition,  **infringement of trade secrets by toy manufacturer Hasbro.**

*Milk Studios v. Samsung Electronics Co., Ltd., et al*., Southern District of New York, 2016, report, **defense of Samsung Electronics in a trademark damage valuation.**

*JMC Restaurant Holdings, Inc., et al.  v. Marcelo Pevida, Inc., et al.,* Eastern District of New York, 2016, report and deposition, defense of **trademark user in international restaurant market.**

*House of Auth, LLC v. 721 Bourbon, Inc.*, District of Connecticut, 2016, report, regarding **damages from trademark infringement of beverage**

*Events Media, Inc.  v. The Weather Channel, Inc.*, District Court of New Jersey, 2015, report and deposition, trade **secret infringement by major cable network *The Weather Channel.***

10

EXHIBIT 13
PAGE 330

*KLM & M, LLC, et al. v.  VCP2 Augusta, P.C., et al.,* Southern District of Georgia, 2015, report, valuation of damages related to **trademark infringement by a medical practice.**

*Simone Kelly-Brown v. Oprah Winfrey and Harpo Productions,*  Southern District of New York, 2014, report and deposition, valuation of damages resulting from a **trademark infringement  by Oprah Winfrey and Harpo Productions.**

*Who Dat?, Inc. v.  Who Dat Shoppe, et al.,* Eastern District of Louisiana, 2014,  report, valuation of damages resulting from infringement of  **trademark of major regional brand of apparel.**

*Vivid Entertainment, LLC v. Jose Baserva,* Middle District of Florida, 2014,  report, valuation of damages resulting from infringement of **business name in entertainment chain**

*Benchmark Young Adult School v. Launchworks Life Services LLC*, Southern District of California, 2014, report, valuation of damages resulting from infringement of **plaintiff's  business  name  by  competing  health  care  provider**.

*Kim, Khloe, and Kourtney Kardashian, and BOLDFACE Licensing + Branding v.  By Lee Tillett, Inc.,* Central District of California, 2013, report, valuation of damages resulting from trademark infringement in **cosmetics line KROMA by the Kardashian sisters.**

*Original Gourmet Food Company, Inc. v. Jelly Belly Candy Company*, District of New Hampshire, 2013, report and deposition, regarding declaratory judgment to enforce trademark rights for **candy manufacturer.**

*East West LLC v. Caribbean Crescent,  Inc.,* Northern District of Virginia, 2012, report and deposition, valuation of damages involving use of a trademark and trade name by a competitor in the **food provision business.**

*Rock and Roll Religion v. Cels Enterprises,* Central District of California, 2012, report, valuation of damages resulting from infringement of trademark in **women's apparel.**

*PML Clubs v. Gold Suit, Inc., Northern District of Texas, 2012, report and deposition, valuation of damages* resulting from trademark infringement in the market for **adult cabaret establishments.**

11

EXHIBIT 13
PAGE 331

*Super-Krete International v. Lafarge Group,* 2013, opinion letter, regarding trademark valuation of a **cement product** for a settlement conference between two parties.

*Kilter, Inc. v. Avon Corporation,* Southern District of New York, 2011, report and deposition, damage valuation of trademark infringement and misappropriation of intellectual property by **major cosmetics company.**

*L.A. Triumph, Inc. v. Madonna Louise Veronica Ciccone and Material Girl,* Central District of California, 2011, report, valuation of damages from a trademark infringement in **clothing line (Material Girl) owned by Madonna**.

*Miller International, Inc. v. Clinch Gear, Inc., et al.,* District of Colorado, 2010, report, valuation of damages from a trademark infringement by a designer of **martial arts apparel.**

*Golf Cart World, Inc.  v. Mike's Golf Carts, Inc.*, Middle District of Georgia, 2010, report, estimated damages resulting from a trademark infringement in **golf carts and hunting carts.**

*Doctor's Associates, Inc. v. QIP Holder, LLC  and IFilm, Corp.,* District Court of Connecticut,  2008, consultant,  reviewed expert materials in false advertising matter **involving *Subway* and *Quizno's.***

## Publicity Rights

*Alana Campos, et al. v. Metropolitan Bush Company*, Sup. Ct. of the State of Ariz., 2019, report, valuation of damages resulting from use **of name and images of ten glamour models** by adult nightclub in Arizona..

*Timed Out v. Red Tie Gentlemen' Club,*. No. Dist. of California, 2019, consultant, valuation of damages resulting from use **of name and images of glamour models** by adult nightclub in California.

*Hilary Hepner, et al. v. Déjà vu Services, Inc. et al*., Eastern District of Michigan, 2018, report,  valuation of damages resulting from use **of images of eleven glamour models** by adult nightclubs in Michigan.

12

EXHIBIT 13
PAGE 332

*Irina Voronina,  et al. v. Scores Holding Company, et al*,  Southern District of New York, 2018, report,  valuation of damages resulting from use of **images of fifty-one glamour models** by a chain  of adult  clubs in New York City.

*Jamie Edmondson  et al. v.  Caliente Resorts,  LLC, et al*.  Middle District of Florida, 2016, report and deposition, valuation of damages resulting from use of **images of glamour models** by adult resort in  Florida.

*Reese Witherspoon v. Marketing Advantages International*, Superior  Court of California, 2015, report, valuation of damages involving use of **name and image of  actress Reese Witherspoon** in connection with online retailer.

*Jason Lezak v. Active Network,* Superior  Court of California,  2015, report, valuation of damages involving use of **image of Olympic swimmer Jason Lezak** in connection with online software application

*Sandra Bullock v. ToyWatch USA,* Superior Court of California, 2013, opinion letter, valuation of damages involving use of **image of actress Sandra Bullock** in a commercial website for apparel accessory.

*Zooey Deschanel v. Steve Madden, et al.,* Superior Court of California, 2011, report and deposition, valuation of publicity rights of **actress Zooey Deschanel** used in line of women's shoes.

*Michelle Pfeiffer, et al. v. CompUSA,* Superior Court of California, 2011, report, valuation of **publicity rights of Sandra Bullock, Michelle Pfeiffer, Diane Keaton, Mandy Moore, Cameron Diaz, and Kate Hudson** in retail advertisements .

*Woody Allen v. American Apparel, Inc.*, Southern District of New York, 2009, consultant in valuation of reasonable damages in publicity rights of **movie director Woody Allen** used on urban billboards .

*Evgeni Petrosyan v. DIRECTV, Inc.,* Eastern District of New York. 2009, consultant regarding damages for infringement of publicity rights of **comedian Evgeni Petrossian** by satellite network.

13

EXHIBIT 13
PAGE 333

*Arnold Schwarzenegger and Oak Productions, Inc. v. Recycled Paper Greetings, Inc., et al.,* Superior Court of California, 2005, report, estimated damages in publicity rights case involving greeting card merchandise bearing **image likeness of Arnold Schwarzenegger.**

*Lawrence "Yogi" Berra v. Turner Broadcasting System*, Superior Court of New York, 2005, consultant, valued publicity rights case involving the unauthorized use of **personal name Yogi Berra** in citywide advertising campaign.

*Rosa Parks v. BMG Music/Laface Records, et al.,* Eastern District of Michigan, 2004, deposition, valued publicity rights involving use of **celebrity name Rosa Parks** in a BMG album bearing the name and track *Rosa Parks.*

*Melina Kanakaredes v. Ouidad, Inc.*, Eastern District of Ohio, consultant, 2004; publicity rights case involving damages resulting from magazine articles bearing **actress name Melina Kanakaredes. Apparel, Design, Art, and Photography**

*Neil Zlozower and Barry Levine v. Motley Crue, Inc.,* Southern District of New York, 2017, report and deposition, infringement of **copyrighted photographs of famous music group** by touring company and merchandise sellers.

*Dana Ruth Lixenberg v. Bioworld Merchandising, Inc., et al.,* Central District of California, 2017, infringement of photos of Tupac Shakur and Notorious B.I.G. used on **apparel sold in major retail chain**.

*PK Studios, Inc. v. RLR Investments, LLC, et al.,* Middle District of Florida, 2016, report, matter involving **infringement of architectural plans** in residential development.

*Idra Alta Mode, LLC v. D'Lymer, Inc. d/b/a Edwards Lowell, Central* District of California, 2016, report, matter involving **breach of contract in furrier operations.**

*Hansel Oy v. US Department of Health and Human Services, et al.,* 2016, opinion letter, report, valuation of **copyright damages in use of designs** created by a Finnish technology company.

14

EXHIBIT 13
PAGE 334

*Glen Craig v. Universal Music Group  et al.*  Southern District of New York, 2016, report**,** infringement of **copyrighted photographs of legendary artist B.B. King** by parties related to his estate.

*Radix Textile, Inc. v. Anthropologie, Inc., et al*., Central District of California,  2015, report, valuation of damages resulting from **copyright infringement of apparel design** by major clothing chain.

*Klauber Brothers, Inc. v. Forever 21 Retail, Inc., et al*., Central District of California, 2015,  report, valuation of damages resulting from **infringement of copyrighted apparel design** by a major apparel chain.

*Star Fabrics, Inc. v.  Joyce Leslie, Inc.,* Central District of California, 2014,   report, valuation of damages resulting from **infringement of  copyrighted apparel design**  by major retail chain.

*Ron Satija and Heather Lynette Mowder v. General Automobile Insurance Company*, District Court of Northern Ohio, 2014, report, valuation of damages resulting from infringement of **cartoon character *The General* in national advertising campaign.**

*NTD Architects v. Baker Nowicki Design Studio,* Southern District of California, 2013, report and deposition, estimated damages resulting from copyright infringement involving **architectural plans**.

*Sheila Lyons, DVM  v. Robert Gillette, et al.,* District of Massachusetts, 2013,  report, valuation of  damages resulting from copyright infringement of **professional training materials**.

*Turnkey Associates v. Steph Weiand*, et al., District of Iowa, 2012, report, estimated damages resulting from copyright infringement of **architectural plans** by severed employee in new professional concern.

*Murray Engineering v. Windermere Properties, et al*., Southern District of New York, 2012, report, estimated damages resulting from copyright infringement of **architectural plans** in New York residential building.

15

EXHIBIT 13
PAGE 335

*Home Design, LLC v. Collard Properties*, District of Colorado, 2012, report, valuation of damages and defendant profits in connection with copyright infringement of **architectural plans** in new residential development.

*U.S. Textile Printing v. Crew Knitwear, et al.,* Central District of California, 2010, report and deposition, estimated damages resulting from copyright infringement of **textile design** by retail chain**.**

*Melk Communications v. Pennsylvania Medical Society, et al.*, Eastern District of Pennsylvania, 2010, report, estimated damages resulting from fraud, misappropriation, and copyright infringement of **commercial marketing materials.**

*Timpco v. Implementation Services*, Southern District of Indiana, 2009, report, valuation of damages resulting from copyright infringement of **commercial marketing materials.**

*Malibu Textiles v. CABI, Inc.*, Southern District of New York, 2008, report and deposition, estimated damages for copyright infringement of **eight apparel designs.**

*Melissa Flock v. State of Florida, Division of Emergency Management*, Northern District of Florida, 2007, report, estimated damages for copyright infringement of **cartoon characters** by the State of Florida.

*Neil Zlozower v. Harris Publications, Inc.,* Southern District of New York, 2006, report and deposition, valuation of lost **photographic slides owned by famous photographer** of rock group *Metallica.*

*Vera Bradley, Inc. v. Target Stores, Inc.,* Northern District of Indiana, 2006, report, valuation of unauthorized **apparel design on swimwear** distributed by Target Stores.

*Command Cinema Corp.* v. *VCA Labs, Inc.,* Southern District of New York, 2006, report, estimated commercial damages resulting from the **destruction of master tapes** bearing releases of two adult movies.

*Impala Lechner v. Marco-Domo Internationales Interieur, et al.*, Southern District of New York, 2004, consultant, estimated damages for copyright infringement of **sculpture designs.**

16

EXHIBIT 13
PAGE 336

*Core Group P.C. v. Sprint PCS*,  American Arbitration Association, 2004, report and trial testimony, estimated damages for copyright infringement of **architectural plans** used in nationwide redesign of retail space operated by Sprint.

## Technology and Cyberspace

*Nite Glow Industries Inc., et al. v. Central Garden & Pet Company, et al.,* District of New Jersey, 2018, testimony at trial, estimation of damages related to **patent infringement for pet goods products.**

*Nouis Technologies v. Polaris Industries,* W. D. Wisc., 2015, report, matter involving **patent infringement for clutch components in all-terrain vehicles.**

*Brian Lemper, M.D. v. Legacy IP, LLC,*  Superior Court of Nevada, 2015, deposition, matter involving purported breach of contract in procuring **patent application for medical technology.**

*Cellebrite Mobile SyncRonization Ltd. v. Micro Systemation AB,* Northern District of Virginia, 2014, report, estimated damages for **copyright infringement of intelligence software** designed to remove records from suspect cell phones.

*Scott E. D. Skyrm v. Newedge USA, LLC,* FINRA Dispute Resolution  #12-02346, 2014, testimony, , valuation of damages  resulting from **copyright infringement of data format in online financial newsletter.**

*Munhwa Broadcasting Corporation v. Media Journal, Inc., et al.,*  Central District of California, 2014,  declaration in support of plaintiff in **anti-circumvention liability**.

*Virtual Studios v. Beaulieu Group, LLC,*  Eastern District of Tennessee,  2013,  report, valuation of damages involving **copyright infringement of design software** for virtual display of interior designs.

*TVB Holdings (USA), Inc. v. Tai Lake Communication, Inc.,* Central District of California, 2013, report, regarding economic harm created by **circumvention device** that breached access and copyright protection on Asian programming.

17

EXHIBIT 13
PAGE 337

*James DeCordova v. MCG Nevada, Inc.*, Central District of California, 2012, report, valuation of damages resulting from **patent infringement for a sleep-enhancing device.**

*BanxCorp. v. Costco Wholesale Corporation, Inc.,  et al.,* Southern District of New York, 2012, report, valuation of damages resulting from infringing use of **compilation data** in an **online banking service.**

*Robert Jacobsen v. Matthew Katzer*, Northern District of California, 2009, report, estimated damages in landmark copyright case involving **copyright infringement of open source software** created by world-renowned Berkeley professor.

*Centrifugal Force, Inc. v. Softnet*, et al., Southern District of New York, 2009, report, valuation of damages resulting from copyright infringement of **operations  software.**

*Frogsware,  Ltd. v. Viva Media, et al.,* Southern District of New York, 2009, consultant, assisted video game designer for recovery of damages resulting from a breach of contract and copyright infringement of **video game software.**

*Carpal Therapy, Inc., and David Graston v. Jennifer Graham, Esq.,* Marian County Superior Court of Indiana, 2008, report and deposition, estimated commercial losses for inventor of **medical technology** for loss of rights to intellectual property.

*Great Lakes Intellectual Property, Ltd. v. Sakar International, Inc.,* Western District of Michigan, 2006, report, valuation of reasonable royalties for patent infringement in a **graphical user interface chip.**

*Frederic H. Martini v. Pearson Education Services,* Northern District of California, 2005, report, estimated damages for website infringements of prominent illustrator by leading **publisher of medical books.**

*Sandi Gray, et al. v. eUniverse, Inc., et al.,* Eastern District of Texas, consultant, 2004; valuation for copyright infringement by **digital provider of shared content.**

*General Electric v. Kodak,* 2002*,* consultant, assisted General Electric in valuation of **semiconductor portfolio in patent infringement matter.**

*RIAA v. MP3Board*, Southern District of New York, 2001, report and deposition, involving the **economic effects of search engines** that post links to infringing material.

18

EXHIBIT 13
PAGE 338

*Universal City Studios.Inc.,et al. v. Eric Corley*, Southern District of New York, 2000, report and trial testimony, regarding economic effects of decrypting protective code established to protect copyrighted digital works.


## Private Valuations of Intellectual Property

*Juarez Foods,* 2015, trademarks now controlled by Wise Foods, Atlanta.

*Tom Binns Design, LLC,* 2015, **trademarks and copyrights controlled by the international jewelry concern** Tom Binns Design, LLC.

*The Domain Names of eCommerce, IX Web Hosting, and Host Excellence.* 2012, **domain names and websites** owned by *online business.*

*The Estate of Tasha Tudor*, 2009, valued the worth of **publishing royalties due to the estate of renowned author and illustrator**.

*New York Observer.* 2008, **domain name of political blog**.

*Greens Today*, 2006, **trademarks for greens health product.**

*Bernard Lewis*, 2005, future **publishing royalties** due to Princeton professor and writer of twenty four books on politics and history.

*Estate of Marlon Brando.* 2005, consultant, valued worth of the Marlon Brando **name for estate purposes.**


## Commercial Losses, Wrongful Termination, and Personal Injury

*Jakks Pacific, Inc.      v. Wicked Cool Toys, LLC      and Jeremy Padawer*, Supreme Court of the State of New York, 2017,  report and deposition, valued commercial losses **resulting from breach of contract and tortious interference.**
 \

19

EXHIBIT 13
PAGE 339

*Pansy Harris-Lane, M.D. v. Jersey City Medical Center, et al.,* Superior Court of New Jersey, 2017, report,  valued **professional damages resulting from disputed termination of mediicaldoctor**

*Hasan Khushaim v. Tullow Inc.* Superior Court of the State of Delaware,  2017, report, valued actual damages resulting from breach of contract regarding software design.

*Anti-Aging Essentials v. Brian T. Must. et al..* Court of Common Pleas of Alleghenv Countv, 2016, report, valued commercial losses resulting from **manufacturing malfeasance.**

*DeMartino v. Belleville Board of Education,* Superior Court of New Jersey, 2014, consultant, assisted defense counsel for courtroom preparation against plaintiff expert in **wrongful termination case.**

*Deborah Rollins and Luke Randall v. Sunrise Village,* LLC, Superior Court of New Jersey, 2013, report, examined economic losses resulting from **property negligence**.

*Crystal Evans v. Meadowlands Hospital,* Superior Court of New Jersey, 2012, report and testimony, examined economic losses resulting from **medical malpractice.**

*Christine Delurski v. Chester Stone, M.D.,* Superior Court of New Jersey, Morris County Court, 2012, report, estimated economic losses resulting from **wrongful death.**

*Carl Lawson* v. *K2 Sports U.S.A., et al,* Superior Court of New Jersey, Monmouth County Court, 2012, report, estimated economic losses resulting from **personal injury.**

*Peter Piegdon v.  H&S Bakery,* Superior Court of New Jersey, Middlesex County Court, 2007, report and deposition, calculated economic losses from  **automobile accident.**

*Dash Artist Management and Dash Entertainment Management v. Ruben Gomez, et al.,* Southern District of Texas, 2004, report, calculated commercial losses for music manager arising from **breach of contract.**

*Florencia Flores, et al. v. Parkchester Preservation Company, et al.,* New York Superior Court, 2004 report, examined economic losses suffered by domestic worker from **on-the-job injury.**

20

EXHIBIT 13
PAGE 340

*Safmor, Inc. v. Ministers, Elders, & Deacons of the Reformed Protestant Dutch Church of City of New York,* New York Superior Court, 2005, report and deposition, calculated **commercial losses** for New York business foreclosed from use of its storefront sign.

*Sharon Haygood, et al. v. Coca-Cola, et al.*, 17th District Court of Tarrant County, Texas, 2004, report and deposition, calculated economic losses for gospel artist who suffered from **personal injury.**

## Antitrust

*American Home Realty Network v. Edina Realty,* District of Minnesota, 2014, report, examined antitrust liability involving **group boycott of an online realty referral service**

*Royal Benson, M.D. v. St. Joseph Regional Health Center*, Central District of Texas, 2006, report and deposition, examined antitrust liability for **vertical restraints in hospital admissions.**

*United Magazine Company, Inc. v. Murdoch Magazine Distribution, Inc., et al.*, Southern District of New York, 2004, report and deposition, examined antitrust damages **in price discrimination matter involving magazine distributors.**

*The Coalition for a Level Playing Field v. Autozone, Inc., et al.*, Eastern District of New York, 2003, report and trial testimony, examined antitrust damages **in price discrimination matter involving auto part retailers.**

*AT&T Corp. v. Winback and Conserve Program, Inc., et al.*, New Jersey District Court, 2003, consultant, calculated commercial losses suffered by third party telecom provider for **improper termination of AT&T wholesale service.**

*California Scents v. Medo Industries, Inc.,* Central District of California, 2002, report, examined antitrust liability in matter involving the **anticompetitive use of slotting allowances** in retail outlets.

*Prime Communications, Inc. v. AT&T Corp.*, Eastern District of Massachusetts, 2002, report and deposition, examined liability in antitrust lawsuit involving **vertical restraints in access to cable advertising.**

21

EXHIBIT 13
PAGE 341

*The Intimate Bookshop, Inc. v. Barnes and Noble, Inc., et al.*, Southern District of New York, 2001, report and deposition, examined economic issues in antitrust suit involving **price discrimination in book retailing.**

*SESAC v. WPNT*, Western District of Pennsylvania, 2001, report and deposition, antitrust case involving the economic consequences of **blanket licensing of musical compositions**.

*Nobody in Particular, Inc. v. Clear Channel, Inc.*,  District of Colorado, 2001, consultant,  antitrust case involving advertising restrictions enforced by a **radio station against a competing concert promoter.**

*State of Florida, et al. v. BMG Music, et al.*,  District of Maine*, 2001, consultant, antitrust case involving the **anti-competitive effects of minimum advertising pricing rules** established by five major record companies.

*Golden Channels Company, et al. v. Director General of the Antitrust Authority*, The Court of Trade Restrictions, Tel Aviv, Israel, 2000, report, case involving **vertical licensing restrictions on content of Sony, Warner, and Paramount.**


# PUBLISHED BOOKS


Media, Technology, and Copyright:Integrating Law and Economics, Edward Elgar, 2004


# ARTICLES AND CHAPTERS

*See also* http://mediatechcopy.com/?page_id=71

Reasonable Royalties in Patent Litigation:  Methods, Evidence, and Experts,  presented at Knowledge Group Webinar, March 22, 2017.

EXHIBIT 13
PAGE 342

First Sale Rights at SCOTUS: *Kirtsaeng v. John Wiley & Sons*, Journal of the Copyright Society, Spring, 2016.

Copyright, Causality, and the Courts, Journal of the Copyright Society, Winter, 2015.

The ASCAP and BMI Consent Decrees:  Is Partial Withdrawal Wise?,  Journal of the Copyright Society,  Fall, 2014

Copyright, Causality, and Statutory Reform, Landslide, January-February, 2013-2014.

Gorillas in our Midst: Searching for King Kong in the Music Jungle, Journal of the Copyright Society, Winter, 2007.

 Patent Reform and Infringement Damages:  Some Economic Reasoning,  IP Lawyer, December, 2007;  new version at  Patents and the Entire Market Value Rule.

Copyright Settlement Strategies from a  Damages Expert, GPSOLO, September, 2008.

Expediting the Settlement:  The Use of an Expert, Entertainment and Sports Lawyer, October, 2007.

 How Advertising and Peer to Peer are Transforming Media and Copyright,  Journal of the Copyright Society, Spring, 2007.

 Copyright at a Crossroads, Again!:  The Copyright Modernization Act, Entertainment,  Arts, and Sports Law  Journal,  December, 2006.

Swords Into Plowshares:  A Convergence of Interests in P2P, Entertainment and  Sports Lawyer,  Summer, 2006.

Publicity Rights, Merchandise, and Economic Reasoning, Entertainment and  Sports Lawyer, March, 2006.

Canadian Quandary:  Digital Rights Management,  Access Protection, and Free Markets, Progress on Point 3:12,  Progress and Freedom Foundation, May, 2006.

"File-Sharing at Madison and Vine: The New Convergence", Century City Lawyer, December, 2005.

23

EXHIBIT 13
PAGE 343

"File-Sharing and Market Harm", <u>Entertainment, Arts, and Sports Law Journal</u>, July, 2005.

<u>Transactions Costs and Administered Markets:  The Case of Music Performance Rights</u>, <u>Review of Economic Research in Copyright Issues</u>, 3 (1), 37, 2006.

<u>Grokster v. Sony: The Supreme Court's Real Decision</u>, <u>Entertainment and Sports Lawyer</u>, Summer, 2004.

"Peer-to-Peer Networking and Digital Rights Management: How Market Tools Can Solve Copyright Problems" (with Bill Rosenblatt), <u>Journal of the Copyright Society</u>, Winter, 2005.

<u>Music, Mantras, and Markets:  Facts and Myths in the Brave New World,</u> <u>Entertainment, Arts,  and  Sports Law Journal,</u> Winter, 2004.

"Music in the Crucible: A Year in Review", <u>Entertainment and Sports Lawyer</u>, Summer, 2004.

<u>Digitization and its Discontents: Digital Rights Management,  Access Protection, and Free Markets</u>, <u>Journal of the Copyright Society</u>,  Spring, 2004.

<u>Whose Song is it Anyway?: Infringement and Damages in Musical Compositions</u>, <u>Entertainment and Sports Lawyer</u>, Spring, 2004;  new version at  <u>Damage Valuation in Music Copyright</u>

<u>Vertical Merger in a High Tech Industry: Synopsis, Avant!, and the FTC</u>, 2 <u>Economics Committee Newsletter of the American Bar Association</u> 2, 2002.

<u>Tying, Patents, and Refusal to Deal:  Economics at the Summit</u>, 2 <u>Economics Committee Newsletter of the American Bar Association</u> 1, 2002.

<u>Intellectual Property and Antitrust: Music Performance Rights in Broadcasting</u>, <u>Columbia Journal for Law and the Arts</u>, 2002.

"Keep Off My Privacy:  How Sweet the Sound?", <u>Bright Ideas</u>,  2002.

<u>Purple Beasts and Lewd Tunes:  Economic Reasoning and Copyright</u>, <u>Entertainment, Arts, and Sports Law Journal</u>, 2002.

24

EXHIBIT 13
PAGE 344

"How to Cure Performance Anxiety", 13 Entertainment, Arts, and Sports Law Journal, 2 Summer, 2002.

"Traffic Jam on the Music Superhighway: Is it a Reproduction or a Performance?", Journal of the Copyright Society, 2002 (with Lewis Kurlantzick).

Miss Scarlett's License Done Gone: Parody, Satire, and Economic Reasoning, 20 Cardozo Arts and Entertainment Law Journal 4, 2002.

Copyright, Prevention, and Rational Governance: File-Sharing and Napster, Columbia Journal for Law and the Arts, 2002.

"Internet Television and Copyright Licensing", 20 Cardozo Arts and Entertainment Law Journal 2, 2002.

Old Friends: ASCAP and DOJ Reach a New Consent Decree, Entertainment and Sports Lawyer, 2002.

"Digital Rights Management and Access Protection" in Proceedings of the ALAI Congress: June 13-17, 2001, J. Ginsburg, ed., Columbia University, 2002.

Digitalization' and the Arts", Handbook of Cultural Economics, Ruth Towse, ed., Edward Elgar Publishing Ltd., 2002.

Internet TV and Copyright Licensing: Balancing Cents and Sensibility, Internet Television, ed. D. Gerbarg, E. Noam, J. Groebbel, Lawrence Erlbaum Publishers, Mahwah, NJ, 2002.

"Music Licensing in the Digital Age", Copyright in the Cultural Industries, Ruth Towse, ed., Edward Elgar Publishing Ltd., 2002.

Search and Destroy: How to Tame a Spider, IPL Newsletter 1, 2001.

"Biting the Hand that Feeds", Century City Lawyer, November, 2001, with Duncan Cameron.

"Interpreting Amended ASCAP Consent Decree: More Options to Avoid Blanket Royalties", Entertainment Law and Finance, October, 2001.

25

EXHIBIT 13
PAGE 345

## UNPUBLISHED ARTICLES

Reasonable Royalties in Patent Litigation:  Methods, Evidence, and Experts

Trademarks and Financial Remedies:  Standards in the Common Law

Trademark Valuation and Market Analysis

Pharmaceuticals and Compulsory Licensing

Trademarks, Injunctions, and *eBay v. MercExchange*

Publicity Rights and Rational Valuation

Art as Innovation:  "The Wind Done Gone" Case

Market Imperfection and  Failed Governance:  The Case of  Music  Performance Rights

Information Transfer in Cyberspace:  Popups,  Keying,  and  Privacy

Copyright Settlement Strategies from a Damages Expert

EXHIBIT 13
PAGE 346

## OTHER AFFILIATIONS

Columbia Institute for Tele-Information, Senior Research Fellow, Columbia University, New York, New York

ecomp Consultants, Special Consultant, Tampa, Florida:

Giant Steps Media, Affiliate, New York

Contributor to *MusicDish* E-Journal

**April, 2019**

27

EXHIBIT 13
PAGE 347

# EXHIBIT 14

EXHIBIT 14
PAGE 348

UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Marcus Gray (p/k/a Flame), et al.<br>　　　Plaintiffs,<br>　　　v.<br>Katheryn Elizabeth Hudson (p/k/a Katy Perry), et al.<br>　　　Defendants. | Civil Action 2:15-cv-05642-CAS-(JCx)<br>Judge: Christina A. Snyder<br><br>EXPERT REPORT OF<br>MICHAEL A. EINHORN, Ph.D.,<br>ON BEHALF OF PLAINTIFFS<br>—UPDATED MAY ~~1~~24, 2019—<br><br>Subject to change as more information becomes available April 12, 2019 |

1.      INTRODUCTION

1.1)    I have been asked by the law firm of Capes Sokol, counsel for Plaintiffs Marcus Gray (p/k/a/ Flame), Emanuel Lambert, and Chike Ojukwu, to provide my expert valuation of actual damages and Defendants' profits resulting from a presumed infringement of Plaintiffs' authorship, ownership, and production rights in a musical composition called "Joyful Noise," which they contend was later infringed by the musical composition and recorded track "Dark Horse." The track "Dark Horse" was imprinted on the Prism album that was released by Defendant Capitol Records, a division of Universal Music Group.

1.2)    I am advised that the three Plaintiffs co-wrote the words and melody of "Joyful Noise" in 2007, recorded the work in March of 2008, and was honored in 2008 with nominations at the Grammys and the Gospel Music Association Dove Award.

1.3)    Plaintiffs contend that "Dark Horse" infringes their copyrights in "Joyful Noise." My report assumes this to be true as I offer no opinion on Defendants' liability.

1.4)    Capitol Records first released the album Prism on October 18, 2013. The track "Dark Horse" appeared in physical and digital albums, singles, and related work distributed in the U.S. and elsewhere. "Dark Horse" earned considerable play on radio, video, digital services, and concert setlists.

1.5)    Defendants Katheryn Elizabeth Hudson (p/k/a Katy Perry), Jordan Houston (p/k/a Juicy J) Lukasz Gottwald (p/k/a/ Dr. Luke), Karl Martin Sandberg (p/k/a Max Martin), Henry Russell Walter (p/k/a/ Cirkut), and Sarah Hudson received directly, or through their publishing entities, royalties related to mechanical, digital, performance, and synchronization of the underlying musical composition "Dark Horse." As copyright holders to the infringed work "Joyful Noise," plaintiffs should have received some share of total royalties paid.

1.6)    Defendant Katy Perry also received artist royalties for her participation as a primary artist in the recorded track "Dark Horse."

1.7)    Defendant Juicy J also received artist royalties for his participation as a featured artist in the recorded track "Dark Horse."

EXHIBIT 14<br>PAGE 349

1.8)    Defendants Dr. Luke, Max Martin, and Cirkut received producer royalties for engineering the studio recording featured on the album and digital single

1.9)    I am an economist with expertise in valuation of damages related to infringement of intellectual property. My testimony is consistent with the techniques of my profession, in which I earned a Ph.D. in economics.

1.10)   I am paid an hourly rate of $425 for report-writing, and $600 for preparation for, travel to, and appearance at deposition and/or trial. This rate is consistent with my standard professional arrangements for appearance as an expert witness in court.

1.11)   I am not related to any of the parties, nor do I have any financial interest in the outcome of this matter.

2.      STATEMENT OF QUALIFICATIONS

2.1)    I have worked as a professional economist since I received a Ph.D. in Economics from Yale University in 1981. Since graduation, I was employed at Bell Telephone Laboratories, Rutgers University, U.S. Department of Justice (Antitrust Division), and Broadcast Music Inc.

2.2)    I have worked since 2001 as a testifying expert in the area of media and intellectual property. My current curriculum vita is attached as Appendix A. I testified as an expert at deposition and/or trial on cases so identified in my professional resume.

2.3)    I have served as a testifying economist in court cases involving the valuation of the intellectual property owned by commercial artists, software designers, writers, publishers, musicians, record labels, photographers, inventors, celebrities, actors, cartoonists, television producers, cable companies, and radio stations.

2,4)    I have written 38 professional articles in the area of intellectual property in law journals and periodicals. I have delivered numerous professional lectures or CLE seminars related to these topics. I am also the author of the book Media, Technology, and Copyright: Integrating Law and Economics (Edward Elgar Publishers).

2.5)    I have never been disqualified from testifying in court or limited in any manner related to the applied standards, concepts, or techniques of the economics profession.

3.      DOCUMENTS REVIEWED

I reviewed the following documents in connection with my work as an expert witness here:

•    Third Amended Complaint for Copyright Infringement,

•    UMG Recordings, Inc. Financial Statements, "Dark Horse",
     June 2013 – June 2018, CAPITOL-01099-01197

•    Royalty Statements, Katy Perry, "Dark Horse", KP000278-279

11083171.                          2

EXHIBIT 14
PAGE 350

- Contract, Katy Perry, Kasz Money Inc., August 31, 2013, KP000183-000209

- Contract, Katy Perry, Maratone AB., August 31, 2013, KP000210-000238

- Prismatic World Tour, License Agreement, KP000239-000242

- Administration Agreement, BMG Chrysalis,
  Jordan Houston, BMG000257-000290

- Broadcast Music Inc., Royalty Report, Jordan Houston, May 20, 2016

- Contract, Capitol Music Group (a division of Capitol Records),
  Katy Perry, June 20, 2007; amended September 1, 2010, CAPITOL00001-00061

- Royalties, Kobalt Songs Music Publishing, KOBALT00006-00007

- Royalties, Katy Perry, "Dark Horse", January 23, 2019

- Declaration, Silvio Pietroluongo, January 14, 2019

- Summaries of revenues and costs provided by Lukasz Gottwald,
  Henry Russell Walker, Sarah Hudson, Jordan Houston, all dated March 19, 2019

- Joint Stipulation Regarding Defendant Karl Martin Sandberg, July 1, 2014

- Expert Report of Todd Decker, April 6, 2017

- Wikipedia, Prism (Katy Perry Album)

- Wikipedia, "Dark Horse" (Katy Perry song)

- Deposition, Steven Drellishak, February 28, 2019

- Deposition, Katy Perry, March 13, 2019

- Radio Play, Five Songs, CAPITOL01034- 01098

- Chartmasters, pages 9-12, 16, https://chartmasters.org/2018/03/
  cspc-katy-perry-popularity-analysis-2/16,

4.     SUMMARY OF CONCLUSIONS

4.1)     I am advised that Plaintiffs Marcus Gray, Emanuel Lambert, and Chike Ojukwu may recover from Defendants actual damages that represent an amount that would have been rightfully earned had Plaintiffs' rights in the composition "Joyful Noise" been properly licensed and compensated. I am advised that Defendants are jointly and severally liable for the total amount of these damages that Plaintiffs suffered.

4.2)     Actual damages in this matter result from uncollected royalties owing to Plaintiffs' rights in the musical composition "Joyful Noise." These rightful amounts

EXHIBIT 14
PAGE 351

include copyright royalties related to mechanical/digital reproductions, performance, and synchronization royalties that would normally be earned by songwriters or publishers.

4.3)    As described in Section 5, Plaintiffs lost the opportunity to earn copyright royalties amounting to ███████ This amount represents actual damages that can be recovered jointly from all Defendants.

4.4)    In addition to actual damages, I am advised that Plaintiffs may recover severable profits from each individual Defendant. I am advised that Plaintiff must first prove Defendant revenues, from which Defendant must prove appropriate deductions.

4.5)    As itemized in Section 5 and 8, Defendants earned from infringing sales, licenses, and royalty payments (writer, artist, and producer) related to "Dark Horse"

| Defendant | Source of Revenues | Revenues |
|---|---|---|
| Capitol Records | Sale and licensing of recorded track | ████████ |
| Katy Perry | Co-writer and primary artist/performer | ████████ |
| Juicy J | Co-writer and featured artist | ██████ |
| Dr. Luke | Co-writer and co-producer | ████████ |
| Max Martin | Co-writer and co-producer | ████████ |
| Cirkut | Co-writer and co-producer | ███████ |
| Sarah Hudson | Co-writer | ███████ |
| TOTAL | | ████████ |

4.6)    As explained above and in Section 5, a sum of ███████ reflects a royalty that should have been paid to the Plaintiffs for use of their composition "Joyful Noise" in the song and track "Dark Horse". All Defendants are jointly liable for this amount.

4.7)    Defendants earned revenues of ██████████, of which ███████████ is unaccounted for in the actual damages identified above. Each defendant is severally liable for any profit amount not otherwise accounted for in the determination of actual damages.

5.    ACTUAL DAMAGES

5.1)    I am advised that Plaintiffs may recover from Defendants a licensing fee for royalties that would have been earned from use of Plaintiffs' composition "Joyful Noise". Had the composition been licensed, Plaintiffs here would have received some share of the mechanical, digital, performance, and synchronization royalties attributed to the composition of "Dark Horse."

EXHIBIT 14
PAGE 352

5.2)     This share of copyright royalties generally is determined in the music industry through arms-length negotiation involving owners of a copyrighted work and engaged licensees of that work. As a matter of law, the valuation for a lost licensing opportunity should be a transaction amount at which a willing buyer(s) and a willing seller(s) would arrive in a free negotiation.

5.3)     That said, there is no scientific or industry rule for determining an exact amount that would result from a negotiation. The results of other negotiations involving similar situations can sometimes be useful benchmarks to inform this analysis. The determined valuation will then appear in a range of outcomes that can be determined by the market.

5.4)     The Plaintiffs' original work, "Joyful Noise," was a musical composition that appeared as a track on the album Our World: Redeemed (2008) as well as a download single and stream (2014). I am advised that copyright to the song is owned by the Plaintiffs in this lawsuit and that Plaintiffs would have been rightfully compensated by the record label.

5.5)     The album Our World: Redeemed was the fourth studio album from American Christian rapper Flame. It was released on March 4, 2008. The recording label for the album was Cross Movement. The album earned a Grammy Award nomination for Best Rock or Rap Gospel Album, and the label made a video for the lead single "Joyful Noise." This establishes that the composition of "Joyful Noise" had a positive market value."

5.6)     Per the Declaration of Silvio Pietroluongo of Billboard (January 14, 2019), the album recording of Our World: Redeemed was commercially successful. The album appeared on the Billboard Top Gospel Albums chart for thirty-five straight weeks. The album also appeared on the Billboard Top Christian Album on March 22, 2008 (#18) and March 29, 2008 (#34). (Declaration of Silvio Pietroluongo at ¶¶ 6,7)

5.7)     The single-track Joyful Noise was also commercially successful and deserving of a positive market valuation. The song charted on the Billboard Gospel Digital Songs Sales Chart for thirty-four straight weeks (1/15/2014 – 7/26/2014), Billboard Gospel Streaming Songs on July 19, 2014 (#1) and July 26, 2014 (#10), and the Billboard Christian Streaming Charts on July 19, 2014 (#4).

5.8)     Based on a blended formula that takes into account radio airplay, sales data, and streaming, "Joyful Noise" also appeared on the Billboard Hot Christian Songs on July 19, 2014 (#11) and July 26, 2014 (#37) and the Billboard Hot Gospel Songs on July 19, 2014 (#1) and July 26, 2014 (#16), (Declaration of Silvio Pietroluongo at ¶¶ 8-12).

5.9)     As a valued musical work reproduced on a track on the album Our World Redeemed, the musical work "Joyful Noise" was paid, or deserved to have been paid, royalties from its record label Cross Movement.

5.10)     I have read the expert report of musicologist Prof. Todd Decker of Washington University of St. Louis. I am advised that Prof. Decker will testify that the

EXHIBIT 14
PAGE 353

ostinato in "Joyful Noise" is substantially similar to the main ostinato in "Dark Horse." Prof. Decker further opines in his Expert Report that the infringing ostinato is repeated throughout "Dark Horse." Upon written statement of counsel, I am also advised that Prof. Decker has determined that the ostinato accounts for 95 seconds of the song (which Defendants' expert Ferrara times at 3:32, or 212 seconds); or 45 percent of the elapsed time in the entire composition.

5.11)   Per Prof. Decker's opinion, it is also proper for Plaintiffs to share some royalty share sales and licensing of the latter with regard to reproduction, performance, and video synchronization.

5.12)   I believe that a market-based outcome for a copyright negotiation for rights in "Joyful Noise" would have granted to Plaintiffs a fifteen percent (15%) share of copyright royalties (i.e., mechanical, digital, performance, and synchronization) in the musical composition "Dark Horse."

5.13)   I determined the putative share of fifteen percent as follows. I am advised as a legal matter that copyright in a joint composition (i.e., a musical work in which more than one writer participates) vests initially in equal shares for all participants, regardless of the size of any individual contribution to the work. Per Katy Perry's sworn deposition (36-37), there were five listed primary writers of "Dark Horse" – Katy Perry (vocal melody and lyrics, 12:6-9), Sarah Hudson (lyrics), Max Martin (melody, 37:3-4), Dr. Luke (instrumental, 13:1), and Cirkut (instrumental, 13:1)

5.14)   I have seen no contract among the writers to justify any other breakdown of the copyright. It then follows that each originally would have controlled a one fifth share of the copyright, or twenty percent (20%).

5.15)   The final songwriter in this lawsuit -- Juicy J – was not an original writer of "Dark Horse" and but made a rap contribution to the work after the music, melody and lyrics were composed (Perry Dep.. 36:15-16). For his later efforts, Juicy J apparently received a reduced copyright share of ███████████ which is ███ of ████. To provide for the share, the five primary writers (supra 5.13) then divided up the remaining ███ percent equally, each receiving an identical royalty share of ███████████

5.16)   If properly licensed, the taking of the ostinato from "Joyful Noise" would have represented a sixth primary contribution to "Dark Horse" that would have needed to be assigned a copyright share. There is here a pre-existing sale or license agreement in place, and no ill-motive or competitive relationship that would interfere with its reasonable extension. If each of five original writer shares – i.e., Perry, Martin, Luke, Cirkut, and Hudson -- are equally valued at ██████ percent of royalties paid ████████ each of six would then be valued at fifteen percent (███████[1]

---

[1] This analysis maintains Juicy J at his original ███ percent copyright share, and I reserve the right to proffer a different estimate if this assumption is challenged.

EXHIBIT 14
PAGE 354

5.17)   Based on the adjusted benchmark derived from defendant's own copyright assignments, I shall now assign to the Plaintiffs a prorated share of royalties paid equal to fifteen percent of copyright royalties. This is consistent with the legal notion (I am advised) that copyright damages must be assigned and discounted to correspond to plaintiff's ownership interests, and that courts may apportion damages for certain claims at issue pursuant to previous affirmative agreement of copyright holders as to percentage interest held by each. I am also advised that courts may order apportionment based on undisputed calculations provided by plaintiffs.

5.18)   I am advised that the defendants have provided summaries that represent the following amounts of copyright royalties paid to the present (infra Section 8).

| Katy Perry | |
|---|---|
| Publisher Royalties | ████ |
| Performance Royalties | ████ |
| Subtotal: | ████ |

| Juicy J | |
|---|---|
| Publisher Royalties | ████ |
| Performance Royalties | ████ |
| Subtotal | ████ |

| Dr. Luke | |
|---|---|
| Publisher Royalties | ████ |
| Performance Royalties | ████ |
| Subtotal | ████ |

| Max Martin | |
|---|---|
| Publisher Royalties | ████ |
| Performance Royalties | ████ |
| Subtotal | ████ |

11083171.

7

EXHIBIT 14
PAGE 355

| Cirkut | |
|---|---|
| Publisher Royalties | ▮▮▮▮ |
| Performance Royalties | ▮▮▮▮ |
| Subtotal | ▮▮▮▮ |

| Sarah Hudson | |
|---|---|
| Publisher Royalties | ▮▮▮▮ |
| Performance Royalties: | ▮▮▮▮ |
| Subtotal | ▮▮▮▮ |

| TOTAL: | ▮▮▮▮ |
|---|---|

5.19)   Total copyright royalties are ▮▮▮▮. Valued at a fifteen percent share of the total, I estimate that Plaintiffs would have earned a licensing payment of ▮▮▮▮ for their share of "Dark Horse."

5.20)   I am advised that Defendants are jointly liable to pay the identified amount of actual damages.

6.      LABEL REVENUES FROM "DARK HORSE": 2013-2018

6.1)      Defendant Capitol Records recorded the track "Dark Horse" as a component of Katy Perry's album, Prism. The album was released on October 18, 2013.

6.2)      The "Dark Horse" track was released in many different formats, including album, single, and DVD. (Drellishak Dep. 20:15-18). The standard album release contained thirteen (13) tracks and the deluxe release contained sixteen (16) tracks.

6.3)      The "Dark Horse" track was also made available and licensed as a download, ringtone, ringback, digital stream, video use, synchronized work, and compilation work.

6.4)      After returns, net sales of all products bearing the track "Dark Horse," from October 2013 to June 2018, totaled ▮▮▮▮. (CAPITOL00923; CAPITOL1101-1103; CAPITOL01133).  This amount is broken down as follows:

EXHIBIT 14
PAGE 356

| Physical albums (Thirteen tracks) | $ | |
|---|---|---|
| Physical albums (Sixteen tracks) | $ | |
| Download albums (Thirteen tracks) | $ | |
| Download albums (Sixteen tracks) | $ | |
| Download albums (Two tracks) | $ | |
| Single Tracks (Downloads and Streams) | $ | |
| Domestic Licensing Income | $ | |
| Ancillary Income (Tour) | $ | |
| TOTAL | $ | |

6.5)     Capitol Records sells physical albums as follows. The artist makes a master recording in the studio from which actual sales units are imprinted by an independent entity (Drellishak Dep. 59:15-17). Manufacturing is administered by Universal Music Logistics ("UML") (Id. 59:1-8), which receives from the label a designated rate card payment per CD. (Id. 67:2-4)    UML pays the actual manufacturer directly (Id. 60:4-14).

6.6)     after manufacturing, the albums are then moved into inventory through UMG's distribution service (Universal Music Group Distribution) that administers the process of getting it into record stores. (Id. 85: 13-23) A customer then places an order through an EDI transaction to the sales order processing system.     The sales order processing system records the sales in the general ledger (Drellishak Dep. 22:1-7). After distribution, returns of physical product are credited to the buyer (Id. 23:15-18). The label collects all due revenues from physical sales, and distributes royalties and other expenses to the appropriate parties.

6.7)     For sales of digital product, the label sends the file directly to the digital service provider (e.g., Apple iTunes, Spotify, Amazon). The service provider makes the track available to users through downloads or streaming. (Id. 36:6-10, 37:3-8). There are no additional costs of production or distribution for digital product. The service provider pays for the actual download or stream revenues that can be shared with the artist. Publishers collect copyright royalties from the sale of downloads through separate payment arrangements with the digital service provider.

6.8)     Capitol Records earned licensing income for ringtones, ring backs, digital streams, video uses, synchronized works (uses that integrate the music with scripted video or live background), and compilations (use of the track on different albums) (Id. 42:11-15).

EXHIBIT 14
PAGE 357

6.9)     Capitol Records earned ancillary income from revenues received for sale of the Prismatic World Tour DVD (Id. 55:15-18).

6.10)    Unreported to date are the licensing fees for sales to foreign markets. If foreign sales are recoverable, international revenues should be adjusted upward to reflect this licensing total. I reserve the right to amend this report if additional information on these revenues becomes available.

6.11)    To be conservative, I have included only the lower revenue estimates listed above, but reserve the right to include foreign revenues if the Court rules that it is appropriate to include any component of foreign sales in the calculation.

6.12)    I do believe that each amount itemized above implicates a product or service that in some way involves the use of the infringing musical composition "Dark Horse," as reproduced on a master recording by Capitol Records.

7.      ROYALTY PAYMENTS

7.1)     Royalties for "Dark Horse" were earned by the lead artist Katy Perry, featured artist Juicy J producers Dr. Luke, Max Martin, and Circuit, and co-writers Katy Perry, Juicy J., Dr. Luke, Max Martin, Circuit, and Sarah Hudson.

Lead Artist Royalties

7.2)     Recording artist Katy Perry appears as the lead artist on the track "Dark Horse." The track was originally released on September 17, 2013 as the second promotional single (i.e., radio) from the album Prism (2013). The album was later released on October 18, 2013. The single was released for general sales on December 17, 2013.

7.3)     As the lead artist, Ms. Perry earned artist royalties specified in her contract with Capitol Music Group (a division of Capitol Records). (CAPITOL00001-00061). Her contract was first established on June 20, 2007 and amended on December 13, 2012.

7.4)     Per the amended agreement, Ms. Perry earned artist royalties for what I believe to be her Third Committed Album, Prism (Contract, Section 6). Ms. Perry earned a royalty rate of ▮▮ based on all sales of the album in the U.S. and Canada; while foreign sales in the U.K./Eire and Rest of Territory were respectively valued at ▮▮ and ▮▮ of the above specified rate. The royalty for net streaming sales was specified at ▮▮ of total revenues received (not including eligible non-interactive services covered by Sound Exchange (see next).

7.5)     Ms. Perry also earned artist royalties for her share of eligible transmissions performed on non-interactive digital services collected and distributed by Sound Exchange (per eligibility requirements established by the Digital Performance Rights in Sound Recording Act of 1996, 17 U.S.C. 114)

7.6)     Ms. Perry also received a flat payment of ▮▮▮▮ as an upfront payment for artist rights related to a DVD release of her full Prismatics concert that she performed

11083171.

10

EXHIBIT 14
PAGE 358

in Sydney Australia (KP000239-252), as well as a product royalty of ███████
(CAPITOL01193-7). The song "Dark Horse" appeared on the playlist of this concert
(Id.).

      7.7)    Some amount of Ms. Perry's artist royalties were recouped by the label to
cover its production and marketing costs for her album (Contract, Section 4), or paid out
to her designated producers per independent contract. (Infra, Producer Royalties and
Section 8)

      7.8)    Finally, Ms. Perry earned copyright royalties for her share as a writer in
the musical composition This work is regarded to be a controlled composition because
Ms. Perry is also the lead artist on the album.

      7.9)    I have not reviewed any written contracts that Ms. Perry (or any other
writer) may have signed as a copyright owner of the song "Dark Horse." As a matter of
industry custom and practice, I believe that Ms. Perry received a reproduction rate of ███
███ per sold track, pro-rated for her respective share of the composition (███ see 7.18)
and a possible reduction for her appearance in a controlled composition.

Featured Artist Royalties

      7.10)    As a featured artist on the track and video, Juicy J earned artist royalties
specified in a separate contract with Katy Perry. Artist royalties were paid in flat sums for
his work on the recorded track and the video. (BMG000257-BMG000275).

      7.11)    Juicy J also earned royalties for some share of royalties for use of the
recorded track on Sound Exchange. .

      7.12)    Finally, Juicy J earned copyright royalties for his share as a writer in the
musical composition

Producer Royalties

      7.13)    Co-producers of the recorded track "Dark Horse" were Dr. Luke, Max
Martin, and Cirkut who were initially credited with equal shares of producer royalties. I
believe that the co-producers may have arranged additional transfers among themselves.

      7.14)    Katy Perry entered into two producer contracts on August 31, 2013 (Dr.
Luke, Cirkut; Contract, KP000183-209; Max Martin Contract, KP000210-236). These
contracts established that the producers were paid a share of artist royalties otherwise due
to Ms. Perry from physical and digital sales.

      7.15)    Payments to Dr. Luke and Cirkut for produced tracks on the album Prism
were established as follows (Contract, Sections 3-4). The two producers together received
upfront a non-recoupable payment of ███████ a ████ percent royalty based on physical
sales valued at the published price to dealers ("PPD") of the album, a █████ royalty
based on digital sales valued at the same PPD, and ████ of artist royalties for licensing of
video. All royalty amounts were suitably pro-rated for the number of participating tracks
on the album and the producer's royalty relative to the artists. Dr. Luke and Cirkut were

EXHIBIT 14
PAGE 359

also to have received a share of ▮▮▮ of Perry's due artist royalties paid at Sound Exchange, (Contract, Appendix B, KP000204). Dr. Luke and Cirkut seem to have further divided their due royalties in a manner of which I am not aware.

7.16)   Payments to Max Martin for produced tracks on the album Prism were as follows (Contract, Sections 3-4). Max Martin received upfront a non-recoupable payment of ▮▮▮, a ▮▮▮ percent royalty based on physical sales valued at the PPD of the album, a ▮▮▮ royalty based on digital sales valued at the same PPD, and ▮▮▮ of artist royalties for licensing of video. All royalty amounts were suitably pro-rated for the number of participating tracks on the album and the producer's royalty relative to the artists. Max Martin was also to have received a share of ▮▮▮ of Ms. Perry's due artist royalties paid by Sound Exchange (Contract, Appendix B, KP000230).

Songwriter Royalties

7.17)   Co-writers of the musical composition "Dark Horse" are listed as Dr. Luke, Max Martin, Cirkut, and Sarah Hudson, as well as aforementioned artists Katy Perry and Juicy J. I have not reviewed any relevant publisher contracts that Capital Records signed with any writer or his/her publisher entity.

7.18)   Based on information made available from the performing rights organization Broadcast Music Inc., I believe that the writer shares of the copyright in the composition "Dark Horse" are as follows:[2]

| | | |
|---|---|---|
| Katy Perry: | ▮▮ | |
| Dr. Luke: | ▮▮ | |
| Max Martin: | ▮▮ | |
| Cirkut: | ▮▮ | |
| Sarah Hudson: | ▮▮ | |
| Juicy J: | ▮▮ | |

7.19)   As a co-writer of the musical composition "Dark Horse," each listed writer earned royalties from the mechanical and digital reproductions of the song in albums and singles, public performances of the song in broadcast, digital, and general media venues, and third-party licensing of the song.

---

[2]  The same numbers appear as writer shares reported on Katy Perry's artist contract with Juicy J (Jordan Houston). See also Email from Harold Papineau to Jermi Thomas, et al., Re: URGENT: Juicy – Dark Horse Splits, January 28, 2014.

11083171.                                    12

EXHIBIT 14
PAGE 360

7.20)   Per industry custom and practice, record labels generally pay songwriter royalties for reproductions, synchronization, and compilation uses to each writer through his/her designated publisher.

7.21)   Each publisher designated a separate collection entity to administer the accounting for its incoming royalty payments. Each royalty administrator is paid a share of collected revenues as payment for its administrative service.

7.22)   Distinguished from other writer royalties, performance royalties are collected and administered by performing rights organizations (PRO), such as ASCAP (Dr. Luke, Max Martin, Cirkut, Perry, and Sarah Hudson are members) and BMI (Juicy J is an affiliate). The PRO pays some share (usually 50%) of the royalty amount directly to the songwriter. The remainder of the royalty is paid to the writer's designated publisher.

7.23)   Based on the above, songwriter claims in the copyright of "Dark Horse" are summarized as follows:

| Writer | Publisher | Administrator | PRO | Share |
|---|---|---|---|---|
| | When I'm Rich You'll Be My | Warner | | |
| Katy Perry | Bitch Kasz Money | Chappell | ASCAP | ■ |
| Dr. Luke | Publishing Kasz Money | Kobalt Songs | ASCAP | ■ |
| Max Martin | Publishing Kasz Money | Kobalt Songs | ASCAP | ■ |
| Cirkut Sarah | Publishing | Kobalt Songs | ASCAP | ■ |
| Hudson | Prescription Songs | Kobalt Songs BMG | ASCAP | ■ |
| Juicy J | DeeEtta Music | Chrysalis | BMI | ■ |

8.    ROYALTY AMOUNT: 2013-2018

8.1)   Katy Perry, Juicy J, Dr. Luke, Max Martin, Cirkut, and Sarah Hudson earned writer, artist, and/or producer royalties in connection with their contributions to the song and track "Dark Horse.".

EXHIBIT 14
PAGE 361

Katy Perry

8.2)    Defendant Katy Perry was a co-writer and primary artist of "Dark Horse".
As described in Section 7, her due collections accrued through her publishing entity
When I'm Rich You'll Be My Bitch, (as administered and collected by Warner Chappell
Music) performing rights organization ASCAP, and artist collecting society Sound
Exchange. She also earned a payment of ███████ for licensing rights to her Prismatics
concert performed in Australia

8.3)    Based on the most recent records provided to me (KP000239-252,
KP000278-279), Ms. Perry received net royalty payment of ███████████, broken down
as follows.

| | | | |
|---|---|---|---|
| Publisher Royalties (through Kobalt Songs): | ████████ | (2013H2 | – 2018H1) |
| Performance Royalties (through ASCAP): | ████████ | (2014M4 | – 2019:M4) |
| Sound Exchange Royalties: | ████████ | (2014M3 | - 2019M1) |
| Artist Royalties: | ████████ | (2013H2 – 2018H1) | |
| Video Royalties: | ██████ | | |
| Video Upfront | ███████ | | |
| Total: | █████████ | | |

Juicy J

8.4)    Defendant Juicy J was a co-writer and featured artist of "Dark Horse". As
described in Section 7, collected amounts accrued through his publishing entity Dee Etta
Music (as administered and collected by BMG Rights Management), performing rights
organization BMI, and artist collecting society Sound Exchange.

8.5)    Per a direct contract with Katy Perry (KP00032), Juicy J also received
directly from Ms. Perry a flat payment of ███████ for his vocal appearance on the
recorded track "Dark Horse", and a flat payment of ███████ for his appearance on the
video.

8.6)    Based on the most recent records provided to me, Juicy J's total royalties
amounted to ███████████ which were broken down as follows:

EXHIBIT 14
PAGE 362

Publisher Royalties (through BMG Chrysalis) ██████ (2014Q2 – 2018Q2)

Performance Royalties (through BMI):   ██████ (2013Q3 – 2018Q1)

Sound Exchange Royalties :   ██████ (2013Q4 – 2018Q3)

Artist Royalties (through Katy Perry):   ████

Total   ████

Dr. Luke

8.7)    Defendant Dr. Luke was a co-writer and co-producer of "Dark Horse". As described in Section 7, collected amounts accrued to his publishing entity Kasz Money Publishing (as administered and collected by Kobalt Songs Music Publishing), production entity Kasz Money, Inc., performing rights organization ASCAP, artist collecting society Sound Exchange, and shared video royalties.

8.8)    Based on the most recent records provided to me, Dr. Luke's reported royalties amounted to ██████, which were broken down as follows:

Publisher Royalties (through Kobalt Songs):   ██████ (2013Q4 – 2018Q2)

Production Royalties (through Kasz Money):   ██████ (2013Q4 – 2018Q2)

Performance Royalties (through ASCAP):   ██████ (2014Q1 – 2018Q3)

Sound Exchange Royalties:   ██████ (2015Q2 – 2018Q4)

Video Royalties   ██████ (2017Q2 – 2018Q2)

Total   ██████

Max Martin

8.9)    Defendant Max Martin was a co-writer and co-producer of "Dark Horse". As described in Section 7, collected amounts accrued to his publishing entity MXM Music, Inc. (as administered and collected through Kobalt Songs Music Publishing), production entity Maratone AB, Inc., performing rights organization ASCAP, and artist collecting society Sound Exchange and shared video royalties.

8.10)    Based on the most recent records provided to me, Max Martin's gross royalties amounted to ██████, which were broken down as follows

Publisher Royalties (through Kobalt Songs):   ██████ (2013Q4 – 2018Q2)

Production Royalties (through Maratone, AB):   ██████ (2013Q4 – 2018Q2):

Performance Royalties (through ASCAP):   ██████ (2013Q3 – 2017Q4)

Sound Exchange Royalties:   ██████ (2014Q2 – 2018Q3)

11083171.                                        15

EXHIBIT 14
PAGE 363

Video Royalties: ███████ (not available)

Gross Royalty ███████████

8.11)   I am advised that parties stipulate that ████ of Max Martin's gross royalties were paid to his administrator Kobalt Songs Music Publishing, and an additional ██ was diverted for legal and management costs. His net royalty was then ██████████ [3]

Cirkut

8.12)   Defendant Cirkut was a co-writer and co-producer of "Dark Horse." As described in Section 7, collected amounts accrued to his publishing entity Oneiorology, Inc., (as administered and collected through Kobalt Songs Music Publishing), production entity Kasz Money Inc., performing rights organization ASCAP and artist collecting society Sound Exchange.

8.13)   Based on the most recent records provided to me, Cirkut's total royalties amounted to ████████ which were broken down as follows:

| | | |
|---|---|---|
| Publisher Royalties (through Kobalt Songs): | ███████ | (2013Q4 – 2018Q3) |
| Production Royalties (through Kasz Money): | ███████ | (2013Q4 – 2018Q2) |
| Performance Royalties (through ASCAP): | ███████ | (2013Q3 – 2018Q1) |
| Sound Exchange Royalties: | ███████ | |
| Video Royalties: | ███████ | (2017Q2 – 2018Q2) |
| Total | ███████ | |
| Sarah Hudson | | |

8.14)   Defendant Sarah Hudson was a co-writer of "Dark Horse". As described in Section 7, collected amounts accrued to her publishing entity Prescription Songs (as administered and collected through Kobalt Songs Music Publishing) and performing rights organization ASCAP.

8.15)   Based on the most recent records available to me, Ms. Hudson's total royalties amounted to ████████, which were broken down as follows (without dates):

---

[3]  Per Stipulation, April 2019, costs include management commission of ████ of gross ███████████) and legal and administrative fees of ████ of gross ███████████.

EXHIBIT 14
PAGE 364

Publisher Royalties (through Kobalt Songs): ███████

Performance Royalties (through ASCAP): ███████

Total ███████

8.16)   With the exception of Max Martin, all royalty amounts reported above are gross receipts before deduction for any administrative costs by any entity. Based on the specific data that I may yet review and verify, I reserve the right to amend for any suitable deductions that are proven to be paid to administrators.

8.17)   Copyright royalties may accrue only to a songwriter's share of the work, and not to artists and publishers. In the above charts in this Section, copyright royalties to each of six writers include only his/her publisher royalties and performance royalties.

8.18)   Before administration fees, total copyright royalties for the six writers above sum to ███████. This amount can form the basis of a calculation for actual damages that Plaintiffs would have earned had their rights been properly licensed. If Plaintiffs are entitled to 15 percent of the total, actual damages are then ███████

## 9.    IMPORTANCE OF SONG DARK HORSE

9.1)   The album Prism was a leading album that earned over ███████ ███ in sales and licensing for the label Capitol Records. The song Dark Horse was critically important to the success of this album. This is documented in and demonstrated by the appearance of the song in concert tours, radio promotion, video use, and commercial charts.

Concert Tours

9.2)   Record labels generally market new releases by supporting artist tours related to the new album. In the course of her professional career with Capitol Records, I believe that Katy Perry performed in five Concert Tours under the terms specified in her Original Agreement with the label entered in 2007.

9.3)   Ms. Perry's most successful tour of the five tours was the Prismatic World Tour, which promoted her album release of Prism. The tour ran from May 2014 to October 2015 and visited Europe, North America, Australia, Asia and South America.

9.4)   The Prismatic World Tour in 2014-2015 grossed more than $204.3 million from 151 shows with a total attendance of 1,984,503. The Sydney November 28th concert was recorded for her second live album: The Prismatic World Tour Live, which was released two weeks after the tour ended. The setlist for the Prismatic World Tour contained twenty songs,

17

EXHIBIT 14
PAGE 365

1. "Roar"

2. "Part of Me"

3. "Wide Awake"

4. "This Moment" / "Love Me"

5. "Dark Horse"

6. "E.T."

7. "Legendary Lovers"

8. "I Kissed a Girl'

9. "Hot n Cold"

10. "International Smile" / "Vogue"

11. "By the Grace of God"

12. "The One That Got Away" / "Thinking of You"

13. "Unconditionally"

14. "Walking on Air"

15. "It Takes Two"

16. "This Is How We Do" / "Last Friday Night (T.G.I.F.)"

17. "Teenage Dream"

18. "California Gurls"

19. "Birthday"

20. "Firework"

9.5)    Twelve of twenty songs on the setlists for the Prismatic World Tour appeared on the Prism album: "Roar," "This Moment," "Love Me," "Dark Horse," "Legendary Lovers," "International Smile," "By the Grace of God," "Unconditionally," "Walking on Air," It Takes Two" (Prism Deluxe), "This Is How We Do," and "Birthday." "Dark Horse" was one of the twelve songs.

9.6)    Ms. Perry also performed "Dark Horse" for fourteen additional live performances, including the 56th Grammy Awards on January 26, 2014 in Los Angeles.

EXHIBIT 14
PAGE 366

Radio Play

9.7)     In documents ~~provided by the Defendant~~from Media Base that are used by Capital Records itself (CAPITOL010~~34~~21—-1098), the label released five promotional singles from Prism for radio play before and after the release of the album on October 18, 2013.

9.8)     In the order of initial release, the five promotional singles were as follows:[4]

| Song | Date of 1st play | Radio Spins | # of Stations | # of Markets | Audience Impressions |
|---|---|---|---|---|---|
| Roar | 8/~~26~~10/2013 | 770,436 | ~~3~~450 | ~~3~~148 | 5.2 billion |
| Dark Horse | 9/~~22~~17/2013 | 930,186 | ~~2~~539 | ~~2~~148 | 6.3 billion |
| Unconditionally | 10/~~22~~16/2013 | 149,963 | ~~1~~370 | ~~10~~45 | 820.4 million |
| Birthday | 10/22//~~4/20/~~20143 | 141,266 | 320 | 1944 | 775 million |
| This Is How We Do | 810/~~05~~22/201~~4~~3 | 55,024 | ~~1~~285 | 1541 | 262.3 million |

_____

[4]  The aforementioned documents were provided in discovery by the Defendants. The documents were made available to me without the benefits of a previous deposition, and related inquiry thereto. Having achieved more understanding of the documents since the submission of my Original Report on April 12, 2019, I have revised the numbers that appear in the "Date of 1st Play," "# of Stations" and "# of Markets" columns to reflect additional information of which I am now aware. However, I have re-confirmed the two key columns of numbers—namely, Radio Spins and Audience Impressions"—and they remain the same as before.

11083171.                                    19

EXHIBIT 14
PAGE 367

9.9)   The chart is organized as follows~~.~~:

• Column 1: Name of songs performed on radio.

• Column 2: Date of first airplay

• Column 3: Radio Spins: Each broadcast play on a Radio Station is counted as one recorded radio spin

• Column 4: Stations: Number of Individual Broadcast Stations

• Column 5: Markets: Number of Unique Geographic Markets (Some markets can have more than one station performing the song

• Column 6: Number of Record Spins (column 3) ~~M~~multiplied by the ~~Market Population~~ radio station's Listening Audience (as measured by Nielson Ratings.)

9.10) Two songs—" ~~9.10) Of the five listed songs released for promotional radio play, only two e~~—Roar" and "Dark Horse——"—were the first tracks released for radio play before the album was released (October 18, 2013), These two tracks ~~released (October 18, 2013).~~ accounted for over half of the radio spins. Based on release date and number of

~~9.11)   Along with "Unconditionally" (released October 22, 2013)~~spins, "Roar" and "Dark Horse" appear then to be the primary instruments to ~~"Dark Horse" have the most important commercial appeal because they were used to~~ promote and generate momentum for the album release of Prism~~.~~. The ~~two~~three remaining singles~~—~~ "Unconditionally," "Birthday," and "This is How We Do" ~~were introduced well after~~ initiated all of their radio play at a later time and nearly all after the album had ~~the album~~ made its debut~~, and most album copies were sold.~~

9.12)   Of the ~~three most important~~five listed songs on the album, the track "Dark Horse" accounted for ~~45~~50.24 percent of all radio spins, ~~69.0~~27.4 percent of all radio stations, and ~~64~~7.91 percent ~~of all geographic markets, and 66.6 percent~~ of all audience listens since ~~its~~first play. Although Radio Spins in each station and market varied considerably by song, the total count of markets for each was largely

~~9.13)   From its first release on September 21, 2013, the track "Dark Horse" came to play on twenty-nine stations, twenty-three of which were of the Top 40 format, which has the most important commercial appeal. Seven of the top ten Top 40 stations were located in Los Angeles (rank 2), Chicago (3), San Francisco (4), Dallas (5), Washington (7), Atlanta (8), and Boston (10). Geographic locations for other Top 40 stations included Detroit (12), Seattle (13), San Diego (17), and Tampa (19)~~

the same (ranging from 141 to 148). However, only "Dark Horse" and "Roar" appeared in all markets.

EXHIBIT 14
PAGE 368

~~9.14)   The prereleases for "Roar" and "Unconditionally" were more modest in scope. From its first play on August 26, 2013, the prerelease "Roar" came to appear on satellite provider Sirius XM (October 11, 2013) and local stations in Washington, DC (alternative format, August 26, 2013) and Montgomery, Alabama (urban format, September 21, 2013).~~

~~9.15)   The song "Unconditionally" played on ten stations in ten markets (six adult contemporary format, three alternative format, one rhythmic format, and zero Top 40). As pointed out above, these spins of "Unconditionally" occurred between October 22, 2013 and December 31, 2013 – after the release of the album on October 18, 2013.~~

9.1~~6~~3)   ~~From a commercial perspective, the~~Based on evidence available from radio plays ~~demonstrates that~~, "Dark Horse" was a leading promotional song on the album – if not the most important.

Streams and Videos on Chartmasters

9.1~~7~~4) Chartmasters is a rating service in the record industry that charts the popularity of new albums and tracks among digital audiences.

9.1~~8~~5) Using a special analytic technique,~~4~~5 Chartmasters identified the twelve most popular tracks ever released by the recording artist Katy Perry until the present

9.1~~9~~6) The tracks "Dark Horse" (3,660,000 AES) and "Roar" (3,640,000 AES) are the only listed tracks from Katy Perry's album Prism. These two tracks share first and second place among the most popular twelve tracks from the artist. This ranking confirms the commercial importance of the track "Dark Horse".

9.~~20~~17) Chartmaster confirmed the history of the five promotional singles from Prism as they played on digital streaming services, such as Spotify.

---

5 Chartmasters estimates the importance of tracks by calculating album equivalent sales (AES). Album equivalent sales are generated from weighted sums of physical single sales, downloads, and streaming

~~4Chartmasters estimates the importance of tracks by calculating album equivalent sales (AES). Album equivalent sales are generated from weighted sums of physical single sales, downloads, and streaming~~

EXHIBIT 14
PAGE 369

| Song | First Digital Stream | Streams |
|---|---|---|
| Roar | 9/5/2013 | 591,660 |
| Unconditionally | 11/20/2013 | 223,360 |
| Dark Horse | 2/20/2014 | 806,512 |
| Birthday | 4/10/2014 | 160,547 |
| This Is How We Do | 7/31/2014 | 257,370 |

9.2~~1~~8) Judged by relative popularity on all streaming services, "Dark Horse" garnered the most listeners (806,512 streams), while "Roar" came in more distant second (591,660).

9.2~~22~~19) Of all sixteen tracks on Prism, the album hit a total of 2,352,447,000 streams The share of this total for "Dark Horse" is 34.2 percent of the total

9.2~~3~~0) Chartmaster also confirmed the history of the five promotional singles as they appeared on YouTube videos that were officially released by Capitol Records, with the input of Katy Perry and her team (Perry, Dep. 43:22-24, 46:1-2). As Ms. Perry explains, video tracks are chosen based on the belief (i.e., gamble and reaction) that the particular song is "bubbling"; i.e., appealing (44:21-25):

| Song | First | Views |
|---|---|---|
| Roar | 9/5/2013 | 2,645,384 |
| Unconditionally | 11/20/2013 | 505,833 |
| Dark Horse | 2/20/2014 | 2,369,953 |
| Birthday | 4/10/2014 | 334,755 |
| This Is How We Do | 7/31/2014 | 682,581 |

9.2~~4~~1) Judged by relative popularity on YouTube, "Roar" garnered the most viewers and comments, while "Dark Horse" came in a very close second.

37

9.2~~5~~2) The sixteen tracks from Prism together attracted on YouTube a total of 6,610,133,000 video views. The share of this total for "Dark Horse" was 35.9 percent of the total.

EXHIBIT 14
PAGE 370

9.2~~6~~3) Based on my review of data from concerts, radio play, streams, and video views, I believe that "Dark Horse" was one of the most important commercial songs on the album Prism, if not the most important. Given the demonstrated importance of the song "Dark Horse" to generating sales of the Prism album, any method of apportioning album or concert revenues to "Dark Horse" by simply dividing by total sales by the total number of tracks or songs is not an economic means of valuing its relative worth. I believe that Capital Records has made such a valuation error by the track valuation that it deploys on Prism (CAPITAL1101-3; see also Drellishak passim)

10.    COSTS AND APPORTIONMENT

10.1) As a co-defendant, Universal Music Group would bear the burden of proving costs and providing an apportionment technique for valuing infringing and non-infringing components of any record release through Capitol Records of the single "Dark Horse" and the album Prism.

10.2) Based on documents that UMG provided and the Deposition of Edward Drellishak, I believe that UMG might attempt to deduct from sales and licensing revenues cost all components related to paid royalties, manufacturing costs, distribution costs, marketing costs, and overhead.

10.3) Defendant costs generally are deductible only if they can be directly related to the actual release of the product. Claimed deductions cannot represent some apportionment of a common or historic cost that would have been incurred regardless.

10.4) Publisher royalties for rights in musical compositions can be a legitimate deduction from label revenues that arose from sales and licensing of recorded material bearing the infringing work. Amounts that Capitol Records claims to have paid to copyright owners should correspond to amounts received by writers, publishers, and administrators.

10.5) As the recording artist, Katy Perry also earned from Capitol Records a royalty as a recording artist after the label recovered amounts for production and marketing. From her net royalties, Ms. Perry also directed payments to featured artist Juicy J and co-producers Dr. Luke, Max Martin, and Cirkut. All royalty deductions should correspond with payments received by another beneficiary.

10.6) I believe that Defendant UMG might attempt to deduct from sales revenues received through Capitol Records the manufacturing costs and artwork design for all physical units sold. However, manufacturing costs are not properly deductible if they simply reflect rate card payment to any other internal entity owned by UMG itself, such as Universal Music Logistics. Rather, reported payments to Universal Music Logistics here would simply be transfers within the UMG entity and do not reflect any truly incurred manufacturing expense paid to an outside entity. There then could be a variance between the standard rate and the actual cost of operation. (Drellishak Dep. 91:14-17).

10.7) I believe that UMG might also attempt to deduct fees related to amounts paid for distribution of its recordings. However, Capitol Records pays distribution fees to an internal entity, Universal Music Group Distribution, based on a fixed percentage of

EXHIBIT 14
PAGE 371

product revenues that does not reflect any truly incurred expense outside of the Defendant corporation UMG. As explained above, transfer payments within the UMG organization are not properly deductible. This may also implicate handling, returns processing, refurbishment, and ancillary fees (Drellishak Dep. 70:11-72:18).

10.8) As explained above, record labels market new releases by a recording artist through concert promotion, video production, and radio release. Radio costs would include amounts spent for promotion of the single through time buys, promotional appearances, advertising, singles & shipping, and payments to independent promoters. If Capitol Records can prove amounts related to infringing material, costs are deductible. The label may not deduct marketing costs that it later recouped previously from Ms. Perry's artist royalties.

10.9) I also believe that UMG might attempt to deduct amounts related to an apportionment of company overhead and related costs among units sold, including the infringing recordings. Overhead costs would include the salaries of marketing employees, among other things (Id. 115:3-5). The amounts are generally based upon some formulaic assignment of common and/or historic costs, but without any causal relation to the infringing event. Assigned overhead expenses for the album are portioned from total overhead for the first eighteen months of the album (called the frontline, Id. 121; 19-24; 125:16-23). There is then no necessary relation between apportioned costs and the infringing activity.

10.10) I am advised that the Defendants then bear the responsibility to identify all deductible costs and to apportion the worth of "Dark Horse" from every sale or licensing transaction on which the song appears, and must then present a credible means of performing both assignments.  I reserve the right to contest any suggested procedure.

## 11.     CONCERT REVENUES

11.1) Depending on the court's final ruling on the recoverability of concert revenues, I would expect to add to Katy Perry's recoverable revenues a share of her earnings from concerts in the U.S. where "Dark Horse" was performed. No such information has been provided.

11.2) Within the appropriate recovery period, the court should compel Ms. Perry to disclose all U.S. concerts where DARK HORSE was performed, the composite play list of each concert, and her payments for each event.

## 12.     CONCLUSION

The above conclusions constitute my personal independent assessment. These conclusions will form the basis of my testimony should I be called at trial.

Amounts are subject to change as more information becomes available.

11083171.                                           24

EXHIBIT 14
PAGE 372

(Add)

/s/ Michael A. Einhorn

Michael A. Einhorn, Ph.D.

May 124, 2019

EXHIBIT 14
PAGE 373

Appendix A

Professional Resume of Michael A. Einhorn

Michael A. Einhorn, Ph.D.    973-618-1212



MEDIA, TECHNOLOGY, COPYRIGHT

|  | MICHAEL A. EINHORN<br><br>mae@mediatechcopy.com  http://www.mediatechcopy.com |
| --- | --- |

Michael A. Einhorn is an economic consultant and expert witness in the areas of intellectual property, media, entertainment, technology, trademarks, publicity rights, and product design. He received a B.A. from Dartmouth College, a Ph. D. in economics from Yale University, and is the author of Media, Technology, and Copyright: Integrating Law and Economics (Edward Elgar Publishers, 2004). He is also a former professor of economics at Rutgers University and adjunct professor at the Silberman School of Business (Fairleigh Dickinson University), a Senior Research Fellow at the Columbia Institute for Tele-Information, and the author of seventy professional and academic articles related to intellectual property and economic analysis.

Dr. Einhorn has provided valuation services in the following areas as a consultant or expert witness:

Trademarks, Trade Secrets, and False Advertising: Trademarks (Samsung Electronics, Dish Network, Madonna/Material Girl, Jakks Pacific, Kische USA, Oprah Winfrey/Harpo Productions, Avon Cosmetics, The New York Observer, the Kardashians/BOLDFACE Licensing + Branding, Wazu Holdings), trade secrets (The Weather Channel, Hasbro), and advertising (J. Walter Thompson/Banco Popular, Kia Motors, Coca Cola, General Automobile Insurance Company).

11083171.                                    26

EXHIBIT 14
PAGE 374

Music: Recording artists (Led Zeppelin, U2, Madonna, 50 Cent, Usher, Rascal Flatts, LMFAO, Aimee Mann, Nappy Roots, Justin Moore, Xzibit, Nelly Furtado, George Clinton, Notorious B.I.G., D.L. Byron), record labels (Sony Music Holdings, Universal Music Group, Disney Music, Atlantic Records, Rhino Entertainment), producers (P. Diddy, Timbaland), publishers (Major Bob Publishing, Universal Music Publishing, Bridgeport Music, Hamstein Music, Chrysalis Music, Kobalt Music), performing rights organizations (SESAC), radio stations (WPNT in Pittsburgh), live venues (World Wrestling Entertainment), and estates (Bill Graham Archives, Tasha Tudor, Bernard Lewis).

Video: Movies (Paramount/DreamWorks, Bold Films), cable programs (NBCUniversal), musicals (Zorro Productions) product placement (Paxson Productions), treatments (Burnett Productions), soundtrack (Warner Bros. Entertainment), TV programs Televicentro of Puerto Rico), satellite programming (Golden Channels Company of Israel), DVD videos (Steve Harvey), commercials (Gray Television Group), and cable operations (AT&T).

Design, Apparel, and Art: Apparel (Target Stores, Carol Anderson, .Forever 21, Crew Knitwear, Joyce Leslie, Anthropologie), architecture (Sprint PCS, Home Design LLC, Murray Engineering, Turnkey Associates), medical illustrations (Pearson Education Services), photography (Harris Publications, Neil Zlozower, Dana Ruth Lixenberg), sculpture (Marco Domo), cartoons (A.V. Phibes, Melissa Flock), toys (Jakks Pacific), and commercial marketing (Kaufman Global).

Publicity Rights and Estate Valuations: Names and likenesses (Reese Witherspoon, Steve Harvey, Woody Allen, Rosa Parks, Arnold Schwarzenegger, Sandra Bullock, Cameron Diaz, Diane Keaton, Zooey Deschanel, Yogi Berra), estate valuations (Tasha Tudor, Marlon Brando, Bernard Lewis).

Cyberspace: Music services (Apple iTunes, Napster, MP3.com), proprietary software (Centrifugal Force, Frogsware), open source software (Jacobsen v. Katzer), electronic publishing (Pearson), video games (Activision), search engines (eUniverse), and domain names (eCommerce).

Patents and Technology: Semiconductors (General Electric v. Kodak, Great Lakes v. Sakar, cellular (Cellebrite v. Micro Systemation), software (Jacobsen v. Katzer, Centrifugal Force v. Softnet), medical technology (Lemper v. Legacy, Graston v. Graham), clutch components (Nouis Technologies v. Polaris Industries), pet topicals (Nite Glow Industries Inc. v. Central Garden & Pet Company) and general patents (DeCordova v. MCG).

Antitrust and Commercial Losses: Antitrust, breach of contract, and commercial injury in actions (Los Angeles Rams, AT&T, American Home Realty Network, California Scents, Safmor, Inc., Golden Channels Company of Israel, St. Joseph's Regional Hospital (College Station, Texas)).

EXHIBIT 14
PAGE 375

REPRESENTATIVE CLIENTS

New York State Attorney General; New York

Fish & Richardson; Boston

Arnold & Porter; Washington

Baker & Hostetler; Cleveland

Palmer & Dodge; Boston

Hunton & Williams; Washington

Blecher & Collins; Los Angeles

Stokes Bartholomew Evans & Petree; Nashville

King & Ballow; Nashville

Frankfurt Kurnit Klein & Selz; New York

Lavely & Singer; Los Angeles

Davis and Gilbert; New York

Cowan DeBaets Abrahams & Sheppard; New York

Taft Stettinius & Hollister; Indianapolis

Sheppard Mullin Hampton & Richter; Los Angeles

Seyfarth Shaw; Los Angeles

Connolly Bove Lodge & Hutz; Wilmington

Blackwell Sanders Peper Martin; St. Louis

Lipsitz Green Faringer Roll Salisbury & Cambria; Buffalo

EXHIBIT 14
PAGE 376

~~LITIGATION~~PROFESSSIONAL ENGAGEMENTS

Media and Entertainment

Gray et al. v. Katy Perry et al. Central District of California, 2019, ~~consultant~~report, valuation of damages resulting from copyright infringement in Katy Perry's song Dark Horse. Dan Marino v. Dante Barton and Will Guice, Pennsylvania Court of Common Pleas, 2018, report and testimony, valuation of damages resulting from breach of contract among three songwriters claiming rights in Usher's song Bad Girl.

Robert W. Cabell v. Zorro Productions, Inc., et al., Northern District of California, report, estimated commercial damages resulting from infringement of copyright in a musical adaptation.

Gray Television Group, Inc. v. Found Footage Festival, LLC, et al., Eastern District of New York, report, estimated commercial damages resulting from infringement of television programming

Richard Dutcher v. Bold Films LLP, et al., Central District of Utah, 2017, report, estimated commercial damages resulting from copyright infringement of leading screenwriter in the movie Nightcrawlers.

RCN Capital, LLC, et al. v. The Los Angeles Rams, LLC, et al., Eastern District of Missouri, 2017, report and deposition, breach of contract regarding use of rights to sell tickets in secondary markets.

Michael Skidmore v. Led Zeppelin, et al., Central District of California, 2016, trial testimony, copyright infringement matter against rock group Led Zeppelin regarding classic song Stairway to Heaven.

Joseph Cooper v. Broderick Steven "Steve" Harvey, Northern District of Texas, 2016, report and deposition, breach of contract matter regarding recorded films of comedian/actor Steve Harvey.

Sidney Earl Swanson v. MJJ Productions, Central District of California, 2015, report, copyright infringement matter regarding a musical composition used in a sound recording Chicago by Michael Jackson.

Original Appalachian Artworks, Inc. v. Jakks Pacific, Inc., International Institute for Conflict Prevention and Resolution, 2015, report and deposition, matter involving lost sales related to breach of contract for copyright owners of Cabbage Patch Kids. Alexander Graham-Sult and David Graham v. Bill Graham Archives, LLC, et al., Northern District of California, 2015, report and deposition, valuation of copyrights and business concern resulting from fiduciary breach of the estate of rock concert producer Bill Graham.

William L. Roberts (p/k/a Rick Ross), et al. v. Stefan Kendal Gordy, Southern District of Florida, 2015, report, valuation of defendant enrichment resulting from infringement of a

EXHIBIT 14
PAGE 377

musical composition in a multi-platinum release (Party Rock Anthem) and a Kia automobile commercial.

Cartagena Enterprises, Inc. v. J. Walter Thompson Co., et al., American Arbitration Association, 2015, report, valuation of damages resulting from infringement of prominent salsa composition in an advertising message by the leading advertising agency and the largest bank in Puerto Rico.

Digital Satellite Connection v. Dish Network Corporation, et al., District of Colorado, 2014, report and deposition, valuation of damages resulting from trademark infringement by national satellite provider.

Ron Satija and Heather Lynette Mowder v. General Automobile Insurance Company, District Court of Northern Ohio, 2014, report, valuation of damages resulting from infringement of cartoon character The General in national advertising campaign.

Daniel Moser v. Raymond Ayala (p/k/a Daddy Yankee), et al., District Court of Puerto Rico, 2014, report, valuation of damages resulting from infringing reproduction and performance rights in Daddy Yankee's multi-platinum song Rompe.

Dan Marino v. Usher Raymond, et al., Eastern District of Pennsylvania, 2013, report, valuation of damages resulting from infringing reproduction and performance rights in Usher's song Bad Girl.

Preston Asevedo v. NBCUniversal Media, et al., Eastern District of Louisiana, 2013, report, estimated damages for commercial artwork used on a Syfy cable television program Dream Machines.

Ryan Lessem and Douglas Johnson v. Universal Music Group, Southern District of New York, 2013, report and deposition, valuation of damages involving copyright infringement in 50 Cent's song How We Do, recorded by The Game.

Montana Connection, et al. v. Justin Moore, Middle District of Tennessee, 2013, report, estimated damages for infringement in country hit song Backwoods on Justin Moore's record album and concert performances.

VMG Salsoul v. Madonna Louise Ciccone, et al., Central District of California, 2013, report, valuation of damages resulting from copyright infringement in Madonna's song Vogue.

Interstar Holdings v. Truman Press, Superior Court of California, 2011, report, matter involving valuation of commercial losses resulting from breach of contract involving DVD movie Dawn of the Living Dead.

Lutfu Murat Uckardesler, et al. v. Azteca International Corporation, et al., Central District of California, 2010, consultant, estimated damages resulting from infringement of treatment on internationally popular reality television show.

EXHIBIT 14
PAGE 378

Kernel Records Oy v. Timbaland, et al., Southern District of Florida, 2010, report, estimated damages resulting from copyright infringement of sound recording on multi-platinum Nelly Furtado song "Do It."

Anthony Lawrence Dash v. World Wrestling Entertainment, Inc., District of South Carolina, 2011, report, valuation of damages involving use of a copyrighted song in a highly promoted WrestleMania event.

Rafael Vergara Hermosilla v. The Coca Cola Company, Southern District of Florida, 2010, report and deposition, valuation of defendant profits resulting from infringement of song in international advertising campaign for the World Cup.

Chris Lester v. U2, Apple Computer, and Universal Music Group, Central District of California, 2009, report and deposition, estimated damages from copyright infringement involving U2's song Vertigo used in concerts and recordings.

Serendip LLC, et al. v. Warner Bros. Entertainment, Inc., Central District of California, 2009, report and deposition, estimated damages in copyright infringement on released DVD containing the soundtrack to A Clockwork Orange.

D.L. Byron v. Rascal Flatts and Disney Corp., Southern District of New York, 2009, report, estimated copyright damages for settlement involving infringement of classic Pat Benatar composition "Shadows of the Night" by Rascal Flatts.

Evilkid Productions v. DreamWorks LLC & Paramount Pictures, Southern District of New York, 2009, report, estimated damages and assisted settlement involving the unauthorized use of commercial art in the hit movie Transformers.

Victor Lopez v. Daddy Yankee and Universal Music, Central District of California, 2009, consultant on damages for album track used on multi-platinum release Barrio Fino.

Charles Watt v. Dennis Butler, et al., Northern District of Georgia, 2009, report, estimated copyright damages involving platinum release by rap group D4L.

The Jackson Sisters v. Universal Music Group, Superior Court of the State of California, 2008, consultant, assisted classic recording act for recovery of damages for unfair trade practices in use of legacy materials in sound recording.

MCS Music America, Inc., et al. v. Napster, Inc., et al., Central District of California, 2008, consultant to music publishers in copyright infringement matter involving limited downloads and subscription streaming by the digital music service Napster.

Henry Carter v. Independent Productions, Inc., et al., Superior Court of Delaware, 2008, consultant, royalty dispute among members of rock band George Thorogood and the Destroyers.

Bridgeport Music, Inc. v. Smelzgood Entertainment, et al., Middle District of Tennessee, 2007, report and trial testimony, estimated damages for unauthorized use of George Clinton's classic composition Atomic Dog on later infringing record album.

11083171.

31

EXHIBIT 14
PAGE 379

TMTV Corp. v. Mass Productions, Inc., District of Puerto Rico, 2006, report and trial testimony, estimated damages resulting from copyright infringement of television program by producer and comedian Sunshine Logrono.

Velocity Entertainment Group v. NBC Universal and Donald Trump, 2006, Los Angeles Superior Court, Los Angeles, California, consultant, valuation of treatment used in popular reality television show, The Apprentice.

Bridgeport Music, et al. v. Crited Music., Middle District of Tennessee, 2006, report, estimated damages for copyright infringement of musical composition You'll Like it Too.

Thomas Turino, et al. v. Universal Music, et al., Central District of California, 2006, report and deposition, estimated damages resulting from copyright infringement in Christina Milian's sound recording Dip It Low.

Bridgeport Music, et al. v. Universal Music, et al., Middle District of Tennessee, 2006, report and trial testimony, estimated damages for unauthorized use of three compositions and sound recordings on Notorious B.I.G. album produced by P. Diddy.

TMTV Corp. v. Televicentro de Puerto Rico, Inc., District Court of Puerto Rico, 2005, report, estimated damages resulting from infringement of television program.

The Royalty Network, Inc., et al. v. Activision, et al., Central District of California, 2005, report, estimated damages for use of music on best-selling video game Streets of Los Angeles.

Al Howard Productions, Inc. v. Paxson Productions, Central District of California, 2005, report, estimated commercial damages for breach of contract involving product placements on prominent game show, Supermarket Sweeps.

Mojo Music, et al., v. Walt Disney Records, Los Angeles Superior Court, 2004, report, valued synchronization rights in musical compositions used in Lion King 2.

Willie Woods v. BMG Music/Atlantic Recording Company, et al., Eastern District of Missouri, 2004, report, valued damages for unauthorized use of musical compositions in a Nappy Roots' multi-platinum song "Po Folks".

Darryl D. Lassiter, et al., v. Twentieth Century Fox Film Corp., Central District of California, 2004, consultant, regarding damages due for use of unauthorized screenplay in the movie Drumline.

Sharon Haygood, et al. v. Coca-Cola, et al., 17th District Court of Tarrant County, Texas, 2004, report and deposition, calculated professional losses for gospel artist who suffered personal injury in automobile accident.

Universal Music Publishing Group v. Fitness Quest, Inc., Northern District of Ohio, 2003, report and deposition, estimated damages from copyright infringement of music soundtrack in an exercise video tape.

EXHIBIT 14
PAGE 380

Brought to Life v. MCA Records, Inc., et al., Southern District of New York, 2002, consultant, valued copyright damages in Mary J. Blige song "Family Affair".

Michael A. Lowe v. Loud Records, Eastern District of Pennsylvania, 2002, report, valued damages for copyright infringement in musical track "X" produced by Dr. Dre.

Aimee Mann v. UMG Recordings, Inc., et al., Central District of California, 2002, consultant, estimated sales displacement and loss of income resulting from the unauthorized release of compilation album.

Jacques Loussier v. UMG Recordings, Inc., et al., Southern District of New York, 2002, consultant, surveyed data regarding copyright infringement of improvisational composer by Eminem in song "Kill You".

Hamstein Music Group, et al. v. MP3.com, Inc., et al., Central District of California, 2002, consultant, estimated damages for multiple infringements involving musical compositions.

Chrysalis Music v. MP3.com, Inc., et al., Central District of California, 2002, consultant, estimated damages for multiple infringements of musical compositions.

Major Bob Music, Inc., et al. v. MP3.com, Inc., Southern District of New York, 2001, report, estimated damages for unauthorized use of Garth Brooks' musical catalog by digital library service.

Trademarks, Trade Secrets, and False Advertising

GoDigital Media Group, LLC v. GoDigital Inc., Central District of California, report, 2018, liability and damage valuation from infringement of trademark owned by digital media company

Helpful Hound, LLC, v. New Orleans Bldg. Corp., et al., Eastern District of Louisiana, 2019, report, damages related to use of an infringing trademark used in a food market based in New Orleans.

Computer Programs and Systems, Inc. et al. v. Wazu Holdings, Inc., et al., Southern District of Alabama, 2018, report and deposition. damages related to use of an infringing mark in a software application in medical technology.

The Choice is Yours v. The City of Philadelphia, et al, Eastern District of Pennsylvania, 2018, report, damages related to trademark infringement of worker training program

Kische USA, LLC v. Ali Simsek and Jane Doe Simsek, et al., Western District of Washington, 2017, report. damages related to trademark infringement and unfair competition from a competing distributor of imported apparel.

VBS Distribution, Inc. et al. v. Nutrivita Laboratories, Inc., et al., Central District of California, report, 2017, damages related to false advertising and unjust enrichment involving dietary supplements.

11083171.                                    33

EXHIBIT 14
PAGE 381

Mladen Pintur, et al. v. Helen Rogic, et al., Southern District of New York, report, 2017, damages related to trademark infringement of business name

Baskim Holdings, Inc. v. Two M, Inc. d/b/a Babe's Cabaret, et al., District of Nevada, report and deposition, 2017, damages related to misuse of trademarked name.

Healthmate International, Inc., v. Timothy W.T. French, et al., Western District of Missouri, report, 2016, damages related to false advertising and unfair competition.

Elinor Shapiro v. Hasbro, Inc., Central District of California, 2016, report and deposition, infringement of trade secrets by toy manufacturer Hasbro.

Milk Studios v. Samsung Electronics Co., Ltd., et al., Southern District of New York, 2016, report, defense of Samsung Electronics in a trademark damage valuation.

JMC Restaurant Holdings, Inc., et al. v. Marcelo Pevida, Inc., et al., Eastern District of New York, 2016, report and deposition, defense of trademark user in international restaurant market.

House of Auth, LLC v. 721 Bourbon, Inc., District of Connecticut, 2016, report, regarding damages from trademark infringement of beverage

Events Media, Inc. v. The Weather Channel, Inc., District Court of New Jersey, 2015, report and deposition, trade secret infringement by major cable network The Weather Channel.

KLM & M, LLC, et al. v. VCP2 Augusta, P.C., et al., Southern District of Georgia, 2015, report, valuation of damages related to trademark infringement by a medical practice.

Simone Kelly-Brown v. Oprah Winfrey and Harpo Productions, Southern District of New York, 2014, report and deposition, valuation of damages resulting from a trademark infringement by Oprah Winfrey and Harpo Productions.

Who Dat?, Inc. v. Who Dat Shoppe, et al., Eastern District of Louisiana, 2014, report, valuation of damages resulting from infringement of trademark of major regional brand of apparel.

Vivid Entertainment, LLC v. Jose Baserva, Middle District of Florida, 2014, report, valuation of damages resulting from infringement of business name in entertainment chain

Benchmark Young Adult School v. Launchworks Life Services LLC, Southern District of California, 2014, report, valuation of damages resulting from infringement of plaintiff's business name by competing health care provider.

Kim, Khloe, and Kourtney Kardashian, and BOLDFACE Licensing + Branding v. By Lee Tillett, Inc., Central District of California, 2013, report, valuation of damages resulting from trademark infringement in cosmetics line KROMA by the Kardashian sisters.

EXHIBIT 14
PAGE 382

Original Gourmet Food Company, Inc. v. Jelly Belly Candy Company, District of New Hampshire, 2013, report and deposition, regarding declaratory judgment to enforce trademark rights for candy manufacturer.

East West LLC v. Caribbean Crescent, Inc., Northern District of Virginia, 2012, report and deposition, valuation of damages involving use of a trademark and trade name by a competitor in the food provision business.

Rock and Roll Religion v. Cels Enterprises, Central District of California, 2012, report, valuation of damages resulting from infringement of trademark in women's apparel. PML Clubs v. Gold Suit, Inc., Northern District of Texas, 2012, report and deposition, valuation of damages resulting from trademark infringement in the market for adult cabaret establishments.

Super-Krete International v. Lafarge Group, 2013, opinion letter, regarding trademark valuation of a cement product for a settlement conference between two parties.

Kilter, Inc. v. Avon Corporation, Southern District of New York, 2011, report and deposition, damage valuation of trademark infringement and misappropriation of intellectual property by major cosmetics company.

L.A. Triumph, Inc. v. Madonna Louise Veronica Ciccone and Material Girl, Central District of California, 2011, report, valuation of damages from a trademark infringement in clothing line (Material Girl) owned by Madonna.

Miller International, Inc. v. Clinch Gear, Inc., et al., District of Colorado, 2010, report, valuation of damages from a trademark infringement by a designer of martial arts apparel.

Golf Cart World, Inc. v. Mike's Golf Carts, Inc., Middle District of Georgia, 2010, report, estimated damages resulting from a trademark infringement in golf carts and hunting carts.

Doctor's Associates, Inc. v. QIP Holder, LLC and IFilm, Corp., District Court of Connecticut, 2008, consultant, reviewed expert materials in false advertising matter involving Subway and Quizno's.

Publicity Rights

Alana Campos, et al. v. Metropolitan Bush Company, Sup. Ct. of the State of Ariz., 2019, report, valuation of damages resulting from use of name and images of ten glamour models by adult nightclub in Arizona..

Timed Out v. Red Tie Gentlemen' Club,. No. Dist. of California, 2019, consultant, valuation of damages resulting from use of name and images of glamour models by adult nightclub in California.

EXHIBIT 14
PAGE 383

Hilary Hepner, et al. v. Déjà vu Services, Inc. et al., Eastern District of Michigan, 2018, report, valuation of damages resulting from use of images of eleven glamour models by adult nightclubs in Michigan.

Irina Voronina, et al. v. Scores Holding Company, et al, Southern District of New York, 2018, report, valuation of damages resulting from use of images of fifty-one glamour models by a chain of adult clubs in New York City.

Jamie Edmondson et al. v. Caliente Resorts, LLC, et al. Middle District of Florida, 2016, report and deposition, valuation of damages resulting from use of images of glamour models by adult resort in Florida.

Reese Witherspoon v. Marketing Advantages International, Superior Court of California, 2015, report, valuation of damages involving use of name and image of actress Reese Witherspoon in connection with online retailer.

Jason Lezak v. Active Network, Superior Court of California, 2015, report, valuation of damages involving use of image of Olympic swimmer Jason Lezak in connection with online software application

Sandra Bullock v. ToyWatch USA, Superior Court of California, 2013, opinion letter, valuation of damages involving use of image of actress Sandra Bullock in a commercial website for apparel accessory.

Zooey Deschanel v. Steve Madden, et al., Superior Court of California, 2011, report and deposition, valuation of publicity rights of actress Zooey Deschanel used in line of women's shoes.

Michelle Pfeiffer, et al. v. CompUSA, Superior Court of California, 2011, report, valuation of publicity rights of Sandra Bullock, Michelle Pfeiffer, Diane Keaton, Mandy Moore, Cameron Diaz, and Kate Hudson in retail advertisements .

Woody Allen v. American Apparel, Inc., Southern District of New York, 2009, consultant in valuation of reasonable damages in publicity rights of movie director Woody Allen used on urban billboards .

Evgeni Petrosyan v. DIRECTV, Inc., Eastern District of New York. 2009, consultant regarding damages for infringement of publicity rights of comedian Evgeni Petrossian by satellite network.

Arnold Schwarzenegger and Oak Productions, Inc. v. Recycled Paper Greetings, Inc., et al., Superior Court of California, 2005, report, estimated damages in publicity rights case involving greeting card merchandise bearing image likeness of Arnold Schwarzenegger.

Lawrence "Yogi" Berra v. Turner Broadcasting System, Superior Court of New York, 2005, consultant, valued publicity rights case involving the unauthorized use of personal name Yogi Berra in citywide advertising campaign.

EXHIBIT 14
PAGE 384

Rosa Parks v. BMG Music/Laface Records, et al., Eastern District of Michigan, 2004, deposition, valued publicity rights involving use of celebrity name Rosa Parks in a BMG album bearing the name and track Rosa Parks.

Melina Kanakaredes v. Ouidad, Inc., Eastern District of Ohio, consultant, 2004; publicity rights case involving damages resulting from magazine articles bearing actress name Melina Kanakaredes. Apparel, Design, Art, and Photography

Neil Zlozower and Barry Levine v. Motley Crue, Inc., Southern District of New York, 2017, report and deposition, infringement of copyrighted photographs of famous music group by touring company and merchandise sellers.

Dana Ruth Lixenberg v. Bioworld Merchandising, Inc., et al., Central District of California, 2017, infringement of photos of Tupac Shakur and Notorious B.I.G. used on apparel sold in major retail chain.

PK Studios, Inc. v. RLR Investments, LLC, et al., Middle District of Florida, 2016, report, matter involving infringement of architectural plans in residential development.

Idra Alta Mode, LLC v. D'Lymer, Inc. d/b/a Edwards Lowell, Central District of California, 2016, report, matter involving breach of contract in furrier operations.

Hansel Oy v. US Department of Health and Human Services, et al., 2016, opinion letter, report, valuation of copyright damages in use of designs created by a Finnish technology company.

Glen Craig v. Universal Music Group et al. Southern District of New York, 2016, report, infringement of copyrighted photographs of legendary artist B.B. King by parties related to his estate.

Radix Textile, Inc. v. Anthropologie, Inc., et al., Central District of California, 2015, report, valuation of damages resulting from copyright infringement of apparel design by major clothing chain.

Klauber Brothers, Inc. v. Forever 21 Retail, Inc., et al., Central District of California, 2015, report, valuation of damages resulting from infringement of copyrighted apparel design by a major apparel chain.

Star Fabrics, Inc. v. Joyce Leslie, Inc., Central District of California, 2014, report, valuation of damages resulting from infringement of copyrighted apparel design by major retail chain.

Ron Satija and Heather Lynette Mowder v. General Automobile Insurance Company, District Court of Northern Ohio, 2014, report, valuation of damages resulting from infringement of cartoon character The General in national advertising campaign.

NTD Architects v. Baker Nowicki Design Studio, Southern District of California, 2013, report and deposition, estimated damages resulting from copyright infringement involving architectural plans.

11083171.                                        37

EXHIBIT 14
PAGE 385

Sheila Lyons, DVM v. Robert Gillette, et al., District of Massachusetts, 2013, report, valuation of damages resulting from copyright infringement of professional training materials.

Turnkey Associates v. Steph Weiand, et al., District of Iowa, 2012, report, estimated damages resulting from copyright infringement of architectural plans by severed employee in new professional concern.

Murray Engineering v. Windermere Properties, et al., Southern District of New York, 2012, report, estimated damages resulting from copyright infringement of architectural plans in New York residential building.

Home Design, LLC v. Collard Properties, District of Colorado, 2012, report, valuation of damages and defendant profits in connection with copyright infringement of architectural plans in new residential development.

U.S. Textile Printing v. Crew Knitwear, et al., Central District of California, 2010, report and deposition, estimated damages resulting from copyright infringement of textile design by retail chain.

Melk Communications v. Pennsylvania Medical Society, et al., Eastern District of Pennsylvania, 2010, report, estimated damages resulting from fraud, misappropriation, and copyright infringement of commercial marketing materials.

Timpco v. Implementation Services, Southern District of Indiana, 2009, report, valuation of damages resulting from copyright infringement of commercial marketing materials.

Malibu Textiles v. CABI, Inc., Southern District of New York, 2008, report and deposition, estimated damages for copyright infringement of eight apparel designs.

Melissa Flock v. State of Florida, Division of Emergency Management, Northern District of Florida, 2007, report, estimated damages for copyright infringement of cartoon characters by the State of Florida.

Neil Zlozower v. Harris Publications, Inc., Southern District of New York, 2006, report and deposition, valuation of lost photographic slides owned by famous photographer of rock group Metallica.

Vera Bradley, Inc. v. Target Stores, Inc., Northern District of Indiana, 2006, report, valuation of unauthorized apparel design on swimwear distributed by Target Stores.

Command Cinema Corp. v. VCA Labs, Inc., Southern District of New York, 2006, report, estimated commercial damages resulting from the destruction of master tapes bearing releases of two adult movies.

Impala Lechner v. Marco-Domo Internationales Interieur, et al., Southern District of New York, 2004, consultant, estimated damages for copyright infringement of sculpture designs.

EXHIBIT 14
PAGE 386

Core Group P.C. v. Sprint PCS, American Arbitration Association, 2004, report and trial testimony, estimated damages for copyright infringement of architectural plans used in nationwide redesign of retail space operated by Sprint.

Technology and Cyberspace

Nite Glow Industries Inc., et al. v. Central Garden & Pet Company, et al., District of New Jersey, 2018, testimony at trial, estimation of damages related to patent infringement for pet goods products.

Nouis Technologies v. Polaris Industries, W. D. Wisc., 2015, report, matter involving patent infringement for clutch components in all-terrain vehicles.

Brian Lemper, M.D. v. Legacy IP, LLC, Superior Court of Nevada, 2015, deposition, matter involving purported breach of contract in procuring patent application for medical technology.

Cellebrite Mobile SyncRonization Ltd. v. Micro Systemation AB, Northern District of Virginia, 2014, report, estimated damages for copyright infringement of intelligence software designed to remove records from suspect cell phones.

Scott E. D. Skyrm v. Newedge USA, LLC, FINRA Dispute Resolution #12-02346, 2014, testimony, , valuation of damages resulting from copyright infringement of data format in online financial newsletter.

Munhwa Broadcasting Corporation v. Media Journal, Inc., et al., Central District of California, 2014, declaration in support of plaintiff in anti-circumvention liability.

Virtual Studios v. Beaulieu Group, LLC, Eastern District of Tennessee, 2013, report, valuation of damages involving copyright infringement of design software for virtual display of interior designs.

TVB Holdings (USA), Inc. v. Tai Lake Communication, Inc., Central District of California, 2013, report, regarding economic harm created by circumvention device that breached access and copyright protection on Asian programming.

James DeCordova v. MCG Nevada, Inc., Central District of California, 2012, report, valuation of damages resulting from patent infringement for a sleep-enhancing device.

BanxCorp. v. Costco Wholesale Corporation, Inc., et al., Southern District of New York, 2012, report, valuation of damages resulting from infringing use of compilation data in an online banking service.

Robert Jacobsen v. Matthew Katzer, Northern District of California, 2009, report, estimated damages in landmark copyright case involving copyright infringement of open source software created by world-renowned Berkeley professor.

Centrifugal Force, Inc. v. Softnet, et al., Southern District of New York, 2009, report, valuation of damages resulting from copyright infringement of operations software.

EXHIBIT 14
PAGE 387

Frogsware, Ltd. v. Viva Media, et al., Southern District of New York, 2009, consultant, assisted video game designer for recovery of damages resulting from a breach of contract and copyright infringement of video game software.

Carpal Therapy, Inc., and David Graston v. Jennifer Graham, Esq., Marian County Superior Court of Indiana, 2008, report and deposition, estimated commercial losses for inventor of medical technology for loss of rights to intellectual property.

Great Lakes Intellectual Property, Ltd. v. Sakar International, Inc., Western District of Michigan, 2006, report, valuation of reasonable royalties for patent infringement in a graphical user interface chip.

Frederic H. Martini v. Pearson Education Services, Northern District of California, 2005, report, estimated damages for website infringements of prominent illustrator by leading publisher of medical books.

Sandi Gray, et al. v. eUniverse, Inc., et al., Eastern District of Texas, consultant, 2004; valuation for copyright infringement by digital provider of shared content.

General Electric v. Kodak, 2002, consultant, assisted General Electric in valuation of semiconductor portfolio in patent infringement matter.

RIAA v. MP3Board, Southern District of New York, 2001, report and deposition, involving the economic effects of search engines that post links to infringing material.

Universal City Studios.Inc.,et al. v. Eric Corley, Southern District of New York, 2000, report and trial testimony, regarding economic effects of decrypting protective code established to protect copyrighted digital works.

Private Valuations of Intellectual Property

Juarez Foods, 2015, trademarks now controlled by Wise Foods, Atlanta.

Tom Binns Design, LLC, 2015, trademarks and copyrights controlled by the international jewelry concern Tom Binns Design, LLC.

The Domain Names of eCommerce, IX Web Hosting, and Host Excellence. 2012, domain names and websites owned by online business.

The Estate of Tasha Tudor, 2009, valued the worth of publishing royalties due to the estate of renowned author and illustrator.

New York Observer. 2008, domain name of political blog.

Greens Today, 2006, trademarks for greens health product.

Bernard Lewis, 2005, future publishing royalties due to Princeton professor and writer of twenty four books on politics and history.

11083171.                                         40

EXHIBIT 14
PAGE 388

Estate of Marlon Brando. 2005, consultant, valued worth of the Marlon Brando name for estate purposes.

Commercial Losses, Wrongful Termination, and Personal Injury

Jakks Pacific, Inc. v. Wicked Cool Toys, LLC and Jeremy Padawer, Supreme Court of the State of New York, 2017, report and deposition, valued commercial losses resulting from breach of contract and tortious interference.

Pansy Harris-Lane, M.D. v. Jersey City Medical Center, et al., Superior Court of New Jersey, 2017, report, valued professional damages resulting from disputed termination of medical doctor

Hasan Khushaim v. Tullow Inc. Superior Court of the State of Delaware, 2017, report, valued actual damages resulting from breach of contract regarding software design.

Anti-Aging Essentials v. Brian T. Must, et al., Court of Common Pleas of Allegheny County, 2016, report, valued commercial losses resulting from manufacturing malfeasance.

DeMartino v. Belleville Board of Education, Superior Court of New Jersey, 2014, consultant, assisted defense counsel for courtroom preparation against plaintiff expert in wrongful termination case.

Deborah Rollins and Luke Randall v. Sunrise Village, LLC, Superior Court of New Jersey, 2013, report, examined economic losses resulting from property negligence.

Crystal Evans v. Meadowlands Hospital, Superior Court of New Jersey, 2012, report and testimony, examined economic losses resulting from medical malpractice.

Christine Delurski v. Chester Stone, M.D., Superior Court of New Jersey, Morris County Court, 2012, report, estimated economic losses resulting from wrongful death.

Carl Lawson v. K2 Sports U.S.A., et al, Superior Court of New Jersey, Monmouth County Court, 2012, report, estimated economic losses resulting from personal injury.

Peter Piegdon v. H&S Bakery, Superior Court of New Jersey, Middlesex County Court, 2007, report and deposition, calculated economic losses from automobile accident.

Dash Artist Management and Dash Entertainment Management v. Ruben Gomez, et al., Southern District of Texas, 2004, report, calculated commercial losses for music manager arising from breach of contract.

Florencia Flores, et al. v. Parkchester Preservation Company, et al., New York Superior Court, 2004 report, examined economic losses suffered by domestic worker from on-the-job injury.

Safmor, Inc. v. Ministers, Elders, & Deacons of the Reformed Protestant Dutch Church of City of New York, New York Superior Court, 2005, report and deposition, calculated commercial losses for New York business foreclosed from use of its storefront sign.

11083171.                                    41

EXHIBIT 14
PAGE 389

Sharon Haygood, et al. v. Coca-Cola, et al., 17th District Court of Tarrant County, Texas, 2004, report and deposition, calculated economic losses for gospel artist who suffered from personal injury.

Antitrust

American Home Realty Network v. Edina Realty, District of Minnesota, 2014, report, examined antitrust liability involving group boycott of an online realty referral service Royal Benson, M.D. v. St. Joseph Regional Health Center, Central District of Texas, 2006, report and deposition, examined antitrust liability for vertical restraints in hospital admissions.

United Magazine Company, Inc. v. Murdoch Magazine Distribution, Inc., et al., Southern District of New York, 2004, report and deposition, examined antitrust damages in price discrimination matter involving magazine distributors.

The Coalition for a Level Playing Field v. Autozone, Inc., et al., Eastern District of New York, 2003, report and trial testimony, examined antitrust damages in price discrimination matter involving auto part retailers.

AT&T Corp. v. Winback and Conserve Program, Inc., et al., New Jersey District Court, 2003, consultant, calculated commercial losses suffered by third party telecom provider for improper termination of AT&T wholesale service.

California Scents v. Medo Industries, Inc., Central District of California, 2002, report, examined antitrust liability in matter involving the anticompetitive use of slotting allowances in retail outlets.

Prime Communications, Inc. v. AT&T Corp., Eastern District of Massachusetts, 2002, report and deposition, examined liability in antitrust lawsuit involving vertical restraints in access to cable advertising.

The Intimate Bookshop, Inc. v. Barnes and Noble, Inc., et al., Southern District of New York, 2001, report and deposition, examined economic issues in antitrust suit involving price discrimination in book retailing.

SESAC v. WPNT, Western District of Pennsylvania, 2001, report and deposition, antitrust case involving the economic consequences of blanket licensing of musical compositions.

Nobody in Particular, Inc. v. Clear Channel, Inc., District of Colorado, 2001, consultant, antitrust case involving advertising restrictions enforced by a radio station against a competing concert promoter.

State of Florida, et al. v. BMG Music, et al., District of Maine, 2001, consultant, antitrust case involving the anti-competitive effects of minimum advertising pricing rules established by five major record companies.

11083171.                                        42

EXHIBIT 14
PAGE 390

Golden Channels Company, et al. v. Director General of the Antitrust Authority, The Court of Trade Restrictions, Tel Aviv, Israel, 2000, report, case involving vertical licensing restrictions on content of Sony, Warner, and Paramount.

PUBLISHED BOOKS

Media, Technology, and Copyright: Integrating Law and Economics, Edward Elgar, 2004

ARTICLES AND CHAPTERS

See also http://mediatechcopy.com/?page id=71

Reasonable Royalties in Patent Litigation: Methods, Evidence, and Experts, presented at Knowledge Group Webinar, March 22, 2017.

First Sale Rights at SCOTUS: Kirtsaeng v. John Wiley & Sons, Journal of the Copyright Society, Spring, 2016.

Copyright, Causality, and the Courts, Journal of the Copyright Society, Winter, 2015.

The ASCAP and BMI Consent Decrees: Is Partial Withdrawal Wise?, Journal of the Copyright Society, Fall, 2014

Copyright, Causality, and Statutory Reform, Landslide, January-February, 2013-2014.

Gorillas in our Midst: Searching for King Kong in the Music Jungle, Journal of the Copyright Society, Winter, 2007.

Patent Reform and Infringement Damages: Some Economic Reasoning IP Lawyer, December, 2007; new version at Patents and the Entire Market Value Rule.

Copyright Settlement Strategies from a Damages Expert, GPSOLO, September, 2008.

Expediting the Settlement: The Use of an Expert, Entertainment and Sports Lawyer, October, 2007.

How Advertising and Peer to Peer are Transforming Media and Copyright, Journal of the Copyright Society, Spring, 2007.

Copyright at a Crossroads, Again!: The Copyright Modernization Act, Entertainment, Arts, and Sports Law Journal, December, 2006.

Swords Into Plowshares: A Convergence of Interests in P2P, Entertainment and Sports Lawyer, Summer, 2006.

Publicity Rights, Merchandise, and Economic Reasoning, Entertainment and Sports Lawyer, March, 2006.

Canadian Quandary: Digital Rights Management, Access Protection, and Free Markets, Progress on Point 3:12, Progress and Freedom Foundation, May, 2006.

EXHIBIT 14
PAGE 391

"File-Sharing at Madison and Vine: The New Convergence", Century City Lawyer, December, 2005.

"File-Sharing and Market Harm", Entertainment, Arts, and Sports Law Journal, July, 2005.

Transactions Costs and Administered Markets: The Case of Music Performance

Rights, Review of Economic Research in Copyright Issues, 3 (1), 37, 2006.

Grokster v. Sony: The Supreme Court's Real Decision, Entertainment and Sports Lawyer, Summer, 2004.

"Peer-to-Peer Networking and Digital Rights Management: How Market Tools Can Solve Copyright Problems" (with Bill Rosenblatt), Journal of the Copyright Society, Winter, 2005.

Music, Mantras, and Markets: Facts and Myths in the Brave New World,  Entertainment, Arts, and Sports Law Journal, Winter, 2004.

"Music in the Crucible: A Year in Review", Entertainment and Sports Lawyer, Summer, 2004.

Digitization and its Discontents: Digital Rights Management, Access Protection, and Free Markets, Journal of the Copyright Society, Spring, 2004.

Whose Song is it Anyway?: Infringement and Damages in Musical Compositions, Entertainment and Sports Lawyer, Spring, 2004; new version at Damage Valuation in Music Copyright

Vertical Merger in a High Tech Industry: Synopsis, Avant!, and the FTC, 2 Economics Committee Newsletter of the American Bar Association 2, 2002.

Tying, Patents, and Refusal to Deal: Economics at the Summit, 2 Economics Committee Newsletter of the American Bar Association  1, 2002.

Intellectual Property and Antitrust: Music Performance Rights in Broadcasting, Columbia Journal for Law and the Arts, 2002.

"Keep Off My Privacy: How Sweet the Sound?", Bright Ideas, 2002.

Purple Beasts and Lewd Tunes: Economic Reasoning and Copyright, Entertainment, Arts, and Sports Law Journal, 2002.

"How to Cure Performance Anxiety", 13 Entertainment, Arts, and Sports Law Journal, 2 Summer, 2002.

"Traffic Jam on the Music Superhighway: Is it a Reproduction or a Performance?", Journal of the Copyright Society, 2002 (with Lewis Kurlantzick).

EXHIBIT 14
PAGE 392

Miss Scarlett's License Done Gone: Parody, Satire, and Economic Reasoning, 20 Cardozo Arts and Entertainment Law Journal 4, 2002.

Copyright, Prevention, and Rational Governance: File-Sharing and Napster, Columbia Journal for Law and the Arts, 2002.

"Internet Television and Copyright Licensing", 20 Cardozo Arts and Entertainment Law Journal 2, 2002.

Old Friends: ASCAP and DOJ Reach a New Consent Decree, Entertainment and Sports Lawyer, 2002.

"Digital Rights Management and Access Protection" in Proceedings of the ALAI Congress: June 13-17, 2001, J. Ginsburg, ed., Columbia University, 2002.

Digitalization' and the Arts", Handbook of Cultural Economics, Ruth Towse, ed., Edward Elgar Publishing Ltd., 2002.

Internet TV and Copyright Licensing: Balancing Cents and Sensibility, Internet Television, ed. D. Gerbarg, E. Noam, J. Groebbel, Lawrence Erlbaum Publishers, Mahwah, NJ, 2002.

"Music Licensing in the Digital Age", Copyright in the Cultural Industries, Ruth Towse, ed., Edward Elgar Publishing Ltd., 2002.

Search and Destroy: How to Tame a Spider, IPL Newsletter 1, 2001.

"Biting the Hand that Feeds", Century City Lawyer, November, 2001, with Duncan Cameron.

"Interpreting Amended ASCAP Consent Decree: More Options to Avoid Blanket Royalties", Entertainment Law and Finance, October, 2001.

UNPUBLISHED ARTICLES

Reasonable Royalties in Patent Litigation: Methods, Evidence, and Experts

Trademarks and Financial Remedies: Standards in the Common Law

Trademark Valuation and Market Analysis

Pharmaceuticals and Compulsory Licensing

Trademarks, Injunctions, and eBay v. MercExchange

Publicity Rights and Rational Valuation

Art as Innovation: "The Wind Done Gone" Case

Market Imperfection and Failed Governance: The Case of Music Performance Rights

11083171.                                          45

EXHIBIT 14
PAGE 393

Information Transfer in Cyberspace: Popups, Keying, and Privacy

Copyright Settlement Strategies from a Damages Expert

OTHER AFFILIATIONS

Columbia Institute for Tele-Information, Senior Research Fellow, Columbia University, New York, New York

ecomp Consultants, Special Consultant, Tampa, Florida:

Giant Steps Media, Affiliate, New York

Contributor to MusicDish E-Journal

~~March~~April, 2019

2~~6~~7

EXHIBIT 14
PAGE 394