Michael A. Kahn (pro hac vice)
Kahn@capessokol.com
Lauren R. Cohen (pro hac vice)
lcohen@capessokol.com
CAPES SOKOL
7701 Forsyth Blvd. 12th Floor
St. Louis, MO 63015
(314) 721-7701

Eric. F. Kayira (pro hac vice)
eric.kayira@kayiralaw.com
KAYIRA LAW, LLC
200 S. Hanley Road, Suite 208
Clayton, Missouri 63105
(314) 899-9381

Daniel R. Blakey (SBN 143748)
blakey@capessokol.com
CAPES SOKOL
3601 Oak Avenue
Manhattan Beach, CA 90266

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCUS GRAY, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>KATHERYN ELIZABETH HUDSON, et al.,<br><br>  Defendants. | CASE NO. 2:15-cv-05642-CAS (JCx )<br><br>Honorable Christina A. Snyder<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO PRECLUDE THE TESTIMONY OF PLAINTIFFS' EXPERT DR. MICHAEL EINHORN AT TRIAL**<br><br>Final Pretrial Conference<br>Date: July 1, 2019<br>Time: 11 a.m.<br>Courtroom: 8D<br><br>Filed: July 1, 2014<br>Trial: July 16, 2019 |

## I. INTRODUCTION

Defendants, while admitting that Plaintiffs' expert economist, Dr. Michael Einhorn, has "impressive credentials," seek to "preclude all of Einhorn's intended testimony under the principles espoused by the Supreme Court in *Daubert*." Defendants' arguments can best be described as a gross perversion of the principles governing the admission of expert testimony in federal courts, as set out in Fed. R. Evid. 702, *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and other applicable federal precedent on the issue. Defendants label each and every one of Dr. Einhorn's opinions as "improper"; they are not. Dr. Einhorn's opinions are proper and based upon more than twenty (20) years of experience and sound economic principles applied to the facts of this case. Each of Defendants' arguments for the preclusion of Dr. Einhorn's opinions and testimony more properly go to the weight of the testimony, not the admissibility. The Court should not deprive the jury of its role to evaluate Dr. Einhorn's testimony and opinions. Accordingly, Defendants motion should be denied in its entirety.

## I. ARGUMENT

### A. Daubert and Rule 702 Standard

Fed. R. Evid. 702 requires that expert testimony must be both relevant and reliable. *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir.), opinion amended on denial of reh'g, 246 F.3d 1150 (9th Cir. 2001) (citing *Daubert* at 597). "The relevancy bar is low, requiring only that the evidence logically advances a material aspect of the proposing party's case. Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *La Amapola, Inc. v. Honeyville, Inc*, 2018 WL 6167928, at *3 (C.D. Cal. Aug. 7, 2018) (internal quotations and citations omitted).

*Daubert* requires that a district judge act as "a gatekeeper, not a fact finder" while scrutinizing the soundness of an expert's methodology, not the correctness of his conclusions. *Primiano v. Cook*, 598 F.3d 558, 564–65 (9th Cir. 2010), as amended (Apr. 27, 2010). In its gatekeeper role, the court is "to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013). The district court's function is not to decide whether the expert is right or wrong, but only whether his testimony has substance that would be helpful to a jury. *Id*.

When an expert meets the Rule 702 threshold, the expert may testify and the jury should decide how much weight to give that testimony. *Id*. *See also*, *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1047 (9th Cir. 2014) (holding that it is a question for the jury, not the court, to determine what weight to afford expert testimony, as *Daubert* "does not forbid admission" of a report where the weight of the conclusions are subject to challenge). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564; *Kaneka Corp. v. SKC Kolon PI, Inc.*, 2015 WL 12696109, at *5 (C.D. Cal. Nov. 5, 2015).

### B. Dr. Einhorn's Opinions Regarding Profits are Proper and Admissible

Defendants premise their main argument for the exclusion of Dr. Einhorn's opinions on profits by attempting to muddy the waters of the damages issues to be determined by the jury in this case. They do so in order to advance the argument that Dr. Einhorn, an economist, is not qualified to render opinions that involve, touch upon or comment on accounting principles or the work of certain of Defendants' accounting employees. That

3
**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO PRECLUDE DR. EINHORN**

premise is faulty for several reasons. First, Dr. Einhorn, in commenting upon Defendants' accounting data (including the Profit and Loss Statements (P&Ls) that Defendants reference), is not performing accounting work. Rather, he is commenting on how the Defendants are trying to use figures plucked from the P&Ls to reduce their profits under the damages scheme contemplated by 17 U.S.C. § 504(b). This is not an accounting function and does not require accounting expertise in order to undertake.

Certainly, accountants and economists would most likely take different approaches to reducing a plaintiff's damages attributable to costs:

> Still, many laypersons, accountants, and business people are inclined to account for those other costs. One proffered defense of full cost allocation is that all costs have to be "accounted for somewhere."
>
> ….
>
> A reasonable approach to profit, therefore, is to look at a product as a portion of an enterprise, allocating the costs that cannot be readily associated with individual products in proportion to the share of the business that each product represents. Although the "in proportion" is not uncontroversial, common allocation methods involve allocating fixed costs to individual products in proportion to their shares of direct costs or total revenues.
>
> Economists typically reject such reasoning about cost where the purpose of the cost calculation is to inform a decision about whether to undertake an additional activity or to determine the optimal level of activity. The economic dictum is that the activity is worth undertaking if the incremental gains are greater than the incremental costs, properly defined. Further, the gain from the undertaking (the profit) is the difference between the two. Economists are correct about this, and everyone else is wrong. This, however, is only true when we confine the issue to the tidy problem in which the choice is simple-- this activity or nothing--with all incremental costs and benefits readily understood and quantified.

Stephen E. Margolis, *The Profits of Infringement: Richard Posner v. Learned Hand*, 22 Berkeley Tech. L.J. 1521, 1533 (2007). The fact that an economist's approach to the treatment of costs in calculating damages would differ from an accountant's approach does not, however, render the economist's opinion unreliable or inadmissible.

Second, Defendants wrongly equate the Plaintiffs' acceptance of Defendants' evidence of their gross profits (Doc. 351, pp. 14-15) with an alleged inability or preclusion of the Plaintiffs to challenge Defendants' claimed cost/overhead deductions from profits. One does not follow from the other. To do so would essentially eliminate the Defendants' acknowledged burden of proving its properly deductible expenses.[1] Moreover, as an economist, Dr. Einhorn is qualified and able to comment upon and critique the scheme used by Defendants to arrive at their allegedly deductible costs. This is not an application of accounting – this is a doctor of economics applying sound and well-established economic principles.

> Experts who quantify damages come from a variety of backgrounds. Whatever his or her background, however, a damages expert should be trained and experienced in quantitative analysis. For economists, the common qualification is the Ph.D.
>
> ….
>
> It is not uncommon for an analysis by even the most qualified expert to face a challenge under the criteria associated with the Daubert case. These criteria are intended to prevent testimony based on untested and unreliable theories. On the one hand, it would appear that an economist serving as a damages expert is unlikely to succumb to a Daubert challenge because most damages analyses operate in the familiar territory of restating economic flows using a combination of professional judgment and standard tools. The parts of economics that might be accused of verging on junk science are rarely used in damages work.

Mark A. Allen, Robert E. Hall, and Victoria A. Lazear, Reference Guide on Estimation of Economic Damages, in Reference Manual on Scientific Evidence 425, 431-32 (3d ed. 2011).

Third, Dr. Einhorn's approach to profit calculations is proper as it is in line with the dictates of the relevant federal statute, 17 U.S.C. § 504(b), which states:

---

[1] Doc. 351, Defendant's Motion to Preclude the Testimony of Plaintiff's Expert Michael Einhorn at Trial (hereinafter "Defendant's Motion") p. 13, l. 23-25, "Once the plaintiff meets that burden, the burden then shifts to the defendant to prove its deductible **expenses**." (emphasis in original).

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. **In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.**

17 U.S.C.A. § 504(b) (emphasis added). Dr. Einhorn's report and damages analysis properly applies this principle and Dr. Einhorn is not required to make the Defendants' case for them; he is entitled to rely upon the Defendants' gross profits as an accurate indication of the Plaintiffs' damages. His approach finds support in the published article of another economist:

> Regardless of terminology, this margin--a gross profit--gives a rough indication of the magnitude of profits that a court might award if it disallows any deduction of overheads in determining an infringer's "profits."

Margolis, *The Profits of Infringement*, *supra* at 1526.

Even were the Court to determine that Dr. Einhorn should have considered the Defendants' costs and overhead in his damages calculation, such a determination goes solely to the weight to be afforded to Dr. Einhorn's opinions, and not to their admissibility. *Humetrix, Inc., v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001) ("To the extent [defendant] sought to challenge the correctness of [plaintiff's] experts' testimony, its recourse is not exclusion of the testimony, but, rather, refutation of it by cross-examination and by the testimony of its own expert witnesses."); *Slip-N-Slide Records, Inc. v. TVT Records, LLC*, No. 05-21113-CIV, 2007 WL 3232274, at *13 (S.D. Fla. Oct. 31, 2007) (Expert's failure to consider certain marketing expenses incurred, calculation of profits which failed to include numerous line items for expenses including marketing and promotion expenses, advertising, and royalties, among other claimed deficiencies go to the weight of the expert's testimony, not to its legal admissibility or

reliability. Resolution of those claimed deficiencies were matters for the jury to consider.); *Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 386 (S.D.N.Y. 2014) (Party's disagreement on expert's opinion or damage calculation can and should be addressed on cross examination in front of the jury, not excluded under *Daubert*.)

Finally, Dr. Einhorn's calculation of profits is the proper subject of expert testimony. The average lay person is not conversant in or well-versed in economic theories and principles. His damages calculation applies those economic principles to the facts of this case and arrives at a result that will be helpful to the jury. His testimony on this issue goes well beyond a "simple arithmetic exercise." (Defendant's Motion at p. 20).

### C. Dr. Einhorn's Opinions Regarding Actual Damages are Proper and Admissible

Defendants mischaracterize Dr. Einhorn's opinions and his methodology in an attempt to impugn and exclude his opinion as to the Plaintiffs' actual damages. First, Defendants claim that Dr. Einhorn fails to cite any generally accepted methodology, other than referring to the use of other negotiations involving similar situations as benchmarks.[2] (Defendants' Motion at p. 21, l. 4-7, citing to only ¶¶ 5.2-5.3 of Dr. Einhorn's report). This is not true. Defendants ignore the fact that ¶¶ 5.10-5.16 contain Dr. Einhorn's

---

[2] Defendants' attack Dr. Einhorn's expert qualification by mischaracterizing the *Dash v. Mayweather*, 731 F.3d 303, 321-22 (4th Cir. 2013) opinion. Defendants insinuate that the *Dash* court "disqualified" Dr. Einhorn (Defendants' Motion, p. 11 n.2) and that Dr. Einhorn lied to cover up that fact. This assertion is false. The court in *Dash* did not disqualify Dr. Einhorn as an expert. Rather, the court entered summary judgment based upon the technicality that Dr. Einhorn's report quantified the Plaintiff's damages as no greater than $3,000, but in doing so did not state the minimal amount of their damage. Hence, the court concluded that Dr. Einhorn's report did not establish the fact of damage, as it did not establish Plaintiff's minimum amount of damages was greater than zero.

application of the principles of cooperative game theory[3] to the facts presented of this case in order to reach his opinion as to the value of royalty share. (Doc. 350-2, Wais Decl. Ex. 3, Dr. Einhorn Report). Game theory is well-established, widely used by economists, generally accepted in the field of economics, and often utilized by economists to establish values. See, *Grand River Enterprises Six Nations, Ltd. v. King*, 783 F. Supp. 2d 516, 527–28 (S.D.N.Y. 2011) (The scientific validity of game theory analysis (and others) are textbook economic methodologies which are generally accepted and widely used by economists). Furthermore, contrary to Defendants' argument, a doctor of economics such as Dr. Einhorn is not required to have "personal knowledge" or personal experience negotiating licenses in order to apply sound and well-established economic principles to the facts of this case. (Defendants' Motion at p. 23, l. 11-19). See, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (In some cases expert testimony reliability rests upon the reliability of the underlying scientific foundation, "[i]n other cases, the relevant reliability concerns may focus upon personal knowledge or experience…. "[T]here are many different kinds of experts, and many different kinds of expertise.")

Next, improperly labeling Dr. Einhorn's analysis as *ipse dixit*, Defendants wrongly state that, "Einhorn does **not** consider "results of other negotiations." (Defendants' Motion at p. 21, l. 11). Dr. Einhorn did in fact consider the results of other negotiations and his report reflects that fact. (Doc. 350-2, Wais Decl. Ex. 3, Dr. Einhorn Report, ¶¶ 5.10-5.16). In fact,

---

[3] In particular, Dr. Einhorn applied principles relating to the pie-splitting problem to the facts at hand in this case. Though Dr. Einhorn may not have explicitly referenced either the term "cooperative game theory" or "pie-splitting problem" in his report or testimony, his report clearly describes the application of that theory (Doc. 350-2, Ex. 3, Dr. Einhorn Report ¶¶ 5.10-5.16). Had he been asked to assign a name to the methodology in his deposition, which he was not, he would have done so.

Dr. Einhorn considered the **most relevant prior transactions**, namely the prior royalty negotiations and transactions amongst the songwriter and producer Defendants which resulted in the royalty splits **related to the very song at issue in this case** – "Dark Horse." Defendants rely only upon the argument of counsel and cite no evidence or opinion supporting that their alternative benchmark transactions – other sales by the Plaintiffs of unrelated beats or an anomalous transfer of the "Joyful Noise" beat (which also ignores that Plaintiff Ojukwu retained a 50% ownership interest in the "Joyful Noise" copyright).[4] Dr. Einhorn did consider other negotiations and benchmarks and he reviewed and utilized the most relevant and comparable transactions to his task at hand. Based upon the legal authorities cited above (*supra* at 8-9), Defendants' *Daubert* attack as to Dr. Einhorn's actual damages analysis is unwarranted, both factually and legally. The Defendants' may cross-examine Dr. Einhorn on what Defendants' perceive to be deficiencies in his methodology or results, but Dr. Einhorn's opinion is not precluded under the relevant applicable standards.

### D. Dr. Einhorn's Opinions Regarding Apportionment are Proper and Admissible

As with their other attacks upon the admissibility of Dr. Einhorn's opinions, the Defendants' attacks upon Dr. Einhorn's apportionment opinions are likewise misguided and unsupported, both legally and factually. The Defendants' arguments with respect to profits is most analogous. These rehashed arguments relating to lack of personal knowledge and experience

---

[4] The "alternative benchmarks" that Defendants propose should have been used are irrelevant to Dr. Einhorn's damages analysis and Plaintiffs have moved to preclude any such evidence under Fed. R. Evid. 402 and 403 as it is irrelevant, and its probative value, if any, is outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury. (Doc. 328, Plaintiffs' Motion *In Limine* No. 2 to Exclude Evidence, Reference and Argument Related to Matters Not Relevant to the Issues in this Case.

and failing to undertake Defendants' burden of proof on apportionment fail for the same reasons discussed above. Further, though he may not have ever "promoted a concert tour or album," (Defendants' Motion at p. 24, l. 15) Dr. Einhorn has worked in the music industry as an employee and observed music industry marketing and promotional practices throughout the course of his long tenure as an economist rendering expert opinions in various matters relating to the music industry spanning several decades. (Doc. 351-1, Wais Decl. Ex. 3, pp. 112-1370). Dr. Einhorn has sufficient knowledge and experience.

Once again the Defendants' attacks on the data and methodology are properly resolved by the jury, as they go to the weight to be afforded Dr. Einhorn's testimony, not its admissibility. Moreover, the data reporting errors in his report that Defendants rely upon were corrected in his updated report. Dr. Einhorn promised to do so at his deposition when they were brought to his attention, and he promptly prepared a corrected report.

### E. Dr. Einhorn's Rebuttal Opinions Regarding Profits are Proper and Admissible

Defendants' seek the exclusion of Dr. Einhorn's rebuttal report regarding the musicological value assessment by Dr. Ferrara (Defendants' Motion at pp. 25-26) on the bases that the report does not contain expert opinions and contains improper legal opinions or legal conclusions.

While Plaintiffs concede that Dr. Einhorn's rebuttal report may not be artfully drafted, the gist of the opinion Dr. Einhorn seeks to convey is that: i) in his extensive tenure in assessing and valuing damage claims related to the music industry, he has never seen a "musicological" value assessment in the nature of Dr. Ferrara's that attempts to apportion value based upon an

apportionment of the number of "infringing noteheads" as a proportion of the total number of noteheads in an infringing work; ii) that such an analysis is not sound, when evaluated under economic theories and principles; and iii) that such an analysis is not sound when evaluated under either music industry business principles, or their customs and practices. *Faulkner*, 46 F. Supp. 3d at 386. (a rebuttal expert witness' testimony should explain, repel, counteract or disprove evidence presented by the expert to whom he or she is responding). Dr. Einhorn's testimony calls into question the propriety and validity of Ferrara's apportionment valuation methodology, which he is entitled to do. Therefore, because the opinion is proper and Dr. Einhorn is qualified to so opine and should be allowed to testify to those opinions at trial.

### F. Dr. Einhorn's Updated Opinions are Proper and Admissible

Under Federal Rule 26(e)(2), there is an affirmative duty to "supplement or correct" an expert report "if [a] party learns that in some material respect the [expert report] is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Supplementing a report means "correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *Luke v. Family Care & Urgent Med. Clinics*, 323 F. App'x 496, 500 (9th Cir. 2009). In fact, Rule 26(e) provides that "a party must supplement or correct its expert's report if the party 'learns that in some material respect the [report] is incomplete or incorrect.'" *Collinge v. IntelliQuick Delivery, Inc.*, 2017 WL 3887337, at *2 (D. Ariz. Sept. 6, 2017) (quoting Fed. R. Civ. P. 26(e)(1)(A)).

1    Dr. Einhorn supplemented his report twice—once on May 14, 2019
2    ("May 14 Report") and once on May 28, 2019 ("May 28 Report").  On the
3    cover of his initial report, Dr. Einhorn reserved the right to supplement his
4    report as he learned of new information. (Doc. 351-1, Wais Decl., Ex. 3, p.
5    69). Both supplemental reports fall within the definition of supplemental
6    reports.  The May 14, 2019 Report noted the review of Defendant Katy
7    Perry's deposition transcript as among the documents reviewed and made
8    various other minor corrections and amplifications to Dr. Einhorn's report.
9    Dr. Einhorn's May 28 Report fixed incorrect information in a chart
10   that was the exact type of error Rule 26(e)(1)(A) was intended to address.
11   During Dr. Einhorn's deposition, Defendants' counsel pointed out to Dr.
12   Einhorn that a chart in his report that was based on documents produced
13   from Defendants was erroneous.  In response, Dr. Einhorn acknowledged
14   that he used the incorrect numbers in his chart and promised to correct it.
15   (Doc. 351-1, Wais Decl., Ex. 2, pp. 33-34). Upon clarifying questions from
16   defense counsel, Dr. Einhorn again articulated that he made an error in
17   transcribing the data and would correct it. (Doc. 351-1, Wais Decl., Ex. 2, p.
18   37).
19   Thereafter, Dr. Einhorn corrected the data that he promised to correct
20   based on defense counsel pointing out his error.  Dr. Einhorn did not use new
21   data unfamiliar to Defendants in correcting his chart.  Rather, he used the
22   data highlighted by defense counsel in a document produced by Defendants
23   in the exact way Dr. Einhorn promised he would during his deposition.
24   Moreover, the corrections in his table did not change Dr. Einhorn's
25   conclusions, methodology, or theory behind his opinion.  *See Marcias v.*
26   *Perez*, No. 10-cv-973-MMA (BGS), 2011 WL 2669475, at *3 (S.D. Cal. July
27   7, 2011) (finding late service of expert report harmless because "this is not a
28

12
**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO PRECLUDE DR. EINHORN**

situation where Defendant is caught by surprise with a new theory of liability" where "[the expert's] conclusion represents what has been Plaintiffs' contention all along"); *Qualcomm Inc. v. Broadcom Corp.*, No. 05-cv-1958-B (BLM), 2006 WL 5201392 (S.D. Cal. Dec. 14, 2006), at *4 (rejecting motion to strike for issues on which where there had been "months of intensive discovery" and the previous disclosure of a "lengthy" opening expert report, such that "it is unlikely… that Broadcom had no knowledge or understanding of the nature and specifics of Qualcomm's infringement theories."); *Wechsler v. Macke Int'l Trade, Inc.*, 221 F.R.D. 619, 623 (C.D. Cal. 2004) (denying motion in limine to exclude expert testimony regarding damages based on a reasonable royalty that were calculated in a supplemental report because the expert's initial report placed defendants on notice that he intended to testify regarding damages based upon a reasonable royalty).

     Moreover, both supplemental reports were timely.[5] Additions or changes to an expert report "shall be disclosed by the time the party's disclosures under Rule 26(a)(3) are due." *See* Fed. R. Civ. P. 26(e)(1). Rule 26(a)(3) governs initial pretrial disclosures, which must be made at least 30 days before trial, unless otherwise directed by the Court. *See* Fed. R. Civ. P. 26(a)(3). Dr. Einhorn supplemented his report two times—both of which were within the time restraints of Rule 26. The first time was on May 14, 2019 – before he was deposed and over 60 days before trial. The second

---

[5] Defendants imply that Plaintiffs' experts were not permitted to supplement their reports after May 24, 2019. However, the Scheduling Order is not that broad. The Scheduling Order provides "Expert Discovery Cut-Off" is May 24, 2019. The Court set no express deadline for supplementation of disclosures and responses, and therefore the default deadline for supplementation of expert reports is established by Rule 26(a)(3)(B). See *Sarantis v. ADP, Inc.*, 2008 WL 4057007, at *6 (D. Ariz. Aug. 28, 2008).

supplemental report was served on May 28, 2019, 19 days before the 30 day cut off. Thus, excluding Dr. Einhorn's May 28 Report is unwarranted

## II. CONCLUSION

For the reasons stated above, Dr. Einhorn's opinions are reliable and admissible opinions based upon more than twenty (20) years of experience and sound economic principles applied to the facts of this case. Defendants' arguments for the preclusion of Dr. Einhorn's opinions and testimony more properly go to the weight of the testimony, not the admissibility. The Court should not deprive the jury of its role to evaluate Dr. Einhorn's testimony and opinions. Accordingly, Defendants' Motion should be denied.

Dated: June 19, 2019

s/ Michael A. Kahn
Michael A. Kahn (pro hac vice)
Kahn@capessokol.com
Lauren R. Cohen (pro hac vice)
lcohen@capessokol.com
Capes Sokol Goodman Sarachan PC
7701 Forsyth Blvd., 12th Floor
St. Louis, MO 63105
Telephone: (314) 721-7701

Eric F. Kayira (pro hac vice)
Clayton, Missouri 63105

Daniel R. Blakey (SBN 143748)
3601 Oak Avenue
Manhattan Beach, CA 90266

***Attorneys for Plaintiffs***