CHRISTINE LEPERA (admitted *pro hac vice*)
   ctl@msk.com
JEFFREY M. MOVIT (admitted *pro hac vice*)
   jmm@msk.com
JACOB D. ALBERTSON (admitted *pro hac vice*)
   j1a@msk.com
MITCHELL SILBERBERG & KNUPP LLP
437 Madison Avenue, 25th Floor
New York, New York 10022
Telephone: (212) 509-3900
Facsimile: (212) 509-7239

AARON M. WAIS (SBN 250671)
   amw@msk.com
GABRIELLA A. NOURAFCHAN (SBN 301594)
   gan@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, California 90067
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

GREENBERG TRAURIG, LLP
VINCENT H. CHIEFFO (SBN 49069)
Email: ChieffoV@gtlaw.com
ALANA C. SROUR (SBN 271905)
Email: SrourA@gtlaw.com
1840 Century Park East, Suite 1900
Los Angeles, CA 90067-2121
Telephone: 310-586-7700
Facsimile: 310-586-7800

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| MARCUS GRAY, et al., | CASE NO. 2:15-cv-05642-CAS (JCx) |
| Plaintiffs, | Honorable Christina A. Snyder |
| v. | **DEFENDANTS' OPPOSITION TO PLAINTIFFS *DAUBERT* MOTION NO. 1** |
| KATHERYN ELIZABETH HUDSON, et al., | |
| Defendants. | Final Pretrial Conference<br>Date: July 1, 2019<br>Time: 11:00 a.m.<br>Courtroom: 8D – 8th Fl., First Street<br><br>Filed: July 1, 2014<br>Trial: July 16, 2019 |

# TABLE OF CONTENTS

**Page**

I. Introduction ..................................................................................................5

II. Background..................................................................................................7

    A. Ferrara's Qualifications......................................................................7

    B. Ferrara's Damages Opinion In This Case..........................................9

        1. Ferrara's Quantitative Value Assessment.................................9

        2. Ferrara's Qualitative Value Assessment.................................10

III. Standard For Admissibility Of Expert Testimony .....................................11

IV. Argument....................................................................................................12

    A. Ferrara's Report Does Not Quantify The Monetary Value Of Ostinato #2 ........................................................................................12

    B. Ferrara's Methodology Is Reliable And Testable..............................14

        1. Ferrara's Specific Methodology Is Accepted In The Musicological Community ........................................................14

        2. Ferrara's Methodology Is Testable; The Plaintiffs Have Simply Failed To Test It..........................................................15

    C. The Assertions In The Untimely Decker Declaration Do Not Constitute A Basis To Exclude Ferrara's Testimony ........................16

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Cream Records, Inc. v. Jos. Schlitz Brewing Co.*,
   754 F.2d 826 (9th Cir. 1985) .................................................................................. 13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ................................................................................................ 11

*Fahmy v. Jay Z*,
   2015 WL 5680299 (C.D. Cal. Sept. 24, 2015) ............................................... 11, 14

*Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*,
   886 F.2d 1545 (9th Cir. 1989) ................................................................................ 13

*Hangarter v. Provident Life & Acc. Ins. Co.*,
   373 F.3d 998 (9th Cir. 2004) .................................................................................. 12

*Humetrix, Inc. v. Gemplus S.C.A.*,
   268 F.3d 910 (9th Cir. 2001) .................................................................................. 16

*In re Silicone Gel Breast Implants Prod. Liab. Litig.*,
   318 F. Supp. 2d 879 (C.D. Cal. 2004) ................................................................... 12

*Kennedy v. Collagen Corp.*,
   161 F.3d 1226 (9th Cir. 1998) ................................................................................ 16

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ................................................................................................ 11

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
   309 U.S. 390 (1940) .............................................................................................. 5, 7

*Thomas v. Newton Int'l Enters.*,
   42 F.3d 1266 (9th Cir. 1994) .................................................................................. 12

*Ty, Inc. v. Publications Int'l, Ltd.*,
   2004 WL 2359250 (N.D. Ill. Oct. 19, 2004) ..................................................... 7, 13

*United States v. W.R. Grace*,
   504 F.3d 745 (9th Cir. 2007) .................................................................................. 12

Mitchell Silberberg & Knupp LLP

11155661.1

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*William Hablinski Architecture v. Amir Const. Inc.*,
   332 F. App'x 363 (9th Cir. 2009) .................................................................... 5

**STATUTES**

17 U.S.C. § 504(b) ............................................................................................... 5

**OTHER AUTHORITIES**

Federal Rules of Evidence, Rule 702 ............................................................. 11, 12

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.  Introduction

When a plaintiff in a copyright infringement action asserts a claim for a defendant's profits, the Copyright Act provides the defendant with the right to establish the "elements of profit attributable to factors other than the copyrighted work," in a process known as **apportionment**.  17 U.S.C. § 504(b).  *See William Hablinski Architecture v. Amir Const. Inc.*, 332 F. App'x 363, 364-65 (9th Cir. 2009) (A plaintiff is "not entitled to 'elements of profit attributable to factors other than the copyrighted work.'").

In this case, Plaintiffs allege that Defendants' composition "Dark Horse" infringes their composition "Joyful Noise," and they seek Defendants' profits earned from the exploitation of "Dark Horse."  But there is no dispute that the **majority** of the musical expression in "Dark Horse" has nothing to do with "Joyful Noise."[1]  In fact, the only expression in "Dark Horse" that Plaintiffs contend to be infringing is an eight-note ostinato (referred to herein as "Ostinato #2").

Therefore, in the event of a finding that "Dark Horse" infringes "Joyful Noise," the jury will be required to: (a) first perform a **quantitative** analysis by breaking down and segregating Ostinato #2 from the remainder of the musical components of "Dark Horse"; and (b) then perform a **qualitative** analysis by determining the value of Ostinato #2 to "Dark Horse."  These analyses are specialized areas of inquiry that are far outside the experience of a typical juror, and expert testimony is therefore entirely proper to provide guidance to the jury.  *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 408 (1940) (in apportioning profits in a copyright infringement action, "the testimony of those who are informed by observation and experience may be not only helpful but, as we have said, may be indispensable").

---

[1] Defendants adamantly dispute that any portion of "Dark Horse" infringes "Joyful Noise."

Accordingly, to assist the jury in conducting this apportionment analysis, Defendants have proffered the opinions of their expert musicologist Dr. Lawrence Ferrara ("Ferrara"). Ferrara is Professor of Music and Director Emeritus of all studies in Music and the Performing Arts in New York University's Steinhardt School. In his expert report on damages, Ferrara drew upon his vast knowledge and experience in the field of musicology to perform a quantitative and qualitative assessment of the contribution of Ostinato #2 to "Dark Horse." To perform his **quantitative** analysis, Ferrara first transcribed the entire musical score for the composition "Dark Horse." Ferrara then identified all of the notes in the score which constitute iterations of the allegedly infringing Ostinato #2, in order to determine the percentage of musical expression in "Dark Horse" that is allegedly infringing. Next, Ferrara performed a **qualitative** analysis to determine the overall value of this allegedly infringing expression to "Dark Horse" as a whole.[2]

Plaintiffs do not want the jury to know that Ostinato #2 constitutes a very small percentage of the overall musical expression in "Dark Horse"—because it would hurt Plaintiffs' chances of obtaining a substantial damages award. Accordingly, Plaintiffs have moved to preclude Ferrara's apportionment opinion under *Daubert* by making several completely incorrect characterizations regarding its contents.

For example, Plaintiffs wrongly contend that Ferrara has provided an opinion as to the percentage of Defendants' financial profits from "Dark Horse" that are attributable to Ostinato #2. This is completely incorrect. Rather, Ferrara has provided a quantitative opinion which states what percentage of "Dark Horse" is comprised of the allegedly infringing Ostinato #2, and a qualitative opinion

---

[2] In their Motion, Plaintiffs make the obvious and undisputed point that some notes are more important to a composition than other notes, and cite the eight-note riff in the Rolling Stones' "Satisfaction" as an example. Dkt. 330, p. 6. It is the very point and purpose of Ferrara's qualitative analysis to determine how important the allegedly infringing notes are to the composition as a whole.

regarding how important Ostinato #2 is to the composition as a whole. Ferrara's quantitative and qualitative opinions constitute important **considerations** for the jury to take into account in making a financial apportionment of profits, but Ferrara's opinions themselves do not apportion profits. Ferrara's opinions are precisely the kind of expert testimony that courts have long held to be appropriate or even "indispensable" for the finder of fact to consider in making a profit apportionment. *Sheldon*, 309 U.S. at 404; *see also, e.g.*, *Ty, Inc. v. Publications Int'l, Ltd.*, 2004 WL 2359250, at *6-7 (N.D. Ill. Oct. 19, 2004).

Plaintiffs also wrongly assert that Ferrara's methodology is purportedly novel and cannot be tested. However, Ferrara's quantitative and qualitative assessments are firmly grounded in a great body of scholarly analysis, including Ferrara's own peer-reviewed musicological publications, and accepted practices in musicology and other respected academic fields. Moreover, in his report, Ferrara clearly sets forth his process such that any qualified musicologist could duplicate it. Although Plaintiffs' claim it is "untestable," this is not so. Plaintiffs simply failed to offer a rebuttal expert to test it. But Plaintiffs' failure is no basis to exclude Ferrara's report.

Accordingly, Plaintiffs' motion should be denied.

## II.  Background

### A.  Ferrara's Qualifications

Plaintiffs do not challenge Ferrara's qualifications as a musicologist. Briefly, as further set forth in his Report and his *curriculum vitae*, Ferrara is an internationally-renowned scholar in the field of musicology with 40 years of experience in the field. He is currently a Professor of Music and Director Emeritus of all studies in Music and the Performing Arts in New York University's ("NYU") Steinhardt School. Dkt. 330-1 (Ferrara Report), p. 1; *see also* Declaration of Lawrence Ferrara, dated June 19, 2019 ("Ferrara Decl."), Ex. 1 (Ferrara CV), p. 8.

Ferrara received his Ph.D. in Music from NYU, a Masters in Music from the Manhattan School of Music, and a Bachelors in Music from Montclair State University. *Id.* He began teaching at NYU in 1979 as an Assistant Professor of Music, and has been a Full Professor of Music at NYU since 1992. He is a former Chair of the Music Department at NYU (from 1995 to 2006) and Director of Music and the Performing Arts (from 2006 to 2011). *Id.* He has taught courses for Ph.D., Masters, and Bachelors students, including "Contemporary Music, Analysis," "Music History," "Music Reference & Research Methods," and "Music Theory and Analysis." *Id.*, p. 14-15.

Ferrara has "written and co-written published books and articles (in peer-reviewed journals) regarding music analysis, methodologies in music research, and other scholarly areas related to music," including *A Guide to Research in Music Education* (Rowman & Littlefield, Fifth Edition, 2005). Dkt. 330-1 (Ferrara Report), p.1; Ferrara Decl., Ex. 1 (Ferrara CV), p. 14. He also "sit[s] on editorial boards of peer-reviewed journals," and is a member of the American Musicological Society and Society for Music Theory. Dkt. 330-1 (Ferrara Report), p.1; Ferrara Decl., Ex. 1 (Ferrara CV), p. 14.

Ferrara is also the recipient of numerous awards, including a Presidential Research Fellowship from NYU, multiple federal research grants, and the Daniel E. Griffiths Award for publication by Cambridge University Press regarding the analysis of Arthur Schopenhauer's works on music. *Id.*, p. 13.

As a pianist, Ferrara has performed solo recitals and as an accompanist in the United States and Europe, including on radio and television, recordings released by Orion Master Recordings and Musique International, and performed for musical theatre shows, accompanist to internationally acclaimed singers, and as a session pianist in pop styles. *Id.*

### B. Ferrara's Damages Opinion In This Case

Ferrara completed "musicological quantitative and qualitative value assessments of the music that is at issue in 'Dark Horse.'" Dkt. 330-1 (Ferrara Report), p. 1. He began by identifying the music at issue: Ostinato #2. Ostinato #2 is iterated for the first time at 0:15 (15 seconds) into "Dark Horse," and is four bars in duration "consisting of eighth notes in its initial iterations." *Id.*, pp. 1-2. In later iterations, this ostinato "is varied and developed." *Id.* Ferrara notes that, "[c]ollectively, Ostinato #2 . . . is present during Verse 1 (commencing at 0:15), the 'Break' (commencing at 1:13), Verse 2 (commencing at 1:21), and the Rap Verse (commencing at 2:18)." *Id.*, p. 2. Ferrara also prepared a full score transcription of the entirety of "Dark Horse," which he included as Visual Exhibit 1 to his Report. In order to facilitate the identification of the notes at issue in "Dark Horse," Ferrara highlighted every note in Ostinato #2 in red. *Id.*, p. 3.

#### 1. Ferrara's <u>Quantitative</u> Value Assessment

Using his transcription of the "Dark Horse" score, Ferrara conducted a quantitative value assessment, as follows: First, he identified the total number of note heads, subtracting out duplicative "Sub Bass" parts, which yielded a total of 2,865 note heads. *Id.*, p. 4. Next, he identified all note heads in all iterations and variations of Ostinato #2, which yielded a total of 207 note heads. *Id.* Thus, Ferrara concluded that the music at issue, i.e., Ostinato #2, constitutes 7.2% of the total note heads in the "Dark Horse" composition. *Id.* Next, Ferrara noted that none of the lyrics in "Dark Horse" are at issue. *Id.* Ferrara opined that, "[i]f the lyrics constitute 50% of the 'Dark Horse' composition and the music constitutes the remaining 50% of the 'Dark Horses' composition, 7.2% of the (50%) musical portion of 'Dark Horse' is 3.6% of the (combined music and lyrics) 'Dark Horse' composition." *Id.* In summary, Ferrara's assessment is that the music at issue has a quantitative value of 3.6% of the "Dark Horse" composition. *Id.*

## 2. Ferrara's <u>Qualitative</u> Value Assessment

Using his knowledge and experience as a highly qualified musicological scholar, Ferrara next conducted a qualitative value assessment of the music at issue in "Dark Horse" within the context of the overall musical <u>and</u> lyrical "Dark Horse" composition. *Id.* Ferrara noted that, when combined with a quantitative value assessment, the qualitative value assessment "may increase or decrease the value of the total number of notes that are at issue in the 'Dark Horse' composition." *Id.* at 4-5. "For example, if the music at issue includes the 'hook' (i.e., the most memorable part) of the 'Dark Horse' composition, such an inclusion would represent a higher qualitative value than other portions of the composition and thereby could increase the (3.6%) quantitative value," and vice versa. *Id.*, p. 5. Ferrara explains that:

> Each part of a song – Introduction, Verse, Chorus, etc. – does not function by itself, but rather functions as an organic part of the overall composition. Moreover, each song is marked by its compositional trajectory from beginning to end. A qualitative analysis assesses the value of the music at issue in the "Dark Horse" composition within the trajectory of the overall musical and lyrical "Dark Horse" composition.

*Id.*, p. 5.

With respect to "Dark Horse" in particular, Ferrara found that the "hook" is "the vocal melody and lyrics (as sung by Katy Perry) in the Chorus section," which are not at issue in this case. *Id.* Ferrara also found that a separate ostinato (referred to herein as "Ostinato #1") is more important than Ostinato #2. *Id.*, pp. 5-6. As Ferrara explained, "Dark Horse" opens and ends with Ostinato #1, Ostinato #1 prominently plays during the Chorus sections, and unlike Ostinato #2, which is varied, Ostinato #1 is consistent and not varied. *Id.* While other qualitative factors

could <u>increase</u> the quantitative value of the music at issue—such as the fact that Ostinato #2 is the main melody during the brief "Break section" and is repeated in the Verses—Ferrara "concluded that more weight must be given to the more substantive and greater number of qualitative factors that could decrease the 3.6% quantitative value of the music at issue." *Id.*, p. 6.

Accordingly, Ferrara concluded that "the value of the music at issue in the 'Dark Horse' composition should be less than 3.6% of the 'Dark Horse' composition." *Id.*, pp. 6-7.

### III. Standard For Admissibility Of Expert Testimony

Under Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" may offer opinion testimony if: (1) her scientific, technical, or other specialized knowledge will assist the trier of fact; (2) her "testimony is based on sufficient facts or data"; (3) her testimony is the product of reliable principles and methods"; and (4) she has reliably applied those principles and methods to the facts of the case. Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* the Supreme Court held that expert testimony is admissible so long as it "rests on a reliable foundation and is relevant to the task at hand." 509 U.S. 579, 597 (1993). While *Daubert* highlighted several indicia of reliability, the Court has since made clear that the *Daubert* test is "flexible" and that "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). *See also id.* at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

"When an expert's testimony is not scientific or technical, the reliability of that testimony need not be based on 'a particular methodology or technical framework,' but instead can be found reliable based on the expert's knowledge and experience alone." *Fahmy v. Jay Z*, 2015 WL 5680299 at *1 (C.D. Cal. Sept. 24,

2015) (citing *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1018 (9th Cir. 2004)). The relevant question is simply whether Ferrara's testimony, viewed in a "holistic" manner, is reliable. *See United States v. W.R. Grace*, 504 F.3d 745, 762 (9th Cir. 2007).

In applying Rule 702, the Ninth Circuit "contemplates a broad conception of expert qualifications." *Hangarter*, 373 F.3d at 1015 (quoting *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994)). "Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert." *Thomas*, 42 F.3d at 1269. "A court abuses its discretion when it excludes expert testimony solely on the ground that the witness's qualifications are not sufficiently specific if the witness is generally qualified." *In re Silicone Gel Breast Implants Prod. Liab. Litig.*, 318 F. Supp. 2d 879, 889 (C.D. Cal. 2004). Even where a court finds that an expert is not sufficiently specialized, this is not grounds for exclusion. "A lack of specialization affects the weight of the expert's testimony, not its admissibility." *Id.*

## IV.   Argument

Plaintiffs attempt to attack the Ferrara report as unreliable. Specifically, Plaintiffs argue that: (1) Ferrara is not qualified to "quantify the monetary value" of Ostinato #2; (2) Ferrara's methodology is "novel, untested, and untestable"; and (3) Ferrara's valuation is purportedly contradicted by a Declaration from Plaintiffs' expert, Dr. Todd Decker. Dkt. 330, pp. 4-7. None of Plaintiffs' arguments have any merit.

### A.   Ferrara's Report Does Not Quantify The Monetary Value Of Ostinato #2

As explained above, Ferrara is eminently qualified to offer musicological opinions. Plaintiffs do not dispute those qualifications; rather, Plaintiffs argue that Ferrara is purportedly unqualified to "precisely quantify the monetary value of the infringing portions of 'Dark Horse.'" *Id.*, p. 5. This is a "straw man" argument

1  because Ferrara's damages report nowhere opines on the monetary value of
2  Ostinato #2.  Rather, Ferrara's report first opines on the percentage of "Dark
3  Horse" which is comprised by Ostinato #2 (his quantitative analysis), and then he
4  opines on the **musical significance** of Ostinato #2 to "Dark Horse" as a whole (his
5  qualitative analysis).

6  Courts have long recognized that the task of apportionment requires the
7  quantitative assessment of separating the infringing elements of a work from the
8  non-infringing elements, followed by the qualitative assessment of the significance
9  of those elements to the overall work.  That is exactly the analysis that Ferrara
10 performed here.  **After** those quantitative and qualitative assessments are made, the
11 finder of fact can **then** apportion an appropriate percentage of monetary profits to
12 the alleged infringement.  *See Cream Records, Inc. v. Jos. Schlitz Brewing Co.*,
13 754 F.2d 826, 828 (9th Cir. 1985) (holding that "the infringement [of a musical
14 composition] 'was minimal,' **consisting principally of a ten-note ostinato**" and
15 therefore apportioning profits of "[o]ne-tenth of 1 percent") (emphasis added).

16 Indeed, the two-step quantitative and qualitative apportionment analysis
17 employed by Ferrara was approved by the Ninth Circuit in *Frank Music Corp. v.*
18 *Metro-Goldwyn-Mayer Inc.*, 886 F.2d 1545 (9th Cir. 1989).  In that case, the
19 plaintiffs, authors of a play called *Kismet*, alleged that the defendants used *Kismet*
20 as one of ten acts in a musical revue called *Hallelujah Hollywood*.  The district
21 court apportioned profits from the entire work—*Hallelujah Hollywood*—by
22 combining a "quantitative comparison" with a consideration of the "relative quality
23 or drawing power of the show's various component parts." *Id.* at 1548–49.
24 Specifically, with respect to the quantitative comparison, the court divided the
25 length of the infringing act (*Kismet*) by the entire length of the revue. *Id.*
26 Similarly, in *Ty, Inc.*, the plaintiffs' apportionment expert calculated the "number
27 of photographs on the interior pages of the publications" at issue and calculated a
28

Mitchell
Silberberg &
Knupp LLP

11155661.1

13

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' *DAUBERT* NO. 1**

percentage of pages on which the allegedly infringing photographs appeared. *Ty, Inc.*, 2004 WL 2359250, at *7.

In sum, because Ferrara does not opine on the monetary value of Ostinato #2, but instead provides quantitative and qualitative value assessments of **musical** value that the jury may take into account in thereafter assigning a monetary apportionment, there is no basis to exclude his opinion.

### B.  Ferrara's Methodology Is Reliable And Testable

#### 1.  Ferrara's Specific Methodology Is Accepted In The Musicological Community

Ferrara's specific approach is accepted in the field of musicology.  As set forth in the accompanying Declaration of Lawrence Ferrara, "corpus analysis"—quantitative analysis of a work or body of works—"is currently used in music theory, studies in popular music, ethnomusicology, and music copyright." Ferrara Decl. ¶ 10.  In his declaration, Ferrara cites several examples of quantitative computation of musical components.  *Id.*[3]

In addition, Ferrara has presented the methodology employed in this case for peer review.  On April 30, 2016, Ferrara presented a peer-reviewed paper for the American Musicological Society ("AMS"), Greater New York Chapter, titled "Counting Musical Elements: Corpus Analysis in Musicology."[4]  This presentation is listed in the February 2017 Newsletter of the American Musicological Society in

---

[3] Plaintiffs wrongly argue that this Court's opinion in *Fahmy v. Jay Z*, which held that the defendants' marketing expert Dr. King could not provide the jury with a numerical apportionment of profits, purportedly precludes Ferrara from providing the jury with his quantitative analysis in this case.  This is completely incorrect.  In *Fahmy*, the Court held that the jury could have been confused by Dr. King's numerical apportionment because his numbers were only approximations which could not be tested.  *Fahmy*, 2015 WL 5680299, at *4-5.  Here, in contrast, Ferrara's quantitative apportionment percentage is exact, precise, and can be tested.

[4] This presentation was listed on Ferrara's *curriculum vitae*, which was an appendix to his original report in this case, dated May 5, 2017.  Ferrara Decl., Ex. 1, p. 9.

a section listing papers given at AMS Chapter meetings in the previous 2016 calendar year. *See* Ferrara Decl. ¶¶ 3-5, Ex. 2. In his peer-reviewed presentation, Ferrara discussed the methodology he implements in quantitative and qualitative value assessments of the music at issue in copyright matters, namely, to identify the notes in a composition that are at issue, to quantify that number of notes as a simple percentage of the total number of notes in a composition, and to engage in a qualitative assessment of those notes at issue within the context of the composition as a whole. Ferrara Decl. ¶¶ 3-5.

Ferrara has also published on the practice of **combining** quantitative and qualitative findings. In his chapter, "Qualitative Research: Concepts and Techniques" in the book, *A Guide to Research in Music Education* (Rowman & Littlefield, Fifth Edition, 2005), Ferrara discusses combining (termed "triangulating") quantitative and qualitative methods and findings. *Id.* ¶¶ 13-15. Ferrara is a co-writer of that book, now in its Fifth Edition, which includes chapters on quantitative and qualitative methods of research.

### 2. Ferrara's Methodology Is Testable; The Plaintiffs Have Simply Failed To Test It

As described above, Ferrara's quantitative musicological valuation is quite simple, easy to understand, and could be tested by any qualified musicologist. First, Ferrara transcribed the entire score of "Dark Horse"; next, he counted all of the note heads in the score, specifically identifying those note heads that are part of Ostinato #2; finally, he conducted a simple calculation to determine the percentage of all note heads that are part of Ostinato #2.

Notably, Plaintiffs could have submitted a rebuttal expert report to "test" Ferrara's methodology and conclusions, but they declined to do so. The fact that Plaintiffs failed to test this methodology certainly does not make it "untestable." Indeed, as discussed above, this methodology is widely accepted, both by courts and in the field of musicology.

### C. The Assertions In The Untimely Decker Declaration Do Not Constitute A Basis To Exclude Ferrara's Testimony

Plaintiffs also wrongly argue in that the assertions in a Declaration from their expert Decker establish the unreliability of Ferrara's apportionment opinion. In his Declaration, Decker opines that 95 of the 212 seconds of "playing time" of the sound recording of "Dark Horse" include Ostinato #2. Dkt. 330-2 ¶ 5. Plaintiffs calculate this to mean that Ostinato #2 "comprises 45% of the song." Dkt. 330, p. 6. According to Plaintiffs, "Ferrara [improperly] reduces that [45%] number to … to 3.6%." Dkt. 330, p. 6. This is completely incorrect. *First*, Decker's Declaration was submitted long after the deadlines for expert disclosures, and Defendants have separately moved to preclude the opinions in the Declaration from being offered at the trial of this action. Dkt. 348. *Second*, it is not true that Ferrara "reduces" Decker's 45% number—the comparison is apples to oranges. Decker's overly simplistic apportionment fails to account for the many undisputedly non-infringing musical elements in "Dark Horse"—such as Katy Perry's vocals—that are heard on the recording **simultaneously** with Ostinato #2. *Third*, in any event, a disagreement among experts is not grounds for exclusion. *See Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230–31 (9th Cir. 1998) ("In arriving at a conclusion, the factfinder may be confronted with opposing experts, additional tests, experiments, and publications, all of which may increase or lessen the value of the expert's testimony. But their presence should not preclude the admission of the expert's testimony—they go to the *weight*, not the admissibility." (emphasis in the original)); *Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001) (where opposing party believes expert testimony is incorrect, its "recourse is not exclusion of the testimony, but, rather, refutation of it by cross-examination and by the testimony of its own expert witnesses").

In sum, the untimely and inapposite Decker Declaration provides no basis for excluding Ferrara's opinions.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to exclude Ferrara's damages testimony should be denied.

DATED: June 19, 2019          MITCHELL SILBERBERG & KNUPP LLP

                              By: /s/ Aaron M. Wais
                              Aaron M. Wais (SBN 250671)
                              Attorneys for Defendants other than Katheryn
                              Elizabeth Hudson, and Kitty Purry, Inc.

DATED: June 19, 2019          GREENBERG TRAURIG, LLP

                              By: /s/ Vincent H. Chieffo
                              Vincent H. Chieffo (SBN 49069)
                              Attorneys for Defendants Katheryn Elizabeth
                              Hudson p/k/a Katy Perry and Kitty Purry, Inc.

## ATTESTATION REGARDING SIGNATURES

Pursuant to Local Civil Rule 5-4.3.4(a)(2)(i), I hereby attest that all Parties, on whose behalf this entire filing is jointly submitted, concur in this filing's content and have authorized its filing.

Dated: June 19, 2019          /s/ Aaron M. Wais
                              Aaron M. Wais