CHRISTINE LEPERA (admitted *pro hac vice*)
  ctl@msk.com
JEFFREY M. MOVIT (admitted *pro hac vice*)
  jmm@msk.com
JACOB D. ALBERTSON (admitted *pro hac vice*)
  j1a@msk.com
MITCHELL SILBERBERG & KNUPP LLP
437 Madison Avenue, 25th Floor
New York, New York 10022
Telephone: (212) 509-3900
Facsimile: (212) 509-7239

AARON M. WAIS (SBN 250671)
  amw@msk.com
GABRIELLA A. NOURAFCHAN (SBN 301594)
  gan@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, California 90067
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

GREENBERG TRAURIG, LLP
VINCENT H. CHIEFFO (SBN 49069)
Email: ChieffoV@gtlaw.com
ALANA C. SROUR (SBN 271905)
Email: SrourA@gtlaw.com
1840 Century Park East, Suite 1900
Los Angeles, CA 90067-2121
Telephone: 310-586-7700
Facsimile: 310-586-7800

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| MARCUS GRAY, et al.,<br><br>     Plaintiffs,<br><br>     v.<br><br>KATHERYN ELIZABETH HUDSON, et al.,<br><br>     Defendants. | CASE NO. 2:15-cv-05642-CAS (JCx)<br><br>Honorable Christina A. Snyder<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' *DAUBERT* MOTION NO. 4 TO EXCLUDE TESTIMONY OF ZACHARY P. ST. MARTIN**<br><br>**Final Pretrial Conference**<br>Date:     July 1, 2019<br>Time:     11:00 a.m.<br>Courtroom:  8D – 8th Fl., First Street<br><br>Filed:    July 1, 2014<br>Trial:    July 16, 2019 |

1

# **TABLE OF CONTENTS**

2

**Page**

3

I.      Introduction ......................................................5

4

II.     St. Martin Is Qualified To Testify About His Opinions Stated. ...................6

5

III.    St. Martin's Opinions are Well-Founded and Reliable.................................11

6

7

IV.     St. Martin's Opinions are Relevant .............................................15

8

Conclusion ...........................................................................20

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

11150040.2

**DEFENDANTS' OPPOSITION TO PL. *DAUBERT* MOTION NO. 4 RE: ST. MARTIN TESTIMONY**

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ...................................................................................11, 12

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ............................................................................14

*Guzman v. Hacienda Records & Rec. Studio, Inc.*,
2014 WL 6982331 (S.D. Tex. Dec. 9, 2014),
*aff'd* 808 F.3d 1031 (5th Cir. 2015) .................................................................16

*Hangarter v. Provident Life and Acc. Ins. Co.*,
373 F.3d 998 (9th Cir. 2004) .........................................................................6, 12

*In re Canvas Specialty, Inc.*,
261 B.R. 12 (2001) .............................................................................................11

*In re Silicone Gel Breast Implants Prods. Liab. Litig.*,
318 F. Supp. 2d 879 (C.D. Cal. 2004)............................................................7, 11

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999) .......................................................................................12, 13

*Loomis v. Cornish*,
836 F.3d 991 (9th Cir. 2016) ...............................................................15, 16, 19

*Morin v. U.S.*,
534 F. Supp. 2d 1179 (D. Nev. 2005) ...............................................................11

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co*,
752 F.3d 807 (9th Cir. 2013).................................................................12, 13, 15

*Scott v. Ross*,
140 F.3d 1275 (9th Cir. 1998) ........................................................................6, 8

*Sementelli v. Trinidad Corp.*,
155 F.3d 1130 (9th Cir. 1998) ......................................................................6, 15

*Three Boys Music Corp. v. Bolton*,
212 F.3d 477 (9th Cir. 2000)........................................................................16, 19

# TABLE OF AUTHORITIES
<u>continued</u>

**Page(s)**

*U.S. v. Morales*,
   108 F.3d 1031 (9th Cir. 1997) ..................................................................... 6, 8, 9

*U.S. v. W.R. Grace*,
   504 F.3d 745 (9th Cir. 2007) ................................................................................ 12

*United States v. Brooks*,
   610 F.3d 1186 (9th Cir. 2010) ............................................................................. 10

*Warner Bros. Entm't v. Global Asylum, Inc.*,
   2013 WL 12114836 (C.D. Cal. Jan. 29, 2013) .................................................. 11

*Wendell v. GlaxoSmithKline LLC*,
   858 F.3d 1227 (9th Cir. 2017) ............................................................................. 13

## OTHER AUTHORITIES

Fed. R. Evid.
   702 .................................................................................................................. 6, 11
   703 ...................................................................................................................... 13

**DEFENDANTS' OPPOSITION TO PL. *DAUBERT* MOTION NO. 4 RE: ST. MARTIN TESTIMONY**

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    Introduction

As explained in Defendants' various motions *in limine*, Plaintiffs' sole theory of access in this case is that "Joyful Noise" was allegedly "widely disseminated" such that a jury could infer a reasonable possibility that defendants Walter or Gottwald—the sole defendants responsible for creating the allegedly infringing instrumental music for "Dark Horse"[1]—heard and copied "Joyful Noise" in creating their instrumental music.  In support of their theory, Plantiffs intend to introduce evidence at trial of the "play" counts of "Joyful Noise" on the personal Myspace pages of plaintiff Marcus Gray and third party Lecrae Moore, their contention being that these play counts are so high that it is reasonable to say anyone—including Walter and Gottwald—had a reasonable opportunity to hear "Joyful Noise."

Plaintiffs are intent on seeking to avoid scrutiny into how users actually interact with content on Myspace (actively, not passively) and grossly overestimate the volume of views received by "Joyful Noise" in the context of the greater Myspace universe.  These are points that Defendants intend to prove, in part, through the testimony of their expert Zachary P. St. Martin.  As detailed in his Report and curriculum vitae attached thereto, St. Martin has extensive experience working in the media industry, specifically with Myspace, and has an intimate understanding of its operations and functions.  He will testify in this case about "how users generally viewed or listened to content on Myspace during the period of 2008-2013, and the circumstances under which an individual could possibly have come upon Plaintiffs' song 'Joyful Noise,' as it appeared on the Myspace pages of plaintiff Marcus Gray (p/k/a 'Flame') and the artist Lecrae Moore (p/k/a 'Lecrae')."  Dkt. 336-1, p. 1, ¶ 1.  His testimony will include his ultimate opinion

---

[1] *See* Dkt. 287 (Pls. Rsp. to SUF), p. 3, ¶ 11; Dkt. 299 (MSJ Order), pp. 3-4.

Mitchell Silberberg & Knupp LLP

11150040.2

1   that it was "not reasonably possible" for someone (including, but not limited to,

2   Walter or Gottwald) to come across "Joyful Noise" on Myspace without having

3   sought it out affirmatively.  *Id.*

4          Because Plaintiffs obviously dislike St. Martin's conclusions, they seek to

5   exclude his testimony at trial.  They claim, without any basis, that he is unqualified

6   to offer these opinions, that his opinions are unreliable, and that his opinions are

7   somehow irrelevant to the issues in this case.  In making these arguments,

8   Plaintiffs ignore St. Martin's extensive qualifications working in and with the

9   media industry including with Myspace specifically—qualifications that are

10  detailed expressly in St. Martin's Report and further details of which would have

11  been known to Plaintiffs had they not declined to depose St. Martin—as well as the

12  well-settled legal standards regarding the reliability of expert opinions based on

13  industry experience.

14         As detailed further below, Plaintiffs' motion to exclude St. Martin's

15  testimony should be denied.

16  **II.     St. Martin Is Qualified To Testify About His Opinions Stated**

17         Plaintiffs fail in their attempt to challenge St. Martin's qualifications.  The

18  determinative query in each case is whether the witness has sufficient knowledge,

19  skill or experience in the field so that his or her testimony would be likely to assist

20  the jury in its search for the truth.  *See* Fed. R. Evid. 702; *U.S. v. Morales*, 108 F.3d

21  1031, 1038 (9th Cir. 1997).  Whether an expert meets this standard is construed

22  liberally and a broad range of knowledge, skill, or training can qualify an expert.

23  *See Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir.

24  2004) ("Rule 702 'contemplates a broad conception of expert qualifications.'")

25  (quoting *Thomas v. Newton Intern. Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994));

26  *Sementelli v. Trinidad Corp.*, 155 F.3d 1130, 1134 (9th Cir. 1998) (FRE 702 has

27  "broad parameters of reliability, relevancy, and assistance to the trier of fact.");

28  *Scott v. Ross*, 140 F.3d 1275, 1286 (9th Cir. 1998) (same).  "A court abuses its

1  discretion when it excludes expert testimony solely on the ground that the
2  witness's qualifications are not sufficiently specific if the witness is generally
3  qualified … A lack of specialization affects the weight of the expert's testimony,
4  not its admissibility." *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 318
5  F. Supp. 2d 879, 889 (C.D. Cal. 2004) (internal citation omitted).

6      Here, St. Martin opines on "how users generally viewed or listened to
7  content on Myspace during the period of 2008-2013, and the circumstances under
8  which an individual could possibly have come upon Plaintiffs' song 'Joyful
9  Noise,' as it appeared on the Myspace pages of plaintiff Marcus Gray (p/k/a
10  'Flame') and the artist Lecrae Moore (p/k/a 'Lecrae')." Dkt. 336-1, p.1, ¶ 1.  In
11  this regard, his Report and resume are more than sufficient to establish his
12  qualifications:

13  • St. Martin holds a Bachelor of Science in Engineering degree from Tulane
14    University, and a Juris Doctorate degree from Tulane University School of
15    Law.  Dkt. 336-1, p. 1, ¶ 2.

16  • In 2006, St. Martin became a Director of Business and Legal Affairs for Fox
17    Interactive Media ("FIM"), which, at the time, was the parent company of
18    Myspace.  Dkt. 336-1, p. 2, ¶ 3.  From this time, and until 2015, St. Martin
19    worked directly with and for Myspace.  *Id.*, pp. 2-3, ¶¶ 3-4.

20  • In 2009, St. Martin began working exclusively for Myspace as Senior
21    Director of Business and Legal Affairs.  Dkt. 336-1, p. 2, ¶ 3.  In January
22    2011, St. Martin was promoted to Vice President, Business and Legal
23    Affairs at Myspace.  *Id.*

24  • In 2011, FIM sold Myspace to Specific Media, which then retained St.
25    Martin to work for its collection of companies, including Myspace, as its
26    Assistant General Counsel and Vice President, Business and Legal Affairs.
27    Dkt. 336-1, p. 2, ¶ 3.  St. Martin continued to work for Specific Media until
28    April 2015.  *Id.*

- St. Martin's job responsibilities in connection with his positions at FIM, Myspace, and Specific Media included counseling the business and product teams at Myspace, working on terms of use and other governing agreements between Myspace and its end users, and creating and maintaining the Myspace application. Dkt. 336-1, pp. 2-3, ¶ 4. St. Martin also worked directly with employees who were directly responsible for exposing users of the Myspace services to music made available on the website. *Id.*, p. 3, ¶ 6. As a result of St. Martin's work for Myspace, he became intimately familiar with the site and the services it offered. *Id.*, pp. 2-3, ¶ 4.

In short, St. Martin has extensive experience with and knowledge of the issues relevant to his opinions beyond that possessed by the average person. *See Scott*, 140 F.3d at 1286 (testimony of sociology professor who had studied and written about "anti-cult movement" for 19 years "was proper for the jury because he testified regarding matters beyond the general knowledge of jurors."); *Morales*, 108 F.3d at 1039 (district court abused its discretion by excluding expert with "twenty years of bookkeeping experience" from testifying at trial regarding bookkeeping expertise).

Despite St. Martin's extensive knowledge and experience working with Myspace detailed in his report, Plaintiffs nevertheless make vague challenges to his qualifications in seeking his exclusion. Plaintiffs' challenges are beside the point because whether St. Martin possesses the qualifications identified by Plaintiffs has no bearing on his ability to render the opinions he has rendered. They also lack a factual basis; indeed, as stated above, St. Martin's Report and resume make clear that he is more than qualified to render his opinions. And to the extent that Plaintiffs had wanted to challenge or probe those qualifications they should have deposed St. Martin, which they declined to.

First, Plaintiffs contend that St. Martin is not qualified to testify because he is "not an internet platform engineer or historian" and his "supposed qualifications

1   regarding Myspace … are limited to his work there as *a lawyer* and his own

2   personal 'heavy [use] of Myspace.'"  Dkt. 336, p. 9; *id.* (St. Martin's experience

3   "does not involve website design, forensics, functionality, viewership or user

4   experience.").  As a threshold matter, Plaintiffs fail to explain why experience in

5   website engineering matters; it does not because St. Martin is not opining on an

6   issue involving website construction or coding.  Moreover, the contention is simply

7   false, as is made clear by St. Martin's Report and resume, which St. Martin has

8   further elaborated on solely for the purpose of rebutting Plaintiffs' challenges to

9   his qualifications.[2]

10      Indeed, as his resume reflects, St. Martin has a degree in engineering.  Dkt.

11   336-1, p. 18.  To obtain this degree, St. Martin was required to take classes in

12   computer programming, including basic html work, Fortran, and assembly

13   language.  St. Martin Decl., ¶ 2.  In addition, St. Martin conducted research and

14   drafted an honors thesis, which he presented and defended in front of three Ph.Ds

15   in connection with this degree.  *Id.*

16      Moreover, while Plaintiffs contend that St. Martin is not a "historian," he is

17   as it pertains to his testimony regarding Myspace.  St. Martin worked at Myspace

18   for **eight and a half years**, a very long period of time in Myspace's history.  Dkt.

19   336-1, p. 2-3, ¶¶ 3, 6.  His eight years included the time period in issue.  *Id.*  And

20   while a lawyer, that role certainly does disqualify him from providing this

21   testimony.  Indeed, Plaintiffs seem to improperly assume that all lawyers do is

22   draft contracts and consult on purely academic legal matters.  Not so.  To the

23   contrary, as expressed in St. Martin's Report, in order to properly advise Myspace

24   on legal issues, St. Martin became very cognizant of the functionality, product

25
---
[2] As explained above, St. Martin's Report and resume sufficiently establish his
26   qualifications to provide his opinions in this case.  *Supra*, pp. 6-7.  To the extent
that additional detail regarding these qualification would be helpful to the Court in
27   evaluating Plantiffs' motion, Defendants have submitted a declaration from St.
Martin with this Opposition, which elaborates on the qualifications identified in his
28   Report and resume.

choices, look and feel, content, and data collection processes of Myspace. Dkt. 336-1, p. 2-3, ¶ 4; *see also* St. Martin Decl., ¶ 3. During this time, he also became intimately familiar with how third party developers were publishing software on the Myspace platform. *Id.* The same is true for the other online services he worked for. *Id.*, ¶ 4. Among other things, he advised product teams on various issues associated with their websites, apps, software, and platforms, which required him to understand their functionality in detail. *Id.* St. Martin also helped develop many mobile apps, and through this work, developed a deep understanding of their functionality and various features. *Id.*

Plaintiffs also argue emphatically that St. Martin lacks "any specialized training or has ever performed any similar analyses related to the functionality of Myspace, the legitimacy of plays, or how a user may have heard any particular work." Dkt. 336, p. 9. This is another false statement. In his report, he specifically identifies his personal knowledge of Myspace, including his work with the music features of the site. *Supra*, pp. 6-7. And, as detailed above, had Plaintiffs deposed St. Martin, they would have gained further insight into this relevant knowledge and experience of the Myspace platform. *Id.* St. Martin's intimate knowledge of Myspace's features and functions is directly relevant to the features that he investigated and opined on in this action.

Finally, Plaintiffs claim that St. Martin is not qualified to testify because he has never served as an expert witness before and has never previously published anything on the topic of his opinions in this case. Dkt. 336, p. 10. Yet, the law does not require an expert to have testified as an expert before. *United States v. Brooks*, 610 F.3d 1186, 1196 (9th Cir. 2010) ("The fact that Detective Hein lacked an advanced degree, supervisory experience, previous experience as an expert witness, or relevant publications did not render her unfit to provide expert

1    testimony.").[3] Nor does it require expertise at such a granular level. *See In re*

2    *Silicone Gel*, 318 F. Supp. 2d at 889.

3       In sum, St. Martin's experience and knowledge as discussed above suffices

4    to support his testimony at trial.[4]

5    **III.**    **St. Martin's Opinions are Well-Founded and Reliable**

6       Plaintiffs' challenge to St. Martin's opinions miss the point because it treats

7    St. Martin's testimony, which is based on *specialized* knowledge regarding

8    Myspace, as *scientific* testimony based on *scientific* knowledge. In *Daubert v.*

9    *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the U.S. Supreme Court

10   held that Federal Rule of Evidence 702 obligates a trial judge "to ensure that any

11   and all scientific testimony … is not only relevant, but reliable." 509 U.S. at 589.

12   In doing so, the Court identified certain factors that the trial court *may* consider in

13   making its gatekeeping determination, namely, those identified by Plaintiffs—e.g.,

14   whether the expert used a theory or technique that has been tested, subject to peer

15   review, has a known or potential rate of error, and is generally accepted in the

16   relevant community. *Id*. at 592-594; Dkt. 336, pp. 11-13.

17       Following *Daubert*, the Court confirmed that *Daubert*'s "general principles"

18   of establishing reliability of expert testimony apply to all expert matters described

19

---

20   [3] If it does, then Defendants counter-move to disqualify Plaintiffs' musicologist, Dr. Todd Decker, who has also never testified as an expert before.

21   [4] The cases cited by Plaintiffs to support their argument that St. Martin is not

22   qualified are inapposite. In *In re Canvas Specialty, Inc.*, 261 B.R. 12, 18 (2001), the expert was not qualified as an expert in architecture because he did not "state

23   where he received his education, what type of experience he ha[d], or what kind of knowledge or training he ha[d] in the field of architecture." Similarly, in *Warner*

24   *Bros. Entm't v. Global Asylum, Inc.*, 2013 WL 12114836, at *7 (C.D. Cal. Jan. 29, 2013), the court excluded a proffered expert on consumer surveys because his

25   "biography d[id] not suggest that he has any experience or training in crafting surveys of any kind." And in *Morin v. U.S.*, 534 F. Supp. 2d 1179, 1185 (D. Nev.

26   2005), the medical expert proffered to establish a "causal link between jet fuel and cancer" had no prior experience diagnosing cancer caused by jet fuel. These cases

27   are entirely different from the situation here, where St. Martin has provided extensive detail regarding his applicable prior experience working intimately with

28   Myspace.

**DEFENDANTS' OPPOSITION TO PL. *DAUBERT* MOTION NO. 4 RE: ST. MARTIN TESTIMONY**

in Rule 702, but also clarified that the specific factors espoused in *Daubert* "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149, 150 (1999).  Instead, the *Daubert* inquiry is a "flexible one" "tied to the facts of a particular case." *Id.* at 150 (internal quote marks and citations omitted) (assessment of reliability "depends upon the particular circumstances of the particular case at issue"); *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co*, 752 F.3d 807, 817 (9th Cir. 2013) ("The 'reliability' test is flexible and should be applied based on the circumstances of the case.").  As a result, the relevant question is not whether an expert's testimony satisfies the standards applicable to statisticians and survey experts, but whether the testimony, viewed in a "holistic" manner, is reliable.  *See U.S. v. W.R. Grace*, 504 F.3d 745, 762 (9th Cir. 2007).

Here, Plaintiffs' challenges to the reliability of St. Martin's testimony are really an effort to fit a square peg in a round hole.  First, Plaintiffs claim that St. Martin should be excluded because he "fails to identify any recognized theory or technique he relied upon in reaching his opinions."  Dkt. 336, p. 11.  However, it is well-settled that "[a]n expert opinion is reliable 'if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline.'" *Pyramid Techs., Inc.*, 752 F.3d at 817.  For instance, industry experts like St. Martin regularly offer expert opinions, even though their findings are not necessarily "scientific" or based on a methodology that can be quantified.  *See, e.g., Hangarter*, 373 F.3d at 1018 ("Given that, unlike scientific or technical testimony, the reliability of [the expert's] testimony was not contingent upon a particular methodology or technical framework, the district court did not abuse its discretion in finding [the expert's] testimony reliable based on his knowledge and experience.").

1    Plaintiffs also take issue with the fact that St. Martin's methodology

2    "consists of reconstructing Myspace, including its functionality and design, based

3    upon his own memory and … screenshots of a sampling of past version of the now

4    [basically] defunct internet platform." Dkt. 336, p. 11.  However, it is appropriate

5    for St. Martin to rely on his experiences using Myspace in both his personal and

6    professional life to render his opinions in this case and his qualifications and his

7    experience make it clear that he is neither speculating nor guessing about

8    Myspace's functionality during the period at issue; he was at Myspace working

9    heavily on the platform that is in issue.  The law is clear that the facts or data

10   forming the basis of an expert's opinion may be those "the expert has been made

11   aware of or personally observed."  Fed. R. Evid. 703; *see also Kumho Tire*, 526

12   U.S. at 150 ("Engineering testimony rests upon scientific foundations, the

13   reliability of which will be at issue in some cases … In other cases, the relevant

14   reliability concerns may focus upon personal knowledge or experience.") (internal

15   citations omitted).

16   Plaintiffs also contend that St. Martin should be excluded because his

17   conclusions are "without explanation." Dkt. 336, pp. 11-12.  This argument is

18   nonsensical and ignores the language of the report itself.  Indeed, in his report, St.

19   Martin explains in detail the precise reasons for his opinion that it would not be

20   reasonably possible for any individual to come upon "Joyful Noise" on Myspace

21   without taking specific affirmative action.  *See, e.g.*, Dkt. 336-1, pp. 4-13; *see also*

22   *Pyramid Techs.*, 752 F.3d at 815 (expert "adequately explained his methodology in

23   reaching his opinion" where he "described how the data he collected and reviewed

24   helped him determine [his opinions]").[5]

25

26   _____

[5] In their conclusion, Plaintiffs also make a passing reference that St. Martin's
methodology has purportedly not been peer reviewed.  Dkt. 336, p. 10.  Not only
do Plaintiffs fail to even argue this point in the body of the motion itself, the Ninth
Circuit has made clear that, while peer review is one of many relevant factors in
assessing reliability, it is not a requirement, and an expert's methodology "may
still be reliable . . . without peer review and publication."  *Wendell v.*

(…continued)

1   In addition, Plaintiffs contend that St. Martin should be excluded because he

2   purportedly "fails to explore several important discovery functions, including the

3   Christian music genre page and the possibility of dissemination through embeds on

4   other web pages or social media." Dkt. 336, p. 12. This is false. St. Martin's

5   report contains an entire section devoted Myspace's discovery features (*see* Dkt.

6   336-1, p. 10), in which he specifically analyzes the discovery features as they are

7   applied to the Christian music pages of Myspace:

8         I surveyed the home pages from the period between 2008

9         and 2013 and saw almost no evidence of Christian

10        themed music and zero evidence of Christian Hip Hop.

11        The only reference I saw to Christian music was a

12        hyperlink in a list of genres that was only visible when a

13        user pressed the 'more' button to expose it. In other

14        words, if a user didn't click 'more,' there was no

15        indication that Christian music even existed on Myspace

16        from an editorial or functionality perspective. Thus, even

17        the discovery features of Myspace would have required a

18        user to take affirmative action to experience and explore

19        that genre of music.

20   Dkt. 336-1, pp. 11-12, ¶ 28. Contrary to Plaintiffs' contentions, St. Martin

21   considered these features of Myspace, analyzed their applicability to the issues he

22   was opining on, and ruled them out.

23        Finally, Plaintiffs request exclusion because of a purported "analytical gap"

24   between the data and St. Martin's opinions. Dkt. 336, p. 12. This argument also

25   (…continued)

26   *GlaxoSmithKline LLC*, 858 F.3d 1227, 1235 (9th Cir. 2017). Indeed, the Ninth
     Circuit has acknowledged "good reasons" that an expert's work may not be peer

27   reviewed – for instance, it may be "too recent," or the subject matter may be of
     "insufficiently broad interest." *Daubert v. Merrell Dow Pharms., Inc.* ("Daubert

28   II"), 43 F.3d 1311, 1318 n.9 (9th Cir. 1995).

1  fails.  Plaintiffs do not identify these so-called gaps; St. Martin's testimony and

2  opinions flow logically from his experience and knowledge of Myspace and the

3  data he reviewed.  An expert may properly base his or her opinions on reasonable

4  inferences from facts in the record.  *Sementelli*, 155 F.3d at 1134 (expert's

5  "opinions and inferences" that "were based on his review of [the factual record], as

6  well as his knowledge, experience, training and education" were permissible).

7          Plaintiffs' arguments challenging the reliability of St. Martin's opinions

8  should be rejected.

9  **IV.    St. Martin's Opinions are Relevant**

10         Plaintiffs' argument that St. Martin's testimony is not relevant to any fact or

11  issue in the case is nonsensical; his opinions clearly relate to access; *i.e.*, to

12  whether Walter and Gottwald had a reasonable opportunity to hear "Joyful Noise"

13  through Myspace before creating the instrumental music for "Dark Horse."

14  *Pyramid Techs.*, 752 F.3d at 813 ("Expert testimony is relevant if the knowledge

15  underlying it has a valid connection to the pertinent inquiry.").

16         At trial, Plaintiffs bear the burden of proving by a preponderance of

17  evidence both access and substantial similarity.  As to access, Plaintiffs have long

18  admitted that they have no direct evidence of Walter or Gottwald having heard

19  "Joyful Noise" or circumstantial evidence that they heard it through a chain of

20  events (i.e., an intermediary).  Instead, Plaintiffs' sole theory of access has always

21  been that "Joyful Noise" was allegedly "widely disseminated" such that a jury

22  could infer that Walter or Gottwald had a reasonable opportunity to hear the song.

23  Dkt. 336, p. 13.  In *Loomis*, the Ninth Circuit summarized two types of

24  "widespread dissemination" cases: (1) those where a song achieves "an appreciable

25  level of *national* saturation," which centers on "the degree of a work's commercial

26  success and on its distribution through radio, television, and other relevant

27  mediums" and (2) those where there is "saturation in a relevant market in which

28  both the plaintiff and the defendant participate." *Loomis v. Cornish*, 836 F.3d 991,

994-95, 997-98 (9th Cir. 2016) (citing cases) (emphasis added).  Of course, widespread dissemination cannot be considered in a vacuum; no different than any theory of access, any evidence of access must support a "*reasonable* possibility, not merely a bare possibility," that the defendant heard the work.  *Id.* at 995 (emphasis added); *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482-84 (9th Cir. 2000) (reasonable opportunity requires more than mere speculation or conjecture).

      As such, dissemination alone may not necessarily support an inference that the defendant author had a *reasonable* opportunity to hear plaintiff's song.  For example, in *Loomis*, the plaintiff attempted to prove access through evidence that the defendant songwriters were recording songs in Santa Barbara at the same time that the plaintiff's song was "receiving 'tons of airplay' on local radio stations" and local and national newspapers were carrying stories about the band's achievements.  *Loomis*, 836 F.3d at 998.  The Ninth Circuit rejected this evidence, concluding that the fact that the plaintiff's song had saturated the local Santa Barbara music scene was completely irrelevant because the defendant songwriters were not participating in the Santa Barbara music scene.  *See id.*; *see also Guzman v. Hacienda Records & Rec. Studio, Inc.*, 2014 WL 6982331, at *5-6 (S.D. Tex. Dec. 9, 2014), *aff'd* 808 F.3d 1031 (5th Cir. 2015) (not reasonable possibility of access where plaintiff's song "did not achieve popularity outside of the Tejano music scene").

      This is true even in cases finding access.  In *Three Boys Music Corp.*, for example, the Ninth Circuit upheld a jury's finding that it was reasonable for the jury to infer that the songwriters, Bolton and Goldmark, had heard plaintiff's song because it "was widely disseminated on radio and television stations *where Bolton and Goldmark grew up*" (212 F.3d at 483-84) (emphasis added) **and** Bolton also admitted that he "grew up listening to groups such as the Isley Brothers," was a "huge fan," a "collector of their music," "kn[ew] everything [the Isley Brothers

had] done" (*id*.), and had even expressed concern to his co-writer that they "were copying a song by another famous soul singer." *Id.* at 484.

Here, Plaintiffs intend to present evidence at trial that—among other methods of dissemination—a sound recording of "Joyful Noise" was posted on the personal Myspace pages of plaintiff Marcus Gray and third-party Lecrae Moore and were "played" 933,868 times on Gray's Myspace page through January 2012, and 1,556,404 times on Moore's Myspace page through June 2013.[6]  Plaintiffs then intend to argue that these view counts are so high as to constitute dissemination "widespread" enough to infer a reasonable possibility that Walter or Gottwald heard of "Joyful Noise."

In doing so, Plaintiff do not intend to, nor can they, introduce evidence that Walter or Gottwald was actually one of the people to view "Joyful Noise" on Myspace.  Plaintiffs also do not intend to, nor can they, introduce evidence that the availability of "Joyful Noise" on Myspace helped it achieve saturation in a "relevant market" in which Walter or Gottwald also participated or that some other circumstance exists that makes it more likely that Walter or Gottwald was one of the people to hear "Joyful Noise" on Myspace as opposed to others.  To the contrary, it is undisputed that Walter and Gottwald did not follow Christian music and did not know who Plaintiffs were or about their music before this litigation. Wais Decl., Ex. 1 (Walter MSJ Decl.), ¶¶ 7-10, 18-19; Ex. 2 (Gottwald MSJ Decl.), ¶¶ 6-9, 17-18.  Instead, Plaintiffs' theory of "widespread dissemination" theory boils down to their belief that "Joyful Noise" achieved such a level of ubiquity (i.e., national saturation) that it reasonable to infer that *anyone*, including Walter or Gottwald, heard the song.

---

[6] Plaintiffs' Motion *in Limine* No. 7 seeks the exclusion of Plaintiffs' Myspace evidence on the grounds that it lacks foundation, is speculative, is unreliable, and is hearsay.  *See* Dkt. 343.  However, to the extent that the Court permits Plaintiffs to introduce this Myspace evidence at trial, Defendants should be permitted to challenge the evidence, including through St. Martin's testimony.

Mitchell
Silberberg &
Knupp LLP

11150040.2

According to Plaintiffs, their theory means that only *their* evidence of dissemination, including through Myspace, is relevant.  Put differently, Plaintiffs apparently believe it should work like this at trial: Plaintiffs will introduce evidence that "Joyful Noise" was on Myspace, as well as the "play" counts for those recordings, and, on this basis alone, a jury will decide whether the view counts constitute "widespread dissemination."  If yes, then it will be inferred that Walter or Gottwald heard "Joyful Noise."  This is ludicrous.  Plainly, Defendants are entitled to challenge Plaintiffs' evidence, present their own evidence dispelling any inference of access, and explain to a jury why Plaintiffs' evidence proves nothing at all.

Indeed, to the extent that Plaintiffs intend to introduce evidence that "Joyful Noise" built up a cumulative view count of over 2 million+ "plays" on Myspace and argue that these numbers are so massive that there is a reasonable possibility that anyone, including Walter and Gottwald, heard "Joyful Noise,"  Defendants are equally entitled to present evidence of, *inter alia*, the ways in which users actually interact with Myspace (actively, not passively), Walter's and Gottwald's minimal or nonuse of Myspace, their lack of knowledge of Plaintiffs and their music, the immense volume of content that was available on Myspace and the billions to trillions of views that other content receives each year, as well as the unreliability of the "play" counts of "Joyful Noise, and to rely on such evidence to argue that the "plays" of "Joyful Noise" on Myspace are *de minimis* and in no way constitute "widespread dissemination" and to argue that even if the view count was sizeable, it still does not prove a *reasonable* possibility that Walter or Gottwald heard the song.

In point of fact, one need look no farther than how plaintiff Gray came across his co-plaintiff, Chike Ojukwu's beat, in creating "Joyful Noise."  The two did not know each other prior to the creation of "Joyful Noise" and Gray did not stumble upon Ojukwu's beat.  Instead, a friend of Gray was a follower of Ojukwu

on Myspace and heard the track and thought it fit Gray's style and "drew [his] attention to it."  Wais Decl., Ex. 3 (Gray Depo. Tr.), p. 23, ll. 11-18.  Absent his friend, Gray "wouldn't have normally gone to his Myspace page to look for [Ojukwu's] work."  *Id.*, p. 24, ll. 15-18.[7]

In this regard, St. Martin's testimony emphatically *is* relevant to and will assist the trier of fact in determining this question.  While the average juror likely knows what Myspace is and has perhaps has accessed it, it is unlikely that jurors understand the features of Myspace by which a user can explore Myspace; the unreliability of plays (which are susceptible to bots and being bought in bulk); the nearly infinite volume of content available Myspace and volume of plays and views this content receives; and why all of this makes it exponentially unlikely that any individual user would have come across "Joyful Noise" by chance absent a specific reason to search for "Joyful Noise."

Keep in mind also that the relevant time period is 2008-2013.  It is equally unlikely that the typical juror knows what features existed on Myspace versus what features exist now.  It is important to educate the jury on such differences and not allow the jury's current personal use and limited knowledge of Myspace to erroneously influence their decision.  It is also important in the sense that Myspace is a defunct platform and a modern day jury may have no idea how it functioned when it did function.[8]

---

[7] Plaintiffs' theory also finds no support in the law and none is cited by Plaintiffs. As is made clear in cases like *Loomis, Three Boys, and Guzman*, while evidence of dissemination may be probative of access, also relevant is evidence tending to prove that the dissemination at issue does or does not raise a reasonable possibility that the defendant author heard plaintiff's work.  Otherwise, "widespread dissemination" would essentially equate to a strict liability standard where if a plaintiff shows sales or internet views above a certain number, access is automatically inferred without any regard to whether those sales or views make it reasonably possible that the defendant author heard the song.

[8] Plaintiffs also challenge St. Martin's opinion regarding inflated and/or inaccurate play counts because he cited to the declaration of Myspace's corporate representative, Christopher Magill in his report. Dkt. 336, at 15.  However, had Plaintiffs taken St. Martin's deposition, they would have gleaned additional insight regarding the bases for his opinions, including that from working at Myspace, St.

(…continued)

**DEFENDANTS' OPPOSITION TO PL. *DAUBERT* MOTION NO. 4 RE: ST. MARTIN TESTIMONY**

In short, it is not Defendants' position that Plaintiffs must present direct proof of Walter or Gottwald hearing "Joyful Noise" to prevail.  Nor do they seek to prevent Plaintiffs from presenting **admissible** and **relevant** evidence of widespread dissemination that might give rise to an inference of a reasonable possibility that Walter or Gottwald heard "Joyful Noise."  Defendants, however, are equally entitled to present contrary evidence and explain to a jury why Plaintiffs' so-called proof does not give rise to an inference of access, which includes St. Martin's testimony.

## **CONCLUSION**

Wherefore, the Court should deny Plaintiffs' *Daubert* Motion No. 4.

DATED: June 19, 2019          MITCHELL SILBERBERG & KNUPP LLP

                              By:  /s/ Aaron M. Wais
                              Aaron M. Wais (SBN 250671)
                              Attorneys for Defendants other than Katheryn
                              Elizabeth Hudson, and Kitty Purry, Inc.

DATED: June 19, 2019          GREENBERG TRAURIG, LLP

                              By:  /s/ Vincent H. Chieffo
                              Vincent H. Chieffo (SBN 49069)
                              Attorneys for Defendants Katheryn Elizabeth
                              Hudson p/k/a Katy Perry and Kitty Purry, Inc.

_____

(…continued)
Martin had personal knowledge of that issues regarding inflated play counts on the site existed, and that Myspace instituted technical solutions to try to block certain types of bots that would auto-play certain tracks.  St. Martin Decl., ¶ 3.

Mitchell
Silberberg &
Knupp LLP
11150040.2

**DEFENDANTS' OPPOSITION TO PL. *DAUBERT* MOTION NO. 4 RE: ST. MARTIN TESTIMONY**

## **ATTESTATION REGARDING SIGNATURES**

Pursuant to Local Civil Rule 5-4.3.4(a)(2)(i), I hereby attest that all Parties, on whose behalf this entire filing is jointly submitted, concur in this filing's content and have authorized its filing.

Dated:  June 19, 2019                          /s/ Aaron M. Wais
                                                          Aaron M. Wais

**DEFENDANTS' OPPOSITION TO PL. *DAUBERT* MOTION NO. 4 RE: ST. MARTIN TESTIMONY**