Michael A. Kahn (pro hac vice)
Kahn@capessokol.com
Lauren R. Cohen (pro hac vice)
lcohen@capessokol.com
CAPES SOKOL
7701 Forsyth Blvd. 12th Floor
St. Louis, MO 63015
(314) 721-7701

Eric. F. Kayira (pro hac vice)
eric.kayira@kayiralaw.com
KAYIRA LAW, LLC
200 S. Hanley Road, Suite 208
Clayton, Missouri 63105
(314) 899-9381

Daniel R. Blakey (SBN 143748)
blakey@capessokol.com
CAPES SOKOL
3601 Oak Avenue
Manhattan Beach, CA 90266

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCUS GRAY, et al.,<br><br>  Plaintiffs,<br><br> v.<br><br>KATHERYN ELIZABETH HUDSON, et al.,<br><br>  Defendants. | CASE NO. 2:15-cv-05642-CAS (JCx )<br><br>Honorable Christina A. Snyder<br><br>**PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>Final Pretrial Conference<br>Date:  July 1, 2019<br>Time: 11 a.m.<br>Courtroom: 8D<br><br>Trial: July 16, 2019 |

Pursuant to Local Rule 16-4, Plaintiffs submit this Memorandum of Contentions of Fact and Law.

### Introduction

The Plaintiffs are the owners of the 2008 song "Joyful Noise." "Joyful Noise," together with the album on which it appears – *Our World Redeemed* – is critically acclaimed and has achieved significant commercial success, including, among

other things: concert performances in most of the states of the nation, over six million plays/views online, appearances on several Billboard charts for multiple weeks over a period of several years, and nominations for a Grammy, a Dove and a Stellar award. In 2013, Defendants released the song "Dark Horse," which copies "Joyful Noise" without Plaintiffs' permission. Specifically, Defendants' song contains a repeating 8-note ostinato (or beat) that is substantially, if not strikingly, similar to the ostinato in Plaintiffs' song. Defendants' unauthorized copying of "Joyful Noise" violates the federal copyright statute (17 U.S.C. §102, et seq.). As a result of Defendants' copyright infringement, Plaintiffs are entitled to damages.

## Plaintiffs' Claim

To prevail on their copyright infringement claim, Plaintiffs must prove by a preponderance of the evidence

1. That they are the owners of a valid copyright in the composition "Joyful Noise" and
2. That defendants' song "Dark Horse" copies original expression from "Joyful Noise."

*See* Ninth Circuit Manual of Model Civil Jury Instructions § 17.5 ("Elements of Copyright Infringement"). There appears to be no dispute over the validity of the copyright registration for "Joyful Noise" and Plaintiffs' ownership of that registration.

To prove the second element—copying—plaintiffs must prove by a preponderance of the evidence (a) that there are substantial similarities between the defendants' work and original elements of the Plaintiffs' work and (b) that the defendants had access to the Plaintiffs' work. *See* Ninth Circuit Manual of Model Civil Jury Instructions § 17.17 ("Access and Substantial Similarity").

**PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

**Proof of Substantial Similarity:**

As the Ninth Circuit confirmed in *Antonick v. Elec. Arts, Inc.*, 841 F.3d 1062, 1065-66 (9th Cir. 2016), the court employs a two-part test for determining whether one work is substantially similar to another:

> [A plaintiff] must prove both substantial similarity under the "extrinsic test" and substantial similarity under the "intrinsic test." The "extrinsic test" is an objective comparison of specific expressive elements. The "intrinsic test" is a subjective comparison that focuses on whether the ordinary, reasonable audience would find the works substantially similar in the total concept and feel of the works.

Here, Plaintiffs' musicologist, Dr. Todd Decker, will provide expert testimony objectively comparing the substantial similarity between specific expressive elements of the two songs. Specifically, as more fully detailed in his Expert Report and Rebuttal, Dr. Decker will testify that "Joyful Noise" and "Dark Horse" share the following significant similarities of ideas and expression as measured by the following external, objective criteria:

1. <u>Descending ostinato</u>. A descending ostinato (or repeating) figure which serves as the primary formal building block for both songs;

2. <u>Phrase Length</u>. The ostinatos in both songs are identical in phrase length;

3. <u>Rhythm</u>. The ostinatos in both songs are identical in rhythm;

4. <u>Pitch Content</u>. The ostinatos in both songs are nearly identical in pitch content (i.e., scale degrees) and melodic contour (descending in the same pattern);

5. <u>Overlapping Musical Domains</u>. The above overlapping musical domains, occurring in identical combination in both tracks, present substantial and significant similarities;

6. <u>Timbre</u>. The timbre of the upper and primary voice in the ostinatos in both songs is remarkably similar; and

7. <u>Texture</u>. The ostinatos in both songs are placed in a melodic treble voice, i.e., neither functions as a bassline. This melodic nature of the ostinato is especially noteworthy since ostinatos across Western music history most often take the form of basslines which organize cyclical harmonic motion.

Based upon this testimony, Plaintiffs' expect to easily prove that the works are, minimally, substantially similar. Importantly, as outlined below, Dr. Decker's opinion also supports an argument that the works are "strikingly similar." In addition to testimony by Dr. Decker, the jury will listen to the works and make a subjective determination as to whether the repeating ostinato in Defendants' song is substantially similar to the one in Plaintiffs' song.

**Proof of Access:**

There are various ways to prove Defendants had access to Plaintiffs' song. Plaintiffs will meet their burden on access by offering the following evidence:

(a) that "Joyful Noise" was widely disseminated from 2008 to the end of 2012;

(b) that the 51st Annual GRAMMY Awards ("GRAMMYs") served as a third-party intermediary linking Plaintiffs and Defendants; and

(c) that there are "striking similarities" between "Joyful Noise" and the infringing ostinato in "Dark Horse," namely, proof of "a similarity between the plaintiffs' work and the defendants' work that is so 'striking' that it is highly likely the works were not created independent of one another." (Model Civil Jury Instruction 17.18).

<u>Widespread Dissemination</u>:

Access is often proven through circumstantial evidence by showing that the plaintiff's work has been widely disseminated. *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009); *L.A. Printex Indus., Inc., v. Aeropostale, Inc.*, 676 F. 3d 841, 846-47 (9th Cir. 2012); Ninth Circuit Manual of Model Civil Jury Instructions ("MCJI"), MCJI §17.18 (2017 edition, last updated April 2019). Plaintiffs are *not* required to prove where or how Defendants heard "Joyful Noise." Instead, as the Ninth Circuit explained in *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482–83 (9th Cir. 2000)(citations omitted), "Proof of access requires 'an opportunity to view or to copy plaintiff's work.' This is often described as providing a "reasonable opportunity" or "reasonable possibility" of viewing the plaintiff's work."

**PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

This is particularly true in recent times. Over the last two decades, the music industry has changed. Consumers generally no longer travel to record stores to purchase their desired album or single. Instead, they turn on their computer. Music is readily available on the internet (both for purchase and for free[1]), which the Ninth Circuit recognizes can widely disseminate content. *Art Attacks*, 581 F.3d at 1145 ("we recognize the power of the internet to reach a wide and diverse audience").

Plaintiffs' evidence supporting their claim that defendants had "a 'reasonable opportunity' or 'reasonable possibility' of viewing the plaintiffs' work" includes, among other things:

1. Critical recognition in the form of the following prestigious award nominations:
    - In January of 2009, the album *Our World Redeemed* (which included "Joyful Noise") was a nominee for Rap/Hip Hop Gospel Album of the Year at the Stellar Award Show held at the Grand Ole Opry in Nashville, Tennessee.
    - In February of 2009, the album *Our World Redeemed* was a nominee for Best Rock or Rap Gospel Album at the 51st Annual Grammy Awards Show in Los Angeles, California.
    - In April of 2009, "Joyful Noise" was a nominee for the Best Rap/Hip Hop Song of the Year at the 40th GMA Dove Awards, which was televised live from the Grand Ole Opry in Nashville, Tennessee.

2. Commercial success, as reflected on the following Billboard Magazine charts:
    - The album *Our World Redeemed* (which includes "Joyful Noise") appeared on the Billboard Top Christian Albums chart in position 18 on March 22, 2008 and in position 34 on March 29, 2008. The 2008 methodology for that ranking is based on traditional album sales.

---

[1] Plaintiffs are under no obligation to produce evidence of sales of "Joyful Noise." All Plaintiffs must show is that "Joyful Noise" was widely disseminated such that Defendants had a reasonable opportunity to view or copy "Joyful Noise."

5
**PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

- - The album *Our World Redeemed* (which includes "Joyful Noise") appeared on the Billboard Top Gospel Albums chart for 35 weeks beginning in position 5 on March 22, 2008 and continuing on that chart until January 17, 2009. The methodology for that ranking is based on traditional album sales.
  - The song "Joyful Noise" appeared on the Billboard Gospel Digital Song Sales chart for 33 weeks before the release of "Dark Horse," beginning in position 11 on January 15, 2011 and continuing on that chart for one year until January 21, 2012. During that period, the methodology for determining placement was based on the most sold Gospel download tracks of the week.

3. A widespread Internet presence totaling more than 6 million view/plays prior to the creation of "Dark Horse," including:

   - <u>YouTube views</u>: There were six music videos of "Joyful Noise" publicly available on YouTube, and by March of 2012 they had been viewed a total of more than 3.8 million times.[2]
   - <u>MySpace plays</u>: Plaintiff Marcus Gray and performer Lecrae Moore both placed the "Joyful Noise" recording on their MySpace page for anyone to play. As of March of 2012, "Joyful Noise" had 1,531,856 plays on Mr. Moore's MySpace page and 968,868 plays on Mr. Gray's MySpace page, for a total combined MySpace plays of 2,500,724.

4. Performance of "Joyful Noise" at scores of concert venues across the nation by Mr. Gray and Mr. Moore from 2008 to 2012, which occasionally included radio or TV interviews of Mr. Gray in which the song was played.

As with most accused infringers, Defendants deny that they heard or had access to "Joyful Noise." But Plaintiffs are not required to prove ***direct*** access. Rather, Plaintiffs must prove that "Joyful Noise" was widely disseminated such that Defendants had a reasonable opportunity to hear it. The objective evidence,

---

[2] As explained in Plaintiff's response to the Defendants' Motion in Limine No. 8 (Dkt. 375 at 18), YouTube views covered by the parties' draft stipulation did not include an additional 2.5 million views which, due to a misunderstanding, Google failed to include in its response to the subpoena in this case. Plaintiffs intend to introduce into evidence these additional 2.5 million views.

6

**PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

alone, shows that "Joyful Noise" was in fact widely disseminated such that it is reasonably possible that Defendants— sophisticated musicians, many of whom had a Myspace account, and who listen to other works as part of their process of creating music—had a reasonable chance to hear "Joyful Noise."

At the summary judgment phase, the Court observed the following with respect to Plaintiff's ability to prove widespread dissemination (Dkt. 299):

> Due to the millions of views and plays of "Joyful Noise" on YouTube and Myspace, both readily accessible websites, and the success and popularity of "Joyful Noise" in the Christian hip-hop/rap industry, a reasonable jury could conclude that there is more than a "bare possibility" that defendants—who are experienced professional songwriters—had the opportunity to hear "Joyful Noise.

### The GRAMMYs as Intermediary:

Courts in this Circuit have repeatedly held that where there is a sufficient nexus between a third-party intermediary and the infringer, and where there is evidence that the third party dealing with the plaintiff and the defendant has possession of the work, the factfinder may infer not just a "bare" possibility, but a "reasonable" possibility of access. *Three Boys*, 212 F.3d at 482 (access may be inferred if "a particular chain of events is established between the plaintiff's work and the defendant's access to that work (such as through dealings with a publisher or record company").

To permit an inference of access, "the dealings between the plaintiff and the intermediary and between the intermediary and the alleged copier must involve some overlap in subject matter." *Meta-Film Assocs., Inc. v. MCA, Inc.*, 586 F.Supp. 1346, 1358 (C.D. Cal. 1984). Plaintiffs must show a sufficient nexus between "the individual who possesses knowledge of a plaintiff's work and the creator of the allegedly infringing work." *Id.* at 1357. Here, Defendant Gottwald (a/k/a Dr. Luke) was a voting member of the GRAMMYs during the same year

when Plaintiffs' album *Our World Redeemed,* which included the song "Joyful Noise" was nominated for a GRAMMY award. Accordingly, the GRAMMYs served as an intermediary who had possession of "Joyful Noise," with whom both Plaintiffs and Defendants were dealing concurrently, sufficient for the jury to infer access.

Defendants attempt to defend against Plaintiffs' indirect evidence of access by claiming that Gottwald did not *actually* listen to the song. But all that is needed for the jury to infer access is that Plaintiffs and Defendants shared a connection to an intermediary, in this case the GRAMMYs, which provided Defendants with the chance to listen to "Joyful Noise" – not evidence that they availed themselves of the opportunity. *Three Boys Music Corp.,* 212 F. 3d at 482 (whether a defendant actually viewed or copied the work is not relevant to the specific inquiry of whether it had the opportunity to do so).

<u>Striking Similarity:</u>

Another way to prove access is through proof of "a similarity between the plaintiffs' work and the defendants' work that is so 'striking' that it is highly likely the works were not created independent of one another." Ninth Circuit's Model Civil Jury Instruction 17.18.

Plaintiffs' musicologist, Dr. Todd Decker, stated in his Expert Report (emphasis added):

> "The similarities between Joyful Noise and Dark Horse are substantial and significant. These similarities are evident in several overlapping musical domains, including, as detailed above, the rhythm, pitch content, melodic contour, and timbre of the ostinatos in both tracks.

> "In my view, the ostinato in Dark Horse clearly borrows a memorable and highly characteristic combination of discrete and specific musical elements heard in Joyful Noise*. **Given the important structural function and expressive use of the ostinato in Dark Horse, Joyful Noise can be said to have provided essential and highly characteristic musical materials for Dark Horse.***"

Dr. Decker's opinion supports a finding of "striking similarity." If the jury believes the works are strikingly similar, they are permitted to assume access.

**Damages:**

Plaintiffs are entitled to an award of their damages (such as the license fee or royalties they should have been paid for the use of the distinctive ostinato that plays through 45% of Defendants' song) <u>plus</u> that portion of Defendants' relevant profits that exceed the damages amount. The parties have agreed to certain stipulations regarding revenues earned by each of the defendants from sales of the song and the *Prism* album (on which the song appears). Plaintiffs' damages expert witness, Dr. Michael Einhorn, will testify as to the proper measure of damages, including Defendants' recoverable profits. Because Defendants have expressed concern over public disclosure of their revenues and profits prior to the damages phase of the trial, Plaintiffs will not quantify them here. Nevertheless, given the astounding popularity (and sales) of "Dark Horse," the figures are significant.

**Bifurcation (and unresolved Discovery Issue)**:

The parties agreed and the Court has ordered that the trial be bifurcated between liability and damages. (Dkt. 352.) However, as set forth in footnote 3 to that Joint Application, one significant issue—namely, revenues from the Prismatic Concert Tour, and in particular, Plaintiffs' right to recover a portion of those revenues reflecting the performance of the infringing song—remains an open issue. Although the Court did grant the Perry Defendants' motion for partial summary judgment regarding concert performances of "Dark Horse" (Dkt. 246), the Court specifically explained that its ruling "does not suggest a finding that there are no circumstances under which concert revenues from the Tour might be relevant if a trier of fact determines that defendants infringed upon 'Joyful Noise.'" (Dkt. 246 at 17) The Court continued:

> Here, the complexity and conceptual difficulties involved in plausibly demonstrating any such causal link, as well as the issues of apportionment it might entail, caution against compelling disclosure

of defendants' concert revenue information at this stage of the litigation. Unless and until plaintiffs establish that "Dark Horse" infringes upon "Joyful Noise," profits from the Tour are not relevant. Before determining what portion, if any, of revenues from the concert could, *theoretically be* the basis for a damage award where the performance itself was licensed but other alleged antecedent infringements were not, it seems appropriate to determine whether, in fact, Dark Horse infringes Joyful Noise. Accordingly, such discovery should be bifurcated. Until such time as defendants have been found to have infringed upon "Joyful Noise," the existing stay of the Discovery Order shall remain in effect.

Thus, the parties need guidance from the Court as to how the issue of concert revenues will be handled if the jury returns a verdict in Plaintiffs' favor. Plaintiffs' damages expert, Dr. Michael Einhorn, has published articles on the issue of concert revenues and, in his Expert Report in this case, specifically identified concert revenues as comprising a recoverable amount, explaining: "Depending on the court's final ruling on the recoverability of concert revenues, I would expect to add to Katy Perry's recoverable revenues a share of her earnings from concerts in the U.S. where 'Dark Horse' was performed." Dr. Einhorn went on to explain that he would need—and thus the Court should compel Ms. Perry to disclose—"all U.S. concerts where DARK HORSE was performed, the composite play list of each concert, and her payments for each event."

**Jury Trial:**

The issues of liability and damages are all triable to a jury as a matter of right. There is no dispute that Plaintiffs have made at timely jury demand.

10

**PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Respectfully submitted,

/s/ Michael A. Kahn
Michael A. Kahn (pro hac vice)
Kahn@capessokol.com
Lauren R. Cohen (pro hac vice)
lcohen@capessokol.com
Capes Sokol Goodman Sarachan PC
7701 Forsyth Blvd., 12th Floor
St. Louis, MO 63105
Telephone: (314) 721-7701

Eric F. Kayira (pro hac vice)
Kayira Law, LLC

Daniel R. Blakey (SBN 143748)
blakey@capessokol.com
CAPES SOKOL
3601 Oak Avenue
Manhattan Beach, CA 90266

***Attorneys for Plaintiffs***

**PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**