CHRISTINE LEPERA (admitted *pro hac vice*)
    ctl@msk.com
JEFFREY M. MOVIT (admitted *pro hac vice*)
    jmm@msk.com
JACOB D. ALBERTSON (admitted *pro hac vice*)
    j1a@msk.com
MITCHELL SILBERBERG & KNUPP LLP
437 Madison Avenue, 25th Floor
New York, New York 10022
Telephone: (212) 509-3900
Facsimile: (212) 509-7239

AARON M. WAIS (SBN 250671)
    amw@msk.com
GABRIELLA A. NOURAFCHAN (SBN 301594)
    gan@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, California  90067
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

GREENBERG TRAURIG, LLP
VINCENT H. CHIEFFO (SBN 49069)
Email:  ChieffoV@gtlaw.com
1840 Century Park East, Suite 1900
Los Angeles, CA 90067-2121
Telephone:  310-586-7700
Facsimile:  310-586-7800

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| MARCUS GRAY (p/k/a FLAME), et al., | CASE NO. 2:15-cv-05642-CAS (JCx) |
| | Honorable Christina A. Snyder |
| Plaintiffs, | |
| v. | **MEMORANDUM IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR A NEW TRIAL** |
| KATHERYN ELIZABETH HUDSON (p/k/a KATY PERRY), et al., | (Fed. R. Civ. P. 50(b) and, alternatively, Rule 59) |
| Defendants. | |
| | Date:      January 27, 2020 |
| | Time:      10:00 a.m. |
| | Ctrm:      8D—8th Fl., First Street |
| | Filed:      July 1, 2014 |
| | Trial:      July 17, 2019 |

Mitchell
Silberberg &
Knupp LLP

11495919.1

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR JMOL OR NEW TRIAL

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................................10

II.   THE COURT SHOULD ENTER JUDGMENT AS A MATTER OF
LAW ON PLAINTIFFS' COPYRIGHT INFRINGEMENT CLAIM .........13

A.   Rule 50(b) Judgment As A Matter Of Law Standard .........................13

B.   No Reasonable Jury Could Have Found "Joyful Noise" And
"Dark Horse" To Be Substantially Similar Based On The
Undisputed Evidence At Trial .........................................................15

1.    It Is A Fundamental Tenet Of The Copyright Act That
Commonplace Expression Is Not Copyrightable And May
Not Be Monopolized................................................................15

2.    The Substantial Similarity Test Must Be Applied In A
Manner Consistent With The Purpose And Policy Of The
Copyright Act .........................................................................16

3.    A Reasonable Jury Following The Court's Instructions
Could Not Have Found Substantial Similarity.........................20

C.   No Legally Sufficient Evidentiary Basis Supports The Jury's
Finding Of Access Based Solely On Plaintiffs' Claim Of Alleged
Widespread Dissemination Of "Joyful Noise" ..................................27

1.    Plaintiffs' Mischaracterization Of The Widespread
Dissemination Doctrine Must Be Debunked...........................29

2.    Joyful Noise Was Disseminated, At Most, In A Niche
Market, Was Not Nationally Well Known And Was Not
Extensively Available To A Large Group On A Wide Scale...31

3.    The Evidence Showed That Defendants Did Not Avail
Themselves Of The Opportunity To Hear "Joyful Noise".......38

D.   No Legally Sufficient Evidentiary Basis Supports The Jury's
Finding That Defendants Did Not Independently Create "Dark
Horse" ...............................................................................................40

Mitchell
Silberberg &
Knupp LLP

11495919.1

1

2                                                                                      **Page**

3      E.     No Legally Sufficient Evidentiary Basis Supports The Jury's
              Finding That The Inclusion Of Ojukwu's Beat In "Joyful Noise"
4             Is Part Of A Joint Work of Authorship ..............................................41

5
       F.     No Legally Sufficient Evidentiary Basis Supports The Jury's
6             Finding Of Liability As To Multiple Defendants ..............................44

7
III.   AS A MATTER OF LAW, PLAINTIFFS FAILED TO REBUT
8      DEFENDANTS' PROOF OF APPORTIONMENT ....................................45

9
IV.    AS A MATTER OF LAW, THE JURY SHOULD HAVE DEDUCTED
10     CAPITOL'S OVERHEAD AND CALCULATED ITS NET PROFIT
       AS TOTALING $629,725..............................................................................48
11

12
V.     ALTERNATIVELY, THE COURT SHOULD ORDER A NEW TRIAL...50

13     A.     Rule 59 New Trial And Remittitur Standard ......................................50

14     B.     The Court Should Grant A New Trial On Liability............................52

15            1.     The Jury's Findings Were Against The Clear Weight Of
                     The Evidence ..........................................................................52
16

17            2.     Misconduct By Plaintiffs' Counsel And Witnesses Also
                     Requires A New Trial..............................................................52
18

19     C.     The Court Should Remit The Amount Of The Damages Award .......58

20
VI.    CONCLUSION ..............................................................................................59

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP
11495919.1

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR JMOL OR NEW TRIAL**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................... 13

*Anheuser-Busch, Inc. v. Natural Beverage Distributors*,
  68 F.3d 337 (9th Cir. 1995) ........................................................ 57

*Apple Computer, Inc. v. Microsoft Corp.*,
  35 F.3d 1435 (9th Cir. 1994) ................................................ 17, 18

*Archibald v. Cty. of San Bernardino*,
  2018 WL 6017032 (C.D. Cal. Oct. 2, 2018) ........................... 14, 29

*Art Attacks Ink, LLC v. MGA Entm't Inc.*,
  581 F.3d 1138 (9th Cir. 2009) ............................................... 27, 37

*Batiste v. Island Records Inc.*,
  179 F.3d 217 (5th Cir. 1999) ...................................................... 43

*Batts v. Adams*,
  2011 WL 13217923 (C.D. Cal. Feb. 8, 2011) .......................... 31, 34

*Benay v. Warner Bros. Entm't*,
  607 F.3d 620 (9th Cir. 2010) ...................................................... 21

*Blue Underground Inc. v. Caputo*,
  2015 WL 12683972 (C.D. Cal. Mar. 16, 2015) .......................... 42

*Bouchat v. Baltimore Ravens Football Club*,
  346 F.3d 514 (4th Cir.2003) ....................................................... 48

*Burns v. Imagine Films Entm't., Inc.*,
  2001 WL 34059379 (W.D.N.Y. Aug. 23, 2001) .......................... 48

*Calhoun v. Lillehas Publ'g*,
  298 F.3d 1228 (11th Cir. 2002) .................................................. 17

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 ............................................................................. 16

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Cavalier v. Random House, Inc.*,
297 F.3d 815 (9th Cir. 2002) .............................................................. 20

*City of Cleveland v. Peter Kiewit Sons' Co.*,
624 F.2d 749 (6th Cir. 1980) .............................................................. 58

*Cnty. of Suffolk v. Long Island Lighting Co.*,
907 F.2d 1295 (2d Cir. 1990) ............................................................ 14

*Cream Records Inc. v. Jos. Schlitz Brewing Co.*,
754 F.2d 826 (9th Cir. 1985) ............................................................ 59

*D & S Redi–Mix v. Sierra Redi–Mix & Contracting Co.*,
692 F.2d 1245 (9th Cir. 1982) ........................................................... 51

*Darrell v. Joe Morris Music Co.*,
113 F.2d 80 (2d Cir. 1940) (*per curiam*) ........................................... 17

*Dash v. Mayweather*,
731 F.3d 303 (4th Cir. 2013) ............................................................. 46

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*,
762 F.3d 829 (9th Cir. 2014) ........................................................ 51, 52

*Fahmy v. Jay-Z*,
2015 WL 6394455 (C.D. Cal. Oct. 21, 2015) (Snyder, J.), *aff'd*,
908 F.3d 383 (9th Cir. 2018) ............................................................. 14

*Feist Publ'ns, Inc. v. Rural Telephon Serv. Co.*,
499 U.S. 340 (1991) ..................................................................... 15, 19

*Fenner v. Dependable Trucking Co., Inc.*,
716 F.2d 598 (9th Cir. 1983) ............................................................. 51

*Folkens v. Wyland Worldwide, LLC*,
882 F.3d 768 (9th Cir. 2018) ............................................................. 18

*Ford v. Ray*,
130 F. Supp. 3d 1358 (W.D. Wash. 2015) .......................................... 43

Mitchell
Silberberg &
Knupp LLP

11495919.1

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR JMOL OR NEW TRIAL**

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,
772 F.2d 505 (9th Cir. 1985) .......................................................................48, 59

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,
886 F.2d 1545 (9th Cir. 1989) ..............................................................................59

*Frybarger v. Int'l Bus. Machines Corp.*,
812 F.2d 525 (9th Cir. 1987) ................................................................................19

*Funky Films, Inc. v. Time Warner Ent'mt Co.*,
462 F.3d 1072 (9th Cir. 2006) ..............................................................................52

*Gaste v. Kaiserman*,
863 F.2d 1061 (2d Cir. 1988) ...............................................................................17

*Genthe v. Lincoln*,
383 F.3d 713 (8th Cir. 2004) ................................................................................14

*Golan v. Holder*,
132 S. Ct. 873 (2012).............................................................................................15

*Guzman v. Hacienda Records & Rec. Studio, Inc.*,
2014 WL 6982331 (S.D. Tex. Dec. 9, 2014), *aff'd* 808 F.3d 1031
(5th Cir. 2015) .......................................................................................................38

*Herbert Rosenthal Jewelry Corp. v. Kalpakian*,
446 F.2d 738 (9th Cir. 1971) ................................................................................40

*Home Design Servs, Inc. v. Turner Heritage Homes, Inc.*,
101 F. Supp. 3d 1201 (N.D. Fla. 2015) ..........................................................14, 20

*Hubbard v. BankAtlantic Bancorp, Inc.*,
688 F.3d 713 (11th Cir. 2012) ..............................................................................13

*In re Letterman Bros. Energy Sec. Lit.*,
799 F.2d 967 (5th Cir. 1986) ..........................................................................13, 28

*Jason v. Fonda*,
526 F. Supp. 774 (C.D. Cal. 1981).......................................................................37

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Jerden v. Amstutz*,
    430 F.3d 1231 (9th Cir. 2005) ........................................................................ 51

*Johnson v. Gordon*,
    409 F.3d 12 (1st Cir. 2005) ........................................................................... 17

*Kamar Int'l, Inc. v. Russ Berrie & Co.*,
    752 F.2d 1326 (9th Cir. 1984) ....................................................................... 48

*Lakeside-Scott v. Multnomah Cnty.*,
    556 F.3d 797 (9th Cir. 2009) ................................................................... 13, 14

*Lillie v. ManTech Int'l Corp.*,
    2019 WL 3387732 (C.D. Cal. July 26, 2019) (Snyder, J.).................... 14, 29, 50

*Loomis v. Cornish*,
    2013 WL 6044345 (C.D. Cal. Nov. 13, 2013), *aff'd*, 836 F.3d 991
    (9th Cir. 2016) ........................................................................................ 31, 37

*Loomis v. Cornish*,
    836 F.3d 991 (9th Cir. 2016) .......................................15, 27, 28, 34, 36, 38, 41

*Mackie v. Rieser*,
    296 F.3d 909 (9th Cir. 2002) ........................................................................ 46

*Mag Jewelry Co., Inc. v. Cherokee, Inc.*,
    496 F.3d 108 (1st Cir. 2007) ......................................................................... 14

*Mahone v. Lehman*,
    347 F.3d 1170 (9th Cir. 2003) .................................................................. 51, 53

*Molski v. M.J. Cable, Inc.*,
    481 F.3d 724 (9th Cir. 2007) .................................................................. 50, 51

*Nationwide Transp. Fin. v. Cass. Info. Sys., Inc.*,
    523 F.3d 1051 (9th Cir. 2008) ................................................................. 22, 52

*Newton v. Diamond* (*Newton II*),
    388 F.3d 1189, 1192-93 (9th Cir. 2004).......................................................... 16

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR JMOL OR NEW TRIAL**

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Oravec v. Sunny Isles Luxury Ventures, LC,*
    527 F.3d 1218 (11th Cir. 2008) ................................................................ 17

*Pappas v. Middle Earth Condo Ass'n,*
    963 F.2d 534 (2d. Cir. 1992) ................................................................... 50

*Perfect 10, Inc. v. Giganews, Inc.,*
    2014 WL 10894452 (C.D. Cal. Oct. 31, 2014) ................................................ 54

*Polar Bear Prods., Inc. v. Timex Corp.,*
    384 F.3d 700 (9th Cir. 2004) ............................................................. 45, 46

*Reeves v. Sanderson Plumbing Prods., Inc.,*
    530 U.S. 133 (2000) ........................................................................ 13

*Rice v. Fox Broad. Co.,*
    330 F.3d 1170 (9th Cir. 2003) ............................................................. 37

*Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.,*
    531 F.3d 962 (9th Cir. 2008) .............................................................. 42

*Satava v. Lowry,*
    323 F.3d 805 (9th Cir. 2003) ..................................................... 15, 18, 19, 26

*Sheldon v. Metro-Goldwyn Pictures Corp.,*
    309 U.S. 390 (1940) ........................................................................ 59

*Skidmore v. Led Zeppelin,*
    Nos. 16-56057, 16-56287 (9th Cir.) ....................................................... 16

*Smith v. Jackson,*
    84 F.3d 1213 (9th Cir. 1996) ........................................................... 16, 52

*Sony Corp. of Am. v. Univ. City Studios, Inc.,*
    464 U.S. 417 (1984) ........................................................................ 15

*Stewart v. Abend,*
    495 U.S. 207 (1990) ........................................................................ 15

*Swirsky v. Carey,*
    376 F.3d 841, 845 (9th Cir. 2004) ...................................................... 16, 17

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR JMOL OR NEW TRIAL**

1

**TABLE OF AUTHORITIES**
(continued)

2

3

**Page(s)**

*Three Boys Music Corp. v. Bolton*,
    212 F.3d 477 (9th Cir. 2000) ...............................................................27, 37, 40

*Ventura v. Kyle*,
    825 F.3d 876 (8th Cir. 2016) ................................................................................58

*Williams v. Gaye*,
    895 F.3d 1106 (9th Cir. 2018) .....................................................................19, 45

*Willis v. Marion Cnty. Auditor's Office*,
    118 F.3d 542 (7th Cir. 1997) ..............................................................................13

**STATUTES**

17 U.S.C.
    § 101 .................................................................................................................43
    § 103 ...........................................................................................................42, 44
    § 106 .................................................................................................................44
    § 410(c) .............................................................................................................42
    § 411(a) .............................................................................................................41
    §§ 501, 106 ........................................................................................................44
    § 504(b).......................................................................................................45, 46

**OTHER AUTHORITIES**

Fed. R. Civ. P.
    50 .........................................................................................................14, 29, 51
    50(a) ..................................................................................................................13
    50(b)...............................................................................................10, 13, 50, 59
    50(c) ..................................................................................................................50
    59 .......................................................................................10, 50, 51, 52, 59
    59(a)(1) ..............................................................................................................50
    59(d)...................................................................................................................51

1 Melville D. Nimmer & David Nimmer, *Nimmer on Copyright* §
    2.05[B] (rev. ed. 2017) .......................................................................................17

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mitchell
Silberberg &
Knupp LLP

11495919.1

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR JMOL OR NEW TRIAL**

## I.     INTRODUCTION

Pursuant to FRCP 50(b) and, alternatively, Rule 59, Defendants[1] respectfully ask this Court to overturn and vacate the legally unsupportable jury verdicts in this music copyright infringement case that are widely recognized within the music industry—and beyond—as a grave miscarriage of justice. No reasonable factfinder could have returned a copyright infringement liability verdict in Plaintiffs' favor based upon the undisputed facts and paucity of Plaintiffs' evidence. Applying the proper standards to the trial record in this case, Plaintiffs utterly failed to prove copying through access and substantial similarity, and the Court should enter judgment as a matter of law in Defendants' favor or, at minimum, grant a new trial as the jury verdicts are against the clear weight of the evidence.

The erroneous verdicts in this case and the precedent established thereby present serious harm to music creators and to the music industry as a whole. As the recent spate of Ninth Circuit cases and briefings have shown, there is a deep level of interest in, and necessary attention being given by the courts to, the issue of where to draw the line between the permissible use of commonplace and unprotectable expression (or "building blocks") in musical compositions and copyright infringement, as well as the application of existing copyright jurisprudence to those situations. While musical compositions employ a language unto themselves, they are not second-class citizens when it comes to the application of the United States copyright laws in infringement cases. Music creators who use commonplace expression in music are entitled to the same amount of breathing room afforded creators of other art forms; this breathing room is essential to the advancement and balancing of the goals of our copyright laws.

---

[1] "Defendants" are Capitol Records LLC, Jordan Houston, Lukasz Gottwald, Sarah Theresa Hudson, Karl Martin Sandberg, Henry Russell Walter, WB Music Corp., Kobalt Music Publishing America, Inc., Kasz Money, Inc., and Katheryn Elizabeth Hudson. Defendants UMG Recordings, Inc., Universal Music Group, Inc., and Kitty Purry, Inc. were dismissed with prejudice during trial. Declaration of Aaron M. Wais dated October 9, 2019 (cited herein as "WD"), Ex. 6, p. 1113 l. 7-22.

1    This case presents a critical opportunity to address these issues and rectify a wholly

2    improper finding of infringement based on nothing more than the proper use of

3    unprotectable expression that no creator can monopolize.

4         Here, the jury erroneously found both extrinsic and intrinsic similarity,

5    which only could have occurred by it failing to follow the legal standards provided

6    in the jury instructions and as applied to the undisputed evidence presented at trial.

7    Plaintiffs' own expert musicologist testified that Plaintiffs' "Joyful Noise" ostinato

8    is ***comprised entirely*** of commonplace (thus unprotectable) elements of music. The

9    sole basis for the Plaintiffs' alleged substantial similarity claim is their expert's

10   opinion that "Joyful Noise" created a purported "combination" of those

11   unprotectable elements which are allegedly copied in "Dark Horse." As discussed

12   below, under the proper application of the extrinsic test, the undisputed record

13   mandates a finding that there is no extrinsic similarity based upon this

14   "combination" allegedly in common between the two ostinatos at issue. Under

15   copyright law, Plaintiffs' ostinato was entitled to only a "thin" copyright

16   protection, at best, because it was an admitted combination of unprotectable

17   elements. As such, no finding of substantial similarity could be found absent

18   virtual identity between the two purported "combinations."  Given Plaintiffs'

19   expert's admissions and unrebutted proof that there are several differences in the

20   purported combinations, no such virtual identity exists as a matter of law. Thus, the

21   intrinsic test should never have been considered by the jury and the verdict

22   rendered during the liability phase of the trial should have been for Defendants.[2]

23        Compounding these errors, no evidence whatsoever supported the jury's

24   finding that "Joyful Noise" was "widely disseminated," which was Plaintiffs' sole

25   flimsy "access" theory.[3] No reasonable factfinder could have concluded that

---

[2] This standard in all events was also clearly not followed as no reasonable juror
could have found that the ***works as wholes*** were substantially similar. *Infra*
§ II.B.3.c.

[3] Plaintiffs had no theory of access. *Infra* § II.C.

"Joyful Noise" was so well-known that it could be reasonably inferred that Defendants heard it, particularly in this digital age of content overload, with billions of videos and songs available to users with trillions of streams, as Defendants' evidence demonstrated (and Plaintiffs failed to rebut). The few million views of "Joyful Noise" on the Internet presented by Plaintiffs, over a period of five years, equals an undisputed "drop in the bucket" in modern day view count statistics—and can hardly constitute widespread dissemination—as a matter of undisputed fact and law. Plaintiffs adduced no other evidence that could meet their burden of proving widespread dissemination.

Plaintiffs adduced no evidence of *any* sales and no documentary evidence of *any* radio or television play, or of actual performances of "Joyful Noise." Indeed, Plaintiffs only proffered the self-serving testimony of one plaintiff and his wife in order to prove dissemination through live performances; however, even that testimony merely revealed that the song was played to audiences of unknown sizes, intermittently, and at mostly religious venues of unknown sizes. Most importantly, Plaintiffs failed to establish that any Defendant ever attended, or was even aware of, these performances. Finally, Plaintiffs' evidence of critical acclaim for "Joyful Noise" was in a niche genre within which, indisputably, the relevant authors of "Dark Horse" do not participate. Under Ninth Circuit law, this evidence is wholly insufficient to give rise to a *reasonable* inference that Defendants had a *reasonable* opportunity to have heard "Joyful Noise"; the uncontroverted evidence was to the contrary. Here again, the jury's verdict constitutes a dangerously wrong precedent if allowed to stand.

For these important reasons and the others set forth below, Defendants respectfully request that the Court enter judgment as a matter of law in their favor. Alternatively, they request a new trial or a reduction of the damage award.

## II.     THE COURT SHOULD ENTER JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' COPYRIGHT INFRINGEMENT CLAIM

### A.     Rule 50(b) Judgment As A Matter Of Law Standard

If a Court does not grant a motion for judgment as a matter of law made at the close of evidence and instead submits the issues to the jury, the moving party may renew the motion after entry of judgment under Fed. R. Civ. P. 50(b). The standard for subsections (a) and (b) is the same; judgment as a matter of law is appropriate where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a); *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 149 (2000) (same). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.").

On a Rule 50(b) motion, the court does not consider what the jury actually found, but whether a sufficient evidentiary basis supported finding for the nonmoving party. *See Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 724 (11th Cir. 2012) ("Only the sufficiency of the evidence matters; what the jury actually found is irrelevant.") (affirming grant of JMOL). Judgment as a matter of law is not limited to situations where "there is a complete absence of probative facts to support a jury verdict." *In re Letterman Bros. Energy Sec. Lit.*, 799 F.2d 967, 972 (5th Cir. 1986). Indeed, a "mere scintilla" of evidence is not enough to sustain a verdict for the prevailing party. *Id.* at 971; *Willis v. Marion Cnty. Auditor's Office*, 118 F.3d 542, 548 (7th Cir. 1997) (affirming post-verdict grant of JMOL). And while courts "draw all reasonable inferences in [the non-movant's] favor," a reasonable inference "cannot be supported by only threadbare conclusory statements instead of *significant probative evidence*." *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802 (9th Cir. 2009) (emphasis added) (reversing

denial of JMOL motion); *see also Genthe v. Lincoln,* 383 F.3d 713, 716 (8th Cir. 2004) (an inference is reasonable "when it may be drawn from the evidence without resort to speculation") (affirming grant of JMOL). As such, judgment as a matter of law is also appropriate where the jury disregarded the evidence and jury instructions at trial, or where "the jury could have relied only on speculation to reach its verdict." *Lakeside-Scott*, 556 F.3d at 803; *see also Home Design Servs, Inc. v. Turner Heritage Homes, Inc.*, 101 F. Supp. 3d 1201, 1215 (N.D. Fla. 2015) (granting motion for JMOL on basis that "no jury following the Court's instructions on the law" could have found substantial similarity); *Mag Jewelry Co., Inc. v. Cherokee, Inc.*, 496 F.3d 108, 118 (1st Cir. 2007) (affirming grant of JMOL where plaintiff failed to satisfy burden of proving access). Moreover, "unimpeached and uncontradicted evidence favorable to the movant [] can be considered by [the court] in evaluating the merits" of a motion for judgment as a matter of law. *Cnty. of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1314-15 (2d Cir. 1990) (affirming grant of JMOL).

Under these standards, as explained further below, Defendants are entitled to judgment as a matter of law. *See Lillie v. ManTech Int'l Corp.*, 2019 WL 3387732, at *24 (C.D. Cal. July 26, 2019) (Snyder, J.) (granting renewed motion for JMOL to the defendant following a jury verdict in the plaintiff's favor); *see also Fahmy v. Jay-Z*, 2015 WL 6394455, at *10 (C.D. Cal. Oct. 21, 2015) (Snyder, J.), *aff'd*, 908 F.3d 383 (9th Cir. 2018) (granting the defendants' motion for JMOL).[4]

---

[4] "Although both motions employ the same legal standard, denial of a motion for summary judgment does not mandate that a Rule 50 motion be denied, because the latter tests the sufficiency of evidence actually presented at trial." *Archibald v. Cty. of San Bernardino*, 2018 WL 6017032, at *4 n.3 (C.D. Cal. Oct. 2, 2018). Indeed, "after trial, the court [may have] a better basis on which to determine the existence of material issues, including that there was never a true issue of fact at all." *Id.* (citing *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 772 (9th Cir. 1981)); *Lillie*, 2019 WL 3387732, at *22 (granting JMOL after denying summary judgment on the same claims, noting that "[n]ow, viewing all the evidence in the light most favorable to plaintiff, the Court finds that the evidentiary record does not permit a reasonable jury to" find in favor of the plaintiff).

**B.** **No Reasonable Jury Could Have Found "Joyful Noise" And "Dark Horse" To Be Substantially Similar Based On The Undisputed Evidence At Trial[5]**

    **1.** **It Is A Fundamental Tenet Of The Copyright Act That Commonplace Expression Is Not Copyrightable And May Not Be Monopolized**

The purpose of copyright law is not to provide copyright owners with all-encompassing monopoly rights so as to deter future authors from creating original works of their own. Quite the contrary, the goal of the Copyright Act is to "promot[e]" the creation and "public availability of literature, music, and the other arts." *Sony Corp. of Am. v. Univ. City Studios, Inc.*, 464 U.S. 417, 432 (1984) (citation omitted). *Accord*, *Golan v. Holder*, 132 S. Ct. 873, 889 (2012).

Consistent with this goal, copyright owners do not have exclusive rights over each and every element of their copyrighted works. *Feist Publ'ns, Inc.*, 499 U.S. at 348. Rather, "expressions that are standard, stock or common to a particular subject matter or medium are not protectable under the copyright law." *Satava v. Lowry*, 323 F.3d 805, 810 (9th Cir. 2003). When an author creates a work incorporating commonplace "elements [which] are already in the public domain," that author is entitled to "receive protection only for [her or] his original additions to the" new work. *Stewart v. Abend*, 495 U.S. 207, 234-35 (1990). *See also* Dkt. 441, Jury Instr. 34 ("While an author of an original work may be entitled to prevent others from copying original, protectable expression in the author's work, copyright protection does not extend to commonplace expression.").

---

[5] "To establish copyright infringement, a plaintiff must prove two elements: '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Loomis v. Cornish*, 836 F.3d 991, 994 (9th Cir. 2016), quoting *Feist Publ'ns, Inc. v. Rural Telephon Serv. Co.*, 499 U.S. 340, 361 (1991). Regarding the latter element, "[a]bsent direct evidence of copying," Plaintiffs were required to prove that the Defendants had (1) access to "Joyful Noise" and (2) that "Joyful Noise" and "Dark Horse" are substantially similar in protected expression. *Loomis*, 836 F.3d at 994 (internal quote marks and citations omitted). This Memorandum addresses these elements in the order set forth in the Special Verdict Form. Dkt. 456.

Mitchell
Silberberg &
Knupp LLP
11495919.1

Preventing copyright claimants from monopolizing commonplace expression is critical to accomplishing the Copyright Act's ultimate goal of encouraging the creation of new artistic works. This is because "in art, there are, and can be, few, if any, things, which in an abstract sense, are strictly new and original throughout. Every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (quoting *Emerson v. Davies*, 8 F. Cas. 615, 619 (No. 4,436) (CCD Mass. 1845)).

Musical compositions are no exception to this rule; they are entitled to the same scope of copyright protection as any other creative work. *Smith v. Jackson*, 84 F.3d 1213, 1216 n. 3 (9th Cir. 1996) ("common or trite" musical elements not protected); *see also* WD, Ex. 38, pp. 1947-51 (Amicus Brief of United States, *Skidmore v. Led Zeppelin*, Nos. 16-56057, 16-56287 (9th Cir.)). As the Ninth Circuit explained in *Newton v. Diamond* (*Newton II*), an action concerning the alleged infringement of a musical composition:

> … [E]ven where the fact of copying is conceded, no legal consequences will follow from that fact unless the copying is ***substantial***. … The principle that trivial copying does not constitute actionable infringement has long been a part of copyright law.

388 F.3d 1189, 1192-93 (9th Cir. 2004) (emphasis added).

**2.    The Substantial Similarity Test Must Be Applied In A Manner Consistent With The Purpose And Policy Of The Copyright Act**

**a.    The Extrinsic Test**

In conducting the substantial similarity analysis, the trier of fact must first apply the extrinsic test. As the Ninth Circuit explained in *Swirsky v. Carey*, the extrinsic test "requires breaking the [plaintiff's and defendant's] works down into their constituent elements, and comparing those elements for proof of copying as

measured by substantial similarity." 376 F.3d 841, 845 (9th Cir. 2004) (quotation marks omitted). "Because the requirement is one of *substantial* similarity to *protected* elements of the copyrighted work, it is *essential* to distinguish between the protected and unprotected material" and *extract* the unprotected material before comparing the two works. *Id.* (emphasis added); *see also Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1446 (9th Cir. 1994).

In music copyright cases, this discerning and critical test must be applied to extract the unprotectable elements within the allegedly infringing passages in common with a plaintiff's composition, prior to assessing substantial similarity. This test is meant to ensure that commonplace material is not and may not be the basis of any infringement claim. Courts should act as gatekeepers to ensure this essential test is met because there are a "limited number of notes and chords available to composers and … common themes frequently reappear in various compositions, especially in popular music." *Gaste v. Kaiserman*, 863 F.2d 1061, 1068 (2d Cir. 1988) (citing *Arnstein v. Edward B. Marks Music Corp.*, 82 F.2d 275, 277 (2d Cir. 1936)).[6] "Given the limited number of musical notes (as opposed to words in a language) and the combination of those notes and their phrasing, it is not surprising that a simple composition of a short length might well be susceptible to original creations by more than one composer." *Calhoun v. Lillehas Publ'g*, 298 F.3d 1228, 1232 (11th Cir. 2002). If such commonplace musical devices are not extracted from the extrinsic analysis, but are instead accorded copyright protection, then "future authors, composers and artists will find a diminished store of ideas on which to build their works." *Oravec v. Sunny Isles Luxury Ventures, LC*, 527 F.3d

---

[6] *See also Johnson v. Gordon*, 409 F.3d 12, 22 (1st Cir. 2005) (noting the "limited musical vocabulary available to composers"); 1 Melville D. Nimmer & David Nimmer, *Nimmer on Copyright* § 2.05[B] (rev. ed. 2017) ("In the field of popular songs, many, if not most, compositions bear some similarity to prior songs."). Indeed, "while there are an enormous number of possible permutations of the musical notes of the scale, only a few are pleasing; and much fewer still suit the infantile demands of the popular ear." *Darrell v. Joe Morris Music Co.*, 113 F.2d 80, 80 (2d Cir. 1940) (*per curiam*).

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR JMOL OR NEW TRIAL**

1218, 1225 (11th Cir. 2008) (quoting *Meade v. U.S.*, 27 Fed. Cl. 367, 372 (Fed. Cl. 1992)).

Similarly, courts apply—and must apply—a further series of copyright limiting doctrines to ensure that claims of infringement of combinations of unprotectable expression do not stifle other creators from using the unprotectable expression within those combinations. Thus, and first, a combination of unprotectable musical elements may ***only*** be potentially subject to copyright protection ***if*** "those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." *Satava*, 323 F.3d at 811; *see also Apple Computer*, 35 F.3d at 1445.[7] Second, and this next step in the analysis is critical, ***even if*** a combination of commonplace musical elements meets the above test, that combination is still only entitled, at most, to a ***"thin copyright that protects against only virtually identical copying*** ." *Satava*, 323 F.3d at 812 (emphasis added) (citing *Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d at 766 (9th Cir. 2003) ("When we apply the limiting doctrines, subtracting the unoriginal elements, Ets Hokin is left with … a 'thin' copyright, which protects against only virtually identical copying."); *Apple Computer*, 35 F.3d at 1439 ("When the range of protectable...expression is narrow, the appropriate standard for illicit copying is virtual identity.").

The Ninth Circuit has routinely applied this "thin" copyright standard where the claimed similarity is the selection and arrangement of a limited number of unprotected elements in cases involving other artistic works. *Folkens v. Wyland*

---

[7] In its Order on Defendants' Motion for Summary Judgment, the Court stated that "[t]o the extent the defendants seek to persuade the Court to deviate from the substantial similarity standard as it is articulated in *Swirsky*, the Court declines to do so." Dkt. 299, p. 10 n.6. But the Ninth Circuit in *Swirsky* did not hold that music copyright cases are any different from copyright cases involving other works. Citing *Satava* with approval, the Court noted that "a substantial similarity **can** be found in a combination of elements, even if those elements are individually unprotected." 376 F.3d at 848 (emphasis added). This is true and undisputed. A combination of unprotected elements **can** be protected **if** it meets the criteria set forth in *Satava*, *Apple Computer*, and numerous other cases.

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR JMOL OR NEW TRIAL**

*Worldwide, LLC*, 882 F.3d 768, 776 (9th Cir. 2018) (pen-and-ink drawing); *Satava*, 323 F.3d at 812 (sculpture); *Frybarger v. Int'l Bus. Machines Corp.*, 812 F.2d 525, 530 (9th Cir. 1987) (video bingo game); *Feist*, 499 U.S. at 348-49 (compilations protected against copying "precise words used").

Musical compositions are not to be treated any better or worse than any other art form under the law and these doctrines, including the "thin copyright doctrine," equally apply to them, as this Court already recognized in instructing the jury. *See* Dkt. 441, Jury Instr. 34.[8] These limiting doctrines—requiring the extraction of unprotectable expression from consideration of substantial similarity under the extrinsic test, and the affording of a thin copyright which protects against only virtually identical copying to combinations of unprotectable expression—are critically designed to insure that no creator monopolizes unprotectable expression to the exclusion of other creators and in derogation of the principles of our copyright laws.

### b.    The Intrinsic Test

If a plaintiff fails to satisfy the extrinsic test, the inquiry is over. The intrinsic test takes the inquiry to the next level, with the goal of only allowing infringement to be found as to *substantial* copying of protectable expression in the context of analyzing the works as a whole, including their differences. The jury

---

[8] *Williams v. Gaye*, 895 F.3d 1106 (9th Cir. 2018) addressed the thin copyright doctrine in the context of a work as a whole and is thus not to the contrary. *Gaye* did not address the issue of whether a specific phrase of a musical composition concededly comprised of only a combination of a few unprotectable elements is entitled to at most a thin copyright. Unlike the Plaintiffs in this action, the counterclaim plaintiffs in *Williams* did *not* allege that only a discrete portion of the musical composition "Got to Give It Up" was unlawfully copied by "Blurred Lines." Rather, the counterclaim plaintiffs alleged that "Blurred Lines" improperly copied a "constellation" of musical elements from the *entirety* of "Got To Give It Up." On appeal, the Court rejected the counterclaim defendants' argument that the *entire* musical composition "Got To Give It Up"—which unquestionably was comprised of much more than merely a small number of unprotectable elements— was only entitled to a "thin" copyright. There is no contention here that "Joyful Noise," considered as a musical composition in its entirety, is entitled to a thin copyright. The ostinato at issue in "Joyful Noise," however, is entitled to nothing more than a thin copyright.

1   must consider whether the two works as a whole are "*substantially* similar in the
2   total concept and feel of the works." *Cavalier v. Random House, Inc.*, 297 F.3d
3   815, 822 (9th Cir. 2002) (emphasis added, citation omitted). Again, this inquiry is
4   limited to the consideration only of similarities that are protectable expression, as
5   this Court properly instructed the jury. *See* Dkt. 441, Jury Instr. 37.

### 3.   A Reasonable Jury Following The Court's Instructions Could Not Have Found Substantial Similarity

8       This Court properly instructed the jury to first apply the above principles of
9   the extrinsic test: "you must inquire only whether the protectable elements,
10  standing alone, are substantially similar, and must filter out and disregard the non-
11  protectable." Dkt. 441, Jury Instr. 37. The Court further accurately instructed the
12  jury that "[a] combination of unprotectable elements may be eligible for copyright
13  protection if those elements are numerous enough and their selection and
14  arrangement original enough that their combination constitutes an original work of
15  authorship. Trivial elements of compilation and arrangement are not
16  copyrightable." *Id.*, Jury Instr. 34. Critically here, in an instruction that focused
17  properly only on the ostinato in "Joyful Noise," and not the entire composition, the
18  Court instructed that "when a work embodies only the minimum level of creativity
19  necessary for copyright, it is said to have 'thin' copyright protection. A thin
20  copyright only protects against virtually identical copying." *Id.* Instructing on the
21  intrinsic test, the Court charged the jury with "determin[ing] whether … the total
22  concept and feel of 'Joyful Noise' and 'Dark Horse' are substantially similar in
23  **original, protectable expression**." *Id.*, Jury Instr. 37 (emphasis added).

24      No reasonable jury properly applying these legal standards would have
25  found that Plaintiffs met their burden under the extrinsic test to show that the
26  ostinatos in "Joyful Noise" and "Dark Horse" are substantially similar in protected
27  expression. *See Home Design Servs., Inc.*, 101 F. Supp. 3d at 1215 (granting
28  JMOL on grounds that "no jury following the Court's instructions on the law could

1  reasonably find the … designs substantially similar … the jury in this case must

2  have disregarded the significant differences that existed at the level of protected

3  expression and focused instead on the unprotected similarities in the designs.").

4  The inquiry should have stopped there, based upon the undisputed trial record.

5  A proper application of the Ninth Circuit's legal standards to the factual

6  record establishes that the works do not meet the extrinsic test (no less the intrinsic

7  test), and there is no substantial similarity as a matter of law. *See, e.g.*, *Benay v.*

8  *Warner Bros. Entm't*, 607 F.3d 620, 624 (9th Cir. 2010) (substantial similarity

9  "may often be decided as a matter of law") (quoting *Funky Films, Inc. v. Time*

10  *Warner Ent'mt Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006)).

### a. The Only Claimed Similarities Are A Small Number Of Undisputedly Commonplace Elements In The Ostinatos

13  At trial, the only portion of "Joyful Noise" which Plaintiffs claimed to be

14  infringed was its ostinato, and the only portion of "Dark Horse" which Plaintiffs

15  claimed to be infringing was its Ostinato 2. As the Court stated on the record: "this

16  whole case was about whether Ostinato No. 2 in Dark Horse infringed the ostinato

17  in Joyful Noise." WD, Ex. 8, p. 1349 l. 24-1350 l. 3. The undisputed transcriptions

18  of these two ostinatos prior to the transposition to the same key (*see* WD, Ex. 28)

19  are set forth below:



26  As detailed below, it was undisputed by both parties' expert musicologists

27  that all of the claimed similarities between the portions of the works at issue (the

Mitchell
Silberberg &
Knupp LLP
11495919.1

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR JMOL OR NEW TRIAL**

ostinato in "Joyful Noise" and Ostinato 2 in "Dark Horse") are commonplace, and that those ostinatos contain numerous differences.

At trial, Dr. Decker testified that these two ostinatos contained the following similarities: a pitch sequence of 3, 3, 3, 3, 2, 2 on evenly spaced notes (along with a melodic descent from 3 to 2 to 1); timbre (in the form of a "pingy" synthesizer sound); a purported phrase length of eight notes; and the "placement" of the ostinato in the sound recording's mix. WD, Ex. 3, p. 445 l.17-446 l.3. Dr. Decker *conceded*, and thus it is undisputed fact, that each of these similarities was individually commonplace and unremarkable, testifying that "**[a]ny single one of those would not have been enough**." *Id.* p. 524 l. 9-23. Rather, according to Dr. Decker, "[i]t's the combination of them" that was purportedly significant. *Id.*[9]

In addition to the above clear concession by Plaintiffs' expert that the purported similarities were individually not protectable, his specific testimony at trial further conceded and established the commonplace nature of each of the similarities between the portions of the two ostinatos, similarities that necessarily flow from an independent compositional choice of writing in the minor mode and using a descending ostinato. Dr. Decker acknowledged the obvious point that the use of an ostinato itself is not protectable, in that countless musical works have contained ostinatos. *Id.* p. 506 l. 14-507 l. 7. Nor can writing in the minor mode be copyrightable. With respect to the main similarity asserted by Dr. Decker of scale degrees "3, 3, 3, 3, 2, 2" (or "C, C, C, C, B, B") on an evenly spaced rhythm:

- Scale degree 3 in the minor mode informs the listener that a song is "in the minor mode." *Id.* p. 450 l. 13-14.
- Dr. Decker conceded that "scale degrees have tendencies" in that they "want to go places." *Id.* p. 443 l. 24-444 l. 14; 450 l. 18-20. Specifically, "3 wants

---

[9] Dr. Decker's assertion that the combination of commonplace elements in "Joyful Noise" was protectable and substantially similar to "Dark Horse," is a conclusion of law that no expert witness is allowed to make. *See Nationwide Transp. Fin. v. Cass. Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008).

to go down to 2" and "2 desperately wants to go to 1" because "1 is our home note." *Id.* p. 450 l. 19-22, 458 l. 6-7, 18-21. *See also id.* p. 459 l. 1-6.

- Dr. Decker conceded that repeating scale degree 3 is a technique composers use to build "up tension that wants to be released and it is released to 2" (*id.* p. 451 l. 22-23); "you repeat [scale degree 3] more often and it creates more of a desire for it to go down" (*id.* p. 450 l. 21-22).

- Ostinato 1 in "Dark Horse," which Dr. Decker concedes is not infringing, contains this same descent from 3 to 2 to 1.  *Id.* p. 496 l. 9-497 l. 6.[10]

- He admitted that a C note and a B note are two white keys next to each other on a piano, these notes are not hard to play, and it is relatively simple to hit four C notes in a row followed by two B notes. *Id.* p. 494 l. 1-7, 516 l. 1-14.

- Dr. Decker admitted that evenly spaced notes are a "relatively simple rhythmic choice" that "no composer's entitled to monopolize." *Id.* p. 507 l. 12-23, 516 l. 18-20.

- Dr. Decker did not dispute that "Love Me Or Hate Me," released prior to "Joyful Noise" in 2006 and co-written by Gottwald, contains a descending ostinato with a "3, 2, 1, 5" pitch content, evenly spaced notes, and a sparse texture. WD, Ex. 5 p. 913 l. 8-914 l. 11.

- Dr. Decker did not dispute that "Brainchild," released in 1996, and "Choosing Life," released in 2002 (prior to "Joyful Noise"), also contain the repeating scale degrees ("3, 2, 1, 5" or "C, B, A, E") that are present in both Ostinato 1 and Ostinato 2 in "Dark Horse." *Id.* p. 884 l. 8-20, 886 l. 12-24.

- The children's song "Merrily We Roll Along" (found in a beginning instructional book for elementary school students) and the Christmas carol "Jolly Old St. Nicholas" also contain the pitch sequence 3, 3, 3, 3, 2, 2 on evenly spaced notes. *Id*. p. 904 l. 7-905 l. 17; 907 l. 17-908 l. 4. Dr. Decker

---

[10] Dr. Decker's admission regarding Ostinato 1 creates a further undisputed fact in support of this motion.

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR JMOL OR NEW TRIAL**

Mitchell
Silberberg &
Knupp LLP

11495919.1

1   did not dispute this, and it is unrebutted.

2   With respect the purported shared phrase length of eight notes, Dr. Decker

3   admitted that "[i]t's characteristic for a phrase like this to last for eight beats." WD,

4   Ex. 3, p. 448 l. 3-9.[11]

5   While Dr. Decker testified that the "t[imbre] or the quality and color of the

6   sound" is similar, in that both works are produced in a sound recording using a

7   "pingy sound" with a synthesizer (WD, Ex. 3, p. 452 l. 21-453 l. 19) he conceded

8   that the timbre of the songs are "not identical" (*id.*), and that a pingy synthesized

9   timbre cannot be monopolized (*id.* p. 516 l. 21-517 l. 4).

10  Finally, unrebutted testimony from Dr. Ferrara established that sparse

11  texture is commonplace. WD, Ex. 5 p. 912 l. 15-913 l. 7.[12]

12          **b.     The Undisputed Evidence Establishes The Many**

13                  **Differences Between The Ostinatos In "Joyful Noise"**

14                  **And "Dark Horse"**

15  The undisputed record adduced at trial similarly establishes that the ostinato

16  in "Joyful Noise" and Ostinato 2 in "Dark Horse" contain important differences:

17  • The pitch on Beat 7 of the ostinato in "Joyful Noise" is a B, while the pitch

18     on Beat 7 of Ostinato 2 in "Dark Horse" is an A. WD, Ex. 3, p. 499 l. 8-16.

19  • The pitch on Beat 8 of the ostinato in "Joyful Noise" is an A or an F,

20     depending on the iteration. The pitch on Beat 8 of Ostinato 2 in "Dark

21     Horse" is an E. *Id.* p. 499 l. 18-501 l. 7.

22  • The B is repeated three times in the ostinato in "Joyful Noise" but is only

23     repeated twice in Ostinato 2 in "Dark Horse." Thus, Ostinato 2 descends to

24     A a full beat before the ostinato in "Joyful Noise." *Id.* p. 499 l. 8-16.

25  _____

26  [11] In fact, the "Joyful Noise" ostinato consists of 16 beats. WD, Ex. 5 p. 918 l. 16-919 l. 13.

27  [12] As discussed *infra* § II.B.3.c, the "mix" of a sound recording is not an element of

28  the underlying musical composition and therefore may not be considered in the substantial similarity analysis.

Mitchell
Silberberg &
Knupp LLP

11495919.1

- The ostinato in "Joyful Noise" takes 16 beats for all of the melodic content in that ostinato to be expressed before it repeats. In contrast, it only takes 8 beats for all the melodic content in Ostinato 2 in "Dark Horse" to be expressed. WD, Ex. 5 p. 918 l. 16-919 l. 13.

- The ostinato in "Joyful Noise" contains portamentos (also known as slides). WD, Ex. 3, p. 505 l. 9-22. In contrast, there are no such portamentos in "Dark Horse." That gives the ostinato in "Joyful Noise" rhythmic and melodic content that is nowhere present in Ostinato 2 in "Dark Horse." *Id.*

- The ostinato in "Joyful Noise" occurs throughout the entirety of "Joyful Noise"; in contrast, Ostinato 2 in "Dark Horse" is only iterated during the verse sections. *Id.* p. 495 l. 15-17.

- The ostinatos are in different keys (*id.* p.460 l. 5-25); the tempos are different (*id.* p. 462 l. 1-6, 504 l. 23-25); the harmony is different (*id.* p. 504 l. 11-18); and the harmonic rhythm is different (*id.* p. 504 l. 19-22).[13]

### c.   Proper Application Of The Extrinsic And Intrinsic Tests To These Facts Requires A Finding Of No Substantial Similarity

#### (i)   The Extrinsic Test

As discussed above, the proper application of the extrinsic test requires analytical dissection of the ostinatos, and extraction of all of the unprotectable and commonplace expression therein. Pursuant to this test, *all* of the claimed similarities between the ostinato in "Joyful Noise" and Ostinato 2 in "Dark Horse" must be extracted and filtered out because, as both parties' experts agree, each of those similarities is commonplace and unremarkable. *Swirsky*, 376 F.3d at 845.

---

[13] Dr. Decker also admitted numerous differences between the works as wholes: Ostinato 2 (the only portion Dr. Decker claims is similar to "Joyful Noise") does not play during 55% of the "Dark Horse" recording (*id.* p. 464 l. 24-465 l. 6); "Dark Horse" and "Joyful Noise" are in different keys (*id.* p. 460 l. 5-25); and the tempo, harmony, and harmonic rhythm of the works, and rhythm of the rap vocals in the works, are different (*id.* p. 462 l. 1-6; 504 l. 11-25; 505 l. 1-5). It is also undisputed that "this lawsuit doesn't involve lyrics." WD, Ex. 6 p. 1174 l. 6-10.

When the commonplace similarities are removed, nothing remains other than undisputed differences between the two ostinatos.

Nor do the allegedly infringed elements in the "Joyful Noise" ostinato constitute a sufficiently original selection, arrangement, and coordination of numerous enough commonplace elements to warrant copyright protection. Quite the contrary. The centerpiece of Plaintiffs' infringement claim—the pitch sequence of 3, 3, 3, 3, 2, 2 (me, me, me, me, re, re) on evenly spaced notes—is a simplistic iteration of two white keys next to each other on the keyboard. It is wholly unremarkable, and concededly present in famous (and basic) compositions in the public domain, including "Jolly Old St. Nicholas" and "Merrily We Roll Along."

Dr. Decker's other claimed similarities—which he alleged to constitute a "combination" in tandem with the aforementioned trite similarity—are few in number, also admittedly commonplace, and do not remotely change the analysis. The 3, 2, 1 melodic progression is not only contained in Gottwald's own prior art, but moreover, it is what the ear expects to hear, and where the pitches "want to go," as Dr. Decker admitted. *Supra* § II.B.3.a. Dr. Decker further conceded that an eight-note length is "characteristic for a phrase like this." *Id.* Dr. Decker also admitted that no composer can monopolize a "pingy" synthesizer tone, and that the timbres of the ostinatos at issue are, in fact, different. *Id.* Finally, a "sparse" mix of a recording is also commonplace in hip-hop and pop music (*id.*); moreover this is an element of the sound recording, not the composition, and accordingly should not even be considered as part of the substantial similarity analysis in any event. *Newton II*, 388 F.3d at 1194 ("unique performance elements" of a sound recording "must be filter[ed] out … from consideration.").

Even if, *arguendo*, the commonplace similarities at issue were accorded copyright protection in combination, the ostinato in "Joyful Noise" would at most be entitled to a "thin" copyright that would only protect against "virtually identical" copying. *Satava*, 323 F.3d at 812. There is no dispute that the ostinatos

at issue are *not* virtually identical, but instead have significant differences. The thin copyright doctrine properly applied resoundingly negates Plaintiffs' infringement claim for all of the legal and policy reasons discussed above.

No reasonable jury could have found for Plaintiffs on to the extrinsic test.

### (i)   The Intrinsic Test

Because the extrinsic test, properly applied, must result in a finding of no substantial similarity, there should be no application of the intrinsic test. However, a reasonable jury applying the intrinsic test also could never find substantial similarity. The Court correctly explained to the jury that in applying the intrinsic test, they must "determine whether … the total concept and feel of 'Joyful Noise' and 'Dark Horse' are substantially similar in **original, protectable expression**." Dkt. 441, Jury Instr. 37 (emphasis added). Because the ostinatos at issue have no original, protectable expression in common, the intrinsic test cannot be met here. Moreover, there is no dispute that the works wholes are very different (*supra* note 13), which further eliminates any finding of infringement under the intrinsic test.

### C.   No Legally Sufficient Evidentiary Basis Supports The Jury's Finding Of Access Based Solely On Plaintiffs' Claim Of Alleged Widespread Dissemination Of "Joyful Noise"

Proof of access requires "an opportunity to view or to copy plaintiff's work." *Loomis*, 836 F.3d at 995. "To prove access, a plaintiff must show a reasonable possibility, not merely a bare possibility, that an alleged infringer had the chance to view the protected work." *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009). Put differently, a reasonable opportunity "does not encompass any bare possibility in the sense that anything is possible." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482-84 (9th Cir. 2000) (quoting 4 Nimmer on Copyright § 13.02[A] (1999)). A reasonable opportunity requires more than mere speculation or conjecture. *Id.* Yet, the jury's finding of access was just that: mere speculation or conjecture.

1       Access can be proven through direct evidence of access or, "[w]here there is

2   no direct evidence of access, circumstantial evidence can be used to prove access

3   either by (1) establishing a chain of events linking the plaintiff's work and the

4   defendant's access, or (2) showing that the plaintiff's work has been widely

5   disseminated." *Loomis*, 836 F.3d at 995.

6       At trial, Plaintiffs conceded they had no proof for prong one above: no direct

7   evidence of access or circumstantial evidence establishing a chain of events linking

8   the plaintiff's work and the defendant's access. WD, Ex. 6 p. 1164 l. 7-14, 1166 l.

9   7-13.[14] Plaintiffs solely relied on prong two above: widespread dissemination, and

10   thus had the burden to prove that "Joyful Noise" was so widely disseminated as to

11   make it reasonably possible that either Walter or Gottwald[15] had the opportunity to

12   hear it. As discussed below, however, no legally sufficient evidentiary basis exists

13   to support the jury's finding that "Joyful Noise" was widely disseminated to

14   provide Walter or Gottwald with a reasonable opportunity to hear "Joyful Noise"

15   prior to creating "Dark Horse," or to rebut Defendants' showing that in all events

16   they did not avail themselves of any such opportunity. Dkt. 456, Ques. 4 & 5. At

17   best, Plaintiffs presented only a "mere scintilla" of evidence in support of their

18   widespread dissemination theory, which is insufficient. *Letterman*, 799 F.2d at

19   971. Further, the uncontroverted evidence proved that, whatever the reach of

20   "Joyful Noise," neither Walter nor Gottwald (or any other defendant author for that

---

21   [14] Plaintiffs admitted that they had never met, spoken to, or communicated with

22   any defendant author and never sent any music to them directly or through an intermediary. WD, Ex. 2 p. 117 l. 12-120 l. 9; p. 217 l. 19-219 l. 19; WD, Ex. 3 p.

23   337 l. 6-338 l. 24. They also admitted that they had no knowledge of any defendant author hearing "Joyful Noise" (*id*.), and each defendant author—without

24   contradiction—denied ever hearing it. WD, Ex. 4 p. 683 l. 6-14; p. 627 l. 7-21, 647 l. 22-650 l. 2; p. 595 l. 16-598 l. 2; p. 777 l. 11-780 l. 7; WD, Ex. 2 p. 168 l. 1-12.

25   [15] At trial, Plaintiffs conceded that only Walter and Gottwald are relevant to access.

26   WD, Ex. 6 p. 1167 l. 2-9. The evidence proved that Walter and Gottwald created the "Dark Horse" ostinatos on a single day in March 2013. No other defendant had

27   any involvement in creating the ostinatos. WD, Ex. 4 p. 334 l. 18-335 l. 13; p. 703 l. 10-704 l. 18, 707 l. 6-708 l. 4; WD, Ex. 2 p. 151 l. 3-153 l. 12; WD, Ex. 3 p. 531

28   l., 7-9, p. 531 l. 18-532 l. 5; WD, Ex. 2 p. 240 l. 4-11; WD, Ex. 4 p. 776 l. 2-22; WD, Ex. 3 p. 534 l. 6-24.

matter) availed himself of the opportunity to hear the song. Any other conclusion is impermissible speculation.[16]

### 1. Plaintiffs' Mischaracterization Of The Widespread Dissemination Doctrine Must Be Debunked.

Plaintiffs' description of the widespread dissemination doctrine was completely wrong. Plaintiffs claimed: "Joyful Noise" "*was out there* in the song universe, and it was available to professional songwriters who make a living listening to music" (WD, Ex. 6 p. 1167 l. 2-4). First, being "***out there***" is not the test for widespread dissemination; nor should it be.[17] This argument promotes nothing other than speculation in lieu of sound factual evidence demonstrating far and wide reaching distribution of a musical work. Being "out there" in no way shape or form constitutes "widespread dissemination" so as to support the conclusion that "Mr. Gottwald and Mr. Walter had a reasonable opportunity to hear ['Joyful Noise'] … before they created Dark Horse's instrumental" (*id*. p. 1167 l. 7-9).[18] Second, Plaintiffs' contention that "it was available to professional songwriters who make a living listening to music"[19] is not only the antithesis of

---

[16] At the hearing on Defendants' motion for summary judgment, the Court acknowledged that it could reassess its decision as it related to the issue of access after hearing evidence at trial. WD, Ex. 36, p. 1916 l. 11-16 ("And after hearing evidence, if we do go to trial, I may well come back and reassess based on Rule 50 which I sometimes do because rather than granting summary judgment, it may make more sense to hear all the evidence and assess things."). Indeed, Plaintiffs' lack of proof of access was confirmed at trial, and JMOL is mandated on access. *Archibald*, 2018 WL 6017032, at *4 (denial of MSJ does not preclude JMOL); *Lillie*, 2019 WL 3387732, at *22 (granting JMOL after denying summary judgment on the same claims, noting that "[n]ow, viewing all the evidence in the light most favorable to plaintiff, the Court finds that the evidentiary record does not permit a reasonable jury to" find in favor of the plaintiff).

[17] Based on its plain meaning, "widespread" is synonymous with "extensive," "far-reaching," and "sweeping." *See* https://merriam-webster.com/thesaurus/widespread.

[18] This argument was presented on summary judgment, and Defendants submit that, just as at trial, it was raised to confuse the Court and jury and to lessen Plaintiffs' burden on their sole access claim: widespread dissemination. Nothing in the record or the law supports this theory and it must be soundly rejected.

[19] WD, Ex. 6 p. 1167 l. 1-4 (Mr. Kahn: "Joyful Noise" "was available to professional songwriters who make a living listening to music"), p. 1167 l. 5-12 (Mr. Kahn: Walter and Gottwald "have an incentive to be out there listening"); p.

widespread dissemination as narrowly focuses solely on professional songwriters, it is also a wholly incorrect factual statement (with zero proof and indeed contrary proof) that professional songwriters make their living "listening to music."

Indeed, Gottwald testified that, in his experience, while "people think, oh, you just sit around and listen to music all day, …. in fact, that's the opposite." WD, Ex. 4 p. 685 l. 5-7. He elaborated:

> [T]he reality is that you can't [] listen to two songs at the same time. So if you're working on music all the time, um, which I have been for a very long time, you actually listen to less music in my experience because also, when you've been workin' on it all night, you know, it's—you kind of want to get away from it sometimes.

*Id*. p. 685 l. 10-16. To the extent he did listen to music, he listened to music made by him and people he worked with. *Id*. p. 687 l. 6-9. Walter concurred, testifying that some days he is "creating so much music that I don't feel like listening to any more music" and that when he did listen to music, he would "throw on some of my favorite music just to kind of relax or unwind." *Id*. p. 656 l. 3-9. Both also testified that they did not listen to religious music, including Christian hip-hop. *Id.* p. 648 l. 22-649 l. 3; 683 l. 15-24. This testimony was not contradicted or impeached.[20]

---

1167 l. 24-1168 l. 1 (Mr. Kahn: "professional songwriters are more likely to pay attention to songs that are getting recognized and are getting nominated"); p. 1168 l. 6-10 (Mr. Kahn: songwriters used Myspace pages "to seek out music"); p. 1170 l. 14-20 (Mr. Kahn: "[Y]ou're a professional songwriter. And you've listened to thousands and thousands of songs…").

[20] As discussed in more detail below, Walter and Gottwald also explicitly testified that they did not search, including online, for music unknown to them, particularly religious music such as Christian hip-hop, and did not pay attention to Grammy nominations or Billboard charts other than for the categories that pertained to their music and their careers—*i.e.*, the pop categories. *See infra* § II.C.3. The testimony of the other defendant authors—also professional songwriters—was in accord. WD, Ex. 4, p. 598 l. 20-602 l. 2; p. 780 l. 2-19, p. 780 l. 24-782 l. 11; WD, Ex. 2 p. 148 l. 5-149 l. 14, p. 168 l. 13-170 l. 4, p. 170 l. 9-171 l. 2. This evidence was uncontroverted.

Plaintiffs' counsel's improper attempt to shed Plaintiffs' widespread dissemination burden and shift to Defendants a burden to disprove a false negative inference about professional songwriters undoubtedly impacted the jury as it promoted pure speculation. There is no legal or factual basis for his concocted proposition that professional songwriters seek out new music, whether online or otherwise, and it of course provides no substitute for evidence necessary to meet Plaintiffs' burden to prove widespread dissemination of "Joyful Noise."

> **2.     Joyful Noise Was Disseminated, At Most, In A Niche Market, Was Not Nationally Well Known And Was Not Extensively Available To A Large Group On A Wide Scale**
>
> **a.     The Views Of "Joyful Noise" On YouTube And Myspace Were The Opposite Of Widespread; They Were Undisputedly *De Minimis* In The Context Of The Online World Of Music**

Initially, "[t]he availability of a copyrighted work on the Internet, in and of itself, is insufficient to show access through widespread dissemination." *Loomis v. Cornish*, 2013 WL 6044345, at *12 (C.D. Cal. Nov. 13, 2013), *aff'd*, 836 F.3d 991 (9th Cir. 2016); *Batts v. Adams*, 2011 WL 13217923, at *4 (C.D. Cal. Feb. 8, 2011) ("the posting of videos and/or songs on YouTube, Amazon.com, and iTunes by an unknown singer...is hardly 'widespread' [dissemination] and, in fact, is quite limited, and clearly insufficient to support a finding of access").

Here, this Court is presented with the question as to whether Plaintiffs presented sufficient non-speculative proof necessary to establish widespread dissemination of "Joyful Noise" in the universe of content on the Internet, and in light of how that content is obtained by users. Defendants respectfully submit that Plaintiffs' proof was woefully and indisputably insufficient.

On this issue, Plaintiffs relied solely on (1) six videos of "Joyful Noise" available on YouTube with a cumulative "view" count of **3.88** million views **between 2008 and 2012** and (2) the presence of "Joyful Noise" on the Myspace profile pages for Gray and Moore that had a cumulative "play" count of **2.49**

million plays during those same five years. While Plaintiffs' counsel then *argued* that these view counts proved the widespread dissemination of "Joyful Noise" because "6 million is a big number" (WD, Ex. 6 p. 1167 l. 19), his argument is not evidence. Plaintiffs bore the burden to prove that the view counts of "Joyful Noise" indeed constituted widespread dissemination *in the context of those platforms*. They completely failed to do so, which alone warrants rejecting the jury's finding of widespread dissemination.

Consistent with their false premise that widespread dissemination is equal to a work being "out there," Plaintiffs would have this Court ignore what widespread dissemination means in the context of online music. Indeed, it was Defendants who demonstrated by unrebutted evidence the insignificance of Plaintiffs' numbers in the context of the universe they relied on. Defendants' evidence established that the "Joyful Noise" view counts are a miniscule drop in the bucket when compared to the *trillions* of views/plays that YouTube and Myspace received *during the same time period*. The "Joyful Noise" view/play counts at issue do not remotely suggest *widespread* dissemination affording Walter and Gottwald a reasonable opportunity to find and listen to "Joyful Noise" on YouTube and Myspace.

As demonstrated by the stipulated facts and unrebutted testimony of Bill Rosenblatt regarding the YouTube platform, Plaintiffs' *six* videos were among *billions* of other available videos during the relevant time period, including *hundreds of millions* of music videos alone. WD, Ex. 4 p. 764 l. 24-766 l. 10, p. 767 l. 11-21, p. 768 l. 8-24; Wais Decl, Ex. 5 p. 981 l. 4-982 l. 14. A view count of *3.88 million* pales compared to the *4.14 trillion* total views of videos during the relevant time period. WD, Ex. 4 p. 768 l. 8-771 l. 3; Wais Decl, Ex. 5 p. 979 l. 12-980 l. 7. Critically, Rosenblatt testified that to find a "Joyful Noise" video on YouTube, a user would have had to take affirmative steps to search for it by the song or artist's name; otherwise, trying to find it would be like trying to find six

1  people in China without knowing their names. This testimony was unrebutted.

2  Wais Decl, Ex. 5 p. 985 l. 14-987 l. 1.

3      Regarding the Myspace platform, Defendants' expert Zachary St. Martin

4  testified that the two Myspace pages presented by Plaintiffs were **two** out of **265**

5  **million** registered accounts, and that "Joyful Noise" was **one** song out of up to **53**

6  **million songs** from over **14 million** artists. WD, Ex. 4 p. 800 l. 12-801 l. 11. He

7  also testified that the **2.49 million** plays of "Joyful Noise" over four years were

8  dwarfed by the **billion plays every month** that occurred during the same time

9  period. *Id*. St. Martin also testified that the primary ways in which users could

10  access a song on Myspace were by searching for a particular artist or song that the

11  user already knew about and that users were not satisfied with search features of

12  Myspace because "there was so much music on the site and the ability to find it

13  was rudimentary." *Id*. p. 795 l. 9-797 l. 24, p. 798 l. 17-24, p. 801 l. 12-802 l. 2.

14  Songs "featured" on Myspace were popular, mainstream songs in the rap, rock, and

15  pop genres, *not* religious music or Christian hip-hop. *Id*. And the genre page would

16  have to be expanded to locate any Christian categories within the alphabetical list

17  of genres. *Id.* p.799 l.10-800 l.11[21]

18      Accordingly, there was no legally sufficient evidentiary basis for a

19  reasonable jury to conclude Plaintiffs proved widespread dissemination of "Joyful

20  Noise" based on the 6 million views/plays[22] in the context of YouTube and

21  Myspace. As a matter of law and undisputed fact, these numbers cannot be

22  considered widespread dissemination in the massive universe of online content.

23

24  [21] Plaintiffs had no proof that any of the "Dark Horse" writers searched for
    Christian rap on YouTube or Myspace, as was Plaintiffs' burden. Moreover, again,
25  Walter and Gottwald testified that they had never heard of Plaintiffs or their music,
    including "Joyful Noise," before this lawsuit and did not search online for or listen
26  to religious music, including Christian hip-hop. *Infra* § II.C.3.

27  [22] Additionally, the undisputed evidence at trial established that view counts are
    inherently unreliable, because there are repeat listeners and both YouTube and
28  Myspace suffered from view/play artificial inflation through the use of bots and
    paid views/plays. WD, Ex. 4 p. 767 l. 22-768 l. 7; WD, Ex. 5 p. 989 l. 15-990 l. 18.

Mitchell
Silberberg &
Knupp LLP
11495919.1

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR JMOL OR NEW TRIAL**

There is also an unrebutted bar to entry into that massive universe by virtue of the fact that search terms need to be employed to find a work. Plaintiffs proffered no evidence, and none exists, that any defendant searched for "Joyful Noise."[23]

This unrebutted evidence shows Plaintiffs' claim of access to "Joyful Noise" is wholly speculative and without any evidentiary support from which to infer that any defendant had a reasonable opportunity to hear it. It is "the modern day equivalent of looking for a needle in a haystack—where the alleged seeker does not know the needle exists, and isn't looking for it." *Batts*, 2011 WL 13217923, at *4 (using this analogy to describe the "posting of videos and/or songs on YouTube, Amazon.com, and iTunes by an unknown singer"); *see also Loomis*, 836 F.3d at 998 ("Although there was a bare possibility that they heard Bright Red Chords on the radio, or that they read about Loomis and the Lust in a magazine in the break room of Playback Studios, or that they picked up one of Loomis's promotional CDs while at Playback, that is not enough to raise a triable issue of access."); *id*. (quoting Nimmer explaining that "evidence showing that Gloria Estefan was present in a room with 15,000 records, including one containing plaintiff's song" was insufficient to demonstrate access). Nothing in this record demonstrates anything remotely close to widespread dissemination of "Joyful Noise"—it offers only sheer speculation as to access which is legally insufficient.

**b.    Plaintiffs Had Virtually No Evidence Of Traditional Dissemination Of "Joyful Noise"**

Since Plaintiffs failed to prove widespread dissemination of Joyful Noise online, by their YouTube and Myspace views or otherwise, as discussed above, it was incumbent upon them to fill that void with proof that could constitute "brick

---

[23] In this regard, *Loomis* confirms that it is also relevant that Plaintiffs and Defendants operate in different music universes, a distinction that both sides agreed upon. *See* WD, Ex. 3, p. 336 l. 13-337 l. 22 (Gray, Lambert, and Moore all perform in the genre of Christian rap and, in that genre, they "cross paths and encounter each other on a regular basis" but had never met or communicated with any of the "Dark Horse" authors); WD, Ex. 4 p. 668 l. 13-669 l. 6; *see also supra* notes 14 & 20.

Mitchell
Silberberg &
Knupp LLP
11495919.1

and mortar" widespread distribution of Joyful Noise through traditional channels (e.g., sales, concerts, radio). There was no such widespread dissemination proof as a matter of law and undisputed fact.

- Sales: Plaintiffs did not offer proof of one single digital or brick-and-mortar sale of "Joyful Noise" or *Our World Redeemed* and admitted that they have no such evidence. WD, Ex. 3 p. 354 l. 2-5; WD, Ex. 2 p. 120 l. 22-121 l. 8; WD, Ex. 4 p. 736 l. 10-15. Thus, Plaintiffs failed to prove "Joyful Noise" or *Our World Redeemed* were sold at all, let alone in quantities sufficient to prove widespread dissemination.

- Radio/TV[24]: Plaintiffs did not prove that "Joyful Noise" received any radio or television play. Even if Gray's testimony that it "may" have played *in the background* during, at most, a few hundred of his interviews touring unknown stations, at unknown times, and reaching an unknown audience, is credited, that testimony of course fails entirely to show any widespread dissemination by this means. WD, Ex. 2 p. 261 l. 3-11. There were absolutely no documents admitted regarding this channel of distribution.

- Live Performances[25]: Plaintiffs did not have any documentary evidence that Gray (or Lecrae Moore) performed "Joyful Noise" at large concerts attended by large crowds. Plaintiffs did not even have any documentary evidence showing it was played at any venue. Instead, Plaintiffs only testified that the two performed the song, at most, about 300 times over several years at unknown venues to audiences of unknown size. Their testimony confirmed that 70 percent of these concerts were at churches and other religious venues (WD, Ex. 3, p. 349 l.

---

[24] On summary judgment, the Court did not rely on evidence of radio and TV interviews because of the lack of "any evidence identifying the names of the television and radio stations that Gray claims to have been interviewed by." Dkt. 299, pp. 6-7, n.3. Plaintiffs' evidence was no better at trial.

[25] On summary judgment, the Court noted that Plaintiffs failed to "identify[] the names of the venues where Gray performed or the size of the audience at any of his performances." Dkt. 299, pp. 6-7, n.3. Plaintiffs' evidence was no better at trial.

16-18; WD, Ex. 4 p. 723 l. 7-11, p. 743 l, 11-13) and, of the remaining 30 percent, "a good portion" of those venues were still religious themed events. WD, Ex. 3 p. 406 l. 17-407 l. 8. Plaintiffs only testified to this; they presented no corroborating evidence such as set lists or tapes of such performances. This testimony is not evidence of widespread dissemination of "Joyful Noise"; and plaintiffs have no proof, as none exists, that any defendant attended any of these 300 concerts.

• <u>Critical Acclaim</u>: Plaintiffs did not prove critical acclaim that would suggest that anyone other than those who follow Christian and Gospel music would have been made aware of "Joyful Noise." While Plaintiffs presented evidence that "Joyful Noise" and *Our World Redeemed* appeared on Billboard charts in the Christian and Gospel music categories and were also nominated for music awards in Christian or gospel music categories, these charts and nominations do not evidence the *reach* of "Joyful Noise." All this evidence proves is that the name of a song or an album appeared on a chart or list of nominees for awards in a niche genre of music Defendants did not know about and had no interest in following. It is speculation to surmise from this that it is reasonably possible that someone saw the name of the song, sought the song out, and listened to it. This is particularly true for a niche genre like Christian hip hop.[26] Plaintiffs' evidence merely shows that the song achieved some amount of critical acclaim in the genre of Christian music—a genre that both Walter and Gottwald testified that they did not follow. Importantly, Plaintiffs presented no evidence to the contrary, nor did they otherwise impeach or rebut that testimony. *See infra* § II.C.3.

Whether the Court considers this evidence by individual category or in the aggregate, the case law makes clear that this sparse level of dissemination cannot

---

[26] In fact, Billboard produces nearly 200 charts a week, of which Christian and Gospel music categories are just two. Billboard's most popular charts are the Billboard Top 100 and the Billboard 200 and the charts relating to mainstream Top 40, rock, R&B and hip hop, and country music are larger in terms of market volume and audience volume than the charts relating to gospel and Christian. WD, Ex. 5 p. 1011 l. 1-13.

reasonably support a finding of **widespread** dissemination. *See, e.g., Loomis*, 836 F.3d at 994 (where the plaintiff's song had won several awards, the Court found that, "[d]espite these achievements, Bright Red Chords was not commercially successful"); *Art Attacks Ink,* 581 F.3d at 1144 (T-shirt design not widely disseminated where plaintiff sold 2,000 shirts a year and displayed the design at fair booths and store kiosks); *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1178 (9th Cir. 2003) (no widespread dissemination where plaintiff sold 17,000 copies of a video over a 13 year period); *Loomis*, 2013 WL 6044345, at *11 ("evidence of small circulation . . . or local air time without other proof of access is generally not enough to demonstrate a reasonable possibility of access"); *Jason v. Fonda*, 526 F. Supp. 774, 776-77 (C.D. Cal. 1981) (book sales of no more than 2,000 copies nationwide and no more than 700 copies in Southern California were insufficient).

In short, Plaintiffs were obligated to prove actual sales, radio plays, and concert performances. In this regard, context matters. Simply saying that "Joyful Noise" was "out there," without proof of a sufficient number, level, or volume of sales, radio plays, or performances, is wholly insufficient. All that Plaintiffs proved here is speculation and a bare possibility of access through these channels, if that.[27]

The rule of widespread dissemination must be properly applied because otherwise there cannot be a *reasonable* opportunity for any defendant to hear "Joyful Noise." Again, Plaintiffs have never claimed, nor can they, that any chain or conduit exists. They must therefore show that "Joyful Noise" had a sufficiently

---

[27] Even cases finding access make clear that context matters and that the plaintiff has a duty to present evidence of dissemination sufficient to give rise to a reasonable opportunity of access. In *Three Boys Music Corp.*, for example, the Ninth Circuit upheld a jury's finding that it was reasonable for the jury to infer that the songwriters, Bolton and Goldmark, had heard plaintiff's song because it "was widely disseminated on radio and television stations *where Bolton and Goldmark grew up*" (*Three Boys Music Corp.*, 212 F.3d at 483-84) (emphasis added) **and** Bolton also admitted that he "grew up listening to groups such as the Isley Brothers," was a "huge fan," a "collector of their music," "kn[ew] everything [the Isley Brothers had] done" (*id.*), and had even expressed concern to his co-writer that they "were copying a song by another famous soul singer." *Id.* at 484. Such evidence is completely lacking here.

Mitchell Silberberg & Knupp LLP

11495919.1

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR JMOL OR NEW TRIAL**

*wide* reach on commercial platforms such that there can be a reasonable inference of access. Plaintiffs woefully failed to carry this burden.[28] Even if one combined the drop in the bucket Internet evidence with the sparse traditional dissemination proof, the unquestionable conclusion remains that there was no widespread dissemination of "Joyful Noise." Both the online and the brick and mortar proofs of dissemination were quantifiably extremely low, not remotely widespread.

### 3. The Evidence Showed That Defendants Did Not Avail Themselves Of The Opportunity To Hear "Joyful Noise"

In the face of this deficient proof of widespread dissemination, judgment for Defendants is even more warranted by Defendants' unrebutted and unimpeached evidence that they did not avail themselves of any alleged opportunity to hear "Joyful Noise" and, thus, did not copy. *See* WD, Ex. 4 p. 647 l. 22-650 l. 2, p. 650 l. 8-651 l. 10, p. 652 l. 9-16, p. 660 l. 7-16, p. 681 l. 22-684 l. 24, 688 l. 13-22, p. 695 l. 17-19.[29] This dispels any inference of copying. *See* Dkt. 403, p. 3 (citing 4 *Nimmer on Copyright*, § 13.02[A]). Plaintiffs offered no impeachment or other evidence, and none exists, to contradict this testimony. Indeed, Walter and Gottwald, who testified they never heard of Plaintiffs or their music, including "Joyful Noise," also:

- Explicitly disclaimed searching online for music unknown to them, particularly religious music such as Christian hip-hop. *See* WD, Ex. 4 p. 650 l. 3-651 l. 10 (Walter did not use Myspace to search for music or "browse" YouTube

---

[28] Plaintiffs had no alternative theory as they did not present any evidence that Gottwald or Walter listened to, sought out, or followed religious music or attended religious concerts, including those of Gray and Moore. The evidence was to the contrary. WD, Ex. 4 p. 647 l. 22-650 l. 2; p. 651 l. 5-10; p. 683 l. 15-684 l. 24. The other defendant authors' testimony was in accord. WD, Ex. 2 p. 168 l. 1-170 l. 4, p. 171 l. 3-9; WD, Ex. 4 p. 592 l. 14-597 l. 18; p. 772 l. 22-774 l. 21, p. 777 l 11-779 l. 17. *See Loomis*, 836 F.3d at 998 (no triable issue of fact arose from Santa Barbara music scene being saturated with "Bright Red Chords" because the "Domino" songwriters were not participating in that scene); *Guzman v. Hacienda Records & Rec. Studio, Inc.*, 2014 WL 6982331, at *5-6 (S.D. Tex. Dec. 9, 2014), *aff'd* 808 F.3d 1031 (5th Cir. 2015) (a song was not "widely disseminated" where it "did not achieve popularity outside of the Tejano music scene").

[29] *See also supra* note 14.

or look for religious music or Christian rap; he would "search for [his] favorite songs," listen to a song that a friend sent him a link to, or to "look up a funny video"); p. 670 l. 25-671 l. 2 (Gottwald "may have listened to music on MySpace if it was referred to me by somebody"); p. 688 l. 23-689 l. 6 (Gottwald explained that "he is focused in the pop music genre" and has "never really looked at [Christian music]"). *See also supra* notes 14 & 28.

- Explicitly testified that they did not know Gray or Moore and never attended one of their concerts; never attended concerts of religious music; and did not listen to religious music, including Christian hip-hop, meaning they were not listening to the radio stations and shows on which Gray purportedly appeared. WD, Ex. 4 p. 647 l. 22-650 l. 2, p. 681 l. 22-674 l. 24.

- Explicitly testified that they never listened to or heard of "Joyful Noise" or *Our World Redeemed* prior to the filing of the instant action. *Id.* p. 627 l. 7-21, p. 649 l. 12-15 ; p. 683 l. 6-14.[30]

Finally, as to the Billboard charts and Grammy nomination, Walter and Gottwald testified that they barely paid attention to either and, when they did, they only paid attention to the categories that pertained to their music and their careers—*i.e.*, the pop categories. *Id.* p. 616 l. 7-13; 651 l. 14-652 l. 2 (Walter looked at Billboard's Hot 100 chart but did not look at charts that his music was not on or outside the Top 100); 652 l. 9-16 (Walter would pay attention to "Song of the Year, Record of the Year" and "that's kind of [] about it"; he was "not [] an enthusiastic [] Grammy follower or watcher" and did not follow any of the awards in any of the gospel or religious music categories); 686 l. 25-687 l. 5; p. 688 l. 1-22 (Gottwald, at times, looked at Billboard's Hot 100 but would mostly just look at "Top 10 of the Nielsen for pop" or the "top 10 of Media Base for radio"; he never looked at gospel or Christian rap charts or religious music charts).

---

[30] Nor was there any evidence proffered at trial to suggest that either Gottwald or Walter purchased "Joyful Noise" or *Our World Redeemed*, as there was no evidence presented that *anyone* bought the song or album.

1   Defendants unquestionably established with unrebutted testimony,

2   particularly in the context of the sparse proof Plaintiffs presented, that they did not

3   avail themselves of any opportunity to hear "Joyful Noise."

4   **D.**   **No Legally Sufficient Evidentiary Basis Supports The Jury's Finding That Defendants Did Not Independently Create "Dark**

5   **Horse"**

6   A *prima facie* claim of copying can be rebutted by showing that the alleged

7   infringing work was independently created. *Three Boys Music*, 212 F.3d at 486

8   ("By establishing reasonable access and substantial similarity, a copyright plaintiff

9   creates a presumption of copying. The burden shifts to the defendant to rebut that

10   presumption through proof of independent creation.") (citing *Granite Music Corp.*

11   *v. United Artists Corp.*, 532 F.2d 718, 721 (9th Cir. 1976)); *see also Herbert*

12   *Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 741 (9th Cir. 1971) ("It is

13   true that defendants had access to plaintiff's [copyrighted] pin and that there is an

14   obvious similarity between plaintiff's pin and those of defendants. These two facts

15   constitute strong circumstantial evidence of copying. But they are not conclusive,

16   and there was substantial evidence to support the trial court's finding that

17   defendant's pin was in fact an independent creation.") (citations omitted).

18   Here, Defendants presented affirmative evidence of independent creation

19   that Plaintiffs failed to rebut or impeach. Specifically, Walter first testified about

20   his creative process that led to the creation of the beat, including Ostinatos 1 and 2,

21   which would eventually become the musical bed of "Dark Horse." WD, Ex. 4 p.

22   634 l. 10-639 l. 9. He testified that, in March 2013, while he and Gottwald were at

23   Conway Studios waiting for an artist to show up, he took out his equipment and

24   started playing music. *Id.* p. 635 l. 4-24. He eventually played a simple downward

25   run of phrases—3, 2, 1, 5 (Ostinato 1). *Id.* p. 636 l. 24-637 l. 14. He liked the

26   sound so he recorded it to his music program, Cubase, and looped it. *Id.* However,

27   after about 13 seconds, the intro started to sound repetitive, so Walter decided to

28   stretch the notes out and slow it down to give it some space for an eventual verse.

*Id.* p. 637 l. 16-639 l. 9. In doing so, he simply kept his fingers on the same keys and stretched it out by repeating the keys. *Id.* He repeated the 3 four times, the 2 two times, and again played the 1 and the 5, turning it into 3, 3, 3, 3, 2, 2, 1, 5 (Ostinato 2). *Id.* Then he added some drum sounds, copied Ostinato 1 into the chorus, and made some additional modifications. *Id.* p. 639 l. 10-22. At that point, Gottwald joined Walter and suggested adding some different underlying bass notes to give it more depth. *Id.*; *see also id.* p. 639 l. 23-640 l. 17. Defendants introduced this initial instrumental track, titled "Oh No!" into evidence. WD, Ex. 24.[31]

This testimony is also highly important in this case generally, because it shows as a matter of undisputed fact that Ostinato 1 in "Dark Horse," which Dr. Decker admitted was not infringing (*supra* § II.B.3.a) was created first by Walter, and it has the exact same pitches (3, 2, 1, 5) that are found in Ostinato 2 of "Dark Horse." This salient and undisputed fact not only demonstrates that the allegedly infringed music is commonplace, unprotectable expression, it unequivocally establishes that Defendants carried their burden of proving independent creation.

E.   **No Legally Sufficient Evidentiary Basis Supports The Jury's Finding That The Inclusion Of Ojukwu's Beat In "Joyful Noise" Is Part Of A Joint Work of Authorship**

In order to prevail on a copyright infringement claim, a plaintiff must prove that it owns the expression that is allegedly infringed. *Loomis*, 836 F.3d at 994. Furthermore, under 17 U.S.C. § 411(a), "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title." Without a registration that covers the expression that the plaintiff contends was

---

[31] They and the other "Dark Horse" authors also testified about the process by which they then created "Dark Horse" through songwriting sessions in Santa Barbara with Perry, Sarah Hudson, and Max Martin, the addition of a rap verse by Houston, and the continued refinement of the song. WD, Ex. 2 p. 160 l. 23-162 l. 11; WD, Ex. 3 p. 535 l. 18-536 l. 4; WD, Ex. 4 p. 642 l. 11-643 l. 18; p. 706 l. 9-15; p. 594 l. 4-595 l. 15; p. 644 l. 15-646 l. 8; p. 706 l. 16-707 l. 5; p. 775 l. 23-776 l. 10. Ostinato 1 and 2, however, remained the same from the original beat created by Walter. *Id.* p. 646 l. 13-647 l. 3; p. 707 l. 6-708 l. 4.

Mitchell Silberberg & Knupp LLP

11495919.1

infringed, there is no claim.

Here, Plaintiffs only claim infringement of the ostinato in "Joyful Noise," part of the beat that Plaintiff Chike Ojukwu created. Ojukwu's beat was a pre-existing work that Ojukwu published to his Myspace page, and which Gray purchased and later incorporated into "Joyful Noise." WD, Ex. 2 p. 183 l. 17-184 l. 1, 118:19-119:3, p. 194 l. 19-22; WD, Ex. 3 p. 356 l. 6-8. Ojukwu's pre-existing beat is not part of a joint work with the rest of "Joyful Noise"; rather "Joyful Noise" is a derivative work incorporating his beat. Since the copyright in this derivative work does not protect the preexisting material embodied in the beat (17 U.S.C. § 103),[32] Plaintiffs cannot establish ownership of the beat or that their registration covers the beat.

There are three criteria for determining whether a work is jointly authored, the "most important" of which is whether the alleged author "superintended the work by exercising control." *Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 968 (9th Cir. 2008) (citing *Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 2000)). Here, the undisputed evidence showed that Ojukwu had no control whatsoever over "Joyful Noise." After he sold the beat to Gray, Ojukwu had no input into the lyrics or the mixing and mastering of "Joyful Noise"; no input into the decision to replace the synthesizer sounds in the beat with guitars; and did not receive any versions of "Joyful Noise" until after the song was finalized. WD, Ex. 2 p. 213 l. 16-25; 215 l. 2-16.

Plaintiffs also made no objective manifestations of intent to be co-authors. They made no agreement concerning ownership of the beat or any subsequent

---

[32] Although the copyright registration for "Joyful Noise" states that it is a "joint work," this is not *prima facie* evidence of the validity of the copyright or of the facts stated in the certificate because the registration was not made within five years after first publication of "Joyful Noise." 17 U.S.C. § 410(c). The registration for "Joyful Noise" should be accorded "no weight." *See, e.g., Blue Underground Inc. v. Caputo*, 2015 WL 12683972, at *5 (C.D. Cal. Mar. 16, 2015) (citing *Sem-Torq, Inc. v. KMart Corp.*, 936 F.2d 851, 853-54 (6th Cir. 1991)).

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR JMOL OR NEW TRIAL**

1  work by Gray that incorporated the beat (*id.* p. 209 l. 3-12; WD, Ex. 3 p. 359 l. 4-

2  9); had no discussions about the type of agreement for the purchase of the beat

3  (WD, Ex. 2 p. 210 l. 1-10); and Ojukwu did not even know Gray was going to pay

4  him for the beat (*id.* p. 209 l. 3-12). In the liner notes for "Joyful Noise," Ojukwu

5  was not listed as a "writer." WD, Ex. 19.[33] When "Joyful Noise" was nominated for

6  a Dove Award, he was not listed as a "writer." WD, Ex. 17; WD, Ex. 3 p. 363 l. 7-

7  367 l. 10, p. 407 l. 9-409 l. 14. At no point until 2014, after this lawsuit was filed,

8  did Ojukwu enter into any written agreement concerning any ownership in "Joyful

9  Noise." WD, Ex. 2 p. 211 l. 20-23, p. 212 l. 5-9; WD, Ex. 3 p. 389 l. 4-7.[34]

10      Under these circumstances, it is clear that "Joyful Noise" was not a joint

11  work incorporating Ojukwu's beat. *Ford v. Ray*, 130 F. Supp. 3d 1358, 1362-64

12  (W.D. Wash. 2015), is illustrative. In that case, the plaintiff claimed that he was a

13  joint author of the song "Baby Got Back" because he created the "beat" for the

14  song. In finding that the plaintiff was **not** a joint author, the court relied on the fact

15  that, "[a]lthough plaintiff possessed initial control over his contribution to 'Baby

16  Got Back,' the ultimate decision as to how or whether to incorporate plaintiff's

17  creations was left to defendant." *Id.* at 1363. As the court noted, "[t]he choices

18  regarding whether to use one of the beats, in whole or in part, and whether to make

19  alterations to the track rested entirely with defendant." *Id.*

20      This case is no different. The evidence at trial demonstrated not only that

21  Ojukwu did not "superintend[] the work by exercising control," there is no

22  evidence that he had any role in even deciding whether his beat was incorporated

23  in "Joyful Noise." Accordingly, Ojukwu cannot be said to be a joint author of

[33] He was listed as a "producer," and admitted that he understands that there are differences between producers and writers. WD, Ex. 2 p. 226 l. 18-21.

[34] Agreements executed after the creation of "Joyful Noise" cannot retroactively create a joint work. 17 U.S.C. § 101; *see also Batiste v. Island Records Inc.*, 179 F.3d 217, 222 (5th Cir. 1999) (noting that the Copyright Act of 1976 "overruled the so-called 'Twelfth Street Rag' doctrine, which had allowed an assignee of an ownership interest in a composition to add elements to a pre-existing work and create a "joint work").

Mitchell
Silberberg &
Knupp LLP
11495919.1

43

"Joyful Noise." Instead, "Joyful Noise" is a derivative work incorporating the beat, and the copyright in "Joyful Noise" does not protect the preexisting material embodied in the beat. 17 U.S.C. § 103.

### F. No Legally Sufficient Evidentiary Basis Supports The Jury's Finding Of Liability As To Multiple Defendants

Even if, *arguendo*, the jury could have properly concluded that "Dark Horse" infringes "Joyful Noise"—and it could not—there still was no basis to support the jury's finding of liability against numerous of the Defendants. A plaintiff in a copyright case may only recover for direct infringement[35] against a defendant "who violates any of the exclusive rights of the copyright owner," namely: the rights to reproduce, prepare derivative works, distribute, publicly perform, and display the copyrighted work. 17 U.S.C. §§ 501, 106. Here, Plaintiffs failed to present sufficient evidence of direct infringement by Kobalt Music Publishing America, Inc. ("Kobalt"), WB Music Corp. ("WB"), Kasz Money, Inc. ("KMI"), Katheryn Hudson, Gottwald, Sarah Hudson, Sandberg, and Houston.

As to Kobalt and WB, the sole evidence that Plaintiffs presented was that they "provide[] music publishing administrative services" for certain Defendants with respect to "Dark Horse." WD, Ex. 34. Plaintiffs presented no evidence about what "administrative services" means, and no evidence to demonstrate that such activity violates any of the exclusive rights. Further, as the Court noted, 17 U.S.C. § 106 "does not include publishing" as an exclusive right. WD, Ex. 6 p. 1117 l. 7-9. Similarly, as to KMI, the sole evidence Plaintiffs presented was that it "furnished the production services of Walter and Gottwald for the 'Dark Horse' sound recording." WD, Ex. 34. Plaintiffs presented no evidence of what it means to "furnish" "production services," or that doing so violates an exclusive right.

---

[35] Plaintiffs asserted no claim against any defendant for vicarious or contributory infringement. WD, Ex. 5 p. 1030 l. 2-9; WD, Ex. 6 p. 1104 l. 22-23, p. 1107 l. 20-1108 l. 7 & p. 1110 l. 5-6.

As the Court aptly observed after all of the evidence had been presented in the liability phase, "I'm not sure what all these [corporate] entities did [in connection with "Dark Horse"] and I'm not sure the jury does either based on the evidence before us. . . ." WD, Ex. 6 p. 1104 l. 10-12.

Plaintiffs similarly failed to present any evidence that Katheryn Hudson, Gottwald, Sarah Hudson, Sandberg, or Houston copied or distributed "Joyful Noise," or violated any exclusive right under the Copyright Act. *Supra* § II.D & notes 14, 15, 28 & 31.[36] Instead, at trial, Plaintiffs merely contended that these individuals were all liable for copyright infringement simply by virtue of being co-owners of the copyright in the "Dark Horse" composition. However, as the Court acknowledged, all co-owners of a copyrighted work are not automatically liable for direct copyright infringement by the mere fact of their co-ownership. WD, Ex. 6 p. 1121 l. 8-1122 l. 1. *Williams*, 895 F.3d at 1130-32 (rejecting argument that co-owner of a copyright in an infringing work is *per se* liable as a matter of law). Again, Plaintiffs did not assert a vicarious liability claim and presented no evidence to support such a claim. *Supra* notes 15, 31 & 35.

## III.   AS A MATTER OF LAW, PLAINTIFFS FAILED TO REBUT DEFENDANTS' PROOF OF APPORTIONMENT

To recover a percentage of Defendants' profits, Plaintiffs had the burden to prove Defendants' gross revenue *attributable* to the infringement. 17 U.S.C. § 504(b). The Ninth Circuit takes "the statute's general reference to 'gross revenue' to mean the gross revenue associated with the infringement, as opposed to the infringer's overall gross sales resulting from all streams of revenue." *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 n.8 (9th Cir. 2004) (citing *Bouchat v. Baltimore Ravens Football Club*, 346 F.3d 514, 520-21 (4th Cir.2003)).

---

[36] While Gottwald worked on the underlying instrumental track, the undisputed evidence at trial was that his contribution thereto related only to elements that are not alleged to infringe "Joyful Noise." *Id.*

1   A "causal link between the infringement and the monetary remedy sought is a

2   predicate to recovery of … profits." *Polar Bear*, 384 F.3d at 708; *see also Dash v.*

3   *Mayweather*, 731 F.3d 303, 330 (4th Cir. 2013).[37]

4   If a causal link is established, the defendant has the **initial burden** to

5   demonstrate that some or all of its profits were attributable to factors other than the

6   infringement. 17 U.S.C. § 504(b); *Mackie*, 296 F.3d at 915. If the defendant meets

7   its initial burden, then the **burden shifts to the plaintiff** to show that "at least

8   some portion of the revenue was actually generated by the infringement, rather

9   than by other factors." *Dash*, 731 F.3d at 331.

10   At trial, the jury found that 22.5% percent of the net profit earned by each

11   Defendant from "Dark Horse" was "attributable to the use of the 'Joyful Noise'

12   musical composition in Ostinato 2 in 'Dark Horse' as opposed to other factors."

13   Dkt. 456, Ques. 3. However, this was pure speculation unsupported by evidence.

14   Defendants presented the unrebutted testimony of two expert witnesses who

15   testified about the insignificance of Ostinato 2 to the commercial success and

16   profits of "Dark Horse" and *Prism*.

17   ***First***, with respect to the musicological value of Ostinato 2, Defendants

18   offered the unrebutted testimony of Dr. Lawrence Ferrara that the ostinato was

19   minimally valuable to "Dark Horse," both qualitatively and quantitatively. *See*

20   *generally*, WD, Ex. 9 p. 1474-1485. With respect to his **quantitative** analysis, Dr.

21   Ferrara concluded that Ostinato 2 comprises 7.2% of the total note heads of "Dark

22   Horse." Next, Dr. Ferrara testified that, because the lyrics of "Dark Horse" are not

23   at issue, and the lyrics constituted 50% of the music, the 7.2% total must be

24

25   [37] Based upon the unrebutted testimony discussed below, Plaintiffs also failed to establish a causal nexus between the claimed infringement and Defendants' profits.

26   Proving such a causal nexus requires the plaintiff to "(1) allege a 'conceivable connection' between the infringement and the claimed revenues and (2) offer

27   nonspeculative evidence that a causal link exists." *Dash*, 731 F.3d at 330; *see also Mackie v. Rieser*, 296 F.3d 909, 911 (9th Cir. 2002). Plaintiffs failed to proffer any

28   evidence to rebut Defendants' evidence regarding any lack of a causal connection.

reduced by half. As a result, Dr. Ferrara testified that 3.6% of the combined music and lyrics in "Dark Horse" are comprised of the notes in Ostinato 2. *Id.*; WD, Ex. 28. Next, Dr. Ferrara performed a **qualitative** analysis to determine the value of this allegedly infringing expression to "Dark Horse" as a whole. Dr. Ferrara testified that because Ostinato 2 is **not** part of the hook (i.e., the most memorable part) of "Dark Horse," this reduced the value of Ostinato 2 in the "Dark Horse" composition below 3.6%. WD, Ex. 9 p. 1474-1485.

*Second*, Defendants offered the unrebutted testimony of Dr. Jason King. As to "Dark Horse," Dr. King categorized the various factors that drove its success and profit. The primary factors were the celebrity star power/branding of Katy Perry and Juicy J, as well as marketing efforts. *Id.* p. 1508 l. 9-24. The secondary factors were the "hook" of the song (*i.e.*, the chorus), its vocal performances, its instrumental musical elements taken together, and production/arrangement. *Id.* p. 1516 l. 22-1521 l. 5. Finally, he testified about the "tertiary factors," those factors that "do[n't] drive the song in and of itself." *Id.* p. 1521 l. 8-1523 l. 17. These included the lyrics of the song and individual musical elements. And, as for Ostinato 2 specifically, Dr. King testified that, on its own, the ostinato had "relatively insignificant value" and that "nobody bought Dark Horse simply because of Ostinato No. 2 alone." *Id.* p. 1522 l. 14-17. He elaborated that Ostinato 2 could have been replaced with any number of trap synth parts and it would not have changed the success of the song. *Id.* p. 1522 l. 2-1523 l. 17.

As to the *Prism* album, Dr. King testified that the primary factors driving its success were Katy Perry's celebrity star power/branding and the massive marketing efforts of Capitol. *Id.* p. 1523 l. 18-1528 l. 23. He further testified that "Dark Horse" was one of 13 or 16 tracks on the album and that if consumers "just wanted the single [as opposed to the entire album], they would just buy the single." *Id.* p. 1524 l. 3-14. "Dark Horse" as a whole (as distinguished from Ostinato 2 in particular) was a secondary factor contributing to the success of *Prism*. However,

1    as to Ostinato 2, Dr. King testified that because "Ostinato 2 is just one element of

2    Dark Horse," its value was even more insignificant. *Id.* p. 1528 l. 24-1529 l. 15.

3        The testimony of Dr. Ferrara and Dr. King was uncontroverted. Plaintiffs did

4    not present their own experts, or any other apportionment evidence. The jury was

5    not permitted to simply ignore Defendants' evidence and conclude—without

6    proof—that Ostinato 2 drove any of the success of "Dark Horse" or *Prism*. Thus,

7    the Court should hold as a matter of law that Defendants failed to rebut Plaintiffs'

8    proof of apportionment. *See Bouchat*, 346 F.3d at 520-21.

9    **IV.    AS A MATTER OF LAW, THE JURY SHOULD HAVE DEDUCTED**

10   **CAPITOL'S OVERHEAD AND CALCULATED ITS NET PROFIT**

11   **AS TOTALING $629,725**

12       Finally, if the Court upholds the jury's finding of a causal nexus and its

13   apportionment calculation, as to defendant Capitol Records, no sufficient

14   evidentiary basis exists to support the jury's decision to exclude Capitol's overhead

15   costs in calculating its net profit. As a matter of law, the jury should have deducted

16   overhead and calculated Capitol's net profit as equaling $629,725.

17       The Court instructed the jury on how to calculate each Defendant's net

18   profit, that "[a] defendant's profit is determined by deducting all appropriate

19   expenses incurred by that defendant from that defendant's gross revenue." Dkt.

20   461, Jury Instr. 3. Expenses were defined to include "all appropriate costs,

21   including but not necessarily limited to, appropriate operating costs, **overhead**

22   **costs**, and production costs incurred in producing a defendant's gross revenue." *Id.*

23   (emphasis added). This is the law. *Kamar Int'l, Inc. v. Russ Berrie & Co.*, 752 F.2d

24   1326, 1333 (9th Cir. 1984); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*

25   ("*Frank Music I*"), 772 F.2d 505, 515 (9th Cir. 1985); *Burns v. Imagine Films*

26   *Entm't., Inc.*, 2001 WL 34059379, at *7 (W.D.N.Y. Aug. 23, 2001).

27       At trial, Capitol presented unrebutted and unimpeached evidence of its net

28   profit through Capitol's profit & loss statement and the backup thereto.

1    Specifically, it proved that its costs totaled $11,772,912, including $5,103,213 in

2    overhead costs. WD, Ex. 30 p. 1762. Based on gross revenues of $12,402,637,

3    Capitol proved that its net profit totaled $629,725. *Id.*.

4         Simple math makes clear that the jury ignored the Court's instruction and

5    Capitol's undisputed evidence by not deducting Capitol's overhead costs in

6    calculating Capitol's net profit. The jury determined Capitol's net profit to equal

7    $5,732,938. Dkt. 456, Ques. 2. Mathematically, the only way to reach this number

8    is to conclude that the jury accepted Capitol's calculation of its gross revenues at

9    $12,402,637 and then deducted $6,669,699 (i.e., the non-overhead costs):

10   $12,402,637 minus $6,669,699 equals $5,732,938. There was no basis for the jury

11   to ignore Capitol's overhead.

12        Defendants established in painstaking detail the existence and amount of

13   overhead, as well as how the overhead supported the release and exploitation of

14   "Dark Horse" and *Prism*, through Capitol's profit & loss statement and the backup

15   thereto, as well as through the trial testimony of Capitol's financial designee,

16   Steven Drellishak. *See* WD, Ex. 30 p. 1762; *id.* p. 1841-53; & WD, Ex. 9 p. 1428 l.

17   14-1435 l. 11, p. 1449 l. 13-21, p. 1450 l. 12-1451 l. 12, p. 1463 l. 23-1467 l. 22.

18   More specifically, Drellishak testified about how he calculated overhead,

19   explaining that he limited overhead to the 18-month period following the release of

20   *Prism* "when the label was active working the new release [*Prism*]" (*id.* p. 1429 l.

21   17-25) and to 5.4% of total overhead for those 18 months, a percentage equal to the

22   percentage of Capitol's total sales attributable to *Prism* and "Dark Horse" (*id.* p.

23   1464 l. 16-1465 l. 14). Drellishak testified what overhead consisted of, explaining

24   it "is mainly the people that make up the company and the building and the phone

25   lines and everything else required to run the business. And then lastly AFM and

26   AFTRA, those are costs that we pay to the musicians unions mainly funding the

27   pension plans." *Id.* p. 1449 l. 16-21. He also explained why this overhead related to

28   the exploitation of "Dark Horse" and *Prism*, noting that a Katy Perry release would

have "touched everyone" at the company and that "[a] release like this was a big part of the [company's overall] revenue. If we didn't have an artist like Katy Perry, we wouldn't have as many people employed. So while not directly … associated with a specific release, … if we didn't have Katy Perry on the roster, Capitol's overhead would be smaller." *Id.* p. 1432 l. 14-15, p. 1434 l. 4-11; *see also id.* p. 1463 l. 23-1464 l. 11, p. 1467 l. 1-20.

Plaintiffs, in response, did not present a single document or any witness to refute or rebut the facts regarding Capitol's overhead and its connection to the exploitation of "Dark Horse" and *Prism*, as proven by the profit & loss statement, backup, and Drellishak's testimony. Indeed, although Plaintiffs had identified a damages expert, Dr. Michael Einhorn, to rebut Defendants' proof of costs, Plaintiffs ultimately withdrew Dr. Einhorn as a witness at trial at the last minute. *Defendants* presented Dr. Einhorn's deposition testimony to the jury, in which he admitted that Capitol incurred expenses in connection with exploiting "Dark Horse" and *Prism*. WD, Ex. 10 p. 1604 l. 17-1605 l. 21. Thus as a matter of law, the jury should have accepted Capitol's proven overhead costs and deducted it from Capitol's revenue, which would make Capitol's net profit equal $629,725.

# V.   ALTERNATIVELY, THE COURT SHOULD ORDER A NEW TRIAL[38]

## A.   <u>Rule 59 New Trial And Remittitur Standard</u>

Under Fed. R. Civ. P. 59, a new trial may be granted "for any of the reasons for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). Those reasons include "if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc*., 481 F.3d 724, 729 (9th Cir. 2007); *see also Lillie*, 2019 WL 3387732, at \*24 (new trial warranted

---

[38] In the event that the Court grants Defendants' motion for judgment as a matter of law under Fed. R. Civ. P. 50(b), Defendants respectfully request that the Court also conditionally grant its motion for new trial pursuant to Fed. R. Civ. P. 50(c).

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR JMOL OR NEW TRIAL**

1  where "it is quite clear that the jury has reached a seriously erroneous result")

2  (citation omitted). A new trial may also be ordered "when the conduct of counsel

3  in argument causes prejudice to the opposing party and unfairly influences a jury's

4  verdict," *Pappas v. Middle Earth Condo Ass'n*, 963 F.2d 534, 540 (2d. Cir. 1992),

5  or where an expert witness provides "irrelevant and prejudicial" testimony.

6  *Mahone v. Lehman*, 347 F.3d 1170, 1174 (9th Cir. 2003). Ultimately, the district

7  court can grant a new trial under Rule 59 on any ground necessary to prevent a

8  miscarriage of justice. *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*,

9  762 F.3d 829, 842 (9th Cir. 2014); Fed. R. Civ. P. 59(d).

10      "Unlike with a Rule 50 determination, the district court, in considering a

11  Rule 59 motion for new trial, is not required to view the trial evidence in the light

12  most favorable to the verdict." *Experience Hendrix*, 762 F.3d at 842. Rather, the

13  Ninth Circuit has emphasized that the district court has "the duty … to weigh the

14  evidence as [the court] saw it, and to set aside the verdict of the jury, ***even though***

15  ***supported by substantial evidence***, where, in [the court's] conscientious opinion,

16  the verdict is contrary to the clear weight of the evidence." *Molski*, 481 F.3d at 729

17  (emphasis added). Importantly, "the district court can weigh the evidence, make

18  credibility determinations, and grant a new trial for any reason necessary to prevent

19  a miscarriage of justice." *Experience Hendrix*, 762 F.3d at 841. Moreover,

20  "cumulative error in a civil trial may suffice to warrant a new trial even if each

21  error standing alone may not be prejudicial." *Jerden v. Amstutz*, 430 F.3d 1231,

22  1240-41 (9th Cir. 2005) (collecting cases).

23      If, on a motion for a new trial, the district court decides that the jury's

24  damages award is excessive, the district court may grant a new trial or deny the

25  motion if the prevailing party accepts a remittitur. *Fenner v. Dependable Trucking

26  Co., Inc.*, 716 F.2d 598, 603 (9th Cir. 1983). Where a court offers remittitur, the

27  jury's verdict should be reduced to the "maximum amount ***sustainable by the***

28  ***proof***." *D & S Redi–Mix v. Sierra Redi–Mix & Contracting Co.,* 692 F.2d 1245,

1249 (9th Cir. 1982) (emphasis added). If the prevailing party does not consent to the reduced amount, a new trial must be granted. *Fenner*, 716 F. 2d at 603.

### B.   The Court Should Grant A New Trial On Liability

#### 1.   The Jury's Findings Were Against The Clear Weight Of The Evidence

If the Court is not inclined to grant judgment as a matter of law, then the arguments set forth above apply with even more force under the relaxed Rule 59 standard and necessitate a new trial. On each element discussed above, incorporated again herein by reference, the jury's findings were wholly contrary to the weight of the evidence. Moreover, each defense witness proved entirely credible, never once being impeached or contradicted with evidence. By contrast, the Plaintiffs were impeached multiple times, including with prior inconsistent statements regarding the question of joint authorship. *See* WD, Ex. 2 p. 208 l. 9-210 l. 10; p. 211 l. 5-212 l. 9; p. 214 l. 11-215 l. 6; WD, Ex. 3 p. 358 l. 14-359 l. 9. The Court can and should determine that the Defendants' witnesses offered credible testimony, while the Plaintiffs' witnesses did not. *Experience Hendrix*, 762 F.3d at 841 (court may make "credibility determinations" on Rule 59 motion).

#### 2.   Misconduct By Plaintiffs' Counsel And Witnesses Also Requires A New Trial.

##### a.   Plaintiffs Offered Improper And Highly Prejudicial Testimony That Invaded The Province Of The Jury

An expert musicologist in a copyright case may only offer testimony on the objective "extrinsic" test. *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996); *Swirsky*, 376 F.3d at 845. The "intrinsic test, which examines an ordinary person's subjective impressions of the similarities between two works, is exclusively the province of the jury." *Funky Films*, 462 F.3d at 1077; Dkt. 403, p. 32 (precluding "Decker from testifying about how the two songs are perceived by lay listeners"). Furthermore, it goes without saying that a musicologist cannot give an opinion as to the ultimate legal conclusion in a copyright infringement case: whether there

was **copying**. *Nationwide*, 523 F.3d at 1058 ("[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law.").

During Dr. Decker's testimony, he and Plaintiffs' counsel flouted these well-established rules and violated—repeatedly and despite warnings from the Court—multiple evidentiary Orders of the Court. Dr. Decker offered highly improper testimony on (1) "musical borrowing," (2) the intrinsic test, and (3) "striking similarity." This prejudicial testimony warrants a new trial. *See, e.g.*, *Mahone*, 347 F.3d at 1174 (ordering new trial on ground that the expert testimony offered by the prevailing party at trial was "irrelevant and prejudicial").

*First*, Dr. Decker's testimony that the "Dark Horse" authors "borrowed" the ostinato in "Joyful Noise" was improper, pervasive, and highly prejudicial. Dr. Decker began his testimony by defining "musical borrowing." He was clear that "borrowing" means "copying." WD, Ex. 3 p. 426 l.19-427 l. 15 ("in musical borrowing, . . . you consider how a composer took material from another piece and used it in their own piece"); *id.* p. 427 l. 4-11 ("Borrowing means copying in this respect."); *id.* p. 427 l. 12-15 (Q: "in analyzing different pieces for musical borrowing, are you looking to identify whether something is copied?" A: "Yes."). Dr. Decker presented himself as an expert on this subject. *Id.* p. 426 l. 13-18.

In response, the Court cautioned Plaintiffs' counsel that "obviously, we do not want [Dr. Decker] to opine on a fact that is to be decided by the jury." *Id.* p. 427 l. 12-22. In spite of this warning, counsel proceeded to draw from Dr. Decker testimony that "Dark Horse" borrows from "Joyful Noise." *Id.* p. 439 l. 1-10 (Q: "***Do you think Dark Horse borrows from Joyful Noise?***" A: "***I do.***") & p. 463 l. 8-20 (Q: "***[H]ow do these subtle distinctions impact your opinion related to whether the authors of Dark Horse borrowed from Joyful Noise?***").

Following these questions and answers, the Court **again** cautioned that whether something was "borrowed" from "Joyful Noise" "is ambiguous and is a jury question." *Id.* p. 463 l. 18-20. The Court aptly stated that "the question is

1    similarity." *Id.* But even after this second admonition, Dr. Decker brazenly argued

2    to the jury that his expert opinion was that "Dark Horse is developing materials

3    heard in . . . Joyful Noise. . . . [I]t's working with them. It's changing them in ways

4    . . . ***that to my ear have evidence for . . . borrowing***." *Id.* p. 475 l. 17-476 l. 4.

5         In response , the Court was compelled to explain to the jury that:

6              [T]he difficulty and the reason we have these objections,

7              ladies and gentlemen is there is a concern there may be a

8              confusion between borrowing and copying. And you're

9              the people who have to decide whether something has

10             been copied or not. That's going to be part of your

11             assignment. So we are trying to urge this witness not to

12             use the word borrowing even though he's using it in a

13             purely musical sense and he's not using it in the legal

14             sense of copying so that's why we're going through this.

15   *Id.* 9. 476 l. 10-19.

16        Remarkably, however, Dr. Decker did not stop. After this **third** warning, he

17   testified once again about the reasons he believes there was "musical borrowing"

18   in this case. *Id.* p. 524 l. 1-23.

19        Dr. Decker's impermissible testimony that the "Dark Horse" creators

20   "borrowed" from "Joyful Noise" gave the imprimatur of expert credibility as to the

21   ultimate fact conclusion reserved for the jury. *Perfect 10, Inc. v. Giganews, Inc.*,

22   2014 WL 10894452, *6 (C.D. Cal. Oct. 31, 2014) (excluding expert testimony that

23   was "little more than an attempt to add the gloss of expert opinion to what are, at

24   their core, factual questions that the jury must decide on their own").

25        ***Second***, Dr. Decker testified multiple times regarding the *subjective*

26   similarities in the "sound" or "feeling" of the works, improperly invading the

27   province of the jury to apply the intrinsic test in blatant violation of the Court's *in*

28   *limine* Order. Dkt. 403, pp. 31-32. When Plaintiffs' counsel asked, "**for a**

Mitchell
Silberberg &
Knupp LLP

11495919.1

1  **layperson like me** is [the difference in key] something that in your expert opinion

2  is a difference that's recognizable audibly"; Dr. Decker replied, "I would not think

3  so. They are quite close. In fact they couldn't be closer; right?" WD, Ex. 3 p. 460 l.

4  23-461 l. 7.

5      As with his testimony about musical borrowing, the Court admonished that

6  Dr. Decker "can't give an expert opinion on what the jury has to decide. And if he

7  persists in doing that and **if this continues, we will remove him from the stand**."

8  *Id.* p. 461 l. 12-15. But, again, Dr. Decker did not stop; instead, he told the jury that

9  the subjective aural similarities between the works were central to his analysis:

10         the insistence in both pieces **that you feel** on the

11         repetition of this melody. **You hear it** -- of this ostinato.

12         **You hear it over and over again**. So that the, um, the

13         piece itself, you know, the repetition also draws attention

14         to the similarity.

15  *Id.* p. 524 l. 17-21 (emphasis added).

16      This is, without a doubt, an impermissible opinion on the **intrinsic** test; i.e.,

17  "whether an ordinary, reasonable person would find the total concept and feel of

18  'Joyful Noise' and "Dark Horse' are substantially similar in original, protectable

19  expression." Dkt. 441, Jury Instr. 37. But Dr. Decker is not an "ordinary,

20  reasonable person" in the context of musical analysis. *Id*. He is a trained

21  musicologist with a Ph.D. from "a top musicology program specifically for the

22  study of American music," who hears things that the ordinary listener would not.

23  WD, Ex. 3 p. 425 l. 3-11. His subjective impressions of the works are irrelevant

24  and barred as a matter of law. The jury nonetheless heard them, and this was

25  plainly prejudicial to Defendants.

26      ***Third***, in direct contravention of the Court's order precluding him from

27  opining that the works were "strikingly similar" (Dkt. 403, pp. 5-6), Dr. Decker

28  testified no less than ***three times*** that the works bore "striking" similarity. *See* WD,

Mitchell
Silberberg &
Knupp LLP
11495919.1

Ex. 3 p. 450 l. 18-23 (the fact that both ostinatos "step down to 2" "is striking"), p. 454 l. 10-18 (similarities in texture are "striking") & p. 456 l. 7-11 (same).

The intent behind these statements was evident. Although he never uttered the phrase "striking similarity" in two voluminous expert reports, he suddenly could not stop himself from doing so at trial. Particularly combined with Dr. Decker's testimony regarding "***borrowing***" and the intrinsic "***feel***" of the works, the multiple references to "***striking***" prejudiced the Defendants by creating an inference that the works are so similar that the Plaintiffs did not need to prove access. That is precisely testimony which the Court ruled was impermissible, and it was given in violation of the Court's Order. Dkt. 403, pp. 5-6.

Dr. Decker's many improper statements undoubtedly confused and misled the jury. *See* WD, Ex. 3 p. 466 l. 25 (The Court: "This is a confused jury at this stage."). This testimony was not harmless; it bore directly on the key elements of the Plaintiffs' claims. Accordingly, a new trial should be granted.

### b. Plaintiffs' Counsel Made Highly Prejudicial Assertions During His Closing Arguments

During his closing arguments, Plaintiffs' counsel made repeated assertions that Plaintiffs were not, and would not be, challenging: (a) Defendants' right to exploit "Dark Horse" after the trial, or (b) Defendants' right to keep 100% of the revenue and profit resulting from that subsequent exploitation.

- During his closing in the liability phase of the trial, Mr. Kahn stated that "after this trial is over, the defendants will continue on. They'll be able to exploit Dark Horse in a wide variety. They'll be able to keep selling the album. They'll be able to keep doing other stuff with the song. This is the plaintiffs['] one and only opportunity to seek some measure of justice and we are asking you for that justice." WD, Ex. 6 p. 1205 l. 5-11.

- During his closing in the damages phase, he reiterated that "today is the plaintiffs' last day for justice. Tomorrow, next week, next month, next year,

the defendants will be able to continue to exploit and make money from Dark Horse and they'll be keeping 100 percent of the profits for every day after today. So this is the one day for these plaintiffs." WD, Ex. 10 p. 1588 l. 11-15.

- Later in that closing, he stated that "beginning tomorrow, [Defendants] will keep a hundred percent of their profits going forward." *Id.* p. 1597 l. 15-16.

- Finally, in rebuttal, he again repeated that Defendants "[will] get to keep a hundred percent of the profits going forward." *Id.* p. 1618 l. 2-3.

Plaintiffs' highly prejudicial and improper assertions, cited above, were also apparently false. On September 5, 2019, Defendants' counsel sent an email to Mr. Kahn, asking him to confirm that Plaintiffs would not be challenging or seeking damages for Defendants' exploitations of "Dark Horse" on a going-forward basis, given his representations to the jury during closing arguments. Mr. Kahn then said the opposite: "I acknowledge those statements. However, ***we reserve all rights and claims regarding damages***." WD, Ex. 37 (emphasis added).[39]

Plaintiffs' statements that Defendants would be entitled to exploit "Dark Horse" on a going-forward basis, and retain all of their profits from same, were completely illegitimate and irrelevant. By his message, however, Plaintiffs' counsel improperly sought to convince the jurors to look beyond the evidence, and render a verdict as "[P]laintiffs' last day for justice." In doing so, counsel improperly and falsely contended Defendants would not be financially harmed. These comments also violate the Court's ruling that the comparative wealth of the parties should not be adduced. *See* Dkt. 403, pp. 19-20.

A new trial is warranted based on these improper statements. *See generally Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 346 (9th Cir.

---

[39] Notwithstanding this belated "reservation of rights," any attempt by Plaintiffs to assert a new claim for infringement or seek relief for subsequent exploitations of "Dark Horse" would fail based upon, *inter alia*, principles of waiver and estoppel.

Mitchell
Silberberg &
Knupp LLP

11495919.1

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR JMOL OR NEW TRIAL**

1995). Notably, courts routinely overturn jury verdicts in civil cases when the plaintiff's counsel ***truthfully*** introduces extraneous and improper facts such as, for example, saying that a damages verdict would be paid by a third-party insurance company. Courts recognize this prejudicial commentary invites the jury to award substantial damages on the irrelevant basis that doing so will not actually cause financial harm to the defendant. *See, e.g., Ventura v. Kyle*, 825 F.3d 876, 886 (8th Cir. 2016) ("it was utterly repugnant to a fair trial or … a just verdict for the jury to hear that the damages sued for ... will be taken care of by an insurance … company") (citation omitted); *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 758 (6th Cir. 1980) (it is "well settled" that introducing "the fact that a defendant in a tort action is protected by liability insurance, is prejudicial error and grounds for a mistrial") (citations omitted). Here, Plaintiffs' statements to the jury that an adverse verdict would not financially harm the Defendants were even more egregious and prejudicial than the statements in the above-cited cases, because Plaintiffs' counsel states ***they were not even truthful***. A new trial is warranted.

### C.  <u>The Court Should Remit The Amount Of The Damages Award</u>

If the Court reaches the jury's damage award, it should find that the award is contrary to the clear weight of authority and excessive for two reasons.

*First*, as discussed above, as to Capitol, because Capitol proved its overhead costs through unrebutted documents and testimony, the jury should have deducted overhead and calculated Capitol's profit as totaling $629,725.

*Second*, as discussed above, the percentage of each Defendant's profit that the jury awarded was excessive and lacking any basis in fact. *Supra* § III. Even if the Court concludes that *some* percentage of Defendants' profit is attributable to the use of the "Joyful Noise" musical composition in Ostinato 2 in "Dark Horse" as opposed to other factors, nothing supports this percentage equaling 22.5%. Defendants satisfied their burden of proving that profits were attributable to factors other than the use of "Joyful Noise" in Ostinato 2. While Defendants bore the

Mitchell
Silberberg &
Knupp LLP
11495919.1

58

initial burden to apportion, Defendants were not required to prove to a mathematical certainty the profits that are attributable to other factors—Defendants need only provide a rational division. *See Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 408-09 (1940); *Frank Music I*, 772 F.2d at 518; *Cream Records Inc. v. Jos. Schlitz Brewing Co.*, 754 F.2d 826, 829 (9th Cir. 1985); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.* ("*Frank Music II*"), 886 F.2d 1545, 1549 (9th Cir. 1989). Defendants satisfied their burden and, as discussed above, proved that other factors drove the success of "Dark Horse." *Supra* § III. Plaintiffs, in turn, presented no evidence; instead, Plaintiffs' counsel's simply argued—without a scintilla of evidence by expert testimony or otherwise—that Ostinato 2 appears in 45% of "Dark Horse," thereby entitling Plaintiffs to 45% of Defendants' profits. Simple math shows that Plaintiffs divided this 45% figure by two to reach their arbitrary 22.5%.

No evidence or logic supports this allocation. It is made up. Dr. Ferrara testified without contradiction that, quantitatively, only 3.6% of the combined music and lyrics in "Dark Horse" are comprised of the notes in Ostinato 2 and that the qualitative value of Ostinato 2 is even less. Dr. King, in turn, testified without contradiction that numerous other primary and secondary factors drove the success of "Dark Horse" and that Ostinato 2 was a relatively insignificant tertiary factor. Accordingly, the Court should remit the amount of damages sharply downward.

## VI.   CONCLUSION

WHEREFORE, Defendants respectfully request that the Court grant the relief sought here pursuant to Rule 50(b) or, alternatively, Rule 59.

Mitchell
Silberberg &
Knupp LLP

11495919.1

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR JMOL OR NEW TRIAL**

| | | |
|---|---|---|
| 1 | DATED: October 9, 2019 | MITCHELL SILBERBERG & KNUPP LLP |
| 2 | | |
| 3 | | By: /s/ Aaron M. Wais<br>Aaron M. Wais (SBN 250671) |
| 4 | | Attorneys for Defendants Capitol Records, |
| 5 | | LLC, Jordan Houston, Lukasz Gottwald,<br>Sarah Theresa Hudson, Karl Martin Sandberg, |
| 6 | | Henry Russell Walter, WB Music Corp.,<br>Kobalt Music Publishing America, Inc., and |
| 7 | | Kasz Money, Inc. |
| 8 | DATED: October 9, 2019 | GREENBERG TRAURIG, LLP |
| 9 | | |
| 10 | | By: /s/ Vincent H. Chieffo<br>Vincent H. Chieffo (SBN 49069) |
| 11 | | Attorneys for Defendants Katheryn Elizabeth<br>Hudson p/k/a Katy Perry |
| 12 | | |

### ATTESTATION REGARDING SIGNATURES

Pursuant to Local Civil Rule 5-4.3.4(a)(2)(i), I hereby attest that all Parties, on whose behalf this filing is jointly submitted, concur in this filing's content and have authorized its filing.

DATED: October 9, 2019

/s/ Aaron M. Wais
Aaron M. Wais

Mitchell
Silberberg &
Knupp LLP

11495919.1

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR JMOL OR NEW TRIAL**