CHRISTINE LEPERA (admitted *pro hac vice*)
  ctl@msk.com
JEFFREY M. MOVIT (admitted *pro hac vice*)
  jmm@msk.com
JACOB D. ALBERTSON (admitted *pro hac vice*)
  j1a@msk.com
MITCHELL SILBERBERG & KNUPP LLP
437 Madison Avenue, 25th Floor
New York, New York 10022
Telephone: (212) 509-3900
Facsimile: (212) 509-7239

AARON M. WAIS (SBN 250671)
  amw@msk.com
GABRIELLA A. NOURAFCHAN (SBN 301594)
  gan@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, California  90067
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

GREENBERG TRAURIG, LLP
VINCENT H. CHIEFFO (SBN 49069)
Email:  ChieffoV@gtlaw.com
ALANA C. SROUR (SBN 271905)
Email:  SrourA@gtlaw.com
1840 Century Park East, Suite 1900
Los Angeles, CA 90067-2121
Telephone:  310-586-7700
Facsimile:  310-586-7800

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| MARCUS GRAY (p/k/a FLAME), et al.,<br><br>            Plaintiffs,<br><br>       v.<br><br>KATHERYN ELIZABETH HUDSON (p/k/a KATY PERRY), et al.,<br><br>            Defendants. | CASE NO. 2:15-cv-05642-CAS (JCx)<br><br>Honorable Christina A. Snyder<br><br>**DECLARATION OF AARON M. WAIS IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR A NEW TRIAL**<br><br>Date:      January 27, 2020<br>Time:     10:00 a.m.<br>Ctrm:     8D—8th Fl., First Street<br><br>Filed:     July 1, 2014<br>Trial:      July 17, 2019 |

Mitchell
Silberberg &
Knupp LLP

11473958.1

## DECLARATION OF AARON M. WAIS

I, Aaron M. Wais, declare:

1.      I am an attorney at law duly licensed to practice law in the State of California and before this Court.  I am, through my professional corporation, a partner in the law firm of Mitchell Silberberg & Knupp LLP, attorneys of record for Defendants Capitol Records, LLC, Jordan Houston, Lukasz Gottwald, Sarah Theresa Hudson, Karl Martin Sandberg, Henry Russell Walter, WB Music Corp., Kobalt Music Publishing America, Inc., and Kasz Money, Inc.  I have personal knowledge of the following facts, and if called and sworn as a witness, could and would competently testify thereto.

### A.      Trial Transcripts

2.      Attached hereto as **Exhibit 1** is a true and correct copy of the transcript of the trial in this action dated July 17, 2019.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of the transcript of the trial in this action dated July 18, 2019.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of the transcript of the trial in this action dated July 19, 2019.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of the transcript of the trial in this action dated July 23, 2019.

6.      Attached hereto as **Exhibit 5** is a true and correct copy of the transcript of the trial in this action dated July 24, 2019.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of the transcript of the trial in this action dated July 25, 2019.

8.      Attached hereto as **Exhibit 7** is a true and correct copy of the transcript of the trial in this action dated July 29, 2019.

**WAIS DECL. ISO DEFENDANTS' MOTION FOR JMOL OR NEW TRIAL**

9.      Attached hereto as **Exhibit 8** is a true and correct copy of the transcript of the trial in this action dated July 30, 2019.

10.     Attached hereto as **Exhibit 9** is a true and correct copy of the transcript of the trial in this action dated July 31, 2019.

11.     Attached hereto as **Exhibit 10** is a true and correct copy of the transcript of the trial in this action dated August 1, 2019.

**B.      Trial Exhibits**

12.     Attached hereto as **Exhibit 11** is a true and correct copy of the document admitted into evidence as Exhibit 1 at the trial in this action.

13.     Attached hereto as **Exhibit 12** is a true and correct copy of the document admitted into evidence as Exhibit 4 at the trial in this action.

14.     Attached hereto as **Exhibit 13** is a true and correct copy of the document admitted into evidence as Exhibit 5 at the trial in this action.

15.     Attached hereto as **Exhibit 14** is a true and correct copy of the document admitted into evidence as Exhibit 6 at the trial in this action.

16.     Attached hereto as **Exhibit 15** is a true and correct copy of the document admitted into evidence as Exhibit 7 at the trial in this action.

17.     Attached hereto as **Exhibit 16** is a true and correct copy of the audio file admitted into evidence as Exhibit 16 at the trial in this action.  As explained in Defendants' concurrently filed Notice of Lodging, this Exhibit has been lodged with the Court in hard copy.

18.     Attached hereto as **Exhibit 17** is a true and correct copy of the document admitted into evidence as Exhibit 21 at the trial in this action.

19.     Attached hereto as **Exhibit 18** is a true and correct copy of the document admitted into evidence as Exhibit 26 at the trial in this action.

20.     At trial Plaintiffs offered a Certified Copy of the Copyright Registration of "Joyful Noise," a copy of which had been previously admitted into

Mitchell
Silberberg &
Knupp LLP

11473958.1

3

**WAIS DECL. ISO DEFENDANTS' MOTION FOR JMOL OR NEW TRIAL**

evidence as Exhibit 1.  According to Defendants' records, the Certified Copy, marked as Exhibit 30, was not admitted.  Defendants will check their records and will supplement if necessary.

21.    Attached hereto as **Exhibit 19** is a true and correct copy of the document admitted into evidence as Exhibit 58A at the trial in this action.

22.    Attached hereto as **Exhibit 20** is a true and correct copy of the document admitted into evidence as Exhibit 67 at the trial in this action.

23.    Attached hereto as **Exhibit 21** is a true and correct copy of the music video for "Joyful Noise," admitted into evidence as Exhibit 68 at the trial in this action.  As explained in Defendants' concurrently filed Notice of Lodging, this Exhibit has been lodged with the Court in hard copy.

24.    Attached hereto as **Exhibit 22** is a true and correct copy of the document admitted into evidence as Exhibit 69 at the trial in this action.

25.    Attached hereto as **Exhibit 23** is a true and correct copy of the audio file admitted into evidence as Exhibit 74 at the trial in this action.  As explained in Defendants' concurrently filed Notice of Lodging, this Exhibit has been lodged with the Court in hard copy.

26.    Attached hereto as **Exhibit 24** is a true and correct copy of the sound recording of "Joyful Noise," admitted into evidence as Exhibit 75 at the trial in this action.  As explained in Defendants' concurrently filed Notice of Lodging, this Exhibit has been lodged with the Court in hard copy.

27.    Attached hereto as **Exhibit 25** is a true and correct copy of the sound recording of "Dark Horse," admitted into evidence as Exhibit 76 at the trial in this action.  As explained in Defendants' concurrently filed Notice of Lodging, this Exhibit has been lodged with the Court in hard copy.

28.    Attached hereto as **Exhibit 26** is a true and correct copy of the music video for "Dark Horse," admitted into evidence as Exhibit 77 at the trial in this

action.  As explained in Defendants' concurrently filed Notice of Lodging, this Exhibit has been lodged with the Court in hard copy.

29.     Attached hereto as **Exhibit 27** is a true and correct copy of the document admitted into evidence as Exhibit 79 at the trial in this action.

30.     Attached hereto as **Exhibit 28** is a true and correct copy of the document admitted into evidence as Exhibit 89 at the trial in this action.

31.     Attached hereto as **Exhibit 29** is a true and correct copy of the document admitted into evidence as Exhibit 111 at the trial in this action.

32.     Attached hereto as **Exhibit 30** is a true and correct copy of the document admitted into evidence as Exhibit 116 at the trial in this action.

33.     Attached hereto as **Exhibit 31** is a true and correct copy of the document admitted into evidence as Exhibit 117 at the trial in this action.

34.     Attached hereto as **Exhibit 32** is a true and correct copy of the document admitted into evidence as Exhibit 122 at the trial in this action.

35.     Attached hereto as **Exhibit 33** is a true and correct copy of the document admitted into evidence as Exhibit 123 at the trial in this action.

36.     Attached hereto as **Exhibit 34** is a true and correct copy of the document admitted into evidence as Exhibit 124 at the trial in this action.

37.     Attached hereto as **Exhibit 35** is a true and correct copy of the document admitted into evidence as Exhibit 125 at the trial in this action.

**C.     <u>Other Documents</u>**

38.     Attached hereto as **Exhibit 36** is a true and correct copy of portions of the transcript from the hearing on Defendants' motion for summary judgment in this action dated August 13, 2018.

39.     Attached hereto as **Exhibit 37** is a true and correct copy of an email exchange between counsel for Plaintiffs and counsel for Defendants dated September 5, 2019.

**WAIS DECL. ISO DEFENDANTS' MOTION FOR JMOL OR NEW TRIAL**

40.     Attached hereto as **Exhibit 38** is a true and correct copy of an amicus curiae brief filed by the United States in the Ninth Circuit Court of Appeals on or about August 15, 2019, in connection with the pending appeal of *Skidmore v. Zeppelin* (Nos. 16-56057, 16-56287).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 9th day of October, 2019, at Los Angeles, California

_____/s/ Aaron M. Wais_____
Aaron M. Wais

**WAIS DECL. ISO DEFENDANTS' MOTION FOR JMOL OR NEW TRIAL**

# EXHIBIT 1

EXHIBIT  1
PAGE  7

1                    UNITED STATES OF AMERICA
                  UNITED STATES DISTRICT COURT
2                CENTRAL DISTRICT OF CALIFORNIA
                        WESTERN DIVISION
3
                            - - -
4                HONORABLE CHRISTINA A. SNYDER
             UNITED STATES DISTRICT JUDGE PRESIDING
5                           - - -

6
      MARCUS GRAY; ET AL.,              )
7                                       )
              PLAINTIFF,                )
8                                       )  CASE NO.:
      VS.                               )  CV 15-5642-CAS
9                                       )
      KATY PERRY; ET AL.,               )
10                                      )
              DEFENDANT.                )
11    _____)

12

13

14         REPORTER'S TRANSCRIPT OF PROCEEDINGS

15              WEDNESDAY, JULY 17, 2019

16              LOS ANGELES, CALIFORNIA

17

18

19

20

21           LAURA MILLER ELIAS, CSR 10019
              FEDERAL OFFICIAL COURT REPORTER
22           350 WEST FIRST STREET, ROOM 4455
              LOS ANGELES, CALIFORNIA 90012
23                PH:  (213)894-0374

24

25

                  UNITED STATES DISTRICT COURT

EXHIBIT  1
PAGE  8

```
 1    APPEARANCES OF COUNSEL:

 2    ON BEHALF OF PLAINTIFF:

 3              CAPES SOKOL
                BY: MICHAEL A. KAHN, ESQ.
 4                  LAUREN COHEN, ESQ.

 5              7701 FORSYTH BOULEVARD
                12TH FLOOR
 6              ST. LOUIS, MO 63105

 7
                KAYIRA LAW, LLC
 8              BY:  ERIC F. KAYIRA, ESQ.

 9              2100 HANLEY ROAD, SUITE 208
                CLAYTON, MO 63105
10

11    ON BEHALF OF DEFENDANTS OTHER THAN MS. PERRY:

12              MITCHELL SILBERBERG & KNUPP
                BY: CHRISTINE LEPERA, ESQ.
13                  AARON M. WAIS, ESQ.
                    JEFFREY MOVIT, ESQ.
14
                11377 WEST OLYMPIC BOULEVARD
15              LOS ANGELES, CA 90064

16
      ON BEHALF OF THE PERRY DEFENDANTS:
17
                GREENBERG TRAURIG
18              BY:  VINCENT H. CHIEFFO, ESQ.

19              1840 CENTURY PARK EAST
                SUITE 1900
20              LOS ANGELES, CA 90067

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

EXHIBIT  1
PAGE  9

```
 1
 2                              INDEX
 3
 4     PROCEEDINGS                              PAGE
 5
 6     PRELIMINARY MATTERS                       4
 7
 8     PRE-INSTRUCTION OF THE JURY              29
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT  1
PAGE  10

```
 1    LOS ANGELES, CALIFORNIA; WEDNESDAY, JULY 17, 2019; 9:49 A.M.
 2                          - - -
 3              THE CLERK:  Calling Calendar Item No. 1.
 4              Case No. 15-5642.
 5              Marcus Gray versus Katy Perry.
 6              Counsel, please state your appearances.
 7              MR. KAHN:  Michael Kahn, Laura Cohen and Eric
 8    Kayira for the plaintiff.
 9              MS. LEPERA:  Christine Lepera, Jeff Movit, Aaron
10    Wais, Gabby Nourafchan on behalf of the defendants other than
11    Ms. Perry.
12              MR. CHIEFFO:  Good morning, Your Honor.
13              Vincent Chieffo on behalf of Ms. Perry and her
14    company.
15              THE COURT:  Good morning.
16              MR. CHIEFFO:  We will be referring to her as
17    Ms. Hudson during the trial.
18              THE COURT:  Yes.
19              Okay.  We have some preliminary matters to resolve.
20    As far as I can tell, the plaintiff is correct that many of
21    the newly added defenses require input from the registrar of
22    copyright under Section 411-B.  That, of course, was not
23    disclosed to me at the time I permitted those claims to be
24    added, and I do not see any basis for proceeding with those
25    claims because they will delay these proceedings.
```

UNITED STATES DISTRICT COURT

EXHIBIT  1
PAGE  11

1           And as a consequence, it is my intention subject to

2     hearing an argument to strike the additional defenses insofar

3     as they rely on misstatements in copyright applications.

4     What I believe remains after that would be the defense

5     argument that the beat itself is not copyrighted, and

6     therefore, um . . . that is not subject to copyright

7     protection.

8           But I think the claims regarding derivative works

9     or misstatements in the copyright application would be

10    excluded because those all depend upon the Court seeking

11    input from the copyright office, something that I did not

12    know about, was not disclosed, and as a consequence, I think

13    that were I to go down that rode, we would delay these

14    proceedings, and I do not want to delay these proceedings.

15          Um, I think with that said, we still have the

16    motion to disqualify Mr. Kayira.  I'm not quite sure what Mr.

17    Kayira's role is gong to be in this trial, uh, because he is

18    new on the scene, and my question is does, um, my tentative

19    decision moot any need on his part to be a witness.

20          So let me start with whoever wishes to be heard

21    first.

22          MR. MOVIT:  May defendant be heard?

23          THE COURT:  Sure.  Please go to the lectern,

24    though.

25          MR. MOVIT:  Okay, Your Honor.

EXHIBIT  1
PAGE  12

1          So Your Honor, setting aside the issue that

2     requires the input of the Registrar of Copyrights, then we

3     are left with the issue of whether the copyright registration

4     on which the plaintiffs are suing encompasses the allegedly

5     infringed expression which is Mr. Ojukwu's beat.

6          And that is also entangled with the derivative work

7     issue because if Joyful Noise is a derivative work of

8     Mr. Ojukwu's beat, then the copyright registration of Joyful

9     Noise does not encompass allegedly infringed material.

10         But that's separate and apart.  We can set aside

11    the issue of whether the registration contains false

12    statements.  That's not what we're talking about when we talk

13    about the derivative work issue, Your Honor.  The issue is

14    whether this copyright registration that they have protects

15    what's at issue in this case.

16         And Mr. Kayira is a critical witness for that

17    issue.  Um, at trial, Your Honor, we intend to establish that

18    a paper trail was covered up -- was -- was created after this

19    lawsuit was filed largely to essentially camouflage the fact

20    that it is a derivative work, and that Mr. Ojukwu's beat was

21    a completed work, exploited on the Internet, put up on the

22    Internet, published before the creation of Joyful Noise.

23         And that the evidence will show that Mr. Kayira put

24    together, uh, among other things the so-called, um,

25    assignment by Lecrae Moore to the other plaintiffs, put

UNITED STATES DISTRICT COURT

EXHIBIT 1
PAGE 13

1    together this, um, quote unquote "split agreement" which

2    essentially tries to, we submit, conceal the derivative work

3    nature of Joyful Noise, um, as well as facts of arrangement

4    to the submission of the copyright registration application

5    itself and related correspondence with the Copyright Office.

6           And Your Honor, these are facts that, um, the

7    plaintiffs themselves are not gonna be able to establish.

8    Their testimony in deposition reflects essentially they said,

9    you know, we got these papers, and we signed them so

10   Mr. Kayira is a critical witness on this point, Your Honor,

11   on these points.

12          In addition, there's a more minor issue that

13   Your Honor referenced in -- in the limine decision about, uh,

14   the failure to subpoena cross movement records, and, again,

15   Mr. Kayira would be the witness for that as well.

16          THE COURT:  Well, I guess the problem I'm having is

17   that's probably something that should have been raised in

18   connection with the motions in limine.  I think that this

19   alleged conflict arises because you sought to add claims

20   which makes Mr. Kayira a witness, um, and I don't think under

21   the law that's appropriate, but let me hear from the

22   plaintiffs.

23          MR. MOVIT:  May I add one point, Your Honor?

24          THE COURT:  Yes.

25          MR. MOVIT:  Mr. Kayira is listed on the plaintiff's

EXHIBIT 1
PAGE 14

8

1    witness list.  So we were -- we were very surprised when we

2    heard that he was going to be trial counsel.  We thought he

3    was going to be a witness.  So at the time we did the in

4    limines, we didn't know this was an issue, Your Honor.

5         THE COURT:  Well, there's been counsel of record in

6    the case for how long?  Since the beginning of time.

7         MR. MOVIT:  And he was on the witness list, Your

8    Honor, for trial by the plaintiffs so we -- we didn't

9    anticipate him being trial counsel.  We anticipated him

10   testifying as part of the plaintiff's case-in-chief and not,

11   Your Honor, during a cross-examination.

12        THE COURT:  Okay.  Well, I'm not well convinced

13   but, let me hear from the plaintiffs.

14        MR. KAHN:  Briefly on the last point that Mr. Movit

15   made, Mr. Kayira was listed as a may call witness at a time

16   when none of these issues had been raised or we were waiting

17   to see whether or not the defendants were gonna object to the

18   copy of the copyright registration which we had ordered, and

19   it's now finally arriving, the official government copy.

20        And since we don't know if they were gonna object,

21   and it turns out that they are not objecting, we didn't then

22   need to call Mr. Kayira to confirm this is what he received

23   from the Copyright Office.

24        Um, as to Mr. Movit's other point, um, the evidence

25   will hinge on whether or not Joyful Noise is a joint work.

UNITED STATES DISTRICT COURT

EXHIBIT 1
PAGE 15

9

```
1    Under the Black Letter law in the 9th Circuit, for joint
2    authors to be joint authors of a -- of a joint work, they
3    each have to contribute something that's independently
4    copyrightable.  They don't have to each copyright that
5    separate item.  They become independently copyrightable.
6          Mr. Ojukwu will testify as will the other two
7    plaintiffs that from the very beginning, he put this beat up
8    on MySpace in the hopes that some rap artist would want to
9    make a song out of it.
10          And he will also testify that every time he ever
11    sold a beat to any rap artist including Mr. Gray here, he
12    retained a 50 percent interest in the finished song.  So
13    these are clearly joint works.
14          And in a case that we cited, it quotes the fact
15    that a joint work can be created by two or more authors at
16    different times, and they don't even need to know each other.
17          In this case, without any testimony needed from any
18    lawyer, the Court will hear testimony that this is
19    unquestionably a joint work.
20          THE COURT:  I guess -- I guess my question is this.
21          Is it your position now that in light of my
22    tentative rulings, Mr. Kayira need not testify?
23          MR. KAHN:  Yes, Your Honor.
24          THE COURT:  So we don't have an issue anymore.
25          MR. KAHN:  Yes, Your Honor.
```

UNITED STATES DISTRICT COURT

EXHIBIT 1
PAGE 16

```
 1              THE COURT:  Okay.  So that's one more issue out of

 2    the way.

 3              MR. KAHN:  Okay.

 4              MR. MOVIT:  May I briefly respond, Your Honor?

 5              THE COURT:  Sure.

 6              MR. MOVIT:  Okay.

 7              With respect to Mr. Kahn's statement, the fact

 8    remains about first of all that this, um -- that -- that

 9    testimony that he intended for it to an anti-rapper at some

10    point is not dispositive of the state of mind of the authors

11    at the time they created it.  And because the record will

12    show that Mr. Ojukwu actually copyrighted beats, other beats

13    with the Copyright Office, um, without vocals.

14              And -- and it -- it doesn't change the fact that

15    there is, um, evidence that the defendants are seeking to

16    submit to, um -- you know, to refute and rebut the

17    anticipated testimony by Mr. Ojukwu which Mr. Kahn just

18    summarized.

19              And, again, this -- this paper trail to cover it up

20    can only be established through Mr. Kayira.  And, again --

21              THE COURT:  Well, then you're calling him.

22              Is that what you're telling me?

23              MR. MOVIT:  Yes, Your Honor.

24              THE COURT:  Well, then you're -- you're stuck.  I'm

25    sorry.  You can't call a witness and then disqualify him on
```

UNITED STATES DISTRICT COURT

EXHIBIT 1
PAGE 17

1    the grounds that he's listed as an attorney for the other

2    side so I'm afraid that's your problem.

3         MR. MOVIT:  Well, we didn't know that -- first of

4    all, Your Honor, we didn't know this was a problem cause

5    Mr. Kahn said that there was gonna be a limited thing that he

6    was testifying about, but we didn't know that.  We just knew

7    that Mr. Kayira was on the witness list.  And for a fact

8    witness to be trial counsel, that puts us in a spot, and

9    that's their choice -- their to have put him on their list

10   and then seeking for him to be --

11        THE COURT:  No, it's your choice -- it's your

12   choice to raise this defense.  Okay?  You raised it at the

13   last minute.  You raised three defenses you don't disclose to

14   the Court that I'm supposed to submit the question to the

15   Copyright Office, and you tell me that this is something

16   that, you know, the other side has known about since Day 1.

17   Not true.

18        Secondly, um, now yesterday have a motion ex parte

19   to disqualify Mr. Kayira who has been listed as a witness or

20   a may call witness and counsel of record, and now, the

21   plaintiffs have said they're not calling him.  You're the

22   people you are gonna call him.  If you want to call him, you

23   can call him, but that said, I will not disqualify him

24   because you have created the conflict.

25        MR. MOVIT:  That's fine.

UNITED STATES DISTRICT COURT

EXHIBIT 1
PAGE 18

 1            Thank you very much, Your Honor.

 2            THE COURT:  Okay?

 3            MR. CHIEFFO:  Your Honor, my -- I'm not disagreeing

 4    with Your Honor's ruling.  I did want to add a point.

 5            THE COURT:  Could you go to the lectern?  I'll have

 6    a very unhappy court reporter unless everyone remembers to do

 7    that.

 8            MR. CHIEFFO:  Thank you.

 9            Uh, the -- the question of the derivative work or a

10    jointly authored work has truly always been.

11            THE COURT:  I know that.

12            MR. CHIEFFO:  And -- and that's -- I just want to

13    clarify that still is an issue we're gonna have to figure out

14    one way or another.

15            The only other point is, and, again, I'm not

16    disagreeing with Your Honor's ruling, but there have been

17    cases where the issue of whether or not there has been, uh,

18    knowing misstatements which have gone to the jury and then

19    based upon the jury's decision on the issue then gone to

20    the -- to the, uh, Register of Copyright.

21            THE COURT:  Okay.  Well, no one has given me such a

22    case.

23            MR. CHIEFFO:  I understand, Your Honor.

24            THE COURT:  Uh, and, um, the only thing I have to

25    rely on is what Nimmer says and what, uh, Judge Klausner did

1    in his case, and all I'm is saying this is too little, too

2    late.

3            MR. CHIEFFO:  Your Honor, I'm not trying to

4    reargue.

5            THE COURT:  I know that.  I'm not -- I'm not trying

6    to reengage with you.  I'm just trying to move us forward.

7            MR. CHIEFFO:  Yes.

8            THE COURT:  We've got a lot of people who, uh, have

9    busy schedules.  They've made themselves available, and we

10    need to forge ahead.

11            MR. CHIEFFO:  Very good, Your Honor.  Thank you.

12            THE COURT:  So the Court is going to, um, strike

13    the amendment to the pretrial conference order uh, other than

14    the contention that the beat itself is not copyrightable, and

15    we will proceed accordingly.

16            MS. LEPERA:  May I ask for clarification, Your

17    Honor.

18            THE COURT:  Sure, Ms. Lepera, because I'm probably

19    not being as clear as I'd like to be.

20            MS. LEPERA:  I think the main issue which is not at

21    all a defense, a fraud on the copyright office, is that the

22    plaintiff bears the burden to establish a valid copyright in

23    Joyful Noise.  That has always been part of the case.  It is

24    filed as a joint work of authorship.  The position that we've

25    had from inception is that it does not -- that registration

EXHIBIT 1
PAGE 20

 1    does not encompass the beat.  That was created separately by

 2    Mr. Ojukwu and published and then sold.

 3          Our position is not whether it's copyrightable i.e.

 4    original or common.  That's a separate issue.  It is whether

 5    or not it is encompassed in the copyright registration for

 6    Joyful Noise because our position is it is not.  It was

 7    concocted after the fact to be a joint work of authorship,

 8    and therefore, Joyful Noise itself is a derivative work of

 9    the beat.

10          And in copyright law jurisprudence which is very

11    clear, you do not have by virtue of a derivative work

12    protection in the previously existed work that it's derived

13    on.  So therefore, the registration itself does not cover the

14    beat.

15          THE COURT:  Okay.

16          MR. KAHN:  Do you want to hear from me, Judge?

17          THE COURT:  I do.  I think that is consistent with

18    my understanding of what we were doing before these later

19    defenses were added, but tell me if I'm incorrect.

20          MR. KAHN:  No.  I mean, we are confident that the

21    evidence will meet the threshold for a joint work.

22          THE COURT:  I -- that's -- that's what we're doing

23    here.  That's what this case is about.

24          MR. KAHN:  Exactly.

25          THE COURT:  Um --

UNITED STATES DISTRICT COURT

EXHIBIT 1
PAGE 21

```
1              MR. KAHN:  And the only thing Mr. Kayira could

2    offer was an expert opinion on the law which I'm sure they

3    don't want, and they don't want him as a witness, um, but I

4    don't need to say anymore.

5              I'm just saying that the issue is a joint work.

6    It -- it wasn't clearly out there before.  It was -- it

7    brought up now.  And I can assure the Court I'm very

8    confident that from Mr. Ojukwu's testimony and the others,

9    from the very outset, he would own 50 percent of any song

10   created.

11             THE COURT:  And leaving that legal contention aside

12   for a minute, do you agree that Ms. Lepera, uh, stated what

13   the legal dispute is?

14             MR. KAHN:  Yeah.  I -- I would disagree that it was

15   clearly flagged, but -- but I understand what her dispute is.

16             THE COURT:  Because we've been dealing with that

17   for a very long period of time.  That's nothing new.  Okay.

18             So that is the -- frankly, it's an old issue, but I

19   suppose it is covered at some level by the new defense, and

20   to the extent it's part of the new defense, I will let that

21   contention stand.  The others will be stricken.

22             MR. KAHN:  Thank you, Your Honor.

23             MS. LEPERA:  Thank you very much, Your Honor.

24             THE COURT:  Okay.  So, um, do we have anything else

25   for the good and welfare of the group before we bring down
```

UNITED STATES DISTRICT COURT

EXHIBIT 1
PAGE 22

1    jurors?

2            MS. LEPERA:  A couple of housekeeping matters,

3    Your Honor.

4            THE COURT:  Sure.

5            MS. LEPERA:  Number one, there's disputes on both

6    sides with respect to opening demonstratives.

7            Number two, we would like to discuss with the Court

8    at some juncture the resolution process mechanism for what

9    remains in dispute on the exhibit list vis-a-vie objections,

10   whether they will be done seriatim in order to not have them

11   shown to the jury at the time.

12           Um, and thirdly, there is just a simple question

13   with respect to, um, if sensitive topics are potentially

14   going to come up in a juror's statement, so not to pollute, I

15   would say, the entire pool, um, we would like to just create

16   a mechanism for the Court for addressing a side bar on that

17   before it happens.

18           THE COURT:  Okay.  Well, let -- let me go in

19   reverse order.

20           Typically, what I have done is to tell the jurors

21   that if they want to discuss something confidentially, they

22   may come over to side bar, and I have lawyers come over to

23   side bar, and we deal with the matter out of the hearing of

24   the other people in the veneer.  That's part one.

25           Part two, if you have critically important

UNITED STATES DISTRICT COURT

EXHIBIT 1
PAGE 23

```
 1    follow-up questions, I will let you ask one or two at side

 2    bar.

 3              MS. LEPERA:  My question was really whether or not

 4    something inadvertently gets blurted out about someone that

 5    might be infection to the entire pool, um, so we wanted to

 6    perhaps discuss a couple of things with Your Honor before

 7    that on that topic.

 8              THE COURT:  Okay.  Well, do you want to tell me

 9    what those issues are?

10              MS. LEPERA:  I think we should but at side bar.

11              THE COURT:  Okay.  Why don't we do that because I

12    would like --

13              MR. KAHN:  I have one.

14              THE COURT:  Yes.

15              MR. KAHN:  I just have one thing to say that

16    affects Mr. Kayira's participation which is important in this

17    case.

18              My understanding of what is or is not a joint work

19    depends upon what the parties who are claiming to be joint

20    authors did and believed.  We have no intention of calling

21    Mr. Kayira.  I don't think he can add anything to that.  My

22    concern is that the defendants are nevertheless, um, gonna

23    try to put on him the stand, and we just want to make sure

24    that's not gonna happen.

25              THE COURT:  Well, I've indicated that if they
```

UNITED STATES DISTRICT COURT

EXHIBIT 1
PAGE 24

 1    wanted to call him, they could call him.  I mean, they're

 2    gonna have to demonstrate that his testimony is relevant to

 3    something.  We're not just gonna sit here and put him on the

 4    stand so he can be examined.  So I would want some offer of

 5    proof.

 6              MR. KAHN:  Okay.  Okay.

 7              THE COURT:  Before they call him.

 8              MR. KAHN:  Okay.  Thank you.

 9              THE COURT:  All right.

10         Let's go to side bar to discuss whatever issues.

11         (The following proceedings were held at side bar.)

12              MS. LEPERA:  There has been a lot of press on some

13    other litigations which are completely unrelated to this case

14    involving certain of our clients and one of the cases is one

15    that Ms. Perry and Mr. Gottwald are embroiled in to some

16    extent.  When you ask if you've heard of them, yes, in this

17    case.  Perhaps there's a mechanism of if you've heard of

18    such-and-such person before they say how.

19              THE COURT:  We can have them come over and address

20    it.

21              MS. LEPERA:  That's what I would suggest.  I didn't

22    want to say that publicly.

23              THE COURT:  So that's all you have on that issue?

24              I'm sure we can accommodate that.

25                    (Side bar concluded.)


                    UNITED STATES DISTRICT COURT

                                        EXHIBIT 1
                                        PAGE 25

 1          THE COURT:  You cannot walk through.  You must walk

 2     around.  And I know you are not from Los Angeles, but I have

 3     colleagues who would, uh, probably issue a warrant to someone

 4     who walks through the well.  I haven't reached that point.

 5          Um, okay.  Now, look.  Going in reverse order,

 6     Ms. Lepera, we've dealt with the, uh, voir dire issue.

 7          So the second issue you had was?

 8          MS. LEPERA:  Two other issues, Your Honor, the

 9     first being the parties' objections on demonstratives for

10     openings.  There's a few on each side, objections.

11          THE COURT:  Could I simply say that my practice,

12     and I am not going to deviate, is that unless you can agree

13     to demonstratives, you may not use them --

14          MS. LEPERA:  Okay.

15          THE COURT:  -- in opening.  They will have to come

16     into evidence down the road.

17          MS. LEPERA:  Very well.

18          The, um, second issue is with respect to exhibits

19     on the joint list which there are objections still posed

20     which is a much narrower subset obviously than previously

21     given the motions in limine and agreements, um, but there are

22     still a narrow subset.

23          And we would just like to ask the Court how the

24     Court would like us to handle that with respect to making

25     sure if an exhibit is offered that's not been agreed to and

1    rulings are not yet made on its admissibility that the jury

2    is not permitted to see it.

3            THE COURT:  Okay.  Well, first of all, I do not

4    permit counsel to publish an exhibit until it's received in

5    evidence.  So the first order of business if you're going to

6    offer an exhibit is to show it to the witness and ask the

7    witness if the witness recognizes it or authenticate it, and

8    then if there is an objection, I'm gonna have to resolve the

9    objection.

10           However, that said, a more efficient way of doing

11   this is if you have a fairly limited number of exhibits in

12   the range of 20 or 25, I don't know why we can't take them up

13   and argue them in advance out of the presence of the jury so

14   that we know what each side may use.

15           MS. LEPERA:  I'm fine with either process.  I just

16   wanted to make sure we clarified it.  But there are less

17   than -- I hope there's less than 20 or 25 in dispute.  I

18   haven't specifically counted them.  And there's a few

19   deposition designations that are also open to which

20   objections have been posed within the same category.  So if

21   the Court would prefer to do it that way assuming I'm

22   correct, and there's less than 20 or 25, I could do it that

23   way if counsel for plaintiff --

24           THE COURT:  Well, on the deposition just under the

25   local rules, you're gonna have to submit to me in advance

UNITED STATES DISTRICT COURT

EXHIBIT 1
PAGE 27

```
1    whatever one side wishes to use in its case-in-chief and the
2    other side and any objections written in the margins so I can
3    rule on those in advance.
4         MS. LEPERA:  That's been done, Your Honor.
5         THE COURT:  Okay.  So we just need to track them
6    down wherever they may be.
7         MS. LEPERA:  Okay.  So whatever the Court prefers
8    on that issue with the exhibits.
9         THE COURT:  Okay, Ms. Cohen?
10        MS. COHEN:  May I just raise one ancillary issue?
11        THE COURT:  If you go to the lectern, you may.
12        MS. COHEN:  I think we understand the process with
13   respect to documentary exhibits, but we have some audio files
14   in this case, of course, and everybody knows what they are.
15   As far as publishing -- well, as far as introducing that
16   evidence to a witness prior to publishing it to the jury, how
17   would you like for that to be handled?
18        THE COURT:  Well, isn't -- at least some of the
19   audio files, haven't I said they can be used, and others
20   can't be used?  So I'm not quite sure what you're going to be
21   showing.
22        MS. COHEN:  I believe you guys have the same
23   question for the Judge.
24        MR. KAHN:  Yeah.  Ms. Lepera and I spoke earlier
25   about some audio files, and it's my understanding with the
```

1    exception of one which they simply reserve their right cause

2    they haven't had an opportunity to hear it, um, there -- this

3    should not be a problem during either opening or during the

4    case.

5         THE COURT:  Okay, Ms. Lepera.

6         MS. LEPERA:  There's no dispute that the two songs

7    sound recordings fully mastered can be played.  There are

8    questions with respect to what he wants to play in the

9    opening that we've not agreed to yet.  That's different, and

10   Your Honor's addressed that.

11        THE COURT:  We've solved that problem.

12        MS. LEPERA:  Correct.

13        When it comes time to playing audios for witnesses,

14   I don't know what he's speaking about.  There are experts.

15   And so when he says we know what he's talking about, I don't.

16   There's recordings that experts may be using, and I don't

17   know -- we can't just say carte blanche so it seems that we

18   have to go case by case for the evidence on those.  Perhaps

19   with headphones depending on what it is.  I just can't say in

20   a vacuum.

21        THE COURT:  Okay.  Well, how would you propose we

22   go through things with headphones?  I mean, in other words,

23   what are we gonna have to do, have a jury sitting here with

24   headphones while you play through something that's some

25   immense period of time?

```
 1          MS. LEPERA:  No.  I don't intend to do that.  I'm

 2     just addressing what Mr. Kahn is saying, that he knows what

 3     they're going to play, and I don't specifically.

 4     Particularly for cross, for example.  I don't know how -- how

 5     far off the exhibit list he's intending to go.  So when we

 6     can speak specifically?  Then this is one of the things that

 7     I think we can address with the exhibits which will be, I

 8     think, maybe a helpful exercise on the cross.

 9          THE COURT:  Well, I guess what we're trying to

10     understand is I can see that there might be an expert on the

11     stand, and that expert is going to be asked about a

12     particular song or composition, and are you saying that

13     person would have to hear it with headphones first?

14          MS. LEPERA:  I'm saying only if it's something

15     that's not been disclosed and something that is going to be

16     used potentially, um, outside of the joint exhibit list, and

17     that's all I'm saying.  I don't know what he's talking about.

18     So he's being vague to me is my point.

19          MS. COHEN:  Can I?

20          THE COURT:  Yeah.  Please.

21          MS. COHEN:  Judge, I'm really just talking about

22     the two recorded songs which I don't think we have an issue

23     with and the two instrumental files which -- do we have an

24     issue with that or not?

25          MS. LEPERA:  When she says the two instrumental
```

UNITED STATES DISTRICT COURT

EXHIBIT 1
PAGE 30

1    files, without referring to an exhibit list or a specific

2    file, I can't answer that question.

3              THE COURT:  Okay.

4              MS. COHEN:  I'm happy to pull up the exhibit list.

5              THE COURT:  Well, I strongly suggest that you meet

6    and confer.  It sounds to me that these things could be

7    resolved, and I'm certainly not gonna rule in a vacuum

8    because if one side doesn't even know what you're talking

9    about, I certainly can't make a ruling.

10             MS. LEPERA:  And we're happy to do that,

11   Your Honor.

12             THE COURT:  Okay.  Okay.  So does that take care of

13   your housekeeping issues, Ms. Lepera?

14             MS. LEPERA:  Yes, Your Honor.

15             THE COURT:  Anything from the plaintiffs?

16             MS. COHEN:  Not right now.  Thank you.

17             THE COURT:  Okay.  It's pretty much speak now or

18   forever hold your peace unless something new comes up, but if

19   we have nothing new right now, then I suggest we bring the

20   jury down and proceed with voir dire.

21             What I propose doing -- I'm not gonna ask all of

22   your questions because I think some of them are perhaps too

23   invasive, but I do want each side to introduce all counsel

24   and the witnesses that they anticipate calling and also,

25   obviously, their clients to the extent their clients are here

EXHIBIT 1
PAGE 31

1    today, but introduce your clients anyway.

2              And then what I'm trying to decide --

3              C.J., how many do we have?

4              THE CLERK:  The last count was 41.

5              THE COURT:  41?  Okay.  So there will be three

6    peremptories per side.

7              Have we discussed the number of jurors?  Do you

8    think we can do with this eight.

9              MS. LEPERA:  My preference, Your Honor, is nine

10   with three alternates if it's feasible.

11             THE COURT:  Well, we don't have alternates in civil

12   cases.

13             MS. LEPERA:  Nine then.  If that's --

14             THE COURT:  I --  any problem on the plaintiff's

15   side with nine?  The point being that if they all, you know,

16   are here at the conclusion of the case, they all deliberate.

17             MR. KAHN:  You know, I don't think it's worth a big

18   fight.  We're used to having eight.  We'd prefer eight.  Um,

19   that's been my experience.  I'm not sure -- I've never had

20   one with nine.

21             THE COURT:  Oh, I've had them with nine, twelve and

22   whatever number, but I think eight is standard.  And my

23   strong feeling is that, uh, given that this is at least

24   theoretically a fairly short proceeding, um, there is a

25   reason to do it.  On the other hand, because the case is

UNITED STATES DISTRICT COURT

EXHIBIT  1
PAGE  32

1    bifurcated, if it turns out that there were a verdict for the

2    plaintiff in Phase one, then I guess we would go directly to

3    the damage part of the case.

4          And so that gets me to next question.  When I tell

5    these people how long -- obviously, I'm not going to disclose

6    that the case is bifurcated, and, you know, that if they find

7    liability, they'll have to stay longer, but I do need to give

8    them a, you know, time line on the assumption that if, in

9    fact, the plaintiff establishes infringement in part one, how

10   long are the -- is the damage case gonna take?

11         MR. KAHN:  This could be famous last words.  I

12   think we could put our damages on in a day.  At most, a

13   day-and-a-half.

14         THE COURT:  I would kind of think that in light of

15   the rulings that I've made in the case.

16         MR. KAHN:  Right.  We have stipulations that are

17   under seal, but as to all of the individual defendants and,

18   you know, as far as revenues and costs, we have an expert

19   witness.  And I don't know what the defendants plan to do.

20   They have a bunch of experts so I don't know how long they

21   think it would take.

22         THE COURT:  Okay.  Ms. Lepera?

23         MS. LEPERA:  If plaintiff thinks a day-and-a-half

24   which I think makes sense for the stipulations and his

25   expert.  Um, then I think our three experts, um, one would be

1    short, and the other two I would think another two days,

2    maybe max three total so roughly fourish, four or five days.

3    Max.

4              THE COURT:  Okay.  So then here's what we need to

5    do.  Okay.  In a perfect world although no world is perfect

6    anymore with our vacancies, I would not be here on Friday,

7    the 26th, but if we have to do it, then we have to do it.

8    But what I'm saying is we have two days this week, at least

9    three days next week.  That should based on everything you've

10   told me get us through Phase one.

11             Do we agree about that?

12             MR. KAHN:  I believe it should, Your Honor.

13             I -- I believe it should.

14             THE COURT:  Ms. Lepera.

15             MS. LEPERA:  Yes.  My original estimate was four or

16   five days for Phase one.

17             THE COURT:  Which would mean that probably we could

18   somewhere in here instruct the jury and get them going.  And

19   then, of course, I guess we would pick up if need be on the

20   30th, 31st, 1st and 2nd.  Does that sound fair?

21             MR. KAHN:  It does sound fair, Your Honor.  I -- I

22   am hoping we get to that phase and have to deal with that

23   issue, um, cause I'm actually moving at the end of that week

24   and closing in a house sale, but I have highly competent

25   people here, and hopefully, I'll be able to be here

EXHIBIT  1
PAGE  34

 1    throughout the entire time.

 2              THE COURT:  Right, I understand.  Well, I think

 3    many of us signed up for the wrong profession, but that's how

 4    it goes.  In any event --

 5              MR. KAHN:  Yes, Your Honor.

 6              THE COURT:  I just -- I just need, though, to give

 7    the jurors some estimate because we do not want a situation

 8    where people will be, uh, you know, leaving on a summer

 9    vacation or going to the hospital or doing whatever happens

10    in the summer.

11              MS. LEPERA:  And I presume Your Honor will do the

12    jury, um, charges after the close of one of the trial days

13    with us, um, so we don't waste the time during the trial

14    days.

15              THE COURT:  Yes.  Well, I usually instruct after

16    evidence closes but before closing argument.

17              MS. LEPERA:  Okay.

18              THE COURT:  And obviously, that means we have two

19    rounds of -- to instruct, and I know there are a lot of

20    objections, and I'm going to encourage you all to meet and

21    confer.

22              I pretty much adhere to the 9th Circuit

23    instructions unless absolutely essential.  I do not rely on

24    cases.  So I think you need to use that as the guiding rule

25    in working on these instructions.  And I note that there are

UNITED STATES DISTRICT COURT

EXHIBIT 1
PAGE 35

1    some brand new 9th Circuit instructions in copyright cases

2    that we all have to look at and become familiar with.

3          Okay.  Then why don't we take a short recess.  I

4    have got to adjourn at 12:30 for about 20 minutes just for

5    your planning purposes, and then I can be back.

6          Okay.  Then I think we're in recess.

7          THE CLERK:  This court's in recess.

8                    (Recess taken.)

9      (Jury selection not requested, not transcribed.)

10                    (Jury sworn.)

11          THE COURT:  All right.

12          Ladies and gentlemen, here's what's going to

13    happen.  I'm going to give you some pre-instructions today.

14    I've got a couple of matters to take up with counsel so once

15    I pre-instruct you, I'm going to send you home today.  We are

16    going to ask you to be back here at 9:00 a.m. tomorrow.

17    We're gonna try to start as close to 9:00 as possible.

18          At that time we are going to have opening

19    statements by each side, and that is intended to tell you

20    what they intend to prove in the course of the trial or what

21    they contend will not be proved.

22          It's very important that you do everything you can

23    to be on time.  If you have any questions regarding parking

24    or getting here, talk to Ms. Jeang.  She knows everything.

25    And so let me begin with the pre-instructions.

1          Members of the jury, you are now the jury in this

2     case and it is my duty to instruct you on the law.  These

3     instructions are preliminary instructions to help you

4     understand the principals that apply to a civil trial and

5     help you understand the evidence as you listen to it.

6          You will be allowed to keep this set of

7     instructions, uh, actually, I'm not going to give you to them

8     in writing.  At the end of the trial, I am going to give you

9     a final set of instructions and those are the instructions

10    that will govern your deliberations in this case.

11          But as jurors it is your duty to find the facts

12    from all of the evidence in the case.  To those facts you

13    will apply the law as I give it to you.  And you will follow

14    the law as I give it to you whether you agree with it or not.

15    And you must not be influenced by any personal likes or

16    dislikes, opinions, prejudices or sympathy.  That means that

17    you must decide the case solely on the evidence before you.

18    You will recall that you took an oath to do so.

19          Please do not read into these instructions or

20    anything I may say or do during the trial that I have an

21    opinion regarding the evidence or what your verdict should

22    be.  Let me give you an example.  I don't have the best back

23    in the world and sometimes I have to stand up.  If I do and a

24    witness is testifying, please do not think that I am

25    commenting on witness's testimony or on what the lawyer is

1    saying or doing.  Sometimes I just need to stretch.

2         Same thing for you.  If you have some orthopedic

3    issues and need to stand, just raise your hand and let me

4    know.  If you need a quick bathroom break before the regular

5    break, if you raise your hand, we'll let you go out without a

6    formal recess and we'll just hold up until you can come back.

7    But as I say, we're going to try to take 15 minutes in the

8    morning, 15 minutes in the afternoon and the lunch break.  So

9    hopefully you won't need any extra bathroom breaks.

10        Now, in the course of this trial, you are going to

11   receive evidence and hear evidence and that's what you will

12   rely upon to make your ultimate decisions.  And let me tell

13   you what evidence you are going to receive.  Sworn testimony

14   of witnesses, exhibits that are admitted into evidence, any

15   facts to which the lawyers have agreed, and any facts which I

16   have instructed you to accept as true.  That is evidence you

17   can consider.

18        On the other hand, you may only consider the

19   testimony and exhibits that are received into evidence.  And

20   certain things are not evidence and you may not consider them

21   in deciding what the facts are.  Let me give you an example

22   or several examples.  First of all, the arguments and

23   statements of the lawyers are not evidence.

24        The lawyers are not witnesses.  What they may say

25   in their opening statements, closings arguments and at other

EXHIBIT  1
PAGE  38

```
 1    times is intended to help you interpret the evidence, but it
 2    is not evidence.  If the facts as you remember them differ
 3    from the way the lawyers have stated them, your memory
 4    controls.
 5          Questions and objections by lawyers are not
 6    evidence.  Attorneys have a duty to their clients to object
 7    when they believe that a question is improper under the Rules
 8    of Evidence.  You may not be influenced or should not be
 9    influenced by an objection or by the Court's ruling on it.
10    Testimony that is excluded or stricken or that you have been
11    instructed to disregard is not evidence and you must not
12    consider it.
13          In addition some evidence may be received only for
14    a limited purpose.  And when I say that it's received for a
15    particular purpose, you may only consider it for that
16    purpose.  Also, anything you may see or hear when the court
17    is not in session is not evidence.  You are to decide the
18    case only on the evidence that is received here in the
19    courtroom.
20          And in that regard, as Ms. Jeang indicated, if you
21    go to the rest room and you probably will have your own
22    private rest room.  You will as jurors because there's rest
23    rooms back by the jury room.
24          But if you run into the lawyers or the parties in
25    this case, I am going to instruct them not to communicate
```

EXHIBIT  1
PAGE  39

 1    with you either verbally or in any other way.  So if we all

 2    appear to be kind of rude and we don't smile and acknowledge

 3    you, that's because I've asked the parties and the lawyers

 4    not to do that because no one should communicate with you

 5    while you're sitting as a juror.

 6           Now, evidence may be direct or circumstantial.

 7    Direct evidence is direct proof of a fact such as testimony

 8    by a witness about what that witness personally saw or heard

 9    or did.  By contrast circumstantial evidence is proof of one

10    or more facts from which you could find another fact.  You

11    should consider both kinds of evidence.

12           The law makes no distinction between the weight to

13    be given to either direct or circumstantial evidence.  It is

14    for you to decide how much weight to give to any evidence.

15           In the course of the trial, I may be called upon to

16    rule on objections.  There are Rules of Evidence that control

17    what can be received into evidence and what may not be

18    received in evidence.  When a lawyer asks a question or

19    offers an exhibit into evidence and the lawyer on the other

20    side thinks that that should not be permitted by the Rules of

21    Evidence that lawyer my object.

22           If I overrule the objection, the question may be

23    answered or the exhibit received.  On the other hand, if I

24    sustain the objection, the question cannot be answered and

25    the exhibit cannot be received.  Whenever I sustain an

1    objection to a question, you must ignore the question and you

2    must not guess as to what the answer might have been.

3    Sometimes I may order that specific evidence be stricken.  If

4    I do that, you may not consider the evidence.

5           In deciding the facts of this case, you may have to

6    decide which testimony to believe and which testimony not to

7    believe.  You may believe everything a witness says or part

8    of it or none of it.  In considering the testimony of any

9    witness, you may take into account:

10          1.  The opportunity and ability of the witness to

11   see or hear or know the things testified to.

12          2.  The witness's memory.

13          3.  The witness's manner while testifying.

14          4.  The witness's interest in the outcome of the

15   case, if any.

16          5.  The witness's bias or prejudice, if any.

17          6.  Whether other evidence contradicted the

18   witness's testimony.

19          7.  The reasonableness of the witness's testimony

20   in light of all the evidence, and.

21          8.  Any other factors that bear on believability.

22          Sometimes a witness may say something that is not

23   consistent with something else he or she said.  Sometimes

24   different witnesses will give different versions of what

25   happened.  People often forget things or make mistakes in

EXHIBIT  1
PAGE 41

1    what they remember.

2           Also, two people may see the same event, but

3    remember it differently.  You make consider these

4    differences, but do not decide the testimony is untrue just

5    because it differs from other testimony.  However, if you

6    suspect that a witness has deliberately testified

7    untruthfully about something important, you may choose not to

8    believe anything that witness said.

9           On the other hand, if you think the witness

10    testified untruthfully about some things and told the truth

11    about others, you may accept the part you think is true and

12    ignore the rest.  The weight of evidence as to a fact does

13    not necessarily depend on the number of witness who testify.

14    What is important is how believable the witnesses were and

15    how much weight you think the testimony deserves.

16           Now, let me say a few words about your conduct as

17    jurors.  First, keep an open mind throughout the trial and do

18    not decide what the verdict should be until you and your

19    fellow jurors have completed your deliberations at the end of

20    the case.

21           Second, because you must decide the case based only

22    on the evidence received in the case and on my instructions

23    as to the law that applies, you must not be exposed to any

24    other information about the case or to the issues it involves

25    during the course of your jury duty.

UNITED STATES DISTRICT COURT

EXHIBIT 1
PAGE 42

1              Thus, until the end of the case or unless I tell

2    you otherwise, do not communicate with anyone in any way and

3    do let anyone else communicate with you in any way about the

4    merits of the case or anything to do with it.  This includes

5    discussing the case in person, in writing, by phone or

6    electronic means, via email, text messaging or any Internet

7    chat room, blog, website or application including, but not

8    limited to Facebook, YouTube, Twitter, Instagram, LinkedIn,

9    Snap Chat or any other forms of social media.

10             This applies to communicating with your fellow

11   jurors until I give you the case for deliberation and it

12   applies to communicating with everyone else including your

13   family members, your employer, the media or press and the

14   people involved in the trial.

15             Although, you may notify your family and your

16   employer that you have been seated as a juror in the case and

17   how long you expect the trial to last.  But if you are asked

18   or approached in any way about your jury service or anything

19   about this case, you must respond that you have been ordered

20   not to discuss the matter and report the contact to the

21   Court.

22             Because you will receive all the evidence and legal

23   instructions you properly may consider to return a verdict,

24   do not read, watch or listen to any news or media commentary

25   about the case or anything to do with it.  Do not do any

EXHIBIT  1
PAGE 43

 1    research such as consulting dictionaries, searching the

 2    Internet or using other reference materials and do not make

 3    any investigation or in any way try to learn about the case

 4    on your own.

 5            Do not visit or view any place discussed in this

 6    case and do not use Internet programs or other devices to

 7    search for or view any place discussed during the trial.

 8    Also, do not do any research about the case, the law or the

 9    people involved including the parties, the witnesses or the

10    lawyers until you have been excused as jurors.  If you happen

11    to read or hear anything touching on this case in the media,

12    turn away and report it to me as soon as possible.

13            These rules protect each party's right to have this

14    case decided only on the evidence that has been presented

15    here in court.  Witnesses here in court take an oath to tell

16    the truth and the accuracy of their testimony is tested

17    through the trial process.

18            If you do any research or investigation outside the

19    courtroom or gain any information through improper

20    communication, then your verdict may be influenced by

21    inaccurate, incomplete or misleading information that has not

22    been tested by the trial process.

23            Each of the parties is entitled to a fair trial by

24    an impartial jury.  And if you decide the case based on

25    information not presented in court, you will have denied the

EXHIBIT  1
PAGE  44

1    parties a fair trial.  Remember, you have taken an oath to

2    follow the rules and it is very important that you follow

3    these rules.  A juror who violates these restrictions

4    jeopardizes the fairness of these proceedings and a mistrial

5    could result which would require the entire trial process to

6    start over.

7              If any juror is exposed to any outside information,

8    please notify the Court immediately.

9              If there is any news, media account or commentary

10   about the case or anything to do with it, you must ignore it.

11   You must not read, watch or listen to any news, media

12   accounts, commentary about the case or anything to do with

13   it.

14             The case must be decided by you solely and

15   exclusively on the evidence that will be received in the case

16   and on my instructions as to the law that applies.  If any

17   juror is exposed to any outside information, please notify me

18   immediately.

19             I also urge you to pay close attention to the trial

20   testimony as it is given.  During deliberations you will not

21   have a transcript of the trial testimony.  And if you were to

22   request a rereading of the transcript, that could be

23   accomplished, but it's going to take time and extend the

24   period of your deliberations.  So the best way to proceed is

25   to listen carefully and rely on your memory.

1          If you wish, you may take notes to help you

2   remember the evidence.  If you do take notes, please keep

3   them to yourselves until you go to the jury room to decide

4   the case.  Do not let note taking distract you.

5          And what I always say to people is if you're the

6   kind of note taker who can record notes without diverting

7   your attention from the proceedings, that's fine.  But some

8   people have a tendency to let the notes overtake their

9   consciousness and they don't hear the evidence.  If you're in

10  that latter group, I would urge you not to take notes.

11         No one should serve as the note taker for the jury.

12  Each of you is an independent judge of the facts and so you

13  should take your own notes, rely on your own notes.  And only

14  when you commence deliberations if there's a difference in

15  the notes you've taken, you can discuss them at that point in

16  time.

17         Now, from time to time, we may need bench

18  conferences.  I'm going to try to minimize them, but please

19  understand that we are undertaking bench conferences or

20  asking you to go to the jury room so we can accomplish more

21  and finish sooner rather than later.

22         The purpose of these conferences is not to keep

23  relevant information from you, but to decide how certain

24  evidence is to be treated under the Rules of Evidence and to

25  avoid confusion and error.  We will do everything possible to

UNITED STATES DISTRICT COURT

EXHIBIT 1
PAGE 46

1    keep bench conferences at a very minimum.

2          When you come tomorrow, the trial will begin.

3    First, each side will make an opening statement.  An opening

4    statement is not evidence and is simply an outline to help

5    you understand what the party on the each side expects the

6    evidence will show.  A party is not required to make an

7    opening statement, but I rather suspect each side will make

8    an opening statement in this case.

9          After opening statement, the plaintiff will then

10   present evidence and counsel for the defendant may

11   cross-examine.  Then the defendant may present evidence and

12   counsel for the plaintiff may cross-examine.  However, in

13   this trial because of the various schedules of some of the

14   witnesses, the parties have agreed some witnesses may be

15   taken out of order.  So it is possible, I can't say for sure,

16   but it is possible that a defense witness will be called in

17   the plaintiff's case.  And I will at that time explain to you

18   how that works, but we are again doing this to save time and

19   to keep you here for as short a period as possible.

20         While ordinarily the defendant presents all of its

21   evidence and the defendant has an opportunity cross-examine,

22   and then the defense presents its evidence and the plaintiff

23   has opportunity to cross-examine, here we may have to make

24   adjustments in the testimony.  There may also be people who

25   testify by deposition or by video conference because of their

EXHIBIT  1
PAGE 47

 1    travel plans.

 2            Whether we're reading a transcript here in the

 3    court or whether there is a video conference, you should

 4    treat it the same way as if the witness were actually here

 5    testifying.

 6            Once the evidence has been presented, I will give

 7    you the final instructions.  Copies of which you will have in

 8    the jury room.  And you will hearing closing argument from

 9    each side regarding what each side thinks has been proved.

10    The plaintiff will have an opportunity to make a rebuttal

11    argument because the plaintiff has the burden of proof in the

12    case which I will describe to you at a later point in time.

13            But in any event, that is how we're going to

14    proceed.  We appreciate your time and effort today.  We all

15    are going to do everything possible to use your time as

16    efficiently as possible so thank you very much.

17            Remember don't talk to one another or anyone else

18    about the case other than to say you are on a jury, and we

19    will see you back here at 9:00 tomorrow.  Thank you.

20            THE CLERK:  All rise.

21                 (Jury not present.)

22            THE COURT:  I said 9:00 just in hopes that everyone

23    will get here and parked.  We'll probably start more like

24    9:15, but if we can start at 9:00, I'd like that.  Our

25    reporter has to take a train, and there are several problems

UNITED STATES DISTRICT COURT

EXHIBIT  1
PAGE  48

1    so we'll figure it out.

2         Okay.  I can't even remember who had the issue on

3    opening statement.  I think you did, Mr. Kahn.

4         MR. KAHN:  Thank you, Your Honor.

5         It's really more a matter of clarification so the

6    people are not objecting.

7         THE COURT:  Yes.

8         MR. KAHN:  The way I had thought of organizing the

9    opening statement which was to explain the jury why we were

10   putting on certain evidence was to explain we need to provide

11   them evidence of substantial similarity and widespread

12   dissemination.  And when I was talking to counsel,

13   Ms. Lepera, that seemed to be a problem for her.

14        They had objected to many of our demonstratives in

15   the opening which we've removed cause the Court said if you

16   don't agree, they have to come out.  I just want to make sure

17   I can substantially similar, I can say extrinsic evidence,

18   intrinsic evidence.  I want to make sure it's not going to be

19   a problem when I say here's the kind of evidence we're going

20   to offer on widespread dissemination.  Here's the kind of

21   evidence we're gonna offer on substantial similarity.

22        THE COURT:  Okay.  Let me hear Ms. Lepera's

23   objection.

24        MS. LEPERA:  Obviously, at this juncture in the

25   case, the jury is not familiar with the legal terms which the

EXHIBIT 1
PAGE 49

1    Court will instruct on what is substantial similarity, what

2    is extrinsic, what is intrinsic.  So my view of the opening

3    was to basically tell the story and lay out the facts and the

4    evidence without resorting to argument that such-and-such is

5    going to prove that there is or is not substantial similarity

6    or access.

7           And that was we had demonstratives that plaintiff

8    had offered which were essentially saying this is

9    substantially similar and this is why, et cetera so I

10   objected to that.  And I think it should be more in the

11   nature -- I don't plan to object unless it gets, you know,

12   obviously, way to the point of where he's arguing closing.

13          THE COURT:  Well, here's what I would propose and

14   see if this strikes the balance.  Obviously, the jury will

15   not have been instructed as to the law that applies to the

16   case, but I think that plaintiffs can say that this is a case

17   where there is a claim of infringement.  And the Court is

18   going to give you instructions later in the case regarding

19   what constitutes infringement.

20          And I expect that the Court is going to instruct

21   you regarding substantial similarity and you will hear

22   evidence about substantial similarity.  And that there is,

23   you know, when things are substantially similar, it's

24   necessary to show access.  And in this case we believe that

25   we will demonstrate access through X, Y and Z.

EXHIBIT 1
PAGE 50

```
 1              I mean, I think that's the way to do it without

 2     putting up a chart or anything else.  I mean, I think it's

 3     fair for you to be able to tell them why they're here and

 4     what they're generally going to be required to do, but you

 5     have make it clear that the Court's going to give those

 6     instructions.  But here is the evidence we intend to offer to

 7     show the things that we believe we need to show to

 8     demonstrate infringement.

 9              MS. LEPERA:  Correct.  I think we're saying the

10     same thing.

11              MR. KAHN:  I think we agree, Your Honor.  I just

12     really wanted to have it clarified really for both sides to

13     make sure that I don't plan to be arguing tomorrow, but just

14     to make sure that I could say the term substantial

15     similarity.

16              THE COURT:  I think you can use the term.  I think

17     you just have to make clear that that's a legal term of art

18     which the Court is gonna provide an instruction on.

19              MR. KAHN:  I will do that, Judge.

20              THE COURT:  Okay.  Does that solve our problem for

21     now until the next one arises?

22              MS. LEPERA:  Yes, Your Honor.  That's fine.  Again,

23     I just didn't want him arguing this constitutes substantial

24     similarity all of the things in closing.

25              THE COURT:  No, I understand.  If he's not going to
```

1    put up charts and things like that, I don't think there's a

2    lot to point to.  And as I say, at this juncture I think you

3    need to tell them why they're here and what each side is

4    trying to do and go from there.

5         Okay.  Do we know the order of witnesses for

6    example?

7         MR. KAHN:  Mr. Chieffo and I will need to discuss

8    this.  Our plan having thought that we would have had opening

9    today and we would have put on one of our witnesses, um, now

10   we're doing opening in the morning, we'll try to put on two

11   of the three plaintiffs, um, because one of them will need to

12   leave tomorrow.  He's flying to Africa that evening and I

13   know that Ms. Hudson also needs to testify tomorrow.  We have

14   a short passage to read into the evidence, but Mr. Chieffo,

15   I'm sure has got some -- I don't know how long you think

16   she'll be on.

17        MR. CHIEFFO:  With the amount of direct testimony,

18   we did designations, but rather than having Ms. Perry sitting

19   here, I will put her on the stand and we'll move into issues

20   raised in her testimony.  I don't think we're gonna be longer

21   than 45 minutes, my questioning.  I haven't tried to time it.

22   The deposition, the entire deposition itself took a little

23   more than an hour so the reading is not going to be long.

24        But the issue is because we have a plaintiff and a

25   defendant that after tomorrow are not available, not in the

1  country, I just wanted to make sure that, you know, even if

2  you started the first witness and seems to me the safest is

3  that the witnesses who are disappearing should start

4  testifying somewhere around 1:00 so we know they're gonna get

5  done by 4:00.  And then whatever might have to spill over

6  into Friday will be from witnesses who are here.

7          THE COURT:  Well, I think that makes sense, but

8  let's start at the beginning.  I'm sorry.  I would have tried

9  to do the opening statement today had I known we had these

10  problems, but hopefully, everyone can try to be a little

11  shorter knowing where we're going.

12         But my question is this.  Are you presenting

13  Ms. Perry both by deposition and live?

14         MR. CHIEFFO:  Am I?  No.  That's what I said.  Our

15  counter-designations, I think we discussed this, don't need

16  to be read when they're doing their portion.  I will cover

17  whatever, you know, expansion on what the questions have been

18  in the deposition live.

19         THE COURT:  Are we calling her out of order or are

20  we calling her as part of the plaintiff's case?

21         MR. CHIEFFO:  I actually don't think we're calling

22  her out of order technically.  Our examination would have

23  been, well, some of it is subjects covered by counsel, but

24  it's basically, you know, they've asked her questions going

25  to how was the song created, how was Dark Horse created, was

1    there background, this and that.  We're technically not out

2    of order in one sense.  It's not the timing the plaintiffs

3    would have provided.

4         THE COURT:  Let's start again.

5         MR. CHIEFFO:  Yes, she is -- her testimony is --

6    would otherwise be in the defense case, but it's not a

7    situation here where we will be going into some new subjects

8    that the plaintiffs haven't raised.  That's the only point

9    and she's not here by the time we get to the case.

10        THE COURT:  Let me lay this out in language I can

11   understand.  We complete opening statement.  Then which of

12   the -- we're going to call Mr. Gray tomorrow; is that right?

13        MR. KAHN:  Your Honor, no, because Mr. Gray would

14   probably be the longest of the three plaintiffs.

15        THE COURT:  So you're going to call?

16        MR. KAHN:  Hopefully, it would be Chike and

17   Emanuel.

18        THE COURT:  How long do you think they're going to

19   take?

20        MR. KAHN:  Emanuel's probably no more than an hour.

21   Chike may be an hour-and-a-half or two maximum.  It depends

22   on how much cross-examination.

23        THE COURT:  You're including cross in that?

24        MR. KAHN:  For Emanuel, yes.  For Chike I don't

25   know.

EXHIBIT  1
PAGE  54

1          THE COURT:  Well, I can tell you right now is if

2     we're gonna get into beats and things like that in

3     cross-examination, you're gonna take a while.

4          MS. LEPERA:  It would be helpful for me if you

5     could just articulate what you think your direct will be for

6     Mr. Ojukwu and Mr. Lambert.  And then I can tell you what our

7     cross would be in terms of time.  Might be a little clearer.

8          MR. KAHN:  Our direct for Chike, Your Honor, would

9     be his creation of the underlying instrumental beat along

10    with some background on his -- on the music that he's

11    created.  And some foreground after he did create it when

12    he's contacted by Mr. Gray.  Um, the actual creation of the

13    music is a little complicated.  We've got the original

14    sessions files now, but even that, I don't think it's gonna

15    take more than a half hour to walk people through how you

16    created that particular beat.

17         MS. LEPERA:  I just wanted to get an estimate of

18    time on direct, if you could.

19         MR. KAHN:  45 minutes, maybe an hour.  For

20    Mr. Lambert it's less.

21         MS. LEPERA:  Okay.  Operating on the assumption

22    that we're doing an hour to an hour and 15 or roughly direct

23    of Mr. Chike Ojukwu, I would assume my cross would be

24    approximately an hour.  That's 2 hours 15 minutes.  If

25    Mr. Lambert is approximately 30, 45 on your direct on the

EXHIBIT  1
PAGE  55

```
 1    outside, I think ours approximately would be about the same

 2    so whatever that tally is.

 3            THE COURT:  By that time, folks, you're not going

 4    to be starting at 1:00 with Ms. Perry.

 5            MR. CHIEFFO:  Well, we don't have to start at 1:00,

 6    but it has to start in time where we're gonna be finished.

 7    My understanding is Mr. Ojukwu is here on Friday and

 8    Mr. Lambert and Ms. Hudson are not here on Friday.

 9            THE COURT:  Well, I may make this friendly

10    suggestion.  If Mr. Lambert isn't here on Friday, but

11    Mr. Ojukwu is here on Friday, can we do the direct and cross

12    of Mr. Lambert tomorrow, the direct of Mr. Ojukwu tomorrow,

13    but the cross on Friday?

14            MS. LEPERA:  That's fine with me, Your Honor.  I'm

15    trying to just look at the clock and figure out how we can

16    accommodate Ms. Hudson as well.  I'm hearing you're talking

17    about approximately a 45 minute direct of Ms. Hudson?

18            THE COURT:  Remember you have your opening

19    statement.  We won't even get a witness on until 10:45

20    tomorrow if everything goes swimmingly well.

21            MS. LEPERA:  Right.  So if we then do Mr. Lambert

22    in full and see where we are clockwise, and then make sure

23    Ms. Perry can get on for direct and cross.

24            MR. CHIEFFO:  We may have a confusion here.  As I

25    understand what will first happen with Ms. Perry is that
```

1    plaintiffs intend to read portions of her deposition; right?

2    It's obviously an adverse witness and that's the way they ask

3    the questions.  I will then direct examine her cause I can't

4    cross her.  It will be direct examination on the subject

5    matters covered.  I think we're getting a technical confusion

6    here.

7            THE COURT:  Well, we're getting more technical

8    confusion because are there objections to what you want to

9    read from Ms. Perry?  What they want to read from Ms. Perry,

10   do you have any objections?

11           MR. CHIEFFO:  There's four objections, I think and

12   there was one objection from the other side to something I

13   counter-designated.  I don't intend to read anything.

14           THE COURT:  Folks, this is not the way to do this.

15           MS. LEPERA:  If I might offer a solution.  If

16   Ms. Perry is here, it would seem to me that you would have

17   the opportunity to call her, and then they could do whatever

18   they wish to do on cross.  Ultimately, she will be provided

19   as a defense witness in this exam, and then to the extent

20   there's additional deposition testimony to be read in beyond

21   what's been accomplished live, it can be done later is my

22   suggestion.

23           THE COURT:  Mr. Kahn, what do you think about that?

24           MR. KAHN:  I don't think the excerpts we're going

25   to read are even going to take a half hour.  It's just very

EXHIBIT  1
PAGE  57

```
 1    short.  It's not going to be more than a half hour.  Boom,

 2    boom, boom for our case, and then Mr. Chieffo will take over.

 3              MR. CHIEFFO:  My view is that her live testimony

 4    will be approximately the same.

 5              THE COURT:  Okay.  Well, here's what I think we

 6    need to do then.  The plaintiff's are going to call Ms. Perry

 7    in your case and examine her or read whatever you're going to

 8    read.  Mr. Chieffo will quote conduct cross-examination.  I

 9    will tell the jury that he is going to examine her as he

10    would have in the defense case because she's traveling.  And

11    that we have the same problem with some of the plaintiffs and

12    that's why we're approaching it this way.

13              MR. CHIEFFO:  That would be fine, Your Honor.

14              THE COURT:  Mr. Kahn, is that workable?

15              MR. KAHN:  And I think it's pretty straightforward.

16    You're not going to read the counter-designations.  You're

17    going to ask her the questions.

18              THE COURT:  Do we have Ms. Perry's deposition?

19              THE CLERK:  I do not.

20              MR. CHIEFFO:  Which is not here?  I thought the

21    marked deposition --

22              THE CLERK:  Ms. Hudson.

23              MR. CHIEFFO:  I know.  Do you have the marked

24    depositions here?

25              MS. COHEN:  The index is here.
```

UNITED STATES DISTRICT COURT

EXHIBIT 1
PAGE 58

```
 1              THE COURT:  That's not the way you do it.  You've

 2     got to give me a marked deposition with objections in the

 3     margins.  If you read our rules, if you're a plaintiff, you

 4     mark in blue.  If you're a defendant, you mark in red.

 5              MS. COHEN:  We have it prepared, Your Honor.  We

 6     will get it to you.  We can file it or --

 7              THE COURT:  No, give it to Ms. Jeang.  Don't file

 8     anything because it will take five years to get to this

 9     courtroom.

10              MS. COHEN:  I will bring hard copies tomorrow.

11              THE COURT:  Let's do that.

12              MR. CHIEFFO:  We have three clean copies.

13              MS. COHEN:  No, they're marked.

14              THE COURT:  I can't do this without something

15     marked telling me what I'm looking at and what the objection

16     is.

17              MR. CHIEFFO:  Counsel has marked them.

18              MS. COHEN:  We shared them.

19              MR. CHIEFFO:  And so unfortunately, we skipped an

20     important step I see.  So we need to get them to you.

21              THE COURT:  Yes, you need to lodge them.  That's

22     the problem.  Okay.  So I think we have a general plan.  I

23     unfortunately am going to have to end around 4:45 tomorrow at

24     the latest, but I think we will be able to do what we're

25     talking about in that period of time.
```

UNITED STATES DISTRICT COURT

EXHIBIT 1
PAGE 59

```
 1          MR. CHIEFFO:  It doesn't seem difficult to me.  We
 2    have two witnesses tomorrow who will never be back here.  We
 3    have other witnesses who will be.  We'll meet and confer and
 4    figure out how to do it.
 5          THE COURT:  Well, let me just be as direct as I
 6    can.  I have an engagement tomorrow night.  If you think we
 7    are not going to be done, then I am going to tell my husband
 8    to take the people himself and I will stay here with you, but
 9    I need to know what we're doing.  And maybe I have to wait
10    until tomorrow and warn him that is a possibility.
11          MS. LEPERA:  Your Honor, I hate to see you do that.
12    It's really math.  If we have approximately, I would say an
13    hour, hour 15 with Mr. Lambert.  Openings we already know are
14    roughly an hour-and-a-half themselves.  Then if we put
15    Ms. Perry on with or without the transcripts in the middle
16    before Mr. Chike gets on for direct, it would seem to
17    alleviate the problem.  That's the question I have and that's
18    the only issue, I think, that might bump it out if they want
19    to put Mr. Chike on and leave the cross to Friday.  That
20    might make the time frame more difficult.
21          THE COURT:  I'm not going to issue an order in that
22    regard.  I'm gonna let you people come to an agreement
23    because everyone is trying to accommodate everyone else.  All
24    I'm saying is if we think that we're going later, I don't
25    need to know the answer tonight.  I just want to create a
```

UNITED STATES DISTRICT COURT

EXHIBIT 1
PAGE 60

1    warning that I may not be along for the ride tomorrow with

2    the group.

3              MR. CHIEFFO:  Understood, Your Honor.

4              THE COURT:  Okay.  I've got the picture.  I'll

5    alert him and we'll go from there.  Thank you.

6              MR. CHIEFFO:  Thank you, Your Honor.

7              THE COURT:  We'll see you all in the morning.

8              THE CLERK:  This court is adjourned.

9              (Proceedings were concluded at 4:33 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 1
PAGE 61

```
 1
 2                    CERTIFICATE OF REPORTER
 3
 4   COUNTY OF LOS ANGELES      )
 5                             )  SS.
 6   STATE OF CALIFORNIA        )
 7
 8   I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED
 9   STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,
10   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE
11   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET
12   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN
13   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO
14   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION
15   OF MY STENOGRAPHIC NOTES.
16
17
18   DATE:  JULY 18, 2019
19
20       /s/  LAURA MILLER ELIAS
21   LAURA MILLER ELIAS, CSR 10019
22   FEDERAL OFFICIAL COURT REPORTER
23
24
25
```

UNITED STATES DISTRICT COURT

EXHIBIT 1
PAGE 62

## /

**/s** [1] - 55:20

## 5

**4:45** [1] - 52:23

## 5

**5** [1] - 34:16
**50** [2] - 9:12, 15:9

## 1

**1** [3] - 4:3, 11:16, 34:10
**10019** [2] - 1:21, 55:21
**10:45** [1] - 49:19
**11377** [1] - 2:14
**12:30** [1] - 29:4
**12TH** [1] - 1:22
**15** [5] - 31:7, 31:8, 48:22, 48:24, 53:13
**15-5642** [1] - 4:4
**15-5642-CAS** [1] - 1:8
**17** [2] - 1:15, 4:1
**18** [1] - 55:18
**1840** [1] - 2:19
**1900** [1] - 2:19
**1:00** [3] - 46:4, 49:4, 49:5
**1st** [1] - 27:20

## 2

**2** [2] - 34:12, 48:24
**20** [4] - 20:12, 20:17, 20:22, 29:4
**2019** [3] - 1:15, 4:1, 55:18
**208** [1] - 2:9
**2100** [1] - 2:9
**213)894-0374** [1] - 1:23
**25** [3] - 20:12, 20:17, 20:22
**26th** [1] - 27:7
**29** [1] - 3:8
**2nd** [1] - 27:20

## 3

**3** [1] - 34:13
**30** [1] - 48:25
**30th** [1] - 27:20
**31st** [1] - 27:20
**350** [1] - 1:22

## 4

**4** [2] - 3:6, 34:14
**41** [2] - 25:4, 25:5
**411-B** [1] - 4:22
**4455** [1] - 1:22
**45** [4] - 45:21, 48:19, 48:25, 49:17
**4:00** [1] - 46:5
**4:33** [1] - 54:9

## 6

**6** [1] - 34:17
**63105** [2] - 2:6, 2:9

## 7

**7** [1] - 34:19
**7701** [1] - 2:5

## 8

**8** [1] - 34:21

## 9

**90012** [1] - 1:22
**90064** [1] - 2:15
**90067** [1] - 2:20
**9:00** [5] - 29:16, 29:17, 41:19, 41:22, 41:24
**9:15** [1] - 41:24
**9:49** [1] - 4:1
**9th** [3] - 9:1, 28:22, 29:1

## A

**a.m** [1] - 29:16
**A.M** [1] - 4:1
**Aaron** [1] - 4:9
**AARON** [1] - 2:13
**ability** [1] - 34:10
**able** [4] - 7:7, 27:25, 44:3, 52:24
**absolutely** [1] - 28:23
**accept** [2] - 31:16, 35:11
**access** [3] - 43:6, 43:24, 43:25
**accommodate** [3] - 18:24, 49:16, 53:23
**accomplish** [1] - 39:20
**accomplished** [2] - 38:23, 50:21
**accordingly** [1] - 13:15
**account** [2] - 34:9, 38:9
**accounts** [1] - 38:12
**accuracy** [1] - 37:16
**acknowledge** [1] -

33:2
**actual** [1] - 48:12
**add** [4] - 7:19, 7:23, 12:4, 17:21
**added** [3] - 4:21, 4:24, 14:19
**addition** [2] - 7:12, 32:13
**additional** [2] - 5:2, 50:20
**address** [2] - 18:19, 23:7
**addressed** [1] - 22:10
**addressing** [2] - 16:16, 23:2
**adhere** [1] - 28:22
**adjourn** [1] - 29:4
**adjourned** [1] - 54:8
**adjustments** [1] - 40:24
**admissibility** [1] - 20:1
**admitted** [1] - 31:14
**advance** [3] - 20:13, 20:25, 21:3
**adverse** [1] - 50:2
**affects** [1] - 17:16
**afraid** [1] - 11:2
**Africa** [1] - 45:12
**afternoon** [1] - 31:8
**agree** [6] - 15:12, 19:12, 27:11, 30:14, 42:16, 44:11
**agreed** [4] - 19:25, 22:9, 31:15, 40:14
**agreement** [2] - 7:1, 53:22
**agreements** [1] - 19:21
**ahead** [1] - 13:10
**AIDED** [1] - 55:13
**AL** [2] - 1:6, 1:9
**alert** [1] - 54:5
**alleged** [1] - 7:19
**allegedly** [2] - 6:4, 6:9
**alleviate** [1] - 53:17
**allowed** [1] - 30:6
**alternates** [2] - 25:10, 25:11
**amendment** [1] - 13:13
**AMERICA** [1] - 1:1
**amount** [1] - 45:17
**ancillary** [1] - 21:10
**AND** [4] - 55:8, 55:11, 55:13, 55:14
**ANGELES** [6] - 1:16, 1:22, 2:15, 2:20, 4:1, 55:4
**Angeles** [1] - 19:2

**answer** [3] - 24:2, 34:2, 53:25
**answered** [2] - 33:23, 33:24
**anti** [1] - 10:9
**anti-rapper** [1] - 10:9
**anticipate** [2] - 8:9, 24:24
**anticipated** [2] - 8:9, 10:17
**anyway** [1] - 25:1
**apart** [1] - 6:10
**appear** [1] - 33:2
**appearances** [1] - 4:6
**APPEARANCES** [1] - 2:1
**application** [3] - 5:9, 7:4, 36:7
**applications** [1] - 5:3
**applies** [5] - 35:23, 36:10, 36:12, 38:16, 43:15
**apply** [2] - 30:4, 30:13
**appreciate** [1] - 41:14
**approached** [1] - 36:18
**approaching** [1] - 51:12
**appropriate** [1] - 7:21
**argue** [1] - 20:13
**arguing** [3] - 43:12, 44:13, 44:23
**argument** [6] - 5:2, 5:5, 28:16, 41:8, 41:11, 43:4
**arguments** [2] - 31:22, 31:25
**arises** [2] - 7:19, 44:21
**arrangement** [1] - 7:3
**arriving** [1] - 8:19
**art** [1] - 44:17
**articulate** [1] - 48:5
**artist** [2] - 9:8, 9:11
**aside** [3] - 6:1, 6:10, 15:11
**assignment** [1] - 6:25
**assume** [1] - 48:23
**assuming** [1] - 20:21
**assumption** [2] - 26:8, 48:21
**assure** [1] - 15:7
**AT** [1] - 55:11
**attention** [2] - 38:19, 39:7
**attorney** [1] - 11:1
**attorneys** [1] - 32:6
**audio** [3] - 21:13, 21:19, 21:25
**audios** [1] - 22:13

**authenticate** [1] - 20:7
**authored** [1] - 12:10
**authors** [5] - 9:2, 9:15, 10:10, 17:20
**authorship** [2] - 13:24, 14:7
**available** [2] - 13:9, 45:25
**avoid** [1] - 39:25

## B

**background** [2] - 47:1, 48:10
**balance** [1] - 43:14
**bar** [6] - 16:16, 16:22, 16:23, 17:2, 17:10, 18:10, 18:11, 18:25
**based** [4] - 12:19, 27:9, 35:21, 37:24
**basis** [1] - 4:24
**bathroom** [2] - 31:4, 31:9
**bear** [1] - 34:21
**bears** [1] - 13:22
**beat** [12] - 5:5, 6:5, 6:8, 6:20, 9:7, 9:11, 13:14, 14:1, 14:9, 14:14, 48:9, 48:16
**beats** [3] - 10:12, 48:2
**become** [2] - 9:5, 29:2
**begin** [2] - 29:25, 40:2
**beginning** [3] - 8:6, 9:7, 46:8
**BEHALF** [3] - 2:2, 2:11, 2:16
**behalf** [2] - 4:10, 4:13
**believability** [1] - 34:21
**believable** [1] - 35:14
**bench** [3] - 39:17, 39:19, 40:1
**best** [2] - 30:22, 38:24
**between** [1] - 33:12
**beyond** [1] - 50:20
**bias** [1] - 34:16
**bifurcated** [2] - 26:1, 26:6
**big** [1] - 25:17
**Black** [1] - 9:1
**blanche** [1] - 22:17
**blog** [1] - 36:7
**blue** [1] - 52:4
**blurted** [1] - 17:4
**boom** [3] - 51:1, 51:2
**BOULEVARD** [2] - 2:5, 2:14
**brand** [1] - 29:1
**break** [3] - 31:4, 31:5, 31:8

**breaks** [1] - 31:9
**briefly** [2] - 8:14, 10:4
**bring** [3] - 15:25, 24:19, 52:10
**brought** [1] - 15:7
**bump** [1] - 53:18
**bunch** [1] - 26:20
**burden** [2] - 13:22, 41:11
**business** [1] - 20:5
**busy** [1] - 13:9
**BY** [5] - 2:3, 2:8, 2:12, 2:18, 55:13

**C**

**C.J** [1] - 25:3
**CA** [2] - 2:15, 2:20
**Calendar** [1] - 4:3
**CALIFORNIA** [6] - 1:2, 1:16, 1:22, 4:1, 55:6, 55:9
**camouflage** [1] - 6:19
**cannot** [3] - 19:1, 33:24, 33:25
**CAPES** [1] - 2:3
**care** [1] - 24:12
**carefully** [1] - 38:25
**carte** [1] - 22:17
**case** [68] - 6:15, 8:6, 8:10, 9:14, 9:17, 12:22, 13:1, 13:23, 14:23, 17:17, 18:13, 18:17, 21:1, 21:14, 22:4, 22:18, 25:16, 25:25, 26:3, 26:6, 26:10, 26:15, 30:2, 30:10, 30:12, 30:17, 32:18, 32:25, 34:5, 34:15, 35:20, 35:21, 35:22, 35:24, 36:1, 36:4, 36:5, 36:11, 36:16, 36:19, 36:25, 37:3, 37:6, 37:8, 37:11, 37:14, 37:24, 38:10, 38:12, 38:14, 38:15, 39:4, 40:8, 40:17, 41:12, 41:18, 42:25, 43:16, 43:18, 43:24, 46:20, 47:6, 47:9, 51:2, 51:7, 51:10
**CASE** [1] - 1:8
**Case** [1] - 4:4
**case-in-chief** [2] - 8:10, 21:1
**cases** [5] - 12:17, 18:14, 25:12, 28:24, 29:1
**category** [1] - 20:20

**CENTRAL** [2] - 1:2, 55:9
**CENTURY** [1] - 2:19
**certain** [4] - 18:14, 31:20, 39:23, 42:10
**certainly** [2] - 24:7, 24:9
**CERTIFICATE** [1] - 55:2
**CERTIFY** [2] - 55:10, 55:13
**cetera** [1] - 43:9
**change** [1] - 10:14
**charges** [1] - 28:12
**chart** [1] - 44:2
**charts** [1] - 45:1
**chat** [1] - 36:7
**Chat** [1] - 36:9
**chief** [2] - 8:10, 21:1
**Chieffo** [5] - 4:13, 45:7, 45:14, 51:2, 51:8
**CHIEFFO** [27] - 2:18, 4:12, 4:16, 12:3, 12:8, 12:12, 12:23, 13:3, 13:7, 13:11, 45:17, 46:14, 46:21, 47:5, 49:5, 49:24, 50:11, 51:3, 51:13, 51:20, 51:23, 52:12, 52:17, 52:19, 53:1, 54:3, 54:6
**Chike** [7] - 47:16, 47:21, 47:24, 48:8, 48:23, 53:16, 53:19
**choice** [1] - 11:9, 11:11, 11:12
**choose** [1] - 35:7
**CHRISTINA** [1] - 1:4
**Christine** [1] - 4:9
**CHRISTINE** [1] - 2:12
**Circuit** [3] - 9:1, 28:22, 29:1
**circumstantial** [3] - 33:6, 33:9, 33:13
**cited** [1] - 9:14
**civil** [2] - 25:11, 30:4
**claim** [1] - 43:17
**claiming** [1] - 17:19
**claims** [4] - 4:23, 4:25, 5:8, 7:19
**clarification** [2] - 13:16, 42:5
**clarified** [2] - 20:16, 44:12
**clarify** [1] - 12:13
**CLAYTON** [1] - 2:9
**clean** [1] - 52:12
**clear** [4] - 13:19, 14:11, 44:5, 44:17

**clearer** [1] - 48:7
**clearly** [3] - 9:13, 15:6, 15:15
**CLERK** [7] - 4:3, 25:4, 29:7, 41:20, 51:19, 51:22, 54:8
**clients** [5] - 18:14, 24:25, 25:1, 32:6
**clock** [1] - 49:15
**clockwise** [1] - 49:22
**close** [3] - 28:12, 29:17, 38:19
**closes** [1] - 28:16
**closing** [5] - 27:24, 28:16, 41:8, 43:12, 44:24
**closings** [1] - 31:25
**COHEN** [13] - 2:4, 21:10, 21:12, 21:22, 23:19, 23:21, 24:4, 24:16, 51:25, 52:5, 52:10, 52:13, 52:18
**Cohen** [2] - 4:7, 21:9
**colleagues** [1] - 19:3
**commence** [1] - 39:14
**commentary** [3] - 36:24, 38:9, 38:12
**commenting** [1] - 30:25
**common** [1] - 14:4
**communicate** [4] - 32:25, 33:4, 36:2, 36:3
**communicating** [2] - 36:10, 36:12
**communication** [1] - 37:20
**company** [1] - 4:14
**competent** [1] - 27:24
**complete** [1] - 47:11
**completed** [2] - 6:21, 35:19
**completely** [1] - 18:13
**complicated** [1] - 48:13
**composition** [1] - 23:12
**COMPUTER** [1] - 55:13
**COMPUTER-AIDED** [1] - 55:13
**conceal** [1] - 7:2
**concern** [1] - 17:22
**concluded** [2] - 18:25, 54:9
**conclusion** [1] - 25:16
**concocted** [1] - 14:7
**conduct** [2] - 35:16, 51:8
**confer** [3] - 24:6,

28:21, 53:3
**conference** [3] - 13:13, 40:25, 41:3
**conferences** [4] - 39:18, 39:19, 39:22, 40:1
**confident** [2] - 14:20, 15:8
**confidentially** [1] - 16:21
**confirm** [1] - 8:22
**conflict** [2] - 7:19, 11:24
**confusion** [4] - 39:25, 49:24, 50:5, 50:8
**connection** [1] - 7:18
**consciousness** [1] - 39:9
**consequence** [2] - 5:1, 5:12
**consider** [9] - 31:17, 31:18, 31:20, 32:12, 32:15, 33:11, 34:4, 35:3, 36:23
**considering** [1] - 34:8
**consistent** [2] - 14:17, 34:23
**constitutes** [2] - 43:19, 44:23
**consulting** [1] - 37:1
**contact** [1] - 36:20
**contacted** [1] - 48:12
**contains** [1] - 6:11
**contend** [1] - 29:21
**contention** [3] - 13:14, 15:11, 15:21
**contradicted** [1] - 34:17
**contrast** [1] - 33:9
**contribute** [1] - 9:3
**control** [1] - 33:16
**controls** [1] - 32:4
**convinced** [1] - 8:12
**copies** [3] - 41:7, 52:10, 52:12
**copy** [2] - 8:18, 8:19
**Copyright** [5] - 7:5, 8:23, 10:13, 11:15, 12:20
**copyright** [16] - 4:22, 5:3, 5:6, 5:9, 5:11, 6:3, 6:8, 6:14, 7:4, 8:18, 9:4, 13:21, 13:22, 14:5, 14:10, 29:1
**copyrightable** [4] - 9:4, 9:5, 13:14, 14:3
**copyrighted** [2] - 5:5, 10:12
**Copyrights** [1] - 6:2

**CORRECT** [1] - 55:14
**correct** [4] - 4:20, 20:22, 22:12, 44:9
**correspondence** [1] - 7:5
**costs** [1] - 26:18
**COUNSEL** [1] - 2:1
**counsel** [14] - 8:2, 8:5, 8:9, 11:8, 11:20, 20:4, 20:23, 24:23, 29:14, 40:10, 40:12, 42:12, 46:23, 52:17
**Counsel** [1] - 4:6
**count** [1] - 25:4
**counted** [1] - 20:18
**counter** [3] - 46:15, 50:13, 51:16
**counter-designated** [1] - 50:13
**counter-designations** [2] - 46:15, 51:16
**country** [1] - 46:1
**COUNTY** [1] - 55:4
**couple** [3] - 16:2, 17:6, 29:14
**course** [7] - 4:22, 21:14, 27:19, 29:20, 31:10, 33:15, 35:25
**court** [7] - 12:6, 32:16, 37:15, 37:25, 41:3, 54:8
**Court** [5] - 5:10, 9:18, 11:14, 13:12, 15:7, 16:7, 16:16, 19:23, 19:24, 20:21, 21:7, 36:21, 38:8, 42:15, 43:1, 43:17, 43:20, 44:18
**COURT** [110] - 1:1, 1:21, 4:15, 4:18, 5:23, 7:16, 7:24, 8:5, 8:12, 9:20, 9:24, 10:1, 10:5, 10:21, 10:24, 11:11, 12:2, 12:5, 12:11, 12:21, 12:24, 13:5, 13:8, 13:12, 13:18, 14:15, 14:17, 14:22, 14:25, 15:11, 15:16, 15:24, 16:4, 16:18, 17:8, 17:11, 17:14, 17:25, 18:7, 18:9, 18:19, 18:23, 19:1, 19:11, 19:15, 20:3, 20:24, 21:5, 21:9, 21:11, 21:18, 22:5, 22:11, 22:21, 23:9, 23:20, 24:3, 24:5, 24:12, 24:15, 24:17, 25:5,

25:11, 25:14, 25:21, 26:14, 26:22, 27:4, 27:14, 27:17, 28:2, 28:6, 28:15, 28:18, 29:11, 41:22, 42:7, 42:22, 43:13, 44:16, 44:20, 44:25, 46:7, 46:19, 47:4, 47:10, 47:15, 47:18, 47:23, 48:1, 49:3, 49:9, 49:18, 50:7, 50:14, 50:23, 51:5, 51:14, 51:18, 52:1, 52:7, 52:11, 52:14, 52:21, 53:5, 53:21, 54:4, 54:7, 55:9, 55:22

**Court's** [2] - 32:9, 44:5

**court's** [1] - 29:7

**courtroom** [3] - 32:19, 37:19, 52:9

**cover** [3] - 10:19, 14:13, 46:16

**covered** [4] - 6:18, 15:19, 46:23, 50:5

**create** [3] - 16:15, 48:11, 53:25

**created** [10] - 6:18, 9:15, 10:11, 11:24, 14:1, 15:10, 46:25, 48:11, 48:16

**creation** [3] - 6:22, 48:9, 48:12

**critical** [2] - 6:16, 7:10

**critically** [1] - 16:25

**cross** [20] - 7:14, 8:11, 23:4, 23:8, 40:11, 40:12, 40:21, 40:23, 47:22, 47:23, 48:3, 48:7, 48:23, 49:11, 49:13, 49:23, 50:4, 50:18, 51:8, 53:19

**cross-examination** [4] - 8:11, 47:22, 48:3, 51:8

**cross-examine** [4] - 40:11, 40:12, 40:21, 40:23

**CSR** [2] - 1:21, 55:21

**CV** [1] - 1:8

### D

**damage** [2] - 26:3, 26:10

**damages** [1] - 26:12

**Dark** [1] - 46:25

**DATE** [1] - 55:18

**day-and-a-half** [2] - 26:13, 26:23

**days** [7] - 27:1, 27:2, 27:8, 27:9, 27:16, 28:12, 28:14

**deal** [2] - 16:23, 27:22

**dealing** [1] - 15:16

**dealt** [1] - 19:6

**decide** [11] - 25:2, 30:17, 32:17, 33:14, 34:6, 35:4, 35:18, 35:21, 37:24, 39:3, 39:23

**decided** [2] - 37:14, 38:14

**deciding** [2] - 31:21, 34:5

**decision** [3] - 5:19, 7:13, 12:19

**decisions** [1] - 31:12

**DEFENDANT** [1] - 1:10

**defendant** [7] - 5:22, 40:10, 40:11, 40:20, 40:21, 45:25, 52:4

**defendants** [4] - 4:10, 8:17, 10:15, 17:22, 26:17, 26:19

**DEFENDANTS** [2] - 2:11, 2:16

**defense** [10] - 5:4, 11:12, 13:21, 15:19, 15:20, 40:16, 40:22, 47:6, 50:19, 51:10

**defenses** [4] - 4:21, 5:2, 11:13, 14:19

**delay** [4] - 4:25, 5:13, 5:14

**deliberate** [1] - 25:16

**deliberately** [1] - 35:6

**deliberation** [1] - 36:11

**deliberations** [5] - 30:10, 35:19, 38:20, 38:24, 39:14

**demonstrate** [3] - 18:2, 43:25, 44:8

**demonstratives** [5] - 16:6, 19:9, 19:13, 42:14, 43:7

**denied** [1] - 37:25

**deposition** [13] - 7:8, 20:19, 20:24, 40:25, 45:22, 46:13, 46:18, 50:1, 50:20, 51:18, 51:21, 52:2

**depositions** [1] - 51:24

**derivative** [9] - 5:8, 6:6, 6:7, 6:13, 6:20, 7:2, 12:9, 14:8, 14:11

**derived** [1] - 14:12

**describe** [1] - 41:12

**deserves** [1] - 35:15

**designated** [1] - 50:13

**designations** [4] - 20:19, 45:18, 46:15, 51:16

**deviate** [1] - 19:12

**devices** [1] - 37:6

**dictionaries** [1] - 37:1

**differ** [1] - 32:2

**difference** [1] - 39:14

**differences** [1] - 35:4

**different** [4] - 9:16, 22:9, 34:24

**differently** [1] - 35:3

**differs** [1] - 35:5

**difficult** [2] - 53:1, 53:20

**dire** [2] - 19:6, 24:20

**direct** [18] - 33:6, 33:7, 33:13, 45:17, 48:5, 48:8, 48:18, 48:22, 48:25, 49:11, 49:12, 49:17, 49:23, 50:3, 50:4, 53:5, 53:16

**directly** [1] - 26:2

**disagree** [1] - 15:14

**disagreeing** [2] - 12:3, 12:16

**disappearing** [1] - 46:3

**disclose** [2] - 11:13, 26:5

**disclosed** [3] - 4:23, 5:12, 23:15

**discuss** [7] - 16:7, 16:21, 17:6, 18:10, 36:20, 39:15, 45:7

**discussed** [4] - 25:7, 37:5, 37:7, 46:15

**discussing** [1] - 36:5

**dislikes** [1] - 30:16

**dispositive** [1] - 10:10

**dispute** [5] - 15:13, 15:15, 16:9, 20:17, 22:6

**disputes** [1] - 16:5

**disqualify** [4] - 5:16, 10:25, 11:19, 11:23

**disregard** [1] - 32:11

**dissemination** [2] - 42:12, 42:20

**distinction** [1] - 33:12

**distract** [1] - 39:4

**DISTRICT** [5] - 1:1, 1:2, 1:4, 55:9

**diverting** [1] - 39:6

**DIVISION** [1] - 1:2

**DO** [2] - 55:10, 55:13

**documentary** [1] -
21:13

**done** [6] - 16:10, 16:20, 21:4, 46:5, 50:21, 53:7

**down** [5] - 5:13, 15:25, 19:16, 21:6, 24:20

**during** [9] - 4:17, 8:11, 22:3, 28:13, 30:20, 35:25, 37:7, 38:20

**duty** [4] - 30:2, 30:11, 32:6, 35:25

### E

**EAST** [1] - 2:19

**efficient** [1] - 20:10

**efficiently** [1] - 41:16

**effort** [1] - 41:14

**eight** [4] - 25:8, 25:18, 25:22

**either** [4] - 20:15, 22:3, 33:1, 33:13

**electronic** [1] - 36:6

**ELIAS** [4] - 1:21, 55:8, 55:20, 55:21

**email** [1] - 36:6

**Emanuel** [2] - 47:17, 47:24

**Emanuel's** [1] - 47:20

**embroiled** [1] - 18:15

**employer** [2] - 36:13, 36:16

**encompass** [2] - 6:9, 14:1

**encompassed** [1] - 14:5

**encompasses** [1] - 6:4

**encourage** [1] - 28:20

**end** [5] - 27:23, 30:8, 35:19, 36:1, 52:23

**engagement** [1] - 53:6

**entangled** [1] - 6:6

**entire** [5] - 16:15, 17:5, 28:1, 38:5, 45:22

**entitled** [1] - 37:23

**Eric** [1] - 4:7

**ERIC** [1] - 2:8

**error** [1] - 39:25

**ESQ** [7] - 2:3, 2:4, 2:8, 2:12, 2:13, 2:13, 2:18

**essential** [1] - 28:23

**essentially** [4] - 6:19, 7:2, 7:8, 43:8

**establish** [3] - 6:17, 7:7, 13:22

**established** [1] - 10:20

**establishes** [1] - 26:9

**estimate** [3] - 27:15, 28:7, 48:17

**et** [1] - 43:9

**ET** [2] - 1:6, 1:9

**evening** [1] - 45:12

**event** [3] - 28:4, 35:2, 41:13

**evidence** [66] - 6:23, 8:24, 10:15, 14:21, 19:16, 20:5, 21:16, 22:18, 28:16, 30:5, 30:12, 30:17, 30:21, 31:11, 31:13, 31:14, 31:16, 31:19, 31:20, 31:23, 32:1, 32:2, 32:6, 32:11, 32:13, 32:17, 32:18, 33:6, 33:7, 33:9, 33:11, 33:13, 33:14, 33:17, 33:18, 33:19, 34:3, 34:4, 34:17, 34:20, 35:12, 35:22, 36:22, 37:14, 38:15, 39:2, 39:9, 39:24, 40:4, 40:6, 40:10, 40:11, 40:21, 40:22, 41:6, 42:10, 42:11, 42:17, 42:18, 42:19, 42:21, 43:4, 43:22, 44:6, 45:14

**Evidence** [4] - 32:8, 33:16, 33:21, 39:24

**ex** [1] - 11:18

**exactly** [1] - 14:24

**exam** [1] - 50:19

**examination** [6] - 8:11, 46:22, 47:22, 48:3, 50:4, 51:8

**examine** [7] - 40:11, 40:12, 40:21, 40:23, 50:3, 51:7, 51:9

**examined** [1] - 18:4

**example** [4] - 23:4, 30:22, 31:21, 45:6

**examples** [1] - 31:22

**exception** [1] - 22:1

**excerpts** [1] - 50:24

**excluded** [2] - 5:10, 32:10

**exclusively** [1] - 38:15

**excused** [1] - 37:10

**exercise** [1] - 23:8

**exhibit** [11] - 16:9, 19:25, 20:4, 20:6, 23:5, 23:16, 24:1, 24:4, 33:19, 33:23, 33:25

**exhibits** [7] - 19:18, 20:11, 21:8, 21:13,

23:7, 31:14, 31:19
**existed** [1] - 14:12
**expansion** [1] - 46:17
**expect** [2] - 36:17, 43:20
**expects** [1] - 40:5
**experience** [1] - 25:19
**expert** [5] - 15:2, 23:10, 23:11, 26:18, 26:25
**experts** [4] - 22:14, 22:16, 26:20, 26:25
**explain** [3] - 40:17, 42:9, 42:10
**exploited** [1] - 6:21
**exposed** [3] - 35:23, 38:7, 38:17
**expression** [1] - 6:5
**extend** [1] - 38:23
**extent** [4] - 15:20, 18:16, 24:25, 50:19
**extra** [1] - 31:9
**extrinsic** [2] - 42:17, 43:2

## F

**Facebook** [1] - 36:8
**fact** [10] - 6:19, 9:14, 10:7, 10:14, 11:7, 14:7, 26:9, 33:7, 33:10, 35:12
**factors** [1] - 34:21
**facts** [12] - 7:3, 7:6, 30:11, 30:12, 31:15, 31:21, 32:2, 33:10, 34:5, 39:12, 43:3
**failure** [1] - 7:14
**fair** [5] - 27:20, 27:21, 37:23, 38:1, 44:3
**fairly** [2] - 20:11, 25:24
**fairness** [1] - 38:4
**false** [1] - 6:11
**familiar** [2] - 29:2, 42:25
**family** [2] - 36:13, 36:15
**famous** [1] - 26:11
**far** [5] - 4:20, 21:15, 23:5, 26:18
**feasible** [1] - 25:10
**FEDERAL** [2] - 1:21, 55:22
**fellow** [2] - 35:19, 36:10
**few** [3] - 19:10, 20:18, 35:16
**fight** [1] - 25:18
**figure** [4] - 12:13, 42:1, 49:15, 53:4

**file** [3] - 24:2, 52:6, 52:7
**filed** [2] - 6:19, 13:24
**files** [6] - 21:13, 21:19, 21:25, 23:23, 24:1, 48:14
**final** [2] - 30:9, 41:7
**finally** [1] - 8:19
**fine** [6] - 11:25, 20:15, 39:7, 44:22, 49:14, 51:13
**finish** [1] - 39:21
**finished** [2] - 9:12, 49:6
**FIRST** [1] - 1:22
**first** [12] - 5:21, 10:8, 11:3, 19:9, 20:3, 20:5, 23:13, 31:22, 35:17, 40:3, 46:2, 49:25
**five** [2] - 27:2, 27:16, 52:8
**flagged** [1] - 15:15
**FLOOR** [1] - 2:5
**flying** [1] - 45:12
**folks** [2] - 49:3, 50:14
**follow** [4] - 17:1, 30:13, 38:2
**follow-up** [1] - 17:1
**following** [1] - 18:11
**FOR** [2] - 55:8, 55:9
**FOREGOING** [1] - 55:11
**foreground** [1] - 48:11
**forever** [1] - 24:18
**forge** [1] - 13:10
**forget** [1] - 34:25
**FORM** [1] - 55:13
**formal** [1] - 31:6
**forms** [1] - 36:9
**FORSYTH** [1] - 2:5
**FORTH** [1] - 55:12
**forward** [1] - 13:6
**four** [3] - 27:2, 27:15, 50:11
**fourish** [1] - 27:2
**frame** [1] - 53:20
**frankly** [1] - 15:18
**fraud** [1] - 13:21
**Friday** [8] - 27:6, 46:6, 49:7, 49:8, 49:10, 49:11, 49:13, 53:19
**friendly** [1] - 49:9
**full** [1] - 49:22
**fully** [1] - 22:7
**FURTHER** [1] - 55:14

## G

**Gabby** [1] - 4:10

**gain** [1] - 37:19
**general** [1] - 52:22
**generally** [1] - 44:4
**gentlemen** [1] - 29:12
**given** [5] - 12:21, 19:21, 25:23, 33:13, 38:20
**gong** [1] - 5:17
**gonna** [26] - 7:7, 8:17, 8:20, 11:5, 11:22, 12:13, 17:22, 17:24, 18:2, 18:3, 20:8, 20:25, 22:23, 24:7, 24:21, 26:10, 29:17, 42:21, 44:18, 45:20, 46:4, 48:2, 48:3, 48:14, 49:6, 53:22
**gottwald** [1] - 18:15
**govern** [1] - 30:10
**government** [1] - 8:19
**gray** [4] - 9:11, 47:12, 47:13, 48:12
**Gray** [1] - 4:5
**GRAY** [1] - 1:6
**GREENBERG** [1] - 2:17
**grounds** [1] - 11:1
**group** [3] - 15:25, 39:10, 54:2
**guess** [7] - 7:16, 9:20, 23:9, 26:2, 27:19, 34:2
**guiding** [1] - 28:24
**guys** [1] - 21:22

## H

**half** [7] - 26:13, 26:23, 47:21, 48:15, 50:25, 51:1, 53:14
**hand** [6] - 25:25, 31:3, 31:5, 31:18, 33:23, 35:9
**handle** [1] - 19:24
**handled** [1] - 21:17
**HANLEY** [1] - 2:9
**happy** [2] - 24:4, 24:10
**hard** [1] - 52:10
**hate** [1] - 53:11
**headphones** [4] - 22:19, 22:22, 22:24, 23:13
**hear** [13] - 7:21, 8:13, 9:18, 14:16, 22:2, 23:13, 31:11, 32:16, 34:11, 37:11, 39:9, 42:22, 43:21
**heard** [6] - 5:20, 5:22, 8:2, 18:16, 18:17, 33:8

**hearing** [4] - 5:2, 16:23, 41:8, 49:16
**held** [1] - 18:11
**help** [5] - 30:3, 30:5, 32:1, 39:1, 40:4
**helpful** [2] - 23:8, 48:4
**HEREBY** [1] - 55:10
**HEREINBEFORE** [1] - 55:11
**highly** [1] - 27:24
**himself** [1] - 53:8
**hinge** [1] - 8:25
**hold** [2] - 24:18, 31:6
**home** [1] - 29:15
**Honor** [47] - 4:12, 5:25, 6:1, 6:13, 6:17, 7:6, 7:10, 7:13, 7:23, 8:4, 8:8, 8:11, 9:23, 9:25, 10:4, 10:23, 11:4, 12:1, 12:3, 12:23, 13:3, 13:11, 13:17, 15:22, 15:23, 16:3, 17:6, 19:8, 21:4, 24:11, 24:14, 25:9, 27:12, 27:21, 28:5, 28:11, 42:4, 44:11, 44:22, 47:13, 48:8, 49:14, 51:13, 52:5, 53:11, 54:3, 54:6
**Honor's** [3] - 12:4, 12:16, 22:10
**HONORABLE** [1] - 1:4
**hope** [1] - 20:17
**hopefully** [4] - 27:25, 31:9, 46:10, 47:16
**hopes** [2] - 9:8, 41:22
**hoping** [1] - 27:22
**Horse** [1] - 46:25
**hospital** [1] - 28:9
**hour** [1] - 45:23, 47:20, 47:21, 48:15, 48:19, 48:22, 48:24, 50:25, 51:1, 53:13, 53:14
**hour-and-a-half** [2] - 47:21, 53:14
**hours** [1] - 48:24
**house** [1] - 27:24
**housekeeping** [2] - 16:2, 24:13
**Hudson** [6] - 4:17, 45:13, 49:8, 49:16, 49:17, 51:22
**husband** [1] - 53:7

## I

**i.e** [1] - 14:3
**ignore** [3] - 34:1,

35:12, 38:10
**immediately** [2] - 38:8, 38:18
**immense** [1] - 22:25
**impartial** [1] - 37:24
**important** [7] - 16:25, 17:16, 29:22, 35:7, 35:14, 38:2, 52:20
**improper** [2] - 32:7, 37:19
**IN** [1] - 55:8
**inaccurate** [1] - 37:21
**inadvertently** [1] - 17:4
**inception** [1] - 13:25
**includes** [1] - 36:4
**including** [5] - 9:11, 36:7, 36:12, 37:9, 47:23
**incomplete** [1] - 37:21
**incorrect** [1] - 14:19
**independent** [1] - 39:12
**independently** [2] - 9:3, 9:5
**index** [1] - 51:25
**INDEX** [1] - 3:2
**indicated** [2] - 17:25, 32:20
**individual** [1] - 26:17
**infection** [1] - 17:5
**influenced** [4] - 30:15, 32:8, 32:9, 37:20
**information** [7] - 35:24, 37:19, 37:21, 37:25, 38:7, 38:17, 39:23
**infringed** [2] - 6:5, 6:9
**infringement** [4] - 26:9, 43:17, 43:19, 44:8
**input** [3] - 4:21, 5:11, 6:2
**insofar** [1] - 5:2
**Instagram** [1] - 36:8
**instruct** [8] - 27:18, 28:15, 28:19, 29:15, 30:2, 32:25, 43:1, 43:20
**instructed** [3] - 31:16, 32:11, 43:15
**instruction** [1] - 44:18
**INSTRUCTION** [1] - 3:8
**instructions** [17] - 28:23, 28:25, 29:1, 29:13, 29:25, 30:3, 30:7, 30:9, 30:19, 35:22, 36:23, 38:16, 41:7, 43:18, 44:6

instrumental [3] - 23:23, 23:25, 48:9
intend [6] - 6:17, 23:1, 29:20, 44:6, 50:1, 50:13
intended [3] - 10:9, 29:19, 32:1
intending [1] - 23:5
intention [2] - 5:1, 17:20
interest [2] - 9:12, 34:14
Internet [5] - 6:21, 6:22, 36:6, 37:2, 37:6
interpret [1] - 32:1
intrinsic [2] - 42:18, 43:2
introduce [2] - 24:23, 25:1
introducing [1] - 21:15
invasive [1] - 24:23
investigation [2] - 37:3, 37:18
involved [2] - 36:14, 37:9
involves [1] - 35:24
involving [1] - 18:14
IS [1] - 55:14
issue [33] - 6:1, 6:3, 6:7, 6:11, 6:13, 6:15, 6:17, 7:12, 8:4, 9:24, 10:1, 12:13, 12:17, 12:19, 13:20, 14:4, 15:5, 15:18, 18:23, 19:3, 19:6, 19:7, 19:18, 21:8, 21:10, 23:22, 23:24, 27:23, 42:2, 45:24, 53:18, 53:21
issues [8] - 8:16, 17:9, 18:10, 19:8, 24:13, 31:3, 35:24, 45:19
Item [1] - 4:3
item [1] - 9:5
itself [6] - 5:5, 7:5, 13:14, 14:8, 14:13, 45:22

**J**

Jeang [3] - 29:24, 32:20, 52:7
Jeff [1] - 4:9
JEFFREY [1] - 2:13
jeopardizes [1] - 38:4
joint [15] - 8:25, 9:1, 9:2, 9:13, 9:15, 9:19, 13:24, 14:7, 14:21,

15:5, 17:18, 17:19, 19:19, 23:16
jointly [1] - 12:10
Joyful [8] - 6:7, 6:8, 6:22, 7:3, 8:25, 13:23, 14:6, 14:8
judge [2] - 23:21, 39:12
Judge [4] - 12:25, 14:16, 21:23, 44:19
JUDGE [1] - 1:4
JULY [3] - 1:15, 4:1, 55:18
juncture [3] - 16:8, 42:24, 45:2
jurisprudence [1] - 14:10
juror [5] - 33:5, 36:16, 38:3, 38:7, 38:17
juror's [1] - 16:14
jurors [10] - 16:1, 16:20, 25:7, 28:7, 30:11, 32:22, 35:17, 35:19, 36:11, 37:10
JURY [1] - 3:8
jury [27] - 12:18, 16:11, 20:1, 20:13, 21:16, 22:23, 24:20, 27:18, 28:12, 29:9, 29:10, 30:1, 32:23, 35:25, 36:18, 37:24, 39:3, 39:11, 39:20, 41:8, 41:18, 41:21, 42:9, 42:25, 43:14, 51:9
jury's [1] - 12:19

**K**

Kahn [7] - 4:7, 10:17, 11:5, 23:2, 42:3, 50:23, 51:14
KAHN [36] - 2:3, 4:7, 8:14, 9:23, 9:25, 10:3, 14:16, 14:20, 14:24, 15:1, 15:14, 15:22, 17:13, 17:15, 18:16, 18:8, 21:24, 25:17, 26:11, 26:16, 27:12, 27:21, 28:5, 42:4, 42:8, 44:11, 44:19, 45:7, 47:13, 47:16, 47:20, 47:24, 48:8, 48:19, 50:24, 51:15
Kahn's [1] - 10:7
Katy [1] - 4:5
KATY [1] - 1:9
KAYIRA [2] - 2:7, 2:8
Kayira [16] - 4:8, 5:16,

6:16, 6:23, 7:10, 7:15, 7:20, 7:25, 8:15, 8:22, 9:22, 10:20, 11:7, 11:19, 15:1, 17:21
Kayira's [2] - 5:17, 17:16
keep [6] - 30:6, 35:17, 39:2, 39:22, 40:1, 40:19
kind [6] - 26:14, 33:2, 39:6, 42:19, 42:20
kinds [1] - 33:11
Klausner [1] - 12:25
knowing [2] - 12:18, 46:11
known [2] - 11:16, 46:9
knows [3] - 21:14, 23:2, 29:24
KNUPP [1] - 2:12

**L**

ladies [1] - 29:12
Lambert [8] - 48:6, 48:20, 48:25, 49:8, 49:10, 49:12, 49:21, 53:13
language [1] - 47:10
largely [1] - 6:19
last [5] - 8:14, 11:13, 25:4, 26:11, 36:17
late [1] - 13:2
latest [1] - 52:24
latter [1] - 39:10
LAURA [4] - 1:21, 55:8, 55:20, 55:21
Laura [1] - 4:7
LAUREN [1] - 2:4
law [12] - 7:21, 9:1, 14:10, 15:2, 30:2, 30:13, 30:14, 33:12, 35:23, 37:8, 38:16, 43:15
LAW [1] - 2:7
lawsuit [1] - 6:19
lawyer [5] - 9:18, 30:25, 33:18, 33:19, 33:21
lawyers [9] - 16:22, 31:15, 31:23, 31:24, 32:3, 32:5, 32:24, 33:3, 37:10
lay [2] - 43:3, 47:10
learn [1] - 37:3
least [3] - 21:18, 25:23, 27:8
leave [2] - 45:12, 53:19

leaving [1] - 15:11, 28:8
Lecrae [1] - 6:25
lectern [3] - 5:23, 12:5, 21:11
left [1] - 6:3
legal [5] - 15:11, 15:13, 36:22, 42:25, 44:17
Lepera [10] - 4:9, 13:18, 15:12, 19:6, 21:24, 22:5, 24:13, 26:22, 27:14, 42:13
LEPERA [40] - 2:12, 4:9, 13:16, 13:20, 15:23, 16:2, 16:5, 17:3, 17:10, 18:12, 18:21, 19:8, 19:14, 19:17, 20:15, 21:4, 21:7, 22:6, 22:12, 23:1, 23:14, 23:25, 24:10, 24:14, 25:9, 25:13, 26:23, 27:15, 28:11, 28:17, 42:24, 44:9, 44:22, 48:4, 48:17, 48:21, 49:14, 49:21, 50:15, 53:11
Lepera's [1] - 42:22
less [4] - 20:16, 20:17, 20:22, 48:20
Letter [1] - 9:1
level [1] - 15:19
liability [1] - 26:7
light [3] - 9:21, 26:14, 34:20
limine [3] - 7:13, 7:18, 19:21
limines [1] - 8:4
limited [4] - 11:5, 20:11, 32:14, 36:8
line [1] - 26:8
LinkedIn [1] - 36:8
list [10] - 8:1, 8:7, 11:7, 11:9, 16:9, 19:19, 23:5, 23:16, 24:1, 24:4
listed [4] - 7:25, 8:15, 11:1, 11:19
listen [4] - 30:5, 36:24, 38:11, 38:25
litigations [1] - 18:13
live [4] - 46:13, 46:18, 50:21, 51:3
LLC [1] - 2:7
local [1] - 20:25
lodge [1] - 52:21
longest [1] - 47:14
look [3] - 19:5, 29:2, 49:15
looking [1] - 52:15

Los [1] - 19:2
LOS [6] - 1:16, 1:22, 2:15, 2:20, 4:1, 55:4
LOUIS [1] - 2:6
lunch [1] - 31:8

**M**

main [1] - 13:20
manner [1] - 34:13
MARCUS [1] - 1:6
Marcus [1] - 4:5
margins [2] - 21:2, 52:3
mark [2] - 52:4
marked [6] - 51:21, 51:23, 52:2, 52:13, 52:15, 52:17
mastered [1] - 22:7
material [1] - 6:9
materials [1] - 37:2
math [1] - 53:12
matter [3] - 16:23, 36:20, 42:5
MATTERS [1] - 3:6
matters [4] - 4:19, 16:2, 29:14, 50:5
max [2] - 27:2, 27:3
maximum [1] - 47:21
mean [6] - 14:20, 18:1, 22:22, 27:17, 44:1, 44:2
MEANS [1] - 55:13
means [3] - 28:18, 30:16, 36:6
mechanism [3] - 16:8, 16:16, 18:17
media [6] - 36:9, 36:13, 36:24, 37:11, 38:9, 38:11
meet [4] - 14:21, 24:5, 28:20, 53:3
members [2] - 30:1, 36:13
memory [3] - 32:3, 34:12, 38:25
merits [1] - 36:4
messaging [1] - 36:6
Michael [1] - 4:7
MICHAEL [1] - 2:3
middle [1] - 53:15
might [8] - 17:5, 23:10, 34:2, 46:5, 48:7, 50:15, 53:18, 53:20
MILLER [3] - 1:21, 55:20, 55:21
mind [2] - 10:10, 35:17
minimize [1] - 39:18

minimum [1] - 40:1
minor [1] - 7:12
minute [3] - 11:13, 15:12, 49:17
minutes [6] - 29:4, 31:7, 31:8, 45:21, 48:19, 48:24
misleading [1] - 37:21
misstatements [3] - 5:3, 5:9, 12:18
mistakes [1] - 34:25
mistrial [1] - 38:4
MITCHELL [1] - 2:12
MO [2] - 2:6, 2:9
Moore [1] - 6:25
moot [1] - 5:19
morning [5] - 4:12, 4:15, 31:8, 45:10, 54:7
most [1] - 26:12
motion [2] - 5:16, 11:18
motions [2] - 7:18, 19:21
move [2] - 13:6, 45:19
movement [1] - 7:14
moving [1] - 27:23
Movit [2] - 4:9, 8:14
MOVIT [11] - 2:13, 5:22, 5:25, 7:23, 7:25, 8:7, 10:4, 10:6, 10:23, 11:3, 11:25
Movit's [1] - 8:24
MR [71] - 4:7, 4:12, 4:16, 5:22, 5:25, 7:23, 7:25, 8:7, 8:14, 9:23, 9:25, 10:3, 10:4, 10:6, 10:23, 11:3, 11:25, 12:3, 12:8, 12:12, 12:23, 13:3, 13:7, 13:11, 14:16, 14:20, 14:24, 15:1, 15:14, 15:22, 17:13, 17:15, 18:6, 18:8, 21:24, 25:17, 26:11, 26:16, 27:12, 27:21, 28:5, 42:4, 42:8, 44:11, 44:19, 45:7, 45:17, 46:14, 46:21, 47:5, 47:13, 47:16, 47:20, 47:24, 48:8, 48:19, 49:5, 49:24, 50:11, 50:24, 51:3, 51:13, 51:15, 51:20, 51:23, 52:12, 52:17, 52:19, 53:1, 54:3, 54:6
MS [52] - 2:11, 4:9, 13:16, 13:20, 15:23, 16:2, 16:5, 17:3,

17:10, 18:12, 18:21, 19:8, 19:14, 19:17, 20:15, 21:4, 21:7, 21:10, 21:12, 21:22, 22:6, 22:12, 23:1, 23:14, 23:19, 23:21, 23:25, 24:4, 24:10, 24:14, 24:16, 25:9, 25:13, 26:23, 27:15, 28:11, 28:17, 42:24, 44:9, 44:22, 48:4, 48:17, 48:21, 49:14, 49:21, 50:15, 51:25, 52:5, 52:10, 52:13, 52:18, 53:11
music [2] - 48:10, 48:13
must [12] - 19:1, 30:15, 30:17, 32:11, 34:1, 34:2, 35:21, 35:23, 36:19, 38:10, 38:11, 38:14
MY [1] - 55:15
MySpace [1] - 9:8

## N

narrow [1] - 19:22
narrower [1] - 19:20
nature [2] - 7:3, 43:11
necessarily [1] - 35:13
necessary [1] - 43:24
need [28] - 5:19, 8:22, 9:16, 9:22, 13:10, 15:4, 21:5, 26:7, 27:4, 27:19, 28:6, 28:24, 31:1, 31:3, 31:4, 31:9, 39:17, 42:10, 44:7, 45:3, 45:7, 45:11, 46:15, 51:6, 52:20, 52:21, 53:9, 53:25
needed [1] - 9:17
needs [1] - 45:13
never [2] - 25:19, 53:2
nevertheless [1] - 17:22
new [8] - 5:18, 15:17, 15:19, 15:20, 24:18, 24:19, 29:1, 47:7
newly [1] - 4:21
news [3] - 36:24, 38:9, 38:11
next [3] - 26:4, 27:9, 44:21
night [1] - 53:6
Nimmer [1] - 12:25
nine [5] - 25:9, 25:13, 25:15, 25:20, 25:21
NO [1] - 1:8

Noise [8] - 6:7, 6:9, 6:22, 7:3, 8:25, 13:23, 14:6, 14:8
none [2] - 8:16, 34:8
note [4] - 28:25, 39:4, 39:6, 39:11
NOTES [1] - 55:15
notes [8] - 39:1, 39:2, 39:6, 39:8, 39:10, 39:13, 39:15
nothing [2] - 15:17, 24:19
notify [3] - 36:15, 38:8, 38:17
Nourafchan [1] - 4:10
number [4] - 20:11, 25:7, 25:22, 35:13
Number [2] - 16:5, 16:7

## O

oath [3] - 30:18, 37:15, 38:1
object [5] - 8:17, 8:20, 32:6, 33:21, 43:11
objected [2] - 42:14, 43:10
objecting [2] - 8:21, 42:6
objection [9] - 20:8, 20:9, 32:9, 33:22, 33:24, 34:1, 42:23, 50:12, 52:15
objections [13] - 16:9, 19:9, 19:10, 19:19, 20:20, 21:2, 28:20, 32:5, 33:16, 50:8, 50:10, 50:11, 52:2
obviously [8] - 19:20, 24:25, 26:5, 28:18, 42:24, 43:12, 43:14, 50:2
OF [14] - 1:1, 1:2, 1:14, 2:1, 2:2, 2:11, 2:16, 3:8, 55:2, 55:4, 55:6, 55:9, 55:13, 55:15
offer [7] - 15:2, 18:4, 20:6, 42:20, 42:21, 44:6, 50:15
offered [2] - 19:25, 43:8
offers [1] - 33:19
office [2] - 5:11, 13:21
Office [4] - 7:5, 8:23, 10:13, 11:15
OFFICIAL [1] - 1:21, 55:8, 55:22
official [1] - 8:19

often [1] - 34:25
Ojukwu [9] - 9:6, 10:12, 10:17, 14:2, 48:6, 48:23, 49:7, 49:11, 49:12
Ojukwu's [4] - 6:5, 6:8, 6:20, 15:8
old [1] - 15:18
OLYMPIC [1] - 2:14
ON [3] - 2:2, 2:11, 2:16
once [2] - 29:14, 41:6
one [32] - 7:23, 10:1, 12:14, 12:21, 16:5, 16:24, 17:1, 17:13, 17:15, 18:14, 21:1, 21:10, 22:1, 23:6, 24:8, 25:20, 26:2, 26:9, 26:25, 27:10, 27:16, 28:12, 33:4, 33:9, 39:11, 41:17, 44:21, 45:9, 45:11, 47:2, 50:12
open [2] - 20:19, 35:17
opening [20] - 16:6, 19:15, 22:3, 22:9, 29:18, 31:25, 40:3, 40:7, 40:8, 40:9, 42:3, 42:9, 42:15, 43:2, 45:8, 45:10, 46:9, 47:11, 49:18
openings [2] - 19:10, 53:13
operating [1] - 48:21
opinion [2] - 15:2, 30:21
opinions [1] - 30:16
opportunity [6] - 22:2, 34:10, 40:21, 40:23, 41:10, 50:17
order [12] - 13:13, 16:10, 16:19, 19:5, 20:5, 34:3, 40:15, 45:5, 46:19, 46:22, 47:2, 53:21
ordered [2] - 8:18, 36:19
ordinarily [1] - 40:20
organizing [1] - 42:8
original [3] - 14:4, 27:15, 48:13
orthopedic [1] - 31:2
OTHER [1] - 2:11
otherwise [2] - 36:2, 47:6
outcome [1] - 34:14
outline [1] - 40:4
outset [1] - 15:9
outside [5] - 23:16, 37:18, 38:7, 38:17,

49:1
overrule [1] - 33:22
overtake [1] - 39:8
own [5] - 15:9, 32:21, 37:4, 39:13

## P

p.m [1] - 54:9
PAGE [1] - 3:4
paper [2] - 6:18, 10:19
papers [1] - 7:9
PARK [1] - 2:19
parked [1] - 41:23
parking [1] - 29:23
part [5] - 5:19, 8:10, 13:23, 15:20, 16:24, 16:25, 26:3, 26:9, 34:7, 35:11, 46:20
parte [1] - 11:18
participation [1] - 17:16
particular [2] - 23:12, 32:15, 48:16
particularly [1] - 23:4
parties [7] - 17:19, 32:24, 33:3, 37:9, 37:23, 38:1, 40:14
parties' [1] - 19:9
party [2] - 40:5, 40:6
party's [1] - 37:13
passage [1] - 45:14
pay [1] - 38:19
peace [1] - 24:18
people [17] - 11:22, 13:8, 16:24, 26:5, 27:25, 28:8, 34:25, 35:2, 36:14, 37:9, 39:5, 39:8, 40:24, 42:6, 48:15, 53:8, 53:22
per [1] - 25:6
percent [2] - 9:12, 15:9
peremptories [1] - 25:6
perfect [2] - 27:5
perhaps [4] - 17:6, 18:17, 22:18, 24:22
period [5] - 15:17, 22:25, 38:24, 40:19, 52:25
permit [1] - 20:4
permitted [3] - 4:23, 20:2, 33:20
PERRY [3] - 1:9, 2:11, 2:16
Perry [3] - 4:5, 4:13, 45:18
perry [11] - 4:11,

18:15, 46:13, 49:4, 49:23, 49:25, 50:9, 50:16, 51:6, 53:15
**Perry's** [1] - 51:18
**person** [3] - 18:18, 23:13, 36:5
**personal** [1] - 30:15
**personally** [1] - 33:8
**PH** [1] - 1:23
**phase** [1] - 27:22
**Phase** [3] - 26:2, 27:10, 27:16
**phone** [1] - 36:5
**pick** [1] - 27:19
**picture** [1] - 54:4
**place** [2] - 37:5, 37:7
**PLACE** [1] - 55:11
**plaintiff** [15] - 4:8, 4:20, 13:22, 20:23, 26:2, 26:9, 26:23, 40:9, 40:12, 40:22, 41:10, 41:11, 43:7, 45:24, 52:3
**PLAINTIFF** [2] - 1:7, 2:2
**plaintiff's** [6] - 7:25, 8:10, 25:14, 40:17, 46:20, 51:6
**plaintiffs** [16] - 6:4, 6:25, 7:7, 7:22, 8:8, 8:13, 9:7, 11:21, 24:15, 43:16, 45:11, 47:2, 47:8, 47:14, 50:1, 51:11
**plan** [5] - 26:19, 43:11, 44:13, 45:8, 52:22
**planning** [1] - 29:5
**plans** [1] - 41:1
**play** [3] - 22:8, 22:24, 23:3
**played** [1] - 22:7
**playing** [1] - 22:13
**point** [15] - 7:10, 7:23, 8:14, 8:24, 10:10, 12:4, 12:15, 19:4, 23:18, 25:15, 39:15, 41:12, 43:12, 45:2, 47:8
**points** [1] - 7:11
**pollute** [1] - 16:14
**pool** [2] - 16:15, 17:5
**portion** [1] - 46:16
**portions** [1] - 50:1
**posed** [2] - 19:19, 20:20
**position** [4] - 9:21, 13:24, 14:3, 14:6
**possibility** [1] - 53:10
**possible** [8] - 29:17, 37:12, 39:25, 40:15,

40:16, 40:19, 41:15, 41:16
**potentially** [2] - 16:13, 23:16
**practice** [1] - 19:11
**PRE** [1] - 3:8
**pre** [3] - 29:13, 29:15, 29:25
**pre-instruct** [1] - 29:15
**PRE-INSTRUCTION** [1] - 3:8
**pre-instructions** [2] - 29:13, 29:25
**prefer** [2] - 20:21, 25:18
**preference** [1] - 25:9
**prefers** [1] - 21:7
**prejudice** [1] - 34:16
**prejudices** [1] - 30:16
**preliminary** [2] - 4:19, 30:3
**PRELIMINARY** [1] - 3:6
**prepared** [1] - 52:5
**presence** [1] - 20:13
**present** [3] - 40:10, 40:11, 41:21
**presented** [3] - 37:14, 37:25, 41:6
**presenting** [1] - 46:12
**presents** [2] - 40:20, 40:22
**PRESIDING** [1] - 1:4
**press** [2] - 18:12, 36:13
**presume** [1] - 28:11
**pretrial** [1] - 13:13
**pretty** [3] - 24:17, 28:22, 51:15
**previously** [2] - 14:12, 19:20
**principals** [1] - 30:4
**private** [1] - 32:22
**problem** [12] - 7:16, 11:2, 11:4, 22:3, 22:11, 25:14, 42:13, 42:19, 44:20, 51:11, 52:22, 53:17
**problems** [2] - 41:25, 46:10
**proceed** [4] - 13:15, 24:20, 38:24, 41:14
**proceeding** [2] - 4:24, 25:24
**PROCEEDINGS** [3] - 1:14, 3:4, 55:11
**proceedings** [7] - 4:25, 5:14, 18:11, 38:4, 39:7, 54:9

**process** [6] - 16:8, 20:15, 21:12, 37:17, 37:22, 38:5
**profession** [1] - 28:3
**programs** [1] - 37:6
**proof** [4] - 18:5, 33:7, 33:9, 41:11
**properly** [1] - 36:23
**propose** [3] - 22:21, 24:21, 43:13
**protect** [1] - 37:13
**protection** [2] - 5:7, 14:12
**protects** [1] - 6:14
**prove** [2] - 29:20, 43:5
**proved** [2] - 29:21, 41:9
**provide** [2] - 42:10, 44:18
**provided** [2] - 47:3, 50:18
**publicly** [1] - 18:22
**publish** [1] - 20:4
**published** [2] - 6:22, 14:2
**publishing** [2] - 21:15, 21:16
**pull** [1] - 24:4
**purpose** [4] - 32:14, 32:15, 32:16, 39:22
**purposes** [1] - 29:5
**put** [14] - 6:21, 6:23, 6:25, 9:7, 11:9, 17:23, 18:3, 26:12, 45:1, 45:9, 45:10, 45:19, 53:14, 53:19
**puts** [1] - 11:8
**putting** [2] - 42:10, 44:2

---

**Q**

**questioning** [1] - 45:21
**questions** [9] - 17:1, 22:8, 24:22, 29:23, 32:5, 46:17, 46:24, 50:3, 51:17
**quick** [1] - 31:4
**quite** [2] - 5:16, 21:20
**quote** [2] - 7:1, 51:8
**quotes** [1] - 9:14

---

**R**

**raise** [4] - 11:12, 21:10, 31:3, 31:5
**raised** [6] - 7:17, 8:16, 11:12, 11:13, 45:20, 47:8

**range** [1] - 20:12
**rap** [2] - 9:8, 9:11
**rapper** [1] - 10:9
**rather** [3] - 29:1, 40:7, 45:18
**reached** [1] - 19:4
**read** [16] - 30:19, 36:24, 37:11, 38:11, 45:14, 46:16, 50:1, 50:9, 50:13, 50:20, 50:25, 51:7, 51:8, 51:16, 52:3
**reading** [2] - 41:2, 45:23
**really** [6] - 17:3, 23:21, 42:5, 44:12, 53:12
**reargue** [1] - 13:4
**reason** [1] - 25:25
**reasonableness** [1] - 34:19
**rebut** [1] - 10:16
**rebuttal** [1] - 41:10
**receive** [3] - 31:11, 31:13, 36:22
**received** [12] - 8:22, 20:4, 31:19, 32:13, 32:14, 32:18, 33:17, 33:18, 33:23, 33:25, 35:22, 38:15
**recess** [4] - 29:3, 29:6, 29:7, 31:6
**Recess** [1] - 29:8
**recognizes** [1] - 20:7
**record** [4] - 8:5, 10:11, 11:20, 39:6
**recorded** [1] - 23:22
**recordings** [2] - 22:7, 22:16
**records** [1] - 7:14
**red** [1] - 52:4
**REDUCED** [1] - 55:12
**reengage** [1] - 13:6
**reference** [1] - 37:2
**referenced** [1] - 7:13
**referring** [2] - 4:16, 24:1
**reflects** [1] - 7:8
**refute** [1] - 10:16
**regard** [2] - 32:20, 53:22
**regarding** [6] - 5:8, 29:23, 30:21, 41:9, 43:18, 43:21
**Register** [1] - 12:20
**registrar** [1] - 4:21
**Registrar** [1] - 6:2
**registration** [9] - 6:3, 6:8, 6:11, 6:14, 7:4, 8:18, 13:25, 14:5, 14:13

**regular** [1] - 31:4
**related** [1] - 7:5
**relevant** [2] - 18:2, 39:23
**rely** [6] - 5:3, 12:25, 28:23, 31:12, 38:25, 39:13
**remains** [3] - 5:4, 10:8, 16:9
**remember** [8] - 32:2, 35:1, 35:3, 38:1, 39:2, 41:17, 42:2, 49:18
**remembers** [1] - 12:6
**removed** [2] - 42:15
**report** [2] - 36:20, 37:12
**REPORTED** [1] - 55:10
**REPORTER** [4] - 1:21, 55:2, 55:8, 55:22
**reporter** [2] - 12:6, 41:25
**REPORTER'S** [1] - 1:14
**request** [1] - 38:22
**requested** [1] - 29:9
**require** [2] - 4:21, 38:5
**required** [2] - 40:6, 44:4
**requires** [1] - 6:2
**rereading** [1] - 38:22
**research** [3] - 37:1, 37:8, 37:18
**reserve** [1] - 22:1
**resolution** [1] - 16:8
**resolve** [2] - 4:19, 20:8
**resolved** [1] - 24:7
**resorting** [1] - 43:4
**respect** [7] - 10:7, 16:6, 16:13, 19:18, 19:24, 21:13, 22:8
**respond** [2] - 10:4, 36:19
**rest** [4] - 32:21, 32:22, 35:12
**restrictions** [1] - 38:3
**result** [1] - 38:5
**retained** [1] - 9:12
**return** [1] - 36:23
**revenues** [1] - 26:18
**reverse** [2] - 16:19, 19:5
**ride** [1] - 54:1
**rise** [1] - 41:20
**road** [1] - 19:16
**ROAD** [1] - 2:9
**rode** [1] - 5:13
**role** [1] - 5:17

room [7] - 32:21, 32:22, 32:23, 36:7, 39:3, 39:20, 41:8
ROOM [1] - 1:22
rooms [1] - 32:23
roughly [3] - 27:2, 48:22, 53:14
rounds [1] - 28:19
rude [1] - 33:2
rule [4] - 21:3, 24:7, 28:24, 33:16
Rules [4] - 32:7, 33:16, 33:20, 39:24
rules [5] - 20:25, 37:13, 38:2, 38:3, 52:3
ruling [4] - 12:4, 12:16, 24:9, 32:9
rulings [3] - 9:22, 20:1, 26:15
run [1] - 32:24

## S

safest [1] - 46:2
sale [1] - 27:24
SAME [1] - 55:12
save [1] - 40:18
saw [1] - 33:8
scene [1] - 5:18
schedules [2] - 13:9, 40:13
seal [1] - 26:17
search [1] - 37:7
searching [1] - 37:1
seated [1] - 36:16
second [2] - 19:7, 19:18
Second [1] - 35:21
secondly [1] - 11:18
Section [1] - 4:22
see [13] - 4:24, 8:17, 20:2, 23:10, 32:16, 34:11, 35:2, 41:19, 43:14, 49:22, 52:20, 53:11, 54:7
seeking [3] - 5:10, 10:15, 11:10
seem [3] - 50:16, 53:1, 53:16
selection [1] - 29:9
send [1] - 29:15
sense [3] - 26:24, 46:7, 47:2
sensitive [1] - 16:13
separate [3] - 6:10, 9:5, 14:4
separately [1] - 14:1
seriatim [1] - 16:10
serve [1] - 39:11

service [1] - 36:18
session [1] - 32:17
sessions [1] - 48:14
set [3] - 6:10, 30:6, 30:9
SET [1] - 55:11
setting [1] - 6:1
several [2] - 31:22, 41:25
shared [1] - 52:18
short [6] - 25:24, 27:1, 29:3, 40:19, 45:14, 51:1
shorter [1] - 46:11
show [7] - 6:23, 10:12, 20:6, 40:6, 43:24, 44:7
showing [1] - 21:21
shown [1] - 16:11
Side [1] - 18:25
side [26] - 11:2, 11:16, 16:16, 16:22, 16:23, 17:1, 17:10, 18:10, 18:11, 19:10, 20:14, 21:1, 21:2, 24:8, 24:23, 25:6, 25:15, 29:19, 33:20, 40:3, 40:5, 40:7, 41:9, 45:3, 50:12
sides [2] - 16:6, 44:12
signed [2] - 7:9, 28:3
SILBERBERG [1] - 2:12
similar [3] - 42:17, 43:9, 43:23
similarity [8] - 42:11, 42:21, 43:1, 43:5, 43:21, 43:22, 44:15, 44:24
simple [1] - 16:12
simply [3] - 19:11, 22:1, 40:4
sit [1] - 18:3
sitting [3] - 22:23, 33:5, 45:18
situation [2] - 28:7, 47:7
skipped [1] - 52:19
smile [1] - 33:2
Snap [1] - 36:9
SNYDER [1] - 1:4
so-called [1] - 6:24
social [1] - 36:9
SOKOL [1] - 2:3
sold [2] - 9:11, 14:2
solely [3] - 30:17, 38:14
solution [1] - 50:15
solve [1] - 44:20
solved [1] - 22:11

someone [2] - 17:4, 19:3
sometimes [5] - 30:23, 31:1, 34:3, 34:22, 34:23
somewhere [2] - 27:18, 46:4
song [5] - 9:9, 9:12, 15:9, 23:12, 46:25
songs [2] - 22:6, 23:22
soon [1] - 37:12
sooner [1] - 39:21
sorry [2] - 10:25, 46:8
sought [1] - 7:19
sound [3] - 22:7, 27:20, 27:21
sounds [1] - 24:6
speaking [2] - 22:14
specific [2] - 24:1, 34:3
specifically [3] - 20:18, 23:3, 23:6
spill [1] - 46:5
split [1] - 7:1
spot [1] - 11:8
SS [1] - 55:5
ST [1] - 2:6
stand [7] - 15:21, 17:23, 18:4, 23:11, 30:23, 31:3, 45:19
standard [1] - 25:22
start [10] - 5:20, 29:17, 38:6, 41:23, 41:24, 46:3, 46:8, 47:4, 49:5, 49:6
started [1] - 46:2
starting [1] - 49:4
state [2] - 4:6, 10:10
STATE [1] - 55:6
statement [12] - 10:7, 16:14, 40:3, 40:4, 40:7, 40:8, 40:9, 42:3, 42:9, 46:9, 47:11, 49:19
statements [4] - 6:12, 29:19, 31:23, 31:25
STATES [4] - 1:1, 1:1, 1:4, 55:9
stay [2] - 26:7, 53:8
STENOGRAPHIC [1] - 55:15
STENOGRAPHICALLY [1] - 55:10
step [1] - 52:20
still [4] - 5:15, 12:13, 19:19, 19:22
stipulations [2] - 26:16, 26:24
story [1] - 43:3

straightforward [1] - 51:15
STREET [1] - 1:22
stretch [1] - 31:1
stricken [3] - 15:21, 32:10, 34:3
strike [2] - 5:2, 13:12
strikes [1] - 43:14
strong [1] - 25:23
strongly [1] - 24:5
stuck [1] - 10:24
subject [3] - 5:1, 5:6, 50:4
subjects [2] - 46:23, 47:7
submission [1] - 7:4
submit [4] - 7:2, 10:16, 11:14, 20:25
subpoena [1] - 7:14
subset [2] - 19:20, 19:22
substantial [8] - 42:11, 42:21, 43:1, 43:5, 43:21, 43:22, 44:14, 44:23
substantially [3] - 42:17, 43:9, 43:23
such-and-such [2] - 18:18, 43:4
suggest [3] - 18:21, 24:5, 24:19
suggestion [2] - 49:10, 50:22
suing [1] - 6:4
SUITE [2] - 2:9, 2:19
summarized [1] - 10:18
summer [2] - 28:8, 28:10
suppose [2] - 15:19
supposed [1] - 11:14
surprised [1] - 8:1
suspect [2] - 35:6, 40:7
sustain [2] - 33:24, 33:25
swimmingly [1] - 49:20
sworn [2] - 29:10, 31:13
sympathy [1] - 30:16

## T

taker [2] - 39:6, 39:11
tally [1] - 49:2
technical [2] - 50:5, 50:7
technically [2] - 46:22, 47:1

tendency [1] - 39:8
tentative [2] - 5:18, 9:22
term [3] - 44:14, 44:16, 44:17
terms [2] - 42:25, 48:7
tested [2] - 37:16, 37:22
testified [3] - 34:11, 35:6, 35:10
testify [9] - 9:6, 9:10, 9:22, 35:13, 40:25, 45:13
testifying [6] - 8:10, 11:6, 30:24, 34:13, 41:5, 46:4
testimony [29] - 7:8, 9:17, 9:18, 10:9, 10:17, 15:8, 18:2, 30:25, 31:13, 31:19, 32:10, 33:7, 34:6, 34:8, 34:18, 34:19, 35:4, 35:5, 35:15, 37:16, 38:20, 38:21, 40:24, 45:17, 45:20, 47:5, 50:20, 51:3
text [1] - 36:6
THAN [1] - 2:11
THAT [3] - 55:10, 55:12, 55:14
THE [120] - 2:16, 3:8, 4:3, 4:15, 4:18, 5:23, 7:16, 7:24, 8:5, 8:12, 9:20, 9:24, 10:1, 10:5, 10:21, 10:24, 11:11, 12:2, 12:5, 12:11, 12:21, 12:24, 13:5, 13:8, 13:12, 13:18, 14:15, 14:17, 14:22, 14:25, 15:11, 15:16, 15:24, 16:4, 16:18, 17:8, 17:11, 17:14, 17:25, 18:7, 18:9, 18:19, 18:23, 19:1, 19:11, 19:15, 20:3, 20:24, 21:5, 21:9, 21:11, 21:18, 22:5, 22:11, 22:21, 23:9, 23:20, 24:3, 24:5, 24:12, 24:15, 24:17, 25:4, 25:5, 25:11, 25:14, 25:21, 26:14, 26:22, 27:4, 27:14, 27:17, 28:2, 28:6, 28:15, 28:18, 29:7, 29:11, 41:20, 41:22, 42:7, 42:22, 43:13, 44:16, 44:20, 44:25, 46:7, 46:19, 47:4, 47:10, 47:15,

transcripts [1] - 53:15
TRAURIG [1] - 2:17
travel [1] - 41:1
traveling [1] - 51:10
treat [1] - 41:4
treated [1] - 39:24
trial [28] - 4:17, 5:17, 6:17, 8:2, 8:8, 8:9, 11:8, 28:12, 28:13, 29:20, 30:4, 30:8, 30:20, 31:10, 33:15, 35:17, 36:14, 36:17, 37:7, 37:17, 37:22, 37:23, 38:1, 38:5, 38:19, 38:21, 40:2, 40:13
tried [2] - 45:21, 46:8
tries [1] - 7:2
true [3] - 11:17, 31:16, 35:11
TRUE [1] - 55:14
truly [1] - 12:10
truth [2] - 35:10, 37:16
try [7] - 17:23, 29:17, 31:7, 37:3, 39:18, 45:10, 46:10
trying [8] - 13:3, 13:5, 13:6, 23:9, 25:2, 45:4, 49:15, 53:23
turn [1] - 37:12
turns [2] - 8:21, 26:1
twelve [1] - 25:21
Twitter [1] - 36:8
two [18] - 9:6, 9:15, 16:7, 16:25, 17:1, 19:8, 22:6, 23:22, 23:23, 23:25, 27:1, 27:8, 28:18, 35:2, 45:10, 47:21, 53:2
TYPEWRITTEN [1] - 55:12
typically [1] - 16:20

**U**

ultimate [1] - 31:12
ultimately [1] - 50:18
Under [1] - 9:1
under [6] - 4:22, 7:20, 20:24, 26:17, 32:7, 39:24
underlying [1] - 48:9
understood [1] - 54:3
undertaking [1] - 39:19
unfortunately [2] - 52:19, 52:23
unhappy [1] - 12:6
UNITED [4] - 1:1, 1:1, 1:4, 55:8

themselves [3] - 7:7, 13:9, 53:14
theoretically [1] - 25:24
THEREAFTER [1] - 55:12
therefore [3] - 5:6, 14:8, 14:13
they've [2] - 13:9, 46:24
thinks [3] - 26:23, 33:20, 41:9
thirdly [1] - 16:12
THIS [1] - 55:14
three [9] - 11:13, 25:5, 25:10, 26:25, 27:2, 27:9, 45:11, 47:14, 52:12
threshold [1] - 14:21
throughout [2] - 28:1, 35:17
TIME [1] - 55:11
timing [1] - 47:2
TO [1] - 55:12
today [6] - 25:1, 29:13, 29:15, 41:14, 45:9, 46:9
together [2] - 6:24, 7:1
tomorrow [17] - 29:16, 40:2, 41:19, 44:13, 45:12, 45:13, 45:25, 47:12, 49:12, 49:20, 52:10, 52:23, 53:2, 53:6, 53:10, 54:1
tonight [1] - 53:25
took [2] - 30:18, 45:22
topic [1] - 17:7
topics [1] - 16:13
total [1] - 27:2
touching [1] - 37:11
track [1] - 21:5
trail [2] - 6:18, 10:19
train [1] - 41:25
transcribed [1] - 29:9
transcript [3] - 38:21, 38:22, 41:2
TRANSCRIPT [1] - 1:14
TRANSCRIPTION [2] - 55:13, 55:14

47:18, 47:23, 48:1, 49:3, 49:9, 49:18, 50:7, 50:14, 50:23, 51:5, 51:14, 51:18, 51:19, 51:22, 52:1, 52:7, 52:11, 52:14, 52:21, 53:5, 53:21, 54:4, 54:7, 54:8, 55:8, 55:9, 55:10, 55:11, 55:12

unless [6] - 12:6, 19:12, 24:18, 28:23, 36:1, 43:11
unquestionably [1] - 9:19
unquote [1] - 7:1
unrelated [1] - 18:13
untrue [1] - 35:4
untruthfully [2] - 35:7, 35:10
up [17] - 6:18, 6:21, 9:7, 10:19, 15:7, 16:14, 17:1, 20:12, 24:4, 24:18, 27:19, 28:3, 29:14, 30:23, 31:6, 44:2, 45:1
urge [2] - 38:19, 39:10

**V**

vacancies [1] - 27:6
vacation [1] - 28:9
vacuum [2] - 22:20, 24:7
vague [1] - 23:18
valid [1] - 13:22
various [1] - 40:13
veneer [1] - 16:24
verbally [1] - 33:1
verdict [5] - 26:1, 30:21, 35:18, 36:23, 37:20
versions [1] - 34:24
versus [1] - 4:5
via [1] - 36:6
video [2] - 40:25, 41:3
vie [1] - 16:9
view [4] - 37:5, 37:7, 43:2, 51:3
Vincent [1] - 4:13
VINCENT [1] - 2:18
violates [1] - 38:3
virtue [1] - 14:11
vis [1] - 16:9
vis-a-vie [1] - 16:9
visit [1] - 37:5
vocals [1] - 10:13
voir [2] - 19:6, 24:20
VS [1] - 1:8

**W**

WAIS [1] - 2:13
Wais [1] - 4:10
wait [1] - 53:9
waiting [1] - 8:16
walk [3] - 19:1, 48:15
walks [1] - 19:4
wants [1] - 22:8
warn [1] - 53:10

warning [1] - 54:1
warrant [1] - 19:3
WAS [1] - 55:12
waste [1] - 28:13
watch [2] - 36:24, 38:11
website [1] - 36:7
WEDNESDAY [2] - 1:15, 4:1
week [3] - 27:8, 27:9, 27:23
weight [4] - 33:12, 33:14, 35:12, 35:15
welfare [1] - 15:25
WEST [2] - 1:22, 2:14
WESTERN [1] - 1:2
widespread [2] - 42:11, 42:20
wish [2] - 39:1, 50:18
wishes [2] - 5:20, 21:1
witness [37] - 5:19, 6:16, 7:10, 7:15, 7:20, 8:1, 8:3, 8:7, 8:15, 10:25, 11:7, 11:8, 11:19, 11:20, 15:3, 20:6, 20:7, 21:16, 26:19, 30:24, 33:8, 34:7, 34:9, 34:10, 34:22, 35:6, 35:8, 35:9, 35:13, 40:16, 41:4, 46:2, 49:19, 50:2, 50:19
witness's [7] - 30:25, 34:12, 34:13, 34:14, 34:16, 34:18, 34:19
witnesses [16] - 22:13, 24:24, 31:14, 31:24, 34:24, 35:14, 37:9, 37:15, 40:14, 45:5, 45:9, 46:3, 46:6, 53:2, 53:3
words [3] - 22:22, 26:11, 35:16
workable [1] - 51:14
works [3] - 5:8, 9:13, 40:18
world [2] - 27:5, 30:23
worth [1] - 25:17
writing [2] - 30:8, 36:5
written [1] - 21:2

**Y**

years [1] - 52:8
yesterday [1] - 11:18
yourselves [1] - 39:3
YouTube [1] - 36:8

# EXHIBIT 2

EXHIBIT 2
PAGE 72

1               UNITED STATES OF AMERICA
                UNITED STATES DISTRICT COURT
2              CENTRAL DISTRICT OF CALIFORNIA
                   WESTERN DIVISION
3
                        - - -
4            HONORABLE CHRISTINA A. SNYDER
           UNITED STATES DISTRICT JUDGE PRESIDING
5                       - - -

6
     MARCUS GRAY; ET AL.,              )
7                                      )
              PLAINTIFF,               )
8                                      )  CASE NO.:
     VS.                               )  CV 15-5642-CAS
9                                      )
     KATY PERRY; ET AL.,               )
10                                     )
              DEFENDANT.               )
11   _____)

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15            THURSDAY, JULY 18, 2019

16            LOS ANGELES, CALIFORNIA

17

18

19

20

21

22        LAURA MILLER ELIAS, CSR 10019
         FEDERAL OFFICIAL COURT REPORTER
23       350 WEST FIRST STREET, ROOM 4455
         LOS ANGELES, CALIFORNIA 90012
24            PH:  (213)894-0374

25

EXHIBIT 2
PAGE 73

```
 1

 2
        APPEARANCES OF COUNSEL:
 3
        ON BEHALF OF PLAINTIFF:
 4

 5              CAPES SOKOL
                BY: MICHAEL A. KAHN, ESQ.
 6                  LAUREN COHEN, ESQ.

 7              7701 FORSYTH BOULEVARD
                12TH FLOOR
 8              ST. LOUIS, MO 63105

 9
                KAYIRA LAW, LLC
10              BY:  ERIC KAYIRA, ESQ.

11              2100 HANLEY ROAD, SUITE 208
                CLAYTON, MO 63105
12

13
        ON BEHALF OF DEFENDANTS OTHER THAN MS. PERRY:
14

15              MITCHELL SILBERBERG & KNUPP
                BY: CHRISTINE LEPERA, ESQ.
16                  AARON M. WAIS, ESQ.
                    JEFFREY MOVIT, ESQ.
17
                11377 WEST OLYMPIC BOULEVARD
18              LOS ANGELES, CA 90064

19
        ON BEHALF OF THE PERRY DEFENDANTS:
20

21              GREENBERG TRAURIG
                BY:  VINCENT H. CHIEFFO, ESQ.
22
                1840 CENTURY PARK EAST
23              SUITE 1900
                LOS ANGELES, CA 90067
24

25
```

EXHIBIT 2
PAGE 74

```
 1                            INDEX
 2
    OPENING STATEMENTS                              PAGE
 3
    BY:  MR. KAHN                                     4
 4
    BY:  MS. LEPERA                                  18
 5
 6  WITNESSES FOR
    THE PLAINTIFF:
 7
                       DIRECT    CROSS   REDIRECT   RECROSS
 8  LAMBERT, EMANUEL
    BY:  MR. KAHN        35                67
 9  BY:  MR. MOVIT                44                  72

10  HUDSON, KATHERYN
    (VIA DEPOSITION)     75
11
    OJUKWO, CHIKE
12  BY:  MR. KAHN       110               151
    BY:  MS. LEPERA              135                 154
13
    HUDSON, SARAH
14  (VIA DEPOSITION)    164

15  GRAY, MARCUS
    BY:  MR. KAHN       169
16

17  WITNESSES FOR
    THE DEFENSE:
18
    HUDSON, KATHERYN
19  BY:  MR. CHIEFFO     87
    BY:  MR. KAHN                 99
20

21        EXHIBITS            RECEIVED

22          16                   40
            77                  101
23           7                  193

24           1                  193
             4                  194
25           6                  197
```

```
 1        LOS ANGELES, CALIFORNIA; THURSDAY, JULY 18, 2019; 9:18 A.M.

 2                            -  -  -

 3              THE CLERK:  Calling Calendar Item No. 1.

 4              Case No. CV 15-5642.  Marcus Gray versus Katy

 5    Perry.

 6              Counsel, please state your appearances.

 7                (Appearances as heretofore noted.)

 8              THE COURT:  All right.  Are we ready to proceed?

 9              MR. KAHN:  Yes, Your Honor.

10              THE COURT:  Fine.  So why don't we bring the jury

11    in.

12                         (Jury present.)

13              THE COURT:  Good morning, ladies and gentlemen.

14              We're going to proceed to opening statement.  As I

15    indicated yesterday, opening statement is not evidence.  It

16    is what each side anticipates will be proved in the course of

17    the trial.  So we're gonna begin with plaintiff's counsel.

18    Thank you.

19              Mr. Kahn.

20              MR. KAHN:  Thank you, Your Honor.

21              Ladies and gentlemen of the jury, my name is Mike

22    Kahn and I'm one of the three lawyers here for the

23    plaintiffs.  With me today is Lauren Cohen and Eric Kayira.

24              This is a case about taking.  About taking

25    someone's valuable creation without their permission.  And
```

```
 1    here that valuable creation is a song that you're gonna be
 2    hearing during the course of this trial, a song called Joyful
 3    Noise that these three gentlemen created.  And actually, the
 4    three, include one, because of a seating shortage, Chike
 5    Ojukwu, this is Marcus Gray and Emanuel Lambert.  You'll get
 6    a chance to hear testimony from all three about their
 7    creation process.
 8            As you'll hear, when you create a song, you own it.
 9    The law gives you a special property right.  It's called a
10    copyright.  And that copyright gives you exclusive control
11    over your property.  Nobody can copy it or use it or any part
12    of it without your permission.  And if they do, they violate
13    the laws known as copyright infringement and that's why we're
14    here today.
15            So the evidence, let me tell you the story of the
16    creation of this song.  Our story begins back in 2007.  And
17    these three gentlemen that I've introduced and a fourth
18    created a Christian gospel rap song that's called Joyful
19    Noise, and you're gonna have a chance to hear it.  It has
20    lyrics that are not maybe what you assume a rap song lyric
21    would be.  This is a different type of lyric in Christian rap
22    songs.
23            So Stage 1 is Mr. Ojukwu.  He creates what are
24    known as beats, hip hop beats, instrumentals.  Back then this
25    was his full-time job.  As you'll hear today, um, he has a
```

1    day job, but he still loves music and he still creates these

2    beats.  He does it at night, he does it on the weekend.

3          Back then, back when MySpace was still a big deal,

4    after he created one of these beats and he felt good about

5    it, he would take a portion of it and he would post it on his

6    MySpace page.  And his hope was that some rap artist would

7    hear the beat and want to work with him to create a song.

8          And he will describe to you, it's actually

9    fascinating how he creates these instrumental beats.  It's

10   all electronic.  It's sort of elaborate.  Does it on a

11   computer.  There's no actual violins or trumpets or

12   clarinets.  He picks the notes.  He'll pick the instruments.

13   He'll pick the pace, the tempo, the texture, different types

14   of drums and he puts it all together into a beat.  So that's

15   part one.

16         Then we enter Mr. Gray.  He's a Christian rap

17   artist who's known as Flame and he'll explain to you how he

18   got that name.  Any way Mr. Ojukwu and Mr. Gray knew each

19   other at the time back in 2007.  They had met, um, at a bible

20   study group.  A friend of Mr. Gray's told him about this beat

21   that he had heard on Mr. Ojukwu's MySpace page.  Mr. Gray

22   listens to it, loves it, contacts Mr. Ojukwu, bought the

23   right to use the beat in a song.

24         And as was usually the case, Mr. Ojukwu agreed.  He

25   sold him the rights.  And part of the deal was he would get

1    50 percent ownership in whatever song was created.  That

2    would be 50 percent in the lyrics and in the music.  It's his

3    standard deal.  So Mr. Gray writes some lyrics, very excited

4    about this.  Writes some lyrics.  As I say, they're not the

5    kind of lyrics you think of when you normally think of rap

6    songs.

7            And then enters our third plaintiff, Mr. Lambert.

8    He's another Christian rap artist and he's known to his fans

9    as D.A. Truth.  And he'll explain to you the origin of that

10   name as well.  He lives in Philadelphia.  Mr. Gray contacts

11   him.  Says I'm coming to Philly.  Can I come over?  I want

12   you to hear something that I think is really special and we

13   could do a song.  And Mr. Lambert hears the beat.  He's

14   inspired.  And as you'll hear, he writes the chorus to this

15   song.

16           Another artist, a man named Lecrae Moore.  He

17   writes the lyric as well.  The finished song is called Joyful

18   Noise.  And it gets released in 2008 on an album called Our

19   World Redeemed.  And as you look down there, you'll see

20   No. 16 is Joyful Noise and this is on Mr. Gray's album in

21   stores March 4, 2008.  You will be hearing this song a lot in

22   the case, but I thought it might help hear at the outset to

23   hear the beginning of the song.  Because when you hear the

24   beginning of the song, you're going to hear the instrumental

25   beat that's at issue in this case.  So here's how the song

1    begins.

2                        (Music played.)

3            MR. KAHN:  So that's how the song begins.  That

4    beat that you heard which is there's a fancy musical term

5    called an ostinato.  That beat that you heard is what's at

6    issue in this case.  So the song gets released in 2008 and it

7    becomes a big hit.  It gets critical acclaim.  It gets

8    nominated for awards, the Grammy's for the album.  A Stellar

9    award for the album, a Dove award for Joyful Noise.  And

10   Mr. Gray will tell you about that.  He and his wife attended

11   all three of these award ceremonies and it was very exciting

12   for them.

13           In addition to that, it charts on the Billboard

14   charts.  I don't know if you've ever seen the Billboard

15   charts Top 100, top whatever you have seen in three different

16   charts.  A top Christian in 2008, top gospel 2008 and '09.

17   And then the song itself, it becomes one of the top songs in

18   digital downloads in gospel in 2011, 2012.  So it becomes a

19   popular song.

20           There are five or six YouTube videos of the song

21   and there are postings of the song on Mr. Gray's website and

22   on Mr. Lecrae Moore who is one of the singers website, and it

23   gets millions of views.  So it's out there.  And Mr. Gray

24   performs this song, it's very popular, all around the

25   country.  Between 2008 and 2012 at every concert, this is a

```
 1   song that he performs.  That is the period from 2007 to 2012
 2   and now we're gonna jump to 2013 which is when these issues
 3   arise.
 4        At some of these concerts that Mr. Gray is
 5   performing at, he's getting approached by fans asking him
 6   about a song call Dark Horse.  Have you heard a song called
 7   Dark Horse?  Did you sell the rights for Joyful Noise to Dark
 8   Horse?  Mr. Gray has no idea what they're talking about and
 9   he goes online and he finds the song Dark Horse and he
10   listens to it.  And just to get this back in your mind, here
11   is Joyful Noise, the beginning.
12                    (Music played.)
13        MR. KAHN:  And he finds this album and the first 15
14   seconds, you'll hear the entire song.  The first 15 seconds
15   of this introduction and then this part gets played and this
16   plays through about half of the song.
17                    (Music played.)
18        MR. KAHN:  Now, just like Joyful Noise where the
19   instrumental came first, the same is true in Dark Horse.  And
20   Exhibit 74 we're just gonna play a brief clip of it.
21   Exhibit 74 is the instrumental that Mr. Gottwald and
22   Mr. Walter created before, uh, Ms. Hudson and the other
23   individual defendant song writers got together to create the
24   song.  And you'll hear now, I believe the 15 or 14 second
25   introduction and we'll play maybe 15 seconds more of where
```

EXHIBIT 2
PAGE 81

1    the instrumental starts.

2                    (Music played.)

3              MR. KAHN:  And that's what brings us here today.

4              And we're here and I'll explain the evidence to

5    prove to you that this beat that plays on and off throughout

6    Dark Horse infringes on the plaintiff's copyright in that

7    same beat in their song Joyful Noise.  We're here to prove

8    that the defendants took this valuable part of the song

9    without permission.

10             Now, to do that I want to give you an outline of

11   the evidence on copying that we're going to present so you'll

12   understand why we're presenting it.  There's -- in proving

13   copyright infringement, we need to prove that our clients

14   have a copyright registration and we need to prove copying by

15   the defendants.

16             As far as the copyright, you will see a copy, it

17   will be introduced into evidence.  Our clients have a

18   copyright registration in Joyful Noise.  And you'll see some

19   highlighted names there, the three authors who are the

20   plaintiffs here today Mr. Ojukwu, Mr. Gray and Mr. Lambert.

21             Then the issue is copying.  How do you prove

22   copying?  As you might imagine in copyright cases, a

23   defendant will rarely admit yeah, I copied your song.  The

24   law recognizes that.  If you recall yesterday when the Judge

25   was giving you instructions, she talked about direct evidence

1  and she talked about circumstantial evidence.  Direct

2  evidence here would be direct evidence of one of the

3  defendants actually listening to the song and copying it

4  down.

5          Circumstantial evidence is evidence that -- it's

6  facts that allow you to infer that.  I'll give you an

7  example.  A guy at your work tells you he never eats at a

8  fast food restaurant.  Never.  One day around 1 o'clock

9  you're in your car and you're driving along in slow traffic

10 and who should you see coming out of a McDonalds, but this

11 guy from work who is wiping his mouth with a napkin.  And you

12 notice he's got a drop of ketchup and a drop of mustard on

13 his shirt.

14         So you don't have direct evidence that he was in

15 that McDonald's.  You don't have a photograph of him eating a

16 sandwich, but you have circumstantial evidence.  You have him

17 walking out of a McDonalds.  You have him with a napkin.  You

18 have him with a drop of ketchup and a drop of mustard and

19 that is our challenge here to give you circumstantial

20 evidence that there was copying.

21         We're gonna offer two types of evidence, the

22 circumstantial evidence.  We're gonna offer some evidence

23 that at least one of these defendants, it was reasonable to

24 conclude that one of these defendants had access to Joyful

25 Noise before they created Dark Horse.  And then we're going

```
 1    to offer evidence that the tracks that are at issue on both
 2    cases are substantially similar.
 3          Now, let me talk about the evidence you're gonna
 4    hear on substantial similarity.  There's really two types.
 5    We're gonna present you with evidence from a musicologist, an
 6    expert.  The expert here is Dr. Todd Decker.  He's the Chair
 7    of the Music Department of Washington University.  He's a
 8    professor of musicology.  He's an experienced musician.  He's
 9    a published author especially on modern popular music.  And
10    he will take you through his analysis.
11          There will be things that you may have heard in the
12    music, but perhaps like me you don't have an actual name for
13    what you've heard, but you've heard it.  He's going to take
14    you through seven elements of those two beats that he
15    concludes is substantially similar.  So that's one way we're
16    gonna prove it.  That if it's that close, it would suggest
17    copying.
18          The other way is through your ears.  You're gonna
19    hear the full versions of both of these songs.  You're gonna
20    contemplate what the experts have said, but you're gonna
21    decide yourself would a reasonable person think these two
22    songs and these two instrumentals sounded similar.  So that's
23    the substantial similarity.
24          And then we need to prove access.  Now, as I said,
25    all the defendants will deny they ever heard Joyful Noise.
```

```
 1    That's okay.  As the Judge will tell you, we don't have to
 2    prove direct access.  We don't have to prove that, for
 3    example, Mr. Gottwald happened to be at one of Mr. Gray's
 4    concerts back in 2012.  They will deny it and we don't have
 5    to try to prove it.  It's circumstantial evidence.
 6          And we're gonna present evidence to you that this
 7    song was out there in a way that a professional song writer
 8    and especially Mr. Gottwald or Mr. Walter had a reasonable
 9    opportunity to hear this song before 2013.  We don't have to
10    prove they actually heard it, but they had a reasonable
11    opportunity.  And we're gonna prove it through the Internet,
12    through concerts, through the radio, television and awards.
13          Now, we've already talked about the awards that the
14    song was nominated for and the question is whether a
15    professional song writer who monitors what songs are being
16    nominated or whether they might want to track them down and
17    see what they sound like.
18          In addition we mentioned the Billboard charts.
19    Billboard's been around compiling these charts every week
20    since the 1940s.  General fans might go to Billboard to see
21    what's hot.  And we're gonna suggest to you that perhaps
22    professional song writers do that as well.
23          In the concert performances, Mr. Gray performed
24    around the country in a wide variety of venues.  He performed
25    as you might imagine in many churches, but he performed in, I
```

```
 1   think he once performed in an amusement park.  He performed

 2   in arenas, he performed at universities, he performed all

 3   over.

 4          And in connection with a lot of those performances

 5   as you'll hear from Mr. Gray and from his wife Crystal, who

 6   is his manager, when he would get to a town as part of the

 7   promotion, he would appear on radio programs and sometimes TV

 8   programs where they would talk to him about the upcoming

 9   concert and often they would play the most popular song of

10   his in the background or as part of the introduction and that

11   song is Joyful Noise.

12          And, again, you're gonna hear more evidence about

13   the Internet accessibility.  There were millions and millions

14   of views on YouTube and on MySpace.  The song was out there.

15   And is it reasonable that a professional song writer might be

16   aware of that and might want to hear what's going on out

17   there?  That will be another bit of our access.

18          The Judge will tell you we don't need to and we

19   don't intend to prove evil intent.  In fact, we don't intend

20   and we don't need to prove intent.  There's even a thing

21   called innocent infringement.  The song could have stuck in

22   someone's ear and two years later when they're writing didn't

23   realize that they were copying.  So we're not accusing

24   anyone.  We're not accusing Ms. Hudson, we're not accusing

25   Mr. Gottwald or anyone else of bad faith here.  We need to
```

```
 1    simply prove copying and that's how we're going to prove it.
 2           This is the album and you'll see Dark Horse is
 3    No. 6 and after Dark Horse, there are list of the song
 4    writers.  And just like Mr. Gray is known as Flame,
 5    Mr. Lambert is known as D.A. Truth, most of the people except
 6    for Sarah Hudson here, these are all performing names.  These
 7    are the writers, these are the original owners of the
 8    completed song, and these are the people who would be
 9    participating in exploiting the song earning revenues from
10    the song.
11           The defendants are listed here.  The six that have
12    pictures with their names are the six song writers and they
13    are the people who created the song.  Again, Mr. Gottwald,
14    Mr. Walter apparently created the instrumental first, and
15    then the rest of them got together to create the rest of the
16    song.
17           Capital Records, you see Capital Records is the
18    company, the so-called record label.  They're the one that
19    had the recording, they're the ones that are marketing the
20    album and selling the song.  And the other companies as
21    you'll hear as the case goes along are involved in the
22    promotion, the sales and the granting of rights to that song.
23    That will be our evidence.
24           Some other evidence is you will hear in response to
25    some of the things we think that the defendants are gonna
```

1    say.  One of the things that I think you'll hear from the

2    defendants is we don't have an access.  This is Christian

3    music.  We don't listen to Christian music.  As I say, the

4    evidence will show these are professional song writers.  They

5    listen to all types of music as you'll hear from our clients,

6    all types of music.  Country, pop, R and B, religious,

7    et cetera.

8             And you probably know one of the most popular forms

9    of music today is rap hip hop.  What's at issue here are not

10   the lyrics of Joyful Noise or the lyrics Dark Horse.  What's

11   at issue here is that instrumental beat.  That is not a

12   Christian instrumental beat.  That is rap hip hop beat.

13            The evidence will also show that Joyful Noise was

14   available in many different nonreligious places for purchase

15   from Best Buy to iTunes.  And when you go online and you try

16   to buy this song, you'll see it's not listed as Christian

17   gospel.  It's listed as rap hip hop.

18            The second thing I think you'll hear is a hole in

19   our evidence.  They will point out that we don't have any

20   sales data.  Billboard may reflect that the album was being

21   sold, we don't have any sales data at all.  And sadly, that's

22   true.  Although, you saw the CD on sale and they saw it on

23   sale in stores and you could purchase it on Amazon, you could

24   purchase it at iTunes, that sales information and all that

25   money went to their record label Cross Movement Records and

1    it's a sad story.

2            You sign -- you're a young artist.  You sign a deal

3    with a record company and you get taken advantage of.  Cross

4    Movement never gave them any sales information and never gave

5    them any money for this song that was sold, that got critical

6    acclaim.  So the evidence that this album was being sold we

7    don't have.  We have other evidence that it was out there.

8    We don't have sales information.

9            And one final point.  Many of you may be fans of TV

10   trials, different TV dramas of trials.  And I want to let you

11   know at the outset, this is not a TV trial.  This is not a

12   trial where all the witnesses are gonna come in a perfect

13   order so you'll able to follow it from the moment Mr. Ojukwu

14   creates his beat to getting to Marcus Gray, on and on and

15   taking it through chronological order.

16           Both sides, if we could pick the order, that would

17   be the order.  But both sides have witnesses flying in from

18   outside of Los Angeles and others who have to leave early and

19   so our first witness today will be Mr. Lambert because he has

20   to leave this evening for Africa.  The second witness will be

21   actually, Ms. Hudson, the performer known as Katy Perry

22   because she has a scheduling conflict as well.  So the

23   evidence will come in a little bit out of order.  That's what

24   happens in real trials.

25           It's like building a house where the first thing to

```
 1   arrive are the roof tops which is before the basement is even
 2   dug and you got a plumber who's putting in the bathtub and
 3   toilet before you even have the bathroom walls up.  So we ask
 4   for your patience.  By the time we rest our case, our goal is
 5   to have our copyright infringement house complete.
 6           Thank you.
 7           THE COURT:  Okay.  Ms. Lepera.
 8           MS. LEPERA:  Good morning, everyone.
 9           So I'm Christine Lepera.  I introduced myself to
10   you yesterday.  I'm here with my colleagues Jeff Movit and
11   Aaron Wais and Mr. Chieffo, who's Ms. Perry's lawyer.  Like
12   to also show you our clients are here behind us if you
13   haven't been able to see them because we are blocking the
14   view somewhat.  But we have Mr. Gottwald, we have Sarah
15   Hudson, we have Henry Walter, and, of course, Ms. Perry is
16   sitting there as well.
17           Mr. Martin, one of the other six writers of the
18   Dark Horse song is out of the country.  He will be testifying
19   by video next week.  And Juicy J who did one of the rap
20   verses he will be here as well to testify.
21           So let me just say this right out of the gate.
22   Plaintiffs are simply wrong.  They're just simply wrong.
23   They're mistaken.  And I don't think there's evil intent on
24   their part either.  I think that the issue here is that they
25   are refusing to acknowledge basic music.  They're refusing to
```

UNITED STATES DISTRICT COURT

EXHIBIT 2

PAGE 90

19

1     acknowledge what is actually going on in a musical creation

2     and what is the difference between a sound recording and a

3     composition and how those things are analyzed.

4          But before I get into that, let me describe a

5     little bit more about my clients.  And I want you to bear in

6     mind throughout this discussion that I'm going to share with

7     you, when Mr. Kahn got up and he started talking about the

8     creation of the song and how it was created.  And this was

9     the joint work that was done in a seriatim way, there are a

10    lot of missing components that we're going to show to you

11    about how this was done and how they also mischaracterized in

12    our view that evidence.

13         There is a missing plaintiff who was previously in

14    the case who's gone, Mr. Lecrae Moore, and we'll talk about

15    that.  But bear in mind these two dates 2008 and 2013.  2008

16    is when you heard this litany of how Joyful Noise was

17    created.  We'll show you how it was really created and the

18    evidence will show you, both sides.  2013 to '14 is when the

19    flurry of activity began with the registration and the

20    assessment of what they're going to do about who is going to

21    own what all after they heard the Dark Horse song.

22         So there's -- I want you to bear these two dates in

23    mind because a lot of the evidence will show and it is our

24    position that this is essentially something that was created

25    and structured in an ownership fashion and a creation fashion

EXHIBIT  2
PAGE  91

1    after the Dark Horse song was created for the purpose of

2    suing here.

3         Similarly, and I'll just mention this briefly,

4    although, I'll get back to it so it's fresh in your minds,

5    you heard this story about Cross Movement Records and the

6    story about how they didn't get any sales data and they

7    didn't have any records of that.  They do admit they have

8    absolutely no evidence of any sales at all of their song or

9    their album.

10        They had a right to pursue that with Cross Movement

11   Records and they did file a lawsuit and they were attempting

12   to get records, but when they heard Dark Horse, they decided

13   never mind, I don't want to get the records.  I'll just get

14   whatever rights Cross Movement had to Joyful Noise away from

15   them and we'll sue.  So they chose, consciously chose not to

16   look for any sales data.

17        But bottom line, the evidence is not here.  So all

18   of the reasons that they may give you as to why they don't

19   have that data, they can't prove.  The only thing that they

20   can prove they don't have it or I should say that we prove.

21        So let me say backing up a bit, my clients did not

22   take anything from Dark Horse -- from Joyful Noise in

23   creating Dark Horse.  They created Dark Horse independently

24   without any reference and without any copying of Joyful

25   Noise.  And yes, you heard Mr. Kahn say repeatedly they'll

EXHIBIT 2
PAGE 92

```
1    say they didn't hear.  Well, yes, they will say they didn't
2    hear it because they didn't hear it.
3            What they keep saying, Mr. Kahn, was that they had
4    this opportunity to hear it and that's the evidence you
5    should consider.  This widespread distribution that he talks
6    about.  The significant exploitation that he talks about.
7    And we're not here to denigrate anyone's product or music or
8    their goals or how they are, you know, attempting to make it
9    with their music.  But we are here to say they do not have
10   this evidence of widespread distribution.  They do not have
11   the evidence they've already established no sales.
12           We've established that, again, they have concerts
13   as Mr. Kahn said largely in churches throughout the country
14   or in a religious venue.  They conceded there's no way to
15   place any of the defendants at any of these concerts.  Their
16   argument is that simply because there's music that may be in
17   common between the two works, and we'll talk about that
18   extensively in a minute, that means they had to have heard
19   it.  But ladies and gentlemen, you use your common sense and
20   the Judge will instruct you on both the law and using your
21   common sense.
22           You know how much content is out there right now in
23   the universe on YouTube and MySpace.  You know how much
24   content is distributed.  We're going to have experts talk
25   about the years in question 2008 to 2012, 41 trillion views
```

```
 1    cumulatively of music and videos were uploaded to YouTube in

 2    that time period.

 3         The views that the plaintiffs had are a drop -- not

 4    even a drop in the bucket because you can't see the drop.

 5    Miniscule, miniscule.  They cannot tie any defendants to

 6    getting on a view or searching for any of their music.  And

 7    this contention that Mr. Kahn repeats over and over about how

 8    just because they're song writers they listen to more music,

 9    there's absolutely of no evidence and there's no basis of

10    that.

11         I would submit the opposite.  I would submit that

12    song writers, and this is where they are denigrating them.

13    They are denigrating them.  They're saying they need to copy

14    someone else to make their craft.  They say they need to go

15    and do this.  They say subconsciously they heard this and

16    they're doing it.  But what that misstates in this whole

17    argument is that they're not proud in their craft that they

18    don't actually take the time and effort --

19         MR. KAHN:  Your Honor, we would object.  This is

20    argument.

21         MS. LEPERA:  I'm addressing your point.

22         THE COURT:  Let's try not to argue.

23         MS. LEPERA:  So let's look at the writers a little

24    more carefully.  So Henry Walter who is sitting here behind

25    us wrote the music in question that they are complaining
```

EXHIBIT 2
PAGE 94

```
 1   about that is at issue.  The evidence will show he is a
 2   prolific producer and song writer who's worked with top
 3   artists from Rhianna to The Weekend to Brittany Spears and
 4   Nicki Minaj.
 5           He will explain how he created the musical bed and
 6   we're gonna go through this a little more specifically so I
 7   can actually get you to the music.  Katy Perry, Ms. Hudson,
 8   we all have heard Mr. Kahn talk about her and obviously,
 9   she's an extraordinarily accomplished artist, performer.  Her
10   views on Vevo are billions of views.  This is the context of
11   the names comparative to what we're talking about.
12           Mr. Gottwald and Ms. Hudson and Mr. Martin also
13   very, very talented and accomplished song writers who have
14   multiple accomplishments to their names.  Multiple songs that
15   they've worked on.  They're proud of their craft.  Juicy J
16   also a very prolific rap artist and writer.  Also, a very
17   seriously accomplished person.
18           The only people who had any hand in actually
19   creating what Mr. Kahn has been referring to as the
20   instrumental beat in Dark Horse that he claims was taken from
21   Joyful Noise are Mr. Walter and Mr. Gottwald.  And you will
22   hear them speak to this creation point and let me actually go
23   through that for you.
24           The companies that are involved in this case as
25   Mr. Kahn correctly pointed out had absolutely no role.  He's
```

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 95

```
 1   not claiming they had any role in obtaining any of the Joyful
 2   Noise music.  They're involved in distribution of Dark Horse.
 3   Some of them not even all of the corporate defendants.  I'll
 4   explain that more to you later.  But ultimately, the focus
 5   here is on the six writers and their creation of Dark Horse
 6   and again, specifically, the beat in question.
 7            So let me start because I think it's important and
 8   this is something Mr. Kahn completely ignores in his opening
 9   and will do his best to ignore in the trial.  What is a
10   musical composition?  What is a musical composition?  Let me
11   first tell you what it is not.  It is not a sound recording.
12   It is embodied in a sound recording.  It can be recorded
13   multiple times, different recordings in different ways.  It
14   can be sung.
15            It can be performed on instruments depending on the
16   composition and that includes instrumental beats.  You can
17   bring them down to their components:  Melody, rhythm,
18   harmony, construction.  And when you have a composition, the
19   music in the composition can be reflected in sheet music.
20            Think about Jingle Bells.  How many times have you
21   hear Jingle Bells recorded by different artists?  We all know
22   it's the same composition.  Just because it's recorded, it
23   doesn't change its nature.  Okay?  But you can recognize it
24   separate from the recording of how that particular artist or
25   performer actually generates his or her version of Jingle
```

1    Bells.

2          So bear in mind in this case, there's no claim,

3    Mr. Kahn doesn't discuss this.  No claim that the sound

4    recording of Joyful Noise, the actual files, the sound

5    recording beats are in Dark Horse.  He doesn't tell you

6    that's not at issue.  It's not at issue and it's important to

7    remember that.

8          Why is it important to remember that?  Because the

9    composition that is reflected or embodied in that underlying

10   beat is what we have to look at.  That is the only thing they

11   can claim rights to assuming they have rights.  They are not,

12   in connection with this case, they are not making a claim

13   there's a sound recording sample in Dark Horse.

14         So let's look, let's now look at what's at issue in

15   Dark Horse.  We're gonna have a musicologist as well.  Our

16   musicologist is Dr. Lawrence Ferrara.  He's the prior head of

17   NYU's School of Music.  He's Director Emeritus now.  He's an

18   accomplished professor.  Books beyond -- lists longer than I

19   can possibly count and obviously, also a performer, pianist.

20         He has created charts.  One of which you are

21   looking at here.  And it's going to be established in this

22   case that these are not in dispute.  What we have up here

23   right now, this is in fact what is going to be discussed in

24   detail from a musical composition point of view.

25         Now, some of you may or may not have background in

1     music.  I don't recall, but I think everyone from a layperson

2     to, you know, an accomplished musician knows Do, Re, Mi, Fa,

3     Sol, La, Ti, Do.  It's a scale.  When you have Do, Re, Mi,

4     Fa, Sol, La, Ti, Do, you have certain pitches in that scale.

5     Okay?  And they are categorized by the Do or Re or Mi,

6     et cetera.

7          If you have look at what we've put on the board for

8     you here, the first tuck is what I'm calling Ostinato No. 1

9     in Dark Horse and we're gonna play this for you in a minute.

10    The thing that Mr. Kahn said about the fancy phrase, it is a

11    fancy phrase ostinato, but it's not a fancy concept.  It just

12    means a musical phrase.  A short musical phrase that is

13    repeated.  That's what an ostinato is in music, in

14    compositions as we're talking about compositions.

15         So what Mr. Walter did with assistance from

16    Mr. Gottwald and ultimately, the Dark Horse track, this

17    underlying bed was created.  You'll hear many, many other

18    things on Dark Horse.  There's the vocals, the melody.

19    They're very different songs and there's no contention

20    otherwise.  This is what it boils down to, ladies and

21    gentlemen.  This Ostinato No. 1, they don't make any claim in

22    this case about.  It is C, B, A, E.

23         This is an example here of how we have

24    characterized and how our expert has characterized and the

25    evidence will show it is two notes, a very simple pattern,

1    three and two.  It's two white keys on a keyboard going back

2    and forth C, B, C, B.  If you've every played a piano before

3    C, B, C, B.  Okay?  That was created in Dark Horse.  First,

4    it's the intro.  It is a melodic contour of those pitches.

5    The first two, Mi Re and it goes down in this fashion.

6         The plaintiff is complaining about Dark Horse

7    Ostinato No. 2 and we'll play both of them for you.  This

8    particular passage was developed strictly out of Ostinato

9    No. 1 and you can see.  All you have to do is use your eye

10   and see you have four Cs instead of one C.  So it's a C note

11   repeated four times which a kindergartner can do, and then it

12   is a B note which is the second repeated two times instead of

13   played once.

14        So the Ostinato No. 2 grows specifically and

15   completely out of Ostinato No. 1 which they're not

16   complaining.  That is how this song was created and developed

17   by Mr. Walter.  And, again, we will demonstrate that their

18   own expert has said what is in common between these two

19   songs -- and they're all evenly spaced rhythmic notes that's

20   not in dispute -- is Mi, Mi, Mi, Mi, Re, Re.  C, C, C, C, B,

21   B.  Six notes.  Two white keys.  Two white keys one of which

22   is repeated four times.  The second one repeated twice.

23        The point of all of this, ladies and gentlemen, is

24   to demonstrate that this is not the most brilliant of

25   creations and even our clients will admit that.  This is

```
 1    common musical building blocks that is used in many, many

 2    other compositions.

 3          If you look at the next slide, please, this is our

 4    trial graphics guy, Scott.  You have Mr. Decker who is the

 5    plaintiff's expert acknowledging, this is his chart of what's

 6    in common between Joyful Noise and Dark Horse.  3, 3, 3, 3,

 7    2, 2.  Back to it again.  This is the evidence.  Mi, Mi, Mi,

 8    Mi, Re, Re.  Okay.  So we have an understanding between the

 9    two sides at least with respect to that.

10          You will hear him talk about this supposed seven

11    similarities that this chart Mr. Kahn put up.  What you have

12    there really is just words.  Those are words and words are

13    not music and words are not musical theory and analysis.

14    This is what it boils down to and he himself, plaintiff's

15    expert, created this.

16          If you would turn to the next slide, please.  Our

17    expert created this.  You may or may not have heard of the

18    old classics Merrily We Roll Along, Jolly Old St. Nick.  They

19    have the same musical components of using four Mi notes and

20    two Re notes.  Again, very simplistic, easily created, not

21    complex.  And because this is what is at issue and the Judge

22    will instruct you on the law, I will not presume to do so.

23          You can't copyright common building blocks of

24    music.  It's not allowed because people have to be able to

25    use it to create.  So at the end of the day here, what we
```

```
 1    have is simply two separate disparate writers using very

 2    basic, like kindergarten basic, white keys on a piano, four

 3    notes and two notes and they cannot monopolize it.  They

 4    cannot say this shows that it was copied.

 5            Because when something is common and simple,

 6    there's no evidence that -- the circumstantial evidence that

 7    Mr. Kahn kept talking about, there's no evidence that they

 8    couldn't create it themselves.  When something is common and

 9    simple, the inference is a lot of people can do it.

10    Everybody can do it.

11            And that's the whole point of looking at the

12    composition and dissecting the elements down to what we're

13    talking about.  If you don't do that, then the actual

14    evidence is not being revealed.  And we're going to show you

15    this evidence not conceal it.

16            Okay.  Now, one of the things Mr. Kahn spoke about

17    is the distribution, again, of Joyful Noise.  And you'll

18    listen to the evidence, but the evidence should be put in the

19    context of your common sense and your knowledge of how things

20    are actually out there.  When he says they're out there,

21    there's a lot of stuff that's out there.  There's a lot of

22    stuff that's out there.  So when he put up the chart, again,

23    acknowledges no sales evidence so we don't have any

24    information.  Okay.  It was in from 2008 to 2013.  It was in

25    90 Best Buy stores in New York and L.A., and they went to
```

```
 1    those stores or lots of people went to the stores we don't

 2    have any of that.  So that's out of the picture.

 3         We have some charts, a few Billboard charts and

 4    some awards and not to say that they don't deserve these

 5    awards.  They do.  I'm not suggesting otherwise.  What I'm

 6    suggesting is that in and of itself is not evidence of the

 7    song being played or heard so that people -- you'd have to

 8    actually specific go and look at everything on charts and say

 9    okay, let me go and play this.  So that is not an avenue of

10    access that we will submit the evidence will show is

11    reasonable.

12         There's no playing of the song at any of the award

13    shows that they mentioned with respect to, um, unless perhaps

14    maybe the Dove show.  There was no appearance by any of the

15    defendants.  There's clearly no way of them having been

16    there.  They keep saying they don't have to show that they

17    were there, but the reality the evidence should suggest that

18    you have to consider how could they be there?  Why would they

19    be there?

20         If their music circle and genre is in pop and in

21    doing things in a different market, um, and there is a big

22    difference between Christian and rap.  There is a big

23    difference between pop and Christian rap.

24         MR. KAHN:  Your Honor, this is opening statement.

25         MS. LEPERA:  That's what the evidence will show.
```

```
 1              THE COURT:  Okay.

 2              MS. LEPERA:  I didn't object to you, Mr. Kahn.  I

 3   don't know why you would be concerned about what I'm saying.

 4              THE COURT:  Let's move.

 5              MS. LEPERA:  Yes.

 6         Okay.  The other thing that I want to talk about is

 7   for you, um, is the issue with respect to the other avenues

 8   of access that they talked about.  They talked about radio.

 9   They talked about television.  They don't have any specific

10   instance in which a Joyful Noise performance was done on

11   radio.  They don't have any specific performance of it on

12   television.

13         You will hear from them say generally they have

14   heard themselves doing it, but without actual proof to you

15   other than their testimony, there's no way to link it to any

16   specific time, day, event channel which would then lead to is

17   this reasonable for someone to have heard it because of the

18   station it was on.  Again, this is common sense.  Thinking

19   about how much there is out there in volume.

20         And, again, similar -- same thing with the

21   concerts.  Again, they may have performed it at concerts.

22   They may have performed it at quite a number of concerts over

23   the four years.  There's no record of that in terms of a

24   specific advertisement or a set list or a video of them

25   having played Joyful Noise at a concert.  They say they did
```

EXHIBIT 2
PAGE 103

```
1    it, but we have no evidence.

2            So it's simply the circumstantial evidence of them

3    having played Joyful Noise.  That is not even corroborated

4    other than their say so.  Even if they did, where is the

5    conduit there?  Where's the reasonable access for any of the

6    defendants to have been at any these concert performances?

7            I want to just put up a couple of slides that we

8    will get to.  We have experts, by the way, on YouTube and on

9    MySpace who will talk about how the functionality of those

10   sites worked between 2008 and 2013.  And explain as I

11   mentioned before, one of the statistics that will come into

12   evidence is that there were 4.14 trillion views on YouTube in

13   that time period that they're talking about their views.

14           So it will be a comparative analysis of where their

15   views sat there.  And I think Mr. Kahn didn't give the

16   specifics, but it's in the mid-millions is what that their

17   evidence will show.

18           Okay.  The next slide is MySpace.  We have, again,

19   265 million registered accounts of which his clients were

20   two.  We have 53 million songs and 13,000 songs uploaded

21   daily from 14.2 million artists.

22           So once, again, the evidence of reasonable

23   opportunity that Mr. Kahn spoke about, I think that you could

24   use your common sense and think about it in the context of

25   these realities.  Acknowledging that there is no direct
```

```
 1    access which has been stated and there isn't, but the
 2    evidence of their distribution doesn't rise to the level in
 3    the context of a pathway by which a person could say ah, this
 4    makes sense.  I can see how this trail would lead a song
 5    writer in this niche versus that niche to their music.
 6            Let me speak about the creation really briefly
 7    because I did want to get back to that, and I had mentioned
 8    in the beginning of my opening.  Mr. Ojukwu who wrote his
 9    beat in 2007, he sold it to Mr. Gray in a buy-out for $300
10    along with another beat.  He did not have any understanding
11    that he was going to be a 50 percent owner.  He was not even
12    credited on liner notes as a writer of Joyful Noise on the
13    album Our World Redeemed.
14            Mr. Lambert, Mr. Moore, Mr. Lecrae Moore who's
15    missing here.  He was a plaintiff originally.  He's gone.  He
16    decided he didn't want to pursue this.  Those two, Mr. Lecrae
17    Moore and Mr. Marcus Gray wrote the lyrics and created along
18    with Mr. Lambert everything other than the underlying which
19    we've just been talking about that I broke down into the
20    composition.  They didn't write any of Mr. Ojukwu's beat.
21    They had no participation in that.  That was not done.
22            Mr. Gray simply took the beat from Mr. Ojukwu and
23    he decided what he would do with it and there was no working
24    together thereafter between them.  So that's why as we fast
25    forward now to 2013, and you have them hearing Dark Horse.
```

```
 1   You have them deciding they're gonna sue.  You have them

 2   saying we are going to now do a copyright registration which

 3   they never did before.  They include Mr. Lecrae Moore.  He

 4   says I don't want to have anything to do with this.

 5   Initially sues, but then dropped out.

 6        The three plaintiffs who are here today, they then

 7   decide well, we're gonna carve up the rights in the song

 8   Joyful Noise.  They're not going to say that.  The evidence

 9   is going to show that's what they did.  They did not have an

10   understanding before.  That ultimately this was a scenario

11   created post hac for purposes of this case.

12        Here's another interesting fact regarding the

13   creation issue of Joyful Noise.  All of the discussion that

14   you have been hearing about how access was easy for the

15   defendants to the MySpace page of Mr. Moore or Mr. Gray,

16   Mr. Gray did not even find Mr. Ojukwu's beat on his MySpace

17   page and they're in the same genre and they even knew each

18   other.  Friends of his had to tell him.  Oh, go listen to it.

19   Go search for it.

20        So when you talk about this whole easy access, you

21   know, you're gonna hear something just by looking through

22   this vast content of trillions and trillions of content, in

23   their own case, in their own circumstance, Mr. Gray didn't

24   even find Mr. Ojukwu's beat.

25        So I think I will conclude and I thank you for
```

35

```
1   listening.  We will have more of this as we go along, but I
2   trust at the conclusion of the evidence, you will use your
3   common sense and you will return a verdict for defendants who
4   did not take anything.
5           Thank you.
6           THE COURT:  Are we ready with the first witness?
7           MR. KAHN:  We are, Your Honor.
8           Your Honor, the plaintiffs call to the stand
9   Emanuel Lambert.
10          THE COURT:  All right.  Mr. Lambert, please come
11  forward.
12          THE CLERK:  Please raise your right hand.
13                  (Witness sworn.)
14          THE CLERK:  Please be seated.
15          Please state your full name and spell your last
16  name for the record.
17          THE WITNESS:  My name is Emanuel Lee Lambert, Jr.
18  My last name is spelled L-a-m-b-e-r-t.
19                  DIRECT EXAMINATION
20  BY MR. KAHN:
21  Q.  Good morning, Mr. Lambert.
22  A.  Good morning, sir.
23  Q.  You were one of the creators of Joyful Noise; correct?
24  A.  Yes, sir.
25  Q.  Can you briefly tell the jury your educational
```

EXHIBIT 2
PAGE 107

```
 1   background after high school?
 2   A.   After high school, I went to a college called
 3   Philadelphia Biblical University where I got an
 4   interdisciplinary study on Social Work and a degree in
 5   Biblical Studies.  From there I went to another school called
 6   the Institution for Jewish Studies.  And then after that, I
 7   went back to school in 2017.  I got accepted into Oxford in
 8   England.
 9   Q.   And you went to school at Oxford in England?
10   A.   Yes, sir.
11   Q.   And what were you studying there?
12   A.   It's a discipline called Apologetics.
13   Q.   And what are Apologetics?
14   A.   It's kinda like the science and art of defending any
15   position.  In my case it would be Christian faith.
16   Q.   You are a musician; correct?
17   A.   Yes, sir.
18   Q.   And among other things as a musician, are you a
19   performer?
20   A.   Yes.
21   Q.   What kind of music do you perform, Mr. Lambert?
22   A.   Hip hop.
23   Q.   Okay.  How did you become a hip hop rapper?
24   A.   Uh, it was kind of something that I stumbled on to
25   because I grew up as a musician as a drummer.  Um, I went to
```

```
 1   school for music theory and a bunch of stuff like that.

 2            And one day I was just kind of in the basement

 3   having fun, you know, free styling.  Rap wasn't even my

 4   preferred genre of music.  While I was kinda poking fun at

 5   it, just having fun with my friends, kinda said to myself

 6   hey, you don't sound too bad.  Um, started to write a little

 7   bit see how I actually sounded, you know, tried it and

 8   discovered that I had a talent.  And everything kind of took

 9   off from there.

10   Q.   And as I mentioned to the jury in the opening, you have

11   a performing name?

12   A.   Yes, sir.

13   Q.   And what is your performing name?

14   A.   My performing name is D.A. Truth.  That's D.A. Truth.

15   Q.   So D.A. Truth?

16   A.   Yes, sir.

17   Q.   So when you go on stage you're announced not as Emanuel

18   Lambert, you're announced as D.A. Truth?

19   A.   Yes, that's correct.

20   Q.   And for the benefit of the jury, explain the origin of

21   that performing name?

22   A.   Um, it just is reflective of what I believe I'm

23   representing as a Christian.

24   Q.   Now, in addition to performing songs, do you also write

25   lyrics?
```

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 109

```
 1    A.    Yes.

 2    Q.    You wrote some of the lyric to Joyful Noise; correct?

 3    A.    That's correct.

 4    Q.    Now, earlier during opening, we'll get into more detail

 5    with Mr. Gray, we talked about some critical acclaim, some

 6    awards that Joyful Noise and the album was nominated.

 7              Have you ever been nominated for any awards for

 8    your work?

 9    A.    Yes, sir.

10    Q.    Tell the jury what kind of awards you've been nominated

11    for and whether you won any?

12    A.    Okay.  So, um, in the gospel arena, there is kinda like

13    the gospel version of the Grammy's.  It's called the Stellar

14    Awards.  So I have won four Stellar awards.  I was nominated

15    for three Dove awards which is like the Grammy's in Christian

16    contemporary music, and then I was also nominated for two

17    actual Grammy awards.

18    Q.    So because we're taking it a little bit out of order

19    here, we'll try to keep in sync here.  How did you get

20    involved in the creation of the song Joyful Noise?

21    A.    Yeah, at the time Marcus Gray called me, he was working

22    on this album.  And he, based on our conversation, you know,

23    he knows that the song was kinda in my lane for what he was

24    trying to go with it.  So he gave me call.  Told me that he

25    was in my city.  Saying man, I can really hear you making
```

```
 1    something special for this chorus.  Came to the house, went

 2    up to my attic and he played the music for me.  Of course,

 3    the music was what it was and inspired me.

 4              MR. KAHN:  Let me stop.  Exhibit 16 is the

 5    instrumental track that was created by Mr. Ojukwu.

 6              MR. MOVIT:  Objection.  No foundation.

 7    BY MR. KAHN:

 8    Q.   And what I would like you to do and we can do it with

 9    headphones first is to have you listen to this instrumental

10    track and tell me if you can identify it.  It's been marked

11    as Exhibit 16.

12    A.   Okay.

13    Q.   And if you have, then we can let the jury hear it.

14              THE COURT:  Ladies and gentlemen, let me explain

15    this is not intended to be a mystery to keep things from you,

16    but we have to authenticate something before it can come into

17    evidence and you're allowed to see it so that's why we're

18    proceeding in this way.

19              MR. KAHN:  We will play that for you and you listen

20    to it.

21    Q.   Can you identify what you just heard?

22    A.   Yes, sir.

23    Q.   What did you just hear?

24    A.   That is the Joyful Noise track.  That's the music that I

25    heard the day that we worked on the song.
```

EXHIBIT 2
PAGE 111

```
 1    Q.    The day you were up in your attic in Philadelphia?

 2    A.    Yes.

 3              MR. KAHN:  And that's been marked as Exhibit 16.

 4    Your Honor, we would offer Exhibit 16 into evidence.

 5              MR. MOVIT:  No objection, Your Honor.

 6              THE COURT:  All right.  16 will be received.

 7                    (Exhibit 16 admitted.)

 8              MR. KAHN:  May we publish it to the jury so they

 9    can hear --

10              THE COURT:  You may.

11              MR. KAHN:  -- what Mr. Lambert heard that day in

12    Philadelphia.

13                    (Exhibit 16 played for the jury.)

14    BY MR. KAHN:

15    Q.    So that's the beat you heard that day?

16    A.    Yes, sir.

17    Q.    And what was your reaction when you heard it?

18    A.    I'm kinda of still having the same reaction.  It's an

19    amazing track.

20    Q.    Okay.  Had you ever heard anything like that before?

21    A.    No, sir.

22              MR. MOVIT:  Objection.  Leading.

23              THE COURT:  Overruled.

24    BY MR. KAHN:

25    Q.    So we played it for you.  That was your reaction, and
```

```
 1  then what did the two of you do up there in your attic?
 2  A.   We played the song.  So we kinda of, you know, at the
 3  time, we had the song playing in the background I think on,
 4  you know, a boom box or whatever back then.  And we had a
 5  recorder and just kind of, you know, as the music was
 6  playing, I was kind of coming up with melodies, coming up
 7  with the lyric for it.  Going through that creative process.
 8  Really simple process.  Like took us a couple of hours to do
 9  it.
10  Q.   Is there any particular portion of Joyful Noise that you
11  actually wrote?
12  A.   Yes, the chorus.
13            MR. KAHN:  We have as Exhibit 75, Your Honor, it is
14  the song Joyful Noise.  We can -- there's been no objection
15  to it.  Rather than playing the entire song now, we thought
16  we'd play the introduction and then the chorus that
17  Mr. Lambert wrote if that's acceptable to the defendants?
18            MR. MOVIT:  No objection.
19            THE COURT:  Fine.
20            MR. KAHN:  We're gonna play a portion of Joyful
21  Noise and what I understand to be the chorus just for the
22  benefit of the jury they know what portion you wrote.
23            (Exhibit 75 played for the jury.)
24  BY MR. KAHN:
25  Q.   Is that the portion that you wrote?
```


```
 1   of the completed song to be?
 2   A.   Initially?
 3   Q.   Yes.
 4   A.   Initially, I believe it was 12 percent.
 5   Q.   12 percent?
 6   A.   Yes.
 7   Q.   And then after Mr. Moore dropped out, you did a new
 8   written split agreement?
 9   A.   Yes, sir.
10   Q.   And what is your percentage of the song now?
11   A.   15 percent.
12   Q.   And that's 15 percent of the music and the lyrics of the
13   entire song; correct?
14   A.   That's correct.
15   Q.   Did you back in 2008, 2007, did you have a MySpace page?
16   A.   Yes, sir.
17   Q.   And what, for the benefit of the jury, what was your
18   understanding of MySpace and your page back then?
19   A.   Um, just a place where -- it was kind of really the only
20   place for independent artists, um, to show case their music.
21   Others used it to meet friends.  I didn't use mine for that.
22   I used it the same as many independent artists which was to
23   bring attention to their music.
24            MR. KAHN:   Thank you, Mr. Lambert.  I have no
25   further questions.
```

```
 1              THE COURT:  Okay.
 2                       CROSS-EXAMINATION
 3   BY MR. MOVIT:
 4   Q.   Good morning, Mr. Lambert.
 5   A.   Good morning.
 6   Q.   We'll start with a little bit of background first.
 7           Mr. Lambert, the type of music that you perform is
 8   Christian rap; correct?
 9   A.   That is correct.
10   Q.   And the type of music that Mr. Gray performs is
11   Christian rap as well?
12   A.   That is correct.
13   Q.   And Lecrae Moore is also in the same music genre?
14   A.   That is correct.
15   Q.   And that genre is Christian rap?
16   A.   Yes.
17   Q.   You're not in any musical group with Mr. Moore; is that
18   correct?
19   A.   That's correct.
20   Q.   And you've never been in a musical group with Mr. Moore?
21   A.   That's correct.
22   Q.   And you're not presently in a musical group with
23   Mr. Gray?
24   A.   That is correct.  I'm not.
25   Q.   And you've never been in a musical group with Mr. Gray?
```

EXHIBIT 2
PAGE 116

1    A.    No.

2    Q.    And you're not presently in a musical group with

3    Mr. Ojukwu?

4    A.    That's correct.

5    Q.    And you've never been in a musical group with

6    Mr. Ojukwu?

7    A.    In a group?  No, yeah.

8    Q.    In fact, you never met Mr. Ojukwu until this lawsuit was

9    filed; is that correct?

10    A.    That is correct.

11    Q.    Let's talk about my clients briefly.

12            Do you understand that in this lawsuit,

13    Mr. Lambert, you have sued six individual people.  And those

14    people are Karl Martin Sandberg professionally known as Max

15    Martin.  Henry Russell Walter professionally known as Cirkut.

16    Lukasz Gottwald, Katheryne Elizabeth Hudson professionally

17    known as Katy Perry, Sarah Theresa Hudson, and Jordan Houston

18    professionally known as Juicy J.  Is that your understanding?

19    A.    Yes, sir.

20    Q.    Going forward I'd like to call them collectively the

21    individual defendants.  Is that okay?

22    A.    Yes, sir.

23    Q.    You've never personally met any of the individual

24    defendants; is that correct?

25    A.    That is correct.

46

1    Q.    And you've never spoken to any of these individual

2    defendants; is that correct?

3    A.    That is correct.

4    Q.    And you've never communicated with the individual

5    defendants whether in person, email, text or any other

6    method?

7    A.    That's correct.

8    Q.    And you've never sent any of the individual defendants

9    any music; is that correct?

10    A.    That is correct.

11    Q.    And that would obviously include Joyful Noise that you

12    never sent them; correct?

13    A.    That's correct.

14    Q.    And you've never asked anyone to send these individuals

15    any music; is that correct?

16    A.    Correct.

17    Q.    And that would again include Joyful Noise?

18    A.    Yes.

19    Q.    And you have no knowledge of anyone else sending these

20    individual defendants any of your music; is that right?

21    A.    I don't have any knowledge.  That is correct.

22    Q.    And that would include Joyful Noise?

23    A.    Yes, sir.

24    Q.    And you've never sent any of these individual defendants

25    any copy of Joyful Noise; correct?

EXHIBIT 2
PAGE 118

47

1    A.    That is correct.

2    Q.    And you never asked anyone to send them Joyful Noise;

3    correct?

4    A.    Correct.

5    Q.    And you're not aware of anyone sending them a copy of

6    Joyful Noise; right?

7    A.    I'm not aware.

8    Q.    And you don't have any knowledge of any of these

9    individuals that are my clients buying the CD entitled Our

10   World Redeemed; is that correct?

11   A.    That is correct.

12   Q.    And you have no documents or any other information that

13   any of the individual defendants that are my clients or

14   Ms. Hudson who is not my client.  You understood that in

15   relation to all these questions; right?

16   A.    Yes.

17   Q.    Katy Perry; right?

18   A.    Yes.

19   Q.    You have no knowledge or documents reflecting that any

20   of these individuals ever heard a recording or a performance

21   of Joyful Noise; is that right?

22   A.    I don't have the knowledge of it, that is correct.

23   Q.    And to your knowledge, you've never performed any music

24   including, but not limited to Joyful Noise for any of these

25   individuals; is that right?

EXHIBIT 2
PAGE 119

48

1    A.    That's right.

2    Q.    And you're not aware of any of these individuals

3    attending a concert where Joyful Noise was performed; is that

4    correct?

5    A.    I'm not aware.  That's correct.

6    Q.    And you don't have any documents reflecting that any of

7    these any individuals have ever received, saw or listened to

8    a performance of Joyful Noise; is that right?

9    A.    That is right.

10   Q.    Okay.  Let's talk a bit more about Joyful Noise.

11         Mr. Lambert, you never heard Joyful Noise being

12   played on the radio; is that correct?

13   A.    That is correct.

14   Q.    And you don't have any knowledge of any of the

15   individual defendants ever hearing Joyful Noise on the radio;

16   is that correct?

17   A.    That's correct.

18   Q.    And you don't have any knowledge of any of the

19   individual defendants seeing or hearing Joyful Noise on TV;

20   is that right?

21   A.    I don't have any knowledge of that.

22   Q.    And you don't have any information about how many copies

23   of the album Our World Redeemed were sold; is that right?

24   A.    That is right.

25   Q.    And you have no information about how many copies of

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 120

49

1    Joyful Noise were sold in any format; is that right?

2    A.    That's right.

3    Q.    And you don't have any information about how much

4    revenue, if any, was earned from Joyful Noise; is that right?

5    A.    That is right.

6    Q.    And you don't know how many copies of Joyful Noise were

7    manufactured; is that right?

8    A.    That is right.

9    Q.    I'm going to talk about some of my other clients with

10    you for a moment, Mr. Lambert.

11            Are you aware you sued the following seven

12    companies:  Capital Records, WB Music Corporation, Universal

13    Music Group, UMG Recordings, Kobalt Music Publishing America,

14    Kasz Money and Kitty Purry?  Are you aware of that?

15    A.    I am aware.

16    Q.    Okay.  So going forward to make it easier, I'm going to

17    call them all collectively the corporate defendants; is that

18    okay?

19    A.    Yes, sir.

20    Q.    Thanks.  Am I correct that you never sent Joyful Noise

21    in any form to any employee or executive at any of these

22    corporate defendants?

23    A.    That is correct.

24    Q.    And you're not aware of anyone who has sent Joyful Noise

25    in any format to any employee or executive at any of these

EXHIBIT 2
PAGE 121

```
 1   corporate defendants?

 2   A.   I'm not aware of that.

 3   Q.   And you have no knowledge of any employee or executive

 4   at any of these corporate defendants buying a CD of Our World

 5   Redeemed; is that right?

 6   A.   I have no knowledge of that.

 7   Q.   Okay.  And personally to your knowledge, you've never

 8   performed Joyful Noise for any employee or executive at any

 9   of these corporate defendants; is that correct?

10   A.   To my knowledge, that is correct.

11   Q.   And you're not aware of any employee or executive at any

12   of these corporate defendants ever attending a concert where

13   Joyful Noise was performed; is that correct?

14   A.   I'm not aware.  That is correct.

15   Q.   And you're not aware of any document showing that any

16   employee or executive at any of these corporate defendants

17   ever received Joyful Noise setbacks?

18   A.   That is correct.

19   Q.   And you're not aware of any documents showing that any

20   employee or executive at any of these corporate defendants

21   ever heard a recording of Joyful Noise; is that correct?

22   A.   Yes, that is correct.

23   Q.   Okay.  Let's talk about the Internet for a moment.

24        You don't have any knowledge of any of the

25   individual defendants downloading any video of Joyful Noise
```

```
 1   on YouTube or any other website; is that correct?
 2   A.   That is correct.  I wouldn't, though.  I wouldn't have
 3   any knowledge of that.  That is correct.
 4   Q.   You had a personal MySpace page; is that correct?
 5   A.   Yes.
 6   Q.   But you don't have any recollection of ever putting
 7   Joyful Noise on your MySpace page?
 8   A.   No, I had never.
 9   Q.   And you don't have any knowledge that any of the
10   individual defendants ever visited your MySpace page; is that
11   right?
12   A.   Right, that's right.
13   Q.   And you don't have any knowledge that any of the
14   individual defendants ever visited Mr. Gray's MySpace page?
15   A.   Yes.
16   Q.   And you don't have any knowledge that any of the
17   individual defendants ever visited Mr. Ojukwu's MySpace page?
18   A.   That's right.
19   Q.   And you don't have any knowledge that any of the
20   individual defendants ever visited Lecrae Moore's MySpace
21   page?
22   A.   I don't have any knowledge of that.
23   Q.   And you don't have any knowledge that any of the
24   individual defendants ever heard Joyful Noise on any of these
25   MySpace pages; is that correct?
```

1    A.    That's correct.  Again, that is not information I would

2    be privy to if it were true.

3    Q.    And is it correct that you've never toured with any

4    non-Christian artists?

5    A.    That is true.

6    Q.    Your recollection is that you personally only performed

7    Joyful Noise twice?

8    A.    Yes, that's true.

9    Q.    And prior to 2014, you only saw Mr. Gray perform Joyful

10   Noise a few times; is that right?

11   A.    Yes.  We don't travel together so just the times where

12   we would end up at the same place.

13   Q.    Which was just a few times?

14   A.    Yes, sir.

15   Q.    Those performances that you just referenced were at

16   Christian venues; is that correct?

17   A.    That's correct.

18   Q.    You don't have any set lists reflecting that you or

19   anyone else performed Joyful Noise on any particular

20   occasion?

21   A.    I didn't personally perform the song live.

22   Q.    And you don't have any set lists reflecting that you or

23   anyone else performed it on any occasion; is that right?

24   A.    I wouldn't have a set list because I never performed the

25   song live.

```
 1   Q.   But you don't have any set lists; is that correct?
 2   A.   I don't, but I wouldn't.  It wouldn't make sense for me
 3   to have it when I've never performed the song live.
 4   Q.   And you don't have copies of any advertisements showing
 5   that Joyful Noise was performed on any particular occasion;
 6   is that correct?
 7   A.   That is correct.
 8   Q.   And you don't have any recordings of Joyful Noise being
 9   performed at any concert; is that correct?
10   A.   That's correct.
11   Q.   So let's talk about the creation of Joyful Noise.
12   A.   Yes, sir.
13   Q.   Joyful Noise was released on an album by Mr. Gray
14   entitled Our World Redeemed; is that correct?
15   A.   Yes, that is correct.
16   Q.   Our World Redeemed was not your album; is that right?
17   A.   That's right.
18   Q.   And am I right that Joyful Noise was never released on
19   any of your albums?
20   A.   That's right.
21   Q.   Okay.  Then we'll talk about the making of the song a
22   bit more.
23        Would you agree that the instrumental track for
24   Joyful Noise is sometimes called the beat?
25   A.   Yes.
```

```
 1   Q.    Okay.  So we're gonna call it the beat.

 2   A.    All right.  Cool.  Yes, sir.

 3   Q.    You did not yourself write any part of the beat for

 4   Joyful Noise; is that right?

 5   A.    That is right.

 6   Q.    So no music that you created is at issue in this

 7   lawsuit; correct?

 8   A.    Correct.

 9   Q.    And the beat for Joyful Noise had already been written

10   by the time you started working on Joyful Noise; is that

11   right?

12   A.    That is correct.

13   Q.    And you were not present for any portion of the creation

14   of the beat; is that right?

15   A.    That is right.

16   Q.    And is it correct no time before this lawsuit was filed

17   did you learn who had created the beat?

18   A.    I'm sorry.  Repeat that question.

19   Q.    Of course.  Is it correct that at no time before this

20   lawsuit was filed, did you learn who had created the beat?

21   A.    Um, I think that I was -- I think that I was made aware

22   of who had created the beat, but I just didn't know him.

23   Q.    Is it correct that you had become aware -- strike that.

24         Is it correct that you did not even ever hear the

25   name Chike Ojukwu before this lawsuit was filed?
```

| | |
|---|---|
| 1 | A.   Um, again, to my recollection, I might have been made |
| 2 | aware of who had created the beat.  What I'm clear on is I |
| 3 | did not know him personally. |
| 4 | Q.   Um, Mr. Lambert, do you remember sitting for a |
| 5 | deposition in this case? |
| 6 | A.   Yes. |
| 7 | Q.   It was back on November 16, 2017; is that right? |
| 8 | A.   Yes, that's correct. |
| 9 | Q.   And at that deposition, you provided testimony under |
| 10 | oath? |
| 11 | A.   Yes. |
| 12 | Q.   Okay.  And you swore to the tell the truth during that |
| 13 | deposition? |
| 14 | A.   Yes, sir. |
| 15 | Q.   Okay.  And just like today even back on November 16, |
| 16 | 2017, it was important to be truthful at deposition? |
| 17 | A.   It was important truthful, sir. |
| 18 | MR. MOVIT:  Just to let counsel and the Court know, |
| 19 | I'm going to read page 44 lines 1 through 3 from |
| 20 | Mr. Lambert's deposition. |
| 21 | THE COURT:  Hang on.  Okay.  You may. |
| 22 | MR. MOVIT:  And the question you were asked, sir |
| 23 | was quote, "You had never heard the name Chike Ojukwu before |
| 24 | this litigation."  Close quote. |
| 25 | Q.   Is that correct? |

1    A.    Yeah, I said that.

2    Q.    The answer you gave to that question was quote "I had

3    not."  Close quote.  Is that correct?

4    A.    Yes, that is correct.

5    Q.    Thank you.  And Mr. Lambert, you certainly had never met

6    Chike Ojukwu before this lawsuit; is that right?

7    A.    That is correct.

8    Q.    Mr. Gray was the person who contacted you to work on

9    what became Joyful Noise; is that right?

10    A.    That is right.

11    Q.    And this was in 2007?

12    A.    Yes.

13    Q.    And your role in the creation of Joyful Noise was

14    limited to working on the vocal hook?

15    A.    Yes, sir.

16    Q.    And that was with Mr. Gray; is that right?

17    A.    Yes.

18    Q.    And you worked with Mr. Gray on this at your house in

19    Philadelphia?

20    A.    Yes, sir.

21    Q.    So, again, the beat was already created by the time you

22    started working on Joyful Noise; right?

23    A.    Yes, sir.

24    Q.    And at that time, did you learn who had created the

25    beat?

```
 1    A.    This is the same question you just asked me so no.

 2    Q.    So when Mr. Gray played the track, the beat, he didn't

 3    tell you who had written it?

 4    A.    Just the same question you just asked me; correct?

 5    Q.    It's slightly different.

 6          So when Mr. Gray played the track for you, he

 7    didn't tell you who had written it?

 8    A.    What I remember clearly hearing the music working on the

 9    chorus.  The musical aspect of it is what I remember clearly.

10    Q.    So he didn't tell you who had written it?

11    A.    Again, what I remember clearly is my musical

12    contribution.

13    Q.    So that would be no, he didn't tell me; is that correct?

14    A.    What I remember clearly is the musical portion of it.  I

15    don't remember all those details.

16    Q.    You certainly have no recollection of him telling you at

17    this time hey, this beat was written by Chike or Mr. Ojukwu;

18    is that correct?

19    A.    Not having a recollection of that.  I don't remember.

20    Q.    Your contribution to Joyful Noise, the hook, was created

21    in a couple of hours; is that right?

22    A.    Yes, sir.

23    Q.    And you did not write any of the rap verses of Joyful

24    Noise; is that right?

25    A.    No, I didn't.
```

1    Q.   And you didn't witness any of the rap verses of Joyful

2    Noise being written; is that right?

3    A.   Um, that's right.   Flame was kind of mumbling as we were

4    working, but that's about the extent of it.

5    Q.   And you didn't witness any of the rap verses of Joyful

6    Noise being recorded?

7    A.   No, no.

8    Q.   And I'm correct that you personally don't perform on the

9    recording of Joyful Noise; is that right?

10   A.   That is correct.

11   Q.   Okay.   Let's talk a bit about this lawsuit, Mr. Lambert.

12        Before this case began, you had a conversation with

13   Mr. Gray explaining that this was going to take place; is

14   that correct?

15   A.   Yes, that's correct.

16   Q.   And Mr. Gray told you this on the telephone?

17   A.   Yes.

18   Q.   And Mr. Gray asked if this was something you were open

19   to participate in since you were a writer of Joyful Noise; is

20   that right?

21   A.   That's correct.

22   Q.   And you agreed to be part of it?

23   A.   I did.

24   Q.   Now, before you had this conversation with Mr. Gray, you

25   had already heard Dark Horse; is that correct?

1    A.    That is correct.

2    Q.    And when you had heard Dark Horse before, you didn't

3    have an impression; is that right?

4    A.    That's right.

5    Q.    And, again, you had no communication whatsoever with

6    Mr. Ojukwu before the claim was filed; right?

7    A.    That's right.

8    Q.    And you had no conversations with Lecrae Moore about

9    this potential lawsuit before it was filed; right?

10   A.    That's right.  Can I go back to the impression question?

11   Would you mind?

12   Q.    Um, it doesn't work that way.  And you signed a retainer

13   agreement for a lawyer named Eric Kayira to represent you in

14   this lawsuit; is that right?

15   A.    Yes.

16   Q.    And you received this retainer agreement in an email

17   from Mr. Gray for you to sign; is that right?

18   A.    Yes.

19   Q.    And Mr. Kayira filed this copyright infringement lawsuit

20   against Katy Perry and the other defendants on July 1st,

21   2014; is that right?

22   A.    That's right.

23   Q.    But you had no conversations with your attorneys about

24   this lawsuit before it was filed; is that right?

25   A.    That's right.

1    Q.   And you did not have any texts or emails with the

2    attorneys before it was filed; is that right?

3    A.   That's right.

4    Q.   And you had no discussions with anyone about what the

5    complaint in this case should say; is that right?

6         MR. KAHN:  Your Honor, I would object.  This is

7    coming awfully close to attorney/client privilege.

8         MR. MOVIT:  Your Honor, this direct question and

9    answer was given at the deposition so there is no privilege.

10        THE COURT:  We don't have speaking objections first

11   and foremost.  So far I do not think we have invaded the

12   attorney/client privilege, but we're close so be careful.

13   BY MR. MOVIT:

14   Q.   And you had no discussion with anyone about what the

15   complaint in this case should say; is that correct?

16   A.   I'm sorry.  Say it again.

17   Q.   You had no discussion with anyone about what the

18   complaint in this lawsuit should say; is that correct?

19   A.   You mean with the other plaintiffs?

20   Q.   With anyone.

21   A.   What the complaint in the lawsuit should say?  I'm not

22   sure I fully understand that question.

23   Q.   We spoke about your deposition a few minutes ago.

24   A.   Uh-huh.

25   Q.   And you're aware that a complaint is something that's

```
 1   filed to start a lawsuit.  Are you aware of that?
 2   A.   Yes.
 3            MR. MOVIT:  I would like to read the deposition
 4   page 77.
 5            MR. KAHN:  Your Honor?
 6            MR. MOVIT:  Line 7 through 9.
 7            MR. KAHN:  We don't object to the reading, but we
 8   object to the display on the screen.
 9            MR. MOVIT:  There's no prejudice for the words that
10   the witness said under oath previously in this case.
11            THE COURT:  Well, wait a minute.  Let me look at 77
12   first.  What displays are we looking at, guys?
13            MR. MOVIT:  We were just going to pull up those
14   lines.
15            THE COURT:  What lines?
16            MR. MOVIT:  Page 77, line 7 through 9.
17            MR. KAHN:  I think Mr. Lambert would need to be
18   given a copy of his deposition.
19            THE COURT:  That would help a lot.  I don't have a
20   problem with putting impeaching material up on the screen,
21   but what I do have a problem with is he has to have a copy.
22            MR. MOVIT:  We'll get that right to the witness,
23   Your Honor.  May I approach?
24            THE COURT:  Yes.  Just give it to Ms. Jeang and
25   she'll take it up there.  You may read 7 through 9.
```

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 133

```
 1                    MR. MOVIT:  Thank you, Your Honor.
 2   Q.   So Mr. Lambert, at your deposition you were asked the
 3   following question quote, "Well, did you have any discussions
 4   with anyone about what the complaint should say?  Close
 5   quote.  Is that correct?
 6   A.   Yes, that's correct.
 7   Q.   And you gave the following answer:  "No."  Is that
 8   correct?
 9   A.   Yes, that is correct.
10   Q.   Thank you.  We're going to speak briefly about the
11   copyright registration for Joyful Noise.
12                    You were not in involved with the process of
13   registering Joyful Noise in the Copyright Office; is that
14   correct?
15   A.   That's correct.
16   Q.   Is it currently your understanding that your lawyer Eric
17   Kayira applied for a copyright registration for Joyful Noise
18   as -- today, sitting here today.
19   A.   Yes.  That's my understanding, yes.
20   Q.   But at the time that Mr. Kayira was applying for this
21   registration, you were not aware of that activity; is that
22   correct?
23   A.   That is correct.
24   Q.   Let's talk about Lecrae Moore for a minute.  Lecrae
25   Moore originally had a copyright interest in Joyful Noise; is
```

EXHIBIT 2
PAGE 134

```
 1   that correct?

 2   A.   That's correct.

 3   Q.   And Mr. Moore was originally a plaintiff in this case;

 4   is that right?

 5   A.   Yes.

 6   Q.   Are you aware that after this lawsuit was filed,

 7   Mr. Moore assigned his copyright interest in Joyful Noise to

 8   yourself, Mr. Gray and Mr. Ojukwu?

 9   A.   Yes, I'm aware of that.

10   Q.   And that was about three weeks after the lawsuit was

11   filed; is that correct?

12   A.   Yes.

13   Q.   And Mr. Moore also removed himself as a plaintiff from

14   this lawsuit; is that correct?

15   A.   That is correct.

16          MR. MOVIT:  I'd like to show the witness a joint

17   Exhibit 5, please.

18          THE COURT:  Is Exhibit 5 in evidence?

19          MR. MOVIT:  I believe there's no objection to five.

20          MS. LEPERA:  No objection, Your Honor.  It's also

21   been reviewed.

22          THE COURT:  Okay.  So you may display it.

23   BY MR. MOVIT:

24   Q.   Mr. Lambert, have you seen this document before?

25   A.   Yes, sir.
```

64

```
1    Q.   This is a document entitled song writer split

2    acknowledgment; is that correct?

3    A.   That's correct.

4    Q.   Okay.  And if we could please scroll down to the

5    signature box.  And that is your signature, Mr. Lambert

6    that's been highlighted?

7    A.   Yes.

8    Q.   Okay.  And so you signed this document; is that correct?

9    A.   That is correct.

10   Q.   And your signature is dated November 8, 2014; is that

11   correct?

12   A.   Yes, sir.

13   Q.   And this document, Mr. Lambert, if we could please

14   scroll up provides you with a 15 percent share of Joyful

15   Noise; is that correct?

16   A.   That is correct.

17   Q.   Do you have any knowledge of how that number was

18   determined?

19   A.   Uh, yes.  My understanding is that the determination was

20   based on the amount of bars.  So, um, Marcus Gray, I think he

21   did 16 bars.  Lecrae Moore did 16 bars to my knowledge, and

22   then I did eight so the percentage was based on the amount of

23   bars.

24   Q.   I would like to show the witness his deposition

25   testimony on page 84 line 16 through 25, please.  Is it fine
```

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 136

1   to publish to the witness?

2           THE COURT:  You may.

3           MR. MOVIT:  Mr. Lambert, at your deposition you're

4   asked the following question:

5           "Q.  Do you have any knowledge it says here writer

6   Emanuel Lambert and it has your publisher Seasack, name Truth

7   on Duty, and then it has a percent.  For you it says 15

8   percent?  Do you see that?"

9   Q.   That was a question you were asked?

10  A.   Yes.

11  Q.   And your answer was, "yes, sir".  Is that correct?

12  A.   Yes, sir.

13  Q.   And the next question was, "Do you have any knowledge of

14  how that number was determined?"  Is that correct?

15  A.   That is correct.

16  Q.   Okay.  And your answer was no.

17  A.   Yes, sir.

18  Q.   Okay.  So at your deposition you testified you had no

19  knowledge of how the 15 percent allocation was given to you;

20  correct?

21  A.   That is correct because at the time I did not.

22          THE COURT:  I am sorry.  We're going to have to

23  take a break, a very short break.  Do you have much to go?

24          MR. MOVIT:  Less than five minutes.

25          THE COURT:  Five minutes is fine, and then we'll

```
 1    break before redirect.
 2    BY MR. MOVIT:
 3    Q.   And before the entry of the song writers split
 4    acknowledgment that you signed, before that you believe you
 5    had a different percentage of the song in terms of your
 6    ownership; is that correct?
 7    A.   Are you speaking of the revised or the original?
 8    Q.   Was there an original in that document, Mr. Lambert
 9    before this Exhibit 5 that we've just looked at?
10    A.   Yeah, it was earlier when Mr. Kahn and we were talking
11    about the original 12 percent, and then after Lecrae assigned
12    the rights, yes, that changed, the number changed.
13    Q.   So you originally had 12 percent?
14    A.   Yes.
15    Q.   But that was not in any document; is that correct?
16    A.   Um, I'm not sure.
17    Q.   Do you have any document --
18    A.   No, I don't.
19    Q.   So you have no document with that 12 percent; correct?
20    A.   That's correct.
21    Q.   Are you aware that your attorneys have never given us
22    any document with that 12 percent for you?
23    A.   All right.  No, I'm not aware of that.
24    Q.   And this song writer split acknowledgment was signed
25    after the lawsuit was filed on July 1st, 2014; correct?
```

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 138

 1    A.    That's correct.

 2    Q.    So several months after you signed?

 3    A.    Yes.

 4    Q.    And this document was signed about six years after the

 5    creation of Joyful Noise; is that correct?

 6    A.    Yes.

 7    Q.    And everyone who signed this document was represented by

 8    Eric Kayira at the time of signing; is that correct?

 9    A.    That is correct.

10    Q.    And this document was entered into after Mr. Moore gave

11    up his rights in Joyful Noise; is that correct?

12    A.    That's correct.

13            MR. MOVIT:  No further questions, Your Honor.

14            THE COURT:  Okay.  Then why don't we take a short

15    recess of about 10 minutes and we will come back with

16    redirect.

17            Ladies and gentlemen, please keep my admonition in

18    mind.  Don't discuss the case with one another or anyone else

19    and we'll be back in 10 minutes, and then go till about

20    12:30.

21                    (Recess taken.)

22            THE COURT:  Okay.  Mr. Kahn.

23                    REDIRECT EXAMINATION

24    BY MR. KAHN:

25    Q.   Mr. Lambert, I just have a few follow-up questions.  I

EXHIBIT 2
PAGE 139

```
1    want to start where Mr. Movit left off.  If you recall, you
2    still have your deposition transcript in front of you?
3    A.   Yes.
4    Q.   And if you recall, if you turn to page 84, this is when
5    he was asking you about the 15 percent?
6    A.   Yes.
7    Q.   And he had you look at the last three lines on that page
8    where you were asked, "Do you have any knowledge how that
9    number was determined?"  And your answer was no; correct?
10   A.   Correct.
11   Q.   He didn't have you turn the page.  So turn the page to
12   page 85 and let me read the next questions and you read your
13   answers and tell me if they're accurate.
14             "Okay.  Did you agree to accept the 15 percent
15   share of the song?"
16   A.   I did.
17   Q.   "Did you ask for any explanation as to why you got
18   15 percent as compared to Marcus or Ojukwu?"
19             And what did you say?
20   A.   Yes.  I understand that we were -- my understanding is
21   that we were splitting a hundred percent, um, so my role in
22   the song didn't warrant anything more than what I received.
23   I thought it was fair.
24   Q.   "So you agreed to receive a smaller amount?"
25   A.   Yes, sir.
```

```
 1    Q.    Mr. Movit also asked you about whether you had any

 2    impression the first time you heard the song Dark Horse;

 3    correct?

 4    A.    Correct.

 5    Q.    And you said no, you didn't have any.  And then you

 6    asked him a few minutes if you could clarify.  He said that

 7    wasn't your role there.  So let me allow you to clarify.

 8          Do you recall why you didn't have an impression the

 9    first time you heard Dark Horse?

10    A.    Yes, because the first time I heard it was in the

11    context of a music video.  So my focus wasn't actually the

12    song itself so much as it was the images and the visuals.

13    Q.    And since that first time, have you had opportunities to

14    listen to Dark Horse after that?

15    A.    Yes, sir.  Yes, when I heard it independent of the music

16    video, yeah, actually I could hear some things a lot more

17    clearly.

18    Q.    And when you did hear it more clearly, did you believe

19    that the instrumental beat in Dark Horse was similar to the

20    beat in your song?

21    A.    Absolutely.

22    Q.    You were asked earlier a whole series of questions about

23    whether you had any knowledge if someone had provided a copy

24    of Joyful Noise to one of the individual defendants, one of

25    the corporate defendants, whether they attended any concerts,
```

```
 1   whether they received the song from someone else, whether
 2   they downloaded it from the Internet.  And your answer was
 3   no.  Correct?  You had no knowledge?
 4   A.   That's correct.
 5   Q.   As you sit here today is there any way you could find
 6   out whether someone gave a copy of that song to anyone?
 7              MR. MOVIT:  Objection.  Calls for speculation.
 8              THE COURT:  Overruled.
 9              THE WITNESS:  No.  As I stated earlier, there was
10   no way that I could know.  Um, it's one of the things I was
11   trying to stress.  Um, there's no way that I would know
12   anything like that.
13   BY MR. KAHN:
14   Q.   And for example at concerts, do you get a list of the
15   concert attendees?
16   A.   No, we don't.
17   Q.   So if it's a large crowd out there and the light's not
18   bright, you couldn't even tell me other than a few people who
19   might come up to you, who attended?
20   A.   That is correct.
21   Q.   Mr. Movit asked you some questions about the copyright
22   registration.
23   A.   Yes.
24   Q.   Do you have any training in the law?
25   A.   No, sir.
```

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 142

1    Q.    And you're not a lawyer; correct?

2    A.    That is correct.

3    Q.    Good for you.  Do you know or have any knowledge of what

4    is actually required in order to file an application to

5    register a copyright?

6    A.    I do not.

7    Q.    Do you know when an application to register a copyright

8    must be filed?

9    A.    I do not.

10   Q.    Do you know the paperwork that's required to have a

11   copyright filed?

12   A.    I don't.

13   Q.    Is that something you left up to the lawyer?

14   A.    Absolutely.

15   Q.    So we've confirmed you have a 15 percent share in this

16   copyright in Joyful Noise; correct?

17   A.    Correct.

18   Q.    And you decided to be part of this lawsuit; correct?

19   A.    Correct.

20   Q.    Why did you decide to be a party to this lawsuit?

21   A.    Fairness.  Um, you know, for our genre, it's a growing

22   genre.

23   Q.    And your genre is?

24   A.    Christian hip hop.  Um, we were really proud of this

25   body of work.  Um, kind of one of the biggest songs I think

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 143

```
 1    that we've ever -- that's ever been recorded in our genre.
 2    And for that to be exploited, you know, I mean, the truth is
 3    we just want what is right, what is fair and what is just.
 4    Q.   And that's why you're here today?
 5    A.   And that's why we're here today.
 6              MR. KAHN:  Thank you, Mr. Lambert.  I have nothing
 7    further.
 8              THE WITNESS:  Thank you.
 9              MR. MOVIT:  May I do a very brief recross?
10              THE COURT:  Sure.
11              MR. MOVIT:  Thank you, Your Honor.
12                           RECROSS-EXAMINATION
13    BY MR. MOVIT:
14    Q.   Mr. Lambert, in your testimony earlier this morning, you
15    spoke about your percentage share of Joyful Noise under the
16    song writers agreement being based upon the number of bars
17    that you contributed to in the song.
18              But there's nothing that you said in your
19    deposition testimony about counting the number of bars; is
20    that correct?
21    A.   That is correct.  That was information that I became
22    privy to a lot later, yes.
23    Q.   So later than the time in 2017 when you gave your
24    deposition; correct?
25    A.   That is correct.
```

1    Q.   And many years after the release of Joyful Noise;

2    correct?

3    A.   That is correct.

4    Q.   Mr. Lambert, um, the entire song of Dark Horse, the

5    entire musical recording of Dark Horse, the recording is in

6    the music video; is that correct?

7    A.   Yes.

8    Q.   So when you watched the music video, you hear the entire

9    recording of Dark Horse; correct?

10   A.   That is correct.

11            MR. MOVIT:  No further questions.

12            THE COURT:  Anything further?

13            MR. KAHN:  Nothing, Your Honor.

14            THE COURT:  Then you may step down.  Thank you very

15   much.

16            Who is next?

17            MR. KAHN:  Your Honor, the next witness will be

18   Katheryn Hudson, but because we had designated portions of

19   her deposition to be read and her counsel then wants to

20   follow-up with direct examination, we will start by reading

21   her deposition.  The video is not available.  And then

22   Mr. Chieffo will, I believe, call Ms. Hudson live; is that

23   correct?

24            THE COURT:  Is that what we agreed to?

25            MR. CHIEFFO:  Yes, Your Honor.

```
 1              THE COURT:  Fine.  Then that's how we will proceed.
 2              MR. KAHN:  Ms. Cohen will have the unenviable role
 3    of playing Katy Perry.
 4              MR. CHIEFFO:  May I confer?
 5              THE COURT:  Sure.
 6              And ladies and gentlemen, let me try to explain
 7    what we're doing here because I know it seems a little
 8    unusual.  Because we were not sure whether Ms. Perry would be
 9    called today or after she was going to become unavailable,
10    the plaintiffs had the right to put her testimony on through
11    her deposition.  In other words, to read to you what she
12    testified to in her deposition which you should treat exactly
13    as if she were testifying in court.
14              Her counsel, Mr. Chieffo has decided that since
15    she's here, he's going to ask her questions live as part of
16    his case and as part of any follow-up on what the plaintiffs
17    have put on.  What the bottom line is what is being read to
18    you now and what Ms. Perry testifies to should all be
19    considered as the same sort of live testimony.  In other
20    words, you ought to treat what is read on the stand just the
21    same as you would when someone is testifying here in the
22    courtroom.
23              MR. KAHN:  Thank you, Your Honor.  And as
24    Mr. Chieffo mentioned and I think it's a good idea which I'll
25    pass along to Ms. Cohen, if there is an objection in the
```

```
 1    margin, we will pause before an answer.

 2              THE COURT:  I could actually short cut that.  I'm

 3    prepared to overall all the relevance objections and there is

 4    a hearsay objection that I'm going to sustain.

 5              MR. KAHN:  Okay.  I will do my best to avoid that

 6    question.

 7              THE COURT:  Please.

 8              MR. KAHN:  Start on page 7 of the deposition of

 9    Katheryn Elizabeth Hudson taken on Wednesday, March 13th of

10    this year.

11                          EXAMINATION

12    BY MR. KAHN:

13    Q.   Could you state your full name for the record,

14    Ms. Hudson?

15    A.   Yes.  My name is Katheryn Hudson.

16    Q.   Okay.

17    A.   Katheryn Elizabeth Hudson.  Excuse me.

18    Q.   And you perform under the name Katy Perry?

19    A.   Yes.

20    Q.   In your original album back in 2001 which was I believe

21    entitled Katy Hudson?

22    A.   Yes.

23    Q.   Is that Christian music or Christian gospel music or

24    both?

25    A.   Christian music mostly.
```

EXHIBIT 2
PAGE 147

1   Q.   Okay.  According to the records I have seen, the Prism

2   album was released on October of 2013.  Is that your

3   recollection?

4   A.   Yes.

5   Q.   Turn to page 17.  Back in the early 2000s, did you have

6   a MySpace page?

7   A.   Yeah.

8   Q.   And what did you do with that place on MySpace?

9   A.   I used it to promote myself mostly.

10   Q.   In what period of time were you using it to promote

11   yourself?

12   A.   Well, when was MySpace created?

13   Q.   I think it was created in the 1990s, but I don't know.

14   We can leave it in the -- during your professional career.

15   A.   I would say that probably like 2000.  I don't -- I don't

16   recall.  I don't want to generalize that.

17   Q.   Would it be fair to say some time between 2000 and 2010?

18   A.   Definitely, not 2000.  Maybe 2006.  I could look up when

19   I first posted my first MySpace video.

20   Q.   You would be able to find it?

21   A.   Yeah, probably.  Let's just do a quick look.

22   Q.   Okay.

23   A.   It looks about 2007.  I mean, it's not a video.  It's

24   just an article talking about me being on MySpace in 2007.

25   Q.   Okay.  So you were still there in 2007?

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 148

1    A.    That's probably around when I started.

2    Q.    Oh, when you started.  I'm sorry.

3    A.    Yeah.

4    Q.    And are you still there or have you --

5    A.    No.

6    Q.    -- left?

7    A.    We can look into that more.

8    Q.    No, that's okay.  You were probably on for at least a

9    year or two?

10    A.    Yes.

11    Q.    When we took Dr. Luke, Mr. Gottwald's deposition, he

12    compared it back then to Facebook.  Is that how you would

13    describe MySpace back then?

14    A.    Yeah.

15    Q.    Next page.  Ms. Hudson, I've given you what's marked as

16    Perry Exhibit 2 which is the first page of the Wikipedia

17    entry for your Prism album.  And principally I just want to

18    focus on a couple of fact to make sure that they're -- that

19    they're accurate.

20          So it opens that in the second sentence this was

21    released by Capital Records on October 18, 2013.  As far as

22    you know, is that accurate?

23    A.    Yes.

24    Q.    My understanding is there were 13 songs on the original

25    album, and then there's 16 on the deluxe?

1    A.    Yes.

2    Q.    That's your understanding.  The third paragraph it talks

3    about different release dates.  It mentions that Roar was

4    released on August 10, 2013 as the album's lead single.

5    Unconditionally debuted on October 16th as the record's

6    second single.  It says in between the release of these two

7    tracks were the releases of the promotional singles Dark

8    Horse on September 17th and Walking on Air on September 30th.

9    And then it says Dark Horse was released as the album's third

10   single three months later on December 17, 2013.

11          As far as you know is that accurate?

12   A.    Correct.

13   Q.    And what is your understanding of a release of a

14   promotional single?

15   A.    Well, I guess it would be like, uh, it's not really -- I

16   don't think that that would be something I would define it

17   as.  It was more of a teaser to the record.

18   Q.    So to try to encourage record sales when the record got

19   released?

20   A.    Yes, excitement.

21   Q.    Do you know who makes the decision as to when to release

22   a single or a promotional single?

23   A.    Yes, it's me and my team.

24   Q.    So it's not Capital Record?

25   A.    They're part of the team.

```
1    Q.    Okay.  So you were consulted on these release dates?

2    A.    Yes.

3    Q.    All right.  I'm gonna read you a quote from an article.

4    So you can read along with me, I'll have it marked as Perry

5    Exhibit 4.  We mark this -- this is from an October 14th,

6    2013 issue of the New Yorker.  It was a profile of

7    Mr. Gottwald written by John Seabrook and there's a quote

8    here about the creation of these songs.

9          I suppose all of the songs you've identified with

10   Dr. Luke.  It's a quotation from you and I'll read it into

11   the record.  I just want to ask you a couple questions about

12   it.

13         "Luke and Max came to Santa Barbara, Perry told me

14   and we'd hang out.  Go to the ocean.  Have nice dinners.

15   There's this really amazing studio we like to work at called

16   the Secret Garden and it's in the woods of Montecito.  We go

17   there and listen to music.  We do a lot of YouTubing.  We

18   drink some Chablis.  Luke and his protege Cirkut make these

19   little beds of music for me to listen to.  Not too long.

20   Just kind of appetizer size, and then they'll do the full

21   entrees if I like them."

22         Is that a fairly accurate description of the

23   creation process?

24   A.    Yes.

25   Q.    And I love your description little beds of music
```

80

1    appetizer size.  Roughly, how many of these appetizers do you

2    recall them playing for you?

3    A.    I don't recall.

4    Q.    Would it have been more than seven or eight?

5    A.    Yes.

6    Q.    In other words, they played for you more of these

7    instrumental beds that ultimately became songs in the album.

8    Is that fair to say?

9    A.    Possibly.

10   Q.    Okay.  So an appetizer size instrumental, how long would

11   that be?

12   A.    It could be anything from a drum beat to, you know,

13   eight bars of music.

14   Q.    Okay.  Now, I'm gonna play for you an instrumental track

15   that we received from Mr. Walter, Cirkut's lawyer which is

16   actually much longer than eight bars.  The lawyer and I quote

17   says, "This contains the earliest version of the audio file

18   containing the instrumental track that became Dark Horse."  I

19   will play 30 seconds of it.

20   A.    Sure.

21         MR. KAHN:  And then, Your Honor, we have an

22   agreement with counsel we can play the 30 seconds that we

23   played during Ms. Hudson's deposition.

24         THE COURT:  All right.

25              (Music played.)

EXHIBIT 2
PAGE 152

81

1    BY MR. KAHN:

2    Q.   Obviously you recognize the instrumental because that is

3    what became the instrumental for the song.  Do you recognize

4    either part of something that was played for you when they

5    had these -- these appetizer size beds?

6    A.   Yes, but I don't recall if that was in that shape.

7    Q.   What do you recall?

8    A.   I mean, it could have been less bare bones like with

9    less structure to it.

10   Q.   Okay.  And that would have been not unusual at that

11   point?

12   A.   Yes.

13   Q.   Okay.  So the first 12 or 13 seconds is this arpeggio of

14   four notes going up and down.  Should we call that part one,

15   theme one?  I mean, what would you call that as a musician?

16   A.   Which part?

17   Q.   The first.  Those first 13 seconds?

18   A.   Right.  Well, I don't read music and I don't know how to

19   reference music.  We'll just call it the intro.

20   Q.   Okay.  Got the intro.  And then we'll call the next

21   part, what should we call that?

22   A.   The beginning of the verse.

23   Q.   Okay.  So we have the intro, and then we have the

24   beginning of the verse.  As you sit here today, can you

25   recall whether in that session with the bed where you heard

EXHIBIT 2
PAGE 153

1    the intro or you heard the beginning of the verse?

2    A.    I don't recall.

3    Q.    Do you recall what appealed to you when they played it?

4    A.    The kind of dark feeling with it.  I'm sorry.  About it.

5    Q.    Page 40.  Ms. Hudson, I'm going to show you what's been

6    marked as Perry Exhibit 5 which is a document I printed off

7    of a website just to make sure I understand all the lyrics.

8    It's not from your website.  I would ask you if you wouldn't

9    mind reading through it and telling me if this appears to be

10   an accurate transcription of the lyrics for Dark Horse?

11   A.    Yes.

12   Q.    I'm gonna ask the court reporter to mark as the next

13   exhibit Perry Exhibit 6, a homemade document that lists what

14   I believe, and you can correct me if I'm wrong, are the five

15   music videos from the Prism album.

16          According to this exhibit that we made, by we I

17   mean myself, there were five music videos from the songs on

18   the Prism album.  Namely, Roar, Birthday, Unconditionally,

19   Dark Horse and This Is How We Do.

20   A.    Correct.

21   Q.    Is that correct, Ms. Hudson?

22   A.    Correct, correct.

23   Q.    Okay.  To your knowledge, who was involved in the

24   decision to make a song into a music video?

25   A.    Me and my team.  My team and I.

```
1    Q.   And that team would include Capital Records?

2    A.   Correct.

3    Q.   Who was involved in the budget decisions for a music

4    video?  How much to spend on it?

5    A.   It was a conversation between me and my team which

6    included Capital Records.

7    Q.   Okay.  Do you recall what the budget was for creating

8    the Dark Horse video?

9    A.   Not exactly, but I know it was over a million dollars.

10   Q.   And as you look down the list of this Exhibit 6 of the

11   other four, was there any video that had a budget larger than

12   the budget for Dark Horse?

13   A.   I don't recall.  Possibly Roar.

14   Q.   As you look at that list, are there any music videos

15   that had a budget smaller than the one for Dark Horse?

16   A.   Yeah.

17   Q.   Which were those?

18   A.   I don't know for sure, but I would imagine, yes.

19   Unconditionally, This Is How We Do.

20   Q.   How about Birthday?

21   A.   Not sure.

22   Q.   Based on your recollection, do you believe Roar and Dark

23   Horse were the two most expensive music videos?

24   A.   Possibly.

25   Q.   Now, what role did you have in the music video creation
```

1    besides starring in it and singing in it?

2    A.   Well, creative direction, story line editing.

3    Q.   So the whole process.

4    A.   The whole process.

5    Q.   Were you pleased with the result?

6    A.   Yes.

7    Q.   Ms. Hudson, I'm giving you the first page of -- marked

8    Perry Exhibit 7 of a Wikipedia printout of the Prismatic

9    World Tour.  According to the facts in the block on the right

10   side, this tour started in May of 2014 and ended in October

11   of 2015; is that correct?

12   A.   Correct.

13   Q.   And it looks like you performed 151 shows in total

14   around the world.

15   A.   Correct.

16   Q.   Including 66 in North America.

17   A.   Correct.

18   Q.   I'm sorry.  Strike that.  In the 66 concerts you

19   performed in North America, did you include Dark Horse in the

20   play list in all 66?

21   A.   Correct.

22   Q.   I think I have one more.  In the version of Dark Horse

23   that you performed at the Super Bowl, that part one that we

24   listened to, the introductory portion of the instrumental was

25   not included.  It went right into part two.  Who made that

```
 1   decision?
 2            MS. COHEN:  I think you missed one designation from
 3   page 56.
 4            MR. KAHN:  Oh, I apologize to the jury.
 5   Q.   One of the songs you performed at the Super Bowl was
 6   Dark Horse; correct?
 7   A.   Correct.
 8   Q.   As we established earlier, the lawsuit alleging
 9   infringement of my client's song had been on file already for
10   six months; correct?
11   A.   Correct.
12   Q.   In the version of Dark Horse that you performed at the
13   Super Bowl, the part one that we listened to, the
14   introductory portion of the instrumental was not included.
15   It went right into the part two.  Who made that decision?
16   A.   It probably was a combination of me and my musical
17   director.
18   Q.   And do you recall why you decided to drop that opening
19   12 seconds?
20   A.   Because we had to make all the songs fit.
21   Q.   Okay.
22   A.   And the chorus is the most identifiable part of the song
23   I'd imagine.
24   Q.   Okay.  In addition to any conversations you had with
25   your attorney before today, Ms. Hudson, did you do anything
```

EXHIBIT 2
PAGE 157

1   to prepare for this deposition?

2   A.   I reread that article up and to the point that you

3   highlighted, and then I also looked at my statement.

4   Q.   That article would be?

5   A.   The New Yorker.

6   Q.   The New Yorker that we --

7   A.   Article.

8   Q.   -- marked as Exhibit 4.  So you read that article

9   including the quote that I read to you?

10  A.   Correct.

11  Q.   And did you do anything else to prepare?

12  A.   Just spoke with my team.

13  Q.   Okay.  In that quote that I read you from Exhibit 4, you

14  say we went -- we go there and listen to music.  We do a lot

15  of YouTubing.  We drink some Chablis.  What is YouTubing?

16  A.   Looking things up on YouTubing, on YouTube.

17  Q.   And how would you do that?  On a complete screen?  On a

18  computer screen or on a TV or?

19  A.   On a computer screen.

20  Q.   Look things up and play them?

21  A.   Yes.

22          MR. KAHN:  That's all the designated portions.

23          THE COURT:  Okay, Mr. Chieffo.

24          MR. CHIEFFO:  I'd ask Ms. Hudson to take the stand,

25  please.

```
 1              THE CLERK:  Please raise your right hand.

 2                     (Witness sworn.)

 3              THE CLERK:  Please be seated.

 4              Please state your full name and spell your last

 5     name for the record.

 6              THE WITNESS:  My name is Katheryn Elizabeth Hudson.

 7     My last name is spelled H-u-d-s-o-n.

 8              THE CLERK:  Thank you.

 9                     DIRECT EXAMINATION

10     BY MR. CHIEFFO:

11     Q.   I guess it's still good morning.  We'll proceed.

12              You've just listened to the reading of a portion of

13     your deposition transcript from a deposition was taken

14     earlier.  Yes?

15     A.   Yes, correct.

16     Q.   So I'm gonna ask you some questions that sort of arise

17     out of that testimony.  And let me just start cause this

18     lawsuit seems to be about this, the creation of Dark Horse.

19              Now, I think the deposition portion ended with you

20     explaining how the instrumental bed that you were listening

21     to had a dark feeling.  Do you recall that testimony?

22     A.   Correct.

23     Q.   All right.  So I'd like, if you can, sort of in a

24     narrative way to explain to the jury how the ultimate song

25     Dark Horse came into existence co-written by you and
```

```
 1   performed by you ultimately starting from that time in

 2   Santa Barbara when you first heard what the other two

 3   defendants had created.  So what generally happened next

 4   after you listened to that?

 5   A.    After I listened to the small portion that was

 6   presented?

 7   Q.    Right.

 8   A.    After I heard the sounds that were presented, um, by

 9   Luke and Henry, um, which were presented in a medley of

10   files, in many different files.  And so we would hear the

11   different files or I would hear different files and if

12   something sparked my interest, I'd go hmm, I have some ideas

13   or themes or, um, titles that I think would fit well on this

14   type of sound.

15           And so I heard the sound and I actually called one

16   of my friends who was in Los Angeles and we were in

17   Santa Barbara which is where I go to make most of my music.

18   Um, and I called her up.  And I said, we had never written

19   together before, but I knew she was an up and coming song

20   writer.  And I said you've got to get here.  I think that you

21   would love this sound, and I have this idea or metaphor about

22   what the song should be.

23           Um, so she came and we collaborated with lyrics.

24   Um, my strengths are lyrics and melody.  And what we

25   typically do is we volley kind of lyrics.  It's like a game
```

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 160

1    of synonyms so it's like finding the right word or the right

2    title or the right theme.  And this theme was kind of a

3    metaphor about, well, it was a moody metaphor a little bit

4    about like the Trojan horse and the power of a woman and how

5    not to cross a woman because, um, that karma is not good for

6    you.

7    Q.   And the collaborator you're speaking about was Sarah

8    Hudson; correct?

9    A.   Correct.

10   Q.   Who's here today?

11   A.   Yes.

12   Q.   And how -- the -- the process of the melody creation,

13   your song writing for the melody of your singing, how did

14   that proceed?

15   A.   Um, it can proceed many different ways, but for me

16   typically, I'll just start humming whatever kind of comes on

17   top of my head.  It's kind of like when you hum something in

18   the shower just randomly.  You start with that, and then I

19   put it down in my phone usually in a voice note.  And I'll

20   play it for Luke and Max and Cirkut and see what, see what

21   they say.

22        And it really is about best melody wins and

23   everybody contributes.  Um, and it's, it's quite a long

24   process and a very serious process so much so that, you know,

25   we all leave our lives and go to Santa Barbara, um, and leave

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 161

90

1    our families and take time out of the year to really

2    investigate and to really, um, really take seriously the art

3    and the craft of making songs.

4    Q.    And at some point, Mr. Houston became involved; correct?

5    Juicy J?

6    A.    Yes, correct at the very end.

7    Q.    And what was his contribution?

8    A.    Uh, Juicy J did a verse on the song.  He ended up coming

9    in after the song was finished.

10    Q.    And was that a rap verse?

11    A.    Correct.

12    Q.    Was that the first time in one of the songs you've

13    written the performance would then have a rap verse?

14    A.    It's not the first time.

15    Q.    What were the prior examples?

16    A.    Um, prior examples were I had Kayne West on a song

17    called ET.  I had Snoop Dog on a song called California

18    Girls.  Those are some examples.

19    Q.    In general is it unusual these days in pop music to

20    include a rap verse or two?

21    A.    Uh, no, collaborations are very usual.

22    Q.    Now, ultimately, we had a completed song that then went

23    through the technical process and was released on Prism; is

24    that correct?

25    A.    Correct.

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 162

```
 1              MR. CHIEFFO:  I'd like to play at this moment
 2    Your Honor, I don't think the jury has heard it yet, what's
 3    Exhibit 76.  I believe there's no objection.
 4              MR. KAHN:  No.
 5              THE COURT:  All right.  You may.
 6              MR. CHIEFFO:  Exhibit 76 is the sound recording of
 7    Ms. Hudson's performance and Juicy J's performance of Dark
 8    Horse as it appears on the Prism album.
 9              THE COURT:  Okay.
10              THE WITNESS:  I could perform it for you live.
11              MR. CHIEFFO:  Counsel has kindly lent me his tech
12    and we hope to return the favor later in the trial.
13                  (Exhibit 76 played for the jury.)
14    BY MR. CHIEFFO:
15    Q.   Mr. Kahn asked you about the Super Bowl performance and
16    he asked you some questions about that -- in that performance
17    the Dark Horse song was performed without the intro.  Do you
18    recall that?
19    A.   Correct.
20    Q.   What was -- do you know the reason why?
21    A.   Yes.
22    Q.   -- that was done?  Can you explain it to the jury,
23    please?
24    A.   For the Super Bowl, I was allotted about 12 minutes and
25    I wanted to put in as many songs as possible.  So therefore,
```

```
 1   I had to do what is called a medley which is basically weave
 2   in the most familiar songs all together for the enjoyment of
 3   the audience and that's what I did.
 4   Q.   Do you recall how many songs were actually included in
 5   that 12-minute performance?
 6   A.   I believe eight or so.
 7   Q.   And Missy Elliott and Lenny Kravitz were also performing
 8   with you?
 9   A.   Correct.
10   Q.   And is it fair to say that in the editing process that
11   affected all these songs, you and your team decided it was
12   more important to have the chorus of Dark Horse than the 12,
13   few second introduction of the song?
14   A.   Correct.
15   Q.   And all the other songs were edited as well?
16   A.   Correct.
17   Q.   Now, I think counsel mentioned that and I believe the
18   album's name was Katy Hudson, your original album in 2001.
19   Can you tell the jury more about the content and the song
20   writing in that album?
21   A.   Yes.  Um, my journey has been long.  I started singing
22   when I was nine years old in church because both my parents
23   were pastors at the time.  And then I went to Nashville,
24   Tennessee about 13 when I learned how to play the guitar.
25   And in Nashville, Tennessee I learned how to craft a song and
```

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 164

1    the importance of lyrics and melody and the all around song.

2           When I was in Nashville, I made a Christian pop

3    record.  Um, I was about 13, 14, 15 when I was making it.  It

4    came out when I was about 15.  And it was not successful

5    necessarily, um, because the label that I was on at the time

6    went bankrupt so they could not promote me any more.

7    Q.    Do you recall approximately how many copies of that

8    album sold?

9    A.    I would say hundreds, in the hundreds, maybe 200, 300.

10   Q.    Now, that album I think was released, you said it was

11   released in 2001.  Since then how has artistic goals and

12   intentions as a song writer performer, have they developed

13   since then?

14   A.    Yes.  Uh, my, uh, my goal's always been to be a

15   messenger of authenticity and vulnerability and truth and my

16   own perspective.  Um, and to share that with the world

17   through three minute, three 30 second songs.  And after I

18   left, I came back to Los Angeles when the label basically

19   went bankrupt.  Um, I worked a job and I got to meet my

20   mentor at 17 when my father drove me up to Los Angeles from

21   Santa Barbara which is where I'm from.

22           And from then on, I was from 17 to 23, I was

23   writing songs every day and he was teaching me how to write

24   songs.  And I was signed on three different record labels and

25   let go from three different record labels.  And then at 23, I

```
 1   got my first big chance with a song called I Kissed A Girl.
 2   Q.   And ultimately, I Kissed A Girl was on which of your
 3   studio albums?
 4   A.   Uh, my first one as Katy Perry.  I only made one record
 5   as Katy Hudson when I was a young teenager.  Um, and that was
 6   called One of the Boys.
 7   Q.   And in general did you have an artistic vision for the
 8   song writing and performing in One of the Boys?
 9   A.   Yes, very much so.  I mean, I would say seven out of ten
10   times, I would not only see the narrative or the story line
11   of what could be a video when I was creating and writing the
12   song, um, but what the tour could be.  Sound with me goes
13   very well with visuals and it's something that is very clear
14   to me.  And so, yes.  Um, does that answer your question?
15   Q.   Yes.  And the same goal you had -- well, you have four
16   more studio albums?
17   A.   Correct.
18   Q.   Including Prism?
19   A.   Correct.
20   Q.   And what were the other three?
21   A.   One of The Boys was first.  Then it was Teenage Dream,
22   and then it was Prism.  And the last record is called
23   Witness.
24   Q.   Now, there was some testimony elicited by Mr. Kahn, and
25   I think you just mentioned it also.  Part of your creative
```

1    imaging is how will these songs you're writing be presented

2    on tour.

3    A.    Correct.

4    Q.    I'm not gonna ask you to detail everywhere, but is it

5    fair to say when you tour, it's a pretty extensive schedule?

6    A.    Yes, sir.  I did on Prismatic World Tour which was

7    correlating to the record Prism, I did 151 shows.  Never

8    cancelled a show.  Very proud of it.  Um, showed up to all of

9    them even if I got a little cold and traveled the world for

10   over a year on that particular tour.

11   Q.    Do you recall whether you had any time off during the

12   Prismatic World Tour?

13   A.    Yes, I have balance in my life.  And so I create that

14   also in my tours and I do about four shows a week.  That

15   would be two, uh, two consecutive, and then a day off which

16   is consecutive, and then maybe another two days off.

17   Q.    You didn't take three-month vacations during that time,

18   did you?

19   A.    No, that would cost a lot of money for everyone

20   especially me.

21   Q.    And, again, I'm not asking you to detail it, but can you

22   generally give us an idea of the types of venues where you

23   were performing?  Let's focus on the Prismatic World Tour.

24   A.    On the Prismatic World Tour, I toured all arenas and

25   arenas vary from 10,000 to 20,000 people.

1    Q.    Now, prior to this lawsuit being filed, have you ever --

2    had you ever heard of any of the plaintiffs or even Lecrae

3    Moore?

4    A.    No, sir.

5    Q.    And had you heard any music that any one of them whether

6    together or individually may have created?

7    A.    No, sir.

8    Q.    Since the lawsuit have you heard any music that they've

9    created?

10   A.    Only what's in question.

11   Q.    The Joyful Noise song?

12   A.    Correct.

13   Q.    And you talked a little bit about developing from a

14   teenager in the gospel music of your youth, and then moving

15   into a much more pop music field, but have you made any habit

16   of searching whatever MySpace or YouTube or any online

17   searching for, you know, Christian focus music since your

18   teenage years?

19   A.    No habit, sir.

20   Q.    And you were questioned about a phrase I think you used

21   called YouTubing?

22   A.    Correct.

23   Q.    And the questions were focused on you and Max and Luke

24   in Santa Barbara listening to these beds of music.   Did

25   anybody sitting there go look to try to find Joyful Noise

97

1    while you're trying to create what became the beginning of

2    the Prism album?

3    A.    At that time a form of entertainment would be to go on

4    YouTube and watch videos of cats and that's what we did when

5    we drink white wine for a break from our ears.

6    Q.    I may stop drinking Chablis because the cat part.  You

7    haven't really -- let me just ask.  I thought did at one

8    point testify about one day where you did listen to some

9    gospel music?

10   A.    Correct.

11   Q.    When was that?

12   A.    For the Super Bowl, I, um, was preparing backstage.  Um,

13   I was taking it very serious.  It was a very serious event

14   for me.  It's the ceiling of being a performer.  It's really

15   touching the sky.  And I don't wish it upon anyone, but it is

16   an incredible opportunity.  And, um, I wanted to honor the

17   journey that I had been on since I was a nine-year-old girl

18   singing in church.

19          And when I was singing in church, I used to sing Oh

20   Happy Day and His Eyes on the Sparrow and I would listen to

21   DC Talk and Kirk Franklin.  So to remember that young child,

22   um, that young little girl that had this dream and had come

23   so far, I put on Kirk Franklin so I could listen to, um, his

24   music and gospel and just prepare my mind, my heart and my

25   soul for this big event.

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 169

98

1    Q.   And I think it's Reverend Franklin.  It's sort of

2    traditional choir, large choir, church choir gospel

3    performances?

4    A.   Correct.

5                MR. CHIEFFO:  If I may confer, Your Honor, we may

6    be able to take a lunch break soon.

7                THE COURT:  Okay.

8    BY MR. CHIEFFO:

9    Q.   I think he asked you about you having a MySpace page?

10   A.   Yes.

11   Q.   Sometime in the 2000s?

12   A.   Yes.

13   Q.   Do you remember what your video, your first video you

14   may have posted on your MySpace page?

15   A.   Yes, I put a song that had an accompanying video called

16   You're So Gay.

17   Q.   And then do you recall around what year that was?  You

18   said in the testimony I think 2007.

19   A.   Yes, I think it was about then.

20   Q.   Now, I mean, from a career purpose, what was the

21   function for you, the purpose for you of having a MySpace

22   page?

23   A.   MySpace was the first of social media or one of the

24   first.  And it would be a place you could direct people to

25   listen to your music or whatever you were promoting at the

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 170

99

1    time and that's what I would use it to.  It would be like

2    having your own YouTube channel these days.

3    Q.    And let me just clarify one thing.  I thought I asked

4    you about whether before this lawsuit was filed had you ever

5    heard the song Joyful Noise?

6    A.    No, sir.

7    Q.    So you never heard it before you listened to it after

8    they sued you?

9    A.    Correct.

10                  MR. CHIEFFO:  Thank you, Your Honor.

11                      CROSS-EXAMINATION

12   BY MR. KAHN:

13   Q.    I just have a few follow-up questions.  Sarah Hudson is

14   not your sister; correct?

15   A.    Correct.

16   Q.    Um, she had testified that her role in helping with the

17   lyrics, it was fairly quick.  Took about four hours.  Is that

18   consistent with your recollection?

19   A.    Correct.

20   Q.    And you indicated in, I guess, even in my deposition,

21   but when Mr. Chieffo was asking, that you stopped doing

22   Christian music after 2001?

23   A.    Correct.

24   Q.    And why is that?

25   A.    Because I was no longer on a Christian label.

EXHIBIT 2
PAGE 171

1    Q.    Okay.  And did you stop listening to Christian music

2    after 2001?

3    A.    Basically.

4    Q.    And why is that?

5    A.    Because I was mostly always listening to what they call

6    secular music any ways.

7    Q.    Did you read anything or hear anything about the size of

8    the audience, the TV audience, for your Super Bowl

9    performance?

10   A.    Yes, sir.

11   Q.    How big was it?

12          MR. CHIEFFO:  I just want to check.  That was your

13   sustained.

14          THE COURT:  The sustained hearsay objection.  It

15   calls for hearsay, but she may know independently.  Although,

16   I doubt without hearsay.

17   BY MR. KAHN:

18   Q.    It was a large audience; correct?

19   A.    Very.

20   Q.    And as far as copyright filings, registrations and

21   stuff, you don't do that personally, do you?

22   A.    I have a team that manages all the logistics.

23   Q.    And the last question I have goes to an interesting

24   comment of yours.  That when you are writing a song, you're

25   actually visualizing not just the song, but how it would look

```
 1    in a music video; correct?
 2    A.   Correct.
 3          MR. KAHN:  If Mr. Chieffo, doesn't object since
 4    Ms. Perry will not be with us, can we show the music video
 5    and let Ms. Perry identify it of Dark Horse?
 6          MR. CHIEFFO:  No objection, Your Honor.
 7          MR. KAHN:  Okay.  We will show this and that will
 8    probably be it.
 9              (Exhibit 77 played for the jury.)
10          MR. KAHN:  That was Exhibit 77, Your Honor.  May we
11    offer Exhibit 77 into evidence?
12          THE COURT:  I think so.  There's no objection;
13    correct?
14          MR. CHIEFFO:  No objection.
15              (Exhibit 77 admitted.)
16    BY MR. KAHN:
17    Q.   You said that when you heard the instrumental way back
18    in Santa Barbara, it had a dark -- that what appealed to you
19    was the darkness of it?
20    A.   Correct.
21    Q.   And this sort of a vision you had as you're writing this
22    song as captured in the music video?
23    A.   Not every vision that I have when creating out the song
24    turns out to be the music video so I wouldn't say it was the
25    exact vision necessarily.
```

1    Q.    But it was a dark vision.

2    A.    No.   The texture and the sound of the song was dark,

3    moody, like the twilight zone.

4    Q.    Okay.  And that's what appealed to you?

5    A.    Correct.

6              MR. KAHN:  Thank you very much.

7              MR. CHIEFFO:  Nothing further, Your Honor.

8              Thank you, Ms. Hudson.

9              THE COURT:  All right.  You may step down.

10             Thank you.

11             So is this a good moment for a noon recess?

12             Okay.  Why don't we return if we can as close to

13   1 o'clock as possible and we will pick up and forge ahead at

14   that time.  Please keep an open mind.  Don't discuss the case

15   with one another or anyone else and we'll see you back at

16   1:00.  Thank you.

17                  (Jury not present.)

18             MR. KAHN:  Your Honor, I should have moved

19   admission of the exhibits that were mentioned in the reading

20   of Ms. Hudson's deposition and I suppose also in the sound

21   recording.  So Exhibits 53, 55, 74 and I believe the sound

22   recording is 76, the one we played.  I'm sorry.  74.

23             MR. CHIEFFO:  We actually have pending objections

24   to the Wikipedia pages and things like that.  I don't think

25   that's evidence.

```
 1            THE COURT:  I don't think it's either.

 2            MR. CHIEFFO:  Well, can I have a chance to take a

 3    look?

 4            MR. KAHN:  You know what, Your Honor?  If there is

 5    an objection and you've already ruled on it, we will not move

 6    to admit that exhibit.

 7            THE COURT:  Just to be clear, my earlier comments

 8    were directed to the objections in the deposition not to the

 9    objections to the exhibits.  And let me leave it there and

10    let you meet and confer and see if you can come to an

11    agreement.  If there's something I have to resolve, I will.

12            MR. CHIEFFO:  Very well.

13            MR. KAHN:  Thank you, Your Honor.

14            THE CLERK:  This court's in recess.

15                      (Recess taken.)

16            THE CLERK:  So I understand we have an issue we

17    want to take up.

18            THE COURT:  Okay.

19            MR. KAHN:  So Your Honor, here is -- here is the

20    issue.  Um, Mr. Ojukwu will testify this is -- he created FL

21    Studios in 2010 the instrumental beat that became the basis

22    for Joyful Noise.  Um, the defendant had a security

23    operation, parameter security.  We gave 'em a copy of

24    Mr. Ojukwu's hard drive, and they were able to extract that

25    particular file that's identified.  Um, I'm not sure, I don't
```

1     have it in front of me now, but it's got a name.

2           So that is the file.  But in order to display it --

3     you can have a Word document, but in order to display it, you

4     have to have Word loaded onto your computer.  So the only way

5     this can be displayed for Mr. Ojukwu to be able to explain

6     how he used the program is to have it loaded onto a computer

7     and then put this thing that the defendants produced so it

8     can be displayed.

9           He's gonna not do anything with it physically, he's

10    not gonna start playing stuff, but it's simply a way of

11    displaying it, and the defendants object to that.

12          MS. LEPERA:  Yes, Your Honor.

13          And this is where it gets into the technology issue

14    because what Mr. Kahn just said is incorrect.  We did not get

15    a computerized program from Paramount Securities.  We got

16    audio files, the audio files of what Mr. Ojukwu created on

17    Joyful Noise, and that is obviously something that we will

18    stipulate can be used.

19          They've now had their trial graphics guy come up

20    with a program FL Studios, and they want to use this program

21    which has never been authenticated.  We haven't tested it if

22    it's the right program.  We don't know if it's FL Studios or

23    anything.  They have not disclosed it.  They -- we actually

24    have Exhibit 16 which is what they claim this is.  We don't

25    have that document, Your Honor.  Defendants do not know what

1    this document is and therefore reserve our right to object.

2    And we don't --

3         So it's not analogous to anything that he's saying.

4    It's not something we had.  Respectively, there's versions of

5    Word which are obviously from 2007, 2009, you can't just say

6    I'm gonna put up a version, and he's gonna show how I created

7    a document or how I created a beat with a computer program.

8    The audio files that we got off of his hard drive is a

9    different story.  So it's not appropriate, Your Honor.

10        THE COURT:  Okay, Mr. Kahn, what do you have to say

11   in response?  If they haven't seen it, they haven't seen it,

12   and then I don't know how you can use it.

13        MR. KAHN:  Your Honor, we -- both sides had the

14   actual, um, thing from the hard drive.  So we both had access

15   to it.  We identified it.  They gave us that particular file.

16   We're simply trying to figure out how to show it on a screen.

17   Um, and it was the screenshot we took which we showed to them

18   beforehand.

19        THE COURT:  Well, why can't -- and maybe I'm

20   misunderstanding the point, but why can't we just show them

21   the screenshot without showing them something on Word?

22        MS. LEPERA:  The FL Studios program has many

23   variations, many iterations just like any computer program.

24   We're talking it's 2019 now.  It was 2007.  And that is why

25   we got the hard drive to have the security system extract the

1    audio files that he created for Joyful Noise.

2            We do not have, and we never received the

3    opportunity to go and look at a computer program at FL

4    Studios and have him put a screenshot and say this is the one

5    that was used to create those audio files just like this is

6    the Word program to create these audio files.

7            It's a third party vendor.  It's a third party

8    computer program.  It's nothing that's authenticated.  It's

9    blatant hearsay that this is the program in specifics.  So I

10   don't know what, in fact, is the point.

11           If there's an audio file of the beat, he will

12   explain this is the audio file I've created on an FL Studios

13   program, what's the difference, because he's bringing in now

14   hearsay as to what this FL Studios program looked like.  And,

15   um, we object.  It's hearsay, it's not authenticated, and

16   it's not something that we can verify with FL Studios.

17           THE COURT:  Well, I think that's --

18           MS. LEPERA:  At this late point.

19           THE COURT:  That is the problem, Mr. Kahn.  I --

20           Here is what I have to say.  I think we have to go

21   forward without putting this up on Word.  If you can later

22   authenticate it, and you need to recall the witness, you

23   know, I'll consider it, but I just don't think we can do it

24   right now, and we can't have these debates on the jury's time

25   cause we really need to move forward.

```
 1              MR. KAHN:  I understand, Your Honor.

 2              THE COURT:  Okay?

 3              MS. LEPERA:  One other brief issue, Your Honor.

 4              Your Honor made a ruling in liminae that there

 5      would be no evidence to suggest a moral rights violation.

 6              THE COURT:  I -- I know.  I heard the testimony.

 7              MS. LEPERA:  I'd like a caution, Your Honor.

 8              THE COURT:  Yeah, I -- I saw you, uh, chomping at

 9      the bit and decided not to do it based on Ms. Perry's answer.

10      But this is not a moral rights case.  We're not an element of

11      damage.  Even if there were a finding of infringement, the

12      element of damage is not taking their work and -- and, uh,

13      uh, subjecting it to, uh, whatever.

14              MR. KAHN:  And Your Honor, I understand that, and

15      if I didn't use my words, uh, properly, I apologize.  We

16      viewed the -- the dark as the texture of the song, not as to

17      some moral rights issue, and we don't intend to argue --

18              THE COURT:  Well, but --

19              MR. KAHN:  -- that the dark texture . . .

20              THE COURT:  Why do you care if the song is dark if

21      you aren't going to suggest that there's some moral rights

22      issue that somehow has -- uh, the darkness is impacted the

23      value of their song and composition?

24              MR. KAHN:  No.  It's -- it would be -- with the

25      expert opinions on the different elements, it would be the
```

EXHIBIT 2
PAGE 179

```
 1   texture of the two elements.  We're not -- we have no intent

 2   to violate the Court's order or to argue that there's any,

 3   uh, damage to our clients through Ms. Perry's -- rather

 4   Ms. -- Ms. Hudson's statement that what appealed to her was

 5   its darkness.

 6           THE COURT:  That's -- does your expert say that

 7   your client's beat has a dark texture?

 8           MR. KAHN:  He will talk about texture.  I don't

 9   know cause --

10           THE COURT:  I don't think he will.  That's why I am

11   raising the questions I am and why Ms. Lepera is, too.

12           MS. LEPERA:  Thank you, Your Honor.

13           He does not say it's a dark texture.  The entire,

14   um, effort here on the part of Mr. Kahn notwithstanding his

15   professed recitation thereof is to suggest a difference in

16   morality.  And the big theme has been their professed

17   Godliness with all due respect, um, and our client's

18   apparently not.  And that is not appropriate for this case.

19           And the last question he asked Ms. Perry is it's a

20   dark vision; correct?  Vision and texture are two different

21   things, and I suggest we -- I -- I would almost like the jury

22   instructed at this point if Your Honor would do that --

23           THE COURT:  I --

24           MS. LEPERA:  -- on this.

25           THE COURT:  I really am not prepared to do it at
```

1    this point in light of Ms. Perry's answer --

2              MS. LEPERA:  Okay.

3              THE COURT:  -- which I think resolved the issue.

4              MS. LEPERA:  If we could have cautionary with Mr.

5    Kahn on this, thank you.

6              THE CLERK:  Are we ready for jury?

7              THE COURT:  Yes.

8              MR. KAHN:  Yes.

9              THE CLERK:  All rise.

10                     (Jury present.)

11             THE CLERK:  Please be seated.

12             THE COURT:  Okay.

13             Who is next?  Mr. Kahn.

14             MR. KAHN:  Your Honor, we call, uh, Chike Ojukwu.

15             THE COURT:  Okay.

16             Mr. Ojukwu, please come forward.

17             THE CLERK:  And please raise your right hand.

18                     (Witness sworn.)

19             THE CLERK:  Please be seated.

20             Please state your full name, and please spell your

21    full name for the record.

22             THE WITNESS:  Yes.  My name is Chike Gregory

23    Ojukwu.  My last name is spelled O-j-u-k-w-u.

24             THE COURT:  And go ahead.

25

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 181

```
 1                      DIRECT EXAMINATION

 2   BY MR. KAHN:

 3   Q.   That's an unusual last name, sir.  What's the origin of

 4   that name?

 5   A.   It's Nigerian.

 6   Q.   That's your father?

 7   A.   Yes.

 8   Q.   And your mother?

 9   A.   Uh, my mom's from here, from America.

10   Q.   And you're one of the plaintiffs in this lawsuit;

11   correct?

12   A.   I am, yes.

13   Q.   Um, currently, do you have a day job?

14   A.   I do.

15   Q.   What -- what is your day job?

16   A.   Um, I'm a trainer at a cable company teaching people how

17   to talk on the phone and handle the computers.

18   Q.   And do you have another career outside of your day job?

19   A.   I do.

20   Q.   And what is that other career, Mr. Ojukwu?

21   A.   I'm a music producer.

22   Q.   Okay.  And what -- for the jury's benefit, what does it

23   mean to be a music producer?

24   A.   So as a music producer, I would, uh, create, uh, the

25   musical composition of the song like or beat or something
```

EXHIBIT 2
PAGE 182

```
 1    like that.  Uh, um, and then from there, I would, you know,
 2    uh, present it to someone so that way, we could create a full
 3    song.
 4    Q.    And how are your -- well, I guess back in 2007, how were
 5    your beats when they were being converted to songs being --
 6    being used?
 7    A.    Yeah.  Um, uh, they were used for, uh, uh, hip hop
 8    songs, R&B songs for people to rap and sing on.
 9    Q.    In any particular genre within hip hop and R&B?
10    A.    Yeah, specifically Christian hip hop.
11    Q.    Okay.  Is that still the case today?
12    A.    No, it's not.
13    Q.    Now, you've been identified as one of the creators of
14    the composition Joyful Noise that appeared in the album Our
15    World Redeemed; is that correct?
16    A.    Yes.
17    Q.    And the jury's now heard the song.  We may the entire
18    song played.  What portion of Joyful Noise did you create?
19    A.    Uh, the music.
20    Q.    And the music being the beat or the instrumental?
21    A.    Yes.
22    Q.    What do you prefer to call that?
23    A.    We call it the best.
24    Q.    You call it the beat.  Okay.  And for the beat for
25    Joyful Noise, when did you create that?
```

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 183

1    A.    Uh, in 2007.

2    Q.    Okay.  And were you able to make a living back in 2007

3    creating beats?

4    A.    Yes.

5    Q.    How old were you back then?

6    A.    Uh, like 20, 21?

7    Q.    Okay.  And when you would create a beat, how would you

8    let potential, um, collaborators know about your beat?

9    A.    Um, I would, um, post my beat on MySpace, uh, or, you

10   know, I might have contacted somebody directly, maybe, you

11   know, worked on beats like that.

12   Q.    And what was MySpace from your perspective like back in

13   2007 for a producer?

14   A.    Yeah.  Um, as a producer, it was an easy way for me to

15   post, uh, beats, uh, for people to see, uh, online and then

16   contact me as well.

17   Q.    Okay.  And when you would post a beat online, um, did

18   you have in mind some goal for what was gonna happen?

19   A.    Yeah.  Uh, it was the hope that, you know, somebody

20   would hear my beat, they would like it, uh, and they would

21   contact me, and then from that point, you know, we might work

22   together on a song.

23   Q.    Mm-mm.  And did you -- on some of these beats, did you

24   sometimes just sell them outright and keep no rights in the

25   song?

EXHIBIT 2
PAGE 184

```
 1    A.    Um, I always -- well, it just depended on the situation.
 2    Sometimes I did, um, uh, sell my beats outright.  Sometimes I
 3    did make, uh, connections with artists, and we did work on
 4    those songs thereafter.
 5    Q.    And would you -- in those situations, did you keep
 6    rights in whatever the song was that was produced?
 7    A.    Yes, I did.
 8    Q.    And did you have a general practice for those songs when
 9    you kept the rights --
10    A.    I did, yeah.
11    Q.    -- as to how much of the rights you would keep?
12    A.    50 percent.
13    Q.    50 percent.  Now, what -- and we're gonna get into this
14    cause I don't know how to create beats.  Maybe some of the
15    jury does, but we're gonna go into detail on this.  But, um,
16    when you would create a beat, what -- what would you create
17    it with?
18    A.    Uh, I used a program called FL Studio.
19    Q.    That's something on your computer?
20    A.    Yes.
21    Q.    Okay.  And I've heard the term, I don't know what it
22    means, a session file?
23    A.    Yes.
24    Q.    What is a session file?
25    A.    So the session file is the file that I would save in
```

```
 1    that particular program, um, uh, with the beat contained that

 2    I created.

 3    Q.   Okay.  And, um . . . with -- would it be more than

 4    file?

 5    A.   Um, it would be one file at a time, but I have many.

 6    Q.   And when you posted something up on MySpace to try to

 7    market that beat, is that -- are those session files what you

 8    posted on MySpace?

 9    A.   No.  Um, from that session file, I could -- uh, I could

10    render out an MVV -- an MP3 file.  Uh, from there, I could

11    post it onto MySpace so people could hear it.

12    Q.   And your goal, I understand, was to hope some rap

13    artists would like the file and create a song.

14    A.   Yes.

15    Q.   And you said that you would keep a 50 percent interest

16    in the song?

17    A.   Yes.

18         MS. LEPERA:  Objection.  Vague.  Asked and

19    answered.

20         THE COURT:  Overruled.

21         You may answer.

22    BY MR. KAHN:

23    Q.   And when you say the song, you mean you keep a

24    50 percent interest in the music and the lyric?

25    A.   Yes.
```

```
 1    Q.    So the entire song.

 2    A.    Yes.

 3    Q.    Now, as a professional musician, Mr. Ojukwu, do you

 4    listen to music?

 5    A.    I do.

 6    Q.    Do you listen to music on a regular basis?

 7    A.    I do, yes.

 8    Q.    And what would you define as a regular basis?

 9    A.    Every day.

10    Q.    Okay.  Did you listen to a particular type of music?

11    A.    Um, no, I listen to all -- all music.

12    Q.    Give me examples of the types of music you listen to.

13    A.    Uh, rap, hip hop, R&B.  Uh, pop, country.  Any . . .

14    any genre.

15    Q.    Okay.  Now, you mentioned that you used this program, FL

16    Studio I think --

17    A.    Yeah.

18    Q.    -- you called it?  To, um, create an instrumental?  And

19    let's use Joyful Noise as an example.  Um, I want you to try

20    to explain to me and to the jury how you go about creating,

21    and in particular, Joyful Noise?

22    A.    Sure.

23    Q.    Um, and first off is a -- is a preliminary.  This is

24    electronic music?

25    A.    Yes, it is.
```

```
 1   Q.   But there are no actual instruments in what you're
 2   creating.
 3   A.   No.
 4   Q.   No violins?  No trumpets?
 5   A.   No.
 6   Q.   Okay.  And you used the computer.
 7   A.   Yes.
 8   Q.   And back then, you used this FL Studio program; correct?
 9   A.   I did, yes.
10   Q.   Now, so what kind of choices do you need to make as you
11   were creating one of these beats?
12   A.   Yes.  So, uh, in that particular program, I could pull,
13   uh, a particular sound or a synth, uh, which could be like an
14   electronic creation of a sound.
15        Um, and then from there, uh, pulling it from that
16   browser, I could pull it into the actual program.
17        Uh, from there, it could be a base drum, a snare
18   drum, a hi-hat, uh, that would comprise the beat, you know,
19   the first layer of it.
20        And then from there, I could also add other sounds
21   to it as well to create a full song.
22        Um, I could also, uh, decide, um, the notes, how
23   long I want that note to be, um, how long I want the song to
24   be, how fast I want the song to go.
25        So it's -- you're completely -- it's completely
```

1    expansive on how you can make that beat.

2    Q.    So you get to pick the notes you want to play.

3    A.    Yes.

4    Q.    And you get to pick which instruments, other sounds you

5    want to include in that beat?

6    A.    Yes.

7    Q.    Do you have an ability to adjust the volume of the

8    particular . . .

9    A.    Yes.  Among many things, I could adjust volume.  I could

10   also adjust, um, uh, the pan as well which is basically

11   hearing it in one ear or in the other ear if you're listening

12   to the music.  I could also, uh, manipulate the frequencies

13   of the sound.  So there's a -- there's -- there's a lot of,

14   uh, different things that you could do in that program with

15   the sounds.

16   Q.    Okay.  Can you control the -- can you control the tempo?

17   A.    Yes.

18   Q.    And the timber, the way things sound?

19   A.    Yes.

20   Q.    And you mentioned drums.  In this particular, um,

21   instrumental beat you created that eventually became Joyful

22   Noise, how many drums -- different drums were there?

23   A.    I had -- I believe I had two base drums.  I had a, uh,

24   snap as well that would, uh, take the place of the snare.

25   Uh, hi-hats as well.  Uh, there were bongos, I believe, in

1    there as well.  That was just the -- the drum portion.

2    Q.    And so roughly, how many different sounds or instruments

3    are in Joyful Noise that you created?

4    A.    A lot.

5    Q.    Like more than five?

6    A.    Yes.

7    Q.    Okay.

8    A.    So, I mean, if I was to give an estimate, maybe about

9    12.

10   Q.    About 12.

11   A.    Mm-hmm.

12   Q.    And on these instrumental beats, how long does it take

13   you to create one?

14   A.    Um, I mean, it varies.  It could take me five minutes

15   if, you know, the -- if I'm just, you know, super inspired,

16   it could go really quick or it may take me a little bit

17   longer depending on the process or if I like it or if I want

18   to make changes to it later so it could take two weeks.

19   Q.    Okay.  Um, and did you create this instrumental beat for

20   what became Joyful Noise?  Did you -- did you create that on

21   your own?

22   A.    I did, yes.

23   Q.    And you picked every note and sound?

24   A.    Yes.

25   Q.    You picked the tempo?

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 190

119

1    A.    Yes.

2    Q.    You picked the timber?

3    A.    I did, yes.

4    Q.    I asked you earlier there's no live instrument.  It's

5    all electronic; correct?

6    A.    Yes.

7              MR. KAHN:  Um, so we have an MP3 of it which is,

8    um, it's either Exhibit 16 or Exhibit 17.  It's not the FL

9    Studios.  It's just the MP3 part that we wanted to play.

10              MS. LEPERA:  Which exhibit?

11              MR. KAHN:  Pardon?

12              MS. LEPERA:  Which exhibit?

13              MR. KAHN:  We think it's -- it may be 16?  It may

14   be 17?

15              MS. LEPERA:  16 is what we showed the judge.

16              MR. KAHN:  16 is what we showed the Judge, but

17   we're not gonna play the FL Studios.  Within that is an MP3.

18              MS. LEPERA:  Okay.

19              MR. KAHN:  Well, there's gonna be nothing shown to

20   the jury.  There's gonna be nothing shown at all.  It's gonna

21   be the recording.

22              THE COURT:  But are you playing the recording for

23   him or for the jury?

24              MR. KAHN:  Well, first for him so he can identify

25   it as his beat, and then we would ask for permission to play

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 191

1    it for the jury.

2            MS. LEPERA:  I'm just trying to clarify what

3    exhibit it is, Your Honor.

4            THE COURT:  I understand.

5            Do you know what exhibit?

6            MR. KAHN:  Well, it is Exhibit -- it's the MP3

7    that's within Exhibit 16 which we're not gonna show or doing

8    anything with the FLP file.  It's just gonna be played.

9            MS. LEPERA:  Is it 17?

10           MR. KAHN:  Is it 17?  I think -- I think it's 16.

11           Anyway, it's the beat that has been in the case.

12           THE COURT:  Well, let's -- before we -- before we

13   do it, why don't we identify what it is so everyone in the

14   room knows, and objections can be made.

15           MR. KAHN:  Okay.  It's an MP3 file.

16           It's not an FLP studio file.

17           THE COURT:  Does it have an exhibit number?

18           MR. KAHN:  Well, it's within Exhibit 16 to my

19   understanding which is the FLP file, but we're not playing

20   that portion.  We're instead playing just the MP3.

21           MS. LEPERA:  Your co-counsel said it was

22   Exhibit 17?

23           MR. KAHN:  She was mistaken.

24           MS. LEPERA:  Right.  Both of which say the same

25   thing.

121

```
1              THE CLERK:  Well, 16 is admitted.

2              THE COURT:  No, it isn't.  16 is not in.

3              THE CLERK:  No?  With Mr. Lambert?

4              MR. KAHN:  So it's the MP3 for Mr. Lambert that

5    is -- has already been admitted, and that's all we're gonna

6    play.  We're not gonna show the FLP files.

7              MS. LEPERA:  Okay.  So it's part of 16.

8              MR. KAHN:  Yes.

9              MS. LEPERA:  Okay.

10             THE COURT:  It's part of 16, and it's the part of

11   16 that we admitted when Mr. Lambert was testifying.

12             MR. KAHN:  Yes.  Just the recording part.  That's

13   all we're --

14             MS. LEPERA:  Okay.

15             THE COURT:  That's fine.

16             MR. KAHN:  And --

17             MS. LEPERA:  That's fine.

18             MR. KAHN:  -- since it's already been identified by

19   Mr. Lambert, can we just have it played?

20             MS. LEPERA:  Absolutely.  I just want to make sure

21   17 wasn't . . .

22             MR. KAHN:  It's confusing, I apologize.

23             MS. LEPERA:  Thank you.

24             MR. KAHN:  Anyway, let me back up.  We're gonna

25   play . . .
```

```
 1   Q.   Well, we want you to identify it.  Mr. Lambert

 2   identified it as the beat, but you were the one who created

 3   it so --

 4   A.   Correct.

 5   Q.   -- listen to what is, um, gonna be played and tell me if

 6   this is the beat you created for Joyful Noise.

 7   A.   Okay.

 8   Q.   Or what became Joyful Noise.  At the time, it was just a

 9   beat you put on MySpace.

10   A.   Yes.

11                          (Music played.)

12   BY MR. KAHN:

13   Q.   Do you recognize that beat, Mr. Ojukwu?

14   A.   Yes, I do.

15   Q.   And what is that beat?

16   A.   Uh, that's the beat that I created.

17   Q.   Okay.

18   A.   Yeah, and it was eventually used in Joyful Noise.

19   Q.   Okay.  So going back to 2007, you've taken us through

20   your creation of the beat.  Um, let's take to the next step.

21   You put it up on the MySpace.

22   A.   Yes.

23   Q.   And what happens next in 2007?

24   A.   Um, I was contacted, uh, by a friend of Flame, Flame was

25   with him, and they said that, uh, Flame wanted to use the
```

1    beat for his song.

2    Q.    Okay.  And just to be clear, Flame is the performing

3    name of Marcus Gray; correct?

4    A.    Yes.

5    Q.    Do you call him Flame or do you call him Marcus?

6    A.    I do call him Flame.

7    Q.    Okay.

8    A.    Yeah.

9    Q.    Um, and when you were contacted by Mr. Gray, did you

10   already know him or was he somebody you never met?

11   A.    I did.  Um, uh, before that, I -- we had bible classes

12   together, uh, we had bible study, um, and so we talked about

13   the bible, of course.  We also had conversations about music

14   as well.  He was actually working on, um, uh, some albums.

15   Um, and, uh, I got, um, one song in there, and he said that

16   he liked this -- uh, he liked the beat that I -- that I

17   created.  And, um -- and then from there, he actually then

18   contacted me about that second beat which is -- which became,

19   uh, Joyful Noise.

20   Q.    And did he pay you any money for that beat?

21   A.    He did, yes.

22   Q.    What did he pay you?

23   A.    Uh, $300.

24   Q.    Okay.  And at the time that he acquired the beat and

25   paid you the $300, did you have any discussion about

1    ownership rights?

2    A.    We did, yes.

3    Q.    Tell me what that discussion was.

4    A.    Um, he told me that I would own half of the song, uh,

5    and that would be 50 percent.

6    Q.    Okay.  So you'd own half of the song itself.

7    A.    Yes.

8    Q.    The music and the lyrics.

9    A.    Yes.

10    Q.    Okay.  And was there a written agreement back then?

11    A.    No, there was not.

12    Q.    Was that your practice back then when you were 21 or

13    whatever to have written agreements or just oral agreements?

14    A.    I didn't really have like agreements, um, uh, by

15    definition, but in that case, yeah, it was -- it was

16    something we spoke about so that could be considered an oral

17    agreement, yes.

18    Q.    Okay.  And since then, we've seen an actual written

19    agreement.  It was marked as Exhibit 5.  It was the sound,

20    the songwriter split agreement?

21    A.    Yes.

22    Q.    Um, and that's an agreement you signed?

23    A.    Yes.

24    Q.    And what percentage of the song do you own in that

25    agreement?

1    A.    It's 50 percent.

2    Q.    And has that been, uh, your ownership throughout from

3    2007 as far as you understood through today?

4    A.    Yes.

5    Q.    Now, you're contacted by Mr. Gray.  He likes the beat.

6    He wants to use it in creating a rap song.  And, um, so I

7    assume at some point, you'd have to deliver to Mr. Gray

8    something with your beat on it; correct?

9    A.    Yes.

10          MR. KAHN:  It should be up there, maybe not,

11    Exhibit 17?

12          THE CLERK:  The book.

13          MR. KAHN:  And Ms. Cohen -- Mrs. Cohen can bring it

14    up to you.

15          THE CLERK:  It's not within the book?

16          MR. KAHN:  It is within the book.

17          THE CLERK:  Do you want to use this one?

18          MR. KAHN:  No, it was in the list of all the stuff

19    that was included.

20          MS. LEPERA:  I'm talking about 17.

21          Could we have a side bar, Your Honor?

22          THE COURT:  Yes, if we have to.

23          MS. LEPERA:  Never mind.

24    BY MR. KAHN:

25    Q.    So we're not gonna to do the exhibit.

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 197

1    A.    Okay.

2    Q.    17.  So the instrumental beat that we heard.

3    A.    Yes.

4    Q.    Well, first of all, when you -- without even looking at

5    an exhibit, when you sent your beat to Mr. Gray, what was it

6    that you sent?

7    A.    Um, so I initially sent him an MP3 so that way, he would

8    be able to hear the song.

9    Q.    And that was the MP3 that we just heard?

10    A.    Yes.

11    Q.    Okay.

12    A.    Um, and then after that, um, he contacted me again

13    because he needed, um, separate files so that way he would be

14    able to, uh, mix the files, um, do any recordings that he

15    needed to do with it in a -- in the program, Pro Tools.  Um,

16    and that's what I sent him.  I went back to FL Studio, um,

17    and then I rendered out, uh, wave files, separate wave files

18    for him to receive so that way, he would be able, uh, to, uh,

19    produce the beat from that point, the song.

20    Q.    Now, let me ask you a question about FL Studios.  If you

21    go into that program back in 2007, in addition to creating

22    your own stuff, were there like things that you could just

23    play or pre-existing creations that were part of the file?

24    A.    Um, there were.  Um, in -- in, uh -- in my case, I

25    didn't use anything that was pre-existing as far as melodies

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 198

1    or anything like that.

2    Q.    So you -- you created your own melody.

3    A.    Yes.

4    Q.    Okay.    You mentioned you listen to lots of music.

5    A.    Yes.

6    Q.    You listened to lots of music in 2007?

7    A.    Yes.

8    Q.    And every since 2008, 2009?

9    A.    I did, yes.

10    Q.    2010?

11    A.    Yes.

12    Q.    2011?

13    A.    Yes.

14    Q.    2012?

15    A.    Yes.

16    Q.    And all types of genres; correct?

17    A.    Correct.

18    Q.    Rap, soul, country?

19    A.    Correct.

20    Q.    Now, during all those years, did you ever hear a song

21    that had an instrumental beat that was similar in your view

22    to Joyful Noise?

23    A.    No, I did not.

24    Q.    So Joyful Noise was on an album called Our World

25    Redeemed.    Correct?

1    A.    Correct.

2    Q.    And we have an image of that as Exhibit 58.  It's been

3    shown, but maybe we can put it up again.  Is that the album

4    cover for Our World Redeemed?

5    A.    Yes, it is.

6    Q.    Now, did you ever see that album on sale in any stores?

7    A.    I did, yes.

8    Q.    Where did you see it?

9    A.    Um, I saw it at Best Buy.  Uh, also saw it on Amazon

10   online and various other retailers online as well.

11   Q.    Okay.  So it was out there to be -- to be purchased.

12   A.    Yes, it was.

13   Q.    Okay.  Now, and we may show this later on, there's a --

14   there was a music video created of Joyful Noise; correct?

15   A.    Yes.

16   Q.    And were you involved in the actual production of that

17   music video?

18   A.    Uh, I didn't create the video, but I was in the video.

19   Q.    Oh, really.

20   A.    Yes.

21   Q.    And in what way?

22   A.    Uh, so Flame invited me to come to the shooting of the

23   video.  I -- I live in St. Louis, and we shot the video in

24   Atlanta, and I went down there, and I was a part of the music

25   video.

1    Q.    So you're in there on the stage somewhere?

2    A.    Yes.

3    Q.    And if you click on that video to play it, how long

4    would it take before you would hear the instrumental version

5    that you created?

6    A.    It would be right away.

7    Q.    So is that the way the song opens?

8    A.    Yes.

9    Q.    Now, you said you had a MySpace page back in 2007?

10   A.    Yes, I did.

11   Q.    Uh, how long do you -- was that page active?

12   A.    Mmm, um . . . probably right after high school so maybe

13   eight years?  Something like that.

14   Q.    And is -- is it still active or not anymore?

15   A.    I don't use it, no, I don't think it's active anymore.

16   Q.    And back then in 2007, 2008, um, did Mr. Gray have a

17   MySpace page?

18   A.    He did, yes.

19   Q.    How do you know that?

20   A.    I went to it.

21   Q.    Okay.  And when you went to it, was there a link there

22   to Joyful Noise?

23   A.    Yes, there was.

24   Q.    And we've heard about Lecrae Moore, one of the other

25   writers and performers.  Back then, did he have a MySpace

1    page?

2    A.    He did, yes.

3    Q.    How do you know that?

4    A.    I went to it.    Mm-hmm.

5    Q.    And did he have a link on that page to Joyful Noise?

6    A.    He did, yes.

7    Q.    Okay.    Have you ever attended a concert in which Flame,

8    Mr. Gray, performed?

9    A.    I did, yes.

10    Q.    More than one?

11    A.    About two or three.

12    Q.    Okay.    Do you recall where they were and when?

13    A.    Um, there was one in St. Louis.    Um, I think it was the

14    same year that the -- uh, the album came out.    Um, and then

15    another one in, uh, Kansas City, I believe.

16    Q.    Okay.    Do you recall what the venues were?

17    A.    Uh, they were churches.

18    Q.    Churches?

19    A.    Mm-hmm.

20    Q.    And you attended those two concerts?

21    A.    I did, yes.

22    Q.    And did, uh, Mr. Gray perform Joyful Noise at either

23    one?

24    A.    He did, yes.

25    Q.    At both?

1    A.    Yes.

2    Q.    And another performer that was one of the original, um,

3    creators of Joyful Noise we've heard is Lecrae Moore.  Have

4    you ever attended any of his concerts?

5    A.    Yes.

6    Q.    How many of those?

7    A.    Um, just one in St. Louis.

8    Q.    Okay.  And when -- and do you recall that venue?

9    A.    Uh, it was a church.

10    Q.    A church?

11    A.    Mm-hmm.

12    Q.    And during his performance, did he perform Joyful Noise?

13    A.    He did, yes.

14    Q.    Okay.  Um, now, you understand that this lawsuit in

15    which you're a party is over the instrumental beat in Dark

16    Horse; correct?

17    A.    Yes.

18    Q.    And that lawsuit was filed in 2014?

19    A.    Correct.

20    Q.    And you've listened -- you listened to Dark Horse before

21    the lawsuit was filed?

22    A.    I did, yes.

23    Q.    Okay.  Have you listened to it since?

24    A.    I did.  Yes.

25    Q.    And do you find any similarities between your

```
 1    instrumental in Joyful Noise and the one in Dark Horse?

 2    A.    I absolutely do, yes.

 3    Q.    What I would like to ask you to do, Mr. Ojukwu, is we're

 4    gonna play the sound recording of Dark Horse.

 5    A.    Okay.

 6          MR. KAHN:  Which I believe is Exhibit 76?

 7    Q.    And I want you to listen to it.

 8          And whenever you hear what you believe is an

 9    instrumental similar to yours, I want you to raise your hand,

10    and I want you to keep it up until that portion of the song

11    ends and another portion comes in.  And then do it again each

12    time just so we can get a sense from you as the creator of

13    that beat which form do you think is similar.

14    A.    Okay.

15          MS. LEPERA:  Objection, this witness has not been

16    qualified as a musicologist, I take it.

17          THE COURT:  Um, I don't think assuming this, it's

18    his lay opinion, but I have a bigger problem.  How are we

19    gonna record that his hand is up and going down through the

20    record?  How do you -- how do you intend to preserve the

21    record?  Because the court reporter can try, but I can't bear

22    witness to the fact that it's going to be completely

23    accurate.

24          MS. LEPERA:  I also think it invades in the

25    province of the jury.
```

EXHIBIT 2
PAGE 204

```
 1              THE COURT:  Well, it does.  That's the next problem
 2    because the jury has to decide the question of whether the
 3    songs are similar.
 4              MR. KAHN:  Right.
 5              THE COURT:  So why is he giving his lay opinion on
 6    that subject?
 7              MR. KAHN:  Because he was the creator of the beat
 8    that's at issue.
 9              THE COURT:  I'm not sure that gets us there.
10              MR. KAHN:  I mean, it -- it's -- he can listen to
11    the song, and when he hears what he thinks is his
12    instrumental, he can raise his hand.  The jury can disagree.
13              MR. CHIEFFO:  Your Honor, this is, you know -- this
14    is not even a lay opinion, of course.  The witness is a
15    plaintiff, uh, and so we're probably gonna stipulate to what
16    his view might be.  But this is not the way copyright
17    infringement needs to be proved extrinsically or
18    intrinsically.  Uh, he may in all good faith think those two
19    songs are identical, but that's not evidence in this case.
20              THE COURT:  No, I -- I understand, and I think -- I
21    think they are correct.  I don't think --
22              Obviously, I'm not suggesting that Mr. Ojukwu
23    doesn't have an informed opinion.  It's just it's not the
24    opinion that we should be giving to the jury because the
25    jury's gonna have to decide based on what they hear is what
```

134

```
 1    is substantially similar, and then the experts are gonna have

 2    to provide opinions, too.

 3              MR. KAHN:  Okay.

 4              THE COURT:  But I -- I think everyone could

 5    stipulate that he believes that certain passages of the, uh,

 6    composition are, uh, similar.

 7              MR. KAHN:  Okay.

 8              MS. LEPERA:  We can stipulate that's their claim.

 9              THE COURT:  Yeah.  I understand.

10              MR. KAHN:  So maybe we could just end then with --

11    I don't think we've yet played the full version of Joyful

12    Noise.

13    Q.   Um, so maybe we could end with that, and you can confirm

14    whether that's your instrumental?

15    A.   Okay.

16              MR. KAHN:  And then let the jury finally hear the

17    entire --

18              THE COURT:  I think that's appropriate.

19              MR. KAHN:  Okay.  And that would be Exhibit 75.

20                   (Exhibit 75 played.)

21    BY MR. KAHN:

22    Q.   Did we just hear Joyful Noise?

23    A.   Yes.

24    Q.   And we heard your beats.  So there's some mixing and

25    mastering that's going on after you send your beat?
```

1    A.    Yes.

2    Q.    Okay.  I think it's obvious to everyone that the lyrics

3    to Joyful Noise are Christian?

4    A.    Yes.  Very.

5    Q.    Um, but what is the instrumental beat?  What is that

6    genre?

7    A.    Uh, it's hip hop.

8            MR. KAHN:  Thank you.

9            Thank you, Mr. Ojukwu.

10            THE WITNESS:  Thank you.

11            THE COURT:  Okay, any cross?

12            Ms. Lepera.

13            MS. LEPERA:  Yes.  May I approach to give the

14    witness a copy of his transcripts?

15            THE COURT:  Sure.  Just give it to Ms. Jeang --

16            MR. LEPERA:  Thank you.

17            THE COURT:  -- and she'll take care of it.

18                    CROSS-EXAMINATION

19    BY MS. LEPERA:

20    Q.    Good afternoon --

21    A.    Hi.

22    Q.    -- Mr. Ojukwu?

23    A.    Ojukwu.

24    Q.    Juku.  No wu.

25    A.    Mm-hmm.  The w is silent.

1    Q.    Okay, no wu.  All right.  Um, let me first ask you

2    Mr. Kahn asked you about your conversation with Mr. Gray

3    regarding your rights in Joyful Noise.  Do you recall that?

4    A.    Yes.

5    Q.    And do you recall you discussed in your direct testimony

6    that you were paid $300 by Mr. Gray for the Joyful Noise beat

7    and another beat; correct?

8    A.    Yes.

9    Q.    Okay.  Isn't it, in fact, the case that you didn't have

10   any other agreement with Mr. Gray in 2007?  You didn't make

11   any direct agreement and didn't even know he was not gonna

12   pay you?

13   A.    Um, in that situation, no.

14   Q.    In that situation, you had no other agreement with him;

15   correct?

16   A.    No.

17   Q.    So when you testified earlier that you had an agreement

18   for 50 percent in 2007, that's not correct.

19   A.    Uh, in that situation, yes, that was the initial

20   agreement, 50 percent.

21   Q.    Sir, did you not testify that you in your deposition

22   which I'd ask you to look at.

23   A.    Mm-hmm.

24   Q.    Friday, November 17th, 2017, page 67, lines 12 to 18.

25         THE COURT:  Hang on until I get there.

137

1          MS. LEPERA:  Take -- take your time, Your Honor.

2          THE COURT:  Okay.  You may read it.

3          MS. LEPERA:  Okay.  Isn't it, in fact, the case

4    that you testified as follows:

5          "Q.  Did you enter into an agreement with him, we

6    can call agree that's Mr. Gray, in exchange for that $300

7    along the lines of what we were talking about earlier, a

8    buy-out agreement or a nonexclusive license?

9          "A.  We didn't make any direct agreement, didn't

10   even know he was going to pay me for the beat."

11   Q.   Do you recall giving that testimony in your deposition?

12   A.   Yes, I do.

13   Q.   And is it, in fact, the case that you had no discussion

14   with him about the type of agreement you were going to have

15   regarding the check at all?

16   A.   Um, no.  Not until he actually sent it.

17   Q.   You had no agreement with him regarding 50 percent;

18   correct?

19   A.   We did have that agreement, yes, but not an agreement

20   after that.

21   Q.   I will ask you to turn to page 68 and 69 from lines 24

22   to 4 on 69.

23          MR. LEPERA:  May I read it, Your Honor?

24          THE COURT:  Um, yes.

25          MS. LEPERA:  You were asked the following question:

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 209

1              "Q.  Did you have any discussions with him, again

2    we know that's Mr. Gray, about the type of agreement you

3    were -- when you got the check what this was for?

4              "A.  No.

5              "Q.  Or beforehand?

6              "A.  No."

7    Q.    Did you give that testimony --

8    A.    I did.

9    Q.    -- in November 2017?

10   A.    Yes.

11   Q.    Thank you.  There's been testimony about Mr. Lecrae

12   Moore.  Mr. Lecrae Moore at some point in time was a

13   plaintiff in this case.  You knew that; correct?

14   A.    Yes.

15   Q.    And at some point in time, Mr. Moore withdrew from being

16   a plaintiff; correct?

17   A.    Correct.

18   Q.    It was not until after Mr. Moore withdrew from being a

19   plaintiff in this case that you obtained 50 percent interest

20   in Joyful Noise; correct?

21   A.    Uh, written, yes.

22   Q.    Isn't it, in fact, the case, sir, that you didn't even

23   know you had one before then?

24   A.    Um, if that's what it says here.  Um, usually in that

25   situation, if I ever, uh, sort of, uh, worked on somebody

```
 1   with a beat or if I -- uh, somebody decided they wanted to
 2   use my music, there may have been some cases where they
 3   retained 50 -- uh, retained 50 percent, and I retain the
 4   other half.
 5   Q.   I'll ask you the question again.  Isn't it, in fact, the
 6   case that before Mr. Moore dropped out of this case which was
 7   in July of 2014, six years after the creation or longer of
 8   Joyful Noise, it was not until then that you became a
 9   50 percent owner?
10   A.   On paper, yes.
11   Q.   It was, in fact, the case that you did not know before
12   then what you were.  Correct?
13   A.   Um, no.  I mean, I knew that I was producer of the beat,
14   and that I owned 50 percent of the song.
15   Q.   Okay.  I would turn your attention, please, to your
16   deposition, sir, once again, page 114, line 25 to line -- to
17   115, lines 1 to 7.
18              THE COURT:  Okay.  You may read it.
19              MS. LEPERA:  Thank you, Your Honor.
20              "Q.  But you don't have a recollection of whether
21   you owned 50 percent before Mr. Moore signed his copyright,
22   do you.
23              "A.  No.
24              You don't know whether you owned --
25              THE COURT REPORTER:  I'm sorry.  Is that a
```

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 211

140

1    question?

2          MS. LEPERA:  Question.  Thank you.

3          THE COURT REPORTER:  Uh-huh.

4          MS. LEPERA:

5          "Q.  You don't know whether you owned 50 percent

6    before you entered into that document.

7          "A.  No."

8    Q.  Did you give that testimony?

9    A.  Yes.

10   Q.  As of 2017, um, when your deposition was taken, isn't

11   it, in fact, the case that the most you had been paid for a

12   beat at that juncture in time for your career was $500?

13   A.  Yes.

14   Q.  And isn't it, in fact, the case that you were selling

15   your beats on the Internet for approximately, um, anywhere

16   from 15 to $19?

17   A.  Uh, it depended on the situation.  In that particular

18   situation, yes, I did.

19   Q.  Now, we had testimony with Mr. Kahn about the creation

20   of your beat in Joyful Noise, and you used a program called

21   FL Studios; correct?

22   A.  Yes.

23   Q.  Now, FL Studios provides free beats, does it not?

24   A.  No, not beats.  No.

25   Q.  Free sounds.

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 212

1    A.    Yes, there are free sounds in that program.

2    Q.    Okay.  And there's also, uh, possibilities to purchase

3    sounds; correct?

4    A.    There is possibility, yes.

5    Q.    And isn't it, in fact, the case that in connection with

6    Joyful Noise, you used only free sounds.

7    A.    That is correct, yes.

8    Q.    Mr. Kahn asked you how long it took you to create beats.

9    Isn't it, in fact, the case that you believe it took you

10    approximately 30 to 45 minutes to -- to create the beat

11    that's at issue here?

12    A.    That's what I had said I remembered.  It may have been

13    more, it may have been less.  Around 30 to 45.

14    Q.    It wasn't two weeks; correct?

15    A.    No, it was not.

16    Q.    And after you sold Mr. Gray the beat in Joyful Noise

17    that's at issue here, um, did you have any, uh, input in any

18    of the lyrical creations subsequent to that?

19    A.    No, I didn't.

20    Q.    And you didn't write any lyrics?

21    A.    No.

22    Q.    You had no input whatsoever in the mixing or mastering

23    of your beat; correct?

24    A.    Uh, except for the -- uh, the wave files that I gave

25    him.

142

1   Q.   Giving him wave files is not mixing or mastering a beat,

2   is it?

3   A.   He needed that to be able to mix and master it.

4   Q.   I understand.  That's not my question, sir.

5   A.   Mm-hmm.

6   Q.   Providing a Wave file, a very separate files is not

7   mixing or mastering the beat; correct?

8   A.   Yes.

9   Q.   It's not; right?

10   A.   No.

11   Q.   Thank you.  You had no input in mixing or mastering the

12   beat that became part of Joyful Noise.  Correct?

13   A.   Not the direct mixing and mastering, no, I did not.

14   Q.   Well, you didn't have any input whatsoever in the mixing

15   or mastering.  Correct?

16   A.   When you say input, um, what do you mean by input?

17   Q.   You don't know what the word inputs means.

18   A.   Are you saying that I like actually went in, did the

19   mixing and the mastering of the song?

20   Q.   I would like you to turn to your deposition, sir, if you

21   wouldn't mind to page 70.

22        MR. LEPERA:  Line 19 to 23, Your Honor.

23        THE COURT:  Go ahead.

24        MS. LEPERA:  Yes, Your Honor?  Thank you.

25        You were asked this question at the deposition in

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 214

143

| | |
|---|---|
| 1 | 2017. |
| 2 | "Q. And did you have any input whatsoever into the |
| 3 | mixing or the mastering of that track? |
| 4 | "A.  No." |
| 5 | Q.  You remember that testimony -- |
| 6 | A.  Yes. |
| 7 | Q.  -- and giving that answer; correct?  Okay.  Now, someone |
| 8 | replaced your synthesizer function with guitars, didn't they. |
| 9 | A.  Yes. |
| 10 | Q.  And you -- you didn't have any input in that decision; |
| 11 | correct? |
| 12 | A.  No, I did not. |
| 13 | Q.  In fact, you received no versions of the song Joyful |
| 14 | Noise until after it was mixed and mastered and finalized; |
| 15 | correct? |
| 16 | A.  Correct. |
| 17 | Q.  May we look at Joint Exhibit 58?  It's in the exhibit |
| 18 | book next to you. |
| 19 | MS. LEPERA:  And we have no objection on this; |
| 20 | correct? |
| 21 | MR. KAHN:  No. |
| 22 | MS. LEPERA:  I'm just looking at a larger version, |
| 23 | Your Honor, cause my eyes are so bad. |
| 24 | THE CLERK:  No objection? |
| 25 | MR. KAHN:  No objection. |

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 215

```
 1   BY MS. LEPERA:

 2   Q.   Okay.  If you would turn to the credits page where

 3   Joyful Noise is identified as a -- as one of the tracks on

 4   album Our World Redeemed.  Do you see that?

 5   A.   Yes, I do.

 6   Q.   Okay.  Do you see it says Joyful Noise featuring Lecrae

 7   and John Reilly?

 8   A.   Yes.

 9   Q.   And then who does it say it's written by?

10   A.   Um, it says Marcus . . .

11   Q.   Okay.

12   A.   I can't see the letter.

13   Q.   Isn't it, in fact, the case, sir, that you're not

14   identified as a writer of Joyful Noise on the liner notes,

15   only a producer?

16   A.   Correct.

17   Q.   Um, you heard the song Dark Horse before you spoke to,

18   uh, Mr. Kayira who became your counsel in this case; correct?

19   A.   Yes.

20   Q.   Okay.  But isn't it, in fact, the case that you did not

21   raise the possibility of a claim or filing a claim with, uh,

22   anyone prior to speaking to him.

23   A.   No, I did not.

24   Q.   And you've never met Mr. Lambert in person, uh, prior to

25   this lawsuit; correct?
```

```
 1    A.   No, I didn't.

 2    Q.   Uh, and you've never spoken to him about Joyful Noise or

 3    anything separate and apart from your communications with

 4    counsel; correct?

 5    A.   That is correct.

 6    Q.   You've registered copyrights before; correct?

 7    A.   I have, yes.

 8    Q.   You know how to fill out a certification of a copyright

 9    registration.

10    A.   Yes.

11    Q.   Correct?  You talked about the various, um, sounds and

12    instrumentals in your tracks, do you recall, the drums, et

13    cetera?  You have no claim in this case that any portion of

14    your sound recording was taken; correct?

15    A.   Uh, could you repeat that?

16    Q.   You have no claim in this case that any portion of your

17    sound recording of the beat was taken.

18    A.   Oh, no.  I do not, no.

19    Q.   So I'm gonna refer to, um, the writers, uh, in -- in

20    this case for Dark Horse as the six individual writers.

21    You're aware you've sued them all; correct?

22    A.   Yes.

23    Q.   And you know who they are.

24    A.   Yes.

25    Q.   Correct.  Okay.  And you've never met any of them;
```

EXHIBIT 2
PAGE 217

146

1    correct?

2    A.    No.

3    Q.    Okay.  You've never spoken to any of them; correct?

4    A.    No.

5    Q.    And you never email or texted or communicated in any way

6    with any of those six writers; correct?

7    A.    I did not, no.

8    Q.    You've never sent any of them any -- any of your

9    music --

10   A.    No.

11   Q.    -- including the Joyful Noise song?

12   A.    Absolutely not, no.

13   Q.    And you're not aware of anyone sending any of your music

14   or of Joyful Noise to any of the individual defendants.

15   A.    No, I'm not aware.

16   Q.    And you never sent a copy of Joyful Noise to anyone, uh,

17   associated with the defendants to your knowledge; correct?

18   A.    No.

19   Q.    I'm not correct?  Or I am correct.

20   A.    You're correct.

21   Q.    Okay.  Uh, so you have no knowledge of any of the

22   individual defendants ever hearing your beat or the

23   instrumental portion of Joyful Noise; correct?

24   A.    No, I don't.

25   Q.    Okay.  And you have no knowledge or information that any

EXHIBIT 2
PAGE 218

147

1    of the individual defendants heard or viewed Joyful Noise at

2    anytime; correct?

3    A.   I do not.

4    Q.   You never asked or directed anyone to send any of the

5    individual defendants the beat which became incorporated into

6    Joyful Noise.  Correct?

7    A.   Correct.

8    Q.   And you're not aware of anyone sending that beat to any

9    of the individual defendants; right?

10   A.   Correct.

11   Q.   You have no knowledge of any of the individual

12   defendants purchasing a CD containing Joyful Noise?

13   A.   I do not.

14   Q.   And you have no document that would show that any of the

15   individual defendants or anyone working for them ever

16   received a copy of Joyful Noise; correct?

17   A.   Correct.

18   Q.   You're not aware of any such documents; correct?

19   A.   Correct.

20   Q.   Okay.  You have no documents or -- or information

21   reflecting, um, any sales of Joyful Noise; correct?

22   A.   I do not, no.

23   Q.   And you personally attended only two performances

24   yourself of Joyful Noise; correct?

25   A.   Uh, about two or three.

EXHIBIT 2
PAGE 219

```
 1   Q.   Okay.  And both of these concerts were at churches;

 2   correct?

 3   A.   Correct.

 4   Q.   Okay.  Now, Mr. Kahn asked you about your music, uh, and

 5   listening to a lot of music.  Is it your -- is it your

 6   testimony, sir, that you've heard every one -- every single

 7   one of the, uh, music tracks that's been posted to YouTube

 8   over a period of five years?

 9   A.   Uh, not every single track, no.

10   Q.   Would it -- would it surprise you to know that there's

11   approximately 41 -- 4.1 trillion, uh, videos posted over that

12   period of time?

13   A.   It would cause I didn't know that.

14   Q.   Have -- have you listened to 41 trillion videos?

15   A.   No, I have not.

16   Q.   You've never heard Joyful Noise being played on the

17   radio; correct?

18   A.   I have not, no.

19   Q.   You have no knowledge of any of the individual

20   defendants and any of the -- any of the performances by

21   either Mr. Moore or Mr. Gray of Joyful Noise; correct?

22   A.   Correct.

23   Q.   Okay.  Now, you've also sued seven corporations.  I

24   trust you know who they are; correct?

25   A.   Correct.
```

```
 1   Q.   Okay.  Uh, you've never sent Joyful Noise to any

 2   employee or executive of any of the corporate defendants;

 3   correct?

 4   A.   Correct.

 5   Q.   You never sent any of the corporate defendants your beat

 6   separately which was eventually incorporated into Joyful

 7   Noise; correct?

 8   A.   Correct.

 9   Q.   And you're not aware of anyone else who sent any copy of

10   Joyful Noise or your beat prior to its incorporation to

11   anyone at the corporate defendants; correct?

12   A.   I'm not aware, correct.

13   Q.   You have no knowledge of any employee or executive of

14   any of the corporate defendants purchasing a CD containing

15   Joyful Noise; correct?

16   A.   Correct.

17   Q.   You don't know how many CDs were manufactured of Joyful

18   Noise; correct?

19   A.   Correct.

20   Q.   You don't know how many CDs were actually sold in any

21   store or online ever; correct?

22   A.   Correct.

23   Q.   Okay.  And you're not aware of any employee or executive

24   of any of the corporate defendants attending any concert,

25   performance of Joyful Noise; correct?
```

EXHIBIT 2
PAGE 221

1    A.    Correct.

2    Q.    You have no knowledge that any of the individual

3    defendants or anyone associated with the corporate defendants

4    viewed or downloaded any video featuring Joyful Noise on

5    YouTube or any other site; correct?

6    A.    Correct.

7    Q.    Um, you said Mr. Gray's friend called you to tell you

8    that Mr. Gray liked your beat on MySpace.

9    A.    Yes.

10   Q.    Mr. Gray didn't call you; correct?

11   A.    No, not directly, no.

12   Q.    Okay.  You have no knowledge that any of the defendants

13   listened to an audio recording of Joyful Noise through the

14   Internet; correct?

15   A.    Can you repeat that?

16   Q.    You have no knowledge that any of the individuals

17   listened to any audio recording of Joyful Noise through any

18   Internet source at all.

19   A.    When you say individuals, are you talking about --

20   who are you -- who are you talking about when you're saying

21   individuals?

22   Q.    Individual defendants.

23   A.    Oh.  No, I do not.

24   Q.    You never attended any award show in which Joyful Noise,

25   uh, was played; correct?

1    A.    Correct.

2    Q.    You've never watched any award show or other show on TV

3    which, uh, involved a performance of Joyful Noise; correct?

4    A.    Correct.

5            MS. LEPERA:  Nothing further at the moment,

6    Your Honor.

7            THE COURT:  Okay.  Redirect.

8                    REDIRECT EXAMINATION

9    BY MR. KAHN:

10   Q.    Counsel was asking you whether you knew or had any

11   knowledge regarding employees of some of these, uh, corporate

12   defendants receiving copies of Joyful Noise or the individual

13   defendants, and you said you had no knowledge of that;

14   correct?

15   A.    Correct.

16   Q.    Would you have any way to find that out?

17   A.    I wouldn't, no.

18   Q.    Now, I notice in the album credits . . .

19           MR. KAHN:  I don't know if we can get those back up

20   on the screen?  Great.

21           MS. LEPERA:  It's our turn to help.

22           MR. KAHN:  Can you -- if we could zoom in on the

23   credits for Joyful Noise?

24   Q.    Now, can you see those credits?

25   A.    I do.  Yes.

1    Q.    And, um, do you receive a credit on those liner notes?

2    A.    I do.

3    Q.    And what is that credit?

4    A.    It says produced by Chike Ojukwu.

5    Q.    Okay.  And in the world of hip hop, what does it mean to

6    be a producer?

7            MR. CHIEFFO:  Objection, Your Honor.

8            Calls for speculation, no foundation.

9            THE COURT:  Uh, I think that he can answer the

10   question based on his personal knowledge.

11   BY MR. KAHN:

12   Q.    Based on your personal knowledge, what does it mean to

13   be a producer --

14   A.    Uh --

15   Q.    -- in liner notes?

16   A.    Yeah.  So as the producer, uh, in this particular liner

17   note, I, uh, created this song.  It's labeled that I created

18   the song which would, uh, note me as the producer.

19   Q.    Okay.

20   A.    And/Or created the musical part of that song.

21   Q.    And as the producer, was it your understanding that you

22   would have a share of that song?

23   A.    I did, yes.

24            MR. CHIEFFO:  Same objection, Your Honor.

25            THE COURT:  Uh, I'm going to strike the answer and,

1    um, sustain the objection.

2              MR. KAHN:  Okay.

3    Q.   So regardless of whatever your credit line was, it's

4    your testimony that you understood that you had owned

5    50 percent of this song.

6    A.   Yes.

7    Q.   So you agreed to be part of this lawsuit; correct?

8    A.   Correct.

9    Q.   And you are a plaintiff in this lawsuit?

10   A.   Correct.

11   Q.   So please tell the jury why you decided to be a

12   plaintiff in this lawsuit.

13   A.   Um . . .

14             MS. LEPERA:  Objection.  Relevance, Your Honor.

15             THE COURT:  Sustained.

16             MR. KAHN:  Okay.

17             Mr. Lambert testified to this without objection.

18             THE COURT:  Well, let me try it this way.  I think

19   as phrased, it invites a narrative.  I think you can ask him

20   did he . . .  does he, you know, I can't remember what you

21   asked, uh, precisely of, uh, Mr. Lambert, but I think the

22   question is what -- well, maybe you want to ask him what is

23   the basis for his decision to file this suit.

24             MS. LEPERA:  That's fine.

25             MR. KAHN:  Okay.

1    Q.    What is the basis for your decision to be a plaintiff in

2    this lawsuit?

3    A.    Um, my basis is that the song sounds similar.  Um,

4    specifically, um, uh, the beginning of my song, it sounds --

5    uh, I can hear that song in, uh, the Dark Horse sound -- uh,

6    song.

7              MR. KAHN:  I have nothing further.

8              THE COURT:  All right.

9              MS. LEPERA:  Very brief.

10             THE COURT:  Yes.

11                      RECROSS-EXAMINATION

12   BY MS. LEPERA:

13   Q.    Okay.  And you're not a musicologist; correct?

14   A.    I am not, no.

15   Q.    Uh, and you're not a student of musical composition or

16   theory; correct?

17   A.    No.

18   Q.    And are you, um, aware that in the music industry, there

19   are differences between producers and writers and how they're

20   compensated?

21   A.    Yes.

22             MS. LEPERA:  No further questions.

23             THE COURT:  Okay.

24             Anything further?

25             MR. KAHN:  Nothing further.

```
 1              THE COURT:  Okay.  Then Mr. Ojukwu, you may step
 2    down.  Thank you very much.
 3              THE WITNESS:  Thank you.
 4              THE COURT:  Who's our next?
 5              MR. KAHN:  Your Honor, do you think we could take a
 6    short break?  Um, we probably will have depositions to read.
 7    Um, we had told the defendants who would be testifying
 8    tomorrow, and this part has, um, ended earlier.
 9              THE COURT:  We can take a short break, but we are
10    going to fill up the afternoon because the rule is that if
11    you run out of witnesses, you rest.
12              MR. KAHN:  Right.  And we have witnesses, Judge.
13              THE COURT:  Okay.
14              MR. KAHN:  We have a witness who is flying in who
15    is here and will be available tomorrow morning.  Uh, but if
16    we could take a short break?
17              THE COURT:  But I expect you to use up the day.
18              MR. KAHN:  Uh, no, we plan to use up the day,
19    Your Honor.
20              THE COURT:  Okay.  Thank you.
21              THE CLERK:  Okay.  All rise.
22                        (Jury not present.)
23              THE CLERK:  Please be seated.
24              THE COURT:  By the way, what are we going to be the
25    doing the rest of the afternoon?
```

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 227

```
 1              MR. KAHN:  That's what we're going to decide right
 2    now, Your Honor.  I tried to arrange stuff so we wouldn't run
 3    late, and we ran early.
 4              THE COURT:  I understand, and I appreciate that.
 5              THE CLERK:  Okay.  This court's in recess.
 6                        (Recess taken.)
 7              THE CLERK:  I understand there's an issue.
 8              MS. COHEN:  Your Honor, yesterday we had a lengthy
 9    discussion about scheduling for purposes of the testimony
10    today.
11              Um, it was understood or I think all parties
12    understood yesterday that we had a lot to get through where
13    the thought was certain people had to leave, and we were
14    worried that we weren't going to finish everything today
15    especially given Your Honor's scheduling issue this afternoon
16    and the need to stop early.
17              We agreed to put on witnesses in a different order
18    than we had preferred based upon all of those scheduling
19    issues.  So now, things have moved faster than we had
20    expected, and what we have remaining for today is a very
21    short deposition transcript from Sarah Hudson which will not
22    take very long.
23              And we're inclined if the Court would permit it to
24    stop for the day without resting, but if Your Honor would
25    prefer to keep going, then there is an evidentiary issue
```

```
 1   related to the Billboard deposition transcript that we'll
 2   need to take up.
 3              THE COURT:  I want to get everything we can done --
 4   or everything we have to do done today.  So let's do the
 5   transcript, let's take up the issue, and if that doesn't
 6   exhaust the time of 4:30, then I think you better find a
 7   witness.
 8              MS. LEPERA:  Yes.  We agree, Your Honor.
 9              Mr. Gray is here, and he's their next witness so
10   they could start with him.  Certainly.
11              THE COURT:  Well, I, you know, anything is
12   possible.  I have no idea what the issue is.  I'm just here
13   to say we cannot go on like this.
14              MR. KAHN:  We understand.
15              MS. COHEN:  Understand.
16              MR. KAHN:  And I had one question that I just posed
17   to counsel a couple minutes ago so I don't expect them to
18   have a full answer.  It would be -- it would relate to
19   Mr. Gray's testimony.
20              We have two business record affidavits from the
21   Internet archives.  They both have exhibits attached.  One is
22   the YouTube official video that the Court said we could --
23   um, if we could authenticate it, um, you would consider
24   letting it in.  The other is the MySpace affidavit.
25              We will have Mr. Gray authenticate the screenshots,
```

EXHIBIT 2
PAGE 229

```
 1    but I didn't know whether there's gonna be a fight.  I don't

 2    think there will be on the actual business records from the

 3    Internet archives, but I better get that out of the way right

 4    now.

 5            MS. LEPERA:  Well, I just respectfully asked him

 6    just to give me exhibit numbers to help me understand what

 7    he's talking about and go through it, check on the liminae,

 8    and he hasn't done that yet.  So I'm happy to meet and

 9    confer, it should take no longer than five minutes, and I

10    think this is just wasting a lot of the Court's time.

11            MR. KAHN:  Yes.  I mean, there's already a

12    stipulation as to the two MySpace pages, but you're reserving

13    your right to make objections.

14            THE COURT:  Folks.

15            MR. KAHN:  Okay.  We can move ahead with Sarah

16    Hudson, and then hopefully, we will have an answer on the

17    Internet archives, and then we can get to Mr. Gray.

18            THE COURT:  Okay.  I --

19            MS. LEPERA:  Can I say something, Your Honor?

20            The Sarah Hudson deposition testimony, bringing the

21    jury out for all of what, 10, 15 minutes?  Then to fight over

22    an evidentiary issue on transcripts that aren't resolved yet

23    and issues -- I think it's just not a productive use of the

24    Court's or the jury's time.

25            THE COURT:  Well, I think that's for me to decide,
```

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 230

```
 1    but the point being I don't know what you're trying to do
 2    here, Mr. Kahn.  That's my problem.  If we're just gonna read
 3    a transcript, send them home and have a fight over
 4    evidentiary matters which it sounds we can't even deal with
 5    because she doesn't know what exhibits you're talking about,
 6    then I suggest that you're gonna have to put your client on
 7    because these jurors deserve more respect.
 8          Um, I suppose you can do whatever you want, but
 9    these are citizens who are for the most part probably not
10    been paid, uh, who are here wondering what they're doing
11    here, feeling kind of overwhelmed by a lot of issues, and we
12    just have to move ahead with this case.
13          MR. KAHN:  Okay, Your Honor.
14          THE COURT:  Okay?  So I guess my question is now
15    that you've said okay, what does that mean you're gonna do?
16          MR. KAHN:  We will read the Sarah Hudson
17    deposition, and then we will start, um, with Mr. Gray.  And
18    hopefully, by then, we'll know from counsel as to Exhibit 67
19    and 69, the two Internet affidavits.
20          If we have to have a fight over the business
21    records, then we can simply put the exhibits up to try to ask
22    him to authenticate 'em.  And the exhibits are -- it's his
23    MySpace page from 2012, Mr. Moore's MySpace page from 2012,
24    and then it's that other YouTube page from 2012.
25          The two MySpace pages are in the stipulation
```

```
 1    already, and I think that -- but it was with the portion

 2    that's stipulated the people, they're reserving objections.

 3    I'm not sure what their objections are, and it could be

 4    simply they want to have Mr. Gray authenticate the two pages.

 5            THE COURT:  Okay.  May I suggest -- hopefully, we

 6    will reach an agreement so that we can just move ahead with

 7    Mr. Gray's testimony, but in the event you need time to

 8    confer between today and tomorrow, is there -- are there

 9    other areas of Mr. Gray's testimony that you can move to to

10    keep us going to a reasonable hour?

11            MR. KAHN:  Yes.  There certainly are, Your Honor.

12            THE COURT:  Okay.  That's what I would suggest you

13    do.

14            MR. KAHN:  Okay.  So we'll do the Sarah Hudson, and

15    then we'll do Mr. Gray.

16            THE COURT:  Fine.  And then just so we all are on

17    the same wave length, we'll plan to break at 4:30 today.

18    Tomorrow we'll probably go longer but . . .

19            MR. KAHN:  That's perfect.

20            THE COURT:  Okay?

21            MR. KAHN:  Thank you, Judge.

22            THE COURT:  Thank you.

23            THE CLERK:  Are we ready for the jury?

24            THE COURT:  Yes.

25            MR. WAIS:  We'll just clarify one thing about as to
```

1    Ms. Hudson's transcript?

2              THE COURT:  Yes.

3              MR. WAIS:  Before the jury comes in?

4              THE COURT:  They're gonna be here.

5              MR. WAIS:  The problem with Ms. Hudson's deposition

6    transcript is the same one that affects Billboard which is

7    plaintiffs were responsible for designating the -- their

8    designations, our counter-designations and objections.  When

9    we got the transcripts designated yesterday, they were wrong.

10             We raised that with plaintiff's counsel.  We did

11   not get a response from them until midnight last night so we

12   haven't had a chance to fully review the designations,

13   counter-designations and objections to make sure they're

14   accurate.  Um, I think no one expected to go forward so --

15             THE COURT:  Yes.  They're coming in right now so --

16             THE CLERK:  I'm sorry.

17             THE COURT:  -- we'll have to -- I guess we'll just

18   have to raise the objections --

19             MR. WAIS:  I guess we'll sit down.

20             THE COURT:  What?

21             MR. WAIS:  Well, I think, you know . . .

22             I mean, I think the alternative is to put Mr. Gray

23   on.

24             THE COURT:  Let's just put the deposition on.  You

25   really can't dictate how they put on their case.  I can

162

```
 1    dictate that we're gonna use the time and . . .

 2              MS. LEPERA:  I think what he's saying, Your Honor,

 3    is the designations that they were responsible for they

 4    didn't do correctly.

 5              THE COURT:  Well, there are things that are in

 6    blue.  I assume that's what you're gonna read.

 7              MS. COHEN:  Your Honor, they were provided the

 8    correct designations last night.  We were only advised of the

 9    issue after trial.  It took a little while to revise them,

10    and they do have a copy.

11              THE COURT:  I'm -- you know, folks?  You are all

12    sophisticated attorneys.  This should not be happening.  I

13    assume you're gonna read what you've marked in blue.  And I

14    guess when there's an evidentiary objection, you'll have to

15    stop long enough for me to make a ruling because I've seen

16    this more recently than all of you.

17              MS. LEPERA:  If there's an absence of designation

18    that the Court doesn't have, we will have to flag that is, I

19    guess, the point.

20              THE COURT:  What?  You're telling me that you

21    haven't had an opportunity to designate.

22              MS. LEPERA:  We haven't had an opportunity since

23    they redid what was wrong at midnight last night today to

24    check whether they fixed it correctly.

25              THE COURT:  Okay.
```

EXHIBIT 2
PAGE 234

163

```
1              MS. LEPERA:  They originally did it wrong.
2              THE COURT:  I assume you can call Ms. Hudson in
3   your case and --
4              MS. LEPERA:  Absolutely.  And that's what we intend
5   to do.
6              THE COURT:  So then we won't have a problem.
7              MS. LEPERA:  Okay.
8              THE COURT:  Okay.  Thank you.
9              THE CLERK:  Are we ready for the jury?
10             THE COURT:  I think so.
11             THE CLERK:  All rise.
12                         (Jury present.)
13             THE CLERK:  Please be seated.
14             THE COURT:  Ladies and gentlemen, please accept our
15  apologies.  Sometimes at the beginning of trials, we run into
16  little snafus, and sometimes they arise when you're standing
17  in the hallway which is not our intention so we -- we
18  apologize.
19             Okay.  Are we going to read testimony?
20             MR. KAHN:  Yes, we will.  Your Honor.
21             Before we call Mr. Gray, we're gonna read the
22  testimony from one of the defendants, uh, Sarah Teresa
23  Hudson, from her deposition taken on March 22nd of this year
24  at the offices of Mitchell, Silberberg & Knupp in
25  Los Angeles.
```

EXHIBIT 2
PAGE 235

1          THE COURT:  Okay.  And this will be her direct

2     testimony.  As I understand it, the defendants are reserving

3     their right to call her in their case.

4          MS. LEPERA:  We will definitely be calling her in

5     our case, yes.

6          THE COURT:  Very well.  Thank you.

7                          EXAMINATION

8     BY MR. KAHN:

9     Q.   Good afternoon, Ms. Hudson.

10    A.   Hi.

11    Q.   So our focus today will on your role in the creation of

12    the Dark Horse song?

13    A.   Uh-huh.

14    Q.   Before we get to that, I just would like a little

15    background on your singing and songwriting career before Dark

16    Horse.  What was your start in the songwriting and singing

17    business?

18    A.   Well, long story short, I came from -- I come from a

19    musical family.  My father is in music, and I just kind of

20    grew up in it.  I started singing really early on, writing

21    songs early on.  And out of high school, I got my first

22    publishing deal as an artist.  Got signed to a major label,

23    made a record, ended up getting dropped.  Started my own

24    band, electro, sort of a really left of center type of band.

25    Did that for, you know, maybe five, six years, and then we

EXHIBIT  2
PAGE  236

```
 1    broke up.  And I just sort of started writing with other
 2    writers and artists, and, you know, songwriting just became
 3    my career at that point.
 4    Q.   Going back to I think the first album, was that the
 5    album entitled Naked Truth?
 6    A.   Yes.
 7    Q.   What musical genre was that in?
 8    A.   I would say pop, maybe a little pop rock but mostly pop
 9    music.
10    Q.   And then during your Ultra Violet sound years, was there
11    a particular genre that you were working in?
12    A.   I would say electro pop.
13             THE COURT:  Okay.  I'm gonna overrule the
14    objection.
15    BY MR. KAHN:
16    Q.   Do you listen to the music of other performers?
17    A.   Yes.
18             THE COURT:  Okay.  I'll overrule that objection,
19    too.
20    Q.   Now, back in the early days of your career, let's say
21    2000 to 2010, did you listen to music on the radio?
22    A.   Yes.
23    Q.   And what other sources did you use for listening to
24    music?
25    A.   I would say -- I mean, I would go buy physical CDs of
```

EXHIBIT 2
PAGE 237

```
 1    music that I like.  We -- you know, as a band, we promoted

 2    ourselves on the Internet so MySpace.  I would look for music

 3    in my genre and maybe some live -- go see some live shows of

 4    artists that inspired me.

 5    Q.   Okay.  But you had your own -- was it your MySpace

 6    account or was it your band's MySpace account?

 7    A.   It was for my band.

 8    Q.   Okay.  And that was back in the Naked Truth and the

 9    Ultra Violet sound days?

10    A.   That was more Ultra Violet sound.  Naked Truth was -- I

11    think it was -- must have been pre-MySpace.  Well, it

12    definitely was because --

13    Q.   Okay.

14    A.   Yeah.

15    Q.   And focusing on that MySpace account, did you and your

16    band post some of your own music on that account?

17    A.   We did, yes.

18    Q.   So you had the MySpace account, and you used it to post

19    your own music?

20    A.   Yes.

21    Q.   I believe you testified, but I may be wrong, that you

22    also used it to search for other music in your genre.

23    A.   I think there was times, yeah, to look for other bands

24    in our genre to maybe tour with or, you know, associate

25    ourselves with, but it was mostly used for the promotion of
```

1    our own music and my own project, my band.

2            MR. KAHN:  Okay.  Page 11.

3    Q.   Now, we can shift to the creation of Dark Horse.  Okay?

4    A.   Okay.

5    Q.   In interviews of you that I've read, you describe the

6    beginning of that process as a text that you received from

7    Katy Perry asking you to come to her Santa Barbara studio the

8    next day?

9    A.   Yes.

10   Q.   Before you received a text from Katherine Hudson, the

11   performer known as Katy Perry, asking you to come to her

12   studio to write the song, had the two of you worked together

13   in creating any other songs in the past?

14   A.   Not before that, no.

15   Q.   Okay.  From what I've read, the Dark Horse song was

16   created sometime in the Spring or early Summer of 2013.  Can

17   you pin that timing down to a month when you got that text?

18   A.   I can't recall the exact month, but it was early Summer

19   of 2013.

20   Q.   Okay.  So you get the text.  What happens next?

21   A.   It was -- I got the text the night before.  So basically

22   the next day, in the afternoon, I drove up to Santa Barbara

23   and got to the studio there.  And yeah, then that's where we

24   wrote the song.

25   Q.   Okay.  And when you got to the studio, who else was

1    there?

2    A.    When I got to the studio, it was Dr. Luke, Max Martin,

3    Cirkut and Katy Perry.

4    Q.    Did the people who were already there at the studio play

5    any existing portion of what became Dark Horse for you?

6    A.    When I arrived, most of the track was completed.  What

7    we worked on when I was there was mostly lyrics and some

8    melodies, but the track was for the most part completed.

9    Q.    Okay.  And when you say track, is that what I understand

10    to be the instrumental track?

11    A.    Yes.  The -- yeah.

12    Q.    So could you describe for me after you arrived the

13    creative process that took place in writing Dark Horse your

14    role and the other people's roles?

15    A.    When I arrived, there was some melodies that had been

16    already created, and, you know, I contributed.  We all

17    contributed on some melodies together.  But my biggest

18    contribution was me and Katy going through -- into the other

19    room and coming up with the concept and the title and the

20    lyrics to the song.

21    Q.    So you and Katy wrote the lyrics to the song?

22    A.    We did, yes.

23          MR. KAHN:  Page 17.

24    Q.    You own 18 percent of the rights in that song.  Do you

25    still own 18 percent of the rights?

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 240

```
 1    A.    I believe so.

 2              MR. KAHN:  That's mainly it.

 3              THE COURT:  It appears to be.

 4              MR. KAHN:  That's it, Your Honor.

 5              THE COURT:  Thank you.

 6              MR. KAHN:  We can call Mr. Gray.

 7              THE COURT:  Yes.

 8              MR. KAHN:  Plaintiff calls to the stand Marcus

 9    Gray.

10              THE CLERK:  Mr. Gray, please raise your right hand.

11                       (Witness sworn.)

12              THE CLERK:  Please be seated.

13         Please state your full name, spell your last name

14    for the record, and please make sure you speak into the

15    microphone.

16              THE WITNESS:  My name is Marcus Tyrone Gray.

17              My last name is spelled G-r-a-y.

18              THE CLERK:  Thank you.

19              THE WITNESS:  Yes.

20              THE COURT:  Mr. Kahn?

21              MR. KAHN:  Thank you.

22                        DIRECT EXAMINATION

23    BY MR. KAHN:

24    Q.   Good afternoon, Mr. Gray.

25    A.   Good afternoon.
```

1    Q.    You are one of the plaintiffs in this lawsuit; correct?

2    A.    Yes.  That is correct.

3    Q.    And are you one of the creators of the composition

4    Joyful Noise that appeared in the album Our World Redeemed?

5    A.    I am.

6    Q.    You are a musical artist; correct?

7    A.    Correct.

8    Q.    How would you describe yourself as a musical artist?

9    A.    So it's a bit of a dichotomy.  So I'm a rap artist from

10    the hip hop culture while at the same time, my content is

11    informed by my faith.  So typically, we'd use phrases like

12    Christian rap, gospel rap, also known as a rap artist.  But

13    my goal is -- um, being heavily influenced by hip hop culture

14    and rap music is to fill a void within the rap, hip hop

15    community.  There's a lot of regular rap, but I want to

16    contribute something different of love, hope, grace,

17    forgiveness through my genre or my style.

18    Q.    And that's the void that you hope to fill.

19    A.    That's correct.

20    Q.    So as a musical artist, do you perform?

21    A.    Yes, I do perform.

22    Q.    And you perform songs in concerts?

23    A.    Yes.

24    Q.    Do you go on concert tours?

25    A.    Yes, I do tour.

```
 1    Q.   Can you tell the jury what types of venues over the
 2    years you've performed your concerts in?
 3    A.   Absolutely.  So, I mean, it's just -- it's a wide array
 4    of venues; uh, churches, arenas, universities, colleges, NBA
 5    half-time shows, juvenile detention centers, prisons,
 6    community centers, block parties.  Really wherever I'm
 7    invited, I go because I feel that my music is unlimited.
 8    It's for everyone so I don't turn down an opportunity to show
 9    up wherever they will have me.
10    Q.   Now, we've heard you referred to by some of your
11    colleagues as Flame.  Is that your performer's name?
12    A.   Yes.  Flame is my performer, artist name.
13    Q.   Can you tell us how you came up with the name Flame as
14    your performer's name?
15    A.   Yeah.  So really after a series of events that lead up
16    to me considering the big issues of life, I became a
17    Christian.  And I was reading through the bible, and I came
18    across an old testament figure by the name of Jeremiah who
19    pretty much was passionate about saying things that needed to
20    be said, um, but it got him into a lot of trouble.  And he
21    responds to God by saying you know what?  I'm not gonna make
22    mention of your name anymore because I keep getting in
23    trouble.  But then he says but your word is like a fire shot
24    up in my bones, and I thought that fit my personality, to
25    love on the world that way and say things that I feel need to
```

1    be said hence the name Flame.

2    Q.    And for how long have you been a professional musician?

3    A.    Yikes.  Uh, so I started off at 16 years old, and my

4    first album came out 2004 so it's been over 15 years now.

5    Q.    How old were you when your first album came out?

6    A.    I was around 23?  Yeah.  22, 23.

7    Q.    Now, you've mentioned your religious background.  Would

8    you describe your religion?

9    A.    Yeah.

10           MR. MOVIT:  Objection.  Relevance?

11           THE COURT:  Um, we're kind of getting there, but

12    I'll let you do a little bit by way of background, and then

13    let's move ahead.

14           THE WITNESS:  So, uh, I would be considered, uh, a

15    Christian in terms of following Christ the person, not some

16    of the baggage that comes with it.

17    BY MR. KAHN:

18    Q.    Okay.  And have you had any formal study of religion in

19    school?

20    A.    Yes, I have.

21           MR. MOVIT:  Objection, relevance.

22           THE COURT:  Let's just get through this and move

23    on.

24           Go ahead.  You may answer.

25           THE WITNESS:  So my Bachelor's degree is in

```
 1    Biblical Counseling.  My Master's degree is in Church History
 2    and Theology.  So forth.
 3              THE COURT:  Okay.  Let's move on.
 4              MR. KAHN:  Okay.
 5    Q.   So let's talk about the creation of the song that's at
 6    issue here going back to 2007.  I think we've confirmed from
 7    the other witnesses Joyful Noise is on the album Our World
 8    Redeemed, and this is the song at issue.  So talk to me about
 9    the creation process.  How did you get involved in the
10    creation of Joyful Noise?  Um, like what came first?
11    A.   Okay.  So for me, the album Our World Redeemed was in my
12    mind.  And at this point, um, I have a idea of a concept.  In
13    fact, it was a part two to an album titled Our World Fallen.
14    So I'm looking for new production and new sound to finish the
15    story.
16              So what's typical in the rap world is just to scour
17    production via beat makers, producers.  Um, but as a
18    personal, I guess, conviction I like to work with a pool of
19    producers that I know, that I can vouch for or someone else
20    can vouch for their character and personality in my
21    direction.
22              So a friend of mine and myself we were together.
23    He pulled up Chike's MySpace page, um, and then he's thumbing
24    through tracks while I'm in the room.  He hears the track
25    from the song Joyful Noise.  He's like yo, Flame, check this
```

```
 1   track out.  So he turns the speakers up and I'm listening and
 2   I'm like this track is lit.  I love it.  It's a big sound,
 3   has the snaps, that energy.
 4         So we contact Chike who at that time was, uh, I had
 5   known from a Bible study that my friend and I would host.  So
 6   we reach out to him and he's like yeah, the track's you all
 7   should listen to it, vibe to it, see what happens and I was
 8   inspired by it.
 9   Q.  Okay.  And is that similar to the beginnings of other
10   rap songs that you've created?
11   A.  Yes.
12   Q.  In that you reached out to some producer who created a
13   beat?
14   A.  Correct.  That's protocol, yeah.
15   Q.  And, uh, so you worked out an arrangement with
16   Mr. Ojukwu to be able to use that beat?
17   A.  Correct.
18         MR. MOVIT:  Objection.  Leading.
19         THE COURT:  Overruled.
20         THE WITNESS:  Yes.
21   BY MR. KAHN:
22   Q.  Okay.  And what was that arrangement?
23   A.  So the arrangement is that the producer would get
24   50 percent of the writer's share and I would get the rest.
25   Q.  Okay.  And I assume then that means that Mr. Ojukwu was
```

1    gonna be the producer?

2    A.    Correct.

3    Q.    In the world of rap, what is the producer?

4    A.    Yeah, I was gonna say in the rap community, everyone's

5    not killin' from all that fancy terms and phraseology.  So a

6    producer is the guy who makes the beat.  That's how we

7    understand them.  But we know that he's a writer of a portion

8    of the song, but among the community.

9    Q.    His title would be producer.

10   A.    That's what we would call.  Him he's the producer.

11   Q.    At what point in the creation process, if at all, do you

12   recall reaching an understanding with Mr. Ojukwu as to his

13   ownership of any song that would be created using his beat?

14   A.    Um, just early on, we, you know, it's -- it's pretty

15   standard.  Once you're getting really serious about the song,

16   lyrics are happening, hooks are happening, producers want to

17   know okay, what's gonna happen next.  So we just verbally

18   discussed him being 50 percent of this song.

19   Q.    By that you mean he would be credited as the producer?

20   A.    Correct.

21   Q.    And your understanding was a producer gets 50 percent?

22   A.    Absolutely.

23   Q.    So you reach this understanding with Mr. Ojukwu.  And

24   does he then deliver this instrumental to you?

25   A.    Yes.  So, uh, so I get, you know, email of the MP 3 or

```
 1   the wave file.  And you just sit with that MP 3 and mulls it
 2   over.  And it's -- you wait for really the track to speak to
 3   you to inspire you.
 4   Q.   And did that eventually happen to you?
 5   A.   Yeah, absolutely, yeah.
 6   Q.   And what was the nature of the inspiration?
 7   A.   So it was -- it was a big record.  I knew it wasn't
 8   like, you know, in an album, you're gonna have what we call
 9   album fillers and then those singles.  So when I heard the
10   track, I'm thinking this is one of those big records, one of
11   those special tracks.  So I wanted to give it, like, the
12   unique attention in the creative process.
13   Q.   And when did you start writing the lyrics to what became
14   Joyful Noise?
15   A.   So it wasn't too long after I heard the track.  Uh,
16   first, it starts with the mumbling, the cadence.  Then you're
17   just filling it out.  As was mentioned earlier, you might
18   record it on, back then, like a voice recorder now cell
19   phone.  Uh, so it's pretty early on when I heard the track, I
20   started writing lyrics, composing lyrics in my mind.
21   Q.   And was there some theme to your lyrics back then?
22   A.   Back then it was honestly, it's being informed by my
23   faith.  I wanted it to be a universal, uh, sound and theme
24   that would draw people from different backgrounds together
25   via the message of hope, love, forgiveness, grace.
```

1    Q.    So you've heard earlier testimony, um, regarding the

2    trip you took to Philadelphia to meet with Mr. Lambert.  And

3    my question to you is before you took that trip, did you have

4    any lyrics written down?

5    A.    No, I didn't have.  I didn't have any hard core lyrics

6    in the pocket yet.

7    Q.    But you and Mr. Lambert knew each other?

8    A.    Yes, yeah.

9    Q.    So you contacted him?

10   A.    Yes.

11   Q.    Said you were going to be in Philly?

12   A.    Correct, correct.

13   Q.    So tell me what happens when you get to his house?

14   A.    Yeah.  So I'm in Philly.  I reach out to -- I call him

15   Manny, Mr. Lambert, D.A. Truth, and I said yo, I got this

16   track.  It's big and I know you specialize in that, uh, arena

17   sound I would call it.  Like making those big hooks and

18   cadences.

19        So we link up.  We're in his attic now playing the

20   music.  He starts to then hear melody, cadence, and then he's

21   putting lyrics to the emotion that I'm describing.  And it's

22   the -- the hook or the chorus that you heard earlier today.

23   Q.    And how long were the two of you together in that, I

24   think he said it was his attic?

25   A.    Yeah, yeah, definitely in the attic.  It was a small,

1    little space, yeah.

2    Q.    And how long were you up there doing this listening and

3    writing?

4    A.    Um, maybe a couple hours, yeah.  Maybe a couple of

5    hours.  It was hot.

6    Q.    And when you left the attic, what did you leave with?

7    A.    A hit.  So, I mean, again, that's what he does.  That's

8    why I reached out to him.  And, uh, he just came up with a

9    sound that wouldn't just appeal to a rap audience.  That was

10   my thing.  I know people that love rock music if you heard

11   the track today, people that love CCM, people that love pop

12   would all rally around this record because of, you know,

13   Manny's contribution.

14   Q.    And then at some point Lecrae Moore got involved as

15   well?

16   A.    Correct.

17   Q.    And how did that come about?

18   A.    Yeah, so I leave Philly with the hook and I fly back

19   home, St. Louis, Missouri, um, but I felt like the song

20   wasn't complete.  I wanted to build on where the song was

21   going in terms of size and reach.  And Lecrae at the time was

22   one of the artists who was just really taking off and he's

23   very talented, creative.

24           So I reached out to him, send him the beat, the

25   hook.  He falls in love.  Feels the same inspiration, the

```
 1   same motivation.  Recorded his verse within a day or so, sent
 2   it back, and I'm feeling really good about the record.
 3   Q.   So you've now got his verse, you've got what Mr. Lambert
 4   had given you, and you've got your own --
 5   A.   Yes.
 6   Q.   -- lyrics that you're writing.  And then just for the
 7   jury and the rest of us, what happens next in the creation of
 8   this song?
 9   A.   Yeah, then I laid my vocals lastly.  Uh, we compiled a
10   song together with all the parts, all the contributed
11   elements, and then we go to a studio and we take the track,
12   the vocals, we get instrumentation.  And then at this point,
13   I'm thinking arrangement.  Where we should we put this, where
14   should we put that as well cause it's -- it's a body of work
15   and I'm excited about it.  So, uh, we get it mixed, mastered,
16   and then it's ready for mass consumption once the sound
17   levels are equal and -- and big.
18   Q.   Now, we're not gonna play the song again.  It's been
19   played, um, but can you kind of summarize the lyrics?  What
20   is being said in this song?
21   A.   Yeah.
22            MR. MOVIT:  Objection, relevance?
23            THE COURT:  Um, I'm not sure I understand the
24   relevance.  We've all heard it.
25            MR. KAHN:  Well, I mean, I didn't know if everyone
```

EXHIBIT 2
PAGE 251

```
 1    was able to hear the lyrics, and I thought a very brief
 2    summary of the theme of the song --
 3            THE COURT:  Well, he can tell us what the theme is,
 4    but he can't summarize the lyrics.
 5            MR. KAHN:  Okay.
 6    Q.   So what is the theme in your view of the song you
 7    created Joyful Noise?
 8    A.   It's in the title.  The song is called Joyful Noise so
 9    we wanted the theme to be joy.  We wanted people to hear this
10    collection of sounds that would bring joy, hope, grace, and
11    that type of message from the, uh, Christian world view
12    paradigm.
13    Q.   So the song we've seen gets released in 2008.
14    A.   Yes.
15    Q.   Within the music community and industry, was either the
16    album or the song nominated for any awards?
17    A.   Yes, it was.
18    Q.   So which awards was -- let's first do the album.  Which
19    awards was the album nominated for?
20    A.   So Our World Redeem which had the song Joyful Noise on
21    it was nominated for a Grammy.  Uh, also, it was nominated
22    for a Stella award for best album, uh, which the Stella
23    awards is the highest, it's the peak of gospel music.  And
24    then the song Joyful Noise was also nominated for best rap
25    song which the Dove awards is the peak of Christian
```

```
 1    contemporary music.
 2    Q.    Okay.  So let's start with the Grammy.  What was it
 3    nominated for again?
 4    A.    The album was nominated for best gospel/rock album of
 5    the year.
 6    Q.    And did you attend the Grammy's ceremony?
 7    A.    Yes, I did.  I did.
 8    Q.    Did you go alone or with your wife?
 9    A.    Took my wife and my sister-in-law and, uh, it was fun.
10    Good experience.
11    Q.    And this was in 2009?
12    A.    2009, correct.  Yes.
13    Q.    And then you mentioned the Stellar awards?
14    A.    Yes.
15    Q.    And what -- the top of the gospel community?
16    A.    Yes.  It's -- it's the -- the zenith of the gospel
17    community's recognition of great contributions to gospel
18    music.  So it's the -- it's the peak.  It's what you want to
19    accomplish.
20    Q.    And where was that award ceremony held?
21    A.    It was held in, uh, Nashville, Tennessee.
22    Q.    Okay.  And it was also in 2009?
23    A.    Yes.
24    Q.    And did you attend that --
25    A.    Yes, I did.
```

1    Q.    -- ceremony?

2    A.    I did.

3    Q.    Alone or with anyone?

4    A.    With my wife as well.

5    Q.    Okay.  And then you also mentioned the Dove awards?

6    A.    Correct.

7    Q.    What are the Dove awards?

8    A.    The Dove awards, it's -- it's similar to the -- the

9    Stellar awards, but it's just -- a collection of more so

10   Christian contemporary music and they have a separate

11   celebration, but it's also highest award you can receive in

12   that Christian contemporary market so my song was nominated

13   for best song of the year there.

14   Q.    And did you attend that ceremony?

15   A.    Yes, I did.

16   Q.    Where was that ceremony?

17   A.    That was also in Nashville, Tennessee.

18   Q.    Now, back to the Grammy's.  Um, to your knowledge was

19   that ceremony televised that year?

20   A.    The Grammy ceremony was televised.

21   Q.    What about the Stellar awards?

22   A.    The Stellar awards was also televised.

23   Q.    And the Dove awards?

24   A.    The Dove awards, yes, it's televised.

25   Q.    But if I understand it, your -- the actual song was not

```
 1    played during any of those award ceremonies?

 2    A.   Neither of the televised portions.

 3    Q.   But it was listed as the nominee?

 4    A.   Correct, correct.

 5    Q.   Now, in addition to the song and the album, Mr. Gray,

 6    was there also a music video created?

 7    A.   Yes, there was.

 8    Q.   And what was your involvement in the creation of the

 9    music video?

10    A.   My portion was performance element.  So going over the

11    treatment, kind of giving it the thumb's up.  The treatment

12    is just really the concept of the music video.  Sing it.

13    Saying I think this would be a great depiction of the song,

14    and then performing in front of the camera bringing the

15    visuals to the audio.

16    Q.   And was there an official version, an official video?

17    A.   Yes, absolutely.

18              MR. KAHN:  Your Honor, we don't want to show the

19    entire video cause it's the same as the song, but if we could

20    be allowed, maybe show 45 seconds of the music video?

21              THE COURT:  That's fine.

22              MR. KAHN:  And that is Exhibit 68.

23              And I just want you to watch.  We'll play about 45

24    seconds, and you can tell us if this is the music video.

25                   (Exhibit 68 played.)
```

```
 1   BY MR. KAHN:

 2   Q.   Is that the official video?

 3   A.   Yes, it is.

 4   Q.   And where was that video displayed?

 5   A.   So it was displayed on MySpace which is -- it was the

 6   theme at that point.  Uh, displayed on YouTube as well as,

 7   um, just other railroads that we could get the actual video,

 8   um, featured on.  But yeah, MySpace definitely and YouTube.

 9   Q.   And when you say MySpace, which -- was it your page on

10   MySpace or somewhere else?

11   A.   It was on my page as well as Lecrae's MySpace page.

12   Q.   Lecrae Moore?

13   A.   Correct.

14   Q.   And you mentioned YouTube as well?

15   A.   Yes, also on YouTube.

16   Q.   Did you ever go on YouTube to see whether anybody was

17   viewing it?

18   A.   Yeah, absolutely.  So as an artist, you kind of

19   hypersensitive in monitoring the views because in your mind,

20   it's like validation, and you do it so people can see it.  So

21   that's an exercise we kind of over do even some time.

22           MR. KAHN:  Your Honor, Exhibit 67 is an affidavit.

23   We go back in time to March of 2012.  It's an affidavit from

24   the Internet archive.  It's a screenshot from March 2012

25   which we would like to show the screenshot to Mr. Gray to see
```

1    if he can authenticate it, um, but I guess we need to hear

2    from defendants first.  We believe that the Internet archive

3    is a business record.

4            MR. MOVIT:  Your Honor, I believe this is what was

5    given to counsel as the exhibit numbers to evaluate very,

6    very shortly ago, and I thought the agreement was that

7    Mr. Kahn would ask about other areas.

8            THE COURT:  I think that's what we said.  If there

9    was something they hadn't had an opportunity to review, y9ou

10   would move on to something else, and we'll come back to it

11   later.

12           MR. KAHN:  Okay.  And similarly, in the

13   stipulations, there's -- in 5B, there is one for the two

14   MySpace pages that are stipulated as facts, but I think we

15   have to have them authenticated.  I just want to make sure

16   those will be the attachments to Exhibit 69.

17           MR. MOVIT:  Again, Your Honor, my understanding was

18   that a pin was gonna be put on this area cause we were just

19   told about it and that other area.

20           THE COURT:  Why don't we just move on to something

21   else.

22           MR. KAHN:  Okay.  All right.

23   Q.   So we will come back to the views that took place on

24   YouTube and the views on your page and Mr. Moore's page on

25   MySpace.

1    A.    Okay.

2    Q.    And let's now turn to your concerts.  Okay?  So you are

3    a performer; correct?

4    A.    Correct, I am a performer.

5    Q.    And you perform at concerts?

6    A.    Yes, I do.

7    Q.    And you've already told the jury the different types of

8    venues you perform at.

9    A.    Yes.

10    Q.    And were you doing that from 2008 through 2012?

11    A.    Yes, absolutely.

12    Q.    And, uh, since your deposition, have you had a chance to

13    try to refresh your recollection as to, um, where all these

14    concerts were?

15    A.    Yes.  Yes, I have.

16    Q.    And how did you do that?

17    A.    Uh, just looking at, uh, booking forms and -- and

18    digging up archives and revisiting that time period.

19    Q.    Did you have a chance to talk to your manager?

20    A.    Yes, I did.

21    Q.    And who is your manager?

22    A.    My lovely wife, Crystal Gray.

23    Q.    So without appearing to give me an actual number, but

24    during those four, um, to five years, roughly how many

25    concerts did you perform?

```
 1    A.    Surely over 100 --

 2    Q.    Okay.

 3    A.    -- shows.

 4    Q.    And was it in any particular geographic area or around

 5    the country?

 6    A.    It was around the country.

 7    Q.    Okay.  And you talked about the venues.  A lot of

 8    churches you performed in?

 9    A.    True.

10    Q.    But there's these other venues you mentioned?

11    A.    Absolutely.

12    Q.    And at those concerts, did you ever perform Joyful

13    Noise?

14    A.    Each one, every one.

15    Q.    You said you performed at every concert Joyful Noise?

16    A.    Every concert I performed Joyful Noise.

17    Q.    And as an entertainer, based on the audience response,

18    was Joyful Noise a popular song?

19    A.    It's -- it's the song you have to do.  So even if I

20    didn't want to do it because of I'm always doing it, I know I

21    have to perform it.  So at each one, I performed it.  It's a

22    fan favorite.

23    Q.    Okay.  And we've heard the underlying beats so obviously

24    there's not a band behind you playing; correct?

25    A.    Correct.
```

UNITED STATES DISTRICT COURT

EXHIBIT 2
PAGE 259

```
 1    Q.   So was that recording being played and you would be
 2    rapping over it?
 3    A.   Yeah.  So I record over the -- the track, actually, uh,
 4    and -- and my wife was functioning as my DJ.
 5    Q.   So she would play the --
 6    A.   Yeah.
 7    Q.   -- the recording and you would rap over it?
 8    A.   Correct.  She was literally hit play for me.
 9    Q.   And, um, you mentioned earlier there was a MySpace page
10    for Mr. Moore.
11    A.   Correct.
12    Q.   Um, and did you ever perform with Mr. Moore in a
13    concert?
14    A.   Yes, we did.  We -- we toured together in fact, and, uh,
15    that would be the song that would be like the grand finale.
16    You know, we would perform it together as well as the other
17    artists on the tour would come out and we would celebrate
18    that way.
19    Q.   And you said you were on a tour together with him?
20    A.   Yes.
21    Q.   Do you recall what cities you went to?
22    A.   Uh, it was all over the states, east and west coast,
23    mid-West, southern region.
24    Q.   Okay.
25    A.   Up north, down south.
```

1    Q.    And at every concert, you performed Joyful Noise?

2    A.    Yes, every single one.

3    Q.    Now, as you traveled around the country on these concert

4    tours, um, were you ever interviewed on a radio program?

5    A.    Yeah.

6    Q.    Um, in advance of that particular night's concert?

7    A.    Yes.  So typically when you land, um, there may be a

8    short promo run where you go visit local radio stations,

9    university radio stations, news stations, and you'll promote

10   the concert and just raise awareness.  Hey, I'm here in town.

11   Come check out the concert.

12   Q.    You would go on to some radio program?

13   A.    Yes.  Yeah.

14   Q.    And sometimes a TV program?

15   A.    Correct.

16   Q.    And who actually set up those interviews?  Do you know?

17   A.    So most of the time, it's the venue.  They'll reach out

18   to their -- they'll do their due diligence and reach out to

19   the local radio stations, university stations, local news or

20   television stations there.  Other times it would be my wife

21   planning to liaison between, you know, our label and the

22   venue.

23   Q.    And one of these typical radio interviews, how long

24   would they last?

25   A.    They would be quick.

1    Q.   Five minutes?  20 minutes?  10 minutes?

2    A.   Couple of minutes, yeah.

3    Q.   And during those interviews or at some point during the

4    interview, did they ever play one of your songs?

5    A.   Yes, they would play Joyful Noise.  It was a hit.  Flame

6    is in town.  Come hear the song that resonates.  So they

7    would have a bed of music underneath, you know, my talking

8    portion of the interview and that's how people would hear it.

9    Q.   So they wouldn't play the entire song, would they?

10   A.   No, just a snippet, a song byte.

11   Q.   Let me turn to your record label back then.  Um, what

12   was the record company that your album Our World Redeemed was

13   released on?

14   A.   It was released under, um, in print record label Cross

15   Movement Records.

16   Q.   And for those of us who are not musicians, what -- how

17   would you describe the record label?

18   A.   Yeah.  So my understanding of a record label is just a

19   company that foots the bill that provides distribution, um,

20   and money so you can record, mix master, and then mash

21   publish -- mass publish the product so the people can see it,

22   hear it in stores, online.  Marketing promo.  Things of that

23   nature.

24   Q.   Um, and are you still with Cross Movements Records?

25   A.   I am not.  My wife and I own our own company Clear Site

1   Music now.

2   Q.   And why are you no longer with Cross Movement?

3   A.   Unfortunate music industry tale.  Uh, we were young, got

4   into a contract, um, and it wasn't honored.  And we were just

5   patiently trying to endure that, but eventually, we had to

6   find our way out so we did.  And now we own our own label

7   Clear Sight Music.

8   Q.   And did Cross Movement ever give you any information on

9   the sales of your album Our World Redeemed or the song Joyful

10  Noise?

11  A.   No.  Unfortunately, not.

12  Q.   Did they ever send you any money --

13  A.   No --

14  Q.   -- for those sales?

15  A.   No.  In fact I was filling out an application at Office

16  Depot while my album was Grammy nominated.

17  Q.   An application, what?  A job application?

18  A.   A job application, yeah.

19  Q.   When did you leave Cross Movement?

20  A.   We left Cross Movement 2009.

21  Q.   Okay.  And you say you currently own your own record

22  label?

23  A.   Correct.  Clear Sight Music.

24  Q.   Clear Sight.  And have you released any of your own

25  albums on your new record label?

1    A.    Yes.  Every album since 2010 has come out under my own

2    label.

3    Q.    And you have a manager?

4    A.    Yes, my wife.  She's, uh, 20 people.

5    Q.    And what does -- and her name is Crystal; right?

6    A.    Yes.

7    Q.    So what does Mrs. Gray do as your manager?

8    A.    Oh, my goodness.  So, um, she's the liaison between our

9    royalty company, our booking department.  She does, you now,

10   marketing coming up with the promo ideas.  Uh, she -- she

11   travels with me as well just in terms of being a road

12   manager.  Uh, yeah, so she's there through and through

13   touching every element, every aspect.

14   Q.    Did you obtain -- Joyful Noise.  Did you obtain a

15   copyright registration for the composition Joyful Noise?

16   A.    Yes, we did.

17   Q.    Um, I'm gonna show you what's been marked as Exhibit 1

18   and ask you if you recognize that document?

19   A.    Yes, I do.

20   Q.    What is that document?

21   A.    That is the copyright certificate of registration for

22   Joyful Noise from Our World Redeemed, yeah.

23   Q.    If you go down, we have four authors.  The three of you,

24   and then Mr. Moore; correct?

25   A.    Correct.

```
 1   Q.   Let me show you Exhibit 7.  When you filed an

 2   application for the copyright, and I don't know if you know

 3   this, you need to send a deposit copy so they know what it is

 4   that you're protecting.

 5           This is, uh, this is actually, Exhibit 7 is the

 6   certified copy of the deposit copy that Ms. Lepera actually,

 7   um, represented to you at your deposition.

 8               MR. MOVIT:  Objection to the --

 9               MS. LEPERA:  Your Honor?

10               MR. MOVIT:  Objection to the testimony by counsel.

11               THE COURT:  Sustained.

12               THE CLERK:  And are these stipulated to?

13               MR. KAHN:  Yes.  Well, these are -- this has been

14   admitted.  Or it hasn't been objected to.

15               MS. LEPERA:  It hasn't been admitted yet.

16               You haven't offered it.

17               THE CLERK:  I need to know.

18               MR. KAHN:  Is there an objection?

19               MS. LEPERA:  No.

20               MR. KAHN:  We offer it into evidence.

21               THE CLERK:  Is that the same for 1?

22               MR. KAHN:  Exhibit 1 as well.

23               THE COURT:  All right.

24                   (Exhibits 7 and 1 admitted.)

25               THE COURT:  They're both admitted.
```

```
 1                Now let's try to ask questions.
 2      BY MR. KAHN:
 3      Q.   Now, as we've seen on the registration, there are four
 4      owners that are listed and one of them is Mr. Moore; correct?
 5      A.   Correct.
 6      Q.   Is he still one of the owners of the copyright?
 7      A.   No, he is not.
 8      Q.   Okay.  Did he assign his copyright interests to anyone?
 9      A.   Yes, he did.
10      Q.   Who did he assign it to?
11      A.   He assigned it to the -- the plaintiffs in this case.
12              MR. KAHN:  Okay.  That assignment of copyright is
13      Exhibit 4.  Can I publish that to the jury?
14              THE COURT:  Are you offering it into evidence?
15              MR. MOVIT:  No -- no objection to that exhibit.
16              MR. KAHN:  Yes.
17              THE COURT:  Okay.  4 may be received, and you may
18      publish.
19                      (Exhibit 4 admitted.)
20      BY MR. KAHN:
21      Q.   Okay.  And do you recognize this document?
22      A.   Yes.
23      Q.   And in this document, we could agree Mr. Moore assigns
24      his rights, including the copyright, to the three of you;
25      correct?
```

```
1    A.    Correct.

2    Q.    So he is not a plaintiff any more in this case?

3    A.    No longer.

4    Q.    And other than the three of you, as of today, does

5    anyone else own any portion of the copyright?

6    A.    No.

7    Q.    In the composition to Joyful Noise?

8    A.    No.

9    Q.    And we've heard testimony from the other two plaintiffs,

10   but did the three of you agree after Mr. Moore assigned his

11   rights how to divide up the ownership of the copyright?

12   A.    Yes, we did.

13   Q.    And we've seen that as Exhibit 5 which shows you with

14   35 percent, uh, Mr. Lambert with 15 and Mr. Ojukwu with

15   50 percent?

16   A.    Yes.

17   Q.    Is that still the current ownership percentages?

18   A.    That is still the current ownership percentages.

19   Q.    And do you recall how you arrived at those numbers?

20   A.    Yes.  So 50 percent is the standard understanding of

21   what the producer gets, and then the other portions are split

22   between, uh, Mr. Lambert and myself in terms of being the

23   writers and amount of writing that went into Joyful Noise.

24   Q.    And during the time that you were with Cross Movement

25   Records back in 2008, 2009, I assume you had a contract with
```

EXHIBIT 2
PAGE 267

```
 1   them covering your albums.  Uh, did Cross Movement own a
 2   share -- a portion of your share of the copyright?
 3              MR. MOVIT:  Objection to the preamble to the
 4   question, lacks foundation.
 5              THE COURT:  Why don't you rephrase.
 6   BY MR. KAHN:
 7   Q.   At some point in time after -- or before or after the
 8   album Our World Redeemed was released, did the record label
 9   own a portion of your copyright interest in Joyful Noise?
10   A.   No.
11   Q.   So to your understanding, they did not.
12   A.   No.  I mean, in full disclosure, it's fuzzy, uh, but as
13   a label, they had their hands in it.
14   Q.   Okay.  At some point, to the extent they ever owned
15   anything, did they -- are you aware that they assigned their
16   rights back to you?
17   A.   Yeah, in fact.  Okay.  In fact.
18   Q.   And if you can take the exhibit folder, the first one
19   which is behind you and ask you look at Exhibit 6?  Let me
20   know when you have it.
21   A.   I'm here.
22   Q.   Do you recognize Exhibit 6?
23   A.   Okay.  Yes.  Yes, I do.
24   Q.   And what is Exhibit 6?
25   A.   Um, this is the assignment of copyright between myself
```

```
 1    and, uh, John Kevin Wells here owner of Cross Movement

 2    Records.

 3                   MR. KAHN:  Okay.  Um, Your Honor, I would request

 4    that Exhibit 6 be admitted into evidence.

 5                   MR. MOVIT:  No objection.

 6                   THE COURT:  All right.  It will be.

 7                        (Exhibit 6 admitted.)

 8                   MR. KAHN:  May we publish to the jury?

 9                   THE COURT:  You may.

10    BY MR. KAHN:

11    Q.   So this is the assignment from Cross Movement Records to

12    you, and there's a list which is part of this assignment;

13    correct?

14    A.   Mm-hmm.

15    Q.   Why don't you scroll down and see if we can find it.

16    This lists all the songs in Our World Redeemed.  So whatever

17    interest that Cross Movement may have owned in your

18    copyright, they have assigned back to you in this document;

19    correct?

20    A.   Correct.  Absolutely.

21    Q.   Now, let's move on to Dark Horse, um, in 2013.  Okay?

22    How did you learn about the song Dark Horse?

23    A.   So I'm -- I'm just livin' life as an artist, traveling,

24    performing.  And then there was just an overwhelming surge

25    of, uh, tags on social media, and everyone's like yo, did you
```

```
 1   hear the song Dark Horse?  Did you hear the song Dark Horse?
 2   And I'm like --
 3            MR. MOVIT:  This is intruding on, you know, lay
 4   listener opinions being provided in testimony, and it's also
 5   hearsay.
 6            THE COURT:  Well, I'm gonna sustain the objection.
 7   It's hearsay.
 8   BY MR. KAHN:
 9   Q.   So you somehow heard about the song.
10   A.   Correct.
11   Q.   And then when you heard about the song, what did you do?
12   A.   So after hearing about the song, eventually, we sought
13   counsel to figure out a way to -- to reconcile the issue of
14   the similarity.
15   Q.   Okay.  So you felt that there were parts of Dark Horse
16   that were similar to your song?
17   A.   Absolutely, yeah.
18   Q.   And is that why we're here today?
19   A.   Yeah, in fact, that is.  Yeah.  It's a big record that
20   we really value and care about.
21            THE COURT:  There's not a question pending.  You've
22   got to wait for a question.
23            THE WITNESS:  Sorry, Your Honor.
24   BY MR. KAHN:
25   Q.   Now, you've heard, um, in the opening statement that and
```

EXHIBIT 2
PAGE 270

```
 1    you've also heard from Ms. Hudson that the defendants say
 2    they don't listen to Christian music; correct?
 3    A.    Correct.
 4    Q.    Um, are the lyrics to Joyful Noise Christian lyrics?
 5    A.    Yes.
 6    Q.    Is -- in your opinion is the beat, the instrumental to
 7    that a Christian beat?
 8              MR. MOVIT:  Objection, relevance?
 9              THE COURT:  I -- I know --
10              MR. MOVIT:  Also not within the scope of the
11    witness's knowledge.
12              THE COURT:  Well, I think he does have knowledge of
13    the work he does.  I'm gonna let him answer the question.
14              THE WITNESS:  The beat is not Christian because
15    what makes something Christian are the words.  It's just
16    music.  Music is music.
17    BY MR. KAHN:
18    Q.    Okay.  And, um, have you ever checked any secular, um,
19    outlets to see whether Joyful Noise is available outside of a
20    religious community?
21    A.    Yes.  Absolutely.  Because the song is uploaded as a rap
22    song.  It's -- it's everywhere.  So I checked mainstream
23    hip hop spots for the presence of Joyful Noise.
24    Q.    And what mainstream hip hop sites have you checked?
25              MR. MOVIT:  Objection, hearsay.
```

1          THE COURT:  I think it's what he did.  The question

2    is what has he checked.

3          MR. MOVIT:  But Your Honor, he's being asked what

4    they say essentially.  What did he check that says the

5    following things.

6          THE COURT:  I understand your objection.  I just

7    don't agree with it.

8          THE WITNESS:  So I checked iTunes, Amazon,

9    Billboard, things of that nature to see the happenings of.

10   BY MR. KAHN:

11   Q.   And is your song listed on Amazon?

12   A.   Yes.

13   Q.   Is it listed on iTunes?

14   A.   Yes.

15   Q.   And on Amazon is it listed as Christian gospel?

16   A.   No, it is not.

17   Q.   What is it listed as?

18   A.   Rap/hip hop.

19         MR. KAHN:  Your Honor, other than the issue with

20   the two Internet archives, we're done, and we can turn to

21   cross-examination for now.

22         I realize I have a few questions I forgot to ask.

23         THE COURT:  Go ahead.

24   BY MR. KAHN:

25   Q.   So you have released songs and you've released albums

1   since Our World Redeemed; correct?

2   A.   Correct.

3   Q.   And, um, have you seen any of your other albums on

4   Billboard charts?

5   A.   Yes, I have.

6   Q.   Which ones?

7   A.   Um, Royal Flush, The Sixth, um, to name a few that were

8   featured there.

9   Q.   And have any of these albums reached, um, up in the

10   charts in places like iTunes or Amazon?

11   A.   Yes.

12          MR. MOVIT:  Objection, relevance.

13          THE COURT:  Well, if he'd laid foundation, he

14   could.  I mean, it's not necessarily relevant but . . .

15          MR. KAHN:  It would just show that his name and his

16   music is out there, Your Honor.

17          THE COURT:  I understand, but we've just got to end

18   with these speaking objections.

19          MR. MOVIT:  And the time frame, Your Honor.

20          THE COURT:  Let's start at the beginning.

21          MR. KAHN:  Yeah.  And you know what?  We can let,

22   um, Mrs. Gray talk to this.  She's the one who tracks.

23          THE COURT:  Well, we may not be able to let her

24   talk to this.  It depends upon what relevance it has to what

25   we're doing here.

EXHIBIT 2
PAGE 273

```
 1              MR. KAHN:  Okay.
 2    Q.   So why to your view would it be relevant that your music
 3    would be tracking on nonreligious sites such as iTunes or
 4    Amazon?
 5              MR. MOVIT:  Objection.
 6              THE COURT:  Sustained.
 7    BY MR. KAHN:
 8    Q.   Let's talk briefly about Lecrae Moore.
 9    A.   Okay.
10    Q.   We'll hopefully get to his MySpace page today or
11    tomorrow.  Um, for those who don't know, who is Lecrae Moore?
12    A.   Lecrae Moore, uh, is a fellow rap artist in our
13    community who has transcended the -- the boundaries if ever
14    there were any to come out of the Christian rap world.  So
15    he's one of the biggest acts from this market.
16    Q.   And he is no longer a plaintiff; correct?
17    A.   Correct.
18    Q.   And what is your understanding of why he is no longer a
19    plaintiff?
20    A.   My understanding is --
21              MR. MOVIT:  Objection, hearsay.
22              THE COURT:  Sustained.
23              MR. KAHN:  Okay.  So he's talked to you about it,
24    but it would be hearsay.
25              THE COURT:  Well, you need to lay that down.  I
```

```
 1   mean, we can admit it for his understanding if he's had a
 2   direct conversation, not for truth of the matter asserted.
 3   BY MR. KAHN:
 4   Q.   Did you have a direct conversation with Mr. Moore?
 5   A.   I did.
 6   Q.   And this was about his decision to cease being a
 7   plaintiff?
 8   A.   Correct.  Yes.
 9   Q.   And what did he tell you?
10   A.   It was -- it was during the time of his pending promo
11   run of his new album, and he didn't want that media backlash.
12        MR. CHIEFFO:  The question asked was what was he
13   told by Mr. Moore.
14        THE COURT:  That is correct.
15        Let's try it again, Mr. Gray.  What we're trying to
16   get is what you were told was the reason for your colleague's
17   failure or decision not to participate.  And we're not
18   receiving it for the truth of what he's saying, but just for
19   your understanding.  In other words, what is your
20   understanding of the reason he gave you?
21        THE WITNESS:  My understanding is in his
22   conscience, there was a conflict of interest in being aligned
23   or affiliated with the backlash.
24   BY MR. KAHN:
25   Q.   What backlash was that?  What -- what did he tell you
```

EXHIBIT 2
PAGE 275

```
 1   would be the backlash?

 2   A.    The media storm as he approaches a new album promo.

 3   Q.    Okay.  So he thought it would be a distraction?

 4   A.    Correct.

 5              MR. KAHN:  Your Honor, I have no further questions

 6   other than the YouTube and the MySpace issues.

 7              THE COURT:  Okay.  Well, what I'd like to suggest

 8   if you want to conduct any cross today, you may.  Otherwise,

 9   if you want to review the documents, then we'll start

10   tomorrow morning.

11              MR. MOVIT:  Yeah, we prefer the latter option,

12   Your Honor.  Thank you.

13              THE COURT:  I understand.  Okay.

14              So ladies and gentlemen, we're gonna let you go a

15   bit early today.  We're going to start again tomorrow at 9:00

16   and forge ahead, uh, at that time.  Please keep an open mind,

17   don't discuss the case with one another or anyone else, and

18   have a good evening.

19              THE CLERK:  All rise.

20                     (Jury not present.)

21              THE CLERK:  Please be seated.

22              THE COURT:  So before we say goodbye for the day,

23   if I'm to understand, what -- who do we expect to call

24   tomorrow?  And do you think you're going to rest tomorrow or

25   what do we think is gonna occur?
```

```
 1            MR. KAHN:  Since things went quicker today than we
 2    thought, it's possible.
 3            THE COURT REPORTER:  I'm sorry, I can't hear you.
 4            THE COURT:  Can you go to the lectern?
 5            We have Mr. Gray to complete.
 6            MR. KAHN:  We have Mr. Gray to complete.  We have
 7    Professor Decker who is the expert witness.  We have
 8    Mrs. Gray, Crystal, who is his manager.
 9            THE COURT:  Right.
10            MR. KAHN:  I don't think she will be any longer and
11    will probably be shorter than Mr. Gray.  We have to resolve
12    the Billboard issues, and then we have cross-examination and
13    examinations of Mr. Gottwald and Mr. Walters.  And it would
14    be wonderful if we could finish tomorrow.  I don't know if it
15    might spill over to early next week.
16            THE COURT:  I just want them to have notice to have
17    a witness ready in the event you finish.
18            MR. KAHN:  Okay.
19            THE COURT:  That's what this is all about so we
20    don't stumble into the abyss that we stumbled into today.
21            MR. KAHN:  I understand, Judge.
22            Um, I will -- we will sit down, um, early after
23    recess today and try to come up with a reasonable time frame,
24    and we'll let defense counsel know what we think, whether we
25    think we can finish tomorrow, whether we think we'll go a
```

EXHIBIT 2
PAGE 277

 1    little bit into Tuesday.

 2            I assume we're not gonna have trial on Monday?

 3            THE COURT:  We can't because I have my law and

 4    motion and criminal calendars Monday.

 5            MR. KAHN:  So, I mean, I tend to think, you know,

 6    it could spill over into Tuesday, but I confess, Your Honor,

 7    I thought -- well, I was really concerned with today.  That's

 8    why we didn't want to put Mr. Gray on in the morning cause we

 9    though it would take up the time.  Then we had the two

10    witnesses who couldn't be here.

11            THE COURT:  No, I understand.  These things do

12    happen, but I'm just trying to plan ahead because somewhere

13    in here, we're gonna have to deal with jury instructions,

14    verdict forms and things like that, and I need to think ahead

15    and carve out time because in all honesty, I haven't looked

16    at any of that stuff yet.

17            MR. KAHN:  I understand, Judge.

18            THE COURT:  Um, so Ms. Lepera, do you have anything

19    to add?

20            MS. LEPERA:  Just to clarify so I'm understanding,

21    you're gonna finish Mr. Gray.

22            MR. KAHN:  Which -- yes.

23            MR. LEPERA:  Call Professor Decker which I believe

24    you indicated was roughly an hour, hour-and-a-half?

25            MS. COHEN:  No.

```
1              MS. LEPERA:  More?

2              MR. KAHN:  It'll be longer.

3              MS. LEPERA:  Much longer.  Much longer?

4              THE COURT:  How much longer?

5              MS. LEPERA:  Exactly.  Thank you.

6              MR. KAHN:  We'll have a better sense, um, probably

7     in an hour or two, and we can -- we will let you know.

8              THE COURT:  Okay.  Well, your first job is to meet

9     and confer about the YouTube, MySpace, Billboard materials

10    and get that resolved.

11             MS. LEPERA:  Okay.

12             THE COURT:  So before you start worrying about

13    experts because I really don't want to use the jury's time

14    tomorrow having a brouhaha over whether something is a

15    business record or not.

16             MS. LEPERA:  Yes.  We agree.

17             MR. KAHN:  And we def -- yeah, we want to try to be

18    efficient, Judge.

19             MS. LEPERA:  So after -- just for the live

20    testimony, though, after Mr. Decker, you're gonna call

21    Ms. Gray.  Mrs. Gray?

22             MR. KAHN:  Well, and we think Mr. Gottwald and

23    Mr. Walter.

24             MS. LEPERA:  As the -- as the Court indicated,

25    trying to schedule people being here on the times you want
```

```
 1    them, I'm just trying to understand.  So is it Mrs. Gray,

 2    then --

 3              MS. COHEN:  No.  Mrs. Gray is gonna be last.

 4              MS. LEPERA:  You would like to call Mr. Walter --

 5              MS. COHEN:  Mr. Gray --

 6              MS. LEPERA:  -- then Mr. Gottwald and then

 7    Mr. Gray?

 8              THE COURT REPORTER:  I'm sorry.  Judge, this is --

 9              I can't take this down.

10              THE COURT:  This is not fair to her.

11              MS. LEPERA:  Can you just tell me what you plan on

12    doing?

13              MS. COHEN:  Yes.

14              MS. LEPERA:  Thank you.

15              MS. COHEN:  We will finish Mr. Gray.  Then we'll

16    call Dr. Decker --

17              THE COURT REPORTER:  Can you --  can you speak into

18    the record -- into the microphone, please.

19              MS. COHEN:  Would you like me to go up there?

20              THE COURT:  Yes, we would.

21              THE COURT REPORTER:  That would be much easier

22    cause I can't hear you over there.

23              THE COURT:  Mr. Gray.

24              MS. COHEN:  Mr. Gray.  We will call Dr. Decker.

25    Then we will call Mr. Walter.  Then we call Mr. Gottwald.  We
```

```
 1    have other evidence to read, and we will close with

 2    Mrs. Gray.

 3              THE COURT:  Okay.

 4              MS. LEPERA:  And that's it.

 5              MR. KAHN:  That's it.

 6              MS. LEPERA:  Okay.

 7              THE COURT:  I assume that's it in the

 8    case-in-chief.

 9              MS. LEPERA:  Yes.

10              THE COURT:  Okay.  So that's what we will do.

11              If we're going to have a dispute over the

12    admissibility of the MySpace Billboard stuff, I'd really

13    appreciate that, knowing that, having you email us tonight so

14    that we can plan accordingly.  I would have thought that we

15    had given enough guidance in our in liminae order, but if we

16    haven't, then we will try to do a better job.

17              MS. LEPERA:  I think -- so it's really a question

18    of making clear exactly which exhibits they're speaking

19    about.  That's not clear, and we'll do that fast.

20              THE COURT:  Okay.  That would be much appreciated.

21              MS. LEPERA:  Absolutely.

22              THE COURT:  Okay.  So have a good evening,

23    everybody.

24              MR. KAHN:  Thank you, Your Honor.

25              MS. COHEN:  Thank you, Your Honor.
```

```
1              THE CLERK:  This court's adjourned.

2              (Proceedings were concluded at 4:20 p.m.)

3                    CERTIFICATE OF REPORTER

4

5    COUNTY OF LOS ANGELES        )

6                                 )  SS.

7    STATE OF CALIFORNIA          )

8

9    I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

10   STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

11   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

12   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

13   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

14   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

15   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

16   OF MY STENOGRAPHIC NOTES.

17

18

19   DATE:  JULY 19, 2019_____

20

21      /s/  LAURA MILLER ELIAS

22   LAURA MILLER ELIAS, CSR 10019

23   FEDERAL OFFICIAL COURT REPORTER

24

25
```

## $

**$19** [1] - 140:16
**$300** [5] - 33:9, 123:23, 123:25, 136:6, 137:6
**$500** [1] - 140:12

## '

**'09** [1] - 8:16
**'14** [1] - 19:18
**'em** [2] - 103:23, 159:22

## /

**/s** [1] - 210:21

## 1

**1** [15] - 3:24, 4:3, 5:23, 11:8, 26:8, 26:21, 27:9, 27:15, 55:19, 102:13, 139:17, 192:17, 193:21, 193:22, 193:24
**10** [5] - 67:15, 67:19, 78:4, 158:21, 190:1
**10,000** [1] - 95:25
**100** [2] - 8:15, 187:1
**10019** [2] - 1:22, 210:22
**101** [1] - 3:22
**11** [1] - 167:2
**110** [1] - 3:12
**11377** [1] - 2:17
**114** [1] - 139:16
**115** [1] - 139:17
**12** [13] - 43:4, 43:5, 66:11, 66:13, 66:19, 66:22, 81:13, 85:19, 91:24, 92:12, 118:9, 118:10, 136:24
**12-minute** [1] - 92:5
**12:30** [1] - 67:20
**12TH** [1] - 2:7
**13** [5] - 77:24, 81:13, 81:17, 92:24, 93:3
**13,000** [1] - 32:20
**135** [1] - 3:12
**13th** [1] - 75:9
**14** [2] - 9:24, 93:3
**14.2** [1] - 32:21
**14th** [1] - 79:5
**15** [19] - 9:13, 9:14, 9:24, 9:25, 43:11, 43:12, 64:14, 65:7, 65:19, 68:5, 68:14, 68:18, 71:15, 93:3,

93:4, 140:16, 158:21, 172:4, 195:14
**15-5642** [1] - 4:4
**15-5642-CAS** [1] - 1:8
**151** [3] - 3:12, 84:13, 95:7
**154** [1] - 3:12
**16** [29] - 3:22, 7:20, 39:4, 39:11, 40:3, 40:4, 40:6, 40:7, 40:13, 55:7, 55:15, 64:21, 64:25, 77:25, 104:24, 119:8, 119:13, 119:15, 119:16, 120:7, 120:10, 120:18, 121:1, 121:2, 121:7, 121:10, 121:11, 172:3
**164** [1] - 3:14
**169** [1] - 3:15
**16th** [1] - 78:5
**17** [14] - 76:5, 78:10, 93:20, 93:22, 119:8, 119:14, 120:9, 120:10, 120:22, 121:21, 125:11, 125:20, 126:2, 168:23
**17th** [2] - 78:8, 136:24
**18** [7] - 1:15, 3:4, 4:1, 77:21, 136:24, 168:24, 168:25
**1840** [1] - 2:22
**19** [2] - 142:22, 210:19
**1900** [1] - 2:23
**193** [2] - 3:23, 3:24
**194** [1] - 3:24
**1940s** [1] - 13:20
**197** [1] - 3:25
**1990s** [1] - 76:13
**1:00** [1] - 102:16
**1st** [2] - 59:20, 66:25

## 2

**2** [5] - 27:7, 27:14, 28:7, 77:16
**20** [3] - 112:6, 190:1, 192:4
**20,000** [1] - 95:25
**200** [1] - 93:9
**2000** [4] - 76:15, 76:17, 76:18, 165:21
**2000s** [2] - 76:5, 98:11
**2001** [5] - 75:20, 92:18, 93:11, 99:22, 100:2
**2004** [1] - 172:4

**2006** [1] - 76:18
**2007** [26] - 5:16, 6:19, 9:1, 33:9, 43:15, 56:11, 76:23, 76:24, 76:25, 98:18, 105:5, 105:24, 111:4, 112:1, 112:2, 112:13, 122:19, 122:23, 125:3, 126:21, 127:6, 129:9, 129:16, 136:10, 136:18, 173:6
**2008** [17] - 7:18, 7:21, 8:6, 8:16, 8:25, 19:15, 21:25, 29:24, 32:10, 43:15, 127:8, 129:16, 180:13, 186:10, 195:25
**2009** [7] - 105:5, 127:8, 181:11, 181:12, 181:22, 191:20, 195:25
**2010** [5] - 76:17, 103:21, 127:10, 165:21, 192:1
**2011** [2] - 8:18, 127:12
**2012** [12] - 8:18, 8:25, 9:1, 13:4, 21:25, 127:14, 159:23, 159:24, 184:23, 184:24, 186:10
**2013** [16] - 9:2, 13:9, 19:15, 19:18, 29:24, 32:10, 33:25, 42:19, 76:2, 77:21, 78:4, 78:10, 79:6, 167:16, 167:19, 197:21
**2014** [7] - 52:9, 59:21, 64:10, 66:25, 84:10, 131:18, 139:7
**2015** [1] - 84:11
**2017** [8] - 36:7, 55:7, 55:16, 72:23, 136:24, 138:9, 140:10, 143:1
**2019** [4] - 1:15, 4:1, 105:24, 210:19
**208** [1] - 2:11
**21** [2] - 112:6, 124:12
**2100** [1] - 2:11
**213)894-0374** [1] - 1:24
**22** [1] - 172:6
**22nd** [1] - 163:23
**23** [5] - 93:22, 93:25, 142:22, 172:6
**24** [1] - 137:21
**25** [2] - 64:25, 139:16
**265** [1] - 32:19

## 3

**3** [7] - 28:6, 55:19, 175:25, 176:1
**30** [5] - 80:19, 80:22, 93:17, 141:10, 141:13
**300** [1] - 93:9
**30th** [1] - 78:8
**35** [2] - 3:8, 195:14
**350** [1] - 1:23

## 4

**4** [10] - 3:3, 3:24, 7:21, 79:5, 86:8, 86:13, 137:22, 194:13, 194:17, 194:19
**4.1** [1] - 148:11
**4.14** [1] - 32:12
**40** [2] - 3:22, 82:5
**41** [3] - 21:25, 148:11, 148:14
**44** [2] - 3:9, 55:19
**4455** [1] - 1:23
**45** [4] - 141:10, 141:13, 183:20, 183:23
**4:20** [1] - 210:2
**4:30** [2] - 157:6, 160:17

## 5

**5** [6] - 63:17, 63:18, 66:9, 82:6, 124:19, 195:13
**50** [25] - 7:1, 7:2, 33:11, 113:12, 113:13, 114:15, 114:24, 124:5, 125:1, 136:18, 136:20, 137:17, 138:19, 139:3, 139:9, 139:14, 139:21, 140:5, 153:5, 174:24, 175:18, 175:21, 195:15, 195:20
**53** [2] - 32:20, 102:21
**55** [1] - 102:21
**56** [1] - 85:3
**58** [2] - 128:2, 143:17
**5B** [1] - 185:13

## 6

**6** [9] - 3:25, 15:3, 82:13, 83:10, 196:19, 196:22,

196:24, 197:4, 197:7
**63105** [2] - 2:8, 2:11
**66** [3] - 84:16, 84:18, 84:20
**67** [4] - 3:8, 136:24, 159:18, 184:22
**68** [3] - 137:21, 183:22, 183:25
**69** [4] - 137:21, 137:22, 159:19, 185:16

## 7

**7** [10] - 3:23, 61:6, 61:16, 61:25, 75:8, 84:8, 139:17, 193:1, 193:5, 193:24
**70** [1] - 142:21
**72** [1] - 3:9
**74** [4] - 9:20, 9:21, 102:21, 102:22
**75** [5] - 3:10, 41:13, 41:23, 134:19, 134:20
**76** [5] - 91:3, 91:6, 91:13, 102:22, 132:6
**77** [8] - 3:22, 61:4, 61:11, 61:16, 101:9, 101:10, 101:11, 101:15
**7701** [1] - 2:7

## 8

**8** [1] - 64:10
**84** [2] - 64:25, 68:4
**85** [1] - 68:12
**87** [1] - 3:19

## 9

**9** [3] - 61:6, 61:16, 61:25
**90** [1] - 29:25
**90012** [1] - 1:23
**90064** [1] - 2:18
**90067** [1] - 2:23
**99** [1] - 3:19
**9:00** [1] - 204:15
**9:18** [1] - 4:1

## A

**A.M** [1] - 4:1
**AARON** [1] - 2:16
**Aaron** [1] - 18:11
**ability** [1] - 117:7
**able** [15] - 17:13, 18:13, 28:24, 76:20,

98:6, 103:24, 104:5, 112:2, 126:8, 126:14, 126:18, 142:3, 174:16, 180:1, 201:23
**absence** [1] - 162:17
**absolutely** [20] - 20:8, 22:9, 23:25, 69:21, 71:14, 121:20, 132:2, 146:12, 163:4, 171:3, 175:22, 176:5, 183:17, 184:18, 186:11, 187:11, 197:20, 198:17, 199:21, 209:21
**abyss** [1] - 205:20
**accept** [2] - 68:14, 163:14
**acceptable** [1] - 41:17
**accepted** [1] - 36:7
**access** [12] - 11:24, 12:24, 13:2, 14:17, 16:2, 30:10, 31:8, 32:5, 33:1, 34:14, 34:20, 105:14
**accessibility** [1] - 14:13
**acclaim** [3] - 8:7, 17:6, 38:5
**accompanying** [1] - 98:15
**accomplish** [1] - 181:19
**accomplished** [5] - 23:9, 23:13, 23:17, 25:18, 26:2
**accomplishments** [1] - 23:14
**according** [3] - 76:1, 82:16, 84:9
**accordingly** [1] - 209:14
**account** [5] - 166:6, 166:15, 166:16, 166:18
**accounts** [1] - 32:19
**accurate** [8] - 68:13, 77:19, 77:22, 78:11, 79:22, 82:10, 132:23, 161:14
**accusing** [3] - 14:23, 14:24
**acknowledge** [2] - 18:25, 19:1
**acknowledges** [1] - 29:23
**acknowledging** [2] - 28:5, 32:25
**acknowledgment** [3] -

64:2, 66:4, 66:24
**acquired** [1] - 123:24
**active** [3] - 129:11, 129:14, 129:15
**activity** [2] - 19:19, 62:21
**acts** [1] - 202:15
**actual** [15] - 6:11, 12:12, 25:4, 29:13, 31:14, 38:17, 105:14, 116:1, 116:16, 124:18, 128:16, 158:2, 182:25, 184:7, 186:23
**add** [2] - 116:20, 206:19
**addition** [6] - 8:13, 13:18, 37:24, 85:24, 126:21, 183:5
**addressing** [1] - 22:21
**adjourned** [1] - 210:1
**adjust** [3] - 117:7, 117:9, 117:10
**admissibility** [1] - 209:12
**admission** [1] - 102:19
**admit** [5] - 10:23, 20:7, 27:25, 103:6, 203:1
**admitted** [12] - 40:7, 101:15, 121:1, 121:5, 121:11, 193:14, 193:15, 193:24, 193:25, 194:19, 197:4, 197:7
**admonition** [1] - 67:17
**advance** [1] - 189:6
**advantage** [1] - 17:3
**advertisement** [1] - 31:24
**advertisements** [1] - 53:4
**advised** [1] - 162:8
**affected** [1] - 92:11
**affects** [1] - 161:6
**affidavit** [3] - 157:24, 184:22, 184:23
**affidavits** [2] - 157:20, 159:19
**affiliated** [1] - 203:23
**Africa** [1] - 17:20
**afternoon** [8] - 135:20, 155:10, 155:25, 156:15, 164:9, 167:22, 169:24, 169:25
**ago** [3] - 60:23, 157:17, 185:6

**agree** [8] - 53:23, 68:14, 137:6, 157:8, 194:23, 195:10, 200:7, 207:16
**agreed** [6] - 6:24, 58:22, 68:24, 73:24, 153:7, 156:17
**agreement** [30] - 42:16, 42:17, 42:22, 43:8, 59:13, 59:16, 72:16, 80:22, 103:11, 124:10, 124:17, 124:19, 124:20, 124:22, 124:25, 136:10, 136:11, 136:14, 136:17, 136:20, 137:5, 137:8, 137:9, 137:14, 137:17, 137:19, 138:2, 160:6, 185:6
**agreements** [3] - 124:13, 124:14
**ahead** [12] - 102:13, 109:24, 142:23, 158:15, 159:12, 160:6, 172:13, 172:24, 200:23, 204:16, 206:12, 206:14
**AIDED** [1] - 210:14
**Air** [1] - 78:8
**AL** [2] - 1:6, 1:9
**album** [60] - 7:18, 7:20, 8:8, 8:9, 9:13, 15:2, 15:20, 16:20, 17:6, 20:9, 33:13, 38:6, 38:22, 48:23, 53:13, 53:16, 75:20, 76:2, 77:17, 77:25, 80:7, 82:15, 82:18, 91:8, 92:18, 92:20, 93:8, 93:10, 97:2, 111:14, 127:24, 128:3, 128:6, 130:14, 144:4, 151:18, 165:4, 165:5, 170:4, 172:4, 172:5, 173:7, 173:11, 173:13, 176:8, 176:9, 180:16, 180:18, 180:19, 180:22, 181:4, 183:5, 190:12, 191:9, 191:16, 192:1, 196:8, 203:11, 204:2
**album's** [3] - 78:4, 78:9, 92:18
**albums** [9] - 53:19,

94:3, 94:16, 123:14, 191:25, 196:1, 200:25, 201:3, 201:9
**aligned** [1] - 203:22
**alleging** [1] - 85:8
**allocation** [1] - 65:19
**allotted** [1] - 91:24
**allow** [2] - 11:6, 69:7
**allowed** [3] - 28:24, 39:17, 183:20
**almost** [1] - 108:21
**alone** [2] - 181:8, 182:3
**alternative** [1] - 161:22
**amazing** [2] - 40:19, 79:15
**Amazon** [7] - 16:23, 128:9, 200:8, 200:11, 200:15, 201:10, 202:4
**America** [4] - 49:13, 84:16, 84:19, 110:9
**AMERICA** [1] - 1:1
**amount** [4] - 64:20, 64:22, 68:24, 195:23
**amusement** [1] - 14:1
**analogous** [1] - 105:3
**analysis** [3] - 12:10, 28:13, 32:14
**analyzed** [1] - 19:3
**AND** [4] - 210:9, 210:12, 210:14, 210:15
**Angeles** [5] - 17:18, 88:16, 93:18, 93:20, 163:25
**ANGELES** [6] - 1:16, 1:23, 2:18, 2:23, 4:1, 210:5
**announced** [2] - 37:17, 37:18
**answer** [19] - 56:2, 60:9, 62:7, 65:11, 65:16, 68:9, 70:2, 75:1, 94:14, 107:9, 109:1, 114:21, 143:7, 152:9, 152:25, 157:18, 158:16, 172:24, 199:13
**answered** [1] - 114:19
**answers** [1] - 68:13
**anticipates** [1] - 4:16
**anytime** [1] - 147:2
**anyway** [2] - 120:11, 121:24
**apart** [1] - 145:3
**Apologetics** [2] - 36:12, 36:13

**apologies** [1] - 163:15
**apologize** [4] - 85:4, 107:15, 121:22, 163:18
**appeal** [1] - 178:9
**appealed** [4] - 82:3, 101:18, 102:4, 108:4
**appear** [1] - 14:7
**appearance** [1] - 30:14
**APPEARANCES** [1] - 2:2
**appearances** [2] - 4:6, 4:7
**appeared** [2] - 111:14, 170:4
**appearing** [1] - 186:23
**appetizer** [4] - 79:20, 80:1, 80:10, 81:5
**appetizers** [1] - 80:1
**application** [7] - 71:4, 71:7, 191:15, 191:17, 191:18, 193:2
**applied** [1] - 62:17
**applying** [1] - 62:20
**appreciate** [2] - 156:4, 209:13
**appreciated** [1] - 209:20
**approach** [2] - 61:23, 135:13
**approached** [1] - 9:5
**approaches** [1] - 204:2
**appropriate** [3] - 105:9, 108:18, 134:18
**archive** [2] - 184:24, 185:2
**archives** [5] - 157:21, 158:3, 158:17, 186:18, 200:20
**area** [3] - 185:18, 185:19, 187:4
**areas** [2] - 160:9, 185:7
**arena** [2] - 38:12, 177:16
**arenas** [4] - 14:2, 95:24, 95:25, 171:4
**argue** [3] - 22:22, 107:17, 108:2
**argument** [3] - 21:16, 22:17, 22:20
**arise** [3] - 9:3, 87:16, 163:16
**arpeggio** [1] - 81:13
**arrange** [1] - 156:2
**arrangement** [4] -

174:15, 174:22, 174:23, 179:13
**array** [1] - 171:3
**arrive** [1] - 18:1
**arrived** [4] - 168:6, 168:12, 168:15, 195:19
**art** [2] - 36:14, 90:2
**article** [6] - 76:24, 79:3, 86:2, 86:4, 86:7, 86:8
**artist** [18] - 6:6, 6:17, 7:8, 7:16, 17:2, 23:9, 23:16, 24:24, 164:22, 170:6, 170:8, 170:9, 170:12, 170:20, 171:12, 184:18, 197:23, 202:12
**artistic** [2] - 93:11, 94:7
**artists** [12] - 23:3, 24:21, 32:21, 43:20, 43:22, 52:4, 113:3, 114:13, 165:2, 166:4, 178:22, 188:17
**aspect** [2] - 57:9, 192:13
**asserted** [1] - 203:2
**assessment** [1] - 19:20
**assign** [2] - 194:8, 194:10
**assigned** [6] - 63:7, 66:11, 194:11, 195:10, 196:15, 197:18
**assignment** [4] - 194:12, 196:25, 197:11, 197:12
**assigns** [1] - 194:23
**assistance** [1] - 26:15
**associate** [1] - 166:24
**associated** [2] - 146:17, 150:3
**assume** [9] - 5:20, 125:7, 162:6, 162:13, 163:2, 174:25, 195:25, 206:2, 209:7
**assuming** [2] - 25:11, 132:17
**AT** [1] - 210:12
**Atlanta** [1] - 128:24
**attached** [1] - 157:21
**attachments** [1] - 185:16
**attempting** [2] - 20:11, 21:8

**attend** [3] - 181:6, 181:24, 182:14
**attended** [8] - 8:10, 69:25, 70:19, 130:7, 130:20, 131:4, 147:23, 150:24
**attendees** [1] - 70:15
**attending** [3] - 48:3, 50:12, 149:24
**attention** [4] - 42:13, 43:23, 139:15, 176:12
**attic** [7] - 39:2, 40:1, 41:1, 177:19, 177:24, 177:25, 178:6
**attorney** [1] - 85:25
**attorney/client** [2] - 60:7, 60:12
**attorneys** [4] - 59:23, 60:2, 66:21, 162:12
**audience** [6] - 92:3, 100:8, 100:18, 178:9, 187:17
**audio** [12] - 80:17, 104:16, 105:8, 106:1, 106:5, 106:6, 106:11, 106:12, 150:13, 150:17, 183:15
**August** [1] - 78:4
**authenticate** [7] - 39:16, 106:22, 157:23, 157:25, 159:22, 160:4, 185:1
**authenticated** [4] - 104:21, 106:8, 106:15, 185:15
**authenticity** [1] - 93:15
**author** [1] - 12:9
**authors** [2] - 10:19, 192:23
**available** [4] - 16:14, 73:21, 155:15, 199:19
**avenue** [1] - 30:9
**avenues** [1] - 31:7
**avoid** [1] - 75:5
**award** [10] - 8:9, 8:11, 30:12, 150:24, 151:2, 180:22, 181:20, 182:11, 183:1
**Awards** [1] - 38:14
**awards** [25] - 8:8, 13:12, 13:13, 30:4, 30:5, 38:6, 38:7, 38:10, 38:14, 38:15, 38:17, 180:16,

180:18, 180:19, 180:23, 180:25, 181:13, 182:5, 182:7, 182:8, 182:9, 182:21, 182:22, 182:23, 182:24
**aware** [34] - 14:16, 47:5, 47:7, 48:2, 48:5, 49:11, 49:14, 49:15, 49:24, 50:2, 50:11, 50:14, 50:15, 50:19, 54:21, 54:23, 55:2, 60:25, 61:1, 62:21, 63:6, 63:9, 66:21, 66:23, 145:21, 146:13, 146:15, 147:8, 147:18, 149:9, 149:12, 149:23, 154:18, 196:15
**awareness** [1] - 189:10
**awfully** [1] - 60:7

## B

**Bachelor's** [1] - 172:25
**background** [8] - 14:10, 25:25, 36:1, 41:3, 44:6, 164:15, 172:7, 172:12
**backgrounds** [1] - 176:24
**backing** [1] - 20:21
**backlash** [4] - 203:11, 203:23, 203:25, 204:1
**backstage** [1] - 97:12
**bad** [3] - 14:25, 37:6, 143:23
**baggage** [1] - 172:16
**balance** [1] - 95:13
**band** [7] - 164:24, 166:1, 166:7, 166:16, 167:1, 187:24
**band's** [1] - 166:6
**bands** [1] - 166:23
**bankrupt** [2] - 93:6, 93:19
**bar** [1] - 125:21
**Barbara** [9] - 79:13, 88:2, 88:17, 89:25, 93:21, 96:24, 101:18, 167:7, 167:22
**bare** [1] - 81:8
**bars** [8] - 64:20, 64:21, 64:23, 72:16,

72:19, 80:13, 80:16
**base** [2] - 116:17, 117:23
**based** [11] - 38:22, 64:20, 64:22, 72:16, 83:22, 107:9, 133:25, 152:10, 152:12, 156:18, 187:17
**basement** [2] - 18:1, 37:2
**basic** [3] - 18:25, 29:2
**basis** [7] - 22:9, 103:21, 115:6, 115:8, 153:23, 154:1, 154:3
**bathroom** [1] - 18:3
**bathtub** [1] - 18:2
**bear** [5] - 19:5, 19:15, 19:22, 25:2, 132:21
**beat** [115] - 6:7, 6:14, 6:20, 6:23, 7:13, 7:25, 8:4, 8:5, 10:5, 10:7, 16:11, 16:12, 17:14, 23:20, 24:6, 25:10, 33:9, 33:10, 33:20, 33:22, 34:16, 34:24, 40:15, 53:24, 54:1, 54:3, 54:9, 54:14, 54:17, 54:20, 54:22, 55:2, 56:21, 56:25, 57:2, 57:17, 69:19, 69:20, 80:12, 103:21, 105:7, 106:11, 108:7, 110:25, 111:20, 111:24, 112:7, 112:8, 112:9, 112:17, 112:20, 113:16, 114:1, 114:7, 116:18, 117:1, 117:5, 117:21, 118:19, 119:25, 120:11, 122:2, 122:6, 122:9, 122:13, 122:15, 122:16, 122:20, 123:1, 123:16, 123:18, 123:20, 123:24, 125:5, 125:8, 126:2, 126:5, 126:19, 127:21, 131:15, 132:13, 133:7, 134:25, 135:5, 136:6, 136:7, 137:10, 139:1, 139:13, 140:12, 140:20, 141:10, 141:16, 141:23, 142:1, 142:7,

142:12, 145:17, 146:22, 147:5, 147:8, 149:5, 149:10, 150:8, 173:17, 174:13, 174:16, 175:6, 175:13, 178:24, 199:6, 199:7, 199:14
**beats** [23] - 5:24, 6:2, 6:4, 6:9, 12:14, 24:16, 25:5, 111:5, 112:3, 112:11, 112:15, 112:23, 113:2, 113:14, 116:11, 118:12, 134:24, 140:15, 140:23, 140:24, 141:8, 187:23
**became** [20] - 56:9, 72:21, 80:7, 80:18, 81:3, 90:4, 97:1, 103:21, 117:21, 118:20, 122:8, 123:18, 139:8, 142:12, 144:18, 147:5, 165:2, 168:5, 171:16, 176:13
**become** [3] - 36:23, 54:23, 74:9
**becomes** [3] - 8:7, 8:17, 8:18
**bed** [5] - 23:5, 26:17, 81:25, 87:20, 190:7
**beds** [5] - 79:19, 79:25, 80:7, 81:5, 96:24
**beforehand** [2] - 105:18, 138:5
**began** [2] - 19:19, 58:12
**begin** [1] - 4:17
**beginning** [12] - 7:23, 7:24, 9:11, 33:8, 81:22, 81:24, 82:1, 97:1, 154:4, 163:15, 167:6, 201:20
**beginnings** [1] - 174:9
**begins** [3] - 5:16, 8:1, 8:3
**BEHALF** [3] - 2:3, 2:13, 2:19
**behind** [4] - 18:12, 22:24, 187:24, 196:19
**believes** [1] - 134:5
**Bells** [3] - 24:20, 24:21, 25:1
**benefit** [4] - 37:20, 41:22, 43:17, 110:22
**Best** [3] - 16:15,

29:25, 128:9
**best** [8] - 24:9, 75:5, 89:22, 111:23, 180:22, 180:24, 181:4, 182:13
**better** [4] - 157:6, 158:3, 207:6, 209:16
**between** [21] - 8:25, 19:2, 21:17, 27:18, 28:6, 28:8, 30:22, 30:23, 32:10, 33:24, 42:22, 76:17, 78:6, 83:5, 131:25, 154:19, 160:8, 189:21, 192:8, 195:22, 196:25
**beyond** [1] - 25:18
**Bible** [1] - 174:5
**bible** [5] - 6:19, 123:11, 123:12, 123:13, 171:17
**Biblical** [3] - 36:3, 36:5, 173:1
**big** [16] - 6:3, 8:7, 30:21, 30:22, 94:1, 97:25, 100:11, 108:16, 171:16, 174:2, 176:7, 176:10, 177:16, 177:17, 179:17, 198:19
**bigger** [1] - 132:18
**biggest** [3] - 71:25, 168:17, 202:15
**bill** [1] - 190:19
**Billboard** [13] - 8:13, 8:14, 13:18, 13:20, 16:20, 30:3, 157:1, 161:6, 200:9, 201:4, 205:12, 207:9, 209:12
**Billboard's** [1] - 13:19
**billions** [1] - 23:10
**Birthday** [2] - 82:18, 83:20
**bit** [18] - 14:17, 17:23, 19:5, 20:21, 37:7, 38:18, 44:6, 48:10, 53:22, 58:11, 89:3, 96:13, 107:9, 118:16, 170:9, 172:12, 204:15, 206:1
**blatant** [1] - 106:9
**block** [2] - 84:9, 171:6
**blocking** [1] - 18:13
**blocks** [2] - 28:1, 28:23
**blue** [2] - 162:6, 162:13

**board** [1] - 26:7
**body** [2] - 71:25, 179:14
**boils** [2] - 26:20, 28:14
**bones** [2] - 81:8, 171:24
**bongos** [1] - 117:25
**book** [4] - 125:12, 125:15, 125:16, 143:18
**booking** [2] - 186:17, 192:9
**books** [1] - 25:18
**boom** [1] - 41:4
**bottom** [2] - 20:17, 74:17
**bought** [1] - 6:22
**BOULEVARD** [2] - 2:7, 2:17
**boundaries** [1] - 202:13
**Bowl** [7] - 84:23, 85:5, 85:13, 91:15, 91:24, 97:12, 100:8
**box** [2] - 41:4, 64:5
**Boys** [3] - 94:6, 94:8, 94:21
**break** [9] - 65:23, 66:1, 97:5, 98:6, 155:6, 155:9, 155:16, 160:17
**brief** [5] - 9:20, 72:9, 107:3, 154:9, 180:1
**briefly** [7] - 20:3, 33:6, 35:25, 42:15, 45:11, 62:10, 202:8
**bright** [1] - 70:18
**brilliant** [1] - 27:24
**bring** [5] - 4:10, 24:17, 43:23, 125:13, 180:10
**bringing** [3] - 106:13, 158:20, 183:14
**brings** [1] - 10:3
**Brittany** [1] - 23:3
**broke** [2] - 33:19, 165:1
**brouhaha** [1] - 207:14
**browser** [1] - 116:16
**bucket** [1] - 22:4
**budget** [5] - 83:3, 83:7, 83:11, 83:12, 83:15
**build** [1] - 178:20
**building** [3] - 17:25, 28:1, 28:23
**bunch** [1] - 37:1
**business** [6] - 157:20, 158:2, 159:20, 164:17, 185:3,

207:15
**Buy** [3] - 16:15, 29:25, 128:9
**buy** [4] - 16:16, 33:9, 137:8, 165:25
**buy-out** [2] - 33:9, 137:8
**buying** [2] - 47:9, 50:4
**BY** [63] - 2:5, 2:10, 2:15, 2:21, 3:3, 3:4, 3:8, 3:9, 3:12, 3:12, 3:15, 3:19, 3:19, 35:20, 39:7, 40:14, 40:24, 41:24, 42:10, 44:3, 60:13, 63:23, 66:2, 67:24, 70:13, 72:13, 75:12, 81:1, 87:10, 91:14, 98:8, 99:12, 100:17, 101:16, 110:2, 114:22, 122:12, 125:24, 134:21, 135:19, 144:1, 151:9, 152:11, 154:12, 164:8, 165:15, 169:23, 172:17, 174:21, 184:1, 194:2, 194:20, 196:6, 197:10, 198:8, 198:24, 199:17, 200:10, 200:24, 202:7, 203:3, 203:24, 210:14
**byte** [1] - 190:10

# C

**CA** [2] - 2:18, 2:23
**cable** [1] - 110:16
**cadence** [2] - 176:16, 177:20
**cadences** [1] - 177:18
**Calendar** [1] - 4:3
**calendars** [1] - 206:4
**CALIFORNIA** [6] - 1:2, 1:16, 1:23, 4:1, 210:7, 210:10
**California** [1] - 90:17
**camera** [1] - 183:14
**cancelled** [1] - 95:8
**cannot** [4] - 22:5, 29:3, 29:4, 157:13
**CAPES** [1] - 2:5
**capital** [2] - 15:17, 49:12
**Capital** [5] - 15:17, 77:21, 78:24, 83:1, 83:6
**captured** [1] - 101:22

**car** [1] - 11:9
**care** [3] - 107:20, 135:17, 198:20
**career** [8] - 76:14, 98:20, 110:18, 110:20, 140:12, 164:15, 165:3, 165:20
**careful** [1] - 60:12
**carefully** [1] - 22:24
**carve** [2] - 34:7, 206:15
**case** [61] - 4:24, 6:24, 7:22, 7:25, 8:6, 15:21, 18:4, 19:14, 23:24, 25:2, 25:12, 25:22, 26:22, 34:11, 34:23, 36:15, 43:20, 55:5, 58:12, 60:5, 60:15, 61:10, 63:3, 67:18, 74:16, 102:14, 107:10, 108:18, 111:11, 120:11, 124:15, 126:24, 133:19, 136:9, 137:3, 137:13, 138:13, 138:19, 138:22, 139:6, 139:11, 140:11, 140:14, 141:5, 141:9, 144:13, 144:18, 144:20, 145:13, 145:16, 145:20, 159:12, 161:25, 163:3, 164:3, 164:5, 194:11, 195:2, 204:17, 209:8
**Case** [1] - 4:4
**CASE** [1] - 1:8
**case-in-chief** [1] - 209:8
**cases** [3] - 10:22, 12:2, 139:2
**cat** [1] - 97:6
**categorized** [1] - 26:5
**cats** [1] - 97:4
**caution** [1] - 107:7
**cautionary** [1] - 109:4
**CCM** [1] - 178:11
**CD** [5] - 16:22, 47:9, 50:4, 147:12, 149:14
**CDs** [3] - 149:17, 149:20, 165:25
**cease** [1] - 203:6
**ceiling** [1] - 97:14
**celebrate** [1] - 188:17
**celebration** [1] - 182:11
**cell** [1] - 176:18

**center** [1] - 164:24
**centers** [2] - 171:5, 171:6
**CENTRAL** [2] - 1:2, 210:10
**CENTURY** [1] - 2:22
**ceremonies** [2] - 8:11, 183:1
**ceremony** [7] - 181:6, 181:20, 182:1, 182:14, 182:16, 182:19, 182:20
**certain** [2] - 26:4, 134:5, 156:13
**certainly** [4] - 56:5, 57:16, 157:10, 160:11
**certificate** [1] - 192:21
**CERTIFICATE** [1] - 210:3
**certification** [1] - 145:8
**certified** [1] - 193:6
**CERTIFY** [2] - 210:11, 210:15
**cetera** [3] - 16:7, 26:6, 145:13
**Chablis** [3] - 79:18, 86:15, 97:6
**Chair** [1] - 12:6
**challenge** [1] - 11:19
**chance** [7] - 5:6, 5:19, 94:1, 103:2, 161:12, 186:12, 186:19
**change** [1] - 24:23
**changed** [2] - 66:12
**changes** [1] - 118:18
**channel** [2] - 31:16, 99:2
**character** [1] - 173:20
**characterized** [2] - 26:24
**chart** [3] - 28:5, 28:11, 29:22
**charts** [12] - 8:13, 8:14, 8:15, 8:16, 13:18, 13:19, 25:20, 30:3, 30:8, 201:4, 201:10
**check** [8] - 100:12, 137:15, 138:3, 158:7, 162:24, 173:25, 189:11, 200:4
**checked** [5] - 199:18, 199:22, 199:24, 200:2, 200:8
**chief** [1] - 209:8
**CHIEFFO** [24] - 2:21, 3:19, 73:25, 74:4,

86:24, 87:10, 91:1, 91:6, 91:11, 91:14, 98:5, 98:8, 99:10, 100:12, 101:6, 101:14, 102:7, 102:23, 103:2, 103:12, 133:13, 152:7, 152:24, 203:12

**Chieffo** [7] - 18:11, 73:22, 74:14, 74:24, 86:23, 99:21, 101:3

**Chike** [9] - 5:4, 54:25, 55:23, 56:6, 57:17, 109:14, 109:22, 152:4, 174:4

**CHIKE** [1] - 3:11

**Chike's** [1] - 173:23

**child** [1] - 97:21

**choices** [1] - 116:10

**choir** [3] - 98:2

**chomping** [1] - 107:8

**chorus** [10] - 7:14, 39:1, 41:12, 41:16, 41:21, 42:2, 57:9, 85:22, 92:12, 177:22

**chose** [2] - 20:15

**Christ** [1] - 172:15

**Christian** [44] - 5:18, 5:21, 6:16, 7:8, 8:16, 16:2, 16:3, 16:12, 16:16, 30:22, 30:23, 36:15, 37:23, 38:15, 44:8, 44:11, 44:15, 52:4, 52:16, 71:24, 75:23, 75:25, 93:2, 96:17, 99:22, 99:25, 100:1, 111:10, 135:3, 170:12, 171:17, 172:15, 180:11, 180:25, 182:10, 182:12, 199:2, 199:4, 199:7, 199:14, 199:15, 200:15, 202:14

**CHRISTINA** [1] - 1:4

**CHRISTINE** [1] - 2:15

**Christine** [1] - 18:9

**chronological** [1] - 17:15

**Church** [1] - 173:1

**church** [6] - 92:22, 97:18, 97:19, 98:2, 131:9, 131:10

**churches** [7] - 13:25, 21:13, 130:17, 130:18, 148:1, 171:4, 187:8

**circle** [1] - 30:20

**circumstance** [1] -

34:23

**circumstantial** [8] - 11:1, 11:5, 11:16, 11:19, 11:22, 13:5, 29:6, 32:2

**Cirkut** [4] - 45:15, 79:18, 89:20, 168:3

**Cirkut's** [1] - 80:15

**cities** [1] - 188:21

**citizens** [1] - 159:9

**City** [1] - 130:15

**city** [1] - 38:25

**claim** [12] - 25:2, 25:3, 25:11, 25:12, 26:21, 59:6, 104:24, 134:8, 144:21, 145:13, 145:16

**claiming** [1] - 24:1

**claims** [1] - 23:20

**clarify** [6] - 69:6, 69:7, 99:3, 120:2, 160:25, 206:20

**clarinets** [1] - 6:12

**classes** [1] - 123:11

**classics** [1] - 28:18

**CLAYTON** [1] - 2:11

**Clear** [3] - 190:25, 191:7, 191:24

**clear** [7] - 55:2, 94:13, 103:7, 123:2, 191:23, 209:18, 209:19

**clearly** [7] - 30:15, 57:8, 57:9, 57:11, 57:14, 69:17, 69:18

**CLERK** [37] - 4:3, 35:12, 35:14, 87:1, 87:3, 87:8, 103:14, 103:16, 109:6, 109:9, 109:11, 109:17, 109:19, 121:1, 121:3, 125:12, 125:15, 125:17, 143:24, 155:21, 155:23, 156:5, 156:7, 160:23, 161:16, 163:9, 163:11, 163:13, 169:10, 169:12, 169:18, 193:12, 193:17, 193:21, 204:19, 204:21, 210:1

**click** [1] - 129:3

**client** [2] - 47:14, 159:6

**client's** [3] - 85:9, 108:7, 108:17

**clients** [13] - 10:13, 10:17, 16:5, 18:12,

19:5, 20:21, 27:25, 32:19, 45:11, 47:9, 47:13, 49:9, 108:3

**clip** [1] - 9:20

**close** [8] - 12:16, 55:24, 56:3, 60:7, 60:12, 62:4, 102:12, 209:1

**co** [2] - 87:25, 120:21

**co-counsel** [1] - 120:21

**co-written** [1] - 87:25

**coast** [1] - 188:22

**COHEN** [13] - 2:6, 85:2, 156:8, 157:15, 162:7, 206:25, 208:3, 208:5, 208:13, 208:15, 208:19, 208:24, 209:25

**Cohen** [5] - 4:23, 74:2, 74:25, 125:13

**cold** [1] - 95:9

**collaborated** [1] - 88:23

**collaborations** [1] - 90:21

**collaborator** [1] - 89:7

**collaborators** [1] - 112:8

**colleague's** [1] - 203:16

**colleagues** [2] - 18:10, 171:11

**collection** [2] - 180:10, 182:9

**collectively** [2] - 45:20, 49:17

**college** [1] - 36:2

**colleges** [1] - 171:4

**combination** [1] - 85:16

**coming** [10] - 7:11, 11:10, 41:6, 60:7, 88:19, 90:8, 161:15, 168:19, 192:10

**comment** [1] - 100:24

**comments** [1] - 103:7

**common** [13] - 21:17, 21:19, 21:21, 27:18, 28:1, 28:6, 28:23, 29:5, 29:8, 29:19, 31:18, 32:24, 35:3

**communicated** [2] - 46:4, 146:5

**communication** [1] - 59:5

**communications** [1] - 145:3

**community** [8] -

170:15, 171:6, 175:4, 175:8, 180:15, 181:15, 199:20, 202:13

**community's** [1] - 181:17

**companies** [3] - 15:20, 23:24, 49:12

**company** [7] - 15:18, 17:3, 110:16, 190:12, 190:19, 190:25, 192:9

**comparative** [2] - 23:11, 32:14

**compared** [2] - 68:18, 77:12

**compensated** [1] - 154:20

**compiled** [1] - 179:9

**compiling** [1] - 13:19

**complaining** [3] - 22:25, 27:6, 27:16

**complaint** [6] - 60:5, 60:15, 60:18, 60:21, 60:25, 62:4

**complete** [5] - 18:5, 86:17, 178:20, 205:5, 205:6

**completed** [5] - 15:8, 43:1, 90:22, 168:6, 168:8

**completely** [5] - 24:8, 27:15, 116:25, 132:22

**complex** [1] - 28:21

**components** [3] - 19:10, 24:17, 28:19

**composing** [1] - 176:20

**composition** [19] - 19:3, 24:10, 24:16, 24:18, 24:19, 24:22, 25:9, 25:24, 29:12, 33:20, 107:23, 110:25, 111:14, 134:6, 154:15, 170:3, 192:15, 195:7

**compositions** [3] - 26:14, 28:2

**comprise** [1] - 116:18

**COMPUTER** [1] - 210:14

**computer** [11] - 6:11, 86:18, 86:19, 104:4, 104:6, 105:7, 105:23, 106:3, 106:8, 113:19, 116:6

**COMPUTER-AIDED** [1] - 210:14

**computerized** [1] -

104:15

**computers** [1] - 110:17

**conceal** [1] - 29:15

**conceded** [1] - 21:14

**concept** [4] - 26:11, 168:19, 173:12, 183:12

**concerned** [2] - 31:3, 206:7

**concert** [20] - 8:25, 13:23, 14:9, 31:25, 32:6, 48:3, 50:12, 53:9, 70:15, 130:7, 149:24, 170:24, 187:15, 187:16, 188:13, 189:1, 189:3, 189:6, 189:10, 189:11

**concerts** [21] - 9:4, 13:4, 13:12, 21:12, 21:15, 31:21, 31:22, 69:25, 70:14, 84:18, 130:20, 131:4, 148:1, 170:22, 171:2, 186:2, 186:5, 186:14, 186:25, 187:12

**conclude** [2] - 11:24, 34:25

**concluded** [1] - 210:2

**concludes** [1] - 12:15

**conclusion** [1] - 35:2

**conduct** [1] - 204:8

**conduit** [1] - 32:5

**confer** [6] - 74:4, 98:5, 103:10, 158:9, 160:8, 207:9

**confess** [1] - 206:6

**confirm** [1] - 134:13

**confirmed** [2] - 71:15, 173:6

**conflict** [2] - 17:22, 203:22

**confusing** [1] - 121:22

**connection** [3] - 14:4, 25:12, 141:5

**connections** [1] - 113:3

**conscience** [1] - 203:22

**consciously** [1] - 20:15

**consecutive** [2] - 95:15, 95:16

**consider** [4] - 21:5, 30:18, 106:23, 157:23

**considered** [3] - 74:19, 124:16,

172:14
**considering** [1] - 171:16
**consistent** [1] - 99:18
**construction** [1] - 24:18
**consulted** [1] - 79:1
**consumption** [1] - 179:16
**contact** [3] - 112:16, 112:21, 174:4
**contacted** [8] - 56:8, 112:10, 122:24, 123:9, 123:18, 125:5, 126:12, 177:9
**contacts** [2] - 6:22, 7:10
**contained** [1] - 114:1
**containing** [3] - 80:18, 147:12, 149:14
**contains** [1] - 80:17
**contemplate** [1] - 12:20
**contemporary** [4] - 38:16, 181:1, 182:10, 182:12
**content** [6] - 21:22, 21:24, 34:22, 92:19, 170:10
**contention** [2] - 22:7, 26:19
**context** [5] - 23:10, 29:19, 32:24, 33:3, 69:11
**contour** [1] - 27:4
**contract** [2] - 191:4, 195:25
**contribute** [1] - 170:16
**contributed** [4] - 72:17, 168:16, 168:17, 179:10
**contributes** [1] - 89:23
**contribution** [5] - 57:12, 57:20, 90:7, 168:18, 178:13
**contributions** [1] - 181:17
**control** [3] - 5:10, 117:16
**conversation** [7] - 38:22, 58:12, 58:24, 83:5, 136:2, 203:2, 203:4
**conversations** [4] - 59:8, 59:23, 85:24, 123:13
**converted** [1] - 111:5
**conviction** [1] -

173:18
**cool** [1] - 54:2
**copied** [2] - 10:23, 29:4
**copies** [6] - 48:22, 48:25, 49:6, 53:4, 93:7, 151:12
**copy** [18] - 5:11, 10:16, 22:13, 46:25, 47:5, 61:18, 61:21, 69:23, 70:6, 103:23, 135:14, 146:16, 147:16, 149:9, 162:10, 193:3, 193:6
**copying** [10] - 10:11, 10:14, 10:21, 10:22, 11:3, 11:20, 12:17, 14:23, 15:1, 20:24
**Copyright** [1] - 62:13
**copyright** [39] - 5:10, 5:13, 10:6, 10:13, 10:14, 10:16, 10:18, 10:22, 18:5, 28:23, 34:2, 59:19, 62:11, 62:17, 62:25, 63:7, 70:21, 71:5, 71:7, 71:11, 71:16, 100:20, 133:16, 139:21, 145:8, 192:15, 192:21, 193:2, 194:6, 194:8, 194:12, 194:24, 195:5, 195:11, 196:2, 196:9, 196:25, 197:18
**copyrights** [1] - 145:6
**core** [1] - 177:5
**corporate** [17] - 24:3, 49:17, 49:22, 50:1, 50:4, 50:9, 50:12, 50:16, 50:20, 69:25, 149:2, 149:5, 149:11, 149:14, 149:24, 150:3, 151:11
**Corporation** [1] - 49:12
**corporations** [1] - 148:23
**correct** [347] - 35:23, 36:16, 37:19, 38:2, 38:3, 43:13, 43:14, 44:8, 44:9, 44:12, 44:14, 44:18, 44:19, 44:21, 44:24, 45:4, 45:9, 45:10, 45:24, 45:25, 46:2, 46:3, 46:7, 46:9, 46:10, 46:12, 46:13, 46:15, 46:16, 46:21, 46:25,

47:1, 47:3, 47:4, 47:10, 47:11, 47:22, 48:4, 48:5, 48:12, 48:13, 48:16, 48:17, 49:20, 49:23, 50:9, 50:10, 50:13, 50:14, 50:18, 50:21, 50:22, 51:1, 51:2, 51:3, 51:4, 51:25, 52:1, 52:3, 52:16, 52:17, 53:1, 53:6, 53:7, 53:9, 53:10, 53:14, 53:15, 54:7, 54:8, 54:12, 54:16, 54:19, 54:23, 54:24, 55:8, 55:25, 56:3, 56:4, 56:7, 57:4, 57:13, 57:18, 58:8, 58:20, 58:14, 58:15, 58:21, 58:25, 59:1, 60:15, 60:18, 62:5, 62:6, 62:8, 62:9, 62:14, 62:15, 62:22, 62:23, 63:1, 63:2, 63:11, 63:14, 63:15, 64:2, 64:3, 64:8, 64:9, 64:11, 64:15, 64:16, 65:11, 65:14, 65:15, 65:20, 65:21, 66:6, 66:15, 66:19, 66:20, 66:25, 67:1, 67:5, 67:8, 67:9, 67:11, 67:12, 68:9, 68:10, 69:3, 69:4, 70:3, 70:4, 70:20, 71:1, 71:2, 71:16, 71:17, 71:18, 71:19, 72:20, 72:21, 72:24, 72:25, 73:2, 73:3, 73:6, 73:9, 73:10, 73:23, 78:12, 82:14, 82:20, 82:21, 82:22, 83:2, 84:11, 84:12, 84:15, 84:17, 84:21, 85:6, 85:7, 85:10, 85:11, 86:10, 87:15, 87:22, 89:8, 89:9, 90:4, 90:6, 90:11, 90:24, 90:25, 91:19, 92:9, 92:14, 92:16, 94:17, 94:19, 95:3, 96:12, 96:22, 97:10, 98:4, 99:9, 99:14, 99:15, 99:19, 99:23, 100:18, 101:1, 101:2, 101:13, 101:20, 102:5, 108:20, 110:11, 111:15, 116:8, 119:5, 122:4, 123:3, 125:8, 127:16,

127:17, 127:19, 127:25, 128:1, 128:14, 131:16, 131:19, 133:21, 136:7, 136:15, 136:18, 137:18, 138:13, 138:16, 138:17, 138:20, 139:12, 140:21, 141:3, 141:7, 141:14, 141:23, 142:7, 142:12, 142:15, 143:7, 143:11, 143:15, 143:16, 143:20, 144:16, 144:18, 144:25, 145:4, 145:5, 145:6, 145:11, 145:14, 145:21, 145:25, 146:1, 146:3, 146:6, 146:17, 146:19, 146:20, 146:23, 147:2, 147:6, 147:7, 147:10, 147:16, 147:17, 147:18, 147:19, 147:21, 147:24, 148:2, 148:3, 148:17, 148:21, 148:22, 148:24, 148:25, 149:3, 149:4, 149:7, 149:8, 149:11, 149:12, 149:15, 149:16, 149:18, 149:19, 149:21, 149:22, 149:25, 150:1, 150:5, 150:6, 150:10, 150:14, 150:25, 151:1, 151:3, 151:4, 151:14, 151:15, 153:7, 153:8, 153:10, 154:13, 154:16, 162:8, 170:1, 170:2, 170:6, 170:7, 170:19, 174:14, 174:17, 175:2, 175:20, 177:12, 178:16, 181:12, 182:6, 183:4, 184:13, 186:3, 186:4, 187:24, 187:25, 188:8, 188:11, 189:15, 191:23, 192:24, 192:25, 194:4, 194:5, 194:25, 195:1, 197:13, 197:19, 197:20, 198:10,

199:2, 199:3, 201:1, 201:2, 202:16, 202:17, 203:8, 203:14, 204:4
**CORRECT** [1] - 210:15
**correctly** [3] - 23:25, 162:4, 162:24
**correlating** [1] - 95:7
**corroborated** [1] - 32:3
**cost** [1] - 95:19
**counsel** [19] - 4:6, 4:17, 55:18, 73:19, 74:14, 80:22, 91:11, 92:17, 120:21, 144:18, 145:4, 151:10, 157:17, 159:18, 161:10, 185:5, 193:10, 198:13, 205:24
**COUNSEL** [1] - 2:2
**Counseling** [1] - 173:1
**count** [1] - 25:19
**counter** [2] - 161:8, 161:13
**counter-designations** [2] - 161:8, 161:13
**counting** [1] - 72:19
**country** [10] - 8:25, 13:24, 16:6, 18:18, 21:13, 115:13, 127:18, 187:5, 187:6, 189:3
**COUNTY** [1] - 210:5
**couple** [9] - 32:7, 41:8, 57:21, 77:18, 79:11, 157:17, 178:4, 190:2
**course** [7] - 4:16, 5:2, 18:15, 39:2, 54:19, 123:13, 133:14
**court** [3] - 74:13, 82:12, 132:21
**Court** [5] - 55:18, 156:23, 157:22, 162:18, 207:24
**COURT** [206] - 1:1, 1:22, 4:8, 4:10, 4:13, 18:7, 22:22, 31:1, 31:4, 35:6, 35:10, 39:14, 40:6, 40:10, 40:23, 41:19, 42:8, 44:1, 55:21, 60:10, 61:11, 61:15, 61:19, 61:24, 63:18, 63:22, 65:2, 65:22, 65:25, 67:14, 67:22, 70:8,

72:10, 73:12, 73:14, 73:24, 74:1, 74:5, 75:2, 75:7, 80:24, 86:23, 91:5, 91:9, 98:7, 100:14, 101:12, 102:9, 103:1, 103:7, 103:18, 105:10, 105:19, 106:17, 106:19, 107:2, 107:6, 107:8, 107:18, 107:20, 108:6, 108:10, 108:23, 108:25, 109:3, 109:7, 109:12, 109:15, 109:24, 114:20, 119:22, 120:4, 120:12, 120:17, 121:2, 121:10, 121:15, 125:22, 132:17, 133:1, 133:5, 133:9, 133:20, 134:4, 134:9, 134:18, 135:11, 135:15, 135:17, 136:25, 137:2, 137:24, 139:18, 139:25, 140:3, 142:23, 151:7, 152:9, 152:25, 153:15, 153:18, 154:8, 154:10, 154:23, 155:1, 155:4, 155:9, 155:13, 155:17, 155:20, 155:24, 156:4, 157:3, 157:11, 158:14, 158:18, 158:25, 159:14, 160:5, 160:12, 160:16, 160:20, 160:22, 160:24, 161:2, 161:4, 161:15, 161:17, 161:20, 161:24, 162:5, 162:11, 162:20, 162:25, 163:2, 163:6, 163:8, 163:10, 163:14, 164:1, 164:6, 165:13, 165:18, 169:3, 169:5, 169:7, 169:20, 172:11, 172:22, 173:3, 174:19, 179:23, 180:3, 183:21, 185:8, 185:20, 193:11, 193:23, 193:25, 194:14,

194:17, 196:5, 197:6, 197:9, 198:6, 198:21, 199:9, 199:12, 200:1, 200:6, 200:23, 201:13, 201:17, 201:20, 201:23, 202:6, 202:22, 202:25, 203:14, 204:7, 204:13, 204:22, 205:3, 205:4, 205:9, 205:16, 205:19, 206:3, 206:11, 206:18, 207:4, 207:8, 207:12, 208:8, 208:10, 208:17, 208:20, 208:21, 208:23, 209:3, 209:7, 209:10, 209:20, 209:22, 210:10, 210:23
**Court's** [3] - 108:2, 158:10, 158:24
**court's** [3] - 103:14, 156:5, 210:1
**courtroom** [1] - 74:22
**cover** [1] - 128:4
**covering** [1] - 196:1
**craft** [5] - 22:14, 22:17, 23:15, 90:3, 92:25
**create** [27] - 5:8, 6:7, 9:23, 15:15, 28:25, 29:8, 95:13, 97:1, 106:5, 106:6, 110:24, 111:2, 111:18, 111:25, 112:7, 113:14, 113:16, 114:13, 115:18, 116:21, 118:13, 118:19, 118:20, 118:18, 141:8, 141:10
**created** [64] - 5:3, 5:18, 6:4, 7:1, 9:22, 11:25, 15:13, 15:14, 19:8, 19:17, 19:24, 20:1, 20:23, 23:5, 25:20, 26:17, 27:3, 27:16, 28:15, 28:17, 28:20, 33:17, 34:11, 39:5, 54:6, 54:17, 54:20, 54:22, 55:2, 56:21, 56:24, 57:20, 76:12, 76:13, 88:3, 96:6, 96:9, 103:20, 104:16, 105:6, 105:7, 106:1,

106:12, 114:2, 117:21, 118:3, 122:2, 122:6, 122:16, 123:17, 127:2, 128:14, 129:5, 152:17, 152:20, 167:16, 168:16, 174:10, 174:12, 175:13, 180:7, 183:6
**creates** [4] - 5:23, 6:1, 6:9, 17:14
**creating** [12] - 20:23, 23:19, 83:7, 94:11, 101:23, 112:3, 115:20, 116:2, 116:11, 125:6, 126:21, 167:13
**creation** [33] - 4:25, 5:1, 5:7, 5:16, 19:1, 19:8, 19:25, 23:22, 24:5, 33:6, 34:13, 38:20, 53:11, 54:13, 56:13, 67:5, 79:8, 79:23, 83:25, 87:18, 89:12, 116:14, 122:20, 139:7, 140:19, 164:11, 167:3, 173:5, 173:9, 173:10, 175:11, 179:7, 183:8
**creations** [3] - 27:25, 126:23, 141:18
**creative** [6] - 41:7, 84:2, 94:25, 168:13, 176:12, 178:23
**creator** [2] - 132:12, 133:7
**creators** [4] - 35:23, 111:13, 131:3, 170:3
**credit** [3] - 152:1, 152:3, 153:3
**credited** [2] - 33:12, 175:19
**credits** [4] - 144:2, 151:18, 151:23, 151:24
**criminal** [1] - 206:4
**critical** [3] - 8:7, 17:5, 38:5
**Cross** [15] - 16:25, 20:5, 20:10, 20:14, 190:14, 190:24, 191:2, 191:8, 191:19, 191:20, 195:24, 196:1, 197:1, 197:11, 197:17
**CROSS** [4] - 3:7, 44:2, 99:11, 135:18

**cross** [6] - 17:3, 89:5, 135:11, 200:21, 204:8, 205:12
**cross-examination** [2] - 200:21, 205:12
**CROSS-EXAMINATION** [3] - 44:2, 99:11, 135:18
**crowd** [1] - 70:17
**Crystal** [4] - 14:5, 186:22, 192:5, 205:8
**Cs** [1] - 27:10
**CSR** [2] - 1:22, 210:22
**culture** [2] - 170:10, 170:13
**cumulatively** [1] - 22:1
**current** [2] - 195:17, 195:18
**cut** [1] - 75:2
**CV** [2] - 1:8, 4:4

# D

**D.A** [7] - 7:9, 15:5, 37:14, 37:15, 37:18, 177:15
**daily** [1] - 32:21
**damage** [3] - 107:11, 107:12, 108:3
**Dark** [76] - 9:6, 9:7, 9:9, 9:19, 10:6, 11:25, 15:2, 15:3, 16:10, 18:18, 19:21, 20:1, 20:12, 20:22, 20:23, 23:20, 24:2, 24:5, 25:5, 25:13, 25:15, 26:9, 26:16, 26:18, 27:3, 27:6, 28:6, 33:25, 58:25, 59:2, 69:2, 69:9, 69:14, 69:19, 73:4, 73:5, 73:9, 78:7, 78:9, 80:18, 82:10, 82:19, 83:8, 83:12, 83:15, 83:22, 84:19, 84:22, 85:6, 85:12, 87:18, 87:25, 91:7, 91:17, 92:12, 101:5, 131:15, 131:20, 132:1, 132:4, 144:17, 145:20, 154:5, 164:12, 164:15, 167:3, 167:15, 168:5, 168:13, 197:21, 197:22, 198:1, 198:15
**dark** [11] - 82:4, 87:21, 101:18, 102:1,

102:2, 107:16, 107:19, 107:20, 108:7, 108:13, 108:20
**darkness** [3] - 101:19, 107:22, 108:5
**data** [5] - 16:20, 16:21, 20:6, 20:16, 20:19
**DATE** [1] - 210:19
**dated** [1] - 64:10
**dates** [4] - 19:15, 19:22, 78:3, 79:1
**days** [5] - 90:19, 95:16, 99:2, 165:20, 166:9
**DC** [1] - 97:21
**deal** [7] - 6:3, 6:25, 7:3, 17:2, 159:4, 164:22, 206:13
**debates** [1] - 106:24
**debuted** [1] - 78:5
**December** [1] - 78:10
**decide** [8] - 12:21, 34:7, 71:20, 116:22, 133:2, 133:25, 156:1, 158:25
**decided** [10] - 20:12, 33:16, 33:23, 71:18, 74:14, 85:18, 92:11, 107:9, 139:1, 153:11
**deciding** [1] - 34:1
**decision** [9] - 78:21, 82:24, 85:1, 85:15, 143:10, 153:23, 154:1, 203:6, 203:17
**decisions** [1] - 83:3
**decker** [4] - 28:4, 207:20, 208:16, 208:24
**Decker** [3] - 12:6, 205:7, 206:23
**def** [1] - 207:17
**DEFENDANT** [1] - 1:10
**defendant** [3] - 9:23, 10:23, 103:22
**defendants** [73] - 10:8, 10:15, 11:3, 11:23, 11:24, 12:25, 15:11, 15:25, 16:2, 21:15, 22:5, 24:3, 30:15, 32:6, 34:15, 35:3, 41:17, 45:21, 45:24, 46:2, 46:5, 46:8, 46:20, 46:24, 47:13, 48:15, 48:19, 49:17, 49:22, 50:1, 50:4, 50:9, 50:12, 50:16, 50:20, 50:25, 51:10, 51:14, 51:17,

51:20, 51:24, 59:20, 69:24, 69:25, 88:3, 104:7, 104:11, 104:25, 146:14, 146:17, 146:22, 147:1, 147:5, 147:9, 147:12, 147:15, 148:20, 149:2, 149:5, 149:11, 149:14, 149:24, 150:3, 150:12, 150:22, 151:12, 151:13, 155:7, 163:22, 164:2, 185:2, 199:1

**DEFENDANTS** [2] - 2:13, 2:19

**defending** [1] - 36:14

**DEFENSE** [1] - 3:17

**defense** [1] - 205:24

**define** [2] - 78:16, 115:8

**definitely** [5] - 76:18, 164:4, 166:12, 177:25, 184:8

**definition** [1] - 124:15

**degree** [3] - 36:4, 172:25, 173:1

**deliver** [2] - 125:7, 175:24

**deluxe** [1] - 77:25

**demonstrate** [2] - 27:17, 27:24

**denigrate** [1] - 21:7

**denigrating** [2] - 22:12, 22:13

**deny** [2] - 12:25, 13:4

**department** [1] - 192:9

**Department** [1] - 12:7

**depended** [2] - 113:1, 140:17

**depiction** [1] - 183:13

**deposit** [2] - 193:3, 193:6

**deposition** [46] - 42:4, 55:5, 55:9, 55:13, 55:16, 55:20, 60:9, 60:23, 61:3, 61:18, 62:2, 64:24, 65:3, 65:18, 68:2, 72:19, 72:24, 73:19, 73:21, 74:11, 74:12, 75:8, 77:11, 80:23, 86:1, 87:13, 87:19, 99:20, 102:20, 103:8, 136:21, 137:11, 139:16, 140:10, 142:20, 142:25, 156:21, 157:1, 158:20, 159:17,

161:5, 161:24, 163:23, 186:12, 193:7

**DEPOSITION** [2] - 3:10, 3:14

**depositions** [1] - 155:6

**Depot** [1] - 191:16

**describe** [9] - 6:8, 19:4, 42:11, 77:13, 167:5, 168:12, 170:8, 172:8, 190:17

**described** [1] - 42:4

**describing** [1] - 177:21

**description** [2] - 79:22, 79:25

**deserve** [2] - 30:4, 159:7

**designate** [1] - 162:21

**designated** [3] - 73:18, 86:22, 161:9

**designating** [1] - 161:7

**designation** [2] - 85:2, 162:17

**designations** [6] - 161:8, 161:12, 161:13, 162:3, 162:8

**detail** [5] - 25:24, 38:4, 95:4, 95:21, 113:15

**details** [1] - 57:15

**detention** [1] - 171:5

**determination** [1] - 64:19

**determined** [3] - 64:18, 65:14, 68:9

**developed** [3] - 27:8, 27:16, 93:12

**developing** [1] - 96:13

**dichotomy** [1] - 170:9

**dictate** [2] - 161:25, 162:1

**difference** [5] - 19:2, 30:22, 30:23, 106:13, 108:15

**differences** [1] - 154:19

**different** [29] - 5:21, 6:13, 8:15, 16:14, 17:10, 24:13, 24:21, 26:19, 30:21, 57:5, 66:5, 78:3, 88:10, 88:11, 89:15, 93:24, 93:25, 105:9, 107:25, 108:20, 117:14, 117:22, 118:2, 156:17, 170:16, 176:24, 186:7

**digging** [1] - 186:18

**digital** [1] - 8:18

**diligence** [1] - 189:18

**dinners** [1] - 79:14

**DIRECT** [5] - 3:7, 35:19, 87:9, 110:1, 169:22

**direct** [16] - 10:25, 11:1, 11:2, 11:14, 13:2, 32:25, 60:8, 73:20, 98:24, 136:5, 136:11, 137:9, 142:13, 164:1, 203:2, 203:4

**directed** [2] - 103:8, 147:4

**direction** [2] - 84:2, 173:21

**directly** [2] - 112:10, 150:11

**director** [1] - 85:17

**Director** [1] - 25:17

**disagree** [1] - 133:12

**discipline** [1] - 36:12

**disclosed** [1] - 104:23

**disclosure** [1] - 196:12

**discovered** [1] - 37:8

**discuss** [4] - 25:3, 67:18, 102:14, 204:17

**discussed** [1] - 25:23, 136:5, 175:18

**discussion** [8] - 19:6, 34:13, 60:14, 60:17, 123:25, 124:3, 137:13, 156:9

**discussions** [3] - 60:4, 62:3, 138:1

**disparate** [1] - 29:1

**display** [4] - 61:8, 63:22, 104:2, 104:3

**displayed** [5] - 104:5, 104:8, 184:4, 184:5, 184:6

**displaying** [1] - 104:11

**displays** [1] - 61:12

**dispute** [3] - 25:22, 27:20, 209:11

**dissecting** [1] - 29:12

**distraction** [1] - 204:3

**distributed** [1] - 21:24

**distribution** [6] - 21:5, 21:10, 24:2, 29:17, 33:2, 190:19

**DISTRICT** [5] - 1:1, 1:2, 1:4, 210:10

**divide** [1] - 195:11

**DIVISION** [1] - 1:2

**DJ** [1] - 188:4

**DO** [2] - 210:11, 210:14

**document** [26] - 50:15, 63:24, 64:1, 64:8, 64:13, 66:8, 66:15, 66:17, 66:19, 66:22, 67:4, 67:7, 67:10, 82:6, 82:13, 104:3, 104:25, 105:1, 105:7, 140:6, 147:14, 192:18, 192:20, 194:21, 194:23, 197:18

**documents** [7] - 47:12, 47:19, 48:6, 50:19, 147:18, 147:20, 204:9

**Dog** [1] - 90:17

**dollars** [1] - 83:9

**done** [9] - 19:9, 19:11, 31:10, 33:21, 91:22, 157:3, 157:4, 158:8, 200:20

**doubt** [1] - 100:16

**Dove** [9] - 8:9, 30:14, 38:15, 180:25, 182:5, 182:7, 182:8, 182:23, 182:24

**down** [28] - 7:19, 11:4, 13:16, 24:17, 26:20, 27:5, 28:14, 29:12, 33:19, 64:4, 73:14, 81:14, 83:10, 89:19, 102:9, 128:24, 132:19, 155:2, 161:19, 167:17, 171:8, 177:4, 188:25, 192:23, 197:15, 202:25, 205:22, 208:9

**downloaded** [2] - 70:2, 150:4

**downloading** [1] - 50:25

**downloads** [1] - 8:18

**Dr** [7] - 12:6, 25:16, 77:11, 79:10, 168:2, 208:16, 208:24

**dramas** [1] - 17:10

**draw** [1] - 176:24

**Dream** [1] - 94:21

**dream** [1] - 97:22

**drink** [3] - 79:18, 86:15, 97:5

**drinking** [1] - 97:6

**drive** [4] - 103:24, 105:8, 105:14, 105:25

**driving** [1] - 11:9

**drop** [8] - 11:12, 11:18, 22:3, 22:4, 85:18

**dropped** [4] - 34:5, 43:7, 139:6, 164:23

**drove** [2] - 93:20, 167:22

**drum** [4] - 80:12, 116:17, 116:18, 118:1

**drummer** [1] - 36:25

**drums** [6] - 6:14, 117:20, 117:22, 117:23, 145:12

**due** [2] - 108:17, 189:18

**dug** [1] - 18:2

**during** [16] - 5:2, 38:4, 55:12, 76:14, 80:23, 95:11, 95:17, 127:20, 131:12, 165:10, 183:1, 186:24, 190:3, 195:24, 203:10

**Duty** [1] - 65:7

## E

**ear** [3] - 14:22, 117:11

**earliest** [1] - 80:17

**early** [14] - 17:18, 76:5, 156:3, 156:16, 164:20, 164:21, 165:20, 167:16, 167:18, 175:14, 176:19, 204:15, 205:15, 205:22

**earned** [1] - 49:4

**earning** [1] - 15:9

**ears** [2] - 12:18, 97:5

**easier** [2] - 49:16, 208:21

**easily** [1] - 28:20

**east** [1] - 188:22

**EAST** [1] - 2:22

**easy** [3] - 34:14, 34:20, 112:14

**eating** [1] - 11:15

**eats** [1] - 11:7

**edited** [1] - 92:15

**editing** [2] - 84:2, 92:10

**educational** [1] - 35:25

**efficient** [1] - 207:18

**effort** [2] - 22:18, 108:14

**eight** [6] - 64:22, 80:4, 80:13, 80:16, 92:6, 129:13

**either** [7] - 18:24, 81:4, 103:1, 119:8, 130:22, 148:21, 180:15
**elaborate** [1] - 6:10
**electro** [2] - 164:24, 165:12
**electronic** [4] - 6:10, 115:24, 116:14, 119:5
**element** [4] - 107:10, 107:12, 183:10, 192:13
**elements** [5] - 12:14, 29:12, 107:25, 108:1, 179:11
**ELIAS** [4] - 1:22, 210:9, 210:21, 210:22
**elicited** [1] - 94:24
**Elizabeth** [4] - 45:16, 75:9, 75:17, 87:6
**Elliott** [1] - 92:7
**email** [5] - 46:5, 59:16, 146:5, 175:25, 209:13
**emails** [1] - 60:1
**Emanuel** [5] - 5:5, 35:9, 35:17, 37:17, 65:6
**EMANUEL** [1] - 3:8
**embodied** [2] - 24:12, 25:9
**Emeritus** [1] - 25:17
**emotion** [1] - 177:21
**employee** [10] - 49:21, 49:25, 50:3, 50:8, 50:11, 50:16, 50:20, 149:2, 149:13, 149:23
**employees** [1] - 151:11
**encourage** [1] - 78:18
**end** [6] - 28:25, 52:12, 90:6, 134:10, 134:13, 201:17
**ended** [5] - 84:10, 87:19, 90:8, 155:8, 164:23
**ends** [1] - 132:11
**endure** [1] - 191:5
**energy** [1] - 174:3
**England** [2] - 36:8, 36:9
**enjoyment** [1] - 92:2
**enter** [2] - 6:16, 137:5
**entered** [2] - 67:10, 140:6
**enters** [1] - 7:7
**entertainer** [1] -

187:17
**entertainment** [1] - 97:3
**entire** [12] - 9:14, 41:15, 43:13, 73:4, 73:5, 73:8, 108:13, 111:17, 115:1, 134:17, 183:19, 190:9
**entitled** [5] - 47:9, 53:14, 64:1, 75:21, 165:5
**entrees** [1] - 79:21
**entry** [2] - 66:3, 77:17
**equal** [1] - 179:17
**ERIC** [1] - 2:10
**Eric** [4] - 4:23, 59:13, 62:16, 67:8
**especially** [4] - 12:9, 13:8, 95:20, 156:15
**ESQ** [7] - 2:5, 2:6, 2:10, 2:15, 2:16, 2:16, 2:21
**essentially** [2] - 19:24, 200:4
**established** [4] - 21:11, 21:12, 25:21, 85:8
**estimate** [1] - 118:8
**ET** [3] - 1:6, 1:9, 90:17
**et** [3] - 16:7, 26:6, 145:12
**evaluate** [1] - 185:5
**evening** [3] - 17:20, 204:18, 209:22
**evenly** [1] - 27:19
**event** [5] - 31:16, 97:13, 97:25, 160:7, 205:17
**events** [1] - 171:15
**eventually** [6] - 117:21, 122:18, 149:6, 176:4, 191:5, 198:12
**everywhere** [2] - 95:4, 199:22
**evidence** [74] - 4:15, 5:15, 10:4, 10:11, 10:17, 10:25, 11:1, 11:2, 11:5, 11:14, 11:16, 11:20, 11:21, 11:22, 12:1, 12:3, 12:5, 13:5, 13:6, 14:12, 15:23, 15:24, 16:4, 16:13, 16:19, 17:6, 17:7, 17:23, 19:12, 19:18, 19:23, 20:8, 20:17, 21:4, 21:10, 21:11, 22:9, 23:1, 26:25, 28:7,

29:6, 29:7, 29:14, 29:15, 29:18, 29:23, 30:6, 30:10, 30:17, 30:25, 32:1, 32:2, 32:12, 32:17, 32:22, 33:2, 34:8, 35:2, 39:17, 40:4, 63:18, 101:11, 102:25, 107:5, 133:19, 193:20, 194:14, 197:4, 209:1
**evidentiary** [4] - 156:25, 158:22, 159:4, 162:14
**evil** [2] - 14:19, 18:23
**exact** [2] - 101:25, 167:18
**exactly** [4] - 74:12, 83:9, 207:5, 209:18
**EXAMINATION** [13] - 35:19, 44:2, 67:23, 72:12, 75:11, 87:9, 99:11, 110:1, 135:18, 151:8, 154:11, 164:7, 169:22
**examination** [3] - 73:20, 200:21, 205:12
**examinations** [1] - 205:13
**example** [5] - 11:7, 13:3, 26:23, 70:14, 115:19
**examples** [4] - 90:15, 90:16, 90:18, 115:12
**except** [2] - 15:5, 141:24
**exchange** [1] - 137:6
**excited** [2] - 7:3, 179:15
**excitement** [1] - 78:20
**exciting** [1] - 8:11
**exclusive** [1] - 5:10
**excuse** [1] - 75:17
**executive** [10] - 49:21, 49:25, 50:3, 50:8, 50:11, 50:16, 50:20, 149:2, 149:13, 149:23
**exercise** [1] - 184:21
**exhaust** [1] - 157:6
**exhibit** [15] - 82:13, 82:16, 103:6, 119:10, 119:12, 120:3, 120:5, 120:17, 125:25, 126:5, 143:17, 158:6, 185:5, 194:15, 196:18

**Exhibit** [59] - 9:20, 9:21, 39:4, 39:11, 40:3, 40:4, 40:7, 40:13, 41:13, 41:23, 63:17, 63:18, 66:9, 77:16, 79:5, 82:6, 82:13, 83:10, 84:8, 86:8, 86:13, 91:3, 91:6, 91:13, 101:9, 101:10, 101:11, 101:15, 104:24, 119:8, 120:6, 120:7, 120:18, 120:22, 124:19, 125:11, 128:2, 132:6, 134:19, 134:20, 143:17, 159:18, 183:22, 183:25, 184:22, 185:16, 192:17, 193:1, 193:5, 193:22, 194:13, 194:19, 195:13, 196:19, 196:22, 196:24, 197:4, 197:7
**EXHIBITS** [1] - 3:21
**exhibits** [7] - 102:19, 103:9, 157:21, 159:5, 159:21, 159:22, 209:18
**Exhibits** [2] - 102:21, 193:24
**existence** [1] - 87:25
**existing** [3] - 126:23, 126:25, 168:5
**expansive** [1] - 117:1
**expect** [3] - 155:17, 157:17, 204:23
**expected** [2] - 156:20, 161:14
**expensive** [1] - 83:23
**experience** [1] - 181:10
**experienced** [1] - 12:8
**expert** [10] - 12:6, 26:24, 27:18, 28:5, 28:15, 28:17, 107:25, 108:6, 205:7
**experts** [5] - 12:20, 21:24, 32:8, 134:1, 207:13
**explain** [14] - 6:17, 7:9, 10:4, 23:5, 24:4, 32:10, 37:20, 39:14, 74:6, 87:24, 91:22, 104:5, 106:12, 115:20
**explaining** [2] - 58:13, 87:20
**explanation** [1] -

68:17
**exploitation** [1] - 21:6
**exploited** [1] - 72:2
**exploiting** [1] - 15:9
**extensive** [1] - 95:5
**extensively** [1] - 21:18
**extent** [2] - 58:4, 196:14
**extract** [2] - 103:24, 105:25
**extraordinarily** [1] - 23:9
**extrinsically** [1] - 133:17
**eye** [1] - 27:9
**eyes** [1] - 143:23
**Eyes** [1] - 97:20

## F

**Fa** [2] - 26:2, 26:4
**Facebook** [1] - 77:12
**fact** [26] - 14:19, 25:23, 34:12, 45:8, 77:18, 106:10, 132:22, 136:9, 137:3, 137:13, 138:22, 139:5, 139:11, 140:11, 140:14, 141:5, 141:9, 143:13, 144:13, 144:20, 173:13, 188:14, 191:15, 196:17, 198:19
**facts** [3] - 11:6, 84:9, 185:14
**failure** [1] - 203:17
**fair** [7] - 68:23, 72:3, 76:17, 80:8, 92:10, 95:5, 208:10
**fairly** [2] - 79:22, 99:17
**fairness** [1] - 71:21
**faith** [5] - 14:25, 36:15, 133:18, 170:11, 176:23
**Fallen** [1] - 173:13
**falls** [1] - 178:25
**familiar** [1] - 92:2
**families** [1] - 90:1
**family** [1] - 164:19
**fan** [1] - 187:22
**fancy** [5] - 8:4, 26:10, 26:11, 175:5
**fans** [4] - 7:8, 9:5, 13:20, 17:9
**far** [8] - 10:16, 60:11, 77:21, 78:11, 97:23, 100:20, 125:3, 126:25

220

**fascinating** [1] - 6:9
**fashion** [3] - 19:25, 27:5
**fast** [4] - 11:8, 33:24, 116:24, 209:19
**faster** [1] - 156:19
**father** [3] - 93:20, 110:6, 164:19
**favor** [1] - 91:12
**favorite** [1] - 187:22
**featured** [2] - 184:8, 201:8
**featuring** [2] - 144:6, 150:4
**FEDERAL** [2] - 1:22, 210:23
**fellow** [1] - 202:12
**felt** [3] - 6:4, 178:19, 198:15
**Ferrara** [1] - 25:16
**few** [11] - 30:3, 52:10, 52:13, 60:23, 67:25, 69:6, 70:18, 92:13, 99:13, 200:22, 201:7
**field** [1] - 96:15
**fight** [4] - 158:1, 158:21, 159:3, 159:20
**figure** [3] - 105:16, 171:18, 198:13
**file** [26] - 20:11, 71:4, 80:17, 85:9, 103:25, 104:2, 105:15, 106:11, 106:12, 113:22, 113:24, 113:25, 114:4, 114:5, 114:9, 114:10, 114:13, 120:8, 120:15, 120:16, 120:19, 126:23, 142:6, 153:23, 176:1
**filed** [20] - 45:9, 54:16, 54:20, 54:25, 59:6, 59:9, 59:19, 59:24, 60:2, 61:1, 63:6, 63:11, 66:25, 71:8, 71:11, 96:1, 99:4, 131:18, 131:21, 193:1
**files** [20] - 25:4, 88:10, 88:11, 104:16, 105:8, 106:1, 106:5, 106:6, 114:7, 121:6, 126:13, 126:14, 126:17, 141:24, 142:1, 142:6
**filing** [1] - 144:21
**filings** [1] - 100:20
**fill** [4] - 145:8, 155:10,

170:14, 170:18
**fillers** [1] - 176:9
**filling** [2] - 176:17, 191:15
**final** [1] - 17:9
**finale** [1] - 188:15
**finalized** [1] - 143:14
**finally** [1] - 134:16
**fine** [10] - 4:10, 41:19, 64:25, 65:25, 74:1, 121:15, 121:17, 153:24, 160:16, 183:21
**finish** [7] - 156:14, 173:14, 205:14, 205:17, 205:25, 206:21, 208:15
**finished** [2] - 7:17, 90:9
**fire** [1] - 171:23
**FIRST** [1] - 1:23
**first** [50] - 9:13, 9:14, 9:19, 15:14, 17:19, 17:25, 24:11, 26:8, 27:3, 27:5, 35:6, 39:9, 44:6, 60:10, 61:12, 69:2, 69:9, 69:10, 69:13, 76:19, 77:16, 81:13, 81:17, 84:7, 88:2, 90:12, 90:14, 94:1, 94:4, 94:21, 98:13, 98:23, 98:24, 115:23, 116:19, 119:24, 126:4, 136:1, 164:21, 165:4, 172:4, 172:5, 173:10, 176:16, 180:18, 185:2, 196:18, 207:8
**fit** [3] - 85:20, 88:13, 171:24
**five** [13] - 8:20, 63:19, 65:24, 65:25, 82:14, 82:17, 118:5, 118:14, 148:8, 158:9, 164:25, 186:24, 190:1
**fixed** [1] - 162:24
**FL** [17] - 103:20, 104:20, 104:22, 105:22, 106:3, 106:12, 106:14, 106:16, 113:18, 115:15, 116:8, 119:8, 119:17, 126:16, 126:20, 140:21, 140:23
**flag** [1] - 162:18
**Flame** [17] - 6:17,

15:4, 58:3, 122:24, 122:25, 123:2, 123:5, 123:6, 128:22, 130:7, 171:11, 171:12, 171:13, 172:1, 173:25, 190:5
**FLOOR** [1] - 2:7
**FLP** [4] - 120:8, 120:16, 120:19, 121:6
**flurry** [1] - 19:19
**Flush** [1] - 201:7
**fly** [1] - 178:18
**flying** [2] - 17:17, 155:14
**focus** [7] - 24:4, 42:13, 69:11, 77:18, 95:23, 96:17, 164:11
**focused** [1] - 96:23
**focusing** [1] - 166:15
**folder** [1] - 196:18
**folks** [2] - 158:14, 162:11
**follow** [5] - 17:13, 67:25, 73:20, 74:16, 99:13
**follow-up** [4] - 67:25, 73:20, 74:16, 99:13
**following** [7] - 49:11, 62:3, 62:7, 65:4, 137:25, 172:15, 200:5
**follows** [1] - 137:4
**food** [1] - 11:8
**foots** [1] - 190:19
**FOR** [4] - 3:6, 3:17, 210:9, 210:10
**FOREGOING** [1] - 210:12
**foremost** [1] - 60:11
**forge** [2] - 102:13, 204:16
**forgiveness** [2] - 170:17, 176:25
**forgot** [1] - 200:22
**FORM** [1] - 210:14
**form** [3] - 49:21, 97:3, 132:13
**formal** [2] - 42:21, 172:18
**format** [2] - 49:1, 49:25
**forms** [3] - 16:8, 186:17, 206:14
**FORSYTH** [1] - 2:7
**forth** [2] - 27:2, 173:2
**FORTH** [1] - 210:13
**forward** [8] - 33:25, 35:11, 45:20, 49:16,

106:21, 106:25, 109:16, 161:14
**foundation** [4] - 39:6, 152:8, 196:4, 201:13
**four** [15] - 27:10, 27:11, 27:22, 28:19, 29:2, 31:23, 38:14, 81:14, 83:11, 94:15, 95:14, 99:17, 186:24, 192:23, 194:3
**fourth** [1] - 5:17
**frame** [2] - 201:19, 205:23
**Franklin** [3] - 97:21, 97:23, 98:1
**free** [5] - 37:3, 140:23, 140:25, 141:1, 141:6
**frequencies** [1] - 117:12
**fresh** [1] - 20:4
**Friday** [1] - 136:24
**friend** [5] - 6:20, 122:24, 150:7, 173:22, 174:5
**friends** [4] - 34:18, 37:5, 43:21, 88:16
**front** [3] - 68:2, 104:1, 183:14
**full** [14] - 5:25, 12:19, 35:15, 75:13, 79:20, 87:4, 109:20, 109:21, 111:2, 116:21, 134:11, 157:18, 169:13, 196:12
**full-time** [1] - 5:25
**fully** [2] - 60:22, 161:12
**fun** [4] - 37:3, 37:4, 37:5, 181:9
**function** [2] - 98:21, 143:8
**functionality** [1] - 32:9
**functioning** [1] - 188:4
**FURTHER** [1] - 210:15
**fuzzy** [1] - 196:12

---

**G**

**G-r-a-y** [1] - 169:17
**game** [1] - 88:25
**Garden** [1] - 79:16
**gate** [1] - 18:21
**Gay** [1] - 98:16
**general** [4] - 13:20, 90:19, 94:7, 113:8
**generalize** [1] - 76:16
**generally** [3] - 31:13,

88:3, 95:22
**generates** [1] - 24:25
**genre** [18] - 30:20, 34:17, 37:4, 44:13, 44:15, 71:21, 71:22, 71:23, 72:1, 111:9, 115:14, 135:6, 165:7, 165:11, 166:3, 166:22, 166:24, 170:17
**genres** [1] - 127:16
**gentlemen** [12] - 4:13, 4:21, 5:3, 5:17, 21:19, 26:21, 27:23, 39:14, 67:17, 74:6, 163:14, 204:14
**geographic** [1] - 187:4
**Girl** [2] - 94:1, 94:2
**girl** [2] - 97:17, 97:22
**Girls** [1] - 90:18
**given** [9] - 60:9, 61:18, 65:19, 66:21, 77:15, 156:15, 179:4, 185:5, 209:15
**goal** [5] - 18:4, 94:15, 112:18, 114:12, 170:13
**goal's** [1] - 93:14
**goals** [2] - 21:8, 93:11
**God** [2] - 42:14, 171:21
**Godliness** [1] - 108:17
**gonna** [85] - 4:17, 5:1, 5:19, 9:2, 9:20, 11:21, 11:22, 12:3, 12:5, 12:16, 12:18, 12:19, 12:20, 13:6, 13:11, 13:21, 14:12, 15:25, 17:12, 23:6, 25:15, 26:9, 34:1, 34:7, 34:21, 41:20, 42:8, 54:1, 79:3, 80:14, 82:12, 87:16, 95:4, 104:9, 104:10, 105:6, 112:18, 113:13, 113:15, 119:17, 119:19, 119:20, 120:7, 120:8, 121:5, 121:6, 121:24, 122:5, 125:25, 132:4, 132:19, 133:15, 133:25, 134:1, 136:11, 145:19, 158:1, 159:2, 159:6, 159:15, 161:4, 162:1, 162:6, 162:13, 163:21, 165:13, 171:21, 175:1, 175:4,

175:17, 176:8, 179:18, 185:18, 192:17, 198:6, 199:13, 204:14, 204:25, 206:2, 206:13, 206:21, 207:20, 208:3

**goodbye** [1] - 204:22

**goodness** [1] - 192:8

**gospel** [17] - 5:18, 8:16, 8:18, 16:17, 38:12, 38:13, 75:23, 96:14, 97:9, 97:24, 98:2, 170:12, 180:23, 181:15, 181:16, 181:17, 200:15

**gospel/rock** [1] - 181:4

**gottwald** [1] - 9:21

**Gottwald** [14] - 13:3, 13:8, 14:25, 15:13, 18:14, 23:12, 23:21, 26:16, 45:16, 79:7, 205:13, 207:22, 208:6, 208:25

**Gottwald's** [1] - 77:11

**grace** [3] - 170:16, 176:25, 180:10

**Grammy** [5] - 38:17, 180:21, 181:2, 182:20, 191:16

**Grammy's** [5] - 8:8, 38:13, 38:15, 181:6, 182:18

**grand** [1] - 188:15

**granting** [1] - 15:22

**graphics** [2] - 28:4, 104:19

**GRAY** [2] - 1:6, 3:15

**gray** [42] - 123:9, 125:5, 125:7, 126:5, 129:16, 130:8, 130:22, 136:2, 136:6, 136:10, 137:6, 138:2, 141:16, 148:21, 150:8, 150:10, 157:9, 157:25, 158:17, 159:17, 160:4, 160:15, 161:22, 163:21, 169:6, 169:24, 183:5, 184:25, 192:7, 201:22, 205:5, 205:6, 205:8, 205:11, 206:8, 206:21, 207:21, 208:1, 208:3, 208:23, 208:24,

209:2

**Gray** [52] - 4:4, 5:5, 6:16, 6:18, 6:21, 7:3, 7:10, 8:10, 8:23, 9:4, 9:8, 10:20, 13:23, 14:5, 15:4, 17:14, 33:9, 33:17, 33:22, 34:15, 34:16, 34:23, 38:5, 38:21, 42:22, 44:10, 44:23, 44:25, 52:9, 53:13, 56:8, 56:16, 56:18, 57:2, 57:6, 58:13, 58:16, 58:18, 58:24, 59:17, 63:8, 64:20, 123:3, 169:9, 169:10, 169:16, 186:22, 203:15, 207:21, 208:5, 208:7, 208:15

**Gray's** [4] - 6:20, 7:20, 8:21, 13:3

**gray's** [5] - 51:14, 150:7, 157:19, 160:7, 160:9

**great** [3] - 151:20, 181:17, 183:13

**GREENBERG** [1] - 2:21

**Gregory** [1] - 109:22

**grew** [2] - 36:25, 164:20

**group** [8] - 6:20, 44:17, 44:20, 44:22, 44:25, 45:2, 45:5, 45:7

**Group** [1] - 49:13

**growing** [1] - 71:21

**grows** [1] - 27:14

**guess** [11] - 78:15, 87:11, 99:20, 111:4, 159:14, 161:17, 161:19, 162:14, 162:19, 173:18, 185:1

**guidance** [1] - 209:15

**guitar** [1] - 92:24

**guitars** [1] - 143:8

**guy** [5] - 11:7, 11:11, 28:4, 104:19, 175:6

**guys** [1] - 61:12

---

# H

**H-u-d-s-o-n** [1] - 87:7

**habit** [2] - 96:15, 96:19

**hac** [1] - 34:11

**half** [6] - 9:16, 124:4, 124:6, 139:4, 171:5, 206:24

**half-time** [1] - 171:5

**hallway** [1] - 163:17

**hand** [8] - 23:18, 35:12, 87:1, 109:17, 132:9, 132:19, 133:12, 169:10

**handle** [1] - 110:17

**hands** [1] - 196:13

**hang** [3] - 55:21, 79:14, 136:25

**HANLEY** [1] - 2:11

**happenings** [1] - 200:9

**Happy** [1] - 97:20

**happy** [1] - 158:8

**hard** [5] - 103:24, 105:8, 105:14, 105:25, 177:5

**harmony** [1] - 24:18

**hat** [1] - 116:18

**hats** [1] - 117:25

**head** [2] - 25:16, 89:17

**headphones** [1] - 39:9

**hear** [66] - 5:6, 5:8, 5:19, 5:25, 6:7, 7:12, 7:14, 7:22, 7:23, 7:24, 9:14, 9:24, 12:4, 12:19, 13:9, 14:5, 14:12, 14:16, 15:21, 15:24, 16:1, 16:5, 16:18, 21:1, 21:2, 21:4, 23:22, 24:21, 26:17, 28:10, 31:13, 34:21, 38:25, 39:13, 39:23, 40:9, 54:24, 69:16, 69:18, 73:8, 88:10, 88:11, 100:7, 112:20, 114:11, 126:8, 127:20, 129:4, 132:8, 133:25, 134:16, 134:22, 154:5, 177:20, 180:1, 180:9, 185:1, 190:6, 190:8, 190:22, 198:1, 205:3, 208:22

**heard** [77] - 6:21, 8:4, 8:5, 9:6, 12:11, 12:13, 12:25, 13:10, 19:16, 19:21, 20:5, 20:12, 20:25, 21:18, 22:15, 23:8, 28:17, 30:7, 31:14, 31:17, 39:21, 39:25, 40:11, 40:15, 40:17, 40:20, 42:15, 47:20, 48:11, 50:21, 51:24, 55:23, 58:25, 59:2, 69:2, 69:9, 69:10, 69:15,

81:25, 82:1, 88:2, 88:8, 88:15, 91:2, 96:2, 96:5, 96:8, 99:5, 99:7, 101:17, 107:6, 111:17, 113:21, 126:2, 126:9, 129:24, 131:3, 134:24, 144:17, 147:1, 148:6, 148:16, 171:10, 176:9, 176:15, 176:19, 177:1, 177:22, 178:10, 179:24, 187:23, 195:9, 198:9, 198:11, 198:25, 199:1

**hearer** [1] - 42:14

**hearing** [10] - 5:2, 7:21, 33:25, 34:14, 48:15, 48:19, 57:8, 117:11, 146:22, 198:12

**hears** [3] - 7:13, 133:11, 173:24

**hearsay** [12] - 75:4, 100:14, 100:15, 100:16, 106:9, 106:14, 106:15, 198:5, 198:7, 199:25, 202:21, 202:24

**heart** [1] - 97:24

**heavily** [1] - 170:13

**held** [2] - 181:20, 181:21

**help** [4] - 7:22, 61:19, 151:21, 158:6

**helping** [1] - 99:16

**hence** [1] - 172:1

**Henry** [4] - 18:15, 22:24, 45:15, 88:9

**HEREBY** [1] - 210:11

**HEREINBEFORE** [1] - 210:12

**heretofore** [1] - 4:7

**hi** [4] - 116:18, 117:25, 135:21, 164:10

**hi-hat** [1] - 116:18

**hi-hats** [1] - 117:25

**high** [4] - 36:1, 36:2, 129:12, 164:21

**highest** [2] - 180:23, 182:11

**highlighted** [3] - 10:19, 64:6, 86:3

**himself** [2] - 28:14, 63:13

**hip** [18] - 5:24, 16:9, 16:12, 16:17, 36:22,

36:23, 71:24, 111:7, 111:9, 111:10, 115:13, 135:7, 152:5, 170:10, 170:13, 170:14, 199:23, 199:24

**History** [1] - 173:1

**hit** [4] - 8:7, 178:7, 188:8, 190:5

**hmm** [9] - 88:12, 118:11, 130:4, 130:19, 131:11, 135:25, 136:23, 142:5, 197:14

**hole** [1] - 16:18

**home** [2] - 159:3, 178:19

**homemade** [1] - 82:13

**honestly** [1] - 176:22

**honesty** [1] - 206:15

**Honor** [86] - 4:9, 4:20, 22:19, 30:24, 35:7, 35:8, 40:4, 40:5, 41:13, 60:6, 60:8, 61:5, 61:23, 62:1, 63:20, 67:13, 72:11, 73:13, 73:17, 73:25, 74:23, 80:21, 91:2, 98:5, 99:10, 101:6, 101:10, 102:7, 102:18, 103:4, 103:13, 103:19, 104:12, 104:25, 105:9, 105:13, 107:1, 107:3, 107:4, 107:7, 107:14, 108:12, 108:22, 109:14, 120:3, 125:21, 133:13, 137:1, 137:23, 139:19, 142:22, 142:24, 143:23, 151:6, 152:7, 152:24, 153:14, 155:5, 155:19, 156:2, 156:8, 156:24, 157:8, 158:19, 159:13, 160:11, 162:2, 162:7, 163:20, 169:4, 183:18, 184:22, 185:4, 185:17, 193:9, 197:3, 198:23, 200:3, 200:19, 201:16, 201:19, 204:5, 204:12, 206:6, 209:24, 209:25

**honor** [1] - 97:16

**Honor's** [1] - 156:15
**HONORABLE** [1] - 1:4
**honored** [1] - 191:4
**hook** [5] - 56:14, 57:20, 177:22, 178:18, 178:25
**hooks** [2] - 175:16, 177:17
**hop** [19] - 5:24, 16:9, 16:12, 16:17, 36:22, 36:23, 71:24, 111:7, 111:9, 111:10, 115:13, 135:7, 152:5, 170:10, 170:13, 170:14, 199:23, 199:24, 200:18
**hope** [8] - 6:6, 91:12, 112:19, 114:12, 170:16, 170:18, 176:25, 180:10
**hopefully** [4] - 158:16, 159:18, 160:5, 202:10
**Horse** [76] - 9:6, 9:7, 9:8, 9:9, 9:19, 10:6, 11:25, 15:2, 15:3, 16:10, 18:18, 19:21, 20:1, 20:12, 20:22, 20:23, 23:20, 24:2, 24:5, 25:5, 25:13, 25:15, 26:9, 26:16, 26:18, 27:3, 27:6, 28:6, 33:25, 58:25, 59:2, 69:2, 69:9, 69:14, 69:19, 73:4, 73:5, 73:9, 78:8, 78:9, 80:18, 82:10, 82:19, 83:8, 83:12, 83:15, 83:23, 84:19, 84:22, 85:6, 85:12, 87:18, 87:25, 91:8, 91:17, 92:12, 101:5, 131:16, 131:20, 132:1, 132:4, 144:17, 145:20, 154:5, 164:12, 164:16, 167:3, 167:15, 168:5, 168:13, 197:21, 197:22, 198:1, 198:15
**horse** [1] - 89:4
**host** [1] - 174:5
**hot** [2] - 13:21, 178:5
**hour** [4] - 160:10, 206:24, 207:7
**hour-and-a-half** [1] - 206:24
**hours** [5] - 41:8,

57:21, 99:17, 178:4, 178:5
**house** [5] - 17:25, 18:5, 39:1, 56:18, 177:13
**Houston** [2] - 45:17, 90:4
**Hudson** [39] - 9:22, 14:24, 15:6, 17:21, 18:15, 23:7, 23:12, 45:16, 45:17, 47:14, 73:18, 73:22, 75:9, 75:14, 75:15, 75:17, 75:21, 77:15, 82:5, 82:21, 84:7, 85:25, 86:24, 87:6, 89:8, 92:18, 94:5, 99:13, 102:8, 156:21, 158:16, 158:20, 159:16, 160:14, 163:2, 163:23, 164:9, 167:10, 199:1
**HUDSON** [3] - 3:10, 3:13, 3:18
**Hudson's** [6] - 80:23, 91:7, 102:20, 108:4, 161:1, 161:5
**hum** [1] - 89:17
**humming** [1] - 89:16
**hundred** [1] - 68:21
**hundreds** [2] - 93:9
**hypersensitive** [1] - 184:19

## I

**idea** [6] - 9:8, 74:24, 88:21, 95:22, 157:12, 173:12
**ideas** [2] - 88:12, 192:10
**identical** [1] - 133:19
**identifiable** [1] - 85:22
**identified** [8] - 79:9, 103:25, 105:15, 111:13, 121:18, 122:2, 144:3, 144:14
**identify** [6] - 39:10, 39:21, 101:5, 119:24, 120:13, 122:1
**ignore** [1] - 24:9
**ignores** [1] - 24:8
**image** [1] - 128:2
**images** [1] - 69:12
**imagine** [4] - 10:22, 13:25, 83:18, 85:23
**imaging** [1] - 95:1
**impacted** [1] - 107:22
**impeaching** [1] -

61:20
**importance** [1] - 93:1
**important** [6] - 24:7, 25:6, 25:8, 55:16, 55:17, 92:12
**impression** [4] - 59:3, 59:10, 69:2, 69:8
**IN** [1] - 210:9
**inclined** [1] - 156:23
**include** [9] - 5:4, 34:3, 46:11, 46:17, 46:22, 83:1, 84:19, 90:20, 117:5
**included** [5] - 83:6, 84:25, 85:14, 92:4, 125:19
**includes** [1] - 24:16
**including** [6] - 47:24, 84:16, 86:9, 94:18, 146:11, 194:24
**incorporated** [2] - 147:5, 149:6
**incorporation** [1] - 149:10
**incorrect** [1] - 104:14
**incredible** [1] - 97:16
**independent** [3] - 43:20, 43:22, 69:15
**independently** [2] - 20:23, 100:15
**INDEX** [1] - 3:1
**indicated** [4] - 4:15, 99:20, 206:24, 207:24
**individual** [31] - 9:23, 45:13, 45:21, 45:23, 46:1, 46:4, 46:8, 46:20, 46:24, 47:13, 48:15, 48:19, 50:25, 51:10, 51:14, 51:17, 51:20, 51:24, 69:24, 145:20, 146:14, 146:22, 147:1, 147:5, 147:9, 147:11, 147:15, 148:19, 150:2, 150:22, 151:12
**individually** [1] - 96:6
**individuals** [9] - 46:14, 47:9, 47:20, 47:25, 48:2, 48:7, 150:16, 150:19, 150:21
**industry** [3] - 154:18, 180:15, 191:3
**infer** [1] - 11:6
**inference** [1] - 29:9
**influenced** [1] - 170:13
**information** [13] -

16:24, 17:4, 17:8, 29:24, 47:12, 48:22, 48:25, 49:3, 52:1, 72:21, 146:25, 147:20, 191:8
**informed** [3] - 133:23, 170:11, 176:22
**infringement** [8] - 5:13, 10:13, 14:21, 18:5, 59:19, 85:9, 107:11, 133:17
**infringes** [1] - 10:6
**initial** [1] - 136:19
**innocent** [1] - 14:21
**input** [8] - 141:17, 141:22, 142:11, 142:14, 142:16, 143:2, 143:10
**inputs** [1] - 142:17
**inspiration** [2] - 176:6, 178:25
**inspire** [1] - 176:3
**inspired** [5] - 7:14, 39:3, 118:15, 166:4, 174:8
**instance** [1] - 31:10
**instead** [3] - 27:10, 27:12, 120:20
**Institution** [1] - 36:6
**instruct** [2] - 21:20, 28:22
**instructed** [1] - 108:22
**instructions** [2] - 10:25, 206:13
**instrument** [1] - 119:4
**instrumental** [43] - 6:9, 7:24, 9:19, 9:21, 10:1, 15:14, 16:11, 16:12, 23:20, 24:16, 39:5, 39:9, 53:23, 69:19, 80:7, 80:10, 80:14, 80:18, 81:2, 81:3, 84:24, 85:14, 87:20, 101:17, 103:21, 111:20, 115:18, 117:21, 118:12, 118:19, 126:2, 127:21, 129:4, 131:15, 132:1, 132:9, 133:12, 134:14, 135:5, 146:23, 168:10, 175:24, 199:6
**instrumentals** [3] - 5:24, 12:22, 145:12
**instrumentation** [1] - 179:12
**instruments** [5] - 6:12, 24:15, 116:1,

117:4, 118:2
**intend** [5] - 14:19, 107:17, 132:20, 163:4
**intended** [1] - 39:15
**intent** [4] - 14:19, 14:20, 18:23, 108:1
**intention** [1] - 163:17
**intentions** [1] - 93:12
**interdisciplinary** [1] - 36:4
**interest** [9] - 62:25, 63:7, 88:12, 114:15, 114:24, 138:19, 196:9, 197:17, 203:22
**interesting** [2] - 34:12, 100:23
**interests** [1] - 194:8
**Internet** [15] - 13:11, 14:13, 50:23, 70:2, 140:15, 150:14, 150:18, 157:21, 158:3, 158:17, 159:19, 166:2, 184:24, 185:2, 200:20
**interview** [2] - 190:4, 190:8
**interviewed** [1] - 189:4
**interviews** [4] - 167:5, 189:16, 189:23, 190:3
**intrinsically** [1] - 133:18
**intro** [6] - 27:4, 81:19, 81:20, 81:23, 82:1, 91:17
**introduced** [3] - 5:17, 10:17, 18:9
**introduction** [5] - 9:15, 9:25, 14:10, 41:16, 92:13
**introductory** [2] - 84:24, 85:14
**intruding** [1] - 198:3
**invaded** [1] - 60:11
**invades** [1] - 132:24
**investigate** [1] - 90:2
**invited** [2] - 128:22, 171:7
**invites** [1] - 153:19
**involved** [12] - 15:21, 23:24, 24:2, 38:20, 62:12, 82:23, 83:3, 90:4, 128:16, 151:3, 173:9, 178:14
**involvement** [1] - 183:8

**IS** [1] - 210:15
**issue** [37] - 7:25, 8:6, 10:21, 12:1, 16:9, 16:11, 18:24, 23:1, 25:6, 25:14, 28:21, 31:7, 34:13, 54:6, 79:6, 103:16, 103:20, 104:13, 107:3, 107:17, 107:22, 109:3, 133:8, 141:11, 141:17, 156:7, 156:15, 156:25, 157:5, 157:12, 158:22, 162:9, 173:6, 173:8, 198:13, 200:19
**issues** [7] - 9:2, 156:19, 158:23, 159:11, 171:16, 204:6, 205:12
**it'll** [1] - 207:2
**Item** [1] - 4:3
**iterations** [1] - 105:23
**itself** [4] - 8:17, 30:6, 69:12, 124:6
**iTunes** [6] - 16:15, 16:24, 200:8, 200:13, 201:10, 202:3

**J**

**J's** [1] - 91:7
**Jeang** [2] - 61:24, 135:15
**Jeff** [1] - 18:10
**JEFFREY** [1] - 2:16
**Jeremiah** [1] - 171:18
**Jewish** [1] - 36:6
**Jingle** [3] - 24:20, 24:21, 24:25
**job** [10] - 5:25, 6:1, 93:19, 110:13, 110:15, 110:18, 191:17, 191:18, 207:8, 209:16
**John** [3] - 79:7, 144:7, 197:1
**Joint** [1] - 143:17
**joint** [2] - 19:9, 63:16
**Jolly** [1] - 28:18
**Jordan** [1] - 45:17
**journey** [2] - 92:21, 97:17
**joy** [2] - 180:9, 180:10
**Joyful** [190] - 5:2, 5:18, 7:17, 7:20, 8:9, 9:7, 9:11, 9:18, 10:7, 10:18, 11:24, 12:25,

14:11, 16:10, 16:13, 19:16, 20:14, 20:22, 20:24, 23:21, 24:1, 25:4, 28:6, 29:17, 31:10, 31:25, 32:3, 33:12, 34:8, 34:13, 35:23, 38:2, 38:6, 38:20, 39:24, 41:10, 41:14, 41:20, 46:11, 46:17, 46:22, 46:25, 47:2, 47:6, 47:21, 47:24, 48:3, 48:8, 48:10, 48:11, 48:15, 48:19, 49:1, 49:4, 49:6, 49:20, 49:24, 50:8, 50:13, 50:17, 50:21, 50:25, 51:7, 51:24, 52:7, 52:9, 52:19, 53:5, 53:8, 53:11, 53:13, 53:18, 53:24, 54:4, 54:9, 54:10, 56:9, 56:13, 56:22, 57:20, 57:23, 58:1, 58:5, 58:9, 58:19, 62:11, 62:13, 62:17, 62:25, 63:7, 64:14, 67:5, 67:11, 69:24, 71:16, 72:15, 73:1, 96:11, 96:25, 99:5, 103:22, 104:17, 106:1, 111:14, 111:18, 111:25, 115:19, 115:21, 117:21, 118:3, 118:20, 122:6, 122:8, 122:18, 123:19, 127:22, 127:24, 128:14, 129:22, 130:5, 130:22, 131:3, 131:12, 132:1, 134:11, 134:22, 135:3, 136:3, 136:6, 138:20, 139:8, 140:20, 141:6, 141:16, 142:12, 143:13, 144:3, 144:6, 144:14, 145:2, 146:11, 146:14, 146:16, 146:23, 147:1, 147:6, 147:12, 147:16, 147:21, 147:24, 148:16, 148:21, 149:1, 149:6, 149:10, 149:15, 149:17, 149:25, 150:4, 150:13, 150:17, 150:24, 151:3,

151:12, 151:23, 170:4, 173:7, 173:10, 173:25, 176:14, 180:7, 180:8, 180:20, 180:24, 187:12, 187:15, 187:16, 187:18, 189:1, 190:5, 191:9, 192:14, 192:15, 192:22, 195:7, 195:23, 196:9, 199:4, 199:19, 199:23
**Jr** [1] - 35:17
**Judge** [12] - 10:24, 13:1, 14:18, 21:20, 28:21, 119:16, 155:12, 160:21, 205:21, 206:17, 207:18, 208:8
**judge** [1] - 119:15
**JUDGE** [1] - 1:4
**Juicy** [5] - 18:19, 45:18, 90:5, 90:8, 91:7
**juicy** [1] - 23:15
**juku** [1] - 135:24
**JULY** [3] - 1:15, 4:1, 210:19
**July** [3] - 59:20, 66:25, 139:7
**jump** [1] - 9:2
**juncture** [1] - 140:12
**jurors** [1] - 159:7
**jury** [48] - 4:10, 4:12, 4:21, 35:25, 37:10, 37:20, 38:10, 39:13, 40:8, 40:13, 41:22, 41:23, 43:17, 85:4, 87:24, 91:2, 91:13, 91:22, 92:19, 101:9, 102:17, 108:21, 109:6, 109:10, 113:15, 115:20, 119:20, 119:23, 120:1, 132:25, 133:2, 133:12, 133:24, 134:16, 153:11, 155:22, 158:21, 160:23, 161:3, 163:9, 163:12, 171:1, 179:7, 186:7, 194:13, 197:8, 204:20, 206:13
**jury's** [6] - 106:24, 110:22, 111:17, 133:25, 158:24, 207:13

**juvenile** [1] - 171:5

**K**

**Kahn** [36] - 4:19, 4:22, 19:7, 20:25, 21:3, 21:13, 22:7, 23:8, 23:19, 23:25, 24:8, 25:3, 26:10, 28:11, 29:7, 29:16, 31:2, 32:15, 32:23, 66:10, 67:22, 91:15, 94:24, 104:14, 105:10, 106:19, 108:14, 109:5, 109:13, 136:2, 140:19, 141:8, 148:4, 159:2, 169:20, 185:7
**KAHN** [192] - 2:5, 3:3, 3:8, 3:12, 3:15, 3:19, 4:9, 4:20, 8:3, 9:13, 9:18, 10:3, 22:19, 30:24, 35:7, 35:20, 39:4, 39:7, 39:19, 40:3, 40:8, 40:11, 40:14, 40:24, 41:13, 41:20, 41:24, 42:10, 43:24, 60:6, 61:5, 61:7, 61:17, 67:24, 70:13, 72:6, 73:13, 73:17, 74:2, 74:23, 75:5, 75:8, 75:12, 80:21, 81:1, 85:4, 86:22, 91:4, 99:12, 100:17, 101:3, 101:7, 101:10, 101:16, 102:6, 102:18, 103:4, 103:13, 103:19, 105:13, 107:1, 107:14, 107:19, 107:24, 108:8, 109:8, 109:14, 110:2, 114:22, 119:7, 119:11, 119:13, 119:16, 119:19, 119:24, 120:6, 120:10, 120:15, 120:18, 120:23, 121:4, 121:8, 121:12, 121:16, 121:18, 121:22, 121:24, 122:12, 125:10, 125:13, 125:16, 125:18, 125:24, 132:6, 133:4, 133:7, 133:10, 134:3, 134:7, 134:10, 134:16, 134:19, 134:21, 135:8,

143:21, 143:25, 151:9, 151:19, 151:22, 152:11, 153:2, 153:16, 153:25, 154:7, 154:25, 155:5, 155:12, 155:14, 155:18, 156:1, 157:14, 157:16, 158:11, 158:15, 159:13, 159:16, 160:11, 160:14, 160:19, 160:21, 163:20, 164:8, 165:15, 167:2, 168:23, 169:2, 169:4, 169:6, 169:8, 169:21, 169:23, 172:17, 173:4, 174:21, 179:25, 180:5, 183:18, 183:22, 184:1, 184:22, 185:12, 185:22, 193:13, 193:18, 193:20, 193:22, 194:2, 194:12, 194:16, 194:20, 196:6, 197:3, 197:8, 197:10, 198:8, 198:24, 199:17, 200:10, 200:19, 200:24, 201:15, 201:21, 202:1, 202:7, 202:23, 203:3, 203:24, 204:5, 205:1, 205:6, 205:10, 205:18, 205:21, 206:5, 206:17, 206:22, 207:2, 207:6, 207:17, 207:22, 209:5, 209:24
**Kansas** [1] - 130:15
**Karl** [1] - 45:14
**karma** [1] - 89:5
**Kasz** [1] - 49:14
**Katherine** [1] - 167:10
**Katheryn** [5] - 73:18, 75:9, 75:15, 75:17, 87:6
**KATHERYN** [2] - 3:10, 3:18
**Katheryne** [1] - 45:16
**KATY** [1] - 1:9
**Katy** [17] - 4:4, 17:21, 23:7, 45:17, 47:17, 59:20, 74:3, 75:18, 75:21, 92:18, 94:4, 94:5, 167:7, 167:11,

168:3, 168:18, 168:21
**KAYIRA** [2] - 2:9, 2:10
**Kayira** [7] - 4:23, 59:13, 59:19, 62:17, 62:20, 67:8, 144:18
**Kayne** [1] - 90:16
**keep** [16] - 21:3, 30:16, 38:19, 39:15, 67:17, 102:14, 112:24, 113:5, 113:11, 114:15, 114:23, 132:10, 156:25, 160:10, 171:22, 204:16
**kept** [2] - 29:7, 113:9
**ketchup** [2] - 11:12, 11:18
**Kevin** [1] - 197:1
**keyboard** [1] - 27:1
**keys** [4] - 27:1, 27:21, 29:2
**killin'** [1] - 175:5
**kind** [25] - 7:5, 36:21, 36:24, 37:2, 37:8, 38:10, 41:5, 41:6, 43:19, 58:3, 71:25, 79:20, 82:4, 88:25, 89:2, 89:16, 89:17, 116:10, 159:11, 164:19, 172:11, 179:19, 183:11, 184:18, 184:21
**kinda** [7] - 36:14, 37:4, 37:5, 38:12, 38:23, 40:18, 41:2
**kindergarten** [1] - 29:2
**kindergartner** [1] - 27:11
**kindly** [1] - 91:11
**Kirk** [2] - 97:21, 97:23
**Kissed** [2] - 94:1, 94:2
**Kitty** [1] - 49:14
**knowing** [1] - 209:13
**knowledge** [48] - 29:19, 46:19, 46:21, 47:8, 47:19, 47:22, 47:23, 48:14, 48:18, 48:21, 50:3, 50:6, 50:7, 50:10, 50:24, 51:3, 51:9, 51:13, 51:16, 51:19, 51:22, 51:23, 64:17, 64:21, 65:5, 65:13, 65:19, 68:8, 69:23, 70:3, 71:3, 82:23, 146:17, 146:21, 146:25, 147:11, 148:19, 149:13, 150:2,

150:12, 150:16, 151:11, 151:13, 152:10, 152:12, 182:18, 199:11, 199:12
**known** [14] - 5:13, 5:24, 6:17, 7:8, 15:4, 15:5, 17:21, 45:14, 45:15, 45:17, 45:18, 167:11, 170:12, 174:5
**knows** [3] - 26:2, 38:23, 120:14
**Knupp** [1] - 163:24
**KNUPP** [1] - 2:15
**Kobalt** [1] - 49:13
**Kravitz** [1] - 92:7

# L

**L-a-m-b-e-r-t** [1] - 35:18
**L.A** [1] - 29:25
**label** [17] - 15:18, 16:25, 93:5, 93:18, 99:25, 164:22, 189:21, 190:11, 190:14, 190:17, 190:18, 191:6, 191:22, 191:25, 192:2, 196:8, 196:13
**labeled** [1] - 152:17
**labels** [2] - 93:24, 93:25
**lacks** [1] - 196:4
**ladies** [10] - 4:13, 4:21, 21:19, 26:20, 27:23, 39:14, 67:17, 74:6, 163:14, 204:14
**laid** [2] - 179:9, 201:13
**Lambert** [50] - 5:5, 7:7, 7:13, 10:20, 15:5, 17:19, 33:14, 33:18, 35:9, 35:10, 35:17, 35:21, 36:21, 37:18, 40:11, 41:17, 43:24, 44:4, 44:7, 45:13, 48:11, 49:10, 55:4, 56:5, 58:11, 61:17, 62:2, 63:24, 64:5, 64:13, 65:3, 65:6, 66:8, 67:25, 72:6, 72:14, 73:4, 121:3, 121:4, 121:11, 121:19, 122:1, 144:24, 153:17, 153:21, 177:2, 177:7, 177:15, 179:3, 195:14

**LAMBERT** [1] - 3:8
**lambert** [1] - 195:22
**Lambert's** [1] - 55:20
**land** [1] - 189:7
**lane** [1] - 38:23
**large** [3] - 70:17, 98:2, 100:18
**largely** [1] - 21:13
**larger** [2] - 83:11, 143:22
**last** [17] - 35:15, 35:18, 68:7, 87:4, 87:7, 94:22, 100:23, 108:19, 109:23, 110:3, 161:11, 162:8, 162:23, 169:13, 169:17, 189:24, 208:3
**lastly** [1] - 179:9
**late** [2] - 106:18, 156:3
**latter** [1] - 204:11
**LAURA** [4] - 1:22, 210:9, 210:21, 210:22
**Lauren** [1] - 4:23
**LAUREN** [1] - 2:6
**law** [7] - 5:9, 10:24, 21:20, 28:22, 70:24, 181:9, 206:3
**LAW** [1] - 2:9
**Lawrence** [1] - 25:16
**laws** [1] - 5:13
**lawsuit** [37] - 20:11, 45:8, 45:12, 54:7, 54:16, 54:20, 54:25, 56:6, 58:11, 59:9, 59:14, 59:19, 59:24, 60:18, 60:21, 61:1, 63:6, 63:10, 63:14, 66:25, 71:18, 71:20, 85:8, 87:18, 96:1, 96:8, 99:4, 110:10, 131:14, 131:18, 131:21, 144:25, 153:7, 153:9, 153:12, 154:2, 170:1
**lawyer** [7] - 18:11, 59:13, 62:16, 71:1, 71:13, 80:15, 80:16
**lawyers** [1] - 4:22
**lay** [5] - 132:18, 133:5, 133:14, 198:3, 202:25
**layer** [1] - 116:19
**layperson** [1] - 26:1
**lead** [4] - 31:16, 33:4, 78:4, 171:15
**leading** [4] - 40:22, 42:7, 42:9, 174:18
**learn** [4] - 54:17,

54:20, 56:24, 197:22
**learned** [2] - 92:24, 92:25
**least** [3] - 11:23, 28:9, 77:8
**leave** [10] - 17:18, 17:20, 76:14, 89:25, 103:9, 156:13, 178:6, 178:18, 191:19
**Lecrae** [25] - 7:16, 8:22, 19:14, 33:14, 33:16, 34:3, 44:13, 51:20, 59:8, 62:24, 64:21, 66:11, 96:2, 129:24, 131:3, 138:11, 138:12, 144:6, 178:14, 178:21, 184:12, 202:8, 202:11, 202:12
**Lecrae's** [1] - 184:11
**lectern** [1] - 205:4
**Lee** [1] - 35:17
**left** [7] - 68:1, 71:13, 77:6, 93:18, 164:24, 178:6, 191:20
**length** [1] - 160:17
**lengthy** [1] - 156:8
**Lenny** [1] - 92:7
**lent** [1] - 91:11
**LEPERA** [92] - 2:15, 3:4, 3:12, 18:8, 22:21, 22:23, 30:25, 31:2, 31:5, 63:20, 104:12, 105:22, 106:18, 107:3, 107:7, 108:12, 108:24, 109:2, 109:4, 114:18, 119:10, 119:12, 119:15, 119:18, 120:2, 120:9, 120:21, 120:24, 121:7, 121:9, 121:14, 121:17, 121:20, 121:23, 125:20, 125:23, 132:15, 132:24, 134:8, 135:13, 135:16, 135:19, 137:1, 137:3, 137:23, 137:25, 139:19, 140:2, 140:4, 142:22, 142:24, 143:19, 143:22, 144:1, 151:5, 151:21, 153:14, 153:24, 154:9, 154:12,

154:22, 157:8, 158:5, 158:19, 162:2, 162:17, 162:22, 163:1, 163:4, 163:7, 164:4, 193:9, 193:15, 193:19, 206:20, 206:23, 207:1, 207:3, 207:5, 207:11, 207:16, 207:19, 207:24, 208:4, 208:6, 208:11, 208:14, 209:4, 209:6, 209:9, 209:17, 209:21
**Lepera** [7] - 18:7, 18:9, 42:15, 108:11, 135:12, 193:6, 206:18
**less** [4] - 65:24, 81:8, 81:9, 141:13
**letter** [1] - 144:12
**letting** [1] - 157:24
**level** [1] - 33:2
**levels** [1] - 179:17
**liaison** [2] - 189:21, 192:8
**license** [1] - 137:8
**life** [3] - 95:13, 171:16, 197:23
**light** [1] - 109:1
**light's** [1] - 70:17
**liminae** [3] - 107:4, 158:7, 209:15
**limited** [2] - 47:24, 56:14
**Line** [1] - 61:6
**line** [10] - 20:17, 61:16, 64:25, 74:17, 84:2, 94:10, 139:16, 142:22, 153:3
**liner** [5] - 33:12, 144:14, 152:1, 152:15, 152:16
**lines** [8] - 55:19, 61:14, 61:15, 68:7, 136:24, 137:7, 137:21, 139:17
**link** [4] - 31:15, 129:21, 130:5, 177:19
**list** [9] - 15:3, 31:24, 52:24, 70:14, 83:10, 83:14, 84:20, 125:18, 197:12
**listed** [9] - 15:11, 16:16, 16:17, 183:3, 194:4, 200:11, 200:13, 200:15, 200:17

**listen** [28] - 16:3, 16:5, 22:8, 29:18, 34:18, 39:9, 39:19, 69:14, 79:17, 79:19, 86:14, 97:8, 97:20, 97:23, 98:25, 115:4, 115:6, 115:10, 115:11, 115:12, 122:5, 127:4, 132:7, 133:10, 165:16, 165:21, 174:7, 199:2
**listened** [14] - 48:7, 84:24, 85:13, 87:12, 88:4, 88:5, 99:7, 127:6, 131:20, 131:23, 148:14, 150:13, 150:17
**listener** [1] - 198:4
**listening** [11] - 11:3, 35:1, 87:20, 96:24, 100:1, 100:5, 117:11, 148:5, 165:23, 174:1, 178:2
**listens** [2] - 6:22, 9:10
**lists** [6] - 25:18, 52:18, 52:22, 53:1, 82:13, 197:16
**lit** [1] - 174:2
**litany** [1] - 19:16
**literally** [1] - 188:8
**litigation** [1] - 55:24
**live** [12] - 52:21, 52:25, 53:3, 73:22, 74:15, 74:19, 91:10, 119:4, 128:23, 166:3, 207:19
**lives** [2] - 7:10, 89:25
**livin'** [1] - 197:23
**living** [1] - 112:2
**LLC** [1] - 2:9
**loaded** [2] - 104:4, 104:6
**local** [3] - 189:8, 189:19
**logistics** [1] - 100:22
**look** [26] - 7:19, 20:16, 22:23, 25:10, 25:14, 26:7, 28:3, 30:8, 61:11, 68:7, 76:18, 76:21, 77:7, 83:10, 83:14, 86:20, 96:25, 100:25, 103:3, 106:3, 136:22, 143:17, 166:2, 166:23, 196:19
**looked** [4] - 66:9, 86:3, 106:14, 206:15
**looking** [9] - 25:21, 29:11, 34:21, 61:12, 86:16, 126:4,

143:22, 173:14, 186:17
**looks** [2] - 76:23, 84:13
**LOS** [6] - 1:16, 1:23, 2:18, 2:23, 4:1, 210:5
**Los** [5] - 17:18, 88:16, 93:18, 93:20, 163:25
**LOUIS** [1] - 2:8
**Louis** [4] - 128:23, 130:13, 131:7, 178:19
**love** [10] - 79:25, 88:21, 170:16, 171:25, 174:2, 176:25, 178:10, 178:11, 178:25
**lovely** [1] - 186:22
**loves** [2] - 6:1, 6:22
**Lukasz** [1] - 45:16
**Luke** [8] - 77:11, 79:10, 79:13, 79:18, 88:9, 89:20, 96:23, 168:2
**lunch** [1] - 98:6
**lyric** [6] - 5:20, 5:21, 7:17, 38:2, 41:7, 114:24
**lyrical** [1] - 141:18
**lyrics** [37] - 5:20, 7:2, 7:3, 7:4, 7:5, 16:10, 33:17, 37:25, 43:12, 82:7, 82:10, 88:23, 88:24, 88:25, 93:1, 99:17, 124:8, 135:2, 141:20, 168:7, 168:20, 168:21, 175:16, 176:13, 176:20, 176:21, 177:4, 177:5, 177:21, 179:6, 179:19, 180:1, 180:4, 199:4

## M

**mainstream** [2] - 199:22, 199:24
**major** [1] - 164:22
**makers** [1] - 173:17
**man** [2] - 7:16, 38:25
**manager** [7] - 14:6, 186:19, 186:21, 192:3, 192:7, 192:12, 205:8
**manages** [1] - 100:22
**manipulate** [1] - 117:12
**Manny** [1] - 177:15

**Manny's** [1] - 178:13
**manufactured** [2] - 49:7, 149:17
**March** [5] - 7:21, 75:9, 163:23, 184:23, 184:24
**Marcus** [12] - 4:4, 5:5, 17:14, 33:17, 38:21, 64:20, 68:18, 123:3, 123:5, 144:10, 169:8, 169:16
**MARCUS** [2] - 1:6, 3:15
**margin** [1] - 75:1
**mark** [2] - 79:5, 82:12
**marked** [10] - 39:10, 40:3, 77:15, 79:4, 82:6, 84:7, 86:8, 124:19, 162:13, 192:17
**market** [4] - 30:21, 114:7, 182:12, 202:15
**marketing** [3] - 15:19, 190:22, 192:10
**Martin** [5] - 18:17, 23:12, 45:14, 45:15, 168:2
**mash** [1] - 190:20
**mass** [2] - 179:16, 190:21
**master** [2] - 142:3, 190:20
**Master's** [1] - 173:1
**mastered** [2] - 143:14, 179:15
**mastering** [9] - 134:25, 141:22, 142:1, 142:7, 142:11, 142:13, 142:15, 142:19, 143:3
**material** [1] - 61:20
**materials** [1] - 207:9
**matter** [1] - 203:2
**matters** [1] - 159:4
**Max** [5] - 45:14, 79:13, 89:20, 96:23, 168:2
**McDonald's** [1] - 11:15
**McDonalds** [2] - 11:10, 11:17
**mean** [29] - 60:19, 72:2, 76:23, 81:8, 81:15, 82:17, 94:9, 98:20, 110:23, 114:23, 118:8, 118:14, 133:10, 139:13, 142:16, 152:5, 152:12,

158:11, 159:15, 161:22, 165:25, 171:3, 175:19, 178:7, 179:25, 196:12, 201:14, 203:1, 206:5
**means** [5] - 21:18, 26:12, 113:22, 142:17, 174:25
**MEANS** [1] - 210:14
**media** [4] - 98:23, 197:25, 203:11, 204:2
**medley** [2] - 88:9, 92:1
**meet** [6] - 43:21, 93:19, 103:10, 158:8, 177:2, 207:8
**melodic** [1] - 27:4
**melodies** [5] - 41:6, 126:25, 168:8, 168:15, 168:17
**melody** [9] - 24:17, 26:18, 88:24, 89:12, 89:13, 89:22, 93:1, 127:2, 177:20
**mention** [2] - 20:3, 171:22
**mentioned** [19] - 13:18, 30:13, 32:11, 33:7, 37:10, 74:24, 92:17, 94:25, 102:19, 115:15, 117:20, 127:4, 172:7, 176:17, 181:13, 182:5, 184:14, 187:10, 188:9
**mentions** [1] - 78:3
**mentor** [1] - 93:20
**Merrily** [1] - 28:18
**message** [2] - 176:25, 180:11
**messenger** [1] - 93:15
**met** [7] - 6:19, 45:8, 45:23, 56:5, 123:10, 144:24, 145:25
**metaphor** [3] - 88:21, 89:3
**method** [1] - 46:6
**mi** [1] - 28:7
**Mi** [12] - 26:2, 26:3, 26:5, 27:5, 27:20, 28:7, 28:8, 28:19
**MICHAEL** [1] - 2:5
**microphone** [2] - 169:15, 208:18
**mid** [2] - 32:16, 188:23
**mid-millions** [1] - 32:16
**mid-West** [1] - 188:23

**midnight** [2] - 161:11, 162:23
**might** [14] - 7:22, 10:22, 13:16, 13:20, 13:25, 14:15, 14:16, 55:1, 70:19, 112:10, 112:21, 133:16, 176:17, 205:15
**Mike** [1] - 4:21
**MILLER** [3] - 1:22, 210:21, 210:22
**million** [4] - 32:19, 32:20, 32:21, 83:9
**millions** [4] - 8:23, 14:13, 32:16
**Minaj** [1] - 23:4
**mind** [18] - 9:10, 19:6, 19:15, 19:23, 20:13, 25:2, 59:11, 67:18, 82:9, 97:24, 102:14, 112:18, 125:23, 142:21, 173:12, 176:20, 184:19, 204:16
**minds** [1] - 20:4
**mine** [2] - 43:21, 173:22
**miniscule** [2] - 22:5
**minute** [5] - 21:18, 26:9, 61:11, 62:24, 93:17
**minutes** [16] - 60:23, 65:24, 65:25, 67:15, 67:19, 69:6, 91:24, 118:14, 141:10, 157:17, 158:9, 158:21, 190:1, 190:2
**mischaracterized** [1] - 19:11
**missed** [1] - 85:2
**missing** [3] - 19:10, 19:13, 33:15
**Missouri** [1] - 178:19
**misstates** [1] - 22:16
**Missy** [1] - 92:7
**mistaken** [2] - 18:23, 120:23
**misunderstanding** [1] - 105:20
**Mitchell** [1] - 163:24
**MITCHELL** [1] - 2:15
**mix** [3] - 126:14, 142:3, 190:20
**mixed** [2] - 143:14, 179:15
**mixing** [9] - 134:24, 141:22, 142:1, 142:7, 142:11, 142:13, 142:14, 142:19, 143:3

**MO** [2] - 2:8, 2:11
**modern** [1] - 12:9
**mom's** [1] - 110:9
**moment** [6] - 17:13, 49:10, 50:23, 91:1, 102:11, 151:5
**Monday** [2] - 206:2, 206:4
**Money** [1] - 49:14
**money** [6] - 16:25, 17:5, 95:19, 123:20, 190:20, 191:12
**monitoring** [1] - 184:19
**monitors** [1] - 13:15
**monopolize** [1] - 29:3
**Montecito** [1] - 79:16
**month** [3] - 95:17, 167:17, 167:18
**months** [3] - 67:2, 78:10, 85:10
**moody** [2] - 89:3, 102:3
**Moore** [43] - 7:16, 8:22, 19:14, 33:14, 33:17, 34:3, 34:15, 43:7, 44:13, 44:17, 44:20, 59:8, 62:24, 62:25, 63:3, 63:7, 63:13, 64:21, 67:10, 96:3, 129:24, 131:3, 138:12, 138:15, 138:18, 139:6, 139:21, 148:21, 178:14, 184:12, 188:10, 188:12, 192:24, 194:4, 194:23, 195:10, 202:8, 202:11, 202:12, 203:4, 203:13
**Moore's** [3] - 51:20, 159:23, 185:24
**moral** [4] - 107:5, 107:10, 107:17, 107:21
**morality** [1] - 108:16
**morning** [11] - 4:13, 18:8, 35:21, 35:22, 44:4, 44:5, 72:14, 87:11, 155:15, 204:10, 206:8
**most** [13] - 14:9, 15:5, 16:8, 27:24, 83:23, 85:22, 88:17, 92:2, 140:11, 159:9, 168:6, 168:8, 189:17
**mostly** [6] - 75:25, 76:9, 100:5, 165:8, 166:25, 168:7

**mother** [1] - 110:8
**motion** [1] - 206:4
**motivation** [1] - 179:1
**mouth** [1] - 11:11
**move** [13] - 31:4, 103:5, 106:25, 158:15, 159:12, 160:6, 160:9, 172:13, 172:22, 173:3, 185:10, 185:20, 197:21
**moved** [2] - 102:18, 156:19
**Movement** [15] - 16:25, 17:4, 20:5, 20:10, 20:14, 190:15, 191:2, 191:8, 191:19, 191:20, 195:24, 196:1, 197:1, 197:11, 197:17
**Movements** [1] - 190:24
**moves** [1] - 42:9
**moving** [1] - 96:14
**MOVIT** [52] - 2:16, 3:9, 39:6, 40:5, 40:22, 41:18, 42:7, 44:3, 55:18, 55:22, 60:8, 60:13, 61:3, 61:6, 61:9, 61:13, 61:16, 61:22, 62:1, 63:16, 63:19, 63:23, 65:3, 65:24, 66:2, 67:13, 70:7, 72:9, 72:11, 72:13, 73:11, 172:10, 172:21, 174:18, 179:22, 185:4, 185:17, 193:8, 193:10, 194:15, 196:3, 197:5, 198:3, 198:8, 199:10, 199:25, 200:3, 201:12, 201:19, 202:5, 202:21, 204:11
**Movit** [4] - 18:10, 68:1, 69:1, 70:21
**MP** [2] - 175:25, 176:1
**MP3** [10] - 114:10, 119:7, 119:9, 119:17, 120:6, 120:15, 120:20, 121:4, 126:7, 126:9
**MR** [273] - 3:3, 3:8, 3:9, 3:12, 3:15, 3:19, 3:19, 4:9, 4:20, 8:3, 9:13, 9:18, 10:3, 22:19, 30:24, 35:7, 35:20, 39:4, 39:6,

39:7, 39:19, 40:3, 40:5, 40:8, 40:11, 40:14, 40:22, 40:24, 41:13, 41:18, 41:20, 41:24, 42:7, 42:10, 43:24, 44:3, 55:18, 55:22, 60:6, 60:8, 60:13, 61:3, 61:5, 61:6, 61:7, 61:9, 61:13, 61:16, 61:17, 61:22, 62:1, 63:16, 63:19, 63:23, 65:3, 65:24, 66:2, 67:13, 67:24, 70:7, 70:13, 72:6, 72:9, 72:11, 72:13, 73:11, 73:13, 73:17, 73:25, 74:2, 74:4, 74:23, 75:5, 75:8, 75:12, 80:21, 81:1, 85:4, 86:22, 86:24, 87:10, 91:1, 91:4, 91:6, 91:11, 91:14, 98:5, 98:8, 99:10, 99:12, 100:12, 100:17, 101:3, 101:6, 101:7, 101:10, 101:14, 101:16, 102:6, 102:7, 102:18, 102:23, 103:2, 103:4, 103:12, 103:13, 103:19, 105:13, 107:1, 107:14, 107:19, 107:24, 108:8, 108:9, 109:14, 110:2, 114:22, 119:7, 119:11, 119:13, 119:16, 119:19, 119:24, 120:6, 120:10, 120:15, 120:18, 120:23, 121:4, 121:8, 121:12, 121:16, 121:18, 121:22, 121:24, 122:12, 125:10, 125:13, 125:16, 125:18, 125:24, 132:6, 133:4, 133:7, 133:10, 133:13, 134:3, 134:7, 134:10, 134:19, 134:21, 135:8, 135:16, 137:23, 142:22, 143:21, 143:25, 151:9, 151:19, 151:22, 152:7, 152:11, 152:24, 153:2, 153:16, 153:25,

154:7, 154:25, 155:5, 155:12, 155:14, 155:18, 156:1, 157:14, 157:16, 158:11, 158:15, 159:13, 159:16, 160:11, 160:14, 160:19, 160:21, 160:25, 161:3, 161:5, 161:19, 161:21, 163:20, 164:8, 165:15, 167:2, 168:23, 169:2, 169:4, 169:6, 169:8, 169:21, 169:23, 172:10, 172:17, 172:21, 173:4, 174:18, 174:21, 179:22, 179:25, 180:5, 183:18, 183:22, 184:1, 184:22, 185:4, 185:12, 185:17, 185:22, 193:8, 193:10, 193:13, 193:18, 193:20, 193:22, 194:2, 194:12, 194:15, 194:16, 194:20, 196:3, 196:6, 197:3, 197:5, 197:8, 197:10, 198:3, 198:8, 198:24, 199:8, 199:10, 199:17, 199:25, 200:3, 200:10, 200:19, 200:24, 201:12, 201:15, 201:19, 201:21, 202:1, 202:5, 202:7, 202:21, 202:23, 203:3, 203:12, 203:24, 204:5, 204:11, 205:1, 205:6, 205:10, 205:18, 205:21, 206:5, 206:17, 206:22, 206:23, 207:2, 207:6, 207:17, 207:22, 209:5, 209:24
**MS** [99] - 2:13, 3:4, 3:12, 18:8, 22:21, 22:23, 30:25, 31:2, 31:5, 63:20, 85:2, 104:12, 105:22, 106:18, 107:3, 107:7, 108:12, 109:2, 109:4, 114:18, 119:10,

119:12, 119:15, 119:18, 120:2, 120:9, 120:21, 120:24, 121:7, 121:9, 121:14, 121:17, 121:20, 121:23, 125:20, 125:23, 132:15, 132:24, 134:8, 135:13, 135:19, 137:1, 137:3, 137:25, 139:19, 140:2, 140:4, 142:24, 143:19, 143:22, 144:1, 151:5, 151:21, 153:14, 153:24, 154:9, 154:12, 154:22, 156:8, 157:8, 157:15, 158:5, 158:19, 162:2, 162:7, 162:17, 162:22, 163:1, 163:4, 163:7, 164:4, 193:9, 193:15, 193:19, 206:20, 206:25, 207:1, 207:3, 207:5, 207:11, 207:16, 207:19, 207:24, 208:3, 208:4, 208:5, 208:6, 208:11, 208:13, 208:14, 208:15, 208:19, 208:24, 209:4, 209:6, 209:9, 209:17, 209:21, 209:25
**mulls** [1] - 176:1
**multiple** [3] - 23:14, 24:13
**mumbling** [2] - 58:3, 176:16
**music** [152] - 6:1, 7:2, 8:2, 9:12, 9:17, 10:2, 12:9, 12:12, 16:3, 16:5, 16:6, 16:9, 18:25, 21:7, 21:9, 21:16, 22:1, 22:6, 22:8, 22:25, 23:7, 24:2, 24:19, 26:1, 26:13, 28:13, 28:24, 30:20, 33:5, 36:21, 37:1, 37:4, 38:16, 39:2, 39:3, 39:24, 41:5, 43:12, 43:20, 43:23, 44:7, 44:10, 44:13, 46:9, 46:15, 46:20, 47:23, 54:6, 57:8, 69:11, 69:15, 73:6, 73:8, 75:23,

75:25, 79:17, 79:19, 79:25, 80:13, 80:25, 81:18, 81:19, 82:15, 82:17, 82:24, 83:3, 83:14, 83:23, 83:25, 86:14, 88:17, 90:19, 96:5, 96:8, 96:14, 96:15, 96:17, 96:24, 97:9, 97:24, 98:25, 99:22, 100:1, 100:6, 101:1, 101:4, 101:22, 101:24, 110:21, 110:23, 110:24, 111:19, 111:20, 114:24, 115:4, 115:6, 115:10, 115:11, 115:12, 115:24, 117:12, 122:11, 123:13, 124:8, 127:4, 127:6, 128:14, 128:17, 128:24, 139:2, 146:9, 146:13, 148:4, 148:5, 148:7, 154:18, 164:19, 165:9, 165:16, 165:21, 165:24, 166:1, 166:2, 166:16, 166:19, 166:22, 167:1, 170:14, 171:7, 177:20, 178:10, 180:15, 180:23, 181:1, 181:18, 182:10, 183:6, 183:9, 183:12, 183:20, 183:24, 190:7, 191:3, 199:2, 199:16, 201:16, 202:2

**Music** [8] - 12:7, 25:17, 49:12, 49:13, 191:1, 191:7, 191:23

**musical** [30] - 8:4, 19:1, 23:5, 24:10, 25:24, 26:12, 28:1, 28:13, 28:19, 44:17, 44:20, 44:22, 44:25, 45:2, 45:5, 57:9, 57:11, 57:14, 73:5, 85:16, 110:25, 152:20, 154:15, 164:19, 165:7, 170:6, 170:8, 170:20

**musician** [8] - 12:8, 26:2, 36:16, 36:18, 36:25, 81:15, 115:3, 172:2

**musicians** [1] - 190:16

**musicologist** [5] - 12:5, 25:15, 25:16, 132:16, 154:13

**musicology** [1] - 12:8

**must** [2] - 71:8, 166:11

**mustard** [2] - 11:12, 11:18

**MVV** [1] - 114:10

**MY** [1] - 210:16

**MySpace** [64] - 6:3, 6:6, 6:21, 14:14, 21:23, 32:9, 32:18, 34:15, 34:16, 43:15, 43:18, 51:4, 51:7, 51:10, 51:14, 51:17, 51:20, 51:25, 76:6, 76:8, 76:12, 76:19, 76:24, 77:13, 96:16, 98:9, 98:14, 98:21, 98:23, 112:9, 112:12, 114:6, 114:8, 114:11, 122:9, 122:21, 129:9, 129:17, 129:25, 150:8, 157:24, 158:12, 159:23, 159:25, 166:2, 166:5, 166:6, 166:11, 166:15, 166:18, 173:23, 184:5, 184:8, 184:9, 184:10, 184:11, 185:14, 185:25, 188:9, 202:10, 204:6, 207:9, 209:12

**mystery** [1] - 39:15

## N

**Naked** [3] - 165:5, 166:8, 166:10

**name** [45] - 4:21, 6:18, 7:10, 12:12, 35:15, 35:16, 35:17, 35:18, 37:11, 37:13, 37:14, 37:21, 54:25, 55:23, 65:6, 75:13, 75:15, 75:18, 87:4, 87:5, 87:6, 87:7, 92:18, 104:1, 109:20, 109:21, 109:22, 109:23, 110:3, 110:4, 123:3, 169:13, 169:16, 169:17, 171:11, 171:12, 171:13, 171:14, 171:18, 171:22, 172:1, 192:5, 201:7, 201:15

**named** [2] - 7:16, 59:13

**namely** [1] - 82:18

**names** [5] - 10:19, 15:6, 15:12, 23:11, 23:14

**napkin** [2] - 11:11, 11:17

**narrative** [3] - 87:24, 94:10, 153:19

**Nashville** [5] - 92:23, 92:25, 93:2, 181:21, 182:17

**nature** [4] - 24:23, 176:6, 190:23, 200:9

**NBA** [1] - 171:4

**necessarily** [3] - 93:5, 101:25, 201:14

**need** [21] - 10:13, 10:14, 12:24, 14:18, 14:20, 14:25, 22:13, 22:14, 61:17, 106:22, 106:25, 116:10, 156:16, 157:2, 160:7, 171:25, 185:1, 193:3, 193:17, 202:25, 206:14

**needed** [4] - 126:13, 126:15, 142:3, 171:19

**needs** [1] - 133:17

**never** [50] - 11:7, 11:8, 17:4, 20:13, 34:3, 44:20, 44:25, 45:5, 45:8, 45:23, 46:1, 46:4, 46:8, 46:12, 46:14, 46:24, 47:2, 47:23, 48:11, 49:20, 50:7, 51:8, 52:3, 52:24, 53:3, 53:18, 55:23, 56:5, 66:21, 88:18, 95:7, 99:7, 104:21, 106:2, 123:10, 125:23, 144:24, 145:2, 145:25, 146:3, 146:5, 146:8, 146:16, 147:4, 148:16, 149:1, 149:5, 150:24, 151:2

**new** [6] - 43:7, 173:14, 191:25, 203:11, 204:2

**New** [4] - 29:25, 79:6, 86:5, 86:6

**news** [2] - 189:9, 189:19

**next** [25] - 18:19, 28:3, 28:16, 32:18, 65:13,

68:12, 73:16, 73:17, 77:15, 81:20, 82:12, 88:3, 109:13, 122:20, 122:23, 133:1, 143:18, 155:4, 157:9, 167:8, 167:20, 167:22, 175:17, 179:7, 205:15

**nice** [1] - 79:14

**niche** [2] - 33:5

**Nick** [1] - 28:18

**Nicki** [1] - 23:4

**Nigerian** [1] - 110:5

**night** [5] - 6:2, 161:11, 162:8, 162:23, 167:21

**night's** [1] - 189:6

**nine** [2] - 92:22, 97:17

**nine-year-old** [1] - 97:17

**NO** [1] - 1:8

**nobody** [1] - 5:11

**Noise** [190] - 5:3, 5:19, 7:18, 7:20, 8:9, 9:7, 9:11, 9:18, 10:7, 10:18, 11:25, 12:25, 14:11, 16:10, 16:13, 19:16, 20:14, 20:22, 20:25, 23:21, 24:2, 25:4, 28:6, 29:17, 31:10, 31:25, 32:3, 33:12, 34:8, 34:13, 35:23, 38:2, 38:6, 38:20, 39:24, 41:10, 41:14, 41:21, 46:11, 46:17, 46:22, 46:25, 47:2, 47:6, 47:21, 47:24, 48:3, 48:8, 48:10, 48:11, 48:15, 48:19, 49:1, 49:4, 49:6, 49:20, 49:24, 50:8, 50:13, 50:17, 50:21, 50:25, 51:7, 51:24, 52:7, 52:10, 52:19, 53:5, 53:8, 53:11, 53:13, 53:18, 53:24, 54:4, 54:9, 54:10, 56:9, 56:13, 56:22, 57:20, 57:24, 58:2, 58:6, 58:9, 58:19, 62:11, 62:13, 62:17, 62:25, 63:7, 64:15, 67:5, 67:11, 69:24, 71:16, 72:15, 73:1, 96:11, 96:25, 99:5, 103:22, 104:17, 106:1, 111:14, 111:18, 111:25, 115:19,

115:21, 117:22, 118:3, 118:20, 122:6, 122:8, 122:18, 123:19, 127:22, 127:24, 128:14, 129:22, 130:5, 130:22, 131:3, 131:12, 132:1, 134:12, 134:22, 135:3, 136:3, 136:6, 138:20, 139:8, 140:20, 141:6, 141:16, 142:12, 143:14, 144:3, 144:6, 144:14, 145:2, 146:11, 146:16, 146:16, 146:23, 147:1, 147:6, 147:12, 147:16, 147:21, 147:24, 148:16, 148:21, 149:1, 149:7, 149:10, 149:15, 149:18, 149:25, 150:4, 150:13, 150:17, 150:24, 151:3, 151:12, 151:23, 170:4, 173:7, 173:10, 173:25, 176:14, 180:7, 180:8, 180:20, 180:24, 187:13, 187:15, 187:16, 187:18, 189:1, 190:5, 191:10, 192:14, 192:15, 192:22, 195:7, 195:23, 196:9, 199:4, 199:19, 199:23

**nominated** [17] - 8:8, 13:14, 13:16, 38:6, 38:7, 38:10, 38:14, 38:16, 180:16, 180:19, 180:21, 180:24, 181:3, 181:4, 182:12, 191:16

**nominee** [1] - 183:3

**non** [1] - 52:4

**non-Christian** [1] - 52:4

**nonexclusive** [1] - 137:8

**nonreligious** [2] - 16:14, 202:3

**noon** [1] - 102:11

**normally** [1] - 7:5

**North** [2] - 84:16, 84:19
**north** [1] - 188:25
**note** [7] - 27:10, 27:12, 89:19, 116:23, 118:23, 152:17, 152:18
**noted** [1] - 4:7
**notes** [15] - 6:12, 26:25, 27:19, 27:21, 28:19, 28:20, 29:3, 33:12, 81:14, 116:22, 117:2, 144:14, 152:1, 152:15
**NOTES** [1] - 210:16
**nothing** [10] - 72:6, 72:18, 73:13, 102:7, 106:8, 119:19, 119:20, 151:5, 154:7, 154:25
**notice** [3] - 11:12, 151:18, 205:16
**notwithstanding** [1] - 108:14
**November** [5] - 55:7, 55:15, 64:10, 136:24, 138:9
**number** [9] - 31:22, 64:17, 65:14, 66:12, 68:9, 72:16, 72:19, 120:17, 186:23
**numbers** [3] - 158:6, 185:5, 195:19
**NYU's** [1] - 25:17

## O

**o'clock** [2] - 11:8, 102:13
**O-j-u-k-w-u** [1] - 109:23
**oath** [2] - 55:10, 61:10
**object** [9] - 22:19, 31:2, 60:6, 61:7, 61:8, 101:3, 104:11, 105:1, 106:15
**objected** [1] - 193:14
**objection** [48] - 39:6, 40:5, 40:22, 41:14, 41:18, 42:7, 42:8, 63:19, 63:20, 70:7, 74:25, 75:4, 91:3, 100:14, 101:6, 101:12, 101:14, 103:5, 114:18, 132:15, 143:19, 143:24, 143:25, 152:7, 152:24, 153:1, 153:14,

153:17, 162:14, 165:14, 165:18, 172:10, 172:21, 174:18, 179:22, 193:8, 193:10, 193:18, 194:15, 196:3, 197:5, 198:6, 199:8, 199:25, 200:6, 201:12, 202:5, 202:21
**objections** [13] - 60:10, 75:3, 102:23, 103:8, 103:9, 120:14, 158:13, 160:2, 160:3, 161:8, 161:13, 161:18, 201:18
**obtain** [2] - 192:14
**obtained** [1] - 138:19
**obtaining** [1] - 24:1
**obvious** [1] - 135:2
**obviously** [8] - 23:8, 25:19, 46:11, 81:2, 104:17, 105:5, 133:22, 187:23
**occasion** [3] - 52:20, 52:23, 53:5
**occur** [1] - 204:25
**ocean** [1] - 79:14
**October** [5] - 76:2, 77:21, 78:5, 79:5, 84:10
**OF** [13] - 1:1, 1:2, 1:14, 2:2, 2:3, 2:13, 2:19, 210:3, 210:5, 210:7, 210:10, 210:14, 210:16
**offer** [6] - 11:21, 11:22, 12:1, 40:4, 101:11, 193:20
**offered** [1] - 193:16
**offering** [1] - 194:14
**Office** [2] - 62:13, 191:15
**offices** [1] - 163:24
**official** [4] - 157:22, 183:16, 184:2
**OFFICIAL** [3] - 1:22, 210:9, 210:23
**often** [1] - 14:9
**OJUKWO** [1] - 3:11
**Ojukwu** [40] - 5:5, 5:23, 6:18, 6:22, 6:24, 10:20, 17:13, 33:8, 33:22, 39:5, 45:3, 45:6, 45:8, 54:25, 55:23, 56:6, 57:17, 59:6, 63:8, 68:18, 103:20, 104:5, 104:16,

109:14, 109:16, 109:23, 110:20, 115:3, 122:13, 132:3, 133:22, 135:9, 135:22, 152:4, 155:1, 174:16, 174:25, 175:12, 175:23, 195:14
**ojukwu** [1] - 135:23
**Ojukwu's** [6] - 6:21, 33:20, 34:16, 34:24, 51:17, 103:24
**old** [7] - 28:18, 92:22, 97:17, 112:5, 171:18, 172:3, 172:5
**Old** [1] - 28:18
**OLYMPIC** [1] - 2:17
**ON** [3] - 2:3, 2:13, 2:19
**once** [6] - 14:1, 27:13, 32:22, 139:16, 175:15, 179:16
**One** [2] - 94:6, 94:8
**one** [98] - 4:22, 5:4, 6:4, 6:15, 8:17, 8:22, 11:2, 11:8, 11:23, 11:24, 12:15, 13:3, 15:18, 16:1, 16:8, 17:9, 18:17, 18:19, 25:20, 27:10, 27:21, 27:22, 29:16, 32:11, 35:23, 37:2, 67:18, 69:24, 70:10, 71:25, 81:14, 81:15, 83:15, 84:22, 84:23, 85:2, 85:5, 85:13, 88:15, 90:12, 94:4, 94:21, 96:5, 97:7, 97:8, 98:23, 99:3, 102:15, 102:22, 106:4, 107:3, 110:10, 111:13, 114:5, 116:11, 117:11, 118:13, 122:2, 123:15, 125:17, 129:24, 130:10, 130:13, 130:15, 130:23, 131:2, 131:7, 132:1, 138:23, 144:3, 148:6, 148:7, 157:16, 157:21, 160:25, 161:6, 161:14, 163:22, 170:1, 170:3, 176:10, 178:22, 185:13, 187:14, 187:21, 189:2, 189:23, 190:4, 194:4, 194:6,

196:18, 201:22, 202:15, 204:17
**ones** [2] - 15:19, 201:6
**online** [9] - 9:9, 16:15, 96:16, 112:15, 112:17, 128:10, 149:21, 190:22
**open** [3] - 58:18, 102:14, 204:16
**OPENING** [1] - 3:2
**opening** [9] - 4:14, 4:15, 24:8, 30:24, 33:8, 37:10, 38:4, 85:18, 198:25
**opens** [2] - 77:20, 129:7
**operation** [1] - 103:23
**opinion** [6] - 132:18, 133:5, 133:14, 133:23, 133:24, 199:6
**opinions** [3] - 107:25, 134:2, 198:4
**opportunities** [1] - 69:13
**opportunity** [10] - 13:9, 13:11, 21:4, 32:23, 97:16, 106:3, 162:21, 162:22, 171:8, 185:9
**opposite** [1] - 22:11
**option** [1] - 204:11
**oral** [2] - 124:13, 124:16
**order** [12] - 17:13, 17:15, 17:16, 17:17, 17:23, 38:18, 71:4, 104:2, 104:3, 108:2, 156:17, 209:15
**origin** [3] - 7:9, 37:20, 110:3
**original** [8] - 15:7, 66:7, 66:8, 66:11, 75:20, 77:24, 92:18, 131:2
**originally** [5] - 33:15, 62:25, 63:3, 66:13, 163:1
**Ostinato** [2] - 26:8, 26:21, 27:7, 27:8, 27:14, 27:15
**ostinato** [2] - 8:5, 26:11, 26:13
**OTHER** [1] - 2:13
**otherwise** [3] - 26:20, 30:5, 204:8
**ought** [1] - 74:20
**ourselves** [2] - 166:2, 166:25
**outlets** [1] - 199:19

**outline** [1] - 10:10
**outright** [2] - 112:24, 113:2
**outset** [2] - 7:22, 17:11
**outside** [3] - 17:18, 110:18, 199:19
**overall** [1] - 75:3
**overrule** [3] - 42:8, 165:13, 165:18
**overruled** [4] - 40:23, 70:8, 114:20, 174:19
**overwhelmed** [1] - 159:11
**overwhelming** [1] - 197:24
**own** [33] - 5:8, 19:21, 27:18, 34:23, 93:16, 99:2, 118:21, 124:4, 124:6, 124:24, 126:22, 127:2, 164:23, 166:5, 166:16, 166:19, 167:1, 168:24, 168:25, 179:4, 190:25, 191:6, 191:21, 191:24, 192:1, 195:5, 196:1, 196:9
**owned** [7] - 139:14, 139:21, 139:24, 140:5, 153:4, 196:14, 197:17
**owner** [3] - 33:11, 139:9, 197:1
**owners** [3] - 15:7, 194:4, 194:6
**ownership** [9] - 7:1, 19:25, 66:6, 124:1, 125:2, 175:13, 195:11, 195:17, 195:18
**Oxford** [2] - 36:7, 36:9

## P

**p.m** [1] - 210:2
**pace** [1] - 6:13
**PAGE** [1] - 3:2
**page** [56] - 6:6, 6:21, 34:15, 34:17, 43:15, 43:18, 51:4, 51:7, 51:10, 51:14, 51:17, 51:21, 55:19, 61:4, 61:16, 64:25, 68:4, 68:7, 68:11, 68:12, 75:8, 76:5, 76:6, 77:15, 77:16, 82:5, 84:7, 85:3, 98:9, 98:14, 98:22, 129:9,

129:11, 129:17, 130:1, 130:5, 136:24, 137:21, 139:16, 142:21, 144:2, 159:23, 159:24, 167:2, 168:23, 173:23, 184:9, 184:11, 185:24, 188:9, 202:10

**pages** [6] - 51:25, 102:24, 158:12, 159:25, 160:4, 185:14

**paid** [4] - 123:25, 136:6, 140:11, 159:10

**pan** [1] - 117:10

**paper** [1] - 139:10

**paperwork** [1] - 71:10

**paradigm** [1] - 180:12

**paragraph** [1] - 78:2

**parameter** [1] - 103:23

**Paramount** [1] - 104:15

**pardon** [1] - 119:11

**parents** [1] - 92:22

**park** [1] - 14:1

**PARK** [1] - 2:22

**part** [42] - 5:11, 6:15, 6:25, 9:15, 10:8, 14:6, 14:10, 18:24, 42:2, 54:3, 58:22, 71:18, 74:15, 74:16, 81:16, 81:21, 84:23, 84:25, 85:13, 85:15, 85:22, 94:25, 97:6, 108:14, 119:9, 121:7, 121:10, 121:12, 126:23, 128:24, 142:12, 152:20, 153:7, 155:8, 159:9, 168:8, 173:13, 197:12

**participate** [2] - 58:19, 203:17

**participating** [1] - 15:9

**participation** [1] - 33:21

**particular** [21] - 24:24, 27:8, 41:10, 52:19, 53:5, 95:10, 103:25, 105:15, 111:9, 114:1, 115:10, 115:21, 116:12, 116:13, 117:8, 117:20, 140:17, 152:16, 165:11,

187:4, 189:6

**parties** [2] - 156:11, 171:6

**parts** [2] - 179:10, 198:15

**party** [4] - 71:20, 106:7, 131:15

**pass** [1] - 74:25

**passage** [1] - 27:8

**passages** [1] - 134:5

**passionate** [1] - 171:19

**past** [1] - 167:13

**pastors** [1] - 92:23

**pathway** [1] - 33:3

**patience** [1] - 18:4

**patiently** [1] - 191:5

**pattern** [1] - 26:25

**pause** [1] - 75:1

**pay** [4] - 123:20, 123:22, 136:12, 137:10

**peak** [3] - 180:23, 180:25, 181:18

**pending** [3] - 102:23, 198:21, 203:10

**people** [30] - 15:5, 15:8, 15:13, 23:18, 28:24, 29:9, 30:1, 30:7, 45:13, 45:14, 70:18, 95:25, 98:24, 110:16, 111:8, 112:15, 114:11, 156:13, 160:2, 168:4, 176:24, 178:10, 178:11, 180:9, 184:20, 190:8, 190:21, 192:4, 207:25

**people's** [1] - 168:14

**percent** [44] - 7:1, 7:2, 33:11, 43:4, 43:5, 43:11, 43:12, 64:14, 65:7, 65:8, 65:19, 66:11, 66:13, 66:19, 66:22, 68:5, 68:14, 68:18, 68:21, 71:15, 113:12, 113:13, 114:15, 114:24, 124:5, 125:1, 136:18, 136:20, 137:17, 138:19, 139:3, 139:9, 139:14, 139:21, 140:5, 153:5, 168:24, 168:25, 174:24, 175:18, 175:21, 195:14, 195:15, 195:20

**percentage** [5] -

43:10, 64:22, 66:5, 72:15, 124:24

**percentages** [2] - 195:17, 195:18

**perfect** [2] - 17:12, 160:19

**perform** [19] - 36:21, 44:7, 52:9, 52:21, 58:8, 75:18, 91:10, 130:22, 131:12, 170:20, 170:21, 170:22, 186:5, 186:8, 186:25, 187:12, 187:21, 188:12, 188:16

**performance** [15] - 31:10, 31:11, 47:20, 48:8, 90:13, 91:7, 91:15, 91:16, 92:5, 100:9, 131:12, 149:25, 151:3, 183:10

**performances** [7] - 13:23, 14:4, 32:6, 52:15, 98:3, 147:23, 148:20

**performed** [35] - 13:23, 13:24, 13:25, 14:1, 14:2, 24:15, 31:21, 31:22, 47:23, 48:3, 50:8, 50:13, 52:6, 52:19, 52:23, 52:24, 53:3, 53:5, 53:9, 84:13, 84:19, 84:23, 85:5, 85:12, 88:1, 91:17, 130:8, 171:2, 187:8, 187:15, 187:16, 187:21, 189:1

**performer** [12] - 17:21, 23:9, 24:25, 25:19, 36:19, 93:12, 97:14, 131:2, 167:11, 171:12, 186:3, 186:4

**performer's** [2] - 171:11, 171:14

**performers** [2] - 129:25, 165:16

**performing** [13] - 9:5, 15:6, 37:11, 37:13, 37:14, 37:21, 37:24, 92:7, 94:8, 95:23, 123:2, 183:14, 197:24

**performs** [3] - 8:24, 9:1, 44:10

**perhaps** [3] - 12:12, 13:21, 30:13

**period** [7] - 9:1, 22:2, 32:13, 76:10, 148:8,

148:12, 186:18

**permission** [4] - 4:25, 5:12, 10:9, 119:25

**permit** [1] - 156:23

**Perry** [19] - 4:5, 17:21, 23:7, 45:17, 47:17, 59:20, 74:3, 75:18, 77:16, 79:4, 79:13, 82:6, 82:13, 84:8, 94:4, 108:19, 167:7, 167:11, 168:3

**perry** [5] - 18:15, 74:8, 74:18, 101:4, 101:5

**PERRY** [3] - 1:9, 2:13, 2:19

**Perry's** [4] - 18:11, 107:9, 108:3, 109:1

**person** [7] - 12:21, 23:17, 33:3, 46:5, 56:8, 144:24, 172:15

**personal** [4] - 51:4, 152:10, 152:12, 173:18

**personality** [2] - 171:24, 173:20

**personally** [8] - 45:23, 50:7, 52:6, 52:21, 55:3, 58:8, 100:21, 147:23

**perspective** [2] - 93:16, 112:12

**PH** [1] - 1:24

**Philadelphia** [6] - 7:10, 36:3, 40:1, 40:12, 56:19, 177:2

**Philly** [4] - 7:11, 177:11, 177:14, 178:18

**phone** [3] - 89:19, 110:17, 176:19

**photograph** [1] - 11:15

**phrase** [5] - 26:10, 26:11, 26:12, 96:20

**phrased** [1] - 153:19

**phraseology** [1] - 175:5

**phrases** [1] - 170:11

**physical** [1] - 165:25

**physically** [1] - 104:9

**pianist** [1] - 25:19

**piano** [2] - 27:2, 29:2

**pick** [6] - 6:12, 6:13, 17:16, 102:13, 117:2, 117:4

**picked** [3] - 118:23, 118:25, 119:2

**picks** [1] - 6:12

**picture** [1] - 30:2

**pictures** [1] - 15:12

**pin** [2] - 167:17, 185:18

**pitches** [2] - 26:4, 27:4

**PLACE** [1] - 210:12

**place** [10] - 21:15, 43:19, 43:20, 52:12, 58:13, 76:8, 98:24, 117:24, 168:13, 185:23

**places** [2] - 16:14, 201:10

**PLAINTIFF** [3] - 1:7, 2:3, 3:6

**plaintiff** [18] - 7:7, 19:13, 27:6, 33:15, 63:3, 63:13, 133:15, 138:13, 138:16, 138:19, 153:9, 153:12, 154:1, 169:8, 195:2, 202:16, 202:19, 203:7

**plaintiff's** [5] - 4:17, 10:6, 28:5, 28:14, 161:10

**plaintiffs** [15] - 4:23, 10:20, 18:22, 22:3, 34:6, 35:8, 60:19, 74:10, 74:16, 96:2, 110:10, 161:7, 170:1, 194:11, 195:9

**plan** [5] - 155:18, 160:17, 206:12, 208:11, 209:14

**planning** [1] - 189:21

**play** [34] - 9:20, 9:25, 14:9, 26:9, 27:7, 30:9, 39:19, 41:16, 41:20, 80:14, 80:19, 80:22, 84:20, 86:20, 89:20, 91:1, 92:24, 117:2, 119:9, 119:17, 119:25, 121:6, 121:25, 126:23, 129:3, 132:4, 168:4, 179:18, 183:23, 188:5, 188:8, 190:4, 190:5, 190:9

**played** [39] - 8:2, 9:12, 9:15, 9:17, 10:2, 27:2, 27:13, 30:7, 31:25, 32:3, 39:2, 40:13, 40:25, 41:2, 41:23, 48:12, 57:2, 57:6, 80:6, 80:23, 80:25, 81:4, 82:3, 91:13, 101:9, 102:22, 111:18,

120:8, 121:19, 122:5, 122:11, 134:11, 134:20, 148:16, 150:25, 179:19, 183:1, 183:25, 188:1
**playing** [12] - 30:12, 41:3, 41:6, 41:15, 74:3, 80:2, 104:10, 119:22, 120:19, 120:20, 177:19, 187:24
**plays** [2] - 9:16, 10:5
**pleased** [1] - 84:5
**plumber** [1] - 18:2
**pocket** [1] - 177:6
**point** [32] - 16:19, 17:9, 22:21, 23:22, 25:24, 27:23, 29:11, 81:11, 86:2, 90:4, 97:8, 105:20, 106:10, 106:18, 108:22, 109:1, 112:21, 125:7, 126:19, 138:12, 138:15, 159:1, 162:19, 165:3, 173:12, 175:11, 178:14, 179:12, 184:6, 190:3, 196:7, 196:14
**pointed** [1] - 23:25
**poking** [1] - 37:4
**pool** [1] - 173:18
**pop** [12] - 16:6, 30:20, 30:23, 90:19, 93:2, 96:15, 115:13, 165:8, 165:12, 178:11
**popular** [6] - 8:19, 8:24, 12:9, 14:9, 16:8, 187:18
**portion** [29] - 6:5, 41:10, 41:20, 41:22, 41:25, 42:25, 54:13, 57:14, 84:24, 85:14, 87:12, 87:19, 88:5, 111:18, 118:1, 120:20, 132:10, 132:11, 145:13, 145:16, 146:23, 160:1, 168:5, 175:7, 183:10, 190:8, 195:5, 196:2, 196:9
**portions** [4] - 73:18, 86:22, 183:2, 195:21
**posed** [1] - 157:16
**position** [2] - 19:24, 36:15
**possibilities** [1] -

141:2
**possibility** [2] - 141:4, 144:21
**possible** [4] - 91:25, 102:13, 157:12, 205:2
**possibly** [4] - 25:19, 80:9, 83:13, 83:24
**post** [8] - 6:5, 34:11, 112:9, 112:15, 112:17, 114:11, 166:16, 166:18
**posted** [6] - 76:19, 98:14, 114:6, 114:8, 148:7, 148:11
**postings** [1] - 8:21
**potential** [2] - 59:9, 112:8
**power** [1] - 89:4
**practice** [2] - 113:8, 124:12
**pre** [3] - 126:23, 126:25, 166:11
**pre-existing** [2] - 126:23, 126:25
**pre-MySpace** [1] - 166:11
**preamble** [1] - 196:3
**precisely** [1] - 153:21
**prefer** [3] - 111:22, 156:25, 204:11
**preferred** [2] - 37:4, 156:18
**prejudice** [1] - 61:9
**preliminary** [1] - 115:23
**prepare** [3] - 86:1, 86:11, 97:24
**prepared** [2] - 75:3, 108:25
**preparing** [1] - 97:12
**presence** [1] - 199:23
**present** [11] - 4:12, 10:11, 12:5, 13:6, 54:13, 102:17, 109:10, 111:2, 155:22, 163:12, 204:20
**presented** [4] - 88:6, 88:8, 88:9, 95:1
**presenting** [1] - 10:12
**presently** [2] - 44:22, 45:2
**preserve** [1] - 132:20
**PRESIDING** [1] - 1:4
**presume** [1] - 28:22
**pretty** [4] - 95:5, 171:19, 175:14, 176:19
**previously** [2] - 19:13,

61:10
**primarily** [1] - 42:13
**principally** [1] - 77:17
**print** [1] - 190:14
**printed** [1] - 82:6
**printout** [1] - 84:8
**Prism** [10] - 76:1, 77:17, 82:15, 82:18, 90:23, 91:8, 94:18, 94:22, 95:7, 97:2
**Prismatic** [5] - 84:8, 95:6, 95:12, 95:23, 95:24
**prisons** [1] - 171:5
**privilege** [3] - 60:7, 60:9, 60:12
**privy** [2] - 52:2, 72:22
**Pro** [1] - 126:15
**problem** [8] - 61:20, 61:21, 106:19, 132:18, 133:1, 159:2, 161:5, 163:6
**proceed** [6] - 4:8, 4:14, 74:1, 87:11, 89:14, 89:15
**proceeding** [1] - 39:18
**Proceedings** [1] - 210:2
**PROCEEDINGS** [2] - 1:14, 210:12
**process** [18] - 5:7, 41:7, 41:8, 62:12, 79:23, 84:3, 84:4, 89:12, 89:24, 90:23, 92:10, 118:17, 167:6, 168:13, 173:9, 175:11, 176:12
**produce** [1] - 126:19
**produced** [3] - 104:7, 113:6, 152:4
**producer** [23] - 23:2, 110:21, 110:23, 110:24, 112:13, 112:14, 139:13, 144:15, 152:6, 152:13, 152:16, 152:18, 152:21, 174:12, 174:23, 175:1, 175:3, 175:6, 175:9, 175:10, 175:19, 175:21, 195:21
**producers** [4] - 154:19, 173:17, 173:19, 175:16
**product** [2] - 21:7, 190:21
**production** [3] - 128:16, 173:14,

173:17
**productive** [1] - 158:23
**professed** [2] - 108:15, 108:16
**professional** [8] - 13:7, 13:15, 13:22, 14:15, 16:4, 76:14, 115:3, 172:2
**professionally** [4] - 45:14, 45:15, 45:16, 45:18
**Professor** [2] - 205:7, 206:23
**professor** [2] - 12:8, 25:18
**profile** [1] - 79:6
**program** [28] - 104:6, 104:15, 104:20, 104:22, 105:7, 105:22, 105:23, 106:3, 106:6, 106:8, 106:9, 106:13, 106:14, 113:18, 114:1, 115:15, 116:8, 116:12, 116:16, 117:14, 126:15, 126:21, 140:20, 141:1, 189:4, 189:12, 189:14
**programs** [2] - 14:7, 14:8
**project** [1] - 167:1
**prolific** [2] - 23:2, 23:16
**promo** [5] - 189:8, 190:22, 192:10, 203:10, 204:2
**promote** [4] - 76:9, 76:10, 93:6, 189:9
**promoted** [1] - 166:1
**promoting** [1] - 98:25
**promotion** [3] - 14:7, 15:22, 166:25
**promotional** [3] - 78:7, 78:14, 78:22
**proof** [1] - 31:14
**properly** [1] - 107:15
**property** [2] - 5:9, 5:11
**protecting** [1] - 193:4
**protege** [1] - 79:18
**protocol** [1] - 174:14
**proud** [4] - 22:17, 23:15, 71:24, 95:8
**prove** [19] - 10:5, 10:7, 10:13, 10:14, 10:21, 12:16, 12:24, 13:2, 13:5, 13:10, 13:11, 14:19, 14:20, 15:1,

20:19, 20:20
**proved** [2] - 4:16, 133:17
**provide** [1] - 134:2
**provided** [4] - 55:9, 69:23, 162:7, 198:4
**provides** [3] - 64:14, 140:23, 190:19
**providing** [1] - 142:6
**province** [1] - 132:25
**proving** [1] - 10:12
**publish** [7] - 40:8, 65:1, 190:21, 194:13, 194:18, 197:8
**published** [1] - 12:9
**publisher** [1] - 65:6
**publishing** [1] - 164:22
**Publishing** [1] - 49:13
**pull** [3] - 61:13, 116:12, 116:16
**pulled** [1] - 173:23
**pulling** [1] - 116:15
**purchase** [4] - 16:14, 16:23, 16:24, 141:2
**purchased** [1] - 128:11
**purchasing** [2] - 147:12, 149:14
**purpose** [3] - 20:1, 98:20, 98:21
**purposes** [2] - 34:11, 156:9
**Purry** [1] - 49:14
**pursue** [2] - 20:10, 33:16
**put** [27] - 26:7, 28:11, 29:18, 29:22, 32:7, 74:10, 74:17, 89:19, 91:25, 97:23, 98:15, 104:7, 105:6, 106:4, 122:9, 122:21, 128:3, 156:17, 159:6, 159:21, 161:22, 161:24, 161:25, 179:13, 179:14, 185:18, 206:8
**puts** [1] - 6:14
**putting** [5] - 18:2, 51:6, 61:20, 106:21, 177:21

## Q

**qualified** [1] - 132:16
**questioned** [1] - 96:20
**questions** [19] - 43:25, 47:15, 67:13, 67:25,

68:12, 69:22, 70:21, 73:11, 74:15, 79:11, 87:16, 91:16, 96:23, 99:13, 108:11, 154:22, 194:1, 200:22, 204:5

**quick** [4] - 76:21, 99:17, 118:16, 189:25

**quicker** [1] - 205:1

**quite** [2] - 31:22, 89:23

**quotation** [1] - 79:10

**quote** [11] - 55:23, 55:24, 56:2, 56:3, 62:3, 62:5, 79:3, 79:7, 80:16, 86:9, 86:13

## R

**R&B** [3] - 111:8, 111:9, 115:13

**radio** [14] - 13:12, 14:7, 31:8, 31:11, 48:12, 48:15, 148:17, 165:21, 189:4, 189:8, 189:9, 189:12, 189:19, 189:23

**railroads** [1] - 184:7

**raise** [9] - 35:12, 87:1, 109:17, 132:9, 133:12, 144:21, 161:18, 169:10, 189:10

**raised** [1] - 161:10

**raising** [1] - 108:11

**rally** [1] - 178:12

**ran** [1] - 156:3

**randomly** [1] - 89:18

**rap** [46] - 5:18, 5:20, 5:21, 6:6, 6:16, 7:5, 7:8, 16:9, 16:12, 16:17, 18:19, 23:16, 30:22, 30:23, 37:3, 44:8, 44:11, 44:15, 57:23, 58:1, 58:5, 90:10, 90:13, 90:20, 111:8, 114:12, 115:13, 125:6, 127:18, 170:9, 170:12, 170:14, 170:15, 173:16, 174:10, 175:3, 175:4, 178:9, 180:24, 188:7, 199:21, 202:12, 202:14

**rap/hip** [1] - 200:18

**rapper** [1] - 36:23

**rapping** [1] - 188:2

**rarely** [1] - 10:23

**rather** [2] - 41:15, 108:3

**Re** [9] - 26:2, 26:3, 26:5, 27:5, 27:20, 28:8, 28:20

**reach** [7] - 160:6, 174:6, 175:23, 177:14, 178:21, 189:17, 189:18

**reached** [4] - 174:12, 178:8, 178:24, 201:9

**reaching** [1] - 175:12

**reaction** [3] - 40:17, 40:18, 40:25

**read** [30] - 55:19, 61:3, 61:25, 68:12, 73:19, 74:11, 74:17, 74:20, 79:3, 79:4, 79:10, 81:18, 86:8, 86:9, 86:13, 100:7, 137:2, 137:23, 139:18, 155:6, 159:2, 159:16, 162:6, 162:13, 163:19, 163:21, 167:5, 167:15, 209:1

**reading** [6] - 61:7, 73:20, 82:9, 87:12, 102:19, 171:17

**ready** [7] - 4:8, 35:6, 109:6, 160:23, 163:9, 179:16, 205:17

**real** [1] - 17:24

**realities** [1] - 32:25

**reality** [1] - 30:17

**realize** [2] - 14:23, 200:22

**really** [37] - 7:12, 12:4, 19:17, 28:12, 33:6, 38:25, 41:8, 43:19, 71:24, 78:15, 79:15, 89:22, 90:1, 90:2, 97:7, 97:14, 106:25, 108:25, 118:16, 124:14, 128:19, 161:25, 164:20, 164:24, 171:6, 171:15, 175:15, 176:2, 178:22, 179:2, 183:12, 198:20, 206:7, 207:13, 209:12, 209:17

**reason** [3] - 91:20, 203:16, 203:20

**reasonable** [11] -

11:23, 12:21, 13:8, 13:10, 14:15, 30:11, 31:17, 32:5, 32:22, 160:10, 205:23

**reasons** [1] - 20:18

**receive** [4] - 68:24, 126:18, 152:1, 182:11

**received** [13] - 40:6, 48:7, 50:17, 59:16, 68:22, 70:1, 80:15, 106:2, 143:13, 147:16, 167:6, 167:10, 194:17

**RECEIVED** [1] - 3:21

**receiving** [2] - 151:12, 203:18

**recently** [1] - 162:16

**recess** [8] - 67:15, 67:21, 102:11, 103:14, 103:15, 156:5, 156:6, 205:23

**recitation** [1] - 108:15

**recognition** [1] - 181:17

**recognize** [7] - 24:23, 81:2, 81:3, 122:13, 192:18, 194:21, 196:22

**recognizes** [1] - 10:24

**recollection** [10] - 51:6, 52:6, 55:1, 57:16, 57:19, 76:3, 83:22, 99:18, 139:20, 186:13

**reconcile** [1] - 198:13

**record** [42] - 15:18, 16:25, 17:3, 31:23, 35:16, 75:13, 78:17, 78:18, 79:11, 87:5, 93:3, 93:24, 93:25, 94:4, 94:22, 95:7, 109:21, 132:19, 132:20, 132:21, 157:20, 164:23, 169:14, 176:7, 176:18, 178:12, 179:2, 185:3, 188:3, 190:11, 190:12, 190:14, 190:17, 190:18, 190:20, 191:21, 191:25, 196:8, 198:19, 207:15, 208:18

**Record** [1] - 78:24

**record's** [1] - 78:5

**recorded** [6] - 24:12, 24:21, 24:22, 58:6, 72:1, 179:1

**recorder** [2] - 41:5,

176:18

**recording** [27] - 15:19, 19:2, 24:11, 24:12, 24:24, 25:4, 25:5, 25:13, 47:20, 50:21, 58:9, 73:5, 73:9, 91:6, 102:21, 102:22, 119:21, 119:22, 121:12, 132:4, 145:14, 145:17, 150:13, 150:17, 188:1, 188:7

**Recordings** [1] - 49:13

**recordings** [3] - 24:13, 53:8, 126:14

**Records** [14] - 15:17, 16:25, 20:5, 20:11, 49:12, 77:21, 83:1, 83:6, 190:15, 190:24, 195:25, 197:2, 197:11

**records** [7] - 20:7, 20:12, 20:13, 76:1, 158:2, 159:21, 176:10

**recross** [1] - 72:9

**RECROSS** [3] - 3:7, 72:12, 154:11

**RECROSS-EXAMINATION** [2] - 72:12, 154:11

**Redeem** [1] - 180:20

**Redeemed** [20] - 7:19, 33:13, 47:10, 48:23, 50:5, 53:14, 53:16, 111:15, 127:25, 128:4, 144:4, 170:4, 173:8, 173:11, 190:12, 191:9, 192:22, 196:8, 197:16, 201:1

**redid** [1] - 162:23

**redirect** [3] - 66:1, 67:16, 151:7

**REDIRECT** [3] - 3:7, 67:23, 151:8

**REDUCED** [1] - 210:13

**refer** [1] - 145:19

**reference** [3] - 20:24, 42:16, 81:19

**referenced** [1] - 52:15

**referred** [1] - 171:10

**referring** [1] - 23:19

**reflect** [1] - 16:20

**reflected** [2] - 24:19, 25:9

**reflecting** [5] - 47:19, 48:6, 52:18, 52:22,

147:21

**reflective** [1] - 37:22

**refresh** [1] - 186:13

**refusing** [1] - 18:25

**regarding** [6] - 34:12, 136:3, 137:15, 137:17, 151:11, 177:1

**regardless** [1] - 153:3

**region** [1] - 188:23

**register** [2] - 71:5, 71:7

**registered** [2] - 32:19, 145:6

**registering** [1] - 62:13

**registration** [12] - 10:14, 10:18, 19:19, 34:2, 62:11, 62:17, 62:21, 70:22, 145:9, 192:15, 192:21, 194:3

**registrations** [1] - 100:20

**regular** [3] - 115:6, 115:8, 170:15

**Reilly** [1] - 144:7

**relate** [1] - 157:18

**related** [1] - 157:1

**relation** [1] - 47:15

**release** [6] - 73:1, 78:3, 78:6, 78:13, 78:21, 79:1

**released** [17] - 7:18, 8:6, 53:13, 53:18, 76:2, 77:21, 78:4, 78:9, 78:19, 90:23, 93:10, 93:11, 180:13, 190:13, 190:14, 191:24, 196:8, 200:25

**releases** [1] - 78:7

**relevance** [9] - 75:3, 153:14, 172:10, 172:21, 179:22, 179:24, 199:8, 201:12, 201:24

**relevant** [2] - 201:14, 202:2

**religion** [2] - 172:8, 172:18

**religious** [4] - 16:6, 21:14, 172:7, 199:20

**remaining** [1] - 156:20

**remember** [13] - 25:7, 25:8, 55:4, 57:8, 57:9, 57:11, 57:14, 57:15, 57:19, 97:21, 98:13, 143:5, 153:20

**remembered** [1] - 141:12

removed [1] - 63:13
render [1] - 114:10
rendered [1] - 126:17
repeat [3] - 54:18, 145:15, 150:15
repeated [5] - 26:13, 27:11, 27:12, 27:22
repeatedly [1] - 20:25
repeats [1] - 22:7
rephrase [1] - 196:5
replaced [1] - 143:8
REPORTED [1] - 210:11
reporter [2] - 82:12, 132:21
REPORTER [10] - 1:22, 139:25, 140:3, 205:3, 208:8, 208:17, 208:21, 210:3, 210:9, 210:23
REPORTER'S [1] - 1:14
represent [1] - 59:13
represented [2] - 67:7, 193:7
representing [1] - 37:23
request [1] - 197:3
required [2] - 71:4, 71:10
reread [1] - 86:2
reserve [1] - 105:1
reserving [3] - 158:12, 160:2, 164:2
resolve [2] - 103:11, 205:11
resolved [3] - 109:3, 158:22, 207:10
resonates [1] - 190:6
respect [5] - 28:9, 30:13, 31:7, 108:17, 159:7
respectfully [1] - 158:5
respectively [1] - 105:4
responds [1] - 171:21
response [4] - 15:24, 105:11, 161:11, 187:17
responsible [2] - 161:7, 162:3
rest [8] - 15:15, 18:4, 155:11, 155:25, 174:24, 179:7, 204:24
restaurant [1] - 11:8
resting [1] - 156:24
result [1] - 84:5
retailers [1] - 128:10

retain [1] - 139:3
retained [2] - 139:3
retainer [2] - 59:12, 59:16
return [3] - 35:3, 91:12, 102:12
revealed [1] - 29:14
revenue [1] - 49:4
revenues [1] - 15:9
Reverend [1] - 98:1
review [3] - 161:12, 185:9, 204:9
reviewed [1] - 63:21
revise [1] - 162:9
revised [1] - 66:7
revisiting [1] - 186:18
Rhianna [1] - 23:3
rhythm [1] - 24:17
rhythmic [1] - 27:19
rights [24] - 6:25, 9:7, 15:22, 20:14, 25:11, 34:7, 66:12, 67:11, 107:5, 107:10, 107:17, 107:21, 112:24, 113:6, 113:9, 113:11, 124:1, 136:3, 168:24, 168:25, 194:24, 195:11, 196:16
rise [3] - 33:2, 109:9, 155:21, 163:11, 204:19
road [1] - 192:11
ROAD [1] - 2:11
Roar [4] - 78:3, 82:18, 83:13, 83:22
rock [2] - 165:8, 178:10
role [10] - 23:25, 24:1, 56:13, 68:21, 69:7, 74:2, 83:25, 99:16, 164:11, 168:14
roles [1] - 168:14
Roll [1] - 28:18
roof [1] - 18:1
ROOM [1] - 1:23
room [3] - 120:14, 168:19, 173:24
roughly [4] - 80:1, 118:2, 186:24, 206:24
Royal [1] - 201:7
royalty [1] - 192:9
rule [1] - 155:10
ruled [1] - 103:5
ruling [2] - 107:4, 162:15
run [5] - 155:11, 156:2, 163:15,

189:8, 203:11
Russell [1] - 45:15

# S

sad [1] - 17:1
sadly [1] - 16:21
sale [3] - 16:22, 16:23, 128:6
sales [15] - 15:22, 16:20, 16:21, 16:24, 17:4, 17:8, 20:6, 20:8, 20:16, 21:11, 29:23, 78:18, 147:21, 191:9, 191:14
SAME [1] - 210:13
sample [1] - 25:13
Sandberg [1] - 45:14
sandwich [1] - 11:16
Santa [9] - 79:13, 88:2, 88:17, 89:25, 93:21, 96:24, 101:18, 167:7, 167:22
Sarah [11] - 15:6, 18:14, 45:17, 89:7, 99:13, 156:21, 158:15, 158:20, 159:16, 160:14, 163:22
SARAH [1] - 3:13
sat [1] - 32:15
save [1] - 113:25
saw [7] - 16:22, 48:7, 52:9, 107:8, 128:9
scale [2] - 26:3, 26:4
scenario [1] - 34:10
schedule [2] - 95:5, 207:25
scheduling [4] - 17:22, 156:9, 156:15, 156:18
School [1] - 25:17
school [9] - 36:1, 36:2, 36:5, 36:7, 36:9, 37:1, 129:12, 164:21, 172:19
science [1] - 36:14
scope [1] - 199:10
Scott [1] - 28:4
scour [1] - 173:16
screen [7] - 61:8, 61:20, 86:17, 86:18, 86:19, 105:16, 151:20
screenshot [5] - 105:17, 105:21, 106:4, 184:24, 184:25

screenshots [1] - 157:25
scroll [3] - 64:4, 64:14, 197:15
Seabrook [1] - 79:7
search [2] - 34:19, 166:22
searching [3] - 22:6, 96:16, 96:17
Seasack [1] - 65:6
seated [8] - 35:14, 87:3, 109:11, 109:19, 155:23, 163:13, 169:12, 204:21
seating [1] - 5:4
second [10] - 9:24, 16:18, 17:20, 27:12, 27:22, 77:20, 78:6, 92:13, 93:17, 123:18
seconds [10] - 9:14, 9:25, 80:19, 80:22, 81:13, 81:17, 85:19, 183:20, 183:24
Secret [1] - 79:16
secular [2] - 100:6, 199:18
Securities [1] - 104:15
security [3] - 103:22, 103:23, 105:25
see [38] - 7:19, 10:16, 10:18, 11:10, 13:17, 13:20, 15:2, 15:17, 16:16, 18:13, 22:4, 27:9, 27:10, 33:4, 37:7, 39:17, 65:8, 89:20, 94:10, 102:15, 103:10, 112:15, 128:6, 128:8, 144:4, 144:6, 144:12, 151:24, 166:3, 174:7, 184:16, 184:20, 184:25, 190:21, 197:15, 199:19, 200:9
seeing [1] - 48:19
sell [3] - 9:7, 112:24, 113:2
selling [2] - 15:20, 140:14
semi [1] - 42:9
semi-leading [1] - 42:9
send [8] - 46:14, 47:2, 134:25, 147:4, 159:3, 178:24, 191:12, 193:3
sending [4] - 46:19, 47:5, 146:13, 147:8

sense [10] - 21:19, 21:21, 29:19, 31:18, 32:24, 33:4, 35:3, 53:2, 132:12, 207:6
sent [16] - 46:8, 46:12, 46:24, 49:20, 49:24, 126:5, 126:6, 126:7, 126:16, 137:16, 146:8, 146:16, 149:1, 149:5, 149:9, 179:1
sentence [1] - 77:20
separate [7] - 24:24, 29:1, 126:13, 126:17, 142:6, 145:3, 182:10
separately [1] - 149:6
September [2] - 78:8
seriatim [1] - 19:9
series [2] - 69:22, 171:15
serious [4] - 89:24, 97:13, 175:15
seriously [2] - 23:17, 90:2
session [6] - 81:25, 113:22, 113:24, 113:25, 114:7, 114:9
SET [1] - 210:12
set [6] - 31:24, 52:18, 52:22, 52:24, 53:1, 189:16
setbacks [1] - 50:17
seven [6] - 12:14, 28:10, 49:11, 80:4, 94:9, 148:23
several [1] - 67:2
shape [1] - 81:6
share [10] - 19:6, 64:14, 68:15, 71:15, 72:15, 93:16, 152:22, 174:24, 196:2
sheet [1] - 24:19
shift [1] - 167:3
shirt [1] - 11:13
shooting [1] - 128:22
short [10] - 26:12, 65:23, 67:14, 75:2, 155:6, 155:9, 155:16, 156:21, 164:18, 189:8
shortage [1] - 5:4
shorter [1] - 205:11
shortly [1] - 185:6
shot [2] - 128:23, 171:23
show [40] - 16:4, 16:13, 18:12, 19:10, 19:17, 19:18, 19:23,

23:1, 26:25, 29:14, 30:10, 30:14, 30:16, 30:25, 32:17, 34:9, 43:20, 63:16, 64:24, 82:5, 95:8, 101:4, 101:7, 105:6, 105:16, 105:20, 120:7, 121:6, 128:13, 147:14, 150:24, 151:2, 171:8, 183:18, 183:20, 184:25, 192:17, 193:1, 201:15

**showed** [4] - 95:8, 105:17, 119:15, 119:16

**shower** [1] - 89:18

**showing** [4] - 50:15, 50:19, 53:4, 105:21

**shown** [3] - 119:19, 119:20, 128:3

**shows** [9] - 29:4, 30:13, 84:13, 95:7, 95:14, 166:3, 171:5, 187:3, 195:13

**side** [3] - 4:16, 84:10, 125:21

**sides** [5] - 17:16, 17:17, 19:18, 28:9, 105:13

**Sight** [3] - 191:7, 191:23, 191:24

**sign** [3] - 17:2, 59:17

**signature** [3] - 64:5, 64:10

**signed** [11] - 59:12, 64:8, 66:4, 66:24, 67:2, 67:4, 67:7, 93:24, 124:22, 139:21, 164:22

**significant** [1] - 21:6

**signing** [1] - 67:8

**Silberberg** [1] - 163:24

**SILBERBERG** [1] - 2:15

**silent** [1] - 135:25

**similar** [15] - 12:2, 12:15, 12:22, 31:20, 69:19, 127:21, 132:9, 132:13, 133:3, 134:1, 134:6, 154:3, 174:9, 182:8, 198:16

**similarities** [2] - 28:11, 131:25

**similarity** [3] - 12:4, 12:23, 198:14

**similarly** [2] - 20:3,

185:12

**simple** [4] - 26:25, 29:5, 29:9, 41:8

**simplistic** [1] - 28:20

**simply** [11] - 15:1, 18:22, 21:16, 29:1, 32:2, 33:22, 104:10, 105:16, 159:21, 160:4

**sing** [3] - 97:19, 111:8, 183:12

**singers** [1] - 8:22

**singing** [8] - 84:1, 89:13, 92:21, 97:18, 97:19, 164:15, 164:16, 164:20

**single** [9] - 78:4, 78:6, 78:10, 78:14, 78:22, 148:6, 148:9, 189:2

**singles** [2] - 78:7, 176:9

**sir** [1] - 65:11

**sister** [2] - 99:14, 181:9

**sister-in-law** [1] - 181:9

**sit** [5] - 70:5, 81:24, 161:19, 176:1, 205:22

**site** [1] - 150:5

**Site** [1] - 190:25

**sites** [3] - 32:10, 199:24, 202:3

**sitting** [5] - 18:16, 22:24, 55:4, 62:18, 96:25

**situation** [7] - 113:1, 136:13, 136:14, 136:19, 138:25, 140:17, 140:18

**situations** [1] - 113:5

**six** [13] - 8:20, 15:11, 15:12, 18:17, 24:5, 27:21, 45:13, 67:4, 85:10, 139:7, 145:20, 146:6, 164:25

**Sixth** [1] - 201:7

**size** [6] - 79:20, 80:1, 80:10, 81:5, 100:7, 178:21

**sky** [1] - 97:15

**slide** [3] - 28:3, 28:16, 32:18

**slides** [1] - 32:7

**slightly** [1] - 57:5

**slow** [1] - 11:9

**small** [2] - 88:5, 177:25

**smaller** [2] - 68:24,

83:15

**snafus** [1] - 163:16

**snap** [1] - 117:24

**snaps** [1] - 174:3

**snare** [2] - 116:17, 117:24

**snippet** [1] - 190:10

**Snoop** [1] - 90:17

**SNYDER** [1] - 1:4

**so-called** [1] - 15:18

**Social** [1] - 36:4

**social** [2] - 98:23, 197:25

**SOKOL** [1] - 2:5

**Sol** [2] - 26:3, 26:4

**sold** [10] - 6:25, 16:21, 17:5, 17:6, 33:9, 48:23, 49:1, 93:8, 141:16, 149:20

**someone** [9] - 22:14, 31:17, 69:23, 70:1, 70:6, 74:21, 111:2, 143:7, 173:19

**sometime** [2] - 98:11, 167:16

**sometimes** [8] - 14:7, 53:24, 112:24, 113:2, 163:15, 163:16, 189:14

**somewhat** [1] - 18:14

**somewhere** [3] - 129:1, 184:10, 206:12

**song** [228] - 5:1, 5:2, 5:8, 5:16, 5:18, 5:20, 6:7, 6:23, 7:1, 7:13, 7:15, 7:17, 7:21, 7:23, 7:24, 7:25, 8:3, 8:6, 8:17, 8:19, 8:20, 8:21, 8:24, 9:1, 9:6, 9:9, 9:14, 9:16, 9:23, 9:24, 10:7, 10:8, 10:23, 11:3, 13:7, 13:9, 13:14, 13:15, 13:22, 14:9, 14:11, 14:14, 14:15, 14:21, 15:3, 15:8, 15:9, 15:10, 15:12, 15:13, 15:16, 15:20, 15:22, 16:4, 16:16, 17:5, 18:18, 19:8, 19:21, 20:1, 20:8, 22:8, 22:12, 23:2, 23:13, 27:16, 30:7, 30:12, 33:4, 34:7, 38:20, 38:23, 39:25, 41:2, 41:3, 41:14, 41:15, 42:5, 42:12, 42:13, 42:16, 43:1, 43:10, 43:13, 52:21, 52:25,

53:3, 53:21, 64:1, 66:3, 66:5, 66:24, 68:15, 68:22, 69:2, 69:12, 69:20, 70:1, 70:6, 72:16, 72:17, 73:4, 81:3, 82:24, 85:9, 85:22, 87:24, 88:19, 88:22, 89:13, 90:8, 90:9, 90:16, 90:17, 90:22, 91:17, 92:13, 92:19, 92:25, 93:1, 93:12, 94:1, 94:8, 94:12, 96:11, 98:15, 99:5, 100:24, 100:25, 101:22, 101:23, 102:2, 107:16, 107:20, 107:23, 110:25, 111:3, 111:17, 111:18, 112:22, 112:25, 113:6, 114:13, 114:16, 114:23, 115:1, 116:21, 116:23, 116:24, 123:1, 123:15, 124:4, 124:6, 124:24, 125:6, 126:8, 126:19, 127:20, 129:7, 132:10, 133:11, 139:14, 142:19, 143:13, 144:17, 146:11, 152:17, 152:18, 152:20, 152:22, 153:5, 154:3, 154:4, 154:5, 154:6, 164:12, 167:12, 167:15, 167:24, 168:20, 168:21, 168:24, 173:5, 173:18, 173:25, 175:8, 175:13, 175:15, 175:18, 178:19, 178:20, 179:8, 179:10, 179:18, 179:20, 180:2, 180:6, 180:8, 180:13, 180:16, 180:20, 180:24, 180:25, 182:12, 182:13, 182:25, 183:5, 183:13, 183:19, 187:18, 187:19, 188:15, 190:6, 190:9, 190:10, 191:9, 197:22, 198:1, 198:9, 198:11, 198:12, 198:16, 199:21, 199:22,

200:11

**songs** [45] - 5:22, 7:6, 8:17, 12:19, 12:22, 13:15, 23:14, 26:19, 27:19, 32:20, 37:24, 71:25, 77:24, 79:8, 79:9, 80:7, 82:17, 85:5, 85:20, 90:3, 90:12, 91:25, 92:2, 92:4, 92:11, 92:15, 93:17, 93:23, 93:24, 95:1, 111:5, 111:8, 113:4, 113:8, 133:3, 133:19, 164:21, 167:13, 170:22, 174:10, 190:4, 197:16, 200:25

**songwriter** [1] - 124:20

**songwriting** [3] - 164:15, 164:16, 165:2

**soon** [2] - 98:6

**sophisticated** [1] - 162:12

**sorry** [12] - 54:18, 60:16, 65:22, 77:2, 82:4, 84:18, 102:22, 139:25, 161:16, 198:23, 205:3, 208:8

**sort** [9] - 6:10, 74:19, 87:16, 87:23, 98:1, 101:21, 138:25, 164:24, 165:1

**sought** [1] - 198:12

**soul** [2] - 97:25, 127:18

**sound** [35] - 13:17, 19:2, 24:11, 24:12, 25:3, 25:4, 25:13, 37:6, 88:14, 88:15, 88:21, 91:6, 94:12, 102:2, 102:20, 102:21, 116:13, 116:14, 117:13, 117:18, 118:23, 124:19, 132:4, 145:14, 145:17, 154:5, 165:10, 166:9, 166:10, 173:14, 174:2, 176:23, 177:17, 178:9, 179:16

**sounded** [2] - 12:22, 37:7

**sounds** [14] - 88:8, 116:20, 117:4, 117:15, 118:2, 140:25, 141:1, 141:3, 141:6,

145:11, 154:3, 154:4, 159:4, 180:10
**source** [1] - 150:18
**sources** [1] - 165:23
**south** [1] - 188:25
**southern** [1] - 188:23
**space** [1] - 178:1
**spaced** [1] - 27:19
**sparked** [1] - 88:12
**Sparrow** [1] - 97:20
**speakers** [1] - 174:1
**speaking** [6] - 60:10, 66:7, 89:7, 144:22, 201:18, 209:18
**Spears** [1] - 23:3
**special** [4] - 5:9, 7:12, 39:1, 176:11
**specialize** [1] - 177:16
**specific** [5] - 30:8, 31:9, 31:11, 31:16, 31:24
**specifically** [5] - 23:6, 24:6, 27:14, 111:10, 154:4
**specifics** [2] - 32:16, 106:9
**speculation** [2] - 70:7, 152:8
**spell** [4] - 35:15, 87:4, 109:20, 169:13
**spelled** [4] - 35:18, 87:7, 109:23, 169:17
**spend** [1] - 83:4
**spill** [2] - 205:15, 206:6
**split** [7] - 42:16, 43:8, 64:1, 66:3, 66:24, 124:20, 195:21
**splitting** [1] - 68:21
**spoken** [3] - 46:1, 145:2, 146:3
**spots** [1] - 199:23
**Spring** [1] - 167:16
**SS** [1] - 210:6
**St** [5] - 28:18, 128:23, 130:13, 131:7, 178:19
**ST** [1] - 2:8
**Stage** [1] - 5:23
**stage** [2] - 37:17, 129:1
**stand** [4] - 35:8, 74:20, 86:24, 169:8
**standard** [3] - 7:3, 175:15, 195:20
**standing** [1] - 163:16
**starring** [1] - 84:1
**start** [19] - 24:7, 44:6, 61:1, 68:1, 73:20, 75:8, 87:17, 89:16,

89:18, 104:10, 157:10, 159:17, 164:16, 176:13, 181:2, 201:20, 204:9, 204:15, 207:12
**started** [13] - 19:7, 37:6, 54:10, 56:22, 77:1, 77:2, 84:10, 92:21, 164:20, 164:23, 165:1, 172:3, 176:20
**starting** [1] - 88:1
**starts** [3] - 10:1, 176:16, 177:20
**state** [6] - 4:6, 35:15, 75:13, 87:4, 109:20, 169:13
**STATE** [1] - 210:7
**statement** [6] - 4:14, 4:15, 30:24, 86:3, 108:4, 198:25
**STATEMENTS** [1] - 3:2
**states** [1] - 188:22
**STATES** [4] - 1:1, 1:1, 1:4, 210:10
**station** [1] - 31:18
**stations** [6] - 189:8, 189:9, 189:19, 189:20
**statistics** [1] - 32:11
**Stella** [2] - 180:22
**Stellar** [7] - 8:8, 38:13, 38:14, 181:13, 182:9, 182:21, 182:22
**STENOGRAPHIC** [1] - 210:16
**STENOGRAPHICALLY** [1] - 210:17
**step** [4] - 73:14, 102:9, 122:20, 155:1
**still** [15] - 6:1, 6:3, 40:18, 68:2, 76:25, 77:4, 87:11, 111:11, 129:14, 168:25, 190:24, 194:6, 195:17, 195:18
**stipulate** [4] - 104:18, 133:15, 134:5, 134:8
**stipulated** [3] - 160:2, 185:14, 193:12
**stipulation** [2] - 158:12, 159:25
**stipulations** [1] - 185:13
**stop** [6] - 39:4, 97:6, 100:1, 156:16, 156:24, 162:15

**stopped** [1] - 99:21
**store** [1] - 149:21
**stores** [7] - 7:21, 16:23, 29:25, 30:1, 128:6, 190:22
**storm** [1] - 204:2
**story** [10] - 5:15, 5:16, 17:1, 20:5, 20:6, 84:2, 94:10, 105:9, 164:18, 173:15
**STREET** [1] - 1:23
**strengths** [1] - 88:24
**stress** [1] - 70:11
**strictly** [1] - 27:8
**strike** [3] - 54:23, 84:18, 152:25
**structure** [1] - 81:9
**structured** [1] - 19:25
**stuck** [1] - 14:21
**student** [1] - 154:15
**Studies** [2] - 36:5, 36:6
**Studio** [4] - 113:18, 115:16, 116:8, 126:16
**studio** [11] - 79:15, 94:3, 94:16, 120:16, 167:7, 167:12, 167:23, 167:25, 168:2, 168:4, 179:11
**Studios** [13] - 103:21, 104:20, 104:22, 105:22, 106:4, 106:12, 106:14, 106:16, 119:9, 119:17, 126:20, 140:21, 140:23
**study** [5] - 6:20, 36:4, 123:12, 172:18, 174:5
**studying** [1] - 36:11
**stuff** [10] - 29:21, 29:22, 37:1, 100:21, 104:10, 125:18, 126:22, 156:2, 206:16, 209:12
**stumble** [1] - 205:20
**stumbled** [2] - 36:24, 205:20
**style** [1] - 170:17
**styling** [1] - 37:3
**subconsciously** [1] - 22:15
**subject** [1] - 133:6
**subjecting** [1] - 107:13
**submit** [3] - 22:11, 30:10
**subsequent** [1] - 141:18

**substantial** [2] - 12:4, 12:23
**substantially** [3] - 12:2, 12:15, 134:1
**successful** [1] - 93:4
**sue** [2] - 20:15, 34:1
**sued** [5] - 45:13, 49:11, 99:8, 145:21, 148:23
**sues** [1] - 34:5
**suggest** [12] - 12:16, 13:21, 30:17, 107:5, 107:21, 108:15, 108:21, 159:6, 160:5, 160:12, 204:7
**suggesting** [3] - 30:5, 30:6, 133:22
**suing** [1] - 20:2
**suit** [1] - 153:23
**SUITE** [2] - 2:11, 2:23
**summarize** [2] - 179:19, 180:4
**summary** [1] - 180:2
**Summer** [2] - 167:16, 167:18
**sung** [1] - 24:14
**super** [1] - 118:15
**Super** [7] - 84:23, 85:5, 85:13, 91:15, 91:24, 97:12, 100:8
**suppose** [2] - 79:9, 102:20, 159:8
**supposed** [1] - 28:10
**surely** [1] - 187:1
**surge** [1] - 197:24
**surprise** [1] - 148:10
**sustain** [3] - 75:4, 153:1, 198:6
**sustained** [6] - 100:13, 100:14, 153:15, 193:11, 202:6, 202:22
**swore** [1] - 55:12
**sworn** [4] - 35:13, 87:2, 109:18, 169:11
**sync** [1] - 38:19
**synonyms** [1] - 89:1
**synth** [1] - 116:13
**synthesizer** [1] - 143:8
**system** [1] - 105:25

**T**

**tags** [1] - 197:25
**tale** [1] - 191:3
**talent** [1] - 37:8
**talented** [2] - 23:13, 178:23
**talks** [3] - 21:5, 21:6,

78:2
**teaching** [2] - 93:23, 110:16
**team** [9] - 78:23, 78:25, 82:25, 83:1, 83:5, 86:12, 92:11, 100:22
**teaser** [1] - 78:17
**tech** [1] - 91:11
**technical** [1] - 90:23
**technology** [1] - 104:13
**Teenage** [1] - 94:21
**teenage** [1] - 96:18
**teenager** [2] - 94:5, 96:14
**telephone** [1] - 58:16
**televised** [5] - 182:19, 182:20, 182:22, 182:24, 183:2
**television** [4] - 13:12, 31:9, 31:12, 189:20
**tempo** [3] - 6:13, 117:16, 118:25
**ten** [1] - 94:9
**tend** [1] - 206:5
**Tennessee** [4] - 92:24, 92:25, 181:21, 182:17
**Teresa** [1] - 163:22
**term** [2] - 8:4, 113:21
**terms** [7] - 31:23, 66:5, 172:15, 175:5, 178:21, 192:11, 195:22
**testament** [1] - 171:18
**tested** [1] - 104:21
**testified** [7] - 65:18, 74:12, 99:16, 136:17, 137:4, 153:17, 166:21
**testifies** [1] - 74:18
**testify** [4] - 18:20, 97:8, 103:20, 136:21
**testifying** [5] - 18:18, 74:13, 74:21, 121:11, 155:7
**testimony** [35] - 5:6, 31:15, 55:9, 64:25, 72:14, 72:19, 74:10, 74:19, 87:17, 87:21, 94:24, 98:18, 107:6, 136:5, 137:11, 138:7, 138:11, 140:8, 140:19, 143:5, 148:6, 153:4, 156:9, 157:19, 158:20, 160:7, 160:9, 163:19, 163:22, 164:2,

177:1, 193:10, 195:9, 198:4, 207:20
**text** [6] - 46:5, 167:6, 167:10, 167:17, 167:20, 167:21
**texted** [1] - 146:5
**texts** [1] - 60:1
**texture** [9] - 6:13, 102:2, 107:16, 107:19, 108:1, 108:7, 108:8, 108:13, 108:20
**THAN** [1] - 2:13
**THAT** [3] - 210:11, 210:13, 210:15
**THE** [264] - 2:19, 3:6, 3:17, 4:3, 4:8, 4:10, 4:13, 18:7, 22:22, 31:1, 31:4, 35:6, 35:10, 35:12, 35:14, 35:17, 39:14, 40:6, 40:10, 40:23, 41:19, 42:8, 44:1, 55:21, 60:10, 61:11, 61:15, 61:19, 61:24, 63:18, 63:22, 65:2, 65:22, 65:25, 67:14, 67:22, 70:8, 70:9, 72:8, 72:10, 73:12, 73:14, 73:24, 74:1, 74:5, 75:2, 75:7, 80:24, 86:23, 87:1, 87:3, 87:6, 87:8, 91:5, 91:9, 91:10, 98:7, 100:14, 101:12, 102:9, 103:1, 103:7, 103:14, 103:16, 103:18, 105:10, 105:19, 106:17, 106:19, 107:2, 107:6, 107:8, 107:18, 107:20, 108:6, 108:10, 108:23, 108:25, 109:3, 109:6, 109:7, 109:9, 109:11, 109:12, 109:15, 109:17, 109:19, 109:22, 109:24, 114:20, 119:22, 120:4, 120:12, 120:17, 121:1, 121:2, 121:3, 121:10, 121:15, 125:12, 125:15, 125:17, 125:22, 132:17, 133:1, 133:5, 133:9, 133:20, 134:4, 134:9, 134:18,

135:10, 135:11, 135:15, 135:17, 136:25, 137:2, 137:24, 139:18, 139:25, 140:3, 142:23, 143:24, 151:7, 152:9, 152:25, 153:15, 153:18, 154:8, 154:10, 154:23, 155:1, 155:3, 155:4, 155:9, 155:13, 155:17, 155:20, 155:21, 155:23, 155:24, 156:4, 156:5, 156:7, 157:3, 157:11, 158:14, 158:18, 158:25, 159:14, 160:5, 160:12, 160:16, 160:20, 160:22, 160:23, 160:24, 161:2, 161:4, 161:15, 161:16, 161:17, 161:20, 161:24, 162:5, 162:11, 162:20, 162:25, 163:2, 163:6, 163:8, 163:9, 163:10, 163:11, 163:13, 163:14, 164:1, 164:6, 165:13, 165:18, 169:3, 169:5, 169:7, 169:10, 169:12, 169:16, 169:18, 169:19, 169:20, 172:11, 172:14, 172:22, 172:25, 173:3, 174:19, 174:20, 179:23, 180:3, 183:21, 185:8, 185:20, 193:11, 193:12, 193:17, 193:21, 193:23, 193:25, 194:14, 194:17, 196:5, 197:6, 197:9, 198:6, 198:21, 198:23, 199:9, 199:12, 199:14, 200:1, 200:6, 200:8, 200:23, 201:13, 201:17, 201:20, 201:23, 202:6, 202:22, 202:25, 203:14, 203:21, 204:7, 204:13, 204:19, 204:21, 204:22, 205:3, 205:4, 205:9,

205:16, 205:19, 206:3, 206:11, 206:18, 207:4, 207:8, 207:12, 208:8, 208:10, 208:17, 208:20, 208:21, 208:23, 209:3, 209:7, 209:10, 209:20, 209:22, 210:1, 210:9, 210:10, 210:11, 210:12, 210:13
**theme** [11] - 81:15, 89:2, 108:16, 176:21, 176:23, 180:2, 180:3, 180:6, 180:9, 184:6
**themes** [1] - 88:13
**themselves** [2] - 29:8, 31:14
**Theology** [1] - 173:2
**theory** [3] - 28:13, 37:1, 154:16
**thereafter** [2] - 33:24, 113:4
**THEREAFTER** [1] - 210:13
**therefore** [2] - 91:25, 105:1
**thereof** [1] - 108:15
**Theresa** [1] - 45:17
**they've** [4] - 21:11, 23:15, 96:8, 104:19
**thinking** [3] - 31:18, 176:10, 179:13
**thinks** [1] - 133:11
**third** [5] - 7:7, 78:2, 78:9, 106:7
**THIS** [1] - 210:15
**three** [26] - 4:22, 5:3, 5:4, 5:6, 5:17, 8:11, 8:15, 10:19, 27:1, 34:6, 38:15, 63:10, 68:7, 78:10, 93:17, 93:24, 93:25, 94:20, 95:17, 130:11, 147:25, 192:23, 194:24, 195:4, 195:10
**three-month** [1] - 95:17
**throughout** [4] - 10:5, 19:6, 21:13, 125:2
**thumb's** [1] - 183:11
**thumbing** [1] - 173:23
**THURSDAY** [2] - 1:15, 4:1
**Ti** [2] - 26:3, 26:4
**tie** [1] - 22:5

**timber** [2] - 117:18, 119:2
**TIME** [1] - 210:12
**timing** [1] - 167:17
**title** [4] - 89:2, 168:19, 175:9, 180:8
**titled** [1] - 173:13
**titles** [1] - 88:13
**TO** [1] - 210:13
**today** [39] - 4:23, 5:14, 5:25, 10:3, 10:20, 16:9, 17:19, 34:6, 55:15, 62:18, 70:5, 72:4, 72:5, 74:9, 81:24, 85:25, 89:10, 111:11, 125:3, 156:10, 156:14, 156:20, 157:4, 160:8, 160:17, 162:23, 164:11, 177:22, 178:11, 195:4, 198:18, 202:10, 204:8, 204:15, 205:1, 205:20, 205:23, 206:7
**Todd** [1] - 12:6
**together** [19] - 6:14, 9:23, 15:15, 33:24, 52:11, 88:19, 92:2, 96:6, 112:22, 123:12, 167:12, 168:17, 173:22, 176:24, 177:23, 179:10, 188:14, 188:16, 188:19
**toilet** [1] - 18:3
**tomorrow** [12] - 155:8, 155:15, 160:8, 160:18, 202:11, 204:10, 204:15, 204:24, 205:14, 205:25, 207:14
**tonight** [1] - 209:13
**took** [15] - 10:8, 33:22, 37:8, 41:8, 77:11, 99:17, 105:17, 141:8, 141:9, 162:9, 168:13, 177:2, 177:3, 181:9, 185:23
**Tools** [1] - 126:15
**Top** [1] - 8:15
**top** [7] - 8:15, 8:16, 8:17, 23:2, 89:17, 181:15
**tops** [1] - 18:1
**total** [1] - 84:13
**touching** [2] - 97:15, 192:13
**Tour** [5] - 84:9, 95:6,

95:12, 95:23, 95:24
**tour** [9] - 84:10, 94:12, 95:2, 95:5, 95:10, 166:24, 170:25, 188:17, 188:19
**toured** [3] - 52:3, 95:24, 188:14
**tours** [3] - 95:14, 170:24, 189:4
**town** [3] - 14:6, 189:10, 190:6
**track** [28] - 13:16, 26:16, 39:5, 39:10, 39:24, 40:19, 53:23, 57:2, 57:6, 80:14, 80:18, 143:3, 148:9, 168:6, 168:8, 168:9, 168:10, 173:24, 174:1, 174:2, 176:2, 176:10, 176:15, 176:19, 177:16, 178:11, 179:11, 188:3
**track's** [1] - 174:6
**tracking** [1] - 202:3
**tracks** [8] - 12:1, 78:7, 144:3, 145:12, 148:7, 173:24, 176:11, 201:22
**traditional** [1] - 98:2
**traffic** [1] - 11:9
**trail** [1] - 33:4
**trainer** [1] - 110:16
**training** [1] - 70:24
**transcended** [1] - 202:13
**TRANSCRIPT** [1] - 1:14
**transcript** [8] - 68:2, 87:13, 156:21, 157:1, 157:5, 159:3, 161:1, 161:6
**transcription** [1] - 82:10
**TRANSCRIPTION** [2] - 210:14, 210:15
**transcripts** [3] - 135:14, 158:22, 161:9
**TRAURIG** [1] - 2:21
**travel** [1] - 52:11
**traveled** [2] - 95:9, 189:3
**traveling** [1] - 197:23
**travels** [1] - 192:11
**treat** [2] - 74:12, 74:20
**treatment** [2] - 183:11
**trial** [10] - 4:17, 5:2, 17:11, 17:12, 24:9, 28:4, 91:12, 104:19,

162:9, 206:2
**trials** [4] - 17:10, 17:24, 163:15
**tried** [2] - 37:7, 156:2
**trillion** [4] - 21:25, 32:12, 148:11, 148:14
**trillions** [2] - 34:22
**trip** [2] - 177:2, 177:3
**Trojan** [1] - 89:4
**trouble** [2] - 171:20, 171:23
**true** [6] - 9:19, 16:22, 52:2, 52:5, 52:8, 187:9
**TRUE** [1] - 210:15
**trumpets** [2] - 6:11, 116:4
**trust** [2] - 35:2, 148:24
**Truth** [11] - 7:9, 15:5, 37:14, 37:15, 37:18, 65:6, 165:5, 166:8, 166:10, 177:15
**truth** [5] - 55:12, 72:2, 93:15, 203:2, 203:18
**truthful** [2] - 55:16, 55:17
**try** [18] - 13:5, 16:15, 22:22, 38:19, 74:6, 78:18, 96:25, 114:6, 115:19, 132:21, 153:18, 159:21, 186:13, 194:1, 203:15, 205:23, 207:17, 209:16
**trying** [11] - 38:24, 70:11, 97:1, 105:16, 120:2, 159:1, 191:5, 203:15, 206:12, 207:25, 208:1
**tuck** [1] - 26:8
**Tuesday** [2] - 206:1, 206:6
**turn** [14] - 28:16, 68:4, 68:11, 76:5, 137:21, 139:15, 142:20, 144:2, 151:21, 171:8, 186:2, 190:11, 200:20
**turns** [2] - 101:24, 174:1
**TV** [9] - 14:7, 17:9, 17:10, 17:11, 43:19, 86:18, 100:8, 151:2, 189:14
**twice** [2] - 27:22, 52:7
**twilight** [1] - 102:3
**two** [58] - 11:21, 12:4, 12:14, 12:21, 12:22, 14:22, 19:15, 19:22,

21:17, 26:25, 27:1, 27:5, 27:12, 27:18, 27:21, 28:9, 28:20, 29:1, 29:3, 32:20, 33:16, 38:16, 41:1, 77:9, 78:6, 83:23, 84:25, 85:15, 88:2, 90:20, 95:15, 95:16, 108:1, 108:20, 117:23, 118:18, 130:11, 130:20, 133:18, 141:14, 147:23, 147:25, 157:20, 158:12, 159:19, 159:25, 160:4, 167:12, 173:13, 177:23, 185:13, 195:9, 200:20, 206:9, 207:7
**type** [9] - 5:21, 44:7, 44:10, 88:14, 115:10, 137:14, 138:2, 164:24, 180:11
**types** [10] - 6:13, 11:21, 12:4, 16:5, 16:6, 95:22, 115:12, 127:16, 171:1, 186:7
**TYPEWRITTEN** [1] - 210:13
**typical** [2] - 173:16, 189:23
**typically** [4] - 88:25, 89:16, 170:11, 189:7
**Tyrone** [1] - 169:16

## U

**ultimate** [1] - 87:24
**ultimately** [7] - 24:4, 26:16, 34:10, 80:7, 88:1, 90:22, 94:2
**Ultra** [3] - 165:10, 166:9, 166:10
**UMG** [1] - 49:13
**unavailable** [1] - 74:9
**unconditionally** [1] - 78:5
**Unconditionally** [2] - 82:18, 83:19
**under** [6] - 55:9, 61:10, 72:15, 75:18, 90:14, 192:1
**underlying** [4] - 25:9, 26:17, 33:18, 187:23
**underneath** [1] - 190:7
**understood** [5] - 47:14, 125:3, 153:4, 156:11, 156:12

**unenviable** [1] - 74:2
**unfortunate** [1] - 191:3
**unfortunately** [1] - 191:11
**unique** [1] - 176:12
**UNITED** [4] - 1:1, 1:1, 1:4, 210:9
**Universal** [1] - 49:12
**universal** [1] - 176:23
**universe** [1] - 21:23
**universities** [1] - 14:2, 171:4
**university** [2] - 189:9, 189:19
**University** [2] - 12:7, 36:3
**unless** [1] - 30:13
**unlimited** [1] - 171:7
**unusual** [4] - 74:8, 81:10, 90:19, 110:3
**up** [80] - 18:3, 19:7, 20:21, 25:22, 28:11, 29:22, 32:7, 34:7, 36:25, 39:2, 40:1, 41:1, 41:6, 52:12, 61:13, 61:20, 61:25, 64:14, 67:11, 67:25, 70:19, 71:13, 73:20, 74:16, 76:18, 81:14, 86:2, 86:16, 86:20, 88:18, 88:19, 90:8, 93:20, 95:8, 99:13, 102:13, 103:17, 104:19, 105:6, 106:21, 114:6, 121:24, 122:21, 125:10, 125:14, 128:3, 132:10, 132:19, 151:19, 155:10, 155:17, 155:18, 157:2, 157:5, 159:21, 164:20, 164:23, 165:1, 167:22, 168:19, 171:9, 171:13, 171:15, 171:24, 173:23, 174:1, 177:19, 178:2, 178:8, 183:11, 186:18, 188:25, 189:16, 192:10, 195:11, 201:9, 205:23, 206:9, 208:19
**upcoming** [1] - 14:8
**uploaded** [3] - 22:1, 32:20, 199:21
**usual** [1] - 90:21

## V

**vacations** [1] - 95:17
**vague** [1] - 114:18
**validation** [1] - 184:20
**valuable** [3] - 4:25, 5:1, 10:8
**value** [2] - 107:23, 198:20
**variations** [1] - 105:23
**varies** [1] - 118:14
**variety** [1] - 13:24
**various** [2] - 128:10, 145:11
**vary** [1] - 95:25
**vast** [1] - 34:22
**vendor** [1] - 106:7
**venue** [4] - 21:14, 131:8, 189:17, 189:22
**venues** [9] - 13:24, 52:16, 95:22, 130:16, 171:1, 171:4, 186:8, 187:7, 187:10
**verbally** [1] - 175:17
**verdict** [2] - 35:3, 206:14
**verify** [1] - 106:16
**verse** [9] - 81:22, 81:24, 82:1, 90:8, 90:10, 90:13, 90:20, 179:1, 179:3
**verses** [4] - 18:20, 57:23, 58:1, 58:5
**version** [10] - 24:25, 38:13, 80:17, 84:22, 85:12, 105:6, 129:4, 134:11, 143:22, 183:16
**versions** [3] - 12:19, 105:4, 143:13
**versus** [2] - 4:4, 33:5
**Vevo** [1] - 23:10
**via** [2] - 173:17, 176:25
**VIA** [2] - 3:10, 3:14
**vibe** [1] - 174:7
**video** [43] - 18:19, 31:24, 50:25, 69:11, 69:16, 73:6, 73:8, 73:21, 76:19, 76:23, 82:24, 83:4, 83:8, 83:11, 83:25, 94:11, 98:13, 98:15, 101:1, 101:4, 101:22, 101:24, 128:14, 128:17, 128:18, 128:23, 128:25, 129:3, 150:4,

157:22, 183:6, 183:9, 183:12, 183:16, 183:19, 183:20, 183:24, 184:2, 184:4, 184:7
**videos** [9] - 8:20, 22:1, 82:15, 82:17, 83:14, 83:23, 97:4, 148:11, 148:14
**view** [9] - 18:14, 19:12, 22:6, 25:24, 127:21, 133:16, 180:6, 180:11, 202:2
**viewed** [3] - 107:16, 147:1, 150:4
**viewing** [1] - 184:17
**views** [12] - 8:23, 14:14, 21:25, 22:3, 23:10, 32:12, 32:13, 32:15, 184:19, 185:23, 185:24
**VINCENT** [1] - 2:21
**violate** [2] - 5:12, 108:2
**violation** [1] - 107:5
**Violet** [3] - 165:10, 166:9, 166:10
**violins** [2] - 6:11, 116:4
**vision** [7] - 94:7, 101:21, 101:23, 101:25, 102:1, 108:20
**visit** [1] - 189:8
**visited** [4] - 51:10, 51:14, 51:17, 51:20
**visualizing** [1] - 100:25
**visuals** [3] - 69:12, 94:13, 183:15
**vocal** [1] - 56:14
**vocals** [3] - 26:18, 179:9, 179:12
**voice** [2] - 89:19, 176:18
**void** [2] - 170:14, 170:18
**volley** [1] - 88:25
**volume** [3] - 31:19, 117:7, 117:9
**vouch** [2] - 173:19, 173:20
**VS** [1] - 1:8
**vulnerability** [1] - 93:15

## W

**Wais** [1] - 18:11
**WAIS** [6] - 2:16,

160:25, 161:3, 161:5, 161:19, 161:21
**wait** [3] - 61:11, 176:2, 198:22
**walking** [1] - 11:17
**Walking** [1] - 78:8
**walls** [1] - 18:3
**Walter** [13] - 9:22, 13:8, 15:14, 18:15, 22:24, 23:21, 26:15, 27:17, 45:15, 80:15, 207:23, 208:4, 208:25
**Walters** [1] - 205:13
**wants** [2] - 73:19, 125:6
**warrant** [1] - 68:22
**WAS** [1] - 210:13
**Washington** [1] - 12:7
**wasting** [1] - 158:10
**watch** [2] - 97:4, 183:23
**watched** [2] - 73:8, 151:2
**wave** [6] - 126:17, 141:24, 142:1, 160:17, 176:1
**Wave** [1] - 142:6
**ways** [3] - 24:13, 89:15, 100:6
**WB** [1] - 49:12
**weave** [1] - 92:1
**website** [5] - 8:21, 8:22, 51:1, 82:7, 82:8
**Wednesday** [1] - 75:9
**week** [4] - 13:19, 18:19, 95:14, 205:15
**Weekend** [1] - 23:3
**weekend** [1] - 6:2
**weeks** [3] - 63:10, 118:18, 141:14
**Wells** [1] - 197:1
**WEST** [2] - 1:23, 2:17
**West** [2] - 90:16, 188:23
**west** [1] - 188:22
**WESTERN** [1] - 1:2
**whatsoever** [4] - 59:5, 141:22, 142:14, 143:2
**white** [5] - 27:1, 27:21, 29:2, 97:5
**whole** [6] - 22:16, 29:11, 34:20, 69:22, 84:3, 84:4
**wide** [2] - 13:24, 171:3
**widespread** [2] - 21:5, 21:10

**wife** [10] - 8:10, 14:5, 181:8, 181:9, 182:4, 186:22, 188:4, 189:20, 190:25, 192:4
**Wikipedia** [3] - 77:16, 84:8, 102:24
**wine** [1] - 97:5
**wins** [1] - 89:22
**wiping** [1] - 11:11
**wish** [1] - 97:15
**withdrew** [2] - 138:15, 138:18
**witness** [25] - 17:19, 17:20, 35:6, 35:13, 58:1, 58:5, 61:10, 61:22, 63:16, 64:24, 65:1, 73:17, 87:2, 106:22, 109:18, 132:15, 132:22, 133:14, 135:14, 155:14, 157:7, 157:9, 169:11, 205:7, 205:17
**Witness** [1] - 94:23
**WITNESS** [17] - 35:17, 70:9, 72:8, 87:6, 91:10, 109:22, 135:10, 155:3, 169:16, 169:19, 172:14, 172:25, 174:20, 198:23, 199:14, 200:8, 203:21
**witness's** [1] - 199:11
**witnesses** [7] - 17:12, 17:17, 155:11, 155:12, 156:17, 173:7, 206:10
**WITNESSES** [2] - 3:6, 3:17
**woman** [2] - 89:4, 89:5
**won** [2] - 38:11, 38:14
**wonderful** [1] - 205:14
**wondering** [1] - 159:10
**woods** [1] - 79:16
**Word** [6] - 104:3, 104:4, 105:5, 105:21, 106:6, 106:21
**word** [3] - 89:1, 142:17, 171:23
**words** [11] - 28:12, 28:13, 61:9, 74:11, 74:20, 80:6, 107:15, 199:15, 203:19
**works** [1] - 21:17
**World** [27] - 7:19, 33:13, 47:10, 48:23,

50:4, 53:14, 53:16, 84:9, 95:6, 95:12, 95:23, 95:24, 111:15, 127:24, 128:4, 144:4, 170:4, 173:7, 173:11, 173:13, 180:20, 190:12, 191:9, 192:22, 196:8, 197:16, 201:1
**world** [9] - 84:14, 93:16, 95:9, 152:5, 171:25, 173:16, 175:3, 180:11, 202:14
**worried** [1] - 156:14
**worrying** [1] - 207:12
**worship** [2] - 42:5, 42:11
**write** [8] - 33:20, 37:6, 37:24, 54:3, 57:23, 93:23, 141:20, 167:12
**writer** [15] - 13:7, 13:15, 14:15, 23:2, 23:16, 33:5, 33:12, 58:19, 64:1, 65:5, 66:24, 88:20, 93:12, 144:14, 175:7
**writer's** [1] - 174:24
**writers** [23] - 9:23, 13:22, 15:4, 15:7, 15:12, 16:4, 18:17, 22:8, 22:12, 22:23, 23:13, 24:5, 29:1, 42:16, 66:3, 72:16, 129:25, 145:19, 145:20, 146:6, 154:19, 165:2, 195:23
**writes** [4] - 7:3, 7:4, 7:14, 7:17
**writing** [17] - 14:22, 89:13, 92:20, 93:23, 94:8, 94:11, 95:1, 100:24, 101:21, 164:20, 165:1, 168:13, 176:13, 176:20, 178:3, 179:6, 195:23
**written** [19] - 42:16, 42:22, 43:8, 54:9, 57:3, 57:7, 57:10, 57:17, 58:2, 79:7, 87:25, 88:18, 90:13, 124:10, 124:13, 124:18, 138:21, 144:9, 177:4
**wrote** [10] - 22:25, 33:8, 33:17, 38:2,

41:11, 41:17, 41:22, 41:25, 167:24, 168:21
**wu** [2] - 135:24, 136:1

## Y

**y9ou** [1] - 185:9
**year** [11] - 75:10, 77:9, 90:1, 95:10, 97:17, 98:17, 130:14, 163:23, 181:5, 182:13, 182:19
**years** [17] - 14:22, 21:25, 31:23, 67:4, 73:1, 92:22, 96:18, 127:20, 129:13, 139:7, 148:8, 164:25, 165:10, 171:2, 172:3, 172:4, 186:24
**yesterday** [6] - 4:15, 10:24, 18:10, 156:8, 156:12, 161:9
**yikes** [1] - 172:3
**yo** [3] - 173:25, 177:15, 197:25
**York** [1] - 29:25
**Yorker** [3] - 79:6, 86:5, 86:6
**young** [5] - 17:2, 94:5, 97:21, 97:22, 191:3
**yourself** [6] - 12:21, 54:3, 63:8, 76:11, 147:24, 170:8
**youth** [1] - 96:14
**YouTube** [23] - 8:20, 14:14, 21:23, 22:1, 32:8, 32:12, 51:1, 86:16, 96:16, 97:4, 99:2, 148:7, 150:5, 157:22, 159:24, 184:6, 184:8, 184:14, 184:15, 184:16, 185:24, 204:6, 207:9
**YouTubing** [5] - 79:17, 86:15, 86:16, 96:21

## Z

**zenith** [1] - 181:16
**zone** [1] - 102:3
**zoom** [1] - 151:22

# EXHIBIT 3

EXHIBIT  3
PAGE  310

1                    UNITED STATES OF AMERICA
                  UNITED STATES DISTRICT COURT
2               CENTRAL DISTRICT OF CALIFORNIA
                        WESTERN DIVISION
3
                            -  -  -
4                HONORABLE CHRISTINA A. SNYDER
           UNITED STATES DISTRICT JUDGE PRESIDING
5                           -  -  -

6
     MARCUS GRAY; ET AL.,                )
7                                        )
              PLAINTIFF,                  )
8                                        )   CASE NO.:
     VS.                                 )   CV 15-5642-CAS
9                                        )
     KATY PERRY; ET AL.,                 )
10                                       )
              DEFENDANT.                  )
11   _____)

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15              FRIDAY, JULY 19, 2019

16              LOS ANGELES, CALIFORNIA

17

18

19

20

21

22          LAURA MILLER ELIAS, CSR 10019
          FEDERAL OFFICIAL COURT REPORTER
23        350 WEST FIRST STREET, ROOM 4455
          LOS ANGELES, CALIFORNIA 90012
24             PH:  (213)894-0374

25

```
 1

 2
       APPEARANCES OF COUNSEL:
 3
       ON BEHALF OF PLAINTIFF:
 4

 5             CAPES SOKOL
               BY: MICHAEL A. KAHN, ESQ.
 6                 LAUREN COHEN, ESQ.

 7             7701 FORSYTH BOULEVARD
               12TH FLOOR
 8             ST. LOUIS, MO 63105

 9
               KAYIRA LAW, LLC
10             BY:  ERIC KAYIRA, ESQ.

11             2100 HANLEY ROAD, SUITE 208
               CLAYTON, MO 63105
12

13
       ON BEHALF OF DEFENDANTS OTHER THAN MS. PERRY:
14

15             MITCHELL SILBERBERG & KNUPP
               BY: CHRISTINE LEPERA, ESQ.
16                 AARON M. WAIS, ESQ.
                   JEFFREY MOVIT, ESQ.
17
               11377 WEST OLYMPIC BOULEVARD
18             LOS ANGELES, CA 90064

19
       ON BEHALF OF THE PERRY DEFENDANTS:
20

21             GREENBERG TRAURIG
               BY:  VINCENT H. CHIEFFO, ESQ.
22
               1840 CENTURY PARK EAST
23             SUITE 1900
               LOS ANGELES, CA 90067
24

25
```

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 312

```
 1                              INDEX
 2

 3   WITNESSES FOR
     THE PLAINTIFF:
 4
                       DIRECT     CROSS     REDIRECT     RECROSS
 5   GRAY, MARCUS
     BY:  MR. KAHN        16                81, 101
 6   BY:  MR. MOVIT                 26                      92

 7   DECKER, TODD
     BY:  MS. COHEN      113               207, 216
 8   BY:  MS. LEPERA             180                   215,219

 9   SANDBERG, CARL
     (VIA DEPOSITION)    220
10
     HOUSTON, JORDAN
11   (VIA DEPOSITION)    223

12

13

             EXHIBITS               RECEIVED
14
                67 PG 4                20
15
                24                    22
16
                69 PG 5                24
17

18

19

20

21

22

23

24

25
```

```
 1        LOS ANGELES, CALIFORNIA; THURSDAY, JULY 19, 2019; 9:15 A.M.

 2                            - - -

 3              THE CLERK:  Calling Calendar Item 1.

 4              Case No. CV 15-5642.

 5              Marcus Gray, et al versus Katy Perry, et al.

 6              Counsel, please state your appearances.

 7              (Appearances as heretofore noted.)

 8              THE COURT:  Okay, Mr. Chieffo.

 9              MR. CHIEFFO:  Yes, Your Honor.  We have which is

10    not unexpected, there is press coverage of the trial.  Uh,

11    both of testimony that's been, but also which seems to touch

12    upon issues that we sort of categorized as the moral rights

13    question.  And I would like to request another cautionary

14    instruction to the jury about not looking at any press

15    articles.  Thank you.

16              THE COURT:  I'm happy to do that.

17              Okay.  Now, let's take the matters that you've

18    shipped our way overnight.  First of all, let's take up

19    Exhibit 67.  I continue to believe that the plaintiffs are

20    correct and that Mr. Gray because he was involved in the

21    creation of the music video can identify the video as his and

22    he has already testified that he frequently monitored YouTube

23    to total times his video was viewed.  I don't think that's an

24    issue.

25              Exhibit 69, again, I believe for the reasons stated
```

EXHIBIT  3
PAGE  314

```
 1    in the limine orders, that Mr. Gray is able to identify his
 2    MySpace pages and those of Lecrae Moore.  And I just think
 3    that the suggestion that a proper foundation hasn't been laid
 4    is incorrect.  On the other hand, and I will hear what you
 5    have to say about Billboard.  I am not going to permit
 6    Billboard to be used to show sales or anything of that
 7    nature.
 8            I know that the plaintiffs are going to tell me oh,
 9    no, we're not offering it for that, but what I said back at
10    the time of the in limine hearing was that the appearance of
11    Joyful Noise and Our World Redeemed on Billboard charts is
12    relevant to the issue of access because Billboard is a
13    popular musical publication and as such, defendants may have
14    learned about Joyful Noise by seeing it on a Billboard chart.
15            But the Billboard charts also indicate that those
16    works are relatively popular within the Christian music
17    market.  That may be relevant.  However, they cannot come in
18    to show sales.  There is no basis as far as I can tell,
19    although I'm happy to look at the deposition that you're
20    gonna offer, I just don't know where to look, that the
21    summaries can somehow or another be discussed through
22    deposition testimony or otherwise.
23            So that's where I am at the moment.
24            MS. COHEN:  Judge, I'd like to address it, but
25    since it's your objection, would you like to go first?
```

```
1          MR. WAIS:  Good morning.  We understand your
2    rulings and have no objections to what you've stated and rest
3    on that.  Thank you.
4          THE COURT:  So Ms. Cohen, we've done this before,
5    but let's hear what you have to say.
6          MS. COHEN:  Your Honor, I think there's two
7    different objections to the Billboard testimony.  One relates
8    to testimony regarding the methodology of compiling the
9    charts.  And if it's Your Honor's belief that goes to sales,
10   my only concern about that was it may be necessary to lay a
11   foundation for the Billboard testimony at all.  But if that's
12   not an issue, then I don't think plaintiffs have any problem
13   omitting that testimony specifically.
14         THE COURT:  I don't know what you just said so
15   let's try again.  I don't want to have a miscommunication.
16   I'm sure you were quite clear.  I just didn't understand it.
17         MS. COHEN:  Okay.  I'll try it again.
18         So there's two issues here.  One is this issue of
19   testimony related to sales or the methodology of calculating
20   or compiling the charts, and Billboard says we do this based
21   upon sales data.
22         THE COURT:  Well, there are two problems which we
23   went through at the time of the motions in limine which is we
24   don't know because there is not testimony available to us as
25   to what it means on Billboard chart.  Does it mean sales?
```

```
 1    Does it mean how many times something is played?  How many
 2    times something was purchased or whatever else?
 3           And because we don't know what it is and what the
 4    significance is, I don't think they can be offered to show
 5    sales or anything regarding the songs.  What we did say was
 6    the fact that they were on a Billboard chart is something
 7    that is publicly available information and may have
 8    significance to certain people in the music industry.  And
 9    therefore, they were potentially relevant for access which I
10    think the defendants begrudgingly agreed with, but they
11    nonetheless agreed with that.  That is my issue.
12           Now, if you're trying to use the Billboard
13    information for some other purpose, I don't know what it is
14    and I don't know what the foundation is.
15           MS. COHEN:  Judge, the summary chart issue is a
16    separate issue I believe.  We're talking about testimony
17    related to how Billboard compiles its charts.  And I do
18    believe the testimony is clear they compile it based upon
19    sales data.  We're not looking to offer that for purposes of
20    showing sales.  There are no numbers.  And if there's no
21    foundational with respect to admitting the remainder of the
22    testimony without that, plaintiffs are fine to omit those
23    designations.
24           THE COURT:  Well, let me hear from the defendants.
25    I expect there will be an objection.
```

```
 1          MS. LEPERA:  This is just a back doorway of trying
 2   to get in to testimony that the chart is based on sales and
 3   therefore they have sales.  If they want to show that they
 4   were on a Billboard chart, it's very simple.  Here's the
 5   chart, here's the date, here's the number.  And whatever
 6   inferences can be drawn from that publication by virtue of
 7   the chart's status is what I believe Your Honor is getting at
 8   and that is what we believe -- we take issue with it being in
 9   at all, but you're correct, Your Honor, if it's in, it should
10   be limited to that.
11          THE COURT:  What I don't understand you're gonna
12   bring in the deposition of Mr. Pietroluongo.  First of all,
13   as I recall, he's in New York or out of the subpoena power.
14          MS. COHEN:  Correct.
15          THE COURT:  But what are you going to offer?
16   Because I have a bunch of highlighted stuff, but what do you
17   propose to offer?
18          MS. COHEN:  That's the other issue.  And just to
19   clarify, what I'm saying we agree to remove those
20   designations related to the methodology.  It sounds that's
21   not an issue.  Related to the summary charts, Your Honor
22   ruled that the document that was produced containing the
23   summary charts is out.  We understand that.
24          There is a deposition wherein the corporate
25   representative testifies at length regarding his methodology
```

1  of researching the business records related to where the

2  album, the song appeared on the Billboard charts.  So it's

3  our position that we believe that the testimony is based

4  properly on business records.  But if Your Honor's inclined

5  to believe that it's hearsay, we would submit that the

6  residual exception 807 would require that this evidence comes

7  in for all of the reasons.

8       Your Honor did rule that the Billboard evidence is

9  relevant to access.  It's being offered as evidence of that

10 material fact.  It's more probative on that point than any

11 other evidence that we can obtain through our reasonable

12 efforts.  We did attempt to obtain the actual charts and the

13 Billboard representative testifies in the deposition that in

14 many instances, the charts are simply not capable of being

15 produced.

16      THE COURT:  Well, we went through this at the

17 limine hearing.  This is a motion for reconsideration then

18 and I don't see that anything has changed.

19      MS. COHEN:  Okay, Your Honor.  Thank you.

20      MS. LEPERA:  Thank you, Your Honor.

21      THE COURT:  Okay.  So are we ready for the jury or

22 do we have more?

23      MR. KAHN:  I just have a question.  I was talking

24 to counsel.  When I present the witness with Exhibit 67 and

25 Exhibit 69, um, the first page of both of those is the

1    business record affidavit.  Do I -- I want to make sure that

2    I don't run into problems there.  Is it -- should I not

3    mention that first page and simply have him turn to the

4    exhibit?

5              THE COURT:  Well, I guess you want to him look at

6    the exhibit and see if he can identify it because

7    otherwise --

8              MR. KAHN:  Okay.

9              THE COURT:  -- it doesn't come in.  I don't know we

10   need the business record or whatever else of page 1.  You

11   need to show him the exhibit, see if he can identify it, tell

12   you what it is, and then if so you can publish it.

13             MR. KAHN:  I want to make sure I didn't run into

14   problems.

15             THE COURT:  I appreciate your inquiry.

16             MS. COHEN:  I'd like to raise one other issue so we

17   don't have to deal with it in front of the jury.

18             THE COURT:  Sure.  Your Honor, this morning we're

19   going to finish up with the plaintiff Marcus Gray after which

20   we'll call the plaintiff's expert musicologist, Dr. Todd

21   Decker.  Dr. Decker attached as an exhibit and relied upon

22   mashup videos that Your Honor has already are out.  We're not

23   talking about that.

24             However, in Dr. Decker's testimony today, we plan

25   to have him use his computer and software on his computer to

```
 1    provide a demonstration of audio comparison and I anticipate
 2    objections from the other side and I'm raising it now so we
 3    don't have to do that in front of the jury.
 4         MS. LEPERA:  What I'm hearing is that we have a new
 5    audio example or exhibit that is not contained in
 6    Mr. Decker's report.  What I'm hearing, I think, is that he's
 7    doing some sort of alteration of the sound recordings at
 8    issue for comparative purposes.
 9         He can use only the materials that are in his
10    report and that includes audio and visual in my opinion.  And
11    I would object to any introduction to anything that is a new
12    or altered sound recording including a mashup that was not
13    disclosed even if he's creating it.
14         MS. COHEN:  Judge, I can clarify that.  There is no
15    new file that's been created.  However, he intends to
16    essentially prepare a demonstration of the audio comparison
17    live.  There is nothing that has been created.  There is
18    nothing to produce.  It's no different than what I anticipate
19    defendants plan to do with their expert with a keyboard live
20    in the courtroom.
21         THE COURT:  Here's the problem.  I can't sit here
22    and tell you whether it's new or not new because I haven't
23    seen it.  The fact of the matter is that before he goes on,
24    you're gonna have to, I think, show and demonstrate --
25         MS. COHEN:  Of course.
```

1        THE COURT:  -- to the defense that this is simply

2   an illustration of what's already in his report and not

3   something new because if it's something new, then it can't

4   come in.  As an abstract proposition, I do not have a problem

5   with an expert demonstrating on a keyboard what's in his

6   report.  We've done that before.  I expect that the defense

7   will do it this time, but you can't bring in new stuff.

8        MS. COHEN:  Correct.

9        THE COURT:  And that is my problem.

10       MS. COHEN:  Okay.  This is not new.  It just as

11  Your Honor said, it's simply an illustration of the opinions

12  in his report.

13       THE COURT:  I'd appreciate your making that

14  available and having him explain what he's going to play and

15  play it for the defense before we become embroiled in an

16  unnecessary brouhaha.

17       MS. COHEN:  And I want to clarify what I had

18  intended to do was to lay the foundation first, and then to

19  have him walk us through step-by-step literally every click

20  that he makes so that everyone understands that he's doing

21  this live.  There's nothing that's been created that will be

22  played that wasn't produced.  This is a live demonstration.

23       THE COURT:  Okay.  I'm confused.  What he's going

24  to do?

25       MS. COHEN:  So his testimony will be that he

```
 1    believes the most effective way to demonstrate his opinions
 2    are through an audio comparison and that he uses the software
 3    that he has on his computer in his research and his teaching.
 4    That's it's considered reliable in the musical field.  That
 5    he does this in his classroom.
 6              And he will walk us step-by-step through exactly
 7    what he will do so we can literally see his computer and see
 8    him explain everything that he's doing based upon Exhibit 75
 9    and 76.
10              THE COURT:  Now, I'm becoming worried.  Does he say
11    anything about that in his expert report?
12              MS. LEPERA:  No.
13              MS. COHEN:  It's a demonstrative, Your Honor.  It's
14    no different than having a keyboard.
15              THE COURT:  Well, it is different if he hasn't
16    indicated in his report.  I'm highly skeptical because the
17    report should have explained that, you know, he intends to
18    demonstrate these facts through whatever because someone
19    might have wanted to depose him on that subject.
20              MS. LEPERA:  I think if I'm understanding
21    plaintiff's counsel correctly and please forgive me if I'm
22    not, what she's really saying is the same thing that we
23    talked about yesterday with the programming and the computer
24    that Mr. Ojukwu was going to get up there and use on a
25    program like a Word program or a computer software program
```

14

```
 1   not been disclosed, not been tested, not been authenticated.
 2   Computer programs are a lot different than acoustic piano or
 3   even electric piano.
 4            This is a situation where there's a software
 5   program that he's using and saying for the first time, he's
 6   going to now create sounds on a computer program for which we
 7   have been receiving no information.  This is an ambush.  It's
 8   the second day of trial that we're first hearing this.  It is
 9   not a demonstrative or illustrative of anything he's done
10   because he has not disclosed the program.  He has not
11   disclosed any methodology that could be tested.  He's not a
12   producer.
13            He's not a trained -- he's never worked with Pro
14   Tools before.  I can go on from his deposition, but this is
15   not an appropriate strategy at the point in the trial,
16   Your Honor.
17            THE COURT:  I am leaning in her position, but you
18   still ought to show it.  You can't -- you can't start adding
19   new parts to the opinion.  You may say it's illustrative and
20   maybe it is, but I fear at this point, if it's gonna be on a
21   computer, is it he doing it live or is he doing it on a
22   computer?
23            MS. COHEN:  He's doing it live on a computer.
24            THE COURT:  Well, that's the problem.
25            MS. COHEN:  I don't see how it's any different than
```

EXHIBIT 3
PAGE 324

1  a piano demonstration.  They didn't disclose the piano.  We

2  haven't had the opportunity to inspect it, tune it, do all of

3  those things.  All the same arguments that they're making

4  with respect to the software.  He is an expert.  This is

5  different than yesterday when we were talking about

6  Mr. Ojukwu.  He's a lay witness.  We're not attempting to

7  show that the software was in the same condition as it was

8  eight years or 10 years ago.  It's -- it's totally different.

9          THE COURT:  I just totally disagree.

10          MS. COHEN:  Thank you, Your Honor.  So how would

11  you like us to address the issue?

12          THE COURT:  Well, I think have we're going to have

13  Mr. Gray on for a little while.  I suspect if you're going to

14  call your expert, we'll have a morning recess and you'll have

15  to take it up then and I'll decide.

16          MS. COHEN:  So we'll do it outside the presence of

17  the jury?

18          THE COURT:  We certainly will.

19          MS. COHEN:  Thank you.

20          THE COURT:  Okay.  Anything else?

21                  (Jury present.)

22          THE COURT:  Good morning, ladies and gentlemen.

23  Sorry, we're a bit late.

24          One thing I want to start out with a reminder

25  about, obviously, this case has engendered some press

```
 1    coverage, and as I've indicated, you ought not look at it,

 2    let anyone talk to you about it.  If anyone approaches you

 3    about something that they've seen either on the Internet or

 4    in the newspapers or otherwise, please tell that person

 5    you've been instructed by the court not to discuss it and

 6    report it to me.

 7            It's very important that you're -- the evidence you

 8    consider be limited to that which goes on here in the

 9    courtroom and not in the press where there is often

10    speculation and misinformation.  So for those reasons, please

11    stick with what we're doing here.

12            I think we're going to proceed now with Mr. Gray.

13            THE COURT:  Mr. Gray, I'd like to remind you you

14    are still under oath.

15            THE WITNESS:  Yes.

16                   DIRECT EXAMINATION (RESUMED)

17    BY MR. KAHN:

18    Q.   Good morning, Mr. Gray.

19    A.   Good morning.

20    Q.   Yesterday afternoon, we watched a clip from the official

21    Joyful Noise music video that's on YouTube.  Do you recall

22    that?

23    A.   Yes.

24    Q.   And I asked you about the frequency with which you would

25    visit that YouTube page to check out the number of views;
```

1    correct?

2    A.    Correct.

3    Q.    And I think you explained -- why you were visiting that

4    page frequently?

5    A.    I was explaining because as an artist, you're really

6    obsessed with your own views and monitoring and tracking the

7    response so it's something that we were regularly looking to.

8    Q.    I want you just -- I've got a smaller notebook there

9    that has photocopies of some of the exhibits.  If you could

10   turn to the second to the last tab which is Exhibit 67, it

11   says 67 down at the bottom.

12   A.    Yes.

13   Q.    And if you turn to the third page, you will see it says

14   Exhibit A?

15   A.    Mmm, let's see.  I'm looking for the location of it?

16   Q.    Should be the third page of Exhibit 67.

17   A.    All right.  I'm there.

18   Q.    I want ask you to now turn one more page.

19   A.    All right.

20   Q.    And you're now looking at a computer screenshot?

21   A.    Yes.

22   Q.    The first question I have for you, Mr. Gray, is do you

23   recognize the, um -- that particular screenshot?

24   A.    Yes.

25   Q.    And what are you looking at right now?

```
 1   A.   I am looking at a YouTube page for the song Joyful Noise
 2   and the music video.
 3   Q.   And it's the official music video?
 4   A.   Yes.
 5   Q.   Is there a view count there, sir?
 6   A.   Yes, there is.
 7   Q.   What the view count on the YouTube video for the
 8   official music video for Joyful Noise?
 9   A.   The page I'm looking at has 2,246,240.  If I'm lookin'
10   at the same page as you are.
11   Q.   I guess you're looking at what appears to be page 6,
12   67-6?
13   A.   Correct.
14   Q.   Okay.  And that is the screenshot of the official
15   YouTube video of Joyful Noise?
16           MR. CHIEFFO:  Leading, Your Honor.
17           The witness can read.
18           THE COURT:  I'm gonna overrule the objection.
19           MR. KAHN:  I just wanted to clarify.  I think that
20   he's already testified --
21           THE COURT:  I think he did.
22   BY MR. KAHN:
23   Q.   -- that you recognize this.
24   A.   Correct.  Yes, I recognize it.
25   Q.   I would ask you to turn backwards toward the front two
```

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 328

1    pages to Exhibit 67, page 4?

2    A.    Yes.

3    Q.    And do you recognize that screenshot?

4    A.    Yes, I do.

5    Q.    And would you tell us what that screenshot is?

6    A.    This is also my YouTube page -- uh, the YouTube page for

7    the song Joyful Noise and music video.

8    Q.    And is there a view count there?

9    A.    Yes, it is.

10   Q.    And what is the view on that count?

11   A.    2,515,247.

12   Q.    And if you look down at the bottom of the page with the

13   URL?

14   A.    Mm-hmm.

15   Q.    You will be able to see there's a date?

16   A.    Yes.

17   Q.    Can you tell us what the date is for this screenshot?

18   A.    Uh, 2012, March, the 11th.

19   Q.    Okay.  So this is a screenshot from March 11th, 2012 of

20   the YouTube video, the official music video for Joyful Noise;

21   correct?

22   A.    Correct.

23   Q.    And then the other view count that you mentioned?

24   A.    Mm-hmm.

25   Q.    Which is two pages on 67-6?

1    A.    Yes.

2    Q.    Can you look at the bottom of that page of the URL and

3    tell us what the date is for that?

4    A.    Okay.  It says 2011, 07-26.

5    Q.    Okay.  And so there's no confusion, these are the same

6    pages, just different dates; correct?

7    A.    Correct, just different dates.

8    Q.    And then there's one final screenshot.  It's page 67-8.

9    And maybe look down at the bottom first and tell us what that

10   date is.

11   A.    It says 2010, November 24th.

12   Q.    Okay.  So that's a year earlier.  So what was the view

13   count there?

14   A.    The view count was 1,731,361.

15         MR. KAHN:  Your Honor, we would offer Exhibit 67

16   into evidence.

17         THE COURT:  All right.  It will be received.

18              (Exhibit 67, page 4 admitted.)

19         MR. KAHN:  May we publish page 67-4 to the jury so

20   they can see what the screenshot looks like?

21         THE COURT:  Yes.

22   BY MR. KAHN:

23   Q.    And just to confirm, Mr. Gray, this is a page you

24   identified as the official music video screenshot from

25   March 11th, 2012?

1    A.    Correct.

2    Q.    And at that time, you said there were 2,515,247 views;

3    correct?

4    A.    Correct.

5    Q.    Now I would ask you to turn to the final tab in that

6    exhibit group.  And actually, before we turn to the final

7    tab, would you flip back before the one you were just looking

8    at, and you'll see there's a photocopy of an email.  That's

9    Exhibit 26.

10    A.    Yes.

11    Q.    Okay.

12    A.    I see it.

13    Q.    Yesterday -- and we're not talking about MySpace.  And

14    yesterday you testified regarding your MySpace page.

15    A.    Correct.

16    Q.    And you also testified regarding Lecrae Moore's MySpace

17    page.

18    A.    Yes.

19    Q.    And you testified that you visited both pages.

20    A.    Correct.

21    Q.    Did you ever communicate with Mr. Moore regarding his

22    MySpace page?

23    A.    I did.  Absolutely.

24    Q.    Um, take a look at Exhibit 26.  And can you describe

25    what Exhibit 26 is?

```
1    A.    Yes.  This is an email correspondence between Lecrae and

2    myself.

3    Q.    Okay.  And, um, what -- what are the dates of this email

4    correspondence?

5    A.    Um, the date is March 26th, 2008.

6    Q.    Okay.  And that's -- that's the first email, and you're,

7    um, sending an email to Mr. Lecrae --

8    A.    Correct.

9    Q.    -- Moore?  And the second one above, that what is that?

10   A.    It says March 26, 2008.

11   Q.    And who is the author of that email back?

12   A.    Lecrae.

13         MR. KAHN:  Your Honor, we would offer Exhibit 26

14   into evidence.

15         MR. MOVIT:  No objection.

16         THE COURT:  All right.  It will be received.

17              (Exhibit 26 admitted.)

18         MR. KAHN:  Okay.  And may we publish that to the

19   jury, Your Honor?

20         THE COURT:  You may.

21   BY MR. KAHN:

22   Q.    So explain to us the jury, and we can see your email to

23   Mr. Moore which starts off, hey, dude, what is the subject

24   matter of that email?

25   A.    Uh, the subject matter is really me asking him to add
```

```
 1   Flame's Joyful Noise to the front end of the title of the

 2   song.

 3   Q.   Okay.  And to add it where?

 4   A.   Onto his MySpace page.

 5   Q.   Okay.  So this is one of your communications with

 6   Mr. Moore regarding his MySpace page.

 7   A.   Correct.

 8   Q.   Did you have other communications with him regarding his

 9   MySpace page?

10   A.   Yes.

11   Q.   Now I would ask you to turn to that final tab which was

12   Exhibit 69.  And if you turn to page 69-10, you will see

13   another screenshot.

14   A.   Correct.

15   Q.   And can you look at the bottom of that page at the URL

16   and tell us the date that that screenshot was taken?

17   A.   2012, January 24th.

18   Q.   And as you look at that screenshot, do you recognize

19   what you are looking at?

20   A.   Yes.  This is my MySpace page.

21   Q.   So this is your MySpace page --

22   A.   Yes.

23   Q.   -- as it appeared in 2012 in January; correct?

24   A.   Correct.

25   Q.   And now let me ask you to turn back in Exhibit 69 to
```

EXHIBIT  3
PAGE  333

1    page 5?

2    A.   I'm there.

3    Q.   And what is the date that that screenshot was taken?

4    A.   This is 2011, September 7th.

5    Q.   And do you recognize that page?

6    A.   Yes.  This is Lecrae's MySpace page.

7              MR. KAHN:  Your Honor, we would offer Exhibit 69

8    into evidence.

9              THE COURT:  All right.  69 will be received.

10                 (Exhibit 69, page 5 admitted.)

11             MR. MOVIT:  Your Honor, we would request that just

12   the pages to which the witness has testified be offered into

13   evidence at this time.

14             THE COURT:  That's fine.

15             MR. MOVIT:  And the same for 67, Your Honor.

16             THE COURT:  That's fine.

17             MR. KAHN:  That's certainly fine, Your Honor.

18             We have no problem with that.

19             May we start publishing to the jury Mr. Gray's page

20   which is 69, page 10.

21             THE COURT:  So page 10 is in evidence.

22             What's in evidence?

23             MR. KAHN:  Only page 69-10.

24   Q.   And so to make it clear, this was your MySpace page as

25   it appeared in January of 2012; correct?

```
 1    A.    Correct.

 2    Q.    And on your MySpace page, did you post Joyful Noise?

 3    A.    Absolutely.

 4    Q.    And is there a view count for that date on your MySpace

 5    page?

 6    A.    Yes, it is.

 7    Q.    And what is that number?

 8    A.    It is 933,868 plays.

 9    Q.    Okay.  Is that the most plays on that page?

10    A.    Yes, it is.

11          MR. KAHN:  Now, Your Honor, may we publish page

12    Exhibit 69-5 which the witness identified Mr. Moore's MySpace

13    page for -- in September 2011?

14          THE COURT:  You may.

15    BY MR. KAHN:

16    Q.    And is this Mr. Moore's page for that date on MySpace?

17    A.    That's correct.  It is.

18    Q.    And does Joyful Noise appear on that page?

19    A.    Yes, it does.

20    Q.    And, um, how many plays on MySpace does Joyful Noise

21    show on Mr. Moore's page?

22    A.    Yes.  1,531,856 plays.

23          MR. KAHN:  I have nothing further.

24          Thank you, Mr. Gray.

25          THE WITNESS:  Thank you.
```

```
1              THE COURT:  Okay, Mr. Movit.

2              MR. MOVIT:  Your Honor, before we begin, may I hand

3      up Mr. Gray's deposition testimony so there's no

4      interruption?

5              THE COURT:  Do I not have it here?

6              MS. COHEN:  Well, he --

7              THE COURT:  But he needs it.

8              MS. COHEN:  Yes.

9                        CROSS-EXAMINATION

10     BY MR. MOVIT:

11     Q.   Good morning, Mr. Gray.

12     A.   Good morning, good morning.

13     Q.   Let's talk a little bit first about yourself and the

14     other plaintiffs and Mr. Moore.  Mr. Gray, is it correct that

15     you and Emanuel Lambert and Lecrae Moore all perform in the

16     genre of music?

17     A.   Yes.

18     Q.   And that genre of music is Christian rap; correct?

19     A.   Correct.

20     Q.   Okay.  And it's fair to say, Mr. Gray, that performers

21     in the genre of Christian rap --

22              THE COURT REPORTER:  Oh, I'm sorry, Counsel.

23              Can you move the microphone a little closer?

24              MR. MOVIT:  Of course.

25              THE COURT REPORTER:  Thank you.
```

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 336

1          I couldn't hear you.

2          MR. MOVIT:  I'll speak a little closer.

3          THE COURT REPORTER:  Thank you very much.

4     BY MR. MOVIT:

5     Q.   Um, it's fair to say, Mr. Gray that performers in the

6     genre such as yourself, Lecrae Moore and Mr. Lambert, uh,

7     cross paths and encounter each other on a regular basis?

8     A.   Um, relatively.  Yes.

9     Q.   Okay.  Uh, let's speak about the defendants for a

10    moment.  And you're aware that you've sued six individuals;

11    right?

12    A.   Yes.

13    Q.   And they are the writers of Dark Horse; right?

14    A.   Correct.

15    Q.   Okay.  And you're familiar with their identities; right?

16    A.   Yes.

17    Q.   Okay.  And we're gonna just call them collective the

18    individual defendants if that's okay?

19    A.   Okay.

20    Q.   Okay.  And you never personally sent any of your music

21    to any of the individual defendants; is that right?

22    A.   I did not.

23    Q.   And you never directed anyone to send any of your music

24    to the individual defendants; is that right?

25    A.   I did not.

28

1 Q. And you don't have any knowledge of anyone sending any

2 of the individual defendants any of your music including

3 Joyful Noise; is that right?

4 A. I don't have any knowledge of that.

5 Q. And you don't have any knowledge that any of the

6 individual defendants ever purchased or received a copy of

7 your Our World Redeemed album; is that right?

8 A. Yeah, I do not have any knowledge of that.

9 Q. And you don't have any knowledge of anyone ever having

10 played or performed Joyful Noise for any of the individuals

11 that are defendants; is that right?

12 A. Correct.  I wouldn't have access to that.

13 Q. And you don't have any knowledge of anyone providing any

14 of the individual defendants with Mr. Ojukwu's beat; is that

15 right?

16 A. That is right.

17 Q. Okay.

18 A. I don't have any knowledge of that.

19 Q. And you don't have any documents reflecting that any of

20 the individual defendants ever heard Joyful Noise or viewed

21 the video for Joyful Noise; is that right?

22 A. That is right.

23 Q. At anytime.  Correct?

24 A. Correct, correct.

25 Q. Okay.  Let's talk a little bit more about Joyful Noise.

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 338

```
1    Um, am I correct that you don't have any documents reflecting
2    sales of the recording of Joyful Noise?
3    A.    I do not have any documents.
4    Q.    And you don't have documents from any source reflecting
5    any income earned from sales of Joyful Noise; is that right?
6    A.    That is correct.
7    Q.    And am I correct that you don't know how many copies of
8    the Joyful Noise -- excuse me, how many copies of Our World
9    Redeemed, the CD, were manufactured; is that right?
10   A.    That is right.
11   Q.    And you don't have any documents reflecting income from
12   any source for the composition Joyful Noise; is that right?
13   A.    I do not have any documents.
14   Q.    Okay.  Mr. Gray, yesterday you testified that you'd seen
15   the recording of Joyful Noise for sale on Amazon; is that
16   correct?
17   A.    Correct.
18   Q.    Mr. Gray, I'd like to show you Joint Exhibit 79 which
19   was designated as an exhibit by your attorneys for trial in
20   this case.
21   A.    Is there a page number on here?  Okay.  I'm there, I
22   believe.
23   Q.    This is Joint Exhibit 79, and it should say in the
24   middle of the very bottom of the first page 79-1.  Do you see
25   that, sir?
```

```
 1    A.    You said of the first page?  Can you say that again?
 2    I'm sorry.
 3    Q.    Yes, sir.  This is Joint Exhibit 79 for trial?
 4    A.    I'm just really struggling to find these placements.
 5    Q.    It should be in the binder.  Just get the binder.
 6    A.    Oh.  Sorry, it's a like library here.  Okay.
 7    Q.    Okay.  Are you ready, sir?
 8    A.    Yes.
 9    Q.    Okay, great.  Why don't I just recap my last question
10    because there was little bit of pause there?
11    A.    Please, thank you.
12    Q.    Okay.  And yesterday, Mr. Gray, you testified that you
13    had seen your recording of the Joyful Noise for sale on
14    Amazon; correct?
15    A.    Correct.
16    Q.    And if you'd look at Joint Exhibit 79 which again is
17    designated as a trial exhibit by your attorneys, do you see
18    on the top left page where it says 06-29-2018?
19    A.    Yes.
20    Q.    Okay.  So in your understanding, that would be
21    June 29th, 2018?
22    A.    Yes.
23          MR. MOVIT:  And I'd like to request to publish this
24    to the jury for the questioning?
25          THE COURT:  You may.
```

1    MR. MOVIT:

2    Q.   And so now that the jury is looking at the document

3    along with us, Mr. Gray, can you please confirm again that it

4    says June 29th, 2018 in the upper left-hand corner?

5    A.   Yes.

6    Q.   Okay.

7    A.   It does.

8    Q.   Okay.  And this document appears to show the song Joyful

9    Noise for sale on Amazon as of June 29th, 2018; correct?

10   A.   Correct.

11   Q.   Okay.  If you'd please look at the second page of the

12   document, sir.

13   A.   All right.  I believe I'm there.

14   Q.   Do you see there's some customer reviews?

15   A.   Yes.

16   Q.   Okay.  Um, 21 of them; correct?

17   A.   Correct.

18   Q.   Okay.  And is it correct that, uh, the oldest review on

19   the page is July 10, 2014.  Do you see that, sir?

20   A.   Yes.

21   Q.   Okay.  And this lawsuit was filed on July 1st, 2014;

22   correct?

23   A.   Correct.

24   Q.   Okay.  So the oldest review on this page is a little

25   over a week after this lawsuit was filed; correct?

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 341

1    A.    Okay.  Correct.

2    Q.    Okay.  And there's no indication on these two pages that

3    Joyful Noise was specifically sold at Amazon as opposed to

4    anywhere else in the world anytime earlier than July 10,

5    2014; correct?

6    A.    I'm sorry.  I got a bit lost on --

7    Q.    Sure.

8    A.    -- the front end.

9    Q.    Sure.  So we saw that the oldest review on this page is

10   July 10th, 2014.

11   A.    Correct.

12   Q.    And that's a little over a week after this lawsuit was

13   filed; correct?

14   A.    Correct.

15   Q.    And I just wanted to ask if you agree, Mr. Gray, that

16   there's nothing on this page that indicates that Joyful Noise

17   was sold as a digital download on Amazon, and we're not

18   talking about other markets, we're just talking about Amazon,

19   any earlier than that date of July 10th, 2014 given that

20   that's the earliest review on this page is my question.

21   A.    Yes.

22   Q.    Is that correct?

23   A.    Yeah.

24   Q.    Okay.  Thank you, sir.

25   A.    Yes.

```
1    Q.    Okay.  And Mr. Gray, you testified yesterday that the

2    reason you did not provide any sales information in this case

3    was because Cross Movement Records did not provide that

4    information to you; is that correct?

5    A.    That is correct.

6    Q.    Okay.  Are you aware in this case that your attorneys

7    served a document called a subpoena on Billboard magazine

8    that required Billboard to provide certain information for

9    this case?  Are you aware of that?

10   A.    Vaguely.

11   Q.    Sir, are you aware that while your lawyers served a

12   document called a subpoena on Billboard magazine that

13   required Billboard to provide information in this case, they

14   did not serve any such subpoena on Cross Movement Records to

15   require --

16            MS. COHEN:  Objection, Your Honor.

17            Lack of foundation.

18            THE COURT:  Okay.  Well --

19            MR. MOVIT:  I'm asking if he's aware, Your Honor.

20            THE COURT:  I think that's right.  He's gonna . . .

21            MR. MOVIT:  He's either aware or he's not,

22   Your Honor.

23            THE COURT:  I understand.

24            MR. MOVIT:  Thank you.

25   Q.    So are you aware, Mr. Gray?
```

EXHIBIT  3
PAGE  343

```
 1   A.   Um, as an artist, I didn't get into the weeds, but we
 2   certainly, you know, made proper pursuits in -- in my
 3   estimation.
 4   Q.   Okay.  But my specific question, Mr. Gray, is whether
 5   you're aware that your lawyers never served any subpoena on
 6   Cross Movement Records even though they did serve a subpoena
 7   on Billboard for information.  Are you aware of that, sir?
 8   A.   As far as I can recall right now, I was not -- I'm not
 9   aware that they did not.
10   Q.   So you don't know whether they did or did not; is that
11   correct?
12   A.   As far as I can recall right now, correct, that's
13   correct.
14   Q.   But your lawyer, Eric Kayira, he would know that.  Is
15   that fair?
16   A.   Correct, correct.
17   Q.   Okay.  So now if we could talk for a couple moments
18   about the corporate defendants in this case.  Um, and you're
19   aware that there's, um, a number of corporate defendants in
20   this case, and, um, their names have been disclosed
21   repeatedly throughout this case, and you're aware of those
22   companies and their identities, and that you've sued them; is
23   that correct?
24   A.   Correct, correct.
25   Q.   Okay.  I'm gonna refer to them as a group as the
```

```
 1    corporate defendants if that's all right?

 2    A.    That's fine.  Yeah.

 3    Q.    Okay.  You never personally sent any employee or

 4    executive at any of the corporate defendants a copy of the

 5    Our World Redeemed album; is that correct?

 6    A.    I did not personally, no.

 7    Q.    Okay.  And you never told anyone to send them a copy of

 8    the Our World Redeemed album.  Is that correct?

 9    A.    That is correct.

10    Q.    And you never personally sent them a copy of any version

11    of Joyful Noise; is that right?

12    A.    That is correct.

13    Q.    And you never told anyone to send them a copy of any

14    version of Joyful Noise; is that right?

15    A.    I did not.

16    Q.    And you have no knowledge that anyone ever provided any

17    of them with a copy of Joyful Noise; is that right?

18    A.    That is right.  I have no knowledge of that.

19    Q.    And you have no knowledge that anyone ever performed

20    Joyful Noise for any of them; is that right?

21    A.    That is right.

22    Q.    Okay.  Let's talk about YouTube and MySpace for a

23    moment?

24    A.    Okay.

25    Q.    You have no knowledge that any of the six individual
```

```
 1   defendants ever viewed Joyful Noise on MySpace; is that
 2   right?
 3   A.   That is right.  Mm-hmm.
 4   Q.   Okay.  And you have no knowledge regarding what periods
 5   of time Lecrae Moore had Joyful Noise on his MySpace page; is
 6   that right?
 7   A.   From the inception of the song till MySpace dismantled
 8   as a company, Joyful Noise was on his page.
 9   Q.   You have no knowledge of what periods of time Lecrae
10   Moore had his MySpace page; isn't that right?
11   A.   That he had a MySpace page itself?  Is that what you're
12   asking?
13   Q.   You have no knowledge of what period of time Mr. Moore
14   had the MySpace page; is that right?
15   A.   No, I don't know the specifics of that.
16   Q.   And you don't have knowledge that any of the six
17   individual defendants ever visited your MySpace page; right?
18   A.   Correct, no knowledge of that.
19   Q.   Okay.  And you have no knowledge that any of the six
20   defendants ever visited Mr. Moore's MySpace page; is that
21   right?
22   A.   That's right.
23   Q.   And you have no knowledge that any of the six individual
24   defendants ever visited Mr. Ojukwu's MySpace page; is that
25   right?
```

EXHIBIT  3
PAGE  346

```
 1    A.    That's right.  Correct.

 2    Q.    And you don't have any individual that any of the

 3    individual defendants ever viewed or visited your MySpace

 4    page; is that right?

 5    A.    That's correct.

 6    Q.    And you don't have any knowledge that any of the six

 7    individual defendants ever viewed anything on Lecrae Moore's

 8    MySpace page; is that right?

 9    A.    That is right.  I do not have any knowledge of that.

10    Q.    And you don't have any knowledge that any of the six

11    individual defendants ever viewed anything on Mr. Ojukwu's

12    MySpace page?

13    A.    Correct.

14    Q.    You testified that you attended the 2009 Stellar Awards;

15    is that correct?

16    A.    Yes.

17    Q.    The Stellar Awards are given to gospel music; is that

18    right?

19    A.    Correct.

20    Q.    Although the album, Our World Redeemed, was nominated

21    for an award, the song Joyful Noise itself was not nominated

22    for any Stellar Award; is that right?

23    A.    Correct.

24    Q.    And Joyful Noise was not performed on this award show;

25    is that right?
```

```
 1   A.   That is right.

 2   Q.   And you don't have any knowledge that any of the

 3   defendants attended the 2009 Stellar Awards; is that right?

 4   A.   Yeah, I wouldn't have any knowledge either way.

 5   Q.   Okay.  And you testified that you attended the 51st

 6   Annual Grammys Award Show in February of 2009; is that right?

 7   A.   Yes.

 8   Q.   Okay.  Although the album, Our World Redeemed, was

 9   nominated for Best Rock or Rap Gospel Album, the song Joyful

10   Noise itself was not nominated for any Grammy award; is that

11   right?

12   A.   Correct.  It was not.

13   Q.   And Our World Redeemed was not performed was not

14   performed during the Grammy Award show; is that correct?

15   A.   Correct.  It was not.

16   Q.   And Joyful Noise was not performed during the Grammy

17   Award show; correct?

18   A.   Correct.  It was not.

19   Q.   Okay.  And Our World Redeemed was not mentioned during

20   the televised broadcast at the Grammy Awards; is that

21   correct?

22   A.   It was not.

23   Q.   And Joyful Noise was not mentioned during the televised

24   broadcast of the Grammy Awards; is that correct?

25   A.   Correct.  It was not.
```

```
 1    Q.   Okay.  Mr. Gray, you also mentioned the GMA Dove awards;

 2    is that correct?

 3    A.   Yes.

 4    Q.   The GMA Dove Awards are given to Christian music; is

 5    that correct?

 6    A.   Yes.

 7    Q.   And GMA stands for Gospel Music Association?

 8    A.   Yes.

 9    Q.   Okay.  And no one performed Joyful Noise at the 40th GMA

10    Dove Awards in April 2009; is that right?

11    A.   That's right.  No one did.

12    Q.   And you have no knowledge that any of the individual

13    defendants attended the Dove awards in April 2009; is that

14    right?

15    A.   I do not have that knowledge.

16    Q.   And your concert performances are mostly in churches and

17    then other religious organizations; is that correct?

18    A.   About 70 percent.  Mostly.

19    Q.   Okay.  And you have no documents indicating what songs

20    you performed at any of your concerts; is that correct?

21    A.   Traditionally, in the rap genre, we don't have like a

22    set list.  It's more about the mood in the room.  So I do not

23    have any documents other than . . . no documents.

24    Q.   No documents; right?

25    A.   Correct.
```

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 349

1    Q.    And you have no documents which indicate that you

2    performed Joyful Noise at any particular concert; is that

3    right?

4    A.    Correct.

5    Q.    And you have no tapes of any concert performance or live

6    performance of Joyful Noise anywhere; is that right?

7    A.    VHS tapes?  Or footage from phones?  It's kind of . . .

8    Dated question.

9    Q.    Okay.

10    A.    So I don't have a tape, but I do have recordings.

11    Q.    Were any recordings of Joyful Noise being performed

12    prior to your filing of this lawsuit?

13    A.    Can you state that again?  I'm sorry.

14    Q.    Sure, sure.  Do you have any recordings of performances

15    of Joyful Noise prior to the filing of this lawsuit?

16    A.    No, just the footage on YouTube.

17    Q.    Your footage?

18    A.    From tours and things of that sort.

19    Q.    Was this produced by your lawyers in this case?

20    A.    Um, no.

21    Q.    So you have no footage of live performances of Joyful

22    Noise that were ever given by your lawyers in this case to

23    the defendants; correct?

24    A.    Correct.

25    Q.    And you don't have any documents reflecting sales of any

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 350

```
 1    of your music at your concerts; correct?

 2    A.   Correct.

 3    Q.   Okay.  Uh, Mr. Gray, you, um, were deposed in this

 4    action; correct?

 5    A.   Correct.

 6    Q.   Okay.  And you sat for a day of questions, and you gave

 7    answers to those questions; right?

 8    A.   Yes.

 9    Q.   Okay.  And you were under oath on that day just like you

10    are today; is that right?

11    A.   Yes.

12    Q.   Okay.  Um, do you remember being asked the following?

13            MR. MOVIT:  I'm referencing deposition, page 77,

14    lines 22 through 25.

15            THE COURT.  Okay, go ahead.

16    BY MR. MOVIT:

17    Q.   Mr. Gray, am I correct that you were asked the following

18    question at your deposition?  Quote --

19            THE COURT:  Wait a minute.

20            Are you in the dep -- he's in the wrong place.

21    BY MR. MOVIT:

22    Q.   Okay.  Well, of course.  Mr. Gray, please let me know

23    when you're ready.  Page 77?

24            THE COURT REPORTER:  You got it.

25    BY MR. MOVIT:
```

```
 1    A.    Okay.  So there's page 77 on . . .  Okay.  Yeah, I was

 2    there originally.

 3    Q.    Line 22.

 4    A.    Okay.

 5    Q.    And you were asked the following question.  Quote so do

 6    you have any tapes of any concert performance or live

 7    performance anywhere of Joyful Noise close quote.  That's the

 8    question you were asked; right?

 9    A.    Correct.

10    Q.    Okay.  And the answer you gave was I do not.  Is that

11    correct?

12    A.    Correct.

13    Q.    Okay.

14    A.    I do remember stumbling through the same thing there,

15    fishing for what is a tape or just trying to get more

16    information.

17    Q.    Okay.  You did not ask the attorney on the day of your

18    deposition what is a tape, did you?

19    A.    No.  I mean, just struggling through, trying to

20    understand the question.

21    Q.    But -- but my question specifically was on the day of

22    your deposition.

23    A.    Mm-hmm.

24    Q.    You did not indicate that you were struggling through

25    that question; correct?
```

EXHIBIT 3
PAGE 352

1    A.    I recall page 78.  I'm kind of doin' the same thing.

2    Other friends had been present.  That's the only extent of

3    people that I know that had footage.  So I think clearly, I

4    was fishing as well, tryin' to figure out the nature of these

5    tapes.

6    Q.    Okay.  Um, let's look at the testimony on page 78,

7    Mr. Gray.

8    A.    Okay.

9    Q.    And beginning on line 1, you were asked quote do you

10   know anyone that does have any such taping or video of any

11   live performance of Joyful Noise ever.  That's the question

12   you were asked?

13   A.    Correct.

14   Q.    Okay.  And you gave the following answer.  Other than

15   friends who have been present at concerts, that's the only

16   extent of people I know who would have footage from a live

17   concert.

18   A.    Mm-hmm.

19   Q.    And then you were asked but do they.  Do you know

20   someone that specifically has footage of Joyful Noise?  And

21   you gave the following answer.  No, I don't recall anyone who

22   has footage of.  Correct?

23   A.    Right.

24   Q.    Okay.  And that's the answer you gave under oath on

25   November 15, 2017; is that correct?

1    A.    Correct.

2    Q.    Okay.  Is it correct, Mr. Gray, that you don't have

3    documents reflecting sales of any of your music at your

4    concerts?

5    A.    Correct.

6    Q.    And you have no knowledge that any of the individual

7    defendants ever attended any of your concert performances;

8    correct?

9    A.    Correct, correct.

10   Q.    And you don't have a set list for any Lecrae Moore's

11   concerts; is that right?

12   A.    I do not.

13   Q.    And you have no documents reflecting the broadcast of

14   Joyful Noise on any radio station ever; is that right?

15   A.    True.

16   Q.    Okay.  And you have no documents reflecting the

17   broadcast of Joyful Noise on any television or cable station

18   ever?

19   A.    I do not have those documents.

20   Q.    Okay.  Let's, uh, turn the page, so to speak, and

21   discuss the creation of Joyful Noise?

22   A.    All right.

23   Q.    Okay.  So you know it's not literally turning the page.

24   A.    Yeah, that was known as a pun.  I like it.

25   Q.    Okay.  Joyful Noise is created in 2007; is that right?

EXHIBIT 3
PAGE 354

1    A.    Yes.

2    Q.    Okay.  Uh, let's discuss the instrumental musical track

3    in Joyful Noise?

4    A.    All right.

5    Q.    Uh, would you agree that the instrumental track in

6    Joyful Noise is often called the beat?

7    A.    Yes.

8    Q.    Okay.  So we're just going to call it the beat for

9    short.

10   A.    Okay.

11   Q.    You did not write that beat yourself; is that right?

12   A.    I did not.

13   Q.    Okay.  You got the beat from Mr. Ojukwu?

14   A.    Yes.

15   Q.    So this lawsuit is not about any music that you wrote.

16   Right?

17   A.    The collective unit but not about the music, the beat,

18   correct.

19   Q.    Yeah.  It's the beat that's at issue, not the lyrics in

20   this case; is that right?

21   A.    The song.  I see it as a unit, but in terms of the beat,

22   Chike made the beat.

23   Q.    Right.  And you did not; correct?

24   A.    Correct, correct.

25   Q.    And you weren't there when this beat was, uh, created;

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 355

46

1    right?

2    A.    I was not.

3    Q.    And am I correct that the beat for Joyful Noise was

4    created before any of the vocals were created.

5    A.    Yes.  You are correct.

6    Q.    And by the time you heard the beat, the beat was a

7    musical composition that was already constructed; correct?

8    A.    Yes.

9    Q.    Okay.  And you've never been in a musical group with

10    Mr. Ojukwu or Mr. Lambert or Lecrae; is that right?

11    A.    I have not.  No.

12    Q.    And you already knew Mr. Ojukwu before you got the beat

13    from him; right?

14    A.    Yes.

15    Q.    But you first learned about this beat from, uh, another

16    friend of yours; is that right?

17    A.    Yes.  Who would have got it, right.

18    Q.    Okay.  And, um, your friend, uh, regularly visited

19    Mr. Ojukwu's MySpace page; is that right?

20    A.    Yes.

21    Q.    Okay.  And, um, Mr. Ojukwu had posted this beat on his

22    MySpace page?

23    A.    Yes.

24    Q.    Okay.  And your friend who regularly visited that page

25    had encountered the beat on that MySpace page of Mr. Ojukwu;

EXHIBIT 3
PAGE 356

```
 1    is that correct?
 2    A.    Yes.
 3    Q.    Okay.
 4    A.    That's correct.
 5    Q.    Okay.  You on other the hand were not in the practice of
 6    going to Mr. Ojukwu's MySpace page; is that right?
 7    A.    I was not.
 8    Q.    Okay.  So the mere fact that Mr. Ojukwu who is someone
 9    that you already knew posted this beat on his MySpace page,
10    that fact alone was not enough for you to learn about the
11    beat; is that correct?
12    A.    Not at the time, no.
13    Q.    Your friend actually had to bring this beat to your
14    attention for you to learn about it; is that right?
15    A.    Yes.  Yes.
16    Q.    And after hearing the beat, you decided that you were
17    interested in writing and recording vocals over it?
18    A.    Yes, correct.
19    Q.    And the vocal parts for Joyful Noise written by
20    yourself, Emanuel Lambert and Lecrae Moore; is that right?
21    A.    Yes.  That's right.
22    Q.    And the three of you are the only people to your
23    knowledge who wrote the vocal parts for Joyful Noise?
24    A.    Yes.
25    Q.    No one else wrote vocal parts; correct?
```

1    A.    No one else, correct.

2    Q.    Okay.  And all three of you to be clear wrote your vocal

3    parts after the beat was made?

4    A.    Yes.  Absolutely.

5    Q.    Okay.  And you and Mr. Moore separately wrote rap verses

6    for Joyful Noise; right?

7    A.    Yes.  We did.

8    Q.    And you wrote your respective verses in separate

9    locations?

10    A.    Yes.

11    Q.    And you and Mr. Lambert, uh, co-wrote the vocal hook for

12    Joyful Noise at his Philadelphia home?

13    A.    Yes.

14    Q.    Okay.  And you never had an agreement with Mr. Ojukwu

15    regard -- regarding your use of his beat prior to recording

16    the song?

17    A.    Nothing beyond verbals, correct.

18    Q.    Okay.  Now, Mr. Gray, I would like to, um, read you some

19    of your deposition testimony?

20    A.    Okay.

21    Q.    And it is on page 40 beginning line 23 to 41, line 2.

22    A.    Page 40?

23    Q.    Yes, sir.  Page 40, line 23?

24    A.    Okay.

25    Q.    Okay.

EXHIBIT 3
PAGE 358

49

1          MR. MOVIT:  And it's okay to proceed, Your Honor?

2          THE COURT:  You may.

3     BY MR. MOVIT:

4     Q.   You were asked the following question.  What, if

5     anything, in terms of an agreement did you have with Chike in

6     terms of using that track?  And you provided the following

7     answer.  We recorded the song prior to any agreement.  Is

8     that correct, sir?

9     A.   Yes.

10    Q.   Okay.  Now let's discuss who performs on the Joyful

11    Noise recording.  The only performers on the Joyful Noise

12    recording are yourself, Lecrae Moore and a gentleman named

13    John Reilly; is that correct?

14    A.   That is correct.

15    Q.   And you performed the rap verses that you wrote for

16    Joyful Noise?

17    A.   Yes.

18    Q.   And Lecrae Moore performed the rap verses that he wrote?

19    A.   Yes.

20    Q.   Okay.  And Mr. Reilly performs the vocal hook that you

21    co-wrote with Emanuel Lambert?

22    A.   Correct.

23    Q.   Okay, let's talk about the release of Joyful Noise.

24    A.   Okay.

25    Q.   Um, the recording of Joyful Noise was included on an

1    album by you called Our World Redeemed?

2    A.    Yes.

3    Q.    Okay.  And there were numerous other songs in addition

4    to Joyful Noise on that album; right?

5    A.    You're right.  Yeah.

6    Q.    And the Our World Redeemed album was released in 2008?

7    A.    Yes.

8    Q.    And the album was released by a record label called

9    Cross Movement Records?

10   A.    Correct.

11   Q.    Okay.  Is it your understanding that at the time Joyful

12   Noise was released, Cross Movement Records had ownership

13   rights in certain musical compositions that you wrote?

14   A.    Yes.

15   Q.    Okay.  And one of those musical compositions was Joyful

16   Noise?

17   A.    Yes.

18   Q.    Okay.  So it's your understanding that at the time

19   Joyful Noise was released, Cross Movement Records owned part

20   of the copyright in the composition of Joyful Noise; is that

21   right?

22   A.    Yes.

23   Q.    Okay.  And Cross Movement Records was the sole owner to

24   your knowledge of the copyright in the sound recording --

25   A.    Correct.

UNITED STATES DISTRICT COURT

EXHIBIT  3
PAGE  360

```
 1    Q.    -- of Joyful Noise, sir?

 2    A.    Sorry.  Correct.

 3    Q.    Did you ever sign a recording contract with Cross

 4    Movement Records?

 5    A.    Yes.

 6    Q.    Um, did your attorney, Eric Kayira, represent you in

 7    entering into that contract?

 8    A.    Yes.

 9    Q.    Okay.  I'd like you to look, Mr. Gray, at your

10    deposition again.

11    A.    Okay.

12    Q.    Can you please look at page 69 beginning on line 20?

13    A.    All right, I'm there.

14          MR. MOVIT:  Your Honor, may I proceed?

15          THE COURT:  Let me look and see.

16          MR. MOVIT:  Through line 2 on page 70.

17          THE COURT:  Okay.  Let me just see.

18          Go ahead.

19          MR. MOVIT:  Okay.

20    Q.    Mr. Gray, at your deposition, you were asked the

21    following question.  What is the first -- did you hire

22    Mr. Kayira for services other than the litigation to do

23    transaction deals?  And you provided the following answer.

24    No, just consulting.  Is that correct?

25    A.    That is correct.
```

```
 1    Q.   Okay.  And then you were asked the following question.
 2    But he was not involved in your transactions, your recording
 3    agreement or any documentation with Cross Movement?  And you
 4    gave the following answer.  No, he was not.  Is that correct?
 5    A.   That is correct.
 6    Q.   Okay.  I'd like to look at Joint Exhibit 58-A, please?
 7               MR. MOVIT:  And this is already in.
 8               May I publish it, Your Honor?
 9               THE COURT:  You may.
10               MR. MOVIT:  Thank you.
11    Q.   And Mr. Gray, this is the booklet for your album Our
12    World Redeemed; is that correct?
13    A.   Yes.
14    Q.   Okay.  Um, if we could please look at the credits for
15    the song Joyful Noise?
16               Okay.  Would you agree that these are the officials
17    credits for, um, the -- the works on the Our World Redeemed
18    album?
19    A.   Yes.
20    Q.   Okay.  And if we could please zoom in on Joyful Noise?
21    It's kind of diagonally printed.  That's the way it was in
22    your booklet?
23    A.   It was cool back then.
24    Q.   When we zoom in on Joyful Noise, it lists three writers;
25    correct?
```

```
1    A.   Correct.

2    Q.   Yourself, Lecrae Moore and Emanuel Lambert; correct?

3    A.   Yes.

4    Q.   Okay.  And it does not list Mr. Ojukwu as a writer;

5    correct?

6    A.   It does not.

7    Q.   And you testified that Joyful Noise was nominated for a

8    Dove Award; correct?

9    A.   Yes.

10   Q.   Okay.  And we may have covered this, that the Dove

11   Awards are awards for music in, uh, contemporary Christian

12   genre; is that correct?

13   A.   Correct.

14   Q.   And, um, the Dove Award, um, for which Joyful Noise was

15   nominated was Best Rap/Hip Hop Song of the Year?

16   A.   Yes.

17   Q.   Okay.  And if we could please look at Joint Exhibit 21?

18   So that's in your big thick binder.  Do you have it there?

19   Tab 21?

20   A.   Yes.  I'm there.

21   Q.   The first page of this document is an email; is that

22   correct?

23   A.   Yes.

24   Q.   Okay.  And, um, at the time of February 20, 2009, was

25   your email address star@flame314.com?
```

54

1    A.    Yes.

2    Q.    Okay.  And is this document -- do you recognize this

3    document?

4    A.    Yes.  Yes, from my email.

5    Q.    Okay.  This is an email that you sent yourself?

6    A.    From -- from star to star.

7    Q.    Right.  From you to you; correct?

8    A.    Mm-hmm.

9    Q.    Okay.  On February 20, 2009; is that correct?

10   A.    Yes, I see that.

11          MR. MOVIT:  Uh, permission to publish this to the

12   jury?

13          THE COURT:  Yes, you may.

14   MR. MOVIT:

15   Q.    And this is an email, Mr. Gray, that you sent yourself

16   attaching a press release with the list of nominations for

17   the 40th Dove Awards; is that correct?

18   A.    Yes -- oh.  So, um -- it says star which was my manager

19   at the time so . . .  I know you're referring to it as me?

20   So I'm just a little frustrated.

21   Q.    Okay.  Did you say, sir, that your email address was

22   star@flame314.com in there, though?

23   A.    I don't recall.

24   Q.    So was your email as of February 20, 2009

25   starflame314.com?

UNITED STATES DISTRICT COURT

EXHIBIT  3
PAGE  364

55

1    A.    She was on my team running things for me as an artist.

2    Q.    So this was Star's email address?  Or your email

3    address.  Did you ever use -- strike that.  Did you ever

4    personally use this email address?

5    A.    Yes.

6    Q.    Okay.  And I'll represent this document was produced in

7    this lawsuit by your lawyers.

8    A.    Mm-hmm.

9    Q.    Do you have any reason to challenge that?

10   A.    No.

11   Q.    If you would please look at page 21-5?  So there's the

12   numbers on the bottom in the middle of each page?

13   A.    All right.

14   Q.    Are you there, sir?

15   A.    Yes.  Sorry.

16   Q.    And do you see about two-thirds of the way down the page

17   where it says Rap/Hip Hop Recorded Song in capital letters?

18   A.    Yes, I see that.

19   Q.    And above that line, it says Dove Awards in recorded

20   song categories are given to the artist and songwriter if

21   other than the artist.  Do you see that, sir?

22   A.    Yes.

23   Q.    Now, do you see under Rap/Hip Hop Recorded Song where it

24   says song, album, artist, writer or label?  Do you see that,

25   sir?

UNITED STATES DISTRICT COURT

EXHIBIT  3

PAGE  365

56

1    A.    Yes.

2    Q.    Okay.  And then there's five songs listed; is that

3    correct, sir?

4    A.    Correct.

5    Q.    Okay.  And those were the -- to your knowledge, those

6    were the five nominees for the Rap/Hip Hop Recorded Song

7    category for the Dove Awards that year?

8    A.    Yes.

9    Q.    Okay.  And one of them is Joyful Noise; right?

10   A.    Correct.

11   Q.    Okay.  So it's song, album, artist, writer, label;

12   correct?

13   A.    Yes.

14   Q.    Okay.  For Joyful Noise, it lists song as Joyful Noise;

15   correct?

16   A.    Correct.

17   Q.    Okay.  And then for album, it lists Our World Redeemed;

18   correct?

19   A.    Yes.

20   Q.    Okay.  And then for artist, it lists Flame featuring

21   Lecrae and John Reilly; is that correct?

22   A.    Yes, it is.

23   Q.    Okay.  And then for writer, it lists Marcus T. Williams

24   Gray.  Is that you, sir?

25   A.    Yes.

EXHIBIT 3
PAGE 366

57

1    Q.   Okay.

2    A.   That is me.

3    Q.   Lecrae Moore and Emanuel Lambert.  Correct?

4    A.   Correct.

5    Q.   Okay.  And it lists no one else as a writer; is that

6    correct?

7    A.   It does not, correct.

8    Q.   Okay.  So the Dove Awards did not list Mr. Ojukwu as a

9    writer of Joyful Noise in this document; correct?

10   A.   Correct.

11   Q.   Okay.  Let's talk about this case a bit?

12   A.   All right.

13   Q.   So you can close that document, sir.  Is it correct that

14   Lecrae Moore first brought the Katy Perry song Dark Horse to

15   your attention?

16   A.   He was -- it was fans, and then Lecrae reached out to me

17   as well.

18   Q.   Isn't it correct that you checked out the song Dark

19   Horse when Lecrae made reference to the song being used by

20   Katy Perry?

21   A.   Yes.

22   Q.   Okay.  And this was on a phone call where he did this?

23   A.   This was via text.

24   Q.   And this was in 2013?

25   A.   Yes.

1    Q.   And had you heard Dark Horse before Mr. Moore called you

2    about it?

3    A.   I had not.

4    Q.   And when Mr. Moore brought Dark Horse to your attention,

5    your initial reaction was not that Dark Horse infringed

6    Joyful Noise?

7    A.   Please say it again, I'm sorry.

8    Q.   Of course.  When Mr. Moore brought Dark Horse to your

9    attention, your initial reaction was not that Dark Horse

10   infringed Joyful Noise; is that correct?

11   A.   It was -- my initial response was that the -- there was

12   a similarity.

13   Q.   Okay.  Um, I'd like to look at your deposition again,

14   please, sir?

15   A.   Sure, sure.

16   Q.   And specifically page 15.

17        MR. MOVIT:  Your Honor, I'd like to ask the witness

18   about page 15, lines 16 Through 22.

19        THE COURT:  Okay.

20        MR. MOVIT:  Is that fine, Your Honor?

21        THE COURT:  I'm looking.

22        MR. MOVIT:  Of course.

23        THE COURT:  Go ahead.

24        MR. MOVIT:  Thank you, Your Honor.

25   Q.   Okay.  At your deposition, you're asked the following

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 368

```
 1   question.  Did you bring that issue to -- when I say that
 2   issue, did you bring to either the other plaintiffs'
 3   attention a contention that Katy Perry's song, Dark Horse,
 4   potentially infringed your song Joyful Noise?  And you gave
 5   the following answer.  I did not.  That wasn't my initial
 6   reaction.  Is that correct?
 7   A.   My initial reaction was not reaching out to the other
 8   plaintiffs.
 9   Q.   Okay.  So in reaching out to the other plaintiffs, you
10   spoke to your lawyer, Eric Kayira, about making this
11   copyright claim; is that right?
12   A.   Yes.  I consulted with him to see if he even had the
13   time.
14   Q.   And you advised Mr. Moore that you were speaking to
15   counsel about this matter?
16   A.   Correct.
17   Q.   And your impression was that Lecrae Moore was excited to
18   hear that?
19   A.   Yes.
20   Q.   Okay.  And your impression was that Lecrae Moore was on
21   board with asserting this claim?
22   A.   Certainly.
23   Q.   I'm sorry?
24   A.   Certainly.
25   Q.   But you didn't have any conversations with Emanuel
```

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 369

```
 1   Lambert or Mr. Ojukwu about the copyright claim at that time?
 2   A.   Not initially.  No, I did not.
 3   Q.   Is it your understanding that Mr. Kayira reached out to
 4   them to get them on board?
 5   A.   Yes.
 6   Q.   And eventually, the four of you, yourself, Mr. Lambert,
 7   Mr. Moore, Mr. Ojukwu signed a retainer agreement with
 8   Mr. Kayira?
 9   A.   Correct.
10   Q.   And Mr. Kayira filed this copyright infringement lawsuit
11   against Katy Perry and the other defendants on July 1st,
12   2014?
13   A.   Yes.
14   Q.   Is it correct that at no time before this lawsuit was
15   filed did you, Mr. Lambert, Mr. Moore and Mr. Ojukwu have any
16   conversation together?
17   A.   Correct.
18   Q.   And instead the preparation and filing of this lawsuit
19   was coordinated by Mr. Kayira?
20   A.   Correct.
21   Q.   Is it correct that you personally did not apply for any
22   certificate of registration from the U.S. Copyright Office
23   for Joyful Noise?
24   A.   Correct.
25   Q.   Is it your understanding that Mr. Kayira applied for
```

```
 1   this copyright registration?

 2   A.   Correct.

 3   Q.   Are you familiar with the copyright registration for

 4   Joyful Noise?

 5   A.   By familiar, you mean . . .

 6   Q.   If I showed you, would you be able to identify it?

 7   A.   Oh.  Yeah.

 8   Q.   Okay.

 9             MR. MOVIT:  I'd like to show the witness Exhibit 1?

10             THE COURT:  Sure.

11             MR. MOVIT:  Okay.  And publish it to the jury,

12   thank you.

13   Q.   And, um, Mr. Gray, is it your understanding that this

14   exhibit is the copyright registration for Joyful Noise?

15   A.   Yes.

16             MR. MOVIT:  Your Honor, I'd like to offer this into

17   evidence if it's not already.

18             THE CLERK:  It is admitted.

19             MR. MOVIT:  Oh, it is admitted, thank you.

20   Q.   Okay.  And do you see, sir, where it states the

21   effective date of registration is June 3rd, 2014?

22   A.   Yes.

23   Q.   Okay.  So it's your understanding that that's the date

24   when Mr. Kayira applied for this registration?

25   A.   Yes.
```

```
 1              MR. MOVIT:  I'd like to show the witness Joint
 2    Exhibit No. 6.
 3    Q.   If you would please look at Joint Exhibit No. 6, sir.
 4    A.   All right.  I'm there.
 5    Q.   Mr. Gray, are you familiar with this document?
 6    A.   Yes.
 7    Q.   Okay.  Is it your signature, um, under your name on the
 8    first page of this document?
 9    A.   Yes.
10    Q.   Okay.
11              MR. MOVIT:  Um, may I publish this to the jury?
12              THE COURT:  Yes.
13              MR. MOVIT:  Thank you.
14    Q.   And, um, to your knowledge, below your signature is the
15    signature of a gentleman named John wells.  Is that correct?
16    A.   Correct.
17    Q.   Okay.  And he was signing personally and on behalf of
18    Cross Movement Records; is that correct?
19    A.   Is it, please, John Wells that you're asking?
20    Q.   Yes, sir.  Is it your understanding that he was signing
21    this document in his individual capacity and behalf of Cross
22    Movement --
23    A.   Correct.
24    Q.   -- Records?
25    A.   Correct.
```

UNITED STATES DISTRICT COURT

EXHIBIT  3
PAGE  372

```
 1    Q.   Okay.  And this document dated July 3rd, 2014; is that

 2    right?

 3    A.   Yes.

 4    Q.   Okay.  So this document was entered into two days after

 5    you started this lawsuit against Katy Perry and the other

 6    defendants; is that right?

 7    A.   Mm-hmm.  Mm-hmm.

 8              THE COURT REPORTER:  I'm sorry, is that yes?

 9              THE WITNESS:  Yes.

10              THE COURT:  Yeah, you have to . . .

11    BY MR. MOVIT:

12    Q.   Okay.  And in this document, Cross Movement Records

13    assigned any rights that it had in the composition of Joyful

14    Noise to you; correct?

15    A.   Yes.

16    Q.   Okay.

17    A.   Yes.

18    Q.   Uh, but in this document, Cross Movement Records

19    retained ownership of the sound recording of Joyful Noise;

20    correct?

21    A.   Yes.

22    Q.   And you had previously filed a lawsuit against Cross

23    Movement Records, uh, seeking payment of royalties; is that

24    correct?

25    A.   Correct.
```

```
 1   Q.   Okay.  And this agreement was in settlement of that
 2   lawsuit.  Is that correct?
 3   A.   Yes.
 4   Q.   And in exchange for dropping your lawsuit against Cross
 5   Movement for unpaid royalties, you received rights from Cross
 6   Movement in the Joyful Noise composition that you're suing
 7   over in this case.  Is that correct?
 8   A.   That is correct.
 9            MR. KAHN:  I would object, Your Honor.
10            He received many more rights than that.
11            MR. MOVIT:  I object to the witness -- to the
12   counsel providing testimony.
13            THE COURT:  I think that's correct.
14   BY MR. MOVIT:
15   Q.   Um, so you gave up your claim against Cross Movement
16   Records for money they never paid you in exchange for the
17   right to sue the Dark Horse writers.  Correct?
18   A.   The Dark Horse scenario had nothing to do with Cross
19   Movement and myself.
20   Q.   But you received rights in the composition that you're
21   claiming was infringed in this case from Cross Movement
22   Records in exchange for giving up your claim against them for
23   not paying you money.  Is that correct?
24   A.   Yes.  Just . . .  just the rights back for the album.
25   Q.   Right, so you got rights in the song you're suing over.
```

```
 1    A.    Correct.
 2    Q.    In exchange for giving up your claim against Cross
 3    Movement for money.  Correct?
 4    A.    Correct.
 5    Q.    And you were represented about Eric Kayira, um, in
 6    connection with your lawsuit against Cross Movement Records;
 7    is that right?
 8    A.    Correct.
 9    Q.    And to be clear, you still don't own the sound recording
10    of Joyful Noise; correct?
11    A.    So okay, we're getting into the weeds.  I'm just an
12    artist so some of these terms, but I received rights back to
13    the Our World Redeemed album as well as the others that came
14    it and had nothing to do with Dark Horse.  Just trying to get
15    out of that contract.
16    Q.    But, again, you received rights in -- in Joyful Noise in
17    the settlement; correct?
18    A.    Yes.
19    Q.    Two days after the lawsuit was filed; correct?
20    A.    Mm-hmm.
21    Q.    The lawsuit against Katy Perry and the other defendants?
22    A.    Mmm-hmm.  Yes, yes.
23    Q.    Uh, did Lecrae Moore approve the filing of this lawsuit?
24    A.    Yes.  Absolutely.
25    Q.    Are you aware that Lecrae Moore submitted a sworn
```

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 375

 1    statement called a declaration in this case?

 2    A.    Yes.

 3    Q.    Are you familiar -- generally familiar with the content

 4    of it?

 5    A.    I'm not.

 6            MR. MOVIT:  I'd like to show the witness Lecrae

 7    Moore's declaration dated December 11th, 2017, and -- and I

 8    have a copy for, um, plaintiff's counsel and for the Court.

 9            MS. COHEN:  Objection, Your Honor.

10            A declaration is not proper evidence.

11            MR. MOVIT:  I'm -- I'm not admitting it as evidence

12    into evidence.  I'm using it for impeachment.

13            THE COURT:  I think he's using it for impeachment.

14    It's not coming in as direct evidence.

15            MS. COHEN:  Okay.

16            MR. MOVIT:  Uh, does counsel have a copy?

17            MS. COHEN:  Yes.

18            MR. MOVIT:  Okay.

19            THE COURT:  And do we have one for the witness or

20    just for me?

21            MR. MOVIT:  Oh.  I apologize, Your Honor.

22            I do have one for the witness.

23    Q.    Okay.  Take a moment to read it, please.  I would direct

24    your attention in particular to paragraph 6.

25    A.    Okay, I'm there.

```
 1    Q.   And do you see in paragraph 6 where it says -- or

 2    Mr. Moore says I was originally named as the plaintiff in

 3    this lawsuit.  I, however, was not interested --

 4              THE COURT:  Hold on.  Hold on.  He can read it to

 5    himself.  But disregard what he said, not because it doesn't

 6    have relevance, it's just -- it's an out-of-court statement,

 7    and we call that hearsay so that can't come into evidence.

 8    MR. MOVIT:

 9    Q.   So have you read paragraph 6?

10    A.   I'm currently reading it.

11    Q.   Okay, let me know when you're finished reading

12    paragraph 6.

13    A.   Okay.  I'm good here.

14    Q.   And, um, before, you know, um, Mr. Gray, you testified

15    yesterday as to your mental state in believing that Lecrae

16    had approved the lawsuit; is that correct?

17    A.   Correct.

18    Q.   Okay.

19              MR. MOVIT:  Um, so, Your Honor, I may not read

20    this, but I'd like to read this to the witness to impeach

21    his -- and -- and to ask questions about the statements in

22    here and to impeach his statements about his mental state.

23              MS. COHEN:  Your Honor, this is not appropriate

24    impeachment.

25              THE COURT:  I don't think it is.  That's the
```

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 377

1    problem.

2         MR. MOVIT:  But the -- the -- we'd respectfully

3    submit the plaintiffs and relied on it yesterday in terms of

4    hearsay statements regarding Mr. Moore and purported things

5    he said in reflecting his mental state.  And given that

6    latitude, we respectfully request that we be given similar

7    latitude because these are -- these are sworn words on a

8    page, Your Honor.

9         THE COURT:  Hang on for a minute, everyone.

10        MR. MOVIT:  And we will have a side bar if

11   Your Honor wants.

12        MR. KAHN:  And Your Honor, the defendants

13   immediately objected, and the Court prohibited any

14   information in any statements that Mr. Moore, um, made to the

15   Mr. Gray.

16        MR. MOVIT:  That -- that's not correct.  Your Honor

17   sustain -- Your Honor overruled the objection, and Mr. Gray

18   gave testimony --

19        THE CLERK:  We might need a side bar.

20        THE COURT:  We do need a side bar.

21        MR. MOVIT:  Of course.

22      (The following proceedings occurred at side bar:)

23        THE COURT:  Let's start at the beginning.

24        MS. LEPERA:  The beginning was yesterday Mr. Gray

25   specifically testified about a conversation he had with

```
 1    Mr. Moore who allegedly told him the reason he withdrew from
 2    the lawsuit was because he had a conflict and wanted to go on
 3    a concert and tour promotion.  And that was allowed to come
 4    into evidence notwithstanding the hearsay.
 5              THE COURT:  That is correct.
 6              MS. LEPERA:  I think that in order to properly
 7    address that not one-sided view presented to the jury, given
 8    we have an actual declaration from Mr. Moore which states the
 9    exact opposite.  There was no authority for him to file the
10    lawsuit and he demanded to be withdrawn.  He didn't authorize
11    it.  This is in direct conflict with this witness's testimony
12    with respect to that conversation that he has now sworn under
13    oath existed.  And without the other side of it is unfairly
14    prejudicial.
15              THE COURT:  I take it Mr. Moore is not available?
16              MS. LEPERA:  No, he is not available and not
17    interested in participating in this litigation.
18              MR. KAHN:  Declaration was drafted by defense
19    counsel.
20              THE COURT:  He signed it.
21              MS. LEPERA:  You opened the door.
22              MR. KAHN:  It was a conversation I had with his
23    agent that he was uncomfortable.
24              MS. LEPERA:  You opened the door yesterday and got
25    this one-sided presentation of a conversation directly
```

```
 1    refuted by the person he's saying gave that statement.  It's
 2    not admitted for the truth.  The version of the conversation
 3    Mr. Moore says occurred rather than the one Mr. Gray says
 4    occurred.  They opened the door.
 5            MS. COHEN:  Your Honor, yesterday you required us
 6    to rephrase the question as to his knowledge and
 7    understanding Mr. Gray had.  That's what he did.  He did not
 8    testify to a direct statement made by Lecrae Moore.  Simply
 9    his understanding of Lecrae's decision to participate.
10            THE COURT:  That's not what happened.  I said
11    Mr. Moore's statement could not come in for the truth of the
12    matter asserted.  You could offer it for the understanding
13    Mr. Gray had of the reason that Mr. Moore withdrew.
14            MS. COHEN:  This doesn't correct his understanding.
15            THE COURT:  If everyone would be quiet so I can
16    read it, perhaps I can tell you what I think.  What I think
17    can come in as it's effectively it's not a statement, but it
18    is a prior, it is a statement by Mr. Moore that refutes the
19    implication that Mr. Gray was told that he wanted out to go
20    on a concert tour as opposed to he wanted out because he
21    hadn't authorized the suit.
22            And to the extent it's hearsay, it still I think
23    can come in under one of the residual exceptions of prior
24    inconsistent statements because it's offered to impeach the
25    understanding, what he says was his understanding.
```

```
 1              So the question is how to phrase it.  You can't

 2    read it, but I do think you can ask him after reading this,

 3    does it refresh your recollection that Mr. Lecrae stated that

 4    he had not -- that he had demanded to be dismissed.  The

 5    question is.

 6              MS. LEPERA:  He demanded to be dismissed as a

 7    plaintiff.

 8              MR. KAHN:  We get into the weeds then.

 9              THE COURT:  I mean, the real point is what he's

10    saying is that the lawsuit was filed without his knowledge.

11              MS. LEPERA:  Correct.  Mr. Gray has testified under

12    oath that Mr. Moore told him that he authorized the lawsuit.

13              THE COURT:  That I think is appropriate.

14              MS. LEPERA:  That's exactly the point.

15              THE COURT:  I think that's fair.  What's ambiguous

16    here is why he asked to be dismissed?

17              MS. LEPERA:  Right.  The real point Mr. Moore has

18    testified he authorized the lawsuit effectively and the only

19    reason he got out of it was because of a concert.  It's the

20    predicate there that's fair.

21              May I suggest that we do the following.  You

22    testified that -- you just asked him this that Mr. Moore

23    authorized the lawsuit.  Does this refresh your recollection

24    that Mr. Moore -- Mr. Gray, you testified that you spoke to

25    Mr. Moore and he authorized the filing of the lawsuit
```

EXHIBIT 3
PAGE 381

1    correct?  Yes.

2         THE COURT:  One of the problems I'm having here is

3    Mr. Marcus is in effect a party opponent.

4         MS. LEPERA:  To Mr. Moore.

5         THE COURT:  No, to your client in other words.

6         MS. LEPERA:  Mr. Gray?

7         THE COURT:  I mean, Mr. Moore.  Mr. Gray obviously

8    is.  I do think given where we are now, you certainly can

9    bring out that.

10        MR. KAHN:  That was his recollection.

11        THE COURT:  Having read this, do you recall that

12   Mr. Moore. . .

13        MS. LEPERA:  Said the following.

14        THE COURT:  Said that he had not authorized the

15   suit.

16        MR. MOVIT:  Was not interested in pursuing a

17   lawsuit to the end of that sentence?

18        MR. KAHN:  No.

19        THE COURT:  Not interested in pursuing the suit.

20   The point is he did not authorize.

21        MS. LEPERA:  That's correct.  Upon learning he

22   demanded to be withdrawn.  That's the key part.

23        THE COURT:  Well, upon learning that the lawsuit

24   had been filed, I demanded to be dismissed.  I mean, it

25   doesn't really make the point we're trying to make.  He

```
1    didn't authorize the suit.
2            MS. LEPERA:  It suggests he didn't know it was
3    being filed.  How can you authorize something if you don't
4    know it's filed?
5            THE COURT:  That's what you want to say.
6            MS. LEPERA:  He didn't know the lawsuit was filed
7    once he found out and demanded to be dismissed.
8            MR. MOVIT:  Upon learning, demanded to be
9    dismissed.
10           MS. COHEN:  That's not what he said yesterday.
11           MR. MOVIT:  He said --
12           THE COURT:  I think there are only two points,
13   maybe three points.  Do you recall yesterday you testified
14   that it was your understanding that Mr. Moore withdrew
15   because. . .
16           MS. LEPERA:  He knew there was a lawsuit and didn't
17   want to participate.
18           THE COURT:  Start at the beginning.  He wanted to
19   withdraw because he had -- he wanted to pursue his concerts
20   or his career.  Having read this, does it refresh your
21   recollection that Mr. Moore stated that he -- that the
22   lawsuit was filed before he learned of it?  That's really
23   what it says and at that time demanded to be dismissed.
24           MS. LEPERA:  Yes, that's exactly right.  Okay.  I
25   think that's enough, Your Honor.
```

```
 1                    THE COURT:  I think that's all.

 2                    MS. LEPERA:  Thank you, Your Honor.

 3                    MS. COHEN:  And Your Honor, just to preserve the

 4      record, we do object this is not appropriate impeachment.

 5                    THE COURT:  Yes.  Your objection is noted.

 6                          (Side bar concluded.)

 7                    MR. MOVIT:  Uh, Your Honor, may we resume?

 8                    THE COURT:  Yes.

 9                    MR. MOVIT:  Thank you.

10      Q.   Mr. Gray, um, yesterday you testified that Lecrae Moore

11      withdrew from this lawsuit because he wanted to pursue his

12      career.  Do you recall that?

13      A.   I don't recall those words, but I . . . understand what

14      you're referencing.

15      Q.   Do you recall giving testimony, in essence, in some sum

16      and substance in saying that that was your impression?

17      A.   Yes, in terms of his new release, then yes.  Yes, I did.

18      Q.   Okay.  Having read paragraph 6 of Mr. Moore's

19      declaration, does it refresh your recollection that Mr. Moore

20      stated that this lawsuit was filed before he knew of it, and

21      at that time, he demanded to be dismissed as a plaintiff?

22      A.   I'm not sure what to say to it.  In terms of this is

23      what he said, I agree this is what he said.

24      Q.   To you?

25      A.   No.  Here.
```

```
 1    Q.    Oh.  Does it refresh your recollection that that, in

 2    fact, is what he said at that time?

 3    A.    No, he did not say that to me.

 4    Q.    Okay.  And -- and Mr. Moore we all agree did ask to be

 5    removed as a plaintiff from the case and withdrew as a

 6    plaintiff from the case.

 7    A.    Correct.  Absolutely.

 8    Q.    And Mr. Moore didn't just ask to be removed from the

 9    case.  He gave up his rights in the composition of Joyful

10    Noise; is that correct?

11    A.    Yes.  Absolutely.

12    Q.    And Mr. Moore, Lecrae Moore, gave up his rights in

13    Joyful Noise, um, around July 22nd, 2014; is that correct?

14    A.    Correct.  Yes.

15    Q.    So that's about three weeks after this lawsuit was

16    filed?

17    A.    Correct.

18    Q.    Are you familiar with a document in which Lecrae Moore

19    gave up his rights --

20    A.    Yes.

21    Q.    -- to Joyful Noise?

22    A.    Yes.

23    Q.    Okay.  I'd like you to look at Joint Exhibit No. 4,

24    please.  So Mr. Gray, that would be in of your big books of

25    exhibits, Exhibit No 4?
```

1            THE CLERK:  It should be Volume I.

2            THE WITNESS:  Okay.  Yes, I have it.

3     MR. MOVIT:

4     Q.   Okay.  Is this the document that you just referenced

5     that you are familiar with?

6     A.   Yes.

7     Q.   Okay.  And it's your understanding that that's Lecrae

8     Moore's signature on the document?

9     A.   Yes.

10    Q.   Okay.

11           MR. MOVIT:  Um, permission to publish to the jury?

12           THE COURT:  You may.

13           MR. MOVIT:  Okay.  And permission to, um, offer

14    into evidence?

15           THE CLERK:  It's already admitted.

16           MR. MOVIT:  Okay, thank you.

17    Q.   This document is, indeed, dated July 22nd, 2014;

18    correct?

19    A.   Correct.

20    Q.   Okay.  And is it correct that pursuant to this document,

21    Lecrae Moore, in fact, assigned his copyright interest in

22    Joyful Noise to yourself, Emanuel Lambert and Chike Ojukwu?

23    A.   Yes, that is correct.

24    Q.   And he did so about three weeks after this lawsuit was

25    filed; right?

1    A.    Yes.

2    Q.    Okay.  So he was giving up his rights in Joyful Noise

3    after the case was filed; right?

4    A.    Yes, you're right.

5    Q.    Okay.  And, uh, Mr. Moore assigned his rights in Joyful

6    Noise to you, Mr. Lambert and Mr. Ojukwu just a few weeks

7    after Cross Movement Records had assigned its rights in

8    Joyful Noise to you.  Is that correct?

9    A.    Correct.

10   Q.    Okay.  And he assigned those rights . . .  Mr. Moore,

11   Lecrae Moore assigned his rights in Joyful Noise to you,

12   Mr. Lambert and Mr. Ojukwu for free; right?

13   A.    Correct.

14   Q.    So no money exchanged hands when Lecrae Moore assigned

15   his rights in Joyful Noise --

16   A.    That is correct.

17   Q.    -- to you and the two gentlemen that are still

18   plaintiffs --

19   A.    Sorry.

20   Q.    -- correct?

21   A.    Sorry I cut you off.  Yes, that is correct.

22   Q.    I'd like to, um -- if you can please take out, Mr. Gray,

23   uh, Exhibit 5 in that same binder you're looking at.

24   A.    Okay.  I'm there.

25   Q.    Okay.  Have you seen this document before?

1    A.    Yes.

2    Q.    Okay.  Is that your signature on the bottom left?

3    A.    Correct.

4    Q.    Okay.

5         MR. MOVIT:  Uh, permission to publish Gray Exhibit

6    5 to the jury?

7         THE COURT:  Is it in evidence?

8         THE CLERK:  It is.

9         THE COURT:  Yes.

10    MR. MOVIT:

11    Q.    Okay.  And this agreement was done after Lecrae Moore

12    gave up his rights in Joyful Noise; correct?

13    A.    Yes.

14    Q.    Okay.  And given that the date next to your signature is

15    September 30, 2014, and given that the lawsuit was filed on

16    July 1st, 2014, would it be correct to say this document was

17    done several months after this lawsuit was filed?

18    A.    Yes, it would be correct to say that.

19    Q.    And, uh, do you agree this document appears to have been

20    prepared by your lawyer, Eric Kayira?

21    A.    Yes.

22    Q.    And this agreement gives you a 35 percent interest in

23    Joyful Noise; is that correct?

24    A.    Yes.  That is correct.

25    Q.    And a 15 percent interest to Mr. Lambert?

```
 1    A.    Yes.

 2    Q.    And a 50 percent interest to Mr. Ojukwu?

 3    A.    Correct.

 4    Q.    Okay.  And this is the first written agreement that you

 5    entered into with Mr. Lambert or Mr. Ojukwu regarding how you

 6    would share the income for Joyful Noise; is that correct?

 7    A.    Yes.

 8    Q.    So in summary, Mr. Gray, is it correct that all of this

 9    activity about the rights in Joyful Noise, the copyright

10    registration, Mr. Moore's assignment, the split agreement,

11    all of this activity occurs after you hire Eric Kayira to

12    assert a copyright infringement claim regarding Dark Horse;

13    is that correct?

14    A.    Correct.

15              MR. MOVIT:  Nothing further.

16              THE COURT:  Okay.

17              Do you have a long redirect?

18              MR. KAHN:  I probably do, Your Honor.

19              THE COURT:  Okay.  Why don't we then take the

20    morning recess.  Let's take ten minutes now.  We'll come

21    back, and we'll pick up with the redirect of the witness.

22              THE CLERK:  All rise.

23                        (Jury not present.)

24              THE CLERK:  Please be seated.

25              Anything to take up?
```

UNITED STATES DISTRICT COURT

EXHIBIT  3
PAGE  389

```
 1                    All right.  This court's in recess.
 2           THE COURT:  All right.
 3                       (Recess taken.)
 4           THE CLERK:  Are we ready for the jury?
 5           THE COURT:  I have to say one thing before.
 6           THE CLERK:  Okay.
 7           THE COURT:  Uh, typically, we have a rule that
 8  whoever's examining a witness is the person who should be the
 9  doing the objecting, and the reason for that the court
10  reporter just can't deal with chaos.
11           And so if everyone would just remember that when
12  we're doing the redirect on this exhibit -- or this witness,
13  Mr. Movit should be the speaker.  And, again, if there's any
14  further redirect, then obviously, um, Mr. Kahn ought to be
15  the speaker.
16           MS. COHEN:  Yes, Your Honor.
17           MR. KAHN:  Yes.
18           MR. MOVIT:  Understood, Your Honor.
19           MR. KAHN:  Understood.
20           THE COURT:  Side bar is different.
21           MR. KAHN:  Yeah.
22           MR. MOVIT:  I understand.
23           THE CLERK:  And at side bar, try to just either
24  state your name.  It'll give that pause.
25           MR. MOVIT:  Absolutely.
```

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 390

```
 1                  THE CLERK:  Okay.  Ready for the jury?

 2                  THE COURT:  Yes.

 3                  THE CLERK:  All rise.

 4                       (Jury present.)

 5                  THE CLERK:  Please be seated.

 6                  THE COURT:  Okay, Mr. Kahn.

 7                       REDIRECT EXAMINATION

 8      BY MR. KAHN:

 9      Q.   Mr. Gray, earlier in his cross-examination, Mr. Movit

10      had you look at Exhibit 79 which is the listing on Amazon.

11      Let me ask if we can call that up again on the screen.

12              And a couple quick questions.  Mr. Movit pointed

13      out that on this screen and in that particular document, the

14      comments went back as far as 2014.  Who would have any

15      knowledge regarding the pre-2014 listing of that album on

16      Amazon.com?

17                  MR. MOVIT:  Objection, foundation.

18                  THE COURT:  You can rephrase it.

19      BY MR. KAHN:

20      Q.   Would someone other than yourself --

21                  THE COURT:  Who if you'd know.

22      BY MR. KAHN:

23      Q.   Who if you'd know would have knowledge regarding the

24      pre-2014 listing of that album on the Amazon.com website?

25      A.   Cross Movement Records.
```

EXHIBIT 3
PAGE 391

```
1    Q.   Okay.  And would anyone within your organization have

2    knowledge of what was happening before 2014 with that album

3    on Amazon?

4    A.   My manager, Star, my wife.

5    Q.   Mr. Movit told you that your attorneys had served a

6    subpoena on Billboard.  Do you recall that?

7    A.   Correct.

8    Q.   Uh, and he made a point of stating that your attorneys

9    didn't serve a subpoena on Cross Movement; correct?

10   A.   Correct.

11   Q.   Did you do anything else with Cross Movement over the

12   years that would involve a court proceeding?

13   A.   Yes.

14   Q.   What did you do?

15   A.   Filed to get out of the contract.

16   Q.   Okay.

17   A.   Simply.

18   Q.   And Mr. Movit showed you Exhibit 6 which is the

19   assignment of copyright which you received from Cross

20   Movement Records.

21        MR. KAHN:  And I believe that was introduced into

22   evidence.

23        THE WITNESS:  Correct.

24   BY MR. KAHN:

25   Q.   And he asked you whether you had settled that lawsuit to
```

1   get rights back to Joyful Noise; correct?

2   A.    Correct.  He did ask that.

3   Q.    And is that the only reason you settled that lawsuit?

4   A.    No, it is not.

5   Q.    Did you get any other rights besides Joyful Noise?

6   A.    Yes.  I received the rights to all four of my albums

7   released under Cross Movement Records.

8   Q.    And I know he -- he showed you the first page, but if we

9   look at the second page of that assignment, what -- what do

10  those names . . .

11  A.    Yes, this is my --

12  Q.    Refer to?

13  A.    These -- these are referring to all of my albums.  So 19

14  songs from my first album, 21 songs from my second album and

15  so on and so forth all the way through Our World Redeemed.

16  16 songs, four albums.

17  Q.    So you received all the rights to dozens and dozens of

18  your songs; correct?

19  A.    Correct.  Each one.

20  Q.    And why was that important to you?

21  A.    Because I was unfortunately in a bad contract, and I was

22  trying to get out, and I want to release again some of my

23  best music that I've ever recorded.  This is real and true

24  for me.  You know.  I'm approaching 15 years.  I would like

25  to release a Greatest Hits album.  That's important to me as

```
1    well.
2    Q.   So, in other words, this assignment was just -- was not
3    just about Joyful Noise; correct?
4    A.   Correct.
5              MR. KAHN:   Let me ask, um, if we can pull up be
6    able, and you'll be able to see on the screen, this split
7    agreement we keep seeing.   And if we can exactly hone in on
8    the . . . those -- that, um, set of columns.
9    Q.   We've talked a lot about the first column which are the
10   three writers.   Correct?
11   A.   Correct.
12   Q.   And we've talked a lot about the third column which is
13   the percentages.
14   A.   Correct.
15   Q.   But we haven't talked about the second column which
16   is -- the heading is publisher.   Correct?
17   A.   Correct.
18   Q.   And, for example, after your name is the word -- just
19   the -- the name Clear Sight Music.   What is Clear Sight
20   Music?
21   A.   That is my publishing company.
22   Q.   And what does a publishing company do?
23   A.   A publishing company just collects the earnings, uh,
24   that the artists deserves from his writings.
25   Q.   Okay.   So it -- okay, so it collects earnings for the
```

1    writer; correct?

2    A.    Correct.

3    Q.    And for, uh, Mr. Lambert, it's -- there's a listing of

4    Truth on Duty?

5    A.    Correct.

6    Q.    So that's his publisher?

7    A.    That is his publisher.

8    Q.    And they would collect revenues from his writings;

9    correct?

10   A.    Absolutely.

11   Q.    And for Mr. Ojukwu, the publisher's Renew -- Renew Mind?

12   A.    Correct.  Renew Mind.  That's his publisher.

13   Q.    Okay.  So that -- they would collect his writing

14   revenues; correct?

15   A.    Absolutely.

16   Q.    They're listed here as his publishers?

17   A.    Yes.

18   Q.    And for how long did you know that Mr. Ojukwu had, um,

19   Renew Mind as his publisher?

20   A.    He's been on the actual Our Redeemed album.  He's listed

21   in the liner as Renew Mind publishing because --

22   Q.    Okay.  Well, let's -- well, let's -- let's take a look

23   at that album cover again with the liner notes.  And we'll

24   zoom in on the Joyful Noise.  And do you see that there, sir?

25   A.    Yes.

```
 1    Q.    Now, who put together these credits?

 2    A.    I personally drafted all of these notes for the graphic

 3    artist myself.

 4    Q.    Okay.  So you identified who would get credit for what;

 5    correct?

 6    A.    Correct.

 7    Q.    And I see there that you have given Mr. Ojukwu credit as

 8    a producer; correct?

 9    A.    Yes.  Correct.

10    Q.    In the rap hip hop world that you've experienced, what

11    is a producer?

12    A.    A producer is a writer, but we call the beat maker a

13    producer.  He's a writer.

14    Q.    Okay.

15    A.    Those terms are synonymous.

16    Q.    Okay.  And we saw earlier that for Mr. Ojukwu's writing

17    revenues, he had in the split agreement that, um, publisher

18    called Renew Mind; correct?

19    A.    Correct.

20    Q.    And is Renew Mind listed here?

21    A.    Yes, it is.  Absolutely.

22    Q.    And that was listed for Mr. Ojukwu.

23    A.    Yes.

24    Q.    And why was Renew Mind listed?

25    A.    Because he is a writer.
```

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 396

```
 1    Q.    Okay.  So as early as the release of this album, you and

 2    the others viewed Mr. Ojukwu as a writer; correct?

 3    A.    Yes.

 4              MR. MOVIT:  Objection.

 5              THE WITNESS:  Since the inception.

 6    BY MR. KAHN:

 7    Q.    Uh, well, certainly you did; correct?

 8    A.    Correct.

 9    Q.    Mr. Movit asked you if you had any documents regarding

10    the set list for your concerts.  Do you recall?

11    A.    Yes.

12    Q.    And you said you didn't.

13    A.    Correct.

14    Q.    Do you have any knowledge of what songs you performed at

15    your concerts?

16    A.    Absolutely.

17    Q.    And did you ever perform Joyful Noise at one of your --

18    to one of your concerts?

19    A.    At each one.  Absolutely.

20    Q.    So you performed Joyful Noise.  That was on your set

21    list at every concert.

22    A.    Yes.  Absolutely.

23    Q.    And why -- why was that?  Why do you have that on your

24    set list?

25    A.    It's my biggest song, and it is a fan favorite.  I love
```

1    to perform it, and everyone wants to hear it.

2    Q.   Okay.  And he asked you about people who attended your

3    concerts and whether you knew who had attended your concerts?

4    A.   Correct.

5    Q.   Are you given a list of the attendees when you -- when

6    you do a concert?

7    A.   No, I'm not.

8    Q.   So you don't know who's there.

9    A.   I don't know who's there.  I don't know who isn't there.

10   Q.   Okay.  And you mentioned that about 70 percent of your

11   concerts were at, um, religious, um, organizations; correct?

12   A.   Correct.

13   Q.   But so 30 percent were not?

14   A.   Absolutely.

15   Q.   And were some of those other 30 percent at large, um,

16   concert venues?

17   A.   Absolutely.  Tens of thousands of participants.

18   Q.   But you wouldn't know who was at that concert; correct?

19   A.   At all.

20   Q.   You wouldn't know whether a friend of one of these

21   defendants was at that concert or not; right?

22   A.   Correct.

23   Q.   Would there be -- would there be any way for you to find

24   out?

25   A.   Not at all.

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 398

```
 1    Q.   Mr. Movit had you look at a page of your deposition in

 2    which you stated that after hearing Dark Horse, the first

 3    person you contacted was an attorney; correct?

 4    A.   Correct.

 5    Q.   As of the date that you first heard Dark Horse,

 6    Mr. Gray, had you ever filed a lawsuit for copyright

 7    infringement?

 8    A.   Never.

 9    Q.   Do you have any legal training in what is required for a

10    lawsuit for copyright infringement?

11    A.   None whatsoever.

12    Q.   Do you have any knowledge of the elements you need to

13    prove for copyright infringement?

14    A.   I have zero knowledge.

15    Q.   And is that why you first sought out a layer before

16    contacting your fellow writers?

17    A.   Absolutely.

18    Q.   I'd like to show you again, and we can put it on the

19    screen because it's an admitted, I believe, Exhibit 21 which

20    was the email that looks like it's from Star to Star, and you

21    had seemed somewhat confused when Mr. Movit showed this to

22    you?

23             MR. MOVIT:  Objection, Your Honor.

24             THE COURT:  Sustained.

25             No comments, please.
```

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 399

```
 1              MR. KAHN:  Uh, yes, Your Honor.  Sorry.
 2   Q.    Have you had any of your confusion cleared up?
 3              MR. MOVIT:  Objection.
 4              THE COURT:  Sustained.
 5   BY MR. KAHN:
 6   Q.    Okay.  Who is star@flame314.com?
 7   A.    Star was my manager at the time.  Of --
 8   Q.    Okay.
 9   A.    -- the release of Our World Redeemed.
10   Q.    And you said that you used that email at that time.  In
11   what way did you use that email?
12   A.    Just corresponding with Star --
13   Q.    Okay.
14   A.    -- from my email to hers back and forth.
15   Q.    Okay.  Could you remember your email address back then?
16   A.    My email back then was, um, truth@flame314, something
17   like that.
18   Q.    And I believe that, um, we scrolled down in this exhibit
19   which was an announcement, I guess a press release about the
20   Dove Awards, and we scrolled all the way down to where your,
21   um, song was nominated?
22   A.    Correct.
23   Q.    And first of all, was it typical with nominations for
24   these types of awards that there would be some sort of press
25   release listing who was nominated?
```

```
 1              THE WITNESS:  Absolutely.
 2              MR. MOVIT:  Objection, foundation.
 3   BY MR. KAHN:
 4   Q.   On the -- on the awards where you were nominated, and
 5   particularly the three that we've talked about for this album
 6   and your song, the Stellar award, the Grammy award and the
 7   Dove award in 2009, were those three award nominations
 8   publically announced to your knowledge?
 9   A.   Absolutely.  Through press, we jumped down on it
10   quickly.
11   Q.   And I look at the list of the writers identified in this
12   nomination for Joyful Noise.  Is that a list that you
13   provided to the Dove Awards?
14   A.   Not personally, no.
15   Q.   Okay.  Uh, okay.  And they didn't ask you for the names
16   of the writers or anyone; correct?
17   A.   Correct.
18   Q.   You just found out your -- your song had been nominated.
19   A.   Correct.
20   Q.   And finally, I think it's been confirmed you don't know
21   personally any of these individual defendants; correct?
22   A.   I do not.
23   Q.   And you don't know personally any of their friends or
24   colleagues of any of these defendants; correct?
25   A.   I do not.
```

EXHIBIT  3
PAGE 401

```
 1   Q.   So you don't know whether any of these -- you would have
 2   no way to know whether any of these -- any individual
 3   defendants or their friends had, um, visited your MySpace
 4   page; correct?
 5   A.   Correct.  There's no way I would know.
 6             MR. KAHN:  I have nothing further, Judge.
 7             THE COURT:  Okay.  Mr. Movit?
 8             MR. MOVIT:  Okay.  Thank you.
 9                       RECROSS-EXAMINATION
10   MR. MOVIT:
11   Q.   Um, Mr. Gray, this lawsuit's been going on since 2014.
12   Is that correct?
13   A.   Correct.
14   Q.   Okay.  And would you agree that, um, you and your
15   attorneys have, um, vigorously pursued, um, this lawsuit and,
16   uh, made, um, extensive efforts, uh, to try to prove your
17   claim?  Would you agree with that?
18   A.   Correct.
19   Q.   Okay.  And, in fact, uh, your lawyers deposed all of the
20   writers of Dark Horse; correct?
21   A.   Yes.
22   Q.   Okay.  And, um, after all of those extensive efforts by
23   you and your lawyers and those depositions, you still have no
24   knowledge or documents establishing that any of the Dark
25   Horse writers viewed or heard Joyful Noise; isn't that
```

```
 1    correct?
 2             MR. KAHN:  Object.  Lack of foundation.
 3             MR. MOVIT:  This is follow0up from his admissions
 4    on cross, Your Honor.
 5             THE COURT:  I think it's repetitive, but you may
 6    answer.
 7             THE WITNESS:  There's no way I would know, have
 8    known.
 9    BY MR. MOVIT:
10    Q.    So that would be correct?
11    A.    Correct.
12    Q.    And you testified before that . . .  and you testified
13    before that, um, Cross Movement Records would have the
14    knowledge about the posting of, uh, Joyful Noise on Amazon;
15    is that correct?
16    A.    Correct.
17    Q.    Okay.  And that's because, um, Cross Movement Records
18    still owns the sound recording of Joyful Noise and not you;
19    is that correct?
20    A.    We own the copyrights.  They own the sound recording
21    only.
22    Q.    You own the copyright in the musical composition;
23    correct?
24    A.    And they own the sound recording only.
25    Q.    So when you settled your lawsuit with Cross Movement
```

```
 1    Records, you did not receive, um, the sound recording of
 2    Joyful Noise or, uh, your other sound recordings as part of
 3    that settlement; is that correct?
 4    A.    Correct.
 5    Q.    And because you don't own your sound recordings, is it
 6    your understanding that you could not release a Greatest Hits
 7    album of your own earlier recordings without the permission
 8    of Cross Movement Records?
 9    A.    Well, with the permission of the copyrights, I can have
10    a -- a liberty to reinvent, recreate those songs.
11    Q.    Right.
12    A.    You have to release a Greatest Hits.
13    Q.    You'd have to recreate them.  You couldn't use the
14    recordings that were released before by Cross Movement; is
15    that correct?
16    A.    I believe so.
17    Q.    Isn't it correct, Mr. Gray, that when you sued Cross
18    Movement Records, um, your petition in that case only asked
19    for money in the forms of royalties you were not paid, and it
20    did not seek, uh, the returns of any of your copyrights; is
21    that correct?
22    A.    Yes.  We were trying to just get royalties on the
23    albums.  Due royalties shall I say that I feel we deserved.
24    Q.    Okay.  And it's correct that, sir, you drafted the
25    credit liner notes for the Our World Redeemed CD booklet?
```

1   A.   Yes.

2   Q.   Okay.  So you could have listed Mr. Ojukwu as a

3   co-writer along with Mr. Lambert, yourself and Lecrae Moore,

4   but you did not; is that correct?

5   A.   I could not have in terms of my only state of knowledge.

6   So if we call the music producer a producer, that's the

7   extent of which I would have listed him based on what he's

8   respected as.  He's respected as a producer, known as

9   producer so I want to oblige him in that way.

10  Q.   Um, so it's your testimony that you have never -- in any

11  of your CD booklets, no producer has ever been credited as

12  writer in any of your CD booklets.  Is that your testimony,

13  sir?

14  A.   I would have to go through each and every liner.

15  Q.   So you don't know.

16  A.   I would -- I would have to go through each and every

17  liner to make that definitive statement at this -- at this

18  moment.

19  Q.   Okay.  And just to confirm, you gave some testimony

20  about set lists with Mr. Kahn a moment ago, but just so we're

21  clear about this issue, uh, you testified that you don't do

22  set lists for your concert performances; is that correct?

23  A.   I believe you referred to a -- a written in advance set

24  list.

25  Q.   Yes.  A written set list, a -- a written list of your

1    songs, yes, sir.

2    A.    In the rap world, we just create a set list personally.

3    There's no protocol for it.  Maybe in other genres, you would

4    send out a set list in advance.  This is not part of the

5    culture.

6    Q.    But you can only speak for your experience, sir, not --

7    not other people's.  Is that fair?

8    A.    In terms of me being a part of that culture.

9    Q.    Yes, sir.

10   A.    Yes.

11   Q.    So just so we're all clear, there are no set lists for

12   your performances.  Just so we're all clear.

13   A.    They are not printed out, not written.

14   Q.    Not written.  Okay.  And, um, you testified that not all

15   of your events were in churches?

16   A.    Correct.

17   Q.    Isn't it true that, um, you did, um, perform -- that you

18   did performances at events -- at venues that were not

19   churches, but the events were still, uh, religious themed or

20   Christian themed even if they were at places that might hold

21   events sometimes that are not religious themed or Christian

22   themed; is that correct?

23   A.    No, no.  Not at all.

24   Q.    But that wasn't my question.  I said you do -- in

25   addition to performing in churches, when you perform outside

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 406

1    of churches at nonreligious venues . . .

2    A.    Mm-hmm.

3    Q.    Those events are often still religious themed events

4    that are just being held at a venue that doesn't always hold

5    religious themed events; is that correct?

6    A.    A -- a good portion.  As I mentioned, NBA half-time

7    shows, events with mainstream artists where none would be

8    Christian at all.

9    Q.    And Mr. Gray, um, you testified that when there was

10   public announcement of, uh, the award nomination, the three

11   award nominations that you testified about?

12   A.    Mm-hmm.

13   Q.    Okay.  You jumped on it; right?  It's something you

14   jumped on; right?

15   A.    Oh.  Press releases.

16   Q.    Yes.

17   A.    Correct, correct, correct.

18   Q.    But you never asked, uh, for Dove Awards press release

19   that, um, we looked at to be corrected or changed to add

20   Mr. Ojukwu as a writer; is that correct?

21   A.    I didn't get that prior to.  I just found out I was

22   nominated and was happy.

23   Q.    But when you found out you were nominated and happy

24   about it, after that, you did not ask for it to be changed to

25   credit Mr. Ojukwu; is that correct?

98

1   A.   I didn't see it.  I mean, it wasn't submitted.  Cause I

2   was an artist on a label so I wasn't in that seat.

3   Q.   But you found out about it, and you were happy about it;

4   correct?

5   A.   The nomination is what I was happy about, not the liner

6   notes if that makes sense or the listing.

7   Q.   You never asked for the listing to be corrected.  Is

8   that true?  Or changed to reflect Mr. Ojukwu as a writer; is

9   that correct?

10  A.   No.  It was too late by that point.  I mean, it was

11  published.

12  Q.   But you didn't ask -- you didn't say, in the event that

13  there's a further press release or further publication or a

14  further communication, please credit Mr. Ojukwu.  You never

15  did that; is that correct?

16  A.   There was -- there was no opportunity to do that.

17  Q.   But you never -- you never asked your manager, please

18  say is this something you can do; is that correct?

19  A.   Not in that instance because the award's ceremony was

20  over.

21  Q.   So it's your testimony that you didn't find out about

22  the credits until after the ceremony was over?

23  A.   Yeah, the -- the listing that we all saw.  Or during,

24  not necessarily over but . . .

25  Q.   Okay, this press release that we looked at was dated

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 408

99

1    February 20, 2009; correct?  Do you want to look at it again?

2    A.    Sure, sure, sure.

3    Q.    Exhibit 21.  And so this email is dated February 20,

4    2009; is that correct?

5    A.    Correct.

6    Q.    Okay.  And on page 2, it states that the Dove Awards

7    will be April 23rd, 2009 in the first paragraph of the press

8    release after the headline.  Do you see that?

9    A.    Yes.

10   Q.    Okay.  So between February 20, 2009, and April 23rd,

11   2009, is it correct that you're not aware of any efforts to

12   add Mr. Ojukwu as a credited songwriter for purposes of this

13   award show award nomination?

14   A.    Correct.

15   Q.    Okay.  And so you testified a moment ago, Mr. Gray,

16   that, um, your petition in the -- the case against -- that

17   you commenced through your lawyer, Mr. Kayira, against Cross

18   Movement Records just sought money, royalties you said were

19   owed and did not seek copyrights in that petition we talked

20   about; is that right?

21   A.    Yes, we talked about that.

22   Q.    So when you were asked by Mr. Kahn that you sued Cross

23   Movement to get your rights back, and you said yes, that

24   was -- that was not accurate cause, in fact, you were just

25   suing for the money and not the copyrights; is that correct?

EXHIBIT 3
PAGE 409

```
 1   A.    So at the very, long, drawn out process of us being

 2   patient on our end, tryin' to cooperate with friends, um,

 3   that was the resolution was the -- the copyrights.  So in

 4   terms of the history that we built, things that we

 5   established over the years, we thought that was fair way to

 6   part and still have some level and respect and honor for one

 7   another, but obviously, we wanted the due royalties off the

 8   music that we put out.

 9   Q.    Okay.  And that's what you sued for, the royalties, not

10   the copyright in the petition.  Correct?

11   A.    Initially, yeah, correct.

12   Q.    And your -- your lawsuit against Cross Movement was

13   settled in 2014; correct?

14   A.    Correct.

15   Q.    Okay.  And this case has been going on for about five

16   years since you settled with Cross Movement; right?

17   A.    Correct.

18   Q.    Okay.  And just to confirm that during those five years

19   since the Cross Movement case was over, you are not aware of

20   any efforts, um, by your lawyers to serve a formal legal

21   subpoena on Cross Movement Records for sales information for

22   use in this case; is that correct?

23   A.    I believe so.

24   Q.    Okay, thank you.  And, again, you only gave up your

25   money claim against Cross Movement Records after this case
```

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 410

1    regarding Dark Horse had been filed; is that correct?

2    A.   In terms of, yes, date.  It's completely unrelated.

3    Absolutely unrelated.

4    Q.   Right.  So my question is about the -- the dates; right?

5    It was after this lawsuit was filed that we're here today for

6    that you gave up your claim against Cross Movement --

7    A.   Yes.

8    Q.   -- Records?

9    A.   Yes.

10   Q.   Okay.

11           MR. MOVIT:  Nothing further.

12           MR. KAHN:  A very brief question, Your Honor?

13           THE COURT:  Sure.

14               FURTHER REDIRECT EXAMINATION

15   BY MR. KAHN:

16   Q.   Could you pull Exhibit 6 which is this assignment of

17   copyright?  If you look down -- well, first, if you look at

18   the introductory, um, paragraph, and then you look down at

19   the in witness whereof paragraph, do you see that a month has

20   been crossed out, and a new one has been put in?

21   A.   Yes.

22   Q.   So the original plan was to have this deal completed in

23   June --

24           MR. MOVIT:  Objection.

25           THE COURT:  Sustained.

1    BY MR. KAHN:

2    Q.   So you understood -- do you have any understanding as to

3    when this assignment was supposed to have been signed?

4    A.   The month of June.

5    Q.   Okay.

6              MR. KAHN:  I have nothing further.

7              THE COURT:  Anything?

8              MR. MOVIT:  Nothing further.

9              THE COURT:  Okay.

10             Then Mr. Gray, you may step down.  Thank you.

11             THE WITNESS:  Thank you.

12             THE COURT:  So it seems to me this is the right

13   time to take the noon recess.  Why don't you plan to return

14   at 1:00 p.m., and we will pick up and, uh, hopefully go till

15   about 4:30 today.  Thank you.

16             THE CLERK:  All rise.

17                  (Jury not present.)

18             THE CLERK:  Please be seated.

19             THE COURT:  Okay.  Counsel, if we're gonna have

20   issues on what the expert can testify to in terms of

21   computers and so forth, then I'd like you to back here at

22   12:45 so we can resolve them and get going.

23             MS. LEPERA:  Absolutely.

24             MS. COHEN:  Yes, Your Honor.

25             THE COURT:  Thank you.

```
 1              MS. COHEN:  Thank you.

 2              THE CLERK:  This court's in recess.

 3                      (Lunch recess.)

 4              THE COURT:  Okay.  So what do you all have to

 5    report?

 6              MS. LEPERA:  Thank you, Your Honor.

 7              I'll start.  So during the break, we were able to

 8    preview some of what Mr. Decker was attempting to accomplish

 9    and it has only solidified my objections.  What he is

10    attempting to do is something that is absolutely not been

11    disclosed.  He is going take a computer, pull up two computer

12    programs neither of which are identified in his report.

13              Have on those computer programs his copies of what

14    are sound recordings supposedly of the two works that are not

15    the exhibits.  Manipulate those sound recordings with edits,

16    changes and alterations.  Create a mashup of this new work

17    that he's creating on the computer that has not been

18    disclosed.

19              This is not a demonstrative, Your Honor.  This is

20    an actual new opinion with new computerized software with a

21    mashup -- Your Honor excluded the mashups that he pulled off

22    the Internet.  So now belatedly, he's trying to ambush us

23    with a mashup that is not part of his report, but he's doing

24    on the fly in front of the jury.

25              And it's certainly not been tested by our expert
```

```
 1    which is their burden first, to go first, put in their
 2    documents.  Our expert gets to review all the audios and all
 3    of the mashups and challenge them musicologically.  Of
 4    course, we've had zero opportunity for that, Your Honor.  I
 5    have a strenuous objection to this purported evidence.
 6            THE COURT:  Okay.  And Ms. Cohen.
 7            MS. COHEN:  Your Honor, what Ms. Lepera just
 8    described is truly nothing more than an illustration of his
 9    opinions which he will testify to prior to any use of any
10    software.  He also will be able to establish a foundation for
11    his use of this kind of material.  Specifically, for this
12    illustrative purpose in his classroom.
13            And just as the defendants are planning to use a
14    piano with their expert because presumably he believes that's
15    the most reliable way to illustrate his opinions, our expert
16    should be permitted to put on demonstrative testimony and to
17    use the methodology that he considers to be the most reliable
18    for purposes of illustrating to the jury the opinions that
19    are contained within his report and that he will testify to
20    here in court.
21            Additionally, I'd make note that -- well, actually,
22    that's really it.  Strike that.
23            THE COURT:  Can you point to any portion of his
24    report where indicates he's going to use this computer
25    because I've already excluded the mashups that were offered.
```

```
 1    Tell me why you think this is just part of his report.
 2              MS. COHEN:  Correct.
 3              Your Honor, the mashups that were discussed earlier
 4    and excluded were related --
 5              THE COURT:  That's not my question.
 6              My question is what in the report other than the
 7    excluded mashups support your position that this has been
 8    fully disclosed?
 9              MS. COHEN:  Your Honor, I don't believe it needs to
10    be disclosed.
11              THE COURT:  I do.
12              MS. COHEN:  His, his belief as to the most reliable
13    method of illustrating his opinions?
14              THE COURT:  Yes.  Yes.
15              I mean, because you have to go give the other
16    side -- that's what Rule 26 is about.  You have to give the
17    other side an opportunity to pursue and examine the
18    methodology.  And I don't understand how we can just drop a
19    computer in now and say by the way, he can use this computer
20    to testify, um, to demonstrate his opinion.
21              To me it's a lot different than using a keyboard.
22    I know he thinks a keyboard is irrelevant and that a keyboard
23    shouldn't be used.  I know that he thinks that you can't
24    quantify electronic music and notes and things of that nature
25    but that doesn't answer my question.
```

1          Because my question is what gives him the right to

2    walk in on the day of trial and now use a computer when no

3    one knows he was gonna -- well, we knew he was gonna use it

4    for mashups, but we said he couldn't use those mashup.  And

5    now he's back again saying well, I have something else on the

6    computer.  I don't understand it.

7          MS. COHEN:  Yeah, I think we're maybe conflating

8    the issues.  This doesn't have any relation to the mashups

9    that we discussed before.  He was relying on those.  Those

10   are out.  This is being used for an illustration for

11   demonstrative testimony in the same manner that defendants

12   plan to use a keyboard.

13          Each expert based upon their expertise will testify

14   as to what they believe is the most reliable methodology for

15   illustrating to the jury their opinions.  We've had no

16   opportunity to inspect the equipment that they intend to use

17   either.  And he's an expert.  He is a music historian and a

18   professor of music, and he can certainly lay an adequate

19   foundation for his own use of the software for this purpose

20   and the reliability within his field.

21          THE COURT:  Well, but here's my problem.  We know

22   nothing about the software.  They have not had an opportunity

23   to examine the software.  This all comes as a new theory

24   after I excluded the mashups.

25          By contrast we have from Ferrara, he has an opinion

1    regarding notes.  You say the notes are irrelevant.  I can

2    understand someone has a note.  That person plays it on a

3    keyboard.  This is a C, this is an E.  But that doesn't rely

4    on a computer software program and that's where I'm having

5    great difficulty.

6            What notice does the defense have that you're gonna

7    rely on the computer software program that he's going to use

8    just to apparently explain his opinion?

9            MS. COHEN:  I don't believe that there's any

10   requirement that we put them on notice of the methodology

11   that we intend to use to demonstrate or illustrate to the

12   jury.  We both submitted letters to the court showing what

13   equipment we intended to use.  We both did that through the

14   same means.  We both had the same opportunity to know what

15   the other side was bringing.  We did provide them an

16   opportunity to inspect the software over the lunch hour which

17   we did together, and then the discussion was ended because --

18   at their choice.

19           THE COURT:  I just do not think that what you are

20   doing is compliant with Rule 26.  It's that simple.  We have

21   a rule that requires you to disclose an opinion and the basis

22   for the opinion.  And as I understand it, the computer is

23   part of the basis for the opinion.  I don't understand how it

24   can be anything other than that.

25           MS. COHEN:  It's -- it's really not, Judge.  It's

EXHIBIT  3
PAGE  417

1    just an illustration.  He will testify as to all of his

2    opinions, and then illustrate those using the same kind of

3    equipment that was actually used to create both songs at

4    issue in this case.

5             THE COURT:  Okay.  Well, that's a bit different,

6    but go ahead.  Yes, Ms. Lepera.

7             MS. LEPERA:  With due respect to counsel for

8    plaintiff, there's a massive difference between taking two

9    sound recordings that are in evidence that are not even the

10   ones in evidence, but he's now put two copies of these sound

11   recordings on an undisclosed computer file that has not been

12   examined by our music expert and he's going to alter the

13   sound recordings to mashup them and justify them.

14            It is completely not illustrative in his report in

15   any way, shape or form because there is no audio mashup in

16   his report.  It is a completely new opinion, identified by a

17   new recording, altering evidence without our expert having an

18   opportunity to look at what he's doing and dissect it an hour

19   before he goes on the stand.

20            There's a fundamental difference here as well when

21   we're talking about a compositional copyright and a sound

22   recording copyright.  And one of the issues that is a great

23   difference between what Dr. Ferrara is doing and what

24   Mr. Decker is attempting to do is Dr. Ferrara is playing the

25   composition on a piano.  He's not altering sound recordings.

EXHIBIT  3
PAGE 418

1        He's not taking sound recordings and pause them in

2   the middle and say well, listen to this part of the sound

3   recording Exhibit 75 all of which Mr. Decker can do.  But he

4   can't take these pieces of evidence, edit them on a computer

5   program which he never did before, take that audio and play

6   it for the jury without our musicologist being able to

7   analyze it.

8        It is beyond even whole the disclosure issue which

9   Your Honor is completely right about.  Beyond that it is not

10  remotely appropriate in the context of this case certainly

11  not at this juncture.

12       THE COURT:  Well, you probably said it better than

13  I could at this moment.  There is in my mind a difference

14  between a musicologist saying this is how he about putting

15  together the beat as opposed to saying by the way, now, I'm

16  going to do a mashup and show you something.  That's the

17  problem.

18       MS. COHEN:  Your Honor, I don't see why.  I truly

19  don't see why it's any different than use of a piano that

20  hasn't been tested.  We haven't been given the opportunity.

21  They did see the software.  The fact of the matter is they

22  don't want the jury to hear the two songs together because

23  they sound very, very similar.  That's the issue.

24       THE COURT:  Well, that may be the fact of the

25  matter, but the point is you had an obligation to provide

110

1    notice earlier about how you were going to go about proving

2    this rather than five minutes before your expert got on the

3    stand.  That's why we have, uh, the Rule 26 expert reports

4    for.

5         MS. COHEN:  Your Honor, this isn't a new opinion,

6    though.  The question I intend to ask Dr. Decker is what is

7    the best way in your expert opinion to illustrate the

8    opinions that are in your report and that you've testified to

9    here in court related to the similarities and the differences

10   between Joyful Noise and Dark Horse.

11        THE COURT:  You can ask that question, but the

12   answer you're gonna get is an entirely different answer

13   because it's not illustrating the opinions.  What it is doing

14   is it is saying now, here is a new computer software program

15   I'm relying on to demonstrate my opinion.  And I think you

16   had obligation to do that in your expert report.  So I am of

17   the mind that it is inappropriate for him to use his computer

18   program and produce these mashups.

19        MS. LEPERA:  Thank you, Your Honor.

20        MS. COHEN:  In that case Judge, may we make an

21   offer proof?

22        THE COURT:  Sure.

23        MS. COHEN:  Thank you.

24        Judge, I prefer to do it after I've laid a full

25   foundation for the testimony so I believe we should put him

EXHIBIT  3
PAGE 420

```
 1    on first.
 2          MS. LEPERA:  If I may, Your Honor, if I may, I
 3    think that this is actually one of the most inappropriate
 4    things I've seen in a very long time that they're attempting
 5    to do here.  To actually say in this courtroom that it's the
 6    same thing to play a composition on a piano and take two
 7    sound recordings, alter them up, edit them and play a mashup
 8    that you never disclosed before, to analyze -- to put those
 9    two things in the same sentence is like the complete apple
10    and orange version of reality.
11          THE COURT:  Yeah, I agree with you.  I've said
12    that.  But now the question is she wants to make an offer of
13    proof.  My concern is --
14          MS. LEPERA:  Not in front of the jury is my
15    concern.
16          THE COURT:  Yeah, that's where I'm headed.  How are
17    we going to do?  Can he make his offer of proof right now?
18          MS. COHEN:  I would propose doing it afterwards.
19    After I established his opinion testimony.
20          THE COURT:  But then what are we all going to do?
21    Are we going to take a recess to have him do an offer of
22    proof, and then I'm gonna rule again.  And then we'll all
23    come back and tell the jury to come back?  How long is his
24    testimony before you get to this stuff?
25          MS. COHEN:  I can leave -- just leave that out,
```

EXHIBIT 3
PAGE 421

```
 1    pluck that portion out.  And I believe it's probably an hour
 2    and 30 to 45 minutes.
 3             THE COURT:  Well. . .
 4             MS. COHEN:  Without that.
 5             THE COURT:  This is what I would say.  Let's get
 6    him on the stand.  He may not testify -- if I see a computer
 7    coming out, I'm going to stand up and say something.
 8             MS. COHEN:  No, of course.  We're not doing that.
 9             THE COURT:  The computer I know is on the stand.
10    Yes, I'm aware of that.
11             MS. COHEN:  We will remove it.
12             THE COURT:  Fine.
13             MS. COHEN:  Of course.
14             THE COURT:  Let's remove it.  Bring him out.  Get
15    his opinion.  And then if we have a need to have you make a
16    short offer of proof at a recess, I'm prepared to do that.
17             MS. COHEN:  Thank you, Judge.
18             MS. LEPERA:  And I would ask that we receive this
19    offer of proof in the sense of show us where in the report or
20    where in the opinions there is proof of an audio file mashup
21    that supports any opinion or methodology.
22             THE COURT:  That's fine.  When we do the offer of
23    proof, that's fine.
24             MS. LEPERA:  Thank you.
25                    (Jury present.)
```

```
 1                    THE COURT:  Okay.  Who is our next witness?
 2                    MS. COHEN:  The plaintiffs would like to call
 3     Dr. Todd Decker.
 4                    THE CLERK:  Please raise your right hand.
 5                         (Witness sworn.)
 6                    THE CLERK:  Please be seated.
 7              Please state your full name and spell your last
 8     name for the record.
 9                    THE WITNESS:  Todd Ryan Decker D-e-c-k-e-r.
10                         DIRECT EXAMINATION
11     BY MS. COHEN:
12     Q.   Good afternoon, Dr. Decker.
13              You're here to talk to us about music; right?
14     A.   Yes.
15     Q.   Before we get to that, I want the jury to understand who
16     you are, what you do and your role in this case so I'm gonna
17     start with a little bit of background information.
18              So starting with your education post-high school,
19     where did you go to college?
20     A.   Fresno Pacific College in Fresno, California where I
21     grew up.
22     Q.   And what did you study?
23     A.   I studied music and intellectual history, philosophy.
24     Q.   And in what year did you receive your degree?
25     A.   1989.  Sorry 1985.  Excuse me.
```

1    Q.    Was that a B.A.?

2    A.    This is a B.A., yes.

3    Q.    And after you completed your Bachelor's in music, did

4    you go on for any graduate training?

5    A.    I did.  I went directly into a Master's program at the

6    San Francisco Conservatory of Music where I studied

7    harpsichord which is a keyboard instrument -- the keyboard

8    instrument before the piano.

9    Q.    And what year did you receive your Master's degree in

10   harpsichord?

11   A.    1991.

12   Q.    So I it take you play the harpsichord?

13   A.    I do, yes.  I'm a professional musician in that regard.

14   Q.    Okay.  Do you play any other instruments?

15   A.    I play the piano.  I played the piano first um, from a

16   child and through my Bachelor's.  I switched to harpsichord

17   while my Bachelor's, but I've always continued to play.  And

18   then I also play organ.  I was a Lutheran church musician,

19   professional church musician for about 10 years.

20   Q.    Do -- I take it you read music then.

21   A.    Yes.

22   Q.    And in addition to your Bachelor's and your Master's, do

23   you have any additional degrees?

24   A.    Yes, I have PhD in Historical Musicology from the

25   University of Michigan.

1   Q.   And in what year did you receive that PhD?

2   A.   2007.

3   Q.   Okay.  And to your knowledge is University of Michigan a

4   top musicology program?

5   A.   It is.  It is a top musicology program specifically for

6   the study of American music, um, and American --

7            THE COURT REPORTER:  I'm sorry.  You're gonna need

8   to slow down, please.

9            THE WITNESS:  Sorry.  It is a top program for the

10  study of American music for, um, the historical study of

11  American music and musical traditions.

12  BY MS. COHEN:

13  Q.   What is musicology?

14  A.   Musicology is a fancy word for music history.  Music --

15  I'm a music historian.  Uh, the word musicology is an attempt

16  to make the field sound more scientific.  In fact, I'm a

17  historian and my training is as a historian in the study of

18  music.

19  Q.   And when you say music history, are you talking about

20  music from a long time ago?

21  A.   All musics are open to study historically.  Music from

22  thousands of years ago, um, what little there is of it, uh,

23  music from 200 years ago, if you want to study Mozart or

24  music from yesterday.  Um, anything, um, any musical

25  experience that humans have had whether they be a composer or

```
 1   a performer, audiences, any way that music interacts with
 2   culture and society.
 3   Q.   And what kind of musical studies specifically were
 4   involved in obtaining all of the degrees that you already
 5   mentioned in music history, music performance and musicology?
 6   A.   So I have a grounding in music theory which is the study
 7   of how notes relate to each other.  That's a less historical
 8   discipline.  Uh, I have a grounding in music history in
 9   various eras.  Mostly European classical music like you might
10   hear at Walt Disney Hall.  Um, but also in American popular
11   music.  Um, most of my work is in what we call Western music,
12   United States and Europe of all eras.
13   Q.   And as part of your studies, did you study a subfield
14   called musical borrowing?
15   A.   Yes, I did.  Musical borrowing is an approach to the
16   understanding of how two pieces of music might relate to each
17   other.  So yes, that was a core -- it's a core aspect of how
18   musicologists of any kind do their work.
19   Q.   Um, so just so that it's clear, can you tell us again,
20   can you explain what is musical borrowing in simple terms?
21   A.   Musical borrowing is the study of how two pieces of
22   music or more, but let's say two relate to each other.  So
23   you look at the specific musical parameters of this music:
24   The rhythm, the melody, the harmony, the phrase length, all
25   these sort of music ways that we can describe what happens in
```

117

1    a piece of music.  And in musical borrowing, the study of

2    musical borrowing, you consider how a composer took material

3    from another piece and used it in their own piece.

4    Q.    And so in that regard, what does the term borrowing

5    means?

6    A.    Borrowing means copying in this respect.  Um, borrowing

7    is -- musical borrowing is a term of art in musicology.

8    There's a huge entry on it in the standard dictionary of

9    musicologist and music history.  Musical borrowing is a

10   category, but what it essentially means is a composer copying

11   material from elsewhere and putting it into their own work.

12   Q.    And so in your work, um, in analyzing different pieces

13   for musical borrowing, are you looking to identify whether

14   something is copied?  Is that accurate?

15   A.    Yes.

16              MS. LEPERA:  Objection.  Legal conclusion.

17              THE COURT:  I'm going to overrule the objection.

18              MS. COHEN:  Thank you, Judge.

19              Could you finish your answer?  I'll be careful.

20              THE COURT:  Yeah, because obviously, we do not want

21   him to opine on a fact that is to be decided by the jury.

22              MS. COHEN:  Understood.

23   Q.    Had you finished your answer?

24   A.    Uh, the -- the -- perhaps I'm suggesting the word copy

25   here in a more literal sense.  That a composer would copy

1    into their own music notes from someone else's music.  So

2    it's and often that is the way you identify it by looking at

3    composers' manuscripts and things like that.

4    Q.    Okay.  So when you say copying do you ascribe any legal

5    meaning to that?

6    A.    No, no.

7    Q.    And what features of two musical works do you compare

8    when analyzing for musical borrowing?

9    A.    So there's a set of things you can compare.  The rhythm

10   can be the same, a rhythmic pattern.  The notes can be the

11   same, um, and often in that case, you need to look at the

12   notes in a way that makes two works comparable.  So the two

13   works might be in a different key; right?  So to look at

14   borrowing between these two works, you might have to put them

15   into the same key or find another way to understand them in a

16   way that makes them comparable.

17         You'll also look at if the material is used in the

18   same way in both pieces.  Maybe there's a gesture that Mozart

19   uses to start a piece.  If you find a piece by Beethoven that

20   starts in the same way, um, that would be another argument

21   for borrowing.  Particularly, if both of those pieces let's

22   say were in the same key same.  In the same key of say C

23   minor then it would be stronger.

24         So that borrowing it's not enough to find one

25   element.  You need to find the cluster of elements or a

```
 1   combination of elements that are borrowed that will then
 2   cement the connection between these two works.
 3   Q.   Dr. Decker, where you do you currently work?
 4   A.   I work at Washington University in St. Louis in
 5   Missouri.
 6   Q.   And what do you do at Washington University?
 7   A.   I'm a professor of music and the chair of the Music
 8   Department.
 9   Q.   And how long have you been a professor of music at
10   Washington University?
11   A.   I've been there 12 years.
12   Q.   And are you a tenured professor?
13   A.   Yes.
14   Q.   You already said you hold the position of Chair of the
15   Music Department?
16   A.   Yes.
17   Q.   And how long have you held that position?
18   A.   I'm entering my fifth year.
19   Q.   Have you ever taught anywhere other than Washington
20   University?
21   A.   Yes.  Before going to Washington University, I taught
22   one year at UCLA in the Musicology Department.
23   Q.   Have you ever taught anywhere internationally?
24   A.   I'd also recently held a visiting position at the Perry
25   Wheat Paris 8 which is one of the cluster of universities in
```

```
 1    Paris.  So I was teaching and lecturing on popular music and
 2    film music in Paris.
 3    Q.   And Dr. Decker, is your study specific to notated music
 4    or recorded music?
 5    A.   No.  Musicologists are trained to work with both
 6    recorded and notated music which is music that would appear
 7    on the page and also recorded music that only exists as a
 8    recording.  As someone who works on popular music, um, both
 9    of those are obviously necessary to my scholarship.  And I
10    train my graduate students in the study of both of those
11    kinds of music.
12    Q.   And what about is your work specific to a genre?
13    A.   No.  Uh, musicologists -- I trained in both classical
14    music, and I published articles on classical music, art
15    music, but most of my publication is on popular music.  What
16    I like to call commercial popular music, music that is
17    designed to make money.  Uh, art music usually doesn't make
18    money and requires usually rich people to support it.
19             Popular music, the kind I study, is music that
20    attracts a customer and makes money so film music.  I study
21    film music.  Um, I study music on the Broadway stage, the
22    Broadway musical.  I study popular music broadly speaking in
23    the United States.  Jazz, for example, when jazz was a
24    popular music in that sense.
25    Q.   And you say you've published on these topics?
```

1    A.    Right.

2    Q.    Have you published any books?

3    A.    I've published four books on these topics.

4    Q.    And what about articles?

5    A.    And, um, close to 30 articles.

6    Q.    Um, have you ever published on -- specifically on 21st

7    Century popular music?

8    A.    I have.  I have an article on the hip hop and EDM music

9    heard in the Fast and Furious film franchise.  I also have an

10   article on country music composed in the wake of 911.  And I

11   also, a section -- I have a book on music in Hollywood war

12   movies from Apocalypse Now which is 1978 to American Sniper.

13   So music in films like Blackhawk Down and such like that,

14   popular music.

15   Q.    And are your publications that we've talked about, have

16   they been peered review?

17   A.    Yes.  I have two boxes with Oxford University Press and

18   two books with the University of California Press.  These are

19   both in the top five of university presses.

20   Q.    And what does it mean to be peer reviewed?

21   A.    Peer review means that you write a book or an article,

22   and then it is sent out to peers, to anonymous peers.  You do

23   not know who they are.  They read the material and write a

24   report and weigh in on whether it should be published or not.

25   So it's essential to getting published in -- in my field for

1  your peers to, um, weigh in anonymously on your arguments.

2  Q.   And does your research draw on your expertise from

3  musical borrowing?

4  A.   Yes, all four of my books include arguments that involve

5  musical borrowing.

6  Q.   And Dr. Decker, do you teach on these same topics that

7  you research and write about?

8  A.   I do.  I have the enviably position of being in a job

9  where I teach my research areas and I train my graduate

10  students, um, in all of these areas.

11  Q.   And what kind of courses do you teach that touch on 21st

12  century popular music?

13  A.   I teach a course for, um, a 100 level course so an entry

14  level college course, um, called Popular Music in American

15  Culture that looks at the history of recorded music from

16  about 1920 to yesterday basically.  Um, so that includes a

17  lot of time spent on the 21st century.

18       I teach a course on the history of Hollywood film

19  music that also takes me into the 21st century with popular

20  music.  A lot of film music is borrowed from pop music.  Uh,

21  I also teach a graduate level course on popular music in

22  visual media.  So how popular music interacts with film, with

23  television, with cable television and MTV, and then with

24  YouTube.  So yes, 21st century popular music enters into

25  virtually every class that I teach about popular music.

EXHIBIT 3
PAGE 432

1    Q.    Thank you.  And so to the extent you haven't already

2    mentioned it, what classes have you taught that involve the

3    study of musical borrowing?

4    A.    You know, musical borrowing is something that comes up

5    when the material you're working with warrants it.  So with

6    my graduate students, I always do an article about George

7    Frederick Handel's Messiah which has the Hallelujah course in

8    it.  There's a lot of scholarship on melodies within the

9    Hallelujah chorus that George Frederick Handel might have

10   borrowed from other composers or perhaps from church music

11   traditions.

12          So I always make sure and teach that controversy

13   because it's central to understanding how to talk about how

14   two pieces of music might relate to each other, how they

15   might be implicated with each other so that enters into that.

16          When I teach popular music, I often teach my own

17   book on the song Old Man River which is a song from the

18   musical Showboat.  In my research on Old Man River, I

19   discovered a song that predates Old Man River by 14 months.

20          It was heard on the Broadway stage and it has, um,

21   significant -- there are musical borrowings in Old Man River

22   from this song I discovered in a vertical file at the Library

23   of Congress.  So that's an example of two pieces of sheet

24   music that I've compared.

25   Q.    Thank you.

1    A.    There's just also audio comparisons.  It comes up when

2    it, um, when you want to make a connection between two pieces

3    of music.

4    Q.    And when you're analyzing with your students whether

5    some musical work has been borrowed from another, what kind

6    of tools do you use?

7    A.    Oh, the most important tool is always listening.  Music

8    is something we hear.  It's not something that's on paper.

9    Uh, notated music is directions for making musical sound.

10   When you're working with recorded music, that's particularly

11   easy because you just have the recorded music to work with so

12   you're always being put back to the sound.  So I always try

13   to go back to the sound.

14         Sometimes we sing it.  Sometimes you'll try to find

15   the borrowed part and sing it.  I'm a pianist so I'll go and

16   play it on the piano and mess around with the piano to see

17   how the two pieces might relate to each other.  Obviously, if

18   there is printed sheet music for two pieces that I want to

19   compare, then I look at that.  If that resource is there, I

20   would look at that as well.

21   Q.    And I think you mentioned notation.  What is that?  What

22   is notation?

23   A.    Musical notation is a set of conventional marks on the

24   page.  Um, they're different in different cultures.  The one

25   that we know is the one with the five lines; right?  And four

```
 1    spaces in western music.  Musical notation is primarily a set
 2    of instructions for performance; right?  That's why composers
 3    put music -- use music notation.  It's a set of instructions
 4    for performance.  There are other uses --
 5    Q.   Can you slow down?
 6    A.   I apologize.
 7    Q.   Okay.  I'll try to remind you.
 8         Okay.  Do you use notation in your work in
 9    comparing musical works?
10    A.   Sometimes when needed.  When warranted.  It's a tool.
11    Q.   Okay.  I'm gonna shift now to talk about this case and
12    why you're here today.  How was it that you were first
13    engaged to work on this matter?
14    A.   Plaintiffs' attorneys, uh, contacted me to look at these
15    two tracks and offer my opinion.
16    Q.   Do you know any of the plaintiffs?
17    A.   I do not.
18    Q.   And I believe you've met them once; is that right?
19    A.   Right.
20    Q.   Before arriving in L.A. for this trial, had you ever met
21    them?
22    A.   I had not met them before arriving in L.A.
23    Q.   And did you talk to them upon meeting them about this
24    case at all?
25    A.   No.
```

EXHIBIT 3
PAGE 435

```
 1    Q.   Do you know anything about them other than the fact that
 2    they're musicians?
 3    A.   I know they're Christian rappers, but I got that from
 4    the content of the song.
 5    Q.   Did you do any independent research as to who they are?
 6    A.   None.
 7    Q.   Do you have any financial stake in the outcome of this
 8    case?
 9    A.   I do not.
10    Q.   So tell us what specifically you were asked to do.
11    A.   I was asked to compare these two tracks on the
12    understanding that Joyful Noise had been composed before --
13    released before Dark Horse.
14    Q.   And were you asked to render an opinion?
15    A.   I was.
16    Q.   What materials were you given to review?
17    A.   The two audio files of the tracks as released.
18    Q.   Are you referring to the sound recordings?
19    A.   Yes, the sound recordings.
20    Q.   And Dr. Decker, did you need anything else in order to
21    compare the music?
22    A.   I did not.
23    Q.   So walk us through what you did in order to analyze the
24    works and render your opinion related to their similarity or
25    dissimilarity.
```

1    A.    Well, the first thing I did was listen to them

2    back-to-back and toggling between the two.  I hummed or sang

3    along so I played the material that sounded similar to me.  I

4    went to the piano and toyed around with the notes on the

5    piano to, uh, determine what pitch level they were at, what

6    key they were in.  Um, and that was how I would, yes, by

7    listening essentially.

8    Q.    Did you put them in the same key?

9    A.    I did, yes.

10   Q.    And how did you do that?

11   A.    Um, once you establish -- once I had established the

12   pattern that I heard as similar, I was able to transpose or

13   shift it, shift the two into one in the same key.  I also as

14   my report will show, found a way to describe their similarity

15   that did not require them to be in any key at all.  So I

16   could understand them without assigning a key to them, a

17   letter name.

18   Q.    And hopefully we'll get to understand some of these

19   terms a little bit better.  Sort of terms of art.  And so in

20   putting them in the same key, did you then put them down on

21   paper at any manner?

22   A.    At some point, I would have put them down on paper.  The

23   way I initially expressed them was in scale degrees so I did

24   not begin by writing out the music notation.  I began with

25   scale degrees.

1    Q.    Is that reflected in your report?

2    A.    That is reflected in my report.

3    Q.    And, again, what is it that you were looking to do?

4    A.    I was looking to isolate the musical material, if there

5    was any, to isolate if there was any musical material that

6    was shared between two tracks.  And, um, I very quickly

7    determined that there was and that it was an easily expressed

8    similarity between the two that I could do in -- that I could

9    express in writing or in words or in symbols quite easily.

10    Q.    And is all that work contained within your report?

11    A.    It's in my first report, yeah.

12    Q.    Um, you said that the primary method that you used to

13    compare the works was listening?

14    A.    Yes.

15    Q.    How many times did you listen to the songs?

16    A.    Uh, countless.  Musicologists can't keep count of how

17    many times we listen to what we work on.  We listen to it

18    over and over and then you go back and check again.  And then

19    you back and you check again, you write, you check.

20         It's a constant back and forth to make sure that

21    the way you describe it matches what you hear on the

22    understanding that a colleague or student or someone else who

23    reads your description is going to do that as well.  They're

24    going to use your description as a guide for listening.  So

25    you want to get it right so you listen repeatedly.

1    Q.    And so we're going to get into the details of your

2    opinion, but to summarize based on your expertise and music

3    performance, musical history and musical borrowing, do you

4    think Joyful Noise and Dark Horse are substantially similar?

5    A.    I do.

6    Q.    Do you think Dark Horse borrows from Joyful Noise?

7    A.    I do.

8    Q.    Did you memorialize your opinion in the form of a

9    report?

10   A.    Yes.

11   Q.    I'd like to now shift to talk about the details of your

12   opinion.  In your report you said the most obvious or

13   pervasive similarity is the ostinato; is that right?

14   A.    Yes.

15   Q.    What is an ostinato?

16   A.    An ostinato is a repeating figure that cycles within a

17   piece.  Um, in this case it's eight notes long.  Uh, it's a

18   repeating figure that cycles and upon which the structure of

19   the piece is built.  So one analogy to use would be, um,

20   sections of toy train track.  The ostinato is a section and

21   you line up sections of that train track and build the piece

22   upon those repetitions of the ostinato.

23   Q.    And you said that the ostinato that you believe is at

24   issue here is eight notes?

25   A.    It's eight notes in length.

 1   Q.   We've also, I think, heard it referred to throughout the

 2   trial by various people as a musical melody or a beat.   Is

 3   that consistent with your understanding of an ostinato?

 4   A.   It can be in this case.   We can describe it as eight

 5   beats in length.   We describe it as a melody of eight notes.

 6   In this case the ostinato is a melodic figure, yeah.

 7   Q.   Do you musicians use those terms interchangeably?

 8   A.   Yeah.   Um, one of the things about music is when you're

 9   working with a musicians, you often don't need words because

10   you say do it like this and you do it and you copy.   So, um,

11   the describing of music in words is essentially my job as a

12   music historian and that's a challenge.   And often you'll

13   find the same word used to refer to the different elements.

14   And especially, I would say in popular music, there is no

15   fixed set of terms that we all use.

16   Q.   So I'd like to have you look now at a chart that's

17   contained within your report.   It's been marked as

18   Exhibit 81, parties joint exhibits.   The chart is on page 6.

19   A.   Yes, this is my report and my chart from the report.

20            MS. COHEN:   May I have permission to publish to the

21   jury?

22            THE COURT:   Yes.

23            MS. LEPERA:   Publishing just the chart.

24            MS. COHEN:   Just the chart.

25            MS. LEPERA:   Absolutely.

```
 1    BY MS. COHEN:
 2    Q.    Dr. Decker, is this the chart that's included on page 6
 3    of your report?
 4    A.    It is.
 5    Q.    Um, can you describe for us what is represented in this
 6    chart in very simple terms?
 7    A.    Yes.  So this chart, I spoke of wanting to isolate the
 8    musical material that is shared by these two tracks, and this
 9    chart attempts to do that.  So it's an eight note or eight
10    beat ostinato.  So each of the columns, each of the numbered
11    columns, they're numbered in the top row is one of those
12    beats.  Joyful Noise is the second row.  Dark Horse is the
13    third row.
14    Q.    Good.  Simple.  Thank you.
15          Um, and so if you were to demonstrate for a class
16    that you were teaching what you believed to be the ostinato
17    that we're talking about in each song, how would you go about
18    doing that?
19    A.    I would sing it.
20    Q.    Can you go ahead and do that for us?
21    A.    Sure.  So, um, Joyful Noise as expressed here, I'm
22    singing off the chart, 3 3 3 3 2 2 2 1, 3 3 3 3 2 2 2 6, 3 3
23    3 3 2 2 2 1, 3 3 3 3 2 2 2 6.  So I just sang four
24    repetitions of the ostinato in Joyful Noise.
25    Q.    And now, would you do the same for Dark Horse?
```

```
1    A.    Sure.  3 3 3 3 2 2 1 5, 3 3 3 3 2 2 1 5, 3 3 3 3 2 2 1

2    5, 3 3 3 3 2 2 1 5.  Again, that was four repetitions of the

3    ostinato in Dark Horse.

4    Q.    And can you explain for us why it is you're singing in

5    numbers?

6    A.    Right.  We're singing in numbers with the little carets

7    above them here.  Here I'm using what are called scale

8    degrees and I do that for two reasons.  First --

9    Q.    Well, wait.  First, can you tell us what is a scale

10   degree?

11   A.    So a scale degree is a number that identifies where a

12   given pitch -- it's a way to assign a number to a pitch in a

13   scale.  So one would be the tonic or the home note.  Five

14   would be the dominance for those with some musical training

15   and so forth.

16         So there are seven pitches in a scale and so it

17   would seven scale degrees.  Scale degrees are indicated in

18   music theory with a number and a little caret above it so

19   that's why I use that caret.  That's music theory notations

20   or lingo.

21   Q.    And so what would happen after seven?

22   A.    Um, after seven you would be back at one.

23   Q.    Can you demonstrate that for us by singing?

24   A.    Sure.  I'll sing a major scale; right?  1 2 3 4 5 6 7 1.

25   Q.    Thank you.  Can you demonstrate in the minor mode?
```

EXHIBIT 3
PAGE 442

1    A.    Uh, there are three versions of the minor mode so I will

2    sing the natural minor 1 2 3 4 5 6 7 1.

3    Q.    Thank you.  And what is the purpose of using scale

4    degrees?

5    A.    So scale degrees allow you to see through the

6    differences in letter names.  For example, if you sing the

7    song Happy Birthday and you sing it in C major, it would go

8    C C D C F G.  If you sing it in G major, it would go

9    G G A G C B.  Sounds like two completely different melodies

10   in that respect, but we all know that those are in fact the

11   same melody starting at different starting point.

12        So a way to sing Happy Birthday that wipes

13   away those -- that elements letter names is to sing degrees.

14   1 1 2 1 4 3.  You can start on any pitch 1 1 2 1 4 3,

15   1 1 2 1 4 3, anywhere, and you have a sense for the

16   relationship of the notes in that melody.  The relationship

17   of the pitches.

18        That's why scale degrees are so important in

19   musical borrowing cause if we're looking for relationships,

20   we can't be, um, it's -- it's useful not to be confused by

21   letter names; right?  This allows us to put a melody into no

22   particular key, but instead just see the relationships

23   between the notes in that melody.

24        The other reason to use these and this is

25   especially important in musical borrowing is that scale

134

1  degrees have in them tendencies.  So if I sang Three Blind

2  Mice, we all know where that second note would go.  Right?

3  Three Blind Mice.  In scale degrees that would be 3 2 1.  So

4  melodies in our musical system want to go to one.

5         So that if you use scale degree 3 and you use scale

6  degree 2, and if you understand the melody through scale

7  degrees, you can identify the way that melody is using the

8  way the music works to do its -- to express something or to

9  make musical sense.  So this allows for a comparison of how

10  notes in comparable melodies do the same sort of work or have

11  the same sort of effect.

12         There are scale degrees that want to go somewhere,

13  want us to go somewhere and scale degrees that say you're

14  home like 1.  So those are the two reasons why I use scale

15  degrees in this case.

16  Q.   And how do you measure the distance between notes in a

17  scale?

18  A.   Right.  So the distance between notes in a scale is

19  measured in half steps which is, um, the smallest musical

20  measure in our system.  And that is the space between two

21  adjacent notes on the piano whether they're both white or

22  white and black.  So half notes.

23         So, for instance, in the minor mode, the distance

24  between the third and the second scale degree is a half step.

25  In the major mode, the distance between the third and the

EXHIBIT  3
PAGE 444

1    second degree is a whole step.  So it's another way we

2    understand how these notes work within a scale, melodies work

3    within scales.

4    Q.   So to get us moving along a little bit, I'm gonna list

5    for you the similarities that you identified in your report.

6    You can let me know if I cover through them all and then we

7    can go through them each one-by-one.

8         You identified substantial similarities between

9    Joyful Noise and Dark Horse --

10        MS. LEPERA:  I object to this, Your Honor.  She can

11   ask the question what are the materials in his report rather

12   than having her paraphrasing them.

13        MS. COHEN:  That's fine.  I can do it that way,

14   Judge.

15        THE COURT:  Thank you.

16   BY MS. COHEN:

17   Q.   In your report, Dr. Decker, what were the features of

18   the two songs that you identified as substantially similar?

19   A.   Well, first that they both have a prominent ostinato.

20   The length of the ostinato is similar, eight notes.  The

21   rhythm of the ostinato is similar.  The melodic content, the

22   scale degrees present.  The melodic shape so the -- the way

23   the melody moves through musical space.

24        Similar, the tambor or the quality and color of the

25   sound is similar, and the use of the -- the placement of this

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 445

136

material, this ostinato, in the musical space of the
recording in the mix that is also similar.  So that's five or
six points of similarity between the two ostinatos.

Q.   And did you make any determination regarding, um, the
similarity of the pitch?

A.   I --

Q.   Did you already cover that?

A.   Of the pitches, yes.  The pitch content, right.  The
repetition of pitches are the same as well.

Q.   I see.  And what about the texture?  Is that something
you also considered?

A.   Yes, yes.  I mentioned that as part of the way this
melody is placed in the texture in the mix.

Q.   Okay.  I think you first mentioned the ostinato and the
descending nature of the ostinato.

A.   Right.

Q.   What do you mean by that?

A.   Can we continue to look at the chart?

Q.   Yes, please.  Thank you.

A.   So if you look at the chart in -- in both cases, this
melody starts at 3, the third scale degree and over the
course and remains on that third scale degree for four notes,
four iterations, four playings of the note.  Then it steps
down to 2, and then it goes to 1.  So both of the melodies
have this 3, 2, 1 gesture.

EXHIBIT 3
PAGE 446

137

```
1            And then the 6 and 5 at the end have to do with a
2    leap down.  So while those notes are higher, our ear they're
3    in a lower octave so they are actually a jump down.  So to
4    sing it again, 3 3 3 3 2 2 2 1, 3 3 3 3 2 2 2 6.  There's a
5    leap there that then we jump back up to 3 to restart the
6    ostinato.
7            This also happens in Dark Horse.  3 3 3 3 2 2 1 5,
8    3 3 3 3 2 2 1 5.  So that, that descending melodic trajectory
9    and also the fact the melody sits on 3 for four playings
10   is -- is noteworthy.
11   Q.   And is that descending quality or contour of the
12   ostinato is that something that you see commonly in this kind
13   of music?
14   A.   I don't know.  Um, it's -- it's shared by these two, um,
15   it's shared by these two examples in an identical fashion.
16   So I wouldn't -- I wouldn't speak to all possible music.
17   It's one option.  A descending contour is one option.
18   Q.   Do you see it often?
19            MS. LEPERA:  Objection.  See what?
20   BY MS. COHEN:
21   Q.   Do you see this often with an eight note ostinato or
22   beat such as this that you would see commonly that a beat
23   descends in this fashion?
24   A.   I have not seen another, a third piece that descends in
25   the way these two do.
```

UNITED STATES DISTRICT COURT

EXHIBIT  3
PAGE 447

1   Q.    Is that significant to you?

2   A.    Oh, certainly, certainly.

3   Q.    So as far as the phrase length goes, I think you already

4   testified that there are eight beats in each --

5   A.    Yes.

6   Q.    -- in each ostinato.  Um, is that characteristic in

7   contemporary beat driven music?

8   A.    Sure.  It's characteristic for a phrase like this to

9   last for eight beats.  What's distinctive here is that rhythm

10  of eight beats is completely even.  All eight of those beats

11  for both ostinatos are completely the same.

12       So a way to demonstrate that would be to clap this,

13  um, clap the ostinato.  So I'll sing both ostinatos and clap.

14  3 3 3 3 2 2 1 6, 3 3 3 3 2 2 1 5.  So if I just clap the

15  rhythm of these ostinatos without singing.

16                      (Witness clapping.)

17       THE WITNESS:  Completely even, all of the values

18  are the same, and they unfold, um, with no syncopation.  For

19  example, these are squarely on the beat which is unusual.  In

20  popular music in America for the last 150 years, syncopation

21  has been the thing that says American music and that's

22  lacking here.

23  BY MS. COHEN:

24  Q.    What is syncopation?

25  A.    Syncopation is a melody that has notes or accents that

1    are off the beats.

2    Q.    Would you demonstrate an example of that?

3    A.    So syncopation the Dark Horse 3 3 3 3 2 2 1 5,

4    3 3 3 3 2 2 1 5.    There I'm syncopating and creating some off

5    beat accents.    Those are lacking off beat accents which are

6    entirely characteristic of almost all American popular music

7    since 1900.    Are both -- syncopation is lacking in both of

8    these ostinatos and that's noteworthy and I think kind of

9    cool, actually.

10   Q.    And is that what you just described for us the melodic,

11   um, I think you call it meter time is that referred to as

12   rhythm?

13   A.    Rhythm is the occurrence of musical events in time.    So

14   we can say here that these musical events occur in -- in --

15   they're of equal length and they're, um, they're all the same

16   in terms of their length.

17   Q.    So let's talk about another similarity that you found

18   which you said was the pitch content.

19   A.    Yes.

20   Q.    Can you explain for us the pitch in super simple terms?

21   A.    Yes.

22   Q.    As simple as you can.

23   A.    So to return to scale degrees, uh, this is in the minor

24   mode and the third scale degree in the minor mode is a very

25   important scale degree.    So I mentioned that there are three

```
 1    forms of the minor mode.  The only note that stays the same
 2    in all three of those is the third scale degree which is
 3    lower than the third scale degree as you would find it in the
 4    major mode.
 5            So just to demonstrate, Three Blind Mice, 3 2 1.
 6    That's the major mode.  3 between 3 and 2, there's two half
 7    steps, 3 2.  Between 2 and 1, there's two half steps, 2, 1 so
 8    those are two steps; right?  In the minor mode, 3 is just a
 9    half step above 2 so 3 2 1.  3, this is minor mode, 3 2, 3 2
10    1.  A half step followed by a whole step.
11            Looking at this ostinato, both of the ostinatos at
12    issue here are in the minor mode.  They insistently sit on
13    that lowered third degree.  The lowered third degree that
14    says to our ear we're in the minor mode 3 3 3 3.  That's
15    completely identical in both ostinatos.  Four playings, four
16    soundings of the lowered third degree of the minor scale,
17    third scale degree.
18            And then at exactly the same moment, both ostinatos
19    step down to 2.  Remember I mentioned that scale degrees want
20    to go places?  3 wants to go to down to 2.  3 in minor mode
21    3333332.  Right?  You repeat it more often and it creates
22    more of a desire for it to go down.  It is striking in these
23    two ostinatos that after four playings they both step down --
24            THE COURT:  I'm sorry?
25            MS. LEPERA:  Objection to the phrase.
```

```
 1              THE COURT:  Yes.  Sustained.
 2              MS. LEPERA:  Can we have that testimony stricken?
 3              THE COURT:  Yes, the words striking will be
 4    stricken so to speak because we're talking about substantial
 5    similarity not striking similarity.
 6              THE WITNESS:  So it's significant that those four
 7    iterations -- after four iterations of three, four even
 8    notes, even rhythms both of these ostinatos step down to two
 9    at exactly the same spot.  At the fifth note which is the
10    strongest note rhythmically in this ostinato, 1 and 5 are the
11    strong and rhythmic points of arrival here.
12              So the two ostinatos at issue for the first six of
13    their notes are absolutely identical.  3 3 3 3 2 2.  There's
14    no way to which of the ostinatos I was singing there cause
15    that what I just sang expresses both of them equally well.
16    BY MS. COHEN:
17    Q.   And if you had to say which of these eight notes is most
18    significant in the ostinatos?
19    A.   For me it's the, it's the fifth note when the music
20    shifts down from the -- it's hard to say what single one note
21    is the most significant, but to me it is that gesture where
22    we repeat third scale degree three times building up tension
23    that wants to be released and it's released to two on a
24    particularly strong beat.
25              So that's the moment that for me is particularly
```

```
 1   significant and signals to me through several different

 2   levels here; right?  Rhythm, pitch content, expressed as

 3   scale degrees, um, and a pattern of repetition that these two

 4   pieces have a relationship to each other.  That these two

 5   themes have a relationship to each other.

 6   Q.   And I believe you mentioned tambor and their similarity.

 7   What is tambor?

 8   A.   Tambor is a squishy set of words that we use to describe

 9   the quality or sometimes we say the color of sound, but it's

10   not necessarily blue or green that we're talking about here.

11   It's a way to put into words the distinctive color or quality

12   of a sound that we hear.  It's a particularly difficult area

13   to pin down.

14           MS. COHEN:  Okay.  Since it's hard to describe with

15   words, why don't we listen to each of the songs.  We would

16   like to play Exhibit 75 which is Joyful Noise first, and then

17   an excerpt of Dark Horse Exhibit 76 second.

18           THE COURT:  Fine.

19           (Exhibits 75 and 76 played for the jury.)

20   BY MS. COHEN:

21   Q.   So after having listened again, if you had to describe

22   in the words the tambor of the ostinatos, how would you do

23   that?

24   A.   So they're not identical, but they both sit within the

25   same family of sounds.  The first thing I notice about them
```

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 452

1    is that they don't suggest to my ear any real instruments.

2    One of the ways we talk about tambor is we hear a sound and

3    we go, oh, that's the sound or the color or the tambor of

4    clarinets or the tambor of a piano.  So we're making a

5    reference to an instrument that we know produces sound and we

6    understand that relationship.

7         The sounds produced here do not -- of the ostinatos

8    do not to me suggest any real instrument.  So these are

9    sounds made in a synthesizer because synthesized sounds,

10   digitally produced sounds, um, they're particularly high in

11   the same way.  They're treble voices.  They have for me a

12   pingy sound.  They don't sound -- they don't necessarily

13   sound like musical sounds, like a musical instrument.  They

14   sound like a tone you might hear on your phone; right?

15        It's an artificial sound.  It's an empty sound.

16   It's artificial in that respect.  So that's significant.

17   They're high; right?  They have this piercing quality.

18   That's not to say they are identical, but they are within the

19   same family of digitally produced sounds.

20   Q.   Is the tambor of the two songs substantially similar?

21   A.   I think so.

22   Q.   And you also mention texture.  What is texture?

23   A.   So texture is a way of talking about the, um, vertical

24   dimension of sound.  Um, texture can sometimes be thought

25   about as the number of things that are going on.  So like

1    when you listen to a Beatles' record, you hear John's bass,

2    you hear George's rhythm guitar, you hear Ringo on drums and

3    you might hear -- I'm sorry.  Paul's bass.  Excuse me.

4         You hear Paul McCartney's bass.  Ringo on drums.

5    George Harrison on a guitar solo and John on rhythm guitar;

6    right?  So you've got four separate players.  They are

7    fitting in the texture together and you can listen to any of

8    those elements that you want to; right?  They're all

9    happening simultaneously.

10        So that the texture suggests four men playing

11   instruments, it suggest four instruments being played, and

12   it's mixed in a way so that we can feel or so that we can

13   sort out the different elements.  So texture in one way, I

14   often talk about pop records being transparent, but thick.

15   So that they're full of sounds, but they're mixed in a way

16   that we can hear each of those sounds, can distinguish each

17   of those sounds.  And what is striking -- does that answer

18   the texture?

19   Q.   Yes.

20        MS. LEPERA:  Again, Your Honor, keeps using the

21   word striking.

22        THE WITNESS:  Oh, sorry.

23        MS. COHEN:  I apologize, Your Honor.

24        THE WITNESS:  I apologize.

25   BY MS. COHEN:

```
1   Q.   Do you attribute any legal meaning to --

2   A.   No, I'm not attributing legal meaning to it.

3        THE COURT:  Just so the jury understands, this

4   opinion is that the songs are substantially similar and that

5   is the claim in the case.  We have a different standard that

6   applies if the opinion were they were strikingly similar.

7   And therefore, we're trying to separate the two because this

8   case is based on substantially similar as is this opinion.

9        MS. COHEN:  Try to avoid using that term.

10        THE WITNESS:  Yes, I apologize.

11   BY MS. COHEN:

12   Q.   And so what did you find when you compared the texture

13   of each song Joyful Noise and Dark Horse?  What did you find

14   with respect to the similarity?

15   A.   I think at this particular -- I've heard, I've heard

16   both textures as remarkably empty.  There are relatively few

17   things going on and this is especially at the beginning of

18   both of these tracks when we're first hearing these melodies.

19   Um, when we first hear these ostinatos, they are in relative

20   isolation.  There's very little else going on.  It's only

21   this one thing happening.  Um, other things happen through

22   the course of track.  This is the nature of pop music for

23   layers to come in and go out, but the ostinatos are

24   introduced in both tracks in -- in isolation which directs

25   your ear to it.  It's the only thing to listen.  It's the
```

```
 1    only music to hear.  It's the only content.

 2    Q.   Perhaps we should listen again.

 3                    (Music played.)

 4         THE WITNESS:  There were two more notes in that

 5    repetition, yes.

 6    BY MS. COHEN:

 7    Q.   I don't know that anybody else heard that.  I appreciate

 8    it.  So in listening, again, is it your opinion, do you

 9    believe that kind of empty texture is common in this kind of

10    music?

11    A.   I don't -- it's -- it's -- strike.

12         MS. LEPERA:  Your Honor?

13         THE WITNESS:  All right.  All right.

14         MR. CHIEFFO:  Could we have an admonition to the

15    witness, please, Your Honor?

16         THE COURT:  Yes.

17         MS. LEPERA:  Maybe a further instruction to the

18    jury with respect to the level of difference at issue in the

19    two standards.

20         THE COURT:  Well, we're going to do that so that

21    I'm not just making it up.  I think we have to discuss it out

22    of the presence of the jury.  I understand.  You really must

23    not do this.  Okay?

24         THE WITNESS:  Can you repeat the question again?

25         MS. COHEN:  Why don't I just strike the question
```

1    and the answer.

2              THE COURT:  I think you should withdraw it, yes.

3              MS. COHEN:  Yes, I will.

4              THE COURT:  And I'll strike the answer.

5    BY MS. COHEN:

6    Q.   So I'll try again.  When you listen to the texture of

7    the songs and the empty quality that you described in the

8    texture, is that unusual for this kind of music?

9    A.   I think it is.

10   Q.   Now, you acknowledged earlier that there are some

11   distinctions in the songs; correct?

12   A.   Yes, of course.

13   Q.   Let's talk about some of those.  Can you pull up that

14   chart from page 6 again, please?

15              So you describe for us the first six notes or beats

16   which you testified are the same, the identical notes for the

17   first six; right?

18   A.   Yes.

19   Q.   What about the last two notes?

20   A.   So as you can see, the last two notes are different.

21   Let's talk about Joyful Noise first.  Joyful Noise has two

22   alternate and alternating endings to its ostinato.  Right?

23   It plays, just to talk through the entire ostinato there,

24   there's four repetitions of three followed by three

25   repetitions of the second scale degree, and then it

1    alternates between dropping to 1 and dropping to 6.

2           I'll demonstrate.  3 3 3 3 2 2 2 1,

3    3 3 3 3 2 2 2 6.  So that Joyful Noise offers two options,

4    two solutions to the problem of how to end the ostinato and

5    restart it.  Right?  So one of the things that has to happen

6    to end this ostinato, 2 wants to go to 1.  2 desperately

7    wants to go to 1.  So 2 goes to 1 in one of these alternating

8    versions, but there's also some musical pleasure to be had

9    from a leap -- from a leap down like that that then vaults us

10   up back up to 3.

11          So singing the sixth version 3 3 3 3 2 2 2 6,

12   3 3 3 3 and that vaulting up in some way signals to our ear

13   the ostinato is starting again.  Um, it's also -- there's a

14   harmonic, there's something going on harmonically there, too.

15   It's suggesting a 5 1 sort of feeling, although with a sixth

16   scale degree.

17   Q.   And why is it that the 2 wants to go back to 1?

18   A.   The 2 wants to go to 1, um, that's another tendency

19   tone; right?  The 3 wants to go to 2, the 2 wants to go to 1

20   because 1 is our home note.  1 is the magnet against which

21   individual notes in the scale are pulling or not.  And scale

22   degrees allow us to describe that, um, energy as it moves

23   through a melody.

24   Q.   So I think you've mentioned Joyful Noise.  What about

25   the last two notes in Dark Horse?

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 458

1   A.   The Dark Horse uses both of the options offered in

2   Joyful Noise.  Joyful Noise models two ways to end this

3   ostinato and Dark Horse uses both in every repetition.  So as

4   you can see it goes, this is Dark Horse now, there's four

5   repetitions of 3, two repetitions of 2, and then it goes to 1

6   because 2 is gonna have to go to 1.  2 wants to go to one.

7          There is also the pleasure of that leap down and

8   the rebounding back up.  That happens in Dark Horse in 8th

9   beat.  Again, there's harmonic implications here that we do a

10  5 1 for those of you with some knowledge of music theory.  It

11  manages to take qualities from both of the endings of Joyful

12  Noise and bake them into every repetition of the Dark Horse

13  ostinato.  So if I could sing?

14  Q.   Sure.

15  A.   3 3 3 3 2 2 1 5, 3 3 3 3 2 2 1 5 and so on.

16          So that the two ostinatos, um, might end

17  differently in terms of the actual rhythm of the notes, but

18  they're adopting and sharing similar musical strategies for

19  how to end this ostinato.

20  Q.   And so you acknowledge that the last two notes in the

21  song are different; correct?

22  A.   Certainly.

23  Q.   Um, and do you -- do you believe that those differences

24  are meaningful?

25  A.   I think that they, they, uh, they are meaningful in the

1    sense that you've got the endings of these ostinatos are not

2    identical, but they are -- the -- the way, the strategies

3    that both ostinatos use to end the ostinato and to restart it

4    are similar.

5    Q.    You also mention that the keys are different in Joyful

6    Noise and Dark Horse; right?

7    A.    Right.

8    Q.    What is the first distinction that you observed with

9    respect to the key?

10   A.    So Joyful Noise is in the key of A so Joyful Noise's 1

11   note is A.  So if we were going to spell Joyful Noise, we

12   would spell it C C C C -- sorry.  C C C C B B B A; right?  We

13   would sing those letter names.

14          Dark Horse is a half step higher.  Its home note is

15   B flat.  So if we were going to sing Dark Horse, we would

16   sing B flat B flat B flat B flat A.  Sorry.  That was wrong.

17   D flat D flat D flat D flat C C B flat E flat.  They have

18   different home notes.  That difference is negligible when you

19   translate these into scale degrees.

20   Q.    Is key sometimes referred to as pitch?

21   A.    It's -- it's the starting note.  It's the note letter

22   name that you start a piece on.

23   Q.    And so you said that Dark Horse being in B flat is

24   that -- you said it's one half step apart?

25   A.    It's a half step higher than Joyful Noise.

151

1    Q.    Okay.  So for a layperson like me is that something that

2    in your expert opinion is a difference that's recognizable

3    audibly?

4    A.    I would not think so.  They are quite close.  In fact

5    they couldn't be closer; right?  There is no, um, a half step

6    apart, two pieces that are a half step apart could not be

7    closer.

8              MS. LEPERA:  Lay listener.

9              THE COURT:  Yes, I think . . .

10             MS. COHEN:  I'm sorry, Judge.  I'm asking in his

11   expert opinion.

12             THE COURT:  Well, but he can't give an expert

13   opinion on what the jury has to decide.  And he persists in

14   doing that and if this continues, we will remove him from the

15   stand.

16             MS. COHEN:  Understood.

17   Q.    Dr. Decker, let's move on to talking about tempo.

18   That's third distinction that you --

19   A.    Yes.

20   Q.    -- recognized in your report; is that right?

21   A.    Yes.

22   Q.    How do you count music?

23   A.    You count it by popular music like this is counted in

24   beats per minute.  The tempo or the speed of the music is

25   quantified in beats per minute.

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 461

1    Q.    And do you recall how many beats per minute are in

2    Joyful Noise?

3    A.    154 beats per minute.

4    Q.    And do you recall how many beats per minute are in Dark

5    Horse?

6    A.    132.

7    Q.    And in determining the difference between the tempo as

8    far as the beats per minute, is that math you do in the

9    course of your work?

10   A.    Yes.  Well, I use, uh, I tap the, uh, I use a metronome;

11   right?  I have a metronome and I match the beats on the

12   metronome to the tempo of the recording.

13   Q.    And then is that how you determine the difference in the

14   tempo?

15   A.    It is.  That's how I determine the tempo of the

16   respective tracks.

17   Q.    So is Dark Horse faster than Joyful Noise?

18   A.    No.  Dark Horse is slower than Joyful Noise.

19   Q.    Okay.  And how much slower is it?

20   A.    By about 22 beats per minute.

21   Q.    Um, is that difference meaningful to you?

22   A.    I hear both of these tracks as moderately paced.  They

23   are not dance tracks, they are not fast and they are not

24   ballads.  They are similar in their moderate tempo.

25   Q.    And so to summarize, the three distinctions that you

```
 1    observed in your report that we've talked about here, the
 2    final note, the key and the tempo; is that right?
 3    A.   Correct.
 4    Q.   And when you rendered your opinion that the songs are
 5    substantially similar, did you take these distinctions into
 6    account?
 7    A.   I did.
 8    Q.   And how do these subtle distinctions impact your opinion
 9    related to whether the authors of Dark Horse borrowed from
10    Joyful Noise?
11              MS. LEPERA:  Objection.
12              THE COURT:  Sustained.  Rephrase.
13    BY MS. COHEN:
14    Q.   Do your -- do these distinctions impact your decision or
15    opinion related to whether the authors of Dark Horse borrowed
16    from Joyful Noise?
17              MS. LEPERA:  Same objection, Your Honor.
18              THE COURT:  I'm gonna sustain it.  The question is
19    similarity not borrowed which is ambiguous and is a jury
20    question.
21              MS. COHEN:  Well, he's testified that --
22              THE COURT:  I don't want to hear it.
23              MS. LEPERA:  Side bar, Your Honor.
24    BY MS. COHEN:
25    Q.   Dr. Decker, in referring to your report, did you time
```

154

```
 1    the amount of seconds during which the instrumental beat or
 2    the ostinato plays in Dark Horse?
 3    A.    I did using the time code from the recording.
 4    Q.    And that's in your report?
 5    A.    That's in my report.
 6    Q.    And can we pull up page 12?
 7              Can we have permission to publish to the jury
 8    page 12 from Exhibit 81?
 9              THE COURT:  Yes.
10              MS. LEPERA:  It's an incomplete page.
11              THE COURT:  I don't know what that means.
12              MS. LEPERA:  It's an incomplete page from this
13    report, Your Honor.  It starts at an incomplete sentence on
14    the top page.
15              MR. CHIEFFO:  Could you please -- I don't think
16    that's been permitted.
17              MS. LEPERA:  It's not even been admitted into
18    evidence.
19              THE COURT:  Is it part of the expert report?
20              MS. COHEN:  It is part of the expert report.
21              THE COURT:  The expert report's not gonna come into
22    evidence.
23    BY MS. COHEN:
24    Q.    Dr. Decker, do you recall, roughly, how many seconds the
25    ostinato plays in Dark Horse?
```

EXHIBIT 3
PAGE 464

155

1    A.    95 seconds.

2    Q.    And when you say that, are you referring to the eight

3    note ostinato?

4    A.    I'm referring to the eight note ostinato that I have

5    been describing.  That is heard in Dark Horse for 95 total

6    seconds.

7    Q.    Now, do you have an understanding that the defendants

8    have engaged a musicologist or an expert as well?

9          MS. LEPERA:  Objection, Your Honor.  Rebuttal.  May

10   we have a side bar?

11         THE COURT:  I think we need to have a side bar

12   because this entire performance is out of hand on all sides.

13         (Following proceedings were held at side bar:)

14         MS. LEPERA:  Dr. Decker is about to speak about my

15   musicologist and presumably his conclusions and rebut them

16   before my musicologist has testified.  So I want to make sure

17   that did not occur and that's where it appeared to be going.

18         THE COURT:  I thought he was going to be able to

19   testify.

20         MS. LEPERA:  In rebuttal of my musicologist not

21   before my musicologist testifies.

22         THE COURT:  Well, if we want to take him off the

23   stand and recall him, we can do that.

24         MS. LEPERA:  Dr. Ferrara hasn't put in testimony

25   and to have it be rebutted before it's even addressed is not

EXHIBIT 3
PAGE 465

```
 1    only confusing, but not procedurally correct.

 2              MS. COHEN:  He produced a rebuttal expert report.

 3              THE COURT:  I know he did and I permitted it.

 4              MS. LEPERA:  That's not my concern.

 5              THE COURT:  Everyone, if I could have Ms. Lepera

 6    stop nodding at me and Mr. Kayira as well.  Otherwise, I'm

 7    gonna send everyone out of the courtroom.  It's just

 8    inappropriate.  That's number one.

 9              Number two, I think it would be best if you wait

10    till her person testifies to put your person on as an expert,

11    although, I know you are trying to use our time efficiently.

12    I do not want to keep your expert hanging around

13    unnecessarily, but as long as there is an objection, and I'm

14    not sure, you know, that, I mean, she is's entitled to make

15    the objection.  If I were in her shoes, I don't know that I

16    would want a testier Judge.

17              MS. LEPERA:  How much -- if you're gonna put up

18    Dr. Ferrara, tell me when you're going to do it.  I know you

19    want to shortcut this, but this is not my normal practice to

20    see it done this way.

21              THE COURT:  I understand your concern.  We may have

22    to do it twice and then put her rebuttal on.

23              MS. LEPERA:  I'm not trying to lengthen this or do

24    anything like that.  I don't want this to be a confused jury.

25              THE COURT:  This is a confused jury at this stage.
```

```
 1              MS. COHEN:  We will be putting on the defendants in
 2    our case-in-chief with respect to two witnesses, one of which
 3    we did.
 4              THE COURT:  I'm not disagreeing.
 5              MS. COHEN:  We also entertained a request by you to
 6    allow you to do your direct in our case-in-chief related to
 7    two more defendants.  This is one-sided treatment.
 8              MS. LEPERA:  Again, rebuttal by an expert before
 9    the expert testified to what his opinion is is not the same
10    thing as calling a witness out of order.
11              THE COURT:  Here's what I'm going to say.  I don't
12    care how you do it.  If you want to examine him at this point
13    in time on this subject, that's fine with me.  However, do
14    not -- we're not going to recall him again to rebut Ferrara
15    or anyone else.
16              MS. COHEN:  Correct.
17              THE COURT:  And as long as you do that and if you
18    want to do it now, it's fine with me.
19              MS. COHEN:  Yes, Your Honor.  I apologize about his
20    language.  Obviously, he's not aware of the legal issues
21    going on in this case.
22              THE COURT:  He is a very smart gentleman who likes
23    to perform and he's just got to tone it down and stay within
24    the four corners of his opinion.  That's all.
25              MS. LEPERA:  My other issue is now we have a phrase
```

1    called musical borrowing that creates an issue of copying in

2    this case.

3            THE COURT:  That's why I have sustained objections.

4    Musical borrowing wasn't copying per se.  I think you're

5    getting unduly excited.  I know everyone has strong opinions,

6    but do a better job of containing yourselves.

7            MR. KAYIRA:  I didn't realize I was nodding.  I

8    apologize.

9            THE COURT:  Cut it out because the jury sees it and

10   it does not appear good for anyone.

11           MS. COHEN:  Can we make some statement to the jury

12   with regard to what's going on?

13           THE COURT:  I'm more than happy to do that.  Just

14   so I'm saying the same thing, he is rebutting?

15           MS. COHEN:  Certain opinions of defendant's expert

16   Dr. Ferrara.

17           THE COURT:  Okay.

18           MS. LEPERA:  I understand Your Honor is allowing

19   that.

20           MS. COHEN:  He's getting on a plane.  This will be

21   the last day you see him.

22                   (Side bar concluded.)

23           THE COURT:  Okay, ladies and gentlemen we're back.

24       Let me try to explain why we all went running over

25   to the side bar.  Professor Decker is testifying as an expert

1    witness, but he also has provided some opinions that rebut

2    the witness that the defense is going to put on who is

3    Dr. Ferrara.   In an effort to save time, we are going to let

4    him give his rebuttal testimony right now.

5            You've not heard the defense expert who is going to

6    of course disagree with Dr. Decker regarding substantially

7    similarity.   But because we don't want to turn this into a

8    situation where he testifies, Ferrara testifies, then we have

9    to bring him back, and then we have to bring Ferrara back

10   again, we're going to let him testify today as to those

11   issues with which he disagrees regarding their expert.

12           And then their expert can get on the stand and he

13   will testify why he believes that both opinions, both the

14   initial opinion and the rebuttal opinion are incorrect.

15           MS. COHEN:   Judge, before I start again, may I

16   confer with counsel for just a second?

17           THE COURT:   Absolutely.

18           Go ahead, Ms. Cohen.

19   BY MS. COHEN:

20   Q.   Dr. Decker, we were talking -- we were starting to talk

21   about the defendant's expert, Dr. Ferrara.

22           You understand as part of your engagement that the

23   defendants also have an expert musicologist; is that right?

24   A.   Yes.

25   Q.   You understand that?

160

```
 1    A.    Yes.

 2    Q.    Okay.  And you understand he's Dr. Lawrence Ferrara;

 3    right?

 4    A.    Right.

 5    Q.    Did you have an opportunity to read his report which

 6    identifies his opinions in this case?

 7    A.    I did.

 8    Q.    I'm going to ask you about some of the Dr. Ferrara's

 9    opinions.  Is that okay?

10    A.    Yes.

11    Q.    First, Dr. Ferrara opines that the first six notes in

12    each of the instrumentals are the same, but that they're

13    generic or lacking in distinctiveness.  Do you agree with

14    that?

15    A.    I do not.

16    Q.    And to demonstrate what he calls that lack of

17    originality, he refers to two examples where four iterations

18    of the 3 and 2 iterations of the two appear.  Do you recall

19    that?

20    A.    I do.

21                MS. COHEN:  I'd like to show what's been provided

22    by defendant's counsel as demonstrative page 43.

23                MS. LEPERA:  No objection.

24                MS. COHEN:  May I publish it to the jury?

25                THE COURT:  Yes.  This won't go into evidence,
```

```
 1   ladies and gentlemen, but it is put up to explain to you the

 2   opinion of this witness.

 3   BY MS. COHEN:

 4   Q.   Do you recognize these are the first six notes of Joyful

 5   Noise and Dark Horse?

 6   A.   Yes.

 7   Q.   The 3 3 3 3 2 2?

 8   A.   Yes.

 9   Q.   I won't sing it for you.  Don't want to shatter anyone's

10   ears.  These examples provided by Dr. Ferrara include two

11   other songs Merrily We Roll Along and Jolly Old St. Nicholas.

12   Do you recall reading that in his report?

13   A.   I do.

14   Q.   I'd like to show now what was provided by defendants as

15   demonstrative page 33.  And Dr. Ferrara, do you recognize

16   this as the sheet music from Jolly Old St. Nick?

17           MS. LEPERA:  I think he's Dr. Decker.

18           MS. COHEN:  Oh, I'm sorry.

19   Q.   Dr. Decker, do you recognize this sheet music from Jolly

20   Old St. Nicholas?

21   A.   Yes.

22   Q.   And are you familiar with the song?

23   A.   I am.

24   Q.   Are you able to sing for us in the same way you've done

25   with Joyful Noise and Dark Horse, the words of, well, this
```

```
 1   time with the words, can you sing for us Jolly Old

 2   St. Nicholas?

 3   A.   (Singing) Jolly Old St. Nicholas, lean your ear this

 4   way.

 5            Is that enough?

 6   Q.   Yes.

 7   A.   Thank you.

 8   Q.   And now can you sing it in the same way that you've done

 9   for Joyful Noise and Dark Horse using the scale degrees?

10   A.   Sure.  3 3 3 3 3 2 2 2 1 1 1 1 3.

11   Q.   Dr. Decker, in your expert opinion, is this the same as

12   the ostinato in Joyful Noise and Dark Horse?

13   A.   It is not.

14   Q.   And what makes you say that?

15   A.   Several reasons.  It's not an ostinato.  It's a tune.

16   The repetition, the -- the six notes labeled here, um, are

17   part of a tune.  They're part of the larger structure.  They

18   must be understood in context so that.

19            Also, and another aspect that I disagree with this,

20   um, is that this song is the major mode.  So that the third

21   degree here is, um, different in pitch content than the third

22   degree in the ostinatos at issue here.  So 3 3 3 3 2 2 2

23   that's Jolly Old Saint Nicholas.  That's in major.

24   3 3 3 3 2 2 2.  The ostinatos at heard are in minor

25   3 3 3 3 2 2 2.  So this is a, uh, this is where music
```

```
 1    terminology can be, um, can be -- can obscure differences.
 2              Both of those are the third degree of the scale.
 3    Right?  Both of them are the third scale degree in major and
 4    the third scale degree in minor are different pitches even if
 5    they are both the third scale degree.  And that is, again,
 6    the substantive and unchanging difference between the major
 7    mode and the minor mode is that third degree.  So that is a
 8    difference in literally in the -- in the pitch between these
 9    two.
10    Q.   And Dr. Decker, is it important in comparing these works
11    to acknowledge the 7th and the 8th note?
12    A.   In the, well, okay.  So as I said this is a tune and not
13    an ostinato so it goes its way.  These, uh, these six notes
14    are part of a melody, a tune that repeats, uh, within the
15    nature of this -- of this tune.  It's not an ostinato so it's
16    a context difference.
17    Q.   And so are you persuaded that Jolly Old Saint Nicholas
18    is an example of a prior use of the beat from Joyful Noise?
19    A.   I'm not.
20    Q.   Let's talk about Merrily We Roll Along.  If we could
21    show the demonstrative.  It's marked as page 18.  Do you
22    recognize this as sheet music provided by Dr. Ferrara for
23    Merrily We Roll Along?
24    A.   I do.
25    Q.   You've had an opportunity to review this?
```

1     A.    Yes.

2     Q.    In your opinion can you tell us whether you're persuaded

3     that this is a prior example of the music in Joyful Noise's

4     eight note ostinato?

5     A.    In my opinion it is not.

6     Q.    And why is that?

7     A.    Again, this is not an ostinato.  Again, this is in the

8     major mode and not in the minor mode.  And those would be,

9     you know, and -- and yes.  And again it's part of a tune as

10    opposed to an ostinato.

11    Q.    I'm now going to reference defendant's demonstrative

12    page 32, please.  Dr. Ferrara also opines there's more than

13    one note at beat 1, beat 5 and beat 8 as depicted in this

14    demonstrative.  Do you agree with him?

15    A.    I do not.

16    Q.    And why is that?

17    A.    I hear those pitches.  I hear these sliding pitches that

18    are, um, entered into the table here, but I do not hear them

19    as structural.  I do not hear them -- I hear them as

20    ornaments.  As decorations on the core notes that make up the

21    ostinato.

22    Q.    Maybe I should ask you what is your understanding of a

23    sliding note so we can all understand?

24    A.    So is a sliding note is a -- is a gesture that moves

25    between two so 1 1 (singing).

1   Q.   And so here do you believe that the way that the beats

2   are -- the way that they sound warrants having more than one

3   note at 1, 5 and 8?

4   A.   I do not because I hear those gestures.  I hear those

5   gestures in Joyful Noise.  They are certainly there, but I

6   don't give them structural weight.  I don't believe that they

7   are part of the structure of the ostinato.  They're

8   decorative and, uh, ornamental.

9   Q.   And so in that regard, do you consider what Dr. Ferrara

10  believes to be a sliding note persuasive evidence that Joyful

11  Noise and Dark Horse are different?

12  A.   I don't.

13  Q.   Dr. Ferrara also focuses on the fact that the last two

14  notes in 7 and 8 render the ostinatos different from one

15  another.  Do you agree with that?

16  A.   I stated that they are different, yes.

17  Q.   Okay.  And when you demonstrated for us -- strike that.

18       Do you agree with Dr. Ferrara that the difference

19  in the 7th and 8th note causes Joyful Noise and Dark Horse to

20  be not substantially similar?

21  A.   I do not.

22  Q.   And why is that?

23  A.   As I explained, I hear Dark Horse using both of the

24  options offered by Joyful Noise.  So I understand the

25  relationship between those two ostinatos as one where Dark

166

1   Horse is developing materials heard in, uh, Joyful Noise.

2   Right?  It's applying -- it's -- it's, um, developing, it's

3   working with them.  It's changing them in ways, uh, that to

4   my ear have evidence for, um, borrowing.

5              MS. LEPERA:  Objection.

6              MR. CHIEFFO:  I think that needs to be stricken,

7   Your Honor.

8              THE COURT:  I think that the word borrowed needs to

9   be stricken.  The witness has described borrowed for you

10  before that he's using it in a musical sense.  But the

11  difficulty and the reason we have these objections, ladies

12  and gentlemen is there is a concern there may be a confusion

13  between borrowing and copying.  And you're the people who

14  have to decide whether something has been copied or not.

15  That's going to be part of your assignment.

16             So we are trying to urge this witness not to use

17  the word borrowing even though he's using it in a purely

18  musical sense and he's not using it in the legal sense of

19  copying so that's why we're going through this.  So if you

20  can help me, I'd be grateful.

21             MS. COHEN:  Thank you, Judge.

22  Q.   Dr. Decker, Dr. Ferrara also opines there's two

23  ostinatos observed in Dark Horse.  Do you agree with him?

24  A.   Yes.

25  Q.   Can you identify the two ostinatos, please?

```
 1    A.    There's one that we've been discussing, the eight note
 2    one that I have been singing, and then there's one that is
 3    heard at the opening of Dark Horse.
 4    Q.    And can you sing at that for us, the four notes?
 5    A.    Yes.  3 2 1 5.  Repeating.
 6    Q.    And what does it sound like when you repeat?
 7    A.    3 2 1 5, 3 2 1 5, 3 2 1 5. (Singing)
 8    Q.    And is that the part that you hear at the very start of
 9    Dark Horse?
10    A.    Yes.
11    Q.    Dr. Ferrara opines that eight note ostinato that we have
12    been talking about in Dark Horse originates or comes from the
13    four note ostinato in Dark Horse not from Joyful Noise.
14          Can we actually pull up defendant's demonstrative
15    page 27, please?
16          And Dr. Decker, would it be helpful for in
17    explaining your opinion with regard to this, with regard to
18    Dr. Ferrara's opinion, to listen to that four note ostinato
19    in Dark Horse?
20    A.    Uh, sure.  Yes.
21          MS. COHEN:  Can you play just the beginning part of
22    Exhibit 76, please?
23              (Exhibit 76 played for the jury.)
24    BY MS. COHEN:
25    Q.    Is that the four note ostinato that you were talking
```

EXHIBIT 3
PAGE 477

```
 1    about?

 2    A.    That is the four note ostinato, yes.

 3    Q.    And can you describe for us the effect of the sound that

 4    you believe that ostinato has?

 5              MS. LEPERA:  Objection.

 6              THE COURT:  I'm sorry?  Can you rephrase it

 7    perhaps?

 8              MS. COHEN:  I think I'll just strike it.

 9              THE COURT:  Okay.

10              MS. COHEN:  Thank you.

11    Q.    Dr. Decker, do you agree with Dr. Ferrara that the

12    ostinato, the four note ostinato comes from -- I'm sorry.

13    Strike that.

14              Do you agree that the eight note ostinato

15    originates from the four note ostinato in Dark Horse?

16    A.    I do not.

17    Q.    And why do you not agree with him?

18    A.    I do not hear these materials as related in the way they

19    unfold in the track.  So in analyzing a musical work, you

20    don't necessarily understand it best by listening to it in

21    order and saying this happened first, and then this happened.

22    So the first thing that happened had to have been made or be

23    the ground from which the next thing that happened unfolds.

24    All right.

25              So we don't necessarily analyze music in order.  We
```

```
 1    can understand that music is made out of order.  Sections of
 2    a piece are made out of order.  And that it might be that
 3    what we hear first came out of something that we hear later,
 4    but that was composed first.  So the order of the
 5    composing -- of the materials in the piece is, uh, remains at
 6    issue for me.  And that as I understand is the argument put
 7    forward here.
 8    Q.   And so in looking at page 27 from defendant's
 9    demonstrative, do you recognize the top line or example as
10    the four note ostinato in Dark Horse?
11    A.   Yes.
12    Q.   And do you recognize the second example as the eight
13    note ostinato from Dark Horse?
14    A.   I do.
15    Q.   Okay.  And so Dr. Ferrara has them labeled here the four
16    note is Ostinato No. 1 and the eight note is Ostinato No. 2.
17    Do you see that?
18    A.   Yes.
19    Q.   And so do you agree that the notes here are notated
20    properly as far as the scales go?
21    A.   The pitches of these notes and the repetition pattern is
22    accurate.
23    Q.   Okay.  Is it just the numbering of the ostinatos that
24    you disagree with?
25    A.   So, um, the -- the numbering of the ostinatos makes
```

```
 1   sense in the piece.  The first ostinato, Ostinato 1 is heard
 2   first.  Ostinato 2 is heard second.
 3   Q.   I see.  Um, if you had to say which ostinato was born
 4   from the other, what is your opinion in that regard?
 5   A.   So, uh, musical materials, the Ostinato 1 is a
 6   collection of pitches.  Four pitches taken from the scale.
 7   Three scale degrees 3, 2 1 and 5.  A collection of pitches
 8   played in a particular order.  So in that respect, it's a --
 9   it has a certain -- it's a -- there's a limited amount of
10   specificity here; right?  In terms of our repetition pattern
11   or, um, a pattern, repetition pattern.
12          Ostinato 2 displays more specific musical choices;
13   right?  We still have 3 2 1 and 5, but 3 is repeated four
14   times.  2 is repeated twice.  1 happens once and 5 happens
15   once.  There are, um, musical decisions that have been made
16   to create Ostinato 2.  Um, there are more music decisions
17   that have been made.
18          There are more things to talk about, more
19   distinctive qualities to Ostinato 2.  While Ostinato 1 is a
20   collection of the four pitches each played once.  In some
21   ways you can say there's more specific information to talk
22   about in Ostinato 2, musical information.
23   Q.   And does that persuade you that it's more likely that
24   Ostinato 1 was born from Ostinato 2 as opposed to the other
25   way around?
```

```
 1    A.    I hear the piece as Ostinato 1 as being a reduction of

 2    materials found in Ostinato 2.  So that the repetition

 3    pattern's taken away and you're left with the four pitches,

 4    the four scale degrees that are there in Ostinato 1.

 5    Q.    So put differently, do you believe that the four note

 6    ostinato was inspired by the eight note ostinato of Dark

 7    Horse?

 8    A.    I do.

 9    Q.    Now, turning back to your opinions, you said that you

10    believe that both patterns from Dark Horse, the four note

11    ostinato and the eight note ostinato which form the musical

12    track for the song is derived from the ostinato in Joyful

13    Noise; is that right?

14    A.    Yes.

15            MS. LEPERA:  Objection.  Where in the report?

16    That's not in the report, Your Honor.

17            THE COURT:  Well. . .

18            MS. COHEN:  I'll find it, Judge.  The bottom of

19    page 12.  Exhibit 81 page 12 Paragraph J.

20            MS. LEPERA:  Thank you.  Withdraw the objection.

21            THE COURT:  Thank you.

22    BY MS. COHEN:

23    Q.    So Dr. Decker, in your report you state, I just want to

24    ask the question again so we don't lose track of it.  You

25    state that you believe both patterns from Dark Horse, both
```

1    the four note ostinato and the eight note ostinato form the

2    musical track for the entire song and that those can be said

3    to be derived from the ostinato in Joyful Noise; is that

4    right?

5    A.    Yes.

6    Q.    And why is that important?

7    A.    Uh, it's important because it suggests the, uh, the

8    power, the power of this pattern, this repetition pattern

9    found in Joyful Noise; right?  The musical power, the musical

10   efficacy of that particular phrase and gesture.

11   Q.    And because the large scale form is similar, can you

12   imagine Juicy J, for instance, rapping to Joyful Noise?

13   A.    Yes.

14   Q.    After everything we've just discussed, is it your

15   opinion that Dark Horse is substantially similar to Joyful

16   Noise?

17   A.    It is.

18   Q.    And do you believe that -- strike that.

19         Dr. Decker, all the opinions that you've expressed

20   here and in your report, are they based upon your years of

21   experience and expertise as a musician and music historian?

22   A.    Yes.

23   Q.    And just to be technical, were all of the opinions that

24   you expressed here today made to a reasonable degree of

25   musicological certainty?

1    A.    Yes.

2              MS. COHEN:  No further questions.

3              THE COURT:  Okay.  I think we need to take a recess

4    at this juncture.  Let's take 10 minutes.  It may be 15.  I

5    apologize in advance.

6                        (Recess taken.)

7                     (Jury not present.)

8              THE COURT:  Okay.  Ms. Cohen.

9              MS. COHEN:  So I have not conveyed this to the

10   witness yet, but instead of having him testify as to what he

11   would have done, we will just make an offer of proof.  I will

12   describe what he would have done, lay the foundation for

13   that, and then she will lodge her objection for the record.

14             THE COURT:  Okay.  And then cross-examine

15   hopefully.

16             MS. COHEN:  I think this process was designed to

17   avoid the cross-examination.

18             MS. LEPERA:  In other words, I think basically what

19   she's going to have the witness describe is essentially what

20   she told to the Court earlier.  I'm gonna describe what I

21   said he's gonna function to do with respect to the sound

22   recordings and we can lodge the objection that way.

23             THE COURT:  That's fine.

24             MS. LEPERA:  We could take a half hour with this

25   witness just on this issue.

1          THE COURT:  No, no.  I understand all that.  I

2     guess when I was referring to cross-examination, I was

3     referring to -- I would have been hopeful that we obviated

4     all cross-examination, but I know in this case that's not

5     going to happen.  Okay.  You can step down right now.  You're

6     welcome to sit in.

7          MS. COHEN:  Your Honor, the plaintiffs would like

8     to make an offer of proof related to testimony that

9     Dr. Decker would have provided, but for the Court's ruling

10    otherwise regarding what he believes to be the best way to

11    illustrate for the jury his opinions that are outlined in his

12    report and that he testified to here in court today.

13         I had planned to ask him what he would use to

14    demonstrate or make that illustration for the jury to which

15    he would have testified that he has software on his computer

16    called Mixed Pad and Wave Pad.  They're two programs within a

17    suite manufactured by NCH, an Australian software company.

18    That he's been using those software programs for over five

19    years.

20         That as a music historian and researcher and

21    professor of music, it's his opinion that this software is

22    considered in his field to be a reliable means of comparing

23    two songs and illustrating their relative similarities and

24    differences.

25         And that he believes this is the preferable mode

```
 1    for making such an illustration based upon the fact that the
 2    two songs we're comparing here were generated by a computer.
 3    And that it would allow us to compare the actual songs as
 4    opposed to some kind of duplication of them by means of some
 5    instrument.
 6             He then would have opened his computer and opened
 7    the programs.  He would have shown us that he has Exhibit 75
 8    and 76 which were provided by counsel.  They are the sound
 9    recordings for Joyful Noise and Dark Horse.  He then would
10    have -- I would have asked him using the software are you
11    able to adjust the tempo of the song of Dark Horse to match
12    that of Joyful Noise?  He would have said yes.
13             He would have described for us how he would go
14    about doing that click-by-click.  Um, how he would -- how he
15    calculated that difference and then he would have made that
16    adjustment, and he would play each song in succession for the
17    jury.  I then would have asked him are you able to use this
18    software to adjust the pitch or the key of the song to which
19    he would have answered yes.  And then I would have asked him
20    to walk us through his process of making that adjustment
21    which is one half step.
22             He would have shown us click-by-click exactly what
23    he would have done, and then after making the adjustment, he
24    would have played Joyful Noise and Dark Horse which at that
25    point would reflect both adjustment in tempo and key.
```

1          And then I would have asked him using the software,

2     are you able to lay one track on top of the another?  To

3     which he would have responded yes.  He would have done that.

4     And then he would play the songs together matching up the

5     place or the bookmark as he would describe where they both

6     start on the first beat.

7          Um, I then would have asked him if he was able to

8     use the software to isolate one song and then the other.  To

9     which he would have replied yes.  And then he would have

10    demonstrated or illustrated that for the jury by muting out

11    one song and then the other.

12         THE COURT:  Okay.  And your response?

13         MS. LEPERA:  Thank you, Your Honor.

14         On behalf of the defense, we object to this offer

15    of proof as untimely under the federal rules regarding the

16    disclosure of expert testimony.  It's a requirement that the

17    witness provide a written report that contain all of the

18    materials that they've reviewed, all of the exhibits that

19    will be used to summarize or support both their methodology

20    and their opinions.

21         It is undisputed that Professor Decker did not

22    provide any information in either of his reports regarding

23    two computer programs to the offers of proof that have been

24    made.  Namely, a Wave Pad and a Mix Pad computer program.

25    These were not disclosed.

1          In addition the suggestion of making an audio

2     recording on the eve of trial and altering the exhibit sound

3     recordings in a fashion that's not been disclosed in the

4     expert report is highly prejudicial, inappropriate.  It

5     cannot be examined by the musicologist whom the defendants

6     have retained and the authenticity of the program have been

7     established as a foundation.  And similarly the audio mashup

8     that is suggested will be made will not be able to be

9     reviewed.

10          So for all of those reasons, we think that it would

11     be entirely inappropriate to have this evidence offered and

12     believe the Court appropriately sustained our objection.

13          THE COURT:  Okay.  I'm going to sustain the

14     objection for the reasons I previously stated.  I do think

15     this is new material that is not contained in the expert

16     designation, but I will say that it seems to me that

17     Dr. Decker by his vocal demonstration of the notes was able

18     to do exactly what one might do on a keyboard with his voice.

19     And therefore, I think there really is not prejudice in any

20     sense to your side, but that's where I am.  I think it's just

21     too late.

22          MS. COHEN:  And Judge, I apologize.  I should have

23     done this before, may I just state on the record my

24     reasoning?

25          THE COURT:  Yes, of course.

```
1           MS. COHEN:  Your Honor, it's the plaintiffs'

2   position that this illustration is nothing more than that.

3   It's simply a live illustration based upon Dr. Decker's

4   expert opinion regarding the most effective way to

5   demonstrate for the jury the similarities and differences

6   that are outlined in his report and also in his testimony

7   here in court today.

8           There was nothing to produce to the defendants

9   because there is no file that's been created yet.  It would

10  have been a live illustration.

11          Additionally, the defendants were provided the

12  opportunity to inspect the software program here in the

13  courtroom which they did over the lunch hour.  And we believe

14  that after properly laying a foundation for Dr. Decker's use

15  of the software and perhaps, I forgot to mention this before,

16  but I believe he would also testify that he uses this

17  software in his classes as a means of illustrating to his

18  students similarities and differences between works.

19          And so after laying that foundation and also

20  establishing what he believes to be the reliability of the

21  software in his field for use specifically for this purpose,

22  we believe that it should be permitted.

23          Additionally, to speak to the issue of recording

24  the file, it is possible to record the file after it's

25  created and we would have suggested that it be recorded on an
```

```
 1    empty USB and offered into evidence.

 2              THE COURT:  Okay.

 3              MS. LEPERA:  Very briefly, Your Honor.

 4              THE COURT:  Yes, Ms. Lepera.

 5              MS. LEPERA:  Very briefly that last comment by

 6    plaintiffs' counsel makes the objection even more important

 7    and respectfully submit that the Court's sustaining of it

 8    correct.  They have now indicated that not only would they

 9    create an exhibit and a methodology on a computer that has

10    not been authenticated or verified, they would now actually

11    create a separate sound recording which has never been used

12    in the reports or created previously as an exhibit to submit

13    in the case.  That is the antithesis of discovery and the

14    rules especially with respect to ambush on the eve of trial

15    and Rule 702 and 703 prohibit it.

16              THE COURT:  Okay.  I am going to, as I say, sustain

17    the objection.  I don't think there was adequate disclosure.

18    I don't think the disclosure today gives Dr. Ferrara a chance

19    to respond or know what the testimony is.  The whole point of

20    expert designation is to give advance notice so that the

21    parties can conduct discovery and test the theorys of each

22    side's experts.  And if, in fact, this is only intended to be

23    a demonstrative of his opinion, then it is simply cumulative

24    of his vocal testimony during the proceeding today.

25              With that, I'm done.
```

```
 1              MS. COHEN:  Thank you, Judge.
 2              THE COURT:  Okay.  We should probably get the jury
 3    and if Dr. Decker's ready to go, put him back on the stand.
 4                        (Jury present.)
 5              THE COURT:  Okay.  Cross-examination.
 6                        CROSS-EXAMINATION
 7    BY MS. LEPERA:
 8    Q.   How are you, Professor Decker?  Holding out on a Friday
 9    afternoon at 3:20.  Okay.  All right.
10              Let me start by asking you in your reports, am I
11    correct that you do not have any chart of any musical
12    material other than the chart that was prepared and shown to
13    you during your direct examination?
14    A.   These are in all my reports.
15    Q.   The initial report.
16    A.   The initial report that is the only chart in my initial
17    report as I recall.
18    Q.   And so in your initial report -- pardon me.  There is no
19    question pending.  This is the chart that we're referring to;
20    correct?
21    A.   This is not my chart.  This is the, this similar to my
22    chart, but it's not the one from my report.  Is that not an
23    issue?
24    Q.   What is the difference between this chart?
25    A.   There's no little carets above the numbers which I
```

```
 1   included in my chart so that there was no ambiguity about
 2   using the scale degrees.
 3   Q.   Okay.  Other than that --
 4   A.   Yes.
 5   Q.   The same; correct?
 6   A.   Yes.
 7   Q.   And there's nothing in your initial report where you
 8   chart in any fashion what we've been discussing as Ostinato
 9   No. 1 in Dark Horse; correct?
10   A.   That is correct.
11   Q.   Let's put that slide back up.  Now, you agree there are
12   two ostinatos in Dark Horse; correct?
13   A.   Yes.
14   Q.   And your counsel or counsel for the plaintiff was asking
15   you questions about Dark Horse Ostinato No. 1 and Dark Horse
16   Ostinato No. 2 relative to what we have placed on the screen
17   here.  You recall that?
18   A.   Yes.
19   Q.   Okay.  And nowhere in your initial report, correct, do
20   you map out the pitches of Ostinato No. 1; correct?
21   A.   I list them in textual form.  I describe them in a -- in
22   a sentence as opposed to making a chart.  Correct.
23   Q.   You don't chart them anywhere and you don't compare them
24   in any way in any chart form to either Ostinato No. 2 or
25   Joyful Noise; correct?
```

```
 1    A.    Not in chart form.
 2    Q.    Okay.  Now, you would agree with me, would you not, that
 3    the first pitch in Ostinato No. 1 is a C?
 4    A.    On this chart?
 5    Q.    Do you have an --
 6    A.    Yes.
 7    Q.    -- issue with that in terms of the truth?  In other
 8    words, is that not what it is in reality?  Is it a C in
 9    reality on the recording as transcribed in A minor?  Is it a
10    C?
11    A.    As transcribed into A minor, yes.
12    Q.    So it's a C note, yes, or C pitch in Ostinato No. 1 in
13    Dark Horse?
14    A.    As transposed to A minor.
15    Q.    And it's C pitch in Ostinato No. 2; correct?
16    A.    The first pitch, yes.
17    Q.    And that C pitch is repeated four times; correct?
18    A.    It's --
19    Q.    Three times.
20    A.    Three times.
21    Q.    Just --
22    A.    It's my musicology training.
23          THE COURT:  You've got to speak and let the other
24    person finish.
25    BY MS. LEPERA:
```

```
 1    Q.    The C note or the C pitch?

 2    A.    Yes.

 3    Q.    In Ostinato No. 2 is repeated three times; correct?

 4    A.    Yes.

 5    Q.    But it's still a C pitch; correct?

 6    A.    It is.

 7    Q.    There's no difference between the C pitch in the

 8    Ostinato No. 1 and the C pitch in Ostinato No. 2 in pitch;

 9    correct?

10    A.    Yes, yes.

11    Q.    There's a B pitch in Ostinato No. 1 that follows the C

12    pitch; correct?

13    A.    Yes.

14    Q.    Do you remember how you were talking in your direct

15    examination about how the sound down from the C to the B was

16    a significant point for you?

17    A.    Yes.

18    Q.    Do you recall that?  That happens in Ostinato No. 1,

19    does it not?

20    A.    It does.

21    Q.    So now let's look at Ostinato No. 2.  The next pitch in

22    Ostinato No. 2 is also a B; correct?

23    A.    After the Cs, yes.

24    Q.    And you play piano; correct?

25    A.    I do.
```

1    Q.   Professor Decker?  Okay.  How close in proximity on a

2    piano are those two notes?

3    A.   They're right next to each other.

4    Q.   And they're two white notes; correct?

5    A.   They are.

6    Q.   Are they hard to play?

7    A.   That really depends.  Not for me, yeah.

8    Q.   Okay.  And the next pitch in Dark Horse Ostinato No. 1

9    is an A; correct?

10   A.   Correct.

11   Q.   Okay.  And right -- the next pitch directly following

12   the B in Ostinato No. 2 is also an A; correct?

13   A.   Yes.

14   Q.   So we have the same three pitches in common between

15   Ostinato No. 1 and Ostinato No. 2.  The only difference with

16   respect to those pitches is that there's a repeat of the C

17   three times and a repeat of the B once; correct?

18   A.   Yes.

19   Q.   Okay.  You have no knowledge of the order in which the

20   Dark Horse writers created the various sections of their

21   song; correct?

22   A.   I do not.

23   Q.   So when you speculate that Dark Horse Ostinato No. 2 was

24   created first followed by Ostinato No. 1, you have no basis

25   for that knowledge other than your conclusion based on what

```
 1   you think the music shows you; correct?
 2   A.   It comes from musical analysis, yes.
 3   Q.   Now, the music in Dark Horse that starts out the track
 4   is which ostinato?
 5   A.   Ostinato 1.
 6   Q.   So the introduction in Dark Horse is not Ostinato No. 2;
 7   correct?
 8   A.   Correct.
 9   Q.   So sequentially Ostinato No. 1 comes first in Dark
10   Horse.
11   A.   We hear it first, correct.
12   Q.   And Ostinato No. 1 is in the chorus of Dark Horse;
13   correct?
14   A.   Correct.
15   Q.   The only sections of Dark Horse that contained Ostinato
16   No. 2 are the verses; correct?
17   A.   Correct.
18   Q.   You testified when you were asked on direct --
19   A.   Can I qualify?  There is an instance where Ostinato
20   No. 2 happens in Dark Horse and it's not part of the verse.
21   There's a section after the first chorus where it's heard by
22   itself as a precursor to the start of the verse.  There's
23   two.  So there is a following where it doesn't align with the
24   verse.
25   Q.   Okay.  Now, we've gone over, have we not, the pitches
```

1    that are in Ostinato No. 1 in Dark Horse from C to A;

2    correct?

3    A.    Yes.

4    Q.    And then what do you have following the A pitch in

5    Ostinato No. 1 and Ostinato No. 2 it's the same pitch of E;

6    correct?

7    A.    Yes.

8    Q.    Okay.  So you would agree with me, would you not, that

9    the melodic contour of pitches is exactly the same

10   notwithstanding between Ostinato No. 1 and Ostinato No. 2 in

11   Dark Horse?

12   A.    The melodic contours of these two ostinatos, yes.

13   Q.    Exactly the same; correct?

14   A.    The same, yes.

15   Q.    Now, isn't it in fact the case that you have given an

16   opinion in this case that Ostinato No. 1 in Joyful Noise and

17   ostinato number -- well, there's only one ostinato in Joyful

18   Noise; correct?

19   A.    Yes.

20   Q.    So I may call it No. 1, but we agree there's only one.

21   A.    Right.

22   Q.    And that is the eight notes that you have been talking

23   about which we'll put on the screen in a minute again.

24   A.    Yes.

25   Q.    So when you have Ostinato No. 1 in Dark Horse and Joyful

187

1    Noise, you said in your rebuttal report, have you not, that

2    they're plainly dissimilar; correct?

3    A.    Can you say that again?

4    Q.    You said in your report that Ostinato No. 1 in Dark

5    Horse and Joyful Noise ostinato are plainly dissimilar.

6    A.    Yes.

7    Q.    Isn't it in fact the case, sir, that they both have a C

8    pitch, a B pitch in common?

9    A.    They have a C pitch and a B pitch in common.

10   Q.    And isn't it in fact the case, those are the only two

11   pitches in common between Joyful Noise and Dark Horse in

12   those ostinatos that you've been talking about?

13   A.    No, there's a third that's similar.

14   Q.    Can I please have his chart back?

15         This is your chart, Dr. Decker; correct?

16   A.    Yes.

17   Q.    Now, we talked about what these, um, scale steps are;

18   correct?

19   A.    Yes, scale degrees.

20   Q.    Isn't it in fact the case when you talk about the 3 and

21   the 3 and the 3 and the 3 you're talking four C notes;

22   correct?  C pitches.

23   A.    In the key of A minor, correct.  It's only in the key of

24   A minor.

25   Q.    And they have two B pitches?

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 497

1    A.    In the key of A minor, correct.

2    Q.    So what other pitch other than C and B are in common

3    between these two?

4    A.    The one.

5    Q.    Where are the ones lined up?

6    A.    You mean, I understood these as the pitch content of the

7    ostinato not as how they were lined up.  So if you're talking

8    just are they lined up?  If you're talking only when they are

9    lined up and happening on the same beat?

10   Q.    So --

11   A.    -- yes, there are only two pitches.

12         THE COURT:  Wait, wait.

13   BY MS. LEPERA:

14   Q.    Sorry.  I'm sorry.  I didn't mean to interrupt you.  Are

15   you finished?

16   A.    Um, just I understood your question to be the content,

17   the pitch content so like, um, when you analyze an ostinato,

18   you can look at it and say what are -- let's name --

19         THE COURT:  Slow down.

20         THE WITNESS:  Let's name all the pitches in a given

21   melody; right?  That would be the collection of notes the

22   composer uses.  The order in which those pitches are repeated

23   and used is another issue.  I was taking your description of

24   the contents of the pitches in these ostinatos in the -- in

25   the way of collections of pitches used in a melody.

```
 1    BY MS. LEPERA:

 2    Q.   Understood.  But the -- the pitch similarities in

 3    sequence in melodic contour ends, does it not, on the sixth

 4    note?

 5    A.   If we are speaking of an exact, of an exact, of an

 6    identical relationship between the pitches and the beat, it

 7    does.

 8    Q.   Isn't it in fact the case that the B note or B pitch,

 9    pardon me, that is the 7th, uh, pitch in this ostinato in

10    Joyful Noise, okay, is a B?

11    A.   In A minor.

12    Q.   And isn't the one pitch in Dark Horse that is on the

13    seventh beat an A?

14    A.   In A minor.

15    Q.   Those are two separate pitches, aren't they?

16    A.   They are.

17    Q.   Okay.  So can we cross those out?

18         Now, let's look at the 8th note that you've

19    discussed in your testimony.  What is the pitch of the one in

20    the 8th beat of Joyful Noise?

21    A.   What key are we in?

22    Q.   A minor.

23    A.   A minor.  Thank you.  Then it's A.

24    Q.   Everything we talk about is an A minor.

25    A.   All right.  Thank you.
```

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 499

190

1    Q.    That song was analyzed in A minor; correct?

2    A.    I did not analyze it in A minor.

3    Q.    Okay.  In terms of this particular discussion, then we

4    will analyze it in A minor.

5    A.    Thank you.  Makes it simpler for me to talk about.

6    Q.    And just so we can be on the same page here, transposing

7    a song from one key to another is typical musicological

8    practice when you are trying to compare; correct?

9    A.    Yes.

10   Q.    So in the key of A minor here and you're looking at the

11   8th note?

12   A.    Yes.

13   Q.    Of Joyful Noise, what is the pitch one?

14   A.    A.

15   Q.    And then you indicated in your direct testimony that it

16   would vary from time to time and sometimes fall on the 6th;

17   correct?

18   A.    Yes.

19   Q.    What is the 6th?

20   A.    F.

21   Q.    So it's either A or F; correct?

22   A.    Correct.

23   Q.    What is the pitch in the 8th note of Dark Horse?

24   A.    G.

25   Q.    G. They are not the same pitches; correct?  Neither --

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 500

191

1    A.    That's incorrect.  Then it's E.  I'm sorry.

2    Q.    Oh, A minor.

3    A.    I'm thinking in A minor, it's E.

4    Q.    You're right.

5    A.    Sorry.

6    Q.    But nevertheless an is E not an A or an F; correct?

7    A.    Correct.

8    Q.    So you can cross out the A/F and you have the E below

9    and those are different pitches; correct?

10    A.    They are different pitches in A minor.

11    Q.    Going back to your testimony, so we've established, have

12    we not, that the E that is the last note in Dark Horse

13    Ostinato No. 2 is not present in Joyful Noise and vice versa

14    Dark Horse does not have the last two pitches from Joyful

15    Noise, the ostinato you describe; correct?

16    A.    That is not the case.  Dark Horse -- are you talking

17    just as they're lined up on the beat?

18    Q.    Correct.

19    A.    Oh, right.  So just as they're lined up on the beat,

20    Dark Horse --

21    Q.    I'll say it again.  Do you agree with me Dark Horse does

22    not have either the A -- actually, doesn't have the last two

23    pitches in beats 7 and 8 at all lined up with Dark Horse;

24    correct?  Those don't line up at all, the pitches don't line

25    up at all?

EXHIBIT 3
PAGE 501

1    A.    They do not line up.

2    Q.    Okay.  And going back to your, um, testimony on direct

3    that Ostinato No. 2 grew out of Ostinato No -- um, excuse me.

4    Ostinato No. 1 grew out of Ostinato No. 2?

5    A.    Yes.

6    Q.    And you have no basis of that from your own knowledge of

7    that in terms of how the Dark Horse writers created the

8    sequence; correct?

9    A.    Correct.

10   Q.    So assume for purposes of this discussion that the Dark

11   Horse writers wrote C B A E in the Ostinato No. 1 which you

12   called plainly dissimilar to Joyful Noise and that came

13   first, wouldn't Ostinato No. 2 grow out of it?

14   A.    It's unlikely to me that that would happen given my

15   knowledge of the similarity at several levels, the

16   combination of similarities between the Dark Horse Ostinato

17   No. 2 and Joyful Noise.

18   Q.    When you create a sound recording before vocals are

19   placed on it, isn't it often the case you have to stretch out

20   music so you can make sure the vocals fit in?

21   A.    I don't work in that area.

22   Q.    Okay.  Well, again, we have the same pitches in Ostinato

23   No. 1 as exist in Ostinato No. 2 save repeats; correct?

24   A.    We do have the same pitches.

25   Q.    Now, one of the other things you were asked on direct

1    was about differences in the works; right?

2    A.    Yes.

3    Q.    You didn't throughout your report analyze the two works

4    in their entirety; correct?

5    A.    I did not.

6    Q.    Save for the chart that we've looked at, you've not

7    transcribed any of the material in Dark Horse or Joyful Noise

8    in full; correct?

9    A.    No.

10   Q.    You did not analyze any of the differences between the

11   two songs separate and apart from this charted matter?

12   A.    Yes.

13   Q.    You did not; correct?

14   A.    I did not.

15   Q.    But you would agree with me, would you not, that the

16   overall harmony which is one of the elements of music that

17   you said you analyzed is different in Joyful Noise than Dark

18   Horse; correct?

19   A.    I -- in my report I note the -- that Dark Horse uses the

20   ostinato over a continuing tone of notes over a first scale

21   degree and that Joyful Noise uses it over a -- has a base

22   pattern that uses both the 1 and 5.  I believe I noted that.

23   Q.    Okay.  Do you have a copy of your deposition?

24   A.    Yes, I do.  I'm looking at it right now.

25   Q.    So you recall you were deposed in this case?

```
 1    A.    Yes.

 2    Q.    January 22nd, 2018?

 3    A.    I was.

 4           MS. LEPERA:  Okay.  For the Court and for counsel,

 5    we are looking at the testimony on page 243 specifically

 6    lines 9 to 11.

 7           THE COURT:  Hang on.  Okay.

 8           MS. LEPERA:  May I?

 9           THE COURT:  You may.

10    BY MS. LEPERA:

11    Q.    And did you give the following answer at your

12    deposition?

13           "Q.  The harmony is different in Joyful Noise than

14    in Dark Horse; correct?

15           "A.  Yes."

16    A.    Yes.

17    Q.    Did you give that answer to that question?

18    A.    Yes.

19    Q.    And counsel also asked you about some other differences,

20    but you also found that the harmonic rhythm is different in

21    Dark Horse and Joyful Noise; correct?

22    A.    Yes.

23    Q.    We've discussed before the tempo is not the same in

24    Joyful Noise and Dark Horse; correct?

25    A.    Yes.
```

1    Q.    Okay.  And you do not have any similarities or issue at

2    all in your report between the rhythm, the rap vocals in Dark

3    Horse and the rhythms of the rap vocals in Joyful Noise;

4    correct?

5    A.    Of the rapping, specifically, yes, correct.

6    Q.    Now, I believe counsel was asking you about slides.  Do

7    you recall that testimony?

8    A.    Yes.

9    Q.    And you agree that there's certain what you call slides

10   in Joyful Noise that are not in Dark Horse specifically in

11   the chart we just spoke about; correct?

12   A.    Yes.

13   Q.    Okay.  Can you sing those for us?  Actually, sing Joyful

14   Noise?  Put the portamentos in?

15   A.    Uh, sure, I'll try.

16   Q.    And then follow it with a Dark Horse Ostinato 2.

17   A.    Okay.  3 3 3 3 2 2 -- let me think for a second.

18   3 3 3 3 2 2 2 1, 3 3 3 3 2 2 2 6.

19   Q.    Okay.  So that vocal change that you did on two of those

20   beats in Dark Horse is a difference between the Joyful Noise

21   ostinato and the Dark Horse ostinato, is it not?

22   A.    It's a difference.

23   Q.    Okay.  But you didn't notate that; correct?

24   A.    I did not notate that.

25   Q.    Okay.

1    A.    I don't hear it as significant.

2    Q.    Okay.  You talked about the fact that we have, for the

3    purposes of record, I am clapping evenly spaced notes that

4    are not syncopated in common between Joyful Noise and Dark

5    Horse in their ostinatos; correct?

6    A.    Yes.

7    Q.    And you also have, um, said that that's a similarity

8    between the two songs; correct?

9    A.    Yes.

10    Q.    Okay.  Isn't it in fact the case that in Ostinato No. 1

11    in Dark Horse there are also evenly spaced beats that are

12    faster?

13    A.    Yes.

14    Q.    And by the way, there were countless musical works

15    predating the creation of Joyful Noise that have ostinatos;

16    correct?

17    A.    There are many.  I don't know about countless, but there

18    are many.

19    Q.    Okay.  Can we look at your deposition?

20         Before I read it, I'm gonna ask Court and counsel

21    to look at page 215 line 21 to 24 on page 215.  May I read

22    that, Your Honor?

23         THE COURT:  Yes.

24    BY MS. LEPERA:

25    Q.    Were you asked this question in your deposition and did

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 506

197

1    you give the following answer, sir?

2        "Q.  Dr. Decker, countless musical works predating

3    the creation of Joyful Noise have contained ostinatos;

4    correct?

5        "A.  Yes.

6        Do you see that?

7    A.   Yes.

8    Q.   An ostinato is just a short musical phrase, isn't it,

9    that repeats?

10   A.   It's a musical phrase that repeats form an element of

11   structure.

12   Q.   And going back to the issue of the even notes, evenly

13   spaced notes, isn't that a relative simplistic choice,

14   rthymic choice?

15   A.   I believe I've used the words before.  I -- I use

16   relative simplicity in my teaching, yes.

17   Q.   And isn't it in fact the case that using the evenly

18   spaced notes that are in common between Dark Horse and Joyful

19   Noise, that's a relatively simple rhythmic choice?

20   A.   It is.

21   Q.   And no composer's entitled to monopolize the rhythm of

22   eight even quarter notes; correct?

23   A.   Yes.

24   Q.   And they're certainly not the first composers in history

25   to be using eight even quarter notes in duple meter; correct?

EXHIBIT 3
PAGE 507

```
 1   A.   We have seen --
 2           THE COURT REPORTER:  Can you say that one more
 3   time?
 4           THE COURT:  Everyone has to slow down.
 5           MS. LEPERA:  I know.  My apologies once again.
 6   Q.   Certainly the authors of Joyful Noise are not the first
 7   composers in history to use eight even notes in quarter and
 8   duple meter time; correct?
 9   A.   It is not -- it is not established for me that this
10   piece is in quarter -- that the notes are quarter notes so
11   eight even notes, yes is not.  But this music is not notated
12   anywhere.  It's a recording so there's no way to know if
13   these are quarter note, half notes.  They're even in value.
14   They're even in value.
15   Q.   You cannot determine whether they're quarter notes,
16   eighth notes?
17   A.   Not just by listening to it, no.  You'd have to look at
18   the music to see that and there's no music for this.
19   Q.   How do you look at the music?
20   A.   You don't look at the music.  It's a recording.
21   Q.   You can't transcribe the music?
22   A.   Transcription -- in the act of transcription, you make
23   the decision what the value is.  I could transcribe and Dark
24   Horse and Joyful Noise in all whole notes and it would still
25   be rhythmically correct.  All transcription is that the
```

1    transcriber's choice is to choose specific musical values.

2    Q.   My question to you will be repeated again.  The authors

3    of Joyful Noise are not the first composers in history to use

4    eight even quarter notes in duple meter time; correct?

5    A.   It is not established for me that the authors of Joyful

6    Noise use quarter notes.

7    Q.   Can we look please at your deposition, sir?

8          And for everyone's reference, it is page 223 to 224

9    at lines 25 on 223 to line 5 on 224.

10         THE COURT:  Yes, you may do that.

11   BY MS. LEPERA:

12   Q.   Have you in your deposition, given the following answer

13   to the following question?

14         "Q.  Certainly the authors of Joyful Noise are not

15   the first composers in history to use eight even quarter

16   notes in duple meter time; correct?

17         "A.  No.

18         "Q.  That's correct?

19         "A.  That's correct."

20         Did you give that testimony, sir?

21   A.   I did, I did.

22   Q.   Moving along.  I'm trying to shortcut it.

23         Your counsel, um, showed you certain prior art

24   references, prior art that Dr. Ferrara had identified.  Do

25   you recall that in your testimony?

200

```
 1    A.    I do.
 2    Q.    Okay.  Can we please have that chart back?  The Jolly
 3    Old Saint Nicholas and the Merrily We Roll Along.  Thank you.
 4    Perfect.
 5            Okay.  Now, we spoke about this on your direct
 6    examination and you sang the, um, one of them any way.  Do
 7    you recall that?
 8    A.    Yes.
 9    Q.    I would love for you to sing all four of them in a row,
10    if you can.
11    A.    Sure.  Can I establish the key first for myself?
12    Q.    Yes.
13    A.    Just because singing these will be shifting between
14    modes.
15    Q.    Why don't you sing Joyful Noise and Dark Horse in A
16    minor and sing Merrily We Roll Along and Jolly Old Saint
17    Nicholas in C which is the major, C major?  Would you like to
18    do it that way so there's a correlation?
19    A.    I would rather do them in the relative -- in the
20    parallel major and minor where you have the same key note.
21    Q.    Sounds fine.
22    A.    Merrily We Roll Along first.  You want me to sing the
23    numbers?
24    Q.    Yes.
25    A.    Okay.  3 3 3 3 2 2.  Jolly 3 3 3 3 2 2.  Joyful
```

EXHIBIT 3
PAGE 510

1    3 3 3 3 2 2.  Dark Horse 3 3 3 3 2 2.

2    Q.   Thank you.  Now, you talked about the scales; correct?

3    A.   Yes.

4    Q.   And just so we're all clear on some of this terminology

5    we've been talking about, when you're looking at pitches, you

6    can define them essentially in three ways; correct?

7         You can define them by scale step which is the

8    numbers; right?

9    A.   Right.

10   Q.   Or you can -- pardon me?

11   A.   Scale degree is the word I would use, scale degree.

12   Q.   Which was what we have here on the screen.

13   A.   Yes.

14   Q.   We can also define the pitches by letters; correct?

15   A.   Yes, that requires that we set a key note.

16   Q.   And as we were looking at earlier, in the other

17   examples, we have, um, demonstrated that the key of A minor,

18   we were looking at pitches C and B?

19   A.   Yes.

20   Q.   In sequence as the only pitches in common between Joyful

21   Noise and Dark Horse; correct?

22   A.   These are not the only pitches in common.  They are if

23   we're talking in, uh, sequence with each other set forth

24   here, yes.

25   Q.   So when we narrowed it down, these are the only pitches

1    in common between Joyful Noise and Dark Horse that are

2    identified on this chart and they are four Cs and two Bs;

3    correct in A minor?

4    A.    No.    In A minor, sorry.    In A minor, yes, these would be

5    C and B.    Excuse me.    Yes.    Sorry.    I'm keeping track of the

6    names of the songs.    Thank you for the box.

7    Q.    No problem.    And when you're talking about the pitches,

8    there was another way, you can describe or refer to them.

9    Isn't that Do Re Mi Fa So La Ti Do?

10   A.    Yes, Solfege syllables.

11   Q.    Solfege syllables.    Correct.

12         And wouldn't you agree that no matter what key or

13   mode you're talking about here, what you have here in all

14   four of these works are four Mi's and two Re's?

15   A.    I would not.

16   Q.    Okay.

17   A.    It depends on the Solfege singing method that you use.

18   So there are Solfege singing methods that distinguish between

19   the major and the minor mode by changing the syllables.

20   Q.    So you don't believe that in Merrily We Roll Along the,

21   uh, let's say it's in the key of C major.    What would be

22   third of that?

23   A.    In Solfege syllables?    Writing in Solfege syllables?

24   Q.    Yeah.

25   A.    Mi.

```
 1    Q.   Okay.  And let's stick with the key of C.  So if Merrily
 2    We Roll Along is in the key of C, then the E is Mi Mi Mi Mi;
 3    correct?
 4    A.   Yes.
 5    Q.   And if we're still in the key of C with respect to
 6    Merrily We Roll Along, then what is the Solfege symbol for 2?
 7    A.   Re.
 8    Q.   So if both of these Merrily We Roll Along and Jolly Old
 9    Saint Nicholas are in the key of C, they're Mi Mi Mi Mi Re
10    Re; correct?
11    A.   I would -- I would add that they are in the key of C
12    major.
13    Q.   Yes.  Absolutely.
14    A.   And then they would be Mi and Re.
15    Q.   Okay.  So we have all four of these works containing the
16    exact same pitch sequences in terms of the Solfege symbol?
17    A.   No.
18    Q.   No.  Okay.  We just went through --
19    A.   Because --
20    Q.   Let's go through it again so I'm clear.  If we have
21    Merrily We Roll Along in the key of C?
22    A.   Major.
23    Q.   Major a hundred percent.  Then we have the E, that's the
24    third and that's Mi; correct?
25    A.   Yes.
```

EXHIBIT 3
PAGE 513

1    Q.   And the Re note is in the key of C, it's the D and it's

2    Re; correct?

3    A.   Yes.

4    Q.   Okay.  So they are the same scale steps, if you have a

5    scale of seven Solfege Do Re Mi Fa So La Ti Do; right?

6    A.   Yes.

7    Q.   Okay.  We are dealing with the scale and we're dealing

8    with Mi and Re being used between, um, all of these four

9    works assuming my hypothetical that we're in the key of C

10   major for both Merrily We Roll Along and Jolly Old Saint

11   Nicholas?

12   A.   For those two lines on this chart, we are in C major and

13   Mi and Re correctly describes the second and third scale

14   degrees for those two lines only.

15   Q.   Now, when you're actually creating music, and you play

16   the piano; correct?

17   A.   I do.

18   Q.   Okay.  And when you're creating music and you're

19   actually going to create a Mi Mi Mi Mi Re Re in A minor with

20   the C and B, don't you just have to hit the C note four times

21   and then go down to the B and hit it twice?

22   A.   Are we now in A minor?

23   Q.   Yes, sir, all the time.

24   A.   The comparison would be more direct if we were in C

25   minor.

1   Q.   Sir, I'm asking you in A minor.

2   A.   Okay.  In A minor the third degree of the scale would be

3   3 would C and Solfege syllable would be Me, M-e, Me.

4   Q.   Okay.  So --

5   A.   So in minor the third scale degree Solfege syllable is

6   Me M-e.  It's a combination of Mi and Re because it's between

7   those two notes in the major scale.  So Solfege singers,

8   myself included, would use Me instead of Mi in this case with

9   Joyful Noise and Dark Horse.

10   Q.   My question and maybe I wasn't clear when you are going

11   to -- Joyful Noise is in what key?

12   A.   Joyful Noise as recorded and released is in A minor.

13   Q.   If you were to sit down and play Mi Mi Mi Mi Re Re in A

14   minor, would you not on the piano, would you not be simply

15   hitting the C note four times and then the B note twice?

16   A.   I wouldn't use Mi.  I would use Me.

17   Q.   I said the C note.

18   A.   The syllable I would not use the syllable Mi.  I would

19   use the syllable Me which is spelled M-e.  It's a combination

20   of Mi and Re and it expresses the fact that third degree of a

21   scale in minor is a half step lower than the third degree

22   scale in major.  So a Solfege singer will clarify that for

23   the listening and themselves.  Solfege is designed to help

24   you sing.  Will clarify to themselves I'm in minor so I don't

25   use Mi.  I use Me.

```
 1    Q.   I don't think we're hearing each other, sir.  When you
 2    sit at a piano?
 3    A.   Yes.
 4    Q.   And you want to play something in A minor and you want
 5    to play C note, the C note you want to hit it four times;
 6    right?
 7    A.   Yes.
 8    Q.   Where's the B note?  Right below it?
 9    A.   A half step lower.
10    Q.   How hard is that?
11    A.   How hard is that to do?
12    Q.   Yeah, how is it hard to hit four Cs in a row on a piano
13    and then two Bs?
14    A.   That's relatively simple.
15    Q.   Thank you.  Now, a great many popular songs feature both
16    singing and rapping; correct?
17    A.   Correct.
18    Q.   And repetitive syncopated bass lines are common in
19    popular music; correct?
20    A.   Correct.
21    Q.   And you've already established the tambor that's used
22    even though it claimed to be a similarity, the tambor that's
23    used in Dark Horse and Joyful Noise with respect to the
24    ostinatos are not identical; correct?
25    A.   Correct.
```

207

1    Q.    And you can't monopolize a pingy synthesized tambor;

2    correct?

3    A.    Tambor is one of the very difficult things to

4    monopolize, if you will.

5    Q.    So your counsel was going over the material that you

6    found to be the basis of your substantial similarity

7    conclusion and focused you on your chart that we've been

8    looking at; correct?

9    A.    Correct.

10   Q.    And that's the basis of your substantial similarity

11   argument; correct?

12   A.    It's a chart of the similarities that I find.

13   Q.    Okay.  No other charts; right?

14   A.    This is in my original report?  Yes.

15   Q.    Now, if you were to hear Mary Had a Little Lamb played

16   on a recording or by a flute or a trumpet or whatever mode of

17   playing it was, it would still be -- you'd still recognize it

18   as Mary had a Little lamb as the composition; correct?

19   A.    If it was played competently, yes.

20   Q.    I'm assuming.

21          I think subject to recross, Your Honor, I think I'm

22   done.

23          THE COURT:  Okay.  Ms. Cohen, anything further?

24                      REDIRECT EXAMINATION

25   BY MS. COHEN:

```
 1    Q.    Dr. Decker?

 2    A.    Yes.

 3    Q.    Ms. Lepera highlighted the fact that other than the

 4    chart that we showed you on page 6 from your report?

 5    A.    Right.

 6    Q.    You did not chart the music from Joyful Noise and Dark

 7    Horse; is that right?

 8    A.    Correct.

 9    Q.    And why is it that you chose not to chart the music

10    other than the one that was provided on page 6 of your

11    report?

12    A.    For several reasons.  One, for clarity.  I think I'm

13    writing this analysis not for fellow music scholars.  So in

14    my publishing and in all of my work when I want to reach a

15    broad audience, especially an audience who doesn't already

16    read music, I try to find ways to express what's happening in

17    the music that don't use musical notation, traditional

18    musical notation.

19           Because to use traditional musical notations with

20    some readers is to exclude them from the argument.  So in my

21    publications, I regularly use tables and charts, diagrams

22    that describe the experience of a piece.  When I do use

23    musical notation, it tends to be from a popular song where

24    there are lyrics.

25           So you can, you know, if you can't read music, you
```

1    can look at it and get a sense for where you are in the song.

2    That was one of my prime motivations was for clarity's sake

3    for an audience that I did not assume read music, I wanted my

4    argument to be understand by those readers.

5         Secondarily, I didn't think it was necessary.  I

6    see descriptions like that chart and I use it in my class in

7    my teaching all the time.  I put charts like that up on the

8    board and I'll play a recording, and, you know, point to

9    where we are in the structure.  I'll demonstrate the chart to

10   help guide the listening.

11        So I thought a chart in the tradition or in the

12   vein of that kind of work where, um, the similarity I heard

13   between these tracks could for me be expressed best in that

14   chart for the largest number of people.

15   Q.   And when I asked you on your direct what you believed to

16   be the most persuasive way to understand or compare the

17   relative similarities or differences between two sound

18   recordings, what did you tell me?

19   A.   I said listening.

20   Q.   Listening.  And do you recall that I asked you to listen

21   to the ostinato in Joyful Noise and Dark Horse several times

22   during your direct exam?

23   A.   I do.

24   Q.   Do you recall that I asked you to sing the ostinato from

25   Joyful Noise and Dark Horse several times in your exam?

```
 1    A.    I do.
 2    Q.    Did Ms. Lepera ever once ask you to listen to the
 3    ostinato in Joyful Noise and Dark Horse?
 4    A.    No.
 5    Q.    Did Ms. Lepera play either song one time in your
 6    cross-examination?
 7    A.    No.
 8    Q.    Did Ms. Lepera ask you to sing the ostinato from Joyful
 9    Noise and Dark Horse once during your cross-examination?
10    A.    No.
11    Q.    If we could pull up again defendant's demonstrative.
12          Dr. Decker, when Ms. Lepera was asking questions of
13    you regarding what Dr. Ferrara calls Ostinato No. 1 which is
14    the four note ostinato and Ostinato No. 2 which is the eight
15    note ostinato from Dark Horse, do you recall that she drew
16    your attention to the similarities between note 1, the C
17    where the B notes line up, the A and the E?
18    A.    Right, yes.
19    Q.    Is it controversial to you that there's a C B A E in
20    both of those ostinatos?
21    A.    No.
22    Q.    And was it your testimony earlier today that instead of
23    the second ostinato as described by Dr. Ferrara being born
24    from the first, that the opposite is true in your mind?
25    A.    By my analysis the first ostinato comes -- is a
```

1    development of materials in the second.

2    Q.    And in that regard, is your opinion informed by the fact

3    that these notes and these scales line up in this way that

4    Ms. Lepera outlined?

5    A.    Completely.  So the way I get to that understanding is

6    by noting that there are eight notes in Ostinato 2 and there

7    are only four pitches.  So that if you were playing with

8    these notes and you said, let's remove the repetitions.  What

9    have we got?  You've have those four pitches.  You say the

10   array of pitches, the set of pitches in these two ostinatos

11   is identical; right?  Four pitches.  Third, second, first and

12   fifth scale degrees so that relationship is of the essence

13   here.

14   Q.    Will you sing for us again the eight note ostinato from

15   Dark Horse in the scale degree?

16   A.    Sure.  3 3 3 3 2 2 1, 3 3 3 3 2 2 1 5.

17   Q.    And now will you sing the four note ostinato?

18   A.    3 2 1 5, 3 2 1 5, 3 2 1 5.

19   Q.    Can we pull up, again, the chart that Ms. Lepera focused

20   on that includes Merrily We Roll Along, Jolly Old Saint

21   Nicholas, Joyful Noise and Dark Horse, please?

22          Dr. Decker, we talked at length about the ostinato

23   in Joyful Noise and whether it's similar to the ostinato in

24   Dark Horse; is that right?

25   A.    Yes.

```
1    Q.   Is Merrily We Roll Along an ostinato?

2    A.   It is not.

3    Q.   Is Jolly Old Saint Nicholas an ostinato?

4    A.   No.

5    Q.   And so do you agree with the numbers contained within

6    this chart that these six notes and each of these four songs

7    are the same?

8    A.   I feel like there's something lacking in the chart.

9    What's lacking in the chart is a notation that would tell us

10   that Merrily We Roll Along and Jolly Old Saint Nicholas are

11   in the major mode.  You would have to have that and that

12   Joyful Noise and Dark Horse are in the minor mode.  You would

13   have to have that for this chart to be correct.  You could

14   also use the carets.  The carets would make it without a

15   shadow of doubt that we're talking about scale degrees.  The

16   carets are very important to me.

17        Because -- so you would need a notation on this

18   chart that distinguishes the songs in the major mode from the

19   songs in the minor mode.  Because the absolute identity of

20   notes of the third scale degree in the major and the minor

21   mode are different.  These are different pitches.  They are

22   half steps apart.  They have nothing, you know, they are

23   different pitches.

24        And this chart leaves out the distinctions between

25   songs in the major mode, songs in the minor mode, and leaves
```

1   out the fact that the 3s in Merrily We Roll Along and Jolly

2   Old Saint Nicholas are not the same notes, not the same pitch

3   as the 3s in Joyful Noise and Dark Horse.

4   Q.   Did Ms. Lepera ever play for you Merrily We Roll Along?

5   A.   No.

6   Q.   Did she play for you Jolly Old Saint Nicholas?

7   A.   No.

8   Q.   Did she ask you to sing either song beyond these six

9   notes outlined in this chart?

10  A.   I'm -- I'm recalling no.

11  Q.   And so when you consider all of these other features

12  that you just mentioned that are not contained within this

13  chart, do you believe that the ostinatos from Joyful Noise

14  and Dark Horse are reflected in Merrily We Roll Along and

15  Jolly Old Saint Nicholas?

16  A.   Not at all.

17  Q.   Ms. Lepera asked you if you agree that there are

18  differences between the ostinatos in Joyful Noise and Dark

19  Horse and you acknowledge that; right?

20  A.   I did.

21  Q.   In your experience in your research, in your teaching,

22  do you come across songs in your comparisons that have

23  differences, but are also substantially similar?

24  A.   I do.  As I mentioned, I have examples of that in all

25  four of my books.  Instances of that in all four of my books.

```
 1   Q.    Is there any one feature in particular that you looked
 2   at in isolation that caused you to determine that the works
 3   were substantially similar?
 4   A.    No one single, um, element.  I think as I noted, the
 5   arguments about musical borrowing require multiple
 6   parameters.  So is the rhythm the same?  Are the scale
 7   degrees the same?  Does it play a similar role structurally
 8   in the piece?
 9         Then there's other elements like its placement in a
10   texture or the tambor that can support that.  I would say the
11   bedrock for me here is the similar phrase lengths.  The
12   identical phrase lengths, the identical rhythm.  The almost
13   identical pitches.  You know, the repetition pattern of four
14   3s followed by a step down to 2 in the minor mode.  The
15   combination of these things is what convinced me.
16         Any single one of those would not have been enough.
17   It's the combination of them.  And I think, too, the
18   insistence in both pieces that you feel on the repetition of
19   this melody.  You hear it -- of this ostinato.  You hear it
20   over and over again.  So that the, um, the piece itself, you
21   know, the repetition also draws attention to the similarity.
22   So it's a combination.  It's always a combination and it's
23   always in a context.
24   Q.    And so Ms. Lepera isolated for you various features of
25   these works; right?
```

 1    A.    Yes.

 2    Q.    Did she ever once ask you for your analysis as to the

 3    totality of the features with respect to your opinion?

 4    A.    No, she did not.

 5              MS. COHEN:   That's all I have.

 6              THE COURT:   Okay.  Ms. Lepera.

 7                         RECROSS-EXAMINATION

 8    BY MS. LEPERA:

 9    Q.    Did I have to play the two songs for you again to make

10    your opinion?

11    A.    No.

12    Q.    Okay.  So you were able to give me your opinion with

13    respect to these issues without me playing the songs for you;

14    correct?

15    A.    After listening to the songs for five years, I was.

16    Q.    Okay.  So when your counsel asked you I hadn't played

17    the songs for you, did that prevent you from answering any of

18    my questions?

19    A.    It did not.

20    Q.    And did it prevent you from you being able to answer any

21    of her questions that I didn't play those songs?

22    A.    It did not.

23    Q.    Isn't in fact the case that contrary to what she said, I

24    did ask you to sing the materials from Joyful Noise and from

25    Dark Horse that were on the prior art example?

```
1    A.   I believe I did sing the complete ostinato from Dark

2    Horse.  Ostinato 2, excuse me, the complete eight note

3    ostinato from Dark Horse.

4    Q.   Can we please have, uh, once again your rendition?  Sing

5    for us, please the Merrily We Roll Along in C, Jolly Old

6    Saint Nicholas in C.  If you'd prefer to change the major

7    key, and then Joyful Noise in A minor and Dark Horse in A

8    minor and give us those renditions again?

9    A.   So you want numbers or Solfege syllables?

10   Q.   Um, let's do the 3s.

11   A.   Okay.  Start with Merrily We Roll Along 3 3 3 3 2 2.

12   Jolly, 3 3 3 3 2 2.  Joyful, 3 3 3 3 2 2.  Dark Horse

13   3 3 3 3 2 2.

14             MS. LEPERA:  No further questions.

15             THE COURT:  Okay.  Anything further?

16                  FURTHER REDIRECT EXAMINATION

17   BY MS. COHEN:

18   Q.   You're going to kill us I'm sure.  Can you pull that

19   same demonstrative back up one more time, please.  It's the

20   one with Merrily We Roll Along, Jolly Old Saint Nicholas and

21   Joyful Noise and Dark Horse.

22   A.   Yes.

23   Q.   So this is six notes outlined; right?

24   A.   Yes.

25   Q.   The notes that we're concerned with in this case, the
```

```
 1    songs that we're concerned, the ostinatos we're concerned
 2    with have eight; is that right?
 3    A.    Correct.
 4    Q.    Can you do the same thing that you just did, sing each
 5    of these songs, but include the next two notes 7 and 8?
 6    A.    For all four songs?
 7    Q.    Yes, please.
 8    A.    I'd like to go to the end of the phrase for the first
 9    two songs just to round out cause I don't want to stop in the
10    middle.  We'll all feel unsettled.
11              MS. LEPERA:  I object to that.
12              THE WITNESS:  Then I'll just stop at the phrase.
13    Just the 7th and 8th notes of Merrily and Jolly?
14              MS. COHEN:  All four songs, eight notes.
15              THE WITNESS:  Eight notes for all four songs.
16    Okay.  Merrily, 3 3 3 3 2 2 3 2.  Jolly 3 3 3 3 2 2 2 1.
17    Joyful 3 3 3 3 2 2 2 1.  3 3 3 3 2 2 2 6.
18    Dark 3 3 3 3 2 2 1 5, 3 3 3 3 2 2 1 5.
19    BY MS. COHEN:
20    Q.    And as you testified before, both Joyful Noise and Dark
21    Horse would swing back up again to the 3?
22    A.    Right.
23    Q.    Okay.  Does the same thing happen in Merrily We Roll
24    Along and Jolly Old Saint Nicholas?
25    A.    In Merrily We Roll Along, this group of six notes
```

1    happens at the end of the song as in Mary Had a Little Lamb,

2    it's the same tune as Mary Had a Little Lamb.  It's little

3    lamb its fleece.  So Merrily We Roll Along here, when it uses

4    these six scale degrees is headed towards a conclusion;

5    right?  It's a part in the middle of the song.

6         Jolly Old Saint Nicholas these are the opening

7    notes of the tune.  So they continue on to end the first line

8    of the tune, the first four bars of the tune.

9    Q.   Okay.  And the ostinatos that we're talking about in the

10   two songs Joyful Noise and Dark Horse, that's a repeating

11   eight note phrase?

12   A.   Right, it's a repeating figure.  And for instance, in

13   the case of Joyful Noise, it repeats through the whole track.

14   So it starts and it just keeps on rolling.  Dark Horse it

15   repeats in certain sections of the song in the verses is when

16   it appears.

17   Q.   And is the same true of Merrily We Roll Along and Jolly

18   Old Saint Nicholas?

19   A.   No.

20   Q.   And is that significant to you?

21   A.   Context is important so this is extremely significant.

22   It's the ostinato identity that's at issue here.  Finding

23   these six notes in a tune in the wrong mode does not for me

24   creat a connection between these four songs.

25   Q.   So although you have opined that Joyful Noise and Dark

219

```
 1    Horse are substantially similar, would you also -- would you

 2    say that Merrily We Roll Along and Jolly Old Saint Nicholas

 3    are also substantially similar to the other two?

 4    A.   No.  So are the two songs at the top of the chart

 5    similar to the two at the bottom?

 6    Q.   That's what I'm asking.

 7    A.   No, no.

 8              MS. COHEN:  Thank you.

 9              MS. LEPERA:  Okay.  One more time.

10              THE WITNESS:  Okay.

11              MS. LEPERA:  If I may, Your Honor.

12                    FURTHER RECROSS-EXAMINATION

13    BY MS. LEPERA:

14    Q.   Do you remember, Professor Decker, when we walked

15    through this exercise and you confirmed for us that the 7th

16    and 8th pitches in Joyful Noise are not the same as the 7th

17    and 8th pitches in Dark Horse in sequence?

18    A.   In sequence as they sound together in the 7th and 8th

19    beat, yes.

20    Q.   So when your counsel just had you sing the last two

21    pitches in Joyful Noise and the ones in Dark Horse that she

22    said are different, and then sing the pitches that followed

23    in Merrily We Roll Along and Jolly Old Saint Nicholas, they

24    all have different pitches after the sequence of 3 3 3 3 2 2,

25    do they not?
```

EXHIBIT 3
PAGE 529

220

```
1    A.    They have different pitches in terms of sequence.

2    Q.    All four have different pitches in the beats following

3    the six that we were dealing with; correct?

4    A.    Yes.

5    Q.    So they're all the same that way; correct?

6    A.    They are all different in beats 7th and 8th, notes 7th

7    and 8th.

8              MS. LEPERA:  Nothing further.

9              THE COURT:  Okay.  May we let the professor go?

10   Thank you very much for your time.

11             Are we at a conclusion today or do we have a very

12   short witness?

13             MR. KAHN:  We could read.

14             THE COURT:  Who are we reading?

15             MS. COHEN:  The defendants Max Martin and Jordan

16   Houston.

17             THE COURT:  Okay.  If they're really short, we can

18   read them.

19             MS. COHEN:  I believe they're really short.

20             THE COURT:  Okay.

21             MS. COHEN:  Carl Martin Sandberg, please.

22                          EXAMINATION

23   BY MS. COHEN:

24   Q.    Starting on page 5, Mr. Sandberg, would you start by

25   stating your full name?
```

UNITED STATES DISTRICT COURT

EXHIBIT  3
PAGE  530

1    A.    My name is Carl Martin Sandberg.

2    Q.    Did you as Ms. Perry states --

3           I apologize, Your Honor.  Are you gonna rule on the

4    objections?

5           THE COURT:  I'm gonna overrule the objections.

6    BY MS. COHEN:

7    Q.    Did you as Ms. Perry states come to Santa Barbara with

8    Dr. Luke to work on the Prism album?

9    A.    Yes.

10   Q.    Okay.  And she said that you would listen to music, do a

11   lot of YouTubing and drink some Chablis.  Is that something

12   that you -- and -- you did when you were working on the

13   album?

14          THE COURT:  Overrule the next objection.

15          THE WITNESS:  I don't remember exactly what we did

16   in -- concerning those three things to be honest.

17   BY MS. COHEN:

18   Q.    Explain for me at least with the Prism album, the

19   technical ways things are done.

20   A.    As I remember it, the way we did it was, that we would

21   play Katy tracks, and then she would pick the ones that she

22   liked and we would work from them.

23   Q.    Who created these tracks that you played for Katy?

24   A.    It was as I remember it, Dr. Luke and Cirkut.

25   Q.    Were these instrumental tracks?

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 531

222

1    A.    Yes.

2    Q.    At what stage of the creation of the Dark Horse song did

3    you become involved?

4    A.    I would say after she had picked the track and we

5    started working on it as I remember it.

6    Q.    And once that track is picked and you started working on

7    it, describe the creative process of the songwriting from

8    that point on?

9    A.    Can I ask you a question?  Do you mean in general or for

10   this song in particular?

11   Q.    If you can recall, for this song in particular.

12              MR. MOVIT:  So just the question is you'd like

13   Mr. Sandberg to discuss the creative process for creating

14   Dark Horse as far as he knows it after the track was

15   selected, the instrumental track was selected by Ms. Perry;

16   is that correct?

17              MS. COHEN:  Yes, yes.

18              MR. MOVIT:  Okay.  Do you understand that?

19              THE WITNESS:  I do.

20              MR. MOVIT:  Okay.

21              THE WITNESS:  As I remember, it we started writing

22   melodies to this instrumental background and then it -- you

23   know, all of a sudden, you have a song.  The process in

24   between it's really hard for me to remember exactly, but I

25   remember we started writing, and then they wrote lyrics and

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 532

```
 1    then we starting recording it.  That's basically what I
 2    remember.
 3    BY MS. COHEN:
 4    Q.   Okay.  Were you yourself involved in writing the lyrics
 5    to Dark Horse?
 6    A.   I would say more of a feedback situation where Katy and
 7    Sarah would write and I would give feedback.
 8    Q.   Who wrote the melody?
 9    A.   Again, it's a little blurry to be honest since it's been
10    a while, but I remember the process.  It would be all of us
11    involved would come up with ideas, and then somehow in the
12    end you have a song.  So it's not particularly -- I don't
13    remember anyone being oh, let me take care of this.  I'll do
14    it.  It was more as I remember it, a collaborative situation.
15              MS. COHEN:  I believe that's it from that
16    transcript.
17              THE COURT:  Okay.  On to the next one.  This is?
18              MS. COHEN:  Jordan Houston, Your Honor.
19              THE COURT:  Okay.
20                        EXAMINATION
21    BY MS. COHEN:
22    Q.   Could you state your full name, full legal name for the
23    record?
24    A.   Jordan Houston, III.
25    Q.   All right.  And Mr. Houston, I understand that you're a
```

1    rapper, a songwriter and a record producer; is that correct?

2    A.    Yes.

3    Q.    All right.  And you were originally with a group known

4    as 36 Mafia; is that correct?

5    A.    Yes.

6    Q.    You were contacted by Dr. Luke or Lukasz Gottwald to

7    participate and contribute to the song known as Dark Horse.

8    Is that fairly accurate in your recollection?

9    A.    I was asked by Dr. Luke to be featured on the song.

10   Q.    Okay.  And do you recall when that was that you were

11   contacted by Dr. Luck?

12   A.    I can't remember the exact date.

13   Q.    Do you recall how that -- how that went?  Can you tell

14   me how long he contacted you and how you got involved in the

15   song?

16   A.    He called me and said Katy Perry would like to have you

17   featured on a song on her album.

18   Q.    Okay.  And then after that did you -- well, apparently,

19   you accepted; correct?

20   A.    Yes.

21   Q.    Okay.  And what was the process that you went through to

22   record your lyrics?

23   A.    Dr. Luke emailed me the instrumental and I wrote my

24   lyrics by listening to instrumental.

25   Q.    Okay.  Did you receive that -- when you received the

```
 1    beat instrumental which studio did you go to to record your
 2    lyrics?
 3    A.   A friend of mine has a studio in L.A.
 4    Q.   Okay.
 5    A.   I record at his studio.  I'm sorry.  I recorded at his
 6    studio, a friend of mine.
 7    Q.   And do you recall who?  Your friend's name?
 8    A.   Victory Belt.
 9    Q.   And at Mr. Belt's studio, did you record more than one
10    version of your lyrics?
11    A.   Yes.
12    Q.   And when you completed these recordings of these lyrics,
13    what did you do with those session files?
14    A.   My engineer mailed them to Dr. Luke.
15         THE COURT:  Page 16 I'm gonna sustain the objection
16    on relevance grounds.  Page 20, do you want to do that?
17    BY MS. COHEN:
18    Q.   Did you have any involvement with the instrumental track
19    for Dark Horse?
20    A.   No.
21    Q.   Did you provide any alterations for the instrumental
22    track for Dark Horse?
23    A.   No.
24    Q.   Did you provide any modifications to the instrumental
25    track for Dark Horse?
```

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 535

1    A.    No.

2    Q.    Is it fair to say that you had no involvement in

3    creating, altering or modifying the beat for Dark Horse?

4    A.    Yes.

5                    MS. COHEN:    That's it, Your Honor.

6                    THE COURT:    Okay.  So ladies and gentlemen, we will

7    call it a day at this juncture.  Please remember all of my

8    admonitions.  Keep an open mind.  Don't discuss the case with

9    anyone and don't discuss the case with one another other.

10   Please don't pay attention to any publicity.  If someone

11   approaches you, tell them you can't talk about it and let you

12   us know about the contact when you return.

13                   You'll come back Tuesday at 9:00 a.m. and pick up

14   there.  I will at that point in time probably have a better

15   sense on where we stand on timing.  And I hope you all have a

16   great weekend and thank you for your forbearance with all of

17   us.

18                        (Jury not present.)

19                   THE COURT:    Tuesday I think we have what Ms. Gray?

20   Who do we have on Tuesday?

21                   MR. KAHN:    We had planned to call Henry Walter

22   today, Your Honor.  We will talk to the defense counsel over

23   the weekend to try to work out a schedule.  Our last witness

24   from the plaintiff's side would be Crystal Gray, Mr. Gray's

25   wife.

```
 1            I have one procedural question or not procedural
 2    question just a general question.  We have some stipulations.
 3    Some are attached in Schedule 5A, and then we had another set
 4    that we were able to work out on some of the corporate
 5    defendants.  Do those get marked as exhibits?
 6            THE COURT:  I think you read them into the record
 7    as exhibits, and then they're submitted to the jury.
 8            MR. KAHN:  So the jury would end up getting a copy
 9    of them?
10            THE COURT:  Correct.
11            MR. KAHN:  Okay.  I just didn't know how that
12    worked.  If you mark them as exhibits or just read them and
13    give to them.
14            THE COURT:  What you're going to do is you mark
15    them as exhibits and say here's Exhibit 28.  The parties have
16    stipulated to the following.  Read the stipulations, who
17    signed the stipulations, and then I'll receive it into
18    evidence as the exhibit and the exhibit will go to the jury.
19            MR. KAHN:  Okay.  Thank you, Judge.
20            MS. LEPERA:  So you have two other witnesses in
21    addition to Mrs. Gray that you're calling in your case; is
22    that right?
23            MR. KAHN:  Yes.
24            MS. LEPERA:  Just to be clear.
25            MR. KAHN:  We will talk to you over the weekend.
```

UNITED STATES DISTRICT COURT

EXHIBIT  3
PAGE  537

```
 1            MR. MOVIT:  One other issue which is Max Martin

 2    because of his travel schedule and Internet connectivity, he

 3    needs to testify first thing on the 23rd.

 4            MR. KAHN:  Which is when?

 5            THE COURT:  That's Tuesday.

 6            MS. COHEN:  Your Honor, I also have two

 7    housekeeping questions that I'd like to raise.

 8            THE COURT:  Sure.

 9            MS. COHEN:  The first is just that I'd like to get

10    Your Honor's sense of when we might have an instruction

11    conference and that may be impacted by what defendants

12    anticipate as far as their case.

13            THE COURT:  That is correct.  I hope it's sooner

14    rather than later, but I do want to know what the defense

15    plans in terms of witnesses.

16            MS. LEPERA:  Absolutely, Your Honor.

17            So if I'm understanding what we're going to have on

18    Tuesday is Max Martin assuming that's okay with you guys on

19    the Skype conference.  Mr. Walter adverse with his direct so

20    taking him out of order so he's only here once.  The same

21    thing with Mr. Gottwald is my understanding we've agreed.

22    And then I understand you're doing Mrs. Gray or maybe not in

23    that specific order, but then that would be plaintiff's case.

24    Correct me if I'm wrong just in terms of scheduling.

25            MS. COHEN:  Just to clarify, we also have
```

```
 1    whatever's left of Billboard and the stipulations.

 2              MS. LEPERA:  Right.  In terms of our live witnesses

 3    following plaintiffs' close, we have Mr. Gottwald and

 4    Mr. Walter will have been done, we have Ms. Hudson and

 5    Mr. Houston.  Remaining is Dr. Ferrara and our two Internet

 6    experts from the YouTube and MySpace issues.

 7              THE COURT:  How long are they going to take?

 8              MS. LEPERA:  Dr. Ferrara will be my guess two hours

 9    on direct.  I would think the other two would probably be

10    roughly an hour, hour and 15 on direct.  Those are the

11    experts.  The crosses for Mr. Walter and Mr. Gottwald, I

12    don't know what timing is precisely on that.  I think

13    Ms. Hudson will be relatively short and Mr. Houston will be

14    relatively short.

15              THE COURT:  What does that mean?

16              MS. LEPERA:  Two days.

17              THE COURT:  Are we saying two days beyond Tuesday

18    and Wednesday?

19              MS. LEPERA:  No, no.  I'm assuming our case is

20    going to start on Tuesday and so I'm thinking we will be done

21    with defense side I'm hoping by, I don't want to say the end

22    of Wednesday, but Thursday.  Yes, I still think that's my

23    estimate, three days max.

24              MS. COHEN:  It seems unlikely we would start

25    defense case on Tuesday given everything else that's
```

UNITED STATES DISTRICT COURT

EXHIBIT 3
PAGE 539

230

```
 1    happening, but I suppose it's possible.
 2             THE COURT:  Well, because this is gonna impact how
 3    we go about doing this.  The jury instruction dispute should
 4    be limited by the two of you over the weekend because I have
 5    too many disputed instructions.  It's just not sensible.
 6    What I would like to do is have you reconvene on that subject
 7    and let us know Tuesday morning as we start.  I don't want to
 8    take up the instructions then, but I want to know how many
 9    are really going to be disputed.  Same thing on verdict
10    forms.
11             Then on the assumption which I'm sure is overly
12    optimistic that we would be done taking evidence on
13    Wednesday, um, let's assume that we would Thursday finish up,
14    have closing, settle instructions.  I would want to be in a
15    position to have closing argument completed on Thursday and
16    instructions completed on Thursday.
17             MS. LEPERA:  Do our best, Your Honor.
18             THE COURT:  That then lead us to the question of
19    Friday and whether I will be here or not.  We'll see.  But
20    the jury would deliberate and I will see if one of my
21    colleagues can cover and I will be available by telephone if
22    necessary to answer questions that may come from the jury.
23             I may not do that.  I may just give up and stay
24    here, but I'm going to figure out where we are.  In a perfect
25    world, I would very much like to see us complete our closing
```

EXHIBIT 3
PAGE 540

1    argument by noon on Thursday but. . .

2                MS. LEPERA:  We'll make every effort, Your Honor.

3                THE COURT:  Well, I know you're making every

4    effort.  It's just this is taking somewhat longer than

5    whatever.  Because my concern for these people is that we've

6    told them certainly they may have to be here into the third

7    week, but you've got people leaving on August 7th, you've got

8    all kinds of issues and that's why I'm trying to push this

9    thing ahead so that, you know, we preserve this jury.

10                MS. COHEN:  Understood, Your Honor.

11                MS. LEPERA:  Yes, understood.

12                THE COURT:  Okay.  Then let's see where we are and

13   we'll go from there.

14                Okay.  Have a very, very, good weekend.  I hope a

15   very productive weekend.

16                THE CLERK:  This court's adjourned.

17                (Proceedings were concluded at 4:39 p.m.)

18

19

20

21

22

23

24

25

EXHIBIT  3
PAGE  541

1

2                           CERTIFICATE OF REPORTER

3

4    COUNTY OF LOS ANGELES       )

5                               )  SS.

6    STATE OF CALIFORNIA         )

7

8    I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

9    STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

10   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

11   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

12   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

13   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

14   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

15   OF MY STENOGRAPHIC NOTES.

16

17

18   DATE:  JULY 21, 2019_____

19

20   _____/s/  LAURA MILLER ELIAS_____

21   LAURA MILLER ELIAS, CSR 10019

22   FEDERAL OFFICIAL COURT REPORTER

23

24

25

**/**

**/s** [1] - 232:20

**0**

**06-29-2018** [1] - 30:18
**07-26** [1] - 20:4

**1**

**1** [117] - 4:3, 10:10, 43:9, 61:9, 131:22, 131:23, 132:1, 132:2, 132:24, 133:2, 133:14, 133:15, 134:3, 134:14, 136:24, 136:25, 137:4, 137:7, 137:8, 138:14, 139:3, 139:4, 140:5, 140:7, 140:9, 140:10, 141:10, 148:1, 148:2, 148:6, 148:7, 148:15, 148:17, 148:18, 148:19, 148:20, 149:5, 149:6, 149:10, 149:15, 150:10, 162:10, 164:13, 164:25, 165:3, 167:5, 167:7, 169:16, 170:1, 170:5, 170:7, 170:13, 170:14, 170:19, 170:24, 171:1, 171:4, 181:9, 181:15, 181:20, 182:3, 182:12, 183:8, 183:11, 183:18, 184:8, 184:15, 184:24, 185:5, 185:9, 185:12, 186:1, 186:5, 186:10, 186:16, 186:20, 186:25, 187:4, 192:4, 192:11, 192:23, 193:22, 195:18, 196:10, 210:13, 210:16, 211:16, 211:18, 217:16, 217:17, 217:18
**1,531,856** [1] - 25:22
**1,731,361** [1] - 20:14
**10** [7] - 15:8, 24:20, 24:21, 31:19, 32:4, 114:19, 173:4
**100** [1] - 122:13

**10019** [2] - 1:22, 232:21
**101** [1] - 3:5
**10th** [2] - 32:10, 32:19
**11** [1] - 194:6
**113** [1] - 3:7
**11377** [1] - 2:17
**11th** [4] - 19:18, 19:19, 20:25, 66:7
**12** [5] - 119:11, 154:6, 154:8, 171:19
**12:45** [1] - 102:22
**12TH** [1] - 2:7
**132** [1] - 152:6
**14** [1] - 123:19
**15** [7] - 43:25, 58:16, 58:18, 78:25, 83:24, 173:4, 229:10
**15-5642** [1] - 4:4
**15-5642-CAS** [1] - 1:8
**150** [1] - 138:20
**154** [1] - 152:3
**16** [4] - 3:5, 58:18, 83:16, 225:15
**18** [1] - 163:21
**180** [1] - 3:8
**1840** [1] - 2:22
**19** [3] - 1:15, 4:1, 83:13
**1900** [2] - 2:23, 139:7
**1920** [1] - 122:16
**1978** [1] - 121:12
**1985** [1] - 113:25
**1989** [1] - 113:25
**1991** [1] - 114:11
**1:00** [1] - 102:14
**1st** [3] - 31:21, 60:11, 78:16

**2**

**2** [192] - 48:21, 51:16, 99:6, 131:22, 131:23, 132:1, 132:2, 132:24, 133:2, 133:14, 133:15, 134:3, 134:6, 136:24, 136:25, 137:4, 137:7, 137:8, 138:14, 139:3, 139:4, 140:5, 140:6, 140:7, 140:9, 140:19, 140:20, 141:13, 148:2, 148:3, 148:6, 148:7, 148:11, 148:17, 148:18, 148:19, 149:5, 149:6, 149:15, 160:18,

161:7, 162:10, 162:22, 162:24, 162:25, 167:5, 167:7, 169:16, 170:2, 170:7, 170:12, 170:13, 170:14, 170:16, 170:19, 170:22, 170:24, 171:2, 181:16, 181:24, 182:15, 183:3, 183:8, 183:21, 183:22, 184:12, 184:15, 184:23, 185:6, 185:16, 185:20, 186:5, 186:10, 191:13, 192:3, 192:4, 192:13, 192:17, 192:23, 195:16, 195:17, 195:18, 200:25, 201:1, 203:6, 210:14, 211:6, 211:16, 211:18, 214:14, 216:2, 216:11, 216:12, 216:13, 217:16, 217:17, 217:18, 219:24
**2,246,240** [1] - 18:9
**2,515,247** [2] - 19:11, 21:2
**20** [9] - 3:14, 51:12, 53:24, 54:9, 54:24, 99:1, 99:3, 99:10, 225:16
**200** [1] - 115:23
**2007** [2] - 44:25, 115:2
**2008** [3] - 22:5, 22:10, 50:6
**2009** [14] - 37:14, 38:3, 38:6, 39:10, 39:13, 53:24, 54:9, 54:24, 91:7, 99:1, 99:4, 99:7, 99:10, 99:11
**2010** [1] - 20:11
**2011** [3] - 20:4, 24:4, 25:13
**2012** [6] - 19:18, 19:19, 20:25, 23:17, 23:23, 24:25
**2013** [1] - 57:24
**2014** [16] - 31:19, 31:21, 32:5, 32:10, 32:19, 60:12, 61:21, 63:1, 75:13, 76:17, 78:15, 78:16, 81:14, 82:2, 92:11, 100:13
**2017** [2] - 43:25, 66:7
**2018** [4] - 30:21, 31:4,

31:9, 194:2
**2019** [3] - 1:15, 4:1, 232:18
**207** [1] - 3:7
**208** [1] - 2:11
**21** [8] - 31:16, 53:17, 53:19, 83:14, 89:19, 99:3, 196:21, 232:18
**21-5** [1] - 55:11
**2100** [1] - 2:11
**213)894-0374** [1] - 1:24
**215** [2] - 196:21
**215,219** [1] - 3:8
**216** [1] - 3:7
**21st** [5] - 121:6, 122:11, 122:17, 122:19, 122:24
**22** [5] - 3:15, 41:14, 42:3, 58:18, 152:20
**220** [1] - 3:9
**223** [3] - 3:11, 199:8, 199:9
**224** [2] - 199:8, 199:9
**22nd** [3] - 75:13, 76:17, 194:2
**23** [2] - 48:21, 48:23
**23rd** [3] - 99:7, 99:10, 228:3
**24** [3] - 3:15, 3:16, 196:21
**243** [1] - 194:5
**24th** [2] - 20:11, 23:17
**25** [2] - 41:14, 199:9
**26** [10] - 3:6, 21:9, 21:24, 21:25, 22:10, 22:13, 22:17, 105:16, 107:20, 110:3
**26th** [1] - 22:5
**27** [2] - 167:15, 169:8
**28** [1] - 227:15
**29th** [3] - 30:21, 31:4, 31:9

**3**

**3** [241] - 131:22, 131:23, 132:1, 132:2, 132:24, 133:2, 133:14, 133:15, 134:3, 134:5, 136:21, 136:25, 137:4, 137:5, 137:7, 137:8, 137:9, 138:14, 139:3, 139:4, 140:5, 140:6, 140:7, 140:8, 140:9, 140:14, 140:20, 141:13,

148:2, 148:3, 148:10, 148:11, 148:12, 148:19, 149:5, 149:15, 160:18, 161:7, 162:10, 162:22, 162:24, 162:25, 167:5, 167:7, 170:7, 170:13, 187:20, 187:21, 195:17, 195:18, 200:25, 201:1, 205:3, 211:16, 211:18, 216:11, 216:12, 216:13, 217:16, 217:17, 217:18, 217:21, 219:24
**30** [5] - 78:15, 88:13, 88:15, 112:2, 121:5
**32** [1] - 164:12
**33** [1] - 161:15
**3333332** [1] - 140:21
**35** [1] - 78:22
**350** [1] - 1:23
**36** [1] - 224:4
**3:20** [1] - 180:9
**3rd** [2] - 61:21, 63:1
**3s** [4] - 213:1, 213:3, 214:14, 216:10

**4**

**4** [10] - 3:14, 19:1, 20:18, 75:23, 75:25, 132:24, 133:2, 133:14, 133:15
**40** [3] - 48:21, 48:22, 48:23
**40th** [2] - 39:9, 54:17
**41** [1] - 48:21
**43** [1] - 160:22
**4455** [1] - 1:23
**45** [1] - 112:2
**4:30** [1] - 102:15
**4:39** [1] - 231:17

**5**

**5** [40] - 3:16, 24:1, 24:10, 77:23, 78:6, 132:1, 132:2, 132:24, 133:2, 137:1, 137:7, 137:8, 138:14, 139:3, 139:4, 141:10, 148:15, 149:10, 149:15, 164:13, 165:3, 167:5, 167:7, 170:7, 170:13, 170:14, 193:22,

199:9, 211:16, 211:18, 217:18, 220:24
**50** [1] - 79:2
**51st** [1] - 38:5
**58-A** [1] - 52:6
**5A** [1] - 227:3

## 6

**6** [27] - 18:11, 62:2, 62:3, 66:24, 67:1, 67:9, 67:12, 74:18, 82:18, 101:16, 130:18, 131:2, 131:22, 131:23, 132:24, 133:2, 137:1, 137:4, 138:14, 147:14, 148:1, 148:3, 148:11, 195:18, 208:4, 208:10, 217:17
**63105** [2] - 2:8, 2:11
**67** [10] - 3:14, 4:19, 9:24, 17:10, 17:11, 17:16, 19:1, 20:15, 20:18, 24:15
**67-4** [1] - 20:19
**67-6** [2] - 18:12, 19:25
**67-8** [1] - 20:8
**69** [10] - 3:16, 4:25, 9:25, 23:12, 23:25, 24:7, 24:9, 24:10, 24:20, 51:12
**69-10** [2] - 23:12, 24:23
**69-5** [1] - 25:12
**6th** [2] - 190:16, 190:19

## 7

**7** [5] - 132:24, 133:2, 165:14, 191:23, 217:5
**70** [3] - 39:18, 51:16, 88:10
**702** [1] - 179:15
**703** [1] - 179:15
**75** [5] - 13:8, 109:3, 142:16, 142:19, 175:7
**76** [6] - 13:9, 142:17, 142:19, 167:22, 167:23, 175:8
**77** [3] - 41:13, 41:23, 42:1
**7701** [1] - 2:7
**78** [2] - 43:1, 43:6

**79** [5] - 29:18, 29:23, 30:3, 30:16, 81:10
**79-1** [1] - 29:24
**7th** [11] - 24:4, 163:11, 165:19, 189:9, 217:13, 219:15, 219:16, 219:18, 220:6, 231:7

## 8

**8** [6] - 119:25, 164:13, 165:3, 165:14, 191:23, 217:5
**807** [1] - 9:6
**81** [4] - 3:5, 130:18, 154:8, 171:19
**8th** [13] - 149:8, 163:11, 165:19, 189:18, 189:20, 190:11, 190:23, 217:13, 219:16, 219:17, 219:18, 220:6, 220:7

## 9

**9** [1] - 194:6
**90012** [1] - 1:23
**90064** [1] - 2:18
**90067** [1] - 2:23
**911** [1] - 121:10
**92** [1] - 3:6
**933,868** [1] - 25:8
**95** [2] - 155:1, 155:5
**9:00** [1] - 226:13
**9:15** [1] - 4:1

## A

**a.m** [1] - 226:13
**A.M** [1] - 4:1
**A/F** [1] - 191:8
**AARON** [1] - 2:16
**able** [20] - 5:1, 19:15, 61:6, 84:6, 103:7, 104:10, 109:6, 127:12, 155:18, 161:24, 175:11, 175:17, 176:2, 176:7, 177:8, 177:17, 215:12, 215:20, 227:4
**absolute** [1] - 212:19
**absolutely** [26] - 21:23, 25:3, 48:4, 65:24, 75:7, 75:11, 80:25, 85:10, 85:15, 86:21, 87:16, 87:19, 87:22, 88:14, 88:17,

89:17, 91:1, 91:9, 101:3, 102:23, 103:10, 130:25, 141:13, 159:17, 203:13, 228:16
**abstract** [1] - 12:4
**accents** [3] - 138:25, 139:5
**accepted** [1] - 224:19
**access** [4] - 5:12, 7:9, 9:9, 28:12
**accomplish** [1] - 103:8
**account** [1] - 153:6
**accurate** [4] - 99:24, 117:14, 169:22, 224:8
**acknowledge** [3] - 149:20, 163:11, 213:19
**acknowledged** [1] - 147:10
**acoustic** [1] - 14:2
**act** [1] - 198:22
**action** [1] - 41:4
**activity** [2] - 79:9, 79:11
**actual** [6] - 9:12, 69:8, 85:20, 103:20, 149:17, 175:3
**add** [5] - 22:25, 23:3, 97:19, 99:12, 203:11
**adding** [1] - 14:18
**addition** [5] - 50:3, 96:25, 114:22, 177:1, 227:21
**additional** [1] - 114:23
**additionally** [3] - 104:21, 178:11, 178:23
**address** [9] - 5:24, 15:11, 53:25, 54:21, 55:2, 55:3, 55:4, 69:7, 90:15
**addressed** [1] - 155:25
**adequate** [2] - 106:18, 179:17
**adjacent** [1] - 134:21
**adjourned** [1] - 231:16
**adjust** [2] - 175:11, 175:18
**adjustment** [4] - 175:16, 175:20, 175:23, 175:25
**admissions** [1] - 93:3
**admitted** [9] - 20:18, 22:17, 24:10, 61:18, 61:19, 70:2, 76:15, 89:19, 154:17

**admitting** [2] - 7:21, 66:11
**admonition** [1] - 146:14
**admonitions** [1] - 226:8
**adopting** [1] - 149:18
**advance** [4] - 95:23, 96:4, 173:5, 179:20
**adverse** [1] - 228:19
**advised** [1] - 59:14
**affidavit** [1] - 10:1
**afternoon** [3] - 16:20, 113:12, 180:9
**afterwards** [1] - 111:18
**agent** [1] - 69:23
**ago** [6] - 15:8, 95:20, 99:15, 115:20, 115:22, 115:23
**agree** [29] - 8:19, 32:15, 45:5, 52:16, 74:23, 75:4, 78:19, 92:14, 92:17, 111:11, 160:13, 164:14, 165:15, 165:18, 166:23, 168:11, 168:14, 168:17, 169:19, 181:11, 182:2, 186:8, 186:20, 191:21, 193:15, 195:9, 202:12, 212:5, 213:17
**agreed** [3] - 7:10, 7:11, 228:21
**agreement** [12] - 48:14, 49:5, 49:7, 52:3, 60:7, 64:1, 78:11, 78:22, 79:4, 79:10, 84:7, 86:17
**ahead** [7] - 41:15, 51:18, 58:23, 108:6, 131:20, 159:18, 231:9
**AIDED** [1] - 232:13
**al** [2] - 4:5
**AL** [2] - 1:6, 1:9
**Album** [1] - 38:9
**album** [32] - 9:2, 28:7, 35:5, 35:8, 37:20, 38:8, 50:1, 50:4, 50:6, 50:8, 52:11, 52:18, 55:24, 56:11, 56:17, 64:24, 65:13, 81:15, 81:24, 82:2, 83:14, 83:25, 85:20, 85:23, 87:1, 91:5, 94:7, 221:8, 221:13, 221:18, 224:17

**albums** [4] - 83:6, 83:13, 83:16, 94:23
**align** [1] - 185:23
**allegedly** [1] - 69:1
**allow** [4] - 133:5, 148:22, 157:6, 175:3
**allowed** [1] - 69:3
**allowing** [1] - 158:18
**allows** [2] - 133:21, 134:9
**almost** [2] - 139:6, 214:12
**alone** [1] - 47:10
**alter** [2] - 108:12, 111:7
**alteration** [1] - 11:7
**alterations** [2] - 103:16, 225:21
**altered** [1] - 11:12
**altering** [4] - 108:17, 108:25, 177:2, 226:3
**alternate** [1] - 147:22
**alternates** [1] - 148:1
**alternating** [2] - 147:22, 148:7
**Amazon** [9] - 29:15, 30:14, 31:9, 32:3, 32:17, 32:18, 81:10, 82:3, 93:14
**Amazon.com** [2] - 81:16, 81:24
**ambiguity** [1] - 181:1
**ambiguous** [2] - 71:15, 153:19
**ambush** [3] - 14:7, 103:22, 179:14
**AMERICA** [1] - 1:1
**America** [1] - 138:20
**American** [9] - 115:6, 115:10, 115:11, 116:10, 121:12, 122:14, 138:21, 139:6
**amount** [2] - 154:1, 170:9
**analogy** [1] - 129:19
**analysis** [4] - 185:2, 208:13, 210:25, 215:2
**analyze** [9] - 109:7, 111:8, 126:23, 168:25, 188:17, 190:2, 190:4, 193:3, 193:10
**analyzed** [2] - 190:1, 193:17
**analyzing** [4] - 117:12, 118:8, 124:4, 168:19
**AND** [4] - 232:8, 232:11, 232:13,

232:14
**ANGELES** [6] - 1:16, 1:23, 2:18, 2:23, 4:1, 232:4
**announced** [1] - 91:8
**announcement** [2] - 90:19, 97:10
**Annual** [1] - 38:6
**anonymous** [1] - 121:22
**anonymously** [1] - 122:1
**answer** [23] - 42:10, 43:14, 43:21, 43:24, 49:7, 51:23, 52:4, 59:5, 93:6, 105:25, 110:12, 117:19, 117:23, 144:17, 147:1, 147:4, 194:11, 194:17, 197:1, 199:12, 215:20, 230:22
**answered** [1] - 175:19
**answering** [1] - 215:17
**answers** [1] - 41:7
**anticipate** [3] - 11:1, 11:18, 228:12
**antithesis** [1] - 179:13
**anytime** [2] - 28:23, 32:4
**apart** [5] - 150:24, 151:6, 193:11, 212:22
**Apocalypse** [1] - 121:12
**apologies** [1] - 198:5
**apologize** [10] - 66:21, 125:6, 144:23, 144:24, 145:10, 157:19, 158:8, 173:5, 177:22, 221:3
**appear** [4] - 25:18, 120:6, 158:10, 160:18
**appearance** [1] - 5:10
**appearances** [2] - 4:6, 4:7
**APPEARANCES** [1] - 2:2
**appeared** [4] - 9:2, 23:23, 24:25, 155:17
**apple** [1] - 111:9
**applied** [2] - 60:25, 61:24
**applies** [1] - 145:6
**apply** [1] - 60:21
**applying** [1] - 166:2
**appreciate** [3] - 10:15, 12:13, 146:7

approach [1] - 116:15
**approaches** [2] - 16:2, 226:11
**approaching** [1] - 83:24
**appropriate** [5] - 14:15, 67:23, 71:13, 74:4, 109:10
**appropriately** [1] - 177:12
**approve** [1] - 65:23
**approved** [1] - 67:16
**April** [4] - 39:10, 39:13, 99:7, 99:10
**area** [2] - 142:12, 192:21
**areas** [2] - 122:9, 122:10
**argument** [7] - 118:20, 169:6, 207:11, 208:20, 209:4, 230:15, 231:1
**arguments** [4] - 15:3, 122:1, 122:4, 214:5
**array** [1] - 211:10
**arrival** [1] - 141:11
**arriving** [2] - 125:20, 125:22
**art** [7] - 117:7, 120:14, 120:17, 127:19, 199:23, 199:24, 215:25
**article** [4] - 121:8, 121:10, 121:21, 123:6
**articles** [4] - 4:15, 120:14, 121:4, 121:5
**artificial** [2] - 143:15, 143:16
**artist** [11] - 17:5, 34:1, 55:1, 55:20, 55:21, 55:24, 56:11, 56:20, 65:12, 86:3, 98:2
**artists** [2] - 84:24, 97:7
**ascribe** [1] - 118:4
**aspect** [2] - 116:17, 162:19
**assert** [1] - 79:12
**asserted** [1] - 70:12
**asserting** [1] - 59:21
**assign** [1] - 132:12
**assigned** [2] - 63:13, 76:21, 77:5, 77:7, 77:10, 77:11, 77:14
**assigning** [1] - 127:16
**assignment** [7] - 79:10, 82:19, 83:9, 84:2, 101:16, 102:3, 166:15

**Association** [1] - 39:7
**assume** [3] - 192:10, 209:3, 230:13
**assuming** [4] - 204:9, 207:20, 228:18, 229:19
**assumption** [1] - 230:11
**AT** [1] - 232:11
**attached** [2] - 10:21, 227:3
**attaching** [1] - 54:16
**attempt** [2] - 9:12, 115:15
**attempting** [5] - 15:6, 103:8, 103:10, 108:24, 111:4
**attempts** [1] - 131:9
**attended** [7] - 37:14, 38:3, 38:5, 39:13, 44:7, 88:2, 88:3
**attendees** [1] - 88:5
**attention** [9] - 47:14, 57:15, 58:4, 58:9, 59:3, 66:24, 210:16, 214:21, 226:10
**attorney** [3] - 42:17, 51:6, 89:3
**attorneys** [7] - 29:19, 30:17, 33:6, 82:5, 82:8, 92:15, 125:14
**attracts** [1] - 120:20
**attribute** [1] - 145:1
**attributing** [1] - 145:2
**audibly** [1] - 151:3
**audience** [3] - 208:15, 209:3
**audiences** [1] - 116:1
**audio** [12] - 11:1, 11:5, 11:10, 11:16, 13:2, 108:15, 109:5, 112:20, 124:1, 126:17, 177:1, 177:7
**audios** [1] - 104:2
**August** [1] - 231:7
**Australian** [1] - 174:17
**authenticated** [2] - 14:1, 179:10
**authenticity** [1] - 177:6
**author** [1] - 22:11
**authority** [1] - 69:9
**authorize** [4] - 69:10, 72:20, 73:1, 73:3
**authorized** [6] - 70:21, 71:12, 71:18, 71:23, 71:25, 72:14
**authors** [6] - 153:9, 153:15, 198:6, 199:2, 199:5, 199:14

**available** [6] - 6:24, 7:7, 12:14, 69:15, 69:16, 230:21
**avoid** [2] - 145:9, 173:17
**award** [11] - 37:21, 37:24, 38:10, 91:6, 91:7, 97:10, 97:11, 99:13
**Award** [6] - 37:22, 38:6, 38:14, 38:17, 53:8, 53:14
**award's** [1] - 98:19
**Awards** [7] - 37:14, 37:17, 38:3, 38:20, 38:24, 39:4, 39:10, 53:11, 54:17, 55:19, 56:7, 57:8, 90:20, 91:13, 97:18, 99:6
**awards** [5] - 39:1, 39:13, 53:11, 90:24, 91:4
**aware** [17] - 27:10, 33:6, 33:9, 33:11, 33:19, 33:21, 33:25, 34:5, 34:7, 34:9, 34:19, 34:21, 65:25, 99:11, 100:19, 112:10, 157:20

## B

**B.A** [2] - 114:1, 114:2
**Bachelor's** [4] - 114:3, 114:16, 114:17, 114:22
**back-to-back** [1] - 127:2
**background** [2] - 113:17, 222:22
**backwards** [1] - 18:25
**bad** [1] - 83:21
**bake** [1] - 149:12
**ballads** [1] - 152:24
**bar** [13] - 68:10, 68:19, 68:20, 68:22, 74:6, 80:20, 80:23, 153:23, 155:10, 155:11, 155:13, 158:22, 158:25
**Barbara** [1] - 221:7
**bars** [1] - 218:8
**base** [1] - 193:21
**based** [13] - 6:20, 7:18, 8:2, 9:3, 13:8, 95:7, 106:13, 129:2, 145:8, 172:20, 175:1, 178:3, 184:25
**basis** [8] - 5:18, 27:7, 107:21, 107:23,

184:24, 192:6, 207:6, 207:10
**bass** [4] - 144:1, 144:3, 144:4, 206:18
**beat** [50] - 28:14, 45:6, 45:8, 45:11, 45:13, 45:17, 45:19, 45:21, 45:22, 45:25, 46:3, 46:6, 46:12, 46:15, 46:21, 46:25, 47:9, 47:11, 47:13, 47:16, 48:3, 48:15, 86:12, 109:15, 130:2, 131:10, 137:22, 138:7, 138:19, 139:5, 141:24, 149:9, 154:1, 163:18, 164:13, 176:6, 188:9, 189:6, 189:13, 189:20, 191:17, 191:19, 219:19, 225:1, 226:3
**Beatles'** [1] - 144:1
**beats** [22] - 130:5, 131:12, 138:4, 138:9, 138:10, 139:1, 147:15, 151:24, 151:25, 152:1, 152:3, 152:4, 152:8, 152:11, 152:20, 165:1, 191:23, 195:20, 196:11, 220:2, 220:6
**become** [2] - 12:15, 222:3
**becoming** [1] - 13:10
**bedrock** [1] - 214:11
**Beethoven** [1] - 118:19
**began** [1] - 127:24
**begin** [2] - 26:2, 127:24
**beginning** [8] - 43:9, 48:21, 51:12, 68:23, 68:24, 73:18, 145:17, 167:21
**begrudgingly** [1] - 7:10
**BEHALF** [3] - 2:3, 2:13, 2:19
**behalf** [3] - 62:17, 62:21, 176:14
**belatedly** [1] - 103:22
**belief** [2] - 6:9, 105:12
**believes** [7] - 13:1, 104:14, 159:13, 165:10, 174:10, 174:25, 178:20
**below** [3] - 62:14, 191:8, 206:8

**Belt** [1] - 225:8
**Belt's** [1] - 225:9
**Best** [2] - 38:9, 53:15
**best** [7] - 83:23, 110:7, 156:9, 168:20, 174:10, 209:13, 230:17
**better** [4] - 109:12, 127:19, 158:6, 226:14
**between** [57] - 22:1, 99:10, 108:8, 108:23, 109:14, 110:10, 118:14, 119:2, 124:2, 127:2, 128:6, 128:8, 133:23, 134:16, 134:18, 134:20, 134:24, 134:25, 135:8, 136:3, 140:6, 140:7, 148:1, 152:7, 163:6, 163:8, 164:25, 165:25, 166:13, 178:18, 180:24, 183:7, 184:14, 186:10, 187:11, 188:3, 189:6, 192:16, 193:10, 195:2, 195:20, 196:4, 196:8, 197:18, 200:13, 201:20, 202:1, 202:18, 204:8, 205:6, 209:13, 209:17, 210:16, 212:24, 213:18, 218:24, 222:24
**beyond** [5] - 48:17, 109:8, 109:9, 213:8, 229:17
**big** [2] - 53:18, 75:24
**biggest** [1] - 87:25
**Billboard** [24] - 5:5, 5:6, 5:11, 5:12, 5:14, 5:15, 6:7, 6:11, 6:20, 6:25, 7:6, 7:12, 7:17, 8:4, 9:2, 9:8, 9:13, 33:7, 33:8, 33:12, 33:13, 34:7, 82:6, 229:1
**binder** [4] - 30:5, 53:18, 77:23
**Birthday** [2] - 133:7, 133:12
**bit** [10] - 15:23, 26:13, 28:25, 30:10, 32:6, 57:11, 108:5, 113:17, 127:19, 135:4

**black** [1] - 134:22
**Blackhawk** [1] - 121:13
**Blind** [3] - 134:1, 134:3, 140:5
**blue** [1] - 142:10
**blurry** [1] - 223:9
**board** [3] - 59:21, 60:4, 209:8
**book** [3] - 121:11, 121:21, 123:17
**booklet** [3] - 52:11, 52:22, 94:25
**booklets** [2] - 95:11, 95:12
**bookmark** [1] - 176:5
**books** [7] - 75:24, 121:2, 121:3, 121:18, 122:4, 213:25
**born** [3] - 170:3, 170:24, 210:23
**borrowed** [10] - 119:1, 122:20, 123:10, 124:5, 124:15, 153:9, 153:15, 153:19, 166:8, 166:9
**borrowing** [29] - 116:14, 116:15, 116:20, 116:21, 117:1, 117:2, 117:4, 117:6, 117:7, 117:9, 117:13, 118:8, 118:14, 118:21, 118:24, 122:3, 122:5, 123:3, 123:4, 129:3, 133:19, 133:25, 158:1, 158:4, 164:4, 166:13, 166:17, 214:5
**borrowings** [1] - 123:21
**borrows** [1] - 129:6
**bottom** [10] - 17:11, 19:12, 20:2, 20:9, 23:15, 29:24, 55:12, 78:2, 171:18, 219:5
**BOULEVARD** [2] - 2:7, 2:17
**box** [1] - 202:6
**boxes** [1] - 121:17
**break** [1] - 103:7
**brief** [1] - 101:12
**briefly** [2] - 179:3, 179:5
**bring** [9] - 8:12, 12:7, 47:13, 59:1, 59:2, 72:9, 112:14, 159:9
**bringing** [1] - 107:15

**broad** [1] - 208:15
**broadcast** [4] - 38:20, 38:24, 44:13, 44:17
**broadly** [1] - 120:22
**Broadway** [3] - 120:21, 120:22, 123:20
**brought** [3] - 57:14, 58:4, 58:8
**brouhaha** [1] - 12:16
**Bs** [2] - 202:2, 206:13
**build** [1] - 129:21
**building** [1] - 141:22
**built** [2] - 100:4, 129:19
**bunch** [1] - 8:16
**burden** [1] - 104:1
**business** [4] - 9:1, 9:4, 10:1, 10:10
**BY** [68] - 2:5, 2:10, 2:15, 2:21, 3:5, 3:7, 3:8, 16:17, 18:22, 20:22, 22:21, 25:15, 26:10, 27:4, 41:16, 41:21, 41:25, 49:3, 63:11, 64:14, 81:8, 81:19, 81:22, 82:24, 87:6, 90:5, 91:3, 93:9, 101:15, 102:1, 113:11, 115:12, 131:1, 135:16, 137:20, 138:23, 141:16, 142:20, 144:25, 145:11, 146:6, 147:5, 153:13, 153:24, 154:23, 159:19, 161:3, 167:24, 171:22, 180:7, 182:25, 188:13, 189:1, 194:10, 196:24, 199:11, 207:25, 215:8, 216:17, 217:19, 219:13, 220:23, 221:6, 221:17, 223:3, 223:21, 225:17, 232:13

## C

**CA** [2] - 2:18, 2:23
**cable** [2] - 44:17, 122:23
**calculated** [1] - 175:15
**calculating** [1] - 6:19
**Calendar** [1] - 4:3
**CALIFORNIA** [6] - 1:2, 1:16, 1:23, 4:1,

232:6, 232:9
**California** [2] - 113:20, 121:18
**cannot** [3] - 5:17, 177:5, 198:15
**capable** [1] - 9:14
**capacity** [1] - 62:21
**CAPES** [1] - 2:5
**capital** [1] - 55:17
**care** [2] - 157:12, 223:13
**career** [2] - 73:20, 74:12
**careful** [1] - 117:19
**caret** [2] - 132:18, 132:19
**carets** [5] - 132:6, 180:25, 212:14, 212:16
**Carl** [2] - 220:21, 221:1
**CARL** [1] - 3:9
**CASE** [1] - 1:8
**case** [69] - 15:25, 29:20, 33:2, 33:6, 33:9, 33:13, 34:18, 34:20, 34:21, 40:19, 40:22, 45:20, 57:11, 64:7, 64:21, 66:1, 75:5, 75:6, 75:9, 77:3, 94:18, 99:16, 100:15, 100:19, 100:22, 100:25, 108:4, 109:10, 110:20, 113:16, 118:11, 125:11, 125:24, 126:8, 129:17, 130:4, 130:6, 134:15, 145:5, 145:8, 157:2, 157:6, 157:21, 158:2, 160:6, 174:4, 179:13, 186:15, 186:16, 187:7, 187:10, 187:20, 189:8, 191:16, 192:19, 193:25, 196:10, 197:17, 205:8, 215:23, 216:25, 218:13, 226:8, 226:9, 227:21, 228:12, 228:23, 229:19, 229:25
**Case** [1] - 4:4
**case-in-chief** [2] - 157:2, 157:6
**cases** [1] - 136:20
**categories** [1] - 55:20
**categorized** [1] - 4:12

**category** [2] - 56:7, 117:10
**caused** [1] - 214:2
**causes** [1] - 165:19
**cautionary** [1] - 4:13
**CD** [4] - 29:9, 94:25, 95:11, 95:12
**cement** [1] - 119:2
**central** [1] - 123:13
**CENTRAL** [2] - 1:2, 232:9
**Century** [1] - 121:7
**CENTURY** [1] - 2:22
**century** [4] - 122:12, 122:17, 122:19, 122:24
**ceremony** [2] - 98:19, 98:22
**certain** [8] - 7:8, 33:8, 50:13, 158:15, 170:9, 195:9, 199:23, 218:15
**certainly** [12] - 15:18, 24:17, 34:2, 59:22, 59:24, 72:8, 87:7, 103:25, 106:18, 109:10, 138:2, 149:22, 165:5, 197:24, 198:6, 199:14, 231:6
**certainty** [1] - 172:25
**CERTIFICATE** [1] - 232:2
**certificate** [1] - 60:22
**CERTIFY** [2] - 232:10, 232:14
**Chablis** [1] - 221:11
**chair** [1] - 119:7
**Chair** [1] - 119:14
**challenge** [3] - 55:9, 104:3, 130:12
**chance** [1] - 179:18
**change** [2] - 195:19, 216:6
**changed** [4] - 9:18, 97:19, 97:24, 98:8
**changes** [1] - 103:16
**changing** [2] - 166:3, 202:19
**chaos** [1] - 80:10
**characteristic** [3] - 138:6, 138:8, 139:6
**chart** [60] - 5:14, 6:25, 7:6, 7:15, 8:2, 8:4, 8:5, 130:16, 130:18, 130:19, 130:23, 130:24, 131:2, 131:6, 131:7, 131:9, 131:22, 136:18, 136:20, 147:14,

180:11, 180:12, 180:16, 180:19, 180:21, 180:22, 180:24, 181:1, 181:8, 181:22, 181:23, 181:24, 182:1, 182:4, 187:14, 187:15, 193:6, 195:11, 200:2, 202:2, 204:12, 207:7, 207:12, 208:4, 208:6, 208:9, 209:6, 209:9, 209:11, 209:14, 211:19, 212:6, 212:8, 212:9, 212:13, 212:18, 212:24, 213:9, 213:13, 219:4

**chart's** [1] - 8:7
**charted** [1] - 193:11
**charts** [13] - 5:11, 5:15, 6:9, 6:20, 7:17, 8:21, 8:23, 9:2, 9:12, 9:14, 207:13, 208:21, 209:7
**check** [4] - 16:25, 128:18, 128:19
**checked** [1] - 57:18
**chief** [2] - 157:2, 157:6
**CHIEFFO** [6] - 2:21, 4:9, 18:16, 146:14, 154:15, 166:6
**chieffo** [1] - 4:8
**Chike** [3] - 45:22, 49:5, 76:22
**child** [1] - 114:16
**choice** [5] - 107:18, 197:13, 197:14, 197:19, 199:1
**choices** [1] - 170:12
**choose** [1] - 199:1
**chorus** [3] - 123:9, 185:12, 185:21
**chose** [1] - 208:9
**Christian** [9] - 5:16, 26:18, 26:21, 39:4, 53:11, 96:20, 96:21, 97:8, 126:3
**CHRISTINA** [1] - 1:4
**CHRISTINE** [1] - 2:15
**church** [3] - 114:18, 114:19, 123:10
**churches** [5] - 39:16, 96:15, 96:19, 96:25, 97:1
**Cirkut** [1] - 221:24
**claim** [11] - 59:11, 59:21, 60:1, 64:15, 64:22, 65:2, 79:12,

92:17, 100:25, 101:6, 145:5
**claimed** [1] - 206:22
**claiming** [1] - 64:21
**clap** [4] - 138:12, 138:13, 138:14
**clapping** [2] - 138:16, 196:3
**clarify** [7] - 8:19, 11:14, 12:17, 18:19, 205:22, 205:24, 228:25
**clarinets** [1] - 143:4
**clarity** [1] - 208:12
**clarity's** [1] - 209:2
**class** [3] - 122:25, 131:15, 209:6
**classes** [2] - 123:2, 178:17
**classical** [3] - 116:9, 120:13, 120:14
**classroom** [2] - 13:5, 104:12
**CLAYTON** [1] - 2:11
**Clear** [2] - 84:19
**clear** [13] - 6:16, 7:18, 24:24, 48:2, 65:9, 95:21, 96:11, 96:12, 116:19, 201:4, 203:20, 205:10, 227:24
**cleared** [1] - 90:2
**clearly** [1] - 43:3
**CLERK** [20] - 4:3, 61:18, 68:19, 76:1, 76:15, 78:8, 79:22, 79:24, 80:4, 80:6, 80:23, 81:1, 81:3, 81:5, 102:16, 102:18, 103:2, 113:4, 113:6, 231:16
**click** [5] - 12:19, 175:14, 175:22
**click-by-click** [2] - 175:14, 175:22
**client** [1] - 72:5
**clip** [1] - 16:20
**close** [6] - 42:7, 57:13, 121:5, 151:4, 184:1, 229:3
**closer** [4] - 26:23, 27:2, 151:5, 151:7
**closing** [3] - 230:14, 230:15, 230:25
**cluster** [2] - 118:25, 119:25
**co** [3] - 48:11, 49:21, 95:3
**co-writer** [1] - 95:3
**co-wrote** [2] - 48:11,

49:21
**code** [1] - 154:3
**Cohen** [5] - 6:4, 104:6, 159:18, 173:8, 207:23
**COHEN** [136] - 2:6, 3:7, 5:24, 6:6, 6:17, 7:15, 8:14, 8:18, 9:19, 10:16, 11:14, 11:25, 12:8, 12:10, 12:17, 12:25, 13:13, 14:23, 14:25, 15:10, 15:16, 15:19, 26:6, 26:8, 33:16, 66:9, 66:15, 66:17, 67:23, 70:5, 70:14, 73:10, 74:3, 80:16, 102:24, 103:1, 104:7, 105:2, 105:9, 105:12, 106:7, 107:9, 107:25, 109:18, 110:5, 110:20, 110:23, 111:18, 111:25, 112:4, 112:8, 112:11, 112:13, 112:17, 113:2, 113:11, 115:12, 117:18, 117:22, 130:20, 130:24, 131:1, 135:13, 135:16, 137:20, 138:23, 141:16, 142:14, 142:20, 144:23, 144:25, 145:9, 145:11, 146:6, 146:25, 147:3, 147:5, 151:10, 151:16, 153:13, 153:21, 153:24, 154:20, 154:23, 156:2, 157:1, 157:5, 157:16, 157:19, 158:11, 158:15, 158:20, 159:15, 159:19, 160:21, 160:24, 161:3, 161:18, 166:21, 167:21, 167:24, 168:8, 168:10, 171:18, 171:22, 173:2, 173:9, 173:16, 174:7, 177:22, 178:1, 180:1, 207:25, 215:5, 216:17, 217:14, 217:19, 219:8, 220:15, 220:19, 220:21, 220:23, 221:6, 221:17, 222:17,

223:3, 223:15, 223:18, 223:21, 225:17, 226:5, 228:6, 228:9, 228:25, 229:24, 231:10
**collaborative** [1] - 223:14
**colleague** [1] - 128:22
**colleagues** [2] - 91:24, 230:21
**collect** [2] - 85:8, 85:13
**collection** [4] - 170:6, 170:7, 170:20, 188:21
**collections** [1] - 188:25
**collective** [2] - 27:17, 45:17
**collects** [2] - 84:23, 84:25
**college** [2] - 113:19, 122:14
**College** [1] - 113:20
**color** [4] - 135:24, 142:9, 142:11, 143:3
**column** [3] - 84:9, 84:12, 84:15
**columns** [3] - 84:8, 131:10, 131:11
**combination** [8] - 119:1, 192:16, 205:6, 205:19, 214:15, 214:17, 214:22
**coming** [2] - 66:14, 112:7
**commenced** [1] - 99:17
**comment** [1] - 179:5
**comments** [2] - 81:14, 89:25
**commercial** [1] - 120:16
**common** [12] - 146:9, 184:14, 187:8, 187:9, 187:11, 188:2, 196:4, 197:18, 201:20, 201:22, 202:1, 206:18
**commonly** [2] - 137:12, 137:22
**communicate** [1] - 21:21
**communication** [1] - 98:14
**communications** [2] - 23:5, 23:8

**companies** [1] - 34:22
**company** [5] - 36:8, 84:21, 84:22, 84:23, 174:17
**comparable** [3] - 118:12, 118:16, 134:10
**comparative** [1] - 11:8
**compare** [10] - 118:7, 118:9, 124:19, 126:11, 126:21, 128:13, 175:3, 181:23, 190:8, 209:16
**compared** [2] - 123:24, 145:12
**comparing** [4] - 125:9, 163:10, 174:22, 175:2
**comparison** [5] - 11:1, 11:16, 13:2, 134:9, 204:24
**comparisons** [2] - 124:1, 213:22
**competently** [1] - 207:19
**compile** [1] - 7:18
**compiles** [1] - 7:17
**compiling** [2] - 6:8, 6:20
**complete** [4] - 111:9, 216:1, 216:2, 230:25
**completed** [5] - 101:22, 114:3, 225:12, 230:15, 230:16
**completely** [10] - 101:2, 108:14, 108:16, 109:9, 133:9, 138:10, 138:11, 138:17, 140:15, 211:5
**compliant** [1] - 107:20
**composed** [3] - 121:10, 126:12, 169:4
**composer** [5] - 115:25, 117:2, 117:10, 117:25, 188:22
**composer's** [1] - 197:21
**composers** [6] - 123:10, 125:2, 197:24, 198:7, 199:3, 199:15
**composers'** [1] - 118:3
**composing** [1] - 169:5
**composition** [11] -

29:12, 46:7, 50:20, 63:13, 64:6, 64:20, 75:9, 93:22, 108:25, 111:6, 207:18

**compositional** [1] - 108:21

**compositions** [2] - 50:13, 50:15

**computer** [36] - 10:25, 13:3, 13:7, 13:23, 13:25, 14:2, 14:6, 14:21, 14:22, 14:23, 17:20, 103:11, 103:13, 103:17, 104:24, 105:19, 106:2, 106:6, 107:4, 107:7, 107:22, 108:11, 109:4, 110:14, 110:17, 112:6, 112:9, 174:15, 175:2, 175:6, 176:23, 176:24, 179:9

**COMPUTER** [1] - 232:13

**COMPUTER-AIDED** [1] - 232:13

**computerized** [1] - 103:20

**computers** [1] - 102:21

**concern** [7] - 6:10, 111:13, 111:15, 156:4, 156:21, 166:12, 231:5

**concerned** [3] - 216:25, 217:1

**concerning** [1] - 221:16

**concert** [15] - 39:16, 40:2, 40:5, 42:6, 43:17, 44:7, 69:3, 70:20, 71:19, 87:21, 88:6, 88:16, 88:18, 88:21, 95:22

**concerts** [12] - 39:20, 41:1, 43:15, 44:4, 44:11, 73:19, 87:10, 87:15, 87:18, 88:3, 88:11

**concluded** [3] - 74:6, 158:22, 231:17

**conclusion** [5] - 117:16, 184:25, 207:7, 218:4, 220:11

**conclusions** [1] - 155:15

**condition** [1] - 15:7

**conduct** [1] - 179:21

**confer** [1] - 159:16

**conference** [2] - 228:11, 228:19

**confirm** [4] - 20:23, 31:3, 95:19, 100:18

**confirmed** [2] - 91:20, 219:15

**conflating** [1] - 106:7

**conflict** [2] - 69:2, 69:11

**confused** [5] - 12:23, 89:21, 133:20, 156:24, 156:25

**confusing** [1] - 156:1

**confusion** [3] - 20:5, 90:2, 166:12

**Congress** [1] - 123:23

**connection** [4] - 65:6, 119:2, 124:2, 218:24

**connectivity** [1] - 228:2

**Conservatory** [1] - 114:6

**consider** [4] - 16:8, 117:2, 165:9, 213:11

**considered** [3] - 13:4, 136:11, 174:22

**considers** [1] - 104:17

**consistent** [1] - 130:3

**constant** [1] - 128:20

**constructed** [1] - 46:7

**consulted** [1] - 59:12

**consulting** [1] - 51:24

**contact** [1] - 226:12

**contacted** [5] - 89:3, 125:14, 224:6, 224:11, 224:14

**contacting** [1] - 89:16

**contain** [1] - 176:17

**contained** [9] - 11:5, 104:19, 128:10, 130:17, 177:15, 185:15, 197:3, 212:5, 213:12

**containing** [3] - 8:22, 158:6, 203:15

**contemporary** [2] - 53:11, 138:7

**content** [11] - 66:3, 126:4, 135:21, 136:8, 139:18, 142:2, 146:1, 162:21, 186:6, 188:16, 188:17

**contention** [1] - 59:3

**contents** [1] - 188:24

**context** [5] - 109:10, 162:18, 163:16, 214:23, 218:21

**continue** [3] - 4:19, 136:18, 218:7

**continued** [1] - 114:17

**continues** [1] - 151:14

**continuing** [1] - 193:20

**contour** [4] - 137:11, 137:17, 186:9, 189:3

**contours** [1] - 186:12

**contract** [5] - 51:3, 51:7, 65:15, 82:15, 83:21

**contrary** [1] - 215:23

**contrast** [1] - 106:25

**contribute** [1] - 224:7

**controversial** [1] - 210:19

**controversy** [1] - 123:12

**conventional** [1] - 124:23

**conversation** [6] - 60:16, 68:25, 69:12, 69:22, 69:25, 70:2

**conversations** [1] - 59:25

**conveyed** [1] - 173:9

**convinced** [1] - 214:15

**cool** [2] - 52:23, 139:9

**cooperate** [1] - 100:2

**coordinated** [1] - 60:19

**copied** [2] - 117:14, 166:14

**copies** [4] - 29:7, 29:8, 103:13, 108:10

**copy** [13] - 28:6, 35:4, 35:7, 35:10, 35:13, 35:17, 66:8, 66:16, 117:24, 117:25, 130:10, 193:23, 227:8

**copying** [7] - 117:6, 117:10, 118:4, 158:1, 158:4, 166:13, 166:19

**copyright** [20] - 50:20, 50:24, 59:11, 60:1, 60:10, 61:1, 61:3, 61:14, 76:21, 79:9, 79:12, 82:19, 89:6, 89:10, 89:13, 93:22, 100:10, 101:17, 108:21, 108:22

**Copyright** [1] - 60:22

**copyrights** [6] - 93:20, 94:9, 94:20, 99:19, 99:25, 100:3

**core** [3] - 116:17, 164:20

**corner** [1] - 31:4

**corners** [1] - 157:24

**corporate** [6] - 8:24, 34:18, 34:19, 35:1, 35:4, 227:4

**correct** [440] - 4:20, 8:9, 8:14, 12:8, 17:1, 17:2, 18:13, 18:24, 19:21, 19:22, 20:6, 20:7, 21:1, 21:3, 21:4, 21:15, 21:20, 22:8, 23:7, 23:14, 23:23, 23:24, 24:25, 25:1, 25:17, 26:14, 26:18, 26:19, 27:14, 28:12, 28:23, 28:24, 29:1, 29:6, 29:7, 29:16, 29:17, 30:14, 30:15, 31:9, 31:10, 31:16, 31:17, 31:18, 31:22, 31:23, 31:25, 32:1, 32:5, 32:11, 32:13, 32:14, 32:22, 33:4, 33:5, 34:11, 34:12, 34:13, 34:16, 34:23, 34:24, 35:5, 35:8, 35:9, 35:12, 36:18, 37:1, 37:5, 37:13, 37:15, 37:19, 37:23, 38:12, 38:14, 38:15, 38:17, 38:18, 38:21, 38:24, 38:25, 39:2, 39:5, 39:17, 39:20, 39:25, 40:4, 40:23, 40:24, 41:1, 41:2, 41:4, 41:5, 41:17, 42:9, 42:11, 42:12, 42:25, 43:13, 43:22, 43:25, 44:1, 44:2, 44:5, 44:8, 44:9, 45:18, 45:23, 45:24, 46:3, 46:5, 46:7, 47:1, 47:4, 47:11, 47:18, 47:25, 48:1, 48:17, 49:8, 49:13, 49:14, 49:22, 50:10, 50:25, 51:2, 51:24, 51:25, 52:4, 52:5, 52:12, 52:25, 53:1, 53:2, 53:5, 53:8, 53:12, 53:13, 53:22, 54:7, 54:9, 54:17, 56:3, 56:4, 56:10, 56:12, 56:15, 56:16, 56:18, 56:21, 57:3, 57:4, 57:6, 57:7, 57:9, 57:10, 57:13, 57:18, 58:10, 59:6, 59:16, 60:9, 60:14, 60:17, 60:20, 60:21, 60:24, 61:2, 62:15, 62:16, 62:18,

62:23, 62:25, 63:14, 63:20, 63:24, 63:25, 64:2, 64:7, 64:8, 64:13, 64:17, 64:23, 65:1, 65:3, 65:4, 65:8, 65:10, 65:17, 65:19, 67:16, 67:17, 68:16, 69:5, 70:14, 71:11, 72:1, 72:21, 75:7, 75:10, 75:13, 75:14, 75:17, 76:18, 76:19, 76:20, 76:23, 77:8, 77:9, 77:13, 77:16, 77:20, 77:21, 78:3, 78:12, 78:16, 78:18, 78:23, 78:24, 79:3, 79:6, 79:8, 79:13, 79:14, 82:7, 82:9, 82:10, 82:23, 83:1, 83:2, 83:18, 83:19, 84:3, 84:4, 84:10, 84:11, 84:14, 84:16, 84:17, 85:1, 85:2, 85:5, 85:9, 85:12, 85:14, 86:5, 86:6, 86:8, 86:9, 86:18, 86:19, 87:2, 87:7, 87:8, 87:13, 88:4, 88:11, 88:12, 88:18, 88:22, 89:3, 89:4, 90:22, 91:16, 91:17, 91:19, 91:21, 91:24, 92:4, 92:5, 92:12, 92:13, 92:18, 92:20, 93:1, 93:10, 93:11, 93:15, 93:16, 93:19, 93:23, 94:3, 94:4, 94:15, 94:17, 94:21, 94:24, 95:4, 95:22, 96:16, 96:22, 97:5, 97:17, 97:20, 97:25, 98:4, 98:9, 98:15, 98:18, 99:1, 99:4, 99:5, 99:11, 99:14, 99:25, 100:10, 100:11, 100:13, 100:14, 100:17, 100:22, 101:1, 105:2, 147:11, 149:21, 153:3, 156:1, 157:16, 179:8, 180:11, 180:20, 181:5, 181:9, 181:10, 181:12, 181:19, 181:20, 181:22, 181:25, 182:15, 182:17, 183:3, 183:5, 183:9, 183:12, 183:22, 183:24, 184:4,

184:9, 184:10, 184:12, 184:17, 184:21, 185:1, 185:7, 185:8, 185:11, 185:13, 185:14, 185:16, 185:17, 186:2, 186:6, 186:13, 186:18, 187:2, 187:15, 187:18, 187:22, 187:23, 188:1, 190:1, 190:8, 190:17, 190:21, 190:22, 190:25, 191:6, 191:7, 191:9, 191:15, 191:18, 191:24, 192:8, 192:9, 192:23, 193:4, 193:8, 193:13, 193:18, 194:14, 194:21, 194:24, 195:4, 195:5, 195:11, 195:23, 196:5, 196:8, 196:16, 197:4, 197:22, 197:25, 198:8, 198:25, 199:4, 199:16, 199:18, 199:19, 201:2, 201:6, 201:14, 201:21, 202:3, 202:11, 203:3, 203:10, 203:24, 204:2, 204:16, 206:16, 206:17, 206:19, 206:20, 206:24, 206:25, 207:2, 207:8, 207:9, 207:11, 207:18, 208:8, 212:13, 215:14, 217:3, 220:3, 220:5, 222:16, 224:1, 224:4, 224:19, 227:10, 228:13, 228:24
**CORRECT** [1] - 232:14
**corrected** [2] - 97:19, 98:7
**correctly** [2] - 13:21, 204:13
**correlation** [1] - 200:18
**correspondence** [2] - 22:1, 22:4
**corresponding** [1] - 90:12
**counsel** [25] - 4:6,

9:24, 13:21, 59:15, 64:12, 66:8, 66:16, 69:19, 102:19, 108:7, 159:16, 160:22, 175:8, 179:6, 181:14, 194:4, 194:19, 195:6, 196:20, 199:23, 207:5, 215:16, 219:20, 226:22
**Counsel** [1] - 26:22
**COUNSEL** [1] - 2:2
**count** [11] - 18:5, 18:7, 19:8, 19:10, 19:23, 20:13, 20:14, 25:4, 128:16, 151:22, 151:23
**counted** [1] - 151:23
**countless** [4] - 128:16, 196:14, 196:17, 197:2
**country** [1] - 121:10
**COUNTY** [1] - 232:4
**couple** [2] - 34:17, 81:12
**course** [21] - 11:25, 26:24, 41:22, 58:8, 58:22, 68:21, 104:4, 112:8, 112:13, 122:13, 122:14, 122:18, 122:21, 123:7, 136:22, 145:22, 147:12, 152:9, 159:6, 177:25
**courses** [1] - 122:11
**COURT** [240] - 1:1, 1:22, 4:8, 4:16, 6:4, 6:14, 6:22, 7:24, 8:11, 8:15, 9:16, 9:21, 10:5, 10:9, 10:15, 10:18, 11:21, 12:1, 12:9, 12:13, 12:23, 13:10, 13:15, 14:17, 14:24, 15:9, 15:12, 15:18, 15:20, 15:22, 16:13, 18:18, 18:21, 20:17, 20:21, 22:16, 22:20, 24:9, 24:14, 24:16, 24:21, 25:14, 26:1, 26:5, 26:7, 26:22, 26:25, 27:3, 30:25, 33:18, 33:20, 33:23, 41:15, 41:19, 41:24, 49:2, 51:15, 51:17, 52:9, 54:13, 58:19, 58:21, 58:23, 61:10, 62:12, 63:8, 63:10, 64:13, 66:13, 66:19, 67:4,

67:25, 68:9, 68:20, 68:23, 69:5, 69:15, 69:20, 70:10, 70:15, 71:9, 71:13, 71:15, 72:2, 72:5, 72:7, 72:11, 72:14, 72:19, 72:23, 73:5, 73:12, 73:18, 74:1, 74:5, 74:8, 76:12, 78:7, 78:9, 79:16, 79:19, 80:2, 80:5, 80:7, 80:20, 81:2, 81:6, 81:18, 81:21, 89:24, 90:4, 92:7, 93:5, 101:13, 101:25, 102:7, 102:9, 102:12, 102:19, 102:25, 103:4, 104:6, 104:23, 105:5, 105:11, 105:14, 106:21, 107:19, 108:5, 109:12, 109:24, 110:11, 110:22, 111:1, 111:16, 111:20, 112:3, 112:5, 112:9, 112:12, 112:14, 112:22, 113:1, 115:7, 117:17, 117:20, 130:22, 135:15, 140:24, 141:1, 141:3, 142:18, 145:3, 146:16, 146:20, 147:2, 147:4, 151:9, 151:12, 153:12, 153:18, 153:22, 154:9, 154:11, 154:19, 154:21, 155:11, 155:18, 155:22, 156:3, 156:5, 156:21, 156:25, 157:4, 157:11, 157:17, 157:22, 158:3, 158:9, 158:13, 158:17, 158:23, 159:17, 160:25, 166:8, 168:6, 168:9, 171:17, 171:21, 173:3, 173:8, 173:14, 173:23, 174:1, 176:12, 177:13, 177:25, 179:2, 179:4, 179:16, 180:2, 180:5, 182:23, 188:12, 188:19, 194:7, 194:9, 196:23, 198:2,

198:4, 199:10, 207:23, 215:6, 216:15, 220:9, 220:14, 220:17, 220:20, 221:5, 221:14, 223:17, 223:19, 225:15, 226:6, 226:19, 227:6, 227:10, 227:14, 228:5, 228:8, 228:13, 229:7, 229:15, 229:17, 230:2, 230:18, 231:3, 231:12, 232:9, 232:22
**court** [9] - 16:5, 67:6, 80:9, 82:12, 104:20, 107:12, 110:9, 174:12, 178:7
**Court** [6] - 66:8, 68:13, 173:20, 177:12, 194:4, 196:20
**Court's** [2] - 174:9, 179:7
**court's** [3] - 80:1, 103:2, 231:16
**courtroom** [5] - 11:20, 16:9, 111:5, 156:7, 178:13
**cover** [4] - 85:23, 135:6, 136:7, 230:21
**coverage** [2] - 4:10, 16:1
**covered** [1] - 53:10
**creat** [1] - 218:24
**create** [9] - 14:6, 96:2, 103:16, 108:3, 170:16, 179:9, 179:11, 192:18, 204:19
**created** [14] - 11:15, 11:17, 12:21, 44:25, 45:25, 46:4, 178:9, 178:25, 179:12, 184:20, 184:24, 192:7, 221:23
**creates** [2] - 140:21, 158:1
**creating** [7] - 11:13, 103:17, 139:4, 204:15, 204:18, 222:13, 226:3
**creation** [5] - 4:21, 44:21, 196:15, 197:3, 222:2
**creative** [2] - 222:7, 222:13
**credit** [5] - 86:4, 86:7,

94:25, 97:25, 98:14
**credited** [2] - 95:11, 99:12
**credits** [4] - 52:14, 52:17, 86:1, 98:22
**Cross** [40] - 33:3, 33:14, 34:6, 50:9, 50:12, 50:19, 50:23, 51:3, 52:3, 62:18, 62:21, 63:12, 63:18, 63:22, 64:4, 64:5, 64:15, 64:18, 64:21, 65:2, 65:6, 77:7, 82:9, 82:11, 82:19, 83:7, 93:13, 93:17, 93:25, 94:8, 94:14, 94:17, 99:17, 99:22, 100:12, 100:16, 100:19, 100:21, 100:25, 101:6
**CROSS** [3] - 3:4, 26:9, 180:6
**cross** [13] - 27:7, 81:9, 81:25, 93:4, 173:14, 173:17, 174:2, 174:4, 180:5, 189:17, 191:8, 210:6, 210:9
**cross-examination** [7] - 81:9, 173:17, 174:2, 174:4, 180:5, 210:6, 210:9
**CROSS-EXAMINATION** [2] - 26:9, 180:6
**cross-examine** [1] - 173:14
**crossed** [1] - 101:20
**crosses** [1] - 229:11
**Crystal** [1] - 226:24
**Cs** [3] - 183:23, 202:2, 206:12
**CSR** [2] - 1:22, 232:21
**Culture** [1] - 122:15
**culture** [3] - 96:5, 96:8, 116:2
**cultures** [1] - 124:24
**cumulative** [1] - 179:23
**customer** [2] - 31:14, 120:20
**cut** [2] - 77:21, 158:9
**CV** [2] - 1:8, 4:4
**cycles** [2] - 129:16, 129:18

**D**

**D-e-c-k-e-r** [1] - 113:9
**dance** [1] - 152:23

**Dark** [156] - 27:13, 57:14, 57:18, 58:1, 58:4, 58:5, 58:8, 58:9, 59:3, 64:17, 64:18, 65:14, 79:12, 89:2, 89:5, 92:20, 92:24, 101:1, 110:10, 126:13, 129:4, 129:6, 131:12, 131:25, 132:3, 135:9, 137:7, 139:3, 142:17, 145:13, 148:25, 149:1, 149:3, 149:4, 149:8, 149:12, 150:6, 150:14, 150:15, 150:23, 152:4, 152:17, 152:18, 153:9, 153:15, 154:2, 154:25, 155:5, 161:5, 161:25, 162:9, 162:12, 165:11, 165:19, 165:23, 165:25, 166:23, 167:3, 167:9, 167:12, 167:13, 167:19, 168:15, 169:10, 169:13, 171:6, 171:10, 171:25, 172:15, 175:9, 175:11, 175:24, 181:9, 181:12, 181:15, 182:13, 184:8, 184:20, 184:23, 185:3, 185:6, 185:9, 185:12, 185:15, 185:20, 186:1, 186:11, 186:25, 187:4, 187:11, 189:12, 190:23, 191:12, 191:14, 191:16, 191:20, 191:21, 191:23, 192:7, 192:10, 192:16, 193:7, 193:17, 193:19, 194:14, 194:21, 194:24, 195:2, 195:10, 195:16, 195:20, 195:21, 196:4, 196:11, 197:18, 198:23, 200:15, 201:1, 201:21, 202:1, 205:9, 206:23, 208:6, 209:21, 209:25, 210:3, 210:9, 210:15,

211:15, 211:21, 211:24, 212:12, 213:3, 213:14, 213:18, 215:25, 216:1, 216:3, 216:7, 216:12, 216:21, 217:20, 218:10, 218:14, 218:25, 219:17, 219:21, 222:2, 222:14, 223:5, 224:7, 225:19, 225:22, 225:25, 226:3
**dark** [1] - 217:18
**data** [2] - 6:21, 7:19
**date** [17] - 8:5, 19:15, 19:17, 20:3, 20:10, 22:5, 23:16, 24:3, 25:4, 25:16, 32:19, 61:21, 61:23, 78:14, 89:5, 101:2, 224:12
**DATE** [1] - 232:18
**dated** [6] - 40:8, 63:1, 66:7, 76:17, 98:25, 99:3
**dates** [4] - 20:6, 20:7, 22:3, 101:4
**days** [5] - 63:4, 65:19, 229:16, 229:17, 229:23
**deal** [3] - 10:17, 80:10, 101:22
**dealing** [3] - 204:7, 220:3
**deals** [1] - 51:23
**December** [1] - 66:7
**decide** [3] - 15:15, 151:13, 166:14
**decided** [2] - 47:16, 117:21
**decision** [3] - 70:9, 153:14, 198:23
**decisions** [2] - 170:15, 170:16
**decker** [3] - 103:8, 108:24, 109:3
**Decker** [39] - 10:21, 110:6, 113:3, 113:9, 113:12, 119:3, 120:3, 122:6, 126:20, 131:2, 135:17, 151:17, 153:25, 154:24, 155:14, 158:25, 159:6, 159:20, 161:17, 161:19, 162:11, 163:10, 166:22, 167:16, 168:11, 171:23, 172:19, 174:9,

176:21, 177:17, 180:8, 184:1, 187:15, 197:2, 208:1, 210:12, 211:22, 219:14
**DECKER** [1] - 3:7
**Decker's** [4] - 10:24, 178:3, 178:14, 180:3
**decker's** [1] - 11:6
**declaration** [6] - 66:1, 66:7, 66:10, 69:8, 69:18, 74:19
**decorations** [1] - 164:20
**decorative** [1] - 165:8
**DEFENDANT** [1] - 1:10
**defendant's** [7] - 158:15, 159:21, 160:22, 164:11, 167:14, 169:8, 210:11
**DEFENDANTS** [2] - 2:13, 2:19
**defendants** [49] - 5:13, 7:10, 7:24, 11:19, 27:9, 27:18, 27:21, 27:24, 28:2, 28:6, 28:11, 28:14, 28:20, 34:18, 34:19, 35:1, 35:4, 36:1, 36:17, 36:20, 36:24, 37:3, 37:7, 37:11, 38:3, 39:13, 40:23, 44:7, 60:11, 63:6, 65:21, 68:12, 88:21, 91:21, 91:24, 92:3, 104:13, 106:11, 155:7, 157:1, 157:7, 159:23, 161:14, 177:5, 178:8, 178:11, 220:15, 227:5, 228:11
**defense** [12] - 12:1, 12:6, 12:15, 69:18, 107:6, 159:2, 159:5, 176:14, 226:22, 228:14, 229:21, 229:25
**define** [3] - 201:6, 201:7, 201:14
**definitive** [1] - 95:17
**degree** [38] - 113:24, 114:9, 132:10, 132:11, 134:5, 134:6, 134:24, 135:1, 136:21, 136:22, 139:24, 139:25, 140:2, 140:3, 140:13,

140:16, 140:17, 141:22, 147:25, 148:16, 162:21, 162:22, 163:2, 163:3, 163:5, 163:7, 172:24, 193:21, 201:11, 205:2, 205:5, 205:20, 205:21, 211:15, 212:20
**degrees** [33] - 114:23, 116:4, 127:23, 127:25, 132:8, 132:17, 133:4, 133:5, 133:13, 133:18, 134:1, 134:3, 134:7, 134:12, 134:13, 134:15, 135:22, 139:23, 140:19, 142:3, 148:22, 150:19, 162:9, 170:7, 171:4, 181:2, 187:19, 204:14, 211:12, 212:15, 214:7, 218:4
**deliberate** [1] - 230:20
**demanded** [9] - 69:10, 71:4, 71:6, 72:22, 72:24, 73:7, 73:8, 73:23, 74:21
**demonstrate** [17] - 11:24, 13:1, 13:18, 105:20, 107:11, 110:15, 131:15, 132:23, 132:25, 138:12, 139:2, 140:5, 148:2, 160:16, 174:14, 178:5, 209:9
**demonstrated** [3] - 165:17, 176:10, 201:17
**demonstrating** [1] - 12:5
**demonstration** [5] - 11:1, 11:16, 12:22, 15:1, 177:17
**demonstrative** [15] - 13:13, 14:9, 103:19, 104:16, 106:11, 160:22, 161:15, 163:21, 164:11, 164:14, 167:14, 169:9, 179:23, 210:11, 216:19
**dep** [1] - 41:20
**Department** [3] - 119:8, 119:15, 119:22

**depicted** [1] - 164:13
**depose** [1] - 13:19
**deposed** [3] - 41:3, 92:19, 193:25
**DEPOSITION** [2] - 3:9, 3:11
**deposition** [23] - 5:19, 5:22, 8:12, 8:24, 9:13, 14:14, 26:3, 41:13, 41:18, 42:18, 42:22, 48:19, 51:10, 51:20, 58:13, 58:25, 89:1, 193:23, 194:12, 196:19, 196:25, 199:7, 199:12
**depositions** [1] - 92:23
**derived** [2] - 171:12, 172:3
**descending** [4] - 136:15, 137:8, 137:11, 137:17
**descends** [1] - 137:23, 137:24
**describe** [22] - 21:24, 116:25, 127:14, 128:21, 130:4, 130:5, 131:5, 142:8, 142:14, 142:21, 147:15, 148:22, 168:3, 173:12, 173:19, 173:20, 176:5, 181:21, 191:15, 202:8, 208:22, 222:7
**described** [6] - 104:8, 139:10, 147:7, 166:9, 175:13, 210:23
**describes** [1] - 204:13
**describing** [2] - 130:11, 155:5
**description** [3] - 128:23, 128:24, 188:23
**descriptions** [1] - 209:6
**deserved** [1] - 94:23
**deserves** [1] - 84:24
**designated** [2] - 29:19, 30:17
**designation** [2] - 177:16, 179:20
**designations** [2] - 7:23, 8:20
**designed** [3] - 120:17, 173:16, 205:23
**desire** [1] - 140:22
**desperately** [1] -

148:6
**details** [2] - 129:1, 129:11
**determination** [1] - 136:4
**determine** [5] - 127:5, 152:13, 152:15, 198:15, 214:2
**determined** [1] - 128:7
**determining** [1] - 152:7
**developing** [2] - 166:1, 166:2
**development** [1] - 211:1
**diagonally** [1] - 52:21
**diagrams** [1] - 208:21
**dictionary** [1] - 117:8
**difference** [20] - 108:8, 108:20, 108:23, 109:13, 146:18, 150:18, 151:2, 152:7, 152:13, 152:21, 163:6, 163:8, 163:16, 165:18, 175:15, 180:24, 183:7, 184:15, 195:20, 195:22
**differences** [13] - 110:9, 133:6, 149:23, 163:1, 174:24, 178:5, 178:18, 193:1, 193:10, 194:19, 209:17, 213:18, 213:23
**different** [47] - 6:7, 11:18, 13:14, 13:15, 14:2, 14:25, 15:5, 15:8, 20:6, 20:7, 80:20, 105:21, 108:5, 109:19, 110:12, 117:12, 118:13, 124:24, 130:13, 133:9, 133:11, 142:1, 144:13, 145:5, 147:20, 149:21, 150:5, 150:18, 162:21, 163:4, 165:11, 165:14, 165:16, 191:9, 191:10, 193:17, 194:13, 194:20, 212:21, 212:23, 219:22, 219:24, 220:1, 220:2, 220:6
**differently** [2] - 149:17, 171:5

**difficult** [2] - 142:12, 207:3
**difficulty** [2] - 107:5, 166:11
**digital** [1] - 32:17
**digitally** [2] - 143:10, 143:19
**dimension** [1] - 143:24
**direct** [18] - 66:14, 66:23, 69:11, 70:8, 157:6, 180:13, 183:14, 185:18, 190:15, 192:2, 192:25, 200:5, 204:24, 209:15, 209:22, 228:19, 229:9, 229:10
**DIRECT** [3] - 3:4, 16:16, 113:10
**directed** [1] - 27:23
**directions** [1] - 124:9
**directly** [3] - 69:25, 114:5, 184:11
**directs** [1] - 145:24
**disagree** [4] - 15:9, 159:6, 162:19, 169:24
**disagreeing** [1] - 157:4
**disagrees** [1] - 159:11
**discipline** [1] - 116:8
**disclose** [2] - 15:1, 107:21
**disclosed** [12] - 11:13, 14:1, 14:10, 14:11, 34:20, 103:11, 103:18, 105:8, 105:10, 111:8, 176:25, 177:3
**disclosure** [4] - 109:8, 176:16, 179:17, 179:18
**discovered** [2] - 123:19, 123:22
**discovery** [2] - 179:13, 179:21
**discuss** [8] - 16:5, 44:21, 45:2, 49:10, 146:21, 222:13, 226:8, 226:9
**discussed** [6] - 5:21, 105:3, 106:9, 172:14, 189:19, 194:23
**discussing** [2] - 167:1, 181:8
**discussion** [3] - 107:17, 190:3, 192:10

**dismantled** [1] - 36:7
**dismissed** [8] - 71:4, 71:6, 71:16, 72:24, 73:7, 73:9, 73:23, 74:21
**Disney** [1] - 116:10
**displays** [1] - 170:12
**dispute** [1] - 230:3
**disputed** [2] - 230:5, 230:9
**disregard** [1] - 67:5
**dissect** [1] - 108:18
**dissimilar** [3] - 187:2, 187:5, 192:12
**dissimilarity** [1] - 126:25
**distance** [4] - 134:16, 134:18, 134:23, 134:25
**distinction** [2] - 150:8, 151:18
**distinctions** [6] - 147:11, 152:25, 153:5, 153:8, 153:14, 212:24
**distinctive** [3] - 138:9, 142:11, 170:19
**distinctiveness** [1] - 160:13
**distinguish** [2] - 144:16, 202:18
**distinguishes** [1] - 212:18
**DISTRICT** [5] - 1:1, 1:2, 1:4, 232:9
**DIVISION** [1] - 1:2
**DO** [2] - 232:10, 232:13
**document** [28] - 8:22, 31:2, 31:8, 31:12, 33:7, 33:12, 53:21, 54:2, 54:3, 55:6, 57:9, 57:13, 62:5, 62:8, 62:21, 63:1, 63:4, 63:12, 63:18, 75:18, 76:4, 76:8, 76:17, 76:20, 77:25, 78:16, 78:19, 81:13
**documentation** [1] - 52:3
**documents** [19] - 28:19, 29:1, 29:3, 29:4, 29:11, 29:13, 39:19, 39:23, 39:24, 40:1, 40:25, 44:3, 44:13, 44:16, 44:19, 87:9, 92:24, 104:2
**doin'** [1] - 43:1
**dominance** [1] - 132:14

**done** [19] - 6:4, 12:6, 14:9, 78:11, 78:17, 156:20, 161:24, 162:8, 173:11, 173:12, 175:23, 176:3, 177:23, 179:25, 207:22, 221:19, 229:4, 229:20, 230:12
**door** [3] - 69:21, 69:24, 70:4
**doorway** [1] - 8:1
**doubt** [1] - 212:15
**Dove** [16] - 39:1, 39:4, 39:10, 39:13, 53:8, 53:10, 53:14, 54:17, 55:19, 56:7, 57:8, 90:20, 91:7, 91:13, 97:18, 99:6
**down** [35] - 17:11, 19:12, 20:9, 55:16, 90:18, 90:20, 91:9, 101:17, 101:18, 102:10, 115:8, 125:5, 127:20, 127:22, 136:24, 137:2, 137:3, 140:19, 140:20, 140:22, 140:23, 141:8, 141:20, 142:13, 148:9, 149:7, 157:23, 174:5, 183:15, 188:19, 198:4, 201:25, 204:21, 205:13, 214:14
**Down** [1] - 121:13
**download** [1] - 32:17
**dozens** [2] - 83:17
**dr** [1] - 161:19
**Dr** [71] - 10:20, 10:21, 10:24, 108:23, 108:24, 110:6, 113:3, 113:12, 119:3, 120:3, 122:6, 126:20, 131:2, 135:17, 151:17, 153:25, 154:24, 155:14, 155:24, 156:18, 158:16, 159:3, 159:6, 159:20, 159:21, 160:2, 160:8, 160:11, 161:10, 161:15, 161:17, 162:11, 163:10, 163:22, 164:12, 165:9, 165:13, 165:18, 166:22, 167:11, 167:16,

167:18, 168:11, 169:15, 171:23, 172:19, 174:9, 177:17, 178:3, 178:14, 179:18, 180:3, 187:15, 197:2, 199:24, 208:1, 210:12, 210:13, 210:23, 211:22, 221:8, 221:24, 224:6, 224:9, 224:11, 224:23, 225:14, 229:5, 229:8
**drafted** [3] - 69:18, 86:2, 94:24
**draw** [1] - 122:2
**drawn** [2] - 8:6, 100:1
**draws** [1] - 214:21
**drew** [1] - 210:15
**drink** [1] - 221:11
**driven** [1] - 138:7
**drop** [1] - 105:18
**dropping** [3] - 64:4, 148:1
**drums** [2] - 144:2, 144:4
**dude** [1] - 22:23
**due** [3] - 94:23, 100:7, 108:7
**duple** [4] - 197:25, 198:8, 199:4, 199:16
**duplication** [1] - 175:4
**during** [12] - 38:14, 38:16, 38:19, 38:23, 98:23, 100:18, 103:7, 154:1, 179:24, 180:13, 209:22, 210:9
**Duty** [1] - 85:4

## E

**ear** [7] - 137:2, 140:14, 143:1, 145:25, 148:12, 162:3, 166:4
**earliest** [1] - 32:20
**early** [1] - 87:1
**earned** [1] - 29:5
**earnings** [2] - 84:23, 84:25
**ears** [1] - 161:10
**easily** [2] - 128:7, 128:9
**EAST** [1] - 2:22
**easy** [1] - 124:11
**edit** [2] - 109:4, 111:7
**edits** [1] - 103:15
**EDM** [1] - 121:8
**education** [1] - 113:18

**effect** [3] - 72:3, 134:11, 168:3
**effective** [3] - 13:1, 61:21, 178:4
**effectively** [2] - 70:17, 71:18
**efficacy** [1] - 172:10
**efficiently** [1] - 156:11
**effort** [3] - 159:3, 231:2, 231:4
**efforts** [5] - 9:12, 92:16, 92:22, 99:11, 100:20
**Eight** [1] - 217:15
**eight** [40] - 15:8, 129:17, 129:24, 129:25, 130:4, 130:5, 131:9, 135:20, 137:21, 138:4, 138:9, 138:10, 141:17, 155:2, 155:4, 164:4, 167:1, 167:11, 168:14, 169:12, 169:16, 171:6, 171:11, 172:1, 186:22, 197:22, 197:25, 198:7, 198:11, 199:4, 199:15, 210:14, 211:6, 211:14, 216:2, 217:2, 217:14, 218:11
**eighth** [1] - 198:16
**either** [12] - 16:3, 33:21, 38:4, 59:2, 80:23, 106:17, 176:22, 181:24, 190:21, 191:22, 210:5, 213:8
**electric** [1] - 14:3
**electronic** [1] - 105:24
**element** [3] - 118:25, 197:10, 214:4
**elements** [9] - 89:12, 118:25, 119:1, 130:13, 133:13, 144:8, 144:13, 193:16, 214:9
**ELIAS** [4] - 1:22, 232:8, 232:20, 232:21
**elsewhere** [1] - 117:11
**email** [25] - 21:8, 22:1, 22:3, 22:6, 22:7, 22:11, 22:22, 22:24, 53:21, 53:25, 54:4, 54:5, 54:15, 54:21, 54:24, 55:2, 55:4, 89:20, 90:10, 90:11,

90:14, 90:15, 90:16, 99:3
**emailed** [1] - 224:23
**Emanuel** [7] - 26:15, 47:20, 49:21, 53:2, 57:3, 59:25, 76:22
**embroiled** [1] - 12:15
**employee** [1] - 35:3
**empty** [5] - 143:15, 145:16, 146:9, 147:7, 179:1
**encounter** [1] - 27:7
**encountered** [1] - 46:25
**end** [17] - 23:1, 32:8, 72:17, 100:2, 137:1, 148:4, 148:6, 149:2, 149:16, 149:19, 150:3, 217:8, 218:1, 218:7, 223:12, 227:8, 229:21
**ended** [1] - 107:17
**endings** [3] - 147:22, 149:11, 150:1
**ends** [1] - 189:3
**energy** [1] - 148:22
**engaged** [2] - 125:13, 155:8
**engagement** [1] - 159:22
**engendered** [1] - 15:25
**engineer** [1] - 225:14
**entered** [3] - 63:4, 79:5, 164:18
**entering** [2] - 51:7, 119:18
**enters** [2] - 122:24, 123:15
**entertained** [1] - 157:5
**entire** [3] - 147:23, 155:12, 172:2
**entirely** [3] - 110:12, 139:6, 177:11
**entirety** [1] - 193:4
**entitled** [2] - 156:14, 197:21
**entry** [2] - 117:8, 122:13
**enviably** [1] - 122:8
**equal** [1] - 139:15
**equally** [1] - 141:15
**equipment** [1] - 106:16, 107:13, 108:3
**eras** [2] - 116:9, 116:12
**ERIC** [1] - 2:10
**Eric** [6] - 34:14, 51:6, 59:10, 65:5, 78:20,

79:11
**especially** [5] - 130:14, 133:25, 145:17, 179:14, 208:15
**ESQ** [7] - 2:5, 2:6, 2:10, 2:15, 2:16, 2:16, 2:21
**essence** [2] - 74:15, 211:12
**essential** [1] - 121:25
**essentially** [6] - 11:16, 117:10, 127:7, 130:11, 173:19, 201:6
**establish** [3] - 104:10, 127:11, 200:11
**established** [8] - 100:5, 111:19, 127:11, 177:7, 191:11, 198:9, 199:5, 206:21
**establishing** [2] - 92:24, 178:20
**estimate** [1] - 229:23
**estimation** [1] - 34:3
**et** [2] - 4:5
**ET** [2] - 1:6, 1:9
**Europe** [1] - 116:12
**European** [1] - 116:9
**eve** [2] - 177:2, 179:14
**evenly** [4] - 196:3, 196:11, 197:12, 197:17
**event** [1] - 98:12
**events** [10] - 96:15, 96:18, 96:19, 96:21, 97:3, 97:5, 97:7, 139:13, 139:14
**eventually** [1] - 60:6
**evidence** [35] - 9:6, 9:8, 9:9, 9:11, 16:7, 20:16, 22:14, 24:8, 24:13, 24:21, 24:22, 61:17, 66:10, 66:11, 66:12, 66:14, 67:7, 69:4, 76:14, 78:7, 82:22, 104:5, 108:9, 108:10, 108:17, 109:4, 154:18, 154:22, 160:25, 165:10, 166:4, 177:11, 179:1, 227:18, 230:12
**exact** [5] - 69:9, 189:5, 203:16, 224:12
**exactly** [12] - 13:6, 71:14, 73:24, 84:7, 140:18, 141:9, 175:22, 177:18,

186:9, 186:13, 221:15, 222:24
**exam** [2] - 209:22, 209:25
**examination** [10] - 81:9, 173:17, 174:2, 174:4, 180:5, 180:13, 183:15, 200:6, 210:6, 210:9
**EXAMINATION** [13] - 16:16, 26:9, 81:7, 92:9, 101:14, 113:10, 180:6, 207:24, 215:7, 216:16, 219:12, 220:22, 223:20
**examine** [4] - 105:17, 106:23, 157:12, 173:14
**examined** [2] - 108:12, 177:5
**examining** [1] - 80:8
**example** [12] - 11:5, 84:18, 120:23, 123:23, 133:6, 138:19, 139:2, 163:18, 164:3, 169:9, 169:12, 215:25
**examples** [5] - 137:15, 160:17, 161:10, 201:17, 213:24
**exception** [1] - 9:6
**exceptions** [1] - 70:23
**excerpt** [1] - 142:17
**exchange** [4] - 64:4, 64:16, 64:22, 65:2
**exchanged** [1] - 77:14
**excited** [2] - 59:17, 158:5
**exclude** [1] - 208:20
**excluded** [5] - 103:21, 104:25, 105:4, 105:7, 106:24
**excuse** [6] - 29:8, 113:25, 144:3, 192:3, 202:5, 216:2
**executive** [1] - 35:4
**exercise** [1] - 219:15
**exhibit** [16] - 10:4, 10:6, 10:11, 10:21, 11:5, 21:6, 29:19, 30:17, 61:14, 80:12, 90:18, 177:2, 179:9, 179:12, 227:18
**Exhibit** [49] - 4:19, 4:25, 9:24, 9:25, 13:8, 17:10, 17:14, 17:16, 19:1, 20:15, 20:18, 21:9, 21:24,

21:25, 22:13, 22:17, 23:12, 23:25, 24:7, 24:10, 25:12, 29:18, 29:23, 30:3, 30:16, 52:6, 53:17, 61:9, 62:2, 62:3, 75:23, 75:25, 77:23, 78:5, 81:10, 82:18, 89:19, 99:3, 101:16, 109:3, 130:18, 142:16, 142:17, 154:8, 167:22, 167:23, 171:19, 175:7, 227:15
**exhibits** [9] - 17:9, 75:25, 103:15, 130:18, 176:18, 227:5, 227:7, 227:12, 227:15
**Exhibits** [1] - 142:19
**EXHIBITS** [1] - 3:13
**exist** [1] - 192:23
**existed** [1] - 69:13
**exists** [1] - 120:7
**expect** [2] - 7:25, 12:6
**experience** [5] - 96:6, 115:25, 172:21, 208:22, 213:21
**experienced** [1] - 86:10
**expert** [44] - 10:20, 11:19, 12:5, 13:11, 15:4, 15:14, 102:20, 103:25, 104:2, 104:14, 104:15, 106:13, 106:17, 108:12, 108:17, 110:2, 110:3, 110:7, 110:16, 151:2, 151:11, 151:12, 154:19, 154:20, 154:21, 155:8, 156:2, 156:10, 156:12, 157:8, 157:9, 158:15, 158:25, 159:5, 159:11, 159:12, 159:21, 159:23, 162:11, 176:16, 177:4, 177:15, 178:4, 179:20
**expertise** [4] - 106:13, 122:2, 129:2, 172:21
**experts** [3] - 179:22, 229:6, 229:11
**explain** [10] - 12:14, 13:8, 22:22, 107:8, 116:20, 132:4, 139:20, 158:24, 161:1, 221:18

**explained** [3] - 13:17, 17:3, 165:23
**explaining** [2] - 17:5, 167:17
**express** [3] - 128:9, 134:8, 208:16
**expressed** [7] - 127:23, 128:7, 131:21, 142:2, 172:19, 172:24, 209:13
**expresses** [2] - 141:15, 205:20
**extensive** [2] - 92:16, 92:22
**extent** [5] - 43:2, 43:16, 70:22, 95:7, 123:1
**extremely** [1] - 218:21

**F**

**Fa** [2] - 202:9, 204:5
**fact** [33] - 7:6, 9:10, 11:23, 47:8, 47:10, 75:2, 76:21, 92:19, 99:24, 109:21, 109:24, 115:16, 117:21, 126:1, 133:10, 137:9, 151:4, 165:13, 175:1, 179:22, 186:15, 187:7, 187:10, 187:20, 189:8, 196:2, 196:10, 197:17, 205:20, 208:3, 211:2, 213:1, 215:23
**facts** [1] - 13:18
**fair** [8] - 26:20, 27:5, 34:15, 71:15, 71:20, 96:7, 100:5, 226:2
**fairly** [1] - 224:8
**fall** [1] - 190:16
**familiar** [9] - 27:15, 61:3, 61:5, 62:5, 66:3, 75:18, 76:5, 161:22
**family** [2] - 142:25, 143:19
**fan** [1] - 87:25
**fancy** [1] - 115:14
**fans** [1] - 57:16
**far** [9] - 5:18, 34:8, 34:12, 81:14, 138:3, 152:8, 169:20, 222:14, 228:12
**fashion** [4] - 137:15, 137:23, 177:3, 181:8
**fast** [1] - 152:23

**Fast** [1] - 121:9
**faster** [2] - 152:17, 196:12
**favorite** [1] - 87:25
**fear** [1] - 14:20
**feature** [2] - 206:15, 214:1
**featured** [2] - 224:9, 224:17
**features** [5] - 118:7, 135:17, 213:11, 214:24, 215:3
**featuring** [1] - 56:20
**February** [7] - 38:6, 53:24, 54:9, 54:24, 99:1, 99:3, 99:10
**FEDERAL** [2] - 1:22, 232:22
**federal** [1] - 176:15
**feedback** [2] - 223:6, 223:7
**fellow** [2] - 89:16, 208:13
**Ferrara** [30] - 106:25, 108:23, 108:24, 155:24, 156:18, 157:14, 158:16, 159:3, 159:8, 159:9, 159:21, 160:2, 160:11, 161:10, 161:15, 163:22, 164:12, 165:9, 165:13, 165:18, 166:22, 167:11, 168:11, 169:15, 179:18, 199:24, 210:13, 210:23, 229:5, 229:8
**Ferrara's** [2] - 160:8, 167:18
**few** [2] - 77:6, 145:16
**field** [6] - 13:4, 106:20, 115:16, 121:25, 174:22, 178:21
**fifth** [4] - 119:18, 141:9, 141:19, 211:12
**figure** [6] - 43:4, 129:16, 129:18, 130:6, 218:12, 230:24
**file** [8] - 11:15, 69:9, 108:11, 112:20, 123:22, 178:9, 178:24
**filed** [23] - 31:21, 31:25, 32:13, 60:10, 60:15, 63:22, 65:19, 71:10, 72:24, 73:3, 73:4, 73:6, 73:22,

74:20, 75:16, 76:25, 77:3, 78:15, 78:17, 82:15, 89:6, 101:1, 101:5
**files** [1] - 126:17, 225:13
**filing** [5] - 40:12, 40:15, 60:18, 65:23, 71:25
**film** [7] - 120:2, 120:20, 120:21, 121:9, 122:18, 122:20, 122:22
**films** [1] - 121:13
**final** [5] - 20:8, 21:5, 21:6, 23:11, 153:2
**finally** [1] - 91:20
**financial** [1] - 126:7
**fine** [15] - 7:22, 24:14, 24:16, 24:17, 35:2, 58:20, 112:12, 112:22, 112:23, 135:13, 142:18, 157:13, 157:18, 173:23, 200:21
**finish** [4] - 10:19, 117:19, 182:24, 230:13
**finished** [3] - 67:11, 117:23, 188:15
**first** [81] - 4:18, 5:25, 8:12, 9:25, 10:3, 12:18, 14:5, 14:8, 17:22, 20:9, 22:6, 26:13, 29:24, 30:1, 46:15, 51:21, 53:21, 57:14, 62:8, 79:4, 83:8, 83:14, 84:9, 89:2, 89:5, 89:15, 90:23, 99:7, 101:17, 104:1, 111:1, 114:15, 125:12, 127:1, 128:11, 132:8, 132:9, 135:19, 136:14, 141:12, 142:16, 142:25, 145:18, 145:19, 147:15, 147:17, 147:21, 150:8, 160:11, 161:4, 168:21, 168:22, 169:3, 169:4, 170:1, 170:2, 176:6, 182:3, 182:16, 184:24, 185:9, 185:11, 185:21, 192:13, 193:20, 197:24, 198:6, 199:3, 199:15, 200:11,

200:22, 210:24, 210:25, 211:11, 217:8, 218:7, 218:8, 228:3, 228:9
**FIRST** [1] - 1:23
**fishing** [2] - 42:15, 43:4
**fit** [1] - 192:20
**fitting** [1] - 144:7
**five** [11] - 56:2, 56:6, 100:15, 100:18, 110:2, 121:19, 124:25, 132:13, 136:2, 174:18, 215:15
**fixed** [1] - 130:15
**Flame** [1] - 56:20
**Flame's** [1] - 23:1
**flat** [12] - 150:15, 150:16, 150:17, 150:23
**fleece** [1] - 218:3
**flip** [1] - 21:7
**FLOOR** [1] - 2:7
**flute** [1] - 207:16
**fly** [1] - 103:24
**focused** [2] - 207:7, 211:19
**focuses** [1] - 165:13
**follow** [1] - 195:16
**follow0up** [1] - 93:3
**followed** [5] - 140:10, 147:24, 184:24, 214:14, 219:22
**following** [27] - 41:12, 41:17, 42:5, 43:14, 43:21, 49:4, 49:6, 51:21, 51:23, 52:1, 52:4, 58:25, 59:5, 68:22, 71:21, 72:13, 155:13, 184:11, 185:23, 186:4, 194:11, 197:1, 199:12, 199:13, 220:2, 227:16, 229:3
**follows** [1] - 183:11
**footage** [8] - 40:7, 40:16, 40:17, 40:21, 43:3, 43:16, 43:20, 43:22
**FOR** [3] - 3:3, 232:8, 232:9
**forbearance** [1] - 226:16
**FOREGOING** [1] - 232:11
**forgive** [1] - 13:21
**forgot** [1] - 178:15
**FORM** [1] - 232:13
**form** [9] - 108:15,

129:8, 171:11, 172:1, 172:11, 181:21, 181:24, 182:1, 197:10
**formal** [1] - 100:20
**forms** [3] - 94:19, 140:1, 230:10
**FORSYTH** [1] - 2:7
**forth** [6] - 83:15, 90:14, 102:21, 128:20, 132:15, 201:23
**FORTH** [1] - 232:12
**forward** [1] - 169:7
**foundation** [15] - 5:3, 6:11, 7:14, 12:18, 33:17, 81:17, 91:2, 93:2, 104:10, 106:19, 110:25, 173:12, 177:7, 178:14, 178:19
**foundational** [1] - 7:21
**four** [69] - 60:6, 83:6, 83:16, 121:3, 122:4, 124:25, 131:23, 132:2, 136:22, 136:23, 137:9, 140:15, 140:23, 141:6, 141:7, 144:6, 144:10, 144:11, 147:24, 149:4, 157:24, 160:17, 167:4, 167:13, 167:18, 167:25, 168:2, 168:12, 168:15, 169:10, 169:15, 170:6, 170:13, 170:20, 171:3, 171:4, 171:5, 171:10, 172:1, 182:17, 187:21, 200:9, 202:2, 202:14, 203:15, 204:8, 204:20, 205:15, 206:5, 206:12, 210:14, 211:7, 211:9, 211:11, 211:17, 212:6, 213:25, 214:13, 217:6, 217:14, 217:15, 218:8, 218:24, 220:2
**franchise** [1] - 121:9
**Francisco** [1] - 114:6
**Frederick** [2] - 123:7, 123:9
**free** [1] - 77:12
**frequency** [1] - 16:24
**frequently** [2] - 4:22,

17:4
**Fresno** [2] - 113:20
**FRIDAY** [1] - 1:15
**Friday** [2] - 180:8, 230:19
**friend** [7] - 46:16, 46:18, 46:24, 47:13, 88:20, 225:3, 225:6
**friend's** [1] - 225:7
**friends** [5] - 43:2, 43:15, 91:23, 92:3, 100:2
**front** [7] - 10:17, 11:3, 18:25, 23:1, 32:8, 103:24, 111:14
**frustrated** [1] - 54:20
**full** [7] - 110:24, 113:7, 144:15, 193:8, 220:25, 223:22
**fully** [1] - 105:8
**function** [1] - 173:21
**fundamental** [1] - 108:20
**Furious** [1] - 121:9
**FURTHER** [4] - 101:14, 216:16, 219:12, 232:14

## G

**general** [2] - 222:9, 227:2
**generally** [1] - 66:3
**generated** [1] - 175:2
**generic** [1] - 160:13
**genre** [7] - 26:16, 26:18, 26:21, 27:6, 39:21, 53:12, 120:12
**genres** [1] - 96:3
**gentleman** [3] - 49:12, 62:15, 157:22
**gentlemen** [6] - 15:22, 77:17, 158:23, 161:1, 166:12, 226:6
**George** [3] - 123:6, 123:9, 144:5
**George's** [1] - 144:2
**gesture** [5] - 118:18, 136:25, 141:21, 164:24, 172:10
**gestures** [2] - 165:4, 165:5
**given** [21] - 32:19, 37:17, 39:4, 40:22, 55:20, 68:5, 68:6, 69:7, 72:8, 78:14, 78:15, 86:7, 88:5, 109:20, 126:16, 132:12, 186:15, 188:20, 192:14,

199:12, 229:25
**GMA** [4] - 39:1, 39:4, 39:7, 39:9
**gonna** [30] - 5:20, 8:11, 11:24, 14:20, 18:18, 27:17, 33:20, 34:25, 102:19, 106:3, 107:6, 110:12, 111:22, 113:16, 115:7, 125:11, 135:4, 149:6, 153:18, 154:21, 156:7, 156:17, 173:20, 173:21, 196:20, 221:3, 221:5, 225:15, 230:2
**gospel** [1] - 37:17
**Gospel** [2] - 38:9, 39:7
**Gottwald** [4] - 224:6, 228:21, 229:3, 229:11
**graduate** [5] - 114:4, 120:10, 122:9, 122:21, 123:6
**Grammy** [6] - 38:10, 38:14, 38:16, 38:20, 38:24, 91:6
**Grammys** [1] - 38:6
**graphic** [1] - 86:2
**grateful** [1] - 166:20
**GRAY** [2] - 1:6, 3:5
**Gray** [65] - 4:5, 4:20, 5:1, 10:19, 15:13, 16:12, 16:13, 16:18, 17:22, 20:23, 25:24, 26:11, 26:14, 26:20, 27:5, 29:14, 29:18, 30:12, 31:3, 32:15, 33:1, 33:25, 34:4, 39:1, 41:3, 41:17, 41:22, 43:7, 44:2, 48:18, 51:9, 51:20, 52:11, 54:15, 56:24, 61:13, 62:5, 67:14, 68:15, 68:17, 68:24, 70:3, 70:7, 70:13, 70:19, 71:11, 71:24, 72:6, 72:7, 74:10, 75:24, 77:22, 78:5, 79:8, 81:9, 89:6, 92:11, 94:17, 97:9, 99:15, 102:10, 226:19, 226:24, 227:21, 228:22
**Gray's** [3] - 24:19, 26:3, 226:24
**great** [5] - 30:9, 107:5, 108:22, 206:15, 226:16

**Greatest** [3] - 83:25, 94:6, 94:12
**green** [1] - 142:10
**GREENBERG** [1] - 2:21
**grew** [3] - 113:21, 192:3, 192:4
**ground** [1] - 168:23
**grounding** [2] - 116:6, 116:8
**grounds** [1] - 225:16
**group** [5] - 21:6, 34:25, 46:9, 217:25, 224:3
**grow** [1] - 192:13
**guess** [5] - 10:5, 18:11, 90:19, 174:2, 229:8
**guide** [2] - 128:24, 209:10
**guitar** [2] - 144:2, 144:5
**guys** [1] - 228:18

## H

**half** [19] - 97:6, 134:19, 134:22, 134:24, 140:6, 140:7, 140:9, 140:10, 150:14, 150:24, 150:25, 151:5, 151:6, 173:24, 175:21, 198:13, 205:21, 206:9, 212:22
**half-time** [1] - 97:6
**Hall** [1] - 116:10
**Hallelujah** [2] - 123:7, 123:9
**hand** [6] - 5:4, 26:2, 31:4, 47:5, 113:4, 155:12
**Handel** [1] - 123:9
**Handel's** [1] - 123:7
**hands** [1] - 77:14
**hang** [2] - 68:9, 194:7
**hanging** [1] - 156:12
**HANLEY** [1] - 2:11
**Happy** [2] - 133:7, 133:12
**happy** [7] - 4:16, 5:19, 97:22, 97:23, 98:3, 98:5, 158:13
**hard** [7] - 141:20, 142:14, 184:6, 206:10, 206:11, 206:12, 222:24
**harmonic** [3] - 148:14, 149:9, 194:20

**harmonically** [1] - 148:14
**harmony** [3] - 116:24, 193:16, 194:13
**harpsichord** [4] - 114:7, 114:10, 114:12, 114:16
**Harrison** [1] - 144:5
**headed** [2] - 111:16, 218:4
**heading** [1] - 84:16
**headline** [1] - 99:8
**hear** [47] - 5:4, 6:5, 7:24, 27:1, 59:18, 88:1, 109:22, 116:10, 124:8, 128:21, 142:12, 143:2, 143:14, 144:1, 144:2, 144:3, 144:4, 144:16, 145:19, 146:1, 152:22, 153:22, 164:17, 164:18, 164:19, 165:4, 165:23, 167:8, 168:18, 169:3, 171:1, 185:11, 196:1, 207:15, 214:19
**heard** [21] - 28:20, 46:6, 58:1, 89:5, 92:25, 121:9, 123:20, 127:12, 130:1, 145:15, 146:7, 155:5, 159:5, 162:24, 166:1, 167:3, 170:1, 170:2, 185:21, 209:12
**hearing** [9] - 5:10, 9:17, 11:4, 11:6, 14:8, 47:16, 89:2, 145:18, 206:1
**hearsay** [5] - 9:5, 67:7, 68:4, 69:4, 70:22
**held** [4] - 97:4, 119:17, 119:24, 155:13
**help** [3] - 166:20, 205:23, 209:10
**helpful** [1] - 167:16
**Henry** [1] - 226:21
**HEREBY** [1] - 232:10
**HEREINBEFORE** [1] - 232:11
**heretofore** [1] - 4:7
**high** [3] - 113:18, 143:10, 143:17
**higher** [3] - 137:2, 150:14, 150:25
**highlighted** [2] - 8:16, 208:3

**highly** [2] - 13:16, 177:4
**himself** [1] - 67:5
**hip** [2] - 86:10, 121:8
**hire** [2] - 51:21, 79:11
**historian** [7] - 106:17, 115:15, 115:17, 130:12, 172:21, 174:20
**Historical** [1] - 114:24
**historical** [2] - 115:10, 116:7
**historically** [1] - 115:21
**history** [14] - 100:4, 113:23, 115:14, 115:19, 116:5, 116:8, 117:9, 122:15, 122:18, 129:3, 197:24, 198:7, 199:3, 199:15
**hit** [4] - 204:20, 204:21, 206:5, 206:12
**Hits** [3] - 83:25, 94:6, 94:12
**hitting** [1] - 205:15
**hmm** [13] - 19:14, 19:24, 36:3, 42:23, 43:18, 54:8, 55:8, 63:7, 65:20, 65:22, 97:2, 97:12
**hold** [5] - 67:4, 96:20, 97:4, 119:14
**holding** [1] - 180:8
**Hollywood** [2] - 121:11, 122:18
**home** [6] - 48:12, 132:13, 134:14, 148:20, 150:14, 150:18
**hone** [1] - 84:7
**honest** [2] - 221:16, 223:9
**honor** [1] - 100:6
**Honor** [98] - 4:9, 6:6, 8:7, 8:9, 8:21, 9:8, 9:19, 9:20, 10:18, 10:22, 12:11, 13:13, 14:16, 15:10, 18:16, 20:15, 22:13, 22:19, 24:7, 24:11, 24:15, 24:17, 25:11, 26:2, 33:16, 33:19, 33:22, 49:1, 51:14, 52:8, 58:17, 58:20, 58:24, 61:16, 64:9, 66:9, 66:21, 67:19, 67:23, 68:8, 68:11, 68:12, 68:16, 68:17, 70:5,

73:25, 74:2, 74:3, 74:7, 79:18, 80:16, 80:18, 89:23, 90:1, 93:4, 101:12, 102:24, 103:6, 103:19, 103:21, 104:4, 104:7, 105:3, 105:9, 109:9, 109:18, 110:5, 110:19, 111:2, 135:10, 144:20, 144:23, 146:12, 146:15, 153:17, 153:23, 154:13, 155:9, 157:19, 158:18, 166:7, 171:16, 174:7, 176:13, 178:1, 179:3, 196:22, 207:21, 219:11, 221:3, 223:18, 226:5, 226:22, 228:6, 228:16, 230:17, 231:2, 231:10
**Honor's** [3] - 6:9, 9:4, 228:10
**HONORABLE** [1] - 1:4
**hook** [2] - 48:11, 49:20
**hop** [2] - 86:10, 121:8
**Hop** [4] - 53:15, 55:17, 55:23, 56:6
**hope** [3] - 226:15, 228:13, 231:14
**hopeful** [1] - 174:3
**hopefully** [3] - 102:14, 127:18, 173:15
**hoping** [1] - 229:21
**Horse** [156] - 27:13, 57:14, 57:19, 58:1, 58:4, 58:5, 58:8, 58:9, 59:3, 64:17, 64:18, 65:14, 79:12, 89:2, 89:5, 92:20, 92:25, 101:1, 110:10, 126:13, 129:4, 129:6, 131:12, 131:25, 132:3, 135:9, 137:7, 139:3, 142:17, 145:13, 148:25, 149:1, 149:3, 149:4, 149:8, 149:12, 150:6, 150:14, 150:15, 150:23, 152:5, 152:17, 152:18, 153:9, 153:15, 154:2, 154:25, 155:5,

161:5, 161:25, 162:9, 162:12, 165:11, 165:19, 165:23, 166:1, 166:23, 167:3, 167:9, 167:12, 167:13, 167:19, 168:15, 169:10, 169:13, 171:7, 171:10, 171:25, 172:15, 175:9, 175:11, 175:24, 181:9, 181:12, 181:15, 182:13, 184:8, 184:20, 184:23, 185:3, 185:6, 185:10, 185:12, 185:15, 185:20, 186:1, 186:11, 186:25, 187:5, 187:11, 189:12, 190:23, 191:12, 191:14, 191:16, 191:20, 191:21, 191:23, 192:7, 192:11, 192:16, 193:7, 193:18, 193:19, 194:14, 194:21, 194:24, 195:3, 195:10, 195:16, 195:20, 195:21, 196:5, 196:11, 197:18, 198:24, 200:15, 201:1, 201:21, 202:1, 205:9, 206:23, 208:7, 209:21, 209:25, 210:3, 210:9, 210:15, 211:15, 211:21, 211:24, 212:12, 213:3, 213:14, 213:19, 215:25, 216:2, 216:3, 216:7, 216:12, 216:21, 217:21, 218:10, 218:14, 219:1, 219:17, 219:21, 222:2, 222:14, 223:5, 224:7, 225:19, 225:22, 225:25, 226:3
**hour** [7] - 107:16, 108:18, 112:1, 173:24, 178:13, 229:10
**hours** [1] - 229:8
**housekeeping** [1] - 228:7
**Houston** [6] - 220:16,

223:18, 223:24, 223:25, 229:5, 229:13
**HOUSTON** [1] - 3:10
**Hudson** [2] - 229:4, 229:13
**huge** [1] - 117:8
**humans** [1] - 115:25
**hummed** [1] - 127:2
**hundred** [1] - 203:23
**hypothetical** [1] - 204:9

**I**

**ideas** [1] - 223:11
**identical** [13] - 137:15, 140:15, 141:13, 142:24, 143:18, 147:16, 150:2, 189:6, 206:24, 211:11, 214:12, 214:13
**identified** [11] - 20:24, 25:12, 86:4, 91:11, 103:12, 108:16, 135:5, 135:8, 135:18, 199:24, 202:2
**identifies** [2] - 132:11, 160:6
**identify** [9] - 4:21, 5:1, 10:6, 10:11, 61:6, 117:13, 118:2, 134:7, 166:25
**identities** [2] - 27:15, 34:22
**identity** [2] - 212:19, 218:22
**III** [1] - 223:24
**illustrate** [5] - 104:15, 107:11, 108:2, 110:7, 174:11
**illustrated** [1] - 176:10
**illustrating** [6] - 104:18, 105:13, 106:15, 110:13, 174:23, 178:17
**illustration** [10] - 12:2, 12:11, 104:8, 106:10, 108:1, 174:14, 175:1, 178:2, 178:3, 178:10
**illustrative** [4] - 14:9, 14:19, 104:12, 108:14
**imagine** [1] - 172:12
**immediately** [1] - 68:13
**impact** [3] - 153:8,

153:14, 230:2
**impacted** [1] - 228:11
**impeach** [3] - 67:20, 67:22, 70:24
**impeachment** [4] - 66:12, 66:13, 67:24, 74:4
**implicated** [1] - 123:15
**implication** [1] - 70:19
**implications** [1] - 149:9
**important** [14] - 16:7, 83:20, 83:25, 124:7, 133:18, 133:25, 139:25, 163:10, 172:6, 172:7, 179:6, 212:16, 218:21
**impression** [3] - 59:17, 59:20, 74:16
**IN** [1] - 232:8
**inappropriate** [5] - 110:17, 111:3, 156:8, 177:4, 177:11
**inception** [2] - 36:7, 87:5
**inclined** [1] - 9:4
**include** [3] - 122:4, 161:10, 217:5
**included** [4] - 49:25, 131:2, 181:1, 205:8
**includes** [1] - 11:10, 122:16, 211:20
**including** [2] - 11:12, 28:2
**income** [3] - 29:5, 29:11, 79:6
**incomplete** [3] - 154:10, 154:12, 154:13
**inconsistent** [1] - 70:24
**incorrect** [3] - 5:4, 159:14, 191:1
**indeed** [1] - 76:17
**independent** [1] - 126:5
**INDEX** [1] - 3:1
**indicate** [3] - 5:15, 40:1, 42:24
**indicated** [5] - 13:16, 16:1, 132:17, 179:8, 190:15
**indicates** [2] - 32:16, 104:24
**indicating** [1] - 39:19
**indication** [1] - 32:2
**individual** [20] - 27:18, 27:21, 27:24, 28:2, 28:6, 28:14, 28:20,

35:25, 36:17, 36:23, 37:2, 37:3, 37:7, 37:11, 39:12, 44:6, 62:21, 91:21, 92:2, 148:21
**individuals** [2] - 27:10, 28:10
**industry** [1] - 7:8
**inferences** [1] - 8:6
**information** [15] - 7:7, 7:13, 14:7, 33:2, 33:4, 33:8, 33:13, 34:7, 42:16, 68:14, 100:21, 113:17, 170:21, 170:22, 176:22
**informed** [1] - 211:2
**infringed** [4] - 58:5, 58:10, 59:4, 64:21
**infringement** [5] - 60:10, 79:12, 89:7, 89:10, 89:13
**initial** [12] - 58:5, 58:9, 58:11, 59:5, 59:7, 159:14, 180:15, 180:16, 180:18, 181:7, 181:19
**inquiry** [1] - 10:15
**insistence** [1] - 214:18
**insistently** [1] - 140:12
**inspect** [4] - 15:2, 106:16, 107:16, 178:12
**inspired** [1] - 171:6
**instance** [5] - 98:19, 134:23, 172:12, 185:19, 218:12
**instances** [2] - 9:14, 213:25
**instead** [5] - 60:18, 133:22, 173:10, 205:8, 210:22
**instructed** [1] - 16:5
**instruction** [4] - 4:14, 146:17, 228:10, 230:3
**instructions** [6] - 125:2, 125:3, 230:5, 230:8, 230:14, 230:16
**instrument** [6] - 114:7, 114:8, 143:5, 143:8, 143:13, 175:5
**instrumental** [12] - 45:2, 45:5, 154:1, 221:25, 222:15, 222:22, 224:23, 224:24, 225:1,

225:18, 225:21, 225:24

**instrumentals** [1] - 160:12

**instruments** [4] - 114:14, 143:1, 144:11

**intellectual** [1] - 113:23

**intend** [3] - 106:16, 107:11, 110:6

**intended** [3] - 12:18, 107:13, 179:22

**intends** [2] - 11:15, 13:17

**interacts** [2] - 116:1, 122:22

**interchangeably** [1] - 130:7

**interest** [4] - 76:21, 78:22, 78:25, 79:2

**interested** [5] - 47:17, 67:3, 69:17, 72:16, 72:19

**internationally** [1] - 119:23

**Internet** [4] - 16:3, 103:22, 228:2, 229:5

**interrupt** [1] - 188:14

**interruption** [1] - 26:4

**introduced** [2] - 82:21, 145:24

**introduction** [2] - 11:11, 185:6

**introductory** [1] - 101:18

**involve** [3] - 82:12, 122:4, 123:2

**involved** [7] - 4:20, 52:2, 116:4, 222:3, 223:4, 223:11, 224:14

**involvement** [2] - 225:18, 226:2

**irrelevant** [2] - 105:22, 107:1

**IS** [1] - 232:14

**is's** [1] - 156:14

**isolate** [4] - 128:4, 128:5, 131:7, 176:8

**isolated** [1] - 214:24

**isolation** [3] - 145:20, 145:24, 214:2

**issue** [37] - 4:24, 5:12, 6:12, 6:18, 7:11, 7:15, 7:16, 8:8, 8:18, 8:21, 10:16, 11:8, 15:11, 45:19, 59:1, 59:2, 95:21, 108:4, 109:8, 109:23,

129:24, 140:12, 141:12, 146:18, 157:25, 158:1, 162:22, 169:6, 173:25, 178:23, 180:23, 182:7, 188:23, 195:1, 197:12, 218:22, 228:1

**issues** [10] - 4:12, 6:18, 102:20, 106:8, 108:22, 157:20, 159:11, 215:13, 229:6, 231:8

**it'll** [1] - 80:24

**Item** [1] - 4:3

**iterations** [5] - 136:23, 141:7, 160:17, 160:18

**itself** [5] - 36:11, 37:21, 38:10, 185:22, 214:20

---

### J

**January** [4] - 23:17, 23:23, 24:25, 194:2

**jazz** [2] - 120:23

**JEFFREY** [1] - 2:16

**job** [3] - 122:8, 130:11, 158:6

**John** [5] - 49:13, 56:21, 62:15, 62:19, 144:5

**John's** [1] - 144:1

**joint** [1] - 130:18

**Joint** [9] - 29:18, 29:23, 30:3, 30:16, 52:6, 53:17, 62:1, 62:3, 75:23

**Jolly** [28] - 161:11, 161:16, 161:19, 162:1, 162:3, 162:23, 163:17, 200:2, 200:16, 200:25, 203:8, 204:10, 211:20, 212:3, 212:10, 213:1, 213:6, 213:15, 216:5, 216:12, 216:20, 217:13, 217:16, 217:24, 218:6, 218:17, 219:2, 219:23

**JORDAN** [1] - 3:10

**Jordan** [3] - 220:15, 223:18, 223:24

**Joyful** [222] - 5:11, 5:14, 16:21, 18:1,

18:8, 18:15, 19:7, 19:20, 23:1, 25:2, 25:18, 25:20, 28:3, 28:10, 28:20, 28:21, 28:25, 29:2, 29:5, 29:8, 29:12, 29:15, 30:13, 31:8, 32:3, 32:16, 35:11, 35:14, 35:17, 35:20, 36:1, 36:5, 36:8, 37:21, 37:24, 38:9, 38:16, 38:23, 39:9, 40:2, 40:6, 40:11, 40:15, 40:21, 42:7, 43:11, 43:20, 44:14, 44:17, 44:21, 44:25, 45:3, 45:6, 46:3, 47:19, 47:23, 48:6, 48:12, 49:10, 49:11, 49:16, 49:23, 49:25, 50:4, 50:11, 50:15, 50:19, 50:20, 51:1, 52:15, 52:20, 52:24, 53:7, 53:14, 56:9, 56:14, 57:9, 58:6, 58:10, 59:4, 60:23, 61:4, 61:14, 63:13, 63:19, 64:6, 65:10, 65:16, 75:9, 75:13, 75:21, 76:22, 77:2, 77:5, 77:8, 77:11, 77:15, 78:12, 78:23, 79:6, 79:9, 83:1, 83:5, 84:3, 85:24, 87:17, 87:20, 91:12, 92:25, 93:14, 93:18, 94:2, 110:10, 126:12, 129:4, 129:6, 131:12, 131:21, 131:24, 135:9, 142:16, 145:13, 147:21, 148:3, 148:24, 149:2, 149:11, 150:5, 150:10, 150:11, 150:25, 152:2, 152:17, 152:18, 153:10, 153:16, 161:4, 161:25, 162:9, 162:12, 163:18, 164:3, 165:5, 165:10, 165:19, 165:24, 166:1, 167:13, 171:12, 172:3, 172:9, 172:12, 172:15, 175:9, 175:12, 175:24, 181:25, 186:16, 186:17, 186:25, 187:5, 187:11,

189:10, 189:20, 190:13, 191:13, 191:14, 192:12, 192:17, 193:7, 193:17, 193:21, 194:13, 194:21, 194:24, 195:3, 195:10, 195:13, 195:20, 196:4, 196:15, 197:3, 197:18, 198:6, 198:24, 199:3, 199:5, 199:14, 200:15, 200:25, 201:20, 202:1, 205:9, 205:11, 205:12, 206:23, 208:6, 209:21, 209:25, 210:3, 210:8, 211:21, 211:23, 212:12, 213:3, 213:13, 213:18, 215:24, 216:7, 216:12, 216:21, 217:17, 217:20, 218:10, 218:13, 218:25, 219:16, 219:21

**JUDGE** [1] - 1:4

**Judge** [14] - 7:15, 92:6, 107:25, 110:20, 112:17, 117:18, 135:14, 151:10, 156:16, 166:21, 171:18, 177:22, 180:1, 227:19

**judge** [4] - 5:24, 11:14, 110:24, 159:15

**Juicy** [1] - 172:12

**JULY** [3] - 1:15, 4:1, 232:18

**July** [10] - 31:19, 31:21, 32:4, 32:10, 32:19, 60:11, 63:1, 75:13, 76:17, 78:16

**jump** [2] - 137:3, 137:5

**jumped** [3] - 91:9, 97:13, 97:14

**juncture** [2] - 109:11, 173:4, 226:7

**June** [6] - 30:21, 31:4, 31:9, 61:21, 101:23, 102:4

**Jury** [2] - 79:23, 81:4

**jury** [62] - 4:14, 9:21, 10:17, 11:3, 15:17, 15:21, 20:19, 22:19,

22:22, 24:19, 30:24, 31:2, 54:12, 61:11, 62:11, 69:7, 76:11, 78:6, 80:4, 81:1, 102:17, 103:24, 104:18, 106:15, 107:12, 109:6, 109:22, 111:14, 111:23, 112:25, 113:15, 117:21, 130:21, 142:19, 145:3, 146:18, 146:22, 151:13, 153:19, 154:7, 156:24, 156:25, 158:9, 158:11, 160:24, 167:23, 173:7, 174:11, 174:14, 175:17, 176:10, 178:5, 180:2, 180:4, 226:18, 227:7, 227:8, 227:18, 230:3, 230:20, 230:22, 231:9

**justify** [1] - 108:13

---

### K

**KAHN** [54] - 2:5, 3:5, 9:23, 10:8, 10:13, 16:17, 18:19, 18:22, 20:15, 20:19, 20:22, 22:13, 22:18, 22:21, 24:7, 24:17, 24:23, 25:11, 25:15, 25:23, 64:9, 68:12, 69:18, 69:22, 71:8, 72:10, 72:18, 79:18, 80:17, 80:19, 80:21, 81:8, 81:19, 81:22, 82:21, 84:5, 87:6, 90:1, 90:5, 91:3, 92:6, 93:2, 101:12, 101:15, 102:1, 102:6, 220:13, 226:21, 227:8, 227:11, 227:19, 227:23, 227:25, 228:4

**Kahn** [4] - 80:14, 81:6, 95:20, 99:22

**kAHN** [1] - 82:24

**Katy** [11] - 4:5, 57:14, 57:20, 59:3, 60:11, 63:5, 65:21, 221:21, 221:23, 223:6, 224:16

**KATY** [1] - 1:9

**KAYIRA** [3] - 2:9, 2:10, 158:7

**Kayira** [15] - 34:14, 51:6, 51:22, 59:10, 60:3, 60:8, 60:10, 60:19, 60:25, 61:24, 65:5, 78:20, 79:11, 99:17, 156:6
**keep** [4] - 84:7, 128:16, 156:12, 226:8
**keeping** [1] - 202:5
**keeps** [2] - 144:20, 218:14
**key** [40] - 72:22, 118:13, 118:15, 118:22, 127:6, 127:8, 127:13, 127:15, 127:16, 127:20, 133:22, 150:9, 150:10, 150:20, 153:2, 175:18, 175:25, 187:23, 188:1, 189:21, 190:7, 190:10, 200:11, 200:20, 201:15, 201:17, 202:12, 202:21, 203:1, 203:2, 203:5, 203:9, 203:11, 203:21, 204:1, 204:9, 205:11, 216:7
**keyboard** [11] - 11:19, 12:5, 13:14, 105:21, 105:22, 106:12, 107:3, 114:7, 177:18
**keys** [1] - 150:5
**kill** [1] - 216:18
**kind** [17] - 40:7, 43:1, 52:21, 104:11, 108:2, 116:3, 116:18, 120:19, 122:11, 124:5, 137:12, 139:8, 146:9, 147:8, 175:4, 209:12
**kinds** [2] - 120:11, 231:8
**knowledge** [48] - 28:1, 28:4, 28:5, 28:8, 28:9, 28:13, 28:18, 35:16, 35:18, 35:19, 35:25, 36:4, 36:9, 36:13, 36:16, 36:18, 36:19, 36:23, 37:6, 37:9, 37:10, 38:2, 38:4, 39:12, 39:15, 44:6, 47:23, 50:24, 56:5, 62:14, 70:6, 71:10, 81:15, 81:23, 82:2, 87:14, 89:12,

89:14, 91:8, 92:24, 93:14, 95:5, 115:3, 149:10, 184:19, 184:25, 192:6, 192:15
**known** [5] - 44:24, 93:8, 95:8, 224:3, 224:7
**knows** [2] - 106:3, 222:14
**KNUPP** [1] - 2:15

---

**L**

**L.A** [3] - 125:20, 125:22, 225:3
**label** [4] - 50:8, 55:24, 56:11, 98:2
**labeled** [2] - 162:16, 169:15
**lack** [3] - 33:17, 93:2, 160:16
**lacking** [6] - 138:22, 139:5, 139:7, 160:13, 212:8, 212:9
**ladies** [5] - 15:22, 158:23, 161:1, 166:11, 226:6
**laid** [2] - 5:3, 110:24
**Lamb** [3] - 207:15, 218:1, 218:2
**lamb** [2] - 207:18, 218:3
**Lambert** [18] - 26:15, 27:6, 46:10, 47:20, 48:11, 49:21, 53:2, 57:3, 60:1, 60:6, 67:15, 76:22, 77:6, 77:12, 78:25, 79:5, 85:3, 95:3
**language** [1] - 157:20
**large** [2] - 88:15, 172:11
**larger** [1] - 162:17
**largest** [1] - 209:14
**last** [17] - 17:10, 30:9, 113:7, 138:9, 138:20, 147:19, 147:20, 148:25, 149:20, 158:21, 165:13, 179:5, 191:12, 191:14, 191:22, 219:20, 226:23
**late** [3] - 15:23, 98:10, 177:21
**latitude** [2] - 68:6, 68:7
**LAURA** [4] - 1:22, 232:8, 232:20,

232:21
**LAUREN** [1] - 2:6
**LAW** [1] - 2:9
**Lawrence** [1] - 160:2
**lawsuit** [46] - 31:21, 31:25, 32:12, 40:12, 40:15, 45:15, 55:7, 60:10, 60:14, 60:18, 63:5, 63:22, 64:2, 64:4, 65:6, 65:19, 65:21, 65:23, 67:3, 67:16, 69:2, 69:10, 71:10, 71:12, 71:18, 71:23, 71:25, 72:17, 72:23, 73:6, 73:16, 73:22, 74:11, 74:20, 75:15, 76:24, 78:15, 78:17, 82:25, 83:3, 89:6, 89:10, 92:15, 93:25, 100:12, 101:5
**lawsuit's** [1] - 92:11
**lawyer** [4] - 34:14, 59:10, 78:20, 99:17
**lawyers** [8] - 33:11, 34:5, 40:19, 40:22, 55:7, 92:19, 92:23, 100:20
**lay** [7] - 6:10, 12:18, 15:6, 106:18, 151:8, 173:12, 176:2
**layer** [1] - 89:15
**layers** [1] - 145:23
**laying** [2] - 178:14, 178:19
**layperson** [1] - 151:1
**lead** [1] - 230:18
**leading** [1] - 18:16
**lean** [1] - 162:3
**leaning** [1] - 14:17
**leap** [5] - 137:2, 137:5, 148:9, 149:7
**learn** [2] - 47:10, 47:14
**learned** [3] - 5:14, 46:15, 73:22
**learning** [3] - 72:21, 72:23, 73:8
**least** [1] - 221:18
**leave** [2] - 111:25
**leaves** [2] - 212:24, 212:25
**leaving** [1] - 231:7
**Lecrae** [38] - 5:2, 21:16, 22:1, 22:7, 22:12, 26:15, 27:6, 36:5, 36:9, 37:7, 44:10, 46:10, 47:20, 49:12, 49:18, 53:2, 56:21, 57:3, 57:14, 57:16, 57:19, 59:17,

59:20, 65:23, 65:25, 66:6, 67:15, 70:8, 71:3, 74:10, 75:12, 75:18, 76:7, 76:21, 77:11, 77:14, 78:11, 95:3
**Lecrae's** [2] - 24:6, 70:9
**lecturing** [1] - 120:1
**left** [5] - 30:18, 31:4, 78:2, 171:3, 229:1
**left-hand** [1] - 31:4
**legal** [9] - 89:9, 100:20, 117:16, 118:4, 145:1, 145:2, 157:20, 166:18, 223:22
**length** [9] - 8:25, 116:24, 129:25, 130:5, 135:20, 138:3, 139:15, 139:16, 211:22
**lengthen** [1] - 156:23
**lengths** [2] - 214:11, 214:12
**LEPERA** [98] - 2:15, 3:8, 8:1, 9:20, 11:4, 13:12, 13:20, 68:24, 69:6, 69:16, 69:21, 69:24, 71:6, 71:11, 71:14, 71:17, 72:4, 72:6, 72:13, 72:21, 73:2, 73:6, 73:16, 73:24, 74:2, 102:23, 103:6, 108:7, 110:19, 111:2, 111:14, 112:18, 112:24, 117:16, 130:23, 130:25, 135:10, 137:19, 140:25, 141:2, 144:20, 146:12, 146:17, 151:8, 153:11, 153:17, 153:23, 154:10, 154:12, 154:17, 155:9, 155:14, 155:20, 155:24, 156:4, 156:17, 156:23, 157:8, 157:25, 158:18, 160:23, 161:17, 166:5, 168:5, 171:15, 171:20, 173:18, 173:24, 176:13, 179:3, 179:5, 180:7, 182:25, 188:13, 189:1, 194:4, 194:8, 194:10, 196:24,

198:5, 199:11, 215:8, 216:14, 217:11, 219:9, 219:11, 219:13, 220:8, 227:20, 227:24, 228:16, 229:2, 229:8, 229:16, 229:19, 230:17, 231:2, 231:11
**Lepera** [15] - 104:7, 108:6, 156:5, 179:4, 208:3, 210:2, 210:5, 210:8, 210:12, 211:4, 211:19, 213:4, 213:17, 214:24, 215:6
**less** [1] - 16:7
**letter** [6] - 127:17, 133:6, 133:13, 133:21, 150:13, 150:21
**letters** [3] - 55:17, 107:12, 201:14
**level** [6] - 100:6, 122:13, 122:14, 122:21, 127:5, 146:18
**levels** [2] - 142:2, 192:15
**liberty** [1] - 94:10
**Library** [1] - 123:22
**library** [1] - 30:6
**likely** [1] - 170:23
**limine** [4] - 5:1, 5:10, 6:23, 9:17
**limited** [4] - 8:10, 16:8, 170:9, 230:4
**line** [18] - 42:3, 43:9, 48:21, 48:23, 51:12, 51:16, 55:19, 129:21, 169:9, 191:24, 192:1, 196:21, 199:9, 210:17, 211:3, 218:7
**lined** [7] - 188:5, 188:7, 188:8, 188:9, 191:17, 191:19, 191:23
**liner** [6] - 85:21, 85:23, 94:25, 95:14, 95:17, 98:5
**lines** [8] - 41:14, 58:18, 124:25, 194:6, 199:9, 204:12, 204:14, 206:18
**lingo** [1] - 132:20
**list** [18] - 39:22, 44:10, 53:4, 54:16, 57:8,

87:10, 87:21, 87:24, 88:5, 91:11, 91:12, 95:24, 95:25, 96:2, 96:4, 135:4, 181:21
**listed** [8] - 56:2, 85:16, 85:20, 86:20, 86:22, 86:24, 95:2, 95:7
**listen** [16] - 109:2, 127:1, 128:15, 128:17, 128:25, 142:15, 144:1, 144:7, 145:25, 146:2, 147:6, 167:18, 209:20, 210:2, 221:10
**listened** [1] - 142:21
**listener** [1] - 151:8
**listening** [13] - 124:7, 127:7, 128:13, 128:24, 146:8, 168:20, 198:17, 205:23, 209:10, 209:19, 209:20, 215:15, 224:24
**listing** [8] - 81:10, 81:15, 81:24, 85:3, 90:25, 98:6, 98:7, 98:23
**lists** [9] - 52:24, 56:14, 56:17, 56:20, 56:23, 57:5, 95:20, 95:22, 96:11
**literal** [1] - 117:25
**literally** [4] - 12:19, 13:7, 44:23, 163:8
**litigation** [2] - 51:22, 69:17
**live** [14] - 11:17, 11:19, 12:21, 12:22, 14:21, 14:23, 40:5, 40:21, 42:6, 43:11, 43:16, 178:3, 178:10, 229:2
**LLC** [1] - 2:9
**location** [1] - 17:15
**locations** [1] - 48:9
**lodge** [2] - 173:13, 173:22
**look** [53] - 5:19, 5:20, 10:5, 16:1, 19:12, 20:2, 20:9, 21:24, 23:15, 23:18, 30:16, 31:11, 43:6, 51:9, 51:12, 51:15, 52:6, 52:14, 53:17, 55:11, 58:13, 62:3, 75:23, 81:10, 83:9, 85:22, 89:1, 91:11, 99:1, 101:17, 101:18, 108:18, 116:23, 118:11, 118:13,

118:17, 124:19, 14:20, 125:14, 130:16, 136:18, 136:20, 183:21, 188:18, 189:18, 196:19, 196:21, 198:17, 198:19, 198:20, 199:7, 209:1
**looked** [4] - 97:19, 98:25, 193:6, 214:1
**lookin'** [1] - 18:9
**looking** [28] - 4:14, 7:19, 17:7, 17:15, 17:20, 17:25, 18:1, 18:9, 18:11, 21:7, 23:19, 31:2, 58:21, 77:23, 117:13, 118:2, 128:3, 128:4, 133:19, 140:11, 169:8, 190:10, 193:24, 194:5, 201:5, 201:16, 201:18, 207:8
**looks** [3] - 20:20, 89:20, 122:15
**LOS** [6] - 1:16, 1:23, 2:18, 2:23, 4:1, 232:4
**lose** [1] - 171:24
**lost** [1] - 32:6
**Louis** [1] - 119:4
**LOUIS** [1] - 2:8
**love** [2] - 87:25, 200:9
**lower** [4] - 137:3, 140:3, 205:21, 206:9
**lowered** [3] - 140:13, 140:16
**Luck** [1] - 224:11
**Lukasz** [1] - 224:6
**Luke** [6] - 221:8, 221:24, 224:6, 224:9, 224:23, 225:14
**lunch** [2] - 107:16, 178:13
**Lunch** [1] - 103:3
**Lutheran** [1] - 114:18
**lyrics** [9] - 45:19, 208:24, 222:25, 223:4, 224:22, 224:24, 225:2, 225:10, 225:12

---

# M

**M-e** [2] - 205:6, 205:19
**Mafia** [1] - 224:4
**magazine** [2] - 33:7, 33:12
**magnet** [1] - 148:20

**mailed** [1] - 225:14
**mainstream** [1] - 97:7
**major** [28] - 132:24, 133:7, 133:8, 134:25, 140:4, 140:6, 162:20, 162:23, 163:3, 163:6, 164:8, 200:17, 200:20, 202:19, 202:21, 203:12, 203:22, 203:23, 204:10, 204:12, 205:7, 205:22, 212:11, 212:18, 212:20, 212:25, 216:6
**maker** [1] - 86:12
**Man** [4] - 123:17, 123:18, 123:19, 123:21
**manager** [4] - 54:18, 82:4, 90:7, 98:17
**manages** [1] - 149:11
**manipulate** [1] - 103:15
**manner** [2] - 106:11, 127:21
**manufactured** [2] - 29:9, 174:17
**manuscripts** [1] - 118:3
**map** [1] - 181:20
**March** [5] - 19:18, 19:19, 20:25, 22:5, 22:10
**Marcus** [4] - 4:5, 10:19, 56:23, 72:3
**MARCUS** [2] - 1:6, 3:5
**mark** [2] - 227:12, 227:14
**marked** [3] - 130:17, 163:21, 227:5
**market** [1] - 5:17
**markets** [1] - 32:18
**marks** [1] - 124:23
**Martin** [5] - 220:15, 220:21, 221:1, 228:1, 228:18
**Mary** [4] - 207:15, 207:18, 218:1, 218:2
**mashup** [12] - 10:22, 11:12, 103:16, 103:21, 103:23, 106:4, 108:13, 108:15, 109:16, 111:7, 112:20, 177:7
**mashups** [9] - 103:21, 104:3, 104:25, 105:3, 105:7, 106:4, 106:8, 106:24,

110:18
**massive** [1] - 108:8
**Master's** [3] - 114:5, 114:9, 114:22
**match** [2] - 152:11, 175:11
**matches** [1] - 128:21
**matching** [1] - 176:4
**material** [16] - 9:10, 104:11, 117:2, 117:11, 118:17, 121:23, 123:5, 127:3, 128:4, 128:5, 131:8, 136:1, 177:15, 180:12, 193:7, 207:5
**materials** [11] - 11:9, 126:16, 135:11, 166:1, 168:18, 169:5, 170:5, 171:2, 176:18, 211:1, 215:24
**math** [1] - 152:8
**matter** [10] - 11:23, 22:24, 22:25, 59:15, 70:12, 109:21, 109:25, 125:13, 193:11, 202:12
**matters** [1] - 4:17
**Max** [3] - 220:15, 228:1, 228:18
**max** [1] - 229:23
**McCartney's** [1] - 144:4
**ME** [1] - 205:3
**mean** [17] - 6:25, 7:1, 42:19, 61:5, 71:9, 72:7, 72:24, 98:1, 98:10, 105:15, 121:20, 136:17, 156:14, 188:6, 188:14, 222:9, 229:15
**meaning** [3] - 118:5, 145:1, 145:2
**meaningful** [3] - 149:24, 149:25, 152:21
**MEANS** [1] - 232:13
**means** [10] - 6:25, 107:14, 117:5, 117:6, 117:10, 121:21, 154:11, 174:22, 175:4, 178:17
**measure** [2] - 134:16, 134:20
**measured** [1] - 134:19
**media** [1] - 122:22
**meeting** [1] - 125:23

**melodic** [8] - 130:6, 135:21, 135:22, 137:8, 139:10, 186:9, 186:12, 189:3
**melodies** [8] - 123:8, 133:9, 134:4, 134:10, 135:2, 136:24, 145:18, 222:22
**melody** [20] - 116:24, 130:2, 130:5, 133:11, 133:16, 133:21, 133:23, 134:6, 134:7, 135:23, 136:13, 136:21, 137:9, 138:25, 148:23, 163:14, 188:21, 188:25, 214:19, 223:8
**memorialize** [1] - 129:8
**men** [1] - 144:10
**mental** [3] - 67:15, 67:22, 68:5
**mention** [4] - 10:3, 143:22, 150:5, 178:15
**mentioned** [17] - 19:23, 38:19, 38:23, 39:1, 88:10, 97:6, 116:5, 123:2, 124:21, 136:12, 136:14, 139:25, 140:19, 142:6, 148:24, 213:12, 213:24
**mere** [1] - 47:8
**Merrily** [29] - 161:11, 163:20, 163:23, 200:3, 200:16, 200:22, 202:20, 203:1, 203:6, 203:8, 203:21, 204:10, 211:20, 212:1, 212:10, 213:1, 213:4, 213:14, 216:5, 216:11, 216:20, 217:13, 217:16, 217:23, 217:25, 218:3, 218:17, 219:2, 219:23
**mess** [1] - 124:16
**Messiah** [1] - 123:7
**met** [3] - 125:18, 125:20, 125:22
**meter** [5] - 139:11, 197:25, 198:8, 199:4, 199:16

**method** [3] - 105:13, 128:12, 202:17
**methodology** [12] - 6:8, 6:19, 8:20, 8:25, 14:11, 104:17, 105:18, 106:14, 107:10, 112:21, 176:19, 179:9
**methods** [1] - 202:18
**metronome** [3] - 152:10, 152:11, 152:12
**Mi** [29] - 202:9, 202:25, 203:2, 203:9, 203:14, 203:24, 204:5, 204:8, 204:13, 204:19, 205:6, 205:8, 205:13, 205:16, 205:18, 205:20, 205:25
**Mi's** [1] - 202:14
**Mice** [3] - 134:2, 134:3, 140:5
**MICHAEL** [1] - 2:5
**Michigan** [2] - 114:25, 115:3
**microphone** [1] - 26:23
**middle** [5] - 29:24, 55:12, 109:2, 217:10, 218:5
**might** [17] - 13:19, 68:19, 96:20, 116:9, 116:16, 118:13, 118:14, 123:9, 123:14, 123:15, 124:17, 143:14, 144:3, 149:16, 169:2, 177:18, 228:10
**MILLER** [3] - 1:22, 232:20, 232:21
**mind** [4] - 109:13, 110:17, 210:24, 226:8
**Mind** [7] - 85:11, 85:12, 85:19, 85:21, 86:18, 86:20, 86:24
**mine** [2] - 225:3, 225:6
**minor** [61] - 118:23, 132:25, 133:1, 133:2, 134:23, 139:23, 139:24, 140:1, 140:8, 140:9, 140:12, 140:14, 140:16, 140:20, 162:24, 163:4, 163:7, 164:8, 182:9, 182:11, 182:14,

187:23, 187:24, 188:1, 189:11, 189:14, 189:22, 189:23, 189:24, 190:1, 190:2, 190:4, 190:10, 191:2, 191:3, 191:10, 200:16, 200:20, 201:17, 202:3, 202:4, 202:19, 204:19, 204:22, 204:25, 205:1, 205:2, 205:5, 205:12, 205:14, 205:21, 205:24, 206:4, 212:12, 212:19, 212:20, 212:25, 214:14, 216:7, 216:8
**minute** [10] - 41:19, 68:9, 151:24, 151:25, 152:1, 152:3, 152:4, 152:8, 152:20, 186:23
**minutes** [4] - 79:20, 110:2, 112:2, 173:4
**miscommunication** [1] - 6:15
**misinformation** [1] - 16:10
**Missouri** [1] - 119:5
**MITCHELL** [1] - 2:15
**Mix** [1] - 176:24
**mix** [2] - 136:2, 136:13
**mixed** [2] - 144:12, 144:15
**Mixed** [1] - 174:16
**mmm-hmm** [1] - 65:22
**MO** [2] - 2:8, 2:11
**mode** [32] - 132:25, 133:1, 134:23, 134:25, 139:24, 140:1, 140:4, 140:6, 140:8, 140:9, 140:12, 140:14, 140:20, 162:20, 163:7, 164:8, 174:25, 202:13, 202:19, 207:16, 212:11, 212:12, 212:18, 212:19, 212:21, 212:25, 214:14, 218:23
**models** [1] - 149:2
**moderate** [1] - 152:24
**moderately** [1] - 152:22
**modes** [1] - 200:14
**modifications** [1] - 225:24

**modifying** [1] - 226:3
**moment** [10] - 5:23, 27:10, 35:23, 66:23, 95:18, 95:20, 99:15, 109:13, 140:18, 141:25
**moments** [1] - 34:17
**money** [11] - 64:16, 64:23, 65:3, 77:14, 94:19, 99:18, 99:25, 100:25, 120:17, 120:18, 120:20
**monitored** [1] - 4:22
**monitoring** [1] - 17:6
**monopolize** [3] - 197:21, 207:1, 207:4
**month** [2] - 101:19, 102:4
**months** [2] - 78:17, 123:19
**mood** [1] - 39:22
**Moore** [62] - 5:2, 21:21, 22:9, 22:23, 23:6, 26:14, 26:15, 27:6, 36:5, 36:10, 36:13, 47:20, 48:5, 49:12, 49:18, 53:2, 57:3, 57:14, 58:1, 58:4, 58:8, 59:14, 59:17, 59:20, 60:7, 60:15, 65:23, 65:25, 67:2, 68:4, 68:14, 69:1, 69:8, 69:15, 70:3, 70:8, 70:13, 70:18, 71:12, 71:17, 71:22, 71:24, 71:25, 72:4, 72:7, 72:12, 73:14, 73:21, 74:10, 74:19, 75:4, 75:8, 75:12, 75:18, 76:21, 77:5, 77:10, 77:11, 77:14, 78:11, 95:3
**Moore's** [12] - 21:16, 25:12, 25:16, 25:21, 36:20, 37:7, 44:10, 66:7, 70:11, 74:18, 76:8, 79:10
**moral** [1] - 4:12
**morning** [11] - 6:1, 10:18, 15:14, 15:22, 16:18, 16:19, 26:11, 26:12, 79:20, 230:7
**most** [15] - 13:1, 25:9, 104:15, 104:17, 105:12, 106:14, 111:3, 116:11, 120:15, 124:7, 129:12, 141:17, 141:21, 178:4, 209:16

**mostly** [3] - 39:16, 39:18, 116:9
**motion** [1] - 9:17
**motions** [1] - 6:23
**motivations** [1] - 209:2
**move** [2] - 26:23, 151:17
**Movement** [41] - 33:3, 33:14, 34:6, 50:9, 50:12, 50:19, 50:23, 51:4, 52:3, 62:18, 62:22, 63:12, 63:18, 63:23, 64:5, 64:6, 64:15, 64:19, 64:21, 65:3, 65:6, 77:7, 81:25, 82:9, 82:11, 82:20, 83:7, 93:13, 93:17, 93:25, 94:8, 94:14, 94:18, 99:18, 99:23, 100:12, 100:16, 100:19, 100:21, 100:25, 101:6
**moves** [3] - 135:23, 148:22, 164:24
**movies** [1] - 121:12
**moving** [2] - 135:4, 199:22
**MOVIT** [84] - 2:16, 3:6, 22:15, 24:11, 24:15, 26:2, 26:10, 26:24, 27:2, 27:4, 30:23, 31:1, 33:19, 33:21, 33:24, 41:13, 41:16, 41:21, 41:25, 49:1, 49:3, 51:14, 51:16, 51:19, 52:7, 52:10, 54:11, 54:14, 58:17, 58:20, 58:22, 58:24, 61:9, 61:11, 61:16, 61:19, 62:1, 62:11, 62:13, 63:11, 64:9, 64:11, 64:14, 66:6, 66:11, 66:16, 66:18, 66:21, 67:8, 67:19, 68:2, 68:10, 68:16, 68:21, 72:16, 72:18, 73:8, 73:11, 74:7, 74:9, 76:3, 76:11, 76:13, 76:16, 78:5, 78:10, 79:15, 79:18, 80:17, 80:18, 80:19, 80:21, 80:22, 80:25, 81:8, 81:17, 81:19, 81:22, 82:21, 82:24, 84:5, 87:4, 87:6, 89:23, 90:1, 90:3, 90:5, 91:2, 92:10, 93:2, 93:3, 93:9, 101:11, 101:12, 101:15, 101:24, 102:1, 102:6, 102:8, 146:14, 154:15, 158:7, 166:6, 220:13, 222:12, 222:18, 222:20, 226:21, 227:8, 227:11, 227:19, 227:23, 227:25, 228:1, 228:4
**MS** [233] - 2:13, 3:7, 3:8, 5:24, 6:6, 6:17, 7:15, 8:1, 8:14, 8:18, 9:19, 9:20, 10:16,

80:13, 81:9, 81:12, 82:5, 82:18, 87:9, 89:1, 89:21, 92:7
**Mozart** [2] - 115:23, 118:18
**MR** [144] - 3:5, 3:6, 4:9, 6:1, 9:23, 10:8, 10:13, 16:17, 18:16, 18:19, 18:22, 20:15, 20:19, 20:22, 22:13, 22:15, 22:18, 22:21, 24:7, 24:11, 24:15, 24:17, 24:23, 25:11, 25:15, 25:23, 26:2, 26:10, 26:24, 27:2, 27:4, 30:23, 31:1, 33:19, 33:21, 33:24, 41:13, 41:16, 41:21, 41:25, 49:1, 49:3, 51:14, 51:16, 51:19, 52:7, 52:10, 54:11, 54:14, 58:17, 58:20, 58:22, 58:24, 61:9, 61:11, 61:16, 61:19, 62:1, 62:11, 62:13, 63:11, 64:9, 64:11, 64:14, 66:6, 66:11, 66:16, 66:18, 66:21, 67:8, 67:19, 68:2, 68:10, 68:12, 68:16, 68:21, 69:18, 69:22, 71:8, 72:10, 72:16, 72:18, 73:8, 73:11, 74:7, 74:9, 76:3, 76:11, 76:13, 76:16, 78:5, 78:10, 79:15, 79:18, 80:17, 80:18, 80:19, 80:21, 80:22, 80:25, 81:8, 81:17, 81:19, 81:22, 82:21, 82:24, 84:5, 87:4, 87:6, 89:23, 90:1, 90:3, 90:5, 91:2, 92:10, 93:2, 93:3, 93:9, 101:11, 101:12, 101:15, 101:24, 102:1, 102:6, 102:8, 146:14, 154:15, 158:7, 166:6, 220:13, 222:12, 222:18, 222:20, 226:21, 227:8, 227:11, 227:19, 227:23, 227:25, 228:1, 228:4

11:4, 11:14, 11:25, 12:8, 12:10, 12:17, 12:25, 13:12, 13:13, 13:20, 14:23, 14:25, 15:10, 15:16, 15:19, 26:6, 26:8, 33:16, 66:9, 66:15, 66:17, 67:23, 68:24, 69:6, 69:16, 69:21, 69:24, 70:5, 70:14, 71:6, 71:11, 71:14, 71:17, 72:4, 72:6, 72:13, 72:21, 73:2, 73:6, 73:10, 73:16, 73:24, 74:2, 74:3, 80:16, 102:23, 102:24, 103:1, 103:6, 104:7, 105:2, 105:9, 105:12, 106:7, 107:9, 107:25, 108:7, 109:18, 110:5, 110:19, 110:20, 110:23, 111:2, 111:14, 111:18, 111:25, 112:4, 112:8, 112:11, 112:13, 112:17, 112:18, 112:24, 113:2, 113:11, 115:12, 117:16, 117:18, 117:22, 130:20, 130:23, 130:24, 130:25, 131:1, 135:10, 135:13, 135:16, 137:19, 137:20, 138:23, 140:25, 141:2, 141:16, 142:14, 142:20, 144:20, 144:23, 144:25, 145:9, 145:11, 146:6, 146:12, 146:17, 146:25, 147:3, 147:5, 151:8, 151:10, 151:16, 153:11, 153:13, 153:17, 153:21, 153:23, 153:24, 154:10, 154:12, 154:17, 154:20, 154:23, 155:9, 155:14, 155:20, 155:24, 156:2, 156:4, 156:17, 156:23, 157:1, 157:5, 157:8, 157:16, 157:19, 157:25, 158:11, 158:15, 158:18, 158:20, 159:15,

159:19, 160:21, 160:23, 160:24, 161:3, 161:17, 161:18, 166:5, 166:21, 167:21, 167:24, 168:5, 168:8, 168:10, 171:15, 171:18, 171:20, 171:22, 173:2, 173:9, 173:16, 173:18, 173:24, 174:7, 176:13, 177:22, 178:1, 179:3, 179:5, 180:1, 180:7, 182:25, 188:13, 189:1, 194:4, 194:8, 194:10, 196:24, 198:5, 199:11, 207:25, 215:5, 215:8, 216:14, 216:17, 217:11, 217:14, 217:19, 219:8, 219:9, 219:11, 219:13, 220:8, 220:15, 220:19, 220:21, 220:23, 221:6, 221:17, 222:17, 223:3, 223:15, 223:18, 223:21, 225:17, 226:5, 227:20, 227:24, 228:6, 228:9, 228:16, 228:25, 229:2, 229:8, 229:16, 229:19, 229:24, 230:17, 231:2, 231:10, 231:11
**MTV** [1] - 122:23
**multiple** [1] - 214:5
**Music** [8] - 39:7, 84:19, 84:20, 114:6, 115:14, 119:7, 119:15, 122:14
**music** [172] - 4:21, 5:16, 7:8, 16:21, 18:2, 18:3, 18:8, 19:7, 19:20, 20:24, 26:16, 26:18, 27:20, 27:23, 28:2, 37:17, 39:4, 41:1, 44:3, 45:15, 45:17, 53:11, 83:23, 95:6, 100:8, 105:24, 106:17, 106:18, 108:12, 113:13, 113:23, 114:3, 114:20, 115:6, 115:10, 115:11, 115:14,

115:15, 115:18, 115:19, 115:20, 115:21, 115:23, 115:24, 116:1, 116:5, 116:6, 116:8, 116:9, 116:11, 116:16, 116:22, 116:23, 116:25, 117:1, 117:9, 118:1, 119:7, 119:9, 120:1, 120:2, 120:3, 120:4, 120:6, 120:7, 120:8, 120:11, 120:14, 120:15, 120:16, 120:17, 120:19, 120:20, 120:21, 120:22, 120:24, 121:7, 121:8, 121:10, 121:11, 121:13, 121:14, 122:12, 122:15, 122:19, 122:20, 122:21, 122:22, 122:24, 122:25, 123:10, 123:14, 123:16, 123:24, 124:3, 124:7, 124:9, 124:10, 124:11, 124:18, 125:1, 125:3, 126:21, 127:24, 129:2, 130:8, 130:11, 130:12, 130:14, 132:18, 132:19, 134:8, 137:13, 137:16, 138:7, 138:20, 138:21, 139:6, 141:19, 145:22, 146:1, 146:3, 146:10, 147:8, 149:10, 151:22, 151:23, 151:24, 161:16, 161:19, 162:25, 163:22, 164:3, 168:25, 169:1, 170:16, 172:21, 174:20, 174:21, 185:1, 185:3, 192:20, 193:16, 198:11, 198:18, 198:19, 198:20, 198:21, 204:15, 204:18, 206:19, 208:6, 208:9, 208:13, 208:16, 208:17, 208:25, 209:3, 221:10
**musical** [80] - 5:13, 13:4, 45:2, 46:7, 46:9, 50:13, 50:15,

93:22, 115:11, 115:24, 116:3, 116:14, 116:15, 116:20, 116:21, 116:23, 117:1, 117:2, 117:7, 117:9, 117:13, 118:7, 118:8, 120:22, 122:3, 122:5, 123:3, 123:4, 123:18, 123:21, 124:5, 124:9, 124:23, 125:1, 125:9, 128:4, 128:5, 129:3, 130:2, 131:8, 132:14, 133:19, 133:25, 134:4, 134:9, 134:19, 135:23, 136:1, 139:13, 139:14, 143:13, 148:8, 149:18, 158:1, 158:4, 166:10, 166:18, 168:19, 170:5, 170:12, 170:15, 170:22, 171:11, 172:2, 172:9, 180:11, 185:2, 196:14, 197:2, 197:8, 197:10, 199:1, 208:17, 208:18, 208:19, 208:23, 214:5
**musician** [4] - 114:13, 114:18, 114:19, 172:21
**musicians** [3] - 126:2, 130:7, 130:9
**musicological** [2] - 172:25, 190:7
**musicologically** [1] - 104:3
**musicologist** [11] - 10:20, 109:6, 109:14, 117:9, 155:8, 155:15, 155:16, 155:20, 155:21, 159:23, 177:5
**musicologists** [4] - 116:18, 120:5, 120:13, 128:16
**Musicology** [2] - 114:24, 119:22
**musicology** [8] - 115:4, 115:5, 115:13, 115:14, 115:15, 116:5, 117:7, 182:22
**musics** [1] - 115:21

**must** [2] - 146:22, 162:18
**muting** [1] - 176:10
**MY** [1] - 232:15
**MySpace** [37] - 5:2, 21:13, 21:14, 21:16, 21:22, 23:4, 23:6, 23:9, 23:20, 23:21, 24:6, 24:24, 25:2, 25:4, 25:12, 25:16, 25:20, 35:22, 36:1, 36:5, 36:7, 36:10, 36:11, 36:14, 36:17, 36:20, 36:24, 37:3, 37:8, 37:12, 46:19, 46:22, 46:25, 47:6, 47:9, 92:3, 229:6

### N

**name** [15] - 62:7, 80:24, 84:18, 84:19, 113:7, 113:8, 127:17, 150:22, 188:18, 188:20, 220:25, 221:1, 223:22, 225:7
**named** [3] - 49:12, 62:15, 67:2
**namely** [1] - 176:24
**names** [8] - 34:20, 83:10, 91:15, 133:6, 133:13, 133:21, 150:13, 202:6
**narrowed** [1] - 201:25
**natural** [1] - 133:2
**nature** [6] - 5:7, 43:4, 105:24, 136:15, 145:22, 163:15
**NBA** [1] - 97:6
**NCH** [1] - 174:17
**necessarily** [5] - 98:24, 142:10, 143:12, 168:20, 168:25
**necessary** [4] - 6:10, 120:9, 209:5, 230:22
**need** [14] - 10:10, 10:11, 68:19, 68:20, 89:12, 112:15, 115:7, 118:11, 118:25, 126:20, 130:9, 155:11, 173:3, 212:17
**needed** [1] - 125:10
**needs** [5] - 26:7, 105:9, 166:6, 166:8, 228:3
**negligible** [1] - 150:18
**never** [21] - 14:13,

27:20, 27:23, 34:5, 35:3, 35:7, 35:10, 35:13, 46:9, 48:14, 64:16, 89:8, 95:10, 97:18, 98:7, 98:14, 98:17, 109:5, 111:8, 179:11

**nevertheless** [1] - 191:6

**new** [21] - 11:4, 11:11, 11:15, 11:22, 12:3, 12:7, 12:10, 14:19, 74:17, 101:20, 103:16, 103:20, 106:23, 108:16, 108:17, 110:5, 110:14, 177:15

**New** [1] - 8:13

**newspapers** [1] - 16:4

**next** [10] - 78:14, 113:1, 168:23, 183:21, 184:3, 184:8, 184:11, 217:5, 221:14, 223:17

**Nicholas** [23] - 161:11, 161:20, 162:2, 162:3, 162:23, 163:17, 200:3, 200:17, 203:9, 204:11, 211:21, 212:3, 212:10, 213:2, 213:6, 213:15, 216:6, 216:20, 217:24, 218:6, 218:18, 219:2, 219:23

**Nick** [1] - 161:16

**NO** [1] - 1:8

**Noise** [217] - 5:11, 5:14, 16:21, 18:1, 18:8, 18:15, 19:7, 19:20, 23:1, 25:2, 25:18, 25:20, 28:3, 28:10, 28:20, 28:21, 28:25, 29:2, 29:5, 29:8, 29:12, 29:15, 30:13, 31:9, 32:3, 32:16, 35:11, 35:14, 35:17, 35:20, 36:1, 36:5, 36:8, 37:21, 37:24, 38:10, 38:16, 38:23, 39:9, 40:2, 40:6, 40:11, 40:15, 40:22, 42:7, 43:11, 43:20, 44:14, 44:17, 44:21, 44:25, 45:3, 45:6, 46:3, 47:19, 47:23, 48:6, 48:12, 49:11, 49:16, 49:23,

49:25, 50:4, 50:12, 50:16, 50:19, 50:20, 51:1, 52:15, 52:20, 52:24, 53:7, 53:14, 56:9, 56:14, 57:9, 58:6, 58:10, 59:4, 60:23, 61:4, 61:14, 63:14, 63:19, 64:6, 65:10, 65:16, 75:10, 75:13, 75:21, 76:22, 77:2, 77:6, 77:8, 77:11, 77:15, 78:12, 78:23, 79:6, 79:9, 83:1, 83:5, 84:3, 85:24, 87:17, 87:20, 91:12, 92:25, 93:14, 93:18, 94:2, 110:10, 126:12, 129:4, 129:6, 131:12, 131:21, 131:24, 135:9, 142:16, 145:13, 147:21, 148:3, 148:24, 149:2, 149:12, 150:6, 150:10, 150:11, 150:25, 152:2, 152:17, 152:18, 153:10, 153:16, 161:5, 161:25, 162:9, 162:12, 163:18, 165:5, 165:11, 165:19, 165:24, 166:1, 167:13, 171:13, 172:3, 172:9, 172:12, 172:16, 175:9, 175:12, 175:24, 181:25, 186:16, 186:18, 187:1, 187:5, 187:11, 189:10, 189:20, 190:13, 191:13, 191:15, 192:12, 192:17, 193:7, 193:17, 193:21, 194:13, 194:21, 194:24, 195:3, 195:10, 195:14, 195:20, 196:4, 196:15, 197:3, 197:19, 198:6, 198:24, 199:3, 199:6, 199:14, 200:15, 201:21, 202:1, 205:9, 205:11, 205:12, 206:23, 208:6, 209:21, 209:25, 210:3, 210:9, 211:21, 211:23,

212:12, 213:3, 213:13, 213:18, 215:24, 216:7, 216:21, 217:20, 218:10, 218:13, 218:25, 219:16, 219:21

**Noise's** [2] - 150:10, 164:3

**nominated** [12] - 37:20, 37:21, 38:9, 38:10, 53:7, 53:15, 90:21, 90:25, 91:4, 91:18, 97:22, 97:23

**nomination** [4] - 91:12, 97:10, 98:5, 99:13

**nominations** [4] - 54:16, 90:23, 91:7, 97:11

**nominees** [1] - 56:6

**none** [3] - 89:11, 97:7, 126:6

**nonetheless** [1] - 7:11

**nonreligious** [1] - 97:1

**noon** [2] - 102:13, 231:1

**normal** [1] - 156:19

**notate** [2] - 195:23, 195:24

**notated** [5] - 120:3, 120:6, 124:9, 169:19, 198:11

**notation** [12] - 124:21, 124:22, 124:23, 125:1, 125:3, 125:8, 127:24, 208:17, 208:18, 208:23, 212:9, 212:17

**notations** [2] - 132:19, 208:19

**note** [74] - 104:21, 107:2, 131:9, 132:13, 134:2, 136:23, 137:21, 140:1, 141:9, 141:10, 141:19, 141:20, 148:20, 150:11, 150:14, 150:21, 153:2, 155:3, 155:4, 163:11, 164:4, 164:13, 164:23, 164:24, 165:3, 165:10, 165:19, 167:1, 167:11, 167:13, 167:18, 167:25, 168:2, 168:12, 168:14,

168:15, 169:10, 169:13, 169:16, 171:5, 171:6, 171:10, 171:11, 172:1, 182:12, 183:1, 189:4, 189:8, 189:18, 190:11, 190:23, 191:12, 193:19, 198:13, 200:20, 201:15, 204:1, 204:20, 205:15, 205:17, 206:5, 206:8, 210:14, 210:15, 210:16, 211:14, 211:17, 216:2, 218:11

**notebook** [1] - 17:8

**noted** [4] - 4:7, 74:5, 193:22, 214:4

**notes** [93] - 85:23, 86:2, 94:25, 98:6, 105:24, 107:1, 116:7, 118:1, 118:10, 118:12, 127:4, 129:17, 129:24, 129:25, 130:5, 133:16, 133:23, 134:10, 134:16, 134:18, 134:21, 134:22, 135:2, 135:20, 136:22, 137:2, 138:25, 141:8, 141:13, 141:17, 146:4, 147:15, 147:16, 147:19, 147:20, 148:21, 148:25, 149:17, 149:20, 150:18, 160:11, 161:4, 162:16, 163:13, 164:20, 165:14, 167:4, 169:19, 169:21, 177:17, 184:2, 184:4, 186:22, 187:21, 188:21, 193:20, 196:3, 197:12, 197:13, 197:18, 197:22, 197:25, 198:7, 198:10, 198:11, 198:13, 198:15, 198:16, 198:24, 199:4, 199:6, 199:16, 205:7, 210:17, 211:3, 211:6, 211:8, 212:6, 212:20, 213:2, 213:9, 216:23, 216:25,

168:15, 169:10, 169:13, 169:16, 171:5, 171:6,

217:5, 217:13, 217:14, 217:15, 217:25, 218:7, 218:23, 220:6

**NOTES** [1] - 232:15

**noteworthy** [2] - 137:10, 139:8

**nothing** [20] - 11:17, 11:18, 12:21, 25:23, 32:16, 48:17, 64:18, 65:14, 79:15, 92:6, 101:11, 102:6, 102:8, 104:8, 106:22, 178:2, 178:8, 181:7, 212:22, 220:8

**notice** [5] - 107:6, 107:10, 110:1, 142:25, 179:20

**noting** [1] - 211:6

**notwithstanding** [2] - 69:4, 186:10

**November** [2] - 20:11, 43:25

**nowhere** [1] - 181:19

**number** [12] - 8:5, 16:25, 25:7, 29:21, 34:19, 132:11, 132:12, 132:18, 143:25, 156:8, 186:17, 209:14

**Number** [1] - 156:9

**numbered** [2] - 131:10, 131:11

**numbering** [2] - 169:23, 169:25

**numbers** [9] - 7:20, 55:12, 132:5, 132:6, 180:25, 200:23, 201:8, 212:5, 216:9

**numerous** [1] - 50:3

---

**O**

---

**oath** [5] - 16:14, 41:9, 43:24, 69:13, 71:12

**object** [8] - 11:11, 64:9, 64:11, 74:4, 93:2, 135:10, 176:14, 217:11

**objected** [1] - 68:13

**objecting** [1] - 80:9

**objection** [37] - 5:25, 7:25, 18:18, 22:15, 33:16, 66:9, 68:17, 74:5, 81:17, 87:4, 89:23, 90:3, 91:2, 101:24, 104:5, 117:16, 117:17, 137:19, 140:25,

153:11, 153:17, 155:9, 156:13, 156:15, 160:23, 166:5, 168:5, 171:15, 171:20, 173:13, 173:22, 177:12, 177:14, 179:6, 179:17, 221:14, 225:15
**objections** [8] - 6:2, 6:7, 11:2, 103:9, 158:3, 166:11, 221:4, 221:5
**obligation** [2] - 109:25, 110:16
**oblige** [1] - 95:9
**obscure** [1] - 163:1
**observed** [3] - 150:8, 153:1, 166:23
**obsessed** [1] - 17:6
**obtain** [2] - 9:11, 9:12
**obtaining** [1] - 116:4
**obviated** [1] - 174:3
**obvious** [1] - 129:12
**obviously** [8] - 15:25, 72:7, 80:14, 100:7, 117:20, 120:9, 124:17, 157:20
**occur** [2] - 139:14, 155:17
**occurred** [3] - 68:22, 70:3, 70:4
**occurrence** [1] - 139:13
**occurs** [1] - 79:11
**octave** [1] - 137:3
**OF** [13] - 1:1, 1:2, 1:14, 2:2, 2:3, 2:13, 2:19, 232:2, 232:4, 232:6, 232:9, 232:13, 232:15
**offer** [21] - 5:20, 7:19, 8:15, 8:17, 20:15, 22:13, 24:7, 61:16, 70:12, 76:13, 110:21, 111:12, 111:17, 111:21, 112:16, 112:19, 112:22, 125:15, 173:11, 174:8, 176:14
**offered** [9] - 7:4, 9:9, 24:12, 70:24, 104:25, 149:1, 165:24, 177:11, 179:1
**offering** [1] - 5:9
**offers** [2] - 148:3, 176:23
**Office** [1] - 60:22

**OFFICIAL** [3] - 1:22, 232:8, 232:22
**official** [6] - 16:20, 18:3, 18:8, 18:14, 19:20, 20:24
**officials** [1] - 52:16
**often** [13] - 16:9, 45:6, 97:3, 118:2, 118:11, 123:16, 130:9, 130:12, 137:18, 137:21, 140:21, 144:14, 192:19
**Ojukwu** [30] - 13:24, 15:6, 45:13, 46:10, 46:12, 46:21, 46:25, 47:8, 48:14, 53:4, 57:8, 60:1, 60:7, 60:15, 76:22, 77:6, 77:12, 79:2, 79:5, 85:11, 85:18, 86:7, 86:22, 87:2, 95:2, 97:20, 97:25, 98:8, 98:14, 99:12
**Ojukwu's** [6] - 28:14, 36:24, 37:11, 46:19, 47:6, 86:16
**Old** [28] - 123:17, 123:18, 123:19, 123:21, 161:11, 161:16, 161:20, 162:1, 162:3, 162:23, 163:17, 200:3, 200:16, 203:8, 204:10, 211:20, 212:3, 212:10, 213:2, 213:6, 213:15, 216:5, 216:20, 217:24, 218:6, 218:18, 219:2, 219:23
**oldest** [3] - 31:18, 31:24, 32:9
**OLYMPIC** [1] - 2:17
**omit** [1] - 7:22
**omitting** [1] - 6:13
**ON** [3] - 2:3, 2:13, 2:19
**once** [15] - 73:7, 125:18, 127:11, 170:14, 170:15, 170:20, 184:17, 198:5, 210:2, 210:9, 215:2, 216:4, 222:6, 228:20
**one** [102] - 6:7, 6:18, 10:16, 15:24, 17:18, 20:8, 21:7, 22:9, 23:5, 39:9, 39:11, 47:25, 48:1, 50:15, 56:9, 57:5, 66:19,

66:22, 69:7, 69:25, 70:3, 70:23, 72:2, 80:5, 83:19, 87:17, 87:18, 87:19, 88:20, 100:6, 101:20, 106:3, 108:22, 111:3, 118:24, 119:22, 119:25, 124:24, 124:25, 127:13, 129:19, 130:8, 131:11, 132:13, 132:22, 134:4, 135:7, 137:17, 141:20, 143:2, 144:13, 145:21, 148:5, 148:7, 149:6, 150:24, 156:8, 157:2, 157:7, 164:13, 165:2, 165:14, 165:25, 167:1, 167:2, 175:21, 176:2, 176:8, 176:11, 177:18, 180:22, 186:17, 186:20, 188:4, 189:12, 189:19, 190:7, 190:13, 192:25, 193:16, 198:2, 200:6, 207:3, 208:10, 208:12, 209:2, 210:5, 214:1, 214:4, 214:16, 216:19, 216:20, 219:9, 223:17, 225:9, 226:9, 227:1, 228:1, 230:20
**one-by-one** [1] - 135:7
**one-sided** [3] - 69:7, 69:25, 157:7
**ones** [4] - 108:10, 188:5, 219:21, 221:21
**open** [2] - 115:21, 226:8
**opened** [5] - 69:21, 69:24, 70:4, 175:6
**opening** [2] - 167:3, 218:6
**opine** [1] - 117:21
**opined** [1] - 218:25
**opines** [4] - 160:11, 164:12, 166:22, 167:11
**opinion** [52] - 11:10, 14:19, 103:20, 105:20, 106:25, 107:8, 107:21, 107:22, 107:23,

108:16, 110:5, 110:7, 110:15, 111:19, 112:15, 112:21, 125:15, 126:14, 126:24, 129:2, 129:8, 129:12, 145:4, 145:6, 145:8, 146:8, 151:2, 151:11, 151:13, 153:4, 153:8, 153:15, 157:9, 157:24, 159:14, 161:2, 162:11, 164:2, 164:5, 167:17, 167:18, 170:4, 172:15, 174:21, 178:4, 179:23, 186:16, 211:2, 215:3, 215:10, 215:12
**opinions** [22] - 12:11, 13:1, 104:9, 104:15, 104:18, 105:13, 106:15, 108:2, 110:8, 110:13, 112:20, 158:5, 158:15, 159:1, 159:13, 160:6, 160:9, 171:9, 172:19, 172:23, 174:11, 176:20
**opponent** [1] - 72:3
**opportunity** [13] - 15:2, 98:16, 104:4, 105:17, 106:16, 106:22, 107:14, 107:16, 108:18, 109:20, 160:5, 163:25, 178:12
**opposed** [7] - 32:3, 70:20, 109:15, 164:10, 170:24, 175:4, 181:22
**opposite** [2] - 69:9, 210:24
**optimistic** [1] - 230:12
**option** [2] - 137:17
**options** [3] - 148:3, 149:1, 165:24
**orange** [1] - 111:10
**order** [14] - 69:6, 126:20, 126:23, 157:10, 168:21, 168:25, 169:1, 169:2, 169:4, 170:8, 184:19, 188:22, 228:20, 228:23
**orders** [1] - 5:1
**organ** [1] - 114:18

**organization** [1] - 82:1
**organizations** [2] - 39:17, 88:11
**original** [2] - 101:22, 207:14
**originality** [1] - 160:17
**originally** [3] - 42:2, 67:2, 224:3
**originates** [2] - 167:12, 168:15
**ornamental** [1] - 165:8
**ornaments** [1] - 164:20
**ostinato** [104] - 129:13, 129:15, 129:16, 129:20, 129:22, 129:23, 130:3, 130:6, 131:10, 131:16, 131:24, 132:3, 135:19, 135:20, 135:21, 136:1, 136:14, 136:15, 137:6, 137:12, 137:21, 138:6, 138:13, 140:11, 141:10, 147:22, 147:23, 148:4, 148:6, 148:13, 149:3, 149:13, 149:19, 150:3, 154:2, 154:25, 155:3, 155:4, 162:12, 162:15, 163:13, 163:15, 164:4, 164:7, 164:10, 164:21, 165:7, 167:11, 167:13, 167:18, 167:25, 168:2, 168:4, 168:12, 168:14, 168:15, 169:10, 169:13, 170:1, 170:2, 170:3, 170:12, 171:6, 171:11, 171:12, 172:1, 172:3, 185:4, 185:5, 186:17, 187:5, 188:7, 188:17, 189:9, 191:15, 192:4, 193:20, 195:21, 197:8, 209:21, 209:24, 210:3, 210:8, 210:14, 210:15, 210:23, 210:25, 211:14, 211:17, 211:22, 211:23, 212:1, 212:3, 214:19,

216:1, 216:2, 216:3, 218:22
**Ostinato** [61] - 169:16, 170:1, 170:5, 170:16, 170:19, 170:22, 170:24, 171:1, 171:2, 171:4, 181:8, 181:15, 181:16, 181:20, 181:24, 182:3, 182:12, 182:15, 183:3, 183:8, 183:11, 183:18, 183:21, 183:22, 184:8, 184:12, 184:15, 184:23, 184:24, 185:6, 185:9, 185:12, 185:15, 185:19, 186:1, 186:5, 186:10, 186:16, 186:25, 187:4, 191:13, 192:3, 192:4, 192:11, 192:13, 192:16, 192:22, 192:23, 195:16, 196:10, 210:13, 210:14, 211:6
**ostinatos** [42] - 136:3, 138:11, 138:13, 138:15, 139:8, 140:11, 140:15, 140:18, 140:23, 141:8, 141:12, 141:14, 141:18, 142:22, 143:7, 145:19, 145:23, 149:16, 150:1, 150:3, 162:22, 162:24, 165:14, 165:25, 166:23, 166:25, 169:23, 169:25, 181:12, 186:12, 187:12, 188:24, 196:5, 196:15, 197:3, 206:24, 210:20, 211:10, 213:13, 213:18, 217:1, 218:9
**OTHER** [1] - 2:13
**otherwise** [5] - 5:22, 10:7, 16:4, 156:6, 174:10
**ought** [3] - 14:18, 16:1, 80:14
**out-of-court** [1] - 67:6
**outcome** [1] - 126:7
**outlined** [5] - 174:11, 178:6, 211:4, 213:9,

216:23
**outside** [2] - 15:16, 96:25
**overall** [1] - 193:16
**overly** [1] - 230:11
**overnight** [1] - 4:18
**overrule** [4] - 18:18, 117:17, 221:5, 221:14
**overruled** [1] - 68:17
**owed** [1] - 99:19
**own** [14] - 17:6, 65:9, 93:20, 93:22, 93:24, 94:5, 94:7, 106:19, 117:3, 117:11, 118:1, 123:16, 192:6
**owned** [1] - 50:19
**owner** [1] - 50:23
**ownership** [2] - 50:12, 63:19
**owns** [1] - 93:18
**Oxford** [1] - 121:17

**P**

**p.m** [2] - 102:14, 231:17
**paced** [1] - 152:22
**Pacific** [1] - 113:20
**Pad** [4] - 174:16, 176:24
**Page** [1] - 225:15
**page** [127] - 9:25, 10:3, 10:10, 16:25, 17:4, 17:13, 17:16, 17:18, 18:1, 18:9, 18:10, 18:11, 19:1, 19:6, 19:12, 20:2, 20:8, 20:18, 20:19, 20:23, 21:14, 21:17, 21:22, 23:4, 23:6, 23:9, 23:12, 23:15, 23:20, 23:21, 24:1, 24:5, 24:6, 24:10, 24:19, 24:20, 24:21, 24:23, 24:24, 25:2, 25:5, 25:9, 25:11, 25:13, 25:16, 25:18, 25:21, 29:21, 29:24, 30:1, 30:18, 31:11, 31:19, 31:24, 32:9, 32:16, 32:20, 36:5, 36:8, 36:10, 36:11, 36:14, 36:17, 36:20, 36:24, 37:4, 37:8, 37:12, 41:13, 41:23, 42:1, 43:1, 43:6, 44:20, 44:23, 46:19, 46:22, 46:24, 46:25, 47:6, 47:9, 48:21, 48:22,

48:23, 51:12, 51:16, 53:21, 55:11, 55:12, 55:16, 58:16, 58:18, 62:8, 68:8, 83:8, 83:9, 89:1, 92:4, 99:6, 120:7, 124:24, 130:18, 131:2, 147:14, 154:6, 154:8, 154:10, 154:12, 154:14, 160:22, 161:15, 163:21, 164:12, 167:15, 169:8, 171:19, 190:6, 194:5, 196:21, 199:8, 208:4, 208:10, 220:24, 225:16
**pages** [7] - 5:2, 19:1, 19:25, 20:6, 21:19, 24:12, 32:2
**paid** [2] - 64:16, 94:19
**paper** [3] - 124:8, 127:21, 127:22
**Paragraph** [1] - 171:19
**paragraph** [8] - 66:24, 67:1, 67:9, 67:12, 74:18, 99:7, 101:18, 101:19
**parallel** [1] - 200:20
**parameters** [2] - 116:23, 214:6
**paraphrasing** [1] - 135:12
**pardon** [3] - 180:18, 189:9, 201:10
**Paris** [3] - 119:25, 120:1, 120:2
**PARK** [1] - 2:22
**part** [26] - 50:19, 72:22, 94:2, 96:4, 96:8, 100:6, 103:23, 105:1, 107:23, 109:2, 116:13, 124:15, 136:12, 154:19, 154:20, 159:22, 162:17, 163:14, 164:9, 165:7, 166:15, 167:8, 167:21, 185:20, 218:5
**participants** [1] - 88:17
**participate** [3] - 70:9, 73:17, 224:7
**participating** [1] - 69:17
**particular** [12] - 17:23, 40:2, 66:24, 81:13,

133:22, 145:15, 170:8, 172:10, 190:3, 214:1, 222:10, 222:11
**particularly** [8] - 91:5, 118:21, 124:10, 141:24, 141:25, 142:12, 143:10, 223:12
**parties** [3] - 130:18, 179:21, 227:15
**parts** [5] - 14:19, 47:19, 47:23, 47:25, 48:3
**party** [1] - 72:3
**paths** [1] - 27:7
**patient** [1] - 100:2
**pattern** [11] - 118:10, 127:12, 142:3, 169:21, 170:10, 170:11, 172:8, 193:22, 214:13
**pattern's** [1] - 171:3
**patterns** [2] - 171:10, 171:25
**Paul** [1] - 144:4
**Paul's** [1] - 144:3
**pause** [3] - 30:10, 80:24, 109:1
**pay** [1] - 226:10
**paying** [1] - 64:23
**payment** [1] - 63:23
**peer** [2] - 121:20, 121:21
**peered** [1] - 121:16
**peers** [3] - 121:22, 122:1
**pending** [1] - 180:19
**people** [11] - 7:8, 43:3, 43:16, 47:22, 88:2, 120:18, 130:2, 166:13, 209:14, 231:5, 231:7
**people's** [1] - 96:7
**per** [8] - 151:24, 151:25, 152:1, 152:3, 152:4, 152:8, 152:20, 158:4
**percent** [8] - 39:18, 78:22, 78:25, 79:2, 88:10, 88:13, 88:15, 203:23
**percentages** [1] - 84:13
**perfect** [2] - 200:4, 230:24
**perform** [6] - 26:15, 87:17, 88:1, 96:17, 96:25, 157:23
**performance** [10] -

40:5, 40:6, 42:6, 42:7, 43:11, 116:5, 125:2, 125:4, 129:3, 155:12
**performances** [7] - 39:16, 40:14, 40:21, 44:7, 95:22, 96:12, 96:18
**performed** [14] - 28:10, 35:19, 37:24, 38:13, 38:14, 38:16, 39:9, 39:20, 40:2, 40:11, 49:15, 49:18, 87:14, 87:20
**performer** [1] - 116:1
**performers** [3] - 26:20, 27:5, 49:11
**performing** [1] - 96:25
**performs** [2] - 49:10, 49:20
**perhaps** [6] - 70:16, 117:24, 123:10, 146:2, 168:7, 178:15
**period** [1] - 36:13
**periods** [2] - 36:4, 36:9
**permission** [8] - 54:11, 76:11, 76:13, 78:5, 94:7, 94:9, 130:20, 154:7
**permit** [1] - 5:5
**permitted** [4] - 104:16, 154:16, 156:3, 178:22
**perry** [3] - 221:2, 221:7, 222:15
**PERRY** [3] - 1:9, 2:13, 2:19
**Perry** [8] - 4:5, 57:14, 57:20, 60:11, 63:5, 65:21, 119:24, 224:16
**Perry's** [1] - 59:3
**persists** [1] - 151:13
**person** [8] - 16:4, 70:1, 80:8, 89:3, 107:2, 156:10, 182:24
**personally** [12] - 27:20, 35:3, 35:6, 35:10, 55:4, 60:21, 62:17, 86:2, 91:14, 91:21, 91:23, 96:2
**persuade** [1] - 170:23
**persuaded** [2] - 163:17, 164:2
**persuasive** [2] - 165:10, 209:16
**pervasive** [1] - 129:13
**petition** [4] - 94:18,

99:16, 99:19, 100:10
**PG** [2] - 3:14, 3:16
**PH** [1] - 1:24
**PhD** [2] - 114:24, 115:1
**Philadelphia** [1] - 48:12
**philosophy** [1] - 113:23
**phone** [2] - 57:22, 143:14
**phones** [1] - 40:7
**photocopies** [1] - 17:9
**photocopy** [1] - 21:8
**phrase** [14] - 71:1, 116:24, 138:3, 138:8, 140:25, 157:25, 172:10, 197:8, 197:10, 214:11, 214:12, 217:8, 217:12, 218:11
**pianist** [1] - 124:15
**piano** [23] - 14:2, 14:3, 15:1, 104:14, 108:25, 109:19, 111:6, 114:8, 114:15, 124:16, 127:4, 127:5, 134:21, 143:4, 183:24, 184:2, 204:16, 205:14, 206:2, 206:12
**pick** [4] - 79:21, 102:14, 221:21, 226:13
**picked** [2] - 222:4, 222:6
**piece** [18] - 117:1, 117:3, 118:19, 129:17, 129:19, 129:21, 137:24, 150:22, 169:2, 169:5, 170:1, 171:1, 198:10, 208:22, 214:8, 214:20
**pieces** [14] - 109:4, 116:16, 116:21, 117:12, 118:18, 118:21, 123:14, 123:23, 124:2, 124:17, 124:18, 142:4, 151:6, 214:18
**piercing** [1] - 143:17
**Pietroluongo** [1] - 8:12
**pin** [1] - 142:13
**pingy** [2] - 143:12, 207:1
**pitch** [46] - 127:5,

132:12, 133:14, 136:5, 136:8, 139:18, 139:20, 142:2, 150:20, 162:21, 163:8, 175:18, 182:3, 182:12, 182:15, 182:16, 182:17, 183:1, 183:5, 183:7, 183:8, 183:11, 183:12, 183:21, 184:8, 184:11, 186:4, 186:5, 187:8, 187:9, 188:2, 188:6, 188:17, 189:2, 189:8, 189:9, 189:12, 189:19, 190:13, 190:23, 203:16, 213:2
**pitches** [58] - 132:16, 133:17, 136:8, 136:9, 163:4, 164:17, 169:21, 170:6, 170:7, 170:20, 171:3, 181:20, 184:14, 184:16, 185:25, 186:9, 187:11, 187:22, 187:25, 188:11, 188:20, 188:22, 188:24, 188:25, 189:6, 189:15, 190:25, 191:9, 191:10, 191:14, 191:23, 191:24, 192:22, 192:24, 201:5, 201:14, 201:18, 201:20, 201:22, 201:25, 202:7, 211:7, 211:9, 211:10, 211:11, 212:21, 212:23, 214:13, 219:16, 219:17, 219:21, 219:22, 219:24, 220:1, 220:2
**place** [2] - 41:20, 176:5
**PLACE** [1] - 232:11
**placed** [3] - 136:13, 181:16, 192:19
**placement** [2] - 135:25, 214:9
**placements** [1] - 30:4
**places** [2] - 96:20, 140:20
**plainly** [3] - 187:2, 187:5, 192:12
**plaintiff** [8] - 10:19,

67:2, 71:7, 74:21, 75:5, 75:6, 108:8, 181:14
**PLAINTIFF** [3] - 1:7, 2:3, 3:3
**plaintiff's** [5] - 10:20, 13:21, 66:8, 226:24, 228:23
**plaintiffs** [12] - 4:19, 5:8, 6:12, 7:22, 26:14, 59:8, 59:9, 68:3, 77:18, 113:2, 125:16, 174:7
**plaintiffs'** [5] - 59:2, 125:14, 178:1, 179:6, 229:3
**plan** [5] - 10:24, 11:19, 101:22, 102:13, 106:12
**plane** [1] - 158:20
**planned** [2] - 174:13, 226:21
**planning** [1] - 104:13
**plans** [1] - 228:15
**play** [29] - 12:14, 12:15, 109:5, 111:6, 111:7, 114:12, 114:14, 114:15, 114:17, 114:18, 124:16, 142:16, 167:21, 175:16, 176:4, 183:24, 184:6, 204:15, 205:13, 206:4, 206:5, 209:8, 210:5, 213:4, 213:6, 214:7, 215:9, 215:21, 221:21
**played** [16] - 7:1, 12:22, 28:10, 114:15, 127:3, 142:19, 144:11, 146:3, 167:23, 170:8, 170:20, 175:24, 207:15, 207:19, 215:16, 221:23
**players** [1] - 144:6
**playing** [5] - 108:24, 144:10, 207:17, 211:7, 215:13
**playings** [4] - 136:23, 137:9, 140:15, 140:23
**plays** [8] - 25:8, 25:9, 25:20, 25:22, 107:2, 147:23, 154:2, 154:25
**pleasure** [2] - 148:8, 149:7

**pluck** [1] - 112:1
**point** [21] - 9:10, 14:15, 14:20, 71:9, 71:14, 71:17, 72:20, 72:25, 82:8, 98:10, 104:23, 109:25, 127:22, 133:11, 157:12, 175:25, 179:19, 183:16, 209:8, 222:8, 226:14
**pointed** [1] - 81:12
**points** [4] - 73:12, 73:13, 136:3, 141:11
**pop** [3] - 122:20, 144:14, 145:22
**popular** [26] - 5:13, 5:16, 116:10, 120:1, 120:8, 120:15, 120:16, 120:19, 120:22, 120:24, 121:7, 121:14, 122:12, 122:19, 122:21, 122:22, 122:24, 122:25, 123:16, 130:14, 138:20, 139:6, 151:23, 206:15, 206:19, 208:23
**Popular** [1] - 122:14
**portamentos** [1] - 195:14
**portion** [3] - 97:6, 104:23, 112:1
**position** [9] - 9:3, 14:17, 105:7, 119:14, 119:17, 119:24, 122:8, 178:2, 230:15
**possible** [3] - 137:16, 178:24, 230:1
**post** [2] - 25:2, 113:18
**post-high** [1] - 113:18
**posted** [2] - 46:21, 47:9
**posting** [1] - 93:14
**potentially** [2] - 7:9, 59:4
**power** [4] - 8:13, 172:8, 172:9
**practice** [3] - 47:5, 156:19, 190:8
**pre-2014** [2] - 81:15, 81:24
**precisely** [1] - 229:12
**precursor** [1] - 185:22
**predates** [1] - 123:19
**predating** [2] - 196:15, 197:2
**predicate** [1] - 71:20
**prefer** [2] - 110:24,

216:6
**preferable** [1] - 174:25
**prejudice** [1] - 177:19
**prejudicial** [2] - 69:14, 177:4
**preparation** [1] - 60:18
**prepare** [1] - 11:16
**prepared** [3] - 78:20, 112:16, 180:12
**presence** [2] - 15:16, 146:22
**present** [13] - 9:24, 15:21, 43:2, 43:15, 79:23, 81:4, 102:17, 112:25, 135:22, 173:7, 180:4, 191:13, 226:18
**presentation** [1] - 69:25
**presented** [1] - 69:7
**preserve** [2] - 74:3, 231:9
**PRESIDING** [1] - 1:4
**press** [13] - 4:10, 4:14, 15:25, 16:9, 54:16, 90:19, 90:24, 91:9, 97:15, 97:18, 98:13, 98:25, 99:7
**Press** [2] - 121:17, 121:18
**presses** [1] - 121:19
**presumably** [2] - 104:14, 155:15
**prevent** [2] - 215:17, 215:20
**preview** [1] - 103:8
**previously** [3] - 63:22, 177:14, 179:12
**primarily** [1] - 125:1
**primary** [1] - 128:12
**prime** [1] - 209:2
**printed** [3] - 52:21, 96:13, 124:18
**Prism** [2] - 221:8, 221:18
**Pro** [1] - 14:13
**probative** [1] - 9:10
**problem** [11] - 6:12, 11:21, 12:4, 12:9, 14:24, 24:18, 68:1, 106:21, 109:17, 148:4, 202:7
**problems** [4] - 6:22, 10:2, 10:14, 72:2
**procedural** [2] - 227:1
**procedurally** [1] - 156:1
**proceed** [3] - 16:12, 49:1, 51:14

**proceeding** [2] -
82:12, 179:24
**PROCEEDINGS** [2] -
1:14, 232:11
**proceedings** [2] -
68:22, 155:13
**Proceedings** [1] -
231:17
**process** [8] - 100:1,
173:16, 175:20,
222:7, 222:13,
222:23, 223:10,
224:21
**produce** [3] - 11:18,
110:18, 178:8
**produced** [9] - 8:22,
9:15, 12:22, 40:19,
55:6, 143:7, 143:10,
143:19, 156:2
**producer** [11] - 14:12,
86:8, 86:11, 86:12,
86:13, 95:6, 95:8,
95:9, 95:11, 224:1
**produces** [1] - 143:5
**productive** [1] -
231:15
**professional** [2] -
114:13, 114:19
**professor** [8] - 106:18,
119:7, 119:9,
119:12, 158:25,
174:21, 184:1, 220:9
**Professor** [3] -
176:21, 180:8,
219:14
**program** [18] - 13:25,
14:5, 14:6, 14:10,
107:4, 107:7, 109:5,
110:14, 110:18,
114:5, 115:4, 115:5,
115:9, 176:24,
177:6, 178:12
**programming** [1] -
13:23
**programs** [7] - 14:2,
103:12, 103:13,
174:16, 174:18,
175:7, 176:23
**prohibit** [1] - 179:15
**prohibited** [1] - 68:13
**prominent** [1] -
135:19
**promotion** [1] - 69:3
**proof** [12] - 110:21,
111:13, 111:17,
111:22, 112:16,
112:19, 112:20,
112:23, 173:11,
174:8, 176:15,
176:23

**proper** [3] - 5:3, 34:2,
66:10
**properly** [4] - 9:4,
69:6, 169:20, 178:14
**propose** [2] - 8:17,
111:18
**proposition** [1] - 12:4
**protocol** [1] - 96:3
**prove** [2] - 89:13,
92:16
**provide** [11] - 11:1,
33:2, 33:3, 33:8,
33:13, 107:15,
109:25, 176:17,
176:22, 225:21,
225:24
**provided** [13] - 35:16,
49:6, 51:23, 91:13,
159:1, 160:21,
161:10, 161:14,
163:22, 174:9,
175:8, 178:11,
208:10
**providing** [2] - 28:13,
64:12
**proving** [1] - 110:1
**proximity** [1] - 184:1
**public** [1] - 97:10
**publically** [1] - 91:8
**publication** [4] - 5:13,
8:6, 98:13, 120:15
**publications** [2] -
121:15, 208:21
**publicity** [1] - 226:10
**publicly** [1] - 7:7
**publish** [14] - 10:12,
20:19, 22:18, 25:11,
30:23, 52:8, 54:11,
61:11, 62:11, 76:11,
78:5, 130:20, 154:7,
160:24
**published** [8] - 98:11,
120:14, 120:25,
121:2, 121:3, 121:6,
121:24, 121:25
**publisher** [6] - 84:16,
85:6, 85:7, 85:12,
85:19, 86:17
**publisher's** [1] - 85:11
**publishers** [1] - 85:16
**publishing** [7] - 24:19,
84:21, 84:22, 84:23,
85:21, 130:23,
208:14
**pull** [9] - 84:5, 101:16,
103:11, 147:13,
154:6, 167:14,
210:11, 211:19,
216:18
**pulled** [1] - 103:21

**pulling** [1] - 148:21
**pun** [1] - 44:24
**purchased** [2] - 7:2,
28:6
**purely** [1] - 166:17
**purported** [2] - 68:4,
104:5
**purpose** [5] - 7:13,
104:12, 106:19,
133:3, 178:21
**purposes** [6] - 7:19,
11:8, 99:12, 104:18,
192:10, 196:3
**pursuant** [1] - 76:20
**pursue** [3] - 73:19,
74:11, 105:17
**pursued** [1] - 92:15
**pursuing** [2] - 72:16,
72:19
**pursuits** [1] - 34:2
**push** [1] - 231:8
**put** [31] - 86:1, 89:18,
100:8, 101:20,
104:1, 104:16,
107:10, 108:10,
110:25, 111:8,
118:14, 124:12,
125:3, 127:8,
127:20, 127:22,
133:21, 142:11,
155:24, 156:10,
156:17, 156:22,
159:2, 161:1, 169:6,
171:5, 180:3,
181:11, 186:23,
195:14, 209:7
**putting** [4] - 109:14,
117:11, 127:20,
157:1

## Q

**qualify** [1] - 185:19
**qualities** [2] - 149:11,
170:19
**quality** [6] - 135:24,
137:11, 142:9,
142:11, 143:17,
147:7
**quantified** [1] - 151:25
**quantify** [1] - 105:24
**quarter** [10] - 197:22,
197:25, 198:7,
198:10, 198:13,
198:15, 199:4,
199:6, 199:15
**questioning** [1] -
30:24
**questions** [12] - 41:6,
41:7, 67:21, 81:12,

173:2, 181:15,
210:12, 215:18,
215:21, 216:14,
228:7, 230:22
**quick** [1] - 81:12
**quickly** [2] - 91:10,
128:6
**quiet** [1] - 70:15
**quite** [5] - 6:16, 128:9,
151:4
**Quote** [1] - 41:18
**quote** [3] - 42:5, 42:7,
43:9

## R

**radio** [1] - 44:14
**raise** [3] - 10:16,
113:4, 228:7
**raising** [1] - 11:2
**Rap** [1] - 38:9
**rap** [10] - 26:18, 26:21,
39:21, 48:5, 49:15,
49:18, 86:10, 96:2,
195:2, 195:3
**Rap/Hip** [4] - 53:15,
55:17, 55:23, 56:6
**rapper** [1] - 224:1
**rappers** [1] - 126:3
**rapping** [3] - 172:12,
195:5, 206:16
**rather** [5] - 70:3,
110:2, 135:11,
200:19, 228:14
**Re** [15] - 202:9, 203:9,
203:10, 203:14,
204:1, 204:2, 204:5,
204:8, 204:13,
204:19, 205:6,
205:13, 205:20
**re** [1] - 203:7
**Re's** [1] - 202:14
**reach** [1] - 208:14
**reached** [2] - 57:16,
60:3
**reaching** [2] - 59:7,
59:9
**reaction** [4] - 58:5,
58:9, 59:6, 59:7
**read** [25] - 18:17,
48:18, 66:23, 67:4,
67:9, 67:19, 67:20,
70:16, 71:2, 72:11,
73:20, 74:18,
114:20, 121:23,
160:5, 196:20,
196:21, 208:16,
208:25, 209:3,
220:13, 220:18,
227:6, 227:12,

227:16
**readers** [2] - 208:20,
209:4
**reading** [5] - 67:10,
67:11, 71:2, 161:12,
220:14
**reads** [1] - 128:23
**Ready** [1] - 81:1
**ready** [5] - 9:21, 30:7,
41:23, 80:4, 180:3
**real** [5] - 71:9, 71:17,
83:23, 143:1, 143:8
**reality** [3] - 111:10,
182:8, 182:9
**realize** [1] - 158:7
**really** [15] - 13:22,
17:5, 22:25, 30:4,
72:25, 73:22,
104:22, 107:25,
146:22, 177:19,
184:7, 220:17,
220:19, 222:24,
230:9
**reason** [9] - 33:2,
55:9, 69:1, 70:13,
71:19, 80:9, 83:3,
133:24, 166:11
**reasonable** [2] - 9:11,
172:24
**reasoning** [1] - 177:24
**reasons** [9] - 4:25,
9:7, 16:10, 132:8,
134:14, 162:15,
177:10, 177:14,
208:12
**rebounding** [1] -
149:8
**rebut** [3] - 155:15,
157:14, 159:1
**rebuttal** [8] - 155:9,
155:20, 156:2,
156:22, 157:8,
159:4, 159:14, 187:1
**rebutted** [1] - 155:25
**rebutting** [1] - 158:14
**recalling** [1] - 213:10
**recap** [1] - 30:9
**receive** [7] - 94:1,
112:18, 113:24,
114:9, 115:1,
224:25, 227:17
**received** [13] - 20:17,
22:16, 24:9, 28:6,
64:5, 64:10, 64:20,
65:12, 65:16, 82:19,
83:6, 83:17, 224:25
**RECEIVED** [1] - 3:13
**receiving** [1] - 14:7
**recently** [1] - 119:24
**Recess** [2] - 80:3,

173:6
**recess** [9] - 15:14, 79:20, 80:1, 102:13, 103:2, 103:3, 111:21, 112:16, 173:3
**recognizable** [1] - 151:2
**recognize** [14] - 17:23, 18:23, 18:24, 19:3, 23:18, 24:5, 54:2, 161:4, 161:15, 161:19, 163:22, 169:9, 169:12, 207:17
**recognized** [1] - 151:20
**recollection** [7] - 71:3, 71:23, 72:10, 73:21, 74:19, 75:1, 224:8
**reconsideration** [1] - 9:17
**reconvene** [1] - 230:6
**record** [17] - 10:1, 10:10, 50:8, 74:4, 113:8, 144:1, 173:13, 177:23, 178:24, 196:3, 223:23, 224:1, 224:22, 225:1, 225:5, 225:9, 227:6
**Recorded** [3] - 55:17, 55:23, 56:6
**recorded** [12] - 49:7, 55:19, 83:23, 120:4, 120:6, 120:7, 122:15, 124:10, 124:11, 178:25, 205:12, 225:5
**recording** [35] - 11:12, 29:2, 29:15, 30:13, 47:17, 48:15, 49:11, 49:12, 49:25, 50:24, 51:3, 52:2, 63:19, 65:9, 93:18, 93:20, 93:24, 94:1, 108:17, 108:22, 109:3, 120:8, 136:2, 152:12, 154:3, 177:2, 178:23, 179:11, 182:9, 192:18, 198:12, 198:20, 207:16, 209:8, 223:1
**recordings** [23] - 11:7, 40:10, 40:11, 40:14, 94:2, 94:5, 94:7, 94:14, 103:14, 103:15, 108:9, 108:11, 108:13,

108:25, 109:1, 111:7, 126:18, 126:19, 173:22, 175:9, 177:3, 209:18, 225:12
**Records** [29] - 33:3, 33:14, 34:6, 50:9, 50:12, 50:19, 50:23, 51:4, 62:18, 62:24, 63:12, 63:18, 63:23, 64:16, 64:22, 65:6, 77:7, 81:25, 82:20, 83:7, 93:13, 93:17, 94:1, 94:8, 94:18, 99:18, 100:21, 100:25, 101:8
**records** [3] - 9:1, 9:4, 144:14
**recreate** [2] - 94:10, 94:13
**recross** [1] - 207:21
**RECROSS** [4] - 3:4, 92:9, 215:7, 219:12
**RECROSS-EXAMINATION** [3] - 92:9, 215:7, 219:12
**Redeemed** [19] - 5:11, 28:7, 29:9, 35:5, 35:8, 37:20, 38:8, 38:13, 38:19, 50:1, 50:6, 52:12, 52:17, 56:17, 65:13, 83:15, 85:20, 90:9, 94:25
**REDIRECT** [5] - 3:4, 81:7, 101:14, 207:24, 216:16
**redirect** [4] - 79:17, 79:21, 80:12, 80:14
**REDUCED** [1] - 232:12
**reduction** [1] - 171:1
**refer** [4] - 34:25, 83:12, 130:13, 202:8
**reference** [4] - 57:19, 143:5, 164:11, 199:8
**referenced** [1] - 76:4
**references** [1] - 199:24
**referencing** [2] - 41:13, 74:14
**referred** [4] - 95:23, 130:1, 139:11, 150:20
**referring** [9] - 54:19, 83:13, 126:18, 153:25, 155:2, 155:4, 174:2, 174:3, 180:19
**refers** [1] - 160:17
**reflect** [2] - 98:8,

175:25
**reflected** [3] - 128:1, 128:2, 213:14
**reflecting** [9] - 28:19, 29:1, 29:4, 29:11, 40:25, 44:3, 44:13, 44:16, 68:5
**refresh** [5] - 71:3, 71:23, 73:20, 74:19, 75:1
**refuted** [1] - 70:1
**refutes** [1] - 70:18
**regard** [9] - 48:15, 114:13, 117:4, 158:12, 165:9, 167:17, 170:4, 211:2
**regarding** [26] - 6:8, 7:5, 8:25, 21:14, 21:16, 21:21, 23:6, 23:8, 36:4, 48:15, 68:4, 79:5, 79:12, 81:15, 81:23, 87:9, 101:1, 107:1, 136:4, 159:6, 159:11, 174:10, 176:15, 176:22, 178:4, 210:13
**registration** [7] - 60:22, 61:1, 61:3, 61:14, 61:21, 61:24, 79:10
**regular** [1] - 27:7
**regularly** [4] - 17:7, 46:18, 46:24, 208:21
**Reilly** [3] - 49:13, 49:20, 56:21
**reinvent** [1] - 94:10
**relate** [5] - 116:7, 116:16, 116:22, 123:14, 124:17
**related** [13] - 6:19, 7:17, 8:20, 8:21, 9:1, 105:4, 110:9, 126:24, 153:9, 153:15, 157:6, 168:18, 174:8
**relates** [1] - 6:7
**relation** [1] - 106:8
**relationship** [8] - 133:16, 142:4, 142:5, 143:6, 165:25, 189:6, 211:12
**relationships** [2] - 133:19, 133:22
**relative** [7] - 145:19, 174:23, 181:16, 197:13, 197:16, 200:19, 209:17
**relatively** [7] - 5:16,

27:8, 145:16, 197:19, 206:14, 229:13, 229:14
**release** [15] - 49:23, 54:16, 74:17, 83:22, 83:25, 87:1, 90:9, 90:19, 90:25, 94:6, 94:12, 97:18, 98:13, 98:25, 99:8
**released** [11] - 50:6, 50:8, 50:12, 50:19, 83:7, 94:14, 126:13, 126:17, 141:23, 205:12
**releases** [1] - 97:15
**relevance** [2] - 67:6, 225:16
**relevant** [4] - 5:12, 5:17, 7:9, 9:9
**reliability** [2] - 106:20, 178:20
**reliable** [6] - 13:4, 104:15, 104:17, 105:12, 106:14, 174:22
**relied** [2] - 10:21, 68:3
**religious** [6] - 39:17, 88:11, 96:19, 96:21, 97:3, 97:5
**rely** [2] - 107:3, 107:7
**relying** [2] - 106:9, 110:15
**remainder** [1] - 7:21
**remaining** [1] - 229:5
**remains** [2] - 136:22, 169:5
**remarkably** [1] - 145:16
**remember** [20] - 41:12, 42:14, 80:11, 90:15, 140:19, 183:14, 219:14, 221:15, 221:20, 221:24, 222:5, 222:21, 222:24, 222:25, 223:2, 223:10, 223:13, 223:14, 224:12, 226:7
**remind** [2] - 16:13, 125:7
**reminder** [1] - 15:24
**remotely** [1] - 109:10
**remove** [5] - 8:19, 112:11, 112:14, 151:14, 211:8
**removed** [2] - 75:5, 75:8
**render** [3] - 126:14, 126:24, 165:14

**rendered** [1] - 153:4
**rendition** [1] - 216:4
**renditions** [1] - 216:8
**Renew** [8] - 85:11, 85:12, 85:19, 85:21, 86:18, 86:20, 86:24
**repeat** [6] - 140:21, 141:22, 146:24, 167:6, 184:16, 184:17
**repeated** [6] - 170:13, 170:14, 182:17, 183:3, 188:22, 199:2
**repeatedly** [2] - 34:21, 128:25
**repeating** [5] - 129:16, 129:18, 167:5, 218:10, 218:12
**repeats** [6] - 163:14, 192:23, 197:9, 197:10, 218:13, 218:15
**repetition** [14] - 136:9, 142:3, 146:5, 149:3, 149:12, 162:16, 169:21, 170:10, 170:11, 171:2, 172:8, 214:13, 214:18, 214:21
**repetitions** [8] - 129:22, 131:24, 132:2, 147:24, 147:25, 149:5, 211:8
**repetitive** [2] - 93:5, 206:18
**rephrase** [4] - 70:6, 81:18, 153:12, 168:6
**replied** [1] - 176:9
**report** [70] - 11:6, 11:10, 12:2, 12:6, 12:12, 13:11, 13:16, 13:17, 16:6, 103:5, 103:12, 103:23, 104:19, 104:24, 105:1, 105:6, 108:14, 108:16, 110:8, 110:16, 112:19, 121:24, 127:14, 128:1, 128:2, 128:10, 128:11, 129:9, 129:12, 130:17, 130:19, 131:3, 135:5, 135:11, 135:17, 151:20, 153:1, 153:25, 154:4, 154:5, 154:13, 154:19, 154:20, 156:2, 160:5, 161:12,

171:15, 171:16, 171:23, 172:20, 174:12, 176:17, 177:4, 178:6, 180:15, 180:16, 180:17, 180:18, 180:22, 181:7, 181:19, 187:1, 187:4, 193:3, 193:19, 195:2, 207:14, 208:4, 208:11

**report's** [1] - 154:21

**REPORTED** [1] - 232:10

**REPORTER** [11] - 1:22, 26:22, 26:25, 27:3, 41:24, 63:8, 115:7, 198:2, 232:2, 232:8, 232:22

**reporter** [1] - 80:10

**REPORTER'S** [1] - 1:14

**reports** [5] - 110:3, 176:22, 179:12, 180:10, 180:14

**represent** [2] - 51:6, 55:6

**representative** [2] - 8:25, 9:13

**represented** [2] - 65:5, 131:5

**request** [5] - 4:13, 24:11, 30:23, 68:6, 157:5

**require** [4] - 9:6, 33:15, 127:15, 214:5

**required** [4] - 33:8, 33:13, 70:5, 89:9

**requirement** [2] - 107:10, 176:16

**requires** [3] - 107:21, 120:18, 201:15

**research** [7] - 13:3, 122:2, 122:7, 122:9, 123:18, 126:5, 213:21

**researcher** [1] - 174:20

**researching** [1] - 9:1

**residual** [2] - 9:6, 70:23

**resolution** [1] - 100:3

**resolve** [1] - 102:22

**resource** [1] - 124:19

**respect** [20] - 7:21, 15:4, 69:12, 100:6, 108:7, 117:6, 133:10, 143:16, 145:14, 146:18,

150:9, 157:2, 170:8, 173:21, 179:14, 184:16, 203:5, 206:23, 215:3, 215:13

**respected** [2] - 95:8

**respectfully** [3] - 68:2, 68:6, 179:7

**respective** [2] - 48:8, 152:16

**respond** [1] - 179:19

**responded** [1] - 176:3

**response** [3] - 17:7, 58:11, 176:12

**rest** [1] - 6:2

**restart** [3] - 137:5, 148:5, 150:3

**resume** [1] - 74:7

**RESUMED** [1] - 16:16

**retained** [2] - 63:19, 177:6

**retainer** [1] - 60:7

**return** [3] - 102:13, 139:23, 226:12

**returns** [1] - 94:20

**revenues** [3] - 85:8, 85:14, 86:17

**review** [9] - 31:18, 31:24, 32:9, 32:20, 104:2, 121:16, 121:21, 126:16, 163:25

**reviewed** [3] - 121:20, 176:18, 177:9

**reviews** [1] - 31:14

**rhythm** [16] - 116:24, 118:9, 135:21, 138:9, 138:15, 139:12, 139:13, 142:2, 144:2, 144:5, 149:17, 194:20, 195:2, 197:21, 214:6, 214:12

**rhythmic** [3] - 118:10, 141:11, 197:19

**rhythmically** [2] - 141:10, 198:25

**rhythms** [2] - 141:8, 195:3

**rich** [1] - 120:18

**rights** [26] - 4:12, 50:13, 63:13, 64:5, 64:10, 64:20, 64:24, 64:25, 65:12, 65:16, 75:9, 75:12, 75:19, 77:2, 77:5, 77:7, 77:10, 77:11, 77:15, 78:12, 79:9, 83:1, 83:5, 83:6, 83:17, 99:23

**Ringo** [2] - 144:2, 144:4

**rise** [3] - 79:22, 81:3, 102:16

**River** [4] - 123:17, 123:18, 123:19, 123:21

**ROAD** [1] - 2:11

**Rock** [1] - 38:9

**role** [2] - 113:16, 214:7

**Roll** [27] - 161:11, 163:20, 163:23, 200:3, 200:16, 200:22, 202:20, 203:2, 203:6, 203:8, 203:21, 204:10, 211:20, 212:1, 212:10, 213:1, 213:4, 213:14, 216:5, 216:11, 216:20, 217:23, 217:25, 218:3, 218:17, 219:2, 219:23

**rolling** [1] - 218:14

**room** [1] - 39:22

**ROOM** [1] - 1:23

**roughly** [2] - 154:24, 229:10

**round** [1] - 217:9

**row** [5] - 131:11, 131:12, 131:13, 200:9, 206:12

**royalties** [8] - 63:23, 64:5, 94:19, 94:22, 94:23, 99:18, 100:7, 100:9

**rthmic** [1] - 197:14

**rule** [5] - 9:8, 80:7, 107:21, 111:22, 221:3

**Rule** [4] - 105:16, 107:20, 110:3, 179:15

**ruled** [1] - 8:22

**rules** [2] - 176:15, 179:14

**ruling** [1] - 174:9

**rulings** [1] - 6:2

**run** [2] - 10:2, 10:13

**running** [2] - 55:1, 158:24

**Ryan** [1] - 113:9

**S**

**Saint** [19] - 162:23, 163:17, 200:3, 200:16, 203:9,

204:10, 211:20, 212:3, 212:10, 213:2, 213:6, 213:15, 216:6, 216:20, 217:24, 218:6, 218:18, 219:2, 219:23

**sake** [1] - 209:2

**sale** [3] - 29:15, 30:13, 31:9

**sales** [17] - 5:6, 5:18, 6:9, 6:19, 6:21, 6:25, 7:5, 7:19, 7:20, 8:2, 8:3, 29:2, 29:5, 33:2, 40:25, 44:3, 100:21

**SAME** [1] - 232:12

**San** [1] - 114:6

**SANDBERG** [1] - 3:9

**Sandberg** [4] - 220:21, 220:24, 221:1, 222:13

**sang** [5] - 127:2, 131:23, 134:1, 141:15, 200:6

**Santa** [1] - 221:7

**Sarah** [1] - 223:7

**sat** [1] - 41:6

**save** [3] - 159:3, 192:23, 193:6

**saw** [3] - 32:9, 86:16, 98:23

**scale** [74] - 127:23, 127:25, 132:7, 132:9, 132:11, 132:13, 132:16, 132:17, 132:24, 133:3, 133:5, 133:18, 133:25, 134:3, 134:5, 134:6, 134:12, 134:13, 134:14, 134:17, 134:18, 134:24, 135:2, 135:22, 136:21, 136:22, 139:23, 139:24, 139:25, 140:2, 140:3, 140:16, 140:17, 140:19, 141:22, 142:3, 147:25, 148:16, 148:21, 150:19, 162:9, 163:2, 163:3, 163:4, 163:5, 170:6, 170:7, 171:4, 172:11, 181:2, 187:17, 187:19, 193:20, 201:7, 201:11, 204:4, 204:5, 204:7, 204:13, 205:2,

205:5, 205:7, 205:21, 205:22, 211:12, 211:15, 212:15, 212:20, 214:6, 218:4

**scales** [4] - 135:3, 169:20, 201:2, 211:3

**scenario** [1] - 64:18

**schedule** [2] - 226:23, 228:2

**Schedule** [1] - 227:3

**scheduling** [1] - 228:24

**scholars** [1] - 208:13

**scholarship** [2] - 120:9, 123:8

**school** [1] - 113:18

**scientific** [1] - 115:16

**screen** [7] - 81:11, 81:13, 84:6, 89:19, 181:16, 186:23, 201:12

**screenshot** [14] - 17:20, 17:23, 18:14, 19:3, 19:5, 19:17, 19:19, 20:8, 20:20, 20:24, 23:13, 23:16, 23:18, 24:3

**scrolled** [2] - 90:18, 90:20

**se** [1] - 158:4

**seat** [1] - 98:2

**seated** [4] - 79:24, 81:5, 102:18, 113:6

**second** [21] - 14:8, 17:10, 22:9, 31:11, 83:9, 83:14, 84:15, 131:12, 134:2, 134:24, 135:1, 142:17, 147:25, 159:16, 169:12, 170:2, 195:17, 204:13, 210:23, 211:1, 211:11

**secondarily** [1] - 209:5

**seconds** [4] - 154:1, 154:24, 155:1, 155:6

**section** [3] - 121:11, 129:20, 185:21

**sections** [6] - 129:20, 129:21, 169:1, 184:20, 185:15, 218:15

**see** [62] - 9:18, 10:6, 10:11, 13:7, 14:25, 17:13, 17:15, 19:15, 20:20, 21:8, 21:12, 22:22, 23:12, 29:24, 30:17, 31:14, 31:19,

45:21, 51:15, 51:17, 54:10, 55:16, 55:18, 55:21, 55:23, 55:24, 59:12, 61:20, 67:1, 84:6, 85:24, 86:7, 98:1, 99:8, 101:19, 109:18, 109:19, 109:21, 112:6, 124:16, 133:5, 133:22, 136:10, 137:12, 137:18, 137:19, 137:21, 137:22, 147:20, 149:4, 156:20, 158:21, 169:17, 170:3, 197:6, 198:18, 209:6, 230:19, 230:20, 230:25, 231:12
**seeing** [2] - 5:14, 84:7
**seek** [2] - 94:20, 99:19
**seeking** [1] - 63:23
**sees** [1] - 158:9
**selected** [2] - 222:15
**send** [5] - 27:23, 35:7, 35:13, 96:4, 156:7
**sending** [2] - 22:7, 28:1
**sense** [15] - 98:6, 112:19, 117:25, 120:24, 133:15, 134:9, 150:1, 166:10, 166:18, 170:1, 177:20, 209:1, 226:15, 228:10
**sensible** [1] - 230:5
**sent** [6] - 27:20, 35:3, 35:10, 54:5, 54:15, 121:22
**sentence** [4] - 72:17, 111:9, 154:13, 181:22
**separate** [7] - 7:16, 48:8, 144:6, 145:7, 179:11, 189:15, 193:11
**separately** [1] - 48:5
**September** [3] - 24:4, 25:13, 78:15
**sequence** [8] - 189:3, 192:8, 201:20, 201:23, 219:17, 219:18, 219:24, 220:1
**sequences** [1] - 203:16
**sequentially** [1] - 185:9
**serve** [4] - 33:14, 34:6,

82:9, 100:20
**served** [4] - 33:7, 33:11, 34:5, 82:5
**services** [1] - 51:22
**session** [1] - 225:13
**SET** [1] - 232:11
**set** [23] - 39:22, 44:10, 84:8, 87:10, 87:20, 87:24, 95:20, 95:22, 95:23, 95:25, 96:2, 96:4, 96:11, 118:9, 124:23, 125:1, 125:3, 130:15, 142:8, 201:15, 201:23, 211:10, 227:3
**settle** [1] - 230:14
**settled** [5] - 82:25, 83:3, 93:25, 100:13, 100:16
**settlement** [3] - 64:1, 65:17, 94:3
**seven** [5] - 132:16, 132:17, 132:21, 132:22, 204:5
**seventh** [1] - 189:13
**several** [7] - 78:17, 142:1, 162:15, 192:15, 208:12, 209:21, 209:25
**shadow** [1] - 212:15
**shall** [1] - 94:23
**shape** [2] - 108:15, 135:22
**share** [1] - 79:6
**shared** [4] - 128:6, 131:8, 137:14, 137:15
**sharing** [1] - 149:18
**shatter** [1] - 161:9
**sheet** [5] - 123:23, 124:18, 161:16, 161:19, 163:22
**shift** [4] - 125:11, 127:13, 129:11
**shifting** [1] - 200:13
**shifts** [1] - 141:20
**shipped** [1] - 4:18
**shoes** [1] - 156:15
**short** [8] - 45:9, 112:16, 197:8, 220:12, 220:17, 220:19, 229:13, 229:14
**shortcut** [2] - 156:19, 199:22
**Show** [1] - 38:6
**show** [25] - 5:6, 5:18, 7:4, 8:3, 10:11, 11:24, 14:18, 15:7,

25:21, 29:18, 31:8, 37:24, 38:14, 38:17, 61:9, 62:1, 66:6, 89:18, 99:13, 109:16, 112:19, 127:14, 160:21, 161:14, 163:21
**Showboat** [1] - 123:18
**showed** [6] - 61:6, 82:18, 83:8, 89:21, 199:23, 208:4
**showing** [2] - 7:20, 107:12
**shown** [3] - 175:7, 175:22, 180:12
**shows** [2] - 97:7, 185:1
**side** [20] - 11:2, 68:10, 68:19, 68:20, 68:22, 69:13, 80:20, 80:23, 105:16, 105:17, 107:15, 153:23, 155:10, 155:11, 155:13, 158:22, 158:25, 177:20, 226:24, 229:21
**Side** [1] - 74:6
**side's** [1] - 179:22
**sided** [3] - 69:7, 69:25, 157:7
**sides** [1] - 155:12
**Sight** [2] - 84:19
**sign** [1] - 51:3
**signals** [2] - 142:1, 148:12
**signature** [6] - 62:7, 62:14, 62:15, 76:8, 78:2, 78:14
**signed** [4] - 60:7, 69:20, 102:3, 227:17
**significance** [2] - 7:4, 7:8
**significant** [11] - 123:21, 138:1, 141:6, 141:18, 141:21, 142:1, 143:16, 183:16, 196:1, 218:20, 218:21
**signing** [2] - 62:17, 62:20
**SILBERBERG** [1] - 2:15
**similar** [32] - 68:6, 109:23, 127:3, 127:12, 129:4, 135:18, 135:20, 135:21, 135:24, 135:25, 136:2, 143:20, 145:4,

145:6, 145:8, 149:18, 150:4, 152:24, 153:5, 165:20, 172:11, 172:15, 180:21, 187:13, 211:23, 213:23, 214:3, 214:7, 214:11, 219:1, 219:3, 219:5
**similarities** [12] - 110:9, 135:5, 135:8, 174:23, 178:5, 178:18, 189:2, 192:16, 195:1, 207:12, 209:17, 210:16
**similarity** [21] - 58:12, 126:24, 127:14, 128:8, 129:13, 136:3, 136:5, 139:17, 141:5, 142:6, 145:14, 153:19, 159:7, 192:15, 196:7, 206:22, 207:6, 207:10, 209:12, 214:21
**similarly** [1] - 177:7
**simple** [9] - 8:4, 107:20, 116:20, 131:6, 131:14, 139:20, 139:22, 197:19, 206:14
**simpler** [1] - 190:5
**simplicity** [1] - 197:16
**simplistic** [1] - 197:13
**simply** [9] - 9:14, 10:3, 12:1, 12:11, 70:8, 82:17, 178:3, 179:23, 205:14
**simultaneously** [1] - 144:9
**sing** [39] - 124:14, 124:15, 131:19, 132:24, 133:2, 133:6, 133:7, 133:8, 133:12, 133:13, 137:4, 138:13, 149:13, 150:13, 150:15, 150:16, 161:9, 161:24, 162:1, 162:8, 167:4, 195:13, 200:9, 200:15, 200:16, 200:22, 205:24, 209:24, 210:8, 211:14, 211:17, 213:8, 215:24, 216:1, 216:4, 217:4, 219:20, 219:22

**singer** [1] - 205:22
**singers** [1] - 205:7
**singing** [13] - 131:22, 132:4, 132:6, 132:23, 138:15, 141:14, 148:11, 162:3, 167:2, 200:13, 202:17, 202:18, 206:16
**Singing** [1] - 167:7
**singing)** [1] - 164:25
**single** [3] - 141:20, 214:4, 214:16
**sit** [6] - 11:21, 140:12, 142:24, 174:6, 205:13, 206:2
**sits** [1] - 137:9
**situation** [4] - 14:4, 159:8, 223:6, 223:14
**six** [22] - 27:10, 35:25, 36:16, 36:19, 36:23, 37:6, 37:10, 136:3, 141:12, 147:15, 147:17, 160:11, 161:4, 162:16, 163:13, 212:6, 213:8, 216:23, 217:25, 218:4, 218:23, 220:3
**sixth** [3] - 148:11, 148:15, 189:3
**skeptical** [1] - 13:16
**Skype** [1] - 228:19
**slide** [1] - 181:11
**slides** [2] - 195:6, 195:9
**sliding** [4] - 164:17, 164:23, 164:24, 165:10
**slow** [4] - 115:8, 125:5, 188:19, 198:4
**slower** [2] - 152:18, 152:19
**smaller** [1] - 17:8
**smallest** [1] - 134:19
**smart** [1] - 157:22
**Sniper** [1] - 121:12
**SNYDER** [1] - 1:4
**society** [1] - 116:2
**software** [28] - 10:25, 13:2, 13:25, 14:4, 15:4, 15:7, 103:20, 104:10, 106:19, 106:22, 106:23, 107:4, 107:7, 107:16, 109:21, 110:14, 174:15, 174:17, 174:18, 174:21, 175:10, 175:18, 176:1,

176:8, 178:12, 178:15, 178:17, 178:21
**SOKOL** [1] - 2:5
**sold** [2] - 32:3, 32:17
**sole** [1] - 50:23
**Solfege** [15] - 202:10, 202:11, 202:17, 202:18, 202:23, 203:6, 203:16, 204:5, 205:3, 205:5, 205:7, 205:22, 205:23, 216:9
**solidified** [1] - 103:9
**solo** [1] - 144:5
**solutions** [1] - 148:4
**someone** [9] - 13:18, 43:20, 47:8, 81:20, 107:2, 118:1, 120:8, 128:22, 226:10
**sometimes** [8] - 96:21, 124:14, 125:10, 142:9, 143:24, 150:20, 190:16
**somewhat** [2] - 89:21, 231:4
**somewhere** [2] - 134:12, 134:13
**Song** [4] - 53:15, 55:17, 55:23, 56:6
**song** [63] - 9:2, 18:1, 19:7, 23:2, 31:8, 36:7, 37:21, 38:9, 45:21, 48:16, 49:7, 52:15, 55:20, 55:24, 56:11, 56:14, 57:14, 57:18, 57:19, 59:3, 59:4, 64:25, 87:25, 90:21, 91:6, 91:18, 123:17, 123:19, 123:22, 126:4, 131:17, 133:7, 145:13, 149:21, 161:22, 162:20, 171:12, 172:2, 175:11, 175:16, 175:18, 176:8, 176:11, 184:21, 190:1, 190:7, 208:23, 209:1, 210:5, 213:8, 218:1, 218:5, 218:15, 222:2, 222:10, 222:11, 222:23, 223:12, 224:7, 224:9, 224:15, 224:17
**songs** [50] - 7:5, 39:19, 50:3, 56:2,

83:14, 83:16, 83:18, 87:14, 94:10, 96:1, 108:3, 109:22, 128:15, 135:18, 142:15, 143:20, 145:4, 147:7, 147:11, 153:4, 161:11, 174:23, 175:2, 175:3, 176:4, 193:11, 196:8, 202:6, 206:15, 212:6, 212:18, 212:19, 212:25, 213:22, 215:9, 215:13, 215:15, 215:17, 215:21, 217:1, 217:5, 217:6, 217:9, 217:14, 217:15, 218:10, 218:24, 219:4
**songwriter** [3] - 55:20, 99:12, 224:1
**songwriting** [1] - 222:7
**sooner** [1] - 228:13
**sorry** [33] - 15:23, 26:22, 30:2, 30:6, 32:6, 40:13, 51:2, 55:15, 58:7, 59:23, 63:8, 77:19, 77:21, 90:1, 113:25, 115:7, 115:9, 140:24, 144:3, 144:22, 150:12, 150:16, 151:10, 161:18, 168:6, 168:12, 188:14, 191:1, 191:5, 202:4, 202:5, 225:5
**sort** [10] - 4:12, 11:7, 40:18, 90:24, 116:25, 127:19, 134:10, 134:11, 144:13, 148:15
**sought** [2] - 89:15, 99:18
**sound** [52] - 11:7, 11:12, 50:24, 63:19, 65:9, 93:18, 93:20, 93:24, 94:1, 94:2, 94:5, 103:14, 103:15, 108:9, 108:10, 108:13, 108:21, 108:25, 109:1, 109:2, 109:23, 111:7, 115:16, 124:9, 124:12, 124:13, 126:18, 126:19, 135:25, 142:9,

142:12, 143:2, 143:3, 143:5, 143:12, 143:13, 143:14, 143:15, 143:24, 165:2, 167:6, 168:3, 173:21, 175:8, 177:2, 179:11, 183:15, 192:18, 209:17, 219:18
**sounded** [1] - 127:3
**soundings** [1] - 140:16
**sounds** [14] - 8:20, 14:6, 133:9, 142:25, 143:7, 143:9, 143:10, 143:13, 143:19, 144:15, 144:16, 144:17, 200:21
**source** [2] - 29:4, 29:12
**space** [3] - 134:20, 135:23, 136:1
**spaced** [4] - 196:3, 196:11, 197:13, 197:18
**spaces** [1] - 125:1
**speaker** [2] - 80:13, 80:15
**speaking** [3] - 59:14, 120:22, 189:5
**specific** [8] - 34:4, 116:23, 120:3, 120:12, 170:12, 170:21, 199:1, 228:23
**specifically** [15] - 6:13, 32:3, 42:21, 43:20, 58:16, 68:25, 104:11, 115:5, 116:3, 121:6, 126:10, 178:21, 194:5, 195:5, 195:10
**specificity** [1] - 170:10
**specifics** [1] - 36:15
**speculate** [1] - 184:23
**speculation** [1] - 16:10
**speed** [1] - 151:24
**spell** [3] - 113:7, 150:11, 150:12
**spelled** [1] - 205:19
**spent** [1] - 122:17
**split** [3] - 79:10, 84:6, 86:17
**spot** [1] - 141:9
**squarely** [1] - 138:19
**squishy** [1] - 142:8
**SS** [1] - 232:5

**ST** [1] - 2:8
**St** [6] - 119:4, 161:11, 161:16, 161:20, 162:2, 162:3
**stage** [4] - 120:21, 123:20, 156:25, 222:2
**stake** [1] - 126:7
**stand** [10] - 108:19, 110:3, 112:6, 112:7, 112:9, 151:15, 155:23, 159:12, 180:3, 226:15
**standard** [2] - 117:8, 145:5
**standards** [1] - 146:19
**stands** [1] - 39:7
**Star** [4] - 82:4, 89:20, 90:12
**star** [4] - 54:6, 54:18, 90:7
**Star's** [1] - 55:2
**star@flame314.com** [3] - 53:25, 54:22, 90:6
**starflame314.com** [1] - 54:25
**start** [20] - 14:18, 15:24, 24:19, 68:23, 73:18, 103:7, 113:17, 118:19, 133:14, 150:22, 159:15, 167:8, 176:6, 180:10, 185:22, 216:11, 220:24, 229:20, 229:24, 230:7
**started** [5] - 63:5, 222:5, 222:6, 222:21, 222:25
**starting** [8] - 113:18, 133:11, 148:13, 150:21, 159:20, 220:24, 223:1
**starts** [6] - 22:23, 118:20, 136:21, 154:13, 185:3, 218:14
**state** [12] - 4:6, 40:13, 67:15, 67:22, 68:5, 80:24, 95:5, 113:7, 171:23, 171:25, 177:23, 223:22
**STATE** [1] - 232:6
**statement** [9] - 66:1, 67:6, 70:1, 70:8, 70:11, 70:17, 70:18, 95:17, 158:11
**statements** [5] - 67:21, 67:22, 68:4,

68:14, 70:24
**STATES** [4] - 1:1, 1:1, 1:4, 232:9
**states** [5] - 61:20, 69:8, 99:6, 221:2, 221:7
**States** [2] - 116:12, 120:23
**stating** [2] - 82:8, 220:25
**station** [2] - 44:14, 44:17
**status** [1] - 8:7
**stay** [2] - 157:23, 230:23
**stays** [1] - 140:1
**Stellar** [5] - 37:14, 37:17, 37:22, 38:3, 91:6
**STENOGRAPHIC** [1] - 232:15
**STENOGRAPHICAL LY** [1] - 232:10
**step** [24] - 12:19, 13:6, 102:10, 134:24, 135:1, 140:9, 140:10, 140:19, 140:23, 141:8, 150:14, 150:24, 150:25, 151:5, 151:6, 174:5, 175:21, 201:7, 205:21, 206:9, 214:14
**step-by-step** [2] - 12:19, 13:6
**steps** [8] - 134:19, 136:23, 140:7, 140:8, 187:17, 204:4, 212:22
**stick** [2] - 16:11, 203:1
**still** [17] - 14:18, 16:14, 65:9, 70:22, 77:17, 92:23, 93:18, 96:19, 97:3, 100:6, 170:13, 183:5, 198:24, 203:5, 207:17, 229:22
**stipulated** [1] - 227:16
**stipulations** [4] - 227:2, 227:16, 227:17, 229:1
**stop** [3] - 156:6, 217:9, 217:12
**strategies** [2] - 149:18, 150:2
**strategy** [1] - 14:15
**STREET** [1] - 1:23
**strenuous** [1] - 104:5
**stretch** [1] - 192:19

stricken [4] - 141:2, 141:4, 166:6, 166:9
strike [9] - 55:3, 104:22, 146:11, 146:25, 147:4, 165:17, 168:8, 168:13, 172:18
striking [5] - 140:22, 141:3, 141:5, 144:17, 144:21
strikingly [1] - 145:6
strong [3] - 141:11, 141:24, 158:5
stronger [1] - 118:23
strongest [1] - 141:10
structural [2] - 164:19, 165:6
structurally [1] - 214:7
structure [5] - 129:18, 162:17, 165:7, 197:11, 209:9
struggling [3] - 30:4, 42:19, 42:24
student [1] - 128:22
students [5] - 120:10, 122:10, 123:6, 124:4, 178:18
studied [2] - 113:23, 114:6
studies [2] - 116:3, 116:13
studio [2] - 225:1, 225:3, 225:5, 225:6, 225:9
study [18] - 113:22, 115:6, 115:10, 115:17, 115:21, 115:23, 116:6, 116:13, 116:21, 117:1, 120:3, 120:10, 120:19, 120:20, 120:21, 120:22, 123:3
stuff [3] - 8:16, 12:7, 111:24
stumbling [1] - 42:14
subfield [1] - 116:13
subject [6] - 13:19, 22:23, 22:25, 157:13, 207:21, 230:6
submit [4] - 9:5, 68:3, 179:7, 179:12
submitted [4] - 65:25, 98:1, 107:12, 227:7
subpoena [9] - 8:13, 33:7, 33:12, 33:14, 34:5, 34:6, 82:6, 82:9, 100:21
substance [1] - 74:16

substantial [4] - 135:8, 141:4, 207:6, 207:10
substantially [13] - 129:4, 135:18, 143:20, 145:4, 145:8, 153:5, 159:6, 165:20, 172:15, 213:23, 214:3, 219:1, 219:3
substantive [1] - 163:6
subtle [1] - 153:8
succession [1] - 175:16
sudden [1] - 222:23
sue [1] - 64:17
sued [5] - 27:10, 34:22, 94:17, 99:22, 100:9
suggest [4] - 71:21, 143:1, 143:8, 144:11
suggested [2] - 177:8, 178:25
suggesting [2] - 117:24, 148:15
suggestion [2] - 5:3, 177:1
suggests [3] - 73:2, 144:10, 172:7
suing [3] - 64:6, 64:25, 99:25
suit [4] - 70:21, 72:15, 72:19, 73:1
SUITE [2] - 2:11, 2:23
suite [1] - 174:17
sum [1] - 74:15
summaries [1] - 5:21
summarize [3] - 129:2, 152:25, 176:19
summary [4] - 7:15, 8:21, 8:23, 79:8
super [1] - 139:20
support [4] - 105:7, 120:18, 176:19, 214:10
supports [1] - 112:21
suppose [1] - 230:1
supposed [1] - 102:3
supposedly [1] - 103:14
suspect [1] - 15:13
sustain [5] - 68:17, 153:18, 177:13, 179:16, 225:15
sustained [7] - 89:24, 90:4, 101:25, 141:1, 153:12, 158:3, 177:12

sustaining [1] - 179:7
swing [1] - 217:21
switched [1] - 114:16
sworn [4] - 65:25, 68:7, 69:12, 113:5
syllable [5] - 205:3, 205:5, 205:18, 205:19
syllables [6] - 202:10, 202:11, 202:19, 202:23, 216:9
symbol [2] - 203:6, 203:16
symbols [1] - 128:9
syncopated [2] - 196:4, 206:18
syncopating [1] - 139:4
syncopation [6] - 138:18, 138:20, 138:24, 138:25, 139:3, 139:7
synonymous [1] - 86:15
synthesized [2] - 143:9, 207:1
synthesizer [1] - 143:9
system [2] - 134:4, 134:20

## T

tab [5] - 17:10, 21:5, 21:7, 23:11, 53:19
table [1] - 164:18
tables [1] - 208:21
tambor [14] - 135:24, 142:6, 142:7, 142:8, 142:22, 143:2, 143:3, 143:4, 143:20, 206:21, 206:22, 207:1, 207:3, 214:10
tap [1] - 152:10
tape [3] - 40:10, 42:15, 42:18
tapes [4] - 40:5, 40:7, 42:6, 43:5
taping [1] - 43:10
taught [4] - 119:19, 119:21, 119:23, 123:2
teach [10] - 122:6, 122:9, 122:11, 122:13, 122:18, 122:21, 122:25, 123:12, 123:16
teaching [6] - 13:3, 120:1, 131:16,

197:16, 209:7, 213:21
team [1] - 55:1
technical [2] - 172:23, 221:19
telephone [1] - 230:21
televised [2] - 38:20, 38:23
television [3] - 44:17, 122:23
tempo [11] - 151:17, 151:24, 152:7, 152:12, 152:14, 152:15, 152:24, 153:2, 175:11, 175:25, 194:23
ten [1] - 79:20
tendencies [1] - 134:1
tendency [1] - 148:18
tends [1] - 208:23
tens [1] - 88:17
tension [1] - 141:22
tenured [1] - 119:12
term [3] - 117:4, 117:7, 145:9
terminology [2] - 163:1, 201:4
terms [31] - 45:21, 49:5, 49:6, 65:12, 68:3, 74:17, 74:22, 86:15, 95:5, 96:8, 100:4, 101:2, 102:20, 116:20, 127:19, 130:7, 130:15, 131:6, 139:16, 139:20, 149:17, 170:10, 182:7, 190:3, 192:7, 203:16, 220:1, 228:15, 228:24, 229:2
test [1] - 179:21
tested [4] - 14:1, 14:11, 103:25, 109:20
testier [1] - 156:16
testified [37] - 4:22, 18:20, 21:14, 21:16, 21:19, 24:12, 29:14, 30:12, 33:1, 37:14, 38:5, 53:7, 67:14, 68:25, 71:11, 71:18, 71:22, 71:24, 73:13, 74:10, 93:12, 95:21, 96:14, 97:9, 97:11, 99:15, 110:8, 138:4, 147:16, 153:21, 155:16, 157:9, 174:12, 174:15, 185:18, 217:20

testifies [6] - 8:25, 9:13, 155:21, 156:10, 159:8
testify [14] - 70:8, 102:20, 104:9, 104:19, 105:20, 106:13, 108:1, 112:6, 155:19, 159:10, 159:13, 173:10, 178:16, 228:3
testifying [1] - 158:25
testimony [48] - 4:11, 5:22, 6:7, 6:8, 6:11, 6:13, 6:19, 6:24, 7:16, 7:18, 7:22, 8:2, 9:3, 10:24, 12:25, 26:3, 43:6, 48:19, 64:12, 68:18, 69:11, 74:15, 95:10, 95:12, 95:19, 98:21, 104:16, 106:11, 110:25, 111:19, 111:24, 141:2, 155:24, 159:4, 174:8, 176:16, 178:6, 179:19, 179:24, 189:19, 190:15, 191:11, 192:2, 194:5, 195:7, 199:20, 199:25, 210:22
text [4] - 57:23
textual [1] - 181:21
texture [15] - 136:10, 136:13, 143:22, 143:23, 143:24, 144:7, 144:10, 144:13, 144:18, 145:12, 146:9, 147:6, 147:8, 214:10
textures [1] - 145:16
THAN [1] - 2:13
THAT [3] - 232:10, 232:12, 232:14
THE [288] - 2:19, 3:3, 4:3, 4:8, 4:16, 6:4, 6:14, 6:22, 7:24, 8:11, 8:15, 9:16, 9:21, 10:5, 10:9, 10:15, 10:18, 11:21, 12:1, 12:9, 12:13, 12:23, 13:10, 13:15, 14:17, 14:24, 15:9, 15:12, 15:18, 15:20, 15:22, 16:13, 16:15, 18:18, 18:21, 20:17, 20:21, 22:16, 22:20, 24:9, 24:14, 24:16, 24:21, 25:14, 25:25,

26:1, 26:5, 26:7,
26:22, 26:25, 27:3,
30:25, 33:18, 33:20,
33:23, 41:15, 41:19,
41:24, 49:2, 51:15,
51:17, 52:9, 54:13,
58:19, 58:21, 58:23,
61:10, 61:18, 62:12,
63:8, 63:9, 63:10,
64:13, 66:13, 66:19,
67:4, 67:25, 68:9,
68:19, 68:20, 68:23,
69:5, 69:15, 69:20,
70:10, 70:15, 71:9,
71:13, 71:15, 72:2,
72:5, 72:7, 72:11,
72:14, 72:19, 72:23,
73:5, 73:12, 73:18,
74:1, 74:5, 74:8,
76:1, 76:2, 76:12,
76:15, 78:7, 78:8,
78:9, 79:16, 79:19,
79:22, 79:24, 80:2,
80:4, 80:5, 80:6,
80:7, 80:20, 80:23,
81:1, 81:2, 81:3,
81:5, 81:6, 81:18,
81:21, 82:23, 87:5,
89:24, 90:4, 91:1,
92:7, 93:5, 93:7,
101:13, 101:25,
102:7, 102:9,
102:11, 102:12,
102:16, 102:18,
102:19, 102:25,
103:2, 103:4, 104:6,
104:23, 105:5,
105:11, 105:14,
106:21, 107:19,
108:5, 109:12,
109:24, 110:11,
110:22, 111:11,
111:16, 111:20,
112:3, 112:5, 112:9,
112:12, 112:14,
112:22, 113:1,
113:4, 113:6, 113:9,
115:7, 115:9,
117:17, 117:20,
130:22, 135:15,
138:17, 140:24,
141:1, 141:3, 141:6,
142:18, 144:22,
144:24, 145:3,
145:10, 146:4,
146:13, 146:16,
146:20, 146:24,
147:2, 147:4, 151:9,
151:12, 153:12,
153:18, 153:22,
154:9, 154:11,

154:19, 154:21,
155:11, 155:18,
155:22, 156:3,
156:5, 156:21,
156:25, 157:4,
157:11, 157:17,
157:22, 158:3,
158:9, 158:13,
158:17, 159:17,
160:25, 166:8,
168:6, 168:9,
171:17, 171:21,
173:3, 173:8,
173:14, 173:23,
174:1, 176:12,
177:13, 177:25,
179:2, 179:4,
179:16, 180:2,
180:5, 182:23,
188:12, 188:19,
188:20, 194:7,
194:9, 196:23,
198:2, 198:4,
199:10, 207:23,
215:6, 216:15,
217:12, 217:15,
219:10, 220:9,
220:14, 220:17,
220:20, 221:5,
221:14, 221:15,
222:19, 222:21,
223:17, 223:19,
225:15, 226:6,
226:19, 227:6,
227:10, 227:14,
228:5, 228:8,
228:13, 229:7,
229:15, 229:17,
230:2, 230:18,
231:3, 231:12,
231:16, 232:8,
232:9, 232:10,
232:11, 232:12
**themed** [6] - 96:19,
96:20, 96:21, 96:22,
97:3, 97:5
**themes** [1] - 142:5
**themselves** [2] -
205:23, 205:24
**theory** [5] - 106:23,
116:6, 132:18,
132:19, 149:10
**theorys** [1] - 179:21
**THEREAFTER** [1] -
232:12
**therefore** [4] - 7:9,
8:3, 145:7, 177:19
**they've** [2] - 16:3,
176:18
**thick** [2] - 53:18,

144:14
**thinking** [2] - 191:3,
229:20
**thinks** [2] - 105:22,
105:23
**third** [36] - 17:13,
17:16, 84:12,
131:13, 134:24,
134:25, 136:21,
136:22, 137:24,
139:24, 140:2,
140:3, 140:13,
140:16, 140:17,
141:22, 151:18,
162:20, 162:21,
163:2, 163:3, 163:4,
163:5, 163:7,
187:13, 202:22,
203:24, 204:13,
205:2, 205:5,
205:20, 205:21,
211:11, 212:20,
231:6
**thirds** [1] - 55:16
**THIS** [1] - 232:14
**thousands** [2] - 88:17,
115:22
**Three** [2] - 134:1,
140:5
**three** [28] - 47:22,
48:2, 52:24, 73:13,
75:15, 76:24, 84:10,
91:5, 91:7, 97:10,
133:1, 134:3,
139:25, 140:2,
141:7, 141:22,
147:24, 152:25,
170:7, 182:19,
182:20, 183:3,
184:14, 184:17,
201:6, 221:16,
229:23
**throughout** [3] -
34:21, 130:1, 193:3
**Thursday** [5] - 229:22,
230:13, 230:15,
230:16, 231:1
**THURSDAY** [1] - 4:1
**Ti** [2] - 202:9, 204:5
**TIME** [1] - 232:11
**timing** [2] - 226:15,
229:12
**title** [1] - 23:1
**TO** [1] - 232:12
**today** [14] - 10:24,
41:10, 101:5,
102:15, 125:12,
159:10, 172:24,
174:12, 178:7,
179:18, 179:24,

210:22, 220:11,
226:22
**TODD** [1] - 3:7
**Todd** [3] - 10:20,
113:3, 113:9
**together** [6] - 60:16,
86:1, 107:17,
109:15, 109:22,
144:7, 176:4, 219:18
**toggling** [1] - 127:2
**tone** [4] - 143:14,
148:19, 157:23,
193:20
**tonic** [1] - 132:13
**took** [1] - 117:2
**tool** [2] - 124:7,
125:10
**Tools** [1] - 14:14
**tools** [1] - 124:6
**top** [10] - 30:18, 115:4,
115:5, 115:9,
121:19, 131:11,
154:14, 169:9,
176:2, 219:4
**topics** [3] - 120:25,
121:3, 122:6
**total** [2] - 4:23, 155:5
**totality** [1] - 215:3
**totally** [2] - 15:8, 15:9
**touch** [2] - 4:11,
122:11
**tour** [2] - 69:3, 70:20
**tours** [1] - 40:18
**toward** [1] - 18:25
**towards** [1] - 218:4
**toy** [1] - 129:20
**toyed** [1] - 127:4
**track** [21] - 45:2, 45:5,
49:6, 129:20,
129:21, 145:22,
168:19, 171:12,
171:24, 172:2,
176:2, 185:3, 202:5,
218:13, 222:4,
222:6, 222:14,
222:15, 225:18,
225:22, 225:25
**tracking** [1] - 17:6
**tracks** [14] - 125:15,
126:11, 126:17,
128:6, 131:8,
145:18, 145:24,
152:16, 152:22,
152:23, 209:13,
221:21, 221:23,
221:25
**tradition** [1] - 209:11
**traditional** [2] -
208:17, 208:19
**traditionally** [1] -

39:21
**traditions** [2] - 115:11,
123:11
**train** [4] - 120:10,
122:9, 129:20,
129:21
**trained** [3] - 14:13,
120:5, 120:13
**training** [5] - 89:9,
114:4, 115:17,
132:14, 182:22
**trajectory** [1] - 137:8
**transaction** [1] - 51:23
**transactions** [1] - 52:2
**transcribe** [2] -
198:21, 198:23
**transcribed** [3] -
182:9, 182:11, 193:7
**transcriber's** [1] -
199:1
**transcript** [1] - 223:16
**TRANSCRIPT** [1] -
1:14
**TRANSCRIPTION** [2] -
232:13, 232:14
**transcription** [3] -
198:22, 198:25
**translate** [1] - 150:19
**transparent** [1] -
144:14
**transpose** [1] - 127:12
**transposed** [1] -
182:14
**transposing** [1] -
190:6
**TRAURIG** [1] - 2:21
**travel** [1] - 228:2
**treatment** [1] - 157:7
**treble** [1] - 143:11
**trial** [11] - 4:10, 14:8,
14:15, 29:19, 30:3,
30:17, 106:2,
125:20, 130:2,
177:2, 179:14
**TRUE** [1] - 232:14
**true** [6] - 44:15, 83:23,
96:17, 98:8, 210:24,
218:17
**truly** [2] - 104:8,
109:18
**trumpet** [1] - 207:16
**truth** [3] - 70:2, 70:11,
182:7
**Truth** [1] - 85:4
**truth@flame314** [1] -
90:16
**try** [13] - 6:15, 6:17,
80:23, 92:16,
124:12, 124:14,
125:7, 145:9, 147:6,

158:24, 195:15, 208:16, 226:23
**tryin'** [2] - 43:4, 100:2
**trying** [16] - 7:12, 8:1, 42:15, 42:19, 65:14, 72:25, 83:22, 94:22, 103:22, 145:7, 156:11, 156:23, 166:16, 190:8, 199:22, 231:8
**Tuesday** [9] - 226:13, 226:19, 226:20, 228:5, 228:18, 229:17, 229:20, 229:25, 230:7
**tune** [12] - 15:2, 162:15, 162:17, 163:12, 163:14, 163:15, 164:9, 218:2, 218:7, 218:8, 218:23
**turn** [12] - 10:3, 17:10, 17:13, 17:18, 18:25, 21:5, 21:6, 23:11, 23:12, 23:25, 44:20, 159:7
**turning** [2] - 44:23, 171:9
**twice** [4] - 156:22, 170:14, 204:21, 205:15
**two** [130] - 6:6, 6:18, 6:22, 18:25, 19:25, 32:2, 55:16, 63:4, 65:19, 73:12, 77:17, 103:11, 103:14, 108:8, 108:10, 109:22, 111:6, 111:9, 116:16, 116:21, 116:22, 118:7, 118:12, 118:14, 119:2, 121:17, 121:18, 123:14, 123:23, 124:2, 124:17, 124:18, 125:15, 126:11, 126:17, 127:2, 127:13, 128:6, 128:8, 131:8, 132:8, 133:9, 134:14, 134:20, 135:18, 136:3, 137:14, 137:15, 137:25, 140:6, 140:7, 140:8, 140:23, 141:8, 141:12, 141:23, 142:3, 142:4, 143:20, 145:7, 146:4, 146:19,

147:19, 147:20, 147:21, 148:3, 148:4, 148:25, 149:2, 149:5, 149:16, 149:20, 151:6, 156:9, 157:2, 157:7, 160:17, 160:18, 161:10, 163:9, 164:25, 165:13, 165:25, 166:22, 166:25, 174:16, 174:23, 175:2, 176:23, 181:12, 184:2, 184:4, 185:23, 186:12, 187:10, 187:25, 188:3, 188:11, 189:15, 191:14, 191:22, 193:3, 193:11, 195:19, 196:8, 202:2, 202:14, 204:12, 204:14, 205:7, 206:13, 209:17, 211:10, 215:9, 217:5, 217:9, 218:10, 219:3, 219:4, 219:5, 219:20, 227:20, 228:6, 229:5, 229:8, 229:9, 229:16, 229:17, 230:4
**two-thirds** [1] - 55:16
**types** [1] - 90:24
**TYPEWRITTEN** [1] - 232:12
**typical** [2] - 90:23, 190:7
**typically** [1] - 80:7

# U

**U.S** [1] - 60:22
**UCLA** [1] - 119:22
**unchanging** [1] - 163:6
**uncomfortable** [1] - 69:23
**under** [10] - 16:14, 41:9, 43:24, 55:23, 62:7, 69:12, 70:23, 71:11, 83:7, 176:15
**understood** [11] - 80:18, 80:19, 102:2, 117:22, 151:16, 162:18, 188:6, 188:16, 189:2, 231:10, 231:11
**undisclosed** [1] - 108:11

**undisputed** [1] - 176:21
**unduly** [1] - 158:5
**unexpected** [1] - 4:10
**unfairly** [1] - 69:13
**unfold** [2] - 138:18, 168:19
**unfolds** [1] - 168:23
**unfortunately** [1] - 83:21
**unit** [2] - 45:17, 45:21
**UNITED** [4] - 1:1, 1:1, 1:4, 232:8
**United** [2] - 116:12, 120:23
**universities** [1] - 119:25
**university** [1] - 121:19
**University** [9] - 114:25, 115:3, 119:4, 119:6, 119:10, 119:20, 119:21, 121:17, 121:18
**unlikely** [2] - 192:14, 229:24
**unnecessarily** [1] - 156:13
**unnecessary** [1] - 12:16
**unpaid** [1] - 64:5
**unrelated** [2] - 101:2, 101:3
**unsettled** [1] - 217:10
**untimely** [1] - 176:15
**unusual** [2] - 138:19, 147:8
**up** [66] - 4:18, 10:19, 13:24, 15:15, 26:3, 64:15, 64:22, 65:2, 75:9, 75:12, 75:19, 77:2, 78:12, 79:21, 79:25, 81:11, 84:5, 90:2, 100:24, 101:6, 102:14, 103:11, 111:7, 112:7, 113:21, 123:4, 124:1, 129:21, 137:5, 141:22, 146:21, 147:13, 148:10, 148:12, 149:8, 154:6, 156:17, 161:1, 164:20, 167:14, 176:4, 181:11, 188:5, 188:7, 188:8, 188:9, 191:17, 191:19, 191:23, 191:24, 191:25, 192:1, 209:7,

210:11, 210:17, 211:3, 211:19, 216:19, 217:21, 223:11, 226:13, 227:8, 230:8, 230:13, 230:23
**upper** [1] - 31:4
**urge** [1] - 166:16
**URL** [3] - 19:13, 20:2, 23:15
**USB** [1] - 179:1
**useful** [1] - 133:20
**uses** [11] - 13:2, 118:19, 125:4, 149:1, 149:3, 178:16, 188:22, 193:19, 193:21, 193:22, 218:3

# V

**vaguely** [1] - 33:10
**value** [3] - 198:13, 198:14, 198:23
**values** [2] - 138:17, 199:1
**various** [4] - 116:9, 130:2, 184:20, 214:24
**vary** [1] - 190:16
**vaulting** [1] - 148:12
**vaults** [1] - 148:9
**vein** [1] - 209:12
**venue** [1] - 97:4
**venues** [3] - 88:16, 96:18, 97:1
**verbals** [1] - 48:17
**verdict** [1] - 230:9
**verified** [1] - 179:10
**versa** [1] - 191:13
**verse** [3] - 185:20, 185:22, 185:24
**verses** [6] - 48:5, 48:8, 49:15, 49:18, 185:16, 218:15
**version** [6] - 35:10, 35:14, 70:2, 111:10, 148:11, 225:10
**versions** [2] - 133:1, 148:8
**versus** [1] - 4:5
**vertical** [2] - 123:22, 143:23
**VHS** [1] - 40:7
**VIA** [2] - 3:9, 3:11
**via** [1] - 57:23
**vice** [1] - 191:13
**Victory** [1] - 225:8
**video** [15] - 4:21, 4:23, 16:21, 18:2, 18:3,

18:7, 18:8, 18:15, 19:7, 19:20, 20:24, 28:21, 43:10
**videos** [1] - 10:22
**view** [9] - 18:5, 18:7, 19:8, 19:10, 19:23, 20:12, 20:14, 25:4, 69:7
**viewed** [8] - 4:23, 28:20, 36:1, 37:3, 37:7, 37:11, 87:2, 92:25
**views** [3] - 16:25, 17:6, 21:2
**vigorously** [1] - 92:15
**VINCENT** [1] - 2:21
**virtually** [1] - 122:25
**virtue** [1] - 8:6
**visit** [1] - 16:25
**visited** [8] - 21:19, 36:17, 36:20, 36:24, 37:3, 46:18, 46:24, 92:3
**visiting** [2] - 17:3, 119:24
**visual** [2] - 11:10, 122:22
**vocal** [9] - 47:19, 47:23, 47:25, 48:2, 48:11, 49:20, 177:17, 179:24, 195:19
**vocals** [6] - 46:4, 47:17, 192:18, 192:20, 195:2, 195:3
**voice** [1] - 177:18
**voices** [1] - 143:11
**Volume** [1] - 76:1
**VS** [1] - 1:8

# W

**WAIS** [2] - 2:16, 6:1
**wait** [5] - 41:19, 132:9, 156:9, 188:12
**wake** [1] - 121:10
**walk** [5] - 12:19, 13:6, 106:2, 126:23, 175:20
**walked** [1] - 219:14
**Walt** [1] - 116:10
**Walter** [4] - 226:21, 228:19, 229:4, 229:11
**wants** [12] - 68:11, 88:1, 111:12, 140:20, 141:23, 148:6, 148:7, 148:17, 148:18, 148:19, 149:6

**war** [1] - 121:11
**warranted** [1] - 125:10
**warrants** [2] - 123:5, 165:2
**WAS** [1] - 232:12
**Washington** [5] - 119:4, 119:6, 119:10, 119:19, 119:21
**watched** [1] - 16:20
**Wave** [2] - 174:16, 176:24
**ways** [8] - 116:25, 143:2, 149:2, 166:3, 170:21, 201:6, 208:16, 221:19
**website** [1] - 81:24
**Wednesday** [3] - 229:18, 229:22, 230:13
**weeds** [3] - 34:1, 65:11, 71:8
**week** [3] - 31:25, 32:12, 231:7
**weekend** [6] - 226:16, 226:23, 227:25, 230:4, 231:14, 231:15
**weeks** [3] - 75:15, 76:24, 77:6
**weigh** [2] - 121:24, 122:1
**weight** [1] - 165:6
**welcome** [1] - 174:6
**wells** [1] - 62:15
**Wells** [1] - 62:19
**WEST** [2] - 1:23, 2:17
**western** [1] - 125:1
**Western** [1] - 116:11
**WESTERN** [1] - 1:2
**whatever's** [1] - 229:1
**whatsoever** [1] - 89:11
**Wheat** [1] - 119:25
**wherein** [1] - 8:24
**whereof** [1] - 101:19
**white** [3] - 134:21, 134:22, 184:4
**whoever's** [1] - 80:8
**whole** [6] - 109:8, 135:1, 140:10, 179:19, 198:24, 218:13
**wife** [2] - 82:4, 226:25
**Williams** [1] - 56:23
**wipes** [1] - 133:12
**withdraw** [3] - 73:19, 147:2, 171:20
**withdrawn** [2] - 69:10, 72:22

**withdrew** [5] - 69:1, 70:13, 73:14, 74:11, 75:5
**witness** [32] - 9:24, 15:6, 18:17, 24:12, 25:12, 58:17, 61:9, 62:1, 64:11, 66:6, 66:19, 66:22, 67:20, 79:21, 80:8, 80:12, 101:19, 113:1, 113:5, 146:15, 157:10, 159:1, 159:2, 161:2, 166:9, 166:16, 173:10, 173:19, 173:25, 176:17, 220:12, 226:23
**WITNESS** [26] - 16:15, 25:25, 63:9, 76:2, 82:23, 87:5, 91:1, 93:7, 102:11, 113:9, 115:9, 138:17, 141:6, 144:22, 144:24, 145:10, 146:4, 146:13, 146:24, 188:20, 217:12, 217:15, 219:10, 221:15, 222:19, 222:21
**Witness** [1] - 138:16
**witness's** [1] - 69:11
**witnesses** [4] - 157:2, 227:20, 228:15, 229:2
**WITNESSES** [1] - 3:3
**word** [9] - 84:18, 115:14, 115:15, 117:24, 130:13, 144:21, 166:8, 166:17, 201:11
**Word** [1] - 13:25
**words** [17] - 68:7, 72:5, 74:13, 84:2, 128:9, 130:9, 130:11, 141:3, 142:8, 142:11, 142:15, 142:22, 161:25, 162:1, 173:18, 182:8, 197:15
**works** [24] - 5:16, 52:17, 103:14, 118:7, 118:12, 118:13, 118:14, 119:2, 120:8, 125:9, 126:24, 128:13, 134:8, 163:10, 178:18, 193:1, 193:3, 196:14, 197:2, 202:14,

203:15, 204:9, 214:2, 214:25
**world** [4] - 32:4, 86:10, 96:2, 230:25
**World** [18] - 5:11, 28:7, 29:8, 35:5, 35:8, 37:20, 38:8, 38:13, 38:19, 50:1, 50:6, 52:12, 52:17, 56:17, 65:13, 83:15, 90:9, 94:25
**worried** [1] - 13:10
**write** [6] - 45:11, 121:21, 121:23, 122:7, 128:19, 223:7
**writer** [15] - 53:4, 55:24, 56:11, 56:23, 57:5, 57:9, 85:1, 86:12, 86:13, 86:25, 87:2, 95:3, 95:12, 97:20, 98:8
**writers** [12] - 27:13, 52:24, 64:17, 84:10, 89:16, 91:11, 91:16, 92:20, 92:25, 184:20, 192:7, 192:11
**writing** [10] - 47:17, 85:13, 86:16, 127:24, 128:9, 202:23, 208:13, 222:21, 222:25, 223:4
**writings** [2] - 84:24, 85:8
**written** [8] - 47:19, 79:4, 95:23, 95:25, 96:13, 96:14, 176:17
**wrote** [15] - 45:15, 47:23, 47:25, 48:2, 48:5, 48:8, 48:11, 49:15, 49:18, 49:21, 50:13, 192:11, 222:25, 223:8, 224:23

**Y**

**Year** [1] - 53:15
**year** [7] - 20:12, 56:7, 113:24, 114:9, 115:1, 119:18, 119:22
**years** [15] - 15:8, 82:12, 83:24, 100:5, 100:16, 100:18, 114:19, 115:22, 115:23, 119:11, 138:20, 172:20, 174:19, 215:15

**yesterday** [18] - 13:23, 15:5, 16:20, 21:13, 21:14, 29:14, 30:12, 33:1, 67:15, 68:3, 68:24, 69:24, 70:5, 73:10, 73:13, 74:10, 115:24, 122:16
**York** [1] - 8:13
**yourself** [13] - 26:13, 27:6, 45:11, 47:20, 49:12, 53:2, 54:5, 54:15, 60:6, 76:22, 81:20, 95:3, 223:4
**yourselves** [1] - 158:6
**YouTube** [13] - 4:22, 16:21, 16:25, 18:1, 18:7, 18:15, 19:6, 19:20, 35:22, 40:16, 122:24, 229:6
**YouTubing** [1] - 221:11

**Z**

**zero** [2] - 89:14, 104:4
**zoom** [3] - 52:20, 52:24, 85:24

# EXHIBIT 4

EXHIBIT  4
PAGE  574

```
 1                    UNITED STATES OF AMERICA
                     UNITED STATES DISTRICT COURT
 2                   CENTRAL DISTRICT OF CALIFORNIA
                          WESTERN DIVISION
 3
                              -  -  -
 4                 HONORABLE CHRISTINA A. SNYDER
            UNITED STATES DISTRICT JUDGE PRESIDING
 5                            -  -  -

 6
      MARCUS GRAY; ET AL.,             )
 7                                     )
              PLAINTIFF,               )
 8                                     )   CASE NO.:
      VS.                              )   CV 15-5642-CAS
 9                                     )
      KATY PERRY; ET AL.,              )
10                                     )
              DEFENDANT.               )
11    _____)

12

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                   TUESDAY, JULY 23, 2019

16                   LOS ANGELES, CALIFORNIA

17

18

19

20

21

22              LAURA MILLER ELIAS, CSR 10019
                FEDERAL OFFICIAL COURT REPORTER
23             350 WEST FIRST STREET, ROOM 4455
                LOS ANGELES, CALIFORNIA 90012
24                  PH:  (213)894-0374

25
```

EXHIBIT 4
PAGE 575

```
 1

 2
        APPEARANCES OF COUNSEL:
 3
        ON BEHALF OF PLAINTIFF:
 4

 5                CAPES SOKOL
                  BY: MICHAEL A. KAHN, ESQ.
 6                    LAUREN COHEN, ESQ.

 7                7701 FORSYTH BOULEVARD
                  12TH FLOOR
 8                ST. LOUIS, MO 63105

 9
                  KAYIRA LAW, LLC
10                BY:  ERIC KAYIRA, ESQ.

11                2100 HANLEY ROAD, SUITE 208
                  CLAYTON, MO 63105
12

13
        ON BEHALF OF DEFENDANTS OTHER THAN MS. PERRY:
14

15                MITCHELL SILBERBERG & KNUPP
                  BY: CHRISTINE LEPERA, ESQ.
16                    AARON M. WAIS, ESQ.
                      JEFFREY MOVIT, ESQ.
17                    GABRIELLA NOURAFCHAN, ESQ.
                      JACOB ALBERTSON, ESQ.
18
                  11377 WEST OLYMPIC BOULEVARD
19                LOS ANGELES, CA 90064

20
        ON BEHALF OF THE PERRY DEFENDANTS:
21
                  GREENBERG TRAURIG
22                BY:  VINCENT H. CHIEFFO, ESQ.

23                1840 CENTURY PARK EAST
                  SUITE 1900
24                LOS ANGELES, CA 90067

25
```

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 576

1                                    INDEX

2

3    WITNESSES FOR
     THE PLAINTIFF:
4
                          DIRECT      CROSS      REDIRECT      RECROSS
5    WALTER, HENRY
     BY:  MR. KAHN          34                      80
6    BY:  MR. WAIS                     53                        86

7    GOTTWALD, LUKASZ
     BY:  MS. COHEN         87                      136
8    BY:  MS. MOVIT                   107                       136

9    GRAY, CRYSTAL
     BY:  MR. KAHN         137                      178
10   BY:  MR. WAIS                    161                       182

11   WITNESSES FOR
     THE DEFENSE:
12
     SANDBERG, KARL
13   BY:  MR. MOVIT         15                       31
     BY:  MR. KAHN                     28                        32
14
     HUDSON, SARA
15   BY:  MS. NOURAFCHAN   199
     BY:  MR. KAHN                    209
16
     ST.MARTIN, ZACHARY
17   BY:  MR. ALBERTSON    213                      233
     BY:  MR. KAHN                    229                       234
18

19            EXHIBITS              RECEIVED

20            (NONE OFFERED)

21

22

23

24

25

EXHIBIT 4
PAGE 577

4

```
 1       LOS ANGELES, CALIFORNIA; TUESDAY, JULY 23, 2019; 9:15 A.M.

 2                          - - -

 3             THE CLERK:  Calling Calendar Item 1.

 4             Case CV-15-5642.

 5             Marcus Gray versus Katy Perry.

 6             Counsel, please state your appearances.

 7             (Appearances heretofore noted.)

 8             THE COURT:  All right.  Good morning.

 9             Okay.  So I gather we have a video witness first.

10             MR. MOVIT:  Yes, Your Honor.

11             He's being taken out of order, Your Honor.  By

12     defendants.

13             THE COURT:  Okay.  And then who's next after that?

14             Just out of idle curiosity from the plaintiff's

15     side.  Yes?

16             MS. COHEN:  Mr. Walter.

17             THE COURT:  Okay.

18             MS. COHEN:  And then Mr. Gottwald.

19             THE COURT:  Okay.  So --

20             THE CLERK:  Counsel, I understand you have

21     something to bring up.

22             MR. WAIS:  Yes, Your Honor.  We have a couple

23     issues.

24             THE COURT:  Sure.

25             MR. WAIS:  So Your Honor, just really quickly, we
```

EXHIBIT 4
PAGE 578

```
 1    don't know, uh, exactly when you want to take this up.  One

 2    issue pertains to Mr. Walter's testimony, and the other issue

 3    pertains to the Billboard issue that we've discussed with you

 4    multiple times.  I don't think that's an issue until the

 5    afternoon so we can certainly defer that until then.

 6            Um, as to Mr. Walter's testimony and also

 7    Mr. Gottwald, in discussing jury instructions with plaintiffs

 8    over the weekend, it came to our attention that they intend

 9    to seek an adverse inference that Mr. Gottwald and Mr. Walter

10    didn't produce certain music files.  Um, in light of that,

11    it's our expectation that they're gonna ask questions about

12    both witnesses without the non-production of music files.

13            Um, during the course of discovery, we had a

14    dispute over that very issue.  The parties resolved that

15    issue.  It's corroborated in emails and a confirmatory

16    letter.  So it's our position that any questions about that

17    issue would be in violation of the parties' order -- of

18    parties agreement directly that they reached during

19    discovery.

20            THE COURT:  Okay.  Do we have a response?

21            I, of course, haven't seen the agreement you've

22    reached but . . .

23            MR. KAHN:  We don't intend to make any argument

24    that this failure to produce somehow is -- implicates them.

25    Um, my -- as I explained yesterday to Mr. Weighs, our only
```

```
 1   caution is that we don't know on the issue of independent

 2   creation what they intend to offer into evidence.

 3          And it may be nothing.  It may be simply testimony,

 4   but we wanted at least an opportunity without going into

 5   whether it should have been produced or not, at least an

 6   opportunity to ask some questions about their creation

 7   process.

 8          THE COURT:  I don't know what anyone just said to

 9   me to be --

10          MR. KAHN:  Okay.

11          THE COURT:  -- completely candid with you all.

12          MR. KAHN:  If -- if you all recall, Mr. Ojukwu

13   talked about how he created the beat.

14          THE COURT:  Yes.

15          MR. KAHN:  And all we want to do is since we're

16   calling them first, ask them some questions about how they

17   created the beat, what it's saved on.  We don't intend to

18   claim at any point that those documents if they even exist

19   which we don't know should have been produced.  We just want

20   to find out about the creation process which we assume could

21   be relevant to their defense of independent creation.

22          THE COURT:  Well, what's wrong with that?

23          MR. WAIS:  To the extent they want to ask

24   Mr. Walter about his creation of the beat, that's fine, but I

25   believe they're going to try to do is gonna go farther.
```

```
 1            In evidence already is Exhibit 74 which is the

 2    music file that was produced that shows the earliest version

 3    of the instrumental track that thereafter became the

 4    instrumental track of Dark Horse.  To the extent they want to

 5    ask him questions about Exhibit 74, we have no problem with

 6    that.

 7            But for the extent that they're going to say, well,

 8    do you have a bunch of other music files, where are those

 9    file, you didn't produce them in this litigation, that's

10    where we have a problem, and that's where they will be

11    violating the agreement that was reached during discovery.

12            THE COURT:  Okay.

13            So let me see is that your intention to ask that

14    question?

15            MR. KAHN:  No.  Our intention is not to ask them

16    why these files weren't produced.  We don't even know if they

17    exist.  All we're trying to find out since we're going first

18    in this is on the issue of independent creation, um, if

19    what -- what happened before you have this completed beat.

20    And the answer may be here's what we did.  We did this, we

21    did that, we did this.  We're not gonna ask them why didn't

22    you produce these.

23            THE COURT:  Well, but I guess the question is are

24    you gonna -- in asking are there independent files, I don't

25    know what the answer is so I don't know if the answer is yes
```

EXHIBIT 4
PAGE 581

```
 1    or no.  If the answer is no, who's got a quick.  If the
 2    answer is yes, then I'm not sure what you intend to do about
 3    that.  Are you gonna make any argument?  That he has files?
 4              MR. KAHN:  I don't believe so.
 5              THE COURT:  Well, why do you care if he has them.
 6              MR. KAHN:  Well, we don't know what their evidence
 7    will be of independent creation.  And maybe it is, you know,
 8    he's -- we started working six months before.  We did this,
 9    this, this and this.  Because by the time this music file is
10    produced to us, it's -- it's sort of a dark hole.  We just
11    don't know what happened before that, and we want to be able
12    to ask him what was done before that.  But we're not gonna --
13              THE COURT:  Well --
14              MR. KAHN:  -- seek some negative inference from it.
15    I mean, Mr. Kayira could probably better address this.  He's
16    gonna be asking the questions, and he understands what these
17    files are.
18              THE COURT:  Okay, let's try again.  Mr. Kayira?
19              MR. KAYIRA:  Good morning again, Your Honor.
20              First of all, it's their burden to prove the
21    independent creation, and for them to do that, they need to
22    produce or prove up these additional files we believe which
23    are called session files.  So there's an audio file which is
24    what we listened to, and then an audio file is rendered from
25    session files.
```

1          This entire case on both sides has also electronic

2     music production which means these things are does in an

3     audio -- a Digital Audio Work station format, and every time

4     they save what they've created, it's called a session file.

5          An audio file is rendered from that file, and so

6     the creation process necessarily implicates the discussion of

7     did you save after you did this?  When you collaborated with

8     so-and-so, did you do that?  It is a natural discussion of

9     the creation process no different than discussing, uh,

10    someone writing Chapter 1 and another person writing Chapter

11    2.  Who is the scribner matters.

12          THE COURT:  Okay.  The response?

13          MS. LEPERA:  Yes, Your Honor.

14          Let me briefly say the file that is Exhibit 74 is,

15    in fact, the file that demonstrates the independent creation.

16    It is the culmination of everything to create that.  That was

17    produced to them.  They made a motion to compel.  Once we

18    produced that, they obviated the motion to compel, and we

19    agreed that that was if they sought no further discovery.

20    They were satisfied and effectively made no further efforts

21    to get anything additional.

22          To come in now and suggest, well, maybe I want to

23    now go back and ask for more discovery or contend there

24    should have been more discovery or contend there was a

25    failure to produce, and therefore, there's inferences negates

EXHIBIT 4
PAGE 583

 1    completely what was done in the discovery process whereby we

 2    demonstrated unequivocally through 74.

 3            This is the fallout, and Mr. Kayira's trying to

 4    slice this salami between the audio file and the session file

 5    when the audio file is the actual culmination of that

 6    produced to them to demonstrate both the prior creation, the

 7    independent creation and the timing thereof.

 8            So this is another one of the attempted, um,

 9    efforts to back step into the discovery process which has

10    been rectified and resolved and to try to create a spectra

11    that does not exist, Your Honor.

12            THE COURT:  Okay.  Mr. Kayira, what do you say?

13            MR. KAYIRA:  I say we're entitled to at least

14    understand who all contributed to the creation of the session

15    file for which the audio file was rendered because, um, there

16    is testimony that demonstrates that more than one producer

17    contributed to the creation of the instrumental music.

18    Number two, uh, that instrumental music production file that

19    was rendered to us in the form of a wave file does not

20    contain the iterations leading up to its creation.

21            THE COURT:  So why didn't you move to compel

22    discovery?  Why did you agree that they produced whatever

23    they were gonna produce?

24            MR. KAYIRA:  Your Honor, um, what they had to

25    produce, first of all, was always compelled under Rule 26,

```
 1   but secondarily, there was a discussion, uh, on a motion to
 2   compel in which my co-counsel was involved with discussions
 3   with one of the attorneys on the other side.
 4          What they produced, uh, to my co-counsel was an
 5   audio wave file.  They're saying that it was the earliest,
 6   uh, audio file.  The distinction between the audio file and a
 7   session file is something that the -- it's the difference
 8   between having the product and having the process, and we
 9   should have a right to pursue the process in which the song
10   was created.
11          THE COURT:  Well, not if you've agreed that they
12   didn't have to produce anything further.  I don't understand.
13          MR. KAYIRA:  We -- we don't believe that we agreed
14   that they didn't have to produce anything.  They had the
15   burden to come forward with -- with that information.
16          THE COURT:  Who -- who made -- who made the
17   agreement?  Who made the agreement for your side?  I -- you
18   know, this is not something we should be doing in the middle
19   of the trial.
20          MR. KAHN:  Right.  It -- it was my agreement,
21   Your Honor.  And as I said, we're not seeking any negative
22   inference.  We just don't want to be finding out whatever the
23   process was --
24          THE COURT:  But --
25          MR. KAHN:  We -- I mean, we understand that the --
```

EXHIBIT 4
PAGE 585

1   the two gentlemen . . .

2        THE COURT:  But, you know, it's like when did you

3   stop beating your wife.  I mean, it's that kind of question,

4   you know.  Are there files that haven't been produced to us?

5   That's where he's going, and they haven't had the opportunity

6   because they relied upon apparently an agreement that you

7   weren't gonna further prosecute the motion to compel.

8        MR. KAHN:  And -- and we aren't, Your Honor.  It

9   was simply asking them about the creation process.  That's

10  all.

11       THE COURT:  Well, I would suggest strongly that if

12  you're gonna ask about the creation process we not leave the

13  implication that somehow, there's an unproduced file

14  because --

15       MR. KAHN:  I understand.

16       THE COURT:  -- I don't think that is fair, and I

17  don't care what Mr. Kayira thinks.  He -- he can't say, well,

18  my co-counsel did it, and I'm not bound which is what I hear

19  happening.

20       MR. KAHN:  No.  I -- we -- we understand,

21  Your Honor.

22       THE COURT:  I . . .

23       MR. KAHN:  We'll ask general questions about the

24  creation without getting into computer files.

25       THE COURT:  I think that that's what you need to

1    do.

2            MS. LEPERA:  And we have no problem.  The witnesses

3    intend to speak to verbally how they created it and then

4    ultimately culminated in this but not the inference with

5    respect to this missing session files is exactly what we were

6    concerned about, Your Honor.

7            And I think that that -- they made the motion.

8    They drafted the motion under the rules, they gave us the

9    motion, and we resolved the motion.  This concept of, well,

10   okay, you still have an obligation under 26 when there's been

11   essentially an agreement on this issue, uh, is -- is not

12   availing.

13           THE COURT:  Well, I'm not -- I'm not saying they

14   aren't entitled to ask how things are recorded in files.

15   Because --

16           MS. LEPERA:  That is not a problem, Your Honor.

17   It's the question of where are these, and they're not here,

18   et cetera.

19           THE COURT:  Well --

20           MR. KAHN:  We're not getting into that, Judge.

21           Not where are these and why aren't they here.

22           THE COURT:  Okay.  I hope, uh, I hope not, but

23   we'll see.  So that's that issue.

24           The other issue, I guess, we can defer to the

25   afternoon.

```
 1              MR. WAIS:  That's fine, Your Honor.

 2              THE COURT:  So we can get going here.

 3              MR. WAIS:  We agree.

 4              THE COURT:  Is that okay?

 5              MR. KAHN:  And one very minor I think we've

 6    resolved based on my conversation with Mr. Wais, the Schedule

 7    5A which were the stipulations that the parties have agreed

 8    to, the version that was filed had some redacted stuff, and

 9    we didn't have a copy of the unredacted stuff, um, but I

10    think Mr. Wais does so we'll be able to get copies from him

11    when we mark that as an exhibit.

12              THE COURT:  Okay.  Once again, perhaps seeing the

13    document will help me more than this --

14              MR. KAHN:  Understood.

15              THE COURT:  -- discussion but okay.

16              THE CLERK:  Are we ready for the jury?

17              MR. MOVIT:  The defense are ready, yes.

18              THE CLERK:  Please rise.

19                        (Jury present.)

20              THE CLERK:  Please be seated.

21              THE COURT:  So our next witness is?

22              MR. MOVIT:  Karl Martin Sandberg, Your Honor.

23              THE COURT:  Okay.  We're calling this witness out

24    of order, the witness is going to appear by video, and you

25    should assume that the testimony is live and here in the
```

EXHIBIT 4
PAGE 588

```
 1    court.  Okay.
 2              THE CLERK:  Mr. Sandberg, if you could raise your
 3    right hand.
 4                        (Witness sworn.)
 5              THE CLERK:  Thank you.
 6              Please state your full name, spell your last name
 7    for the record.
 8              THE WITNESS:  Karl Martin Sandberg,
 9    S-a-n-d-b-e-r-g.
10              THE CLERK:  Thank you.
11              THE COURT:  Okay.  Mr. Movit.
12                        DIRECT EXAMINATION
13    BY MR. MOVIT:
14    Q.   Hi, Mr. Sandberg.
15    A.   Hello.
16    Q.   Mr. Sandberg, there may be few seconds of delay in the
17    video connection between when I say something and you say
18    something and when we hear it so I am going to pause before
19    speaking when you're done speaking, and I'd also ask
20    similarly if you'd please pause before speaking when I'm
21    speaking make so that we make sure we don't speak over each
22    other given the delay in the video connection.  Is that fine?
23    A.   That is fine.
24    Q.   Thank you.  So Mr. Sandberg?  Can you please tell us --
25    A.   Yes.
```

EXHIBIT 4
PAGE 589

```
 1   Q.   Can you see me fine?
 2   A.   Yes, I can see you.
 3   Q.   Can you please tell us where in the world you are right
 4   now?
 5   A.   Yes.  I'm actually -- I'm in Kenya on a family trip to
 6   celebrate my father-in-law.  It's a trip we've been planning
 7   for years.  And I actually offered to fly in to Los Angeles
 8   from Sweden to testify last week.  I understand that wasn't
 9   possible.  And I also want to say how grateful I am that I
10   can do this by video so I don't have to -- didn't have to
11   miss this.  So I really appreciate that.
12   Q.   So you said you were in Sweden, Mr. Sandberg.  Is that
13   where you are from?
14   A.   I am from Sweden, yes.
15   Q.   And obviously, you speak English very well, but is
16   English your first language?
17   A.   It is not.
18   Q.   And Mr. Sandberg, can you please tell us your
19   profession?
20   A.   I'm a songwriter and music producer.
21   Q.   And do you go by any professional name?
22   A.   Uh, yes.  Max Martin.
23   Q.   Okay.  And can you please describe as a general matter
24   in your experience what it means to be a music producer?
25   A.   Uh, I guess the easiest way to describe it is that
```

EXHIBIT 4
PAGE 590

```
 1    you're in charge of the sonics --
 2              THE COURT REPORTER:  I'm sorry, Your Honor.  I
 3    can't hear him.
 4              Counsel, I can't hear him.
 5              THE COURT:  Can you turn up the volume?
 6    BY MR. MOVIT:
 7    Q.   Okay.  Mr. Sandberg, there is a technical issue in the
 8    courtroom in which there was some difficulty, nothing to do
 9    with you, in hearing so I'm gonna ask that last question
10    again if that's all right?  And if you could please --
11    A.   Okay.
12    Q.   -- describe for us again in your experience what it
13    means to be a music producer.  And given the technical
14    issues, if you could please speak up, that would be greatly
15    appreciated.
16    A.   Okay.
17              THE COURT REPORTER:  Much better.  Very good.
18              THE WITNESS:  Uh, in my opinion, um . . .  I think
19    to me, it means that you're in charge of the technical or the
20    sonics of a -- of a recording, uh, deciding who plays what
21    and when, you know, the length of the song, uh, what style
22    the production should be.  It also means that you have
23    certain obligations towards, you know, the finance and the --
24    and the clients which in our case is usually the record
25    company and the artist, you know, to deliver the song on
```

EXHIBIT 4
PAGE 591

```
 1   time, staying within budget and all that.  So . . .
 2   Q.   And in your experience, Mr. Sandberg, what does it mean
 3   to be a songwriter?
 4   A.   It means -- I think that's what we would more the
 5   composing.  You compose the song.  Um, you can -- you know,
 6   you write the melody and the lyric.  It doesn't necessarily
 7   mean you need technical things.  You can sit down with a
 8   guitar and sing and write a song together or alone.
 9   Q.   And Mr. Sandberg, in your experience, are all music
10   producers songwriters?
11   A.   No.
12   Q.   Okay.  And are all songwriters music producers?
13   A.   No.
14   Q.   And Mr. Sandberg, approximately how long have you worked
15   professionally in the music business?
16   A.   I've been doing producing, writing for oh, wow, 20 --
17   since '93, what is that?  27 years?  26 years?  Math was
18   never my thing, but, um, yeah, 26 years I would say.
19   Q.   And could you please tell us briefly about how you got
20   started as a professional in the music business, how that
21   happened?
22   A.   Um, I started like many people in this business having
23   dreams of becoming a rock star.  And, uh -- but, uh -- so,
24   you know, I played shows all over the place.  And then my
25   aunt was actually assigned, believe it or not, to a label
```

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 592

1    that was -- you know, they had studio in their facilities,

2    and I started working there and fell in love with that.  And

3    that was I would say '93.  So kind of from then on, uh, I

4    started making records, taking a step back, if you will, um,

5    writing songs for other people than myself.

6    Q.   And can you please tell us some of the recording artists

7    that you've worked with as a songwriter and music producer?

8    A.   Um, well, Britney Spears, the Backstreet Boys, Taylor

9    Swift, Katy Perry, Bon Jovi.  Um, yeah, there's been a lot,

10   lot of 'em.

11   Q.   And Mr. Sandberg, you mentioned Katy Perry?  Do you

12   recall approximately --

13   A.   Mm-hmm.

14   Q.   -- when you first worked with her professionally?

15   A.   Uh, I started -- the first record that came out that I

16   was working on was One of the Boys, I believe.  2008.

17   Q.   You said 2008?

18   A.   Yeah.  Yes.

19   Q.   Okay.  Mr. Sandberg, have you ever written or produced

20   Christian rap?

21   A.   Okay.  I have not.

22   Q.   Have you written or produced any type of religious music

23   for that matter?

24   A.   No.

25   Q.   Uh, do you listen to Christian rap?

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 593

20

1    A.    I don't.

2    Q.    Do you listen to any type of religious music?

3    A.    No.

4    Q.    Okay.  Mr. Sandberg, let's turn to the song Dark Horse.

5    Did you have any role in the creation of Dark Horse?

6    A.    I did.  Um . . . yes, I did.  Yeah.

7    Q.    Okay.  Could you please explain your role to the jury in

8    the creation of Dark Horse?

9    A.    Um, so Luke and Henry made a track, an instrumental that

10   was played for Katy?  Uh, this was in Santa Barbara by the

11   way.  Uh, we were making a record out there, and, um, I came

12   in -- I don't recall being there when it was played, but, uh,

13   we started working on it, and my role was, uh, writing

14   melodies and, um, giving feedback on the lyrics that, uh,

15   Sarah and Katy, um, wrote.  If that makes any sense.

16   Q.    And when -- Mr. Sandberg, when you refer to Henry,

17   that's Henry and Walter professionally known as Cirkut?

18   A.    Exactly.  Sorry.

19   Q.    And, um, when you referred to Sarah, that's Sara Hudson?

20   A.    Yes.

21   Q.    So you were talking about working on the melody with

22   Katy Perry and while Katy Perry and Sarah Hudson were working

23   on the lyrics in Santa Barbara.  What happened next with

24   respect to the creation of Dark Horse?

25   A.    Well, once we had what we thought was a good song, uh,

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 594

21

1    we, uh, started recording it, recording her on the -- on the

2    track, and, uh, that happened in Santa Barbara, and we

3    actually did work on it, uh, in Sweden later on a few months

4    later.

5    Q.    Are you aware if there are rap vocals on the final

6    version of Dark Horse?

7    A.    I'm aware of that, yes.

8    Q.    Are you aware of who performs those rap vocals?

9    A.    I know his rap name.    Juicy J.

10   Q.    And, did you have anything to do with, uh, the creation

11   and recording of Juicy J's rap music?

12   A.    I did not.

13   Q.    And to be clear, did you have anything to do with the

14   creation of the instrumental musical track for Dark Horse?

15   A.    No.

16   Q.    Okay.   Mr. Sandberg, if we could please move on to the

17   topic of the plaintiff's song Joyful Noise?   Before this

18   lawsuit was filed, Mr. Sandberg, had you ever heard the song

19   Joyful Noise?

20   A.    No.

21   Q.    When did you first hear the song Joyful Noise?

22   A.    Um, well, it was when I was told that this whole thing

23   was happening, and, uh, that's when I listened to it.

24   Q.    Okay.   And how did you -- how did you know you'd never

25   heard it before this lawsuit when you first listened to it?

UNITED STATES DISTRICT COURT

EXHIBIT 4

22

1    A.    Uh, I just never heard.  I -- I didn't recognize it.

2    Q.    And before this filing of this lawsuit, had you ever

3    heard of a song entitled Joyful Noise?

4    A.    No.

5    Q.    Okay.  And before the filing of this lawsuit, had you

6    ever heard of an album entitled Our World Redeemed?

7    A.    No.

8    Q.    One of the plaintiffs in this case is Marcus Gray

9    professionally known as Flame.  Um, had you -- have you ever

10   met him?

11   A.    I had not.

12   Q.    Okay.  Have you ever heard his name, either his given

13   name or his professional name before this lawsuit?

14   A.    No.

15   Q.    Had you ever heard of any of Mr. Gray's music before

16   this lawsuit?

17   A.    No.

18   Q.    Two of the other plaintiffs are Emanuel Lambert

19   professionally known as Da Truth and Chike Ojukwu

20   professionally known as Chike Beatz or Chike Beatz Down.  Had

21   you ever met either of these gentlemen ever?

22   A.    No.

23   Q.    Had you ever heard of these gentlemen either by their

24   given names or their professional names before this lawsuit?

25   A.    No.

EXHIBIT 4
PAGE 596

1    Q.   Had you ever heard any of their music before this

2    lawsuit?

3    A.   No.

4    Q.   And then let's speak about another gentleman, Lecrae

5    Moore professionally known as Lecrae.  Um, have you ever met

6    this gentleman?

7    A.   No.

8    Q.   Had you ever heard of this gentleman by his professional

9    name or his given name before this lawsuit?

10   A.   Sorry, can you repeat that?

11   Q.   Sure.

12   A.   It's breaking up.

13   Q.   No problem.  Can you hear me now?

14   A.   Yes, I can hear you now.

15   Q.   Okay.  Had you ever heard of, um, Lecrae Moore either by

16   his given name or his professional name, Lecrae, before this

17   lawsuit?

18   A.   No.

19   Q.   Um, had you ever heard any of Lecrae Moore's music

20   before this lawsuit?

21   A.   No.

22   Q.   Okay.  Um, have you ever gone to see, um, any of the

23   plaintiffs in this lawsuit or Lecrae Moore in concert?

24        THE COURT REPORTER:  What was the answer?

25   BY MR. MOVIT:

EXHIBIT 4
PAGE 597

24

1    Q.    Was it -- can you please repeat your answer?

2    A.    No.

3    Q.    Uh, do you like to go to concerts as a general matter,

4    Mr. Sandberg?

5    A.    I -- no.

6    Q.    Um, when you do go to concerts, why do you go to them?

7    A.    Uh, it's usually when I sort of, I guess, have to go if

8    that makes any sense, if there's an artist that I work with,

9    um, and they want me to come or -- it's more of a

10   work-related thing for me.

11   Q.    Have you ever gone to a concert where Christian rap was

12   performed?

13   A.    No.

14   Q.    Uh, do you ever watch religious programs on television?

15   A.    No.

16   Q.    Do you ever listen to Christian radio stations?

17   A.    I don't.

18   Q.    Do you ever listen to religious radio programs?

19   A.    No.

20   Q.    Um, let's talk about a different subject, award shows.

21   Before this lawsuit, had you ever heard of the Dove Awards?

22   A.    Uh, sorry, can you repeat that?

23   Q.    Of course.  Before this lawsuit, had you ever heard of

24   an awards show called the Dove Awards?

25   A.    No.

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 598

25

1    Q.    Have you ever attended the Dove Awards?

2    A.    I have not.

3    Q.    Have you ever watched the Dove Awards on television?

4    A.    No.

5    Q.    Before this lawsuit, had you ever heard of an awards

6    show called the Stellar Awards?

7    A.    No.

8    Q.    Have you ever attended the Stellar Awards?

9    A.    No.

10   Q.    Had you ever watched the Stellar Awards on television?

11   A.    No.

12   Q.    Uh, were you a voter for the 51st Annual Grammy Awards

13   which were given out in February of 2009?

14   A.    I was not.

15   Q.    Do you follow the nominations for gospel or religious

16   music categories at the Grammy Awards?

17   A.    Um, no.  Afraid not.

18   Q.    Okay.  Uh, are you familiar with the publication

19   Billboard?

20   A.    I am.

21   Q.    Okay.  What's your understanding of Billboard?

22   A.    It presents different charts, and they have articles

23   about music.

24   Q.    Okay.  Do you ever look at the charts in Billboard?

25   A.    Yes, I do.

UNITED STATES DISTRICT COURT

EXHIBIT 4

26

1    Q.   When do you look at the charts?

2    A.   Well, uh, this is gonna sound a little narcissistic, but

3    you tend to look at the charts when you have something there

4    that you have been part of.

5    Q.   So -- so you look at the charts when your music is on

6    the chart; is that correct?

7    A.   If I'm lucky enough to have a song out that has made it

8    into the Billboard chart, I tend to check it, yes.

9    Q.   Okay.

10   A.   I admit.

11   Q.   I would, too.  Um, do you -- do you, um -- do you look

12   at charts on which your songs don't appear?  As a general

13   matter.

14   A.   No, no.

15   Q.   To your knowledge, do your songs appear on Christian,

16   gospel or other religious charts in Billboard?

17   A.   I don't believe so, no.

18   Q.   Do you ever look at the charts for Christian gospel or

19   religious categories?

20   A.   I don't.

21   Q.   Okay.  Let's talk about a website called MySpace.  Let's

22   go back in time.  In the time period between 2008 and 2013,

23   do you recall if you had a MySpace account?

24   A.   Yes, I did.

25   Q.   Okay.  What, if anything, did you do on MySpace with

UNITED STATES DISTRICT COURT

EXHIBIT 4

PAGE 600

1   your account?

2   A.   Uh, when MySpace, uh, started, I created an account

3   which I normally do, uh, to protect my name.  So I put -- you

4   know, you get the Max Martin, whatever it was, so -- so -- so

5   no one else can use it, but I -- I never used the actual, uh,

6   thing.

7   Q.   So you never used your MySpace account?

8   A.   No.

9   Q.   Okay.  Let's talk about the time period between 2008 and

10  2013 again but this time with respect to YouTube.  During

11  that time period, did you use YouTube?

12  A.   Yes.

13  Q.   Okay.  What do you recall using YouTube for during that

14  time period?

15  A.   Sorry, can you repeat the question?

16  Q.   Of course.  Uh, during this time period, going back

17  between 2008 and 2013, what did you use YouTube for?  What

18  did you do on YouTube?

19  A.   Um, you know, I listened to music, but, uh, you know,

20  you get recommended something to look at.  Then I would look,

21  check it out on YouTube.

22  Q.   Did you use YouTube to look at music that had not been

23  recommended to you?

24  A.   No.  Never.

25  Q.   So you did not use YouTube to search for music that no

28

 1   one had told you about; is that correct?

 2   A.   That is correct.

 3   Q.   Okay.

 4          MR. MOVIT:  Uh, no further questions.

 5          THE COURT:  Okay.  Any cross?

 6          Mr. Kayira.

 7          MR. MOVIT:  Mr. Sandberg, if you can hold tight for

 8   a moment.  The plaintiff's counsel wants to ask you

 9   questions.

10          THE WITNESS:  Okay.

11                      CROSS-EXAMINATION

12   BY MR. KAYIRA:

13   Q.   Good morning, Mr. Sandberg.  Can you hear me okay?

14          THE COURT REPORTER:  I can't hear you.

15          THE WITNESS:  I can't.

16          THE CLERK:  If you could pull the microphone closer

17   to you.

18   BY MR. KAYIRA:

19   Q.   I just have a couple questions for you this morning over

20   here.  The first is you began talking about song writing

21   versus producing.  Do you recall testifying to that?

22   A.   Yes.

23   Q.   As a music producer, you can be a songwriter.  That's

24   correct?

25   A.   That is correct.

EXHIBIT  4
PAGE  602

1    Q.   And you have produced music electronically, haven't you,

2    sir?

3    A.   I have.

4    Q.   And when you produce music electronically, did you use a

5    Digital Audio Work station software program?

6    A.   I believe I did, yes.

7    Q.   Okay.  Can you compose music electronically?

8    A.   Um . . . well, you can -- sorry, I'm just trying to

9    understand.  You can obviously come up with things that you

10   then put into the computer.  Yes.  See, if I have a melody, I

11   can record it onto the -- to the program, yeah.

12   Q.   Okay.  So instrumental music or a beat can be composed

13   using a computer program; is that correct, sir?

14   A.   Yes.  But -- but it's not the computer program that

15   makes it.  It's the -- well, nowadays, it's -- but yeah.  You

16   have to put something in it so the computer just records what

17   you're putting in it.  Yeah.

18   Q.   It's a tool, an extension of your creation; is that

19   correct?

20   A.   That is correct.

21   Q.   Now, when you're creating electronically, do you -- have

22   you had occasion to save what you created?  On the computer?

23         MR. MOVIT:  I'm gonna object to this line of

24   questioning, Your Honor.

25         THE COURT:  I -- I think he can -- he can ask this

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 603

```
 1    question.
 2              THE WITNESS:  Just so I understand correctly, do
 3    you mean if I have made something on the computer, I make
 4    sure it stays there?  Is that what you mean by saving it?
 5    BY MR. KAYIRA:
 6    Q.   I believe so.  You did kind of break up.  I believe
 7    that's correct.
 8    A.   Okay.  Then the question was if I ever saved a song on
 9    my computer.
10    Q.   That's correct.
11    A.   Yes, I definitely have.
12    Q.   Okay.  And what you save, that's called a session file;
13    is that correct, sir?
14    A.   One could call it that, yeah.
15    Q.   What else could one call it?
16    A.   A save?  I don't know.  There are many names internally.
17    Q.   Okay.  Uh, sir, earlier, you testified, uh, that you
18    will look at charts when you have songs that are on them; is
19    that correct?
20    A.   That is correct.
21    Q.   And among those charts was -- was Billboard; is that
22    correct?
23    A.   Well, there's many charts in Billboard, but the ones
24    that I was on, yes.
25    Q.   Okay.  And are you familiar with charts, uh, on a
```

```
 1    program known as Spotify?

 2    A.    I am.

 3    Q.    Okay.  And are you aware that Spotify ranks music?

 4    A.    I am.

 5    Q.    Are you also familiar with iTunes?

 6    A.    I'm sorry, you were breaking up.  Familiar with what?

 7    Q.    Are you familiar with iTunes?

 8    A.    I am.

 9    Q.    And you're aware that iTunes also ranks music.

10    A.    I am.

11          MR. KAYIRA:  Those are all the questions I have,

12    Your Honor.

13          THE COURT:  Okay.

14                    REDIRECT EXAMINATION

15    BY MR. MOVIT:

16    Q.    Hello again.  Can you hear me, Mr. Sandberg?

17    A.    I can.

18    Q.    Okay, thank you.  Um, Mr. Sandberg, in your experience,

19    does a music producer who works on a recording, uh, sometimes

20    have no rights in the underlying composition?

21    A.    Uh, do you mean if you're not a composer, I'm not being

22    a composer, just the sole producer?

23    Q.    That's correct.

24    A.    Is that what you mean?

25    Q.    Yes.  Does that ever happen --
```

```
 1    A.   Yes.

 2    Q.   -- in your understanding?

 3    A.   Yes.

 4              MR. MOVIT:  Thank you.  No further questions.

 5              THE COURT:  Anything further?

 6              MR. KAYIRA:  Yes, Your Honor.

 7              THE COURT:  Go ahead.

 8                         RECROSS-EXAMINATION

 9    BY MR. KAYIRA:

10    Q.   Hello again, Mr. Sandberg.

11    A.   Hello.

12    Q.   All right.  When you've described a situation in which a

13    music producer was not a songwriter, you said you were aware

14    of that in your experience; is that correct?

15    A.   Yes.

16    Q.   Can you describe for us what that -- what that -- what

17    that is?  How that happens.

18    A.   Um, I mean, I can only describe how it happened for me.

19    Uh, I don't know . . .  there's so many different ways these

20    things happen, I just want to point that out.  But the few --

21    the few times that I've done myself is that when you hear a

22    song that you really like, and you say, hey, I want to

23    produce that, and then you take the song, and you create the

24    sonics of the song, and then you end being the producer of

25    the song.  If that make makes sense.
```

```
 1   Q.   Okay.  Are you talking about a remix situation, sir?
 2   Where you hear another --
 3   A.   Um, uh, I think -- I would say a remix is usually
 4   something that's already out.  You create a new version of a
 5   song that already exists in the world.  And I'm generalizing
 6   now so that is not always the case, but I would say mostly,
 7   that's the case.  When it's called a remix.  If that makes
 8   sense?
 9   Q.   Yes.  Now, when -- have you had an occasion where you
10   worked with a songwriter and created an instrumental in which
11   you were not a co-writer?
12   A.   Um . . .  sorry, I can't -- say that again.  You were
13   breaking up a little bit.
14   Q.   Well, I'm just asking you if you're collaborating with a
15   songwriter as a music producer to make the instrumental, has
16   that ever happened in which you were not a songwriter?
17   A.   I mean, I usually write the songs that I produce.  I'm
18   usually a -- you know, a writer on -- on -- on the songs.
19   Um, so I -- I -- it's hard for me to answer that question,
20   that I don't -- I don't know if it's ever happened to me
21   because I usually write every time I'm on something.  Most of
22   the times.
23               MR. KAYIRA:  All right.
24               Thank you, sir.  No further questions.
25               THE WITNESS:  Thank you.
```

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 607

```
1              MR. MOVIT:  I have nothing further.

2          Thank you, Mr. Sandberg.

3          THE COURT:  Okay.  Thank you.

4          THE WITNESS:  Thank you.

5          THE COURT:  -- Sandberg.

6          We appreciate you interrupting your vacation.

7          THE WITNESS:  Oh.  Well, thank you for having me.

8          I appreciate it.

9          THE COURT:  Do we have a next witness?

10         MR. KAYIRA:  Yes, Your Honor.

11         Plaintiffs are gonna call Mr. Walter.

12         THE CLERK:  Please raise your right hand.

13                    (Witness sworn.)

14         THE CLERK:  Please be seated.

15         Plaintiff's counsel, can I ask you to move those

16  boxes?

17         Please state your full name, spell your last name

18  for the record, and please make sure you speak into the

19  microphone.

20         THE WITNESS:  My name is Henry Russell Walter,

21  W-a-l-t-e-r.

22         THE CLERK:  Thank you.

23                    DIRECT EXAMINATION

24  BY MR. KAYIRA:

25  Q.  Good morning, Mr. Walter.
```

```
 1    A.    Good morning.
 2    Q.    You're also known professionally by the name of Cirkut;
 3    is that correct?
 4    A.    Yes, that's correct.
 5    Q.    And are you also or have you also been known as DJ
 6    Cirkut?
 7    A.    Yes.
 8    Q.    And you're a citizen of Canada; is that right, sir?
 9    A.    I am Canadian, yes.
10    Q.    And your interest in music began in Montreal; correct?
11    A.    Yes.
12    Q.    And when you were in Montreal, did you find yourself
13    interested in hip hop and rap music?
14    A.    Yes.
15    Q.    And you had some buddies that got you into that music;
16    is that correct, sir?
17    A.    I had friends who were into it, and yes, they got me
18    into it.  Yeah.
19    Q.    And then you also become a DJ around that time.  Is that
20    true?
21    A.    Yes.
22    Q.    And you were DJing.  Was -- would that have been hip hop
23    music or rap music?
24    A.    Primarily, yes.
25    Q.    And then what kind of venues, and where did you DJ?  Did
```

1    you DJ for parties?

2    A.    Um, I guess it would start -- it mostly started in my

3    bedroom just practicing, messin' around, and then gradually,

4    as I got older, I started doin' some high school parties, um,

5    had like a little radio show I was on one time.  Um, little

6    things like that.

7    Q.    And so you did you listen to -- you listened to a lot of

8    music as part of being a DJ; is that correct?

9    A.    Yes.

10    Q.    Would that have been mostly hip hop music you listened

11    to?

12    A.    Um, at that time, it was mostly hip hop, rap music,

13    yeah.

14    Q.    Okay.  And just to be sure in case there is anyone that

15    is unclear about what a DJ does, can you just give us a brief

16    description of what you do as a DJ?

17    A.    Um, a DJ plays music, um, on -- you know, it could be --

18    in my case, it was vinyl, I was really into vinyl, and turn

19    tables.  Um, they play music for an audience.  Um, it doesn't

20    necessarily have to be an audience.  I mean, they can have

21    various scratching and mixing, and you can just DJ for

22    yourself, too.  It doesn't necessarily have to be to an

23    audience.

24    Q.    Okay.  In addition to being a DJ, um, back around 2008,

25    2009, uh, you were also a member of a band.  Is that true?

```
 1    A.    Yes.

 2    Q.    The name of that band was Let's Go to War; correct?

 3    A.    Yes.

 4    Q.    And -- and how would you describe Let's Go to War's

 5    music?

 6    A.    I'd say it was, um, our music fused electronic music and

 7    rap and pop.

 8    Q.    It covered a several -- a few genres; correct?

 9    A.    Yes.

10    Q.    And in 2009, your band released a studio album called

11    Carmageddon.  Isn't that true?

12    A.    That's correct.

13    Q.    And back in 2009, MySpace was used to market and promote

14    your band, Carmageddon's album; is that right?

15    A.    Yes.

16    Q.    And that would have been then marketed to the public;

17    correct?

18    A.    Yes.

19    Q.    Now, you were more than just a DJ.  You were more than a

20    band member.  You were a developing music producer.  Isn't

21    that true?

22    A.    Yes, that's correct.

23    Q.    And -- and you still are a music producer today;

24    correct?

25    A.    Yes.
```

```
 1    Q.   And so would it be fair to say that you primarily
 2    produce your music electronically?
 3    A.   Yes.
 4    Q.   In composing music electronically, you use a computer
 5    with a Digital Audio Work station.  Correct?
 6    A.   That's correct.
 7    Q.   And a Digital Audio Work station is a -- essentially,
 8    it's a software application for computers.  Is that true?
 9    A.   Yes.
10    Q.   And it is a software program that is used for creating
11    or composing, editing and recording music; correct?
12    A.   Yes.
13    Q.   Now, just generally speaking, when you are creating or
14    composing an instrumental track or beat on your computer,
15    you're able if you want to to create a melody with that
16    computer; is that correct?
17    A.   Yes.  You could create a melody.  Yeah.
18    Q.   And you could create rhythms; is that correct?
19    A.   Yeah.
20    Q.   And with the MIDI, you can -- you even alter the sound
21    of notes you've selected.  Is that true?
22    A.   Yes.
23    Q.   So those changes could include changes to pitch.
24    Correct?
25    A.   Yes.
```

1    Q.    Changes to texture?

2    A.    Yes.

3    Q.    And changes to the tambor of a note.  Isn't that true?

4    A.    That's correct.

5    Q.    And also for tempo is a factor in a creative process as

6    well.  Is that true, sir?

7    A.    Yes, it is.

8    Q.    Now I want to talk to you about your specific Digital

9    Audio Work station you were working on in early 2013.  Okay?

10   A.    Yes.

11   Q.    In early 2013, you were using Q Base.  Is that true?

12   A.    That's correct.

13   Q.    And it's a software for music and maybe recording,

14   arranging and editing; right?

15   A.    Yes.

16   Q.    So Q Base is definitely a software that would be

17   installed onto a computer; correct?

18   A.    Yes, correct.

19   Q.    In early 2013, some version of Q Base software was

20   installed onto your computer; right?

21   A.    Yes, it was.

22   Q.    And it's through that Q Base, you were able to

23   electronically compose or produce instrumental music such as

24   the instrumental that we'll be discussing here for Dark

25   Horse; correct?

1    A.    Yes.

2    Q.    I want to ask what -- are you able to save your

3    creations in music on your computer, sir?

4    A.    Yes.

5    Q.    And you would save those in the form of a -- of a

6    session file; is that correct?

7    A.    That's what we typically refer to it as, a session file,

8    yeah.

9    Q.    Okay.  And a session file allows you to go back and

10   forth over time and make changes to the music you're

11   composing; is that correct, sir?

12   A.    That's correct.

13   Q.    Now, there's another party in this case named Lukasz

14   Gottwald.  Um, most know him by his moniker, Dr. Luke.  Are

15   you familiar with him, sir?

16   A.    Yes, I am.

17   Q.    You started working with Mr. Gottwald at some point in

18   2008.  Is that true, sir?

19   A.    I don't believe it was around 2008, no.

20   Q.    Do you recall when that might be as you sit here today?

21   A.    It's hard for me to recall an exact date, but I believe

22   it would have been more around 2011, 2012.

23   Q.    And do you recall if that was close to the time that you

24   had the song play Seal It With a Kiss?

25   A.    That was around that time, yes.

```
 1    Q.   Now, do you know who actually introduced you to

 2    Dr. Luke -- or I mean, I'm sorry, to Mr. Gottwald, sir?

 3    A.   Um, it wasn't an in-person, direct introduction.  It

 4    was, um, another mutual person we knew who had some of my

 5    instrumental tracks that I had given him, and he played those

 6    for Luke, and then Luke contacted me.  Well, that's how we

 7    met first.

 8    Q.   And so those couple people that knew each other, is

 9    that -- I don't want to put words in your mouth but --

10    A.   I'd say it was one person who played my tracks for Luke,

11    and then Luke called me.

12    Q.   And do you know who that person was?

13    A.   Yes.

14    Q.   And who was that person?

15    A.   His name is Andrew Luxman.

16    Q.   Now, you signed to Mr. Gottwald's publishing company,

17    Prescription Songs; is that correct?

18    A.   Yes, that's correct.

19    Q.   And you also signed to Mr. Gottwald's production

20    company, Kasz Money Incorporated; correct?

21    A.   Yes.

22    Q.   With it those agreements, is it safe to say that you

23    were working as a producer for Mr. Gottwald at that time?

24    A.   Yes.

25    Q.   Are you familiar with Billboard magazine?
```

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 615

1    A.    Yes, I am.

2    Q.    And are you familiar with Billboard charts?

3    A.    Yes.

4    Q.    And you have occasion to look at those Billboard charts;

5    is that correct?

6    A.    Occasionally.

7    Q.    And when you look at those Billboard charts, is there a

8    reason why you're looking at those Billboard charts?

9    A.    Um, well, you know, selfishly, if I have a song charting

10   on the Hot 100s, I might glance at it to see if the position

11   has changed since the week before.  Um, I might just glance

12   at the Top 10 of the Hot 100 to educate myself on the Top 10

13   songs of the moment.

14   Q.    Okay.  And are you familiar with other charts such as

15   Spotify?

16   A.    Yes.

17   Q.    And are you familiar with Spotify's chart for a Top

18   Trending songs?

19   A.    There are several different charts, but I'm aware that

20   they exist, yes.

21   Q.    Can you tell me which ones do you recall?

22   A.    Um . . .  Today's Top Hits.  I don't know any of the

23   other names on the chart, no.

24   Q.    Okay.  And you're familiar with the Grammys; is that

25   correct?

```
 1    A.    Yes.

 2    Q.    And what is a Grammy?

 3    A.    A Grammy is an award, um, that you can be nominated for

 4    or you can win in several different -- many different

 5    categories.

 6    Q.    Is it a -- in your mind, in your experience, do you find

 7    a Grammy award to be something that is -- that you're proud

 8    of?

 9    A.    Yes.

10    Q.    And it's something that you believe that professionals

11    seek; is that correct?

12    A.    I can't speak for every professional, what they would or

13    would not seek.  I mean, for personally, it's something that

14    I would be honored by, but I can't speak for every

15    professional.

16    Q.    Okay.  Excellent.  And are you familiar with charts such

17    as, the iTunes chart?

18    A.    Yes.

19    Q.    Now, I recognize I talked to you about Spotify earlier,

20    but, you know, just because I understand what Spotify is, not

21    everybody will.  And so could you a brief description of what

22    Spotify is?

23    A.    Spotify is a music streaming application, um, that you

24    can use on your phone or computer, and it allows you to

25    stream music, listen to it, um as opposed to physically
```

```
 1   downloading a file onto your computer.  You can just stream
 2   it from the cloud or whatever you want to call it without
 3   having to download it, and you have access to I don't know
 4   how many songs but many songs just right there.
 5   Q.   Okay.  Now, earlier, you let us know that you were
 6   signed to Mr. Gottwald's company, Kasz Money Incorporated;
 7   right?
 8   A.   Yes.
 9   Q.   Um, was it your understanding Kasz Money would furnish
10   your services and see that you were compensated for
11   production services?
12            MR. WAIS:  Objection, relevance.
13            THE COURT:  Sustained.
14   BY MR. KAYIRA:
15   Q.   Were you aware that Kasz Money Incorporated entered into
16   a contract with Katy Perry for the production of music?
17            MR. WAIS:  Objection, relevance.
18            THE COURT:  Overruled.  He may answer if he knows.
19            THE WITNESS:  I'm not aware of that, no.
20            MR. KAYIRA:  I'd like to present a copy of
21   Exhibit 98 to the witness.
22            MR. WAIS:  Objection.  That's not in . . .
23            Can we have a side bar real quick?
24            THE COURT:  Yeah, what . . .
25            THE CLERK:  Are you just identifying it with him?
```

```
 1              MR. KAYIRA:  Yeah.  I'm just --
 2              THE CLERK:  Okay.  98 is in.
 3              THE COURT:  Well, you're saying that it's not
 4     relevant for this stage?
 5              MR. WAIS:  Correct.
 6              THE COURT:  Well, we may have to have a side bar.
 7              Let's go to side bar.
 8         (The following proceedings occurred at side bar.)
 9              THE COURT:  What's 98?
10              MR. KAYIRA:  It's a contract between Katheryn
11     Hudson and Kasz Money for production services that
12     establishes that Kasz Money -- we believe was related to
13     liability in terms of creation of the infringing work.
14              MS. LEPERA:  The contracts between the parties all
15     of which are from 98 on including all the stipulated facts
16     with respect to the economics are relevant, if at all, to the
17     damages phase.  The question of whether or not Kasz Money is
18     a producer of the track, you do not need to show the
19     contract.  You can lay it just by asking a question.  You
20     don't need to show a contract.
21              MR. KAYIRA:  Additionally, the agreement has
22     Exhibit 100, the songwriter split.
23              THE COURT:  Why are we doing that now?
24              MR. KAYIRA:  I thought it was relevant to the fact
25     it's a joint work, a joint infringing work created by the
```

1    defendant Kasz Money and the other songwriters.

2            MS. LEPERA:  Once again you don't need to do that

3    through a document relative to the numbers.  We have a

4    question that can be asked did Kasz Money produce through

5    either Mr. Gottwald or Mr. Walter the underlying track at

6    issue?  That would be the answer to whether or not they

7    produced.  What the actual division is in the terms of the

8    economics of the song is unrelated to whether they created

9    the song.

10           THE COURT:  Well, this is ridiculous is what it is.

11   Why don't you just -- if you're trying to establish that Kasz

12   Money --

13           MS. LEPERA:  Produced the track.

14           THE COURT:  Produced the track, why don't you ask

15   him that.  If not, Dr. Luke should know.

16           MR. KAYIRA:  He said he didn't know.  That's why

17   I'm using Exhibit 98.

18           THE COURT:  We're trying not to have damages at

19   this stage.  That's why we bifurcated.  So I don't care if

20   you refresh his recollection with something, that's not going

21   to come into evidence.

22           MR. KAYIRA:  Okay.

23           MS. LEPERA:  I agree with the Court.  He can simply

24   ask Mr. Gottwald if Kasz Money through his services and

25   Mr. Cirkut produced the track.

```
 1              THE COURT:  I think it is -- I'm not trying to be
 2    difficult.  We have bifurcated.  The reason we bifurcated is
 3    we're trying to keep the economics out at this stage.
 4                      (Side bar concluded.)
 5              THE COURT:  Let's try again.
 6    BY MR. KAYIRA:
 7    Q.   Mr. Walter, are you familiar with what Kasz Money did in
 8    terms of creation of the song Dark Horse?
 9    A.   What Kasz Money did?
10    Q.   Yes.
11    A.   I'm not sure what you mean by that.  I'm not sure.  A
12    company didn't create the song.  I don't know what you mean
13    by that.
14    Q.   Well, you were one of the co-creators of the
15    instrumental, is that correct, for the song?
16    A.   Yes.
17    Q.   And you were also uh, assigned to Kasz Money as a
18    producer; is that correct?
19    A.   Yes.
20    Q.   And let's move on to the instrumental that would later
21    become Dark Horse.
22    A.   Yes.
23    Q.   At the outset, just so that I'm clear, both you and
24    Dr. Luke co-created that instrumental beat; is that correct?
25    A.   Yes, we did.
```

```
 1              MR. KAYIRA:  Your Honor, I'd like to publish
 2    Exhibit 74.
 3              MR. WAIS:  No objection.
 4              THE COURT:  Is there an objection?
 5              MR. WAIS:  No.
 6              THE COURT:  It's in evidence.
 7                   (Exhibit 74 played for the jury.)
 8    BY MR. KAYIRA:
 9    Q.   Do you recognize that instrumental, sir?
10    A.   Yes.
11    Q.   And was that, uh, the instrumental that you created with
12    Mr. Gottwald?
13    A.   Yes.
14    Q.   And was that instrumental created using Q Base, sir?
15    A.   Yes, it was.
16    Q.   In early 2013, you started the creation of the
17    instrumental beat that would later become Dark Horse; is that
18    correct?
19    A.   That's correct.
20    Q.   And at some point after that, Mr. Gottwald heard what
21    you had created; is that correct?
22    A.   Yes, that's correct.
23    Q.   And it's after he heard what you created that he then
24    began to work with you on that instrumental beat; is that
25    correct, sir?
```

1    A.    Yes.

2    Q.    When you played -- was that the music that you played

3    for Mr. Gottwald prior to his involvement?

4    A.    The version we just heard was, um, after his

5    involvement.

6    Q.    Okay.  So there were prior versions; is that correct?

7    A.    Uh, yes.

8    Q.    Do you recall what part of the version we just heard

9    that Mr. Gottwald contributed to the creation of that song?

10   A.    Um, he suggested the lower notes, um, kind of the -- not

11   the chords but the bass notes being played in the -- in the

12   intro section which is -- would further be in the chords

13   section after the verse.

14   Q.    Okay.  And all of those are things that you would save

15   on your computer as you were working along; is that correct,

16   sir?

17             MR. WAIS:  Object to this line of questioning, Your

18   Honor.

19             THE COURT:  I think you're going into the area we

20   discussed that you would not go into, you can certainly

21   rephrase.

22   BY MR. KAYIRA:

23   Q.    Uh, Mr. Walter, as you and Mr. Gottwald worked together,

24   you worked together and made changes on more than one

25   occasion; is that correct, sir?

```
 1              MR. WAIS:  Objection, vague.

 2              THE WITNESS:  Um, we made changes to the overall

 3   instrumental and -- and song but not to the original

 4   underlying composition.

 5   BY MR. KAYIRA:

 6   Q.   Okay.  Did you and Mr. Gottwald complete -- was that the

 7   version of the song that you played for Ms. Hudson, Katy

 8   Perry, in Santa Barbara along with the other songs?

 9   A.   The one we just heard, I'm not a hundred percent sure if

10   that's the exact one we played for Katy.  But it's consistent

11   with what I believe may have been played.  I'm not sure if

12   it's that exact file.

13   Q.   Okay.  And do you recall what you named that file?

14   A.   Not the exact name, no.

15   Q.   Uh, would you be surprised if it was saved as Oh, no?

16              MR. WAIS:  Objection.

17              THE COURT:  I think he can answer the question.

18              THE WITNESS:  That sounds about right.  I don't

19   want to guess the exact name, but I believe that the word Oh,

20   no was in there.  That was the name of the track, yeah.  I

21   don't know if that's -- that was it, but I think the word Oh,

22   no was in there, yeah.

23              MR. KAYIRA:  I would also like to play Exhibit 16,

24   the MP3 file.

25              THE COURT:  Any objection?
```

```
 1                    MR. WAIS:  Object . . .

 2              Uh, can we approach the bench, Your Honor?

 3              THE COURT:  You know, this is -- this is completely

 4    unacceptable, folks.  You can't do this to the jury.

 5              MR. WAIS:  All right.  No objection, Your Honor.

 6              THE COURT:  Fine.  You may play it.

 7                    (Exhibit 16 played for the jury.)

 8    BY MR. KAYIRA:

 9    Q.   Uh, Mr. Walter, have you heard that instrumental before

10    today?

11    A.   Yes.

12    Q.   And based on your personal experience, does that sound

13    like an instrumental that was created electronically?

14    A.   It does.  Yeah.

15    Q.   Would that be would it be fair to say that that sounds

16    like an electronic composition that was composed in a Digital

17    Audio Work station?

18    A.   I didn't create it so I can't speak to exactly how it

19    was created but . . .

20    Q.   Do you have any reason to believe that it wasn't created

21    in Digital Audio Work station?

22    A.   I -- I believe it would have been.  Yeah.

23    Q.   And after hearing both of those, do you believe that

24    those instrumentals sound alike?

25    A.   No, I don't believe they sound alike.
```

52

```
 1   Q.   Okay.  Now I want to talk to you about your song
 2   writing.  Now, when you are creating a song, do you prepare
 3   written notations as part of your composing process?
 4   A.   No, not typically.
 5   Q.   Is it fair to say that you make -- you create and
 6   compose music based on what's pleasing to your ear?
 7   A.   Yes.
 8   Q.   Okay.  What you hear is -- is every bit as -- it is very
 9   important to you in your process; is that correct?
10   A.   Yes.
11   Q.   When Mr. Gottwald and you started to work together, did
12   you -- did you provide him any written notation of the
13   instrumental that you heard earlier?
14   A.   No, I did not.
15   Q.   Is it fair to -- uh, did you provide Mr. Gottwald
16   anything other than the sound of instrumental?
17   A.   I'm sorry, I don't know what you mean by that question.
18   Q.   That alls you did was play the music that Mr. Gottwald
19   heard; is that correct?
20   A.   You're saying on the day that I created the original
21   instrumental, did I just play it for him?  Is that what
22   you're asking?
23   Q.   Yes.  Did he just respond to hearing the song?
24   A.   Yes.
25           MR. KAYIRA:  I don't have any further questions at
```

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 626

```
 1    this time.

 2              THE COURT:  Okay.

 3                        CROSS-EXAMINATION

 4    BY MR. WAIS:

 5    Q.    Good morning, Mr. Walter.

 6    A.    Good morning.

 7    Q.    I just want to clarify one thing real quick.  Mr. Kayira

 8    played for you the instrumental for plaintiff's song Joyful

 9    Noise just a moment ago; is that correct?

10    A.    Yes.

11    Q.    And when was the first time that you heard the

12    instrumental to plaintiff's song?

13    A.    Um, after I heard . . .  I was -- you know, this whole

14    case was going on.  Then I listened to it see, you know, what

15    it was.

16    Q.    So prior to the litigation, you never heard the song

17    Joyful Noise?

18    A.    Prior to the litigation, no.  Never heard it.

19    Q.    You never heard the instrumental for Joyful Noise prior

20    to this litigation?

21    A.    No.

22    Q.    We're gonna revisit some of the topics Mr. Kayira raised

23    with you like the creation of Dark Horse, but I want to take

24    a step first back and talk more about your background.  So

25    you testified that you're a songwriter and music producer;
```

```
 1    correct?
 2    A.    Yes.
 3    Q.    And how long have you been writing music and producing
 4    music?
 5    A.    Um, I'd say around 15 years.
 6    Q.    And what made you decide to pursue that career in the
 7    first place?
 8    A.    Um, I just fell in love with music at, you know, an
 9    early age, got into DJing, had friends who were into it.  Um,
10    I just really, you know, wanted to know how these pieces of
11    music were created.  I got really just obsessed with the
12    creation of music, and um, you know, I was always kinda good
13    with computers so, um, I felt like it was something I
14    could -- I could do.
15    Q.    I believe you testified for Mr. Kayira that your
16    interest in music began in Montreal?
17    A.    Yes.
18    Q.    And that you were primarily interested at that point in
19    hip hop?
20    A.    Yes.
21    Q.    What were -- who were some of your favorite artists at
22    that time?
23    A.    Um, I really liked, um, Notorious B.I.G., um, Bone
24    Thugs-N-Harmony.  Um, Nas.  N-a-s, Nas.
25    Q.    Those are mainstream rappers?
```

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 628

```
 1    A.    I'd say so, yeah.
 2    Q.    Is that consistent with the type of rap or hip hop you
 3    were listening to back in those days?
 4    A.    Yes.
 5    Q.    Were you listening to Christian rap during your high
 6    school years?
 7    A.    No, I was not.
 8    Q.    Were you listening to any sort of religious rap back in
 9    your high school days?
10    A.    No.
11    Q.    Um, I believe Mr. Kayira also talked about your former
12    profession as a DJ?
13    A.    Yes.
14    Q.    Okay.  And you explained where you would DJ?
15    A.    Yes.
16    Q.    And where would you primarily DJ?
17    A.    Um, at the very beginning, it was just me in my bedroom.
18    I was just practicing, messin' around, you know, scratching,
19    mixing records.  Um, and then afterwards, once I got into
20    high school, I'd play for some high school parties.  Um, you
21    know, I had a radio show that I had with some other DJs where
22    we would just play music over -- you know, at a small some
23    kind of university college radio station kind of thing.
24    Q.    Were you DJing at religious venues?
25    A.    No.
```

```
 1   Q.   So after high school, what steps did you take to pursue

 2   your music career at that point?

 3   A.   Um, After high school, I moved to Toronto, and I was

 4   just actively honing my craft, you know, working, trying to

 5   become better at what I did.  Um, sought out different

 6   connections, um, tried to meet as many people as I could.

 7           I went to school briefly where I took a one-year

 8   course a school called the Harris Institute in Toronto.  And

 9   after that, I did brief a internship with some electronic

10   music producers called Master Craft, and, um --

11   Q.   And how did you meet Master Craft?

12   A.   I basically -- a friend showed me their music, and it

13   was really different from anything I was listening to at the

14   time.  It was, you know, much more dance, electronic, house

15   kind of music, and it really excited me cause it was just

16   something different.  So I said, you know, hey, I'm looking

17   for opportunities after -- after this course I just took.

18           Let me just email these guys.  You know, I found

19   their email somewhere, and I started interning with them,

20   just doing odd jobs around the studio, anything I could to

21   just be in that environment, um, just around the music and

22   equipment, and, uh, it taught -- taught me a lot.

23   Q.   What did you learn from them?

24   A.   Um, just they had a lot of vintage synthesizers, kind of

25   analogue consoles.  They're into that stuff.  I learned about
```

```
 1   the recording process and how to -- you know, I just really
 2   loved the sound of their music.  I learned about how they,
 3   you know, created their music, and that helped me learn.
 4   Q.   And after interning for Master Craft, what did you do at
 5   that point in your career?
 6   A.   Um, I . . . the details are kind of fuzzy, but, I mean,
 7   I kept just creating music.  Um, eventually, I met two other
 8   people who I basically became friends with, and -- well, the
 9   other person I had met back in high school.  But basically me
10   and these two other guys, we started a group called Let's Go
11   to War.  And we, um, got signed to a Canadian record label.
12   We made an album and did a brief tour around Canada.  It
13   didn't end up being extremely successful, but it was a
14   learning process for me so, yeah.
15   Q.   And at this point in -- uh, at this time, were you also
16   writing music on your own?
17   A.   Yes.
18   Q.   And at this point when you're in Let's Go to War, it's
19   been about four to five years since you had graduated from
20   high school?
21   A.   Um, around that, yeah.
22   Q.   And how much time at that time were you putting into
23   creating music?
24   A.   Just every day.  It was all I ever did.  I had nothing
25   else to do.  I had no Plan B.  This was it for me.  I was
```

EXHIBIT 4
PAGE 631

```
 1    just music is my life and what I love, and I'm gonna spend as
 2    much time as possible getting great at it.
 3    Q.   And did you at some point finally get the big break you
 4    were looking for?
 5    A.   Um, it came in several different forms, you know, I
 6    mean, after a lot of struggle and kind of dead end roads here
 7    and there.
 8         But, um, I'd say, the first big thing I could put
 9    my finger on, is, um, you know, after Let's Go to War, I --
10    kind of through almost a stroke of luck, a track that I
11    produced got into the hands of a songwriter who's in the
12    studio with Britney Spears, and, you know, my lawyer at the
13    time got it to them somehow.
14         And so one day, my lawyer called me up and said,
15    hey, you have a song with Britney Spears.  It's your track.
16    They chose your track, and now you have a song with Britney
17    Spears so, um, that was -- that changed a lot for sure.
18    Q.   What was the name of that song?
19    A.   It was called Mmm, Papi.
20    Q.   What did that for your career?
21    A.   It was just kind of a validation that okay, you know,
22    what I'm doing, I feel like I can do this on a professional
23    scale, and I can -- you know, it gave me the motivation to
24    move forward and a little bit in my money pocket to be able
25    to just keep doing what I'm doing.  And it made other people
```

EXHIBIT 4
PAGE 632

```
 1   take note -- other people in the music industry take notice a

 2   little bit.

 3   Q.   All right.  I think one of the things you testified with

 4   Mr. Kayira was that you subsequently met Mr. Luke -- or

 5   Mr. Gottwald.

 6   A.   Yes.

 7   Q.   And explain that relationship to me.  You already

 8   explained how it came about, but how did that work in terms

 9   of working with artists?

10   A.   Yeah.  When Luke and I met, um, you know, we -- we kind

11   of -- I didn't know what it was gonna be like going into a

12   situation like that.

13        I had no idea what it was like being a producer and

14   songwriter, signed, you know, under that kind of deal.  I

15   didn't really know him, but as soon as we met, we became --

16   we became very close.  We realized we had a very, um, like a

17   shorthand.  We -- we communicated well with each other.  We

18   just complimented each other very well.

19        And it became, you know, somewhat -- I would

20   consider him my mentor, and I was learning from him, but that

21   developed into a relationship where we were just working on

22   literally everything together.

23   Q.   What other artists were you working with at the time?

24   A.   Um, at the time.  Like when we first met or --

25   Q.   Yeah.  Just in general when you first met.
```

1    A.    Um, well, we did more Britney music.  Um, Flow Ryda.

2    Um, various other -- I mean, there's so many songs, I don't

3    recall, but we -- we just started doing everything together.

4    Q.    Okay.  And at some point, you had an opportunity to work

5    with Ms. Hudson professionally known as Ms. Perry?

6    A.    Yes.

7    Q.    And let's talk about that for a minute.  Now, it

8    involved the creation of the song Dark Horse?

9    A.    Yes.

10   Q.    I believe with Mr. Kayira, you testified that you

11   created the underlying instrumental beat for Dark Horse; is

12   that correct?

13   A.    Yes, that's correct.

14   Q.    And we've heard testimony through this case that that

15   includes two ostinatos, Ostinato 1 and Ostinato 2?

16   A.    That's correct.

17   Q.    Are you familiar with that testimony?

18          MR. WAIS:  Why don't we just play Exhibit 74 again

19   for the -- for the jury.

20                    (Exhibit 74 played.)

21   BY MR. WAIS:

22   Q.    Can you explain to the jury again what that is?

23   A.    Um, that is the original beat that was created that

24   soon -- that became Dark Horse.

25   Q.    And as we go forward, I'm gonna refer to that as the

EXHIBIT 4
PAGE 634

1   original beat from Dark Horse to distinguish it from the end

2   result which you can hear in the Dark Horse recording.  Okay?

3   A.   Okay.

4   Q.   Do you recall where you were when you created that

5   original beat?

6   A.   Yes.  I was at Conway Studios here in Los Angeles.

7   Q.   And how many days did it take you to create that?

8   A.   Um, that initial one, it was just part of a day.

9   Q.   And do you recall what date you created the beat on?

10   A.   It was March 8th, 2013.

11   Q.   And how do you recall the specific day?

12   A.   Um, in preparation for me testifying, I went back to

13   refresh my memory to make sure I knew the exact date.

14   Q.   And what were you doing in the studio that day?  Well,

15   where were you when you're at Conway Studios?  What you were

16   doing that day?

17   A.   Um, Luke and I were scheduled to work with another

18   artist that day.  I don't remember who the specific artist

19   was.  Um, but as soon as I got to the studio, you know, what

20   I typically do is just set up my equipment; my computer,

21   keyboard, external mouse keyboard, whatever I needed.  And,

22   um, you know, I -- the artist hadn't shown up so I had some

23   free time, I was just alone, and, um, so I set up my -- my

24   equipment, and I was in the studio.

25   Q.   Okay.  So let's back up a minute and just talk about how

62

1    you create beats in general and the equipment you're

2    referring to.

3    A.    Yeah.

4    Q.    I believe you testified that you use a specific computer

5    program called Q Base to help you record the music you're

6    creating?

7    A.    Yes.

8    Q.    And just explain to me a little bit more about what Q

9    Base is.

10   A.    It's a -- it's a -- it's a high end, professional, um,

11   DAW, Digital Audio Work station, that allows you to compose,

12   edit, mix, produce, create music, electronic music or you can

13   record analogue instruments into it, too, organic acoustic

14   instrument, but it's a program that you record into.

15   Q.    Okay.  And you mentioned that you can connect equipment

16   to that.  What would that be?

17   A.    Um, I would have a -- what's kind a MIDI keyboard.  It

18   stands for Musical Instrument Digital Interface.  It's

19   basically just a keyboard that you can connect your computer

20   and play notes into the software of your choice.  Um, I'd

21   have that and just an external keyboard and mouse.  Pretty

22   basic setup.  And an audio interface that you would connect

23   to speakers.  Pretty bare bones.

24   Q.    All right.  So return to the creation of Dark Horse or

25   your original beat.  You set up your equipment you testified.

EXHIBIT 4
PAGE 636

1    What -- what came next?

2    A.    Um, I set up my equipment and, um, figured I had some

3    free time to spare, you know, start making a beat.  So I

4    opened up Q Base, pulled up a sound, start of kind of --

5    typically, you know, I start messin' around on the keyboard

6    to see if anything -- you know, I start playing anything

7    that -- that I like.

8         Um, I was messin' around with it a bit, a little

9    bit.  And then I started playing (Witness humming).  I

10    started playing that on the keyboard.  I kind of liked how

11    that sounded.  So, um, I recorded that into Q Base and

12    started --

13    Q.    We've heard testimony those pitches are 3 2 1 5.

14    A.    Yes.

15    Q.    Go ahead.

16    A.    I recorded that into Q Base, and I liked the way it was

17    sounding, um, but it's a little repetitive so I -- you know,

18    I was like I need another section to go with this.  I

19    can't -- just can't go onto the entire duration of the song.

20    It's getting a little monotonous so --

21    Q.    Okay.  So you created the math, and let's talk about

22    that, you know, the 3 2 1 5 we were just talking about.

23    A.    Mm-hmm.

24    Q.    Um, was that the first sequence of notes that you played

25    on your keyboard?

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 637

64

1    A.    Yes.

2    Q.    And -- and you liked it.

3    A.    Yes.

4    Q.    And, uh, you testified that you started looping the note

5    sequence into Q Base.  What does that mean, you started

6    looping it?

7    A.    Um, just so I wouldn't have to play the entire thing by

8    hand the entire time.  I could play (Witness humming).  And

9    then take what I just played and copy it so that I wouldn't

10    have to keep playing the entire passage of the notes.

11         MR. WAIS:  If we go back to Exhibit 74 and just

12    play the first 13 seconds.

13    Q.    Okay.  So we have this repeating series of four pitches,

14    3215; correct?

15    A.    Yes.

16    Q.    And so go back to what you were telling me.  What

17    happens next?

18    A.    Um, so after I created that intro part, um, I figured it

19    needed another section.  It needed some space to breathe and

20    to give some room for a vocal to come in.  So, um, I

21    played -- I literally just even kept my fingers on the same

22    notes.  It went from (Witness humming) to (Witness humming).

23    I started playing that.

24         Um, I really liked the sound of that so, you know,

25    it's -- basically, I just stretched out the first intro.  I

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 638

65

1    stretched that out into a -- what would become the verse

2    section, um, same notes.  And just then I recorded that into

3    Q Base.

4    Q.   And in doing, that, uh, did you change the tambor

5    between Ostinato 1 and Ostinato 2?

6    A.   The tambor did not change, no.

7    Q.   And so are the tambors in Ostinato 1 and Ostinato 2 the

8    same?

9    A.   Yes, they are the same.

10   Q.   All right.  So you have the first ostinato.  Then you

11   have the second ostinato that you stretched out to

12   accommodate a verse.  What did you do next in the creation of

13   the original beat?

14   A.   Um, I added some drums to that verse section just to

15   kind of give it some rhythm, create kind of a -- some

16   movement.  Um, and some percussion kind of sounds in that

17   section.

18        And then I copied the intro, Ostinato 1 to the

19   section after the verse which would subsequently become the

20   chorus of Dark Horse.  And, um, then I played kind of an

21   underlying bass note underneath that ostinato in order to

22   just differentiate it from the other sections.

23        Um, and I think it was around that time that Luke

24   walked into the room.  And he, you know, said, hey, what are

25   you workin' on?  You know?  I played him what I was working

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 639

66

 1    on.  I played him that beat, and he liked the sound of it.

 2              And, um, then we started working on -- on it

 3    together.  He -- he changed some of the bass notes in the --

 4    in the chorus section underneath the ostinato.  Um, he

 5    suggested, hey, maybe this would be better, you know.  And he

 6    suggested that, and then I recorded that.

 7              MR. WAIS:  Well, let's take a look at the chorus

 8    which I think is 37 seconds and play that through.

 9                   (Audio played for jury.)

10    BY MR. WAIS:

11    Q.   Is that the chorus you were referring to?

12    A.   Yes.

13    Q.   Anything else you two did that day to finalize what

14    we've been listening to?

15    A.   No, that was about it.  After Luke suggested those

16    different bass notes, we pretty much saved it, closed it and

17    moved on to the next thing.

18    Q.   Okay.  Now, when you're creating this beat, we've heard

19    talk about using synthesized ostinatos as we just heard in

20    there.  Is that the first time you've used synthesized sound?

21    A.   It's not the first time, no.

22    Q.   Is that the first time you've used synthesized

23    ostinatos?

24    A.   No.

25    Q.   You have used them before?

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 640

```
 1    A.    Yes.

 2    Q.    And in your experience, was that something that you've

 3    commonly used in creating pop music?

 4    A.    Yes, it's very common.

 5    Q.    And now, in reference to ostinato one which we've heard,

 6    what was your thinking about it at the time, just that

 7    ostinato itself?

 8    A.    Um, what was my thinking about it?  Like what do you

 9    mean by that?

10    Q.    We've heard testimony that it's basic sequence; correct?

11    A.    Yes.

12    Q.    So in your experience, was that a basic musical phrase?

13    A.    Yeah, it was very basic.  You know.  Nothing incredibly

14    unique or complex about it.  All I did -- I'm not, you know,

15    the most incredible keyboard player, but um, yeah, it was --

16    it was basic.  Yeah.

17    Q.    And so going beyond the ostinatos, what was it about the

18    beat as a whole that you really liked?

19    A.    Um, I just liked kind of the general.  I liked how the

20    parts transition from one to another.  I liked the overall

21    just vibe of the track.  Um, I liked just the way it made my

22    head nod a little bit, you know.  And yeah, I liked it.

23    Q.    And in Exhibit 74, the original beat that you created

24    that day in Conway Studios, we can hear both ostinato one and

25    ostinato two in that.  Correct?
```

EXHIBIT 4
PAGE 641

1    A.    Uh, sorry, could you repeat the question?

2    Q.    Yeah.  In the original beat which we've just been

3    listening, you can hear both the first ostinato and the

4    second ostinato; correct?

5    A.    That's correct.

6    Q.    Did those change after that day?

7    A.    No, they did not change after that.

8    Q.    So the ostinatos you hear in Dark Horse are the same

9    ostinatos that you hear in that original beat?

10    A.    That's correct.

11    Q.    I believe that Mr. Kayira next talked to you about a

12    meeting with Katy Perry and playing music for her up in

13    Santa Barbara.  I want to talk about that a little more with

14    you if that's okay.

15    A.    Okay.

16    Q.    How did that come about, your opportunity to work with

17    Ms. Hudson?

18    A.    Um, well, Luke and I like I said had been working very

19    closely together, and we were working on really everything

20    together.

21          So he had a previous working relationship with

22    Katy.  He had worked on her music in the past.  So the time

23    came that Katy, you know, approached Luke and said, hey, I'm

24    working on a new album.  I'd like you to be involved.  So

25    subsequently, I was involved because I was working with Luke.

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 642

69

1    Um, so yeah, we were -- I was invited to go up to

2    Santa Barbara to work with -- with Katy and Luke and everyone

3    else.

4    Q.    This is still the Spring of 2013?

5    A.    Yes.

6    Q.    Had you ever worked with Ms. Hudson before?

7    A.    No.

8    Q.    So explain to me this initial meeting where you're

9    playing music for Ms. Hudson, you know.  Just walk me -- walk

10    us through what happened.

11    A.    Um, the initial meeting, um, we basically came into the

12    studio in Santa Barbara.  And, um, Luke and I played a bunch

13    of tracks for Katy, um, just to see what kind of caught her

14    ear, what -- what she -- she -- what she liked, you know.  So

15    we went through kind of just a playlist of a bunch of

16    different tracks we had made together.

17    Q.    Approximately how many tracks did you play for her?

18    A.    Maybe 15 to 20.

19    Q.    All right.  So you're playing music for her.  Just keep

20    walkin' us through what happened.

21    A.    Um, we -- you know, you kind of skip through different

22    tracks to see what she might react to.  Um, you know, if

23    she's kind of like not really interested or falling asleep,

24    then you move to the next track.  And, um, you know, so we

25    finally --

EXHIBIT 4
PAGE 643

```
 1          You know, I was skipping through tracks, and I
 2    skipped the one, the track in question, and she said wait,
 3    wait.  Go back to that one.  I kinda like that one, you know.
 4    And it was oh.  Okay.  Check it out.  You know, I didn't
 5    think she would like it, you know.
 6          So I went back to that one, and, you know, we all
 7    kind of -- we were kind of groovin' along to it and noddin'
 8    our heads to it, you know.  So she picked that one.  She
 9    liked that track.
10    Q.    She wanted to write a song to that?
11    A.    Yeah.
12    Q.    And so do you continue to work on the song with her that
13    day?
14    A.    Yes.
15    Q.    And walk us through.  How does that happen?  What do you
16    guys start doing?
17    A.    Basically, it doesn't happen like this every single
18    time, but typically, we would all listen to the instrumental
19    on loop, and, you know, you would -- someone would go into
20    the vocal booth and start free styling some melodies over the
21    top of the track, um, vocal melodies.
22          Um, so, um, once we had arrived at a point where we
23    liked all the melodies, then, um, Katy and Sarah would go
24    into kind of a separate room privately, and they would, um,
25    work on the lyrics for those melodies.
```

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 644

1   Q.   And by Sarah, you mean Sarah Hudson?

2   A.   Yes.

3   Q.   And was -- uh, we heard from Mr. Sandberg.  Was he also

4   involved?

5   A.   He was involved in the song, yes.

6   Q.   Okay.  And he explained what his involvment was.  What

7   was your role from there on out once you had this initial

8   song put together?

9   A.   Um, pretty much, uh, Luke and I just would oversee the

10   song, making sure that it, you know, arrived at the best

11   possible song, you know.  We work on the instrumental, added

12   a bunch of parts to it, you know, to produce up the track,

13   make it sound fuller and more complete.  And, um, yeah,

14   basically just seeing the process through until the very end.

15   Q.   When you say you added some elements, explain to us what

16   you mean by that.

17   A.   Um, just adding things to keep the -- keep the listener

18   interested, you know.  Adding -- building up certain parts,

19   breaking down other parts.  Um, you know, we added -- I

20   believe the session in total was 56 tracks.  There were, you

21   know, quite a few elements in there that are -- some are very

22   subtle.

23        They're kind of socked in there, but, you know, we

24   added piano, guitar, different percussion, cymbals,

25   transition effects, you know, all these different things that

72

1    come together to create a whole song.

2    Q.    And once you've added all these layers of the music,

3    these 56 layers of music, what's the next step?  Where does

4    it go then?

5    A.    Um, basically, once, you know, all the vocals are

6    completed and the track feels done, I mean -- well, at the

7    end, Juicy J put his verse on it.  And after that, you send

8    it to the mixer to mix.

9    Q.    And what does that mean?  What is mixing?

10   A.    Mixing is basically, um, a specialized role where

11   someone will basically balance the tone and the frequencies

12   of -- of the -- of the song to make it sound as pleasing as

13   possible to the listener, um, uh, and just get it ready to

14   put out in the marketplace, basically.

15              MR. WAIS:  So if we can play Exhibit 76?

16              We're gonna play the Dark Horse song.

17                 (Exhibit 76 played for jury.)

18   BY MR. WAIS:

19   Q.    So that's the finished product; correct?

20   A.    Yes.

21   Q.    That incorporates all the layers of music you added into

22   it?

23   A.    Yes.

24   Q.    But we can still the hear the first ostinato and the

25   second ostinato from your original beat; correct?

EXHIBIT 4
PAGE 646

73

1    A.    That's correct.

2    Q.    And those didn't change?

3    A.    Those did not change, no.

4    Q.    Now, you're done creating Dark Horse.  Let's sort of

5    move on.  Were you involved in the creation of any other

6    songs for the Prism album?

7    A.    Yes.

8    Q.    Do you recall what other songs you were involved with?

9    A.    Um, there were maybe five or six songs in total.  There

10   was Dark Horse, Roar, Birthday, Unconditionally.  A couple

11   others.  I don't remember exact names.

12   Q.    And the following year is when this lawsuit was filed?

13   A.    Yes.

14   Q.    And what was your reaction to this lawsuit?

15   A.    Um, I was very surprised, you know, and to be honest,

16   kind of, you know, hurt by it cause, I mean, I -- I consider

17   myself to be an honest person, you know.  I base all of my

18   actions and my work on, you know, integrity and honesty.

19   And, um, you know, to hear that someone would accuse me of --

20   of plagiarism is -- you know, is a serious matter, and I

21   was -- you know, I was hurt by it to be honest, you know?

22   Q.    And you've come to learn that the plaintiffs in this

23   case are Marcus Gray professionally known as Gray.  Is that

24   correct?

25   A.    Um . . .

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 647

74

```
 1              MR. KAHN:  Your Honor, I think that --
 2              THE COURT:  I think you don't mean that.
 3    BY MR. WAIS:
 4    Q.   Professionally known as Flame.  I apologize.
 5    A.   Yes.
 6    Q.   And Emanuel Lambert is professionally known as Da Truth?
 7    A.   Yes.
 8    Q.   And Chike Ojukwu who's professionally known as Chike
 9    Beatz or Chike Beats Down?
10    A.   Yes.
11    Q.   When you heard who those individuals were, had you ever
12    heard of them before?
13    A.   No.
14    Q.   Um, had you ever heard of any of their music before this
15    litigation?
16    A.   No.
17    Q.   Um, and when you eventually as you testified heard
18    Joyful Noise, had you ever heard it prior to this litigation?
19    A.   No, I had not.
20    Q.   And how do you know that you had never heard it before?
21    A.   Um, I would remember if I had heard it.
22    Q.   And we've heard testimony that it's -- Joyful Noise is
23    in the genre of Christian rap.  Prior to litigation, had you
24    ever listened to Christian rap?
25    A.   No.
```

UNITED STATES DISTRICT COURT

EXHIBIT 4

1    Q.    And had you ever listened to religious music of any

2    sort?

3    A.    No.

4    Q.    And we've also heard testimony about another individual

5    named Lecrae Moore who goes professionally just by Lecrae.

6    Prior to this litigation, were you familiar with Mr. Moore?

7    A.    No, I was not.

8    Q.    Had you ever heard of his name before?

9    A.    No.

10   Q.    Had you ever heard of his music before this litigation?

11   A.    No.

12   Q.    And the song Joyful Noise appeared on an album called

13   Our World Redeemed.  Had you heard of Our World Redeemed

14   prior to this litigation?

15   A.    No, I had not.

16   Q.    And have ever seen Mr. Gray perform live in concert?

17   A.    No.

18   Q.    Have you ever seen Mr. Lambert perform live in concert?

19   A.    No.

20   Q.    Have you ever seen Mr. Ojukwu perform live in concert?

21   A.    No.

22   Q.    The same question for Mr. Moore.  Have you ever seen

23   Mr. Moore perform live in concert?

24   A.    No.

25   Q.    Have you ever attended a concert where religious music

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 649

76

1    was being played?

2    A.    No.

3    Q.    I believe you testified with Mr. Kayira that you were

4    part of a band called Let's Go to War?

5    A.    Yes, I was.

6    Q.    And that band had a MySpace page?

7    A.    Yes.

8    Q.    Did you personally have a MySpace page during the --

9    from 2008 or any point in time?

10   A.    No, I did not.

11   Q.    And your MySpace page for your band, Let's Go to War,

12   what did you primarily use that for?

13   A.    It was used to -- for us to upload our music and share

14   it with the public and to promote our group and our music.

15   Q.    Did you use it to search for music?

16   A.    No.

17   Q.    Did you use MySpace to search for music?

18   A.    No.

19   Q.    And staying in the time frame with this time frame of

20   2008 to 2013, did you use YouTube during that time period?

21   A.    Yes, I did.

22   Q.    And what would you use YouTube -- how would you use

23   YouTube during this time period?

24   A.    Um, you could search for your favorite songs on there.

25   Um, if someone wanted to recommend you, you know, a friend

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 650

77

1    would send a link, hey, check out this song.  Send me the

2    YouTube link.  Um, that's -- that's how I used YouTube, you

3    know.  Or look up a funny video or something.  Someone would

4    send you a funny video, you know.  That kind of stuff.

5    Q.    Were you browsing on YouTube for lack of a better word?

6    A.    That's not what I would use it for, no.

7    Q.    Did you ever use YouTube to look for religious music?

8    A.    No.

9    Q.    Did you ever use it to look for Christian rap?

10   A.    No.

11   Q.    During your testimony with Mr. Kayira, you were talking

12   about how you were familiar with certain Billboard charts?

13   A.    Yes.

14   Q.    Um, could you just explain what -- during your career

15   what you -- when you would look at Billboard charts?

16   A.    Um, you know, if I had a song that was charting on the

17   Hot 100 chart, I might check just real quick if, um -- you

18   know, if it had moved up or down a position, um, from the

19   week before.  And I might just quickly glance at the Top 10

20   of the Hot 100 just to educated myself on what were the most

21   popular songs at the time.

22   Q.    Are you familiar with how many charts Billboard has?

23   A.    I'm not familiar with the exact number of their charts,

24   no.

25   Q.    Would you ever look at charts that your music was not on

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 651

78

1  or outside the Top 100?

2  A.   No.

3  Q.   And I believe Mr. Kayira asked you questions about the

4  Grammy awards.

5  A.   Mm-hmm.

6  Q.   It's your understanding that there are many categories

7  of Grammy awards; is that correct?

8  A.   Yes.

9  Q.   To the extent that you pay attention to the Grammys,

10  what categories do you follow?

11  A.   Um, I'd say just Song of the Year, Record of the Year.

12  Um, that's kind of, I mean, about it.  I'm not like an

13  enthusiastic, you know, Grammy follower or watcher but yeah.

14  Q.   And do you follow any of the awards in any of the

15  religious music categories?

16  A.   No.

17  Q.   I just have a few more questions, Mr. Walter.  By 2013

18  when you get to working with Katy Perry and creating Dark

19  Horse, how long had you been in the music business for at

20  that point?

21  A.   Um, it's hard to say an exact number but maybe . . .

22  seven years or something like -- six, seven years.  Part of

23  it was not professionally, but I've probably been making

24  music for around seven years or so.  Yeah.

25  Q.   And you've continued to create music since then;

EXHIBIT 4
PAGE 652

 1    correct?

 2    A.    Yes, I've created music since then.  Yeah.

 3    Q.    Was it easy to get to a point of where you were working

 4    with Ms. Perry?

 5    A.    No, it's not easy.

 6    Q.    Okay.  And just explain generally what it took to get to

 7    that point.

 8    A.    Um, just a lot of perseverance, you know, um, kind of

 9    not knowing which direction to go.  Um, a lot of doors

10    slammed in your face.  A lot of, uh, you know, just kind of

11    wondering if this is really a good career path for you, you

12    know.  Should I go back to school?  You know.  So, you know,

13    a lot of that kind of stuff.  But, um, yeah, I mean,

14    eventually if you -- a little bit of luck on your side and

15    just making the right decisions and believing in yourself,

16    you can, you know -- you can get there.

17    Q.    And are you proud of the work you did on Dark Horse?

18    A.    Yes, I am.

19    Q.    Are you proud of your career?

20    A.    Yes.

21              MR. WAIS:  No further questions.

22              THE COURT:  Redirect?

23              THE COURT REPORTER:  I'm sorry, Judge.

24              I think I need to take a --

25              THE COURT:  We need to take a short recess

```
 1    according to the reporter.  So why don't you hold on for a
 2    minute.
 3              Ladies and gentlemen, let us take a ten-minute
 4    recess.  Please keep an open mind, don't discuss the case
 5    with one another or anyone else, and we'll pick up and
 6    probably go till 12:30.
 7              THE CLERK:  All rise.
 8                        (Jury not present.)
 9              THE CLERK:  Please be seated.
10              THE COURT:  Why don't we just take a recess, and
11    we'll come back.
12              THE CLERK:  Okay.  This court's in recess.
13                        (Recess taken.)
14              THE CLERK:  All rise.
15                        (Jury present.)
16              THE CLERK:  Please be seated.
17              THE COURT:  Okay.  Mr. Kayira.
18                        REDIRECT EXAMINATION
19    BY MR. KAYIRA:
20    Q.   All right.  Mr. Walter, earlier today, you testified
21    that to refresh your recollection in anticipation of your
22    testimony today, you looked at some materials to learn when
23    you created the instrumental.  Is that a fair statement?
24    A.   Yes.
25    Q.   Um, what did you look at?
```

1    A.    Uh, they showed me a CD that had the date on it.

2    Q.    They showed you a CD that had the date?

3    A.    Mm-hmm.

4    Q.    Did you look at anything else?

5    A.    No.

6    Q.    Did you -- did you play the CD or did you have to put

7    the CD in a computer to see the date or was it written on the

8    CD?

9    A.    It was just written on the CD.

10    Q.    And do you know who wrote the date on the CD?

11    A.    Someone from my counsel.  I'm not sure specifically

12    which person.

13    Q.    Did you double-check to make sure that date was correct?

14    A.    Um . . . yes.

15    Q.    And how did you do that, sir?

16    A.    Um, I just kind of refreshed my memory from -- from what

17    I knew in the past.

18    Q.    Did you look at your computer or any electronic files to

19    determine that date?

20    A.    No, I did not.

21    Q.    All right.  So now I want to ask you a simple question.

22    You're a professional music producer; correct?

23    A.    Correct.

24    Q.    And your livelihood is in music; correct?

25    A.    Um, that's how I make a living, yes.

1    Q.   Okay.  So do you listen to music every day?

2    A.   Um, I'd say I listen to music every day, yeah.

3    Q.   Uh, would you like listen to like ten -- ten songs in a

4    day or 15?  How much music do you listen to in a day?

5    A.   Every day is different.  Some days, I'm, you know,

6    creating so much music that I don't feel like listening to

7    any more music.  And other days, I might throw on some of my

8    favorite music just to kind of relax or unwind.  Every day's

9    different.

10   Q.   Okay.  And do you listen to different types of music in

11   genres like pop?

12   A.   Yes.

13   Q.   How about in electronic?

14   A.   Yes.

15   Q.   How about dance music?

16   A.   Yes.

17   Q.   Uh, rap and hip hop?

18   A.   Yes.

19              MR. KAYIRA:  I'd like to play for you Exhibit 75.

20              MR. WAIS:  No objection.

21              THE COURT:  I believe it's in evidence so you may.

22                   (Exhibit 75 played.)

23   BY MR. KAYIRA:

24   Q.   I played a portion of the song known as Joyful Noise,

25   and I intentionally stopped it before we got to the lyrics.

```
 1    Can you describe what kind of beat that was that you just

 2    heard?  Ignoring the lyrics.

 3    A.   Um, I'd say it's a hip hop beat.

 4    Q.   Okay.  Now, I want to ask a question about one of the

 5    awards you've received.  You received an ASCAP award; is that

 6    correct?

 7    A.   Uh, I've received several ASCAP awards, yes.

 8    Q.   And were those awards for song writing?

 9    A.   Yes.

10    Q.   Do you -- do you know if you've received an award for

11    writing lyrics in any song?

12    A.   No, I have not.

13    Q.   And so the ASCAP award that you received for Songwriter

14    of the Year, uh, you did that -- you achieved that award by

15    your production, by you're producing; correct?

16    A.   I didn't receive an award for Songwriter of the Year.

17    Q.   What award did you win?

18    A.   Um, I won an award for one of the most popular, one of

19    the most consumed songs of the year but not for songwriter of

20    the year.

21    Q.   Okay.  So that was from ASCAP; is that correct?

22    A.   Yes.

23    Q.   And ASCAP, it's a performing rights organization; is

24    that correct?

25    A.   That's correct.
```

 1  Q.   And it is specifically dedicated to publishing, music

 2  publishing.  Is that not correct?

 3  A.   Um, I'd say they cover a variety of different kind of

 4  roles, but that's part of it.

 5  Q.   Well, do you -- uh, do you have a publishing company?

 6  A.   Do I have my own publishing company?

 7  Q.   Are you signed to a publishing company?

 8  A.   Um, I have an administrative deal with Cobalt Music, not

 9  a co-publishing deal, but you could say so, yes.

10  Q.   Do you know if you're member of ASCAP?

11  A.   Yes, I am member of ASCAP.

12  Q.   And do you agree that ASCAP collects earnings for

13  songwriters?

14  A.   Yes, they do.

15  Q.   Earlier you testified that you received -- when you're

16  on YouTube, some of your friends will send you links; is that

17  correct?

18  A.   Yes.

19  Q.   And other people would send you links that might include

20  a video, and some of them might include music; is that

21  correct?

22  A.   That's correct.

23  Q.   Um, as a music producer that's as successful as you are,

24  would you find that -- or have you found that more and more

25  people are sending you links as you've become more and more

EXHIBIT 4
PAGE 658

```
 1   popular?

 2            MR. WAIS:  Objection, vague.

 3            THE COURT:  Do you understand the question?

 4            THE WITNESS:  Um, can you repeat it one more time?

 5            THE COURT:  Why don't you rephrase.

 6            MR. KAYIRA:  Okay.

 7   Q.   As you were becoming a well-known music producer, did

 8   more people start sending you links more frequently?

 9            MR. WAIS:  Same objection.  As to time and scope,

10   also.

11            THE COURT:  Well, we have time.  I think I know the

12   question but . . .

13            THE WITNESS:  I'd say people have been sending me

14   links, that as I got more successful, people would send me

15   more links, yes.

16   BY MR. KAYIRA:

17   Q.   Also, as you've become more successful as a music

18   producer, did -- um, have you felt more pressure to keep

19   coming up with good beats?

20   A.    Um . . . sometimes.  Some days, I'm, you know, very

21   confident in myself.  Other days, I, you know, feel like I

22   may never do anything great again, you know?  Every day's

23   different, but, you know, sometimes, there's a pressure,

24   yeah.

25            MR. KAYIRA:  And those are all the questions I
```

1    have.

2              THE COURT:  Okay.  Anything else?

3              MR. WAIS:  Just a couple brief questions.

4              THE COURT:  Okay.

5                        RECROSS-EXAMINATION

6    BY MR. WAIS:

7    Q.    Mr. Walter, when you were talking about receiving links

8    to YouTube videos, who were the individuals who were sending

9    you those links?

10   A.    Um, friends, people I work with.

11   Q.    Isn't the case that sometimes you receive music

12   unsolicited from people you do not know?

13   A.    Yes, that happens.

14   Q.    And do you have a policy as to what you do in those

15   circumstances?

16   A.    I don't listen to those links.

17   Q.    I believe you heard the portion of Joyful Noise that

18   stopped off before the lyrics.

19   A.    Yes.

20   Q.    Uh, when you listen to music, do you typically listen to

21   entire songs?

22   A.    Yes.

23   Q.    And do you enjoy both the music and the lyrics?

24   A.    Yes.

25              MR. WAIS:  No further questions.

```
 1              THE COURT:  Okay.  Anything further?

 2              MR. KAYIRA:  Nothing, Your Honor.

 3              THE COURT:  You may step down.  Thank you.

 4              THE WITNESS:  Thank you.

 5              THE COURT:  And who's next?

 6              MS. COHEN:  Mr. Gottwald.

 7              THE COURT:  Okay.

 8              THE CLERK:  Please raise your right hand.

 9                    (Witness sworn.)

10              THE CLERK:  Please be seated.

11              MS. COHEN:  And Your Honor, may I approach the

12      witness with his deposition transcript and exhibits?

13              THE COURT:  Sure.

14              THE CLERK:  Please state your full name and spell

15      your last name.

16              THE WITNESS:  Lukasz Sebastian Gottwald.

17              Last name is G-o-t-t-w-a-l-d.

18              THE CLERK:  Thank you.

19                    DIRECT EXAMINATION

20      BY MS. COHEN:

21      Q.   Good morning, Mr. Gottwald.

22      A.   Good morning.

23      Q.   Is it true that you're a music producer, sir?

24      A.   Correct.

25      Q.   And you're also a songwriter?
```

EXHIBIT 4
PAGE 661

1    A.    Yes.

2    Q.    Um, is it true that you create music for a professional

3    living?

4    A.    Yes.

5    Q.    And, of course, that requires you to work directly with

6    lots of artists; is that right?

7    A.    Yes.

8    Q.    Um, do you recall being interviewed by a journalist by

9    the name of John Seabrooke who prepared an article on you in

10   the New Yorker in 2013?

11   A.    I do.

12   Q.    Do you recall that he followed you around and spent time

13   in your home and in your studio for several days in

14   preparation for writing that article?

15   A.    I do.

16   Q.    And do you recall reading the article when it came out?

17   A.    I didn't.

18   Q.    You did not.

19   A.    No.

20   Q.    Have you since that time read the article?

21   A.    I have.

22   Q.    In the article, Mr. Seabrooke that says as of 2013, you

23   had co-written, co-produced -- co-written and/or co-produced

24   more than thirty Top 10 singles between 2004 and 2013.  Is

25   that true?

```
 1   A.    Um, I don't -- I'm not sure of the accuracy of that

 2   statement.  Um, it may or may not have been in that article.

 3   But one of the reasons I didn't read the article cause there

 4   was so many factual inaccuracies in there.  And, um, I heard

 5   about it from my sister like including the same article

 6   spelled my name three different ways.  Um, it said that I

 7   didn't like Jazz music which I went to college for Jazz

 8   music.  So there was quite a bit of inaccuracy in that

 9   article.

10   Q.    Did you ever contact Mr. Seabrooke to let him know that

11   there were certain inaccuracies that you thought should be

12   corrected?

13   A.    Um, we did.  And the way that that generally works is

14   that someone writes an article on you, and then there's

15   someone else at the -- at the -- you know, the magazine would

16   basically contact someone of mine to fact check it.

17         And at that time, it was the first time I realized

18   that there was so many problems with the article.  Um, there

19   was basically so many inaccuracies that -- but we only got to

20   change so many of them.  So it was sort of the article came

21   out with a lot of things that were not correct.

22   Q.    Okay.  Well, I'm gonna use certain facts included here

23   as reference, and you can tell me what's accurate and what's

24   not accurate.

25         MR. MOVIT:  Objection to the characterization the
```

```
 1    assertions in the article as facts.
 2              THE COURT:  Well, I'm gonna sustain the objection,
 3    and I wonder isn't the entire article hearsay?
 4              MR. MOVIT:  That would be our position, Your Honor.
 5              THE COURT:  How can you possibly quote the article
 6    when it's hearsay to someone's out-of-court statement?  You
 7    can ask questions based on, you know, what he's read in there
 8    but . . .
 9              MS. COHEN:  I'll just ask my questions, Judge.
10              THE COURT:  I think that would be.
11              MS. COHEN:  Yeah, I'm not seeking to get the
12    article into evidence.
13              THE COURT:  Well, yeah.
14              And ladies and gentlemen, the fact that something
15    was in an article is hearsay.  It's not admissible because
16    it's a statement made out-of-court where there's no
17    opportunity to cross-examine the speaker, and so that's why
18    we keep it out.
19              So why don't you go ahead and ask your questions.
20    BY MS. COHEN:
21    Q.   Yeah.  So let me just ask it this way.  By 2013, had you
22    had many, many Top 10 singles?
23    A.   I believe so.
24    Q.   And did you work with big name artists such as Britney
25    Spears?
```

```
 1    A.    Yes.  I believe so.

 2    Q.    Katy Perry?

 3    A.    Yes.

 4    Q.    Miley Cyrus?

 5    A.    Yes.

 6    Q.    FEG?

 7    A.    Yes.

 8    Q.    Kesha?

 9    A.    Yes.

10    Q.    At the time, were you also serving as an exclusive

11    in-house hit maker to an array -- to an array of artists on

12    some of Sony's major labels?

13              MR. MOVIT:  Objection.

14              THE WITNESS:  I'm not sure I would use those choice

15    of words.  I was -- um, Sony, uh, seeked to have my

16    exclusivity as a producer.

17    BY MS. COHEN:

18    Q.    So is it true then that you were working as an exclusive

19    producer for Sony at that time in 2013?

20    A.    I -- I believe so.

21    Q.    And so in that regard in your role as an exclusive

22    producer for Sony, um, were you frequently called upon to

23    create hit songs?

24    A.    I'm not sure that's how it works, but, um, I was a

25    producer, and I produced songs for Sony.
```

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 665

1  Q.   And so you were called upon by Sony to produce songs for

2  the label; is that right?

3  A.   On occasion.

4  Q.   Is it true that in 2011 and again in 2014, you were

5  nominated for Best Producer of the Year at the Grammys?

6  A.   Um, I don't know the particular years, but I do believe

7  I've been nominated several times.

8  Q.   And so during this -- this, um, time period that you had

9  where you were being called upon by Sony and working with

10  lots of big name artists, um, same question that we asked

11  Mr. Walter, did you feel pressure to keep coming up with hit

12  songs?

13  A.   I would say that in working as a creative person, um,

14  I've always felt pressure.  Um, some days, I feel really

15  confident.  Some days, I feel like I do great work.  Some

16  days, I feel like I'm terrible.  And, um, that's part of the

17  process in being a creator.

18  Q.   Is it true that in continuing to come up with music, you

19  listen to a lot of music?

20          MR. MOVIT:  Objection.  That's --

21          THE WITNESS:  I feel I've listened to a fair amount

22  of music.

23  BY MS. COHEN:

24  Q.   Do you listen to music every day?

25  A.   No, I do not.

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 666

```
 1   Q.   Do you recall giving an interview on an ASCAP panel in
 2   2011 related to your creative process?
 3   A.   I'm aware that I did do several ASCAP panels.  I don't
 4   know the specific years.
 5   Q.   And is it true that, um, for you, the key to performing
 6   and creating a -- at a high level is continuing to listen to
 7   music that's not created by you; is that right?
 8   A.   Um, I'm not sure what -- are you quoting something?
 9   Are -- are you quoting something right now?
10   Q.   Well, I've been asked not to so I'm just asking you the
11   question.
12   A.   Are you saying that I said that?  I'm just trying to
13   understand.
14   Q.   Yeah, I believe you have -- you have said that.
15   A.   Could you please repeat it?
16   Q.   Sure.  In -- in your view, is -- is the key for your
17   creative process, the key to creating at a high level to
18   continuing at a high level is listening to music that's not
19   created by you?
20   A.   Um, I believe that what that means is I work with a lot
21   of different people.  Right?  And when you're working with
22   people, you're listening to them.  You're sharing in the
23   creative process.  And so I also have a publishing company
24   which I'm sure you'll probably ask me about, and I have many,
25   um, musicians, songwriters and producers, and this is what I
```

```
 1    do.  I'm in the studio all the time with different producers
 2    and writers, and I listen.
 3    Q.   And do you -- do you have a lot of people who are
 4    constantly bringing you music and playing music for you?
 5    A.   I would say yes.
 6    Q.   And you get inspiration from other people's songs?
 7    A.   Uh, yeah.  I would say when someone that I work with
 8    plays me something that I like, it inspires me to be better
 9    as well.
10    Q.   Do you listen to a variety of genres?
11    A.   Um, I have throughout my life.
12    Q.   In the time frame 2012 to 2013, can you tell us what
13    genres you were listening to frequently at that time?
14    A.   Probably mostly pop music.
15    Q.   How about hip hop?
16    A.   Hip hop, but mostly in the popular sense so when
17    something becomes big to become popular.
18    Q.   What do you mean by that?
19    A.   Well, popular music is a -- is basically most pop music
20    is the popular genre of music.  So, um, I wouldn't say that I
21    was super deep into hip hop, um, but I would say that when
22    something became really popular and well known, it might come
23    on my radar.
24    Q.   And how would it come on your radar?
25    A.   From hearing it, hearing about it from somebody I know,
```

1  from seeing a video or, you know, I -- I don't know.  Various

2  ways.

3  Q.   Is it true that you monitor charts for -- for what music

4  becomes popular?

5  A.   I have at different times in my career, um, monitored

6  charts and looked at various data.

7  Q.   And what charts are those that you look at?

8  A.   Um, these days, uh, Spotify charts.  Um . . . I -- I'm

9  guilty also as checking the charts more frequently when a

10  song that I've contributed on or worked on has luckily been

11  on the charts.  I tend to follow it a little bit more then.

12  Um, so there are periods of time that I don't listen to --

13  um, look at the charts as well.

14  Q.   Do you recall saying with respect to charts that you

15  scour the charts?

16  A.   I don't recall that.

17  Q.   Would that have been true of the time period 2012 to

18  2013?

19  A.   Um, I may have been looking at charts more frequently at

20  that time.

21  Q.   Okay.  And what charts were those?

22  A.   Um, usually sales charts and, um, radio charts.

23  Q.   And where would you look at those charts?

24  A.   Um, well, I believe at that time, I had a label so I

25  would -- people would be bringing me things.  Um, the -- the

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 669

1   radio charts you can just see on Top 40 radio charts.

2   Q.   Uh, did you look at iTunes charts?

3   A.   I believe so, yes.

4   Q.   And which charts in iTunes would have you looked at?

5   A.   The sales chart.

6   Q.   And that would have been true during this time period of

7   2012 to 2013 before the song Dark Horse was written?

8   A.   You're asking if I would look at that sales charts at

9   that time?

10  Q.   Yes.  I believe you just said that --

11  A.   Yes.

12  Q.   -- during that period of time, you did that frequently.

13  A.   Yes.

14  Q.   Did you make a point to make yourself aware of artists

15  charting in the Top 10, for instance?

16  A.   I think I would generally be aware of artists that were

17  in the Top 10.

18  Q.   In the 2000s, did you have a MySpace page?

19  A.   I believe so.

20  Q.   And how is it that you used your MySpace page?

21  A.   Well, MySpace was kind of like Facebook at that time,

22  and, um, I think I used it socially and also in the same way

23  to keep my name from someone else using it and pretending to

24  be.

25  Q.   Did you listen to music on MySpace?

UNITED STATES DISTRICT COURT

EXHIBIT 4

PAGE 670

97

1  A.  I may have listened to music on MySpace if it was

2  referred to me by somebody.

3  Q.  Um, during this time period of 2012 to 2013, did you

4  also listen to music on YouTube?

5  A.  I believe I did.

6  Q.  Um, and as of '13, is it true you preferred to do a soft

7  launch of certain songs of your own on YouTube?

8  A.  I'm not sure I know what that means.

9  Q.  Did you launch songs of your own on YouTube during this

10  time frame?

11  A.  When you say -- what do you mean by my own?  I'm not an

12  artist.  I'm a music --

13  Q.  Songs--

14  A.  -- producer.

15  Q.  Fair enough.  Songs that you had produced.

16  A.  Songs that I . . . well, I'm sorry, but if I produced a

17  song, that doesn't mean that I wouldn't have the rights to

18  launch it on YouTube.

19  Q.  So maybe what I'm referring to is more songs that would

20  have been on your own label at that time.

21  A.  It's -- it's possible that songs from artists at that

22  time came out on YouTube, that's correct.

23  Q.  And at that time, did you have a record label that was

24  called Kemosabee Records?

25  A.  Yes.

1    Q.    And is it true that you signed an artist named Becky G

2    to your label in 2011 after seeing her rap over a Kanye,

3    Jay Z song called Odus on YouTube?

4    A.    Um, it's true that I signed Becky G.  It's true that I

5    saw that video on YouTube.  But I also met her in person, met

6    her family, you know.  There was just more to it than just

7    that.

8    Q.    So how did you first learn of Becky G?

9    A.    I first learned about Becky G from an A&R person named

10    Reid Hancock.

11    Q.    You said an AR person?

12    A.    A&R person.

13    Q.    A&R.  What's that mean?

14    A.    Artist and Repertoire.

15    Q.    I see.  And are you aware that in 2012 which would have

16    been after the time you signed Becky G that her video on

17    YouTube had less than 78,000 views?

18    A.    I'm not aware of how many views it had.  It was referred

19    to me by an A&R person that I worked with, and I looked at

20    the video, and I thought she was great.

21    Q.    Um, we already spoke with Mr. Walter this morning.  And

22    I'm sorry, I forgot to ask this question.  You're

23    professionally known as Dr. Luke; is that right?

24    A.    That is correct.

25    Q.    And, um, we spoke with Mr. Walter this morning.  Do

```
 1    you -- do you refer to him as Cirkut or Mr. Walter?
 2    A.   I don't think I've ever called him Mr. Walter.
 3    Q.   Henry.
 4    A.   Henry and Cirkut.
 5    Q.   Okay.  I'll refer to him as Mr. Walter if that's okay
 6    with you.
 7    A.   That's fine with me.
 8    Q.   And during this time 2012 and 2013, it's true that
 9    Mr. Walter was essentially your protege; is that right?
10    A.   Um, he -- I -- I guess you could describe him that way.
11    He was someone who I thought was really talented and I work
12    with a lot.
13    Q.   You collaborated together and worked in the studio
14    frequently?
15    A.   Yes.  That is correct.
16    Q.   Did you frequently listen to music together?
17    A.   Yeah.
18    Q.   And share ideas together.
19    A.   Yes.
20    Q.   And we've already heard that you and Mr. Walter worked
21    together on the song Dark Horse; correct?
22    A.   That is correct.
23    Q.   And that with respect to the instrumental beat for Dark
24    Horse, you and Mr. Walter collaborated; is that right?
25    A.   That is correct.
```

1    Q.   And at that time that the instrumental for Dark Horse

2    was -- was created, uh, Mr. Walter worked for you.  Is that

3    true?

4    A.   I wouldn't describe that he worked for me.  He was not

5    an employee of mine.

6    Q.   Was he under an exclusive contract with your production

7    company, Prescription Songs?

8    A.   Um, I believe so, but that's as a producer.  He wasn't

9    paid in as a salary.  He was not an employee.  He was an

10   independent contractor.

11   Q.   Um, is it true that when you heard the instrumental beat

12   that Mr. Walter was working that later became Dark Horse that

13   you were together in the studio?

14   A.   Yes, I heard it in the studio.

15   Q.   And is it true that at least as of the time of your

16   deposition barring what you've heard as testimony here today

17   in court, um, back when we took your deposition, you weren't

18   sure whether the intro was created before the eight note

19   ostinato or vice versa?  Is that true?

20             MR. MOVIT:  Object to the form.

21             THE COURT:  Well, I think the question can stand.

22             Go ahead and answer if you can.

23             THE WITNESS:  Could you please rephrase the

24   question?

25   BY MS. COHEN:

EXHIBIT  4
PAGE  674

```
 1    Q.   Sure.  Um, you've been sitting here today in the
 2    courtroom during the testimony; correct?
 3    A.   That is correct.
 4    Q.   Okay.  So barring what you've heard today, I'm referring
 5    back to your testimony at your deposition.  At the time, sir,
 6    you were not sure whether -- you couldn't say or remember
 7    whether the intro portion, the four note -- the four
 8    repeating notes that go up and down, whether that portion was
 9    created before the eight note portion or whether the eight
10    notes were created before the four notes; is that right?
11    A.   I wasn't there when that happened so I can't say for
12    certainty because I wasn't there at that time, um, although
13    it does make sense that the music would start with the intro,
14    and then that it would be stretched out and slowed down to
15    make way for vocal in the verse.
16    Q.   And in your experience, is that ever not the case, that
17    the beat would be created first, and then later an intro
18    would be added?
19    A.   It -- it could be done that way as well.
20    Q.   And is it true that, um, as a producer, you oversaw the
21    instrumental melody and then what later became the lyrical
22    melody in the chorus of the song and how it all came
23    together?
24    A.   Um, I think you're combining maybe producing and
25    writing?  Um, but yes.  I am a co-producer on the song and a
```

```
 1    co-writer of the song.

 2    Q.    So you held all of those different roles.

 3    A.    Sorry, say that again?

 4    Q.    You got producing credit for the song; correct?

 5    A.    Yes.

 6    Q.    You also got song writing credit.

 7    A.    Yes.

 8    Q.    Okay.

 9    A.    For two different things I did on the song.

10    Q.    Is it true that, um, the -- that the instrumental

11    composition never was reduced to writing?

12    A.    I'm sorry, what do you mean by that?

13    Q.    Did you ever notate the song on paper?

14    A.    Oh, you mean writing it out on notations?

15    Q.    Yes.

16    A.    Um, I haven't done that in many years.

17    Q.    Do you know of anybody who did that with respect to this

18    song during its creation?

19    A.    I don't know personally know.

20    Q.    So whenever it came to be that you liked the way it

21    heard, how was it that you would record it?

22    A.    Sorry.  Repeat that one more time?

23    Q.    You were all working together.

24    A.    Who is all?  What do you mean?

25    Q.    Well, after the creation of the instrumental beat, did
```

1    you play it for Ms. Perry?

2    A.    Yes.  At some point, we played it for Ms. Perry.

3    Q.    And then later on at the studio in Santa Barbara, Ms.

4    Perry, Ms. -- Ms. Sarah Hudson and others were all involved

5    in what later became the song Dark Horse; is that right?

6    A.    Yes, they were all involved.

7    Q.    Okay.  And we heard testimony earlier that, um, Ms.

8    Perry and Ms. Hudson went into a different room at one point

9    to create the lyrics?  Is that consistent with your

10    recollection?

11    A.    Yeah.  Um, they would often times after the melodies

12    were written, um, would concentrate on the lyrical parts.

13    Q.    And so once, uh, you were satisfied with the lyrics and

14    the lyrical melody, how it fit with the instrumental melody,

15    how was it that you then recorded the song?  If -- if not on

16    paper.

17    A.    We recorded it in Pro Tools.

18    Q.    A sound recording?

19    A.    When you say recording, you mean like recording the

20    vocals?  Is that what you're talking about?

21    Q.    Correct.

22    A.    Yeah.  We did that in Pro Tools.

23    Q.    I'd like to show you what's been marked as Exhibit 80,

24    please.  You should have a copy in the binder that's sitting

25    there.

1    A.    I have something, 80-2?  Is that what you're referring

2    to?

3    Q.    Uh, it's actually 80- -- the first page is 80-1.

4    A.    Okay.  I got it.

5    Q.    Have it?

6    A.    Yeah.

7    Q.    Do you recognize this document, Mr. Gottwald?

8    A.    Um, not really.

9    Q.    Okay.  Have you seen -- and I'll represent to you this

10    is a copy of the copyright registration for the song Dark

11    Horse.

12    A.    Can I just say, I'm sorry, it also says Exhibit 12.

13    Q.    Yeah.  I believe this was Exhibit 12 to your deposition.

14    It's been remarked.

15    A.    Okay.  Okay.  That's why I was confused.

16    Q.    Yeah.  So we looked at this in your deposition.

17    A.    Okay.

18    Q.    Do you recall that?

19    A.    I'll take your word for it.

20    Q.    Okay.  Can you identify this as the copyright

21    registration for Dark Horse?

22    A.    I'll take your word for it.  I believe so.

23    Q.    You didn't prepare this document?

24    A.    I didn't personally prepare it.

25    Q.    Okay.  You have lawyers do that kind of thing for you?

1    A.    Um, I have a team.  Um, I have management and, uh,

2    attorneys as well.

3    Q.    And reflected here, do you see, um, on the bottom of the

4    document says authorship on application?  You see that

5    section at the bottom?

6    A.    Yes, I do.

7    Q.    Do you see, uh, Katy Perry listed?

8    A.    Yes.

9    Q.    And this document reflects that she's an owner with

10   respect to the music and the lyrics?

11         MR. MOVIT:  Objection.  That's not what the

12   document says.

13         THE WITNESS:  It -- it doesn't say that.

14         MS. COHEN:  I apologize.

15   Q.    It says she's an author of the music and lyrics.  Do you

16   see that?

17   A.    I'll take your word for it.  It just says authorship on

18   application that I see but . . .

19   Q.    Do you see at the end of the line, it starts Katy Perry?

20   A.    Oh, at the end of the line.

21   Q.    Yes.

22   A.    Yes.  I see authorship, music, lyrics.

23   Q.    Okay.  And then you see your name listed next, Lukasz

24   Gottwald?

25   A.    That's correct.

```
 1   Q.   And next to authorship, for your name, you're listed as
 2   an author of the music and the lyrics; is that right?
 3   A.   Yes.
 4   Q.   And then Max Martin is on the next line?
 5   A.   That is correct.
 6   Q.   And is Max Martin listed as an author of the music and
 7   the lyrics?
 8   A.   Yes.
 9   Q.   And then Jordan Houston?  Professionally known as Juicy
10   J?  He's also listen as the author of the music and the
11   lyrics; is that right?
12   A.   That is correct.
13   Q.   And if you turn the page, Mr. Henry Walter?  He's also
14   listed as an author of the music and the lyrics.  Is that
15   true?
16   A.   That is true.
17   Q.   And same for Sarah Hudson who's also on the next line.
18   She also listed as an author of the music and the lyrics;
19   correct?
20   A.   Correct.
21   Q.   If you turn back to the first page . . .  and I should
22   have mentioned.  When you see where the application title say
23   Dark Horse.  Do you see that?
24   A.   Yes.
25   Q.   Okay.  And under the copyright claimants, do you see
```

1    Kasz Money publishing listed?

2    A.    Yes, I do.

3    Q.    Okay.  And what is Kasz Money?

4    A.    I believe that's my first publishing company.

5    Q.    And was Kasz Money, um, a publisher of the song Dark

6    Horse?

7    A.    For my share.  Yes.

8              MS. COHEN:  That's all I have for now.  Thank you.

9              THE COURT:  Okay.  Any . . .

10             MR. MOVIT:  Your Honor, if we're taking a 12:30

11   lunch, um . . .

12             THE COURT:  How long are you gonna have?

13             MR. MOVIT:  I -- I anticipate it could be over an

14   hour.  I am not sure.

15             THE COURT:  Why don't you get started.

16             MR. MOVIT:  Yes, Your Honor.

17                     CROSS-EXAMINATION

18   MR. MOVIT:

19   Q.    Mr. Gottwald, how would you describe your profession?

20   A.    I'd say I'm a profess -- I'm a musician, songwriter and

21   producer.

22   Q.    Okay.  Before we talk about you and your music, let's

23   discuss the plaintiffs.  One of the plaintiffs is Marcus Gray

24   professionally known as Flame.  Um, have you ever met him

25   before this trial?

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 681

1   A.   Uh, no.

2   Q.   Uh, ever heard his name before he sued you?

3   A.   No.

4   Q.   Um, ever heard his music before he sued you?

5   A.   No.

6   Q.   Another one of the plaintiffs is Emanuel Lambert

7   professionally known as D.A. Truth.  Did you ever meet him

8   before trial?

9   A.   No.

10   Q.   Ever hear of him before he sued you?

11   A.   No.

12   Q.   Ever hear any of his music before he sued you?

13   A.   No.

14   Q.   Another one of the plaintiffs is Chike Ojukwu

15   professionally Chike Beatz or Chike Beatz Down.  Uh, did you

16   ever meet him before this trial?

17   A.   No.

18   Q.   Ever hear his name, a personal name or professional name

19   before he sued you?

20   A.   No.

21   Q.   Ever hear any his music before he sued you?

22   A.   No.

23   Q.   Okay.  How about Lecrae Moore professionally known as

24   Lecrae?  Have you ever met this gentleman?

25   A.   No.

1  Q.  Did you ever hear of this gentleman by name or otherwise

2  before this lawsuit?

3  A.  No.

4  Q.  Ever hear of any his music before this lawsuit?

5  A.  No.

6  Q.  Um, when did you first hear the song Joyful Noise?

7  A.  Sometime after I was aware of this lawsuit.

8  Q.  So you listened to the song the first time after the

9  plaintiffs sued you; is that correct?

10  A.  Correct.

11  Q.  And how do you know you never heard it before when you

12  third after this lawsuit?

13  A.  Because I'm sure I never heard it, and, um, it's just in

14  general not the type of music I would listen to.

15  Q.  Do you listen to Christian rap?

16  A.  I do not.

17  Q.  Uh, do you listen to religious music?

18  A.  No.

19  Q.  Have you ever written or produced music, uh, for artists

20  in the Christian rap genre?

21  A.  I have not.

22  Q.  Have you ever written or produced religious music of any

23  type?

24  A.  No.

25  Q.  Mr. Gray says that he performed Joyful Noise at

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 683

110

1   concerts, and that Lecrae Moore also did.  Do you have a

2   response to that?

3   A.   They may have performed it in concerts, but I have never

4   been there.

5   Q.   So you've never been to any concert where Joyful Noise

6   has performed; is that correct?

7   A.   That is correct.

8   Q.   Have you ever been to any concerts where any of the

9   plaintiffs performed?

10  A.   No.

11  Q.   Have you ever been to any concert where Lecrae Moore

12  performed?

13  A.   No.

14  Q.   Have you ever been to any Christian rap concert?

15  A.   No.

16  Q.   Ever been to any Christian music concert?

17  A.   No.

18  Q.   Do you ever watch religious television programs?

19  A.   No.

20  Q.   Do you listen to religious radio programs?

21  A.   I do not.

22  Q.   Okay.  Do you follow any awards given out to Christian

23  music?

24  A.   I do not.

25  Q.   There's been assertions in this case that professional

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 684

1    songwriters spend a lot of time listening to music in all

2    different genres.  Is that your experience?

3    A.   It's not my experience, no.

4    Q.   What is your experience, Mr. Gottwald?

5    A.   Um, in general, uh, you know, when people ask me about

6    what we do, um, people think, oh, you just sit around and

7    listen to music all day, and, in fact, that's the opposite.

8    Um, you know, when I was younger, I listened to quite a bit

9    more music, um, in my teenage years.

10         And, um, you know, the reality is that you can't

11   you listen to two songs at the same time.  And so if you're

12   working on music all the time, um, which I have been for a

13   very long time, you actually listen to less music in my

14   experience because also, when you've been workin' on it all

15   night, you know, it's -- you kind of want to get away from it

16   sometimes.

17   Q.   Okay.  Mr. Gottwald, you talked about -- when you were

18   examined by the plaintiff's attorney, you talked about

19   looking at certain sales data and radio data.  Is there a

20   service that provides you with the sales data you were

21   referring to?

22   A.   Um, we would get -- sometimes through the label, we

23   would get -- um, when I was in the Sony -- Sony records

24   system, I would get something, um, sales data from them.

25   Q.   Have you heard of a company called Neilson?

```
 1    A.    I have.

 2    Q.    Okay.  And what -- what do you know about that company?

 3    A.    They track sales data.

 4    Q.    Have they ever given you the sales data?

 5    A.    Directly?  To me?

 6    Q.    Or have you ever reviewed Neilson sales data?

 7    A.    I've looked at it before, yes.

 8    Q.    And we talked about radio data is there a service that

 9    provides that data?

10    A.    I believe there are a couple services.

11    Q.    And so these -- these -- what is it -- do you know the

12    names of the companies that provide that data?

13    A.    One is called Media Base, um, I believe one is called

14    BDS.

15    Q.    And are those services you're referring to that provide

16    the sales and radio charts that you were talking about?

17    A.    Correct.

18    Q.    And you referred to artists in the Top 10 when the

19    plaintiff counsel was examining you.  The Top 10 of what were

20    you referring to?

21    A.    The Top 10 of the popular chart.  So, um, that's like --

22    so, for instance, um, certain charts, they just take all

23    music, and whatever is the most popular, the most sales, the

24    most radio, that's the chart that I would look at.

25    Q.    So, for example, you'd look at the Top 10 of the Neilson
```

UNITED STATES DISTRICT COURT

EXHIBIT 4

113

1    for pop?

2    A.    Yes.

3    Q.    Or the Top 10 of Neilson for -- excuse me.  Or the Top

4    10n of Media Base for radio; is that correct?

5    A.    Yes.

6    Q.    And you -- you talked about, uh, listening to music, you

7    know, in your testimony before as part of your job.  Who was

8    making the music that you were listening to?

9    A.    Um, often times myself and people I work with.

10   Q.    And so when you're referring to the sales and the radio

11   chart data that you're referring to, before were you

12   referring to Billboard?  Were you referring to Neilson and

13   Media Base?  Who are you referring to?

14   A.    I'm sorry.

15   Q.    Of course.

16   A.    Say the question one more time?

17   Q.    So when you referred to in your testimony by the

18   plaintiff's counsel --

19   A.    Yes.

20   Q.    -- when he asked you questions.  When you talked about

21   reviewing sales and radio data, were you referring to

22   Neilson?  Were you referring to Media Base?

23   A.    Yeah.

24   Q.    Were you referring to Billboard?  What were you

25   referring to?

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 687

1    A.    So for those, Billboard is basically an aggregator, and

2    that chart -- the chart that we look at is the Hot 100, and

3    that has formulas that they get various information from

4    which includes radio play, streaming of a song and sales, and

5    they combine that.  And so generally, you know, I look at the

6    Hot 100, but often times, I would just look at the radio

7    chart or the sales chart.

8    Q.    And you'd look directly at the Media Base.  Or the at

9    the Neilson.

10   A.    Correct.

11   Q.    As opposed to Billboard; is that correct?

12   A.    Correct.

13   Q.    At any point in time, have you ever looked at gospel

14   charts?

15   A.    Never.

16   Q.    Okay.  Or Christian rap charts?

17   A.    Never.

18   Q.    Okay.  Or charts for any kind of religious music?

19   A.    No, I have not.

20   Q.    By any service?

21   A.    No service, I have not.  It's really a different world

22   musically.  It's a different world.

23   Q.    What's a different world?

24   A.    Like Christian music and just pop music are just -- if

25   you're -- I'm focused in the pop music genre.  Which I don't

115

1   really -- I've never really looked at the other.

2   Q.   Okay.  And do you have an understanding of why that

3   might be that they're different worlds?  Pop music and

4   Christian rap?

5   A.   Well, I feel like people's faith is very personal, and

6   pop music appeals to everybody.

7   Q.   Have you ever had a policy regarding unsolicited music?

8   A.   Yes.

9   Q.   Okay.  And what is that policy?

10  A.   I don't listen to unsolicited music.

11  Q.   And is that -- was that your policy between 2008 and

12  2013?

13  A.   Correct.

14  Q.   Okay.  And you were also asked some questions by the

15  plaintiff's attorney regarding the intro and regarding the

16  beat.  Do you recall that?

17  A.   I do.

18  Q.   Okay.  And specifically regarding the intro and

19  regarding the beat of Dark Horse; is that correct?

20  A.   Correct.

21  Q.   Okay.  In your opinion, is the music in the intro part

22  of the beat in Dark Horse?

23  A.   Yeah, I would say it's part of it.

24  Q.   And is that music in the intro also present in later

25  parts of Dark Horse?

EXHIBIT 4
PAGE 689

```
1    A.   Yes.  It's in the intro.  It's in all the choruses
2    throughout the song.
3    Q.   Okay.  Let's step back and talk about your history and
4    background a bit, Mr. Gottwald.  Could you please tell us how
5    you got started in the music business?
6    A.   Um, I started out as a drummer and guitar player and
7    basically grew up in New York City and used the guitar as a
8    means to make a living.  I was a session guitar player, and I
9    played guitar in people's music.
10   Q.   Do you have any formal musical training?
11   A.   Um, I went to -- when I was in high school, I was able
12   to go to certain college classes, and so I went to the Mannes
13   Conservatory, the New School of Music, and I went two years
14   of college at Manhattan School of Music.
15   Q.   So take us to the next stop of your career beyond which
16   you've testified about.  You were playing guitar.  What
17   happened next?
18   A.   I was playing guitar.  I was, you know, recording on,
19   you know, TV commercials, you know people's songs.  And I
20   eventually -- you know, was practicing every day.  And
21   eventually, I got an audition to Saturday Night Live
22   television show, and I auditioned for that, and I became the
23   guitar player on that show.
24   Q.   And how long were you the guitar on Saturday Night Live?
25   A.   Um, for ten years.
```

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 690

1    Q.    So that would be until 2006 or 2007?

2    A.    From '96 to 2006, 7, yeah.  Correct.

3    Q.    What happened in your career during the time that you

4    were the Saturday Night Live guitar player?

5    A.    Um, uh, while I was doing that, in between shows, I was

6    always working as a songwriter and producer and trying to

7    become better.  And eventually, it got to the point where

8    they were playing my songs on the -- on the show with artists

9    that I worked at while I was still the guitar player on the

10   show.

11          And I also got to write all the music for all the

12   big music acts that would come on Saturday Night Live.  So

13   like if Britney Spears was on the show, I would make the

14   music that she would -- that would be in the show for her and

15   M& M and all kinds of different writers and stuff.

16   Q.    What happened next with your career?

17   A.    Um, let me see.  I just kept producing and writing

18   songs.

19   Q.    And at some point in time, did you meet Max Martin?

20   A.    Yes, I did.

21   Q.    Okay.  That's Martin Sandberg professionally known as

22   Max Martin.  Could you please tell us about that, meeting Max

23   Martin?

24   A.    Um, I met him at a party that I was DJing at, and we

25   became friends, and we -- you know, after a couple years, I

```
 1   think we started to work together.
 2   Q.   And can you please tell us some of the names of the
 3   songs that you produced and co-wrote with Max Martin?
 4   A.   Um, a Kelly Clarkson called Since You've Been Gone.  We
 5   had Behind These Hazel Eyes for Kelly Clarkson.  Um, Britney
 6   Spears, Hold It Against Me.  Um, Katy Perry stuff.  Uh, Pink,
 7   uh, Who Knew.  A lot of -- there's a lot of songs.
 8   Q.   And you mentioned Katy Perry just now; is that correct?
 9   A.   Correct.
10   Q.   Okay.  Can you please tell us when your professional
11   relationship began with Katy Perry?
12   A.   Like probably about a year-and-a-half, maybe two years
13   before her first album?
14   Q.   And do you recall when that album was?
15   A.   I don't remember the exact date.
16   Q.   Was it about 2008?  Does that refresh your recollection?
17   A.   It sounds right.
18   Q.   Uh, and what was that album?  Do you recall what it was
19   called?
20   A.   It was called One of the Boys, I believe.
21   Q.   And do you recall any of the songs that you co-wrote and
22   produced of that album?
23   A.   Uh, yes.  I did, um, I Kissed a Girl and Hot and Cold
24   which were the first and second single.
25   Q.   And did you work with -- Katy Perry, that's her
```

```
 1    professional name, Ms. Hudson as we're referring to her in
 2    this case, did you work with her again after the One of the
 3    Boys album?
 4    A.    Yes.  After that, I did her next album called Teenage
 5    Dream.
 6    Q.    Okay.  And what were some of the songs that you worked
 7    on and co-wrote and co-produced on the Teenage Dream album?
 8    A.    Um, Teenage dream.  Um, ET.  Last Friday Night, The One
 9    that Got Away.  Um, Part of Me.
10              THE WITNESS:  Yeah?
11              THE COURT REPORTER:  I'm sorry.  Part of Me?
12              THE WITNESS:  I think so.  That might have been
13    another album.
14    BY MR. MOVIT:
15    Q.    And Mr. Walter professionally known as Cirkut testified
16    right before you.  Could you please tell us how your
17    professional relationship with Mr. Walter began?
18    A.    Um, as he said, um, uh, someone, you know, introduced
19    us, and I heard some of his music.  Um I though he was
20    talented.  I saw a lot of raw talent.  And at some point, I
21    met with him.  And, uh, it's probably a little later, I was
22    working on a Brittany Spears album, and I had him come in.
23    Sorry, my voice.  I had him come in and work on the song.
24    Q.    And what's your view of, um, Mr. Walter as a songwriter
25    and record producer?
```

1    A.    I think he's really talented.

2    Q.    When you're working -- when you were working with

3    Mr. Walter on tracks like the Katy Perry track, um, how much

4    time would you spend in the day on the music while you're in

5    the studio?

6    A.    All day.  I mean, it's like it's super tough, and it

7    requires super long hours so . . .

8    Q.    A lot of hard work?

9    A.    Yes.

10    Q.    What's sustained you?

11          THE COURT REPORTER:  I'm sorry?

12    BY MR. MOVIT:

13    Q.    What sustained you during these long hours?

14    A.    Um, you gotta love it.  And, um, I feel very fortunate

15    to be able to do what I've done.  And, um, I love the music.

16    And I, uh -- also, I think, uh, striving for perfection, just

17    really trying to make whatever we do as great as possible.

18    Q.    And when you were working in the studio with Katy Perry,

19    who would be present in the studio during that process?

20    A.    Probably just the writers.  Occasionally, an A&R person

21    would come which stands for Artists and Repertoire, I

22    believe, and they work for the record labels.

23    Q.    Would anyone else be there?

24    A.    Um, there were times when I believe her management would

25    come in, but pretty much, it would just be the writers.

EXHIBIT 4
PAGE 694

1    Q.    Okay.  Is there a reason why you would want it to pretty

2    much just be the writers?

3    A.    Yeah.  I mean, it's a very personal experience, writing,

4    and we'd want to keep it personal and -- and not have outside

5    influences when we're trying to create.

6    Q.    And you own a music publishing company that signs other

7    songwriters.  Is that correct?

8    A.    That is correct.

9    Q.    Okay.

10    A.    I've had a company called Prescription Songs for over

11    ten years.

12    Q.    And you're also the CEO of a record label; is that

13    right?

14    A.    I was.  Yeah.

15    Q.    So you've worked with a lot of artists?

16    A.    Yes.

17    Q.    And to your knowledge, have you ever worked with an

18    artist who performs religious music?

19    A.    Not to my knowledge.

20    Q.    Okay.  Um, let's turn specifically to Dark Horse.

21           THE COURT:  If you're gonna to do that, this would

22    be a good time for lunch.

23           MR. MOVIT:  Okay.

24           THE COURT:  Okay.  Ladies and gentlemen, why don't

25    we try to be back by 1:15.  I know that's cutting it close

```
 1    for you, but aiming for that, and if it takes a little

 2    longer, we'll understand.  But in the meantime, please keep

 3    an open mind, don't discuss with one another or anyone else,

 4    and we'll see you back here at or about 1:15.

 5            THE CLERK:  All rise.

 6                    (Jury not present.)

 7            THE CLERK:  Please be seated.

 8            THE COURT:  Okay.  Before we go, do we have to do

 9    anything about Billboard right now?

10            MS. LEPERA:  If the Court wants to do it now?

11            It's up to Your Honor.

12            THE COURT:  I don't care.  I'm tired of Billboard,

13    but what's the Billboard issue?

14            MS. COHEN:  Your Honor, I -- I had a conversation

15    with.

16            THE COURT REPORTER:  I'm sorry.  Can you go to the

17    lectern?

18            MS. COHEN:  Oh.  Yes.

19            THE COURT REPORTER:  I can't see you over there.

20            MS. COHEN:  Your Honor, I think it would be helpful

21    for counsel to confer again before we discuss this with the

22    Court.

23            THE COURT:  Okay.

24            MS. COHEN:  Because the last conversation that we

25    had was unresolved.
```

1           THE COURT:  Okay.  Well, I would certainly like you

2    to resolve it if you can.

3           MS. LEPERA:  Understood, Your Honor.

4           MS. COHEN:  Thank you.

5           THE CLERK:  Anything further?

6           THE COURT:  Just one more question.

7           Any closer on jury instructions?

8           MR. WAIS:  So over the weekend, we had proposed a

9    new set of jury instructions that we had hoped would bridge

10   the gap between the parties.  Plaintiff's took a look at that

11   yesterday, and they said they had line edits, but they never

12   provide 'em to us so I think we can continue to meet and

13   confer a little more time about that and see if we can reach

14   resolution.

15          THE COURT:  I would encourage you to do that.

16          MR. WAIS:  Okay, great.

17          THE COURT:  Okay.  We'll see you in a while.

18          MR. MOVIT:  Thank you, Your Honor.

19          THE CLERK:  This court's in recess.

20                    (Lunch recess.)

21          MR. WAIS:  We have two issues, I guess, we need to

22   raise with Your Honor.

23          THE COURT:  Okay.  Mr. Wais.

24          MR. WAIS:  If Your Honor would rather continue with

25   Mr. Gottwald, it's up to you.

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 697

```
 1              THE COURT:  Tell me what our issues are and I'll
 2      tell you.
 3              MR. WAIS:  Issue number one is as to Billboard,
 4      we're right back to where we were again on Friday.  Pursuant
 5      to Your Honor's request, defendants took it upon themselves
 6      to go through the designations to remove anything that
 7      related to summaries, related to anything dealing with the
 8      metrics.  All that testimony provided to plaintiff's counsel.
 9      Last night we received back from them a separate version they
10      would like to use which still includes testimony about
11      summaries, still includes testimony about the metrics.
12              To try to avoid that issue, they're actually
13      suggesting to modify the witness's testimony by striking some
14      portions out or adding to it which we feel is completely
15      improper.  And then today when we got into court, we were
16      provided with this which is a stake of unauthenticated,
17      unverified charts which we hadn't received prior to today.
18              In you're your Honor's motion in limine order, you
19      made it very clear that any documents or charts should be
20      provided prior to start of trial.  We did not receive these
21      prior to now.  I don't know where we go from this, but we've
22      tried to address this issue multiple times and we're right
23      back to where we started.
24              THE COURT:  We're not going very far, but let me
25      say this.  No one will raise anything about Billboard until
```

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 698

```
1    we go through this and resolve it because I am quite serious
2    no summaries.  Producing these whatever they are today is too
3    late and too little, and I'm not gonna permit testimony of
4    witnesses to be altered.  Other than that, I have nothing
5    else to say right now.
6              MS. COHEN:  I understand.  May I respond, Judge,
7    briefly?
8              THE COURT:  Of course.
9              MS. COHEN:  Judge, it's a little bit misleading to
10   say that they provided something over the weekend.  They only
11   responded last night.  We made several attempts to get
12   together in person with the defendants over the weekend.
13   They declined and told us that they could only have a short
14   phone call at 9:00 p.m. last night.  So what was provided to
15   them was for purposes of discussion.
16             It was our understanding that we needed to get
17   together and work this issues out.  And the plaintiffs are
18   not required to simply take what defendant's prepare which is
19   a cherry-picked version and read it in front of the jury.
20             THE COURT:  I agree with that.  But the point
21   being, I didn't choose to be here in this trial.  You all
22   chose to be here in this trial and I am not gonna use my time
23   or the jury's time for that purpose.  So if you can meet and
24   confer and come to a conclusion, that's fine, but I'm trying
25   to give you some overview that at this juncture, I don't
```

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 699

```
 1   think I could be any clearer no summaries.
 2             MS. COHEN:  Understood, Judge.
 3             THE COURT:  And I don't know what, you know, the
 4   problem is the summaries were prepared by someone else and we
 5   don't know what he relied upon in preparing the summaries.
 6             MS. COHEN:  Well, we do actually.  The testimony is
 7   in here and that's what I think we --
 8             THE COURT:  I know, but the problem is all that had
 9   to be produced before trial and it is just impossible right
10   now in the middle of this trial to start looking for
11   supporting business records.  If they had been available
12   prior to trial, produced prior to trial, I would be happy to
13   take them up.  But at this juncture, I don't know even where
14   to begin.
15             But that said why don't you folks meet and confer
16   and then we'll try to take it up tomorrow.  We're certainly
17   not going to be able to take it up today.  I want witnesses
18   all day today.
19             MS. COHEN:  Okay, Judge.  Understood.  If the
20   plaintiffs are able to close our case today, then we will be
21   permitted to read it out of order tomorrow; is that right?
22             THE COURT:  It will be -- if you conclude your
23   case, it will subject to reopening based on my permitting
24   additional evidence to come in.  Namely, what you're trying
25   to read from the Billboard material.
```

```
 1              MS. COHEN:  Okay.  Understood.  Thank you.

 2              THE COURT:  Anything else?

 3              MR. WAIS:  Just one more thing, Your Honor.

 4              Along the same lines, we've heard a lot of

 5      testimony today about iTunes charts and Spotify charts.

 6      Again, during the course of discovery, no iTune charts or

 7      Spotify charts were provided to us or mentioned in any

 8      interrogatory responses.

 9              It's our understanding that Crystal Gray is gonna

10      get on the stand and testify about such charts.  Before we

11      get to that point, obviously, that's hearsay.  There's no

12      underlying documentation that either can authenticate it or

13      lay a foundation for her to testify about.  So it's our view

14      that they shouldn't be able to get into those lines of

15      questioning at all.

16              THE COURT:  Well, the fact that someone looked at a

17      Spotify chart or something like that or Nielson's rating

18      chart seems to me fine.  The question is how are you going to

19      use it?

20              MR. WAIS:  They're gonna use it to try to prove the

21      truth of the matter asserted that Joyful Noise was on those

22      charts and absent having the charts --

23              THE COURT:  Well, we've got to have the charts.

24              MR. WAIS:  They don't have the charts and they've

25      admitted that to us.
```

```
 1              THE COURT:  Then we're going to have a problem
 2    because it seems to me you've got a hearsay problem.
 3              MS. COHEN:  We would like the opportunity to lay a
 4    proper foundation with Ms. Gray which we think that we can
 5    do.  And additionally, the information she's prepared to
 6    testify about does not relate to the song Joyful Noise or
 7    album Our World Redeemed.  It was not requested in discovery.
 8    Moreover, the defendants made the choice not to depose her.
 9              THE COURT:  You know, I'm sorry.  I must be dense,
10    but let's start at the beginning.  If she's not going to
11    testify about the position of Joyful Noise on charts, then
12    what's left to testify about?
13              MS. COHEN:  She will testify about the appearance
14    of Flame and his music on iTunes charts generally during the
15    period at issue which was accessible to the defendants.
16              THE COURT:  Yeah, and then what?
17              MS. COHEN:  And that goes to our access argument.
18              THE COURT:  The fact that they knew he existed goes
19    to access.
20              MS. COHEN:  Correct.
21              THE COURT:  Okay.  And what she's going to offer is
22    that she saw charts with his name on it.
23              MS. COHEN:  You know, I'm not sure I feel
24    comfortable having this colloquy in front of the witness
25    who's about to testify.
```

EXHIBIT 4
PAGE 702

1          THE COURT:  I think you're right and so we'll defer
2     this.
3          MS. COHEN:  Okay.  Thank you, Judge.
4          THE CLERK:  Ready for the jury?
5          THE COURT:  Hopefully.
6               (Jury present.)
7          THE COURT:  Okay.  Mr. Movit.
8          CROSS-EXAMINATION (CONTINUED)
9     BY MR. MOVIT:
10    Q.   Welcome back, Mr. Gottwald.
11    A.   Thank you.
12    Q.   So right before the lunch break, we were about to talk
13    about the song Dark Horse specifically.  So let's do that and
14    turn to Dark Horse.
15         Did you play a role yourself in the creation of
16    Dark Horse?
17    A.   Yes, I did.
18    Q.   And what role was that?
19    A.   I was a producer and the songwriter, and I played some
20    instruments on it as well.
21    Q.   And was Mr. Walter professionally known as Cirkut, was
22    he also a writer and producer?
23    A.   Correct.
24    Q.   Mr. Walter said that the original instrumental beat was
25    created in March 2013.  Is that your recollection?

130

1    A.    I believe so.

2    Q.    And do you remember what you were doing on the day the

3    beat was created?

4    A.    I believe it was in the studio at Conway Studios.

5    Q.    And who first worked on the beat?  Mr. Walter or you?

6    A.    Cirkut, Mr. Walter.

7    Q.    So how did you get involved in the making of the beat?

8    A.    At some point he played it for me and I liked it and he

9    liked it.  And I -- we started to work on that.

10   Q.    And what contributions did you make to the beat, if any?

11   A.    I believe I changed or helped create the chords or bass

12   notes below Ostinato No.1.

13   Q.    So we've had discussions in this case about Ostinato 1

14   and Ostinato 2.  Did you write Ostinato 1 or Ostinato 2?

15   A.    I did not.

16   Q.    To your understanding, who wrote Ostinato 1 and

17   Ostinato 2?

18   A.    Cirkut.

19   Q.    Did you witness Cirkut creating Ostinato 1 and

20   Ostinato 2?

21   A.    I did not.

22   Q.    Based upon, while you weren't there and you didn't see,

23   based on collaboration and experience, do you have an

24   understanding whether Ostinato 1 was created first or

25   Ostinato 2 was created first?

```
 1    A.    Like I said, I was not there, but it seems very likely
 2    that Ostinato 1 would have been created before Ostinato 2.
 3    It's -- it's earlier in the song.  It's what Ostinato 2 is
 4    based on.  It's sort of like a simpler version of it.  And
 5    generally, in my experience in making music with Cirkut, you
 6    know, we often simplify those ideas for areas where we know
 7    we're gonna write vocals and write melodies.
 8    Q.    So your opinion as a participant your understanding is
 9    that Ostinato 2 is a slowed down version of Ostinato 1?
10    A.    It's a stretched out simplified version of Ostinato 1.
11    Q.    As a co-writer and producer of Dark Horse, can you
12    please provide your understanding as to the relationship of
13    Ostinato 1 and Ostinato 2 to the rest of the Dark Horse
14    composition?
15    A.    Well, it's a part of it.  Obviously, it's not the lyrics
16    and it's not the melody.  It's part of the instrumentation
17    melody and, you know, they're basic -- they're basic building
18    blocks of how we create music.  It's 3, 2, 1.  It's 1, 2, 3.
19    It's Doe Re Mi.  It's A, B, C.  This is basic stuff that
20    composers and producers use to create songs.  And it's sort
21    of like trying to write a book without being able to use the
22    word the, there, at and when.  You know, these are the
23    building blocks of our language in making music.
24    Q.    Could you provide us with an example of your use
25    referred to as these building blocks earlier in your career?
```

EXHIBIT 4
PAGE 705

1    A.    Yes.  I did another song in 2006 called Love Me or Hate

2    Me with an artist named Lady Sovereign who was signed by L.A.

3    Reed and Jay Z.  And in that song, I'm literally using the

4    exact same notes in the exact same rhythmic pattern which is

5    eighth notes.

6    Q.    And throughout the creation process for Dark Horse, did

7    the composition of Ostinato 1 and Ostinato 2 ever changed?

8    A.    No, that part remained the same.

9    Q.    So after you and Mr. Walter created the instrumental

10    beat for Dark Horse at Conway Studio, what happened next with

11    respect to the creation of Dark Horse?  When did Katy enter

12    the picture?

13    A.    At some point when we were working with Katy Perry, we

14    played it for her in Santa Barbara and she liked it.  And we

15    ended up, you know, choosing to write a song on that track.

16    Q.    Did Karl Martin Sandberg professionally as Max Martin,

17    have any role in the creation of Dark Horse?

18    A.    Yes, he did.

19    Q.    And what was that role?

20    A.    Well, as a producer, as a -- I believe he helped with

21    melodies.  I believe he helped with some of the lyrics.  Um,

22    he also did the ad libs which are vocal melody alterations

23    that usually come afterwards.  He was involved all the way

24    through approving the mixes and even approving mastering.

25    Q.    How about Sarah Hudson?  Did she have any role in the

EXHIBIT 4
PAGE 706

133

1   creation of Dark Horse?

2   A.   Yes, she did.

3   Q.   What was that role?

4   A.   Mostly lyric.  She may have been involved in some melody

5   stuff, but I believe mostly lyrics.

6   Q.   Did anyone other than yourself and Henry Walter PKA

7   Cirkut have any role in the creation of the instrumental

8   composition of the beat for Dark Horse?

9   A.   Um, I think it's primarily us.  Um, it is possible, I

10   mean, we made the beat.  There might have been talk that we

11   make it bigger in the last chorus or something, but I don't

12   remember that.

13   Q.   But that wouldn't have changed the composition; correct?

14   A.   Absolutely not.

15   Q.   Did anyone other than yourself and Henry Walter compose

16   the instrumental beat of Dark Horse?

17   A.   No.

18   Q.   Did anyone other than Henry Walter to your knowledge

19   compose the ostinato's in Dark Horse?

20   A.   No.

21   Q.   So any suggestions that anyone may have given about the

22   beat were not with respect to the composition; correct?

23   A.   No, not with those parts.  Absolutely not.

24   Q.   And they weren't with respect to the ostinato's;

25   correct?

134

1   A.   No.

2   Q.   No one's suggestions ever changed the composition;

3   correct?

4   A.   No.

5   Q.   And is it your understanding Dark Horse was released as

6   part of the Prism album by Katy Perry in 2014?

7   A.   Yes.

8   Q.   And is it your understanding that later in 2014, you

9   were sued in this lawsuit?

10   A.   That is correct.

11   Q.   What was your reaction to being sued in this lawsuit?

12   A.   Um, initially, I was surprised and I wasn't happy about

13   it.  You know, it's -- it wasn't great.  I felt like people

14   were trying to take away something that we had created and

15   they were accusing us of stealing something and demanding

16   money.

17        And it, you know, feels bad because, you know, I

18   have been doing this for a really long time, um, and I've

19   always taken it seriously writing our own music and composing

20   our own songs.  And I can also speak to the character of my

21   co- writers who are, you know, all, you know, similarly, we

22   work, you know, we take this very seriously and write

23   original music ourselves.

24   Q.   Do you copy other people's music?

25   A.   No.

EXHIBIT 4
PAGE 708

```
 1    Q.   Are you in the practice of working with people who copy

 2    other people's music?

 3    A.   No.

 4    Q.   Just to circle back, is it your understanding that the

 5    instrumental beat that's been played in this case before the

 6    vocals were added is in a file called oh no?

 7    A.   Yes, it is my understanding.

 8    Q.   Do you know where that title oh no comes from?

 9    A.   I do.  My daughter who was about two or three at the

10    time, at some point when she was speaking, she came to

11    realize that when she said oh no, mommy and daddy would be

12    like what happened?  What's going on?  And so she sort of

13    tended to repeat that.

14         And they would often come by the studio and she

15    kind of used that quite a bit.  Like oh no, what happened?

16    She dropped something?  Sometimes it could have been

17    something that was real, but oftentimes it wasn't.  So we

18    just happened to call this track oh no.  And, um, in the

19    final version the oh no at the beginning of the song is

20    actually my daughter.

21    Q.   So your daughter provides some vocals?

22    A.   Yes.

23    Q.   And those vocals being oh no?

24    A.   Yes.

25              MR. MOVIT:  Nothing further.
```

136

1           THE COURT:  Okay.  Any redirect?

2           MS. COHEN:  I just have a few brief questions for

3    you.

4                    REDIRECT EXAMINATION

5    BY MS. COHEN:

6    Q.   Mr. Gottwald, you don't remember every song you've ever

7    heard, do you?

8    A.   I do not remember every song I've ever heard.

9    Q.   You don't remember every video you've ever watched, do

10   you?

11   A.   Not off the top of my head.

12   Q.   And in your -- well, that's actually all the questions I

13   think I have.  Thank you.

14           THE WITNESS:  Thank you.

15           THE COURT:  Anything?

16                    RECROSS-EXAMINATION

17   BY MR. MOVIT:

18   Q.   Mr. Gottwald, as a trained musician and music producer,

19   when you hear a song for the first time, can you tell you've

20   never heard it before?

21   A.   Yes, I believe so.

22           MR. MOVIT:  Nothing further.

23           THE COURT:  Okay.  Anything further?

24           MS. COHEN:  No, Your Honor.

25           THE COURT:  Thank you.  Then Mr. Gottwald, you may

EXHIBIT 4
PAGE 710

```
 1    step down.

 2              THE WITNESS:  Thank you.

 3              THE CLERK:  Counsel, your next witness?

 4              MR. KAHN:  The witness is Crystal Gray, Your Honor.

 5              THE COURT:  All right.

 6              THE CLERK:  Ms. Gray, if you could come forward,

 7    I'll swear you in.  Please raise your right hand.

 8                     (Witness sworn.)

 9              THE CLERK:  Please be seated.  Please state your

10    full name.

11              THE WITNESS:  Crystal Gray.  C-r-y-s-t-a-l G-r-a-y.

12              THE CLERK:  Thank you.

13                     DIRECT EXAMINATION

14    BY MR. KAHN:

15    Q.   Good afternoon, Ms. Gray.

16    A.   Hello.

17    Q.   You are married to Marcus Gray; correct?

18    A.   Yes.

19    Q.   How long have the two of you been married?

20    A.   11 years.

21    Q.   And what's the highest level of education you have

22    achieved?

23    A.   I have a Doctorate in Clinical Psychology with an

24    emphasis in marriage and family therapy, anxiety and

25    depression disorders.
```

EXHIBIT 4
PAGE 711

138

```
1    Q.    Are you currently practicing in that field?

2    A.    No.

3    Q.    Are you currently employed?

4    A.    Yes.

5    Q.    And what is your employment?

6    A.    I work for our family owned business.

7    Q.    And what is your family owned business?

8    A.    My husband and I own our record label.

9    Q.    What's the name of record label?

10   A.    Clear Sight Music.

11   Q.    Do you have a title at Clear Sight Music?

12   A.    COO.

13   Q.    Chief operating officer?

14   A.    Yes.

15   Q.    When was this record label formed?

16   A.    2010.

17   Q.    So what are your duties at Clear Sight as the chief

18   operating officer?

19   A.    I handle all the logistics and everything that has to do

20   with our record label including distribution, marketing

21   manufacturing, merchandising.

22   Q.    You handle marketing?

23   A.    Yes.

24   Q.    And as for your husband, Clear Sight started in 2010?

25   A.    Yes.
```

```
1    Q.    Has Clear Sight issued any albums by Mr. Gray?

2    A.    Yes.

3    Q.    And how many have been issued?

4    A.    Five solo Flame projects and two collaborations.

5    Q.    When was the first one released?

6    A.    2010.

7    Q.    What was title of that album?

8    A.    Captured.

9    Q.    Next one?

10   A.    2012.

11   Q.    What was that title?

12   A.    The Sixth.

13   Q.    So you mentioned your duties as chief operating officer

14   include marketing and sales of the albums; correct?

15   A.    Correct.

16   Q.    So describe to the jury what those duties include?

17   A.    Okay.  So as COO I'm in charge of distribution so I

18   manually upload our music files to our physical distributor

19   who then puts our music in brick and mortar stores.

20   Q.    And the music in brick and mortar stores would that be

21   CDs?

22   A.    Yes.

23   Q.    Physical CDs?

24   A.    Yes, physical CDs.

25   Q.    And what brick and mortar stores did these albums go
```

1    into?

2    A.    Walmart, Best Buy, Target, Family Christian Bookstore,

3    Lifeway, Mardel's.

4    Q.    So lots of different stores?

5    A.    Yes.

6    Q.    And so that's the physical distribution?

7    A.    Uh-huh.

8    Q.    Do you have a digital distribution of these CDs as well?

9    A.    Yes.  I manually upload the music files to our digital

10   distribution companies and they distribute our music to all

11   the music platforms such as iTunes, Google Play, Amazon,

12   Spotify, Apple Music.

13   Q.    So when these albums are uploaded to iTunes or Amazon or

14   Google Play, are they uploaded into a particular genre of

15   music?

16   A.    Yes.  So when I manually upload these albums, I type in

17   all of the data including the genre.  So there's a menu, a

18   drop down menu of ten pre-existing genres and I chose which

19   genre that it should be categorized under.

20   Q.    Which genre do you chose?

21   A.    Rap hip hop.

22   Q.    And is that for each of the albums that Clear Sight has

23   uploaded?

24   A.    Yes, that's correct.

25   Q.    And taking iTunes as an example, if an album is up there

```
 1    and you click on Flame, what shows up?

 2    A.    A list of his top songs.

 3    Q.    On that album or in general?

 4    A.    In general --

 5              MR. WAIS:  Objection.  Hearsay.

 6              THE COURT:  I'm sorry?

 7              MR. WAIS:  Objection.  Hearsay.

 8              THE COURT:  Well, it is hearsay.

 9              MR. KAHN:  Ms. Gray is in charge of marketing.

10    She's just describing how these albums are placed.

11              THE COURT:  She can say how they're placed, but the

12    problem is she's now testifying about what she sees when she

13    clicks onto it.

14              MR. KAHN:  Okay.

15    Q.    Are there different charts on iTunes?

16    A.    Yes.

17    Q.    Is there a hip hop chart?

18    A.    Yes.

19              MR. WAIS:  Objection.  Hearsay.

20              THE COURT:  I don't think that's hearsay.

21    BY MR. KAHN:

22    Q.    And there are other charts besides hip hop?

23    A.    Yes.  On the home page of iTunes, there's hip hop

24    charts, um, and then there's top albums overall charts with

25    all genres.
```

EXHIBIT 4
PAGE 715

```
1    Q.   Okay.  And as the Clear Sight marketing person, does

2    Clear Sight do any advertising on any of these digital sites?

3    A.   Yes.  It's my job and responsibility to secure ad space

4    on the, for example, on the home page of iTunes Rap.

5    Q.   I think you mentioned the album entitled The Sixth which

6    came out in 2012?

7    A.   Correct.

8    Q.   So just by way of example with that album, can you just

9    describe the marketing efforts with advertising?

10   A.   Yes.  So for that album The Sixth, I believe I was able

11   to secure the largest banner on the home page of the

12   mainstream rap hip hop site on iTunes and our banner Flame

13   The Sixth rotated between young --

14            MR. WAIS:  Object to the content of those

15   advertisements as hearsay.

16            THE COURT:  I think it is.  I'm going to strike the

17   answer.

18   BY MR. KAHN:

19   Q.   You manage the music page for Clear Sight on iTunes;

20   correct?

21   A.   Yes.

22   Q.   I want to turn now to go back in time to Our World

23   Redeemed.

24   A.   Okay.

25   Q.   We've heard an album came out we've heard in 2008?
```

EXHIBIT 4
PAGE 716

```
 1    A.    Okay.

 2    Q.    Are you familiar with that album?

 3    A.    Yes.

 4    Q.    There are what are known as liner notes with that album;

 5    correct?

 6    A.    Correct.

 7    Q.    Can you tell the jury what is a liner note?

 8    A.    So it's -- the way I say it, it's the CD booklet with

 9    all the credits inside of it.

10    Q.    So that's where the different people involved in the

11    song get credits?

12    A.    Correct.

13    Q.    And were you involved at all in the creation of the

14    liner notes for the album Our World Redeemed?

15    A.    Yes, I was.

16    Q.    What was your involvement?

17    A.    I edited the notes that my husband wrote and I did the

18    formatting.

19    Q.    Let me -- we've already seen this in evidence,

20    Exhibit 58, which it's probably easier for you to look on the

21    screen because it's in very small print in your exhibit book.

22    So what are we looking at here?

23    A.    Those are the credits of the liner notes, the inside CD

24    insert.

25    Q.    And maybe we can focus in on Joyful Noise which is the
```

```
 1    song at issue here.  So these are the notes that you reviewed

 2    and edited for the 2008 album; correct?

 3    A.    Correct.

 4    Q.    And there's a line called written by and who are the

 5    three names that were given credit as written by?

 6    A.    Marcus Gray, my husband, Lecrae Moore, Emanuel Lambert.

 7    Q.    And then the next credit on there is produced.  Who was

 8    given credit for that?

 9    A.    Chike Ojukwu.

10    Q.    And back when you were doing these liner notes,

11    Mrs. Gray, what was your understanding of the producer credit

12    on a rap album?

13            MR. WAIS:  Objection.  No foundation.

14            THE COURT:  Sustained.

15    BY MR. KAHN:

16    Q.    What was your understanding of what Mr. Ojukwu did on

17    Joyful Noise?

18            MR. WAIS:  Objection.

19            THE COURT:  She can testify to what she believes he

20    did.

21            THE WITNESS:  He wrote the music.

22    BY MR. KAHN:

23    Q.    So under the written by, are those for the lyrics?

24    A.    Yes.

25    Q.    And as we look further down that liner note for Joyful
```

EXHIBIT 4
PAGE 718

1    Noise, I see Clear Sight Music.  What is Clear Sight Music?

2    A.    The publishing company.

3    Q.    Whose publishing company is that?

4    A.    My husband, Mr. Gray.

5    Q.    What does the publishing company do to your

6    understanding?

7    A.    They collect revenue for writers.

8    Q.    They collect revenues for writers.  And there's another

9    one there at the very end, what is that?

10   A.    Renew Mind.

11   Q.    And that's another publisher?

12   A.    Yes.

13   Q.    And whose publisher is that?

14   A.    Chike Ojukwu.

15   Q.    Okay.  And they would collect writer revenues for

16   Mr. Ojukwu?

17   A.    That's correct.

18   Q.    Now, back in 2008 did you know Mr. Ojukwu?

19   A.    Yes.  He was --

20   Q.    How did the two of you meet?

21   A.    I met him at my husband's bible study that he was

22   teaching.

23   Q.    And that was in 2008, 2007, some time in there?

24   A.    Yeah.

25   Q.    And you said you had been married 11 years?

1    A.    Yeah.

2    Q.    So what year were you married?

3    A.    2008, April 5th.

4    Q.    Did you invite Mr. Ojukwu to your wedding?

5    A.    Yes.

6    Q.    And did he attend?

7    A.    Yes.

8    Q.    And going back to the album with the liner notes, maybe

9    we can zoom in just at random some other liner note.

10   A.    Okay.

11   Q.    And you were involved in editing those liner notes as

12   well?

13   A.    Yes.

14   Q.    Who is credited as producer there?

15   A.    Chike Ojukwu.

16   Q.    And is his publishing company listed as well?

17   A.    Yes.

18   Q.    Now, Mr. Gray has referred to you as his artistic and

19   road manager.

20   A.    Yes.

21   Q.    Are those other duties of yours?

22   A.    Yes.

23   Q.    So what are your duties as artistic and road manager for

24   your husband?

25   A.    Okay.  It's a lot so you can just cut me whenever.  As

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 720

```
 1    artist manager, I manage everything that has to do with Flame

 2    as an artist.  So that includes his concert bookings, his

 3    media.  Um, I give creative input into album titling, song

 4    titling, art work.  Mixing, mastering, um, video treatment

 5    creation.  I direct his music videos.  So everything that has

 6    to do with him as a solo artist, I have my hands in all of

 7    that.

 8    Q.   What about the duties as road manager?

 9    A.   So as a road manager, I insure that on the day of the

10    actual concert everything runs smoothly.  So I organize his

11    sound check, his set list, his travel logistics,

12    merchandising, his autograph signing line all of that day on

13    the day of the show.

14    Q.   And the set list is that written or something that's --

15    A.   Yeah, it's -- we don't have written set lists in our

16    genre.  We just -- causes it's fluid, but I have set lists on

17    my play list when I play his music.

18    Q.   And did you mention you're also the DJ?

19    A.   Yeah.

20    Q.   Why don't you explain to the jury what it means to be

21    the DJ at a concert?

22    A.   So during this time in question, 2008 to 2013, we didn't

23    travel with a DJ.  So I physically played the music for every

24    concert including the one last weekend ironically.

25    Q.   Where were you last weekend?
```

```
 1   A.   We had a concert in Detroit, and then flew back here.
 2   Q.   So you would -- so you would play the instrumental
 3   that's what you're saying?
 4   A.   Yes.
 5   Q.   So, for example, for Joyful Noise, you would when it
 6   came time and your husband wanted to perform that, you would
 7   push the instrumental recording to start playing?
 8   A.   Yes.
 9   Q.   He would rap over that?
10   A.   Yes.  I would plug my lap top -- I would be in the sound
11   booth with the sound engineer and plug my lap top into the
12   sound board and I would manually press play on the music
13   including Joyful Noise.
14   Q.   Did you attend all of your husband's concerts between
15   2008 and 2012?
16   A.   Yes, I did with the exception of a few concerts in the
17   summer of 2008 when he was on tour with Lecrae.  Those were
18   the only concerts I did not attend.
19   Q.   Why didn't you attend those concerts?
20   A.   Because it was all guys.  I didn't want to be the only
21   girl on the tour bus.  I did fly out to three or four shows
22   and met him there.
23   Q.   Those shows with Mr. Moore, did either of them perform
24   Joyful Noise?
25   A.   Yes.  I helped Marcus, my husband, create his set list
```

1    for the tour and so, obviously, because Joyful Noise is his

2    biggest song, we put it in his set list, but then it got

3    changed to the grand finale.  It was the biggest song on the

4    entire tour.

5    Q.    So Mr. Moore and your husband would perform it together?

6    A.    Yes, that's correct for that tour.

7    Q.    Now, you weren't here, you weren't in the courtroom when

8    your husband was testifying.  He estimated, I think, it could

9    have been 70 percent of these venues were church or

10   religious.  Does that conform to your recollection?

11   A.    Yeah, that's pretty accurate.

12   Q.    This other 30 percent of these concerts, where they were

13   at?

14   A.    We would do arenas, colleges, universities, military

15   bases, festivals.

16   Q.    Did you ever do any amusement parks?

17   A.    Yes.

18   Q.    Which ones did you do?

19   A.    Um, various Six Flags and Silver Dollar City in

20   Missouri.

21   Q.    Were those concerts open to everyone or was it a

22   religious theme?

23   A.    It was open to the public.

24   Q.    And I think Mr. Gray mentioned even a NBA Halftime show

25   that he performed at that?

EXHIBIT 4
PAGE 723

```
 1    A.    Yeah, two of those.

 2    Q.    Which teams were they?

 3    A.    I'm not that good at sports.  So one was like the

 4    Hornets and one the Rockets.  I don't know who they were

 5    playing.

 6    Q.    In all these concerts, roughly, how many concerts

 7    between 2008 and 2012 did you attend?

 8    A.    300, a little over.

 9    Q.    And at how many of those concerts that you attended did

10    your husband perform Joyful Noise?

11    A.    All of them.  He had to.

12    Q.    Now, by 2012 he had released other albums?

13    A.    Correct.

14    Q.    You mentioned two of them released under Clear Sight?

15    A.    Yes.

16    Q.    Last week did he perform Joyful Noise at that concert?

17    A.    No, not last weekend.

18    Q.    How about other concerts?  Not this year.  Let's say

19    back in 2012.

20    A.    Oh, yeah, definitely during that time for sure.

21    Q.    Okay.  We have an exhibit list book on your table there,

22    the smaller one.  And can you open to Exhibit 14 which is

23    probably the second tab?  Take a moment to look at that

24    document.

25    A.    Okay.
```

```
1    Q.    Do you recognize this document, Ms. Gray?

2    A.    Yes.

3    Q.    What is it this document?

4    A.    These are our concerts.

5    Q.    Okay.  What is the origin of this document?

6    A.    From my records.

7    Q.    So you created this document from your records?

8    A.    Yes.

9    Q.    And it covers the period it looks like September 2010 up

10   until actually up until December 2014; correct?

11   A.    Yes.

12   Q.    What does it indicate in this document?

13             MR. WAIS:  Objection.  Hearsay.

14             THE COURT:  It is hearsay.

15   BY MR. KAHN:

16   Q.    Is this a document you created in the ordinary course of

17   your duties as the chief operating officer of Clear Sight and

18   your husband's concert manager?

19   A.    Yes.

20   Q.    And what was the purpose of this document that you

21   created?

22   A.    To keep a record of our history of shows.

23   Q.    And what -- was this document created from other

24   documents or was this just a document you kept as you were

25   going along?
```

152

```
 1   A.   Both.  I have this kept as I enter as it goes along and
 2   each individual booking form so both.
 3   Q.   So you'd have a booking form, and then you would enter
 4   the information from the booking form on to this document?
 5   A.   Yes.
 6   Q.   And then you would maintain this document?
 7   A.   Yes.
 8   Q.   And is this document an accurate summary of the dates
 9   and the cities and states where these tours took place from
10   2010 through 2014?
11   A.   Yes.
12             MR. KAHN:  Your Honor, we would offer into evidence
13   Exhibit 14.
14             MR. WAIS:  Your Honor, it's still hearsay and it's
15   an improper summary.
16             THE COURT:  Well, the problem is I don't know what
17   the booking records are.  It's based on bookings records.  Do
18   you want to lay a foundation about booking records because
19   they have to be . . .
20   BY MR. KAHN:
21   Q.   So you were maintaining this based on booking records.
22   Tell me what booking records are.
23   A.   So every time somebody wants to book Flame, they will
24   fill out a form with their city, state, name of the venue,
25   their budget and so forth.
```

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 726

```
 1              MR. WAIS:  Your Honor, these booking reports are

 2   hearsay as well that weren't produced.

 3              THE COURT:  Well, let's start at the beginning.

 4   You have two objections here.  They may be business records,

 5   but your concern is they were not produced to you.

 6              MR. KAHN:  No, these were produced, Your Honor.

 7   These were produced early on in production.  They were even

 8   marked as an exhibit at Mr. Gray's deposition.

 9              MR. WAIS:  The underlying documents were not

10   produced.

11              THE COURT:  Summaries were produced at the

12   deposition?

13              MR. KAHN:  Yes, Your Honor and he was examined on

14   them.

15              THE COURT:  You know, this is just not fair to any

16   of us to raise this now.  We're gonna have to go to side bar,

17   take a recess or do something.  This is happening over and

18   over again and I don't know why.  I'm addressing both sides.

19   I'm not addressing simply the plaintiffs.

20              MR. KAHN:  Well, I can ask her some more about the

21   concerts themselves.  Maybe we don't need the document.

22              THE COURT:  I just think he's already indicated he

23   performed the concerts.

24              MR. KAHN:  Yes.

25              THE COURT:  I don't know that we need all these
```

```
 1    records.  That's his testimony he's performed these concerts.
 2              MR. KAHN:  And Mrs. Gray was at them all.
 3              THE COURT:  Yes.
 4    BY MR. KAHN:
 5    Q.   And you mentioned also as some of your duties as a road
 6    manager, some sort of media management.  What was that
 7    portion?
 8    A.   Yes.  So for our concerts, we would also do local media
 9    to generate hype and awareness so people would come out.
10    Q.   How did that come about?
11    A.   So typically, the venues would contact me and say hey,
12    when you guys land, can we take you to the radio station for
13    an interview or the local news station for an interview.
14    Q.   And how often did that happen for these 300 concerts?
15    A.   About 50 percent of the time.
16    Q.   First of all, what kind of radio stations were these?
17    A.   Colleges, universities and gospel stations.
18    Q.   And so would you accompany Mr. Gray to these stations?
19    A.   Yes.
20    Q.   And so this would be either the day of the concert or
21    day before?
22    A.   Typically, the day of the concert.
23    Q.   How long would these interviews last?
24    A.   Anywhere from 15 minutes to an hour depending on the
25    length of the radio show.
```

155

1    Q.    And during these interviews, did they ever play any of

2    your husband's music?

3    A.    Yes.  Um, they would intersperse music with the

4    interview.  So they would ask him questions and say oh, let's

5    play a song, come back ask a question.

6    Q.    Did they ever play Joyful Noise during those interviews?

7    A.    Yes, definitely.

8    Q.    I assume the TV interviews were shorter, maybe not?

9    A.    Yes, it varies.

10    Q.    And these were at radio and TV entities around the

11    country; correct?

12    A.    Correct.

13    Q.    I now want to move to Cross Movement Records.

14    A.    Okay.

15    Q.    We've heard a fair amount about that.  Were you at all

16    involved in the decision of your husband to leave Cross

17    Movement Records and start your own label?

18    A.    Yes.

19    Q.    Tell me about your involvement.

20    A.    I was the one who was trying to find a solution to

21    unpaid royalties with Cross Movement.  So me and my husband

22    made the decision together to file the lawsuit against Cross

23    Movement Records after I have to say this several years of

24    trying to get into contact with them.

25    Q.    So your principal reason for leaving is you weren't

```
 1    giving you royalties?

 2    A.    That's correct.

 3    Q.    Were they giving you any sales data?

 4    A.    No, they were not.

 5    Q.    And you say that the lawsuit was not filed immediately.

 6    It was filed after you made efforts to get these information?

 7    A.    Yes, multiple efforts.

 8    Q.    What kind of efforts?

 9    A.    Any kind of effort you could think of.  Calling,

10    emailing, postal mail, correspondence, everything.

11    Q.    So eventually you decided that you needed to file a

12    lawsuit?

13    A.    Yes.

14    Q.    Do you recall the year that lawsuit was filed?

15    A.    I believe 2012.

16    Q.    So that lawsuit was filed before Dark Horse was even

17    created; correct?

18    A.    Oh, yes.

19    Q.    And so the lawsuit when it was filed had nothing to do

20    with Dark Horse?

21    A.    No.

22    Q.    Now, your husband and others were shown the -- one of

23    the settlement documents which is Exhibit 6.  It was the

24    document where Cross Movement assigned the copyrights in all

25    of your husband's songs.
```

1          Now, my understanding when you initially filed the

2    lawsuit against Cross Movement, you were seeking royalties

3    correct?

4    A.    Correct.

5    Q.    You were seeking unpaid royalties.

6    A.    Yes.

7    Q.    And did your -- and I speak now to you and your husband,

8    did view of an acceptable outcome change during the time of

9    this lawsuit?

10   A.    Yes.

11   Q.    And what caused the change?

12   A.    We filed the lawsuit to get unpaid royalties, but then

13   once we found out the money wasn't there, I was thinking

14   well, what can we do?  Can we at least get the rights back to

15   all of our old music then we can put out a greatest hits

16   album or something.

17   Q.    Was that how the case was eventually settled?

18   A.    Yes.

19   Q.    And the document we had up on display here, Exhibit 6,

20   is actually several different pages.  You've got it there in

21   your folder.  We can just go on the basis of what's up on the

22   screen.

23   A.    Okay.

24   Q.    So this is the page of that assignment.  What is

25   Exhibit 8?

```
1    A.    So on this page we have Marcus's, Mr. Gray's first album

2    self-titled Flame and that's a list of all his songs that

3    were on that self-titled album.

4    Q.    That was part of what was assigned back, the copyrights

5    in those songs?

6    A.    Yes.

7    Q.    And then below that what is Rewind?

8    A.    That's Mr. Gray's second album.  And a list of all songs

9    on that album.

10   Q.    And then third Our World Falling, what's that?

11   A.    That's Mr. Gray's third album and that has all the songs

12   from the album.

13   Q.    Then we see at the bottom Our World Redeemed.  That was

14   the last album released by Cross Movement?

15   A.    Yes, that's correct.

16   Q.    This assignment is all 16 of those songs; correct?

17   A.    Yes.

18   Q.    And I see No. 16 is the song that's at issue here?

19   A.    Yes.

20   Q.    And have you been able to put out this greatest hits

21   album yet?

22   A.    Actually, we're on it now.  This October is his 15-year

23   anniversary.  We're trying to come up with a marketing plan

24   of greatest hits 15 years since his first album dropped in

25   2004.
```

 1    Q.    Now, your husband was asked some questions about Dark

 2    Horse and what he did after he listened to Dark Horse.  He

 3    testified he first contacted a lawyer before talking to the

 4    other writers.  I assume he first contacted you?

 5    A.    Yeah, I'm always around.

 6    Q.    Were you involved in the decision to contact a lawyer

 7    before the other writers?

 8    A.    Yes.

 9    Q.    And what was your reasoning?  Why did you want to

10    contact a lawyer before you talked to the other writers?

11    A.    Cause I'm not a lawyer so I wanted to see what the ins

12    and outs were regarding copyright and infringement.  I just

13    didn't know what all that would entail.  So I'm like let's

14    talk to a lawyer first before proceeding.

15    Q.    You then talked to the other people who became

16    plaintiffs in the case?

17    A.    Yes, that's correct.

18    Q.    So during those 300 plus concerts, you were the DJ and

19    you played the instrumental beat to Joyful Noise at every

20    concert, what were your thoughts when you first heard Dark

21    Horse?

22    A.    Sounded like our beat.

23           MR. WAIS:  Objection.

24           THE COURT:  Sustained.

25    BY MR. KAHN:

1    Q.    So back briefly to iTunes and the other digital outlets,

2    as the head of marketing, you mentioned earlier how you were

3    able to get -- secure advertising space on iTunes.  And did

4    you monitor how each new album performed on its release?

5    A.    Yes.

6    Q.    And without getting into specifics of where the album

7    charted, tell me how you would monitor how the album was

8    performing?

9              MR. WAIS:  Objection.  Hearsay.

10             THE COURT:  Overruled.  You may limit it as he's

11   described the question.

12   BY MR. KAHN:

13   Q.    Don't tell me where it was in the chart.  Just tell me

14   what you would do to market it, build interest in it,

15   whatever, on your end not on iTunes end.

16   A.    So the night before every release, we would do a live

17   stream with our fans to generate buzz for the album dropping.

18   And so we would at this point music would release on Tuesdays

19   before it changed to Fridays.  So Monday night we would go

20   live and we would, we would play music from the upcoming

21   album.

22             And we would say okay, guys we're counting two more

23   hours till album drops.  One more hour till the album drops

24   and 30 minutes.  And Marcus would answer questions the fans

25   would have.  He would talk about what inspired the music.

EXHIBIT 4
PAGE 734

```
 1    That would generate excitement that way.  Then once it hit
 2    midnight, we would say everybody go out and get your album on
 3    iTunes.
 4                MR. KAHN:  I have nothing further.
 5                THE COURT:  Okay.  Mr. Wais.
 6                           CROSS-EXAMINATION
 7    BY MR. WAIS:
 8    Q.    Good afternoon, Ms. Gray.
 9    A.    Hello.
10    Q.    Can you remind me what the first album you released
11    under your label Clear Sight was?
12    A.    Captured.
13    Q.    And what was the second one?
14    A.    The Sixth.
15    Q.    You did not release Our World Redeemed under your Clear
16    Sight record label; correct?
17    A.    No.
18    Q.    You didn't release Joyful Noise under your Clear Sight
19    record label; is that also correct?
20    A.    Yes.
21    Q.    When you're talking about the physical distribution for
22    Clear Sight that didn't include Our World Redeemed; correct?
23    A.    Correct.
24    Q.    That did not include Joyful Noise?
25    A.    Correct.
```

```
 1   Q.   When you're talking about the digital distribution of
 2   music under your record label Clear Sight, you said you would
 3   upload music and sell it digitally; correct?
 4   A.   Correct.
 5   Q.   That did not include Our World Redeemed; correct?
 6   A.   Correct.
 7   Q.   That did not include Joyful Noise either; is that
 8   correct?
 9   A.   Correct.
10   Q.   In fact you have no records of any sales of Our World
11   Redeemed; is that correct?
12   A.   No.
13   Q.   You have no records of sales of Joyful Noise either; is
14   that correct?
15   A.   Unfortunately, no.
16   Q.   I believe we got Mr. -- when did you first become
17   Mr. Gray's business manager?
18   A.   2008.
19   Q.   Did you have any involvement with his career before
20   that?
21   A.   I would have minor like creative input prior to that,
22   but as far as to the extent that I am now, 2008.
23   Q.   It was your understanding when you started working as
24   Mr. Gray's business manager that he had been signed to Cross
25   Movement Records since 2004?
```

1    A.    Yes.

2    Q.    And that it wasn't until 2010 that you decided to move

3    on?

4    A.    2010 is when we created our label Clear Sight Music.

5    Q.    So he was still signed to Cross Movement Records at the

6    time you created a separate label?

7    A.    No, no.

8    Q.    Starting from 2008 through today, sounds like you have

9    been managing Mr. Gray's career; is that correct?

10   A.    Yes, that's correct.

11   Q.    And you said you're responsible for managing his live

12   performances?

13   A.    Yes.

14   Q.    And you're also responsible for managing the income

15   coming in; is that correct?

16   A.    Yes.

17   Q.    I believe you testified as it relates to Cross Movement

18   Records, you did not receive any evidence of sales; is that

19   correct?

20   A.    Yeah.

21   Q.    You did not receive any royalties or income from them;

22   is that correct?

23   A.    Yeah.

24   Q.    And that's true from inception of his time with Cross

25   Movement Records until he stopped that relationship?

1    A.    I can only attest to our Our World Redeemed.

2    Q.    So when you became his business manager in 2008, was he

3    receiving income for any of his music from Cross Movement

4    Records?

5    A.    I'm not sure about prior to Our World Redeemed.  So from

6    our Our World Redeemed, the answer is no.  Prior to Our World

7    Redeemed, I'm not sure.

8    Q.    Is it your understanding that Mr. Gray resigned with

9    Cross Movement Records in 2008?

10   A.    I don't know what you mean by that.

11   Q.    So I believe we've seen already Exhibit 18.  This is

12   entitled exclusive artist recording agreement; is that

13   correct?

14            THE CLERK:  I don't have that in evidence.

15            MR. WAIS:  My apologies.

16   Q.    So going back to your uploading of music digitally, you

17   testified already that you did not upload Joyful Noise to any

18   digital websites; is that correct?

19   A.    Correct.

20   Q.    And you have no records of any sales through any digital

21   websites of Joyful Noise; correct?

22   A.    Correct.

23   Q.    You have no records of any sales of Joyful Noise through

24   brick and mortar stores as well?

25   A.    Correct.

```
 1    Q.    You have no documents reflecting any income from the

 2    exploitation of Joyful Noise; correct?

 3    A.    Unfortunately, not.

 4    Q.    But you were the manager for Mr. Gray's publishing

 5    company Clear Sight; is that correct?

 6    A.    What do you mean by that?

 7    Q.    So you said, if we go to Exhibit 6 and look at the liner

 8    notes, you refer to Clear Sight Music as the publishing

 9    company as well; correct?

10    A.    Correct.

11    Q.    That's his publishing company?

12    A.    Correct.

13    Q.    Were you involved in managing his publishing company?

14    A.    No.

15    Q.    You have produced no records, though, of any income

16    received through his publishing company; correct?

17    A.    Correct.

18    Q.    Are you aware that Mr. Gray signed an exclusive

19    recording contract with Cross Movement Records in 2008?

20    A.    No.

21    Q.    So you have no knowledge of that whatsoever?

22    A.    No.

23    Q.    As his manager, you don't know one way or other?

24    A.    No.  I just know that Our World Redeemed came out under

25    Cross Movement Records.  Prior to any contract is concerned
```

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 739

1    prior to 2008, no.

2    Q.    Well, what about in 2008?

3    A.    No.

4    Q.    You were talking about securing advertising space on

5    various websites for Clear Sight; correct?

6    A.    For Flame.

7    Q.    And that was for the albums you were releasing for Clear

8    Sight records; correct?

9    A.    Correct.

10   Q.    And you weren't -- by that point Cross Movement Records

11   had already released Joyful Noise; correct?

12   A.    Yeah, correct.

13   Q.    They had already released Our World Redeemed; correct?

14   A.    Correct.

15   Q.    So the advertising is relating to the albums you were

16   releasing under Clear Sight; correct?

17   A.    Yes, during the time in question.

18   Q.    But those were not Joyful Noise, were they?

19   A.    No.

20   Q.    And they were not Our World Redeemed, were they?

21   A.    No.

22   Q.    You talked about how you had knowledge of the lawsuit

23   brought in 2012 against Cross Movement?

24   A.    Correct.

25   Q.    You understood the basis for that lawsuit?

```
 1    A.    Yes.

 2    Q.    Did you understand one of the claims in that lawsuit was

 3    for breach of contract?

 4    A.    It was so long ago.  I have to look.  Where are you

 5    referring me to?

 6    Q.    I'm referring you to the lawsuit you previously

 7    testified about.  The one previously brought against Cross

 8    Movement Records.

 9    A.    Yes.

10    Q.    You said you understood that lawsuit?

11    A.    Yes.

12    Q.    And you understood one of the claims was for breach of

13    contract for failure to pay royalties?

14    A.    Yes, for failure to pay royalties.

15    Q.    Do you understand that a lawsuit that was brought

16    pursuant to a contract and Cross Movement Records.

17    A.    I'm not a lawyer so I don't know the legal jargon.  I

18    just know it was unpaid royalties for several years and

19    several years trying to get in contact with them.

20    Q.    So you said that you were Mr. Gray's business manager

21    and in that capacity, you were also his booking agent;

22    correct?  You managed his concert performances?

23    A.    Yes, I managed his booking calendar.

24    Q.    And you said that you attended all of his performances

25    between 2010 and 2014?
```

EXHIBIT 4
PAGE 741

1    A.    2008 until 2014 besides those summer dates in 2008 when

2    he was on tour.

3    Q.    And I believe you testified that you recall over 300

4    concerts during that time period?

5    A.    Yeah, that's an estimate.

6    Q.    How many of those concerts would you estimate were after

7    March of 2013?

8    A.    After March, probably about 50.

9    Q.    So it's your testimony that there were 250 concerts from

10   the beginning of 2008 through March of 2013?

11   A.    Let's see.  From 2010 until 2013, there was about 300.

12   If you include the 2014 dates, then it would be 350, but

13   we're not including those dates.  So it would be 300, over

14   300.

15   Q.    And what was the last ending date?

16   A.    2013.

17   Q.    We're not going to publish it to the jury, but I would

18   like you to look at Exhibit 14 that your counsel tried to

19   show to you.

20   A.    Okay.

21   Q.    If you look at that, look at the dates listed from 2010

22   to 2013 and tell me if it refreshes your recollection about

23   approximately how many concerts there were during the time

24   period we were just discussing?

25   A.    Okay.

1    Q.    Whether it was 300 as you testified.

2    A.    Okay.  300 including 2008.  2008 and 2009 are not

3    included in this exhibit.

4    Q.    I believe you corrected me.  You said that the time

5    frame where the 300 concerts were was from 2010 through 2013?

6    A.    The 300 dates from 2008 to 2013.

7    Q.    You haven't produced any documents showing that there

8    300 concerts between 2008 and 2013, have you?

9    A.    I believe we have.

10   Q.    You haven't provided any records that would show any --

11   that would show the -- and let's talk about these concerts.

12   I believe you said 70 percent of them were churches?

13   A.    Uh-huh.

14   Q.    And what average, it's my understanding that churches

15   are gonna have a smaller capacity size; is that correct?

16   A.    It's varies.  We do mega churches that have large

17   capacities.

18   Q.    Well, I guess my question is for churches they can be

19   anywhere from -- you have no evidence of the size of the

20   churches that you played that you produced; correct?

21   A.    I believe we have.

22   Q.    There's no evidence in the record that you've seen of

23   capacity size; correct?

24   A.    It's not in the binder, but I don't know -- so yes, if

25   it's in the binder, but I don't know.

170

```
1              MR. WAIS:  Your Honor, I move to strike.

2              THE COURT:  I'm going to strike the answer only

3   because the question is what's in evidence and the binder is

4   not in evidence.

5              THE WITNESS:  The binder is not in evidence?

6              THE COURT:  No.

7              THE WITNESS:  Okay.

8   BY MR. WAIS:

9   Q.   Do you recall playing a concert at the Logan Street

10  Baptist church?

11  A.   Yes, I do.

12  Q.   And do you recall what the venue size of that venue was?

13  A.   Am I allowed to look in the binder?

14  Q.   No.

15             THE COURT:  No.

16             THE WITNESS:  Okay.  I believe around a thousand.

17  BY MR. WAIS:

18  Q.   So you recall what the venue looked like?

19  A.   Yes.

20             MR. WAIS:  I'd like to mark as the next exhibit in

21  order a document.  May I approach?

22             THE COURT:  You may.

23  BY MR. WAIS:

24  Q.   Do you recognize this venue?

25  A.   Uh-huh.
```

EXHIBIT 4
PAGE 744

1    Q.    That's Logan Street Baptist church?

2    A.    Yes.

3    Q.    Looking at this document, this is not a church that

4    holds a thousand people, is it?

5    A.    I can't tell because your picture is zoomed in.  It's

6    not an aerial view.  I can't tell where the doors are in the

7    back.

8    Q.    It shows the pews; correct?

9    A.    To be honest it looks like it's showing half of the

10   pews.

11          MR. WAIS:  I think for purposes of the Rule of

12   Completeness, we should introduce this evidence so the jury

13   can see for themselves.

14          THE COURT:  Well, I'm not going to permit it at

15   this juncture.

16   BY MR. WAIS:

17   Q.    You're aware of the six individual defendants that

18   you're suing in this case?

19   A.    Yes.

20          MR. KAHN:  I would object.  Mrs. Gray hasn't sued

21   anyone.

22          THE COURT:  Sustained.

23   BY MR. WAIS:

24   Q.    You're aware of the six individual defendants that your

25   husband and the other plaintiffs are suing in this case;

1    correct?

2    A.    Correct.

3    Q.    And that's Mr. Gottwald, Mr. Walter, Ms. Hudson,

4    professionally known as Katy Perry, Sarah Hudson,

5    Mr. Sandberg and Mr. Houston; is that correct?

6    A.    I didn't hear the first part of the question.  I heard

7    all the defendants, but what was the first part.

8    Q.    You're aware those are the defendants in this case?

9    A.    Yes.

10   Q.    Now, you have no knowledge that any of those defendants

11   ever heard your husband's song Joyful Noise; correct?

12   A.    I can't say one way or the other.

13   Q.    You have no knowledge that any of those individuals

14   visited your husband's MySpace page; is that also correct?

15   A.    I can't say one way or the other.

16   Q.    You don't have any knowledge that any of those six

17   individuals ever visited Lecrae Moore's MySpace page;

18   correct?

19   A.    I can't say one way or the other.

20   Q.    You don't have any knowledge any of those six

21   individuals viewed Joyful Noise on YouTube; isn't that

22   correct?

23   A.    I can't say one way or the other.

24   Q.    You have no knowledge of any of those six individuals

25   ever purchasing Joyful Noise; is that correct?

```
 1   A.   I can't say one way or the other.

 2   Q.   Did you attend the Stellar Awards with your husband back

 3   in 2009?

 4   A.   Yes.

 5   Q.   You don't have any knowledge that the individual

 6   defendants attended those awards; correct?

 7   A.   I can't say one way or the other.

 8   Q.   And you're also aware that your husband was nominated

 9   for a GMA Dove award; is that correct?

10   A.   Yes.

11   Q.   And did you also attend the GMA Dove Awards with your

12   husband?

13   A.   Yes.

14   Q.   You have no knowledge any of the individual defendants

15   attended the GMA Dove Awards in 2009; correct?

16   A.   I can't say one way or the other.

17   Q.   And, of course, you haven't spoken with any of the

18   individuals I just discussed?

19   A.   No.

20   Q.   You've never personally sent any of Mr. Gray's music to

21   any of those individuals?

22   A.   No.

23   Q.   That includes Joyful Noise?

24   A.   That's correct.

25   Q.   You never directed anyone to send any of his music to
```

```
 1    those individuals either; is that also correct?
 2    A.   That's correct.
 3    Q.   You have no knowledge of anyone sending any of his music
 4    including Joyful Noise to any of those defendants; is that
 5    correct?
 6    A.   I can't say one way or the other.
 7    Q.   I want to turn back to the lawsuit that was filed.  You
 8    mentioned it was filed in 2012.  The lawsuit was filed in
 9    2012 prior to the release of Dark Horse; correct?
10    A.   Correct.
11    Q.   But the assignment that we looked at, Exhibit 6, was
12    actually filed after the release of Dark Horse; isn't that
13    correct?  The assignment that was signed?
14    A.   Uh-huh.
15    Q.   Between you and your clients?
16    A.   Yes.
17    Q.   Between your clients and Cross Movement Records was
18    signed after the release of Dark Horse; correct?
19    A.   Correct.
20    Q.   In fact it was actually signed after this lawsuit; isn't
21    that correct?
22    A.   I don't remember the exact date.
23    Q.   The date of the lawsuit was July 1st, 2014.  Is this
24    after that date?
25    A.   I'm not sure.
```

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 748

1    Q.    If you look at the top where it shows the date of the

2    assignment, it says July 3rd, 2014?

3    A.    It also says June.

4    Q.    Well, that was crossed out, was it not?

5    A.    I'm not sure.

6    Q.    If you look at where they signed at the bottom, there

7    are dates there.  What dates are those?

8    A.    July 3rd.

9    Q.    2014?

10    A.    Yeah.

11    Q.    Two days after July 1st, 2014?

12    A.    Yes.

13    Q.    Now, in talking about Cross Movement Records, you have

14    no evidence that they received income from the exploitation

15    of Our World Redeemed; correct?

16    A.    No, that's not correct.

17    Q.    You have no documents that they received money from the

18    exploitation of Our World Redeemed?

19    A.    I'm confused because the lawsuit was for unpaid

20    royalties so obviously they received payment.

21    Q.    You're speculating at that point.  You don't know what

22    they received or didn't receive; correct?  You weren't an

23    employee of that company, were you?

24    A.    No, I was not an employee of Cross Movement Records.

25    Q.    And you weren't -- you did not have access to any

1    documents they may have; correct?

2    A.    They meaning Cross Movement Records?

3    Q.    Correct.

4    A.    Correct.

5    Q.    And as to the concert performances by Mr. Gray, you

6    don't have written set lists showing the songs he performed

7    at his concerts; correct?

8    A.    That's not standard for our genre.

9    Q.    And you don't have those; correct?  You don't have

10   documents?  That was my question; is that correct?  You do

11   not have written set lists; correct?

12   A.    Does written mean typed, like typed in my records like,

13   but I don't know.  Are you saying like --

14   Q.    You previously testified you don't have written set

15   lists from those performances; isn't that correct?

16   A.    I guess does a play list count as a written record?  If

17   it's a play list, yes.  If it's like a Word document, no.

18   Q.    Did you produce any play lists in this litigation?  Do

19   you know whether your clients (sic) produced any play lists

20   in this litigation?

21   A.    No.

22   Q.    You testified about the playing of Joyful Noise during

23   radio interviews of your husband; correct?

24   A.    Correct.

25   Q.    That didn't play for entire duration of the interview;

1    correct?

2    A.   It depends on how long the interview was.  If there was

3    a short interview, they'd play like half the song.  If it was

4    a long interview, they'd play the whole song.

5    Q.   Outside of that you have no records of Joyful Noise

6    being played on the radio?  Out of interviews, you have no

7    records --

8    A.   Yeah, it has been played outside of interviews.

9    Q.   That wasn't my question.  I asked if you have records

10   showing outside of the interviews?

11   A.   What do you mean by records?  I have like my own records

12   of media, but I don't know what your definition of a record.

13   Q.   Are you aware of any such records being produced in this

14   litigation?

15   A.   No.

16   Q.   In fact you said you've been involved in the pursuit of

17   this litigation; is that correct?

18   A.   Correct.

19   Q.   You've been kept up to date on how the litigation's

20   progressed?

21   A.   Not specifics.

22   Q.   Are you aware that your husband and the plaintiffs hired

23   a musicologist Dr. Todd Decker?

24   A.   Yes, I've seen that name.

25   Q.   Are you familiar with the contents of his reports?

```
1    A.    No, I never read it.

2              MR. WAIS:  I have no further questions.

3              THE COURT:  Okay.  Mr. Kahn.

4                     REDIRECT EXAMINATION

5    BY MR. KAHN:

6    Q.    Mrs. Gray, as to what concerts your husband performed

7    Joyful Noise from 2008 through 2012, my understanding other

8    than the tour with Mr. Moore, you were at every concert;

9    correct?

10   A.    Correct.

11   Q.    And you functioned as the DJ at every concert; correct?

12   A.    Correct.

13   Q.    You would have personal knowledge of what was performed

14   at every concert?

15   A.    Yes.

16   Q.    Was Joyful Noise performed at every concert?

17   A.    Yes, it was.

18   Q.    Also counsel asked you about documents concerning Joyful

19   Noise being played during some of these radio and TV

20   interviews; correct?

21   A.    Correct.

22   Q.    You have no documents; correct?

23   A.    Yeah, no documents.

24   Q.    No videotapes of it being played?

25   A.    No.
```

```
 1    Q.    Did you attend every one of these interviews?

 2    A.    Yes.

 3    Q.    Did you personally hear Joyful Noise being played at

 4    some of them?

 5    A.    Yes.

 6    Q.    Counsel showed you a photograph apparently from Facebook

 7    of at least part of this Logan Street Baptist church and was

 8    asking you about the seating capacity there?

 9    A.    Mm-hmm.

10            THE COURT:  Is that yes?

11            THE WITNESS:  Yes.

12    BY MR. KAHN:

13    Q.    You have to say yes or no.

14    A.    Yes.

15    Q.    It's okay.  It's your first time.  Was the Logan Street

16    Baptist church on the smaller side as far as you can recall

17    of the venues from where your husband performed?

18    A.    Yes, from angle of which this photo was taken, yes.

19    Q.    And can you tell us a couple of the larger venues your

20    husband performed?

21    A.    Yeah, in Kansas City Temper Arena.  Buffalo Coca-Cola

22    Field.  Minneapolis Convention Center, East Tennessee

23    University, Indiana University, University of Wisconsin.

24    Little Rock AT&T Field.

25    Q.    You mentioned, I don't know how big the seating capacity
```

1    is at the army bases?

2    A.    So we did Bremerton, Washington the Naval Base.  We did

3    Fort Jackson in Columbia, South Carolina.  We did West Point

4    Academy in New York.  We did Fort Knox, Kentucky military

5    base.

6    Q.    Also, counsel asked you about questions about

7    advertising from 2010 to 2012 on these digital platforms.

8         Did you as the marketing manager perceive any

9    benefit for your husband's other songs when you were

10   advertising one of those albums?  And by that I mean Joyful

11   Noise or from prior albums?

12            MR. WAIS:  Objection.

13            THE COURT:  Sustained.

14   BY MR. KAHN:

15   Q.    Okay.  As far as sales, I realized you never received

16   sales information from Our World Redeemed; correct?

17   A.    Correct.

18   Q.    Starting with the brick and mortar stores going back to

19   2008 and on your concert tours, did you ever have any -- did

20   you personally witness any evidence of the availability of

21   the CD Our World Redeemed at any stores along the concert

22   tours?

23   A.    Yes.

24   Q.    Tell me about that.

25   A.    We would --

```
 1              MR. WAIS:  Objection.  Hearsay.

 2              THE COURT:  They're asking what she saw in the

 3    store.

 4              MR. KAHN:  Right.

 5              THE COURT:  Which is not hearsay.

 6              THE WITNESS:  Yes.  I saw Our World Redeemed in

 7    Walmart, Best Buy, Target, Family Christian Book Store,

 8    Lifeway.  And Marcus, my husband, also did in-store CD

 9    signings where people would come and get their CD, physical

10    CD signed in these brick and mortar stores.

11    BY MR. KAHN:

12    Q.   You mentioned the stores Walmart, Target, whatever.  Was

13    that just in one city or did you ever visit those stores in

14    more than one city on your concert tours?

15    A.   Yes, multiple cities.

16    Q.   Did you always find that CD available?

17    A.   Yes.

18    Q.   And you had no involvement in the sales of digital

19    version of Our World Redeemed; correct?

20    A.   Correct.

21    Q.   Or the digital sales of Joyful Noise; correct?

22    A.   Correct.

23    Q.   Did you personally view any evidence that those the

24    album or song were available for sale on any of those digital

25    media?
```

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 755

```
1    A.    Yes.

2    Q.    What did you observe?

3          MR. WAIS:  Hearsay.

4          THE COURT:  Overruled.

5          THE WITNESS:  On those digital platforms, his song

6    is available as the top song under his artist name so the

7    music that we put out under Clear Sight linked to --

8          MR. WAIS:  Motion to strike.

9          THE COURT:  I'm going to grant the motion to

10   strike.  It's hearsay.

11         MR. KAHN:  I have nothing further, Judge.

12         THE COURT:  Okay.

13         MR. WAIS:  Just a few more questions.

14                    RECROSS-EXAMINATION

15   BY MR. WAIS:

16   Q.    I believe you mentioned as being one of the venues the

17   War Memorial Stadium in Little Rock, Arkansas?

18   A.    Uh-huh.

19   Q.    Was that part of the event put on by the Nehemia

20   Network?

21   A.    Can I see what document you're talking about?

22   Q.    I'm just asking you the question.  Do you recall that

23   was part of the event put on by that network?

24   A.    I don't remember the names of every sponsor.  I just

25   remember the venues, most venues.
```

```
 1    Q.   Are you familiar with the Nehemia network and working

 2    with them for concerts?

 3    A.   No, I'm really trying to think.  No, it doesn't ring a

 4    bell.  We've done so many concerts.

 5              MR. WAIS:  I'd like to show the witness a document?

 6              THE COURT:  Yes.

 7              MR. WAIS:  You can take a look at this document

 8    really quick.

 9    Q.   Does that refresh your recollection as to what the

10    Nehemia network is?

11    A.   To be honest, it does not.

12    Q.   You also mentioned the Kemper Arena in Kansas City,

13    Montana?

14    A.   Kansas City, Missouri.

15    Q.   And the Minneapolis Convention Center in Minneapolis,

16    Minnesota?

17    A.   Yes.

18    Q.   Were those concerts part of the Acquire the Fire concert

19    series?

20    A.   I'm not sure about Minneapolis Convention Center or the

21    Kemper Arena.  We did do an Acquire the Fire tour, but I

22    don't know if those are linked directly to those venues.

23    Q.   And what was Acquire the Fire?

24    A.   It was a Christian large youth conference.

25    Q.   I'd like to show -- could you turn to Exhibit 23 in your
```

EXHIBIT 4
PAGE 757

```
 1    book?
 2            MR. WAIS:  Never mind, Your Honor.  I'll move on.
 3    Q.   So you said that your husband gave up his rights to get
 4    any money from Cross Movement Records two days after this
 5    lawsuit by signing that assignment; is that correct?
 6    A.   Say that again.  Give up his rights?
 7    Q.   He entered into this assignment with Cross Movement
 8    Records two days after this lawsuit was filed; correct?
 9    A.   Correct.
10    Q.   In signing this assignment, he gave up his right to
11    receive any income from Cross Movement Records; is that
12    correct?
13            MR. KAHN:  I would object.  This witness is not a
14    lawyer.
15            THE COURT:  Well, I think that's right.
16            MR. WAIS:  She testified she had knowledge as to
17    the assignment itself in the settlement of that lawsuit.
18            THE COURT:  I understand, but the assignment speaks
19    for itself and this is really becoming duplicative.
20            MR. WAIS:  Okay.  No further questions then.
21            MR. KAHN:  No further questions, Your Honor.
22            THE COURT:  Then you may step down.  Thank you very
23    much.
24            I think this would be a good time for the afternoon
25    recess.  Let's take 10 minutes, and then we will come back.
```

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 758

```
 1    And I know ladies and gentlemen, you're interested where we

 2    stand in the scheme of things and I will try to give you a

 3    report.

 4                        (Jury not present.)

 5            THE COURT:  Okay.  So just quickly the jury has

 6    asked Mrs. Jeang if we could provide an update as to what

 7    we're doing here.

 8            MR. KAHN:  Yeah, Your Honor.  All that we have left

 9    is to read a few stipulations into the record.  We need to

10    introduce the official copyright document from the U.S.

11    government.  We already have a placeholder for that as

12    Exhibit 30.  Then we will hopefully work out the Billboard

13    deposition excerpts so that would be it.

14            THE COURT:  I understand.

15            Well, let me ask you this.  On the Billboard

16    materials, I would prefer that you try to work things out.

17    I'm kind of skeptical that you are going to work things out

18    the way you're going.  If the plaintiff thinks there's some

19    hope of working out some of this, then I think everyone

20    should meet and confer.

21            But as I've indicated earlier, I think the thing to

22    do depending on when you finish up with these stipulations to

23    rest with my explaining to the jury that you're going to

24    reopen if necessary or maybe the better way to do it is just

25    to permit the defense to start calling witnesses out of
```

```
 1    order.  If, in fact, I don't let you do anything further, you
 2    can rest tomorrow.
 3              MR. KAHN:  That seems fair.
 4              MS. LEPERA:  I think that's fine, Your Honor.
 5              THE COURT:  I mean . . .
 6              MS. LEPERA:  It might be preferable than actually
 7    making a record of closing and then reopening.
 8              THE COURT:  I think that's right.  So that means
 9    then the defense after we get through those things, the
10    defense ought to be able to start calling someone today.
11              MS. LEPERA:  We have a witness, Your Honor.
12              THE COURT:  How long is that witness going to be?
13              MS. LEPERA:  I would say no more than an hour.
14              THE COURT:  We should be able to get that in.
15              Do you think you would be able subject to obviously
16    if we reopen on -- if we let the plaintiffs put on the
17    testimony on Billboard that may take some time, but do you
18    think you can finish tomorrow or not?
19              MS. LEPERA:  That's what I've been working very
20    hard to try to accomplish and I think we can.
21              THE COURT:  So then we have the question of jury
22    instructions and closing argument which in a perfect world I
23    would like to get done by midday Thursday.  I don't know if
24    we can do it or not, but I think it's a laudatory goal.
25              MS. LEPERA:  We're working towards that.
```

```
 1                    THE COURT:  Yes.  So I guess --
 2               MS. LEPERA:  Subject to a rebuttal case which I
 3     haven't heard a word or breath of.
 4               MR. KAHN:  Professor Decker will not be back.
 5               THE COURT:  We've covered him.  He's done his
 6     rebuttal.  So what would you like me to tell the jury?  I
 7     hate to tell them that I think we're just gonna rest on
 8     Thursday because they may make plans for next week and they
 9     may not be able to make plans for next week.
10               So the question, I guess, is do we want to say that
11     we are going to conclude the first phase of the case or do we
12     not want to do that?
13               MS. LEPERA:  I'm fine with that.
14               MR. KAHN:  I think that's fine.
15               THE COURT:  Anyone else?  It seems to me we want to
16     give them a report, but we also want to let them know that --
17     not let them off the hook for next week.
18               MS. LEPERA:  When you charge them, obviously,
19     they'll understand the sequence at that point.
20               THE COURT:  Hopefully, but one never knows.
21               MR. KAHN:  True.
22               THE COURT:  I've seen juries do some unusual things
23     including compute damages even though they're in the
24     liability stage with no evidence before them so many things
25     happen.
```

1          Okay.  Let's do this.  Take a recess.  Come back.

2     Plaintiffs will read their evidence.  I will try to give the

3     jury a report as to where we are and hopefully, we can live

4     up to our promises.  Thank you.

5          MR. KAHN:  Your Honor, one question.  Just a

6     procedural thing.  So we have the two stipulations.  One was

7     attached as Schedule A, Schedule 5A to the final pretrial

8     order.  Your clerk mentioned it would be a good to have the

9     court stamp on top and bottom taken off.  We'll try to get

10    clean copies, but for today just reading them, can we mark

11    them as the next two exhibits and then swap them out?

12          THE COURT:  I think that's what I would do.

13    They're not going to the jury right now.  You're just reading

14    them.

15          MR. KAHN:  We'll give them an exhibit number and

16    read them.

17          THE COURT:  Okay.  That's what we should do.

18          MS. LEPERA:  Do you want to do that before we call

19    the witness?  Doesn't really matter I suppose.

20          THE COURT:  Whatever you want to do.

21          MS. LEPERA:  I'll leave it to you then to decide.

22          MR. KAHN:  We'll do the stipulations.

23          THE CLERK:  This court's in recess.

24                    (Recess taken.)

25          MS. LEPERA:  Just a quick scheduling question,

```
 1   Your Honor.  So as I mentioned, we do have a witness who's
 2   approximately an hour who is here.  We had a second
 3   approximately an hour-and-a-half.  Would you like that person
 4   to stay or go?
 5            THE COURT:  Well, is it still your plan to read the
 6   stipulation?
 7            MS. LEPERA:  We have some cross-reading off of that
 8   to do as well.
 9            MR. KAHN:  Then there's Ms. Hudson.  She's an hour?
10            MS. LEPERA:  I said approximately.
11            THE COURT:  Well, I mean, what you're asking me is
12   how late are we going today so you know whether to send your
13   other witness off.
14            MS. LEPERA:  That's right Your Honor.
15            THE COURT:  What I'm trying to understand is let's
16   assume we can go to around 5 o'clock.  Does that mean, uh,
17   that we could finish up with Ms. Hudson and the stipulation
18   and the reading and have time to start the next witness?
19            MS. LEPERA:  I'm thinking maybe ten minutes.  Maybe
20   a little more.  It's a guess.
21            THE COURT:  Could the witness stay till about
22   4 o'clock and we'll see where we are?
23            MS. LEPERA:  The witness can stay the entire time
24   if you prefer, Your Honor.
25            THE COURT:  Okay.  Thank you.
```

```
 1              THE CLERK:  Ready for the jury?

 2         MS. LEPERA:  Yes.

 3         MR. KAHN:  Yes.

 4                   (Jury present.)

 5         THE COURT:  Okay.  Ladies and gentlemen, before we

 6    begin in an effort to respond to your question as to where we

 7    are schedule wise, I believe that if everything goes

 8    according to plan, we will probably be submitting the first

 9    phase of this trial to you and finishing the first phase some

10    time Thursday.  Thereafter, though, I think you still have to

11    assume that you may be back next week as I initially

12    indicated for the days that I mentioned.  So I can't say for

13    sure, but I certainly would not plan to be elsewhere next

14    week at this stage.

15              What we're gonna do now, though, is we are going to

16    have the plaintiffs read some stipulations, and then again

17    just to keep things moving along, the defense is going to

18    call a witness out of order with the permission of the

19    plaintiffs.  And then the plaintiff review is going to review

20    its evidence see where it stands tomorrow.  So that's how

21    we're gonna go forward.

22              Why don't you go ahead, if you can, Mr. Kahn.

23         MR. KAHN:  Thank you, Your Honor.

24              Ladies and gentlemen of the jury, we have marked as

25    joint Exhibit 122 a set of facts that the parties have
```

EXHIBIT 4
PAGE 764

191

```
1    admitted and require no further proof.  There are total of 38
2    paragraphs.  I'm going to read about eight of them to you
3    now.  They all relate to the YouTube video.
4            1.  The website www.youtube.com is an online
5    video-sharing service owned by Google where users can upload,
6    share and watch videos.
7            2.  YouTube launched in 2005.
8            25.  The sound recording of Joyful Noise is
9    embodied in five videos posted on YouTube:
10           A video posted to YouTube on January 21st, 2011,
11    titled "Flame -- Joyful Noise" at the url and then there's a
12    website address.  That's Video 1.
13           A video posted to YouTube on January 21, 2011,
14    titled Flame -- Joyful Noise at another YouTube address.
15    That's Video 2.
16           A video posted on YouTube on December 18th, 2009
17    titled Joyful Noise -- Flame featuring Lecrae and John Reilly
18    at another url address.  That's Video 3.
19           A video published to YouTube on November 7, 2009,
20    titled Flame -- Joyful Noise with Lyrics and available at
21    another YouTube address.  That's Video 4.
22           Finally, a video posted to YouTube on March 15,
23    2008, entitled Flame featuring Lecrae and John Reilly --
24    Joyful Noise Lyrics at another YouTube url.  That's Video 5.
25           26.  As of March 11, 2012, Video 1 had a view count
```

EXHIBIT 4
PAGE 765

192

of 293,956.

27.  As of March 11, 2012, Video 2 had a view count of 483,981.

28.  As of March 11, 2012, Video 3 had a view count of 7,283.

29.  As of March 11, 2012, Video 4 had a view count of 18,153.

30.  And as of March 11, 2012, Video 5 had a view count of 561,718.  And that was part of the joint Exhibit 122.

I'll read a few paragraphs from joint Exhibit 123 regarding certain of the corporate defendants.

Defendant Capital Records, LLC owns the copyright in sound recording Dark Horse and is the company that marketed and distributed the Prism album and the Dark Horse sound recording.

Defendant Kobalt Music Publishing America, Inc. provides music publishing administrative services for Defendant Gottwald, Sandberg, Walter and Sarah Hudson with respect to the musical composition Dark Horse.

Defendant Kitty Purry, Inc. is a California corporation owned and/or controlled by Defendant Katheryn Hudson, performer known as Katy Perry.

Defendant Kasz Money, Inc. furnished the production services of Defendants Walter and Gottwald for the Dark Horse

EXHIBIT 4
PAGE 766

1  sound recording.

2          And finally, Defendant WB Music Corporation

3  provides music publishing and administrative services for the

4  ownership interest of Katheryn Hudson in the Dark Horse

5  composition.  And that was Exhibit 123.

6          THE COURT:  Okay.  Ms. Lepera.

7          MS. LEPERA:  We have some counter statements to

8  read to that stipulation, Your Honor, and my colleague Jacob

9  Albertson will take care of that.

10          THE COURT:  Very good.

11          MR. ALBERTSON:  By 2010, users were uploading more

12  than 50,000 hours of video content to YouTube each day and

13  there were more than two billion views of YouTube video each

14  day.

15          By 2012, users were uploading more than

16  85,000 hours of video content to YouTube each day and there

17  were more four billion views of YouTube videos each day.

18          Today, YouTube has over a billion users and there

19  are more than 576,000 hours of video content being uploaded

20  to YouTube and each day users watch a billion hours of video

21  generating billions of views each day.

22          A view count does not identify any one person in

23  particular as having watched a particular video.

24          Moreover, a view does not necessarily mean that a

25  human actually watched or listened to the video while it was

194

1   playing; it only means that the video was played.

2          In addition, a view does not necessarily mean that

3   a video was played in its entirety or was even played for

4   more than a few seconds.

5          Google is aware of certain instances in the past in

6   which video view counts were improper inflated by third

7   parties using automated means in violation of YouTube policy.

8          In 2008, there were approximately 194 million

9   videos available for viewing on YouTube, including

10  approximately 61 million videos that were uploaded to YouTube

11  in 2008 alone.  The available videos accumulated

12  approximately 381 billion views during 2008.

13         In 2009, there were approximately 349 million

14  videos available for viewing on YouTube, including

15  approximately 99 million videos that were uploaded to YouTube

16  in 2009 alone.  The available videos accumulated 509 billion

17  views in 2009.

18         In 2010, there were approximately 533 million

19  videos available for viewing on YouTube, including

20  approximately 139 videos that were uploaded to YouTube in

21  2010 alone.

22         MS. LEPERA:  Correction.  139 million.

23         MR. ALBERTSON:  The available videos accumulated

24  756 billion views during 2010.

25         The YouTube receiving the most views in 2010 were:

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 768

195

1          First, the Official Music Video for Justin Bieber's

2    song featuring Ludacris, reached 425,688,273 views in 2010;

3          Second, the video for Shakira's Waka Waka (This

4    Time for Africa), received 270,763,562 views in 2010;

5          Third, the video for Lady Gaga's song Bad Romance,

6    received 266,191,920 views in 2010;

7          Fourth, the Official Music Video for Eminem's song,

8    Love the Way Lie featuring Rihanna, received 251,890,764

9    views in 2010.

10          Fifth, the Official Video for Justin Bieber's song,

11    One Time, received 183,274,415 views in 2010.

12          In 2011, there were approximately 818 million

13    videos available for viewing on YouTube, including

14    approximately 213 million videos that were uploaded to

15    YouTube in 2011 alone.  The available videos accumulated

16    approximately 1.1 trillion views in 2011.

17          The YouTube videos receiving the most views in 2011

18    were:

19          First, the Jennifer Lopez song On the Floor,

20    featuring Pitbull, received 464,437,501 views in 2011;

21          Second, the video Crocodile Attack received

22    407,888,327 views in 2011;

23          Third, the video for LMFAO's song Party Rock

24    Anthem, featuring Lauren Bennett, GoonRock, received

25    339,831,952 views in 2011;

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 769

196

1          Fourth, the video Sterio heart received 313,286,752

2    views in 2011;

3          Fifth, the Official Music Video for Justin Bieber's

4    song Baby, featuring Ludacris, received 259,746,426 views in

5    2011.

6          In 2012, there were approximately 1.1 billion

7    videos available for viewing on YouTube, including

8    approximately 515 million videos that were uploaded to

9    YouTube in 2012 alone.  The available videos accumulated

10   approximately 1.4 trillion views in 2012.

11         The YouTube videos receiving the most views in 2012

12   were:

13         First, the video for Psy's song, Gangnam Style M/V,

14   received 1,101,849,272 views in 2012;

15         Second, the video for Carly Rae Jepsen's song, Call

16   Me Maybe, received 373,789,532 views in 2012;

17         Third, the Official Video for Michel Telo's song,

18   Ai Se Eu Te Pego, received 373,608,879 views in 2012;

19         Fourth, the Official Video for Gotye's song,

20   Somebody That I Used to Know, featuring Kimbra, received

21   331,408,797 views in 2012;

22         Fifth, the Official Video for One Direction's song,

23   What Makes You Beautiful, received 271,945,208 views in 2012.

24         In 2013, there were approximately 1.5 billion

25   videos available for viewing on YouTube, including

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 770

197

1    approximately 697 million videos that were uploaded to

2    YouTube in 2013 alone.  The available videos accumulated

3    approximately 1.6 trillion views in 2013.

4            The YouTube videos receiving the most views in 2013

5    were:

6            First, the video for Psy's song, Gangnam Style M/V,

7    received 783,446,910 views in 2013;

8            Second, the video for Psy's song, Gentleman Style

9    M/V, received 619,058,370 views in 2013;

10           Third, the Official Video for Miley Cyrus's song

11   Wrecking Ball, received 461,848,016 views in 2013;

12           Fourth.  The Official Video for Macklemore & Ryan

13   Lewis's song, Thrift Shop, featuring Wanz, received

14   440,889,984 views in 2013;

15           Fifth, the Official Video for Miley Cyrus's song,

16   We Can't Stop, received 332,047,880 views in 2013.

17           For each video in the above paragraphs for 2008 to

18   2013, the view count stated is only for the specific video

19   identified, not all videos of that song posted on YouTube.

20           The view counts for Videos 1 through 5 identified

21   by plaintiff's counsel do not identify any one person in

22   particular as having watched any of the five videos listed.

23           Each play does not necessarily mean that a person

24   actually listened to the song while it was playing.  Instead,

25   it indicates that the playing of the song was initiated.

EXHIBIT 4
PAGE 771

1          Each play does not necessarily mean that the song

2     was played in its entirety or was even played for more than a

3     few seconds.

4          Each play of a song does not necessarily mean that

5     a person initiated the play of a song.  During MySpace's

6     history, users have used bots, which are autonomous programs

7     that can interact with computer systems and websites such as

8     MySpace to autonomously initiate plays of a song.

9          A play does not identify any one person in

10    particular as having initiated playback or listened to the

11    song in question.  MySpace has no records of and cannot

12    identify whether any one person played or listened to a song.

13          THE COURT:  All right.  Then, Ms. Lepera, I think

14    we'll go to your witness.

15          MS. LEPERA:  Call Sarah Hudson.

16          And for the record, my colleague Gabby Nourafchan

17    will be conducting the examination.

18          THE CLERK:  Please raise your right hand.

19                    (Witness sworn.)

20          THE CLERK:  Please state your full name and spell

21    your last name for the record.

22          THE WITNESS:  My name is Sarah Theresa Hudson

23    H-u-d-s-o-n.

24

25

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 772

199

```
1                     DIRECT EXAMINATION

2    BY MS. NOURAFCHAN:

3    Q.   Good afternoon, Ms. Hudson.

4    A.   Hi.

5    Q.   What is your profession?

6    A.   I am a songwriter.

7    Q.   Can you tell us a little bit about your background and

8    how you got into the music business?

9    A.   I grew up in a musical family.  My father, uh, is in

10   music and we were just surrounded by it and loved it ever

11   since I can remember.  Around three or four, I started

12   singing and, you know, maybe 9 or 10 years old, started

13   writing just little songs.

14        Um, after high school, I decided to pursue it as my

15   career.  I wanted to be a pop star and just started writing

16   my own songs, went to music school for a bit.  And long story

17   short, I got a publishing deal, an artist publishing deal.

18   Again, long story short, I then signed a major label deal,

19   made a record for about three, four years, and then

20   eventually, well, as soon as my record was about to come out,

21   I was dropped which was devastating and horrible at the time.

22        Um, and I decided to start my own band at that time

23   called Ultraviolet Sound.  We were an electro pop band.  Um,

24   and basically for the next, I don't know, maybe five,

25   six years, we toured, we made our own music, put out our own
```

EXHIBIT 4
PAGE 773

200

1    music.  Um, you know, just really put every ounce of

2    ourselves into this project and were sleeping on our studio

3    floor and, you know, it was just my entire life.

4           Um, and then we kind of got to a point where it

5    wasn't really, you know, working.  Couldn't really afford to

6    live and eat.  Um, so the band broke up, and I started, you

7    know, I didn't know what else to do so I just started

8    writing.  I wrote with people I had met along the way, and

9    eventually realized that I loved writing for other people.

10   Um, and yeah, and that sort of lead me into a career of song

11   writing.

12   Q.   What kind of music do you write?

13   A.   I write pop music.

14   Q.   Do you write or perform Christian rap music?

15   A.   No.

16   Q.   Do you write or perform any type of Christian music?

17   A.   No, I did not.

18   Q.   Do you listen to Christian rock music?

19   A.   No, I don't.

20   Q.   Do you listen to any type of Christian music?

21   A.   No.

22   Q.   So let's talk a little bit about Dark Horse.  Did you

23   play a role in the creation of Dark Horse?

24   A.   Yes, I did.

25   Q.   Can you please explain your role for the jury?

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 774

```
 1    A.    Basically, I, for Dark Horse, um, you mean tell you how
 2    I came to --
 3    Q.    I'll rephrase the question.
 4    A.    Okay.
 5    Q.    Can you tell the jury how you got involved in the Dark
 6    Horse song?
 7    A.    So through in those years of me, you know, writing with
 8    other people and sort of building my career as a songwriter,
 9    I had met an artist and was doing a lot of writing with him.
10    And he was really good friends with Katy Perry.  And, um, I
11    mean, again, this is a long story short, but she ended up
12    hearing some of the work that we were doing together and she
13    really -- she really loved it.  And, you know, we kind of
14    became friends.
15            And then one night, I got a text from her and she
16    said hey, do you want to come up to Santa Barbara and write
17    with me and Dr. Luke and Max Martin and Cirkut?  I mean, for
18    me at the time, this was the biggest, you know, opportunity I
19    had ever been presented with.  So I was like yes.  Tell me
20    when and where and I'll be there.  So the next morning, I
21    drove up to Santa Barbara and, uh, got to the studio and
22    that's when we wrote the song.
23    Q.    So can you just clarify who was at the studio when you
24    arrived that day?
25    A.    When I arrived at the studio, it was Katy Perry, Luke,
```

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 775

202

1    Max and Cirkut.

2              MS. NOURAFCHAN:   And then before we go any further,

3    I would like to play Exhibit 74 for you.

4    BY MS. NOURAFCHAN:

5    Q.   Can you identify this exhibit, please?

6    A.   Yeah, that's the instrumental track of what became Dark

7    Horse.

8    Q.   And do you remember when you heard this for the first

9    time?

10   A.   Yeah, um, I, when I got to the studio, um, that was

11   already decided what Katy, you know, wanted to work on and

12   they played it for me and we began working on it.

13   Q.   So they played this for you when you arrived in the

14   studio in Santa Barbara?

15   A.   Yes.

16   Q.   And was it already created when you arrived?

17   A.   Yes.

18   Q.   And did you have anything to do with the creation of

19   what we just played for you?

20   A.   No.

21   Q.   Did you make any changes to what we just played for you?

22   A.   No.

23   Q.   And what happened after this was played?

24   A.   Um, basically, you know, there was some melodies and

25   Katy and I went into a separate room and really came up with

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 776

203

1   the concept and, you know, uh, the lyrics and just the -- the

2   overall concept of the song.

3   Q.   So you mentioned that on this day in Santa Barbara, you

4   were present, Katy, Luke, Henry and Max.  Um, did anyone else

5   contribute to the writing of Dark Horse other than those

6   individuals and yourself?

7   A.   Not on that day.  I mean, Juicy J was put on the track

8   later.

9   Q.   And were you involved in Juicy J's contribution?

10  A.   No.

11  Q.   Now, let's talk about the plaintiffs in this case.

12  Prior to the filing of this lawsuit, had you ever heard of

13  the song Joyful Noise?

14  A.   No.

15  Q.   How do you know that?

16  A.   Um, I would have remembered.  When I heard it after I

17  heard about this lawsuit, I would have remembered if I heard

18  it and I had not.

19  Q.   And had you ever heard of album entitled Our World

20  Redeemed prior to this lawsuit?

21  A.   No.

22  Q.   So as you know, the plaintiffs in this case are Marcus

23  Gray professionally known as Flame, Emanuel Lambert

24  professionally known as D.A. Truth, Chike Ojukwu sometimes

25  goes by the aliases Chike Beatz and Chike Beatz Down.

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 777

204

1          Had you ever heard of any these individuals before

2   this lawsuit before this filed?

3   A.    No.

4   Q.    Had you ever met any of these individuals before this

5   lawsuit was filed?

6   A.    No.

7   Q.    Had you ever spoken to any of these individuals before

8   this lawsuit was filed?

9   A.    No.

10  Q.    Had you heard any of their music before this lawsuit was

11  filed?

12  A.    No.

13  Q.    There was a fourth individual who's been involved named

14  Lecrae Moore professionally known as Lecrae.  What do you

15  know about him?

16  A.    I don't know anything about him.

17  Q.    Had you ever heard of him prior to the filing of this

18  lawsuit?

19  A.    No.

20  Q.    Um, had you have ever seen plaintiff Marcus Gray perform

21  in concert?

22  A.    No, I have not.

23  Q.    Have you ever seen him perform live anywhere?

24  A.    No.

25  Q.    Have you ever seen Emanuel Lambert perform live in

EXHIBIT 4
PAGE 778

205

1    concert or anywhere?

2    A.    No.

3    Q.    Have you ever seen Lecrae Moore perform live?

4    A.    No.

5    Q.    Have you ever seen Chike Ojukwu perform live?

6    A.    No.

7    Q.    How do you know that?

8    A.    Um, I mean, I've been here and I've seen them in person

9    and I would have known if I had seen them before.  And, I

10   mean, Christian music isn't really my genre.

11   Q.    Have you ever been to a Christian rap concert?

12   A.    No.

13   Q.    Do you ever watch religious programs on television?

14   A.    I do not.

15   Q.    Do you ever listen to Christian radio stations or

16   Christian radio programs?

17   A.    No.

18   Q.    Now, let's talk about some award shows.  Have you ever

19   attended the Dove Awards or watched the Dove Awards on TV?

20   A.    I have not.

21   Q.    Had you ever heard of the Dove Awards prior to this

22   lawsuit?

23   A.    No, never heard of them.

24   Q.    Have you ever attended the Stellar Awards or watched the

25   Stellar Awards?

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 779

206

1    A.    No.  I also had never heard of them.

2    Q.    Were you a voter for the 51st Annual Grammy Awards which

3    were given out in February 2009?

4    A.    I was not.

5    Q.    Do you follow the Grammy nominations for religious or

6    gospel categories?

7    A.    No.

8    Q.    Prior to this lawsuit, did you know that those

9    categories existed?

10    A.    No, I did not.

11    Q.    And are you familiar with Billboard charts?

12    A.    I am familiar, yes.

13    Q.    Do you ever look at Billboard charts?

14    A.    The only time I really look at them is if I have a song

15    that's out, and I really only look at the Hot 100 or in my

16    genre which is pop.

17    Q.    Do you ever look at the charts for Christian or gospel

18    music?

19    A.    No.

20    Q.    And I just want to clarify.  I don't think my question

21    was 100 percent clear earlier.  Prior to this lawsuit being

22    filed, had you ever heard the song Joyful Noise?

23    A.    No.

24    Q.    Now, let's talk about MySpace.  In the time period

25    between 2008 and 2013, did you use MySpace?

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 780

207

1    A.    I did, yes.

2    Q.    And what did you use it for?

3    A.    Uh, I -- my band at the time, uh, had a MySpace page and

4    used it to promote our band, um, and networking, you know, to

5    meet photographers, hair stylists, other artists in our genre

6    that we could possibly tour with.  Yeah, it was really just a

7    promotional tool for my band.

8    Q.    And can you remind us what your genre was when you were

9    in that band?

10    A.    I mean I would say electro pop music.

11    Q.    And did you ever use MySpace to search for music outside

12    of the electro pop genre?

13    A.    No.

14    Q.    In that same time period 2008 to 2013, did you ever

15    listen to music on YouTube?

16    A.    Yes, I did.

17    Q.    And can you tell us a little bit about your use of

18    YouTube to listen to music?

19    A.    Um, it was more for like my place to promote my band,

20    upload our band to YouTube, um, our live performances.  We

21    really used it as a promotional tool.  Also, you know, to

22    look for funny things people would tell me to look at or, you

23    know, but it was mostly for my band.

24    Q.    Did you ever listen to Joyful Noise on YouTube?

25    A.    No, I did not.

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 781

208

1    Q.    Did you ever listen to Joyful Noise on MySpace?

2    A.    No, I did not.

3    Q.    Did you ever use YouTube to search for music by an

4    artist that you'd never heard of?

5    A.    No.

6    Q.    Did you ever use YouTube to search for music that hadn't

7    been recommended to you?

8    A.    No.

9    Q.    And did anyone ever recommend that you should look up

10   Joyful Noise on YouTube?

11   A.    No.

12   Q.    So I think as we've discussed Dark Horse in 2013.  This

13   lawsuit was filed in 2014.  What was your initial reaction to

14   hearing that you had been sued for copyright infringement?

15   A.    I was -- I was devastated.  You know, for me this is my

16   life and my career.  And I have put a lot of blood, sweat and

17   tears into this.  And, you know, slept on my studio floor,

18   just lived and breathed music.  So to be accused of something

19   like that is absolutely devastating, um, because I believe I

20   have integrity.

21         And, you know, this song changed my life and it

22   opened a lot of doors for people to really see my talent.

23   And, you know, I had the thought the other day that I hope

24   the song that changed my life doesn't now ruin my life so it

25   has been completely devastating for me.

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 782

```
 1              MS. NOURAFCHAN:  I have nothing further.

 2              THE COURT:  Okay.  Cross.  Mr. Kahn.

 3                        CROSS-EXAMINATION

 4   BY MR. KAHN:

 5   Q.   Good afternoon, Ms. Hudson.

 6   A.   Hi.

 7   Q.   I remember when I took your deposition, you described

 8   the very strong reaction you had when you got to

 9   Santa Barbara and you heard the instrumental track.  Do you

10   remember that?

11   A.   Do I remember describing it to you?

12   Q.   It was an interview with you, and then you and I talked

13   about that you had a strong reaction.  What was that

14   reaction?

15   A.   Um, I mean, first of all, I was overwhelmed and so

16   excited to be there in the room with these incredible people

17   that I had looked up to.  And, um, so just being in the room

18   alone for me, I remember saying to myself if this is all that

19   happens, this is amazing so really just take in this moment.

20              And when I heard the track and I saw, you know, the

21   excitement of Katy who I admired and still do to this day, I

22   was overwhelmed with joy.

23   Q.   I believe you testified that you and Katy worked out the

24   overall concept of the song when you were getting ready to

25   write the lyrics?
```

```
 1   A.    Um, I mean, well, yeah.  Part of writing lyrics is
 2   coming up with the concept and the title and the lyrics,
 3   yeah.
 4   Q.    So what was the overall concept of the song?
 5   A.    The concept of Dark Horse is, you know, about the power
 6   of a woman and not crossing a powerful woman.  And, you know,
 7   that just that we as women are powerful beings and, you know,
 8   we used it in a colorful way with a metaphor of the Trojan
 9   horse and Dark Horse and, yeah.
10   Q.    How does the metaphor the Trojan work.
11            MS. NOURAFCHAN:  Objection.
12            THE COURT:  Um, I'm not sure -- I sort think she
13   opened it up.  I'll let her answer it.
14            THE WITNESS:  Well, a dark horse is something that
15   comes out of nowhere and it's unexpected.  So, I mean,
16   that's, it was a metaphor of, you know, don't cross this
17   particular woman in the song because she's very powerful.
18   You know, it's a story.  That's what a lyric usually is.
19   BY MR. KAHN:
20   Q.    And you spent one day at the studio; correct?
21   A.    I did, yes.
22   Q.    I think in some interview you said it took about four
23   hours.  You guys were inspired to write the lyrics?
24   A.    Yeah, I mean, I can't recall the exact amount of time,
25   but it came to us fast and we were very inspired, yes.
```

1    Q.    And you've been in the court when they've played that

2    instrumental track; correct?

3    A.    I have.

4    Q.    And the lyrics that you wrote began with the part of the

5    instrumental track that's Ostinato 2; correct?

6    A.    I can't be sure.  I don't really understand the question

7    exactly.

8    Q.    Mr. Gottwald and Mr. Walter testified that first part,

9    the four notes going up and down?

10    A.    Yes.

11    Q.    They called that Ostinato 1, and then it shifts around

12    14 seconds to what they called Ostinato 2.

13    A.    Okay.

14    Q.    And I'm saying in the lyrics you wrote, those lyrics

15    start with Ostinato 2; correct?

16    A.    Um, I believe so.  I mean, we were -- we were given the

17    instrumental track to sort of have on loop to be inspired by

18    and come up with the lyrics.

19    Q.    Okay.  In her testimony the other Ms. Hudson, Katy

20    Perry, identified the first ostinato.  She called it the

21    introduction.  Is that what you would call it?

22    A.    Sure.

23    Q.    And when Dark Horse finally came out, there were six

24    credited songwriters; correct?

25    A.    Yes.

```
1    Q.   And each of the songwriters have an ownership interest

2    in the song; correct?

3    A.   Yes.

4    Q.   And you were one of those six; correct?

5    A.   Correct.

6    Q.   And just so I'm clear on this, your band had a MySpace

7    page?

8    A.   Yes.

9    Q.   Not you personally, but your band.

10   A.   Yes, my band did.

11   Q.   And it was a way to use it for marketing, get your

12   band's name out there?

13   A.   Yes.

14   Q.   And similarly, when your band was still around that's

15   how you and your band used YouTube?  Namely, post videos of

16   concerts, get your name out there?

17   A.   Yes, mm-huh.

18             MR. KAHN:  I have nothing further.

19             THE COURT:  Okay.

20             MS. NOURAFCHAN:  I have nothing further.

21             THE COURT:  All right.  Then you may step down.

22             And we do need the next witness.

23             MS. LEPERA:  Glad I kept him.  Zachary St. Martin.

24             THE CLERK:  Mr. St. Martin, if you could come

25   forward, I can swear you in.  Please raise your right hand.
```

```
 1                         (Witness sworn.)

 2              THE CLERK:  Please be seated.

 3              Please state your full name and spell your last

 4    name for the record.

 5              THE WITNESS:  Zachary St. Martin.

 6                         DIRECT EXAMINATION

 7    BY MR. ALBERTSON:

 8    Q.   Good afternoon, Mr. St. Martin.

 9    A.   Good afternoon.

10    Q.   Can you briefly explain what you were retained to

11    provide expert testimony about in this case?

12    A.   Yes.  I was retained to explain generally how users

13    would use MySpace and engage with content on MySpace.  And

14    more specifically, how a user of MySpace might have come

15    across Joyful Noise on the MySpace services on the pages of

16    Flame and Lecrae.

17    Q.   Okay.  And just to be clear when you say Flame, are you

18    referring to the plaintiff Marcus Gray?

19    A.   I am.

20    Q.   And when you say Lecrae, you're referring to Lecrae

21    Moore?

22    A.   Yes, that's correct.

23    Q.   Can you tell the jury about educational background after

24    high school, please?

25    A.   Yes.  I have a Bachelor's of Science and Engineering
```

1    Degree from Tulane which I obtained in 1997, and I have a

2    Juris Doctorate degree from Tulane from 2001.

3    Q.   And so you're a lawyer; is that right?

4    A.   That's right.

5    Q.   Can you just explain to the jury generally what kind of

6    lawyer you are?

7    A.   I'm what's called an in-house counsel.  I work for a

8    particular company and I perform a variety of functions.  I

9    do transactional work which means I negotiate and draft

10   contracts and close business deals.  And I also do what's

11   called product counseling which is that I counsel product

12   teams on how to offer products and services to users that are

13   both legal and compliant with our contractual obligations.

14   Q.   And can you just explain your professional background as

15   it relates specifically to MySpace?

16   A.   Yes.  I was employed starting in 2006 by a company

17   called Fox Interactive Media.  That was the company that

18   owned MySpace at the time.  I worked for MySpace until 2009

19   when I became the Senior Director of Business and Legal

20   Affairs.  MySpace was at that point, uh, spun out and made a

21   subsidiary of these corporations.  I continued working for

22   MySpace until 2011 when I was promoted to Vice President of

23   Business and Legal Affairs.

24          Later in 2011 News Corporation sold MySpace to a

25   buyer call Specific Media.  I was retained by Specific Media

1    to work as their Assistant General Counsel and Vice President

2    of Business and Legal Affairs where I worked for MySpace and

3    on MySpace issues through 2015.  So almost a decade of

4    working for MySpace.

5    Q.   So during those years when you were working for MySpace

6    and companies that owned MySpace, what generally were your

7    job responsibilities?

8    A.   My job responsibilities fell into a couple of

9    categories.  Uh, business transactions of all types was one

10   major part.  Product counseling was the second major part.

11   And in that I mean that I had to review how the MySpace

12   product was operated and developed and appeared to users.

13   And I had to understand things about how users uploaded

14   content to MySpace.  Other items like what kind of data was

15   MySpace collecting and making sure that it complied with

16   privacy policies and laws and regulations.

17   Q.   And could you give the jury a little bit of background

18   on MySpace the company starting the time you started working

19   in 2006?

20   A.   MySpace in 2006 was, um, reaching its really fast growth

21   phase.  In 2006 MySpace started to become the most trafficked

22   website on the planet through 2009.  And at that point,

23   MySpace was a place where a user could go online and could

24   connect with other users of MySpace, find their friends.

25   Q.   And so during the approximately 10 years or so that you

```
1    were associated with MySpace, what level of familiarity did

2    you have with the product?

3    A.   I had a very intimate level of familiarity with MySpace

4    because it was my professional responsibility to do so.  One

5    of my primary jobs was to make sure that, um, MySpace wasn't

6    violating any laws or regulations and making sure -- I was

7    trying to make sure that the operator of MySpace was in the

8    lowest legal liability possible.

9    Q.   And were you also a personal user of MySpace?

10   A.   I was.  I started using MySpace in 2004 and I remained a

11   user through 2015 as long I worked for the company.

12   Q.   And just for the sake for completeness, can you explain

13   to the jury what you have been doing professionally since

14   2015?

15   A.   Since 2015 I've had two more employers.  After I left

16   MySpace in 2015, I worked for Sony Pictures Entertainment as

17   Vice President of Legal in their Worldwide Networks Group.

18   After that I became the general counsel of a start-up company

19   called AI which involved virtual reality and holographic

20   video technology.  And today I work for Sony Pictures

21   Entertainment again in a different role as the Vice President

22   of Legal in their Digital and TV Distribution Department.

23   Q.   And did you do any research in preparing to give your

24   testimony in this case?

25   A.   I did.  I refreshed my recollection of MySpace during
```

```
 1    the relevant time period from 2008 to 2013 by visiting a

 2    service called the Internet archive.  And the Internet

 3    archive is a service that takes snapshots of websites over

 4    time so you can go back and review what a website looked like

 5    at the period that you're interested in.

 6    Q.   And you've been retained as an expert in this case; is

 7    that correct?

 8    A.   That's correct.

 9    Q.   Do you have any financial stake in the outcome of this

10    litigation?

11    A.   I do not.

12    Q.   So just to go back to MySpace generally, what was the

13    purpose of MySpace around the time you started at the

14    company?

15    A.   MySpace at that time was called a place for friends.  So

16    the purpose of MySpace was to have an online presence and to

17    make connections.

18    Q.   And I believe you said it was a highly trafficked site

19    back in those days; is that right?

20    A.   From 2005 to 2009, it was the most highly trafficked

21    social networking website and from 2006 to 2009, it was the

22    most trafficked website on earth.

23    Q.   So Mr. St. Martin, can you explain what this slide

24    shows?

25    A.   Yes.  This is the MySpace home page.  It's what we call
```

EXHIBIT 4
PAGE 791

218

```
 1    landing page so it's funnel for users to start to engage with

 2    the MySpace product.  As you can see, there's a spot on the

 3    right-hand side of the page which says log in.  If you were a

 4    registered user meaning you already had an account, that's

 5    the place where you would enter your information to log in or

 6    if you weren't a user, you could sign up and become a

 7    registered user of the service.

 8    Q.   And how would a user interact with MySpace?

 9    A.   A user would interact with MySpace in a number of ways.

10    Primarily, when you started, you would want to create your

11    own online digital presence by creating a profile page.  The

12    profile page contains information that you want other users

13    to know about you.  Primarily, that kind of data would be

14    profile pictures, maybe your home town, maybe your age, maybe

15    things that you're interested in such as music for example.

16    Q.   And if we could look at the next slide, can you describe

17    what this page is?

18    A.   This is called a MySpace profile page and in this

19    particular example, we have a user named Sharon.  She has a

20    picture of herself.  There's some data about profile views

21    and her log in.  There's information about other users that

22    she's connected to status and mood.  And you'll see on the

23    right, there's a unit that would be an advertisement.

24    Q.   And is there a date on the top right of this page?

25    A.   Yes.  This page was a snapshot from Monday, August 31st,
```

1    2009.

2    Q.    I'd like to talk a little bit about finding friends on

3    MySpace.  How would a MySpace user such as this one go about

4    finding friends to connect with on MySpace during that period

5    between 2008 and 2013?

6    A.    There were a few ways to do that.  The primary way would

7    be using the search functionality on the site and you can see

8    that in the white bar at the top of page.  If you had a

9    friend's name, you could type it in, click search and search

10   results would appear to you and if you see your friend, you

11   could connect to that profile and connect to it.

12          Another mechanism that a user could use to find

13   another connections is to upload one's address book or

14   contact list.  So if you choose to do that, MySpace would

15   then use that data to match profiles that it had in its

16   records and present potential connections to you based on

17   those contacts from your address book.

18          And then finally, there's a module or a

19   functionality that MySpace would suggest profiles that you

20   may want to connect to and it would, it would populate those

21   potential connections based on data that it had from your

22   address book potentially or if a connection that you're

23   connected with is connected to someone else, it might assume

24   that you might be friends.  So you might see people you know

25   in that functionality.  So those are the primary ways that

EXHIBIT 4
PAGE 793

1    one would find connections.

2    Q.    Did MySpace change over time as far as users interacted

3    with the site?

4    A.    Yes, it did.    In the earlier days of MySpace, it was a

5    place where people would go online to connect with other

6    people, with their friends.    Over time MySpace became much

7    more of a content focused website.    Users were uploading

8    content.    MySpace was doing deals to have content available

9    on the site.    So it became very much a content consumption

10    website.

11    Q.    And so the content that you're describing, what

12    categories of content were there?

13    A.    Two big categories music obviously and video.

14    Q.    So as far as music on MySpace, did that change over time

15    on MySpace as far as the interaction between music and the

16    site?

17    A.    Yes.    The music became a very important part of the site

18    over time.    Initially, MySpace would have been considered in

19    layman's term a hobby for MySpace.    It was music being

20    uploaded by users.    Users were starting to engage with that

21    music and MySpace realized maybe there's business there.

22            So in September 2008, MySpace did a business

23    transaction with the major worldwide record labels and

24    created a joint venture called MySpace Music.    The intent

25    behind that business transaction was to create an actual

EXHIBIT 4
PAGE 794

1    business to make money based on the fact that users were

2    using and consuming music on MySpace.

3    Q.    And if we could look at the next slide, what is this

4    page, sir?

5    A.    So this page is a snapshot of what we would call the

6    MySpace music home page.  This is the primary page that a

7    user would access to get further into the music-related

8    functionality on MySpace.

9    Q.    And what were the primary ways that a user could find

10   music through the MySpace website?

11   A.    There were a couple of main ways that users could find

12   music on MySpace.  The primary most obvious way would be

13   using the search functionality as you see there the white bar

14   at the top of this page.  A user if he or she knew the name

15   of a song that they were interested in, could type in the

16   name of that song and click search to find particular search

17   results for that particular song.

18         If the user knew an artist that he or she liked and

19   they wanted to find that artist's music, they could also type

20   the artist into the search functionality and obtain search

21   results that would likely have the artist that the user was

22   interested in.

23         Another major way that users of MySpace could find

24   music on the site was through the editorial functionality

25   that the service provided and this was operated by the

222

1    employees of MySpace.  And it was, the editorial features

2    were modules on the site such as you see on this page here

3    under featured videos.  It's little module that the operators

4    of MySpace wanted to draw users' attention to.  And

5    typically, they would want to draw their attention to the

6    most popular artist that had the most broadest audience on

7    the service.  At the time period in question, that type of

8    music was hip hop and rap, rock and pop music.

9    Q.   And so to back up you mentioned that a user could go

10   specifically to an artist's home page on MySpace; is that

11   correct?

12   A.   Correct.

13   Q.   And what would happen next after they got to that site?

14   A.   So after they, uh, clicked through to an artist page,

15   they would see music on the page and a MySpace music player.

16   And the user would decide which music he or she wanted to

17   play by looking at the player and pressing a play button that

18   looked like a little triangle button.

19        There was, um, for a brief period in time on

20   MySpace, a functionality called auto play which made music

21   start playing immediately on the profile page of an artist

22   loading.  The MySpace joint venture decided to turn off that

23   functionality relatively quickly after they launched MySpace

24   Music joint venture because it was so many plays happening

25   from that that it became very expensive.  And the company

EXHIBIT 4
PAGE 796

223

1    decided it would rather let users affirmatively select songs

2    to play.

3              So to summarize generally a user would access an

4    artist's profile page, find the song that he or she wanted to

5    play, click the play button and hear the music.

6    Q.    Okay.  And aside from searching for featured content

7    through editorial as you described and aside from going to an

8    artist's personal page directly, were there other ways that

9    user could find music?

10   A.    Yes.  There was another way that a user could find music

11   and involves looking for genres of music that a interested is

12   in.  So if a user wasn't aware of a particular song and they

13   weren't aware of a particular artist, but they knew they

14   liked hip hop, they could search for the genre of hip hop and

15   have search results appear in that category so the user could

16   then sample songs from the particular genre.

17             And as you can see on the slide, the MySpace music

18   home page near the bottom on this particular slide has a list

19   of top genres.  You'll see the genres on the left in blue and

20   on the right of that, you'll see a series of numbers which

21   indicate the number of songs that are tagged with those

22   particular genres.  And so a user who was interested in hip

23   hop could click hip hop obtain search results and then start

24   to explore music.

25   Q.    I see.  So the number next to, for example, hip hop is

EXHIBIT 4
PAGE 797

1    this over 2.6 million; is that right?

2    A.    Uh-huh.

3    Q.    What does that number mean?

4    A.    That means that there are 2.6 million songs in the genre

5    of hip hop that would be available to play, but it would

6    taken user action to click the link, see the search results

7    and then start to browse through profile pages that have

8    songs tagged with hip hop.

9    Q.    What would happen if, for example, you click hip hop

10   right there?

11   A.    When one clicked hip hop, another page would resolve

12   that would like search results.  And so you would see a

13   number of profile pages that the user would then have to

14   select from those profile pages loaded.  The user would have

15   access to the list of songs that were available on that

16   particular profile page.

17   Q.    And so during this time period, did MySpace have an

18   understanding of user satisfaction with the ability to search

19   for songs?

20   A.    Yes, MySpace did.  Uh, it didn't feel very satisfied

21   with the ability to find particularly music.  There was so

22   much music on the site and the ability to find it was

23   rudimentary and not something that anyone was satisfied with

24   at MySpace.

25   Q.    So you mentioned auto play on a particular page, but was

EXHIBIT 4
PAGE 798

```
 1    there any other automated way for music to be loaded up to
 2    individuals?
 3    A.    No.  The auto play when it was active, was the only
 4    mechanism where music would start playing without user
 5    activity.  But in that case, a user still had to click
 6    through to a particular artist's page to have the song
 7    played.  Contrast that to radio where you hit the on button
 8    music starts playing.  That's not the case on MySpace
 9    generally.
10    Q.    So as you're aware this case concerns Christian hip hop
11    music.  What would a user need to do in order to discover
12    music in that genre or category of music?
13    A.    So if we look at the slide again, you look at the top
14    genre listing and you would see this long list of genres.  If
15    I'm interested in Christian hip hop, I'm not seeing it in
16    this list.  So I would go down to the very bottom of it, and
17    I'll call the jury's attention to a little statement that
18    says browse all genres.  That's the way to expand the list
19    because there were an incredibly large amount of genres
20    available.
21          The user would click browse all genres and that
22    would then resolve into a search results page at the top of
23    which there was a drop down menu that had the entire list of
24    genres at MySpace in alphabetical order.
25          So if a user was interested in Christian hip hop,
```

```
 1    they'd have to pull that list down, scroll down through the

 2    As, through the Bs to the Cs and find Christian hip hop,

 3    click on it.  Then profiles would resolve that had Christian

 4    hip hop music and the user could then begin to explore

 5    profiles to find it.

 6    Q.    Just to clarify when you say profiles would resolve,

 7    what do you mean by that?

 8    A.    I mean, um, you would see a list of profiles as the kind

 9    of search results and the user would have to choose to click

10    a profile, have it load on their web browser and see if the

11    song's available on that user's page.

12    Q.    So to speak more generally about MySpace, could you give

13    the jury a sense of the number of MySpace users and the

14    amount of music on MySpace during this time period we're

15    talking about.

16    A.    During the time in question, it was a very large number

17    of both users and music on MySpace.  In 2009 there were at

18    least 265 million registered accounts on MySpace.  By 2013

19    there were over 53 million songs available on MySpace.  There

20    were over 14 million different artists' profile pages.

21    Q.    If you could just explain to the jury how those numbers

22    relate to the MySpace accounts that are at issue in this

23    case?

24    A.    Well, my understanding is that the issue in this case

25    there are only two profiles in question and only one song and
```

1    that's Joyful Noise.

2    Q.    And you mentioned the word plays, but can you tell the

3    jury generally the number -- the volume of plays on MySpace

4    for music?

5    A.    At least one billion per month.

6    Q.    So we've heard testimony last week and today about, you

7    know, approximately 2.5 million plays on the MySpace pages of

8    Mr. Moore and Mr. Gray.  Could you, again, put that in

9    context of the overall site?

10   A.    In context it's very few considering one billion plus

11   plays per month.

12   Q.    So earlier we spoke about finding music by genre on

13   MySpace.  Plaintiffs in this case have presented testimony

14   that although the song Joyful Noise is a Christian religious

15   song, the underlying beat is a hip hop beat.  Assuming that's

16   true would that change how a user would find the song on

17   MySpace?

18   A.    No, it would because MySpace doesn't categorize songs by

19   beats or sounds the how the user perceived it.  It's

20   categorized by its genre tag.

21   Q.    And do you have an understanding of the genre tags that

22   Mr. Moore's and Mr. Gray's pages used for the Joyful Noise

23   song?

24   A.    I do.  The Joyful Noise song was tagged as either

25   contemporary Christian or religious.  And I point you to the

EXHIBIT 4

PAGE 801

228

1  red square on the slide where it says genre contemporary

2  Christian.

3  Q.   And just to go back to that one which page is this?

4  A.   That's Mr. Lecrae Moore's page.

5  Q.   And is it for a particular song?

6  A.   It's for Joyful Noise.

7  Q.   And the next slide?

8  A.   The next slide is the page for Marcus Gray or Flame, and

9  as you'll see, the song Joyful Noise is tagged with genre

10  religious.

11  Q.   Okay.  Is there a separate categorization for the

12  underlying instrumental portion of the song?

13  A.   No, there's no separate beat categorization

14  instrumentation.

15  Q.   Now, we've been discussing MySpace plays in the

16  abstract, but could just explain more clearly for the jury

17  what is a play on MySpace?

18  A.   For MySpace a play, and that's the numbers you see

19  totaling two plus million, a play only means that a playback

20  of a particular song was initiated.

21  Q.   And so does a play say anything beyond the fact that the

22  song was initiated?

23  A.   No, it doesn't.  And for instance, a play doesn't mean

24  that we know that a particular user listened to the entirety

25  of a song.  We don't know that a particular user listened to

```
 1    to the song multiple times or only one time.  We don't know
 2    even that a human user initiated the playback of a song.
 3            And what I mean by that is we at MySpace were aware
 4    of automated attempts to increase the number of plays on
 5    particular pages through what we call bots.  A bot was a
 6    software program that someone developed in order to
 7    fraudulently increase play counts beyond what were actually
 8    implemented by an actual user.
 9    Q.   And so does a play on MySpace indicate anything about
10    whether a particular person listened to a particular song?
11    A.   No, it doesn't.
12            MR. ALBERTSON:  I have no further questions at this
13    time.
14            THE COURT:  Okay.  Cross.
15                        CROSS-EXAMINATION
16    BY MR. KAHN:
17    Q.   Good afternoon.
18    A.   Good afternoon.
19    Q.   Just to be clear, you're not here as an official
20    spokesperson for MySpace; correct?
21    A.   Correct.
22    Q.   You were hired by these attorneys and you're getting
23    paid for your testimony by these attorneys; correct?
24    A.   Correct.
25    Q.   What is your hourly rate for this testimony?
```

1    A.    $500 per hour.

2    Q.    And how many hours have you spent so far in preparing

3    your opinion?

4    A.    10 to 15 hours, I think.

5    Q.    During your time at MySpace, those ten years or so, your

6    official position was as an attorney; correct?

7    A.    Correct.

8    Q.    And as you've gone through the rest of your employment

9    history, it's always been as an attorney; correct?

10   A.    Correct.

11   Q.    What is your current title?  You're currently general

12   counsel?

13   A.    I'm Vice President of Digital Distribution at Sony

14   Pictures Entertainment.

15   Q.    All right.  So as an attorney MySpace, you had no

16   involvement in the construction of website or its

17   maintenance?

18   A.    That's correct.

19   Q.    And you didn't write any computer code for the site?

20   A.    I did not.

21   Q.    At least listening to your testimony, um, it at least

22   sounded to me like a good chunk of your knowledge came

23   through the fact that you yourself were an active user on

24   MySpace; correct?

25   A.    Correct.  Partially.

```
 1    Q.   One of the pages we looked at when they were putting it
 2    on display was that MySpace page for Hello Sharon.  Do you
 3    remember that one?
 4    A.   Yes.
 5    Q.   And there's a Willie Nelson ad that popped up on that
 6    page.  So how does a Willie Nelson ad end up on Hello
 7    Sharon's page?
 8    A.   MySpace served advertisements to generate profits for
 9    the service.
10    Q.   And how would it show up on her page?  Was there any
11    specific demographic information that would give her a Willie
12    Nelson page?
13    A.   Potentially.
14    Q.   You're not sure, though?
15    A.   Some demographics would impact ad serving.
16    Q.   Now, and I confess, I'm not MySpace user.
17         Let's say in 2009 a user instead of going to
18    MySpace goes to Google.  Types in Johnny Cash or Aretha
19    Franklin and gets a bunch of search results.  Would a MySpace
20    page or two show up in those search results, if you know?
21    A.   I think it's possible.
22    Q.   So you wouldn't necessarily have to be on MySpace to end
23    up with a search result that had MySpace in it; correct?
24    A.   Correct.
25    Q.   And we were looking at the pages for the two artists
```

```
 1    Mr. Gray and Mr. Moore which had during that period a total

 2    of 2.5 million plays; correct?

 3    A.    Correct.

 4    Q.    And you had mentioned something about the use of bots, I

 5    guess bots is short for robots that try to inflate play

 6    counts?

 7    A.    Yes.

 8    Q.    And you have no knowledge, do you, of bots inflating

 9    play counts on those two pages?

10    A.    I don't.

11    Q.    And so to get up to 2.5 million which to me seems a lot,

12    how many users would have to get to those pages?

13              MR. ALBERTSON:  Objection.

14              THE COURT:  You are arguing.

15              MR. KAHN:  He's the expert.  I'm just trying to

16    find out.

17              THE COURT:  But the jury should ignore what you

18    implied was a lot.  It's for you to decide.

19              MR. KAHN:  Oh, I apologize.

20    Q.    The 2.5 million how would users get to those pages then

21    from inside of MySpace as opposed to Google?

22    A.    Users would if they knew of the artist, they would

23    search for them and click the profile page when the search

24    results came through or they might search through the genre

25    functions to find music that they're interested in and come
```

```
 1   across those pages.

 2              MR. KAHN:  Okay.  Thank you, sir.

 3              THE COURT:  Any redirect?

 4              MR. ALBERTSON:  Briefly, Your Honor.

 5              THE COURT:  Okay.

 6                      REDIRECT EXAMINATION

 7   BY MR. ALBERTSON:

 8   Q.   Hello again.

 9   A.   Hi.

10   Q.   Mr. Kahn asked you whether you had any role in

11   constructing code or building MySpace site.  Do you recall

12   that?

13   A.   Yes.

14   Q.   Are you offering an opinion in any capacity regarding

15   the code in MySpace?

16   A.   No.

17   Q.   Are you offering any opinion regarding the construction

18   of the site?

19   A.   No.

20   Q.   Now, you said that you were a lawyer for MySpace; right?

21   A.   Correct.

22   Q.   In your capacity as a lawyer, what level of familiarity

23   did you have with some of the technical specifications of

24   MySpace?

25   A.   Very strong familiarity because it was my job to do so.
```

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 807

234

```
 1   For instance, if I didn't have that knowledge, I might miss
 2   something that would result in legal liability for the
 3   company for MySpace and obviously, that would be a failure of
 4   my role.
 5   Q.   And so did you work closely with people in the product
 6   development team?
 7   A.   I did.
 8   Q.   And you are a lawyer, but can you just say for the jury
 9   again what your undergraduate degree is in?
10   A.   My undergraduate degree is in biomedical engineering.
11   Q.   Mr. Kahn asked you about running a search for, I
12   believe, Johnny Cash and what would pop up after that.  Do
13   you recall?
14   A.   Yes.
15   Q.   So a user would still need to search for Johnny Cash in
16   order to populate those pages; correct?
17   A.   Yes.  It would take user action to find those pages.
18            MR. ALBERTSON:  Nothing further.
19            THE COURT:  Okay.  Mr. Kahn?
20            MR. KAHN:  Very quickly.
21                      RECROSS-EXAMINATION
22   BY MR. KAHN:
23   Q.   So your undergraduate degree is in engineering and has
24   nothing to do with computer science; correct?
25   A.   That's not correct.
```

```
 1    Q.   Okay.  Tell me what was involved.

 2    A.   I had to take numerous classes in programming both

 3    software and hardware components.

 4    Q.   And you have no specific knowledge of how the MySpace

 5    algorithms work; correct?  The underlying code and stuff?

 6    A.   I mean, I have general knowledge of how MySpace works,

 7    but that was not my specific job.

 8    Q.   And according to you, you need to have a name to be able

 9    to do the search in the music file; correct?  Other than the

10    genre.

11    A.   It would help to find the song or the artist that a user

12    knows.

13    Q.   So if you search for Flame, you would be more likely to

14    come up with Mr. Gray; correct?

15    A.   Yes.

16    Q.   What if you searched Joyful Noise?

17    A.   Uh, you would have search results that would probably

18    have pages that have that song.

19    Q.   What about just joyful?

20    A.   That's getting into real minutia around search

21    functionality on MySpace.  It's a possibility.

22    Q.   It's a possibility?

23    A.   Possibility.

24         MR. KAHN:  Okay.  Thanks.

25         MR. ALBERTSON:  Nothing further, Your Honor.
```

UNITED STATES DISTRICT COURT

EXHIBIT 4
PAGE 809

```
 1                    THE COURT:  All right.  Then thank you very much.
 2                    Okay.  Ladies and gentlemen, I think we will call
 3       it a day and we will resume at 9:00 a.m. tomorrow and plod
 4       ahead.  Thank you.
 5                    Keep an open mind, don't discuss the case with one
 6       another or anyone else, and we'll see you in the morning.
 7                              (Jury not present.)
 8                    THE COURT:  Anything else for now?
 9                    MS. LEPERA:  I don't think so.
10                    MS. COHEN:  I don't, Your Honor.
11                    THE COURT:  Go ahead and resolve everything so we
12       can move ahead.
13                    THE CLERK:  This court's adjourned.
14                    (Proceedings were concluded at 5:00 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2                        CERTIFICATE OF REPORTER
 3
 4   COUNTY OF LOS ANGELES        )
 5                                )  SS.
 6   STATE OF CALIFORNIA          )
 7
 8   I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED
 9   STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,
10   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE
11   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET
12   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN
13   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO
14   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION
15   OF MY STENOGRAPHIC NOTES.
16
17
18   DATE:  JULY 24, 2019_____
19
20      ___/s/  LAURA MILLER ELIAS_____
21   LAURA MILLER ELIAS, CSR 10019
22   FEDERAL OFFICIAL COURT REPORTER
23
24
25
```

EXHIBIT 4
PAGE 811

## $

**$500** [1] - 230:1

## '

**'13** [1] - 97:6
**'93** [2] - 18:17, 19:3
**'96** [1] - 117:2
**'em** [2] - 19:10, 123:12

## /

**/s** [1] - 237:20

## 1

**1** [25] - 4:3, 9:10, 60:15, 63:13, 63:22, 65:5, 65:7, 65:18, 130:13, 130:14, 130:16, 130:19, 130:24, 131:2, 131:9, 131:10, 131:13, 131:18, 132:7, 191:4, 191:12, 191:25, 197:20, 211:11
**1,101,849,272** [1] - 196:14
**1.1** [2] - 195:16, 196:6
**1.4** [1] - 196:10
**1.5** [1] - 196:24
**1.6** [1] - 197:3
**10** [16] - 42:12, 77:19, 88:24, 90:22, 96:15, 96:17, 112:18, 112:19, 112:21, 112:25, 113:3, 184:25, 199:12, 215:25, 230:4
**100** [9] - 42:12, 45:22, 77:17, 77:20, 78:1, 114:2, 114:6, 206:15, 206:21
**10019** [2] - 1:22, 237:21
**100s** [1] - 42:10
**107** [1] - 3:8
**10n** [1] - 113:4
**11** [7] - 137:20, 145:25, 191:25, 192:2, 192:4, 192:6, 192:8
**11377** [1] - 2:18
**12** [2] - 104:12, 104:13
**122** [2] - 190:25, 192:10
**123** [2] - 192:11, 193:5
**12:30** [2] - 80:6,

107:10
**12TH** [1] - 2:7
**13** [1] - 64:12
**136** [2] - 3:7, 3:8
**137** [1] - 3:9
**139** [2] - 194:20, 194:22
**14** [5] - 150:22, 152:13, 168:18, 211:12, 226:20
**15** [8] - 3:13, 54:5, 69:18, 82:4, 154:24, 158:24, 191:22, 230:4
**15-5642-CAS** [1] - 1:8
**15-year** [1] - 158:22
**16** [4] - 50:23, 51:7, 158:16, 158:18
**161** [1] - 3:10
**178** [1] - 3:9
**18** [1] - 164:11
**18,153** [1] - 192:7
**182** [1] - 3:10
**183,274,415** [1] - 195:11
**1840** [1] - 2:23
**18th** [1] - 191:16
**1900** [1] - 2:23
**194** [1] - 194:8
**199** [1] - 3:15
**1997** [1] - 214:1
**1:15** [2] - 121:25, 122:4
**1st** [2] - 174:23, 175:11

## 2

**2** [24] - 9:11, 60:15, 63:13, 63:22, 65:5, 65:7, 130:14, 130:17, 130:20, 130:25, 131:2, 131:3, 131:9, 131:13, 131:18, 132:7, 191:7, 191:15, 192:2, 211:5, 211:12, 211:15
**2.5** [4] - 227:7, 232:2, 232:11, 232:20
**2.6** [2] - 224:1, 224:4
**20** [2] - 18:16, 69:18
**2000s** [1] - 96:18
**2001** [1] - 214:2
**2004** [4] - 88:24, 158:25, 162:25, 216:10
**2005** [2] - 191:7, 217:20

**2006** [8] - 117:1, 117:2, 132:1, 214:16, 215:19, 215:20, 215:21, 217:21
**2007** [2] - 117:1, 145:23
**2008** [48] - 19:16, 19:17, 26:22, 27:9, 27:17, 36:24, 40:18, 40:19, 76:9, 76:20, 115:11, 118:16, 142:25, 144:2, 145:18, 145:23, 146:3, 147:22, 148:15, 148:17, 150:7, 162:18, 162:22, 163:8, 164:2, 164:9, 165:19, 166:1, 166:2, 168:1, 168:10, 169:2, 169:6, 169:8, 178:7, 180:19, 191:23, 194:8, 194:11, 194:12, 197:17, 206:25, 207:14, 217:1, 219:5, 220:22
**2009** [20] - 25:13, 36:25, 37:10, 37:13, 169:2, 173:3, 173:15, 191:16, 191:19, 194:13, 194:16, 194:17, 206:3, 214:18, 215:22, 217:20, 217:21, 219:1, 226:17, 231:17
**2010** [22] - 138:16, 138:24, 139:6, 151:9, 152:10, 163:2, 163:4, 167:25, 168:11, 168:21, 169:5, 180:7, 193:11, 194:18, 194:21, 194:24, 194:25, 195:2, 195:4, 195:6, 195:9, 195:11
**2011** [17] - 40:22, 92:4, 93:2, 98:2, 191:10, 191:13, 195:12, 195:15, 195:16, 195:17, 195:20, 195:22, 195:25, 196:2, 196:5, 214:22, 214:24
**2012** [34] - 40:22, 94:12, 95:17, 96:7, 97:3, 98:15, 99:8,

139:10, 142:6, 148:15, 150:7, 150:12, 150:19, 156:15, 166:23, 174:8, 174:9, 178:7, 180:7, 191:25, 192:2, 192:4, 192:6, 192:8, 193:15, 196:6, 196:9, 196:10, 196:11, 196:14, 196:16, 196:18, 196:21, 196:23
**2013** [48] - 26:22, 27:10, 27:17, 39:9, 39:11, 39:19, 48:16, 61:10, 69:4, 76:20, 78:17, 88:10, 88:22, 88:24, 90:21, 91:19, 94:12, 95:18, 96:7, 97:3, 99:8, 115:12, 129:25, 147:22, 168:7, 168:10, 168:11, 168:16, 168:22, 169:5, 169:6, 169:8, 196:24, 197:2, 197:3, 197:4, 197:7, 197:9, 197:11, 197:14, 197:16, 197:18, 206:25, 207:14, 208:12, 217:1, 219:5, 226:18
**2014** [13] - 92:4, 134:6, 134:8, 151:10, 152:10, 167:25, 168:1, 168:12, 174:23, 175:2, 175:9, 175:11, 208:13
**2015** [5] - 215:3, 216:11, 216:14, 216:15, 216:16
**2019** [3] - 1:15, 4:1, 237:18
**208** [1] - 2:11
**209** [1] - 3:15
**21** [1] - 191:13
**2100** [1] - 2:11
**213** [2] - 3:17, 195:14
**213)894-0374** [1] - 1:24
**21st** [1] - 191:10
**229** [1] - 3:17
**23** [3] - 1:15, 4:1, 183:25
**233** [1] - 3:17
**234** [1] - 3:17
**24** [1] - 237:18
**25** [1] - 191:8

**250** [1] - 168:9
**251,890,764** [1] - 195:8
**259,746,426** [1] - 196:4
**26** [5] - 10:25, 13:10, 18:17, 18:18, 191:25
**265** [1] - 226:18
**266,191,920** [1] - 195:6
**27** [2] - 18:17, 192:2
**270,763,562** [1] - 195:4
**271,945,208** [1] - 196:23
**28** [2] - 3:13, 192:4
**29** [1] - 192:6
**293,956** [1] - 192:1

## 3

**3** [6] - 63:13, 63:22, 131:18, 191:18, 192:4
**30** [4] - 149:12, 160:24, 185:12, 192:8
**300** [12] - 150:8, 154:14, 159:18, 168:3, 168:11, 168:13, 168:14, 169:1, 169:2, 169:5, 169:6, 169:8
**31** [1] - 3:13
**313,286,752** [1] - 196:1
**31st** [1] - 218:25
**32** [1] - 3:13
**3215** [1] - 64:14
**331,408,797** [1] - 196:21
**332,047,880** [1] - 197:16
**339,831,952** [1] - 195:25
**34** [1] - 3:5
**349** [1] - 194:13
**350** [2] - 1:23, 168:12
**37** [1] - 66:8
**373,608,879** [1] - 196:18
**373,789,532** [1] - 196:16
**38** [1] - 191:1
**381** [1] - 194:12
**3rd** [2] - 175:2, 175:8

## 4

**4** [3] - 189:22, 191:21,

192:6
**40** [1] - 96:1
**407,888,327** [1] - 195:22
**425,688,273** [1] - 195:2
**440,889,984** [1] - 197:14
**4455** [1] - 1:23
**461,848,016** [1] - 197:11
**464,437,501** [1] - 195:20
**483,981** [1] - 192:3

**5**

**5** [6] - 63:13, 63:22, 189:16, 191:24, 192:8, 197:20
**50** [2] - 154:15, 168:8
**50,000** [1] - 193:12
**509** [1] - 194:16
**515** [1] - 196:8
**51st** [2] - 25:12, 206:2
**53** [2] - 3:6, 226:19
**533** [1] - 194:18
**56** [2] - 71:20, 72:3
**561,718** [1] - 192:9
**576,000** [1] - 193:19
**58** [1] - 143:20
**5:00** [1] - 236:14
**5A** [2] - 14:7, 188:7
**5th** [1] - 146:3

**6**

**6** [4] - 156:23, 157:19, 165:7, 174:11
**61** [1] - 194:10
**619,058,370** [1] - 197:9
**63105** [2] - 2:8, 2:11
**697** [1] - 197:1

**7**

**7** [2] - 117:2, 191:19
**7,283** [1] - 192:5
**70** [2] - 149:9, 169:12
**74** [11] - 7:1, 7:5, 9:14, 10:2, 48:2, 48:7, 60:18, 60:20, 64:11, 67:23, 202:3
**75** [2] - 82:19, 82:22
**756** [1] - 194:24
**76** [2] - 72:15, 72:17
**7701** [1] - 2:7
**78,000** [1] - 98:17
**783,446,910** [1] -

197:7

**8**

**8** [1] - 157:25
**80** [3] - 3:5, 103:23, 104:3
**80-1** [1] - 104:3
**80-2** [1] - 104:1
**818** [1] - 195:12
**85,000** [1] - 193:16
**86** [1] - 3:6
**87** [1] - 3:7
**8th** [1] - 61:10

**9**

**9** [1] - 199:12
**90012** [1] - 1:23
**90064** [1] - 2:19
**90067** [1] - 2:24
**98** [5] - 44:21, 45:2, 45:9, 45:15, 46:17
**99** [1] - 194:15
**9:00** [2] - 125:14, 236:3
**9:15** [1] - 4:1

**A**

**A&R** [3] - 98:9, 98:19, 120:20
**a&R** [2] - 98:12, 98:13
**a.m** [1] - 236:3
**A.M** [1] - 4:1
**AARON** [1] - 2:16
**ability** [3] - 224:18, 224:21, 224:22
**able** [20] - 8:11, 14:10, 38:15, 39:22, 40:2, 58:24, 116:11, 120:15, 126:17, 126:20, 127:14, 131:21, 142:10, 158:20, 160:3, 186:10, 186:14, 186:15, 187:9, 235:8
**absent** [1] - 127:22
**absolutely** [3] - 133:14, 133:23, 208:19
**abstract** [1] - 228:16
**Academy** [1] - 180:4
**acceptable** [1] - 157:8
**access** [7] - 44:3, 128:17, 128:19, 175:25, 221:7, 223:3, 224:15
**accessible** [1] - 128:15

**accommodate** [1] - 65:12
**accompany** [1] - 154:18
**accomplish** [1] - 186:20
**according** [3] - 80:1, 190:8, 235:8
**account** [5] - 26:23, 27:1, 27:2, 27:7, 218:4
**accounts** [2] - 226:18, 226:22
**accumulated** [6] - 194:11, 194:16, 194:23, 195:15, 196:9, 197:2
**accuracy** [1] - 89:1
**accurate** [4] - 89:23, 89:24, 149:11, 152:8
**accuse** [1] - 73:19
**accused** [1] - 208:18
**accusing** [1] - 134:15
**achieved** [2] - 83:14, 137:22
**acoustic** [1] - 62:13
**Acquire** [3] - 183:18, 183:21, 183:23
**action** [2] - 224:6, 234:17
**actions** [1] - 73:18
**active** [2] - 225:3, 230:23
**actively** [1] - 56:4
**activity** [1] - 225:5
**acts** [1] - 117:12
**actual** [6] - 10:5, 27:5, 46:7, 147:10, 220:25, 229:8
**ad** [5] - 132:22, 142:3, 231:5, 231:6, 231:15
**added** [9] - 65:14, 71:11, 71:15, 71:19, 71:24, 72:2, 72:21, 101:18, 135:6
**adding** [3] - 71:17, 71:18, 124:14
**addition** [2] - 36:24, 194:2
**additional** [3] - 8:22, 9:21, 126:24
**additionally** [2] - 45:21, 128:5
**address** [9] - 8:15, 124:22, 191:12, 191:14, 191:18, 191:21, 219:13, 219:17, 219:22
**addressing** [2] - 153:18, 153:19

**adjourned** [1] - 236:13
**administrative** [3] - 84:8, 192:18, 193:3
**admired** [1] - 209:21
**admissible** [1] - 90:15
**admit** [1] - 26:10
**admitted** [2] - 127:25, 191:1
**adverse** [1] - 5:9
**advertisement** [1] - 218:23
**advertisements** [2] - 142:15, 231:8
**advertising** [7] - 142:2, 142:9, 160:3, 166:4, 166:15, 180:7, 180:10
**aerial** [1] - 171:6
**Affairs** [3] - 214:20, 214:23, 215:2
**affirmatively** [1] - 223:1
**afford** [1] - 200:5
**afraid** [1] - 25:17
**Africa** [1] - 195:4
**afternoon** [11] - 5:5, 13:25, 137:15, 161:8, 184:24, 199:3, 209:5, 213:8, 213:9, 229:17, 229:18
**afterwards** [2] - 55:19, 132:23
**age** [2] - 54:9, 218:14
**agent** [1] - 167:21
**aggregator** [1] - 114:1
**ago** [2] - 53:9, 167:4
**agree** [5] - 10:22, 14:3, 46:23, 84:12, 125:20
**agreed** [4] - 9:19, 11:11, 11:13, 14:7
**agreement** [10] - 5:18, 5:21, 7:11, 11:17, 11:20, 12:6, 13:11, 45:21, 164:12
**agreements** [1] - 41:22
**ahead** [8] - 32:7, 63:15, 90:19, 100:22, 190:22, 236:4, 236:11, 236:12
**AI** [1] - 216:19
**Ai** [1] - 196:18
**AIDED** [1] - 237:13
**aiming** [1] - 122:1
**AL** [2] - 1:6, 1:9
**Albertson** [1] - 193:9
**ALBERTSON** [11] -

2:17, 3:17, 193:11, 194:23, 213:7, 229:12, 232:13, 233:4, 233:7, 234:18, 235:25
**album** [54] - 22:6, 37:10, 37:14, 57:12, 68:24, 73:6, 75:12, 118:13, 118:14, 118:18, 118:22, 119:3, 119:4, 119:7, 119:13, 119:22, 128:7, 134:6, 139:7, 140:25, 141:3, 142:5, 142:8, 142:10, 142:25, 143:2, 143:4, 143:14, 144:2, 144:12, 146:8, 147:3, 157:16, 158:1, 158:3, 158:8, 158:9, 158:11, 158:12, 158:14, 158:21, 158:24, 160:4, 160:6, 160:7, 160:17, 160:21, 160:23, 161:2, 161:10, 181:24, 192:15, 203:19
**albums** [13] - 139:1, 139:14, 139:25, 140:13, 140:16, 140:22, 141:10, 141:24, 150:12, 166:7, 166:15, 180:10, 180:11
**algorithms** [1] - 235:5
**aliases** [1] - 203:25
**alike** [2] - 51:24, 51:25
**allowed** [1] - 170:13
**allows** [3] - 40:9, 43:24, 62:11
**alls** [1] - 52:18
**almost** [2] - 58:10, 215:3
**alone** [9] - 18:8, 61:23, 194:11, 194:16, 194:21, 195:15, 196:9, 197:2, 209:18
**alphabetical** [1] - 225:24
**alter** [1] - 38:20
**alterations** [1] - 132:22
**altered** [1] - 125:4
**amazing** [1] - 209:19
**Amazon** [2] - 140:11, 140:13
**AMERICA** [1] - 1:1
**America** [1] - 192:17

amount [5] - 92:21, 155:15, 210:24, 225:19, 226:14
amusement [1] - 149:16
analogue [2] - 56:25, 62:13
AND [4] - 237:8, 237:11, 237:13, 237:14
Andrew [1] - 41:15
Angeles [2] - 16:7, 61:6
ANGELES [6] - 1:16, 1:23, 2:19, 2:24, 4:1, 237:4
angle [1] - 179:18
anniversary [1] - 158:23
Annual [2] - 25:12, 206:2
answer [17] - 7:20, 7:25, 8:1, 8:2, 23:24, 24:1, 33:19, 44:18, 46:6, 50:17, 100:22, 142:17, 160:24, 164:6, 170:2, 210:13
Anthem [1] - 195:24
anticipate [1] - 107:13
anticipation [1] - 80:21
anxiety [1] - 137:24
apologies [1] - 164:15
apologize [3] - 74:4, 105:14, 232:19
appeals [1] - 115:6
appear [5] - 14:24, 26:12, 26:15, 219:10, 223:15
appearance [1] - 128:13
APPEARANCES [1] - 2:2
appearances [1] - 4:6
Appearances [1] - 4:7
appeared [2] - 75:12, 215:12
Apple [1] - 140:12
application [5] - 38:8, 43:23, 105:4, 105:18, 106:22
appreciate [3] - 16:11, 34:6, 34:8
appreciated [1] - 17:15
approach [3] - 51:2, 87:11, 170:21
approached [1] - 68:23
approving [2] - 132:24

April [1] - 146:3
AR [1] - 98:11
archive [2] - 217:2, 217:3
area [1] - 49:19
areas [1] - 179:14
Arena [3] - 179:21, 183:12, 183:21
arenas [1] - 149:14
Aretha [1] - 231:18
arguing [1] - 232:14
argument [4] - 5:23, 8:3, 128:17, 186:22
Arkansas [1] - 182:17
army [1] - 180:1
arranging [1] - 39:14
array [1] - 91:11
arrived [6] - 70:22, 71:10, 201:24, 201:25, 202:13, 202:16
art [1] - 147:4
article [17] - 88:9, 88:14, 88:16, 88:20, 88:22, 89:2, 89:3, 89:5, 89:9, 89:14, 89:18, 89:20, 90:1, 90:3, 90:5, 90:12, 90:15
articles [1] - 25:22
artist [27] - 17:25, 24:8, 61:18, 61:22, 97:12, 98:1, 98:14, 121:18, 132:2, 147:1, 147:2, 147:6, 164:12, 182:6, 199:17, 201:9, 208:4, 221:18, 221:20, 221:21, 222:6, 222:14, 222:21, 223:13, 232:22, 235:11
artist's [5] - 221:19, 222:10, 223:4, 223:8, 225:6
artistic [2] - 146:18, 146:23
Artists [1] - 120:21
artists [17] - 19:6, 54:21, 59:9, 59:23, 88:6, 90:24, 91:11, 92:10, 96:14, 96:16, 97:21, 109:19, 112:18, 117:8, 121:15, 207:5, 231:25
artists' [1] - 226:20
ASCAP [10] - 83:5, 83:7, 83:13, 83:21, 83:23, 84:10, 84:11,

84:12, 93:1, 93:3
aside [2] - 223:6, 223:7
asleep [1] - 69:23
asserted [1] - 127:21
assertions [2] - 90:1, 110:25
assigned [4] - 18:25, 47:17, 156:24, 158:4
assignment [10] - 157:24, 158:16, 174:11, 174:13, 175:2, 184:5, 184:7, 184:10, 184:17, 184:18
Assistant [1] - 215:1
associated [1] - 216:1
assume [7] - 6:20, 14:25, 155:8, 159:4, 189:16, 190:11, 219:23
assuming [1] - 227:15
AT [1] - 237:11
AT&T [1] - 179:24
attached [1] - 188:7
Attack [1] - 195:21
attempted [1] - 10:8
attempts [2] - 125:11, 229:4
attend [8] - 146:6, 148:14, 148:18, 148:19, 150:7, 173:2, 173:11, 179:1
attended [9] - 25:1, 25:8, 75:25, 150:9, 167:24, 173:6, 173:15, 205:19, 205:24
attention [5] - 5:8, 78:9, 222:4, 222:5, 225:17
attest [1] - 164:1
attorney [5] - 111:18, 115:15, 230:6, 230:9, 230:15
attorneys [4] - 11:3, 105:2, 229:22, 229:23
audience [4] - 36:19, 36:20, 36:23, 222:6
audio [1] - 8:23, 8:24, 9:3, 9:5, 10:4, 10:5, 10:15, 11:5, 11:6, 62:22
Audio [9] - 9:3, 29:5, 38:5, 38:7, 39:9, 51:17, 51:21, 62:11, 66:9
audition [1] - 116:21
auditioned [1] -

116:22
August [1] - 218:25
aunt [1] - 18:25
authenticate [1] - 127:12
author [6] - 105:15, 106:2, 106:6, 106:10, 106:14, 106:18
authorship [4] - 105:4, 105:17, 105:22, 106:1
auto [3] - 222:20, 224:25, 225:3
autograph [1] - 147:12
automated [3] - 194:7, 225:1, 229:4
autonomous [1] - 198:6
autonomously [1] - 198:8
availability [1] - 180:20
available [23] - 126:11, 181:16, 181:24, 182:6, 191:20, 194:9, 194:11, 194:14, 194:16, 194:19, 194:23, 195:13, 195:15, 196:7, 196:9, 196:25, 197:2, 220:8, 224:5, 224:15, 225:20, 226:11, 226:19
availing [1] - 13:12
average [1] - 169:14
avoid [1] - 124:12
award [12] - 24:20, 43:3, 43:7, 83:5, 83:10, 83:13, 83:14, 83:16, 83:17, 83:18, 173:9, 205:18
Awards [18] - 24:21, 24:24, 25:1, 25:3, 25:6, 25:8, 25:10, 25:12, 25:16, 173:2, 173:11, 173:15, 205:19, 205:21, 205:24, 205:25, 206:2
awards [10] - 24:24, 25:5, 78:4, 78:7, 78:14, 83:5, 83:7, 83:8, 110:22, 173:6
aware [27] - 21:5, 21:7, 21:8, 31:3, 31:9, 32:13, 42:19, 44:15, 44:19, 93:3,

96:14, 96:16, 98:15, 98:18, 109:7, 165:18, 171:17, 171:24, 172:8, 173:8, 177:13, 177:22, 194:5, 223:12, 223:13, 225:10, 229:3
awareness [1] - 154:9

**B**

B.I.G [1] - 54:23
Baby [1] - 196:4
Bachelor's [1] - 213:25
background [6] - 53:24, 116:4, 199:7, 213:23, 214:14, 215:17
Backstreet [1] - 19:8
bad [1] - 134:17
Bad [1] - 195:5
balance [1] - 72:11
Ball [1] - 197:11
band [23] - 36:25, 37:2, 37:10, 37:14, 37:20, 76:4, 76:6, 76:11, 199:22, 199:23, 200:6, 207:3, 207:4, 207:7, 207:9, 207:19, 207:20, 207:23, 212:6, 212:9, 212:10, 212:14, 212:15
band's [1] - 212:12
banner [2] - 142:11, 142:12
Baptist [4] - 170:10, 171:1, 179:7, 179:16
bar [8] - 44:23, 45:6, 45:7, 45:8, 47:4, 153:16, 219:8, 221:13
Barbara [14] - 20:10, 20:23, 21:2, 50:8, 68:13, 69:2, 69:12, 103:3, 132:14, 201:16, 201:21, 202:14, 203:3, 209:9
bare [1] - 62:23
barring [2] - 100:16, 101:4
base [2] - 73:17, 180:5
Base [18] - 39:11, 39:16, 39:19, 39:22, 48:14, 62:5, 62:9, 63:4, 63:11, 63:16, 64:5, 65:3, 112:13,

113:4, 113:13, 113:22, 114:8, 180:2
**based** [13] - 14:6, 51:12, 52:6, 90:7, 126:23, 130:22, 130:23, 131:4, 152:17, 152:21, 219:16, 219:21, 221:1
**bases** [2] - 149:15, 180:1
**basic** [8] - 62:22, 67:10, 67:12, 67:13, 67:16, 131:17, 131:19
**basis** [2] - 157:21, 166:25
**bass** [5] - 49:11, 65:21, 66:3, 66:16, 130:11
**BDS** [1] - 112:14
**beat** [49] - 6:13, 6:17, 6:24, 7:19, 29:12, 38:14, 47:24, 48:17, 48:24, 60:11, 60:23, 61:1, 61:5, 61:9, 62:25, 63:3, 65:13, 66:1, 66:18, 67:18, 67:23, 68:2, 68:9, 72:25, 83:1, 83:3, 99:23, 100:11, 101:17, 102:25, 115:16, 115:19, 115:22, 129:24, 130:3, 130:5, 130:7, 130:10, 132:10, 133:8, 133:10, 133:16, 133:22, 135:5, 159:19, 159:22, 227:15, 228:13
**beating** [1] - 12:3
**beats** [3] - 62:1, 85:19, 227:19
**Beats** [1] - 74:9
**Beatz** [7] - 22:20, 74:9, 108:15, 203:25
**Beautiful** [1] - 196:23
**became** [22] - 7:3, 57:8, 59:15, 59:16, 59:19, 60:24, 94:22, 100:12, 101:21, 103:5, 116:22, 117:25, 159:15, 164:2, 201:14, 202:6, 214:19, 216:18, 220:6, 220:9, 220:17, 222:25
**Becky** [5] - 98:1, 98:4,

98:8, 98:9, 98:16
**become** [13] - 35:19, 47:21, 48:17, 56:5, 65:1, 65:19, 84:25, 85:17, 94:17, 117:7, 162:16, 215:21, 218:6
**becomes** [2] - 94:17, 95:4
**becoming** [3] - 18:23, 85:7, 184:19
**bedroom** [2] - 36:3, 55:17
**began** [8] - 28:20, 35:10, 48:24, 54:16, 118:11, 119:17, 202:12, 211:4
**begin** [3] - 126:14, 190:6, 226:4
**beginning** [5] - 55:17, 128:10, 135:19, 153:3, 168:10
**BEHALF** [3] - 2:3, 2:13, 2:20
**Behind** [1] - 118:5
**behind** [1] - 220:25
**beings** [1] - 210:7
**believes** [1] - 144:19
**bell** [1] - 183:4
**below** [2] - 130:12, 158:7
**bench** [1] - 51:2
**benefit** [1] - 180:9
**Bennett** [1] - 195:24
**best** [1] - 71:10
**Best** [3] - 92:5, 140:2, 181:7
**better** [8] - 8:15, 17:17, 56:5, 66:5, 77:5, 94:8, 117:7, 185:24
**between** [24] - 10:4, 11:6, 11:8, 15:17, 26:22, 27:9, 27:17, 45:10, 45:14, 65:5, 88:24, 115:11, 117:5, 123:10, 142:13, 148:14, 150:7, 167:25, 169:8, 174:15, 174:17, 206:25, 219:5, 220:15
**beyond** [4] - 67:17, 116:15, 228:21, 229:7
**bible** [1] - 145:21
**Bieber's** [3] - 195:1, 195:10, 196:3
**bifurcated** [3] - 46:19, 47:2

**big** [8] - 58:3, 58:8, 90:24, 92:10, 94:17, 117:12, 179:25, 220:13
**bigger** [1] - 133:11
**biggest** [3] - 149:2, 149:3, 201:18
**Billboard** [31] - 5:3, 25:19, 25:21, 25:24, 26:8, 26:16, 30:21, 30:23, 41:25, 42:2, 42:4, 42:7, 42:8, 77:12, 77:15, 77:22, 113:12, 113:24, 114:1, 114:11, 122:9, 122:12, 122:13, 124:3, 124:25, 126:25, 185:12, 185:15, 186:17, 206:11, 206:13
**billion** [11] - 193:13, 193:17, 193:18, 193:20, 194:12, 194:16, 194:24, 196:6, 196:24, 227:5, 227:10
**billions** [1] - 193:21
**binder** [6] - 103:24, 169:24, 169:25, 170:3, 170:5, 170:13
**biomedical** [1] - 234:10
**Birthday** [1] - 73:10
**bit** [21] - 33:13, 52:8, 58:24, 59:2, 62:8, 63:8, 63:9, 67:22, 79:14, 89:8, 95:11, 111:8, 116:4, 125:9, 135:15, 199:7, 199:16, 200:22, 207:17, 215:17, 219:2
**blocks** [3] - 131:18, 131:23, 131:25
**blood** [1] - 208:16
**blue** [1] - 223:19
**board** [1] - 148:12
**Bon** [1] - 19:9
**Bone** [1] - 54:23
**bones** [1] - 62:23
**book** [8] - 131:21, 143:21, 150:21, 152:23, 184:1, 219:13, 219:17, 219:22
**Book** [1] - 181:7
**booking** [10] - 152:2, 152:3, 152:4, 152:17, 152:18,

152:21, 152:22, 153:1, 167:21, 167:23
**bookings** [2] - 147:2, 152:17
**booklet** [1] - 143:8
**Bookstore** [1] - 140:2
**booth** [2] - 70:20, 148:11
**bot** [1] - 229:5
**bots** [5] - 198:6, 229:5, 232:4, 232:5, 232:8
**bottom** [7] - 105:3, 105:5, 158:13, 175:6, 188:9, 223:18, 225:16
**BOULEVARD** [2] - 2:7, 2:18
**bound** [1] - 12:18
**boxes** [1] - 34:16
**Boys** [4] - 19:8, 19:16, 118:20, 119:3
**breach** [2] - 167:3, 167:12
**break** [3] - 30:6, 58:3, 129:12
**breaking** [4] - 23:12, 31:6, 33:13, 71:19
**breath** [1] - 187:3
**breathe** [1] - 64:19
**breathed** [1] - 208:18
**Bremerton** [1] - 180:2
**brick** [6] - 139:19, 139:20, 139:25, 164:24, 180:18, 181:10
**bridge** [1] - 123:9
**brief** [7] - 36:15, 43:21, 56:9, 57:12, 86:3, 136:2, 222:19
**briefly** [7] - 9:14, 18:19, 56:7, 125:7, 160:1, 213:10, 233:4
**bring** [1] - 4:21
**bringing** [2] - 94:4, 95:25
**Britney** [8] - 19:8, 58:12, 58:15, 58:16, 60:1, 90:24, 117:13, 118:5
**Brittany** [1] - 119:22
**broadest** [1] - 222:6
**broke** [1] - 200:6
**brought** [3] - 166:23, 167:7, 167:15
**browse** [3] - 224:7, 225:18, 225:21
**browser** [1] - 226:10
**browsing** [1] - 77:5

**Bs** [1] - 226:2
**buddies** [1] - 35:15
**budget** [2] - 18:1, 152:25
**Buffalo** [1] - 179:21
**build** [1] - 160:14
**building** [6] - 71:18, 131:17, 131:23, 131:25, 201:8, 233:11
**bunch** [5] - 7:8, 69:12, 69:15, 71:12, 231:19
**burden** [2] - 8:20, 11:15
**bus** [1] - 148:21
**Business** [3] - 214:19, 214:23, 215:2
**business** [20] - 18:15, 18:20, 18:22, 78:19, 116:5, 126:11, 138:6, 138:7, 153:4, 162:17, 162:24, 164:2, 167:20, 199:8, 214:10, 215:9, 220:21, 220:22, 220:25, 221:1
**button** [4] - 222:17, 222:18, 223:5, 225:7
**Buy** [2] - 140:2, 181:7
**buyer** [1] - 214:25
**buzz** [1] - 160:17
**BY** [78] - 2:5, 2:10, 2:15, 2:22, 3:5, 3:7, 3:8, 3:9, 3:10, 3:13, 3:13, 3:15, 3:15, 3:17, 3:17, 15:13, 17:6, 23:25, 28:12, 28:18, 30:5, 31:15, 32:9, 34:24, 44:14, 47:6, 48:8, 49:22, 50:5, 51:8, 53:4, 60:21, 66:10, 72:18, 74:3, 80:19, 82:23, 85:16, 86:6, 87:20, 90:20, 91:17, 92:23, 100:25, 119:14, 120:12, 129:9, 136:5, 136:17, 137:14, 141:21, 142:18, 144:15, 144:22, 151:15, 152:20, 154:4, 159:25, 160:12, 170:8, 170:17, 170:23, 171:16, 171:23, 178:5, 179:12, 180:14, 181:11, 182:15, 199:2, 202:4, 209:4,

210:19, 213:7, 229:16, 233:7, 234:22, 237:13

**C**

**CA** [2] - 2:19, 2:24
**Calendar** [1] - 4:3
**calendar** [1] - 167:23
**CALIFORNIA** [6] - 1:2, 1:16, 1:23, 4:1, 237:6, 237:9
**California** [1] - 192:21
**Canada** [2] - 35:8, 57:12
**Canadian** [2] - 35:9, 57:11
**candid** [1] - 6:11
**cannot** [1] - 198:11
**capacities** [1] - 169:17
**capacity** [7] - 167:21, 169:15, 169:23, 179:8, 179:25, 233:14, 233:22
**CAPES** [1] - 2:5
**Capital** [1] - 192:13
**captured** [2] - 139:8, 161:12
**care** [5] - 8:5, 12:17, 46:19, 122:12, 193:9
**career** [18] - 54:6, 56:2, 57:5, 58:20, 77:14, 79:11, 79:19, 95:5, 116:15, 117:3, 117:16, 131:25, 162:19, 163:9, 199:15, 200:10, 201:8, 208:16
**Carly** [1] - 196:15
**Carmageddon** [1] - 37:11
**Carmageddon's** [1] - 37:14
**Carolina** [1] - 180:3
**case** [39] - 9:1, 17:24, 22:8, 33:6, 33:7, 36:14, 36:18, 40:13, 53:14, 60:14, 73:23, 80:4, 86:11, 101:16, 110:25, 119:2, 126:20, 126:23, 130:13, 135:5, 157:17, 159:16, 171:18, 171:25, 172:8, 187:2, 187:11, 203:11, 203:22, 213:11, 216:24, 217:6, 225:5, 225:8, 225:10, 226:23,

226:24, 227:13, 236:5
**CASE** [1] - 1:8
**Case** [1] - 4:4
**Cash** [3] - 231:18, 234:12, 234:15
**categories** [11] - 25:16, 26:19, 43:5, 78:6, 78:10, 78:15, 206:6, 206:9, 215:9, 220:12, 220:13
**categorization** [2] - 228:11, 228:13
**categorize** [1] - 227:18
**categorized** [2] - 140:19, 227:20
**category** [2] - 223:15, 225:12
**caught** [1] - 69:13
**caused** [1] - 157:11
**causes** [1] - 147:16
**caution** [1] - 6:1
**CD** [14] - 81:1, 81:2, 81:6, 81:7, 81:8, 81:9, 81:10, 143:8, 143:23, 180:21, 181:8, 181:9, 181:10, 181:16
**CDs** [4] - 139:21, 139:23, 139:24, 140:8
**celebrate** [1] - 16:6
**Center** [3] - 179:22, 183:15, 183:20
**CENTRAL** [2] - 1:2, 237:9
**CENTURY** [1] - 2:23
**CEO** [1] - 121:12
**certain** [12] - 5:10, 17:23, 71:18, 77:12, 89:11, 89:22, 97:7, 111:19, 112:22, 116:12, 192:12, 194:5
**certainly** [5] - 5:5, 49:20, 123:1, 126:16, 190:13
**certainty** [1] - 101:12
**CERTIFICATE** [1] - 237:2
**CERTIFY** [2] - 237:10, 237:14
**cetera** [1] - 13:18
**change** [12] - 65:4, 65:6, 68:6, 68:7, 73:2, 73:3, 89:20, 157:8, 157:11, 220:2, 220:14, 227:16

changed [11] - 42:11, 58:17, 66:3, 130:11, 132:7, 133:13, 134:2, 149:3, 160:19, 208:21, 208:24
**changes** [8] - 38:23, 39:1, 39:3, 40:10, 49:24, 50:2, 202:21
**Chapter** [2] - 9:10
**character** [1] - 134:20
**characterization** [1] - 89:25
**charge** [5] - 17:1, 17:19, 139:17, 141:9, 187:18
**chart** [18] - 26:6, 26:8, 42:17, 42:23, 43:17, 77:17, 96:5, 112:21, 112:24, 113:11, 114:2, 114:7, 127:17, 127:18, 141:17, 160:13
**charted** [1] - 160:7
**charting** [3] - 42:9, 77:16, 96:15
**charts** [69] - 25:22, 25:24, 26:1, 26:3, 26:5, 26:12, 26:16, 26:18, 30:18, 30:21, 30:23, 30:25, 42:2, 42:4, 42:7, 42:8, 42:14, 42:19, 43:16, 77:12, 77:15, 77:22, 77:23, 77:25, 95:3, 95:6, 95:7, 95:8, 95:9, 95:11, 95:13, 95:14, 95:15, 95:19, 95:21, 95:22, 95:23, 96:1, 96:2, 96:4, 96:8, 112:16, 112:22, 114:14, 114:16, 114:18, 124:17, 124:19, 127:5, 127:6, 127:7, 127:10, 127:22, 127:23, 127:24, 128:11, 128:14, 128:22, 141:15, 141:22, 141:24, 206:11, 206:13, 206:17
**check** [8] - 26:8, 27:21, 70:4, 77:1, 77:17, 81:13, 89:16, 147:11
**checking** [1] - 95:9
**cherry** [1] - 125:19
**cherry-picked** [1] - 125:19

**chief** [4] - 138:13, 138:17, 139:13, 151:17
**CHIEFFO** [1] - 2:22
**Chike** [16] - 22:19, 22:20, 74:8, 74:9, 108:14, 108:15, 144:9, 145:14, 146:15, 203:24, 203:25, 205:5
**choice** [3] - 62:20, 91:14, 128:8
**choose** [3] - 125:21, 219:14, 226:9
**choosing** [1] - 132:15
**chords** [3] - 49:11, 49:12, 130:11
**chorus** [6] - 65:20, 66:4, 66:7, 66:11, 101:22, 133:11
**choruses** [1] - 116:1
**chose** [4] - 58:16, 125:22, 140:18, 140:20
**Christian** [38] - 19:20, 19:25, 24:11, 24:16, 26:15, 26:18, 55:5, 74:23, 74:24, 77:9, 109:15, 109:20, 110:14, 110:16, 110:22, 114:16, 114:24, 115:4, 140:2, 181:7, 183:24, 200:14, 200:16, 200:18, 200:20, 205:10, 205:11, 205:15, 205:16, 206:17, 225:10, 225:15, 225:25, 226:2, 226:3, 227:14, 227:25, 228:2
**CHRISTINA** [1] - 1:4
**CHRISTINE** [1] - 2:15
**chunk** [1] - 230:22
**church** [6] - 149:9, 170:10, 171:1, 171:3, 179:7, 179:16
**churches** [5] - 169:12, 169:14, 169:16, 169:18, 169:20
**circle** [1] - 135:4
**circumstances** [1] - 86:15
**Cirkut** [15] - 20:17, 35:2, 35:6, 46:25, 99:1, 99:4, 119:15, 129:21, 130:6, 130:18, 130:19, 131:5, 133:7,

201:17, 202:1
**cities** [2] - 152:9, 181:15
**citizen** [1] - 35:8
**City** [5] - 116:7, 149:19, 179:21, 183:12, 183:14
**city** [3] - 152:24, 181:13, 181:14
**claim** [1] - 6:18
**claimants** [1] - 106:25
**claims** [2] - 167:2, 167:12
**clarify** [4] - 53:7, 201:23, 206:20, 226:6
**Clarkson** [2] - 118:4, 118:5
**classes** [2] - 116:12, 235:2
**CLAYTON** [1] - 2:11
**clean** [1] - 188:10
**Clear** [24] - 138:11, 138:17, 138:24, 139:1, 140:22, 142:1, 142:2, 142:19, 145:1, 150:14, 151:17, 161:11, 161:15, 161:18, 161:22, 162:2, 163:4, 165:5, 165:8, 166:5, 166:7, 166:16, 182:7
**clear** [8] - 21:13, 47:23, 124:19, 138:10, 206:21, 212:6, 213:17, 229:19
**clearer** [1] - 126:1
**clearly** [1] - 228:16
**CLERK** [40] - 4:3, 4:20, 14:16, 14:18, 14:20, 15:2, 15:5, 15:10, 28:16, 34:12, 34:14, 34:22, 44:25, 45:2, 80:7, 80:9, 80:12, 80:14, 80:16, 87:8, 87:10, 87:14, 87:18, 122:5, 122:7, 123:5, 123:19, 129:4, 137:3, 137:6, 137:9, 137:12, 164:14, 188:23, 190:1, 198:18, 198:20, 212:24, 213:2, 236:13
**clerk** [1] - 188:8
**click** [12] - 141:1, 219:9, 221:16, 223:5, 223:23,

224:6, 224:9, 225:5, 225:21, 226:3, 226:9, 232:23
**clicked** [2] - 222:14, 224:11
**clicks** [1] - 141:13
**clients** [4] - 17:24, 174:15, 174:17, 176:19
**Clinical** [1] - 137:23
**close** [5] - 40:23, 59:16, 121:25, 126:20, 214:10
**closed** [1] - 66:16
**closely** [2] - 68:19, 234:5
**closer** [2] - 28:16, 123:7
**closing** [2] - 186:7, 186:22
**cloud** [1] - 44:2
**co** [19] - 11:2, 11:4, 12:18, 33:11, 47:14, 47:24, 84:9, 88:23, 101:25, 102:1, 118:3, 118:21, 119:7, 131:11, 134:21
**co-counsel** [3] - 11:2, 11:4, 12:18
**co-created** [1] - 47:24
**co-creators** [1] - 47:14
**co-produced** [3] - 88:23, 119:7
**co-producer** [1] - 101:25
**co-publishing** [1] - 84:9
**co-writer** [3] - 33:11, 102:1, 131:11
**co-written** [2] - 88:23
**co-wrote** [3] - 118:3, 118:21, 119:7
**Cobalt** [1] - 84:8
**Coca** [1] - 179:21
**Coca-Cola** [1] - 179:21
**code** [4] - 230:19, 233:11, 233:15, 235:5
**COHEN** [36] - 2:6, 3:7, 4:16, 4:18, 87:6, 87:11, 87:20, 90:9, 90:11, 90:20, 91:17, 92:23, 100:25, 105:14, 107:8, 122:14, 122:18, 122:20, 122:24, 123:4, 125:6, 125:9, 126:2, 126:6,

126:19, 127:1, 128:3, 128:13, 128:17, 128:20, 128:23, 129:3, 136:2, 136:5, 136:24, 236:10
**Cola** [1] - 179:21
**Cold** [1] - 118:23
**collaborated** [3] - 9:7, 99:13, 99:24
**collaborating** [1] - 33:14
**collaboration** [1] - 130:23
**collaborations** [1] - 139:4
**colleague** [2] - 193:8, 198:16
**collect** [3] - 145:7, 145:8, 145:15
**collecting** [1] - 215:15
**collects** [1] - 84:12
**college** [4] - 55:23, 89:7, 116:12, 116:14
**colleges** [2] - 149:14, 154:17
**colloquy** [1] - 128:24
**colorful** [1] - 210:8
**Columbia** [1] - 180:3
**combine** [1] - 114:5
**combining** [1] - 101:24
**comfortable** [1] - 128:24
**coming** [4] - 85:19, 92:11, 163:15, 210:2
**commercials** [1] - 116:19
**common** [1] - 67:4
**commonly** [1] - 67:3
**communicated** [1] - 59:17
**companies** [3] - 112:12, 140:10, 215:6
**company** [35] - 17:25, 41:16, 41:20, 44:6, 47:12, 84:5, 84:6, 84:7, 93:23, 100:7, 107:4, 111:25, 112:2, 121:6, 121:10, 145:2, 145:3, 145:5, 146:16, 165:5, 165:9, 165:11, 165:13, 165:16, 175:23, 192:14, 214:8, 214:16, 214:17, 215:18, 216:11, 216:18,

217:14, 222:25, 234:3
**compel** [5] - 9:17, 9:18, 10:21, 11:2, 12:7
**compelled** [1] - 10:25
**compensated** [1] - 44:10
**complete** [2] - 50:6, 71:13
**completed** [2] - 7:19, 72:6
**completely** [5] - 6:11, 10:1, 51:3, 124:14, 208:25
**Completeness** [1] - 171:12
**completeness** [1] - 216:12
**complex** [1] - 67:14
**compliant** [1] - 214:13
**complied** [1] - 215:15
**complimented** [1] - 59:18
**components** [1] - 235:3
**compose** [7] - 18:5, 29:7, 39:23, 52:6, 62:11, 133:15, 133:19
**composed** [2] - 29:12, 51:16
**composer** [2] - 31:21, 31:22
**composers** [1] - 131:20
**composing** [7] - 18:5, 38:4, 38:11, 38:14, 40:11, 52:3, 134:19
**composition** [12] - 31:20, 50:4, 51:16, 102:11, 131:14, 132:7, 133:8, 133:13, 133:22, 134:2, 192:20, 193:5
**compute** [1] - 187:23
**computer** [25] - 12:24, 29:10, 29:13, 29:14, 29:16, 29:22, 30:3, 30:9, 38:4, 38:14, 38:16, 39:17, 39:20, 40:3, 43:24, 44:1, 49:15, 61:20, 62:4, 62:19, 81:7, 81:18, 198:7, 230:19, 234:24
**COMPUTER** [1] - 237:13
**COMPUTER-AIDED** [1] - 237:13

**computers** [2] - 38:8, 54:13
**concentrate** [1] - 103:12
**concept** [7] - 13:9, 203:1, 203:2, 209:24, 210:2, 210:4, 210:5
**concern** [1] - 153:5
**concerned** [2] - 13:6, 165:25
**concerning** [1] - 178:18
**concerns** [1] - 225:10
**concert** [35] - 23:23, 24:11, 75:16, 75:18, 75:20, 75:23, 75:25, 110:5, 110:11, 110:14, 110:16, 147:2, 147:10, 147:21, 147:24, 148:1, 150:16, 151:18, 154:20, 154:22, 159:20, 167:22, 170:9, 176:5, 178:8, 178:11, 178:14, 178:16, 180:19, 180:21, 181:14, 183:18, 204:21, 205:1, 205:11
**concerts** [35] - 24:3, 24:6, 110:1, 110:3, 110:8, 148:14, 148:16, 148:18, 148:19, 149:12, 149:21, 150:6, 150:9, 150:18, 151:4, 153:21, 153:23, 154:1, 154:8, 154:14, 159:18, 168:4, 168:6, 168:9, 168:23, 169:5, 169:8, 169:11, 176:7, 178:6, 183:2, 183:4, 183:18, 212:16
**conclude** [2] - 126:22, 187:11
**concluded** [2] - 47:4, 236:14
**conclusion** [1] - 125:24
**conducting** [1] - 198:17
**confer** [5] - 122:21, 123:13, 125:24, 126:15, 185:20
**conference** [1] -

183:24
**confess** [1] - 231:16
**confident** [2] - 85:21, 92:15
**confirmatory** [1] - 5:15
**conform** [1] - 149:10
**confused** [2] - 104:15, 175:19
**connect** [9] - 62:15, 62:19, 62:22, 215:24, 219:4, 219:11, 219:20, 220:5
**connected** [3] - 218:22, 219:23
**connection** [3] - 15:17, 15:22, 219:22
**connections** [6] - 56:6, 217:17, 219:13, 219:16, 219:21, 220:1
**Conservatory** [1] - 116:13
**consider** [2] - 59:20, 73:16
**considered** [1] - 220:18
**considering** [1] - 227:10
**consistent** [3] - 50:10, 55:2, 103:9
**consoles** [1] - 56:25
**constantly** [1] - 94:4
**constructing** [1] - 233:11
**construction** [2] - 230:16, 233:17
**consumed** [1] - 83:19
**consuming** [1] - 221:2
**consumption** [1] - 220:9
**contact** [8] - 89:10, 89:16, 154:11, 155:24, 159:6, 159:10, 167:19, 219:14
**contacted** [3] - 41:6, 159:3, 159:4
**contacts** [1] - 219:17
**contain** [1] - 10:20
**contains** [1] - 218:12
**contemporary** [2] - 227:25, 228:1
**contend** [2] - 9:23, 9:24
**content** [13] - 142:14, 193:12, 193:16, 193:19, 213:13, 215:14, 220:7,

220:8, 220:9, 220:11, 220:12, 223:6

**contents** [1] - 177:25

**context** [2] - 227:9, 227:10

**continue** [3] - 70:12, 123:12, 123:24

**CONTINUED** [1] - 129:8

**continued** [2] - 78:25, 214:21

**continuing** [2] - 92:18, 93:6, 93:18

**contract** [10] - 44:16, 45:10, 45:19, 45:20, 100:6, 165:19, 165:25, 167:3, 167:13, 167:16

**contractor** [1] - 100:10

**contracts** [2] - 45:14, 214:10

**contractual** [1] - 214:13

**contrast** [1] - 225:7

**contribute** [1] - 203:5

**contributed** [4] - 10:14, 10:17, 49:9, 95:10

**contribution** [1] - 203:9

**contributions** [1] - 130:10

**controlled** [1] - 192:22

**Convention** [3] - 179:22, 183:15, 183:20

**conversation** [3] - 14:6, 122:14, 122:24

**Conway** [5] - 61:6, 61:15, 67:24, 130:4, 132:10

**COO** [2] - 138:12, 139:17

**copied** [1] - 65:18

**copies** [2] - 14:10, 188:10

**copy** [7] - 14:9, 44:20, 64:9, 103:24, 104:10, 134:24, 135:1

**copyright** [7] - 104:10, 104:20, 106:25, 159:12, 185:10, 192:13, 208:14

**copyrights** [2] - 156:24, 158:4

**corporate** [1] - 192:12

**corporation** [1] -

192:22

**Corporation** [2] - 193:2, 214:24

**corporations** [1] - 214:21

**CORRECT** [1] - 237:14

**correct** [290] - 26:6, 28:1, 28:2, 28:24, 28:25, 29:13, 29:19, 29:20, 30:7, 30:10, 30:13, 30:19, 30:20, 30:22, 31:23, 32:14, 35:3, 35:4, 35:10, 35:16, 36:8, 37:2, 37:8, 37:12, 37:17, 37:22, 37:24, 38:5, 38:6, 38:11, 38:16, 38:18, 38:24, 39:4, 39:12, 39:17, 39:18, 39:25, 40:6, 40:11, 40:12, 41:17, 41:18, 41:20, 42:5, 42:25, 43:11, 45:5, 47:15, 47:18, 47:24, 48:18, 48:19, 48:21, 48:22, 48:25, 49:6, 49:15, 49:25, 52:9, 52:19, 53:9, 54:1, 60:12, 60:13, 60:16, 64:14, 67:10, 67:25, 68:4, 68:5, 68:10, 72:19, 72:25, 73:1, 73:24, 78:7, 79:1, 81:13, 81:22, 81:23, 81:24, 83:6, 83:15, 83:21, 83:24, 83:25, 84:2, 84:17, 84:21, 84:22, 87:24, 89:21, 97:22, 98:24, 99:15, 99:21, 99:22, 99:25, 101:2, 101:3, 102:4, 103:21, 105:25, 106:5, 106:12, 106:19, 106:20, 109:9, 109:10, 110:6, 110:7, 112:17, 113:4, 114:10, 114:11, 114:12, 115:13, 115:19, 115:20, 117:2, 118:8, 118:9, 121:7, 121:8, 128:20, 129:23, 133:13, 133:22, 133:25, 134:3, 134:10, 137:17, 139:14, 139:15, 140:24, 142:7, 142:20, 143:5, 143:6, 143:12,

144:2, 144:3, 145:17, 149:6, 150:13, 151:10, 155:11, 155:12, 156:2, 156:17, 157:3, 157:4, 158:15, 158:16, 159:17, 161:16, 161:19, 161:22, 161:23, 161:25, 162:3, 162:4, 162:5, 162:6, 162:8, 162:9, 162:11, 162:14, 163:9, 163:10, 163:15, 163:19, 163:22, 164:13, 164:18, 164:19, 164:21, 164:22, 164:25, 165:2, 165:5, 165:9, 165:10, 165:12, 165:16, 165:17, 166:5, 166:8, 166:9, 166:11, 166:12, 166:13, 166:14, 166:16, 166:24, 167:22, 169:15, 169:20, 169:23, 171:8, 172:1, 172:2, 172:5, 172:11, 172:14, 172:18, 172:22, 172:25, 173:6, 173:9, 173:15, 173:24, 174:1, 174:2, 174:5, 174:9, 174:10, 174:13, 174:18, 174:19, 174:21, 175:15, 175:16, 175:22, 176:1, 176:3, 176:4, 176:7, 176:9, 176:10, 176:11, 176:15, 176:23, 176:24, 177:1, 177:17, 177:18, 178:9, 178:10, 178:11, 178:12, 178:20, 178:21, 178:22, 180:16, 180:17, 181:19, 181:20, 181:21, 181:22, 184:5, 184:8, 184:9, 184:12, 210:20, 211:2, 211:5, 211:15, 211:24, 212:2, 212:4, 212:5, 213:22, 217:7, 217:8, 222:11, 222:12, 229:20, 229:21, 229:23,

229:24, 230:6, 230:7, 230:9, 230:10, 230:18, 230:24, 230:25, 231:23, 231:24, 232:2, 232:3, 233:21, 234:16, 234:24, 234:25, 235:5, 235:9, 235:14

**corrected** [2] - 89:12, 169:4

**correction** [1] - 194:22

**correctly** [1] - 30:2

**correspondence** [1] - 156:10

**corroborated** [1] - 5:15

**counsel** [23] - 4:6, 4:20, 11:2, 11:4, 12:18, 17:4, 28:8, 34:15, 81:11, 112:19, 113:18, 122:21, 124:8, 137:3, 168:18, 178:18, 179:6, 180:6, 197:21, 214:7, 214:11, 216:18, 230:12

**COUNSEL** [1] - 2:2

**Counsel** [1] - 215:1

**counseling** [2] - 214:11, 215:10

**count** [8] - 176:16, 191:25, 192:2, 192:4, 192:6, 192:9, 193:22, 197:18

**counter** [1] - 193:7

**counting** [1] - 160:22

**country** [1] - 155:11

**counts** [5] - 194:6, 197:20, 229:7, 232:6, 232:9

**COUNTY** [1] - 237:4

**couple** [10] - 4:22, 28:19, 41:8, 73:10, 86:3, 112:10, 117:25, 179:19, 215:8, 221:11

**course** [12] - 5:13, 5:21, 24:23, 27:16, 56:8, 56:17, 88:5, 113:15, 125:8, 127:6, 151:16, 173:17

**COURT** [208] - 1:1, 1:22, 4:8, 4:13, 4:17, 4:19, 4:24, 5:20, 6:8, 6:11, 6:14, 6:22, 7:12, 7:23, 8:5, 8:13, 8:18, 9:12, 10:12,

10:21, 11:11, 11:16, 11:24, 12:2, 12:11, 12:16, 12:22, 12:25, 13:13, 13:19, 13:22, 14:2, 14:4, 14:12, 14:15, 14:21, 14:23, 15:11, 17:2, 17:5, 17:17, 23:24, 28:5, 28:14, 29:25, 31:13, 32:5, 32:7, 34:3, 34:7, 34:9, 44:13, 44:18, 44:24, 45:3, 45:6, 45:9, 45:23, 46:10, 46:14, 46:18, 47:1, 47:5, 48:4, 48:6, 49:19, 50:17, 50:25, 51:3, 51:6, 53:2, 74:2, 79:22, 79:23, 79:25, 80:10, 80:17, 82:21, 85:3, 85:5, 85:11, 86:2, 86:4, 87:1, 87:3, 87:5, 87:7, 87:13, 90:2, 90:5, 90:10, 90:13, 100:21, 107:9, 107:12, 107:15, 119:11, 120:11, 121:21, 121:24, 122:8, 122:12, 122:16, 122:19, 122:23, 123:1, 123:6, 123:15, 123:17, 123:23, 124:1, 124:24, 125:8, 125:20, 126:3, 126:8, 126:22, 127:2, 127:16, 127:23, 128:1, 128:9, 128:16, 128:18, 128:21, 129:1, 129:5, 129:7, 136:1, 136:15, 136:23, 136:25, 137:5, 141:6, 141:8, 141:11, 141:20, 142:16, 144:14, 144:19, 151:14, 152:16, 153:3, 153:11, 153:15, 153:22, 153:25, 154:3, 159:24, 160:10, 161:5, 170:2, 170:6, 170:15, 170:22, 171:14, 171:22, 178:3, 179:10, 180:13, 181:2, 181:5, 182:4, 182:9, 182:12, 183:6, 184:15, 184:18,

184:22, 185:5,
185:14, 186:5,
186:8, 186:12,
186:14, 186:21,
187:1, 187:5,
187:15, 187:20,
187:22, 188:12,
188:17, 188:20,
189:5, 189:11,
189:15, 189:21,
189:25, 190:5,
193:6, 193:10,
198:13, 209:2,
210:12, 212:19,
212:21, 229:14,
232:14, 232:17,
233:3, 233:5,
234:19, 236:1,
236:8, 236:11,
237:9, 237:22
**Court** [3] - 46:23,
122:10, 122:22
**court** [7] - 15:1, 90:6,
90:16, 100:17,
124:15, 188:9, 211:1
**court's** [4] - 80:12,
123:19, 188:23,
236:13
**courtroom** [3] - 17:8,
101:2, 149:7
**cover** [1] - 84:3
**covered** [2] - 37:8,
187:5
**covers** [1] - 151:9
**craft** [1] - 56:4
**Craft** [3] - 56:10,
56:11, 57:4
**create** [26] - 9:16,
10:10, 32:23, 33:4,
38:15, 38:17, 38:18,
47:12, 51:18, 52:5,
61:7, 62:1, 62:12,
65:15, 72:1, 78:25,
88:2, 91:23, 103:9,
121:5, 130:11,
131:18, 131:20,
148:25, 218:10,
220:25
**created** [53] - 6:13,
6:17, 9:4, 11:10,
13:3, 27:2, 29:22,
33:10, 45:25, 46:8,
47:24, 48:11, 48:14,
48:21, 48:23, 51:13,
51:19, 51:20, 52:20,
54:11, 57:3, 60:11,
60:23, 61:4, 61:9,
63:21, 64:18, 67:23,
79:2, 80:23, 93:7,
93:19, 100:2,

100:18, 101:9,
101:10, 101:17,
129:25, 130:3,
130:24, 130:25,
131:2, 132:9,
134:14, 151:7,
151:16, 151:21,
151:23, 156:17,
163:4, 163:6,
202:16, 220:24
**creating** [16] - 29:21,
38:10, 38:13, 52:2,
57:7, 57:23, 62:6,
66:18, 67:3, 73:4,
78:18, 82:6, 93:6,
93:17, 130:19,
218:11
**creation** [47] - 6:2, 6:6,
6:20, 6:21, 6:24,
7:18, 8:7, 8:21, 9:6,
9:9, 9:15, 10:6, 10:7,
10:14, 10:17, 10:20,
12:9, 12:12, 12:24,
20:5, 20:8, 20:24,
21:10, 21:14, 29:18,
45:13, 47:8, 48:16,
49:9, 53:23, 54:12,
60:8, 62:24, 65:12,
73:5, 102:18,
102:25, 129:15,
132:6, 132:11,
132:17, 133:1,
133:7, 143:13,
147:5, 200:23,
202:18
**creations** [1] - 40:3
**creative** [7] - 39:5,
92:13, 93:2, 93:17,
93:23, 147:3, 162:21
**creator** [1] - 92:17
**creators** [1] - 47:14
**credit** [6] - 102:4,
102:6, 144:5, 144:7,
144:8, 144:11
**credited** [2] - 146:14,
211:24
**credits** [3] - 143:9,
143:11, 143:23
**Crocodile** [1] - 195:21
**cross** [6] - 28:5,
90:17, 189:7, 209:2,
210:16, 229:14
**CROSS** [8] - 3:4,
28:11, 53:3, 107:17,
129:8, 161:6, 209:3,
229:15
**Cross** [26] - 155:13,
155:16, 155:21,
155:22, 156:24,
157:2, 158:14,

162:24, 163:5,
163:17, 163:24,
164:3, 164:9,
165:19, 165:25,
166:10, 166:23,
167:7, 167:16,
174:17, 175:13,
175:24, 176:2,
184:4, 184:7, 184:11
**CROSS-
EXAMINATION** [7] -
28:11, 53:3, 107:17,
129:8, 161:6, 209:3,
229:15
**cross-examine** [1] -
90:17
**cross-reading** [1] -
189:7
**crossed** [1] - 175:4
**crossing** [1] - 210:6
**CRYSTAL** [2] - 3:9,
137:11
**Crystal** [1] - 127:9,
137:4, 137:11
**Cs** [1] - 226:2
**CSR** [2] - 1:22, 237:21
**culminated** [1] - 13:4
**culmination** [2] - 9:16,
10:5
**curiosity** [1] - 4:14
**current** [1] - 230:11
**cut** [1] - 146:25
**cutting** [1] - 121:25
**CV** [1] - 1:8
**CV-15-5642** [1] - 4:4
**cymbals** [1] - 71:24
**Cyrus** [1] - 91:4
**Cyrus's** [2] - 197:10,
197:15

# D

**D.A** [2] - 108:7, 203:24
**daddy** [1] - 135:11
**damages** [3] - 45:17,
46:18, 187:23
**dance** [2] - 56:14,
82:15
**Dark** [76] - 7:4, 20:4,
20:5, 20:8, 20:24,
21:6, 21:14, 39:24,
47:8, 47:21, 48:17,
53:23, 60:8, 60:11,
60:24, 61:1, 61:2,
62:24, 65:20, 68:8,
72:16, 73:4, 73:10,
78:18, 79:17, 96:7,
99:21, 99:23, 100:1,
100:12, 103:5,
104:10, 104:21,

106:23, 107:5,
115:19, 115:22,
115:25, 121:20,
129:13, 129:14,
129:16, 131:11,
131:13, 132:6,
132:10, 132:11,
132:17, 133:1,
133:8, 133:16,
133:19, 134:5,
156:16, 156:20,
159:1, 159:2,
159:20, 174:9,
174:12, 174:18,
192:14, 192:15,
192:20, 192:25,
193:4, 200:22,
200:23, 201:1,
201:5, 202:6, 203:5,
208:12, 210:5,
210:9, 211:23
**dark** [2] - 8:10, 210:14
**data** [20] - 95:6,
111:19, 111:20,
111:24, 112:3,
112:4, 112:6, 112:8,
112:9, 112:12,
113:11, 113:21,
140:17, 156:3,
215:14, 218:13,
218:20, 219:15,
219:21
**DATE** [1] - 237:18
**date** [17] - 40:21, 61:9,
61:13, 81:1, 81:2,
81:7, 81:10, 81:13,
81:19, 118:15,
168:15, 174:22,
174:23, 174:24,
175:1, 177:19,
218:24
**dates** [8] - 152:8,
168:1, 168:12,
168:13, 168:21,
169:6, 175:7
**daughter** [3] - 135:9,
135:20, 135:21
**DAW** [1] - 62:11
**day's** [2] - 82:8, 85:22
**days** [18] - 55:3, 55:9,
61:7, 82:5, 82:7,
85:20, 85:21, 88:13,
92:14, 92:15, 92:16,
95:8, 175:11, 184:4,
184:8, 190:12,
217:19, 220:4
**dead** [1] - 58:6
**deal** [6] - 59:14, 84:8,
84:9, 199:17, 199:18
**dealing** [1] - 124:7

**deals** [2] - 214:10,
220:8
**decade** [1] - 215:3
**December** [2] -
151:10, 191:16
**decide** [4] - 54:6,
188:21, 222:16,
232:18
**decided** [7] - 156:11,
163:2, 199:14,
199:22, 202:11,
222:22, 223:1
**deciding** [1] - 17:20
**decision** [3] - 155:16,
155:22, 159:6
**decisions** [1] - 79:15
**Decker** [2] - 177:23,
187:4
**declined** [1] - 125:13
**dedicated** [1] - 84:1
**deep** [1] - 94:21
**Defendant** [4] -
192:19, 192:21,
192:22, 193:2
**DEFENDANT** [1] -
1:10
**defendant** [4] - 46:1,
192:13, 192:17,
192:24
**defendant's** [1] -
125:18
**Defendants** [1] -
192:25
**DEFENDANTS** [2] -
2:13, 2:20
**defendants** [14] -
4:12, 124:5, 125:12,
128:8, 128:15,
171:17, 171:24,
172:7, 172:8,
172:10, 173:6,
173:14, 174:4,
192:12
**defense** [6] - 6:21,
14:17, 185:25,
186:9, 186:10,
190:17
**DEFENSE** [1] - 3:11
**defer** [3] - 5:5, 13:24,
129:1
**definitely** [4] - 30:11,
39:16, 150:20, 155:7
**definition** [1] - 177:12
**Degree** [1] - 214:1
**degree** [4] - 214:2,
234:9, 234:10,
234:23
**delay** [2] - 15:16,
15:22
**deliver** [1] - 17:25

demanding [1] - 134:15
demographic [1] - 231:11
demographics [1] - 231:15
demonstrate [1] - 10:6
demonstrated [1] - 10:2
demonstrates [2] - 9:15, 10:16
dense [1] - 128:9
Department [1] - 216:22
depose [1] - 128:8
deposition [10] - 87:12, 100:16, 100:17, 101:5, 104:13, 104:16, 153:8, 153:12, 185:13, 209:7
depression [1] - 137:25
describe [13] - 16:23, 16:25, 17:12, 32:16, 32:18, 37:4, 83:1, 99:10, 100:4, 107:19, 139:16, 142:9, 218:16
described [4] - 32:12, 160:11, 209:7, 223:7
describing [3] - 141:10, 209:11, 220:11
description [2] - 36:16, 43:21
designations [1] - 124:6
details [1] - 57:6
determine [1] - 81:19
Detroit [1] - 148:1
devastated [1] - 208:15
devastating [3] - 199:21, 208:19, 208:25
developed [3] - 59:21, 215:12, 229:6
developing [1] - 37:20
development [1] - 234:6
difference [1] - 11:7
different [40] - 9:9, 24:20, 25:22, 32:19, 42:19, 43:4, 56:5, 56:13, 56:16, 58:5, 66:16, 69:16, 69:21, 71:24, 71:25, 82:5, 82:9, 82:10, 84:3, 85:23, 89:6, 93:21,

94:1, 95:5, 102:2, 102:9, 103:8, 111:2, 114:21, 114:22, 114:23, 115:3, 117:15, 140:4, 141:15, 143:10, 157:20, 216:21, 226:20
differentiate [1] - 65:22
difficult [1] - 47:2
difficulty [1] - 17:8
digital [13] - 140:8, 140:9, 142:2, 160:1, 162:1, 164:18, 164:20, 180:7, 181:18, 181:21, 181:24, 182:5, 218:11
Digital [11] - 9:3, 29:5, 38:5, 38:7, 39:8, 51:16, 51:21, 62:11, 62:18, 216:22, 230:13
digitally [2] - 162:3, 164:16
DIRECT [7] - 3:4, 15:12, 34:23, 87:19, 137:13, 199:1, 213:6
direct [2] - 41:3, 147:5
directed [1] - 173:25
direction [1] - 79:9
Direction's [1] - 196:22
directly [6] - 5:18, 88:5, 112:5, 114:8, 183:22, 223:8
Director [1] - 214:19
discover [1] - 225:11
discovery [11] - 5:13, 5:19, 7:11, 9:19, 9:23, 9:24, 10:1, 10:9, 10:22, 127:6, 128:7
discuss [5] - 80:4, 107:23, 122:3, 122:21, 236:5
discussed [4] - 5:3, 49:20, 173:18, 208:12
discussing [5] - 5:7, 9:9, 39:24, 168:24, 228:15
discussion [5] - 9:6, 9:8, 11:1, 14:15, 125:15
discussions [2] - 11:2, 130:13
disorders [1] - 137:25
display [2] - 157:19,

231:2
dispute [1] - 5:14
distinction [1] - 11:6
distinguish [1] - 61:1
distribute [1] - 140:10
distributed [1] - 192:15
Distribution [2] - 216:22, 230:13
distribution [7] - 138:20, 139:17, 140:6, 140:8, 140:10, 161:21, 162:1
distributor [1] - 139:18
DISTRICT [5] - 1:1, 1:2, 1:4, 237:9
division [1] - 46:7
DIVISION [1] - 1:2
DJ [19] - 35:5, 35:19, 35:25, 36:1, 36:8, 36:15, 36:16, 36:17, 36:21, 36:24, 37:19, 55:12, 55:14, 55:16, 147:18, 147:21, 147:23, 159:18, 178:11
DJing [4] - 35:22, 54:9, 55:24, 117:24
DJs [1] - 55:21
DO [2] - 237:10, 237:13
Doctorate [2] - 137:23, 214:2
document [30] - 14:13, 46:3, 104:7, 104:23, 105:4, 105:9, 105:12, 150:24, 151:1, 151:3, 151:5, 151:7, 151:12, 151:16, 151:20, 151:23, 151:24, 152:4, 152:6, 152:8, 153:21, 156:24, 157:19, 170:21, 171:3, 176:17, 182:21, 183:5, 183:7, 185:10
documentation [1] - 127:12
documents [13] - 6:18, 124:19, 151:24, 153:9, 156:23, 165:1, 169:7, 175:17, 176:1, 176:10, 178:18, 178:22, 178:23

Doe [1] - 131:19
doin' [1] - 36:4
Dollar [1] - 149:19
done [12] - 8:12, 10:1, 15:19, 32:21, 72:6, 73:4, 101:19, 102:16, 120:15, 183:4, 186:23, 187:5
doors [3] - 79:9, 171:6, 208:22
double [1] - 81:13
double-check [1] - 81:13
Dove [10] - 24:21, 24:24, 25:1, 25:3, 173:9, 173:11, 173:15, 205:19, 205:21
down [17] - 18:7, 71:19, 77:18, 87:3, 101:8, 101:14, 131:9, 137:1, 140:18, 144:25, 184:22, 211:9, 212:21, 225:16, 225:23, 226:1
Down [4] - 22:20, 74:9, 108:15, 203:25
download [1] - 44:3
downloading [1] - 44:1
Dr [7] - 40:14, 41:2, 46:15, 47:24, 98:23, 177:23, 201:17
draft [1] - 214:9
drafted [1] - 13:8
draw [2] - 222:4, 222:5
Dream [2] - 119:5, 119:7
dream [1] - 119:8
dreams [1] - 18:23
drop [2] - 140:18, 225:23
dropped [3] - 135:16, 158:24, 199:21
dropping [1] - 160:17
drops [2] - 160:23
drove [1] - 201:21
drummer [1] - 116:6
drums [1] - 65:14
duplicative [1] - 184:19
duration [2] - 63:19, 176:25
during [48] - 5:13, 5:18, 7:11, 27:10, 27:13, 27:16, 55:5, 76:8, 76:20, 76:23, 77:11, 77:14, 92:8, 96:6, 96:12, 97:3,

97:9, 99:8, 101:2, 102:18, 117:3, 120:13, 120:19, 127:6, 128:14, 147:22, 150:20, 155:1, 155:6, 157:8, 159:18, 166:17, 168:4, 168:23, 176:22, 178:19, 194:12, 194:24, 198:5, 215:5, 215:25, 216:25, 219:4, 224:17, 226:14, 226:16, 230:5, 232:1
duties [8] - 138:17, 139:13, 139:16, 146:21, 146:23, 147:8, 151:17, 154:5

### E

ear [2] - 52:6, 69:14
earliest [2] - 7:2, 11:5
early [6] - 39:9, 39:11, 39:19, 48:16, 54:9, 153:7
earnings [1] - 84:12
earth [1] - 217:22
easier [1] - 143:20
easiest [1] - 16:25
EAST [1] - 2:23
East [1] - 179:22
easy [2] - 79:3, 79:5
eat [1] - 200:6
economics [3] - 45:16, 46:8, 47:3
edit [1] - 62:12
edited [2] - 143:17, 144:2
editing [3] - 38:11, 39:14, 146:11
editorial [3] - 221:24, 222:1, 223:7
edits [1] - 123:11
educate [1] - 42:12
educated [1] - 77:20
education [1] - 137:21
educational [1] - 213:23
effectively [1] - 9:20
effects [1] - 71:25
effort [2] - 156:9, 190:6
efforts [6] - 9:20, 10:9, 142:9, 156:6, 156:7, 156:8
eight [4] - 100:18, 101:9, 191:2
eighth [1] - 132:5

**either** [12] - 22:12, 22:21, 22:23, 23:15, 46:5, 127:12, 148:23, 154:20, 162:7, 162:13, 174:1, 227:24
**electro** [3] - 199:23, 207:10, 207:12
**electronic** [8] - 9:1, 37:6, 51:16, 56:9, 56:14, 62:12, 81:18, 82:13
**electronically** [8] - 29:1, 29:4, 29:7, 29:21, 38:2, 38:4, 39:23, 51:13
**elements** [2] - 71:15, 71:21
**ELIAS** [4] - 1:22, 237:8, 237:20, 237:21
**elsewhere** [1] - 190:13
**email** [2] - 56:18, 56:19
**emailing** [1] - 156:10
**emails** [1] - 5:15
**Emanuel** [6] - 22:18, 74:6, 108:6, 144:6, 203:23, 204:25
**embodied** [1] - 191:9
**Eminem's** [1] - 195:7
**emphasis** [1] - 137:24
**employed** [2] - 138:3, 214:16
**employee** [4] - 100:5, 100:9, 175:23, 175:24
**employees** [1] - 222:1
**employers** [1] - 216:15
**employment** [2] - 138:5, 230:8
**encourage** [1] - 123:15
**end** [14] - 32:24, 57:13, 58:6, 61:1, 62:10, 71:14, 72:7, 105:19, 105:20, 145:9, 160:15, 231:6, 231:22
**ended** [2] - 132:15, 201:11
**ending** [1] - 168:15
**engage** [3] - 213:13, 218:1, 220:20
**engineer** [1] - 148:11
**engineering** [2] - 234:10, 234:23
**Engineering** [1] - 213:25

**English** [2] - 16:15, 16:16
**enjoy** [1] - 86:23
**entail** [1] - 159:13
**enter** [4] - 132:11, 152:1, 152:3, 218:5
**entered** [2] - 44:15, 184:7
**Entertainment** [3] - 216:16, 216:21, 230:14
**enthusiastic** [1] - 78:13
**entire** [12] - 9:1, 63:19, 64:7, 64:8, 64:10, 86:21, 90:3, 149:4, 176:25, 189:23, 200:3, 225:23
**entirety** [3] - 194:3, 198:2, 228:24
**entities** [1] - 155:10
**entitled** [8] - 10:13, 13:14, 22:3, 22:6, 142:5, 164:12, 191:23, 203:19
**environment** [1] - 56:21
**equipment** [7] - 56:22, 61:20, 61:24, 62:1, 62:15, 62:25, 63:2
**ERIC** [1] - 2:10
**ESQ** [9] - 2:5, 2:6, 2:10, 2:15, 2:16, 2:16, 2:17, 2:17, 2:22
**essentially** [3] - 13:11, 38:7, 99:9
**establish** [1] - 46:11
**establishes** [1] - 45:12
**estimate** [2] - 168:5, 168:6
**estimated** [1] - 149:8
**ET** [3] - 1:6, 1:9, 119:8
**et** [1] - 13:18
**Eu** [1] - 196:18
**event** [2] - 182:19, 182:23
**eventually** [10] - 57:7, 74:17, 79:14, 116:20, 116:21, 117:7, 156:11, 157:17, 199:20, 200:9
**evidence** [24] - 6:2, 7:1, 8:6, 46:21, 48:6, 82:21, 90:12, 126:24, 143:19, 152:12, 163:18, 164:14, 169:19,

169:22, 170:3, 170:4, 170:5, 171:12, 175:14, 180:20, 181:23, 187:24, 188:2, 190:20
**exact** [14] - 40:21, 50:10, 50:12, 50:14, 50:19, 61:13, 73:11, 77:23, 78:21, 118:15, 132:4, 174:22, 210:24
**exactly** [5] - 5:1, 13:5, 20:18, 51:18, 211:7
**EXAMINATION** [23] - 15:12, 28:11, 31:14, 32:8, 34:23, 53:3, 80:18, 86:5, 87:19, 107:17, 129:8, 136:4, 136:16, 137:13, 161:6, 178:4, 182:14, 199:1, 209:3, 213:6, 229:15, 233:6, 234:21
**examination** [1] - 198:17
**examine** [1] - 90:17
**examined** [2] - 111:18, 153:13
**examining** [1] - 112:19
**example** [10] - 112:25, 131:24, 140:25, 142:4, 142:8, 148:5, 218:15, 218:19, 223:25, 224:9
**excellent** [1] - 43:16
**exception** [1] - 148:16
**excerpts** [1] - 185:13
**excited** [2] - 56:15, 209:16
**excitement** [2] - 161:1, 209:21
**exclusive** [6] - 91:10, 91:18, 91:21, 100:6, 164:12, 165:18
**exclusivity** [1] - 91:16
**excuse** [1] - 113:3
**Exhibit** [38] - 7:1, 7:5, 9:14, 44:21, 45:22, 46:17, 48:2, 48:7, 50:23, 51:7, 60:18, 60:20, 64:11, 67:23, 72:15, 72:17, 82:19, 82:22, 103:23, 104:12, 104:13, 143:20, 150:22, 152:13, 156:23, 157:19, 157:25,

164:11, 165:7, 168:18, 174:11, 183:25, 185:12, 190:25, 192:10, 192:11, 193:5, 202:3
**exhibit** [8] - 14:11, 143:21, 150:21, 153:8, 169:3, 170:20, 188:15, 202:5
**EXHIBITS** [1] - 3:19
**exhibits** [2] - 87:12, 188:11
**exist** [4] - 6:18, 7:17, 10:11, 42:20
**existed** [2] - 128:18, 206:9
**existing** [1] - 140:18
**exists** [1] - 33:5
**expand** [1] - 225:18
**expectation** [1] - 5:11
**expensive** [1] - 222:25
**experience** [18] - 16:24, 17:12, 18:2, 18:9, 31:18, 32:14, 43:6, 51:12, 67:2, 67:12, 101:16, 111:2, 111:3, 111:4, 111:14, 121:3, 130:23, 131:5
**expert** [3] - 213:11, 217:6, 232:15
**explain** [18] - 20:7, 59:7, 60:22, 62:8, 69:8, 71:15, 77:14, 79:6, 147:20, 200:25, 213:10, 213:12, 214:5, 214:14, 216:12, 217:23, 226:21, 228:16
**explained** [4] - 5:25, 55:14, 59:8, 71:6
**explaining** [1] - 185:23
**exploitation** [3] - 165:2, 175:14, 175:18
**explore** [2] - 223:24, 226:4
**extension** [1] - 29:18
**extent** [5] - 6:23, 7:4, 7:7, 78:9, 162:22
**external** [2] - 61:21, 62:21
**extremely** [1] - 57:13
**Eyes** [1] - 118:5

**F**

**face** [1] - 79:10
**Facebook** [2] - 96:21, 179:6
**facilities** [1] - 19:1
**fact** [14] - 9:15, 45:24, 89:16, 90:14, 111:7, 127:16, 128:18, 162:10, 174:20, 177:16, 186:1, 221:1, 228:21, 230:23
**factor** [1] - 39:5
**facts** [4] - 45:15, 89:22, 90:1, 190:25
**factual** [1] - 89:4
**failure** [5] - 5:24, 9:25, 167:13, 167:14, 234:3
**fair** [11] - 12:16, 38:1, 51:15, 52:5, 52:15, 80:23, 92:21, 97:15, 153:15, 155:15, 186:3
**faith** [1] - 115:5
**falling** [1] - 69:23
**Falling** [1] - 158:10
**fallout** [1] - 10:3
**familiar** [23] - 25:18, 30:25, 31:5, 31:6, 31:7, 40:15, 41:25, 42:2, 42:14, 42:17, 42:24, 43:16, 47:7, 60:17, 75:6, 77:12, 77:22, 77:23, 143:2, 177:25, 183:1, 206:11, 206:12
**familiarity** [4] - 216:1, 216:3, 233:22, 233:25
**family** [6] - 16:5, 98:6, 137:24, 138:6, 138:7, 199:9
**Family** [2] - 140:2, 181:7
**fans** [2] - 160:17, 160:24
**far** [8] - 124:24, 162:22, 179:16, 180:15, 220:2, 220:14, 220:15, 230:2
**fast** [2] - 210:25, 215:20
**father** [2] - 16:6, 199:9
**father-in-law** [1] - 16:6
**favorite** [3] - 54:21, 76:24, 82:8
**featured** [2] - 222:3,

223:6
**features** [1] - 222:1
**featuring** [9] - 191:17, 191:23, 195:2, 195:8, 195:20, 195:24, 196:4, 196:20, 197:13
**February** [2] - 25:13, 206:3
**FEDERAL** [2] - 1:22, 237:22
**feedback** [1] - 20:14
**FEG** [1] - 91:6
**fell** [3] - 19:2, 54:8, 215:8
**felt** [4] - 54:13, 85:18, 92:14, 134:13
**festivals** [1] - 149:15
**few** [16] - 15:16, 21:3, 32:20, 32:21, 37:8, 71:21, 78:17, 136:2, 148:16, 182:13, 185:9, 192:11, 194:4, 198:3, 219:6, 227:10
**field** [1] - 138:1
**Field** [2] - 179:22, 179:24
**fifth** [4] - 195:10, 196:3, 196:22, 197:15
**figured** [2] - 63:2, 64:18
**file** [34] - 7:2, 7:9, 8:9, 8:23, 8:24, 9:4, 9:5, 9:14, 9:15, 10:4, 10:5, 10:15, 10:18, 10:19, 11:5, 11:6, 11:7, 12:13, 30:12, 40:6, 40:7, 40:9, 44:1, 50:12, 50:13, 50:24, 135:6, 155:22, 156:11, 235:9
**filed** [21] - 14:8, 21:18, 73:12, 156:5, 156:6, 156:14, 156:16, 156:19, 157:1, 157:12, 174:7, 174:8, 174:12, 184:8, 204:2, 204:5, 204:8, 204:11, 206:22, 208:13
**files** [17] - 5:10, 5:12, 7:8, 7:16, 7:24, 8:3, 8:17, 8:22, 8:23, 8:25, 12:4, 12:24, 13:5, 13:14, 81:18, 139:18, 140:9
**filing** [4] - 22:2, 22:5,

203:12, 204:17
**fill** [1] - 152:24
**final** [3] - 21:5, 135:19, 188:7
**finale** [1] - 149:3
**finalize** [1] - 66:13
**finally** [6] - 58:3, 69:25, 191:22, 193:2, 211:23, 219:18
**finance** [1] - 17:23
**financial** [1] - 217:9
**fine** [12] - 6:24, 14:1, 15:22, 15:23, 16:1, 51:6, 99:7, 125:24, 127:18, 186:4, 187:13, 187:14
**finger** [1] - 58:9
**fingers** [1] - 64:21
**finish** [3] - 185:22, 186:18, 189:17
**finished** [1] - 72:19
**finishing** [1] - 190:9
**Fire** [3] - 183:18, 183:21, 183:23
**FIRST** [1] - 1:23
**first** [66] - 4:9, 6:16, 7:17, 8:20, 10:25, 16:16, 19:14, 19:15, 21:21, 21:25, 28:20, 41:7, 53:11, 53:24, 54:7, 58:8, 59:24, 59:25, 63:24, 64:12, 64:25, 65:10, 66:20, 66:21, 66:22, 68:3, 72:24, 89:17, 98:8, 98:9, 101:17, 104:3, 106:21, 107:4, 109:6, 109:8, 118:13, 118:24, 130:5, 130:24, 130:25, 136:19, 139:5, 154:16, 158:1, 158:24, 159:3, 159:4, 159:14, 159:20, 161:10, 162:16, 172:6, 172:7, 179:15, 187:11, 190:8, 190:9, 195:1, 195:19, 196:13, 197:6, 202:8, 209:15, 211:8, 211:20
**fit** [1] - 103:14
**five** [6] - 57:19, 73:9, 139:4, 191:9, 197:22, 199:24
**Flags** [1] - 149:19
**Flame** [21] - 22:9,

74:4, 107:24, 128:14, 139:4, 141:1, 142:12, 147:1, 152:23, 158:2, 166:6, 191:11, 191:14, 191:17, 191:20, 191:23, 203:23, 213:16, 213:17, 228:8, 235:13
**flew** [1] - 148:1
**FLOOR** [1] - 2:7
**floor** [2] - 200:3, 208:17
**Floor** [1] - 195:19
**Flow** [1] - 60:1
**fluid** [1] - 147:16
**fly** [2] - 16:7, 148:21
**focus** [1] - 143:25
**focused** [2] - 114:25, 220:7
**folder** [1] - 157:21
**folks** [2] - 51:4, 126:15
**follow** [6] - 25:15, 78:10, 78:14, 95:11, 110:22, 206:5
**followed** [1] - 88:12
**follower** [1] - 78:13
**following** [2] - 45:8, 73:12
**FOR** [4] - 3:3, 3:11, 237:8, 237:9
**FOREGOING** [1] - 237:11
**forgot** [1] - 98:22
**FORM** [1] - 237:13
**form** [7] - 10:19, 40:5, 100:20, 152:2, 152:3, 152:4, 152:24
**formal** [1] - 116:10
**format** [1] - 9:3
**formatting** [1] - 143:18
**formed** [1] - 138:15
**former** [1] - 55:11
**forms** [1] - 58:5
**formulas** [1] - 114:3
**FORSYTH** [1] - 2:7
**Fort** [2] - 180:3, 180:4
**forth** [2] - 40:10, 152:25
**FORTH** [1] - 237:12
**fortunate** [1] - 120:14
**forward** [6] - 11:15, 58:24, 60:25, 137:6, 190:21, 212:25
**foundation** [4] - 127:13, 128:4, 144:13, 152:18
**four** [11] - 57:19,

64:13, 101:7, 101:10, 148:21, 193:17, 199:11, 199:19, 210:22, 211:9
**fourth** [5] - 195:7, 196:1, 196:19, 197:12, 204:13
**Fox** [1] - 214:17
**frame** [5] - 76:19, 94:12, 97:10, 169:5
**Franklin** [1] - 231:19
**fraudulently** [1] - 229:7
**free** [3] - 61:23, 63:3, 70:20
**frequencies** [1] - 72:11
**frequently** [8] - 85:8, 91:22, 94:13, 95:9, 95:19, 96:12, 99:14, 99:16
**Friday** [2] - 119:8, 124:4
**Fridays** [1] - 160:19
**friend** [3] - 56:12, 76:25, 219:10
**friend's** [1] - 219:9
**friends** [14] - 35:17, 54:9, 57:8, 84:16, 86:10, 117:25, 201:10, 201:14, 215:24, 217:15, 219:2, 219:4, 219:24, 220:6
**front** [2] - 125:19, 128:24
**full** [6] - 15:6, 34:17, 87:14, 137:10, 198:20, 213:3
**fuller** [1] - 71:13
**functionality** [10] - 219:7, 219:19, 219:25, 221:8, 221:13, 221:20, 221:24, 222:20, 222:23, 235:21
**functioned** [1] - 178:11
**functions** [2] - 214:8, 232:25
**funnel** [1] - 218:1
**funny** [3] - 77:3, 77:4, 207:22
**furnish** [1] - 44:9
**furnished** [1] - 192:24
**FURTHER** [1] - 237:14
**fused** [1] - 37:6
**fuzzy** [1] - 57:6

**G**

**G-o-t-t-w-a-l-d** [1] - 87:17
**G-r-a-y** [1] - 137:11
**Gabby** [1] - 198:16
**GABRIELLA** [1] - 2:17
**Gaga's** [1] - 195:5
**Gangnam** [2] - 196:13, 197:6
**gap** [1] - 123:10
**gather** [1] - 4:9
**General** [1] - 215:1
**general** [14] - 12:23, 16:23, 24:3, 26:12, 59:25, 62:1, 67:19, 109:14, 111:5, 141:3, 141:4, 216:18, 230:11, 235:6
**generalizing** [1] - 33:5
**generally** [15] - 38:13, 79:6, 89:13, 96:16, 114:5, 128:14, 131:5, 213:12, 214:5, 215:6, 217:12, 223:3, 225:9, 226:12, 227:3
**generate** [4] - 154:9, 160:17, 161:1, 231:8
**generating** [1] - 193:21
**genre** [27] - 74:23, 94:20, 109:20, 114:25, 140:14, 140:17, 140:19, 140:20, 147:16, 176:8, 205:10, 206:16, 207:5, 207:8, 207:12, 223:14, 223:16, 224:4, 225:12, 225:14, 227:12, 227:20, 227:21, 228:1, 228:9, 232:24, 235:10
**genres** [16] - 37:8, 82:11, 94:10, 94:13, 111:2, 140:18, 141:25, 223:11, 223:19, 223:22, 225:14, 225:18, 225:19, 225:21, 225:24
**Gentleman** [1] - 197:8
**gentleman** [5] - 23:4, 23:6, 23:8, 108:24, 109:1
**gentlemen** [10] - 12:1, 22:21, 22:23, 80:3,

90:14, 121:24,
185:1, 190:5,
190:24, 236:2
**Girl** [1] - 118:23
**girl** [1] - 148:21
**given** [15] - 15:22,
17:13, 22:12, 22:24,
23:9, 23:16, 25:13,
41:5, 110:22, 112:4,
133:21, 144:5,
144:8, 206:3, 211:16
**glad** [1] - 212:23
**glance** [3] - 42:10,
42:11, 77:19
**GMA** [3] - 173:9,
173:11, 173:15
**goal** [1] - 186:24
**gonna** [33] - 5:11,
6:25, 7:21, 7:24, 8:3,
8:12, 8:16, 10:23,
12:7, 12:12, 17:9,
26:2, 29:23, 34:11,
53:22, 58:1, 59:11,
60:25, 72:16, 89:22,
90:2, 107:12,
121:21, 125:3,
125:22, 127:9,
127:20, 131:7,
153:16, 169:15,
187:7, 190:15,
190:21
**Google** [6] - 140:11,
140:14, 191:5,
194:5, 231:18,
232:21
**GoonRock** [1] -
195:24
**gospel** [7] - 25:15,
26:16, 26:18,
114:13, 154:17,
206:6, 206:17
**gotta** [1] - 120:14
**GOTTWALD** [1] - 3:7
**Gottwald** [37] - 4:18,
5:7, 5:9, 40:14,
40:17, 41:2, 41:23,
46:5, 46:24, 48:12,
48:20, 49:3, 49:9,
49:23, 50:6, 52:11,
52:15, 52:18, 59:5,
87:6, 87:16, 87:21,
104:7, 105:24,
107:19, 111:4,
111:17, 116:4,
123:25, 129:10,
136:6, 136:18,
136:25, 172:3,
192:19, 192:25,
211:8
**Gottwald's** [3] - 41:16,

41:19, 44:6
**Gotye's** [1] - 196:19
**government** [1] -
185:11
**gradually** [1] - 36:3
**graduated** [1] - 57:19
**Grammy** [10] - 25:12,
25:16, 43:2, 43:3,
43:7, 78:4, 78:7,
78:13, 206:2, 206:5
**Grammys** [3] - 42:24,
78:9, 92:5
**grand** [1] - 149:3
**grant** [1] - 182:9
**grateful** [1] - 16:9
**GRAY** [2] - 1:6, 3:9
**Gray** [7] - 4:5, 22:8,
73:23, 75:16,
107:23, 109:25,
127:9, 128:4, 137:4,
137:6, 137:11,
137:15, 137:17,
139:1, 141:9, 144:6,
144:11, 145:4,
146:18, 149:24,
151:1, 154:2,
154:18, 161:8,
164:8, 165:18,
171:20, 176:5,
178:6, 203:23,
204:20, 213:18,
227:8, 228:8, 232:1,
235:14
**Gray's** [12] - 22:15,
153:8, 158:1, 158:8,
158:11, 162:17,
162:24, 163:9,
165:4, 167:20,
173:20, 227:22
**great** [7] - 58:2, 85:22,
92:15, 98:20,
120:17, 123:16,
134:13
**greatest** [3] - 157:15,
158:20, 158:24
**greatly** [1] - 17:14
**GREENBERG** [1] -
2:21
**grew** [2] - 116:7, 199:9
**groovin'** [1] - 70:7
**Group** [1] - 216:17
**group** [2] - 57:10,
76:14
**growth** [1] - 215:20
**guess** [14] - 7:23,
13:24, 16:25, 24:7,
36:2, 50:19, 99:10,
123:21, 169:18,
176:16, 187:1,
187:10, 189:20,

232:5
**guilty** [1] - 95:9
**guitar** [12] - 18:8,
71:24, 116:6, 116:7,
116:8, 116:9,
116:16, 116:18,
116:23, 116:24,
117:4, 117:9
**guys** [7] - 56:18,
57:10, 70:16,
148:20, 154:12,
160:22, 210:23

## H

**H-u-d-s-o-n** [1] -
198:23
**hair** [1] - 207:5
**half** [4] - 118:12,
171:9, 177:3, 189:3
**Halftime** [1] - 149:24
**Hancock** [1] - 98:10
**hand** [8] - 15:3, 34:12,
64:8, 87:8, 137:7,
198:18, 212:25,
218:3
**handle** [2] - 138:19,
138:22
**hands** [2] - 58:11,
147:6
**HANLEY** [1] - 2:11
**happy** [2] - 126:12,
134:12
**hard** [5] - 33:19,
40:21, 78:21, 120:8,
186:20
**hardware** [1] - 235:3
**Harmony** [1] - 54:24
**Harris** [1] - 56:8
**Hate** [1] - 132:1
**hate** [1] - 187:7
**Hazel** [1] - 118:5
**head** [3] - 67:22,
136:11, 160:2
**heads** [1] - 70:8
**hear** [31] - 12:18,
15:18, 17:3, 17:4,
21:21, 23:13, 23:14,
28:13, 28:14, 31:16,
32:21, 33:2, 52:8,
61:2, 67:24, 68:3,
68:8, 68:9, 72:24,
73:19, 108:10,
108:12, 108:18,
108:21, 109:1,
109:4, 109:6,
136:19, 172:6,
179:3, 223:5
**heard** [91] - 21:18,
21:25, 22:1, 22:3,

22:6, 22:12, 22:15,
22:23, 23:1, 23:8,
23:15, 23:19, 24:21,
24:23, 25:5, 48:20,
48:23, 49:4, 49:8,
50:9, 51:9, 52:13,
52:19, 53:11, 53:13,
53:16, 53:18, 53:19,
60:14, 63:13, 66:18,
66:19, 67:5, 67:10,
71:3, 74:11, 74:12,
74:14, 74:17, 74:18,
74:20, 74:21, 74:22,
75:4, 75:8, 75:10,
75:13, 83:2, 86:17,
89:4, 99:20, 100:11,
100:14, 100:16,
101:4, 102:21,
103:7, 108:2, 108:4,
109:11, 109:13,
111:25, 119:19,
127:4, 136:7, 136:8,
136:20, 142:25,
155:15, 159:20,
172:6, 172:11,
187:3, 202:8,
203:12, 203:16,
203:17, 203:19,
204:1, 204:10,
204:17, 205:21,
205:23, 206:1,
206:22, 208:4,
209:9, 209:20, 227:6
**hearing** [7] - 17:9,
51:23, 52:23, 94:25,
201:12, 208:14
**hearsay** [20] - 90:3,
90:6, 90:15, 127:11,
128:2, 141:5, 141:7,
141:8, 141:19,
141:20, 142:15,
151:13, 151:14,
152:14, 153:2,
160:9, 181:1, 181:5,
182:3, 182:10
**heart** [1] - 196:1
**held** [1] - 102:2
**Hello** [2] - 231:2,
231:6
**hello** [7] - 15:15,
31:16, 32:10, 32:11,
137:16, 161:9, 233:8
**help** [3] - 14:13, 62:5,
235:11
**helped** [5] - 57:3,
130:11, 132:20,
132:21, 148:25
**helpful** [1] - 122:20
**HENRY** [1] - 3:5
**Henry** [11] - 20:9,

20:16, 20:17, 34:20,
99:3, 99:4, 106:13,
133:6, 133:15,
133:18, 203:4
**HEREBY** [1] - 237:10
**HEREINBEFORE** [1] -
237:11
**heretofore** [1] - 4:7
**herself** [1] - 218:20
**hi** [4] - 15:14, 199:4,
209:6, 233:9
**high** [16] - 36:4, 55:5,
55:9, 55:20, 56:1,
56:3, 57:9, 57:20,
62:10, 93:6, 93:17,
93:18, 116:11,
199:14, 213:24
**highest** [1] - 137:21
**highly** [2] - 217:18,
217:20
**hip** [32] - 35:13, 35:22,
36:10, 36:12, 54:19,
55:2, 82:17, 83:3,
94:15, 94:16, 94:21,
140:21, 141:17,
141:22, 141:23,
142:12, 222:8,
223:14, 223:22,
223:23, 223:25,
224:5, 224:8, 224:9,
224:11, 225:10,
225:15, 225:25,
226:2, 226:4, 227:15
**hired** [2] - 177:22,
229:22
**history** [4] - 116:3,
151:22, 198:6, 230:9
**hit** [5] - 91:11, 91:23,
92:11, 161:1, 225:7
**hits** [3] - 157:15,
158:20, 158:24
**Hits** [1] - 42:22
**hmm** [5] - 19:13,
63:23, 78:5, 81:3,
179:9
**hobby** [1] - 220:19
**Hold** [1] - 118:6
**hold** [2] - 28:7, 80:1
**holds** [1] - 171:4
**hole** [1] - 8:10
**holographic** [1] -
216:19
**home** [9] - 88:13,
141:23, 142:4,
142:11, 217:25,
218:14, 221:6,
222:10, 223:18
**honest** [5] - 73:15,
73:17, 73:21, 171:9,
183:11

honesty [1] - 73:18
honing [1] - 56:4
Honor [60] - 4:10, 4:11, 4:22, 4:25, 8:19, 9:13, 10:11, 10:24, 11:21, 12:8, 12:21, 13:6, 13:16, 14:1, 14:22, 17:2, 29:24, 31:12, 32:6, 34:10, 48:1, 49:18, 51:2, 51:5, 74:1, 87:2, 87:11, 90:4, 107:10, 107:16, 122:11, 122:14, 122:20, 123:3, 123:18, 123:22, 123:24, 127:3, 136:24, 137:4, 152:12, 152:14, 153:1, 153:6, 153:13, 170:1, 184:2, 184:21, 185:8, 186:4, 186:11, 188:5, 189:1, 189:14, 189:24, 190:23, 193:8, 233:4, 235:25, 236:10
Honor's [2] - 124:5, 124:18
HONORABLE [1] - 1:4
honored [1] - 43:14
hook [1] - 187:17
hop [32] - 35:13, 35:22, 36:10, 36:12, 54:19, 55:2, 82:17, 83:3, 94:15, 94:16, 94:21, 140:21, 141:17, 141:22, 141:23, 142:12, 222:8, 223:14, 223:23, 223:25, 224:5, 224:8, 224:9, 224:11, 225:10, 225:15, 225:25, 226:2, 226:4, 227:15
hope [4] - 13:22, 185:19, 208:23
hoped [1] - 123:9
hopefully [4] - 129:5, 185:12, 187:20, 188:3
Hornets [1] - 150:4
horrible [1] - 199:21
Horse [76] - 7:4, 20:4, 20:5, 20:8, 20:24, 21:6, 21:14, 39:25, 47:8, 47:21, 48:17, 53:23, 60:8, 60:11, 60:24, 61:1, 61:2,

62:24, 65:20, 68:8, 72:16, 73:4, 73:10, 78:19, 79:17, 96:7, 99:21, 99:24, 100:1, 100:12, 103:5, 104:11, 104:21, 106:23, 107:6, 115:19, 115:22, 115:25, 121:20, 129:13, 129:14, 129:16, 131:11, 131:13, 132:6, 132:10, 132:11, 132:17, 133:1, 133:8, 133:16, 133:19, 134:5, 156:16, 156:20, 159:2, 159:21, 174:9, 174:12, 174:18, 192:14, 192:15, 192:20, 192:25, 193:4, 200:22, 200:23, 201:1, 201:6, 202:7, 203:5, 208:12, 210:5, 210:9, 211:23
horse [2] - 210:9, 210:14
Hot [8] - 42:10, 42:12, 77:17, 77:20, 114:2, 114:6, 118:23, 206:15
hour [8] - 107:14, 154:24, 160:23, 186:13, 189:2, 189:3, 189:9, 230:1
hour-and-a-half [1] - 189:3
hourly [1] - 229:25
hours [10] - 120:7, 120:13, 160:23, 193:12, 193:16, 193:19, 193:20, 210:23, 230:2, 230:4
house [3] - 56:14, 91:11, 214:7
Houston [2] - 106:9, 172:5
HUDSON [1] - 3:14
Hudson [26] - 20:19, 20:22, 45:11, 50:7, 60:5, 68:17, 69:6, 69:9, 71:1, 103:4, 103:8, 106:17, 119:1, 132:25, 172:3, 172:4, 189:9, 189:17, 192:19, 192:23, 193:4, 198:15, 198:22, 199:3, 209:5, 211:19

human [2] - 193:25, 229:2
humming [1] - 64:22
humming) [3] - 63:9, 64:8, 64:22
hundred [1] - 50:9
hurt [2] - 73:16, 73:21
husband [27] - 138:8, 138:24, 143:17, 144:6, 145:4, 146:24, 148:6, 148:25, 149:5, 149:8, 150:10, 155:16, 155:21, 156:22, 157:7, 159:1, 171:25, 173:2, 173:8, 173:12, 176:23, 177:22, 178:6, 179:17, 179:20, 181:8, 184:3
husband's [8] - 145:21, 148:14, 151:18, 155:2, 156:25, 172:11, 172:14, 180:9
hype [1] - 154:9

## I

idea [1] - 59:13
ideas [2] - 99:18, 131:6
identified [3] - 197:19, 197:20, 211:20
identify [6] - 104:20, 193:22, 197:21, 198:9, 198:12, 202:5
identifying [1] - 44:25
idle [1] - 4:14
ignore [1] - 232:17
ignoring [1] - 83:2
immediately [2] - 156:5, 222:21
impact [1] - 231:15
implemented [1] - 229:8
implicates [2] - 5:24, 9:6
implication [1] - 12:13
implied [1] - 232:18
important [2] - 52:9, 220:17
impossible [1] - 126:9
improper [3] - 124:15, 152:15, 194:6
IN [1] - 237:8
in-house [2] - 91:11, 214:7
in-person [1] - 41:3

in-store [1] - 181:8
inaccuracies [3] - 89:4, 89:11, 89:19
inaccuracy [1] - 89:8
Inc [2] - 192:17, 192:21, 192:24
inception [1] - 163:24
include [10] - 38:23, 84:19, 84:20, 139:14, 139:16, 161:22, 161:24, 162:5, 162:7, 168:12
included [2] - 89:22, 169:3
includes [6] - 60:15, 114:4, 124:10, 124:11, 147:2, 173:23
including [16] - 45:15, 89:5, 138:20, 140:17, 147:24, 148:13, 168:13, 169:2, 174:4, 187:23, 194:9, 194:14, 194:19, 195:13, 196:7, 196:25
income [7] - 163:14, 163:21, 164:3, 165:1, 165:15, 175:14, 184:11
Incorporated [3] - 41:20, 44:6, 44:15
incorporates [1] - 72:21
increase [2] - 229:4, 229:7
incredible [2] - 67:15, 209:16
incredibly [2] - 67:13, 225:19
independent [9] - 6:1, 6:21, 7:18, 7:24, 8:7, 8:21, 9:15, 10:7, 100:10
INDEX [1] - 3:1
Indiana [1] - 179:23
indicate [3] - 151:12, 223:21, 229:9
indicated [3] - 153:22, 185:21, 190:12
indicates [1] - 197:25
individual [7] - 75:4, 152:2, 171:17, 171:24, 173:5, 173:14, 204:13
individuals [14] - 74:11, 86:8, 172:13, 172:17, 172:21, 172:24, 173:18,

173:21, 174:1, 203:6, 204:1, 204:4, 204:7, 225:2
industry [1] - 59:1
inference [4] - 5:9, 8:14, 11:22, 13:4
inferences [1] - 9:25
inflate [1] - 232:5
inflated [1] - 194:6
inflating [1] - 232:8
influences [1] - 121:5
information [10] - 11:15, 114:3, 128:5, 152:4, 156:6, 180:16, 218:5, 218:12, 218:21, 231:11
infringement [2] - 159:12, 208:14
infringing [2] - 45:13, 45:25
initial [5] - 61:8, 69:8, 69:11, 71:7, 208:13
initiate [1] - 198:8
initiated [6] - 197:25, 198:5, 198:10, 228:20, 228:22, 229:2
input [2] - 147:3, 162:21
insert [1] - 143:24
inside [3] - 143:9, 143:23, 232:21
inspiration [1] - 94:6
inspired [4] - 160:25, 210:23, 210:25, 211:17
inspires [1] - 94:8
installed [2] - 39:17, 39:20
instance [4] - 96:15, 112:22, 228:23, 234:1
instances [1] - 194:5
instead [2] - 197:24, 231:17
Institute [1] - 56:8
instructions [4] - 5:7, 123:7, 123:9, 186:22
instrument [1] - 62:14
Instrument [1] - 62:18
instrumental [55] - 7:3, 7:4, 10:17, 10:18, 20:9, 21:14, 29:12, 33:10, 33:15, 38:14, 39:23, 39:24, 41:5, 47:15, 47:20, 47:24, 48:9, 48:11, 48:14, 48:17, 48:24, 50:3, 51:9, 51:13,

52:13, 52:16, 52:21, 53:8, 53:12, 53:19, 60:11, 70:18, 71:11, 80:23, 99:23, 100:1, 100:11, 101:21, 102:10, 102:25, 103:14, 129:24, 132:9, 133:7, 133:16, 135:5, 148:2, 148:7, 159:19, 202:6, 209:9, 211:2, 211:5, 211:17, 228:12

**instrumentals** [1] - 51:24
**instrumentation** [2] - 131:16, 228:14
**instruments** [2] - 62:13, 129:20
**insure** [1] - 147:9
**integrity** [2] - 73:18, 208:20
**intend** [6] - 5:8, 5:23, 6:2, 6:17, 8:2, 13:3
**intent** [1] - 220:24
**intention** [2] - 7:13, 7:15
**intentionally** [1] - 82:25
**interact** [3] - 198:7, 218:8, 218:9
**interacted** [1] - 220:2
**interaction** [1] - 220:15
**Interactive** [1] - 214:17
**interest** [5] - 35:10, 54:16, 160:14, 193:4, 212:1
**interested** [14] - 35:13, 54:18, 69:23, 71:18, 185:1, 217:5, 218:15, 221:15, 221:22, 223:11, 223:22, 225:15, 225:25, 232:25
**Interface** [1] - 62:18
**interface** [1] - 62:22
**internally** [1] - 30:16
**Internet** [2] - 217:2
**interning** [2] - 56:19, 57:4
**internship** [1] - 56:9
**interrogatory** [1] - 127:8
**interrupting** [1] - 34:6
**intersperse** [1] - 155:3
**interview** [10] - 93:1, 154:13, 155:4, 176:25, 177:2,

177:3, 177:4, 209:12, 210:22
**interviewed** [1] - 88:8
**interviews** [10] - 154:23, 155:1, 155:6, 155:8, 176:23, 177:6, 177:8, 177:10, 178:20, 179:1
**intimate** [1] - 216:3
**intro** [13] - 49:12, 64:18, 64:25, 65:18, 100:18, 101:7, 101:13, 101:17, 115:15, 115:18, 115:21, 115:24, 116:1
**introduce** [2] - 171:12, 185:10
**introduced** [2] - 41:1, 119:18
**introduction** [2] - 41:3, 211:21
**invite** [1] - 146:4
**invited** [1] - 69:1
**involved** [25] - 11:2, 60:8, 68:24, 68:25, 71:4, 71:5, 73:5, 73:8, 103:4, 103:6, 130:7, 132:23, 133:4, 143:10, 143:13, 146:11, 155:16, 159:6, 165:13, 177:16, 201:5, 203:9, 204:13, 216:19, 235:1
**involvement** [7] - 49:3, 49:5, 143:16, 155:19, 162:19, 181:18, 230:16
**involves** [1] - 223:11
**involvment** [1] - 71:6
**ironically** [1] - 147:24
**IS** [1] - 237:14
**issue** [23] - 5:2, 5:3, 5:4, 5:14, 5:15, 5:17, 6:1, 7:18, 13:11, 13:23, 13:24, 17:7, 46:6, 122:13, 124:3, 124:12, 124:22, 128:15, 144:1, 158:18, 226:22, 226:24
**issued** [2] - 139:1, 139:3
**issues** [6] - 4:23, 17:14, 123:21, 124:1, 125:17, 215:3
**Item** [1] - 4:3

**items** [1] - 215:14
**iterations** [1] - 10:20
**itself** [3] - 67:7, 184:17, 184:19
**iTune** [1] - 127:6
**iTunes** [20] - 31:5, 31:7, 31:9, 43:17, 96:2, 96:4, 127:5, 128:14, 140:11, 140:13, 140:25, 141:15, 141:23, 142:4, 142:12, 142:19, 160:1, 160:3, 160:15, 161:3

## J

**J's** [2] - 21:11, 203:9
**Jackson** [1] - 180:3
**Jacob** [1] - 193:8
**JACOB** [1] - 2:17
**January** [2] - 191:10, 191:13
**jargon** [1] - 167:17
**Jay** [2] - 98:3, 132:3
**Jazz** [2] - 89:7
**Jeang** [1] - 185:6
**JEFFREY** [1] - 2:16
**Jennifer** [1] - 195:19
**Jepsen's** [1] - 196:15
**job** [6] - 113:7, 142:3, 215:7, 215:8, 233:25, 235:7
**jobs** [2] - 56:20, 216:5
**John** [2] - 88:9, 191:17, 191:23
**Johnny** [3] - 231:18, 234:12, 234:15
**joint** [8] - 45:25, 190:25, 192:9, 192:11, 220:24, 222:22, 222:24
**Jordan** [1] - 106:9
**journalist** [1] - 88:8
**Jovi** [1] - 19:9
**joy** [1] - 209:22
**joyful** [1] - 235:19
**Joyful** [71] - 21:17, 21:19, 21:21, 22:3, 53:8, 53:17, 53:19, 74:18, 74:22, 75:12, 82:24, 86:17, 109:6, 109:25, 110:5, 127:21, 128:6, 128:11, 143:25, 144:17, 144:25, 148:5, 148:13, 148:24, 149:1, 150:10, 150:16, 155:6, 159:19,

161:18, 161:24, 162:7, 162:13, 164:17, 164:21, 164:23, 165:2, 166:11, 166:18, 172:11, 172:21, 172:25, 173:23, 174:4, 176:22, 177:5, 178:7, 178:16, 178:18, 179:3, 180:10, 181:21, 191:8, 191:11, 191:14, 191:17, 191:20, 191:24, 203:13, 206:22, 207:24, 208:1, 208:10, 213:15, 227:1, 227:14, 227:22, 227:24, 228:6, 228:9, 235:16

**judge** [1] - 125:9
**JUDGE** [1] - 1:4
**Judge** [8] - 13:20, 79:23, 90:9, 125:6, 126:2, 126:19, 129:3, 182:11
**Juicy** [6] - 21:9, 21:11, 72:7, 106:9, 203:7, 203:9
**July** [4] - 174:23, 175:2, 175:8, 175:11
**JULY** [3] - 1:15, 4:1, 237:18
**juncture** [3] - 125:25, 126:13, 171:15
**June** [1] - 175:3
**juries** [1] - 187:22
**Juris** [1] - 214:2
**jury** [47] - 5:7, 14:16, 14:19, 20:7, 48:7, 51:4, 51:7, 60:19, 60:22, 66:9, 72:17, 80:8, 80:15, 122:6, 123:7, 123:9, 125:19, 129:4, 129:6, 139:16, 143:7, 147:20, 168:17, 171:12, 185:4, 185:5, 185:23, 186:21, 187:6, 188:3, 188:13, 190:1, 190:4, 190:24, 200:25, 201:5, 213:23, 214:5, 215:17, 216:13, 226:13, 226:21, 227:3, 228:16, 232:17, 234:8, 236:7

**jury's** [2] - 125:23, 225:17
**Justin** [3] - 195:1, 195:10, 196:3

## K

**Kahn** [6] - 178:3, 190:22, 209:2, 233:10, 234:11, 234:19
**KAHN** [74] - 2:5, 3:5, 3:9, 3:13, 3:15, 3:17, 5:23, 6:10, 6:12, 6:15, 7:15, 8:4, 8:6, 8:14, 11:20, 11:25, 12:8, 12:15, 12:20, 12:23, 13:20, 14:5, 14:14, 74:1, 137:4, 137:14, 141:9, 141:14, 141:21, 142:18, 144:15, 144:22, 151:15, 152:12, 152:20, 153:6, 153:13, 153:20, 153:24, 154:2, 154:4, 159:25, 160:12, 161:4, 171:20, 178:5, 179:12, 180:14, 181:4, 181:11, 182:11, 184:13, 184:21, 185:8, 186:3, 187:4, 187:14, 187:21, 188:5, 188:15, 188:22, 189:9, 190:3, 190:23, 209:4, 210:19, 212:18, 229:16, 232:15, 232:19, 233:2, 234:20, 234:22, 235:24
**Kansas** [3] - 179:21, 183:12, 183:14
**Kanye** [1] - 98:2
**Karl** [3] - 14:22, 15:8, 132:16
**KARL** [1] - 3:12
**Kasz** [18] - 41:20, 44:6, 44:9, 44:15, 45:11, 45:12, 45:17, 46:1, 46:4, 46:11, 47:17, 107:1, 107:3, 107:5, 192:24
**Katheryn** [3] - 45:10, 192:22, 193:4
**KATY** [1] - 1:9
**Katy** [39] - 4:5, 19:9,

19:11, 20:10, 20:15, 20:22, 44:16, 50:7, 50:10, 68:12, 68:22, 68:23, 69:2, 69:13, 70:23, 78:18, 91:2, 105:7, 105:19, 118:6, 118:8, 118:11, 118:25, 120:3, 120:18, 132:11, 132:13, 134:6, 172:4, 192:23, 201:10, 201:25, 202:11, 202:25, 203:4, 209:21, 209:23, 211:19

**KAYIRA** [38] - 2:9, 2:10, 8:19, 10:13, 10:24, 11:13, 28:12, 28:18, 30:5, 31:11, 32:6, 32:9, 33:23, 34:10, 34:24, 44:14, 44:20, 45:1, 45:10, 45:21, 45:24, 46:16, 46:22, 47:6, 48:1, 48:8, 49:22, 50:5, 50:23, 51:8, 52:25, 80:19, 82:19, 82:23, 85:6, 85:16, 85:25, 87:2

**Kayira** [16] - 8:15, 8:18, 10:12, 12:17, 28:6, 53:7, 53:22, 54:15, 55:11, 59:4, 60:10, 68:11, 76:3, 77:11, 78:3, 80:17

**Kayira's** [1] - 10:3

**keep** [16] - 47:3, 58:25, 64:10, 69:19, 71:17, 80:4, 85:18, 90:18, 92:11, 96:23, 121:4, 122:2, 151:22, 190:17, 236:5

**Kelly** [2] - 118:4, 118:5

**Kemosabee** [1] - 97:24

**Kemper** [2] - 183:12, 183:21

**Kentucky** [1] - 180:4

**Kenya** [1] - 16:5

**kept** [7] - 57:7, 64:21, 117:17, 151:24, 152:1, 177:19, 212:23

**Kesha** [1] - 91:8

**key** [3] - 93:5, 93:16, 93:17

**keyboard** [9] - 61:21, 62:17, 62:19, 62:21, 63:5, 63:10, 63:25, 67:15

**Kimbra** [1] - 196:20

**kind** [57] - 12:3, 19:3, 30:6, 35:25, 49:10, 55:23, 56:15, 56:24, 57:6, 58:6, 58:10, 58:21, 59:10, 59:14, 62:17, 63:4, 63:10, 65:15, 65:16, 65:20, 67:19, 69:13, 69:15, 69:21, 69:23, 70:7, 70:24, 71:23, 73:16, 77:4, 78:12, 79:8, 79:10, 79:13, 81:16, 82:8, 83:1, 84:3, 96:21, 104:25, 111:15, 114:18, 135:15, 134:16, 156:8, 156:9, 185:17, 200:4, 200:12, 201:13, 214:5, 215:14, 218:13, 226:8

**kinda** [2] - 54:12, 70:3

**kinds** [1] - 117:15

**Kiss** [1] - 40:24

**Kissed** [1] - 118:23

**Kitty** [1] - 192:21

**knowing** [1] - 79:9

**knowledge** [21] - 26:15, 121:17, 121:19, 133:18, 165:21, 166:22, 172:10, 172:13, 172:16, 172:20, 172:24, 173:5, 173:14, 174:3, 178:13, 184:16, 230:22, 232:8, 234:1, 235:4, 235:6

**known** [31] - 20:17, 22:9, 22:19, 22:20, 23:5, 31:1, 35:2, 35:5, 60:5, 73:23, 74:4, 74:6, 74:8, 82:24, 85:7, 94:22, 98:23, 106:9, 107:24, 108:7, 108:23, 117:21, 119:15, 129:21, 143:4, 172:4, 192:23, 203:23, 203:24, 204:14, 205:9

**knows** [3] - 44:18, 187:20, 235:12

**Knox** [1] - 180:4

**KNUPP** [1] - 2:15

**Kobalt** [1] - 192:17

# L

**L.A** [1] - 132:2

**label** [21] - 18:25, 57:11, 92:2, 95:24, 97:20, 97:23, 98:2, 111:22, 121:12, 138:8, 138:9, 138:15, 138:20, 155:17, 161:11, 161:16, 161:19, 162:2, 163:4, 163:6, 199:18

**labels** [3] - 91:12, 120:22, 220:23

**lack** [1] - 77:5

**ladies** [7] - 80:3, 90:14, 121:24, 185:1, 190:5, 190:24, 236:2

**Lady** [2] - 132:2, 195:5

**Lambert** [7] - 22:18, 74:6, 75:18, 108:6, 144:6, 203:23, 204:25

**land** [1] - 154:12

**landing** [1] - 218:1

**language** [2] - 16:16, 131:23

**lap** [2] - 148:10, 148:11

**large** [4] - 169:16, 183:24, 225:19, 226:16

**larger** [1] - 179:19

**largest** [1] - 142:11

**last** [21] - 15:6, 16:8, 17:9, 34:17, 87:15, 87:17, 122:24, 124:9, 125:11, 125:14, 133:11, 147:24, 147:25, 150:16, 150:17, 154:23, 158:14, 168:15, 198:21, 213:3, 227:6

**Last** [1] - 119:8

**late** [2] - 125:3, 189:12

**laudatory** [1] - 186:24

**launch** [3] - 97:7, 97:9, 97:18

**launched** [2] - 191:7, 222:23

**LAURA** [4] - 1:22, 237:8, 237:20, 237:21

**LAUREN** [1] - 2:6

**Lauren** [1] - 195:24

**LAW** [1] - 2:9

**law** [1] - 16:6

**laws** [2] - 215:16, 216:6

**lawsuit** [58] - 21:18, 21:25, 22:2, 22:5, 22:13, 22:16, 22:24, 23:2, 23:9, 23:17, 23:20, 23:23, 24:21, 24:23, 25:5, 73:12, 73:14, 109:2, 109:4, 109:7, 109:12, 134:9, 134:11, 155:22, 156:5, 156:12, 156:14, 156:16, 156:19, 157:2, 157:9, 157:12, 166:22, 166:25, 167:2, 167:6, 167:10, 167:15, 174:7, 174:8, 174:20, 174:23, 175:19, 184:5, 184:8, 184:17, 203:12, 203:17, 203:20, 204:2, 204:5, 204:8, 204:10, 204:18, 205:22, 206:8, 206:21, 208:13

**lawyer** [14] - 58:12, 58:14, 159:3, 159:6, 159:10, 159:11, 159:14, 167:17, 184:14, 214:3, 214:6, 233:20, 233:22, 234:8

**lawyers** [1] - 104:25

**lay** [4] - 45:19, 127:13, 128:3, 152:18

**layers** [3] - 72:2, 72:3, 72:21

**layman's** [1] - 220:19

**lead** [1] - 200:10

**leading** [1] - 10:20

**learn** [5] - 56:23, 57:3, 73:22, 80:22, 98:8

**learned** [3] - 56:25, 57:2, 98:9

**learning** [2] - 57:14, 59:20

**least** [10] - 6:4, 6:5, 10:13, 100:15, 157:14, 179:7, 226:18, 227:5, 230:21

**leave** [3] - 12:12, 155:16, 188:21

**leaving** [1] - 155:25

**Lecrae** [24] - 23:4, 23:5, 23:15, 23:16, 23:19, 23:23, 75:5,

108:23, 108:24, 110:1, 110:11, 144:6, 148:17, 172:17, 191:17, 191:23, 204:14, 205:3, 213:16, 213:20, 228:4

**lectern** [1] - 122:17

**left** [4] - 128:12, 185:8, 216:15, 223:19

**Legal** [5] - 214:19, 214:23, 215:2, 216:17, 216:22

**legal** [4] - 167:17, 214:13, 216:8, 234:2

**length** [2] - 17:21, 154:25

**Lepera** [2] - 193:6, 198:13

**LEPERA** [33] - 2:15, 9:13, 13:2, 13:16, 45:14, 46:2, 46:13, 46:23, 122:10, 123:3, 186:4, 186:6, 186:11, 186:13, 186:19, 186:25, 187:2, 187:13, 187:18, 188:18, 188:21, 188:25, 189:7, 189:10, 189:14, 189:19, 189:23, 190:2, 193:7, 194:22, 198:15, 212:23, 236:9

**less** [2] - 98:17, 111:13

**letter** [1] - 5:16

**level** [7] - 93:6, 93:17, 93:18, 137:21, 216:1, 216:3, 233:22

**Lewis's** [1] - 197:13

**liability** [4] - 45:13, 187:24, 216:8, 234:2

**libs** [1] - 132:22

**Lie** [1] - 195:8

**life** [7] - 58:1, 94:11, 200:3, 208:16, 208:21, 208:24

**Lifeway** [2] - 140:3, 181:8

**light** [1] - 5:10

**likely** [3] - 131:1, 221:21, 235:13

**limine** [1] - 124:18

**limit** [1] - 160:10

**line** [9] - 29:23, 49:17, 105:19, 105:20, 106:4, 106:17, 123:11, 144:4,

147:12
**liner** [10] - 143:4, 143:7, 143:14, 143:23, 144:10, 144:25, 146:8, 146:9, 146:11, 165:7
**lines** [2] - 127:4, 127:14
**link** [3] - 77:1, 77:2, 224:6
**linked** [2] - 182:7, 183:22
**links** [9] - 84:16, 84:19, 84:25, 85:8, 85:14, 85:15, 86:7, 86:9, 86:16
**list** [20] - 141:2, 147:11, 147:14, 147:17, 148:25, 149:2, 150:21, 158:2, 158:8, 176:16, 176:17, 219:14, 223:18, 224:15, 225:14, 225:16, 225:18, 225:23, 226:1, 226:8
**listed** [10] - 105:7, 105:23, 106:1, 106:6, 106:14, 106:18, 107:1, 146:16, 168:21, 197:22
**listen** [40] - 19:25, 20:2, 24:16, 24:18, 36:7, 43:25, 70:18, 82:1, 82:2, 82:3, 82:4, 82:10, 86:16, 86:20, 92:19, 92:24, 93:6, 94:2, 94:10, 95:12, 96:25, 97:4, 99:16, 106:10, 109:14, 109:15, 109:17, 110:20, 111:7, 111:11, 111:13, 115:10, 200:18, 200:20, 205:15, 207:15, 207:18, 207:24, 208:1
**listened** [21] - 8:24, 21:23, 21:25, 27:19, 36:7, 36:10, 53:14, 74:24, 75:1, 92:21, 97:1, 109:8, 111:8, 159:2, 193:25, 197:24, 198:10, 198:12, 228:24, 228:25, 229:10
**listener** [2] - 71:17, 72:13

**listening** [14] - 55:3, 55:5, 55:8, 56:13, 66:14, 68:3, 82:6, 93:18, 93:22, 94:13, 111:1, 113:6, 113:8, 230:21
**listing** [1] - 225:14
**lists** [7] - 147:15, 147:16, 176:6, 176:11, 176:15, 176:18, 176:19
**literally** [3] - 59:22, 64:21, 132:3
**litigation** [15] - 7:9, 53:16, 53:18, 53:20, 74:15, 74:18, 74:23, 75:6, 75:10, 75:14, 176:18, 176:20, 177:14, 177:17, 217:10
**litigation's** [1] - 177:19
**live** [15] - 14:25, 75:16, 75:18, 75:20, 75:23, 160:16, 160:20, 163:11, 188:3, 200:6, 204:23, 204:25, 205:3, 205:5, 207:20
**Live** [4] - 116:21, 116:24, 117:4, 117:12
**lived** [1] - 208:18
**livelihood** [1] - 81:24
**living** [3] - 81:25, 88:3, 116:8
**LLC** [2] - 2:9, 192:13
**LMFAO's** [1] - 195:23
**load** [1] - 226:10
**loaded** [2] - 224:14, 225:1
**loading** [1] - 222:22
**local** [2] - 154:8, 154:13
**log** [3] - 218:3, 218:5, 218:21
**Logan** [4] - 170:9, 171:1, 179:7, 179:15
**logistics** [2] - 138:19, 147:11
**look** [56] - 25:24, 26:1, 26:3, 26:5, 26:11, 26:18, 27:20, 27:22, 30:18, 42:4, 42:7, 66:7, 77:3, 77:7, 77:9, 77:15, 77:25, 80:25, 81:4, 81:18, 95:7, 95:13, 95:23, 96:2, 96:8, 112:24, 112:25, 114:2,

114:5, 114:6, 114:8, 123:10, 143:20, 144:25, 150:23, 165:7, 167:4, 168:18, 168:21, 170:13, 175:1, 175:6, 183:7, 206:13, 206:14, 206:15, 206:17, 207:22, 208:9, 218:16, 221:3, 225:13
**looked** [15] - 80:22, 95:6, 96:4, 98:19, 104:16, 112:7, 114:13, 115:1, 127:16, 170:18, 174:11, 209:17, 217:4, 222:18, 231:1
**looking** [11] - 42:8, 56:16, 58:4, 95:19, 111:19, 126:10, 143:22, 171:3, 222:17, 223:11, 231:25
**looks** [2] - 151:9, 171:9
**loop** [2] - 70:19, 211:17
**looping** [2] - 64:4, 64:6
**Lopez** [1] - 195:19
**LOS** [6] - 1:16, 1:23, 2:19, 2:24, 4:1, 237:4
**Los** [2] - 16:7, 61:6
**LOUIS** [1] - 2:8
**love** [5] - 19:2, 54:8, 58:1, 120:14, 120:15
**Love** [2] - 132:1, 195:8
**loved** [4] - 57:2, 199:10, 200:9, 201:13
**lower** [1] - 49:10
**lowest** [1] - 216:8
**luck** [2] - 58:10, 79:14
**luckily** [1] - 95:10
**lucky** [1] - 26:7
**Ludacris** [2] - 195:2, 196:4
**LUKASZ** [1] - 3:7
**Lukasz** [3] - 40:13, 87:16, 105:23
**Luke** [24] - 20:9, 40:14, 41:2, 41:6, 41:10, 41:11, 46:15, 47:24, 59:4, 59:10, 61:17, 65:23, 66:15, 68:18, 68:23, 68:25, 69:2, 69:12, 71:9,

98:23, 201:17, 201:25, 203:4
**Lunch** [1] - 123:20
**lunch** [3] - 107:11, 121:22, 129:12
**Luxman** [1] - 41:15
**lyric** [3] - 18:6, 133:4, 210:18
**lyrical** [3] - 101:21, 103:12, 103:14
**lyrics** [31] - 20:14, 20:23, 70:25, 82:25, 83:2, 83:11, 86:18, 86:23, 103:9, 103:13, 105:10, 105:15, 105:22, 106:2, 106:7, 106:11, 106:14, 106:18, 131:15, 132:21, 133:5, 144:23, 203:1, 209:25, 210:1, 210:2, 210:23, 211:4, 211:14, 211:18
**Lyrics** [2] - 191:20, 191:24

**M**

**M/V** [3] - 196:13, 197:6, 197:9
**Macklemore** [1] - 197:12
**magazine** [2] - 41:25, 89:15
**mail** [1] - 156:10
**main** [1] - 221:11
**mainstream** [2] - 54:25, 142:12
**maintain** [1] - 152:6
**maintaining** [1] - 152:21
**maintenance** [1] - 230:17
**major** [6] - 91:12, 199:18, 215:10, 220:23, 221:23
**maker** [1] - 91:11
**manage** [2] - 142:19, 147:1
**managed** [2] - 167:22, 167:23
**management** [3] - 105:1, 120:24, 154:6
**manager** [14] - 146:19, 146:23, 147:1, 147:8, 147:9, 151:18, 154:6, 162:17, 162:24,

164:2, 165:4, 165:23, 167:20, 180:8
**managing** [4] - 163:9, 163:11, 163:14, 165:13
**Manhattan** [1] - 116:14
**Mannes** [1] - 116:12
**manually** [4] - 139:18, 140:9, 140:16, 148:12
**manufacturing** [1] - 138:21
**March** [11] - 61:10, 129:25, 168:7, 168:8, 168:10, 191:22, 191:25, 192:2, 192:4, 192:6, 192:8
**MARCUS** [1] - 1:6
**Marcus** [13] - 4:5, 22:8, 73:23, 107:23, 137:17, 144:6, 148:25, 160:24, 181:8, 203:22, 204:20, 213:18, 228:8
**Marcus's** [1] - 158:1
**Mardel's** [1] - 140:3
**mark** [3] - 14:11, 170:20, 188:10
**marked** [2] - 103:23, 153:8, 190:24
**market** [2] - 37:13, 160:14
**marketed** [2] - 37:16, 192:15
**marketing** [10] - 138:20, 138:22, 139:14, 141:9, 142:1, 142:9, 158:23, 160:2, 180:8, 212:11
**marketplace** [1] - 72:14
**marriage** [1] - 137:24
**married** [4] - 137:17, 137:19, 145:25, 146:2
**Martin** [19] - 14:22, 15:8, 16:22, 27:4, 106:4, 106:6, 117:19, 117:21, 117:22, 117:23, 118:3, 132:16, 201:17, 212:23, 212:24, 213:5, 213:8, 217:23
**Master** [3] - 56:10,

56:11, 57:4
**mastering** [2] - 132:24, 147:4
**match** [1] - 219:15
**material** [1] - 126:25
**materials** [2] - 80:22, 185:16
**math** [2] - 18:17, 63:21
**matter** [7] - 16:23, 19:23, 24:3, 26:13, 73:20, 127:21, 188:19
**matters** [1] - 9:11
**Max** [12] - 16:22, 27:4, 106:4, 106:6, 117:19, 117:22, 118:3, 132:16, 201:17, 202:1, 203:4
**mean** [73] - 8:15, 11:25, 12:3, 18:2, 18:7, 30:3, 30:4, 31:21, 31:24, 32:18, 33:17, 36:20, 41:2, 43:13, 47:11, 47:12, 52:17, 57:6, 58:6, 60:2, 64:5, 67:9, 71:1, 71:16, 72:6, 72:9, 73:16, 74:2, 78:12, 79:13, 94:18, 97:11, 97:17, 98:13, 102:12, 102:14, 102:24, 103:19, 120:6, 121:3, 133:10, 164:10, 165:6, 176:12, 177:11, 180:10, 186:5, 189:11, 189:16, 193:24, 194:2, 197:23, 198:1, 198:4, 201:1, 201:11, 201:17, 203:7, 205:8, 205:10, 207:10, 209:15, 210:1, 210:15, 210:24, 211:16, 215:11, 224:3, 226:7, 226:8, 228:23, 229:3, 235:6
**meaning** [2] - 176:2, 218:4
**MEANS** [1] - 237:13
**means** [16] - 9:2, 16:24, 17:13, 17:19, 17:22, 18:4, 93:20, 97:8, 116:8, 147:20, 186:8, 194:1, 194:7, 214:9, 224:4, 228:19
**meantime** [1] - 122:2
**mechanism** [2] -

219:12, 225:4
**Media** [8] - 112:13, 113:4, 113:13, 113:22, 114:8, 214:17, 214:25
**media** [5] - 147:3, 154:6, 154:8, 177:12, 181:25
**meet** [11] - 56:6, 56:11, 108:7, 108:16, 117:19, 123:12, 125:23, 126:15, 145:20, 185:20, 207:5
**meeting** [4] - 68:12, 69:8, 69:11, 117:22
**mega** [1] - 169:16
**melodies** [9] - 20:14, 70:20, 70:21, 70:23, 70:25, 103:11, 131:7, 132:21, 202:24
**melody** [13] - 18:6, 20:21, 29:10, 38:15, 38:17, 101:21, 101:22, 103:14, 131:16, 131:17, 132:22, 133:4
**member** [4] - 36:25, 37:20, 84:10, 84:11
**Memorial** [1] - 182:17
**memory** [2] - 61:13, 81:16
**mention** [1] - 147:18
**mentioned** [24] - 19:11, 62:15, 106:22, 118:8, 127:7, 139:13, 142:5, 149:24, 150:14, 154:5, 160:2, 174:8, 179:25, 181:12, 182:16, 183:12, 188:8, 189:1, 190:12, 203:3, 222:9, 224:25, 227:2, 232:4
**mentor** [1] - 59:20
**menu** [3] - 140:17, 140:18, 225:23
**merchandising** [2] - 138:21, 147:12
**messin'** [4] - 36:3, 55:18, 63:5, 63:8
**met** [22] - 22:10, 22:21, 23:5, 41:7, 57:7, 57:9, 59:4, 59:10, 59:15, 59:24, 59:25, 98:5, 107:24, 108:24, 117:24,

119:21, 145:21, 148:22, 200:8, 201:9, 204:4
**metaphor** [3] - 210:8, 210:10, 210:16
**metrics** [2] - 124:8, 124:11
**Mi** [1] - 131:19
**MICHAEL** [1] - 2:5
**Michel** [1] - 196:17
**microphone** [2] - 28:16, 34:19
**midday** [1] - 186:23
**middle** [2] - 11:18, 126:10
**MIDI** [2] - 38:20, 62:17
**midnight** [1] - 161:2
**might** [20] - 40:20, 42:10, 42:11, 69:22, 77:17, 77:19, 82:7, 84:19, 84:20, 94:22, 115:3, 119:12, 133:10, 186:6, 213:14, 219:23, 219:24, 232:24, 234:1
**miley** [1] - 91:4
**Miley** [2] - 197:10, 197:15
**military** [2] - 149:14, 180:4
**MILLER** [3] - 1:22, 237:20, 237:21
**million** [20] - 194:8, 194:10, 194:13, 194:15, 194:18, 194:22, 195:12, 195:14, 196:8, 197:1, 224:1, 224:4, 226:18, 226:19, 226:20, 227:7, 228:19, 232:2, 232:11, 232:20
**mind** [5] - 43:6, 80:4, 122:3, 184:2, 236:5
**Mind** [1] - 145:10
**mine** [2] - 89:16, 100:5
**Minneapolis** [4] - 179:22, 183:15, 183:20
**Minnesota** [1] - 183:16
**minor** [2] - 14:5, 162:21
**minute** [4] - 60:7, 61:25, 80:2, 80:3
**minutes** [4] - 154:24, 160:24, 184:25, 189:19
**minutia** [1] - 235:20

**misleading** [1] - 125:9
**miss** [2] - 16:11, 234:1
**missing** [1] - 13:5
**Missouri** [2] - 149:20, 183:14
**MITCHELL** [1] - 2:15
**mix** [2] - 62:12, 72:8
**mixer** [1] - 72:8
**mixes** [1] - 132:24
**mixing** [5] - 36:21, 55:19, 72:9, 72:10, 147:4
**mm-huh** [1] - 212:17
**MO** [2] - 2:8, 2:11
**modify** [1] - 124:13
**module** [2] - 219:18, 222:3
**modules** [1] - 222:2
**moment** [5] - 28:8, 42:13, 53:9, 150:23, 209:19
**mommy** [1] - 135:11
**Monday** [2] - 160:19, 218:25
**money** [6] - 58:24, 134:16, 157:13, 175:17, 184:4, 221:1
**Money** [1] - 41:20, 44:6, 44:9, 44:15, 45:11, 45:12, 45:17, 46:1, 46:4, 46:12, 46:24, 47:7, 47:9, 47:17, 107:1, 107:3, 107:5, 192:24
**moniker** [1] - 40:14
**monitor** [3] - 95:3, 160:4, 160:7
**monitored** [1] - 95:5
**monotonous** [1] - 63:20
**Montana** [1] - 183:13
**month** [2] - 227:5, 227:11
**months** [2] - 8:8, 21:3
**Montreal** [3] - 35:10, 35:12, 54:16
**mood** [1] - 218:22
**Moore** [19] - 23:5, 23:15, 23:23, 75:5, 75:6, 75:22, 75:23, 108:23, 110:1, 110:11, 144:6, 148:23, 149:5, 178:8, 204:14, 205:3, 213:21, 227:8, 232:1
**Moore's** [4] - 23:19, 172:17, 227:22, 228:4
**moreover** [1] - 128:8,

193:24
**morning** [14] - 4:8, 8:19, 28:13, 28:19, 34:25, 35:1, 53:5, 53:6, 87:21, 87:22, 98:21, 98:25, 201:20, 236:6
**mortar** [6] - 139:19, 139:20, 139:25, 164:24, 180:18, 181:10
**most** [21] - 33:21, 40:14, 67:15, 77:20, 83:18, 83:19, 94:19, 112:23, 112:24, 182:25, 194:25, 195:17, 196:11, 197:4, 215:21, 217:20, 217:22, 221:12, 222:6
**mostly** [9] - 33:6, 36:2, 36:10, 36:12, 94:14, 94:16, 133:4, 133:5, 207:23
**motion** [11] - 9:17, 9:18, 11:1, 12:7, 13:7, 13:8, 13:9, 124:18, 182:8, 182:9
**motivation** [1] - 58:23
**mouse** [2] - 61:21, 62:21
**mouth** [1] - 41:9
**move** [12] - 10:21, 21:16, 34:15, 47:20, 58:24, 69:24, 73:5, 155:13, 163:2, 170:1, 184:2, 236:12
**moved** [3] - 56:3, 66:17, 77:18
**movement** [1] - 65:16
**Movement** [26] - 155:13, 155:17, 155:21, 155:23, 156:24, 157:2, 158:14, 162:25, 163:5, 163:17, 163:25, 164:3, 164:9, 165:19, 165:25, 166:10, 166:23, 167:8, 167:16, 174:17, 175:13, 175:24, 176:2, 184:4, 184:7, 184:11
**moving** [1] - 190:17
**MOVIT** [3] - 2:16, 3:8, 3:13, 4:10, 14:17, 14:22, 15:13, 17:6, 23:25, 28:4, 28:7, 29:23, 31:15, 32:4,

34:1, 89:25, 90:4,
91:13, 92:20,
100:20, 105:11,
107:10, 107:13,
107:16, 107:18,
119:14, 120:12,
121:23, 123:18,
129:9, 135:25,
136:17, 136:22

**Movit** [2] - 15:11,
129:7

**MP3** [1] - 50:24

**MR** [226] - 3:5, 3:6,
3:9, 3:10, 3:13, 3:13,
3:15, 3:17, 3:17,
4:10, 4:22, 4:25,
5:23, 6:10, 6:12,
6:15, 6:23, 7:15, 8:4,
8:6, 8:14, 8:19,
10:13, 10:24, 11:13,
11:20, 11:25, 12:8,
12:15, 12:20, 12:23,
13:20, 14:1, 14:3,
14:5, 14:14, 14:17,
14:22, 15:13, 17:6,
23:25, 28:4, 28:7,
28:12, 28:18, 29:23,
30:5, 31:11, 31:15,
32:4, 32:6, 32:9,
33:23, 34:1, 34:10,
34:24, 44:12, 44:14,
44:17, 44:20, 44:22,
45:1, 45:5, 45:10,
45:21, 45:24, 46:16,
46:22, 47:6, 48:1,
48:3, 48:5, 48:8,
49:17, 49:22, 50:1,
50:5, 50:16, 50:23,
51:1, 51:5, 51:8,
52:25, 53:4, 60:18,
60:21, 64:11, 66:7,
66:10, 72:15, 72:18,
74:1, 74:3, 79:21,
80:19, 82:19, 82:20,
82:23, 85:2, 85:6,
85:9, 85:16, 85:25,
86:3, 86:6, 86:25,
87:2, 89:25, 90:4,
91:13, 92:20,
100:20, 105:11,
107:10, 107:13,
107:16, 107:18,
119:14, 120:12,
121:23, 123:8,
123:16, 123:18,
123:21, 123:24,
124:3, 127:3,
127:20, 127:24,
129:9, 135:25,
136:17, 136:22,
137:4, 137:14,

141:5, 141:7, 141:9,
141:14, 141:19,
141:21, 142:14,
142:18, 144:13,
144:15, 144:18,
144:22, 151:13,
151:15, 152:12,
152:14, 152:20,
153:1, 153:6, 153:9,
153:13, 153:20,
153:24, 154:2,
154:4, 159:23,
159:25, 160:9,
160:12, 161:4,
161:7, 164:15,
170:1, 170:8,
170:17, 170:20,
170:23, 171:11,
171:16, 171:20,
171:23, 178:2,
178:5, 179:12,
180:12, 180:14,
181:1, 181:4,
181:11, 182:3,
182:8, 182:11,
182:13, 182:15,
183:5, 183:7, 184:2,
184:13, 184:16,
184:20, 184:21,
185:8, 186:3, 187:4,
187:14, 187:21,
188:5, 188:15,
188:22, 189:9,
190:3, 190:23,
193:11, 194:23,
209:4, 210:19,
212:18, 213:7,
229:12, 229:16,
232:13, 232:15,
232:19, 233:2,
233:4, 233:7,
234:18, 234:20,
234:22, 235:24,
235:25

**MS** [76] - 2:13, 3:7,
3:8, 3:15, 4:16, 4:18,
9:13, 13:2, 13:16,
45:14, 46:2, 46:13,
46:23, 87:6, 87:11,
87:20, 90:9, 90:11,
90:20, 91:17, 92:23,
100:25, 105:14,
107:8, 122:10,
122:14, 122:18,
122:20, 122:24,
123:3, 123:4, 125:6,
125:9, 126:2, 126:6,
126:19, 127:1,
128:3, 128:13,
128:17, 128:20,
128:23, 129:3,

136:2, 136:5,
136:24, 186:4,
186:6, 186:11,
186:13, 186:19,
186:25, 187:2,
187:13, 187:18,
188:18, 188:21,
188:25, 189:7,
189:10, 189:14,
189:19, 189:23,
190:2, 193:7,
194:22, 198:15,
199:2, 202:2, 202:4,
209:1, 210:11,
212:20, 212:23,
236:9, 236:10

**multiple** [5] - 5:4,
124:22, 156:7,
181:15, 229:1

**Music** [17] - 84:8,
116:13, 116:14,
138:10, 138:11,
140:12, 145:1,
163:4, 165:8,
192:17, 193:2,
195:1, 195:7, 196:3,
220:24, 222:24

**music** [301] - 5:10,
5:12, 7:2, 7:8, 8:9,
9:2, 10:17, 10:18,
16:20, 16:24, 17:13,
18:9, 18:12, 18:15,
18:20, 19:7, 19:22,
20:2, 21:11, 22:15,
23:1, 23:19, 25:16,
25:23, 26:5, 27:19,
27:22, 27:25, 28:23,
29:1, 29:4, 29:7,
29:12, 31:3, 31:9,
31:19, 32:13, 33:15,
35:10, 35:13, 35:15,
35:23, 36:8, 36:10,
36:12, 36:17, 36:19,
37:5, 37:6, 37:20,
37:23, 38:2, 38:4,
38:11, 39:13, 39:23,
40:3, 40:10, 43:23,
43:25, 44:16, 49:2,
52:6, 52:18, 53:25,
54:3, 54:4, 54:8,
54:11, 54:12, 54:16,
55:22, 56:2, 56:10,
56:12, 56:15, 56:21,
57:2, 57:3, 57:7,
57:16, 57:23, 58:1,
59:1, 60:1, 62:5,
62:12, 67:3, 68:12,
68:22, 69:9, 69:19,
72:2, 72:3, 72:21,
74:14, 75:1, 75:10,
75:25, 76:13, 76:14,

76:15, 76:17, 77:7,
77:25, 78:15, 78:19,
78:24, 78:25, 79:2,
81:22, 81:24, 82:1,
82:2, 82:4, 82:6,
82:7, 82:8, 82:10,
82:15, 84:1, 84:20,
84:23, 85:7, 85:17,
86:11, 86:20, 86:23,
87:23, 88:2, 89:7,
89:8, 92:18, 92:19,
92:22, 92:24, 93:7,
93:18, 94:4, 94:14,
94:19, 94:20, 95:3,
96:25, 97:1, 97:4,
97:12, 99:16,
101:13, 105:10,
105:15, 105:22,
106:2, 106:6,
106:10, 106:14,
106:18, 107:22,
108:4, 108:12,
108:21, 109:4,
109:14, 109:17,
109:19, 109:22,
110:16, 110:23,
111:1, 111:7, 111:9,
111:12, 111:13,
112:23, 113:6,
113:8, 114:18,
114:24, 114:25,
115:3, 115:6, 115:7,
115:10, 115:21,
115:24, 116:5,
116:9, 117:11,
117:12, 117:14,
119:19, 120:4,
120:15, 121:6,
121:18, 128:14,
131:5, 131:18,
131:23, 134:19,
134:23, 134:24,
135:2, 136:18,
139:18, 139:19,
139:20, 140:9,
140:10, 140:11,
140:15, 142:19,
144:21, 147:5,
147:17, 147:23,
148:12, 155:2,
155:3, 157:15,
160:18, 160:20,
160:25, 162:2,
162:3, 164:3,
164:16, 173:20,
173:25, 174:3,
182:7, 192:18,
193:3, 199:8,
199:10, 199:16,
199:25, 200:1,
200:12, 200:13,

200:14, 200:16,
200:18, 200:20,
204:10, 205:10,
206:18, 207:10,
207:11, 207:15,
207:18, 208:3,
208:6, 208:18,
218:15, 220:13,
220:14, 220:15,
220:17, 220:19,
220:21, 221:2,
221:6, 221:7,
221:10, 221:12,
221:19, 221:24,
222:8, 222:15,
222:16, 222:20,
223:5, 223:9,
223:10, 223:11,
223:17, 223:24,
224:21, 224:22,
225:1, 225:4, 225:8,
225:11, 225:12,
226:4, 226:14,
226:17, 227:4,
227:12, 232:25,
235:9

**music-related** [1] -
221:7

**Musical** [1] - 62:18

**musical** [5] - 21:14,
67:12, 116:10,
192:20, 199:9

**musically** [1] - 114:22

**musician** [2] - 107:20,
136:18

**musicians** [1] - 93:25

**musicologist** [1] -
177:23

**must** [1] - 128:9

**mutual** [1] - 41:4

**MY** [1] - 237:15

**MySpace** [137] - 26:21,
26:23, 26:25, 27:2,
27:7, 37:13, 76:6,
76:8, 76:11, 76:17,
96:18, 96:20, 96:21,
96:25, 97:1, 172:14,
172:17, 198:8,
198:11, 206:24,
206:25, 207:3,
207:11, 208:1,
212:6, 213:13,
213:14, 213:15,
214:15, 214:18,
214:20, 214:22,
214:24, 215:2,
215:3, 215:4, 215:5,
215:6, 215:11,
215:14, 215:15,
215:18, 215:20,

215:21, 215:23, 215:24, 216:1, 216:3, 216:5, 216:7, 216:9, 216:10, 216:16, 216:25, 217:12, 217:13, 217:15, 217:16, 217:25, 218:2, 218:8, 218:9, 218:18, 219:3, 219:4, 219:14, 219:19, 220:2, 220:4, 220:6, 220:8, 220:14, 220:15, 220:18, 220:19, 220:21, 220:22, 220:24, 221:2, 221:6, 221:8, 221:10, 221:12, 221:23, 222:1, 222:4, 222:10, 222:15, 222:20, 222:22, 222:23, 223:17, 224:17, 224:20, 224:24, 225:8, 225:24, 226:12, 226:13, 226:14, 226:17, 226:18, 226:19, 226:22, 227:3, 227:7, 227:13, 227:17, 227:18, 228:15, 228:17, 228:18, 229:3, 229:9, 229:20, 230:5, 230:15, 230:24, 231:2, 231:8, 231:16, 231:18, 231:19, 231:22, 231:23, 232:21, 233:11, 233:15, 233:20, 233:24, 234:3, 235:4, 235:6, 235:21
**MySpace's** [1] - 198:5

## N

**name** [56] - 15:6, 16:21, 21:9, 22:12, 22:13, 23:9, 23:16, 27:3, 34:17, 34:20, 35:2, 37:2, 41:15, 50:14, 50:19, 50:20, 58:18, 75:8, 87:14, 87:15, 87:17, 88:9, 89:6, 90:24, 92:10, 96:23, 105:23, 106:1, 108:2, 108:18, 109:1, 119:1, 128:22,

137:10, 138:9, 152:24, 177:24, 182:6, 198:20, 198:21, 198:22, 212:12, 212:16, 213:3, 213:4, 219:9, 221:14, 221:16, 235:8
**named** [8] - 40:13, 50:13, 75:5, 98:1, 98:9, 132:2, 204:13, 218:19
**namely** [2] - 126:24, 212:15
**names** [9] - 22:24, 30:16, 42:23, 73:11, 112:12, 118:2, 144:5, 182:24
**narcissistic** [1] - 26:2
**Nas** [2] - 54:24
**NAS** [1] - 54:24
**natural** [1] - 9:8
**Naval** [1] - 180:2
**NBA** [1] - 149:24
**near** [1] - 223:18
**necessarily** [10] - 9:6, 18:6, 36:20, 36:22, 193:24, 194:2, 197:23, 198:1, 198:4, 231:22
**necessary** [1] - 185:24
**need** [17] - 8:21, 12:25, 18:7, 45:18, 45:20, 46:2, 63:18, 79:24, 79:25, 123:21, 153:21, 153:25, 185:9, 212:22, 225:11, 234:15, 235:8
**needed** [5] - 61:21, 64:19, 125:16, 156:11
**negates** [1] - 9:25
**negative** [2] - 8:14, 11:21
**negotiate** [1] - 214:9
**Nehemia** [3] - 182:19, 183:1, 183:10
**Neilson** [7] - 111:25, 112:6, 112:25, 113:3, 113:12, 113:22, 114:9
**Nelson** [3] - 231:5, 231:6, 231:12
**Network** [1] - 182:20
**network** [3] - 182:23, 183:1, 183:10
**networking** [2] - 207:4, 217:21
**Networks** [1] - 216:17

**never** [30] - 18:18, 21:24, 22:1, 27:5, 27:7, 27:24, 53:16, 53:18, 53:19, 74:20, 85:22, 102:11, 109:11, 109:13, 110:3, 110:5, 114:15, 114:17, 115:1, 123:11, 136:20, 173:20, 173:25, 178:1, 180:15, 184:2, 187:20, 205:23, 206:1, 208:4
**New** [4] - 88:10, 116:7, 116:13, 180:4
**new** [4] - 33:4, 68:24, 123:9, 160:4
**News** [1] - 214:24
**news** [1] - 154:13
**next** [41] - 4:13, 14:21, 20:23, 34:9, 63:1, 64:17, 65:12, 66:17, 68:11, 69:24, 72:3, 87:5, 105:23, 106:1, 106:4, 106:17, 116:15, 116:17, 117:16, 119:4, 132:10, 137:3, 139:9, 144:7, 170:20, 187:8, 187:9, 187:17, 188:11, 189:18, 190:11, 190:13, 199:24, 201:20, 212:22, 218:16, 221:3, 222:13, 223:25, 228:7, 228:8
**Nielson's** [1] - 127:17
**night** [7] - 111:15, 124:9, 125:11, 125:14, 160:16, 160:19, 201:15
**Night** [5] - 116:21, 116:24, 117:4, 117:12, 119:8
**NO** [1] - 1:8
**No.1** [1] - 130:12
**noddin'** [1] - 70:7
**Noise** [71] - 21:17, 21:19, 21:21, 22:3, 53:9, 53:17, 53:19, 74:18, 74:22, 75:12, 82:24, 86:17, 109:6, 109:25, 110:5, 127:21, 128:6, 128:11, 143:25, 144:17, 145:1, 148:5, 148:13, 148:24, 149:1,

150:10, 150:16, 155:6, 159:19, 161:18, 161:24, 162:7, 162:13, 164:17, 164:21, 164:23, 165:2, 166:11, 166:18, 172:11, 172:21, 172:25, 173:23, 174:4, 176:22, 177:5, 178:7, 178:16, 178:19, 179:3, 180:11, 181:21, 191:8, 191:11, 191:14, 191:17, 191:20, 191:24, 203:13, 206:22, 207:24, 208:1, 208:10, 213:15, 227:1, 227:14, 227:22, 227:24, 228:6, 228:9, 235:16
**nominated** [4] - 43:3, 92:5, 92:7, 173:8
**nominations** [2] - 25:15, 206:5
**non** [1] - 5:12
**non-production** [1] - 5:12
**NONE** [1] - 3:20
**normally** [1] - 27:3
**notate** [1] - 102:13
**notation** [1] - 52:12
**notations** [2] - 52:3, 102:14
**note** [10] - 39:3, 59:1, 64:4, 65:21, 100:18, 101:7, 101:9, 143:7, 144:25, 146:9
**noted** [1] - 4:7
**NOTES** [1] - 237:15
**notes** [26] - 38:21, 49:10, 49:11, 62:20, 63:24, 64:10, 64:22, 65:2, 66:3, 66:16, 101:8, 101:10, 130:12, 132:4, 132:5, 143:4, 143:14, 143:17, 143:23, 144:1, 144:10, 146:8, 146:11, 165:8, 211:9
**nothing** [18] - 6:3, 17:8, 34:1, 57:24, 67:13, 87:2, 125:4, 135:25, 136:22, 156:19, 161:4, 182:11, 209:1, 212:18, 212:20,

234:18, 234:24, 235:25
**notice** [1] - 59:1
**Notorious** [1] - 54:23
**Nourafchan** [1] - 198:16
**NOURAFCHAN** [8] - 2:17, 3:15, 199:2, 202:2, 202:4, 209:1, 210:11, 212:20
**November** [1] - 191:19
**nowadays** [1] - 29:15
**nowhere** [1] - 210:15
**number** [13] - 77:23, 78:21, 124:3, 188:15, 218:9, 223:21, 223:25, 224:3, 224:13, 226:13, 226:16, 227:3, 229:4
**Number** [1] - 10:18
**numbers** [4] - 46:3, 223:20, 226:21, 228:18
**numerous** [1] - 235:2

## O

**o'clock** [2] - 189:16, 189:22
**object** [7] - 29:23, 49:17, 51:1, 100:20, 142:14, 171:20, 184:13
**objection** [29] - 44:12, 44:17, 44:22, 48:3, 48:4, 50:1, 50:16, 50:25, 51:5, 82:20, 85:2, 85:9, 89:25, 90:2, 91:13, 92:20, 105:11, 141:5, 141:7, 141:19, 144:13, 144:18, 151:13, 159:23, 160:9, 180:12, 181:1, 210:11, 232:13
**objections** [1] - 153:4
**obligation** [1] - 13:10
**obligations** [2] - 17:23, 214:13
**observe** [1] - 182:2
**obsessed** [1] - 54:11
**obtain** [2] - 221:20, 223:23
**obtained** [1] - 214:1
**obviated** [1] - 9:18
**obvious** [1] - 221:12
**obviously** [10] - 16:15, 29:9, 127:11,

131:15, 149:1, 175:20, 186:15, 187:18, 220:13, 234:3
**occasion** [5] - 29:22, 33:9, 42:4, 49:25, 92:3
**occasionally** [2] - 42:6, 120:20
**occurred** [1] - 45:8
**October** [1] - 158:22
**odd** [1] - 56:20
**Odus** [1] - 98:3
**OF** [13] - 1:1, 1:2, 1:14, 2:2, 2:3, 2:13, 2:20, 237:2, 237:4, 237:6, 237:9, 237:13, 237:15
**offer** [4] - 6:2, 128:21, 152:12, 214:12
**OFFERED** [1] - 3:20
**offered** [1] - 16:7
**offering** [2] - 233:14, 233:17
**officer** [4] - 138:13, 138:18, 139:13, 151:17
**Official** [10] - 195:1, 195:7, 195:10, 196:3, 196:17, 196:19, 196:22, 197:10, 197:12, 197:15
**official** [3] - 185:10, 229:19, 230:6
**OFFICIAL** [3] - 1:22, 237:8, 237:22
**often** [6] - 103:11, 113:9, 114:6, 131:6, 135:14, 154:14
**oftentimes** [1] - 135:17
**Ojukwu** [14] - 6:12, 22:19, 74:8, 75:20, 108:14, 144:9, 144:16, 145:14, 145:16, 145:18, 146:4, 146:15, 203:24, 205:5
**old** [2] - 157:15, 199:12
**older** [1] - 36:4
**OLYMPIC** [1] - 2:18
**ON** [3] - 2:3, 2:13, 2:20
**once** [12] - 9:17, 14:12, 20:25, 46:2, 55:19, 70:22, 71:7, 72:2, 72:5, 103:13, 157:13, 161:1
**one** [99] - 5:1, 10:8,

10:16, 11:3, 14:5, 22:8, 27:5, 28:1, 30:14, 30:15, 36:5, 41:10, 47:14, 49:24, 50:9, 50:10, 53:7, 56:7, 58:14, 59:3, 61:8, 67:5, 67:20, 67:24, 70:2, 70:3, 70:6, 70:8, 80:5, 83:4, 83:18, 85:4, 89:3, 102:22, 103:8, 107:23, 108:6, 108:14, 112:13, 113:16, 122:3, 123:6, 124:3, 124:25, 127:3, 139:5, 139:9, 145:9, 147:24, 150:3, 150:4, 150:22, 155:20, 156:22, 160:23, 161:13, 165:23, 167:2, 167:7, 167:12, 172:12, 172:15, 172:19, 172:23, 173:1, 173:7, 173:16, 174:6, 179:1, 180:10, 181:13, 181:14, 182:16, 187:20, 188:5, 188:6, 193:22, 197:21, 198:9, 198:12, 201:15, 210:20, 212:4, 215:9, 216:4, 219:3, 220:1, 224:11, 226:25, 227:5, 227:10, 228:3, 229:1, 231:1, 231:3, 236:5
**One** [6] - 19:16, 118:20, 119:2, 119:8, 195:11, 196:22
**one's** [2] - 134:2, 219:13
**one-year** [1] - 56:7
**ones** [3] - 30:23, 42:21, 149:18
**online** [5] - 191:4, 215:23, 217:16, 218:11, 220:5
**open** [6] - 80:4, 122:3, 149:21, 149:23, 150:22, 236:5
**opened** [3] - 63:4, 208:22, 210:13
**operated** [2] - 215:12, 221:25
**operating** [4] - 138:13,

138:18, 139:13, 151:17
**operator** [1] - 216:7
**operators** [1] - 222:3
**opinion** [6] - 17:18, 115:21, 131:8, 230:3, 233:14, 233:17
**opportunities** [1] - 56:17
**opportunity** [8] - 6:4, 6:6, 12:5, 60:4, 68:16, 90:17, 128:3, 201:18
**opposed** [3] - 43:25, 114:11, 232:21
**opposite** [1] - 111:7
**order** [14] - 4:11, 5:17, 14:24, 65:21, 124:18, 126:21, 170:21, 186:1, 188:8, 190:18, 225:11, 225:24, 229:6, 234:16
**ordinary** [1] - 151:16
**organic** [1] - 62:13
**organization** [1] - 83:23
**organize** [1] - 147:10
**origin** [1] - 151:5
**original** [13] - 50:3, 52:20, 60:23, 61:1, 61:5, 62:25, 65:13, 67:23, 68:2, 68:9, 72:25, 129:24, 134:23
**ostinato** [14] - 65:10, 65:11, 65:21, 66:4, 67:5, 67:7, 67:24, 67:25, 68:3, 68:4, 72:24, 72:25, 100:19, 211:20
**Ostinato** [32] - 60:15, 65:5, 65:7, 65:18, 130:12, 130:13, 130:14, 130:16, 130:17, 130:19, 130:20, 130:24, 130:25, 131:2, 131:3, 131:9, 131:10, 131:13, 132:7, 211:5, 211:11, 211:12, 211:15
**ostinato's** [2] - 133:19, 133:24
**ostinatos** [6] - 60:15, 66:19, 66:23, 67:17, 68:8, 68:9
**OTHER** [1] - 2:13

**otherwise** [1] - 109:1
**ought** [1] - 186:10
**ounce** [1] - 200:1
**ourselves** [2] - 134:23, 200:2
**out-of-court** [2] - 90:6, 90:16
**outcome** [2] - 157:8, 217:9
**outlets** [1] - 160:1
**outs** [1] - 159:12
**outset** [1] - 47:23
**outside** [6] - 78:1, 121:4, 177:5, 177:8, 177:10, 207:11
**overall** [7] - 50:2, 67:20, 141:24, 203:2, 209:24, 210:4, 227:9
**overruled** [3] - 44:18, 160:10, 182:4
**oversaw** [1] - 101:20
**oversee** [1] - 71:9
**overview** [1] - 125:25
**overwhelmed** [2] - 209:15, 209:22
**own** [17] - 57:16, 84:6, 97:7, 97:9, 97:11, 97:20, 121:6, 134:19, 134:20, 138:8, 155:17, 177:11, 199:16, 199:22, 199:25, 218:11
**owned** [6] - 138:6, 138:7, 191:5, 192:22, 214:18, 215:6
**owner** [1] - 105:9
**ownership** [2] - 193:4, 212:1
**owns** [1] - 192:13

## P

**p.m** [2] - 125:14, 236:14
**page** [57] - 76:6, 76:8, 76:11, 96:18, 96:20, 104:3, 106:13, 106:21, 141:23, 142:4, 142:11, 142:19, 157:24, 158:1, 172:14, 172:17, 207:3, 212:7, 217:25, 218:1, 218:3, 218:11, 218:12, 218:17, 218:18, 218:24, 218:25,

219:8, 221:4, 221:5, 221:6, 221:14, 222:2, 222:10, 222:14, 222:15, 222:21, 223:4, 223:8, 223:18, 224:11, 224:16, 224:25, 225:6, 225:22, 226:11, 228:3, 228:4, 228:8, 231:2, 231:6, 231:7, 231:10, 231:12, 231:20, 232:23
**pages** [18] - 157:20, 213:15, 224:7, 224:13, 224:14, 226:20, 227:7, 227:22, 229:5, 231:1, 231:25, 232:9, 232:12, 232:20, 233:1, 234:16, 234:17, 235:18
**paid** [2] - 100:9, 229:23
**panel** [1] - 93:1
**panels** [1] - 93:3
**paper** [2] - 102:13, 103:16
**Papi** [1] - 58:19
**paragraphs** [3] - 191:2, 192:11, 197:17
**PARK** [1] - 2:23
**parks** [1] - 149:16
**Part** [2] - 119:9, 119:11
**part** [31] - 26:4, 36:8, 49:8, 52:3, 61:8, 64:18, 76:4, 78:22, 84:4, 92:16, 113:7, 115:21, 115:23, 131:15, 131:16, 132:8, 134:6, 158:4, 172:6, 172:7, 179:7, 182:19, 182:23, 183:18, 192:9, 210:1, 211:4, 211:8, 215:10, 220:17
**partially** [1] - 230:25
**participant** [1] - 131:8
**particular** [26] - 92:6, 140:14, 193:23, 197:22, 198:10, 210:17, 214:8, 218:19, 221:16, 221:17, 223:12, 223:13, 223:16, 223:18, 223:22, 224:16, 224:25,

225:6, 228:5, 228:20, 228:24, 228:25, 229:5, 229:10

**particularly** [1] - 224:21

**parties** [10] - 5:14, 5:18, 14:7, 36:1, 36:4, 45:14, 55:20, 123:10, 190:25, 194:7

**parties'** [1] - 5:17

**parts** [7] - 67:20, 71:12, 71:18, 71:19, 103:12, 115:25, 133:23

**Party** [1] - 195:23

**party** [2] - 40:13, 117:24

**passage** [1] - 64:10

**past** [3] - 68:22, 81:17, 194:5

**path** [1] - 79:11

**pattern** [1] - 132:4

**pause** [2] - 15:18, 15:20

**pay** [3] - 78:9, 167:13, 167:14

**payment** [1] - 175:20

**Pego** [1] - 196:18

**people** [38] - 18:22, 19:5, 41:8, 56:6, 57:8, 58:25, 59:1, 84:19, 84:25, 85:8, 85:13, 85:14, 86:10, 86:12, 93:21, 93:22, 94:3, 95:25, 111:5, 111:6, 113:9, 134:13, 135:1, 143:10, 154:9, 159:15, 171:4, 181:9, 200:8, 200:9, 201:8, 207:22, 208:22, 209:16, 219:24, 220:5, 220:6, 234:5

**people's** [6] - 94:6, 115:5, 116:9, 116:19, 134:24, 135:2

**per** [3] - 227:5, 227:11, 230:1

**perceive** [1] - 180:8

**perceived** [1] - 227:19

**percent** [6] - 50:9, 149:9, 149:12, 154:15, 169:12, 206:21

**percussion** [2] - 65:16, 71:24

**perfect** [1] - 186:22

**perfection** [1] - 120:16

**perform** [17] - 75:16, 75:18, 75:20, 75:23, 148:6, 148:23, 149:5, 150:10, 150:16, 200:14, 200:16, 204:20, 204:23, 204:25, 205:3, 205:5, 214:8

**performances** [6] - 163:12, 167:22, 167:24, 176:5, 176:15, 207:20

**performed** [16] - 24:12, 109:25, 110:3, 110:6, 110:9, 110:12, 149:25, 153:23, 154:1, 160:4, 176:6, 178:6, 178:13, 178:16, 179:17, 179:20

**performer** [1] - 192:23

**performing** [3] - 83:23, 93:5, 160:8

**performs** [2] - 21:8, 121:18

**perhaps** [1] - 14:12

**period** [26] - 26:22, 27:9, 27:11, 27:14, 27:16, 76:20, 76:23, 92:8, 95:17, 96:6, 96:12, 97:3, 128:15, 151:9, 168:4, 168:24, 206:24, 207:14, 217:1, 217:5, 219:4, 222:7, 222:19, 224:17, 226:14, 232:1

**periods** [1] - 95:12

**permission** [1] - 190:18

**permit** [3] - 125:3, 171:14, 185:25

**permitted** [1] - 126:21

**permitting** [1] - 126:23

**Perry** [28] - 4:5, 19:9, 19:11, 20:22, 44:16, 50:8, 60:5, 68:12, 78:18, 91:2, 103:4, 103:8, 105:7, 105:19, 118:6, 118:8, 118:11, 118:25, 120:3, 120:18, 132:13, 134:6, 172:4, 192:23, 201:10, 201:25, 211:20

**PERRY** [3] - 1:9, 2:13, 2:20

**perry** [3] - 79:4, 103:1, 103:2

**perseverance** [1] - 79:8

**person** [27] - 9:10, 41:3, 41:4, 41:10, 41:12, 41:14, 57:9, 73:17, 81:12, 92:13, 98:5, 98:9, 98:11, 98:12, 98:19, 120:20, 125:12, 142:1, 189:3, 193:22, 197:21, 197:23, 198:5, 198:9, 198:12, 205:8, 229:10

**personal** [8] - 51:12, 108:18, 115:5, 121:3, 121:4, 178:13, 216:9, 223:8

**personally** [9] - 43:13, 76:8, 102:19, 104:24, 173:20, 179:3, 180:20, 181:23, 212:9

**pertains** [2] - 5:2, 5:3

**pews** [2] - 171:8, 171:10

**PH** [1] - 1:24

**phase** [5] - 45:17, 187:11, 190:9, 215:21

**phone** [2] - 43:24, 125:14

**photo** [1] - 179:18

**photograph** [1] - 179:6

**photographers** [1] - 207:5

**phrase** [1] - 67:12

**physical** [6] - 139:18, 139:23, 139:24, 140:6, 161:21, 181:9

**physically** [2] - 43:25, 147:23

**piano** [1] - 71:24

**pick** [1] - 80:5

**picked** [2] - 70:8, 125:19

**picture** [3] - 132:12, 171:5, 218:20

**Pictures** [3] - 216:16, 216:20, 230:14

**pictures** [1] - 218:14

**pieces** [1] - 54:10

**Pink** [1] - 118:6

**Pitbull** [1] - 195:20

**pitch** [1] - 38:23

**pitches** [2] - 63:13,

64:13

**PKA** [1] - 133:6

**PLACE** [1] - 237:11

**place** [8] - 18:24, 54:7, 152:9, 207:19, 215:23, 217:15, 218:5, 220:5

**placed** [2] - 141:10, 141:11

**placeholder** [1] - 185:11

**plagiarism** [1] - 73:20

**PLAINTIFF** [3] - 1:7, 2:3, 3:3

**plaintiff** [5] - 112:19, 185:18, 190:19, 204:20, 213:18

**plaintiff's** [12] - 4:14, 21:17, 28:8, 34:15, 53:8, 53:12, 111:18, 113:18, 115:15, 123:10, 124:8, 197:21

**plaintiffs** [25] - 5:7, 22:8, 22:18, 23:23, 34:11, 73:22, 107:23, 108:6, 108:14, 109:9, 110:9, 125:17, 126:20, 153:19, 159:16, 171:25, 177:22, 186:16, 188:2, 190:16, 190:19, 203:11, 203:22, 227:13

**Plan** [1] - 57:25

**plan** [4] - 158:23, 189:5, 190:8, 190:13

**planet** [1] - 215:22

**planning** [1] - 16:6

**plans** [2] - 187:8, 187:9

**platforms** [3] - 140:11, 180:7, 182:5

**play** [62] - 36:19, 40:24, 50:23, 51:6, 52:18, 52:21, 55:20, 55:22, 60:18, 62:20, 64:7, 64:8, 64:12, 66:8, 69:17, 72:15, 72:16, 81:6, 82:19, 103:1, 114:4, 129:15, 147:17, 148:2, 148:12, 155:1, 155:5, 155:6, 160:20, 176:16, 176:17, 176:18, 176:19, 176:25, 177:3, 177:4, 197:23, 198:1,

198:4, 198:5, 198:9, 200:23, 202:3, 222:17, 222:20, 223:2, 223:5, 224:5, 224:25, 225:3, 228:17, 228:18, 228:19, 228:21, 228:23, 229:7, 229:9, 232:5, 232:9

**Play** [2] - 140:11, 140:14

**playback** [3] - 198:10, 228:19, 229:2

**played** [54] - 18:24, 20:10, 20:12, 41:5, 41:10, 48:7, 49:2, 49:11, 50:7, 50:10, 50:11, 51:7, 53:8, 60:20, 63:24, 64:9, 64:21, 65:20, 65:25, 66:1, 66:9, 69:12, 72:17, 76:1, 82:22, 82:24, 103:2, 116:9, 129:19, 130:8, 132:14, 135:5, 147:23, 159:19, 169:20, 177:6, 177:8, 178:19, 178:24, 179:3, 194:1, 194:3, 198:2, 198:12, 202:12, 202:13, 202:19, 202:21, 202:23, 211:1, 225:7

**player** [8] - 67:15, 116:6, 116:8, 116:23, 117:4, 117:9, 222:15, 222:17

**playing** [22] - 63:6, 63:9, 63:10, 64:10, 64:23, 68:12, 69:9, 69:19, 94:4, 116:16, 116:18, 117:8, 148:7, 150:5, 170:9, 176:22, 194:1, 197:24, 197:25, 222:21, 225:4, 225:8

**playlist** [1] - 69:15

**plays** [12] - 17:20, 36:17, 94:8, 198:8, 222:24, 227:2, 227:3, 227:7, 227:11, 228:15, 229:4, 232:2

**pleasing** [2] - 52:6, 72:12

**plod** [1] - 236:3

**plug** [2] - 148:10, 148:11

**plus** [3] - 159:18, 227:10, 228:19
**pocket** [1] - 58:24
**Point** [1] - 180:3
**point** [36] - 6:18, 32:20, 40:17, 48:20, 54:18, 56:2, 57:5, 57:15, 57:18, 58:3, 60:4, 70:22, 76:9, 78:20, 79:3, 79:7, 96:14, 103:2, 103:8, 114:13, 117:7, 117:19, 119:20, 125:20, 127:11, 130:8, 132:13, 135:10, 160:18, 166:10, 175:21, 187:19, 200:4, 214:20, 215:22, 227:25
**policies** [1] - 215:16
**policy** [5] - 86:14, 115:7, 115:9, 115:11, 194:7
**pop** [18] - 37:7, 67:3, 82:11, 94:14, 94:19, 113:1, 114:24, 114:25, 115:3, 115:6, 199:15, 199:23, 200:13, 206:16, 207:10, 207:12, 222:8, 234:12
**popped** [1] - 231:5
**popular** [12] - 77:21, 83:18, 85:1, 94:16, 94:17, 94:19, 94:20, 94:22, 95:4, 112:21, 112:23, 222:6
**populate** [2] - 219:20, 234:16
**portion** [7] - 82:24, 86:17, 101:7, 101:8, 101:9, 154:7, 228:12
**portions** [1] - 124:14
**position** [6] - 5:16, 42:10, 77:18, 90:4, 128:11, 230:6
**possibility** [3] - 235:21, 235:22, 235:23
**possible** [9] - 16:9, 58:2, 71:11, 72:13, 97:21, 120:17, 133:9, 216:8, 231:21
**possibly** [2] - 90:5, 207:6
**post** [1] - 212:15
**postal** [1] - 156:10
**posted** [6] - 191:9,

191:10, 191:13, 191:16, 191:22, 197:19
**potential** [2] - 219:16, 219:21
**potentially** [2] - 219:22, 231:13
**power** [1] - 210:5
**powerful** [3] - 210:6, 210:7, 210:17
**practice** [1] - 135:1
**practicing** [4] - 36:3, 55:18, 116:20, 138:1
**pre** [1] - 140:18
**pre-existing** [1] - 140:18
**prefer** [2] - 185:16, 189:24
**preferable** [1] - 186:6
**preferred** [1] - 97:6
**preparation** [2] - 61:12, 88:14
**prepare** [4] - 52:2, 104:23, 104:24, 125:18
**prepared** [3] - 88:9, 126:4, 128:5
**preparing** [3] - 126:5, 216:23, 230:2
**Prescription** [3] - 41:17, 100:7, 121:10
**presence** [2] - 217:16, 218:11
**present** [13] - 14:19, 44:20, 80:8, 80:15, 115:24, 120:19, 122:6, 129:6, 185:4, 190:4, 203:4, 219:16, 236:7
**presented** [2] - 201:19, 227:13
**presents** [1] - 25:22
**President** [5] - 214:22, 215:1, 216:17, 216:21, 230:13
**PRESIDING** [1] - 1:4
**press** [1] - 148:12
**pressing** [1] - 222:17
**pressure** [4] - 85:18, 85:23, 92:11, 92:14
**pretending** [1] - 96:23
**pretrial** [1] - 188:7
**pretty** [7] - 62:21, 62:23, 66:16, 71:9, 120:25, 121:1, 149:11
**previous** [1] - 68:21
**previously** [3] - 167:6, 167:7, 176:14
**primarily** [8] - 35:24,

38:1, 54:18, 55:16, 76:12, 133:9, 218:10, 218:13
**primary** [6] - 216:5, 219:6, 219:25, 221:6, 221:9, 221:12
**principal** [1] - 155:25
**print** [1] - 143:21
**Prism** [3] - 73:6, 134:6, 192:15
**privacy** [1] - 215:16
**privately** [1] - 70:24
**Pro** [2] - 103:17, 103:22
**problem** [11] - 7:5, 7:10, 13:2, 13:16, 23:13, 126:4, 126:8, 128:1, 128:2, 141:12, 152:16
**problems** [1] - 89:18
**procedural** [1] - 188:6
**proceeding** [1] - 159:14
**PROCEEDINGS** [2] - 1:14, 237:11
**proceedings** [2] - 45:8, 236:14
**process** [23] - 6:7, 6:20, 9:6, 9:9, 10:1, 10:9, 11:8, 11:9, 11:23, 12:9, 12:12, 39:5, 52:3, 52:9, 57:1, 57:14, 71:14, 92:17, 93:2, 93:17, 93:23, 120:19, 132:6
**produce** [20] - 5:10, 5:24, 7:9, 7:22, 8:22, 9:25, 10:23, 10:25, 11:12, 11:14, 29:4, 32:23, 33:17, 38:2, 39:23, 46:4, 62:12, 71:12, 92:1, 176:18
**produced** [43] - 6:5, 6:19, 7:2, 7:16, 8:10, 9:17, 9:18, 10:6, 10:22, 11:4, 12:4, 19:19, 19:22, 29:1, 46:7, 46:13, 46:14, 46:25, 58:11, 88:23, 91:25, 97:15, 97:16, 109:19, 109:22, 118:3, 118:22, 119:7, 126:9, 126:12, 144:7, 153:2, 153:5, 153:6, 153:7, 153:10, 153:11, 165:15, 169:7, 169:20, 176:19, 177:13
**producer** [41] - 10:16,

16:20, 16:24, 17:13, 19:7, 28:23, 31:19, 31:22, 32:13, 32:24, 33:15, 37:20, 37:23, 41:23, 45:18, 47:18, 53:25, 59:13, 81:22, 84:23, 85:7, 85:18, 87:23, 91:16, 91:19, 91:22, 91:25, 97:14, 100:8, 101:20, 101:25, 107:21, 117:6, 119:25, 129:19, 129:22, 131:11, 132:20, 136:18, 144:11, 146:14
**Producer** [1] - 92:5
**producers** [6] - 18:10, 18:12, 56:10, 93:25, 94:1, 131:20
**producing** [8] - 18:16, 28:21, 54:3, 83:15, 101:24, 102:4, 117:17, 125:2
**product** [9] - 11:8, 72:19, 214:11, 215:10, 215:12, 216:2, 218:2, 234:5
**production** [12] - 5:12, 9:2, 10:18, 17:22, 41:19, 44:11, 44:16, 45:11, 83:15, 100:6, 153:7, 192:24
**products** [1] - 214:12
**profess** [1] - 107:20
**profession** [4] - 16:19, 55:12, 107:19, 199:5
**professional** [19] - 16:21, 18:20, 22:13, 22:24, 23:8, 23:16, 43:12, 43:15, 58:22, 62:10, 81:22, 88:2, 108:18, 110:25, 118:10, 119:1, 119:17, 214:14, 216:4
**professionally** [30] - 18:15, 19:14, 20:17, 22:9, 22:19, 22:20, 23:5, 35:2, 60:5, 73:23, 74:4, 74:6, 74:8, 75:5, 78:23, 98:23, 106:9, 107:24, 108:7, 108:15, 108:23, 117:21, 119:15, 129:21, 132:16, 172:4, 203:23, 203:24, 204:14, 216:13

**professionals** [1] - 43:10
**professor** [1] - 187:4
**profile** [15] - 218:11, 218:12, 218:14, 218:18, 218:20, 219:11, 222:21, 223:4, 224:7, 224:13, 224:14, 224:16, 226:10, 226:20, 232:23
**profiles** [7] - 219:15, 219:19, 226:3, 226:5, 226:6, 226:8, 226:25
**profits** [1] - 231:8
**program** [9] - 29:5, 29:11, 29:13, 29:14, 31:1, 38:10, 62:5, 62:14, 229:6
**programming** [1] - 235:2
**programs** [7] - 24:14, 24:18, 110:18, 110:20, 198:6, 205:13, 205:16
**progressed** [1] - 177:20
**project** [1] - 200:2
**projects** [1] - 139:4
**promises** [1] - 188:4
**promote** [4] - 37:13, 76:14, 207:4, 207:19
**promoted** [1] - 214:22
**promotional** [2] - 207:7, 207:21
**proof** [1] - 191:1
**proper** [1] - 128:4
**proposed** [1] - 123:8
**prosecute** [1] - 12:7
**protect** [1] - 27:3
**protege** [1] - 99:9
**proud** [3] - 43:7, 79:17, 79:19
**prove** [3] - 8:20, 8:22, 127:20
**provide** [9] - 52:12, 52:15, 112:12, 112:15, 123:12, 131:12, 131:24, 185:6, 213:11
**provided** [8] - 124:8, 124:16, 124:20, 125:10, 125:14, 127:7, 169:10, 221:25
**provides** [5] - 111:20, 112:9, 135:21, 192:18, 193:3
**Psy's** [3] - 196:13,

197:6, 197:8
**Psychology** [1] - 137:23
**public** [3] - 37:16, 76:14, 149:23
**publication** [1] - 25:18
**publish** [2] - 48:1, 168:17
**published** [1] - 191:19
**publisher** [3] - 107:5, 145:11, 145:13
**publishing** [24] - 41:16, 84:1, 84:2, 84:5, 84:6, 84:7, 84:9, 93:23, 107:1, 107:4, 121:6, 145:2, 145:3, 145:5, 146:16, 165:4, 165:8, 165:11, 165:13, 165:16, 192:18, 193:3, 199:17
**Publishing** [1] - 192:17
**pull** [2] - 28:16, 226:1
**pulled** [1] - 63:4
**purchasing** [1] - 172:25
**purpose** [4] - 125:23, 151:20, 217:13, 217:16
**purposes** [2] - 125:15, 171:11
**Purry** [1] - 192:21
**pursuant** [2] - 124:4, 167:16
**pursue** [4] - 11:9, 54:6, 56:1, 199:14
**pursuit** [1] - 177:16
**push** [1] - 148:7
**put** [21] - 27:3, 29:10, 29:16, 41:9, 58:8, 71:8, 72:7, 72:14, 81:6, 149:2, 157:15, 158:20, 182:7, 182:19, 182:23, 186:16, 199:25, 200:1, 203:7, 208:16, 227:8
**puts** [1] - 139:19
**putting** [3] - 29:17, 57:22, 231:1

## Q

**questioning** [3] - 29:24, 49:17, 127:15
**questions** [36] - 5:11, 5:16, 6:6, 6:16, 7:5, 8:16, 12:23, 28:4,

28:9, 28:19, 31:11, 32:4, 33:24, 52:25, 78:3, 78:17, 79:21, 85:25, 86:3, 86:25, 90:7, 90:9, 90:19, 113:20, 115:14, 136:2, 136:12, 155:4, 159:1, 160:24, 178:2, 180:6, 182:13, 184:20, 184:21, 229:12
**quick** [6] - 8:1, 44:23, 53:7, 77:17, 183:8, 188:25
**quickly** [5] - 4:25, 77:19, 185:5, 222:23, 234:20
**quite** [5] - 71:21, 89:8, 111:8, 125:1, 135:15
**quote** [1] - 90:5
**quoting** [2] - 93:8, 93:9

## R

**radar** [2] - 94:23, 94:24
**radio** [28] - 24:16, 24:18, 36:5, 55:21, 55:23, 95:22, 96:1, 110:20, 111:19, 112:8, 112:16, 112:24, 113:4, 113:10, 113:21, 114:4, 114:6, 154:12, 154:16, 154:25, 155:10, 176:23, 177:6, 178:19, 205:15, 205:16, 225:7
**Rae** [1] - 196:15
**raise** [9] - 15:2, 34:12, 87:8, 123:22, 124:25, 137:7, 153:16, 198:18, 212:25
**raised** [1] - 53:22
**random** [1] - 146:9
**ranks** [2] - 31:3, 31:9
**rap** [31] - 19:20, 19:25, 21:5, 21:8, 21:9, 21:11, 24:11, 35:13, 35:23, 36:12, 37:7, 55:2, 55:5, 55:8, 74:23, 74:24, 77:9, 82:17, 98:2, 109:15, 109:20, 110:14, 114:16, 115:4, 140:21, 142:12,

144:12, 148:9, 200:14, 205:11, 222:8
**Rap** [1] - 142:4
**rappers** [1] - 54:25
**rate** [1] - 229:25
**rather** [2] - 123:24, 223:1
**rating** [1] - 127:17
**raw** [1] - 119:20
**Re** [1] - 131:19
**reach** [1] - 123:13
**reached** [4] - 5:18, 5:22, 7:11, 195:2
**reaching** [1] - 215:20
**react** [1] - 69:22
**reaction** [6] - 73:14, 134:11, 208:13, 209:8, 209:13, 209:14
**read** [15] - 88:20, 89:3, 90:7, 125:19, 126:21, 126:25, 178:1, 185:9, 188:2, 188:16, 189:5, 190:16, 191:2, 192:11, 193:8
**reading** [5] - 88:16, 188:10, 188:13, 189:7, 189:18
**ready** [6] - 14:16, 14:17, 72:13, 129:4, 190:1, 209:24
**real** [5] - 44:23, 53:7, 77:17, 135:17, 235:20
**reality** [2] - 111:10, 216:19
**realize** [1] - 135:11
**realized** [5] - 59:16, 89:17, 180:15, 200:9, 220:21
**really** [46] - 4:25, 16:11, 32:22, 36:18, 54:10, 54:11, 54:23, 56:13, 56:15, 57:1, 59:15, 64:24, 67:18, 68:19, 69:23, 79:11, 92:14, 94:22, 99:11, 104:8, 114:21, 115:1, 120:1, 120:17, 134:18, 183:3, 183:8, 184:19, 188:19, 200:1, 200:5, 201:10, 201:13, 202:25, 205:10, 206:14, 206:15, 207:6, 207:21, 208:22, 209:19,

211:6, 215:20
**reason** [5] - 42:8, 47:2, 51:20, 121:1, 155:25
**reasoning** [1] - 159:9
**reasons** [1] - 89:3
**rebuttal** [2] - 187:2, 187:6
**receive** [7] - 83:16, 86:11, 124:20, 163:18, 163:21, 175:22, 184:11
**RECEIVED** [1] - 3:19
**received** [33] - 83:5, 83:7, 83:10, 83:13, 84:15, 124:9, 124:17, 165:16, 175:14, 175:17, 175:20, 175:22, 180:15, 195:4, 195:6, 195:8, 195:11, 195:20, 195:21, 195:24, 196:1, 196:4, 196:14, 196:16, 196:18, 196:20, 196:23, 197:7, 197:9, 197:11, 197:13, 197:16
**receiving** [6] - 86:7, 164:3, 194:25, 195:17, 196:11, 197:4
**recess** [12] - 79:25, 80:4, 80:10, 80:12, 80:13, 123:19, 123:20, 153:17, 184:25, 188:1, 188:23, 188:24
**recognize** [6] - 22:1, 43:19, 48:9, 104:7, 151:1, 170:24
**recollection** [9] - 46:20, 80:21, 103:10, 118:16, 129:25, 149:10, 168:22, 183:9, 216:25
**recommend** [2] - 76:25, 208:9
**recommended** [3] - 27:20, 27:23, 208:7
**record** [34] - 15:7, 17:24, 19:15, 20:11, 29:11, 34:18, 57:11, 62:5, 62:13, 62:14, 97:23, 102:21, 119:25, 120:22, 121:12, 138:8, 138:9, 138:15,

138:20, 151:22, 161:16, 161:19, 162:2, 169:22, 176:16, 177:12, 185:9, 186:7, 198:16, 198:21, 199:19, 199:20, 213:4, 220:23
**Record** [1] - 78:11
**recorded** [7] - 13:14, 63:11, 63:16, 65:2, 66:6, 103:15, 103:17
**recording** [21] - 17:20, 19:6, 21:1, 21:11, 31:19, 38:11, 39:13, 57:1, 61:2, 103:18, 103:19, 116:18, 148:7, 164:12, 165:19, 191:8, 192:14, 192:16, 193:1
**records** [30] - 19:4, 29:16, 55:19, 111:23, 126:11, 151:6, 151:7, 152:17, 152:18, 152:21, 152:22, 153:4, 154:1, 162:10, 162:13, 164:20, 164:23, 165:15, 166:8, 169:10, 176:12, 177:5, 177:7, 177:9, 177:11, 177:13, 198:11, 219:16
**Records** [23] - 97:24, 155:13, 155:17, 155:23, 162:25, 163:5, 163:18, 163:25, 164:4, 164:9, 165:19, 165:25, 166:10, 167:8, 167:16, 174:17, 175:13, 175:24, 176:2, 184:4, 184:8, 184:11, 192:13
**RECROSS** [6] - 3:4, 32:8, 86:5, 136:16, 182:14, 234:21
**RECROSS-EXAMINATION** [5] - 32:8, 86:5, 136:16, 182:14, 234:21
**rectified** [1] - 10:10
**red** [1] - 228:1
**redacted** [1] - 14:8
**Redeemed** [25] - 22:6, 75:13, 128:7, 142:23, 143:14,

158:13, 161:15, 161:22, 162:5, 162:11, 164:1, 164:5, 164:6, 164:7, 165:24, 166:13, 166:20, 175:15, 175:18, 180:16, 180:21, 181:6, 181:19, 203:20
**redirect** [3] - 79:22, 136:1, 233:3
**REDIRECT** [6] - 3:4, 31:14, 80:18, 136:4, 178:4, 233:6
**REDUCED** [1] - 237:12
**reduced** [1] - 102:11
**Reed** [1] - 132:3
**refer** [6] - 20:16, 40:7, 60:25, 99:1, 99:5, 165:8
**reference** [2] - 67:5, 89:23
**referred** [7] - 20:19, 97:2, 98:18, 112:18, 113:17, 131:25, 146:18
**referring** [22] - 62:2, 66:11, 97:19, 101:4, 104:1, 111:21, 112:15, 112:20, 113:10, 113:11, 113:12, 113:13, 113:21, 113:22, 113:24, 113:25, 119:1, 167:5, 167:6, 213:18, 213:20
**reflected** [1] - 105:3
**reflecting** [1] - 165:1
**reflects** [1] - 105:9
**refresh** [5] - 46:20, 61:13, 80:21, 118:16, 183:9
**refreshed** [2] - 81:16, 216:25
**refreshes** [1] - 168:22
**regard** [1] - 91:21
**regarding** [9] - 115:7, 115:15, 115:18, 115:19, 159:12, 192:12, 233:14, 233:17
**registered** [3] - 218:4, 218:7, 226:18
**registration** [2] - 104:10, 104:21
**regulations** [2] - 215:16, 216:6
**Reid** [1] - 98:10
**Reilly** [2] - 191:17,

191:23
**relate** [3] - 128:6, 191:3, 226:22
**related** [6] - 24:10, 45:12, 93:2, 124:7, 221:7
**relates** [2] - 163:17, 214:15
**relating** [1] - 166:15
**relationship** [7] - 59:7, 59:21, 68:21, 118:11, 119:17, 131:12, 163:25
**relative** [1] - 46:3
**relatively** [1] - 222:23
**relax** [1] - 82:8
**release** [8] - 160:4, 160:16, 160:18, 161:15, 161:18, 174:9, 174:12, 174:18
**released** [9] - 37:10, 134:5, 139:5, 150:12, 150:14, 158:14, 161:10, 166:11, 166:13
**releasing** [2] - 166:7, 166:16
**relevance** [2] - 44:12, 44:17
**relevant** [5] - 6:21, 45:4, 45:16, 45:24, 217:1
**relied** [2] - 12:6, 126:5
**religious** [26] - 19:22, 20:2, 24:14, 24:18, 25:15, 26:16, 26:19, 55:8, 55:24, 75:1, 75:25, 77:7, 78:15, 109:17, 109:22, 110:18, 110:20, 114:18, 121:18, 149:10, 149:22, 205:13, 206:5, 227:14, 227:25, 228:10
**remained** [2] - 132:8, 216:10
**remarked** [1] - 104:14
**remember** [20] - 61:18, 73:11, 74:21, 101:6, 118:15, 130:2, 133:12, 136:6, 136:8, 136:9, 174:22, 182:24, 182:25, 199:11, 202:8, 209:7, 209:10, 209:11, 209:18, 231:3
**remembered** [2] -

203:16, 203:17
**remind** [2] - 161:10, 207:8
**remix** [3] - 33:1, 33:3, 33:7
**remove** [1] - 124:6
**rendered** [4] - 8:24, 9:5, 10:15, 10:19
**renew** [1] - 145:10
**reopen** [2] - 185:24, 186:16
**reopening** [2] - 126:23, 186:7
**repeat** [9] - 23:10, 24:1, 24:22, 27:15, 68:1, 85:4, 93:15, 102:22, 135:13
**repeating** [2] - 64:13, 101:8
**Repertoire** [2] - 98:14, 120:21
**repetitive** [1] - 63:17
**rephrase** [4] - 49:21, 85:5, 100:23, 201:3
**report** [3] - 185:3, 187:16, 188:3
**REPORTED** [1] - 237:10
**reporter** [1] - 80:1
**REPORTER** [13] - 1:22, 17:2, 17:17, 23:24, 28:14, 79:23, 119:11, 120:11, 122:16, 122:19, 237:2, 237:8, 237:22
**REPORTER'S** [1] - 1:14
**reports** [2] - 153:1, 177:25
**represent** [1] - 104:9
**request** [1] - 124:5
**requested** [1] - 128:7
**require** [1] - 191:1
**required** [1] - 125:18
**requires** [2] - 88:5, 120:7
**research** [1] - 216:23
**resigned** [1] - 164:8
**resolution** [1] - 123:14
**resolve** [7] - 123:2, 125:1, 224:11, 225:22, 226:3, 226:6, 226:11
**resolved** [4] - 5:14, 10:10, 13:9, 14:6
**respect** [12] - 13:5, 20:24, 27:10, 45:16, 95:14, 99:23, 102:17, 105:10, 132:11, 133:22,

133:24, 192:20
**respond** [3] - 52:23, 125:6, 190:6
**responded** [1] - 125:11
**response** [3] - 5:20, 9:12, 110:2
**responses** [1] - 127:8
**responsibilities** [2] - 215:7, 215:8
**responsibility** [2] - 142:3, 216:4
**responsible** [2] - 163:11, 163:14
**rest** [5] - 131:13, 185:23, 186:2, 187:7, 230:8
**result** [3] - 61:2, 231:23, 234:2
**results** [13] - 219:10, 221:17, 221:21, 223:15, 223:23, 224:6, 224:12, 225:22, 226:9, 231:19, 231:20, 232:24, 235:17
**resume** [1] - 236:3
**retained** [4] - 213:10, 213:12, 214:25, 217:6
**return** [1] - 62:24
**revenue** [1] - 145:7
**revenues** [2] - 145:8, 145:15
**review** [4] - 190:19, 215:11, 217:4
**reviewed** [2] - 112:6, 144:1
**reviewing** [1] - 113:21
**revisit** [1] - 53:22
**Rewind** [1] - 158:7
**rhythm** [1] - 65:15
**rhythmic** [1] - 132:4
**rhythms** [1] - 38:18
**ridiculous** [1] - 46:10
**right-hand** [1] - 218:3
**rights** [5] - 31:20, 83:23, 97:17, 157:14, 184:3, 184:6
**Rihanna** [1] - 195:8
**ring** [1] - 183:3
**rise** [4] - 14:18, 80:7, 80:14, 122:5
**ROAD** [1] - 2:11
**road** [5] - 146:19, 146:23, 147:8, 147:9, 154:5
**roads** [1] - 58:6
**Roar** [1] - 73:10
**robots** [1] - 232:5

**Rock** [3] - 179:24, 182:17, 195:23
**rock** [4] - 18:23, 200:18, 222:8
**Rockets** [1] - 150:4
**role** [18] - 20:5, 20:7, 20:13, 71:7, 72:10, 91:21, 129:15, 129:18, 132:17, 132:19, 132:25, 133:3, 133:7, 200:23, 200:25, 216:21, 233:10, 234:4
**roles** [2] - 84:4, 102:2
**Romance** [1] - 195:5
**ROOM** [1] - 1:23
**room** [7] - 64:20, 65:24, 70:24, 103:8, 202:25, 209:16, 209:17
**rotated** [1] - 142:13
**roughly** [1] - 150:6
**royalties** [10] - 155:21, 156:1, 157:2, 157:5, 157:12, 163:21, 167:13, 167:14, 167:18, 175:20
**rudimentary** [1] - 224:23
**ruin** [1] - 208:24
**Rule** [2] - 10:25, 171:11
**rules** [1] - 13:8
**running** [1] - 234:11
**runs** [1] - 147:10
**Russell** [1] - 34:20
**Ryan** [1] - 197:12
**Ryda** [1] - 60:1

**S**

**S-a-n-d-b-e-r-g** [1] - 15:9
**safe** [1] - 41:22
**sake** [1] - 216:12
**salami** [1] - 10:4
**salary** [1] - 100:9
**sale** [1] - 181:24
**sales** [26] - 95:22, 96:5, 96:8, 111:19, 111:20, 111:24, 112:3, 112:4, 112:6, 112:16, 112:23, 113:10, 113:21, 114:4, 114:7, 139:14, 156:3, 162:10, 162:13, 163:18, 164:20, 164:23, 180:15,

180:16, 181:18, 181:21
**SAME** [1] - 237:12
**sample** [1] - 223:16
**Sandberg** [31] - 14:22, 15:2, 15:8, 15:14, 15:16, 15:24, 16:12, 16:18, 17:7, 18:2, 18:9, 18:14, 19:11, 19:19, 20:4, 20:16, 21:16, 21:18, 24:4, 28:7, 28:13, 31:16, 31:18, 32:10, 34:2, 34:5, 71:3, 117:21, 132:16, 172:5, 192:19
**SANDBERG** [1] - 3:12
**Santa** [14] - 20:10, 20:23, 21:2, 50:8, 68:13, 69:2, 69:12, 103:3, 132:14, 201:16, 201:21, 202:14, 203:3, 209:9
**Sara** [1] - 20:19
**SARA** [1] - 3:14
**Sarah** [13] - 20:15, 20:19, 20:22, 70:23, 71:1, 103:4, 106:17, 132:25, 172:4, 192:19, 198:15, 198:22
**satisfaction** [1] - 224:18
**satisfied** [4] - 9:20, 103:13, 224:20, 224:23
**Saturday** [4] - 116:21, 116:24, 117:4, 117:12
**save** [8] - 9:4, 9:7, 29:22, 30:12, 30:16, 40:2, 40:5, 49:14
**saved** [4] - 6:17, 30:8, 50:15, 66:16
**saving** [1] - 30:4
**saw** [6] - 98:5, 119:20, 128:22, 181:2, 181:6, 209:20
**scale** [1] - 58:23
**schedule** [1] - 190:7
**Schedule** [3] - 14:6, 188:7
**scheduled** [1] - 61:17
**scheduling** [1] - 188:25
**scheme** [1] - 185:2
**school** [16] - 36:4, 55:6, 55:9, 55:20, 56:1, 56:3, 56:7, 56:8, 57:9, 57:20,

79:12, 116:11, 199:14, 199:16, 213:24
**School** [2] - 116:13, 116:14
**science** [1] - 234:24
**Science** [1] - 213:25
**scope** [1] - 85:9
**scour** [1] - 95:15
**scratching** [2] - 36:21, 55:18
**screen** [2] - 143:21, 157:22
**scribner** [1] - 9:11
**scroll** [1] - 226:1
**Se** [1] - 196:18
**Seabrooke** [3] - 88:9, 88:22, 89:10
**Seal** [1] - 40:24
**search** [35] - 27:25, 76:15, 76:17, 76:24, 207:11, 208:3, 208:6, 219:7, 219:9, 221:13, 221:16, 221:20, 223:14, 223:15, 223:23, 224:6, 224:12, 224:18, 225:22, 226:9, 231:19, 231:20, 231:23, 232:23, 232:24, 234:11, 234:15, 235:9, 235:13, 235:17, 235:20
**searched** [1] - 235:16
**searching** [1] - 223:6
**seated** [8] - 14:20, 34:14, 80:9, 80:16, 87:10, 122:7, 137:9, 213:2
**seating** [2] - 179:8, 179:25
**Sebastian** [1] - 87:16
**second** [13] - 65:11, 68:4, 72:25, 118:24, 150:23, 158:8, 161:13, 189:2, 195:3, 195:21, 196:15, 197:8, 215:10
**secondarily** [1] - 11:1
**seconds** [6] - 15:16, 64:12, 66:8, 194:4, 198:3, 211:12
**section** [10] - 49:12, 49:13, 63:18, 64:19, 65:2, 65:14, 65:17, 65:19, 66:4, 105:5
**sections** [1] - 65:22
**secure** [3] - 142:3,

142:11, 160:3
**securing** [1] - 166:4
**see** [62] - 7:13, 13:23, 16:1, 16:2, 23:22, 29:10, 42:10, 44:10, 53:14, 63:6, 69:13, 69:22, 81:7, 96:1, 98:15, 105:3, 105:4, 105:7, 105:16, 105:18, 105:19, 105:22, 105:23, 106:22, 106:23, 106:25, 117:17, 122:4, 122:19, 123:13, 123:17, 130:22, 145:1, 158:13, 158:18, 159:11, 168:11, 171:13, 182:21, 189:22, 190:20, 208:22, 218:2, 218:22, 219:7, 219:10, 219:24, 221:13, 222:2, 222:15, 223:17, 223:19, 223:20, 223:25, 224:6, 224:12, 225:14, 226:8, 226:10, 228:9, 228:18, 236:6
**seeing** [5] - 14:12, 71:14, 95:1, 98:2, 225:15
**seek** [4] - 5:9, 8:14, 43:11, 43:13
**seeked** [1] - 91:15
**seeking** [4] - 11:21, 90:11, 157:7, 157:5
**sees** [1] - 141:12
**select** [2] - 223:1, 224:14
**selected** [1] - 38:21
**self** [2] - 158:2, 158:3
**self-titled** [2] - 158:2, 158:3
**selfishly** [1] - 42:9
**sell** [1] - 162:3
**send** [9] - 72:7, 77:1, 77:4, 84:16, 84:19, 85:14, 173:25, 189:12
**sending** [5] - 84:25, 85:8, 85:13, 86:8, 174:3
**Senior** [1] - 214:19
**sense** [7] - 20:15, 24:8, 32:25, 33:8, 94:16, 101:13, 226:13
**sent** [1] - 173:20

**separate** [6] - 70:24, 124:9, 163:6, 202:25, 228:11, 228:13
**September** [2] - 151:9, 220:22
**sequence** [4] - 63:24, 64:5, 67:10, 187:19
**series** [3] - 64:13, 183:19, 223:20
**serious** [2] - 73:20, 125:1
**seriously** [2] - 134:19, 134:22
**served** [1] - 231:8
**service** [11] - 111:20, 112:8, 114:20, 114:21, 191:5, 217:2, 217:3, 218:7, 221:25, 222:7, 231:9
**services** [11] - 44:10, 44:11, 45:11, 46:24, 112:10, 112:15, 192:18, 192:25, 193:3, 213:15, 214:12
**serving** [2] - 91:10, 231:15
**session** [13] - 8:23, 8:25, 9:4, 10:4, 10:14, 11:7, 13:5, 30:12, 40:6, 40:7, 40:9, 71:20, 116:8
**SET** [1] - 237:11
**set** [15] - 61:20, 61:23, 62:25, 63:2, 123:9, 147:11, 147:14, 147:15, 147:16, 148:25, 149:2, 176:6, 176:11, 176:14, 190:25
**settled** [1] - 157:17
**settlement** [2] - 156:23, 184:17
**setup** [1] - 62:22
**seven** [3] - 78:22, 78:24
**several** [13] - 37:8, 42:19, 43:4, 58:5, 83:7, 88:13, 92:7, 93:3, 125:11, 155:23, 157:20, 167:18, 167:19
**Shakira's** [1] - 195:3
**share** [4] - 76:13, 99:18, 107:7, 191:6
**sharing** [2] - 93:22, 191:5
**Sharon** [2] - 218:19, 231:2

**Sharon's** [1] - 231:7
**shifts** [1] - 211:11
**Shop** [1] - 197:13
**short** [7] - 79:25, 125:13, 177:3, 199:17, 199:18, 201:11, 232:5
**shorter** [1] - 155:8
**shorthand** [1] - 59:17
**show** [23] - 24:24, 25:6, 36:5, 45:18, 45:20, 55:21, 103:23, 116:22, 116:23, 117:8, 117:10, 117:13, 117:14, 147:13, 149:24, 154:25, 168:19, 169:10, 169:11, 183:5, 183:25, 231:10, 231:20
**showed** [4] - 56:12, 81:1, 81:2, 179:6
**showing** [4] - 169:7, 171:9, 176:6, 177:10
**shown** [2] - 61:22, 156:22
**shows** [12] - 7:2, 18:24, 24:20, 117:5, 141:1, 148:21, 148:23, 151:22, 171:8, 175:1, 205:18, 217:24
**sic** [1] - 176:19
**side** [11] - 4:15, 11:3, 11:17, 44:23, 45:6, 45:7, 45:8, 79:14, 153:16, 179:16, 218:3
**Side** [1] - 47:4
**sides** [2] - 9:1, 153:18
**Sight** [25] - 138:10, 138:11, 138:17, 138:24, 139:1, 140:22, 142:1, 142:2, 142:19, 145:1, 150:14, 151:17, 161:11, 161:16, 161:18, 161:22, 162:2, 163:4, 165:5, 165:8, 166:5, 166:8, 166:16, 182:7
**sign** [1] - 218:6
**signed** [19] - 41:16, 41:19, 44:6, 57:11, 59:14, 84:7, 98:1, 98:4, 98:16, 132:2, 162:24, 163:5, 165:18, 174:13,

174:18, 174:20, 175:6, 181:10, 199:18
**signing** [3] - 147:12, 184:5, 184:10
**signings** [1] - 181:9
**signs** [1] - 121:6
**SILBERBERG** [1] - 2:15
**Silver** [1] - 149:19
**similarly** [3] - 15:20, 134:21, 212:14
**simple** [1] - 81:21
**simpler** [1] - 131:4
**simplified** [1] - 131:10
**simplify** [1] - 131:6
**simply** [5] - 6:3, 12:9, 46:23, 125:18, 153:19
**sing** [1] - 18:8
**singing** [1] - 199:12
**single** [2] - 70:17, 118:24
**singles** [2] - 88:24, 90:22
**sister** [1] - 89:5
**sit** [3] - 18:7, 40:20, 111:6
**site** [15] - 142:12, 217:18, 219:7, 220:3, 220:9, 220:16, 220:17, 221:24, 222:2, 222:13, 224:22, 227:9, 230:19, 233:11, 233:18
**sites** [1] - 142:2
**sitting** [2] - 101:1, 103:24
**situation** [3] - 32:12, 33:1, 59:12
**Six** [1] - 149:19
**six** [11] - 8:8, 73:9, 78:22, 171:17, 171:24, 172:16, 172:20, 172:24, 199:25, 211:23, 212:4
**Sixth** [5] - 139:12, 142:5, 142:10, 142:13, 161:14
**size** [4] - 169:15, 169:19, 169:23, 170:12
**skeptical** [1] - 185:17
**skip** [1] - 69:21
**skipped** [1] - 70:2
**skipping** [1] - 70:1
**slammed** [1] - 79:10
**sleeping** [1] - 200:2

**slept** [1] - 208:17
**slice** [1] - 10:4
**slide** [9] - 217:23, 218:16, 221:3, 223:17, 223:18, 225:13, 228:1, 228:7, 228:8
**slowed** [2] - 101:14, 131:9
**small** [2] - 55:22, 143:21
**smaller** [3] - 150:22, 169:15, 179:16
**smoothly** [1] - 147:10
**snapshot** [2] - 218:25, 221:5
**snapshots** [1] - 217:3
**SNYDER** [1] - 1:4
**so-and-so** [1] - 9:8
**social** [1] - 217:21
**socially** [1] - 96:22
**socked** [1] - 71:23
**soft** [1] - 97:6
**software** [9] - 29:5, 38:8, 38:10, 39:13, 39:16, 39:19, 62:20, 229:6, 235:3
**SOKOL** [1] - 2:5
**sold** [1] - 214:24
**sole** [1] - 31:22
**solo** [2] - 139:4, 147:6
**solution** [1] - 155:20
**someone** [9] - 9:10, 70:19, 72:11, 73:19, 76:25, 77:3, 81:11, 89:14, 89:15, 89:16, 94:7, 96:23, 99:11, 119:18, 126:4, 127:16, 186:10, 219:23, 229:6
**sometime** [1] - 109:7
**sometimes** [8] - 31:19, 85:20, 85:23, 86:11, 111:16, 111:22, 135:16, 203:24
**somewhat** [1] - 59:19
**somewhere** [1] - 56:19
**song** [162] - 11:9, 17:21, 17:25, 18:5, 18:8, 20:4, 20:25, 21:17, 21:18, 21:21, 22:3, 26:7, 28:20, 30:8, 32:22, 32:23, 32:24, 32:25, 33:5, 40:24, 42:9, 46:8, 46:9, 47:8, 47:12, 47:15, 49:9, 50:3, 50:7, 52:1, 52:2,

52:23, 53:8, 53:12, 53:16, 58:15, 58:16, 58:18, 60:8, 63:19, 70:10, 70:12, 71:5, 71:8, 71:10, 71:11, 72:1, 72:12, 72:16, 75:12, 77:1, 77:16, 82:24, 83:8, 83:11, 95:10, 96:7, 97:17, 98:3, 99:21, 101:22, 101:25, 102:1, 102:4, 102:6, 102:9, 102:13, 102:18, 103:5, 103:15, 104:10, 107:5, 109:6, 109:8, 114:4, 116:2, 119:23, 128:6, 129:13, 131:3, 132:1, 132:3, 132:15, 135:19, 136:6, 136:8, 136:19, 143:11, 144:1, 147:3, 149:2, 149:3, 155:5, 158:18, 172:11, 177:3, 177:4, 181:24, 182:5, 182:6, 195:2, 195:5, 195:7, 195:10, 195:19, 195:23, 196:4, 196:13, 196:15, 196:17, 196:19, 196:22, 197:6, 197:8, 197:10, 197:13, 197:15, 197:19, 197:24, 197:25, 198:1, 198:4, 198:5, 198:8, 198:11, 198:12, 200:10, 201:6, 201:22, 203:2, 203:13, 206:14, 206:22, 208:21, 208:24, 209:24, 210:4, 210:17, 212:2, 221:15, 221:16, 221:17, 223:4, 223:12, 225:6, 226:25, 227:14, 227:15, 227:16, 227:23, 227:24, 228:5, 228:9, 228:12, 228:20, 228:22, 228:25, 229:1, 229:2, 229:10, 235:11, 235:18
**Song** [1] - 78:11
**song's** [1] - 226:11
**Songs** [3] - 41:17,

100:7, 121:10
**songs** [62] - 19:5, 26:12, 26:15, 30:18, 33:17, 33:18, 42:13, 42:18, 44:4, 50:8, 60:2, 73:6, 73:8, 73:9, 76:24, 77:21, 82:3, 83:19, 86:21, 91:23, 91:25, 92:1, 92:12, 94:6, 97:7, 97:9, 97:13, 97:15, 97:16, 97:19, 97:21, 111:11, 116:19, 117:8, 117:18, 118:3, 118:7, 118:21, 119:6, 131:20, 134:20, 141:2, 156:25, 158:2, 158:5, 158:8, 158:11, 158:16, 176:6, 180:9, 199:13, 199:16, 223:1, 223:16, 223:21, 224:4, 224:8, 224:15, 224:19, 226:19, 227:18
**Songwriter** [2] - 83:13, 83:16
**songwriter** [20] - 16:20, 18:3, 19:7, 28:23, 32:13, 33:10, 33:15, 33:16, 45:22, 53:25, 58:11, 59:14, 83:19, 87:25, 107:20, 117:6, 119:24, 129:19, 199:6, 201:8
**songwriters** [9] - 18:10, 18:12, 46:1, 84:13, 93:25, 111:1, 121:7, 211:24, 212:1
**sonics** [3] - 17:1, 17:20, 32:24
**Sony** [11] - 91:15, 91:19, 91:22, 91:25, 92:1, 92:9, 111:23, 216:16, 216:20, 230:13
**Sony's** [1] - 91:12
**soon** [4] - 59:15, 60:24, 61:19, 199:20
**sorry** [25] - 17:2, 20:18, 23:10, 24:22, 27:15, 29:8, 31:6, 33:12, 41:2, 52:17, 68:1, 79:23, 97:16, 98:22, 102:3, 102:12, 102:22, 104:12, 113:14,

119:11, 119:23, 120:11, 122:16, 128:9, 141:6
**sort** [14] - 8:10, 24:7, 55:8, 73:4, 75:2, 89:20, 131:4, 131:20, 135:12, 154:6, 200:10, 201:8, 210:12, 211:17
**sought** [2] - 9:19, 56:5
**sound** [22] - 26:2, 38:20, 51:12, 51:24, 51:25, 52:16, 57:2, 63:4, 64:24, 66:1, 66:20, 71:13, 72:12, 103:18, 147:11, 148:10, 148:11, 148:12, 191:8, 192:14, 192:16, 193:1
**Sound** [1] - 199:23
**sounded** [3] - 63:11, 159:22, 230:22
**sounding** [1] - 63:17
**sounds** [6] - 50:18, 51:15, 65:16, 118:17, 163:8, 227:19
**South** [1] - 180:3
**Sovereign** [1] - 132:2
**space** [4] - 64:19, 142:3, 160:3, 166:4
**spare** [1] - 63:3
**speaker** [1] - 90:17
**speakers** [1] - 62:23
**speaking** [6] - 15:19, 15:20, 15:21, 38:13, 135:10
**speaks** [1] - 184:18
**Spears** [8] - 19:8, 58:12, 58:15, 58:17, 90:25, 117:13, 118:6, 119:22
**specialized** [1] - 72:10
**specific** [9] - 39:8, 61:11, 61:18, 62:4, 93:4, 197:18, 231:11, 235:4, 235:7
**Specific** [2] - 214:25
**specifically** [8] - 81:11, 84:1, 115:18, 121:20, 129:13, 213:14, 214:15, 222:10
**specifications** [1] - 233:23
**specifics** [2] - 160:6, 177:21
**spectra** [1] - 10:10

speculating [1] - 175:21
spell [5] - 15:6, 34:17, 87:14, 198:20, 213:3
spelled [1] - 89:6
spend [3] - 58:1, 111:1, 120:4
spent [3] - 88:12, 210:20, 230:2
split [1] - 45:22
spoken [2] - 173:17, 204:7
spokesperson [1] - 229:20
sponsor [1] - 182:24
sports [1] - 150:3
spot [1] - 218:2
Spotify [12] - 31:1, 31:3, 42:15, 43:19, 43:20, 43:22, 43:23, 95:8, 127:5, 127:7, 127:17, 140:12
Spotify's [1] - 42:17
Spring [1] - 69:4
spun [1] - 214:20
square [1] - 228:1
SS [1] - 237:5
ST [1] - 2:8
St [4] - 212:23, 213:5, 213:8, 217:23
st [1] - 212:24
ST.MARTIN [1] - 3:16
Stadium [1] - 182:17
stage [5] - 45:4, 46:19, 47:3, 187:24, 190:14
stake [2] - 124:16, 217:9
stamp [1] - 188:9
stand [3] - 100:21, 127:10, 185:2
standard [1] - 176:8
stands [3] - 62:18, 120:21, 190:20
star [2] - 18:23, 199:15
start [26] - 36:2, 63:3, 63:4, 63:5, 63:6, 70:16, 70:20, 85:8, 101:13, 124:20, 126:10, 128:10, 148:7, 153:3, 155:17, 185:25, 186:10, 189:18, 199:22, 211:15, 216:18, 218:1, 222:21, 223:23, 224:7, 225:4
start-up [1] - 216:18
started [42] - 8:8, 18:20, 18:22, 19:2, 19:4, 19:15, 20:13,

21:1, 27:2, 36:2, 36:4, 40:17, 48:16, 52:11, 56:19, 57:10, 60:3, 63:9, 63:10, 63:12, 64:4, 64:5, 64:23, 66:2, 107:15, 116:5, 116:6, 118:1, 124:23, 130:9, 138:24, 162:23, 199:11, 199:12, 199:15, 200:6, 200:7, 215:18, 215:21, 216:10, 217:13, 218:10
starting [5] - 163:8, 180:18, 214:16, 215:18, 220:20
starts [2] - 105:19, 225:8
STATE [1] - 237:6
state [8] - 4:6, 15:6, 34:17, 87:14, 137:9, 152:24, 198:20, 213:3
statement [5] - 80:23, 89:2, 90:6, 90:16, 225:17
statements [1] - 193:7
states [1] - 152:9
STATES [4] - 1:1, 1:1, 1:4, 237:9
station [11] - 9:3, 29:5, 38:5, 38:7, 39:9, 51:17, 51:21, 55:23, 62:11, 154:12, 154:13
stations [5] - 24:16, 154:16, 154:17, 154:18, 205:15
status [1] - 218:22
stay [3] - 189:4, 189:21, 189:23
staying [2] - 18:1, 76:19
stays [1] - 30:4
stealing [1] - 134:15
Stellar [6] - 25:6, 25:8, 25:10, 173:2, 205:24, 205:25
STENOGRAPHIC [1] - 237:15
STENOGRAPHICAL LY [1] - 237:10
step [9] - 10:9, 19:4, 53:24, 72:3, 87:3, 116:3, 137:1, 184:22, 212:21
steps [1] - 56:1
Sterio [1] - 196:1
still [15] - 13:10,

37:23, 69:4, 72:24, 117:9, 124:10, 124:11, 152:14, 163:5, 189:5, 190:10, 209:21, 212:14, 225:5, 234:15
stipulated [1] - 45:15
stipulation [3] - 189:6, 189:17, 193:8
stipulations [6] - 14:7, 185:9, 185:22, 188:6, 188:22, 190:16
Stop [1] - 197:16
stop [2] - 12:3, 116:15
stopped [3] - 82:25, 86:18, 163:25
store [2] - 181:3, 181:8
Store [1] - 181:7
stores [10] - 139:19, 139:20, 139:25, 140:4, 164:24, 180:18, 180:21, 181:10, 181:12, 181:13
story [4] - 199:16, 199:18, 201:11, 210:18
stream [3] - 43:25, 44:1, 160:17
streaming [2] - 43:23, 114:4
Street [4] - 170:9, 171:1, 179:7, 179:15
STREET [1] - 1:23
stretched [5] - 64:25, 65:1, 65:11, 101:14, 131:10
strike [5] - 142:16, 170:1, 170:2, 182:8, 182:10
striking [1] - 124:13
striving [1] - 120:16
stroke [1] - 58:10
strong [3] - 209:8, 209:13, 233:25
strongly [1] - 12:11
struggle [1] - 58:6
studio [27] - 19:1, 37:10, 56:20, 58:12, 61:14, 61:19, 61:24, 69:12, 88:13, 94:1, 99:13, 100:13, 100:14, 103:3, 120:5, 120:18, 120:19, 130:4, 135:14, 200:2, 201:21, 201:23,

201:25, 202:10, 202:14, 208:17, 210:20
Studio [1] - 132:10
Studios [4] - 61:6, 61:15, 67:24, 130:4
study [1] - 145:21
stuff [10] - 14:8, 14:9, 56:25, 77:4, 79:13, 117:15, 118:6, 131:19, 133:5, 235:5
Style [3] - 196:13, 197:6, 197:8
style [1] - 17:21
styling [1] - 70:20
stylists [1] - 199:1
subject [4] - 24:20, 126:23, 186:15, 187:2
submitting [1] - 190:8
subsequently [3] - 59:4, 65:19, 68:25
subsidiary [1] - 214:21
subtle [1] - 71:22
successful [4] - 57:13, 84:23, 85:14, 85:17
sued [11] - 108:2, 108:4, 108:10, 108:12, 108:19, 108:21, 109:9, 134:9, 134:11, 171:20, 208:14
suggest [3] - 9:22, 12:11, 219:19
suggested [4] - 49:10, 66:5, 66:6, 66:15
suggesting [1] - 124:13
suggestions [2] - 133:21, 134:2
suing [2] - 171:18, 171:25
SUITE [2] - 2:11, 2:23
summaries [7] - 124:7, 124:11, 125:2, 126:1, 126:4, 126:5, 153:11
summarize [1] - 223:3
summary [2] - 152:8, 152:15
summer [2] - 148:17, 168:1
super [3] - 94:21, 120:6, 120:7
supporting [1] - 126:11
suppose [1] - 188:19
surprised [3] - 50:15,

73:15, 134:12
surrounded [1] - 199:10
sustain [1] - 90:2
sustained [7] - 44:13, 120:10, 120:13, 144:14, 159:24, 171:22, 180:13
swap [1] - 188:11
swear [2] - 137:7, 212:25
sweat [1] - 208:16
Sweden [4] - 16:8, 16:12, 16:14, 21:3
Swift [1] - 19:9
sworn [6] - 15:4, 34:13, 87:9, 137:8, 198:19, 213:1
synthesized [3] - 66:19, 66:20, 66:22
synthesizers [1] - 56:24
system [1] - 111:24
systems [1] - 198:7

**T**

tab [1] - 150:23
table [1] - 150:21
tables [1] - 36:19
tag [1] - 227:20
tagged [4] - 223:21, 224:8, 227:24, 228:9
tags [1] - 227:21
talent [2] - 119:20, 208:22
talented [3] - 99:11, 119:20, 120:1
tambor [2] - 39:3, 65:4, 65:6
tambors [1] - 65:7
Target [3] - 140:2, 181:7, 181:12
taught [1] - 56:22
Taylor [1] - 19:8
teaching [1] - 145:22
team [2] - 105:1, 234:6
teams [2] - 150:2, 214:12
tears [1] - 208:17
technical [5] - 17:7, 17:13, 17:19, 18:7, 233:23
technology [1] - 216:20
teenage [1] - 111:9
Teenage [3] - 119:4, 119:7, 119:8
television [6] - 24:14, 25:3, 25:10, 110:18,

116:22, 205:13
**Telo's** [1] - 196:17
**Temper** [1] - 179:21
**tempo** [1] - 39:5
**ten** [8] - 80:3, 82:3, 116:25, 121:11, 140:18, 189:19, 230:5
**ten-minute** [1] - 80:3
**tend** [3] - 26:3, 26:8, 95:11
**tended** [1] - 135:13
**Tennessee** [1] - 179:22
**term** [1] - 220:19
**terms** [4] - 45:13, 46:7, 47:8, 59:8
**terrible** [1] - 92:16
**testified** [25] - 30:17, 53:25, 54:15, 59:3, 60:10, 62:4, 62:25, 64:4, 74:17, 76:3, 80:20, 84:15, 116:16, 119:15, 159:3, 163:17, 164:17, 167:7, 168:3, 169:1, 176:14, 176:22, 184:16, 209:23, 211:8
**testify** [9] - 16:8, 127:10, 127:13, 128:6, 128:11, 128:12, 128:13, 128:25, 144:19
**testifying** [4] - 28:21, 61:12, 141:12, 149:8
**testimony** [37] - 5:2, 5:6, 6:3, 10:16, 14:25, 60:14, 60:17, 63:13, 67:10, 74:22, 75:4, 77:11, 80:22, 100:16, 101:2, 101:5, 103:7, 113:7, 113:17, 124:8, 124:10, 124:11, 124:13, 125:3, 126:6, 127:5, 154:1, 168:9, 186:17, 211:19, 213:11, 216:24, 227:6, 227:13, 229:23, 229:25, 230:21
**text** [1] - 201:15
**texture** [1] - 39:1
**THAN** [1] - 2:13
**THAT** [3] - 237:10, 237:12, 237:14
**THE** [287] - 2:20, 3:3, 3:11, 4:3, 4:8, 4:13,

4:17, 4:19, 4:20, 4:24, 5:20, 6:8, 6:11, 6:14, 6:22, 7:12, 7:23, 8:5, 8:13, 8:18, 9:12, 10:12, 10:21, 11:11, 11:16, 11:24, 12:2, 12:11, 12:16, 12:22, 12:25, 13:13, 13:19, 13:22, 14:2, 14:4, 14:12, 14:15, 14:16, 14:18, 14:20, 14:21, 14:23, 15:2, 15:5, 15:8, 15:10, 15:11, 17:2, 17:5, 17:17, 17:18, 23:24, 28:5, 28:10, 28:14, 28:15, 28:16, 29:25, 30:2, 31:13, 32:5, 32:7, 33:25, 34:3, 34:4, 34:5, 34:7, 34:9, 34:12, 34:14, 34:20, 34:22, 44:13, 44:18, 44:19, 44:24, 44:25, 45:2, 45:3, 45:6, 45:9, 45:23, 46:10, 46:14, 46:18, 47:1, 47:5, 48:4, 48:6, 49:19, 50:2, 50:17, 50:18, 50:25, 51:3, 51:6, 53:2, 74:2, 79:22, 79:23, 79:25, 80:7, 80:9, 80:10, 80:12, 80:14, 80:16, 80:17, 82:21, 85:3, 85:4, 85:5, 85:11, 85:13, 86:2, 86:4, 87:1, 87:3, 87:4, 87:5, 87:7, 87:8, 87:10, 87:13, 87:14, 87:16, 87:18, 90:2, 90:5, 90:10, 90:13, 91:14, 92:21, 100:21, 100:23, 105:13, 107:9, 107:12, 107:15, 119:10, 119:11, 119:12, 120:11, 121:21, 121:24, 122:5, 122:7, 122:8, 122:12, 122:16, 122:19, 122:23, 123:1, 123:5, 123:6, 123:15, 123:17, 123:19, 123:23, 124:1, 124:24, 125:8, 125:20, 126:3, 126:8, 126:22, 127:2, 127:16, 127:23, 128:1, 128:9, 128:16, 128:18,

128:21, 129:1, 129:4, 129:5, 129:7, 136:1, 136:14, 136:15, 136:23, 136:25, 137:2, 137:3, 137:5, 137:6, 137:9, 137:11, 137:12, 141:6, 141:8, 141:11, 141:20, 142:16, 144:14, 144:19, 144:21, 151:14, 152:16, 153:3, 153:11, 153:15, 153:22, 153:25, 154:3, 159:24, 160:10, 161:5, 164:14, 170:2, 170:5, 170:6, 170:7, 170:15, 170:16, 170:22, 171:14, 171:22, 178:3, 179:10, 179:11, 180:13, 181:2, 181:5, 181:6, 182:4, 182:5, 182:9, 182:12, 183:6, 184:15, 184:18, 184:22, 185:5, 185:14, 186:5, 186:8, 186:12, 186:14, 186:21, 187:1, 187:5, 187:15, 187:20, 187:22, 188:12, 188:17, 188:20, 188:23, 189:5, 189:11, 189:15, 189:21, 189:25, 190:1, 190:5, 193:6, 193:10, 198:13, 198:18, 198:20, 198:22, 209:2, 210:12, 210:14, 212:19, 212:21, 212:24, 213:2, 213:5, 229:14, 232:14, 232:17, 233:3, 233:5, 234:19, 236:1, 236:8, 236:11, 236:13, 237:8, 237:9, 237:10, 237:11, 237:12
**theme** [1] - 149:22
**themselves** [3] - 124:5, 153:21, 171:13
**therapy** [1] - 137:24
**THEREAFTER** [1] - 237:12

**thereafter** [2] - 7:3, 190:10
**therefore** [1] - 9:25
**thereof** [1] - 10:7
**Theresa** [1] - 198:22
**they've** [3] - 9:4, 127:24, 211:1
**thinking** [4] - 67:6, 67:8, 157:13, 189:19
**thinks** [2] - 12:17, 185:18
**third** [8] - 109:12, 158:10, 158:11, 194:6, 195:5, 195:23, 196:17, 197:10
**thirty** [1] - 88:24
**THIS** [1] - 237:14
**thoughts** [1] - 159:20
**thousand** [2] - 170:16, 171:4
**three** [6] - 89:6, 135:9, 144:5, 148:21, 199:11, 199:19
**Thrift** [1] - 197:13
**throughout** [3] - 94:11, 116:2, 132:6
**throw** [1] - 82:7
**Thugs** [1] - 54:24
**Thugs-N-Harmony** [1] - 54:24
**Thursday** [3] - 186:23, 187:8, 190:10
**tight** [1] - 28:7
**TIME** [1] - 237:11
**timing** [1] - 10:7
**tired** [1] - 122:12
**title** [7] - 106:22, 135:8, 138:11, 139:7, 139:11, 210:2, 230:11
**titled** [6] - 158:2, 158:3, 191:11, 191:14, 191:17, 191:20
**titling** [2] - 147:3, 147:4
**TO** [1] - 237:12
**today** [22] - 37:23, 40:20, 51:10, 80:20, 80:22, 100:16, 101:1, 101:4, 124:15, 124:17, 125:2, 126:17, 126:18, 126:20, 127:5, 163:8, 186:10, 188:10, 189:12, 193:18, 216:20, 227:6
**today's** [1] - 42:22

**Todd** [1] - 177:23
**together** [25] - 18:8, 49:23, 49:24, 52:11, 59:22, 60:3, 66:3, 68:19, 68:20, 69:16, 71:8, 72:1, 99:13, 99:16, 99:18, 99:21, 100:13, 101:23, 102:23, 118:1, 125:12, 125:17, 149:5, 155:22, 201:12
**tomorrow** [6] - 126:16, 126:21, 186:2, 186:18, 190:20, 236:3
**tone** [1] - 72:11
**took** [6] - 56:7, 56:17, 79:6, 100:17, 123:10, 124:5, 152:9, 209:7, 210:22
**tool** [3] - 29:18, 207:7, 207:21
**Tools** [2] - 103:17, 103:22
**top** [15] - 70:21, 136:11, 141:2, 141:24, 148:10, 148:11, 175:1, 182:6, 188:9, 218:24, 219:8, 221:14, 223:19, 225:13, 225:22
**Top** [17] - 42:12, 42:17, 42:22, 77:19, 78:1, 88:24, 90:22, 96:1, 96:15, 96:17, 112:18, 112:19, 112:21, 112:25, 113:3
**topic** [1] - 21:17
**topics** [1] - 53:22
**Toronto** [2] - 56:3, 56:8
**total** [4] - 71:20, 73:9, 191:1, 232:1
**totaling** [1] - 228:19
**tough** [1] - 120:6
**tour** [10] - 57:12, 148:17, 148:21, 149:1, 149:4, 149:6, 168:2, 178:8, 183:21, 207:6
**toured** [1] - 199:25
**tours** [4] - 152:9, 180:19, 180:22, 181:14
**towards** [2] - 17:23, 186:25
**town** [1] - 218:14

track [33] - 7:3, 7:4, 20:9, 21:2, 21:14, 38:14, 45:18, 46:5, 46:13, 46:14, 46:25, 50:20, 58:10, 58:15, 58:16, 67:21, 69:24, 70:2, 70:9, 70:21, 71:12, 72:6, 112:3, 120:3, 132:15, 135:18, 202:6, 203:7, 209:9, 209:20, 211:2, 211:5, 211:17

tracks [9] - 41:5, 41:10, 69:13, 69:16, 69:17, 69:22, 70:1, 71:20, 120:3

trafficked [4] - 215:21, 217:18, 217:20, 217:22

trained [1] - 136:18

training [1] - 116:10

transaction [2] - 220:23, 220:25

transactional [1] - 214:9

transactions [1] - 215:9

transcript [1] - 87:12

TRANSCRIPT [1] - 1:14

TRANSCRIPTION [2] - 237:13, 237:14

transition [2] - 67:20, 71:25

TRAURIG [1] - 2:21

travel [2] - 147:11, 147:23

treatment [1] - 147:4

Trending [1] - 42:18

trial [12] - 11:19, 107:25, 108:8, 108:16, 124:20, 125:21, 125:22, 126:9, 126:10, 126:12, 190:9

triangle [1] - 222:18

tried [3] - 56:6, 124:22, 168:18

trillion [3] - 195:16, 196:10, 197:3

trip [2] - 16:5, 16:6

Trojan [2] - 210:8, 210:10

true [36] - 35:20, 36:25, 37:11, 37:21, 38:8, 38:21, 39:3, 39:6, 39:11, 40:18, 87:23, 88:2, 88:25, 91:18, 92:4, 92:18,

93:5, 95:3, 95:17, 96:6, 97:6, 98:1, 98:4, 99:8, 100:3, 100:11, 100:15, 100:19, 101:20, 102:10, 106:15, 106:16, 163:24, 187:21, 227:16

TRUE [1] - 237:14

Truth [4] - 22:19, 74:6, 108:7, 203:24

truth [1] - 127:21

try [14] - 6:25, 8:18, 10:10, 47:5, 121:25, 124:12, 126:16, 127:20, 185:2, 185:16, 186:20, 188:2, 188:9, 232:5

trying [24] - 7:17, 10:3, 29:8, 46:11, 46:18, 47:1, 47:3, 56:4, 93:12, 117:6, 120:17, 121:5, 125:24, 126:24, 131:21, 134:14, 155:20, 155:24, 158:23, 167:19, 183:3, 189:15, 216:7, 232:15

TUESDAY [2] - 1:15, 4:1

Tuesdays [1] - 160:18

Tulane [2] - 214:1, 214:2

turn [11] - 17:5, 20:4, 36:18, 106:13, 106:21, 121:20, 129:14, 142:22, 174:7, 183:25, 222:22

TV [6] - 116:19, 155:8, 155:10, 178:19, 205:19, 216:22

two [34] - 10:18, 12:1, 22:18, 57:7, 57:10, 60:15, 66:13, 67:25, 102:9, 111:11, 116:13, 118:12, 123:21, 135:9, 137:19, 139:4, 145:20, 150:1, 150:14, 153:4, 160:22, 175:11, 184:4, 184:8, 188:6, 188:11, 193:13, 216:15, 220:13, 226:25, 228:19, 231:20, 231:25, 232:9

type [12] - 19:22, 20:2,

55:2, 109:14, 109:23, 140:16, 200:16, 200:20, 219:9, 221:15, 221:19, 222:7

typed [2] - 176:12

types [3] - 82:10, 219:9, 231:18

TYPEWRITTEN [1] - 237:12

typically [9] - 40:7, 52:4, 61:20, 63:5, 70:18, 86:20, 154:11, 154:22, 222:5

## U

U.S [1] - 185:10

ultimately [1] - 13:4

Ultraviolet [1] - 199:23

unacceptable [1] - 51:4

unauthenticated [1] - 124:16

unclear [1] - 36:15

Unconditionally [1] - 73:10

under [18] - 10:25, 13:8, 13:10, 59:14, 100:6, 106:25, 140:19, 144:23, 150:14, 161:11, 161:15, 161:18, 162:2, 165:24, 166:16, 182:6, 182:7, 222:3

undergraduate [3] - 234:9, 234:10, 234:23

underlying [10] - 31:20, 46:5, 50:4, 60:11, 65:21, 127:12, 153:9, 227:15, 228:12, 235:5

underneath [2] - 65:21, 66:4

understood [7] - 123:3, 126:2, 126:19, 127:1, 166:25, 167:10, 167:12

Understood [1] - 14:14

unequivocally [1] - 10:2

unexpected [1] - 210:15

unfortunately [2] -

162:15, 165:3

unique [1] - 67:14

unit [1] - 218:23

UNITED [4] - 1:1, 1:1, 1:4, 237:8

universities [2] - 149:14, 154:17

University [3] - 179:23

university [1] - 55:23

unpaid [5] - 155:21, 157:5, 157:12, 167:18, 175:19

unproduced [1] - 12:13

unredacted [1] - 14:9

unrelated [1] - 46:8

unresolved [1] - 122:25

unsolicited [3] - 86:12, 115:7, 115:10

unusual [1] - 187:22

unverified [1] - 124:17

unwind [1] - 82:8

up [77] - 4:21, 5:1, 8:22, 10:20, 17:5, 17:14, 23:12, 29:9, 30:6, 31:6, 33:13, 57:13, 58:14, 61:20, 61:22, 61:23, 61:25, 62:25, 63:2, 63:4, 68:12, 69:1, 71:12, 71:18, 77:3, 77:18, 80:5, 85:19, 92:11, 92:18, 101:8, 116:7, 122:11, 123:25, 126:13, 126:16, 126:17, 132:15, 140:25, 141:1, 151:9, 151:10, 157:19, 157:21, 158:23, 177:19, 184:3, 184:6, 184:10, 185:22, 188:4, 189:17, 199:9, 200:6, 201:11, 201:16, 201:21, 202:25, 208:9, 209:17, 210:2, 210:13, 211:9, 211:18, 216:18, 218:6, 222:9, 225:1, 231:5, 231:6, 231:10, 231:20, 231:23, 232:11, 234:12, 235:14

upcoming [1] - 160:20

update [1] - 185:6

upload [9] - 76:13, 139:18, 140:9,

140:16, 162:3, 164:17, 191:5, 207:20, 219:13

uploaded [12] - 140:13, 140:14, 140:23, 193:19, 194:10, 194:15, 194:20, 195:14, 196:8, 197:1, 215:13, 220:20

uploading [4] - 164:16, 193:11, 193:15, 220:7

url [3] - 191:11, 191:18, 191:24

user [48] - 213:14, 215:23, 216:9, 216:11, 218:4, 218:6, 218:7, 218:8, 218:9, 218:19, 219:3, 219:12, 221:7, 221:9, 221:14, 221:18, 221:21, 222:9, 222:16, 223:3, 223:9, 223:10, 223:12, 223:15, 223:22, 224:6, 224:13, 224:14, 224:18, 225:4, 225:5, 225:11, 225:21, 225:25, 226:4, 226:9, 227:16, 227:19, 228:24, 228:25, 229:2, 229:8, 230:23, 231:16, 231:17, 234:15, 234:17, 235:11

user's [1] - 226:11

users [27] - 191:5, 193:11, 193:15, 193:18, 193:20, 198:6, 213:12, 214:12, 215:12, 215:13, 215:24, 218:1, 218:12, 218:21, 220:2, 220:7, 220:20, 221:1, 221:11, 221:23, 223:1, 226:13, 226:17, 232:12, 232:20, 232:22

users' [1] - 222:4

## V

vacation [1] - 34:6

vague [2] - 50:1, 85:2

**validation** [1] - 58:21
**varies** [2] - 155:9, 169:16
**variety** [3] - 84:3, 94:10, 214:8
**various** [7] - 36:21, 60:2, 95:1, 95:6, 114:3, 149:19, 166:5
**venture** [3] - 220:24, 222:22, 222:24
**venue** [5] - 152:24, 170:12, 170:18, 170:24
**venues** [10] - 35:25, 55:24, 149:9, 154:11, 179:17, 179:19, 182:16, 182:25, 183:22
**verbally** [1] - 13:3
**versa** [1] - 100:19
**verse** [7] - 49:13, 65:1, 65:12, 65:14, 65:19, 72:7, 101:15
**version** [15] - 7:2, 14:8, 21:6, 33:4, 39:19, 49:4, 49:8, 50:7, 124:9, 125:19, 131:4, 131:9, 131:10, 135:19, 181:19
**versions** [1] - 49:6
**versus** [2] - 4:5, 28:21
**vibe** [1] - 67:21
**vice** [1] - 100:19
**Vice** [5] - 214:22, 215:1, 216:17, 216:21, 230:13
**Video** [20] - 191:12, 191:15, 191:18, 191:21, 191:24, 191:25, 192:2, 192:4, 192:6, 192:8, 195:1, 195:7, 195:10, 196:3, 196:17, 196:19, 196:22, 197:10, 197:12, 197:15
**video** [44] - 4:9, 14:24, 15:17, 15:22, 16:10, 77:3, 77:4, 84:20, 95:1, 98:5, 98:16, 98:20, 136:9, 147:4, 191:3, 191:5, 191:10, 191:13, 191:16, 191:19, 191:22, 193:12, 193:13, 193:16, 193:19, 193:20, 193:23, 193:25, 194:1, 194:3, 194:6,

195:3, 195:5, 195:21, 195:23, 196:1, 196:13, 196:15, 197:6, 197:8, 197:17, 197:18, 216:20, 220:13
**video-sharing** [1] - 191:5
**videos** [30] - 86:8, 147:5, 191:6, 191:9, 193:17, 194:9, 194:10, 194:11, 194:14, 194:15, 194:16, 194:19, 194:20, 194:23, 195:13, 195:14, 195:15, 195:17, 196:7, 196:8, 196:9, 196:11, 196:25, 197:1, 197:2, 197:4, 197:19, 197:22, 212:15, 222:3
**Videos** [1] - 197:20
**videotapes** [1] - 178:24
**view** [17] - 93:16, 119:24, 127:13, 157:8, 171:6, 181:23, 191:25, 192:2, 192:4, 192:6, 192:8, 193:22, 193:24, 194:2, 194:6, 197:18, 197:20
**viewed** [1] - 172:21
**viewing** [6] - 194:9, 194:14, 194:19, 195:13, 196:7, 196:25
**views** [36] - 98:17, 98:18, 193:13, 193:17, 193:21, 194:12, 194:17, 194:24, 194:25, 195:2, 195:4, 195:6, 195:9, 195:11, 195:16, 195:17, 195:20, 195:22, 195:25, 196:2, 196:4, 196:10, 196:11, 196:14, 196:16, 196:18, 196:21, 196:23, 197:3, 197:4, 197:7, 197:9, 197:11, 197:14, 197:16, 218:20
**VINCENT** [1] - 2:22
**vintage** [1] - 56:24

**vinyl** [2] - 36:18
**violating** [2] - 7:11, 216:6
**violation** [2] - 5:17, 194:7
**virtual** [1] - 216:19
**visit** [1] - 181:13
**visited** [2] - 172:14, 172:17
**visiting** [1] - 217:1
**vocal** [5] - 64:20, 70:20, 70:21, 101:15, 132:22
**vocals** [8] - 21:5, 21:8, 72:5, 103:20, 131:7, 135:6, 135:21, 135:23
**voice** [1] - 119:23
**volume** [2] - 17:5, 227:3
**voter** [2] - 25:12, 206:2
**VS** [1] - 1:8

## W

**W-a-l-t-e-r** [1] - 34:21
**wais** [1] - 123:23
**WAIS** [77] - 2:16, 3:6, 3:10, 4:22, 4:25, 6:23, 14:1, 14:3, 44:12, 44:17, 44:22, 45:5, 48:3, 48:5, 49:17, 50:1, 50:16, 51:1, 51:5, 53:4, 60:18, 60:21, 64:11, 66:7, 66:10, 72:15, 72:18, 74:3, 79:21, 82:20, 85:2, 85:9, 86:3, 86:6, 86:25, 123:8, 123:16, 123:21, 123:24, 124:3, 127:3, 127:20, 127:24, 141:5, 141:7, 141:19, 142:14, 144:13, 144:18, 151:13, 152:14, 153:1, 153:9, 159:23, 160:9, 161:7, 164:15, 170:1, 170:8, 170:17, 170:20, 170:23, 171:11, 171:16, 171:23, 178:2, 180:12, 181:1, 182:3, 182:8, 182:13, 182:15, 183:5, 183:7, 184:2, 184:16, 184:20

**Wais** [3] - 14:6, 14:10, 161:5
**wait** [2] - 70:2, 70:3
**Waka** [2] - 195:3
**walk** [3] - 69:9, 70:15
**walked** [1] - 65:24
**walkin'** [1] - 69:20
**Walmart** [3] - 140:2, 181:7, 181:12
**Walter** [43] - 4:16, 5:9, 6:24, 20:17, 34:11, 34:20, 34:25, 46:5, 47:7, 49:23, 51:9, 53:5, 78:17, 80:20, 86:7, 92:11, 98:21, 98:25, 99:1, 99:2, 99:5, 99:9, 99:20, 99:24, 100:2, 100:12, 106:13, 119:15, 119:17, 119:24, 120:3, 129:21, 129:24, 130:5, 130:6, 132:9, 133:6, 133:15, 133:18, 172:3, 192:19, 192:25, 211:8
**WALTER** [1] - 3:5
**Walter's** [2] - 5:2, 5:6
**wants** [3] - 28:8, 122:10, 152:23
**Wanz** [1] - 197:13
**War** [7] - 37:2, 57:11, 57:18, 58:9, 76:4, 76:11, 182:17
**War's** [1] - 37:4
**WAS** [1] - 237:12
**Washington** [1] - 180:2
**watch** [5] - 24:14, 110:18, 191:6, 193:20, 205:13
**watched** [8] - 25:3, 25:10, 136:9, 193:23, 193:25, 197:22, 205:19, 205:24
**watcher** [1] - 78:13
**wave** [2] - 10:19, 11:5
**ways** [9] - 32:19, 89:6, 95:2, 218:9, 219:6, 219:25, 221:9, 221:11, 223:8
**WB** [1] - 193:2
**web** [1] - 226:10
**website** [11] - 26:21, 191:4, 191:12, 215:22, 217:4, 217:21, 217:22, 220:7, 220:10,

221:10, 230:16
**websites** [5] - 164:18, 164:21, 166:5, 198:7, 217:3
**wedding** [1] - 146:4
**week** [10] - 16:8, 42:11, 77:19, 150:16, 187:8, 187:9, 187:17, 190:11, 190:14, 227:6
**weekend** [7] - 5:8, 123:8, 125:10, 125:12, 147:24, 147:25, 150:17
**weighs** [1] - 5:25
**welcome** [1] - 129:10
**well-known** [1] - 85:7
**West** [1] - 180:3
**WEST** [2] - 1:23, 2:18
**WESTERN** [1] - 1:2
**whatsoever** [1] - 165:21
**whereby** [1] - 10:1
**white** [2] - 219:8, 221:13
**whole** [5] - 21:22, 53:13, 67:18, 72:1, 177:4
**wife** [1] - 12:3
**Willie** [3] - 231:5, 231:6, 231:11
**win** [2] - 43:4, 83:17
**Wisconsin** [1] - 179:23
**wise** [1] - 190:7
**witness** [31] - 4:9, 14:21, 14:23, 14:24, 15:4, 34:9, 34:13, 44:21, 87:9, 87:12, 128:24, 130:19, 137:3, 137:4, 137:8, 180:20, 183:5, 184:13, 186:11, 186:12, 188:19, 189:1, 189:13, 189:18, 189:21, 189:23, 190:18, 198:14, 198:19, 212:22, 213:1
**WITNESS** [35] - 15:8, 17:18, 28:10, 28:15, 30:2, 33:25, 34:4, 34:7, 34:20, 44:19, 50:2, 50:18, 85:4, 85:13, 87:4, 87:16, 91:14, 92:21, 100:23, 105:13, 119:10, 119:12, 136:14, 137:2,

137:11, 144:21, 170:5, 170:7, 170:16, 179:11, 181:6, 182:5, 198:22, 210:14, 213:5
**Witness** [4] - 63:9, 64:8, 64:22
**witness's** [1] - 124:13
**WITNESSES** [2] - 3:3, 3:11
**witnesses** [5] - 5:12, 13:2, 125:4, 126:17, 185:25
**woman** [3] - 210:6, 210:17
**women** [1] - 210:7
**won** [1] - 83:18
**wonder** [1] - 90:3
**wondering** [1] - 79:11
**Word** [1] - 176:17
**word** [9] - 50:19, 50:21, 77:5, 104:19, 104:22, 105:17, 131:22, 187:3, 227:2
**words** [2] - 41:9, 91:15
**work-related** [1] - 24:10
**workin'** [2] - 65:25, 111:14
**works** [4] - 31:19, 89:13, 91:24, 235:6
**World** [26] - 22:6, 75:13, 128:7, 142:22, 143:14, 158:10, 158:13, 161:15, 161:22, 162:5, 162:10, 164:1, 164:5, 164:6, 165:24, 166:13, 166:20, 175:15, 175:18, 180:16, 180:21, 181:6, 181:19, 203:19
**world** [6] - 16:3, 33:5, 114:21, 114:22, 114:23, 186:22
**worlds** [1] - 115:3
**Worldwide** [1] - 216:17
**worldwide** [1] - 220:23
**wow** [1] - 18:16
**Wrecking** [1] - 197:11
**write** [20] - 18:6, 18:8, 33:17, 33:21, 70:10, 117:11, 130:14, 131:7, 131:21, 132:15, 134:22,

200:12, 200:13, 200:14, 200:16, 201:16, 209:25, 210:23, 230:19
**writer** [6] - 33:11, 33:18, 102:1, 129:22, 131:11, 145:15
**writers** [11] - 94:2, 117:15, 120:20, 120:25, 121:2, 134:21, 145:7, 145:8, 159:4, 159:7, 159:10
**writes** [1] - 89:14
**writing** [28] - 9:10, 18:16, 19:5, 20:13, 28:20, 52:2, 54:3, 57:16, 83:8, 83:11, 88:14, 101:25, 102:6, 102:11, 102:14, 117:17, 121:3, 134:19, 199:13, 199:15, 200:8, 200:9, 200:11, 201:7, 201:9, 203:5, 210:1
**written** [22] - 19:19, 19:22, 52:3, 52:12, 81:7, 81:9, 88:23, 96:7, 103:12, 109:19, 109:22, 144:4, 144:5, 144:23, 147:14, 147:15, 176:6, 176:11, 176:12, 176:14, 176:16
**wrote** [12] - 20:15, 81:10, 118:3, 118:21, 119:7, 130:16, 143:17, 144:21, 200:8, 201:22, 211:4, 211:14
**www.youtube.com** [1] - 191:4

## Y

**Year** [5] - 78:11, 83:14, 83:16, 92:5
**year** [8] - 56:7, 73:12, 83:19, 83:20, 118:12, 146:2, 150:18, 156:14
**year-and-a-half** [1] - 118:12
**years** [32] - 16:7, 18:17, 18:18, 54:5, 55:6, 57:19, 78:22,

78:24, 92:6, 93:4, 102:16, 111:9, 116:13, 116:25, 117:25, 118:12, 121:11, 137:20, 145:25, 155:23, 158:24, 167:18, 167:19, 199:12, 199:19, 199:25, 201:7, 215:5, 215:25, 230:5
**yesterday** [2] - 5:25, 123:11
**York** [2] - 116:7, 180:4
**Yorker** [1] - 88:10
**young** [1] - 142:13
**younger** [1] - 111:8
**yourself** [9] - 35:12, 36:22, 79:15, 96:14, 129:15, 133:6, 133:15, 203:6, 230:23
**youth** [1] - 183:24
**YouTube** [69] - 27:10, 27:11, 27:13, 27:17, 27:18, 27:21, 27:22, 27:25, 76:20, 76:22, 76:23, 77:2, 77:5, 77:7, 84:16, 86:8, 97:4, 97:7, 97:9, 97:18, 97:22, 98:3, 98:5, 98:17, 172:21, 191:3, 191:7, 191:9, 191:10, 191:13, 191:14, 191:16, 191:19, 191:21, 191:22, 191:24, 193:12, 193:13, 193:16, 193:17, 193:18, 193:20, 194:7, 194:9, 194:10, 194:14, 194:15, 194:19, 194:20, 194:25, 195:13, 195:15, 195:17, 196:7, 196:9, 196:11, 196:25, 197:2, 197:4, 197:19, 207:15, 207:18, 207:20, 207:24, 208:3, 208:6, 208:10, 212:15

## Z

**Zachary** [2] - 212:23, 213:5
**ZACHARY** [1] - 3:16
**zoom** [1] - 146:9

**zoomed** [1] - 171:5

# EXHIBIT 5

EXHIBIT  5
PAGE  843

```
 1                    UNITED STATES OF AMERICA
                    UNITED STATES DISTRICT COURT
 2                 CENTRAL DISTRICT OF CALIFORNIA
                        WESTERN DIVISION
 3
                            - - -
 4                HONORABLE CHRISTINA A. SNYDER
             UNITED STATES DISTRICT JUDGE PRESIDING
 5                          - - -

 6
      MARCUS GRAY; ET AL.,              )
 7                                      )
              PLAINTIFF,                )
 8                                      )   CASE NO.:
      VS.                               )   CV 15-5642-CAS
 9                                      )
      KATY PERRY; ET AL.,               )
10                                      )
              DEFENDANT.                )
11    _____ )

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15              WEDNESDAY, JULY 24, 2019

16              LOS ANGELES, CALIFORNIA

17

18

19

20

21

22              LAURA MILLER ELIAS, CSR 10019
             FEDERAL OFFICIAL COURT REPORTER
23           350 WEST FIRST STREET, ROOM 4455
              LOS ANGELES, CALIFORNIA 90012
24                 PH:  (213)894-0374

25
```

```
 1

 2
       APPEARANCES OF COUNSEL:
 3
       ON BEHALF OF PLAINTIFF:
 4

 5             CAPES SOKOL
               BY: MICHAEL A. KAHN, ESQ.
 6                 LAUREN COHEN, ESQ.

 7             7701 FORSYTH BOULEVARD
               12TH FLOOR
 8             ST. LOUIS, MO 63105

 9
               KAYIRA LAW, LLC
10             BY:  ERIC KAYIRA, ESQ.

11             2100 HANLEY ROAD, SUITE 208
               CLAYTON, MO 63105
12

13
       ON BEHALF OF DEFENDANTS OTHER THAN MS. PERRY:
14

15             MITCHELL SILBERBERG & KNUPP
               BY: CHRISTINE LEPERA, ESQ.
16                 AARON M. WAIS, ESQ.
                   JEFFREY MOVIT, ESQ.
17                 GABRIELLA NOURAFCHAN, ESQ.
                   JACOB ALBERTSON, ESQ.
18
               11377 WEST OLYMPIC BOULEVARD
19             LOS ANGELES, CA 90064

20
       ON BEHALF OF THE PERRY DEFENDANTS:
21
               GREENBERG TRAURIG
22             BY:  VINCENT H. CHIEFFO, ESQ.

23             1840 CENTURY PARK EAST
               SUITE 1900
24             LOS ANGELES, CA 90067

25
```

```
 1                                    INDEX
 2

 3    WITNESSES FOR
      THE DEFENSE:
 4
                          DIRECT     CROSS     REDIRECT     RECROSS
 5
      FERRARA, LAWRENCE
 6
      BY:  MS. LEPERA        10                  102
 7    BY:  MS. COHEN                   85

 8

      ROSENBLATT, WILLIAM
 9
      BY:  MR. MOVIT        125
10    BY:  MR. KAHN                   149

11
                                 EXHIBITS
12
                             (NONE OFFERED)
13

14
      STIPULATION                                 167
15
      JURY INSTRUCTION DISCUSSION                  171
16

17

18

19

20

21

22

23

24

25
```

```
 1    LOS ANGELES, CALIFORNIA; WEDNESDAY, JULY 24, 2019; 9:15 A.M.

 2                        - - -

 3         THE CLERK:  Calling Item No. 1.

 4         Case No. CV 15-5642.

 5         Marcus Gray versus Katy Perry, et al.

 6         Counsel, please state your appearances.

 7              (Appearances heretofore noted.)

 8         THE COURT:  All right.  Good morning.

 9         Okay.  So what are we doing?

10         MS. LEPERA:  We're still out of order, but we're

11    calling in the defense case Dr. Lawrence Ferrara.

12         THE COURT:  Okay.

13         MS. COHEN:  And, Judge, we have two issues.  One is

14    the Billboard issue which we can take up now or later and the

15    other is an objection to the equipment we expect to be used

16    with Dr. Ferrara's testimony.

17         THE COURT:  We better take it up now.

18         MS. LEPERA:  You want to take up Billboard now,

19    too, Your Honor?

20         THE COURT:  I thought, you know, I don't know that

21    we have to take Billboard now because he's not going to rely

22    on Billboard.  But we have had an ongoing objection regarding

23    equipment.

24         MS. COHEN:  Yeah.  So our objection related to the

25    equipment is no different than the defendant's objection that
```

```
1    was lodged with respect to Dr. Decker's testimony.   It
2    appears that they seek to use a digital piano which is
3    essence no different than a computer.   The plaintiffs have
4    had no opportunity to inspect this piano.   Digital pianos
5    have plug-in cards, reverbs, hundreds of settings and their
6    use of this piece of equipment is no different than the same
7    kind of equipment to which they objected just a few days ago.
8              THE COURT:   Okay.   Let me hear from defense.
9              MS. LEPERA:   It's completely different, Your Honor.
10   The keyboard has been used in copyright infringement trials
11   over and over.   It is not a computer program in which
12   Dr. Ferrara is going to be altering the sound recordings that
13   are exhibits in evidence.   That is precisely what they were
14   offering to do with Dr. Decker is to put into evidence a
15   computer program which we're not doing.   Take that computer
16   program, create a wave file, put in the exhibits that are the
17   sound recordings change the pitches and alter them.
18             They specifically were saying they were going to do
19   that.   We're not doing that.   This is a commercial piano.
20   And by the way, they've had notice of this now for I don't
21   know how long.   They never asked to inspect it.   This is a
22   standard computer, Your Honor.   Dr. Ferrara is not going to
23   alter or change anything.   Completely unlike what they were
24   proffering with Dr. Decker.
25             THE COURT:   Okay.   Well, this is not a new issue.
```

1   This is the first I've heard that the plaintiffs consider

2   this to be computer based.  My understanding is that he's

3   playing the keyboard to illustrate the sounds of the music

4   that he's describing rather using his voice to sing.

5          MS. LEPERA:  And that is correct, Your Honor.  And

6   there's nothing being altered with respect to the

7   standardized keys on this computer -- on this electric piano.

8   So if you hit a C note or hit a B note, it's just going to be

9   the same.  He's not changing pitches.  He's not altering

10  things software-wise in any way, shape or form like they were

11  proffering to do with Dr. Decker.  If Dr. Decker can sing,

12  Dr. Ferrara can play the piano.

13         THE COURT:  Okay.  Ms. Cohen.

14         MS. COHEN:  Your Honor, Dr. Decker testified that

15  his preferable method of demonstrating or illustrating to the

16  jury was through the use of his computer.  That was not

17  permitted by this Court based upon defendant's objection that

18  they weren't permitted to inspect the software, the

19  equipment.  This is no different.  It's a digital piano.

20         We've had no opportunity to inspect it.  We don't

21  know that when he plays a certain note, that it's in the

22  right pitch or right key.  Our expert has not had an

23  opportunity to opportunity to inspect it.  The use for which

24  they're seeking to use this equipment is precisely the same

25  as it was with Dr. Decker.

EXHIBIT 5
PAGE 849

```
 1              THE COURT:  Well, I don't know that I see it that
 2    ways because let's start at the beginning.  I don't
 3    understand that there's going to be an alteration of sounds
 4    on this piano.  If there is, I'm going to be extremely
 5    unhappy I can assure you and I will strike the testimony.
 6              Secondly, as far as examining this piece of
 7    equipment, we knew he was going to use a keyboard back at
 8    square one.  So to raise the objection today and say you need
 9    to examine the keyboard today, I don't know how we're going
10    to do that.
11              Do you have a proposal how you're going to examine
12    the keyboard?  You just simply I think want to exclude it.
13              MS. LEPERA:  Your Honor, we actually put the make
14    and the model of the keyboard into our letter to the court on
15    July 12th.  The make and the model is something that can be
16    looked at in any store and purchased.  So this is just
17    another tactic, Your Honor, to try to mix apples and oranges
18    to once again to try to compare what is done in sound
19    musicological practice on an instrument that's not altered
20    versus taking in a computer software program and actually
21    altering, specifically asking to alter and create a new
22    exhibit of the sound recording.  It's very different,
23    Your Honor, and they're well on notice.  This is a tactic
24    they're doing just to exclude the relevant testimony.
25              THE COURT:  Okay.  Ms. Cohen, what do you say in
```

```
 1    response?

 2              MS. COHEN:  My only response to that, Your Honor,

 3    would just be that we provided the same amount of information

 4    to each other regarding what equipment each would be using.

 5    The fact that the plaintiff's expert testified several days

 6    ago closer to the start of trial does not somehow raise an

 7    inference that now it's three days later we should have had

 8    time and notice to inspect their equipment.  They raised

 9    their objection on the day that Dr. Decker was here to

10    testify despite their knowledge of his intention to use a

11    computer and our objection today is no different.

12              THE COURT:  I don't know that the defense would

13    agree.

14              MS. LEPERA:  No.  And frankly, we were talking that

15    very day.  July 12th is when we notified them about the

16    computer make and model.  Dr. Decker is on the stand and

17    literally I think half an hour before he got on the stand is

18    the very first time they demonstrated to us the program that

19    he was going to use.  He demonstrated what he was going to do

20    with the program.

21              Again, it's a complete apples and oranges

22    comparison taking that computer, putting software on it

23    specifically designed which he said he would do to alter the

24    pitch and the tempo and all these other elements that he

25    could edit in the software of the actual exhibit to create a
```

```
 1    mashup, Your Honor.  A mashup which he said he was then gonna

 2    offer as an exhibit to the Court to enter into evidence.

 3            So an effort by Dr. Decker to do all those things

 4    disclosed literally ten minutes or so before he gets on the

 5    stand is completely different than what we have been doing

 6    systematically consistently with practices in this court and

 7    other courts with the use of a piano.

 8            THE COURT:  Okay.  I have to say, Ms. Cohen that I

 9    agree with the defendants.  The problem we had with your

10    expert was that he was providing evidence that had not been

11    disclosed in the expert report or otherwise.  And he was

12    going to create a mashup to use defense's words.  Here we

13    have the piano being used to illustrate the notes.

14            If there is any change or mashup or anything like

15    that, I'm going to exclude it.  But certainly, I think that

16    assuming you had notice last July 12th that this was the

17    equipment going to be used, you certainly could have

18    conducted an investigation.  And I think that's a far cry

19    different from telling the defense on the day of your

20    expert's testimony that you were going to use a computer and

21    create the mashup that caused me to exclude that portion of

22    his testimony.

23            So I am going to subject to the concerns I have

24    raised permit the witness to use the keyboard, but obviously

25    only for illustrative purposes not to alter sounds or create
```

```
 1    mashups or anything of that nature.
 2              MS. LEPERA:  He has no intention of doing that.
 3              THE COURT:  So that's my ruling.
 4              MS. COHEN:  Would you like us to take up Billboard
 5    now or maybe over lunch?
 6              THE COURT:  Maybe lunch because I'd like to get the
 7    expert off and on.
 8              THE CLERK:  Let me go get the jury.
 9                        (Jury present.)
10              THE COURT:  Good morning.
11              We're going to start with another defense witness
12    taken out of order and that will be the defense expert
13    Dr. Ferrara.
14              THE CLERK:  Dr. Ferrara, if you could come forward,
15    I'll swear you in.
16                        (Witness sworn.)
17              THE CLERK:  Please be seated.  Please state your
18    full name and spell your last name for the regard.
19              THE WITNESS:  Lawrence Ferrara F-e-r-r-a-r-a.
20              THE CLERK:  Thank you.  Ms. Lepera?
21              MS. LEPERA:  Yes, thank you.
22                        DIRECT EXAMINATION
23    BY MS. LEPERA:
24    Q.  Good morning, Dr. Ferrara.
25    A.  Good morning.
```

EXHIBIT 5
PAGE 853

```
 1    Q.    Can you please tell us where you are currently employed
 2    and what is your title?
 3    A.    I'm employed at New York University.  I'm a full
 4    Professor of Music and Director Emeritus.
 5    Q.    What is your role as Director?  What are your tasks?
 6    A.    While Director I oversaw approximately 400 faculty.  We
 7    mentored and taught about 14 to 1600 students who were
 8    majoring in music in the performing arts in the Steinhart
 9    School at New York University as well as another 14 to 1500
10    non-majors who came from music courses and so forth.  So in
11    given a semester, we taught and mentored about 3,000
12    students.  And as far as being emeritus, in 2011 the
13    university named me Director Emeritus as an honorary title.
14    Q.    When were you first promoted to full professor?
15    A.    1992.
16    Q.    Do you have any experience as a performer?
17    A.    Yes, I do.
18    Q.    Could you please tell us what that experience is?
19    A.    Certainly.  I began piano studies at a young age and was
20    very active pianist.  I played in all styles of music.  I
21    also played in bands through high school and college.  Had my
22    own band post-college helped to work through our, my wife and
23    I, our schooling.  We got married in college and worked
24    through graduate school.  So I played in bands and basically
25    played in musical styles and genres of all types.
```

1    Q.   Do you have a particular area of expertise as a

2    musicologist?

3    A.   Yes.  Music theory and analysis.

4    Q.   Is music analysis the area of expertise you've employed

5    for the work you've done in this case?

6    A.   Yes.

7    Q.   Now, are you a member of any organizations pertaining to

8    your area of expertise?

9    A.   Yes.  I'm a member of the American Society for

10   Musicology and that's the American Musicological Society and

11   the Society for Music Theory.

12   Q.   Have you written any books or scholarly articles about

13   music?

14   A.   I have about ten published peer-reviewed articles and I

15   have written or co-written three books.  One of those three

16   books is currently in a fifth edition.

17   Q.   And do you sit on any editorial boards of any scholarly

18   journals related to music?

19   A.   Yes, I do.  I sit on a scholarly journal in music and

20   this is an editorial board for a publication published by the

21   University of Illinois Press.  I also am an editorial board

22   member of another journal, scholarly journal in music that is

23   published by Indiana University Press.

24   Q.   And have you been the recipient of any awards as an

25   author?

1    A.    Yes.    At New York University, there is a Daniel

2    Griffith's award.    It's given out to one professor each year.

3    There's a cross-school committee that looks at publications

4    that have been sent out and published.    And on that basis,

5    they award the Griffiths for the best research of the year.

6    I won that in around 1996, I think.    It was based on a

7    chapter in a peer-reviewed book published in England at

8    Cambridge University Press.

9    Q.    Okay.    Going back to your area of expertise musicology,

10   what is musicology?

11   A.    According to the definition of musicology in the Harvard

12   Dictionary of Music, it's the systematic study of music.    The

13   Harvard Dictionary also sub-divides the three, what it

14   considers the three large approaches or areas.    There are

15   also subdivisions.    The three large areas in musicology

16   according to the Harvard is first, historical musicology

17   which is the study of the history of music.    Ethno musicology

18   which is the study of music in cultures, and music theory and

19   analysis which is about the analysis of music.

20   Q.    And which of these three types of divisions in

21   musicology specifically focuses on a dissection and a

22   comparison of musical compositions?

23   A.    Musical theory and analysis.

24   Q.    And which of these three areas of musicology is

25   Dr. Decker's PhD?

EXHIBIT 5
PAGE 856

1    A.    My understanding is that Dr. Decker's PhD is in

2    historical musicology.

3    Q.    And is that a different discipline than musical

4    analysis?

5    A.    It is under the umbrella of musicology, but certainly

6    different, yes.

7    Q.    Do you have any experience with music copyright claims?

8    A.    Yes, I do.

9    Q.    And have you been engaged on behalf of both plaintiffs

10   and defendants in music copyright cases?

11   A.    Yes, I have.

12   Q.    Can you please briefly identify some of the matters or

13   artists on whose behalf you've provided music analysis?

14   A.    Lady Gaga, Madonna, Jennifer Lopez, Gloria Estefan,

15   Shakira, Bruno Mars, Drake, Brad Paisley, Carrie Underwood,

16   Dr. Dray, Eminem, Bono.  There are many more.

17   Q.    Okay.  And one more area of information about your

18   expertise.  Have you given any lectures outside of NYU

19   regarding the analysis of music copyright infringement

20   claims?

21   A.    Yes.  I have given a number of lectures, invited

22   lectures and peer-reviewed lectures on the relationship

23   between musicology and music copyright issues.  For example,

24   in each of the last nine years, I have given an invited

25   lecture on music and copyright at Harvard University Law

1    School so nine lectures now in nine years.  That's the

2    Harvard Law School.

3         Over the last 10 years, I have presented eight

4    times at Columbia University Law School as well as other law

5    schools.  I've also presented peer-reviewed papers for the

6    American Musicological Society on this subject and also for

7    the Copyright Society of America.

8    Q.   Have you been qualified to testify as an expert in

9    another copyright infringement cases?

10   A.   Yes, I have.

11   Q.   Are you being compensated for your work in this case?

12   A.   Yes, I am.

13   Q.   You have an hourly rate that you use for your work?

14   A.   Yes, I do.

15   Q.   What is that?

16   A.   My hourly rate for doing analysis, research and so forth

17   is $395 per hour and when giving testimony at a deposition or

18   at a trial like this, it is $475 per hour.

19   Q.   Do you have any financial interest in the outcome of

20   this case?

21   A.   I do not.

22   Q.   Okay.  You were asked to look at two compositions in

23   this case; is that correct?

24   A.   That is correct.

25   Q.   And what were those two compositions?

1    A.   Dark Horse by the defendants and Joyful Noise by the

2    plaintiffs.

3    Q.   In musicology is there a distinction between a

4    composition and a sound recording?

5    A.   Yes, there is.

6    Q.   What is that distinction?

7    A.   From a musicological standpoint, the sound recording are

8    the sounds that are the result of the production, the

9    creation of that sound recording.  Whereas with respect to

10   what's often called a composition embodied in that sound

11   recording, the composition is essentially the harmony, the

12   melody, the lyrics, the rhythm as well as other elements that

13   largely can be transcribed into musical notation.

14   Q.   Can there be many recordings of the same composition?

15   A.   Yes, indeed.

16   Q.   So for example, if I were to want to hear a sound

17   recording of Jingle Bells, I would have many different

18   variations to choose from?

19   A.   So the composition of Jingle Bells essentially would be

20   largely the same whereas it would be many different

21   recordings of it.

22   Q.   Is there any claim that you've seen in connection with

23   Dr. Decker's analysis that the Joyful Noise sound recording

24   itself is in the Dark Horse sound recording?

25   A.   No.  It is my understanding that there is no claim that

UNITED STATES DISTRICT COURT

EXHIBIT 5
PAGE 859

1    the sound recording --

2         MS. COHEN:  Objection, Your Honor.  This is a legal

3    issue.

4         THE COURT:  Well, I think he can testify as to his

5    understanding of what the claim is.  He can't give a legal

6    opinion, but he's testifying about claims.

7    BY MS. LEPERA:

8    Q.   Can we have the answer?

9    A.   I'm happy to continue.  It is my understanding that

10   there is no claim that any portion of the Joyful Noise sound

11   recording has been taken digitally and inserted in the Dark

12   Horse sound recording.

13   Q.   And there's certainly nothing in Dr. Decker's report

14   that suggests there is; correct?

15   A.   I did not see anything in Dr. Decker's reports to so

16   suggest.

17   Q.   Did you create -- well, let me ask you this.  What is a

18   transcription of music?

19   A.   A transcription of music is writing in musical notation,

20   in the notes, the harmony, the melody and the rhythm in a

21   recorded performance of music.

22   Q.   And did you create those transcriptions of the

23   compositions for Joyful Noise and Dark Horse?

24   A.   Yes, I did.

25   Q.   Is creating transcriptions including of recorded music,

```
 1   a part of your musicological practice in analyzing two

 2   compositions?

 3   A.    Yes, it is.

 4   Q.    And why is that so?

 5   A.    A musical transcription provides a level of detail of

 6   the harmony and the rhythm and the melodies that listening

 7   alone will simply not provide.  Once all of those notes have

 8   been transcribed and placed in the same key, you can much

 9   more readily analyze the similarities and the differences.

10          This is analogous loosely to having a realtor with

11   an electric tape measure going into each of the rooms of

12   let's say of a nine room house.  Those electric tape measures

13   give you very detailed and specific information about the

14   room size, how much footage there is from wall to wall and so

15   forth.  That's analogous to a transcription.

16          On the other hand, one go into that house, perhaps

17   you're interested in buying it or renting it, and you could

18   eyeball it.  That would be analogous to only using listening

19   not using both listening and transcription.  In such an

20   eyeballing of the those rooms, you might say well, these

21   rooms seem like they're about the same size.

22          Once you get specifications from that, you can call

23   it transcription of the realtor's electronic tape measures,

24   you say wow, there are actually some real differences or

25   similarities I didn't notice before.  That's essentially the
```

EXHIBIT 5
PAGE 861

1    reason why musicologist use transcription in these kinds of

2    analyses.

3    Q.    Does that mean that you ignore the sound recordings?

4    A.    Heavens no.

5    Q.    Did Dr. Decker prepare any transcriptions?

6    A.    No.

7    Q.    And how would characterize as being consistent or

8    inconsistent with established musicological practice?

9    A.    Over the last 25 years, I have provided opinions in

10    music copyright issues and I can't recall another formal

11    musicological report from a musicologist that does not

12    include transcriptions.

13           In addition, if one simply looks at the entry for

14    analysis, that is music analysis in the 29 volume Grove's

15    Dictionary of Music, early into that long article on music

16    analysis, Grove says that in music analysis, the

17    transcription, that is the musical notation of that melody,

18    harmony, rhythm that that is implicitly understood to

19    represent some of the primary elements in a composition.  If

20    you don't have that transcription, indeed you are contrary to

21    those kinds of musicological practices.

22    Q.    So as a result of your analysis and as presented in your

23    reports, did you reach any conclusions in this case?

24    A.    Yes, I did.

25    Q.    Would you please summarize the conclusions that you

1    reached in this case?

2    A.    Well, first, I didn't find any musicological evidence to

3    support a claim that any musical or lyrical expression in

4    Joyful Noise was taken and used in Dark Horse.  In addition,

5    on the basis of my musicological analysis, I did not find any

6    musicological support for a claim that Dark Horse and Joyful

7    Noise are substantially similar.

8         Based on my analysis of both songs in their

9    entirety, I found that there are no significant structural

10   similarities, no significant harmonic similarities, no

11   significant rhythmic similarities, no significant melodic

12   similarities and no significant lyrical similarities whether

13   you look at those individually or in combination.

14        In fact, I found that the similarities represent

15   expression that was already used prior to Joyful Noise, and

16   expression, musical fragments in some cases, that are parts

17   of musical building blocks.  I also having analyzed both

18   works in their entireties discovered that there are very

19   substantial differences in these two songs.  And that in

20   fact, those substantial differences greatly exceed the rather

21   slight, trite similarity.

22        I also discovered in my analysis and research that

23   some of the writers of Dark Horse, for example, Max Martin

24   and Dr. Luke composed or co-wrote songs that were released

25   prior to Joyful Noise which I understand was released in

```
 1    2008.  And so these co-writers of Dark Horse co-wrote songs

 2    that predate the plaintiff's work.  And those songs embody

 3    some of the similarities that the plaintiffs are claiming are

 4    at issue.  Once, again, the co-writers had written those

 5    first.

 6              And in addition to that, in my opinion because of

 7    that evidence and evidence with respect to the source for

 8    Ostinato 2 which we'll be getting into, it is in fact

 9    ostinato number one from a musicological perspective in my

10    opinion there is exceedingly strong musicological support for

11    my finding that Dark Horse was created independently of

12    Joyful Noise.

13    Q.   Okay.  Let's now get into some of your specific findings

14    regarding the two compositions.  What's the first step that

15    you take to analyze the two compositions?

16    A.   I listen to both works in their commercially released

17    sound recordings many, many times.

18    Q.   And after listening to them many times, what is the next

19    step that you take in your musicological analysis?

20    A.   On the basis of those listenings, I begin to get a sense

21    of the overall structure.  I certainly have a sense of any

22    tambral, the issues of tambra in both works.  And certainly

23    begin to get a sense of the melody, the harmony, the rhythm

24    the lyrics.  And as a result of those listenings, I then

25    began to transcribe, to put into musical notation.  And in
```

 1  this case, I transcribed the vocal raps.  I transcribed the

 2  vocal melodies.

 3         There is a vocal melody in Joyful Noise and, of

 4  course, there's vocal melodies in both the choruses and the

 5  song verses in Dark Horse.  I also transcribed the harmony, I

 6  transcribed instrumental parts, and in those transcriptions

 7  was able to then do a proper musicological comparative

 8  analysis.

 9  Q.   And in your material that you're speaking about, you

10  also looked at what we've been calling the ostinatos in

11  Joyful Noise and Dark Horse that are at issue?

12  A.   Yes.

13  Q.   And what is an ostinato?

14  A.   An ostinato simply put is a relatively short pattern.

15  Now, it can be a melodic pattern, it can be a rhythmic

16  pattern, it can be a pattern of chords, but the keys that it

17  repeats consecutively.  And it has some kind of a structural

18  function within the work.  Ostinatos have been commonplace in

19  Western music of all genres for centuries including in

20  popular music, in jazz.  And as per the Harvard Dictionary

21  definition of ostinato, it says that it is something that is

22  practiced in cultures throughout the world.

23  Q.   Have you analyzed ostinatos in your classes at NYU?

24  A.   Yes.

25  Q.   And identified them in other matters that you've been

1    involved in?

2    A.    I have identified them and what they're normally called

3    are riffs.  If you look at the definition of riff r-i-f-f in

4    a musical dictionary, it will say it's an ostinato.  So riff,

5    ostinato are interchanged and it is an ostinato when it is

6    being consecutively repeated.  Also in hip hop, the term in

7    the business that people use, producers use is a loop.

8    Essentially, digitally you can just hit the button and loop,

9    that is repeat, that same melody or that same rhythm and you

10   just keep hitting that and as result, you create consecutive

11   ostinatos.

12   Q.    Now, in connection with your analysis, did you look at

13   the structure, overall structure of the two songs?

14   A.    Yes, I did.

15   Q.    And if we could please put up for Dr. Ferrara,

16   Demonstrative No. 1.  Could you identify that, Dr. Ferrara?

17   A.    Yes, this is a structural chart --

18           MS. COHEN:  Objection.  This is a demonstrative not

19   disclosed to the plaintiff.

20           MS. LEPERA:  This is exactly from his report.

21           MS. COHEN:  Where?

22           MS. LEPERA:  If you look at page 6 and 7,

23   Ms. Cohen.

24           MS. COHEN:  I see.  Thank you.

25           THE COURT:  Go ahead.

1          THE WITNESS:  This is a structural chart that I

2      presented in my first report.

3      BY MS. LEPERA:

4      Q.   Okay.  Sorry for the interruption, Dr. Ferrara.

5          Can we please have you identify by both looking at

6      the chart and also I will have Mr. Duvall through your

7      instruction play the portions of the songs that you instruct

8      off of Exhibit 75 and 76 which are Joyful Noise and Dark

9      Horse that are in evidence.

10          Where would you like to start, Dr. Ferrara?

11     A.   We will begin with the introduction in Joyful Noise, and

12     I've just put a red dot on it for your screens.  This is the

13     opening section, the opening structural section of Joyful

14     Noise and it includes the ostinato that is at issue in Joyful

15     Noise.  So if we can play that.

16                     (Music played.)

17          THE WITNESS:  So that is the ostinato at issue

18     being consecutively reiterated.  And you notice, of course,

19     the slides.  Those slides are one of the distinctive

20     characteristics of that ostinato.  Once again it occurs in

21     the introduction of Joyful Noise.  Now, side-by-side we're

22     going to listen to the introduction of Dark Horse.  I've put

23     my red dot on that so this is to the right.  This is the

24     introduction of Dark Horse and it includes the Ostinato

25     No. 1.

```
 1                    (Music played.)

 2           THE WITNESS:  Now we're going to go to the very

 3   next structural section in Joyful Noise.  This is the rap

 4   verse one and here again we find that the ostinato that's at

 5   issue in Joyful Noise continues in the rap verse one.

 6                    (Music played.)

 7           THE WITNESS:  And now we go to the corresponding

 8   verse in Dark Horse.  This is a sung verse.  I'm going to put

 9   the red dot on it in Dark Horse and here Katy Perry is

10   singing and we have now for the first time in Dark Horse

11   Ostinato No. 2.

12                    (Music played.)

13           THE WITNESS:  So what we heard in these two

14   ostinatos to begin with is that those slides in the ostinato

15   in Joyful Noise are not in the ostinato in Dark Horse.  In

16   addition in terms of the texture, that is what other sounds

17   are going on, halfway through that verse in Joyful Noise, we

18   have low notes that are sustained that add to the texture and

19   thereby begin to not make it so sparse.

20           Whereas in the verse in Dark Horse, like many other

21   songs, the texture is sparser than the difference halfway

22   through the verse in Joyful Noise in texture compared with

23   Dark Horse.

24           Now, using my pointer, that sliding ostinato that's

25   at issue in Joyful Noise occurs in every section.  So I'm
```

```
 1   looking here the introduction.  It continues in the rap
 2   verses.  It continues in the post-verse break.  It continues
 3   in chorus one.  It continues into rap verse two.  It
 4   continues in the post-verse break.  It continues in chorus
 5   two.  It continues in rap verse three.  And it continues in
 6   chorus three and into the outro.  Th outro is what we use in
 7   the business as an ending.  So like many outros, it continues
 8   to some use of the material from the chorus.
 9        What is notable then is that that sliding ostinato
10   in Joyful Noise is there all the way through, and you'll see
11   at the very bottom, I noted at 4 minutes 28 seconds, there's
12   a new section that appears quite different from anything else
13   in the song.  And that is where for the first time the
14   ostinato drops out completely, but it essentially runs all
15   the way through.
16        By way of difference, the ostinato that's at issue
17   in Dark Horse Ostinato No. 2, we heard it not in
18   introduction.  It's in the verses.  It is not in chorus that
19   first ostinato that we heard.  I'm going to play it for you
20   in a moment at the piano once I have it working.  That first
21   ostinato that we heard (playing) that plays in the choruses
22   and in the introduction.
23        In Dark Horse by way of difference, we have the
24   Ostinato No. 2 that's at issue in the verses.  And in fact in
25   the last verse, the rap verse halfway through it, Ostinato
```

```
 1   No. 2 drops out and Ostinato No. 1 comes back in only to
 2   continue into Chorus 3.  And so I know that you have listened
 3   to the sound recordings and just to kind of wrap up, start
 4   with chorus number three which is here in Joyful Noise.
 5   We're gonna hear all the way to the end, and then we'll go to
 6   Chorus No. 3 in Dark Horse and hear it all the way to the
 7   end.  So the chorus in Joyful Noise that has the ostinato at
 8   issue.  We'll start right there.  The chorus in Joyful Noise.
 9                     (Music played.)
10           THE WITNESS:  Now, that was Chorus 3 and we're
11   gonna go right now to the outro.  Continue.
12                     (Music played.)
13           THE WITNESS:  It's difficult to hear that ostinato
14   at issue, but it's still back there.  It's not near the front
15   of the mix at all, but it's part of the chorus.  It's back
16   there.
17   BY MS. LEPERA:
18   Q.   Chorus 3, Dr. Ferrara?
19   A.   That was the end of the outro.  And now we go to
20   4 minutes and 28 seconds, the final section was really a new
21   section in Joyful Noise.
22                     (Music played.)
23   BY MS. LEPERA:
24   Q.   You have played all the sections through you wish with
25   respect to Joyful Noise?
```

```
 1    A.    Yes.

 2    Q.    Was there an additional section you wanted to play?

 3    A.    Yes, as I mentioned earlier, we're now going to hear

 4    Chorus 3 in Dark Horse which would be the corresponding

 5    Chorus 3 to the end of the song.

 6                        (Music played.)

 7                THE WITNESS:  So just to wrap it up, you heard

 8    (playing) that's Ostinato No. 1.  That's what you were

 9    hearing during the chorus of Dark Horse.

10    BY MS. LEPERA:

11    Q.    Okay.  Having looked at the structures of the two songs

12    and having played portions of the music, could you explain

13    the reason why you go through this exercise in terms of

14    looking at the structure this way?

15    A.    Yes.  It's -- essentially, it's a map of what's going on

16    in each song and from one time to another.  And it also

17    allows me as an analyst to articulate for a reader of my

18    reports or for a trier of facts, where the music at issue is.

19                So here it's clearly in the verses and only two

20    verses and half of one verses in Dark Horse not in the

21    introductions and choruses and yet it plays all the way

22    through the first approximately 4 minutes 27 seconds in

23    Joyful Noise.  That information is important.

24    Q.    And did you find differences with respect to the

25    structures?
```

1    A.    Yes.   First, in terms of similarities, the similarities

2    are generic.   That is many songs, countless songs begin with

3    an introduction.   Countless songs, most songs, in fact in

4    various genres have verses and choruses.   So those are things

5    that are ideas that have been around for decades and decades

6    and again used in countless songs in many genres.

7            On the other hand, you can see that there are

8    differences in, for example, in the duration.   It's an

9    eight-bar intro as compared to a four-bar intro.   We say

10   intro rather than introduction.   The rap versus is 16-bars.

11   The sung verses is eight.   The choruses are eight in both.

12           There are two post-verse breaks in Joyful Noise.

13   There is no post-verse break in Dark Horse.   There's a break

14   after the chorus and so there are these structural

15   differences between the two.

16   Q.    And do the ostinatos that you have been speaking about

17   in Joyful Noise and Dark Horse Ostinato No. 2 have similar

18   structure functions?

19   A.    No, they're actually quite different, and I think it's

20   procedurally pretty obvious right now.   The ostinato that's

21   at issue in Joyful Noise and I used this word purposefully

22   merely repeats.   It just keep repeating.   It just keeps

23   repeating.   Whereas the Ostinato No. 2 in Dark Horse comes in

24   strategically.   It really does have a structural function

25   that's quite different.

```
 1              And what is it?  It identifies the beginning of
 2   each verse.  It identifies of sung verse one, of sung verse
 3   two and of rap verse.  Remember, it plays in the first half
 4   of the rap verse.  That's a very different structural
 5   function between the ostinatos that are at issue in the two
 6   songs.
 7   Q.   Of the two ostinatos in Dark Horse, we've been calling
 8   it Ostinato No. 1 which is in the introduction we discussed
 9   and Ostinato No. 2 that's at issue.  Is either of two
10   ostinatos more important or less important in the Dark Horse
11   composition?
12   A.   So within Dark Horse itself, we're not talking about
13   Joyful Noise at all here, the question is this first ostinato
14   that opens Dark Horse and that we hear in the choruses
15   (playing) is that more important overall than (playing).
16              In my opinion the answer is that that first
17   ostinato is more important.  It's more important first
18   because it's the first thing that you hear in Dark Horse
19   (playing) and it's part of the last thing that you hear in
20   Dark Horse.  We heard it just before in the chorus, Chorus 3.
21              In the business the word hook which means the most
22   memorable part is often used interchangeably with the word
23   chorus.  Like sometimes they combine it and they say it's the
24   chorus hook.  And so in my opinion, this is the fact here in
25   Dark Horse as well.  That the most memorable part of Dark
```

```
 1    Horse is the hook.  It's the chorus and that is also where
 2    Ostinato No. 1 is.  Ostinato No. 2 is never in the chorus.
 3          And so on those bases, I would say from a
 4    musicological perspective, the Ostinato No. 1 is more
 5    important than Ostinato No. 2 in Dark Horse.
 6    Q.    Okay.  So we've looked at the structure and you've done
 7    your comparative analysis there.  Another element of a
 8    musical composition is harmony; is that right?
 9    A.    Yes.
10    Q.    What is harmony?
11    A.    Harmony is the simultaneous sounding of notes that
12    essentially creates chords and when you have series of
13    chords, we called it a chord progression.
14    Q.    Did you make any findings regard the harmonies of the
15    two compositions?
16    A.    Yes.  In my report I provided the chords that are in
17    both of the songs and particularly, in the choruses of both
18    songs.
19    Q.    Can we please identify Ferrara Demonstrative No. 2?
20    A.    Yes, that's my analysis from my first report.  And what
21    you see, and these are put in the same key I should say so
22    that you can put this in context, the proper context.  Joyful
23    Noise is in the key of A minor, but Dark Horse is in the key
24    of B flat minor.  And so following accepted musicological
25    practices, I transposed, I changed the key because Dark Horse
```

 1   is in a different key.  I transposed it down to A minor so

 2   that we can properly compare the chords.

 3         So these chords are based on A minor in both.  In

 4   Joyful Noise these are the chords and this is the harmonic

 5   rhythm.  Harmonic rhythm is the rate of change of chords.  So

 6   here are the beats 1-2-3-4.  (Playing.)  So the first chord

 7   is held for four beats.  That's the A5 chord.  The second

 8   chord C5 is held for three beats and the final chord F is

 9   held for one beat.  (Playing.)

10   Q.   That was Joyful Noise.

11   A.   Thank you.  That's Joyful Noise.  That was the upper

12   line going from left to right.

13         In Dark Horse, the lower line, you see that there

14   are very different chords.  In the first bar, there is an F

15   major 7 chord, a C chord, an A minor chord, and then another

16   A minor chord, but with G as lowest note.  So it's not only

17   the fact that the chord progression is rather different, it's

18   rather completely different.

19         In addition to that difference in the chord

20   progression, the harmonic rhythm is completely different

21   because in Dark Horse each chord is held for two beats.

22   (Playing.)  F major 7, C, A minor, A minor with G.

23         That harmonic context and ground provides a very,

24   very different overall context for both songs.  Both in terms

25   of the difference in the chord progressions, the difference

1    in the harmony, but also the difference in the harmonic

2    rhythm.

3    Q.    And another element of a musical composition, I believe

4    you indicated earlier when you were describing the various

5    elements is rhythm?

6    A.    Yes.

7    Q.    Now, did you make any findings regarding the rhythm of

8    Joyful Noise and Dark Horse generally?

9    A.    Yes.  As I mentioned, I transcribed into musical

10   notation, of course, and listened very carefully.  You have

11   to listen very carefully just to able to transcribe it into

12   notes.  I transcribed the vocal parts which have a rhythm

13   including the rap parts.  The rap parts don't have pitches as

14   they're spoken in rhythm, but that rhythm can be notated.

15          And what I covered is that the rhythm in the vocal

16   parts in the two songs is very different.  Indeed, Dr. Decker

17   didn't present any similarities in the rhythm in the vocal

18   parts.  I also found that the rhythm in the instrumental

19   parts, and let's just put aside the ostinatos for right now.

20   That the rhythm in other instrumental parts is also quite

21   different in the two songs.

22          And once again, Dr. Decker didn't say that they

23   were similar.  He didn't consider that to be a similarity.

24   And that's correct they aren't similar.

25          With respect to the rhythm in the ostinatos, we're

 1     going to get more into that, but just preliminarily, my

 2     finding is that the fast notes, those slides that gives you

 3     fast notes on a beat which then takes away from the note that

 4     follows it.  So while you have all even notes in the two

 5     ostinatos in Dark Horse, (playing) that's Ostinato No. 1 all

 6     even played and Ostinato No. 2 in Dark Horse (playing)

 7     they're all evenly played.

 8            You don't have in my opinion that even playing of

 9     notes because that distinctive characteristic of the ostinato

10     in Joyful Noise, those slides, which interrupt that flow are

11     not present.

12     Q.   And again we're gonna get into the ostinatos in more

13     detail in a moment both in Dark Horse and in Joyful Noise.

14     Before we do that, you mentioned the term melody and you've

15     mentioned it several times now.  Can you please just briefly

16     describe what does melody constitute from a musicological

17     perspective?

18     A.   Melody is defined as a sequence or series of single

19     notes, a string of notes with rhythmic durations.

20     Q.   And we've heard the term pitch used.  What is the

21     definition of pitch?  What does it mean from a musicological

22     perspective?

23     A.   It's the high or low placement of a sound, a pitch,

24     usually in terms of a scale.

25     Q.   And I believe you discussed your views with respect to

| | |
|---|---|
| 1 | the melodies in Dark Horse.  Just to clarify, are there any |
| 2 | similarities whatsoever in your opinion between the two |
| 3 | melodies of Dark Horse and Joyful Noise? |
| 4 | A.    No.  And before I was speaking about the rhythms, that |
| 5 | is the rhythms in the ostinatos.  The rhythms in the |
| 6 | instrumental parts.  The rhythms in the vocal parts, the raps |
| 7 | for example.  There are no rhythmic similarities in my |
| 8 | opinion. |
| 9 | With respect to the melody, that is the setting to |
| 10 | pitch of the melodies, I did not find any -- any notable |
| 11 | similarities in the pitch sequence other than a trite and |
| 12 | slight similarity of some notes that are part of in fact |
| 13 | Ostinato No. 1 and Ostinato No. 2 in Dark Horse and in the |
| 14 | ostinato at issue in Joyful Noise. |
| 15 | Q.    Okay.  So let's get into that.  If we could first please |
| 16 | identify what we have in front of you as Demonstrative 4, |
| 17 | Dr. Ferrara. |
| 18 | A.    Yes. |
| 19 | Q.    Dr. Ferrara, No. 3. |
| 20 | A.    Oh, thank you. |
| 21 | Q.    What is that? |
| 22 | A.    This is a keyboard, and what I instructed to be done was |
| 23 | to have the letter names written on each of the white keys so |
| 24 | that we can see from left to right, the scope of the musical |
| 25 | alphabet.  There's only seven letters in the musical alphabet |

```
 1    A, B, C, D, E, F, G, and then you just keep repeating as go

 2    higher or lower.  The scale degrees also do the same.

 3            If we can, perhaps, highlight the first A at the

 4    bottom.  Yes, that's A.  If we move up the scale, the next is

 5    B.  The next is C.  The next is D.  The next is E.  The next

 6    is F.  The next is G.  And notice now we start all over again

 7    on A, B, C.  It just continues all the way up.  Seven letters

 8    in the musical alphabet.

 9    Q.   Now, if we could turn to Demonstrative No. 4, what is

10    this?

11    A.   In Demonstrative No. 4, I added the scale degrees that

12    correspond to those letters.  A musical scale consists of

13    seven scale degrees and each one is associated or corresponds

14    to a pitch that is a letter name.  So scale degree one if we

15    can highlight that is A, but it's also there's a system

16    called Solfege that music students learn.

17            And so instead of calling it A or even calling it

18    1, they call it Do.  This is like the song from the Sound of

19    Music Do Re Mi.  So this is Do, that's A.  And then B is

20    scale degree 2 which is also Re.  C is scale degree 3 which

21    is Mi.  Fa is scale degree 4 which is next to E is 5.  F is 6

22    is La and G is 7 which is Ti and then it just continues.

23    Q.   And there are three different ways of essentially

24    explaining the same pitch; is that right?

25    A.   That is right.
```

1    Q.   So the fact that they're differently notated with letter

2    and then numbers and Solfege, it's describing exactly the

3    sale thing for that pitch?

4    A.   That is correct.

5    Q.   And by the way, I believe you mentioned this.  Did you

6    transpose the keys of Dark Horse and Joyful Noise in any way

7    to facilitate your analysis?

8    A.   Yes.  Following musicological practices so that I can

9    see and readily present the similarities and differences, I

10   put them both, well, I lowered the key of Dark Horse from B

11   flat minor to A minor which is the key of Joyful Noise.

12   Q.   So they initially start in different keys?

13   A.   That's correct.

14   Q.   Now, if you would please look at what we've put as

15   Demonstrative 5, Dr. Ferrara, can you identify this?

16   A.   Yes.  This is also from my report and this is the

17   musical notation of Ostinato No. 1.  (Playing.)  As you can

18   see, it has the alphabet letters C-B-A-E written over each

19   note.

20   Q.   Ostinato No. 1 in Dark Horse.

21   A.   That's correct.

22   Q.   Because there's two in Dark Horse and there's only one

23   in Joyful Noise?

24   A.   That is correct.

25   Q.   Now, could we play from the Dark Horse Exhibit 76, the

```
 1    introduction portion so you can identify it with respect to
 2    this demonstrative.
 3                          (Music played.)
 4    BY MS. LEPERA:
 5    Q.   Now, Dr. Ferrara, it's only here with four notes, but we
 6    heard more.  Can you explain why?
 7    A.   Yes, it is an ostinato that means this rather simple
 8    melody of four notes consecutively repeats which, of course,
 9    is a necessary ingredient to call it an ostinato or to call
10    it a riff or to call it a loop.
11    Q.   So this is all the musical material in Ostinato No. 1?
12    A.   Yes.
13    Q.   Simply the four notes.
14    A.   That's correct.
15    Q.   Repeating.
16    A.   Yes.
17    Q.   Can we turn to Demonstrative No. 6, can you identify
18    that, please?
19    A.   Yes, as we did before with the keyboard, the scale
20    degrees have been listed under the notes.  And so you can see
21    that C, the first note is scale degree is three.  The second
22    note is scale degree two.  The third note one.  The fourth
23    note five.
24    Q.   Okay.  And demonstrative No. 7?
25    A.   Following what we did with the keyboard, we've added
```

```
 1   solfege Mi Re Do So.

 2   Q.    So these demonstrative all reflect the notes in Ostinato

 3   No. 1 described in those three methods is that fair?

 4   A.    That's correct.

 5   Q.    Now, look at Demonstrative No. 8, can you identify this

 6   Dr. Ferrara?

 7   A.    This is the same Ostinato No. 1 from Dark Horse at the

 8   top in notes with letters above them, and we go back now to

 9   our keyboard and we have a full octave from C to C and all of

10   the notes in the demonstrative are included in that keyboard.

11   Q.    So those notes that are highlighted in this keyboard are

12   merely the reflection of the notes above C-B-A-E?

13   A.    That is correct.  So that is C, you see.  This is B.

14   This is A and now E.  If you notice going back to C, C moved

15   down to B, C to B is the beginning of Ostinato No. 1.  Then

16   it continues to A and there is a leap down, it's not the

17   adjacent note, down to E.

18   Q.    Dr. Decker, was talking about a C, B interval in Dark

19   Horse Ostinato No. 2 being extremely important.  Do you

20   recall that?

21   A.    Yes.  My understanding is that he considered the

22   movement from C to B from scale degree 3 to 2 to be

23   significant.

24   Q.    And is that interval from C to B in Ostinato No. 1?

25   A.    Yes, it is.
```

```
1    Q.   Now, turn to Demonstrative No. 9.  And what is
2    Demonstrative No. 9?
3    A.   It's essentially, the same as eight.  Now we have the
4    Solfege and we have high lighted the four notes and the four
5    corresponding keys on the keyboard just like the one that I'm
6    playing here.
7    Q.   So on this demonstrative when you look at the Solfege,
8    you're looking at as a Mi, Re, Do in Solfege?
9    A.   That is right.  Mi Re Do sole.
10   Q.   Now, if we could look at Demonstrative No. 10.  What is
11   Demonstrative No. 10, Dr. Ferrara?
12   A.   That begins to gives us a sense of four notes in
13   Ostinato No. 1.  You hear four iterations of that Ostinato
14   No. 1.  In fact, when we heard the introduction of Dark
15   Horse, it was iterated 14 times.  14 times before we hear
16   Ostinato No. 2.
17   Q.   Okay.  And again just for clarification, no matter how
18   many times you repeat those four notes in this ostinato, it's
19   still the same four notes; correct?
20   A.   It's still the same four notes.  It's a very simply
21   melody and simply repeating it doesn't make it more than
22   simple.  It's simply a simple repeating melody of four notes
23   (playing).
24   Q.   Okay.  I think we can move on to the next.  Well, let me
25   ask you this first.  In connection with your overall analysis
```

```
1    here looking at the two compositions and comparing them, did

2    you look at any music outside of those two compositions for

3    any purpose?

4    A.    Yes.  I looked at music that predates 2008 the release

5    year of Joyful Noise.  And one of the things that I looked

6    for was ostinatos that are like the Ostinato No. 1 in Dark

7    Horse.

8    Q.    Okay.  And what did you find?

9    A.    I found several.  We're just going to look at two today

10   for the sake of time.  And we can begin with that first find

11   of what's called a prior art work.  That is a song or

12   composition.  You can see here in the top that I have this

13   from my report.  This is Brainchild, the ostinato.  It was

14   released in 1996 so 12 years before Joyful Noise.

15          And as you can see even if you can't read music, if

16   you read the letters C-B-A-E, 3-2-1-5, Mi Re Do So, they're

17   identical.  And so here is Brainchild (playing) and as we'll

18   hear in a moment, it keeps repeating.  And here is Ostinato

19   No. 1 in Dark Horse and like in the Brainchild, it just keeps

20   repeating (playing).

21   Q.    And just for the record, we've shown you Demonstrative

22   No. 11.  Is this the four notes in Brainchild and Dark Horse

23   that you have been referring to?

24   A.    Yes.

25   Q.    Now, let's look at Demonstrative 12.
```

1    A.    Yes.  Here I have like I did before, provided a more

2    expansive view of what it means to simply repeat the same

3    simple four notes.  So in Brainchild (playing) that's what

4    I've written.  And here's Dark Horse (playing).  They're the

5    same.

6    Q.    Okay.  And do we have an audio recording from your

7    report that you have for the Brainchild ostinato?

8    A.    Yes, it was submitted with my first report.

9              MS. LEPERA:  Can we please play that.

10                      (Music played.)

11             MS. LEPERA:  And the Dark Horse Ostinato No. 1 from

12   Exhibit 76, please.

13                      (Music played.)

14   BY MS. LEPERA:

15   Q.    Okay.  Is one a little faster?

16   A.    Yes.

17   Q.    Which one?

18   A.    Brainchild is a little and, of course, the Joyful Noise

19   is a little faster than Dark Horse.  Actually, about 15 to

20   16 percent faster.

21   Q.    But just to sum up other than that differential point is

22   there any difference whatsoever between the four notes that

23   you have indicated here are in connection with Brainchild and

24   Dark Horse Ostinato No. 1, any difference?

25   A.    In my opinion the difference would be one of

 1    articulation, performance that is the notes in Brainchild

 2    articulated that way.  Whereas in Dark Horse, they're played

 3    what's called connected (playing).

 4    Q.    Does that change underlying composition?

 5    A.    No, it does not.

 6    Q.    Still the same four notes C-B-E-A?

 7    A.    That is correct.

 8    Q.    Mi Re Do So?

 9    A.    Mi Re Do So, that's correct.

10    Q.    Or 3-2-1-5?

11    A.    Yes.

12    Q.    Now, let's look at Demonstrative No. 13.  Did you find

13    any other material in your, what you called the prior art

14    search, that is relevant or related to Ostinato No. 1 in Dark

15    Horse?

16    A.    Yes.  This is one of those others and again, we're just

17    limiting it to this one right now.  There were others in my

18    report with this Ostinato No. 1.  This is a track from a

19    movie that was released in 2002 called The Hours and the film

20    score written by a very well known composer Phillip Glass.

21    Q.    And what did you find In Choosing Life?

22    A.    Just like in Brainchild, In Choosing Life, we have a

23    four note repeating melody (playing) on exactly the same

24    notes.

25    Q.    And if you look at Demonstrative No. 14, what have you

1    prepared here?

2    A.    So once again to give you a sense of the extent where

3    you keep repeating the same simple four notes In Choosing

4    Life and in Dark Horse (playing) just go back and forth

5    because they're the same.

6    Q.    So once again in both of these -- withdrawn.

7              In Choosing Life you have the same four notes that

8    you have in Dark Horse Ostinato No. 1.

9    A.    That is correct.

10   Q.    Can you explain to the jury what's the musicological

11   relevance of finding these examples?

12   A.    Well, first, it confirms the simplicity of the ostinato

13   and it shows that other composers created this ostinato

14   independent of Joyful Noise.  They created it independently

15   because they were released before so they must have been

16   independent of Joyful Noise.

17   Q.    Now, let's look at Demonstrative No. 15.  Can you

18   identify this, Dr. Ferrara?

19   A.    Yes.  This is the first bar of Ostinato No. 2.  This is

20   the ostinato in Dark Horse that Dr. Decker has placed in

21   issue.  What you see the first bar, the first eight notes.

22   And as we did before, I have the letter names and this

23   transcription is from my report.  I have the letter names

24   above C-C-C-C-B-B-A-E and you see the scale degrees and the

25   Solfege below that.

```
 1              MS. LEPERA:  And can we please just have that
 2    played from Exhibit 76 so we can have our memories refreshed.
 3                         (Music played.)
 4    BY MS. LEPERA:
 5    Q.   Now, let's look at Demonstrative No. 16.  Can you please
 6    identify and describe what Demonstrative 16 is?
 7    A.   In my first report, I placed Ostinato No. 1 over
 8    Ostinato No. 2.  These are both in Dark Horse.  The opening
 9    ostinato from the introduction (playing) and Ostinato No. 2
10    that we hear for the first time in the verse (playing) with
11    all of the letters and the scale degrees and sole.
12    Q.   What does this demonstrate to you?
13    A.   This demonstrates for me that Ostinato No. 2 literally
14    grows out and is an extension of Ostinato No. 1.  As you can
15    see, what we've simply done is moved over the C, that's the C
16    on the top line that's in Dark Horse Ostinato No. 1 and below
17    it you see Ostinato No. 2.  Compositionally, all that's
18    occurred is it's been stretched out.  Instead of (playing),
19    now same pitch, the same scale degree.  The very next note is
20    that movement from scale degree 3 to 2 which Dr. Decker finds
21    significant.  (Playing.)  It's in Ostinato No. 1.
22              And as you can see, that scale degree 2, that Re is
23    repeated one extra time in Ostinato No. 2.  So instead of
24    (playing) we have.  But significantly now, take a look at the
25    last two notes.  You'll see an A to an E.  Now, look top line
```

EXHIBIT 5
PAGE 888

```
 1    A-E bottom line A-E or 1-5 or Do So.  No matter how you spell
 2    it, the last two notes of Ostinato No. 2 are identical to the
 3    last two notes of Ostinato No. 1.  They're identical.
 4          So on that basis and because Ostinato No. 1 occurs
 5    14 times (playing) from a musicological perspective in
 6    musical time, the way in which a composition develops in
 7    musical time.  The way in which melodies and themes are
 8    transformed.  It's part of standard musicological practice.
 9          We say that compositionally, Ostinato No. 2
10    (playing) simply stretched out Ostinato No. 1.  And on the B
11    as compared on the last two notes, they're identical.  And so
12    there is very, very strong musicological evidence that
13    Ostinato No. 2 was created as having grown out of Ostinato
14    No. 1.
15    Q.   Stated otherwise the first pitch in Ostinato No. 1 being
16    a C.  Yes?
17    A.   Yes.
18    Q.   It's just repeated three times in Ostinato No. 2.
19    A.   That is correct as you can see on the screen C-C-C, yes.
20    Q.   And stated more simply perhaps, if B is the second pitch
21    in Ostinato No. 1, it's just repeated more time in Ostinato
22    No. 2; right?
23    A.   That's right.
24    Q.   So you've discussed that Ostinato No. 2 in your opinion
25    came after Ostinato No. 1 and it grew out of it.  And
```

1    previously you talked about the placement of Ostinato No. 1

2    and the hook with the chorus.  What does Dr. Decker say about

3    Ostinato No. 1?

4    A.    In his second report, Dr. Decker wrote that Ostinato

5    No. 1 in Dark Horse is quote "plainly dissimilar" end quote

6    as compared with the ostinato at issue in Joyful Noise.

7    Ostinato No. 1 in Dark Horse is plainly dissimilar as

8    compared with the ostinato he places in issue in plaintiff's

9    Joyful Noise.

10   Q.    And by virtue of that statement by him, what is the

11   relevance to you from a musicological perspective of that

12   acknowledgment?

13   A.    Well, as you can see, there's very strong musicological

14   evidence that Ostinato No. 2 grows out of Ostinato No. 1.

15   Moreover, many of the purported similarities between Ostinato

16   No. 2 in Dark Horse and the ostinato in Joyful Noise are also

17   present in Ostinato No. 1.  For example, they're both

18   descending ostinatos (playing).

19          They both have that movement from scale degree 3 to

20   2.  The Ostinato No. 1 and No. 2 have even notes.  The

21   texture is sparse.  When Ostinato No. 1 first appears in the

22   introduction and it's also sparse in Ostinato No. 2 when it's

23   first introduced in the verse.

24          And in addition, the tambra, the sound quality,

25   well, the sound quality in Ostinato No. 1 in Dark Horse and

EXHIBIT 5
PAGE 890

1    Ostinato No. 2 in Dark Horse is the same.  To me it sounds

2    like the same synthesizer patch.  There is no question it's

3    the same tambra.

4         And so what's extraordinary about Dr. Decker's

5    finding is on the one hand he says that clearly Ostinato

6    No. 1 is plainly dissimilar to the ostinato in the Joyful

7    Noise.  And then he finds that Ostinato No. 2 is

8    substantially similar to the ostinato in Joyful Noise.

9         Well, that's a self-contradiction.  In fact, it's

10   nonsensical from a musicological perspective.  Because on the

11   one hand, you can't say that one ostinato is plainly

12   dissimilar from another, and then say that second ostinato is

13   substantially similar even though that first ostinato

14   embodies many of the same similarities that you're putting at

15   issue with Ostinato No. 2 so it is self-contradictory.

16   Q.   Now, let's look at the ostinato in Joyful Noise.  How

17   many ostinatos are there in Joyful Noise?

18   A.   One.

19   Q.   Okay.  And let's look at exhibit -- Ferrara

20   Demonstrative 19.  Okay.  Can you identify this, Dr. Ferrara?

21   A.   Yes.  This is right out of my report.  The top line is

22   the 22 note Ostinato No. 2 in Joyful Noise.  So you can see

23   it's two bars in length and if you take a look at these

24   heavily bracketed notes, those are the swoops.  It's not just

25   (playing).  Those slides are there.  Dr. Decker concedes that

```
 1    they're there.  Then you have single notes and then right
 2    there, and then another slide and that goes to scale degree
 3    1, but now in the next bar, (playing), listen.
 4          That is why it's a two-bar not a one-bar phrase
 5    because this first bar never repeats by itself.  This second
 6    bar always, every time follows the first bar.  It is a
 7    two-bar phrase.  And if one correctly counts the notes that
 8    Dr. Decker conceded are there, you get 22 notes.  If you look
 9    at Dr. Decker's table, we will later, he says there are 16.
10          Actually, he says there are eight, but his table
11    tells us there's 16.  I'll walk you through that.  That's
12    clearly different from the number of notes that he puts in
13    issue in Ostinato No. 2, what I call the first bar, where he
14    says there are 8.
15    Q.   Let me ask you this in another way.  If you look at the
16    very last note in or the last series of notes in the first
17    measure of Joyful Noise?
18    A.   Yes.  Here?
19    Q.   Yes, right there.  And compare them to the last notes in
20    second measure of Joyful Noise.
21    A.   Yes.
22    Q.   They're different, are they not?
23    A.   They are different.  Just a scale degree which
24    Dr. Decker writes in his table, this is scale degree 1 and
25    then he puts a slash and this here is scale degree 6.  There
```

EXHIBIT 5
PAGE 892

```
 1   is no scale degree 6 anywhere in the ostinato in Dark Horse.
 2   Q.   But the reason you're characterizing the Joyful Noise
 3   ostinato two measure such as this with all of these notes is
 4   because of the different endings?
 5   A.   That is correct.
 6   Q.   Okay.  Because an ostinato as you indicated is a
 7   repeating phrase that is not changed; is that right?
 8   A.   It's a repeating melodic phrase and the phrase doesn't
 9   end until here right at the F.
10   Q.   So Dr. Decker talked about the phrase length of both
11   Joyful Noise and Dark Horse being the same, i.e. eight notes.
12   Can you speak to that?  What's your opinion on that?
13   A.   Once again if properly transcribed, these were not
14   transcribed in his report, though he did admit set those
15   notes up here.  These extra notes here in Joyful Noise with
16   these brackets, there, there, and so forth.  There's 22 notes
17   as compared to eight.  And Dr. Decker and I agree at least on
18   these notes with respect to the first bar of Ostinato No. 2.
19   But even if you go to Dr. Decker's table on page 6 of his
20   first report --
21   Q.   We'll get there, Dr. Ferrara.
22   A.   He lists 16 notes.  So to answer your question, based on
23   my analysis, based on Dr. Decker's analysis, the phrase
24   lengths are different.  They are not the same.
25            MS. LEPERA:  Now, let us to identify it
```

1    specifically on the recording Joyful Noise, let us play

2    Exhibit 75 in the opening.

3                    (Music played.)

4    BY MS. LEPERA:

5    Q.    So you talked about the slides and you have on

6    Demonstrative 19 these notes, certain notes in Joyful Noise.

7    Can you demonstrate what you mean by the slides that create

8    the differences in these two ostinatos?

9    A.    Well, a slide is something that you can do easily on a

10   wind instrument.  For example, a slide trombone.  You can do

11   it on a string instrument that basically just simply move up

12   the string.  On a piano it's sort of difficult to do a slide

13   because you have to iterate each of the notes.  And so if I

14   do it on the piano, it's basically this (playing).

15   Q.    Is that anywhere in Dark Horse in Ostinato No. 2?

16   A.    No.  That distinctive characteristic of those slides in

17   Joyful Noise's ostinato is nowhere in the ostinato in Dark

18   Horse, in either ostinato.

19   Q.    So now let's move on to Demonstrative 20 and can you

20   describe what this is?

21   A.    Yes.  You might have noticed that where I played, the

22   range of the notes that I played in Demonstrative 19 for the

23   ostinato in Joyful Noise was quite high.  (Playing.)  Whereas

24   in Dark Horse, it's actually what we call down an octave.

25   And so in order to be fair, in order to be able to give

```
 1    Joyful Noise's ostinato the very best possible light to show
 2    what is the same, I brought it down an octave into the same
 3    range as Dark Horse.
 4              So Demonstrative No. 20 differs from 19 insofar as
 5    instead of Joyful Noise where it's actually recorded, here I
 6    bring it down an octave so that is in the same range.  You
 7    can really hear them more clearly next to each other, Dark
 8    Horse Ostinato No. 2.
 9    Q.    That is a difference.  It is an octave higher.  If we
10    can go back to 19 for a moment and demonstrate the original,
11    that is the original pitch level that Joyful Noise is in;
12    correct?
13    A.    That is correct.
14    Q.    And then let's go back to 20.  With respect to
15    Demonstrative 20, can you identify from your musical analysis
16    what notes are not in common between the two songs?
17    A.    Certainly.  And --
18    Q.    Between the two ostinatos.
19    A.    So if we look at the first beat which is right there.
20    You see it starts on A.  Dr. Decker said that he hears an A
21    there on the down beat so that's A to C.  This is just C.
22    That's not the same.  On the other hand, the next three Cs
23    (playing) are the same.  And now we go to the third beat and
24    as you can see, we have (playing) whereas here we just have a
25    B and so these are not the same.
```

```
 1            Now, the very next note B and B is the same.  Now

 2     even in Dr. Decker's table, here the two ostinatos separate.

 3     According to Dr. Decker table, this note is a B or scale

 4     degree 2.  And according to his table, this note is A.  So

 5     both here and in Dr. Decker's table, they're different.  And

 6     once again at the end of the first bar, you have a (playing)

 7     B flat A which is clearly not E.  And even in Dr. Decker's

 8     table, this note he writes as an A or scale degree 1 not the

 9     same as an E.  And so even according to Dr. Decker's table,

10     they're not the same.  And essentially this continues in the

11     next bar.

12            As you can see, one of the things I've done, those

13     differences continue.  As you can see, what I've done here is

14     I've added a second iteration of the first notes of Ostinato

15     No. 2 and they do repeat like that so we can make up for the

16     difference in phrase length.  The phrase length is twice as

17     long in Joyful Noise's ostinato as compared to the ostinato

18     that Dr. Decker places in issue, Ostinato No. 2.

19     Q.   So in reality the second measure that you have for Dark

20     Horse Ostinato No. 2 is the repeat of the ostinato in Dark

21     Horse, but on top the ostinato in Joyful Noise is the

22     entirety of that.  Is that what you're saying?

23     A.   That's correct.

24     Q.   Let's look this information removing the X'ed out notes.

25     What is this Doctor, Demonstrative 22?
```

1    A.    These are the notes that remain that are in fact the

2    same in bar one and in bar two.    Essentially, the same

3    differences, the same similarities.    So what you see here is

4    in fact right there, there's a beat, there's a down beat.    So

5    it's different and three notes that are the same Mi Mi Mi

6    (playing).    The next note we saw is different, and then we

7    have a single note Re.    That's the same.    That's it.

8             That is the demonstrable similarity between

9    Ostinato No. 2 in the pitches and the ostinato in Joyful

10   Noise.    This is fragmentary, it's basic, it's elementary,

11   it's trite.

12   Q.    It's a C and a B?

13   A.    It's a C and a B.

14   Q.    It's Mi Re?

15   A.    It's Mi Re.

16   Q.    With a couple repeats of the Mi.

17   A.    That's right.

18   Q.    Now, let's look at Dr. Decker's chart which is

19   Demonstrative 23.    Does he have any other musical

20   transcription or even a chart of anything else in his initial

21   report comparing Joyful Noise to Dark Horse?

22   A.    No.    As I recall this is, I think, on page 6 of his

23   first report.    This is it in terms of any kind of attempt at

24   presenting the pitches and some sense of the pace, rhythmic

25   pace.

55

```
 1   Q.   Do you agree with the scale degrees -- we talked earlier

 2   about how you can call a note or a pitch either by a letter

 3   or by a number or the solfege which is Do Re Mi; right?  So

 4   he's just using the scale degrees here; right?

 5   A.   Yes.

 6   Q.   Okay.  But we are now still talking about pitches.

 7   A.   That is correct.

 8   Q.   So what is your opinion with respect to how he has

 9   articulated these scale degrees?  Do you agree?

10   A.   No.  The scale degrees that he's presented distort the

11   melody in Joyful Noise.  It's not 3-3-3-3-2-2-2-1 and then

12   repeat it 3-3-3-3-2-2-2-6 because this is rather deceptive in

13   that box underneath No. 8, he writes 1/6.  That's very

14   deceptive.  In fact what he means is the first eight notes

15   goes to a one, but the next eight notes goes to six.  Eight

16   plus eight is 16.  The phrase length is 16.

17        Importantly, as you saw, that three underneath beat

18   one, this three, it is a three in Dark Horse, but in Joyful

19   Noise it's not three.  It is 1-3 (playing) and he admits it

20   starts on A so this misrepresents.  There are other notes

21   that we've shown in my transcription that also misrepresent

22   the keys that what he's written here -- two points.

23        What he's written here cannot be used as evidence

24   in support because it -- because it misrepresents what's

25   actually in the pitches in Joyful Noise.  That's the first.
```

EXHIBIT 5
PAGE 898

```
 1    The second is let's say just for the sake of argument that
 2    this correct and it is not, but just for the sake of argument
 3    if it was correct, according to Dr. Decker, the only
 4    similarity is 3-3-3-3-2-2.  That's it.
 5    Q.   Let's move to the next slide.  And we have identified
 6    the 3s and 2s.  And once again in the solfege what's that,
 7    Dr. Ferrara?
 8    A.   Yes, this is solfege.  And as we saw before, essentially
 9    what Dr. Decker is finding to be the same is Mi Mi Mi Mi Re
10    Re.
11    Q.   If you look at even Dr. Decker's chart, what do you
12    conclude by virtue of the 7th and 8th beat?
13    A.   Under the numbers 7 and 8 as you can see, even as he
14    presents it, the pitches are different.
15    Q.   So once again even assuming any accuracy of this chart,
16    what is the only musical material in common between Joyful
17    Noise and Dark Horse per this chart?
18    A.   Mi Mi Mi Mi Re Re with even notes that don't exist in
19    that rhythm because of the slides in Joyful Noise.  But even
20    if you want to say well, those slides not there, even though
21    he admitted they are, you would still have only Mi Mi Mi Mi
22    Re Re in evenly played notes.
23    Q.   We have the keyboard on Demonstrative No. 25.  Can you
24    just play the demonstrative?
25    A.   Yes, of course.  According to this chart of
```

```
 1   Dr. Decker's, these are the notes (playing) that's the C four
 2   times, and then the note right next to it that's it
 3   according to Dr. Decker.
 4              MS. LEPERA:  Okay.
 5              THE COURT:  Is this a good time for a morning
 6   recess?
 7              MS. LEPERA:  It's a good idea.  I have quite a bit
 8   more.
 9              THE COURT:  Why don't we then take the morning
10   recess.  Let's take ten minutes if we can.  Please keep an
11   open mind.  Don't discuss the case with one another or anyone
12   else.
13                    (Jury not present.)
14              THE COURT:  What's your estimate, Ms. Lepera?
15              MS. LEPERA:  Half an hour.
16              THE COURT:  Then you're going to have a fairly long
17   cross I assume.
18              MS. COHEN:  Um maybe, maybe not.  Maybe 30 minutes.
19              THE COURT:  Okay.  Then we ought to be able to get
20   it in and take up Billboard at lunch.
21              MS. COHEN:  Thank you.
22              MS. LEPERA:  Thank you.
23              THE CLERK:  This court's in recess.
24                    (Recess taken.)
25              THE COURT:  Okay, Ms. Lepera.
```

EXHIBIT 5
PAGE 900

```
1              MS. LEPERA:  Thank you, Your Honor.
2              THE COURT:  Go ahead.
3    BY MS. LEPERA:
4    Q.   Okay.  Dr. Ferrara, we're going to resume and turn back
5    to Demonstrative 25 where we left off, I believe.  And you
6    had . . . well, let me actually move back to the slide
7    immediately prior to that.  And the one prior to that,
8    actually.  This was Demonstrative 24.  It was Dr. Decker's
9    chart we were looking at earlier.  Do you recall?
10   A.   I do.
11   Q.   Okay.  And the last two beats, 7 and 8, and the pitches
12   that are identified in those -- uh, in this chart, your
13   opinion previously stated with respect to them was what?
14   A.   That they were very different.
15   Q.   And can you explain why?
16   A.   Yes, certainly.  Uh, bring back -- that's right.
17             So if you look under the No. 7, Dr. Decker lists
18   the pitch in Joyful Noise as 2.  That's this B.  (Playing.)
19   And then going to 8, he lists 1 so he finds this.  (Playing.)
20   That's Re Do.  Whereas in Dark Horse, he lists a 1 which is
21   correct (Playing) going down to 5.  Now, that's a huge
22   difference.  From 2 to 1 is a step-wise motion because it's
23   literally going down in steps on the keyboard.  We did it in
24   the beginning, 2, 1.  (Playing.)  Whereas in Dark Horse, it's
25   a leap from 1 to 5.  (Playing.)
```

```
 1              That interval, and an interval is the simply the
 2      space between two pitches.  So from 1 to 5 is an interval
 3      that's very recognizable.  (Playing.)  It's the opening
 4      interval in Here Comes the Bride.  A perfect fourth is what
 5      it's called.  It's extremely different as compared with
 6      (Playing) 2, 1 as charted by Dr. Decker.
 7              In addition, once again, we have to remember that
 8      it's not just eight notes.  It's 16 notes.  The product
 9      phrase lengths are different.  The second time around after
10      you 8, we have a 6 so you can see that 6.  So now we're going
11      from 2 to 6. (Playing.)
12              Now, listen to this.  (Playing.)
13              Now, that's distinctive.  That interval is the
14      interval of a tri-tone, and it is a typical interval in
15      riffs.  For example, (Playing.)  It's got a real jazz flavor.
16      (Playing.)  There's nothing remotely like that in Ostinato 1
17      or 2 in Dark Horse.  In fact, once again, we still have the
18      same interval in Dark Horse from 7 to 8.  (Playing.)  The
19      perfect fourth which is very different from (Playing.)
20              So the very character of those intervals are
21      distinctly different, and that is one of the distinctive
22      things about the melody in the ostinato in Joyful Noise.  So
23      it's not only the (Playing.)  It's not only those slides,
24      but at the end this interval of a tri-tone. (Playing.)
25              Those are the two for me distinctive things about
```

 1    what is in the ostinato in issue in Joyful Noise, and they

 2    are completely absent in Dark Horse.

 3    Q.    Okay.  So if we move now to next demonstrative, uh, just

 4    to confirm, what is your opinion with respect to any

 5    commonality between the 7 and the 8 beats of these two?

 6    A.    Well, once again, per my transcription and analysis,

 7    it's not four 3s and two 2s.  It's three 3s (playing) spaced,

 8    different note at a single tone (playing) very fragmentary.

 9    But even if one accepts Dr. Decker's chart, and I do not, at

10    most, what he has is simply going side-by-side (playing) the

11    very next note down (Playing.)  That's it.

12    Q.    So we've eliminated the 7 and the 8 notes from your

13    opinion under your analysis is that they're completely

14    different between Joyful Noise and Dark Horse.

15    A.    And they are charted as different by Dr. Decker.

16    Q.    Very well.  Okay.  So now we are left with the chart,

17    um, Dr. Decker which has got the set 3 repeated three times

18    so it's 1, 2, 3, 4, and then we have the second scale set

19    repeated twice.  Is this all that remains from even

20    Dr. Decker's analysis in common between the two?

21    A.    Yes.  It won't accept the accuracy of the chart.  That's

22    all there is for Dr. Decker.  I do not accept the accuracy.

23    Q.    Okay.  And from a musicological perspective, are the

24    plaintiffs the first ones in history's music to have created

25    this?

1    A.    No.    It's actually a building block.    Uh, it is part of

2    a descending scale that students all over the world,

3    beginning students practice on every day.    Practice on a

4    trumpet.    C-C-C-C-B-B-B-B.    This is how beginner students on

5    a violin, C-C-C-C-B-B-B-B.    It's basic fundamental musical

6    building blocks.

7    Q.    And as we looked at earlier, you looked to see if there

8    was some music that was comparable to the Ostinato No. 1 in

9    Dark Horse, and you looked at Brainchild and Choosing Life.

10    Did you also look for music that reflects any of this

11    commonality that Dr. Decker describes between Joyful Noise

12    and Dark Horse?

13    A.    Well, what came to mind immediately for a 3-3-3-3-2-2 is

14    the opening vocal melody in Jolly Old Saint Nicholas.    That's

15    the melody that's set to the title lyrics, Jolly Old Saint

16    Nicholas, but it's in a major key.    (Playing.)    That's Jolly

17    Old Saint Nicholas.    So it's 4-4-4-4 3-3-3-3-2-2-2.    And

18    interestingly, if you look -- if you're brought back bar 7,

19    Joyful Noise also has a 2 there, but it's in a minor key

20    (Playing).    That's Joyful Noise.    This is Jolly Old Saint

21    Nicholas.    (Playing.)    Joyful Noise (Playing).    Saint

22    Nicholas (Playing.)

23             Whereas Dark Horse according to Dr. Decker, at most

24    has (playing) no third two.    So on that basis, I didn't look

25    at an awful lot for -- for more prior art with respect to

UNITED STATES DISTRICT COURT

EXHIBIT 5
PAGE 904

62

1   that.

2   Q.   Well, let's look at Demonstrative 26.  What is

3   Demonstrative 26?

4   A.   What you have here is out of my report wherein I show

5   that in addition to Jolly Old Saint Nicholas so it's scale

6   degree 3, second line.  It's 3-3-3-2-2 that that scale degree

7   three in a major key is functioning the same way.

8       Scale degree 3 in a major or minor key function the

9   same way.  So I the melodic function is the same,

10   one-and-a-half step higher.  Also, with Merrily We Roll Along

11   (Playing.)  So 3-3-3-2-2 is the same melody as Merrily We

12   Roll Along.  By the way, it's the same melody as Mary had a

13   Little Lamb. (Playing.)

14       So on that basis, I felt rather confident that I

15   had established that this 3-3-3-3-2-2 if one accepts it, and

16   I don't, in Dr. Decker's chart is simply something that

17   everybody has to have the ability to use in their music.

18   Q.   Okay.  And do you have to show in using this material

19   that Jolly Old Saint Nicholas and Joyful Noise or Dark Horse

20   are substantially similar?

21   A.   Absolutely not.

22   Q.   Is that, uh, not the point of this?

23   A.   It is not the point.

24   Q.   Okay.  Um, and let's look at what we have next,

25   demonstrative 27.  Okay.  So demonstrative 27, this is the --

EXHIBIT 5
PAGE 905

```
 1   would you like to identify what this is, Dr. Ferrara?
 2   A.   Yes.  This is the visual exhibit in my report as the --
 3   all the way to left, and I've put a circle on it, uh, that
 4   was the published sheet music, and then we blew it up.  And
 5   here it is now a little bigger.
 6            And over the melody notes, and this is the key of B
 7   flat so it's up here (Playing.)  I put 3-3-3-3-2-2 because
 8   that's what's at issue, but there's, again, I know that extra
 9   C there with another two.  And then, once again, we broke it
10   out so you can see it a little bit more clearly.  So
11   essentially, these two simply flow out of this.
12   Q.   So when we're talking about scale steps, and we're back
13   to Do Re Mi Fa So La Ti Do, what exactly are the 3-3-3-3 and
14   2-2 in 27?
15   A.   It's Mi Mi Mi Mi Re Re.  That's it.  In my opinion, it's
16   only different note Mi Mi Mi, different note Re.  That's it.
17   If it's the proper transcription, that's what you get, but
18   even as charted by Dr. Decker, it's only Mi Mi Mi Mi Re Re.
19   Q.   And let's look now at the next exhibit.  28.  Thank you,
20   Scott.  What is demonstrative 28, Dr. Ferrara?
21   A.   This is the book cover, Tradition of Excellence, and as
22   you can, it's at the very top, you can read it.  It says book
23   one right there.  It says book one.  There you go.  So right
24   there, Book one.  This is a band method, and this is what --
25   kids usually in most school systems that have music band
```

1    programs start in fourth grade so they're about 9 or 10 years
2    old book.  Book one means this is basically at the beginning
3    of fourth grade, and these are the kinds of things they're
4    playing.
5            And so as you can see, we have a skill builder,
6    Merrily We Roll Along, and it boxed out.  So essentially
7    here's the cover of the book.  Here's the page.  Now we
8    zoomed see to that you can see it a little bit more clearly,
9    and we zoomed in again to make it even more clear.  That's my
10   sloppy handwriting above with the 3s and two 2s.
11           But as you can see, Merrily We Roll Along and Mary
12   Had a Little Lamb have the same melody.  They're set to the
13   same melody, just different lyrics.  And as you can see, they
14   both have this 3-3-3-3-2-2 scale movement.
15   Q.   And it's again Mi Mi Mi Mi Re Re.
16   A.   Mi Mi Mi Mi Re Re, that is correct.
17   Q.   And what about the spacing of the notes, Dr. Ferrara,
18   with respect to both Jolly Saint Nick and Merrily We Roll
19   Along?  One of the things that Dr. Decker talked about is the
20   notes that were in Dark Horse and Joyful Noise Ostinato No. 1
21   and 2 were evenly spaced notes.  What do we have here?
22   A.   That's right.  He says that they are.  In fact, in both
23   of these exhibits as you can readily see, the 3-3-3-3-2-2 are
24   evenly spaced notes, but it's the same rhythm that Dr. Decker
25   says is in both Ostinato 2 and in Joyful Noise.  In fact,

1    that rhythm is not in Joyful Noise.  The slides interrupt

2    that rhythm.  But even if one accepted it, they're also in

3    Merrily We Roll Along.  They're also in Jolly Old Saint

4    Nicholas as per these two, visual exhibits.

5    Q.    In addition to the Mi Mi Mi Mi Re Re pitches being as

6    you said in your opinion simplistic in these works, what

7    about the rhythm?  How would you characterize that?

8    A.    The rhythm is as easy as you can get.  It's just dot dot

9    dot dot dot dot.  That rhythm is as simple as a rhythm can

10   be, and, of course, that makes sense.  This is -- this is

11   book one, the beginning of what would typically be a fourth

12   grade band program, and so they're not going to have complex

13   or creative rhythms.  They're going to have the most basic

14   rhythms that you can have, and that basic rhythm is just

15   simply playing the notes evenly.

16   Q.    And when you say this is in book one, approximately what

17   grade level is this in your experience?

18   A.    Grade four.  When I completed my undergraduate degree, I

19   was certified to teach K through 12th, and though I went on

20   to graduate school, in order to get that certification, I had

21   to one semester student teach in an elementary school in a

22   band program and then student teach the next year for a

23   semester in a high school.

24           And teaching as a student teacher, these are the

25   kinds of books that we used, and, indeed, that same (playing)

1   moving down the scale four notes, that's the thing -- that is

2   the very same exercise of a scale that we -- that we taught.

3   It's what I learned when I was in classes to learn how to

4   play these instruments basically so that I could teach them

5   as a student teacher and ultimately a teacher.

6          And by the way, I have four grandchildren.  The

7   oldest is ten.  She just finished fourth grade.  She plays

8   trumpet like her dad did.  And she's playing (playing.)

9   She's doing the same scale.  It's rather universal,

10  C-C-C-C-B-B-B moving down the scale in this case on a wind

11  instrument.

12  Q.   Okay.  And we did look earlier at the keyboard and the

13  seven, you know, scale steps in the keyboard.  And when you

14  talk about an elementary education, is it, in fact, the case

15  that from your experience, what people learn to play is the

16  scale?

17  A.   That's exactly right.

18  Q.   And different components of the scale.

19  A.   That is right.

20  Q.   And what we really have here are just two components of

21  that seven note scale starting with Mi and Re.

22  A.   That's right.  Just two notes of a building block.

23  Q.   Could you provide an analogy?

24  A.   Sure.  Uh, claiming that essentially this is your

25  expression, that is 3-3-3-3-2-2 would be analogous to let's

1    say a homeowner who's having a home built right next door.

2    And he goes to the home builder.  He goes to the builder, and

3    this person who owns the house says you're putting cinder

4    blocks as the foundation of your new house.  I have cinder

5    blocks in the foundation of my house.  That's what we're

6    talking about, Cinder blocks as a foundation of a house.  It

7    is an idea that anybody can use.  A part of a scale, a

8    descending scale are like cinder blocks.  Anyone can use

9    them.

10   Q.   One of the things that Dr. Decker talked about was

11   texture.  Did you find any work that you would like to share

12   with us that has some of the similarity that Dr. Decker was

13   complaining about in the public domain or in prior art?

14   Let's look at Exhibit demonstrative No. 29.  Can you identify

15   this?

16   A.   It is one of really many prior art works that I

17   presented in my two reports.  And, again, for the sake of

18   time, we're only gonna look at one of them.  This is by Gucci

19   Mane, 2006 so it was released two years before Joyful Noise.

20          And this is right out of my report transcription

21   and all of the information, that this ostinato (playing)

22   which has repeated notes, and by the way, it has a little

23   (playing) slide.  And then it does what?  (Playing.)  It

24   moves down.  So it is a descending ostinato.  It keeps

25   repeating.  It also plays throughout most of the song but not

```
 1    the entirety of the song so it's like Dark Horse.

 2            The ostinato is in the treble.  This is something

 3    that Dr. Decker for whatever reason thought was important.

 4    Centuries ago, in classical music, most of the ostinatos were

 5    in the bass, but in the dictionary definitions of ostinato,

 6    they tell you that in popular music and in jazz, it's most

 7    often in the treble.  So there's nothing significant about

 8    the fact that the ostinatos in Dark Horse and the ostinato in

 9    Joyful Noise are in the treble.

10            In other words, they're not(playing.)  They're not

11    down in the bass.  They're up here so it's in the treble just

12    like the ostinatos at issue.  It obviously has a structural

13    set function as I just said.  It's mostly in 8th notes.

14    (Playing.)

15            And why do say I mostly?  Because(playing)of that

16    one slide.  But it has more 8th notes that are evenly played

17    than the ostinato in Joyful Noise.  It has repeating pitches.

18    (Playing.)

19            And we're gonna hear in a moment in the sound

20    recording is the texture that is the -- essentially, all of

21    the sounds that are sounding at a given time is sparse.  Not

22    very thick.  Not think like in the choruses in Joyful Noise

23    wherein some cases, you can barely hear that ostinato.  Those

24    are not sparse.  Those are very thick.

25            But here, it's sparse, and it's quite true that the
```

EXHIBIT 5
PAGE 911

```
 1    ostinatos open in a sparse texture in the songs at issue, but
 2    the -- but the texture in Ostinato No. 1 is also sparse.
 3    Q.   Okay.  So would you like to play the audio for this
 4    demonstrative, Dr. Ferrara?
 5    A.   Please.
 6                    (Music played.)
 7         THE WITNESS:  What I asked the technologist to do
 8    is what came right after where we diminished the sound, the
 9    language is really offensive, and I didn't want to expose you
10    to that, and that's why we skipped it.  We can play a little
11    bit more, but I think the point is made.  This, once again,
12    is played through most but not the entirety of the song, and
13    it has a structural function.
14    BY MS. LEPERA:
15    Q.   And one of the main points that Dr. Decker spoke to is
16    the sparse nature of the texture of the ostinatos in Joyful
17    Noise and Dark Horse and claiming that that was indicative of
18    a substantial similarity.  And what is your opinion with
19    respect to that?
20    A.   Well, it's commonplace.  In fact, very often in popular
21    songs of multiple genres, you start off with a more sparse, a
22    thinner texture, and as you build compositionally, you get a
23    thicker texture.  That's something that is commonplace.  So
24    the fact that the ostinato begins with a sparse texture in
25    the two songs that are at issue really tells us just about
```

1    nothing.

2         Interestingly, though, if one were to analyze the

3    entirety of the two songs, and Dr. Decker testified that he

4    did not analyze the entirety of the two songs as per his

5    testimony, if he would of analyzed the entirety, we heard

6    that the chorus has anything but a sparse texture in the

7    Joyful Noise composition.

8    Q.   Okay.  Now, one of the other points you made, I believe,

9    early on was that you looked at some of the writings, other

10   songs of the defendants.  And can you speak to what you found

11   with respect to that, at least with respect to identified

12   Demonstrative 30?

13   A.   Yes.  I -- I found several works, uh, written by

14   Dr. Luke and several works written by Max Martin.  I even

15   found a work that was co-written by Juicy J.  And all of

16   these works predate 2008.

17        Once again, for the sake of time, I'm just going to

18   provide one example.  This is something that was co-written

19   by Dr. Luke.  That's Love Me Or Hate Me, 2006.  So when

20   Dr. Luke co-wrote this, Joyful Noise was not released.  This

21   is before Joyful Noise.  And what you're gonna hear is

22   (Playing).

23        So what do we have?  Obviously, first which is in

24   the check and as per my report, this is a descending

25   ostinato.  In addition, it's actually all the way up here.

UNITED STATES DISTRICT COURT

EXHIBIT 5
PAGE 913

71

```
 1      (Playing).  It's in the treble.  Yes?  It has a structural

 2   function.  It's mostly played in the introduction and

 3   choruses.

 4          It also includes -- and take a look at the letters

 5   and the scale degrees.  It includes 3-2-1-5. (Playing.)  That

 6   is what?  That's Ostinato No. 1.  (Playing.)  So this

 7   repeating figure (playing) includes the pitch content that's

 8   at issue (playing).  It consists as you hear of all evenly

 9   performed notes.  And as what you will hear in a moment on

10   the sound recording, the texture is sparse when it's first

11   introduced.
```

```
12   Q.   Can you reflect on this chart where the 3-2-1-5 is?

13   A.   Yes, of course.  So there are 3-2-1-5.  And that's

14   C-B-A-E.  And then it repeats.  3-2-1-5, 3-2-1-5, 3-2-1-5 all

15   the way down.

16   Q.   If we can just for a moment go back before we play that,

17   if you wish, to Demonstrative 23?  Again, in Dr. Decker's

18   chart, what are the scale steps that he identifies for Dark

19   Horse?

20   A.   This is for Ostinato No. 2, and he identifies 3-2-1-5.

21   So these pitches that he identifies -- and those are the

22   pitches.  We're in agreement they are on the pitches in Dark

23   Horse.  These pitches were in an ostinato that was co-written

24   by Dr. Luke two years before the release of the plaintiff's

25   work.  He can't say that it was influenced by the plaintiff's
```

EXHIBIT 5
PAGE 914

 1    work.  It's before the plaintiff's work.

 2         Whereas as charted by Dr. Decker, in 7, 8, you

 3    don't have those pitches, and furthermore, you've got a six.

 4    (Playing.)  Remember that tri-tone?  There is no six in Dark

 5    Horse, and there's no six in what Dr. Luke wrote two years

 6    before in Joyful Noise.

 7    Q.   To be clear, with respect to demonstrative 30, the

 8    3-2-1-5 that was in Love Me or Hate Me written by Dr. Luke,

 9    those pitches are found not just in Ostinato No. 1 but in

10    Ostinato No. 2, that is the ostinato that plaintiffs are

11    complaining about; correct?

12    A.   That is right.  So the pitch content 3-2-1-5 (playing)

13    that is Ostinato No. 1 in Dark Horse.  (Playing.)  3-2-1-5,

14    3-2-1-5, 3-2-1-5.  Simply stretched, (playing)3-3-3-2-2-1-5.

15    Q.   And this document also demonstrative 30 in which you

16    have in your report, you've indicated that it also consists

17    of evenly performed 8th notes.  Can speak to that with

18    respect to how that relates to the ostinato in Dark Horse?

19    A.   Yeah.  So the Ostinato No. 1 in Dark Horse consists

20    completely of evenly played notes (Playing.)  They're played

21    faster, but they're all evenly placed (playing) in Ostinato

22    No. 2.  So like Dr. Luke's 2006 work, all the notes in

23    Ostinato No. 1 and Ostinato No. 2 in Dark Horse are evenly

24    played notes whereas (playing) you have fast notes and other

25    notes in the ostinato in Joyful Noise which in my opinion are

1    not all evenly played.  You can just simply hear it.

2    Q.   Okay.  In addition, another similarity we've been

3    discussing that Dr. Decker finds is the texture and says that

4    the texture between Joyful Noise and Dark Horse are both

5    sparse, and he says that's relevant.  Is there a sparse

6    texture in this as well?

7    A.   Yes.  As we'll hear when we hear the audio recording.

8              MS. LEPERA:  Let's do that.

9                    (Music played.)

10             THE WITNESS:  That's a -- that's a sparse texture.

11   There's not an awful lot going on.  It's rather empty space

12   around.

13   BY MS. LEPERA:

14   Q.   Okay.  And the ostinato is also in the treble?

15   A.   Yes.

16   Q.   And, again, you've indicated it's the same, evenly

17   spaced notes as we have in the ostinatos at issue?

18   A.   Yes.

19   Q.   All right.  Let's move now to demonstrative 31.

20   Dr. Decker identified seven similarities; correct?

21   A.   Yes.

22   Q.   Okay.  Is his substantial similarity opinion supported

23   by any of the elements he claims exist?

24   A.   No.

25   Q.   Between the compositions, either individually or in

EXHIBIT 5
PAGE 916

1  combination?

2  A.    In my opinion, no.

3  Q.    Okay.  Why don't we walk through them one by one.

4  Descending ostinato.  Why does that not support his opinion?

5  Why does that not support an opinion of substantial

6  similarity?

7  A.    Well, first of all, an ostinato, here the ostinatos are

8  a melody.  A melody can either go up.  (Playing.)  How Dry I

9  Am (playing )in a minor key.  Or it can go down.  (Playing.)

10  It could also simply repeat.  Incessantly.  (Playing.)  Those

11  only the possibilities.  Melodies go up.  They ascend.  They

12  go down.  The descend or they repeat.  To say that the

13  ostinatos at issue are descending doesn't say an awful lot.

14  To say that they're ostinatos.  Well, along with countless

15  ostinatos that have been written for centuries all over the

16  world.  So that doesn't say a lot.

17          In addition, Ostinato No. 1 which I find to be

18  musicologically is the support for Ostinato No. 2 and the

19  source for Ostinato No. 2 in Dark Horse is also a descending

20  ostinato. (Playing.)

21          And, in fact, the prior art works that I showed,

22  the two (playing) Brainchild and one the one from The Hours,

23  (playing) they're also descending.  And by the way so is

24  (Playing).  So is the descending ostinato in Gucci Mane and,

25  of course, so with (Playing.)  So there are four prior art

1    works that have ostinatos that descend, and furthermore,

2    Ostinato No. 1 descends.

3         The problem for Dr. Decker is he tells us that

4    Ostinato No. 1 and the ostinato in Joyful Noise are, his

5    words, plainly dissimilar.  Well, if they're plainly

6    dissimilar, then why isn't Ostinato No. 2 dissimilar from

7    Ostinato No. 1?  Because like Ostinato No. 1, with respect to

8    this first, they both descend.  So that's first.  And it's

9    commonplace, it's in Ostinato No. 1, and, of course, it's in

10   the prior art.

11   Q.   Okay.  And what about the -- and by the way, when he

12   says there's a descending ostinato, the next items that he's

13   talking about are all about what's in that descending

14   ostinato; right?

15   A.   That is correct.

16   Q.   Okay.  So let's talk about the phrase length.  In his

17   opinion, with respect to the phrase length in the Joyful

18   Noise ostinato and the Dark Horse 2 Ostinato, is there any

19   musicological support that the phrase length of those two

20   could rise to the level of substantial similarity

21   musicologically?

22   A.    Well, first, if they were the same length, let's say

23   they were both eight notes, that would be commonplace.

24   Countless phrases are eight notes.

25        But one simply needs to look at Dr. Decker's table.

1  He deceptively writes one slash six under the eight.  Very

2  easy to confuse the reader.  It's eight notes.  No, it's not

3  because the one slash six, you gotta go back to go after you

4  hit one and do the whole thing again.  And in the end, you

5  hit six.  That's 16 notes as the chart tells us.

6          So even according to Dr. Decker, the phrase length

7  in ostinato -- in the ostinato in Joyful Noise is twice as

8  long as the ostinato in Dark Horse, Ostinato No. 2.  If you

9  transcribe it in the way that I think is proper, it's even

10  more different because it's not just 16 notes, it's 22 notes.

11          But no matter how you slice it, Dr. Decker's own

12  report and chart contradict this.  There is no phrase length

13  similarity.  He's pointing to a difference.

14  Q.   So there is no phrase length of eight notes that are in

15  common.

16  A.   That is correct.

17  Q.   And let's speak to the rhythm within the ostinato of

18  Joyful Noise and Dark Horse, Ostinato No. 2.  Are those

19  rhythms the same or even similar?

20  A.    No, the -- the ostinato in Dark Horse, Ostinato No. 2,

21  is all evenly played notes.  We've heard these notes so many

22  times (playing) whereas the ostinato in Joyful Noise is

23  (Playing.)  Those (playing).  That's a fast note and a longer

24  note (Playing.)  That's a fast note and a longer note.  That

25  is not an even, all evenly played notes.

EXHIBIT 5
PAGE 919

```
 1              Interestingly, though, once again, Ostinato No. 1
 2   consists of all even notes, but Dr. Decker says that Ostinato
 3   No. 1 is plainly dissimilar from ostinato in Joyful Noise.
 4   But if it's plainly dissimilar, then it's got to be plainly
 5   dissimilar like the descending ostinato between Ostinato
 6   No. 2 and the ostinato in Joyful Noise.  You can't have it
 7   both ways.  It's self-contradiction.
 8   Q.   When Dr. Decker identifies eight evenly spaced notes on
 9   the same beats between the two ostinatos, is that incorrect
10   based on your opinion that there's the additional sliding
11   notes and spaces between the beats?
12   A.   That is correct.  And, once again, even if one accepted
13   Dr. Decker, not the phrase length because he's contradicted
14   himself on that, but if one accepted that it's all even
15   notes, and they're not, and you can hear that they're not,
16   okay, if you accept that, those even notes are still in
17   Ostinato No. 1, and Ostinato No. 1 in Dark Horse is the
18   compositional source of Ostinato No. 2.
19   Q.   Okay.  Now let's look at the pitch content.  Dr. Decker
20   has, again, this eight note chart, and we've identified that
21   with respect to the pitch content, what is actually in
22   common?
23   A.   We saw in that table chart, one, that the sliding notes
24   are omitted, but even if one accepted as accurate that table
25   chart, the similar pitches according to Dr. Decker is nothing
```

EXHIBIT 5
PAGE 920

1    more than a descending scale.  (Playing.)  That's it.

2            And as charted by Dr. Decker, we have (Playing) in

3    that first bar in the ostinato in Joyful Noise moving down

4    just a step.  (Playing.)  But by way of difference, we have

5    (Playing.)  We have a perfect fourth.  That's different.

6    That's charted in pitch context -- content by Dr. Decker.

7            And then even worse, in the end of that 16 note

8    according to Dr. Decker, ostinato in Joyful Noise, we have

9    (Playing.)  This is something nothing like that, and that is

10   not like (Playing.)  That's not like Here Comes the Bride.

11           So according to Dr. Decker, if you take as

12   accurate, and I do not, that table, you not only have these

13   big differences.  There's an E (playing) scale degree five in

14   Ostinato No. 2, but there isn't in the ostinato in Joyful

15   Noise, and there's a (playing) that wonderful note in Joyful

16   Noise, but it's not in the Ostinato No. 2.

17           So even if you take him at what he's put in his

18   chart, first of all, there are pitch differences, and

19   furthermore, all that's the same is the musical building

20   block (playing) which kids all over the world practice on

21   instruments as beginners.

22   Q.   So there's no musicological basis in your opinion for

23   concluding that the pitch content between those two ostinatos

24   would give rise to a claim of substantial similarity.

25   A.   Right.  And, once again, by way of self contradiction,

1    the pitch content -- as I showed you on that chart, the

2    content (Playing) that is Ostinato Number 1.  (Playing.)

3    That's 3-2-1-5.  That pitch content is the same pitch

4    content.  (Playing.)  Those are the same pitches.  C-B-A-E

5    Ostinato No. 1.  C-C-C-C-B-B-A-E.

6         So once, again, by way of self-contradiction, if

7    Ostinato No. 1 (playing) which has the same pitch, pool of

8    pitches, if you will, as Ostinato No. 2 -- if Ostinato No. 1

9    in Dark Horse is in his words, plainly dissimilar from

10   (playing) the ostinato in Joyful Noise, then you also have to

11   find -- now we're starting to stack up the similarities,

12   you're also gonna have to say, well, okay, then that means

13   that Ostinato No. 2 in Dark Horse is not substantially

14   similar.

15        It's also dissimilar because you can't say that for

16   Ostinato one when Ostinato No. 2 as you have charted it has

17   so many of the very same similarities that you're putting at

18   issue.  Once again, it's musicological nonsense, and it is

19   deep self contradiction.

20   Q.   And the 3-2-1-5 is also in Dr. Luke's 2006 composition;

21   correct?

22   A.   That is correct.  And it's also in the prior art works

23   with respect to Ostinato No. 1.

24   Q.   Okay.  So what's the next reported similar element?

25   What's an overlapping musical domain?

```
 1   A.   Well, it's usually just called the combination.

 2   Basically, what he's saying is that within the ostinato --

 3   and as Ms. Lepera said, this is all about the ostinato

 4   because Dr. Decker didn't do the analysis with the rest of

 5   the songs.  This is all about the ostinatos.  He's basically

 6   saying, hey, there's a combination of similarities.

 7          Well, first of all, a combination doesn't exist,

 8   but the point is it's redundant because yes, okay, there is a

 9   combination according to you, and you're just simply throwing

10   in overlapping.

11          It's all about the ostinatos, and what he's

12   basically saying is that -- that there's phrase length, but

13   there isn't, that there's rhythm, but there isn't.  There's

14   pitch content which is different, but it's also an Ostinato

15   Number 1.  There's descending ostinatos and so forth.  And so

16   this is just redundant.

17   Q.   Okay.  Let me just recap before we get to the last two.

18   Okay.  So each of these five similarities out of the seven,

19   you find that with respect to each of those, there's no

20   similarity, and there's a great difference; is that correct?

21   A.   That is correct.

22   Q.   And the only similarity that you find at all with any of

23   this is the simple C and B pitch even if you were to take

24   Dr. Decker's chart at its word.

25   A.   That is correct.
```

```
 1    Q.   Okay.  So given that there can be no selection or
 2    arrangement or combination of these elements as similar;
 3    correct?
 4    A.   That is correct.
 5    Q.   Now let's talk a little bit about tambor.  What is
 6    tambor?
 7    A.   It's simply the sound quality.
 8    Q.   And Dr. Decker claims that the sound quality or the
 9    tambor of Dark Horse Ostinato No. 2 is similar to the tambor
10    in the Joyful Noise ostinato; is that right?
11    A.   He does.  In fact, I believe he says they are
12    substantially similar.
13    Q.   Okay.  So what is your opinion with respect to that?
14    A.   Well, they're not the same clearly.  The tambor or sound
15    quality in the ostinato in Joyful Noise has a sharper attack.
16    It also has a lot of delay in it which is not in the tambor
17    of Ostinato No. 2 in Dark Horse.
18           In fact, Dr. Decker in his own report wrote that
19    the tambor in the ostinato in Joyful Noise is more, his word,
20    piercing.  I agree.  That's why I call it more a sharper
21    attack.  It's a sharper attack.  He says it's more piercing,
22    he admits that, than the tambor in Ostinato No. 2 in Dark
23    Horse.
24           In addition, in his report, he says and basically
25    one of the reasons while there's some similarity in the
```

```
 1    sounds in his words, and I'm paraphrasing, it comes from the
 2    same family of electronic instruments used in pop music.
 3    Very, very close to exactly what he said.
 4           Well, yes that's one of the reasons that they sound
 5    alike, but what's important is that the tambor, the tambor of
 6    Ostinato Number one (playing) in Dark Horse and Ostinato
 7    No. 2 in Dark Horse (playing) is identical.  It's the same
 8    tambor.  It' the same synth patch.
 9           So how on the one hand can you say that the tambor,
10    how can you say that overall, Ostinato No. 1 is plainly
11    dissimilar in Dark Horse from the ostinato in Joyful Noise
12    and not say it about Ostinato No. 2 in Joyful Noise?  Because
13    Ostinato 2 and 1 have identical tambors.
14    Q.   And how common it, Dr. Ferrara, to there to be
15    electronic sounds heard in current popular music?
16    A.   It's everywhere.
17    Q.   Okay.  Uh, so the fact that he claims that they come
18    from the general family of electronic sounds heard in current
19    popular music, what, if anything, does that mean to you?
20    A.   It's really not significant at all.
21    Q.   Let's last look at his seventh similar element which he
22    calls texture.  Can you describe briefly what texture is?
23    A.   It's just basically the piling up of sounds that sound
24    simultaneously.  And so once can, hey, this is pretty thick.
25    There's a lot of things going like in the chorus of Joyful
```

EXHIBIT 5
PAGE 925

1    Noise.  Or you know what?  When the ostinato starts, it's

2    pretty sparse.  It's pretty thin in texture.  There's not a

3    lot going on.

4    Q.   Okay.  And what is your view with respect to his

5    contention that the texture between these two ostinatos in

6    some way raises this to a claim of substantial similarity?

7    A.   It -- it -- it makes no sense, uh, on a number of

8    counts.  First, many songs begin with sparse textures.  In

9    addition, some of the prior art that I presented, sorry, I

10   played with a sparse texture.  We heard them in Dr. Luke's

11   2006 song.  It starts with an ostinato as part of a sparse

12   texture.

13           In addition, once again, this comes back to haunt

14   Dr. Decker. (Playing.)  When we had that structural chart

15   over, I noted that Ostinato No. 1 begins with a sparse

16   texture.  It would keep piling up, these purported

17   similarities between Joyful Noise and Ostinato No. 2, but

18   they also occur in Ostinato No. 1.

19           But Dr. Decker says that Ostinato No. 1 is plainly

20   dissimilar from the ostinato in Joyful Noise.  He can't have

21   it both ways.  But all of these similarities are in both

22   Ostinato Number 1 and Number 2.  You can't say Ostinato

23   Number 1 is plainly dissimilar to Joyful Noise.  Oh, but

24   Ostinato No. 2 is substantially similar to Joyful Noise.

25   That's a self-contradiction.

84

Q.   Okay.  So in your estimation then, none of these seven

alleged similarities that Dr. Decker identified alone or in

combination or arrangement would rise to the level of

substantial similarities in a musicological basis?

A.   Yes.  In my opinion, from a musicological approach and

perspective, there is no musicological support for a claim of

substantial similarities, and certainly, as we've just gone

through, these purported similarities don't support such a

thing.

Q.   And in terms of the independent creation of Dark Horse,

what is your opinion with respect to the writers of Dark

Horse, uh, creating their music in Dark Horse?  Do you have

an opinion with respect to that?

A.   I do.  In my opinion, based on an accepted approach to

how do I analyze this music and how themes or melodies are

transformed through a work, we have 14 iterations of Ostinato

No. 1 followed by a simple stretching out and the last two

notes remaining identical (playing) between Ostinato No. 1

and Ostinato No. 2.

        It's clear that Ostinato No. 2, what the plaintiffs

are saying infringes their work was created out of Ostinato

No. 1 that Dr. Decker says is plainly dissimilar from their

work.

        In addition, Ostinato No. 1 is really a very simple

melody (playing) that as we saw existed in works that predate

1   both Joyful Noise and Dark Horse.

2   Q.   Okay.  And so to the extent there's any material in

3   common, if it's just Mi Mi Mi Mi Re Re, the fact that's in

4   common between two works, is that in your opinion the result

5   of coincidence or something else?

6   A.   In my opinion, the use of a part of a musical building

7   block in the result of coincidence.

8        MS. LEPERA:  No further questions subject to

9   redirect.

10        THE COURT:  All right.

11        Um, okay.  Do you want to proceed now or do you

12   want to take lunch?  What do you want to do?

13        MS. COHEN:  Either way, Your Honor.

14        THE COURT:  Why don't we handle the cross then.

15        MS. COHEN:  Okay.

16        THE COURT:  And then we'll take the lunch break,

17   hopefully when you're done with the witness.

18                      CROSS-EXAMINATION

19   BY MS. COHEN:

20   Q.   Good afternoon, Dr. Ferrara.

21   A.   Good afternoon.

22   Q.   You testified that your primary method of comparing the

23   two works at issue is transcription; is that right?

24   A.   No, that's not what I testified.

25   Q.   You used transcription as a means of comparing the

1    works; correct?

2    A.    I didn't use the word primary.    It's a part of the

3    methodology that I use.

4    Q.    And you understand that this music was created

5    electronically; is that right?

6    A.    Yes, I do.

7    Q.    And you understand that it never was reduced to writing

8    by the authors?

9    A.    I don't know about that part of the creative process.    I

10   know that it's electronically produced.

11   Q.    You didn't receive written music or sheet music from

12   counsel, did you?

13   A.    No.    Just sound recordings.

14   Q.    And do you agree that transcription of music does not

15   take into account the tambor of the audio sound?

16   A.    That is correct.

17   Q.    And do you agree that written music does not take into

18   account the texture of a sound recording?

19   A.    That is incorrect.

20   Q.    That is incorrect?

21   A.    Yes.

22   Q.    Okay.    Can you explain that to me?

23   A.    Of course.    The last visual of the exhibit to my second

24   report includes a transcription into musical notation of

25   corresponding parts of, I believe, the last eight bars in

```
 1    verse one of Dark Horse and Joyful Noise, and what I showed
 2    in that transcription was that the textures were quite
 3    different.
 4    Q.   And does this transcription take into account all of the
 5    sounds that are going on in a given sound recording?  Is that
 6    reflected on paper?
 7    A.   A transcription captures the harmony, the melody, the
 8    rhythm and to an extent, the structure, but harmony, rhythm
 9    melody.  The harmony, the rhythm and the melody are what
10    ultimately come together to create the texture.  Texture is
11    the harmony, the chords that are playing the melodies, the
12    rhythms, and the texture is how they all occur at a given
13    point in the musical work at the same time.  That's all part
14    of a transcription.
15    Q.   That wasn't my question.  My question was does the
16    written music that's transcribed reflect every sound that's
17    reflected in the sound recording?
18    A.   No, it doesn't reflect tambor.  That requires listening
19    as, of course, I said I do.
20    Q.   And similarly, does playing notes on a piano reflect
21    tambor?
22    A.   No, it does not.
23    Q.   And would playing notes from a work on a piano reflect
24    the texture of a sound recording?
25    A.   There are what's called the piano arrangements in some
```

EXHIBIT 5
PAGE 930

1    cases of symphonic works that try to get all of the notes in,

2    but to the extent there so many notes, probably not.

3    Q.   So when you played the notes that we're here to talk

4    about today on your piano, it didn't take account the other

5    sounds that were going in the sound recording; is that right?

6    A.   It did not include those other sounds clearly.  I only

7    played the ostinato that was placed in issue.

8    Q.   And when you say the ostinato that was placed at issue,

9    you do realize that we're talking about the beat from Joyful

10   Noise; is that right?

11   A.   That is right.  The -- the beat, uh, is -- in the

12   business is often the instrumental accompaniment to the

13   vocals that are on top.  And it can be, and it is much more

14   than just a synthesizer part.  It can be the percussion.  Uh,

15   if there is a bass, if there's a guitar, they are all the

16   part of the beat.

17        MS. COHEN:  Your Honor?  I'm going to move to

18   strike the answer.

19        MS. LEPERA:  I object, Your Honor.

20        THE COURT:  I thought it was responsive, I'm sorry.

21        Maybe do you want to rephrase your question?

22   BY MS. COHEN

23   Q.   My question was simply you -- you understand that the --

24   the claimed copyright infringement relates simply to the beat

25   in Joyful Noise; is that right?

```
 1   A.   That is.  Correct, and I wanted to make certain that the

 2   jury understands how the word beat is used in the business.

 3   It is not limited to a single line that is part of the

 4   overall beat.  The beat is the overall instrumental that's

 5   accompanying the vocal.

 6   Q.   And you understand that the plaintiff's claim relates to

 7   the eight notes that -- that appear in Joyful Noise on a

 8   repeating basis.  I understand you think there's 16, but it's

 9   what you call ostinato two; is that right?  From Dark Horse.

10   A.   Well, you just said Joyful Noise.

11   Q.   Correct.  The -- the -- the work that we're here to talk

12   about today, that's what you call ostinato two in Dark Horse;

13   is that right?

14   A.   But your question was about the eight notes in the

15   ostinato in Joyful Noise.  Once again, as charted by

16   Dr. Decker, there's 16, not eight.  The second eight notes

17   never -- are never omitted.  The first eight notes always are

18   followed by the next eight notes, and that's why it's a 16

19   note ostinato.

20   Q.   On paper; right?

21   A.   No, not on paper.  In the sound recording in a

22   composition that's in the sound recording and as charted by

23   Dr. Decker.  That's that deceptive one six that's under

24   eight.

25        He -- he is saying to us that you gotta go back to
```

```
 1    go and do those first seven notes again, but the second time
 2    around, it's not scale degree one.  It's scale degree six.  8
 3    plus 8 is 16 as charted by Dr. Decker.  And if he's right,
 4    the first bar of the Ostinato 2 in Dark Horse is eight, half
 5    the phrase length.
 6    Q.    So what he said actually was that to the ear, it sounds
 7    like eight notes which is why he believes that last note is
 8    insignificant, and I take it you disagree.
 9    A.    No.  He's not saying that at all.  He's not saying that
10    you don't hear (playing.)  He never says anything remotely
11    like that.  What Dr. Decker says is that the second time
12    around, and he charts it, there is a scale degree six
13    (playing) which we don't hear in the other song and which
14    makes this ostinato in Joyful Noise 16 notes.
15    Q.    So you distinguish between what you call Ostinato 1
16    which is the intro of four notes; right?
17    A.    Yes.
18    Q.    And Ostinato No. 2, the eight notes in Dark Horse?
19    A.    Yes.
20    Q.    Okay.  And your opinion is that you said that you have
21    very, very strong musicological evidence that what you call
22    Ostinato 2 came from Ostinato 1.  Is that your testimony,
23    sir?
24    A.    What I said is, uh, that based on accepted musicological
25    practices in analysis that Ostinato No. 1 (playing) which you
```

EXHIBIT 5
PAGE 933

```
 1   hear 14 times simply expands and is stretched into Ostinato
 2   No. 2.  And, in fact, the last two notes (playing) continue
 3   to be identical, and the pitch content (playing) is the same
 4   whereas the pitch content in Joyful Noise's ostinato is not
 5   the same.
 6   Q.   So as far as evidence goes, you said there's strong
 7   musicological evidence.  Did you examine any computer files
 8   to make that determination?
 9   A.   No, because that isn't the point.  The point is that a
10   musicologist deals with the finished work.  And on the basis
11   of what's called Thematic Transformation Analysis, the word
12   transformation and thematic in the Harvard Dictionary and
13   other dictionaries.
14        What you is you see how the theme or the melody
15   literally is transformed, is developed in musical time.  It
16   is patently obvious that this (playing) Ostinato No. 1 simply
17   stretches out into Ostinato No. 2.  Based on musicological
18   practices and analysis.
19   Q.   And in your rebuttal report on page 30, is it true that
20   you explicitly say you don't actually know, you don't know
21   for sure whether No. 2 came from No. 1 or No. 1 came from No.
22   2?
23   A.   No, that's not what I say.  I think you need to read it.
24   What I say is that I have no way of knowing which was created
25   first.  Only the co-writers know.  But what I do know is
```

UNITED STATES DISTRICT COURT

EXHIBIT 5
PAGE 934

| | |
|---|---|
| 1 | based on musicological practices what comes first, and it |
| 2 | clearly grows into what comes next in Ostinato No.2 tells us |
| 3 | as musicologists that Ostinato No. 2 grows out of No. 1. |
| 4 | So all I said there is no, I don't know.  It |
| 5 | doesn't matter which was created first.  As a musician, my |
| 6 | intuition is that one was created first, but I say in my |
| 7 | report explicitly, it doesn't matter because proper |
| 8 | musicological analysis begins with where the theme starts and |
| 9 | how it's developed.  It starts with one.  It developed into |
| 10 | two. |
| 11 | Q.   And is it true in your report in analyzing the |
| 12 | similarities and concluding that the works are not similar in |
| 13 | your opinion, you spent some time comparing the lyrics of the |
| 14 | song? |
| 15 | A.   I compared the harmony, the rhythm and the lyrics which |
| 16 | is part of standard musicological practice.  Those were |
| 17 | omitted in the Decker report.  And so one cannot say in doing |
| 18 | an analysis of the two works in their entirety the lyrics are |
| 19 | different unless you've done analysis of the lyrics.  I did |
| 20 | that analysis, and in my report, I reported the harmony's |
| 21 | different, and I showed the four rhythms are different, and |
| 22 | the lyrics are different.  It's proper musicological |
| 23 | practice. |
| 24 | Q.   And you understand that the plaintiffs are not claiming |
| 25 | that the lyrics were copied from Joyful Noise; is that right? |

1    A.    Yes.  And I'm also saying that musicologists don't limit

2    their analysis to what is claimed.  Musicologists look at the

3    two works in their entirety.  Then dissect the constituent

4    parts and then pull it all back together again.  That's the

5    expectation of a musicological report.  Dr. Decker does not.

6    Dr. Decker says he did not look at the two works in their

7    entirety.  That's like buying a house and only looking in

8    three rooms and not all nine.

9    Q.    And similarly, you spent some time earlier today going

10   through the comparative structure of the two songs; is that

11   right?

12   A.    Yes.

13   Q.    And you looked at the structure and compared those in

14   rendering your opinion regarding whether the works were

15   substantially similar; is that right?

16   A.    An analysis of structure is one of the elements that one

17   analyzes in order to come to a conclusion as to whether any

18   similarities in the aggregate all put together would provide

19   musicological support for a claim of substantially similarity

20   or not.

21   Q.    And you realize that the plaintiffs in this case are not

22   copying (sic) that the authors of Dark Horse copied the

23   structure of Joyful Noise; is that right?

24   A.    Of course.  What I'm saying, once again, is that the

25   analysis of structure is part of a proper musical analysis of

```
 1    two works in their entirety.
 2    Q.    And Ms. Lepera took you through piece by piece of the
 3    song and compared the intro of Dark Horse versus the intro of
 4    Joyful Noise and so on and so forth; right?  Do you remember
 5    that?
 6    A.    I do.
 7    Q.    Okay.  Did she ever ask you to compare -- did we ever
 8    get to listen to the comparison of that ostinato that the
 9    plaintiffs are claiming is copied from their song?  Did we
10    listen to those side by side today?
11    A.    Yes, of course.  The second section that we listened to
12    in both works is the first verse in Joyful Noise which has
13    the ostinato at issue and the first verse in Dark Horse which
14    has the ostinato at issue.  So directly to your question,
15    yes, we did.  We played them side by side.
16    Q.    And Dr. Decker said that based upon his own timing or
17    analysis, the -- the beat, the ostinato that's at issue here
18    plays -- he believes it plays throughout 95 seconds of the
19    Joyful Noise song.  Do you recall reading that?
20    A.    I do.
21    Q.    And that would be what you consider Ostinato 2 in Dark
22    Horse; right?
23    A.    Yes.  The ostinato that he put at issue that he says is
24    the ostinato that he's concerned about in Dark Horse is what
25    I call Ostinato No. 2.
```

```
 1   Q.   Okay.  And assuming it's Ostinato No. 2 for the moment,

 2   do you have any reason to disagree that Ostinato No. 2 plays

 3   for 95 seconds of Dark Horse?

 4   A.   I have not checked the accuracy of that, but what is

 5   clear, and that's why we went through it in structural charts

 6   that we could actually see the timing and so forth, that the

 7   Ostinato No. 2, the one that Dr. Decker finds is at issue in

 8   Dark Horse occurs in verse one, it occurs in verse two and in

 9   approximately the first half of verse three.  And that is it.

10   If that adds up to 95 seconds, uh, out of work that's over

11   three minutes, then that makes -- that sounds about right.

12   Q.   And, um, defense counsel played for you a couple of

13   songs, uh, written or co-written by some of the other

14   defendants in this case that you've opined are similar, that

15   Dark Horse is similar to these pre-existing songs.  Do you

16   remember that?

17   A.   Yes.  In fact, she only played one, uh, the Dr. Luke

18   song.  I had mentioned that I found several by Max Martin,

19   Dr. Luke and, in fact, one by Juicy J all that predated the

20   plaintiff's work, but for the sake of time, uh, I only

21   presented one of those, and that was the Dr. Luke work.  So a

22   singular, not a plural.

23   Q.   And that's Love Me or Hate Me?

24   A.   Yes.  That's right.

25   Q.   And she also played for you Brainchild.
```

1   A.   Brainchild is not by the co-writers.   Brainchild is a

2   prior art work.

3   Q.   Correct.   That was my mistake.   She played that song for

4   you as well.   Is that right?

5   A.   Yes, she did.

6   Q.   Okay.   And in both of those songs, those have the notes

7   3-2-1-5; is that right?

8   A.   That is correct.

9   Q.   Okay.   And that would be what you call Ostinato 1.

10   A.   That is correct.

11   Q.   So, in other words, they don't include the notes that

12   the plaintiffs claim were taken from their song.

13   A.   That is right.   They do not include specifically the

14   (playing) according to Dr. Decker or (playing) according to

15   me.

16   Q.   Um, you've also opined -- and you've opined that the

17   notes in the Joyful Noise, the 3-3-3-3-2-2 are trite and

18   basic and can be found everywhere or in lots of examples of

19   prior art that you've provided.   Is that right?

20   A.   No, that's not what I said.

21        I said that, first of all, they represent a musical

22   building block, simply repeating notes on a descending scale,

23   that as a student teacher, that as a dad and now a grand-dad,

24   I can tell you it's standard practice for how beginners learn

25   to play instruments whether it's a violin or a trumpet.

```
 1   C-C-C-C-B-B-B-B.  And so that tells me that what we're
 2   talking about, that all Dr. Decker finds is similarity in
 3   musical building block that everyone has the right to use.
 4           In addition, what I testified to was the fact in a
 5   major key (playing.)  That's the opening of Jolly Old Saint
 6   Nicholas.  Now, again, it's not (Playing.)  It's (Playing.)
 7   But that difference in a half step is not a significant
 8   difference.  These two passages show how simple, how
 9   elementary, how much used a descending scale on the same
10   scale degrees 3-3-3-3-2-2 is.
11           As so as I testified, with that and with what
12   Dr. Decker says is similar more than what I say even with
13   what he says is similar as a musical building block, it
14   doesn't need to go beyond that.  It's -- it's really quite
15   enough.
16   Q.   So that was one of your examples; right?  Jolly Old
17   Saint Nick.  That's an example you provided?
18   A.   That's right.
19   Q.   Okay.  So I take it you're familiar with the song?
20   A.   Yes.
21   Q.   Okay.  Can you play the whole song on the piano?
22   A.   I can.
23   Q.   Okay.  Can you play it and sing it, please?
24   A.   No, I'm not a singer.
25   Q.   You're not a singer.  Okay.  Can you go ahead and play
```

EXHIBIT 5
PAGE 940

 1    it, please.

 2              (Witness plays Jolly Old St. Nicholas.)

 3    BY MS. COHEN:

 4    Q.    Thank you.

 5    A.    My pleasure.

 6    Q.    And that's an example of what you believe to be prior

 7    art that reflects the music that's at issue in this case; is

 8    that right?

 9    A.    No, that actually really mischaracterizes because

10    nowhere do I say and certainly haven't testified and nowhere

11    in my reports do I say that the entire song in Jolly Old

12    Saint Nicholas is in the ostinato.  I simply say if we take

13    Dr. Decker at his word, if he's correct that it's

14    3-3-3-3-2-2, and, again, I don't agree with that, but even if

15    he's correct, those are the opening notes in a major key of

16    Jolly Old Saint Nicholas.

17              Now, how can you say that you are the first one to

18    write that?  How can you say that composers all over the

19    world can't use that?

20    Q.    So, in other words, that's an example of an another song

21    where 3-3-3-3-2-2 appears.

22    A.    That is correct.

23    Q.    Okay.  Thank you.  And how about Merrily We Roll Along?

24    That was another of your examples that you provided?

25    A.    Yes.

```
 1    Q.    Okay.  Can you play that for us, sir.
 2    A.    Yes.  And, again, it's the same melody, just different
 3    words of Mary Had a Little Lamb.
 4               (Witness plays Merrily We Roll Along.)
 5    BY MS. COHEN:
 6    Q.    And, again, that's another instance where you say this
 7    is right trite and basic because those notes appear in Mary
 8    had a Little Lamb.  Is that right?
 9    A.    (Playing.)  Yes, they are the second half of Mary Had a
10    Little Lamb, and they are the second half of Merrily We Roll
11    Along because they are simple, and these are the simple
12    children's songs, and they simply rely on musical building
13    blocks.
14    Q.    And I believe you testified earlier, sir, that you're
15    getting paid for your testimony here at the rate of $475?
16    A.    My rate is $475 when I'm here, not in the northeast, uh,
17    actually testifying, but the rate for anything else that I do
18    including preparation here for this trial is 395.
19    Q.    Okay.  And you've on the stand at least three or so
20    hours today; is that right?
21    A.    I -- I guess so, yes.
22    Q.    Is it true that you have worked for defense counsel in
23    the past?
24    A.    Yes.  Well, I don't know that you can say I worked for
25    them.  I, uh -- I have worked with them in various music
```

EXHIBIT 5
PAGE 942

```
 1   copyright, uh, claims.

 2   Q.    You've been engaged by them in the past to give an

 3   opinion?

 4   A.    That is correct.

 5   Q.    And those were in copyright infringement cases?

 6   A.    That's correct.

 7   Q.    Do you recall how many times you've been engaged by

 8   these attorneys to provide an opinion in a copyright

 9   infringement case?

10   A.    Over the last 25 years . . .  perhaps ten times?

11   Q.    So is it fair to say that you've made a million dollars

12   off of services you've provided related to your opinions in

13   copyright infringement cases?

14           MS. LEPERA:  Objection.

15           THE WITNESS:  Well, you're not -- I'm sorry, that's

16   not clear.  Do you mean that I have made working with

17   Ms. Lepera and Mitchell Silberberg & Knupp a million dollars?

18   Is that's what the question is?

19   BY MS. COHEN:

20   Q.    That's my question.  Yes.

21   A.    First of all, I have no way of assessing that, but I

22   really don't think that that's correct.

23   Q.    Have you ever served as an expert in any other cases on

24   behalf of any defendant involved here?

25           MS. LEPERA:  Objection.  We're not talking about
```

EXHIBIT 5
PAGE 943

```
 1   other claims in this case.

 2           THE COURT:  I think she's entitled to know if he's

 3   served as an expert on behalf of any defendant in the case.

 4           MS. LEPERA:  In actual trial setting or deposition?

 5           THE COURT:  Well that, of course, we need

 6   clarification on.  Are you asking has he been retained or has

 7   he testified at a trial or what?

 8           MS. COHEN:  My question really is whether he's

 9   been engaged to provide an opinion as an expert on behalf of

10   any of the defendants involved in this case?

11           THE COURT:  In this case or some other case?

12           MS. COHEN:  In another case.

13           I'm talking about the defendants in this case.

14           MR. CHIEFFO:  If I may, Your Honor, there is a

15   difference between a testimonial and a expert and what it's

16   not.

17           THE COURT:  Well, it does, but I mean, I think the

18   question goes to has he been retained on prior occasions.

19           MS. LEPERA:  Without getting into the substance.

20           THE COURT:  Exactly.

21           MS. LEPERA:  Fine.

22           MS. COHEN:  Of course.

23           THE WITNESS:  To the best of my recollection, uh,

24   only one of the co-writers, and that is Dr. Luke in one case

25   in which there was no trial, but I did, uh, give deposition
```

UNITED STATES DISTRICT COURT

EXHIBIT 5
PAGE 944

1    testimony.

2    BY MS. COHEN:

3    Q.   Do you know Dr. Luke, sir?

4    A.   I've never met Dr. Luke.

5           MS. COHEN:   That's all the questions I have.

6           THE COURT:   Okay.

7           MS. LEPERA:   One question.

8           THE COURT:   Okay.   Thank you, Ms. Lepera.

9           And then it will be lunch time, I think.

10                    REDIRECT EXAMINATION

11   BY MS. LEPERA:

12   Q.   Dr. Ferrara, Ms. Cohen had you play Jolly Saint Nick and

13   Merrily We Roll Along.  Do you recall that?

14   A.   I do.

15   Q.   Okay.  And she, uh, suggested that you, um, were only

16   looking at the 3-3-3-3-2-2 in those songs; correct?

17   A.   That is correct.

18   Q.   Okay.  Did Dr. Decker do any analysis of the entirety of

19   Dark Horse and Joyful Noise other than that isolated

20   extraction of what became 3-3-3-3-2-2?

21   A.   As he testified, he did not.

22           MS. LEPERA:   Thank you.  No further questions.

23           THE COURT:   Okay.  Anything further?

24           MS. COHEN:   Nothing further.

25           THE COURT:   Okay.  Thank you, Doctor.

```
 1              You may step down.

 2              THE WITNESS:  Thank you very much.

 3              THE COURT:  Okay, folks, I think we should take the

 4    noon break.  Why don't you try to be back here at 1:15 if

 5    possible.  And, again, please keep an open mind, don't the

 6    discuss with one another or anyone else, and we will see you

 7    back here this afternoon.

 8              THE CLERK:  All rise.

 9                    (Jury not present.)

10              THE CLERK:  Please be seated.

11              THE COURT:  I know we have Billboard, and you have

12    one more witness; is that right?

13              MS. LEPERA:  One more witness, Your Honor.

14              THE COURT:  Okay.  And where do we stand on jury

15    instructions, if anywhere?

16              MS. LEPERA:  Narrowing but not done.

17              THE COURT:  Okay.  Why don't we take up the

18    Billboard stuff first because plaintiffs need to know where

19    we stand on that.  Have you had further discussions?

20              MS. LEPERA:  My colleague, Aaron Wais is gonna

21    handle that.

22              THE COURT:  Yes, Mr. Wais.

23              MR. WAIS:  Um, we have had further discussions,

24    Your Honor, in emails back and forth, and we apologize that

25    the issue can't be resolved.  I think what plaintiff's
```

EXHIBIT 5
PAGE 946

```
 1   counsel is gonna stand up and tell you is that they tried to
 2   meet and confer with us, and we refused, but that's simply
 3   not true.
 4            The problem is that the idea of meet and conferring
 5   to them is to convince us why the parties should ignore your
 6   order and on the motions in limine by allowing in testimony
 7   that relates to the summaries, by allowing in testimony that
 8   relates to the underlying metrics that go into those
 9   summaries and by, uh, seeking introduction of the screenshots
10   that we explained to you were produced just yesterday.
11            Um, we've tried to provide a very straightforward
12   list of designations that would allow plaintiffs to offer
13   into evidence exactly what Your Honor allows them to which is
14   the three Billboard charts that Billboard authenticated and
15   laid the foundation for as well as the process by which they
16   authenticated and produced those charts.
17            Beyond that, we ask that our own designations that
18   we believe should come in, too, but everything else we think
19   is outside the scope.
20            THE COURT:  Well, I, of course, haven't seen the
21   designations, but here -- here is the situation.
22            MS. COHEN:  Judge, may I respond?
23            THE COURT:  Yes.  Go ahead.  Please.
24            MS. COHEN:  In fact, what counsel believes I'm
25   going to say is exactly what I'm going to say.
```

EXHIBIT 5
PAGE 947

1          We invited the defendants several times both over

2     the weekend and yesterday to sit down with us and go through

3     these designations.  They are not in violation of the Court's

4     order.  We have no intention of getting into any kind of

5     summary chart evidence.  And they refused.

6          We were supposed to talk and have a conversation

7     last night.  I was told at 9 or 9:30, we would talk.  I sent

8     several follow-up emails at 11:00.  I was told the defendants

9     will not confer.  They will not discuss any of the

10    designations, everything that was in their proposed

11    designations.  That's their position.  Period.  So that is

12    why we're here still talking about this issue.

13          The first thing that I wanted to raise which is the

14    first dispute is on page 16 of the designations.  This has

15    nothing to do with the summary chart or the summary evidence.

16          The question was:

17          "Q.  When you say you researched this information,

18    where did you conduct that research.

19          "A.  We have an internal database of all titles and

20    artists who appear on the Billboard charts.

21          "Q.  And so what specifically did you do to

22    research the song and album title?

23          "A.  Input the artist name and the relevant titles

24    into the system."

25          And then I go on on this page to seek more

```
 1    information about what he did to research the song and the
 2    album.  This is not summary evidence.  This is testimony.
 3    This is laying a foundation for the evidence.  I don't know
 4    why this can't come in, but I haven't been able to discuss it
 5    with them.
 6            On page 60. . .
 7            THE COURT:  6-0?
 8            MS. COHEN:  Six zero.  While defendants claim that
 9    certain designations that really don't relate in any way to
10    the Court's order shouldn't come in, they leave in their
11    counter-designations.
12            Starting at question, page 60 line 4.  This seems
13    to ask . . .  ancillary information related to the chart and
14    then -- I'm sorry.  This one says:
15            "Q.  Let me ask the question this way.  Are you
16    aware -- based on your review of information for this case,
17    are you aware of either the Our World Redeemed album or the
18    Joyful Noise song appearing on being identified on any
19    Billboard chart other than the charts that you refer to in
20    your testimony?
21            "A.  There was no other genre charts or overall
22    charts that those titles appeared on."
23            Your Honor, given the exclusion of certain summary
24    evidence, this answer is misleading.  So if the other stuff
25    comes out, this has to come out.
```

1           There's more.  In the counter-designations that

2    relate to how the charts are compiled, what other charts,

3    yada, yada, it's similar to what I said.  It's completely

4    one-sided.  If evidence related to how the charts are

5    compiled, a foundation for those charts shouldn't come in,

6    there's no reason for that, but if that shouldn't come in,

7    the defendants can't get their counter-designations in which

8    they with the charts don't purport to show.

9           An example.

10          THE COURT:  Go ahead.

11          MS. COHEN:

12          "Q.  Isn't it fair to say that nothing in the

13    Billboard chart reflects or indicates whether any individual

14    person listened to a song?

15          "A.  Correct.

16          "Q.  It doesn't reflect or indicate where any

17    listener listened to a song?

18          "A.  Define where.

19          "Q.  Geographically.

20          "A.  Billboard does not reveal that information."

21          And it goes on.

22          So Your Honor, this is the purpose of the meet and

23    confer.  These designations do not relate to Your Honor's

24    order.  These things could have been worked out.  We tried

25    several times, and the reason that we're standing here

```
 1    talking about this is because the defendants refused to meet
 2    with us.
 3            THE COURT:  Well, let's start at the beginning.
 4    That really isn't why we're here.
 5            We're here because I issued an order indicating
 6    that I couldn't tell what the Billboard charts demonstrated.
 7    You were trying to use them to show profitability as I
 8    understood it or commercial success, and I said I could not
 9    tell based on the record what the Billboard charts
10    demonstrated.
11            So now, I assume all this testimony is offered on
12    this point in an attempt to show what Billboard -- what the
13    Billboard ratings mean.
14            MS. COHEN:  Correct, Judge.  Actually, we are
15    following Your Honor's order.  We are not seeking to get this
16    evidence into to show sale.
17            THE COURT:  Well --
18            MS. COHEN:  Right now, I'm simply talking about the
19    designations that are at issue?
20            THE COURT:  I know you're talking about the
21    designations, and so I'm just looking at it now for the first
22    time because they had not been presented to me.
23            It does seem to me that to the extent that this
24    testimony shows what goes into the Billboard compilations, it
25    can come in, whether designated by your side or their side,
```

EXHIBIT 5
PAGE 951

 1    but it's got to come in with a limiting instruction

 2    explaining to the jury the significance.

 3              You see, the only reason I'm letting in any of the

 4    Billboard stuff in the first place, it should be handled by

 5    stipulation and not by this testimony, is to demonstrate

 6    access, that my entire order was premised on access, that the

 7    presence of your clients' songs on Billboard charts was

 8    relevant to the subject of access and nothing else.

 9              MS. COHEN:  Correct.

10              THE COURT:  And so at this juncture, I'm not even

11    sure what all this other stuff relates and why we're eve

12    reading it.  That's, I guess, my question.

13              MS. LEPERA:  Can I mention something briefly?  And

14    it hasn't been my particular focus, but I'm just trying to

15    cut to the chase.

16              There's three charts that are admitted into

17    evidence that are admittedly, they were up.  They have their

18    names on it.  People can read them.  The testimony about what

19    they say is irrelevant because they can read them, and they

20    use them for access.  I think that's their argument.

21              The summary chart or questions relating to it

22    should be out.  And I know that they're dancing on the head

23    of a pin on this issue, Your Honor, but the summary charts

24    are a large part of the testimony.

25              Then the charts that they gave us that they just

```
 1    ambushed us with last night or the night before should not
 2    come in because they are two weeks after Your Honor's order,
 3    and they should be excluded.
 4         So it seems to me it's like a tempest in a teapot.
 5    There's three Billboard charts that are evidence from which
 6    you can make argument.
 7         THE COURT:  I don't disagree with that.
 8         My first point at the time of the motion in limine
 9    was that the summaries couldn't come in because you couldn't
10    tell if they were based on business records or not.  I
11    thereupon said if you could provide the underlying business
12    records in advance of trial, then I would reconsider the
13    issue.
14         I excluded all this Billboard evidence for other
15    purposes except to the extent that you argued that you may be
16    able to provide evidence of some of the weekly billboard
17    through its screenshots of the Billboard website.  I don't
18    know what that has to do with this testimony.
19         MS. COHEN:  And that's exactly what I provided to
20    them, Your Honor.  It's nothing new.  The link to these
21    screenshots was provided by Billboard, and the Billboard
22    representative testified about his whole process of
23    researching, and that the link is the chart.  The website is
24    the chart.  There is no other --
25         THE COURT:  But I've already ruled that can't come
```

```
1    in.  I've said -- you've suggested that you'd have other

2    evidence that you could provide to us to serve as a business

3    record, and that's --

4         I mean, the problem here is that a Billboard

5    representative who decided to do this, I guess, on the cheap

6    or whatever he did and threw things together with a computer,

7    and he may have said in his deposition what he did, but it's

8    beyond me what he did.

9         And the real point was that because we're dealing

10   with access at this juncture of the case, it seemed to me

11   that the real relevance, and there was no disagreement from

12   the defendant, was to show the fact that your clients who

13   were on Billboard, uh, provided a basis for you're arguing

14   access, and that there was reason to go search out and listen

15   for their music.

16             MS. COHEN:  That's exactly it.  That is the --

17             THE COURT:  So why -- why are we reading this?

18             MS. COHEN:  Well, Judge, if they want to stipulate

19   to all the times that it was on the chart, I supposed we

20   would entertain that.  That would be one way to handle it.  I

21   haven't -- I haven't been able to meet and confer.

22        I mean, the charts that I've printed that are from

23   the Billboard website, they were provided in the production

24   itself via link.  He explained why he provided it in that

25   manner.  We have them now, it's nothing new, they had equal
```

1    access to them.

2           The links only show the positions one through 25 so

3    for anything where the song fell under that, they're not

4    here.  I don't have them.  But we have 30, 30-ish, a little

5    bit over 30 charts where the song appeared.  On the chart.

6    That is critical to our access claim.  I mean, we --

7           MS. LEPERA:  Well, then why didn't you produce it

8    before trial started as opposed to last night, and to keep

9    saying that we refuse to do a meet and confer with is

10   outrageous because what you've been keeping to do is giving

11   us documents the night of trial and saying we have equal

12   access.  It's not our obligation to go and find the proof for

13   you.  Number one.

14          Number two, you keep talking about the summary of

15   the chart and trying to get in deposition testimony relating

16   to it that is excluded.

17          Number three, you have the Billboard charts.  In

18   there's three of them.  You can make your arguments as to

19   access.  But trying to now bootstrap and bring in other

20   charts that were not produced and that were given to us long

21   after the judge said do this before trial in the limine

22   motion should not be permitted at this juncture.

23          Number four, the only things we're trying to get in

24   at this juncture is to relate to those three charts which is

25   basically to say there are -- it's a category issue,

EXHIBIT 5
PAGE 955

```
 1    essentially.  There's other charts in other genres that are

 2    bigger.  That's basically it.

 3           So we we're trying to simply this, Your Honor.  And

 4    with all due respect to counsel, he's saying that we're not

 5    cooperating is just a complete misrepresentation.  I know you

 6    think it serves you, but it' not accurate.

 7           What we're doing is we're trying to be accurate

 8    with respect to the ruling and the evidence.  And I think

 9    that's the point.  You know.  We're not gonna agree -- if the

10    Court rules otherwise, fine, but we're not gonna agree to

11    have new charts, 30 new charts that come in, you know, during

12    the trial.

13           THE COURT:  Well, here's the problem.  As we all

14    know either from this life, this trial or I know from my

15    prior life, when you're in trial, lots of things are

16    happening at once.  Now, I don't know why these could not

17    have been produced prior to the trial, but for whatever

18    reason, they weren't and I wanted them produced before the

19    trial.

20           It does seem unduly punitive, however, if for

21    example, there are 30 instances where your clients' songs

22    were on the chart and you're trying to show access since we

23    know this is coming in for access say you can't produce

24    because, you are correct, uh, they were on the charts.

25           Now, that said, I don't know why there can't be a
```

EXHIBIT 5
PAGE 956

114

```
 1    stipulation, though, that Mr. Gray's song or the album was on

 2    Billboard religious music charts no less than X times during

 3    period A to B.  And it seems to me that is the relevant

 4    evidence.

 5         The discussion about what the charts tell us about

 6    income, what they tell us about numbers of plays, what they

 7    tell us about everything else is to my way of thinking

 8    completely irrelevant particularly at this stage of the case.

 9         MS. COHEN:  A stipulation would be fine with the

10    plaintiffs, Your Honor.  Related to the charts that we

11    actually have.  A stipulation is more than fine.  I think

12    that would obviate a lot of these issues.

13         THE COURT:  And I hate to do that, Ms. Lepera.

14         MS. LEPERA:  My only concern is the following.

15    They're not all the same charts.  There's some sales charts,

16    there's some radio charts.  They're not here's one chart, top

17    Christian rap or top whatever it is so that we can say they

18    appeared X times on this chart.  Now, we're talking about

19    they appeared this time on another subset of charts so the

20    stipulation is not as simplistic as they would lead you to

21    believe.  That's the problem.

22         THE COURT:  I haven't seen the charts.  Part of the

23    problem is as always, I'm speaking in a complete vacuum.  But

24    to the extent, I don't know can someone tell me what these

25    charts are?  Show me.
```

EXHIBIT 5
PAGE 957

1          MS. COHEN:  Your Honor, in the testimony the

2     representative goes through and explains what each chart

3     represents and the methodology upon which each chart was

4     calculated.

5          THE COURT:  I know, but --

6          MS. COHEN:  That's what we wanted in.  It's out.

7     Now, Ms. Lepera is saying the charts can't come in without

8     the explanation because it's misleading.

9          THE COURT:  No, I don't think she's saying that at

10    all.

11         MS. LEPERA:  What I'm saying is simply the charts

12    were nowhere near the deposition.  So whatever he was talking

13    about, looking at and saying what he did was in relationship

14    to either the ones that were there or the summary.  The stuff

15    you've pulled off the website, whatever it was, the night

16    before last was never before the witness so his testimony is

17    irrelevant to that.

18         MS. COHEN:  Your Honor, it was before the witness

19    insofar as he did the research.  He testified that he did the

20    research and he has them all -- every chart is listed.

21         THE COURT:  How do I know that?

22         MS. COHEN:  It's in his testimony.

23         THE COURT:  How do I know that?  The problem is all

24    of this should have been done earlier for the motions in

25    limine linking whatever he did to whatever.  Now, we have a

```
 1    group of charts that have been brought in which you say were
 2    part of what was linked to his testimony and research.  And I
 3    have no way to test it, they have no way to test it.  It is
 4    just impossible.
 5            And I don't think -- if I thought that the manner
 6    in which these charts were compiled or the significance of
 7    the chart were at issue in this case at this time, I might
 8    feel differently, but we're talking access.  So the real
 9    question in my mind is on how many occasions, however the
10    stuff was compiled, was it possible for the defendants in
11    this case to observe that your client had a song on a chart
12    or an album on a chart?  We're not going to have an exact
13    number.
14            MS. COHEN:  I agree with you, Judge.  I don't think
15    we need an explanation here.  The fact that they were on the
16    chart, they were on the chart.
17            MS. LEPERA:  There isn't one chart.
18            MS. COHEN:  They're called different things and
19    they're listed on the charts themselves.
20            MS. LEPERA:  The context of that is significant and
21    something we cannot rebut.  So we can list them and say
22    they're on these without any sort of explanation as to what
23    they are now that the Billboard witness isn't here and can
24    put them in context or they could be compared to other
25    existing charts is prejudicial to suggest a level of access
```

EXHIBIT 5
PAGE 959

1    without that context.

2            THE COURT:  I hear what you're saying.  I don't

3    believe I agree.  Here's the situation in my very simple

4    terms.  The plaintiff's song Joyful Noise or album was listed

5    on charts as a best something.  I don't know if it was a best

6    seller, best whatever, but a best something.  We have a

7    situation where each defendant has denied any knowledge of or

8    access to those things.

9            What you are trying to say is the fact that it was

10   on a chart made it more likely they had reason to go out and

11   specifically seek out and listen to the song.  We have

12   contrary testimony obviously from the parties.  I don't know

13   what your 30 charts show because, of course, we're doing this

14   in the middle of trial.  So I don't know if anyone can tell

15   me what exactly it is that you're presenting which is why

16   I've gone the stipulation route which is basically that the

17   song appeared on the Christian record charts no less than

18   however many times.

19           MS. LEPERA:  They're different charts, Your Honor.

20           THE COURT:  Tell me what the charts are because

21   that may be a problem.

22           MS. COHEN:  There's a Top Christian chart on which

23   the album appeared, a Top Gospel Chart on which the album

24   appeared.  There's a digital -- Gospel Digital Song chart on

25   which the song appeared.  The song appeared on the Gospel

EXHIBIT 5
PAGE 960

```
 1    Digital Song sale chart over 30 something times.  The only
 2    chart -- the only screenshot of the chart that was provided
 3    by Billboard, there's only one.  They provided a summary of
 4    all the other entries and they provided a link to the charts.
 5    The charts that I now have here are the print-offs from the
 6    link that Billboard provided.
 7              THE COURT:  I understand that.
 8              MS. COHEN:  So that's what it is.  There are other
 9    entries from the time that the song Joyful Noise appeared on
10    the gospel digital songs chart.
11              THE COURT:  I don't know what gospel digital song
12    charts are.
13              MS. LEPERA:  And they're not top charts.  That's
14    another one of the problems.  So to suggest without context
15    and what the chart is in the metrics of the Billboard
16    hierarchy is problematic.
17              THE COURT:  I understand, but I guess, you know,
18    and it just shows I'm a dinosaur.  I don't look at Billboard.
19    I'm sure there are a lot of charts.  Do they list the
20    religious digital chart in Billboard?
21              MS. LEPERA:  Apparently, so and that's not a top
22    chart listing.  In other words, there's Top 100 so this is
23    the problem with their -- and why to think about doing it,
24    you know, gives me great concern because it's presented as if
25    it is in isolation they're 30 times, 40 times they're on
```

```
 1   these charts.  Suggesting that these charts may have more of
 2   a, you know, outside of context more importance to people who
 3   don't know anything about it than if it was in context.
 4            THE COURT:  I understand.  It's not that I don't
 5   understand.  I think the way to solve this is just to have a
 6   stipulation that plaintiffs song Joyful Noise and the album
 7   were listed at various times on the following Billboard
 8   charts and tell us what they are:  Christian whatever, gospel
 9   whatever, religious digital and not try to count up the
10   numbers or whatever.  I don't know how count up the numbers.
11   I don't know what we have.  But if they're charts that
12   actually appeared publicly. . .
13            MR. WAIS:  Your Honor, I mean, one of the issues,
14   too is that as it relates to these charts, again, we've gone
15   through the fact that they weren't produce, the
16   screenshots --
17            THE COURT:  I know all of that, I know that.
18            MR. WAIS:  If you're gonna allow a stipulation,
19   then what we need is the contradictory testimony from the
20   Billboard that there's other genres, there's over 200 charts.
21   There's other genres that are more popular than these gospel
22   charts.  Because we have these charts and the testimony about
23   specific a genre, I think the stipulation would have to say
24   that it appeared on a gospel or Christian charts period.
25   Leave it in the genre and not get into the details because
```

```
 1    the details will start to reveal songs and sales and other
 2    issues that you've already excluded.
 3              THE COURT:  I think that's satisfactory.
 4              MS. LEPERA:  Okay.  We could have that stipulation
 5    and save the reading of the deposition.
 6              THE COURT:  I don't see any reason to read
 7    deposition in light of my ruling.
 8              MS. LEPERA:  As minimal as it is and it's not fully
 9    in context, at least there's some deposition testimony.  They
10    will have to stipulate that the context would apply to these
11    charts.
12              THE COURT:  I don't know what you just said to me.
13              MS. LEPERA:  As Mr. Wais was saying in the
14    deposition with respect to those charts that did get
15    authenticated that are out, but what this made clear is there
16    are a lot of other charts pop and rock, et cetera and a
17    number of charts.  So the context either has to be read in
18    through the deposition to put these charts that they want in
19    stipulation into evidence or we need that in the stipulation.
20              THE COURT:  Why can't we have a stipulation that
21    Billboard contains many charts in many genres of music.
22              MS. LEPERA:  Right.
23              THE COURT:  Some charts are directed to digital
24    music, some are to directed to music that plays on the air in
25    certain segments.  And the parties agree because this is not
```

1    new news to the jury that the plaintiffs song Joyful Noise

2    and the album appeared on the following charts.

3            MS. LEPERA:  Just have to put in some context.

4            THE COURT:  That is consistent with the order I

5    started out with.  It deals with the fact I don't want to

6    have to try to read the deposition from this Billboard person

7    at this juncture when we have things being designated today

8    or last night or whenever.  And I think it provides what I

9    intended for us to do in the first place, evidence of access

10   or at least potential for access.

11           MS. COHEN:  Sure, Judge.  I think all that's needed

12   is that Billboard produces 200 charts.  They're produced on a

13   week-to-week basis.  Here are the charts.  And if I could my

14   understanding is that we're permitted to include any of the

15   charts that we have.

16           MS. LEPERA:  I'm still keeping my formal objection

17   on the record for that.

18           THE COURT:  I understand.

19           MS. LEPERA:  If I enter into this, I'll be doing it

20   on the basis you're essentially allowing it in.

21           THE COURT:  I understand that everyone has an

22   objection to be preserved for purposes of appeal and they are

23   noted for the record.

24           MS. LEPERA:  Thank you, Your Honor.

25           MS. COHEN:  Thank you.

122

 1            THE COURT:  What I am trying to do, though, because

 2     we cannot recess this trial to go get a Billboard expert to

 3     come in, we know that these links were there.  We know the

 4     information was there.  We also know that I wanted everything

 5     produced before trial.  That didn't happen.  And so now we

 6     are where we are.

 7            And given the fact that the only relevance I was

 8     able to assign to the Billboard information in the course of

 9     the pretrial motions in limine was their pertinence to the

10     potential for access, it seems to me we meet all those goals

11     by just talking about the fact that they're, you know, the

12     200 charts and he at least appeared on religious and gospel

13     charts.

14            MS. LEPERA:  We'll draft something, Your Honor,

15     taking the excerpts from the deposition.  Hopefully, they

16     will agree to the context as we just discussed.

17            MS. COHEN:  Yeah, what I just said I think we're

18     okay with just that there's 200 charts.  If we start getting

19     into context --

20            MS. LEPERA:  We're gonna draft it and we'll see if

21     you agree.  Hopefully you will.

22            MR. WAIS:  There's additional context that needs to

23     go into the stipulation which would reflect what the

24     Billboard representative testified about charts in general.

25            MS. COHEN:  This is the issue, Judge.  It's

EXHIBIT 5
PAGE 965

```
 1   completely one-sided.  We can't explain our context for why
 2   they appeared or how they appeared, but that's the point of
 3   the stipulation to obviate all of these issues.
 4         MR. KAHN:  Let me suggest, you're gonna -- hold it
 5   just a second.  You are planning to draft something?
 6         MS. LEPERA:  Yes.
 7         MR. KAHN:  Why don't we see what they draft and
 8   then we can work out any language issues.  Hopefully, it will
 9   get done.  Okay?  I mean, you understand our position, you
10   understand ours.  We all understand the Judge's position.  So
11   we'll get something short that we can catch some of these as
12   examples.
13         MS. LEPERA:  In the context of what they signify to
14   Billboard which will be additional paragraphs that are not
15   reflected on those documents you're belatedly trying to get
16   in.
17         THE COURT:  Well, I can't wait to see what you come
18   up with.  Here's what I propose.  Let's see what you can do
19   with the stipulation.  I think you ought to be prepared to
20   call your next witness, and then we'll try to deal with the
21   stipulation because you can't close until you have that
22   evidence in.
23         MR. KAHN:  Yes.
24         THE COURT:  Okay.  Thank you.
25         MR. KAHN:  Thank you, Judge.
```

EXHIBIT 5
PAGE 966

124

```
 1              MS. LEPERA:  Thank you, Your Honor.

 2              THE CLERK:  This court's in recess.

 3                         (Lunch Recess.)

 4              THE CLERK:  Are we ready for the jury?

 5              MR. KAYIRA:  Yes.

 6              THE CLERK:  All rise.

 7                         (Jury present.)

 8              THE CLERK:  Please be seated.

 9              THE COURT:  Okay.  We're gonna call one more

10    witness out of order and then give you a status report.

11         Who's next?

12              MR. MOVIT:  Your Honor, we hereby call Bill

13    Rosenblatt.

14              THE COURT:  Okay.

15              THE CLERK:  Please raise your right hand.

16                         (Witness sworn.)

17              THE CLERK:  Please be seated.

18         Please state your full name, spell your last name

19    for the record, and please make sure you speak into the

20    microphone.

21              THE WITNESS:  My name is William Rice Rosenblatt,

22    and the last name is spelled R-o-s-e-n-b-l-a-t-t.

23              THE CLERK:  Thank you.

24              THE COURT:  You may proceed.

25              MR. MOVIT:  Thank you, Your Honor.
```

EXHIBIT 5
PAGE 967

```
 1                      DIRECT EXAMINATION

 2    BY MR. MOVIT:

 3    Q.   Good afternoon, Mr. Rosenblatt.

 4    A.   Good afternoon.

 5    Q.   Could you please tell us the issues that you were

 6    engaged on to provide testimony about in this case?

 7    A.   Sure.  So I was engaged to talk about YouTube,

 8    specifically its features and functions, the way it worked

 9    during the period that's at issue with this case and also the

10    amount of content that was on it and the number of people who

11    looked at that content, and with regard to the composition at

12    issue in this case, views of videos of that composition and

13    how they relate to the YouTube universe during that time.

14    Q.   And the period at issue that you referred to was the

15    period between 2008 and 2013; is that correct?

16    A.   Yes.

17    Q.   Okay.  Could you please let us know the company that you

18    worked for and what your position is at that company?

19    A.   Uh, yes.  It's Giant Steps Media Technology Strategies,

20    and, I'm the President and Founder.

21    Q.   And could you please tell us what Giant Steps Media

22    does?

23    A.   Uh, yes.  It's a consulting firm, and we focus on media

24    -- digital media technology and technical issues related to

25    copyright in the digital age.
```

EXHIBIT 5
PAGE 968

1    Q.    And you founded that company?

2    A.    Yes, I did.

3    Q.    Okay.  And when did you found it?

4    A.    In June of 2000.

5    Q.    Okay.  And what are some of the companies that you

6    represent?

7    A.    Um, well, a wide variety of companies including big

8    media companies, major record labels, movie studios --

9              THE COURT REPORTER:  You're gonna need to slow

10   down.

11             THE WITNESS:  Okay, sorry.

12             THE COURT REPORTER:  Big media companies?

13             THE WITNESS:  Large media companies such as major

14   record labels, major movie studios, um, large technology

15   companies such as Google and Microsoft, uh, electronics

16   companies such as LG and Sony, uh, digital media services,

17   start up companies, things of that nature.

18   BY MR. MOVIT:

19   Q.    And what are some of the issues that you've advised your

20   clients on?

21   A.    Well, again, um, issues related to digital media

22   technology and issues about copyright in the age of digital

23   media.

24   Q.    And let's back up and discuss your background a bit.

25   Uh, where did you attend college?

```
 1   A.    I went to Princeton.

 2   Q.    And did you get a degree?

 3   A.    Yes.

 4   Q.    And what was that degree?

 5   A.    It was in electrical -- it was a Bachelor of Science and

 6   Engineering degree in electrical engineering and computer

 7   science.

 8   Q.    Do you have any advance degrees?

 9   A.    Yes.  I have a Master's in Computer and Information

10   Science from, uh, University of Massachusetts at Amherst.

11   Q.    And if you could please briefly provide us with your

12   relevant career background to which you haven't yet testified

13   to?

14   A.    Sure.  So as -- as I mentioned, I founded Giant Steps,

15   my consulting firm, 19 years ago.  Uh, I started out as a

16   software engineer working for Motorola in data

17   communications.

18        And then after graduate school, just hitting the

19   highlights, uh, I worked as an Information Technology

20   Executive for a couple of large media companies including the

21   parent companies of L.A. Times which is literally right

22   across the street from here.

23        And then, uh, I worked as a Market Strategist and

24   Consultant for a computer company, Sun Microsystems.  And I

25   was also Chief Technology Officer for an Internet start up
```

EXHIBIT 5
PAGE 970

1    during the late '90s, early 2000s at Columbia University.  It

2    was an online education and content start up.

3    Q.   And are you a member of any organizations related to

4    digital media and content technology?

5    A.   Yes.  Um, I'm a member of the Open Music Initiative

6    which is a standards body, the, um, Music Business

7    Association, the Copyright Society of the U.S.A. and the Book

8    Industry Study Group.

9    Q.   And during your career, have you consulted or testified

10   on behalf of any public policy entities?

11   A.   Yes, I have.  Um, those would include the U.S. Copyright

12   Office, the, uh, French Culture Ministry, the European

13   Commission and the Korean Copyright Commission of South

14   Korea.

15   Q.   And have you written any materials or given speeches on

16   the areas that you've been talking about?

17   A.   Yes.  Uh, so I wrote a book in 2002 on Digital Rights

18   Management which has to do with protecting copyrights in the

19   digital age.  Uh, I am currently and have for the past five

20   years been a Media Engineer Entertainment Industry

21   Contributor to Forbes, and I've written dozens of articles

22   and white papers on the subject matter.

23   Q.   And you've been retained by defendant's counsel in this

24   case as an expert; is that correct?

25   A.   Yes.

```
 1   Q.   And you're being paid for your expert consulting and
 2   witness services; is that correct?
 3   A.   Yes, I am.
 4   Q.   Okay.  And what is your hourly rate?
 5   A.   It's, uh, $580 an hour.
 6   Q.   And is your pay contingent in any way upon the outcome
 7   of this case?
 8   A.   Not at all.
 9   Q.   And is your payment contingent in any way upon the
10   opinions you're giving?
11   A.   No.
12   Q.   So Mr. Rosenblatt, what experience do you have with
13   YouTube?
14   A.   Well, I've been a personal and professional user of
15   YouTube for a very long time.  And the first significant task
16   that I did regarding YouTube was in the period around 2009
17   through 2011 which was during the period at issue in this
18   case.  I was working for a digital music start up company.
19   We were trying to build a service that might be like Spotify
20   or Apple Music or one of those.
21          And one of the things that I had to do was
22   something called competitive strategy.  And what that means
23   is you look at all of the businesses or companies or products
24   that you might be competing with, and you look at them in
25   great detail to figure out what they do and how they do it so
```

```
 1   that you can build something that will be a competitive
 2   offering.
 3          And so this was a time when Digital Music Services
 4   were becoming a big deal, and YouTube particularly was kind
 5   of a rising star among, um, online services that were being
 6   used for music.
 7          And so I had to look very closely at a lot of
 8   different Digital Music Services to determine what features
 9   they had, how they worked, how users would interact with
10   them, what content they had and how many songs are in their
11   catalogs and so forth.  And YouTube one of those services so
12   I had to obtain an intimate familiarity with how it worked
13   again during that 2009 through 2011 time frame.
14          That was the first, uh, professional encounter I
15   had with YouTube.
16   Q.   What other professional encounters have you had with
17   YouTube, Mr. Rosenblatt?
18   A.   So there were, um, a couple of instances where I was
19   engaged as an expert in, um, legal proceedings that have to
20   do with music royalty rate settings.  And one of those was
21   around 2011, 2012, once again, within the period at issue in
22   this case.
23          And I was retained by Sirius XM Satellite Radio
24   which is, you know, you listen in cars to satellite radio.
25   And what I was engaged to do in that case among other things
```

1   was to provide a historical background of the evolution of

2   Mobile Music Services from the period of 2008 through 2012

3   which was when I was doing the work, um, in order to show how

4   the market had evolved since the last royalty rates were set.

5           And so what I had to do was kind of draw a picture

6   of or build a picture of what services were in the market,

7   when did come in, what features did they come out, what

8   features did they add over time and things like that.  And

9   YouTube was again one of those services that I needed to

10  describe and tell the history of.

11          And then there was a similar matter a little bit

12  later on in 2012 in another royalty rate proceeding where I

13  was engaged on behalf of YouTube to talk about specifically

14  online video services, how users got music, uh, access to

15  music through them and how much content they had and how

16  YouTube was used for music compared to other services, and so

17  it was a similar type of inquiry.

18          And then finally, there was one later on around

19  2014, '15 when I was engaged on behalf of Pandora which is

20  the digital radio service to, um, look at how Pandora

21  compared to other types of Digital Music Services including

22  YouTube and to look at their audiences, their comparative

23  audience sizes and things of that nature.

24  Q.   Now, Mr. Rosenblatt, in other words, you were retained

25  in the past by YouTube to provide expert testimony regarding

1    the same subjects that you will be discussing with us today;

2    is that correct?

3    A.   Yes, that's right.

4    Q.   Mr. Rosenblatt, do you have teaching experience

5    regarding the subject of your testimony today?

6    A.   Yes, I do.

7    Q.   Okay.  And what is that experience?

8    A.   Well, I have, uh, guess lectured on digital music

9    business issues at Berkeley College of Music.  And starting

10   in the Fall, I will be teaching a class at New York

11   University called Data Analysis in the Music Industry where

12   we're going to be looking at YouTube view data, uh, and

13   things of that nature as part of the course that I'm

14   teaching.

15   Q.   And in preparing to give testimony in this case,

16   Mr. Rosenblatt, did you do any additional research?

17   A.   Yes.  Um, for example, I looked at the way -- to refresh

18   my memory on the way YouTube used to work during the time

19   that we are discussing, I looked at something called the

20   Internet archive.

21   Q.   And what is the Internet archive?

22   A.   The Internet archive is an online library, an enormous

23   online library of snapshots of web pages over time.  And the

24   way it works -- it's free to anyone to use.  The way it works

25   is you go onto the website archives.org.  Um, you type in the

```
1    URL that you want to look such as youtube.com which is the

2    home page of the YouTube website.  And then what you are

3    shown is a calendar view of dates on a time line, and you can

4    pick the dates that you want and see captures of that website

5    on that date, and in some cases, several per day.

6             And in the case of a very popular site like

7    YouTube, you'll see thousands, if not millions of these

8    captures.  You can look at the pages.  You can click on links

9    in the pages which will take you to captures of those other

10   pages and essentially explore what the site that you're

11   looking at, uh, looked like at a certain period of time.

12   Q.   All right.  Well, let's start talking about YouTube.

13   I'm sure many of us have heard of YouTube, but for everyone's

14   benefit, could you please explain what YouTube is?

15   A.   Sure.  So YouTube is an online video service that

16   started out in 2005, and that was a time when people started

17   to have PCs with web cams, cameras on their phones and so on

18   and could capture digital video, and people also had fast

19   Internet connections so that they could upload those videos

20   to the Internet.

21            And so YouTube's concept was, uh, at its core very

22   simple.  You take videos, you upload them to YouTube, and

23   they get published to anyone as a default.  So that's what

24   YouTube started in 2005, and it grew -- it took off like a

25   rock rocket ship after that.
```

134

```
 1    Q.   How quickly did it become popular, Mr. Rosenblatt?

 2    A.   So just to give you an idea, a year-and-a-half after it

 3    launched, Google bought the company for 1.65 billion dollars

 4    which at the time was an absolutely heard of sum of money,

 5    uh, certainly for a start up company.  But by the time,

 6    YouTube had 50 million users.  So it had gone from nothing to

 7    15 -- 50, five zero, million users in about a

 8    year-and-a-half, and it kept on growing.

 9              So, for example, in 2010, YouTube had about

10    50,000 hours of content uploaded to it every day.

11    Q.   And how did that user base translate into the number of

12    videos that were available?

13    A.   Sure.  So let's go to our first slide.

14              And what we're gonna see here is numbers that were

15    provided by YouTube to us of the number of videos by the end

16    of each of the years that are relevant to this case.  So

17    these numbers are just incredibly large here.

18              Here we are.  At the end of 2008, 194 million

19    videos were on YouTube.

20              When we get to 2009, that number's gone up to 349

21    million.

22              When we get to 2010, it's exceeded half a billion.

23    We've gotten to 533 million videos.

24              And the numbers just keep going and going.

25              By the end of 2011, that's up above three quarters
```

```
1    of a billion videos.  It's 818 million.
2           Next.  Then by the end of 2012, more than a billion
3    videos had been posted to YouTube, 1.1 billion videos.
4           And then by the end of 2013, it was a
5    billion-and-a-half.
6           So those are just numbers that are unheard of or
7    were at the time unheard of in the world of media and
8    content.
9    Q.   And how much engagement were users having with all these
10   videos?
11   A.   So the basic measure of user engagement with YouTube is
12   view counts.  And so a view count --  we're gonna talk about
13   this, I think, more later, but simply put, a view count is
14   when a server as YouTube gets a request to show a video, and
15   it starts playing the video to whatever device requested it.
16          And so we measure, uh engagement with YouTube by
17   users by, uh, video view counts.  And YouTube has provided to
18   us numbers from 2008 through 2012 which you will see are even
19   more jaw-droppingly large than the video volumes that we were
20   just seeing.
21          So let's go to the next slide.
22          MR. KAHN:  Your Honor, I would object to this as
23   cumulative.  This is precisely what, um, the defendants read
24   into evidence yesterday in stipulations, we -- these numbers
25   the jury have already heard.  Maybe we could move on to
```

EXHIBIT 5
PAGE 978

1    something else.

2            MR. MOVIT:  Your Honor, several things.  First,

3    the -- we -- we've served these as demonstratives so the

4    plaintiffs have been on notice that these would be used and

5    explained.  That's number 1, and they did not object.

6            Number 2, this is obviously foundation and

7    important background for further opinion that the witness --

8            THE COURT:  I'm -- I'm gonna overrule the objection

9    so just continue.

10           MR. MOVIT:  Please continue.

11           THE WITNESS:  Thank you, Your Honor.

12           Um, so 2008, 381 billion, that's billion, uh, views

13   of videos on YouTube during that year, not until that year

14   but during that year.

15           Then next?

16           2009.  And you'll see this number -- these numbers

17   increase even more rapidly than the numbers of videos, the

18   numbers that we saw.  We're up to half a trillion videos --

19   uh, video views during 2009.  Half a trillion.  509 billion.

20           Next file?

21           2010.  YouTube got over three quarters of

22   billion -- sorry, three quarters of a trillion.  756 billion

23   views.

24           2011.  Next slide?

25           In 2011, there were more than a trillion views on

UNITED STATES DISTRICT COURT

EXHIBIT 5
PAGE 979

137

```
1   YouTube, 1.1 trillion video views on YouTube during the year

2   2011.

3            And then during 2012, 1.4 trillion views on

4   YouTube.

5            Next.  So if you add up the numbers from the start

6   of 2008 through the end of 2012, we get over 4 trillion views

7   on YouTube, 4.14 trillion views.
```

```
8   BY MR. MOVIT:

9   Q.   And Mr. Rosenblatt, when we talk about this 4.14

10  trillion views, what type of -- what types of videos are

11  represented by these views?  What categories of videos.

12  A.    Well, so YouTube, of course, there are lots of

13  different -- as anyone who's used YouTube would know, there

14  are lots of -- of different videos on YouTube, different

15  types.  There's How To videos.  There's videos like the ones

16  I take of my kids, uh, and, um, so forth and so on.

17           But the Number one -- and by the way, YouTube gives

18  you a choice of category when you upload a video, and it's

19  very small number of categories.  It's somewhere around half

20  dozen to a dozen.  It varies over time.  But music is always

21  one of those categories.  And so when you upload a video to

22  YouTube, you can choose music as your category.

23           And a study that I saw from 2008 has shown that

24  music is the most popular category of uploaded videos.  And

25  another study in 2011 showed that music is the most popular
```

EXHIBIT 5
PAGE 980

138

| | |
|---|---|
| 1 | viewing category.  So music actually, um, accounts for about |
| 2 | a fifth of the videos on YouTube so one in every five videos |
| 3 | on YouTube more or less is a music video. |
| 4 | Q.    And Mr. Rosenblatt, how does the volume of users on |
| 5 | YouTube compare to other Internet streaming services? |
| 6 | A.    Okay, let's go to the next slide. |
| 7 | So in 2008, uh, when this period that we're |
| 8 | interested in here began, iTunes was the big Digital Music |
| 9 | Service, and many people are familiar with that.  You buy a |
| 10 | song for 99 cents, and it downloads to your iPod, and you can |
| 11 | play it. |
| 12 | And let's not move on.  Let's back up. |
| 13 | So in 2008, um, even then YouTube as I said, rising |
| 14 | star among music services, it's actually the most popular |
| 15 | music service today.  38 million or so music videos on |
| 16 | YouTube compared to about 8 million songs in the iTunes |
| 17 | catalog. |
| 18 | Now, if we go on, you will see that the disparity, |
| 19 | uh, increases. |
| 20 | So in 2009, we were almost at 7 million music |
| 21 | videos on YouTube and about 10 million songs in the iTunes |
| 22 | catalog. |
| 23 | If we go to 2010, that gets above 100 million |
| 24 | songs -- uh, music videos on YouTube and about 10 million |
| 25 | songs on iTunes. |

EXHIBIT 5
PAGE 981

139

1        Move on.

2        2011, Spotify launches in the United States after

3    being up and running in Europe for a couple of years.  And

4    Spotify has not quite as much music as iTunes, and iTunes, in

5    turn, has something like 16 million songs in its catalog,

6    but, um, I think it's, sorry, 18 million songs.

7        YouTube is above 160 million videos.  And it's a

8    ratio of about nine times the number of music videos on

9    YouTube compared to the songs in the iTunes catalog.  And

10   that ratio holds fairly steady as we'll see in the next

11   slide.

12       Uh, by 2012, YouTube is up above 200 million, and

13   iTunes is at 25 million, and Spotify is at about 20 million.

14   So there's much more music content than on Spotify or iTunes.

15   Q.   Thank you.  Uh, let's turn to the plaintiff's song

16   Joyful Noise.  Um, Before we do so, could you please remind

17   us of the subject, the testimony specifically relating to

18   Joyful Noise that you were asked to provide?

19   A.   Sure.  So with respect to Joyful Noise, what I was asked

20   to do was to look at, uh, YouTube view count data that the

21   plaintiffs provided and to place that in the context of what

22   YouTube was doing at the time in terms of the amount of

23   content and amount of views, just to give an opinion on how

24   those view counts fit into that context.

25   Q.   And were you familiar with Joyful Noise before you were

EXHIBIT 5
PAGE 982

1   engaged for this case?

2   A.   No, I was not.

3   Q.   And during the period at issue, how many videos of

4   Joyful Noise were posted to YouTube?

5   A.   Well, the plaintiffs provided evidence of, uh, six

6   videos that were posted, and I was, indeed, able to look at

7   all six of them on YouTube.

8   Q.   And when were these videos posted to YouTube, these six

9   videos?

10   A.   They were posted during, uh, roughly a three-year period

11   starting in March 2008, uh, just very shortly after -- the

12   first one was posted very shortly after the song was released

13   by the record company, and the last of the six was posted

14   sometime in 2011 so about three years later.

15   Q.   Okay.  So we've discussed these six videos of Joyful

16   Noise on YouTube, and we've discussed the volume of content

17   on YouTube.  So given those facts, how could one, if at all,

18   come across Joyful Noise on YouTube during the period at

19   issue?

20   A.   So the -- the main way that you find things on YouTube

21   is by using the search function.

22           Let's go to the next slide.

23           Right.  So this is YouTube today.  Uh, I -- I took

24   this a couple weeks ago.  But YouTube's always had a search

25   function, and I just ran a search on dogs just to show what

```
 1   the search function looks like.  And what you can see is the
 2   search results.
 3           The first one is ad.  It says ad.  I don't know how
 4   visible that is to the jury, but, um, that's an ad feature
 5   that YouTube has added, uh, subsequent to the period that
 6   we're talking about here.
 7           But below that, there's a video called Try Not to
 8   Laugh at this Ultimate Funny Dog video compilation, Funny Pet
 9   videos, and you can see that had 18 million views and was
10   posted a year ago.
11           And then there are -- there are other views -- uh,
12   videos on there.  That's just the typical search results
13   page.  And so search is the way that you would access Joyful
14   Noise videos or any other video that you wanted to access on
15   YouTube.
16   Q.   So Mr. Rosenblatt, did -- the functionality of YouTube
17   during the period at issue, uh, was it the same as the
18   current functionality of YouTube as of today?
19   A.   Well, as I said, YouTube's always had a search, uh,
20   function, but -- and, of course, uh, YouTube continues to
21   evolve its feature -- feature set over -- over time, but
22   there's one important difference between, uh, the period that
23   we're talking about and later on which is that there's a
24   feature called auto play.
25           And some of you who use YouTube might be familiar
```

1    with this feature where you've watched the video, and then

2    another one just comes up automatically and starts playing.

3    That feature did not exist in the period before 2013.  It was

4    added in about 2014.  So that's the main difference.

5            The only way that you could get a video to play on

6    YouTube was -- except for playlists which we'll talk about in

7    a moment was -- was actually to click on it.  And you could

8    click on something on the YouTube website or someone might

9    email you a link or you might find a link to a YouTube video

10   in Twitter, a tweet on Twitter or a Facebook page or it was

11   something like that, but the point is that you have to take

12   this action clicking on a link in order to watch the video.

13   It doesn't just sort of come up on its own.

14   Q.   Mr. Rosenblatt, can you go into a bit more detail about

15   the search that one would have needed to perform to access

16   Joyful Noise through the search function of YouTube during

17   the period at issue?

18   A.   Sure.  So it's -- it's my view that in order to find any

19   of these six videos, you would of had to type in both the

20   name of the song, Joyful Noise, and the name of the artist,

21   Flame because Flame is a common word.  If you just typed in

22   Flame, you would have gotten all kinds of things, and Joyful

23   Noise is also two common words phrase.  It's a phrase from

24   the bible.  Uh, you wouldn't have gotten the videos at issue

25   if you had just typed in Joyful Noise.  My view is that you

UNITED STATES DISTRICT COURT

EXHIBIT 5
PAGE 985

143

1    would of had to type in both things.

2         So let's -- let's put that in a little bit of

3    context in terms of what -- what I'll call the needle in the

4    haystack, uh, analogy that I want to make here.

5         Here we have, uh, populations -- current

6    populations of the United States and China.  And you'll see

7    here that the U.S. population is currently 331 million, and

8    that happens to be a similar number to the number of videos

9    on YouTube in 2009, 394 million.

10        So what if you were told to go find one of six

11   people because there's six videos, one of six people in the

12   United States, what would need to know in order to find them?

13   Well, you'd certainly need to know their name, and you'd need

14   to know other information such as maybe their street address

15   or phone number in order to find them.  Otherwise, you

16   couldn't find them.

17        And similarly, population of China is 1.38 billion

18   which, uh, turns out to be about equal to the number of

19   videos on YouTube i the 2012, 2013 time frame so towards the

20   end of the period that we are discussing in this litigation.

21        Um, same thing.  If you needed to find one of six

22   people in China, you'd certainly need to know their name.

23   You'd need to know other information such as maybe a street

24   address and phone number.  And it's that kind of task of

25   locating each one of those six videos that I'm referring to

UNITED STATES DISTRICT COURT

EXHIBIT 5
PAGE 986

1    here.

2    Q.    So Mr. Rosenblatt, if a person did not know the name of

3    the song Joyful Noise and did not know the name of the artist

4    Flame, would that person have been able to locate Joyful

5    Noise, uh, any of the six videos during the period at issue

6    using the search function?

7                    MR. KAHN:    I'll object.    Calls for speculation.

8                    THE COURT:    Overruled.

9                    THE WITNESS:    No.

10    BY MR. MOVIT:

11    Q.    Okay.    Um, is there any other way that a person could

12    access one of the six videos of Joyful Noise on YouTube

13    during the period at issue?

14    A.    Sure.    So as I mentioned there, uh, someone could have

15    sent somebody a link in an email message or text message

16    or -- or anything like that, and it work -- would have worked

17    just the same way as if you found it on the website.    It's a

18    link, you click on, it plays.

19                    The other way that you could get it is if it were

20    included in a playlist.    So people know about playlists

21    nowadays from things like Spotify, um.    YouTube during the

22    period we're talking about certainly always had playlist

23    capabilities, but playlists were these things that were

24    created at the time we're talking about.

25                    Playlists were just things created by users.    They

```
 1   weren't created, um, automatically by YouTube.  And the user
 2   would have to post the playlist, and then someone else would
 3   need to play the playlist.
 4         And so I -- actually, it's possible to search for
 5   playlists containing, uh, the song Joyful Noise, and so I did
 6   that.  And I found that there were two playlists that looked
 7   like they were created during this time period of 2008
 8   through '13.
 9         Um, and those two playlists between them together
10   had less than 100 views, and some of those were mine when I
11   viewed them myself.  So, uh, these playlists were not -- were
12   hardly at all, uh, accessed by anyone.
13   Q.   Okay.  Mr. Rosenblatt, we've discussed Joyful Noise, and
14   we've discussed, uh, view counts, the issue of view counts.
15   Let's discuss, uh, the view counts for Joyful Noise during
16   the period at issue.  What were the view counts of Joyful
17   Noise, the six videos?
18   A.   Mm-hmm.  Let's go to the next slide.  Thank you.
19         So here we have, um, information about those six
20   videos that were, um -- that were posted, and I hope that
21   everyone can see -- can see this over here.  But there were
22   six videos, and you can see that they were posted in a date
23   range of 15 March 2008 through, uh, January 21st, 2011, and
24   there are various view counts.
25         And what I did here on the right-hand column is
```

1    calculate the percentage of total views on YouTube that each

2    one of those view counts represents.

3          So let's just take the first one as an example.  We

4    don't need to go through all of these.  But the first one was

5    uploaded right after the song was released by obviously a fan

6    of the song, a user named 116 boy.  And this video was one of

7    the more popular of these videos.  It had over half a million

8    views, 562,000 views, roughly.

9          And that translates as a percentage of the total

10   number of views on YouTube which we -- as we discussed was

11   over 4 trillion.  That translates to about

12   one-one-hundredth-thousandth of a percentage of those views,

13   0.000014 percent of those views, and that's a pretty tiny

14   number.

15   Q.    Okay.  Let's discuss a bit more what view counts

16   actually represent.  Uh, could you please provide us with

17   some more detail about what is a view count?

18   A.    Yes.  Um, so a view count as I said is -- nominally,

19   there are servers at YouTube.  A request comes in to fire up

20   the video.  The server fires up the video and starts it

21   playing.  That's a view count.

22          So let's go to the next slide.  That does not

23   necessarily mean that a human user is watching or listening

24   to the audio.  It doesn't necessarily mean that the video was

25   viewed or heard, uh, all the way through to the end, and it

EXHIBIT 5
PAGE 989

147

1    also does not take into account something called click fraud.

2    Q.    And what is click fraud?

3    A.    So click fraud is essentially a fraudulent inflation of

4    view counts on YouTube.  This is something that's been a

5    constant problem for YouTube and also other online services

6    in any one of them; Yahoo, Facebook, Twitter, what have you.

7         Um, whenever somebody has a reason to want people

8    to think that they are more famous or popular than they

9    actually are, they may have a motivation to pay people who do

10   this kind of thing to engage in click fraud.

11        And click fraud can be done by automated processes

12   which are called bots.  Those are just machines out there

13   that are programmed to fire up YouTube videos in this case,

14   uh, just one after another after another or there are

15   sometimes even humans, uh, people, who are paid to just sit

16   there all day and go click, click, click, click, click, fire

17   up YouTube videos in order to inflate view counts.  And this

18   has been a real problem.

19        Let's -- let's go to the next slide.  Here's a

20   quote from a New York Times article that was written last

21   year but discusses the 2013 time frame.  So it says -- and

22   I'll read it kind cause it's -- it's kind of interesting.

23        It says the challenges are significant.  At one

24   point, in 2013, YouTube had as much traffic from bots

25   masquerading as people as it did from real, human visitors

148

```
 1    according to the company.  Some employees feared that this
 2    would cause the fraud detection to -- uh, system to flip
 3    classifying fake traffic as real and vice versa, a prospect
 4    engineers called the inversion.
 5            So that was the level of concern at the time about
 6    click fraud.  And, of course, Google and YouTube do their
 7    best to combat click fraud, but it's still a problem and has
 8    been.
 9    Q.   So Mr. Rosenblatt, what is your overall takeaway
10    regarding view counts?
11    A.   Uh, my overall takeaway is that they are not a good
12    representation of actual people watching the videos.  They,
13    uh, overstate, uh, that -- that quantity.
14    Q.   Okay.  Well, let's turn back to Joyful Noise and the
15    view counts for the six videos of Joyful Noise.  Plaintiffs
16    added up those views and say that Joyful Noise had about
17    3.9 million views by March 2012.  Is that a lot?
18    A.   No.
19    Q.   Why not?
20    A.   Well, again, you need to think of this.  3.9 million may
21    seem like a large number in some other contexts, but in the
22    YouTube context, it's not -- uh, it's a tiny number because
23    you have to consider it in the context of this 4.14 trillion
24    views that took place over that -- that period of time.
25            And so you look at these percentages over on the
```

EXHIBIT 5
PAGE 991

```
 1    right.  Those are tiny percentages, and even if you add them
 2    all up, it's still a very tiny percentage.  So that number is
 3    not a large number at all.
 4              MR. MOVIT:  Thank you very much, Mr. Rosenblatt.
 5              Your Honor, I'm done with direct examination
 6    subject to redirect.
 7              THE COURT:  Okay.  Thank you.
 8              Cross, please.
 9                        CROSS-EXAMINATION
10    BY MR. KAHN:
11    Q.    Hello, Mr. Rosenblatt.  My name is Mike Kahn.  I
12    represent the plaintiffs.
13    A.    Good afternoon.
14    Q.    Um . . .  so just to make sure I understand, although
15    you've had numbers that were showing 4.1 trillion views on
16    YouTube, you're saying that maybe a lot of those are actually
17    robot views?
18    A.    Some of them are.
19    Q.    And do you have any actual statistics about how many are
20    like fake or inflated views?
21    A.    Well, that Time's article suggests that as many as half
22    were at one point.  It's gonna vary over time.
23    Q.    And in your research for this matter, did you come
24    across any evidence, uh, of -- for the -- any of the Joyful
25    Noise, uh, views were inflated by robots or some other
```

```
 1    device?

 2    A.   I did not.

 3    Q.   Okay.

 4    A.   I did not look into that.

 5    Q.   Now, we looked at a lot of statics you've compiled on

 6    views on YouTube; correct?

 7    A.   Yes.

 8    Q.   So help me understand, um, the context for one of my

 9    experiences.  I have -- one of my granddaughters is in

10    kindergarten.  Um, she's up in Chicago.  We live in

11    St. Louis.  And she takes ballet.  And she was in a ballet

12    recital.  Um, and someone, maybe it was a teacher or parent,

13    did what I guess happens a lot on YouTube, they uploaded a

14    video.

15    A.   I did the same when my granddaughter -- or daughter, uh,

16    took ballet.

17    Q.   Okay.  So I actually went on the other day, um, as we

18    were getting ready for this case, and I saw there now are 88

19    views of that video.  And my question to you is do you have

20    any statistics on all those billions and billions of views,

21    um, of how many are for videos that are viewed by less than

22    100 people?

23    A.   I don't have those statistics.

24    Q.   How about fewer than a thousand people, do you have

25    those statistics?
```

```
 1    A.    I do not.
 2    Q.    Okay.  And do you have any statistic on how many of
 3    those videos out there are viewed by more than a million
 4    people?
 5    A.    Not offhand, no.
 6    Q.    Okay.
 7    A.    Those numbers are not, um, publically available.
 8    Q.    Okay.  And we were looking at the disparity between
 9    YouTube views and . . .  or rather music on YouTube versus
10    Spotify and iTunes; right?
11    A.    Yes.
12    Q.    And is there a difference in what kind of music is
13    allowed to uploaded on YouTube versus iTunes or Spotify?
14    A.    Um, could you be more specific about what you mean by
15    difference?
16    Q.    Okay.  Um --
17    A.    There's many differ -- there are many answers I could
18    give to that question.
19    Q.    Okay.
20    A.    I'd like to answer the appropriate question.
21    Q.    So can anyone, even someone unaffiliated with a record
22    label or an artist upload a video onto YouTube of that -- of
23    some performance?
24    A.    Usually.
25    Q.    Okay.  And that's also true with iTunes or do you need
```

```
 1    to be in the recording industry to be able to have a song on
 2    iTunes?
 3    A.   Well, so there are a couple of things that I would like
 4    to say in answering that question.
 5             First of all, since around 2008, YouTube put in a
 6    program called Content ID acknowledging the fact, uh, that
 7    people like to do exactly what you just said such as 116boy
 8    who uploaded this video of Joyful Noise as a fan of that
 9    song.
10             And what the Content ID technology does is it
11    recognizes what song it is provided that someone's given that
12    song to it to recognize, and if it finds a match, it checks
13    whether the record company or -- or right's holder as we call
14    it has given permission for users to upload that video.
15             And in the vast majority of cases nowadays or since
16    about 2011 if not earlier, the answer's been yes, um, the
17    vast majority of user uploads of what you might commercial
18    music, um, have been allowed.
19             And, um, the other -- the other answer to your
20    question has to do with who's allowed to upload to iTunes
21    or -- or provide music to iTunes?
22    Q.   Yes.
23    A.   That was your question?
24    Q.   Yes.
25    A.   So you don't need to be a record label to, uh,
```

1    distribute music on iTunes or Spotify or any of those.  Um,

2    anyone who wants to put music up there can do so through any

3    one of a number of different services that for a small amount

4    of money will do that for you.  For example, my 15 year-old

5    son does that with his -- with his music that he does.

6    Q.   Okay.  But it's slightly different standards to upload

7    onto YouTube versus iTunes, for example.

8    A.   Well, the -- the mechanics of the processes are

9    different, but the reality is nowadays, if you're

10   distributing music online, you're gonna distribute it on --

11   on all of those platforms at once.  There really isn't much

12   difference.

13   Q.   Okay.  And earlier today, I think you testified that

14   your hourly rate as an expert witness is $580 an hour?

15   A.   Yes.

16   Q.   And is there a higher hourly rate when you're on the

17   stand like you are right now?

18   A.   Yes.

19   Q.   And what is that hourly rate?

20   A.   It's whatever 1.5 times 580 is.  It's a 50 percent

21   increase.

22   Q.   And your -- in paragraph 11 in your report, you say you

23   are being paid $870 an hour for your testimony?

24   A.   Yes.

25   Q.   Okay.  And going back to the $580 per hour, um, rate,

```
 1    was that the rate when you did the research, um, and writing
 2    of your expert report?
 3    A.    Yes.
 4    Q.    And do you recall how many hours that involved?
 5    A.    Not offhand, I don't recall that.
 6    Q.    More than 20?
 7    A.    Probably.
 8    Q.    50?
 9    A.    Not sure.
10    Q.    Okay.  Somewhere between 20, possibly more than 50?
11    A.    Maybe.  I -- I really couldn't tell you sitting here
12    today.
13    Q.    Okay.  And that would be at the $580 an hour rate;
14    correct?
15    A.    Yes.
16              MR. KAHN:  I have nothing further, Your Honor.
17              THE COURT:  Okay.
18              Mr. Movit?
19              MR. MOVIT:  Nothing further, Your Honor.
20              THE COURT:  All right.  Then thank you very much.
21              You may step down.
22              Um, so I'm guessing we don't have stipulation yet?
23              MR. KAHN:  I think it's been drafted by defendants.
24              Hopefully, we will have it shortly.
25              THE COURT:  Okay.  Then what we ought to do is take
```

UNITED STATES DISTRICT COURT

EXHIBIT 5
PAGE 997

```
 1    a short recess, and then ladies and gentlemen, when you come
 2    back, I will try to give you an overview as to where we are.
 3    I think we're nearing the end of evidence in this phase.  And
 4    so please keep an open mind, and we'll see you in about ten
 5    minutes or 15.
 6              THE CLERK:  All rise.
 7                   (Jury not present.)
 8              THE CLERK:  Please be seated.
 9              THE COURT:  Assuming we can get the stipulation
10    read, then is everyone prepared to rest?
11              MS. LEPERA:  Both cases are open.
12              MR. KAHN:  Yes, Your Honor.  The plaintiff will be
13    prepared to rest.
14              MS. LEPERA:  We're just going through the joint
15    exhibit list for housekeeping and clean up.  Subject to that,
16    I think we are as well, Your Honor after the stipulation
17    issue.
18              THE COURT:  I understand.  Um, and do we have a
19    rebuttal case from anyone?
20              MR. KAHN:  We're not planning to, Your Honor.
21              THE COURT:  Okay.  So that means that assuming we
22    get the stipulation, and I'm just trying to figure out where
23    we go from here today, we do not have jury instructions which
24    means that this afternoon, we should probably excuse the
25    jury, have them come back tomorrow for closing argument and
```

EXHIBIT 5
PAGE 998

```
 1    we ought to get these jury instructions done this afternoon,

 2    and they can be finalized.

 3          Do you have any sense of how long closing argument

 4    will be on each side?

 5          MR. KAHN:  I confess I don't, Your Honor.

 6          I'm hoping it will be under an hour.

 7          THE COURT:  I'm hoping that too.

 8          MR. KAHN:  Yes.

 9          THE COURT:  From everyone.

10          MS. LEPERA:  Yeah, I'm as well.

11          THE COURT:  Okay.  Um, just tomorrow, I'm gonna

12    have to start at 9:30, but my hope would be to instruct the

13    jury and complete closing argument before the noon hour

14    tomorrow with the understanding that they can start their

15    deliberations tomorrow.

16          MR. KAHN:  That would be good.

17          THE COURT:  Yes?

18          MR. CHIEFFO:  Your Honor, I have a question.  I see

19    your normal ordering.  Do you instruct before closing or

20    after closing?

21          THE COURT:  I usually do it before.  Um, but I will

22    confess that if we have chaos here, I may have to instruct

23    afterwards, but I will let you guys argue, you know, based on

24    what you expect the Court will instruct.

25          MR. CHIEFFO:  All right.  Thank you.
```

UNITED STATES DISTRICT COURT

EXHIBIT 5
PAGE 999

```
1              We hope to avoid chaos.

2              THE COURT:  That would be a good goal.

3              MS. LEPERA:  And Your Honor, as you probably

4    anticipate, we'll be making a Rule 50 motion, um, at the

5    close.

6              THE COURT:  Yes.  And I will reserve judgment on it

7    as I customarily always do so . . .

8              MR. KAHN:  I'm sorry, I missed the last part.

9              THE COURT:  I always reserve judgment on Rule 50

10   motions.

11             MR. KAHN:  Okay.

12             THE COURT:  And let the jury come back and do what

13   it's going to do.

14             MR. KAHN:  I -- I understand, Your Honor.

15             MS. LEPERA:  Would you, um -- the timing of the

16   filing of that, Your Honor, would that be acceptable to file

17   it tonight?

18             THE COURT:  Yeah.  I'm gonna deem it to have been

19   made at the appropriate time when the -- when the plaintiff

20   rests and then again remade at the time you rest.

21             MS. LEPERA:  Thank you.  So we preserve it before

22   the jury.

23             THE COURT:  Right.  Right.

24             MR. KAHN:  And -- and this is not my experience in

25   this court, Your Honor, but in the other courts, um, you
```

EXHIBIT 5
PAGE 1000

```
 1    know, the initial Rule 50 motion, um, is allowed to be made

 2    orally?

 3            THE COURT:  Yeah.

 4            MR. KAHN:  That's okay.  And we don't need -- in

 5    other words, we don't need to file something.  We just need

 6    to make our arguments.

 7            THE COURT:  Well, here's -- here's what gonna

 8    happen.  The reality is you're going to preserve your right

 9    to make the motion.  As far as I'm concerned, uh,

10    particularly because this case is bifurcated, you're gonna

11    have to stipulate to some schedule on briefing.  That's gonna

12    depend upon what happens in the jury's first pronouncement.

13            Um, but what I'm assuming we'll -- you'll do is

14    just preserve the motion.  You don't have to get involved in

15    all of the details at this juncture.  And then we'll have a

16    briefing schedule and set a hearing, a post-trial hearing.

17            MR. KAHN:  Okay, Your Honor.  Thanks.

18            THE COURT:  Okay?

19            MS. LEPERA:  Yes.

20            THE COURT:  I'll see you shortly.

21            THE CLERK:  This court's in recess.

22                     (Recess taken.)

23            MR. WAIS:  For plaintiffs' counsel, we read 'em for

24    comments.  We just received those so we were just taking a

25    look at those, and then Your Honor came to the bench.
```

EXHIBIT 5
PAGE 1001

```
 1                  THE COURT:  Okay.  Well, why don't you take a look.
 2             Are there many?
 3                  MS. WAIS:  I think there's an issue with two facts
 4   so I just need to look at 'em.  I'm not quite sure.  We
 5   haven't got that far, basically.
 6                  THE COURT:  Well, I can disappear.  The question is
 7   when we go to jury instructions, do you have any set for me
 8   to look at or what am I doing?
 9                  MS. LEPERA:  Okay.  So we have a set we've given
10   them that you're looking at so it's your turn now.
11                  MS. COHEN:  Yes.  We just received them during
12   Mr. Rosenblatt's testimony so we have not had a chance to
13   review them yet.
14                  THE COURT:  Well, guy --
15                  MS. LEPERA:  But we're getting closer.  I mean, we
16   are.  And frankly, maybe this is a time where we can sit in
17   the room.  I would happy to do that now that we're closer,
18   and there's a little bit of time?
19                  THE COURT:  Well, look.
20             Tell me what you're saying.
21                  MS. LEPERA:  What I'm saying, Your Honor, is that I
22   think that we should sit in the room with the set that we
23   just gave them that narrowed it, see what additional issues
24   they may have with it, and then hopefully, that will be the
25   last, and I can give it to you.
```

```
1                   THE COURT:  Okay.

2                   MS. LEPERA:  And there will be probably a few

3     issues we will have to argue.  Undoubtedly.

4                   THE COURT:  I have no doubt about that.

5                   When do you anticipate doing this?

6                   MS. LEPERA:  Once we finish the Billboard issue, if

7     we sit down with them for maybe 10 or 15 minutes maybe?

8                   MS. COHEN:  Give us a chance to look at it.

9                   MR. CHIEFFO:  How about once we're done with

10    Billboard, both sides are gonna be resting?

11                  MR. LEPERA:  Yes.

12                  MR. CHIEFFO:  And then it seems to me that we no

13    longer have a jury sitting around doing nothing, they get to

14    go home, and we can spend a little bit of time, and then,

15    whether half an hour or 45 minutes, we don't have the

16    pressure of the jury here.

17                  MS. LEPERA:  Well, we'll obviously want to give

18    this set to the Judge so she can hear argument on that.

19                  THE COURT:  My point is I don't want to see these

20    at 6 o'clock tonight.

21                  MS. LEPERA:  No, God no.  No.  So if we can get

22    this Billboard issue resolved and close up the case in the

23    next half an hour?

24                  THE COURT:  Fine.  Why don't you go do that, and

25    let's see if we can get the jury out of here first.
```

EXHIBIT 5
PAGE 1003

```
1              THE CLERK:  This court's in recess.
2                       (Recess taken.)
3              MS. LEPERA:  We don't have a printer, Your Honor.
4      So I'm reading it from the computer, and I'll tell you what
5      the issues are as I understand them.  I'm sure I'll be
6      corrected if I'm wrong.
7              So we have a stipulation.  I believe the first
8      paragraph is fine.  Billboard is a company that produces
9      charts in relation to music.  Okay.
10             We added paragraphs two, and two, I believe, is
11     also okay, and correct me if I'm wrong.  Billboard produces
12     nearly 200 charts a week relating to mainstream Top 40 and in
13     various genres including pop, rock, R&B, hip hop, country,
14     gospel and Christian music.  That's okay, too; right?
15             MS. COHEN:  Correct.
16             MS. LEPERA:  Okay.  Three and four are where
17     there's an -- an issue.  Five and six is where we've agreed
18     to their chart numbers.  So let me read five and six first
19     subject to three and four.
20             Okay.  So five says Our World Redeemed appeared 37
21     times on two charts in the genres of gospel and Christian
22     music between March 22nd, 2008 and January 17th, 2009.
23             Six says Joyful Noise appeared 32 times on one
24     chart in the genres of gospel and Christian music between
25     January 15, 2011 and January 21 and 2012.
```

```
 1              Because of those agreements that we're giving them,
 2    we wanted the following for context.
 3              Billboard most popular charts are the Billboard Hot
 4    100 which is the top songs of the week and the Billboard 200
 5    which are the top albums.  The charts relating to mainstream
 6    Top 40, rock, R& B, hip hop and country are larger in terms
 7    of the market volume and audience volume than the charts
 8    relating to gospel and Christian music.  This comes out of
 9    the witness's testimony.
10              Specifically, we want it for context so people who
11    don't know that these charts that we're speaking about in
12    paragraphs five and six in a vacuum are, um, you know,
13    mainstream.
14              Um, that is the contentious, contention point.
15    They will not agree to that unless we also add in which I
16    believe Your Honor's made very clear cannot be added in the
17    non-access part which is that the Billboard charts are
18    compiled based on data from Neilson music.
19              And we've said that's not access.  That's back to
20    sales.  We've now tried to stipulate to this to give you your
21    access proof which we don't agree with, but it has to be done
22    in the context of the overall magazine.  So we would submit
23    that, um, this is where we are, and we're prepared to do
24    that.
25              The last point which I think is not in contention
```

EXHIBIT 5
PAGE 1005

```
 1    is, um, paragraph seven which says neither Our World Redeemed

 2    nor Joyful Noise appeared on any Billboard charts outside of

 3    genres of gospel and Christian.  So it's really the context

 4    paragraphs that we are -- they won't agree to even if we

 5    agree to their numbers.

 6              THE COURT:  Okay.

 7              MS. COHEN:  Your Honor, I think the context issue

 8    is what caused us to be at this place right now, and so the

 9    reason for the stipulation was to obviate the need for

10    anybody's contextualization of the charts.

11              They're on the charts.  We know the numbers.  We

12    know the dates.  We've agreed to include a paragraph that

13    says we don't contend they were on any chart outside of the

14    genres of gospel and Christian.  And so if we're gonna have

15    context on one side, I think we need it on the other.  It's

16    only fair.

17              We would not refer specifically to sales.  It also

18    would come straight from the testimony.  I don't think it's

19    necessary at all.  I think the preference would be to have

20    all the other agreed paragraphs not have any context on

21    either side.

22              But if the defense is going to have context related

23    to which charts are most important and that kind of thing,

24    then, certainly, we should be entitled to include some

25    context on our end.
```

EXHIBIT 5
PAGE 1006

```
 1              THE COURT:  Well, I would say that if the context
 2    you were trying to conclude were consistent with my earlier
 3    order, but it's not.  So given that we have no stipulation,
 4    and we don't have an agreement, we won't read a stipulation,
 5    and we won't do anything.  We'll just live by my order.
 6              MS. COHEN:  Your Honor, if you're inclined to let
 7    those two paragraphs come in, that's fine.  We would prefer
 8    that to not reading it at all.
 9              THE COURT:  Okay.  But when you say those two
10    paragraphs . . .
11              MS. COHEN:  The paragraphs related to which charts
12    are more important than the other charts.
13              THE COURT:  Well, to the paragraphs that I think
14    can come in, the one that you propose as a condition of that,
15    I think it's inconsistent with my order.
16              MS. COHEN:  Okay, Judge.
17              THE COURT:  Okay?
18              MS. COHEN:  Mmm-hmm.
19              THE COURT:  All right.  Then . . .
20              MS. LEPERA:  Maybe we should just finalize it.
21              Um, and you need to just confirm the accuracy of
22    the numbers that we've put in, the counts?
23              MS. COHEN:  I did.
24              MS. LEPERA:  Is that the right -- the right
25    numbers?
```

         1              MS. COHEN:  I believe so, yes.

         2              MS. LEPERA:  So then we can read this to the jury

         3     whenever, um, the Court says we should do that?

         4              THE COURT:  Well, I -- I don't know if you're in a

         5     position to read it now, but let's get them in here so they

         6     can go home so that we can do jury instructions.

         7              MR. WAIS:  Before the jury comes in, we just wanted

         8     to read a quick agreement between the parties as to the

         9     stipulation that would be coming into evidence just to

        10     preserve that for the record?

        11              THE COURT:  Okay.

        12              MS. WAIS:  If that's okay.

        13              The parties agree that the attached stipulation of

        14     facts is being submitted at the direction of the Court and

        15     subject to and without waiver of any parties' objections and

        16     positions as to plaintiff's proffered Billboard evidence

        17     which specifically includes the Billboard charts, including

        18     those defendants contend were produced on July 23rd, 2019, a

        19     position with which plaintiffs disagree as well as summaries

        20     and Billboard deposition designations.

        21              These objections and positions were stated on the

        22     record and are preserved for appeal.

        23              THE COURT:  I follow the whole thing, but what does

        24     he say that defendants contend were produced on July 23rd?

        25              MR. WAIS:  Uh, specifically the Billboard charts

1    which would include those charts which defendants contend

2    were produced on July 23rd, 2019, a position with which

3    plaintiff's disagree.

4              THE COURT:  Okay.  Then -- then I understand what

5    you just read.  Okay.

6              MR. WAIS:  Thank you.

7              THE COURT:  Okay.  Um, jury?  May we bring them in?

8              MR. KAHN:  Your Honor?

9              THE COURT:  Yes.

10             MR. KAHN:  Out of an abundance of caution, before

11   the case began, we had a placeholder for Exhibit 30.  You've

12   put an order in for a certified copy from the Copyright

13   Office of the certificate of registration which did arrive.

14   I don't think defendants have an issue.  If the Court could

15   take judicial notice.  I just wanted to offer it into

16   evidence.

17             THE COURT:  You may.

18             MR. KAHN:  And we can add it to the notebooks.

19             THE COURT:  Yes.

20             MR. WAIS:  That's fine, Your Honor.

21             MR. KAHN:  Thank you, Your Honor.

22             THE COURT:  Thank you.

23             MR. MOVIT:  We need clarification actually.

24             There's a xerox copy of a flash drive in the

25   exhibit so our question is is it only intended to exhibit the

UNITED STATES DISTRICT COURT

EXHIBIT 5
PAGE 1009

```
1    three pieces of paper?  And I just want to make sure there's

2    nothing in terms of a flash drive being proposed for the

3    exhibit.  We have no objections to three pieces of paper.

4              MR. KAHN:  You know, yeah, sorry.  It's not part of

5    the exhibit I gave 'em.

6              THE CLERK:  Do you want to see this exhibit?

7              MR. MOVIT:  If we could, please.

8              Thank you for the clarification.

9              THE COURT:  Okay.

10             THE CLERK:  Have you reviewed the stip?

11             MR. MOVIT:  My colleague is in the process of doing

12   it, hopefully very shortly.  Thank you.

13             MR. WAIS:  It looks fine to defendants, Your Honor.

14             THE COURT:  Okay.  Thank you, Mr. Wais.

15             THE CLERK:  Ready for the jury?

16             MR. KAHN:  Yes.

17             THE CLERK:  All rise.

18                      (Jury present.)

19             THE CLERK:  Please be seated.

20             THE COURT:  Okay.  Ladies and gentlemen, we have a

21   stipulation to read to you, and then, um, counsel will

22   proceed accordingly.

23             Ms. Cohen.

24             MS. COHEN:  Plaintiffs would like to read the

25   following stipulation of agreed facts:
```

UNITED STATES DISTRICT COURT

EXHIBIT 5
PAGE 1010

1.  Billboard is a company that produces charts in relation to music.

2.  Billboard produces nearly 200 charts a week relating to mainstream, Top 40s and the various genres including pop, rock R&B and hip hop, country, gospel and Christian music.

3.  Billboard's most popular charts are the Billboard Top 100 which is the top songs of the week and the Billboard 200 which are the top albums.

4.  The charts relating to mainstream Top 40, rock, R&B and hip hop and country music are larger in terms of market volume and the audience volume than the charts relating to gospel and Christian.

5.  Our World Redeemed appeared 37 times on two charts in the genres of gospel and Christian music between March 22nd, 2008 and January 17th, 2009.

6.  The song Joyful Noise appeared 32 times on one chart in the genre of gospel and Christian music between January 15th, 2011 and January 21st, 2012.

7.  Neither the album Our World Redeemed or the song Joyful Noise appeared on any charts outside of the genre of gospel and Christian music.

THE COURT:  Okay, thank you.

With that, Mr. Kahn?

MR. KAHN:  And Your Honor, plaintiff rests.

EXHIBIT 5
PAGE 1011

```
1                    THE COURT:  All right.

2                    Ms. Lepera.

3                    MS. LEPERA:  Defense rests, Your Honor.

4                    THE COURT:  All right.

5               So ladies and gentlemen, what this means is I am

6     going to send you home and ask you to return at 9:30 tomorrow

7     morning for closing argument and jury instructions.  Uh, I'd

8     like to do them today, but we still have some work to do, and

9     I don't want you to have to sit around anymore than

10    necessary.

11              So we will see you in the morning.  Please keep,

12    though, that you are not to commence discussing the case or

13    deliberating with one another until after you have been

14    instructed and you've heard closing argument, and we send you

15    out at that time.  So please keep an open mind, don't form

16    any opinions at this stage, and we'll see you tomorrow

17    morning.

18                   Thank you.  Have a good evening.

19                   THE CLERK:  All rise.

20                        (Jury not present.)

21                   THE CLERK:  Please be seated.

22                   THE COURT:  Okay.  Um, you obviously need some time

23    to confer.  Fine.  Um, hopefully, you'll be able to whittle

24    this down so you have very few disputes.

25                   Thank you.
```

UNITED STATES DISTRICT COURT

EXHIBIT 5
PAGE 1012

170

```
1              THE CLERK:  This court's in recess.

2              We need a time.  We need somewhat of a --

3              THE COURT:  A time?

4              Tell us what a reasonable estimate would be, folks,

5    to sit in a room and come back with something.

6              MS. LEPERA:  I would like to think that we already

7    know the key issues in dispute.  So I think ultimately, I

8    just want to go get ours set to the point where we are this

9    is what we have, present to the Court which is some --

10             THE COURT:  Well, hold on.  You have separate --

11   when you say separate versions, under the Rule of the Court,

12   you are supposed to file jointly agreed upon instructions and

13   the instructions to which there is not an agreement.

14             MS. LEPERA:  Correct.  That's -- that's essentially

15   what I'm saying so when I say separate versions, I mean

16   narrowing the ones that are in dispute so they can be

17   clarified.

18             THE COURT:  Okay.  Because the court reporter takes

19   a train home, and that train leaves so you better be back and

20   ready to talk at 4:30.

21             MS. LEPERA:  Sounds good to me.

22             THE CLERK:  Court's in recess.

23                   (Recess taken.)

24             THE COURT:  Okay.  Are we ready or are we not

25   ready?
```

EXHIBIT 5
PAGE 1013

```
 1              MS. LEPERA:  I'm ready, Your Honor.

 2              THE COURT:  I have no idea what I have here so

 3     that's my first problem.

 4              MS. LEPERA:  Let me see if I can try to help.

 5              We have a set that we will submit that is

 6     acceptable to both sides.  What we just submitted to the

 7     Court under the heading Defendant's Amended Disputed Proposed

 8     Jury Instructions are those that we have conferred with,

 9     quite extensively, with, um, plaintiff's counsel and to which

10     we have not reached agreement essentially in concept no less

11     language with the exception there should not have been, um,

12     the assignee instruction.  That is acceptable to both sides.

13              So the balance of these, Your Honor, are

14     instructions we think are imperative.  I'm happy to discuss

15     why.  That is what this document represents.  I'm not really

16     quite sure what the other document represents.  I'll let

17     plaintiff's counsel speak to that.  If Your Honor would like,

18     I'd be happy to explain.

19              THE COURT:  I'll let you explain, but my problem is

20     is there a contention on your part that these things that

21     have been submitted by the plaintiffs should not be included

22     or is your concern that they have modified them in an

23     unacceptable fashion?

24              MS. LEPERA:  The Plaintiff's Proposed Disputed

25     Instructions, um, are number one, we just went over, yeah,
```

EXHIBIT 5
PAGE 1014

1    I'm submitting that we are disagreeing with 31.  We have a

2    different instruction for 32.  I think this is incomplete.

3    And we are -- I thought we had agreed on a registration

4    instruction so I'm not sure why this is here, that's 38.  And

5    I thought agreed on instruction for 42 so I'm not sure why

6    that's there.  And the balance -- similarly, I had thought we

7    agreed on 44.

8              THE COURT:  What I'm trying to do first is before

9    we start talking about these, I want to get down them to the

10   minimum number.  So I guess the first question, Mr. Kahn, is

11   there an agreement on 42?  38?  I mean, I don't want to

12   discuss things if you guys have agreed to something.  I'm

13   starting with the Plaintiff's Proposed Disputed Instructions

14   because Ms. Lepera's comments lead me to believe that she at

15   least that thought some of these had been agreed to.

16             MR. KAHN:  Okay.

17             MS. LEPERA:  We have an instruction in the set that

18   we sent you which was No. 3 which looks a lot like this and I

19   think we had agreed so I'm not sure why you put that in

20   there.

21             THE COURT:  Well, I'm lost now.  Your Defendant's

22   No. 3 is 9th Circuit 1715 modified.  Is that what we're

23   talking about?

24             MS. LEPERA:  No, that's a different set,

25   Your Honor.  The ones we just looked at together.

EXHIBIT 5
PAGE 1015

```
 1                THE COURT:  I don't have those.
 2                MS. LEPERA:  No, we didn't submit that.  So 29
 3      should not be in here at all because we have an agreement on
 4      29.
 5                THE COURT:  The Plaintiff's 29.
 6                MS. LEPERA:  Correct.
 7                THE COURT:  So we're not gonna worry about that.
 8                MR. KAHN:  And 31 should not be in here.  We would
 9      agree this is not -- we can work with defendant's definition.
10                THE COURT:  So we're going to take -- I don't have
11      to worry about 31.  You're withdrawing this 31.
12                MR. KAHN:  This is incorrect.
13                THE COURT:  What about 32?  That actually looks
14      like an unmodified.
15                MS. LEPERA:  Yeah, we have an instruction on ideas
16      and expression that is. . .
17                MR. KAHN:  I mean this is literally unmodified.
18                THE COURT:  It's unmodified.  I don't know what's
19      wrong with it, Ms. Lepera.
20                MS. LEPERA:  Well, I'll tell you the problem,
21      Your Honor.  The problem is actually that the 9th Circuit had
22      a reversal in Led Zeppelin and the issue with failing to
23      instruct on protectability of expression or combinations
24      thereof.  We have several instructions which we were trying
25      to consolidate on these issues.  One including thin copyright
```

1     which we believe must be instructed on.

2            Because if we do not have -- if we just simply tell

3     the jury common ideas and common expression without

4     explaining what protectable means, explaining what is, um, if

5     there's not protectable and then there's some selection or

6     arrangement, that may be.  But these are the issues that are

7     specifically being focused on in the 9th Circuit now in the

8     Led Zeppelin case and there was a reversal on the Led

9     Zeppelin trial for specifically failing to instruct on

10    protectability issues.

11           Similarly, in the 9th Circuit, and this is not in

12    the Neiley case, but I think it's directly on all fours on

13    the issues.  In the Harper case which we have here which

14    we've been discussing with plaintiff's counsel expanding

15    these general instructions and that's 889 F2d 197.  Again,

16    the 9th Circuit reversed for failing to instruct on issues of

17    what's protectable versus not protectable and in a selection

18    and arrangement issue.  So this is why we have submitted

19    instructions that we believe are more in line with protection

20    of the ultimate verdict on these issues that are being

21    examined closely by the 9th Circuit.

22           THE COURT:  Okay.  Bear with me.  I see nothing

23    wrong with giving 17.4, and then if you need to have a

24    supplement instruction.

25           MS. LEPERA:  That's fine, too, Your Honor.

EXHIBIT 5
PAGE 1017

```
1              THE COURT:  So that we know what we're dealing with
2    it, but I don't want to take the existing approved
3    instructions and all of a sudden rewrite them based upon the
4    9th Circuit in Led Zeppelin.
5              MS. LEPERA:  Well, the thin copyright is, I
6    believe, directly out of the model that they refuse to agree
7    to, but the additional supplemental as you call it which is
8    what we were attempting to do and combine this issue with the
9    common idea expression and combination selection and
10   arrangements into one and have the thin copyright.
11             THE COURT:  I understand, but you're probably more
12   conversant with the copyright stuff than anyone else in the
13   room and you follow it all the time.  I'm just trying to have
14   something that can be given to a jury that has some -- that
15   tries to meet some of these 9th Circuit concerns that are
16   coming down with the new cases.
17             MS. LEPERA:  Exactly, and that's what I'm trying to
18   accomplish as well.  And not erasing the model rule, but
19   supplementing it by virtue of what's occurring because I've
20   seen the reversals and -- and -- on this area and it's a very
21   pertinent area.
22             THE COURT:  I know, I know.
23             MR. KAHN:  You know, I would only point out,
24   Your Honor, I know we're now down in the weeds that the
25   Harper House thin copyright case, I think that involved
```

UNITED STATES DISTRICT COURT

EXHIBIT 5
PAGE 1018

```
1    printed compilations.  And the question was coming down from

2    the Supreme Court case in the Feist case that the thin

3    copyright applied to compilations.  This is not a

4    compilation.  It's a piece of music.

5              THE COURT:  I hear what you're saying.  I'm going

6    to go and read some of these cases because I haven't read

7    them in an anticipation because not surprisingly when you

8    come to me four minutes before we're supposed to solve

9    instruction and I don't even know what cases you're relying

10   on, I can't really make a very informed decision.

11             MS. LEPERA:  I apologize, Your Honor.  It's been a

12   tight time frame.

13             THE COURT:  I'm not being critical.  I'm just

14   saying that we have got to decide what we're doing here in an

15   orderly fashion.

16             MS. LEPERA:  And I completely disagree with what

17   Mr. Kahn just said, and I understand the Court will look at

18   it, but the exact issue of what is protectable or not was on

19   all fours and it was a reversal.  I think it's completely

20   analogous in the sense of an instruction.

21             THE COURT:  And just tell me the case, tell me the

22   site.  We'll read it.

23             MS. LEPERA:  Yes, Your Honor.  It's 889 F2 197

24   9th Circuit.

25             THE COURT:  Okay.  Now, what I'm trying to
```

EXHIBIT 5
PAGE 1019

```
 1    understand again so 32, the Plaintiff's 32 which is the
 2    unmodified 17.4, we're going to give, but perhaps with
 3    something else.
 4              MS. LEPERA:  That's fine as long as there's with
 5    something else.
 6              THE COURT:  Have we decided we don't need the
 7    proposed No. 38?  So we have a substitute for plaintiff's
 8    proposed 38; is that right?
 9              MS. LEPERA:  That is correct, Your Honor.
10              THE COURT:  42.  Access which, again, is
11    9th Circuit 17.18 modified though.
12              MS. LEPERA:  We have what we would consider a
13    supplemental to this.  We don't have a problem with this
14    portion, but we did have a supplemental on No. 17.
15              THE COURT:  Is there an objection to your
16    supplemental?
17              MS. LEPERA:  I believe there was no objection to
18    it.  Provided we put in the preponderance.
19              MR. KAHN:  Our only -- I'm sorry, Judge.  Our only
20    problem is in the third paragraph --
21              THE COURT:  I don't have their 17, of course.
22    That's part of my problem.
23              MS. LEPERA:  We thought it was agreed upon.  I
24    didn't think it was a disputed one.
25              MR. KAHN:  The only dispute that we had is this is
```

```
 1    a definition of widespread definition, but in the third

 2    paragraph it reads, even if the plaintiffs demonstrate a

 3    reasonable possible of access any inference of access can be

 4    rebutted by defendants by showing they never availed

 5    themselves of this opportunity.

 6           I don't think that's part of the -- there was

 7    showing there was no direct access.  So that's our only --

 8    we're just trying to stick.

 9           THE COURT:  I don't have it in front of me.

10           MS. LEPERA:  No. 8 of our original proposed set.

11           THE COURT:  Okay.  Fine.  I see it.

12           MS. LEPERA:  It's straight from your order,

13    Your Honor.

14           THE COURT:  I understand.  I can see it.  It sounds

15    somewhat familiar.  I think the Defendant's Proposed Jury

16    Instruction 8 is consistent with my understanding of the law.

17    What was the problem, Mr. Kahn?  What word is missing?

18           MR. KAHN:  No, I mean my understanding with

19    widespread dissemination is that you can establish that and

20    if you do establish it, then the defendants can prove that

21    they independently created it.  This adds another element

22    which is you prove widespread and they can disprove by saying

23    we didn't look in any of those places.

24           THE COURT:  That's true.

25           MS. LEPERA:  There's two potential rebuttals.
```

```
 1              THE COURT:  You first have show widespread access.
 2    You're going to go argue there wasn't widespread access,
 3    you're gonna argue there was; correct?
 4              MR. KAHN:  Correct.
 5              THE COURT:  And then they're gonna say even if you
 6    find widespread access, we've rebutted it because all of our
 7    witness said we never heard the song, we never saw the song,
 8    we never knew about the song.
 9              MS. LEPERA:  Then we have the independent creation
10    which is separate.
11              THE COURT:  So --
12              MR. KAHN:  They didn't add preponderance of the
13    evidence language.
14              THE COURT:  Okay.  So if they did that, this one
15    would be okay.
16              Now, let's go back and that's going to be in lieu
17    of Proposed Instruction No. 32 submitted by the plaintiff if
18    I understand.  Now, 43 we've got subconscious copying.
19              MR. KAHN:  This is in the commentary of the
20    widespread dissemination model jury instruction and we simply
21    cite the case law to it.
22              THE COURT:  Um, that goes back to George Harrison
23    in my eyes.
24              MS. LEPERA:  I don't think there's any application
25    here.  It's not in the model rules and that's why I objected
```

1    to it, Your Honor.  We were attempting to take the

2    9th Circuit guidance on protectability being our focus.

3              THE COURT:  I understand, but why wouldn't they be

4    an entitled to that instruction?

5              MS. LEPERA:  I'm looking at the comments.

6              THE COURT:  I think it's the state of the law.

7              MR. KAHN:  It is.

8              THE COURT:  We're going to take out unconscious

9    which is fine.

10             MS. LEPERA:  Yes, it's inappropriate.  I can live

11   with it then.

12             THE COURT:  Okay.  Now, just going to

13   Plaintiff's 44.

14             MS. LEPERA:  Again, we had just gone over this

15   downstairs with our proposed instruction and I thought we

16   were on board with it.

17             THE COURT:  Well, you may or may not be, but

18   Proposed Instruction No. 44 substantial similarity, extrinsic

19   test, intrinsic test.

20             MS. LEPERA:  There's a joint one that we agree

21   upon.  It's the one that we've submitted.

22             MR. KAHN:  Our objection was there are verdict

23   directors within the instruction.

24             THE COURT:  There are what?

25             MR. KAHN:  There are verdict directors within the

```
 1    instruction.
 2              MS. LEPERA:  We were happy to take that out and we
 3    were, I thought, in accord.  18 we went over downstairs and
 4    you said it was acceptable.  There's no model for substantial
 5    similarity at all.  That's the problem.  So we're accepting
 6    18.
 7              THE COURT:  Defendant's 18 which is in the other
 8    packet.
 9              MS. LEPERA:  Correct.
10              And then the last one for you, folks it seemed like
11    a catch-all where they're attempting to bring in nonparties
12    as having joint liability.
13              MR. KAHN:  Your Honor, if you look at 45, I think
14    this would work where we would read instead, we would take
15    out the words Dark Horse and infringe.  It would read, if you
16    find that plaintiffs have proven infringement of Joyful
17    Noise, and then they would proceed on.
18              MS. LEPERA:  But, again, that suggests like binding
19    parties that are not parties to a ruling in this case.
20    Again, I object to this.
21              THE COURT:  So what are we doing?
22              MS. LEPERA:  45, Your Honor.  They're attempting to
23    have the jury find that people who are not in this case are
24    infringers and that's not how it works.
25              MS. COHEN:  Your Honor, what's intended with this
```

```
 1    instruction is to explain to the jury which of the defendants

 2    would be liable if infringement is found.  So we believe that

 3    that's required as part of the verdict director with the

 4    special verdict form.

 5            And this instruction would simply instruct the

 6    jury that if -- we'd have to finesse the language, but if

 7    essentially plaintiff's have proven infringement, then you

 8    must find that any defendant who, and then, um, model it

 9    after the language that is in Instruction 3.

10            THE COURT:  What does that have to do with the

11    evidence in this case?  I thought that your position was if

12    your client establishes an infringement, each person who is

13    listed as a songwriter is liable.

14            MS. COHEN:  That's correct, but in addition to

15    that, we have corporate defendants.

16            THE COURT:  Can't you name them?

17            MS. LEPERA:  Well, this is my concern, Your Honor.

18    If you read what they've written here, all entities involved

19    in producing, publishing distributing.  That could be people

20    that they haven't sued here that collaterally can't be

21    estopped this way, and so I think that that's just a

22    catch-all bet that should not be used, and they simply

23    haven't even established liability.

24            MS. COHEN:  Your Honor, there's got to be a way for

25    the jury to determine who's liable and who's not.  You have
```

EXHIBIT 5
PAGE 1025

```
 1    to instruct them whose liable, and the language under the
 2    definitional on instruction says who reproduces, publically
 3    distributes, helps, performs, et cetera, would be liable.  So
 4    this instruction would essentially tie in which defendants --
 5    essentially, it would read if the defendants did X, Y and Z
 6    from this definition, then they would be liable.
 7              MS. LEPERA:  That's not what this says.
 8              THE COURT:  It doesn't.  This says that if you find
 9    that there's an infringement, anyone involved in the world
10    who ever had anything to do with this is liable.  You've sued
11    certain defendants who've had a chance to be in court.  I
12    think you can identify them.
13              I'm having some difficulty with the corporate
14    defendants because I think there's a separate instruction
15    that might be applicable to them, but, I mean, the first
16    problem is did the defendant songwriters infringe, and if you
17    find infringement, then I think based on the evidence in this
18    case, they would be all be liable because the song infringes.
19              MS. LEPERA:  We have an issue with that
20    potentially, Your Honor, with a Rule 50 motion.  But, again,
21    they have to prove that each of the defendants, not people
22    who aren't even in the case, people who are in the case have
23    violated one or more of the exclusive rights of the copyright
24    stature, the burden to prove each element for each of the
25    defendants.
```

EXHIBIT 5
PAGE 1026

184

1              THE COURT:  True.

2              MS. LEPERA:  So this wash over that they wish that

3    Dark Horse infringes Joyful Noise is -- is not how it should

4    be stated.

5              THE COURT:  Well, I think that's right.  What

6    you're telling me is that you're gonna have a verdict form

7    that asks the jury to find as to each defendant whether that

8    defendant infringed or didn't; is that correct?

9              MS. COHEN:  That's correct.  And I'm saying we

10   would revise language in the current version of 45, this was

11   our earlier submitted form, to reflect language that's been

12   agreed in the definitional instruction to simply instruct the

13   jurors, have them determine which of the defendants are

14   liable.

15             THE COURT:  I don't know what you just said.

16             MS. LEPERA:  I don't either, but that doesn't say

17   that.  This says if the song's infringing in a hypothetical

18   way, not like someone having infringed it, then you must find

19   that they're all liable.  You put the cart before the horse.

20             THE COURT:  I think she's right as phrased.  I

21   understand where you're trying to go, but I just don't know

22   what to tell you because . . .

23             MS. COHEN:  Judge, we're happy to revise it.  But

24   what I'm suggesting is that it would say any defendant that

25   reproduced, publically distributed, publically performed,

EXHIBIT  5
PAGE 1027

```
1    publically displayed or prepared a derivative work from the
2    copy of Joyful Noise without authority.  It's not just the
3    definition.
4            THE COURT:  But how does that line up with the
5    evidence in this case?  How does a juror -- even if you were
6    correct, the instruction is so terribly complex that I don't
7    know what a juror would do.  If I was sitting on the jury,
8    and I know more about this than the jury, I wouldn't know
9    what to do.
10           MS. LEPERA:  It's palpably improper.  And to talk
11   about speculation of what they're gonna do right is not of
12   any use right now.
13           THE COURT:  I agree with that completely.
14           So the question here is does Dark Horse infringe
15   Joyful Noise?  And then I suppose the jury could find that
16   some of the defendants are not liable because they did not
17   have access or they believed that they had never saw
18   different it, and they have a different view about other
19   defendants.
20           MS. LEPERA:  That they didn't reproduce or
21   distribute.
22           MR. KAHN:  What we can do, this needs to be fixed,
23   Your Honor.
24           THE COURT:  It does.
25           MR. KAHN:  We will make it clear.
```

```
 1           For example, if you're one of the songwriters, you
 2    don't have to have access as long as one of the songwriters
 3    had access, and then they create something.  There's no need
 4    to prove intent as long as you can prove access.  It would be
 5    the same with Capital Records.  Whether Capital Records knew
 6    or didn't know about it, it would be an infringement.  But we
 7    would have to make this clear that anyone -- and we will then
 8    spell it out using the terminology of the copyright ad, and
 9    we'll sent it back to defense counsel tonight and see if it
10    works.
11           MS. LEPERA:  Right.  But bear in mind that you have
12    to show the defendant violated one of the exclusive rights by
13    reproduction or distribution.  I don't know that there's a
14    lot of evidence in the case on this point.  Speaking of
15    evidence.
16           THE COURT:  Well, here's the difficulty I'm having
17    because I just don't know the answer.
18           Let us hypothetically assume that this jury decides
19    that one of these songwriters had access, and it disbelieves
20    the statement that, you know, I never had access, I didn't
21    know about it, and so that one of the songwriters in the
22    jury's mind thinks it's responsible for infringement.
23           MS. LEPERA:  The problem here is we have unrebutted
24    testimony about the different roles that were undertaken, and
25    they would have to prove not only did that one percent didn't
```

```
1    have the access, but somehow, it was communicated.
2              THE COURT:  Well, but what I hear the plaintiff
3    arguing is that the fact of the evidence there were
4    songwriters on the song makes them vicariously liable.
5              MS. LEPERA:  But he had no right to enter his
6    vicarious claim, Your Honor.  No vicarious or secondary
7    liable, you know, contributory or vicarious claim in this
8    case -- evidence.
9              THE COURT:  That is true.
10             MS. LEPERA:  That's exactly the point.
11             MR. KAHN:  Correct.  All the creators of a joint
12   work if you can prove the level of access by one of those
13   creators, all the creators, so all six songwriters would then
14   be liable as would Capital Records.
15             THE COURT:  Well, hold on for a minute.  That's the
16   problem.  That's the problem.  I think don't you need a
17   vicarious liability claim?
18             MS. LEPERA:  And there was that very issue in
19   Blurred Lines.
20             MR. KAHN:  I don't think we do for the -- for the
21   joint work.  The joint work --
22             THE COURT:  We're gonna have to look at Williams
23   versus Gay, but I've got some problems because there may be a
24   legal impediment to the argument you're making.
25             MS. LEPERA:  Right.
```

EXHIBIT 5
PAGE 1030

```
1              THE COURT:  There may not be, but there may be
2    because I can see what the issue is.
3              MS. LEPERA:  Right.
4              MR. KAHN:  It would be the same for Capital
5    Records.  They created, produced and distributed the song.
6    They're direct infringers.
7              THE COURT:  But it is the same problem as to
8    whether that is direct infringement or not.  And I haven't a
9    clue, but I'm certainly not going to give you my opinion
10   without reading some cases.
11             MS. LEPERA:  Or an instruction like 45.
12             MR. CHIEFFO:  Clearly not.
13             THE COURT:  45 is not going to be an instruction
14   whatever we do.
15             MS. LEPERA:  Okay.  On the topic of the Rule 50,
16   Your Honor, just so I'm clear and obviously I haven't made my
17   argument, but I understand from our prior discussion
18   effectively now everybody's rested, I'm stating that we're
19   making a Rule 50 A motion on the case and the elements --
20             THE COURT:  You're renewing.
21             MS. LEPERA:  I'm renewing and we will be filing,
22   um, so we can submit a briefing schedule hopefully to the
23   Court as well promptly.
24             THE COURT:  That's true.
25             Okay.  Look, we'll have to look at those cases and
```

EXHIBIT 5
PAGE 1031

```
 1    decide what to do about them.  Now, let's go to what
 2    apparently are the defendant's disputed instructions.
 3          MS. LEPERA:  Okay.  Let's start with the easy one.
 4    I hope it's easy.  I think that given, it's actually the last
 5    one in the bunch.  I think however we characterize it or call
 6    it, given some of the questioning that's gone on, an
 7    instruction that the messages and the imaging of the works
 8    and people's morality or religious belief don't factor into
 9    this case.  People may be confused.
10          THE COURT:  I don't think they will be.  I don't
11    know what morality means.  I think you may not consider any
12    parties religious beliefs.
13          MS. LEPERA:  Something like that, Your Honor, yes.
14          THE COURT:  And you've got to correct a typo.
15          You are also instructed that you may not consider
16    the messages or imagery of either of the two works at issue
17    in reaching your verdict.  I think that's fine.
18          MS. LEPERA:  Thank you.
19          I think that one of the problems that we had with
20    plaintiff's instruction on the sound recording and the
21    musical composition is they collapsed them and didn't clarify
22    to the jury that there's no sound recording copyright
23    infringement claim here and they have no copyright interest
24    in the sound recording.  And we were attempting to get some
25    agreement on that.
```

UNITED STATES DISTRICT COURT

EXHIBIT 5
PAGE 1032

1          But even if this is not in its entirety included, I

2     think at minimum that instruction as to the distinction

3     between a music compositional copyright and a sound recording

4     copyright.  And to clarify for the jury, there's no sound

5     recording infringement claim here.

6          MR. KAHN:  Which is fine.  And this has been

7     clarified.

8          MS. LEPERA:  You're okay with this now?

9          MR. KAHN:  Yeah.

10         MS. LEPERA:  Okay, great.

11         THE COURT:  So No. 1 is okay.

12         MS. LEPERA:  Great.

13         THE COURT:  Let's now look at No. 2.

14         MS. LEPERA:  Right.

15         Again, back to the Element 1 of the plaintiff's

16    case whether or not plaintiff have a valid copyright.  The

17    issue as to whether they are joint authors or in fact is

18    Joyful Noise a derivative work that was crafted out of a

19    previously existing copyrighted work, Mr. Ojukwu's beat.

20         Such that the beat is not encompassed in the

21    copyright registration because you cannot have a preexisting

22    work that is not identified as such included in this joint

23    authorship copyright registration.  What you can only have in

24    a copyright registration is copyright protection in what is

25    around the derivative work.

```
 1              In other words, if Mr. Ojukwu had a pre-existing

 2     published copyrighted work that was never registered and we

 3     find that there is no joint authorship because this is a

 4     concocted after-the-fact joint authorship done after Dark

 5     Horse was released, et cetera, et cetera, then the question

 6     becomes is the Joyful Noise registration one for a derivative

 7     work of the original.

 8              And therefore, the original is not encompassed in

 9     that registration.  It is exactly on point to Element 1 of

10     their case.

11              MR. KAHN:  There's actually three points.  No. 1,

12     this is a jury instruction that is for someone who's suing to

13     be designated as the joint author.  He's claiming that he has

14     a joint authorship right.  That's number one.

15              No. 2, we took the position on the issue of what

16     had to be referred to the Registrar of Copyrights.  This is

17     an issue that should have been referred to the Registrar of

18     Copyrights.  And No. 3, I would hope the Court has heard

19     enough evidence now including the original liner notes that

20     this is a joint work.

21              And I -- I look at this, I can't -- I just am very

22     worried that the jury is gonna be confused in trying to pars

23     their way through a really fairly esoteric copyright issue

24     when there -- there really is no -- nothing was contrived.

25     This is the way it was in 2008.  And the case law is clear
```

1    that these things number one, to be considered joint works

2    contributions have to been independently copyrightable,

3    that's 9th Circuit law.

4         No. 2, they don't have be -- in the DC Comics case,

5    they don't even have to know each other.

6         THE COURT:  Well, let me start at the beginning.  I

7    believe that to the extent the claim is that there was some

8    kind of misrepresentation regarding it being a derivative

9    work or not, that was something we said that went to the

10   Registrar of Copyrights.  And that's not in the case and we

11   don't need the instruction for that purpose.

12        The only question I thought that we had preserved

13   that we said would stay in here was whether, and I've got to

14   go back and look at my notes, but whether Mr. Ojukwu's beat

15   was a separate composition by reason of how it was

16   constructed off the Internet and so forth so that it was not

17   subject to copyright protection in the first place.

18        MS. LEPERA:  No, Your Honor.  It's a slightly

19   different argument.

20        The issue with respect to a valid copyright and a

21   valid copyright registration is what is covered by it.  It is

22   nothing to do with the Registrar of Copyright.  It's strictly

23   devolves down to do they have a valid copyright in the only

24   thing that's in issue here, and a copyright registration, the

25   only that's in issue here is the beat.

```
1          If the beat was separately copyrightable whether or
2     not it's original or whatever, if it's a published work fixed
3     in a tangible medium of expression and it is not, despite
4     what they say, at the time when he had a buy out, when he had
5     no agreement, there's all of these factors that demonstrate
6     that he may have been a producer, but he concocted the whole
7     writer story later on after there's no split agreement,
8     there's no anything until after the song Dark Horse comes out
9     and there's a lawsuit.
10         So the fact he was not in control of any of the
11    Joyful Noise production and was not participating in it, but
12    did this, sold it, that work existed.  It was fixed in a
13    tangible medium of expression.
14         Come along the Joyful Noise registration, the law
15    is that regardless of what it says, there's no presumption of
16    validity with this registration.  They don't get a
17    presumption that they're joint authors because it's past five
18    years.
19         THE COURT:  I know that.
20         MS. LEPERA:  Okay.  So if you have a registration
21    that does not cover -- it would be a derivative work.  Joyful
22    Noise would be a derivative work of this.  A derivative work
23    under case law and under the model rules, a derivative work
24    does not cover the underlying material that was previously
25    separately copyrightable, okay, whether registered or not.
```

EXHIBIT 5
PAGE 1036

```
1    It doesn't cover that in the registration.

2            So if Joyful Noise is not, as we submit, a joint

3    work of authorship, it is a derivative work.  Derivative of

4    the only thing that is relevant here which is that

5    instrumental.  And that derivative work was never registered

6    so there's no copyright registration.

7            THE COURT:  Yeah, but this instruction doesn't do

8    that.  This instruction makes it so complicated.  Why not

9    just instruct them that if the copyrighted work was based on

10   a derivative work -- more specifically if the copyrighted

11   work -- I guess, if Ojukwu's beat was entitled to copyright

12   protection --

13           MR. KAHN:  Which is a requirement of the

14   9th Circuit for joint works.  Each contribution has to be

15   independently copyrightable.

16           MS. LEPERA:  They also have to maintain control

17   over the entirety of the work in order for there to be joint

18   authorship.

19           MR. KAHN:  Or to intend if they merge.

20           MS. LEPERA:  That's a fact question, Your Honor.

21           THE COURT:  I mean, the jury's got to find

22   something, but I don't think your instruction is appropriate.

23           MS. LEPERA:  We can limit it.  Here's the question.

24   It has to either find that he had a separate work that he

25   wrote that was separate and that was put into Joyful Noise
```

1    and Joyful Noise is derivative of it or they're joint

2    authors.  That's it.  He wants them to find they're joint

3    authors.  We're saying they're not.

4         We're saying that Joyful Noise is a derivative work

5    and he was the owner of the beat.  It's essentially like a

6    sample.  It's goes in and it's not part of underlying

7    copyrightability Joyful Noise.  And that's Element 1,

8    Your Honor.  We're entitled to that.

9         MR. KAHN:  As we cited in that 9th Circuit case in

10   responding to their amended affirmative defenses, issues like

11   is it a derivative work should have been raised with the

12   Registrar of Copyrights, and the 9th Circuit said it's an

13   immaterial error.

14        MS. LEPERA:  It's not --

15        MR. KAHN:  And now we're gonna give it to the jury

16   instead of the Registrar of Copyrights.

17        MS. LEPERA:  You're missing the point entirely.

18        You have to prove you have a valid copyright

19   registration and a copyright in the entirety of Joyful Noise

20   which you do that's your burden.  We're entitled to show that

21   you do not have in that registration the beat.  It's not

22   covered, it's not covered, and you have no presumption of

23   validity.  So you do not have a presumption that you're joint

24   authors so we can show that they're not.

25        And we can show that the derivative work Joyful

```
 1   Noise does not encompass the original copyrightable work of
 2   Mr. Ojukwu.  That's Element 1 of their claim.  And we're
 3   entitled to attack the validity of the copyright
 4   registration.  It has nothing to with the Registrar.
 5            THE COURT:  While this is all very interesting and
 6   I hate to cut everyone off, but you aren't helping the jury
 7   doing it this way.  You're each trying to construct an
 8   instruction that requires the jury to reach your finding and
 9   that's not the way to do it.
10            MS. LEPERA:  I'm not --
11            THE COURT:  No, be quiet.  What I'm saying is why
12   don't you just say here is what is necessary to establish a
13   joint work.  In this case defendants contend that the beat
14   was created independently and is not part of the joint work.
15            MS. LEPERA:  We can do that, Your Honor.  That's
16   fine.  We were just trying to use the model rule on joint
17   authorship.  We can make it much simpler.
18            THE COURT:  I would make it simple so a jury knows
19   what you're -- what you're telling them.
20            MS. LEPERA:  Absolutely.  We can do that.  We will
21   try to stay with the model rule on joint authorship and
22   derivative work, but we can do that.  They won't agree to
23   anything on this topic is the problem.
24            THE COURT:  You know, I understand.  But the point
25   of the matter is we do have a question in this case as to
```

EXHIBIT 5
PAGE 1039

```
1    whether the beat by Mr. Ojukwu was in fact part of the work.

2    And we have a dispute here as to whether there's joint

3    authorship or not.

4            MS. LEPERA:  We'll make it narrower.  Happy to do

5    it.

6            MR. KAHN:  And that would eliminate the derivative

7    work instruction because it either is a joint work or not.

8    If it's not a joint work, the jury doesn't have to try to

9    figure out and pars --

10           THE COURT:  I can tell you something that, you

11   know, if in fact the jury finds that it is not a joint work,

12   then yours truly is gonna have to decide on a Rule 50, uh,

13   motion, you know, whether or not it's a derivative work and

14   whether. . .

15           MS. LEPERA:  Well, it's one or the other because

16   it's in there.

17           THE COURT:  If it's not a joint work, then it is a

18   derivative work.

19           MS. LEPERA:  They're the opposite sides of the same

20   coin, I guess, is what I'm saying.

21           THE COURT:  I understand, but you need to tell this

22   jury what you'd like them to decide.

23           MS. LEPERA:  Let me try to make a -- and maybe we

24   can agree on a single instruction that combines the topic.

25   Would you be willing to do that?
```

```
 1              MR. KAHN:  With the caveat that the 9th Circuit is
 2    clear that for joint work each contribution has to be
 3    separately copyrightable.  That's my only concern.  Yes, his
 4    beat is separately copyrightable, but that doesn't mean it's
 5    not a joint work.
 6              MS. LEPERA:  I didn't say it was.  The fact that
 7    it's separately copyrightable in and of itself does not make
 8    it a joint work.
 9              MR. KAHN:  Right.
10              THE COURT:  Do you agree?  It sounds like you agree
11    on that.
12              MR. KAHN:  Yes.  I mean, it would have to be
13    separately copyrightable in order to be part of a joint work.
14              MS. LEPERA:  And the question is whether it was
15    ever merged with intent at the time to be part of the joint
16    work or an after-the-fact concoction.  And there's a lot of
17    factual indicia suggesting what I'm saying is accurate and
18    he'll argue the opposite.
19              THE COURT:  I mean, that's correct.
20              So my question now is are you better off starting
21    with the instruction on a derivative work?
22              MS. LEPERA:  Yeah, perhaps.  And the order of these
23    exactly may not be, um, precise.
24              THE COURT:  I mean because what you're really
25    trying to determine is whether the jury thinks this is a
```

EXHIBIT 5
PAGE 1041

```
 1    derivative work as opposed to a joint work.

 2              MS. LEPERA:  Of a pre-existing work, yeah.

 3              MR. KAHN:  Well, it can be a pre-existing work.

 4              MS. LEPERA:  The ultimate bottom line is that the

 5    law is clear that if you find that it is a derivative work of

 6    a pre-existing work, then the registration does not cover the

 7    material in the derivative work as a matter of law.

 8              THE COURT:  I think we all agree about that.

 9              MR. KAHN:  We agree about that.

10              And my only concern is that in order to be part of

11    a joint work, it has to be independently copyrightable.  So

12    that's where things get confusing.  I'm just saying that's

13    where it gets confusing.

14              THE COURT:  But I'm not sure that I agree with you,

15    Mr. Kahn.  If you're saying the beat is independently

16    copyrightable.

17              MR. KAHN:  Which is what the 9th Circuit says for

18    joint works.  Each contribution has to be independently

19    copyrightable or it cannot be a joint work.

20              THE COURT:  If it's a contribution, but if it's

21    derivative of another copyrighted work, then it's not a joint

22    work.  That's the difficulty that I'm having with this

23    formulation.

24              MR. KAHN:  Yeah, and the way it normally comes up

25    is someone suing and saying I should be on this copyright.
```

EXHIBIT 5
PAGE 1042

1           THE COURT:  Of course.

2           MR. KAHN:  This is a joint work.  That's not what

3    we have here and that's why this instruction is a little off.

4           MS. LEPERA:  We'll come to something that explains

5    it.

6           THE COURT:  Try because we know the respective

7    contentions of the parties so you've got to help the jury

8    understand what they're trying to find.

9           MS. LEPERA:  What would be helpful if we can then

10   in this particular instruction be a little more factual.

11          THE COURT:  I think you should be.

12          MS. LEPERA:  Okay.  Instead of just following the

13   model rule.

14          THE COURT:  I think you should be.

15          MS. LEPERA:  Thank you.

16          THE COURT:  Because it will at least put it within

17   the four corners of your contentions.

18          Okay.  So now we have copyright interest of

19   assignee?

20          MS. LEPERA:  That's not a disputed issue.

21          THE COURT:  Okay.  Originality.  Do we have a

22   disagreement?

23          MS. LEPERA:  Yes, they don't like the last part.

24   And here's where we come to this issue of protectability.

25   And frankly, Your Honor, hopefully, if we could have agreed

EXHIBIT 5
PAGE 1043

1    with them, combined some of these which included the thin

2    copyright and the combination of protectable expression into

3    something to make sure that the universe of same was covered,

4    but I couldn't get agreement with them anything in 5, 6 or 7.

5            THE COURT:  Well, I'm looking at 1714.  We agree

6    through 2.  Then. . . so the objection is to the because

7    originality involves the use of at least some minimal

8    creativity?

9            MR. KAHN:  No.  She was asking if our objection was

10   to that.  No, I think, um, the minimum level of creativity is

11   fine.

12           MS. COHEN:  On this we don't disagree on the law.

13   We just disagree as to where and how it should appear in the

14   instructions.  And as they were put together, it appears in

15   several different places, but that's really the only issue.

16           MS. LEPERA:  And, again, I was trying to suggest we

17   combine -- if you're gonna dispute that we can have an

18   instruction on thin copyright or protectability and

19   combination of protectability, if you dispute that we have

20   that, then we have an issue.  And so I'm trying to present

21   something that covers those bases.

22           THE COURT:  Well, I understand.  Obviously, I've

23   got to read the Led Zeppelin case before I can tell you what

24   the answer is.

25           MS. LEPERA:  To make it worse, Your Honor, they

```
 1    just did an en banc.  They're gonna do an en banc on that.

 2              THE COURT:  I know.  And that's another reason not

 3    to necessarily feel that I have to adhere to that decision.

 4              MS. LEPERA:  However, I think that the law in the

 5    9th Circuit there was no instruction in the Zeppelin case on

 6    protectable versus unprotectable or any combination,

 7    selection or arrangement of protectability.

 8              That's in the pre-existing case law.  I mean, it

 9    was not event -- it wasn't until -- it wasn't as if the

10    District Court chose one.  There was none.  So, um, I think

11    whatever happens with the en banc, I think there's very

12    little harm.

13              I think it's much more protective to have something

14    that includes the issue of protectable versus unprotectable

15    and the combination.  And I do think the Harper case, even

16    though it's not music, speaks to this very eloquently.

17              THE COURT:  I'll look at the Harper case.  But what

18    I'm saying is the concept we are trying to get across to a

19    jury is that originality involves some minimal creativity and

20    the work must contain variations from previously existing art

21    that are more than trivial, miniscule, common or trite.

22              MS. LEPERA:  Well, that's what we put in and we

23    didn't like it.

24              MR. KAHN:  No, we're okay.  It was in several

25    different places.  It was kind of overkill.
```

```
 1            MS. LEPERA:  You're okay with this then?

 2            MR. KAHN:  Yes.

 3            THE COURT:  Because I think this is accurate.

 4            MR. KAHN:  It is, Your Honor.

 5            THE COURT:  And so I think Instruction No. 5 is

 6    okay.

 7            MS. LEPERA:  Great.

 8            THE COURT:  But I don't think we should say it six

 9    times over in the instructions.

10            MS. LEPERA:  No.  6 and 7 go to a slightly

11    different issue.  When the Court reads the Harper case and

12    certainly, the thin copyright instruction, No. 7 is straight

13    black letter law.

14            And what both 6 and 7 are intending to accomplish

15    is to help the jury understand that, you know, there's common

16    place expression, and then to the extent there's an alleged

17    selection or combination of protectable elements, the courts

18    finds that the comparison and the burden elevates.

19            So you have thin copyright or you have a copyright

20    that's got to be -- the expression has to be virtually

21    identical or it has to be, um, demonstrated to be essentially

22    the same expression taken.  And that's the thin copyright

23    concept and that's the concept in Harper when it talks about

24    a combination of unprotectable expression.  It's another

25    higher level threshold that you are looking at.
```

1          THE COURT:  I will have to look at the cases.  I'm

2    not sure either of these is necessary.  I may change my mind

3    once I see the case.

4          MS. LEPERA:  Okay.

5          MR. KAHN:  These are not normally instructions in

6    music cases.

7          THE COURT:  I understand that.  Frankly, I think

8    that we really ought to be focusing on, you know, the real

9    issues besides the derivative work issue which we've

10   discussed is that, first of all, are we dealing with

11   something that's entitled to copyright protection.

12         MS. LEPERA:  This brings us to the ideas and

13   expression, building blocks issue which is precisely why I'm

14   focussing on this.

15         THE COURT:  I understand.  But I also understand

16   Mr. Kahn fairly says these instructions aren't for music

17   cases, they're for writing cases, but let me go look at the

18   two cases.

19         MS. LEPERA:  The Led Zeppelin was obviously a music

20   case.

21         THE COURT:  I -- I know that.

22         MS. LEPERA:  There's no difference in the law,

23   Your Honor.  If something is not -- if it's something that's

24   commonly used or trite or unprotectable whether or not -- in

25   other words, music's not a second class copyright.  They're

 1   similar concepts.

 2          THE COURT:  Oh, I think that's right, but what I'm

 3   saying is this doesn't have a great deal to do with the

 4   testimony in this case.  You've got experts who are talking

 5   about a beat and whether in fact the beat is protectable or

 6   not protectable.  And it seems to me that you ought to be

 7   talking about this case in those terms to help this jury

 8   understand.

 9          MS. LEPERA:  I would love to put it in a more

10   factual recitation, but I was trying to follow the model

11   rules.

12          THE COURT:  Well, I think you need to try to come

13   up with an instruction that is tailored to this.  I'll look,

14   uh, as I say, the fact that. . .

15          MS. LEPERA:  We were trying to do that in some ways

16   when we were trying to talk about building blocks, we were

17   trying to talk about it.  Um, but the point is we were, um,

18   you know, trying to stay more aligned to the model rules, but

19   yet apply it here.  I would be very happy to explain it to

20   them more simply.

21          THE COURT:  Yeah, I mean, I'm going to be

22   influenced -- obviously, if the 9th Circuit reverses me and

23   issues a mandate, I'm gonna follow it.  On the other hand, as

24   I sit here as an idle spectator, I don't always have to

25   believe they're right because there are sometimes circuit

```
 1    judges who know lots more about copyright law than others and
 2    that can cause a variance in the cases.
 3              MS. LEPERA:  Right.  I think, though, that at the
 4    end of the day what we're really talking about here is
 5    whether or not this is copyrightable expression in common
 6    between the two of them.
 7              THE COURT:  Exactly, exactly.
 8              MS. LEPERA:  That's the question.  And our position
 9    is obviously it's not and it falls within the same thing --
10              THE COURT:  All I'm saying is that I think you can
11    find an instruction that lays out the law as applied to that
12    fact whether this is, you know --
13              MS. LEPERA:  Protectable beat.
14              THE COURT:  A protectable beat or not.
15              MS. LEPERA:  Even better.  Yes, we'll do that.
16              THE COURT:  Do you disagree, Mr. Kahn?
17              MR. KAHN:  No.  I think, I mean, the jury has to
18    decide if this is protectable.
19              THE COURT:  Yeah, and they've heard two experts.
20    One of whom says it is.  The other says no, you know, this is
21    a pre-existing, uh, common beat that's been around forever
22    and no one has the right to own it.
23              MS. LEPERA:  Exactly.
24              THE COURT:  And, I mean, I think that's gonna be
25    more helpful to a jury if you can agree on that stuff than,
```

UNITED STATES DISTRICT COURT

EXHIBIT 5
PAGE 1049

```
1   you know, some sort of instruction that's just based, you

2   know, on a literary novel.

3             MS. LEPERA:  I agree, I agree.  And with that

4   guidance, Your Honor, which I very much appreciate, we will

5   address the issue head on.

6             THE COURT:  Okay.  Now, it may be, I hope not, but

7   if we still have disagreements tomorrow, maybe I'm gonna have

8   you argue first before I instruct because we could easily

9   waste half the day on this and I don't want to do that.

10            MR. KAHN:  No, we don't.

11            MS. LEPERA:  No, we don't, Your Honor.

12            MR. KAHN:  The one thing I think we're gonna have

13  to coordinate with tonight our verdict directors.  We're

14  actually closer now.  Um, we had a more general one

15  originally.  The defendants, as you might imagine, they had

16  specific ones so we're now trying to work with a series of

17  interrogatories.

18            THE COURT:  Okay.

19            MR. KAHN:  And hopefully we can reach an agreement.

20            MS. LEPERA:  Okay.

21            THE COURT:  Okay.  Well, we'll see where we are in

22  the morning.

23            MR. KAHN:  And the good news is Your Honor we no

24  longer have instructions on two affirmative defenses.

25            MS. LEPERA:  That's right.  We withdrew those.
```

UNITED STATES DISTRICT COURT

EXHIBIT 5
PAGE 1050

```
 1              MR. KAHN:  So we have a little progress.

 2              THE COURT:  True.  A little progress is fine.

 3              All right.  Good luck.

 4              MS. LEPERA:  I assume the Court's rules with

 5      respect to demonstratives in closing is the same as the

 6      opening.  We have to share and agree or not use.

 7              THE COURT:  Exactly.

 8              MR. KAHN:  And we'll do that in the morning?

 9              MS. LEPERA:  No.

10              THE COURT:  But if your demonstrative is something

11      that has been received into evidence --

12              MS. LEPERA:  We can use it.

13              THE COURT:  -- you can use it, yes.

14              MS. LEPERA:  Okay.  And the demonstratives used

15      with the experts.

16              THE COURT:  Okay.  We will start again tomorrow.

17              THE CLERK:  Court's adjourned.

18              (Proceedings were concluded at 6:20 p.m.)

19

20

21

22

23

24

25
```

```
 1

 2                        CERTIFICATE OF REPORTER

 3

 4   COUNTY OF LOS ANGELES      )

 5                              )  SS.

 6   STATE OF CALIFORNIA        )

 7

 8   I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

 9   STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

10   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

11   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

12   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

13   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

14   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

15   OF MY STENOGRAPHIC NOTES.

16

17

18   DATE:  JULY 26, 2019_____

19

20        /s/  LAURA MILLER ELIAS

21   LAURA MILLER ELIAS, CSR 10019

22   FEDERAL OFFICIAL COURT REPORTER

23

24

25
```

EXHIBIT 5
PAGE 1052

## $

**$395** [1] - 15:17
**$475** [3] - 15:18, 99:15, 99:16
**$580** [4] - 129:5, 153:14, 153:25, 154:13
**$870** [1] - 153:23

## '

**'13** [1] - 145:8
**'15** [1] - 131:19
**'90s** [1] - 128:1
**'em** [3] - 158:23, 159:4, 167:5

## /

**/s** [1] - 209:20

## 0

**0.000014** [1] - 146:13

## 1

**1** [111] - 4:3, 23:16, 24:25, 27:1, 28:8, 30:8, 31:2, 31:4, 34:5, 35:13, 36:18, 37:17, 37:20, 38:11, 39:3, 39:7, 39:15, 39:24, 40:13, 40:14, 41:6, 41:19, 42:11, 42:24, 43:14, 43:18, 44:8, 45:7, 45:14, 45:16, 45:21, 46:3, 46:4, 46:10, 46:14, 46:15, 46:21, 46:25, 47:1, 47:3, 47:5, 47:7, 47:14, 47:17, 47:20, 47:21, 47:25, 48:6, 49:3, 49:24, 53:8, 58:19, 58:20, 58:22, 58:24, 58:25, 59:2, 59:6, 59:16, 60:18, 61:8, 64:20, 69:2, 71:6, 72:9, 72:13, 72:19, 72:23, 74:17, 75:2, 75:4, 75:7, 75:9, 77:1, 77:3, 77:17, 79:2, 79:5, 79:7, 79:8, 79:23, 80:15, 82:10, 82:13, 83:15, 83:18, 83:19, 83:22, 83:23, 84:17, 84:18, 84:22, 84:24, 90:15, 90:22, 90:25, 91:16, 91:21,
92:3, 96:9, 136:5, 168:1, 190:11, 190:15, 191:9, 191:11, 195:7, 196:2
**1-2-3-4** [1] - 32:6
**1-3** [1] - 55:19
**1-5** [1] - 46:1
**1.1** [2] - 135:3, 137:1
**1.38** [1] - 143:17
**1.4** [1] - 137:3
**1.5** [1] - 153:20
**1.65** [1] - 134:3
**1/6** [1] - 55:13
**10** [8] - 3:6, 15:3, 40:10, 40:11, 64:1, 138:21, 138:24, 160:7
**100** [6] - 118:22, 138:23, 145:10, 150:22, 162:4, 168:8
**10019** [2] - 1:22, 209:21
**102** [1] - 3:6
**11** [2] - 41:22, 153:22
**11377** [1] - 2:18
**116** [1] - 146:6
**116boy** [1] - 152:7
**11:00** [1] - 105:8
**12** [2] - 41:14, 41:25
**125** [1] - 3:9
**12th** [4] - 7:15, 8:15, 9:16, 65:19
**12TH** [1] - 2:7
**13** [1] - 43:12
**14** [8] - 11:7, 11:9, 40:15, 43:25, 46:5, 84:16, 91:1
**149** [1] - 3:10
**15** [8] - 42:19, 44:17, 134:7, 145:23, 153:4, 155:5, 160:7, 161:25
**15-5642** [1] - 4:4
**15-5642-CAS** [1] - 1:8
**1500** [1] - 11:9
**15th** [1] - 168:19
**16** [19] - 42:20, 45:5, 45:6, 49:9, 49:11, 50:22, 55:16, 59:8, 76:5, 76:10, 78:7, 89:8, 89:16, 89:18, 90:3, 90:14, 105:14, 139:5
**16-bars** [1] - 29:10
**160** [1] - 139:7
**1600** [1] - 11:7
**167** [1] - 3:14
**17** [2] - 177:14, 177:21
**17.18** [1] - 177:11
**17.4** [2] - 174:23,
177:2
**171** [1] - 3:15
**1714** [1] - 201:5
**1715** [1] - 172:22
**17th** [2] - 161:22, 168:16
**18** [5] - 139:6, 141:9, 181:3, 181:6, 181:7
**1840** [1] - 2:23
**19** [6] - 48:20, 51:6, 51:22, 52:4, 52:10, 127:15
**1900** [1] - 2:23
**194** [1] - 134:18
**197** [2] - 174:15, 176:23
**1992** [1] - 11:15
**1996** [2] - 13:6, 41:14
**1:15** [1] - 103:4

## 2

**2** [107] - 21:8, 25:11, 26:17, 26:24, 27:1, 29:17, 29:23, 30:9, 31:2, 31:5, 31:19, 34:6, 35:13, 36:20, 39:19, 39:22, 40:16, 44:19, 45:8, 45:9, 45:13, 45:17, 45:20, 45:22, 45:23, 46:2, 46:9, 46:13, 46:18, 46:22, 46:24, 47:14, 47:16, 47:20, 47:22, 48:1, 48:7, 48:15, 48:22, 49:13, 50:18, 51:15, 52:8, 53:4, 53:15, 53:18, 53:20, 54:9, 58:18, 58:22, 58:24, 59:6, 59:11, 59:17, 60:18, 61:19, 64:21, 64:25, 71:20, 72:10, 72:22, 72:23, 74:18, 74:19, 75:6, 75:18, 76:8, 76:18, 76:20, 77:6, 77:18, 78:14, 78:16, 79:8, 79:13, 79:16, 81:9, 81:17, 81:22, 82:7, 82:12, 82:13, 83:17, 83:22, 83:24, 84:19, 84:20, 90:4, 90:18, 90:22, 91:2, 91:17, 91:21, 91:22, 92:3, 94:21, 94:25, 95:1, 95:2, 95:7, 136:6, 168:3, 190:13, 191:15, 192:4, 201:6
**2-2** [1] - 63:14
**20** [7] - 51:19, 52:4,
52:14, 52:15, 139:13, 154:6, 154:10
**200** [9] - 119:20, 121:12, 122:12, 122:18, 139:12, 161:12, 162:4, 168:3, 168:9
**2000** [1] - 126:4
**2000s** [1] - 128:1
**2002** [2] - 43:19, 128:17
**2005** [2] - 133:16, 133:24
**2006** [5] - 67:19, 70:19, 72:22, 79:20, 83:11
**2008** [19] - 21:1, 41:4, 70:16, 125:15, 131:2, 134:18, 135:18, 136:12, 137:6, 137:23, 138:7, 138:13, 140:11, 145:7, 145:23, 152:5, 161:22, 168:16, 191:25
**2009** [9] - 129:16, 130:13, 134:20, 136:16, 136:19, 138:20, 143:9, 161:22, 168:16
**2010** [4] - 134:9, 134:22, 136:21, 138:23
**2011** [15] - 11:12, 129:17, 130:13, 130:21, 134:25, 136:24, 136:25, 137:2, 137:25, 139:2, 140:14, 145:23, 152:16, 161:25, 168:19
**2012** [12] - 130:21, 131:2, 131:12, 135:2, 135:18, 137:3, 137:6, 139:12, 143:19, 148:17, 161:25, 168:19
**2013** [6] - 125:15, 135:4, 142:3, 143:19, 147:21, 147:24
**2014** [2] - 131:19, 142:4
**2019** [5] - 1:15, 4:1, 165:18, 166:2, 209:18
**208** [1] - 2:11

**21** [1] - 161:25
**2100** [1] - 2:11
**213)894-0374** [1] - 1:24
**21st** [2] - 145:23, 168:19
**22** [5] - 48:22, 49:8, 50:16, 53:25, 76:10
**22nd** [2] - 161:22, 168:16
**23** [2] - 54:19, 71:17
**23rd** [3] - 165:18, 165:24, 166:2
**24** [3] - 1:15, 4:1, 58:8
**25** [6] - 19:9, 56:23, 58:5, 100:10, 112:2, 139:13
**26** [3] - 62:2, 62:3, 209:18
**27** [4] - 28:22, 62:25, 63:14
**28** [4] - 26:11, 27:20, 63:19, 63:20
**29** [5] - 19:14, 67:14, 173:2, 173:4, 173:5
**2s** [3] - 56:6, 60:7, 64:10

## 3

**3** [21] - 27:2, 27:6, 27:10, 27:18, 28:4, 28:5, 30:20, 35:19, 36:20, 39:22, 45:20, 47:19, 60:17, 60:18, 62:6, 62:8, 168:7, 172:18, 172:22, 182:9, 191:18
**3,000** [1] - 11:11
**3-2-1-5** [17] - 41:16, 43:10, 71:5, 71:12, 71:13, 71:14, 71:20, 72:8, 72:12, 72:13, 72:14, 79:3, 79:20, 96:7
**3-3-3-2-2** [2] - 62:6, 62:11
**3-3-3-3** [1] - 63:13
**3-3-3-3-2-2** [13] - 56:4, 61:13, 62:15, 63:7, 64:14, 64:23, 66:25, 96:17, 97:10, 98:14, 98:21, 102:16, 102:20
**3-3-3-3-2-2-2** [1] - 61:17
**3-3-3-3-2-2-2-1** [1] - 55:11
**3-3-3-3-2-2-2-6** [1] - 55:12

**3.9** [2] - 148:17, 148:20
**30** [13] - 57:18, 70:12, 72:7, 72:15, 91:19, 112:4, 112:5, 113:11, 113:21, 117:13, 118:1, 118:25, 166:11
**30-ish** [1] - 112:4
**31** [5] - 73:19, 172:1, 173:8, 173:11
**32** [7] - 161:23, 168:17, 172:2, 173:13, 177:1, 179:17
**331** [1] - 143:7
**349** [1] - 134:20
**350** [1] - 1:23
**37** [2] - 161:20, 168:14
**38** [5] - 138:15, 172:4, 172:11, 177:7, 177:8
**381** [1] - 136:12
**394** [1] - 143:9
**395** [1] - 99:18
**3s** [4] - 56:6, 60:7, 64:10

### 4

**4** [12] - 26:11, 27:20, 28:22, 35:16, 36:9, 36:11, 36:21, 60:18, 106:12, 137:6, 146:11, 168:10
**4-4-4-4** [1] - 61:17
**4.1** [1] - 149:15
**4.14** [3] - 137:7, 137:9, 148:23
**40** [4] - 118:25, 161:12, 162:6, 168:10
**400** [1] - 11:6
**40s** [1] - 168:4
**42** [3] - 172:5, 172:11, 177:10
**43** [1] - 179:18
**44** [3] - 172:7, 180:13, 180:18
**4455** [1] - 1:23
**45** [6] - 160:15, 181:13, 181:22, 184:10, 188:11, 188:13
**4:30** [1] - 170:20

### 5

**5** [8] - 36:21, 37:15, 58:21, 58:25, 59:2, 168:14, 201:4, 203:5

### 50

**50** [12] - 134:6, 134:7, 153:20, 154:8, 154:10, 157:4, 157:9, 158:1, 183:20, 188:15, 188:19, 197:12
**50,000** [1] - 134:10
**509** [1] - 136:19
**533** [1] - 134:23
**562,000** [1] - 146:8
**580** [1] - 153:20

### 6

**6** [15] - 23:22, 36:21, 38:17, 49:25, 50:1, 50:19, 54:22, 59:10, 59:11, 160:20, 168:17, 201:4, 203:10, 203:14
**6-0** [1] - 106:7
**60** [2] - 106:6, 106:12
**63105** [2] - 2:8, 2:11
**6:20** [1] - 208:18

### 7

**7** [19] - 23:22, 32:15, 32:22, 36:22, 38:24, 56:13, 58:11, 58:17, 59:18, 60:5, 60:12, 61:18, 72:2, 138:20, 168:20, 201:4, 203:10, 203:12, 203:14
**75** [2] - 24:8, 51:2
**756** [1] - 136:22
**76** [4] - 24:8, 37:25, 42:12, 45:2
**7701** [1] - 2:7
**7th** [1] - 56:12

### 8

**8** [16] - 39:5, 49:14, 55:13, 56:13, 58:11, 58:19, 59:10, 59:18, 60:5, 60:12, 72:2, 90:2, 90:3, 138:16, 178:10, 178:16
**818** [1] - 135:1
**85** [1] - 3:7
**88** [1] - 150:18
**889** [2] - 174:15, 176:23
**8th** [4] - 56:12, 68:13, 68:16, 72:17

### 9

**9** [4] - 40:1, 40:2, 64:1, 105:7
**90012** [1] - 1:23
**90064** [1] - 2:19
**90067** [1] - 2:24
**95** [3] - 94:18, 95:3, 95:10
**99** [1] - 138:10
**9:15** [1] - 4:1
**9:30** [3] - 105:7, 156:12, 169:6
**9th** [19] - 172:22, 173:21, 174:7, 174:11, 174:16, 174:21, 175:4, 175:15, 176:24, 177:11, 180:2, 192:3, 194:14, 195:9, 195:12, 198:1, 199:17, 202:5, 205:22

### A

**A.M** [1] - 4:1
**A5** [1] - 32:7
**Aaron** [1] - 103:20
**AARON** [1] - 2:16
**ability** [1] - 62:17
**able** [12] - 22:7, 33:11, 51:25, 57:19, 106:4, 110:16, 111:21, 122:8, 140:6, 144:4, 152:1, 169:23
**absent** [1] - 60:2
**absolutely** [3] - 62:21, 134:4, 196:20
**abundance** [1] - 166:10
**accept** [3] - 60:21, 60:22, 77:16
**acceptable** [4] - 157:16, 171:6, 171:12, 181:4
**accepted** [7] - 31:24, 65:2, 77:12, 77:14, 77:24, 84:14, 90:24
**accepting** [1] - 181:5
**accepts** [2] - 60:9, 62:15
**access** [41] - 109:6, 109:8, 109:20, 111:10, 111:14, 112:1, 112:6, 112:12, 112:19, 113:22, 113:23, 116:8, 116:25, 117:8, 121:9,

121:10, 122:10, 131:14, 141:13, 141:14, 142:15, 144:12, 162:17, 162:19, 162:21, 177:10, 178:3, 178:7, 179:1, 179:2, 179:6, 185:17, 186:2, 186:3, 186:4, 186:19, 186:20, 187:1, 187:12
**accessed** [1] - 145:12
**accompaniment** [1] - 88:12
**accompanying** [1] - 89:5
**accomplish** [2] - 175:18, 203:14
**accord** [1] - 181:3
**according** [17] - 13:11, 13:16, 53:3, 53:4, 53:9, 56:3, 56:25, 57:3, 61:23, 76:6, 77:25, 78:8, 78:11, 80:9, 96:14, 148:1
**accordingly** [1] - 167:22
**account** [5] - 86:15, 86:18, 87:4, 88:4, 147:1
**accounts** [1] - 138:1
**accuracy** [5] - 56:15, 60:21, 60:22, 95:4, 164:21
**accurate** [6] - 77:24, 78:12, 113:6, 113:7, 198:17, 203:3
**acknowledging** [1] - 152:6
**acknowledgment** [1] - 47:12
**action** [1] - 142:12
**active** [1] - 11:20
**actual** [4] - 8:25, 101:4, 148:12, 149:19
**ad** [4] - 141:3, 141:4, 186:8
**add** [7] - 25:18, 131:8, 137:5, 149:1, 162:15, 166:18, 179:12
**added** [8] - 36:11, 38:25, 53:14, 141:5, 142:4, 148:16, 161:10, 162:16
**addition** [18] - 19:13, 20:4, 21:6, 25:16, 32:19, 47:24, 59:7,

62:5, 65:5, 70:25, 73:2, 74:17, 81:24, 83:9, 83:13, 84:24, 97:4, 182:14
**additional** [7] - 28:2, 77:10, 122:22, 123:14, 132:16, 159:23, 175:7
**address** [3] - 143:14, 143:24, 207:5
**adds** [2] - 95:10, 178:21
**adhere** [1] - 202:3
**adjacent** [1] - 39:17
**adjourned** [1] - 208:17
**admit** [1] - 50:14
**admits** [2] - 55:19, 81:22
**admitted** [2] - 56:21, 109:16
**admittedly** [1] - 109:17
**advance** [2] - 110:12, 127:8
**advised** [1] - 126:19
**AE** [2] - 46:1
**after-the-fact** [2] - 191:4, 198:16
**afternoon** [8] - 85:20, 85:21, 103:7, 125:3, 125:4, 149:13, 155:24, 156:1
**afterwards** [1] - 156:23
**age** [4] - 11:19, 125:25, 126:22, 128:19
**aggregate** [1] - 93:18
**ago** [6] - 5:7, 8:6, 68:4, 127:15, 140:24, 141:10
**agree** [37] - 8:13, 9:9, 50:17, 55:1, 55:9, 81:20, 86:14, 86:17, 98:14, 113:9, 113:10, 116:14, 117:3, 120:25, 122:16, 122:21, 162:15, 162:21, 163:4, 163:5, 165:13, 173:9, 175:6, 180:20, 185:13, 196:22, 197:24, 198:10, 199:8, 199:9, 199:14, 201:5, 206:25, 207:3, 208:6
**agreed** [14] - 161:17, 163:12, 163:20, 167:25, 170:12,

172:3, 172:5, 172:7, 172:12, 172:15, 172:19, 177:23, 184:12, 200:25

**agreement** [12] - 71:22, 164:4, 165:8, 170:13, 171:10, 172:11, 173:3, 189:25, 193:5, 193:7, 201:4, 207:19

**agreements** [1] - 162:1

**ahead** [5] - 23:25, 58:2, 97:25, 104:23, 107:10

**AIDED** [1] - 209:13

**air** [1] - 120:24

**al** [1] - 4:5

**AL** [2] - 1:6, 1:9

**ALBERTSON** [1] - 2:17

**album** [11] - 105:22, 106:2, 106:17, 114:1, 116:12, 117:4, 117:23, 119:6, 121:2, 168:20

**albums** [2] - 162:5, 168:9

**aligned** [1] - 205:14

**alike** [1] - 82:5

**alleged** [2] - 84:2, 203:16

**allow** [2] - 104:12, 119:18

**allowed** [4] - 151:13, 152:18, 152:20, 158:1

**allowing** [3] - 104:6, 104:7, 121:20

**allows** [2] - 28:17, 104:13

**almost** [1] - 138:20

**alone** [2] - 18:7, 84:2

**alphabet** [4] - 35:25, 36:8, 37:18

**alter** [5] - 5:17, 5:23, 7:21, 8:23, 9:25

**alteration** [1] - 7:3

**altered** [2] - 6:6, 7:19

**altering** [3] - 5:12, 6:9, 7:21

**ambushed** [1] - 110:1

**amended** [1] - 195:10

**Amended** [1] - 171:7

**America** [1] - 15:7

**AMERICA** [1] - 1:1

**American** [3] - 12:9, 12:10, 15:6

**Amherst** [1] - 127:10

**amount** [5] - 8:3,

125:10, 139:22, 139:23, 153:3

**analogous** [5] - 18:10, 18:15, 18:18, 66:25, 176:20

**analogy** [2] - 66:23, 143:4

**analyses** [1] - 19:2

**Analysis** [2] - 91:11, 132:11

**analysis** [44] - 12:3, 12:4, 13:19, 13:23, 14:4, 14:13, 14:19, 15:16, 16:23, 19:14, 19:16, 19:22, 20:5, 20:8, 20:22, 21:19, 22:8, 23:12, 31:7, 31:20, 37:7, 40:25, 50:23, 52:15, 60:6, 90:25, 91:18, 92:8, 92:18, 92:19, 92:20, 93:2, 93:16, 93:25, 94:17, 102:18

**analyst** [1] - 28:17

**analyze** [5] - 18:9, 21:15, 70:2, 70:4, 84:15

**analyzed** [3] - 20:17, 22:23, 70:5

**analyzes** [1] - 93:17

**analyzing** [2] - 18:1, 92:11

**ancillary** [1] - 106:13

**AND** [4] - 209:8, 209:11, 209:13, 209:14

**ANGELES** [6] - 1:16, 1:23, 2:19, 2:24, 4:1, 209:4

**answer** [9] - 17:8, 30:16, 50:22, 88:18, 106:24, 151:20, 152:19, 186:17, 201:24

**answer's** [1] - 152:16

**answering** [1] - 152:4

**answers** [1] - 151:17

**anticipate** [2] - 157:4, 160:5

**anticipation** [1] - 176:7

**apologize** [2] - 103:24, 176:11

**appeal** [2] - 121:22, 165:22

**appear** [4] - 89:7, 99:7, 105:20, 201:13

**appearances** [2] - 4:6, 4:7

**APPEARANCES** [1] - 2:2

**appeared** [22] - 106:22, 112:5, 114:18, 114:19, 117:17, 117:23, 117:24, 117:25, 118:9, 119:12, 119:24, 121:2, 122:12, 123:2, 161:20, 161:23, 163:2, 168:14, 168:17, 168:21

**appearing** [1] - 106:18

**Apple** [1] - 129:20

**apples** [2] - 7:17, 8:21

**applicable** [1] - 183:15

**application** [1] - 179:24

**applied** [2] - 176:3, 206:11

**apply** [2] - 120:10, 205:19

**appreciate** [1] - 207:4

**approach** [2] - 84:5, 84:14

**approaches** [1] - 13:14

**appropriate** [3] - 151:20, 157:19, 194:22

**approved** [1] - 175:2

**archive** [3] - 132:20, 132:21, 132:22

**archives.org** [1] - 132:25

**area** [7] - 12:1, 12:4, 12:8, 13:9, 14:17, 175:20, 175:21

**areas** [4] - 13:14, 13:15, 13:24, 128:16

**argue** [6] - 156:23, 160:3, 179:2, 179:3, 198:18, 207:8

**argued** [1] - 110:15

**arguing** [2] - 111:13, 187:3

**argument** [13] - 56:1, 56:2, 109:20, 110:6, 155:25, 156:3, 156:13, 160:18, 169:7, 169:14, 187:24, 188:17, 192:19

**arguments** [2] - 112:18, 158:6

**arrangement** [5] - 81:2, 84:3, 174:6, 174:18, 202:7

**arrangements** [2] - 87:25, 175:10

**arrive** [1] - 166:13

**art** [14] - 41:11, 43:13, 61:25, 67:13, 67:16, 74:21, 74:25, 75:10, 79:22, 83:9, 96:2, 96:19, 98:7, 202:20

**article** [3] - 19:15, 147:20, 149:21

**articles** [3] - 12:12, 12:14, 128:21

**articulate** [2] - 28:17, 55:9

**articulated** [2] - 43:2, 55:9

**articulation** [1] - 43:1

**artist** [4] - 105:23, 142:20, 144:3, 151:22

**artists** [2] - 14:13, 105:20

**arts** [1] - 11:8

**ascend** [1] - 74:11

**aside** [1] - 33:19

**assessing** [1] - 100:21

**assign** [1] - 122:8

**assignee** [2] - 171:12, 200:19

**associated** [1] - 36:13

**Association** [1] - 128:7

**assume** [4] - 57:17, 108:11, 186:18, 208:4

**assuming** [6] - 9:16, 56:15, 95:1, 155:9, 155:21, 158:13

**assure** [1] - 7:5

**AT** [1] - 209:11

**attached** [1] - 165:13

**attack** [4] - 81:15, 81:21, 196:3

**attempt** [2] - 54:23, 108:12

**attempting** [5] - 175:8, 180:1, 181:11, 181:22, 189:24

**attend** [1] - 126:25

**attorneys** [1] - 100:8

**audience** [3] - 131:23, 162:7, 168:12

**audiences** [1] - 131:22

**audio** [5] - 42:6, 69:3, 73:7, 86:15, 146:24

**authenticated** [3] - 104:14, 104:16, 120:15

**author** [2] - 12:25, 191:13

**arrangements** [2] - 87:25, 175:10

**authority** [1] - 185:2

**authors** [7] - 86:8, 93:22, 190:17, 193:17, 195:2, 195:3, 195:24

**authorship** [9] - 190:23, 191:3, 191:4, 191:14, 194:3, 194:18, 196:17, 196:21, 197:3

**auto** [1] - 141:24

**automated** [1] - 147:11

**automatically** [2] - 142:2, 145:1

**available** [2] - 134:12, 151:7

**availed** [1] - 178:4

**avoid** [1] - 157:1

**award** [2] - 13:2, 13:5

**awards** [1] - 12:24

**aware** [2] - 106:16, 106:17

**awful** [3] - 61:25, 73:11, 74:13

## B

**Bachelor** [1] - 127:5

**background** [4] - 126:24, 127:12, 131:1, 136:7

**balance** [2] - 171:13, 172:6

**ballet** [3] - 150:11, 150:16

**banc** [2] - 202:1, 202:11

**band** [5] - 11:22, 63:24, 63:25, 65:12, 65:22

**bands** [2] - 11:21, 11:24

**bar** [21] - 29:9, 32:14, 44:19, 44:21, 49:3, 49:4, 49:5, 49:6, 49:7, 49:13, 50:18, 53:6, 53:11, 54:2, 61:18, 78:3, 90:4

**barely** [1] - 68:23

**bars** [2] - 48:23, 86:25

**base** [1] - 134:11

**based** [22] - 6:2, 6:17, 13:6, 20:8, 32:3, 50:22, 50:23, 77:10, 84:14, 90:24, 91:17, 92:1, 94:16, 106:16, 108:9, 110:10, 156:23, 162:18,

175:3, 183:17, 194:9, 207:1
**bases** [2] - 31:3, 201:21
**basic** [7] - 54:10, 61:5, 65:13, 65:14, 96:18, 99:7, 135:11
**basis** [13] - 13:4, 20:5, 21:20, 46:4, 61:24, 62:14, 78:22, 84:4, 89:8, 91:10, 111:13, 121:13, 121:20
**bass** [3] - 68:5, 68:11, 88:15
**bear** [2] - 174:22, 186:11
**beat** [34] - 32:9, 34:3, 52:19, 52:21, 52:23, 54:4, 55:17, 56:12, 88:9, 88:11, 88:16, 88:24, 89:2, 89:4, 94:17, 190:19, 190:20, 192:14, 192:25, 193:1, 194:11, 195:5, 195:21, 196:13, 197:1, 198:4, 199:15, 205:5, 206:13, 206:14, 206:21
**beats** [8] - 32:6, 32:7, 32:8, 32:21, 58:11, 60:5, 77:9, 77:11
**became** [1] - 102:20
**because(playing)of** [1] - 68:15
**become** [1] - 134:1
**becomes** [1] - 191:6
**becoming** [1] - 130:4
**began** [4] - 11:19, 21:25, 138:8, 166:11
**begin** [8] - 21:20, 21:23, 24:11, 25:14, 25:19, 29:2, 41:10, 83:8
**beginner** [1] - 61:4
**beginners** [2] - 78:21, 96:24
**beginning** [9] - 7:2, 30:1, 39:15, 58:24, 61:3, 64:2, 65:11, 108:3, 192:6
**begins** [4] - 40:12, 69:24, 83:15, 92:8
**BEHALF** [3] - 2:3, 2:13, 2:20
**behalf** [8] - 14:9, 14:13, 100:24, 101:3, 101:9, 128:10, 131:13,

131:19
**belatedly** [1] - 123:15
**belief** [1] - 189:8
**beliefs** [1] - 189:12
**believes** [3] - 90:7, 94:18, 104:24
**Bells** [2] - 16:17, 16:19
**below** [3] - 44:25, 45:16, 141:7
**bench** [1] - 158:25
**benefit** [1] - 133:14
**Berkeley** [1] - 132:9
**best** [8] - 13:5, 52:1, 101:23, 117:5, 117:6, 148:7
**bet** [1] - 182:22
**better** [4] - 4:17, 170:19, 198:20, 206:15
**between** [40] - 14:23, 16:3, 29:15, 30:5, 35:2, 42:22, 47:15, 52:16, 52:18, 54:8, 56:16, 59:2, 60:5, 60:14, 60:20, 61:11, 73:4, 73:25, 77:5, 77:9, 77:11, 78:23, 83:5, 83:17, 84:18, 85:4, 90:15, 101:15, 125:15, 141:22, 145:9, 151:8, 154:10, 161:22, 161:24, 165:8, 168:15, 168:18, 190:3, 206:6
**beyond** [3] - 97:14, 104:17, 111:8
**bible** [1] - 142:24
**bifurcated** [1] - 158:10
**big** [5] - 78:13, 126:7, 126:12, 130:4, 138:8
**bigger** [2] - 63:5, 113:2
**Bill** [1] - 124:12
**Billboard** [64] - 4:14, 4:18, 4:21, 4:22, 10:4, 57:20, 103:11, 103:18, 104:14, 105:20, 106:19, 107:13, 107:20, 108:6, 108:9, 108:12, 108:13, 108:24, 109:4, 109:7, 110:5, 110:14, 110:17, 110:21, 111:4, 111:13, 111:23, 112:17, 114:2, 116:23, 118:3,

118:6, 118:15, 118:18, 118:20, 119:7, 119:20, 120:21, 121:6, 121:12, 122:2, 122:8, 122:24, 123:14, 160:6, 160:10, 160:22, 161:8, 161:11, 162:3, 162:4, 162:17, 163:2, 165:16, 165:17, 165:20, 165:25, 168:1, 168:3, 168:8, 168:9
**billboard** [1] - 110:16
**Billboard's** [1] - 168:7
**billion** [12] - 134:3, 134:22, 135:1, 135:2, 135:3, 135:5, 136:12, 136:19, 136:22, 143:17
**billion-and-a-half** [1] - 135:5
**billions** [2] - 150:20
**binding** [1] - 181:18
**bit** [13] - 57:7, 63:10, 64:8, 69:11, 81:5, 112:5, 126:24, 131:11, 142:14, 143:2, 146:15, 159:18, 160:14
**black** [1] - 203:13
**blew** [1] - 63:4
**block** [7] - 61:1, 66:22, 78:20, 85:7, 96:22, 97:3, 97:13
**blocks** [9] - 20:17, 61:6, 67:4, 67:5, 67:6, 67:8, 99:13, 204:13, 205:16
**Blurred** [1] - 187:19
**board** [3] - 12:20, 12:21, 180:16
**boards** [1] - 12:17
**body** [1] - 128:6
**Bono** [1] - 14:16
**book** [9] - 13:7, 63:21, 63:22, 63:23, 64:2, 64:7, 65:11, 65:16, 128:17
**Book** [3] - 63:24, 64:2, 128:7
**books** [4] - 12:12, 12:15, 12:16, 65:25
**bootstrap** [1] - 112:19
**bots** [2] - 147:12, 147:24
**bottom** [4] - 26:11, 36:4, 46:1, 199:4

**bought** [1] - 134:3
**BOULEVARD** [2] - 2:7, 2:18
**box** [1] - 55:13
**boxed** [1] - 64:6
**boy** [1] - 146:6
**bracketed** [1] - 48:24
**brackets** [1] - 50:16
**Brad** [1] - 14:15
**Brainchild** [12] - 41:13, 41:17, 41:19, 41:22, 42:3, 42:7, 42:23, 43:1, 43:22, 61:9, 74:22, 95:25
**brainchild** [3] - 42:18, 96:1
**break** [6] - 26:2, 26:4, 29:13, 85:16, 103:4
**breaks** [1] - 29:12
**Bride** [2] - 59:4, 78:10
**briefing** [3] - 158:11, 158:16, 188:22
**briefly** [5] - 14:12, 34:15, 82:22, 109:13, 127:11
**bring** [5] - 52:6, 58:16, 112:19, 166:7, 181:11
**brings** [1] - 204:12
**broke** [1] - 63:9
**brought** [3] - 52:2, 61:18, 116:1
**Bruno** [1] - 14:15
**build** [4] - 69:22, 129:19, 130:1, 131:6
**builder** [3] - 64:5, 67:2
**building** [12] - 20:17, 61:1, 61:6, 66:22, 78:19, 85:6, 96:22, 97:3, 97:13, 99:12, 204:13, 205:16
**built** [1] - 67:1
**bunch** [1] - 189:5
**burden** [3] - 183:24, 195:20, 203:18
**Business** [1] - 128:6
**business** [9] - 23:7, 26:7, 30:21, 88:12, 89:2, 110:10, 110:11, 111:2, 132:9
**businesses** [1] - 129:23
**button** [1] - 23:8
**buy** [2] - 138:9, 193:4
**buying** [2] - 18:17, 93:7
**BY** [33] - 2:5, 2:10, 2:15, 2:22, 3:6, 3:9, 3:10, 10:23, 17:7, 24:3, 27:17, 27:23,

28:10, 38:4, 42:14, 45:4, 51:4, 58:3, 69:14, 73:13, 85:19, 88:22, 98:3, 99:5, 100:19, 102:2, 102:11, 125:2, 126:18, 137:8, 144:10, 149:10, 209:13

## C

**C-B-A-E** [1] - 71:14
**c-C-C-C-B-B-A-E** [1] - 79:5
**C-C-C-C-B-B-B-B** [3] - 61:4, 61:5, 97:1
**C5** [1] - 32:8
**CA** [2] - 2:19, 2:24
**calculate** [1] - 146:1
**calculated** [1] - 115:4
**calendar** [1] - 133:3
**CALIFORNIA** [6] - 1:2, 1:16, 1:23, 4:1, 209:6, 209:9
**Cambridge** [1] - 13:8
**cameras** [1] - 133:17
**cams** [1] - 133:17
**cannot** [7] - 55:23, 92:17, 116:21, 122:2, 162:16, 190:21, 199:19
**capabilities** [1] - 144:23
**CAPES** [1] - 2:5
**Capital** [4] - 186:5, 187:14, 188:4
**capture** [1] - 133:18
**captures** [4] - 87:7, 133:4, 133:8, 133:9
**cards** [1] - 5:5
**career** [2] - 127:12, 128:9
**carefully** [2] - 33:10, 33:11
**Carrie** [1] - 14:15
**cars** [1] - 130:24
**cart** [1] - 184:19
**Case** [1] - 4:4
**CASE** [1] - 1:8
**case** [85] - 4:11, 12:5, 15:11, 15:20, 15:23, 19:23, 20:1, 22:1, 57:11, 66:10, 66:14, 93:21, 95:14, 98:7, 100:9, 101:1, 101:3, 101:10, 101:11, 101:12, 101:13, 101:24, 106:16, 111:10, 114:8,

116:7, 116:11,
125:6, 125:9,
125:12, 128:24,
129:7, 129:18,
130:22, 130:25,
132:15, 133:6,
134:16, 140:1,
147:13, 150:18,
155:19, 158:10,
160:22, 166:11,
169:12, 174:8,
174:12, 174:13,
175:25, 176:2,
176:21, 179:21,
181:19, 181:23,
182:11, 183:18,
183:22, 185:5,
186:14, 187:8,
188:19, 189:9,
190:16, 191:10,
191:25, 192:4,
192:10, 193:23,
195:9, 196:13,
196:25, 201:23,
202:5, 202:8,
202:15, 202:17,
203:11, 204:3,
204:20, 205:4, 205:7
**cases** [22] - 14:10,
15:9, 20:16, 68:23,
88:1, 100:5, 100:13,
100:23, 133:5,
152:15, 155:11,
175:16, 176:6,
176:9, 188:10,
188:25, 204:1,
204:6, 204:17,
204:18, 206:2
**catalog** [4] - 138:17,
138:22, 139:5, 139:9
**catalogs** [1] - 130:11
**catch** [3] - 123:11,
181:11, 182:22
**catch-all** [2] - 181:11,
182:22
**categories** [3] -
137:11, 137:19,
137:21
**category** [5] - 112:25,
137:18, 137:22,
137:24, 138:1
**caused** [2] - 9:21,
163:8
**caution** [1] - 166:10
**caveat** [1] - 198:1
**CBAE** [4] - 37:18,
39:12, 41:16, 79:4
**CBEA** [1] - 43:6
**CCC** [1] - 46:19
**CCCCBBAE** [1] -

44:24
**CCCCBBB** [1] - 66:10
**CENTRAL** [2] - 1:2,
209:9
**cents** [1] - 138:10
**centuries** [3] - 22:19,
68:4, 74:15
**CENTURY** [1] - 2:23
**certain** [8] - 6:21,
51:6, 89:1, 106:9,
106:23, 120:25,
133:11, 183:11
**certainly** [18] - 9:15,
9:17, 11:19, 14:5,
17:13, 21:21, 21:22,
52:17, 58:16, 84:7,
98:10, 134:5,
143:13, 143:22,
144:22, 163:24,
188:9, 203:12
**certificate** [1] - 166:13
**CERTIFICATE** [1] -
209:2
**certification** [1] -
65:20
**certified** [2] - 65:19,
166:12
**CERTIFY** [2] - 209:10,
209:14
**cetera** [4] - 120:16,
183:3, 191:5
**challenges** [1] -
147:23
**chance** [3] - 159:12,
160:8, 183:11
**change** [6] - 5:17,
5:23, 9:14, 32:5,
43:4, 204:2
**changed** [2] - 31:25,
50:7
**changing** [1] - 6:9
**chaos** [2] - 156:22,
157:1
**chapter** [1] - 13:7
**character** [1] - 59:20
**characteristic** [2] -
34:9, 51:16
**characteristics** [1] -
24:20
**characterize** [3] -
19:7, 65:7, 189:5
**characterizing** [1] -
50:2
**Chart** [1] - 117:23
**chart** [63] - 23:17,
24:1, 24:6, 54:18,
54:20, 56:11, 56:15,
56:17, 56:25, 58:9,
58:12, 60:9, 60:16,
60:21, 62:16, 71:12,

71:18, 76:5, 76:12,
77:20, 77:23, 77:25,
78:18, 79:1, 80:24,
83:14, 105:5,
105:15, 106:13,
106:19, 107:13,
109:21, 110:23,
110:24, 111:19,
112:5, 112:15,
113:22, 114:16,
114:18, 115:2,
115:3, 115:20,
116:7, 116:11,
116:12, 116:16,
116:17, 117:10,
117:22, 117:24,
118:1, 118:2,
118:10, 118:15,
118:20, 118:22,
161:18, 161:24,
163:13, 168:18
**charted** [10] - 59:6,
60:15, 63:18, 72:2,
78:2, 78:6, 79:16,
89:15, 89:22, 90:3
**charts** [102] - 90:12,
95:5, 104:14,
104:16, 105:20,
106:19, 106:21,
106:22, 107:2,
107:4, 107:5, 107:8,
108:6, 108:9, 109:7,
109:16, 109:23,
109:25, 110:5,
111:22, 112:5,
112:17, 112:20,
112:24, 113:1,
113:11, 113:24,
114:2, 114:5,
114:10, 114:15,
114:16, 114:19,
114:22, 114:25,
115:7, 115:11,
116:1, 116:6,
116:19, 116:25,
117:5, 117:13,
117:17, 117:19,
117:20, 118:4,
118:5, 118:12,
118:13, 118:19,
119:1, 119:8,
119:11, 119:14,
119:20, 119:22,
119:24, 120:11,
120:14, 120:16,
120:17, 120:18,
120:21, 120:23,
121:2, 121:12,
121:13, 121:15,
122:12, 122:13,
122:18, 122:24,

161:9, 161:12,
161:21, 162:3,
162:5, 162:7,
162:11, 162:17,
163:2, 163:10,
163:11, 163:23,
164:11, 164:12,
165:17, 165:25,
166:1, 168:1, 168:3,
168:7, 168:10,
168:12, 168:15,
168:21
**chase** [1] - 109:15
**cheap** [1] - 111:5
**check** [1] - 70:24
**checked** [1] - 95:4
**checks** [1] - 152:12
**Chicago** [1] - 150:10
**Chief** [1] - 127:25
**CHIEFFO** [7] - 2:22,
101:14, 156:18,
156:25, 160:9,
160:12, 188:12
**children's** [1] - 99:12
**China** [3] - 143:6,
143:17, 143:22
**choice** [1] - 137:18
**choose** [2] - 16:18,
137:22
**Choosing** [5] - 43:21,
43:22, 44:3, 44:7,
61:9
**chord** [13] - 31:13,
32:6, 32:7, 32:8,
32:15, 32:16, 32:17,
32:19, 32:21, 32:25
**chords** [10] - 22:16,
31:12, 31:13, 31:16,
32:2, 32:3, 32:4,
32:5, 32:14, 87:11
**chorus** [20] - 26:3,
26:4, 26:6, 26:8,
26:18, 27:4, 27:7,
27:8, 27:15, 27:18,
28:9, 29:14, 30:20,
30:23, 30:24, 31:1,
31:2, 47:2, 70:6,
82:25
**Chorus** [6] - 27:2,
27:6, 27:10, 28:4,
28:5, 30:20
**choruses** [9] - 22:4,
26:21, 28:21, 29:4,
29:11, 30:14, 31:17,
68:22, 71:3
**chose** [1] - 202:10
**Christian** [16] -
114:17, 117:17,
117:22, 119:8,
119:24, 161:14,

161:21, 161:24,
162:8, 163:3,
163:14, 168:6,
168:13, 168:15,
168:18, 168:22
**CHRISTINA** [1] - 1:4
**CHRISTINE** [1] - 2:15
**cinder** [3] - 67:3, 67:4,
67:8
**Cinder** [1] - 67:6
**circle** [1] - 63:3
**circuit** [1] - 205:25
**Circuit** [19] - 172:22,
173:21, 174:7,
174:11, 174:16,
174:21, 175:4,
175:15, 176:24,
177:11, 180:2,
192:3, 194:14,
195:9, 195:12,
198:1, 199:17,
202:5, 205:22
**cite** [1] - 179:21
**cited** [1] - 195:9
**claim** [21] - 16:22,
16:25, 17:5, 17:10,
20:3, 20:6, 78:24,
83:6, 84:6, 89:6,
93:19, 96:12, 106:8,
112:6, 187:6, 187:7,
187:17, 189:23,
190:5, 192:7, 196:2
**claimed** [2] - 88:24,
93:2
**claiming** [6] - 21:3,
66:24, 69:17, 92:24,
94:9, 191:13
**claims** [8] - 14:7,
14:20, 17:6, 73:23,
81:8, 82:17, 100:1,
101:1
**clarification** [4] -
40:17, 101:6,
166:23, 167:8
**clarified** [2] - 170:17,
190:7
**clarify** [3] - 35:1,
189:21, 190:4
**class** [2] - 132:10,
204:25
**classes** [2] - 22:23,
66:3
**classical** [1] - 68:4
**classifying** [1] - 148:3
**CLAYTON** [1] - 2:11
**clean** [1] - 155:15
**clear** [13] - 64:9, 72:7,
84:20, 95:5, 100:16,
120:15, 162:16,
185:25, 186:7,

188:16, 191:25, 198:2, 199:5

**clearly** [11] - 28:19, 48:5, 49:12, 52:7, 53:7, 63:10, 64:8, 81:14, 88:6, 92:2, 188:12

**CLERK** [29] - 4:3, 10:8, 10:14, 10:17, 10:20, 57:23, 103:8, 103:10, 124:2, 124:4, 124:6, 124:8, 124:15, 124:17, 124:23, 155:6, 155:8, 158:21, 161:1, 167:6, 167:10, 167:15, 167:17, 167:19, 169:19, 169:21, 170:1, 170:22, 208:17

**click** [16] - 133:8, 142:7, 142:8, 144:18, 147:1, 147:2, 147:3, 147:10, 147:11, 147:16, 148:6, 148:7

**clicking** [1] - 142:12

**client** [2] - 116:11, 182:12

**clients** [2] - 111:12, 126:20

**clients'** [2] - 109:7, 113:21

**close** [4] - 82:3, 123:21, 157:5, 160:22

**closely** [2] - 130:7, 174:21

**closer** [4] - 8:6, 159:15, 159:17, 207:14

**closing** [8] - 155:25, 156:3, 156:13, 156:19, 156:20, 169:7, 169:14, 208:5

**clue** [1] - 188:9

**co** [13] - 12:15, 20:24, 21:1, 21:4, 70:15, 70:18, 70:20, 71:23, 91:25, 95:13, 96:1, 101:24

**co-writers** [5] - 21:1, 21:4, 91:25, 96:1, 101:24

**co-written** [5] - 12:15, 70:15, 70:18, 71:23, 95:13

**co-wrote** [3] - 20:24, 21:1, 70:20

**COHEN** [67] - 2:6, 3:7, 4:13, 4:24, 6:14, 8:2, 10:4, 17:2, 23:18, 23:21, 23:24, 57:18, 57:21, 85:13, 85:15, 85:19, 88:17, 88:22, 98:3, 99:5, 100:19, 101:8, 101:12, 101:22, 102:2, 102:5, 102:24, 104:22, 104:24, 106:8, 107:11, 108:14, 108:18, 109:9, 110:19, 111:16, 111:18, 114:9, 115:1, 115:6, 115:18, 115:22, 116:14, 116:18, 117:22, 118:8, 121:11, 121:25, 122:17, 122:25, 159:11, 160:8, 161:15, 163:7, 164:6, 164:11, 164:16, 164:18, 164:23, 165:1, 167:24, 181:25, 182:14, 182:24, 184:9, 184:23, 201:12

**Cohen** [6] - 6:13, 7:25, 9:8, 23:23, 102:12, 167:23

**coin** [1] - 197:20

**coincidence** [2] - 85:5, 85:7

**collapsed** [1] - 189:21

**collaterally** [1] - 182:20

**colleague** [2] - 103:20, 167:11

**college** [4] - 11:21, 11:22, 11:23, 126:25

**College** [1] - 132:9

**Columbia** [2] - 15:4, 128:1

**column** [1] - 145:25

**combat** [1] - 148:7

**combination** [15] - 20:13, 74:1, 80:1, 80:6, 80:7, 80:9, 81:2, 84:3, 175:9, 201:2, 201:19, 202:6, 202:15, 203:17, 203:24

**combinations** [1] - 173:23

**combine** [3] - 30:23, 175:8, 201:17

**combined** [1] - 201:1

**combines** [1] - 197:24

**Comics** [1] - 192:4

**coming** [4] - 113:23, 165:9, 175:16, 176:1

**commence** [1] - 169:12

**commentary** [1] - 179:19

**comments** [3] - 158:24, 172:14, 180:5

**commercial** [3] - 5:19, 108:8, 152:17

**commercially** [1] - 21:16

**Commission** [2] - 128:13

**committee** [1] - 13:3

**common** [17] - 52:16, 56:16, 60:20, 76:15, 77:22, 82:14, 85:3, 85:4, 142:21, 142:23, 174:3, 175:9, 202:21, 203:15, 206:5, 206:21

**commonality** [2] - 60:5, 61:11

**commonly** [1] - 204:24

**commonplace** [5] - 22:18, 69:20, 69:23, 75:9, 75:23

**communicated** [1] - 187:1

**communications** [1] - 127:17

**companies** [11] - 126:5, 126:7, 126:8, 126:12, 126:13, 126:15, 126:16, 126:17, 127:20, 127:21, 129:23

**company** [12] - 125:17, 125:18, 126:1, 127:24, 129:18, 134:3, 134:5, 140:13, 148:1, 152:13, 161:8, 168:1

**comparable** [1] - 61:8

**comparative** [4] - 22:7, 31:7, 93:10, 131:22

**compare** [5] - 7:18, 32:2, 49:19, 94:7, 138:5

**compared** [16] - 25:22, 29:9, 46:11, 47:6, 47:8, 50:17,

53:17, 59:5, 92:15, 93:13, 94:3, 116:24, 131:16, 131:21, 138:16, 139:9

**comparing** [5] - 41:1, 54:21, 85:22, 85:25, 92:13

**comparison** [4] - 8:22, 13:22, 94:8, 203:18

**compensated** [1] - 15:11

**competing** [1] - 129:24

**competitive** [2] - 129:22, 130:1

**compilation** [2] - 141:8, 176:4

**compilations** [3] - 108:24, 176:1, 176:3

**compiled** [6] - 107:2, 107:5, 116:6, 116:10, 150:5, 162:18

**complaining** [2] - 67:13, 72:11

**complete** [4] - 8:21, 113:5, 114:23, 156:13

**completed** [1] - 65:18

**completely** [15] - 5:9, 5:23, 9:5, 26:14, 32:18, 32:20, 60:2, 60:13, 72:20, 107:3, 114:8, 123:1, 176:16, 176:19, 185:13

**complex** [2] - 65:12, 185:6

**complicated** [1] - 194:8

**components** [2] - 66:18, 66:20

**composed** [1] - 20:24

**composer** [1] - 43:20

**composers** [2] - 44:13, 98:18

**composition** [19] - 16:4, 16:10, 16:11, 16:14, 16:19, 19:19, 30:11, 31:8, 33:3, 41:12, 43:4, 46:6, 70:7, 79:20, 89:22, 125:11, 125:12, 189:21, 192:15

**compositional** [2] - 77:18, 190:3

**compositionally** [3] - 45:17, 46:9, 69:22

**compositions** [11] - 13:22, 15:22, 15:25,

17:23, 18:2, 21:14, 21:15, 31:15, 41:1, 41:2, 73:25

**Computer** [1] - 127:9

**COMPUTER** [1] - 209:13

**computer** [18] - 5:3, 5:11, 5:15, 5:22, 6:2, 6:7, 6:16, 7:20, 8:11, 8:16, 8:22, 9:20, 91:7, 111:6, 127:6, 127:24, 161:4

**COMPUTER-AIDED** [1] - 209:13

**conceded** [1] - 49:8

**concedes** [1] - 48:25

**concept** [5] - 133:21, 171:10, 202:18, 203:23

**concepts** [1] - 205:1

**concern** [7] - 114:14, 118:24, 148:5, 171:22, 182:17, 198:3, 199:10

**concerned** [2] - 94:24, 158:9

**concerns** [2] - 9:23, 175:15

**conclude** [2] - 56:12, 164:2

**concluded** [1] - 208:18

**concluding** [2] - 78:23, 92:12

**conclusion** [1] - 93:17

**conclusions** [2] - 19:23, 19:25

**concocted** [2] - 191:4, 193:6

**concoction** [1] - 198:16

**condition** [1] - 164:14

**conduct** [1] - 105:18

**conducted** [1] - 9:18

**confer** [6] - 104:2, 105:9, 107:23, 111:21, 112:9, 169:23

**conferred** [1] - 171:8

**conferring** [1] - 104:4

**confess** [2] - 156:5, 156:22

**confident** [1] - 62:14

**confirm** [2] - 60:4, 164:21

**confirms** [1] - 44:12

**confuse** [1] - 76:2

**confused** [2] - 189:9, 191:22

**confusing** [2] -

199:12, 199:13
**connected** [1] - 43:3
**connection** [4] -
16:22, 23:12, 40:25,
42:23
**connections** [1] -
133:19
**consecutive** [1] -
23:10
**consecutively** [4] -
22:17, 23:6, 24:18,
38:8
**consider** [7] - 6:1,
33:23, 94:21,
148:23, 177:12,
189:11, 189:15
**considered** [2] -
39:21, 192:1
**considers** [1] - 13:14
**consistent** [4] - 19:7,
121:4, 164:2, 178:16
**consistently** [1] - 9:6
**consists** [5] - 36:12,
71:8, 72:16, 72:19,
77:2
**consolidate** [1] -
173:25
**constant** [1] - 147:5
**constituent** [1] - 93:3
**constitute** [1] - 34:16
**construct** [1] - 196:7
**constructed** [1] -
192:16
**Consultant** [1] -
127:24
**consulted** [1] - 128:9
**consulting** [3] -
125:23, 127:15,
129:1
**contain** [1] - 202:20
**containing** [1] - 145:5
**contains** [1] - 120:21
**contend** [5] - 163:13,
165:18, 165:24,
166:1, 196:13
**Content** [2] - 152:6,
152:10
**content** [24] - 71:7,
72:12, 77:19, 77:21,
78:6, 78:23, 79:1,
79:2, 79:3, 79:4,
80:14, 91:3, 91:4,
125:10, 125:11,
128:2, 128:4,
130:10, 131:15,
134:10, 135:8,
139:14, 139:23,
140:16
**contention** [4] - 83:5,
162:14, 162:25,

171:20
**contentions** [2] -
200:7, 200:17
**contentious** [1] -
162:14
**context** [36] - 31:22,
32:23, 32:24, 78:6,
116:20, 116:24,
117:1, 118:14,
119:2, 119:3, 120:9,
120:10, 120:17,
121:3, 122:16,
122:19, 122:22,
123:1, 123:13,
139:21, 139:24,
143:3, 148:22,
148:23, 150:8,
162:2, 162:10,
162:22, 163:3,
163:7, 163:15,
163:20, 163:22,
163:25, 164:1
**contexts** [1] - 148:21
**contextualization** [1] -
163:10
**contingent** [2] - 129:6,
129:9
**continue** [7] - 17:9,
27:2, 27:11, 53:13,
91:2, 136:9, 136:10
**continues** [15] - 25:5,
26:1, 26:2, 26:3,
26:4, 26:5, 26:7,
36:7, 36:22, 39:16,
53:10, 141:20
**contradict** [1] - 76:12
**contradicted** [1] -
77:13
**contradiction** [6] -
48:9, 77:7, 78:25,
79:6, 79:19, 83:25
**contradictory** [2] -
48:15, 119:19
**contrary** [2] - 19:20,
117:12
**contribution** [4] -
194:14, 198:2,
199:18, 199:20
**contributions** [1] -
192:2
**Contributor** [1] -
128:21
**contributory** [1] -
187:7
**contrived** [1] - 191:24
**control** [2] - 193:10,
194:16
**conversant** [1] -
175:12
**conversation** [1] -

105:6
**convince** [1] - 104:5
**cooperating** [1] -
113:5
**coordinate** [1] -
207:13
**copied** [3] - 92:25,
93:22, 94:9
**copy** [3] - 166:12,
166:24, 185:2
**copying** [2] - 93:22,
179:18
**copyright** [54] - 5:10,
14:7, 14:10, 14:19,
14:23, 14:25, 15:9,
19:10, 88:24, 100:1,
100:5, 100:8,
100:13, 125:25,
126:22, 173:25,
175:5, 175:10,
175:12, 175:25,
176:3, 183:23,
186:8, 189:22,
189:23, 190:3,
190:4, 190:16,
190:21, 190:23,
190:24, 191:23,
192:17, 192:20,
192:21, 192:23,
192:24, 194:6,
194:11, 195:18,
195:19, 196:3,
199:25, 200:18,
201:2, 201:18,
203:12, 203:19,
203:22, 204:11,
204:25, 206:1
**Copyright** [6] - 15:7,
128:7, 128:11,
128:13, 166:12,
192:22
**copyrightability** [1] -
195:7
**copyrightable** [13] -
192:2, 193:1,
193:25, 194:15,
196:1, 198:3, 198:4,
198:7, 198:13,
199:11, 199:16,
199:19, 206:5
**copyrighted** [5] -
190:19, 191:2,
194:9, 194:10,
199:21
**copyrights** [1] -
128:18
**Copyrights** [5] -
191:16, 191:18,
192:10, 195:12,
195:16

**core** [1] - 133:21
**corners** [1] - 200:17
**corporate** [2] - 182:15,
183:13
**CORRECT** [1] -
209:14
**correct** [78] - 6:5,
15:23, 15:24, 17:14,
33:24, 37:4, 37:13,
37:21, 37:24, 38:14,
39:4, 39:13, 40:19,
43:7, 43:9, 44:9,
46:19, 50:5, 52:12,
52:13, 53:23, 55:7,
56:2, 56:3, 58:21,
64:16, 72:11, 73:20,
75:15, 76:16, 77:12,
79:21, 79:22, 80:20,
80:21, 80:25, 81:3,
81:4, 86:1, 86:16,
89:1, 89:11, 96:3,
96:8, 96:10, 98:13,
98:15, 98:22, 100:4,
100:6, 100:22,
102:16, 102:17,
107:15, 108:14,
109:9, 113:24,
125:15, 128:24,
129:2, 132:2, 150:6,
154:14, 161:11,
161:15, 170:14,
173:6, 177:9, 179:3,
179:4, 181:9,
182:14, 184:8,
184:9, 185:6,
187:11, 189:14,
198:19
**corrected** [1] - 161:6
**correctly** [1] - 49:7
**correspond** [1] -
36:12
**corresponding** [4] -
25:7, 28:4, 40:5,
86:25
**corresponds** [1] -
36:13
**counsel** [14] - 4:6,
86:12, 95:12, 99:22,
104:1, 104:24,
113:4, 128:23,
158:23, 167:21,
171:9, 171:17,
174:14, 186:9
**COUNSEL** [1] - 2:2
**count** [8] - 119:9,
119:10, 135:12,
135:13, 139:20,
146:17, 146:18,
146:21
**counter** [3] - 106:11,

107:1, 107:7
**counter-
designations** [3] -
106:11, 107:1, 107:7
**countless** [5] - 29:2,
29:3, 29:6, 74:14,
75:24
**country** [4] - 161:13,
162:6, 168:5, 168:11
**counts** [17] - 49:7,
83:8, 135:12,
135:17, 139:24,
145:14, 145:15,
145:16, 145:24,
146:2, 146:15,
147:4, 147:17,
148:10, 148:15,
164:22
**COUNTY** [1] - 209:4
**couple** [7] - 54:16,
95:12, 127:20,
130:18, 139:3,
140:24, 152:3
**course** [25] - 22:4,
24:18, 33:10, 38:8,
42:18, 56:25, 65:10,
71:13, 74:25, 75:9,
86:23, 87:19, 93:24,
94:11, 101:5,
101:22, 104:20,
117:13, 122:8,
132:13, 137:12,
141:20, 148:6,
177:21, 200:1
**courses** [1] - 11:10
**COURT** [258] - 1:1,
1:22, 4:8, 4:12, 4:17,
4:20, 5:8, 5:25, 6:13,
7:1, 7:25, 8:12, 9:8,
10:3, 10:6, 10:10,
17:4, 23:25, 57:5,
57:9, 57:14, 57:16,
57:19, 57:25, 58:2,
85:10, 85:14, 85:16,
88:20, 101:2, 101:5,
101:11, 101:17,
101:20, 102:6,
102:8, 102:23,
102:25, 103:3,
103:11, 103:14,
103:17, 103:22,
104:20, 104:23,
106:7, 107:10,
108:3, 108:17,
108:20, 109:10,
110:7, 110:25,
111:17, 113:13,
114:13, 114:22,
115:5, 115:9,
115:21, 115:23,

117:2, 117:20,
118:7, 118:11,
118:17, 119:4,
119:17, 120:3,
120:6, 120:12,
120:20, 120:23,
121:4, 121:18,
121:21, 122:1,
123:17, 123:24,
124:9, 124:14,
124:24, 126:9,
126:12, 136:8,
144:8, 149:7,
154:17, 154:20,
154:25, 155:9,
155:18, 155:21,
156:7, 156:9,
156:11, 156:17,
156:21, 157:2,
157:6, 157:9,
157:12, 157:18,
157:23, 158:3,
158:7, 158:18,
158:20, 159:1,
159:6, 159:14,
159:19, 160:1,
160:4, 160:19,
160:24, 163:6,
164:1, 164:9,
164:13, 164:17,
164:19, 165:4,
165:11, 165:23,
166:4, 166:7, 166:9,
166:17, 166:19,
166:22, 167:9,
167:14, 167:20,
168:23, 169:1,
169:4, 169:22,
170:3, 170:10,
170:18, 170:24,
171:2, 171:19,
172:8, 172:21,
173:1, 173:5, 173:7,
173:10, 173:13,
173:18, 174:22,
175:1, 175:11,
175:22, 176:5,
176:13, 176:21,
176:25, 177:6,
177:10, 177:15,
177:21, 178:9,
178:11, 178:14,
178:24, 179:1,
179:5, 179:11,
179:14, 179:22,
180:3, 180:6, 180:8,
180:12, 180:17,
180:24, 181:7,
181:21, 182:10,
182:16, 183:8,
184:1, 184:5,

184:15, 184:20,
185:4, 185:13,
185:24, 186:16,
187:2, 187:9,
187:15, 187:22,
188:1, 188:7,
188:13, 188:20,
188:24, 189:10,
189:14, 190:11,
190:13, 192:6,
193:19, 194:7,
194:21, 196:5,
196:11, 196:18,
196:24, 197:10,
197:17, 197:21,
198:10, 198:19,
198:24, 199:8,
199:14, 199:20,
200:1, 200:6,
200:11, 200:14,
200:16, 200:21,
201:5, 201:22,
202:2, 202:17,
203:3, 203:5, 203:8,
204:1, 204:7,
204:15, 204:21,
205:2, 205:12,
205:21, 206:7,
206:10, 206:14,
206:16, 206:19,
206:24, 207:6,
207:18, 207:21,
208:2, 208:7,
208:10, 208:13,
208:16, 209:9,
209:22
**Court** [16] - 6:17, 9:2,
113:10, 156:24,
165:3, 165:14,
166:14, 170:9,
170:11, 171:7,
176:2, 176:17,
188:23, 191:18,
202:10, 203:11
**court** [5] - 7:14, 9:6,
157:25, 170:18,
183:11
**Court's** [3] - 105:3,
106:10, 208:4
**court's** [7] - 57:23,
124:2, 158:21,
161:1, 170:1,
170:22, 208:17
**courts** [3] - 9:7,
157:25, 203:17
**cover** [6] - 63:21, 64:7,
193:21, 193:24,
194:1, 199:6
**covered** [5] - 33:15,
192:21, 195:22,

201:3
**covers** [1] - 201:21
**crafted** [1] - 190:18
**create** [12] - 5:16,
7:21, 8:25, 9:12,
9:21, 9:25, 17:17,
17:22, 23:10, 51:7,
87:10, 186:3
**created** [17] - 21:11,
44:13, 44:14, 46:13,
60:24, 84:21, 86:4,
91:24, 92:5, 92:6,
144:24, 144:25,
145:1, 145:7,
178:21, 188:5,
196:14
**creates** [1] - 31:12
**creating** [2] - 17:25,
84:12
**creation** [3] - 16:9,
84:10, 179:9
**creative** [2] - 65:13,
86:9
**creativity** [3] - 201:8,
201:10, 202:19
**creators** [3] - 187:11,
187:13
**critical** [2] - 112:6,
176:13
**cross** [4] - 13:3,
57:17, 85:14, 149:8
**CROSS** [3] - 3:4,
85:18, 149:9
**CROSS-
EXAMINATION** [2] -
85:18, 149:9
**cross-school** [1] -
13:3
**cry** [1] - 9:18
**Cs** [1] - 52:22
**CSR** [2] - 1:22, 209:21
**Culture** [1] - 128:12
**cultures** [2] - 13:18,
22:22
**cumulative** [1] -
135:23
**current** [5] - 82:15,
82:18, 141:18,
143:5, 184:10
**customarily** [1] -
157:7
**cut** [2] - 109:15, 196:6
**CV** [2] - 1:8, 4:4

## D

**dad** [3] - 66:8, 96:23
**dancing** [1] - 109:22
**Daniel** [1] - 13:1
**Dark** [147] - 16:1,

16:24, 17:11, 17:23,
20:4, 20:6, 20:23,
21:1, 21:11, 22:5,
22:11, 24:8, 24:22,
24:24, 25:8, 25:9,
25:10, 25:15, 25:20,
25:23, 26:17, 26:23,
27:6, 28:4, 28:9,
28:20, 29:13, 29:17,
29:23, 30:7, 30:10,
30:12, 30:14, 30:18,
30:20, 30:25, 31:5,
31:23, 31:25, 32:13,
32:21, 33:8, 34:5,
34:6, 34:13, 35:1,
35:3, 35:13, 37:6,
37:10, 37:20, 37:22,
37:25, 39:7, 39:18,
40:14, 41:6, 41:19,
41:22, 42:4, 42:11,
42:19, 42:24, 43:2,
43:14, 44:4, 44:8,
44:20, 45:8, 45:16,
47:5, 47:7, 47:16,
47:25, 48:1, 50:1,
50:11, 51:15, 51:17,
51:24, 52:3, 52:7,
53:19, 53:20, 54:21,
55:18, 56:17, 58:20,
58:24, 59:17, 59:18,
60:2, 60:14, 61:9,
61:12, 61:23, 62:19,
64:20, 68:1, 68:8,
69:17, 71:18, 71:22,
72:4, 72:13, 72:18,
72:19, 72:23, 73:4,
74:19, 75:18, 76:8,
76:18, 76:20, 77:17,
79:9, 79:13, 81:9,
81:17, 81:22, 82:6,
82:7, 82:11, 84:10,
84:11, 84:12, 85:1,
87:1, 89:9, 89:12,
90:4, 90:18, 93:22,
94:3, 94:13, 94:21,
94:24, 95:3, 95:8,
95:15, 102:19,
181:15, 184:3,
185:14, 191:4, 193:8
**Data** [1] - 132:11
**data** [4] - 127:16,
132:12, 139:20,
162:18
**database** [1] - 105:19
**DATE** [1] - 209:18
**date** [2] - 133:5,
145:22
**dates** [3] - 133:3,
133:4, 163:12
**daughter** [1] - 150:15

**days** [3] - 5:7, 8:5, 8:7
**DC** [1] - 192:4
**deal** [3] - 123:20,
130:4, 205:3
**dealing** [3] - 111:9,
175:1, 204:10
**deals** [2] - 91:10,
121:5
**decades** [2] - 29:5
**deceptive** [3] - 55:12,
55:14, 89:23
**deceptively** [1] - 76:1
**decide** [5] - 176:14,
189:1, 197:12,
197:22, 206:18
**decided** [2] - 111:5,
177:6
**decides** [1] - 186:18
**decision** [2] - 176:10,
202:3
**decker** [4] - 6:14,
19:5, 56:9, 102:18
**Decker** [74] - 5:14,
5:24, 6:11, 6:25, 8:9,
8:16, 9:3, 33:16,
33:22, 39:18, 44:20,
45:20, 47:2, 47:4,
48:25, 49:8, 49:24,
50:10, 50:17, 52:20,
53:3, 53:18, 56:3,
57:3, 58:17, 59:6,
60:15, 60:17, 60:22,
61:11, 61:23, 63:18,
64:19, 64:24, 67:10,
67:12, 68:3, 69:15,
70:3, 72:2, 73:3,
73:20, 75:3, 76:6,
77:2, 77:8, 77:13,
77:19, 77:25, 78:2,
78:6, 78:8, 78:11,
80:4, 81:8, 81:18,
83:14, 83:19, 84:2,
84:22, 89:16, 89:23,
90:3, 90:11, 92:17,
93:5, 93:6, 94:16,
95:7, 96:14, 97:2,
97:12, 98:13
**decker's** [1] - 48:4
**Decker's** [24] - 5:1,
13:25, 14:1, 16:23,
17:13, 17:15, 49:9,
50:19, 50:23, 53:2,
53:5, 53:7, 53:9,
54:18, 56:11, 57:1,
58:8, 60:9, 60:20,
62:16, 71:17, 75:25,
76:11, 80:24
**deem** [1] - 157:18
**deep** [1] - 79:19
**default** [1] - 133:23

**DEFENDANT** [1] - 1:10
**defendant** [10] - 100:24, 101:3, 111:12, 117:7, 182:8, 183:16, 184:7, 184:8, 184:24, 186:12
**Defendant's** [3] - 171:7, 172:21, 178:15
**defendant's** [6] - 4:25, 6:17, 128:23, 173:9, 181:7, 189:2
**defendants** [35] - 9:9, 14:10, 16:1, 70:10, 95:14, 101:10, 101:13, 105:1, 105:8, 106:8, 107:7, 108:1, 116:10, 135:23, 154:23, 165:18, 165:24, 166:1, 166:14, 167:13, 178:4, 178:20, 182:1, 182:15, 183:4, 183:5, 183:11, 183:14, 183:21, 183:25, 184:13, 185:16, 185:19, 196:13, 207:15
**DEFENDANTS** [2] - 2:13, 2:20
**defense** [11] - 4:11, 5:8, 8:12, 9:19, 10:11, 10:12, 95:12, 99:22, 163:22, 169:3, 186:9
**DEFENSE** [1] - 3:3
**defense's** [1] - 9:12
**defenses** [2] - 195:10, 207:24
**define** [1] - 107:18
**defined** [1] - 34:18
**definition** [9] - 13:11, 22:21, 23:3, 34:21, 173:9, 178:1, 183:6, 185:3
**definitional** [2] - 183:2, 184:12
**definitions** [1] - 68:5
**degree** [29] - 36:14, 36:20, 36:21, 38:21, 38:22, 39:22, 45:19, 45:20, 45:22, 47:19, 49:2, 49:23, 49:24, 49:25, 50:1, 53:4, 53:8, 62:6, 62:8, 65:18, 78:13, 90:2, 90:12, 127:2, 127:4,

127:6
**degrees** [13] - 36:2, 36:11, 36:13, 38:20, 44:24, 45:11, 55:1, 55:4, 55:9, 55:10, 71:5, 97:10, 127:8
**delay** [1] - 81:16
**deliberating** [1] - 169:13
**deliberations** [1] - 156:15
**demonstrable** [1] - 54:8
**demonstrate** [6] - 45:12, 51:7, 52:10, 109:5, 178:2, 193:5
**demonstrated** [5] - 8:18, 8:19, 108:6, 108:10, 203:21
**demonstrates** [1] - 43:13
**demonstrating** [1] - 6:15
**Demonstrative** [34] - 23:16, 31:19, 35:16, 36:9, 36:11, 37:15, 38:17, 39:5, 40:1, 40:2, 40:10, 40:11, 41:21, 41:25, 43:12, 43:25, 44:17, 45:5, 45:6, 48:20, 51:6, 51:19, 51:22, 52:4, 52:15, 53:25, 54:19, 56:23, 58:5, 58:8, 62:2, 62:3, 70:12, 71:17
**demonstrative** [17] - 23:18, 38:2, 38:24, 39:2, 39:10, 40:7, 56:24, 60:3, 62:25, 63:20, 67:14, 69:4, 72:7, 72:15, 73:19, 208:10
**demonstratives** [3] - 136:3, 208:5, 208:14
**denied** [1] - 117:7
**deposition** [14] - 15:17, 101:4, 101:25, 111:7, 112:15, 115:12, 120:5, 120:7, 120:9, 120:14, 120:18, 121:6, 122:15, 165:20
**derivative** [27] - 185:1, 190:18, 190:25, 191:6, 192:8, 193:21, 193:22, 193:23, 194:3, 194:5, 194:10,

195:1, 195:4, 195:11, 195:25, 196:22, 197:6, 197:13, 197:18, 198:21, 199:1, 199:5, 199:7, 199:21, 204:9
**descend** [3] - 74:12, 75:1, 75:8
**descending** [17] - 47:18, 61:2, 67:8, 67:24, 70:24, 74:4, 74:13, 74:19, 74:23, 74:24, 75:12, 75:13, 77:5, 78:1, 80:15, 96:22, 97:9
**descends** [1] - 75:2
**describe** [5] - 34:16, 45:6, 51:20, 82:22, 131:10
**described** [1] - 39:3
**describes** [1] - 61:11
**describing** [3] - 6:4, 33:4, 37:2
**designated** [3] - 108:25, 121:7, 191:13
**designations** [15] - 104:12, 104:17, 104:21, 105:3, 105:10, 105:11, 105:14, 106:9, 106:11, 107:1, 107:7, 107:23, 108:19, 108:21, 165:20
**designed** [1] - 8:23
**despite** [2] - 8:10, 193:3
**detail** [5] - 18:5, 34:13, 129:25, 142:14, 146:17
**detailed** [1] - 18:13
**details** [3] - 119:25, 120:1, 158:15
**detection** [1] - 148:2
**determination** [1] - 91:8
**determine** [4] - 130:8, 182:25, 184:13, 198:25
**developed** [3] - 91:15, 92:9
**develops** [1] - 46:6
**device** [2] - 135:15, 150:1
**devolves** [1] - 192:23
**dictionaries** [1] - 91:13
**dictionary** [2] - 23:4,

68:5
**Dictionary** [5] - 13:12, 13:13, 19:15, 22:20, 91:12
**differ** [1] - 151:17
**difference** [25] - 25:21, 26:16, 26:23, 32:19, 32:25, 33:1, 42:22, 42:24, 42:25, 52:9, 53:16, 58:22, 76:13, 78:4, 80:20, 97:7, 97:8, 101:15, 141:22, 142:4, 151:12, 151:15, 153:12, 204:22
**differences** [13] - 18:9, 18:24, 20:19, 20:20, 28:24, 29:8, 29:15, 37:9, 51:8, 53:13, 54:3, 78:13, 78:18
**different** [75] - 4:25, 5:3, 5:6, 5:9, 6:19, 7:22, 8:11, 9:5, 9:19, 14:3, 14:6, 16:17, 16:20, 26:12, 29:19, 29:25, 30:4, 32:1, 32:14, 32:17, 32:18, 32:20, 32:24, 33:16, 33:21, 36:23, 37:12, 49:12, 49:22, 49:23, 50:4, 50:24, 53:5, 54:5, 54:6, 56:14, 58:14, 59:5, 59:9, 59:19, 59:21, 60:8, 60:14, 60:15, 63:16, 64:13, 66:18, 76:10, 78:5, 80:14, 87:3, 92:19, 92:21, 92:22, 99:2, 116:18, 117:19, 130:8, 137:13, 137:14, 153:3, 153:6, 153:9, 172:2, 172:24, 185:18, 186:24, 192:19, 201:15, 202:25, 203:11
**differential** [1] - 42:21
**differently** [2] - 37:1, 116:8
**differs** [1] - 52:4
**difficult** [2] - 27:13, 51:12
**difficulty** [3] - 183:13, 186:16, 199:22
**digital** [20] - 5:2, 5:4, 6:19, 117:24, 118:10, 118:11, 118:20, 119:9, 120:23, 125:24,

125:25, 126:16, 126:21, 126:22, 128:4, 128:19, 129:18, 131:20, 132:8, 133:18
**Digital** [7] - 117:24, 118:1, 128:17, 130:3, 130:8, 131:21, 138:8
**digitally** [2] - 17:11, 23:8
**diminished** [1] - 69:8
**dinosaur** [1] - 118:18
**DIRECT** [3] - 3:4, 10:22, 125:1
**direct** [4] - 149:5, 178:7, 188:6, 188:8
**directed** [2] - 120:23, 120:24
**direction** [1] - 165:14
**directly** [3] - 94:14, 174:12, 175:6
**director** [1] - 182:3
**Director** [4] - 11:4, 11:5, 11:6, 11:13
**directors** [3] - 180:23, 180:25, 207:13
**disagree** [9] - 90:8, 95:2, 110:7, 165:19, 166:3, 176:16, 201:12, 201:13, 206:16
**disagreeing** [1] - 172:1
**disagreement** [2] - 111:11, 200:22
**disagreements** [1] - 207:7
**disappear** [1] - 159:6
**disbelieves** [1] - 186:19
**discipline** [1] - 14:3
**disclosed** [3] - 9:4, 9:11, 23:19
**discovered** [2] - 20:18, 20:22
**discuss** [9] - 57:11, 103:6, 105:9, 106:4, 126:24, 145:15, 146:15, 171:14, 172:12
**discussed** [10] - 30:8, 34:25, 46:24, 122:16, 140:15, 140:16, 145:13, 145:14, 146:10, 204:10
**discusses** [1] - 147:21
**discussing** [6] - 73:3, 132:1, 132:19,

143:20, 169:12,
174:14
**discussion** [2] -
114:5, 188:17
**DISCUSSION** [1] -
3:15
**discussions** [2] -
103:19, 103:23
**disparity** [2] - 138:18,
151:8
**displayed** [1] - 185:1
**disprove** [1] - 178:22
**dispute** [7] - 105:14,
170:7, 170:16,
177:25, 197:2,
201:17, 201:19
**disputed** [3] - 177:24,
189:2, 200:20
**Disputed** [3] - 171:7,
171:24, 172:13
**disputes** [1] - 169:24
**dissect** [1] - 93:3
**dissection** [1] - 13:21
**dissemination** [2] -
178:19, 179:20
**dissimilar** [16] - 47:5,
47:7, 48:6, 48:12,
75:5, 75:6, 77:3,
77:4, 77:5, 79:9,
79:15, 82:11, 83:20,
83:23, 84:22
**distinction** [3] - 16:3,
16:6, 190:2
**distinctive** [6] - 24:19,
34:9, 51:16, 59:13,
59:21, 59:25
**distinctly** [1] - 59:21
**distinguish** [1] - 90:15
**distort** [1] - 55:10
**distribute** [3] - 153:1,
153:10, 185:21
**distributed** [2] -
184:25, 188:5
**distributes** [1] - 183:3
**distributing** [2] -
153:10, 182:19
**distribution** [1] -
186:13
**District** [1] - 202:10
**DISTRICT** [5] - 1:1,
1:2, 1:4, 209:9
**divides** [1] - 13:13
**DIVISION** [1] - 1:2
**divisions** [1] - 13:20
**DO** [2] - 209:10,
209:13
**Doctor** [2] - 53:25,
102:25
**document** [3] - 72:15,
171:15, 171:16

**documents** [2] -
112:11, 123:15
**Dog** [1] - 141:8
**dogs** [1] - 140:25
**dollars** [3] - 100:11,
100:17, 134:3
**domain** [2] - 67:13,
79:25
**done** [18] - 7:18, 12:5,
31:6, 35:22, 45:15,
53:12, 53:13, 85:17,
92:19, 103:16,
115:24, 123:9,
147:11, 149:5,
156:1, 160:9,
162:21, 191:4
**door** [1] - 67:1
**dot** [9] - 24:12, 24:23,
25:9, 65:8, 65:9
**doubt** [1] - 160:4
**down** [30] - 32:1,
39:15, 39:16, 39:17,
51:24, 52:2, 52:6,
52:21, 54:4, 58:21,
58:23, 60:11, 66:1,
66:10, 67:24, 68:11,
71:15, 74:9, 74:12,
78:3, 103:1, 105:2,
126:10, 154:21,
160:7, 169:24,
172:9, 175:16,
175:24, 176:1,
192:23
**downloads** [1] -
138:10
**downstairs** [2] -
180:15, 181:3
**dozen** [2] - 137:20
**dozens** [1] - 128:21
**Dr** [149] - 4:11, 4:16,
5:1, 5:12, 5:14, 5:22,
5:24, 6:11, 6:12,
6:14, 6:25, 8:9, 8:16,
9:3, 10:13, 10:14,
10:24, 13:25, 14:1,
14:16, 16:23, 17:13,
17:15, 19:5, 20:24,
23:15, 23:16, 24:4,
24:10, 27:18, 33:16,
33:22, 35:17, 35:19,
37:15, 38:5, 39:6,
39:18, 40:11, 44:18,
44:20, 45:20, 47:2,
47:4, 48:4, 48:20,
48:25, 49:8, 49:9,
49:24, 50:10, 50:17,
50:19, 50:21, 50:23,
52:20, 53:2, 53:3,
53:5, 53:7, 53:9,
53:18, 54:18, 56:3,

56:7, 56:9, 56:11,
57:1, 57:3, 58:4,
58:8, 58:17, 59:6,
60:9, 60:15, 60:17,
60:20, 60:22, 61:11,
61:23, 62:16, 63:1,
63:18, 63:20, 64:17,
64:19, 64:24, 67:10,
67:12, 68:3, 69:4,
69:15, 70:3, 70:14,
70:19, 70:20, 71:17,
71:24, 72:2, 72:5,
72:8, 72:22, 73:3,
73:20, 75:3, 75:25,
76:6, 76:11, 77:2,
77:8, 77:13, 77:19,
77:25, 78:2, 78:6,
78:8, 78:11, 79:20,
80:4, 80:24, 81:8,
81:18, 82:14, 83:10,
83:14, 83:19, 84:2,
84:22, 85:20, 89:16,
89:23, 90:3, 90:11,
93:5, 93:6, 94:16,
95:7, 95:17, 95:19,
95:21, 96:14, 97:2,
97:12, 98:13,
101:24, 102:3,
102:4, 102:18
**dr** [1] - 102:12
**draft** [4] - 122:14,
122:20, 123:5, 123:7
**drafted** [1] - 154:23
**Drake** [1] - 14:15
**draw** [1] - 131:5
**Dray** [1] - 14:16
**drive** [2] - 166:24,
167:2
**droppingly** [1] -
135:19
**drops** [2] - 26:14, 27:1
**Dry** [1] - 74:8
**due** [1] - 113:4
**duration** [1] - 29:8
**durations** [1] - 34:19
**during** [26] - 28:9,
113:11, 114:2,
125:9, 125:13,
128:1, 128:9,
129:17, 130:13,
132:18, 136:13,
136:14, 136:19,
137:1, 137:3, 140:3,
140:10, 140:18,
141:17, 142:16,
144:5, 144:13,
144:21, 145:7,
145:15, 159:11
**Duvall** [1] - 24:6

**E**

**ear** [1] - 90:6
**early** [3] - 19:15, 70:9,
128:1
**easily** [2] - 51:9, 207:8
**EAST** [1] - 2:23
**easy** [4] - 65:8, 76:2,
189:3, 189:4
**edit** [1] - 8:25
**edition** [1] - 12:16
**editorial** [3] - 12:17,
12:20, 12:21
**education** [2] - 66:14,
128:2
**effectively** [1] - 188:18
**effort** [1] - 9:3
**eight** [32] - 15:3, 29:9,
29:11, 40:3, 44:21,
49:10, 50:11, 50:17,
55:14, 55:15, 55:16,
59:8, 75:23, 75:24,
76:1, 76:2, 76:14,
77:8, 77:20, 86:25,
89:7, 89:14, 89:16,
89:17, 89:18, 89:24,
90:4, 90:7, 90:18
**eight-bar** [1] - 29:9
**either** [16] - 30:9,
51:18, 55:2, 73:25,
74:8, 85:13, 106:17,
113:14, 115:14,
120:17, 163:21,
184:16, 189:16,
194:24, 197:7, 204:2
**electric** [3] - 6:7,
18:11, 18:12
**electrical** [2] - 127:5,
127:6
**electronic** [4] - 18:23,
82:2, 82:15, 82:18
**electronically** [2] -
86:5, 86:10
**electronics** [1] -
126:15
**Element** [4] - 190:15,
191:9, 195:7, 196:2
**element** [6] - 31:7,
33:3, 79:24, 82:21,
178:21, 183:24
**elementary** [4] -
54:10, 65:21, 66:14,
97:9
**elements** [9] - 8:24,
16:12, 19:19, 33:5,
73:23, 81:2, 93:16,
188:19, 203:17
**elevates** [1] - 203:18
**ELIAS** [4] - 1:22,
209:8, 209:20,

209:21
**eliminate** [1] - 197:6
**eliminated** [1] - 60:12
**eloquently** [1] -
202:16
**email** [2] - 142:9,
144:15
**emails** [2] - 103:24,
105:8
**embodied** [1] - 16:10
**embodies** [1] - 48:14
**embody** [1] - 21:2
**emeritus** [1] - 11:12
**Emeritus** [2] - 11:4,
11:13
**Eminem** [1] - 14:16
**employed** [3] - 11:1,
11:3, 12:4
**employees** [1] - 148:1
**empty** [1] - 73:11
**en** [3] - 202:1, 202:11
**encompass** [1] -
196:1
**encompassed** [2] -
190:20, 191:8
**encounter** [1] - 130:14
**encounters** [1] -
130:16
**end** [21] - 27:5, 27:7,
27:19, 28:5, 47:5,
50:9, 53:6, 59:24,
76:4, 78:7, 134:15,
134:18, 134:25,
135:2, 135:4, 137:6,
143:20, 146:25,
155:3, 163:25, 206:4
**ending** [1] - 26:7
**endings** [1] - 50:4
**engage** [1] - 147:10
**engaged** [11] - 14:9,
100:2, 100:7, 101:9,
125:6, 125:7,
130:19, 130:25,
131:13, 131:19,
140:1
**engagement** [3] -
135:9, 135:11,
135:16
**Engineer** [1] - 128:20
**engineer** [1] - 127:16
**Engineering** [1] -
127:6
**engineering** [1] -
127:6
**engineers** [1] - 148:4
**England** [1] - 13:7
**enormous** [1] - 132:22
**enter** [3] - 9:2, 121:19,
187:5
**entertain** [1] - 111:20

**Entertainment** [1] - 128:20

**entire** [2] - 98:11, 109:6

**entirely** [1] - 195:17

**entireties** [1] - 20:18

**entirety** [15] - 20:9, 53:22, 68:1, 69:12, 70:3, 70:4, 70:5, 92:18, 93:3, 93:7, 94:1, 102:18, 190:1, 194:17, 195:19

**entities** [2] - 128:10, 182:18

**entitled** [8] - 101:2, 163:24, 180:4, 194:11, 195:8, 195:20, 196:3, 204:11

**entries** [2] - 118:4, 118:9

**entry** [1] - 19:13

**equal** [3] - 111:25, 112:11, 143:18

**equipment** [11] - 4:15, 4:23, 4:25, 5:6, 5:7, 6:19, 6:24, 7:7, 8:4, 8:8, 9:17

**erasing** [1] - 175:18

**ERIC** [1] - 2:10

**error** [1] - 195:13

**esoteric** [1] - 191:23

**ESQ** [9] - 2:5, 2:6, 2:10, 2:15, 2:16, 2:16, 2:17, 2:17, 2:22

**essence** [1] - 5:3

**essentially** [27] - 16:11, 16:19, 18:25, 23:8, 26:14, 28:15, 31:12, 36:23, 40:3, 53:10, 54:2, 56:8, 63:11, 64:6, 66:24, 68:20, 113:1, 121:20, 133:10, 147:3, 170:14, 171:10, 182:7, 183:4, 183:5, 195:5, 203:21

**establish** [3] - 178:19, 178:20, 196:12

**established** [3] - 19:8, 62:15, 182:23

**establishes** [1] - 182:12

**Estefan** [1] - 14:14

**estimate** [2] - 57:14, 170:4

**estimation** [1] - 84:1

**estopped** [1] - 182:21

**et** [5] - 4:5, 120:16, 183:3, 191:5

**ET** [2] - 1:6, 1:9

**ethno** [1] - 13:17

**Europe** [1] - 139:3

**European** [1] - 128:12

**eve** [1] - 109:11

**evening** [1] - 169:18

**evenly** [16] - 34:7, 56:22, 64:21, 64:24, 65:15, 68:16, 71:8, 72:17, 72:20, 72:21, 72:23, 73:1, 73:16, 76:21, 76:25, 77:8

**event** [1] - 202:9

**everywhere** [2] - 82:16, 96:18

**evidence** [49] - 5:13, 5:14, 9:2, 9:10, 20:2, 21:7, 24:9, 46:12, 47:14, 55:23, 90:21, 91:6, 91:7, 104:13, 105:5, 105:15, 106:2, 106:3, 106:24, 107:4, 108:16, 109:17, 110:5, 110:14, 110:16, 111:2, 113:8, 114:4, 120:19, 121:9, 123:22, 135:24, 140:5, 149:24, 155:3, 165:9, 165:16, 166:16, 179:13, 182:11, 183:17, 185:5, 186:14, 186:15, 187:3, 187:8, 191:19, 208:11

**evolution** [1] - 131:1

**evolve** [1] - 141:21

**evolved** [1] - 131:4

**exact** [2] - 116:12, 176:18

**exactly** [21] - 23:20, 37:2, 43:23, 63:13, 66:17, 82:3, 101:20, 104:13, 104:25, 110:19, 111:16, 117:15, 152:7, 175:17, 187:10, 191:9, 198:23, 206:7, 206:23, 208:7

**EXAMINATION** [5] - 10:22, 85:18, 102:10, 125:1, 149:9

**examination** [1] - 149:5

**examine** [3] - 7:9, 7:11, 91:7

**examined** [1] - 174:21

**examining** [1] - 7:6

**example** [20] - 14:23, 16:16, 20:23, 29:8, 35:7, 47:17, 51:10, 59:15, 70:18, 97:17, 98:6, 98:20, 107:9, 113:21, 132:17, 134:9, 146:3, 153:4, 153:7, 186:1

**examples** [5] - 44:11, 96:18, 97:16, 98:24, 123:12

**exceed** [1] - 20:20

**exceeded** [1] - 134:22

**exceedingly** [1] - 21:10

**Excellence** [1] - 63:21

**except** [2] - 110:15, 142:6

**exception** [1] - 171:11

**excerpts** [1] - 122:15

**exclude** [4] - 7:12, 7:24, 9:15, 9:21

**excluded** [4] - 110:3, 110:14, 112:16, 120:2

**exclusion** [1] - 106:23

**exclusive** [2] - 183:23, 186:12

**excuse** [1] - 155:24

**Executive** [1] - 127:20

**exercise** [2] - 28:13, 66:2

**exhibit** [13] - 7:22, 8:25, 9:2, 48:19, 63:2, 63:19, 86:23, 155:15, 166:25, 167:3, 167:5, 167:6

**Exhibit** [7] - 24:8, 37:25, 42:12, 45:2, 51:2, 67:14, 166:11

**exhibits** [4] - 5:13, 5:16, 64:23, 65:4

**EXHIBITS** [1] - 3:11

**exist** [4] - 56:18, 73:23, 80:7, 142:3

**existed** [2] - 84:25, 193:12

**existing** [11] - 95:15, 116:25, 175:2, 190:19, 191:1, 199:2, 199:3, 199:6, 202:8, 202:20, 206:11

**expanding** [1] - 174:14

**expands** [1] - 91:1

**expansive** [1] - 42:2

**expect** [2] - 4:15,

156:24

**expectation** [1] - 93:5

**experience** [9] - 11:16, 11:18, 14:7, 65:17, 66:15, 129:12, 132:4, 132:7, 157:24

**experiences** [1] - 150:9

**expert** [18] - 6:22, 8:5, 9:10, 9:11, 10:7, 10:12, 15:8, 100:23, 101:3, 101:9, 101:15, 122:2, 128:24, 129:1, 130:19, 131:25, 153:14, 154:2

**expert's** [1] - 9:20

**expertise** [5] - 12:1, 12:4, 12:8, 13:9, 14:18

**experts** [3] - 205:4, 206:19, 208:15

**explain** [11] - 28:12, 38:6, 44:10, 58:15, 86:22, 123:1, 133:14, 171:18, 171:19, 182:1, 205:19

**explained** [3] - 104:10, 111:24, 136:5

**explaining** [4] - 36:24, 109:2, 174:4

**explains** [2] - 115:2, 200:4

**explanation** [3] - 115:8, 116:15, 116:22

**explicitly** [2] - 91:20, 92:7

**explore** [1] - 133:10

**expose** [1] - 69:9

**expression** [17] - 20:3, 20:15, 20:16, 66:25, 173:16, 173:23, 174:3, 175:9, 193:3, 193:13, 201:2, 203:16, 203:20, 203:22, 203:24, 204:13, 206:5

**extension** [1] - 45:14

**extensively** [1] - 171:9

**extent** [9] - 44:2, 85:2, 87:8, 88:2, 108:23, 110:15, 114:24, 192:7, 203:16

**extra** [3] - 45:23, 50:15, 63:8

**extraction** [1] - 102:20

**extraordinary** [1] - 48:4

**extremely** [3] - 7:4, 39:19, 59:5

**extrinsic** [1] - 180:18

**eyeball** [1] - 18:18

**eyeballing** [1] - 18:20

**eyes** [1] - 179:23

## F

**F-e-r-r-a-r-a** [1] - 10:19

**F2** [1] - 176:23

**F2d** [1] - 174:15

**Fa** [2] - 36:21, 63:13

**Facebook** [2] - 142:10, 147:6

**facilitate** [1] - 37:7

**fact** [52] - 8:5, 20:14, 20:20, 21:8, 26:24, 29:3, 30:24, 32:17, 35:12, 37:1, 40:14, 48:9, 54:1, 54:4, 55:14, 59:17, 64:22, 64:25, 66:14, 68:8, 69:20, 69:24, 74:21, 81:11, 81:18, 82:17, 85:3, 91:2, 95:17, 95:19, 97:4, 104:24, 111:12, 116:15, 117:9, 119:15, 121:5, 122:7, 122:11, 152:6, 187:3, 190:17, 191:4, 193:10, 194:20, 197:1, 197:11, 198:6, 198:16, 205:5, 205:14, 206:12

**factor** [1] - 189:8

**factors** [1] - 193:5

**facts** [5] - 28:18, 140:17, 159:3, 165:14, 167:25

**factual** [2] - 198:17, 200:10, 205:10

**faculty** [1] - 11:6

**failing** [3] - 173:22, 174:9, 174:16

**fair** [5] - 39:3, 51:25, 100:11, 107:12, 163:16

**fairly** [4] - 57:16, 139:10, 191:23, 204:16

**fake** [2] - 148:3, 149:20

**Fall** [1] - 132:10

**falls** [1] - 206:9

**familiar** [5] - 97:19,

138:9, 139:25, 141:25, 178:15
**familiarity** [1] - 130:12
**family** [2] - 82:2, 82:18
**famous** [1] - 147:8
**fan** [2] - 146:5, 152:8
**far** [6] - 7:6, 9:18, 11:12, 91:6, 158:9, 159:5
**fashion** [2] - 171:23, 176:15
**fast** [6] - 34:2, 34:3, 72:24, 76:23, 76:24, 133:18
**faster** [4] - 42:15, 42:19, 42:20, 72:21
**feared** [1] - 148:1
**feature** [6] - 141:4, 141:21, 141:24, 142:1, 142:3
**features** [4] - 125:8, 130:8, 131:7, 131:8
**FEDERAL** [1] - 1:22, 209:22
**Feist** [1] - 176:2
**fell** [1] - 112:3
**felt** [1] - 62:14
**Ferrara** [33] - 4:11, 5:12, 5:22, 6:12, 10:13, 10:14, 10:19, 10:24, 23:15, 23:16, 24:4, 24:10, 27:18, 31:19, 35:17, 35:19, 37:15, 38:5, 39:6, 40:11, 44:18, 48:19, 48:20, 50:21, 56:7, 58:4, 63:1, 63:20, 64:17, 69:4, 82:14, 85:20, 102:12
**FERRARA** [1] - 3:5
**Ferrara's** [1] - 4:16
**few** [3] - 5:7, 160:2, 169:24
**fewer** [1] - 150:24
**fifth** [2] - 12:16, 138:2
**figure** [4] - 71:7, 129:25, 155:22, 197:9
**file** [5] - 5:16, 136:20, 157:16, 158:5, 170:12
**files** [1] - 91:7
**filing** [2] - 157:16, 188:21
**film** [1] - 43:19
**final** [2] - 27:20, 32:8
**finalize** [1] - 164:20
**finalized** [1] - 156:2
**finally** [1] - 131:18
**financial** [1] - 15:19

**findings** [3] - 21:13, 31:14, 33:7
**fine** [19] - 101:21, 113:10, 114:9, 114:11, 160:24, 161:8, 164:7, 166:20, 167:13, 169:23, 174:25, 177:4, 178:11, 180:9, 189:17, 190:6, 196:16, 201:11, 208:2
**finesse** [1] - 182:6
**finish** [1] - 160:6
**finished** [2] - 66:7, 91:10
**fire** [3] - 146:19, 147:13, 147:16
**fires** [1] - 146:20
**firm** [2] - 125:23, 127:15
**first** [102] - 6:1, 8:18, 11:14, 13:16, 20:2, 21:5, 21:14, 24:2, 25:10, 26:13, 26:19, 26:20, 28:22, 29:1, 30:3, 30:13, 30:16, 30:17, 30:18, 31:20, 32:6, 32:14, 35:15, 36:3, 38:21, 40:25, 41:10, 42:8, 44:12, 44:19, 44:21, 45:7, 45:10, 46:15, 47:21, 47:23, 48:13, 49:5, 49:6, 49:13, 49:16, 50:18, 50:20, 52:19, 53:6, 53:14, 54:23, 55:14, 55:25, 60:24, 70:23, 71:10, 74:7, 75:8, 75:22, 78:3, 78:18, 80:7, 83:8, 89:17, 90:1, 90:4, 91:25, 92:1, 92:5, 92:6, 94:12, 94:13, 95:9, 96:21, 98:17, 100:21, 103:18, 105:13, 105:14, 108:21, 109:4, 110:8, 121:9, 129:15, 130:14, 134:13, 136:2, 140:12, 141:3, 146:3, 146:4, 152:5, 158:12, 160:25, 161:7, 161:18, 171:3, 172:8, 172:10, 179:1, 183:15, 192:17, 204:10, 207:8
**FIRST** [1] - 1:23

**fit** [1] - 139:24
**five** [11] - 38:23, 78:13, 80:18, 128:19, 134:7, 138:2, 161:17, 161:18, 161:20, 162:12, 193:17
**fixed** [3] - 185:22, 193:2, 193:12
**Flame** [4] - 142:21, 142:22, 144:4
**flash** [2] - 166:24, 167:2
**flat** [4] - 31:24, 37:11, 53:7, 63:7
**flavor** [1] - 59:15
**flip** [1] - 148:2
**FLOOR** [1] - 2:7
**flow** [2] - 34:10, 63:11
**focus** [3] - 109:14, 125:23, 180:2
**focused** [1] - 174:7
**focuses** [1] - 13:21
**focusing** [1] - 204:8
**focussing** [1] - 204:14
**folks** [3] - 103:3, 170:4, 181:10
**follow** [5] - 105:8, 165:23, 175:13, 205:10, 205:23
**follow-up** [1] - 105:8
**followed** [2] - 84:17, 89:18
**following** [10] - 31:24, 37:8, 38:25, 108:15, 114:14, 119:7, 121:2, 162:2, 167:25, 200:12
**follows** [2] - 34:4, 49:6
**footage** [1] - 18:14
**FOR** [3] - 3:3, 209:8, 209:9
**Forbes** [1] - 128:21
**FOREGOING** [1] - 209:11
**forever** [1] - 206:21
**form** [5] - 6:10, 169:15, 182:4, 184:6, 184:11
**FORM** [1] - 209:13
**formal** [2] - 19:10, 121:16
**formulation** [1] - 199:23
**FORSYTH** [1] - 2:7
**FORTH** [1] - 209:12
**forth** [12] - 11:10, 15:16, 18:15, 44:4, 50:16, 80:15, 94:4, 95:6, 103:24,

130:11, 137:16, 192:16
**forward** [1] - 10:14
**foundation** [7] - 67:4, 67:5, 67:6, 104:15, 106:3, 107:5, 136:6
**founded** [2] - 126:1, 127:14
**Founder** [1] - 125:20
**four** [33] - 29:9, 32:7, 38:5, 38:8, 38:13, 40:4, 40:12, 40:13, 40:18, 40:19, 40:20, 40:22, 41:22, 42:3, 42:22, 43:6, 43:23, 44:3, 44:7, 57:1, 60:7, 65:18, 66:1, 66:6, 74:25, 90:16, 92:21, 112:23, 161:16, 161:19, 176:8, 200:17
**four-bar** [1] - 29:9
**fours** [2] - 174:12, 176:19
**fourth** [8] - 38:22, 59:4, 59:19, 64:1, 64:3, 65:11, 66:7, 78:5
**fragmentary** [2] - 54:10, 60:8
**fragments** [1] - 20:16
**frame** [4] - 130:13, 143:19, 147:21, 176:12
**frankly** [4] - 8:14, 159:16, 200:25, 204:7
**fraud** [8] - 147:1, 147:2, 147:3, 147:10, 147:11, 148:2, 148:6, 148:7
**fraudulent** [1] - 147:3
**free** [1] - 132:24
**French** [1] - 128:12
**front** [3] - 27:14, 35:16, 178:9
**full** [5] - 10:18, 11:3, 11:14, 39:9, 124:18
**fully** [1] - 120:8
**function** [14] - 22:18, 29:24, 30:5, 62:8, 62:9, 68:13, 69:13, 71:2, 140:21, 140:25, 141:1, 141:20, 142:16, 144:6
**functionality** [2] - 141:16, 141:18
**functioning** [1] - 62:7
**functions** [2] - 29:18,

125:8
**fundamental** [1] - 61:5
**Funny** [2] - 141:8
**FURTHER** [1] - 209:14
**furthermore** [3] - 72:3, 75:1, 78:19

---

## G

**GABRIELLA** [1] - 2:17
**Gaga** [1] - 14:14
**Gay** [1] - 187:23
**general** [4] - 82:18, 122:24, 174:15, 207:14
**generally** [1] - 33:8
**generic** [1] - 29:2
**genre** [5] - 106:21, 119:23, 119:25, 168:18, 168:21
**genres** [16] - 11:25, 22:19, 29:4, 29:6, 69:21, 113:1, 119:20, 119:21, 120:21, 161:13, 161:21, 161:24, 163:3, 163:14, 168:4, 168:15
**gentlemen** [3] - 155:1, 167:20, 169:5
**geographically** [1] - 107:19
**George** [1] - 179:22
**Giant** [3] - 125:19, 125:21, 127:14
**given** [21] - 11:11, 13:2, 14:18, 14:21, 14:24, 68:21, 81:1, 87:5, 87:12, 106:23, 112:20, 122:7, 128:15, 140:17, 152:11, 152:14, 159:9, 164:3, 175:14, 189:4, 189:6
**Glass** [1] - 43:20
**Gloria** [1] - 14:14
**goal** [1] - 157:2
**goals** [1] - 122:10
**God** [1] - 160:21
**gonna** [44] - 9:1, 27:5, 27:11, 34:12, 67:18, 68:19, 70:21, 79:12, 103:20, 104:1, 113:9, 113:10, 119:18, 122:20, 123:4, 124:9, 126:9, 134:14, 135:12, 136:8, 149:22, 153:10, 156:11, 157:18, 158:7,

158:10, 158:11,
160:10, 163:14,
173:7, 179:3, 179:5,
184:6, 185:11,
187:22, 191:22,
195:15, 197:12,
201:17, 202:1,
205:23, 206:24,
207:7, 207:12
**Google** [3] - 126:15,
134:3, 148:6
**Gospel** [3] - 117:23,
117:24, 117:25
**gospel** [17] - 118:10,
118:11, 119:8,
119:21, 119:24,
122:12, 161:14,
161:21, 161:24,
162:8, 163:3,
163:14, 168:5,
168:13, 168:15,
168:18, 168:22
**gotta** [2] - 76:3, 89:25
**grade** [6] - 64:1, 64:3,
65:12, 65:17, 65:18,
66:7
**graduate** [3] - 11:24,
65:20, 127:18
**grand** [1] - 96:23
**grand-dad** [1] - 96:23
**grandchildren** [1] -
66:6
**granddaughter** [1] -
150:15
**granddaughters** [1] -
150:9
**GRAY** [1] - 1:6
**Gray** [1] - 4:5
**Gray's** [1] - 114:1
**great** [7] - 80:20,
118:24, 129:25,
190:10, 190:12,
203:7, 205:3
**greatly** [1] - 20:20
**GREENBERG** [1] -
2:21
**grew** [2] - 46:25,
133:24
**Griffith's** [1] - 13:2
**Griffiths** [1] - 13:5
**ground** [1] - 32:23
**Group** [1] - 128:8
**group** [1] - 116:1
**Grove** [1] - 19:16
**Grove's** [1] - 19:14
**growing** [1] - 134:8
**grown** [1] - 46:13
**grows** [4] - 45:14,
47:14, 92:2, 92:3
**Gucci** [2] - 67:18,

74:24
**guess** [9] - 99:21,
109:12, 111:5,
118:17, 132:8,
150:13, 172:10,
194:11, 197:20
**guessing** [1] - 154:22
**guidance** [2] - 180:2,
207:4
**guitar** [1] - 88:15
**guy** [1] - 159:14
**guys** [2] - 156:23,
172:12

## H

**half** [22] - 8:17, 28:20,
30:3, 57:15, 62:10,
90:4, 95:9, 97:7,
99:9, 99:10, 134:2,
134:8, 134:22,
135:5, 136:18,
136:19, 137:19,
146:7, 149:21,
160:15, 160:23,
207:9
**halfway** [3] - 25:17,
25:21, 26:25
**hand** [9] - 18:16, 29:7,
48:5, 48:11, 52:22,
82:9, 124:15,
145:25, 205:23
**handle** [3] - 85:14,
103:21, 111:20
**handled** [1] - 109:4
**handwriting** [1] -
64:10
**HANLEY** [1] - 2:11
**happy** [8] - 17:9,
159:17, 171:14,
171:18, 181:2,
184:23, 197:4,
205:19
**hardly** [1] - 145:12
**harm** [1] - 202:12
**harmonic** [6] - 20:10,
32:4, 32:5, 32:20,
32:23, 33:1
**harmonies** [1] - 31:14
**harmony** [16] - 16:11,
17:20, 18:6, 19:18,
21:23, 22:5, 31:8,
31:10, 31:11, 33:1,
87:7, 87:8, 87:9,
87:11, 92:15
**harmony's** [1] - 92:20
**Harper** [6] - 174:13,
175:25, 202:15,
202:17, 203:11,
203:23

**Harrison** [1] - 179:22
**Harvard** [7] - 13:11,
13:13, 13:16, 14:25,
15:2, 22:20, 91:12
**Hate** [3] - 70:19, 72:8,
95:23
**hate** [2] - 114:13,
196:6
**haunt** [1] - 83:13
**haystack** [1] - 143:4
**head** [2] - 109:22,
207:5
**heading** [1] - 171:7
**hear** [30] - 5:8, 16:16,
27:5, 27:6, 27:13,
28:3, 30:14, 30:18,
30:19, 40:13, 40:15,
41:18, 45:10, 52:7,
68:19, 68:23, 70:21,
71:8, 71:9, 73:1,
73:7, 77:15, 90:10,
90:13, 91:1, 117:2,
160:18, 176:5, 187:2
**heard** [23] - 6:1, 25:13,
26:17, 26:19, 26:21,
28:7, 30:20, 34:20,
38:6, 40:14, 70:5,
76:21, 82:15, 82:18,
83:10, 133:13,
134:4, 135:25,
146:25, 169:14,
179:7, 191:18,
206:19
**hearing** [3] - 28:9,
158:16
**hears** [1] - 52:20
**heavens** [1] - 19:4
**heavily** [1] - 48:24
**held** [4] - 32:7, 32:8,
32:9, 32:21
**Hello** [1] - 149:11
**help** [5] - 150:8, 171:4,
200:7, 203:15, 205:7
**helped** [1] - 11:22
**helpful** [2] - 200:9,
206:25
**helping** [1] - 196:6
**helps** [1] - 183:3
**HEREBY** [1] - 209:10
**hereby** [1] - 124:12
**HEREINBEFORE** [1] -
209:11
**heretofore** [1] - 4:7
**hierarchy** [1] - 118:16
**high** [5] - 11:21,
34:23, 40:4, 51:23,
65:23
**higher** [5] - 36:2, 52:9,
62:10, 153:16,
203:25

**highlight** [2] - 36:3,
36:15
**highlighted** [1] - 39:11
**highlights** [1] - 127:19
**himself** [1] - 77:14
**hip** [5] - 23:6, 161:13,
162:6, 168:5, 168:11
**historical** [3] - 13:16,
14:2, 131:1
**history** [2] - 13:17,
131:10
**history's** [1] - 60:24
**hit** [5] - 6:8, 23:8, 76:4,
76:5
**hitting** [2] - 23:10,
127:18
**hmm** [2] - 145:18,
164:18
**hold** [3] - 123:4,
170:10, 187:15
**holder** [1] - 152:13
**holds** [1] - 139:10
**home** [7] - 67:1, 67:2,
133:2, 160:14,
165:6, 169:6, 170:19
**homeowner** [1] - 67:1
**Honor** [94] - 4:19, 5:9,
5:22, 6:5, 6:14, 7:13,
7:17, 7:23, 8:2, 9:1,
17:2, 58:1, 85:13,
88:17, 88:19,
101:14, 103:13,
103:24, 104:13,
106:23, 107:22,
109:23, 110:20,
113:3, 114:10,
115:1, 115:18,
117:19, 119:13,
121:24, 122:14,
124:1, 124:12,
124:25, 135:22,
136:2, 136:11,
149:5, 154:16,
154:19, 155:12,
155:16, 155:20,
156:5, 156:18,
157:3, 157:14,
157:16, 157:25,
158:17, 158:25,
159:21, 161:3,
163:7, 164:6, 166:8,
166:20, 166:21,
167:13, 168:25,
169:3, 171:1,
171:13, 171:17,
172:25, 173:21,
174:25, 175:24,
176:11, 176:23,
177:9, 178:13,
180:1, 181:13,

181:22, 181:25,
182:17, 182:24,
182:20, 185:23,
187:6, 188:16,
189:13, 192:18,
194:20, 195:8,
196:15, 200:25,
201:25, 203:4,
204:23, 207:4,
207:11, 207:23
**Honor's** [4] - 107:23,
108:15, 110:2,
162:16
**HONORABLE** [1] - 1:4
**honorary** [1] - 11:13
**hook** [4] - 30:21,
30:24, 31:1, 47:2
**hop** [5] - 23:6, 161:13,
162:6, 168:5, 168:11
**hope** [6] - 145:20,
156:12, 157:1,
189:4, 191:18, 207:6
**hopefully** [11] - 85:17,
122:15, 122:21,
123:8, 154:24,
159:24, 167:12,
169:23, 188:22,
200:25, 207:19
**hoping** [2] - 156:6,
156:7
**Horse** [147] - 16:1,
16:24, 17:12, 17:23,
20:4, 20:6, 20:23,
21:1, 21:11, 22:5,
22:11, 24:9, 24:22,
24:24, 25:8, 25:9,
25:10, 25:15, 25:20,
25:23, 26:17, 26:23,
27:6, 28:4, 28:9,
28:20, 29:13, 29:17,
29:23, 30:7, 30:10,
30:12, 30:14, 30:18,
30:20, 30:25, 31:1,
31:5, 31:23, 31:25,
32:13, 32:21, 33:8,
34:5, 34:6, 34:13,
35:1, 35:3, 35:13,
37:6, 37:10, 37:20,
37:22, 37:25, 39:7,
39:19, 40:15, 41:7,
41:19, 41:22, 42:4,
42:11, 42:19, 42:24,
43:2, 43:15, 44:4,
44:8, 44:20, 45:8,
45:16, 47:5, 47:7,
47:16, 47:25, 48:1,
50:1, 50:11, 51:15,
51:18, 51:24, 52:3,
52:8, 53:20, 53:21,
54:21, 55:18, 56:17,

58:20, 58:24, 59:17, 59:18, 60:2, 60:14, 61:9, 61:12, 61:23, 62:19, 64:20, 68:1, 68:8, 69:17, 71:19, 71:23, 72:5, 72:13, 72:18, 72:19, 72:23, 73:4, 74:19, 75:18, 76:8, 76:18, 76:20, 77:17, 79:9, 79:13, 81:9, 81:17, 81:23, 82:6, 82:7, 82:11, 84:10, 84:12, 85:1, 87:1, 89:9, 89:12, 90:4, 90:18, 93:22, 94:3, 94:13, 94:22, 94:24, 95:3, 95:8, 95:15, 102:19, 181:15, 184:3, 185:14, 191:5, 193:8
**horse** [1] - 184:19
**Hot** [1] - 162:3
**hour** [13] - 8:17, 15:17, 15:18, 57:15, 129:5, 153:14, 153:23, 153:25, 154:13, 156:6, 156:13, 160:15, 160:23
**hourly** [6] - 15:13, 15:16, 129:4, 153:14, 153:16, 153:19
**hours** [3] - 99:20, 134:10, 154:4
**Hours** [2] - 43:19, 74:22
**house** [7] - 18:12, 18:16, 67:3, 67:4, 67:5, 67:6, 93:7
**House** [1] - 175:25
**housekeeping** [1] - 155:15
**huge** [1] - 58:21
**human** [2] - 146:23, 147:25
**humans** [1] - 147:15
**hundreds** [1] - 5:5
**hundredth** [1] - 146:12
**hypothetical** [1] - 184:17
**hypothetically** [1] - 186:18

**I**

**i.e** [1] - 50:11
**ID** [2] - 152:6, 152:10
**idea** [6] - 57:7, 67:7, 104:4, 134:2, 171:2,

175:9
**ideas** [4] - 29:5, 173:15, 174:3, 204:12
**identical** [9] - 41:17, 46:2, 46:3, 46:11, 82:7, 82:13, 84:18, 91:3, 203:21
**identified** [10] - 22:25, 23:2, 56:5, 58:12, 70:11, 73:20, 77:20, 84:2, 106:18, 190:22
**identifies** [6] - 30:1, 30:2, 71:18, 71:20, 71:21, 77:8
**identify** [17] - 14:12, 23:16, 24:5, 31:19, 35:16, 37:15, 38:1, 38:17, 39:5, 44:18, 45:6, 48:20, 50:25, 52:15, 63:1, 67:14, 183:12
**idle** [1] - 205:24
**ignore** [1] - 19:3, 104:5
**Illinois** [1] - 12:21
**illustrate** [2] - 6:3, 9:13
**illustrating** [1] - 6:15
**illustrative** [1] - 9:25
**imagery** [1] - 189:16
**imagine** [1] - 207:15
**imaging** [1] - 189:7
**immaterial** [1] - 195:13
**immediately** [2] - 58:7, 61:13
**impediment** [1] - 187:24
**imperative** [1] - 171:14
**implicitly** [1] - 19:18
**importance** [1] - 119:2
**important** [14] - 28:23, 30:10, 30:15, 30:17, 31:5, 39:19, 68:3, 82:5, 136:7, 141:22, 163:23, 164:12
**importantly** [1] - 55:17
**impossible** [1] - 116:4
**improper** [1] - 185:10
**IN** [1] - 209:8
**inappropriate** [1] - 180:10
**incessantly** [1] - 74:10
**inclined** [1] - 164:6
**include** [9] - 19:12, 88:6, 96:11, 96:13, 121:14, 128:11, 163:12, 163:24,

166:1
**included** [6] - 39:10, 144:20, 171:21, 190:1, 190:22, 201:1
**includes** [8] - 24:14, 24:24, 71:4, 71:5, 71:7, 86:24, 165:17, 202:14
**including** [12] - 17:25, 22:19, 33:13, 99:18, 126:7, 127:20, 131:21, 161:13, 165:17, 168:5, 173:25, 191:19
**income** [1] - 114:6
**incomplete** [1] - 172:2
**inconsistent** [2] - 19:8, 164:15
**incorrect** [4] - 77:9, 86:19, 86:20, 173:12
**increase** [2] - 136:17, 153:21
**increases** [1] - 138:19
**incredibly** [1] - 134:17
**indeed** [5] - 16:15, 19:20, 33:16, 65:25, 140:6
**independent** [4] - 44:14, 44:16, 84:10, 179:9
**independently** [9] - 21:11, 44:14, 178:21, 192:2, 194:15, 196:14, 199:11, 199:15, 199:18
**INDEX** [1] - 3:1
**Indiana** [1] - 12:23
**indicate** [1] - 107:16
**indicated** [5] - 33:4, 42:23, 50:6, 72:16, 73:16
**indicates** [1] - 107:13
**indicating** [1] - 108:5
**indicative** [1] - 69:17
**indicia** [1] - 198:17
**individual** [1] - 107:13
**individually** [2] - 20:13, 73:25
**industry** [1] - 152:1
**Industry** [3] - 128:8, 128:20, 132:11
**inference** [2] - 8:7, 178:3
**inflate** [1] - 147:17
**inflated** [2] - 149:20, 149:25
**inflation** [1] - 147:3
**influenced** [2] - 71:25, 205:22

**Information** [2] - 127:9, 127:19
**information** [16] - 8:3, 14:17, 18:13, 28:23, 53:24, 67:21, 105:17, 106:1, 106:13, 106:16, 107:20, 122:4, 122:8, 143:14, 143:23, 145:19
**informed** [1] - 176:10
**infringe** [3] - 181:15, 183:16, 185:14
**infringed** [2] - 184:8, 184:18
**infringement** [18] - 5:10, 14:19, 15:9, 88:24, 100:5, 100:9, 100:13, 181:16, 182:2, 182:7, 182:12, 183:9, 183:17, 186:6, 186:22, 188:8, 189:23, 190:5
**infringers** [2] - 181:24, 188:6
**infringes** [3] - 84:21, 183:18, 184:3
**infringing** [1] - 184:17
**ingredient** [1] - 38:9
**initial** [2] - 54:20, 158:1
**Initiative** [1] - 128:5
**input** [1] - 105:23
**inquiry** [1] - 131:17
**inserted** [1] - 17:11
**insignificant** [1] - 90:8
**insofar** [2] - 52:4, 115:19
**inspect** [6] - 5:4, 5:21, 6:18, 6:20, 6:23, 8:8
**instance** [1] - 99:6
**instances** [2] - 113:21, 130:18
**instead** [7] - 36:17, 45:18, 45:23, 52:5, 181:14, 195:16, 200:12
**instruct** [1] - 24:7, 156:12, 156:19, 156:22, 156:24, 173:23, 174:9, 174:16, 182:5, 183:1, 184:12, 194:9, 207:8
**instructed** [4] - 35:22, 169:14, 174:1, 189:15
**INSTRUCTION** [1] - 3:15

**Instruction** [5] - 178:16, 179:17, 180:18, 182:9, 203:5
**instruction** [45] - 24:7, 109:1, 171:12, 172:2, 172:4, 172:5, 172:17, 173:15, 174:24, 176:9, 176:20, 179:20, 180:4, 180:15, 180:23, 181:1, 182:1, 182:5, 183:2, 183:4, 183:14, 184:12, 185:6, 188:11, 188:13, 189:7, 189:20, 190:2, 191:12, 192:11, 194:7, 194:8, 194:22, 196:8, 197:7, 197:24, 198:21, 200:3, 200:10, 201:18, 202:5, 203:12, 205:13, 206:11, 207:1
**instructions** [19] - 103:15, 155:23, 156:1, 159:7, 165:6, 169:7, 170:12, 170:13, 171:14, 173:24, 174:15, 174:19, 175:3, 189:2, 201:14, 203:9, 204:5, 204:16, 207:24
**Instructions** [3] - 171:8, 171:25, 172:13
**instrument** [4] - 7:19, 51:10, 51:11, 66:11
**instrumental** [7] - 22:6, 33:18, 33:20, 35:6, 88:12, 89:4, 194:5
**instruments** [4] - 66:4, 78:21, 82:2, 96:25
**intend** [1] - 194:19
**intended** [3] - 121:9, 166:25, 181:25
**intending** [1] - 203:14
**intent** [2] - 186:4, 198:15
**intention** [3] - 8:10, 10:2, 105:4
**interact** [1] - 130:9
**interchangeably** [1] - 30:22
**interchanged** [1] - 23:5

**interest** [3] - 15:19, 189:23, 200:18
**interested** [2] - 18:17, 138:8
**interesting** [2] - 147:22, 196:5
**interestingly** [3] - 61:18, 70:2, 77:1
**internal** [1] - 105:19
**Internet** [8] - 127:25, 132:20, 132:21, 132:22, 133:19, 133:20, 138:5, 192:16
**interrogatories** [1] - 207:17
**interrupt** [2] - 34:10, 65:1
**interruption** [1] - 24:4
**interval** [11] - 39:18, 39:24, 59:1, 59:2, 59:4, 59:13, 59:14, 59:18, 59:24
**intervals** [1] - 59:20
**intimate** [1] - 130:12
**intrinsic** [1] - 180:19
**intro** [6] - 29:9, 29:10, 90:16, 94:3
**introduced** [2] - 47:23, 71:11
**introduction** [16] - 24:11, 24:21, 24:22, 24:24, 26:1, 26:18, 26:22, 29:3, 29:10, 30:8, 38:1, 40:14, 45:9, 47:22, 71:2, 104:9
**introductions** [1] - 28:21
**intuition** [1] - 92:6
**inversion** [1] - 148:4
**investigation** [1] - 9:18
**invited** [3] - 14:21, 14:24, 105:1
**involved** [8] - 23:1, 100:24, 101:10, 154:4, 158:14, 175:25, 182:18, 183:9
**involves** [2] - 201:7, 202:19
**iPod** [1] - 138:10
**irrelevant** [3] - 109:19, 114:8, 115:17
**IS** [1] - 209:14
**isolated** [1] - 102:19
**isolation** [1] - 118:25
**issue** [95] - 4:14, 5:25, 17:3, 21:4, 22:11,

24:14, 24:17, 25:5, 25:25, 26:16, 26:24, 27:8, 27:14, 28:18, 29:21, 30:5, 30:9, 35:14, 44:21, 47:6, 47:8, 48:15, 49:13, 53:18, 60:1, 63:8, 68:12, 69:1, 69:25, 71:8, 73:17, 74:13, 79:18, 85:23, 88:7, 88:8, 94:13, 94:14, 94:17, 94:23, 95:7, 98:7, 103:25, 105:12, 108:19, 109:23, 110:13, 112:25, 116:7, 122:25, 125:9, 125:12, 125:14, 129:17, 130:21, 140:3, 140:19, 141:17, 142:17, 142:24, 144:5, 144:13, 145:14, 145:16, 155:17, 159:3, 160:6, 160:22, 161:17, 163:7, 166:14, 173:22, 174:18, 175:8, 176:18, 183:19, 187:18, 188:2, 189:16, 190:17, 191:15, 191:17, 191:23, 192:20, 192:24, 192:25, 200:20, 200:24, 201:15, 201:20, 202:14, 203:11, 204:9, 204:13, 207:5
**issued** [1] - 108:5
**issues** [28] - 4:13, 14:23, 19:10, 21:22, 114:12, 119:13, 120:2, 123:3, 123:8, 125:5, 125:24, 126:19, 126:21, 126:22, 132:9, 159:23, 160:3, 161:5, 170:7, 173:25, 174:6, 174:10, 174:13, 174:16, 174:20, 195:10, 204:9, 205:23
**it'** [2] - 82:8, 113:6
**Item** [1] - 4:3
**items** [1] - 75:12
**iterate** [1] - 51:13
**iterated** [1] - 40:15
**iteration** [1] - 53:14

**iterations** [2] - 40:13, 84:16
**itself** [5] - 16:24, 30:12, 49:5, 111:24, 198:7
**iTunes** [17] - 138:8, 138:16, 138:21, 138:25, 139:4, 139:9, 139:13, 139:14, 151:10, 151:13, 151:25, 152:2, 152:20, 152:21, 153:1, 153:7

## J

**JACOB** [1] - 2:17
**January** [7] - 145:23, 161:22, 161:25, 168:16, 168:19
**jaw** [1] - 135:19
**jaw-droppingly** [1] - 135:19
**jazz** [3] - 22:20, 59:15, 68:6
**JEFFREY** [1] - 2:16
**Jennifer** [1] - 14:14
**Jingle** [2] - 16:17, 16:19
**joint** [41] - 155:14, 180:20, 181:12, 187:11, 187:21, 190:17, 190:22, 191:3, 191:4, 191:13, 191:14, 191:20, 192:1, 193:17, 194:2, 194:14, 194:17, 195:1, 195:2, 195:23, 196:13, 196:14, 196:16, 196:21, 197:2, 197:7, 197:8, 197:11, 197:17, 198:2, 198:5, 198:8, 198:13, 198:15, 199:1, 199:11, 199:18, 199:19, 199:21, 200:2
**jointly** [1] - 170:12
**Jolly** [14] - 61:14, 61:15, 61:16, 61:20, 62:5, 62:19, 64:18, 65:3, 97:5, 97:16, 98:2, 98:11, 98:16, 102:12
**journal** [3] - 12:19, 12:22
**journals** [1] - 12:18
**Joyful** [189] - 16:1,

16:23, 17:10, 17:23, 20:4, 20:6, 20:15, 20:25, 21:12, 22:3, 22:11, 24:8, 24:11, 24:13, 24:14, 24:21, 25:3, 25:5, 25:15, 25:17, 25:22, 25:25, 26:10, 27:4, 27:7, 27:8, 27:21, 27:25, 29:21, 29:12, 29:17, 29:21, 30:13, 31:22, 32:4, 32:10, 32:11, 33:8, 34:10, 34:13, 35:3, 35:14, 37:6, 37:11, 37:23, 41:5, 41:14, 42:18, 44:14, 44:16, 47:6, 47:9, 47:16, 48:6, 48:8, 48:16, 48:17, 48:22, 49:17, 49:20, 50:2, 50:11, 50:15, 51:1, 51:6, 51:17, 51:23, 52:1, 52:5, 52:11, 53:17, 53:21, 54:9, 54:21, 55:11, 55:18, 55:25, 56:16, 56:19, 58:18, 59:22, 60:1, 60:14, 61:11, 61:19, 61:20, 61:21, 62:19, 64:20, 64:25, 65:1, 67:19, 68:9, 68:17, 68:22, 69:16, 70:7, 70:20, 70:21, 72:6, 72:25, 73:4, 75:4, 75:17, 76:7, 76:18, 76:22, 77:3, 77:6, 78:3, 78:8, 78:14, 78:15, 79:10, 81:10, 81:15, 81:19, 82:11, 82:12, 82:25, 83:17, 83:20, 83:23, 83:24, 85:1, 87:1, 88:9, 88:25, 89:7, 89:10, 89:15, 90:14, 91:4, 92:25, 93:23, 94:4, 94:12, 94:19, 96:17, 102:19, 106:18, 117:4, 118:9, 119:6, 121:1, 139:16, 139:18, 139:19, 139:25, 140:4, 140:15, 140:18, 141:13, 142:16, 142:20, 142:22, 142:25, 144:3, 144:4, 144:12, 145:5, 145:13, 145:15, 145:16, 148:14, 148:15, 148:16, 149:24, 152:8, 161:23,

163:2, 168:17, 168:21, 181:16, 184:3, 185:2, 185:15, 190:18, 191:6, 193:11, 193:14, 193:21, 194:2, 194:25, 195:1, 195:4, 195:7, 195:19, 195:25
**JUDGE** [1] - 1:4
**Judge** [10] - 4:13, 108:14, 111:18, 116:14, 121:11, 122:25, 123:25, 160:18, 164:16, 177:19
**judge** [3] - 104:22, 112:21, 184:23
**Judge's** [1] - 123:10
**judges** [1] - 206:1
**judgment** [2] - 157:6, 157:9
**judicial** [1] - 166:15
**Juicy** [2] - 70:15, 95:19
**July** [6] - 7:15, 8:15, 9:16, 165:18, 165:24, 166:2
**JULY** [3] - 1:15, 4:1, 209:18
**juncture** [6] - 109:10, 111:10, 112:22, 112:24, 121:7, 158:15
**June** [1] - 126:4
**juror** [2] - 185:5, 185:7
**jurors** [1] - 184:13
**jury** [63] - 6:16, 10:8, 10:9, 44:10, 57:13, 89:2, 103:9, 103:14, 109:2, 121:1, 124:4, 124:7, 135:25, 141:4, 155:7, 155:23, 155:25, 156:1, 156:13, 157:12, 157:22, 159:7, 160:13, 160:16, 160:25, 165:2, 165:6, 165:7, 166:7, 167:15, 167:18, 169:7, 169:20, 174:3, 175:14, 179:20, 181:23, 182:1, 182:6, 182:25, 184:7, 185:7, 185:8, 185:15, 186:18, 189:22, 190:4, 191:12, 191:22, 195:15, 196:6,

196:8, 196:18,
197:8, 197:11,
197:22, 198:25,
200:7, 202:19,
203:15, 205:7,
206:17, 206:25
**JURY** [1] - 3:15
**Jury** [2] - 171:8,
178:15
**jury's** [3] - 158:12,
186:22, 194:21

## K

**KAHN** [77] - 2:5, 3:10,
123:4, 123:7,
123:23, 123:25,
135:22, 144:7,
149:10, 154:16,
154:23, 155:12,
155:20, 156:5,
156:8, 156:16,
157:8, 157:11,
157:14, 157:24,
158:4, 158:17,
166:8, 166:10,
166:18, 166:21,
167:4, 167:16,
168:25, 172:16,
173:8, 173:12,
173:17, 175:23,
177:19, 177:25,
178:18, 179:4,
179:12, 179:19,
180:7, 180:22,
180:25, 181:13,
185:22, 185:25,
187:11, 187:20,
188:4, 190:6, 190:9,
191:11, 194:13,
194:19, 195:9,
195:15, 197:6,
198:1, 198:9,
198:12, 199:3,
199:9, 199:17,
199:24, 200:2,
201:9, 202:24,
203:2, 203:4, 204:5,
206:17, 207:10,
207:12, 207:19,
207:23, 208:1, 208:8
**Kahn** [8] - 149:11,
168:24, 172:10,
176:17, 178:17,
199:15, 204:16,
206:16
**Katy** [2] - 4:5, 25:9
**KATY** [1] - 1:9
**KAYIRA** [3] - 2:9,
2:10, 124:5

**keep** [13] - 23:10,
29:22, 36:1, 44:3,
57:10, 83:16, 103:5,
112:8, 112:14,
134:24, 155:4,
169:11, 169:15
**keeping** [2] - 112:10,
121:16
**keeps** [4] - 29:22,
41:18, 41:19, 67:24
**kept** [1] - 134:8
**key** [18] - 6:22, 18:8,
31:21, 31:23, 31:25,
32:1, 37:10, 37:11,
61:16, 61:19, 62:7,
62:8, 63:6, 74:9,
97:5, 98:15, 170:7
**keyboard** [18] - 5:10,
6:3, 7:7, 7:9, 7:12,
7:14, 9:24, 35:22,
38:19, 38:25, 39:9,
39:10, 39:11, 40:5,
56:23, 58:23, 66:12,
66:13
**keys** [7] - 6:7, 22:16,
35:23, 37:6, 37:12,
40:5, 55:22
**kids** [3] - 63:25, 78:20,
137:16
**kind** [15] - 5:7, 22:17,
27:3, 54:23, 105:4,
130:4, 131:5,
143:24, 147:10,
147:22, 151:12,
163:23, 192:8,
202:25
**kindergarten** [1] -
150:10
**kinds** [5] - 19:1, 19:21,
64:3, 65:25, 142:22
**knowing** [1] - 91:24
**knowledge** [2] - 8:10,
117:7
**known** [1] - 43:20
**knows** [1] - 196:18
**KNUPP** [1] - 2:15
**Knupp** [1] - 100:17
**Korea** [1] - 128:14
**Korean** [1] - 128:13

## L

**L.A** [1] - 127:21
**label** [2] - 151:22,
152:25
**labels** [2] - 126:8,
126:14
**ladies** [3] - 155:1,
167:20, 169:5
**lady** [1] - 14:14

**laid** [1] - 104:15
**Lamb** [5] - 62:13,
64:12, 99:3, 99:8,
99:10
**language** [9] - 69:9,
123:8, 171:11,
179:13, 182:6,
182:9, 183:1,
184:10, 184:11
**large** [10] - 13:14,
13:15, 109:24,
126:13, 126:14,
127:20, 134:17,
135:19, 148:21,
149:3
**largely** [2] - 16:13,
16:20
**larger** [2] - 162:6,
168:11
**last** [39] - 9:16, 10:18,
14:24, 15:3, 19:9,
26:25, 30:19, 45:25,
46:2, 46:3, 46:11,
49:16, 49:19, 58:11,
80:17, 82:21, 84:17,
86:23, 86:25, 90:7,
91:2, 100:10, 105:7,
110:1, 112:8,
115:16, 121:8,
124:18, 124:22,
131:4, 140:13,
147:20, 157:8,
159:25, 162:25,
181:10, 189:4,
200:23
**late** [1] - 128:1
**Laugh** [1] - 141:8
**launched** [1] - 134:3
**launches** [1] - 139:2
**LAURA** [4] - 1:22,
209:8, 209:20,
209:21
**LAUREN** [1] - 2:6
**Law** [3] - 14:25, 15:2,
15:4
**LAW** [1] - 2:9
**law** [17] - 15:4, 178:16,
179:21, 180:6,
191:25, 192:3,
193:14, 193:23,
199:5, 199:7,
201:12, 202:4,
202:8, 203:13,
204:22, 206:1,
206:11
**LAWRENCE** [1] - 3:5
**Lawrence** [2] - 4:11,
10:19
**lawsuit** [1] - 193:9
**laying** [1] - 106:3

**lays** [1] - 206:11
**lead** [2] - 114:20,
172:14
**leap** [2] - 39:16, 58:25
**learn** [4] - 36:16, 66:3,
66:15, 96:24
**learned** [1] - 66:3
**least** [9] - 50:17,
70:11, 99:19, 120:9,
121:10, 122:12,
172:15, 200:16,
201:7
**leave** [2] - 106:10,
119:25
**leaves** [1] - 170:19
**lecture** [1] - 14:25
**lectured** [1] - 132:8
**lectures** [5] - 14:18,
14:21, 14:22, 15:1
**Led** [6] - 173:22,
174:8, 175:4,
201:23, 204:19
**left** [5] - 32:12, 35:24,
58:5, 60:16, 63:3
**legal** [4] - 17:2, 17:5,
130:19, 187:24
**length** [15] - 48:23,
50:10, 53:16, 55:16,
75:16, 75:17, 75:19,
75:22, 76:6, 76:12,
76:14, 77:13, 80:12,
90:5
**lengths** [2] - 50:24,
59:9
**Lepera** [11] - 10:20,
57:14, 57:25, 80:3,
94:2, 100:17, 102:8,
114:13, 115:7,
169:2, 173:19
**LEPERA** [202] - 2:15,
3:6, 4:10, 4:18, 5:9,
6:5, 7:13, 8:14, 10:2,
10:21, 10:23, 17:7,
23:20, 23:22, 24:3,
27:17, 27:23, 28:10,
38:4, 42:9, 42:11,
42:14, 45:1, 45:4,
50:25, 51:4, 57:4,
57:7, 57:15, 57:22,
58:1, 58:3, 69:14,
73:8, 73:13, 85:8,
88:19, 100:14,
100:25, 101:4,
101:19, 101:21,
102:7, 102:11,
102:22, 103:13,
103:16, 103:20,
109:13, 112:7,
114:14, 115:11,
116:17, 116:20,

117:19, 118:13,
118:21, 120:4,
120:8, 120:13,
120:22, 121:3,
121:16, 121:19,
121:24, 122:14,
122:20, 123:6,
123:13, 124:1,
155:11, 155:14,
156:10, 157:3,
157:15, 157:21,
158:19, 159:9,
159:15, 159:21,
160:2, 160:6,
160:11, 160:17,
160:21, 161:3,
161:16, 164:20,
164:24, 165:2,
169:3, 170:6,
170:14, 170:21,
171:1, 171:4,
171:24, 172:17,
172:24, 173:2,
173:6, 173:15,
173:20, 174:25,
175:5, 175:17,
176:11, 176:16,
176:23, 177:4,
177:9, 177:12,
177:17, 177:23,
178:10, 178:12,
178:25, 179:9,
179:24, 180:5,
180:10, 180:14,
180:20, 181:2,
181:9, 181:18,
181:22, 182:17,
183:7, 183:19,
184:2, 184:16,
185:10, 185:20,
186:11, 186:23,
187:5, 187:10,
187:18, 187:25,
188:3, 188:11,
188:15, 188:21,
189:3, 189:13,
189:18, 190:8,
190:10, 190:12,
190:14, 192:18,
193:20, 194:16,
194:20, 194:23,
195:14, 195:17,
196:10, 196:15,
196:20, 197:4,
197:15, 197:19,
197:23, 198:6,
198:14, 198:22,
199:2, 199:4, 200:4,
200:9, 200:12,
200:15, 200:20,
200:23, 201:16,

201:25, 202:4, 202:22, 203:1, 203:7, 203:10, 204:4, 204:12, 204:19, 204:22, 205:9, 205:15, 206:3, 206:8, 206:13, 206:15, 206:23, 207:3, 207:11, 207:20, 207:25, 208:4, 208:9, 208:12, 208:14

**Lepera's** [1] - 172:14

**less** [7] - 30:10, 114:2, 117:17, 138:3, 145:10, 150:21, 171:10

**letter** [8] - 7:14, 35:23, 36:14, 37:1, 44:22, 44:23, 55:2, 203:13

**letters** [8] - 35:25, 36:7, 36:12, 37:18, 39:8, 41:16, 45:11, 71:4

**letting** [1] - 109:3

**level** [10] - 18:5, 52:11, 65:17, 75:20, 84:3, 116:25, 148:5, 187:12, 201:10, 203:25

**LG** [1] - 126:16

**liability** [3] - 181:12, 182:23, 187:17

**liable** [14] - 182:2, 182:13, 182:25, 183:1, 183:3, 183:6, 183:10, 183:18, 184:14, 184:19, 185:16, 187:4, 187:7, 187:14

**library** [2] - 132:22, 132:23

**lieu** [1] - 179:16

**Life** [5] - 43:21, 43:22, 44:4, 44:7, 61:9

**life** [2] - 113:14, 113:15

**light** [2] - 52:1, 120:7

**lighted** [1] - 40:4

**likely** [1] - 117:10

**limine** [5] - 104:6, 110:8, 112:21, 115:25, 122:9

**limit** [2] - 93:1, 194:23

**limited** [1] - 89:3

**limiting** [2] - 43:17, 109:1

**line** [13] - 32:12, 32:13, 45:16, 45:25,

46:1, 48:21, 62:6, 89:3, 106:12, 133:3, 174:19, 185:4, 199:4

**liner** [1] - 191:19

**Lines** [1] - 187:19

**link** [10] - 110:20, 110:23, 111:24, 118:4, 118:6, 142:9, 142:12, 144:15, 144:18

**linked** [1] - 116:2

**linking** [1] - 115:25

**links** [3] - 112:2, 122:3, 133:8

**list** [4] - 104:12, 116:21, 118:19, 155:15

**listed** [6] - 38:20, 115:20, 116:19, 117:4, 119:7, 182:13

**listen** [16] - 21:16, 24:22, 33:11, 49:3, 59:12, 94:8, 94:10, 111:14, 117:11, 130:24

**listened** [5] - 27:2, 33:10, 94:11, 107:14, 107:17

**listener** [1] - 107:17

**listening** [6] - 18:6, 18:18, 18:19, 21:18, 87:18, 146:23

**listenings** [2] - 21:20, 21:24

**listing** [1] - 118:22

**lists** [4] - 50:22, 58:17, 58:19, 58:20

**literally** [7] - 8:17, 9:4, 45:13, 58:23, 91:15, 127:21, 173:17

**literary** [1] - 207:2

**litigation** [1] - 143:20

**live** [3] - 150:10, 164:5, 180:10

**LLC** [1] - 2:9

**locate** [1] - 144:4

**locating** [1] - 143:25

**lodged** [1] - 5:1

**look** [74] - 15:22, 20:13, 23:3, 23:12, 23:22, 37:14, 39:5, 40:7, 40:10, 41:2, 41:9, 41:25, 43:12, 43:25, 44:17, 45:5, 45:24, 45:25, 48:16, 48:19, 48:23, 49:8, 49:15, 52:19, 53:24, 54:18, 56:11, 58:17, 61:10, 61:18, 61:24, 62:2, 62:24, 63:19,

66:12, 67:14, 67:18, 71:4, 75:25, 77:19, 82:21, 93:2, 93:6, 118:18, 129:23, 129:24, 130:7, 131:20, 131:22, 133:1, 133:8, 139:20, 140:6, 148:25, 150:4, 158:25, 159:1, 159:4, 159:8, 159:19, 160:8, 176:17, 178:23, 181:13, 187:22, 188:25, 190:13, 191:21, 192:14, 202:17, 204:1, 204:17, 205:13

**looked** [18] - 7:16, 22:10, 28:11, 31:6, 41:4, 41:5, 61:7, 61:9, 70:9, 93:13, 125:11, 132:17, 132:19, 133:11, 145:6, 150:5, 172:25

**looking** [17] - 24:5, 26:1, 28:14, 40:8, 41:1, 58:9, 93:7, 102:16, 108:21, 115:13, 132:12, 133:11, 151:8, 159:10, 180:5, 201:5, 203:25

**looks** [6] - 13:3, 19:13, 141:1, 167:13, 172:18, 173:13

**loop** [3] - 23:7, 23:8, 38:10

**loosely** [1] - 18:10

**Lopez** [1] - 14:14

**LOS** [6] - 1:16, 1:23, 2:19, 2:24, 4:1, 209:4

**lost** [1] - 172:21

**Louis** [1] - 150:11

**LOUIS** [1] - 2:8

**love** [1] - 205:9

**Love** [3] - 70:19, 72:8, 95:23

**low** [2] - 25:18, 34:23

**lower** [2] - 32:13, 36:2

**lowered** [1] - 37:10

**lowest** [1] - 32:16

**luck** [1] - 208:3

**Luke** [13] - 20:24, 70:14, 70:19, 70:20, 71:24, 72:5, 72:8, 95:17, 95:19, 95:21, 101:24, 102:3, 102:4

**Luke's** [3] - 72:22,

79:20, 83:10

**Lunch** [1] - 124:3

**lunch** [6] - 10:5, 10:6, 57:20, 85:12, 85:16, 102:9

**lyrical** [2] - 20:3, 20:12

**lyrics** [10] - 16:12, 21:24, 61:15, 64:13, 92:13, 92:15, 92:18, 92:19, 92:22, 92:25

---

**M**

**machines** [1] - 147:12

**Madonna** [1] - 14:14

**magazine** [1] - 162:22

**main** [3] - 69:15, 140:20, 142:4

**mainstream** [5] - 161:12, 162:5, 162:13, 168:4, 168:10

**maintain** [1] - 194:16

**major** [10] - 32:15, 32:22, 61:16, 62:7, 62:8, 97:5, 98:15, 126:8, 126:13, 126:14

**majoring** [1] - 11:8

**majority** [2] - 152:15, 152:17

**majors** [1] - 11:10

**Management** [1] - 128:18

**mandate** [1] - 205:23

**Mane** [2] - 67:19, 74:24

**manner** [2] - 111:25, 116:5

**map** [1] - 28:15

**March** [5] - 140:11, 145:23, 148:17, 161:22, 168:16

**Marcus** [1] - 4:5

**MARCUS** [1] - 1:6

**market** [4] - 131:4, 131:6, 162:7, 168:12

**Market** [1] - 127:23

**married** [1] - 11:23

**Mars** [1] - 14:15

**Martin** [3] - 20:23, 70:14, 95:18

**Mary** [5] - 62:12, 64:11, 99:3, 99:7, 99:9

**mashup** [5] - 9:1, 9:12, 9:14, 9:21

**mashups** [1] - 10:1

**masquerading** [1] - 147:25

**Massachusetts** [1] - 127:10

**Master's** [1] - 127:9

**match** [1] - 152:12

**material** [9] - 22:9, 26:8, 38:11, 43:13, 56:16, 62:18, 85:2, 193:24, 199:7

**materials** [1] - 128:15

**matter** [10] - 40:17, 46:1, 76:11, 92:5, 92:7, 128:22, 131:11, 149:23, 196:25, 199:7

**matters** [2] - 14:12, 22:25

**Max** [3] - 20:23, 70:14, 95:18

**mean** [30] - 19:3, 34:21, 51:7, 82:19, 100:16, 101:17, 108:13, 111:4, 111:22, 112:6, 119:13, 123:9, 146:23, 146:24, 151:14, 159:15, 170:15, 172:11, 173:17, 178:18, 183:15, 194:21, 198:4, 198:12, 198:19, 198:24, 202:8, 205:21, 206:17, 206:24

**MEANS** [1] - 209:13

**means** [11] - 30:21, 38:7, 42:2, 55:14, 64:2, 79:12, 85:25, 129:22, 155:21, 155:24, 169:5, 174:4, 189:11

**measure** [7] - 18:11, 49:17, 49:20, 50:3, 53:19, 135:11, 135:16

**measures** [2] - 18:12, 18:23

**mechanics** [1] - 153:8

**Media** [3] - 125:19, 125:21, 128:20

**media** [11] - 125:23, 125:24, 126:8, 126:12, 126:13, 126:16, 126:21, 126:23, 127:20, 128:4, 135:7

**medium** [2] - 193:3, 193:13

**meet** [8] - 104:2, 104:4, 107:22, 108:1, 111:21,

112:9, 122:10,
175:15
**melodic** [4] - 20:11,
22:15, 50:8, 62:9
**melodies** [10] - 18:6,
22:2, 22:4, 35:1,
35:3, 35:10, 46:7,
74:11, 84:15, 87:11
**melody** [31] - 16:12,
17:20, 19:17, 21:23,
22:3, 23:9, 34:14,
34:16, 34:18, 35:9,
38:8, 40:21, 40:22,
43:23, 55:11, 59:22,
61:14, 61:15, 62:11,
62:12, 63:6, 64:12,
64:13, 74:8, 84:25,
87:7, 87:9, 91:14,
99:2
**member** [5] - 12:7,
12:9, 12:22, 128:3,
128:5
**memorable** [2] -
30:22, 30:25
**memories** [1] - 45:2
**memory** [1] - 132:18
**mention** [1] - 109:13
**mentioned** [8] - 28:3,
33:9, 34:14, 34:15,
37:5, 95:18, 127:14,
144:14
**mentored** [2] - 11:7,
11:11
**merely** [2] - 29:22,
39:12
**merge** [1] - 194:19
**merged** [1] - 198:15
**Merrily** [10] - 62:10,
62:11, 64:6, 64:11,
64:18, 65:3, 98:23,
99:4, 99:10, 102:13
**message** [2] - 144:15
**messages** [2] - 189:7,
189:16
**met** [1] - 102:4
**method** [3] - 6:15,
63:24, 85:22
**methodology** [2] -
86:3, 115:3
**methods** [1] - 39:3
**metrics** [2] - 104:8,
118:15
**mi** [4] - 40:9, 43:8,
56:18, 64:16
**Mi** [52] - 36:19, 36:21,
39:1, 40:8, 41:16,
43:9, 54:5, 54:14,
54:15, 54:16, 55:3,
56:9, 56:18, 56:21,
63:13, 63:15, 63:16,

63:18, 64:15, 64:16,
65:5, 66:21, 85:3
**MICHAEL** [1] - 2:5
**microphone** [1] -
124:20
**Microsoft** [1] - 126:15
**Microsystems** [1] -
127:24
**middle** [1] - 117:14
**might** [11] - 18:20,
51:21, 116:7,
129:19, 129:24,
141:25, 142:8,
142:9, 152:17,
183:15, 207:15
**Mike** [1] - 149:11
**MILLER** [3] - 1:22,
209:20, 209:21
**million** [27] - 100:11,
100:17, 134:6,
134:7, 134:18,
134:21, 134:23,
135:1, 138:15,
138:16, 138:20,
138:21, 138:23,
138:24, 139:5,
139:6, 139:7,
139:12, 139:13,
141:9, 143:7, 143:9,
146:7, 148:17,
148:20, 151:3
**millions** [1] - 133:7
**mind** [9] - 57:11,
61:13, 103:5, 116:9,
155:4, 169:15,
186:11, 186:22,
204:2
**mine** [1] - 145:10
**minimal** [3] - 120:8,
201:7, 202:19
**minimum** [3] - 172:10,
190:2, 201:10
**miniscule** [1] - 202:21
**Ministry** [1] - 128:12
**minor** [13] - 31:23,
31:24, 32:1, 32:3,
32:15, 32:16, 32:22,
37:11, 61:19, 62:8,
74:9
**minute** [1] - 187:15
**minutes** [11] - 9:4,
26:11, 27:20, 28:22,
57:10, 57:18, 95:11,
155:5, 160:7,
160:15, 176:8
**mischaracterizes** [1] -
98:9
**misleading** [2] -
106:24, 115:8
**misrepresent** [1] -

55:21
**misrepresentation** [2]
- 113:5; 192:8
**misrepresents** [2] -
55:20, 55:24
**missed** [1] - 157:8
**missing** [2] - 178:17,
195:17
**mistake** [1] - 96:3
**MITCHELL** [1] - 2:15
**Mitchell** [1] - 100:17
**mix** [2] - 7:17, 27:15
**mmm-hmm** [1] -
164:18
**MO** [2] - 2:8, 2:11
**Mobile** [1] - 131:2
**model** [15] - 7:14,
7:15, 8:16, 175:6,
175:18, 179:20,
179:25, 181:4,
182:8, 193:23,
196:16, 196:21,
200:13, 205:10,
205:18
**modified** [3] - 171:22,
172:22, 177:11
**moment** [9] - 26:20,
34:13, 41:18, 52:10,
68:19, 71:9, 71:16,
95:1, 142:7
**money** [2] - 134:4,
153:4
**morality** [2] - 189:8,
189:11
**moreover** [1] - 47:15
**morning** [11] - 4:8,
10:10, 10:24, 10:25,
57:5, 57:9, 169:7,
169:11, 169:17,
207:22, 208:8
**most** [17] - 29:3,
30:21, 30:25, 60:10,
61:23, 63:25, 65:13,
67:25, 68:4, 68:6,
69:12, 137:24,
137:25, 138:14,
162:3, 163:23, 168:7
**mostly** [3] - 68:13,
68:15, 71:2
**motion** [10] - 58:22,
110:8, 112:22,
157:4, 158:1, 158:9,
158:14, 183:20,
188:19, 197:13
**motions** [4] - 104:6,
115:24, 122:9,
157:10
**motivation** [1] - 147:9
**Motorola** [1] - 127:16
**move** [12] - 36:4,

40:24, 51:11, 51:19,
56:5, 58:6, 60:3,
73:19, 88:17,
135:25, 138:12,
139:1
**moved** [2] - 39:14,
45:15
**movement** [4] - 39:22,
45:20, 47:19, 64:14
**moves** [1] - 67:24
**movie** [3] - 43:19,
126:8, 126:14
**moving** [3] - 66:1,
66:10, 78:3
**Movit** [1] - 154:18
**MOVIT** [15] - 2:16, 3:9,
124:12, 124:25,
125:2, 126:18,
136:2, 136:10,
137:8, 144:10,
149:4, 154:19,
166:23, 167:7,
167:11
**MR** [107] - 3:9, 3:10,
101:14, 103:23,
119:13, 119:18,
122:22, 123:4,
123:7, 123:23,
123:25, 124:5,
124:12, 124:25,
125:2, 126:18,
135:22, 136:2,
136:10, 137:8,
144:7, 144:10,
149:4, 149:10,
154:16, 154:19,
154:23, 155:12,
155:20, 156:5,
156:8, 156:16,
156:18, 156:25,
157:8, 157:11,
157:14, 157:24,
158:4, 158:17,
158:23, 160:9,
160:11, 160:12,
165:7, 165:25,
166:6, 166:8,
166:10, 166:18,
166:20, 166:21,
166:23, 167:4,
167:7, 167:11,
167:13, 167:16,
168:25, 172:16,
173:8, 173:12,
173:17, 175:23,
177:19, 177:25,
178:18, 179:4,
179:12, 179:19,
180:7, 180:22,
180:25, 181:13,

185:22, 185:25,
187:11, 187:20,
188:4, 190:6, 190:9,
191:11, 194:13,
194:19, 195:9,
195:15, 197:6,
198:1, 198:9,
198:12, 199:3,
199:9, 199:17,
199:24, 200:2,
201:9, 202:24,
203:2, 203:4, 204:5,
206:17, 207:10,
207:12, 207:19,
207:23, 208:1, 208:8
**MS** [269] - 2:13, 3:6,
3:7, 4:10, 4:13, 4:18,
4:24, 5:9, 6:5, 6:14,
7:13, 8:2, 8:14, 10:2,
10:4, 10:21, 10:23,
17:2, 17:7, 23:18,
23:20, 23:21, 23:22,
23:24, 24:3, 27:17,
27:23, 28:10, 38:4,
42:9, 42:11, 42:14,
45:1, 45:4, 50:25,
51:4, 57:4, 57:7,
57:15, 57:18, 57:21,
57:22, 58:1, 58:3,
69:14, 73:8, 73:13,
85:8, 85:13, 85:15,
85:19, 88:17, 88:19,
88:22, 98:3, 99:5,
100:14, 100:19,
100:25, 101:4,
101:8, 101:12,
101:19, 101:21,
101:22, 102:2,
102:5, 102:7,
102:11, 102:22,
102:24, 103:13,
103:16, 103:20,
104:22, 104:24,
106:8, 107:11,
108:14, 108:18,
109:9, 109:13,
110:19, 111:16,
111:18, 112:7,
114:9, 114:14,
115:1, 115:6,
115:11, 115:18,
115:22, 116:14,
116:17, 116:18,
116:20, 117:19,
117:22, 118:8,
118:13, 118:21,
120:4, 120:8,
120:13, 120:22,
121:3, 121:11,
121:16, 121:19,
121:24, 121:25,

122:14, 122:17, 122:20, 122:25, 123:6, 123:13, 124:1, 155:11, 155:14, 156:10, 157:3, 157:15, 157:21, 158:19, 159:3, 159:9, 159:11, 159:15, 159:21, 160:2, 160:6, 160:8, 160:17, 160:21, 161:3, 161:15, 161:16, 163:7, 164:6, 164:11, 164:16, 164:18, 164:20, 164:23, 164:24, 165:1, 165:2, 165:12, 167:24, 169:3, 170:6, 170:14, 170:21, 171:1, 171:4, 171:24, 172:17, 172:24, 173:2, 173:6, 173:15, 173:20, 174:25, 175:5, 175:17, 176:11, 176:16, 176:23, 177:4, 177:9, 177:12, 177:17, 177:23, 178:10, 178:12, 178:25, 179:9, 179:24, 180:5, 180:10, 180:14, 180:20, 181:2, 181:9, 181:18, 181:22, 181:25, 182:14, 182:17, 182:24, 183:7, 183:19, 184:2, 184:9, 184:16, 184:23, 185:10, 185:20, 186:11, 186:23, 187:5, 187:10, 187:18, 187:25, 188:3, 188:11, 188:15, 188:21, 189:3, 189:13, 189:18, 190:8, 190:10, 190:12, 190:14, 192:18, 193:20, 194:16, 194:20, 194:23, 195:14, 195:17, 196:10, 196:15, 196:20, 197:4, 197:15, 197:19, 197:23, 198:6, 198:14, 198:22,

199:2, 199:4, 200:4, 200:9, 200:12, 200:15, 200:20, 200:23, 201:12, 201:16, 201:25, 202:4, 202:22, 203:1, 203:7, 203:10, 204:4, 204:12, 204:19, 204:22, 205:9, 205:15, 206:3, 206:8, 206:13, 206:15, 206:23, 207:3, 207:11, 207:20, 207:25, 208:4, 208:9, 208:12, 208:14
**multiple** [1] - 69:21
**music** [124] - 6:3, 11:8, 11:10, 11:20, 12:3, 12:4, 12:13, 12:18, 12:19, 12:22, 13:12, 13:17, 13:18, 13:19, 14:7, 14:10, 14:13, 14:19, 14:23, 14:25, 17:18, 17:19, 17:21, 17:25, 19:10, 19:14, 19:15, 19:16, 22:19, 22:20, 25:1, 25:6, 25:12, 27:9, 27:12, 27:22, 28:6, 28:12, 28:18, 36:16, 38:3, 41:2, 41:4, 41:15, 42:10, 42:13, 45:3, 51:3, 60:24, 61:8, 61:10, 62:17, 63:4, 63:25, 68:4, 68:6, 69:6, 73:9, 82:2, 82:15, 82:19, 84:12, 84:15, 86:4, 86:11, 86:14, 86:17, 87:16, 98:7, 99:25, 111:15, 114:2, 120:21, 120:24, 129:18, 130:6, 130:20, 131:14, 131:15, 131:16, 132:8, 137:20, 137:22, 137:24, 137:25, 138:1, 138:3, 138:14, 138:15, 138:20, 138:24, 139:4, 139:8, 139:14, 151:9, 151:12, 152:18, 152:21, 153:1, 153:2, 153:5, 153:10, 161:9, 161:14, 161:22, 161:24, 162:8, 162:18, 168:2,

168:6, 168:11, 168:15, 168:18, 168:22, 176:4, 190:3, 202:16, 204:6, 204:16, 204:19
**Music** [16] - 11:4, 12:11, 13:12, 19:15, 24:16, 36:19, 128:5, 128:6, 129:20, 130:3, 130:8, 131:2, 131:21, 132:9, 132:11, 138:8
**music's** [1] - 204:25
**musical** [40] - 11:25, 13:22, 13:23, 14:3, 16:13, 17:19, 18:5, 19:17, 20:3, 20:16, 20:17, 21:25, 23:4, 31:8, 33:3, 33:9, 35:24, 35:25, 36:8, 36:12, 37:17, 38:11, 46:6, 46:7, 52:15, 54:19, 56:16, 61:5, 78:19, 79:25, 85:6, 86:24, 87:13, 91:15, 93:25, 96:21, 97:3, 97:13, 99:12, 189:21
**musician** [1] - 92:5
**Musicological** [2] - 12:10, 15:6
**musicological** [42] - 7:19, 16:7, 18:1, 19:8, 19:11, 19:21, 20:2, 20:5, 20:6, 21:9, 21:10, 21:19, 22:7, 31:4, 31:24, 34:16, 34:21, 37:8, 44:10, 46:5, 46:8, 46:12, 47:11, 47:13, 48:10, 60:23, 75:19, 78:22, 79:18, 84:4, 84:5, 84:6, 90:21, 90:24, 91:7, 91:17, 92:1, 92:8, 92:16, 92:22, 93:5, 93:19
**musicologically** [2] - 74:18, 75:21
**musicologist** [4] - 12:2, 19:1, 19:11, 91:10
**musicologists** [3] - 92:3, 93:1, 93:2
**musicology** [12] - 13:9, 13:10, 13:11, 13:15, 13:16, 13:17, 13:21, 13:24, 14:2, 14:5, 14:23, 16:3
**Musicology** [1] - 12:10

**must** [5] - 44:15, 174:1, 182:8, 184:18, 202:20
**MY** [1] - 209:15

## N

**name** [16] - 10:18, 36:14, 105:23, 124:18, 124:21, 124:22, 142:20, 143:13, 143:22, 144:2, 144:3, 149:11, 182:16
**named** [2] - 11:13, 146:6
**names** [4] - 35:23, 44:22, 44:23, 109:18
**narrowed** [1] - 159:23
**narrower** [1] - 197:4
**narrowing** [2] - 103:16, 170:16
**nature** [5] - 10:1, 69:16, 126:17, 131:23, 132:13
**near** [2] - 27:14, 115:12
**nearing** [1] - 155:3
**nearly** [2] - 161:12, 168:3
**necessarily** [3] - 146:23, 146:24, 202:3
**necessary** [5] - 38:9, 163:19, 169:10, 196:12, 204:2
**need** [37] - 7:8, 91:23, 97:14, 101:5, 103:18, 116:15, 119:19, 120:19, 126:9, 143:12, 143:13, 143:22, 143:23, 145:3, 146:4, 148:20, 151:25, 152:25, 158:4, 158:5, 159:4, 163:9, 163:15, 164:21, 166:23, 169:22, 170:2, 174:23, 177:6, 186:3, 187:16, 192:11, 197:21, 205:12
**needed** [4] - 121:11, 131:9, 142:15, 143:21
**needle** [1] - 143:3
**needs** [3] - 75:25, 122:22, 185:22
**Neiley** [1] - 174:12

**Neilson** [1] - 162:18
**never** [17] - 5:21, 31:2, 49:5, 86:7, 89:17, 90:10, 102:4, 115:16, 178:4, 179:7, 179:8, 185:17, 186:20, 191:2, 194:5
**New** [5] - 11:3, 11:9, 13:1, 132:10, 147:20
**new** [11] - 5:25, 7:21, 26:12, 27:20, 67:4, 110:20, 111:25, 113:11, 121:1, 175:16
**news** [2] - 121:1, 207:23
**next** [45] - 21:18, 25:3, 36:4, 36:5, 36:6, 36:21, 40:24, 45:19, 49:3, 52:7, 52:22, 53:1, 53:11, 54:6, 55:15, 56:5, 57:2, 60:3, 60:11, 62:24, 63:19, 65:22, 67:1, 75:12, 79:24, 89:18, 92:2, 123:20, 124:11, 135:2, 135:21, 136:15, 136:20, 136:24, 137:5, 138:6, 139:10, 140:22, 145:18, 146:22, 147:19, 160:23
**Nicholas** [12] - 61:14, 61:16, 61:17, 61:21, 61:22, 62:5, 62:19, 65:4, 97:6, 98:2, 98:12, 98:16
**Nick** [3] - 64:18, 97:17, 102:12
**night** [7] - 105:7, 110:1, 112:8, 112:11, 115:15, 121:8
**nine** [6] - 14:24, 15:1, 18:12, 93:8, 139:8
**NO** [1] - 1:8
**No.2** [1] - 92:2
**Noise** [185] - 16:1, 16:23, 17:10, 17:23, 20:4, 20:7, 20:15, 20:25, 21:12, 22:3, 22:11, 24:8, 24:11, 24:14, 24:15, 24:21, 25:3, 25:5, 25:15, 25:17, 25:22, 25:25, 26:10, 27:4, 27:7, 27:8, 27:21, 27:25, 28:23, 29:12, 29:17,

29:21, 30:13, 31:23, 32:4, 32:10, 32:11, 33:8, 34:10, 34:13, 35:3, 35:14, 37:6, 37:11, 37:23, 41:5, 41:14, 42:18, 44:14, 44:16, 47:6, 47:9, 47:16, 48:7, 48:8, 48:16, 48:17, 48:22, 49:17, 49:20, 50:2, 50:11, 50:15, 51:1, 51:6, 51:23, 52:5, 52:11, 53:21, 54:10, 54:21, 55:11, 55:19, 55:25, 56:17, 56:19, 58:18, 59:22, 60:1, 60:14, 61:11, 61:19, 61:20, 61:21, 62:19, 64:20, 64:25, 65:1, 67:19, 68:9, 68:17, 68:22, 69:17, 70:7, 70:20, 70:21, 72:6, 72:25, 73:4, 75:4, 75:18, 76:7, 76:18, 76:22, 77:3, 77:6, 78:3, 78:8, 78:15, 78:16, 79:10, 81:10, 81:15, 81:19, 82:11, 82:12, 83:1, 83:17, 83:20, 83:23, 83:24, 85:1, 87:1, 88:10, 88:25, 89:7, 89:10, 89:15, 90:14, 92:25, 93:23, 94:4, 94:12, 94:19, 96:17, 102:19, 106:18, 117:4, 118:9, 119:6, 121:1, 139:16, 139:18, 139:19, 139:25, 140:4, 140:16, 140:18, 141:14, 142:16, 142:20, 142:23, 142:25, 144:3, 144:5, 144:12, 145:5, 145:13, 145:15, 145:17, 148:14, 148:15, 148:16, 149:25, 152:8, 161:23, 163:2, 168:17, 168:21, 181:17, 184:3, 185:2, 185:15, 190:18, 191:6, 193:11, 193:14, 193:22, 194:2, 194:25, 195:1, 195:4, 195:7, 195:19, 196:1
**Noise's** [4] - 51:17, 52:1, 53:17, 91:4

**nominally** [1] - 146:18
**non** [2] - 11:10, 162:17
**non-access** [1] - 162:17
**non-majors** [1] - 11:10
**none** [2] - 84:1, 202:10
**NONE** [1] - 3:12
**nonparties** [1] - 181:11
**nonsense** [1] - 79:18
**nonsensical** [1] - 48:10
**noon** [2] - 103:4, 156:13
**normal** [1] - 156:19
**normally** [3] - 23:2, 199:24, 204:5
**northeast** [1] - 99:16
**not(playing** [1] - 68:10
**notable** [2] - 26:9, 35:10
**notated** [2] - 33:14, 37:1
**notation** [7] - 16:13, 17:19, 19:17, 21:25, 33:10, 37:17, 86:24
**note** [37] - 6:8, 6:21, 32:16, 34:3, 37:19, 38:21, 38:22, 38:23, 39:17, 43:23, 45:19, 48:22, 49:16, 53:1, 53:3, 53:4, 53:8, 54:6, 54:7, 55:2, 57:2, 60:8, 60:11, 63:16, 66:21, 76:23, 76:24, 77:20, 78:7, 78:15, 89:19, 90:7
**notebooks** [1] - 166:18
**noted** [4] - 4:7, 26:11, 83:15, 121:23
**NOTES** [1] - 209:15
**notes** [134] - 9:13, 17:20, 18:7, 25:18, 31:11, 33:12, 34:2, 34:3, 34:4, 34:9, 34:19, 35:12, 38:5, 38:8, 38:13, 38:20, 39:2, 39:8, 39:10, 39:11, 39:12, 40:4, 40:12, 40:18, 40:19, 40:20, 40:22, 41:22, 42:3, 42:22, 43:1, 43:6, 43:24, 44:3, 44:7, 44:21, 45:25, 46:2, 46:3, 46:11, 47:20, 48:24, 49:1, 49:7, 49:8, 49:12,

49:16, 49:19, 50:3, 50:11, 50:15, 50:16, 50:18, 50:22, 51:6, 51:13, 51:22, 52:16, 53:14, 53:24, 54:1, 54:5, 55:14, 55:15, 55:20, 56:18, 56:22, 57:1, 59:8, 60:12, 63:6, 64:17, 64:20, 64:21, 64:24, 65:15, 66:1, 66:22, 67:22, 68:13, 68:16, 71:9, 72:17, 72:20, 72:22, 72:24, 72:25, 73:17, 75:23, 75:24, 76:2, 76:5, 76:10, 76:14, 76:21, 76:25, 77:2, 77:8, 77:11, 77:15, 77:16, 77:23, 84:18, 87:20, 87:23, 88:1, 88:2, 88:3, 89:7, 89:14, 89:16, 89:17, 89:18, 90:1, 90:7, 90:14, 90:16, 90:18, 91:2, 96:6, 96:11, 96:17, 96:22, 98:15, 99:7, 191:19, 192:14
**nothing** [22] - 6:6, 17:13, 59:16, 68:7, 70:1, 77:25, 78:9, 102:24, 105:15, 107:12, 109:8, 110:20, 111:25, 134:6, 154:16, 154:19, 160:13, 167:2, 174:22, 191:24, 192:22, 196:4
**notice** [10] - 5:20, 7:23, 8:8, 9:16, 18:25, 24:18, 36:6, 39:14, 136:4, 166:15
**noticed** [1] - 51:21
**notified** [1] - 8:15
**NOURAFCHAN** [1] - 2:17
**novel** [1] - 207:2
**nowadays** [3] - 144:21, 152:15, 153:9
**nowhere** [4] - 51:17, 98:10, 115:12
**Number** [10] - 79:2, 80:15, 82:6, 83:22, 83:23, 112:13, 112:14, 112:23, 137:17
**number** [33] - 14:21, 21:9, 27:4, 49:12, 55:3, 83:7, 112:17,

116:13, 120:17, 125:10, 134:11, 134:15, 136:5, 136:6, 136:16, 137:19, 139:8, 143:8, 143:15, 143:18, 143:24, 146:10, 146:14, 148:21, 148:22, 149:2, 149:3, 153:3, 171:25, 172:10, 191:14, 192:1
**number's** [1] - 134:20
**numbers** [22] - 37:2, 56:13, 114:6, 119:10, 134:14, 134:17, 134:24, 135:6, 135:18, 135:24, 136:16, 136:17, 136:18, 137:5, 149:15, 151:7, 161:18, 163:5, 163:11, 164:22, 164:25
**NYU** [2] - 14:18, 22:23

## O

**o'clock** [1] - 160:20
**object** [5] - 88:19, 135:22, 136:5, 144:7, 181:20
**objected** [2] - 5:7, 179:25
**objection** [20] - 4:15, 4:22, 4:24, 4:25, 6:17, 7:8, 8:9, 8:11, 17:2, 23:18, 100:14, 100:25, 121:16, 121:22, 136:8, 177:15, 177:17, 180:22, 201:6, 201:9
**objections** [3] - 165:15, 165:21, 167:3
**obligation** [1] - 112:12
**observe** [1] - 116:11
**obtain** [1] - 130:12
**obviate** [3] - 114:12, 123:3, 163:9
**obvious** [2] - 29:20, 91:16
**obviously** [13] - 9:24, 68:12, 70:23, 117:12, 136:6, 146:5, 160:17, 169:22, 188:16, 201:22, 204:19, 205:22, 206:9
**occasions** [2] -

101:18, 116:9
**occur** [2] - 83:18, 87:12
**occurred** [1] - 45:18
**occurring** [1] - 175:19
**occurs** [5] - 24:20, 25:25, 46:4, 95:8
**octave** [5] - 39:9, 51:24, 52:2, 52:6, 52:9
**OF** [13] - 1:1, 1:2, 1:14, 2:2, 2:3, 2:13, 2:20, 209:2, 209:4, 209:6, 209:9, 209:13, 209:15
**offensive** [1] - 69:9
**offer** [3] - 9:2, 104:12, 166:15
**OFFERED** [1] - 3:12
**offered** [1] - 108:11
**offering** [2] - 5:14, 130:2
**offhand** [2] - 151:5, 154:5
**Office** [2] - 128:12, 166:13
**Officer** [1] - 127:25
**OFFICIAL** [3] - 1:22, 209:8, 209:22
**offs** [1] - 118:5
**often** [5] - 16:10, 30:22, 68:7, 69:20, 88:12
**Ojukwu** [3] - 191:1, 196:2, 197:1
**Ojukwu's** [3] - 190:19, 192:14, 194:11
**Old** [12] - 61:14, 61:15, 61:17, 61:20, 62:5, 62:19, 65:3, 97:5, 97:16, 98:2, 98:11, 98:16
**old** [2] - 64:2, 153:4
**oldest** [1] - 66:7
**OLYMPIC** [1] - 2:18
**omitted** [3] - 77:24, 89:17, 92:17
**ON** [3] - 2:3, 2:13, 2:20
**once** [34] - 7:18, 18:7, 18:22, 21:4, 24:20, 26:20, 33:22, 44:2, 44:6, 50:13, 53:6, 56:6, 56:15, 59:7, 59:17, 60:6, 63:9, 69:11, 70:17, 77:1, 77:12, 78:25, 79:6, 79:18, 82:24, 83:13, 89:15, 93:24, 113:16, 130:21, 153:11, 160:6,

160:9, 204:3
**one** [177] - 4:13, 7:8,
12:15, 13:2, 14:17,
18:16, 19:13, 21:9,
24:19, 25:4, 25:5,
26:3, 28:16, 28:20,
30:2, 32:9, 36:13,
36:14, 37:22, 38:22,
40:5, 41:5, 42:15,
42:17, 42:25, 43:16,
43:17, 45:23, 48:5,
48:11, 48:18, 49:4,
49:7, 53:12, 54:2,
55:15, 55:18, 57:11,
58:7, 59:21, 60:9,
62:10, 62:15, 63:23,
63:24, 64:2, 64:19,
65:2, 65:11, 65:16,
65:21, 67:10, 67:16,
67:18, 68:16, 69:15,
70:2, 70:8, 70:18,
74:3, 74:22, 75:25,
76:1, 76:3, 76:4,
77:12, 77:14, 77:23,
77:24, 79:16, 81:25,
82:4, 82:6, 82:9,
87:1, 89:23, 90:2,
92:6, 92:9, 92:17,
93:16, 95:7, 95:8,
95:17, 95:19, 95:21,
97:16, 98:17,
101:24, 102:7,
103:6, 103:12,
103:13, 106:14,
107:4, 111:20,
112:2, 112:13,
114:16, 116:17,
118:3, 118:14,
119:13, 123:1,
124:9, 129:20,
129:21, 130:11,
130:20, 131:9,
131:18, 137:17,
137:21, 138:2,
140:12, 140:17,
141:3, 141:22,
142:2, 142:15,
143:10, 143:11,
143:21, 143:25,
144:12, 146:2,
146:3, 146:4, 146:6,
146:12, 147:6,
147:14, 147:23,
149:22, 150:8,
150:9, 153:3,
161:23, 163:15,
164:14, 168:17,
169:13, 171:25,
173:25, 175:10,
177:24, 179:14,
180:20, 180:21,

181:10, 183:23,
186:1, 186:2,
186:12, 186:19,
186:21, 186:25,
187:12, 189:3,
189:5, 189:19,
191:6, 191:14,
192:1, 197:15,
202:10, 206:20,
206:22, 207:12,
207:14
**one-and-a-half** [1] -
62:10
**one-bar** [1] - 49:4
**one-one-hundredth-
thousandth** [1] -
146:12
**one-sided** [2] - 107:4,
123:1
**ones** [6] - 60:24,
115:14, 137:15,
170:16, 172:25,
207:16
**ongoing** [1] - 4:22
**online** [8] - 128:2,
130:5, 131:14,
132:22, 132:23,
133:15, 147:5,
153:10
**open** [6] - 57:11, 69:1,
103:5, 155:4,
155:11, 169:15
**Open** [1] - 128:5
**opening** [9] - 24:13,
45:8, 51:2, 59:3,
61:14, 97:5, 98:15,
208:6
**opens** [1] - 30:14
**opined** [3] - 95:14,
96:16
**opinion** [42] - 17:6,
21:6, 21:10, 30:16,
30:24, 34:8, 35:2,
35:8, 42:25, 46:24,
50:12, 55:8, 58:13,
60:4, 60:13, 63:15,
65:6, 69:18, 72:25,
73:22, 74:2, 74:4,
74:5, 75:17, 77:10,
78:22, 81:13, 84:5,
84:11, 84:13, 84:14,
85:4, 85:6, 90:20,
92:13, 93:14, 100:3,
100:8, 101:9, 136:7,
139:23, 188:9
**opinions** [4] - 19:9,
100:12, 129:10,
169:16
**opportunity** [5] - 5:4,
6:20, 6:23, 178:5

**opposed** [2] - 112:8,
199:1
**opposite** [2] - 197:19,
198:18
**orally** [1] - 158:2
**oranges** [2] - 7:17,
8:21
**order** [31] - 4:10,
10:12, 51:25, 65:20,
93:17, 104:6, 105:4,
106:10, 107:24,
108:5, 108:15,
109:6, 110:2, 121:4,
124:10, 131:3,
142:12, 142:18,
143:12, 143:15,
147:17, 164:3,
164:5, 164:15,
166:12, 178:12,
194:17, 198:13,
198:22, 199:10
**ordering** [1] - 156:19
**orderly** [1] - 176:15
**organizations** [2] -
12:7, 128:3
**original** [8] - 52:10,
52:11, 178:10,
191:7, 191:8,
191:19, 193:2, 196:1
**originality** [3] -
200:21, 201:7,
202:19
**originally** [1] - 207:15
**Ostinato** [169] - 21:8,
24:24, 25:11, 26:17,
26:24, 26:25, 27:1,
28:8, 29:17, 29:23,
30:8, 30:9, 31:2,
31:4, 31:5, 34:5,
34:6, 35:13, 37:17,
37:20, 38:11, 39:2,
39:7, 39:15, 39:19,
39:24, 40:13, 40:16,
41:6, 41:18, 42:11,
42:24, 43:14, 43:18,
44:8, 44:19, 45:7,
45:8, 45:9, 45:13,
45:14, 45:16, 45:17,
45:21, 45:23, 46:2,
46:3, 46:4, 46:9,
46:10, 46:13, 46:15,
46:18, 46:21, 46:24,
46:25, 47:1, 47:3,
47:4, 47:7, 47:14,
47:15, 47:17, 47:20,
47:21, 47:22, 47:25,
48:1, 48:5, 48:7,
48:15, 48:22, 49:13,
50:18, 51:15, 52:8,
53:14, 53:18, 53:20,

54:9, 59:16, 61:8,
64:20, 64:25, 69:2,
71:6, 71:20, 72:9,
72:10, 72:13, 72:19,
72:21, 72:23, 74:17,
74:18, 74:19, 75:2,
75:4, 75:6, 75:7,
75:9, 75:18, 76:8,
76:18, 76:20, 77:1,
77:2, 77:5, 77:17,
77:18, 78:14, 78:16,
79:2, 79:5, 79:7,
79:8, 79:13, 79:16,
79:23, 80:14, 81:9,
81:17, 81:22, 82:6,
82:10, 82:12, 82:13,
83:15, 83:17, 83:18,
83:19, 83:22, 83:24,
84:16, 84:18, 84:19,
84:20, 84:21, 84:24,
90:4, 90:15, 90:18,
90:22, 90:25, 91:1,
91:16, 91:17, 92:2,
92:3, 94:21, 94:25,
95:1, 95:2, 95:7,
96:9
**ostinato** [118] - 21:9,
22:13, 22:14, 22:21,
23:4, 23:5, 24:14,
24:17, 24:20, 25:4,
25:14, 25:15, 25:24,
26:9, 26:14, 26:16,
26:19, 26:21, 27:7,
27:13, 29:20, 30:13,
30:17, 34:9, 35:14,
38:7, 38:9, 40:18,
41:13, 42:7, 44:12,
44:13, 44:20, 45:9,
47:6, 47:8, 47:16,
48:6, 48:8, 48:11,
48:12, 48:13, 48:16,
50:1, 50:3, 50:6,
51:17, 51:18, 51:23,
52:1, 53:17, 53:20,
53:21, 54:9, 59:22,
60:1, 67:21, 67:24,
68:2, 68:5, 68:8,
68:17, 68:23, 69:24,
70:25, 71:23, 72:10,
72:18, 72:25, 73:14,
74:4, 74:7, 74:20,
74:24, 75:4, 75:12,
75:14, 75:18, 76:7,
76:8, 76:17, 76:20,
76:22, 77:3, 77:5,
77:6, 78:3, 78:8,
78:14, 79:10, 80:2,
80:3, 81:10, 81:15,
81:19, 82:11, 83:1,
83:11, 83:20, 88:7,
88:8, 89:9, 89:12,

89:15, 89:19, 90:14,
91:4, 94:8, 94:13,
94:14, 94:17, 94:23,
94:24, 98:12
**ostinatos** [37] - 22:10,
22:18, 22:23, 23:11,
25:14, 29:16, 30:5,
30:7, 30:10, 33:19,
33:25, 34:5, 34:12,
35:5, 41:6, 47:18,
48:17, 51:8, 52:18,
53:2, 68:4, 68:8,
68:12, 69:1, 69:16,
73:17, 74:7, 74:13,
74:14, 74:15, 75:1,
77:9, 78:23, 80:5,
80:11, 80:15, 83:5
**OTHER** [1] - 2:13
**otherwise** [4] - 9:11,
46:15, 113:10,
143:15
**ought** [6] - 57:19,
123:19, 154:25,
156:1, 204:8, 205:6
**outcome** [2] - 15:19,
129:6
**outrageous** [1] -
112:10
**outro** [4] - 26:6, 27:11,
27:19
**outros** [1] - 26:7
**outside** [7] - 14:18,
41:2, 104:19, 119:2,
163:2, 163:13,
168:21
**overall** [12] - 21:21,
23:13, 30:15, 32:24,
40:25, 82:10, 89:4,
106:21, 148:9,
148:11, 162:22
**overkill** [1] - 202:25
**overlapping** [2] -
79:25, 80:10
**overrule** [1] - 136:8
**overruled** [1] - 144:8
**oversaw** [1] - 11:6
**overstate** [1] - 148:13
**overview** [1] - 155:2
**own** [7] - 11:22, 76:11,
81:18, 94:16,
104:17, 142:13,
206:22
**owner** [1] - 195:5
**owns** [1] - 67:3

---

## P

**p.m** [1] - 208:18
**pace** [2] - 54:24, 54:25
**packet** [1] - 181:8

**page** [12] - 23:22, 50:19, 54:22, 64:7, 91:19, 105:14, 105:25, 106:6, 106:12, 133:2, 141:13, 142:10
**pages** [4] - 132:23, 133:8, 133:9, 133:10
**paid** [4] - 99:15, 129:1, 147:15, 153:23
**Paisley** [1] - 14:15
**palpably** [1] - 185:10
**Pandora** [2] - 131:19, 131:20
**paper** [5] - 87:6, 89:20, 89:21, 167:1, 167:3
**papers** [2] - 15:5, 128:22
**paragraph** [6] - 153:22, 161:8, 163:1, 163:12, 177:20, 178:2
**paragraphs** [9] - 123:14, 161:10, 162:12, 163:4, 163:20, 164:7, 164:10, 164:11, 164:13
**paraphrasing** [1] - 82:1
**parent** [2] - 127:21, 150:12
**PARK** [1] - 2:23
**pars** [2] - 191:22, 197:9
**part** [37] - 18:1, 27:15, 30:19, 30:22, 30:25, 35:12, 46:8, 61:1, 67:7, 83:11, 85:6, 86:2, 86:9, 87:13, 88:14, 88:16, 89:3, 92:16, 93:25, 109:24, 114:22, 116:2, 132:13, 157:8, 162:17, 167:4, 171:20, 177:22, 178:6, 182:3, 195:6, 196:14, 197:1, 198:13, 198:15, 199:10, 200:23
**participating** [1] - 193:11
**particular** [3] - 12:1, 109:14, 200:10
**particularly** [4] - 31:17, 114:8, 130:4, 158:10
**parties** [9] - 104:5,

117:12, 120:25, 165:8, 165:13, 181:19, 189:12, 200:7
**parties'** [1] - 165:15
**parts** [13] - 20:16, 22:6, 33:12, 33:13, 33:16, 33:18, 33:19, 33:20, 35:6, 86:25, 93:4
**passages** [1] - 97:8
**past** [5] - 99:23, 100:2, 128:19, 131:25, 193:17
**patch** [2] - 48:2, 82:8
**patently** [1] - 91:16
**pattern** [4] - 22:14, 22:15, 22:16
**pay** [2] - 129:6, 147:9
**payment** [1] - 129:9
**PCs** [1] - 133:17
**peer** [4] - 12:14, 13:7, 14:22, 15:5
**peer-reviewed** [4] - 12:14, 13:7, 14:22, 15:5
**people** [27] - 23:7, 66:15, 109:18, 119:2, 125:10, 133:16, 133:18, 138:9, 143:11, 143:22, 144:20, 147:7, 147:9, 147:15, 147:25, 148:12, 150:22, 150:24, 151:4, 152:7, 162:10, 181:23, 182:19, 183:21, 183:22, 189:9
**people's** [1] - 189:8
**per** [10] - 15:17, 15:18, 22:20, 56:17, 60:6, 65:4, 70:4, 70:24, 133:5, 153:25
**percent** [4] - 42:20, 146:13, 153:20, 186:25
**percentage** [4] - 146:1, 146:9, 146:12, 149:2
**percentages** [2] - 148:25, 149:1
**percussion** [1] - 88:14
**perfect** [3] - 59:4, 59:19, 78:5
**perform** [1] - 142:15
**performance** [3] - 17:21, 43:1, 151:23
**performed** [3] - 71:9,

72:17, 184:25
**performer** [1] - 11:16
**performing** [1] - 11:8
**performs** [1] - 183:3
**perhaps** [6] - 18:16, 36:3, 46:20, 100:10, 177:2, 198:22
**period** [27] - 105:11, 114:3, 119:24, 125:9, 125:14, 125:15, 129:16, 129:17, 130:21, 131:2, 133:11, 138:7, 140:3, 140:10, 140:18, 141:5, 141:17, 141:22, 142:3, 142:17, 143:20, 144:5, 144:13, 144:22, 145:7, 145:16, 148:24
**permission** [1] - 152:14
**permit** [1] - 9:24
**permitted** [4] - 6:17, 6:18, 112:22, 121:14
**PERRY** [3] - 1:9, 2:13, 2:20
**Perry** [2] - 4:5, 25:9
**person** [7] - 67:3, 107:14, 121:6, 144:2, 144:4, 144:11, 182:12
**personal** [1] - 129:14
**perspective** [9] - 21:9, 31:4, 34:17, 34:22, 46:5, 47:11, 48:10, 60:23, 84:6
**pertaining** [1] - 12:7
**pertinence** [1] - 122:9
**pertinent** [1] - 175:21
**Pet** [1] - 141:8
**PH** [1] - 1:24
**phase** [1] - 155:3
**PhD** [2] - 13:25, 14:1
**Phillip** [1] - 43:20
**phone** [2] - 143:15, 143:24
**phones** [1] - 133:17
**phrase** [22] - 49:4, 49:7, 50:7, 50:8, 50:10, 50:23, 53:16, 55:16, 59:9, 75:16, 75:17, 75:19, 76:6, 76:12, 76:14, 77:13, 80:12, 90:5, 142:23
**phrased** [1] - 184:20
**phrases** [1] - 75:24
**pianist** [1] - 11:20
**piano** [18] - 5:2, 5:4,

5:19, 6:7, 6:12, 6:19, 7:4, 9:7, 9:13, 11:19, 26:20, 51:12, 51:14, 87:20, 87:23, 87:25, 88:4, 97:21
**pianos** [1] - 5:4
**pick** [1] - 133:4
**picture** [2] - 131:5, 131:6
**piece** [5] - 5:6, 7:6, 94:2, 176:4
**pieces** [2] - 167:1, 167:3
**piercing** [2] - 81:20, 81:21
**piling** [2] - 82:23, 83:16
**pin** [1] - 109:23
**pitch** [31] - 6:22, 8:24, 34:20, 34:21, 34:23, 35:10, 35:11, 36:14, 36:24, 37:3, 45:19, 46:15, 46:20, 52:11, 55:2, 58:18, 71:7, 72:12, 77:19, 77:21, 78:6, 78:18, 78:23, 79:1, 79:3, 79:7, 80:14, 80:23, 91:3, 91:4
**pitches** [21] - 5:17, 6:9, 33:13, 54:9, 54:24, 55:6, 55:25, 56:14, 58:11, 59:2, 65:5, 68:17, 71:21, 71:22, 71:23, 72:3, 72:9, 77:25, 79:4, 79:8
**place** [7] - 109:4, 121:9, 139:21, 148:24, 163:8, 192:17, 203:16
**PLACE** [1] - 209:11
**placed** [6] - 18:8, 44:20, 45:7, 72:21, 88:7, 88:8
**placeholder** [1] - 166:11
**placement** [2] - 34:23, 47:1
**places** [5] - 47:8, 53:18, 178:23, 201:15, 202:25
**plainly** [14] - 47:5, 47:7, 48:6, 48:11, 75:5, 77:3, 77:4, 79:9, 82:10, 83:19, 83:23, 84:22
**PLAINTIFF** [2] - 1:7, 2:3
**plaintiff** [7] - 23:19,

155:12, 157:19, 168:25, 179:17, 187:2, 190:16
**Plaintiff's** [5] - 171:24, 172:13, 173:5, 177:1, 180:13
**plaintiff's** [20] - 8:5, 21:2, 47:8, 71:24, 71:25, 72:1, 89:6, 95:20, 103:25, 117:4, 139:15, 165:16, 166:3, 171:9, 171:17, 174:14, 177:7, 182:7, 189:20, 190:15
**plaintiffs** [27] - 5:3, 6:1, 14:9, 16:2, 21:3, 60:24, 72:10, 84:20, 92:24, 93:21, 94:9, 96:12, 103:18, 104:12, 114:10, 119:6, 121:1, 136:4, 139:21, 140:5, 148:15, 149:12, 165:19, 167:24, 171:21, 178:2, 181:16
**plaintiffs'** [1] - 158:23
**planning** [2] - 123:5, 155:20
**platforms** [1] - 153:11
**play** [24] - 6:12, 24:7, 24:15, 26:19, 28:2, 37:25, 42:9, 51:1, 56:24, 66:4, 66:15, 69:3, 69:10, 71:16, 96:25, 97:21, 97:23, 97:25, 99:1, 102:12, 138:11, 141:24, 142:5, 145:3
**played** [45] - 11:20, 11:21, 11:24, 11:25, 24:16, 25:1, 25:6, 25:12, 27:9, 27:12, 27:22, 27:24, 28:6, 28:12, 34:6, 34:7, 38:3, 42:10, 42:13, 43:2, 45:2, 45:3, 51:3, 51:21, 51:22, 56:22, 68:16, 69:6, 69:12, 71:2, 72:20, 72:24, 73:1, 73:9, 76:21, 76:25, 83:10, 88:3, 88:7, 94:15, 95:12, 95:17, 95:25, 96:3
**playing** [96] - 6:3, 26:21, 28:8, 30:15, 30:19, 32:6, 32:9,

32:22, 34:5, 34:6, 34:8, 37:17, 40:6, 41:17, 42:3, 43:23, 44:4, 45:9, 45:10, 45:18, 45:21, 45:24, 46:5, 46:10, 49:3, 51:23, 52:23, 52:24, 53:6, 55:19, 57:1, 58:18, 58:19, 58:24, 58:25, 59:3, 59:11, 59:16, 59:18, 60:7, 60:8, 60:10, 61:24, 62:13, 64:4, 65:15, 65:25, 66:8, 67:21, 67:23, 68:14, 68:18, 71:6, 71:7, 72:12, 72:21, 72:24, 74:8, 74:9, 74:10, 74:22, 74:23, 76:22, 78:1, 78:4, 78:13, 78:15, 78:20, 79:2, 79:4, 79:7, 79:10, 82:6, 82:7, 83:14, 84:18, 84:25, 87:11, 87:20, 87:23, 90:10, 90:13, 90:25, 91:2, 91:3, 91:16, 96:14, 97:5, 99:9, 135:15, 142:2, 146:21

**Playing** [28] - 58:21, 59:6, 59:12, 59:15, 59:19, 59:23, 59:24, 60:11, 61:16, 61:21, 61:22, 62:11, 63:7, 71:5, 72:4, 72:13, 72:20, 74:20, 74:25, 76:23, 76:24, 78:2, 78:5, 78:9, 78:10, 79:2, 97:6

**playing)** [11] - 30:15, 40:23, 41:20, 42:4, 43:3, 47:18, 48:25, 51:14, 54:6, 71:8, 76:23

**Playing)** [5] - 61:20, 61:21, 70:22, 71:1, 74:24

**playing)3-3-3-2-2-1-5** [1] - 72:14

**playlist** [4] - 144:20, 144:22, 145:2, 145:3

**playlists** [8] - 142:6, 144:20, 144:23, 144:25, 145:5, 145:6, 145:9, 145:11

**plays** [14] - 6:21, 26:21, 28:21, 30:3, 66:7, 67:25, 94:18, 95:2, 98:2, 99:4, 114:6, 120:24,

144:18
**pleasure** [1] - 98:5
**plug** [1] - 5:5
**plug-in** [1] - 5:5
**plural** [1] - 95:22
**plus** [2] - 55:16, 90:3
**point** [27] - 42:21, 62:22, 62:23, 69:11, 80:8, 87:13, 91:9, 108:12, 110:8, 111:9, 113:9, 123:2, 142:11, 147:24, 149:22, 160:19, 162:14, 162:25, 170:8, 175:23, 186:14, 187:10, 191:9, 195:17, 196:24, 205:17
**pointer** [1] - 25:24
**pointing** [1] - 76:13
**points** [4] - 55:22, 69:15, 70:8, 191:11
**policy** [1] - 128:10
**pool** [1] - 79:7
**pop** [4] - 82:2, 120:16, 161:13, 168:5
**popular** [15] - 22:20, 68:6, 69:20, 82:15, 82:19, 119:21, 133:6, 134:1, 137:24, 137:25, 138:14, 146:7, 147:8, 162:3, 168:7
**population** [2] - 143:7, 143:17
**populations** [2] - 143:5, 143:6
**portion** [4] - 9:21, 17:10, 38:1, 177:14
**portions** [2] - 24:7, 28:12
**position** [10] - 105:11, 123:9, 123:10, 125:18, 165:5, 165:19, 166:2, 182:11, 191:15, 206:8
**positions** [3] - 112:2, 165:16, 165:21
**possibilities** [1] - 74:11
**possible** [5] - 52:1, 103:5, 116:10, 145:4, 178:3
**possibly** [1] - 154:10
**post** [7] - 11:22, 26:2, 26:4, 29:12, 29:13, 145:2, 158:16
**post-college** [1] - 11:22

**post-trial** [1] - 158:16
**post-verse** [4] - 26:2, 26:4, 29:12, 29:13
**posted** [10] - 135:3, 140:4, 140:6, 140:8, 140:10, 140:12, 140:13, 141:10, 145:20, 145:22
**potential** [3] - 121:10, 122:10, 178:25
**potentially** [1] - 183:20
**practice** [10] - 7:19, 18:1, 19:8, 46:8, 61:3, 78:20, 92:16, 92:23, 96:24
**practiced** [1] - 22:22
**practices** [7] - 9:6, 19:21, 31:25, 37:8, 90:25, 91:18, 92:1
**pre** [7] - 95:15, 191:1, 199:2, 199:3, 199:6, 202:8, 206:21
**pre-existing** [7] - 95:15, 191:1, 199:2, 199:3, 199:6, 202:8, 206:21
**precise** [1] - 198:23
**precisely** [4] - 5:13, 6:24, 135:23, 204:13
**predate** [3] - 21:2, 70:16, 84:25
**predated** [1] - 95:19
**predates** [1] - 41:4
**preexisting** [1] - 190:21
**prefer** [1] - 164:7
**preferable** [1] - 6:15
**preference** [1] - 163:19
**prejudicial** [1] - 116:25
**preliminarily** [1] - 34:1
**premised** [1] - 109:6
**preparation** [1] - 99:18
**prepare** [1] - 19:5
**prepared** [6] - 44:1, 123:19, 155:10, 155:13, 162:23, 185:1
**preparing** [1] - 132:15
**preponderance** [2] - 177:18, 179:12
**presence** [1] - 109:7
**present** [13] - 10:9, 33:17, 34:11, 37:9, 47:17, 57:13, 103:9, 124:7, 155:7, 167:18, 169:20,

170:9, 201:20
**presented** [10] - 15:3, 15:5, 19:22, 24:2, 55:10, 67:17, 83:9, 95:21, 108:22, 118:24
**presenting** [2] - 54:24, 117:15
**presents** [1] - 56:14
**preserve** [4] - 157:21, 158:8, 158:14, 165:10
**preserved** [3] - 121:22, 165:22, 192:12
**President** [1] - 125:20
**PRESIDING** [1] - 1:4
**Press** [3] - 12:21, 12:23, 13:8
**pressure** [1] - 160:16
**presumption** [4] - 193:15, 193:17, 195:22, 195:23
**pretrial** [1] - 122:9
**pretty** [5] - 29:20, 82:24, 83:2, 146:13
**previously** [5] - 47:1, 58:13, 190:19, 193:24, 202:20
**primary** [3] - 19:19, 85:22, 86:2
**Princeton** [1] - 127:1
**print** [1] - 118:5
**print-offs** [1] - 118:5
**printed** [2] - 111:22, 176:1
**printer** [1] - 161:3
**problem** [28] - 9:9, 75:3, 104:4, 111:4, 113:13, 114:21, 114:23, 115:23, 117:21, 118:23, 147:5, 147:18, 148:7, 171:3, 171:19, 173:20, 173:21, 177:13, 177:20, 177:22, 178:17, 181:5, 183:16, 186:23, 187:16, 188:7, 196:23
**problematic** [1] - 118:16
**problems** [3] - 118:14, 187:23, 189:19
**procedurally** [1] - 29:20
**proceed** [4] - 85:11, 124:24, 167:22, 181:17

**proceeding** [1] - 131:12
**proceedings** [2] - 130:19, 208:18
**PROCEEDINGS** [2] - 1:14, 209:11
**process** [4] - 86:9, 104:15, 110:22, 167:11
**processes** [2] - 147:11, 153:8
**produce** [3] - 112:7, 113:23, 119:15
**produced** [12] - 86:10, 104:10, 104:16, 112:20, 113:17, 113:18, 121:12, 122:5, 165:18, 165:24, 166:2, 188:5
**producer** [1] - 193:6
**producers** [1] - 23:7
**produces** [5] - 121:12, 161:8, 161:11, 168:1, 168:3
**producing** [1] - 182:19
**product** [1] - 59:8
**production** [3] - 16:8, 111:23, 193:11
**products** [1] - 129:23
**professional** [3] - 129:14, 130:14, 130:16
**Professor** [1] - 11:4
**professor** [2] - 11:14, 13:2
**proffered** [1] - 165:16
**proffering** [2] - 5:24, 6:11
**profitability** [1] - 108:7
**program** [9] - 5:11, 5:15, 5:16, 7:20, 8:18, 8:20, 65:12, 65:22, 152:6
**programmed** [1] - 147:13
**programs** [1] - 64:1
**progress** [2] - 208:1, 208:2
**progression** [3] - 31:13, 32:17, 32:20
**progressions** [1] - 32:25
**promoted** [1] - 11:14
**promptly** [1] - 188:23
**pronouncement** [1] - 158:12
**proof** [2] - 112:12, 162:21

**proper** [7] - 22:7, 31:22, 63:17, 76:9, 92:7, 92:22, 93:25
**properly** [2] - 32:2, 50:13
**proposal** [1] - 7:11
**propose** [2] - 123:18, 164:14
**proposed** [6] - 105:10, 167:2, 177:7, 177:8, 178:10, 180:15
**Proposed** [6] - 171:7, 171:24, 172:13, 178:15, 179:17, 180:18
**prospect** [1] - 148:3
**protectability** [7] - 173:23, 174:10, 180:2, 200:24, 201:18, 201:19, 202:7
**protectable** [14] - 174:4, 174:5, 174:17, 176:18, 201:2, 202:6, 202:14, 203:17, 205:5, 205:6, 206:13, 206:14, 206:18
**protecting** [1] - 128:18
**protection** [5] - 174:19, 190:24, 192:17, 194:12, 204:11
**protective** [1] - 202:13
**prove** [9] - 178:20, 178:22, 183:21, 183:24, 186:4, 186:25, 187:12, 195:18
**proven** [2] - 181:16, 182:7
**provide** [17] - 18:7, 66:23, 70:18, 93:18, 100:8, 101:9, 104:11, 110:11, 110:16, 111:2, 125:6, 127:11, 131:1, 131:25, 139:18, 146:16, 152:21
**provided** [24] - 8:3, 14:13, 19:9, 31:16, 42:1, 96:19, 97:17, 98:24, 100:12, 110:19, 110:21, 111:13, 111:23, 111:24, 118:2, 118:3, 118:4, 118:6,

134:15, 135:17, 139:21, 140:5, 152:11, 177:18
**provides** [3] - 18:5, 32:23, 121:8
**providing** [1] - 9:10
**public** [2] - 67:13, 128:10
**publically** [5] - 151:7, 183:2, 184:25, 185:1
**publication** [1] - 12:20
**publications** [1] - 13:3
**publicly** [1] - 119:12
**published** [9] - 12:14, 12:20, 12:23, 13:4, 13:7, 63:4, 133:23, 191:2, 193:2
**publishing** [1] - 182:19
**pull** [1] - 93:4
**pulled** [1] - 115:15
**punitive** [1] - 113:20
**purchased** [1] - 7:16
**purport** [1] - 107:8
**purported** [3] - 47:15, 83:16, 84:8
**purpose** [3] - 41:3, 107:22, 192:11
**purposefully** [1] - 29:21
**purposes** [3] - 9:25, 110:15, 121:22
**put** [36] - 5:14, 5:16, 7:13, 21:25, 22:14, 23:15, 24:12, 24:22, 25:8, 31:21, 31:22, 33:19, 37:10, 37:14, 63:3, 63:7, 78:17, 93:18, 94:23, 116:24, 120:18, 121:3, 135:13, 143:2, 152:5, 153:2, 164:22, 166:12, 172:19, 177:18, 184:19, 194:25, 200:16, 201:14, 202:22, 205:9
**puts** [2] - 49:12, 49:25
**putting** [4] - 8:22, 48:14, 67:3, 79:17

### Q

**qualified** [1] - 15:8
**quality** [5] - 47:24, 47:25, 81:7, 81:8, 81:15
**quantity** [1] - 148:13
**quarters** [3] - 134:25, 136:21, 136:22

**questioning** [1] - 189:6
**questions** [4] - 85:8, 102:5, 102:22, 109:21
**quick** [1] - 165:8
**quickly** [1] - 134:1
**quiet** [1] - 196:11
**quite** [13] - 26:12, 29:19, 29:25, 33:20, 51:23, 57:7, 68:25, 87:2, 97:14, 139:4, 159:4, 171:9, 171:16
**quote** [3] - 47:5, 147:20

### R

**R&B** [3] - 161:13, 168:5, 168:11
**R-o-s-e-n-b-l-a-t-t** [1] - 124:22
**Radio** [1] - 130:23
**radio** [3] - 114:16, 130:24, 131:20
**raise** [4] - 7:8, 8:6, 105:13, 124:15
**raised** [3] - 8:8, 9:24, 195:11
**raises** [1] - 83:6
**ran** [1] - 140:25
**range** [4] - 51:22, 52:3, 52:6, 145:23
**rap** [12] - 25:3, 25:5, 26:1, 26:3, 26:5, 26:25, 29:10, 30:3, 30:4, 33:13, 114:17
**rapidly** [1] - 136:17
**raps** [2] - 22:1, 35:6
**rate** [15] - 15:13, 15:16, 32:5, 99:15, 99:16, 99:17, 129:4, 130:20, 131:12, 153:14, 153:16, 153:19, 153:25, 154:1, 154:13
**rates** [1] - 131:4
**rather** [11] - 6:4, 20:20, 29:10, 32:17, 32:18, 38:7, 55:12, 62:14, 66:9, 73:11, 151:9
**ratings** [1] - 108:13
**ratio** [2] - 139:8, 139:10
**Re** [35] - 36:19, 36:20, 39:1, 40:8, 40:9, 41:16, 43:8, 43:9, 45:22, 54:7, 54:14, 54:15, 55:3, 56:9,

56:10, 56:18, 56:22, 58:20, 63:13, 63:15, 63:16, 63:18, 64:15, 64:16, 65:5, 66:21, 85:3
**reach** [3] - 19:23, 196:8, 207:19
**reached** [2] - 20:1, 171:10
**reaching** [1] - 189:17
**read** [29] - 41:15, 41:16, 63:22, 91:23, 109:18, 109:19, 120:6, 120:17, 121:6, 135:23, 147:22, 155:10, 158:23, 161:18, 164:4, 165:2, 165:5, 165:8, 166:5, 167:21, 167:24, 176:6, 176:22, 181:14, 181:15, 182:18, 183:5, 201:23
**reader** [2] - 28:17, 76:2
**readily** [3] - 18:9, 37:9, 64:23
**reading** [7] - 94:19, 109:12, 111:17, 120:5, 161:4, 164:8, 188:10
**reads** [2] - 178:2, 203:11
**ready** [7] - 124:4, 150:18, 167:15, 170:20, 170:24, 170:25, 171:1
**real** [9] - 18:24, 59:15, 111:9, 111:11, 116:8, 147:18, 147:25, 148:3, 204:8
**reality** [3] - 53:19, 153:9, 158:8
**realize** [2] - 88:9, 93:21
**really** [26] - 27:20, 29:24, 52:7, 66:20, 67:16, 69:9, 69:25, 82:20, 84:24, 97:14, 98:9, 100:22, 101:8, 106:9, 108:4, 153:11, 154:11, 163:3, 171:15, 176:10, 191:23, 191:24, 198:24, 201:15, 204:8, 206:4
**realtor** [1] - 18:10
**realtor's** [1] - 18:23
**reason** [16] - 19:1,

28:13, 50:2, 68:3, 95:2, 107:6, 107:25, 109:3, 111:14, 113:18, 117:10, 120:6, 147:7, 163:9, 192:15, 202:2
**reasonable** [2] - 170:4, 178:3
**reasons** [2] - 81:25, 82:4
**rebut** [1] - 116:21
**rebuttal** [2] - 91:19, 155:19
**rebuttals** [1] - 178:25
**rebutted** [2] - 178:4, 179:6
**recap** [1] - 80:17
**receive** [1] - 86:11
**received** [3] - 158:24, 159:11, 208:11
**recess** [1] - 57:6, 57:10, 57:23, 122:2, 124:2, 155:1, 158:21, 161:1, 170:1, 170:22, 170:23
**Recess** [4] - 57:24, 124:3, 158:22, 161:2
**recipient** [1] - 12:24
**recital** [1] - 150:12
**recitation** [1] - 205:10
**recognizable** [1] - 59:3
**recognize** [1] - 152:12
**recognizes** [1] - 152:11
**recollection** [1] - 101:23
**reconsider** [1] - 110:12
**record** [15] - 41:21, 108:9, 111:3, 117:17, 121:17, 121:23, 124:19, 126:8, 126:14, 140:13, 151:21, 152:13, 152:25, 165:10, 165:22
**recorded** [3] - 17:21, 17:25, 52:5
**recording** [29] - 7:22, 16:4, 16:7, 16:9, 16:11, 16:17, 16:23, 16:24, 17:1, 17:11, 17:12, 42:6, 51:1, 68:20, 71:10, 73:7, 86:18, 87:5, 87:17, 87:24, 88:5, 89:21, 89:22, 152:1, 189:20, 189:22,

189:24, 190:3, 190:5
**recordings** [8] - 5:12, 5:17, 16:14, 16:21, 19:3, 21:17, 27:3, 86:13
**records** [2] - 110:10, 110:12
**Records** [4] - 186:5, 187:14, 188:5
**RECROSS** [1] - 3:4
**red** [3] - 24:12, 24:23, 25:9
**Redeemed** [5] - 106:17, 161:20, 163:1, 168:14, 168:20
**redirect** [2] - 85:9, 149:6
**REDIRECT** [2] - 3:4, 102:10
**REDUCED** [1] - 209:12
**reduced** [1] - 86:7
**redundant** [2] - 80:8, 80:16
**refer** [2] - 106:19, 163:17
**referred** [3] - 125:14, 191:16, 191:17
**referring** [2] - 41:23, 143:25
**reflect** [9] - 39:2, 71:12, 87:16, 87:18, 87:20, 87:23, 107:16, 122:23, 184:11
**reflected** [3] - 87:6, 87:17, 123:15
**reflection** [1] - 39:12
**reflects** [3] - 61:10, 98:7, 107:13
**refresh** [1] - 132:17
**refreshed** [1] - 45:2
**refuse** [2] - 112:9, 175:6
**refused** [3] - 104:2, 105:5, 108:1
**regard** [3] - 10:18, 31:14, 125:11
**regarding** [11] - 4:22, 8:4, 14:19, 21:14, 33:7, 93:14, 129:16, 131:25, 132:5, 148:10, 192:8
**regardless** [1] - 193:15
**registered** [3] - 191:2, 193:25, 194:5
**Registrar** [7] - 191:16, 191:17, 192:10,

192:22, 195:12, 195:16, 196:4
**registration** [18] - 166:13, 172:3, 190:21, 190:23, 190:24, 191:6, 191:9, 192:21, 192:24, 193:14, 193:16, 193:20, 194:1, 194:6, 195:19, 195:21, 196:4, 199:6
**reiterated** [1] - 24:18
**relate** [5] - 106:9, 107:2, 107:23, 112:24, 125:13
**related** [12] - 4:24, 12:18, 43:14, 100:12, 106:13, 107:4, 114:10, 125:24, 126:21, 128:3, 163:22, 164:11
**relates** [7] - 72:18, 88:24, 89:6, 104:7, 104:8, 109:11, 119:14
**relating** [9] - 109:21, 112:15, 139:17, 161:12, 162:5, 162:8, 168:4, 168:10, 168:13
**relation** [2] - 161:9, 168:2
**relationship** [2] - 14:22, 115:13
**relatively** [1] - 22:14
**release** [2] - 41:4, 71:24
**released** [11] - 20:24, 20:25, 21:16, 41:14, 43:19, 44:15, 67:19, 70:20, 140:12, 146:5, 191:5
**relevance** [4] - 44:11, 47:11, 111:11, 122:7
**relevant** [9] - 7:24, 43:14, 73:5, 105:23, 109:8, 114:3, 127:12, 134:16, 194:4
**religious** [6] - 114:2, 118:20, 119:9, 122:12, 189:8, 189:12
**rely** [2] - 4:21, 99:12
**relying** [1] - 176:9
**remade** [1] - 157:20
**remain** [1] - 54:1
**remaining** [1] - 84:18

**remains** [1] - 60:19
**remember** [5] - 30:3, 59:7, 72:4, 94:4, 95:16
**remind** [1] - 139:16
**remotely** [2] - 59:16, 90:10
**removing** [1] - 53:24
**rendering** [1] - 93:14
**renewing** [2] - 188:20, 188:21
**renting** [1] - 18:17
**repeat** [8] - 23:9, 40:18, 42:2, 53:15, 53:20, 55:12, 74:10, 74:12
**repeated** [7] - 23:6, 45:23, 46:18, 46:21, 60:17, 60:19, 67:22
**repeating** [17] - 29:22, 29:23, 36:1, 38:15, 40:21, 40:22, 41:18, 41:20, 43:23, 44:3, 50:7, 50:8, 67:25, 68:17, 71:7, 89:8, 96:22
**repeats** [6] - 22:17, 29:22, 38:8, 49:5, 54:16, 71:14
**rephrase** [1] - 88:21
**report** [38] - 9:11, 17:13, 19:11, 23:20, 24:2, 31:16, 31:20, 37:16, 41:13, 42:7, 42:8, 43:18, 44:23, 45:7, 47:4, 48:21, 50:14, 50:20, 54:21, 54:23, 62:4, 63:2, 67:20, 70:24, 72:16, 76:12, 81:18, 81:24, 86:24, 91:19, 92:7, 92:11, 92:17, 92:20, 93:5, 124:10, 153:22, 154:2
**reported** [2] - 79:24, 92:20
**REPORTED** [1] - 209:10
**REPORTER** [6] - 1:22, 126:9, 126:12, 209:2, 209:8, 209:22
**reporter** [1] - 170:18
**REPORTER'S** [1] - 1:14
**reports** [5] - 17:15, 19:23, 28:18, 67:17, 98:11
**represent** [6] - 19:19, 20:14, 96:21, 126:6, 146:16, 149:12

**representation** [1] - 148:12
**representative** [4] - 110:22, 111:5, 115:2, 122:24
**represented** [1] - 137:11
**represents** [4] - 115:3, 146:2, 171:15, 171:16
**reproduce** [1] - 185:20
**reproduced** [1] - 184:25
**reproduces** [1] - 183:2
**reproduction** [1] - 186:13
**request** [2] - 135:14, 146:19
**requested** [1] - 135:15
**required** [1] - 182:3
**requirement** [1] - 194:13
**requires** [2] - 87:18, 196:8
**research** [12] - 13:5, 15:16, 20:22, 105:18, 105:22, 106:1, 115:19, 115:20, 116:2, 132:16, 149:23, 154:1
**researched** [1] - 105:17
**researching** [1] - 110:23
**reserve** [2] - 157:6, 157:9
**resolved** [2] - 103:25, 160:22
**respect** [37] - 5:1, 6:6, 16:9, 21:7, 27:25, 28:24, 33:25, 34:25, 35:9, 38:1, 50:18, 52:14, 55:8, 58:13, 60:4, 61:25, 64:18, 69:19, 70:11, 72:7, 72:18, 75:7, 75:17, 77:21, 79:23, 80:19, 81:13, 83:4, 84:11, 84:13, 113:4, 113:8, 120:14, 139:19, 192:20, 208:5
**respective** [1] - 200:6
**respond** [1] - 104:22
**responding** [1] - 195:10
**response** [2] - 8:1, 8:2
**responsible** [1] - 186:22
**responsive** [1] - 88:20

**rest** [4] - 80:4, 155:10, 155:13, 157:20
**rested** [1] - 188:18
**resting** [1] - 160:10
**rests** [3] - 157:20, 168:25, 169:3
**result** [6] - 16:8, 19:22, 21:24, 23:10, 85:4, 85:7
**results** [2] - 141:2, 141:12
**resume** [1] - 58:4
**retained** [5] - 101:6, 101:18, 128:23, 130:23, 131:24
**return** [1] - 169:6
**reveal** [2] - 107:20, 120:1
**reverbs** [1] - 5:5
**reversal** [3] - 173:22, 174:8, 176:19
**reversals** [1] - 175:20
**reversed** [1] - 174:16
**reverses** [1] - 205:22
**review** [2] - 106:16, 159:13
**reviewed** [5] - 12:14, 13:7, 14:22, 15:5, 167:10
**revise** [2] - 184:10, 184:23
**rewrite** [1] - 175:3
**rhythm** [35] - 16:12, 17:20, 18:6, 19:18, 21:23, 23:9, 32:5, 32:20, 33:2, 33:5, 33:7, 33:12, 33:14, 33:15, 33:17, 33:18, 33:20, 33:25, 56:19, 64:24, 65:1, 65:2, 65:7, 65:8, 65:9, 65:14, 76:17, 80:13, 87:8, 87:9, 92:15
**rhythmic** [5] - 20:11, 22:15, 34:19, 35:7, 54:24
**rhythms** [9] - 35:4, 35:5, 35:6, 65:13, 65:14, 76:19, 87:12, 92:21
**Rice** [1] - 124:21
**riff** [3] - 23:3, 23:4, 38:10
**RIFF** [1] - 23:3
**riffs** [2] - 23:3, 59:15
**right's** [1] - 152:13
**right-hand** [1] - 145:25
**rights** [2] - 183:23, 186:12

**Rights** [1] - 128:17
**rise** [8] - 75:20, 78:24, 84:3, 103:8, 124:6, 155:6, 167:17, 169:19
**rising** [2] - 130:5, 138:13
**ROAD** [1] - 2:11
**robot** [1] - 149:17
**robots** [1] - 149:25
**rock** [6] - 120:16, 133:25, 161:13, 162:6, 168:5, 168:10
**rocket** [1] - 133:25
**role** [1] - 11:5
**roles** [1] - 186:24
**Roll** [10] - 62:10, 62:12, 64:6, 64:11, 64:18, 65:3, 98:23, 99:4, 99:10, 102:13
**ROOM** [1] - 1:23
**room** [6] - 18:12, 18:14, 159:17, 159:22, 170:5, 175:13
**rooms** [4] - 18:11, 18:20, 18:21, 93:8
**ROSENBLATT** [1] - 3:8
**Rosenblatt** [18] - 124:13, 124:21, 125:3, 129:12, 130:17, 131:24, 132:4, 132:16, 134:1, 137:9, 138:4, 141:16, 142:14, 144:2, 145:13, 148:9, 149:4, 149:11
**Rosenblatt's** [1] - 159:12
**roughly** [2] - 140:10, 146:8
**route** [1] - 117:16
**royalty** [3] - 130:20, 131:4, 131:12
**rule** [4] - 175:18, 196:16, 196:21, 200:13
**Rule** [8] - 157:4, 157:9, 158:1, 170:11, 183:20, 188:15, 188:19, 197:12
**ruled** [1] - 110:25
**rules** [6] - 113:10, 179:25, 193:23, 205:11, 205:18, 208:4
**ruling** [4] - 10:3, 113:8, 120:7, 181:19

**running** [1] - 139:3
**runs** [1] - 26:14

**S**

**Saint** [14] - 61:14, 61:15, 61:17, 61:20, 61:21, 62:5, 62:19, 64:18, 65:3, 97:5, 97:17, 98:12, 98:16, 102:12
**sake** [6] - 41:10, 56:1, 56:2, 67:17, 70:17, 95:20
**sale** [3] - 37:3, 108:16, 118:1
**sales** [4] - 114:15, 120:1, 162:20, 163:17
**SAME** [1] - 209:12
**sample** [1] - 195:6
**Satellite** [1] - 130:23
**satellite** [1] - 130:24
**satisfactory** [1] - 120:3
**save** [1] - 120:5
**saw** [10] - 54:6, 55:17, 56:8, 77:23, 84:25, 136:18, 137:23, 150:18, 179:7, 185:17
**scale** [58] - 34:24, 36:2, 36:4, 36:11, 36:12, 36:13, 36:14, 36:20, 36:21, 38:19, 38:21, 38:22, 39:22, 44:24, 45:11, 45:19, 45:20, 45:22, 47:19, 49:2, 49:23, 49:24, 49:25, 50:1, 53:3, 53:8, 55:1, 55:4, 55:9, 55:10, 60:18, 61:2, 62:5, 62:6, 62:8, 63:12, 64:14, 66:1, 66:2, 66:9, 66:10, 66:13, 66:16, 66:18, 66:21, 67:7, 67:8, 71:5, 71:18, 78:1, 78:13, 90:2, 90:12, 96:22, 97:9, 97:10
**schedule** [3] - 158:11, 158:16, 188:22
**scholarly** [4] - 12:12, 12:17, 12:19, 12:22
**School** [4] - 11:9, 15:1, 15:2, 15:4
**school** [8] - 11:21, 11:24, 13:3, 63:25, 65:20, 65:21, 65:23,

127:18
**schooling** [1] - 11:23
**schools** [1] - 15:5
**Science** [2] - 127:5, 127:10
**science** [1] - 127:7
**scope** [2] - 35:24, 104:19
**score** [1] - 43:20
**Scott** [1] - 63:20
**screen** [1] - 46:19
**screens** [1] - 24:12
**screenshot** [1] - 118:2
**screenshots** [4] - 104:9, 110:17, 110:21, 119:16
**search** [14] - 43:14, 111:14, 140:21, 140:24, 140:25, 141:1, 141:2, 141:12, 141:13, 141:19, 142:15, 142:16, 144:6, 145:4
**seated** [7] - 10:17, 103:10, 124:8, 124:17, 155:8, 167:19, 169:21
**second** [22] - 32:7, 38:21, 46:20, 47:4, 48:12, 49:5, 49:20, 53:14, 53:19, 56:1, 59:9, 60:18, 62:6, 86:23, 89:16, 90:1, 90:11, 94:11, 99:9, 99:10, 123:5, 204:25
**secondary** [1] - 187:6
**secondly** [1] - 7:6
**seconds** [6] - 26:11, 27:20, 28:22, 94:18, 95:3, 95:10
**section** [9] - 24:13, 25:3, 25:25, 26:12, 27:20, 27:21, 28:2, 94:11
**sections** [1] - 27:24
**see** [77] - 7:1, 17:15, 23:24, 26:10, 29:7, 31:21, 32:13, 35:24, 37:9, 37:18, 38:20, 39:13, 41:12, 41:15, 44:21, 44:24, 45:15, 45:17, 45:22, 45:25, 46:19, 47:13, 48:22, 52:20, 52:24, 53:12, 53:13, 54:3, 56:13, 59:10, 61:7, 63:10, 64:5, 64:8, 64:11, 64:13, 64:23, 91:14, 95:6, 103:6, 109:3, 120:6, 122:20,

123:7, 123:17, 123:18, 133:4, 133:7, 134:14, 135:18, 136:16, 138:18, 139:10, 141:1, 141:9, 143:6, 145:21, 145:22, 155:4, 156:18, 158:20, 159:23, 160:19, 160:25, 167:6, 169:11, 169:16, 171:4, 174:22, 178:11, 178:14, 186:9, 188:2, 204:3, 207:21
**seeing** [1] - 135:20
**seek** [3] - 5:2, 105:25, 117:11
**seeking** [3] - 6:24, 104:9, 108:15
**seem** [4] - 18:21, 108:23, 113:20, 148:21
**segments** [1] - 120:25
**selection** [6] - 81:1, 174:5, 174:17, 175:9, 202:7, 203:17
**self** [7] - 48:9, 48:15, 77:7, 78:25, 79:6, 79:19, 83:25
**self-contradiction** [4] - 48:9, 77:7, 79:6, 83:25
**self-contradictory** [1] - 48:15
**seller** [1] - 117:6
**semester** [3] - 11:11, 65:21, 65:23
**send** [2] - 169:6, 169:14
**sense** [10] - 21:20, 21:21, 21:23, 40:12, 44:2, 54:24, 65:10, 83:7, 156:3, 176:20
**sent** [5] - 13:4, 105:7, 144:15, 172:18, 186:9
**separate** [9] - 53:2, 170:10, 170:11, 170:15, 179:10, 183:14, 192:15, 194:24, 194:25
**separately** [6] - 193:1, 193:25, 198:3, 198:4, 198:7, 198:13
**sequence** [2] - 34:18, 35:11
**series** [4] - 31:12, 34:18, 49:16, 207:16
**serve** [1] - 111:2

**served** [3] - 100:23, 101:3, 136:3
**server** [2] - 135:14, 146:20
**servers** [1] - 146:19
**serves** [1] - 113:6
**service** [4] - 129:19, 131:20, 133:15, 138:15
**Service** [1] - 138:9
**services** [13] - 100:12, 126:16, 129:2, 130:5, 130:11, 131:6, 131:9, 131:14, 131:16, 138:5, 138:14, 147:5, 153:3
**Services** [4] - 130:3, 130:8, 131:2, 131:21
**SET** [1] - 209:11
**set** [18] - 50:14, 60:17, 60:18, 61:15, 64:12, 68:13, 131:4, 141:21, 158:16, 159:7, 159:9, 159:22, 160:18, 170:8, 171:5, 172:17, 172:24, 178:10
**setting** [2] - 35:9, 101:4
**settings** [2] - 5:5, 130:20
**seven** [10] - 35:25, 36:7, 36:13, 66:13, 66:21, 73:20, 80:18, 84:1, 90:1, 163:1
**seventh** [1] - 82:21
**several** [14] - 8:5, 34:15, 41:9, 70:13, 70:14, 95:18, 105:1, 105:8, 107:25, 133:5, 136:2, 173:24, 201:15, 202:24
**Shakira** [1] - 14:15
**shape** [1] - 6:10
**share** [2] - 67:11, 208:6
**sharper** [3] - 81:15, 81:20, 81:21
**sheet** [2] - 63:4, 86:11
**ship** [1] - 133:25
**short** [3] - 22:14, 123:11, 155:1
**shortly** [5] - 140:11, 140:12, 154:24, 158:20, 167:12
**show** [21] - 52:1, 62:4, 62:18, 97:8, 107:8,

108:7, 108:12, 108:16, 111:12, 112:2, 113:22, 114:25, 117:13, 131:3, 135:14, 140:25, 179:1, 186:12, 195:20, 195:24, 195:25

**showed** [5] - 74:21, 79:1, 87:1, 92:21, 137:25

**showing** [3] - 149:15, 178:4, 178:7

**shown** [4] - 41:21, 55:21, 133:3, 137:23

**shows** [3] - 44:13, 108:24, 118:18

**sic** [1] - 93:22

**side** [13] - 24:21, 60:10, 94:10, 94:15, 108:25, 156:4, 163:15, 163:21

**side-by-side** [2] - 24:21, 60:10

**sided** [2] - 107:4, 123:1

**sides** [4] - 160:10, 171:6, 171:12, 197:19

**significance** [2] - 109:2, 116:6

**significant** [13] - 20:9, 20:10, 20:11, 20:12, 39:23, 45:21, 68:7, 82:20, 97:7, 116:20, 129:15, 147:23

**significantly** [1] - 45:24

**signify** [1] - 123:13

**Silberberg** [1] - 100:17

**SILBERBERG** [1] - 2:15

**similar** [27] - 20:7, 29:17, 33:23, 33:24, 48:8, 48:13, 62:20, 76:19, 77:25, 79:14, 79:24, 81:2, 81:9, 81:12, 82:21, 83:24, 92:12, 93:15, 95:14, 95:15, 97:12, 97:13, 107:3, 131:11, 131:17, 143:8, 205:1

**similarities** [32] - 18:9, 18:25, 20:10, 20:11, 20:12, 20:14, 21:3, 29:1, 33:17, 35:2, 35:7, 35:11, 37:9, 47:15, 48:14, 54:3, 73:20, 79:11, 79:17,

205:24

**site** [3] - 133:6, 133:10, 176:22

**sitting** [3] - 154:11, 160:13, 185:7

**situation** [3] - 104:21, 117:3, 117:7

**six** [34] - 55:15, 72:3, 72:4, 72:5, 76:1, 76:3, 76:5, 89:23, 90:2, 90:12, 106:8, 140:5, 140:7, 140:8, 140:13, 140:15, 142:19, 143:10, 143:11, 143:21, 143:25, 144:5, 144:12, 145:17, 145:19, 145:22, 148:15, 161:17, 161:18, 161:23, 162:12, 187:13, 203:8

**size** [2] - 18:14, 18:21

**sizes** [1] - 131:23

**skill** [1] - 64:5

**skipped** [1] - 69:10

**slash** [3] - 49:25, 76:1, 76:3

**slice** [1] - 76:11

**slide** [17] - 49:2, 51:9, 51:10, 51:12, 56:5, 58:6, 67:23, 68:16, 134:13, 135:21, 136:24, 138:6, 139:11, 140:22, 145:18, 146:22, 147:19

**slides** [13] - 24:19, 25:14, 34:2, 34:10, 48:25, 51:5, 51:7, 51:16, 56:19, 56:20, 59:23, 65:1

**sliding** [4] - 25:24, 26:9, 77:10, 77:23

**slight** [2] - 20:21, 35:12

**slightly** [3] - 153:6, 192:18, 203:10

**sloppy** [1] - 64:10

**slow** [1] - 126:9

**small** [2] - 137:19, 153:3

**snapshots** [1] - 132:23

**SNYDER** [1] - 1:4

**Society** [6] - 12:9, 12:10, 12:11, 15:6, 15:7, 128:7

**software** [6] - 6:10, 6:18, 7:20, 8:22,

8:25, 127:16

**software-wise** [1] - 6:10

**SOKOL** [1] - 2:5

**sold** [1] - 193:12

**sole** [2] - 40:9, 45:11

**Solfege** [6] - 36:16, 37:2, 40:4, 40:7, 40:8, 44:25

**solfege** [4] - 39:1, 55:3, 56:6, 56:8

**solve** [2] - 119:5, 176:8

**someone** [9] - 114:24, 142:8, 144:14, 145:2, 150:12, 151:21, 184:18, 191:12, 199:25

**sometime** [1] - 140:14

**sometimes** [3] - 30:23, 147:15, 205:25

**somewhat** [2] - 170:2, 178:15

**somewhere** [2] - 137:19, 154:10

**son** [1] - 153:5

**song** [61] - 22:5, 26:13, 28:5, 28:16, 36:18, 41:11, 67:25, 68:1, 69:12, 83:11, 90:13, 92:14, 94:3, 94:9, 94:19, 95:18, 96:3, 96:12, 97:19, 97:21, 98:11, 98:20, 105:22, 106:1, 106:18, 107:14, 107:17, 112:3, 112:5, 114:1, 116:11, 117:4, 117:11, 117:17, 117:25, 118:9, 118:11, 119:6, 121:1, 138:10, 139:15, 140:12, 142:20, 144:3, 145:5, 146:5, 146:6, 152:1, 152:9, 152:11, 152:12, 168:17, 168:21, 179:7, 179:8, 183:18, 187:4, 188:5, 193:8

**Song** [2] - 117:24, 118:1

**song's** [1] - 184:17

**songs** [49] - 20:8, 20:19, 20:24, 21:1, 21:2, 23:13, 24:7, 25:21, 28:11, 29:2,

29:3, 29:6, 30:6, 31:17, 31:18, 32:24, 33:16, 33:21, 52:16, 69:1, 69:21, 69:25, 70:3, 70:4, 70:10, 80:5, 83:8, 93:10, 95:13, 95:15, 96:6, 99:12, 102:16, 109:7, 113:21, 118:10, 120:1, 130:10, 138:16, 138:21, 138:24, 138:25, 139:5, 139:6, 139:9, 162:4, 168:8

**songwriter** [1] - 182:13

**songwriters** [7] - 183:16, 186:1, 186:2, 186:19, 186:21, 187:4, 187:13

**Sony** [1] - 126:16

**sorry** [11] - 24:4, 83:9, 88:20, 100:15, 106:14, 126:11, 136:22, 139:6, 157:8, 167:4, 177:19

**sort** [4] - 51:12, 116:22, 142:13, 207:1

**Sound** [1] - 36:18

**sound** [43] - 5:12, 5:17, 7:18, 7:22, 16:4, 16:7, 16:9, 16:10, 16:16, 16:23, 16:24, 17:1, 17:10, 17:12, 19:3, 21:17, 27:3, 34:23, 47:24, 47:25, 68:19, 69:8, 71:10, 81:7, 81:8, 81:14, 82:4, 82:23, 86:13, 86:15, 86:18, 87:5, 87:16, 87:17, 87:24, 88:5, 89:21, 89:22, 189:20, 189:22, 189:24, 190:3, 190:4

**sounding** [2] - 31:11, 68:21

**sounds** [19] - 6:3, 7:3, 9:25, 16:8, 25:16, 48:1, 68:21, 82:1, 82:15, 82:18, 82:23, 87:5, 88:5, 88:6, 90:6, 95:11, 170:21, 178:14, 198:10

**source** [3] - 21:7, 74:19, 77:18

**South** [1] - 128:13

space [2] - 59:2, 73:11
spaced [5] - 60:7, 64:21, 64:24, 73:17, 77:8
spaces [1] - 77:11
spacing [1] - 64:17
sparse [21] - 25:19, 47:21, 47:22, 68:21, 68:24, 68:25, 69:1, 69:2, 69:16, 69:21, 69:24, 70:6, 71:10, 73:5, 73:10, 83:2, 83:8, 83:10, 83:11, 83:15
sparser [1] - 25:21
speaking [6] - 22:9, 29:16, 35:4, 114:23, 162:11, 186:14
speaks [1] - 202:16
special [1] - 182:4
specific [5] - 18:13, 21:13, 119:23, 151:14, 207:16
specifically [18] - 5:18, 7:21, 8:23, 13:21, 51:1, 96:13, 105:21, 117:11, 125:8, 131:13, 139:17, 162:10, 163:17, 165:17, 165:25, 174:7, 174:9, 194:10
specifications [1] - 18:22
spectator [1] - 205:24
speculation [2] - 144:7, 185:11
speeches [1] - 128:15
spell [4] - 10:18, 46:1, 124:18, 186:8
spelled [1] - 124:22
spend [1] - 160:14
spent [2] - 92:13, 93:9
split [1] - 193:7
spoken [1] - 33:14
Spotify [9] - 129:19, 139:2, 139:4, 139:13, 139:14, 144:21, 151:10, 151:13, 153:1
square [1] - 7:8
SS [1] - 209:5
St [2] - 98:2, 150:11
ST [1] - 2:8
stack [1] - 79:11
stage [2] - 114:8, 169:16
stand [8] - 8:16, 8:17, 9:5, 99:19, 103:14, 103:19, 104:1,

153:17
standard [4] - 5:22, 46:8, 92:16, 96:24
standardized [1] - 6:7
standards [2] - 128:6, 153:6
standing [1] - 107:25
standpoint [1] - 16:7
star [2] - 130:5, 138:14
start [26] - 7:2, 8:6, 10:11, 24:10, 27:3, 27:8, 36:6, 37:12, 64:1, 69:21, 108:3, 120:1, 122:18, 126:17, 127:25, 128:2, 129:18, 133:12, 134:5, 137:5, 156:12, 156:14, 172:9, 189:3, 192:6, 208:16
started [6] - 112:8, 121:5, 127:15, 133:16, 133:24
starting [7] - 66:21, 79:11, 106:12, 132:9, 140:11, 172:13, 198:20
starts [9] - 52:20, 55:20, 83:1, 83:11, 92:8, 92:9, 135:15, 142:2, 146:20
STATE [1] - 209:6
state [4] - 4:6, 10:17, 124:18, 180:6
statement [2] - 47:10, 186:20
States [3] - 139:2, 143:6, 143:12
STATES [4] - 1:1, 1:1, 1:4, 209:9
statics [1] - 150:5
stating [1] - 188:18
statistic [1] - 151:2
statistics [4] - 149:19, 150:20, 150:23, 150:25
stature [1] - 183:24
status [1] - 124:10
stay [3] - 192:13, 196:21, 205:18
steady [1] - 139:10
Steinhart [1] - 11:8
STENOGRAPHIC [1] - 209:15
STENOGRAPHICALLY [1] - 209:10
step [8] - 21:14, 21:19, 58:22, 62:10, 78:4, 97:7, 103:1, 154:21
step-wise [1] - 58:22

Steps [3] - 125:19, 125:21, 127:14
steps [4] - 58:23, 63:12, 66:13, 71:18
stick [1] - 178:8
still [15] - 4:10, 27:14, 40:19, 40:20, 43:6, 55:6, 56:21, 59:17, 77:16, 105:12, 121:16, 148:7, 149:2, 169:8, 207:7
stip [1] - 167:10
stipulate [4] - 111:18, 120:10, 158:11, 162:20
stipulation [29] - 109:5, 114:1, 114:9, 114:11, 114:20, 117:16, 119:6, 119:18, 119:23, 120:4, 120:19, 120:20, 122:23, 123:3, 123:19, 123:21, 154:22, 155:9, 155:16, 155:22, 161:7, 163:9, 164:3, 164:4, 165:9, 165:13, 167:21, 167:25
STIPULATION [1] - 3:14
stipulations [1] - 135:24
store [1] - 7:16
story [1] - 193:7
straight [3] - 163:18, 178:12, 203:12
straightforward [1] - 104:11
strategically [1] - 29:24
Strategies [1] - 125:19
Strategist [1] - 127:23
strategy [1] - 129:22
streaming [1] - 138:5
STREET [1] - 1:23
street [3] - 127:22, 143:14, 143:23
stretched [4] - 45:18, 46:10, 72:14, 91:1
stretches [1] - 91:17
stretching [1] - 84:17
strictly [1] - 192:22
strike [2] - 7:5, 88:18
string [3] - 34:19, 51:11, 51:12
strong [5] - 21:10, 46:12, 47:13, 90:21, 91:6
structural [14] - 20:9,

22:17, 23:17, 24:1, 24:13, 25:3, 29:14, 29:24, 30:4, 68:12, 69:13, 71:1, 83:14, 95:5
structure [12] - 21:21, 23:13, 28:14, 29:18, 31:6, 87:8, 93:10, 93:13, 93:16, 93:23, 93:25
structures [2] - 28:11, 28:25
student [5] - 65:21, 65:22, 65:24, 66:5, 96:23
students [6] - 11:7, 11:12, 36:16, 61:2, 61:3, 61:4
studies [1] - 11:19
studios [2] - 126:8, 126:14
study [5] - 13:12, 13:17, 13:18, 137:23, 137:25
Study [1] - 128:8
stuff [8] - 103:18, 106:24, 109:4, 109:11, 115:14, 116:10, 175:12, 206:25
styles [2] - 11:20, 11:25
sub [1] - 13:13
sub-divides [1] - 13:13
subconscious [1] - 179:18
subdivisions [1] - 13:15
subject [12] - 9:23, 15:6, 85:8, 109:8, 128:22, 132:5, 139:17, 149:6, 155:15, 161:19, 165:15, 192:17
subjects [1] - 132:1
submit [5] - 162:22, 171:5, 173:2, 188:22, 194:2
submitted [8] - 42:8, 165:14, 171:6, 171:21, 174:18, 179:17, 180:21, 184:11
submitting [1] - 172:1
subsequent [1] - 141:5
subset [1] - 114:19
substance [1] - 101:19

substantial [12] - 20:19, 20:20, 69:18, 73:22, 74:5, 75:20, 78:24, 83:6, 84:4, 84:7, 180:18, 181:4
substantially [9] - 20:7, 48:8, 48:13, 62:20, 79:13, 81:12, 83:24, 93:15, 93:19
substitute [1] - 177:7
success [1] - 108:8
sudden [1] - 175:3
sued [2] - 182:20, 183:10
suggest [5] - 17:16, 116:25, 118:14, 123:4, 201:16
suggested [2] - 102:15, 111:1
suggesting [3] - 119:1, 184:24, 198:17
suggests [3] - 17:14, 149:21, 181:18
suing [2] - 191:12, 199:25
SUITE [2] - 2:11, 2:23
sum [2] - 42:21, 134:4
summaries [4] - 104:7, 104:9, 110:9, 165:19
summarize [1] - 19:25
summary [10] - 105:5, 105:15, 106:2, 106:23, 109:21, 109:23, 112:14, 115:14, 118:3
Sun [1] - 127:24
sung [4] - 25:8, 29:11, 30:2
supplement [1] - 174:24
supplemental [4] - 175:7, 177:13, 177:14, 177:16
supplementing [1] - 175:19
support [11] - 20:3, 20:6, 21:10, 55:24, 74:4, 74:5, 74:18, 75:19, 84:6, 84:8, 93:19
supported [1] - 73:22
suppose [1] - 185:15
supposed [4] - 105:6, 111:19, 170:12, 176:8
Supreme [1] - 176:2
surprisingly [1] - 176:7

sustained [1] - 25:18
swear [1] - 10:15
swoops [1] - 48:24
sworn [2] - 10:16, 124:16
symphonic [1] - 88:1
synth [1] - 82:8
synthesizer [2] - 48:2, 88:14
system [3] - 36:15, 105:24, 148:2
systematic [1] - 13:12
systematically [1] - 9:6
systems [1] - 63:25

**T**

table [14] - 49:9, 49:10, 49:24, 50:19, 53:2, 53:3, 53:4, 53:5, 53:8, 53:9, 75:25, 77:23, 77:24, 78:12
tactic [2] - 7:17, 7:23
tailored [1] - 205:13
takeaway [2] - 148:9, 148:11
talks [1] - 203:23
tambor [15] - 81:5, 81:6, 81:9, 81:14, 81:16, 81:19, 81:22, 82:5, 82:8, 82:9, 86:15, 87:18, 87:21
tambors [1] - 82:13
tambra [3] - 21:22, 47:24, 48:3
tambral [1] - 21:22
tangible [2] - 193:3, 193:13
tape [3] - 18:11, 18:12, 18:23
task [2] - 129:15, 143:24
tasks [1] - 11:5
taught [3] - 11:7, 11:11, 66:2
teach [4] - 65:19, 65:21, 65:22, 66:4
teacher [5] - 65:24, 66:5, 96:23, 150:12
teaching [4] - 65:24, 132:4, 132:10, 132:14
teapot [1] - 110:4
technical [1] - 125:24
technologist [1] - 69:7
Technology [3] - 125:19, 127:19, 127:25

technology [5] - 125:24, 126:14, 126:22, 128:4, 152:10
tempest [1] - 110:4
tempo [1] - 8:24
ten [6] - 9:4, 12:14, 57:10, 66:7, 100:10, 155:4
term [3] - 23:6, 34:14, 34:20
terminology [1] - 186:8
terms [14] - 25:16, 28:13, 29:1, 32:24, 34:24, 54:23, 84:10, 117:4, 139:22, 143:3, 162:6, 167:2, 168:11, 205:7
terribly [1] - 185:6
test [4] - 116:3, 180:19
testified [17] - 6:14, 8:5, 70:3, 85:22, 85:24, 97:4, 97:11, 98:10, 99:14, 101:7, 102:21, 110:22, 115:19, 122:24, 127:12, 128:9, 153:13
testify [3] - 8:10, 15:8, 17:4
testifying [2] - 17:6, 99:17
testimonial [1] - 101:15
testimony [41] - 4:16, 5:1, 7:5, 7:24, 9:20, 9:22, 15:17, 70:5, 90:22, 99:15, 102:1, 104:6, 104:7, 106:2, 106:20, 108:11, 108:24, 109:5, 109:18, 109:24, 110:18, 112:15, 115:1, 115:16, 115:22, 116:2, 117:12, 119:19, 119:22, 120:9, 125:6, 131:25, 132:5, 132:15, 139:17, 153:23, 159:12, 162:9, 163:18, 186:24, 205:4
text [1] - 144:15
texture [31] - 25:16, 25:18, 25:21, 25:22, 47:21, 67:11, 68:20, 69:1, 69:2, 69:16, 69:22, 69:23, 69:24,

70:6, 71:10, 73:3, 73:4, 73:6, 73:10, 82:22, 83:2, 83:5, 83:10, 83:12, 83:16, 86:18, 87:10, 87:12, 87:24
textures [2] - 83:8, 87:2
th [1] - 26:6
THAN [1] - 2:13
THAT [3] - 209:10, 209:12, 209:14
THE [309] - 2:20, 3:3, 4:3, 4:8, 4:12, 4:17, 4:20, 5:8, 5:25, 6:13, 7:1, 7:25, 8:12, 9:8, 10:3, 10:6, 10:8, 10:10, 10:14, 10:17, 10:19, 10:20, 17:4, 23:25, 24:1, 24:17, 25:2, 25:7, 25:13, 27:10, 27:13, 28:7, 57:5, 57:9, 57:14, 57:16, 57:19, 57:23, 57:25, 58:2, 69:7, 73:10, 85:10, 85:14, 85:16, 88:20, 100:15, 101:2, 101:5, 101:11, 101:17, 101:20, 101:23, 102:6, 102:8, 102:23, 102:25, 103:2, 103:3, 103:8, 103:10, 103:11, 103:14, 103:17, 103:22, 104:20, 104:23, 106:7, 107:10, 108:3, 108:17, 108:20, 109:10, 110:7, 110:25, 111:17, 113:13, 114:13, 114:22, 115:5, 115:9, 115:21, 115:23, 117:2, 117:20, 118:7, 118:11, 118:17, 119:4, 119:17, 120:3, 120:6, 120:12, 120:20, 120:23, 121:4, 121:18, 121:21, 122:1, 123:17, 123:24, 124:2, 124:4, 124:6, 124:8, 124:9, 124:14, 124:15, 124:17, 124:21, 124:23, 124:24, 126:9,

126:11, 126:12, 126:13, 136:8, 136:11, 144:8, 144:9, 149:7, 154:17, 154:20, 154:25, 155:6, 155:8, 155:9, 155:18, 155:21, 156:7, 156:9, 156:11, 156:17, 156:21, 157:2, 157:6, 157:9, 157:12, 157:18, 157:23, 158:3, 158:7, 158:18, 158:20, 158:21, 159:1, 159:6, 159:14, 159:19, 160:1, 160:4, 160:19, 160:24, 161:1, 163:6, 164:1, 164:9, 164:13, 164:17, 164:19, 165:4, 165:11, 165:23, 166:4, 166:7, 166:9, 166:17, 166:19, 166:22, 167:6, 167:9, 167:10, 167:14, 167:15, 167:17, 167:19, 167:20, 168:23, 169:1, 169:4, 169:19, 169:21, 169:22, 170:1, 170:3, 170:10, 170:18, 170:22, 170:24, 171:2, 171:19, 172:8, 172:21, 173:1, 173:5, 173:7, 173:10, 173:13, 173:18, 174:22, 175:1, 175:11, 175:22, 176:5, 176:13, 176:21, 176:25, 177:6, 177:10, 177:15, 177:21, 178:9, 178:11, 178:14, 178:24, 179:1, 179:5, 179:11, 179:14, 179:22, 180:3, 180:6, 180:8, 180:12, 180:17, 180:24, 181:7, 181:21, 182:10, 182:16, 183:8, 184:1, 184:5, 184:15, 184:20, 185:4, 185:13,

185:24, 186:16, 187:2, 187:9, 187:15, 187:22, 188:1, 188:7, 188:13, 188:20, 188:24, 189:10, 189:14, 190:11, 190:13, 192:6, 193:19, 194:7, 194:21, 196:5, 196:11, 196:18, 196:24, 197:10, 197:17, 197:21, 198:10, 198:19, 198:24, 199:8, 199:14, 199:20, 200:1, 200:6, 200:11, 200:14, 200:16, 200:21, 201:5, 201:22, 202:2, 202:17, 203:3, 203:5, 203:8, 204:1, 204:7, 204:15, 204:21, 205:2, 205:12, 205:21, 206:7, 206:10, 206:14, 206:16, 206:19, 206:24, 207:6, 207:18, 207:21, 208:2, 208:7, 208:10, 208:13, 208:16, 208:17, 209:8, 209:9, 209:10, 209:11, 209:12
Thematic [1] - 91:11
thematic [1] - 91:12
theme [2] - 91:14, 92:8
themes [2] - 46:7, 84:15
themselves [2] - 116:19, 178:5
theory [3] - 12:3, 13:18, 13:23
Theory [1] - 12:11
THEREAFTER [1] - 209:12
thereby [1] - 25:19
therefore [1] - 191:8
thereof [1] - 173:24
thereupon [1] - 110:11
they've [3] - 5:20, 182:18, 206:19
thick [3] - 68:22, 68:24, 82:24
thicker [1] - 69:23
thin [11] - 83:2,

173:25, 175:5,
175:10, 175:25,
176:2, 201:1,
201:18, 203:12,
203:19, 203:22
**thinking** [1] - 114:7
**thinks** [2] - 186:22,
198:25
**thinner** [1] - 69:22
**third** [5] - 38:22,
52:23, 61:24,
177:20, 178:1
**THIS** [1] - 209:14
**thousand** [1] - 150:24
**thousands** [1] - 133:7
**thousandth** [1] -
146:12
**three** [45] - 8:7, 12:15,
13:13, 13:14, 13:15,
13:20, 13:24, 26:5,
26:6, 27:4, 32:8,
36:23, 38:21, 39:3,
46:18, 52:22, 54:5,
55:17, 55:18, 55:19,
60:7, 60:17, 62:7,
93:8, 95:9, 95:11,
99:19, 104:14,
109:16, 110:5,
112:17, 112:18,
112:24, 134:25,
136:21, 136:22,
140:10, 140:14,
161:16, 161:19,
167:1, 167:3, 191:11
**three-year** [1] - 140:10
**threshold** [1] - 203:25
**threw** [1] - 111:6
**throughout** [3] -
22:22, 67:25, 94:18
**throwing** [1] - 80:9
**Ti** [2] - 36:22, 63:13
**tie** [1] - 183:4
**tight** [1] - 176:12
**TIME** [1] - 209:11
**Time's** [1] - 149:21
**timing** [3] - 94:16,
95:6, 157:15
**tiny** [4] - 146:13,
148:22, 149:1, 149:2
**title** [4] - 11:2, 11:13,
61:15, 105:22
**titles** [3] - 105:19,
105:23, 106:22
**TO** [1] - 209:12
**today** [19] - 7:8, 7:9,
8:11, 41:9, 88:4,
89:12, 93:9, 94:10,
99:20, 121:7, 132:1,
132:5, 138:15,
140:23, 141:18,

153:13, 154:12,
155:23, 169:8
**together** [7] - 87:10,
93:4, 93:18, 111:6,
145:9, 172:25,
201:14
**tomorrow** [8] -
155:25, 156:11,
156:14, 156:15,
169:6, 169:16,
207:7, 208:16
**tone** [4] - 59:14,
59:24, 60:8, 72:4
**tonight** [4] - 157:17,
160:20, 186:9,
207:13
**took** [6] - 94:2,
133:24, 140:23,
148:24, 150:16,
191:15
**top** [16] - 39:8, 41:12,
45:16, 45:25, 48:21,
53:21, 63:22, 88:13,
114:16, 114:17,
118:13, 118:21,
162:4, 162:5, 168:8,
168:9
**Top** [8] - 117:22,
117:23, 118:22,
161:12, 162:6,
168:4, 168:8, 168:10
**topic** [3] - 188:15,
196:23, 197:24
**total** [2] - 146:1, 146:9
**towards** [1] - 143:19
**track** [1] - 43:18
**Tradition** [1] - 63:21
**traffic** [2] - 147:24,
148:3
**train** [2] - 170:19
**transcribe** [3] - 21:25,
33:11, 76:9
**transcribed** [11] -
16:13, 18:8, 22:1,
22:5, 22:6, 33:9,
33:12, 50:13, 50:14,
87:16
**TRANSCRIPT** [1] -
1:14
**TRANSCRIPTION** [2] -
209:13, 209:14
**transcription** [23] -
17:18, 17:19, 18:5,
18:15, 18:19, 18:23,
19:1, 19:17, 19:20,
44:23, 54:20, 55:21,
60:6, 63:17, 67:20,
85:23, 85:25, 86:14,
86:24, 87:2, 87:4,
87:7, 87:14

**transcriptions** [5] -
17:22, 17:25, 19:5,
19:12, 22:6
**Transformation** [1] -
91:11
**transformation** [1] -
91:12
**transformed** [3] -
46:8, 84:16, 91:15
**translate** [1] - 134:11
**translates** [2] - 146:9,
146:11
**transpose** [1] - 37:6
**transposed** [2] -
31:25, 32:1
**TRAURIG** [1] - 2:21
**treble** [6] - 68:2, 68:7,
68:9, 68:11, 71:1,
73:14
**tri** [3] - 59:14, 59:24,
72:4
**tri-tone** [3] - 59:14,
59:24, 72:4
**trial** [20] - 8:6, 15:18,
99:18, 101:4, 101:7,
101:25, 110:12,
112:8, 112:11,
112:21, 113:12,
113:14, 113:15,
113:17, 113:19,
117:14, 122:2,
122:5, 158:16, 174:9
**trials** [1] - 5:10
**tried** [4] - 104:1,
104:11, 107:24,
162:20
**trier** [1] - 28:18
**tries** [1] - 175:15
**trillion** [12] - 136:18,
136:19, 136:22,
136:25, 137:1,
137:3, 137:6, 137:7,
137:10, 146:11,
148:23, 149:15
**trite** [7] - 20:21, 35:11,
54:11, 96:17, 99:7,
202:21, 204:24
**trivial** [1] - 202:21
**trombone** [1] - 51:10
**true** [11] - 68:25,
91:19, 92:11, 99:22,
104:3, 151:25,
178:24, 184:1,
187:9, 188:24, 208:2
**TRUE** [1] - 209:14
**truly** [1] - 197:12
**trumpet** [3] - 61:4,
66:8, 96:25
**try** [14] - 7:17, 7:18,
88:1, 103:4, 119:9,

121:6, 123:20,
155:2, 171:4,
196:21, 197:8,
197:23, 200:6,
205:12
**Try** [1] - 141:7
**trying** [35] - 108:7,
109:14, 112:15,
112:19, 112:23,
113:3, 113:7,
113:22, 117:9,
122:1, 123:15,
129:19, 155:22,
164:2, 172:8,
173:24, 175:13,
175:17, 176:25,
178:8, 184:21,
191:22, 196:7,
196:16, 198:25,
200:8, 201:16,
201:20, 202:18,
205:10, 205:15,
205:16, 205:17,
205:18, 207:16
**turn** [8] - 36:9, 38:17,
40:1, 58:4, 139:5,
139:15, 148:14,
159:10
**turns** [1] - 143:18
**tweet** [1] - 142:10
**twice** [3] - 53:16,
60:19, 76:7
**Twitter** [3] - 142:10,
147:6
**two** [102] - 4:13, 15:22,
15:25, 18:1, 20:19,
21:14, 21:15, 23:13,
25:13, 26:3, 26:5,
28:11, 28:19, 29:12,
29:15, 30:3, 30:5,
30:7, 30:9, 31:15,
32:21, 33:16, 33:21,
34:4, 35:2, 37:22,
38:22, 41:1, 41:2,
41:9, 45:25, 46:2,
46:3, 46:11, 48:23,
49:4, 49:7, 50:3,
51:8, 52:16, 52:18,
53:2, 54:2, 55:22,
58:11, 59:2, 59:25,
60:5, 60:7, 60:20,
61:24, 63:9, 63:11,
64:10, 65:4, 66:20,
66:22, 67:17, 67:19,
69:25, 70:3, 70:4,
71:24, 72:5, 74:22,
75:19, 77:9, 78:23,
80:17, 83:5, 84:17,
85:4, 85:23, 89:9,
89:12, 91:2, 92:10,

92:18, 93:3, 93:6,
93:10, 94:1, 95:8,
97:8, 110:2, 112:14,
142:23, 145:6,
145:9, 159:3,
161:10, 161:21,
164:7, 164:9,
168:14, 178:25,
189:16, 204:18,
206:6, 206:19,
207:24
**two-bar** [2] - 49:4,
49:7
**type** [5] - 131:17,
132:25, 137:10,
142:19, 143:1
**typed** [2] - 142:21,
142:25
**types** [5] - 11:25,
13:20, 131:21,
131:10, 137:15
**TYPEWRITTEN** [1] -
209:12
**typical** [2] - 59:14,
141:12
**typically** [1] - 65:11
**typo** [1] - 189:14

## U

**U.S** [2] - 128:11, 143:7
**U.S.A** [1] - 128:7
**Ultimate** [1] - 141:8
**ultimate** [2] - 174:20,
199:4
**ultimately** [3] - 66:5,
87:10, 170:7
**umbrella** [1] - 14:5
**unacceptable** [1] -
171:23
**unaffiliated** [1] -
151:21
**unconscious** [1] -
180:8
**under** [14] - 14:5,
38:20, 56:13, 58:17,
60:13, 76:1, 89:23,
112:3, 156:6,
170:11, 171:7,
183:1, 193:23
**undergraduate** [1] -
65:18
**underlying** [5] - 43:4,
104:8, 110:11,
193:24, 195:6
**underneath** [2] -
55:13, 55:17
**understood** [2] -
19:18, 108:8
**undertaken** [1] -

186:24
**Underwood** [1] - 14:15
**undoubtedly** [1] - 160:3
**unduly** [1] - 113:20
**unhappy** [1] - 7:5
**unheard** [2] - 135:6, 135:7
**UNITED** [4] - 1:1, 1:1, 1:4, 209:8
**United** [3] - 139:2, 143:6, 143:12
**universal** [1] - 66:9
**universe** [2] - 125:13, 201:3
**University** [11] - 11:3, 11:9, 12:21, 12:23, 13:1, 13:8, 14:25, 15:4, 127:10, 128:1, 132:11
**university** [1] - 11:13
**unless** [2] - 92:19, 162:15
**unlike** [1] - 5:23
**unmodified** [4] - 173:14, 173:17, 173:18, 177:2
**unprotectable** [4] - 202:6, 202:14, 203:24, 204:24
**unrebutted** [1] - 186:23
**up** [59] - 4:14, 4:17, 4:18, 10:4, 23:15, 27:3, 28:7, 36:4, 36:7, 42:21, 50:15, 51:11, 53:15, 57:20, 63:4, 63:7, 68:11, 70:25, 74:8, 74:11, 79:11, 82:23, 83:16, 95:10, 103:17, 104:1, 105:8, 109:17, 119:9, 119:10, 123:18, 126:17, 126:24, 127:25, 128:2, 129:18, 134:5, 134:20, 134:25, 136:18, 137:5, 138:12, 139:3, 139:12, 142:2, 142:13, 146:19, 146:20, 147:13, 147:17, 148:16, 149:2, 150:10, 153:2, 155:15, 160:22, 185:4, 199:24, 205:13
**upload** [8] - 133:19,

133:22, 137:18, 137:21, 151:22, 152:14, 152:20, 153:6
**uploaded** [6] - 134:10, 137:24, 146:5, 150:13, 151:13, 152:8
**uploads** [1] - 152:17
**upper** [1] - 32:11
**URL** [1] - 133:1
**user** [7] - 129:14, 134:11, 135:11, 145:1, 146:6, 146:23, 152:17
**users** [9] - 130:9, 131:14, 134:6, 134:7, 135:9, 135:17, 138:4, 144:25, 152:14

## V

**vacuum** [2] - 114:23, 162:12
**valid** [5] - 190:16, 192:20, 192:21, 192:23, 195:18
**validity** [3] - 193:16, 195:23, 196:3
**variance** [1] - 206:2
**variations** [2] - 16:18, 202:20
**varies** [1] - 137:20
**variety** [1] - 126:7
**various** [7] - 29:4, 33:4, 99:25, 119:7, 145:24, 161:13, 168:4
**vary** [1] - 149:22
**vast** [2] - 152:15, 152:17
**verdict** [8] - 174:20, 180:22, 180:25, 182:3, 182:4, 184:6, 189:17, 207:13
**versa** [1] - 148:3
**verse** [28] - 25:4, 25:5, 25:8, 25:17, 25:20, 25:22, 26:2, 26:3, 26:4, 26:5, 26:25, 29:12, 29:13, 30:2, 30:3, 30:4, 45:10, 47:23, 87:1, 94:12, 94:13, 95:8, 95:9
**verses** [9] - 22:5, 26:2, 26:18, 26:24, 28:19, 28:20, 29:4, 29:11
**version** [1] - 184:10
**versions** [2] - 170:11,

170:15
**versus** [11] - 4:5, 7:20, 29:10, 94:3, 151:9, 151:13, 153:7, 174:17, 187:23, 202:6, 202:14
**via** [1] - 111:24
**vicarious** [4] - 187:6, 187:7, 187:17
**vicariously** [1] - 187:4
**vice** [1] - 148:3
**video** [28] - 131:14, 133:15, 133:18, 135:14, 135:15, 135:17, 135:19, 136:19, 137:1, 137:18, 137:21, 138:3, 141:7, 141:8, 141:14, 142:1, 142:5, 142:9, 142:12, 146:6, 146:20, 146:24, 150:14, 150:19, 151:22, 152:8, 152:14
**videos** [53] - 125:12, 133:19, 133:22, 134:12, 134:15, 134:19, 134:23, 135:1, 135:3, 135:10, 136:13, 136:17, 136:18, 137:10, 137:11, 137:14, 137:15, 137:24, 138:2, 138:15, 138:21, 138:24, 139:7, 139:8, 140:3, 140:6, 140:8, 140:9, 140:15, 141:9, 141:12, 141:14, 142:19, 142:24, 143:8, 143:11, 143:19, 143:25, 144:5, 144:12, 145:17, 145:20, 145:22, 146:7, 147:13, 147:17, 148:12, 148:15, 150:21, 151:3
**view** [27] - 42:2, 83:4, 132:12, 133:3, 135:12, 135:13, 135:17, 139:20, 139:24, 142:18, 142:25, 145:14, 145:15, 145:16, 145:24, 146:2, 146:15, 146:17, 146:18, 146:21,

147:4, 147:17, 148:10, 148:15, 185:18
**viewed** [4] - 145:11, 146:25, 150:21, 151:3
**viewing** [1] - 138:1
**views** [33] - 34:25, 125:12, 136:12, 136:19, 136:23, 136:25, 137:1, 137:3, 137:6, 137:7, 137:10, 137:11, 139:23, 141:9, 141:11, 145:10, 146:1, 146:8, 146:10, 146:12, 146:13, 148:16, 148:17, 148:24, 149:15, 149:17, 149:20, 149:25, 150:6, 150:19, 150:20, 151:9
**VINCENT** [1] - 2:22
**violated** [2] - 183:23, 186:12
**violation** [1] - 105:3
**violin** [2] - 61:5, 96:25
**virtually** [1] - 203:20
**virtue** [3] - 47:10, 56:12, 175:19
**visible** [1] - 141:4
**visitors** [1] - 147:25
**visual** [3] - 63:2, 65:4, 86:23
**vocal** [10] - 22:1, 22:2, 22:3, 22:4, 33:12, 33:15, 33:17, 35:6, 61:14, 89:5
**vocals** [1] - 88:13
**voice** [1] - 6:4
**volume** [7] - 19:14, 138:4, 140:16, 162:7, 168:12
**volumes** [1] - 135:19
**VS** [1] - 1:8

## W

**WAIS** [13] - 2:16, 103:23, 119:13, 119:18, 122:22, 158:23, 159:3, 165:7, 165:12, 165:25, 166:6, 166:20, 167:13
**Wais** [4] - 103:20, 103:22, 120:13, 167:14
**wait** [1] - 123:17

**waiver** [1] - 165:15
**walk** [2] - 49:11, 74:3
**wall** [2] - 18:14
**wants** [2] - 153:2, 195:2
**WAS** [1] - 209:12
**wash** [1] - 184:2
**waste** [1] - 207:9
**watch** [1] - 142:12
**watched** [1] - 142:1
**watching** [2] - 146:23, 148:12
**wave** [1] - 5:16
**ways** [5] - 7:2, 36:23, 77:7, 83:21, 205:15
**web** [2] - 132:23, 133:17
**website** [9] - 110:17, 110:23, 111:23, 115:15, 132:25, 133:2, 133:4, 142:8, 144:17
**WEDNESDAY** [2] - 1:15, 4:1
**weeds** [1] - 175:24
**week** [6] - 121:13, 161:12, 162:4, 168:3, 168:8
**week-to-week** [1] - 121:13
**weekend** [1] - 105:2
**weekly** [1] - 110:16
**weeks** [2] - 110:2, 140:24
**WEST** [2] - 1:23, 2:18
**Western** [1] - 22:19
**WESTERN** [1] - 1:2
**whatsoever** [2] - 35:2, 42:22
**whereas** [14] - 16:9, 16:20, 25:20, 29:23, 43:2, 51:23, 52:24, 58:20, 58:24, 61:23, 72:2, 72:24, 76:22, 91:4
**wherein** [2] - 62:4, 68:23
**white** [28] - 35:23, 128:22
**whittle** [1] - 169:23
**who've** [1] - 183:11
**whole** [5] - 76:4, 97:21, 110:22, 165:23, 193:6
**wide** [1] - 126:7
**widespread** [7] - 178:1, 178:19, 178:22, 179:1, 179:2, 179:6, 179:20
**wife** [1] - 11:22

**WILLIAM** [1] - 3:8
**William** [1] - 124:21
**Williams** [1] - 187:22
**willing** [1] - 197:25
**wind** [2] - 51:10, 66:10
**wise** [2] - 6:10, 58:22
**wish** [3] - 27:24, 71:17, 184:2
**withdrawing** [1] - 173:11
**withdrawn** [1] - 44:6
**withdrew** [1] - 207:25
**Witness** [2] - 98:2, 99:4
**witness** [16] - 9:24, 10:11, 10:16, 85:17, 103:12, 103:13, 115:16, 115:18, 116:23, 123:20, 124:10, 124:16, 129:2, 136:7, 153:14, 179:7
**WITNESS** [19] - 10:19, 24:1, 24:17, 25:2, 25:7, 25:13, 27:10, 27:13, 28:7, 69:7, 73:10, 100:15, 101:23, 103:2, 124:21, 126:11, 126:13, 136:11, 144:9
**witness's** [1] - 162:9
**WITNESSES** [1] - 3:3
**won** [1] - 13:6
**wonderful** [1] - 78:15
**word** [11] - 29:21, 30:21, 30:22, 80:24, 81:19, 86:2, 89:2, 91:11, 98:13, 142:21, 178:17
**words** [15] - 9:12, 68:10, 75:5, 79:9, 82:1, 96:11, 98:20, 99:3, 118:22, 131:24, 142:23, 158:5, 181:15, 191:1, 204:25
**works** [32] - 20:18, 21:16, 21:22, 65:6, 67:16, 70:13, 70:14, 70:16, 74:21, 75:1, 79:22, 84:25, 85:4, 85:23, 86:1, 88:1, 92:12, 92:18, 93:3, 93:6, 93:14, 94:1, 94:12, 132:24, 181:24, 186:10, 189:7, 189:16, 192:1, 194:14, 199:18

**world** [7] - 22:22, 61:2, 74:16, 78:20, 98:19, 135:7, 183:9
**World** [5] - 106:17, 161:20, 163:1, 168:14, 168:20
**worried** [1] - 191:22
**worry** [2] - 173:7, 173:11
**worse** [2] - 78:7, 201:25
**wow** [1] - 18:24
**wrap** [2] - 27:3, 28:7
**write** [1] - 98:18
**writer** [1] - 193:7
**writers** [7] - 20:23, 21:1, 21:4, 84:11, 91:25, 96:1, 101:24
**writes** [4] - 49:24, 53:8, 55:13, 76:1
**writing** [4] - 17:19, 86:7, 154:1, 204:17
**writings** [1] - 70:9
**written** [26] - 12:12, 12:15, 21:4, 35:23, 37:18, 42:4, 43:20, 55:22, 55:23, 70:13, 70:14, 70:15, 70:18, 71:23, 72:8, 74:15, 86:11, 86:17, 87:16, 95:13, 128:15, 128:21, 147:20, 182:18
**wrote** [8] - 20:24, 21:1, 47:4, 70:20, 72:5, 81:18, 128:17, 194:25

## X

**X'ed** [1] - 53:24
**xerox** [1] - 166:24
**XM** [1] - 130:23

## Y

**yada** [2] - 107:3
**Yahoo** [1] - 147:6
**year** [14] - 13:2, 13:5, 41:5, 65:22, 134:2, 134:8, 136:13, 136:14, 137:1, 140:10, 141:10, 147:21, 153:4
**year-and-a-half** [2] - 134:2, 134:8
**year-old** [1] - 153:4
**years** [16] - 14:24, 15:1, 15:3, 19:9, 41:14, 64:1, 67:19,

71:24, 72:5, 100:10, 127:15, 128:20, 134:16, 139:3, 140:14, 193:18
**yesterday** [3] - 104:10, 105:2, 135:24
**York** [5] - 11:3, 11:9, 13:1, 132:10, 147:20
**young** [1] - 11:19
**YouTube** [98] - 125:7, 125:13, 129:13, 129:15, 129:16, 130:4, 130:11, 130:15, 130:17, 131:9, 131:13, 131:16, 131:22, 131:25, 132:12, 132:18, 133:2, 133:7, 133:12, 133:13, 133:14, 133:15, 133:22, 133:24, 134:6, 134:9, 134:15, 134:19, 135:3, 135:11, 135:14, 135:16, 135:17, 136:13, 136:21, 137:1, 137:4, 137:7, 137:12, 137:13, 137:14, 137:17, 137:22, 138:2, 138:3, 138:5, 138:13, 138:16, 138:21, 138:24, 139:7, 139:9, 139:12, 139:20, 139:22, 140:4, 140:7, 140:8, 140:16, 140:17, 140:18, 140:20, 140:23, 141:5, 141:15, 141:16, 141:18, 141:20, 141:25, 142:6, 142:8, 142:9, 142:16, 143:9, 143:19, 144:12, 144:21, 145:1, 146:1, 146:10, 146:19, 147:4, 147:5, 147:13, 147:17, 147:24, 148:6, 148:22, 149:16, 150:6, 150:13, 151:9, 151:13, 151:22, 152:5, 153:7
**YouTube's** [3] - 133:21, 140:24,

141:19
**youtube.com** [1] - 133:1

## Z

**Zeppelin** [7] - 173:22, 174:8, 174:9, 175:4, 201:23, 202:5, 204:19
**zero** [2] - 106:8, 134:7
**zoomed** [2] - 64:8, 64:9

# EXHIBIT 6

EXHIBIT  6
PAGE  1085

```
 1                    UNITED STATES OF AMERICA
                   UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
                         WESTERN DIVISION
 3
                            -  -  -
 4                HONORABLE CHRISTINA A. SNYDER
              UNITED STATES DISTRICT JUDGE PRESIDING
 5                          -  -  -

 6
       MARCUS GRAY; ET AL.,            )
 7                                     )
                 PLAINTIFF,            )
 8                                     )   CASE NO.:
       VS.                             )   CV 15-5642-CAS
 9                                     )
       KATY PERRY; ET AL.,            )
10                                     )
                 DEFENDANT.            )
11     _____)

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15              THURSDAY, JULY 25, 2019

16              LOS ANGELES, CALIFORNIA

17

18

19

20

21

22              LAURA MILLER ELIAS, CSR 10019
              FEDERAL OFFICIAL COURT REPORTER
23            350 WEST FIRST STREET, ROOM 4455
              LOS ANGELES, CALIFORNIA 90012
24                 PH:  (213)894-0374

25
```

UNITED STATES DISTRICT COURT

EXHIBIT 6
PAGE 1086

1

2

APPEARANCES OF COUNSEL:

3

ON BEHALF OF PLAINTIFF:

4

5              CAPES SOKOL
               BY: MICHAEL A. KAHN, ESQ.
6                  LAUREN COHEN, ESQ.

7              7701 FORSYTH BOULEVARD
               12TH FLOOR
8              ST. LOUIS, MO 63105

9
               KAYIRA LAW, LLC
10             BY:  ERIC KAYIRA, ESQ.

11             2100 HANLEY ROAD, SUITE 208
               CLAYTON, MO 63105
12

13
     ON BEHALF OF DEFENDANTS OTHER THAN MS. PERRY:
14

15             MITCHELL SILBERBERG & KNUPP
               BY: CHRISTINE LEPERA, ESQ.
16                 AARON M. WAIS, ESQ.
                   JEFFREY MOVIT, ESQ.
17                 GABRIELLA NOURAFCHAN, ESQ.
                   JACOB ALBERTSON, ESQ.
18
               11377 WEST OLYMPIC BOULEVARD
19             LOS ANGELES, CA 90064

20
     ON BEHALF OF THE PERRY DEFENDANTS:
21
               GREENBERG TRAURIG
22             BY:  VINCENT H. CHIEFFO, ESQ.

23             1840 CENTURY PARK EAST
               SUITE 1900
24             LOS ANGELES, CA 90067

25

UNITED STATES DISTRICT COURT

EXHIBIT 6
PAGE 1087

INDEX

PROCEEDINGS                                    PAGE

JURY INSTRUCTION DISCUSSION                        4

JURY INSTRUCTIONS                                 48


CLOSING ARGUMENTS

BY:   MR. KAHN                               72, 117

BY:   MS. LEPERA                                 95

EXHIBIT 6
PAGE 1088

```
 1   LOS ANGELES, CALIFORNIA; THURSDAY, JULY 25, 2019; 9:45 A.M.

 2                           -  -  -

 3               THE CLERK:  Calling Item Number 1.

 4               Case No. CV 15-5642.

 5               Marcus Gray versus Katy Perry, et al.

 6               Counsel, please state your appearances.

 7                  (Appearances as heretofore noted.)

 8               THE COURT:  All right.  Good morning.

 9               Okay.  I haven't begun to deal with the verdict

10   forms, but let me tell you on the jury instructions what I

11   think is appropriate.  Regarding Instruction No. 1, what I

12   think I should do is adopt the defendant's but with the

13   following changes.

14               I'm gonna insert the 9th Circuit language back in

15   Paragraph 2 so that it reads, "In order for Joyful Noise to

16   be a joint work, the plaintiff must prove the following by a

17   preponderance of the evidence.  That at the time of the joint

18   work's creation," that's the new language, "each author must

19   have made substantial and valuable contribution.  Each author

20   must have intended that his contribution be merged into

21   inseparable parts of a unitary whole," not the whole work.

22               I think that the next paragraph an author intends

23   is unnecessary, and then I would leave the third paragraph in

24   place.

25               Regarding Instruction No. 2, if I understand the
```

1  difference, the defendants seek to eliminate the word

2  protectable.  I think it's appropriate to have the word

3  protectable in there.

4         MS. LEPERA:  I think that's the plaintiffs,

5  Your Honor.

6         THE COURT:  That's the plaintiffs?

7         MS. LEPERA:  Yes.

8         THE COURT:  They want to omit protectable.

9         MS. LEPERA:  We want it.

10         THE COURT:  And I do want protectable.

11         Let's now go to. . . the defendant's have the word

12  protectable in their Instruction No. 4 if I understand it and

13  the plaintiffs want to delete it.  I think the term

14  protectable belongs in that one, too.

15         And then under five, I think that the plaintiff is

16  correct.  The only thing I would do is say rather than any

17  defendant, I would say any named defendant, but I think that

18  the plaintiffs' joint liability instruction is in line with

19  Section 106 of the Copyright Act, and I think that's the

20  appropriate instruction.

21         There is an instruction that the plaintiffs propose

22  that I don't see any opposition to.  There's a 9th Circuit

23  instruction, "Copyright law allows the author of an original

24  work to stop others from copying," et cetera which is

25  propounded by the plaintiffs, and I don't see what's wrong

```
 1   with that.
 2              MS. LEPERA:  We don't have that one, Your Honor.
 3              MS. COHEN:  I did copy counsel.  Which one are we
 4   talking about?
 5              THE COURT:  I'm talking about I think the last one
 6   in your group.  You have copyright law allows the author of
 7   an original work to stop others from copying, et cetera.  I
 8   think that's appropriate.
 9              MS. LEPERA:  Can I ask for a clarification,
10   Your Honor?
11              THE COURT:  Yes.
12              MS. LEPERA:  I think you said Jury Instruction
13   No. 5 with a named defendant.
14              THE COURT:  You have a disputed No. 5.
15              MS. LEPERA:  Right.  Okay.  The one you're
16   selecting is the one that's not No. 5.  The plaintiffs
17   submitted one with the addition of named.
18              THE COURT:  Yes, that's what I'm doing.
19              MS. LEPERA:  Just a clarification.  It's fine.
20              THE COURT:  Do plaintiffs have anything to offer?
21              MS. LEPERA:  Perhaps the Court is gonna address our
22   Proposed Jury Instruction No. 3 which we had discussed with
23   them.  We have no objection to the jury instruction that was
24   just read.  It's not numbered about copying original
25   expression, however we have with respect to Jury Instruction
```

1    No. 3, we have provided for the jury an explanation as to

2    what's protectable and also made reference to the combination

3    issue that we were speaking about yesterday.  So we would

4    submit that Jury Instruction No. 3 is also appropriate.  I

5    understand the Court has maybe not ruled on that.

6         THE COURT:  I think I had.  I agree protectable

7    should be in it.  The concern I have is the third paragraph

8    in the context of musical works.

9         MS. LEPERA:  In line with Your Honor's guidance

10   yesterday, we attempted to put the issue squarely with

11   respect to music.  Obviously, a lot of other language in the

12   model rules, et cetera deal with specific things in other

13   types of work identifying those building blocks in those

14   types of work.  So, again, so it would be put in the context

15   that was the reason why we added that.  Thank you.

16        THE COURT:  Yes.

17        MR. KAYIRA:  Your Honor, it appears that

18   Instruction No. 3 is predicated upon the Harper case about

19   thin copyrights.

20        MS. LEPERA:  The Harper case is not about thin

21   copyrights, but there's a discussion in there obviously with

22   respect to selection and arrangement and whether there needs

23   to be virtual, identical copying so it is analogous, yes.

24        MR. KAYIRA:  To extent that Jury Instruction No. 3

25   relies on Harper, we believe that Harper is squarely

 1    distinguishable.  It is a case in which the constituent parts

 2    are blank forms, zip codes, things that do not require any

 3    creative input.  However, in the case at hand before this

 4    Court each of the constituent parts requires creative input

 5    and therefore the application of a binder, a case that deals

 6    with a compilation registration should not be applied to a

 7    music copyright registration not as a compilation, but as a

 8    stand-alone copyright.

 9         THE COURT:  Is there any part of three that you

10    find acceptable?

11         MS. LEPERA:  The Harper case referenced yesterday

12    really more for the proposition of the instruction with

13    respect to protectability both in individual elements and in

14    combination.  The law is clear in this circuit irrespective

15    of that case, including in 9th Circuit case in Swirsky and in

16    Satava that protectable expression in a work, including a

17    musical work, has to be extracted.  And to the extent there

18    is unprotectable expression, there is a higher level of proof

19    copying.

20         The thin copyright standard itself is in the model

21    rules.  It's not strictly with respect to Harper.  So Harper

22    is not the, um, genesis of this doctrine.  This was being

23    used yesterday to illustrate the potential pitfalls for

24    failing to instruct on the protectability issues both in the

25    elements and in the combination.

1          But the entire doctrine of protectability both in

2      the underlying elements and the combination is well

3      established in other case law in the 9th Circuit.  And the

4      thin copyright doctrine is in the model rules.

5          MR. KAYIRA:  Your Honor, plaintiff is comfortable

6      with Jury Instruction No. 3 with the exception of Paragraph

7      No. 3 and the last paragraph.  The third paragraph inserts

8      defendant's argument into the instruction.

9          THE COURT:  I must tell you I am more troubled by

10     the third paragraph than the thin copyright paragraph.

11         MS. LEPERA:  I think that the third -- I mean the

12     third paragraph actually as far as I understand it is what

13     the plaintiffs are arguing.

14         THE COURT:  Yeah, I understand, but we have now

15     added the other 9th Circuit instruction.

16         MS. LEPERA:  And my concern remains that it's not

17     an instruction on what happens with the selection and

18     arrangement.  There is no other instruction that deals with

19     that issue at all.  So I do not see this as proponent one way

20     or the other, but rather a discussion of the law applicable

21     to a combination.

22         THE COURT:  I think you can argue it.  I just don't

23     think we necessarily should import your arguments into the

24     instructions.

25         MR. KAYIRA:  That's it, Your Honor.

```
 1              THE COURT:  I'm going to leave the thin copyright
 2   protection language in.  But does that take care of this?
 3              MR. MOVIT:  Your Honor, we were unclear whether
 4   Your Honor has ruled on Defendant's No. 4.
 5              THE COURT:  Defendant's No. 4 I said is okay.
 6              MR. MOVIT:  Thank you, Your Honor.
 7              THE COURT:  You can use the -- I think the
 8   distinction is the use of the word protectable.
 9              MS. COHEN:  Your Honor, can I address that one
10   briefly?
11              THE COURT:  Sure.
12              MS. COHEN:  The use of the word protectable was an
13   issue.  I understand the Court has ruled on that so that's
14   fine.
15              The other issue that we had was in the last
16   sentence of this instruction where it says here this means
17   you should determine whether an ordinary, reasonable person
18   would find that the total concept and feel of Joyful Noise
19   and Dark Horse are substantially similar.  It's just that
20   language the total concept and feel.
21              MS. LEPERA:  It's black letter law, Your Honor.
22              THE COURT:  I thought that was the error that was
23   noted in the Led Zeppelin case.  I think that's appropriate.
24              MS. COHEN:  Okay.  Thank you.
25              THE COURT:  So now the question is are you going to
```

EXHIBIT 6
PAGE 1095

1    input the changes?  Who's gonna input these changes?

2             MS. LEPERA:  My trusted colleague.

3             THE COURT:  All right.  Let's do that.

4             Now, I haven't begun to look at the verdict forms

5    to understand what you disagree on there, but I can sort of

6    tell you that whoever has the simpler verdict form is going

7    to win.  What is, if I may understand, what's the plaintiff's

8    objection to Question No. 1?

9             MS. COHEN:  Your Honor, the objection is to

10   Question No. 1 is the inclusion of language considering the

11   works as a whole and removing from consideration any material

12   that you found to be commonplace expression.  We believe it

13   should start did plaintiffs prove.  The instructions take

14   care of that language which is superfluous here in the

15   verdict form.  The instructions explain how to go about

16   determining substantial similarity adequately.

17            THE COURT:  Well, I think there is some merit to

18   that argument because I don't usually like to repeat

19   instructions in the verdict form because there is a potential

20   ambiguity.

21            MS. LEPERA:  We had an earlier question which we

22   eliminated was did the plaintiffs prove that anything at

23   issue was protectable copyrightable material.  The reason

24   there is a distinction between Questions 1 and 2 is to mirror

25   the extrinsic and the intrinsic test.  If they stop at one,

```
 1   they determine on the basis of extrinsic, and the second

 2   question is based on the intrinsic total concept and feel.

 3            If we take out the language that counsel wants us

 4   to take out, we're back to that initial step which did they

 5   even provide any material at issue that is protectable?  Did

 6   you find that there was any material in common that is

 7   protectable before you can get to the intrinsic test.  That

 8   is why we have the two to have the separate tests.

 9            THE COURT:  Can you live with the three, the

10   original Question 1?

11            MS. LEPERA:  We can do the original question.  We

12   thought that might be more confusing to give the jury three

13   questions so we tried to simply put it into the two.

14            THE COURT:  I know, I know.

15            MS. LEPERA:  But I think the two are critical to be

16   distinguished.

17            THE COURT:  I understand that we need 1 and 2.  The

18   question is would it be advisable in terms of preserving the

19   record not to import the instructions into the verdict form

20   and simply to ask the question.

21            MS. LEPERA:  Then I think I would want No. 1 back

22   in.

23            THE COURT:  I can give you No. 1.

24            MS. LEPERA:  That's acceptable then, Your Honor,

25   because the preamble was about No. 1.
```

UNITED STATES DISTRICT COURT

EXHIBIT 6
PAGE 1097

```
 1              THE COURT:  Okay.  So shouldn't that resolve that
 2      problem for the plaintiffs?
 3              MS. COHEN:  I don't have the current version of
 4      what she sent.
 5              MS. LEPERA:  What we originally had was Question
 6      No. 1.  I don't have the exact language.  It was essentially
 7      do you find that any of the material music that is alleged to
 8      be infringed is protectable expression owned by the
 9      plaintiffs or commonplace expression.  That is essentially
10      the gist of it.
11              Okay.  Did plaintiffs prove by a preponderance of
12      the evidence that Dark Horse contains material from the music
13      composition Joyful Noise that is both original to plaintiffs
14      and not commonplace expression.  Then the next question would
15      be does that rise to the level if it does, does that rise to
16      the level of extrinsic similarity, and then moving on to the
17      issue of intrinsic similarity.
18              THE COURT:  I think that's fine.
19              MS. LEPERA:  Thank you, Your Honor.
20              THE COURT:  Okay.  Then your No. 3.
21              MS. LEPERA:  Is the intrinsic test.
22              THE COURT:  Right, but what is now old 3 and now
23      new 4.
24              MS. LEPERA:  Correct.
25              THE COURT:  Did plaintiff prove by a preponderance
```

EXHIBIT 6
PAGE 1098

```
 1    of the evidence that Joyful Noise was widely disseminated

 2    such that defendants had a reasonable opportunity to hear

 3    Joyful Noise prior to creating Dark Horse.

 4              MS. LEPERA:  Right.

 5              THE COURT:  Do you have an objection on that?

 6              MS. COHEN:  No, we agree on that one.

 7              THE COURT:  Now, let's go to the next one.  Did the

 8    defendants prove by a preponderance of the evidence that they

 9    did not avail themselves of the opportunity to hear Joyful

10    Noise prior to creating Dark Horse?

11              MS. COHEN:  That one's fine.

12              THE COURT:  The next one, did defendants prove by a

13    preponderance of the evidence that defendants independently

14    created Dark Horse?  Do we have a problem with that?

15              MS. COHEN:  No, Judge.

16              THE COURT:  Did the plaintiffs prove by a

17    preponderance of the evidence that the inclusion of

18    instrumental music, i.e., the beat created by Mr. Ojukwu in

19    Joyful Noise was part of the joint work of authorship with

20    the other plaintiffs.  Do we have a problem with that now

21    that we're using --

22              MS. COHEN:  I suppose not.

23              THE COURT:  And then for each defendant listed

24    below, did plaintiffs prove by a preponderance of the

25    evidence that the defendant copied Joyful Noise or
```

EXHIBIT 6
PAGE 1099

1    distributed Dark Horse.

2        MS. COHEN:  Judge, we believe that the version of

3    this question that we submitted reflects the instruction

4    related to joint liability that Your Honor approved.

5        THE COURT:  Let me look at yours then and see.

6    Yours is. . . you have copied or distributed.  What we have

7    in the instruction we adopted was. . .

8        MS. LEPERA:  Your Honor, now that we're back to the

9    instruction, I still think there's a problem with the joint

10   liability when it says authorized, that is with respect to

11   the vicarious or contributory.  It would have to be the

12   direct either authored, produced, published or distributed.

13       THE COURT:  Here's the problem.  If I look at 106,

14   the owner of the copyright under this title has the exclusive

15   rights to do and to authorize any of the following, and then

16   we have reproduce, prepare derivative works that's not

17   relevant here, to distribute copies, to perform the

18   copyrighted work publicly, to display the copyright work

19   publicly.  In the case of sound recordings to perform the

20   copyrighted work preferably by means of a digital audio

21   transmission.

22       MS. LEPERA:  The copyright owner has those

23   exclusive rights.  That is correct.  The distinction I'm

24   making, Your Honor, is with respect to copyright infringement

25   claims.  To establish a direct infringement claim, you have

EXHIBIT 6
PAGE 1100

1    to establish the direct infringement by way of copying,

2    distribution, publication, production.  An authorization to

3    do so is more in the nature of a vicarious or a contributory

4    claim that is not a direct infringement claim.

5            That is the distinction I'm making.  Not to suggest

6    that there's not a right to authorize.  The question is

7    whether or not this relates to the contributory and vicarious

8    infringement claims that are not in this case and none of

9    which are posed against any of these defendants.  So it would

10   be direct liability is to directly doing it.  Authorizing it

11   is in the nature of vicarious or contributory.

12           THE COURT:  Well, let me try it this way.  Well,

13   what I hear you saying and I'll have to go back and look,

14   authored, produced, published or distributed Dark Horse is

15   acceptable.

16           MS. LEPERA:  Yes.

17           THE COURT:  But your problem is or who authorized

18   the production, publication or distribution.

19           MS. LEPERA:  Correct, correct.

20           THE COURT:  So what we're really saying is that the

21   problem with the plaintiff's instruction is not its use of

22   authored, produced, published or distributed.  It's the

23   authorization.

24           MS. LEPERA:  Correct.

25           As I look at this carefully and I noticed this

EXHIBIT 6
PAGE 1101

```
 1    yesterday, that is one of the reasons we submitted five, but

 2    I don't have any problem with the additional couple of words.

 3    I think we just said copied or distributed.  I don't have a

 4    problem with published or produced.  They do essentially

 5    mirror copying and production and publication.

 6            The only other issue I have with this, Your Honor,

 7    I assume there's not going to be any heading.

 8            THE COURT:  I'm not going to put headings on

 9    anything.

10            MS. COHEN:  Judge, I would just say the case law

11    that's cited in the original instruction that plaintiff

12    submitted, this language was derived directly from that case

13    law.

14            THE COURT:  The question is in the cases were there

15    claims for vicarious liability or --

16            MS. LEPERA:  There were.

17            THE COURT:  I think there were.

18            MS. COHEN:  There may have been, but the provisions

19    I pulled this from were related specifically to direct

20    infringement.

21            THE COURT:  I'm not so sure of that.  Let me go

22    take a look.  Here's what I think.  I think that authorized

23    probably is not the appropriate instruction, but you

24    certainly can argue that. . .

25            MS. LEPERA:  If someone doesn't do an act of direct
```

UNITED STATES DISTRICT COURT

EXHIBIT 6
PAGE 1102

```
 1    infringement and they tell someone, yeah, go ahead, then you

 2    have to prove contributory or vicarious.

 3              THE COURT:  I understand.

 4              MR. KAHN:  I think, Your Honor, this would clarify.

 5    If the owners of the copyright have the right to authorize

 6    someone else, but it would be the owner's liability.  It

 7    wouldn't be whoever they authorized and that's what this

 8    does.  It doesn't talk about the person granted the

 9    authority.  It's if you go ahead and authorize someone to do

10    something.

11              MS. COHEN:  And that's because the owner of a

12    copyright has the right to exclude somebody from authorizing

13    all of these acts.

14              THE COURT:  Well, I understand all that.  I guess

15    what I'm asking is let's take Capitol Records, for example.

16    If the jury finds that Dark Horse infringes Joyful Noise,

17    then the fact that Capitol distributed --

18              MS. LEPERA:  Exactly.

19              THE COURT:  -- makes Capitol liable.

20              MS. COHEN:  So Capitol is probably not an issue,

21    but an entity such as Kobalt, for instance, I believe the

22    stipulation states that it authorized the production services

23    of, and then certain individual defendants.

24              MS. LEPERA:  Authorization of a production service

25    is not in the nature of a direct infringement which is the
```

19

```
 1    only claim you've got against them.

 2              THE COURT:  So I guess what I'm trying to

 3    understand, the reproduction of the copyrighted work by any

 4    of the defendants?

 5              MS. LEPERA:  Right.

 6              THE COURT:  Makes them liable assuming its

 7    infringing?

 8              MS. LEPERA:  That's a direct infringement claim if

 9    there's copying, direct reproduction.

10              THE COURT:  I'm not sure what all these entities

11    did and I'm not sure the jury does either based on the

12    evidence before us, but leaving that aside, I think we're

13    making a mountain out of a mole hill with the authorization

14    phrase.  I think the use of the phrase could suggest some

15    form of. . .

16              MS. LEPERA:  There was an or there.  So if someone

17    authorized something, that is a contributory or vicarious

18    claim.  It is not an actual act of infringement.

19              THE COURT:  I know.

20              MS. LEPERA:  And there is a distinction here and so

21    I would object to this instruction as worded.

22              THE COURT:  I think given that this is a direct

23    infringement case, what we ought to have here is to

24    paraphrase, then you must find that any named defendant who

25    authored, published or distributed Dark Horse also infringed
```

EXHIBIT 6
PAGE 1104

```
 1    upon plaintiff's copyright.
 2              MS. LEPERA:  That's it.  Authored, published,
 3    produced or distributed.  We can just insert that into what
 4    we have for No. 7 and that would be acceptable.
 5              THE COURT:  Now, the only question I have is the
 6    following.  If in a direct infringement case, a named
 7    defendant authorizes someone to infringe or do an act that is
 8    infringing, the named defendant can be liable.
 9              MS. LEPERA:  On a contributory or a vicarious count
10    because the named defendant in that instance did not do the
11    direct infringement.  Just because an owner has a right to
12    authorize is not synonymous with saying what a defendant did
13    or did not do to violate one of the exclusive rights.  That's
14    the distinction.
15              THE COURT:  I think we're speaking at
16    cross-purposes.  The person who authorized could be
17    derivatively liable.
18              MS. LEPERA:  The person who does the actual
19    infringing activity is directly, yes.
20              THE COURT:  What I'm saying is that an individual
21    who authorizes a derivative infringement, that person, the
22    person who authorizes the derivative infringement can be
23    liable, but the person who's derivatively infringes can't be
24    liable.
25              MS. LEPERA:  I think it's the other way around if
```

EXHIBIT 6
PAGE 1105

```
 1    I'm hearing correctly.  So reproducing something that someone
 2    is claiming is infringing and I actually copy it and I do it
 3    at the direction of someone, I'm doing it and if they control
 4    me or know about it, that entity or person would be
 5    potentially liable for vicarious or contributory.  I would be
 6    the one liable for direct.
 7            THE COURT:  That's what I was just saying.
 8            MS. LEPERA:  That's what I thought, but I didn't
 9    hear the end.
10            THE COURT:  What I'm suggesting is it is still
11    possible for someone to be liable for direct infringement if
12    he wrongfully authorizes a third party to do something.
13            MS. LEPERA:  If he's the one who was compelled to
14    do it by someone.
15            THE COURT:  I'm not talking about that.  I'm
16    talking about -- I'm not talking about compelled or anything
17    else.  I'm saying if one of the named defendants in this case
18    authorizes some party not named to do something, that person,
19    not the third party, the person giving the authority can be
20    directly infringement.
21            MS. LEPERA:  No, that is not true, Your Honor,
22    because they haven't done any of the acts of infringement.
23    That's what a vicarious and contributory claim's all about.
24    And first of all, there's nothing in here about anybody
25    authorizing anybody and proving up.  Either there was a
```

EXHIBIT 6
PAGE 1106

1    copying here or not so this is a little academic.

2           That is my precise point.  We're actually not

3    saying the same thing.  But the person who was given the

4    authorization and did the act is potentially liable.

5           THE COURT:  Well, that person, yeah, that person.

6           MS. LEPERA:  But the one who authorized it, again,

7    that you didn't do the actual act yourself.  You actually

8    contributory or vicariously, uh, enabled the infringement.

9    That's the whole point.  It's an enabling type of doctrine.

10   Secondary liability because you don't do it yourself.  It's

11   the very nature of a secondary liability claim.

12          THE COURT:  That is for the person who is

13   secondarily liable.

14          MS. LEPERA:  That's the one potentially authorizing

15   an infringement, that party or entity.

16          THE COURT:  But isn't that person also. . .

17          MS. LEPERA:  Not direct infringement, Your Honor.

18   They don't do any direct act.

19          THE COURT:  But isn't --

20          MS. LEPERA:  Let me see if I understand.  The fact

21   they're a copyright owner has the right to authorize; okay?

22   Doesn't mean that the fact that some potential defendant

23   authorized someone else to do something has violated the

24   authority act.  There's nothing plead here with respect to

25   that either.  It is the nature of an authorization to fall

UNITED STATES DISTRICT COURT

EXHIBIT 6
PAGE 1107

23

1   into the contributory and vicarious.

2          What they're claiming here is direct infringement

3   by reproduction and distribution not by an authorization that

4   was improper.

5          THE COURT:  I understand that, I understand that.

6   There is no evidence at this juncture that anyone authorized

7   someone to infringe.  I agree with you.

8          What I'm trying to do is track of the language of

9   106 which says that the -- if you own a copyright, you have

10  the exclusive right to authorize any of the following.

11         MS. LEPERA:  And they have not said that right was

12  violated.  They've said the actual rights of reproduction

13  distribution were violated.

14         THE COURT:  Why don't you tell me, Ms. Cohen.

15         MS. COHEN:  Judge, I think it's just as you

16  understood a minute ago.  It's the act of authorizing the

17  publication, production or distribution of an infringing work

18  itself is an act of direct infringement.

19         THE COURT:  What argument would you make regarding

20  who authorized it?  What are you trying to do?

21         MS. COHEN:  I think we're referring primarily to

22  Kasz Money and Kobalt which were entities that authorized the

23  production or publications services of certain named

24  defendants.  The stipulations say that.  Those are stipulated

25  facts.  It's not an agency argument or a vicarious liability

EXHIBIT 6
PAGE 1108

1     argument.  It's a direct infringement argument based upon a

2     violation of the copyright holder's right to exclude people

3     from authorizing any of these services with respect to an

4     infringing work.

5              MS. LEPERA:  Even if you look at Jury Instruction

6     No. 22 that we've agreed upon, there's nothing in here about

7     authorization because this is not a contributory or vicarious

8     case.  This is strictly with respect to someone actually

9     doing one of the exclusive rights.  That's direct

10    infringement, Your Honor.

11             THE COURT:  I guess what I'm asking is why isn't

12    Kasz Money if there is an infringement, why aren't they

13    wrongfully reproducing the copyrighted work?

14             MS. LEPERA:  There's just no evidence of that.

15    They haven't sold it.  That entity hasn't sold it.  It hasn't

16    distributed it.  It hasn't copied it.  Just because it

17    allowed as a general matter the services of these two writers

18    to be signed, that's not an infringement.

19             And, again, if counsel wanted to have a

20    contributory or vicarious claim, they could have well put it

21    in as they did in Blurred Lines and the 9th Circuit dealt

22    with that sensibly in that case.  And what I don't want is to

23    confuse the jury any more than they are undoubtedly confused.

24    There's no evidence in this case that this has anything to do

25    with anything.  It's not in Instruction No. 22.

EXHIBIT 6
PAGE 1109

```
1              And I think they're just attempting to, um, I don't

2    know.  Perhaps create liability for entities where there is

3    nothing that exists for direct.  And that's what concerns me,

4    Your Honor, I don't want to have that specter.

5              MS. COHEN:  Again, Judge, it's not a vicarious

6    liability argument.  If we have to start arguing that

7    although the stipulation is worded that Kasz Money for

8    instance authorized the production of services, that's --

9    well, we're gonna get into arguing agency.  This would

10   obviate the need for that.

11             MS. LEPERA:  You haven't put on any evidence --

12             MS. COHEN:  And it's consistent with the law.

13             MS. LEPERA:  -- you haven't put on any evidence in

14   your case that it did anything direct and you certainly don't

15   have a contributory or vicarious claim.

16             THE COURT:  I think she's right about that.  That's

17   my problem.

18             MS. LEPERA:  And we're talking in a hypothetical

19   context and I believe very strongly that I'm right on the

20   law, but there's nothing here in this case, no less vicarious

21   or contributory, they haven't even proved any direct

22   infringement for half of these people if they were right on

23   their issues.

24             THE COURT:  Let's try it this way.  Kasz Money is

25   Dr. Luke's company.  If he infringes. . .
```

```
 1              MS. LEPERA:  Separate entity, Your Honor.

 2              THE COURT:  I mean, yeah.

 3              MS. LEPERA:  I mean Ms. Perry might have a contract

 4    with Capitol and if Capitol didn't release an album, just

 5    because they have a contract with her, does that mean that

 6    they're liable for infringement on some other work that she

 7    did?

 8              THE COURT:  No, I understand.  I'm just trying to

 9    understand what defendants we're even talking about.  We're

10    talking about Kasz Money, Kobalt?

11              MS. LEPERA:  Correct.  Warner.

12              THE COURT:  And Warner Brothers.

13              MS. LEPERA:  Correct.

14              THE COURT:  And no one else.

15              MS. LEPERA:  Well, they've already said they know

16    they have no proof with respect to two of the Universal

17    companies, and they're proposing a dismissal with prejudice

18    and costs to us last night on that issue.

19              MS. COHEN:  I didn't say costs.

20              MS. LEPERA:  I'm sorry.  Without costs and with

21    prejudice.

22              THE COURT:  Let's not leap ahead.  Let's just deal

23    with the issue at hand.  And my question is there certainly

24    is not a contributory or derivative claim against Kasz or

25    Kobalt or Warner Brothers.
```

1          MS. LEPERA:  Correct.  And that's part of our

2    Rule 50 motion.

3          THE COURT:  So it seems to the right instruction is

4    one I accepted earlier on which does not include

5    authorization, but simply says authored, produced, published

6    or distributed.

7          MS. LEPERA:  Correct.

8          THE COURT:  That I think is what we're going to do.

9          MS. LEPERA:  Thank you, Your Honor.

10         THE COURT:  Now, that gets us back to what launched

11   this discussion which was the verdict form.  And I guess the

12   answer is consistent with the jury instruction, we would

13   strike the language or authorized the production, publication

14   or distribution.  And how does that differ from the --

15         MS. LEPERA:  I think we have the same one.  I think

16   we may not have had the word published.  We didn't track

17   those two words precisely.

18         THE COURT:  You have that defendant copied or

19   distributed.

20         MS. LEPERA:  Right because, uh, again, I think

21   we're right on that.  Because of the exclusive list, uh, that

22   is in 22 publishing and production are not listed.  And those

23   are vague terms with respect to the exclusive rights.  It's

24   not one of the --

25         THE COURT:  Well, I'm not gonna have a verdict form

1    that is inconsistent.  So I think the verdict form has to say

2    do you find by a preponderance of the evidence that he, she

3    it is author, producer, publisher or distributor of Dark

4    Horse.

5             MS. LEPERA:  Okay.  We'll live with that,

6    Your Honor.

7             THE COURT:  Now, my next question, however, is why

8    do you have more entities listed than the defendants?  For

9    example, you have Kitty Purry, Inc.  They don't.

10            MR. KAHN:  Your Honor, unfortunately, because of

11   the way that the case got bifurcated, the evidence we would

12   have put in on UMG and Universal and Kitty Purry, Inc. is not

13   coming in the liability phase.  So we notified the defendants

14   last night that we would dismiss those three parties from the

15   case and that's why they're not in.

16            THE COURT:  I see.  So you're dismissing Kitty

17   Purry?

18            MR. KAHN:  UMG Recordings and Universal Music

19   Group, Inc.

20            THE COURT:  Okay.  So they would not be included.

21   Got it.  Which accounts for the fact they are not included in

22   your verdict form.

23            MR. KAHN:  Yes, Your Honor.

24            THE COURT:  Okay.  How can we go about getting this

25   cleaned up?

EXHIBIT 6
PAGE 1113

1          MS. LEPERA:  Your Honor, I have to go back to what

2     I said a minute ago and I apologize because I think we are

3     right.  The terms production and publication are vague.  As

4     one of my clients pointed out, publishing is something that

5     is not listed and it's without definition.  One of the -- can

6     be very confusing to the jury.  It's not one of the excluded

7     rights.  If we're going to track it for direct infringement,

8     it should simply list the six exclusive rights.  There is no

9     public performance.  We're not even arguing it.  If they want

10    to be precise, they cannot have words that are not the

11    exclusive rights.

12         THE COURT:  What words are you proposing.

13         MS. LEPERA:  We had reproduce or distribute because

14    they're the only meaningful ones.

15         THE COURT:  I'm not gonna to do that.  Now, what in

16    the statute do you want to use?

17         MS. LEPERA:  Everything that you have in Jury

18    Instruction No. 2 which are the exclusive rights.

19         THE COURT:  Okay.

20         MS. LEPERA:  One, prepared the derivative work,

21    two, three, distributed the copies.  I don't think four has

22    any application, but it's obviously an exclusive right.

23    There's no evidence that there's been any public performance.

24    Display publicly is not relevant and I don't think we have

25    any evidence on six.

EXHIBIT 6
PAGE 1114

```
 1              And again, not publish and not production.  Those
 2     are terms that are not included so I would object to those
 3     being included in both the jury instruction and in the
 4     special verdict form.
 5              MR. KAHN:  Your Honor, the addition of the term of
 6     the author and owner is essential.  That's not an exclusive
 7     right.  That would be a direct infringement.  In other words,
 8     if the six songwriters and they're the author of the song,
 9     that's -- we're not going to the rights that are being
10     authorized.  Those are rights that would be owned by the
11     plaintiff.  This is the issue of liability.
12              If they're an author, they're an owner.  That's
13     where those rights come in and that's -- so these are
14     directed at the defendants.  The plaintiffs have these
15     exclusive rights, but it's the defendants who are the owners,
16     et cetera and that's why we need to have author and owner in
17     there.
18              MS. COHEN:  And Judge, this language comes straight
19     from the case law.  So Williams versus Bridgeport music case,
20     the sources that were cited in the initial packet that we
21     submitted.
22              THE COURT:  You know how I feel about case law.
23              MS. COHEN:  Right.
24              MS. LEPERA:  Here's the issue and actually, you
25     point out something that is also quite relevant here with
```

1    respect to whether or not it would be a joint author of a

2    joint work, you're automatically charged with reproduction.

3    Okay?  If you're not a participant in the infringing activity

4    and you don't do the copying, in fact one of the defendants

5    in the Blurred Lines case was dismissed for that very purpose

6    even though he was -- he contributed a rap verse.

7            THE COURT:  I'm not going to do this.  I'm just not

8    going to do this.

9            MS. LEPERA:  Okay.  But at minimum the publishing

10   and the production, we object to that, Your Honor.

11           THE COURT:  I'm going to include them.

12           MS. LEPERA:  I'm just stating my objection for the

13   record.

14           THE COURT:  And you can argue there was no

15   publishing and not production.

16           MS. LEPERA:  And I similarly, um, so again, I would

17   just state my objection to having it be a statement of

18   persons who are not directly charged or, um, stated.  It

19   doesn't state those persons or entities, defendants who have

20   done any of the rights -- violated any exclusive rights in

21   22.  Um, so if we're gonna have this instruction, I'll just

22   go on the record with an objection to it.

23           MS. COHEN:  I believe Your Honor has said we would

24   insert the words any named defendants to clarify.

25           THE COURT:  That's true.  Why don't we try to get

```
1    everything in order.
2              THE CLERK:  This court's recess.
3                        (Recess taken.)
4              THE COURT:  I've sent the jury to lunch because I'm
5    not convinced anyone really understands what we're doing here
6    including yours truly so let's start at the beginning.
7              We have the jury instruction which purportedly maps
8    on to Section 106.  106 does not include publishing so the
9    word publishing has to be deleted.
10             MS. LEPERA:  Thank you, Your Honor.
11             THE COURT:  That's number one.
12             Number two, and I've gotta understand the theory
13   because the more I look at this, the more I believe we have
14   entirely different views on the matter.
15             Let us take defendant's last verdict question which
16   makes the following inquiry:  Did defendants prove by a
17   preponderance of the evidence that defendants copied Joyful
18   Noise or distributed Dark Horse?
19             Okay.  Let me assume, Ms. Lepera, that there is a
20   finding people that three of the songwriters, three of the
21   people with credits on the song copied and the others didn't,
22   what then does that cause you to conclude?
23             MS. LEPERA:  Well, this is a question that was
24   actually confronted and maybe not so successfully in Blurred
25   Line, but whether there's a -- one of the songwriters does
```

```
 1   not do the direct act of copying simply by virtue of being a
 2   joint author of that work, they are liable for infringement.
 3   And I understand the position of the plaintiffs is that is
 4   the case.  My position is that's not necessarily the case and
 5   I think that's up to the jury to decide.
 6           THE COURT:  But it may be up to the jury to decide,
 7   but Blurred Lines had a different circumstance because there
 8   you had someone who made a subsequent contribution to the
 9   song who happened to be a co-owner the song.
10           MS. LEPERA:  That's what we have with Mr. Houston.
11           THE COURT:  Well, is that his testimony?  I'm not
12   so sure about that.
13           MS. LEPERA:  No, everyone has concluded he's the
14   last one who came in and just laid the rap vocal down.  But
15   there's also the main issue, I think, is not even necessarily
16   that because he's still a joint author, but the ones who did
17   not, and there's no evidence to the contrary, there's only
18   two people, maybe really only one, who created the
19   instrumental bed.
20           So to the extent others made contributions that
21   were not infringing, are they liable for direct copying is
22   the ultimate question.  And I think that's up to the jury to
23   decide.
24           THE COURT:  Well, I think it is, too.
25           I'm just trying to walk through this to understand
```

EXHIBIT 6
PAGE 1118

```
 1    what everyone is thinking because unfortunately, I think that

 2    I have been confronted with a bunch of instructions and

 3    theorys and everything else.  And everyone has his or her own

 4    view as to what the ramifications of the jury verdict is.

 5             MS. LEPERA:  I think ours is very simple.  Did any

 6    of the defendants copy or distribute?  And then we make

 7    argument around that.  So I don't think ours was at all

 8    confusing on that issue.  I think it was just these are the

 9    only two exclusive rights that could be deemed to be violated

10    here.

11             Without getting into a discussion again which I

12    don't think we should on the authorization and the publishing

13    which I think the Court's correctly ruled should come out.

14    So I don't think that issue should preclude the verdict

15    question.  And the names are there and they can make their

16    determination as such based on the question for that issue.

17             MR. KAHN:  Your Honor, they're all co-owners.  The

18    six defendants are co-owners of the song.  So they're all

19    involved in the reproduction of that song, in all the -- in

20    the sales, in the copying.  This is a joint work and they're

21    all owners of it.  So they're the most directly liable, those

22    six, and Capitol Records.

23             THE COURT:  I know that's what you're arguing.  I

24    just don't know if that's the law.

25             MS. LEPERA:  And the sale issue is obviously not
```

```
1    pertinent to the authors.  There's no evidence, number one.
2    And number two, I think in certain instances it varies from
3    case to case.  I think you can ultimately say that in certain
4    instances if the evidence shows that all the joint authors
5    were -- had their finger so to speak on the copying, um, and
6    then I think there can be your argument -- you have an ipse
7    dixit argument and I don't is where we come out.
8              THE COURT:  Exactly.
9              MS. LEPERA:  Like in other words, just because
10   they're an author, they are directly infringing.
11             THE COURT:  I get it.
12             MR. KAHN:  I mean, they're all joint authors.  If
13   you look at the definition of a joint author, contributions
14   get merged into a single copyrightable work.  So if you're an
15   owner and you're making money off of this particularly
16   infringing product, then you're a direct infringer.
17             THE COURT:  But the problem is this.  What you're
18   saying is that if one of the authors copies, then by
19   operation of law everyone else is liable.
20             MR. KAHN:  Well, the way that this testimony went
21   is that we have two authors who created the beat.  They
22   played it for a third author, Ms. Perry who said yes, I like
23   that one, and then they all got together and wrote lyrics
24   around it.  It's a classic joint work.  So the finished
25   product is what is infringing and it's an element of that
```

EXHIBIT 6
PAGE 1120

```
 1   product.
 2           THE COURT:  That's a legal determination.
 3           I think the right question is the defendant's
 4   question which is whether -- do you find whether the
 5   defendant copied Joyful Noise or distributed Dark Horse?  I
 6   think that's the right question.
 7           MS. LEPERA:  Thank you, Your Honor.
 8           THE COURT:  The rest is a legal question which is a
 9   different problem.  You're telling me legally if one of the
10   joint authors or joint owners copied, they're all liable.
11           MR. KAHN:  Yes.
12           MS. LEPERA:  There's no authority that they
13   provided for that and we've not found any.
14           THE COURT:  I haven't either, but that's really
15   what he's saying and that's what I guess I'm trying to
16   understand what is the legal question at the end of the case?
17   And we're gonna, you know, if they find substantial
18   similarity and copying, we're going to be doing these issues
19   until the cows come home.
20           But I don't know based on the evidence that's been
21   presented that it advances the ball to ask whether someone is
22   the author, producer, publisher or distributor.  Certainly,
23   publisher is not contemplated by 107.  But more to the point,
24   they all say they're authors.  That's not -- that's not a
25   jury question.  We know they all claim to be joint authors,
```

1    joint owners.  The question here is did someone copy.

2            MS. LEPERA:  And, again, he's got no authority for

3    the proposition, Your Honor.  We've actually been looking at

4    this very intensely because I don't think you can make the

5    leap that Mr. Kahn is trying to make.

6            THE COURT:  I know, but that doesn't solve my

7    problem today.

8            MS. LEPERA:  No, but I think our question is fairly

9    stated, and then we can make the arguments.

10           THE COURT:  I think that's right.

11           MS. LEPERA:  To the Court as we see fit.

12           THE COURT:  I think that's right because I don't

13   know how this jury -- I mean it's going to decide who

14   authored, who produced, who distributed based on the record

15   it.  That evidence isn't here right now.  The evidence before

16   this jury or the question before this jury are these works

17   substantially similar.

18           First question is are they sufficiently original

19   and if so, are they substantially similar.  And if so, did

20   someone copy.  And I'm leaping over the access issues, but

21   that's what we're doing.

22           MS. LEPERA:  I'm happy with that, Your Honor.  I

23   did have the objection to the other statement.

24           THE COURT:  I don't care who is happy with

25   anything.  I am just trying to do this so we produce

1    something that is a workable record and we don't have to redo

2    this.

3              MR. KAHN:  I guess I'm trying to imagine if there's

4    a finding of liability for two or three of the songwriters at

5    the liability stage, how does damages work if all of them are

6    making money from the exact same song that is found to be

7    infringing?

8              THE COURT:  Well, you're gonna have think about

9    that, aren't you.

10             MR. KAHN:  I know.  I just would assume a joint

11   work where they all worked on it together so that everyone

12   who's involved in the process and working with this allegedly

13   infringing beat, they're all authors and each -- their

14   copyright registration says they're all authors of the music

15   and the lyrics.

16             THE COURT:  That's a great assumption.  You find me

17   a case or something in Nimmer that supports that.  That's the

18   problem.

19             MR. KAHN:  Well, we think the Bridgeport case does.

20             THE COURT:  Boy, I don't.

21             MS. LEPERA:  We apparently have one other issue,

22   Your Honor.  I hate to even raise it because I've been trying

23   to convince them it's not an issue.  The total concept and

24   feel instruction on the intrinsic test in both the

25   instruction and in the verdict form, they don't agree with

EXHIBIT 6
PAGE 1123

```
1    that now even though Your Honor ruled it was in there.
2              THE COURT:  I did, but tell me what's wrong with
3    it.
4              MS. COHEN:  We don't have any objection to the
5    instruction.  I know Your Honor ruled that is the
6    instruction.  It's just with respect to the verdict form, the
7    intrinsic piece of the substantial similarity test also
8    includes that language.  I thought that Your Honor had said
9    any reference to language such as that from the instructions
10   would not be included in the verdict director.
11             So it reads did plaintiffs prove by a preponderance
12   of the evidence that an ordinary reasonable person would find
13   that the total concept and feel of the Joyful Noise and Dark
14   Horse musical compositions are substantially similar and
15   copyrightable protectable expression.  And I believe
16   Your Honor's ruling would require the removal of the total
17   concept and feel, just that language.
18             MS. LEPERA:  I believe that's exactly the opposite.
19   When we looked at the transcript, the Court's ruled that it's
20   in there because how is the jury to know the difference
21   between Question 1 and 2 without that clarification.  It's in
22   the instruction.  What is the problem being in the special
23   verdict form?  Again, I believe Your Honor ruled this is an
24   acceptable verdict form.
25             MS. COHEN:  The ordinary reasonable person, that's
```

EXHIBIT 6
PAGE 1124

```
 1    the language that's required to --

 2              MS. LEPERA:  To do what?

 3              MS. COHEN:  That's the language that is the

 4    intrinsic test.  The total concept and feel simply explains

 5    that test in the instruction.  It's not required in the

 6    verdict form.

 7              MS. LEPERA:  We disagree entirely.

 8              THE COURT:  The question that you're objecting to

 9    considering the --

10              THE COURT REPORTER:  I'm sorry, Your Honor.  I

11    couldn't hear you.

12              MS. LEPERA:  No, Your Honor.  It's the question on

13    the intrinsic test which now would be No. 3.  If you recall,

14    Your Honor, we talked through this earlier.  We had an

15    original question which I believe is now in there which talks

16    about whether there's any material, protectable material from

17    Joyful Noise and Dark Horse, that was one.

18              Then two was the extrinsic test question on whether

19    or not there would be a substantial similarity based on

20    protectable expression.  The third question was the intrinsic

21    test which was whether or not a reasonable person would find

22    that the total concept and feel of the two works rise to the

23    level of substantial similarity.

24              I don't understand what the problem is with that

25    because that's the intrinsic test, that's what the
```

```
 1    instruction says the intrinsic test is, and that's what the
 2    jury has to determine to answer the verdict question.
 3              THE COURT:  That is not helpful.
 4              Who has the revised verdict form to present me so I
 5    can see exactly what we're talking about?
 6              MS. LEPERA:  Certainly.
 7              MS. COHEN:  I believe we highlighted that language.
 8              THE COURT:  The problem with this case is you keep
 9    arguing from things and you don't have them before me.  It's
10    just not acceptable.
11              MS. LEPERA:  Your Honor made this ruling already.
12    It's in the transcript.
13              THE COURT:  I don't care if I made the ruling or
14    not.  I'm revisiting some of the rulings I've made for you --
15    okay.  Number one, did plaintiff prove by a preponderance of
16    the evidence that Dark Horse contains material from the
17    musical composition Joyful Noise that is both original to
18    plaintiffs and not commonplace.  That we agreed upon.  We
19    don't have a problem there.  Right?
20              Second, did plaintiffs prove by a preponderance of
21    the evidence that Joyful Noise and Dark Horse the musical
22    compositions are objectively substantially similar and
23    copyrightable protection expression.  Do we have an objection
24    to that?
25              MS. COHEN:  No, Your Honor.
```

```
 1                THE COURT:  Three, did plaintiff prove by a
 2     preponderance of the evidence that an ordinary reasonable
 3     person would find that the total concept and feel of the
 4     Joyful Noise and Dark Horse musical compositions are
 5     substantially similar and copyrightable protectable
 6     expression.  That's the one you object to?
 7                MS. COHEN:  Yes.
 8                THE COURT:  I don't think it's objectionable.
 9                MS. COHEN:  Okay.
10                THE COURT:  Four, did plaintiff prove by a
11     preponderance of the evidence that Joyful Noise was widely
12     disseminated such that defendants had a reasonable
13     opportunity to hear Joyful Noise prior to creating Dark
14     Horse?
15                We agreed that's appropriate; correct?
16                MS. COHEN:  Correct.
17                THE COURT:  Did defendants prove by a preponderance
18     of the evidence that they did not avail themselves of the
19     opportunity to hear Joyful Noise prior to creating Dark
20     Horse?
21                And we do not have an objection there; correct?
22                MS. COHEN:  That's right.
23                THE COURT:  6.  Did the defendants prove by a
24     preponderance of the evidence that defendants independently
25     created Dark Horse?
```

```
 1              That should be okay.

 2              MS. COHEN:  Okay.

 3              THE COURT:  And did plaintiffs prove by a

 4    preponderance of the evidence that the inclusion of the

 5    instrumental music i.e. the beat created by Mr. Ojukwu in

 6    Joyful Noise is part of a joint work authored with the other

 7    plaintiffs?

 8              We agree as to that; right?

 9              MS. COHEN:  Correct.

10              THE COURT:  Okay.  Then we have No. 8.  We're back

11    to copied or distributed which I know the plaintiffs object

12    to.  As to each defendant listed below, do you find by a

13    preponderance of the evidence that he/she/it copied or

14    distributed Dark Horse?

15              Isn't it copied Joyful Noise or distributed?

16              MS. LEPERA:  Correct.

17              THE COURT:  So the proper objected to question

18    should be copied Joyful Noise or distributed Dark Horse which

19    then goes back to Jury Instruction No. 38 which now needs to

20    be corrected because then you must find that any named

21    defendant who copied Joyful Noise or distributed Dark Horse

22    also infringed.

23              MS. LEPERA:  Right.

24              THE COURT:  And I recognize the objection, but we

25    all seem to be having -- would it be fair to say that the
```

```
 1    legal question that remains unanswered particularly in light

 2    of Blurred Lines is what is the effect of some of the

 3    songwriters who have credits being found to have copy a

 4    substantial similar work whereas others are not.  And in the

 5    absence of a contributory or derivative claim, we have a

 6    problem.

 7              MS. LEPERA:  We have a question.  That's correct.

 8              THE COURT:  Now why we are doing this with a case

 9    that's going to the jury is beyond me, but I don't have the

10    ability to answer the question in three seconds.

11              MS. LEPERA:  We'll do a Rule 50 motion on the topic

12    Your Honor.

13              THE COURT:  I know you will.

14              MS. LEPERA:  It's filed.

15              THE COURT:  We sent the jury to lunch because there

16    wasn't a lot of point having them sit around and twiddle

17    their thumbs too much longer.  We've told them to return at

18    1:15.  My proposal would be to start with the instructions

19    once we get them straightened away, and then have you folks

20    do your closing argument and send them home and have them

21    come back tomorrow unless we finish really early today.

22              MS. LEPERA:  Hopefully, we'll finish earlier.

23              THE COURT:  I don't know what else to do.  Okay.

24              MS. COHEN:  Judge, may I add one thing?

25              THE COURT:  Sure.
```

EXHIBIT 6
PAGE 1129

1          MS. COHEN:  I think this is clear, but I just want

2    to make it clear in case it's not, of course, we object to

3    any reference related to having to come back for another

4    phase if a verdict is found for the plaintiffs.

5          THE COURT:  No, I understand that and I don't

6    intend to say that at all, but, you know, I think the other

7    day you did agree I could say that you were getting to the

8    end of the first phase because obviously that was Mr. Kahn's

9    agreement.

10          I have no idea what they're thinking, but some of

11    these people are smart enough to figure out that if they're

12    dealing with infringement now and find infringement, they may

13    have to come back.  Others maybe don't understand that, but

14    I'm not going to tell them.  I'm just gonna let them decide

15    this issue and then we'll decide where to go.

16          MS. COHEN:  Yeah, and I more meant to preclude the

17    parties from making reference to that in closing.

18          MS. LEPERA:  I have no intention.

19          THE COURT:  Oh, no.  I will probably have the

20    marshals pick up the first person who says that --

21          MS. LEPERA:  I think I'm the only one closing.  I

22    have no intention of doing that.

23          THE COURT:  Find no infringement and you can go

24    home.  If that happens, I'm gonna be extremely unhappy and

25    declare a mistrial so we can do this all over again.

EXHIBIT  6
PAGE  1130

1          Okay.  I will see you at 1:15.  Do we have enough

2     guidance to get these instructions straightened out once and

3     for all?  The minute they're finished, could you give them to

4     Ms. Jeang so we can just look at them in chambers and be sure

5     they comply with what I hope they say.

6          Thank you, everybody.

7          THE CLERK:  This court's in recess.

8                    (Lunch Recess.)

9          THE COURT:  Yes, Mr. Movit.

10         MR. MOVIT:  Your Honor, it's my understanding that

11    the parties need to raise on the record is there an agreement

12    that the jury may have access to the music at issue to listen

13    to while they deliberate.

14         THE COURT:  That is correct, but let me just tell

15    you if we can, the equipment they'll have because we want you

16    to agree to all the equipment.

17         MR. MOVIT:  Thank you, Your Honor.

18         THE CLERK:  Shall I?

19         THE COURT:  Yes.

20         THE CLERK:  Okay.  They will have the ability to

21    listen and view anything that is on the CDs as long as they

22    are straight format and not BluRay.  So basically, some type

23    of a flat screen and equipment to play those CDs to be able

24    to view and listen.

25         MR. MOVIT:  That's fine with defendants.

```
 1                   Thank you very much.

 2                   THE COURT:  Plaintiffs?

 3                   MS. COHEN:  That's agreed by plaintiffs as well,

 4      Your Honor.

 5                   THE COURT:  Okay.  In reviewing the jury

 6      instructions, I think I noticed a few small things.  I don't

 7      want to redo them right now.  You can redo them before we

 8      give them to them.

 9                   First of all, I think we did not give them an

10      instruction that if evidence has been offered only for a

11      limited purpose, then they should consider it only for that

12      limited purpose.  We did not give them the instruction about

13      conduct of the jury regarding no research, no online, no

14      anything, and that is a must.  And then finally, we didn't

15      tell them that if they took notes, they should rely on their

16      memory.  I propose to throw those three in, and then you can

17      add them in the written ones.

18                   Instruction 21.  I don't think we corrected it to

19      delete UMG Recording Universal Music Group and Kitty Purry,

20      Inc., and so I deleted those.  And we'll have to do that

21      obviously in what finally goes to the jury.

22                   Okay.  So I think if everyone's ready, we can bring

23      the jury in.

24                   THE CLERK:  All rise.

25                           (Jury present.)
```

UNITED STATES DISTRICT COURT

EXHIBIT 6
PAGE 1132

```
 1              THE CLERK:  Please be seated.

 2              THE COURT:  Okay.  Ladies and gentlemen, on behalf

 3    of all of us, please accept our apologies.  We had some

 4    unexpected issues this morning which no one could foresee,

 5    and as a result, we're off to a later start than I had hoped.

 6    But, again, it was a matter that we had to work some things

 7    out, and we're now gonna proceed to instruct you, go to

 8    closing argument, and then you will commence your

 9    deliberations.

10              Okay.  Members of the jury, now that you have heard

11    all the evidence and the arguments of the parties, it is my

12    duty to instruct you on the law that applies to this case.  A

13    copy of these instructions will be sent to the jury room for

14    you to consult during your deliberations.

15              It is your duty to find the facts from all of the

16    evidence in the case.  To those facts, you will apply the law

17    as I give it to you.

18              You must follow the law as I give it to you whether

19    you agree with it or not, and you must not be influenced by

20    any personal likes or dislikes, opinions, prejudices or

21    sympathy.  That means that you must decide the case solely on

22    the evidence before you.  You will recall that you took an

23    oath to do so.

24              Please do not read into these instructions anything

25    that I may say or do or have said or done that I have an
```

EXHIBIT 6
PAGE 1133

1  opinion regarding the evidence to what your verdict should

2  be.

3          Before you begin your deliberations, elect one

4  member of the jury as your presiding juror.  The presiding

5  juror will preside over the deliberations and serve as the

6  spokesperson for the jury in court.  You shall diligently

7  strive to reach agreement with all of the other jurors if you

8  can do so.

9          Your verdict must be unanimous.  Each of you must

10 decide the case for yourself, but you should do so only after

11 you have considered all the evidence, discussed it fully with

12 the other jurors and listened to their views.  It is

13 important that you attempt to reach a unanimous verdict but,

14 of course, only if each of you can do so after having made

15 your own conscientious decision.

16         Do not be unwilling to change your opinion if the

17 discussion persuades you that you should, but do not come to

18 a decision simply because other jurors think it's right or

19 change an honest belief about the weight and effect of the

20 evidence simply to reach a verdict.

21         If it becomes necessary during your deliberations

22 to communicate with me, you may send a note through the

23 bailiff signed by any one or more of you.  No member of the

24 jury should ever attempt to communicate with me except by

25 signed writing.  I will not communicate with any member of

1    the jury on anything concerning the case except in writing or

2    here in open court.

3          If you send out a question, I will consult with the

4    lawyers before answering it which may take some time.  You

5    may continue your deliberations while waiting for the answer

6    to any question.

7          Remember that you are not to tell anyone including

8    the Court how the jury stands, whether in terms of vote count

9    or otherwise until after you have reached a unanimous verdict

10   or have been discharged.

11         A verdict form has been prepared for you.  After

12   you have reached unanimous agreement on a verdict, your

13   presiding juror should complete the verdict form according to

14   your deliberations, sign it and date it and advise the

15   bailiff that you are ready to return to the courtroom.

16         When a party has the burden of proof on any claim

17   or affirmative defense by a preponderance of the evidence, it

18   means that you must be persuaded by the evidence that the

19   claim or affirmative defense is more probably true than not.

20   You should base your decision on all of the evidence

21   regardless of which party presented it.

22         You should decide the case as to each party

23   separately.  Unless otherwise stated, the instructions apply

24   to all parties.

25         The evidence you are to consider in deciding what

EXHIBIT 6
PAGE 1135

the facts are consists of:

      (1) the sworn testimony of any witness;

      (2) the exhibits which are received into evidence;

      (3) any facts to which the lawyers are agreed; and

      (4) any facts that I have instructed you to accept as true.

      In reaching your verdict, you may consider only the testimony and exhibits received into evidence.

      Certain things are not evidence, and you may not consider them in deciding what the facts are.  I will list them for you.

      1.  Arguments and statements by lawyers are not evidence.  The lawyers are not witnesses.  What they have said in their opening statements, closing arguments and at other times are intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

      2.  Questions and objections by lawyers are not evidence.  Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence.  You should not be influenced by the objection or by the court's ruling on it.

      3.  Testimony that is excluded or stricken or that you have been instructed to disregard is not evidence and

1    must not be considered.

2            In addition, some evidence was received only for a

3    limited purpose.  When I have instructed you to consider

4    certain evidence only for a limited purpose, you must do so,

5    and you may not consider that evidence for any other purpose.

6            4.  Anything you may have seen or heard when the

7    court was not in session is not evidence.  You are to decide

8    the case solely on the evidence received at the trial.

9            Some evidence may be admitted for a limited purpose

10   only.  When I instructed you that an item of evidence has

11   been admitted only for a limited purpose, you must consider

12   it only for that limited purpose and not for any other

13   purpose.

14           Evidence may be direct or circumstantial.

15           Direct evidence is direct proof of a fact such as

16   testimony by a witness about what that witness personally saw

17   or heard or did.

18           Circumstantial evidence is proof of one or more

19   facts from which you can infer another fact.  By way of

20   example, if you wake up in the morning, and you see the

21   sidewalk is wet, you may infer from that fact that it rained

22   during the night.  However, other evidence such as a turned

23   on garden hose may provide a different explanation for the

24   presence of the water on the sidewalk.

25           Therefore, before you decide that a fact has been

EXHIBIT 6
PAGE 1137

1    proved by circumstantial evidence, you must consider all the

2    evidence in the light of reason, experience and common sense.

3    You should consider both direct and circumstantial evidence.

4    The law makes no distinction between the weight to be given

5    to either direct or circumstantial evidence.  It is for you

6    to decide how much weight to give to any evidence.

7           You are instructed that you may not consider any

8    party's religious beliefs in reaching your verdict.  You are

9    also instructed that you may not consider the messages or

10   imagery of either of the two works at issue in reaching your

11   verdict.

12          In deciding the case -- I'm sorry.  In deciding the

13   facts in this case, you may have to decide which testimony to

14   believe and which testimony not to believe.  You may believe

15   everything a witness says or part of it or none of it.

16          In considering the testimony of any witness, you

17   may take into account:

18          (1) the opportunity and ability of the witness to

19   see or hear or know the things testified to;

20          (2) the witness's memory;

21          (3) the witness's manner while testifying;

22          (4) the within's interest in the outcome of the

23   case, if any;

24          (5) the witness's bias or prejudice, if any;

25          (6) whether other evidence contradicted the

EXHIBIT 6
PAGE 1138

1    witness's testimony;

2            (7) the reasonableness of the witness's testimony

3    in light of all the evidence, and

4            (8) any other factors that bear on believability.

5        Sometimes a witness may say something that is not

6    consistent with something else he or she said.  Sometimes

7    different witnesses will give different versions of what

8    happened.  People often forget things or make mistakes in

9    what they remember.  Also, two people may see the same event

10   but remember it differently.

11       You consider these differences, but do not decide

12   their testimony is untrue just because it differs from other

13   testimony.  However, if you decide that a witness has

14   deliberately testified untruthfully about something

15   important, you may choose not to believe anything that

16   witness said.

17       On the other hand, if you think the witness

18   testified untruthfully about some things but told the truth

19   about others, you may accept the part you think is true and

20   ignore the rest.

21       The weight of the evidence as to a fact does not

22   necessarily depend on the witnesses who testify.  What is

23   important is how believable the witnesses were and how much

24   weight you think their testimony deserves.

25       The evidence that a witness lied under oath may be

1    considered along with all other evidence in deciding whether

2    not to believe -- in deciding whether or not to believe the

3    witness and how much weight to give testimony of the witness

4    and for no other purpose.

5         A deposition is the sworn testimony of a witness

6    taken before trial.  The witness is placed under oath to tell

7    the truth, and the lawyers for each party may ask questions.

8    The questions and answers are recorded.  Insofar as possible,

9    you should consider deposition testimony presented to you in

10   court in lieu of live testimony in the same way as if the

11   witness had been present to testify.  Do not place any

12   significance on the behavior or tone of voice of any person

13   reading the questions or answers.

14        Some witnesses because of education or experience

15   are permitted to state opinions and reasons for those

16   opinions.  Such opinion testimony should be judged like any

17   other testimony.  You may accept it or reject it and give it

18   as much weight as you think it deserves considering the

19   witness's education and experience, the reasons given for the

20   opinion and all the other evidence in the case.

21        From time to time during the trial, it became

22   necessary for me to talk to the attorneys out of the hearing

23   of the jury, either by having a conference at the bench when

24   the jury was present in the courtroom or by calling a recess.

25   Please understand that while you were waiting, we were

1    working.  The purpose of these conferences is not to keep

2    relevant information from you but to decide how certain

3    evidence is to be treated under the rules of evidence and to

4    avoid confusion and error.

5            Of course, we have done what we could to keep the

6    number of length of these conferences to a minimum.  I did

7    not always grant an attorney's request for a conference.  Do

8    not consider my granting or denying my request for a

9    conference as any indication of my opinion of the case or

10   what your verdict should be.

11           There are rules of evidence that control what can

12   be received into evidence.

13           When a lawyer asks a question or offers an exhibit

14   into evidence, and the lawyer on other side thinks that it is

15   not permitted by the rules of evidence, that lawyer may

16   object.  If I overrule the objection, the question may be

17   answered or the exhibit received.  If I sustain the

18   objection, the question cannot be answered, and the exhibit

19   cannot be received.

20           Whenever I sustain an objection to a question, you

21   must ignore the question and must not guess what the answer

22   might have been.  Sometimes I may order that evidence be

23   stricken from the record, and that you disregard or ignore

24   that evidence.  That means that when you are deciding the

25   case, you must not consider the stricken evidence for any

EXHIBIT 6
PAGE 1141

1    purpose.

2         The parties have agreed to certain facts that have

3    been read to you and were placed in evidence as exhibits.

4    You must therefore treat these facts as having been proved.

5         Certain charts and summaries not admitted into

6    evidence have been shown to you in order to help explain the

7    contents of books, records, documents or other evidence in

8    the case.  Charts and summaries are only as good as the

9    underlying evidence that supports them.  You should therefore

10   give them only such weight as you think the underlying

11   evidence deserves.

12        All parties are equal before the law, and a

13   corporation, partnership or limited liability company is

14   entitled to the same fair and conscientious consideration by

15   you as any party.

16        Because you must base your verdict only on the

17   evidence received in the case and on these instructions, I

18   remind you that you must not be exposed to any other

19   information about the case or to the issues it involves.

20        Except for discussing the case with your fellow

21   jurors during deliberations, do not communicate with anyone

22   in any way, and do not let anyone else communicate with you

23   in any way about the merits of the case or anything to do it.

24        This includes discussing the case in-person, in

25   writing, by phone or electronic means, via email, via text

1    messaging or any Internet chatroom, blog, website or

2    application including but not limited to Facebook, YouTube,

3    Twitter, Instagram, LinkedIn, Snapchat or any other form of

4    social media.  This applies to communicating with your family

5    members, your employer, the media or press and the people

6    involved the trial.

7              If you are asked or approached in any way about

8    your jury service or anything about this case, you must

9    respond that you have been ordered not to discuss the matter

10   and to report the contact to the court.

11             Do not read, watch, listen to any news or media

12   account or commentary about the case or anything to do with

13   it.  Do not do any research such as consulting dictionaries,

14   searching the Internet or using any other reference

15   materials, and do not make any investigation or in any other

16   way try to learn about the case on your own.

17             Do not visit or view any place discussed in this

18   case, and do not use Internet programs or other devices to

19   search for or view any place discussed during the trial.

20   Also, do not any research about the case, the law or the

21   people involved including the parties, the witnesses or the

22   lawyers until you have been excused as jurors.

23             If you happen to read or hear anything touching on

24   this case in the media, turn away and report it to me as soon

25   as possible.  These rules protect each party's right to have

```
 1    this case decided only on evidence that has been presented

 2    here in court.  Witnesses here in court take an oath to tell

 3    the truth, and the accuracy of their testimony is tested

 4    through the trial process.

 5         If you do any research or investigation outside the

 6    courtroom or gain any information through improper

 7    communication, then your verdict may be influenced by

 8    inaccurate, incomplete or misleading information that has not

 9    been tested by the trial process.  Each of the parties is

10    entitled to a fair trial by an impartial jury, and if you

11    decide the case based on information not presented in court,

12    you will have denied the parties a fair trial.

13         Remember you have taken an oath to follow the

14    rules, and it is very important that you follow these rules.

15    A juror who violates these restrictions jeopardizes the

16    fairness of the proceedings.  If any juror is exposed to any

17    outside information, please notify the court immediately.

18         Whether or not you took notes, you should rely on

19    your own memory of the evidence.  Notes are only to assist

20    your memory.  You should not be overly influenced by your

21    notes or those of other jurors.

22         The plaintiffs, Marcus Gray, Emanuel Lambert and

23    Chike Ojukwu, claim defendants Katheryn Elizabeth Hudson,

24    Lukasz Gottwald, Henry Russell Walter, Sarah Theresa Hudson,

25    Karl Martin Sandberg, Jordan Houston, Capitol Records, LLC,
```

EXHIBIT 6
PAGE 1144

```
 1   WB Music, Corp., Kobalt Music Publishing America, Inc. and

 2   Kasz Money, Inc. infringed plaintiff's copyright in the

 3   musical composition Joyful Noise.  The defendants deny that

 4   any infringement occurred.

 5            To help you understand the evidence in this case, I

 6   will explain some of the legal terms you will hear during the

 7   trial or have heard during the trial.

 8            First of all, definition of a copyright.

 9            The owner of a copyright has the right to exclude

10   any other person from reproducing, distributing, performing,

11   displaying or preparing derivative works from the work

12   covered by the copyright for a specific period of time.

13            A copyrighted work can be a musical work.

14            Facts, ideas, procedures, processes, systems,

15   methods of operation, concepts, principles of discovery or

16   commonplace expression cannot themselves be copyrighted.

17            Copyright interests.  The copyright owner may

18   transfer to another person all or part of the owner's

19   property interest in the copyright, that is, the right to

20   exclude others from reproducing, distributing, performing,

21   displaying or preparing derivative works from the copyrighted

22   work.  To be valid, the transfer must be in writing and

23   signed by the transferor.  The person to whom a right is

24   transferred is called an assignee.

25            How a copyright is obtained.  Copyright
```

automatically attaches to a work the moment the work is fixed
in any tangible medium of expression.  The owner of the
copyright may register the copyright by completing a
registration from and depositing a copy of the copyrighted
work in the copyright office.

After determining that the material deposited
constitutes copyrighted or subject matter and that certain
legal or formal requirements are satisfied, the Registrar of
Copyright registers the work and issues a certificate of
registration to the copyright owner.

To bring a claim for copyright infringement, the
plaintiff must own a valid copyright registration for the
work at issue.  The copyright registration must encompass the
allegedly infringed component of the work at issue.

Plaintiff's burden of proof.  In this case,
Plaintiffs Marcus Gray, Emanuel Lambert, Chike Ojukwu contend
that the defendants have infringed their copyright in the
musical composition Joyful Noise.  The plaintiffs have the
burden of proving by a preponderance of the evidence that
they are the owners of the copyright, and that the defendants
copied an original expression from the musical composition
Joyful Noise.

Preponderance of the evidence means that you must
be persuaded by of the evidence that it is more probably true
than not true that the copyrighted work was infringed.

EXHIBIT 6
PAGE 1146

```
 1              The plaintiffs must also prove that the defendant's

 2     use of the Joyful Noise musical composition was substantial.

 3              In determining whether the defendants' use of

 4     Joyful Noise was substantial, you may consider how important

 5     the copied portion was to the copyrighted work as a whole.

 6              Proof of copying.  To prove that defendants copied

 7     the plaintiff's work, the plaintiffs must show that the

 8     defendants had access to plaintiff's copyrighted work, and

 9     that they are substantially -- I'm sorry, and that there are

10     substantial similarities between the original expression in

11     the Dark Horse and Joyful Noise musical compositions.

12              Liability for infringement.  One who reproduces,

13     publically distributes, publically performs, publically

14     displays or prepares a derivative work from the copyrighted

15     work without authority from the copyright owner during the

16     term of the copyright infringes the copyright.

17              Defenses to infringement.  The defendants contend

18     that there is no copyright infringement.  There is no

19     copyright infringement if the defendants independently

20     created Dark Horse.  I will explain this concept to you in

21     further detail in later instructions.

22              Copyright is the exclusive right to copy.  The

23     right to copy includes the exclusive rights to:

24              (1) reproduce the copyrighted work;

25              (2) recast, transform or adapt the work, that is
```

EXHIBIT 6
PAGE 1147

1    prepare derivative works based upon the copyrighted work;

2         (3) distribute copies of the copyrighted work to

3    the public by sale or other transfer of ownership;

4         (4) publically perform a copyrighted work;

5         (5) display publically a copyrighted work; and

6         (6) perform a sound recording by means of Digital

7    Audio Transmission.

8         It is the owner of the owner copyright who may

9    exercise these exclusive rights.  The term owner includes the

10   author of the work or an assignee.  In general, copyright law

11   protects against reproduction, adaptation, public

12   distribution, public performance or public display of

13   identical or substantially similar works of the owner's

14   copyrighted work without the owner's permission.  An owner

15   may enforce these rights to exclude others in an action for

16   copyright infringement.

17        The work Joyful Noise involved in this trial is a

18   musical composition.  You are instructed that a copyright may

19   be obtained in a musical composition Joyful Noise.  This work

20   can be protected by copyright law.  Only that part of the

21   Joyful Noise musical composition consisting of original works

22   of authorship is protected by the copyright act.

23        As I just explained, copyrighted works can include

24   musical works.  There are two types of musical works; sound

25   recordings and their underlying musical compositions.  Each

are separate works with their own distinct copyrights.

A musical composition consists of rhythm, harmony, melody and structure captured in a tangible medium of expression.  A musical composition's copyright protects the generic sound that would necessarily result from any performance of the piece.

Sound recordings are works that result from the fixation of a series of musical, spoken or other sounds.  In other words, the sound recording is the sound produced by the performer's rendition of a musical composition.  The same musical composition can be performed and embodied in different ways in multiple sound recordings.

In this case, the plaintiffs contend only that they have a copyright interest in a musical composition in Joyful Noise.  They do not contend that they had a copyright interest in any sound recording of that musical composition or that any sound recording copyright is infringed.

Anyone who copies original expression from a copyrighted work during the term of the copyright without the owner's permission infringes the copyright.

On the plaintiff's copyright infringement claim, the plaintiffs have the burden of proving by a preponderance of the evidence that:

1.  The plaintiffs are the owners of a valid copyright in the allegedly infringed portion of the musical

EXHIBIT 6
PAGE 1149

1    composition Joyful Noise and

2         2.   The defendants copied original expression from

3    the musical composition Joyful Noise.

4         The plaintiffs are the owners of a valid copyright

5    in the musical composition Joyful Noise if the plaintiffs

6    prove by a preponderance of the evidence that:

7         1.   The musical composition Joyful Noise is

8    original and

9         2.   The plaintiffs are the authors or creators of

10   the musical composition Joyful Noise or received a transfer

11   of the copyright.

12        The creator of a work is called the author of the

13   work.  Sometimes separately copyrightable contributions from

14   multiple authors are combined with the intent to merge them

15   into a single work called a joint work.

16        On the other hand, when one author creates a new

17   work based on a pre-existing work, recasting, transforming or

18   adapting the prior work, this is called a derivative work.  A

19   copyright in the derivative work only covers the newly

20   created material in the work and not the pre-existing

21   material.

22        In order for Joyful Noise to be a joint work, the

23   plaintiff must prove the following by a preponderance of the

24   evidence, that at the time of the joint work's creation:

25        1.   Each author must have made a substantial and

1    valuable contribution to the work.

2         2.  Each author must have intended that his

3    contribution be merged into inseparable parts of a unitary

4    whole and

5         3.  Each author must have contributed material to

6    the joint work which could have been independently

7    copyrighted.

8         In deciding whether the parties intended their

9    contributions to be merged in the second element above, you

10   may consider whether each of the parties exercised control

11   over their work, whether each of the parties' actions showed

12   they shared the intent to be co-authors when creating the

13   work and whether the audience appeal or the work depends on

14   the contribution of each party.

15        To bring a claim for copyright infringement, the

16   plaintiff must own a valid copyright registration for the

17   work at issue.  The copyright registration must encompass the

18   allegedly infringed component at issue.

19        The evidence in this case includes Exhibit 30, a

20   certificate of copyright registration from the Copyright

21   Office for the musical composition Joyful Noise.

22        From this certificate, you need not conclude that

23   plaintiffs' work is original or copyrightable or that

24   plaintiff's own copyright in the music composition -- or that

25   plaintiff's own the copyright in the musical composition

EXHIBIT 6
PAGE 1151

1    Joyful Noise.

2              A copyright owner may transfer to another person

3    all or part of the owner's property interest in the

4    copyright, that is, the right to exclude others from copying

5    the work.

6              The person to whom the copyright is transferred

7    becomes the owner of the copyright in the work.

8              To be valid, the transfer must be in writing,

9    signed by the transferor.

10             The person to whom this right is transferred is

11   called an assignee.  The assignee may enforce this right to

12   exclude others in an action for copyright infringement.

13             An original work may include or incorporate

14   elements taken from prior works, works from the public domain

15   or works owned by others with the owner's permission.

16             The original parts of the plaintiff's work are the

17   parts created (1) independently by the works' author, that is

18   the author did not copy it from another work and (2) by use

19   of at least some minimal creativity.

20             In copyright law, the original part of a work need

21   not be new or novel.

22             In addition because originality involves use of at

23   least some minimal creativity, the work must contain

24   variations from previously existing art that are more than

25   trivial, miniscule, common or trite.

1          Copyright law allows the author of an original work

2     to stop others from copying the original expression of the

3     author's work.  Only the particular expression of an idea can

4     be copyrighted and protected.

5          Copyright law does not give the author the right to

6     prevent others from copying or using the underlying ideas

7     contained in the work such as any procedures, processes,

8     systems, methods of operation, concepts, principles or

9     discoveries.

10          The plaintiffs contends that the instrumental beat

11     of the ostinato Joyful Noise -- I'm sorry, of the ostinato in

12     Joyful Noise is protectable expression.  The defendants

13     contend that any similarities between the instrumental beat

14     of the ostinato in Joyful Noise and Ostinato No. 2 in Dark

15     Horse compromise solely nonoriginal and unprotectable

16     commonplace expression.

17          While the author of the original work may be

18     entitled to prevent others from copying original, protectable

19     expression in the author's work, copyright protection does

20     not extend to commonplace expression.

21          While commonplace elements are not protectable, a

22     combination of unprotectable expression may qualify for

23     copyright protection.  A combination of unprotectable

24     elements may be eligible for copyright protection if those

25     elements are numerous enough and a selection and arrangement

EXHIBIT 6
PAGE 1153

1   original enough that their combination constitutes an

2   original work of authorship.  Trivial elements of compilation

3   and arrangement are not copyrightable.

4        In addition, when a work combines only a minimum

5   level of creativity necessary for copyright, it is said to

6   have quote thin copyright protection.  A thin copyright only

7   protects against virtual identical copying.

8        The plaintiffs have the burden of proving that the

9   defendants copied original elements from the musical

10  composition Joyful Noise.

11       To do so, plaintiffs must show by a preponderance

12  of the evidence that (1) the defendants had access to Joyful

13  Noise prior to creating Dark Horse and (2) there are

14  substantial similarities between Dark Horse and original

15  protectable elements of Joyful Noise.

16       As part of their burden, plaintiffs must prove by a

17  preponderance of the evidence that the defendants had access

18  to Joyful Noise prior to creating Dark Horse.  Access may be

19  shown by proving by a preponderance of the evidence that

20  Joyful Noise was widespread disseminated.

21       In order to prove access by widespread

22  dissemination, the plaintiffs must prove by a preponderance

23  of the evidence that defendants had a reasonable opportunity

24  to hear Joyful Noise.

25       A reasonable opportunity means a reasonable

1    possibility, not merely a bare possibility, that the

2    defendants heard Joyful Noise.  Such a possibility cannot

3    rely on speculation or conjecture.

4           Even if the plaintiffs demonstrate a reasonable

5    possibility of access, any inference of access can be

6    rebutted by defendants by proving by a preponderance of the

7    evidence that they never availed themselves of this

8    opportunity.  You may consider the characteristics and

9    practices of the defendants in determining whether the

10   plaintiffs have established access through widespread

11   dissemination.

12          If the plaintiffs show that defendants had access

13   to Joyful Noise and that there is a substantial similarity

14   between Joyful Noise and Dark Horse, a presumption of copying

15   arises.  The burden then shifts to the defendant to rebut the

16   presumption by proving by a preponderance of the evidence

17   that Dark Horse was independently created.

18          In making this determination, you may consider the

19   manner in which the defendants created Dark Horse and any

20   other evidence of the circumstances surrounding the creation

21   of Dark Horse.

22          In addition to proving access, the plaintiffs must

23   also prove by a preponderance of the evidence that the Joyful

24   Noise and Dark Horse musical compositions are substantially

25   similar in original protectable expression.

EXHIBIT 6
PAGE 1155

1         To satisfy their burden of proof, the plaintiffs

2    must prove substantial similarity under both the extrinsic

3    test and the intrinsic test.

4         The extrinsic test considers whether two works

5    share a similarity of ideas and expression based on external,

6    objective criteria.  The extrinsic test requires analytical

7    dissection of a work and expert testimony to break down the

8    works into their constituent elements and prepare those

9    elements for proof of copying as measured by substantial

10   similarity.

11        However, not all similarities are relevant.

12   Protectable expression includes the specific details of an

13   author's rendering of ideas but not the ideas themselves.

14   Accordingly, in applying the extrinsic test, you must inquire

15   only whether the protectable elements standing alone are

16   substantially similar and must filter out and disregard the

17   nonprotectable.

18        You must only consider the intrinsic test if you

19   find that plaintiffs proved that the two works are

20   extrinsically substantially similar by a preponderance of the

21   evidence.

22        The intrinsic test examines an ordinary person's

23   subjective impression of the similarities between the two

24   works as wholes.  Here, this means you should determine

25   whether an ordinary, reasonable person would find the total

1   concept and feel of Joyful Noise and Dark Horse are

2   substantially similar in original protectable expression.

3        In order to find that a defendant copied original

4   expression in the musical composition Joyful Noise, it is not

5   necessary that you find that the defendant consciously or

6   deliberately copied it.  It would be sufficient to find that

7   a defendant subconsciously copied original expression in

8   Joyful Noise through hearing it sometime prior to the

9   creation of Dark Horse.

10       If you find that plaintiffs -- plaintiffs have

11  proved that Dark Horse infringes original expression from

12  Joyful Noise, then you must find that any named defendant who

13  copied Joyful Noise or distributed Dark Horse also infringed

14  upon the plaintiff's copyright.

15       Okay.  Ladies and gentlemen, that concludes the

16  instructions.  You will have them along with the verdict

17  forms in the jury room.  And we will now go to closing

18  argument.  We will begin with the plaintiff who has the

19  burden of proof, and then they will rebut at the end because

20  they do have the burden of proof.

21       Mr. Kahn.

22       MR. KAHN:  Good afternoon.

23       As you may recall about eight or nine days ago,

24  when I first spoke with you, I told you this was a case about

25  taking, taking someone's valuable creation without

1    permission, and here that creation is a song that's called

2    Joyful Noise.

3         As the Judge just told, when you create a song or

4    some other creation, you automatically get a special property

5    right which is known as a copyright.  And that copyright

6    automatically comes into existence, and from that point on,

7    it gives you exclusive control over your song.  No one can

8    copy it or use any part of it without your permission, and if

9    they do, they violate the law, and it's called copyright

10   infringement.

11        Now, one of the defendant's strategies in this case

12   has been to get you to focus on things that we believe don't

13   matter, and I will point these out along the way as I talk to

14   you about the evidence that you have had presented to you and

15   how it fits in to what the Judge has instructed you.

16        As you know, our story begins 12 years ago back in

17   2007 with the three gentlemen and fourth who created a

18   Christian gospel rap song called Joyful Noise.  It's a

19   special type of creation under the copyright law which the

20   Judge mentioned.  It's what's known as a joint work.  And

21   that's one of the things that we have to prove to you, that

22   it is a joint work.

23        In order to prove this song -- cause there were all

24   these people contributing, four in total, we have to prove

25   that these various artists were all making contributions to a

single work with a goal of having then merge into a single

work, here a classic example being a song.  And that's, in

fact, what happened in part of our proof is that this intent

by these creators to have the music and the different lyrics

merged into a single song.

         The first stage begins with Mr. Ojukwu who created

what's called the instrumental beat, and you recall his

testifying about it.  He did it on a computer.  It's kind of

an elaborate process, picking the notes, the tempo, the

instruments, the tambor, the texture until he felt that he

had something that he could put up onto MySpace which was big

back then.  And as he testified, his intent in putting up on

MySpace was the hope that some rap artist would hear it and

say, oh, this is a great beat, I'd like to make a song using

this beat.

         And that's what happened here.  Because the next

person to enter into this process was Mr. Gray known as

Flame.  These two gentlemen had known each other before, and

as you recall, they met at a bible study program.  Marcus

finds out about the beat.  He listens to the beat, he loves

it, he contacts Mr. Ojukwu, and they work out a deal.

Mr. Ojukwu sells him the beat with the understanding that he

would keep 50 percent of any song that was created from the

beat.

         Next so then Mr. Gray listens to the beat, listens

```
 1    to the beat, gets inspired, starts writing some lyrics.  Then
 2    he's in Philadelphia, and he calls up another acquaintance,
 3    Emmanuel lambert, remember that, and they meet up in his Mr.
 4    Lambert's attic where they listen and listen, and Mr. Lambert
 5    ends up writing what's called the chorus which we heard
 6    played when Mr. Lambert was testifying.
 7              And then there's a fourth, Freddie Moore who's no
 8    longer in the case.  And he listens.  Marcus invites him to
 9    write a beat, and then the song gets created.
10              And when the finished song is created, a process
11    that took less than a year, that's when the copyright comes
12    into existence.  And Joyful Noise gets released in 2008, and
13    you've heard this beat before.  We'll maybe just play just
14    15 seconds or so just to refresh your recollection as to the
15    music at issue in this case.
16                        (Joyful Noise played.)
17              MR. KAHN:  We submit that this song on the issue of
18    joint work is a classic example of a joint work.  One of the
19    things you're supposed to decide in deciding whether it's a
20    joint work is what was the parties intent.
21              And we think the best example of the intent is the
22    actual album, the liner notes which were introduced as an
23    exhibit, and you may recall this, but these liner notes were
24    written by Mr. Gray.  They were proofread by his wife.
25              And as you look up close, you will see there's
```

```
1    writing credits for Mr. Gray, Mr. Moore, Mr. Lambert, and
2    there's a production credit for Mr. Ojukwu.  This is back in
3    2008.
4           And as both Mr. Gray and his wife explained, in the
5    rap world, the producer is actually the one who writes the
6    beat which was the case here.  So as early as 2008, when the
7    album gets released, these four are showing their intent to
8    create a joint work.
9           Now we jump to 2013 which is what brings us here
10   today and the song Dark Horse.  And just to refresh your
11   recollection, if you remember, there's an introduction which
12   Ms. Perry identified as the introduction about 14 seconds
13   and, then the song shifts to this beat.
14                   (Dark Horse played.)
15           MR. KAHN:  As the plaintiff's music expert,
16   Professor Decker, testified, that beat comes in three
17   different places in the song and plays for 95 seconds in
18   total which is about 45 percent of the song.
19           We also heard how that song was created in some way
20   similar to the way that Joyful Noise was created.  If you
21   remember, Mr. Gottwald and Mr. Walter worked together first
22   to create this instrumental beat, and then they go out to
23   Santa Barbara to meet with Ms. Perry, and they play about a
24   dozen different beats.  She hears them, she likes this beat,
25   she picks this one out.
```

1            And then Ms. Hudson, Sarah Hudson comes out, and

2      listening to this beat, Ms. Perry and Ms. Hudson write the

3      lyrics while you remember Max Martin, Mr. Sandberg is writing

4      the melody, the sung melody, and then what that's all put

5      together.

6            They send the tape to Mr. Houston, Juicy J, and he

7      listens to the music, and he writes his rap version which is

8      heard during that last part of Dark Horse.  So that was back

9      in 2013.

10           The lawsuit was filed in July of 2014.  This is the

11     fifth anniversary of the lawsuit, and we've now come to the

12     end of the trial.  We've heard the instructions from the

13     Judge.  You heard what the Judge says the plaintiff has to

14     prove in order to prove to you that there's been copyright

15     infringement, and I want to briefly review the evidence that

16     you've heard on each of the points.

17           One of the things that we have to prove is that the

18     plaintiffs own a valid copyright.  And the other thing we

19     have to prove is that the defendants copied an original

20     portion of that song.  So it's two things.  Plaintiff's own a

21     valid copyright in Joyful Noise.  We have to prove that the

22     defendants copied an important part of that song.

23           So the first part, a valid copyright.  Here's the

24     copyright registration that we received, the official

25     registration from the copyright office.  And as you'll see

1    here, the different owners are listed.  This is registered as

2    a joint work.

3            And as I mentioned, as far as the intent, you heard

4    that the best evidence was the intent of the parties, and we

5    saw that all the way back in 2008 with those liner notes.

6    Then you had testimony from all three of the plaintiffs.

7            Originally there were four owners.  As the Judge

8    mentioned, an owner of a copyright can assign his or her

9    rights to the other owners, and that's what Mr. Moore did.

10   We had his exhibit, his assignment of copyright.

11           Okay.  So this is the valid copyright.

12           Now comes the challenge because the second thing we

13   have to do is we have to prove copying.  We have to prove

14   that these defendants copied this ostinato, this beat from

15   Joyful Noise.

16           Now it's probably not a surprise to you that in

17   copyright cases, the defendants almost always deny that they

18   copied the music, and that's what all the defendants have

19   done here.  They all denied that there was any copying that

20   went on.  How do you prove copying when everyone denies it?

21           Well, the law -- as I mentioned in my opening, the

22   law allows you to try to prove copying through what's known

23   as circumstantial evidence.  The example I gave you in my

24   opening was the guy walking out of McDonalds, do you

25   remember, wiping his mouth with a napkin with some ketchup

EXHIBIT 6
PAGE 1163

```
 1   stains.  The Judge gave you another example of the water and
 2   the guy coming in with water on his jacket.
 3        The law recognizes that you can proof copying
 4   through circumstantial evidence.  And as the Judge told you,
 5   that can be proved in this case through two types of
 6   evidence.
 7        One of the evidence is that at least one of these
 8   defendants had a reasonable opportunity to hear Joyful Noise
 9   before Dark Horse was created.  You don't have to prove that
10   that person actually heard it.  That would be direct
11   evidence.  This is circumstantial.  We have to put together
12   evidence for you which I'll explain that we've done that
13   would give that person a reasonable opportunity to hear it.
14   That's part one.
15        But then the other evidence we have to show is that
16   the parts of Dark Horse that are at issue here, these 95
17   seconds, 45 percent of the song are substantially similar to
18   the protected part in Joyful Noise.
19        Put these three together, and you have proof of
20   copying.
21        So let me take them one at a time.  I told you what
22   we hoped to be able to prove to you in the opening and let me
23   tell you just to remind you of the evidence and testimony
24   you've heard.
25        And let's first talk about substantial similarity.
```

EXHIBIT 6
PAGE 1164

 1    There are two types of similarity that the Judge said we're

 2    required to prove.  One is what's known as extrinsic which is

 3    the objective factors usually through an expert witness who

 4    identifies the elements of the two songs.  And you may have

 5    heard he didn't have names for and points out other aspects

 6    of the two songs that the expert finds substantially similar.

 7            Then the other way is this intrinsic evidence.  You

 8    will listen to the two, and you'll decide if a reasonable

 9    person would say yeah, these are substantially similar.

10            As far as extrinsic evidence, you probably recall

11    last week, we had on the witness stand Dr. Decker.

12            And Dr. Decker went through his analysis of the two

13    songs, and he identified these seven elements of the two

14    songs that he found to be substantially similar; the

15    descending ostinato, the phrase length, the rhythm, the pitch

16    content, the overlapping musical domain, the tambor, the

17    texture.  Some of those words you probably never heard, but

18    hopefully, he was able to explain them to you and to me so

19    you would know what he was talking about.

20            Do you remember Professor Ferrara?  But

21    Professor Ferrara came on, and he identified the two

22    ostinatos, do you remember that, the introduction that he

23    called Ostinato 1 and then the part that's at issue,

24    Ostinato 2.

25            Contrary to Professor Ferrara's opinion, Dr. Decker

1    testified that in listening to Dark Horse, he reached the

2    conclusions that Ostinato 1, that da-da-da-da music was

3    actually derived from Ostinato 2.  You could put those notes

4    into an arpeggiator or whatever, and that would create that

5    introduction part.  So that is the substantial similarity

6    part of our proof that we put in.

7         And the other part that we're required with the

8    circumstantial evidence is to prove access.  Now, as I've

9    explained, the defendants all deny they ever heard Joyful

10   Noise.  And as the Judge told you, that's okay.  We don't

11   have to prove direct access.  We don't have to prove that

12   Mr. Gottwald was, you know, at one of Mr. Gray's concerts

13   back in 2012 and heard him perform Joyful Noise.

14        You will recall that defense counsel asked each of

15   the plaintiffs a lot of questions.  Did they know who

16   attended their concerts?  Did they know whether a friend of

17   theirs attended a concert?  Did they know whether somebody

18   who worked for Capitol Records attended a concert?  And they

19   didn't.

20        It'd be like me asking you do you know who attended

21   the court hearing two days ago?  And you may know, you

22   probably don't know, but that's irrelevant.  That's direct

23   access.  We don't have to prove who was actually at the

24   concert.

25        You can prove it through circumstantial evidence.

1    You can prove access by showing the song was widely

2    disseminated, that it was out there in the song universe, and

3    it was available to professional songwriters who make a

4    living listening to music.

5         And we presented evidence which I'm going to review

6    with you that would support a conclusion that particularly

7    Mr. Gottwald and Mr. Walter had a reasonable opportunity to

8    hear this song, to hear this music before they created Dark

9    Horse's instrumental.  Remember they both testified they were

10   under constant pressure to create beats, and they have an

11   incentive to be out there listening.  And we don't have to

12   prove that they actually heard it which they have all denied.

13        Here's how we went about proving this widespread

14   dissemination, this reasonable opportunity during this period

15   of 2008 to 2012 as the song was released and ascended, and it

16   became more popular.

17        One way was through the critical acclaim for the

18   song.  If you recall from Mr. Gray's testimony, the song was

19   nominated for a Grammy award -- not the song, the album was

20   nominated for a Grammy award.  It was nominated for a Stellar

21   award.  It was nominated for a Dove award.  Mr. Gray and his

22   wife, in fact, went to all three award ceremonies.  They were

23   all televised.  Some of us watched the Grammys.  Maybe you've

24   seen one or two of these on the shows, but our point is that

25   professional songwriters are more likely to pay attention to

UNITED STATES DISTRICT COURT

EXHIBIT 6
PAGE 1167

1    songs that are getting recognized and are getting nominated.

2          Another way that we've tried to show widespread

3    dissemination is on the Internet.  Back in the old days, if

4    you wanted to hear a song, you'd go to the record store and

5    buy it.  These days as we all know, they're Spotify, there's

6    iTunes, there's YouTube, there's MySpace.  All but one of the

7    individual defendants had a MySpace page or their band had a

8    MySpace page back in these crucial years, and they used it

9    just like the plaintiffs did to promote themselves and to

10   seek out music.

11         And we showed, and it's not disputed, that the song

12   Joyful Noise on YouTube had approximately 4.5 million views,

13   and on MySpace, it had approximately 2.5 million plays.

14   That's a lot.

15         Now, you recall that defendant had hired two very

16   high priced experts, one from MySpace, one for YouTube, and

17   they tried to belittle these numbers.  They got 6 million

18   hits.  If the song's out there, they'd get 100 million views.

19   And that's true.  But 6 million is a big number.  Sure, China

20   may have 1.4 billion people, but 6 million is actually more

21   than the population of this city.  It's a lot of views.

22         Another way that we tried to prove access was

23   through these Billboard charts.  If you recall, we had a

24   stipulation, and you'll find it in the exhibits.  And the

25   chart -- the song and the album made those charts from 2008

1    to 2012.  The song was on those Billboard Christian and

2    gospel charts for a total of 32 times in 2011 and 2012.  It

3    got to be popular then.  And the album was on those charts 37

4    times, 2008 to 2009.

5            Now, Billboard has been preparing these charts

6    for -- well, since the 1940s, and these are the kind of

7    charts that professional songwriters track.  This is part of

8    their likelihood so it's another way that the song was out

9    there.  We don't have to prove that one of these defendants

10   actually looked at the chart.  It's just that the charts were

11   out there.

12           You heard testimony from Mr. Gray and from

13   Mrs. Gray about concerts.  During this period, over 300

14   concerts around the country.  Yes, there were many at

15   churches, but there were also ones in stadiums amusement

16   parks, Six Flags universities, army bases, even NBA half-time

17   shows.  And at every one at these concerts as both Mr. Gray

18   and his wife confirmed, Joyful Noise was played and was the

19   big hit at these concerts.

20           And before these concerts, in many of these cities,

21   as part of the promotion for the concert, Mr. Gray was

22   interviewed either on radio or on TV or both, broadcast out

23   there, and most of the time, at some point during the

24   interview, they would play Joyful Noise.  So the song was out

25   there, whether it was through award nominations, YouTube,

```
 1    Billboard, concerts, radio, TV.

 2             Now, the songwriters all deny that they ever heard

 3    it.  We don't have to prove that they heard it, but they all

 4    deny they heard it.  But you can think about.  Can you tell

 5    me for certain which songs you listened to six days ago?  Six

 6    months ago?  Or even one year ago?

 7             And this is an important point.  In proving

 8    infringement, we do not have to prove evil intent.  We don't

 9    have to even prove intent.  We just have to proving copying.

10    And you may say what does that mean?  If you recall, the

11    Judge in reading those instructions mentioned something

12    called subconscious copying when you're copying, and you're

13    not even realizing you're copying.

14             So you're a professional songwriter.  And you've

15    listened to thousand and thousands of songs, and now you need

16    to sit down and come up with a new beat.  And you hear this

17    beat that you may think is something you've come up with on

18    your own, but it's been buried in your ears or in your brain

19    for six months, for a year, and it comes out.  And that is

20    copying.

21             We're not standing accusing Katy Perry or

22    Ms. Hudson or any of these people here with evil intent or

23    any intent at all.  It may be that they actually did copy it.

24    If we put in the evidence that would support actual copying

25    with knowledge of it, but we don't have to prove that they
```

```
 1   intended to copy.

 2          So what are defendants' responses?  And you've

 3   listened to and heard their evidence.

 4          One of them came through that Professor Lawrence

 5   Ferrara who we learned during his testimony is the defense

 6   counsel's favorite expert witness.  He's been testifying for

 7   them in copyright cases for more than 20 years.  Including

 8   once for Dr. Luke.  Made him a wealthy man.

 9          And his claim was that this ostinato -- which he

10   calls Ostinato No. 2.  Remember?  He said this was not at all

11   original.

12          And during his testimony -- you remember he

13   searched his huge music library, and brought to the testimony

14   a song that he said was similar to the ostinato in Joyful

15   Noise.  It was a song called Go Ahead, and we're gonna play a

16   brief portion of it.  You don't need to be a musicologist to

17   listen to this song, and this is not the beat in Joyful

18   Noise.

19                  (Music played.)

20          MR. KAHN:  And what else did -- what else

21   Dr. Ferrara show us?  Do you remember that chart, the one

22   with four songs on it where he had even though it was agreed

23   that Joyful Noise was eight beats that repeated, he came up

24   with a reason to try to cut off the last two beats?  And then

25   he showed us according to him that there was nothing original
```

1  about this ostinato.

2         And remember he mentioned Jolly Old Saint Nicholas?

3  I think he even played a little of Jolly Old Saint Nicholas.

4  And he also mentioned Merrily We Roll Along.  And then

5  because he's big on writing scores as opposed to listening,

6  he showed us the musical score for Merrily We Roll Along.

7         And as you'll see, this 3-3-3-3-2-2 is not an

8  ostinato.  It just is six notes that happen to appear in the

9  middle of the song.  It's like taking a full paragraph and

10  pointing out on the third sentence, here are four words that

11  are the same as four words in this paragraph over here.  But,

12  again, you don't need to be musicologist, but listen to

13  Merrily We Roll Along, and you tell me if this sounds like

14  Joyful Noise.

15              (Merrily We Roll Along played.)

16         MR. KAHN:  And as Dr. Decker explained, the eight

17  notes that are in the Joyful Noise ostinato, they're not just

18  the notes themselves, these 3-3-3-3-2-2-1-5.  Maybe that's

19  the right number.  I'm not a musicologist.  It's not just the

20  actual notes that are played by Dr. Ferrara on a piano.  It's

21  all those other elements, those other six elements that we

22  talked about that make that particular ostinato original and

23  unique.

24         And on the issue of originality, our three

25  plaintiffs, particularly Mr. Ojukwu who created the beat,

```
 1    testified he'd never heard anything similar to it until Dark
 2    Horse, but as the Judge explained to you, to try to prove
 3    that it's -- the threshold for proving something original,
 4    sufficiently original to be protected by copyright is really
 5    fairly low.  You don't need to be Beethoven or Mozart to be
 6    able to have something protected by copyright.
 7              And certainly, particularly after Dr. Ferrara's
 8    attempted to find some other ostinato that he thought was the
 9    same is -- actually when you heard that Go Shorty song, it's
10    sort of proof that Joyful Noise really is an original
11    ostinato.
12              Another thing that the defendants put on, and you
13    heard it from all of them, is they don't listen to Christian
14    music.  There's no access.  We didn't listen to Christian
15    music.  Even Ms. Perry who used to be a Christian musician
16    and stopped doing that around 2002 no longer listens to
17    Christian music.
18              Now, they have the burden of proof on that point.
19    After we point out this widespread dissemination, they have
20    the burden to prove to you during that trial that they
21    don't -- that it was not a reasonable type of access.  And
22    just to remind you these are professional songwriters.  They
23    listen as they testified to all types of music.
24              And one of the popular genres today is hip hop rap.
25    And the evidence shows that Joyful Noise was available in
```

```
 1    nonreligious stores like Target, Walmart, Best Buy and on

 2    various nonreligious Internet sites from iTunes to Amazon.

 3    We even saw the Amazon page for Joyful Noise, and it's not

 4    listed in those sites as Christian music or as gospel music.

 5    It's listed there as rap hip hop.

 6            And that's the point.  This case is not about the

 7    lyrics.  Those are deeply religious Christian lyrics, but

 8    this lawsuit doesn't involve lyrics.  This lawsuit is all

 9    about the beat, and that's all it's about, what the

10    musicologist called the ostinato.

11            A second or third thing you heard from the

12    defendants are that our clients don't have any sales

13    information.  They have no proof of how many of these albums

14    or songs were sold.  I told you at the outset that we didn't

15    have that proof.  Our clients have no sales numbers.  So when

16    they saw the CD in the stores, they saw it online, their

17    record label was Cross Movement, and Cross Movement never

18    gave them any information in the sales.  It never gave them

19    any -- any money.

20            In fact, as Mr. Gray testified, when he learned

21    that the album had been nominated for a Grammy, he was

22    actually filling out a job application at, um, I can't

23    remember, um, Best Buy or someplace like that so they were

24    not making money.  They don't know what their sales

25    information was, and that was one of the motivations for them
```

1    leaving Cross Movement and Mr. Gray and his wife forming

2    their own label.

3         And it was another motivation for them back in 2012

4    filing a lawsuit against Cross Movement when they were first

5    hoping to get royalties.  And as Mrs. Gray testified, when

6    they realized that Cross Movement didn't have any money,

7    that's when they decided as their backstop, they would get

8    all of the copyrights in the compositions assigned back to

9    Mr. Gray so they can do whatever they wanted with them.

10        The defendant would like you to believe that they

11   merely just wanted to get Joyful Noise out of this, but as we

12   saw from that assignment from Cross Movement, it was four

13   albums and about 30 songs that they were able to get back

14   which was very valuable if you're a songwriter and a

15   musician.

16        Another thing that the defendants will claim and

17   have claimed is that despite all this evidence of widespread

18   dissemination, Mr. Walters who started with the writing of

19   this instrumental that said he independently created the

20   ostinato for Dark Horse.  And as the Judge mentioned, and as

21   you'll see when you get a chance to look at the instructions,

22   the defendants have the burden of proving that.  They just

23   can't simply say it.

24        And now that the case has been closed and the

25   defendant's have rested, think back to that evidence.

1    There's no corroborating evidence that Mr. Walter

2    independently created that beat.  There's no third party

3    witnesses.  There's no documents or other evidence.  It's

4    just his word.

5             And, again, I'm not accusing Mr. Walter of lying to

6    me or to you.  As you recall from the Judge, this could be

7    subconscious copying.  He could have -- under the pressure to

8    come up with a beat, he's sitting there, and he has --

9    somewhere in his mind, he hears this, and he ends up writing

10   it out and may to this day believe he independently created

11   it, but the burden of proof requires more than him simply

12   saying I created it.

13            Now, a final note.  We have a stipulation, you'll

14   be able to see it, regarding the corporate defendants, and

15   they're all tied to the creation and the sale and the

16   promotion of Dark Horse.  There's Capitol Records.  They put

17   on the album, the music video.

18            There's Kasz Money.  And you'll see in these

19   stipulations that they furnished the production services of

20   Mr. Gottwald and Mr. Walter for the Dark Horse.  Kobalt Music

21   Publishing provides the music publishing, administrative

22   services for four of the defendants.  The WB Music, they

23   provide music publishing administrative services for the

24   ownership interest.

25            So before I sit down, I want to quickly go through

```
 1    the eight questions you're going to be asked to answer when
 2    both of us, both sides rest, and you go back into the jury
 3    room.  I'll just quickly review them with you to remind you
 4    of the evidence.
 5            So the first question you're gonna be asked to
 6    answer when you're in the jury room is did the plaintiffs
 7    prove by a preponderance of the evidence, and preponderance
 8    of the evidence means more likely than not, that Dark Horse
 9    contains material from the music composition of Joyful Noise
10    that is both original to plaintiffs and not commonplace
11    expression?  And we've put in the proof this was original to
12    the plaintiffs, and even Dr. Ferrara as hard as he looked
13    couldn't find another example.  So that's one.  The evidence
14    shows that you should answer that yes.
15            Question No. 2.  Let's hope we can get to that.
16    Did the plaintiffs prove by a preponderance of the evidence
17    that Joyful Noise and Dark Horse music compositions are
18    objectively substantially similar in copyrightable
19    protectable expression?  That's -- if you recall, that's the
20    extrinsic test.  You've heard the two experts testify that's
21    a question, and we believe we put on evidence that they are
22    substantially similar in that protectable expression.
23            Then you're gonna come to Question No. 3.  This is
24    the ordinary person question.  Did we prove by a
25    preponderance of the evidence that an ordinary, reasonable
```

1   person would find the total concept and feel that Joyful

2   Noise and Dark Horse musical composition substantially

3   similar in copyrightable protectable expression?

4         As I mentioned, almost half or 45 percent of Dark

5   Horse is the ostinato substantially similar to the one in

6   Joyful Noise.  When look at the words substantially similar,

7   keep in mind it doesn't mean identical.  There can be some

8   differences.  The question is is it substantially similar.

9   If you listen with your ears, do they sound alike and

10  substantially so.  That's Question 3.

11        Question 4.  Did we prove by a preponderance of the

12  evidence that Joyful Noise was widely disseminated such that

13  the defendants had a reasonable opportunity to hear Joyful

14  Noise prior to creating Dark Horse?  Again, I just went

15  through that widely disseminated evidence from the

16  nominations for awards to the YouTube videos to concerts to

17  the TV and radio interviews.  Does a professional songwriter

18  have reasonable access to that.

19        Question 5.  This is where the defendants in an

20  effort to show that they did not have access.  Can they prove

21  by a preponderance of the evidence that they did not avail

22  themselves of the opportunity?  They have the burden of proof

23  on this.  As you weigh that burden of proof, think about the

24  song.  Is it substantially similar?  Think about the

25  widespread access as to whether you believe that they're able

UNITED STATES DISTRICT COURT

EXHIBIT 6
PAGE 1178

 1    to meet that burden of proof.

 2            Question 6.  Did defendants proof by a

 3    preponderance of the evidence that the defendants

 4    independently created Dark Horse?  As you recall, the sole

 5    testimony in that was from Mr. Walter who said I

 6    independently created.  They have the burden of proof on

 7    this.  There's no other evidence out there that would support

 8    this.

 9            No. 7.  This is -- remember the joint work that we

10    were talking about?  And this is the question:  Of this

11    instrumental music that Mr. Ojukwu created, is that part of a

12    joint work of authorship with the other plaintiffs?

13            And as Mr. Ojukwu testified, he put it up on

14    MySpace in the hopes that a rap artist would come along and

15    want to make a song out of it.  He sold the rights to

16    Mr. Gray with the understanding he keep 50 percent of any

17    song that was created looked.

18            And as you looked at the liner notes way back in

19    2008, not just before this lawsuit was filed, way back in

20    2008, the four individuals were all credited as co-writers of

21    the musical composition.

22            And then Question 8.  As to each defendant listed

23    below, do you find by a preponderance of the evidence that

24    he/she/it had copied Joyful Noise or distributed Dark Horse?

25            And I know our focus will be on Mr. Gottwald and

1    Mr. Walter, but if you recall, when Ms. Cohen was examining

2    Mr. Gottwald, she showed him the copyright registration for

3    Dark Horse.  And every one of the six defendant, the

4    individuals, each one in the copyright registration claimed

5    an authorship and ownership interest in both the music and

6    lyrics.  And keep that in mind when you decide which of these

7    you should be checking the boxes for.

8          Thank you for your attention and for your patience.

9          THE COURT:  Okay.

10          Do you wanna go or do we need a recess?

11          MS. LEPERA:  I think we should take a short --

12          THE COURT REPORTER:  Yeah, we need a quick recess,

13    Judge.

14          THE COURT:  Yes.  Why don't we take a quick recess,

15    come back.  Again, keep an open mind, and we'll let you start

16    deliberating soon.

17          THE CLERK:  All rise.

18                (Recess taken.)

19                (Jury present.)

20          THE COURT:  Okay.  Ms. Lepera.

21          MS. LEPERA:  Thank you, Your Honor.

22          Good afternoon, ladies and gentlemen.  I want to

23    thank you for your time and your attention.  I know this has

24    been a really long process.  A lot of information.  We

25    greatly appreciate your patience and your conscientious

EXHIBIT 6
PAGE 1180

96

1    review of this matter for us.

2            The Judge has instructed you on the law, and unlike

3    my co-counsel, I'm not gonna tell you how to decide the

4    facts.  I'm not gonna give you a special verdict form and

5    write no next to every question.  That's for you and only you

6    to decide to do.  I do suggest, though, and as the Judge

7    instructed you use your common sense.

8            And one of the things my co-counsel -- my adverse

9    counsel, excuse me, not my co-counsel, stated at the

10   beginning of this closing is that we're here -- our strategy

11   is to have you not look at things and to avoid things.  I

12   submit to you that's exactly their strategy, not our

13   strategy.  What they're attempting to do is camouflage what's

14   really going on here.

15           And one of the things I also want to say at the

16   outset is they keep saying this is a case of taking, and

17   that's a very serious acquisition.  To accuse someone of

18   stealing something regardless of how he categorizes it,

19   whether it's conscious, subconscious, this is a very serious

20   accusation.  And my clients take this very seriously, and it

21   has deeply affected them as you've heard.

22           And the other thing, um, I want to mention at the

23   outset is there's this professed, um, claim here that they're

24   protecting music.  And in reality what they're doing is

25   they're trying to own basic building blocks of music, an

```
 1   alphabet of music that cannot be monopolized by anyone.  It's
 2   actually to detriment of music.
 3        They're not here to protect music.  They're here to
 4   actually use the alphabets of music for financial gain and
 5   prevent other people from doing the same.  This is not what
 6   copyright law is about.  And the thread that runs through
 7   everything that the Judge read to you today, and I know it's
 8   a lot of information.  One of the things that the plaintiff's
 9   lawyer does not want you to think about is the predicate
10   concept here is you cannot copyright commonplace expression.
11        It's very, very clear.  You cannot take something
12   that is the building block of the musical alphabet, and as I
13   said in my opening, it's Mi, Mi, Mi, Mi, Re, Re, 3-2-1-5.
14   And we're gonna get into what they don't want you to look at,
15   but this is exactly what they're trying to prevent you from
16   really looking at and focusing on because they do not have
17   copyright protection in that basic building block of music.
18        And all the songs in their entirety is another
19   thing they don't want you to listen to.  Have they played you
20   either of these two songs through?  Well, I'm going to do
21   that for you.  They don't want to look at the total concept
22   and feel of the song.  They want you to look with blinders
23   into this particular very simplistic phrase and that their
24   own expert has admitted is 3-3-3-3-2-2.  And we took you
25   through this with Dr. Ferrara systematically, and I'm gonna
```

EXHIBIT 6
PAGE 1182

1    do a little bit of that now.

2          What they're saying about us frankly is what

3    they're doing.  So when you talk about the elements here and

4    as the Court has instructed you on the elements, they do have

5    three elements that they have to prove and we'll look at

6    them.  Um, the first one is do they have a valid copyright

7    registration?  Have they proved joint ownership?  And I'm

8    gonna do that last.

9          The second element that they talked about that they

10   have the burden of proof on is to prove that their song was

11   widely disseminated.  And widely disseminated means something

12   in the English language.  It means a lot.  Now, they keep

13   saying it's a lot, but everything has to be put in context.

14   This is where common sense comes in.

15         What does wide mean on the Internet?  What does

16   wide mean when there's no document and there's only the

17   witness's testimony?  You heard plaintiff's counsel say well,

18   Mr. Walter was the only one in the room.  It's his testimony

19   that he created something by himself.  You know, there's

20   nobody to witness it.

21         Well, where are the witnesses for Mr. Ojukwu about

22   his beat?  Where are the witnesses for Mr. Gray and his wife

23   about, you know, their performances and the concerts that

24   they speak about?  So there's this disconnect here with what

25   they're saying and their effort to really create something

```
 1   more with this widespread distribution than in reality
 2   exists.
 3          And that is their burden, but I am gonna submit to
 4   you and we'll go through it a little bit that they haven't
 5   come close.  It's not even close with respect to widespread
 6   distribution in all different areas of where you could, you
 7   know, distribute a song so that my clients would have a
 8   reasonable opportunity to actually hear the song.
 9          But let's go back now to the element I started with
10   which is the third element which is the substantial
11   similarity element and argument.  And as I said at the
12   outset, what they do not want you to look at and what they do
13   not want to focus you on is whether or not those plaintiffs
14   have any right to own that simple phrase that we've been
15   talking about and that we've discussed at length with
16   Dr. Ferrara.
17          Because the Court has instructed that if it's
18   commonplace expression and it is something that is a building
19   block essentially, you cannot have copyright protection in
20   it.  In addition to that if -- and the Court instructed on
21   this, too.  You'll go back and you look, there's a thin
22   copyright instruction.  There's an instruction that
23   unprotectable elements have to be extracted from
24   consideration as to whether or not something is copyrightable
25   or even potentially copied.  You have to look carefully so
```

EXHIBIT 6
PAGE 1184

```
1    that you do not allow an infringement claim or a copying

2    claim to rest on something that is not to be owned by the

3    party who's making the claim.

4              The other thing they don't want you to do again

5    we'll go through it is look at the two works as a whole.  The

6    two works as a whole.  They rushed you through the special

7    verdict form, but I'll suggest that you look at it carefully

8    with the instructions because they cannot win unless they

9    prove that a person would consider the total concept and feel

10   of these two songs to be substantially similar.  That's what

11   the Court has instructed on and that's the law.

12             So one, is it even protectable expression that

13   they're talking about?  I would submit to you no.  We'll go

14   through it.  Two, have they proved objectively that this is

15   anything more than a common building block?  That's their

16   burden.  We've come here and we've demonstrated that it's not

17   protectable and that it's a common building block, but it's

18   really their burden to prove that it is protectable

19   expression in the part that they're claiming was copied.

20             Then they have to prove that the total concept and

21   feel of the work is substantially similar.  That's the entire

22   work.  That's the law.  So let's go through it step-by-step,

23   um, and let's start with what we showed you which they've

24   hidden.

25             Structure which is the first chart.  So if you
```

```
 1   recall, Dr. Ferrara, who -- by the way, their musicologist I

 2   assume is not gonna challenge this.  This chart is done by

 3   Dr. Ferrara to give you a map of the entirety of the two

 4   songs.  Okay?  And to demonstrate to you where in fact the

 5   various sections are and what we're talking about here is at

 6   issue in the case.

 7          One of the most important things, again, I'll say

 8   buried by plaintiff's counsel and plaintiffs was how Dark

 9   Horse was created.  And while their expert says Ostinato

10   No. 2 came first, Henry Walter and Dr. Ferrara

11   musicologically say that makes -- Henry says it didn't

12   happen.  He created Ostinato No. 1 first in Dark Horse and

13   Dr. Ferrara says from a musicological perspective that makes

14   sense because Ostinato No. 1 in Dark Horse is the intro and

15   the chorus hook and Ostinato No. 2 is a stretched out version

16   of that.

17          So we start looking at the entirety of the works

18   here, and then we bring it back into what's at issue.  This

19   was not done by the plaintiffs because they don't want you to

20   look at the total work.  So now let's look at Ostinato No. 1

21   in Dark Horse.

22          So we established through the testimony of

23   Dr. Ferrara and hope you agree and Mr. Walter's testimony

24   that we have Ostinato No. 1 that came first in Dark Horse and

25   that is the intro that you hear.  Ultimately, the four notes
```

EXHIBIT 6
PAGE 1186

 1    that you see here, the C, the B, the A and the E are the same

 2    four notes that are in Ostinato No. 2.

 3          And there's no dispute on this by Professor Decker.

 4    He doesn't disagree with this.  He simply says Ostinato No. 2

 5    which has three Cs more and one B more is infringing and

 6    taken out of Joyful Noise, but Ostinato No. 1 is not

 7    infringing.  So what Dr. Ferrara said yesterday, I believe it

 8    was yesterday, is that's completely inconsistent.

 9          How can you possibly take the position that

10    Ostinato No. 1 is plainly dissimilar from Joyful Noise, but

11    Ostinato No. 2 is substantially similar?  It's the same

12    series of notes.  It's just a couple of additional repeats.

13    And there's no dispute Professor Decker or Dr. Decker or

14    however he prefers to be called said under oath that Ostinato

15    No. 1 is plainly dissimilar from Joyful Noise.  That's just

16    completely contradictory information.

17          And when you look at this undisputed in terms of

18    how these pitches are laid out, you can see it's common sense

19    that No. 2 is simply a stretched out version of No. 1 which

20    is exactly what Henry Walter testified to and which

21    Dr. Ferrara corroborated as a musicologist.

22          That was without dispute in terms of the notes

23    because if we look next . . . so this is a demonstrative that

24    we looked at with Dr. Ferrara, and we have no dispute from

25    the plaintiffs or Dr. Decker that we're really boiling this

EXHIBIT 6
PAGE 1187

1    down to two notes in common.

2            As I said in my opening and we've proved, it's Mi,

3    Mi, Mi, Mi, Re, Re.  And it's two notes, it's a C and a B

4    both of which are in Ostinato No. 1.  And this is information

5    that establishes in our view that this is a commonplace

6    building block of music and cannot be monopolized.

7            In addition, the information that we have in

8    Ostinato No. 1 was found verbatim in a couple of works that

9    Dr. Ferrara demonstrated for you.  One of which is called

10   Brainchild.  So it's not as if we're saying that the

11   Ostinatos in 1 and 2 of Dark Horse are brilliant either.

12   We're saying this is commonplace expression throughout.

13   Joyful Noise, Dark Horse 1 and 2, and Brainchild and other

14   musical examples that we've given.

15           Let's look at another example that the plaintiffs

16   are not recognizing here is that Dr. Luke actually created

17   the exact same series of pitches that are in Dark Horse

18   Ostinato 1 and 2 before the plaintiffs even wrote Joyful

19   Noise.  Again, 3-2-1-5, C-B-A-E.

20           When you look at specific pitches and scale steps

21   and you actually focus on the information and not try to

22   camouflage it, what is revealed here is someone wrote this --

23   one of my clients wrote this series of pitches on evenly

24   spaced notes.  Same thing that is in Ostinato 1 and 2 and in

25   Joyful Noise wrote this before the plaintiffs even wrote

1    theirs.

2           So to suggest that they have to be copied to write

3    the simple musical block and building phrase is the

4    information that you aren't hearing.  And that is the key to

5    whether or not their submitted beat is copyrightable.

6           When you read the Judge's instructions, there's

7    clear instructions on commonplace expression not being

8    protectable under the copyright laws.  If it's a copyright --

9    if it's a copyright claim that seeks to make a claim on

10   unprotectable expression, it must fail.  That is what we have

11   here and that is all that we have here.

12          Now, even though they tried to camouflage it,

13   Dr. Decker was compelled to have to admit all the various

14   differences in the two songs.  And he testified that the

15   harmony is different, the rhythm is different, the, um,

16   there's slides in the ostinato in Joyful Noise which

17   Dr. Ferrara demonstrated to you was also a serious difference

18   between the Joyful Noise ostinato and the Dark Horse

19   ostinato.

20          Let's actually go back, if you wouldn't mind, Scott

21   to Ferrara Exhibit 21.  Right.  So the transcription here

22   that Dr. Ferrara provided indicates and you can hear it in

23   the Joyful Noise ostinato that these are not even the same,

24   number one.  Again, it brings you back to note that there's a

25   great number of differences even within the ostinatos which

1    they don't want to talk about and they try to camouflage.

2            And so they try to camouflage the differences even

3    though they were compelled to admit certain on the stand,

4    they tried to camouflage it, and then they also tried to

5    protect and monopolize Mi, Mi, Mi, Mi, Re, Re.

6            Now, while it is our burden to prove independent

7    creation, it's only if they have proved they have substantial

8    similarity in protectable expression as in there can be an

9    inference of copying.  And we submit that they can't come

10   close to that with respect to this music that they're talking

11   about.

12           But, of course, all of the information that we

13   presented to you about independent creation is something that

14   we believe demonstrates unequivocally that the writers of

15   Dark Horse came together and wrote this.  Mr. Walter and

16   Mr. Gottwald wrote this simple beat.  This was obviously

17   written before by Dr. Luke in terms of the melody and the

18   rhythm.

19           And then they created this song and it's so many

20   different layers and so many different textures.  And so much

21   different information beyond that simple building block which

22   Dr. Ferrara analogized to cinder blocks and people trying to

23   build a home and someone trying to prevent people, you know,

24   from using basic cinder blocks.

25           Well, they created this beautiful song.  It's very

1    different than Joyful Noise which I'm not saying that's not a

2    beautiful song.  They're just different.  They're entirely

3    different other than this singularly unremarkable thing that

4    they have in common.  And they have proven nothing else is in

5    common.  That's it.  That's really it.

6           So when you look at the musicological evidence of

7    the C, the B, the A, the E, these four notes, and Henry

8    Walter on the stand talking about how he started with

9    Ostinato No. 1, he played the four notes, he played it in a

10   pretty fast rhythm, and then he said oh, my God.  I want to

11   stretch this out.  I've gotta play some -- there's gonna be

12   vocals that are gonna go into Ostinato No. 2 so let me give

13   some space.

14          And that's what we have there because we simply

15   have those four notes from Ostinato No. 1.  The first two are

16   just simply repeated a couple of times.  They're stretched

17   out and, of course, the rhythm has to stretch out with them.

18   And that is the testimony of the independent creation.

19   There's nothing to contradict that.  It's no different than

20   Mr. Ojukwu getting up on the stand and saying he wrote his

21   beat the way he wrote it.

22          Okay.  So, again, all the writers who participated

23   in creating the instrumental, Mr. Gottwald and Mr. Walter and

24   the producer Max Martin and Katy Perry and Sarah Hudson,

25   they've all come before you.  And they've told you that this

```
 1    process they engaged in they did independently.  They had

 2    absolutely no knowledge of Joyful Noise.

 3         And plaintiff's counsel yet keeps coming forward

 4    and saying, you know, of course, they're gonna say that they

 5    have no knowledge.  It's almost like we have to prove a

 6    negative.  As he mentioned, we've been doing this for four

 7    years, maybe five.  They've scoured the earth to try to find

 8    a connection between my clients and theirs.  There's none.

 9         So a thin thread that they hang this entire case on

10    is this widespread dissemination theory.  This widespread

11    dissemination theory even though that's a legal term, it

12    comes down to what's a reasonable opportunity for people and

13    they don't want you to put it in context.  They want you to

14    essentially look at their numbers or there lack of numbers

15    and say that's a lot.

16         But reality is and use your common sense and your

17    own reasonable judgment, um, if you are looking to find

18    something on the Internet these days or even back in the time

19    period 2008 to 2013, you're gonna be looking through a

20    search.  You understand, I presume, that from your own

21    experience which you should draw on, how much volume is on

22    the Internet.

23         And while plaintiffs want to denigrate our experts

24    because they have put forth these numbers over these four

25    years of approximately 6 million views of certain videos that
```

1    they have, we had to, ladies and gentlemen, put in the

2    context.  Just to be able to demonstrate that even though it

3    may be something that's obvious, I actually think it is, but

4    the Internet is beyond vast.  These are jaw-dropping numbers.

5              You're talking about 1.5 billion views, 1.5 billion

6    views -- or excuse me.  4.1 trillion views over the period of

7    time compared to 6 million views.  That is a massive amount

8    of information.  And if you get to a view, to use a view or

9    get to a particular work as our expert said, you use a search

10   function or someone sends you a link.  There's got to be a

11   methodology that's employed that makes sense.  You don't just

12   stumble upon works.

13             And when the plaintiff's counsel keeps repeating

14   the mantra that because they're professional songwriters that

15   somehow that means they stumble more, well, where's the

16   evidence of that?  They don't stumble more.  If anything,

17   they stumble less.  They're working on their own music.

18   They're not looking to simply randomly search through genres

19   that they're not even interested in.  And everyone has a

20   genre that they're interested in that they go to.

21             So it's almost like saying well, because you're in

22   the music business, that means everything is fair game and

23   you listen to everything that's played.  So if I'm a water

24   polo player, that means I'm obviously into basketball.  The

25   analogy doesn't work.

```
 1              Just because you're in the industry whether it's
 2    sports or music, it doesn't mean you have your finger in
 3    every aspect of every genre or every area of the musical
 4    universe or industry.  And our clients talked about this.
 5    They talked about, you know, their habits.  They talked about
 6    how much they spend time on their own work and on their own
 7    creation process.
 8              The evidence that has been put forward to
 9    demonstrate the widespread distribution, there's just no
10    link.  There's -- there's no link.  And it has to be a
11    reasonable opportunity not just speculation.  So when you
12    point to certain charts of critical acclaim, well, wonderful
13    for Mr. Gray.  It's absolutely wonderful, but it's not
14    something that would connect him to my clients.
15              And similarly, when you have certain Billboard
16    charts, again, there's over 200 Billboard charts.  There's
17    many mainstream Billboard charts.  You tend to look, I think
18    everyone sort of agrees from the artist's perspective, you
19    look at where your song is.  You look at what makes sense for
20    you.  You know, if you've got a hit that's coming up or
21    something, you follow this.
22              And similarly with respect to, um, going and
23    looking at the evidence of the radio or the TV, uh,
24    interviews that they claimed existed, there's no
25    documentation or specifics with respect to any radio play.
```

```
 1   In fact, Mr. Lambert and Mr. Ojukwu said they never heard
 2   Joyful Noise on the radio and they're two of the writers.
 3         So, you know, the inference that there's radio play
 4   of Joyful Noise that somehow one of the writers of Dark Horse
 5   heard, there's no evidence of that radio play and there's no
 6   evidence of a TV performance.
 7         With respect to the concerts, nobody's suggesting
 8   there aren't concerts.  There undoubtedly were concerts, but
 9   the nature of the concerts and the music of the concerts were
10   not venues or areas that my clients were interested.
11         They have no obligation to present them at the
12   concert, but what they do have an obligation to do is show
13   there's a reasonable basis for them to have gone or somehow
14   connect it so it's reasonable to assume that the Dark Horse
15   writers would go to the types of venues or concerts that the
16   plaintiff may have performed in.
17         So we have -- and admittedly, they have no sales
18   data for their widespread distribution claim, but they blame
19   Cross Movement Records.  Now, I'm gonna talk about that in a
20   minute, but one of the things about Cross Movement Records
21   and undoubtedly, you have a lot questions about why we were
22   asking certain questions.  But if you look at the Cross
23   Movement Record issue, they claim they didn't get royalties,
24   they didn't get any sales.
25         Well, who told them not to go get that?  They gave
```

EXHIBIT 6
PAGE 1195

```
 1   it up.  When did they give it up?  Two days after they filed

 2   this lawsuit.  No one told them not to pursue their royalty

 3   claim.  No one told them they shouldn't get evidence of

 4   sales.  They chose to do that.  Not only did they choose to

 5   do that, but they did it two days after this lawsuit was

 6   filed and they claim well, I got all my rights from my other

 7   songs back.

 8            Well, why didn't you do that years and years

 9   earlier if you had unpaid royalties?  Well, coincidentally,

10   you just decide now.  But the bottom line there is they don't

11   have any evidence of sales and they shouldn't be excusing

12   that because of the choices that they made.  They don't have

13   any evidence of sales.

14            They don't have a video of a performance anywhere

15   other than online which we talked about with the MySpace and

16   the YouTube and the viewing issues.  And how those are

17   completely disconnected in the context of the vast universe.

18   We've talked about how there's no evidence that they have of

19   any TV or radio performances of Joyful Noise.

20            They don't even have an iPhone video that they

21   produced in this case of anyone playing Joyful Noise in a

22   concert.  They don't have any booking agency forms.  They

23   don't have any income from any of the concerts.  It's just

24   there's nothing.  There's no documents.

25            And, again, one is not saying that they didn't do
```

1    certain things, but what we are saying it's not widespread

2    distribution.  It's not the type of national saturation or

3    volume that people would just stumble on.  There would have

4    to be a reason for them to go search, look, be there.  None

5    of that exists.  They can't prove that.  That is their

6    burden.  They have to show it's reasonable.

7        So you have the problems with substantial

8    similarity on three levels that we've just gone through.  No

9    protectable expression to begin with.  At issue they can't be

10   deemed to be substantially similar because of that from an

11   objective matrix looking at it musicologically.  And then

12   there's the total concept and the feel of those two songs.

13   There's no way the total concept and feel of those two songs

14   would lead to a conclusion of substantial similarity of

15   protectable expression.

16       There's no widespread distribution and we have

17   unrebutted proof of independent creation by the writers in

18   the specific music that's at issue.

19       Um, again, the nominations wonderful.  Nominations

20   in these particular categories, um, no evidence of a

21   performance of the song Joyful Noise.  Just because there's a

22   nomination doesn't mean that that means that in this

23   particular category there would have been any way for our

24   clients to be looking at that specific chart.  There are

25   hundreds of charts.  They're not in the same genre.

1          And even though Mr. Kahn keeps talking about hip

2     hop, again, there is a very specific distinction in the music

3     business between general hip hop which is very secular and

4     Christian hip hop.  It's reasonable and common sense to

5     understand that's secular music.  Their's is Christian music.

6     No connection other than Mr. Kahn talking about Ms. Perry's

7     very early youthful exposure to Christian music.

8          There's nothing in this record that links any of

9     the defendants to Christian music of any nature.  So it's

10    pure speculation.  And I go back to and you'll see it in the

11    Judge's charges, you don't speculate, um, for access.  There

12    has to be something reasonable that you look to.  What they

13    want you to do is speculate and make conjecture and consider

14    things, um, without sufficient evidence.

15         6 million people in L.A., um, on the issue on the

16    views.  He's tying the number of views to the fact that

17    there's 6 million people in Los Angeles, but the context is

18    we don't live in the Internet in L.A.  We live in the

19    Internet in a 4.1 trillion view count world not a 6 million

20    view count world so that's apples and oranges.

21         And I go back to Mr. Kahn's, um, comment about the

22    circumstantial evidence and the mustard and the ketchup, and

23    someone eating something in the fast food place.  Um, but you

24    don't know they ate in the fast food place, but they come out

25    and they've got a collar with ketchup or mustard.  I'll ask

1    you, ladies and gentlemen, where's the ketchup, where's the

2    mustard on any of their shirts?  I submit there's nothing.

3           Okay.  And then I'll circle to the last element,

4    um, which is the one that Mr. Kahn started with and maybe by

5    doing this answered some of the questions you may have had as

6    to why we were asking certain questions about what we felt

7    were, let's say, suspicious circumstances regarding the

8    registration process here and the validity of it.  They do

9    have to prove they have a valid copyright and copyright

10   registration.

11          So there's no dispute they filed no copyright

12   registration until after Dark Horse was released even though

13   Joyful Noise was released in 2008.  They did not make any

14   agreement between the authors until after the lawsuit was

15   filed.  Mr. Ojukwu testified that he sold the beat to

16   Mr. Gray along with another beat for $300.  When I asked him

17   under oath, you may or may not remember, did they make any

18   agreement as to what his rights would be?  He said oh, yes, I

19   was gonna be 50 percent owner and I was gonna be the writer.

20          What you may or may not recall when I asked him

21   what he said in his deposition, he testified under oath that

22   he didn't know he had 50 percent until after Mr. Moore was

23   out.  And Mr. Moore wasn't out until after this lawsuit was

24   filed.  So we have someone who sells a beat -- and by the

25   way, you can be a producer and not a writer.  I think you've

1    heard testimony to that effect.

2         You can do so if you have a buy out situation, and

3    then after the fact decide you're gonna characterize it as a

4    joint work of authorship.  But our position is and the

5    instructions will show that if you take something that was

6    previously created and published and sold, and you put it

7    into a work, and then you call that a joint work and it's

8    really not a joint work.  You're just characterizing it as

9    such, there's really no protection in this registration for

10   the previously existing work.  This is -- Joyful Noise is a

11   derivative work and the only thing that's protected in that

12   work is everything but the beat.

13        So one can only surmise why Mr. Ojukwu asked for

14   50 percent of this because they're suing over this beat is

15   our position.  We called into question the validity of the

16   copyright, but, again, ladies and gentlemen, I think, and I

17   did it in the order I did it in for a reason.  I think that

18   the evidence is really unrebutted.  Really they don't have

19   any disagreement demonstrating the actual music is Mi, Mi,

20   Mi, Mi, Re, Re.  They just characterize it differently.

21        And they challenge all of the prior art and they

22   want you to believe because Mary Had a Little Lamb in its

23   entirety doesn't sound like Dark Horse or Joyful Noise, the

24   fact that it has Mi, Mi, Mi, Mi, Re, Re is irrelevant.  Well,

25   it's not irrelevant.  That's the whole point.

1          Not that Mary Had a Little Lamb in its entirety is

2     similar to Dark Horse or Joyful Noise.  They share a basic

3     building block 3-2 -- not even 3-2-1-5 because it's different

4     in Dark Horse and Joyful Noise which is the other point.

5     There's no eight note phrase in common.  Dr. Decker knocked

6     out 7 and 8.

7          3-3-3-3-2-2 that is what we've shown you in

8     multiple works.  So we showed you not only that Ostinato

9     No. 1 is unprotectable, 3-2-1-5 with Brainchild and another

10    one of the prior art works, we've shown you that Ostinato

11    No. 2 came out of Ostinato No. 1, same thing.  C-B-A-E.  Four

12    Cs and two Bs and one A and one E here.  C-B-A-E here.

13         We've shown you that in Ostinato No. 2 there's also

14    prior art in these other elementary schoolbooks.  Um, and so

15    rather than acknowledging this, they're denigrating it and

16    they're suggesting we have to prove that Mary Had a Little

17    Lamb is substantially similar to Dark Horse.  That's not what

18    we're doing or using that for.

19         Okay.  So I'm gonna do something now, um, well, I

20    have one more point.  I think that you do -- we will ask you,

21    um, you know, to look at each of the defendants individually

22    with respect to determine whether there's any violation with

23    respect to any of them, particularly, the corporate

24    defendants.

25         It's our position they haven't proved anything with

 1    respect to Warner Brother Music, Kobalt or Kasz in any way,

 2    shape or form.  We respectfully ask that you return a verdict

 3    for everyone on the issues we've just been talking about.  I

 4    want to mention that specifically.

 5          But before I leave you, and I do respectfully ask

 6    that you return a verdict in our favor for all the reasons I

 7    said, I'm gonna do something for you that they have never

 8    done.  I want you to hear the two works back-to-back.  75

 9    Joyful Noise and Dark Horse.  The entirety of the works that

10    they've tried to hide.

11                    (Exhibits 75 and 76 played.)

12          MS. LEPERA:  I want to thank you again for your

13    time and attention and all of your careful deliberations.

14    And I hope and respectfully ask that you come back with a

15    verdict in favor of the defense.  Thank you very much.

16          THE COURT:  Okay.  Thank you.

17          Mr. Kahn.

18          MR. KAHN:  Just a few, um, corrections here.  I

19    won't take a lot of your time.  As you probably recall, we

20    did play both songs.  We even played the music video in their

21    entirety.

22          There is -- this shadow they're trying to cast on

23    the settlement that Mr. Gray reached with his record label

24    that hadn't been paying.  And I want you to remember the

25    lawsuit that was filed against Cross Movement was filed in

 1    2012 long before there ever was the song called Dark Horse.

 2            And as Mrs. Gray testified, the only reason they

 3    decided to try get something other than royalties was when

 4    they found out there was no money available.  And the timing,

 5    you have some settlement agreement, settlement negotiations,

 6    and they eventually settled the case.  And it's pure

 7    coincidence when they end up getting these rights back.

 8            There's an effort to try to convince you with Mary

 9    Had a Little Lamb and Jolly Old Saint Nick that there is

10    nothing protectable in Joyful Noise in that ostinato.  And I

11    would remind you that Dr. Ferrara with his huge music library

12    couldn't find a similar ostinato.

13            And originality doesn't require something complex.

14    I don't have, and my kids would be embarrassed to hear me say

15    I don't have a good voice so I can't do what Dr. Decker did.

16    There are a lot of very distinctive eight note ostinatos out

17    there.  I think of Beethoven's Fifth (singing).  I'd assume

18    as soon as you heard that, you recognized it.

19            I can't possibly do the eight note ostinato in the

20    Rolling Stone's Satisfaction, but if you listen to that,

21    you'll see it's another very simple track.  It doesn't have

22    to be complicated.  There's a low level.

23            MR. CHIEFFO:  Your Honor, I hate to do this, but

24    there's nothing in the evidence related to what counsel is

25    now speaking about.

```
 1          THE COURT:  Okay.  Ladies and gentlemen, if you
 2    remember the evidence differently, your memory controls.
 3          MR. KAHN:  There's also this charting of what
 4    Dr. Ferrara described as Ostinato 1 and Ostinato 2 and how
 5    they're allegedly similar cause they had the same notes in
 6    them.  And I would like you to listen to the first several
 7    measures of the instrumental for what became Dark Horse and
 8    you'll hear Ostinato 1 and Ostinato 2 and you can decide how
 9    similar they are.
10                    (Music played.)
11          MR. KAHN:  As far as the widespread dissemination,
12    the defendants are understandably trying to shove Mr. Gray
13    and his music into some gospel music alleyway where nobody
14    visits.  Um, as we've seen, particularly as his new albums
15    that were released in 2010 and 2012, and he became more
16    popular.
17          And he's on iTunes, and he's on Amazon, and he
18    starts charting again on Billboard, he's out there.  And if
19    you go to iTunes as Ms. Gray testified and you click on
20    Flame, you'll see all of his music including his most popular
21    song which is Joyful Noise.
22          As I mentioned earlier, this lawsuit was filed in
23    2014.  It was filed because the plaintiffs believe that the
24    defendants had taken something of value without their
25    permission.  It was filed in court because the plaintiffs
```

UNITED STATES DISTRICT COURT

EXHIBIT 6
PAGE 1204

```
 1    were seeking justice in a court of law.  It was five years
 2    ago.  It's been a long and difficult path to this day in this
 3    court.
 4              They are still seeking justice for what they feel
 5    was a taking without their permission.  And after this trial
 6    is over, the defendants will continue on.  They'll be able to
 7    exploit Dark Horse in a wide variety.  They'll be able to
 8    keep selling the album.  They'll be able to keep doing other
 9    stuff with the song.  This is the plaintiffs one and only
10    opportunity to seek some measure of justice and we are asking
11    you for that justice.  Thank you.
12              THE COURT:  Okay.  Ladies and gentlemen, just one
13    thing.  Pay attention to the instructions and don't go on the
14    Internet or try to do anything on your own.
15              Meanwhile, do we have a bailiff?
16              THE CLERK:  Please state your name for the record.
17              THE BAILIFF:  David Williams.
18                        (Bailiff sworn.)
19                        (Jury not present.)
20              THE COURT:  Okay.  I have no idea what they will
21    do, but I certainly would stick around for today just to see
22    whether there are questions or anything like that.  And I
23    probably will let them deliberate to about 5:00 or 5:30, and
24    have them return to tomorrow if they haven't reached a
25    conclusion.  Okay?  Thank you.
```

121

```
 1              THE CLERK:  This court's in recess.

 2                        (Jury deliberates.)

 3              (Proceedings were concluded at 4:06 p.m.)

 4

 5                     CERTIFICATE OF REPORTER

 6

 7   COUNTY OF LOS ANGELES        )

 8                                )  SS.

 9   STATE OF CALIFORNIA          )

10

11   I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

12   STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

13   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

14   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

15   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

16   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

17   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

18   OF MY STENOGRAPHIC NOTES.

19

20

21   DATE:  AUGUST 1, 2019_____

22

23       /s/  LAURA MILLER ELIAS

24   LAURA MILLER ELIAS, CSR 10019

25   FEDERAL OFFICIAL COURT REPORTER
```

| $ |
|---|
| **$300** [1] - 114:16 |

| / |
|---|
| **/s** [1] - 121:23 |

| 1 |
|---|
| **1** [44] - 4:3, 4:11, 11:8, 11:10, 11:24, 12:10, 12:17, 12:21, 12:23, 12:25, 13:6, 39:21, 51:2, 51:12, 53:18, 62:24, 64:24, 65:7, 65:25, 67:17, 69:12, 80:23, 81:2, 101:12, 101:14, 101:20, 101:24, 102:6, 102:10, 102:15, 102:19, 103:4, 103:8, 103:11, 103:13, 103:18, 103:24, 106:9, 106:15, 116:9, 116:11, 119:4, 119:8, 121:21 |
| **1.4** [1] - 83:20 |
| **1.5** [2] - 108:5 |
| **100** [1] - 83:18 |
| **10019** [2] - 1:22, 121:24 |
| **106** [5] - 5:19, 15:13, 23:9, 32:8 |
| **107** [1] - 36:23 |
| **11377** [1] - 2:18 |
| **117** [1] - 3:9 |
| **12** [1] - 73:16 |
| **12TH** [1] - 2:7 |
| **14** [1] - 76:12 |
| **15** [1] - 75:14 |
| **15-5642** [1] - 4:4 |
| **15-5642-CAS** [1] - 1:8 |
| **1840** [1] - 2:23 |
| **1900** [1] - 2:23 |
| **1940s** [1] - 84:6 |
| **1:15** [2] - 44:18, 46:1 |

| 2 |
|---|
| **2** [35] - 4:15, 4:25, 11:24, 12:17, 29:18, 39:21, 51:3, 51:19, 53:20, 62:25, 65:2, 65:9, 66:2, 67:18, 68:14, 69:13, 80:24, 81:3, 86:10, 92:15, 101:10, 101:15, 102:2, 102:4, |

102:11, 102:19, 103:11, 103:13, 103:18, 103:24, 106:12, 116:11, 116:13, 119:4, 119:8
**2.5** [1] - 83:13
**20** [1] - 86:7
**200** [1] - 109:16
**2002** [1] - 88:16
**2007** [1] - 73:17
**2008** [11] - 75:12, 76:3, 76:6, 78:5, 82:15, 83:25, 84:4, 94:19, 94:20, 107:19, 114:13
**2009** [1] - 84:4
**2010** [1] - 119:15
**2011** [1] - 84:2
**2012** [7] - 81:13, 82:15, 84:1, 84:2, 90:3, 118:1, 119:15
**2013** [3] - 76:9, 77:9, 107:19
**2014** [2] - 77:10, 119:23
**2019** [3] - 1:15, 4:1, 121:21
**208** [1] - 2:11
**21** [2] - 47:18, 104:21
**2100** [1] - 2:11
**213)894-0374** [1] - 1:24
**22** [4] - 24:6, 24:25, 27:22, 31:21
**25** [2] - 1:15, 4:1

| 3 |
|---|
| **3** [17] - 6:22, 7:1, 7:4, 7:18, 7:24, 9:6, 9:7, 13:20, 13:22, 40:13, 51:4, 51:24, 53:21, 63:2, 66:5, 92:23, 93:10 |
| **3-2** [1] - 116:3 |
| **3-2-1-5** [4] - 97:13, 103:19, 116:3, 116:9 |
| **3-3-3-3-2-2** [1] - 87:7, 97:24, 116:7 |
| **3-3-3-3-2-2-1-5** [1] - 87:18 |
| **30** [2] - 66:19, 90:13 |
| **300** [1] - 84:13 |
| **32** [1] - 84:2 |
| **350** [1] - 1:23 |
| **37** [1] - 84:3 |
| **38** [1] - 43:19 |

| 4 |
|---|
| **4** [10] - 3:4, 5:12, 10:4, 10:5, 13:23, 51:5, 52:6, 53:22, 63:4, 93:11 |
| **4.1** [2] - 108:6, 113:19 |
| **4.5** [1] - 83:12 |
| **4455** [1] - 1:23 |
| **45** [3] - 76:18, 79:17, 93:4 |
| **48** [1] - 3:6 |
| **4:06** [1] - 121:3 |

| 5 |
|---|
| **5** [6] - 6:13, 6:14, 6:16, 53:24, 63:5, 93:19 |
| **50** [7] - 27:2, 44:11, 74:23, 94:16, 114:19, 114:22, 115:14 |
| **5:00** [1] - 120:23 |
| **5:30** [1] - 120:23 |

| 6 |
|---|
| **6** [12] - 42:23, 53:25, 63:6, 83:17, 83:19, 83:20, 94:2, 107:25, 108:7, 113:15, 113:17, 113:19 |
| **63105** [2] - 2:8, 2:11 |

| 7 |
|---|
| **7** [4] - 20:4, 54:2, 94:9, 116:6 |
| **72** [1] - 3:9 |
| **75** [2] - 117:8, 117:11 |
| **76** [1] - 117:11 |
| **7701** [1] - 2:7 |

| 8 |
|---|
| **8** [4] - 43:10, 54:4, 94:22, 116:6 |

| 9 |
|---|
| **90012** [1] - 1:23 |
| **90064** [1] - 2:19 |
| **90067** [1] - 2:24 |
| **95** [3] - 3:10, 76:17, 79:16 |
| **9:45** [1] - 4:1 |
| **9th** [6] - 4:14, 5:22, 8:15, 9:3, 9:15, 24:21 |

| A |
|---|
| **A.M** [1] - 4:1 |
| **AARON** [1] - 2:16 |
| **ability** [3] - 44:10, 46:20, 53:18 |
| **able** [11] - 46:23, 79:22, 80:18, 88:6, 90:13, 91:14, 93:25, 108:2, 120:6, 120:7, 120:8 |
| **absence** [1] - 44:5 |
| **absolutely** [2] - 107:2, 109:13 |
| **academic** [1] - 22:1 |
| **accept** [4] - 48:3, 51:5, 54:19, 55:17 |
| **acceptable** [6] - 8:10, 12:24, 16:15, 20:4, 39:24, 41:10 |
| **accepted** [1] - 27:4 |
| **access** [23] - 37:20, 46:12, 62:8, 69:12, 69:17, 69:18, 69:21, 70:5, 70:10, 70:12, 70:22, 81:8, 81:11, 81:23, 82:1, 83:22, 88:14, 88:21, 93:18, 93:20, 93:25, 113:11 |
| **acclaim** [2] - 82:17, 109:12 |
| **according** [2] - 50:13, 86:25 |
| **accordingly** [1] - 71:14 |
| **account** [2] - 53:17, 58:12 |
| **accounts** [1] - 28:21 |
| **accuracy** [1] - 59:3 |
| **accusation** [1] - 96:20 |
| **accuse** [1] - 96:17 |
| **accusing** [2] - 85:21, 91:5 |
| **acknowledging** [1] - 116:15 |
| **acquaintance** [1] - 75:2 |
| **acquisition** [1] - 96:17 |
| **act** [11] - 17:25, 19:18, 20:7, 22:4, 22:7, 22:18, 22:24, 23:16, 23:18, 33:1, 63:22 |
| **Act** [1] - 5:19 |
| **action** [2] - 63:15, 67:12 |
| **actions** [1] - 66:11 |
| **activity** [2] - 20:19, 31:3 |
| **acts** [2] - 18:13, 21:22 |
| **actual** [8] - 19:18, |

20:18, 22:7, 23:12, 75:22, 85:24, 87:20, 115:19
**adapt** [1] - 62:25
**adaptation** [1] - 63:11
**adapting** [1] - 65:18
**add** [2] - 44:24, 47:17
**added** [2] - 7:15, 9:15
**addition** [8] - 6:17, 30:5, 52:2, 67:22, 69:4, 70:22, 99:20, 103:7
**additional** [2] - 17:2, 102:12
**address** [2] - 6:21, 10:9
**adequately** [1] - 11:16
**administrative** [2] - 91:21, 91:23
**admit** [2] - 104:13, 105:3
**admitted** [4] - 52:9, 52:11, 57:5, 97:24
**admittedly** [1] - 110:17
**adopt** [1] - 4:12
**adopted** [1] - 15:7
**advances** [1] - 36:21
**adverse** [1] - 96:8
**advisable** [1] - 12:18
**advise** [1] - 50:14
**affected** [1] - 96:21
**afternoon** [2] - 72:22, 95:22
**agency** [3] - 23:25, 25:9, 111:22
**ago** [9] - 23:16, 29:2, 72:23, 73:16, 81:21, 85:5, 85:6, 120:2
**agree** [9] - 7:6, 14:6, 23:7, 38:25, 43:8, 45:7, 46:16, 48:19, 101:23
**agreed** [7] - 24:6, 41:18, 42:15, 47:3, 51:4, 57:2, 86:22
**agreement** [7] - 45:9, 46:11, 49:7, 50:12, 114:14, 114:18, 118:5
**agrees** [1] - 109:18
**Ahead** [1] - 86:15
**ahead** [3] - 18:1, 18:9, 26:22
**AIDED** [1] - 121:16
**al** [1] - 4:5
**AL** [2] - 1:6, 1:9
**ALBERTSON** [1] - 2:17
**album** [9] - 26:4,

75:22, 76:7, 82:19, 83:25, 84:3, 89:21, 91:17, 120:8

**albums** [3] - 89:13, 90:13, 119:14

**alike** [1] - 93:9

**alleged** [1] - 13:7

**allegedly** [5] - 38:12, 61:14, 64:25, 66:18, 119:5

**alleyway** [1] - 119:13

**allow** [1] - 100:1

**allowed** [1] - 24:17

**allows** [4] - 5:23, 6:6, 68:1, 78:22

**almost** [4] - 78:17, 93:4, 107:5, 108:21

**alone** [2] - 8:8, 71:15

**alphabet** [2] - 97:1, 97:12

**alphabets** [1] - 97:4

**Amazon** [3] - 89:2, 89:3, 119:17

**ambiguity** [1] - 11:20

**America** [1] - 60:1

**AMERICA** [1] - 1:1

**amount** [1] - 108:7

**amusement** [1] - 84:15

**analogized** [1] - 105:22

**analogous** [1] - 7:23

**analogy** [1] - 108:25

**analysis** [1] - 80:12

**analytical** [1] - 71:6

**AND** [4] - 121:11, 121:14, 121:16, 121:17

**ANGELES** [6] - 1:16, 1:23, 2:19, 2:24, 4:1, 121:7

**Angeles** [1] - 113:17

**anniversary** [1] - 77:11

**answer** [8] - 27:12, 41:2, 44:10, 50:5, 56:21, 92:1, 92:6, 92:14

**answered** [3] - 56:17, 56:18, 114:5

**answering** [1] - 50:4

**answers** [2] - 55:8, 55:13

**apologies** [1] - 48:3

**apologize** [1] - 29:2

**appeal** [1] - 66:13

**appear** [1] - 87:8

**appearances** [2] - 4:6, 4:7

**APPEARANCES** [1] -

2:2

**apples** [1] - 113:20

**applicable** [1] - 9:20

**application** [4] - 8:5, 29:22, 58:2, 89:22

**applied** [1] - 8:6

**applies** [2] - 48:12, 58:4

**apply** [2] - 48:16, 50:23

**applying** [1] - 71:14

**appreciate** [1] - 95:25

**approached** [1] - 58:7

**appropriate** [8] - 4:11, 5:2, 5:20, 6:8, 7:4, 10:23, 17:23, 42:15

**approved** [1] - 15:4

**area** [1] - 109:3

**areas** [2] - 99:6, 110:10

**argue** [3] - 9:22, 17:24, 31:14

**arguing** [6] - 9:13, 25:6, 25:9, 29:9, 34:23, 41:9

**argument** [14] - 9:8, 11:18, 23:19, 23:25, 24:1, 25:6, 34:7, 35:6, 35:7, 44:20, 48:8, 72:18, 99:11

**ARGUMENTS** [1] - 3:8

**arguments** [6] - 9:23, 37:9, 48:11, 51:12, 51:14

**arises** [1] - 70:15

**army** [1] - 84:16

**arpeggiator** [1] - 81:4

**arrangement** [4] - 7:22, 9:18, 68:25, 69:3

**art** [4] - 67:24, 115:21, 116:10, 116:14

**artist** [2] - 74:13, 94:14

**artist's** [1] - 109:18

**artists** [1] - 73:25

**ascended** [1] - 82:15

**aside** [1] - 19:12

**aspect** [1] - 109:3

**aspects** [1] - 80:5

**assign** [1] - 78:8

**assigned** [1] - 90:8

**assignee** [4] - 60:24, 63:10, 67:11

**assignment** [2] - 78:10, 90:12

**assist** [1] - 59:19

**assume** [4] - 17:7, 32:19, 38:10, 101:2, 110:14, 118:17

**assuming** [1] - 19:6

**assumption** [1] - 38:16

**AT** [1] - 121:17

**ate** [1] - 113:24

**attaches** [1] - 61:1

**attempt** [2] - 49:13, 49:24

**attempted** [2] - 7:10, 88:8

**attempting** [2] - 25:1, 96:13

**attended** [4] - 81:16, 81:17, 81:18, 81:20

**attention** [5] - 82:25, 95:8, 95:23, 117:13, 120:13

**attic** [1] - 75:4

**attorney's** [1] - 56:7

**attorneys** [2] - 51:20, 55:22

**audience** [1] - 66:13

**audio** [1] - 15:20

**Audio** [1] - 63:7

**AUGUST** [1] - 121:21

**author** [28] - 4:18, 4:19, 4:22, 5:23, 6:6, 28:3, 30:6, 30:8, 30:12, 30:16, 31:1, 33:2, 33:16, 35:10, 35:13, 35:22, 36:22, 63:10, 65:12, 65:16, 65:25, 66:2, 66:5, 67:17, 67:18, 68:1, 68:5, 68:17

**author's** [3] - 68:3, 68:19, 71:13

**authored** [8] - 15:12, 16:14, 16:22, 19:25, 20:2, 27:5, 37:14, 43:6

**authority** [6] - 18:9, 21:19, 22:24, 36:12, 37:2, 62:15

**authorization** [10] - 16:2, 16:23, 18:24, 19:13, 22:4, 22:25, 23:3, 24:7, 27:5, 34:12

**authorize** [7] - 15:15, 16:6, 18:5, 18:9, 20:12, 22:21, 23:10

**authorized** [15] - 15:10, 16:17, 17:22, 18:7, 18:22, 19:17, 20:16, 22:6, 22:23, 23:6, 23:20, 23:22, 25:8, 27:13, 30:10

**authorizes** [5] - 20:7, 20:21, 20:22, 21:12,

21:18

**authorizing** [6] - 16:10, 18:12, 21:25, 22:14, 23:16, 24:3

**authors** [14] - 35:1, 35:4, 35:12, 35:18, 35:21, 36:10, 36:24, 36:25, 38:13, 38:14, 65:9, 65:14, 66:12, 114:14

**authorship** [6] - 14:19, 63:22, 69:2, 94:12, 95:5, 115:4

**automatically** [4] - 31:2, 61:1, 73:4, 73:6

**avail** [3] - 14:9, 42:18, 93:21

**available** [3] - 82:3, 88:25, 118:4

**availed** [1] - 70:7

**avoid** [2] - 56:4, 96:11

**award** [6] - 82:19, 82:20, 82:21, 82:22, 84:25

**awards** [1] - 93:16

## B

**back-to-back** [1] - 117:8

**backstop** [1] - 90:7

**bailiff** [4] - 49:23, 50:15, 120:15, 120:18

**BAILIFF** [1] - 120:17

**ball** [1] - 36:21

**band** [1] - 83:7

**Barbara** [1] - 76:23

**bare** [1] - 70:1

**base** [2] - 50:20, 57:16

**based** [11] - 12:2, 19:11, 24:1, 34:16, 36:20, 37:14, 40:19, 59:11, 63:1, 65:17, 71:5

**bases** [1] - 84:16

**basic** [4] - 96:25, 97:17, 105:24, 116:2

**basis** [2] - 12:1, 110:13

**basketball** [1] - 108:24

**bear** [1] - 54:4

**beat** [40] - 14:18, 35:21, 38:13, 43:5, 68:10, 68:13, 74:7, 74:14, 74:15, 74:20, 74:22, 74:24, 74:25, 75:1, 75:9, 75:13,

76:6, 76:13, 76:16, 76:22, 76:24, 77:2, 78:14, 85:16, 85:17, 86:17, 87:25, 89:9, 91:2, 91:8, 98:22, 104:5, 105:16, 106:21, 114:15, 114:16, 114:24, 115:12, 115:14

**beats** [4] - 76:24, 82:10, 86:23, 86:24

**beautiful** [2] - 105:25, 106:2

**became** [4] - 55:21, 82:16, 119:7, 119:15

**becomes** [2] - 49:21, 67:7

**bed** [1] - 33:19

**Beethoven** [1] - 88:5

**Beethoven's** [1] - 118:17

**begin** [3] - 49:3, 72:18, 112:9

**beginning** [2] - 32:6, 96:10

**begins** [2] - 73:16, 74:6

**begun** [2] - 4:9, 11:4

**behalf** [1] - 48:2

**BEHALF** [3] - 2:3, 2:13, 2:20

**behavior** [1] - 55:12

**belief** [1] - 49:19

**beliefs** [1] - 53:8

**believability** [1] - 54:4

**believable** [1] - 54:23

**belittle** [1] - 83:17

**belongs** [1] - 5:14

**below** [3] - 14:24, 43:12, 94:23

**bench** [1] - 55:23

**Best** [2] - 89:1, 89:23

**best** [2] - 75:21, 78:4

**between** [12] - 11:24, 39:21, 53:4, 62:10, 68:13, 69:14, 70:14, 71:23, 104:18, 107:8, 113:3, 114:14

**beyond** [3] - 44:9, 105:21, 108:4

**bias** [1] - 53:24

**bible** [1] - 74:19

**bifurcated** [1] - 28:11

**big** [4] - 74:11, 83:19, 84:19, 87:5

**Billboard** [8] - 83:23, 84:1, 84:5, 85:1, 109:15, 109:16, 109:17, 119:18

**billion** [3] - 83:20,

108:5
**binder** [1] - 8:5
**bit** [2] - 98:1, 99:4
**black** [1] - 10:21
**blame** [1] - 110:18
**blank** [1] - 8:2
**blinders** [1] - 97:22
**block** [9] - 97:12, 97:17, 99:19, 100:15, 100:17, 103:6, 104:3, 105:21, 116:3
**blocks** [4] - 7:13, 96:25, 105:22, 105:24
**blog** [1] - 58:1
**BluRay** [1] - 46:22
**Blurred** [5] - 24:21, 31:5, 32:24, 33:7, 44:2
**boiling** [1] - 102:25
**booking** [1] - 111:22
**books** [1] - 57:7
**bottom** [1] - 111:10
**BOULEVARD** [2] - 2:7, 2:18
**boxes** [1] - 95:7
**boy** [1] - 38:20
**brain** [1] - 85:18
**Brainchild** [3] - 103:10, 103:13, 116:9
**break** [1] - 71:7
**Bridgeport** [2] - 30:19, 38:19
**brief** [1] - 86:16
**briefly** [2] - 10:10, 77:15
**brilliant** [1] - 103:11
**bring** [4] - 47:22, 61:11, 66:15, 101:18
**brings** [2] - 76:9, 104:24
**broadcast** [1] - 84:22
**Brother** [1] - 117:1
**Brothers** [2] - 26:12, 26:25
**brought** [1] - 86:13
**Bs** [1] - 116:12
**build** [1] - 105:23
**building** [11] - 7:13, 96:25, 97:12, 97:17, 99:18, 100:15, 100:17, 103:6, 104:3, 105:21, 116:3
**bunch** [1] - 34:2
**burden** [24] - 50:16, 61:15, 61:19, 64:22, 69:8, 61:16, 70:15, 71:1, 72:19, 72:20,

88:18, 88:20, 90:22, 91:11, 93:22, 93:23, 94:1, 94:6, 98:10, 99:3, 100:16, 100:18, 105:6, 112:6
**buried** [2] - 85:18, 101:8
**business** [2] - 108:22, 113:3
**Buy** [2] - 89:1, 89:23
**buy** [2] - 83:5, 115:2
**BY** [7] - 2:5, 2:10, 2:15, 2:22, 3:9, 3:10, 121:16

## C

**C-B-A-E** [2] - 103:19, 116:11
**CA** [2] - 2:19, 2:24
**CALIFORNIA** [6] - 1:2, 1:16, 1:23, 4:1, 121:9, 121:12
**camouflage** [6] - 96:13, 103:22, 104:12, 105:1, 105:2, 105:4
**cannot** [11] - 29:10, 56:18, 56:19, 60:16, 70:2, 97:1, 97:10, 97:11, 99:19, 100:8, 103:6
**CAPES** [1] - 2:5
**Capitol** [10] - 18:15, 18:17, 18:19, 18:20, 26:4, 34:22, 59:25, 81:18, 91:16
**captured** [1] - 64:3
**care** [4] - 10:2, 11:14, 37:24, 41:13
**careful** [1] - 117:13
**carefully** [3] - 16:25, 99:25, 100:7
**Case** [1] - 4:4
**case** [82] - 7:18, 7:20, 8:1, 8:3, 8:5, 8:11, 8:15, 9:3, 10:23, 15:19, 16:8, 17:10, 17:12, 19:23, 20:6, 21:17, 24:8, 24:22, 24:24, 25:14, 25:20, 28:11, 28:15, 30:19, 30:22, 31:5, 33:4, 35:3, 36:16, 38:17, 38:19, 41:8, 44:8, 45:2, 48:12, 48:16, 48:21, 49:10, 50:1, 50:22, 52:8, 53:12, 53:13, 53:23, 55:20, 56:9, 56:25, 57:8,

57:17, 57:19, 57:20, 57:23, 57:24, 58:8, 58:12, 58:16, 58:18, 58:20, 58:24, 59:1, 59:11, 60:5, 61:15, 64:13, 66:19, 72:24, 73:11, 75:8, 75:15, 76:6, 79:5, 89:6, 90:24, 96:16, 101:6, 107:9, 111:21, 118:6
**CASE** [1] - 1:8
**cases** [3] - 17:14, 78:17, 86:7
**cast** [1] - 117:22
**categories** [1] - 112:20
**categorizes** [1] - 96:18
**category** [1] - 112:23
**CBAE** [1] - 116:12
**CD** [1] - 89:16
**CDs** [2] - 46:21, 46:23
**CENTRAL** [2] - 1:2, 121:12
**CENTURY** [1] - 2:23
**ceremonies** [1] - 82:22
**certain** [18] - 18:23, 23:23, 35:2, 35:3, 51:9, 52:4, 56:2, 57:2, 57:5, 61:7, 85:5, 105:3, 107:25, 109:12, 109:15, 110:22, 112:1, 114:6
**certainly** [7] - 17:24, 25:14, 26:23, 36:22, 41:6, 88:7, 120:21
**CERTIFICATE** [1] - 121:5
**certificate** [1] - 61:9, 66:20, 66:22
**CERTIFY** [2] - 121:13, 121:17
**cetera** [4] - 5:24, 6:7, 7:12, 30:16
**challenge** [3] - 78:12, 101:2, 115:21
**chambers** [1] - 46:4
**chance** [1] - 90:21
**change** [2] - 49:16, 49:19
**changes** [3] - 4:13, 11:1
**characteristics** [1] - 70:8
**characterize** [2] - 115:3, 115:20
**characterizing** [1] - 115:8
**charged** [2] - 31:2,

31:18
**charges** [1] - 113:11
**chart** [6] - 83:25, 84:10, 86:21, 100:25, 101:2, 112:24
**charting** [2] - 119:3, 119:18
**charts** [14] - 57:5, 57:8, 83:23, 83:25, 84:2, 84:3, 84:5, 84:7, 84:10, 109:12, 109:16, 109:17, 112:25
**chatroom** [1] - 58:1
**checking** [1] - 95:7
**CHIEFFO** [2] - 2:22, 118:23
**Chike** [2] - 59:23, 61:16
**China** [1] - 83:19
**choices** [1] - 111:12
**choose** [2] - 54:15, 111:4
**chorus** [2] - 75:5, 101:15
**chose** [1] - 111:4
**Christian** [12] - 73:18, 84:1, 88:13, 88:14, 88:15, 88:17, 89:4, 89:7, 113:4, 113:5, 113:7, 113:9
**CHRISTINA** [1] - 1:4
**CHRISTINE** [1] - 2:15
**churches** [1] - 84:15
**cinder** [2] - 105:22, 105:24
**circle** [1] - 114:3
**Circuit** [6] - 4:14, 5:22, 8:15, 9:3, 9:15, 24:21
**circuit** [1] - 8:14
**circumstance** [1] - 33:7
**circumstances** [2] - 70:20, 114:7
**circumstantial** [11] - 52:14, 52:18, 53:1, 53:3, 53:5, 78:23, 79:4, 79:11, 81:8, 81:25, 113:22
**cited** [2] - 17:11, 30:20
**cities** [1] - 84:20
**city** [1] - 83:21
**claim** [30] - 15:25, 16:4, 19:1, 19:8, 19:18, 22:11, 24:20, 25:15, 26:24, 36:25, 44:5, 50:16, 50:19, 59:23, 61:11, 64:21,

66:15, 86:9, 90:16, 96:23, 100:1, 100:2, 100:3, 104:9, 110:18, 110:23, 111:3, 111:6
**claim's** [1] - 21:23
**claimed** [3] - 90:17, 95:4, 109:24
**claiming** [3] - 21:2, 23:2, 100:19
**claims** [3] - 15:25, 16:8, 17:15
**clarification** [3] - 6:9, 6:19, 39:21
**clarify** [2] - 18:4, 31:24
**classic** [3] - 35:24, 74:2, 75:18
**CLAYTON** [1] - 2:11
**cleaned** [1] - 28:25
**clear** [5] - 8:14, 45:1, 45:2, 97:11, 104:7
**CLERK** [10] - 4:3, 32:2, 46:7, 46:18, 46:20, 47:24, 48:1, 95:17, 120:16, 121:1
**click** [1] - 119:19
**clients** [12] - 29:4, 51:20, 89:12, 89:15, 96:20, 99:7, 103:23, 107:8, 109:4, 109:14, 110:10, 112:24
**close** [4] - 75:25, 99:5, 105:10
**closed** [1] - 90:24
**CLOSING** [1] - 3:8
**closing** [7] - 44:20, 45:17, 45:21, 48:8, 51:14, 72:17, 96:10
**co** [8] - 33:9, 34:17, 34:18, 66:12, 94:20, 96:3, 96:8, 96:9
**co-authors** [1] - 66:12
**co-counsel** [3] - 96:3, 96:8, 96:9
**co-owner** [1] - 33:9
**co-owners** [2] - 34:17, 34:18
**co-writers** [1] - 94:20
**codes** [1] - 8:2
**Cohen** [2] - 23:14, 95:1
**COHEN** [39] - 2:6, 6:3, 10:9, 10:12, 10:24, 11:9, 13:3, 14:6, 14:11, 14:15, 14:22, 15:2, 17:10, 17:18, 18:11, 18:20, 23:15, 23:21, 25:5, 25:12, 26:19, 30:18, 30:23,

31:23, 39:4, 39:25, 40:3, 41:7, 41:25, 42:7, 42:9, 42:16, 42:22, 43:2, 43:9, 44:24, 45:1, 45:16, 47:3

**coincidence** [1] - 118:7

**coincidentally** [1] - 111:9

**collar** [1] - 113:25

**colleague** [1] - 11:2

**combination** [8] - 7:2, 8:14, 8:25, 9:2, 9:21, 68:22, 68:23, 69:1

**combined** [1] - 65:14

**combines** [1] - 69:4

**comfortable** [1] - 9:5

**coming** [4] - 28:13, 79:2, 107:3, 109:20

**commence** [1] - 48:8

**comment** [1] - 113:21

**commentary** [1] - 58:12

**common** [14] - 12:6, 53:2, 67:25, 96:7, 98:14, 100:15, 100:17, 102:18, 103:1, 106:4, 106:5, 107:16, 113:4, 116:5

**commonplace** [14] - 11:12, 13:9, 13:14, 41:18, 60:16, 68:16, 68:20, 68:21, 92:10, 97:10, 99:18, 103:5, 103:12, 104:7

**communicate** [5] - 49:22, 49:24, 49:25, 57:21, 57:22

**communicating** [1] - 58:4

**communication** [1] - 59:7

**companies** [1] - 26:17

**company** [2] - 25:25, 57:13

**compared** [1] - 108:7

**compelled** [4] - 21:13, 21:16, 104:13, 105:3

**compilation** [3] - 8:6, 8:7, 69:2

**complete** [1] - 50:13

**completely** [3] - 102:8, 102:16, 111:17

**completing** [1] - 61:3

**complex** [1] - 118:13

**complicated** [1] - 118:22

**comply** [1] - 46:5

**component** [2] - 61:14, 66:18

**composition** [27] - 13:13, 41:17, 60:3, 61:18, 61:21, 62:2, 63:18, 63:19, 63:21, 64:2, 64:10, 64:11, 64:14, 64:16, 65:1, 65:3, 65:5, 65:7, 65:10, 66:21, 66:24, 66:25, 69:10, 72:4, 92:9, 93:2, 94:21

**composition's** [1] - 64:4

**compositions** [8] - 39:14, 41:22, 42:4, 62:11, 63:25, 70:24, 90:8, 92:17

**compromise** [1] - 68:15

**COMPUTER** [1] - 121:16

**computer** [1] - 74:8

**COMPUTER-AIDED** [1] - 121:16

**concept** [10] - 10:18, 10:20, 12:2, 38:23, 39:13, 39:17, 40:4, 40:22, 42:3, 62:20, 72:1, 93:1, 97:10, 97:21, 100:9, 100:20, 112:12, 112:13

**concepts** [2] - 60:15, 68:8

**concern** [2] - 7:7, 9:16

**concerning** [1] - 50:1

**concerns** [1] - 25:3

**concert** [6] - 81:17, 81:18, 81:24, 84:21, 110:12, 111:22

**concerts** [17] - 81:12, 81:16, 84:13, 84:14, 84:17, 84:19, 84:20, 85:1, 93:16, 98:23, 110:7, 110:8, 110:9, 110:15, 111:23

**conclude** [2] - 32:22, 66:22

**concluded** [2] - 33:13, 121:3

**concludes** [1] - 72:15

**conclusion** [3] - 82:6, 112:14, 120:25

**conclusions** [1] - 81:2

**conduct** [1] - 47:13

**conference** [3] - 55:23, 56:7, 56:9

**conferences** [2] - 56:1, 56:6

**confirmed** [1] - 84:18

**confronted** [2] - 32:24, 34:2

**confuse** [1] - 24:23

**confused** [1] - 24:23

**confusing** [3] - 12:12, 29:6, 34:8

**confusion** [1] - 56:4

**conjecture** [2] - 70:3, 113:13

**connect** [2] - 109:14, 110:14

**connection** [2] - 107:8, 113:6

**conscientious** [3] - 49:15, 57:14, 95:25

**conscious** [1] - 96:19

**consciously** [1] - 72:5

**consider** [22] - 47:11, 50:25, 51:7, 51:10, 52:3, 52:5, 52:11, 53:1, 53:3, 53:7, 53:9, 54:11, 55:9, 56:8, 56:25, 62:4, 66:10, 70:8, 70:18, 71:18, 100:9, 113:13

**consideration** [3] - 11:11, 57:14, 99:24

**considered** [3] - 49:11, 52:1, 55:1

**considering** [4] - 11:10, 40:9, 53:16, 55:18

**considers** [1] - 71:4

**consistent** [3] - 25:12, 27:12, 54:6

**consisting** [1] - 63:21

**consists** [2] - 51:1, 64:2

**constant** [1] - 82:10

**constituent** [3] - 8:1, 8:4, 71:8

**constitutes** [2] - 61:7, 69:1

**consult** [2] - 48:14, 50:3

**consulting** [1] - 58:13

**contact** [1] - 58:10

**contacts** [1] - 74:21

**contain** [1] - 67:23

**contained** [1] - 68:7

**contains** [3] - 13:12, 41:16, 92:9

**contemplated** [1] - 36:23

**contend** [5] - 61:16, 62:17, 64:13, 64:15, 68:13

**contends** [1] - 68:10

**content** [1] - 80:16

**contents** [1] - 57:7

**context** [8] - 7:8, 7:14, 25:19, 98:13, 107:13, 108:2, 111:17, 113:17

**continue** [2] - 50:5, 120:6

**contract** [2] - 26:3, 26:5

**contradict** [1] - 106:19

**contradicted** [1] - 53:25

**contradictory** [1] - 102:16

**contrary** [2] - 33:17, 80:25

**contributed** [2] - 31:6, 66:5

**contributing** [1] - 73:24

**contribution** [6] - 4:19, 4:20, 33:8, 66:1, 66:3, 66:14

**contributions** [5] - 33:20, 35:13, 65:13, 66:9, 73:25

**contributory** [17] - 15:11, 16:3, 16:7, 16:11, 18:2, 19:17, 20:9, 21:5, 21:23, 22:8, 23:1, 24:7, 24:20, 25:15, 25:21, 26:24, 44:5

**control** [4] - 21:3, 56:11, 66:10, 73:7

**controls** [2] - 51:18, 119:2

**convince** [2] - 38:23, 118:8

**convinced** [1] - 32:5

**copied** [31] - 14:25, 15:6, 17:3, 24:16, 27:18, 32:17, 32:21, 36:5, 36:10, 43:11, 43:13, 43:15, 43:18, 43:21, 61:21, 62:5, 62:6, 65:2, 69:9, 72:3, 72:6, 72:7, 72:13, 77:19, 77:22, 78:14, 78:18, 94:24, 99:25, 100:19, 104:2

**copies** [5] - 15:17, 29:21, 35:18, 63:2, 64:18

**copy** [14] - 6:3, 21:2, 34:6, 37:1, 37:20, 44:3, 48:13, 61:4, 62:22, 62:23, 67:18, 73:8, 85:23, 86:1

**copying** [38] - 5:24,

6:7, 6:24, 7:23, 8:19, 16:1, 17:5, 19:9, 22:1, 31:4, 33:1, 33:21, 34:20, 35:5, 36:18, 62:6, 67:4, 68:2, 68:6, 68:18, 69:7, 70:14, 71:9, 78:13, 78:19, 78:20, 78:22, 79:3, 79:20, 85:9, 85:12, 85:13, 85:20, 85:24, 91:7, 100:1, 105:9

**Copyright** [4] - 5:19, 5:23, 61:9, 66:20

**copyright** [113] - 6:6, 8:7, 8:8, 8:20, 9:4, 9:10, 10:1, 15:14, 15:18, 15:22, 15:24, 18:5, 18:12, 20:1, 22:21, 23:9, 24:2, 38:14, 60:2, 60:8, 60:9, 60:12, 60:17, 60:19, 60:25, 61:3, 61:5, 61:10, 61:11, 61:12, 61:13, 61:17, 61:20, 62:15, 62:16, 62:18, 62:19, 62:22, 63:8, 63:10, 63:16, 63:18, 63:20, 63:22, 64:4, 64:14, 64:15, 64:17, 64:19, 64:20, 64:21, 64:25, 65:4, 65:11, 65:19, 66:15, 66:16, 66:17, 66:20, 66:24, 66:25, 67:2, 67:4, 67:6, 67:7, 67:12, 67:20, 68:1, 68:5, 68:19, 68:23, 68:24, 69:5, 69:6, 72:14, 73:5, 73:9, 73:19, 75:11, 77:14, 77:18, 77:21, 77:23, 77:24, 77:25, 78:8, 78:10, 78:11, 78:17, 86:7, 88:4, 88:6, 95:2, 95:4, 97:6, 97:10, 97:17, 98:6, 99:19, 99:22, 104:8, 104:9, 114:9, 114:11, 115:16

**copyrightable** [12] - 11:23, 35:14, 39:15, 41:23, 42:5, 65:13, 66:23, 69:3, 92:18, 93:3, 99:24, 104:5

**copyrighted** [23] - 15:18, 15:20, 19:3, 24:13, 60:13, 60:16, 60:21, 61:4, 61:7, 61:25, 62:5, 62:8, 62:14, 62:24, 63:1,

63:2, 63:4, 63:5,
63:14, 63:23, 64:19,
66:7, 68:4
**copyrights** [4] - 7:19,
7:21, 64:1, 90:8
**Corp** [1] - 60:1
**corporate** [2] - 91:14,
116:23
**corporation** [1] -
57:13
**correct** [17] - 5:16,
13:24, 15:23, 16:19,
16:24, 26:11, 26:13,
27:1, 27:7, 42:15,
42:16, 42:21, 43:9,
43:16, 44:7, 46:14
**CORRECT** [1] -
121:17
**corrected** [2] - 43:20,
47:18
**corrections** [1] -
117:18
**correctly** [2] - 21:1,
34:13
**corroborated** [1] -
102:21
**corroborating** [1] -
91:1
**costs** [3] - 26:18,
26:19, 26:20
**counsel** [14] - 4:6, 6:3,
12:3, 24:19, 81:14,
96:3, 96:8, 96:9,
98:17, 101:8, 107:3,
108:13, 118:24
**COUNSEL** [1] - 2:2
**counsel's** [1] - 86:6
**count** [4] - 20:9, 50:8,
113:19, 113:20
**country** [1] - 84:14
**COUNTY** [1] - 121:7
**couple** [4] - 17:2,
102:12, 103:8,
106:16
**course** [6] - 45:2,
49:14, 56:5, 105:12,
106:17, 107:4
**COURT** [152] - 1:1,
1:22, 4:8, 5:6, 5:8,
5:10, 6:5, 6:11, 6:14,
6:18, 6:20, 7:6, 7:16,
8:9, 9:9, 9:14, 9:22,
10:1, 10:5, 10:7,
10:11, 10:22, 10:25,
11:3, 11:17, 12:9,
12:14, 12:17, 12:23,
13:1, 13:18, 13:20,
13:22, 13:25, 14:5,
14:7, 14:12, 14:16,
14:23, 15:5, 15:13,

16:12, 16:17, 16:20,
17:8, 17:14, 17:17,
17:21, 18:3, 18:14,
18:19, 19:2, 19:6,
19:10, 19:19, 19:22,
20:5, 20:15, 20:20,
21:7, 21:10, 21:15,
22:5, 22:12, 22:16,
22:19, 23:5, 23:14,
23:19, 24:11, 25:16,
25:24, 26:2, 26:8,
26:12, 26:14, 26:22,
27:3, 27:8, 27:10,
27:18, 27:25, 28:7,
28:16, 28:20, 28:24,
29:12, 29:15, 29:19,
30:22, 31:7, 31:11,
31:14, 31:25, 32:4,
32:11, 33:6, 33:11,
33:24, 34:23, 35:8,
35:11, 35:17, 36:2,
36:8, 36:14, 37:6,
37:10, 37:12, 37:24,
38:8, 38:16, 38:20,
39:2, 40:8, 40:10,
41:3, 41:8, 41:13,
42:1, 42:8, 42:10,
42:17, 42:23, 43:3,
43:10, 43:17, 43:24,
44:8, 44:13, 44:15,
44:23, 44:25, 45:5,
45:19, 45:23, 46:9,
46:14, 46:19, 47:2,
47:5, 48:2, 95:9,
95:12, 95:14, 95:20,
117:16, 119:1,
120:12, 120:20,
121:12, 121:25
**court** [13] - 49:6, 50:2,
52:7, 55:10, 58:10,
59:2, 59:11, 59:17,
81:21, 119:25,
120:1, 120:3
**Court** [10] - 6:21, 7:5,
8:4, 10:13, 37:11,
50:8, 98:4, 99:17,
99:20, 100:11
**Court's** [2] - 34:13,
39:19
**court's** [4] - 32:2,
46:7, 51:23, 121:1
**courtroom** [3] - 50:15,
55:24, 59:6
**covered** [1] - 60:12
**covers** [1] - 65:19
**cows** [1] - 36:19
**create** [7] - 25:2, 73:3,
76:8, 76:22, 81:4,
82:10, 98:25
**created** [36] - 14:14,

14:18, 33:18, 35:21,
42:25, 43:5, 62:20,
65:20, 67:17, 70:17,
70:19, 73:17, 74:6,
74:23, 75:9, 75:10,
76:19, 76:20, 79:9,
82:8, 87:25, 90:19,
91:2, 91:10, 91:12,
94:4, 94:6, 94:11,
94:17, 98:19, 101:9,
101:12, 103:16,
105:19, 105:25,
115:6
**creates** [1] - 65:16
**creating** [9] - 14:3,
14:10, 42:13, 42:19,
66:12, 69:13, 69:18,
93:14, 106:23
**creation** [14] - 4:18,
65:24, 70:20, 72:9,
72:25, 73:1, 73:4,
73:19, 91:15, 105:7,
105:13, 106:18,
109:7, 112:17
**creative** [2] - 8:3, 8:4
**creativity** [3] - 67:19,
67:23, 69:5
**creator** [1] - 65:12
**creators** [2] - 65:9,
74:4
**credit** [1] - 76:2
**credited** [1] - 94:20
**credits** [3] - 32:21,
44:3, 76:1
**criteria** [1] - 71:6
**critical** [3] - 12:15,
82:17, 109:12
**Cross** [10] - 89:17,
90:1, 90:4, 90:6,
90:12, 110:19,
110:20, 110:22,
117:25
**cross** [1] - 20:16
**cross-purposes** [1] -
20:16
**crucial** [1] - 83:8
**Cs** [2] - 102:5, 116:12
**CSR** [2] - 1:22, 121:24
**current** [1] - 13:3
**cut** [1] - 86:24
**CV** [2] - 1:8, 4:4

**D**

**da-da-da-da** [1] - 81:2
**damages** [1] - 38:5
**Dark** [78] - 10:19,
13:12, 14:3, 14:10,
14:14, 15:1, 16:14,
18:16, 19:25, 28:3,

32:18, 36:5, 39:13,
40:17, 41:16, 41:21,
42:4, 42:13, 42:19,
42:25, 43:14, 43:18,
43:21, 62:11, 62:20,
68:14, 69:13, 69:14,
69:18, 70:14, 70:17,
70:19, 70:21, 70:24,
72:1, 72:9, 72:11,
72:13, 76:10, 76:14,
77:8, 79:9, 79:16,
81:1, 82:8, 88:1,
90:20, 91:16, 91:20,
92:8, 92:17, 93:2,
93:4, 93:14, 94:4,
94:24, 95:3, 101:8,
101:12, 101:14,
101:21, 101:24,
103:11, 103:13,
103:17, 104:18,
105:15, 110:4,
110:14, 114:12,
115:23, 116:2,
116:4, 116:17,
117:9, 118:1, 119:7,
120:7
**data** [1] - 110:18
**date** [1] - 50:14
**DATE** [1] - 121:21
**David** [1] - 120:17
**days** [8] - 72:23,
81:21, 83:3, 83:5,
85:5, 107:18, 111:1,
111:5
**deal** [4] - 4:9, 7:12,
26:22, 74:21
**dealing** [1] - 45:12
**deals** [2] - 8:5, 9:18
**dealt** [1] - 24:21
**decide** [25] - 33:5,
33:6, 33:23, 37:13,
45:14, 45:15, 48:21,
49:10, 50:22, 52:7,
52:25, 53:6, 53:13,
54:11, 54:13, 56:2,
59:11, 75:19, 80:8,
95:6, 96:3, 96:6,
111:10, 115:3, 119:8
**decided** [3] - 59:1,
90:7, 118:3
**deciding** [9] - 50:25,
51:10, 53:12, 55:1,
55:2, 56:24, 66:8,
75:19
**decision** [3] - 49:15,
49:18, 50:20
**Decker** [12] - 76:16,
80:11, 80:12, 80:25,
87:16, 102:3,
102:13, 102:25,

104:13, 116:5,
118:15
**declare** [1] - 45:25
**deemed** [2] - 34:9,
112:10
**deeply** [2] - 89:7,
96:21
**DEFENDANT** [1] -
1:10
**defendant** [24] - 5:17,
6:13, 14:23, 14:25,
19:24, 20:7, 20:8,
20:10, 20:12, 22:22,
27:18, 36:5, 43:12,
43:21, 70:15, 72:3,
72:5, 72:7, 72:12,
83:15, 90:10, 94:22,
95:3
**Defendant's** [1] - 10:4
**defendant's** [9] - 4:12,
5:11, 9:8, 10:5,
32:15, 36:3, 62:1,
73:11, 90:25
**DEFENDANTS** [2] -
2:13, 2:20
**defendants** [71] - 5:1,
14:2, 14:8, 14:12,
14:13, 16:9, 18:23,
19:4, 21:17, 23:24,
26:9, 28:8, 28:13,
30:14, 30:15, 31:4,
31:19, 31:24, 32:16,
32:17, 34:6, 34:18,
42:12, 42:17, 42:23,
42:24, 46:25, 59:23,
60:3, 61:17, 61:20,
62:6, 62:8, 62:17,
62:19, 65:2, 68:12,
69:9, 69:12, 69:17,
69:23, 70:2, 70:6,
70:9, 70:12, 70:19,
77:19, 77:22, 78:14,
78:17, 78:18, 79:8,
81:9, 83:7, 84:9,
88:12, 89:12, 90:16,
90:22, 91:14, 91:22,
93:13, 93:19, 94:2,
94:3, 113:9, 116:21,
116:24, 119:12,
119:24, 120:6
**defendants'** [2] - 62:3,
86:2
**defense** [5] - 50:17,
50:19, 81:14, 86:5,
117:15
**defenses** [1] - 62:17
**definition** [3] - 29:5,
35:13, 60:8
**delete** [2] - 5:13, 47:19
**deleted** [2] - 32:9,

47:20
**deliberate** [2] - 46:13, 120:23
**deliberately** [2] - 54:14, 72:6
**deliberates** [1] - 121:2
**deliberating** [1] - 95:16
**deliberations** [9] - 48:9, 48:14, 49:3, 49:5, 49:21, 50:5, 50:14, 57:21, 117:13
**demonstrate** [4] - 70:4, 101:4, 108:2, 109:9
**demonstrated** [3] - 100:16, 103:9, 104:17
**demonstrates** [1] - 105:14
**demonstrating** [1] - 115:19
**demonstrative** [1] - 102:23
**denied** [3] - 59:12, 78:19, 82:12
**denies** [1] - 78:20
**denigrate** [1] - 107:23
**denigrating** [1] - 116:15
**deny** [6] - 60:3, 78:17, 81:9, 85:2, 85:4
**denying** [1] - 56:8
**deposited** [1] - 61:6
**depositing** [1] - 61:4
**deposition** [3] - 55:5, 55:9, 114:21
**derivative** [3] - 15:16, 20:21, 20:22, 26:24, 29:20, 44:5, 60:11, 60:21, 62:14, 63:1, 65:18, 65:19, 115:11
**derivatively** [2] - 20:17, 20:23
**derived** [2] - 17:12, 81:3
**descending** [1] - 80:15
**described** [1] - 119:4
**deserves** [3] - 54:24, 55:18, 57:11
**despite** [1] - 90:17
**detail** [1] - 62:21
**details** [1] - 71:12
**determination** [3] - 34:16, 36:2, 70:18
**determine** [5] - 10:17, 12:1, 41:2, 71:24, 116:22
**determining** [4] -

11:16, 61:6, 62:3, 70:9
**detriment** [1] - 97:2
**devices** [1] - 58:18
**dictionaries** [1] - 58:13
**differ** [2] - 27:14, 51:17
**difference** [3] - 5:1, 39:20, 104:17
**differences** [5] - 54:11, 93:8, 104:14, 104:25, 105:2
**different** [22] - 32:14, 33:7, 36:9, 52:23, 54:7, 64:12, 74:4, 76:17, 76:24, 78:1, 99:6, 104:15, 105:20, 105:21, 106:1, 106:2, 106:3, 106:19, 116:3
**differently** [3] - 54:10, 115:20, 119:2
**differs** [1] - 54:12
**difficult** [1] - 120:2
**digital** [1] - 15:20
**Digital** [1] - 63:6
**diligently** [1] - 49:6
**direct** [37] - 15:12, 15:25, 16:1, 16:4, 16:10, 17:19, 17:25, 18:25, 19:8, 19:9, 19:22, 20:6, 20:11, 21:6, 21:11, 22:17, 22:18, 23:2, 23:18, 24:1, 24:9, 25:3, 25:14, 25:21, 29:7, 30:7, 33:1, 33:21, 35:16, 52:14, 52:15, 53:3, 53:5, 79:10, 81:11, 81:22
**directed** [1] - 30:14
**direction** [1] - 21:3
**directly** [7] - 16:10, 17:12, 20:19, 21:20, 31:18, 34:21, 35:10
**director** [1] - 39:10
**disagree** [3] - 11:5, 40:7, 102:4
**disagreement** [1] - 115:19
**discharged** [1] - 50:10
**disconnect** [1] - 98:24
**disconnected** [1] - 111:17
**discoveries** [1] - 68:9
**discovery** [1] - 60:15
**discuss** [1] - 58:9
**discussed** [5] - 6:22, 49:11, 58:17, 58:19,

99:15
**discussing** [2] - 57:20, 57:24
**DISCUSSION** [1] - 3:4
**discussion** [5] - 7:21, 9:20, 27:11, 34:11, 49:17
**dislikes** [1] - 48:20
**dismiss** [1] - 28:14
**dismissal** [1] - 26:17
**dismissed** [1] - 31:5
**dismissing** [1] - 28:16
**display** [4] - 15:18, 29:24, 63:5, 63:12
**displaying** [2] - 60:11, 60:21
**displays** [1] - 62:14
**dispute** [5] - 102:3, 102:13, 102:22, 102:24, 114:11
**disputed** [2] - 6:14, 83:11
**disregard** [3] - 51:25, 56:23, 71:16
**dissection** [1] - 71:7
**disseminated** [8] - 14:1, 42:12, 69:20, 82:2, 93:12, 93:15, 98:11
**dissemination** [9] - 69:22, 70:11, 82:14, 83:3, 88:19, 90:18, 107:10, 107:11, 119:11
**dissimilar** [2] - 102:10, 102:15
**distinct** [1] - 64:1
**distinction** [8] - 10:8, 11:24, 15:23, 16:5, 19:20, 20:14, 53:4, 113:2
**distinctive** [1] - 118:16
**distinguishable** [1] - 8:1
**distinguished** [1] - 12:16
**distribute** [5] - 15:17, 29:13, 34:6, 63:2, 99:7
**distributed** [23] - 15:1, 15:6, 15:12, 16:14, 16:22, 17:3, 18:17, 19:25, 20:3, 24:16, 27:6, 27:19, 29:21, 32:18, 36:5, 37:14, 43:11, 43:14, 43:15, 43:18, 43:21, 72:13, 94:24
**distributes** [1] - 62:13

**distributing** [2] - 60:10, 60:20
**distribution** [13] - 16:2, 16:18, 23:3, 23:13, 23:17, 27:14, 63:12, 99:1, 99:6, 109:9, 110:18, 112:2, 112:16
**distributor** [2] - 28:3, 36:22
**DISTRICT** [5] - 1:1, 1:2, 1:4, 121:12
**DIVISION** [1] - 1:2
**dixit** [1] - 35:7
**DO** [2] - 121:13, 121:16
**doctrine** [4] - 8:22, 9:1, 9:4, 22:9
**document** [1] - 98:16
**documentation** [1] - 109:25
**documents** [3] - 57:7, 91:3, 111:24
**domain** [2] - 67:14, 80:16
**done** [9] - 21:22, 31:20, 48:25, 56:5, 78:19, 79:12, 101:2, 101:19, 117:8
**Dove** [1] - 82:21
**down** [6] - 33:14, 71:7, 85:16, 91:25, 103:1, 107:12
**dozen** [1] - 76:24
**Dr** [33] - 25:25, 80:11, 80:12, 80:25, 86:8, 86:21, 87:16, 87:20, 88:7, 92:12, 97:25, 99:16, 101:1, 101:3, 101:10, 101:13, 101:23, 102:7, 102:13, 102:21, 102:24, 102:25, 103:9, 103:16, 104:13, 104:17, 104:22, 105:17, 105:22, 116:5, 118:11, 118:15, 119:4
**draw** [1] - 107:21
**dropping** [1] - 108:4
**during** [17] - 48:14, 49:21, 52:22, 55:21, 57:21, 58:19, 60:6, 60:7, 62:15, 64:19, 77:8, 82:14, 84:13, 84:23, 86:5, 86:12, 88:20
**duty** [3] - 48:12, 48:15, 51:20

**E**

**early** [3] - 44:21, 76:6, 113:7
**ears** [2] - 85:18, 93:9
**earth** [1] - 107:7
**EAST** [1] - 2:23
**eating** [1] - 113:23
**education** [2] - 55:14, 55:19
**effect** [3] - 44:2, 49:19, 115:1
**effort** [3] - 93:20, 98:25, 118:8
**eight** [7] - 72:23, 86:23, 87:16, 92:1, 116:5, 118:16, 118:19
**either** [11] - 15:12, 19:11, 21:25, 22:25, 36:14, 53:5, 53:10, 55:23, 84:22, 97:20, 103:11
**elaborate** [1] - 74:9
**elect** [1] - 49:3
**electronic** [1] - 57:25
**element** [7] - 35:25, 66:9, 98:9, 99:9, 99:10, 99:11, 114:3
**elementary** [1] - 116:14
**elements** [21] - 8:13, 8:25, 9:2, 67:14, 68:21, 68:24, 68:25, 69:2, 69:9, 69:15, 71:8, 71:9, 71:15, 80:4, 80:13, 87:21, 98:3, 98:4, 98:5, 99:23
**ELIAS** [4] - 1:22, 121:11, 121:23, 121:24
**eligible** [1] - 68:24
**eliminate** [1] - 5:1
**eliminated** [1] - 11:22
**Elizabeth** [1] - 59:23
**email** [1] - 57:25
**Emanuel** [2] - 59:22, 61:16
**embarrassed** [1] - 118:14
**embodied** [1] - 64:11
**Emmanuel** [1] - 75:3
**employed** [1] - 108:11
**employer** [1] - 58:5
**enabled** [1] - 22:8
**enabling** [1] - 22:9
**encompass** [2] - 61:13, 66:17
**end** [6] - 21:9, 36:16,

45:8, 72:19, 77:12,
118:7
**ends** [2] - 75:5, 91:9
**enforce** [2] - 63:15,
67:11
**engaged** [1] - 107:1
**English** [1] - 98:12
**enter** [1] - 74:17
**entire** [3] - 9:1,
100:21, 107:9
**entirely** [3] - 32:14,
40:7, 106:2
**entirety** [7] - 97:18,
101:3, 101:17,
115:23, 116:1,
117:9, 117:21
**entities** [5] - 19:10,
23:22, 25:2, 28:8,
31:19
**entitled** [3] - 57:14,
59:10, 68:18
**entity** [5] - 18:21, 21:4,
22:15, 24:15, 26:1
**equal** [1] - 57:12
**equipment** [3] - 46:15,
46:16, 46:23
**ERIC** [1] - 2:10
**error** [2] - 10:22, 56:4
**ESQ** [9] - 2:5, 2:6,
2:10, 2:15, 2:16,
2:16, 2:17, 2:17,
2:22
**essential** [1] - 30:6
**essentially** [5] - 13:6,
13:9, 17:4, 99:19,
107:14
**establish** [2] - 15:25,
16:1
**established** [3] - 9:3,
70:10, 101:22
**establishes** [1] -
103:5
**et** [5] - 4:5, 5:24, 6:7,
7:12, 30:16
**ET** [2] - 1:6, 1:9
**evenly** [1] - 103:23
**event** [1] - 54:9
**eventually** [1] - 118:6
**evidence** [161] - 4:17,
13:12, 14:1, 14:8,
14:13, 14:17, 14:25,
19:12, 23:6, 24:14,
24:24, 25:11, 25:13,
28:2, 28:11, 29:23,
29:25, 32:17, 33:17,
35:1, 35:4, 36:20,
37:15, 39:12, 41:16,
41:21, 42:2, 42:11,
42:18, 42:24, 43:4,
43:13, 47:10, 48:11,

48:16, 48:22, 49:1,
49:11, 49:20, 50:17,
50:18, 50:20, 50:25,
51:3, 51:8, 51:9,
51:13, 51:15, 51:16,
51:20, 51:22, 51:25,
52:2, 52:4, 52:5,
52:7, 52:8, 52:9,
52:10, 52:14, 52:15,
52:18, 52:22, 53:1,
53:2, 53:3, 53:5,
53:6, 53:25, 54:3,
54:21, 54:25, 55:1,
55:20, 56:3, 56:11,
56:12, 56:14, 56:15,
56:22, 56:24, 56:25,
57:3, 57:6, 57:7,
57:9, 57:11, 57:17,
59:1, 59:19, 60:5,
61:19, 61:23, 61:24,
64:23, 65:6, 65:24,
66:19, 69:12, 69:17,
69:19, 69:23, 70:7,
70:16, 70:20, 70:23,
71:21, 73:14, 77:15,
78:4, 78:23, 79:4,
79:6, 79:7, 79:11,
79:12, 79:15, 79:23,
80:7, 80:10, 81:8,
81:25, 82:5, 85:24,
86:3, 88:25, 90:17,
90:25, 91:1, 91:3,
92:4, 92:7, 92:8,
92:13, 92:16, 92:21,
92:25, 93:12, 93:15,
93:21, 94:3, 94:7,
94:23, 106:6,
108:16, 109:8,
109:23, 110:5,
110:6, 111:3,
111:11, 111:13,
111:18, 112:20,
113:14, 113:22,
115:18, 118:24,
119:2
**evil** [2] - 85:8, 85:22
**exact** [3] - 13:6, 38:6,
103:17
**exactly** [7] - 18:18,
35:8, 39:18, 41:5,
96:12, 97:15, 102:20
**examines** [1] - 71:22
**examining** [1] - 95:1
**example** [10] - 18:15,
28:9, 52:20, 74:2,
75:18, 75:21, 78:23,
79:1, 92:13, 103:15
**examples** [1] - 103:14
**except** [3] - 49:24,
50:1, 57:20

**exception** [1] - 9:6
**exclude** [7] - 18:12,
24:2, 60:9, 60:20,
63:15, 67:4, 67:12
**excluded** [2] - 29:6,
51:24
**exclusive** [19] - 15:14,
15:23, 20:13, 23:10,
24:9, 27:21, 27:23,
29:8, 29:11, 29:18,
29:22, 30:6, 30:15,
31:20, 34:9, 62:22,
62:23, 63:9, 73:7
**excuse** [2] - 96:9,
108:6
**excused** [1] - 58:22
**excusing** [1] - 111:11
**exercise** [1] - 63:9
**exercised** [1] - 66:10
**exhibit** [5] - 56:13,
56:17, 56:18, 75:23,
78:10
**Exhibit** [2] - 66:19,
104:21
**exhibits** [4] - 51:3,
51:8, 57:3, 83:24
**Exhibits** [1] - 117:11
**existed** [1] - 109:24
**existence** [2] - 73:6,
75:12
**existing** [4] - 65:17,
65:20, 67:24, 115:10
**exists** [3] - 25:3, 99:2,
112:5
**experience** [4] - 53:2,
55:14, 55:19, 107:21
**expert** [8] - 71:7,
76:15, 80:3, 80:6,
86:6, 97:24, 101:9,
108:9
**experts** [3] - 83:16,
92:20, 107:23
**explain** [6] - 11:15,
57:6, 60:6, 62:20,
79:12, 80:18
**explained** [5] - 63:23,
76:4, 81:9, 87:16,
88:2
**explains** [1] - 40:4
**explanation** [2] - 7:1,
52:23
**exploit** [1] - 120:7
**exposed** [2] - 57:18,
59:16
**exposure** [1] - 113:7
**expression** [46] - 6:25,
8:16, 8:18, 11:12,
13:8, 13:9, 13:14,
39:15, 40:20, 41:23,
42:6, 60:16, 61:2,

61:21, 62:10, 64:4,
64:18, 65:2, 68:2,
68:3, 68:12, 68:16,
68:19, 68:20, 68:22,
70:25, 71:5, 71:12,
72:2, 72:4, 72:7,
72:11, 92:11, 92:19,
92:22, 93:3, 97:10,
99:18, 100:12,
100:19, 103:12,
104:7, 104:10,
105:8, 112:9, 112:15
**extend** [1] - 68:20
**extent** [3] - 7:24, 8:17,
33:20
**external** [1] - 71:5
**extracted** [2] - 8:17,
99:23
**extremely** [1] - 45:24
**extrinsic** [11] - 11:25,
12:1, 13:16, 40:18,
71:2, 71:4, 71:6,
71:14, 80:2, 80:10,
92:20
**extrinsically** [1] -
71:20

## F

**Facebook** [1] - 58:2
**fact** [18] - 18:17,
22:20, 22:22, 28:21,
31:4, 52:15, 52:19,
52:21, 52:25, 54:21,
74:3, 82:22, 89:20,
101:4, 110:1,
113:16, 115:3,
115:24
**factors** [2] - 54:4, 80:3
**facts** [14] - 23:25,
48:15, 48:16, 51:1,
51:4, 51:5, 51:10,
51:16, 52:19, 53:13,
57:2, 57:4, 60:14,
96:4
**fail** [1] - 104:10
**failing** [1] - 8:24
**fair** [5] - 43:25, 57:14,
59:10, 59:12, 108:22
**fairly** [2] - 37:8, 88:5
**fairness** [1] - 59:16
**fall** [1] - 22:25
**family** [1] - 58:4
**far** [4] - 9:12, 78:3,
80:10, 119:11
**fast** [3] - 106:10,
113:23, 113:24
**favor** [2] - 117:6,
117:15
**favorite** [1] - 86:6

**FEDERAL** [2] - 1:22,
121:25
**fellow** [1] - 57:20
**felt** [2] - 74:10, 114:6
**Ferrara** [23] - 80:20,
80:21, 86:5, 86:21,
87:20, 92:12, 97:25,
99:16, 101:1, 101:3,
101:10, 101:13,
101:23, 102:7,
102:21, 102:24,
103:9, 104:17,
104:21, 104:22,
105:22, 118:11,
119:4
**Ferrara's** [2] - 80:25,
88:7
**few** [2] - 47:6, 117:18
**Fifth** [1] - 118:17
**fifth** [1] - 77:11
**figure** [1] - 45:11
**filed** [13] - 44:14,
77:10, 94:19, 111:1,
111:6, 114:11,
114:15, 114:24,
117:25, 119:22,
119:23, 119:25
**filing** [1] - 90:4
**filling** [1] - 89:22
**filter** [1] - 71:16
**final** [1] - 91:13
**finally** [2] - 47:14,
47:21
**financial** [1] - 97:4
**fine** [5] - 6:19, 10:14,
13:18, 14:11, 46:25
**finger** [2] - 35:5, 109:2
**finish** [2] - 44:21,
44:22
**finished** [3] - 35:24,
46:3, 75:10
**first** [20] - 21:24,
37:18, 45:8, 45:20,
47:9, 60:8, 72:24,
74:6, 76:21, 77:23,
79:25, 90:4, 92:5,
98:6, 100:25,
101:10, 101:12,
101:24, 106:15,
119:6
**FIRST** [1] - 1:23
**fit** [1] - 37:11
**fits** [1] - 73:15
**five** [4] - 5:15, 17:1,
107:7, 120:1
**fixation** [1] - 64:8
**fixed** [1] - 61:1
**Flags** [1] - 84:16
**Flame** [2] - 74:18,
119:20

**flat** [1] - 46:23
**FLOOR** [1] - 2:7
**focus** [4] - 73:12, 94:25, 99:13, 103:21
**focusing** [1] - 97:16
**folks** [1] - 44:19
**follow** [4] - 48:18, 59:13, 59:14, 109:21
**following** [7] - 4:13, 4:16, 15:15, 20:6, 23:10, 32:16, 65:23
**food** [2] - 113:23, 113:24
**FOR** [2] - 121:11, 121:12
**FOREGOING** [1] - 121:14
**foresee** [1] - 48:4
**forget** [1] - 54:8
**FORM** [1] - 121:16
**form** [22] - 11:6, 11:15, 11:19, 12:19, 19:15, 27:11, 27:25, 28:1, 28:22, 30:4, 38:25, 39:6, 39:23, 39:24, 40:6, 41:4, 50:11, 50:13, 58:3, 96:4, 100:7, 117:2
**formal** [1] - 61:8
**format** [1] - 46:22
**forming** [1] - 90:1
**forms** [5] - 4:10, 8:2, 11:4, 72:17, 111:22
**FORSYTH** [1] - 2:7
**forth** [1] - 107:24
**FORTH** [1] - 121:15
**forward** [2] - 107:3, 109:8
**four** [19] - 29:21, 42:10, 73:24, 76:7, 78:7, 86:22, 87:10, 87:11, 90:12, 91:22, 94:20, 101:25, 102:2, 106:7, 106:9, 106:15, 107:6, 107:24, 116:11
**fourth** [2] - 73:17, 75:7
**frankly** [1] - 98:2
**Freddie** [1] - 75:7
**friend** [1] - 81:16
**full** [1] - 87:9
**fully** [1] - 49:11
**function** [1] - 108:10
**furnished** [1] - 91:19
**FURTHER** [1] - 121:17

**G**

**GABRIELLA** [1] - 2:17
**gain** [2] - 59:6, 97:4

**game** [1] - 108:22
**garden** [1] - 52:23
**general** [3] - 24:17, 63:10, 113:3
**generic** [1] - 64:5
**genesis** [1] - 8:22
**genre** [3] - 108:20, 109:3, 112:25
**genres** [2] - 88:24, 108:18
**gentlemen** [10] - 48:2, 72:15, 73:17, 74:18, 95:22, 108:1, 114:1, 115:16, 119:1, 120:12
**gist** [1] - 13:10
**given** [5] - 19:22, 22:3, 53:4, 55:19, 103:14
**goal** [1] - 74:1
**God** [1] - 106:10
**gonna** [32] - 4:14, 6:21, 11:1, 25:9, 27:25, 29:15, 31:21, 36:17, 38:8, 45:14, 45:24, 48:7, 86:15, 92:5, 92:23, 96:3, 96:4, 97:14, 97:25, 98:8, 99:3, 101:2, 106:11, 106:12, 107:4, 107:19, 110:19, 114:19, 115:3, 116:19, 117:7
**gospel** [4] - 73:18, 84:2, 89:4, 119:13
**gotta** [2] - 32:12, 106:11
**Gottwald** [9] - 59:24, 76:21, 81:12, 82:7, 91:20, 94:25, 95:2, 105:16, 106:23
**Grammy** [3] - 82:19, 82:20, 89:21
**Grammys** [1] - 82:23
**grant** [1] - 56:7
**granted** [1] - 18:8
**granting** [1] - 56:8
**GRAY** [1] - 1:6
**Gray** [25] - 4:5, 59:22, 61:16, 74:17, 74:25, 75:24, 76:1, 76:4, 82:21, 84:12, 84:13, 84:17, 84:21, 89:20, 90:1, 90:5, 90:9, 94:16, 98:22, 109:13, 114:16, 117:23, 118:2, 119:12, 119:19
**Gray's** [2] - 81:12, 82:18
**great** [3] - 38:16,

74:14, 104:25
**greatly** [1] - 95:25
**GREENBERG** [1] - 2:21
**group** [1] - 6:6
**Group** [2] - 28:19, 47:19
**guess** [7] - 18:14, 19:2, 24:11, 27:11, 36:15, 38:3, 56:21
**guidance** [2] - 7:9, 46:2
**guy** [2] - 78:24, 79:2

**H**

**habits** [1] - 109:5
**half** [3] - 25:22, 84:16, 93:4
**half-time** [1] - 84:16
**hand** [4] - 8:3, 26:23, 54:17, 65:16
**hang** [1] - 107:9
**HANLEY** [1] - 2:11
**happy** [2] - 37:22, 37:24
**hard** [1] - 92:12
**harmony** [2] - 64:2, 104:15
**Harper** [7] - 7:18, 7:20, 7:25, 8:11, 8:21
**hate** [2] - 38:22, 118:23
**he/she/it** [2] - 43:13, 94:24
**heading** [1] - 17:7
**headings** [1] - 17:9
**hear** [25] - 14:2, 14:9, 16:13, 21:9, 40:11, 42:13, 42:19, 53:19, 58:23, 60:6, 69:24, 74:13, 79:8, 79:13, 82:8, 83:4, 85:16, 93:13, 99:8, 101:25, 104:22, 117:8, 118:14, 119:8
**heard** [36] - 48:10, 52:6, 52:17, 60:7, 70:2, 75:5, 75:13, 76:19, 77:8, 77:12, 77:13, 77:16, 78:3, 79:10, 79:24, 80:5, 80:17, 81:9, 81:13, 82:12, 84:12, 85:2, 85:3, 85:4, 86:3, 88:1, 88:9, 88:13, 89:11, 92:20, 96:21, 98:17, 110:1, 110:5, 115:1, 118:18

**hearing** [5] - 21:1, 55:22, 72:8, 81:21, 104:4
**hears** [2] - 76:24, 91:9
**help** [3] - 51:15, 57:6, 60:5
**helpful** [1] - 41:3
**Henry** [5] - 59:24, 101:10, 101:11, 102:20, 106:7
**HEREBY** [1] - 121:13
**HEREINBEFORE** [1] - 121:14
**heretofore** [1] - 4:7
**hidden** [1] - 100:24
**hide** [1] - 117:10
**high** [1] - 83:16
**higher** [1] - 8:18
**highlighted** [1] - 41:7
**hill** [1] - 19:13
**himself** [1] - 98:19
**hip** [5] - 88:24, 89:5, 113:1, 113:3, 113:4
**hired** [1] - 83:15
**hit** [2] - 84:19, 109:20
**hits** [1] - 83:18
**holder's** [1] - 24:2
**home** [4] - 36:19, 44:20, 45:24, 105:23
**honest** [1] - 49:19
**Honor** [53] - 5:5, 6:2, 6:10, 7:17, 9:5, 9:25, 10:3, 10:4, 10:6, 10:9, 10:21, 11:9, 12:24, 13:19, 15:4, 15:8, 15:24, 17:6, 18:4, 21:21, 22:17, 24:10, 25:4, 26:1, 27:9, 28:6, 28:10, 28:23, 29:1, 30:5, 31:10, 31:23, 32:10, 34:17, 36:7, 37:3, 37:22, 38:22, 39:1, 39:5, 39:8, 39:23, 40:10, 40:12, 40:14, 41:11, 41:25, 44:12, 46:10, 46:17, 47:4, 95:21, 118:23
**Honor's** [2] - 7:9, 39:16
**HONORABLE** [1] - 1:4
**hook** [1] - 101:15
**hop** [5] - 88:24, 89:5, 113:2, 113:3, 113:4
**hope** [5] - 46:5, 74:13, 92:15, 101:23, 117:14
**hoped** [2] - 48:5, 79:22
**hopefully** [1] - 44:22,

80:18
**hopes** [1] - 94:14
**hoping** [1] - 90:5
**Horse** [77] - 10:19, 13:12, 14:3, 14:10, 14:14, 15:1, 16:14, 18:16, 19:25, 28:4, 32:18, 36:5, 39:14, 40:17, 41:16, 41:21, 42:4, 42:14, 42:20, 42:25, 43:14, 43:18, 43:21, 62:11, 62:20, 68:15, 69:13, 69:14, 69:18, 70:14, 70:17, 70:19, 70:21, 70:24, 72:1, 72:9, 72:11, 72:13, 76:10, 76:14, 77:8, 79:9, 79:16, 81:1, 88:2, 90:20, 91:16, 91:20, 92:8, 92:17, 93:2, 93:5, 93:14, 94:4, 94:24, 95:3, 101:9, 101:12, 101:14, 101:21, 101:24, 103:11, 103:13, 103:17, 104:18, 105:15, 110:4, 110:14, 114:12, 115:23, 116:2, 116:4, 116:17, 117:9, 118:1, 119:7, 120:7
**Horse's** [1] - 82:9
**hose** [1] - 52:23
**Houston** [3] - 33:10, 59:25, 77:6
**Hudson** [7] - 59:23, 59:24, 77:1, 77:2, 85:22, 106:24
**huge** [2] - 86:13, 118:11
**hundreds** [1] - 112:25
**hypothetical** [1] - 25:18

**I**

**i.e** [2] - 14:18, 43:5
**idea** [3] - 45:10, 68:3, 120:20
**ideas** [5] - 60:14, 68:6, 71:5, 71:13
**identical** [4] - 7:23, 63:13, 69:7, 93:7
**identified** [3] - 76:12, 80:13, 80:21
**identifies** [1] - 80:4
**identifying** [1] - 7:13
**ignore** [3] - 54:20, 56:21, 56:23

illustrate [1] - 8:23
imagery [1] - 53:10
imagine [1] - 38:3
immediately [1] - 59:17
impartial [1] - 59:10
import [2] - 9:23, 12:19
important [8] - 49:13, 54:15, 54:23, 59:14, 62:4, 77:22, 85:7, 101:7
impression [1] - 71:23
improper [3] - 23:4, 51:21, 59:6
IN [1] - 121:11
in-person [1] - 57:24
inaccurate [1] - 59:8
Inc [6] - 28:9, 28:12, 28:19, 47:20, 60:1, 60:2
incentive [1] - 82:11
include [5] - 27:4, 31:11, 32:8, 63:23, 67:13
included [5] - 28:20, 28:21, 30:2, 30:3, 39:10
includes [6] - 39:8, 57:24, 62:23, 63:9, 66:19, 71:12
including [8] - 8:15, 8:16, 32:6, 50:7, 58:2, 58:21, 86:7, 119:20
inclusion [3] - 11:10, 14:17, 43:4
income [3] - 111:23
incomplete [1] - 59:8
inconsistent [2] - 28:1, 102:8
incorporate [1] - 67:13
independent [4] - 105:6, 105:13, 106:18, 112:17
independently [12] - 14:13, 42:24, 62:19, 66:6, 67:17, 70:17, 90:19, 91:2, 91:10, 94:4, 94:6, 107:1
INDEX [1] - 3:1
indicates [1] - 104:22
indication [1] - 56:9
individual [4] - 8:13, 18:23, 20:20, 83:7
individually [1] - 116:21
individuals [2] - 94:20, 95:4

industry [2] - 109:1, 109:4
infer [2] - 52:19, 52:21
inference [3] - 70:5, 105:9, 110:3
influenced [4] - 48:19, 51:22, 59:7, 59:20
information [19] - 56:2, 57:19, 59:6, 59:8, 59:11, 59:17, 89:13, 89:18, 89:25, 95:24, 97:8, 102:16, 103:4, 103:7, 103:21, 104:4, 105:12, 105:21, 108:8
infringe [2] - 20:7, 23:7
infringed [11] - 13:8, 19:25, 43:22, 60:2, 61:14, 61:17, 61:25, 64:17, 64:25, 66:18, 72:13
infringement [49] - 15:24, 15:25, 16:1, 16:4, 16:8, 17:20, 18:1, 18:25, 19:8, 19:18, 19:23, 20:6, 20:11, 20:21, 20:22, 21:11, 21:20, 21:22, 22:8, 22:15, 22:17, 23:2, 23:18, 24:1, 24:10, 24:12, 24:18, 25:22, 26:6, 29:7, 30:7, 33:2, 45:12, 45:23, 60:4, 61:11, 62:12, 62:17, 62:18, 62:19, 63:16, 64:21, 66:15, 67:12, 73:10, 77:15, 85:8, 100:1
infringer [1] - 35:16
infringes [6] - 18:16, 20:23, 25:25, 62:16, 64:20, 72:11
infringing [15] - 19:7, 20:8, 20:19, 21:2, 23:17, 24:4, 31:3, 33:21, 35:10, 35:16, 35:25, 38:7, 38:13, 102:5, 102:7
initial [2] - 12:4, 30:20
input [4] - 8:3, 8:4, 11:1
inquire [1] - 71:14
inquiry [1] - 32:16
inseparable [2] - 4:21, 66:3
insert [3] - 4:14, 20:3, 31:24
inserts [1] - 9:7

insofar [1] - 55:8
inspired [1] - 75:1
Instagram [1] - 58:3
instance [3] - 18:21, 20:10, 25:8
instances [2] - 35:2, 35:4
instruct [3] - 8:24, 48:7, 48:12
instructed [14] - 51:5, 51:25, 52:3, 52:10, 53:7, 53:9, 63:18, 73:15, 96:2, 96:7, 98:4, 99:17, 99:20, 100:11
Instruction [15] - 4:11, 4:25, 5:12, 6:12, 6:22, 6:25, 7:4, 7:18, 7:24, 9:6, 24:5, 24:25, 29:18, 43:19, 47:18
instruction [34] - 5:18, 5:20, 5:21, 5:23, 6:23, 8:12, 9:8, 9:15, 9:17, 9:18, 10:16, 15:3, 15:7, 15:9, 16:21, 17:11, 17:23, 19:21, 27:3, 27:12, 30:3, 31:21, 32:7, 38:24, 38:25, 39:5, 39:6, 39:22, 40:5, 41:1, 47:10, 47:12, 99:22
INSTRUCTION [1] - 3:4
instructions [25] - 4:10, 9:24, 11:13, 11:15, 11:19, 12:19, 34:2, 39:9, 44:18, 46:2, 47:6, 48:13, 48:24, 50:23, 57:17, 62:21, 72:16, 77:12, 85:11, 90:21, 100:8, 104:6, 104:7, 115:5, 120:13
INSTRUCTIONS [1] - 3:6
instrumental [12] - 14:18, 33:19, 43:5, 68:10, 68:13, 74:7, 76:22, 82:9, 90:19, 94:11, 106:23, 119:7
instruments [1] - 74:10
intend [1] - 45:6
intended [5] - 4:20, 51:15, 66:2, 66:8, 86:1
intends [1] - 4:22
intensely [1] - 37:4

intent [13] - 65:14, 66:12, 74:3, 74:12, 75:20, 75:21, 76:7, 78:3, 78:4, 85:8, 85:9, 85:22, 85:23
intention [2] - 45:18, 45:22
interest [7] - 53:22, 60:19, 64:14, 64:16, 67:3, 91:24, 95:5
interested [3] - 108:19, 108:20, 110:10
interests [1] - 60:17
Internet [12] - 58:1, 58:14, 58:18, 83:3, 89:2, 98:15, 107:18, 107:22, 108:4, 113:18, 113:19, 120:14
interpret [1] - 51:15
interview [1] - 84:24
interviewed [1] - 84:22
interviews [2] - 93:17, 109:24
intrinsic [16] - 11:25, 12:2, 12:7, 13:17, 13:21, 38:24, 39:7, 40:4, 40:13, 40:20, 40:25, 41:1, 71:3, 71:18, 71:22, 80:7
intro [2] - 101:14, 101:25
introduced [1] - 75:22
introduction [4] - 76:11, 76:12, 80:22, 81:5
investigation [2] - 58:15, 59:5
invites [1] - 75:8
involve [1] - 89:8
involved [5] - 34:19, 38:12, 58:6, 58:21, 63:17
involves [2] - 57:19, 67:22
iPhone [1] - 111:20
ipse [1] - 35:6
irrelevant [3] - 81:22, 115:24, 115:25
irrespective [1] - 8:14
IS [1] - 121:17
issue [39] - 7:3, 7:10, 9:19, 10:13, 10:15, 11:23, 12:5, 13:17, 17:6, 18:20, 26:18, 26:23, 30:11, 30:24, 33:15, 34:8, 34:14, 34:16, 34:25, 38:21,

38:23, 45:15, 46:12, 53:10, 61:13, 61:14, 66:17, 66:18, 75:15, 75:17, 79:16, 80:23, 87:24, 101:6, 101:18, 110:23, 112:9, 112:18, 113:15
issues [9] - 8:24, 25:23, 36:18, 37:20, 48:4, 57:19, 61:9, 111:16, 117:3
it'd [1] - 81:20
item [1] - 52:10
Item [1] - 4:3
itself [2] - 8:20, 23:18
iTunes [4] - 83:6, 89:2, 119:17, 119:19

## J

jacket [1] - 79:2
JACOB [1] - 2:17
jaw [1] - 108:4
jaw-dropping [1] - 108:4
Jeang [1] - 46:4
JEFFREY [1] - 2:16
jeopardizes [1] - 59:15
job [1] - 89:22
joint [38] - 4:16, 4:17, 5:18, 14:19, 15:4, 15:9, 31:1, 31:2, 33:2, 33:16, 34:20, 35:4, 35:12, 35:13, 35:24, 36:10, 36:25, 37:1, 38:10, 43:6, 65:15, 65:22, 65:24, 66:6, 73:20, 73:22, 75:18, 75:20, 76:8, 78:2, 94:9, 94:12, 98:7, 115:4, 115:7, 115:8
Jolly [3] - 87:2, 87:3, 118:9
Jordan [1] - 59:25
Joyful [113] - 4:15, 10:18, 13:13, 14:1, 14:3, 14:9, 14:19, 14:25, 18:16, 32:17, 36:5, 39:13, 40:17, 41:17, 41:21, 42:4, 42:11, 42:13, 42:19, 43:6, 43:15, 43:18, 43:21, 60:3, 61:18, 61:22, 62:2, 62:4, 62:11, 63:17, 63:19, 63:21, 64:14, 65:1, 65:3, 65:5, 65:7,

65:10, 65:22, 66:21, 67:1, 68:11, 68:12, 68:14, 69:10, 69:12, 69:15, 69:18, 69:20, 69:24, 70:2, 70:13, 70:14, 70:23, 72:1, 72:4, 72:8, 72:12, 72:13, 73:2, 73:18, 75:12, 75:16, 76:20, 77:21, 78:15, 79:8, 79:18, 81:9, 81:13, 83:12, 84:18, 84:24, 86:14, 86:17, 86:23, 87:14, 87:17, 88:10, 88:25, 89:3, 90:11, 92:9, 92:17, 93:1, 93:6, 93:12, 93:13, 94:24, 102:6, 102:10, 102:15, 103:13, 103:18, 103:25, 104:16, 104:18, 104:23, 106:1, 107:2, 110:2, 110:4, 111:19, 111:21, 112:21, 114:13, 115:10, 115:23, 116:2, 116:4, 117:9, 118:10, 119:21

**JUDGE** [1] - 1:4

**Judge** [22] - 14:15, 17:10, 25:5, 30:18, 73:3, 73:15, 73:20, 77:13, 78:7, 79:1, 79:4, 80:1, 81:10, 85:11, 88:2, 90:20, 91:6, 95:13, 96:2, 96:6, 97:7

**judge** [3] - 15:2, 23:15, 44:24

**Judge's** [2] - 104:6, 113:11

**judged** [1] - 55:16

**judgment** [1] - 107:17

**Juicy** [1] - 77:6

**JULY** [2] - 1:15, 4:1

**July** [1] - 77:10

**jump** [1] - 76:9

**juncture** [1] - 23:6

**juror** [5] - 49:4, 49:5, 50:13, 59:15, 59:16

**jurors** [6] - 49:7, 49:12, 49:18, 57:21, 58:22, 59:21

**Jury** [10] - 6:12, 6:22, 6:25, 7:4, 7:24, 9:6, 24:5, 29:17, 43:19, 47:25

**jury** [46] - 4:10, 6:23, 7:1, 12:12, 18:16,

---

19:11, 24:23, 27:12, 29:6, 30:3, 32:4, 32:7, 33:5, 33:6, 33:22, 34:4, 36:25, 37:13, 37:16, 39:20, 41:2, 44:9, 44:15, 46:12, 47:5, 47:13, 47:21, 47:23, 48:10, 48:13, 49:4, 49:6, 49:24, 50:1, 50:8, 55:23, 55:24, 58:8, 59:10, 72:17, 92:2, 92:6, 95:19, 120:19, 121:2

**JURY** [2] - 3:4, 3:6

**justice** [4] - 120:1, 120:4, 120:10, 120:11

## K

**Kahn** [6] - 37:5, 72:21, 113:1, 113:6, 114:4, 117:17

**KAHN** [22] - 2:5, 3:9, 18:4, 28:10, 28:18, 28:23, 30:5, 34:17, 35:12, 35:20, 36:11, 38:3, 38:10, 38:19, 72:22, 75:17, 76:15, 86:20, 87:16, 117:18, 119:3, 119:11

**Kahn's** [2] - 45:8, 113:21

**Karl** [1] - 59:25

**Kasz** [9] - 23:22, 24:12, 25:7, 25:24, 26:10, 26:24, 60:2, 91:18, 117:1

**Katheryn** [1] - 59:23

**Katy** [3] - 4:5, 85:21, 106:24

**KATY** [1] - 1:9

**KAYIRA** [6] - 2:9, 2:10, 7:17, 7:24, 9:5, 9:25

**keep** [12] - 41:8, 56:1, 56:5, 74:23, 93:7, 94:16, 95:6, 95:15, 96:16, 98:12, 120:8

**keeps** [3] - 107:3, 108:13, 113:1

**ketchup** [4] - 78:25, 113:22, 113:25, 114:1

**key** [1] - 104:4

**kids** [1] - 118:14

**kind** [2] - 74:8, 84:6

**Kitty** [4] - 28:9, 28:12,

---

28:16, 47:19

**knocked** [1] - 116:5

**knowledge** [3] - 85:25, 107:2, 107:5

**known** [6] - 73:5, 73:20, 74:17, 74:18, 78:22, 80:2

**KNUPP** [1] - 2:15

**Kobalt** [7] - 18:21, 23:22, 26:10, 26:25, 60:1, 91:20, 117:1

## L

**L.A** [2] - 113:15, 113:18

**label** [3] - 89:17, 90:2, 117:23

**lack** [1] - 107:14

**ladies** [8] - 48:2, 72:15, 95:22, 108:1, 114:1, 115:16, 119:1, 120:12

**laid** [2] - 33:14, 102:18

**Lamb** [4] - 115:22, 116:1, 116:17, 118:7

**lambert** [1] - 75:3

**Lambert** [6] - 59:22, 61:16, 75:4, 75:6, 76:1, 110:1

**Lambert's** [1] - 75:4

**language** [20] - 4:14, 4:18, 7:11, 10:2, 10:20, 11:10, 11:14, 12:3, 13:6, 17:12, 23:8, 27:13, 30:18, 39:8, 39:9, 39:17, 40:1, 40:3, 41:7, 98:12

**last** [12] - 6:5, 9:7, 10:15, 26:18, 28:14, 32:15, 33:14, 77:8, 80:11, 86:24, 98:8, 114:3

**launched** [1] - 27:10

**LAURA** [4] - 1:22, 121:11, 121:23, 121:24

**LAUREN** [1] - 2:6

**law** [35] - 5:23, 6:6, 8:14, 9:3, 9:20, 10:21, 17:10, 17:13, 25:12, 25:20, 30:19, 30:22, 34:24, 35:19, 48:12, 48:16, 48:18, 53:4, 57:12, 58:20, 63:10, 63:20, 67:20, 68:1, 68:5, 73:9, 73:19, 78:21, 78:22, 79:3, 96:2, 97:6,

---

100:11, 100:22, 120:1

**LAW** [1] - 2:9

**Lawrence** [1] - 86:4

**laws** [1] - 104:8

**lawsuit** [12] - 77:10, 77:11, 89:8, 90:4, 94:19, 111:2, 111:5, 114:14, 114:23, 117:25, 119:22

**lawyer** [4] - 56:13, 56:14, 56:15, 97:9

**lawyers** [8] - 50:4, 51:4, 51:12, 51:13, 51:17, 51:19, 55:7, 58:22

**layers** [1] - 105:20

**lead** [1] - 112:14

**leap** [2] - 26:22, 37:5

**leaping** [1] - 37:20

**learn** [1] - 58:16

**learned** [2] - 86:5, 89:20

**least** [3] - 67:19, 67:23, 79:7

**leave** [4] - 4:23, 10:1, 117:5

**leaving** [2] - 19:12, 90:1

**Led** [1] - 10:23

**legal** [7] - 36:2, 36:8, 36:16, 44:1, 60:6, 61:8, 107:11

**legally** [1] - 36:9

**length** [3] - 56:6, 80:15, 99:15

**LEPERA** [109] - 2:15, 3:10, 5:4, 5:7, 5:9, 6:2, 6:9, 6:12, 6:15, 6:19, 6:21, 7:9, 7:20, 8:11, 9:11, 9:16, 10:21, 11:2, 11:21, 12:11, 12:15, 12:21, 12:24, 13:5, 13:19, 13:21, 13:24, 14:4, 15:8, 15:22, 16:16, 16:19, 16:24, 17:16, 17:25, 18:18, 18:24, 19:5, 19:8, 19:16, 19:20, 20:2, 20:9, 20:18, 20:25, 21:8, 21:13, 21:21, 22:6, 22:14, 22:17, 22:20, 23:11, 24:5, 24:14, 25:11, 25:13, 25:18, 26:1, 26:3, 26:11, 26:13, 26:15, 26:20, 27:1, 27:7, 27:9, 27:15, 27:20, 28:5, 29:1, 29:13, 29:17,

---

29:20, 30:24, 31:9, 31:12, 31:16, 32:10, 32:23, 33:10, 33:13, 34:5, 34:25, 35:9, 36:7, 36:12, 37:2, 37:8, 37:11, 37:22, 38:21, 39:18, 40:2, 40:7, 40:12, 41:6, 41:11, 43:16, 43:23, 44:7, 44:11, 44:14, 44:22, 45:18, 45:21, 95:11, 95:21, 117:12

**Lepera** [2] - 32:19, 95:20

**less** [3] - 25:20, 75:11, 108:17

**letter** [1] - 10:21

**level** [6] - 8:18, 13:15, 13:16, 40:23, 69:5, 118:22

**levels** [1] - 112:8

**liability** [17] - 5:18, 15:4, 15:10, 16:10, 17:15, 18:6, 22:10, 22:11, 23:25, 25:2, 25:6, 28:13, 30:11, 38:4, 38:5, 57:13, 62:12

**liable** [17] - 18:19, 19:6, 20:8, 20:17, 20:23, 20:24, 21:5, 21:6, 21:11, 22:4, 22:13, 26:6, 33:2, 33:21, 34:21, 35:19, 36:10

**library** [2] - 86:13, 118:11

**lied** [1] - 54:25

**lieu** [1] - 55:10

**light** [3] - 44:1, 53:2, 54:3

**likelihood** [1] - 84:8

**likely** [2] - 82:25, 92:8

**limited** [9] - 47:11, 47:12, 52:3, 52:4, 52:9, 52:11, 52:12, 57:13, 58:2

**Line** [1] - 32:25

**line** [3] - 5:18, 7:9, 111:10

**liner** [4] - 75:22, 75:23, 78:5, 94:18

**Lines** [4] - 24:21, 31:5, 33:7, 44:2

**link** [3] - 108:10, 109:10

**LinkedIn** [1] - 58:3

**links** [1] - 113:8

**list** [3] - 27:21, 29:8, 51:10

listed [9] - 14:23, 27:22, 28:8, 29:5, 43:12, 78:1, 89:4, 89:5, 94:22
listen [17] - 46:12, 46:21, 46:24, 58:11, 75:4, 80:8, 86:17, 87:12, 88:13, 88:14, 88:23, 93:9, 97:19, 108:23, 118:20, 119:6
listened [4] - 49:12, 85:5, 85:15, 86:3
listening [5] - 77:2, 81:1, 82:4, 82:11, 87:5
listens [6] - 74:20, 74:25, 75:8, 77:7, 88:16
live [5] - 12:9, 28:5, 55:10, 113:18
living [1] - 82:4
LLC [2] - 2:9, 59:25
look [38] - 11:4, 15:5, 15:13, 16:13, 16:25, 17:22, 24:5, 32:13, 35:13, 46:4, 75:25, 90:21, 93:6, 96:11, 97:14, 97:21, 97:22, 98:5, 99:12, 99:21, 99:25, 100:5, 100:7, 101:20, 102:17, 102:23, 103:15, 103:20, 106:6, 107:14, 109:17, 109:19, 110:22, 112:4, 113:12, 116:21
looked [6] - 39:19, 84:10, 92:12, 94:17, 94:18, 102:24
looking [9] - 37:3, 97:16, 101:17, 107:17, 107:19, 108:18, 109:23, 112:11, 112:24
Los [1] - 113:17
LOS [6] - 1:16, 1:23, 2:19, 2:24, 4:1, 121:7
LOUIS [1] - 2:8
loves [1] - 74:20
low [2] - 88:5, 118:22
Lukasz [1] - 59:24
Luke [3] - 86:8, 103:16, 105:17
Luke's [1] - 25:25
Lunch [1] - 46:8
lunch [2] - 32:4, 44:15
lying [1] - 91:5

lyrics [9] - 35:23, 38:15, 74:4, 75:1, 77:3, 89:7, 89:8, 95:6

# M

main [1] - 33:15
mainstream [1] - 109:17
man [1] - 86:8
manner [2] - 53:21, 70:19
mantra [1] - 108:14
map [1] - 101:3
maps [1] - 32:7
Marcus [5] - 4:5, 59:22, 61:16, 74:19, 75:8
MARCUS [1] - 1:6
marshals [1] - 45:20
Martin [3] - 59:25, 77:3, 106:24
Mary [4] - 115:22, 116:1, 116:16, 118:8
massive [1] - 108:7
material [14] - 11:11, 11:23, 12:5, 12:6, 13:7, 13:12, 40:16, 41:16, 61:6, 65:20, 65:21, 66:5, 92:9
materials [1] - 58:15
matrix [1] - 112:11
matter [7] - 24:17, 32:14, 48:6, 58:9, 61:7, 73:13, 96:1
Max [2] - 77:3, 106:24
McDonalds [1] - 78:24
mean [13] - 9:11, 22:22, 26:2, 26:3, 26:5, 35:12, 37:13, 85:10, 93:7, 98:15, 98:16, 109:2, 112:22
meaningful [1] - 29:14
MEANS [1] - 121:16
means [7] - 10:16, 15:20, 48:21, 50:18, 56:24, 57:25, 61:23, 63:6, 69:25, 71:24, 92:8, 98:11, 98:12, 108:15, 108:22, 108:24, 112:22
meant [1] - 45:16
meanwhile [1] - 120:15
measure [1] - 120:10
measured [1] - 71:9
measures [1] - 119:7
media [4] - 58:4, 58:5, 58:11, 58:24

medium [2] - 61:2, 64:3
meet [3] - 75:3, 76:23, 94:1
melody [4] - 64:3, 77:4, 105:17
member [3] - 49:4, 49:23, 49:25
members [2] - 48:10, 58:5
memory [6] - 47:16, 51:17, 53:20, 59:19, 59:20, 119:2
mention [2] - 96:22, 117:4
mentioned [11] - 73:20, 78:3, 78:8, 78:21, 85:11, 87:2, 87:4, 90:20, 93:4, 107:6, 119:22
merely [2] - 70:1, 90:11
merge [2] - 65:14, 74:1
merged [5] - 4:20, 35:14, 66:3, 66:9, 74:5
merit [1] - 11:17
merits [1] - 57:23
Merrily [4] - 87:4, 87:6, 87:13, 87:15
messages [1] - 53:9
messaging [1] - 58:1
met [1] - 74:19
methodology [1] - 108:11
methods [2] - 60:15, 68:8
Mi [20] - 97:13, 103:2, 103:3, 105:5, 115:19, 115:20, 115:24
MICHAEL [1] - 2:5
middle [1] - 87:9
might [3] - 12:12, 26:3, 56:22
MILLER [3] - 1:22, 121:23, 121:24
million [11] - 83:12, 83:13, 83:17, 83:18, 83:19, 83:20, 107:25, 108:7, 113:15, 113:17, 113:19
mind [5] - 91:9, 93:7, 95:6, 95:15, 104:20
minimal [1] - 67:19, 67:23
minimum [1] - 31:9, 56:6, 69:4

miniscule [1] - 67:25
minute [4] - 23:16, 29:2, 46:3, 110:20
mirror [2] - 11:24, 17:5
misleading [1] - 59:8
mistakes [1] - 54:8
mistrial [1] - 45:25
MITCHELL [1] - 2:15
MO [2] - 2:8, 2:11
model [3] - 7:12, 8:20, 9:4
mole [1] - 19:13
moment [1] - 61:1
Money [7] - 23:22, 24:12, 25:7, 25:24, 26:10, 60:2, 91:18
money [6] - 35:15, 38:6, 89:19, 89:24, 90:6, 118:4
monopolize [1] - 105:5
monopolized [2] - 97:1, 103:6
months [2] - 85:6, 85:19
Moore [5] - 75:7, 76:1, 78:9, 114:22, 114:23
morning [3] - 4:8, 48:4, 52:20
most [4] - 34:21, 84:23, 101:7, 119:20
motion [2] - 27:2, 44:11
motivation [1] - 90:3
motivations [1] - 89:25
mountain [1] - 19:13
mouth [1] - 78:25
Movement [10] - 89:17, 90:1, 90:4, 90:6, 90:12, 110:19, 110:20, 110:23, 117:25
moving [1] - 13:16
Movit [1] - 46:9
MOVIT [6] - 2:16, 10:3, 10:6, 46:10, 46:17, 46:25
Mozart [1] - 88:5
MR [31] - 3:9, 7:17, 7:24, 9:5, 9:25, 10:3, 10:6, 18:4, 28:10, 28:18, 28:23, 30:5, 34:17, 35:12, 35:20, 36:11, 38:3, 38:10, 38:19, 46:10, 46:17, 46:25, 72:22, 75:17, 76:15, 86:20, 87:16, 117:18, 118:23, 119:3, 119:11

MS [147] - 2:13, 3:10, 5:4, 5:7, 5:9, 6:2, 6:3, 6:9, 6:12, 6:15, 6:19, 6:21, 7:9, 7:20, 8:11, 9:11, 9:16, 10:9, 10:12, 10:21, 10:24, 11:2, 11:9, 11:21, 12:11, 12:15, 12:21, 12:24, 13:3, 13:5, 13:19, 13:21, 13:24, 14:4, 14:6, 14:11, 14:15, 14:22, 15:2, 15:8, 15:22, 16:16, 16:19, 16:24, 17:10, 17:16, 17:18, 17:25, 18:11, 18:18, 18:20, 18:24, 19:5, 19:8, 19:16, 19:20, 20:2, 20:9, 20:18, 20:25, 21:8, 21:13, 21:21, 22:6, 22:14, 22:17, 22:20, 23:11, 23:15, 23:21, 24:5, 24:14, 25:5, 25:11, 25:12, 25:13, 25:18, 26:1, 26:3, 26:11, 26:13, 26:15, 26:19, 26:20, 27:1, 27:7, 27:9, 27:15, 27:20, 28:5, 29:1, 29:13, 29:17, 29:20, 30:18, 30:23, 30:24, 31:9, 31:12, 31:16, 31:23, 32:10, 32:23, 33:10, 33:13, 34:5, 34:25, 35:9, 36:7, 36:12, 37:2, 37:8, 37:11, 37:22, 38:21, 39:4, 39:18, 39:25, 40:2, 40:3, 40:7, 40:12, 41:6, 41:7, 41:11, 41:25, 42:7, 42:9, 42:16, 42:22, 43:2, 43:9, 43:16, 43:23, 44:7, 44:11, 44:14, 44:22, 44:24, 45:1, 45:16, 45:18, 45:21, 47:3, 95:11, 95:21, 117:12
multiple [3] - 64:12, 65:14, 116:8
Music [8] - 28:18, 47:19, 60:1, 86:19, 91:20, 91:22, 117:1
music [59] - 7:11, 8:7, 13:7, 13:12, 14:18, 30:19, 38:14, 43:5, 46:12, 66:24, 74:4, 75:15, 76:15, 77:7, 78:18, 81:2, 82:4, 82:8, 83:10, 86:13,

88:14, 88:15, 88:17, 88:23, 89:4, 91:17, 91:21, 91:23, 92:9, 92:17, 94:11, 95:5, 96:24, 96:25, 97:1, 97:2, 97:3, 97:4, 97:17, 103:6, 105:10, 108:17, 108:22, 109:2, 110:9, 112:18, 113:2, 113:5, 113:7, 113:9, 115:19, 117:20, 118:11, 119:10, 119:13, 119:20
**musical** [43] - 7:8, 8:17, 39:14, 41:17, 41:21, 42:4, 60:3, 60:13, 61:18, 61:21, 62:2, 62:11, 63:18, 63:19, 63:21, 63:24, 63:25, 64:2, 64:4, 64:8, 64:10, 64:11, 64:14, 64:16, 64:25, 65:3, 65:5, 65:7, 65:10, 66:21, 66:25, 69:9, 70:24, 72:4, 80:16, 87:6, 93:2, 94:21, 97:12, 103:14, 104:3, 109:3
**musician** [2] - 88:15, 90:15
**musicological** [2] - 101:13, 106:6
**musicologically** [2] - 101:11, 112:11
**musicologist** [6] - 86:16, 87:12, 87:19, 89:10, 101:1, 102:21
**must** [48] - 4:16, 4:18, 4:20, 9:9, 19:24, 43:20, 47:14, 48:18, 48:19, 48:21, 49:9, 50:18, 52:1, 52:4, 52:11, 53:1, 56:21, 56:25, 57:4, 57:16, 57:18, 58:8, 60:22, 61:12, 61:13, 61:23, 62:1, 62:7, 65:23, 65:25, 66:2, 66:5, 66:16, 66:17, 67:8, 67:23, 69:11, 69:16, 69:22, 70:22, 71:2, 71:14, 71:16, 71:18, 72:12, 104:10
**mustard** [3] - 113:22, 113:25, 114:2
**MY** [1] - 121:18
**MySpace** [9] - 74:11, 74:13, 83:6, 83:7,

83:8, 83:13, 83:16, 94:14, 111:15

## N

**name** [1] - 120:16
**named** [13] - 5:17, 6:13, 6:17, 19:24, 20:6, 20:8, 20:10, 21:17, 21:18, 23:23, 31:24, 43:20, 72:12
**names** [2] - 34:15, 80:5
**napkin** [1] - 78:25
**national** [1] - 112:2
**nature** [7] - 16:3, 16:11, 18:25, 22:11, 22:25, 110:9, 113:9
**NBA** [1] - 84:16
**necessarily** [5] - 9:23, 33:4, 33:15, 54:22, 64:5
**necessary** [4] - 49:21, 55:22, 69:5, 72:5
**need** [12] - 12:17, 25:10, 30:16, 46:11, 66:22, 67:20, 85:15, 86:16, 87:12, 88:5, 95:10, 95:12
**needs** [2] - 7:22, 43:19
**negative** [1] - 107:6
**negotiations** [1] - 118:5
**never** [7] - 70:7, 80:17, 88:1, 89:17, 89:18, 110:1, 117:7
**new** [6] - 4:18, 13:23, 65:16, 67:21, 85:16, 119:14
**newly** [1] - 65:19
**news** [1] - 58:11
**next** [9] - 4:22, 13:14, 14:7, 14:12, 28:7, 74:16, 74:25, 96:5, 102:23
**Nicholas** [2] - 87:2, 87:3
**Nick** [1] - 118:9
**night** [3] - 26:18, 28:14, 52:22
**Nimmer** [1] - 38:17
**nine** [1] - 72:23
**NO** [1] - 1:8
**nobody** [2] - 98:20, 119:13
**nobody's** [1] - 110:7
**Noise** [113] - 4:15, 10:18, 13:13, 14:1, 14:3, 14:10, 14:19, 14:25, 18:16, 32:18,

36:5, 39:13, 40:17, 41:17, 41:21, 42:4, 42:11, 42:13, 42:19, 43:6, 43:15, 43:18, 43:21, 60:3, 61:18, 61:22, 62:2, 62:4, 62:11, 63:17, 63:19, 63:21, 64:15, 65:1, 65:3, 65:5, 65:7, 65:10, 65:22, 66:21, 67:1, 68:11, 68:12, 68:14, 69:10, 69:13, 69:15, 69:18, 69:20, 69:24, 70:2, 70:13, 70:14, 70:24, 72:1, 72:4, 72:8, 72:12, 72:13, 73:2, 73:18, 75:12, 75:16, 76:20, 77:21, 78:15, 79:8, 79:18, 81:10, 81:13, 83:12, 84:18, 84:24, 86:15, 86:18, 86:23, 87:14, 87:17, 88:10, 88:25, 89:3, 90:11, 92:9, 92:17, 93:2, 93:6, 93:12, 93:14, 94:24, 102:6, 102:10, 102:15, 103:13, 103:19, 103:25, 104:16, 104:18, 104:23, 106:1, 107:2, 110:2, 110:4, 111:19, 111:21, 112:21, 114:13, 115:10, 115:23, 116:2, 116:4, 117:9, 118:10, 119:21
**nominated** [6] - 82:19, 82:20, 82:21, 83:1, 89:21
**nomination** [1] - 112:22
**nominations** [4] - 84:25, 93:16, 112:19
**none** [4] - 16:8, 53:15, 107:8, 112:4
**nonoriginal** [1] - 68:15
**nonprotectable** [1] - 71:17
**nonreligious** [2] - 89:1, 89:2
**note** [6] - 49:22, 91:13, 104:24, 116:5, 118:16, 118:19
**noted** [2] - 4:7, 10:23
**NOTES** [1] - 121:18
**notes** [25] - 47:15,

59:18, 59:19, 59:21, 74:9, 75:22, 75:23, 78:5, 81:3, 87:8, 87:17, 87:18, 87:20, 94:18, 101:25, 102:2, 102:12, 102:22, 103:1, 103:3, 103:24, 106:7, 106:9, 106:15, 119:5
**nothing** [13] - 21:24, 22:24, 24:6, 25:3, 25:20, 86:25, 106:4, 106:19, 111:24, 113:8, 114:2, 118:10, 118:24
**noticed** [2] - 16:25, 47:6
**notified** [1] - 28:13
**notify** [1] - 59:17
**NOURAFCHAN** [1] - 2:17
**novel** [1] - 67:21
**number** [10] - 32:11, 35:1, 35:2, 41:15, 56:6, 83:19, 87:19, 104:24, 104:25, 113:16
**Number** [2] - 4:3, 32:12
**numbered** [1] - 6:24
**numbers** [6] - 83:17, 89:15, 107:14, 107:24, 108:4
**numerous** [1] - 68:25

## O

**oath** [8] - 48:23, 54:25, 55:6, 59:2, 59:13, 102:14, 114:17, 114:21
**object** [8] - 19:21, 30:2, 31:10, 42:6, 43:11, 45:2, 51:20, 56:16
**objected** [1] - 43:17
**objecting** [1] - 40:8
**objection** [16] - 6:23, 11:8, 11:9, 14:5, 31:12, 31:17, 31:22, 37:23, 39:4, 41:23, 42:21, 43:24, 51:22, 56:16, 56:18, 56:20
**objectionable** [1] - 42:8
**objections** [1] - 51:19
**objective** [3] - 71:6, 80:3, 112:11
**objectively** [3] - 41:22,

92:18, 100:14
**obligation** [2] - 110:11, 110:12
**obtained** [2] - 60:25, 63:19
**obviate** [1] - 25:10
**obvious** [1] - 108:3
**obviously** [8] - 7:11, 7:21, 29:22, 34:25, 45:8, 47:21, 105:16, 108:24
**occurred** [1] - 60:4
**OF** [13] - 1:1, 1:2, 1:14, 2:2, 2:3, 2:13, 2:20, 121:5, 121:7, 121:9, 121:12, 121:16, 121:18
**offer** [1] - 6:20
**offered** [1] - 47:10
**offers** [1] - 56:13
**Office** [1] - 66:21
**office** [2] - 61:5, 77:25
**official** [1] - 77:24
**OFFICIAL** [3] - 1:22, 121:11, 121:25
**often** [1] - 54:8
**Ojukwu** [16] - 14:18, 43:5, 59:23, 61:16, 74:6, 74:21, 74:22, 76:2, 87:25, 94:11, 94:13, 98:21, 106:20, 110:1, 114:15, 115:13
**Old** [3] - 87:2, 87:3, 118:9
**old** [2] - 13:22, 83:3
**OLYMPIC** [1] - 2:18
**omit** [1] - 5:8
**ON** [3] - 2:3, 2:13, 2:20
**once** [3] - 44:19, 46:2, 86:8
**one** [103] - 5:14, 6:2, 6:3, 6:5, 6:15, 6:16, 6:17, 9:19, 10:9, 11:25, 14:6, 14:7, 14:12, 17:1, 20:13, 21:6, 21:13, 21:17, 22:6, 22:14, 24:9, 26:14, 27:4, 27:15, 27:24, 29:4, 29:5, 29:6, 29:20, 31:4, 32:11, 32:25, 33:14, 33:18, 35:1, 35:18, 35:23, 36:9, 38:21, 40:17, 41:15, 42:6, 44:24, 45:21, 48:4, 49:3, 49:23, 52:18, 62:12, 65:16, 73:7, 73:11, 73:21, 75:18, 76:5, 76:25, 77:17,

79:7, 79:14, 79:21,
80:2, 81:12, 82:17,
82:24, 83:6, 83:16,
84:9, 84:17, 85:6,
86:4, 86:21, 88:24,
89:25, 92:13, 93:5,
95:3, 95:4, 96:8,
96:15, 97:8, 98:6,
98:18, 100:12,
101:7, 102:5, 103:9,
103:23, 104:24,
110:4, 110:20,
111:2, 111:3,
111:25, 114:4,
115:13, 116:10,
116:12, 116:20,
120:9, 120:12
**one's** [1] - 14:11
**ones** [4] - 29:14,
33:16, 47:17, 84:15
**online** [3] - 47:13,
89:16, 111:15
**open** [2] - 50:2, 95:15
**opening** [6] - 51:14,
78:21, 78:24, 79:22,
97:13, 103:2
**operation** [3] - 35:19,
60:15, 68:8
**opinion** [6] - 49:1,
49:16, 55:16, 55:20,
56:9, 80:25
**opinions** [3] - 48:20,
55:15, 55:16
**opportunity** [18] -
14:2, 14:9, 42:13,
42:19, 53:18, 69:23,
69:25, 70:8, 79:8,
79:13, 82:7, 82:14,
93:13, 93:22, 99:8,
107:12, 109:11,
120:10
**opposed** [1] - 87:5
**opposite** [1] - 39:18
**opposition** [1] - 5:22
**oranges** [1] - 113:20
**order** [10] - 4:15, 32:1,
56:22, 57:6, 65:22,
69:21, 72:3, 73:23,
77:14, 115:17
**ordered** [1] - 58:9
**ordinary** [8] - 10:17,
39:12, 39:25, 42:2,
71:22, 71:25, 92:24,
92:25
**original** [42] - 5:23,
6:7, 6:24, 12:10,
12:11, 13:13, 17:11,
37:18, 40:15, 41:17,
61:21, 62:10, 63:21,
64:18, 65:2, 65:8,

66:23, 67:13, 67:16,
67:20, 68:1, 68:2,
68:17, 68:18, 69:1,
69:2, 69:9, 69:14,
70:25, 72:2, 72:3,
72:7, 72:11, 77:19,
86:11, 86:25, 87:22,
88:3, 88:4, 88:10,
92:10, 92:11
**originality** [3] - 67:22,
87:24, 118:13
**originally** [2] - 13:5,
78:7
**ostinato** [23] - 68:11,
68:14, 78:14, 80:15,
86:9, 86:14, 87:1,
87:8, 87:17, 87:22,
88:8, 88:11, 89:10,
90:20, 93:5, 104:16,
104:18, 104:19,
104:23, 118:10,
118:12, 118:19
**Ostinato** [33] - 68:14,
80:23, 80:24, 81:2,
81:3, 86:10, 101:9,
101:12, 101:14,
101:15, 101:20,
101:24, 102:2,
102:4, 102:6,
102:10, 102:11,
102:14, 103:4,
103:8, 103:18,
103:24, 106:9,
106:12, 106:15,
116:8, 116:10,
116:11, 116:13,
119:4, 119:8
**ostinatos** [3] - 80:22,
104:25, 118:16
**Ostinatos** [1] - 103:11
**OTHER** [1] - 2:13
**otherwise** [2] - 50:9,
50:23
**ought** [1] - 19:23
**outcome** [1] - 53:22
**outset** [4] - 89:14,
96:16, 96:23, 99:12
**outside** [2] - 59:5,
59:17
**overlapping** [1] -
80:16
**overly** [1] - 59:20
**overrule** [1] - 56:16
**own** [23] - 23:9, 34:3,
49:15, 58:16, 59:19,
61:12, 64:1, 66:16,
66:24, 66:25, 77:18,
77:20, 85:18, 90:2,
96:25, 97:24, 99:14,
107:17, 107:20,

108:17, 109:6,
120:14
**owned** [4] - 13:8,
30:10, 67:15, 100:2
**owner** [23] - 15:14,
15:22, 18:11, 20:11,
22:21, 30:6, 30:12,
30:16, 33:9, 55:15,
60:9, 60:17, 61:2,
61:10, 62:15, 63:8,
63:9, 63:14, 67:2,
67:7, 78:8, 114:19
**owner's** [7] - 18:6,
60:18, 63:13, 63:14,
64:20, 67:3, 67:15
**owners** [13] - 18:5,
30:15, 34:17, 34:18,
34:21, 36:10, 37:1,
61:20, 64:24, 65:4,
78:1, 78:7, 78:9
**ownership** [4] - 63:3,
91:24, 95:5, 98:7

---

**P**

**p.m** [1] - 121:3
**packet** [1] - 30:20
**PAGE** [1] - 3:3
**page** [3] - 83:7, 83:8,
89:3
**Paragraph** [2] - 4:15,
9:6
**paragraph** [10] - 4:22,
4:23, 7:7, 9:7, 9:10,
9:12, 87:9, 87:11
**paraphrase** [1] - 19:24
**PARK** [1] - 2:23
**parks** [1] - 84:16
**part** [26] - 8:9, 14:19,
27:1, 43:6, 53:15,
54:19, 60:18, 63:20,
67:3, 67:20, 69:16,
73:8, 74:3, 77:8,
77:22, 77:23, 79:14,
79:18, 80:23, 81:5,
81:6, 81:7, 84:7,
84:21, 94:11, 100:19
**participant** [1] - 31:3
**participated** [1] -
106:22
**particular** [6] - 68:3,
87:22, 97:23, 108:9,
112:20, 112:23
**particularly** [7] -
35:15, 44:1, 82:6,
87:25, 88:7, 116:23,
119:14
**parties** [14] - 28:14,
45:17, 46:11, 48:11,
50:24, 57:2, 57:12,

58:21, 59:9, 59:12,
66:8, 66:10, 75:20,
78:4
**parties'** [1] - 66:11
**partnership** [1] -
57:13
**parts** [7] - 4:21, 8:1,
8:4, 66:3, 67:16,
67:17, 79:16
**party** [12] - 21:12,
21:18, 21:19, 22:15,
50:16, 50:21, 50:22,
55:7, 57:15, 66:14,
91:2, 100:3
**party's** [2] - 53:8,
58:25
**path** [1] - 120:2
**patience** [2] - 95:8,
95:25
**pay** [2] - 82:25, 120:13
**paying** [1] - 117:24
**people** [20] - 24:2,
25:22, 32:20, 32:21,
33:18, 45:11, 54:8,
54:9, 58:5, 58:21,
73:24, 83:20, 85:22,
97:5, 105:22,
105:23, 107:12,
112:3, 113:15,
113:17
**percent** [8] - 74:23,
76:18, 79:17, 93:4,
94:16, 114:19,
114:22, 115:14
**perform** [5] - 15:17,
15:19, 63:4, 63:6,
81:13
**performance** [7] -
29:9, 29:23, 63:12,
64:6, 110:6, 111:14,
112:21
**performances** [2] -
98:23, 111:19
**performed** [2] - 64:11,
110:16
**performer's** [1] -
64:10
**performing** [2] -
60:10, 60:20
**performs** [1] - 62:13
**perhaps** [2] - 6:21,
25:2
**period** [5] - 60:12,
82:14, 84:13,
107:19, 108:6
**permission** [7] -
63:14, 64:20, 67:15,
73:1, 73:8, 119:25,
120:5
**permitted** [2] - 55:15,

56:15
**PERRY** [3] - 1:9, 2:13,
2:20
**Perry** [9] - 4:5, 26:3,
35:22, 76:12, 76:23,
77:2, 85:21, 88:15,
106:24
**Perry's** [1] - 113:6
**person** [36] - 10:17,
18:8, 20:16, 20:18,
20:21, 20:22, 20:23,
21:4, 21:18, 21:19,
22:3, 22:5, 22:12,
22:16, 39:12, 39:25,
40:21, 42:3, 45:20,
55:12, 57:24, 60:10,
60:18, 60:23, 67:2,
67:6, 67:10, 71:25,
74:17, 79:10, 79:13,
80:9, 92:24, 93:1,
100:9
**person's** [1] - 71:22
**personal** [1] - 48:20
**personally** [1] - 52:16
**persons** [2] - 31:18,
31:19
**perspective** [2] -
101:13, 109:18
**persuaded** [2] - 50:18,
61:24
**persuades** [1] - 49:17
**pertinent** [1] - 35:1
**PH** [1] - 1:24
**phase** [3] - 28:13,
45:4, 45:8
**Philadelphia** [1] - 75:2
**phone** [1] - 57:25
**phrase** [7] - 19:14,
80:15, 97:23, 99:14,
104:3, 116:5
**piano** [1] - 87:20
**pick** [1] - 45:20
**picking** [1] - 74:9
**picks** [1] - 76:25
**piece** [2] - 39:7, 64:6
**pitch** [1] - 80:15
**pitches** [4] - 102:18,
103:17, 103:20,
103:23
**pitfalls** [1] - 8:23
**PLACE** [1] - 121:14
**place** [6] - 4:24, 55:11,
58:17, 58:19,
113:23, 113:24
**placed** [2] - 55:6, 57:3
**places** [1] - 76:17
**plainly** [2] - 102:10,
102:15
**PLAINTIFF** [2] - 1:7,
2:3

**plaintiff** [15] - 4:16, 5:15, 9:5, 13:25, 17:11, 30:11, 41:15, 42:1, 42:10, 61:12, 65:23, 66:16, 72:18, 77:13, 110:16
**plaintiff's** [19] - 11:7, 16:21, 20:1, 60:2, 61:15, 62:7, 62:8, 64:21, 66:24, 66:25, 67:16, 72:14, 76:15, 77:20, 97:8, 98:17, 101:8, 107:3, 108:13
**Plaintiffs** [1] - 61:16
**plaintiffs** [72] - 5:4, 5:6, 5:13, 5:21, 5:25, 6:16, 6:20, 9:13, 11:13, 11:22, 13:2, 13:9, 13:11, 13:13, 14:16, 14:20, 14:24, 30:14, 33:3, 39:11, 41:18, 41:20, 43:3, 43:7, 43:11, 45:4, 47:2, 47:3, 59:22, 61:18, 62:1, 62:7, 64:13, 64:22, 64:24, 65:4, 65:5, 65:9, 68:10, 69:8, 69:11, 69:16, 69:22, 70:4, 70:10, 70:12, 70:22, 71:1, 71:19, 72:10, 77:18, 78:6, 81:15, 83:9, 87:25, 92:6, 92:10, 92:12, 92:16, 94:12, 99:13, 101:8, 101:19, 102:25, 103:15, 103:18, 103:25, 107:23, 119:23, 119:25, 120:9
**plaintiffs'** [2] - 5:18, 66:23
**play** [10] - 46:23, 75:13, 76:23, 84:24, 86:15, 106:11, 109:25, 110:3, 110:5, 117:20
**played** [16] - 35:22, 75:6, 75:16, 76:14, 84:18, 86:19, 87:3, 87:15, 87:20, 97:19, 106:9, 108:23, 117:11, 117:20, 119:10
**player** [1] - 108:24
**playing** [1] - 111:21
**plays** [2] - 76:17, 83:13
**plead** [1] - 22:24
**point** [17] - 22:2, 22:9,

30:25, 36:23, 44:16, 73:6, 73:13, 82:24, 84:23, 85:7, 88:18, 88:19, 89:6, 109:12, 115:25, 116:4, 116:20
**pointed** [1] - 29:4
**pointing** [1] - 87:10
**points** [2] - 77:16, 80:5
**polo** [1] - 108:24
**popular** [5] - 82:16, 84:3, 88:24, 119:16, 119:20
**population** [1] - 83:21
**portion** [4] - 62:5, 64:25, 77:20, 86:16
**posed** [1] - 16:9
**position** [6] - 33:3, 33:4, 102:9, 115:4, 115:15, 116:25
**possibility** [4] - 70:1, 70:2, 70:5
**possible** [3] - 21:11, 55:8, 58:25
**possibly** [2] - 102:9, 118:19
**potential** [3] - 8:23, 11:19, 22:22
**potentially** [4] - 21:5, 22:4, 22:14, 99:25
**practices** [1] - 70:9
**pre** [2] - 65:17, 65:20
**pre-existing** [2] - 65:17, 65:20
**preamble** [1] - 12:25
**precise** [2] - 22:2, 29:10
**precisely** [1] - 27:17
**preclude** [2] - 34:14, 45:16
**predicate** [1] - 97:9
**predicated** [1] - 7:18
**preferably** [1] - 15:20
**prefers** [1] - 102:14
**prejudice** [3] - 26:17, 26:21, 53:24
**prejudices** [1] - 48:20
**prepare** [3] - 15:16, 63:1, 71:8
**prepared** [2] - 29:20, 50:11
**prepares** [1] - 62:14
**preparing** [3] - 60:11, 60:21, 84:5
**preponderance** [40] - 4:17, 13:11, 13:25, 14:8, 14:13, 14:17, 14:24, 28:2, 32:17, 39:11, 41:15, 41:20,

42:2, 42:11, 42:17, 42:24, 43:4, 43:13, 50:17, 61:19, 61:23, 64:22, 65:6, 65:23, 69:11, 69:17, 69:19, 69:22, 70:6, 70:16, 70:23, 71:20, 92:7, 92:16, 92:25, 93:11, 93:21, 94:3, 94:23
**presence** [1] - 52:24
**present** [7] - 41:4, 47:25, 55:11, 55:24, 95:19, 110:11, 120:19
**presented** [8] - 36:21, 50:21, 55:9, 59:11, 73:14, 82:5, 105:13
**preserving** [1] - 12:18
**preside** [1] - 49:5
**PRESIDING** [1] - 1:4
**presiding** [3] - 49:4, 50:13
**press** [1] - 58:5
**pressure** [2] - 82:10, 91:7
**presume** [1] - 107:20
**presumption** [2] - 70:14, 70:16
**pretty** [1] - 106:10
**prevent** [5] - 68:6, 68:18, 97:5, 97:15, 105:23
**previously** [3] - 67:24, 115:6, 115:10
**priced** [1] - 83:16
**primarily** [1] - 23:21
**principles** [2] - 60:15, 68:8
**problem** [19] - 13:2, 14:14, 14:20, 15:9, 15:13, 16:17, 16:21, 17:2, 17:4, 25:17, 35:17, 36:9, 37:7, 38:18, 39:22, 40:24, 41:8, 41:19, 44:6
**problems** [1] - 112:7
**procedures** [2] - 60:14, 68:7
**proceed** [1] - 48:7
**PROCEEDINGS** [3] - 1:14, 3:3, 121:14
**proceedings** [2] - 59:16, 121:3
**process** [10] - 38:12, 59:4, 59:9, 74:9, 74:17, 75:10, 95:24, 107:1, 109:7, 114:8
**processes** [2] - 60:14, 68:7

**produce** [1] - 37:25
**produced** [9] - 15:12, 16:14, 16:22, 17:4, 20:3, 27:5, 37:14, 64:9, 111:21
**producer** [5] - 28:3, 36:22, 76:5, 106:24, 114:25
**product** [3] - 35:16, 35:25, 36:1
**production** [16] - 16:2, 16:18, 17:5, 18:22, 18:24, 23:17, 23:23, 25:8, 27:13, 27:22, 29:3, 30:1, 31:10, 31:15, 76:2, 91:19
**professed** [1] - 96:23
**professional** [7] - 82:3, 82:25, 84:7, 85:14, 88:22, 93:17, 108:14
**Professor** [7] - 76:16, 80:20, 80:21, 80:25, 86:4, 102:3, 102:13
**program** [1] - 74:19
**programs** [1] - 58:18
**promote** [1] - 83:9
**promotion** [2] - 84:21, 91:16
**proof** [28] - 8:18, 26:16, 50:16, 52:15, 52:18, 61:15, 62:6, 71:1, 71:9, 72:19, 72:20, 74:3, 79:3, 79:19, 81:6, 88:10, 88:18, 89:13, 89:15, 91:11, 92:11, 93:22, 93:23, 94:1, 94:2, 94:6, 98:10, 112:17
**proofread** [1] - 75:24
**proper** [1] - 43:17
**property** [3] - 60:19, 67:3, 73:4
**proponent** [1] - 9:19
**proposal** [1] - 44:18
**propose** [2] - 5:21, 47:16
**Proposed** [1] - 6:22
**proposing** [2] - 26:17, 29:12
**proposition** [2] - 8:12, 37:3
**propounded** [1] - 5:25
**protect** [3] - 58:25, 97:3, 105:5
**protectability** [3] - 8:13, 8:24, 9:1
**protectable** [38] - 5:2, 5:3, 5:8, 5:10, 5:12, 5:14, 7:2, 7:6, 8:16,

10:8, 10:12, 11:23, 12:5, 12:7, 13:8, 39:15, 40:16, 40:20, 42:5, 68:12, 68:18, 68:21, 69:15, 70:25, 71:12, 71:15, 72:2, 92:19, 92:22, 93:3, 100:12, 100:17, 100:18, 104:8, 105:8, 112:9, 112:15, 118:10
**protected** [7] - 63:20, 63:22, 68:4, 79:18, 88:4, 88:6, 115:11
**protecting** [1] - 96:24
**protection** [9] - 10:2, 41:23, 68:19, 68:23, 68:24, 69:6, 97:17, 99:19, 115:9
**protects** [3] - 63:11, 64:4, 69:7
**prove** [73] - 4:16, 11:13, 11:22, 13:11, 13:25, 14:8, 14:12, 14:16, 14:24, 18:2, 32:16, 39:11, 41:15, 41:20, 42:1, 42:10, 42:17, 42:23, 43:3, 62:1, 62:6, 65:6, 65:23, 69:16, 69:21, 69:22, 70:23, 71:2, 73:21, 73:23, 73:24, 77:14, 77:17, 77:19, 77:21, 78:13, 78:20, 78:22, 79:9, 79:22, 80:2, 81:8, 81:11, 81:23, 81:25, 82:1, 82:12, 83:22, 84:9, 85:3, 85:8, 85:9, 85:25, 88:2, 88:20, 92:7, 92:16, 92:24, 93:11, 93:20, 98:5, 98:10, 100:9, 100:18, 100:20, 105:6, 107:5, 112:5, 114:9, 116:16
**proved** [21] - 25:21, 53:1, 57:4, 71:19, 72:11, 79:5, 98:7, 100:14, 103:2, 105:7, 116:25
**proven** [1] - 106:4
**provide** [3] - 12:5, 52:23, 91:23
**provided** [3] - 7:1, 36:13, 104:22
**provides** [1] - 91:21
**proving** [13] - 21:25, 61:19, 64:22, 69:8, 69:19, 70:6, 70:16,

70:22, 82:13, 85:7, 85:9, 88:3, 90:22
**provisions** [1] - 17:18
**public** [7] - 29:9, 29:23, 63:3, 63:11, 63:12, 67:14
**publically** [5] - 62:13, 63:4, 63:5
**publication** [6] - 16:2, 16:18, 17:5, 23:17, 27:13, 29:3
**publications** [1] - 23:23
**publicly** [3] - 15:18, 15:19, 29:24
**publish** [1] - 30:1
**published** [9] - 15:12, 16:14, 16:22, 17:4, 19:25, 20:2, 27:5, 27:16, 115:6
**publisher** [3] - 28:3, 36:22, 36:23
**Publishing** [2] - 60:1, 91:21
**publishing** [9] - 27:22, 29:4, 31:9, 31:15, 32:8, 32:9, 34:12, 91:21, 91:23
**pulled** [1] - 17:19
**pure** [2] - 113:10, 118:6
**purportedly** [1] - 32:7
**purpose** [13] - 31:5, 47:11, 47:12, 52:3, 52:4, 52:5, 52:9, 52:11, 52:12, 52:13, 55:4, 56:1, 57:1
**purposes** [1] - 20:16
**Purry** [4] - 28:9, 28:12, 28:17, 47:19
**pursue** [1] - 111:2
**put** [26] - 7:10, 7:14, 12:13, 17:8, 24:20, 25:11, 25:13, 28:12, 74:11, 77:4, 79:11, 79:19, 81:3, 81:6, 85:24, 88:12, 91:16, 92:11, 92:21, 94:13, 98:13, 107:13, 107:24, 108:1, 109:8, 115:6
**putting** [1] - 74:12

## Q

**qualify** [1] - 68:22
**Questions** [1] - 11:24
**questions** [12] - 12:13, 51:19, 55:7, 55:8, 55:13, 81:15, 92:1,

110:21, 110:22, 114:5, 114:6, 120:22
**quick** [1] - 95:12, 95:14
**quickly** [2] - 91:25, 92:3
**quite** [1] - 30:25
**quote** [1] - 69:6

## R

**radio** [9] - 84:22, 85:1, 93:17, 109:23, 109:25, 110:2, 110:3, 110:5, 111:19
**rained** [1] - 52:21
**raise** [2] - 38:22, 46:11
**ramifications** [1] - 34:4
**randomly** [1] - 108:18
**rap** [9] - 31:6, 33:14, 73:18, 74:13, 76:5, 77:7, 88:24, 89:5, 94:14
**rather** [3] - 5:16, 9:20, 116:15
**Re** [10] - 97:13, 103:3, 105:5, 115:20, 115:24
**reach** [3] - 49:7, 49:13, 49:20
**reached** [5] - 50:9, 50:12, 81:1, 117:23, 120:24
**reaching** [3] - 51:7, 53:8, 53:10
**read** [7] - 6:24, 48:24, 57:3, 58:11, 58:23, 97:7, 104:6
**reading** [2] - 55:13, 85:11
**reads** [2] - 4:15, 39:11
**ready** [2] - 47:22, 50:15
**reality** [3] - 96:24, 99:1, 107:16
**realized** [1] - 90:6
**realizing** [1] - 85:13
**really** [19] - 8:12, 16:20, 32:5, 33:18, 36:14, 44:21, 88:4, 88:10, 95:24, 96:14, 97:16, 98:25, 100:18, 102:25, 106:5, 115:8, 115:9, 115:18
**reason** [7] - 7:15, 11:23, 53:2, 86:24, 112:4, 115:17, 118:2
**reasonable** [30] -

10:17, 14:2, 39:12, 39:25, 40:21, 42:2, 42:12, 69:23, 69:25, 70:4, 71:25, 79:8, 79:13, 80:8, 82:7, 82:14, 88:21, 92:25, 93:13, 93:18, 99:8, 107:12, 107:17, 109:11, 110:13, 110:14, 112:6, 113:4, 113:12
**reasonableness** [1] - 54:2
**reasons** [4] - 17:1, 55:15, 55:19, 117:6
**rebut** [2] - 70:15, 72:19
**rebutted** [1] - 70:6
**recast** [1] - 62:25
**recasting** [1] - 65:17
**received** [16] - 51:3, 51:8, 52:2, 52:8, 56:12, 56:17, 56:19, 57:17, 65:10, 77:24
**recess** [8] - 32:2, 46:7, 55:24, 95:10, 95:12, 95:14, 95:18, 121:1
**Recess** [2] - 32:3, 46:8
**recognize** [1] - 43:24
**recognized** [2] - 83:1, 118:18
**recognizes** [1] - 79:3
**recognizing** [1] - 103:16
**recollection** [2] - 75:14, 76:11
**record** [12] - 12:19, 31:13, 31:22, 37:14, 38:1, 46:11, 56:23, 83:4, 89:17, 113:8, 117:23, 120:16
**Record** [1] - 110:23
**recorded** [1] - 55:8
**recording** [4] - 63:6, 64:9, 64:16, 64:17
**Recording** [1] - 47:19
**recordings** [4] - 15:19, 63:25, 64:7, 64:12
**Recordings** [1] - 28:18
**records** [1] - 57:7
**Records** [7] - 18:15, 34:22, 59:25, 81:18, 91:16, 110:19, 110:20
**redo** [2] - 38:1, 47:7
**REDUCED** [1] - 121:15
**reference** [5] - 7:2,

39:9, 45:3, 45:17, 58:14
**referenced** [1] - 8:11
**referring** [1] - 23:21
**reflects** [1] - 15:3
**refresh** [2] - 75:14, 76:10
**regarding** [7] - 4:11, 4:25, 23:19, 47:13, 49:1, 91:14, 114:7
**regardless** [2] - 50:21, 96:18
**register** [1] - 61:3
**registered** [1] - 78:1
**registers** [1] - 61:9
**Registrar** [1] - 61:8
**registration** [19] - 8:6, 8:7, 38:14, 61:4, 61:10, 61:12, 61:13, 66:16, 66:17, 66:20, 77:24, 77:25, 95:2, 95:4, 98:7, 114:8, 114:10, 114:12, 115:9
**reject** [1] - 55:17
**related** [4] - 15:4, 17:19, 45:3, 118:24
**relates** [1] - 16:7
**release** [1] - 26:4
**released** [6] - 75:12, 76:7, 82:15, 114:12, 114:13, 119:15
**relevant** [5] - 15:17, 29:24, 30:25, 56:2, 71:11
**relies** [1] - 7:25
**religious** [2] - 53:8, 89:7
**rely** [3] - 47:15, 59:18, 70:3
**remains** [2] - 9:16, 44:1
**Remember** [2] - 59:13, 86:10
**remember** [20] - 50:7, 51:16, 54:9, 54:10, 75:3, 76:11, 76:21, 77:3, 78:25, 80:20, 80:22, 82:9, 86:12, 86:21, 87:2, 89:23, 94:9, 114:17, 117:24, 119:2
**remind** [5] - 57:18, 79:23, 88:22, 92:3, 118:11
**removal** [1] - 39:16
**removing** [1] - 11:11
**rendering** [1] - 71:13
**rendition** [1] - 64:10
**repeat** [1] - 11:18

**repeated** [2] - 86:23, 106:16
**repeating** [1] - 108:13
**repeats** [1] - 102:12
**report** [2] - 58:10, 58:24
**REPORTED** [1] - 121:13
**REPORTER** [6] - 1:22, 40:10, 95:12, 121:5, 121:11, 121:25
**REPORTER'S** [1] - 1:14
**reproduce** [3] - 15:16, 29:13, 62:24
**reproduces** [1] - 62:12
**reproducing** [4] - 21:1, 24:13, 60:10, 60:20
**reproduction** [7] - 19:3, 19:9, 23:3, 23:12, 31:2, 34:19, 63:11
**request** [2] - 56:7, 56:8
**require** [3] - 8:2, 39:16, 118:13
**required** [4] - 40:1, 40:5, 80:2, 81:7
**requirements** [1] - 61:8
**requires** [3] - 8:4, 71:6, 91:11
**research** [4] - 47:13, 58:13, 58:20, 59:5
**resolve** [1] - 13:1
**respect** [22] - 6:25, 7:11, 7:22, 8:13, 8:21, 15:10, 15:24, 22:24, 24:3, 24:8, 26:16, 27:23, 31:1, 39:6, 99:5, 105:10, 109:22, 109:25, 110:7, 116:22, 116:23, 117:1
**respectfully** [3] - 117:2, 117:5, 117:14
**respond** [1] - 58:9
**responses** [1] - 86:2
**rest** [4] - 36:8, 54:20, 92:2, 100:2
**rested** [1] - 90:25
**restrictions** [1] - 59:15
**result** [3] - 48:5, 64:5, 64:7
**return** [5] - 44:17, 50:15, 117:2, 117:6, 120:24
**revealed** [1] - 103:22
**review** [4] - 77:15,

82:5, 92:3, 96:1
**reviewing** [1] - 47:5
**revised** [1] - 41:4
**revisiting** [1] - 41:14
**rhythm** [6] - 64:2,
80:15, 104:15,
105:18, 106:10,
106:17
**rights** [25] - 15:15,
15:23, 20:13, 23:12,
24:9, 27:23, 29:7,
29:8, 29:11, 29:18,
30:9, 30:10, 30:13,
30:15, 31:20, 34:9,
62:23, 63:9, 63:15,
78:9, 94:15, 111:6,
114:18, 118:7
**rise** [5] - 13:15, 40:22,
47:24, 95:17
**ROAD** [1] - 2:11
**Roll** [4] - 87:4, 87:6,
87:13, 87:15
**Rolling** [1] - 118:20
**room** [5] - 48:13,
72:17, 92:3, 92:6,
98:18
**ROOM** [1] - 1:23
**royalties** [4] - 90:5,
110:23, 111:9, 118:3
**royalty** [1] - 111:2
**Rule** [2] - 27:2, 44:11
**ruled** [8] - 7:5, 10:4,
10:13, 34:13, 39:1,
39:5, 39:19, 39:23
**rules** [10] - 7:12, 8:21,
9:4, 51:21, 56:3,
56:11, 56:15, 58:25,
59:14
**ruling** [4] - 39:16,
41:11, 41:13, 51:23
**rulings** [1] - 41:14
**runs** [1] - 97:6
**rushed** [1] - 100:6
**Russell** [1] - 59:24

## S

**Saint** [3] - 87:2, 87:3,
118:9
**sale** [3] - 34:25, 63:3,
91:15
**sales** [10] - 34:20,
89:12, 89:15, 89:18,
89:24, 110:17,
110:24, 111:4,
111:11, 111:13
**SAME** [1] - 121:15
**Sandberg** [2] - 59:25,
77:3
**Santa** [1] - 76:23

**Sarah** [3] - 59:24,
77:1, 106:24
**Satava** [1] - 8:16
**Satisfaction** [1] -
118:20
**satisfied** [1] - 61:8
**satisfy** [1] - 71:1
**saturation** [1] - 112:2
**saw** [6] - 52:16, 78:5,
89:3, 89:16, 90:12
**scale** [1] - 103:20
**schoolbooks** [1] -
116:14
**score** [1] - 87:6
**scores** [1] - 87:5
**Scott** [1] - 104:20
**scoured** [1] - 107:7
**screen** [1] - 46:23
**search** [5] - 58:19,
107:20, 108:9,
108:18, 112:4
**searched** [1] - 86:13
**searching** [1] - 58:14
**seated** [1] - 48:1
**second** [6] - 12:1,
41:20, 66:9, 78:12,
89:11, 98:9
**secondarily** [1] -
22:13
**secondary** [2] - 22:10,
22:11
**seconds** [5] - 44:10,
75:14, 76:12, 76:17,
79:17
**Section** [2] - 5:19,
32:8
**sections** [1] - 101:5
**secular** [2] - 113:3,
113:5
**see** [24] - 5:22, 5:25,
9:19, 15:5, 22:20,
28:16, 37:11, 41:5,
46:1, 52:20, 53:19,
54:9, 75:25, 77:25,
87:7, 90:21, 91:14,
91:18, 102:1,
102:18, 113:10,
118:21, 119:20,
120:21
**seek** [3] - 5:1, 83:10,
120:10
**seeking** [2] - 120:1,
120:4
**seeks** [1] - 104:9
**seem** [1] - 43:25
**selecting** [1] - 6:16
**selection** [3] - 7:22,
9:17, 68:25
**selling** [1] - 120:8
**sells** [2] - 74:22,

114:24
**send** [4] - 44:20,
49:22, 50:3, 77:6
**sends** [1] - 108:10
**sense** [9] - 53:2, 96:7,
98:14, 101:14,
102:18, 107:16,
108:11, 109:19,
113:4
**sensibly** [1] - 24:22
**sent** [4] - 13:4, 32:4,
44:15, 48:13
**sentence** [2] - 10:16,
87:10
**separate** [3] - 12:8,
26:1, 64:1
**separately** [2] - 50:23,
65:13
**series** [4] - 64:8,
102:12, 103:17,
103:23
**serious** [3] - 96:17,
96:19, 104:17
**seriously** [1] - 96:20
**serve** [1] - 49:5
**service** [2] - 18:24,
58:8
**services** [8] - 18:22,
23:23, 24:3, 24:17,
25:8, 91:19, 91:22,
91:23
**session** [1] - 52:7
**SET** [1] - 121:14
**settled** [1] - 118:6
**settlement** [3] -
117:23, 118:5
**seven** [1] - 80:13
**several** [1] - 119:6
**shadow** [1] - 117:22
**shall** [2] - 46:18, 49:6
**shape** [1] - 117:2
**share** [2] - 71:5, 116:2
**shared** [1] - 66:12
**shifts** [2] - 70:15,
76:13
**shirts** [1] - 114:2
**short** [1] - 95:11
**Shorty** [1] - 88:9
**shove** [1] - 119:12
**show** [10] - 62:7,
69:11, 70:12, 79:15,
83:2, 86:21, 93:20,
110:12, 112:6, 115:5
**showed** [7] - 66:11,
83:11, 86:25, 87:6,
95:2, 100:23, 116:8
**showing** [2] - 76:7,
82:1
**shown** [5] - 57:6,
69:19, 116:7,

116:10, 116:13
**shows** [5] - 35:4,
82:24, 84:17, 88:25,
92:14
**side** [1] - 56:14
**sides** [1] - 92:2
**sidewalk** [2] - 52:21,
52:24
**sign** [1] - 50:14
**signed** [5] - 24:18,
49:23, 49:25, 60:23,
67:9
**significance** [1] -
55:12
**SILBERBERG** [1] -
2:15
**similar** [35] - 10:19,
37:17, 37:19, 39:14,
41:22, 42:5, 44:4,
63:13, 70:25, 71:16,
71:20, 72:2, 76:20,
79:17, 80:6, 80:9,
80:14, 86:14, 88:1,
92:18, 92:22, 93:3,
93:5, 93:6, 93:8,
93:24, 100:10,
100:21, 102:11,
112:10, 116:2,
116:17, 118:12,
119:5, 119:9
**similarities** [5] -
62:10, 68:13, 69:14,
71:11, 71:23
**similarity** [18] - 11:16,
13:16, 13:17, 36:18,
39:7, 40:19, 40:23,
70:13, 71:2, 71:5,
71:10, 79:25, 80:1,
81:5, 99:11, 105:8,
112:8, 112:14
**similarly** [3] - 31:16,
109:15, 109:22
**simple** [6] - 34:5,
99:14, 104:3,
105:16, 105:21,
118:21
**simpler** [1] - 11:6
**simplistic** [1] - 97:23
**simply** [15] - 12:13,
12:20, 27:5, 29:8,
33:1, 40:4, 49:18,
49:20, 90:23, 91:11,
102:4, 102:19,
106:14, 106:16,
108:18
**singing** [1] - 118:17
**single** [5] - 35:14,
65:15, 74:1, 74:5
**singularly** [1] - 106:3
**sit** [3] - 44:16, 85:16,

91:25
**sites** [2] - 89:2, 89:4
**sitting** [1] - 91:8
**situation** [1] - 115:2
**Six** [1] - 84:16
**six** [11] - 29:8, 29:25,
30:8, 34:18, 34:22,
85:5, 85:19, 87:8,
87:21, 95:3
**slides** [1] - 104:16
**small** [1] - 47:6
**smart** [1] - 45:11
**Snapchat** [1] - 58:3
**SNYDER** [1] - 1:4
**social** [1] - 58:4
**SOKOL** [1] - 2:5
**sold** [6] - 24:15, 89:14,
94:15, 114:15, 115:6
**sole** [1] - 94:4
**solely** [3] - 48:21,
52:8, 68:15
**solve** [1] - 37:6
**someone** [23] - 17:25,
18:1, 18:6, 18:9,
19:16, 20:7, 21:1,
21:3, 21:11, 21:14,
22:23, 23:7, 24:8,
33:8, 36:21, 37:1,
37:20, 96:17,
103:22, 105:23,
108:10, 113:23,
114:24
**someplace** [1] - 89:23
**sometime** [1] - 72:8
**sometimes** [4] - 54:5,
54:6, 56:22, 65:13
**somewhere** [1] - 91:9
**song** [60] - 30:8,
32:21, 33:9, 34:18,
34:19, 38:6, 73:1,
73:3, 73:7, 73:18,
73:23, 74:2, 74:5,
74:14, 74:23, 75:9,
75:10, 75:17, 76:10,
76:13, 76:17, 76:18,
76:19, 77:20, 77:22,
79:17, 82:1, 82:2,
82:8, 82:15, 82:18,
82:19, 83:4, 83:11,
83:25, 84:1, 84:8,
84:24, 86:14, 86:15,
86:17, 87:9, 88:9,
93:24, 94:15, 94:17,
97:22, 98:10, 99:7,
99:8, 105:19,
105:25, 106:2,
109:19, 112:21,
118:1, 119:21, 120:9
**song's** [1] - 83:18
**songs** [19] - 80:4,

80:6, 80:13, 80:14, 83:1, 85:5, 85:15, 86:22, 89:14, 90:13, 97:18, 97:20, 100:10, 101:4, 104:14, 111:7, 112:12, 112:13, 117:20

**songwriter** [3] - 85:14, 90:14, 93:17

**songwriters** [11] - 30:8, 32:20, 32:25, 38:4, 44:3, 82:3, 82:25, 84:7, 85:2, 88:22, 108:14

**soon** [3] - 58:24, 95:16, 118:18

**sorry** [5] - 26:20, 40:10, 53:12, 62:9, 68:11

**sort** [3] - 11:5, 88:10, 109:18

**sound** [12] - 15:19, 63:6, 63:24, 64:5, 64:7, 64:9, 64:12, 64:16, 64:17, 93:9, 115:23

**sounds** [2] - 64:8, 87:13

**sources** [1] - 30:20

**space** [1] - 106:13

**spaced** [1] - 103:24

**speaking** [3] - 7:3, 20:15, 118:25

**special** [6] - 30:4, 39:22, 73:4, 73:19, 96:4, 100:6

**specific** [7] - 7:12, 60:12, 71:12, 103:20, 112:18, 112:24, 113:2

**specifically** [2] - 17:19, 117:4

**specifics** [1] - 109:25

**specter** [1] - 25:4

**speculate** [2] - 113:11, 113:13

**speculation** [3] - 70:3, 109:11, 113:10

**spend** [1] - 109:6

**spoken** [1] - 64:8

**spokesperson** [1] - 49:6

**sports** [1] - 109:2

**Spotify** [1] - 83:5

**squarely** [2] - 7:10, 7:25

**SS** [1] - 121:8

**ST** [1] - 2:8

**stadiums** [1] - 84:15

**stage** [2] - 38:5, 74:6

**stains** [1] - 79:1

**stand** [5] - 8:8, 80:11, 105:3, 106:8, 106:20

**stand-alone** [1] - 8:8

**standard** [1] - 8:20

**standing** [2] - 71:15, 85:21

**stands** [1] - 50:8

**start** [8] - 11:13, 25:6, 32:6, 44:18, 48:5, 95:15, 100:23, 101:17

**started** [4] - 90:18, 99:9, 106:8, 114:4

**starts** [2] - 75:1, 119:18

**state** [5] - 4:6, 31:17, 31:19, 55:15, 120:16

**STATE** [1] - 121:9

**statement** [2] - 31:17, 37:23

**statements** [2] - 51:12, 51:14

**STATES** [4] - 1:1, 1:1, 1:4, 121:12

**states** [1] - 18:22

**stating** [1] - 31:12

**statute** [1] - 29:16

**stealing** [1] - 96:18

**Stellar** [1] - 82:20

**STENOGRAPHIC** [1] - 121:18

**STENOGRAPHICALLY** [1] - 121:13

**step** [3] - 12:4, 100:22

**step-by-step** [1] - 100:22

**steps** [1] - 103:20

**stick** [1] - 120:21

**still** [4] - 15:9, 21:10, 33:16, 120:4

**stipulated** [1] - 23:24

**stipulation** [4] - 18:22, 25:7, 83:24, 91:13

**stipulations** [2] - 23:24, 91:19

**Stone's** [1] - 118:20

**stop** [4] - 5:24, 6:7, 11:25, 68:2

**stopped** [1] - 88:16

**store** [1] - 83:4

**stores** [2] - 89:1, 89:16

**story** [1] - 73:16

**straight** [2] - 30:18, 46:22

**straightened** [2] - 44:19, 46:2

**strategies** [1] - 73:11

**strategy** [3] - 96:10, 96:12, 96:13

**STREET** [1] - 1:23

**stretch** [2] - 106:11, 106:17

**stretched** [3] - 101:15, 102:19, 106:16

**stricken** [3] - 51:24, 56:23, 56:25

**strictly** [2] - 8:21, 24:8

**strike** [1] - 27:13

**strive** [1] - 49:7

**strongly** [1] - 25:19

**structure** [2] - 64:3, 100:25

**study** [1] - 74:19

**stuff** [1] - 120:9

**stumble** [5] - 108:12, 108:15, 108:16, 108:17, 112:3

**subconscious** [3] - 85:12, 91:7, 96:19

**subconsciously** [1] - 72:7

**subject** [1] - 61:7

**subjective** [1] - 71:23

**submit** [7] - 7:4, 75:17, 96:12, 99:3, 100:13, 105:9, 114:2

**submitted** [6] - 6:17, 15:3, 17:1, 17:12, 30:21, 104:5

**subsequent** [1] - 33:8

**substantial** [21] - 4:19, 11:16, 36:17, 39:7, 40:19, 40:23, 44:4, 62:2, 62:4, 62:10, 65:25, 69:14, 70:13, 71:2, 71:9, 79:25, 81:5, 99:10, 105:7, 112:7, 112:14

**substantially** [29] - 10:19, 37:17, 37:19, 39:14, 41:22, 42:5, 62:9, 63:13, 70:24, 71:16, 71:20, 72:2, 79:17, 80:6, 80:9, 80:14, 92:18, 92:22, 93:2, 93:5, 93:6, 93:8, 93:10, 93:24, 100:10, 100:21, 102:11, 112:10, 116:17

**successfully** [1] - 32:24

**sufficient** [2] - 72:6, 113:14

**sufficiently** [2] - 37:18, 88:4

**suggest** [5] - 16:5,

19:14, 96:6, 100:7, 104:2

**suggesting** [3] - 21:10, 110:7, 116:16

**suing** [1] - 115:14

**SUITE** [2] - 2:11, 2:23

**summaries** [2] - 57:5, 57:8

**sung** [1] - 77:4

**superfluous** [1] - 11:14

**support** [3] - 82:6, 85:24, 94:7

**supports** [2] - 38:17, 57:9

**suppose** [1] - 14:22

**supposed** [1] - 75:19

**surmise** [1] - 115:13

**surprise** [1] - 78:16

**surrounding** [1] - 70:20

**suspicious** [1] - 114:7

**sustain** [2] - 56:17, 56:20

**Swirsky** [1] - 8:15

**sworn** [3] - 51:2, 55:5, 120:18

**sympathy** [1] - 48:21

**synonymous** [1] - 20:12

**systematically** [1] - 97:25

**systems** [2] - 60:14, 68:8

## T

**talks** [1] - 40:15

**tambor** [2] - 74:10, 80:16

**tangible** [2] - 61:2, 64:3

**tape** [1] - 77:6

**Target** [1] - 89:1

**televised** [1] - 82:23

**tempo** [1] - 74:9

**tend** [1] - 109:17

**term** [6] - 5:13, 30:5, 62:16, 63:9, 64:19, 107:11

**terms** [9] - 12:18, 27:23, 29:3, 30:2, 50:8, 60:6, 102:17, 102:22, 105:17

**test** [20] - 11:25, 12:7, 13:21, 38:24, 39:7, 40:4, 40:5, 40:13, 40:18, 40:21, 40:25, 41:1, 71:3, 71:4, 71:6, 71:14, 71:18,

71:22, 92:20

**tested** [2] - 59:3, 59:9

**testified** [18] - 53:19, 54:14, 54:18, 74:12, 76:16, 81:1, 82:9, 88:1, 88:23, 89:20, 90:5, 94:13, 102:20, 104:14, 114:15, 114:21, 118:2, 119:19

**testify** [3] - 54:22, 55:11, 92:20

**testifying** [4] - 53:21, 74:8, 75:6, 86:6

**testimony** [36] - 33:11, 35:20, 51:2, 51:8, 51:24, 52:16, 53:13, 53:14, 53:16, 54:1, 54:2, 54:12, 54:13, 54:24, 55:3, 55:5, 55:9, 55:10, 55:16, 55:17, 59:3, 71:7, 78:6, 79:23, 82:18, 84:12, 86:5, 86:12, 86:13, 94:5, 98:17, 98:18, 101:22, 101:23, 106:18, 115:1

**tests** [1] - 12:8

**text** [1] - 57:25

**texture** [2] - 74:10, 80:17

**textures** [1] - 105:20

**THAN** [1] - 2:13

**THAT** [3] - 121:13, 121:15, 121:17

**THE** [165] - 2:20, 4:3, 4:8, 5:6, 5:8, 5:10, 6:5, 6:11, 6:14, 6:18, 6:20, 7:6, 7:16, 8:9, 9:9, 9:14, 9:22, 10:1, 10:5, 10:7, 10:11, 10:22, 10:25, 11:3, 11:17, 12:9, 12:14, 12:17, 12:23, 13:1, 13:18, 13:20, 13:22, 13:25, 14:5, 14:7, 14:12, 14:16, 14:23, 15:5, 15:13, 16:12, 16:17, 16:20, 17:8, 17:14, 17:17, 17:21, 18:3, 18:14, 18:19, 19:2, 19:6, 19:10, 19:19, 19:22, 20:5, 20:15, 20:20, 21:7, 21:10, 21:15, 22:5, 22:12, 22:16, 22:19, 23:5, 23:14, 23:19, 24:11, 25:16, 25:24, 26:2, 26:8, 26:12,

26:14, 26:22, 27:3, 27:8, 27:10, 27:18, 27:25, 28:7, 28:16, 28:20, 28:24, 29:12, 29:15, 29:19, 30:22, 31:7, 31:11, 31:14, 31:25, 32:2, 32:4, 32:11, 33:6, 33:11, 33:24, 34:23, 35:8, 35:11, 35:17, 36:2, 36:8, 36:14, 37:6, 37:10, 37:12, 37:24, 38:8, 38:16, 38:20, 39:2, 40:8, 40:10, 41:3, 41:8, 41:13, 42:1, 42:8, 42:10, 42:17, 42:23, 43:3, 43:10, 43:17, 43:24, 44:8, 44:13, 44:15, 44:23, 44:25, 45:5, 45:19, 45:23, 46:7, 46:9, 46:14, 46:18, 46:19, 46:20, 47:2, 47:5, 47:24, 48:1, 48:2, 95:9, 95:12, 95:14, 95:17, 95:20, 117:16, 119:1, 120:12, 120:16, 120:17, 120:20, 121:1, 121:11, 121:12, 121:13, 121:14, 121:15

**their's** [1] - 113:5
**theirs** [3] - 81:17, 104:1, 107:8
**themselves** [8] - 14:9, 42:18, 60:16, 70:7, 71:13, 83:9, 87:18, 93:22
**theory** [3] - 32:12, 107:10, 107:11
**theorys** [1] - 34:3
**THEREAFTER** [1] - 121:15
**therefore** [4] - 8:5, 52:25, 57:4, 57:9
**Theresa** [1] - 59:24
**they've** [8] - 23:12, 26:15, 100:23, 106:25, 107:7, 113:25, 117:10
**thin** [10] - 7:19, 7:20, 8:20, 9:4, 9:10, 10:1, 69:6, 99:21, 107:9
**thinking** [2] - 34:1, 45:10
**thinks** [1] - 56:14
**third** [14] - 4:23, 7:7, 9:7, 9:10, 9:11, 9:12, 21:12, 21:19, 35:22,

40:20, 87:10, 89:11, 91:2, 99:10
**THIS** [1] - 121:17
**thousand** [1] - 85:15
**thousands** [1] - 85:15
**thread** [2] - 97:6, 107:9
**three** [20] - 8:9, 12:9, 12:12, 28:14, 29:21, 32:20, 38:4, 42:1, 44:10, 47:16, 73:17, 76:16, 78:6, 79:19, 82:22, 87:24, 98:5, 102:5, 112:8
**threshold** [1] - 88:3
**throughout** [1] - 103:12
**throw** [1] - 47:16
**thumbs** [1] - 44:17
**THURSDAY** [2] - 1:15, 4:1
**tied** [1] - 91:15
**TIME** [1] - 121:14
**timing** [1] - 118:4
**title** [1] - 15:14
**TO** [1] - 121:15
**today** [6] - 37:7, 44:21, 76:10, 88:24, 97:7, 120:21
**together** [7] - 35:23, 38:11, 76:21, 77:5, 79:11, 79:19, 105:15
**tomorrow** [2] - 44:21, 120:24
**tone** [1] - 55:12
**took** [5] - 47:15, 48:22, 59:18, 75:11, 97:24
**topic** [1] - 44:11
**total** [20] - 10:18, 10:20, 12:2, 38:23, 39:13, 39:16, 40:4, 40:22, 42:3, 71:25, 73:24, 76:18, 84:2, 93:1, 97:21, 100:9, 100:20, 101:20, 112:12, 112:13
**touching** [1] - 58:23
**track** [5] - 23:8, 27:16, 29:7, 84:7, 118:21
**TRANSCRIPT** [1] - 1:14
**transcript** [2] - 39:19, 41:12
**transcription** [1] - 104:21
**TRANSCRIPTION** [2] - 121:16, 121:17
**transfer** [6] - 60:18, 60:22, 63:3, 65:10,

67:2, 67:8
**transferor** [2] - 60:23, 67:9
**transferred** [3] - 60:24, 67:6, 67:10
**transform** [1] - 62:25
**transforming** [1] - 65:17
**Transmission** [1] - 63:7
**transmission** [1] - 15:21
**TRAURIG** [1] - 2:21
**treat** [1] - 57:4
**treated** [1] - 56:3
**trial** [15] - 52:8, 55:6, 55:21, 58:6, 58:19, 59:4, 59:9, 59:10, 59:12, 60:7, 63:17, 77:12, 88:20, 120:5
**tried** [8] - 12:13, 83:2, 83:17, 83:22, 104:12, 105:4, 117:10
**trillion** [2] - 108:6, 113:19
**trite** [1] - 67:25
**trivial** [2] - 67:25, 69:2
**troubled** [1] - 9:9
**TRUE** [1] - 121:17
**true** [8] - 21:21, 31:25, 50:19, 51:6, 54:19, 61:24, 61:25, 83:19
**truly** [1] - 32:6
**trusted** [1] - 11:2
**truth** [3] - 54:18, 55:7, 59:3
**try** [14] - 16:12, 25:24, 31:25, 58:16, 78:22, 86:24, 88:2, 103:21, 105:1, 105:2, 107:7, 118:3, 118:8, 120:14
**trying** [16] - 19:2, 23:8, 23:20, 26:8, 33:25, 36:15, 37:5, 37:25, 38:3, 38:22, 96:25, 97:15, 105:22, 105:23, 117:22, 119:12
**turn** [1] - 58:24
**turned** [1] - 52:22
**TV** [6] - 84:22, 85:1, 93:17, 109:23, 110:6, 111:19
**twiddle** [1] - 44:16
**Twitter** [1] - 58:3
**two** [53] - 12:8, 12:13, 12:15, 24:17, 26:16, 27:17, 29:21, 32:12, 33:18, 34:9, 35:2,

35:21, 38:4, 40:18, 40:22, 53:10, 54:9, 63:24, 71:4, 71:19, 71:23, 74:18, 77:20, 79:5, 80:1, 80:4, 80:6, 80:8, 80:12, 80:13, 80:21, 81:21, 82:24, 83:15, 86:24, 92:20, 97:20, 100:5, 100:6, 100:10, 100:14, 101:3, 103:1, 103:3, 104:14, 106:15, 110:2, 111:1, 111:5, 112:12, 112:13, 116:12, 117:8
**tying** [1] - 113:16
**type** [5] - 22:9, 46:22, 73:19, 88:21, 112:2
**types** [7] - 7:13, 7:14, 63:24, 79:5, 80:1, 88:23, 110:15
**TYPEWRITTEN** [1] - 121:15

## U

**ultimate** [1] - 33:22
**ultimately** [2] - 35:3, 101:25
**UMG** [3] - 28:12, 28:18, 47:19
**unanimous** [4] - 49:9, 49:13, 50:9, 50:12
**unanswered** [1] - 44:1
**unclear** [1] - 10:3
**under** [14] - 5:15, 15:14, 51:21, 54:25, 55:6, 56:3, 71:2, 73:19, 82:10, 91:7, 102:14, 104:8, 114:17, 114:21
**underlying** [5] - 9:2, 57:9, 57:10, 63:25, 68:6
**understandably** [1] - 119:12
**understood** [1] - 23:16
**undisputed** [1] - 102:17
**undoubtedly** [3] - 24:23, 110:8, 110:21
**unequivocally** [1] - 105:14
**unexpected** [1] - 48:4
**unfortunately** [2] - 28:10, 34:1
**unhappy** [1] - 45:24
**unique** [1] - 87:23

**unitary** [2] - 4:21, 66:3
**UNITED** [4] - 1:1, 1:1, 1:4, 121:11
**Universal** [4] - 26:16, 28:12, 28:18, 47:19
**universe** [3] - 82:2, 109:4, 111:17
**universities** [1] - 84:16
**unless** [3] - 44:21, 50:23, 100:8
**unlike** [1] - 96:2
**unnecessary** [1] - 4:23
**unpaid** [1] - 111:9
**unprotectable** [7] - 8:18, 68:15, 68:22, 68:23, 99:23, 104:10, 116:9
**unrebutted** [2] - 112:17, 115:18
**unremarkable** [1] - 106:3
**untrue** [1] - 54:12
**untruthfully** [2] - 54:14, 54:18
**unwilling** [1] - 49:16
**up** [24] - 21:25, 28:25, 33:5, 33:6, 33:22, 45:20, 52:20, 74:11, 74:12, 75:2, 75:3, 75:5, 75:25, 85:16, 85:17, 86:23, 91:8, 91:9, 94:13, 106:20, 109:20, 111:1, 118:7

## V

**vague** [2] - 27:23, 29:3
**valid** [12] - 60:22, 61:12, 64:24, 65:4, 66:16, 67:8, 77:18, 77:21, 77:23, 78:11, 98:6, 114:9
**validity** [2] - 114:8, 115:15
**valuable** [4] - 4:19, 66:1, 72:25, 90:14
**value** [1] - 119:24
**variations** [1] - 67:24
**varies** [1] - 35:2
**variety** [1] - 120:7
**various** [4] - 73:25, 89:2, 101:5, 104:13
**vast** [2] - 108:4, 111:17
**venues** [2] - 110:10, 110:15
**verbatim** [1] - 103:8
**verdict** [43] - 4:9, 11:4,

11:6, 11:15, 11:19,
12:19, 27:11, 27:25,
28:1, 28:22, 30:4,
32:15, 34:4, 34:14,
38:25, 39:6, 39:10,
39:23, 39:24, 40:6,
41:2, 41:4, 45:4,
49:1, 49:9, 49:13,
49:20, 50:9, 50:11,
50:12, 50:13, 51:7,
53:8, 53:11, 56:10,
57:16, 59:7, 72:16,
96:4, 100:7, 117:2,
117:6, 117:15
**verse** [1] - 31:6
**version** [5] - 13:3,
15:2, 77:7, 101:15,
102:19
**versions** [1] - 54:7
**versus** [2] - 4:5, 30:19
**via** [2] - 57:25
**vicarious** [17] - 15:11,
16:3, 16:7, 16:11,
17:15, 18:2, 19:17,
20:9, 21:5, 21:23,
23:1, 23:25, 24:7,
24:20, 25:5, 25:15,
25:20
**vicariously** [1] - 22:8
**video** [4] - 91:17,
111:14, 111:20,
117:20
**videos** [2] - 93:16,
107:25
**view** [10] - 34:4, 46:21,
46:24, 58:17, 58:19,
103:5, 108:8,
113:19, 113:20
**viewing** [1] - 111:16
**views** [12] - 32:14,
49:12, 83:12, 83:18,
83:21, 107:25,
108:5, 108:6, 108:7,
113:16
**VINCENT** [1] - 2:22
**violate** [2] - 20:13,
73:9
**violated** [5] - 22:23,
23:12, 23:13, 31:20,
34:9
**violates** [1] - 59:15
**violation** [2] - 24:2,
116:22
**virtual** [2] - 7:23, 69:7
**virtue** [1] - 33:1
**visit** [1] - 58:17
**visits** [1] - 119:14
**vocal** [1] - 33:14
**vocals** [1] - 106:12
**voice** [2] - 55:12,

118:15
**volume** [2] - 107:21,
112:3
**vote** [1] - 50:8
**VS** [1] - 1:8

## W

**WAIS** [1] - 2:16
**waiting** [2] - 50:5,
55:25
**wake** [1] - 52:20
**walk** [1] - 33:25
**walking** [1] - 78:24
**Walmart** [1] - 89:1
**Walter** [14] - 59:24,
76:21, 82:7, 91:1,
91:5, 91:20, 94:5,
95:1, 98:18, 101:10,
102:20, 105:15,
106:8, 106:23
**Walter's** [1] - 101:23
**Walters** [1] - 90:18
**wanna** [1] - 95:10
**wants** [1] - 12:3
**warner** [1] - 26:11
**Warner** [3] - 26:12,
26:25, 117:1
**WAS** [1] - 121:15
**watch** [1] - 58:11
**watched** [1] - 82:23
**water** [4] - 52:24, 79:1,
79:2, 108:23
**ways** [1] - 64:12
**WB** [2] - 60:1, 91:22
**wealthy** [1] - 86:8
**website** [1] - 58:1
**week** [1] - 80:11
**weigh** [1] - 93:23
**weight** [8] - 49:19,
53:4, 53:6, 54:21,
54:24, 55:3, 55:18,
57:10
**WEST** [2] - 1:23, 2:18
**WESTERN** [1] - 1:2
**wet** [1] - 52:21
**whereas** [1] - 44:4
**whole** [9] - 4:21,
11:11, 22:9, 62:5,
66:4, 100:5, 100:6,
115:25
**wholes** [1] - 71:24
**wide** [3] - 98:15,
98:16, 120:7
**widely** [7] - 14:1,
42:11, 82:1, 93:12,
93:15, 98:11
**widespread** [17] -
69:20, 69:21, 70:10,
82:13, 83:2, 88:19,

90:17, 93:25, 99:1,
99:5, 107:10, 109:9,
110:18, 112:1,
112:16, 119:11
**wife** [6] - 75:24, 76:4,
82:22, 84:18, 90:1,
98:22
**Williams** [2] - 30:19,
120:17
**win** [2] - 11:7, 100:8
**wiping** [1] - 78:25
**within's** [1] - 53:22
**witness** [20] - 51:2,
52:16, 53:15, 53:16,
53:18, 54:5, 54:13,
54:16, 54:17, 54:25,
55:3, 55:5, 55:6,
55:11, 80:3, 80:11,
86:6, 98:20
**witness's** [7] - 53:20,
53:21, 53:24, 54:1,
54:2, 55:19, 98:17
**witnesses** [10] -
51:13, 54:7, 54:22,
54:23, 55:14, 58:21,
59:2, 91:3, 98:21,
98:22
**wonderful** [3] -
109:12, 109:13,
112:19
**word** [8] - 5:1, 5:2,
5:11, 10:8, 10:12,
27:16, 32:9, 91:4
**worded** [2] - 19:21,
25:7
**words** [12] - 17:2,
27:17, 29:10, 29:12,
30:7, 31:24, 35:9,
64:9, 80:17, 87:10,
87:11, 93:6
**work's** [2] - 4:18,
65:24
**workable** [1] - 38:1
**works** [32] - 7:8,
11:11, 15:16, 37:16,
40:22, 53:10, 60:11,
60:21, 63:1, 63:13,
63:21, 63:23, 63:24,
64:1, 64:7, 67:14,
67:15, 71:4, 71:8,
71:19, 71:24, 100:5,
100:6, 101:17,
103:8, 108:12,
116:8, 116:10,
117:8, 117:9
**works'** [1] - 67:17
**world** [3] - 76:5,
113:19, 113:20
**write** [4] - 75:9, 77:2,
96:5, 104:2

**writer** [2] - 114:19,
114:25
**writers** [8] - 24:17,
94:20, 105:14,
106:22, 110:2,
110:4, 110:15,
112:17
**writes** [2] - 76:5, 77:7
**writing** [12] - 49:25,
50:1, 57:25, 60:22,
67:8, 75:1, 75:5,
76:1, 77:3, 87:5,
90:18, 91:9
**written** [3] - 47:17,
75:24, 105:17
**wrongfully** [2] - 21:12,
24:13
**wrote** [9] - 35:23,
103:18, 103:22,
103:23, 103:25,
105:15, 105:16,
106:20, 106:21

## Y

**year** [3] - 75:11, 85:6,
85:19
**years** [8] - 73:16, 83:8,
86:7, 107:7, 107:25,
111:8, 120:1
**yesterday** [7] - 7:3,
7:10, 8:11, 8:23,
17:1, 102:7, 102:8
**yourself** [3] - 22:7,
22:10, 49:10
**youthful** [1] - 113:7
**YouTube** [7] - 58:2,
83:6, 83:12, 83:16,
84:25, 93:16, 111:16

## Z

**Zeppelin** [1] - 10:23
**zip** [1] - 8:2

# EXHIBIT 7

EXHIBIT  7
PAGE  1226

1          UNITED STATES OF AMERICA
           UNITED STATES DISTRICT COURT
2          CENTRAL DISTRICT OF CALIFORNIA
              WESTERN DIVISION
3
                  - - -
4          HONORABLE CHRISTINA A. SNYDER
        UNITED STATES DISTRICT JUDGE PRESIDING
5                 - - -

6
   MARCUS GRAY; ET AL.,              )
7                                    )
           PLAINTIFF,                )
8                                    )  CASE NO.:
   VS.                               )  CV 15-5642-CAS
9                                    )
   KATY PERRY; ET AL.,               )
10                                   )
           DEFENDANT.                )
11  _____)

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15             MONDAY, JULY 29, 2019

16            LOS ANGELES, CALIFORNIA

17

18

19

20

21

22          LAURA MILLER ELIAS, CSR 10019
          FEDERAL OFFICIAL COURT REPORTER
23       350 WEST FIRST STREET, ROOM 4455
           LOS ANGELES, CALIFORNIA 90012
24             PH:  (213)894-0374

25

EXHIBIT 7
PAGE 1227

```
 1

 2
        APPEARANCES OF COUNSEL:
 3
        ON BEHALF OF PLAINTIFF:
 4

 5              CAPES SOKOL
                BY: MICHAEL A. KAHN, ESQ.
 6                  LAUREN COHEN, ESQ.

 7              7701 FORSYTH BOULEVARD
                12TH FLOOR
 8              ST. LOUIS, MO 63105

 9
                KAYIRA LAW, LLC
10              BY:  ERIC KAYIRA, ESQ.

11              2100 HANLEY ROAD, SUITE 208
                CLAYTON, MO 63105
12

13
        ON BEHALF OF DEFENDANTS OTHER THAN MS. PERRY:
14

15              MITCHELL SILBERBERG & KNUPP
                BY: CHRISTINE LEPERA, ESQ.
16                  AARON M. WAIS, ESQ.
                    JEFFREY MOVIT, ESQ.
17                  GABRIELLA NOURAFCHAN, ESQ.
                    JACOB ALBERTSON, ESQ.
18
                11377 WEST OLYMPIC BOULEVARD
19              LOS ANGELES, CA 90064

20
        ON BEHALF OF THE PERRY DEFENDANTS:
21
                GREENBERG TRAURIG
22              BY:  VINCENT H. CHIEFFO, ESQ.

23              1840 CENTURY PARK EAST
                SUITE 1900
24              LOS ANGELES, CA 90067

25
```

3

INDEX

PROCEEDINGS                                          PAGE

JURY NOTE NO. 1 and NO. 2                            4

JURY NOTE NO. 3                                      21

VERDICT                                             35

UNITED STATES DISTRICT COURT

EXHIBIT 7
PAGE 1229

```
 1   LOS ANGELES, CALIFORNIA; MONDAY, JULY 29, 2019; 1:00 P.M.

 2                        -  -  -

 3             THE CLERK:  Calling Calendar Item No. 9.

 4             Case No. 15-5642.  Marcus Gray versus Katy Perry.

 5             Counsel, please state your appearances.

 6                (Appearances as heretofore noted.)

 7             THE COURT:  So you have both notes.

 8             Go ahead, Mr. Kahn.

 9             MR. KAHN:  Well, I think as far as Jury Note

10   No. 2 --

11             THE COURT:  Yeah, it's easier.

12             MR. KAHN:  Kitty Purry is not in the case and the

13   publishing company that was Jordan Houston's was dismissed a

14   long time ago.

15             THE COURT:  Can we then just tell them that?

16             So isn't the right answer that Kitty Purry, Inc.

17   and whatever the name of that entity is are no longer

18   defendants.

19             MR. KAHN:  Yes, that would solve that issue.

20             THE COURT:  Let me just write that out.

21             MR. CHIEFFO:  I just have one question, Your Honor.

22   BMG was never a party during the trial unlike Kitty Purry.

23             THE COURT:  I think what we ought to say is to be

24   accurate Kitty Purry, Inc. Is no longer a defendant.

25             MR. KAHN:  And Mr. Houston's publishing company is
```

```
 1   no longer a defendant?

 2           THE COURT:  And Jordan Houston BMG Rights

 3   Management U.S., LLC is not one of the listed -- shall we say

 4   one of the defendant publishing companies?

 5           MR. KAHN:  Yes.

 6           MR. CHIEFFO:  Agreed.

 7           THE COURT:  Kitty Purry is no longer a defendant

 8   and Jordan Houston's publisher BMG Rights Management U.S.,

 9   LLC is not one of the defendant publishing companies.

10           MR. KAHN:  That should solve it, I think.

11           THE COURT:  You want to look at it and see?

12           MS. LEPERA:  I'm actually not sure why we're even

13   naming the entity at this point to the jury.  It doesn't make

14   any sense.  Wouldn't we just say that there is no defendant

15   entity related to Mr. Houston in the case.  Giving them the

16   name doesn't seem to be appropriate in this context.

17           MR. KAHN:  Well, I mean, they were a defendant.

18           THE COURT:  I'm just trying to answer the question.

19           MR. KAHN:  Right.

20           MS. LEPERA:  So the answer to the question really

21   would be no.  Does one of the publishing companies listed as

22   a defendant also represent Jordan Houston?  The answer is no.

23           THE COURT:  Yeah, I know, but that doesn't solve my

24   problem because they're not gonna know what means.

25           MS. LEPERA:  I just thought it might not be
```

```
 1    appropriate to have the name of the entity in the record.
 2              THE COURT:  I can take out the name of the company.
 3    I can just say his publishing company is not one of the
 4    listed entities.
 5              MS. LEPERA:  And frankly, I don't know if it was
 6    publishing or administrative.
 7              THE COURT:  I don't know what it was.
 8              MS. LEPERA:  Exactly.
 9              THE COURT:  Why don't you give it back to me and
10    we'll try to fix it.  Kitty Purry, Inc. is no longer a
11    defendant and Jordan Houston's publisher is not one of the
12    companies that's listed as a defendant.
13              MS. LEPERA:  That's fine.
14              MR. KAHN:  Yes.
15              THE COURT:  Let me show it to you again.
16              MR. KAHN:  That's good.
17              THE COURT:  Okay.  So that one's out of the way.
18              MR. KAHN:  Your Honor, so as for the Jury No. 1
19    should we address that now?
20              THE COURT:  Yes, we should.  I have a pretty simple
21    solution.
22              MR. KAHN:  Okay.  This was our concern with the
23    verdict directive just using the undefined term copy.  Um,
24    there's case law that says the copying, I've seen 9th Circuit
25    case here shorthand for the infringement of any of the
```

```
 1   copyright owners five exclusive rights.

 2           One possibility would be, I don't know if this

 3   would answer the question, but would be to direct them to

 4   Jury Instruction No. 24 which would be a definition of

 5   copying.  The right to copy includes and then it lists all

 6   the exclusive rights.  I think what they're thrown off by is

 7   just the word copy.  If you find any of the defendants

 8   copied.

 9           THE COURT:  I don't think that's the problem at

10   all.  Maybe I'm misunderstanding.  The question I think

11   they're asking is if you find that Dark Horse infringes the

12   song Joyful Noise, then you must find -- the statement is

13   then you must find that any named defendant who copied Joyful

14   Noise or distributed Dark Horse also infringed.

15           I think the problem is the instruction.  I think

16   really what they're asking is now that we found there's an

17   infringement or assuming we found there is an infringement,

18   why do we have to go through each defendant?  And I think the

19   answer is you are directed to find or to determine or to

20   answer Question 8 to find which, if any, defendants

21   infringed.

22           MR. KAHN:  Yeah.

23           THE COURT:  I mean, I think the suggestion in 40 is

24   that if the song infringes, then that's the end of the

25   discussion and they don't know what to do with Question 8.
```

UNITED STATES DISTRICT COURT

EXHIBIT 7
PAGE 1233

```
 1              MR. KAHN:  I mean I would agree.  I thought well,

 2    maybe we could help them by directing them back to

 3    Instruction 24 which would cover all the different types of

 4    copying.

 5              THE COURT:  Yeah, but I think that further confuses

 6    things.

 7              MR. CHIEFFO:  I think actually the confusion, you

 8    gave Instruction No. 6 which states that they have to make a

 9    decision as to each individual defendant separately.  But the

10    general instructions always refer to defendants and so I

11    think that's the confusion.  And a definition of copying

12    doesn't assist solving that.

13              THE COURT:  I don't think at all.  I mean, I think

14    they have to decide the case as to each defendant.

15              MS. LEPERA:  So we wrote together.

16              MR. CHIEFFO:  So what we suggest to the collective

17    body that the answer would be the jury -- for each individual

18    or entity listed in Jury Instruction No. 40 and verdict

19    Question No. 8, the jury must determine whether that person

20    or entity in fact directly copied Joyful Noise in the

21    creation of Dark Horse or in fact directly distributed Dark

22    Horse.

23              And the concept is try to avoid the authorization

24    issue that we spent some time on the other day and to

25    overcome I think the misinterpretation by the jury that if
```

```
 1   one defendant is found to infringe, all defendants are liable

 2   which is not the way this case was presented.

 3            THE COURT:  I understand.  The problem I have is

 4   getting into the direct infringement language and all of

 5   that.  We are where we are at this stage.  What if we said

 6   please see Instruction No. 6?

 7            MR. CHIEFFO:  I'm sorry.  I couldn't --

 8            THE COURT:  Please see Instruction No. 6.  You are

 9   to decide which, if any, defendant infringed on plaintiff's

10   copyright.

11            MS. LEPERA:  The problem, Your Honor, it says

12   copied or distributed so the question goes back to that.

13            THE COURT:  Which defendants, if any, either copied

14   or distributed.  What 40 is directing them to do is say tell

15   us what defendants you find copied Joyful Noise and tell us

16   what defendants distributed.

17            MR. CHIEFFO:  And I think referring their attention

18   to basically reread No. 6, I think that covers they have to

19   determine each party separately.  I'm not sure we can improve

20   upon that two line instruction to say it any clearer.

21            THE COURT:  No, unfortunately, we could have

22   improved, but we didn't.  But I don't think we can get back

23   into -- I don't want to rewrite the instructions because I

24   think the instructions deal with direct infringement.

25            The problem is I think maybe what we want to say is
```

```
 1    as I say, we say please see Instruction No. 6.  You are
 2    directed in Question 8 to determine as to each defendant
 3    whether you find that he/she/it copied Joyful Noise or
 4    whether he/she/it distributed.
 5           Here's my first stab at it and you can look at it.
 6    I've just written it on the draft of the instruction.
 7           Please see Instruction No. 6.  You are directed in
 8    Question 8 to determine as to each defendant whether you find
 9    that he/she/it copied Joyful Noise or whether he/she/it
10    distributed Dark Horse.
11           MR. KAHN:  The only thing I would add was those two
12    and or otherwise infringed Joyful Noise.
13           THE COURT:  But how could you otherwise infringe
14    Joyful Noise?
15           MR. KAHN:  If we don't direct them to
16    Instruction 24, they at least go back and read Instruction 24
17    and what it talks about with exclusive rights.  They've found
18    somebody's infringed, and so we're saying here's what we've
19    done.  Which of these, if any, who copied it, who distributed
20    it, or otherwise infringed.  And then we have the definition
21    of what infringement is.
22           MS. LEPERA:  We went through that whole exercise
23    with that to take out specific things and the authorization
24    and the publishing and the production all to get back to the
25    point that the two issues here are reproduction and
```

```
 1    distribution.  That was the whole point of that exercise.  To
 2    put in a catch-all like that would be completely contrary to
 3    what the instruction and verdict was designed to clarify.
 4              MR. KAHN:  I mean, my only concern, Judge, is that
 5    Dark Horse is a joint work.  All the defendants, individual
 6    defendants --
 7              THE COURT:  That's the legal issue and that's why
 8    we're doing this.
 9              MR. KAHN:  That's I would say add otherwise
10    infringe.
11              THE COURT:  The last thing I want them to do is
12    make the legal conclusion that if one infringes, they all
13    infringe because that's what we're going to fighting about
14    for the next 20 years in post-trial motions regarding what
15    that finding means particularly in light of the Blurred Lines
16    decision.
17              MS. LEPERA:  We specifically took out owners and
18    authors for that reason.
19              THE COURT:  I understand.  So that's my problem.  I
20    don't think your solution remedies the problem.
21              MR. KAHN:  And I would only in this then just refer
22    them also to Instruction 24 which defines copying.
23              THE COURT:  But I don't want to start singling out
24    instructions.  They've obviously looked at 24 and come to
25    some conclusion.  Here's the problem in the simplest and
```

EXHIBIT  7
PAGE  1237

```
 1    bluntest of terms.  None of us are exactly clear about the

 2    effect of one owner of the song infringing as it pertains to

 3    the other owners of the song in a case where only direct

 4    infringement is alleged.  I can come to a legal conclusion on

 5    that issue once I know what the jury says about the

 6    individual owners of the song, and then I'm either right or

 7    wrong and the Circuit can reverse me or not reverse me.

 8         My problem is I don't want to ask them a question

 9    that requires this trial to be retried on that issue and I

10    think your question is gonna do exactly that because it's

11    trying to do too much.  So that is my simplistic view of why

12    I'd like to do it this way.  So let me write it out and

13    see -- why don't you all look at this.  I understand that the

14    plaintiffs have an objection.

15         MR. CHIEFFO:  My only comment or question would be

16    the jury question mention specifically 40.  Somehow I think

17    we need to touch upon that in considering the question --

18         THE COURT:  I think so.

19         MR. CHIEFFO:  -- in Jury Instruction 40, please

20    consider Instruction 6 or something to that effect so they

21    can follow how the answer is being given to them.

22         MR. KAHN:  I think that will just confuse things

23    even more just to at least direct them to an instruction.  We

24    would prefer to have the language infringing.  I understand

25    that's been overruled.  Um, they're already aware of these
```

```
 1   instructions.  You're directing to one more and say here's

 2   how --

 3              THE COURT:  I agree.  I think I don't want to send

 4   them to 40.  I think this is sufficient.  I recognize each

 5   side reserves their objections to my proposed solution.  So

 6   let me try to rewrite it now.  I'm going to say as to each

 7   listed defendant rather than each.  Just confirm I wrote what

 8   I said I was going to write.  Okay.  Here's the other one.

 9              MR. MOVIT:  Your Honor, if we may discuss some

10   scheduling issues?

11              THE COURT:  I have three sentencing to do, and then

12   you can come back and do that.  But why don't you come back

13   about 2:15 and we'll take it up then.

14                         (Recess taken.)

15              THE COURT:  Good afternoon.

16              Okay.  So what do you want to report?

17              MR. MOVIT:  Thank you for hearing from us,

18   Your Honor.

19              The parties have been discussing the scheduling to

20   propose to Your Honor, uh, in the event of a verdict and then

21   for damages for the trial.  Please correct me if I'm wrong,

22   Mr. Kahn has informed me that for the plaintiff's case

23   they'll be using deposition testimony as well as some

24   potential questioning of the Capitol Records corporate

25   designated witness.
```

1           Um, they informed that they do not intend to call

2     their expert that was designated on damages Michael Einhorn

3     so that will be the extent of their case.  Defendants will

4     also be calling that same Capitol Records witness as well as

5     two damages experts.

6           Our proposal would be that in the event of a

7     finding of liability today that tomorrow, um, the Capitol

8     Records witness is traveling -- will be traveling tomorrow we

9     expect so would be here to testify in person on Wednesday.

10    So we would propose if Your Honor finds it acceptable that

11    Mr. Kahn said he could read in deposition testimony on

12    Tuesday afternoon, the witness could testify live, and there

13    would no issue I don't see in getting done with the damages

14    trial on Wednesday.

15          THE COURT:  I don't have a problem with any of

16    that.  Where are your two experts going to fit in?

17          MR. MOVIT:  They would be afterwards.  They would

18    be Jason King who's coming in live and we would respectfully

19    request if there is no objection that Dr. Ferrara to testify

20    by video connection briefly.

21          THE COURT:  What do you have to say about that,

22    Mr. Kahn?

23          MR. KAHN:  You know the only -- we are about

24    90 percent sure that we're not gonna be calling Dr. Einhorn

25    that rather he was principally on the issue of damages

1    opposed to profits.  I think we'll focus our damages evidence

2    on profits.  Um, we would prefer to simply have the Capitol

3    Records witness here live instead of reading portions from

4    his deposition.  I guess we'd be amenable to have some

5    witnesses going out of order.

6            I don't know how complicated the jury instructions

7    will be.  I don't think there is going to be a lot of issues

8    with the jury instructions.  And there are depending on

9    which -- assuming there's some liability found for some of

10   the individual defendants, Your Honor, we have stipulations

11   covering all of them.  We can introduce those to the jury.

12           It would just be a little difficult to be reading

13   from the Capitol deposition because I think it would all go a

14   lot quicker if he simply testifies, we can call him, put him

15   on, cross-examine be done.  I don't think it would take more

16   than a couple hours.

17           MR. MOVIT:  So then based upon that schedule, we

18   could do the opening and read in the stipulations tomorrow if

19   there were a finding of liability today.  And then the

20   witness, the live witness testimony on Wednesday and be

21   wrapped up Wednesday if that's acceptable.

22           MR. KAHN:  I guess we're trying to predict what's

23   going to happen.

24           THE COURT:  Well, obviously, we're all going home

25   if they surprise us and come back with no liability verdict,

UNITED STATES DISTRICT COURT

EXHIBIT 7
PAGE 1241

```
 1    but it seems to me they're headed for finding liability for

 2    someone.

 3              MR. KAHN:  Right.

 4              THE COURT:  So my only point is. . .

 5              MR. KAHN:  Your Honor, we would very much like to

 6    have the jury be done as quick as we could.

 7              THE COURT:  I would, too because there are people

 8    who are leaving next week.  We know that we have time

 9    constraints, and I don't really want to have to excuse people

10    so that we have different people deliberating on damages than

11    on liability if it can be helped.  But we all knew going in

12    that we were facing the exposure of some people having to

13    leave for nonrefundable vacations and things.

14              Here's what I would like to think.  You're gonna do

15    your opening statement tomorrow assuming we're going forward

16    tomorrow.  Then what witnesses other than the Capitol Records

17    person would you read?

18              MR. KAHN:  We might read a little from one or two

19    of the individual defendants Ms. Perry's deposition and

20    Mr. Gottwald's.  It's hard to know if we'd read anything

21    else, but these would be 20 minutes each.

22              MR. MOVIT:  We were not aware and we would object.

23    Those witnesses have been called and we were not aware that

24    there would be any reading of testimony for those two

25    witnesses in the damages phase, and I don't see the relevance
```

EXHIBIT 7
PAGE 1242

```
 1   either.  Your Honor, the numbers for Mr. Gottwald's profits
 2   and Katy Perry's profits have been stipulated to so there's
 3   no relevance.
 4          MR. KAHN:  Let me just before Mr. Chieffo, we're
 5   not going to read anything new.  We're gonna summarize what
 6   they said.  Some of the testimony to remind the jury and
 7   maybe we don't even know to read it.
 8          MR. CHIEFFO:  I thought we designated, originally,
 9   you designated because of the accommodation for me, you
10   designated what I would call damage testimony to the extent
11   she testified to that.  So if that's the testimony you're
12   talking about and not some other portions from her
13   deposition, to me it's up to Your Honor whether we have
14   testimony repeated.  But I was going to stand up here and
15   object to any new testimony because my client's not
16   available.
17          THE COURT:  Well, look.  I want to use the time
18   efficiently.  If he is going to be rereading testimony that
19   you've already agreed to, I don't have a problem with that if
20   it's relevant to the damages case.  I don't know about
21   Mr. Gottwald.  That's a different issue.
22          Because I don't know what testimony you were gonna
23   read from Mr. Gottwald and I'm not sure -- I mean, I suppose
24   it could have some relevance depending on what the jury
25   finds.  But if they find that he didn't infringe, then I'm
```

1    not sure we care about what Mr. Gottwald did.

2            Because we're really talking about the overall

3    profitability of the recording to the extent any of us can

4    figure it out.  And I'm still not sure from an intellectual

5    point of view how we parse anything out, but that's another

6    problem.

7            MR. CHIEFFO:  Your Honor, I would not object to

8    rereading testimony that's already been read.

9            MR. MOVIT:  We would object to reading of testimony

10   from Mr. Gottwald for the reasons Your Honor said.  This is

11   complete surprise to us and I don't see the relevance.

12           THE COURT:  Well, I'm trying to remember.  Did you

13   read any of Mr. Gottwald's testimony previously?

14           MR. KAHN:  No, we did not.  We actually just had

15   him testify.

16           THE COURT:  Why wouldn't you have to rely on that

17   if you haven't given them notice that you were going to read

18   his testimony?

19           MR. KAHN:  It was out of an abundance of caution.

20   I can't think of anything at this moment that he hasn't

21   already testified to that we would to read.  Nothing that

22   would relate strictly to damages.  So you were just asking

23   what else could we possibly do.  We would have the Capitol

24   witness live.

25           THE COURT:  And that sounds like what we're going

1    to do.

2            MR. KAHN:  Right.  And then we would have the

3    stipulations which are probably depending on how many

4    defendants, it will take somewhere between one and

5    three minutes.  Um, and I just was trying to think how do we

6    fill the other time tomorrow if it's like 2 o'clock in the

7    afternoon and we're done other than the Capitol Records

8    witness.  We could try to go through there and find some

9    stuff we could read.

10           THE COURT:  Well, the other thing that we could do

11   which would be I think a capital idea to keep us on schedule

12   is get the jury instructions settled tomorrow afternoon

13   rather than just trying to fill space.

14           MR. MOVIT:  We would endorse that suggestion,

15   Your Honor.  Thank you.

16           MR. KAHN:  We would, too, Judge.

17           THE COURT:  If either of you has more than

18   20 minutes of opening statement tomorrow, I'll probably go to

19   sleep which would not be a good thing to do in front of the

20   jury.

21           MR. KAHN:  I'll keep it to 20 minutes.

22           THE COURT:  Now, if we can get the jury

23   instructions settled, then Wednesday we ought to have the

24   Capitol witness and we ought to be able to instruct the jury,

25   don't we think?

```
 1              MR. MOVIT:  Yes, Your Honor.  The Capitol witness

 2    and the two experts would all be able to be done and the jury

 3    could be instructed, Your Honor.

 4              THE COURT:  Okay.  Do you disagree, Mr. Kahn?

 5              MR. KAHN:  No, that sounds -- I'm hoping that's the

 6    way it will work.

 7              THE COURT:  I know Los Angeles is a wonderful

 8    place, but you may want to go home some day.

 9              MR. MOVIT:  Yes, very much so.

10              And I did just want to confirm just so there's no

11    confusion because we have rebuttals to Dr. Einhorn.  The

12    rebuttal expert does not need to fly in; is that correct,

13    Mr. Kahn?

14              MR. KAHN:  Yes, that is correct.

15              MR. MOVIT:  So Your Honor to confirm the schedule

16    if there were a finding of liability today, there would be

17    jury instructions in the morning, and then bring the jury

18    back in the afternoon for the openings and reading of

19    stipulations?

20              MR. KAHN:  Yes, and possibly something from

21    Ms. Perry that was already designated.

22              THE COURT:  Yeah, but you're not gonna repeat it?

23              MR. KAHN:  We may not want to.

24              MR. CHIEFFO:  My only request is if you could send

25    me an email with designations you want to reread.
```

```
 1            MR. KAHN:  Of course.

 2                    (Recess taken.)

 3            MS. LEPERA:  We also just want to note a concern

 4       for the record, Your Honor, that some of the prior notes

 5       indicated some industry terms that are not set forth in the

 6       instructions or in any of the special verdict form including

 7       publishing.  And we want to note our concern for the record

 8       about that.  I don't know where that information is coming

 9       from in the jury room.

10            THE COURT:  I will note it for the record, but

11       believe me I'm always amazed at what juries know.

12            MS. LEPERA:  Okay.  The answer to this question in

13       our view is no because if you look at 23, this gets back to

14       the same point.  There's a distinction in 23 where it talks

15       about copying generally, and then it talks about liability

16       for infringement and No. 8 is directed to the latter point.

17       One who reproduces, publically distributes, et cetera.  So I

18       think that is the answer to that question.

19            THE COURT:  Okay.  Let me hear from the plaintiff.

20            MR. KAHN:  Your Honor, the answer to that question

21       should be yes.  They're asking is copying the same as

22       infringement as defined in Instruction 23.  I don't know how

23       we do with the second question other than to direct them back

24       to that definition.

25            THE COURT:  Look, we're here because -- I assume
```

```
 1    these questions are being asked because they have found that
 2    Dark Horse infringes Joyful Noise.  So now the question is we
 3    have the word copied and they're asking are we looking to the
 4    same definition as in 23.  I think the answer is yes.
 5         And then can you define distributed?  I think the
 6    answer there is please review the jury instructions.  I don't
 7    want to direct them to a particular instruction.
 8         Yes, Ms. Lepera.
 9         MS. LEPERA:  We just went through the same thing a
10    minute ago, Your Honor, which is the whole point of the
11    separate identifications in No. 8 is because of the
12    reproduction and the distribution prongs.  And it says in 23
13    specifically liability for infringement is on one who does
14    the following.  It's not -- copying is not the same as
15    infringed.  Infringed to the extent there's an issue there,
16    it is determined prior to that that there's a copying and
17    that's proved by access and substantial similarity.  But then
18    you go the next step and say who actually did the
19    reproduction or the distribution.  We're going around on that
20    same circle with respect to the issue who is responsible in
21    No. 8.  This is back to Question 8.
22         THE COURT:  Well, I guess my point is no is not the
23    answer whatever.  Maybe the answer is. . . you can say you
24    must -- is copied the same as infringed as defined in Jury
25    Instruction No. 23 liability of infringement or for
```

1    infringement?  I think the answer to that is yes, and then I

2    think the second one is please refer to the jury

3    instructions.  And then maybe we have to reach your point you

4    must decide as to each defendant listed in Question 8.

5            MS. LEPERA:  I'm just -- we're going back in the

6    same circle with the respect to the issue of what Mr. Kahn is

7    suggesting is the lump sum equation and I'm simply saying the

8    whole point of No. 8 was differentiate.

9            THE COURT:  I agree with that.  I don't think you

10   fix it by answering no because they're asking generically

11   what does copying mean.

12           MS. LEPERA:  Copying means access and substantial

13   similarity not liability from infringement.

14           MR. KAHN:  They would have reached those issues

15   before.

16           THE COURT:  They've already decided that.

17           MS. LEPERA:  That's my point.  That's exactly my

18   point.  If that's the case, then the point being if you have

19   that, then the question is who is liable.

20           THE COURT:  I understand that and that's why I'm

21   saying that. . .

22           MR. KAHN:  Your Honor, this definition just has the

23   word reproduces instead of copies.  It's the same word.

24           THE COURT:  I understand.  I get all that.

25           To try to do this in a reasoned way that's

```
 1    responsive to their question, I think what we're saying is
 2    you must decide whether there was copying or distribution as
 3    to each defendant.  In response to your question, please see
 4    Jury Instruction No. 23.  You know, we can't interview them
 5    and say what really, folks, do you have in mind?
 6              I think they're saying, okay.  Now we know we have
 7    to decide as to each defendant, but you have the word copy in
 8    Question 8.  Is that the same as infringement?  In other
 9    words, as drafts people we were not perhaps as good as we
10    wanted to be, but that's what happens when things are on fly.
11              MR. KAHN:  It should be yes, you can look to the
12    definition of liability for infringement which is what
13    they're asking.
14              THE COURT:  Well, they're asking two things.
15    They're asking what is copying and they're asking what is
16    distribution.  They're really asking that.  They're saying
17    should we be looking at 23.
18              MR. KAHN:  Yes.
19              MR. CHIEFFO:  Your Honor, if you're going to answer
20    that question yes, I think the full answer is yes, you should
21    refer to the entirety of Instruction No. 3.  Because at the
22    top of the page where liability for infringement, the word
23    copied, you know, including their burden of proof,
24    plaintiff's burden of proof, to show defendants copied
25    original expression.
```

```
 1                    THE COURT:  You mean 3 or 23?

 2                    MR. CHIEFFO:  23.  I'm sorry.

 3                    THE COURT:  I don't have a problem with saying look

 4      at the entirety of 23, but you still have to decide as to

 5      each defendant.

 6                    MR. CHIEFFO:  Correct.

 7                    THE COURT:  Or each enumerated defendant.

 8                    MS. LEPERA:  Yeah, I mean, to the extent it's -- if

 9      the question is for No. 8, it's circular.  It's going back in

10      a circle.  If, for example, hypothetically, there's an

11      infringing work, then the next question is who's liable for

12      infringement, copying or distribution.  So two those things

13      are separated and, again, trying to merge those two together

14      is, I think, confusing.  That's the whole point of

15      Question 8.  The answer that I would suggest is to make that

16      point is clear if it's not already.

17                    THE COURT:  Well, tell me what language you're

18      proposing.

19                    MS. LEPERA:  The reason I said no is because

20      they're not the same.  There's a definition of infringement

21      and then there's a definition of who is liable for

22      infringement.

23                    THE COURT:  Right.

24                    MS. LEPERA:  So that's my point.  They're not

25      synonymous.  Copying is not the same as infringed as it
```

EXHIBIT 7
PAGE 1251

1    pertains to each defendant.

2            THE COURT:  I agree with you completely.  The only

3    problem is that no doesn't communicate that.

4            MS. LEPERA:  So it would have to be spelled out.

5    It would have to be spelled out.  If we want to spell it out,

6    we would say an infringement is not synonymous with a finding

7    of liability for infringement.  Each defendant is to be

8    separately assessed in that regard under 23 liability for

9    infringement.

10           THE COURT:  I think can we just say please review

11   the entirety of Instruction No. 23, and remember that you

12   must determine as to each defendant whether he/she/it is

13   liable for copying or distribution.

14           MS. LEPERA:  Yeah, I mean, I think it's still going

15   around in a circle, but if we say that again, that's fine as

16   well as long it's not making them synonymous.

17           THE COURT:  Mr. Kahn.

18           MR. KAHN:  I mean the back end seems fine, but

19   they're asking at the front end does copying mean this last

20   paragraph of liability for infringement.  They're trying to

21   determine liability and that liability includes reproduction

22   which is the same as copying.  I don't know why we can't just

23   tell them yes, but you need to determine this for each

24   defendant as whether they copied --

25           THE COURT:  They're not asking about reproduction.

EXHIBIT 7
PAGE 1252

1    They're asking about copying and they're asking about

2    distribution.  And they may be looking at reproducing in 23

3    and thinking should we be looking at that in considering

4    copying, but then they've skipped over distribution.

5         So it seems to me the thing to do is please review

6    the entirety the Jury Instruction No. 23, and remember that

7    you must determine as to each listed defendant whether

8    he/she/it has copied or distributed.

9         MS. LEPERA:  And if they were to substitute in that

10   each defendant infringed or distributed my point, Your Honor,

11   is that's not -- that's not the substituted word for copying

12   in No. 8.

13        THE COURT:  Well, I -- here's the problem.  Now I'm

14   thinking that you're asking a different question than I

15   believed you were asking.  If you're saying. . . the way this

16   is set up before you get to breaking down which defendant did

17   what, the verdict form requires a finding of substantial

18   similarity, uh, and all the stuff along those lines, and then

19   whether there was access, widespread access.

20        And we've told the jury in the instructions if

21   there's widespread access, uh, that's a basis for copying

22   unless the defendants come back and say no, I didn't do it.

23   I never did it which puts the credibility of defendants at

24   issue.  It seems to me at that point we aren't talking about

25   copying as you're using it.  It seems to me we're talking

1    about copying as to whether it was an unauthorized copying

2    aka an infringement.  We used the words copy and we used the

3    words distributed.

4            MS. LEPERA:  There's two copyings.  There's copying

5    to determine infringement at the substantial similarity.

6            THE COURT:  Right.

7            MS. LEPERA:  And there's liability for

8    infringement.  Those who copy or distribute so they're

9    different.

10           THE COURT:  I understand that.  Look at the

11   question and think about what the jury is asking.

12           MR. KAHN:  I mean, to me they're asking,

13   Your Honor, how do we figure out who is liable?

14           THE COURT:  Here's the problem.  It may be when

15   we're through all this and I'm not saying it will be, but

16   it's conceivable when we get through all of this and they

17   come to sort of a decision or don't, then we're all gonna be

18   running around, I'm not gonna be, but you'll be interviewing

19   jurors and asking them what they thought they meant and so

20   forth and you might be moving for a new trial or whatever

21   else.  But right now my job is try to figure out what they're

22   asking and answer their question.

23           And what I think they're asking is is copied the

24   same as infringed as defined in Instruction 23 and

25   Instruction 23, of course, has liability for infringement and

EXHIBIT 7
PAGE 1254

```
 1    describes reproduction and distribution without authority to

 2    use a copyright.  That's obviously the question they're

 3    asking.

 4              MS. LEPERA:  Right.  That's exactly right, and that

 5    is secondary to the first question which was was there

 6    copying in the sense of access plus substantial similarity.

 7    So the next question is who's liable and that's what the

 8    whole point of No. 8 is.  I'm just trying to avoid that

 9    conflation of that term copying in both of those two

10    sections.

11              THE COURT:  I understand, but the problem is we

12    have already used the word in the question.

13              MS. LEPERA:  Right, but there's -- there's two

14    prongs in 23 and that's why they're broken up.  One says

15    proof of copying and the next one says liability for

16    infringement.  They're distinct.  Just finding that there is

17    arguably infringement does not mean a person or an entity's

18    liable.

19              You go to the next section and say one who

20    reproduces or distributes, et cetera.  And that's the whole

21    point of what we've been going forward on this Question 8

22    over and over about.  And as Your Honor correctly, um, split

23    the question, is this really looking at that copying and

24    distribution in the literal sense of that?  It's broken out

25    in the instruction like this.  It's two stages.
```

EXHIBIT 7
PAGE 1255

1          MR. KAHN:  But we're in the second stage.  That's

2    what this question is about.  And all I'm saying is copying

3    the same as infringed as defined in Instruction 23 liability

4    for infringement.

5          MS. LEPERA:  It doesn't say that.  It says one who

6    reproduces.

7          MR. KAHN:  That's why they're asking.

8          THE COURT:  That's why they're asking the question.

9          MS. LEPERA:  Then I would say it's synonymous with

10   reproduction.  That to me is the answer.

11         THE COURT:  Well, do you want me to say see

12   Instruction 23 copying is the same as reproduction?

13         MS. LEPERA:  No, Your Honor.  That's --

14         MR. KAHN:  Yes.

15         MS. LEPERA:  That's not what I'm saying.  That's

16   what he wants to say.  What I'm saying is liability -- we

17   went through the whole exercise of differentiating between

18   everyone.  The point of doing that was not to have it

19   conflated with a finding of infringement meaning access and

20   substantial similarity.  It was to differentiate in 23 as to

21   who's liable.

22         Liability is on one who reproduces and distributes,

23   et cetera.  We have nothing with respect to the public

24   performance, public displays, et cetera.  So that's why

25   Question 8 was broken down into copying and distribution.  It

```
 1    probably should have said who reproduces and distributes.
 2              MR. KAHN:  And it's got the rest, without authority
 3    from the copyright owner during the term of the copyright.
 4              MR. CHIEFFO:  May I interrupt, please, guys?
 5              My concern is that if we're going to answer this
 6    jury question with reference to one paragraph or one of the
 7    instructions, I think it gives undue weight.  The entire
 8    instruction explains what someone has to do.
 9              THE COURT:  I agree.
10              MR. CHIEFFO:  So I'm still in the same place.
11    We're gonna reference --
12              THE COURT:  I'm going to tell them look at the
13    entirety of Instruction 23, but remember that you must answer
14    the questions in Question 8 regarding copying and
15    distribution as to each defendant.  And the problem,
16    Ms. Lepera with your argument is if you look at this verdict
17    form, we have until you get to No. 8, every time you tell
18    them if you answer any of the questions no, you go home.
19              MS. LEPERA:  Right.  But we're still back to the
20    issue of differentiation and I actually disagree.  I would
21    object it to being -- to being conflated with all of the
22    prior findings with respect to copying.  I submit that it
23    should be reproduction or distribution as what is stated in
24    the bottom of 23 which is when there's liability for
25    infringement.
```

```
1              THE COURT:  So now you want me to say that copying
2    is the same as?
3              MS. LEPERA:  Reproduction.
4              THE COURT:  As reproduction.
5              MS. LEPERA:  Sure.  Differentiated between all of
6    the other issues and narrow it down to who is potentially
7    liable and it's only based on reproduction or distribution.
8    That's the actual statement in the model rule
9    instruction liability for infringement.  One who reproduces,
10   distributes, publicly performs, not relevant, that's the
11   answer to the question in my view.
12             THE COURT:  Well, what if we said please read the
13   entirety of Instruction 23.  Copying is the same as
14   reproduction.
15             MR. CHIEFFO:  Your Honor, in that last paragraph
16   there's also preparing a derivative work without permission.
17             MS. LEPERA:  We don't have that listed in No. 8.
18             MR. KAHN:  That's a copy.
19             MR. CHIEFFO:  So that's what the individual
20   defendants are actually being accused that they have created
21   an infringing derivative work.  Again, you know, I'm
22   concerned, if anything, that just focuses on one that
23   paragraph.  I think, you know, copying is a reproduction of
24   Joyful Noise.  Again, I'm concerned about getting too far
25   away from the instructions they have.
```

```
 1                    THE COURT:  Well, I understand that, but what I'm
 2       saying is please refer to Instruction No. 23.  For your
 3       purposes copying is the same as reproduction.
 4                    MS. LEPERA:  Yeah, that's right.
 5                    MR. CHIEFFO:  And I would just add the entirety of
 6       Instruction 23.
 7                    THE COURT:  I just said that.
 8                    MR. CHIEFFO:  Okay.  I didn't hear it.
 9                    MR. KAHN:  Copying would not be the same as
10       reproduction.  It would also include preparing a derivative
11       work which is presumably what Dark Horse is which would be a
12       copy, but as a derivative work.
13                    MS. LEPERA:  That's not in the question.
14                    MR. KAHN:  It's in the instruction.  It's right
15       here.
16                    THE COURT:  It's in 23.
17                    MR. KAHN:  Yes.
18                    THE COURT:  That's what I'm saying please read 23.
19                    Let me try it this way.  I would say please read
20       the entirety of Instruction No. 23 and answer Question 8 as
21       to each listed party.  And I think I want to just leave it at
22       that without saying something equals something else and I
23       don't think I want to rewrite the jury instruction.
24                    MR. KAHN:  I think that's fine, Your Honor.
25                    THE COURT:  I'm just gonna say please read the
```

```
 1    entirety of Instruction No. 23 and answer Question 8 as to

 2    each listed party.

 3              MS. LEPERA:  Okay.  I'd just note my objection on

 4    that issue with respect to the definition of copying.

 5              THE COURT:  I understand.  If they come back again,

 6    I'll be happy to answer the question, but I really don't

 7    think at this stage -- I think they want to know should they

 8    look at Instruction 23.

 9              MR. KAHN:  Well, we would prefer that they just

10    focus on the one section they asked the question about so we

11    would object, but we understand, Your Honor.

12              THE COURT:  Okay.  Let me do that.  I don't know

13    what else to say.  We'll show it everyone and we'll note

14    their objections for the record.  Why don't we give it to

15    them and see what happens.

16              Returning to scheduling for one minute.

17              MR. CHIEFFO:  Yes, Your Honor.  Originally, I

18    thought counsel was discussing that tomorrow afternoon would

19    be a time to settle the jury instructions, and then I thought

20    I heard you say or somebody say that we'd do that first.

21              THE COURT:  No.  I think that assuming the jury

22    comes back with a verdict, we should have them come back

23    tomorrow.  Use whatever time we can tomorrow, send them home,

24    and then work on jury instructions.  So that by the time we

25    get the Capitol Records witness here on Wednesday, we'll be
```

```
 1    in a position, God willing, to hear him and have closing

 2    argument and send them off.  Is that acceptable?

 3              MR. MOVIT:  And the experts as well would follow

 4    Capitol Records?

 5              THE COURT:  Yes, all of them would be on Wednesday.

 6              MR. KAHN:  Yes, Your Honor.  That would be great.

 7              MR. MOVIT:  Thank you, Your Honor.

 8              THE COURT:  Thank you.

 9                  (Jury continues to deliberate.)

10              THE COURT:  Good afternoon.

11              THE CLERK:  Are we ready for the jury?

12              MR. KAHN:  Yes.

13                      (Jury present.)

14              THE COURT:  Ladies and gentlemen, I understand that

15    you have reached a unanimous verdict; is that correct?

16              THE JURY:  Yes.

17              THE COURT:  ██████████████, are you the

18    foreperson of the jury?

19              ███████████:  Yes.

20              THE COURT:  Okay.  I'm going to ask you to give

21    your verdict form to the courtroom deputy.  I'm gonna review

22    it for completeness and then read it a loud.  Once I read it

23    a loud, I'm gonna ask each of you whether that is in fact

24    your verdict to confirm by way of polling each of you that

25    you agree that this is your verdict.  Okay?
```

```
1                THE JURY:  Yes.
2                THE COURT:  We the jury in the above-entitled
3      action answer the questions submitted to us as follows:
4                Question 1:  Did plaintiffs prove by a
5      preponderance of the evidence that Dark Horse contains
6      material from the musical composition Joyful Noise that is
7      both original to plaintiffs and not commonplace expression?
8                Answer:  Yes.
9                Question 2:  Did plaintiffs prove by a
10     preponderance of the evidence that the Joyful Noise and Dark
11     Horse musical compositions are objectively substantially
12     similar in copyrightable protectable expression?
13               Answer:  Yes.
14               Question 3:  Did plaintiffs prove by a
15     preponderance of the evidence that an ordinary, reasonable
16     person would find that the total concept and feel of Joyful
17     Noise and Dark Horse musical compositions are substantially
18     similar in copyrightable protectable expression?
19               Answer:  Yes.
20               Question 4:  Did plaintiffs prove by a
21     preponderance of the evidence that Joyful Noise was widely
22     disseminated such that defendants had a reasonable
23     opportunity prior to creating Dark Horse?
24               Answer:  Yes.
25               Question 5:  Did defendants prove by a
```

1    preponderance of the evidence that they did not avail

2    themselves of the opportunity to hear Joyful Noise prior to

3    creating Dark Horse?

4            Answer:  No.

5            Question 6:  Did defendants prove by a

6    preponderance of the evidence that defendants independently

7    created Dark Horse?

8            Answer:  No.

9            Question 7:  Did plaintiffs prove by a

10   preponderance of the evidence that the inclusion of the

11   instrumental musical (i.e. the beat) created by Mr. Ojukwu in

12   Joyful Noise is part of a joint work of authorship with the

13   other plaintiffs?

14           Answer:  Yes.

15           Question 8:  As to each defendant listed below, do

16   you find by a preponderance of the evidence that he/she/it

17   copied Joyful Noise or distributed Dark Horse?

18           Capitol Records:  Yes.

19           Jordan Houston:  Yes.

20           Lukasz Gottwald:  Yes.

21           Katheryn Elizabeth Hudson:  Yes.

22           Sarah Theresa Hudson:  Yes.

23           Karl Martin Sandberg:  Yes.

24           Henry Russell Walter:  Yes.

25           Warner Brothers Music, Corp.:  Yes.

EXHIBIT 7
PAGE 1263

```
1              Kobalt Music Publishing America, Inc.:  Yes.

2              Kasz Money, Inc.:  Yes.

3              And then after answering yes or no for each

4    defendant, turn the page and sign and return this verdict

5    form.  And the foreperson did sign the verdict form.  That is

6    ████████████████████  It is dated July 29, 2019.

7              So let me now ask each of you is that your verdict.

8              ████████████████████, is that your verdict?

9              ████████████████        Yes, it is.

10    THE COURT:  And ████████████ is that your verdict?

11              ████████████   It is, Your Honor.

12    THE COURT:  ████████████ is that your verdict?

13              ████████████ Yes, it is, Your Honor.

14    THE COURT:  And ████████████████ is that your

15    verdict?

16              ████████████████   Yes, it is, Your Honor.

17    THE COURT:  ████████████ is that your verdict?

18              ████████████ Yes, it is.

19    THE COURT:  ████████████████ is that your verdict?

20              ████████████████ Yes, it is, Your Honor.

21    THE COURT:  ████████████ is that your verdict?

22              ████████████ Yes, it is, Your Honor.

23    THE COURT:  ████████████████████ is that your

24    verdict?

25              ████████████████████ Yes, Your Honor.
```

1              THE COURT:  And ████████ is that your verdict?

2         ████████  Yes, it is, Your Honor.

3              THE COURT:  Okay.  Then ladies and gentlemen, this

4    means, of course, as we've indicated that you would have to

5    hold yourselves available.  I'm going to ask you to return

6    tomorrow morning at 9:30.  We have discussed in light of your

7    earlier questions how we would proceed.  We believe that we

8    will have the opening statement as to this part of the case

9    tomorrow with testimony read into the record.

10             We probably will excuse you on the earlier side

11   tomorrow so we can get the jury instructions done and not

12   have you waiting around.  And then we should wrap up on

13   Wednesday and we will send the case to you on Wednesday for

14   your last set of deliberations in the case.

15             But in the meantime, please remember that this case

16   is still ongoing.  That you may not talk to anyone about the

17   case.  All my instructions if someone should approach you

18   about your deliberations, tell them you've been directed by

19   the Court not to discuss the case and report any such inquiry

20   to me.

21             Please keep an open mind and we will return

22   tomorrow as I say at 9:30 a.m., pick up where we have left

23   off today and go forward from there.  But for those of you

24   with travel plans next week, I think all of you should stay

25   and I think we'll be sending this case back to you Wednesday

```
 1    afternoon.  Thank you very much for your service and your

 2    hard work.

 3                        (Jury not present.)

 4            THE COURT:  We'll make a copy of this for you, and

 5    then see you tomorrow unless someone has something to take up

 6    at this point in time.

 7            MS. LEPERA:  I just renew my Rule 50 motion.

 8            THE COURT:  Yes, of course.

 9            MR. MOVIT:  Just wanted to confirm, Your Honor,

10    that plaintiffs do not oppose Dr. Ferrara testifying by

11    video.

12            THE COURT:  Is that correct?

13            MR. KAHN:  We do not oppose that, Your Honor.

14            THE COURT:  Okay.  Just so we're clear, let's

15    review what I believe we're doing tomorrow.  Tomorrow we are

16    going to put on, uh, you may be reading or maybe not

17    previously designated testimony by Ms. Perry.  We're going to

18    have an opening statement by both sides.  You're going to be

19    reading Ms. Perry.  Other witnesses tomorrow?

20            MR. KAHN:  I don't think we're going to read any

21    other witnesses, Judge.  The Perry stuff, if we read it, will

22    be very short.  We'll have stipulations as to the revenues of

23    the individual defendants which basically, for everyone

24    except for Capitol Records.

25            And I've talked to Mr. Wais, and he's gonna give us
```

```
 1   an redacted copy so we can have that marked as an exhibit and

 2   we'll explain that to the jury and then move on from there.

 3              THE COURT:  An unredacted copy of let's just be

 4   precise.

 5              MR. KAHN:  I think it was attached to the final

 6   pretrial order as Schedule 5B.  And all the dollar amounts

 7   were redacted by agreement of the parties, but now they've

 8   become relevant.

 9              MR. WAIS:  That's correct, Your Honor.

10              THE COURT:  Anything else that you'll have

11   tomorrow?

12              MR. KAHN:  You know, I don't think so.  If there's

13   something else we think of that we can try to speed things

14   up, we'll contact the other side, but at this point, I think

15   that will be it.

16              THE COURT:  Okay.  You need to let them know.

17              MR. KAHN:  Oh, absolutely, Judge.  We don't intend

18   to.  I'm stating that on the record.  I'm only thinking if

19   there's something we can do to speed it up, I would let them

20   know and they can reserve their rights to tell me we can't do

21   that.

22              THE COURT:  Jury instructions.  I don't want to do

23   what we did before.  I want this done the right way.  I want

24   agreed upon instructions for this part of the trial, and then

25   I want you to submit disputed instructions.  And I want to
```

EXHIBIT 7
PAGE 1267

```
 1   get them done tomorrow.
 2             MR. KAHN:  We do, too, Judge.
 3             MR. CHIEFFO:  If I may request, Counsel, if I had
 4   some counter-designations to I believe some of your damage
 5   testimony, I'll let you know whether I want to have you read
 6   that, too.
 7             MR. KAHN:  Sure.
 8             THE COURT:  Do I have to rule on objections?  This
 9   is the Johnny come lately program.
10             MR. CHIEFFO:  No.  I believe all the objections to
11   all the designations have been ruled upon by Your Honor
12   already.
13             THE COURT:  I think that's right, but I just want
14   to be sure because we have had new things arise here and
15   there.  At this juncture I want to move ahead.
16             MR. KAHN:  I'm sure Mr. Chieffo and I we could go
17   through it and if there's an objection we can't remember,
18   we'll figure it out.  We're not gonna have any controversy.
19             THE COURT:  Yes, Mr. Wais.
20             MR. WAIS:  Just really quickly on the jury
21   instructions, do you intend to read the general instructions
22   again as well?
23             THE COURT:  I would hope not.  I'm going to tell
24   them that, you know, to the extent -- why don't we say to the
25   extent necessary, the previous instructions apply.
```

EXHIBIT 7
PAGE 1268

```
1              MR. WAIS:  Sounds great.

2              MR. KAHN:  Yeah, that works.

3              THE COURT:  They already have a foreperson.  They

4    already have lots of the stuff.  We don't have to go back and

5    reinvent that wheel.  Okay.  Thank you.

6              THE CLERK:  This court is adjourned.

7              (Proceedings were concluded at 4:48 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

EXHIBIT 7
PAGE 1269

```
1

2                        CERTIFICATE OF REPORTER

3

4     COUNTY OF LOS ANGELES       )

5                                 )  SS.

6     STATE OF CALIFORNIA         )

7

8     I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

9     STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

10    DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

11    FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

12    FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

13    FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

14    FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

15    OF MY STENOGRAPHIC NOTES.

16

17

18    DATE:   AUGUST 1, 2019_____

19

20        /s/  LAURA MILLER ELIAS

21    LAURA MILLER ELIAS, CSR 10019

22    FEDERAL OFFICIAL COURT REPORTER

23

24

25
```

**/**

**/s** [1] - 44:20

**1**

**1** [4] - 3:4, 6:18, 36:4, 44:18
**10019** [2] - 1:22, 44:21
**11377** [1] - 2:18
**12TH** [1] - 2:7
**15-5642** [1] - 4:4
**15-5642-CAS** [1] - 1:8
**1840** [1] - 2:23
**1900** [1] - 2:23
**1:00** [1] - 4:1

**2**

**2** [4] - 3:4, 4:10, 19:6, 36:9
**20** [4] - 11:14, 16:21, 19:18, 19:21
**2019** [4] - 1:15, 4:1, 38:6, 44:18
**208** [1] - 2:11
**21** [1] - 3:5
**2100** [1] - 2:11
**213)894-0374** [1] - 1:24
**23** [31] - 21:13, 21:14, 21:22, 22:4, 22:12, 22:25, 24:4, 24:17, 25:1, 25:2, 25:4, 26:8, 26:11, 27:2, 27:6, 28:24, 28:25, 29:14, 30:3, 30:12, 30:20, 31:13, 31:14, 32:13, 33:2, 33:6, 33:16, 33:18, 33:20, 34:1, 34:8
**24** [6] - 7:4, 8:3, 10:16, 11:22, 11:24
**29** [3] - 1:15, 4:1, 38:6
**2:15** [1] - 13:13

**3**

**3** [4] - 3:5, 24:21, 25:1, 36:14
**35** [1] - 3:6
**350** [1] - 1:23

**4**

**4** [2] - 3:4, 36:20
**40** [6] - 7:23, 8:18, 9:14, 12:16, 12:19, 13:4
**4455** [1] - 1:23

**4:48** [1] - 43:7

**5**

**5** [1] - 36:25
**50** [1] - 40:7
**5B** [1] - 41:6

**6**

**6** [8] - 8:8, 9:6, 9:8, 9:18, 10:1, 10:7, 12:20, 37:5
**63105** [2] - 2:8, 2:11

**7**

**7** [1] - 37:9
**7701** [1] - 2:7

**8**

**8** [24] - 7:20, 7:25, 8:19, 10:2, 10:8, 21:16, 22:11, 22:21, 23:4, 23:8, 24:8, 25:9, 25:15, 27:12, 29:8, 29:21, 30:25, 31:14, 31:17, 32:17, 33:20, 34:1, 37:15

**9**

**9** [1] - 4:3
**90** [1] - 14:24
**90012** [1] - 1:23
**90064** [1] - 2:19
**90067** [1] - 2:24
**9:30** [2] - 39:6, 39:22
**9th** [1] - 6:24

**A**

**a.m** [1] - 39:22
**AARON** [1] - 2:16
**able** [2] - 19:24, 20:2
**above-entitled** [1] - 36:2
**absolutely** [1] - 41:17
**abundance** [1] - 18:19
**acceptable** [3] - 14:10, 15:21, 35:2
**access** [2] - 22:17, 23:12, 27:19, 27:21, 29:6, 30:19
**accommodation** [1] - 17:9
**accurate** [1] - 4:24
**accused** [1] - 32:20
**action** [1] - 36:3

**actual** [1] - 32:8
**add** [3] - 10:11, 11:9, 33:5
**address** [1] - 6:19
**adjourned** [1] - 43:6
**administrative** [1] - 6:6
**afternoon** [8] - 13:15, 14:12, 19:7, 19:12, 20:18, 34:18, 35:10, 40:1
**afterwards** [1] - 14:17
**ago** [2] - 4:14, 22:10
**agree** [6] - 8:1, 13:3, 23:9, 26:2, 31:9, 35:25
**agreed** [3] - 5:6, 17:19, 41:24
**agreement** [1] - 41:7
**ahead** [2] - 4:8, 42:15
**AIDED** [1] - 44:13
**aka** [1] - 28:2
**AL** [2] - 1:6, 1:9
**ALBERTSON** [1] - 2:17
**alleged** [1] - 12:4
**amazed** [1] - 21:11
**amenable** [1] - 15:4
**America** [1] - 38:1
**AMERICA** [1] - 1:1
**amounts** [1] - 41:6
**AND** [4] - 44:8, 44:11, 44:13, 44:14
**Anders** [1] - 38:6
**ANGELES** [6] - 1:16, 1:23, 2:19, 2:24, 4:1, 44:4
**Angeles** [1] - 20:7
**answer** [37] - 4:16, 5:18, 5:20, 5:22, 7:3, 7:19, 7:20, 8:17, 12:21, 21:12, 21:18, 21:20, 22:4, 22:6, 22:23, 23:1, 24:19, 24:20, 25:15, 28:22, 30:10, 31:5, 31:13, 31:18, 32:11, 33:20, 34:1, 34:6, 36:3, 36:8, 36:13, 36:19, 36:24, 37:4, 37:8, 37:14
**answering** [2] - 23:10, 38:3
**appearances** [2] - 4:5, 4:6
**APPEARANCES** [1] - 2:2
**apply** [1] - 42:25
**approach** [1] - 39:17
**appropriate** [2] - 5:16,

6:1
**arguably** [1] - 29:17
**argument** [2] - 31:16, 35:2
**arise** [1] - 42:14
**assessed** [1] - 26:8
**assist** [1] - 8:12
**assume** [1] - 21:25
**assuming** [4] - 7:17, 15:9, 16:15, 34:21
**AT** [1] - 44:11
**attached** [1] - 41:5
**attention** [1] - 9:17
**AUGUST** [1] - 44:18
**authority** [2] - 29:1, 31:2
**authorization** [2] - 8:23, 10:23
**authors** [1] - 11:18
**authorship** [1] - 37:12
**avail** [1] - 37:1
**available** [2] - 17:16, 39:5
**avoid** [2] - 8:23, 29:8
**aware** [3] - 12:25, 16:22, 16:23

**B**

**based** [2] - 15:17, 32:7
**basis** [1] - 27:21
**beat** [1] - 37:11
**become** [1] - 42:14
**BEHALF** [3] - 2:3, 2:13, 2:20
**below** [1] - 37:15
**between** [3] - 19:4, 30:17, 32:5
**bluntest** [1] - 12:1
**Blurred** [1] - 11:15
**BMG** [3] - 4:22, 5:2, 5:8
**body** [1] - 8:17
**bottom** [1] - 31:24
**BOULEVARD** [2] - 2:7, 2:18
**breaking** [1] - 27:16
**briefly** [1] - 14:20
**bring** [1] - 20:17
**broken** [3] - 29:14, 29:24, 30:25
**Brothers** [1] - 37:25
**burden** [2] - 24:23, 24:24
**BY** [5] - 2:5, 2:10, 2:15, 2:22, 44:13

**C**

**CA** [2] - 2:19, 2:24

**Calendar** [1] - 4:3
**CALIFORNIA** [6] - 1:2, 1:16, 1:23, 4:1, 44:6, 44:9
**CAPES** [1] - 2:5
**capital** [1] - 19:11
**capitol** [1] - 37:18
**Capitol** [13] - 13:24, 14:4, 14:7, 15:2, 15:13, 16:16, 18:23, 19:7, 19:24, 20:1, 34:25, 35:4, 40:24
**care** [1] - 18:1
**CASE** [1] - 1:8
**Case** [1] - 4:4
**case** [18] - 4:12, 5:15, 6:24, 6:25, 8:14, 9:2, 12:3, 13:22, 14:3, 17:20, 23:18, 39:8, 39:13, 39:14, 39:15, 39:17, 39:19, 39:25
**catch** [1] - 11:2
**catch-all** [1] - 11:2
**caution** [1] - 18:19
**CENTRAL** [2] - 1:2, 44:9
**CENTURY** [1] - 2:23
**CERTIFICATE** [1] - 44:2
**CERTIFY** [2] - 44:10, 44:14
**cetera** [4] - 21:17, 29:20, 30:23, 30:24
**▮** [1] - 38:17
**▮** [1] - 38:18
**Chieffo** [2] - 17:4, 42:16
**CHIEFFO** [24] - 2:22, 4:21, 5:6, 8:7, 8:16, 9:7, 9:17, 12:15, 12:19, 17:8, 18:7, 20:24, 24:19, 25:2, 25:6, 31:4, 31:10, 32:15, 32:19, 33:5, 33:8, 34:17, 42:3, 42:10
**CHRISTINA** [1] - 1:4
**CHRISTINE** [1] - 2:15
**circle** [4] - 22:20, 23:6, 25:10, 26:15
**Circuit** [2] - 6:24, 12:7
**circular** [1] - 25:9
**clarify** [1] - 11:3
**CLAYTON** [1] - 2:11
**clear** [3] - 12:1, 25:16, 40:14
**clearer** [1] - 9:20
**CLERK** [3] - 4:3, 35:11, 43:6
**client's** [1] - 17:15

**closing** [1] - 35:1
**COHEN** [1] - 2:6
**collective** [1] - 8:16
**coming** [2] - 14:18, 21:8
**comment** [1] - 12:15
**commonplace** [1] - 36:7
**communicate** [1] - 26:3
**companies** [4] - 5:4, 5:9, 5:21, 6:12
**company** [4] - 4:13, 4:25, 6:2, 6:3
**complete** [1] - 18:11
**completely** [2] - 11:2, 26:2
**completeness** [1] - 35:22
**complicated** [1] - 15:6
**composition** [1] - 36:6
**compositions** [2] - 36:11, 36:17
**COMPUTER** [1] - 44:13
**COMPUTER-AIDED** [1] - 44:13
**conceivable** [1] - 28:16
**concept** [2] - 8:23, 36:16
**concern** [5] - 6:22, 11:4, 21:3, 21:7, 31:5
**concerned** [2] - 32:22, 32:24
**concluded** [1] - 43:7
**conclusion** [3] - 11:12, 11:25, 12:4
**confirm** [5] - 13:7, 20:10, 20:15, 35:24, 40:9
**conflated** [2] - 30:19, 31:21
**conflation** [1] - 29:9
**confuse** [1] - 12:22
**confuses** [1] - 8:5
**confusing** [1] - 25:14
**confusion** [3] - 8:7, 8:11, 20:11
**connection** [1] - 14:20
**consider** [1] - 12:20
**considering** [2] - 12:17, 27:3
**constraints** [1] - 16:9
**contact** [1] - 41:14
**contains** [1] - 36:5
**context** [1] - 5:16
**continues** [1] - 35:9
**contrary** [1] - 11:2

**controversy** [1] - 42:18
**copied** [17] - 7:8, 7:13, 8:20, 9:12, 9:13, 9:15, 10:3, 10:9, 10:19, 22:3, 22:24, 24:23, 24:24, 26:24, 27:8, 28:23, 37:17
**copies** [1] - 23:23
**copy** [11] - 6:23, 7:5, 7:7, 24:7, 28:2, 28:8, 32:18, 33:12, 40:4, 41:1, 41:3
**Copying** [1] - 25:25
**copying** [40] - 6:24, 7:5, 8:4, 8:11, 11:22, 21:15, 21:21, 22:14, 22:16, 23:11, 23:12, 24:2, 24:15, 25:12, 26:13, 26:19, 26:22, 27:1, 27:4, 27:11, 27:21, 27:25, 28:1, 28:4, 29:6, 29:9, 29:15, 29:23, 30:2, 30:12, 30:25, 31:14, 31:22, 32:1, 32:13, 32:23, 33:3, 33:9, 34:4
**copyings** [1] - 28:4
**copyright** [5] - 7:1, 9:10, 29:2, 31:3
**copyrightable** [2] - 36:12, 36:18
**Corp** [1] - 37:25
**corporate** [1] - 13:24
**CORRECT** [1] - 44:14
**correct** [7] - 13:21, 20:12, 20:14, 25:6, 35:15, 40:12, 41:9
**correctly** [1] - 29:22
**counsel** [2] - 4:5, 34:18
**Counsel** [1] - 42:3
**COUNSEL** [1] - 2:2
**counter** [1] - 42:4
**counter-designations** [1] - 42:4
**COUNTY** [1] - 44:4
**couple** [1] - 15:16
**course** [4] - 21:1, 28:25, 39:4, 40:8
**Court** [1] - 39:19
**COURT** [119] - 1:1, 1:22, 4:7, 4:11, 4:15, 4:20, 4:23, 5:2, 5:7, 5:11, 5:18, 5:23, 6:2, 6:7, 6:9, 6:15, 6:17, 6:20, 7:9, 7:23, 8:5, 8:13, 9:3, 9:8, 9:13,

9:21, 10:13, 11:7, 11:11, 11:19, 11:23, 12:18, 13:3, 13:11, 13:15, 14:15, 14:21, 15:24, 16:4, 16:7, 17:17, 18:12, 18:16, 18:25, 19:10, 19:17, 19:22, 20:4, 20:7, 20:22, 21:10, 21:19, 21:25, 22:22, 23:9, 23:16, 23:20, 23:24, 24:14, 25:1, 25:3, 25:7, 25:17, 25:23, 26:2, 26:10, 26:17, 26:25, 27:13, 28:6, 28:10, 28:14, 29:11, 30:8, 30:11, 31:9, 31:12, 32:1, 32:4, 32:12, 33:1, 33:7, 33:16, 33:18, 33:25, 34:5, 34:12, 34:21, 35:5, 35:8, 35:10, 35:14, 35:17, 35:20, 36:2, 38:10, 38:12, 38:14, 38:17, 38:19, 38:21, 38:23, 39:1, 39:3, 40:4, 40:8, 40:12, 40:14, 41:3, 41:10, 41:16, 41:22, 42:8, 42:13, 42:19, 42:23, 43:3, 44:9, 44:22
**court** [1] - 43:6
**courtroom** [1] - 35:21
**cover** [1] - 8:3
**covering** [1] - 15:11
**covers** [1] - 9:18
**created** [2] - 32:20, 37:7, 37:11
**creating** [2] - 36:23, 37:3
**creation** [1] - 8:21
**credibility** [1] - 27:23
**cross** [1] - 15:15
**cross-examine** [1] - 15:15
**CSR** [2] - 1:22, 44:21
**CV** [1] - 1:8

# D

**damage** [2] - 17:10, 42:4
**damages** [10] - 13:21, 14:2, 14:5, 14:13, 14:25, 15:1, 16:10, 16:25, 17:20, 18:22
**Dark** [15] - 7:11, 7:14, 8:21, 10:10, 11:5, 22:2, 33:11, 36:5,

36:10, 36:17, 36:23, 37:3, 37:7, 37:17
**DATE** [1] - 44:18
**dated** [1] - 38:6
**deal** [1] - 9:24
**decide** [6] - 8:14, 9:9, 23:4, 24:2, 24:7, 25:4
**decided** [1] - 23:16
**decision** [3] - 8:9, 11:16, 28:17
**defendant** [34] - 4:24, 5:1, 5:4, 5:7, 5:9, 5:14, 5:17, 5:22, 6:11, 6:12, 7:13, 7:18, 8:9, 8:14, 9:1, 9:9, 10:2, 10:8, 13:7, 23:4, 24:3, 24:7, 25:5, 25:7, 26:1, 26:7, 26:12, 26:24, 27:7, 27:10, 27:16, 31:15, 37:15, 38:4
**DEFENDANT** [1] - 1:10
**DEFENDANTS** [2] - 2:13, 2:20
**defendants** [23] - 4:18, 7:7, 7:20, 8:10, 9:1, 9:13, 9:15, 9:16, 11:5, 11:6, 14:3, 15:10, 16:19, 19:4, 24:24, 27:22, 27:23, 32:20, 36:22, 36:25, 37:5, 37:6, 40:23
**define** [1] - 22:5
**defined** [4] - 21:22, 22:24, 28:24, 30:3
**defines** [1] - 11:22
**definition** [10] - 7:4, 8:11, 10:20, 21:24, 22:4, 23:22, 24:12, 25:20, 25:21, 34:4
**deliberate** [1] - 35:9
**deliberating** [1] - 16:10
**deliberations** [2] - 39:14, 39:18
**deposition** [6] - 13:23, 14:11, 15:4, 15:13, 16:19, 17:13
**deputy** [1] - 35:21
**derivative** [4] - 32:16, 32:21, 33:10, 33:12
**describes** [1] - 29:1
**designated** [7] - 13:25, 14:2, 17:8, 17:9, 17:10, 20:21, 40:17
**designations** [3] - 20:25, 42:4, 42:11

**designed** [1] - 11:3
**determine** [10] - 7:19, 8:19, 9:19, 10:2, 10:8, 26:12, 26:21, 26:23, 27:7, 28:5
**determined** [1] - 22:16
**different** [5] - 8:3, 16:10, 17:21, 27:14, 28:9
**differentiate** [2] - 23:8, 30:20
**differentiated** [1] - 32:5
**differentiating** [1] - 30:17
**differentiation** [1] - 31:20
**difficult** [1] - 15:12
**direct** [8] - 7:3, 9:4, 9:24, 10:15, 12:3, 12:23, 21:23, 22:7
**directed** [5] - 7:19, 10:2, 10:7, 21:16, 39:18
**directing** [3] - 8:2, 9:14, 13:1
**directive** [1] - 6:23
**directly** [2] - 8:20, 8:21
**disagree** [2] - 20:4, 31:20
**discuss** [2] - 13:9, 39:19
**discussed** [1] - 39:6
**discussing** [2] - 13:19, 34:18
**discussion** [1] - 7:25
**dismissed** [1] - 4:13
**displays** [1] - 30:24
**disputed** [1] - 41:25
**disseminated** [1] - 36:22
**distinct** [1] - 29:16
**distinction** [1] - 21:14
**distribute** [1] - 28:8
**distributed** [13] - 7:14, 8:21, 9:12, 9:14, 9:16, 10:4, 10:10, 10:19, 22:5, 27:8, 27:10, 28:3, 37:17
**distributes** [1] - 21:17, 29:20, 30:22, 31:1, 32:10
**distribution** [15] - 11:1, 22:12, 22:19, 24:2, 24:16, 25:12, 26:13, 27:2, 27:4, 29:1, 29:24, 30:25, 31:15, 31:23, 32:7
**DISTRICT** [5] - 1:1,

1:2, 1:4, 44:9
**DIVISION** [1] - 1:2
**DO** [2] - 44:10, 44:13
**dollar** [1] - 41:6
**done** [9] - 10:19, 14:13, 15:15, 16:6, 19:7, 20:2, 39:11, 41:23, 42:1
**down** [3] - 27:16, 30:25, 32:6
**Dr** [4] - 14:19, 14:24, 20:11, 40:10
**draft** [1] - 10:6
**drafts** [1] - 24:9
**during** [2] - 4:22, 31:3

**E**

**easier** [1] - 4:11
**EAST** [1] - 2:23
**effect** [2] - 12:2, 12:20
**efficiently** [1] - 17:18
**Einhorn** [3] - 14:2, 14:24, 20:11
**either** [4] - 9:13, 12:6, 17:1, 19:17
**ELIAS** [4] - 1:22, 44:8, 44:20, 44:21
**Elizabeth** [1] - 37:21
**email** [1] - 20:25
**end** [3] - 7:24, 26:18, 26:19
**endorse** [1] - 19:24
**entire** [1] - 31:7
**entirety** [9] - 24:21, 25:4, 26:11, 27:6, 31:13, 32:13, 33:5, 33:20, 34:1
**entities** [1] - 6:4
**entitled** [1] - 36:2
**entity** [6] - 4:17, 5:13, 5:15, 6:1, 8:18, 8:20
**entity's** [1] - 29:17
**enumerated** [1] - 25:7
**equals** [1] - 33:22
**equation** [1] - 23:7
**ERIC** [1] - 2:10
**ESQ** [9] - 2:5, 2:6, 2:10, 2:15, 2:16, 2:16, 2:17, 2:17, 2:22
**et** [4] - 21:17, 29:20, 30:23, 30:24
**ET** [2] - 1:6, 1:9
**event** [2] - 13:20, 14:6
**evidence** [9] - 15:1, 36:5, 36:10, 36:15, 36:21, 37:1, 37:6, 37:10, 37:16
**exactly** [5] - 6:8, 12:1,

12:10, 23:17, 29:4
**examine** [1] - 15:15
**example** [1] - 25:10
**except** [1] - 40:24
**exclusive** [3] - 7:1, 7:6, 10:17
**excuse** [2] - 16:9, 39:10
**exercise** [3] - 10:22, 11:1, 30:17
**exhibit** [1] - 41:1
**expect** [1] - 14:9
**expert** [2] - 14:2, 20:12
**experts** [4] - 14:5, 14:16, 20:2, 35:3
**explain** [1] - 41:2
**explains** [1] - 31:8
**exposure** [1] - 16:12
**expression** [4] - 24:25, 36:7, 36:12, 36:18
**extent** [7] - 14:3, 17:10, 18:3, 22:15, 25:8, 42:24, 42:25

**F**

**facing** [1] - 16:12
**fact** [3] - 8:20, 8:21, 35:23
**far** [2] - 4:9, 32:24
**FEDERAL** [2] - 1:22, 44:22
**Ferrara** [2] - 14:19, 40:10
**fighting** [1] - 11:13
**figure** [4] - 18:4, 28:13, 28:21, 42:18
**fill** [2] - 19:6, 19:13
**final** [1] - 41:5
**findings** [1] - 31:22
**fine** [4] - 6:13, 26:15, 26:18, 33:24
**first** [3] - 10:5, 29:5, 34:20
**FIRST** [1] - 1:23
**fit** [1] - 14:16
**five** [1] - 7:1
**fix** [2] - 6:10, 23:10
**FLOOR** [1] - 2:7
**fly** [2] - 20:12, 24:10
**focus** [2] - 15:1, 34:10
**focuses** [1] - 32:22
**folks** [1] - 24:5
**follow** [2] - 12:21, 35:3
**following** [1] - 22:14
**follows** [1] - 36:3
**FOR** [2] - 44:8, 44:9
**FOREGOING** [1] -

44:11
**foreperson** [3] - 35:18, 38:5, 43:3
**FORM** [1] - 44:13
**form** [6] - 21:6, 27:17, 31:17, 35:21, 38:5
**FORSYTH** [1] - 2:7
**forth** [2] - 21:5, 28:20
**FORTH** [1] - 44:12
**forward** [3] - 16:15, 29:21, 39:23
**frankly** [1] - 6:5
**front** [2] - 19:19, 26:19
**full** [1] - 24:20
████████████ [1] - 38:14
████████████ [1] - 38:16
**FURTHER** [1] - 44:14

**G**

**GABRIELLA** [1] - 2:17
**general** [2] - 8:10, 42:21
**generally** [1] - 21:15
**generically** [1] - 23:10
**gentlemen** [2] - 35:14, 39:3
**given** [2] - 12:21, 18:17
**God** [1] - 35:1
**gonna** [15] - 5:24, 12:10, 14:24, 16:14, 17:5, 17:22, 20:22, 28:17, 28:18, 31:11, 33:25, 35:21, 35:23, 40:25, 42:18
**Gottwald** [5] - 17:21, 17:23, 18:1, 18:10, 37:20
**Gottwald's** [3] - 16:20, 17:1, 18:13
**GRAY** [1] - 1:6
**Gray** [1] - 4:4
**great** [2] - 35:6, 43:1
**GREENBERG** [1] - 2:21
**guess** [3] - 15:4, 15:22, 22:22
**guys** [1] - 31:4

**H**

**HANLEY** [1] - 2:11
**happy** [1] - 34:6
**hard** [2] - 16:20, 40:2
**he/she/it** [7] - 10:3, 10:4, 10:9, 26:12, 27:8, 37:16

**headed** [1] - 16:1
**hear** [4] - 21:19, 33:8, 35:1, 37:2
**heard** [1] - 34:20
**hearing** [1] - 13:17
**help** [1] - 8:2
**helped** [1] - 16:11
**Henry** [1] - 37:24
**HEREBY** [1] - 44:10
**HEREINBEFORE** [1] - 44:11
**heretofore** [1] - 4:6
████████████ [2] - 35:17, 38:8
████████████ [2] - 35:19, 38:9
**hold** [1] - 39:5
**home** [4] - 15:24, 20:8, 31:18, 34:23
**Honor** [43] - 4:21, 6:18, 9:11, 13:9, 13:18, 13:20, 14:10, 15:10, 16:5, 17:1, 17:13, 18:7, 18:10, 19:15, 20:1, 20:3, 20:15, 21:4, 21:20, 22:10, 23:22, 24:19, 27:10, 28:13, 29:22, 30:13, 32:15, 33:24, 34:11, 34:17, 35:6, 35:7, 38:11, 38:13, 38:16, 38:20, 38:22, 38:25, 39:2, 40:9, 40:13, 41:9, 42:11
**HONORABLE** [1] - 1:4
**hope** [1] - 42:23
**hoping** [1] - 20:5
**Horse** [15] - 7:11, 7:14, 8:21, 8:22, 10:10, 11:5, 22:2, 33:11, 36:5, 36:11, 36:17, 36:23, 37:3, 37:7, 37:17
**hours** [1] - 15:16
**Houston** [4] - 5:2, 5:15, 5:22, 37:19
**Houston's** [4] - 4:13, 4:25, 5:8, 6:11
**Hudson** [2] - 37:21, 37:22
**hypothetically** [1] - 25:10

**I**

**i.e** [1] - 37:11
**idea** [1] - 19:11
**identifications** [1] - 22:11
**improve** [1] - 9:19

**improved** [1] - 9:22
**IN** [1] - 44:8
**Inc** [5] - 4:16, 4:24, 6:10, 38:1, 38:2
**include** [1] - 33:10
**includes** [2] - 7:5, 26:21
**including** [2] - 21:6, 24:23
**inclusion** [1] - 37:10
**independently** [1] - 37:6
**INDEX** [1] - 3:1
**indicated** [2] - 21:5, 39:4
**individual** [8] - 8:9, 8:17, 11:5, 12:6, 15:10, 16:19, 32:19, 40:23
**industry** [1] - 21:5
**information** [1] - 21:8
**informed** [2] - 13:22, 14:1
**infringe** [5] - 9:1, 10:13, 11:10, 11:13, 17:25
**infringed** [13] - 7:14, 7:21, 9:9, 10:12, 10:18, 10:20, 22:15, 22:24, 25:25, 27:10, 28:24, 30:3
**infringement** [33] - 6:25, 7:17, 9:4, 9:24, 10:21, 12:4, 21:16, 21:22, 22:13, 22:25, 23:1, 23:13, 24:8, 24:12, 24:22, 25:12, 25:20, 25:22, 26:6, 26:7, 26:9, 26:20, 28:2, 28:5, 28:8, 28:25, 29:16, 29:17, 30:4, 30:19, 31:25, 32:9
**infringes** [4] - 7:11, 7:24, 11:12, 22:2
**infringing** [4] - 12:2, 12:24, 25:11, 32:21
**inquiry** [1] - 39:19
**instead** [2] - 15:3, 23:23
**instruct** [1] - 19:24
**instructed** [1] - 20:3
**Instruction** [30] - 7:4, 8:3, 8:8, 8:18, 9:6, 9:8, 10:1, 10:7, 10:16, 11:22, 12:19, 12:20, 21:22, 22:25, 24:4, 24:21, 26:11, 27:6, 28:24, 28:25, 30:3, 30:12, 31:13,

32:13, 33:2, 33:6,
33:20, 34:1, 34:8
**instruction** [11] - 7:15,
9:20, 10:6, 11:3,
12:23, 22:7, 29:25,
31:8, 32:9, 33:14,
33:23
**instructions** [26] -
8:10, 9:23, 9:24,
11:24, 13:1, 15:6,
15:8, 19:12, 19:23,
20:17, 21:6, 22:6,
23:3, 27:20, 31:7,
32:25, 34:19, 34:24,
39:11, 39:17, 41:22,
41:24, 41:25, 42:21,
42:25
**instrumental** [1] -
37:11
**intellectual** [1] - 18:4
**intend** [3] - 14:1,
41:17, 42:21
**interrupt** [1] - 31:4
**interview** [1] - 24:4
**interviewing** [1] -
28:18
**introduce** [1] - 15:11
**IS** [1] - 44:14
**issue** [14] - 4:19, 8:24,
11:7, 12:5, 12:9,
14:13, 14:25, 17:21,
22:15, 22:20, 23:6,
27:24, 31:20, 34:4
**issues** [5] - 10:25,
13:10, 15:7, 23:14,
32:6
**Item** [1] - 4:3

### J

**JACOB** [1] - 2:17
**Jason** [1] - 14:18
**JEFFREY** [1] - 2:16
**job** [1] - 28:21
**Johnny** [1] - 42:9
**joint** [2] - 11:5, 37:12
**Jordan** [6] - 4:13, 5:2,
5:8, 5:22, 6:11,
37:19
**Joyful** [17] - 7:12,
7:13, 8:20, 9:15,
10:3, 10:9, 10:12,
10:14, 22:2, 32:24,
36:6, 36:10, 36:16,
36:21, 37:2, 37:12,
37:17
**JUDGE** [1] - 1:4
**Judge** [5] - 1:4,
19:16, 40:21, 41:17,
42:2

**July** [1] - 38:6
**JULY** [2] - 1:15, 4:1
**juncture** [1] - 42:15
**juries** [1] - 21:11
**jurors** [1] - 28:19
**JURY** [4] - 3:4, 3:5,
35:16, 36:1
**Jury** [8] - 4:9, 6:18,
7:4, 8:18, 12:19,
22:24, 24:4, 27:6
**jury** [39] - 5:13, 8:17,
8:19, 8:25, 12:5,
12:16, 15:6, 15:8,
15:11, 16:6, 17:6,
17:24, 19:12, 19:20,
19:22, 19:24, 20:2,
20:17, 21:9, 22:6,
23:2, 27:20, 28:11,
31:6, 33:23, 34:19,
34:21, 34:24, 35:9,
35:11, 35:13, 35:18,
36:2, 39:11, 40:3,
41:2, 41:22, 42:20

### K

**KAHN** [65] - 2:5, 4:9,
4:12, 4:19, 4:25, 5:5,
5:10, 5:17, 5:19,
6:14, 6:16, 6:18,
6:22, 7:22, 8:1,
10:11, 10:15, 11:4,
11:9, 11:21, 12:22,
14:23, 15:22, 16:3,
16:5, 16:18, 17:4,
18:14, 18:19, 19:2,
19:16, 19:21, 20:5,
20:14, 20:20, 20:23,
21:1, 21:20, 23:14,
23:22, 24:11, 24:18,
26:18, 28:12, 30:1,
30:7, 30:14, 31:2,
32:18, 33:9, 33:14,
33:17, 33:24, 34:9,
35:6, 35:12, 40:13,
40:20, 41:5, 41:12,
41:17, 42:2, 42:7,
42:16, 43:2
**Kahn** [8] - 4:8, 13:22,
14:11, 14:22, 20:4,
20:13, 23:6, 26:17
**Karl** [1] - 37:23
**Kasz** [1] - 38:2
**Katheryn** [1] - 37:21
**KATY** [1] - 1:9
**Katy** [2] - 4:4, 17:2
**KAYIRA** [2] - 2:9, 2:10
**keep** [3] - 11:17,
19:21, 39:21
**King** [1] - 14:18

**kitty** [1] - 4:12
**Kitty** [5] - 4:16, 4:22,
4:24, 5:7, 6:10
**KNUPP** [1] - 2:15
**Kobalt** [1] - 38:1

### L

**ladies** [2] - 35:14, 39:3
**language** [3] - 9:4,
11:12, 29:23
**last** [4] - 11:11, 26:19,
32:15, 39:14
**lately** [1] - 42:9
**latter** [1] - 21:16
**LAURA** [4] - 1:22,
44:8, 44:20, 44:21
**LAUREN** [1] - 2:6
**law** [1] - 6:24
**LAW** [1] - 2:9
**least** [2] - 10:16, 12:23
**leave** [2] - 16:13,
33:21
**leaving** [1] - 16:8
**left** [1] - 39:22
**legal** [3] - 11:7, 11:12,
12:4
**Lepera** [2] - 22:8,
31:16
**LEPERA** [39] - 2:15,
5:12, 5:20, 5:25, 6:5,
6:8, 6:13, 8:15, 9:11,
10:22, 11:17, 21:3,
21:12, 22:9, 23:5,
23:12, 23:17, 25:8,
25:19, 25:24, 26:4,
26:14, 27:9, 28:4,
28:7, 29:4, 29:13,
30:5, 30:9, 30:13,
30:15, 31:19, 32:3,
32:5, 32:17, 33:4,
33:13, 34:3, 40:7
**liability** [26] - 14:7,
15:9, 15:19, 15:25,
16:1, 16:11, 20:16,
21:15, 22:13, 22:25,
23:13, 24:12, 24:22,
26:7, 26:8, 26:20,
26:21, 28:7, 28:25,
29:15, 30:3, 30:16,
30:22, 31:24, 32:9
**liable** [10] - 9:1, 23:19,
25:11, 25:21, 26:13,
28:13, 29:7, 29:18,
30:21, 32:7
**light** [2] - 11:15, 39:6
**line** [1] - 9:20
**lines** [1] - 17:24
**Lines** [1] - 11:15
**listed** [12] - 5:3, 5:21,

6:4, 6:12, 8:18, 13:7,
23:4, 27:7, 32:17,
33:21, 34:2, 37:15
**lists** [1] - 7:5
**literal** [1] - 29:24
**live** [5] - 14:12, 14:18,
15:3, 15:20, 18:24
**LLC** [3] - 2:9, 5:3, 5:9
**look** [12] - 5:11, 10:5,
12:13, 17:17, 21:13,
21:25, 24:11, 25:3,
28:10, 31:12, 31:16,
34:8
**looked** [1] - 11:24
**looking** [5] - 22:3,
24:17, 27:2, 27:3,
29:23
██████ [1] - 38:21
██████ [1] - 38:22
**Los** [1] - 20:7
**LOS** [6] - 1:16, 1:23,
2:19, 2:24, 4:1, 44:4
**loud** [2] - 35:22, 35:23
**LOUIS** [1] - 2:8
**Lukasz** [1] - 37:20
**lump** [1] - 23:7

### M

**Management** [2] - 5:3,
5:8
**MARCUS** [1] - 1:6
**Marcus** [1] - 4:4
**marked** [1] - 41:1
**Martin** [1] - 37:23
**material** [1] - 36:6
**mean** [14] - 5:17, 7:23,
8:1, 8:13, 11:4,
17:23, 23:11, 25:1,
25:8, 26:14, 26:18,
26:19, 28:12, 29:17
**meaning** [1] - 30:19
**MEANS** [1] - 44:13
**means** [4] - 5:24,
11:15, 23:12, 39:4
**meant** [1] - 28:19
**meantime** [1] - 39:15
**mention** [1] - 12:16
**merge** [1] - 25:13
**MICHAEL** [1] - 2:5
**Michael** [1] - 14:2
**might** [3] - 5:25,
16:18, 28:20
**MILLER** [3] - 1:22,
44:20, 44:21
**mind** [2] - 24:5, 39:21
**minute** [2] - 22:10,
34:16
**minutes** [4] - 16:21,
19:5, 19:18, 19:21

**misinterpretation** [1] -
8:25
**misunderstanding** [1]
- 7:10
**MITCHELL** [1] - 2:15
**MO** [2] - 2:8, 2:11
**model** [1] - 32:8
**moment** [1] - 18:20
**MONDAY** [2] - 1:15,
4:1
**Money** [1] - 38:2
██████ [2] - 35:17,
38:8
██████ [2] - 35:19,
38:9
**Morgan** [1] - 38:6
**morning** [2] - 20:17,
39:6
**motion** [1] - 40:7
**motions** [1] - 11:14
**move** [2] - 41:2, 42:15
**moving** [1] - 28:20
**MOVIT** [14] - 2:16,
13:9, 13:17, 14:17,
15:17, 16:22, 18:9,
19:14, 20:1, 20:9,
20:15, 35:3, 35:7,
40:9
**MR** [106] - 4:9, 4:12,
4:19, 4:21, 4:25, 5:5,
5:6, 5:10, 5:17, 5:19,
6:14, 6:16, 6:18,
6:22, 7:22, 8:1, 8:7,
8:16, 9:7, 9:17,
10:11, 10:15, 11:4,
11:9, 11:21, 12:15,
12:19, 12:22, 13:9,
13:17, 14:17, 14:23,
15:17, 15:22, 16:3,
16:5, 16:18, 16:22,
17:4, 17:8, 18:7,
18:9, 18:14, 18:19,
19:2, 19:14, 19:16,
19:21, 20:1, 20:5,
20:9, 20:14, 20:15,
20:20, 20:23, 20:24,
21:1, 21:20, 23:14,
23:22, 24:11, 24:18,
24:19, 25:2, 25:6,
26:18, 28:12, 30:1,
30:7, 30:14, 31:2,
31:4, 31:10, 32:15,
32:18, 32:19, 33:5,
33:8, 33:9, 33:14,
33:17, 33:24, 34:9,
34:17, 35:3, 35:6,
35:7, 35:12, 38:11,
38:25, 39:2, 40:9,
40:13, 40:20, 41:5,
41:9, 41:12, 41:17,

42:2, 42:3, 42:7,
42:10, 42:16, 42:20,
43:1, 43:2
**MS** [44] - 2:13, 5:12,
5:20, 5:25, 6:5, 6:8,
6:13, 8:15, 9:11,
10:22, 11:17, 21:3,
21:12, 22:9, 23:5,
23:12, 23:17, 25:8,
25:19, 25:24, 26:4,
26:14, 27:9, 28:4,
28:7, 29:4, 29:13,
30:5, 30:9, 30:13,
30:15, 31:19, 32:3,
32:5, 32:17, 33:4,
33:13, 34:3, 35:19,
38:9, 38:13, 38:18,
38:20, 40:7
▮▮▮ [1] - 38:12
▮▮▮ [1] - 38:13
**Music** [2] - 37:25, 38:1
**musical** [4] - 36:6,
36:11, 36:17, 37:11
**must** [9] - 7:12, 7:13,
8:19, 22:24, 23:4,
24:2, 26:12, 27:7,
31:13
**MY** [1] - 44:15

## N

**name** [4] - 4:17, 5:16,
6:1, 6:2
**named** [1] - 7:13
**naming** [1] - 5:13
**narrow** [1] - 32:6
**necessary** [1] - 42:25
**need** [4] - 12:17,
20:12, 26:23, 41:16
▮▮▮ [1] - 38:23
▮▮▮ [1] - 38:25
**never** [2] - 4:22, 27:23
**new** [4] - 17:5, 17:15,
28:20, 42:14
**next** [8] - 11:14, 16:8,
22:18, 25:11, 29:7,
29:15, 29:19, 39:24
**NO** [4] - 1:8, 3:4, 3:5
**Noise** [17] - 7:12, 7:14,
8:20, 9:15, 10:3,
10:9, 10:12, 10:14,
22:2, 32:24, 36:6,
36:10, 36:17, 36:21,
37:2, 37:12, 37:17
**none** [1] - 12:1
**nonrefundable** [1] -
16:13
**Note** [1] - 4:9
**note** [5] - 21:3, 21:7,
21:10, 34:3, 34:13

**NOTE** [2] - 3:4, 3:5
**noted** [1] - 4:6
**NOTES** [1] - 44:15
**notes** [4] - 4:7, 21:4
**nothing** [2] - 18:21,
30:23
**notice** [1] - 18:17
**NOURAFCHAN** [1] -
2:17
**numbers** [1] - 17:1

## O

**o'clock** [1] - 19:6
**object** [6] - 16:22,
17:15, 18:7, 18:9,
31:21, 34:11
**objection** [4] - 12:14,
14:19, 34:3, 34:17
**objections** [4] - 13:5,
34:14, 42:8, 42:10
**objectively** [1] - 36:11
**obviously** [3] - 11:24,
15:24, 29:2
**OF** [13] - 1:1, 1:2,
1:14, 2:2, 2:3, 2:13,
2:20, 44:2, 44:4,
44:6, 44:9, 44:13,
44:15
**OFFICIAL** [3] - 1:22,
44:8, 44:22
**Ojukwu** [1] - 37:11
**OLYMPIC** [1] - 2:18
**ON** [3] - 2:3, 2:13, 2:20
**once** [2] - 12:5, 35:22
**one** [29] - 4:21, 5:3,
5:4, 5:9, 5:21, 6:3,
6:11, 7:2, 9:1, 11:12,
12:2, 13:1, 13:8,
16:18, 19:4, 21:17,
22:13, 23:2, 29:14,
29:15, 29:19, 30:5,
30:22, 31:6, 32:9,
32:22, 34:10, 34:16
**one's** [1] - 6:17
**ongoing** [1] - 39:16
**open** [1] - 39:21
**opening** [5] - 15:18,
16:15, 19:18, 39:8,
40:18
**openings** [1] - 20:18
**opportunity** [2] -
36:23, 37:2
**oppose** [2] - 40:10,
40:13
**opposed** [1] - 15:1
**order** [2] - 15:5, 41:6
**ordinary** [1] - 36:15
**original** [2] - 24:25,
36:7

**originally** [2] - 17:8,
34:17
**OTHER** [1] - 2:13
**otherwise** [4] - 10:12,
10:13, 10:20, 11:9
**ought** [3] - 4:23,
19:23, 19:24
**overall** [1] - 18:2
**overcome** [1] - 8:25
**overruled** [1] - 12:25
**owner** [2] - 12:2, 31:3
**owners** [4] - 7:1,
11:17, 12:3, 12:6

## P

**P.M** [1] - 4:1
**p.m** [1] - 43:7
**PAGE** [1] - 3:3
**page** [2] - 24:22, 38:4
**paragraph** [4] - 26:20,
31:6, 32:15, 32:23
**PARK** [1] - 2:23
**parse** [1] - 18:5
**part** [3] - 37:12, 39:8,
41:24
**particular** [1] - 22:7
**particularly** [1] - 11:15
**parties** [2] - 13:19,
41:7
**party** [4] - 4:22, 9:19,
33:21, 34:2
**people** [5] - 16:7,
16:9, 16:10, 16:12,
24:9
**percent** [1] - 14:24
▮▮▮ [1] - 39:1
▮▮▮ [1] - 39:2
**performance** [1] -
30:24
**performs** [1] - 32:10
**perhaps** [1] - 24:9
**permission** [1] - 32:16
**Perry** [5] - 4:4, 20:21,
40:17, 40:19, 40:21
**PERRY** [3] - 1:9, 2:13,
2:20
**Perry's** [2] - 16:19,
17:2
**person** [5] - 8:19,
14:9, 16:17, 29:17,
36:16
**pertains** [2] - 12:2,
26:1
**PH** [1] - 1:24
**phase** [1] - 16:25
**pick** [1] - 39:22
**place** [2] - 20:8, 31:10
**PLACE** [1] - 44:11
**PLAINTIFF** [2] - 1:7,

2:3
**plaintiff** [1] - 21:19
**plaintiff's** [3] - 9:9,
13:22, 24:24
**plaintiffs** [9] - 12:14,
36:4, 36:7, 36:9,
36:14, 36:20, 37:9,
37:13, 40:10
**plans** [1] - 39:24
**plus** [1] - 29:6
**point** [24] - 5:13,
10:25, 11:1, 16:4,
18:5, 21:14, 21:16,
22:10, 22:22, 23:3,
23:8, 23:17, 23:18,
25:14, 25:16, 25:24,
27:10, 27:24, 29:8,
29:21, 30:18, 40:6,
41:14
**polling** [1] - 35:24
**portions** [2] - 15:3,
17:12
**position** [1] - 35:1
**possibility** [1] - 7:2
**possibly** [2] - 18:23,
20:20
**post** [1] - 11:14
**post-trial** [1] - 11:14
**potential** [1] - 13:24
**potentially** [1] - 32:6
**precise** [1] - 41:4
**predict** [1] - 15:22
**prefer** [2] - 12:24,
15:2, 34:9
**preparing** [2] - 32:16,
33:10
**preponderance** [8] -
36:5, 36:10, 36:15,
36:21, 37:1, 37:6,
37:10, 37:16
**present** [2] - 35:13,
40:3
**presented** [1] - 9:2
**PRESIDING** [1] - 1:4
**presumably** [1] -
33:11
**pretrial** [1] - 41:6
**pretty** [1] - 6:20
**previous** [1] - 42:25
**previously** [2] - 18:13,
40:17
**principally** [1] - 14:25
**problem** [5] - 5:24,
7:9, 7:15, 9:3, 9:11,
9:25, 11:19, 11:20,
11:25, 12:8, 14:15,
17:19, 18:6, 25:3,
26:3, 27:13, 28:14,
29:11, 31:15
**proceed** [1] - 39:7

**proceedings** [1] - 43:7
**PROCEEDINGS** [3] -
1:14, 3:3, 44:11
**production** [1] - 10:24
**profitability** [1] - 18:3
**profits** [4] - 15:1, 15:2,
17:1, 17:2
**program** [1] - 42:9
**prongs** [2] - 22:12,
29:14
**proof** [3] - 24:23,
24:24, 29:15
**proposal** [1] - 14:6
**propose** [2] - 13:20,
14:10
**proposed** [1] - 13:5
**proposing** [1] - 25:18
**protectable** [2] -
36:12, 36:18
**prove** [7] - 36:4, 36:9,
36:14, 36:20, 36:25,
37:5, 37:9
**proved** [1] - 22:17
**public** [2] - 30:23,
30:24
**publically** [1] - 21:17
**publicly** [1] - 32:10
**publisher** [2] - 5:8,
6:11
**Publishing** [1] - 38:1
**publishing** [9] - 4:13,
4:25, 5:4, 5:9, 5:21,
6:3, 6:6, 10:24, 21:7
**purposes** [1] - 33:3
**Purry** [6] - 4:12, 4:16,
4:22, 4:24, 5:7, 6:10
**put** [3] - 11:2, 15:14,
40:16
**puts** [1] - 27:23

## Q

**questioning** [1] -
13:24
**questions** [5] - 22:1,
31:14, 31:18, 36:3,
39:7
**quick** [1] - 16:6
**quicker** [1] - 15:14
**quickly** [1] - 42:20

## R

**rather** [3] - 13:7,
14:25, 19:13
**reach** [1] - 23:3
**reached** [2] - 23:14,
35:15
**read** [25] - 10:16,
14:11, 15:18, 16:17,

16:18, 16:20, 17:5, 17:7, 17:23, 18:8, 18:13, 18:17, 18:21, 19:9, 32:12, 33:18, 33:19, 33:25, 35:22, 39:9, 40:20, 40:21, 42:5, 42:21

**reading** [7] - 15:3, 15:12, 16:24, 18:9, 20:18, 40:16, 40:19

**ready** [1] - 35:11

**really** [9] - 5:20, 7:16, 16:9, 18:2, 24:5, 24:16, 29:23, 34:6, 42:20

**reason** [2] - 11:18, 25:19

**reasonable** [2] - 36:15, 36:22

**reasoned** [1] - 23:25

**reasons** [1] - 18:10

**rebuttal** [1] - 20:12

**rebuttals** [1] - 20:11

**Recess** [1] - 13:14

**recess** [1] - 21:2

**recognize** [1] - 13:4

**record** [7] - 6:1, 21:4, 21:7, 21:10, 34:14, 39:9, 41:18

**recording** [1] - 18:3

**Records** [10] - 13:24, 14:4, 14:8, 15:3, 16:16, 19:7, 34:25, 35:4, 37:18, 40:24

**redacted** [2] - 41:1, 41:7

**REDUCED** [1] - 44:12

**refer** [5] - 8:10, 11:21, 23:2, 24:21, 33:2

**reference** [2] - 31:6, 31:11

**referring** [1] - 9:17

**regard** [1] - 26:8

**regarding** [2] - 11:14, 31:14

**reinvent** [1] - 43:5

**relate** [1] - 18:22

**related** [1] - 5:15

**relevance** [4] - 16:25, 17:3, 17:24, 18:11

**relevant** [1] - 17:20, 32:10, 41:8

**rely** [1] - 18:16

**remedies** [1] - 11:20

**remember** [6] - 18:12, 26:11, 27:6, 31:13, 39:15, 42:17

**remind** [1] - 17:6

**renew** [1] - 40:7

**repeat** [1] - 20:22

**repeated** [1] - 17:14

**report** [2] - 13:16, 39:19

**REPORTED** [1] - 44:10

**REPORTER** [4] - 1:22, 44:2, 44:8, 44:22

**REPORTER'S** [1] - 1:14

**represent** [1] - 5:22

**reproduces** [7] - 21:17, 23:23, 29:20, 30:6, 30:22, 31:1, 32:9

**reproducing** [1] - 27:2

**reproduction** [16] - 10:25, 22:12, 22:19, 26:21, 26:25, 29:1, 30:10, 30:12, 31:23, 32:3, 32:4, 32:7, 32:14, 32:23, 33:3, 33:10

**request** [3] - 14:19, 20:24, 42:3

**requires** [2] - 12:9, 27:17

**reread** [2] - 9:18, 20:25

**rereading** [2] - 17:18, 18:8

**reserve** [1] - 41:20

**reserves** [1] - 13:5

**respect** [5] - 22:20, 23:6, 30:23, 31:22, 34:4

**respectfully** [1] - 14:18

**response** [1] - 24:3

**responsible** [1] - 22:20

**responsive** [1] - 24:1

**rest** [1] - 31:2

**retried** [1] - 12:9

**return** [3] - 38:4, 39:5, 39:21

**returning** [1] - 34:16

**revenues** [1] - 40:22

**reverse** [2] - 12:7

**review** [5] - 22:6, 26:10, 27:5, 35:21, 40:15

**rewrite** [3] - 9:23, 13:6, 33:23

**Rights** [2] - 5:2, 5:8

**rights** [4] - 7:1, 7:6, 10:17, 41:20

**ROAD** [1] - 2:11

▮▮▮▮▮ [1] - 38:10

▮▮▮▮ [1] - 38:11

**ROOM** [1] - 1:23

**room** [1] - 21:9

**Rule** [1] - 40:7

**rule** [2] - 32:8, 42:8

**ruled** [1] - 42:11

**running** [1] - 28:18

**Russell** [1] - 37:24

## S

**SAME** [1] - 44:12

▮▮▮▮▮▮ [1] - 38:23

▮▮▮▮ [1] - 38:25

**Sandberg** [1] - 37:23

**Sarah** [1] - 37:22

**Schedule** [1] - 41:6

**schedule** [3] - 15:17, 19:11, 20:15

**scheduling** [3] - 13:10, 13:19, 34:16

**second** [3] - 21:23, 23:2, 30:1

**secondary** [1] - 29:5

**section** [2] - 29:19, 34:10

**sections** [1] - 29:10

**see** [13] - 5:11, 9:6, 9:8, 10:1, 10:7, 12:13, 14:13, 16:25, 18:11, 24:3, 30:11, 34:15, 40:5

**seem** [1] - 5:16

**send** [5] - 13:3, 20:24, 34:23, 35:2, 39:13

**sending** [1] - 39:25

**sense** [3] - 5:14, 29:6, 29:24

**sentencing** [1] - 13:11

**separate** [1] - 22:11

**separated** [1] - 25:13

**separately** [3] - 8:9, 9:19, 26:8

**service** [1] - 40:1

**SET** [1] - 44:11

**set** [3] - 21:5, 27:16, 39:14

**settle** [1] - 34:19

**settled** [2] - 19:12, 19:23

**shall** [1] - 5:3

**short** [1] - 40:22

**shorthand** [1] - 6:25

**show** [3] - 6:15, 24:24, 34:13

**side** [3] - 13:5, 39:10, 41:14

**sides** [1] - 40:18

**sign** [2] - 38:4, 38:5

**SILBERBERG** [1] - 2:15

**similar** [2] - 36:12,

36:18

**similarity** [6] - 22:17, 23:13, 27:18, 28:5, 29:6, 30:20

**simple** [1] - 6:20

**simplest** [1] - 11:25

**simplistic** [1] - 12:11

**simply** [3] - 15:2, 15:14, 23:7

**singling** [1] - 11:23

**skipped** [1] - 27:4

**sleep** [1] - 19:19

**SNYDER** [1] - 1:4

**SOKOL** [1] - 2:5

**solution** [3] - 6:21, 11:20, 13:5

**solve** [3] - 4:19, 5:10, 5:23

**solving** [1] - 8:12

**someone** [4] - 16:2, 31:8, 39:17, 40:5

**somewhere** [1] - 19:4

**song** [5] - 7:12, 7:24, 12:2, 12:3, 12:6

**sorry** [2] - 9:7, 25:2

**sort** [1] - 28:17

**sounds** [3] - 18:25, 20:5, 43:1

**space** [1] - 19:13

**special** [1] - 21:6

**specific** [1] - 21:6

**specifically** [3] - 11:17, 12:16, 22:13

**speed** [2] - 41:13, 41:19

**spell** [1] - 26:5

**spelled** [2] - 26:4, 26:5

**spent** [1] - 8:24

**split** [1] - 29:22

**SS** [1] - 44:5

**ST** [1] - 2:8

**stab** [1] - 10:5

**stage** [3] - 9:5, 30:1, 34:7

**stages** [1] - 29:25

**stand** [1] - 17:14

**start** [1] - 11:23

**state** [1] - 4:5

**STATE** [1] - 44:6

**statement** [6] - 7:12, 16:15, 19:18, 32:8, 39:8, 40:18

**STATES** [4] - 1:1, 1:1, 1:4, 44:9

**states** [1] - 8:8

**stating** [1] - 41:18

**stay** [1] - 39:24

**STENOGRAPHIC** [1] - 44:15

**STENOGRAPHICALLY** [1] - 44:10

**step** [1] - 22:18

**still** [6] - 18:4, 25:4, 26:14, 31:10, 31:19, 39:16

**stipulated** [1] - 17:2

**stipulations** [5] - 15:10, 15:18, 19:3, 20:19, 40:22

**STREET** [1] - 1:23

**strictly** [1] - 18:22

**stuff** [4] - 19:9, 27:18, 40:21, 43:4

**submit** [2] - 31:22, 41:25

**submitted** [1] - 36:3

**substantial** [6] - 22:17, 23:12, 27:17, 28:5, 29:6, 30:20

**substantially** [2] - 36:11, 36:17

**substitute** [1] - 27:9

**substituted** [1] - 27:11

**sufficient** [1] - 13:4

**suggest** [2] - 8:16, 25:15

**suggesting** [1] - 23:7

**suggestion** [2] - 7:23, 19:14

**SUITE** [2] - 2:11, 2:23

**sum** [1] - 23:7

**summarize** [1] - 17:5

**suppose** [1] - 17:23

**surprise** [2] - 15:25, 18:11

**synonymous** [4] - 25:25, 26:6, 26:16, 30:9

## T

**talks** [3] - 10:17, 21:14, 21:15

**term** [3] - 6:23, 29:9, 31:3

**terms** [2] - 12:1, 21:5

**testified** [2] - 17:11, 18:21

**testifies** [1] - 15:14

**testify** [4] - 14:9, 14:12, 14:19, 18:15

**testifying** [1] - 40:10

**testimony** [18] - 13:23, 14:11, 15:20, 16:24, 17:6, 17:10, 17:11, 17:14, 17:15, 17:18, 17:22, 18:8, 18:9, 18:13, 18:18, 39:9, 40:17, 42:5

**THAN** [1] - 2:13
**THAT** [3] - 44:10, 44:12, 44:14
**THE** [126] - 2:20, 4:3, 4:7, 4:11, 4:15, 4:20, 4:23, 5:2, 5:7, 5:11, 5:18, 5:23, 6:2, 6:7, 6:9, 6:15, 6:17, 6:20, 7:9, 7:23, 8:5, 8:13, 9:3, 9:8, 9:13, 9:21, 10:13, 11:7, 11:11, 11:19, 11:23, 12:18, 13:3, 13:11, 13:15, 14:15, 14:21, 15:24, 16:4, 16:7, 17:17, 18:12, 18:16, 18:25, 19:10, 19:17, 19:22, 20:4, 20:7, 20:22, 21:10, 21:19, 21:25, 22:22, 23:9, 23:16, 23:20, 23:24, 24:14, 25:1, 25:3, 25:7, 25:17, 25:23, 26:2, 26:10, 26:17, 26:25, 27:13, 28:6, 28:10, 28:14, 29:11, 30:8, 30:11, 31:9, 31:12, 32:1, 32:4, 32:12, 33:1, 33:7, 33:16, 33:18, 33:25, 34:5, 34:12, 34:21, 35:5, 35:8, 35:10, 35:11, 35:14, 35:16, 35:17, 35:20, 36:1, 36:2, 38:10, 38:12, 38:14, 38:17, 38:19, 38:21, 38:23, 39:1, 39:3, 40:4, 40:8, 40:12, 40:14, 41:3, 41:10, 41:16, 41:22, 42:8, 42:13, 42:19, 42:23, 43:3, 43:6, 44:8, 44:9, 44:10, 44:11, 44:12
**themselves** [1] - 37:2
**THEREAFTER** [1] - 44:12
**Theresa** [1] - 37:22
**they've** [5] - 10:17, 11:24, 23:16, 27:4, 41:7
**thinking** [3] - 27:3, 27:14, 41:18
**THIS** [1] - 44:14
**three** [2] - 13:11, 19:5
**thrown** [1] - 7:6
**TIME** [1] - 44:11
**TO** [1] - 44:12
**today** [4] - 14:7, 15:19, 20:16, 39:23

**together** [2] - 8:15, 25:13
**tomorrow** [21] - 14:7, 14:8, 15:18, 16:15, 16:16, 19:6, 19:12, 19:18, 34:18, 34:23, 39:6, 39:9, 39:11, 39:22, 40:5, 40:15, 40:19, 41:11, 42:1
**took** [1] - 11:17
**top** [1] - 24:22
**total** [1] - 36:16
**touch** [1] - 12:17
**TRANSCRIPT** [1] - 1:14
**TRANSCRIPTION** [2] - 44:13, 44:14
**TRAURIG** [1] - 2:21
**travel** [1] - 39:24
**traveling** [2] - 14:8
**trial** [7] - 4:22, 11:14, 12:9, 13:21, 14:14, 28:20, 41:24
**TRUE** [1] - 44:14
**try** [8] - 6:10, 8:23, 13:6, 19:8, 23:25, 28:21, 33:19, 41:13
**trying** [9] - 5:18, 12:11, 15:22, 18:12, 19:5, 19:13, 25:13, 26:20, 29:8
**Tuesday** [1] - 14:12
**turn** [1] - 38:4
**two** [15] - 9:20, 10:11, 10:25, 14:5, 14:16, 16:18, 16:24, 20:2, 24:14, 25:12, 25:13, 28:4, 29:9, 29:13, 29:25
**types** [1] - 8:3
**TYPEWRITTEN** [1] - 44:12

## U

**U.S** [2] - 5:3, 5:8
**unanimous** [1] - 35:15
**unauthorized** [1] - 28:1
**undefined** [1] - 6:23
**under** [1] - 26:8
**undue** [1] - 31:7
**unfortunately** [1] - 9:21
**UNITED** [4] - 1:1, 1:1, 1:4, 44:8
**unless** [2] - 27:22, 40:5
**unlike** [1] - 4:22
**unredacted** [1] - 41:3

**up** [11] - 13:13, 15:21, 17:13, 17:14, 27:16, 29:14, 39:12, 39:22, 40:5, 41:14, 41:19

## V

**vacations** [1] - 16:13
████████ [1] - 38:19
████████████ [1] - 38:20
**VERDICT** [1] - 3:6
**verdict** [25] - 6:23, 8:18, 11:3, 13:20, 15:25, 21:6, 27:17, 31:16, 34:22, 35:15, 35:21, 35:24, 35:25, 38:4, 38:5, 38:7, 38:8, 38:10, 38:12, 38:15, 38:17, 38:19, 38:21, 38:24, 39:1
**versus** [1] - 4:4
**video** [2] - 14:20, 40:11
**view** [4] - 12:11, 18:5, 21:13, 32:11
**VINCENT** [1] - 2:22
**VS** [1] - 1:8

## W

**Wais** [2] - 40:25, 42:19
**WAIS** [4] - 2:16, 41:9, 42:20, 43:1
**waiting** [1] - 39:12
**Walter** [1] - 37:24
**wants** [1] - 30:16
**warner** [1] - 37:25
**WAS** [1] - 44:12
**Wednesday** [10] - 14:9, 14:14, 15:20, 15:21, 19:23, 34:25, 35:5, 39:13, 39:25
**week** [2] - 16:8, 39:24
**weight** [1] - 31:7
**WEST** [2] - 1:23, 2:18
**WESTERN** [1] - 1:2
**wheel** [1] - 43:5
**whole** [8] - 10:22, 11:1, 22:10, 23:8, 25:14, 29:8, 29:20, 30:17
**widely** [1] - 36:21
**widespread** [2] - 27:19, 27:21
**willing** [1] - 35:1
**witness** [12] - 13:25, 14:4, 14:8, 14:12, 15:3, 15:20, 18:24, 19:8, 19:24, 20:1,

34:25
**witnesses** [6] - 15:5, 16:16, 16:23, 16:25, 40:19, 40:21
**wonderful** [1] - 20:7
**word** [8] - 7:7, 22:3, 23:23, 24:7, 24:22, 27:11, 29:12
**words** [3] - 24:9, 28:2, 28:3
**works** [1] - 43:2
**wrap** [1] - 39:12
**wrapped** [1] - 15:21
**write** [3] - 4:20, 12:12, 13:8
**written** [1] - 10:6
**wrote** [2] - 8:15, 13:7

## Y

**years** [1] - 11:14
**yourselves** [1] - 39:5

# EXHIBIT 8

EXHIBIT  8
PAGE  1278

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

- - -

HONORABLE CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE PRESIDING

- - -

MARCUS GRAY; ET AL.,            )
                               )
          PLAINTIFF,           )
                               )  CASE NO.:
VS.                            )  CV 15-5642-CAS
                               )
KATY PERRY; ET AL.,            )
                               )
          DEFENDANT.           )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TUESDAY, JULY 30, 2019

LOS ANGELES, CALIFORNIA

LAURA MILLER ELIAS, CSR 10019
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, ROOM 4455
LOS ANGELES, CALIFORNIA 90012
PH:  (213)894-0374

EXHIBIT 8
PAGE 1279

```
 1

 2
     APPEARANCES OF COUNSEL:
 3
     ON BEHALF OF PLAINTIFF:
 4

 5          CAPES SOKOL
            BY: MICHAEL A. KAHN, ESQ.
 6              LAUREN COHEN, ESQ.

 7          7701 FORSYTH BOULEVARD
            12TH FLOOR
 8          ST. LOUIS, MO 63105

 9
            KAYIRA LAW, LLC
10          BY:  ERIC KAYIRA, ESQ.

11          2100 HANLEY ROAD, SUITE 208
            CLAYTON, MO 63105
12

13
     ON BEHALF OF DEFENDANTS OTHER THAN MS. PERRY:
14

15          MITCHELL SILBERBERG & KNUPP
            BY: CHRISTINE LEPERA, ESQ.
16              AARON M. WAIS, ESQ.
                JEFFREY MOVIT, ESQ.
17              GABRIELLA NOURAFCHAN, ESQ.
                JACOB ALBERTSON, ESQ.
18
            11377 WEST OLYMPIC BOULEVARD
19          LOS ANGELES, CA 90064

20
     ON BEHALF OF THE PERRY DEFENDANTS:
21
            GREENBERG TRAURIG
22          BY:  VINCENT H. CHIEFFO, ESQ.

23          1840 CENTURY PARK EAST
            SUITE 1900
24          LOS ANGELES, CA 90067

25
```

EXHIBIT 8
PAGE 1280

```
1                              INDEX
2

3    PROCEEDINGS                                    PAGE

4
     OPENING STATEMENTS
5
     BY:  MR. KAHN                                  21
6
     BY:  MR. WAIS                                  25
7

8         EXHIBITS              RECEIVED

9
          125                   34
10

11
     JURY INSTRUCTION DISCUSSION                    39
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

EXHIBIT 8
PAGE 1281

4

| | |
|---|---|
| 1 | LOS ANGELES, CALIFORNIA; TUESDAY, JULY 30, 2019; 9:49 A.M. |
| 2 | - - - |
| 3 | THE CLERK:  Calling Calendar Item No. 1. |
| 4 | Case No. CV 15-5642. |
| 5 | Marcus Gray versus Katy Perry, et al. |
| 6 | Counsel, please state your appearances. |
| 7 | (Appearances heretofore noted.) |
| 8 | THE COURT:  Okay.  I gather you have some things |
| 9 | you want to take up. |
| 10 | MR. MOVIT:  Essentially, whenever Your Honor is |
| 11 | ready? |
| 12 | THE COURT:  I am. |
| 13 | MR. MOVIT:  The first issue, Your Honor, as the |
| 14 | Court may be aware next to the joint pretrial order is a |
| 15 | schedule of stipulated facts about damages? |
| 16 | THE COURT:  Yes. |
| 17 | MR. MOVIT:  And in that stipulation for each of the |
| 18 | individual defendants, there's their gross income from the |
| 19 | exploitation of Dark Horse, and then there's costs in a set |
| 20 | number which the parties have stipulated are attributable to |
| 21 | the exploitation of Dark Horse. |
| 22 | THE COURT:  That's what I have here; correct? |
| 23 | MR. MOVIT:  5B, Your Honor. |
| 24 | There's also a version to be read to the jury |
| 25 | without some of the reservations and preambles and things, |

EXHIBIT  8
PAGE  1282

```
 1   but the numbered paragraphs are identical in the PTO and in

 2   the clean version which I believe Your Honor has.

 3             THE COURT:  Right.

 4             MR. MOVIT:  So essentially or actually not

 5   essentially, definitively for each of the individual

 6   defendants, the net income has been stipulated because we

 7   know the gross and we know the costs attributable to Dark

 8   Horse.  So there can be no fight or argument these costs are

 9   attributable to something else.

10             So we were quite surprised to learn this morning

11   that the plaintiffs intend to challenge the deductibility of

12   the costs in that stipulation.  The whole point of the

13   stipulation was to agree upon a net number for the individual

14   defendants and not have a fight at trial about the net and

15   what the net is.

16             Because all of these costs have been stipulated to

17   be attributable to the exploitation of Dark Horse, there's no

18   legally meritorious argument that can be made that these

19   costs are nondeductible.

20             THE COURT:  I want to hear from you, Mr. Kahn.

21             MR. KAHN:  Mr. Movit has apparently ignored the

22   preceding paragraph of the stipulation where the defendants

23   are reserving their right.  I assume they are continuing to

24   reserve their right to challenge the percentage or amount of

25   this income that would be attributable to the copyright.
```

UNITED STATES DISTRICT COURT

EXHIBIT 8
PAGE 1283

1          And it reads right here plaintiffs in turn reserve

2    their right to challenge the deductibility to some or all of

3    the categories of the costs incurred by defendant.  So we can

4    put this evidence on before the jury.  We have the total

5    gross income, for example, of Mr. Houston, and then we have

6    the costs that he says are attributable to the exploitation.

7    It's up to the jury to decide.

8          There's been no agreement on the net amount and

9    each side has reserved its rights.  I don't understand what

10   Mr. Movit is saying.  We -- we worked this stipulation out

11   carefully more than a month ago when it was filed with the

12   Court.  Um, so I don't think that's an issue the Court needs

13   to decide.  It's up to the jury.

14         And if the defendants want to try to decrease the

15   amount of the net profits by arguing that some percentage of

16   it should be attributed to something else, they've reserved

17   their right to do that.  And if he want to reserve our right

18   to say well, you know, to the jury one of these deductible

19   costs is legal fees, we don't think it should be deducted,

20   we've reserved our right to do it.  It's right in the

21   stipulation.

22         THE COURT:  Well, go ahead, Mr. Movit.

23         MR. MOVIT:  So with respect to the defendant's

24   reservation of rights that concerns apportionment which is a

25   completely separate --

```
 1              THE COURT:  I understand that.

 2              MR. MOVIT:  With respect to the plaintiffs'

 3    reservation of rights, there are obviously defendants other

 4    than the individuals with whom we're now discussing.  Um,

 5    some of who have now been dismissed others remain.  But,

 6    again, with respect to individuals if it's been stipulated

 7    that these costs are attributable to the exploitation, then

 8    as a matter of law, they must be deducted.

 9              THE COURT:  Well, I guess I need to look at the

10    stipulation.  I thought where we left off before the trial

11    was that we had dispute over the expert opinions.  And your

12    attack on plaintiff's expert was that the plaintiff didn't

13    consider the costs and, uh, now we don't have an expert from

14    the plaintiff.  Instead we just have a stipulation and you

15    have no one to cross-examine obviously regarding this theory

16    that costs are whatever, but I assume your own witnesses are

17    going to explain costs.

18              MR. MOVIT:  For -- for Capitol Records a witness

19    will go through that.  Capitol Records is not in this part of

20    the stip that we're talking about.

21              THE COURT:  I need to see the stipulation.  Why

22    don't you just give it to Ms. Jeang and let me look at it.

23    Well, I guess I'm not following your argument, Mr. Movit

24    because it plainly says the plaintiffs in turn reserve the

25    right to challenge the deductibility of some or all the
```

1    categories of the costs incurred by defendants.

2          MR. MOVIT:  Because as a matter of law, if these

3    costs are attributable to the exploitation, the factual

4    question which would be for the jury has been determined, the

5    net for these defendants.  And, again, there are other

6    defendants that remain in dispute.  Well, mostly Capitol

7    Records at this point for which these numbers are not

8    stipulated.  But for these stipulated defendants, the net has

9    been agreed upon.

10          It's a legal question, Your Honor, as to whether

11   management commissions are deductible.  We submit that it is

12   legally required if there's a finding that these costs were

13   incurred.  And because, you know, these costs have been

14   incurred, it's stipulated, indisputable, they must be

15   deducted.  And they can't do an end run to -- to make the net

16   any greater than it's been stipulated to be for these

17   defendants.  What's left for these defendants is a fight

18   about apportionment.

19          THE COURT:  Well, I agree there's a fight about

20   apportionment.  That's the key fight.  But what I'm not

21   understanding is how you can take this language and say

22   they've now stipulated to a net --

23          MR. KAHN:  Let me --

24          MR. MOVIT:  Can I answer Her Honor's question

25   first?

 1            There can't be a fight because they've stipulated

 2    they're attributable to the exploitation of Dark Horse.

 3    There could be a factual question otherwise as to whether

 4    these expenses were attributable to something else,

 5    causation, but now causation has been determined.  They're

 6    attributable to the exploitation.  Therefore, the net has

 7    been agreed upon.

 8            If the stipulation didn't say they were

 9    attributable to the exploitation, they could challenge them,

10    but that's been agreed.  The whole point of this -- and

11    that's why our clients are not showing up to talk about their

12    costs.  This would be a different damages trial otherwise.

13    And they have no factual basis.  They have no witness to

14    challenge this.

15            The whole point of this was to avoid a lengthy

16    damages trial where witnesses would talk about whether these

17    costs for the many, many defendants are attributable to Dark

18    Horse or something else.  The point of that was to side-step

19    all of that.

20            And it's a prejudicial position for defendants to

21    now be in where these costs and these defendants are not here

22    to justify them cause this was stipulated to are now, you

23    know, shots are being taken at them when it's stipulated and

24    agreed upon that they're attributable to the exploitation of

25    Dark Horse.  Causation has been established and the facts of

1    the costs have been established.  Hence, they must be

2    deducted under the law.

3         MR. KAHN:  Your Honor, first of all, I'm getting

4    tired of being accused of making end runs at the last minute.

5    This is a stipulation.  Mr. Movit mentioned this to me this

6    morning.  It was clear in the stipulation as the Court can

7    see that both sides are reserving rights.  So we haven't

8    stipulated to the net amount.

9         We have stipulated to these costs.  We're not going

10   to challenge the management commission, for example, for

11   Mr. Sandberg in the amount of $126,508.36.  They were

12   calculated as ten percent commission of the gross income.

13   We're not gonna challenge that.  We accept that that

14   particular cost.  But as the Court can see, we reserved our

15   right as to whether that should be deducted and that's the

16   only issue here.

17        It's just this morning I get told well, now, you've

18   actually stipulated these are all properly deducted.  I don't

19   think the Court needs to decide this now, but I really don't

20   like being accused again and again of these end runs and last

21   minutes.

22        THE COURT:  You know, obviously, I'm of the opinion

23   that it would have been helpful if everyone thought things

24   out a little earlier, but there have been last minute issues

25   raised by each side.  I want to hear to what Mr. Chieffo has

```
 1   to say, and then I'll tell you what I read this to be which

 2   is very close to what Mr. Kahn has said.

 3           MR. CHIEFFO:  Your Honor, my point is that assume

 4   that the reservation has been made and that's what Your Honor

 5   concludes.  This is a trial.  This is not a legal argument to

 6   a jury.  There has to be some evidence.  They reserved their

 7   right I suppose to produce evidence, but I can tell you with

 8   my client, no one ever questioned her about her deductible

 9   expenses.

10           As far as I know, no other defendant has ever been

11   questioned.  As far as I know, there's absolutely no evidence

12   that plaintiffs will produce in this phase.  So based upon a

13   lack of evidence regardless of what right had been reserved,

14   they don't have facts to present to the jury.

15           THE COURT:  I think that's well stated, yes.

16           Look, here's the problem, folks because I don't

17   know what's going to happen.  I know the plaintiffs have

18   withdrawn their expert who brought us this far in the first

19   place.  I had thought that the defense expert was going to

20   talk about the appropriateness of costs.  And the fact of the

21   matter is I assume Mr. Kahn if that's the case will

22   cross-examine on that.

23           But what I take this to be in the abstract is a

24   statement that these are the numbers.  This is the gross

25   income of the books, this is the incurred costs, but there is
```

EXHIBIT 8
PAGE 1289

```
 1    a reservation to our view that some of the costs are
 2    inappropriate.  The difficulty we're that gonna have here is
 3    what Mr. Chieffo just raised.  We have no evidence as best I
 4    can tell.  And if there was no evidence, then I don't think
 5    you can make the argument.  That's my problem.
 6              MR. KAHN:  I understand, Judge.
 7              THE COURT:  Um, I just don't know magically what
 8    else to do.
 9              MR. KAHN:  Judge, the way it works and the Court
10    knows this, it's simply their burden of proof.  So they can
11    say here are the costs and these should be deducted from the
12    gross.  And if they meet that burden, then they will be
13    deducted.
14              THE COURT:  Fine.
15              MR. KAHN:  If they don't, it won't.
16              THE COURT:  But the problem is without evidence, I
17    don't think you can argue to the jury, unless you're relying
18    on some testimony in the case, you can't argue to the jury by
19    the way, I just decided the fair and equitable thing to do is
20    not deduct these costs because they're attorneys fees,
21    they're this, they're that.
22              I don't know what they are.  But I certainly agree
23    with you that this stipulation sets forth what the numbers
24    are and the parties have agreed to the numbers.
25              MR. KAHN:  Yes.
```

```
 1          THE COURT:  Um, beyond that since I don't know what
 2     anyone's gonna testify to any more in this case, I'm at a
 3     loss to know whatever.  But certainly Mr. Chieffo's point
 4     that you have to have evidence that the costs are in some --
 5     for some reason or another not appropriately deducted from
 6     revenues is correct.
 7          MR. KAHN:  Or that they are appropriately
 8     deductible and they may argue that's what the stipulation
 9     shows.
10          THE COURT:  Okay.
11          MS. LEPERA:  Just one final point on that,
12     Your Honor.  I think that that's correct.  The point is the
13     numbers agreed upon, the net number is agreed upon.  If they
14     want to take an issue that some of that net number is not
15     appropriately deductible, we will simply say that they agreed
16     in the stipulation that is linked to the exploitation of Dark
17     Horse and that would be the counter legal argument.  It's not
18     a factual argument that they're making.
19          THE COURT:  Well, I'm not sure what you just said
20     again because what are you gonna argue?  That this
21     stipulation says they reserve the right to challenge is an
22     agreement that's the amount of the expense?
23          MS. LEPERA:  Yes, they agreed that was the costs.
24     They also stipulated they would not look for further
25     documentation so the number of the gross and the number of
```

```
 1    the net has been stipulated and agreed upon.  And I think

 2    Mr. Kahn is actually saying that.  He's just saying he

 3    reserves the right challenge to whether that cost is

 4    deductible.  Our position is that it is also expressly agreed

 5    that it is deductible by the language in the stipulation that

 6    says it's attributable to the exploitation of Dark Horse.

 7    However, that is a legal question not a fact question on the

 8    number.  Mr. Chieffo pointed out there is no evidence either

 9    way that that number is incorrect.

10         THE COURT:  Well, no one is gonna be arguing here

11    that the stipulation precludes someone from arguing that a

12    number is not appropriately deductible as long as there's

13    evidence; right?

14         MS. LEPERA:  Correct.  However, the number itself,

15    there's no evidence to contradict the number.

16         THE COURT:  Well, that you can certainly say, but

17    you cannot say based on the language in this stipulation that

18    the number set forth in the stipulation bind the jury because

19    they don't bind the jury without some evidence.

20         MR. MOVIT:  This is in lieu of evidence,

21    Your Honor.  This was the whole point of the stipulation

22    would be that it would be deemed an evidentiary facts.  That

23    these are the gross numbers from Dark Horse and these are the

24    costs attributable to Dark Horse.

25         THE COURT:  Subject to -- subject to their right to
```

1    argue that something is not properly deductible.

2            MR. MOVIT:  Which is a legal argument, Your Honor.

3    That's a legal argument as opposed to a factual argument.

4            THE COURT:  Oh, it is not a legal argument.  It can

5    be a factual argument, but you've got to have evidence and we

6    don't have evidence.

7            MR. MOVIT:  That's correct, Your Honor.

8            MR. KAHN:  And just the last point, I think,

9    Your Honor, this is addressed by the instructions.

10           THE COURT:  Well, that's another story for later

11   today.

12           MR. CHIEFFO:  Your Honor, I had one more point on a

13   different matter.  You recall from yesterday counsel was

14   going to send me some designations of Ms. Hudson's testimony

15   that he wants to reread from the trial.  I received no such

16   designation.  I now have to just completely object to any

17   rereading of testimony that's already in the record.

18           Counsel is free in his closing to make what

19   argument he wants to based upon that testimony.  I don't

20   think we need to take time to reread something that the jury

21   heard last week.

22           MR. KAHN:  Your Honor, I agree with Mr. Chieffo.

23   We are not planning to read any of Ms. Perry's deposition.

24           THE COURT:  So that's been taken care.

25           MR. MOVIT:  Very quickly, Your Honor, two final

EXHIBIT 8
PAGE 1293

```
 1    matters.  First is, and I believe this is an agreement that I
 2    reached with Mr. Kahn and please tell me if I'm mistaken.
 3    That the stipulation says plaintiffs agree not to seek any
 4    additional discovery of financial data or backup materials
 5    from the defendants.  Because of that, and Mr. Kahn will
 6    correct me if I'm wrong, I believe the plaintiffs have agreed
 7    and we'll have to speak with Your Honor if they don't so
 8    agree, but I believe the parties are in agreement that there
 9    will not be any argument that the defendants have failed to
10    meet their burden as to costs by not producing backup
11    documentation beyond what was produced in discovery for that
12    reason.
13              MR. KAHN:  Mr. Movit's correct.
14              THE COURT:  I figured as much.
15              MR. MOVIT:  And finally, Your Honor, and again,
16    there's been no attempt at ad hominem.  There was just
17    background before about when things were -- we were informed
18    of it.  But defendants do object to any use by either side of
19    demonstratives in opening or closing.  In the liability phase
20    in the closing, plaintiffs used demonstratives to which
21    defendants had objected and we didn't want to interrupt the
22    closing with an objection as to that.
23              Just so the record is clear, we object and we will
24    not use demonstratives in openings and closings and we object
25    to the use accordingly by plaintiffs in openings and
```

EXHIBIT 8
PAGE 1294

1   closings.

2           THE COURT:  Yes.

3           MS. COHEN:  So on this topic we were informed last

4   night, we haven't exchanged any demonstrative.  We were

5   informed last night that the defendants have a blanket

6   objection to use of any demonstratives whatsoever regardless

7   of the content which we, of course, we believe is not fair.

8   They haven't even had a chance to evaluate the content that

9   would be contained within a demonstrative.  They simply

10  decided it's not helpful to their case any longer for the

11  jury to see the evidence that we're now discussing and

12  therefore have decided that we should be precluded from using

13  demonstratives.

14          MR. MOVIT:  Again, that's not correct.

15          The reason why we're objecting is because

16  demonstratives were used by plaintiffs in closing to which we

17  had previously objected.  And we didn't want to break up and

18  look, you know, obstructive during the closing.

19          So to avoid that situation occurring again, we've

20  objected to demonstratives in openings or closings and we

21  accordingly will not use any either.  They haven't shown us

22  any, but, again, to avoid the situation that happened before

23  where we objected and they were used regardless, we're

24  objecting to any demonstratives for opening or closing.

25          THE COURT:  That's not helpful.

EXHIBIT 8
PAGE 1295

```
 1            The fact of the matter is I said before closing

 2    argument that you could use as demonstrative exhibits things

 3    that were in evidence.  I don't recall that they used

 4    something that wasn't in evidence.  But if someone wants to

 5    point to something that's in evidence, fine.

 6            MR. MOVIT:  We have no objection to that.  Things

 7    were used that were outside of evidence such as

 8    demonstratives purportedly summarizing the law, transcription

 9    from Dr. Ferrara that had not been in evidence that had

10    prejudicial aspects to it.  So there demonstratives outside

11    of what was in evidence.  We have no objection, Your Honor,

12    to demonstratives that are in evidence being used.

13            THE COURT:  Well, Ms. Cohen, I don't know what --

14    if you have demonstratives that you intend to use.  Maybe

15    that's the first question.

16            MS. COHEN:  Your Honor, we won't be using

17    demonstratives in openings, but we do intend to use

18    demonstratives in closing.  And we had intended to use

19    documents during trial examination as well.

20            THE COURT:  Well, you certainly can use documents

21    if they're exhibits to examine witnesses, yes.

22            MS. COHEN:  Well, additionally, we intend to use

23    demonstratives that do summarize the evidence.  They're based

24    on the evidence and drawn directly from the evidence.  It's

25    going to be a lot of dense financial information and we
```

1    think --

2            THE COURT:  Very simple financial information.  I'm

3    sorry to tell you there are two issues, uh, whether the

4    allegedly infringing and now found to be infringing ostinato

5    contributed to the success of the song Dark Horse and if so

6    to what degree.  And then the next question which to avoid

7    the witnesses coming in and testifying, you have a

8    stipulation.  And then we have a Capitol Records person.

9            I mean, it's not hard at all.  None of this is

10   challenging, but what I am trying to understand is what

11   demonstratives are you gonna show people?  Because if they

12   aren't in evidence, you can't show them.

13           MS. COHEN:  The demonstratives that we would show

14   contain a summary of numbers from the capital records

15   documents.  The documents are -- they're spreadsheets that

16   are teeny tiny and hard to even read on a piece of paper much

17   less blow it up on a big screen.

18           THE COURT:  If the evidence is that there were so

19   many -- the receipts for Capitol Records is X.  What happened

20   in the age-old world where you could just say what the number

21   is and argue it?

22           I really think that this is not a stupid jury.

23   This is a pretty smart jury and they are paying close

24   attention.  And so I think you're gonna be able to argue

25   numbers without demonstratives.  And why should we get into a

```
 1    side show over demonstratives?

 2              If they're in evidence you can use them.  You know,

 3    if there's some Capitol records you want to blow up, the

 4    actual thing you put in to evidence, you can certainly do

 5    that.

 6              MS. COHEN:  Okay.

 7              THE COURT:  Okay?

 8              MS. COHEN:  Thank you.

 9              MR. MOVIT:  Thank you, Your Honor.

10              THE CLERK:  Are we ready for the jury?

11              MR. KAHN:  Yes.

12              THE COURT:  You're going to read the stipulation?

13              MR. KAHN:  Just the stipulation, Your Honor.

14              THE COURT:  Okay.  Well, that's probably not our

15    best use of their time, but that's how it goes.

16                        (Jury present.)

17              THE COURT:  Good morning, ladies and gentlemen.  I

18    think this may be a shorter day than I had anticipated

19    because we've worked out the need to read certain deposition

20    transcripts, but the parties are going to proceed as far as

21    they can today.  And then as I've indicated, tomorrow the

22    Capitol Records witness who had to fly in from out of town

23    will be here as will the defense experts, and then we will

24    instruct you and get you back to deliberations hopefully

25    tomorrow afternoon.
```

EXHIBIT  8
PAGE  1298

```
 1              Okay.  Who is leading off with our stipulation?

 2              Mr. Kahn?

 3              MR. KAHN:  Yes, Your Honor.  I have brief opening.

 4              THE COURT:  Yes.  We do have opening statement,

 5    too.  I'm sorry.  I feel like I've already heard it this

 6    morning.

 7              MR. KAHN:  I do want to say we lawyers do this for

 8    a living.  We understand you don't.  And I think speak on

 9    behalf of everyone, I want to acknowledge your hard work and

10    your diligence and your patience.  And we hope to conclude

11    this portion as quickly as possible.

12              As I told you at the outset, this is a case about

13    taking.  About taking something, a valuable creation without

14    permission.  We've now established through your verdict that

15    that occurred.  That there has been copyright infringement.

16              And now the final issue before you in this case is

17    what is the fair compensation to the plaintiffs for this

18    taking.  And I emphasize fair.  We are not here seeking to

19    punish anyone.  We're just seeking fair compensation.

20              As the Judge will tell you, the law says that fair

21    compensation here is based upon the profits that these

22    defendants have earned through their exploitation of Dark

23    Horse and thus their infringement of Joyful Noise.  That's

24    the measure of fair compensation.

25              The Judge will also tell you we have one burden of
```

EXHIBIT 8
PAGE 1299

1    proof, and I'm going to explain how we're going to meet our

2    burden.  And our burden is to prove to you the total revenues

3    that each of these defendants received from their

4    exploitation of Dark Horse.  The total money they received.

5    The evidence you're gonna hear from us is that that total

6    revenue, the total amount that was received by all the

7    defendants adds up to $41 million.

8         The good news is there will only be one witness.

9    It will be this representative from Capitol Records who

10   unfortunately is not here today.  As for all the other

11   defendants, we've been able to work out a stipulation as to

12   how much money each of these defendants received and what

13   each of these defendants claim are their costs.

14        And that presentation will take about five minutes.

15   We will introduce the exhibit, we will read the key portions

16   and that will be it.  At that point as the Judge will tell

17   you, once we put in the total revenues, the burden will shift

18   to the defendants.  And they will need to prove to you the

19   costs that they contend should be deducted from this gross

20   revenue number.

21        And the principal amount of that testimony will

22   involve Capitol Records.  It will take place tomorrow.  We

23   will demonstrate and prove to you that Capitol Records earned

24   roughly $31 million from their exploitation of the song, both

25   of the song and different versions and from their sale of the

 1    album Prism that included the song.

 2             Capitol Records we believe is gonna try to convince

 3    you that they may have received $31 million, their costs were

 4    more than $30 million.  That the only profit they made out of

 5    this $31 million was $630,000 or two percent.  That will

 6    become an issue tomorrow.  We will explore with you and wit

 7    the Capitol Records witness some of the specifics of those

 8    costs.

 9             And I don't want to give away, um, any spoilers

10    here, but get ready for what some of those costs you're gonna

11    hear about.  I guarantee you'll be raising your eyebrows as

12    to whether this is a cost that's really deductible from the

13    sale of Dark Horse.

14             And they will also try to reduce the revenues by

15    trying to minimize the importance of Dark Horse to the sale

16    of the album.  Even though Dark Horse is one of the two

17    biggest hits by far and away of the album.  And of the

18    evidence you've already seen from Ms. Perry and others, they

19    spent over a million dollars on the video.  It had -- it was

20    a big hit.

21             There's another burden that will be on defendants.

22    They are going to try to prove to you after we get down to

23    the actual profit number, whatever that number may be, that

24    only a portion of those profits are because of the

25    infringement.  And that there are other factors that

```
 1    contributed to the success of the song that are much greater
 2    than this ostinato, this beat, that repeats through almost
 3    half of the song.
 4            We expect that they will bring before you once
 5    again two high-priced experts including we think Dr. Ferrara
 6    whom you've all met from before, the musicologist, and they
 7    will try to convince you that this infringing portion of Dark
 8    Horse wasn't at all significant to the success of the song.
 9    We intend to show you that these experts are simply wrong.
10            Some of that proof will come from the actual lips
11    of some of the individual defendants.  We will remind you of
12    what they testified to.  And some of the most important
13    evidence will come from what you remember Professor Decker
14    what he told you was one of the most important ways to
15    evaluate a song and the value of portions of the song and
16    that's from your own two ears.
17            So our intent in the end is to prove to you the
18    profits and the percentage of the profits that are
19    attributable to this infringement.  I told you at the
20    beginning that when the plaintiffs filed this lawsuit five
21    years ago, they were seeking justice.  They're not seeking
22    punishment.  They're seeking simply fair compensation for the
23    profits that these defendants have made from taking their
24    song.  Thank you.
25            THE COURT:  Who will be speaking?  Mr. Wais.
```

UNITED STATES DISTRICT COURT

EXHIBIT 8
PAGE 1302

```
1           MR. WAIS:  Good morning, ladies and gentlemen of

2    the jury.  I'd also like to thank you for your time and

3    attention as we've gone through this case.  As you've heard

4    from Judge Snyder and plaintiff's counsel, the next part of

5    this case is not gonna be long, but it is going to be

6    important.  You just heard from Mr. Kahn about how plaintiffs

7    are not seeking to punish anyone.  They're seeking fair

8    compensation.

9           And what I want you to keep in mind as we go

10   through this portion of the case is that fair is important

11   and fair means fair.  And in taking that into consideration,

12   you need to keep in mind that the success of the Dark Horse

13   song, the success of the Prism album wasn't attributable

14   to -- solely attributable to the inclusion of the Joyful

15   Noise composition and Ostinato No. 2 as you already found.

16          So you've decided that the composition Dark Horse

17   infringes the composition Joyful Noise.  And we're obviously

18   disappointed by that decision, but we're not gonna revisit

19   here.  We're not gonna question that determination now.

20   Instead we're going to move on to damages and what you need

21   to award in order to fairly compensate plaintiffs for that

22   infringement.

23          And the plaintiff's counsel just told you that

24   essentially all of the revenue earned by all the defendants

25   is what you should award to fairly compensate them for that
```

EXHIBIT  8
PAGE  1303

```
 1    infringement.  That's not true under the law and that's not

 2    true as a factual matter.  We're gonna present evidence to

 3    show there are a whole host of other factors that go into the

 4    success of a song.  There are a whole host of other factors

 5    that go into the success of an album.

 6              In fact as the Judge will instruct you later, the

 7    law is clear that to recover -- that plaintiffs are entitled

 8    to recover all of the revenue, they're only entitled to a

 9    percentage of defendant's profit.  And even then that means

10    the percentage of the profit that's attributable to the

11    Joyful Noise composition, uh, being in Ostinato No. 2 of Dark

12    Horse.

13              You cannot simply assume that the profit generated

14    by Dark Horse is solely attributable to that ostinato or to

15    the use of Joyful Noise in that ostinato.  Your job in fact

16    is gonna be twofold.  First, it's gonna be your job to

17    calculate the net profit that was earned by each defendant.

18              Second, it's then gonna be your job to decide what

19    generated that profit and how much of a contributing factor

20    the use of the Joyful Noise composition and Ostinato No. 2

21    was to the generation of that profit.

22              Put differently once you calculate that profit,

23    you're really gonna have to ask yourself what makes a Katy

24    Perry song profitable.  And as we'll discuss in a minute, the

25    question largely answers itself.  What makes a Katy Perry
```

 1    song profitable?  Katy Perry.  And there's more that goes

 2    into than that and we'll get into that as well.

 3           We'll talk about the marketing of the song and the

 4    album.  We'll talk about the music in the song, but you have

 5    to keep in mind that you can't just look at Ostinato No. 2.

 6    You have to look at all of the music.  You have to look at

 7    both the instrumentals and you're gonna to look at the

 8    lyrics.

 9           And we're gonna hear testimony from experts in the

10    field as to what makes, uh, what makes the -- what in the

11    music makes it important and what outside the music makes it

12    important.  And how when you consider all those factors

13    together, the Ostinato No. 2 at issue becomes a relatively

14    minor factor that goes into the success of the Dark Horse

15    song and the Dark Horse album.

16           So just very quickly, I don't want to keep you too

17    long today, we'll talk about each of these topics a little

18    bit more in depth.  First, let's talk about what the profit

19    means.  The profit obviously is not the revenue.  It's not

20    the money earned by Capitol Records or any other defendant.

21    That's just the money in the door.  That's your paycheck for

22    example.  That's the gross.

23           What the profit is is no different than with you in

24    your paycheck.  You don't keep everything that comes in the

25    door and it's no different for the individual defendants.

```
 1    It's no different for the corporate defendants and it's no

 2    different for Capitol Records.  The old adage is that you

 3    have to spend money to make money and that's certainly true

 4    here.

 5            And so while plaintiffs will try to attack those

 6    costs that were spent, the evidence will show through the

 7    testimony of Steven Drellishak that those costs were in fact

 8    incurred and were attributable to the sale, marketing and

 9    promotion of the Dark Horse song or the Prism album in its

10    entirety.  So what you're gonna have to do is you're gonna

11    have to deduct all those costs from the money that came in

12    the door.

13            It's no different than the money you spend for your

14    job.  You know, you have to make a car payment so you can get

15    to work.  You have to put gas in your car so you can get to

16    work.  You need clothes to wear to work and you need all the

17    other overhead that goes into making you so you can be

18    productive at your job.  Once you get through all those

19    things, what you have left is the net.  It's your profit.

20            And as Mr. Kahn said, for every other defendant

21    other than Capitol Records that's gonna be easy because the

22    parties have stipulated to the gross revenue earned by each

23    defendant for the exploitation of Dark Horse.  And as you'll

24    hear in a minute when they read in the stipulation, they've

25    also stipulated to the cost attributable to that
```

```
 1    exploitation.
 2              As for Capitol that's the company that sold the
 3    sound recording of Dark Horse.  They sold it in stores and
 4    they made it available to purchase online and stream as well.
 5    And from Capitol you're going to hear from Steven Drellishak
 6    as I mentioned.  He's gonna walk you through a profit and
 7    loss statement and it's gonna be very simple to follow along.
 8    It will break out revenue at the top, and then costs at the
 9    bottom.
10              He's gonna talk to you about what all those costs
11    are and what it takes to generate a hit song.  He's gonna
12    talk about how Capitol manufactures the product.  He's gonna
13    talk about how they market the product.  He's gonna talk
14    about how they distribute it to retailers for sale.
15              He's gonna talk about how they have to the pay
16    artist and songwriter royalties attributable to the song.
17    He's gonna talk about all the overhead expenses that go into
18    making those things happen.  And it's only after you deduct
19    those costs that we can talk about the profit.
20              Now, Mr. Kahn also talked to you about the fact
21    that they're gonna seek revenues attributable to sale of the
22    Prism album, but it's not fair or appropriate to attribute
23    all those revenues to Dark Horse.  To state the obvious,
24    Prism is not Dark Horse.  If someone wanted to listen or buy
25    Dark Horse, they could have done that online by itself.
```

```
 1              If someone buys an album, they're doing it for a
 2      reason.  They're doing it because they want to get all the
 3      tracks on that album.  So you're going to hear from
 4      Mr. Drellishak and he's going to testify about the
 5      appropriate method for allocating the money from the sales of
 6      Prism to the Dark Horse song.  He's gonna talk about how
 7      that's done fairly and equitably.  And how it should be
 8      divided by the number of tracks on the album itself.
 9              Once you get to the profit of each defendant,
10      you're gonna reach the next stage of the inquiry.  You're
11      gonna have to decide how to apportion the allocation of that
12      profit to the infringement.  And, again, this is where you're
13      gonna hear from our experts Dr. Jason King and Dr. Lawrence
14      Ferrara who are gonna walk you through the factors that go
15      into what makes the song successful.
16              Dr. King's gonna walk you through the fact that
17      when you're talking about a Katy Perry song, you're talking
18      about her star celebrity, her power to bring people to make
19      them want to listen to it.  He's gonna talk about how the
20      fact that the Prism album, for example, was the third album
21      that she was releasing.  It was coming off the heels of two
22      hit albums prior to that.
23              And if you think of making a successful song like
24      soup, Dr. King's gonna talk about how you need a cook, a
25      stove and ingredients.  And how Katy Perry's the cook, how
```

```
 1   the marketing is the stove that drives people to buy the song
 2   itself.  He's also going to talk about the song itself
 3   because the music is important once you get past the Katy
 4   Perry and the marketing.
 5         But, again, he's gonna talk about how you have to
 6   consider all the music because a song is more than just an
 7   ostinato.  A song is lyrics, it's sung vocal melodies, it's
 8   music.  In this case you heard from Mr. Walter who testified
 9   about the fact that there's 56 layers of music in Dark Horse.
10   You can't simply throw that out and ignore it.  It all goes
11   into the equation.  It all goes into the factors.
12         He's gonna talk about how for a song, especially a
13   pop song, the most element is the hook.  It's what catches in
14   your ear.  It's what you hum to yourself in the shower.  He's
15   gonna talk about the fact that it's the sung vocal lyrics
16   because after all, people aren't buying Katy Perry songs not
17   to listen to Katy Perry sing.  So he's gonna talk about all
18   that, the marketing, and the importance of the music.
19         And next you're gonna hear from Dr. Ferrara again.
20   And he's gonna walk you through the composition and all the
21   musical elements that go into the composition.  He's gonna
22   talk about how -- he's gonna break it down much as he did
23   during the first part of the trial and transcribe it, and
24   show you all the musical noteheads in the transcription of
25   Dark Horse.
```

1      He's gonna identify all the musical noteheads where

2  Ostinato No. 2 appears and he's gonna count them each time.

3  He's gonna explain to you that there's over 3,000 musical

4  noteheads in Dark Horse.  And that the Ostinato No. 2 at

5  issue was only in 207 of those or 7.2 percent of the total

6  number of noteheads in Dark Horse and that's not a lot.

7      He's gonna talk to you more about how you need to

8  keep in mind that the song is both music and lyrics.  And

9  therefore, when you're talking about the song and what

10  contributes to the success of the composition, you need to

11  throw out the lyrics which are not at issue here and just

12  focus on the remainder which would be 3.6 percent of the

13  total song.

14      Having done so he's going to explain to you the

15  importance of Ostinato No. 2 to the Dark Horse composition

16  itself.  He's going to remind you that Dark Horse is much

17  more than Dark Horse than Ostinato No. 2.  It's the lyrics as

18  expressed through sung lyrics and vocal melodies with all the

19  other elements of the song itself.  And in comparison to

20  these other components, he's gonna explain to you how it is a

21  relatively minor contributing factor to the success of Dark

22  Horse.

23      And I think, you know, as you go into these

24  deliberations, we too want to make sure you consider things

25  fairly and you award damages that are fair, but fair cannot

1    be considered in a vacuum.  It cannot ignore the

2    contributions made by all the other authors of Dark Horse.

3    It cannot be considered in the context of the enormous

4    expenditures that went into making the song successful by

5    Capitol Records.

6            You need to consider not just the claimed

7    infringement which is what plaintiffs are going to focus on,

8    but everything else that goes into it.  From Capitol Records

9    and their efforts to the songwriters who put together Dark

10   Horse to all the underlying music that goes into it.  And

11   it's our position that when you keep all that in mind as the

12   evidence comes in, you're gonna award damages accordingly and

13   award what takes into account only the claimed infringement

14   and not some larger portion as plaintiffs seek from you.

15           Thank you.

16           THE COURT:  Okay, Mr. Kahn, are you up now?

17           MR. KAHN:  We are, Your Honor.  We will examine the

18   Capitol Records witness when he's available which we

19   understand will not be until tomorrow.

20           THE COURT:  Right.

21           MR. KAHN:  That's the only witness we're putting

22   on.  Um, we do have a stipulation regarding the revenues and

23   costs incurred by all the other defendants.  It's been marked

24   as Joint Exhibit 125, um, and we would first move for its

25   admission into evidence.

EXHIBIT 8
PAGE 1311

```
1                    THE COURT:  All right.  No objection?

2                    MR. WAIS:  No objection.

3                         (Exhibit 125 was admitted.)

4                    MR. KAHN:  And Your Honor, can we publish it to the

5     jury and we'll read through it?

6                    THE COURT:  Sure.

7                    MR. KAHN:  So this is the stipulation that the

8     parties have worked out.  And I will read it to you as you

9     can follow along on the screen for Joint Exhibit 125.

10                   It starts off the following facts are admitted and

11    require no proof.

12                   1.  Jordan Houston received total gross income of

13    $631,448.47 from the exploitation of the composition and

14    sound recording of Dark Horse in the United States.

15                   2.  Jordan Houston incurred costs attributable to

16    the aforementioned exploitation of Dark Horse in the amount

17    of $119,343.76, consisting of legal and accounting fees.

18                   3.  Karl Martin Sandberg received total gross

19    income of $1,265,083.02 from the exploitation of the

20    composition and the sound recording of Dark Horse in the

21    United States.

22                   I should mention, Your Honor, this exhibit will be

23    available to the jury.

24                   THE COURT:  Yes.

25                   MR. KAHN:  4.  Karl Martin Sandberg incurred the
```

1  following costs attributable to the aforementioned

2  exploitation of Dark Horse.

3          a.  Management commissions in the amount of

4  $126,508.30, which was calculated as a ten percent commission

5  of gross income from Dark Horse; and

6          b.  Legal, administrative and accounting fees in

7  the amount of $12,650.83, calculated as a one percent

8  commission on gross income from Dark Horse relating to such

9  professional fees.

10          5.  Lukasz Gottwald received total gross income of

11  $347,797.89 from the exploitation of the composition and

12  sound recording of Dark Horse in the United States.

13          6.  Lukasz Gottwald incurred the following costs

14  attributable to that exploitation of Dark Horse.

15          a.  Production expenses in the amount of

16  $245.17.

17          b.  Professional fees in the amount of

18  77,334.57.

19          7.  Kasz Money, Inc. received total gross income of

20  $1,079,218.20 from the exploitation of the composition and

21  sound recording of Dark Horse in the United States.

22          8.  Kasz Money, Inc. Incurred the following costs

23  attributable to that exploitation of Dark Horse.

24          a.  Production expenses in the amount of

25  $760.75.

EXHIBIT  8
PAGE  1313

1              b.   Professional fees in amount of $239,969.46.

2         9.   Henry Walter, Cirkut, received $826,704.07 from

3    the exploitation of the composition and sound recording of

4    Dark Horse in the United States.

5         10.   Mr. Walter incurred the following costs

6    attributable to that exploitation of Dark Horse.

7              a.   Management fees in the amount of

8    $124,005.61, calculated as a 15 percent commission of gross

9    income from Dark Horse.

10             b.   Legal fees in the amount of $41,335.20,

11   calculated as five percent commission of the gross income

12   from Dark Horse.

13             c.   Business management fees in the amount of

14   $41,335.20, calculated as a five percent commission on the

15   gross income from Dark Horse.

16        11.   Sarah Hudson received total gross income of

17   $670,852.47 from the exploitation of the composition and

18   sound recording of Dark Horse in the United States.

19        12.   Sarah Hudson incurred the following costs

20   attributable to that exploitation.

21             a.   Legal fees in the amount $15,837.50,

22   calculated as a percent of an advance from Prescription

23   Songs.

24             b.   Legal fees in the amount of $32,750.75,

25   calculated as a five percent commission of gross income from

1  Dark Horse less the legal fees on the advance; and

2          c.  Business management fees in the amount of

3  $33,542.63, calculated as a five percent commission on the

4  gross income from Dark Horse.

5      13.  Katheryn Elizabeth Hudson received total gross

6  income of $3,260,782.07 from the exploitation of the

7  composition and sound recording of Dark Horse in the United

8  States.

9      14.  Katheryn Elizabeth Hudson incurred the

10  following costs attributable to the exploitation of Dark

11  Horse.      a.  Management commissions in the amount of

12  $489,117.31, calculated as a 15 percent commission of gross

13  income.

14          b.  Legal fees in the amount of $163,039.10,

15  calculated as a five percent commission on the gross income;

16  and

17          c.  Business management and accounting fees in

18  the amount of $163,039.10, calculated as a five percent

19  commission on the gross income from Dark Horse.

20      15.  Kobalt Music Publishing America, Inc. received

21  measure net income of $132,476.14 from the exploitation of

22  the composition and sound recording of Dark Horse in the

23  United States.

24      16.  WB Music Corp. received net income of

25  $130,450.36 from the exploitation of the composition and

```
 1    sound recording of Dark Horse in the United States.
 2            Those facts are stipulated to.  Admitted without
 3    requiring any further proof as set forth in Joint
 4    Exhibit 125.
 5            THE COURT:  Fine.  Thank you.
 6            MR. KAHN:  And Your Honor, other than Capitol
 7    Records, that will be plaintiff's proof.
 8            THE COURT:  Okay.  Well, as I say it was going to
 9    be a short day.  Please keep an open mind.  We'll see you
10    tomorrow at 9:30 and we will -- we're gonna go to work on
11    jury instructions and verdict forms.  So I apologize for the
12    inconvenience.  Hopefully, you can make use of the day and
13    we'll see you tomorrow.  Thank you very much.
14            The only other thing is please remember don't speak
15    to anyone about the case.  Don't let anyone speak to you
16    about the case.  Don't do any research, and follow all my
17    earlier instructions.
18                    (Jury not present.)
19            THE COURT:  I guess my question is would it help to
20    give you some time to discuss your proposed disputed
21    instructions or shall I just forge ahead?
22            MS. COHEN:  I think we need to forge ahead, Judge.
23            MR. MOVIT:  Yeah, we would respectfully request to
24    forge ahead.
25            THE COURT:  Okay.  Why don't we take a recess so I
```

```
 1    can go get them and I will come back in 15 minutes.

 2                        (Recess taken.)

 3               THE COURT:  Okay.  So what do you all have to

 4    report?

 5               MR. MOVIT:  Your Honor, we greatly appreciate the

 6    Court's proposed jury instruction.  I think it has

 7    significantly moved the ball forward and we greatly

 8    appreciate it.  Um, defendants have a few requested

 9    modifications which we think are well grounded in the facts

10    and law.  If I may discuss them, Your Honor?

11               THE COURT:  Sure.

12               MR. MOVIT:  Whenever Your Honor's ready.

13               THE COURT:  Okay.  We're on Proposed Instruction

14    No. 1.

15               MR. MOVIT:  We are completely fine with No. 1 and

16    we have no requested modifications.

17               THE COURT:  Anything from plaintiffs on that?

18               MS. COHEN:  No, Your Honor.

19               THE COURT:  No. 2.

20               MR. MOVIT:  In the first sentence second line where

21    it says showed a causal nexus, we would propose showed by a

22    preponderance of the evidence a causal nexus.

23               THE COURT:  Well, that's my problem.  I don't think

24    that's what the comment says.  I know you had by a

25    preponderance of the evidence, but I think it's a lower bar
```

```
1    under Frank Music.  That's why I deleted it and used that

2    language and changed it also in the verdict form.

3              MR. MOVIT:  We're reviewing that from Frank Music.

4              THE COURT:  And I'll go reread it.  I haven't

5    looked at it in a long time, but I remember it well.

6              MR. MOVIT:  And then the next requested addition,

7    Your Honor, is to make clear to the jury that for profits,

8    liability is several and not joint.  And for that reason we

9    would request a sentence stating you must determine the

10   profits of each defendant attributable to the infringement

11   separately.

12             THE COURT:  I think that's correct, but now the

13   point is where do you want to put that.

14             MR. MOVIT:  We would request it at the end of the

15   first paragraph of Instruction No. 2.

16             THE COURT:  I don't know -- do you have a different

17   understanding, Ms. Cohen?

18             MS. COHEN:  No, Your Honor.  I think that's

19   accurate.  I mean, I don't think it's necessary given the

20   verdict form, but if Your Honor wants to include it.

21             THE COURT:  We might as well because we know from

22   yesterday's exercise, it's better to be as clear as possible.

23             MR. MOVIT:  And, Your Honor, if I may jump to the

24   fourth paragraph of Proposed Jury Instruction No. 2?

25             THE COURT:  Yeah, sure.
```

EXHIBIT 8
PAGE 1318

1          MR. MOVIT:  Where it says expenses are all

2     operating costs, we would propose expenses can include among

3     other things all operating costs.

4          We think cases such as Sheldon v. Metro Goldwyn

5     Mayer, Clear Pictures 309 U.S. 390 and Frank Music v. Metro

6     Goldwyn Mayer 772 F2d 505, we think these cases make clear

7     that the list of, um, deductions in that sentence operating

8     costs, overhead costs and production costs and many other

9     cases, obviously that's not an exhaustive list, that there

10    may be other types of deductible expenses.

11         So we just want to make clear to the jury that's

12    not the exclusive universe operating costs, overhead costs

13    and production costs.

14         THE COURT:  Ms. Cohen.

15         MS. COHEN:  This is our primary issue with the

16    instruction as well.  The law is clear that not all expenses

17    are deductible, and so the instruction needs to instruct the

18    jury as to what is a properly deductible expense and what is

19    not.  And it seems that this general, broad language like

20    including among other things, et cetera et cetera is, you

21    know, leaves open the universe of expenses for deduction

22    which is not appropriate under the law.

23         In plaintiffs' view and under our review of the

24    cases only expenses that actually assisted in the production,

25    distribution or sale of the infringing work are deductible.

1    And so I would say to the extent that we're going to include

2    some general language, it needs to be clear that the expenses

3    are only deductible if they actually assisted in the

4    production, distribution or sale of the infringing work and

5    that comes straight from cases cited in the comments.

6            Additionally, um, this is a related but separate

7    issue, the plaintiffs object to the inclusion of the sentence

8    at the end of the second paragraph that says here the parties

9    have stipulated to certain defendants' gross revenue and

10   their costs.

11           Insofar as it's lumped in with the deduction of

12   expenses, and this relates back to the conversation that we

13   had earlier today regarding the stipulation which when the

14   parties entered into this agreement, we expressly reserved

15   our right to challenge the deductibility to some or all of

16   the categories of costs incurred by the defendants.

17           THE COURT:  Well, actually, it doesn't say what I

18   had hoped it would say.  I thought what I had intended the

19   parties had stipulated to the amount of certain defendants'

20   gross revenues and their costs.  I mean, it's the numbers

21   you've stipulated to.

22           MS. COHEN:  Correct.  We do not dispute the amounts

23   or the categories.  We dispute whether certain categories are

24   deductible.  We believe it's not a matter of evidence, but

25   it's a matter of law.

1          THE COURT:  Now, we're back to where we started the

2    morning.  I thought we had said that it's not a matter of

3    law.  You've got to provide evidence that something is not

4    deductible.

5          MR. MOVIT:  Yes, Your Honor.  And we submit that

6    our prima facie case for our burden as to the expenses will

7    be made through stipulation for most of the defendants and

8    through Mr. Drellishak for Capital Records and there's no

9    witness that can rebut that.

10          THE COURT:  Well, I guess, and it's just because I

11    don't understand the evidence that's gonna be placed before

12    the jury.

13          MS. COHEN:  Judge, can I just say one more thing on

14    that?

15          THE COURT:  If you have to, yes.

16          MS. COHEN:  Well, I would just say that it's

17    actually the opposite.  It's not that we have to put on

18    evidence that certain things are not deductible.  The

19    defendants have to put on evidence that things are

20    deductible.  It's their burden to establish the costs.  It

21    was their choice not to bring the defendants into court to

22    establish which of the costs are deductible or not.

23          THE COURT:  Aren't you just reversing the position

24    that your colleague took this morning?

25          MS. COHEN:  No, I don't think so.

UNITED STATES DISTRICT COURT

EXHIBIT 8
PAGE 1321

```
 1          THE COURT:  I do.  I thought we settled this.  Um,
 2    I agree the defendants have a burden to show things are
 3    deductible, but you're gonna have to convince the jury that
 4    their evidence should not be considered.  That's not a legal
 5    argument.
 6          That's gonna be through cross-examination and what
 7    you do with the evidence not because you're gonna stand up
 8    and argue and say, I'm arguing from on high that certain
 9    things are not deductible expenses.  It's a very factually
10    driven inquiry as far as I can tell.
11          MS. COHEN:  That is true, but I just think the
12    instruction needs to make clear to the jury how it is they
13    can go about determining which expenses are deductible and
14    which ones are not based upon the law.
15          THE COURT:  I can go look at the case law, but I
16    bet the case law says 16 different things and there's no real
17    consistency.  Let me give you an example.
18          Um, you're gonna argue that the only costs that are
19    permissible are costs that were generated in, uh, promoting
20    the sale of the song.  They're gonna come back and say wait a
21    minute.  There are certain legal costs that should be
22    included because they are intended to protect our copyright
23    or to protect our rights in the song and so forth.
24          Um, I can't possibly put in a jury instruction all
25    of that stuff without it devouring everything we're doing
```

```
 1    here.  And I certainly can't do it right now because I don't
 2    even know what the evidence is gonna be.
 3            MR. MOVIT:  Your Honor, we find Your Honor's
 4    proposed sentence as modified as you read it, I think takes
 5    care of the issue.
 6            As Your Honor noted that expenses and Ms. Cohen
 7    cited an older case that's subsequently been reigned in by
 8    the 9th Circuit that expenses don't have to directly assist
 9    in the production, distribution or sale.  That's been reigned
10    in and legal expenses, fees are routinely recognized to be
11    deductible.  And I think Your Honor's proposed language, uh,
12    quickly takes care of the issue.
13            THE COURT:  Well, the proposed language being the
14    amount of?
15            MR. MOVIT:  About the stipulation, Your Honor.
16            THE COURT:  Stipulated to the amount.  That I think
17    is correct.
18            MR. MOVIT:  Yes, Your Honor.  And then with respect
19    to expenses --
20            THE COURT:  Why don't you say expenses or all
21    appropriate operating costs?
22            MR. MOVIT:  Because it's not just operating costs.
23            MS. COHEN:  We would agree to the inclusion of the
24    word appropriate.
25            MR. MOVIT:  But the issue, Your Honor, proper
```

```
1    deductible expenses are not necessarily limited to operating

2    costs, overhead costs and production cost.  For example --

3             THE COURT:  I understand.  This is the first half

4    of the puzzle.  Expenses are appropriate costs including but

5    not necessarily limited to appropriate operating costs,

6    overhead costs and production costs incurred in producing a

7    defendant's gross revenue.  That is I think the 9th Circuit

8    instruction with the modifiers that everyone seems to want.

9             MS. COHEN:  And the only thing, I guess, I would

10   question, Judge is how the jury will determine what is an

11   appropriate cost?

12            THE COURT:  It's going to be based upon what the

13   testimony is, if any, and the arguments you make.  But what I

14   can't do is have a jury instruction that contains each side's

15   arguments regarding what is deductible and what isn't

16   deductible.  That's what I'm trying to avoid.

17            MR. MOVIT:  And whenever Your Honor's ready, I can

18   move on.

19            THE COURT:  Of course.

20            MR. MOVIT:  With respect to the fifth paragraph,

21   the first sentence and I recognize that's from the model

22   rule, it appears tailored towards or appropriate for a case

23   in which the entirety or nearly the entirety of the allegedly

24   infringed work has infringing content.  Sometimes a work is

25   entirely infringing or nearly entirely infringing.  Here,
```

EXHIBIT  8
PAGE  1324

```
 1    however, I think Dr. Decker has made clear, I think that

 2    common sense makes clear, that 100 percent of the profits

 3    under no circumstance are attributable to the ostinato.  Um,

 4    clearly, if it was just an ostinato and nothing else, no Katy

 5    Perry, no drums, no nothing, there would not be these profits

 6    if this was just three minutes of the ostinato.

 7              THE COURT:  Well, what do you want me to say?  This

 8    is a 9th Circuit instruction and the burden, I mean, you're

 9    obviously gonna argue what you just stated.

10              MR. MOVIT:  We would respectfully request the

11    following sentence:  After determining each defendant's

12    profit, you must then determine whether any portion of the

13    profits is attributable to factors other than the use of the

14    Joyful Noise musical composition in Ostinato No. 2 in Dark

15    Horse.

16              MS. COHEN:  And Judge, we object to the use of that

17    language.

18              THE COURT:  I understand why.

19              I think you are including argument and I understand

20    the situation, but you're gonna have to argue what the

21    various experts have said.  Because I think the problem is

22    that the law says you have the burden of demonstrating what

23    is not attributable to the copyrighted work.

24              MR. MOVIT:  There's two issues.  One is -- I

25    understand that we have the burden and it says that we have
```

```
 1    the burden in the next sentence.

 2              THE COURT:  Right.

 3              MR. MOVIT:  And we're not objecting to the next

 4    sentence.

 5              THE COURT:  No, I know, but you want me to put in

 6    this instruction your interpretation of what their expert

 7    said.

 8              MR. MOVIT:  No.  We have the burden to prove what's

 9    attributable to other factors.

10              THE COURT:  Yes.

11              MR. MOVIT:  We're not disputing that, Your Honor.

12              As drafted, let me refer to the model here.  It

13    kind of turns this kind of a case, like I said -- sorry

14    because I have some notes in there.  I apologize.

15              MS. LEPERA:  I think just very simply stated it

16    turns it into a negative.  You must determine whether any

17    portion of the profit is attributable to factors other than.

18    As opposed to the copyright statute saying that we have the

19    burden to prove what is attributable to the use of, what

20    profits are attributable to the use not the other way around.

21              If I'm not making myself clear, it flips it upside

22    down and says we have to prove -- essentially, it stands that

23    they get everything and then we have to prove what else is

24    out there.  And the statute says we have to prove what is

25    attributable to the use of the infringement.
```

```
 1                THE COURT:  I know that.

 2                MS. LEPERA:  So that's why this is prejudicial in

 3     its negative leaning, upside down suggesting that at the gate

 4     they get everything, and then we have to prove everything

 5     else as opposed to us having to prove the profits

 6     attributable to the infringement which is all they're

 7     entitled to.

 8                THE COURT:  Yeah, but isn't that what the 9th

 9     instruction does?

10                MS. LEPERA:  No, it flips it on the other side and

11     ultimately suggests that there is nothing that is a factor

12     attributable, um, to other things to generate the profit.

13     The copyright statute says they're entitled to profit or a

14     portion of the profits attributable to the infringement.

15                THE COURT:  We're speaking at cross-purposes.  My

16     question is I understand what the copyright statute says, but

17     I'm asking you doesn't the 9th Circuit instruction, you say

18     it flips it on its head.  You're criticizing the 9th Circuit;

19     correct?

20                MS. LEPERA:  Correct.

21                THE COURT:  And what I'm saying is that I'm going

22     to adhere to the 9th Circuit instruction because I think lots

23     of people have thought about it and I think what they're

24     trying to tell the jury is first of all if there are profits,

25     you start with the premises if there are profits, they are
```

```
1    the result of the infringement, and then the burden shifts to

2    the defendant to show that those profits are not attributable

3    to the infringement.

4              MS. LEPERA:  Again, I will object to the

5    instruction as stated.

6              THE COURT:  It's noted for the record, but I just

7    feel --

8              MS. LEPERA:  Okay.

9              THE COURT:  I hear what you're saying, but I think

10   we ought to stick with the instruction.

11             MR. MOVIT:  Okay.  Your Honor, next with respect

12   to, um, after the sentence that we've just been discussing?

13             THE COURT:  Yes.

14             MR. MOVIT:  We would like it to read, these factors

15   may include, but are not limited to the talent, drawing power

16   and popularity of the defendants, and noninfringing musical

17   elements of Dark Horse such as the lyrics and music other

18   than Ostinato No. 2.

19             Um, we're saying that the factors may include,

20   perhaps saying they must include number one.  Number two, the

21   drawing power and popularity of the defendants is taken

22   straight from Frank and Sheldon.  So that's well-established

23   that those may be factors in the apportioning analysis,

24   perhaps saying they must be, but these have been recognized

25   as factors by the 9th Circuit and the Supreme Court.
```

EXHIBIT  8
PAGE  1328

```
 1              And then finally, again, the lyrics and music other
 2    than Ostinato No. 2.  The plaintiffs established liability on
 3    here based upon Ostinato No. 2 and nothing else.  And to
 4    expand the scope of the purported infringement in the damages
 5    case, we think would be not appropriate and prejudicial.
 6              THE COURT:  Okay.  Well, I'm going to leave it as
 7    it is, but you've certainly made your record.
 8              MR. MOVIT:  Okay.  Thank you, Your Honor.  We
 9    respectfully preserve our objection for the record.
10              THE COURT:  I understand, I understand.
11              MR. MOVIT:  And then just one final, Your Honor?
12    This is the last one.  The very end of the instruction with
13    respect to apportionment, we would request it state, in doing
14    so the defendants do not need to prove to a mathematical
15    certainty the profits that are attributable to other factors.
16    They only need to provide a reasonable division.
17              And, again, that's straight from the Korean Records
18    v. Joseph Shulitz Brewing Company 754 F2d 826 makes clear
19    that what's required is only a reasonable approximation, and
20    that, you know, the defendants should not be penalized by any
21    alleged failure to have mathematical certainty.
22              MS. COHEN:  Judge, I would say that our instruction
23    includes both that statement, but also balancing statements
24    that come straight from the comment related to, um, the
25    benefit of the  doubt in apportioning profits must be given
```

```
 1    to the plaintiff.  And that where infringing and
 2    noninfringing elements of a work cannot be readily separated
 3    all of the defendants profited should be awarded to the
 4    plaintiffs.
 5              So I understand why the Court did it the way that
 6    it did, but in the event you're inclined to add in the
 7    defendant's language, we would submit ours should be included
 8    as well.
 9              THE COURT:  Okay.  And I'm not going to, but your
10    objection and proposed suggestion is also noted for the
11    record.
12              MR. MOVIT:  We respectfully preserve those
13    objections.
14              THE COURT:  Everyone does.  I understand.
15              Okay.  Do we have anything to say about the verdict
16    form?
17              MR. MOVIT:  I understand that there was a
18    proposed --
19              MS. COHEN:  The parties have not received a copy.
20              THE COURT:  Okay.  Well, I basically, you can look
21    at it, but let me just tell you exactly what I did here.  I
22    basically used what the defendants -- the format of the
23    defendants except that on Question No. 1 because of the
24    nature of the 9th Circuit instruction, I think it is did
25    plaintiffs show that there is a causal nexus between
```

1    defendants' gross revenue and the use of Joyful Noise in the

2    musical composition in Ostinato No. 2, but take a look and

3    see.

4                MR. MOVIT:  Okay.  Thank you, Your Honor.  We're

5    gonna review it.  Appreciate it.

6                THE COURT:  Then I will go back.

7                Before we do that, we have another issue.  The

8    plaintiffs have a proposed instruction and I don't know that

9    we need it because we already have a pending instructions

10   about stipulations.  But that the parties have agreed to

11   certain facts that will be read to you and will be placed in

12   evidence as exhibits.  You must therefore treat these facts

13   as having been proved.  Is that still at issue?

14               MS. COHEN:  The parties agreed to include that

15   instruction, Your Honor.

16               MR. MOVIT:  No objection.

17               THE COURT:  Okay.  So we will leave that in.  So

18   we're repeating it again.  That's fine.  Okay.

19               THE CLERK:  Anything further?

20               MS. COHEN:  I did want to clarify, Your Honor, on

21   the issue of demonstratives, I understood what you said

22   earlier to mean we're not permitted to use summary

23   demonstratives during testimony, but we are permitted to use

24   them so long as they're based on the evidence in closing

25   argument; is that right?

```
1              THE COURT:  Yeah, well, I guess what I was saying,
2    but I was suggesting that -- this is the first I've heard of
3    summary demonstratives as part of testimony.  Uh, we only
4    this morning talked about the demonstratives in closing.  And
5    you are correct I said in closing something if something is
6    in evidence, you can certainly use that as a demonstrative,
7    blow it up and whatever.  But I don't know what you're
8    talking about, this is something new for me, demonstrative
9    summary exhibits as part of testimony?  I don't know what
10   that means.
11             MS. COHEN:  Well, I don't think we're talking about
12   testimony.  I think Your Honor addressed that earlier today.
13   What I'm talking about is the use of demonstratives in
14   closing argument that would be based upon evidence adduced
15   from the testimony.  Just like we did at the liability phase
16   both sides used them.
17             THE COURT:  Well, there's so little evidence I
18   don't know what we're talking about.  Give me an example.  If
19   you have a Capitol Record income statement, for example, and
20   you want to blow that up and use that because it's already in
21   evidence, I have no problem with that.
22             MR. MOVIT:  And we have no objection to that.
23             THE COURT:  If you have, I mean. . .
24             MS. COHEN:  And what I'm really talking about is
25   more a demonstrative that would show the calculations that
```

EXHIBIT 8
PAGE 1332

1    the plaintiffs believe are appropriate based upon the

2    evidence that's adduced at trial.

3            MR. MOVIT:  I thought that was addressed by

4    Your Honor earlier today and we object to that.

5            THE COURT:  Calculations of what?  Are we talking

6    about calculations of profits versus deducted expenses?  Are

7    we talking about calculations by other experts, musicologists

8    who want to say that, you know, a hundred percent of the

9    profits of the defendants' work are attributable?

10           MS. COHEN:  We're talking about the defendant's

11   calculation of revenues that are then allocated which are

12   prepared in a summary document that was produced by the

13   defendant, Capital Records.

14           The plaintiff doesn't have a similar summary

15   document, um, because it wasn't requested to produce that

16   kind of information, but we would submit that we believe that

17   the defendants have improperly calculated the revenues and

18   thus the profits and the expenses.  And that we should be

19   able to present a demonstrative in closing that summarizes

20   the numbers that are based upon the evidence.

21           MR. MOVIT:  Your Honor, may I respond?

22           THE COURT:  Sure.

23           MR. MOVIT:  Okay.  Um, again, we have no objection

24   to blowing up line items or anything from the documents that

25   are in evidence.  Absolutely no objection to that.  Uh,

EXHIBIT  8
PAGE  1333

```
 1    plaintiffs did have an expert on profits, not just damages,

 2    but profits.

 3              THE COURT:  I know.

 4              MR. MOVIT:  They made a strategic decision not to

 5    use him which is their right, but they cannot -- then they

 6    should not be allowed to essentially create their own expert

 7    report in a closing statement and make new summary

 8    spreadsheets of the kind that Dr. Einhorn made that they

 9    chose not to use strategically.  As Your Honor noted --

10              THE COURT:  Here's, the problem, folks.  As I

11    recall and I haven't gone back and looked at it, but there

12    was a major attack on Einhorn's accounting methodology

13    because he did not include costs and he said he didn't need

14    to use costs.  Rather than putting him on the stand so that

15    he could be subject to examination on that issue, we're now

16    going to attack the defendants -- the amount of the

17    stipulated costs because that right has been reserved based

18    on something.

19              I don't know what the evidence is that's going to

20    form that basis because you keep coming back to the fact that

21    we're talking about a matter of law.  I'm saying you've got

22    to have some evidence because there are sometimes when a

23    legal fee might be appropriately a cost or other times when

24    it might not be an appropriate cost.  I don't know, but we

25    don't have any witness so I'm not clear what you're trying to
```

EXHIBIT 8
PAGE 1334

1    do, Ms. Cohen.

2              MS. COHEN:  So I'm actually referring more to the

3    Capitol Records testimony which will be lengthy and there's

4    lots of financial records from which we will have testimony

5    related to how things were calculated.  And frankly, it's

6    really not a matter of expert testimony.  It's argument and

7    so. . .

8              THE COURT:  I can understand, I mean, I can

9    understand that if you have a live witness from Capital

10   Records on the stand that says we treat these things as costs

11   against the bottom line, you have a right to cross-examine

12   that individual and say what factors went into it.  Isn't it

13   true that this is not typically something that's deductible

14   and whatever else.  That I understand.  I expect you to do

15   that.

16             The problem I have is with the stipulated facts how

17   you're gonna go about doing it.  If you're trying to deal

18   with the guy from Capitol Records, I understand.  To put it

19   in my own terms, you're going to say that, you know, this is

20   the equivalent of motion picture accounting and there are

21   lots of things that are treated as, you know, below the line

22   expenses that shouldn't be and so on and so forth.

23             I think that's appropriate cross and if you adduce

24   the evidence you want, you certainly can argue it.  Um, but

25   the way to argue it, it seems to me, if you put up Capitol's

```
 1    balance sheet or statement or whatever it's going to be, you
 2    can point to the item and say this item, you know, should be
 3    reduced to X based on whatever.  If you want to argue that
 4    way, that's fine.  But there has to be some evidence in the
 5    record supporting the argument.  That's all I'm saying.
 6             MS. COHEN:  There will be, Judge.  And just to
 7    clarify, are we then permitted to use a demonstrative to
 8    summarize that argument?
 9             THE COURT:  You can start with a demonstrative
10    that's in evidence, yes.
11             MS. COHEN:  Okay.
12             MR. MOVIT:  Yes.  Thank you, Your Honor.
13             We object to putting on any numbers on the screens
14    in front of the jury that are not in evidence.  If the
15    numbers are on documents in evidence, we have no objection.
16             THE COURT:  Well, or if it's part of the testimony
17    or if he equivocated on something.
18             MR. MOVIT:  You know, they should not be able to
19    come up with their own new numbers.
20             THE COURT:  I don't want you to produce your own
21    new chart that says here's where we are.  If you want to work
22    off the chart that has been put together by Capitol Records
23    and say that this is a phoney expense because of this
24    testimony and so on and so forth, it should only be Y rather
25    than X, that I think is appropriate.
```

UNITED STATES DISTRICT COURT

EXHIBIT 8
PAGE 1336

```
 1              MS. COHEN:  Okay.  So long as the record reflects
 2    our objection.
 3              THE COURT:  Yes.
 4              MS. COHEN:  Thank you, Judge.
 5              MR. MOVIT:  Thank you, Your Honor.
 6              THE COURT:  Okay.  I'll see you shortly.
 7              THE CLERK:  This court's in recess.
 8                       (Recess taken.)
 9              THE COURT:  Okay.
10              MR. MOVIT:  If I may, Your Honor?
11              THE COURT:  Yes.
12              MR. MOVIT:  Thank you, Your Honor, for the verdict
13    form.  Um, defendants have no comments on the verdict form.
14    We have one final comment on the jury instructions as
15    revised.
16              THE COURT:  Sure.
17              MR. MOVIT:  With respect to No. 3.
18              THE COURT:  Okay.  Yes.
19              MR. MOVIT:  There are several places, I believe,
20    four places in the instruction that used the phrase
21    copyrighted work, and we would request that be changed to
22    copyright material.  The word "work" is used in a different
23    sense of the word as well in this instruction.  In particular
24    in the first sentence of Paragraph 3.  So we think the jury
25    will be confused by two different uses of the word work and
```

```
 1    we think copyright material is more accurate in all events.
 2              THE COURT:  Point me to what you're talking about.
 3              MR. MOVIT:  Yes, Your Honor.  So in the first
 4    sentence of the third paragraph it states, a defendant's
 5    gross revenue is all of the defendant's receipts from the
 6    sale or use of a work containing or using copyrighted work
 7    from Joyful Noise.
 8              THE COURT:  Right.
 9              MR. MOVIT:  We think that would be less confusing
10    to say or using copyrighted material from Joyful Noise and
11    more precise.  And we would request that everywhere in this
12    instruction where it says copyrighted work to instead say
13    copyrighted material.
14              MS. COHEN:  Judge, may I respond?
15              THE COURT:  Sure.
16              MS. COHEN:  We would object to that change.  This
17    language comes straight from the model instruction and
18    moreover we disagree with the characterization of the jury's
19    finding that it's infringing material.  Um, the finding of
20    the jury related to the works as a whole, the total concept
21    and feel.  So, again, it's injecting argument into the
22    language of the instruction.
23              MR. MOVIT:  It's not argument to say copyrighted
24    material.  It's just more precise.
25              THE COURT:  Well, I would rather stick with the
```

EXHIBIT 8
PAGE 1338

```
 1    instruction rather than -- not that that per se will avoid an
 2    appellate issue, but it may.  And I think the fact that it
 3    says copyrighted work from Joyful Noise suggests that it can
 4    be something less than the entirety of the work and I think
 5    that's the problem that you're trying to avoid with the use
 6    of the material, is it not?
 7              MR. MOVIT:  Yeah, we're trying to use what's been
 8    precisely placed at issue in the liability phase and we think
 9    that copyrighted material makes that more clear.  And to
10    extent Your Honor disagrees, we preserve our objection.
11              THE COURT:  I would like to stick with the
12    instruction, but I do not mean to prevent you from arguing
13    that we're talking about something less than the entirety of
14    the work.
15              MR. MOVIT:  Well, we would also have a concern
16    about any kind of arguments by the plaintiffs expanding the
17    scope of the alleged infringement after liability has been
18    established.  And that should not be an argument that should
19    just be what the case is about after liability has been
20    established.
21              THE COURT:  I'd have to go back and look. . .
22              MS. LEPERA:  Let me add one thing for the record
23    because the instruction does not say that.  It says
24    defendant's gross revenue is all of the defendant's receipts
25    from the use bracket, sale bracket of a product bracket, work
```

```
 1    product containing or using the copyrighted work.  This is
 2    the part that's missing associated with the infringement.
 3    This says instead using the copyright work.
 4              THE COURT:  Okay.  I think that's a fair change.
 5    What we're trying to say use of the work containing or using
 6    copyrighted work associated with. . .
 7              MS. LEPERA:  Right.  The infringement.
 8              THE COURT:  With Joyful Noise?
 9              MR. MOVIT:  To say with the infringement would
10    track the model there.
11              THE COURT:  Associated with the infringement.
12              MS. COHEN:  Judge, isn't that accomplished by the
13    words from Joyful Noise as written?
14              MR. MOVIT:   In this circumstance, I think the model
15    is more precise.
16              THE COURT:  Well, let me. . . I think associated
17    with the infringement is the proper language.  Okay.  So what
18    we're saying use of a work containing or using copyrighted --
19    I'm sorry.  Containing or using copyrighted work associated
20    with the infringement.
21              MR. MOVIT:  Thank you, Your Honor.
22              THE COURT:  In other words, we're talking about --
23    I think what we're trying to say is you're looking at the
24    receipts from the sale of a work containing or using
25    copyrighted work associated with the infringement.  In other
```

```
 1    words, that's how you determine the receipts.

 2             MR. MOVIT:  Yes, Your Honor.

 3             MS. COHEN:  Judge, I think the language that's

 4    already in the instruction copyrighted work from Joyful Noise

 5    that is the infringement.  I don't think copyrighted work

 6    associated with the infringement.  That seems very unclear.

 7             THE COURT:  Well, I think it's the 9th Circuit

 8    language, but I mean the problem I'm having and I think that

 9    they're having with containing or using copyrighted work from

10    Joyful Noise or associated with Joyful Noise is the

11    following.

12             Joyful Noise is copyrighted.  They are trying to

13    point out which I think is appropriate that the infringement

14    as argued by you pertains to work contained in Joyful Noise,

15    but not the entirety of Joyful Noise.  And I think that's

16    what they're trying to say which I think is accurate.

17             MR. MOVIT:  That sets forth our position accurately

18    for the record, Your Honor.  Thank you.

19             MS. COHEN:  In the model rule, the use of the

20    bracketed information, typically, when there's two things

21    here, it's sort of an either or situation.  It would make

22    sense to include either containing or using the copyrighted

23    work or as it's written as a copyrighted work from Joyful

24    Noise or you could say associated with the infringement.  I

25    don't believe it's clear to use or I don't think it's
```

```
 1   accurate to say both.
 2             THE COURT:  I could say use of a work associated
 3   with an infringement.  Does that work for everybody?
 4             MS. LEPERA:  Could you say it one more time,
 5   Your Honor?
 6             THE COURT:  All I'm doing is taking out containing
 7   or using copyrighted work and instead it would say from the
 8   sale or use of a work associated with the infringement.
 9             MS. LEPERA:  Actually, no, I think the work
10   containing material associated with the infringement is
11   really what we're trying to say here.  So it's not a work
12   associated with the infringement.  It's a work containing
13   material associated with infringement.
14             THE COURT:  But I'm not gonna use material.  We'll
15   leave it as is.  Use of a work containing or using
16   copyrighted work associated with the infringement.
17             MS. LEPERA:  That's fine.  That's better.  Thank
18   you, Your Honor.
19             MS. COHEN:  I'll just note our objection to that
20   language.
21             THE COURT:  I will.  It is noted for the record.
22             MS. COHEN:  Your Honor, we do have a couple of
23   objections to the special verdict form.
24             THE COURT:  Okay.  Are we done with the jury
25   instructions because I really want them completed today?
```

```
 1              MR. MOVIT:  Defendants have nothing further.
 2              THE COURT:  Okay.  And plaintiffs have nothing
 3     further?  I noted your objections.
 4              MS. COHEN:  The only issue with this is the word in
 5     the second paragraph the last sentence, the word before
 6     costs, their costs it makes it read such that amounts doesn't
 7     modify costs as well, but only modifies defendant's gross
 8     revenue so I would just ask that the word "their" be removed.
 9              THE COURT:  So it would read amounts of certain
10     defendants gross revenue and costs.
11              MS. COHEN:  Correct.
12              THE COURT:  Can we live with that?  Take out
13     "their"?
14              MR. MOVIT:  If Your Honor could give us one moment?
15              THE COURT:  Sure.
16              MS. COHEN:  I am seeking the exclusion of the word
17     "their" in last sentence of Paragraph 2.
18              THE COURT:  So it would read here the parties have
19     stipulated to the amounts of certain defendants' gross
20     revenue and costs.
21              MS. COHEN:  Correct.
22              MS. LEPERA:  What's wrong with the word "their"?
23              MS. COHEN:  That it renders the word amount, it
24     makes -- it doesn't also modify costs.
25              THE COURT:  She's suggesting that "their" suggests
```

```
 1   that they're actual, appropriate costs rather than the

 2   amounts.

 3            MR. CHIEFFO:  My apologies.  Could you just repeat

 4   it again?

 5            THE COURT:  Let me make one more modification.  It

 6   should read this way:  Here, the parties have stipulated to

 7   the amounts of certain defendants' gross revenue and costs.

 8            MS. COHEN:  Thank you, Judge.

 9            MR. CHIEFFO:  My only comment would be to have a

10   plural gross revenues and costs.

11            MS. COHEN:  That's fine.

12            THE COURT:  That's fine.

13            MS. LEPERA:  If they're trying to distance the

14   amount from the defendants, then I have a problem with that.

15            THE COURT:  I don't think they're doing that.  I

16   think what they're saying is certain defendants' gross

17   revenues and their costs suggests that we're not talking

18   about amounts of gross revenues, but it implies actual costs.

19            MS. LEPERA:  Well, they do have actual costs.

20            THE COURT:  I understand, but I don't think the

21   change changes anything.

22            MS. LEPERA:  Well, to the extent it makes it

23   confusing, I don't -- I think there's something manipulative

24   going on here and I'm trying to get my head around it.

25   Frankly, there could be a statement that says here, the
```

```
 1    parties have stipulated to the gross revenue and costs of
 2    certain defendants.  How about that?
 3             THE COURT:  No, because that's what we -- that's
 4    going back to what we said we weren't going to do.  We added
 5    amounts.
 6             MS. LEPERA:  Right.  I'm just changing the grammar
 7    of it.  Here the parties have stipulated to the gross
 8    revenue -- to the amounts of gross revenue and costs of
 9    certain defendants.
10             MS. COHEN:  That would be fine.  The way it's
11    written, that's fine.
12             MS. LEPERA:  Okay.
13             THE COURT:  Here the parties have stipulated to the
14    amounts of?
15             MS. LEPERA:  Gross revenue and costs of certain
16    defendants.
17             THE COURT:  That's fine.  That I think that meets
18    everyone's objections.  Anything else?
19             MS. COHEN:  Not on the instruction, Your Honor.
20             THE COURT:  Okay.
21             MS. COHEN:  On the special verdict form,
22    preliminarily, we would object to the use of a special
23    verdict, um, in its entirety.  We don't think it's necessary
24    and the form that the plaintiffs have submitted is modeled
25    after the Pharrell Williams Blurred Lines case in which just
```

EXHIBIT 8
PAGE 1345

```
 1   one question was used regarding profits and so we would

 2   submit that's appropriate here, too.

 3         But insofar as the Court is inclined to have

 4   special interrogatories, we would object very strongly to

 5   Question 2 and inclusion of the stipulated amounts.  They're

 6   already calculated.  Here the costs are already deducted from

 7   the income which is a point of contention.  So it's not

 8   appropriate to include that calculation here, um, in this

 9   form.  It's a fact for the jury to determine.

10         THE COURT:  So what do you want to do?  You want to

11   just have the question please state the amount of net

12   profits, if any?

13         MS. COHEN:  That would be preferable, yes.

14         MR. MOVIT:  Very briefly cause this has been

15   well-trod territory today that the Court has made clear we

16   agree that the amount of these net profits is a fact

17   question.  And the only witness being called is

18   Mr. Drellishak who is not gonna testify about any of these

19   individuals.

20         So the factual record is settled for all these

21   companies and people other than Capitol Records, and it's

22   settled with these numbers.  There's nothing else in the

23   evidentiary record so we think this is completely appropriate

24   as drafted by Your Honor.

25         THE COURT:  Well, I think we took it from you.
```

```
 1              MR. MOVIT:  As promulgated by Your Honor.

 2              MS. COHEN:  And I understand we've been over this

 3    ad nauseum, but the plaintiffs did expressly reserve the

 4    right to contest the deductibility of certain expenses.

 5              THE COURT:  I know, but an hour ago you said you

 6    were just gonna deal with Capitol Records.  You weren't gonna

 7    attack these.  I can't -- what are we gonna do here?

 8              MS. COHEN:  We are not going to attack the amount.

 9    That's why that word was included in the instruction.  We do

10    not contest the amounts of the income or the costs, but we do

11    contest that certain of the categories are not deductible and

12    it's on the defendants to prove their deductibility.  It

13    should not be assumed that it's proven.

14              THE COURT:  Okay.

15              MR. MOVIT:  I don't want to repeat things I've

16    already said, Your Honor.  I think our position is clear.

17              THE COURT:  Well, rather than performing the math

18    which is the net, why don't we just put in the stipulation

19    and record the stipulation as part of it.

20              MS. LEPERA:  That's fine.

21              MR. MOVIT:  No objection.

22              MS. COHEN:  What do you mean by that?  I'm sorry.

23              THE COURT:  What I'm saying is, I'm sorry that I

24    don't speak English any more.  I'd like to say that was -- I

25    spoken English before the trial, but my husband sometimes
```

```
 1   thinks I don't.  What I'm saying is you have the following

 2   facts are admitted and require no proof.  If you put in that

 3   stipulation that was read this morning by Mr. Kahn, and then

 4   went on to say please state the amount of net profits, if

 5   any, earned by and you'd have to go through each individual

 6   defendant.

 7           MS. COHEN:  Yes, that's fine.

 8           THE COURT:  It's cumbersome, but. . .

 9           MS. LEPERA:  We would just have a continuing

10   objection to their attempting to mischaracterize the

11   stipulation which says these are direct costs from the

12   exploitation of Dark Horse.

13           THE COURT:  I understand and it's noted for the

14   record.

15           MR. MOVIT:  Okay.  With Ms. Lepera's objection, we

16   have nothing further on this point.

17           THE COURT:  Okay.  What else on the verdict form?

18           MS. COHEN:  In No. 3, Your Honor, we would seek the

19   removal of the language that says use of the Joyful Noise

20   musical composition in Ostinato No. 2 in Dark Horse for the

21   same reasons that we, um, expressed earlier when we were

22   discussing the instruction.  It would be more appropriate

23   here to exclude either party's characterization and simply

24   say is attributable to the infringement.

25           MR. MOVIT:  Again, I'd submit that it was in both
```

1   parties characterization in the liability phase that Ostinato

2   No. 2 is what's at issue and that's precisely now the

3   apportionment task of the jury is with the infringing

4   expression, how much did it contribute to the process?

5   That's the jury's task and to obfuscate that we submit is not

6   appropriate.

7           MS. COHEN:  I would just say that that improperly

8   minimizes the jury's verdict.  Defendants previously wanted

9   them to consider the totality of the works which they did.

10  It didn't work and now they're trying to improperly reduce

11  what it is that the jury is supposed to focus on.

12          MR. MOVIT:  That's an incorrect statement.  Both of

13  our positions on the legal standards, the total concept and

14  feel must be considered by the jury as to the two works --

15          THE COURT REPORTER:  I'm sorry.  Could you start

16  over one more time?

17          MR. MOVIT:  I'm sorry.  Of course.

18          We submit that misrepresents both the defendant's

19  position and the case law that the allegedly infringing

20  expression has always been Ostinato No. 2.  That's all that

21  was discussed or argued.  The total concept and feel

22  obviously still has to be considered by the jury, but that

23  doesn't change what the infringing expression was.

24          THE COURT:  To put it in my very simple terms, this

25  whole case was about whether Ostinato No. 2 in Dark Horse

UNITED STATES DISTRICT COURT

EXHIBIT 8
PAGE 1349

1    infringed the ostinato in Joyful Noise.  And the argument was

2    by them that if you looked at it intrinsically, it didn't and

3    if you looked at it extrinsically, it didn't.  The jury came

4    to the opposite conclusion.

5              I think the question now is given that the jury has

6    determined infringement, the question now becomes as to that

7    ostinato, what is its contribution to the profitability of

8    the work?  And I think that's pretty clearly the law.

9              MS. COHEN:  I mean, Judge, insofar as Your Honor

10   removed this language from the instruction, it certainly

11   should not be in the verdict form.

12             THE COURT:  It may be, but I'm still trying to

13   understand that we all agree. . .

14             MS. COHEN:  They have to prove the apportionment.

15   I mean, that's the fact finding.

16             THE COURT:  I agree they have to prove

17   apportionment, but it's the apportionment of the ostinato not

18   the whole song.

19             MS. LEPERA:  Right.  At this point in the case,

20   it's even more critical that that be differentiated in our

21   view because in order to determine the other factors, there's

22   other music, there's other lyrics, there's all sorts of

23   things that they did not put at issue and it is critical to

24   have that analysis presented to them in a clear way.

25             MS. COHEN:  I just don't think that's accurate,

1    Judge.  I mean, there was lots of testimony that it wasn't

2    just Ostinato No. 2.  The whole song was inspired by the beat

3    and there other elements that had to be taken into account in

4    determining the similarity.  It's just an improper

5    minimization of what we're talking about.

6           THE COURT:  I don't think I'm minimizing anything.

7    I'm taking what your expert said that -- he's saying and this

8    is the argument he's making that the beat informs the entire

9    song and the beat was copied and because of the importance of

10   the beat, you have to look at a larger portion of Dark Horse

11   and understand the scope of infringement.

12           Now, as far as the language in Question 3. . .

13           Okay.  I think what we probably should do is use

14   the language from the jury instruction which is. . .

15           I think to be consistent and because Ms. Cohen

16   raises a fair point, should we be saying what portion, if

17   any, of the profit from the sale of the work containing or

18   using copyrighted work from Joyful Noise is attributable to

19   factors other than use of the copyrighted work?

20           MR. MOVIT:  I would say that the using is an issue,

21   Your Honor.  It's containing.  It's not infringement to be

22   inspired by something or for the work as a whole to be

23   informed by the infringing passage.  Um, what's at issue is

24   the infringement and that is Ostinato No. 2 and is not other

25   portions of the work.

```
 1              MS. COHEN:  And I would, um, think that it would be

 2    confusing to use the language -- to calculate a percentage

 3    that relates to the noninfringing work because then the next

 4    question they have to use the percentage -- they have to

 5    multiply it by the percentage that relates to the infringing

 6    portion.

 7              MS. LEPERA:  As Your Honor said very clearly a

 8    minute ago, this case has always been about Ostinato No. 2

 9    and the ostinato in Joyful Noise.  They're attempting to

10    either bury that fact, camouflage that fact, expand upon that

11    fact and not allow there to be a true apportionment analysis

12    based on their own testimony and the testimony of the expert.

13              If the Court is gonna go, um, and allow it to be,

14    um, categorized in a big way such as that, then we would like

15    to stand vigorously by an objection on that because this is

16    now an apportionment analysis.  And ultimately, they've put

17    in their case Ostinato No. 2 was stated over and over and

18    over again by them.  Now they don't want to talk about it.

19    That's very compelling proof of what they're trying to do.

20              THE COURT:  I think it's compelling.  The only

21    thing is that I'm trying to have a question that mirrors the

22    jury instruction.

23              MS. LEPERA:  Well, I think we should just go back

24    to the way it was.

25              THE COURT:  I know you think that, but I'm not sure
```

EXHIBIT 8
PAGE 1352

```
 1    that we can do that.
 2              MS. COHEN:  And, Judge, you know we objected to the
 3    change made to the instructions.  Going based off of
 4    Your Honor's change, what if we said, what percentage, if
 5    any, of the net profits earned by defendants from Dark Horse
 6    is attributable to the use of a work containing or using
 7    copyrighted work associated with the infringement?
 8              MR. MOVIT:  We would object to that.
 9              MS. LEPERA:  Convoluted.
10              MR. MOVIT:  Very confusing.
11              MS. LEPERA:  Attempting to camouflage the reality
12    of what's at issue.
13              MR. CHIEFFO:  Your Honor, if I may suggest, it
14    seems to me on the Court's Instruction No. 3 and the carry
15    over paragraph, the line, last line is work from Joyful Noise
16    is attributable to factors other than the use of the, and I
17    would suggest we insert the use of Joyful Noise in Ostinato
18    No. 2 in Dark Horse.
19              MS. LEPERA:  We're saying the same thing.
20              MS. COHEN:  I think the language in the instruction
21    is appropriate, Your Honor.  And to project, you know, onto
22    the jury what they may or may not have decided is just
23    inappropriate.  And if it's not included in the instruction,
24    certainly it should not be in the verdict form.
25              THE COURT:  That is the only thing I agree with.
```

EXHIBIT 8
PAGE 1353

```
 1            MR. CHIEFFO:  I thought we were discussing how to
 2    get it into the jury instruction.
 3            THE COURT:  I think we were trying -- I thought we
 4    had a settled jury instruction.  She objected.  We had a
 5    settled jury instruction.  We had no objections.  Then the
 6    verdict question was raised and now you're back trying to
 7    reopen the jury instruction.
 8            MS. LEPERA:  But now we have a specific question,
 9    Your Honor, with all due respect, a specific question as to
10    how to look at the factors.  And when you're looking at the
11    factors, if there's not clarity as to what was presented by
12    them to be at issue and only at issue, over and over again
13    they were not afraid to use the term Ostinato No. 2 in the
14    liability phase.  They didn't point to any other material.
15            Now, we're doing an apportionment analysis and it's
16    anything other than that that is relevant for us to discuss
17    to be apportioned out.  So without a comparative point, it's
18    a moosh and that's what they're attempting to do is moosh it.
19            THE COURT:  Do you have the verdict form from
20    yesterday, CJ?  Now, here's where we are.
21            MS. LEPERA:  I'm just gonna note for the record,
22    Your Honor, if I may, plaintiff's memo of fact and law
23    contentions specifically said the following:  "Specifically,
24    defendant's song contains a repeating eight note ostinato or
25    beat that is substantially" -- strike it's not strikingly
```

```
 1   cause that was not allowed -- "to the ostinato in plaintiff's
 2   song."  Again, that was, um, the argument, that was the
 3   evidence, that was their contention, and now they don't want
 4   to allow --
 5          THE COURT:  No, I see the issue.  I'm just trying
 6   to figure out what to do here.
 7          MS. LEPERA:  Thank you, Your Honor.
 8          THE COURT:  Here's what the jury instruction should
 9   say, "After determining each defendant's profit, you must
10   then determine whether any portion of the profit from the
11   sale of a work containing or using copyrighted work from
12   Joyful Noise is attributable to factors other than the use of
13   Ostinato No. 2 in the copyrighted work."
14          That is -- I know that everyone on the plaintiff's
15   side is gonna get up and scream, but that really is what the
16   case was what she just read in the pretrial conference order.
17   And I went back and looked at the verdict form from yesterday
18   to be sure that there was not anything in it that Dark Horse
19   infringed the entirety of the work.
20          This is not about Dark Horse infringing the
21   entirety of Joyful Noise.  This is about the ostinato.  The
22   testimony was about the ostinato.  And all your reflections
23   about the work as a whole go to, um, what was the so-called
24   intrinsic test which the experts were trying to address.
25          MS. LEPERA:  We would be fine with that,
```

```
 1    Your Honor, except I think at the end you just said Dark
 2    Horse so it wouldn't be confusing.
 3              THE COURT:  In the copyrighted work.
 4              MS. LEPERA:  Ostinato No. 2 in Dark Horse.
 5              MS. COHEN:  Do you mind reading the whole thing
 6    again, actually?
 7              THE COURT:  I don't mind at all.  My proposed
 8    change to the instruction would be in the fifth paragraph,
 9    "After determining each defendant's profits, you must then
10    determine whether any portion of the profit from the sale of
11    the work containing or using copyrighted work from Joyful
12    Noise is attributable to factors other than the use of
13    Ostinato No. 2 in Dark Horse."
14              MS. COHEN:  And Judge, we would object to that
15    characterization.
16              THE COURT:  I understand.
17              Then Question 3 in the verdict form.  I think with
18    that change, then Question 3 is appropriate, although I
19    recognize that plaintiffs will object to it.
20              MS. COHEN:  With our objection noted, that's fine.
21              THE COURT:  Okay.
22              MS. LEPERA:  Thank you, Your Honor.
23              MR. MOVIT:  Thank you, Your Honor.
24              THE COURT:  Okay.  Then I'm going to put these
25    things together.  All will be put together subject to
```

```
 1    everyone's objections which have been placed on the record

 2    and we will have them ready to go for the jury tomorrow.

 3              MR. MOVIT:  Thank you, Your Honor.

 4              MS. LEPERA:  Thank you, Your Honor.

 5              MS. COHEN:  Thank you.

 6              THE CLERK:  This court is adjourned.

 7              (Proceedings were concluded at 1:30 p.m.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

EXHIBIT 8
PAGE 1357

1

2                    CERTIFICATE OF REPORTER

3

4    COUNTY OF LOS ANGELES        )

5                                 )  SS.

6    STATE OF CALIFORNIA          )

7

8    I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

9    STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

10   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

11   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

12   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

13   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

14   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

15   OF MY STENOGRAPHIC NOTES.

16

17

18   DATE:  AUGUST 8, 2019_____

19

20   _____/s/  LAURA MILLER ELIAS_____

21   LAURA MILLER ELIAS, CSR 10019

22   FEDERAL OFFICIAL COURT REPORTER

23

24

25

UNITED STATES DISTRICT COURT

EXHIBIT 8
PAGE 1358

## $

**$1,079,218.20** [1] - 35:20
**$1,265,083.02** [1] - 34:19
**$119,343.76** [1] - 34:17
**$12,650.83** [1] - 35:7
**$124,005.61** [1] - 36:8
**$126,508.30** [1] - 35:4
**$126,508.36** [1] - 10:11
**$130,450.36** [1] - 37:25
**$132,476.14** [1] - 37:21
**$15,837.50** [1] - 36:21
**$163,039.10** [2] - 37:14, 37:18
**$239,969.46** [1] - 36:1
**$245.17** [1] - 35:16
**$3,260,782.07** [1] - 37:6
**$30** [1] - 23:4
**$31** [3] - 22:24, 23:3, 23:5
**$32,750.75** [1] - 36:24
**$33,542.63** [1] - 37:3
**$347,797.89** [1] - 35:11
**$41** [1] - 22:7
**$41,335.20** [2] - 36:10, 36:14
**$489,117.31** [1] - 37:12
**$630,000** [1] - 23:5
**$631,448.47** [1] - 34:13
**$670,852.47** [1] - 36:17
**$760.75** [1] - 35:25
**$826,704.07** [1] - 36:2

## /

**/s** [1] - 80:20

## 1

**1** [5] - 4:3, 34:12, 39:14, 39:15, 52:23
**10** [1] - 36:5
**100** [1] - 47:2
**10019** [2] - 1:22, 80:21
**11** [1] - 36:16
**11377** [1] - 2:18
**12** [1] - 36:19
**125** [5] - 3:9, 33:24, 34:3, 34:9, 38:4

## 12

**12TH** [1] - 2:7
**13** [1] - 37:5
**14** [1] - 37:9
**15** [4] - 36:8, 37:12, 37:20, 39:1
**15-5642** [1] - 4:4
**15-5642-CAS** [1] - 1:8
**16** [2] - 37:24, 44:16
**1840** [1] - 2:23
**1900** [1] - 2:23
**1:30** [1] - 79:7

## 2

**2** [33] - 25:15, 26:11, 26:20, 27:5, 27:13, 32:2, 32:4, 32:15, 32:17, 34:15, 39:19, 40:15, 40:24, 47:14, 50:18, 51:2, 51:3, 53:2, 65:17, 68:5, 70:20, 71:2, 71:20, 71:25, 73:2, 73:24, 74:8, 74:17, 75:18, 76:13, 77:13, 78:4, 78:13
**2019** [3] - 1:15, 4:1, 80:18
**207** [1] - 32:5
**208** [1] - 2:11
**21** [1] - 3:5
**2100** [1] - 2:11
**213)894-0374** [1] - 1:24
**25** [1] - 3:6

## 3

**3** [8] - 34:18, 59:17, 59:24, 70:18, 73:12, 75:14, 78:17, 78:18
**3,000** [1] - 32:3
**3.6** [1] - 32:12
**30** [2] - 1:15, 4:1
**309** [1] - 41:5
**34** [1] - 3:9
**350** [1] - 1:23
**39** [1] - 3:11
**390** [1] - 41:5

## 4

**4** [1] - 34:25
**4455** [1] - 1:23

## 5

**5** [1] - 35:10
**505** [1] - 41:6
**56** [1] - 31:9

## 5B

**5B** [1] - 4:23

## 6

**6** [1] - 35:13
**63105** [2] - 2:8, 2:11

## 7

**7** [1] - 35:19
**7.2** [1] - 32:5
**754** [1] - 51:18
**77,334.57** [1] - 35:18
**7701** [1] - 2:7
**772** [1] - 41:6

## 8

**8** [2] - 35:22, 80:18
**826** [1] - 51:18

## 9

**9** [1] - 36:2
**90012** [1] - 1:23
**90064** [1] - 2:19
**90067** [1] - 2:24
**9:30** [1] - 38:10
**9:49** [1] - 4:1
**9th** [10] - 45:8, 46:7, 47:8, 49:8, 49:17, 49:18, 49:22, 50:25, 52:24, 63:7

## A

**A.M** [1] - 4:1
**AARON** [1] - 2:16
**able** [4] - 19:24, 22:11, 55:19, 58:18
**absolutely** [2] - 11:11, 55:25
**abstract** [1] - 11:23
**accept** [1] - 10:13
**accomplished** [1] - 62:12
**accordingly** [3] - 16:25, 17:21, 33:12
**account** [2] - 33:13, 73:3
**accounting** [5] - 34:17, 35:6, 37:17, 56:12, 57:20
**accurate** [5] - 40:19, 60:1, 63:16, 64:1, 72:25
**accurately** [1] - 63:17
**accused** [2] - 10:4, 10:20
**acknowledge** [1] -

21:9
**actual** [6] - 20:4, 23:23, 24:10, 66:1, 66:18, 66:19
**ad** [2] - 16:16, 69:3
**adage** [1] - 28:2
**add** [2] - 52:6, 61:22
**added** [1] - 67:4
**addition** [1] - 40:6
**additional** [1] - 16:4
**additionally** [2] - 18:22, 42:6
**address** [1] - 77:24
**addressed** [3] - 15:9, 54:12, 55:3
**adds** [1] - 22:7
**adduce** [1] - 57:23
**adduced** [2] - 54:14, 55:2
**adhere** [1] - 49:22
**adjourned** [1] - 79:6
**administrative** [1] - 35:6
**admission** [1] - 33:25
**admitted** [4] - 34:3, 34:10, 38:2, 70:2
**advance** [2] - 36:22, 37:1
**aforementioned** [2] - 34:16, 35:1
**afraid** [1] - 76:13
**afternoon** [1] - 20:25
**age** [1] - 19:20
**age-old** [1] - 19:20
**ago** [6] - 6:11, 24:21, 69:5, 74:8
**agree** [12] - 5:13, 8:19, 12:22, 15:22, 16:3, 16:8, 44:2, 45:23, 68:16, 72:13, 72:16, 75:25
**agreed** [14] - 8:9, 9:7, 9:10, 9:24, 12:24, 13:13, 13:15, 13:23, 14:1, 14:4, 16:6, 53:10, 53:14
**agreement** [5] - 6:8, 13:22, 16:1, 16:8, 42:14
**ahead** [4] - 6:22, 38:21, 38:22, 38:24
**AIDED** [1] - 80:13
**al** [1] - 4:5
**AL** [2] - 1:6, 1:9
**ALBERTSON** [1] - 2:17
**album** [14] - 23:1, 23:16, 23:17, 25:13, 26:5, 27:4, 27:15, 28:9, 29:22, 30:1,

30:3, 30:8, 30:20
**albums** [1] - 30:22
**alleged** [2] - 51:21, 61:17
**allegedly** [3] - 19:4, 46:23, 71:19
**allocated** [1] - 55:11
**allocating** [1] - 30:5
**allocation** [1] - 30:11
**allow** [3] - 74:11, 74:13, 77:4
**allowed** [2] - 56:6, 77:1
**almost** [1] - 24:2
**America** [1] - 37:20
**AMERICA** [1] - 1:1
**amount** [34] - 5:24, 6:8, 6:15, 10:8, 10:11, 13:22, 22:6, 22:21, 34:16, 35:3, 35:7, 35:15, 35:17, 35:24, 36:1, 36:7, 36:10, 36:13, 36:21, 36:24, 37:2, 37:11, 37:14, 37:18, 42:19, 45:14, 45:16, 56:16, 65:23, 66:14, 68:11, 68:16, 69:8, 70:4
**amounts** [12] - 42:22, 65:6, 65:9, 65:19, 66:2, 66:7, 66:18, 67:5, 67:8, 67:14, 68:5, 69:10
**analysis** [5] - 50:23, 72:24, 74:11, 74:16, 76:15
**AND** [4] - 80:8, 80:11, 80:13, 80:14
**ANGELES** [6] - 1:16, 1:23, 2:19, 2:24, 4:1, 80:4
**answer** [1] - 8:24
**answers** [1] - 26:25
**anticipated** [1] - 20:18
**apologies** [1] - 66:3
**apologize** [2] - 38:11, 48:14
**appearances** [2] - 4:6, 4:7
**APPEARANCES** [1] - 2:2
**appellate** [1] - 61:2
**apportion** [1] - 30:11
**apportioned** [1] - 76:17
**apportioning** [2] - 50:23, 51:25
**apportionment** [11] - 6:24, 8:18, 8:20, 51:13, 71:3, 72:14,

72:17, 74:11, 74:16, 76:15

**appreciate** [3] - 39:5, 39:8, 53:5

**appropriate** [23] - 29:22, 30:5, 41:22, 45:21, 45:24, 46:4, 46:5, 46:11, 46:22, 51:5, 55:1, 56:24, 57:23, 58:25, 63:13, 66:1, 68:2, 68:8, 68:23, 70:22, 71:6, 75:21, 78:18

**appropriately** [5] - 13:5, 13:7, 13:15, 14:12, 56:23

**appropriateness** [1] - 11:20

**approximation** [1] - 51:19

**argue** [14] - 12:17, 12:18, 13:8, 13:20, 15:1, 19:21, 19:24, 44:8, 44:18, 47:9, 47:20, 57:24, 57:25, 58:3

**argued** [2] - 63:14, 71:21

**arguing** [5] - 6:15, 14:10, 14:11, 44:8, 61:12

**argument** [28] - 5:8, 5:18, 7:23, 11:5, 12:5, 13:17, 13:18, 15:2, 15:3, 15:4, 15:5, 15:19, 16:9, 18:2, 44:5, 47:19, 53:25, 54:14, 57:6, 58:5, 58:8, 60:21, 60:23, 61:18, 72:1, 73:8, 77:2

**arguments** [3] - 46:13, 46:15, 61:16

**artist** [1] - 29:16

**aspects** [1] - 18:10

**assist** [1] - 45:8

**assisted** [2] - 41:24, 42:3

**associated** [16] - 62:2, 62:6, 62:11, 62:16, 62:19, 62:25, 63:6, 63:10, 63:24, 64:2, 64:8, 64:10, 64:12, 64:13, 64:16, 75:7

**assume** [5] - 5:23, 7:16, 11:3, 11:21, 26:13

**assumed** [1] - 69:13

**AT** [1] - 80:11

**attack** [6] - 7:12, 28:5,

56:12, 56:16, 69:7, 69:8

**attempt** [1] - 16:16

**attempting** [4] - 70:10, 74:9, 75:11, 76:18

**attention** [2] - 19:24, 25:3

**attorneys** [1] - 12:20

**attributable** [53] - 4:20, 5:7, 5:9, 5:17, 5:25, 6:6, 7:7, 8:3, 9:2, 9:4, 9:6, 9:9, 9:17, 9:24, 14:6, 14:24, 24:19, 25:13, 25:14, 26:10, 26:14, 28:8, 28:25, 29:16, 29:21, 34:15, 35:1, 35:14, 35:23, 36:6, 36:20, 37:10, 40:10, 47:3, 47:13, 47:23, 48:9, 48:17, 48:19, 48:20, 48:25, 49:6, 49:12, 49:14, 50:2, 51:15, 55:9, 70:24, 73:18, 75:6, 75:16, 77:12, 78:12

**attribute** [1] - 29:22

**attributed** [1] - 6:16

**AUGUST** [1] - 80:18

**authors** [1] - 33:2

**available** [3] - 29:4, 33:18, 34:23

**avoid** [7] - 9:15, 17:19, 17:22, 19:6, 46:16, 61:1, 61:5

**award** [5] - 25:21, 25:25, 32:25, 33:12, 33:13

**awarded** [1] - 52:3

**aware** [1] - 4:14

## B

**background** [1] - 16:17

**backup** [2] - 16:4, 16:10

**balance** [1] - 58:1

**balancing** [1] - 51:23

**ball** [1] - 39:7

**bar** [1] - 39:25

**based** [16] - 11:12, 14:17, 15:19, 18:23, 21:21, 44:14, 46:12, 51:3, 53:24, 54:14, 55:1, 55:20, 56:17, 58:3, 74:12, 75:3

**basis** [2] - 9:13, 56:20

**beat** [6] - 24:2, 73:2, 73:8, 73:9, 73:10,

76:25

**become** [1] - 23:6

**becomes** [2] - 27:13, 72:6

**beginning** [1] - 14:20

**behalf** [1] - 21:9

**BEHALF** [3] - 2:3, 2:13, 2:20

**below** [1] - 57:21

**benefit** [1] - 51:25

**best** [2] - 12:3, 20:15

**bet** [1] - 44:16

**better** [2] - 40:22, 64:17

**between** [1] - 52:25

**beyond** [2] - 13:1, 16:11

**big** [3] - 19:17, 23:20, 74:14

**biggest** [1] - 23:17

**bind** [2] - 14:18, 14:19

**bit** [1] - 27:18

**blanket** [1] - 17:5

**blow** [4] - 19:17, 20:3, 54:7, 54:20

**blowing** [1] - 54:3

**Blurred** [1] - 67:25

**books** [1] - 11:25

**bottom** [2] - 29:9, 57:11

**BOULEVARD** [2] - 2:7, 2:18

**bracket** [3] - 61:25

**bracketed** [1] - 63:20

**break** [3] - 17:17, 29:8, 31:22

**Brewing** [1] - 51:18

**brief** [1] - 21:3

**briefly** [1] - 68:14

**bring** [3] - 24:4, 30:18, 43:21

**broad** [1] - 41:19

**brought** [1] - 11:18

**burden** [18] - 12:10, 12:12, 16:10, 21:25, 22:2, 22:17, 23:21, 43:6, 43:20, 44:2, 47:8, 47:22, 47:25, 48:1, 48:8, 48:19, 50:1

**bury** [1] - 74:10

**business** [3] - 36:13, 37:2, 37:17

**buy** [2] - 29:24, 31:1

**buying** [1] - 31:16

**buys** [1] - 30:1

**BY** [7] - 2:5, 2:10, 2:15, 2:22, 3:5, 3:6, 80:13

## C

**CA** [2] - 2:19, 2:24

**calculate** [3] - 26:17, 26:22, 74:2

**calculated** [15] - 10:12, 35:4, 35:7, 36:8, 36:11, 36:14, 36:22, 36:25, 37:3, 37:12, 37:15, 37:18, 55:17, 57:5, 68:6

**calculation** [2] - 55:11, 68:8

**calculations** [4] - 54:25, 55:5, 55:6, 55:7

**Calendar** [1] - 4:3

**CALIFORNIA** [6] - 1:2, 1:16, 1:23, 4:1, 80:6, 80:9

**camouflage** [2] - 74:10, 75:11

**cannot** [7] - 14:17, 26:13, 32:25, 33:1, 33:3, 52:2, 56:5

**CAPES** [1] - 2:5

**Capital** [3] - 43:8, 55:13, 57:9

**capital** [1] - 19:14

**Capitol** [27] - 7:18, 7:19, 8:6, 19:8, 19:19, 20:3, 20:22, 22:9, 22:22, 22:23, 23:7, 27:20, 28:2, 28:21, 29:2, 29:5, 29:12, 33:5, 33:8, 33:18, 38:6, 54:19, 57:3, 57:18, 58:22, 68:21, 69:6

**capitol** [1] - 23:2

**Capitol's** [1] - 57:25

**car** [2] - 28:14, 28:15

**care** [3] - 15:24, 45:5, 45:12

**carefully** [1] - 6:11

**carry** [1] - 75:14

**case** [27] - 11:21, 12:18, 13:2, 17:10, 21:12, 21:16, 25:3, 25:5, 25:10, 31:8, 38:15, 38:16, 43:6, 44:15, 44:16, 45:7, 46:22, 48:13, 51:5, 61:19, 67:25, 71:19, 71:25, 72:19, 74:8, 74:17, 77:16

**CASE** [1] - 1:8

**Case** [1] - 4:4

**cases** [5] - 41:4, 41:6, 41:9, 41:24, 42:5

**catches** [1] - 31:13

**categories** [6] - 6:3, 8:1, 42:16, 42:23, 69:11

**categorized** [1] - 74:14

**causal** [3] - 39:21, 39:22, 52:25

**causation** [3] - 9:5, 9:25

**celebrity** [1] - 30:18

**CENTRAL** [2] - 1:2, 80:9

**CENTURY** [1] - 2:23

**certain** [17] - 20:19, 42:9, 42:19, 42:23, 43:18, 44:8, 44:21, 53:11, 65:9, 65:19, 66:7, 66:16, 67:2, 67:9, 67:15, 69:4, 69:11

**certainly** [12] - 12:22, 13:3, 14:16, 18:20, 20:4, 28:3, 45:1, 51:7, 54:6, 57:24, 72:10, 75:24

**certainty** [2] - 51:15, 51:21

**CERTIFICATE** [1] - 80:2

**CERTIFY** [2] - 80:10, 80:14

**cetera** [2] - 41:20

**challenge** [11] - 5:11, 5:24, 6:2, 7:25, 9:9, 9:14, 10:10, 10:13, 13:21, 14:3, 42:15

**challenging** [1] - 19:10

**chance** [1] - 17:8

**change** [8] - 60:16, 62:4, 66:21, 71:23, 75:3, 75:4, 78:8, 78:18

**changed** [2] - 40:2, 59:21

**changes** [1] - 66:21

**changing** [1] - 67:6

**characterization** [4] - 60:18, 70:23, 71:1, 78:15

**chart** [2] - 58:21, 58:22

**Chieffo** [4] - 10:25, 12:3, 14:8, 15:22

**CHIEFFO** [7] - 2:22, 11:3, 15:12, 66:3, 66:9, 75:13, 76:1

**Chieffo's** [1] - 13:3

**choice** [1] - 43:21

chose [1] - 56:9
CHRISTINA [1] - 1:4
CHRISTINE [1] - 2:15
Circuit [9] - 45:8, 46:7, 47:8, 49:17, 49:18, 49:22, 50:25, 52:24, 63:7
circumstance [2] - 47:3, 62:14
Cirkut [1] - 36:2
cited [2] - 42:5, 45:7
CJ [1] - 76:20
claim [1] - 22:13
claimed [2] - 33:6, 33:13
clarify [2] - 53:20, 58:7
clarity [1] - 76:11
CLAYTON [1] - 2:11
clean [1] - 5:2
Clear [1] - 41:5
clear [20] - 10:6, 16:23, 26:7, 40:7, 40:22, 41:6, 41:11, 41:16, 42:2, 44:12, 47:1, 47:2, 48:21, 51:18, 56:25, 61:9, 63:25, 68:15, 69:16, 72:24
clearly [3] - 47:4, 72:8, 74:7
CLERK [5] - 4:3, 20:10, 53:19, 59:7, 79:6
client [1] - 11:8
clients [1] - 9:11
close [2] - 11:2, 19:23
closing [15] - 15:18, 16:19, 16:20, 16:22, 17:16, 17:18, 17:24, 18:1, 18:18, 53:24, 54:4, 54:5, 54:14, 55:19, 56:7
closings [1] - 16:24, 17:1, 17:20
clothes [1] - 28:16
COHEN [65] - 2:6, 17:3, 18:16, 18:22, 19:13, 20:6, 20:8, 38:22, 39:18, 40:18, 41:15, 42:22, 43:13, 43:16, 43:25, 44:11, 45:23, 46:9, 47:16, 51:22, 52:19, 53:14, 53:20, 54:11, 54:24, 55:10, 57:2, 58:6, 58:11, 59:1, 59:4, 60:14, 60:16, 62:12, 63:3, 63:19, 64:19, 64:22, 65:4, 65:11, 65:16, 65:21, 65:23,

66:8, 66:11, 67:10, 67:19, 67:21, 68:13, 69:2, 69:8, 69:22, 70:7, 70:18, 71:7, 72:9, 72:14, 72:25, 74:1, 75:2, 75:20, 78:5, 78:14, 78:20, 79:5
Cohen [6] - 18:13, 40:17, 41:14, 45:6, 57:1, 73:15
colleague [1] - 43:24
coming [3] - 19:7, 30:21, 56:20
comment [4] - 39:24, 51:24, 59:14, 66:9
comments [2] - 42:5, 59:13
commission [12] - 10:10, 10:12, 35:4, 35:8, 36:8, 36:11, 36:14, 36:25, 37:3, 37:12, 37:15, 37:19
commissions [3] - 8:11, 35:3, 37:11
common [1] - 47:2
companies [1] - 68:21
company [1] - 29:2
Company [1] - 51:18
comparative [1] - 76:17
comparison [1] - 32:19
compelling [2] - 74:19, 74:20
compensate [2] - 25:21, 25:25
compensation [6] - 21:17, 21:19, 21:21, 21:24, 24:22, 25:8
completed [1] - 64:25
completely [4] - 6:25, 15:16, 39:15, 68:23
components [1] - 32:20
composition [21] - 25:15, 25:16, 25:17, 26:11, 26:20, 31:20, 31:21, 32:10, 32:15, 34:13, 34:20, 35:11, 35:20, 36:3, 36:17, 37:7, 37:22, 37:25, 47:14, 53:2, 70:20
COMPUTER [1] - 80:13
COMPUTER-AIDED [1] - 80:13
concept [3] - 60:20, 71:13, 71:21
concern [1] - 61:15

concerns [1] - 6:24
conclude [1] - 21:10
concluded [1] - 79:7
concludes [1] - 11:5
conclusion [1] - 72:4
conference [1] - 77:16
confused [1] - 59:25
confusing [5] - 60:9, 66:23, 74:2, 75:10, 78:2
consider [6] - 7:13, 27:12, 31:6, 32:24, 33:6, 71:9
consideration [1] - 25:11
considered [5] - 33:1, 33:3, 44:4, 71:14, 71:22
consistency [1] - 44:17
consistent [1] - 73:15
consisting [1] - 34:17
contain [1] - 19:14
contained [2] - 17:9, 63:14
containing [17] - 60:6, 62:1, 62:5, 62:18, 62:19, 62:24, 63:9, 63:22, 64:6, 64:10, 64:12, 64:15, 73:17, 73:21, 75:6, 77:11, 78:11
contains [2] - 46:14, 76:24
contend [1] - 22:19
content [2] - 17:7, 17:8, 46:24
contention [2] - 68:7, 77:3
contentions [1] - 76:23
contest [3] - 69:4, 69:10, 69:11
context [1] - 33:3
continuing [2] - 5:23, 70:9
contradict [1] - 14:15
contribute [1] - 71:4
contributed [2] - 19:5, 24:1
contributes [1] - 32:10
contributing [2] - 26:19, 32:21
contribution [1] - 72:7
contributions [1] - 33:2
conversation [1] - 42:12
convince [3] - 23:2,

24:7, 44:3
convoluted [1] - 75:9
cook [2] - 30:24, 30:25
copied [1] - 73:9
copy [1] - 52:19
copyright [9] - 5:25, 21:15, 44:22, 48:18, 49:13, 49:16, 59:22, 60:1, 62:3
copyrighted [29] - 47:23, 59:21, 60:6, 60:10, 60:12, 60:13, 60:23, 61:3, 61:9, 62:1, 62:6, 62:18, 62:19, 62:25, 63:4, 63:5, 63:9, 63:12, 63:22, 63:23, 64:7, 64:16, 73:18, 73:19, 75:7, 77:11, 77:13, 78:3, 78:11
Corp [1] - 37:24
corporate [1] - 28:1
CORRECT [1] - 80:14
correct [16] - 4:22, 13:6, 13:12, 14:14, 15:7, 16:6, 16:13, 17:14, 40:12, 42:22, 45:17, 49:19, 49:20, 54:5, 65:11, 65:21
cost [8] - 10:14, 14:3, 23:12, 28:25, 46:2, 46:11, 56:23, 56:24
costs [96] - 4:19, 5:7, 5:8, 5:12, 5:16, 5:19, 6:3, 6:6, 6:19, 7:7, 7:13, 7:16, 7:17, 8:1, 8:3, 8:12, 8:13, 9:12, 9:17, 9:21, 10:1, 10:9, 11:20, 11:25, 12:1, 12:11, 12:20, 13:4, 13:23, 14:24, 16:10, 22:13, 22:19, 23:3, 23:8, 23:10, 28:6, 28:7, 28:11, 29:8, 29:10, 29:19, 33:23, 34:15, 35:1, 35:13, 35:22, 36:5, 36:19, 37:10, 41:2, 41:3, 41:8, 41:12, 41:13, 42:10, 42:16, 42:20, 43:20, 43:22, 44:18, 44:19, 44:21, 45:21, 45:22, 46:2, 46:4, 46:5, 46:6, 56:13, 56:14, 56:17, 57:10, 65:6, 65:7, 65:10, 65:20, 65:24, 66:1, 66:7, 66:10, 66:17, 66:18, 66:19, 67:1, 67:8, 67:15,

68:6, 69:10, 70:11
COUNSEL [1] - 2:2
counsel [5] - 4:6, 15:13, 15:18, 25:4, 25:23
count [1] - 32:2
counter [1] - 13:17
COUNTY [1] - 80:4
couple [1] - 64:22
course [3] - 17:7, 46:19, 71:17
Court [12] - 4:14, 6:12, 10:6, 10:14, 10:19, 12:9, 50:25, 52:5, 68:3, 68:15, 74:13
court [2] - 43:21, 79:6
COURT [169] - 1:1, 1:22, 4:8, 4:12, 4:16, 4:22, 5:3, 5:20, 6:22, 7:1, 7:9, 7:21, 8:19, 10:22, 11:15, 12:7, 12:14, 12:16, 13:1, 13:10, 13:19, 14:10, 14:16, 14:25, 15:4, 15:10, 15:24, 16:14, 17:2, 17:25, 18:13, 18:20, 19:2, 19:18, 20:7, 20:12, 20:14, 20:17, 21:4, 24:25, 33:16, 33:20, 34:1, 34:6, 34:24, 38:5, 38:8, 38:19, 38:25, 39:3, 39:11, 39:13, 39:17, 39:19, 39:23, 40:4, 40:12, 40:16, 40:21, 40:25, 41:14, 42:17, 43:1, 43:10, 43:15, 43:23, 44:1, 44:15, 45:13, 45:16, 45:20, 46:3, 46:12, 46:19, 47:7, 47:18, 48:2, 48:5, 48:10, 49:1, 49:8, 49:15, 49:21, 50:6, 50:9, 50:13, 51:6, 51:10, 52:9, 52:14, 52:20, 53:6, 53:17, 54:1, 54:17, 54:23, 55:5, 55:22, 56:3, 56:10, 57:8, 58:9, 58:16, 58:20, 59:3, 59:6, 59:9, 59:11, 59:16, 59:18, 60:2, 60:8, 60:15, 60:25, 61:11, 61:21, 62:4, 62:8, 62:11, 62:16, 62:22, 63:7, 64:2, 64:6, 64:14, 64:21, 64:24, 65:2, 65:9, 65:12, 65:15, 65:18, 65:25,

66:5, 66:12, 66:15, 66:20, 67:3, 67:13, 67:17, 67:20, 68:10, 68:25, 69:5, 69:14, 69:17, 69:23, 70:8, 70:13, 70:17, 71:15, 71:24, 72:12, 72:16, 73:6, 74:20, 74:25, 75:25, 76:3, 76:19, 77:5, 77:8, 78:3, 78:7, 78:16, 78:21, 78:24, 80:9, 80:22
**court's** [1] - 59:7
**Court's** [2] - 39:6, 75:14
**create** [1] - 56:6
**creation** [1] - 21:13
**critical** [2] - 72:20, 72:23
**criticizing** [1] - 49:18
**cross** [6] - 7:15, 11:22, 44:6, 49:15, 57:11, 57:23
**cross-examination** - 44:6
**cross-examine** [3] - 7:15, 11:22, 57:11
**cross-purposes** [1] - 49:15
**CSR** [2] - 1:22, 80:21
**cumbersome** [1] - 70:8
**CV** [2] - 1:8, 4:4

## D

**damages** [8] - 4:15, 9:12, 9:16, 25:20, 32:25, 33:12, 51:4, 56:1
**Dark** [77] - 4:19, 4:21, 5:7, 5:17, 9:2, 9:17, 9:25, 13:16, 14:6, 14:23, 14:24, 19:5, 21:22, 22:4, 23:13, 23:15, 23:16, 24:7, 25:12, 25:16, 26:11, 26:14, 27:14, 27:15, 28:9, 28:23, 29:3, 29:23, 29:24, 29:25, 30:6, 31:9, 31:25, 32:4, 32:6, 32:15, 32:16, 32:17, 32:21, 33:2, 33:9, 34:14, 34:16, 34:20, 35:2, 35:5, 35:8, 35:12, 35:14, 35:21, 35:23, 36:4, 36:6, 36:9, 36:12, 36:15, 36:18, 37:1, 37:4, 37:7,

37:10, 37:19, 37:22, 38:1, 47:14, 50:17, 70:12, 70:20, 71:25, 73:10, 75:5, 75:18, 77:18, 77:20, 78:1, 78:4, 78:13
**data** [1] - 16:4
**DATE** [1] - 80:18
**deal** [2] - 57:17, 69:6
**decide** [5] - 6:7, 6:13, 10:19, 26:18, 30:11
**decided** [5] - 12:19, 17:10, 17:12, 25:16, 75:22
**decision** [2] - 25:18, 56:4
**Decker** [2] - 24:13, 47:1
**decrease** [1] - 6:14
**deduct** [3] - 12:20, 28:11, 29:18
**deducted** [12] - 6:19, 7:8, 8:15, 10:2, 10:15, 10:18, 12:11, 12:13, 13:5, 22:19, 55:6, 68:6
**deductibility** [6] - 5:11, 6:2, 7:25, 42:15, 69:4, 69:12
**deductible** [29] - 6:18, 8:11, 11:8, 13:8, 13:15, 14:4, 14:5, 14:12, 15:1, 23:12, 41:10, 41:17, 41:18, 41:25, 42:3, 42:24, 43:4, 43:18, 43:20, 43:22, 44:3, 44:9, 44:13, 45:11, 46:1, 46:15, 46:16, 57:13, 69:11
**deduction** [2] - 41:21, 42:11
**deductions** [1] - 41:7
**deemed** [1] - 14:22
**DEFENDANT** [1] - 1:10
**defendant** [11] - 6:3, 11:10, 26:17, 27:20, 28:20, 28:23, 30:9, 40:10, 50:2, 55:13, 70:6
**defendant's** [15] - 6:23, 26:9, 46:7, 47:11, 52:7, 55:10, 60:4, 60:5, 61:24, 65:7, 71:18, 76:24, 77:9, 78:9
**DEFENDANTS** [2] - 2:13, 2:20
**defendants** [59] -

4:18, 5:6, 5:14, 5:22, 6:14, 7:3, 8:1, 8:5, 8:6, 8:8, 8:17, 9:17, 9:20, 9:21, 16:5, 16:9, 16:18, 16:21, 17:5, 21:22, 22:3, 22:7, 22:11, 22:12, 22:13, 22:18, 23:21, 24:11, 24:23, 25:24, 27:25, 28:1, 33:23, 39:8, 42:16, 43:7, 43:19, 43:21, 44:2, 50:16, 50:21, 51:14, 51:20, 52:3, 52:22, 52:23, 55:17, 56:16, 59:13, 65:1, 65:10, 66:14, 67:2, 67:9, 67:16, 69:12, 71:8, 75:5
**defendants'** [7] - 42:9, 42:19, 53:1, 55:9, 65:19, 66:7, 66:16
**defense** [2] - 11:19, 20:23
**definitively** [1] - 5:5
**degree** [1] - 19:6
**deleted** [1] - 40:1
**deliberations** [2] - 20:24, 32:24
**demonstrate** [1] - 22:23
**demonstrating** [1] - 47:22
**demonstrative** [9] - 17:4, 17:9, 18:2, 54:6, 54:8, 54:25, 55:19, 58:7, 58:9
**demonstratives** [24] - 16:19, 16:20, 16:24, 17:6, 17:13, 17:16, 17:20, 17:24, 18:8, 18:10, 18:12, 18:14, 18:17, 18:18, 18:23, 19:11, 19:13, 19:25, 20:1, 53:21, 53:23, 54:3, 54:4, 54:13
**dense** [1] - 18:25
**deposition** [2] - 15:23, 20:19
**depth** [1] - 27:18
**designation** [1] - 15:16
**designations** [1] - 15:14
**determination** [1] - 25:19
**determine** [9] - 40:9, 46:10, 47:12, 48:16, 63:1, 68:9, 72:21, 77:10, 78:10

**determined** [3] - 8:4, 9:5, 72:6
**determining** [5] - 44:13, 47:11, 73:4, 77:9, 78:9
**devouring** [1] - 44:25
**different** [12] - 9:12, 15:13, 22:25, 27:23, 27:25, 28:1, 28:2, 28:13, 40:16, 44:16, 59:22, 59:25
**differentiated** [1] - 72:20
**differently** [1] - 26:22
**difficulty** [1] - 12:2
**diligence** [1] - 21:10
**direct** [1] - 70:11
**directly** [2] - 18:24, 45:8
**disagree** [1] - 60:18
**disagrees** [1] - 61:10
**disappointed** [1] - 25:18
**discovery** [2] - 16:4, 16:11
**discuss** [4] - 26:24, 38:20, 39:10, 76:16
**discussed** [1] - 71:21
**discussing** [5] - 7:4, 17:11, 50:12, 70:22, 76:1
**DISCUSSION** [1] - 3:11
**dismissed** [1] - 7:5
**dispute** [4] - 7:11, 8:6, 42:22, 42:23
**disputed** [1] - 38:20
**disputing** [1] - 48:11
**distance** [1] - 66:13
**distribute** [1] - 29:14
**distribution** [3] - 41:25, 42:4, 45:9
**DISTRICT** [5] - 1:1, 1:2, 1:4, 80:9
**divided** [1] - 30:8
**division** [1] - 51:16
**DIVISION** [1] - 1:2
**DO** [2] - 80:10, 80:13
**document** [2] - 55:12, 55:15
**documentation** [2] - 13:25, 16:11
**documents** [6] - 18:19, 18:20, 19:15, 55:24, 58:15
**dollars** [1] - 23:19
**done** [4] - 29:25, 30:7, 32:14, 64:24
**door** [3] - 27:21, 27:25, 28:12

**doubt** [1] - 51:25
**down** [4] - 23:22, 31:22, 48:22, 49:3
**Dr** [9] - 18:9, 24:5, 30:13, 30:16, 30:24, 31:19, 47:1, 56:8
**drafted** [2] - 48:12, 68:24
**drawing** [2] - 50:15, 50:21
**drawn** [1] - 18:24
**Drellishak** [5] - 28:7, 29:5, 30:4, 43:8, 68:18
**driven** [1] - 44:10
**drives** [1] - 31:1
**drums** [1] - 47:5
**due** [1] - 76:9
**during** [4] - 17:18, 18:19, 31:23, 53:23

## E

**ear** [1] - 31:14
**earned** [8] - 21:22, 22:23, 25:24, 26:17, 27:20, 28:22, 70:5, 75:5
**ears** [1] - 24:16
**EAST** [1] - 2:23
**easy** [1] - 28:21
**efforts** [1] - 33:9
**eight** [1] - 76:24
**Einhorn** [1] - 56:8
**Einhorn's** [1] - 56:12
**either** [7] - 14:8, 16:18, 17:21, 63:21, 63:22, 70:23, 74:10
**element** [1] - 31:13
**elements** [5] - 31:21, 32:19, 50:17, 52:2, 73:3
**ELIAS** [4] - 1:22, 80:8, 80:20, 80:21
**Elizabeth** [2] - 37:5, 37:9
**emphasize** [1] - 21:18
**end** [8] - 8:15, 10:4, 10:20, 24:17, 40:14, 42:8, 51:12, 78:1
**English** [2] - 69:24, 69:25
**enormous** [1] - 33:3
**entered** [2] - 42:14
**entire** [1] - 73:8
**entirely** [2] - 46:25
**entirety** [9] - 28:10, 46:23, 61:4, 61:13, 63:15, 67:23, 77:19, 77:21

entitled [4] - 26:7, 26:8, 49:7, 49:13
equation [1] - 31:11
equitable [1] - 12:19
equitably [1] - 30:7
equivalent [1] - 57:20
equivocated [1] - 58:17
ERIC [1] - 2:10
especially [1] - 31:12
ESQ [9] - 2:5, 2:6, 2:10, 2:15, 2:16, 2:16, 2:17, 2:17, 2:22
essentially [6] - 4:10, 5:4, 5:5, 25:24, 48:22, 56:6
establish [2] - 43:20, 43:22
established [7] - 9:25, 10:1, 21:14, 50:22, 51:2, 61:18, 61:20
ET [2] - 1:6, 1:9
et [3] - 4:5, 41:20
evaluate [2] - 17:8, 24:15
event [1] - 52:6
events [1] - 60:1
everywhere [1] - 60:11
evidence [65] - 6:4, 11:6, 11:7, 11:11, 11:13, 12:3, 12:4, 12:16, 13:4, 14:8, 14:13, 14:15, 14:19, 14:20, 15:5, 15:6, 17:11, 18:3, 18:4, 18:5, 18:7, 18:9, 18:11, 18:12, 18:23, 18:24, 19:12, 19:18, 20:2, 20:4, 22:5, 23:18, 24:13, 26:2, 28:6, 33:12, 33:25, 39:22, 39:25, 42:24, 43:3, 43:11, 43:18, 43:19, 44:4, 44:7, 45:2, 53:12, 53:24, 54:6, 54:14, 54:17, 54:21, 55:2, 55:20, 55:25, 56:19, 56:22, 57:24, 58:4, 58:10, 58:14, 58:15, 77:3
evidentiary [2] - 14:22, 68:23
exactly [1] - 52:21
examination [3] - 18:19, 44:6, 56:15
examine [2] - 7:15, 11:22, 18:21, 33:17, 57:11

example [8] - 6:5, 10:10, 27:22, 30:20, 44:17, 46:2, 54:18, 54:19
except [2] - 52:23, 78:1
exchanged [1] - 17:4
exclude [1] - 70:23
exclusion [1] - 65:16
exclusive [1] - 41:12
exercise [1] - 40:22
exhaustive [1] - 41:9
Exhibit [4] - 33:24, 34:3, 34:9, 38:4
exhibit [2] - 22:15, 34:22
EXHIBITS [1] - 3:8
exhibits [4] - 18:2, 18:21, 53:12, 54:9
expand [2] - 51:4, 74:10
expanding [1] - 61:16
expect [2] - 24:4, 57:14
expenditures [1] - 33:4
expense [3] - 13:22, 41:18, 58:23
expenses [27] - 9:4, 11:9, 29:17, 35:15, 35:24, 41:1, 41:2, 41:10, 41:16, 41:21, 41:24, 42:2, 42:12, 43:6, 44:9, 44:13, 45:6, 45:8, 45:10, 45:19, 45:20, 46:1, 46:4, 55:6, 55:18, 57:22, 69:4
expert [11] - 7:11, 7:12, 7:13, 11:18, 11:19, 48:6, 56:1, 56:6, 57:6, 73:7, 74:12
experts [8] - 20:23, 24:5, 24:9, 27:9, 30:13, 47:21, 55:7, 77:24
explain [5] - 7:17, 22:1, 32:3, 32:14, 32:20
exploitation [34] - 4:19, 4:21, 5:17, 6:6, 7:7, 8:3, 9:2, 9:6, 9:9, 9:24, 13:16, 14:6, 21:22, 22:4, 22:24, 28:23, 29:1, 34:13, 34:16, 34:19, 35:2, 35:11, 35:14, 35:20, 35:23, 36:3, 36:6, 36:17, 36:20,

37:6, 37:10, 37:21, 37:25, 70:12
explore [1] - 23:6
expressed [2] - 32:18, 70:21
expression [3] - 71:4, 71:20, 71:23
expressly [3] - 14:4, 42:14, 69:3
extent [3] - 42:1, 61:10, 66:22
extrinsically [1] - 72:3
eyebrows [1] - 23:11

**F**

F2d [2] - 41:6, 51:18
facie [1] - 43:6
fact [20] - 11:20, 14:7, 18:1, 26:6, 26:15, 28:7, 29:20, 30:16, 30:20, 31:9, 31:15, 56:20, 61:2, 68:9, 68:16, 72:15, 74:10, 74:11, 76:22
factor [2] - 26:19, 27:14, 32:21, 49:11
factors [22] - 23:25, 26:3, 26:4, 27:12, 30:14, 31:11, 47:13, 48:9, 48:17, 50:14, 50:19, 50:23, 50:25, 51:15, 57:12, 72:21, 73:19, 75:16, 76:10, 76:11, 77:12, 78:12
facts [11] - 4:15, 9:25, 11:14, 14:22, 34:10, 38:2, 39:9, 53:11, 53:12, 57:16, 70:2
factual [8] - 8:3, 9:3, 9:13, 13:18, 15:3, 15:5, 26:2, 68:20
factually [1] - 44:9
failed [1] - 16:9
failure [1] - 51:21
fair [17] - 12:19, 17:7, 21:17, 21:18, 21:19, 21:20, 21:24, 24:22, 25:7, 25:10, 25:11, 29:22, 32:25, 62:4, 73:16
fairly [4] - 25:21, 25:25, 30:7, 32:25
far [7] - 11:10, 11:11, 11:18, 20:20, 23:17, 44:10, 73:12
FEDERAL [2] - 1:22, 80:22
fee [1] - 56:23
fees [17] - 6:19, 12:20,

34:17, 35:6, 35:9, 35:17, 36:1, 36:7, 36:10, 36:13, 36:21, 36:24, 37:1, 37:2, 37:14, 37:17, 45:10
Ferrara [4] - 18:9, 24:5, 30:14, 31:19
few [1] - 39:8
field [1] - 27:10
fifth [2] - 46:20, 78:8
fight [6] - 5:8, 5:14, 8:17, 8:19, 8:20, 9:1
figure [1] - 77:6
figured [1] - 16:14
filed [2] - 6:11, 24:20
final [5] - 13:11, 15:25, 21:16, 51:11, 59:14
finally [2] - 16:15, 51:1
financial [4] - 16:4, 18:25, 19:2, 57:4
fine [16] - 12:14, 18:5, 38:5, 39:15, 53:18, 58:4, 64:17, 66:11, 66:12, 67:10, 67:11, 67:17, 69:20, 70:7, 77:25, 78:20
first [18] - 4:13, 8:25, 10:3, 11:18, 16:1, 18:15, 26:16, 27:18, 31:23, 33:24, 39:20, 40:15, 46:3, 46:21, 49:24, 54:2, 59:24, 60:3
FIRST [1] - 1:23
five [8] - 22:14, 24:20, 36:11, 36:14, 36:25, 37:3, 37:15, 37:18
flips [3] - 48:21, 49:10, 49:18
FLOOR [1] - 2:7
fly [1] - 20:22
focus [3] - 32:12, 33:7, 71:11
folks [2] - 11:16, 56:10
follow [3] - 29:7, 34:9, 38:16
following [12] - 7:23, 34:10, 35:1, 35:13, 35:22, 36:5, 36:19, 37:10, 47:11, 63:11, 70:1, 76:23
FOR [2] - 80:8, 80:9
FOREGOING [1] - 80:11
forge [3] - 38:21, 38:22, 38:24
FORM [1] - 80:13
form [16] - 40:2, 40:20, 52:16, 56:20, 59:13, 64:23, 67:21, 67:24,

68:9, 70:17, 72:11, 75:24, 76:19, 77:17, 78:17
format [1] - 52:22
forms [1] - 38:11
FORSYTH [1] - 2:7
forth [7] - 12:23, 14:18, 38:3, 44:23, 57:22, 58:24, 63:17
FORTH [1] - 80:12
forward [1] - 39:7
four [1] - 59:20
fourth [1] - 40:24
Frank [4] - 40:1, 40:3, 41:5, 50:22
frankly [2] - 57:5, 66:25
free [1] - 15:18
front [1] - 58:14
FURTHER [1] - 80:14

**G**

GABRIELLA [1] - 2:17
gas [1] - 28:15
gate [1] - 49:3
gather [1] - 4:8
general [2] - 41:19, 42:2
generate [2] - 29:11, 49:12
generated [3] - 26:13, 26:19, 44:19
generation [1] - 26:21
gentlemen [2] - 20:17, 25:1
given [3] - 40:19, 51:25, 72:5
Goldwyn [2] - 41:4, 41:6
gonna [74] - 10:13, 12:2, 13:2, 13:20, 14:10, 19:11, 19:24, 22:5, 23:2, 23:10, 25:5, 25:18, 25:19, 26:2, 26:16, 26:18, 26:23, 27:7, 27:9, 28:10, 28:21, 29:6, 29:7, 29:10, 29:11, 29:12, 29:13, 29:15, 29:17, 29:21, 30:6, 30:10, 30:11, 30:13, 30:14, 30:16, 30:19, 30:24, 31:5, 31:12, 31:15, 31:17, 31:19, 31:20, 31:21, 31:22, 32:1, 32:2, 32:3, 32:7, 32:20, 33:12, 38:10, 43:11, 44:3, 44:6, 44:7, 44:18,

44:20, 45:2, 47:9,
47:20, 53:5, 57:17,
64:14, 68:18, 69:6,
69:7, 74:13, 76:21,
77:15
**Gottwald** [2] - 35:10,
35:13
**grammar** [1] - 67:6
**GRAY** [1] - 1:6
**Gray** [1] - 4:5
**greater** [2] - 8:16, 24:1
**greatly** [2] - 39:5, 39:7
**GREENBERG** [1] -
2:21
**gross** [44] - 4:18, 5:7,
6:5, 10:12, 11:24,
12:12, 13:25, 14:23,
22:19, 27:22, 28:22,
34:12, 34:18, 35:5,
35:8, 35:10, 35:19,
36:8, 36:11, 36:15,
36:16, 36:25, 37:4,
37:5, 37:12, 37:15,
37:19, 42:9, 42:20,
46:7, 53:1, 60:5,
61:24, 65:7, 65:10,
65:19, 66:7, 66:10,
66:16, 66:18, 67:1,
67:7, 67:8, 67:15
**grounded** [1] - 39:9
**guarantee** [1] - 23:11
**guess** [6] - 7:9, 7:23,
38:19, 43:10, 46:9,
54:1
**guy** [1] - 57:18

**H**

**half** [2] - 24:3, 46:3
**HANLEY** [1] - 2:11
**hard** [3] - 19:9, 19:16,
21:9
**head** [2] - 49:18, 66:24
**hear** [11] - 5:20, 10:25,
22:5, 23:11, 27:9,
28:24, 29:5, 30:3,
30:13, 31:19, 50:9
**heard** [6] - 15:21,
21:5, 25:3, 25:6,
31:8, 54:2
**heels** [1] - 30:21
**help** [1] - 38:19
**helpful** [3] - 10:23,
17:10, 17:25
**hence** [1] - 10:1
**Henry** [1] - 36:2
**HEREBY** [1] - 80:10
**HEREINBEFORE** [1] -
80:11
**heretofore** [1] - 4:7

**high** [2] - 24:5, 44:8
**high-priced** [1] - 24:5
**hit** [3] - 23:20, 29:11,
30:22
**hits** [1] - 23:17
**hominem** [1] - 16:16
**Honor** [82] - 4:10,
4:13, 4:23, 5:2, 8:10,
10:3, 11:3, 11:4,
13:12, 14:21, 15:2,
15:7, 15:9, 15:12,
15:22, 15:25, 16:7,
16:15, 18:11, 18:16,
20:9, 20:13, 21:3,
33:17, 34:4, 34:22,
38:6, 39:5, 39:10,
39:18, 40:7, 40:18,
40:20, 40:23, 43:5,
45:3, 45:6, 45:15,
45:18, 45:25, 48:11,
50:11, 51:8, 51:11,
53:4, 53:15, 53:20,
54:12, 55:4, 55:21,
56:9, 58:12, 59:5,
59:10, 59:12, 60:3,
61:10, 62:21, 63:2,
63:18, 64:5, 64:18,
64:22, 65:14, 67:19,
68:24, 69:1, 69:16,
70:18, 72:9, 73:21,
74:7, 75:13, 75:21,
76:9, 76:22, 77:7,
78:1, 78:22, 78:23,
79:3, 79:4
**Honor's** [6] - 8:24,
39:12, 45:3, 45:11,
46:17, 75:4
**HONORABLE** [1] - 1:4
**hook** [1] - 31:13
**hope** [1] - 21:10
**hoped** [1] - 42:18
**hopefully** [2] - 20:24,
38:12
**Horse** [77] - 4:19,
4:21, 5:8, 5:17, 9:2,
9:18, 9:25, 13:17,
14:6, 14:23, 14:24,
19:5, 21:23, 22:4,
23:13, 23:15, 23:16,
24:8, 25:12, 25:16,
26:12, 26:14, 27:14,
27:15, 28:9, 28:23,
29:3, 29:23, 29:24,
29:25, 30:6, 31:9,
31:25, 32:4, 32:6,
32:15, 32:16, 32:17,
32:22, 33:2, 33:10,
34:14, 34:16, 34:20,
35:2, 35:5, 35:8,
35:12, 35:14, 35:21,

35:23, 36:4, 36:6,
36:9, 36:12, 36:15,
36:18, 37:1, 37:4,
37:7, 37:11, 37:19,
37:22, 38:1, 47:15,
50:17, 70:12, 70:20,
71:25, 73:10, 75:5,
75:18, 77:18, 77:20,
78:2, 78:4, 78:13
**host** [2] - 26:3, 26:4
**hour** [1] - 69:5
**Houston** [3] - 6:5,
34:12, 34:15
**Hudson** [4] - 36:16,
36:19, 37:5, 37:9
**Hudson's** [1] - 15:14
**hum** [1] - 31:14
**hundred** [1] - 55:8
**husband** [1] - 69:25

**I**

**identical** [1] - 5:1
**identify** [1] - 32:1
**ignore** [2] - 31:10,
33:1
**ignored** [1] - 5:21
**implies** [1] - 66:18
**importance** [4] -
23:15, 31:18, 32:15,
73:9
**important** [7] - 24:12,
24:14, 25:6, 25:20,
27:11, 27:12, 31:3
**improper** [1] - 73:4
**improperly** [3] - 55:17,
71:7, 71:10
**IN** [1] - 80:8
**inappropriate** [2] -
12:2, 75:23
**Inc** [3] - 35:19, 35:22,
37:20
**inclined** [2] - 52:6,
68:3
**include** [10] - 40:20,
41:2, 42:1, 50:15,
50:19, 50:20, 53:14,
56:13, 63:22, 68:8
**included** [5] - 23:1,
44:22, 52:7, 69:9,
75:23
**includes** [1] - 51:23
**including** [4] - 24:5,
41:20, 46:4, 47:19
**inclusion** [4] - 25:14,
42:7, 45:23, 68:5
**income** [27] - 4:18,
5:6, 5:25, 6:5, 10:12,
11:25, 34:12, 34:19,
35:5, 35:8, 35:10,

35:19, 36:9, 36:11,
36:15, 36:16, 36:25,
37:4, 37:6, 37:13,
37:15, 37:19, 37:21,
37:24, 54:19, 68:7,
69:10
**inconvenience** [1] -
38:12
**incorrect** [2] - 14:9,
71:12
**incurred** [16] - 6:3,
8:1, 8:13, 8:14,
11:25, 28:8, 33:23,
34:15, 34:25, 35:13,
35:22, 36:5, 36:19,
37:9, 42:16, 46:6
**INDEX** [1] - 3:1
**indicated** [1] - 20:21
**indisputable** [1] - 8:14
**individual** [7] - 4:18,
5:5, 5:13, 24:11,
27:25, 57:12, 70:5
**individuals** [3] - 7:4,
7:6, 68:19
**information** [4] -
18:25, 19:2, 55:16,
63:20
**informed** [4] - 16:17,
17:3, 17:5, 73:23
**informs** [1] - 73:8
**infringed** [3] - 46:24,
72:1, 77:19
**infringement** [40] -
21:15, 21:23, 23:25,
24:19, 25:22, 26:1,
30:12, 33:7, 33:13,
40:10, 48:25, 49:6,
49:14, 50:1, 50:3,
51:4, 61:17, 62:2,
62:7, 62:9, 62:11,
62:17, 62:20, 62:25,
63:5, 63:6, 63:13,
63:24, 64:3, 64:8,
64:10, 64:12, 64:13,
64:16, 70:24, 72:6,
73:11, 73:21, 73:24,
75:7
**infringes** [1] - 25:17
**infringing** [16] - 19:4,
24:7, 41:25, 42:4,
46:24, 46:25, 52:1,
60:19, 71:3, 71:19,
71:23, 73:23, 74:5,
77:20
**ingredients** [1] - 30:25
**injecting** [1] - 60:21
**inquiry** [2] - 30:10,
44:10
**insert** [1] - 75:17
**insofar** [3] - 42:11,

68:3, 72:9
**inspired** [2] - 73:2,
73:22
**instead** [5] - 7:14,
25:20, 60:12, 62:3,
64:7
**instruct** [3] - 20:24,
26:6, 41:17
**INSTRUCTION** [1] -
3:11
**instruction** [42] - 39:6,
41:16, 41:17, 44:12,
44:24, 46:8, 46:14,
47:8, 48:6, 49:9,
49:17, 49:22, 50:5,
50:10, 51:12, 51:22,
52:24, 53:8, 53:15,
59:20, 59:23, 60:12,
60:17, 60:22, 61:1,
61:12, 61:23, 63:4,
67:19, 69:9, 70:22,
72:10, 73:14, 74:22,
75:20, 75:23, 76:2,
76:4, 76:5, 76:7,
77:8, 78:8
**Instruction** [4] -
39:13, 40:15, 40:24,
75:14
**instructions** [8] -
15:9, 38:11, 38:17,
38:21, 53:9, 59:14,
64:25, 75:3
**instrumentals** [1] -
27:7
**intend** [5] - 5:11,
18:14, 18:17, 18:22,
24:9
**intended** [3] - 18:18,
42:18, 44:22
**intent** [1] - 24:17
**interpretation** [1] -
48:6
**interrogatories** [1] -
68:4
**interrupt** [1] - 16:21
**intrinsic** [1] - 77:24
**intrinsically** [1] - 72:2
**introduce** [1] - 22:15
**involve** [1] - 22:22
**IS** [1] - 80:14
**issue** [29] - 4:13, 6:12,
10:16, 13:14, 21:16,
23:6, 27:13, 32:5,
32:11, 41:15, 42:7,
45:5, 45:12, 45:25,
53:7, 53:13, 53:21,
56:15, 61:2, 61:8,
65:4, 71:2, 72:23,
73:20, 73:23, 75:12,
76:12, 77:5

issues [3] - 10:24, 19:3, 47:24
item [2] - 58:2
Item [1] - 4:3
items [1] - 55:24
itself [8] - 14:14, 26:25, 29:25, 30:8, 31:2, 32:16, 32:19

## J

JACOB [1] - 2:17
Jason [1] - 30:13
Jeang [1] - 7:22
JEFFREY [1] - 2:16
job [5] - 26:15, 26:16, 26:18, 28:14, 28:18
Joint [1] - 33:24, 34:9, 38:3
joint [2] - 4:14, 40:8
Jordan [1] - 34:12, 34:15
Joseph [1] - 51:18
Joyful [29] - 21:23, 25:14, 25:17, 26:11, 26:15, 26:20, 47:14, 53:1, 60:7, 60:10, 61:3, 62:8, 62:13, 63:4, 63:10, 63:12, 63:14, 63:15, 63:23, 70:19, 72:1, 73:18, 74:9, 75:15, 75:17, 77:12, 77:21, 78:11
JUDGE [1] - 1:4
Judge [16] - 12:6, 21:20, 21:25, 22:16, 25:4, 26:6, 38:22, 46:10, 47:16, 58:6, 59:4, 66:8, 72:9, 73:1, 75:2, 78:14
judge [6] - 12:9, 43:13, 51:22, 60:14, 62:12, 63:3
JULY [2] - 1:15, 4:1
jump [1] - 40:23
JURY [1] - 3:11
Jury [1] - 40:24
jury [55] - 4:24, 6:4, 6:7, 6:13, 6:18, 8:4, 11:6, 11:14, 12:17, 12:18, 14:18, 14:19, 15:20, 17:11, 19:22, 19:23, 20:10, 20:16, 25:2, 34:5, 34:23, 38:11, 38:18, 39:6, 40:7, 41:11, 41:18, 43:12, 44:3, 44:12, 44:24, 46:10, 46:14, 49:24, 58:14, 59:14, 59:24, 60:20, 64:24,

68:9, 71:3, 71:11, 71:14, 71:22, 72:3, 72:5, 73:14, 74:22, 75:22, 76:2, 76:4, 76:5, 76:7, 77:8, 79:2
jury's [5] - 60:18, 71:5, 71:8
justice [1] - 24:21
justify [1] - 9:22

## K

KAHN [23] - 2:5, 3:5, 5:21, 8:23, 10:3, 12:6, 12:9, 12:15, 12:25, 13:7, 15:8, 15:22, 16:13, 20:11, 20:13, 21:3, 21:7, 33:17, 33:21, 34:4, 34:7, 34:25, 38:6
Kahn [12] - 5:20, 11:2, 11:21, 14:2, 16:2, 16:5, 21:2, 25:6, 28:20, 29:20, 33:16, 70:3
Karl [2] - 34:18, 34:25
Kasz [2] - 35:19, 35:22
Katheryn [2] - 37:5, 37:9
Katy [10] - 4:5, 26:23, 26:25, 27:1, 30:17, 30:25, 31:3, 31:16, 31:17, 47:4
KATY [1] - 1:9
KAYIRA [2] - 2:9, 2:10
keep [9] - 25:9, 25:12, 27:5, 27:16, 27:24, 32:8, 33:11, 38:9, 56:20
key [2] - 8:20, 22:15
kind [5] - 48:13, 55:16, 56:8, 61:16
King [1] - 30:13
king's [2] - 30:16, 30:24
knows [1] - 12:10
KNUPP [1] - 2:15
Kobalt [1] - 37:20
Korean [1] - 51:17

## L

lack [1] - 11:13
ladies [2] - 20:17, 25:1
language [22] - 8:21, 14:5, 14:17, 40:2, 41:19, 42:2, 45:11, 45:13, 47:17, 52:7, 60:17, 60:22, 62:17,

63:3, 63:8, 64:20, 70:19, 72:10, 73:12, 73:14, 74:2, 75:20
largely [1] - 26:25
larger [2] - 33:14, 73:10
last [11] - 10:4, 10:20, 10:24, 15:8, 15:21, 17:3, 17:5, 51:12, 65:5, 65:17, 75:15
LAURA [4] - 1:22, 80:8, 80:20, 80:21
LAUREN [1] - 2:6
law [20] - 7:8, 8:2, 10:2, 18:8, 21:20, 26:1, 26:7, 39:10, 41:16, 41:22, 42:25, 43:3, 44:14, 44:15, 44:16, 47:22, 56:21, 71:19, 72:8, 76:22
LAW [1] - 2:9
Lawrence [1] - 30:13
lawsuit [1] - 24:20
lawyers [1] - 21:7
layers [1] - 31:9
leading [1] - 21:1
leaning [1] - 49:3
learn [1] - 5:10
leave [3] - 51:6, 53:17, 64:15
leaves [1] - 41:21
left [3] - 7:10, 8:17, 28:19
legal [20] - 6:19, 8:10, 11:5, 13:17, 14:7, 15:2, 15:3, 15:4, 34:17, 35:6, 36:10, 36:21, 36:24, 37:1, 37:14, 44:4, 44:21, 45:10, 56:23, 71:13
legally [2] - 5:18, 8:12
lengthy [2] - 9:15, 57:3
LEPERA [37] - 2:15, 13:11, 13:23, 14:14, 48:15, 49:2, 49:10, 49:20, 50:4, 50:8, 61:22, 62:7, 64:4, 64:9, 64:17, 65:22, 66:13, 66:19, 66:22, 67:6, 67:12, 67:15, 69:20, 70:9, 72:19, 74:7, 74:23, 75:9, 75:11, 75:19, 76:8, 76:21, 77:7, 77:25, 78:4, 78:22, 79:4
Lepera's [1] - 70:15
less [5] - 19:17, 37:1, 60:9, 61:4, 61:13
liability [9] - 16:19,

40:8, 51:2, 54:15, 61:8, 61:17, 61:19, 71:1, 76:14
lieu [1] - 14:20
limited [3] - 46:1, 46:5, 50:15
line [6] - 39:20, 55:24, 57:11, 57:21, 75:15
Lines [1] - 67:25
linked [1] - 13:16
lips [1] - 24:10
list [2] - 41:7, 41:9
listen [3] - 29:24, 30:19, 31:17
live [2] - 57:9, 65:12
living [1] - 21:8
LLC [1] - 2:9
look [15] - 7:9, 7:22, 11:16, 13:24, 17:18, 27:5, 27:6, 27:7, 44:15, 52:20, 53:2, 61:21, 73:10, 76:10
looked [5] - 40:5, 56:11, 72:2, 72:3, 77:17
looking [2] - 62:23, 76:10
LOS [6] - 1:16, 1:23, 2:19, 2:24, 4:1, 80:4
loss [2] - 13:3, 29:7
LOUIS [1] - 2:8
lower [1] - 39:25
Lukasz [2] - 35:10, 35:13
lumped [1] - 42:11
lyrics [10] - 27:8, 31:7, 31:15, 32:8, 32:11, 32:17, 32:18, 50:17, 51:1, 72:22

## M

magically [1] - 12:7
major [1] - 56:12
management [8] - 8:11, 10:10, 35:3, 36:7, 36:13, 37:2, 37:11, 37:17
manipulative [1] - 66:23
manufactures [1] - 29:12
Marcus [1] - 4:5
MARCUS [1] - 1:6
marked [1] - 33:23
market [1] - 29:13
marketing [5] - 27:3, 28:8, 31:1, 31:4, 31:18
Martin [2] - 34:18,

34:25
material [12] - 59:22, 60:1, 60:10, 60:13, 60:19, 60:24, 61:6, 61:9, 64:10, 64:13, 64:14, 76:14
materials [1] - 16:4
math [1] - 69:17
mathematical [2] - 51:14, 51:21
matter [11] - 7:8, 8:2, 11:21, 15:13, 18:1, 26:2, 42:24, 42:25, 43:2, 56:21, 57:6
matters [1] - 16:1
Mayer [2] - 41:5, 41:6
mean [13] - 19:9, 40:19, 42:20, 47:8, 53:22, 54:23, 57:8, 61:12, 63:8, 69:22, 72:9, 72:15, 73:1
MEANS [1] - 80:13
means [4] - 25:11, 26:9, 27:19, 54:10
measure [2] - 21:24, 37:21
meet [3] - 12:12, 16:10, 22:1
meets [1] - 67:17
melodies [2] - 31:7, 32:18
memo [1] - 76:22
mention [1] - 34:22
mentioned [2] - 10:5, 29:6
meritorious [1] - 5:18
met [1] - 24:6
method [1] - 30:5
methodology [1] - 56:12
Metro [2] - 41:4, 41:5
MICHAEL [1] - 2:5
might [3] - 40:21, 56:23, 56:24
MILLER [3] - 1:22, 80:20, 80:21
million [6] - 22:7, 22:24, 23:3, 23:4, 23:5, 23:19
mind [8] - 25:9, 25:12, 27:5, 32:8, 33:11, 38:9, 78:5, 78:7
minimization [1] - 73:5
minimize [1] - 23:15
minimizes [1] - 71:8
minimizing [1] - 73:6
minor [2] - 27:14, 32:21
minute [6] - 10:4,

10:24, 26:24, 28:24, 44:21, 74:8

**minutes** [4] - 10:21, 22:14, 39:1, 47:6

**mirrors** [1] - 74:21

**mischaracterize** [1] - 70:10

**misrepresents** [1] - 71:18

**missing** [1] - 62:2

**mistaken** [1] - 16:2

**MITCHELL** [1] - 2:15

**MO** [2] - 2:8, 2:11

**model** [6] - 46:21, 48:12, 60:17, 62:10, 62:14, 63:19

**modeled** [1] - 67:24

**modification** [1] - 66:5

**modifications** [2] - 39:9, 39:16

**modified** [1] - 45:4

**modifiers** [1] - 46:8

**modifies** [1] - 65:7

**modify** [2] - 65:7, 65:24

**moment** [1] - 65:14

**Money** [2] - 35:19, 35:22

**money** [9] - 22:4, 22:12, 27:20, 27:21, 28:3, 28:11, 28:13, 30:5

**month** [1] - 6:11

**moosh** [2] - 76:18

**moreover** [1] - 60:18

**morning** [10] - 5:10, 10:6, 10:17, 20:17, 21:6, 25:1, 43:2, 43:24, 54:4, 70:3

**most** [4] - 24:12, 24:14, 31:13, 43:7

**mostly** [1] - 8:6

**motion** [1] - 57:20

**move** [3] - 25:20, 33:24, 46:18

**moved** [1] - 39:7

**MOVIT** [87] - 2:16, 4:10, 4:13, 4:17, 4:23, 5:4, 6:23, 7:2, 7:18, 8:2, 8:24, 14:20, 15:2, 15:7, 15:25, 16:15, 17:14, 18:6, 20:9, 38:23, 39:5, 39:12, 39:15, 39:20, 40:3, 40:6, 40:14, 40:23, 41:1, 43:5, 45:3, 45:15, 45:18, 45:22, 45:25, 46:17, 46:20, 47:10, 47:24, 48:3, 48:8,

48:11, 50:11, 50:14, 51:8, 51:11, 52:12, 52:17, 53:4, 53:16, 54:22, 55:3, 55:21, 55:23, 56:4, 58:12, 58:18, 59:5, 59:10, 59:12, 59:17, 59:19, 60:3, 60:9, 60:23, 61:7, 61:15, 62:9, 62:14, 62:21, 63:2, 63:17, 65:1, 65:14, 68:14, 69:1, 69:15, 69:21, 70:15, 70:25, 71:12, 71:17, 73:20, 75:8, 75:10, 78:23, 79:3

**Movit** [5] - 5:21, 6:10, 6:22, 7:23, 10:5

**Movit's** [1] - 16:13

**MR** [117] - 3:5, 3:6, 4:10, 4:13, 4:17, 4:23, 5:4, 5:21, 6:23, 7:2, 7:18, 8:2, 8:23, 8:24, 10:3, 11:3, 12:6, 12:9, 12:15, 12:25, 13:7, 14:20, 15:2, 15:7, 15:8, 15:12, 15:22, 15:25, 16:13, 16:15, 17:14, 18:6, 20:9, 20:11, 20:13, 21:3, 21:7, 25:1, 33:17, 33:21, 34:2, 34:4, 34:7, 34:25, 38:6, 38:23, 39:5, 39:12, 39:15, 39:20, 40:3, 40:6, 40:14, 40:23, 41:1, 43:5, 45:3, 45:15, 45:18, 45:22, 45:25, 46:17, 46:20, 47:10, 47:24, 48:3, 48:8, 48:11, 50:11, 50:14, 51:8, 51:11, 52:12, 52:17, 53:4, 53:16, 54:22, 55:3, 55:21, 55:23, 56:4, 58:12, 58:18, 59:5, 59:10, 59:12, 59:17, 59:19, 60:3, 60:9, 60:23, 61:7, 61:15, 62:9, 62:14, 62:21, 63:2, 63:17, 65:1, 65:14, 66:3, 66:9, 68:14, 69:1, 69:15, 69:21, 70:15, 70:25, 71:12, 71:17, 73:20, 75:8, 75:10, 75:13, 76:1, 78:23, 79:3

**MS** [101] - 2:13, 13:11, 13:23, 14:14, 17:3, 18:16, 18:22, 19:13,

20:6, 20:8, 38:22, 39:18, 40:18, 41:15, 42:22, 43:13, 43:16, 43:25, 44:11, 45:23, 46:9, 47:16, 48:15, 49:2, 49:10, 49:20, 50:4, 50:8, 51:22, 52:19, 53:14, 53:20, 54:11, 54:24, 55:10, 57:2, 58:6, 58:11, 59:1, 59:4, 60:14, 60:16, 61:22, 62:7, 62:12, 63:3, 63:19, 64:4, 64:9, 64:17, 64:19, 64:22, 65:4, 65:11, 65:16, 65:21, 65:22, 65:23, 66:8, 66:11, 66:13, 66:19, 66:22, 67:6, 67:10, 67:12, 67:15, 67:19, 67:21, 68:13, 69:2, 69:8, 69:20, 69:22, 70:7, 70:9, 70:18, 71:7, 72:9, 72:14, 72:19, 72:25, 74:1, 74:7, 74:23, 75:2, 75:9, 75:11, 75:19, 75:20, 76:8, 76:21, 77:7, 77:25, 78:4, 78:5, 78:14, 78:20, 78:22, 79:4, 79:5

**multiply** [1] - 74:5

**music** [14] - 27:4, 27:6, 27:11, 31:3, 31:6, 31:8, 31:9, 31:18, 32:8, 33:10, 50:17, 51:1, 72:22

**Music** [5] - 37:20, 37:24, 40:1, 40:3, 41:5

**musical** [8] - 31:21, 31:24, 32:1, 32:3, 47:14, 50:16, 53:2, 70:20

**musicologist** [1] - 24:6

**musicologists** [1] - 55:7

**must** [13] - 7:8, 8:14, 10:1, 40:9, 47:12, 48:16, 50:20, 50:24, 51:25, 53:12, 71:14, 77:9, 78:9

**MY** [1] - 80:15

---

# N

**nature** [1] - 52:24

**nauseum** [1] - 69:3

**nearly** [2] - 46:23,

46:25

**necessarily** [2] - 46:1, 46:5

**necessary** [2] - 40:19, 67:23

**need** [18] - 7:9, 7:21, 15:20, 20:19, 22:18, 25:12, 25:20, 28:16, 30:24, 32:7, 32:10, 33:6, 38:22, 51:14, 51:16, 53:9, 56:13

**needs** [5] - 6:12, 10:19, 41:17, 42:2, 44:12

**negative** [2] - 48:16, 49:3

**net** [24] - 5:6, 5:13, 5:14, 5:15, 6:8, 6:15, 8:5, 8:8, 8:15, 8:22, 9:6, 10:8, 13:13, 13:14, 14:1, 26:17, 28:19, 37:21, 37:24, 68:11, 68:16, 69:18, 70:4, 75:5

**new** [4] - 54:8, 56:7, 58:19, 58:21

**news** [1] - 22:8

**next** [10] - 4:14, 19:6, 25:4, 30:10, 31:19, 40:6, 48:1, 48:3, 50:11, 74:3

**nexus** [1] - 39:21, 39:22, 52:25

**night** [2] - 17:4, 17:5

**NO** [1] - 1:8

**Noise** [29] - 21:23, 25:15, 25:17, 26:11, 26:15, 26:20, 47:14, 53:1, 60:7, 60:10, 61:3, 62:8, 62:13, 63:4, 63:10, 63:12, 63:14, 63:15, 63:24, 70:19, 72:1, 73:18, 74:9, 75:15, 75:17, 77:12, 77:21, 78:12

**nondeductible** [1] - 5:19

**none** [1] - 19:9

**noninfringing** [3] - 50:16, 52:2, 74:3

**note** [3] - 64:19, 76:21, 76:24

**noted** [9] - 4:7, 45:6, 50:6, 52:10, 56:9, 64:21, 65:3, 70:13, 78:20

**noteheads** [4] - 31:24, 32:1, 32:4, 32:6

**notes** [1] - 48:14

**NOTES** [1] - 80:15

**nothing** [8] - 47:4, 47:5, 49:11, 51:3, 65:1, 65:2, 68:22, 70:16

**NOURAFCHAN** [1] - 2:17

**number** [20] - 4:20, 5:13, 13:13, 13:14, 13:25, 14:8, 14:9, 14:12, 14:14, 14:15, 14:18, 19:20, 22:20, 23:23, 30:8, 32:6, 50:20

**numbered** [1] - 5:1

**numbers** [14] - 8:7, 11:24, 12:23, 12:24, 13:13, 14:23, 19:14, 19:25, 42:20, 55:20, 58:13, 58:15, 58:19, 68:22

---

# O

**obfuscate** [1] - 71:5

**object** [15] - 15:16, 16:18, 16:23, 16:24, 42:7, 47:16, 50:4, 55:4, 58:13, 60:16, 67:22, 68:4, 75:8, 78:14, 78:19

**objected** [6] - 16:21, 17:17, 17:20, 17:23, 75:2, 76:4

**objecting** [3] - 17:15, 17:24, 48:3

**objection** [21] - 16:22, 17:6, 18:6, 18:11, 34:1, 34:2, 51:9, 52:10, 53:16, 54:22, 55:23, 55:25, 58:15, 59:2, 61:10, 64:19, 69:21, 70:10, 70:15, 74:15, 78:20

**objections** [6] - 52:13, 64:23, 65:3, 67:18, 76:5, 79:1

**obstructive** [1] - 17:18

**obvious** [1] - 29:23

**obviously** [8] - 7:3, 7:15, 10:22, 25:17, 27:19, 41:9, 47:9, 71:22

**occurred** [1] - 21:15

**occurring** [1] - 17:19

**OF** [13] - 1:1, 1:2, 1:14, 2:2, 2:3, 2:13, 2:20, 80:2, 80:4, 80:6, 80:9, 80:13, 80:15

**OFFICIAL** [3] - 1:22,

80:8, 80:22
**old** [2] - 19:20, 28:2
**older** [1] - 45:7
**OLYMPIC** [1] - 2:18
**ON** [3] - 2:3, 2:13, 2:20
**once** [6] - 22:17, 24:4, 26:22, 28:18, 30:9, 31:3
**one** [23] - 6:18, 7:15, 11:8, 13:11, 14:10, 15:12, 21:25, 22:8, 23:16, 24:14, 35:7, 43:13, 47:24, 50:20, 51:11, 51:12, 59:14, 61:22, 64:4, 65:14, 66:5, 68:1, 71:16
**ones** [1] - 44:14
**online** [2] - 29:4, 29:25
**open** [2] - 38:9, 41:21
**opening** [4] - 16:19, 17:24, 21:3, 21:4
**OPENING** [1] - 3:4
**openings** [4] - 16:24, 16:25, 17:20, 18:17
**operating** [8] - 41:2, 41:3, 41:7, 41:12, 45:21, 45:22, 46:1, 46:5
**opinion** [1] - 10:22
**opinions** [1] - 7:11
**opposed** [3] - 15:3, 48:18, 49:5
**opposite** [2] - 43:17, 72:4
**order** [4] - 4:14, 25:21, 72:21, 77:16
**Ostinato** [27] - 25:15, 26:11, 26:20, 27:5, 27:13, 32:2, 32:4, 32:15, 32:17, 47:14, 50:18, 51:2, 51:3, 53:2, 70:20, 71:1, 71:20, 71:25, 73:2, 73:24, 74:8, 74:17, 75:17, 76:13, 77:13, 78:4, 78:13
**ostinato** [16] - 19:4, 24:2, 26:14, 26:15, 31:7, 47:3, 47:4, 47:6, 72:1, 72:7, 72:17, 74:9, 76:24, 77:1, 77:21, 77:22
**OTHER** [1] - 2:13
**otherwise** [2] - 9:3, 9:12
**ought** [1] - 50:10
**outset** [1] - 21:12
**outside** [3] - 18:7, 18:10, 27:11

**overhead** [6] - 28:17, 29:17, 41:8, 41:12, 46:2, 46:6
**own** [7] - 7:16, 24:16, 56:6, 57:19, 58:19, 58:20, 74:12

---

# P

**p.m** [1] - 79:7
**PAGE** [1] - 3:3
**paper** [1] - 19:16
**Paragraph** [2] - 59:24, 65:17
**paragraph** [9] - 5:22, 40:15, 40:24, 42:8, 46:20, 60:4, 65:5, 75:15, 78:8
**paragraphs** [1] - 5:1
**PARK** [1] - 2:23
**part** [6] - 7:19, 25:4, 31:23, 54:3, 54:9, 54:18, 62:2, 69:19
**particular** [2] - 10:14, 59:23
**parties** [18] - 4:20, 12:24, 16:8, 20:20, 28:22, 34:8, 42:8, 42:14, 42:19, 52:19, 53:10, 53:14, 65:18, 66:6, 67:1, 67:7, 67:13, 71:1
**party's** [1] - 70:23
**passage** [1] - 73:23
**past** [1] - 31:3
**patience** [1] - 21:10
**pay** [1] - 29:15
**paycheck** [2] - 27:21, 27:24
**paying** [1] - 19:23
**payment** [1] - 28:14
**penalized** [1] - 51:20
**pending** [1] - 53:9
**people** [6] - 19:11, 30:18, 31:1, 31:16, 49:23, 68:21
**per** [1] - 61:1
**percent** [17] - 10:12, 23:5, 32:5, 32:12, 35:4, 35:7, 36:8, 36:11, 36:14, 36:22, 36:25, 37:3, 37:12, 37:15, 37:18, 47:2, 55:8
**percentage** [9] - 5:24, 6:15, 24:18, 26:9, 26:10, 74:2, 74:4, 74:5, 75:4
**performing** [1] - 69:17
**perhaps** [2] - 50:20,

50:24
**permissible** [1] - 44:19
**permission** [1] - 21:14
**permitted** [3] - 53:22, 53:23, 58:7
**perry** [1] - 23:18
**Perry** [9] - 4:5, 26:24, 26:25, 27:1, 30:17, 31:4, 31:16, 31:17, 47:5
**PERRY** [3] - 1:9, 2:13, 2:20
**perry's** [1] - 15:23
**Perry's** [1] - 30:25
**person** [1] - 19:8
**pertains** [1] - 63:14
**PH** [1] - 1:24
**Pharrell** [1] - 67:25
**phase** [6] - 11:12, 16:19, 54:15, 61:8, 71:1, 76:14
**phoney** [1] - 58:23
**phrase** [1] - 59:20
**picture** [1] - 57:20
**Pictures** [1] - 41:5
**piece** [1] - 19:16
**place** [2] - 11:19, 22:22
**PLACE** [1] - 80:11
**placed** [4] - 43:11, 53:11, 61:8, 79:1
**places** [2] - 59:19, 59:20
**plainly** [1] - 7:24
**PLAINTIFF** [2] - 1:7, 2:3
**plaintiff** [4] - 7:12, 7:14, 52:1, 55:14
**plaintiff's** [7] - 7:12, 25:4, 25:23, 38:7, 76:22, 77:1, 77:14
**plaintiffs** [31] - 5:11, 6:1, 7:24, 11:12, 11:17, 16:3, 16:6, 16:20, 16:25, 17:16, 21:17, 24:20, 25:6, 25:21, 26:7, 28:5, 33:7, 33:14, 39:17, 42:7, 51:2, 52:4, 52:25, 53:8, 55:1, 56:1, 61:16, 65:2, 67:24, 69:3, 78:19
**plaintiffs'** [2] - 7:2, 41:23
**planning** [1] - 15:23
**plural** [1] - 66:10
**point** [24] - 5:12, 8:7, 9:10, 9:15, 9:18, 11:3, 13:3, 13:11,

13:12, 14:21, 15:8, 15:12, 18:5, 22:16, 40:13, 58:2, 60:2, 63:13, 68:7, 70:16, 72:19, 73:16, 76:14, 76:17
**pointed** [1] - 14:8
**pop** [1] - 31:13
**popularity** [2] - 50:16, 50:21
**portion** [13] - 21:11, 23:24, 24:7, 25:10, 33:14, 47:12, 48:17, 49:14, 73:10, 73:16, 74:6, 77:10, 78:10
**portions** [3] - 22:15, 24:15, 73:25
**position** [7] - 9:20, 14:4, 33:11, 43:23, 63:17, 69:16, 71:19
**positions** [1] - 71:13
**possible** [2] - 21:11, 40:22
**possibly** [1] - 44:24
**power** [3] - 30:18, 50:15, 50:21
**preambles** [1] - 4:25
**preceding** [1] - 5:22
**precise** [3] - 60:11, 60:24, 62:15
**precisely** [2] - 61:8, 71:2
**precluded** [1] - 17:12
**precludes** [1] - 14:11
**preferable** [1] - 68:13
**prejudicial** [4] - 9:20, 18:10, 49:2, 51:5
**preliminarily** [1] - 67:22
**premises** [1] - 49:25
**prepared** [1] - 55:12
**preponderance** [2] - 39:22, 39:25
**Prescription** [1] - 36:22
**present** [5] - 11:14, 20:16, 26:2, 38:18, 55:19
**presentation** [1] - 22:14
**presented** [2] - 72:24, 76:11
**preserve** [3] - 51:9, 52:12, 61:10
**PRESIDING** [1] - 1:4
**pretrial** [2] - 4:14, 77:16
**pretty** [2] - 19:23, 72:8
**prevent** [1] - 61:12
**previously** [2] - 17:17,

71:8
**priced** [1] - 24:5
**prima** [1] - 43:6
**primary** [1] - 41:15
**principal** [1] - 22:21
**Prism** [7] - 23:1, 25:13, 28:9, 29:22, 29:24, 30:6, 30:20
**problem** [11] - 11:16, 12:5, 12:16, 39:23, 47:21, 54:21, 56:10, 57:16, 61:5, 63:8, 66:14
**proceed** [1] - 20:20
**PROCEEDINGS** [3] - 1:14, 3:3, 80:11
**proceedings** [1] - 79:7
**process** [1] - 71:4
**produce** [4] - 11:7, 11:12, 55:15, 58:20
**produced** [2] - 16:11, 55:12
**producing** [2] - 16:10, 46:6
**product** [4] - 29:12, 29:13, 61:25, 62:1
**production** [9] - 35:15, 35:24, 41:8, 41:13, 41:24, 42:4, 45:9, 46:2, 46:6
**productive** [1] - 28:18
**professional** [3] - 35:9, 35:17, 36:1
**Professor** [1] - 24:13
**profit** [25] - 23:4, 23:23, 26:9, 26:10, 26:13, 26:17, 26:19, 26:21, 26:22, 27:18, 27:19, 27:23, 28:19, 29:6, 29:19, 30:9, 30:12, 47:12, 48:17, 49:12, 49:13, 73:17, 77:9, 77:10, 78:10
**profitability** [1] - 72:7
**profitable** [2] - 26:24, 27:1
**profited** [1] - 52:3
**profits** [30] - 6:15, 21:21, 23:24, 24:18, 24:23, 40:7, 40:10, 47:2, 47:5, 47:13, 48:20, 49:5, 49:14, 49:24, 49:25, 50:2, 51:15, 51:25, 55:6, 55:9, 55:18, 56:1, 56:2, 68:1, 68:12, 68:16, 70:4, 75:5, 78:9
**project** [1] - 75:21
**promoting** [1] - 44:19

promotion [1] - 28:9
promulgated [1] -
69:1
proof [8] - 12:10, 22:1,
24:10, 34:11, 38:3,
38:7, 70:2, 74:19
proper [2] - 45:25,
62:17
properly [3] - 10:18,
15:1, 41:18
propose [2] - 39:21,
41:2
proposed [5] - 38:20,
39:6, 45:4, 45:11,
45:13, 52:10, 52:18,
53:8, 78:7
Proposed [2] - 39:13,
40:24
protect [2] - 44:22,
44:23
prove [16] - 22:2,
22:18, 22:23, 23:22,
24:17, 48:8, 48:19,
48:22, 48:23, 48:24,
49:4, 49:5, 51:14,
69:12, 72:14, 72:16
proved [1] - 53:13
proven [1] - 69:13
provide [2] - 43:3,
51:16
PTO [1] - 5:1
publish [1] - 34:4
Publishing [1] - 37:20
punish [2] - 21:19,
25:7
punishment [1] -
24:22
purchase [1] - 29:4
purported [1] - 51:4
purportedly [1] - 18:8
purposes [1] - 49:15
put [21] - 6:4, 20:4,
22:17, 26:22, 28:15,
33:9, 40:13, 43:17,
43:19, 44:24, 48:5,
57:18, 57:25, 58:22,
69:18, 70:2, 71:24,
72:23, 74:16, 78:24,
78:25
putting [3] - 33:21,
56:14, 58:13
puzzle [1] - 46:4

## Q

questioned [2] - 11:8,
11:11
quickly [4] - 15:25,
21:11, 27:16, 45:12
quite [1] - 5:10

## R

raised [3] - 10:25,
12:3, 76:6
raises [1] - 73:16
raising [1] - 23:11
rather [6] - 56:14,
58:24, 60:25, 61:1,
66:1, 69:17
reach [1] - 30:10
reached [1] - 16:2
read [19] - 4:24, 11:1,
15:23, 19:16, 20:12,
20:19, 22:15, 28:24,
34:5, 34:8, 45:4,
50:14, 53:11, 65:6,
65:9, 65:18, 66:6,
70:3, 77:16
readily [1] - 52:2
reading [1] - 78:5
reads [1] - 6:1
ready [6] - 4:11, 20:10,
23:10, 39:12, 46:17,
79:2
real [1] - 44:16
reality [1] - 75:11
really [9] - 10:19,
19:22, 23:12, 26:23,
54:24, 57:6, 64:11,
64:25, 77:15
reason [5] - 13:5,
16:12, 17:15, 30:2,
40:8
reasonable [2] -
51:16, 51:19
reasons [1] - 70:21
rebut [1] - 43:9
receipts [5] - 19:19,
60:5, 61:24, 62:24,
63:1
RECEIVED [1] - 3:8
received [16] - 15:15,
22:3, 22:4, 22:6,
22:12, 23:3, 34:12,
34:18, 35:10, 35:19,
36:2, 36:16, 37:5,
37:20, 37:24, 52:19
recess [2] - 38:25,
59:7
Recess [2] - 39:2, 59:8
recognize [2] - 46:21,
78:19
recognized [2] -
45:10, 50:24
Record [1] - 54:19
record [17] - 15:17,
16:23, 50:6, 51:7,
51:9, 52:11, 58:5,
59:1, 61:22, 63:18,
64:21, 68:20, 68:23,

69:19, 70:14, 76:21,
79:1
recording [10] - 29:3,
34:14, 34:20, 35:12,
35:21, 36:3, 36:18,
37:7, 37:22, 38:1
records [3] - 19:14,
20:3, 57:4
Records [27] - 7:18,
7:19, 8:7, 19:8,
19:19, 20:22, 22:9,
22:22, 22:23, 23:2,
23:7, 27:20, 28:2,
28:21, 33:5, 33:8,
33:18, 38:7, 43:8,
51:17, 55:13, 57:3,
57:10, 57:18, 58:22,
68:21, 69:6
recover [2] - 26:7,
26:8
reduce [2] - 23:14,
71:10
REDUCED [1] - 80:12
reduced [1] - 58:3
refer [1] - 48:12
referring [1] - 57:2
reflections [1] - 77:22
reflects [1] - 59:1
regarding [5] - 7:15,
33:22, 42:13, 46:15,
68:1
regardless [3] - 11:13,
17:6, 17:23
reigned [2] - 45:7,
45:9
related [4] - 42:6,
51:24, 57:5, 60:20
relates [3] - 42:12,
74:3, 74:5
relating [1] - 35:8
relatively [2] - 27:13,
32:21
releasing [1] - 30:21
relevant [1] - 76:16
relying [1] - 12:17
remain [2] - 7:5, 8:6
remainder [1] - 32:12
remember [3] - 24:13,
38:14, 40:5
remind [2] - 24:11,
32:16
removal [1] - 70:19
removed [2] - 65:8,
72:10
renders [1] - 65:23
reopen [1] - 76:7
repeat [2] - 66:3,
69:15
repeating [1] - 53:18,
76:24

repeats [1] - 24:2
report [2] - 39:4, 56:7
REPORTED [1] -
80:10
REPORTER [5] - 1:22,
71:15, 80:2, 80:8,
80:22
REPORTER'S [1] -
1:14
representative [1] -
22:9
request [7] - 38:23,
40:9, 40:14, 47:10,
51:13, 59:21, 60:11
requested [4] - 39:8,
39:16, 40:6, 55:15
require [2] - 34:11,
70:2
required [2] - 8:12,
51:19
requiring [1] - 38:3
reread [3] - 15:15,
15:20, 40:4
rereading [1] - 15:17
research [1] - 38:16
reservation [4] - 6:24,
7:3, 11:4, 12:1
reservations [1] - 4:25
reserve [6] - 5:24, 6:1,
6:17, 7:24, 13:21,
69:3
reserved [8] - 6:9,
6:16, 6:20, 10:14,
11:6, 11:13, 42:14,
56:17
reserves [1] - 14:3
reserving [2] - 5:23,
10:7
respect [9] - 6:23, 7:2,
7:6, 45:18, 46:20,
50:11, 51:13, 59:17,
76:9
respectfully [4] -
38:23, 47:10, 51:9,
52:12
respond [2] - 55:21,
60:14
result [1] - 50:1
retailers [1] - 29:14
revenue [20] - 22:6,
22:20, 25:24, 26:8,
27:19, 28:22, 29:8,
42:9, 46:7, 53:1,
60:5, 61:24, 65:8,
65:10, 65:20, 66:7,
67:1, 67:8, 67:15
revenues [13] - 13:6,
22:2, 22:17, 23:14,
29:21, 29:23, 33:22,
42:20, 55:11, 55:17,

66:10, 66:17, 66:18
reversing [1] - 43:23
review [2] - 41:23,
53:5
reviewing [1] - 40:3
revised [1] - 59:15
revisit [1] - 25:18
rights [5] - 6:9, 6:24,
7:3, 10:7, 44:23
ROAD [1] - 2:11
ROOM [1] - 1:23
roughly [1] - 22:24
routinely [1] - 45:10
royalties [1] - 29:16
rule [2] - 46:22, 63:19
run [1] - 8:15
runs [2] - 10:4, 10:20

## S

sale [17] - 22:25,
23:13, 23:15, 28:8,
29:14, 29:21, 41:25,
42:4, 44:20, 45:9,
60:6, 61:25, 62:24,
64:8, 73:17, 77:11,
78:10
sales [1] - 30:5
SAME [1] - 80:12
Sandberg [3] - 10:11,
34:18, 34:25
Sarah [2] - 36:16,
36:19
schedule [1] - 4:15
scope [3] - 51:4,
61:17, 73:11
scream [1] - 77:15
screen [2] - 19:17,
34:9
screens [1] - 58:13
se [1] - 61:1
second [4] - 26:18,
39:20, 42:8, 65:5
see [9] - 7:21, 10:7,
10:14, 17:11, 38:9,
38:13, 53:3, 59:6,
77:5
seek [4] - 16:3, 29:21,
33:14, 70:18
seeking [8] - 21:18,
21:19, 24:21, 24:22,
25:7, 65:16
send [1] - 15:14
sense [3] - 47:2,
59:23, 63:22
sentence [14] - 39:20,
40:9, 41:7, 42:7,
45:4, 46:21, 47:11,
48:1, 48:4, 50:12,
59:24, 60:4, 65:5,

65:17

**separate** [2] - 6:25, 42:6

**separated** [1] - 52:2

**separately** [1] - 40:11

**set** [3] - 4:19, 14:18, 38:3

**SET** [1] - 80:11

**sets** [2] - 12:23, 63:17

**settled** [5] - 44:1, 68:20, 68:22, 76:4, 76:5

**several** [2] - 40:8, 59:19

**shall** [1] - 38:21

**sheet** [1] - 58:1

**Sheldon** [2] - 41:4, 50:22

**shift** [1] - 22:17

**shifts** [1] - 50:1

**short** [1] - 38:9

**shorter** [1] - 20:18

**shortly** [1] - 59:6

**shots** [1] - 9:23

**show** [12] - 19:11, 19:12, 19:13, 20:1, 24:9, 26:3, 28:6, 31:24, 44:2, 50:2, 52:25, 54:25

**showed** [2] - 39:21

**shower** [1] - 31:14

**showing** [1] - 9:11

**shown** [1] - 17:21

**shows** [1] - 13:9

**Shulitz** [1] - 51:18

**side** [7] - 6:9, 9:18, 10:25, 16:18, 20:1, 49:10, 77:15

**side's** [1] - 46:14

**side-step** [1] - 9:18

**sides** [2] - 10:7, 54:16

**significant** [1] - 24:8

**significantly** [1] - 39:7

**SILBERBERG** [1] - 2:15

**similar** [1] - 55:14

**similarity** [1] - 73:4

**simple** [3] - 19:2, 29:7, 71:24

**simply** [9] - 12:10, 13:15, 17:9, 24:9, 24:22, 26:13, 31:10, 48:15, 70:23

**sing** [1] - 31:17

**situation** [4] - 17:19, 17:22, 47:20, 63:21

**smart** [1] - 19:23

**Snyder** [1] - 25:4

**SNYDER** [1] - 1:4

**so-called** [1] - 77:23

**SOKOL** [1] - 2:5

**sold** [2] - 29:2, 29:3

**solely** [2] - 25:14, 26:14

**someone** [4] - 14:11, 18:4, 29:24, 30:1

**sometimes** [3] - 46:24, 56:22, 69:25

**song** [42] - 19:5, 22:24, 22:25, 23:1, 24:1, 24:3, 24:8, 24:15, 24:24, 25:13, 26:4, 26:24, 27:1, 27:3, 27:4, 27:15, 28:9, 29:11, 29:16, 30:6, 30:15, 30:17, 30:23, 31:1, 31:2, 31:6, 31:7, 31:12, 31:13, 32:8, 32:9, 32:13, 32:19, 33:4, 44:20, 44:23, 72:18, 73:2, 73:9, 76:24, 77:2

**songs** [1] - 31:16

**Songs** [1] - 36:23

**songwriter** [1] - 29:16

**songwriters** [1] - 33:9

**sorry** [8] - 19:3, 21:5, 48:13, 62:19, 69:22, 69:23, 71:15, 71:17

**sort** [1] - 63:21

**sorts** [1] - 72:22

**sound** [10] - 29:3, 34:14, 34:20, 35:12, 35:21, 36:3, 36:18, 37:7, 37:22, 38:1

**soup** [1] - 30:24

**speaking** [2] - 24:25, 49:15

**special** [4] - 64:23, 67:21, 67:22, 68:4

**specific** [2] - 76:8, 76:9

**specifically** [1] - 76:23

**Specifically** [1] - 76:23

**specifics** [1] - 23:7

**spend** [2] - 28:3, 28:13

**spent** [2] - 23:19, 28:6

**spoilers** [1] - 23:9

**spoken** [1] - 69:25

**spreadsheets** [2] - 19:15, 56:8

**SS** [1] - 80:5

**ST** [1] - 2:8

**stage** [1] - 30:10

**stand** [4] - 44:7, 56:14, 57:10, 74:15

**standards** [1] - 71:13

**stands** [1] - 48:22

**star** [1] - 30:18

**start** [3] - 49:25, 58:9, 71:15

**started** [1] - 43:1

**starts** [1] - 34:10

**state** [5] - 4:6, 29:23, 51:13, 68:11, 70:4

**STATE** [1] - 80:6

**statement** [9] - 11:24, 21:4, 29:7, 51:23, 54:19, 56:7, 58:1, 66:25, 71:12

**STATEMENTS** [1] - 3:4

**statements** [1] - 51:23

**STATES** [4] - 1:1, 1:1, 1:4, 80:9

**states** [1] - 60:4

**States** [9] - 34:14, 34:21, 35:12, 35:21, 36:4, 36:18, 37:8, 37:23, 38:1

**stating** [1] - 40:9

**statute** [4] - 48:18, 48:24, 49:13, 49:16

**STENOGRAPHIC** [1] - 80:15

**STENOGRAPHICALLY** [1] - 80:10

**step** [1] - 9:18

**Steven** [2] - 28:7, 29:5

**stick** [3] - 50:10, 60:25, 61:11

**still** [3] - 53:13, 71:22, 72:12

**stip** [1] - 7:20

**stipulated** [33] - 4:15, 4:20, 5:6, 5:16, 7:6, 8:8, 8:14, 8:16, 8:22, 9:1, 9:22, 9:23, 10:8, 10:9, 10:18, 13:24, 14:1, 28:22, 28:25, 38:2, 42:9, 42:19, 42:21, 45:16, 56:17, 57:16, 65:19, 66:6, 67:1, 67:7, 67:13, 68:5

**stipulation** [37] - 4:17, 5:12, 5:13, 5:22, 6:10, 6:21, 7:10, 7:14, 7:21, 9:8, 10:5, 10:6, 12:23, 13:8, 13:16, 13:21, 14:5, 14:11, 14:17, 14:18, 14:21, 16:3, 19:8, 20:12, 20:13, 21:1, 22:11, 28:24, 33:22, 34:7, 42:13, 43:7,

45:15, 69:18, 69:19, 70:3, 70:11

**stipulations** [1] - 53:10

**stores** [1] - 29:3

**story** [1] - 15:10

**stove** [2] - 30:25, 31:1

**straight** [5] - 42:5, 50:22, 51:17, 51:24, 60:17

**strategic** [1] - 56:4

**strategically** [1] - 56:9

**stream** [1] - 29:4

**STREET** [1] - 1:23

**strike** [1] - 76:25

**strikingly** [1] - 76:25

**strongly** [1] - 68:4

**stuff** [1] - 44:25

**stupid** [1] - 19:22

**subject** [4] - 14:25, 56:15, 78:25

**submit** [8] - 8:11, 43:5, 52:7, 55:16, 68:2, 70:25, 71:5, 71:18

**submitted** [1] - 67:24

**subsequently** [1] - 45:7

**substantially** [1] - 76:25

**success** [10] - 19:5, 24:1, 24:8, 25:12, 25:13, 26:4, 26:5, 27:14, 32:10, 32:21

**successful** [3] - 30:15, 30:23, 33:4

**suggest** [2] - 75:13, 75:17

**suggesting** [3] - 49:3, 54:2, 65:25

**suggestion** [1] - 52:10

**suggests** [4] - 49:11, 61:3, 65:25, 66:17

**SUITE** [2] - 2:11, 2:23

**summarize** [2] - 18:23, 58:8

**summarizes** [1] - 55:19

**summarizing** [1] - 18:8

**summary** [7] - 19:14, 53:22, 54:3, 54:9, 55:12, 55:14, 56:7

**sung** [3] - 31:7, 31:15, 32:18

**supporting** [1] - 58:5

**suppose** [1] - 11:7

**supposed** [1] - 71:11

**Supreme** [1] - 50:25

**surprised** [1] - 5:10

## T

**tailored** [1] - 46:22

**talent** [1] - 50:15

**task** [2] - 71:3, 71:5

**teeny** [1] - 19:16

**ten** [2] - 10:12, 35:4

**term** [1] - 76:13

**terms** [2] - 57:19, 71:24

**territory** [1] - 68:15

**test** [1] - 77:24

**testified** [2] - 24:12, 31:8

**testify** [3] - 13:2, 30:4, 68:18

**testifying** [1] - 19:7

**testimony** [22] - 12:18, 15:14, 15:17, 15:19, 22:21, 27:9, 28:7, 46:13, 53:23, 54:3, 54:9, 54:12, 54:15, 57:3, 57:4, 57:6, 58:16, 58:24, 73:1, 74:12, 77:22

**THAN** [1] - 2:13

**THAT** [3] - 80:10, 80:12, 80:14

**THE** [176] - 2:20, 4:3, 4:8, 4:12, 4:16, 4:22, 5:3, 5:20, 6:22, 7:1, 7:9, 7:21, 8:19, 10:22, 11:15, 12:7, 12:14, 12:16, 13:1, 13:10, 13:19, 14:10, 14:16, 14:25, 15:4, 15:10, 15:24, 16:14, 17:2, 17:25, 18:13, 18:20, 19:2, 19:18, 20:7, 20:10, 20:12, 20:14, 20:17, 21:4, 24:25, 33:16, 33:20, 34:1, 34:6, 34:24, 38:5, 38:8, 38:19, 38:25, 39:3, 39:11, 39:13, 39:17, 39:19, 39:23, 40:4, 40:12, 40:16, 40:21, 40:25, 41:14, 42:17, 43:1, 43:10, 43:15, 43:23, 44:1, 44:15, 45:13, 45:16, 45:20, 46:3, 46:12, 46:19, 47:7, 47:18, 48:2, 48:5, 48:10, 49:1, 49:8, 49:15, 49:21, 50:6, 50:9, 50:13, 51:6, 51:10, 52:9, 52:14, 52:20, 53:6, 53:17, 53:19, 54:1, 54:17,

54:23, 55:5, 55:22,
56:3, 56:10, 57:8,
58:9, 58:16, 58:20,
59:3, 59:6, 59:7,
59:9, 59:11, 59:16,
59:18, 60:2, 60:8,
60:15, 60:25, 61:11,
61:21, 62:4, 62:8,
62:11, 62:16, 62:22,
63:7, 64:2, 64:6,
64:14, 64:21, 64:24,
65:2, 65:9, 65:12,
65:15, 65:18, 65:25,
66:5, 66:12, 66:15,
66:20, 67:3, 67:13,
67:17, 67:20, 68:10,
68:25, 69:5, 69:14,
69:17, 69:23, 70:8,
70:13, 70:17, 71:15,
71:24, 72:12, 72:16,
73:6, 74:20, 74:25,
75:25, 76:3, 76:19,
77:5, 77:8, 78:3,
78:7, 78:16, 78:21,
78:24, 79:6, 80:8,
80:9, 80:10, 80:11,
80:12
**theory** [1] - 7:15
**THEREAFTER** [1] -
80:12
**therefore** [4] - 9:6,
17:12, 32:9, 53:12
**they've** [5] - 6:16,
8:22, 9:1, 28:24,
74:16
**thinks** [1] - 70:1
**third** [2] - 30:20, 60:4
**THIS** [1] - 80:14
**three** [1] - 47:6
**throw** [2] - 31:10,
32:11
**TIME** [1] - 80:11
**tiny** [1] - 19:16
**tired** [1] - 10:4
**TO** [1] - 80:12
**today** [9] - 15:11,
20:21, 22:10, 27:17,
42:13, 54:12, 55:4,
64:25, 68:15
**together** [5] - 27:13,
33:9, 58:22, 78:25
**tomorrow** [8] - 20:21,
20:25, 22:22, 23:6,
33:19, 38:10, 38:13,
79:2
**took** [2] - 43:24, 68:25
**top** [1] - 29:8
**topic** [1] - 17:3
**topics** [1] - 27:17
**total** [17] - 6:4, 22:2,

22:4, 22:5, 22:6,
22:17, 32:5, 32:13,
34:12, 34:18, 35:10,
35:19, 36:16, 37:5,
60:20, 71:13, 71:21
**totality** [1] - 71:9
**towards** [1] - 46:22
**town** [1] - 20:22
**track** [1] - 62:10
**tracks** [2] - 30:3, 30:8
**transcribe** [1] - 31:23
**TRANSCRIPT** [1] -
1:14
**TRANSCRIPTION** [2] -
80:13, 80:14
**transcription** [2] -
18:8, 31:24
**transcripts** [1] - 20:20
**TRAURIG** [1] - 2:21
**treat** [2] - 53:12, 57:10
**treated** [1] - 57:21
**trial** [10] - 5:14, 7:10,
9:12, 9:16, 11:5,
15:15, 18:19, 31:23,
55:2, 69:25
**trod** [1] - 68:15
**TRUE** [1] - 80:14
**true** [6] - 26:1, 26:2,
28:3, 44:11, 57:13,
74:11
**try** [6] - 6:14, 23:2,
23:14, 23:22, 24:7,
28:5
**trying** [23] - 19:10,
23:15, 46:16, 49:24,
56:25, 57:17, 61:5,
61:7, 62:5, 62:23,
63:12, 63:16, 64:11,
66:13, 66:24, 71:10,
72:12, 74:19, 74:21,
76:3, 76:6, 77:5,
77:24
**TUESDAY** [2] - 1:15,
4:1
**turn** [2] - 6:1, 7:24
**turns** [2] - 48:13,
48:16
**two** [12] - 15:25, 19:3,
23:5, 23:16, 24:5,
24:16, 30:21, 47:24,
50:20, 59:25, 63:20,
71:14
**twofold** [1] - 26:16
**types** [1] - 41:10
**TYPEWRITTEN** [1] -
80:12
**typically** [2] - 57:13,
63:20

## U

**U.S** [1] - 41:5
**ultimately** [2] - 49:11,
74:16
**unclear** [1] - 63:6
**under** [6] - 10:2, 26:1,
40:1, 41:22, 41:23,
47:3
**underlying** [1] - 33:10
**understood** [1] -
53:21
**unfortunately** [1] -
22:10
**UNITED** [4] - 1:1, 1:1,
1:4, 80:8
**United** [9] - 34:14,
34:21, 35:12, 35:21,
36:4, 36:18, 37:7,
37:23, 38:1
**universe** [2] - 41:12,
41:21
**unless** [1] - 12:17
**up** [16] - 4:9, 6:7, 6:13,
9:11, 17:17, 19:17,
20:3, 22:7, 33:16,
44:7, 54:7, 54:20,
55:24, 57:25, 58:19,
77:15
**upside** [2] - 48:21,
49:3
**uses** [1] - 59:25

## V

**vacuum** [1] - 33:1
**valuable** [1] - 21:13
**value** [1] - 24:15
**various** [1] - 47:21
**verdict** [18] - 21:14,
38:11, 40:2, 40:20,
52:15, 59:12, 59:13,
64:23, 67:21, 67:23,
70:17, 71:8, 72:11,
75:24, 76:6, 76:19,
77:17, 78:17
**version** [2] - 4:24, 5:2
**versions** [1] - 22:25
**versus** [2] - 4:5, 55:6
**video** [1] - 23:19
**view** [3] - 12:1, 41:23,
72:21
**vigorously** [1] - 74:15
**VINCENT** [1] - 2:22
**vocal** [2] - 31:7, 31:15,
32:18
**VS** [1] - 1:8

## W

**Wais** [1] - 24:25
**WAIS** [4] - 2:16, 3:6,
25:1, 34:2
**wait** [1] - 44:20
**walk** [4] - 29:6, 30:14,
30:16, 31:20
**Walter** [3] - 31:8, 36:2,
36:5
**wants** [4] - 15:15,
15:19, 18:4, 40:20
**WAS** [1] - 80:12
**ways** [1] - 24:14
**WB** [1] - 37:24
**wear** [1] - 28:16
**week** [1] - 15:21
**well-established** [1] -
50:22
**well-trod** [1] - 68:15
**WEST** [2] - 1:23, 2:18
**WESTERN** [1] - 1:2
**whatsoever** [1] - 17:6
**whole** [13] - 5:12,
9:10, 9:15, 14:21,
26:3, 26:4, 60:20,
71:25, 72:18, 73:2,
73:22, 77:23, 78:5
**Williams** [1] - 67:25
**wit** [1] - 23:6
**withdrawn** [1] - 11:18
**witness** [11] - 7:18,
9:13, 20:22, 22:8,
23:7, 33:18, 33:21,
43:9, 56:25, 57:9,
68:17
**witnesses** [4] - 7:16,
9:16, 18:21, 19:7
**word** [11] - 45:24,
59:22, 59:23, 59:25,
65:4, 65:5, 65:8,
65:16, 65:22, 65:23,
69:9
**words** [3] - 62:13,
62:22, 63:1
**works** [4] - 12:9,
60:20, 71:9, 71:14
**world** [1] - 19:20
**written** [3] - 62:13,
63:23, 67:11

## Y

**years** [1] - 24:21
**yesterday** [3] - 15:13,
76:20, 77:17
**yesterday's** [1] - 40:22
**yourself** [2] - 26:23,
31:14

# EXHIBIT 9

EXHIBIT  9
PAGE  1371

1          UNITED STATES OF AMERICA
           UNITED STATES DISTRICT COURT
2          CENTRAL DISTRICT OF CALIFORNIA
               WESTERN DIVISION
3
                   -  -  -
4          HONORABLE CHRISTINA A. SNYDER
      UNITED STATES DISTRICT JUDGE PRESIDING
5                  -  -  -

6

7    MARCUS GRAY; ET AL.,            )
                                     )
8            PLAINTIFF,              )
                                     )   CASE NO.:
     VS.                             )   CV 15-5642-CAS
9                                    )
     KATY PERRY; ET AL.,             )
10                                   )
             DEFENDANT.              )
11   _____)

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15            WEDNESDAY, JULY 31, 2019

16             LOS ANGELES, CALIFORNIA

17

18

19

20

21

22          LAURA MILLER ELIAS, CSR 10019
          FEDERAL OFFICIAL COURT REPORTER
23         350 WEST FIRST STREET, ROOM 4455
            LOS ANGELES, CALIFORNIA 90012
24             PH:  (213)894-0374

25

EXHIBIT 9
PAGE 1372

```
1

2
     APPEARANCES OF COUNSEL:
3
     ON BEHALF OF PLAINTIFF:
4

5             CAPES SOKOL
               BY: MICHAEL A. KAHN, ESQ.
6                  LAUREN COHEN, ESQ.

7              7701 FORSYTH BOULEVARD
               12TH FLOOR
8              ST. LOUIS, MO 63105

9
               KAYIRA LAW, LLC
10             BY:  ERIC KAYIRA, ESQ.

11             2100 HANLEY ROAD, SUITE 208
               CLAYTON, MO 63105
12

13
     ON BEHALF OF DEFENDANTS OTHER THAN MS. PERRY:
14

15             MITCHELL SILBERBERG & KNUPP
               BY: CHRISTINE LEPERA, ESQ.
16                 AARON M. WAIS, ESQ.
                   JEFFREY MOVIT, ESQ.
17                 GABRIELLA NOURAFCHAN, ESQ.
                   JACOB ALBERTSON, ESQ.
18
               11377 WEST OLYMPIC BOULEVARD
19             LOS ANGELES, CA 90064

20
     ON BEHALF OF THE PERRY DEFENDANTS:
21
               GREENBERG TRAURIG
22             BY:  VINCENT H. CHIEFFO, ESQ.

23             1840 CENTURY PARK EAST
               SUITE 1900
24             LOS ANGELES, CA 90067

25
```

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1373

INDEX

WITNESSES FOR
THE PLAINTIFF:

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DRELLISHAK, STEVEN | | | | |
| BY: MS. COHEN | 12 | | 97 | |
| BY: MR. WAIS | | 72 | | 101 |

WITNESSES FOR
THE DEFENDANT:

| | | | | |
|---|---|---|---|---|
| FERRARA, LAWRENCE | | | | |
| BY: MR. MOVIT | 103 | | | |
| BY: MR. KAHN | | 114 | | |
| | | | | |
| KING, JASON | | | | |
| BY: MR. ALBERTSON | 124 | | 174 | |
| BY: MR. KAYIRA | | 159 | | |

EINHORN, MICHAEL
(VIA VIDEOTAPE DEPOSITION) 176

| EXHIBITS | RECEIVED |
|---|---|
| 111 | 20 |
| 116 | 28 |
| 117 PG. 1 | 106 |
| 89 PG. 59 | 108 |

JURY INSTRUCTIONS                          177

EXHIBIT 9
PAGE 1374

```
 1    LOS ANGELES, CALIFORNIA; WEDNESDAY, JULY 31, 2019; 10:00 A.M.

 2                            - - -

 3                THE CLERK:  Calling Calendar Item 1.

 4                Case No. CV 15-5642.

 5                Marcus Gray versus Katy Perry, et al.

 6                Counsel, please state your appearances.

 7                (Appearances as heretofore stated.)

 8                THE COURT:  Okay.  I don't want to get into a

 9    discussion given the time and everything, but as you can see,

10    I tried with my law clerks to not have a three-page

11    stipulation but to set forth what is in your stipulation in a

12    more economical way.  You can double-check it.  I think we're

13    right but . . .

14                MS. LEPERA:  For the record, Your Honor, the

15    numbers for Kobalt & Warner Brothers were stated in the

16    stipulation to be a net number, not a gross number.

17                THE COURT:  Okay.  So we'll correct that.

18                If you would just -- you can interlineate or

19    something.

20                MS. COHEN:  Your Honor, we have one issue to take

21    up with the Court.

22                THE COURT:  Yes.

23                MS. COHEN:  As Your Honor is aware, the plaintiffs

24    previously designated Dr. Michael Einhorn, primarily on the

25    issue of actual damages, and plaintiffs announced Monday that
```

EXHIBIT 9
PAGE 1375

1    we would not be seeking actual damages and accordingly would

2    not be calling Dr. Einhorn.  And the defendants made no

3    mention of attempting to call him or read from his deposition

4    when we discussed scheduling issues.

5            However, this morning at 8:45 a.m., we received an

6    email from the defendants containing what they called

7    additional deposition designations which we haven't had all

8    that much time to review, but they appear to be primarily

9    impeachment testimony which, of course, because we're not

10   calling him, we don't believe it's appropriate to impeach a

11   witness who hasn't been called to testify at trial among

12   other issues.

13           THE COURT:  Okay.

14           MR. MOVIT:  Your Honor, first of all, Dr. Einhorn

15   was not primarily an actual damages witness.  The Court has

16   read his opinion which had fulsome opinions about profits and

17   deductions.

18           THE COURT:  My question is why at 8:45 this

19   morning?

20           MR. MOVIT:  Okay, that's -- because it's not

21   correct.

22           Before Dr. Einhorn was withdrawn, on Monday

23   morning, we sent designations about Dr. Einhorn's testimony,

24   and I have the email right here, Your Honor, Monday morning

25   before they withdrew Dr. Einhorn.  What happened was once we

```
1    learned he was withdrawn, we needed a few more lines because
2    we weren't gonna get him live.
3          We really only want to do two things with this
4    testimony, Your Honor.  The first and most important is
5    Dr. Einhorn admitted that Capitol Records costs are real
6    costs, and we expect them to state the opposite in their
7    cross-examination, try to establish the opposite in closing.
8    That is critical.
9          Your Honor, the 9th Circuit law is clear that
10   admissions by a party's expert witness are party additions,
11   not hearsay.  It's admissible.  And its critical, and it's
12   hugely prejudicial.  They don't like he said that, and
13   therefore, they don't want to call him, but he said that
14   under oath, Your Honor.
15         The second reason is -- why we need this is that he
16   testified that he was paid $40,000, and that he only
17   testified in the past three years for copyright plaintiffs,
18   and they testified or been retained against the Universal
19   Music Group 12 times.
20         This is also critical to combatting the prejudice
21   when plaintiff's counsel keep crossing our experts and saying
22   how much have you been paid, how many times have you worked
23   with these attorneys.  They've done it in their opening, and
24   we need to combat the prejudice.
25         It's two specific issues.  And it's admissions.
```

```
 1    It's not impeachment.  It's admissions.

 2              THE COURT:  Okay.  Here's the problem.

 3              If these designations were made when they

 4    anticipated Einhorn to be a witness, and you withdrew him and

 5    made him effectively unavailable, I think they're entitled to

 6    use his deposition.

 7              MR. MOVIT:  Thank you, Your Honor.

 8              MS. COHEN:  Your Honor, we -- the timing is -- was

 9    not quite as described.

10              We did receive designations prior to announcing

11    that we would not be calling him.  When we discussed

12    scheduling, we talked about what depositions the parties

13    would read from.  There was no mention of Dr. Einhorn at all.

14    Thus we didn't respond to previous designations that were

15    made nor did we object.  We didn't receive highlighted copies

16    of the transcripts.

17              And, in fact, this morning at 8:45, we did receive

18    additional designations from Dr. Einhorn.  This is a new

19    strategy.  This is not something they were planning to do.

20              And Dr. Einhorn isn't being be called at trial.

21    Unlike the experts that they put on before the jury who we

22    then impeached related to the fees that they've charged,

23    Dr. Einhorn isn't going to be put before the jury.  He --

24    he's not here to testify, and thus, it would be completely

25    inappropriate to put on impeachment testimony.
```

1          THE COURT:  Well, I'm gonna have to do some

2    research on this.  Is Einhorn going up first?

3          MR. MOVIT:  No, Your Honor.  Einhorn would be part

4    of the defendant's case, and the plaintiffs have not closed

5    their damages case yet.

6          Your Honor, may I give you a couple case law cites?

7          THE COURT:  Sure.

8          MR. MOVIT:  Okay.  I have a case.  This is party

9    admissions deposition testimony of 534, F3d 986.  Excuse, me,

10   that was prior to trial testimony.  And that's in re Hanford

11   Nuclear Reservations litigation.  And I also have Reiss v

12   City of Glendale, 2009 WL 2579614 CD Cal August 19th, 2009.

13         And, again, we promptly designated a few extra

14   lines when we learned he wouldn't be here live, but it was

15   always our intent that we never withdrew our right to -- we

16   never withdrew our designations, Your Honor.

17         THE COURT:  Let me put it this way.  I am not --

18   I'm less concerned about the admissibility about the

19   statement of Capitol Records in cross.  I think that probably

20   does come in as an admission.  My concern is his other

21   testimony about the prior times he's testified against

22   Universal Music, whether that's an admission or what because

23   you're really calling him to impeach him on that point.

24         MR. MOVIT:  But Your Honor, the point is -- the

25   point we're trying to make, Your Honor, and we think we will

EXHIBIT 9
PAGE 1379

1    be deeply prejudiced in front of the jury if we cannot make

2    it, is that the plaintiffs keep stating to the jury about the

3    defendant's high-priced experts or hired guns being paid to

4    give this testimony.

5            The jury may not understand that both sides have

6    done this, and they just weren't happy with what Dr. Einhorn

7    said so they didn't use it.  But the fact that the plaintiffs

8    have paid $40,000 to an expert will combat the prejudice that

9    we're being faced with when they keep impeaching our experts

10   about that they're being paid and worked with plaintiff's

11   counsel before.

12           It's not impeachment even.  It's just correcting

13   the record.  It's not impeachment.  It's just showing the

14   jury that this is what both sides do, and this is what is

15   normal in litigation.  That's all we want to do.  We're not

16   trying to show he's a hired gun.  We want to show this is how

17   litigation works.

18           THE COURT:  I'll take a look at it and come back

19   with a ruling.

20           MR. MOVIT:  Thank you, Your Honor.

21           MR. KAHN:  And Your Honor, I would just point out

22   we've not been given a copy of the marked up deposition to be

23   able to make any objections.  Um, I don't know whether they

24   have a copy.

25           THE COURT:  Well, they're gonna have to give you

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1380

1    one.

2              MS. LEPERA:  No problem.

3              THE COURT:  I'm, you know . . .

4              MR. LEPERA:  They have the lines, and obviously,

5    that's the copy.

6              THE COURT:  Okay.  Well, I have, uh, I don't know

7    what to tell you.

8              So are we ready for a witness or . . .

9              MS. LEPERA:  It's their case.

10             MS. COHEN:  Yes.  Plaintiffs will call Capitol

11   Records.

12             THE COURT:  Fine.

13             THE CLERK:  Ready for the jury?

14             THE COURT:  I guess so.

15             Am I correct, Ms. Lepera, on Kobalt, Warner

16   Brothers Music, those numbers are . . .

17             MS. LEPERA:  They're stated in the stipulation to

18   be net.

19             THE COURT:  Net.

20             MS. LEPERA:  There's no two different numbers for

21   those entities.

22             THE COURT:  We need to separate these out.

23             MS. LEPERA:  And just for the record, Your Honor,

24   they're designating -- Capitol Records they're calling as an

25   individual.  It's Steven Drellishak.

UNITED STATES DISTRICT COURT

EXHIBIT  9
PAGE  1381

```
 1              THE COURT:  Okay.
 2              MR. KAHN:  And just a matter of procedure,
 3    Your Honor, we'll look through this deposition.  The copy
 4    we've been given that's been marked up, what do we do?  Do we
 5    write in the --
 6              THE COURT:  You write in the margin your
 7    objections.
 8              MR. KAHN:  If we have additional testimony, we
 9    would just draw an arrow to additional testimony?
10              THE COURT:  I guess if you have additional
11    testimony, you're gonna have to mark it.
12              MR. KAHN:  Right.  Okay.
13              MS. LEPERA:  And give us an opportunity to object,
14    Your Honor.
15              THE COURT:  And give them an opportunity to object.
16              MR. KAHN:  And we'll mark it.
17              THE COURT:  You mark it and present it back to
18    them.
19              MR. KAHN:  Okay.
20              THE CLERK:  All rise.
21                      (Jury present.)
22              THE CLERK:  Please be seated.
23              THE COURT:  Ms. Cohen, who are you calling?
24              MS. COHEN:  Your Honor, the plaintiffs would like
25    to call a corporate representative of Capitol Records, Steve
```

```
 1    Drellishak.
 2              THE COURT:  Okay.  Will you please come forward.
 3              THE CLERK:  Mr. Drellishak?  Please come forward.
 4    I can swear you in.
 5              Please stand there.
 6              Please raise your right hand.
 7                        (Witness sworn.)
 8              THE CLERK:  Please be seated.
 9              Please state your full name, spell your last name
10    for the record, and please make sure you speak into the
11    microphone.
12              THE WITNESS:  Kenneth Steven Drellishak, Jr.
13              Last name is spelled D-r-e-l-l-i-s-h-a-k.
14                        DIRECT EXAMINATION
15    BY MS. COHEN:
16    Q.   Good morning, Mr. Drellishak.
17    A.   Good morning.
18    Q.   Is it true that you're employed by Universal Music
19    Group?
20    A.   Yes.
21    Q.   Are you still Senior Vice-President of Finance for
22    Universal Music Group?
23    A.   Yes.
24    Q.   And Universal Music Group is a global corporation with
25    many subsidiaries; is that right?
```

EXHIBIT 9
PAGE 1383

1    A.    Yes.

2    Q.    And Universal Music Group is the parent company of

3    Capitol Records; correct?

4    A.    Correct.

5    Q.    And Capitol Records is a record label; is that right?

6    A.    Yes.

7    Q.    Is it true that Capitol Records has its own employees?

8    A.    Yes.

9    Q.    And in this litigation, you were designated the

10   corporate representative of the defendant, Capitol Records;

11   is that right?

12   A.    That's correct.

13   Q.    And that means that you're the person with the most

14   knowledge concerning the financial documents that were

15   produced by Capitol Records in this matter.

16   A.    Yes.

17   Q.    And so you understand that your testimony here in court

18   and also the testimony that you previously provided in your

19   deposition, uh, will be and was attributed to Capitol

20   Records; is that correct?

21   A.    Yes.

22   Q.    And you told me in your deposition that you worked with

23   Universal Music in various financial roles since the '90s.

24   Is that true?

25           MR. WAIS:  Objection, vague.

```
1              THE COURT:  I think he can answer yes or no if he
2    understands the question.
3              THE WITNESS:  I understand.
4              Yes, that's correct.
5    BY MS. COHEN:
6    Q.   Okay.  And what's your highest level of education, sir?
7    A.   A BS in Accounting with a Minor in Finance.
8    Q.   Okay.  Um, do you have any advanced degrees?
9    A.   No.
10   Q.   Is it true that Capitol Records owns the sound recording
11   in Dark Horse?
12   A.   Yes.
13   Q.   And that's a song that was, um, performed, recorded by
14   Katy Perry?
15   A.   Yes.
16   Q.   And Capitol Records released and sold the Prism album on
17   which the song Dark Horse appeared in various forms; is that
18   right?
19   A.   Yes.
20   Q.   And as a general proposition, the more albums that
21   Capitol Records sells, the more money it makes.  Is that
22   true?
23   A.   Um, it depends on how you would market the record and
24   the cost structure associated with that, but, in general,
25   more revenues, it would be beneficial.
```

 1   Q.   And so you would agree that Capitol Records wants to

 2   sell as many records as possible; right?

 3   A.   Yes.

 4   Q.   And that was true for the Prism album; correct?

 5   A.   Correct.

 6   Q.   And isn't it true that in general, the label will

 7   release certain tracks from an album at certain times to

 8   generate momentum or to keep up momentum for the sale of an

 9   album?

10   A.   That's correct.

11   Q.   And we've heard evidence in this case that Dark Horse

12   was one of five singles from the Prism album.  Do you have

13   any reason to disagree with that?

14   A.   No.

15   Q.   And the singles from an album are the ones that are

16   played on the radio; is that right?

17   A.   Uh, they would -- you would designate singles that you

18   would want to succeed and be on the radio.  It doesn't

19   necessarily mean you will get that response.

20   Q.   And are you aware that Dark Horse was a promotional

21   single?

22   A.   Uh, how would you define that?

23   Q.   Um, similar to the . . .

24   A.   It would fall in the category of a single?

25   Q.   Yes.  It would fall in a category of single, but it was

1    intended to generate momentum or keep up momentum for the

2    sale of the album; is that right?

3    A.    Yes, that's correct.

4              MR. WAIS:  Calls for speculation.

5              THE COURT:  Overruled.  The answer will stand.

6    BY MS. COHEN:

7    Q.    And you testified previously that Capitol Records puts

8    out singles sometimes ahead of the primary release of the

9    album to generate interest; right?

10   A.    Yes.

11   Q.    Okay.  And so that's really what we mean by promotional

12   single, that Dark Horse was one of those promotional singles.

13   A.    Are you specifically referring to release ahead of the

14   record or just the fact that it was a promotional single?

15   Q.    Well, was it released before the record?

16   A.    I believe it was not.  It was not the first single.

17   Q.    It wasn't the first single, but was it released before

18   the record?

19   A.    I think it was.  I'm not absolutely sure, but I think we

20   do have release dates in the documentation.

21   Q.    You're not sure.

22   A.    I believe it was released after the release date of the

23   album.

24   Q.    Are you aware, sir, that the song Dark Horse had a

25   promotional music video?

1    A.    Yes.

2    Q.    And are you aware that the budget for the music video

3    was over a million dollars?

4    A.    Yes.

5    Q.    And it's true that not every song on the Prism album had

6    a video; is that right?

7    A.    That's correct.

8    Q.    And is it true that Capitol Records -- that only the

9    songs that Capitol Records believes will resonate most with

10   consumers is chosen for a video?

11             MR. WAIS:  Objection, vague and ambiguous.

12             THE WITNESS:  I mean, that -- that requires

13   speculation.  Yeah, the intent is to find tracks that would

14   resonate with the fans.

15   BY MS. COHEN:

16   Q.    And it's true that Capital Records maintains records

17   showing radio play of songs; is that right?

18   A.    Yes.

19   Q.    And, in fact, Capitol Records produced business records

20   in this case which show radio play of all -- um, well, of

21   four of the singles from the Prism album; is that correct?

22   A.    That's correct.

23   Q.    And these were documents that were queried from the

24   Capitol Records system.

25   A.    Well, it uses a third party, uh, information source, but

```
 1    it's not an internal document.  It's, uh, provided by a media

 2    base so they -- they would have queried that database.

 3    Q.    And I'm gonna ask you to turn to the binder next to you.

 4    Not that one, actually.  There's some behind you.

 5    A.    Okay.

 6    Q.    I'm looking for Exhibit 111, and the volumes are marked

 7    on the sides.  Find it?

 8    A.    Yes.

 9    Q.    Okay.  Do you recognize this document as the one that

10    was produced by Capitol Records showing, um, radio plays as

11    recorded by media base?

12    A.    Yes.

13    Q.    And -- and these relate to four of the singles from the

14    Prism album; correct?

15    A.    I haven't reviewed them to prove that, but I assume

16    that's what's here.

17    Q.    Okay.  And we'll go through them in a second, but I'll

18    represent to you that it includes radio spins from Dark

19    Horse, Roar --

20              MR. WAIS:  Objection as to --

21              THE COURT REPORTER:  I'm sorry, I can't hear you.

22              THE COURT:  I can't hear you --

23              MR. WAIS:  Oh.

24              THE COURT:  -- and I can't hear the question.

25              MR. WAIS:  All right.  It's -- she's not asking
```

EXHIBIT 9
PAGE 1389

1    questions.  She's just describing the document.

2            MS. COHEN:  I'm just framing the evidence, but I

3    can -- I can wait.

4            THE COURT:  Why don't you ask the question.

5            MS. COHEN:  Sure.

6            I'd like to move for the admission of Exhibit 111?

7            MR. WAIS:  Objection.  Lacks foundation.

8            THE COURT:  You probably have to lay the

9    foundation.

10   BY MS. COHEN:

11   Q.   Mr. Drellishak, you testified that you're familiar with

12   this document; is that right?

13   A.   It was presented to me at the deposition.  I hadn't seen

14   it before that.  I wasn't aware that it was going to be

15   discussed in our deposition, but yes, it was presented at

16   that time.

17   Q.   Okay.  And in your 25 or 30 years at Capitol Records,

18   are you familiar with this document that -- that shows radio

19   plays from media base?

20           MR. WAIS:  Object.

21           THE COURT:  Do you know what the document is?

22           THE WITNESS:  Yeah, I understand it.  I -- I can't

23   say that I use this in the normal course of my finance role,

24   but I -- I'm aware of media base reports.

25

1    BY MS. COHEN:

2    Q.   And -- and this document was produced by Capitol Records

3    in this litigation and it's Bates labeled with a Capital

4    stamp; is that right?

5    A.   Yes.

6         MS. COHEN:  Your Honor, I think I've laid a

7    foundation for the document.

8         THE COURT:  Okay.

9         MR. WAIS:  I still think she hasn't laid a

10   foundation.  He testified he doesn't know what the

11   document -- he doesn't know the contents of it.

12        THE COURT:  I don't think that was his testimony.

13   The question is can the document come into evidence.  He

14   seems to be familiar with it.

15        MR. WAIS:  No -- no objection, Your Honor.

16             (Exhibit 111 admitted.)

17        MS. COHEN:  Thank you.

18   Q.   Mr. Drellishak, can you take a look first at, um, the

19   bottom?  It says the exhibit number and then the page number

20   for the exhibit.  Do you see that?

21   A.   Capital 1034?

22   Q.   No.  Actually, on the side of the document, it says

23   Exhibit 111-1.  That would be the first page.

24   A.   I see that.

25   Q.   You see that?  Okay.  That's generally how these pages

1    have been marked so I'll reference the page numbers in that

2    manner.  So if you'll take a look first at 111-1, um, is this

3    the first page of the document summarizing radio spins for

4    Dark Horse?

5    A.   Yes.

6    Q.   Okay.  And in the column next to the date, it says spins

7    to date.  Do you see that?

8    A.   Yes.

9    Q.   And is it your understanding that that means or that

10   that column summarizes the total number of times that the

11   song was played on the radio?

12   A.   Yes.

13   Q.   And can you take a look at the far right column where it

14   says total audience?

15   A.   Yes.

16   Q.   And is it your understanding that that column represents

17   an approximation of how many people the song would have

18   reached?

19   A.   Yes.  I'm not aware of how the --

20             MR. WAIS:  I object.

21             THE WITNESS:  -- calculation is calculated.

22             MR. WAIS.  Objection.

23             THE COURT REPORTER:  I -- I --

24             THE WITNESS:  But I think that's the intention of

25   the number.

```
 1                    THE COURT:  You gotta wait.

 2                    THE COURT REPORTER:  I can't hear you when --

 3                    MR. WAIS:  I'm sorry.

 4                    THE COURT REPORTER:  I'm sorry.

 5                    MR. WAIS:  This isn't working apparently.

 6                    THE COURT REPORTER:  Yeah, it's not -- I -- I don't

 7      know.

 8                    MR. WAIS:  Object to the extent it calls for

 9      speculation.

10                    THE COURT:  Well, I'm gonna sustain the objection.

11                    You can rephrase.

12      BY MS. COHEN:

13      Q.   Mr. Drellishak, is it your understanding based on your

14      familiarity with this document and also the title of that

15      column that this column represents the total audience that

16      the song would have reached based upon the radio spin?

17                    MR. WAIS:  Lacks foundation, calls for speculation.

18                    THE COURT:  As phrased, I'm gonna sustain the

19      objection.

20      BY MS. COHEN:

21      Q.   The column says total audience; correct?

22      A.   Yes.

23      Q.   If you'll turn to page, 111-19.  Found it?

24      A.   Yes.

25      Q.   Okay.  Good.  Um, in that first column next to the date
```

```
 1    which we already identified as spins to date, do you see that
 2    Dark Horse, the total spins as of the date of this document
 3    was 930,186 spins?
 4    A.   Yes, I see that.
 5    Q.   Okay.  And in the far right column which was entitled
 6    Total Audience, do you see the number 6.34 billion?
 7    A.   Yes.
 8    Q.   Okay.  If you'll turn to page -- well, it's Exhibit 111,
 9    page 21?
10    A.   Okay.
11    Q.   Um, and you recognize this as the first page for the
12    Roar single?
13    A.   Yes.
14    Q.   If you'll turn to page -- um, Exhibit 111, page 36,
15    please?
16    A.   What number again?  Sorry.
17    Q.   36.  Exhibit 111, page 36.
18    A.   Okay.
19    Q.   Got it?
20    A.   Yes.
21    Q.   Um, do you see listed here for Roar, the spins to date
22    is a total of 770,456?
23    A.   Yes.
24    Q.   And in the far right column entitled Total Audience, do
25    you see the number 5.23 billion?
```

```
 1    A.    Yes.

 2    Q.    And then if you'll turn to Exhibit 111, page 48?

 3    A.    Okay.

 4    Q.    Do you see that this page represents the spins for the

 5    single This Is How We Do?

 6    A.    Yes.

 7    Q.    This is also from the Prism album?

 8    A.    I believe it is.

 9    Q.    And do you see that the total spins to date for This Is

10    How We Do is 55,024?

11    A.    Yes.

12    Q.    And the total audience is 262.27 million?

13    A.    Yes.

14    Q.    And last, if you'll turn to Exhibit 111, page 63?

15    A.    Okay.

16    Q.    Um, does this represent radio spins for the single

17    Unconditionally?

18    A.    Yes.

19    Q.    And Unconditionally also is a single from the Prism

20    album?

21    A.    Yes.

22    Q.    And do you see in the spins to date column that the

23    total number of spins for the single Unconditionally was

24    149,983?

25    A.    Yeah.  At the bottom of the page?
```

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1395

1    Q.    Yeah, in the total line.

2    A.    Yes, I see that.

3    Q.    Okay.  And do you see in the far right column entitled

4    Total Audience that the number shows 820.36 million?

5    A.    Yes.

6    Q.    And you said at your deposition that Capitol Records

7    generally uses and relies upon these media based documents

8    which generally show the radio statistics; is that right?

9    A.    Yes.

10   Q.    And you also testified earlier that because these

11   documents are considered reliable in the industry, Capitol

12   Records assumes that the information contained within them is

13   accurate; is that correct?

14   A.    That's correct.

15   Q.    So having reviewed the radio plays for the Prism album,

16   four of the Prism album single tracks, isn't it true that

17   Dark Horse of these singles got the most radio plays?

18   A.    That's correct.

19   Q.    And also the most audience impressions?

20   A.    Yes.

21   Q.    Would you agree with me that the Dark Horse track was

22   the most popular single from the Prism album played on the

23   radio?

24              MR. WAIS:  Calls for speculation.

25

```
 1   BY MS. COHEN:

 2   Q.   Based upon this data?

 3            MR. WAIS:  Same objection.

 4            THE COURT:  I'm . . .  I think as phrased, it does

 5   call for speculation.

 6   BY MS. COHEN:

 7   Q.   Do you know, sir, whether the Dark Horse track was the

 8   most popular song played on the radio from the Prism album?

 9            MR. WAIS:  Same objection.

10            THE COURT:  Overruled.

11            THE WITNESS:  Do I know if it was the most popular

12   track played?  I would only be basing that on the information

13   I have in front me.  I don't have any other information about

14   it.

15   BY MS. COHEN:

16   Q.   And based on this information, can you say one way or

17   the other?

18            MR. WAIS:  Calls for speculation.

19            THE COURT:  As phrased, it does.

20            MS. COHEN:  I'll move on, Judge.

21   Q.   Is it fair to say, Mr. Drellishak, that not, um -- that

22   the singles from the album Prism were not of equal popularity

23   as far as radio plays were concerned?

24            MR. WAIS:  Same objection.  It calls for

25   speculation.
```

```
 1   BY MS. COHEN:

 2   Q.   If you know based on your understanding of this

 3   document?

 4            THE COURT:  Okay.  You can answer that.

 5            THE WITNESS:  I'm sorry, ask it again.

 6   BY MS. COHEN:

 7   Q.   I believe I asked if you know whether the popularity of

 8   all of the singles from the Prism album were equal as far as

 9   radio plays were concerned.

10   A.   They were not equal in terms of radio play.

11   Q.   Okay.  I'm gonna move on now to discuss some of the

12   financial documents that were produced by Capitol Records.

13   Um, in this litigation, the plaintiffs requested documents

14   showing revenue received by Capitol Records as a result of

15   its exploitation of Dark Horse.  Do you recall that?

16   A.   Yes.

17   Q.   And you oversaw the production of those documents.  Is

18   that true?

19   A.   That's correct.

20   Q.   And you reviewed the documents to insure their accuracy;

21   is that right?

22   A.   Yes.

23   Q.   And the parties have marked the joint Exhibit No. 116

24   which is in the white binder in front of you.  Can you take a

25   look at it and let me know if you recognize that as the
```

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1398

```
 1   production of financial documents produced by Capitol

 2   Records?

 3   A.   Yes, this is what we produced.

 4          MS. COHEN:  Your Honor, I'd like to move for the

 5   admission of Exhibit 116.

 6          MR. WAIS:  No objection.

 7          THE COURT:  Okay.

 8              (Exhibit 116 admitted.)

 9   BY MS. COHEN:

10   Q.   So, sir, first, I'm going to ask you to take a look at

11   116-2.  Do you recognize this as profit and loss statements

12   Capitol Records prepared in this litigation related to Dark

13   Horse?

14   A.   Yes.

15   Q.   And you said before that you helped prepare this

16   document; is that right?

17   A.   Yes.

18   Q.   And so, generally speaking, the top portion of the

19   document reflects what Capitol Records --

20          MR. WAIS:  Objection.

21   BY MS. COHEN:

22   Q.   -- claims as revenue attributable to Dark Horse; is that

23   right?

24          MR. WAIS:  Argumentative.

25          THE COURT:  Overruled.
```

1          THE WITNESS:  Yes.

2    BY MS. COHEN:

3    Q.    Okay.  And that's shown in the figure 12,402,637.

4    A.    That's correct.

5    Q.    And the bottom portion of this document reflects what

6    Capitol Records claims as costs and expenses related to Dark

7    Horse; is that right?

8    A.    That's correct.

9    Q.    And that amount is $11,772,912; is that right?

10   A.    That's correct.

11   Q.    And then what you do to compute profits is you subtract

12   the total claimed costs and expenses from the claimed

13   revenues, and you come up with a total profit of $629,725.

14   A.    That's correct.

15   Q.    And so $629,725 is all the profits that Capitol Records

16   claims it made from the exploitation of Dark Horse; correct?

17   A.    That's correct.

18   Q.    And is it true that Capitol Records prepared this

19   document and the calculation contained within it exclusively

20   for the purpose of this litigation?

21   A.    That's correct.

22   Q.    Prior to this litigation, this document did not exist;

23   right?

24   A.    Right.

25   Q.    Capitol Records had not allocated revenues or costs

1    specific to Dark Horse in this manner prior to the

2    litigation; right?

3    A.    That's correct.

4    Q.    So looking back at the top of the document related to

5    revenues, Capitol Records identified four categories

6    contributing to total net revenue; is that correct?

7    A.    Yes.

8    Q.    And those are domestic net physical sales, domestic

9    digital sales revenue, domestic licensing income and

10   ancillary income; is that right?

11   A.    Correct.

12   Q.    And Capitol produced backup documents that purport to

13   show the revenue received in each of these categories; is

14   that right?

15   A.    That's right.

16   Q.    Okay.  Let's talk about the net physical sales first.

17   I'm gonna ask you to turn to Tab 2 in your binder,

18   Exhibit 116, page 3.  Sir, is this one-page document, does

19   this one-page document, uh, purport to show the revenue that

20   Capitol Records received as a result of physical sales of the

21   Prism album?

22   A.    Of the Prism album or the Dark Horse track?

23   Q.    Well, the Prism album.

24   A.    Yes, it does have total revenue for the Prism album.

25   Q.    And is it true, sir, that, um, in -- in the column

1    entitled Title, there's different titles here which indicates

2    that there were several verifications of the Prism album

3    sold?

4    A.   That's correct.

5    Q.   And these physical albums would have been sold through

6    retail outlets; is that right?

7    A.   That's correct.

8    Q.   Like a Best Buy, for instance.

9    A.   Yes.

10   Q.   Um, and then there's a column called Total Tracks which

11   shows the number of tracks on each album; is that right?

12   A.   Yes.

13   Q.   Okay.  And the albums -- uh, the Prism albums that were

14   sold contained either 13 tracks or 16 tracks; is that right?

15   A.   That's correct.

16   Q.   Um, is it true that the Dark Horse track was contained

17   on all of these albums shown in Exhibit 116, page 3?

18   A.   Yes.

19   Q.   So there's a column called Total Revenue which tallies

20   the total revenue from the sale of each of these albums is;

21   that right?  There's a subtotal listed for each?

22   A.   That's correct.

23   Q.   And then the subtotals of the sale of each physical

24   Prism album is totaled at the bottom of the page; is that

25   right?

1    A.    That's right.

2    Q.    Okay.  And there's also a column just before the total

3    revenue which says Total Units.  Do you see that?

4    A.    Yes.

5    Q.    Okay.  And would that be number of albums sold?

6    A.    That's correct.

7    Q.    And so Capitol Records sold a total of 1,281,995 Prism

8    albums; is that right?

9    A.    Physical albums, yes.

10   Q.    Physical Prism albums, yes.  And so each one of those

11   albums contained the Dark Horse track; is that right?

12   A.    That's correct.

13   Q.    And the subtotal of all of the revenue that Capitol

14   Records received from physical album sales of the various

15   Prism albums containing Dark Horse is 11,511,521; is that

16   correct?

17   A.    That's correct.

18   Q.    But for the purposes of this litigation, Capitol Records

19   claims that the revenue should be prorated for Dark Horse; is

20   that right?

21   A.    That's correct.

22   Q.    Such that only $816,513 of the total revenue should be

23   attributed to Dark Horse; is that right?

24   A.    That's correct.

25   Q.    And so Capitol Records calculated that number by simply

```
1    dividing the total revenue for the sale of each individual
2    physical album by the total number of tracks on each album;
3    is that right?
4    A.   That's correct.
5    Q.   So, for example, if we look at the Prism album that's
6    listed first, Capitol Records received a total of $358,779
7    for the sale of this Prism album containing the Dark Horse
8    track; is that right?
9    A.   Yes.
10   Q.   And then looking across to the total tracks column, it
11   shows that there are 16 tracks on that album.  Do you see
12   that?
13   A.   Yes.
14   Q.   And so then Capitol Records divided the total amount of
15   revenue by 16 and came up with the prorated revenue of
16   $22,424.
17   A.   That's correct.
18   Q.   And, again, this calculation was never done prior to
19   this litigation; correct?
20   A.   Not for this release.
21   Q.   And, in fact, this document, too, was created for the
22   purpose of this litigation; right?
23   A.   Yes.
24   Q.   What existed prior to this litigation is an entry on
25   Capitol Records' books showing total gross revenue for
```

```
 1    physical album sales related to the Prism album on which Dark

 2    Horse appeared; is that right?

 3    A.   That's correct.

 4    Q.   And that amount is $11,511,521; correct?

 5    A.   Yes.

 6    Q.   And you'll recall that when I asked you at your

 7    deposition why Capitol Records prorated the revenue using

 8    this methodology, you testified that it's a neutral way to

 9    prorate the revenue.  Do you recall that, sir?

10    A.   Yes.

11    Q.   So it's true then that the reduction of total gross

12    album sales from $11,511,521 to $816,513 to Dark Horse does

13    not take into account the relative popularity of Dark Horse.

14    Is that true?

15    A.   The -- no, it doesn't specifically factor that in.  It's

16    a straight allocation.

17    Q.   The proration method that Capital Records used values

18    all 13 or all 16 songs on each of these albums evenly; is

19    that right?

20    A.   That's correct.

21    Q.   In other words, Capitol Records would prorate the same

22    $22,424 to every other song on the Prism album that's listed

23    first on this sheet; is that right?

24    A.   That's correct.

25    Q.   And the same is true of the total that's been prorated
```

EXHIBIT 9
PAGE 1405

```
1    to Dark Horse, the $816,513 of total revenue that Capitol
2    Records claims is attributed to Dark Horse, that every other
3    song would receive that same prorated amount under your
4    methodology.
5    A.   That's correct.
6    Q.   So according to Capitol Records, all of the other
7    singles that were played less than Dark Horse on the radio
8    are prorated equally to Dark Horse; correct?
9    A.   That's correct.
10   Q.   And even songs that never were played on the radio are
11   prorated equally to that of Dark Horse; correct?
12   A.   That's correct.
13   Q.   Let's turn now to the next page, Exhibit 116, page 4 and
14   5.  This is a two-page exhibit.  If you'll let me know when
15   you're there?
16   A.   I'm there.
17   Q.   Okay.  Sir, do you recognize this as a document that was
18   produced that purports to summarize all of Capitol Records'
19   digital sales for both the album and the track?
20   A.   Yes.
21   Q.   And the digital sales, the sale of an album or a track
22   in the form of an MP3 or stream; is that right?
23   A.   Uh, there's a number of ways we receive digital income.
24   It could be either through download sales.  It could also be
25   through, um, streaming accounts like Spotify which is
```

```
 1   basically a pay per stream or per play.  Um, similar we have,
 2   uh, services like YouTube which also report streams to us.
 3   So digital revenue encompasses all of those types of
 4   services.
 5   Q.    And so Capitol Records would provide the media to the
 6   digital service providers who would report back on how many
 7   sales were achieved; is that right?
 8   A.    That's correct.
 9   Q.    And so it's true that Capitol Records sold the Prism
10   album which contained the Dark Horse track digitally;
11   correct?
12   A.    Yes.  And that specific example is only download sales
13   of the album.  It doesn't include streaming.  Streaming is on
14   a per track basis.
15   Q.    And Capitol Records also sold the Dark Horse track
16   digitally; correct?
17   A.    Correct.
18   Q.    Okay, let's -- let's talk about the digital album sales
19   first.  Does this document show that digital sales of the
20   various Prism albums totaled $9,122,707?
21   A.    Yes.
22   Q.    And I say various albums cause it appears from the
23   description that there were different digital albums of Prism
24   sold; is that right?
25   A.    That's correct.
```

EXHIBIT 9
PAGE 1407

1    Q.    So, again, some of those albums contained 13 tracks, and

2    some contained 16 tracks, is that true, for the digital

3    albums?

4    A.    Yes.

5    Q.    And so although the total net revenue for the sales of

6    the albums containing Dark Horse were $9,122,707, for the

7    purpose of this litigation, Capitol Records claims that their

8    revenue should be prorated such that only $648,779 is

9    attributable to Dark Horse; is that right?

10   A.    Can you repeat the amount again?

11   Q.    Sure.  It's $648,779.

12   A.    Yes.

13   Q.    And Capitol Records calculated that number by simply

14   dividing the total amount of revenue for the sale of each

15   digital Prism album by the total number of tracks just like

16   we talked about before; is that right?

17   A.    That's correct.

18   Q.    And just like the physical sales, this proration never

19   was done by Capitol Records prior to this litigation;

20   correct?

21   A.    Correct.

22   Q.    And isn't it true that this document also was prepared

23   for the purpose of this litigation?

24   A.    Yes.

25   Q.    So what existed prior to this litigation related to

1    digital album sales was simply an entry on Capitol Records'

2    books showing total gross revenue for digital album sales

3    related to the Prism albums on which Dark Horse appeared in

4    the amount of $9,122,707; is that right?

5    A.    That's correct.

6    Q.    And it's true that Capitol Records sold 1,052,730 units

7    of the digital Prism albums; is that right?

8    A.    Yes.

9    Q.    And it's true that all of those units or albums

10   contained the track Dark Horse; correct?

11   A.    Yes.

12   Q.    Let's talk about the digital track now.  The track is

13   just Dark Horse, the Dark Horse track; right?

14   A.    Yes.

15   Q.    Okay.  Sold separately; is that right?

16   A.    It's either sold or streamed as a single unit, yes.

17   Q.    So if you look at the second page of this document or

18   Exhibit 116, page 5, does this document show that sales of

19   the digital track Dark Horse totaled $9,908,527?

20   A.    Yes.

21   Q.    And Capitol Records doesn't seek to redoes that revenue

22   because all $9.9 million relates exclusively to the sale of

23   Dark Horse; correct?

24   A.    That's right.

25   Q.    And if you look in the column titled Total Units, is it

```
 1   true that Capitol Records sold 1,089,182,568 units of the

 2   Dark Horse track?

 3   A.   Uh, the only thing I would stipulate is the term sold is

 4   not exactly correct because when you stream a track, it's not

 5   a sale.  There's not a transaction.  It's a use that we get

 6   paid for so . . .  yes, that many units were consumed, but I

 7   wouldn't call it a sale.

 8   Q.   I understand.  Thank you.

 9   A.   So that's --

10   Q.   And that sale or --

11   A.   I know it's a -- it's a nuance, but I just want to be

12   clear.

13   Q.   Okay, thank you.

14   A.   Yes.

15   Q.   So in any event, these are units or uses for which

16   Capitol Records was paid; is that right?

17   A.   Yes.

18   Q.   And so you agree with me then that consumers, um,

19   purchased or consumed over 100 times more the Dark Horse

20   single track than they did the Prism album?

21            MR. WAIS:  Objection.

22            THE COURT REPORTER:  I'm sorry?

23            THE COURT:  What's the objection?

24            MR. WAIS:  No objection.

25            THE COURT:  All right, you may answer.
```

```
 1              THE WITNESS:  I -- I think that metric is
 2    misleading because you're comparing album sales with track
 3    sales and track streams.  So in the example, the track
 4    stream, you could -- if you really like a song, you'll play
 5    it yourself over and over again whereas if you purchased it,
 6    that's only one transaction.  So I think it over inflates the
 7    track count using the methodology that you're -- you're
 8    trying to compare apples and oranges so I think it's not the
 9    right measure.
10    BY MS. COHEN:
11    Q.   Understood.
12    A.   Yeah.
13    Q.   So just in looking at the units, you would agree with me
14    that the units of the Dark Horse track is 100 times more than
15    the units of the album.  Right?
16    A.   Yes, just with -- with the caveat that -- that not every
17    unit is the same type of unit.
18    Q.   Understood.
19    A.   Okay.
20    Q.   Is it true that looking at the digital sales, more
21    revenue was derived from the sale or stream of the Dark Horse
22    track than the entire album as a whole?
23    A.   What two numbers are you comparing?  Just the digital?
24    Q.   Yes.  The digital sales for Dark Horse were $9,908,527
25    versus sale of the digital album which was $9,122,707.
```

1    A.    Yes, that's correct.

2    Q.    And so looking at the very bottom line which adds up the

3    total revenue from digital album sales and digital track

4    sales, is it true that Capitol Records realized or received

5    total ret -- net revenue from digital sales of the Prism

6    album and the Dark Horse track in the amount of $19,031,234?

7    A.    That's correct.

8    Q.    And then if we add to that the total net revenue from

9    the physical sales of the Prism album, $11,511,521, it's true

10   that Capitol Records received over $30 million based upon net

11   sales of the Prism album containing Dark Horse and the track

12   Dark Horse; is that right?

13   A.    We don't have that number in the document, but I'm

14   assuming your math is correct.

15   Q.    All right.  Another category that was listed in the

16   profit and loss statement prepared by Capitol Records is

17   ancillary income so let's talk about that.  I believe that's

18   Tab 10 in your binder.  So, sir, uh, do you recognize this

19   document as another one that was prepared for purposes of

20   this litigation?

21   A.    Yes.

22   Q.    And this document, um, shows income related to Capitol

23   Records' sale of the Prismatic World Tour Live DVD video; is

24   that right?

25   A.    Yes.

```
1   Q.   And is that the only product that's accounted for here

2   in this document?

3   A.   Yes.

4   Q.   And the Prismatic World Tour was Katy Perry's tour

5   related to the Prism album; is that right?

6   A.   Yes.

7   Q.   And so, uh, the DVD -- the Prismatic World Tour DVD

8   contains a recording of Katy Perry performing the songs from

9   the Prismatic tour including Dark Horse; is that right?

10  A.   That's correct.

11  Q.   And the DVD also includes interviews and other non-music

12  content; correct?

13  A.   I haven't seen it, but that's my understanding.

14  Q.   Um, and this document shows that total proceeds from the

15  sales of the Prismatic DVD were $76,153; is that right?

16  A.   Yes.

17  Q.   But Capitol Records claims that the income should be

18  prorated to Dark Horse such that only $2,055 was attributable

19  to Dark Horse; is that right?

20  A.   That's right.

21  Q.   And you arrived at that determination by adding up the

22  total number of minutes on the DVD and dividing by the number

23  of minutes during which Dark Horse is performed.

24  A.   That's right.

25  Q.   And then you prorate the revenue generated by the sale
```

```
1    of the DVD by the proportion of the minutes during which

2    the -- the performance of Dark Horse appears; is that right?

3    A.    Uh, prorating the proceeds that we received, yes.

4    Q.    So based on your calculation of minutes and seconds,

5    Capitol Records believes that Dark Horse should be prorated

6    2.69 percent of the revenue received based on the sale of

7    Prismatic DVD.

8    A.    Yes.

9    Q.    Is it true, sir, that the documents that we've just

10   discussed related to sales of the album, the track and the

11   DVD, um, go from July 2013 to June 20, 2018?  In other words,

12   they account for a revenue received up until July 2018?

13   A.    That's correct.

14   Q.    I'm sorry, June 2018.

15   A.    Yes, June 2018.

16   Q.    And has Capitol Records generated revenue from Dark

17   Horse from July 2018 to the present?

18   A.    Yes.

19   Q.    And Capital Records will go on to earn revenues from the

20   exploitation of Dark Horse; is that right?

21   A.    That's correct.

22   Q.    Now, I'd like to talk about the fourth category of

23   income listed in Capitol Records' profit and loss statement,

24   domestic licensing income, and I will direct you to tab 6 in

25   your binder.  It's Exhibit 116, page 35.
```

```
 1    A.   Okay.

 2    Q.   I want to make sure first we understand what licensing

 3    is.  Um, is it true that licensing is contractually allowing

 4    others the right to use the Dark Horse sound recording?

 5    A.   Yes.

 6    Q.   So an example would be permitting the use of the music

 7    with some video product.  Is that an example?

 8    A.   I think you're referring to synchronization?

 9    Q.   Yes.

10    A.   Yes.

11    Q.   And another example might be, um, revenues derived from

12    the public performance on satellite or webcasting services?

13    A.   Yes.

14    Q.   Um, and also licensing would include the use of a song

15    and a compilation.  Here we're gonna talk about the Now 50 or

16    Now 60 Hits CDs.

17    A.   That's correct.

18    Q.   And so essentially, Capitol Records gets paid for other

19    people's use of the sound recording in these variety of

20    manners; is that right?

21    A.   That's right.

22    Q.   And it's based upon a contract.

23    A.   Yes.

24    Q.   And so all of these categories that are listed here in

25    Exhibit 116, page 135 are included in, uh, the revenues that
```

1    Capitol Records would have received because, um, Capital

2    Records got paid for other's use of this song; is that right?

3    A.    That's correct.

4    Q.    And so the total amount of licensing revenue is

5    $1,026,763; is that right?

6    A.    Yes.

7    Q.    So if we take the $76,153 in gross revenue from the DVD

8    and this additional $1,026,763 from domestic licensing and

9    add it to the roughly $31,000,000 that we already talked

10   about related to net revenue from physical and digital album

11   and track sales, then we're well over $31,000,000 in net

12   revenue; is that right?

13   A.    Yes.  Well, I wouldn't call it net revenue.

14   Q.    Gross revenue?  What would you call it, sir?

15   A.    No, I guess net revenue is correct.  That includes,

16   yeah, returns.  That's correct.

17   Q.    And so Capitol Records generated over $31,000,000 for

18   the sale of products containing Dark Horse, but Capital

19   Records is claiming that it only realized a profit

20   $629,000 -- sorry, $629,725; is that right?

21   A.    Uh, yeah, you're compare -- comparing apples and

22   oranges.  That's a prorated amount compared to all revenues.

23   Q.    So -- right.  You claim that --

24   A.    That -- that amount prorates expenses as well.  It's not

25   showing all of the expenses associated with the total revenue

```
 1    figure you're quoting.  But yeah, those two facts while not

 2    related are correct.

 3    Q.   And this is in part due to all the costs and expenses

 4    that Capitol Records claims are appropriately deducted from

 5    the revenues; right?

 6    A.   Yes, we've used the same proration approach to reduce

 7    the expenses we're deducting as well.

 8    Q.   Okay.  Let's talk about some of the costs and expenses.

 9    We're gonna stay on this, um, same exhibit for a moment

10    relating to licensing income.  There's an expense column here

11    listed to the right, and it shows an expense of $236,515.  Do

12    you see that?

13    A.   Yes.

14    Q.   And that number also shows up as an expense that's

15    deducted from the revenue on the Capital Records profit and

16    loss statement that was prepared; right?

17    A.   That's correct.

18    Q.   And is it true that this expense reflects a royalty

19    that's paid to the artist, in this case Katy Perry?

20    A.   Uh, maybe not just Katy Perry, but, yes, this is the

21    artist royalty expense associated with it.

22    Q.   And is it true, sir, that you don't know whether these

23    royalties were actually paid to Katy Perry or any artist?

24    A.   I believe they were paid.

25    Q.   Do you recall when I asked you that question in your
```

1    deposition, you said you couldn't be sure?

2    A.    Well, I have no reason to believe we haven't paid

3    royalties.  That's our standard procedure.  I think what you

4    want is we're looking at accrued royalties here which is an

5    estimate of what's due on the sales that occurred in that

6    period that will eventually be paid, by now should have been

7    paid.  But I haven't validated that that payment specifically

8    went out, but that is our normal process, to pay those out

9    according to the contract.

10   Q.    So can you -- can you grab your deposition that's up

11   there, sir?  And if you'll turn to page 53?

12   A.    Okay.

13   Q.    Do you see starting at line 14 where you explained the

14   answer to the same question, it says --

15              MR. WAIS:  Objection, Your Honor.

16              THE COURT:  Wait, wait, wait.

17              You can't just start reading.

18              MR. WAIS:  It doesn't impeach.

19              THE COURT:  You can ask him to read it and see if

20   it refreshes his recollection.

21   BY MS. COHEN:

22   Q.    Sir, will you read it and see if it refreshes your

23   recollection?

24              THE COURT:  To yourself.  Not aloud.

25              THE WITNESS:  Okay.  Okay.

```
 1    BY MS. COHEN:

 2    Q.    Does that refresh your recollection, sir?

 3    A.    Yes.

 4    Q.    Okay.  And did you previously testify that --

 5              THE COURT:  Wait, wait, wait.  Wait.

 6              The question is having refreshed your recollection.

 7    BY MS. COHEN:

 8    Q.    Having refreshed your recollection, sir . . .

 9              THE COURT:  Does -- does that . . .

10    BY MS. COHEN:

11    Q.    Does that change your answer to my previous question?

12    A.    I -- I think I'm saying the same thing, but it might

13    sound different, but this is -- in this comment, I was

14    referring to whether or not should we recoup our unrecouped

15    and whether or not a payment was made.

16              What we're showing here is accrued royalties which

17    is the expense that we will owe eventually to the artist, but

18    there are -- you know, there's nuances in the recording

19    business that would, uh, limit that payment if there was a

20    previous advance made so that's what I was referring to here.

21    Q.    And that's because in your contract with the artist,

22    certain amounts of expenses have to be recouped before the

23    artist gets paid royalties; is that right?

24    A.    That's correct, because an advance may have been made

25    and that's effectively a premium of royalties.
```

1    Q.    Okay.  And so in the document, Exhibit 116, page 2 in

2    the profit and loss statement, all the royalties that are

3    listed there, the ones we just talked about were domestic

4    licensing royalty expenses.  You don't know for sure that

5    those were actually paid to the artist; right?

6    A.    I have not validated that a payment was made as part of

7    the process of preparing this, but it would be -- it would be

8    standard procedure to do that.  I -- I can't say that I

9    validated, and that check was cut.

10   Q.    And same thing for the accrued artist producer royalties

11   and the accrued copyright royalties which account for over

12   $4 million; is that right?

13   A.    That's correct.

14   Q.    You accrued royalties, but you don't know for sure if

15   they actually were paid.

16   A.    I don't know for sure.

17   Q.    Now, let's talk about manufacturing costs.  This is

18   Tab 4 in your binder.  Exhibit 116, page 9.  DO you recognize

19   this document, sir?

20   A.    Yes.

21   Q.    And this document says -- at the top, IT reflects

22   manufacturing costs, says Katy Perry Dark Horse.  Do you see

23   that?

24   A.    Yes.

25   Q.    Okay.  And the amount listed at the bottom here shows

1    $176,548.68 is the amount of manufacturing costs it incurred

2    in producing Dark Horse; is that right?

3    A.   That's the prorated amount.  To clarify, we didn't

4    manufacture Dark Horse.  We manufactured the Prism album

5    which included Dark Horse.

6    Q.   So the album was gonna cost the same to manufacture

7    regardless; right?

8    A.   Regardless of what?

9    Q.   What tracks appeared on it?  Or more specifically,

10   whether Dark Horse would appear on it?

11   A.   So you're asking me if they didn't have one track on the

12   album, would the manufacturing costs be the same for that

13   unit?

14   Q.   Yes.

15   A.   The answer is yes.

16   Q.   And you explained at your deposition that a variety of

17   Universal Music entities perform jobs related to

18   manufacturing albums; is that right?

19   A.   Did you reference UML?  I'm sorry.

20   Q.   I didn't specifically, but I'm talking about Universal

21   Music Logistics as it relates to manufacturing.

22   A.   Okay.  I took it to mean Universal Manufacturing

23   Logistics, but, yeah, that entity UML oversees the production

24   of CDs.

25   Q.   And so typically or generally speaking, you said that,

```
 1   um, UML is responsible for engaging a third party to
 2   manufacture physical albums; is that right?
 3   A.   That's correct.
 4   Q.   And so typically, UML would pay the third party for the
 5   actual cost of the manufacturing; right?
 6   A.   That's correct.
 7   Q.   And then Capitol Records would essentially reimburse UML
 8   for the cost of the manufacture; correct?
 9   A.   They would -- they would pay based on a rate card that's
10   established annually for the standard cost of units.  But
11   yes, you're correct, they would -- they would pay UML for
12   that service.
13   Q.   So there's a fixed rate card within the Universal Music
14   franchise that governs what one entity will pay to another
15   for various services.  Is that what you're referring to?
16   A.   Yes, that's a rate card.  It's not specifically just,
17   um, between U -- Universal entities.  It's also, uh, what we
18   would charge a third party label that we provide services to.
19   Q.   And the rates are set by Universal.  That rate?
20   A.   Yes.
21   Q.   And so the amount that Capitol Records would pay to
22   Universal -- or UML is not necessarily the amount that UML
23   paid to the third party to actually manufacture an album; is
24   that right?
25   A.   That's correct, there's -- there's more costs associated
```

EXHIBIT 9
PAGE 1422

1    than just specifically the replicator.  You'd also have

2    people who are managing the product that -- that also have to

3    be considered as part of the cost of that product so that's

4    what the rate card is intended to reflect.

5    Q.   And so at times, there are media mark-up above and

6    beyond the actual manufacturing costs that are paid; right?

7    A.   Yes.

8    Q.   And so with respect to this document, Exhibit 116,

9    page 9, if we look at, uh, an example entry, the second gray

10   box that's shown here, it shows the manufacture of 10,337

11   albums.  There's an entry -- or an expense, um, shown for

12   $9,148.25.  You can't say for sure that that amount reflects

13   the actual cost of the manufacturing of the album entered

14   there, can you?

15   A.   No, I can say for sure that is not the actual cost paid

16   for.  That's the rate card.  That's the -- that is the price

17   per the rate card.

18   Q.   And so like you said before, there may be a mark-up in

19   here.

20   A.   Yes.

21   Q.   Relative to the actual cost of the manufacture.

22   A.   Yes.  It's possible.

23   Q.   Now, let's talk about marketing expenses.  That's Tab 7

24   of your binder, sir?  And sir, Exhibit 116, page 15.

25   A.   I'm there.

1  Q.   And so Capitol Records claims that the prorated amount

2  which should be attributable to Dark Horse using the same

3  methodology we talked about earlier related to marketing is

4  $916,392; is that right?

5  A.   That's correct.

6  Q.   If you'll turn to the next page, sir.  Is it Capitol

7  Records' position that all of the marketing expenses that are

8  booked on the profit and loss sheet that was created, um,

9  prorated to Dark Horse were necessary to generate the revenue

10  related to the Dark Horse?

11        MR. WAIS:  Object to the extent it calls for a

12  legal conclusion.

13        THE WITNESS:  I'm struggling because the

14  wrap-around track --

15        THE COURT REPORTER:  Hold on just a second.

16        I didn't -- I didn't hear the Judge.

17        THE WITNESS:  Sorry.

18        THE COURT REPORTER:  I'm sorry.

19        THE COURT:  I said -- let me just restate it.  I'm

20  going to overrule the objection.  I don't think it calls for

21  a legal conclusion.

22        THE COURT REPORTER:  Okay.  Go ahead, I'm sorry.

23        Did you forget the question?

24        THE WITNESS:  Yes, could you repeat the question?

25

```
 1   BY MS. COHEN:

 2   Q.   I forgot my question so I'm just gonna start asking

 3   about the expenses.

 4   A.   Okay.

 5   Q.   Um, we'll come back to it, I'm sure.

 6   A.   Okay.

 7   Q.   So looking at the first page of the line item marketing

 8   expenses Exhibit 116, page 51, and looking about midway down

 9   and, actually, my -- my friend here, John, is gonna highlight

10   it for you.  It might be easier to find on your screen.

11          Do you see the first highlight on that sheet, sir?

12   A.   Yes.

13   Q.   It says flashing ice cube for cocktails.  Do you see

14   that?

15   A.   Yes.

16   Q.   And so the cost of that marketing expense was $1,979.21?

17   A.   Yes.

18   Q.   And the next entry I'm gonna ask you about is a little

19   bit further down the page.  It says styling advance for Katy

20   Perry VMA performance?  Do you see that entry --

21   A.   Yes.

22   Q.   -- sir?

23   A.   Yes.

24   Q.   And, um, you understand that styling is related to

25   Ms. Perry's wardrobe.  Is that right?
```

1    A.    Uh, wardrobe and make-up, yes.

2    Q.    And that entry, uh, for styling advance is $13,600?

3    A.    That's correct.

4    Q.    Then if you look at the bottom of the page, we see Katy

5    Perry's car service in NYC for the VMAs, $6,480?

6    A.    Yes.

7    Q.    Next, Katy Perry's air charter, $73,750.  You see that

8    entry?

9    A.    Yes.

10   Q.    Next, Katy Perry's hairstylist, $4,702.50.  You see that

11   one?

12   A.    Yes.

13   Q.    Okay.  Then if we turn to the next page, John.

14          It's Exhibit 116-52.  We have MTV, VMAs, Katy's

15   hair, $11,212.74.  Do you see that?

16   A.    Yes.

17   Q.    Okay.  And I believe before you said that the styling

18   might include makeup.  Here we have a separate entry for Katy

19   Perry's makeup, $6,270.  Do you see that?

20   A.    Yes.

21   Q.    Next, MTV VMAs, Katy's nails, $821.  Do you see that?

22   A.    Yes.

23   Q.    Another entry down the page is hairstyling for Kimmel,

24   $3,000.  Do you see that one?

25   A.    Yes.

```
 1    Q.   So I'm gonna skip ahead to Exhibit 116, page 54.  It's
 2    just two pages ahead.  And I'll draw your attention to hair
 3    for SNL and Fallon in the amount $14,940.05.  Do you see that
 4    entry?
 5    A.   Did you say it was just for hair?
 6    Q.   It says hair, SNL and Fallon.
 7    A.   It's not 14,000.
 8    Q.   I'm sorry.  $3,135.
 9    A.   That's correct.
10    Q.   Second entry just below that on the same date, another
11    entry for hairstyling in the same amount, $3,135.
12    A.   Yes.
13    Q.   Just a little bit further down the page, there's another
14    manicure, Katy Perry for Kimmel, $600.  Do you see that
15    entry, sir?
16    A.   He is highlighting it.  I haven't seen it yet.  Yes, I
17    see that.
18    Q.   Okay.  And just a couple more I'll highlight on the next
19    page.  Stylist advance, $15,000.  You see that?
20    A.   Yes.
21    Q.   Further down the page a little bit, another, it says
22    back end for stylist for Katy Perry, same supplier a month
23    later at $8,813.48.  Do you see that?
24    A.   Yes.
25    Q.   Okay.  So I could go on, but, um, I won't.  There's
```

1   29 pages of these marketing expenses; right?

2   A.   I haven't counted, but yes.  That sounds right.

3   Q.   And so I think my earlier question was is it Capitol

4   Records' position that all of the marketing expenses that we

5   just read that are included in this packet were necessary to

6   generate the revenue that it received related to Dark Horse?

7   A.   Yeah.  For an artist like Katy Perry, an important part

8   of her -- her image depends on this.  So she always has to be

9   in the most fashionable clothes with the best looking makeup.

10  She is constantly changing her look, it's an important part

11  of image, and that's core to who -- what the Katy Perry brand

12  is.  And these are all costs that Universal paid for those

13  services.

14  Q.   Let's talk about overhead costs next.  This is gonna be

15  in Tab 8, Exhibit 116, page 81.

16  A.   Okay, I'm there.

17  Q.   Got it?

18  A.   Yes.

19  Q.   Okay.  So I'm gonna try not to bore the jury with a

20  lengthy explanation of how this was all calculated, but, um,

21  just to move this along, is it true that in calculating what

22  Capitol Records claims is the overhead allocable to

23  Dark Horse, Capital Records took basically all of Capitol

24  Records' overhead and a portion of, uh, gross physical sales

25  for an 18-month period and then calculated what proportion of

58

1    those sales were allocable to Dark Horse and then came up

2    with 5.4 percent?

3    A.    I think you said physical sales?  It's not just physical

4    sales.

5    Q.    I'm sorry, physical and digital.

6    A.    And digital, yeah, we use both of those.

7    Q.    Okay.  And so based on this calculation that you do, um,

8    you came up with 5.4 percent of all overhead which Capitol

9    Records claims should be attributable to Dark Horse; is that

10   right?

11   A.    That's correct.

12   Q.    And as far as the sales numbers that you relied upon in

13   calculating that percentage, you only included songs that had

14   been released, um, from October 2013 and then for two years.

15   A.    It's 18 months.

16   Q.    18 months.

17   A.    Yeah, we use an 18-month period.  That's what the, uh --

18   the industry would call front line which is the initial

19   period of the release.

20           Um, the reason we limit it -- we limited the

21   overhead to just that period of time so that, uh, it

22   represented the time when the label was active working with

23   the new release.  Later on, these titles go into a catalog

24   and require a less label effort so I've only allocated a

25   portion of the label overhead.

EXHIBIT 9
PAGE 1429

1          And overhead just includes employees and the -- and

2    rent to the building and all the things we need to support

3    the employees working on this project.  It's only limited to

4    an 18-month window which is the most active period for the

5    title.  It's not overhead throughout the entire period.

6    Q.   And so when you calculated the -- the total gross

7    physical and digital sales, in coming up with that

8    5.4 percent, the songs that you subtracted out -- or the

9    sales from the songs that you subtracted out, looking at

10   this, um, page 81, Exhibit 116 page 81, is it true that the

11   sales from the songs that were subtracted out accounted for

12   roughly half?

13   A.   Where do you see half?

14   Q.   Well, if you look at gross physical sales.

15   A.   Yes.

16   Q.   You have 146,000.  Roughly; right?

17   A.   Yes.  Reduced by the catalog.

18   Q.   Right.  And so that's actually more than half.  You

19   reduced it by more than half.

20   A.   For physical, that's correct.

21   Q.   And then for digital, you have roughly 191,000,000, and

22   you reduced it by 85,000,000; is that right?

23   A.   That's correct.

24   Q.   And that's a little less than half; right?

25   A.   Yes.

UNITED STATES DISTRICT COURT

EXHIBIT  9

PAGE  1430

60

```
1    Q.   And if you had included all of those sales figures in

2    calculating the, um -- what you believe should be the

3    proration amount, this percentage, 5.4 percent, which you

4    prorate to Dark Horse would have been a lot smaller; is that

5    right?

6    A.   That is correct, but it wouldn't be representative of

7    the -- the focus that a label has which is on front line

8    products, putting out new records, marketing new records.

9         Um, once it goes to the catalog, that's -- that's

10   managed by another group outside of Capitol.  There's a

11   catalog group that handles that product.  So it's appropriate

12   to focus only on the -- the front line part of the business

13   which is what the Capitol label is spending all of their time

14   on.

15   Q.   Okay.  So let's talk about some of the categories that

16   Capitol Records includes in calculating overhead.  And by the

17   way, based on the 5.4 percent, uh, that you arrived at, you

18   claim that $5,103,213 of Capitol Records' overhead expenses

19   should be attributable to Dark Horse; is that right?

20   A.   That's correct.

21   Q.   Okay.  Let's look at Exhibit 116, page 92.  So as you

22   just mentioned, the overhead expenses that Capitol Records

23   claims are attributable to Dark Horse include things like

24   rent, salaries, severance, pension, other fixed asset costs;

25   is that right?
```

EXHIBIT 9
PAGE 1431

61

1    A.    That's correct.

2    Q.    And isn't it true that at your deposition, we went

3    through each of these categories of expenses, and you were

4    not able to identify any that were directly related to the

5    production of Dark Horse?

6    A.    The way that we track overhead would make it impossible

7    to -- to fulfill that request.  So that's why I've come up

8    with the -- the approach to allocate overhead based on sales

9    which is an indicator of how much the label was working on

10   that product.  Um, we don't --

11         Like a law firm, we don't track hours so we would

12   not be able to specifically say what each person did in -- in

13   working in their respective job on that -- on that, uh,

14   release, but I can assure you that with a -- with a release

15   of this size, it touched everyone's label.

16   Q.    So rent, for instance.  Did Capitol Records have to pay

17   more rent in order to generate the revenue related to Dark

18   Horse?

19   A.    No, they had to pay rent to house the people that were

20   doing the work.

21   Q.    Same question with salary.  Salaries are fixed; correct?

22   A.    Yes.

23   Q.    So there was no increase salary payment as a result of

24   Dark Horse specifically; is that right?

25   A.    No, it -- it's utilization of their time, not

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1432

1    incremental spend per full-time employee.

2    Q.    So these salaries would have been paid regardless of

3    whether Dark Horse was produced; is that right?

4    A.    That's correct.

5    Q.    Same with the rent.  The rent was going to be paid

6    regardless of whether Dark Horse was produced.

7    A.    I mean, if we didn't have Katy Perry on the label, we

8    might not have the same amount of overhead.  We'd probably

9    have to scale back.  But generally speaking, I -- you know, I

10   understand your question.  It's a fixed cost so yes.

11   Q.    And you have severance included here.  Do you know

12   whether any employee was let go or fired as a result of the

13   production of Dark Horse?

14   A.    Well, I think you're looking at the studio overhead

15   which is something we deducted.  So everything you're looking

16   at here was taken out of the overhead for, um, the Capitol

17   operations.  Part of -- part of Capitol is a logistic deal,

18   but I've taken that out of the overhead cause that was not

19   attributable to Katy Perry.  So this is actually a deduction

20   from overhead that you're looking at.

21   Q.    Where does it say that this is . . .

22   A.    On the first page, you'll see Capitol Studio's overhead

23   is a negative, minus five million three.  I'm reducing

24   overhead by that amount.

25   Q.    And you testified at your deposition then that the

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1433

63

1    Capital Studio's overhead was removed because you couldn't

2    connect it directly to Dark Horse; is that right?

3    A.    That's correct.

4    Q.    And so in looking at Exhibit 116, the exhibit that

5    starts 116, page 81, can you point me to which document

6    related to overhead expenses represents the categories of

7    overhead that you are claiming related to Dark Horse?

8    A.    I think it would be the previous page.  Um, 116-91, for

9    instance.

10   Q.    Pension, in general, is a salary insofar as it's a fixed

11   cost?

12   A.    An employee-related cost, yes.

13   Q.    And so those pensions were not paid because of the

14   creation of Dark Horse; is that right?

15   A.    No, it's a component of the employee salary package.

16        THE COURT:  Ms. Cohen, how much longer do you have

17   to go?  The reporter needs a break.  I have a noon

18   proceeding.  So if we take a break at this point -- I'd

19   rather go another 15 minutes and then give the reporter a

20   break before noon.

21        MS. COHEN:  I'm very close to finishing.

22        THE COURT:  Yeah, let's see if we can get you

23   finished up.

24   BY MS. COHEN:

25   Q.    So just -- just to finish up here, Mr. Drellishak, is

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1434

64

1    there any category that you're able to identify as far as

2    overhead goes that would not exist as an expense but for

3    Capitol Records' creation -- production of Dark Horse?

4    A.    As I said before, the -- the size of the -- the label

5    would have to be appropriate with the size of the revenue

6    that we derive.  A release like this was a big part of the

7    revenue.  If we didn't have an artist like Katy Perry, we

8    wouldn't have as many people employed.  So while not

9    directly, um, associated with a specific release, uh, if we

10   didn't have Katy Perry on the roster, Capitol's overhead

11   would be smaller.

12            MS. COHEN:  That's all the questions I have.

13            THE COURT:  Okay.  Why don't we take our break now.

14            Um, ladies and gentlemen, why don't you plan to

15   return, uh, at quarter to 1:00, and we'll pick up at that

16   point in time.

17            THE CLERK:  All rise.

18                    (Jury not present.)

19            THE CLERK:  Please be seated.

20            THE COURT:  Just for planning purposes, what do you

21   think is a good time for your cross of the witness?

22            MR. WAIS:  Um, probably like 45 minutes to an hour.

23            THE COURT:  Okay.  And then the experts, how long

24   are they gonna be?

25            MR. MOVIT:  Uh, Dr. Lawrence Ferrara should be

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1435

```
 1    pretty brief, Your Honor.

 2              THE COURT:  Okay.  Anyone else?

 3              MR. MOVIT:  And then Jason King.

 4              MS. LEPRA:  It will be approximately an hour.

 5              THE COURT:  Okay.  So we should finish up testimony

 6    if anything goes properly by about, what, 4:00?  And then

 7    closing today?

 8              MS. LEPERA:  Sure.

 9              THE COURT:  Okay.  Hopefully, it will be speedier,

10    but if not, that's what I'm going to expect you to do.

11         Okay.

12              THE CLERK:  This court's in recess.

13                        (Lunch Recess.)

14              MS. COHEN:  We have a couple of issues.

15              THE COURT:  Yes.

16              MS. COHEN:  The first issue, Judge, is that over

17    the lunch hour, we were provided for the first time a packet

18    of demonstratives the defendants now would like to use with

19    their expert witness Dr. King.  This is after making a

20    blanket objection to the use of any and all demonstratives by

21    the plaintiff in any phase of the case.

22         Um, we're told that this information is text that

23    is copied into a slide from the report of Dr. King.  That's

24    precisely what we were going to do with the Capitol Records

25    witness.  We were not permitted to do that.  Moreover, the
```

```
 1    documents that we were planning to use with Capitol Records
 2    as a demonstrative would have been evidence.  Whereas the
 3    expert report of Dr. King is not.  So the timing is certainly
 4    interesting and we would certainly --
 5              THE COURT:  You know, guys, I am tired of this.  I
 6    have not seen professionals behave this way.  I'm not looking
 7    at you, Ms. Cohen.  Everything is last minute, unfair and
 8    prejudicial.  First of all, you did not tell me yesterday
 9    what you were going to present.  You just had demonstratives.
10    I said if something was in evidence, you could use it.
11              I did not tell you that -- first of all, I don't
12    know how the Capitol Records witness who shouldn't be on the
13    stand while we're having this discussion has a report.  We're
14    talking about a report by an expert.  We're not talking about
15    some report by our --
16              THE CLERK:  Should I have him step out?
17              THE COURT:  I guess.  I'm beyond frustration.
18              MS. COHEN:  Judge, what we sought to do with the
19    Capitol Records witness was to use portions of the documents,
20    not his report, documents that were produced by Capitol
21    Records.  To basically do screenshots of those in
22    demonstrative slides to simplify the presentation, and we
23    were not permitted to do that.
24              THE COURT:  No, you were not.  You were not
25    listening.  We were talking about closing argument.  We were
```

EXHIBIT 9
PAGE 1437

```
1    not talking about witness when he was on the stand.  No one

2    ever raised the issue of when he was on the stand.  And

3    that's why I am just beyond frustration because we had a

4    discussion about what you could do in closing argument.  That

5    was the sole question we discussed yesterday.

6              And so no one told me that you wanted to show the

7    witness a chart as the way of a demonstrative, some document

8    that Capitol Records had produced.  If you want to do that,

9    I'll reopen testimony and let you.

10             MS. COHEN:  No, we aren't going to do that, Judge.

11   Respectfully, I believe the record would reflect that I did

12   specifically ask that question.

13             THE COURT:  Well, I cannot remember a different

14   anything.  I apologize if you did raise it, but I didn't hear

15   you.

16             MR. MOVIT:  You're correct, Your Honor, in your

17   memory.

18             MR. ALBERTSON:  Just to speak briefly, I don't

19   think this should be a controversial issue, Your Honor.  We

20   prepared some text only slides with information directly from

21   Dr. King's report to aid in his testimony.  I think it would

22   make things run more quickly.  I don't think this is

23   controversial.

24             There's no argument in the slides outside of what's

25   in his report.  There's no visuals other than one image of
```

```
 1    the Prism album which is in evidence.  So we respectfully ask

 2    that we just be permitted to present these slides during his

 3    testimony.

 4            MS. COHEN:  And we would say it's completely

 5    unfair, it's one-sided and it's prejudicial to the

 6    plaintiffs.

 7            THE COURT:  I just don't see what's unfair when no

 8    one has advised me that it was your intention to show the

 9    Capitol documents that were produced to the Capitol witness.

10            MS. COHEN:  I did that, Judge.  We wanted to create

11    demonstratives based upon those documents.

12            THE COURT:  For closing argument.  That's what we

13    were discussing.  The whole thing was closing argument.  It

14    wasn't what you showed the witness.

15            MS. COHEN:  We discussed showing demonstratives to

16    the witness as well.

17            THE COURT:  I'm gonna cure the prejudice and say

18    you can put him back on the stand and show him the

19    demonstratives.

20            MS. LEPERA:  We haven't seen any demonstratives,

21    Your Honor.  I don't know what she's talking about.

22            THE COURT:  Well, I don't either.

23            MS. COHEN:  We're not doing that.  But the point is

24    that the defendants made a blanket objection to the use of

25    any demonstratives.
```

```
 1              THE COURT:  In closing arguments.
 2              MS. LEPERA:  And, Your Honor, it's very apparent
 3    that that's not the case because both parties used
 4    demonstratives with their music experts which were agreed
 5    upon.
 6              THE COURT:  We're talking about yesterday and not
 7    the music experts.
 8              MS. LEPERA:  Well, the differential being we were
 9    objecting to opening and closing demonstratives as
10    Your Honor's saying not with respect to the experts to aid in
11    the testimony.  Both sides used demonstratives on that.  This
12    is the same thing.
13              THE COURT:  I disagree, but I am going to stand by
14    my guns as to what I said yesterday.  My understanding was we
15    were talking about closing argument.  I am saying now that if
16    for some reason I misapprehended Ms. Cohen's argument, I'm
17    giving her the opportunity to reopen and show all the
18    demonstratives to the witness.
19              MS. COHEN:  Thank you, Judge.
20              THE COURT:  Meanwhile. . .
21              THE CLERK:  Are we ready for the jury?
22              THE COURT:  No because I still don't know what
23    reports they're going to show to the expert.  So why don't
24    you tell me what that is and we'll decide.
25              MR. ALBERTSON:  Of course, Your Honor.
```

```
 1              So Dr. King submitted a report in this case in
 2      April.  The slides I can provide a copy to the Court.  It's
 3      just 10 pages of text taken from the report not snippets of
 4      an image of the report, but the text itself.  In the same way
 5      we did with Dr. Ferrara, that the plaintiffs did with
 6      Dr. Decker, and that we did with the MySpace and YouTube
 7      experts.
 8              Just taking them through the slides in an even more
 9      pared down than those in that there's no images or anything
10      like that.  It's just the information from the report of
11      Dr. King that was disclosed many months ago.
12              THE COURT:  So what we're going to put up are
13      portions -- give me an example.  Portions of his expert
14      report.  We're not putting his expert report in evidence.
15      We're putting up --
16              MR. ALBERTSON:  Correct.  It's really just
17      headings, um, from the report without the verbiage of the
18      text of his opinion which he will offer on the stand.  These
19      are sort of just headings so that the jury can follow along
20      with where he will be going.
21              THE COURT:  And these are in his report.
22              MR. ALBERTSON:  Correct, Your Honor.  There are
23      citations on the demonstratives to the pages in the report or
24      in two instances where there is a citation to the Capitol P
25      and L exhibit which is in evidence.
```

```
1              THE COURT:  I think you can use them.

2              MR. ALBERTSON:  Thank you, Your Honor.

3              THE COURT:  Now, let me deal with this deposition

4    reading issue as quickly as I can and get it out of the way.

5    I do believe, although the case law is completely all over

6    the map, and it would be hard to say the 9th Circuit or

7    anyone created a hard and fast rule.

8              It seems that the expert's statement regarding as I

9    understand his conclusion that the Capitol expenses or the

10   Capitol Records' expenses are accurate or whatever he said

11   can come in.  I think it is an admission of a party opponent.

12   And it comes in because at the time you designated him, you

13   thought that he was going to be a witness in the case and

14   then ultimately, the plaintiff decided not to call him.

15             On the other hand, I think that the testimony you

16   want to offer from the expert regarding his prior testimony

17   against UMG and others does not come in because it's a

18   collateral matter.  It is completely confusing and

19   misleading.  I understand why you'd like to argue it, but I

20   just don't think it comes in under the case law.  It's not an

21   admission, it's not anything.  It's just an attempt to. . .

22             MR. MOVIT:  Okay, Your Honor.  We'd just like to

23   preserve our objection for the record.

24             THE COURT:  I understand, I understand.

25             MS. COHEN:  And we also would like to preserve our
```

```
 1    objection to any reading.
 2              THE COURT:  Of course, of course.
 3              MR. MOVIT:  And we will edit the designations
 4    according to Your Honor's ruling.
 5              THE COURT:  Thank you.
 6              MS. COHEN:  And additionally, Your Honor, we
 7    believe that it would be improper for the defendants to
 8    argue, um, that he was listed, but not called or why he
 9    wasn't called or anything of those things.  It would be
10    solely for the purpose of impugning the plaintiff's trial
11    strategy.  It's not relevant to any issue in the case.
12              MR. MOVIT:  The fact we have to say it's their
13    expert and the fact they haven't brought him here speaks for
14    itself.
15              THE COURT:  You're not gonna say they changed their
16    mind and didn't call him because he has unfavorable
17    testimony.  I think you are able to say here's a transcript
18    of what their expert testified to.
19              MR. MOVIT:  Yes, Your Honor.
20              THE COURT:  And that's it.
21         Okay.  Then unless we have more, let's bring the
22    jury back.
23                   (Jury present.)
24              THE COURT:  Okay.  Mr. Wais.
25                   CROSS-EXAMINATION
```

UNITED STATES DISTRICT COURT

EXHIBIT  9
PAGE 1443

1    BY MR. WAIS:

2    Q.    Good afternoon, Mr. Drellishak.   How are you?

3    A.    I'm fine.

4    Q.    So Ms. Cohen asked you some questions, well, let's turn

5    back to Exhibit 116 shall we?   And specifically if we can

6    turn to the next page, 116-2?

7              Ms. Cohen asked you some questions about this being

8    prepared for this litigation.   Do you recall those questions?

9    A.    Yes.

10   Q.    Does Capitol normally prepare a profit and loss

11   statement for a single track?

12   A.    No.

13   Q.    Does it, however, prepare such statements for other

14   purposes?

15   A.    Other than a litigation like this, no.

16   Q.    So it prepares it for other litigations, though.

17   A.    Yes.

18   Q.    Okay.  And in those other litigations, is it prepared in

19   the same fashion?

20   A.    Yeah, it's a consistent format.

21   Q.    And the allocation of revenue that we were discussing

22   from the Prism album to Dark Horse and allocating that

23   equally across all tracks, is that the same allocation that

24   you use in these other litigations?

25   A.    Yes, that's a standard approach.

1    Q.    And can you just explain to us a little bit more about

2    why you use that approach.

3    A.    Well, it's ultimately to be neutral and unbiased in the

4    way that we allocate revenues.  Um, trying to understand when

5    a consumer buys an album, what they were intending is hard

6    to -- it would be impossible to guess.  So the idea is just

7    to be neutral and divide evenly.

8    Q.    Cause it's the case that on the album, for example, with

9    13 tracks on it, there's 12 other tracks other than Dark

10   Horse; correct?

11   A.    Right.  And all of those have value, they're all

12   creative works.  The same amount of work went into them so

13   the idea is they're all valuable.

14   Q.    And the same is true for the albums, the deluxe version

15   with 16 tracks on it?

16   A.    That's correct.

17   Q.    And thinking along those lines when we're talking about

18   allocating from the Prism album to a single track on that

19   album, if someone wanted to listen to Dark Horse, for

20   example, they wouldn't have to buy the Prism album, would

21   they?

22   A.    No.  With the digital landscaping, there are several

23   ways to listen to music.  You can, if you just want the

24   track, you can buy the download.  You can stream it on

25   Spotify under a subscription service.  You could stream it

1    for free also on Spotify and YouTube.  And so the ability to

2    get a la carte tracks now is commonplace.  So if that's all

3    you want, there are several ways to get it.

4    Q.   In fact we go back to Tab 2 in your binder which shows

5    the revenues of sales from albums and Dark Horse, if you turn

6    to Exhibit 116-5, it shows over a million streams in sales of

7    the Dark Horse track individually; is that correct?

8    A.   Is that a million or billion?

9    Q.   One million.  Just over one billion.  My apologies.

10   A.   It's over a billion.

11   Q.   And that equals nine million in revenue to Capitol;

12   correct?

13   A.   That's correct.

14   Q.   And if look at the purchases of the album, it also

15   equals nine million in revenue as well?

16   A.   Right.

17   Q.   And those are people who obviously when you're talking

18   about the digital would have gone beyond just buying simply

19   the Dark Horse track itself?

20   A.   That's correct.

21   Q.   Let's just go back to the profit and loss statement for

22   a minute and talk a little bit more about where these numbers

23   came from.  Just ask the easy question.  Where did these

24   numbers come from?

25            These weren't figures that you created for purposes

1    of this litigation.  They came from --

2              MS. COHEN:  Objection to the leading form.

3              THE COURT:  Why don't you rephrase.

4    BY MR. WAIS:

5    Q.   Where did the numbers come from?

6    A.   These were all derived from Universal Systems.  Each

7    category typically has a different system that we use to

8    store this information.  So we have a royalty system, we have

9    a revenue processing system and so on.  You know, we have a

10   financial system that tracks all of this as well.  SAP

11   ledger.

12             So it's a very robust process that's audited

13   annually by external auditors.  That's the source of all the

14   information we're pulling.  The only thing on top of that is

15   the proration.

16   Q.   So the underlying financial information is something

17   that's kept in the ordinary course of Capitol's business?

18   A.   That's correct.

19   Q.   And what protocols are kept in place to insure the

20   accuracy of the information?

21   A.   Well, we're audited externally and internally by

22   auditors annually and often more frequently than annually.

23   We also have robust key controls in place, um, that dictate

24   rules and responsibilities for what records need to be

25   maintained, who needs to approve, who needs to review the

1    work.  It's a very well-documented approach.  That's also --

2    those procedures are also reviewed by external auditors

3    annually.

4    Q.   And if we look a little bit more at the profit and loss

5    statement which is 116-2, Ms. Cohen talked to you about how

6    it breaks it down into revenue at the top and costs at the

7    bottom.

8              And I want to focus on Capitol's costs first which

9    are at the bottom of that page.  Can you just walk us

10   generally at a high level what the costs are and why they're

11   appropriately attributed to the Dark Horse track?

12   A.   Okay.  Uh, the first two are distribution fees.  Those

13   are costs associated with -- well, I guess I'll break out the

14   physical.  Physical distribution fee is the process of

15   getting the CD to the store for sale.  Uh, digital

16   distribution fee entails, um, we have a supply chain system

17   that distributes the audio digital track to well over

18   hundreds of partners for distribution through digital

19   channels.  Um, we get reporting back from those partners.

20   That's how we recognize revenue.

21             Um, manufacturing costs are specifically related to

22   CDs, that's the manufacturing of the CD.  Ancillary fees are

23   charges that are part of the supply chain that are charged

24   for unusual activity or for returns processing.  Things that

25   are kind of out of the normal course.  Maybe you have to ship

EXHIBIT 9
PAGE 1448

```
1    a product not filling a box entirely.  That has incremental

2    costs associated with it.

3         Um, then we get into the royalty section.  There's

4    basically two kinds of royalties.  There's an artist producer

5    royalty which is related to the recorded music, the recording

6    of the song, and then there's copyright royalties which are

7    associated with the songwriter.  So for each track there are

8    two primary royalties paid for each one of those artists or

9    writers.

10        Domestic licensing falls into that category as well

11   under similar to an artist royalty.  Uh, marketing expense we

12   discussed a bit.  That's the effort that we incur to make

13   people aware of the track or album that we're selling.  I

14   think we went into fair detail on that and we also discussed

15   overhead as well.

16        Overhead is mainly the people that make up the

17   company and the building and the phone lines and everything

18   else required to run the business.  And then lastly AFM and

19   AFTRA, those are costs that we pay to the musicians unions

20   mainly funding the pension plans.  That's agreed upon through

21   a contract with the unions.

22   Q.   And let's dive into these in a little bit more detail

23   and get into the details of the different costs.  So before

24   it gets to manufacturing and distribution, what goes into

25   getting an album ready to go into that distribution chain?
```

```
1    A.    So that's what we would call the A&R process, artist and

2    repertoire.  There's a group of people who work closely with

3    the artists while they're in the studio.  They administer the

4    costs associated with recording that album making sure we

5    stay on budget.  And they insure that -- that we're getting

6    the kind of product that we expect to receive before we

7    distribute it from artist and they're collaborating with them

8    on that process.

9    Q.    Okay.  And during that process, all those employees are

10   employed by Capitol?

11   A.    That's correct.

12   Q.    And obviously we're talking about things such as a

13   overhead.  Are they paid a salary?

14   A.    Yes.

15   Q.    And what does it take otherwise than a salary to attract

16   the best talent to come work at Capitol?

17   A.    Well, advances help.  That's one inducement.  I think

18   when an artist is looking at a label, they look at how

19   successful they have been.  So they want to see the quality

20   of people working there.  They want to see we've got the best

21   talent.  You've got motivated people.

22         You've got dedication to that artist.  You want

23   them to be passionate, as passionate as the artist is about

24   that.  Um, you know, I'm guessing what an artist would be

25   looking for, but that's what we know is important to them.
```

UNITED STATES DISTRICT COURT

EXHIBIT 9

80

1    Q.    Okay.  And when we're talking about these A&R employees

2    to do their jobs, what sort of other overhead goes into that

3    to allow them to do their jobs?

4    A.    Well, basic, you know, support functions like maybe a

5    telephone, an Internet connection, a computer.  They need an

6    office to work out of.  Basic other overhead lines we

7    discussed earlier.

8    Q.    And those would be, uh, obviously, for Dark Horse that's

9    something that would be captured in trying to get something

10   like Dark Horse into the distribution chain, those sort of

11   costs?

12   A.    Yeah, that's right.

13   Q.    And once it gets into the distribution chain, let's talk

14   about manufacturing really quickly.  And if we can turn to,

15   again, Exhibit 116-2 to look at the line item for the amount

16   of manufacturing that's listed there, $176,549.  And those

17   were the manufacturing of CDs, physical CDs; correct?

18            MS. COHEN:  Objection to the leading form.

19            MR. WAIS:  I'm just trying to move it along,

20   Your Honor.

21            THE COURT:  Try not to lead.

22   BY MR. WAIS:

23   Q.    What is the cost, uh, set forth in manufacture for?

24   A.    It's the cost to manufacture CDs and LPs, vinyl.

25   Q.    And is that manufacturing cost prorated at all?

1    A.    It's charged at a per unit rate for the entire unit, and

2    then it has been prorated for these purposes.

3    Q.    And how is that allocation done?

4    A.    On a per track basis.

5    Q.    The same as for revenue?

6    A.    Same method.

7    Q.    If you turn to exhibit or Tab 4, Exhibit 116-9, what is

8    the total unprorated amount for manufacturing costs?

9    A.    Well, I think it's the combination of 2,642,095 plus

10   8,577,000.  I'm sorry.  8,577.

11   Q.    But for Dark Horse you only allocated on a per track

12   basis; is that correct?

13   A.    That's correct.

14   Q.    So if you allocated a different percentage of revenue

15   from the sales of Prism to Dark Horse, what would have

16   happened to the percentage of the costs for manufacturing?

17   A.    We would have used the same approach.  So if it's up or

18   down, that would affect the manufacturing allocation as well.

19   Q.    We were talking about how Capitol uses a separate

20   company by the name of Universal Music Logistics to facility

21   the manufacture.  Do you recall that testimony?

22   A.    Yes.

23   Q.    Um, is that a separate company from Capitol?

24   A.    Yes.

25   Q.    Uh, and do they have separate employees?

1    A.    Yes.

2    Q.    Do they have a separate management team?

3    A.    Yes.

4    Q.    Are they separately incorporated?

5    A.    Yes.

6    Q.    And explain to us why Capitol uses UML instead of doing

7    the -- facilitating the manufacturing directly on their own?

8    A.    So within Universal we're supporting several labels not

9    just Capitol and there's efficiencies to having specific

10   functions grouped together as a Universal function as opposed

11   to a Capitol function by itself.  So, you know, we're the

12   largest record company.  We have economies of scale that we

13   benefit from by centralizing and having that team focus on

14   what they do best.

15   Q.    I believe you testified that UML doesn't do the

16   manufacturing, but uses a third party; correct?

17   A.    That's correct.

18   Q.    It charges Capitol pursuant to a rate card?

19   A.    Yes.

20   Q.    And, again, I guess to the extent that UML uses a third

21   party manufacturer is there a benefit to Capitol of using UML

22   to work with that third party manufacturer as opposed to

23   doing it themselves?

24   A.    If they did it themselves, they would have to hire

25   people to manage that process.  They would also have to

1    negotiate third party deals directly with far less volume

2    than Universal does.  So I assume there would be higher rates

3    associated with having smaller volume.

4    Q.    And UML provides these services for non-Universal music

5    label entities?

6    A.    Yes.

7    Q.    And they also pay pursuant to this rate card?

8    A.    Yeah, the rate card is used for both external and

9    internal parties.

10   Q.    Let's talk about distribution in a little more detail.

11   Return to page 116-2, if you will.  If you could just

12   identify the amount for the physical and digital distribution

13   fees?

14   A.    Physical distribution fee is $56,684.  Digital

15   distribution fees are $536,546.

16   Q.    Can you just explain to us what that cost consists of?

17   What goes into distributing a physical product?

18   A.    For a physical product, you have a physical piece that

19   needs to get to the store for sale.  So that's the process of

20   taking the manufactured unit and shipping it to the store.

21   Um, it also includes sales processing.  You have sales people

22   who work with our customers getting orders, making sure that

23   we ship to the right place.  All that fulfillment activity

24   that happens under a physical distribution.

25         For digital distribution, we have a supply chain

1    that distributes the track.  It holds the digital file and

2    sends it out to well over a hundred digital service providers

3    like Apple, Spotify and YouTube.  We have marketing people

4    that make sure that our products are being represented on the

5    service.  We get a front page view once in a while so it

6    makes people aware of our products.

7              On the back end when we get reported to from those

8    partners that's how we recognize our revenue.  So we ingest

9    millions of lines of data for every stream on every service.

10   It's a massive amount of data that gets processed and

11   recorded as revenue and ultimately, used for paying

12   royalties.

13   Q.   Are those services that Capitol provides or are those

14   provided by a third party?

15   A.   Third party.

16   Q.   What's the name of that company?

17   A.   Commercial Services.

18   Q.   Are they separate from Capitol?

19   A.   Yes.

20   Q.   They have their own employees?

21   A.   Yes.

22   Q.   And they have their own management team?

23   A.   Yes.

24   Q.   They're separately incorporated?

25   A.   Yes.

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1455

1    Q.    And how do they determine what to charge Capitol for

2    these costs?

3    A.    Uh, we annually look at the cost to serve basically

4    which is how much it costs that operation to run and we come

5    up with a distribution fee.  It's a percentage of sales that

6    represents how much it would cost to break even basically.

7    We're not trying to generate profit.

8    Q.    So it's -- the percentage that you're charging, what's

9    it intended to cover?

10   A.    It covers all the services that I covered from supply

11   chain through the sales organizations, the marketing groups

12   all the way to reporting.

13   Q.    And does Commercial Services provide the same

14   distribution services for third parties outside the Universal

15   Music labels?

16   A.    Yes, they do.

17   Q.    And are those third party clients charged less for the

18   distribution services?

19   A.    No, they're charged more.

20   Q.    And so if we look at distribution costs and how they're

21   actually calculated, I believe you said it was a percentage

22   of sales; is that correct?

23   A.    That's correct.

24   Q.    Okay.  And if you look at Tab 3 in your binder,

25   specifically pages 116 through 6, 116 through 7, through 8,

EXHIBIT 9
PAGE 1456

```
 1    my question is was the entire -- there's both distribution
 2    costs for the album itself; is that correct?
 3    A.   Yes.
 4    Q.   The Prism album and also for the Dark Horse track?
 5    A.   Yes.
 6    Q.   Okay.  Um, as it relates to the Prism album was the
 7    distribution fee that was charged, charged on a prorated
 8    basis in your calculations?
 9    A.   For the album?
10    Q.   For the album.
11    A.   Yeah, it was prorated.
12    Q.   And how was that pro rated?
13    A.   The same methodology.  Based on the number of tracks.
14    Q.   And so if you had allocated a different percentage of
15    revenue from sales of Prism to Dark Horse, would have had to
16    allocate a different percentage for the purpose of
17    calculating the distribution fee?
18    A.   Yes.
19    Q.   And what effect would that have had on the distribution
20    fee?
21    A.   It depends on how you adjust the prorations.  Would it
22    be higher or lower?
23    Q.   So if it was higher?
24    A.   It would follow it.  So if it was a higher proration, it
25    would be a higher cost.
```

```
 1   Q.   If you look at page 116-6, does this list the unprorated

 2   cost of distribution for physical?

 3   A.   I think this is the prorated amount.

 4   Q.   Let's look at 116-7 at the bottom.  That lists the total

 5   amount for the albums, and then the prorated amount for the

 6   distribution fee based on those sales; correct?

 7   A.   That's correct.

 8   Q.   If we go back to Exhibit 116-2, the profit and loss,

 9   let's turn to the next cost.  Specifically, let's talk about

10   royalties.

11   A.   Okay.

12   Q.   I know you went through it briefly, but can you just

13   explain to the jury what an accrued artist and producer

14   royalty shows?

15   A.   So we have a contract with the artist that defines how

16   much they'll earn per unit of revenue or unit sold.  We have

17   a royalty system that handles all of that calculation.  It's

18   a massive amount of data we have to process, but ultimately,

19   they administer what the costs associated with the sale we

20   recorded in the current period.

21         So that cost is what we call accrued expense which

22   means it's expense estimated with the revenues recognized in

23   the current period.  That expense will ultimately be paid as

24   an artist royalty later, but it's not paid in the current

25   period.  And that payment cycle is defined by the artist's
```

1    contract how frequently they get paid.

2    Q.    And in the general course are those paid?

3    A.    Yes.

4    Q.    And let's talk about copyright royalties.  Just explain

5    in a little bit more detail what those are.

6    A.    Okay.  So copyright royalties are royalties paid to the

7    songwriter.  In some cases on a track the songwriter and the

8    performing artist may be the same.  In some cases it may be a

9    performing artist doing someone else's song.

10         Um, so these royalties are paid on a per unit basis

11   and they are legislated by the U.S. government body that

12   tells us how much each track should be paid at.  That amount

13   is paid to a music publisher.  A music publisher is a

14   separate company that administers the rights of songwriters.

15   So that's how we compensate them for their work.

16   Q.    And finally, we have domestic licensing royalty

17   expenses.  Just walk us through what that means in more

18   detail.

19   A.    So that is similar to the artist and producer royalties,

20   but it's a different revenue source.  So this is the royalty

21   expense associated with domestic licensing and we covered

22   that earlier.  Domestic licensing includes sound exchange

23   revenues, synchronization revenues.  I forget what else we

24   talked about, but that's basically what's covered on that

25   line.

1   Q.   And how much Capitol has paid out in royalties for each

2   of these categories?

3   A.   I'm not sure I understand the question.

4   Q.   I'm sorry.  So if you look at the artist producer

5   royalties, how much was paid out for those if you look at

6   Exhibit 116-2?

7   A.   3,535,181.

8   Q.   And for copyright royalties, how much was paid out for

9   that amount?

10  A.   1,081,855.

11  Q.   And for domestic licensing royalty, how much was paid

12  out for that?

13  A.   236,515.

14  Q.   And if you look at page 116-11 which I believe is Tab 5

15  of your binder, as it relates to albums was the amount of

16  royalties paid prorated as it pertains to Dark Horse?

17  A.   Yes.

18  Q.   And what allocation was used to do that proration?

19  A.   Same methodology.  The number of tracks.

20  Q.   And so if you had allocated a higher percentage of the

21  revenue from Prism to Dark Horse, what would have happened to

22  the, um, royalties?

23  A.   That would be a higher royalty expense.

24  Q.   Let's move on to marketing.  I know we went through this

25  a lot already, but just walk me through for an album like

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1460

```
 1   Prism, what sort of marketing goes into promoting the album?

 2   A.   So the main things that a marketing campaign would

 3   entail would be making music videos, uh, for the singles that

 4   are being worked.  Um, there would be promotional appearances

 5   that, you know, the artist has to go and show up on all the

 6   night shows, radio interviews, all kinds of press.

 7            Um, what else?  Oh, radio promotion.  We have a

 8   team of people who are constantly on the phone with all the

 9   stations trying to get interest in playing those tracks on

10   the radio.  There's also online marketing, social media

11   marketing, print advertising, all kinds of media purchasing

12   all with the goal of getting people to know there's a release

13   available by Katy Perry.

14   Q.   And who at Capitol is doing all this work?

15   A.   That mostly falls within the marketing department within

16   that label.

17   Q.   And those are employees of Capitol Records?

18   A.   Yes.

19   Q.   So they're also paid salaries to do these functions?

20   A.   Yes.

21   Q.   So Ms. Cohen walked you through some different marketing

22   expenses for Ms. Perry.  Do you recall that testimony?

23   A.   Yes.

24   Q.   Were those costs actually paid by Capitol Records?

25   A.   Yes.
```

EXHIBIT 9
PAGE 1461

1    Q.    What's the benefit of promoting an album to having an

2    artist go do appearances on shows like that?

3    A.    It's just one more way that we have to make people aware

4    of the product.

5    Q.    Is it common for them to do appearances?

6    A.    Yes.

7    Q.    And is it common in that regard to, uh, when they're

8    going on appearances, what's important to them in terms of

9    how they look and how they present themselves to the public?

10   A.    Well, they have to be -- they have to look their best.

11   They have to be on their game.  They have, you know, they

12   have to have -- the personality has to be consistent with who

13   they are.  It takes a lot.  You know, there's travel

14   involved.  They have to be dressed, made up, hair, the whole

15   thing.  They have to look perfect for any of those

16   appearances.

17   Q.    So look at Tab 7 of your binder which starts with

18   116-50.  If we turn to the detail starting on the next page,

19   and how many pages of marketing costs expenses are there?

20   A.    I think we said 29 earlier.

21   Q.    And those were all expenses that were paid by Capitol

22   Records?

23   A.    That's correct.

24   Q.    And looks like if you turn to page 116-78, what are the

25   expenses that start on that page attributable to?

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1462

1    A.    Are you asking for the first line item?

2    Q.    Uh, I'm just asking as between Prism and Dark Horse are

3    these connected to one or the other, the expenses that start

4    on page 116-78?

5    A.    Sorry.  The print's very small.  These were costs

6    specifically associated with Dark Horse.

7    Q.    And if you turn to the next page, is there a line item

8    at the end that shows how much those costs are?

9    A.    Yes.

10    Q.    And what is that amount?

11    A.    1,101,773.

12    Q.    And if you look at the, uh, expenses, if you turn to

13    page 116-77 and look at the album marketing, what was the

14    total marketing spent for the Prism album itself?

15    A.    $8,257,422.

16    Q.    Did you allocate all that to the Dark Horse track?

17    A.    No, I prorated it.

18    Q.    How did you determine that proration?

19    A.    Based on the number of tracks.

20    Q.    So the same proration we've been talking about

21    throughout today?

22    A.    Yes.

23    Q.    Let's talk about overhead really quickly in the context

24    of marketing.  Beyond the employees that are doing the

25    marketing, what other sort of overhead goes into the

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1463

1    marketing function?

2    A.    I'm sorry.  Ask it again.

3    Q.    Yeah.  So other than the employees themselves, what

4    other types of overhead would benefit people who are

5    marketing albums and tracks for Capitol?

6    A.    What type of functions within overhead or?

7    Q.    Yeah, what sort of materials and. . .

8    A.    Okay.  So besides paying the employee, you would have

9    expenses like rent to house the employee, you have a

10   telephone, Internet service, you know, general office

11   supplies to enable the employee to do what they do.

12   Q.    And if we look at the next tab when we talk about

13   overhead, actually, go to Tab 8 which is 116-81.  I know you

14   talked about this briefly, but just walk us through how you

15   got to the overhead number that you allocated to Dark Horse?

16   A.    Okay.  So we start with the total Capitol Records

17   overhead that's 100 million.  Of that I backed out the

18   Capitol Studios because that was not directly associated with

19   Katy's recording that I'm aware of.  We haven't included that

20   as part of the cost structure.  So you're left with 94

21   million.

22          Then we allocate that overhead based on revenues to

23   the Katy Perry track which represents 5.4 percent of the

24   total sales of the front line product as we described

25   earlier.

94

1    Q.   And I believe you were talking about how you backed out

2    sales from essentially the managed catalog.  Can you explain

3    why you did that?

4    A.   The idea that the label is focusing only on new

5    products.  That's their job.  We have a different division

6    that handles catalog once it becomes older and it's been in

7    the market for a while.  So the idea is to link the active

8    period of the album when you're marketing and trying to break

9    the record with the overhead associated with it.  We could

10   assign overhead over a longer period of time, but that would

11   just increase the costs.

12   Q.   And I believe you said you start with when the album is

13   actually released.

14   A.   That's correct.

15   Q.   Is there any activity that goes into promoting the album

16   prior to its release?

17   A.   Oh, absolutely.  You're making the record, you're

18   recording it.  There's a lot of activity around that.  Um,

19   even before it gets released, you have production work that's

20   required which is all of the things you have to do to make

21   the booklets and the art work.  You have to prepare the

22   product for distribution.  All that happens ahead of time.

23   Q.   And is any of the overhead for those activities being

24   allocated to Dark Horse?

25   A.   No.

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1465

1  Q.   Other than marketing, what are some of functions that a

2  label's doing to promote a release like the Prism album or

3  Dark Horse?

4  A.   Other work that the label performs for the release?

5  Q.   Correct.

6  A.   As I mentioned, there's the production team.  They have

7  to get product ready.  They have to get the art work.  They

8  have to make sure all of the information in the lyrics, if

9  there are lyrics, are correct.  Uh, there's lawyers that

10  negotiate the contracts and, you know, make sure that we

11  understand what the business arrangement is with the artist.

12          Finance people like myself who are tracking

13  revenues.  We're performing cost controls.  We make sure that

14  we're staying on budgets and not spending inappropriately.

15  Um, we talked about the A & R function.  That's a sampling of

16  it.

17  Q.   And absent those people performing a function, what

18  happens to the album?  What happens to the track?

19  A.   Well, it wouldn't get attention and the sales would be

20  hampered.

21  Q.   Let's look at the final category which I believe you

22  discussed before which is AFM/AFTRA.  What does that consist

23  of?

24  A.   These are union dues -- union royalties that we pay to

25  unions.  AFM and AFTRA are the two separate unions.  Um, it's

96

1  a negotiated contract for how we compensate the unions so

2  that they have a pension plan.

3  Q.   And what is that amount?  How is that calculated?  What

4  is that amount based on?

5  A.   It's a percentage of sales and each union gets, uh,

6  point five percent of sales.

7  Q.   So it's a percent of all sales?

8  A.   Combined, yes.

9  Q.   And did you apply -- and so is that based on only Dark

10 Horse or also sales of the Prism album?

11 A.   Those are only on the prorated revenues.

12 Q.   So for the prorated for the --

13 A.   It would be Dark Horse.

14 Q.   That's allocated to Dark Horse; correct?

15 A.   Yes.

16 Q.   So what allocation process did you do to reach that

17 number?

18 A.   Well, this is a percentage of revenue so we took the

19 prorated revenue and multiplied it by one percent.

20 Q.   So it's the same allocation approach that you used for

21 revenue and for all the other costs we've been discussing?

22 A.   That's correct.

23 Q.   I wanted to go back to revenue very quickly and talk

24 about sales of the album.  Ms. Cohen tried to equate radio

25 spins to album sales.  Do you agree with that?

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1467

1    A.    No.

2    Q.    And why not?

3    A.    Well, as we talked about the marketing campaign, radio

4    play is one component of what makes people aware of the album

5    being available.  It's not directly correlated with sales of

6    that track.  It's part of a large campaign.

7            And when we're in our active cycle of releasing of

8    album, we're hitting every channel that we can with the

9    message that the album's available.  So it's simply one way

10   for people to hear that that music is available.

11   Q.    And what are some of the other ways?

12   A.    The music video is a marketing tool.  Um, we buy ads on

13   online print, sometimes television.  Um, also social media

14   campaigns.  I'm sure I'm missing some, but there's a lot that

15   they do.

16            MR. WAIS:  I think that's it.  Thank you for your

17   time.

18            THE COURT:  Thank you.

19            Okay.  Ms. Cohen.

20                      REDIRECT EXAMINATION

21   BY MS. COHEN:

22   Q.    Mr. Drellishak, I think we touched on a lot of these

23   categories earlier, but Mr. Wais raised some others so I'm

24   just gonna touch on a few more things.

25            Um, first, if we could pull up Exhibit 115 page 2

1    and look at the Profit and Loss statement again.  You

2    testified just a little while ago that the ancillary fees

3    that are shown on this document in the amount of $5,971 those

4    are related to returns of physical product; is that right?

5    A.    That is one of the ancillary fees, a return of

6    processing fee.

7    Q.    I'm sorry.  Can you say that again?

8    A.    Yeah, that is one of the ancillary fees.  They're listed

9    on 116-10.

10   Q.    At the top it says handling fee?

11   A.    Right.  Each one of those is a type of ancillary fee.

12   Handling fee would be when there's something uniquely more

13   complex about shipping the product, there is a handling fee

14   associated with that.  Returns processing fee is when we get

15   a return back and there's a cost associated to that.  Uh,

16   linked to that is a refurbishment fee if we're going to put

17   that product back in inventory to sell again, we have to

18   refurbish it so there's costs associated with that.  The line

19   charge is a cost per line on the invoice and that covers it.

20   Q.    And is it true that these fees that are charged are

21   based on a standard rate card?

22   A.    Yes.

23   Q.    So they don't reflect the actual handling costs

24   necessarily; is that right?

25   A.    That's correct.

EXHIBIT  9
PAGE  1469

```
 1    Q.   And, um, is it true that as it relates to returns of
 2    physical products, Capitol Records has deducted from the
 3    revenue any physical product that would have been returned?
 4    A.   That's correct.
 5    Q.   And so that is reflected here in this profit and loss
 6    statement; right?
 7    A.   In the profit and loss statement in the revenue
 8    specifically.
 9    Q.   Yeah.
10    A.   Yes.
11    Q.   Isn't it true, though, that when a retailer returns
12    physical product, they also pay a return fee?
13    A.   That's correct.
14    Q.   Is that fee credited here anywhere in the profit and
15    loss statement?
16    A.   No.
17    Q.   And that's because that return fee shows up on the books
18    of some other Universal Music entity; is that right?
19    A.   That's correct.
20    Q.   Now, we talked a little bit about AFM and AFTRA.  And
21    you said those are based on contracts that are essentially
22    pension plans for artists who work through the union; is that
23    right?
24    A.   Yes.
25    Q.   And you've allocated the percentage of expense related
```

EXHIBIT 9
PAGE 1470

1   specifically to Dark Horse here; right?

2   A.   That's correct.

3   Q.   Okay.  Do you have any knowledge that there was any

4   union artist employed to work on the Dark Horse track?

5   A.   I don't have any knowledge about that.  But regardless,

6   we still pay the one percent whether it's a union artist or

7   not.  It's just the way it's calculated.

8   Q.   I just have one more question related to distribution

9   fees.  Um, Mr. Wais asked you a little bit about these, and I

10  just wanted to clarify that also, well, let's look at

11  Exhibit 116, page 6, please.

12          So the total physical distribution fee that's been

13  prorated to Dark Horse here is $56,683.64; is that right?

14  A.   That's correct.

15  Q.   And the physical -- I'm sorry -- the digital

16  distribution fee related specifically to Dark Horse is

17  $536,545.83; is that right?

18  A.   That's correct.

19  Q.   And isn't it true that these distribution fees, um, are

20  based also on the standard rate card?

21  A.   It's not -- it's not part of the rate card itself.  No,

22  I guess it is in the rate card.  It's determined annually

23  that the amount of the distribution fee reflect the cost of

24  the operation and that's how it's determined.

25  Q.   Well, it's actually not the costs of the operation;

1   right?  It's a flat percentage of sales.

2   A.   Right, and that -- that covers the costs.  When you have

3   plan time, you estimate what the cost of the operation will

4   be and you look at what your revenues are gonna be.  And you

5   make sure that the five percent covers those costs.  That's

6   the intent of the fees to break even.

7   Q.   So you can't say for sure that these costs do in fact

8   reflect the amount that was incurred as a result of

9   distribution of these products, can you?

10  A.   No, but I can tell you that they cover the costs of the

11  operation and we adjust annually as we see fit so that it

12  stays at break even point.

13           MS. COHEN:  That's all I have, Your Honor.

14           THE COURT:  Okay.  Mr. Wais.

15                     RECROSS-EXAMINATION

16  BY MR. WAIS:

17  Q.   Just really quickly, we were talking about the

18  distribution fees.  How you said the intent was to break

19  even?

20  A.   Yes.

21  Q.   So sometimes you're up, sometimes you're down?

22  A.   Yeah, there's gonna be a variance every year, but the

23  intent is to cover costs.

24  Q.   And when you're talking about the actual handling fee,

25  those are amounts that are actually paid; correct, for

1    handling fees?

2    A.    Yes, Capitol pays those.

3    Q.    And that's also true for all the costs we've gone

4    through today?

5    A.    Yes.

6          MR. WAIS:   No further questions.

7          THE COURT:  Anything further?

8          MS. COHEN:  I don't have anything further, Judge.

9          THE COURT:  All right.  Then you may step down.

10   Thank you.

11         MR. KAHN:  Your Honor, plaintiff rests.

12         THE COURT:  Okay.

13         MR. WAIS:  Your Honor, can we just state it for the

14   record that the Capitol testimony was on behalf of defendants

15   as well?

16         THE COURT:  Yes.

17         MR. MOVIT:  Your Honor, our first witness in the

18   damages case will be Dr. Lawrence Ferrara.  I believe that

19   the court is currently setting up the video connection for

20   that.

21         THE COURT:  I think so.

22         THE CLERK:  That's the next witness, the video?

23         MR. MOVIT:  That's correct.

24         THE COURT:  Why don't we just take a five-minute

25   recess then.

```
 1                     (Jury not present.)

 2          MS. LEPERA:  We just wanted to put on the record

 3   we're fine with the jury instructions and special verdict

 4   form.

 5          THE COURT:  Okay.

 6          MR. KAHN:  Same here, Judge.

 7          THE COURT:  I recognize you reserve all your

 8   objections.

 9          MS. LEPERA:  Thank you, Your Honor.

10          THE COURT:  Okay.  Thank you.

11                     (Recess taken.)

12                     (Jury present.)

13          THE COURT:  Okay.  Are you ready?

14          MR. MOVIT:  Yes, Your Honor.

15          THE CLERK:  Your witness?

16          MR. MOVIT:  Defendants hereby call Dr. Lawrence

17   Ferrara by video conferencing software.

18          THE CLERK:  I'd like to remind you you are still

19   under oath.

20          THE WITNESS:  Yes, thank you.

21                   DIRECT EXAMINATION

22   BY MR. MOVIT:

23   Q.   Good afternoon, Dr. Ferrara.

24   A.   Good afternoon.

25   Q.   Can you hear me all right?
```

1    A.    Yes, I can.

2    Q.    Okay.  Because we're on video conference, Dr. Ferrara,

3    there's sometimes a delay.  So I'd ask you to please pause

4    before answering my question just in case there's a delay.

5    A.    Thank you.  I will.

6    Q.    Dr. Ferrara, you previously testified about your

7    comparative analysis of the Dark Horse and Joyful Noise

8    compositions.  Were you asked to perform a further analysis

9    of the Dark Horse composition?

10   A.    Yes, I was.

11   Q.    And what was that further analysis?

12   A.    I was asked to complete a quantitative and qualitative

13   value assessment of the expression that is at issue in the

14   Dark Horse composition.

15   Q.    Can you please describe the methodology you used in

16   performing this analysis?

17   A.    Yes.  I began with transcribing all of the notes in the

18   entirety of Dark Horse.  With that transcription in hand, I

19   identified all of the notes that are at issue.  Namely, all

20   of the notes that Dr. Decker placed in issue, what we call

21   Ostinato No. 2.

22         I then quantified those notes in issue as a

23   percentage of all of the notes in the totality of Dark Horse.

24   And finally, I implemented a qualitative value assessment of

25   those notes at issue within the context of the entirety of

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1475

1    the Dark Horse composition.

2    Q.    And have you used this methodology previously,

3    Dr. Ferrara?

4    A.    Yes, I have.

5    Q.    Has this methodology been peer reviewed?

6    A.    Yes, it has.  For example, in April of 2016, I presented

7    a peer-reviewed paper for the American Musicological Society

8    in which I explained and implemented this very thing, the

9    methodology.

10   Q.    Let's discuss the first step of your methodology in more

11   detail.  How did you identify all the notes in Dark Horse?

12   A.    I listened very carefully literally to every note bar by

13   bar, beat by beat through the entirety of Dark Horse.  And I

14   transcribed all of those notes into a complete and full

15   transcription of the entirety.

16   Q.    Thank you, Dr. Ferrara.

17          Your Honor, I would like now like to show

18   Dr. Ferrara, Exhibit 1 within joint Exhibit 117.  That's an

19   exhibit to his report for this stage of the case.

20          THE COURT:  Okay.

21   BY MR. MOVIT:

22   Q.    Dr. Ferrara, could you please turn to your value

23   assessment report and look at Exhibit 1 therein?

24   A.    Yes.  I was given a copy of this here and I have it in

25   hand.

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1476

106

1    Q.    And you have Exhibit 1 in front of you?

2    A.    Exhibit 117-1.

3    Q.    Yes, sir.  And do you have Exhibit 1 within it, your

4    transcription?

5    A.    I'm turning to that now, yes, I do.

6    Q.    Thank you.  Could you please identify this document,

7    please?

8    A.    Yes.  Exhibit 1 to that report is the full transcription

9    that we just discussed.

10   Q.    Okay.

11   A.    A transcription of all of the notes in Dark Horse.

12   Q.    And who prepared that transcription?

13   A.    I did.

14            MR. MOVIT:  Permission to publish to the jury?

15            THE COURT:  Yes.

16            MR. MOVIT:  And permission to admit this into

17   evidence?

18            THE COURT:  Yes.

19                    (Exhibit 117 pg. 1)

20            THE CLERK:  Just dash one?

21            MR. MOVIT:  Yes.  Just the exhibit within the

22   report, the transcription.

23            Is there a way we can make this larger for the

24   benefit of the jury of the exhibit on the screen?

25            THE CLERK:  No.

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1477

107

1    BY MR. MOVIT:

2    Q.    So Dr. Ferrara, unfortunately, this appears to be

3    because of the video technology a very small copy of the

4    transcription that is presently being published to the jury.

5    They will have the opportunity to examine the whole document

6    and hard copy later.

7              Could you please briefly take us through what's in

8    this document?

9    A.    Yes.  The first page lists the various parts in

10   Dark Horse, and if you take a look at the next page, page 2,

11   you see in the lower section two, the words sung verse one.

12   That is where the Ostinato No. 2 first appears in Dark Horse.

13   And you can see that I have identified those notes that

14   Dr. Decker placed in issue with red noteheads.

15             All the other notes above them, for example, in the

16   vocal parts and in the instrumental parts below, the sub bass

17   and the drums part are not highlighted in red.  The reason

18   for that is that Dr. Decker has not placed those in issue.

19   The only notes that are highlighted are those Dr. Decker has

20   placed in issue.

21   Q.    Thank you, Dr. Ferrara.

22             If you could please keep that document out, but

23   we're going to quickly turn to another document which is

24   joint Exhibit 89 at 59.

25             Do you have that in front of you?

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1478

108

1    A.    I do.  Once again, I was handed this earlier.

2    Q.    Okay.  And can you please tell us what this document is?

3    A.    This is my rebuttal report dated July 31st, 2017.

4    Q.    Okay.  And what within that are you looking at a

5    specific page that's 59?

6    A.    Yes, page 59.  Exhibit 89 page 59 is rebuttal visual

7    Exhibit B and at the top part of each staff are the

8    instrumental parts, all of the instrumental parts in the last

9    four measures of verse one in Joyful Noise.

10          Since there are 16 measures in verse one in Joyful

11   Noise, but only eight in verse one of Dark Horse, the

12   corresponding last four measures in verse one in Dark Horse

13   are measures 5 through 8.

14   Q.    We have not published this yet to the jury so if you

15   could please wait a moment.

16          You created this document, Dr. Ferrara?

17   A.    Yes, I did.

18          MR. MOVIT:  Okay.  Permission to publish to the

19   jury and offer into evidence?

20          THE COURT:  Yes.

21          THE CLERK:  89-59.

22          MR. MOVIT:  That's correct.  It's a one-page

23   document within the exhibit.

24              (Exhibit 89 pg. 59 admitted.)

25          MR. MOVIT:  And permission to publish?

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1479

1          THE COURT:  Yes.

2     BY MR. MOVIT:

3     Q.    Okay.  Dr. Ferrara, now that everyone has the benefit of

4     looking at the document, could please describe what it is for

5     everyone in terms of the content?

6     A.    I certainly will.  So the top four staff lines, those

7     are the musical lines with five lines and spaces in between,

8     you can see in the left margin synth, ostinato, guitar,

9     synths and then the drum parts, the kick, the snare and the

10    high hat.  Those are all the instrumental parts in the verse

11    in Joyful Noise and once again specifically, starting in the

12    last four bars of verse one.

13          Underneath that from Dark Horse is the synthesized

14    ostinato that's Ostinato No. 2, that is what is at issue, and

15    I've also included the sub bass and the hand claps.  As you

16    can see what is not included here are the vocal parts that

17    are also present in these portions of the verses.

18    Q.    Okay.  Thank you, Dr. Ferrara.

19          If you could please put that document away and

20    again take out your full transcription of Dark Horse that we

21    first looked at.

22    A.    Yes.

23    Q.    Okay.  Dr. Ferrara, uh, when we were last looking at

24    this document, you were described how you identified all the

25    notes in the transcription which constitute iterations of

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1480

110

```
 1    Ostinato No. 2.  And you further informed us that you

 2    identified those in red, those notes which are Ostinato

 3    No. 2.

 4             What was the next step of your methodology?

 5    A.    The next step was to provide a quantification, to

 6    quantify the number of those highlighted notes.  That is all

 7    of the notes that Dr. Decker has put in issue as a percentage

 8    of the totality.  I counted all of those notes.

 9             There are 207 notes Dr. Decker has placed in issue

10    which includes all of the repeats of Ostinato No. 2

11    throughout Dark Horse.  The entirety of this transcription is

12    that there are 2,865 notes in all in Dark Horse.  And so in

13    keeping with the methodology that I just described, 207 notes

14    at issue is 7.2 percent of all of the notes in the Dark Horse

15    composition.

16    Q.    And what was the next step in your methodology,

17    Dr. Ferrara?

18    A.    To the extent that the lyrics are not at issue and the

19    lyrics in my working in the music industry in this capacity

20    over the last quarter century, the lyrics have been presented

21    to me as 50 percent of the composition and the music

22    50 percent of the composition.  Not suggesting that that is

23    the way it must be.

24             What I write in my assessment report is if the

25    lyrics are 50 percent of the composition and the music is
```

UNITED STATES DISTRICT COURT

EXHIBIT 9

111

```
1    50 percent of the overall Dark Horse composition, the first

2    point is that a 7.2 percent of the notes at issue is

3    7.2 percent of the music which is 50 percent if one accepts

4    that division of the overall Dark Horse composition.

5           To the extent that one does accept that it's 7.2

6    percent of 50 percent of Dark Horse, then therefore it is, of

7    course, 30.6 percent of the totality of the Dark Horse

8    composition.

9    Q.   Okay.  Thank you, Dr. Ferrara.

10          Now that you've described your quantitative value

11   assessment, could you please your qualitative value

12   assessment?

13   A.   Yes.  One of the factors in implementing a qualitative

14   value assessment is to identify what I consider to be the

15   hook, the most memorable part of the music at issue that is

16   in Dark Horse and all of the rest of the music that is in

17   Dark Horse.  And in my opinion, the hook, the most memorable

18   part of Dark Horse is in the chorus.

19          I mentioned in my direct testimony last week that

20   the term hook is often interchanged with the term chorus.  In

21   fact, sometimes they're conjoined and we simply call it the

22   hook chorus because most of the time, the hook of a song is

23   in the chorus.  In my opinion the hook in Dark Horse is very

24   clearly in the sung vocal melody by Katy Perry and the lyrics

25   in the choruses of Dark Horse.
```

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1482

112

1          On that basis one would give a greater qualitative

2     value to the chorus.  That greater value has to come from

3     somewhere.  It comes from all of the other parts.  For

4     example, it will come from some of the accompaniment parts

5     that are not at issue in fact in the chorus.  It would also

6     come from the verse parts.

7          As a result of that and keeping with this

8     methodology, I found that while 3.6 percent is empirically

9     corroborable in the transcription and in the notes that are

10    at issue, on the basis of my qualitative value assessment,

11    one would reduce that 3.6 percent and thereby increase the

12    value of the hook which is not at issue.

13         I do not suggest any particular number from those

14    3.6 percent.  Merely that 3.6 percent is empirically

15    corroborable if one accepts a qualitative value assessment as

16    I just described, then one would reduce that amount.

17    Q.    Thank you, Dr. Ferrara.

18         Dr. Decker has asserted that Ostinato No. 2 occurs

19    in 45 percent of the playing time of Dark Horse.  Do you have

20    a response to that?

21    A.    Yes, I do.  And perhaps we could go to the

22    transcriptions just to demonstrate.  And so we have the sung

23    verse on page 2, and let's go to the next page, page 3 into

24    the verse.  And as you can see, this is all Dark Horse once

25    again, in the left margin I have the parts that are sounding

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1483

1    at this time, at this point in Dark Horse.

2            There are two line of vocals.  They're both sung

3    here by Katy Perry, the different layered vocals.  Below that

4    as you can see highlighted in red noteheads is Ostinato No. 2

5    and below that is the rest of the beat.  As I defined it last

6    week, the beat is not just Ostinato No. 2.  The beat also

7    includes at this portion the sub bass as well as the drums,

8    and so all of that is part of the beat.

9            One can see that at this point, part of the, let's

10   say between 43 and 45 seconds that Ostinato No. 2 is actually

11   playing in Dark Horse, during that time there are other

12   parts.  The problem with Dr. Decker's description is that it

13   leaves out those other parts.

14           Indeed, throughout this verse one can see that

15   there are at least five parts that are simultaneously playing

16   in Dark Horse to vocal parts, the Ostinato No. 2, the

17   sub bass and, in fact, parts within the drums.  So that

18   45 percent that Dr. Decker presents does not accurately

19   represent all of the expressions that he has expressly not

20   placed in issue.

21           He has not placed the vocals in the issue.  He has

22   not placed the rest of the beat, the sub bass or the drums

23   part in issue.  Indeed, during that approximately 45 seconds,

24   all that he has placed in issue is what you see in that grand

25   staff as it is called, all those five parts, and that is the

EXHIBIT 9
PAGE 1484

114

1    one line with the highlighted red notes.

2              MR. MOVIT:  Thank you very much, Dr. Ferrara.

3              Nothing further for direct examination subject to

4    redirect.

5              THE COURT:  Okay.

6                        CROSS-EXAMINATION

7    BY MR. KAHN:

8    Q.   Good afternoon, Dr. Ferrara.

9    A.   Good afternoon, Mr. Kahn.

10   Q.   And you understand Dr. Decker flatly disagrees with your

11   opinion; correct?

12             MR. MOVIT:  Objection.  No foundation.  He didn't

13   serve a rebuttal.

14             THE COURT:  I'm going to overrule the objection.

15   You may answer.

16             THE WITNESS:  Which opinion is that, Mr. Kahn?

17   BY MR. KAHN:

18   Q.   It was the original opinion you testified to last week.

19   A.   We're not talking about my opinion that I just gave with

20   respect to what is at issue in Dark Horse?

21   Q.   Yes, that's correct.

22   A.   So it's not about today.  Okay.  Thank you for

23   clarifying that.

24   Q.   You're welcome.

25   A.   Yes, I think it's very clear that Dr. Decker and I

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1485

```
 1   disagree on not what is at issue.  We agree that what is at
 2   issue is Ostinato No. 2.  What we disagree about is that one,
 3   there is the combination of similarities.  I think that each
 4   of the similarities falls away by its own weight.  There is
 5   no combination.
 6          And furthermore and with respect to the six notes
 7   and it's only six notes that he finds to be the same, to the
 8   extent they essentially repeat one scale degree, and then the
 9   adjacent scale degree in even notes, he finds that
10   significant.  I find that nothing more than a part of a
11   musical building block, trite and unremarkable.
12   Q.   So the answer to my --
13   A.   But the --
14          THE COURT:  Please do not interrupt.
15   BY MR. KAHN:
16   Q.   So the answer to my question was yes?
17   A.   Yes.
18   Q.   And I understand you dispute the 45 percent ratio, but
19   as far as the timing of the Ostinato No. 2, do you disagree
20   with Dr. Decker's conclusion that it plays throughout
21   95 seconds of the song?
22   A.   There was no dispute in my answer a moment ago that
23   approximately between 43 or 45 percent of the playing time
24   and you might call that 95 seconds or so, that during that
25   playing time as represented in the transcription, the
```

```
 1    Ostinato No. 2 is present in Dark Horse.
 2              My point in my testimony was, and I don't know if
 3    there's no dispute there in fact.  You use the word dispute,
 4    but that's incorrect.  As I mentioned in that very testimony,
 5    Dr. Decker and I agree that the only part that is at issue
 6    are the highlighted notes.  The other notes Dr. Decker
 7    expressly has not put in issue, and I do not find any
 8    similarity whatsoever between those notes and the notes in
 9    Joyful Noise.
10    Q.   Now, I'm trying to understand this.  I think it's what
11    you refer to as this notehead counting that gets you to the
12    7.6 percent.  Um, you're counting up the individual noteheads
13    in the music; correct?
14    A.   Yeah, it's 7.2 percent of all of the noteheads and that
15    is correct.
16    Q.   And that counts as nothing about how long any particular
17    portion of the song lasts; correct?
18    A.   Your question I'm sorry is not clear.  Could you ask it
19    again?
20    Q.   Sure.  Well, I'll give you an example.  In what you call
21    Ostinato No. 1, those are a series of 16th notes; correct?
22    A.   That is correct.
23    Q.   And in what you label Ostinato No. 2, that's a series of
24    8th notes; correct?
25    A.   That is correct.
```

1   Q.   So in one measure of Ostinato No. 1, how many noteheads

2   would there be?

3   A.   There would be 16.

4   Q.   And in that same space, that same measure, how many

5   notes would there be in Ostinato No. 2?

6   A.   It would be eight.

7   Q.   So under your notehead count, would Ostinato No. 1 then

8   appear twice as much as Ostinato No. 2?

9   A.   Like every other note in every other part including in

10  the vocal parts, they would all be counted as you've just

11  described.  And the reason for that is that it takes away any

12  additional value that one would add.  This is what is simply

13  in the notes.  Nothing more so that you have a testable

14  empirically verifiable result.

15  Q.   So, for example, in trying to follow your chart, the

16  introduction, which is where Ostinato No. 1 first appears

17  that lasts about 15 seconds; correct?

18  A.   That's correct.  About 14 seconds, yes.

19  Q.   And I counted there's 56 noteheads of Ostinato No. 1 in

20  those 15 seconds; correct?

21  A.   There are 14 iterations.  Yes, do the math.  That's

22  right.

23  Q.   And then the next section which is where Ostinato No. 2

24  begins that lasts almost twice as long; correct?

25  A.   Yes.

1    Q.    And yet I count only 40 noteheads; right?

2    A.    That is correct.

3    Q.    So even though the first 15 seconds are just 15 seconds

4    with Ostinato No. 1 and the second 30-plus seconds include

5    Ostinato No. 2, under your notehead count, right, Ostinato

6    No. 2 would still be a smaller amount than Ostinato No. 1?

7    A.    That is correct.  And that is completely neutralized by

8    the fact that all of the other parts, all of the other notes,

9    2,865 of them are also so counted.

10   Q.    Okay.  So your notehead count says nothing about the

11   length of any particular passage; correct?  That is in

12   seconds.

13   A.    That is correct.  It literally looks at all of the

14   noteheads as some corroborable, empirically corroborable way

15   of counting up what is at issue as compared to the whole.

16   Q.    And it says nothing about the texture of any of these

17   notes; correct?

18   A.    Well, the texture is embodied in this.  The texture is

19   the simultaneous sounding of notes.  All of that is in the

20   transcription.

21   Q.    What does it say about the texture?

22   A.    What it says about the texture is literally bar-by-bar,

23   page-by-page, that the texture changes.  It starts out

24   thinly, it gets much thicker.  And as it does get thicker,

25   then there are gonna be a greater number of notes because a

1    greater number of parts that are performing simultaneously.

2    Q.    And as far as the notehead count, it says nothing about

3    how long a particular note is played; correct?

4    A.    That is correct.

5    Q.    Or how a particular note sounds; correct?

6    A.    How a particular note sounds that is the actual note

7    itself is certainly here in the transcription whether it's a

8    B or a C.  Whether it in terms of the simultaneous sounding

9    creates a particular harmony and so forth.  All of this is in

10   the transcription.

11   Q.    Oh, no.  I understand it's in the transcription.  I'm

12   asking you about the notehead count when you come up with

13   your count, that says nothing about the how the song sounds;

14   correct?

15   A.    Well, insofar as it is drawing from the transcription

16   which represents the composition in its entirety, that is the

17   harmony, the melody and the rhythm, the melody and the lyrics

18   put together then, of course, it represents the composition.

19   Q.    The notehead count does.

20   A.    The notehead count draws from the transcription in its

21   entirety.  The transcription, its representation of the

22   composition, that's embodied in the song recording.

23   Q.    No, I understand.

24          Let me see if I understand.  Are you familiar with

25   Elvis Presley's song Hound Dog?

```
 1   A.    I am.

 2   Q.    And I assume under your method, we could turn that into

 3   noteheads?

 4   A.    We could.

 5   Q.    And we'd come up with a notehead count; correct?

 6   A.    Yes.

 7   Q.    And are you aware that Elvis Presley's version is

 8   actually a cover of the original by a blues singer named

 9   Big Mama Thornton?

10   A.    I do recall something to that effect, yes.

11   Q.    And it's the same lyrics, but the hound dog she's

12   singing about is her ex-boyfriend; right?  She's angry with

13   him?

14   A.    I don't recall enough of the details of the lyrics.

15   Q.    Okay.  Assuming, though, that the lyrics are exactly the

16   same and that the musical score is the same, your notehead

17   count would be the same for both; correct?

18   A.    I would have to see that.  What you're pointing to is

19   not the purpose here.  The purpose is to present a score that

20   can be tested.  It can be viewed.  It was viewed, I assume,

21   by Dr. Decker after it was submitted.  There was no rebuttal

22   to his lack of accuracy.  And it provides a count of the

23   notes that are at issue within the context of all of the

24   notes in its entirety.

25             MR. KAHN:  Your Honor, I would move to strike that
```

1    as nonresponsive.

2            MR. MOVIT:  Objection, to the motion.

3            THE COURT:  And I am going to deny the motion.

4    BY MR. KAHN:

5    Q.   I want to ask you a question about your qualitative

6    approach.  I understand in reading this report of yours, that

7    you believe the value of Ostinato No. 2 is less important

8    than Ostinato No. 1; correct?

9    A.   First, I believe that the value of Ostinato No. 1 is

10   greater than the value of Ostinato No. 2.  That was what I

11   testified to in my direct.

12            With respect to the report that you're pointing to

13   right now that we're discussing, the quantitative and

14   qualitative value assessment report, what I say with respect

15   to value is that in my opinion, Katy Perry's melody and the

16   lyrics with that melody constitute the hook of the song.  I

17   don't suggest, I believe, that Ostinato No. 2 is not the

18   hook.

19            What I do say is that Ostinato No. 1 is the first

20   thing that one hears.  It plays during the chorus, Ostinato

21   No. 1, and on that basis, I find that it has, and it's

22   consistent with my testimony last week, it has greater import

23   than Ostinato No. 2.

24   Q.   And did you conclude and state in your report that

25   Ostinato No. 1 is qualitatively more important than Ostinato

1    No. 2?

2    A.    In the qualitative section of the report, I talk about

3    the relationship.  And once again that is consistent with my

4    testimony last week in which I said for the reasons I just

5    gave that I believe that within Dark Horse, Ostinato No. 1

6    which sounds with the hook chorus, the first thing one hears

7    in the song is the last thing that you hear in the song.

8          You put that all together, and by the way, it

9    sounds longer than Ostinato No. 2.  There are more bars that

10   include Ostinato No. 1 than No. 2.  You put all of that

11   together, and yes, on that basis I do find that Ostinato No.

12   1 has greater import than Ostinato No. 2.

13   Q.    And did you happen to watch the 2015 Super Bowl halftime

14   performance by Katy Perry?

15   A.    I did not.

16   Q.    Have you ever watched the videotape of that performance?

17   A.    Not that I can recall.

18          MR. MOVIT:  Objection to any representations by

19   Mr. Kahn as to the content of something the witness has not

20   seen and that is not in evidence.

21          THE COURT:  I'm going to overrule the objection at

22   this stage.  Let's wait and hear what the question is.

23   BY MR. KAHN:

24   Q.    Are you aware Ms. Perry has testified about the

25   performance during that halftime show and in particular the

1    performance of Dark Horse?

2    A.   I am not aware.

3    Q.   Then I will not ask you about that.

4            What is your hourly rate for this opinion,

5    Dr. Ferrara?

6            MR. MOVIT:  Objection.  Redundant.

7            THE COURT:  It is redundant.

8            MR. KAHN:  Did you ask him?

9            MR. MOVIT:  Redundant of his testimony in the first

10   phase.

11           MR. KAHN:  No, I'm asking for this phase.

12           THE COURT:  All right.

13

14   BY MR. KAHN:

15   Q.   What is your hourly rate for this phase?

16   A.   As I testified last week, my hourly rate is $395 for

17   preparation and actual testimony giving such as this

18   afternoon, it is $475 per hour.

19   Q.   How many hours did you spend in preparing this

20   particular report?

21   A.   The written part of the report was prepared last fall

22   and only submitted based on the Court's schedule I understand

23   in April, but it was actually finished in the fall.  I don't

24   remember how long I would have spent on the written, the

25   narrative part of that report.

EXHIBIT 9
PAGE 1494

         1              In addition, most of the transcription that's

         2    attached as Exhibit 1 that we've just been looking at would

         3    have been completed before I submitted my first report back

         4    in 2017.  It's just simply too long ago for me to give you

         5    anything that would be specifics as to the number of hours.

         6    Q.    More than 20 hours?

         7    A.    I don't think so, no.

         8    Q.    On this particular report.

         9    A.    On this particular report.

        10              MR. KAHN:  Okay.  I have nothing further.

        11              THE COURT:  Okay.  Any redirect?

        12              MR. MOVIT:  Nothing further, Dr. Ferrara.  Thank

        13    you.

        14              THE COURT:  Thank you, Dr. Ferrara.

        15              THE WITNESS:  Thank you very much.

        16              MS. LEPERA:  The defense calls Dr. Jason king.

        17              THE CLERK:  Dr. King, please come forward.  Please

        18    raise your right hand.

        19                        (Witness sworn.)

        20              THE CLERK:  Please be seated.

        21              Please state your full name for the record and

        22    spell your last name for the record.

        23              THE WITNESS:  Sure.  My full name is Jason King and

        24    last name King, K-i-n-g.

        25                        DIRECT EXAMINATION

UNITED STATES DISTRICT COURT

EXHIBIT  9
PAGE  1495

1    BY MR. ALBERTSON:

2    Q.    Hello, Dr. King.

3    A.    Hello.

4    Q.    Would you please tell the jury where you work?

5    A.    I work at New York University.  I work at the Clive

6    Davis Institute of Recorded Music at Tisch School of the

7    Arts.

8    Q.    And what is the Clive Davis Institute?

9    A.    The Clive Davis Institute is an undergraduate program at

10   the Tisch School of the Arts.  It's a four-year undergraduate

11   program where students are trained in the arts and the

12   business of creating and selling recorded music.  So we

13   consider ourselves a leadership training institute for the

14   future music industry leaders of the world.

15           And what that means is students study production,

16   they study songwriting, they study aspects of the music

17   business, they study music journalism, writing, history and

18   they get a Bachelor of Fine Arts degree in recorded music.

19   So that's actually the first degree of its kind in the world

20   where you can study popular recorded music in that way.

21   Q.    And just briefly for our benefit, who is Clive Davis

22   other than the person who the school is named after?

23   A.    Sure.  Clive Davis is the Chief Patron of the Clive

24   Davis Institute of Recorded Music.  He is the legendary music

25   executive, probably one of the most significant and

```
 1    influential music executives in the history of popular

 2    especially in the 20th and 21st century.

 3            He is responsible for record labels that he founded

 4    like Arista Records and J Records.  And he signed, uh,

 5    developed and introduced the stars into the world, um,

 6    artists like Sly and The Family Stone, Janis Joplin, Earth

 7    Wind and Fire, Bruce Springsteen, Whitney Houston, Aretha

 8    Franklin, Alicia Keys, the list goes on and on.

 9            He was considered by Rolling Stone Magazine as one

10    of the last great music moguls in the world, um, and he's

11    currently the Chief Creative Officer of Sony Music

12    Entertainment.

13    Q.   And what's his role in the university?

14    A.   Um, so he's the Chief Patron of the program.  He founded

15    the program, he invested money into the program.  He wanted

16    to create a music program at New York University at Tisch

17    School of the Arts specifically, um, that would be the

18    equivalent of their famed drama program or their film

19    program.  Um, and he has been influential in terms of the

20    development of that program.

21            I didn't actually know him when I started at

22    New York University, but I met him and he approved me being

23    hired for the program.  And I've gotten to work with him very

24    closely since the inception of the program in 2003, he

25    actually came in a couple years earlier and, um, he's been a
```

1    great mentor to me.

2    Q.    And what's your role at the Institute, Dr. King?

3    A.    Sure.  I'm Associate Professor at the Clive Davis

4    Institute.  Um, I am actually the founding faculty member of

5    the program which means that I've been there since the

6    inception of the program as I mentioned and a couple of years

7    before so I've been there since 2001.

8         And, um, so I teach in the program and I was also

9    the artistic director of the program.  And I currently have

10   two titles at the Clive Davis Institute.  I am Director of

11   Writing History and Emergent Media Studies so let me break

12   that down.  That means that I'm head of the music journalism

13   component of the program and music journalism is greatly

14   impacted these days by technology.  So we think about

15   journalism and writing in relationship to technology.

16        And my second title is that I am Director of Global

17   Studies for Clive Davis Institute of Recorded Music.  And

18   that means that I build music programs for the Clive Davis

19   Institute students around the world.  So I currently am

20   Program Curator of a study abroad program for the students.

21   It's mandatory that they have to go to Berlin for one

22   semester to study the future of popular music in Germany and

23   it is also Program Development in Havana, Cuba.

24   Q.    And what degrees do you hold?

25   A.    I hold four degrees.  I have an Associate's Degree from

EXHIBIT 9
PAGE 1498

```
 1    the American Musical and Dramatic Academy in New York and
 2    that's a degree in musical theater.  I have an undergraduate
 3    degree from the New School For Social Research also in
 4    New York and that's in theater.  I have a Master's and a PhD
 5    from New York University in Performance Studies with a focus
 6    on popular music.
 7    Q.   And as a professor, do you focus on any particular areas
 8    of study?
 9    A.   Sure.  I focus on three main areas of study in my work,
10    in my research.  The first is popular music, popular recorded
11    music.  I'm interested in all aspects of popular music.  Um,
12    I'm interested in the historical aspects of popular music,
13    cultural aspects and the social aspects.
14         Um, the second area of research is marketing and
15    branding.  So I'm interested in the business of marketing and
16    branding in music, in the entertainment business in general,
17    but in music in particular.  And the third would be celebrity
18    and stardom.  So in the academy, there's actually an area of
19    scholarship and research called Star Studies.  And in this
20    area scholars such as myself are interested in figuring out
21    why we have stars, why we have celebrities.  What is stardom?
22    What drives stardom?  And how do stars and celebrities drive
23    products in the marketplace.
24    Q.   Do you teach in those areas as well?
25    A.   I do.  Um, I teach in all of those areas.
```

```
1          As I mentioned, I have been teaching at New York
2   University since, um, 2000 so it's actually 19 years now.
3   And I've been teaching in popular music.  So I teach classes
4   on a wide variety of popular music genres so hip hop and
5   R and B and rock and pop.  I've taught a class Record
6   Producer as Creative Artists so where we look at the entire
7   history of 20th and 21st century recorded music.
8          I've also taught a class on, um, music branding
9   since 2007.  So that's a class where I teach students how to
10  brand themselves according to the rules of corporate
11  branding.  And that class that I mentioned I've been teaching
12  it for 12 years, and it's become quite popular and essential
13  in our program.  So I'm actually offering it every semester
14  now because the students find the lessons from branding so
15  essential to their success in the context of the music
16  industry.
17         I've taught classes on music entrepreneurship where
18  I develop and work with students, their business plans and
19  help them succeed professionally in the music industry.  And
20  I've also taught classes on celebrity and stardom.  So I've
21  taught a class on fame, the history of fame, the culture of
22  fame and the politics of fame.  The first time I taught that
23  class was in 2001 and I have done various iterations of it
24  over the years.
25  Q.   And have you published in either academic publications
```

1    or otherwise on these issues?

2    A.    I have published.  Um, I've published extensively in

3    academic circles.  Um, I've published in peer-reviewed

4    journals.  Most recently I published an article on Beyonce

5    and Jay-Z, pop star and hip hop star, um, for the Journal of

6    Popular Music which is one of the more acclaimed, um,

7    academic journals in the context of popular music.

8              I've written a book on Michael Jackson, a biography

9    of him looking at his stardom and deconstructing his appeal.

10   I'm currently working on a book, um, on the life and times of

11   pop star and rock singer Freddie Mercury, and this is for Dey

12   Street Books which is an imprint of HarperCollins.

13             Um, I've also written extensively for the last

14   20 years as a music journalist focusing on stardom and

15   popular culture and popular music.  And I've written for, um,

16   internationally recognized publications, I won't name them

17   here, um, but many over the years.

18   Q.    And do you serve on any councils or boards related to

19   the music industry?

20   A.    I do.  Um, I've served on the board of the R and B

21   Foundation for a long time.  Um, that foundation was

22   populated with many influential figures in music like Berry

23   Gordy, the CEO of Motown, um, Teddy Pendergrass, R and B

24   singer, Daryl Hall of Hall and Oats and others.  And

25   currently I serve on the inaugural Hip Hop Council at the

1    Kennedy Center for the Performing Arts which is one of the

2    most recognized performing arts centers in America.

3    Q.   And aside from what you've already described, have you

4    work professionally in the music industry otherwise?

5    A.   I have.  I have worked as a music manager and I've

6    consulted for, um, artists and also for various music

7    companies including streaming service Spotify.  Um, Diageo

8    which is the parent company of Hennessy which is a brand that

9    works a lot in music, and music apps as well including a new

10   music app called Tunes Map.

11   Q.   And have you been engaged as an expert in this case by

12   the defendants?

13   A.   I have.

14   Q.   And are you being paid for your work?

15   A.   I am.

16   Q.   What are you being paid?

17   A.   I'm being paid $450 an hour for preparing reports in

18   this case and $700 an hour for trial.

19   Q.   And does your payment depend in any way on what opinions

20   you provide?

21   A.   No, it does not.

22   Q.   And does your payment depend on what the jury decides?

23   A.   No, it does not.

24   Q.   And what were you asked to do in your capacity as an

25   expert in this case?

EXHIBIT 9
PAGE 1502

```
 1    A.    In this case I was asked to provide my professional

 2    opinion on the value of Ostinato No. 2 in the Dark Horse

 3    composition to the commercial success of Dark Horse, the

 4    sound recording.  That's the first part.  Then I was also

 5    asked to provide my professional opinion on the value of

 6    Ostinato No. 2 to the success of Katy Perry's Prism album.

 7    Q.    And do you have a methodology that you used to render

 8    these opinions?

 9    A.    I do.

10    Q.    Can you please generally describe what that methodology

11    is?

12    A.    Sure.  So in my academic work and in my teaching, I've

13    developed a methodology in which I conduct what I call a

14    post-mortem assessment or evaluation of factors that drive

15    the success of a single or an album.  So let me explain what

16    I mean by a post-mortem evaluation or assessment.

17              In the music industry, it's often difficult to

18    predict with exactitude why a single or an album is going to

19    become successful; right?  If you knew how to predict that

20    with exactitude every single time, you could just win the

21    lottery; right?  And you could have hits after hits after

22    hits.  And some people are certainly good at making those

23    predictions, but generally speaking, you can't make those

24    predictions with exactitude.

25              What you can do, however, is take an already
```

1    existing single or an already existing album and work

2    backwards in the historical record to assess the range of

3    factors that drive success for that single or for that album.

4    And so what I do is I retroactively value the range of

5    factors that drive success for singles and albums.

6          And I do this through professional expertise that

7    involves a few things coming into confluence.  One is the

8    study of celebrity and stardom.  The other is an

9    understanding of music genres and the importance of music

10   genres and styles.  And the other would be the business of

11   marketing and branding and applying that in the context of

12   this post-mortem evaluation.

13   Q.   And what tools do you use to conduct this analysis?

14   A.   So to do this analysis, you need to do two things.  One,

15   you need to conduct forensic research in music.  And by this

16   I mean going back to into the historical record to understand

17   what drove the success of a single or an album.  So to do

18   that forensic research, you need to pull up a lot of data

19   from the past.

20         And you do that by looking at marketing campaigns

21   if you have access and availability to those campaigns, you

22   can look at chart success, you look at journalistic

23   discussions of those albums in the moment in which they were

24   released or during their commercial lifecycle um, because

25   journalists, publications often are tasked to go in and

```
 1   explain what's happening from a marketing perspective and

 2   what's the driving success of an album or single.

 3            It also involves looking at other kinds of

 4   research.  Looking at promotional campaigns, looking at

 5   advertising campaigns.  Um, it can involve, um, looking at

 6   all kinds of other things, too.

 7            And finally it involves taking that research,

 8   right, that you've done and apply a certain expertise to it

 9   where you analyze and sift through that research and think

10   about it in the context of music genres, music styles, think

11   about it in the context of celebrity and stardom.  And think

12   about it in the context of the music business itself,

13   branding and marketing.

14   Q.   And obviously we're here for a litigation, but do you

15   use this methodology in conducting analysis outside of the

16   litigation context?

17   A.   I do.  So I use this methodology in my classes for

18   instance.  I teach my students how to do this.  It's an

19   essential part of my branding class that I mentioned I've

20   been offering since 2007.

21            Um, what I do, and they sometimes get scared when I

22   say the words post-mortem assessment of the factors, but it's

23   important for them to understand the value of doing this

24   work.  What I ask them to do is to take an album or a single

25   or to look at a very successful artist and to work backwards
```

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1505

1    in the historical record, to conduct research.

2           The same research, forensic research, I was just

3    talking about, and then to apply their analytical skills

4    which we work on in the class to make sense of that data.

5    And then figure out a range of factors that went into driving

6    the success for that single or that album or that artist.

7           And the reason they're doing this is not some

8    cerebral exercise.  They're doing it because they are artists

9    themselves.  They're performers or aspiring producers or

10   aspiring music executives, whatever.  They want success for

11   themselves.  They want to be successful.

12          And so the best way to learn how to become

13   successful is to look at examples of successful albums or

14   singles, and then to deconstruct those albums or singles,

15   identify a range of factors and figure out how those factors

16   drove the success of that single or that album in the context

17   of those artists.

18          So I use it certainly in my classes.  And I also

19   conduct this methodology in my own work as a journalist and

20   as a writer and as a scholar.  Almost everything I write is

21   about popular music, artists and celebrities and stars.  And

22   what I'm interested in is figuring out how to deconstruct

23   their star appeal.

24          Why are we so attracted to a Michael Jackson or to

25   a Freddie Mercury or to any major star on that level?  What

```
1   are the range of factors that determine why we are driven to

2   these artists and their products in the marketplace?  And

3   then, again, to work backwards, deconstruct it and identify a

4   range of factors.

5   Q.   And just for the court reporter's benefit, if you would

6   just remember to slow down.

7   A.   Sorry.  I'm trying.

8   Q.   You're doing well.  Did you apply this methodology in

9   Dark Horse?

10  A.   I did apply this methodology in Dark Horse, yes.

11  Q.   What materials did you review for this task?

12  A.   I reviewed a number of articles and essays from, uh,

13  national and international publications that talked about

14  Katy Perry, that talked about Dark Horse, that talked about

15  Prism.  I was primarily looking at articles from the time,

16  the historical record from the time and era in which it was

17  released to see how people discussed it, how they talked

18  about it and what research they had discovered.

19       I also looked at the marketing, uh, campaigns for

20  Dark Horse by way of Capitol Records P and L statements, um,

21  that I was given access to, and I looked at a couple of the

22  expert witness reports in this case.

23  Q.   And what were your overall conclusions regarding Dark

24  Horse?

25  A.   So what I concluded is that according to my professional
```

1    expertise, I have never seen any case where there's just one

2    factor that drives the success of a single or an album.

3    Can't just be one.  There's in almost every case a variety of

4    factors.

5              And so what I did in this case is to identify what

6    those factors were, and then what I also did was I ranked

7    those factors according to importance.  So I ranked them by

8    primary factors, secondary factors and tertiary factors.

9    Q.    Um, so did you identify the primary factors in the

10   success of Dark Horse?

11   A.    I did.

12   Q.    And just generally when you say primary factors, what do

13   you mean by that?

14   A.    So the primary factors will be the essential driving

15   factors that push and create value for a single in the

16   marketplace.  These factors as I mentioned are essential.

17   Um, they are central to the reason why there's value created

18   around that single in the marketplace.

19   Q.    And what did you conclude were the primary factors in

20   the success of Dark Horse?

21   A.    In Dark Horse I identified two primary factors based on

22   my professional expertise.  And the first is the celebrity

23   star power and branding and the second is the marketing of

24   Dark Horse itself.

25   Q.    What do you mean by celebrity star power and branding in

1    this context?

2    A.    Okay.  So a brand is essentially a reputation.  Um,

3    celebrities can considered to be brands because they are

4    human beings with reputations that have value.  Celebrities

5    have brand value in the marketplace.  Celebrities can drive

6    products.  They can drive sales and success.

7         Katy Perry had enormous celebrity brand value prior

8    to the release of Dark Horse.  Her public was so primed for

9    whatever she was gonna put out into the marketplace that when

10   the release of Prism happened and when Dark Horse came out,

11   they were ready for it; right?  And that has to do with the

12   enormity of her brand value in 2013.

13        So, um, let me just give by way of introduction a

14   little explanation of the nature of her celebrity star appeal

15   prior to the release of Dark Horse.  In 2008 Katy Perry had

16   her first major label debut, um, which is One of the Boys and

17   that album caught on like wildfire.  There were four major

18   singles from that album:  I Kissed a Girl, um, the second

19   single was Hot and Cold, then there was also Thinking of You

20   and Waking Up in Vegas.

21        That album really put Katy Perry on the map to the

22   subject of a lot of attention in popular culture, but it only

23   went to a higher level in 2010 with the release of her second

24   major label album which was Teenage Dream.  And Teenage Dream

25   actually produced five number one singles on the Hot 100.

1          Those singles included Teenage Dream, the title

2     track from the album, California Girls, ET, um, and Last

3     Friday Night and -- Birthday and Last Friday Night.  Um, and

4     also the single This Is How We Do.  So Katy Perry had

5     enormous success with Teenage Dream and actually, she tied

6     with Michael Jackson.

7          The last time any artist in popular music had five

8     singles on the Hot 100 at number one was Michael Jackson in

9     1987 with Bad so that was a huge record that she broke, an

10    enormous achievement.  And I believe she actually had a

11    Guinness Book of World Records commendation for that

12    achievement.

13         That's how magnanimous her celebrity was at that

14    time.  And that kind of celebrity, again, can drive the

15    success of a single because the audience, the public is

16    primed for the release of her material.

17    Q.   And did Katy Perry also have significant fan engagement?

18    A.   She did.  Um, so Katy Perry was not an unknown quantity

19    as I've just mentioned.  She was a known quantity and

20    particularly in the world of social media.  So the

21    International Federation of Phonographic Industry releases a

22    list every year and they talk about artists in popular music

23    who have generated enormous social media influence and

24    appeal.

25         And Katy Perry ranked number nine in 2014 on the

1    list of artists with that kind of social and web engagement.

2    She had 44 million Twitter followers in that year and 55

3    million Facebook friends which is I can assure you a large

4    number.  And she also has a very intimate and deep

5    relationship with her fans.  She calls them Katy cats and

6    they often refer to themselves as Katy cats.

7            And that's a sign of affinity I think between the

8    consumer and the artist.  They're very few pop artists who

9    have that kind of closeness with their fans where they

10   actually have names for their fans and their fans think of

11   themselves according to those identities Beyonce, Lady Gaga

12   and a few others.

13   Q.   And so was there other celebrity star power associated

14   with the songs aside from Katy Perry?

15   A.   Uh, sure.  Um, it's not just Katy Perry on the song

16   driving it with her celebrity, but it's also Juicy J.  Um,

17   Juicy J raps on the intro and also on the bridge.  And he

18   would have been well-known in popular music especially in the

19   context of hip hop.

20           He was part of the Three 6 Mafia and they were

21   quite successful in the 2000s.  Actually, in 2006 they won an

22   academy award, the highest award one can receive in the

23   context of film, for their original song from the film Hustle

24   and Flow.

25           And, uh, Juicy J is also known as a solo artist,

1    he's released several albums, an entrepreneur, has a label

2    called Taylor Gang with another hip hop artist called Wiz

3    Khalifa, and he was well-known.  In 2013 the public was also

4    primed for his releases and it was novel that he and Katy

5    Perry were working together.

6    Q.    You also mentioned marketing.  Um, can you explain what

7    you mean by that in the context of Dark Horse?

8    A.    Sure.  So some people do believe still that songs just

9    become hits on their own.  Um, it's rare that they do

10   especially in the level of pop, at the level pop where we're

11   talking about charts and we're talking about mass widespread

12   recognition.  Um, record labels often in conjunction with

13   their brand partners invest a lot of money, time, resources

14   and human resources, financial resources and human resources

15   to market albums and singles.

16            So what I mean by that is record labels are

17   interested in generating consumer awareness about singles in

18   the marketplace.  You can't just drop something in the

19   marketplace.  You want to make sure that people know that

20   it's out there, and you do that through marketing efforts

21   which involve huge spends often to generate that kind of

22   awareness.  Campaigns and activations, um, designed to

23   promote that sort of visibility.

24            So in other words, in the music industry if you

25   want to go pop, you very often have to spend money to make

EXHIBIT 9
PAGE 1512

 1    money.  What drives singles are marketing efforts.

 2    Q.    And so what were some of the marketing efforts for Dark

 3    Horse?

 4    A.    The marketing efforts for Dark Horse were enormous.

 5              So we can start, if you look at this time line

 6    here, in August of 2013 months before the official release of

 7    Dark Horse, Katy Perry partnered with two brands, two major

 8    brands, Pepsi and MTV to, um, produce an innovative marketing

 9    campaign that would introduce Dark Horse to her fans.

10              So this campaign was an interactive campaign in

11    which Dark Horse and another song from the album Prism

12    Walking on Air were considered to be, uh, promotional

13    singles.  People had not heard them yet, but what fans could

14    do is use their smart phones, enter a hashtags and hear

15    snippets of those songs, and they could vote on whether they

16    wanted Dark Horse or Walking on Air to be the single of

17    choice that would ultimately be released.

18              This is very unusual in the industry.  Fans don't

19    often have that kind of level of choice and access, but it

20    was an interesting branding idea to generate visibility

21    around the single.  So Dark Horse was not officially released

22    by the label Capitol until December of 2013, but it had been

23    circulating in the marketplace.

24              Fans had heard it since August of 2013 because of

25    this Pepsi MTV marketing campaign.  So that helped really

EXHIBIT 9
PAGE 1513

```
 1   drive the single to have that branding effort happening so
 2   many months earlier.
 3   Q.   And did Capitol expend resources on getting the single
 4   out?
 5   A.   Sure.  So we move forward in the time line to
 6   December of 2013 and Dark Horse is now officially released as
 7   a single by Capitol.  And by official release when you move
 8   from a song to a single, what that means is a record label
 9   has decided to invest money and resources to turn into it a
10   single and to promote it to radio and perhaps even to make a
11   video.
12        So Capitol spent about $1.1 million to market Dark
13   Horse as a single and I can assure you that is a great deal
14   of money at any time whether we're talking about 2013 or now
15   that's a lot of money spent, but they wanted to make it a
16   hit.  It had already been circulating in the marketplace, but
17   now they wanted to make it a number one hit which it did
18   become a number one hit, um, about a month or a
19   month-and-a-half later.
20        And one of the ways they did this was they made a
21   music video for Dark Horse which was quite expensive, um,
22   lavish and quite talked about as well.  And that was released
23   in February 2014.
24   Q.   And with the official release of the single of Dark
25   Horse, where that fit in the time line of the release of the
```

1   Prism album?

2   A.   Um, so the Prism album was released in the fall of 2013

3   and Dark Horse came out many months -- the video for Dark

4   Horse came many months after that.  It came out in

5   February of 2014.  So Dark Horse, again, had been circulating

6   as a song.  It had been played on radio, but it was not an

7   official release.

8        It was only because of the Pepsi and MTV campaign

9   that Dark Horse had that kind of circulation.  They decided

10  in December, Capitol decided to release it as an official

11  single, and then about a month-and-a-half later once it had

12  gone to number one, they made a video of the single.  That

13  took it even further so that's the time line.

14  Q.   And are public performances considered part of

15  marketing?

16  A.   Sure.  So live performances of a single can also help

17  drive the success of that single.  Again, what we're talking

18  about in marketing is generating consumer awareness and

19  visibility.  So if you have Katy Perry singing the song,

20  that's gonna generate visibility, awareness and help lead to

21  success.

22       Um, so here are some strategic performances that

23  Katy Perry did in conjunction with her label and others to

24  generate that kind of visibility for Dark Horse.  She

25  performed at the iHeart Radio Music Festival in the fall of

1    2013 and that's in Las Vegas, very well-known music festival.

2    She performed at the iTunes Musical Festival.  It's now

3    called the Apple Music Festival and that's in the London.

4           She performed Dark Horse with Juicy J at the 56th

5    Grammy Awards in 2016 and she also performed Dark Horse as

6    part of a medley at the Super Bowl Halftime Show.  And so

7    that's particularly significant because the viewership for

8    the Super Bowl is about 150 million viewers so that really

9    helped drive the success of Dark Horse to have a song like

10   being played in front of so many people.

11   Q.   So you've identified two of the what you called the

12   primary factors for the success of Dark Horse.  Were there

13   other factors?

14   A.   Yes, there were.  So those were the primary factors

15   drivers of success celebrity, star power and marketing, but

16   the secondary factors had very much to do with the musical

17   and production elements of Dark Horse, and so I've broken

18   those out for you here.

19          The first and most important of the secondary

20   factors that helped drive the success of Dark Horse is the

21   hook.  The hook of the song.

22   Q.   What is the hook?

23   A.   So the hook is the chorus.  The hook is the emotional

24   and melodic center of the track.  It's the memorable part of

25   the song.  When you hear a song over and over, um, and you

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1516

146

1    hear that repeated part, that part of the song that surges

2    and explodes and ascends in a kind of emotional release

3    that's often the chorus of the song, the memorable part of

4    it.

5    Q.   Um, and in Dark Horse in particular, can you identify

6    what the hook is?

7    A.   Sure.  In Dark Horse the hook is explosive surging part

8    of the song.  It's the part that goes are you ready for,

9    ready for a perfect storm, perfect storm and ends with and

10   there's no looking back; right?

11         That is to me the hook of the song because it's the

12   explosive part of the song, um, you know, that -- that pulls

13   you in and it draws you in.  It's the only part of the song

14   that I can actually sing back, the part that I remember.  And

15   Katy Perry is well known for her pop music hooks and I think

16   that's an incredibly strong one.

17   Q.   And what were other secondary factors if you identified

18   them?

19   A.   Sure.  The vocal performances themselves helped drive

20   the success of the single.  Hard to imagine Dark Horse

21   without any vocals on it becoming a success, um, if it was

22   just an instrumental.  It's clearly the fact that there are

23   vocals on the track which is Katy Perry's lead vocal and also

24   Juicy J's rapped vocal on the intro and also on the bridge

25   that drove some success to the single.

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1517

1          And it's not just any vocal, but it's Katy Perry's

2    specific iconic branded vocal.  People wanted to hear a Katy

3    Perry track and they want to hear her vocal.  They want to

4    hear what she sounds like, um, and so they got to do that on

5    Dark Horse.

6    Q.   And did you identify any other secondary factors?

7    A.   Sure.  So another secondary factor would be all the

8    collected instrumental musical elements in Dark Horse, and

9    let me explain what I mean by that.  So that means all the

10   performed and programmed, um, instrumental musical elements

11   in Dark Horse.  So what's played, the actual notes that are

12   played in the synthesizers and other -- in the beat.  Other

13   aspects of the instrumental musical aspect of Dark Horse.

14          And then also the underlying compositional elements

15   in Dark Horse and, again, let me explain what I mean by

16   underlying compositional elements.  So in a song, um, there

17   are aspects that can be notated in sheet music.  When you go

18   to buy or download a piece of sheet music, those are all the

19   compositional elements that can actually be notated, written

20   down on paper.

21          And in Dark Horse that includes elements like

22   Ostinato No. 2, Ostinato No. 1.  There are pieces of vocal

23   melody compositionally in Katy Perry's vocal, also in

24   Juicy J's rapped vocal.  You could notate all of those things

25   and they provide value to Dark Horse as well.  And so I've

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1518

1   considered all of those instrumental musical elements, the

2   actual instrumental of Dark Horse looking at its underlying

3   compositional elements.

4   Q.    And any other factors that you considered secondary?

5   A.    The final factor that I would consider to be a secondary

6   factor is the production and arrangement of Dark Horse.  So

7   in other words, people don't just go in a studio and suddenly

8   magic happens.  It needs to be produced and producing is an

9   artistic practice in which people pull together all these

10  compositional elements and realize them in the context of

11  technology as sound.

12          All right.  So we're talking about the actual sound

13  and the sounds in Dark Horse themselves which also provide

14  value.  It's a very sleek, um, fascinating sound that you

15  hear in Dark Horse and that's the result of producers'

16  intervention, also the mixing and the mastering of Dark Horse

17  as well.

18  Q.    Was there anything in particular about the sound of Dark

19  Horse that was significant at the time?

20  A.    Sure.  In 2013 we had really never heard a song that

21  sounded exactly like Dark Horse.  And the reason for that is

22  because it was a fusion and a merger of several different

23  styles all at once.

24          On one hand, it's a pop track.  And the reason that

25  you can call it a pop track is because it's structured like a

1   pop song with verses and choruses and a bridge.  And the

2   chorus in particular defines it as a pop track because it has

3   a kind of surging chorus that you often hear in contemporary

4   pop music.

5           It also has a hip hop element.  So besides pop, you

6   now have hip hop and that's primarily by way of Juicy J on

7   the track as a feature.  You also have trap elements, and

8   trap is a variant of hip hop that is minimalist, pared down,

9   often kind of sleek, often in a kind of minor key melodic

10  mode.  It's quite a popular genre of music.  It has been

11  since the 2000s at least.  And the trap in Dark Horse comes

12  by way largely of Ostinato No. 2 in that track.

13          And, um, finally, you also have EDM and EDM means

14  electronic dance music.  Another very popular contemporary

15  genre of music.  One of the ways you can hear, um, one of the

16  ways that defines EDM, and it has defined EDM for a long

17  time, is that often there will be a build-up from verses to

18  chorus and there's what you call a drop in EDM.  So after the

19  surging chorus, there's this moment where it continues to

20  surge, but it's called a drop and it's usually instrumental.

21          You hear this in a lot of contemporary EDM and

22  EDM-influenced pop music like David Guetta and Calvin Harris

23  and others.  And Dark Horse has an EDM component because

24  there is a drop that happens after the chorus.

25          So what you have is you have the merger of these

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1520

150

1    different styles pop, hip hop, trap-influenced hip hop and

2    EDM.  And that was a relatively novel fusion in 2013 and that

3    novelty is one of the things that helped drive Dark Horse.

4    It just didn't sound like anything and people were addicted

5    to that sound.

6    Q.   Are there other factors that you identified that

7    contributed to Dark Horse's success?

8    A.   Sure.  So I've identified also tertiary factors.  I've

9    put lyrics as a tertiary factor.  Um, the lyrics in

10   Dark Horse are fun.  They're about romance and seduction.

11   They're using magic as a metaphor for romance one of pop

12   music's oldest subjects.  There was some speculation at the

13   time on the part of the fans and also journalists that Katy

14   Perry had come through a divorce was now dating pop musician

15   John Mayer and so some speculated the lyrics might be about

16   John Mayer or their relationship.  Whatever the case, it

17   provided intrigue, controversy.  That intrigue, that

18   controversy helps drive, um, success, but you can't imagine

19   the song without any lyrics at all.  Nonetheless, the lyrics

20   I considered to be a tertiary factor.

21   Q.   And any other factors that you considered tertiary?

22   A.   Sure.  So what I did here is I isolated music elements,

23   musical elements in Dark Horse.  So what I mean by this is if

24   you take any one musical element other than the hook because

25   I do think the hook is a secondary driving factor.  It's

UNITED STATES DISTRICT COURT

EXHIBIT 9

PAGE 1521

151

1    quite important.

2            Can't imagine Dark Horse without the hook.  The

3    hook drove Dark Horse.  However, any other musical element

4    other than the hook, if you just kind of hypothetically pull

5    it out of the song, it matters, but it's a tertiary factor

6    because it doesn't drive the song in and of itself.

7            And so if you pull out Ostinato No. 2 which is at

8    the heart of this case, you pull out Ostinato No. 2 of

9    Dark Horse, while Ostinato No. 2 has value, it's a relatively

10   insignificant value in relationship to these other much more

11   important driving factors.

12           So I've included Ostinato No. 2 as part of the

13   collected musical and production elements as you see in

14   section -- in the secondary factors.  But if you isolated it

15   alone, I don't think it would drive the success of Dark

16   Horse.  In fact I'm sure nobody bought Dark Horse simply

17   because of Ostinato No. 2 alone so that's what I mean by

18   isolated musical elements.

19   Q.   Well, you mentioned Ostinato No. 2 as being part of what

20   makes Dark Horse have a trap style component.  In your view

21   is it a necessary component of that style that was part of

22   the fusion you mentioned?

23   A.   So Ostinato No. 2 does matter because, again, it's part

24   of those collected musical production elements that I

25   identified as secondary factors.  And, again, Ostinato No. 2

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1522

152

1   does help provide the trap quality of Dark Horse that allows

2   Dark Horse to be understood as a fusion between pop, hip hop,

3   trap-influenced hip hop and EDM.

4          However, to my ears, Ostinato No. 2 is such a

5   relatively simple and kind of basic ostinato pattern.  If you

6   gave me a keyboard right now, I could probably come up with

7   another ostinato pattern that could fit in Dark Horse

8   interchangeably and it wouldn't make a great deal of

9   difference to the sound or the success of that song.

10         Um, I think there are a lot of ostinato patterns

11  that are similar in the context of trap music.  It's not a

12  super sophisticated genre in the sense of its musicality.

13  We're talking about just a few notes.  So I can think of

14  Ostinato No. 2 as relatively interchangeably with other kinds

15  of sounds that you hear in the context of trap.  And for that

16  reason, I only consider it to be a relatively insignificant

17  or minor part of the success of Dark Horse.

18  Q.    Okay.  And so you mentioned at the beginning there was a

19  second task that you worked on for this case, uh, with

20  respect to the album Prism.  What did you do with respect to

21  Prism?

22  A.    Sure.  So I was tasked also to assess the value of

23  Ostinato No. 2 to the success of Prism as an album, and I

24  came up with more factors as well and ranked them as primary

25  factors, secondary factors and tertiary factors.

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1523

153

1    Q.   And so what did you consider the primary factors that

2    lead to the success of the album Prism?

3    A.   Okay.  So first of all, I should mention that there are

4    13 tracks on Prism of which Dark Horse is one track and on

5    the deluxe edition of Prism, there are 16 tracks.  So Prism

6    is one of those 13 tracks or one of those 16 tracks depending

7    on what you're looking at.

8         And I should say that one of the reasons consumers

9    are driven to buy an album as opposed to a single is because

10   they want the album.  Right?  They want to hear the album as

11   a whole.  They want to own the album as a whole or stream the

12   album as a whole.  If they just wanted the single, they would

13   just by the single and that's it.  But part of the reason

14   people buy albums is to have an entire experience.

15        And I think that is also the case in Prism that

16   people wanted the whole experience as opposed to just one

17   single.  So what I've identified here in terms of the album

18   are the primary factors which, again, at the top what drove

19   the success of Prism as an album is celebrity star power and

20   branding.  Katy Perry's enormous brand value, also the brand

21   value of Juicy J and others, but Katy Perry driving the

22   success of that.

23   Q.   Were there other primary factors that you identified?

24   A.   Sure.  So the second primary factor that drove the

25   success of Prism as an album is marketing.  We've talked

154

1    about marketing before, but marketing of the whole album and

2    its singles.  So let me explain what I mean by that.

3            Capitol Records invested a great deal of financial

4    and other resources into making Prism a successful album.  I

5    believe the total marketing spend for Prism as an album was

6    around 8.275 million or $8.2 million to market that album and

7    that's an enormous amount of money.  My students would love

8    to have 8.2 million to market their album in the marketplace.

9            Um, so where did that money go?

10           It went to a number of things, uh, and many of them

11   are listed here.  Um, radio and video promotion.  Again, as I

12   mentioned, songs don't just show up on radio at least pop

13   songs.  It's often the hard behind-the-scenes work of, um,

14   radio pluggers, what they call song pluggers.  Um, executives

15   who work at record labels whose job it is to, um, help get

16   songs played on the radio.

17           And there are also video pluggers.  People who work

18   to get videos, um, greater spins and impressions.  So there

19   was enormous amount of money spent on radio and video

20   promotion of the singles on Prism.

21           Um, and also that 8.2 million included print ads;

22   right?  Ads in publications.  Billboards when you're driving

23   down the street and you see these big billboards, those cost

24   a lot of money.  Co-op ads in partnership with companies.

25   Radio ads or ads on the radio.  Website ads, television ads.

EXHIBIT 9
PAGE 1525

1          There was also innovative marketing strategies that

2    Katy Perry and Capitol Records undertook to promote Prism as

3    an album.  They actually rented a tractor-trailer, painted it

4    gold, put on the side of the tractor-trailer the word Prism

5    and they not only drove it around Los Angeles, but they drove

6    it around the entire country.  And Katy Perry tweeted to her

7    fans that if they took a picture of the tractor-trailer and

8    used a particular hashtag, she would retweet them.

9          So this is a way to generate fan engagement, to

10   drive sales of the album, to get people aware that the album

11   is actually out there in the marketplace.  This is one of the

12   things that helped drive the success of Prism as an album.

13   There were also TV commercials with Katy Perry's brand

14   partners like Citi that were quite popular, often discussed

15   and talked about.

16         And finally, Katy Perry went on a world tour.  So

17   tours are actually marketing; right?  They're one of the ways

18   we come to find out what albums are released in the

19   marketplace.  So she went on a 14-month tour which is a very

20   long time and went to 124 cities.  And each of those tour

21   stops was about marketing Prism and getting people to be

22   aware that it existed and to ideally buy it.

23   Q.   And so mentioned marketing of the album and also

24   singles.  What were some of those singles that you were

25   thinking of?

1    A.    Sure.  So Roar was the lead single from Dark Horse --

2    I'm sorry -- from Prism so that was released first.  That was

3    released in August of 2013 and it actually went to number one

4    on the charts.  Um, it's an inspirational, anthemic ballad or

5    kind of up-tempo, mid-tempo track you could say.  And it was

6    nominated for the Grammy for Song of the Year.  So Roar was

7    an enormous single.

8           And there were other singles as well.  There's

9    Walking on Air which was one of those promotional singles

10   that was part of Pepsi and MTV promotion that I mentioned

11   before.  Unconditionally was the second single from the album

12   that was released on October 16th and that's more of a

13   ballad, um, so it gave a different feeling.  And Birthday was

14   the fourth single from the album released on April 3rd and

15   This is How We Do was the fifth single released on July 24th.

16   Q.    So were some of those singles around at the same time,

17   released around the same time?

18   A.    Yeah, sure.  So one of the things that really

19   interesting about the marketing of Prism is that Roar was the

20   first single.  There were two promotional singles released in

21   August of 2013, Dark Horse and Walking on Air which were also

22   circulating in the marketplace, but were not official

23   singles.

24          And then you had Unconditionally as the second

25   single which was released in October.  While Roar is also

157

```
 1   being serviced to radio and is circulating as an official
 2   single, Unconditionally is also a single in the marketplace.
 3   And Dark Horse was circulating, but unofficially.
 4        So you actually had three singles at the same time
 5   circulating in the marketplace:  Roar, Dark Horse and
 6   Unconditionally.  And that was particularly unique and it
 7   also generated a lot of attention, a lot of visibility for
 8   Prism as an album to have three singles circulating at the
 9   same time.
10   Q.   And were there other songs on Prism that were not
11   singles?
12   A.   Uh, sure.  So as I mentioned, there's 13 songs on Prism.
13   There were five official releases so that leaves other tracks
14   on the album that were considered album cuts.  So the word
15   album cuts in the music industry essentially refers to songs
16   that are on an album, but are not officially released by a
17   record label as singles.  Those are considered album cuts.
18        And they're important because, again, the reason
19   people buy albums as a whole is because of the entire
20   experience of buying an album not just a bunch of singles.
21   They can buy those off individually.  You can go on iTunes
22   and buy each single, but you buy the album as a whole.  And
23   so the album cuts are also valuable as well.
24   Q.   And did you come to any conclusion regarding the amount
25   that Ostinato No. 2 contributed to the success of Prism?
```

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1528

1    A.    I did.    So we've already talked about the way in which

2    Ostinato No. 2 was just one element of a constellation of

3    musical elements that provided value to Dark Horse.    Right?

4    Just one relatively insignificant factor in Dark Horse

5    itself.    Important, but relatively insignificant compared to

6    the other factors like celebrity star power and marketing and

7    the hook and so on.

8          So given that Ostinato No. 2 is just one element of

9    Dark Horse and given that Dark Horse is one of 13 tracks on

10   an album that a lot of people bought because of the nature of

11   the album itself, I would say that the value of Ostinato

12   No. 2 to Prism is even more insignificant in that way because

13   it's just one part of one song on one album.    So overall I

14   would describe the value of Ostinato No. 2 to Prism as

15   relatively insignificant.

16          MR. ALBERTSON:    Thank you.    I have nothing further

17   at this time subject to redirect.

18          THE COURT:    Okay.    Do we need to take a short

19   recess?

20          THE COURT REPORTER:    Yes, Judge.    Yes.

21          THE COURT:    Okay.    Why don't we take 10 minutes.

22   We'll come back, we'll do cross, and then we'll see where we

23   are time wise.

24                    (Jury not present.)

25          THE COURT:    Just quickly do you have an estimate on

EXHIBIT 9
PAGE 1529

159

```
 1   cross?

 2              MR. KAYIRA:  Probably about 30, 35 minutes.

 3              THE COURT:  Okay.  And then closing, what do you

 4   estimate?

 5              MR. KAHN:  20 to 30 minutes.

 6              THE COURT:  Okay.  Well, let's see where we are.

 7                         (Recess taken.)

 8              THE CLERK:  All rise.

 9                         (Jury present.)

10              THE CLERK:  Please be seated.

11              THE COURT:  Okay.

12              Mr. Kayira.

13              MR. KAYIRA:  Thank you, Your Honor.

14                       CROSS-EXAMINATION

15   BY MR. KAYIRA:

16   Q.   Good afternoon, Dr. King.  How are you doing today?

17   A.   Good afternoon.  I'm doing well.

18   Q.   That was a lot of information that you shared with us

19   and a lot of information about pop music and rap music and

20   marketing.  I wanted to ask you a few questions about what

21   you did to prepare for today's testimony.

22              You stated that you reviewed materials from

23   defendant's counsel; is that correct?  From -- from the

24   defendants; is that right?  The Capitol P&L?

25   A.   Yes.
```

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1530

```
 1    Q.   Was that Capitol P&L directed only for Katy Perry or was
 2    it for other artists at Capitol?
 3    A.   It was just Katy Perry.  It's the same material that I
 4    reviewed for my report.
 5    Q.   Okay.  And you also reviewed some expert reports as
 6    well; correct?
 7    A.   Uh, yes.  In my report -- in my initial report, I
 8    reviewed those expert witness reports.
 9    Q.   Okay.  And did you also review any surveys -- uh, any
10    survey materials concerning the Dark Horse song?
11    A.   Can you define what you mean by survey materials?
12    Q.   Surveying?  Uh, asking people why they liked the song.
13    A.   I'm not aware of those surveys, no.
14    Q.   Okay.  Uh, are there any polls that poll people to ask
15    them why they buy a song on -- online or anything like that
16    that you've looked at?
17    A.   In general or in a specific relationship to Dark Horse?
18    Q.   Well, first, in general.
19    A.   Um, I'm not aware of any specific polls that ask people
20    to do that unless you're talking about something on a TMZ
21    site or something like that that I don't consider to be
22    particularly substantive in the context of what we're talking
23    about here.  Um, but no, I did not review any polls as such.
24    Q.   Okay.  Uh, did you talk to people that purchased the
25    Dark Horse song and ask them why they purchased Dark Horse?
```

EXHIBIT 9
PAGE 1531

```
 1   A.   I did not talk to anyone who purchased Dark Horse, no.

 2   Q.   Did you talked to anybody that purchased Prism?

 3   A.   Uh, I did not talk to anybody specifically who bought

 4   Prism, no.

 5   Q.   Did you call anyone to interview them why they thought

 6   Dark Horse was a successful song?

 7   A.   I did not call anybody specifically to ask them why they

 8   thought Dark Horse was a successful song.

 9   Q.   Okay.  Now, I want to ask you a couple of questions

10   about whether you talked to Henry Walter known as Cirkut

11   about his contributions to the song Dark Horse?

12   A.   I did not talk to Henry Walter.  I've never met him.

13   Q.   Have you ever met Dr. Luke or Lukasz Gottwald?

14   A.   I have not.

15   Q.   And so you haven't talked to him either; correct?

16   A.   No.

17   Q.   Okay.  Is that the same for Sarah Hudson?

18   A.   I have not talked to Sarah Hudson.

19   Q.   And have you talked to Katy Perry about her thoughts

20   about Dark Horse?

21   A.   I have not.

22   Q.   In your preparation for today's testimony, did you have

23   the opportunity to compare other successful songs during the

24   same time period as Dark Horse was released as a single such

25   as Meghan Trainor's All About That Bass from 2014?
```

1    A.    I did not.

2    Q.    Did you do a comparison of the Iggy Azalea song known as

3    Fancy by Universal Music Group in Def Jam from 2014?

4    A.    I did not.

5    Q.    You didn't -- you only compared the seven factors within

6    the song known as Dark Horse; is that correct?

7                MR. ALBERTSON:  Objection.

8                THE COURT:  Sustained.

9                MR. KAYIRA:  Well, Your Honor.  I'll tell you what.

10   I'll rephrase.

11   Q.    I've had the opportunity to read your report, and I'll

12   read to you what you said.  You said I will first identify

13   the factors that contributed value to Dark Horse and to

14   Prism.  Is that a correct statement?

15   A.    If that's what's in the report, yes.

16   Q.    Okay.  Then I will weigh and rank the factors.  Primary

17   factors contributed more than secondary factors, and, in

18   turn, secondary factors contributed more than tertiary

19   factors.  In assessing the relative value of the factors, it

20   is important to recognize that each of these factors only has

21   value in combination with other factors and in relationship

22   to those other factors.

23          I'm a simple person so I want to see if I

24   understand what that means; right?  So does that mean you can

25   isolate and remove the issue of celebrity from a discussion

1    of Dark Horse's commercial success as part of your

2    evaluation?

3    A.    No.  So let me just clarify that.  I don't think of you

4    simple, but I'll clarify for you nonetheless.

5            Um, what I mean by that is through my methodology,

6    I identify a range of factors, right, that drive success for

7    a single or an album as I explained previously.  Those

8    factors can be ranked as primary factors or secondary factors

9    or tertiary factors, but they have to be understood in

10   relationship.  Right?  You can't really pull them apart.

11           So in other words, if you take away celebrity, if

12   Katy Perry was an unknown quantity completely, the only

13   primary factor you'd be left with for marketing Dark Horse

14   would be the actual marketing from Capitol, and they would be

15   marketing somebody's who completely unknown.

16   Q.    I think that's a good place to take a break right there.

17   Okay?  Now, how can you remove the instrumental from Dark

18   Horse as you did in your prior testimony and say it's

19   insignificant and -- and can be removed from the song, and

20   you could replace it?  How did you get to that conclusion?

21           MR. ALBERTSON:  Objection to interrupting the

22   witness.

23           THE COURT:  Well, more than that, he's arguing.

24           Let's try again.  You can rephrase.

25   BY MR. KAYIRA:

1    Q.   Dr. King, um, you just finished explaining that you

2    couldn't remove celebrity from your evaluation of the

3    commercial success of Dark Horse; is that correct?

4    A.   It's not exactly correct so let me explain once more.

5         You have to understand these factors in

6    relationship to each other because they're combined and

7    interrelated.  As I was saying before you cut me off, if you

8    removed celebrity which you cannot do, how can you remove

9    celebrity, if you remove celebrity and star power, you'd only

10   be left with marketing as a primary factor, and you would

11   secondary factors and tertiary factors.

12        But clearly, celebrity is an essential part of the

13   marketing -- essential part of what drove success for Dark

14   Horse so you have to understand it in relationship to

15   marketing.  Capitol Records was marketing someone who was a

16   known quantity.  She was enormously successful --

17   Q.   Dr. King?

18        MR. ALBERTSON:  Your Honor?

19        THE COURT:  You cannot interrupt.

20        THE WITNESS:  She was enormously successful in

21   2013, her celebrity star power so they were marketing

22   somebody who already had all this celebrity and star power so

23   those two things worked together.  If you only had celebrity

24   star power and marketing, and you didn't have a compelling

25   song, something that people wanted to actually hear, what

1   would you be marketing?  Right?

2          So you need to have a compelling song full of

3   musical and production elements which I have identified as

4   secondary factors.  You also need to have tertiary factors

5   such as lyrics that I've identified and other factors.  So

6   you need to have those things at work in combination with

7   each other but also in a specific historical context.  Right?

8   Otherwise, these are just ingredients that you can drop into

9   a blender and create success.  Right.

10          But this happened at a particular time in 2013.

11   Right?  And through my methodology of doing a post-mortem

12   evaluation of the factors, you can understand why in 2013

13   Dark Horse became the single that it did, because of the

14   interrelation and the combination of those factors together

15   so you cannot pull any one of those factors out.

16          But hypothetically, if you had to pull an isolated,

17   musical out, if hypothetically you had to do that, right,

18   such as Ostinato No. 2, it would be a tertiary factor, and it

19   would be far less significant than even lyrics.

20   Q.   Is there anyone other than yourself that believes that

21   Ostinato No. 2 is, uh, insignificant to the song known as

22   Dark Horse?

23          MR. ALBERTSON:  Objection.

24          THE COURT:  Sustained.

25          You may rephrase.

```
 1   BY MR. KAYIRA:

 2   Q.   Dr. King, do you have any studies or any data that

 3   supports the conclusion that removing the Ostinato No. 2 from

 4   Dark Horse would not affect the commercial success of that

 5   song?

 6   A.   I don't have those studies because those studies were

 7   never created because to some degree, it is common sense,

 8   right, and intuitive to know that first of all, you can't

 9   remove an ostinato from a song like that.  Right?  Just

10   remove it.  It's part of the song.

11        But also I don't believe there's anybody who would

12   argue that they bought Dark Horse just because of Ostinato

13   No. 2.  They weren't interested in the primary drivers like

14   celebrity, star power, the marketing they didn't think drove

15   them to Dark Horse.  It's just Ostinato No. 2.

16        Actually, if I was teaching a class, and I was

17   asking my students to do post-mortem evaluation of the

18   success of Dark Horse, and they turned in a paper to me, and

19   that paper only had one factor, and it was Ostinato No. 2 is

20   the only factor that drove Dark Horse, I would politely bring

21   that student to my office and say I'd like you to redo this

22   report because it's insufficient.  I have to give you a low

23   grade on it because you didn't do your research.  You didn't

24   do your homework.

25        Clearly, there have to be other factors.  What
```

EXHIBIT 9
PAGE 1537

1    about celebrity star power?  What about marketing?  What

2    about the huge spends by Capitol Records?  What about Pepsi?

3    What about MTV's brand partners?  What about the hook?  And I

4    think if one of the students understood that there was a

5    constellation of factors that are interrelated and combined,

6    they would turn in that essay again, and I might give them a

7    higher grade.

8    Q.    Now, Dr. King, all of the songs, uh, on Prism include

9    Katy Perry music and lyrics; correct?

10    A.    Yes, that's true.

11    Q.    And a number of those songs were selected to be

12    promotionals.  Is that your understanding?

13    A.    Can you rephrase that question?

14    Q.    To be promotional for the sale of the album known as

15    Prism.

16    A.    Uh, it's my understanding that there were just two

17    singles that were considered to be what you call promotional

18    singles so that was Dark Horse, and that also Walking on Air.

19    So those were not official singles.

20          The official singles that were released, uh, by the

21    record label were Roar first, then Unconditionally second.

22    Third was Dark Horse after it had already been released as a

23    promotional single; right?  And then fourth was Birthday, and

24    then fifth was This Is How We Do.

25    Q.    Um, can you explain to us, uh -- for us how Walking on

EXHIBIT 9
PAGE 1538

1  Air did not do as well as Dark Horse?

2  A.   I sure can.

3         So as I mentioned, there were two promotional

4  singles that were part of Pepsi and MTV's collaboration with

5  Katy Perry to, um, provide an interactive, social media

6  experience for her fans where they could vote on either Dark

7  Horse being an official single for Katy Perry or Walking on

8  Air.

9         So fans had to tweet in, and aspects of those songs

10  would unlock.  And if they kept tweeting, if they kept moving

11  forward, they could actually unlock the entire single and

12  hear it.  And remember this is before the album had actually

13  been released so this is special, to be able to a Katy Perry

14  exclusive before it's released.  And the fans chose Dark

15  Horse.  They did not choose Walking on Air.

16         So why is that the case?

17         Even though my report is not about Walking on Air,

18  what I would surmise in terms of my expertise is that Walking

19  on Air did not have the same qualities as Dark Horse.  Even

20  though it's the same celebrity star power, Katy Perry,

21  perhaps the marketing for Walking on Air was different.

22         Actually, we know it's different because the label

23  spent $1.1 million on Dark Horse and actually made it an

24  official single that they serviced to radio and video and

25  made a video, and they didn't do the same thing for Walking

1    on Air.

2         But the other major factor that distinguished

3    Walking on Air and Dark Horse is the novelty factor, right,

4    the factor that Dark Horse didn't sound like anything else in

5    2013.

6         It had Juicy J providing a hip hop element to the

7    song, it had that trap influenced hip hop element we talked

8    about before, and it also had the EDM element, the drop in

9    the context of a pop song.  That was novel.  Walking on Air

10   didn't have that.  Okay.

11        So that's one of the major differences between

12   those tracks.  It wasn't as compelling for the fans clearly

13   by the fact that they didn't vote for it meaning it wasn't as

14   compelling as Dark Horse was.  Dark Horse was compelling.

15   Q.   So they just liked Dark Horse more; is that correct?

16             MR. ALBERTSON:  Objection.

17             THE COURT:  Overruled.

18             You may answer.

19             THE WITNESS:  I mean, clearly, they voted for Dark

20   Horse more.  I can't say whether they liked it more, but they

21   wanted to vote for it more, and they wanted it to become a --

22   an official single which it eventually did.

23   BY MR. KAYIRA:

24   Q.   Okay.  Is there way to, uh, test your opinion or the

25   methodology that you used, uh, to weigh these factors out?

1    Has it been done?

2    A.    Sure.  So let me clarify.

3         Again, I describe my methodology as conducting

4    post-mortem evaluation of these factors.  To do a post-mortem

5    evaluation, just in and of itself, if you look at that word,

6    post-mortem, right, after the fact, that means it can't be

7    predictive.  It's not about looking into the future and

8    predicting it; right?  In that sense, you can't know in

9    advance, right, which of these factors is going to be, uh,

10   important.  If you could, again, you'd be winning the lottery

11   in pop music and just putting factors together and having

12   hits all the time.

13        Post-mortem assumes that you're doing it after the

14   fact.  So in that sense, there's no, uh, testable method like

15   in science, right, for this.  But what you can do is simply

16   look at the historical record, right, and evaluate these

17   factors.

18        And I believe anybody with my methodology, with my

19   particular expertise to understand the confluence of

20   celebrity and star studies, the business of marketing and

21   branding and the historical aspects of popular music,

22   cultural, social and historical aspects would also come to

23   the same reasonable, intuitive findings that these are the

24   primary, secondary and tertiary drivers of Dark Horse.

25        They might have some minor disagreements about

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1541

```
1    which driver, uh, matters a little bit more or the others,

2    but they would all say celebrity star power.  I believe

3    that's common sense.  They would all say, uh, marketing as

4    well.  And I could actually point to journalists to make an

5    historical article that details the intense marketing

6    campaign by Capitol that helped drive the success of that

7    single.

8              So this methodology is sound in the sense that

9    reasonable scholars with the same background and expertise

10   would come to the same conclusions.

11   Q.   So you're saying that this is . . . involves some degree

12   of your own personal opinion based on your experience; is

13   that right?

14   A.   I don't believe I said that at all.

15             Um, my personal experience does matter.  I was

16   alive in 2013, believe it or not, I heard Dark Horse on the

17   radio, I listened to the Prism album so I do recall that

18   time.

19             So in that sense, of course, I'm a human being

20   who's involved in the popular music who's working at one of

21   the major popular music schools and a university, and so I'm

22   aware of what was happening at that time.  So I'm using my

23   personal, intuitive information, uh, to prepare this report

24   and as part of my testimony.

25             But this is methodology.  This is years of
```

```
 1    studying.  This is a PhD in Performance Studies focusing on
 2    popular music when very few other people were getting degrees
 3    like that.  This is 20 years of teaching.  This is, uh, in
 4    depth teaching of specific genres in popular music like hip
 5    hop and pop and so on.
 6            Um, and this is -- this is, uh, substantive
 7    research.  This is actually something that my students find
 8    very difficult to do which is to go back into the record and
 9    actually pull apart these strands to be able to figure out
10    what these factors are.  It's not something that's very easy
11    to do.  People actually struggle a great deal, and that's
12    because it is an actual methodology.
13    Q.   Are you able to quantity the way you assessed each
14    factor?
15            MR. ALBERTSON:  Objection.
16            THE COURT:  I don't think I understand the
17    question.  I'm gonna sustain the objection.
18    BY MR. KAYIRA:
19    Q.   And Dr. King.
20    A.   Yes.
21    Q.   How, uh, did you determine the difference between the
22    secondary and tertiary factors in your methodology?
23            MR. ALBERTSON:  Objection.
24            THE COURT:  Overruled.
25            THE WITNESS:  So as I mentioned before, um, through
```

1    forensic research and through analysis, I came up with a

2    series of factors that drove the success for Dark Horse and

3    also for the Prism album as well.  And I ranked those factors

4    according to importance; right?  And so that importance has

5    to do with the number of things.

6        When you go back into historical record, there's

7    clear evidence that celebrity star power which I identify as

8    the primary driver was discussed in many, many journalistic

9    articles, historical records at being an important factor,

10   the most important factor in driving success.

11       Actually, there were radio programmers who

12   themselves said, and they were quoted in these publications

13   saying, and this is in 2013 when Dark Horse was in the

14   marketplace saying, it's Katy Perry's star power that is

15   fuelling the exposure of Dark Horse.  They themselves are

16   saying based on their research that Katy Perry, her star

17   power is driving the success.

18       There's also, uh, plenty of articles from that time

19   saying that Juicy J and his presence as a hip hop artist was

20   bringing attention and visibility and driving the success of

21   Dark Horse.  So that's one of the ways that I determined what

22   was a primary factor versus a secondary factory versus a

23   tertiary factor; right?

24       It has to do with my own personal expertise but

25   also research and an investigation of the historical record.

1    Spending $1.1 million on a single to market it, that is a

2    huge amount of money.  That -- that doesn't always generate

3    success, but in the context of Katy Perry's magnanimous

4    celebrity and in the context of a compelling song, that

5    becomes a primary factor.

6            And so to answer your question specifically, I

7    identified what was a secondary factor from a tertiary factor

8    because the secondary factor included all of the combined,

9    um, musical and production elements which I think are

10   essential to the success of Dark Horse.  If you had no music,

11   and all you had was lyrics and celebrity star power and

12   marketing, what would you have?  So music is essential to the

13   Dark Horse; right?

14           And I also think lyrics are important.  But I would

15   argue that music played a greater role in the success of Dark

16   Horse then the lyrics alone.  And that's why lyrics are a

17   tertiary factor, and combined musical elements are a

18   secondary factor.

19           MR. KAYIRA:  All right.

20           Thank you, Dr. King.

21           THE WITNESS:  Thank you.

22           MR. ALBERTSON:  Just very briefly.

23                      REDIRECT EXAMINATION

24   BY MR. ALBERTSON:

25   Q.   Dr. King, Mr. Kayira asked you whether you did a

```
 1    comparison of Dark Horse and other popular music songs that
 2    were out at the same time.  Uh, is it possible to do a
 3    comparison, a straight -- straight comparison, apples to
 4    apples, between one pop star and another, uh, in that way?
 5    A.   No, it's not, uh, ible to do that kind of straight
 6    comparison because, again, you need to take each case on a
 7    case by case basis.
 8         In other words, um, if you're looking I think the
 9    mention was Iggy Azalea and the song Fancy, you would need to
10    look at all the specific ways in which that song -- uh, the
11    specific factors that drove success for that song, right,
12    which would be very specific to Iggy Azalea and Fancy.  I
13    would have to assess what are the factors that drove that
14    song, and I would have to do research, and I would have to do
15    analysis according to method just as I did for Dark Horse.
16         And then you still couldn't do a one to one
17    comparison because there are different types of pop stars.
18    There are different genres.  That's why understanding
19    something about musical styles and musical genres become
20    important.
21         Um, they may have been subject to different kinds
22    of marketing efforts and expenses.  Um, they're different
23    songs.  One is a pop fusion merging different styles, and the
24    other one is a hip hop track that went into pop, but it's
25    not --
```

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1546

```
1           But, again, you want specificity.  You don't want

2    just an all purpose, um, one size fits all approach.  If

3    you're gonna do this work with, uh, specificity, um, that's

4    what's gonna lead to, um, results, more effective results to

5    understand the drivers.

6    Q.   Okay.  And you just you mentioned the combined musical

7    elements as a secondary factor, and that includes, uh, all

8    the musical elements together; is that right?

9    A.   It does.  It includes all the musical elements that we

10   hear in, uh -- in Dark Horse.  The musical elements and

11   production elements are also an aspect of the secondary

12   factors, too.

13           MR. ALBERTSON:  I have nothing further.

14           THE COURT:  All right.  Anything further?

15           MR. KAYIRA:  No, Your Honor.

16           THE COURT:  Thank you.

17           Who is next?

18           MR. MOVIT:  I'd like to play an excerpt from the

19   video of the sworn deposition of an expert hired by the

20   plaintiffs named Michael Einhorn.

21           THE COURT:  Okay.

22              (Video played for the jury.)

23           THE COURT:  Okay.  Anything further?

24           MS. LEPERA:  Your Honor, at the close, I'll make my

25   Rule 50 motion.  I can do it in more detail for the jury, but
```

UNITED STATES DISTRICT COURT

EXHIBIT 9
PAGE 1547

1    put I'd like to put it out there now.

2              THE COURT:  Okay.  It's noted.

3              Okay.  Uh, anything further from defense?

4              MS. LEPERA:  No, Your Honor.  We rest.

5              THE COURT:  Anything further from plaintiffs?

6              MR. KAHN:  No, Your Honor.

7              THE COURT:  All right.

8              Then ladies and gentlemen, here's the story in a

9    nutshell.  I have instructions to read to you, and we have

10   closing argument.  Counsel have indicated that each side

11   needs from 20 to 30 minutes to do closing argument.  I leave

12   it to you.  I do have to let the court reporter go somewhere

13   in here to catch a train.

14             I can read the instructions, have them come back

15   tomorrow and argue in the morning and have you start your

16   deliberations which would be around 10:00 or 10:30, maybe

17   10:30?  Alternatively, we can have them all argue today so

18   that when you come back tomorrow, you're prepared to

19   deliberate.

20             You tell me what's better for you because I don't

21   know what your schedules are, if you have evening plans and

22   need to leave because plainly, we will not be leaving until

23   if do everything according to prediction before maybe 5:40.

24   Or later.

25             MS. ███████████  Your Honor, we'd like to do

```
 1    instructions tonight and closing tomorrow.

 2              THE COURT:  Fine.  Then that's what we'll do.

 3              Okay.  Members of the jury, you have returned a

 4    verdict of liability against the defendants.  It is now my

 5    duty to instruct you as to the law regarding an award of

 6    damages.

 7              All of the general and closing instructions

 8    provided to you before you deliberated regarding the

 9    defendant's liability remain in effect for this second phase

10    of your deliberations including issues such as burden of

11    proof, guidelines for considering evidence, witness

12    credibility and your duties as jurors.

13              A copy of the following instructions will be sent

14    to you in the jury room . . .  I'm sorry.  A copy of the

15    following instructions will be sent with you to the jury room

16    when you deliberate.  It is your duty to find the facts from

17    all the evidence in the case.  To those facts, you will apply

18    the law as give it to you.

19              You must follow the law as I give to you whether

20    you agree with it or not, and you must not be influenced by

21    any personal likes or dislikes, opinions, prejudices or

22    sympathy.  That means that you must decide the case solely on

23    the evidence before you.  You will recall that you took an

24    oath to do so.

25              Please do not read into these instructions or
```

EXHIBIT 9
PAGE 1549

1   anything I may say or do or have said or done that I have an

2   opinion regarding the evidence of what damages should be.

3        Having found for the plaintiffs on the claim for

4   copyright infringement, you must now determine the

5   plaintiff's damages.  The plaintiffs are entitled to recover

6   any profits of the defendants attributable to the

7   infringement.

8        The plaintiffs must prove damages by a

9   preponderance of the evidence.

10       You may make award of a defendant's profits only if

11  you find that the plaintiffs showed a causal nexus between

12  the infringement and defendant's gross revenue.

13       You must determine the profits of each defendant

14  attributable to the infringement separately.

15       If you find that the plaintiffs have shown that

16  there is a causal nexus between the infringement and

17  defendant's gross revenue, you must determine each

18  defendant's profits.

19       A defendant's profit is determined by deducting all

20  appropriate expenses incurred by that defendant from the

21  defendant's gross revenue.  Here the parties have stipulated

22  to the amounts of gross revenues and costs of certain

23  defendants.

24       A defendant's gross revenue is all of the

25  defendants' receipts from the sale or use of a work

1    containing or using copyrighted material -- I'm sorry,

2    containing or using copyrighted work associated with the

3    infringement.

4         The plaintiffs have the burden of proving the

5    defendant's gross revenue by a preponderance of the evidence.

6         Expenses are all appropriate costs including but

7    not necessarily limited to appropriate operating costs,

8    overhead costs and productions costs incurred in producing

9    the defendants' gross revenue.

10        The defendants have the burden of proving their

11   respective expenses by a preponderance of the evidence.

12        After determining each defendant's profits, you

13   must then determine whether any portion of the profit from

14   the sale of the work containing or using copyrighted work

15   from Joyful Noise is attributable to factors other than the

16   use of Ostinato No. 2 in Dark Horse.

17        The defendants have the burden of proving the

18   percentage of their profits, if any, attributable to factors

19   other than infringing the copyrighted work.  The parties have

20   agreed to certain facts that have been read to you and were

21   placed in evidence as an exhibit.  You must therefore treat

22   these facts as having been proved.

23        The same person who served as presiding juror

24   during the liability phase of the trial will be the presiding

25   juror for this phase.  As in the liability phase, the

EXHIBIT 9
PAGE 1551

```
 1   presiding juror will preside over the deliberations and serve

 2   as the spokesperson for the jury in the court.

 3          You shall diligently strive to reach agreement with

 4   all the other jurors if you can do so.  Your verdict must be

 5   unanimous.

 6          Each of you must decide the case for yourself, but

 7   you should do so only after you have considered all the

 8   evidence, discussed it fully with the other jurors and

 9   listened to their views.  It is important that you attempt to

10   reach a unanimous verdict but, of course, only if each of you

11   can do so after having made your own conscientious decision.

12          Do not be unwilling to change your opinion if the

13   discussion persuades you that you should, but do not come to

14   a decision simply because other juror thinks it is right or

15   change an honest belief about the weight and effect of the

16   evidence simply to reach a verdict.

17          As in the liability phase, a verdict form has been

18   prepared for you.  After you have unanimous agreement on a

19   verdict, your presiding juror will fill in the form that has

20   been given to you and sign and date it and advise the bailiff

21   that you are ready to return to the courtroom.

22          Okay.  So that concludes the instructions.

23          Uh, I am going to let you go home.  Once again, uh,

24   you haven't heard closing arguments, and so you must not

25   discuss the issues raised by this phase of the case until
```

 1    such time as you've heard closing argument and I have sent

 2    back to the jury room.

 3             And all my other admonitions about not discussing

 4    the case with anyone else, listening to any news reports or

 5    anything of the like, uh, still stand, and we will return

 6    tomorrow at 9:30 a.m.

 7             Thank you, and have a good evening.

 8             THE CLERK:  All rise.

 9                      (Jury not present.)

10             THE CLERK:  Please be seated.

11             Anything?

12             MS. LEPERA:  So just for the record, we are our

13    filing our Rule 50, um, with respect to this phase so all of

14    the arguments are in the written document.

15             THE COURT:  Very well.

16             MS. LEPERA:  I don't have to belabor it with the

17    Court.

18             THE COURT:  Thank you.  Okay.

19             MS. LEPERA:  You're welcome.

20             THE CLERK:  This court's adjourned.

21             MR. LEPERA:  Thank you, Your Honor.

22             THE COURT:  Thank you, everyone.

23             Have a good night.

24             (Proceedings were concluded at 4:43 p.m.)

25

UNITED STATES DISTRICT COURT

EXHIBIT  9
PAGE  1553

1

2                          CERTIFICATE OF REPORTER

3

4    COUNTY OF LOS ANGELES        )

5                                 )  SS.

6    STATE OF CALIFORNIA          )

7

8    I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

9    STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

10   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

11   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

12   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

13   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

14   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

15   OF MY STENOGRAPHIC NOTES.

16

17

18   DATE:  AUGUST 8, 2019_____

19

20   _____/s/  LAURA MILLER ELIAS_____

21   LAURA MILLER ELIAS, CSR 10019

22   FEDERAL OFFICIAL COURT REPORTER

23

24

25

**$**

**$1,026,763** [2] - 45:5, 45:8
**$1,979.21** [1] - 54:16
**$11,212.74** [1] - 55:15
**$11,511,521** [3] - 34:4, 34:12, 41:9
**$11,772,912** [1] - 29:9
**$13,600** [1] - 55:2
**$14,940.05** [1] - 56:13
**$15,000** [1] - 56:19
**$176,548.68** [1] - 50:1
**$176,549** [1] - 80:16
**$19,031,234** [1] - 41:6
**$2,055** [1] - 42:18
**$22,424** [2] - 33:16, 34:22
**$236,515** [1] - 46:11
**$3,000** [1] - 55:24
**$3,135** [2] - 56:8, 56:11
**$30** [1] - 41:10
**$31,000,000** [3] - 45:9, 45:11, 45:17
**$358,779** [1] - 33:6
**$395** [1] - 123:16
**$4,702.50** [1] - 55:10
**$40,000** [2] - 6:16, 9:8
**$450** [1] - 131:17
**$475** [1] - 123:18
**$5,103,213** [1] - 60:18
**$5,971** [1] - 98:3
**$536,545.83** [1] - 100:17
**$536,546** [1] - 83:15
**$56,683.64** [1] - 100:13
**$56,684** [1] - 83:14
**$6,270** [1] - 55:19
**$6,480** [1] - 55:5
**$600** [1] - 56:14
**$629,000** [1] - 45:20
**$629,725** [3] - 29:13, 29:15, 45:20
**$648,779** [2] - 37:8, 37:11
**$700** [1] - 131:18
**$73,750** [1] - 55:7
**$76,153** [2] - 42:15, 45:7
**$8,257,422** [1] - 92:15
**$8,813.48** [1] - 56:23
**$816,513** [3] - 32:22, 34:12, 35:1
**$821** [1] - 55:21
**$9,122,707** [4] - 36:20, 37:6, 38:4, 40:25
**$9,148.25** [1] - 52:12

**$9,908,527** [2] - 38:19, 40:24
**$916,392** [1] - 53:4

**'**

**'90s** [1] - 13:23

**/**

**/s** [1] - 183:20

**1**

**1** [25] - 3:17, 4:3, 105:18, 105:23, 106:1, 106:3, 106:8, 106:19, 116:21, 117:1, 117:7, 117:16, 117:19, 118:4, 118:6, 121:8, 121:9, 121:19, 121:21, 121:25, 122:5, 122:10, 122:12, 124:2, 147:22
**1,052,730** [1] - 38:6
**1,081,855** [1] - 89:10
**1,089,182,568** [1] - 39:1
**1,101,773** [1] - 92:11
**1,281,995** [1] - 32:7
**1.1** [3] - 143:12, 168:23, 174:1
**10** [3] - 41:18, 70:3, 158:21
**10,337** [1] - 52:10
**100** [5] - 39:19, 40:14, 93:17, 138:25, 139:8
**10019** [1] - 1:22, 183:21
**101** [1] - 3:6
**103** [1] - 3:9
**1034** [1] - 20:21
**106** [1] - 3:17
**108** [1] - 3:18
**10:00** [2] - 4:1, 177:16
**10:30** [2] - 177:16, 177:17
**11,511,521** [1] - 32:15
**111** [9] - 3:16, 18:6, 19:6, 20:16, 23:8, 23:14, 23:17, 24:2, 24:14
**111-1** [2] - 20:23, 21:2
**111-19** [1] - 22:23
**11377** [1] - 2:18
**114** [1] - 3:9
**115** [1] - 97:25
**116** [25] - 3:16, 27:23,

**28:5, 28:8, 30:18, 31:17, 35:13, 38:18, 43:25, 44:25, 49:1, 49:18, 52:8, 52:24, 54:8, 56:1, 57:15, 59:10, 60:21, 63:4, 63:5, 73:5, 85:25, 100:11
**116-10** [1] - 98:9
**116-11** [1] - 89:14
**116-2** [7] - 28:11, 73:6, 77:5, 80:15, 83:11, 87:8, 89:6
**116-5** [1] - 75:6
**116-50** [1] - 91:18
**116-52** [1] - 55:14
**116-6** [1] - 87:1
**116-7** [1] - 87:4
**116-77** [1] - 92:13
**116-78** [2] - 91:24, 92:4
**116-81** [1] - 93:13
**116-9** [1] - 81:7
**116-91** [1] - 63:8
**117** [3] - 3:17, 105:18, 106:19
**117-1** [1] - 106:2
**12** [4] - 3:5, 6:19, 74:9, 129:12
**12,402,637** [1] - 29:3
**124** [2] - 3:11, 155:20
**12TH** [1] - 2:7
**13** [8] - 31:14, 34:18, 37:1, 74:9, 153:4, 153:6, 157:12, 158:9
**135** [1] - 44:25
**14** [3] - 47:13, 117:18, 117:21
**14,000** [1] - 56:7
**14-month** [1] - 155:19
**146,000** [1] - 59:16
**149,983** [1] - 24:24
**15** [6] - 52:24, 63:19, 117:17, 117:20, 118:3
**15-5642** [1] - 4:4
**15-5642-CAS** [1] - 1:8
**150** [1] - 145:8
**159** [1] - 3:11
**16** [10] - 31:14, 33:11, 33:15, 34:18, 37:2, 74:15, 108:10, 117:3, 153:5, 153:6
**16th** [2] - 116:21, 156:12
**174** [1] - 3:11
**176** [1] - 3:13
**177** [1] - 3:19
**18** [2] - 58:15, 58:16
**18-month** [3] - 57:25,

**58:17, 59:4
**1840** [1] - 2:23
**19** [1] - 129:2
**1900** [1] - 2:23
**191,000,000** [1] - 59:21
**1987** [1] - 139:9
**19th** [1] - 8:12
**1:00** [1] - 64:15

**2**

**2** [61] - 30:17, 49:1, 75:4, 97:25, 104:21, 107:10, 107:12, 109:14, 110:1, 110:3, 110:10, 112:18, 112:23, 113:4, 113:6, 113:10, 113:16, 115:2, 115:19, 116:1, 116:23, 117:5, 117:8, 117:23, 118:5, 118:6, 121:7, 121:10, 121:17, 121:23, 122:1, 122:9, 122:10, 122:12, 132:2, 132:6, 147:22, 149:12, 151:7, 151:8, 151:9, 151:12, 151:17, 151:19, 151:23, 151:25, 152:4, 152:14, 152:23, 157:25, 158:2, 158:8, 158:12, 158:14, 165:18, 165:21, 166:3, 166:13, 166:15, 166:19, 180:16
**2,642,095** [1] - 81:9
**2,865** [2] - 110:12, 118:9
**2.69** [1] - 43:6
**20** [7] - 3:16, 43:11, 124:6, 130:14, 159:5, 172:3, 177:11
**2000** [1] - 129:2
**2000s** [2] - 140:21, 149:11
**2001** [2] - 127:7, 129:23
**2003** [1] - 126:24
**2006** [1] - 140:21
**2007** [2] - 129:9, 134:20
**2008** [1] - 138:15
**2009** [2] - 8:12

**2010** [1] - 138:23
**2013** [21] - 43:11, 58:14, 138:12, 141:3, 142:6, 142:22, 142:24, 143:6, 143:14, 144:2, 145:1, 148:20, 150:2, 156:3, 156:21, 164:21, 165:10, 165:12, 169:5, 171:16, 173:13
**2014** [2] - 139:25, 143:23, 144:5, 161:25, 162:3
**2015** [1] - 122:13
**2016** [2] - 105:6, 145:5
**2017** [2] - 108:3, 124:4
**2018** [5] - 43:11, 43:12, 43:14, 43:15, 43:17
**2019** [3] - 1:15, 4:1, 183:18
**207** [2] - 110:9, 110:13
**208** [1] - 2:11
**20th** [2] - 126:2, 129:7
**21** [1] - 23:9
**2100** [1] - 2:11
**213)894-0374** [1] - 1:24
**21st** [2] - 126:2, 129:7
**236,515** [1] - 89:13
**24th** [1] - 156:15
**25** [1] - 19:17
**2579614** [1] - 8:12
**262.27** [1] - 24:12
**28** [1] - 3:16
**29** [2] - 57:1, 91:20

**3**

**3** [4] - 30:18, 31:17, 85:24, 112:23
**3,535,181** [1] - 89:7
**3.6** [4] - 112:8, 112:11, 112:14
**30** [4] - 19:17, 159:2, 159:5, 177:11
**30-plus** [1] - 118:4
**30.6** [1] - 111:7
**31** [2] - 1:15, 4:1
**31st** [1] - 108:3
**35** [2] - 43:25, 159:2
**350** [1] - 1:23
**36** [3] - 23:14, 23:17
**3rd** [1] - 156:14

**4**

**4** [4] - 35:13, 49:12,

49:18, 81:7
**40** [1] - 118:1
**43** [2] - 113:10, 115:23
**44** [1] - 140:2
**4455** [1] - 1:23
**45** [7] - 64:22, 112:19, 113:10, 113:18, 113:23, 115:18, 115:23
**48** [1] - 24:2
**4:00** [1] - 65:6
**4:43** [1] - 182:24

**5**

**5** [4] - 35:14, 38:18, 89:14, 108:13
**5.23** [1] - 23:25
**5.4** [6] - 58:2, 58:8, 59:8, 60:3, 60:17, 93:23
**50** [9] - 44:15, 110:21, 110:22, 110:25, 111:1, 111:3, 111:6, 176:25, 182:13
**51** [1] - 54:8
**53** [1] - 47:11
**534** [1] - 8:9
**54** [1] - 56:1
**55** [1] - 140:2
**55,024** [1] - 24:10
**56** [1] - 117:19
**56th** [1] - 145:4
**59** [6] - 3:18, 107:24, 108:5, 108:6, 108:24
**5:40** [1] - 177:23

**6**

**6** [4] - 43:24, 85:25, 100:11, 140:20
**6.34** [1] - 23:6
**60** [1] - 44:16
**63** [1] - 24:14
**63105** [2] - 2:8, 2:11

**7**

**7** [3] - 52:23, 85:25, 91:17
**7.2** [5] - 110:14, 111:2, 111:3, 111:5, 116:14
**7.6** [1] - 116:12
**72** [1] - 3:6
**770,456** [1] - 23:22
**7701** [1] - 2:7

**8**

**8** [5] - 57:15, 85:25,

93:13, 108:13, 183:18
**8,577** [1] - 81:10
**8,577,000** [1] - 81:10
**8.2** [3] - 154:6, 154:8, 154:21
**8.275** [1] - 154:6
**81** [4] - 57:15, 59:10, 63:5
**820.36** [1] - 25:4
**85,000,000** [1] - 59:22
**89** [4] - 3:18, 107:24, 108:6, 108:24
**89-59** [1] - 108:21
**8:45** [3] - 5:5, 5:18, 7:17
**8th** [1] - 116:24

**9**

**9** [2] - 49:18, 52:9
**9.9** [1] - 38:22
**90012** [1] - 1:23
**90064** [1] - 2:19
**90067** [1] - 2:24
**92** [1] - 60:21
**930,186** [1] - 23:3
**94** [1] - 93:20
**95** [2] - 115:21, 115:24
**97** [1] - 3:5
**986** [1] - 8:9
**9:30** [1] - 182:6
**9th** [2] - 6:9, 71:6

**A**

**A&R** [2] - 79:1, 80:1
**a.m** [2] - 5:5, 182:6
**A.M** [1] - 4:1
**AARON** [1] - 2:16
**ability** [1] - 75:1
**able** [8] - 9:23, 61:4, 61:12, 64:1, 72:17, 168:13, 172:9, 172:13
**abroad** [1] - 127:20
**absent** [1] - 95:17
**absolutely** [2] - 16:19, 94:17
**academic** [4] - 129:25, 130:3, 130:7, 132:12
**Academy** [1] - 128:1
**academy** [2] - 128:18, 140:22
**accept** [1] - 111:5
**accepts** [2] - 111:3, 112:15
**access** [3] - 133:21, 136:21, 142:19
**acclaimed** [1] - 130:6

**accompaniment** [1] - 112:4
**according** [10] - 35:6, 47:9, 72:4, 129:10, 136:25, 137:7, 140:11, 173:4, 175:15, 177:23
**accordingly** [1] - 5:1
**account** [3] - 34:13, 43:12, 49:11
**accounted** [2] - 42:1, 59:11
**Accounting** [1] - 14:7
**accounts** [1] - 35:25
**accrued** [7] - 47:4, 48:16, 49:10, 49:11, 49:14, 87:13, 87:21
**accuracy** [3] - 27:20, 76:20, 120:22
**accurate** [2] - 25:13, 71:10
**accurately** [1] - 113:18
**achieved** [1] - 36:7
**achievement** [2] - 139:10, 139:12
**activations** [1] - 141:22
**active** [4] - 58:22, 59:4, 94:7, 97:7
**activities** [1] - 94:23
**activity** [4] - 77:24, 83:23, 94:15, 94:18
**actual** [17] - 4:25, 5:1, 5:15, 51:5, 52:6, 52:13, 52:15, 52:21, 98:23, 101:24, 119:6, 123:17, 147:11, 148:2, 148:12, 163:14, 172:12
**add** [3] - 41:8, 45:9, 117:12
**addicted** [1] - 150:4
**adding** [1] - 42:21
**addition** [1] - 124:1
**additional** [7] - 5:7, 7:18, 11:8, 11:9, 11:10, 45:8, 117:12
**additionally** [1] - 72:6
**additions** [1] - 6:10
**adds** [1] - 41:2
**adjacent** [1] - 115:9
**adjourned** [1] - 182:20
**adjust** [2] - 86:21, 101:11
**administer** [2] - 79:3, 87:19
**administers** [1] - 88:14

**admissibility** [1] - 8:18
**admissible** [1] - 6:11
**admission** [6] - 8:20, 8:22, 19:6, 28:5, 71:11, 71:21
**admissions** [4] - 6:10, 6:25, 7:1, 8:9
**admit** [1] - 106:16
**admitted** [4] - 6:5, 20:16, 28:8, 108:24
**admonitions** [1] - 182:3
**ads** [8] - 97:12, 154:21, 154:22, 154:24, 154:25
**advance** [4] - 48:20, 48:24, 54:19, 55:2, 56:19, 170:9
**advanced** [1] - 14:8
**advances** [1] - 79:17
**advertising** [2] - 90:11, 134:5
**advise** [1] - 181:20
**advised** [1] - 68:8
**affect** [2] - 81:18, 166:4
**affinity** [1] - 140:7
**AFM** [3] - 78:18, 95:25, 99:20
**AFM/AFTRA** [1] - 95:22
**afternoon** [8] - 73:2, 103:23, 103:24, 114:8, 114:9, 123:18, 159:16, 159:17
**AFTRA** [3] - 78:19, 95:25, 99:20
**ago** [4] - 70:11, 98:2, 115:22, 124:4
**agree** [8] - 15:1, 25:21, 39:18, 40:13, 96:25, 115:1, 116:5, 178:20
**agreed** [3] - 69:4, 78:20, 180:20
**agreement** [2] - 181:3, 181:18
**ahead** [6] - 16:8, 16:13, 53:22, 56:1, 56:2, 94:22
**aid** [2] - 67:21, 69:10
**AIDED** [1] - 183:13
**air** [1] - 55:7
**Air** [14] - 142:12, 142:16, 156:9, 156:21, 167:18, 168:1, 168:8, 168:15, 168:17,

168:19, 168:21, 169:1, 169:3, 169:9
**AL** [2] - 1:6, 1:9
**al** [1] - 4:5
**ALBERTSON** [19] - 2:17, 3:11, 67:18, 69:25, 70:16, 70:22, 71:2, 125:1, 158:16, 162:7, 163:21, 164:18, 165:23, 169:16, 172:15, 172:23, 174:22, 174:24, 176:13
**album** [152] - 14:16, 15:4, 15:7, 15:9, 15:12, 15:15, 16:2, 16:9, 16:23, 17:5, 17:21, 18:14, 24:7, 24:20, 25:15, 25:16, 25:22, 26:8, 26:22, 27:8, 30:21, 30:22, 30:23, 30:24, 31:2, 31:11, 31:24, 32:14, 33:2, 33:5, 33:7, 33:11, 34:1, 34:12, 34:22, 35:19, 35:21, 36:10, 36:13, 36:18, 37:15, 38:1, 38:2, 39:20, 40:2, 40:15, 40:22, 40:25, 41:3, 41:6, 41:9, 41:11, 42:5, 43:10, 45:10, 50:4, 50:6, 50:12, 51:23, 52:13, 68:1, 73:22, 74:5, 74:8, 74:18, 74:19, 74:20, 75:14, 78:13, 78:25, 79:4, 86:2, 86:4, 86:6, 86:9, 86:10, 89:25, 90:1, 91:1, 92:13, 92:14, 94:8, 94:12, 94:15, 95:2, 95:18, 96:10, 96:24, 96:25, 97:4, 97:8, 132:6, 132:15, 132:18, 133:1, 133:3, 133:17, 134:2, 134:24, 135:6, 135:16, 137:2, 138:17, 138:18, 138:21, 138:24, 139:2, 142:11, 144:1, 144:2, 152:20, 152:23, 153:2, 153:9, 153:10, 153:11, 153:12, 153:17, 153:19, 153:25, 154:1, 154:4, 154:5, 154:6, 154:8, 155:3,

155:10, 155:12, 155:23, 156:11, 156:14, 157:8, 157:14, 157:15, 157:16, 157:17, 157:20, 157:22, 157:23, 158:10, 158:11, 158:13, 163:7, 167:14, 168:12, 171:17, 173:3

**album's** [1] - 97:9

**albums** [39] - 14:20, 31:5, 31:13, 31:17, 31:20, 32:5, 32:8, 32:9, 32:10, 32:11, 32:15, 34:18, 36:20, 36:22, 36:23, 37:1, 37:3, 37:6, 38:3, 38:7, 38:9, 50:18, 51:2, 52:11, 74:14, 75:5, 87:5, 89:15, 93:5, 133:5, 133:23, 135:13, 135:14, 141:1, 141:15, 153:14, 155:18, 157:19

**Alicia** [1] - 126:8

**alive** [1] - 171:16

**allocable** [2] - 57:22, 58:1

**allocate** [5] - 61:8, 74:4, 86:16, 92:16, 93:22

**allocated** [10] - 29:25, 58:24, 81:11, 81:14, 86:14, 89:20, 93:15, 94:24, 96:14, 99:25

**allocating** [2] - 73:22, 74:18

**allocation** [8] - 34:16, 73:21, 73:23, 81:3, 81:18, 89:18, 96:16, 96:20

**allow** [1] - 80:3

**allowing** [1] - 44:3

**allows** [1] - 152:1

**almost** [3] - 117:24, 135:20, 137:3

**alone** [3] - 151:15, 151:17, 174:16

**aloud** [1] - 47:24

**alternatively** [1] - 177:17

**ambiguous** [1] - 17:11

**AMERICA** [1] - 1:1

**America** [1] - 131:2

**American** [2] - 105:7, 128:1

**amount** [47] - 29:9,

33:14, 34:4, 35:3, 37:10, 37:14, 38:4, 41:6, 45:4, 45:22, 45:24, 49:25, 50:1, 50:3, 51:21, 51:22, 52:12, 53:1, 56:3, 56:11, 60:3, 62:8, 62:24, 74:12, 80:15, 81:8, 83:12, 84:10, 87:3, 87:5, 87:18, 88:12, 89:9, 89:15, 92:10, 96:3, 96:4, 98:3, 100:23, 101:8, 112:16, 118:6, 154:7, 154:19, 157:24, 174:2

**amounts** [3] - 48:22, 101:25, 179:22

**analysis** [9] - 104:7, 104:8, 104:11, 104:16, 133:13, 133:14, 134:15, 173:1, 175:15

**analytical** [1] - 135:3

**analyze** [1] - 134:9

**ancillary** [7] - 30:10, 41:17, 77:22, 98:2, 98:5, 98:8, 98:11

**AND** [4] - 183:8, 183:11, 183:13, 183:14

**ANGELES** [6] - 1:16, 1:23, 2:19, 2:24, 4:1, 183:4

**Angeles** [1] - 155:5

**angry** [1] - 120:12

**announced** [1] - 4:25

**announcing** [1] - 7:10

**annually** [8] - 51:10, 76:13, 76:22, 77:3, 85:3, 100:22, 101:11

**answer** [13] - 14:1, 16:5, 27:4, 39:25, 47:14, 48:11, 50:15, 114:15, 115:12, 115:16, 115:22, 169:18, 174:6

**answering** [1] - 104:4

**anthemic** [1] - 156:4

**anticipated** [1] - 7:4

**apart** [2] - 163:10, 172:9

**apologies** [1] - 75:9

**apologize** [1] - 67:14

**app** [1] - 131:10

**apparent** [1] - 69:2

**appeal** [4] - 130:9, 135:23, 138:14, 139:24

**appear** [2] - 5:8,

50:10, 117:8

**APPEARANCES** [1] - 2:2

**appearances** [7] - 4:6, 4:7, 90:4, 91:2, 91:5, 91:8, 91:16

**appeared** [4] - 14:17, 34:2, 38:3, 50:9

**Apple** [2] - 84:3, 145:3

**apples** [4] - 40:8, 45:21, 175:3, 175:4

**apply** [6] - 96:9, 134:8, 135:3, 136:8, 136:10, 178:17

**applying** [1] - 133:11

**approach** [9] - 46:6, 61:8, 73:25, 74:2, 77:1, 81:17, 96:20, 121:6, 176:2

**appropriate** [6] - 5:10, 60:11, 64:5, 179:20, 180:6, 180:7

**appropriately** [2] - 46:4, 77:11

**approve** [1] - 76:25

**approved** [1] - 126:22

**approximation** [1] - 21:17

**apps** [1] - 131:9

**April** [4] - 70:2, 105:6, 123:23, 156:14

**area** [3] - 128:14, 128:18, 128:20

**areas** [4] - 128:7, 128:9, 128:24, 128:25

**Aretha** [1] - 126:7

**argue** [6] - 71:19, 72:8, 166:12, 174:15, 177:15, 177:17

**arguing** [1] - 163:23

**argument** [10] - 66:25, 67:4, 67:24, 68:12, 68:13, 69:15, 69:16, 177:10, 177:11, 182:1

**argumentative** [1] - 28:24

**arguments** [3] - 69:1, 181:24, 182:14

**Arista** [1] - 126:4

**arrangement** [2] - 95:11, 148:6

**arrived** [2] - 42:21, 60:17

**arrow** [1] - 11:9

**art** [2] - 94:21, 95:7

**article** [2] - 130:4, 171:5

articles [4] - 136:12, 136:15, 173:9, 173:18

**artist** [37] - 46:19, 46:21, 46:23, 48:17, 48:21, 48:23, 49:5, 49:10, 57:7, 64:7, 78:4, 78:11, 79:1, 79:7, 79:18, 79:22, 79:23, 79:24, 87:13, 87:15, 87:24, 88:8, 88:9, 88:19, 89:4, 90:5, 91:2, 95:11, 100:4, 100:6, 134:25, 135:6, 139:7, 140:8, 140:25, 141:2, 173:19

**artist's** [1] - 87:25

**artistic** [2] - 127:9, 148:9

**Artists** [1] - 129:6

**artists** [13] - 78:8, 79:3, 99:22, 126:6, 131:6, 135:8, 135:17, 135:21, 136:2, 139:22, 140:1, 140:8, 160:2

**Arts** [5] - 125:7, 125:10, 125:18, 126:17, 131:1

**arts** [2] - 125:11, 131:2

**ascends** [1] - 146:2

**aside** [2] - 131:3, 140:14

**aspect** [2] - 147:13, 176:11

**aspects** [10] - 125:16, 128:11, 128:12, 128:13, 147:13, 147:17, 168:9, 170:21, 170:22

**aspiring** [2] - 135:9, 135:10

**asserted** [2] - 112:18

**assess** [3] - 133:2, 152:22, 175:13

**assessed** [1] - 172:13

**assessing** [1] - 162:19

**assessment** [13] - 104:13, 104:24, 105:23, 110:24, 111:11, 111:12, 111:14, 112:10, 112:15, 121:14, 132:14, 132:16, 134:22

**asset** [1] - 60:24

**assign** [1] - 94:10

**Associate** [1] - 127:3

**Associate's** [1] - 127:25

**associated** [20] - 14:24, 45:25, 46:21, 51:25, 64:9, 77:13, 78:2, 78:7, 79:4, 83:3, 87:19, 88:21, 92:6, 93:18, 94:9, 98:14, 98:15, 98:18, 140:13, 180:2

**assume** [4] - 18:15, 83:2, 120:2, 120:20

**assumes** [2] - 25:12, 170:13

**assuming** [2] - 41:14, 120:15

**assure** [3] - 61:14, 140:3, 143:13

**AT** [1] - 183:11

**attached** [1] - 124:2

**attempt** [2] - 71:21, 181:9

**attempting** [1] - 5:3

**attention** [5] - 56:2, 95:19, 138:22, 157:7, 173:20

**attorneys** [1] - 6:23

**attract** [1] - 79:15

**attracted** [1] - 135:24

**attributable** [13] - 28:22, 37:9, 42:18, 53:2, 58:9, 60:19, 60:23, 62:19, 91:25, 179:6, 179:14, 180:15, 180:18

**attributed** [4] - 13:19, 32:23, 35:2, 77:11

**audience** [6] - 21:14, 22:15, 22:21, 24:12, 25:19, 139:15

**Audience** [3] - 23:6, 23:24, 25:4

**audio** [1] - 77:17

**audited** [2] - 76:12, 76:21

**auditors** [3] - 76:13, 76:22, 77:2

**AUGUST** [1] - 183:18

**August** [5] - 8:12, 142:6, 142:24, 156:3, 156:21

**availability** [1] - 133:21

**available** [4] - 90:13, 97:5, 97:9, 97:10

**award** [4] - 140:22, 178:5, 179:10

**Awards** [1] - 145:5

**aware** [20] - 4:23, 15:20, 16:24, 17:2,

19:14, 19:24, 21:19, 78:13, 84:6, 91:3, 93:19, 97:4, 120:7, 122:24, 123:2, 155:10, 155:22, 160:13, 160:19, 171:22

**awareness** [4] - 141:17, 141:22, 144:18, 144:20

**Azalea** [2] - 162:2, 175:9, 175:12

## B

**Bachelor** [1] - 125:18
**backed** [2] - 93:17, 94:1
**background** [1] - 171:9
**backup** [1] - 30:12
**backwards** [3] - 133:2, 134:25, 136:3
**Bad** [1] - 139:9
**bailiff** [1] - 181:20
**ballad** [2] - 156:4, 156:13
**bar** [4] - 105:12, 105:13, 118:22
**bar-by-bar** [1] - 118:22
**bars** [2] - 109:12, 122:9
**base** [4] - 18:2, 18:11, 19:19, 19:24
**based** [28] - 22:13, 22:16, 25:7, 26:2, 26:16, 27:2, 41:10, 43:4, 43:6, 44:22, 51:9, 58:7, 60:17, 61:8, 68:11, 86:13, 87:6, 92:19, 93:22, 96:4, 96:9, 98:21, 99:21, 100:20, 123:22, 137:21, 171:12, 173:16
**basic** [3] - 80:4, 80:6, 152:5
**basing** [1] - 26:12
**basis** [10] - 36:14, 81:4, 81:12, 86:8, 88:10, 112:1, 112:10, 121:21, 122:11, 175:7
**bass** [5] - 107:16, 109:15, 113:7, 113:17, 113:22
**Bass** [1] - 161:25
**Bates** [1] - 20:3
**beat** [8] - 105:13,

113:5, 113:6, 113:8, 113:22, 147:12
**became** [1] - 165:13
**become** [7] - 129:12, 132:19, 135:12, 141:9, 143:18, 169:21, 175:19
**becomes** [2] - 94:6, 174:5
**becoming** [1] - 146:21
**began** [1] - 104:17
**beginning** [1] - 152:18
**begins** [1] - 117:24
**behalf** [1] - 102:14
**BEHALF** [3] - 2:3, 2:13, 2:20
**behave** [1] - 66:6
**behind** [2] - 18:4, 154:13
**behind-the-scenes** [1] - 154:13
**beings** [1] - 138:4
**belabor** [1] - 182:16
**belief** [1] - 181:15
**believes** [3] - 17:9, 43:5, 165:20
**below** [6] - 56:10, 107:16, 113:3, 113:5
**beneficial** [1] - 14:25
**benefit** [8] - 82:13, 82:21, 91:1, 93:4, 106:24, 109:3, 125:21, 136:5
**Berlin** [1] - 127:21
**Berry** [1] - 130:22
**Best** [1] - 31:8
**best** [6] - 57:9, 79:16, 79:20, 82:14, 91:10, 135:12
**better** [1] - 177:20
**between** [13] - 51:17, 92:2, 109:7, 113:10, 115:23, 116:8, 140:7, 152:2, 169:11, 172:21, 175:4, 179:11, 179:16
**Beyonce** [2] - 130:4, 140:11
**beyond** [5] - 52:6, 66:17, 67:3, 75:18, 92:24
**big** [2] - 64:6, 154:23
**Big** [1] - 120:9
**Billboards** [1] - 154:22
**billboards** [1] - 154:23
**billion** [5] - 23:6, 23:25, 75:8, 75:9, 75:10

**binder** [11] - 18:3, 27:24, 30:17, 41:18, 43:25, 49:18, 52:24, 75:4, 85:24, 89:15, 91:17
**biography** [1] - 130:8
**Birthday** [3] - 139:3, 156:13, 167:23
**bit** [12] - 54:19, 56:13, 56:21, 74:1, 75:22, 77:4, 78:12, 78:22, 88:5, 99:20, 100:9, 171:1
**blanket** [2] - 65:20, 68:24
**blender** [1] - 165:9
**block** [1] - 115:11
**blues** [1] - 120:8
**board** [1] - 130:20
**boards** [1] - 130:18
**body** [1] - 88:11
**book** [2] - 130:8, 130:10
**Book** [1] - 139:11
**booked** [1] - 53:8
**booklets** [1] - 94:21
**books** [3] - 33:25, 38:2, 99:17
**Books** [1] - 130:12
**bore** [1] - 57:19
**bottom** [10] - 20:19, 24:25, 29:5, 31:24, 41:2, 49:25, 55:4, 77:7, 77:9, 87:4
**bought** [4] - 151:16, 158:10, 161:3, 166:12
**BOULEVARD** [2] - 2:7, 2:18
**Bowl** [3] - 122:13, 145:6, 145:8
**box** [2] - 52:10, 78:1
**boyfriend** [1] - 120:12
**Boys** [1] - 138:16
**brand** [12] - 57:11, 129:10, 131:8, 138:2, 138:5, 138:7, 138:12, 141:13, 153:20, 155:13, 167:3
**branded** [1] - 147:2
**branding** [14] - 128:15, 128:16, 129:8, 129:11, 129:14, 133:11, 134:13, 134:19, 137:23, 137:25, 142:20, 143:1, 153:20, 170:21
**brands** [3] - 138:3,

142:7, 142:8
**break** [12] - 63:17, 63:18, 63:20, 64:13, 77:13, 85:6, 94:8, 101:6, 101:12, 101:18, 127:11, 163:16
**breaks** [1] - 77:6
**bridge** [3] - 140:17, 146:24, 149:1
**brief** [1] - 65:1
**briefly** [6] - 67:18, 87:12, 93:14, 107:7, 125:21, 174:22
**bring** [2] - 72:21, 166:20
**bringing** [1] - 173:20
**broke** [1] - 139:9
**broken** [1] - 145:17
**Brothers** [2] - 4:15, 10:16
**brought** [1] - 72:13
**Bruce** [1] - 126:7
**BS** [1] - 14:7
**budget** [2] - 17:2, 79:5
**budgets** [1] - 95:14
**build** [2] - 127:18, 149:17
**build-up** [1] - 149:17
**building** [3] - 59:2, 78:17, 115:11
**bunch** [1] - 157:20
**burden** [4] - 178:10, 180:4, 180:10, 180:17
**business** [14] - 17:19, 48:19, 60:12, 76:17, 78:18, 95:11, 125:12, 125:17, 128:15, 128:16, 129:18, 133:10, 134:12, 170:20
**Buy** [1] - 31:8
**buy** [12] - 74:20, 74:24, 97:12, 147:18, 153:9, 153:14, 155:22, 157:19, 157:21, 157:22, 160:15
**buying** [2] - 75:18, 157:20
**buys** [1] - 74:5
**BY** [55] - 2:5, 2:10, 2:15, 2:22, 3:5, 3:6, 3:9, 3:9, 3:11, 3:11, 12:15, 14:5, 16:6, 17:15, 19:10, 20:1, 22:12, 22:20, 26:1, 26:6, 26:15, 27:1, 27:6, 28:9, 28:21,

29:2, 40:10, 47:21, 48:1, 48:7, 48:10, 54:1, 63:24, 73:1, 76:4, 80:22, 97:21, 101:16, 103:22, 105:21, 109:2, 114:7, 114:17, 115:15, 121:4, 122:23, 123:14, 125:1, 159:15, 163:25, 166:1, 169:23, 172:18, 174:24, 183:13

## C

**CA** [2] - 2:19, 2:24
**Cal** [1] - 8:12
**calculated** [9] - 21:21, 32:25, 37:13, 57:20, 57:25, 59:6, 85:21, 96:3, 100:7
**calculating** [5] - 57:21, 58:13, 60:2, 60:16, 86:17
**calculation** [6] - 21:21, 29:19, 33:18, 43:4, 58:7, 87:17
**calculations** [1] - 86:8
**Calendar** [1] - 4:3
**CALIFORNIA** [6] - 1:2, 1:16, 1:23, 4:1, 183:6, 183:9
**California** [1] - 139:2
**Calvin** [1] - 149:22
**campaign** [9] - 90:2, 97:3, 97:6, 142:9, 142:10, 142:25, 144:8, 171:6
**campaigns** [7] - 97:14, 133:20, 133:21, 134:4, 134:5, 136:19, 141:22
**cannot** [5] - 9:1, 67:13, 164:8, 164:19, 165:15
**capacity** [2] - 110:19, 131:24
**CAPES** [1] - 2:5
**capital** [1] - 20:21
**Capital** [9] - 17:16, 20:3, 34:17, 43:19, 45:1, 45:18, 46:15, 57:23, 63:1
**Capitol** [141] - 6:5, 8:19, 10:10, 10:24, 11:25, 13:3, 13:5, 13:7, 13:10, 13:15, 13:19, 14:10, 14:16,

14:21, 15:1, 16:7, 17:8, 17:9, 17:19, 17:24, 18:10, 19:17, 20:2, 25:6, 25:11, 27:12, 27:14, 28:1, 28:12, 28:19, 29:6, 29:15, 29:18, 29:25, 30:5, 30:12, 30:20, 32:7, 32:13, 32:18, 32:25, 33:6, 33:14, 33:25, 34:7, 34:21, 35:1, 35:6, 35:18, 36:5, 36:9, 36:15, 37:7, 37:13, 37:19, 38:1, 38:6, 38:21, 39:1, 39:16, 41:4, 41:10, 41:16, 41:22, 42:17, 43:5, 43:16, 43:23, 44:18, 45:1, 45:17, 46:4, 51:7, 51:21, 53:1, 53:6, 57:3, 57:22, 57:23, 58:8, 60:10, 60:13, 60:16, 60:18, 60:22, 61:16, 62:16, 62:17, 62:22, 64:3, 65:24, 66:1, 66:12, 66:19, 66:20, 67:8, 68:9, 70:24, 71:9, 71:10, 73:10, 75:11, 79:10, 79:16, 81:19, 81:23, 82:6, 82:9, 82:11, 82:18, 82:21, 84:13, 84:18, 85:1, 89:1, 90:14, 90:17, 90:24, 91:21, 93:5, 93:16, 93:18, 99:2, 102:2, 102:14, 136:20, 142:22, 143:3, 143:7, 143:12, 144:10, 154:3, 155:2, 159:24, 160:1, 160:2, 163:14, 164:15, 167:2, 171:6
**Capitol's** [3] - 64:10, 76:17, 77:8
**captured** [1] - 80:9
**car** [1] - 55:5
**card** [13] - 51:9, 51:13, 51:16, 52:4, 52:16, 52:17, 82:18, 83:7, 83:8, 98:21, 100:20, 100:21, 100:22
**carefully** [1] - 105:12
**carte** [1] - 75:2
**Case** [1] - 4:4
**case** [40] - 8:4, 8:5, 8:6, 8:8, 10:9, 15:11, 17:20, 46:19, 65:21,

69:3, 70:1, 71:5, 71:13, 71:20, 72:11, 74:8, 102:18, 104:4, 105:19, 131:11, 131:18, 131:25, 132:1, 136:22, 137:1, 137:3, 137:5, 150:16, 151:8, 152:19, 153:15, 168:16, 175:6, 175:7, 178:17, 178:22, 181:6, 181:25, 182:4
**CASE** [1] - 1:8
**cases** [2] - 88:7, 88:8
**catalog** [6] - 58:23, 59:17, 60:9, 60:11, 94:2, 94:6
**catch** [1] - 177:13
**categories** [8] - 30:5, 30:13, 44:24, 60:15, 61:3, 63:6, 89:2, 97:23
**category** [8] - 15:24, 15:25, 41:15, 43:22, 64:1, 76:7, 78:10, 95:21
**cats** [2] - 140:5, 140:6
**caught** [1] - 138:17
**causal** [2] - 179:11, 179:16
**caveat** [1] - 40:16
**CD** [3] - 8:12, 77:15, 77:22
**CDs** [6] - 44:16, 50:24, 77:22, 80:17, 80:24
**celebrities** [6] - 128:21, 128:22, 135:21, 138:3, 138:4, 138:5
**celebrity** [33] - 128:17, 129:20, 133:8, 134:11, 137:22, 137:25, 138:7, 138:14, 139:13, 139:14, 140:13, 140:16, 145:15, 153:19, 158:6, 162:25, 163:11, 164:2, 164:8, 164:9, 164:12, 164:21, 164:22, 164:23, 166:14, 167:1, 168:20, 170:20, 171:2, 173:7, 174:4, 174:11
**center** [1] - 145:24
**Center** [1] - 131:1
**centers** [1] - 131:2
**CENTRAL** [2] - 1:2,

183:9
**central** [1] - 137:17
**centralizing** [1] - 82:13
**CENTURY** [1] - 2:23
**century** [3] - 110:20, 126:2, 129:7
**CEO** [1] - 130:23
**cerebral** [1] - 135:8
**certain** [6] - 15:7, 48:22, 134:8, 179:22, 180:20
**certainly** [6] - 66:3, 66:4, 109:6, 119:7, 132:22, 135:18
**CERTIFICATE** [1] - 183:2
**CERTIFY** [2] - 183:10, 183:14
**chain** [7] - 77:16, 77:23, 78:25, 80:10, 80:13, 83:25, 85:11
**change** [3] - 48:11, 181:12, 181:15
**changed** [1] - 72:15
**changes** [1] - 118:23
**changing** [1] - 57:10
**channel** [1] - 97:8
**channels** [1] - 77:19
**charge** [3] - 51:18, 85:1, 98:19
**charged** [8] - 7:22, 77:23, 81:1, 85:17, 85:19, 86:7, 98:20
**charges** [2] - 77:23, 82:18
**charging** [1] - 85:8
**chart** [3] - 67:7, 117:15, 133:22
**charter** [1] - 55:7
**charts** [2] - 141:11, 156:4
**check** [2] - 4:12, 49:9
**Chief** [3] - 125:23, 126:11, 126:14
**CHIEFFO** [1] - 2:22
**choice** [2] - 142:17, 142:19
**choose** [1] - 168:15
**chorus** [15] - 111:18, 111:20, 111:22, 111:23, 112:2, 112:5, 121:20, 122:6, 145:23, 146:3, 149:2, 149:3, 149:18, 149:19, 149:24
**choruses** [2] - 111:25, 149:1
**chose** [1] - 168:14

chosen [1] - 17:10
**CHRISTINA** [1] - 1:4
**CHRISTINE** [1] - 2:15
**circles** [1] - 130:3
**Circuit** [2] - 6:9, 71:6
**circulating** [8] - 142:23, 143:16, 144:5, 156:22, 157:1, 157:3, 157:5, 157:8
**circulation** [1] - 144:9
**Cirkut** [1] - 161:10
**citation** [1] - 70:24
**citations** [1] - 70:23
**cites** [1] - 8:6
**Citi** [1] - 155:14
**cities** [1] - 155:20
**City** [1] - 8:12
**claim** [3] - 45:23, 60:18, 179:3
**claimed** [2] - 29:12
**claiming** [2] - 45:19, 63:7
**claims** [12] - 28:22, 29:6, 29:16, 32:19, 35:2, 37:7, 42:17, 46:4, 53:1, 57:22, 58:9, 60:23
**claps** [1] - 109:15
**clarify** [5] - 50:3, 100:10, 163:3, 163:4, 170:2
**clarifying** [1] - 114:23
**class** [9] - 129:5, 129:8, 129:9, 129:11, 129:21, 129:23, 134:19, 135:4, 166:16
**classes** [6] - 129:3, 129:17, 129:20, 134:17, 135:18
**CLAYTON** [1] - 2:11
**clear** [5] - 6:9, 39:12, 114:25, 116:18, 173:7
**clearly** [6] - 111:24, 146:22, 164:12, 166:25, 169:12, 169:19
**CLERK** [24] - 4:3, 10:13, 11:20, 11:22, 12:3, 12:8, 64:17, 64:19, 65:12, 66:16, 69:21, 102:22, 103:15, 103:18, 106:20, 106:25, 108:21, 124:17, 124:20, 159:8, 159:10, 182:8, 182:10, 182:20

**clerks** [1] - 4:10
**clients** [1] - 85:17
**Clive** [10] - 125:5, 125:8, 125:9, 125:21, 125:23, 127:3, 127:10, 127:17, 127:18
**close** [2] - 63:21, 176:24
**closed** [1] - 8:4
**closely** [2] - 79:2, 126:24
**closeness** [1] - 140:9
**closing** [16] - 6:7, 65:7, 66:25, 67:4, 68:12, 68:13, 69:1, 69:9, 69:15, 159:3, 177:10, 177:11, 178:1, 178:7, 181:24, 182:1
**clothes** [1] - 57:9
**co** [1] - 154:24
**co-op** [1] - 154:24
**cocktails** [1] - 54:13
**COHEN** [54] - 2:6, 3:5, 4:20, 4:23, 7:8, 10:10, 11:24, 12:15, 14:5, 16:6, 17:15, 19:2, 19:5, 19:10, 20:1, 20:6, 20:17, 22:12, 22:20, 26:1, 26:6, 26:15, 26:20, 27:1, 27:6, 28:4, 28:9, 28:21, 29:2, 40:10, 47:21, 48:1, 48:7, 48:10, 54:1, 63:21, 63:24, 64:12, 65:14, 65:16, 66:18, 67:10, 68:4, 68:10, 68:15, 68:23, 69:19, 71:25, 72:6, 76:2, 80:18, 97:21, 101:13, 102:8
**Cohen** [9] - 11:23, 63:16, 66:7, 73:4, 73:7, 77:5, 90:21, 96:24, 97:19
**Cohen's** [1] - 69:16
**Cold** [1] - 138:19
**collaborating** [1] - 79:7
**collaboration** [1] - 168:4
**collateral** [1] - 71:18
**collected** [3] - 147:8, 151:13, 151:24
**column** [19] - 21:6, 21:10, 21:13, 21:16, 22:15, 22:21, 22:25, 23:5, 23:24, 24:22,

25:3, 30:25, 31:10,
31:19, 32:2, 33:10,
38:25, 46:10
**combat** [2] - 6:24, 9:8
**combatting** [1] - 6:20
**combination** [6] -
81:9, 115:3, 115:5,
162:21, 165:6,
165:14
**combined** [6] - 96:8,
164:6, 167:5, 174:8,
174:17, 176:6
**coming** [2] - 59:7,
133:7
**commendation** [1] -
139:11
**comment** [1] - 48:13
**commercial** [6] -
84:17, 132:3,
133:24, 163:1,
164:3, 166:4
**Commercial** [1] -
85:13
**commercials** [1] -
155:13
**common** [4] - 91:5,
91:7, 166:7, 171:3
**commonplace** [1] -
75:2
**companies** [2] -
131:7, 154:24
**company** [8] - 13:2,
78:17, 81:20, 81:23,
82:12, 84:16, 88:14,
131:8
**comparative** [1] -
104:7
**compare** [3] - 40:8,
45:21, 161:23
**compared** [4] - 45:22,
118:15, 158:5, 162:5
**comparing** [3] - 40:2,
40:23, 45:21
**comparison** [6] -
162:2, 175:1, 175:3,
175:6, 175:17
**compelling** [6] -
164:24, 165:2,
169:12, 169:14,
174:4
**compensate** [2] -
88:15, 96:1
**compilation** [1] -
44:15
**complete** [2] - 104:12,
105:14
**completed** [1] - 124:3
**completely** [7] - 7:24,
68:4, 71:5, 71:18,
118:7, 163:12,

163:15
**complex** [1] - 98:13
**component** [6] -
63:15, 97:4, 127:13,
149:23, 151:20,
151:21
**composition** [14] -
104:9, 104:14,
105:1, 110:15,
110:21, 110:22,
110:25, 111:1,
111:4, 111:8,
119:16, 119:18,
119:22, 132:3
**compositional** [5] -
147:14, 147:16,
147:19, 148:3,
148:10
**compositionally** [1] -
147:23
**compositions** [1] -
104:8
**compute** [1] - 29:11
**computer** [1] - 80:5
**COMPUTER** [1] -
183:13
**COMPUTER-AIDED**
[1] - 183:13
**concern** [1] - 8:20
**concerned** [3] - 8:18,
26:23, 27:9
**concerning** [2] -
13:14, 160:10
**conclude** [2] - 121:24,
137:19
**concluded** [2] -
136:25, 182:24
**concludes** [1] -
181:22
**conclusion** [7] -
53:12, 53:21, 71:9,
115:20, 157:24,
163:20, 166:3
**conclusions** [2] -
136:23, 171:10
**conduct** [5] - 132:13,
133:13, 133:15,
135:1, 135:19
**conducting** [2] -
134:15, 170:3
**conference** [1] - 104:2
**conferencing** [1] -
103:17
**confluence** [2] -
133:7, 170:19
**confusing** [1] - 71:18
**conjoined** [1] - 111:21
**conjunction** [2] -
141:12, 144:23
**connect** [1] - 63:2

**connected** [1] - 92:3
**connection** [2] - 80:5,
102:19
**conscientious** [1] -
181:11
**consider** [6] - 111:14,
125:13, 148:5,
152:16, 153:1,
160:21
**considered** [14] -
25:11, 52:3, 126:9,
138:3, 142:12,
144:14, 148:1,
148:4, 150:20,
150:21, 157:14,
157:17, 167:17,
181:7
**considering** [1] -
178:11
**consist** [1] - 95:22
**consistent** [4] - 73:20,
91:12, 121:22, 122:3
**consists** [1] - 83:16
**constantly** [2] - 57:10,
90:8
**constellation** [2] -
158:2, 167:5
**constitute** [2] -
109:25, 121:16
**consulted** [1] - 131:6
**consumed** [2] - 39:6,
39:19
**consumer** [4] - 74:5,
140:8, 141:17,
144:18
**consumers** [3] -
17:10, 39:18, 153:8
**contained** [9] - 25:12,
29:19, 31:14, 31:16,
32:11, 36:10, 37:1,
37:2, 38:10
**containing** [9] - 5:6,
32:15, 33:7, 37:6,
41:11, 45:18, 180:1,
180:2, 180:14
**contains** [1] - 42:8
**contemporary** [3] -
149:3, 149:14,
149:21
**content** [3] - 42:12,
109:5, 122:19
**contents** [1] - 20:11
**context** [23] - 92:23,
104:25, 120:23,
129:15, 130:7,
133:11, 134:10,
134:11, 134:12,
134:16, 135:16,
138:1, 140:19,
140:23, 141:7,

148:10, 152:11,
152:15, 160:22,
165:7, 169:9, 174:3,
174:4
**continues** [1] - 149:19
**contract** [7] - 44:22,
47:9, 48:21, 78:21,
87:15, 88:1, 96:1
**contracts** [2] - 95:10,
99:21
**contractually** [1] -
44:3
**contributed** [5] -
150:7, 157:25,
162:13, 162:17,
162:18
**contributing** [1] - 30:6
**contributions** [1] -
161:11
**controls** [2] - 76:23,
95:13
**controversial** [2] -
67:19, 67:23
**controversy** [2] -
150:17, 150:18
**copied** [1] - 65:23
**copies** [1] - 7:15
**copy** [10] - 9:22, 9:24,
10:5, 11:3, 70:2,
105:24, 107:3,
107:6, 178:13,
178:14
**copyright** [7] - 6:17,
49:11, 78:6, 88:4,
88:6, 89:8, 179:4
**copyrighted** [4] -
180:1, 180:2,
180:14, 180:19
**core** [1] - 57:11
**corporate** [3] - 11:25,
13:10, 129:10
**corporation** [1] -
12:24
**correct** [168] - 4:17,
5:21, 10:15, 13:3,
13:4, 13:12, 13:20,
14:4, 15:4, 15:5,
15:10, 16:3, 17:7,
17:21, 17:22, 18:14,
22:21, 25:13, 25:14,
25:18, 27:19, 29:4,
29:8, 29:10, 29:14,
29:16, 29:17, 29:21,
30:3, 30:6, 30:11,
31:4, 31:7, 31:15,
31:22, 32:6, 32:12,
32:16, 32:17, 32:21,
32:24, 33:4, 33:17,
33:19, 34:3, 34:4,
34:20, 34:24, 35:5,

35:8, 35:9, 35:11,
35:12, 36:8, 36:11,
36:16, 36:17, 36:25,
37:17, 37:20, 37:21,
38:5, 38:10, 38:23,
39:4, 41:1, 41:7,
41:14, 42:10, 42:12,
43:13, 43:21, 44:17,
45:3, 45:15, 45:16,
46:2, 46:17, 48:24,
49:13, 51:3, 51:6,
51:8, 51:11, 51:25,
53:5, 55:3, 56:9,
58:11, 59:20, 59:23,
60:6, 60:20, 61:1,
61:21, 62:4, 63:3,
67:16, 70:16, 70:22,
74:10, 74:16, 75:7,
75:12, 75:13, 75:20,
76:18, 79:11, 80:17,
81:12, 81:13, 82:16,
82:17, 85:22, 85:23,
86:2, 87:6, 87:7,
91:23, 94:14, 95:5,
95:9, 96:14, 96:22,
98:25, 99:4, 99:13,
99:19, 100:2,
100:14, 100:18,
101:25, 102:23,
108:22, 114:11,
114:21, 116:13,
116:15, 116:17,
116:21, 116:22,
116:24, 116:25,
117:17, 117:18,
117:20, 117:24,
118:2, 118:7,
118:11, 118:13,
118:17, 119:3,
119:4, 119:5,
119:14, 120:5,
120:17, 121:8,
159:23, 160:6,
161:15, 162:6,
162:14, 164:3,
164:4, 167:9, 169:15
**CORRECT** [1] -
183:14
**correcting** [1] - 9:12
**correlated** [1] - 97:5
**corresponding** [1] -
108:12
**corroborable** [4] -
112:9, 112:15,
118:14
**cost** [30] - 14:24, 50:6,
51:5, 51:8, 51:10,
52:3, 52:13, 52:15,
52:21, 54:16, 62:10,
63:11, 63:12, 80:23,

80:24, 80:25, 83:16, 85:3, 85:6, 86:25, 87:2, 87:9, 87:21, 93:20, 95:13, 98:15, 98:19, 100:23, 101:3, 154:23

**costs** [53] - 6:5, 6:6, 29:6, 29:12, 29:25, 46:3, 46:8, 49:17, 49:22, 50:1, 50:12, 51:25, 52:6, 57:12, 57:14, 60:24, 77:6, 77:8, 77:10, 77:13, 77:21, 78:2, 78:19, 78:23, 79:4, 80:11, 81:8, 81:16, 85:2, 85:4, 85:20, 86:2, 87:19, 90:24, 91:19, 92:5, 92:8, 94:11, 96:21, 98:18, 98:23, 100:25, 101:2, 101:5, 101:7, 101:10, 101:23, 102:3, 179:22, 180:6, 180:7, 180:8

**Council** [1] - 130:25
**councils** [1] - 130:18
**counsel** [5] - 4:6, 6:21, 9:11, 159:23, 177:10
**COUNSEL** [1] - 2:2
**count** [13] - 40:7, 117:7, 118:1, 118:5, 118:10, 119:2, 119:12, 119:13, 119:19, 119:20, 120:5, 120:17, 120:22
**counted** [5] - 57:2, 110:8, 117:10, 117:19, 118:9
**counting** [3] - 116:11, 116:12, 118:15
**country** [1] - 155:6
**counts** [1] - 116:16
**COUNTY** [1] - 183:4
**couple** [7] - 8:6, 56:18, 65:14, 126:25, 127:6, 136:21, 161:9
**course** [12] - 5:9, 19:23, 69:25, 72:2, 76:17, 77:25, 88:2, 111:7, 119:18, 171:19, 181:10
**court** [5] - 13:17, 102:19, 136:5, 177:12, 181:2
**Court** [4] - 4:21, 5:15, 70:2, 182:17

**COURT** [148] - 1:1, 1:22, 4:8, 4:17, 4:22, 5:13, 5:18, 7:2, 8:1, 8:7, 8:17, 9:18, 9:25, 10:3, 10:6, 10:12, 10:14, 10:19, 10:22, 11:1, 11:6, 11:10, 11:15, 11:17, 11:23, 12:2, 14:1, 16:5, 18:21, 18:22, 18:24, 19:4, 19:8, 19:21, 20:8, 20:12, 21:23, 22:1, 22:2, 22:4, 22:6, 22:10, 22:18, 26:4, 26:10, 26:19, 27:4, 28:7, 28:25, 39:22, 39:23, 39:25, 47:16, 47:19, 47:24, 48:5, 48:9, 53:15, 53:18, 53:19, 53:22, 63:16, 63:22, 64:13, 64:20, 64:23, 65:2, 65:5, 65:9, 65:15, 66:5, 66:17, 66:24, 67:13, 68:7, 68:12, 68:17, 68:22, 69:1, 69:6, 69:13, 69:20, 69:22, 70:12, 70:21, 71:1, 71:3, 71:24, 72:2, 72:5, 72:15, 72:20, 72:24, 76:3, 80:21, 97:18, 101:14, 102:7, 102:9, 102:12, 102:16, 102:21, 102:24, 103:5, 103:7, 103:10, 103:13, 105:20, 106:15, 106:18, 108:20, 109:1, 114:5, 114:14, 115:14, 121:3, 122:21, 123:7, 123:12, 124:11, 124:14, 158:18, 158:20, 158:21, 158:25, 159:3, 159:6, 159:11, 162:8, 163:23, 164:19, 165:24, 169:17, 172:16, 172:24, 176:14, 176:16, 176:21, 176:23, 177:2, 177:5, 177:7, 178:2, 182:15, 182:18, 182:22, 183:9, 183:22
**Court's** [1] - 123:22
**court's** [2] - 65:12, 182:20

**courtroom** [1] - 181:21
**cover** [4] - 85:9, 101:10, 101:23, 120:8
**covered** [3] - 85:10, 88:21, 88:24
**covers** [4] - 85:10, 98:19, 101:2, 101:5
**create** [4] - 68:10, 126:16, 137:15, 165:9
**created** [7] - 33:21, 53:8, 71:7, 75:25, 108:16, 137:17, 166:7
**creates** [1] - 119:9
**creating** [1] - 125:12
**creation** [2] - 63:14, 64:3
**creative** [1] - 74:12
**Creative** [2] - 126:11, 129:6
**credibility** [1] - 178:12
**credited** [1] - 99:14
**critical** [3] - 6:8, 6:11, 6:20
**CROSS** [4] - 3:3, 72:25, 114:6, 159:14
**cross** [5] - 6:7, 8:19, 64:21, 158:22, 159:1
**CROSS-EXAMINATION** [3] - 72:25, 114:6, 159:14
**cross-examination** [1] - 6:7
**crossing** [1] - 6:21
**CSR** [2] - 1:22, 183:21
**Cuba** [1] - 127:23
**cube** [1] - 54:13
**cultural** [2] - 128:13, 170:22
**culture** [3] - 129:21, 130:15, 138:22
**Curator** [1] - 127:20
**cure** [1] - 68:17
**current** [3] - 87:20, 87:23, 87:24
**customers** [1] - 83:22
**cut** [2] - 49:9, 164:7
**cuts** [4] - 157:14, 157:15, 157:17, 157:23
**CV** [2] - 1:8, 4:4
**cycle** [2] - 87:25, 97:7

## D

**D-r-e-l-l-i-s-h-a-k** [1] - 12:13

**damages** [9] - 4:25, 5:1, 5:15, 8:5, 102:18, 178:6, 179:2, 179:5, 179:8
**dance** [1] - 149:14
**Dark** [279] - 14:11, 14:17, 15:11, 15:20, 16:12, 16:24, 18:18, 21:4, 23:2, 25:17, 25:21, 26:7, 27:15, 28:12, 28:22, 29:6, 29:16, 30:1, 30:22, 31:16, 32:11, 32:15, 32:19, 32:23, 33:7, 34:1, 34:12, 34:13, 35:1, 35:2, 35:7, 35:8, 35:11, 36:10, 36:15, 37:6, 37:9, 38:3, 38:10, 38:13, 38:19, 38:23, 39:2, 39:19, 40:14, 40:21, 40:24, 41:6, 41:11, 41:12, 42:9, 42:18, 42:19, 42:23, 43:2, 43:5, 43:16, 43:20, 44:4, 45:18, 49:22, 50:2, 50:4, 50:5, 50:10, 53:2, 53:9, 53:10, 57:6, 57:23, 58:1, 58:9, 60:4, 60:19, 60:23, 61:5, 61:17, 61:24, 62:3, 62:6, 62:13, 63:2, 63:7, 63:14, 64:3, 73:22, 74:9, 74:19, 75:5, 75:7, 75:19, 77:11, 80:8, 80:10, 81:11, 81:15, 86:4, 86:15, 89:16, 89:21, 92:2, 92:6, 92:16, 93:15, 94:24, 95:3, 96:9, 96:13, 96:14, 100:1, 100:4, 100:13, 100:16, 104:7, 104:9, 104:14, 104:18, 104:23, 105:1, 105:11, 105:13, 106:11, 107:10, 107:12, 108:11, 108:12, 109:13, 109:20, 110:11, 110:12, 110:14, 111:1, 111:4, 111:6, 111:7, 111:16, 111:17, 111:18, 111:23, 111:25, 112:19, 112:24, 113:1, 113:11, 113:16, 114:20, 116:1, 122:5, 123:1,

132:2, 132:3, 136:9, 136:10, 136:14, 136:20, 136:23, 137:10, 137:20, 137:21, 137:24, 138:8, 138:10, 138:15, 141:7, 142:2, 142:4, 142:7, 142:9, 142:11, 142:16, 142:21, 143:6, 143:12, 143:21, 143:24, 144:3, 144:5, 144:9, 144:24, 145:4, 145:5, 145:9, 145:12, 145:17, 145:20, 146:5, 146:7, 146:20, 147:5, 147:8, 147:11, 147:13, 147:15, 147:21, 147:25, 148:2, 148:6, 148:13, 148:15, 148:16, 148:18, 148:21, 149:11, 149:23, 150:3, 150:7, 150:10, 150:23, 151:2, 151:3, 151:9, 151:15, 151:16, 151:20, 152:1, 152:2, 152:7, 152:17, 153:4, 156:1, 156:21, 157:3, 157:5, 158:3, 158:4, 158:9, 160:10, 160:17, 160:25, 161:1, 161:6, 161:8, 161:11, 161:20, 161:24, 162:6, 162:13, 163:1, 163:13, 163:17, 164:3, 164:13, 165:13, 165:22, 166:4, 166:12, 166:15, 166:18, 166:20, 167:18, 167:22, 168:1, 168:6, 168:14, 168:19, 168:23, 169:3, 169:4, 169:14, 169:15, 169:19, 170:24, 171:16, 173:2, 173:13, 173:15, 173:21, 174:10, 174:13, 174:15, 175:1, 175:15, 176:10, 180:16
**Daryl** [1] - 130:24

**dash** [1] - 106:20
**data** [7] - 26:2, 84:9, 84:10, 87:18, 133:18, 135:4, 166:2
**database** [1] - 18:2
**DATE** [1] - 183:18
**date** [11] - 16:22, 21:6, 21:7, 22:25, 23:1, 23:2, 23:21, 24:9, 24:22, 56:10, 181:20
**dated** [1] - 108:3
**dates** [1] - 16:20
**dating** [1] - 150:14
**David** [1] - 149:22
**Davis** [10] - 125:6, 125:8, 125:9, 125:21, 125:23, 125:24, 127:3, 127:10, 127:17, 127:18
**days** [1] - 127:14
**deal** [6] - 62:17, 71:3, 143:13, 152:8, 154:3, 172:11
**deals** [1] - 83:1
**debut** [1] - 138:16
**December** [3] - 142:22, 143:6, 144:10
**decide** [3] - 69:24, 178:22, 181:6
**decided** [4] - 71:14, 143:9, 144:9, 144:10
**decides** [1] - 131:22
**decision** [2] - 181:11, 181:14
**Decker** [14] - 70:6, 104:20, 107:14, 107:18, 107:19, 110:7, 110:9, 112:18, 113:18, 114:10, 114:25, 116:5, 116:6, 120:21
**Decker's** [2] - 113:12, 115:20
**deconstruct** [3] - 135:14, 135:22, 136:3
**deconstructing** [1] - 130:9
**dedication** [1] - 79:22
**deducted** [4] - 46:4, 46:15, 62:15, 99:2
**deducting** [2] - 46:7, 179:19
**deduction** [1] - 62:19
**deductions** [1] - 5:17
**deep** [1] - 140:4
**deeply** [1] - 9:1
**Def** [1] - 162:3

**DEFENDANT** [2] - 1:10, 3:7
**defendant** [3] - 13:10, 179:13, 179:20
**defendant's** [13] - 8:4, 9:3, 159:23, 178:9, 179:10, 179:12, 179:17, 179:18, 179:19, 179:21, 179:24, 180:5, 180:12
**DEFENDANTS** [2] - 2:13, 2:20
**defendants** [14] - 5:2, 5:6, 65:18, 68:24, 72:7, 102:14, 103:16, 131:12, 159:24, 178:4, 179:6, 179:23, 180:10, 180:17
**defendants'** [2] - 179:25, 180:9
**defense** [2] - 124:16, 177:3
**define** [2] - 15:22, 160:11
**defined** [3] - 87:25, 113:5, 149:16
**defines** [3] - 87:15, 149:2, 149:16
**Degree** [1] - 127:25
**degree** [8] - 115:8, 115:9, 125:18, 125:19, 128:2, 128:3, 166:7, 171:11
**degrees** [4] - 14:8, 127:24, 127:25, 172:2
**delay** [2] - 104:3, 104:4
**deliberate** [2] - 177:19, 178:16
**deliberated** [1] - 178:8
**deliberations** [3] - 177:16, 178:10, 181:1
**deluxe** [2] - 74:14, 153:5
**demonstrate** [1] - 112:22
**demonstrative** [3] - 66:2, 66:22, 67:7
**demonstratives** [13] - 65:18, 65:20, 66:9, 68:11, 68:15, 68:19, 68:20, 68:25, 69:4, 69:9, 69:11, 69:18, 70:23
**deny** [1] - 121:3
**department** [1] - 90:15

**DEPOSITION** [1] - 3:13
**deposition** [19] - 5:3, 5:7, 7:6, 8:9, 9:22, 11:3, 13:19, 13:22, 19:13, 19:15, 25:6, 34:7, 47:1, 47:10, 50:16, 61:2, 62:25, 71:3, 176:19
**depositions** [1] - 7:12
**depth** [1] - 172:4
**derive** [1] - 64:6
**derived** [3] - 40:21, 44:11, 76:6
**describe** [5] - 104:15, 109:4, 132:10, 158:14, 170:3
**described** [8] - 7:9, 93:24, 109:24, 110:13, 111:10, 112:16, 117:11, 131:3
**describing** [1] - 19:1
**description** [2] - 36:23, 113:12
**designate** [1] - 15:17
**designated** [4] - 4:24, 8:13, 13:9, 71:12
**designating** [1] - 10:24
**designations** [8] - 5:7, 5:23, 7:3, 7:10, 7:14, 7:18, 8:16, 72:3
**designed** [1] - 141:22
**detail** [8] - 78:14, 78:22, 83:10, 88:5, 88:18, 91:18, 105:11, 176:25
**details** [3] - 78:23, 120:14, 171:5
**determination** [1] - 42:21
**determine** [8] - 85:1, 92:18, 136:1, 172:21, 179:4, 179:13, 179:17, 180:13
**determined** [4] - 100:22, 100:24, 173:21, 179:19
**determining** [1] - 180:12
**develop** [1] - 129:18
**developed** [2] - 126:5, 132:13
**development** [1] - 126:20
**Development** [1] - 127:23
**Dey** [1] - 130:11

**Diageo** [1] - 131:7
**dictate** [1] - 76:23
**difference** [2] - 152:9, 172:21
**differences** [1] - 169:11
**different** [24] - 10:20, 31:1, 36:23, 48:13, 67:13, 76:7, 78:23, 81:14, 86:14, 86:16, 88:20, 90:21, 94:5, 113:3, 148:22, 150:1, 156:13, 168:21, 168:22, 175:17, 175:18, 175:21, 175:22, 175:23
**differential** [1] - 69:8
**difficult** [2] - 132:17, 172:8
**digital** [39] - 30:9, 35:19, 35:21, 35:23, 36:3, 36:6, 36:18, 36:19, 36:23, 37:2, 37:15, 38:1, 38:2, 38:7, 38:12, 38:19, 40:20, 40:23, 40:24, 40:25, 41:3, 41:5, 45:10, 58:5, 58:6, 59:7, 59:21, 74:22, 75:18, 77:15, 77:17, 77:18, 83:12, 83:14, 83:25, 84:1, 84:2, 100:15
**digitally** [2] - 36:10, 36:16
**diligently** [1] - 181:3
**direct** [4] - 43:24, 111:19, 114:3, 121:11
**DIRECT** [4] - 3:3, 12:14, 103:21, 124:25
**directed** [1] - 160:1
**directly** [8] - 61:4, 63:2, 64:9, 67:20, 82:7, 83:1, 93:18, 97:5
**director** [1] - 127:9
**Director** [2] - 127:10, 127:16
**disagree** [5] - 15:13, 69:13, 115:1, 115:2, 115:19
**disagreements** [1] - 170:25
**disagrees** [1] - 114:10
**disclosed** [1] - 70:11
**discovered** [1] - 136:18

**Diageo** [1] - 131:7
**discuss** [3] - 27:11, 105:10, 181:25
**discussed** [15] - 5:4, 7:11, 19:15, 43:10, 67:5, 68:15, 78:12, 78:14, 80:7, 95:22, 106:9, 136:17, 155:14, 173:8, 181:8
**discussing** [5] - 68:13, 73:21, 96:21, 121:13, 182:3
**discussion** [5] - 4:9, 66:13, 67:4, 162:25, 181:13
**discussions** [1] - 133:23
**dislikes** [1] - 178:21
**dispute** [4] - 115:18, 115:22, 116:3
**distinguished** [1] - 169:2
**distribute** [1] - 79:7
**distributes** [2] - 77:17, 84:1
**distributing** [1] - 83:17
**distribution** [32] - 77:12, 77:14, 77:16, 77:18, 78:24, 78:25, 80:10, 80:13, 83:10, 83:12, 83:14, 83:15, 83:24, 83:25, 85:5, 85:14, 85:18, 85:20, 86:1, 86:7, 86:17, 86:19, 87:2, 87:6, 94:22, 100:8, 100:12, 100:16, 100:19, 100:23, 101:9, 101:18
**DISTRICT** [5] - 1:1, 1:2, 1:4, 183:9
**dive** [1] - 78:22
**divide** [1] - 74:7
**divided** [1] - 33:14
**dividing** [3] - 33:1, 37:14, 42:22
**DIVISION** [1] - 1:2
**division** [2] - 94:5, 111:4
**divorce** [1] - 150:14
**DO** [3] - 49:18, 183:10, 183:13
**document** [53] - 18:1, 18:9, 19:1, 19:12, 19:18, 19:20, 20:2, 20:7, 20:11, 20:13, 20:22, 21:3, 22:14, 23:2, 27:3, 28:16, 28:19, 29:5, 29:19, 29:22, 30:4, 30:18,

30:19, 33:21, 35:17,
36:19, 37:22, 38:17,
38:18, 41:13, 41:19,
41:22, 42:2, 42:14,
49:1, 49:19, 49:21,
52:8, 63:5, 67:7,
98:3, 106:6, 107:5,
107:8, 107:22,
107:23, 108:2,
108:16, 108:23,
109:4, 109:19,
109:24, 182:14
**documentation** [1] -
16:20
**documented** [1] - 77:1
**documents** [16] -
13:14, 17:23, 25:7,
25:11, 27:12, 27:13,
27:17, 27:20, 28:1,
30:12, 43:9, 66:1,
66:19, 66:20, 68:9,
68:11
**Dog** [1] - 119:25
**dog** [1] - 120:11
**dollars** [1] - 17:3
**domestic** [11] - 30:8,
30:9, 43:24, 45:8,
49:3, 78:10, 88:16,
88:21, 88:22, 89:11
**done** [9] - 6:23, 9:6,
33:18, 37:19, 81:3,
129:23, 134:8,
170:1, 179:1
**double** [1] - 4:12
**double-check** [1] -
4:12
**down** [15] - 54:8,
54:19, 55:23, 56:13,
56:21, 70:9, 77:6,
81:18, 101:21,
102:9, 127:12,
136:6, 147:20,
149:8, 154:23
**download** [4] - 35:24,
36:12, 74:24, 147:18
**Dr** [72] - 4:24, 5:2,
5:14, 5:22, 5:23,
5:25, 6:5, 7:13, 7:18,
7:20, 7:23, 9:6,
64:25, 65:19, 65:23,
66:3, 67:21, 70:1,
70:5, 70:6, 70:11,
102:18, 103:16,
103:23, 104:2,
104:6, 104:20,
105:3, 105:16,
105:18, 105:22,
107:2, 107:14,
107:18, 107:19,
107:21, 108:16,

109:3, 109:18,
109:23, 110:7,
110:9, 110:17,
111:9, 112:17,
112:18, 113:12,
113:18, 114:2,
114:8, 114:10,
114:25, 115:20,
116:5, 116:6,
120:21, 123:5,
124:12, 124:14,
124:16, 124:17,
125:2, 127:2,
159:16, 161:13,
164:1, 164:17,
166:2, 167:8,
172:19, 174:20,
174:25
**drama** [1] - 126:18
**Dramatic** [1] - 128:1
**draw** [2] - 11:9, 56:2
**drawing** [1] - 119:15
**draws** [2] - 119:20,
146:13
**Dream** [4] - 138:24,
139:1, 139:5
**DRELLISHAK** [1] - 3:5
**Drellishak** [12] -
10:25, 12:1, 12:3,
12:12, 12:16, 19:11,
20:18, 22:13, 26:21,
63:25, 73:2, 97:22
**dressed** [1] - 91:14
**drive** [20] - 128:22,
132:14, 133:3,
133:5, 138:5, 138:6,
139:14, 143:1,
144:17, 145:9,
145:20, 146:19,
150:3, 150:18,
151:6, 151:15,
155:10, 155:12,
163:6, 171:6
**driven** [2] - 136:1,
153:9
**driver** [2] - 171:1,
173:8
**drivers** [4] - 145:15,
166:13, 170:24,
176:5
**drives** [3] - 128:22,
137:2, 142:1
**driving** [11] - 134:2,
135:5, 137:14,
140:16, 150:25,
151:11, 153:21,
154:22, 173:10,
173:17, 173:20
**drop** [6] - 141:18,
149:18, 149:20,

149:24, 165:8, 169:8
**drove** [14] - 133:17,
135:16, 146:25,
151:3, 153:18,
153:24, 155:5,
164:13, 166:14,
166:20, 173:2,
175:11, 175:13
**drum** [1] - 109:9
**drums** [4] - 107:17,
113:7, 113:17,
113:22
**due** [2] - 46:3, 47:5
**dues** [1] - 95:24
**during** [12] - 42:23,
43:1, 68:2, 79:9,
113:11, 113:23,
115:24, 121:20,
122:25, 133:24,
161:23, 180:24
**duties** [1] - 178:12
**duty** [2] - 178:5,
178:16
**DVD** [10] - 41:23, 42:7,
42:11, 42:15, 42:22,
43:1, 43:7, 43:11,
45:7

---

## E

**earn** [2] - 43:19, 87:16
**ears** [1] - 152:4
**Earth** [1] - 126:6
**easier** [1] - 54:10
**EAST** [1] - 2:23
**easy** [2] - 75:23,
172:10
**economical** [1] - 4:12
**economies** [1] - 82:12
**edit** [1] - 72:3
**edition** [1] - 153:5
**EDM** [11] - 149:13,
149:16, 149:18,
149:21, 149:22,
149:23, 150:2,
152:3, 169:8
**EDM-influenced** [1] -
149:22
**education** [1] - 14:6
**effect** [4] - 86:19,
120:10, 178:9,
181:15
**effective** [1] - 176:4
**effectively** [2] - 7:5,
48:25
**efficiencies** [1] - 82:9
**effort** [3] - 58:24,
78:12, 143:1
**efforts** [5] - 141:20,
142:1, 142:2, 142:4,

175:22
**eight** [2] - 108:11,
117:6
**EINHORN** [1] - 3:13
**Einhorn** [15] - 4:24,
5:2, 5:14, 5:22, 5:25,
6:5, 7:4, 7:13, 7:18,
7:20, 7:23, 8:2, 8:3,
9:6, 176:20
**Einhorn's** [1] - 5:23
**either** [7] - 31:14,
35:24, 38:16, 68:22,
129:25, 161:15,
168:6
**electronic** [1] - 149:14
**element** [8] - 149:5,
150:24, 151:3,
158:2, 158:8, 169:6,
169:7, 169:8
**elements** [25] -
145:17, 147:8,
147:10, 147:14,
147:16, 147:19,
147:21, 148:1,
148:3, 148:10,
149:7, 150:22,
150:23, 151:13,
151:18, 151:24,
158:3, 165:3, 174:9,
174:17, 176:7,
176:8, 176:9,
176:10, 176:11
**ELIAS** [4] - 1:22,
183:8, 183:20,
183:21
**Elvis** [2] - 119:25,
120:7
**email** [2] - 5:6, 5:24
**embodied** [2] -
118:18, 119:22
**Emergent** [1] - 127:11
**emotional** [2] -
145:23, 146:2
**empirically** [4] -
112:8, 112:14,
117:14, 118:14
**employed** [4] - 12:18,
64:8, 79:10, 100:4
**employee** [7] - 62:1,
62:12, 63:12, 63:15,
93:8, 93:9, 93:11
**employee-related** [1] -
63:12
**employees** [10] - 13:7,
59:1, 59:3, 79:9,
80:1, 81:25, 84:20,
90:17, 92:24, 93:3
**enable** [1] - 93:11
**encompasses** [1] -
36:3

**end** [3] - 56:22, 84:7,
92:8
**ends** [1] - 146:9
**engaged** [1] - 131:11
**engagement** [3] -
139:17, 140:1, 155:9
**engaging** [1] - 51:1
**enormity** [1] - 138:12
**enormous** [9] - 138:7,
139:5, 139:10,
139:23, 142:4,
153:20, 154:7,
154:19, 156:7
**enormously** [2] -
164:16, 164:20
**entail** [1] - 90:3
**entails** [1] - 77:16
**enter** [1] - 142:14
**entered** [1] - 52:13
**Entertainment** [1] -
126:12
**entertainment** [1] -
128:16
**entire** [9] - 40:22,
59:5, 81:1, 86:1,
129:6, 153:14,
155:6, 157:19,
168:11
**entirely** [1] - 78:1
**entirety** [8] - 104:18,
104:25, 105:13,
105:15, 110:11,
119:16, 119:21,
120:24
**entities** [4] - 10:21,
50:17, 51:17, 83:5
**entitled** [6] - 7:5, 23:5,
23:24, 25:3, 31:1,
179:5
**entity** [3] - 50:23,
51:14, 99:18
**entrepreneur** [1] -
141:1
**entrepreneurship** [1]
- 129:17
**entry** [14] - 33:24,
38:1, 52:9, 52:11,
54:18, 54:20, 55:2,
55:8, 55:18, 55:23,
56:4, 56:10, 56:11,
56:15
**equal** [3] - 26:22, 27:8,
27:10
**equally** [1] - 35:8,
35:11, 73:23
**equals** [2] - 75:11,
75:15
**equate** [1] - 96:24
**equivalent** [1] -
126:18

era [1] - 136:16
**ERIC** [1] - 2:10
**especially** [3] - 126:2, 140:18, 141:10
**ESQ** [9] - 2:5, 2:6, 2:10, 2:15, 2:16, 2:16, 2:17, 2:17, 2:22
**essay** [1] - 167:6
**essays** [1] - 136:12
**essential** [9] - 129:12, 129:15, 134:19, 137:14, 137:16, 164:12, 164:13, 174:10, 174:12
**essentially** [7] - 44:18, 51:7, 94:2, 99:21, 115:8, 138:2, 157:15
**establish** [1] - 6:7
**established** [1] - 51:10
**estimate** [4] - 47:5, 101:3, 158:25, 159:4
**estimated** [1] - 87:22
**ET** [3] - 1:6, 1:9, 139:2
**et** [1] - 4:5
**evaluate** [1] - 170:16
**evaluation** [7] - 132:14, 132:16, 133:12, 163:2, 164:2, 165:12, 166:17, 170:4, 170:5
**evening** [2] - 177:21, 182:7
**evenly** [2] - 34:18, 74:7
**event** [1] - 39:15
**eventually** [3] - 47:6, 48:17, 169:22
**evidence** [22] - 15:11, 19:2, 20:13, 66:2, 66:10, 68:1, 70:14, 70:25, 106:17, 108:19, 122:20, 173:7, 178:11, 178:17, 178:23, 179:2, 179:9, 180:5, 180:11, 180:21, 181:8, 181:16
**ex** [1] - 120:12
**ex-boyfriend** [1] - 120:12
**exactitude** [3] - 132:18, 132:20, 132:24
**exactly** [4] - 39:4, 120:15, 148:21, 164:4
**examination** [2] - 6:7, 114:3

**EXAMINATION** [9] - 12:14, 72:25, 97:20, 101:15, 103:21, 114:6, 124:25, 159:14, 174:23
**examine** [1] - 107:5
**example** [15] - 33:5, 36:12, 40:3, 44:6, 44:7, 44:11, 52:9, 70:13, 74:8, 74:20, 105:6, 107:15, 112:4, 116:20, 117:15
**examples** [1] - 135:13
**excerpt** [1] - 176:18
**exchange** [1] - 88:22
**exclusive** [1] - 168:14
**exclusively** [2] - 29:19, 38:22
**excuse** [1] - 8:9
**executive** [1] - 125:25
**executives** [3] - 126:1, 135:10, 154:14
**exercise** [1] - 135:8
**Exhibit** [50] - 18:6, 19:6, 20:16, 20:23, 23:8, 23:14, 23:17, 24:2, 24:14, 27:23, 28:5, 28:8, 30:18, 31:17, 35:13, 38:18, 43:25, 44:25, 49:1, 49:18, 52:8, 52:24, 54:8, 55:14, 56:1, 57:15, 59:10, 60:21, 63:4, 73:5, 75:6, 80:15, 81:7, 87:8, 89:6, 97:25, 100:11, 105:18, 105:23, 106:1, 106:2, 106:3, 106:8, 106:19, 107:24, 108:6, 108:7, 108:24, 124:2
**exhibit** [12] - 20:19, 20:20, 35:14, 46:9, 63:4, 70:25, 81:7, 105:19, 106:21, 106:24, 108:23, 180:21
**EXHIBITS** [1] - 3:15
**exist** [2] - 29:22, 64:2
**existed** [3] - 33:24, 37:25, 155:22
**existing** [1] - 133:1
**expect** [3] - 6:6, 65:10, 79:6
**expend** [1] - 143:3
**expense** [16] - 46:10, 46:11, 46:14, 46:18, 46:21, 48:17, 52:11, 54:16, 64:2, 78:11,

87:21, 87:22, 87:23, 88:21, 89:23, 99:25
**expenses** [33] - 29:6, 29:12, 45:24, 45:25, 46:3, 46:7, 46:8, 48:22, 49:4, 52:23, 53:7, 54:3, 54:8, 57:1, 57:4, 60:18, 60:22, 61:3, 63:6, 71:9, 71:10, 88:17, 90:22, 91:19, 91:21, 91:25, 92:3, 92:12, 93:9, 175:22, 179:20, 180:6, 180:11
**expensive** [1] - 143:21
**experience** [6] - 153:14, 153:16, 157:20, 168:6, 171:12, 171:15
**expert** [17] - 6:10, 9:8, 65:19, 66:3, 66:14, 69:23, 70:13, 70:14, 71:16, 72:13, 72:18, 131:11, 131:25, 136:22, 160:5, 160:8, 176:19
**expert's** [1] - 71:8
**expertise** [8] - 133:6, 134:8, 137:1, 137:22, 168:18, 170:19, 171:9, 173:24
**experts** [9] - 6:21, 7:21, 9:3, 9:9, 64:23, 69:4, 69:7, 69:10, 70:7
**explain** [14] - 74:1, 82:6, 83:16, 87:13, 88:4, 94:2, 132:15, 134:1, 141:6, 147:9, 147:15, 154:2, 164:4, 167:25
**explained** [4] - 47:13, 50:16, 105:8, 163:7
**explaining** [1] - 164:1
**explanation** [2] - 57:20, 138:14
**explodes** [1] - 146:2
**exploitation** [3] - 27:15, 29:16, 43:20
**explosive** [2] - 146:7, 146:12
**exposure** [1] - 173:15
**expression** [1] - 104:13
**expressions** [1] - 113:19
**expressly** [2] - 113:19, 116:7

**extensively** [2] - 130:2, 130:13
**extent** [6] - 22:8, 53:11, 82:20, 110:18, 111:5, 115:8
**external** [3] - 76:13, 77:2, 83:8
**externally** [1] - 76:21
**extra** [1] - 8:13

---

**F**

**F3d** [1] - 8:9
**Facebook** [1] - 140:3
**faced** [1] - 9:9
**facilitating** [1] - 82:7
**facility** [1] - 81:20
**fact** [19] - 7:17, 9:7, 16:14, 17:19, 33:21, 72:12, 72:13, 75:4, 101:7, 111:21, 112:5, 113:17, 116:3, 118:8, 146:22, 151:16, 169:13, 170:6, 170:14
**factor** [31] - 34:15, 137:2, 147:7, 148:5, 148:6, 150:9, 150:20, 150:25, 151:5, 153:24, 158:4, 163:13, 164:10, 165:18, 166:19, 166:20, 169:2, 169:3, 169:4, 172:14, 173:9, 173:10, 173:22, 173:23, 174:5, 174:7, 174:8, 174:17, 174:18, 176:7
**factors** [86] - 111:13, 132:14, 133:3, 133:5, 134:22, 135:5, 135:15, 136:1, 136:4, 137:4, 137:6, 137:7, 137:8, 137:9, 137:12, 137:14, 137:15, 137:16, 137:19, 137:21, 145:12, 145:13, 145:14, 145:16, 145:20, 146:17, 147:6, 148:4, 150:6, 150:8, 150:21, 151:11, 151:14, 151:25, 152:24, 152:25, 153:1, 153:18, 153:23, 158:6,

162:5, 162:13, 162:16, 162:17, 162:18, 162:19, 162:20, 162:21, 162:22, 163:6, 163:8, 163:9, 164:5, 164:11, 165:4, 165:5, 165:12, 165:14, 165:15, 166:25, 167:5, 169:25, 170:4, 170:9, 170:11, 170:17, 172:10, 172:22, 173:2, 173:3, 175:11, 175:13, 176:12, 180:15, 180:18
**factory** [1] - 173:22
**facts** [5] - 46:1, 178:16, 178:17, 180:20, 180:22
**faculty** [1] - 127:4
**fair** [2] - 26:21, 78:14
**fall** [6] - 15:24, 15:25, 123:21, 123:23, 144:2, 144:25
**Fallon** [2] - 56:3, 56:6
**falls** [3] - 78:10, 90:15, 115:4
**fame** [4] - 129:21, 129:22
**famed** [1] - 126:18
**familiar** [4] - 19:11, 19:18, 20:14, 119:24
**familiarity** [1] - 22:14
**Family** [1] - 126:6
**fan** [2] - 139:17, 155:9
**Fancy** [3] - 162:3, 175:9, 175:12
**fans** [15] - 17:14, 140:5, 140:9, 140:10, 142:9, 142:13, 142:18, 142:24, 150:13, 155:7, 168:6, 168:9, 168:14, 169:12
**far** [12] - 21:13, 23:5, 23:24, 25:3, 26:23, 27:8, 58:12, 64:1, 83:1, 115:19, 119:2, 165:19
**fascinating** [1] - 148:14
**fashion** [1] - 73:19
**fashionable** [1] - 57:9
**fast** [1] - 71:7
**feature** [1] - 149:7
**February** [2] - 143:23, 144:5
**FEDERAL** [2] - 1:22,

183:22
**Federation** [1] - 139:21
**fee** [22] - 77:14, 77:16, 83:14, 85:5, 86:7, 86:17, 86:20, 87:6, 98:6, 98:10, 98:11, 98:12, 98:13, 98:14, 98:16, 99:12, 99:14, 99:17, 100:12, 100:16, 100:23, 101:24
**fees** [14] - 7:22, 77:12, 77:22, 83:13, 83:15, 98:2, 98:5, 98:8, 98:20, 100:9, 100:19, 101:6, 101:18, 102:1
**Ferrara** [25] - 64:25, 70:5, 102:18, 103:17, 103:23, 104:2, 104:6, 105:3, 105:16, 105:18, 105:22, 107:2, 107:21, 108:16, 109:3, 109:18, 109:23, 110:17, 111:9, 112:17, 114:2, 114:8, 123:5, 124:12, 124:14
**FERRARA** [1] - 3:8
**Festival** [3] - 144:25, 145:2, 145:3
**festival** [1] - 145:1
**few** [9] - 6:1, 8:13, 97:24, 133:7, 140:8, 140:12, 152:13, 159:20, 172:2
**fifth** [2] - 156:15, 167:24
**figure** [5] - 29:3, 46:1, 135:5, 135:15, 172:9
**figures** [3] - 60:1, 75:25, 130:22
**figuring** [2] - 128:20, 135:22
**file** [1] - 84:1
**filing** [1] - 182:13
**fill** [1] - 181:19
**filling** [1] - 78:1
**film** [3] - 126:18, 140:23
**final** [2] - 95:21, 148:5
**finally** [5] - 88:16, 104:24, 134:7, 149:13, 155:16
**Finance** [2] - 12:21, 14:7
**finance** [2] - 19:23, 95:12

**financial** [8] - 13:14, 13:23, 27:12, 28:1, 76:10, 76:16, 141:14, 154:3
**findings** [1] - 170:23
**Fine** [1] - 125:18
**fine** [4] - 10:12, 73:3, 103:3, 178:2
**finish** [2] - 63:25, 65:5
**finished** [3] - 63:23, 123:23, 164:1
**finishing** [1] - 63:21
**Fire** [1] - 126:7
**fired** [1] - 62:12
**firm** [1] - 61:11
**first** [55] - 5:14, 6:4, 8:2, 16:16, 16:17, 20:18, 20:23, 21:2, 21:3, 22:25, 23:11, 28:10, 30:16, 33:6, 34:23, 36:19, 44:2, 54:7, 54:11, 62:22, 65:16, 65:17, 66:8, 66:11, 77:8, 77:12, 92:1, 97:25, 102:17, 105:10, 107:9, 107:12, 109:21, 111:1, 117:16, 118:3, 121:9, 121:19, 122:6, 123:9, 124:3, 125:19, 128:10, 129:22, 132:4, 137:22, 138:16, 145:19, 153:3, 156:2, 156:20, 160:18, 162:12, 166:8, 167:21
**FIRST** [1] - 1:23
**fit** [3] - 101:11, 143:25, 152:7
**fits** [1] - 176:2
**five** [11] - 15:12, 62:23, 96:6, 101:5, 102:24, 109:7, 113:15, 113:25, 138:25, 139:7, 157:13
**five-minute** [1] - 102:24
**fixed** [5] - 51:13, 60:24, 61:21, 62:10, 63:10
**flashing** [1] - 54:13
**flat** [1] - 101:1
**flatly** [1] - 114:10
**FLOOR** [1] - 2:7
**Flow** [1] - 140:24
**focus** [2] - 60:7, 60:12, 77:8, 82:13,

128:5, 128:7, 128:9
**focusing** [3] - 94:4, 130:14, 172:1
**follow** [4] - 70:19, 86:24, 117:15, 178:19
**followers** [1] - 140:2
**following** [2] - 178:13, 178:15
**FOR** [4] - 3:2, 3:7, 183:8, 183:9
**FOREGOING** [1] - 183:11
**forensic** [4] - 133:15, 133:18, 135:2, 173:1
**forget** [2] - 53:23, 88:23
**forgot** [1] - 54:2
**FORM** [1] - 183:13
**form** [6] - 35:22, 76:2, 80:18, 103:4, 181:17, 181:19
**format** [1] - 73:20
**forms** [1] - 14:17
**FORSYTH** [1] - 2:7
**forth** [3] - 4:11, 80:23, 119:9
**FORTH** [1] - 183:12
**forward** [5] - 12:2, 12:3, 124:17, 143:5, 168:11
**Foundation** [1] - 130:21
**foundation** [7] - 19:7, 19:9, 20:7, 20:10, 22:17, 114:12, 130:21
**founded** [2] - 126:3, 126:14
**founding** [1] - 127:4
**four** [11] - 17:21, 18:13, 25:16, 30:5, 108:9, 108:12, 109:6, 109:12, 125:10, 127:25, 138:17
**four-year** [1] - 125:10
**fourth** [3] - 43:22, 156:14, 167:23
**framing** [1] - 19:2
**franchise** [1] - 51:14
**Franklin** [1] - 126:8
**Freddie** [2] - 130:11, 135:25
**free** [1] - 75:1
**frequently** [2] - 76:22, 88:1
**Friday** [1] - 139:3
**friend** [1] - 54:9
**friends** [1] - 140:3

**front** [11] - 9:1, 26:13, 27:24, 58:18, 60:7, 60:12, 84:5, 93:24, 106:1, 107:25, 145:10
**frustration** [2] - 66:17, 67:3
**fuelling** [1] - 173:15
**fulfill** [1] - 61:7
**fulfillment** [1] - 83:23
**full** [8] - 12:9, 62:1, 105:14, 106:8, 109:20, 124:21, 124:23, 165:2
**full-time** [2] - 62:1
**fully** [1] - 181:8
**fulsome** [1] - 5:16
**fun** [1] - 150:10
**function** [5] - 82:10, 82:11, 93:1, 95:15, 95:17
**functions** [5] - 80:4, 82:10, 90:19, 93:6, 95:1
**funding** [1] - 78:20
**FURTHER** [1] - 183:14
**furthermore** [1] - 115:6
**fusion** [5] - 148:22, 150:2, 151:22, 152:2, 175:23
**future** [3] - 125:14, 127:22, 170:7

---

# G

**GABRIELLA** [1] - 2:17
**Gaga** [1] - 140:11
**game** [1] - 91:11
**Gang** [1] - 141:2
**general** [10] - 14:20, 14:24, 15:6, 63:10, 88:2, 93:10, 128:16, 160:17, 160:18, 178:7
**generally** [10] - 20:25, 25:7, 25:8, 28:18, 50:25, 62:9, 77:10, 132:10, 132:23, 137:12
**generate** [13] - 15:8, 16:1, 16:9, 53:9, 57:6, 61:17, 85:7, 141:21, 142:20, 144:20, 144:24, 155:9, 174:2
**generated** [5] - 42:25, 43:16, 45:17, 139:23, 157:7
**generating** [2] -

141:17, 144:18
**genre** [3] - 149:10, 149:15, 152:12
**genres** [7] - 129:4, 133:9, 133:10, 134:10, 172:4, 175:18, 175:19
**gentlemen** [2] - 64:14, 177:8
**Germany** [1] - 127:22
**Girl** [1] - 138:18
**Girls** [1] - 139:2
**given** [8] - 4:9, 9:22, 11:4, 105:24, 136:21, 158:8, 158:9, 181:20
**Glendale** [1] - 8:12
**global** [1] - 12:24
**Global** [1] - 127:16
**goal** [1] - 90:12
**gold** [1] - 155:4
**gonna** [30] - 6:2, 8:1, 9:25, 11:11, 18:3, 22:10, 22:18, 27:11, 30:17, 44:15, 46:9, 50:6, 54:2, 54:9, 54:18, 56:1, 57:14, 57:19, 64:24, 68:17, 72:15, 97:24, 101:4, 101:22, 118:25, 138:9, 144:20, 172:17, 176:3, 176:4
**Gordy** [1] - 130:23
**gotta** [1] - 22:1
**Gottwald** [1] - 161:13
**government** [1] - 88:11
**governs** [1] - 51:14
**grab** [1] - 47:10
**grade** [2] - 166:23, 167:7
**Grammy** [2] - 145:5, 156:6
**grand** [1] - 113:24
**Gray** [1] - 4:5
**gray** [1] - 52:9
**GRAY** [1] - 1:6
**great** [6] - 126:10, 127:1, 143:13, 152:8, 154:3, 172:11
**greater** [9] - 112:1, 112:2, 118:25, 119:1, 121:10, 121:22, 122:12, 154:18, 174:15
**greatly** [1] - 127:13
**GREENBERG** [1] - 2:21
**gross** [16] - 4:16, 33:25, 34:11, 38:2,

45:7, 45:14, 57:24, 59:6, 59:14, 179:12, 179:17, 179:21, 179:22, 179:24, 180:5, 180:9
**Group** [6] - 6:19, 12:19, 12:22, 12:24, 13:2, 162:3
**group** [3] - 60:10, 60:11, 79:2
**grouped** [1] - 82:10
**groups** [1] - 85:11
**guess** [8] - 10:14, 11:10, 45:15, 66:17, 74:6, 77:13, 82:20, 100:22
**guessing** [1] - 79:24
**Guetta** [1] - 149:22
**guidelines** [1] - 178:11
**Guinness** [1] - 139:11
**guitar** [1] - 109:8
**gun** [1] - 9:16
**guns** [2] - 9:3, 69:14
**guys** [1] - 66:5

**H**

**hair** [5] - 55:15, 56:2, 56:5, 56:6, 91:14
**hairstyling** [2] - 55:23, 56:11
**hairstylist** [1] - 55:10
**half** [7] - 59:12, 59:13, 59:18, 59:19, 59:24, 143:19, 144:11
**Halftime** [1] - 145:6
**halftime** [2] - 122:13, 122:25
**Hall** [2] - 130:24
**hampered** [1] - 95:20
**hand** [7] - 12:6, 71:15, 104:18, 105:25, 109:15, 124:18, 148:24
**handed** [1] - 108:1
**handles** [3] - 60:11, 87:17, 94:6
**handling** [6] - 98:10, 98:12, 98:13, 98:23, 101:24, 102:1
**Hanford** [1] - 8:10
**HANLEY** [1] - 2:11
**happy** [1] - 9:6
**hard** [6] - 71:6, 71:7, 74:5, 107:6, 146:20, 154:13
**harmony** [2] - 119:9, 119:17
**HarperCollins** [1] -

130:12
**Harris** [1] - 149:22
**hashtag** [1] - 155:8
**hashtags** [1] - 142:14
**hat** [1] - 109:10
**Havana** [1] - 127:23
**head** [1] - 127:12
**headings** [2] - 70:17, 70:19
**hear** [25] - 18:21, 18:22, 18:24, 22:2, 53:16, 67:14, 97:10, 103:25, 122:7, 122:22, 142:14, 145:25, 146:1, 147:2, 147:3, 147:4, 148:15, 149:3, 149:15, 149:21, 152:15, 153:10, 164:25, 168:12, 176:10
**heard** [7] - 15:11, 142:13, 142:24, 148:20, 171:16, 181:24, 182:1
**hears** [2] - 121:20, 122:6
**hearsay** [1] - 6:11
**heart** [1] - 151:8
**hello** [2] - 125:2, 125:3
**help** [6] - 79:17, 129:19, 144:16, 144:20, 152:1, 154:15
**helped** [8] - 28:15, 142:25, 145:9, 145:20, 146:19, 150:3, 155:12, 171:6
**helps** [1] - 150:18
**Hennessy** [1] - 131:8
**Henry** [2] - 161:10, 161:12
**HEREBY** [1] - 183:10
**hereby** [1] - 103:16
**HEREINBEFORE** [1] - 183:11
**heretofore** [1] - 4:7
██████████ [1] - 177:25
**high** [3] - 9:3, 77:10, 109:10
**high-priced** [1] - 9:3
**higher** [9] - 83:2, 86:22, 86:23, 86:24, 86:25, 89:20, 89:23, 138:23, 167:7
**highest** [2] - 14:6, 140:22
**highlight** [3] - 54:9, 54:11, 56:18

**highlighted** [7] - 7:15, 107:17, 107:19, 110:6, 113:4, 114:1, 116:6
**highlighting** [1] - 56:16
**hip** [16] - 129:4, 130:5, 140:19, 141:2, 149:5, 149:6, 149:8, 150:1, 152:2, 152:3, 169:6, 169:7, 172:4, 173:19, 175:24
**Hip** [1] - 130:25
**hire** [1] - 82:24
**hired** [4] - 9:3, 9:16, 126:23, 176:19
**historical** [13] - 128:12, 133:2, 133:16, 135:1, 136:16, 165:7, 170:16, 170:21, 170:22, 171:5, 173:6, 173:9, 173:25
**History** [1] - 127:11
**history** [4] - 125:17, 126:1, 129:7, 129:21
**hit** [3] - 143:16, 143:17, 143:18
**Hits** [1] - 44:16
**hits** [5] - 132:21, 132:22, 141:9, 170:12
**hitting** [1] - 97:8
**hold** [3] - 53:15, 127:24, 127:25
**holds** [1] - 84:1
**home** [1] - 181:23
**homework** [1] - 166:24
**honest** [1] - 181:15
**Honor** [54] - 4:14, 4:20, 4:23, 5:14, 5:24, 6:4, 6:9, 6:14, 7:7, 7:8, 8:3, 8:6, 8:16, 8:24, 8:25, 9:20, 9:21, 10:23, 11:3, 11:14, 11:24, 20:6, 20:15, 28:4, 47:15, 65:1, 67:16, 67:19, 68:21, 69:2, 69:25, 70:22, 71:2, 71:22, 72:6, 72:19, 80:20, 101:13, 102:11, 102:13, 102:17, 103:9, 103:14, 105:17, 120:25, 159:13, 162:9, 164:18, 176:15, 176:24, 177:4, 177:6,

177:25, 182:21
**Honor's** [2] - 69:10, 72:4
**HONORABLE** [1] - 1:4
**hook** [25] - 111:15, 111:17, 111:20, 111:22, 111:23, 112:12, 121:16, 121:18, 122:6, 145:21, 145:22, 145:23, 146:6, 146:7, 146:11, 150:24, 150:25, 151:2, 151:3, 151:4, 158:7, 167:3
**hooks** [1] - 146:15
**hop** [16] - 129:4, 130:5, 140:19, 141:2, 149:5, 149:6, 149:8, 150:1, 152:2, 152:3, 169:6, 169:7, 172:5, 173:19, 175:24
**Hop** [1] - 130:25
**hopefully** [1] - 65:9
**Horse** [277] - 14:11, 14:17, 15:11, 15:20, 16:12, 16:24, 18:19, 21:4, 23:2, 25:17, 25:21, 26:7, 27:15, 28:13, 28:22, 29:7, 29:16, 30:1, 30:22, 31:16, 32:11, 32:15, 32:19, 32:23, 33:7, 34:2, 34:12, 34:13, 35:1, 35:2, 35:7, 35:8, 35:11, 36:10, 36:15, 37:6, 37:9, 38:3, 38:10, 38:13, 38:19, 38:23, 39:2, 39:19, 40:14, 40:21, 40:24, 41:6, 41:11, 41:12, 42:9, 42:18, 42:19, 42:23, 43:2, 43:5, 43:17, 43:20, 44:4, 45:18, 49:22, 50:2, 50:4, 50:5, 50:10, 53:2, 53:9, 53:10, 57:6, 57:23, 58:1, 58:9, 60:4, 60:19, 60:23, 61:5, 61:18, 61:24, 62:3, 62:6, 62:13, 63:2, 63:7, 63:14, 64:3, 73:22, 74:10, 74:19, 75:5, 75:7, 75:19, 77:11, 80:8, 80:10, 81:11, 81:15, 86:4, 86:15, 89:16, 89:21, 92:2, 92:6, 92:16,

93:15, 94:24, 95:3, 96:10, 96:13, 96:14, 100:1, 100:4, 100:13, 100:16, 104:7, 104:9, 104:14, 104:18, 104:23, 105:1, 105:11, 105:13, 106:11, 107:10, 107:12, 108:11, 108:12, 109:13, 109:20, 110:11, 110:12, 110:14, 111:1, 111:4, 111:6, 111:7, 111:16, 111:17, 111:18, 111:23, 111:25, 112:19, 112:24, 113:1, 113:11, 113:16, 114:20, 116:1, 122:5, 123:1, 132:2, 132:3, 136:9, 136:10, 136:14, 136:20, 136:24, 137:10, 137:20, 137:21, 137:24, 138:8, 138:10, 138:15, 141:7, 142:3, 142:4, 142:7, 142:9, 142:11, 142:16, 142:21, 143:6, 143:13, 143:21, 143:25, 144:3, 144:4, 144:5, 144:9, 144:24, 145:4, 145:5, 145:9, 145:12, 145:17, 145:20, 146:5, 146:7, 146:20, 147:5, 147:8, 147:11, 147:13, 147:15, 147:21, 147:25, 148:2, 148:6, 148:13, 148:15, 148:16, 148:19, 148:21, 149:11, 149:23, 150:3, 150:10, 150:23, 151:2, 151:3, 151:9, 151:16, 151:20, 152:1, 152:2, 152:7, 152:17, 153:4, 156:1, 156:21, 157:3, 157:5, 158:3, 158:4, 158:9, 160:10, 160:17, 160:25, 161:1, 161:6, 161:8, 161:11, 161:20, 161:24, 162:6,

162:13, 163:13, 163:18, 164:3, 164:14, 165:13, 165:22, 166:4, 166:12, 166:15, 166:18, 166:20, 167:18, 167:22, 168:1, 168:7, 168:15, 168:19, 168:23, 169:3, 169:4, 169:14, 169:15, 169:20, 170:24, 171:16, 173:2, 173:13, 173:15, 173:21, 174:10, 174:13, 174:16, 175:1, 175:15, 176:10, 180:16

**Horse's** [2] - 150:7, 163:1

**Hot** [3] - 138:19, 138:25, 139:8

**Hound** [1] - 119:25

**hound** [1] - 120:11

**hour** [6] - 64:22, 65:4, 65:17, 123:18, 131:17, 131:18

**hourly** [3] - 123:4, 123:15, 123:16

**hours** [4] - 61:11, 123:19, 124:5, 124:6

**house** [2] - 61:19, 93:9

**Houston** [1] - 126:7

**Hudson** [2] - 161:17, 161:18

**huge** [4] - 139:9, 141:21, 167:2, 174:2

**hugely** [1] - 6:12

**human** [4] - 138:4, 141:14, 171:19

**hundred** [1] - 84:2

**hundreds** [1] - 77:18

**Hustle** [1] - 140:23

**hypothetically** [3] - 151:4, 165:16, 165:17

**I**

**ible** [1] - 175:5

**ice** [1] - 54:13

**iconic** [1] - 147:2

**idea** [5] - 74:6, 74:13, 94:4, 94:7, 142:20

**ideally** [1] - 155:22

**identified** [17] - 23:1, 30:5, 104:19, 107:13, 109:24,

110:2, 137:21, 145:11, 146:17, 150:6, 150:8, 151:25, 153:17, 153:23, 165:3, 165:5, 174:7

**identify** [15] - 61:4, 64:1, 83:12, 105:11, 106:6, 111:14, 135:15, 136:3, 137:5, 137:9, 146:5, 147:6, 162:12, 163:6, 173:7

**identities** [1] - 140:11

**Iggy** [3] - 162:2, 175:9, 175:12

**iHeart** [1] - 144:25

**image** [4] - 57:8, 57:11, 67:25, 70:4

**images** [1] - 70:9

**imagine** [3] - 146:20, 150:18, 151:2

**impacted** [1] - 127:14

**impeach** [3] - 5:10, 8:23, 47:18

**impeached** [1] - 7:22

**impeaching** [1] - 9:9

**impeachment** [5] - 5:9, 7:1, 7:25, 9:12, 9:13

**implemented** [2] - 104:24, 105:8

**implementing** [1] - 111:13

**import** [2] - 121:22, 122:12

**importance** [4] - 133:9, 137:7, 173:4

**important** [20] - 6:4, 57:7, 57:10, 79:25, 91:8, 121:7, 121:25, 134:23, 145:19, 151:1, 151:11, 157:18, 158:5, 162:20, 170:10, 173:9, 173:10, 174:14, 175:20, 181:9

**impossible** [2] - 61:6, 74:6

**impressions** [2] - 25:19, 154:18

**imprint** [1] - 130:12

**improper** [1] - 72:7

**impugning** [1] - 72:10

**IN** [1] - 183:8

**inappropriate** [1] - 7:25

**inappropriately** [1] - 95:14

**inaugural** [1] - 130:25

**inception** [2] - 126:24, 127:6

**include** [7] - 36:13, 44:14, 55:18, 60:23, 118:4, 122:10, 167:8

**included** [13] - 44:25, 50:5, 57:5, 58:13, 60:1, 62:11, 93:19, 109:15, 109:16, 139:1, 151:12, 154:21, 174:8

**includes** [12] - 18:18, 42:11, 45:15, 59:1, 60:16, 83:21, 88:22, 110:10, 113:7, 147:21, 176:7, 176:9

**including** [6] - 42:9, 117:9, 131:7, 131:9, 178:10, 180:6

**income** [2] - 30:9, 30:10, 35:23, 41:17, 41:22, 42:17, 43:23, 43:24, 46:10

**incorporated** [2] - 82:4, 84:24

**incorrect** [1] - 116:4

**increase** [3] - 61:23, 94:11, 112:11

**incredibly** [1] - 146:16

**incremental** [2] - 62:1, 78:1

**incur** [1] - 78:12

**incurred** [4] - 50:1, 101:8, 179:20, 180:8

**indeed** [2] - 113:14, 113:23

**INDEX** [1] - 3:1

**indicated** [1] - 177:10

**indicates** [1] - 31:1

**indicator** [1] - 61:9

**individual** [3] - 10:25, 33:1, 116:12

**individually** [2] - 75:7, 157:21

**inducement** [1] - 79:17

**industry** [12] - 25:11, 58:18, 110:19, 125:14, 129:16, 129:19, 130:19, 131:4, 132:17, 141:24, 142:18, 157:15

**Industry** [1] - 139:21

**inflates** [1] - 40:6

**influence** [1] - 139:23

**influenced** [5] - 149:22, 150:1, 152:3, 169:7, 178:20

**influential** [3] - 126:1, 126:19, 130:22

**information** [16] - 17:25, 25:12, 26:12, 26:13, 26:16, 65:22, 67:20, 70:10, 76:8, 76:14, 76:16, 76:20, 95:8, 159:18, 159:19, 171:23

**informed** [1] - 110:1

**infringement** [6] - 179:4, 179:7, 179:12, 179:14, 179:16, 180:3

**infringing** [1] - 180:19

**ingest** [1] - 84:8

**ingredients** [1] - 165:8

**initial** [2] - 58:18, 160:7

**innovative** [2] - 142:8, 155:1

**insignificant** [8] - 151:10, 152:16, 158:4, 158:5, 158:12, 158:15, 163:19, 165:21

**insofar** [2] - 63:10, 119:15

**inspirational** [1] - 156:4

**instance** [4] - 31:8, 61:16, 63:9, 134:18

**instances** [1] - 70:24

**instead** [1] - 82:6

**Institute** [9] - 125:6, 125:8, 125:9, 125:24, 127:2, 127:4, 127:10, 127:17, 127:19

**institute** [1] - 125:13

**instruct** [1] - 178:5

**instructions** [9] - 103:3, 177:9, 177:14, 178:1, 178:7, 178:13, 178:15, 178:25, 181:22

**INSTRUCTIONS** [1] - 3:19

**instrumental** [12] - 107:16, 108:8, 109:10, 146:22, 147:8, 147:10, 147:13, 148:1, 148:2, 149:20, 163:17

**insufficient** [1] - 166:22

**insure** [3] - 27:20, 76:19, 79:5

**intended** [3] - 16:1, 52:4, 85:9

**intending** [1] - 74:5

**intense** [1] - 171:5

**intent** [5] - 8:15, 17:13, 101:6, 101:18, 101:23

**intention** [2] - 21:24, 68:8

**interactive** [2] - 142:10, 168:5

**interchangeably** [2] - 152:8, 152:14

**interchanged** [1] - 111:20

**interest** [2] - 16:9, 90:9

**interested** [7] - 128:11, 128:12, 128:15, 128:20, 135:22, 141:17, 166:13

**interesting** [3] - 66:4, 142:20, 156:19

**interlineate** [1] - 4:18

**internal** [2] - 18:1, 83:9

**internally** [1] - 76:21

**International** [1] - 139:21

**international** [1] - 136:13

**internationally** [1] - 130:16

**Internet** [2] - 80:5, 93:10

**interrelated** [2] - 164:7, 167:5

**interrelation** [1] - 165:14

**interrupt** [2] - 115:14, 164:19

**interrupting** [1] - 163:21

**intervention** [1] - 148:16

**interview** [1] - 161:5

**interviews** [2] - 42:11, 90:6

**intimate** [1] - 140:4

**intrigue** [2] - 150:17

**intro** [2] - 140:17, 146:24

**introduce** [1] - 142:9

**introduced** [1] - 126:5

**introduction** [2] - 117:16, 138:13

**intuitive** [3] - 166:8, 170:23, 171:23

**inventory** [1] - 98:17

**invest** [2] - 141:13, 143:9
**invested** [2] - 126:15, 154:3
**investigation** [1] - 173:25
**invoice** [1] - 98:19
**involve** [2] - 134:5, 141:21
**involved** [2] - 91:14, 171:20
**involves** [4] - 133:7, 134:3, 134:7, 171:11
**IS** [1] - 183:14
**isolate** [1] - 162:25
**isolated** [4] - 150:22, 151:14, 151:18, 165:16
**issue** [37] - 4:20, 4:25, 65:16, 67:2, 67:19, 71:4, 72:11, 104:13, 104:19, 104:20, 104:22, 104:25, 107:14, 107:18, 107:20, 109:14, 110:7, 110:9, 110:14, 110:18, 111:2, 111:15, 112:5, 112:10, 112:12, 113:20, 113:21, 113:23, 113:24, 114:20, 115:1, 115:2, 116:5, 116:7, 118:15, 120:23, 162:25
**issues** [7] - 5:4, 5:12, 6:25, 65:14, 130:1, 178:10, 181:25
**IT** [1] - 49:21
**Item** [1] - 4:3
**item** [4] - 54:7, 80:15, 92:1, 92:7
**iterations** [3] - 109:25, 117:21, 129:23
**itself** [14] - 70:4, 72:14, 75:19, 82:11, 86:2, 92:14, 100:21, 119:7, 134:12, 137:24, 151:6, 158:5, 158:11, 170:5
**iTunes** [2] - 145:2, 157:21

## J

**J's** [2] - 146:24, 147:24
**Jackson** [4] - 130:8, 135:24, 139:6, 139:8
**JACOB** [1] - 2:17

**Jam** [1] - 162:3
**Janis** [1] - 126:6
**JASON** [1] - 3:10
**Jason** [3] - 65:3, 124:16, 124:23
**Jay** [1] - 130:5
**Jay-Z** [1] - 130:5
**JEFFREY** [1] - 2:16
**job** [3] - 61:13, 94:5, 154:15
**jobs** [3] - 50:17, 80:2, 80:3
**John** [4] - 54:9, 55:13, 150:15, 150:16
**joint** [3] - 27:23, 105:18, 107:24
**Joplin** [1] - 126:6
**Journal** [1] - 130:5
**journalism** [4] - 125:17, 127:12, 127:13, 127:15
**journalist** [2] - 130:14, 135:19
**journalistic** [2] - 133:22, 173:8
**journalists** [3] - 133:25, 150:13, 171:4
**journals** [2] - 130:4, 130:7
**Joyful** [6] - 104:7, 108:9, 108:10, 109:11, 116:9, 180:15
**Jr** [1] - 12:12
**judge** [1] - 66:18
**Judge** [9] - 26:20, 53:16, 65:16, 67:10, 68:10, 69:19, 102:8, 103:6, 158:20
**JUDGE** [1] - 1:4
**Juicy** [10] - 140:16, 140:17, 140:25, 145:4, 146:24, 147:24, 149:6, 153:21, 169:6, 173:19
**JULY** [2] - 1:15, 4:1
**July** [5] - 43:11, 43:12, 43:17, 108:3, 156:15
**June** [3] - 43:11, 43:14, 43:15
**juror** [5] - 180:23, 180:25, 181:1, 181:14, 181:19
**jurors** [3] - 178:12, 181:4, 181:8
**Jury** [1] - 103:12
**jury** [34] - 7:21, 7:23, 9:1, 9:2, 9:5, 9:14,

10:13, 11:21, 57:19, 64:18, 69:21, 70:19, 72:22, 72:23, 87:13, 103:1, 103:3, 106:14, 106:24, 107:4, 108:14, 108:19, 125:4, 131:22, 158:24, 159:9, 176:22, 176:25, 178:3, 178:14, 178:15, 181:2, 182:2, 182:9
**JURY** [1] - 3:19

## K

**K-i-n-g** [1] - 124:24
**Kahn** [3] - 114:9, 114:16, 122:19
**KAHN** [22] - 2:5, 3:9, 9:21, 11:2, 11:8, 11:12, 11:16, 11:19, 102:11, 103:6, 114:7, 114:17, 115:15, 120:25, 121:4, 122:23, 123:8, 123:11, 123:14, 124:10, 159:5, 177:6
**Katy** [68] - 4:5, 14:14, 42:4, 42:8, 46:19, 46:20, 46:23, 49:22, 54:19, 55:4, 55:7, 55:10, 55:18, 56:14, 56:22, 57:7, 57:11, 62:7, 62:19, 64:7, 64:10, 90:13, 93:23, 111:24, 113:3, 121:15, 122:14, 132:6, 136:14, 138:7, 138:15, 138:21, 139:4, 139:17, 139:18, 139:25, 140:5, 140:6, 140:14, 140:15, 141:4, 142:7, 144:19, 144:23, 146:15, 146:23, 147:1, 147:2, 147:23, 150:13, 153:20, 153:21, 155:2, 155:6, 155:13, 155:16, 160:1, 160:3, 161:19, 163:12, 167:9, 168:5, 168:7, 168:13, 168:20, 173:14, 173:16, 174:3
**KATY** [1] - 1:9

**Katy's** [3] - 55:14, 55:21, 93:19
**Kayira** [2] - 159:12, 174:25
**KAYIRA** [13] - 2:9, 2:10, 3:11, 159:2, 159:13, 159:15, 162:9, 163:25, 166:1, 169:23, 172:18, 174:19, 176:15
**keep** [6] - 6:21, 9:2, 9:9, 15:8, 16:1, 107:22
**keeping** [2] - 110:13, 112:7
**Kennedy** [1] - 131:1
**Kenneth** [1] - 12:12
**kept** [4] - 76:17, 76:19, 168:10
**key** [6] - 76:23, 149:9
**keyboard** [1] - 152:6
**Keys** [1] - 130:5
**Khalifa** [1] - 141:3
**kick** [1] - 109:9
**Kimmel** [2] - 55:23, 56:14
**kind** [18] - 77:25, 79:6, 125:19, 139:14, 140:1, 140:9, 141:21, 142:19, 144:9, 144:24, 146:2, 149:3, 149:9, 151:4, 152:5, 156:5, 175:5
**kinds** [7] - 78:4, 90:6, 90:11, 134:3, 134:6, 152:14, 175:21
**king** [1] - 124:16
**KING** [1] - 3:10
**King** [19] - 65:3, 65:19, 65:23, 66:3, 70:1, 70:11, 124:17, 124:23, 124:24, 125:2, 127:2, 159:16, 164:1, 164:17, 166:2, 167:8, 172:19, 174:20, 174:25
**King's** [1] - 67:21
**Kissed** [1] - 138:18
**knowledge** [3] - 13:14, 100:3, 100:5
**known** [12] - 139:19, 140:18, 140:25, 141:3, 145:1, 146:15, 161:10, 162:2, 162:6, 164:16, 165:21, 167:14

**KNUPP** [1] - 2:15
**Kobalt** [2] - 4:15, 10:15

## L

**label** [27] - 13:5, 15:6, 51:18, 58:22, 58:24, 58:25, 60:7, 60:13, 61:9, 61:15, 62:7, 64:4, 79:18, 83:5, 90:16, 94:4, 95:4, 116:23, 138:16, 138:24, 141:1, 142:22, 143:8, 144:23, 151:17, 167:21, 168:22
**label's** [1] - 95:2
**labeled** [1] - 20:3
**labels** [6] - 82:8, 85:15, 126:3, 141:12, 141:16, 154:15
**lack** [1] - 120:22
**lacks** [2] - 19:7, 22:17
**ladies** [2] - 64:14, 177:8
**Lady** [1] - 140:11
**laid** [2] - 20:6, 20:9
**landscaping** [1] - 74:22
**large** [2] - 97:6, 140:3
**largely** [1] - 149:12
**larger** [1] - 106:23
**largest** [1] - 82:12
**Las** [1] - 145:1
**Last** [2] - 139:2, 139:3
**last** [22] - 12:9, 12:13, 24:14, 66:7, 108:8, 108:12, 109:12, 109:23, 110:20, 111:19, 113:5, 114:18, 121:22, 122:4, 122:7, 123:16, 123:21, 124:22, 124:24, 126:10, 130:13, 139:7
**lastly** [1] - 78:18
**lasts** [3] - 116:17, 117:17, 117:24
**LAURA** [4] - 1:22, 183:8, 183:20, 183:21
**LAUREN** [1] - 2:6
**lavish** [1] - 143:22
**LAW** [1] - 2:9
**law** [9] - 4:10, 6:9, 8:6, 61:11, 71:5, 71:20, 178:5, 178:18,

178:19
**Lawrence** [3] - 64:25, 102:18, 103:16
**LAWRENCE** [1] - 3:8
**lawyers** [1] - 95:9
**lay** [1] - 19:8
**layered** [1] - 113:3
**lead** [6] - 80:21, 144:20, 146:23, 153:2, 156:1, 176:4
**leaders** [1] - 125:14
**leadership** [1] - 125:13
**leading** [2] - 76:2, 80:18
**learn** [1] - 135:12
**learned** [2] - 6:1, 8:14
**least** [3] - 113:15, 149:11, 154:12
**leave** [2] - 177:11, 177:22
**leaves** [2] - 113:13, 157:13
**leaving** [1] - 177:22
**ledger** [1] - 76:11
**left** [5] - 93:20, 109:8, 112:25, 163:13, 164:10
**legal** [2] - 53:12, 53:21
**legendary** [1] - 125:24
**legislated** [1] - 88:11
**length** [1] - 118:11
**lengthy** [1] - 57:20
**Lepera** [1] - 10:15
**LEPERA** [22] - 2:15, 4:14, 10:2, 10:4, 10:9, 10:17, 10:20, 10:23, 11:13, 65:8, 68:20, 69:2, 69:8, 103:2, 103:9, 124:16, 176:24, 177:4, 182:12, 182:16, 182:19, 182:21
**LEPRA** [1] - 65:4
**less** [8] - 8:18, 35:7, 58:24, 59:24, 83:1, 85:17, 121:7, 165:19
**lessons** [1] - 129:14
**level** [7] - 14:6, 77:10, 135:25, 138:23, 141:10, 142:19
**liability** [5] - 178:4, 178:9, 180:24, 180:25, 181:17
**licensing** [14] - 30:9, 43:24, 44:2, 44:3, 44:14, 45:4, 45:8, 46:10, 49:4, 78:10, 88:16, 88:21, 88:22,

89:11
**life** [1] - 130:10
**lifecycle** [1] - 133:24
**limit** [2] - 48:19, 58:20
**limited** [3] - 58:20, 59:3, 180:7
**line** [20] - 25:1, 41:2, 47:13, 54:7, 58:18, 60:7, 60:12, 80:15, 88:25, 92:1, 92:7, 93:24, 98:18, 98:19, 113:2, 114:1, 142:5, 143:5, 143:25, 144:13
**lines** [10] - 6:1, 8:14, 10:4, 74:17, 78:17, 80:6, 84:9, 109:6, 109:7
**link** [1] - 94:7
**linked** [1] - 98:16
**list** [4] - 87:1, 126:8, 139:22, 140:1
**listed** [14] - 23:21, 31:21, 33:6, 34:22, 41:15, 43:23, 44:24, 46:11, 49:3, 49:25, 72:8, 80:16, 98:8, 154:11
**listen** [2] - 74:19, 74:23
**listened** [3] - 105:12, 171:17, 181:9
**listening** [2] - 66:25, 182:4
**lists** [2] - 87:4, 107:9
**literally** [3] - 105:12, 118:13, 118:22
**litigation** [24] - 8:11, 9:15, 9:17, 13:9, 20:3, 27:13, 28:12, 29:20, 29:22, 30:2, 32:18, 33:19, 33:22, 33:24, 37:7, 37:19, 37:23, 37:25, 41:20, 73:8, 73:15, 76:1, 134:14, 134:16
**litigations** [3] - 73:16, 73:18, 73:24
**Live** [1] - 41:23
**live** [3] - 6:2, 8:14, 144:16
**LLC** [1] - 2:9
**logistic** [1] - 62:17
**Logistics** [3] - 50:21, 50:23, 81:20
**London** [1] - 145:3
**look** [49] - 9:18, 11:3, 20:18, 21:2, 21:13, 27:25, 28:10, 33:5, 38:17, 38:25, 52:9,

55:4, 57:10, 59:14, 60:21, 75:14, 77:4, 79:18, 80:15, 85:3, 85:20, 85:24, 87:1, 87:4, 89:4, 89:5, 89:14, 91:9, 91:10, 91:15, 91:17, 92:12, 92:13, 93:12, 95:21, 98:1, 100:10, 101:4, 105:23, 107:10, 129:6, 133:22, 134:25, 135:13, 142:5, 170:5, 170:16, 175:10
**looked** [4] - 109:21, 136:19, 136:21, 160:16
**looking** [34] - 18:6, 30:4, 33:10, 40:13, 40:20, 41:2, 47:4, 54:7, 54:8, 57:9, 59:9, 62:14, 62:15, 62:20, 63:4, 66:6, 79:18, 79:25, 108:4, 109:4, 109:23, 124:2, 130:9, 133:20, 134:3, 134:4, 134:5, 136:15, 146:10, 148:2, 153:7, 170:7, 175:8
**looks** [2] - 91:24, 118:13
**LOS** [6] - 1:16, 1:23, 2:19, 2:24, 4:1, 183:4
**Los** [1] - 155:5
**Loss** [1] - 98:1
**loss** [13] - 28:11, 41:16, 43:23, 46:16, 49:2, 53:8, 73:10, 75:21, 77:4, 87:8, 99:5, 99:7, 99:15
**lottery** [2] - 132:21, 170:10
**LOUIS** [1] - 2:8
**love** [1] - 154:7
**low** [1] - 166:22
**lower** [2] - 86:22, 107:11
**LPs** [1] - 80:24
**Lukasz** [1] - 161:13
**Luke** [1] - 161:13
**Lunch** [1] - 65:13
**lunch** [1] - 65:17
**lyrics** [24] - 95:8, 95:9, 110:18, 110:19, 110:20, 110:25, 111:24, 119:17, 120:11, 120:14,

120:15, 121:16, 150:9, 150:15, 150:19, 165:5, 165:19, 167:9, 174:11, 174:14, 174:16

# M

**Mafia** [1] - 140:20
**Magazine** [1] - 126:9
**magic** [2] - 148:8, 150:11
**magnanimous** [2] - 139:13, 174:3
**main** [2] - 90:2, 128:9
**maintained** [1] - 76:25
**maintains** [1] - 17:16
**major** [8] - 135:25, 138:16, 138:17, 138:24, 142:7, 169:2, 169:11, 171:21
**make-up** [1] - 55:1
**makeup** [3] - 55:18, 55:19, 57:9
**Mama** [1] - 120:9
**manage** [1] - 82:25
**managed** [2] - 60:10, 94:2
**management** [2] - 82:2, 84:22
**manager** [1] - 131:5
**managing** [1] - 52:2
**mandatory** [1] - 127:21
**manicure** [1] - 56:14
**manner** [2] - 21:2, 30:1
**manners** [1] - 44:20
**manufacture** [10] - 50:4, 50:6, 51:2, 51:8, 51:23, 52:10, 52:21, 80:23, 80:24, 81:21
**manufactured** [2] - 50:4, 83:20
**manufacturer** [2] - 82:21, 82:22
**manufacturing** [21] - 49:17, 49:22, 50:1, 50:12, 50:18, 50:21, 51:5, 52:6, 52:13, 77:21, 77:22, 78:24, 80:14, 80:16, 80:17, 80:25, 81:8, 81:16, 81:18, 82:7, 82:16
**Manufacturing** [1] - 50:22
**Map** [1] - 131:10

**map** [2] - 71:6, 138:21
**Marcus** [1] - 4:5
**MARCUS** [1] - 1:6
**margin** [3] - 11:6, 109:8, 112:25
**mark** [5] - 11:11, 11:16, 11:17, 52:5, 52:18
**mark-up** [2] - 52:5, 52:18
**marked** [5] - 9:22, 11:4, 18:6, 21:1, 27:23
**market** [7] - 14:23, 94:7, 141:15, 143:12, 154:6, 154:8, 174:1
**marketing** [76] - 52:23, 53:3, 53:7, 54:7, 54:16, 57:1, 57:4, 60:8, 78:11, 84:3, 85:11, 89:24, 90:1, 90:2, 90:10, 90:11, 90:15, 90:21, 91:19, 92:13, 92:14, 92:24, 92:25, 93:1, 93:5, 94:8, 95:1, 97:3, 97:12, 128:14, 128:15, 133:11, 133:20, 134:1, 134:13, 136:19, 137:23, 141:6, 141:20, 142:1, 142:2, 142:4, 142:8, 142:25, 144:15, 144:18, 145:15, 153:25, 154:1, 154:5, 155:1, 155:17, 155:21, 155:23, 156:19, 158:6, 159:20, 163:13, 163:14, 163:15, 164:10, 164:13, 164:15, 164:21, 164:24, 165:1, 166:14, 167:1, 168:21, 170:20, 171:3, 171:5, 174:12, 175:22
**marketplace** [17] - 128:23, 136:2, 137:16, 137:18, 138:5, 138:9, 141:18, 141:19, 142:23, 143:16, 154:8, 155:11, 155:19, 156:22, 157:2, 157:5, 173:14
**mass** [1] - 141:11

**massive** [2] - 84:10, 87:18
**Master's** [1] - 128:4
**mastering** [1] - 148:16
**material** [3] - 139:16, 160:3, 180:1
**materials** [5] - 93:7, 136:11, 159:22, 160:10, 160:11
**math** [2] - 41:14, 117:21
**matter** [5] - 11:2, 13:15, 71:18, 151:23, 171:15
**matters** [2] - 151:5, 171:1
**Mayer** [2] - 150:15, 150:16
**mean** [20] - 15:19, 16:11, 17:12, 50:22, 62:7, 132:16, 133:16, 137:13, 137:25, 141:7, 141:16, 147:9, 147:15, 150:23, 151:17, 154:2, 160:11, 162:24, 163:5, 169:19
**meaning** [1] - 169:13
**MEANS** [1] - 183:13
**means** [14] - 13:13, 21:9, 87:22, 88:17, 125:15, 127:5, 127:12, 127:18, 143:8, 147:9, 149:13, 162:24, 170:6, 178:22
**meanwhile** [1] - 69:20
**measure** [3] - 40:9, 117:1, 117:4
**measures** [4] - 108:9, 108:10, 108:12, 108:13
**Media** [1] - 127:11
**media** [13] - 18:1, 18:11, 19:19, 19:24, 25:7, 36:5, 52:5, 90:10, 90:11, 97:13, 139:20, 139:23, 168:5
**medley** [1] - 145:6
**Meghan** [1] - 161:25
**melodic** [2] - 145:24, 149:9
**melody** [6] - 111:24, 119:17, 121:15, 121:16, 147:23
**member** [1] - 127:4
**members** [1] - 178:3
**memorable** [4] -

111:15, 111:17, 145:24, 146:3
**memory** [1] - 67:17
**mention** [4] - 5:3, 7:13, 153:3, 175:9
**mentioned** [21] - 60:22, 95:6, 111:19, 116:4, 127:6, 129:1, 129:11, 134:19, 137:16, 139:19, 141:6, 151:19, 151:22, 152:18, 154:12, 155:23, 156:10, 157:12, 168:3, 172:25, 176:6
**mentor** [1] - 127:1
**Mercury** [2] - 130:11, 135:25
**merely** [1] - 112:14
**merger** [2] - 148:22, 149:25
**merging** [1] - 175:23
**message** [1] - 97:9
**met** [3] - 126:22, 161:12, 161:13
**metaphor** [1] - 150:11
**method** [5] - 34:17, 81:6, 120:2, 170:14, 175:15
**methodology** [32] - 34:8, 35:4, 40:7, 53:3, 86:13, 89:19, 104:15, 105:2, 105:5, 105:9, 105:10, 110:4, 110:13, 110:16, 112:8, 132:7, 132:10, 132:13, 134:15, 134:17, 135:19, 136:8, 136:10, 163:5, 165:11, 169:25, 170:3, 170:18, 171:8, 171:25, 172:12, 172:22
**metric** [1] - 40:1
**MICHAEL** [2] - 2:5, 3:13
**Michael** [6] - 4:24, 130:8, 135:24, 139:6, 139:8, 176:20
**microphone** [1] - 12:11
**mid** [1] - 156:5
**mid-tempo** [1] - 156:5
**midway** [1] - 54:8
**might** [9] - 44:11, 48:12, 54:10, 55:18, 62:8, 115:24, 150:15, 167:6,

170:25
**MILLER** [3] - 1:22, 183:20, 183:21
**million** [24] - 17:3, 24:12, 25:4, 38:22, 41:10, 49:12, 62:23, 75:6, 75:8, 75:9, 75:11, 75:15, 93:17, 93:21, 140:2, 140:3, 143:12, 145:8, 154:6, 154:8, 154:21, 168:23, 174:1
**millions** [1] - 84:9
**mind** [1] - 72:16
**minimalist** [1] - 149:8
**Minor** [1] - 14:7
**minor** [3] - 149:9, 152:17, 170:25
**minus** [1] - 62:23
**minute** [3] - 66:7, 75:22, 102:24
**minutes** [10] - 42:22, 42:23, 43:1, 43:4, 63:19, 64:22, 158:21, 159:2, 159:5, 177:11
**misapprehended** [1] - 69:16
**misleading** [2] - 40:2, 71:19
**missing** [1] - 97:14
**MITCHELL** [1] - 2:15
**mixing** [1] - 148:16
**MO** [2] - 2:8, 2:11
**mode** [1] - 149:10
**moguls** [1] - 126:10
**moment** [5] - 46:9, 108:15, 115:22, 133:23, 149:19
**momentum** [4] - 15:8, 16:1
**Monday** [3] - 4:25, 5:22, 5:24
**money** [13] - 14:21, 126:15, 141:13, 141:25, 142:1, 143:9, 143:14, 143:15, 154:7, 154:9, 154:19, 154:24, 174:2
**month** [4] - 56:22, 143:18, 143:19, 144:11
**month-and-a-half** [2] - 143:19, 144:11
**months** [7] - 58:15, 58:16, 70:11, 142:6, 143:2, 144:3, 144:4
█████ [1] - 177:25

**moreover** [1] - 65:25
**morning** [8] - 5:5, 5:19, 5:23, 5:24, 7:17, 12:16, 12:17, 177:15
**mortem** [10] - 132:14, 132:16, 133:12, 134:22, 165:11, 166:17, 170:4, 170:6, 170:13
**most** [19] - 6:4, 13:13, 17:9, 25:17, 25:19, 25:22, 26:8, 26:11, 57:9, 59:4, 111:15, 111:17, 111:22, 124:1, 125:25, 130:4, 131:2, 145:19, 173:10
**mostly** [1] - 90:15
**motion** [3] - 121:2, 121:3, 176:25
**motivated** [1] - 79:21
**Motown** [1] - 130:23
**move** [10] - 19:6, 26:20, 27:11, 28:4, 57:21, 80:19, 89:24, 120:25, 143:5, 143:7
**moving** [1] - 168:10
**MOVIT** [38] - 2:16, 3:9, 5:14, 5:20, 7:7, 8:3, 8:8, 8:24, 9:20, 64:25, 65:3, 67:16, 71:22, 72:3, 72:12, 72:19, 102:17, 102:23, 103:14, 103:16, 103:22, 105:21, 106:14, 106:16, 106:21, 107:1, 108:18, 108:22, 108:25, 109:2, 114:2, 114:12, 121:2, 122:18, 122:23, 123:6, 123:8, 123:9, 123:11, 123:14, 124:10, 124:12, 125:1, 158:16, 159:2, 159:5, 159:13, 159:15, 162:7, 162:9, 163:21, 163:25, 164:18, 165:23, 166:1, 169:16, 169:23, 172:15, 172:18, 172:23, 174:19, 174:22, 174:24, 176:13, 176:15, 176:18, 177:6, 182:21
**MS** [75] - 2:13, 3:5, 4:14, 4:20, 4:23, 7:8, 10:2, 10:9, 10:10, 10:17, 10:20, 10:23, 11:13, 11:24, 12:15, 14:5, 16:6, 17:15, 19:2, 19:5, 19:10, 20:1, 20:6, 20:17, 22:12, 22:20, 26:1, 26:6, 26:15, 26:20, 27:1, 27:6, 28:4, 28:9, 28:21, 29:2, 40:10, 47:21, 48:1, 48:7, 48:10, 54:1, 63:21, 63:24, 64:12, 65:4, 65:8, 65:14, 65:16, 66:18, 67:10, 68:4, 68:10, 68:15, 68:20, 68:23, 69:2, 69:8, 69:19, 71:25, 72:6, 76:2, 80:18, 97:21, 101:13, 102:8, 103:2, 103:9,

39:21, 39:24, 47:15, 47:18, 53:11, 64:22, 64:25, 65:3, 67:16, 67:18, 69:25, 70:16, 70:22, 71:2, 71:22, 72:3, 72:12, 72:19, 73:1, 76:4, 80:19, 80:22, 97:16, 101:16, 102:6, 102:11, 102:13, 102:17, 102:23, 103:6, 103:14, 103:16, 103:22, 105:21, 106:14, 106:16, 106:21, 107:1, 108:18, 108:22, 108:25, 109:2, 114:2, 114:7, 114:12, 114:17, 115:15, 120:25, 121:2, 121:4, 122:18, 122:23, 123:6, 123:8, 123:9, 123:11, 123:14, 124:10, 124:12, 125:1, 158:16, 159:2, 159:5, 159:13, 159:15, 162:7, 162:9, 163:21, 163:25, 164:18, 165:23, 166:1, 169:16, 169:23, 172:15, 172:18, 172:23, 174:19, 174:22, 174:24, 176:13, 176:15, 176:18, 177:6, 182:21
**MP3** [1] - 35:22
**MR** [127] - 3:6, 3:9, 3:11, 3:11, 5:14, 5:20, 7:7, 8:3, 8:8, 8:24, 9:20, 9:21, 10:4, 11:2, 11:8, 11:12, 11:16, 11:19, 13:25, 16:4, 17:11, 18:20, 18:23, 18:25, 19:7, 19:20, 20:9, 20:15, 21:20, 21:22, 22:3, 22:5, 22:8, 22:17, 25:24, 26:3, 26:9, 26:18, 26:24, 28:6, 28:20, 28:24,

124:16, 176:24,
177:4, 177:25,
182:12, 182:16,
182:19
**MTV** [6] - 55:14, 55:21,
142:8, 142:25,
144:8, 156:10
**MTV's** [2] - 167:3,
168:4
**multiplied** [1] - 96:19
**music** [99] - 16:25,
17:2, 42:11, 44:6,
69:4, 69:7, 74:23,
78:5, 83:4, 88:13,
90:3, 97:10, 97:12,
110:19, 110:21,
110:25, 111:3,
111:15, 111:16,
116:13, 125:12,
125:14, 125:16,
125:17, 125:18,
125:20, 125:24,
126:1, 126:10,
126:16, 127:12,
127:13, 127:18,
127:22, 128:6,
128:10, 128:11,
128:12, 128:16,
128:17, 129:3,
129:4, 129:7, 129:8,
129:15, 129:17,
129:19, 130:7,
130:14, 130:15,
130:19, 130:22,
131:4, 131:5, 131:6,
131:9, 131:10,
132:17, 133:9,
133:15, 134:10,
134:12, 135:10,
135:21, 139:7,
139:22, 140:18,
141:24, 143:21,
145:1, 146:15,
147:17, 147:18,
149:4, 149:10,
149:14, 149:15,
149:22, 150:22,
152:11, 157:15,
159:19, 167:9,
170:11, 170:21,
171:20, 171:21,
172:2, 172:4,
174:10, 174:12,
174:15, 175:1
**Music** [22] - 6:19,
8:22, 10:16, 12:18,
12:22, 12:24, 13:2,
13:23, 50:17, 50:21,
51:13, 81:20, 85:15,
99:18, 125:6,

125:24, 126:11,
127:17, 130:6,
144:25, 145:3, 162:3
**music's** [1] - 150:12
**Musical** [2] - 128:1,
145:2
**musical** [26] - 109:7,
115:11, 120:16,
128:2, 145:16,
147:8, 147:10,
147:13, 148:1,
150:23, 150:24,
151:3, 151:13,
151:18, 151:24,
158:3, 165:3,
165:17, 174:9,
174:17, 175:19,
176:6, 176:8, 176:9,
176:10
**musicality** [1] - 152:12
**musician** [1] - 150:14
**musicians** [1] - 78:19
**Musicological** [1] -
105:7
**must** [13] - 110:23,
178:19, 178:20,
178:22, 179:4,
179:8, 179:13,
179:17, 180:13,
180:21, 181:4,
181:6, 181:24
**MY** [1] - 183:15
**MySpace** [1] - 70:6

**N**

**nails** [1] - 55:21
**name** [10] - 12:9,
12:13, 81:20, 84:16,
124:21, 124:22,
124:23, 124:24,
130:16
**named** [3] - 120:8,
125:22, 176:20
**namely** [1] - 104:19
**names** [1] - 140:10
**narrative** [1] - 123:25
**national** [1] - 136:13
**nature** [2] - 138:14,
158:10
**necessarily** [4] -
15:19, 51:22, 98:24,
180:7
**necessary** [3] - 53:9,
57:5, 151:21
**need** [16] - 6:15, 6:24,
10:22, 59:2, 76:24,
80:5, 133:14,
135:15, 133:18,
158:18, 165:2,

165:4, 165:6, 175:6,
175:9, 177:22
**needed** [1] - 6:1
**needs** [6] - 63:17,
76:25, 83:19, 148:8,
177:11
**negative** [1] - 62:23
**negotiate** [2] - 83:1,
95:10
**negotiated** [1] - 96:1
**net** [14] - 4:16, 10:18,
10:19, 30:6, 30:8,
30:16, 37:5, 41:5,
41:8, 41:10, 45:10,
45:11, 45:13, 45:15
**neutral** [3] - 34:8,
74:3, 74:7
**neutralized** [1] - 118:7
**never** [9] - 8:15, 8:16,
33:18, 35:10, 37:18,
137:1, 148:20,
161:12, 166:7
**new** [6] - 7:18, 58:23,
60:8, 94:4, 131:9
**New** [8] - 125:5,
126:16, 126:22,
128:1, 128:3, 128:4,
128:5, 129:1
**news** [1] - 182:4
**next** [25] - 18:3, 21:6,
22:25, 35:13, 53:6,
54:18, 55:7, 55:10,
55:13, 55:21, 56:18,
57:14, 73:6, 87:9,
91:18, 92:7, 93:12,
102:22, 107:10,
110:4, 110:5,
110:16, 112:23,
117:23, 176:17
**nexus** [2] - 179:11,
179:16
**Night** [2] - 139:3
**night** [2] - 90:6,
182:23
**nine** [3] - 75:11, 75:15,
139:25
**NO** [1] - 1:8
**nobody** [1] - 114:1
**Noise** [6] - 104:7,
108:9, 108:11,
109:11, 116:9,
180:15
**nominated** [1] - 156:6
**non** [2] - 42:11, 83:4
**non-music** [1] - 42:11
**non-Universal** [1] -
83:4
**nonetheless** [2] -
150:19, 163:4
**nonresponsive** [1] -

121:1
**noon** [2] - 63:17,
63:20
**normal** [4] - 9:15,
19:23, 47:8, 77:25
**normally** [1] - 73:10
**notate** [1] - 147:24
**notated** [2] - 147:17,
147:19
**note** [6] - 105:12,
117:9, 119:3, 119:5,
119:6
**noted** [1] - 177:2
**notehead** [10] -
116:11, 117:7,
118:5, 118:10,
119:2, 119:12,
119:19, 119:20,
120:5, 120:16
**noteheads** [9] -
107:14, 113:4,
116:12, 116:14,
117:1, 117:19,
118:1, 118:14, 120:3
**NOTES** [1] - 183:15
**notes** [43] - 104:17,
104:19, 104:20,
104:22, 104:23,
104:25, 105:11,
105:14, 106:11,
107:13, 107:15,
107:19, 109:25,
110:2, 110:6, 110:7,
110:8, 110:9,
110:12, 110:13,
110:14, 111:2,
112:9, 114:1, 115:6,
115:7, 115:9, 116:6,
116:8, 116:21,
116:24, 117:5,
117:13, 118:8,
118:17, 118:19,
118:25, 120:23,
120:24, 147:11,
152:13
**nothing** [12] - 114:3,
115:10, 116:16,
117:13, 118:10,
118:16, 119:2,
119:13, 124:10,
124:12, 158:16,
176:13
**NOURAFCHAN** [1] -
2:17
**novel** [3] - 141:4,
150:2, 169:9
**novelty** [2] - 150:3,
169:3
**nuance** [1] - 39:11
**nuances** [1] - 48:18

**Nuclear** [1] - 8:11
**number** [44] - 4:16,
20:19, 21:11, 21:25,
23:6, 23:16, 23:25,
24:23, 25:4, 31:11,
32:5, 32:25, 33:2,
35:23, 37:13, 37:15,
41:13, 42:22, 46:14,
86:13, 89:19, 92:19,
93:15, 96:17, 110:6,
112:13, 118:25,
119:1, 124:5,
136:12, 138:25,
139:8, 139:25,
140:4, 143:17,
143:18, 144:12,
154:10, 156:3,
167:11, 173:5
**numbers** [9] - 4:15,
10:16, 10:20, 21:1,
40:23, 58:12, 75:22,
75:24, 76:5
**nutshell** [1] - 177:9
**NYC** [1] - 55:5

**O**

**oath** [3] - 6:14,
103:19, 178:24
**Oats** [1] - 130:24
**object** [7] - 7:15,
11:13, 11:15, 19:20,
21:20, 22:8, 53:11
**objecting** [1] - 69:9
**Objection** [1] - 21:22
**objection** [36] - 13:25,
17:11, 18:20, 19:7,
20:15, 22:10, 22:19,
26:3, 26:9, 26:24,
28:6, 28:20, 39:21,
39:23, 39:24, 47:15,
53:20, 65:20, 68:24,
71:23, 72:1, 76:2,
80:18, 114:12,
114:14, 121:2,
122:18, 122:21,
123:6, 162:7,
163:21, 165:23,
169:16, 172:15,
172:17, 172:23
**objections** [3] - 9:23,
11:7, 103:8
**obviously** [5] - 10:4,
75:17, 79:12, 80:8,
134:14
**occurred** [1] - 47:5
**occurs** [1] - 112:18
**October** [3] - 58:14,
156:12, 156:25
**OF** [13] - 1:1, 1:2,

1:14, 2:2, 2:3, 2:13,
2:20, 183:2, 183:4,
183:6, 183:9,
183:13, 183:15
**offer** [3] - 70:18,
71:16, 108:19
**offering** [2] - 129:13,
134:20
**office** [3] - 80:6,
93:10, 166:21
**Officer** [1] - 126:11
**OFFICIAL** [3] - 1:22,
183:8, 183:22
**official** [13] - 142:6,
143:7, 143:24,
144:7, 144:10,
156:22, 157:1,
157:13, 167:19,
167:20, 168:7,
168:24, 169:22
**officially** [3] - 142:21,
143:6, 157:16
**often** [16] - 76:22,
111:20, 132:17,
133:25, 140:6,
141:12, 141:21,
141:25, 142:19,
146:3, 149:3, 149:9,
149:17, 154:13,
155:14
**older** [1] - 94:6
**oldest** [1] - 150:12
**OLYMPIC** [1] - 2:18
**ON** [3] - 2:3, 2:13, 2:20
**once** [13] - 5:25, 60:9,
80:13, 84:5, 94:6,
108:1, 109:11,
112:24, 122:3,
144:11, 148:23,
164:4, 181:23
**One** [1] - 138:16
**one** [111] - 4:20, 10:1,
15:12, 16:12, 18:4,
18:9, 26:16, 30:18,
30:19, 32:10, 40:6,
41:19, 50:11, 51:14,
55:11, 55:24, 67:1,
67:6, 67:25, 68:5,
68:8, 75:9, 78:8,
79:17, 91:3, 92:3,
96:19, 97:4, 97:9,
98:5, 98:8, 98:11,
100:6, 100:8,
106:20, 107:11,
108:9, 108:10,
108:11, 108:12,
108:22, 109:12,
111:3, 111:5,
111:13, 112:1,
112:11, 112:15,

112:16, 113:9,
113:14, 114:1,
115:2, 115:8, 117:1,
117:12, 121:20,
122:6, 125:25,
126:9, 127:21,
130:6, 131:1, 133:7,
133:14, 137:1,
137:3, 138:25,
139:8, 140:22,
143:17, 143:18,
143:20, 144:12,
146:16, 148:24,
149:15, 150:3,
150:11, 150:24,
153:4, 153:6, 153:8,
153:16, 155:11,
155:17, 156:3,
156:9, 156:18,
158:2, 158:4, 158:8,
158:9, 158:13,
165:15, 166:19,
167:4, 169:11,
171:20, 173:21,
175:4, 175:16,
175:23, 175:24,
176:22
**one-page** [3] - 30:18,
30:19, 108:22
**one-sided** [1] - 68:5
**ones** [2] - 15:15, 49:3
**online** [3] - 90:10,
97:13, 160:15
**op** [1] - 154:24
**opening** [2] - 6:23,
69:9
**operating** [1] - 180:7
**operation** [5] - 85:4,
100:24, 100:25,
101:3, 101:11
**operations** [1] - 62:17
**opinion** [16] - 5:16,
70:18, 111:17,
111:23, 114:11,
114:16, 114:18,
114:19, 121:15,
123:4, 132:2, 132:5,
169:24, 171:12,
179:2, 181:12
**opinions** [4] - 5:16,
131:19, 132:8,
178:21
**opponent** [1] - 71:11
**opportunity** [6] -
11:13, 11:15, 69:17,
107:5, 161:23,
162:11
**opposed** [4] - 82:10,
82:22, 153:9, 153:16
**opposite** [2] - 6:6, 6:7

**oranges** [2] - 40:8,
45:22
**order** [1] - 61:17
**orders** [1] - 83:22
**ordinary** [1] - 76:17
**organizations** [1] -
85:11
**original** [3] - 114:18,
120:8, 140:23
**Ostinato** [70] - 104:21,
107:12, 109:14,
110:1, 110:2,
110:10, 112:18,
113:4, 113:6,
113:10, 113:16,
115:2, 115:19,
116:1, 116:21,
116:23, 117:1,
117:5, 117:7, 117:8,
117:16, 117:19,
117:23, 118:4,
118:5, 118:6, 121:7,
121:8, 121:9,
121:10, 121:17,
121:19, 121:20,
121:23, 121:25,
122:5, 122:9,
122:10, 122:11,
122:12, 132:2,
132:6, 147:22,
149:12, 151:7,
151:8, 151:9,
151:12, 151:17,
151:19, 151:23,
151:25, 152:4,
152:14, 152:23,
157:25, 158:2,
158:8, 158:11,
158:14, 165:18,
165:21, 166:3,
166:12, 166:15,
166:19, 180:16
**ostinato** [6] - 109:8,
109:14, 152:5,
152:7, 152:10, 166:9
**OTHER** [1] - 2:13
**otherwise** [4] - 79:15,
130:1, 131:4, 165:8
**ourselves** [1] - 125:13
**outlets** [1] - 31:6
**outside** [4] - 60:10,
67:24, 85:14, 134:15
**overall** [4] - 111:1,
111:4, 136:23,
158:13
**overhead** [42] - 57:14,
57:22, 57:24, 58:8,
58:21, 58:25, 59:1,
59:5, 60:16, 60:18,
60:22, 61:6, 61:8,

62:8, 62:14, 62:16,
62:18, 62:20, 62:22,
62:24, 63:1, 63:6,
63:7, 64:2, 64:10,
78:15, 78:16, 79:13,
80:2, 80:6, 92:23,
92:25, 93:4, 93:6,
93:13, 93:15, 93:17,
93:22, 94:9, 94:10,
94:23, 180:8
**overrule** [3] - 53:20,
114:14, 122:21
**overruled** [5] - 16:5,
26:10, 28:25,
169:17, 172:24
**oversaw** [1] - 27:17
**oversees** [1] - 50:23
**owe** [1] - 48:17
**own** [11] - 13:7, 82:7,
84:20, 84:22, 115:4,
135:19, 141:9,
153:11, 171:12,
173:24, 181:11
**owns** [1] - 14:10

# P

**P&L** [2] - 159:24,
160:1
**p.m** [1] - 182:24
**package** [1] - 63:15
**packet** [2] - 57:5,
65:17
**page** [77] - 4:10,
20:19, 20:23, 21:1,
21:3, 22:23, 23:8,
23:9, 23:11, 23:14,
23:17, 24:2, 24:4,
24:14, 24:25, 30:18,
30:19, 31:17, 31:24,
35:13, 35:14, 38:17,
38:18, 43:25, 44:25,
47:11, 49:1, 49:18,
52:9, 52:24, 53:6,
54:7, 54:8, 54:19,
55:4, 55:13, 55:23,
56:1, 56:13, 56:19,
56:21, 57:15, 59:10,
60:21, 62:22, 63:5,
63:8, 73:6, 77:9,
83:11, 84:5, 87:1,
89:14, 91:18, 91:24,
91:25, 92:4, 92:7,
92:13, 97:25,
100:11, 107:9,
107:10, 108:5,
108:6, 108:22,
112:23, 118:23
**page-by-page** [1] -
118:23

**pages** [7] - 20:25,
56:2, 57:1, 70:3,
70:23, 85:25, 91:19
**paid** [47] - 6:16, 6:22,
9:3, 9:8, 9:10, 39:6,
39:16, 44:18, 45:2,
46:19, 46:23, 46:24,
47:2, 47:6, 47:7,
48:23, 49:5, 49:15,
51:23, 52:6, 52:15,
57:12, 62:2, 62:5,
63:13, 78:8, 79:13,
87:23, 87:24, 88:1,
88:2, 88:6, 88:10,
88:12, 88:13, 89:1,
89:5, 89:8, 89:11,
89:16, 90:19, 90:24,
91:21, 101:25,
131:14, 131:16,
131:17
**painted** [1] - 155:3
**paper** [4] - 105:7,
147:20, 166:18,
166:19
**pared** [2] - 70:9, 149:8
**parent** [2] - 13:2,
131:8
**PARK** [1] - 2:23
**part** [55] - 8:3, 46:3,
49:6, 52:3, 57:7,
57:10, 60:12, 62:17,
64:6, 77:23, 93:20,
97:6, 100:21,
107:17, 108:7,
111:15, 111:18,
113:8, 113:9,
113:23, 115:10,
116:5, 117:9,
123:21, 123:25,
132:4, 134:19,
140:20, 144:14,
145:6, 145:24,
146:1, 146:3, 146:7,
146:8, 146:12,
146:13, 146:14,
150:13, 151:12,
151:19, 151:21,
151:23, 152:17,
153:13, 156:10,
158:13, 163:1,
164:12, 164:13,
166:10, 168:4,
171:24
**particular** [19] -
112:13, 116:16,
118:11, 119:3,
119:5, 119:6, 119:9,
122:25, 123:20,
124:8, 124:9, 128:7,
128:17, 146:5,

148:18, 149:2,
155:8, 165:10,
170:19
**particularly** [4] -
139:20, 145:7,
157:6, 160:22
**parties** [7] - 7:12,
27:23, 69:3, 83:9,
85:14, 179:21,
180:19
**partnered** [1] - 142:7
**partners** [6] - 77:18,
77:19, 84:8, 141:13,
155:14, 167:3
**partnership** [1] -
154:24
**parts** [21] - 107:9,
107:16, 108:8,
109:9, 109:10,
109:16, 112:3,
112:4, 112:6,
112:25, 113:12,
113:13, 113:15,
113:16, 113:17,
113:25, 117:10,
118:8, 119:1
**party** [15] - 6:10, 8:8,
17:25, 51:1, 51:4,
51:18, 51:23, 71:11,
82:16, 82:21, 82:22,
83:1, 84:14, 84:15,
85:17
**party's** [1] - 6:10
**passage** [1] - 118:11
**passionate** [2] - 79:23
**past** [2] - 6:17, 133:19
**Patron** [2] - 125:23,
126:14
**pattern** [2] - 152:5,
152:7
**patterns** [1] - 152:10
**pause** [1] - 104:3
**pay** [14] - 36:1, 47:8,
51:4, 51:9, 51:11,
51:14, 51:21, 61:16,
61:19, 78:19, 83:7,
95:24, 99:12, 100:6
**paying** [2] - 84:11,
93:8
**payment** [8] - 47:7,
48:15, 48:19, 49:6,
61:23, 87:25,
131:19, 131:22
**pays** [1] - 102:2
**peer** [3] - 105:5,
105:7, 130:3
**peer-reviewed** [2] -
105:7, 130:3
**Pendergrass** [1] -
130:23

**pension** [5] - 60:24,
63:10, 78:20, 96:2,
99:22
**pensions** [1] - 63:13
**people** [46] - 21:17,
52:2, 61:19, 64:8,
75:17, 78:13, 78:16,
79:2, 79:20, 79:21,
82:25, 83:21, 84:3,
84:6, 90:8, 90:12,
91:3, 93:4, 95:12,
95:17, 97:4, 97:10,
132:22, 136:17,
141:8, 141:19,
142:13, 145:10,
147:2, 148:7, 148:9,
150:4, 153:14,
153:16, 154:17,
155:10, 155:21,
157:19, 158:10,
160:12, 160:14,
160:19, 160:24,
164:25, 172:2,
172:11
**people's** [1] - 44:19
**Pepsi** [6] - 142:8,
142:25, 144:8,
156:10, 167:2, 168:4
**per** [12] - 36:1, 36:14,
52:17, 62:1, 81:1,
81:4, 81:11, 87:16,
88:10, 98:19, 123:18
**percent** [33] - 43:6,
58:2, 58:8, 59:8,
60:3, 60:17, 93:23,
96:6, 96:7, 96:19,
100:6, 101:5,
110:14, 110:21,
110:22, 110:25,
111:1, 111:2, 111:3,
111:6, 111:7, 112:8,
112:11, 112:14,
112:19, 113:18,
115:18, 115:23,
116:12, 116:14
**percentage** [17] -
58:13, 60:3, 81:14,
81:16, 85:5, 85:8,
85:21, 86:14, 86:16,
89:20, 96:5, 96:18,
99:25, 101:1,
104:23, 110:7,
180:18
**perfect** [3] - 91:15,
146:9
**perform** [2] - 50:17,
104:8
**Performance** [2] -
128:5, 172:1
**performance** [7] -

43:2, 44:12, 54:20,
122:14, 122:16,
122:25, 123:1
**performances** [4] -
144:14, 144:16,
144:22, 146:19
**performed** [7] - 14:13,
42:23, 144:25,
145:2, 145:4, 145:5,
147:10
**performers** [1] - 135:9
**Performing** [1] - 131:1
**performing** [8] - 42:8,
88:8, 88:9, 95:13,
95:17, 104:16,
119:1, 131:2
**performs** [1] - 95:4
**perhaps** [3] - 112:21,
143:10, 168:21
**period** [13] - 47:6,
57:25, 58:17, 58:19,
58:21, 59:4, 59:5,
87:20, 87:23, 87:25,
94:8, 94:10, 161:24
**permission** [4] -
106:14, 106:16,
108:18, 108:25
**permitted** [3] - 65:25,
66:23, 68:2
**permitting** [1] - 44:6
**PERRY** [3] - 1:9, 2:13,
2:20
**Perry** [54] - 4:5, 14:14,
42:8, 46:19, 46:20,
46:23, 49:22, 54:20,
56:14, 56:22, 57:7,
57:11, 62:7, 62:19,
64:7, 64:10, 90:13,
90:22, 93:23,
111:24, 113:3,
122:14, 122:24,
136:14, 138:7,
138:15, 138:21,
139:4, 139:17,
139:18, 139:25,
140:14, 140:15,
141:5, 142:7,
144:19, 144:23,
146:15, 147:3,
150:14, 153:21,
155:2, 155:6,
155:16, 160:1,
160:3, 161:19,
163:12, 167:9,
168:5, 168:7,
168:13, 168:20,
173:16
**Perry's** [15] - 42:4,
54:25, 55:5, 55:7,
55:10, 55:19,

121:15, 132:6,
146:23, 147:1,
147:23, 153:20,
155:13, 173:14,
174:3
**person** [5] - 13:13,
61:12, 125:22,
162:23, 180:23
**personal** [5] - 171:12,
171:15, 171:23,
173:24, 178:21
**personality** [1] - 91:12
**perspective** [1] -
134:1
**persuades** [1] -
181:13
**pertains** [1] - 89:16
**PG** [2] - 3:17, 3:18
**pg** [2] - 106:19, 108:24
**PH** [1] - 1:24
**phase** [11] - 65:21,
123:10, 123:11,
123:15, 178:9,
180:24, 180:25,
181:17, 181:25,
182:13
**PhD** [2] - 128:4, 172:1
**phone** [2] - 78:17,
90:8
**phones** [1] - 142:14
**Phonographic** [1] -
139:21
**phrased** [2] - 22:18,
26:4, 26:19
**physical** [37] - 30:8,
30:16, 30:20, 31:5,
31:23, 32:9, 32:10,
32:14, 33:2, 34:1,
37:18, 41:9, 45:10,
51:2, 57:24, 58:3,
58:5, 59:7, 59:14,
59:20, 77:14, 80:17,
83:12, 83:14, 83:17,
83:18, 83:24, 87:2,
98:4, 99:2, 99:3,
99:12, 100:12,
100:15
**pick** [1] - 64:15
**picture** [1] - 155:7
**piece** [2] - 83:18,
147:18
**pieces** [1] - 147:22
**place** [4] - 76:19,
76:23, 83:23, 163:16
**PLACE** [1] - 183:11
**placed** [10] - 104:20,
107:14, 107:18,
107:20, 110:9,
113:20, 113:21,
113:22, 113:24,

180:21
**plainly** [1] - 177:22
**PLAINTIFF** [3] - 1:7,
2:3, 3:3
**plaintiff** [3] - 65:21,
71:14, 102:11
**plaintiff's** [4] - 6:21,
9:10, 72:10, 179:5
**plaintiffs** [19] - 4:23,
4:25, 6:17, 8:4, 9:2,
9:7, 10:10, 11:24,
27:13, 68:6, 70:5,
176:20, 177:5,
179:3, 179:5, 179:8,
179:11, 179:15,
180:4
**plan** [3] - 64:14, 96:2,
101:3
**planning** [3] - 7:19,
64:20, 66:1
**plans** [4] - 78:20,
99:22, 129:18,
177:21
**play** [7] - 17:17, 17:20,
27:10, 36:1, 40:4,
97:4, 176:18
**played** [15] - 15:16,
21:11, 25:22, 26:8,
26:12, 35:7, 35:10,
119:3, 144:6,
145:10, 147:11,
147:12, 154:16,
174:15, 176:22
**playing** [6] - 90:9,
112:19, 113:11,
113:15, 115:23,
115:25
**plays** [8] - 18:10,
19:19, 25:15, 25:17,
26:23, 27:9, 115:20,
121:20
**plenty** [1] - 173:18
**pluggers** [3] - 154:14,
154:17
**plus** [1] - 81:9
**point** [15] - 8:23, 8:24,
8:25, 9:21, 63:5,
63:18, 64:16, 68:23,
96:6, 101:12, 111:2,
113:1, 113:9, 116:2,
171:4
**pointing** [2] - 120:18,
121:12
**politely** [1] - 166:20
**politics** [1] - 129:22
**poll** [1] - 160:14
**polls** [3] - 160:14,
160:19, 160:23
**pop** [28] - 129:5,
130:5, 130:11,

140:8, 141:10, 141:25, 146:15, 148:24, 148:25, 149:1, 149:2, 149:4, 149:5, 149:22, 150:1, 150:11, 150:14, 152:2, 154:12, 159:19, 169:9, 170:11, 172:5, 175:4, 175:17, 175:23, 175:24

**popular** [31] - 25:22, 26:8, 26:11, 125:20, 126:1, 127:22, 128:6, 128:10, 128:11, 128:12, 129:3, 129:4, 129:12, 130:7, 130:15, 135:21, 138:22, 139:7, 139:22, 140:18, 149:10, 149:14, 155:14, 170:21, 171:20, 171:21, 172:2, 172:4, 175:1
**Popular** [1] - 130:6
**popularity** [3] - 26:22, 27:7, 34:13
**populated** [1] - 130:22
**portion** [7] - 28:18, 29:5, 57:24, 58:25, 113:7, 116:17, 180:13
**portions** [4] - 66:19, 70:13, 109:17
**position** [2] - 53:7, 57:4
**possible** [3] - 15:2, 52:22, 175:2
**post** [10] - 132:14, 132:16, 133:12, 134:22, 165:11, 166:17, 170:4, 170:6, 170:13
**post-mortem** [10] - 132:14, 132:16, 133:12, 134:22, 165:11, 166:17, 170:4, 170:6, 170:13
**power** [18] - 137:23, 137:25, 140:13, 145:15, 153:19, 158:6, 164:9, 164:21, 164:22, 164:24, 166:14, 167:1, 168:20, 171:2, 173:7, 173:14, 173:17, 174:11

**practice** [1] - 148:9
**precisely** [1] - 65:24
**predict** [2] - 132:18, 132:19
**predicting** [1] - 170:8
**prediction** [1] - 177:23
**predictions** [2] - 132:23, 132:24
**predictive** [1] - 170:7
**prejudice** [4] - 6:20, 6:24, 9:8, 68:17
**prejudiced** [1] - 9:1
**prejudices** [1] - 178:21
**prejudicial** [3] - 6:12, 66:8, 68:5
**premium** [1] - 48:25
**preparation** [2] - 123:17, 161:22
**prepare** [6] - 28:15, 73:10, 73:13, 94:21, 159:21, 171:23
**prepared** [13] - 28:12, 29:18, 37:22, 41:16, 41:19, 46:16, 67:20, 73:8, 73:18, 106:12, 123:21, 177:18, 181:18
**prepares** [1] - 73:16
**preparing** [3] - 49:7, 123:19, 131:17
**preponderance** [3] - 179:9, 180:5, 180:11
**presence** [1] - 173:19
**present** [16] - 11:17, 11:21, 43:17, 64:18, 66:9, 68:2, 72:23, 91:9, 103:1, 103:12, 109:17, 116:1, 120:19, 158:24, 159:9, 182:9
**presentation** [1] - 66:22
**presented** [4] - 19:13, 19:15, 105:6, 110:20
**presently** [1] - 107:4
**presents** [1] - 113:18
**preserve** [2] - 71:23, 71:25
**preside** [1] - 181:1
**President** [1] - 12:21
**PRESIDING** [1] - 1:4
**presiding** [4] - 180:23, 180:24, 181:1, 181:19
**Presley's** [2] - 119:25, 120:7
**press** [1] - 90:6
**pretty** [1] - 65:1
**previous** [4] - 7:14,

48:11, 48:20, 63:8
**previously** [7] - 4:24, 13:18, 16:7, 48:4, 104:6, 105:2, 163:7
**price** [1] - 52:16
**priced** [1] - 9:3
**primarily** [5] - 4:24, 5:8, 5:15, 136:15, 149:6
**primary** [24] - 16:8, 78:8, 137:8, 137:9, 137:12, 137:14, 137:19, 137:21, 145:12, 145:14, 152:24, 153:1, 153:18, 153:23, 153:24, 162:16, 163:8, 163:13, 164:10, 166:13, 170:24, 173:8, 173:22, 174:5
**primed** [3] - 138:8, 139:16, 141:4
**print** [3] - 90:11, 97:13, 154:21
**print's** [1] - 92:5
**Prism** [92] - 14:16, 15:4, 15:12, 17:5, 17:21, 18:14, 24:7, 24:19, 25:15, 25:16, 25:22, 26:8, 26:22, 27:8, 30:21, 30:22, 30:23, 30:24, 31:2, 31:13, 31:24, 32:7, 32:10, 32:15, 33:5, 33:7, 34:1, 34:22, 36:9, 36:20, 36:23, 37:15, 38:3, 38:7, 39:20, 41:5, 41:9, 41:11, 42:5, 50:4, 68:1, 73:22, 74:18, 74:20, 81:15, 86:4, 86:6, 86:15, 89:21, 90:1, 92:2, 92:14, 95:2, 96:10, 132:6, 136:15, 138:10, 142:11, 144:1, 144:2, 152:20, 152:21, 152:23, 153:2, 153:4, 153:5, 153:15, 153:19, 153:25, 154:4, 154:5, 154:20, 155:2, 155:4, 155:12, 155:21, 156:2, 156:19, 157:8, 157:10, 157:12, 157:25, 158:12, 158:14, 161:2, 161:4,

162:14, 167:8, 167:15, 171:17, 173:3
**Prismatic** [6] - 41:23, 42:4, 42:7, 42:9, 42:15, 43:7
**pro** [1] - 86:12
**problem** [3] - 7:2, 10:2, 113:12
**procedure** [3] - 11:2, 47:3, 49:8
**procedures** [1] - 77:2
**proceeding** [1] - 63:18
**proceedings** [1] - 182:24
**PROCEEDINGS** [2] - 1:14, 183:11
**proceeds** [2] - 42:14, 43:3
**process** [11] - 47:8, 49:7, 76:12, 77:14, 79:1, 79:8, 79:9, 82:25, 83:19, 87:18, 96:16
**processed** [1] - 84:10
**processing** [5] - 76:9, 77:24, 83:21, 98:6, 98:14
**produce** [1] - 142:8
**produced** [16] - 13:15, 17:19, 18:10, 20:2, 27:12, 28:1, 28:3, 30:12, 35:18, 62:3, 62:6, 66:20, 67:8, 68:9, 138:25, 148:8
**producer** [5] - 49:10, 78:4, 87:13, 88:19, 89:4
**Producer** [1] - 129:6
**producers** [1] - 135:9
**producers'** [1] - 148:15
**producing** [3] - 50:2, 148:8, 180:8
**product** [19] - 42:1, 44:7, 52:2, 52:3, 60:11, 61:10, 78:1, 79:6, 83:17, 83:18, 91:4, 93:24, 94:22, 95:7, 98:4, 98:13, 98:17, 99:3, 99:12
**production** [16] - 27:17, 28:1, 50:23, 61:5, 62:13, 64:3, 94:19, 95:6, 125:15, 145:17, 148:6, 151:13, 151:24, 165:3, 174:9, 176:11
**productions** [1] - 180:8

**products** [10] - 45:18, 60:8, 84:4, 84:6, 94:5, 99:2, 101:9, 128:23, 136:2, 138:6
**professional** [5] - 132:1, 132:5, 133:6, 136:25, 137:22
**professionally** [2] - 129:19, 131:4
**professionals** [1] - 66:6
**Professor** [1] - 127:3
**professor** [1] - 128:7
**profit** [18] - 28:11, 29:13, 41:16, 43:23, 45:19, 46:15, 49:2, 53:8, 73:10, 75:21, 77:4, 85:7, 87:8, 99:5, 99:7, 99:14, 179:19, 180:13
**Profit** [1] - 98:1
**profits** [9] - 5:16, 29:11, 29:15, 179:6, 179:10, 179:13, 179:18, 180:12, 180:18
**program** [18] - 125:9, 125:11, 126:14, 126:15, 126:16, 126:18, 126:19, 126:20, 126:23, 126:24, 127:5, 127:6, 127:8, 127:9, 127:13, 127:20, 129:13
**Program** [2] - 127:20, 127:23
**programmed** [1] - 147:10
**programmers** [1] - 173:11
**programs** [1] - 127:18
**project** [1] - 59:3
**promote** [4] - 95:2, 141:23, 143:10, 155:2
**promoting** [3] - 90:1, 91:1, 94:15
**promotion** [4] - 90:7, 154:11, 154:20, 156:10
**promotional** [14] - 15:20, 16:11, 16:12, 16:14, 16:25, 90:4, 134:4, 142:12, 156:9, 156:20, 167:14, 167:17, 167:23, 168:3
**promotionals** [1] - 167:12

**promptly** [1] - 8:13
**proof** [1] - 178:11
**properly** [1] - 65:6
**proportion** [2] - 43:1, 57:25
**proposition** [1] - 14:20
**prorate** [4] - 34:9, 34:21, 42:25, 60:4
**prorated** [26] - 32:19, 33:15, 34:7, 34:25, 35:3, 35:8, 35:11, 37:8, 42:18, 43:5, 45:22, 50:3, 53:1, 53:9, 80:25, 81:2, 86:7, 86:11, 87:3, 87:5, 89:16, 92:17, 96:11, 96:12, 96:19, 100:13
**prorates** [1] - 45:24
**prorating** [1] - 43:3
**proration** [9] - 34:17, 37:18, 46:6, 60:3, 76:15, 86:24, 89:18, 92:18, 92:20
**prorations** [1] - 86:21
**protocols** [1] - 76:19
**prove** [2] - 18:15, 179:8
**proved** [1] - 180:22
**provide** [12] - 36:5, 51:18, 70:2, 85:13, 110:5, 131:20, 132:1, 132:5, 147:25, 148:13, 152:1, 168:5
**provided** [7] - 13:18, 18:1, 65:17, 84:14, 150:17, 158:3, 178:8
**providers** [2] - 36:6, 84:2
**provides** [3] - 83:4, 84:13, 120:22
**providing** [1] - 169:6
**proving** [3] - 180:4, 180:10, 180:17
**public** [6] - 44:12, 91:9, 138:8, 139:15, 141:3, 144:14
**publications** [6] - 129:25, 130:16, 133:25, 136:13, 154:22, 173:12
**publish** [3] - 106:14, 108:18, 108:25
**published** [7] - 107:4, 108:14, 129:25, 130:2, 130:3, 130:4
**publisher** [2] - 88:13
**pull** [10] - 97:25,

133:18, 148:9, 151:4, 151:7, 151:8, 163:10, 165:15, 165:16, 172:9
**pulling** [1] - 76:14
**pulls** [1] - 146:12
**purchased** [6] - 39:19, 40:5, 160:24, 160:25, 161:1, 161:2
**purchases** [1] - 75:14
**purchasing** [1] - 90:11
**purport** [2] - 30:12, 30:19
**purports** [1] - 35:18
**purpose** [9] - 29:20, 33:22, 37:7, 37:23, 72:10, 86:16, 120:19, 176:2
**purposes** [6] - 32:18, 41:19, 64:20, 73:14, 75:25, 81:2
**pursuant** [2] - 82:18, 83:7
**push** [1] - 137:15
**put** [20] - 7:21, 7:23, 7:25, 8:17, 68:18, 70:12, 98:16, 103:2, 109:19, 110:7, 116:7, 119:18, 122:8, 122:10, 138:9, 138:21, 150:9, 155:4, 177:1
**puts** [1] - 16:7
**putting** [4] - 60:8, 70:14, 70:15, 170:11

## Q

**qualitative** [10] - 104:12, 104:24, 111:11, 111:13, 112:1, 112:10, 112:15, 121:5, 121:14, 122:2
**qualitatively** [1] - 121:25
**qualities** [1] - 168:19
**quality** [2] - 79:19, 152:1
**quantification** [1] - 110:5
**quantified** [1] - 104:22
**quantify** [1] - 110:6
**quantitative** [3] - 104:12, 111:10, 121:13
**quantity** [5] - 139:18, 139:19, 163:12, 164:16, 172:13
**quarter** [2] - 64:15,

110:20
**queried** [2] - 17:23, 18:2
**questions** [8] - 19:1, 64:12, 73:4, 73:7, 73:8, 102:6, 159:20, 161:9
**quickly** [8] - 67:22, 71:4, 80:14, 92:23, 96:23, 101:17, 107:23, 158:25
**quite** [8] - 7:9, 129:12, 140:21, 143:21, 143:22, 149:10, 151:1, 155:14
**quoted** [1] - 173:12
**quoting** [1] - 46:1

## R

**radio** [39] - 15:16, 15:18, 17:17, 17:20, 18:10, 18:18, 19:18, 21:3, 21:11, 22:16, 24:16, 25:8, 25:15, 25:17, 25:23, 26:8, 26:23, 27:9, 27:10, 35:7, 35:10, 90:6, 90:7, 90:10, 96:24, 97:3, 143:10, 144:6, 154:11, 154:12, 154:14, 154:16, 154:19, 154:25, 157:1, 168:24, 171:17, 173:11
**Radio** [1] - 144:25
**raise** [3] - 12:6, 67:14, 124:18
**raised** [3] - 67:2, 97:23, 181:25
**range** [7] - 133:2, 133:4, 135:5, 135:15, 136:1, 136:4, 163:6
**rank** [1] - 162:16
**ranked** [6] - 137:6, 137:7, 139:25, 152:24, 163:8, 173:3
**rap** [1] - 159:19
**rapped** [2] - 146:24, 147:24
**raps** [1] - 140:17
**rare** [1] - 141:9
**rate** [18] - 51:9, 51:13, 51:16, 51:19, 52:4, 52:16, 52:17, 81:1, 82:18, 83:7, 83:8, 98:21, 100:20, 100:21, 100:22, 123:4, 123:15,

123:16
**rated** [1] - 86:12
**rates** [2] - 51:19, 83:2
**rather** [1] - 63:19
**ratio** [1] - 115:18
**re** [1] - 8:10
**reach** [4] - 96:16, 181:3, 181:10, 181:16
**reached** [2] - 21:18, 22:16
**read** [12] - 5:3, 5:16, 7:13, 47:19, 47:22, 57:5, 162:11, 162:12, 177:9, 177:14, 178:25, 180:20
**reading** [4] - 47:17, 71:4, 72:1, 121:6
**ready** [10] - 10:8, 10:13, 69:21, 78:25, 95:7, 103:13, 138:11, 146:8, 146:9, 181:21
**real** [1] - 6:5
**realize** [1] - 148:10
**realized** [2] - 41:4, 45:19
**really** [14] - 6:3, 8:23, 16:11, 40:4, 70:16, 80:14, 92:23, 101:17, 138:21, 142:25, 145:8, 148:20, 156:18, 163:10
**reason** [14] - 6:15, 15:13, 47:2, 58:20, 69:16, 107:17, 117:11, 135:7, 137:17, 148:21, 148:24, 152:16, 153:13, 157:18
**reasonable** [2] - 170:23, 171:9
**reasons** [2] - 122:4, 153:8
**rebuttal** [4] - 108:3, 108:6, 114:13, 120:21
**receipts** [1] - 179:25
**receive** [7] - 7:10, 7:15, 7:17, 35:3, 35:23, 79:6, 140:22
**received** [13] - 5:5, 27:14, 30:13, 30:20, 32:14, 33:6, 41:4, 41:10, 43:3, 43:6, 43:12, 45:1, 57:6
**RECEIVED** [1] - 3:15
**recently** [1] - 130:4

**recess** [4] - 65:12, 102:25, 158:19, 159:7
**Recess** [2] - 65:13, 103:11
**recognition** [1] - 141:12
**recognize** [11] - 18:9, 23:11, 27:25, 28:11, 35:17, 41:18, 49:18, 77:20, 84:8, 103:7, 162:20
**recognized** [3] - 87:22, 130:16, 131:2
**recollection** [5] - 47:20, 47:23, 48:2, 48:6, 48:8
**Record** [1] - 129:5
**record** [35] - 4:14, 9:13, 10:23, 12:10, 13:5, 14:23, 16:14, 16:15, 16:18, 67:11, 71:23, 82:12, 94:9, 94:17, 102:14, 103:2, 124:21, 124:22, 126:3, 133:2, 133:16, 135:1, 136:16, 139:9, 141:12, 141:16, 143:8, 154:15, 157:17, 167:21, 170:16, 172:8, 173:6, 173:25, 182:12
**Recorded** [3] - 125:6, 125:24, 127:17
**recorded** [10] - 14:13, 18:11, 78:5, 84:11, 87:20, 125:12, 125:18, 125:20, 128:10, 129:7
**recording** [11] - 14:10, 42:8, 44:4, 44:19, 48:18, 78:5, 79:4, 93:19, 94:18, 119:22, 132:4
**Records** [100] - 6:5, 8:19, 10:11, 10:24, 11:25, 13:3, 13:5, 13:7, 13:10, 13:15, 13:20, 14:10, 14:16, 14:21, 15:1, 16:7, 17:8, 17:9, 17:16, 17:19, 17:24, 18:10, 19:17, 20:2, 25:6, 25:12, 27:12, 27:14, 28:2, 28:12, 28:19, 29:6, 29:15, 29:18, 29:25, 30:5, 30:20, 32:7, 32:14, 32:18,

32:25, 33:6, 33:14, 34:7, 34:17, 34:21, 35:2, 35:6, 36:5, 36:9, 36:15, 37:7, 37:13, 37:19, 38:6, 38:21, 39:1, 39:16, 41:4, 41:10, 41:16, 42:17, 43:5, 43:16, 43:19, 44:18, 45:1, 45:2, 45:17, 45:19, 46:4, 46:15, 51:7, 51:21, 53:1, 57:22, 57:23, 58:9, 60:16, 60:22, 61:16, 65:24, 66:1, 66:12, 66:19, 66:21, 67:8, 90:17, 90:24, 91:22, 93:16, 99:2, 126:4, 136:20, 139:11, 154:3, 155:2, 164:15, 167:2

**records** [7] - 15:2, 17:16, 17:19, 60:8, 76:24, 173:9

**Records'** [11] - 33:25, 35:18, 38:1, 41:23, 43:23, 53:7, 57:4, 57:24, 60:18, 64:3, 71:10

**recoup** [1] - 48:14

**recouped** [1] - 48:22

**recover** [1] - 179:5

**RECROSS** [2] - 3:3, 101:15

**RECROSS-EXAMINATION** [1] - 101:15

**red** [5] - 107:14, 107:17, 110:2, 113:4, 114:1

**REDIRECT** [3] - 3:3, 97:20, 174:23

**redirect** [3] - 114:4, 124:11, 158:17

**redo** [1] - 166:21

**redoes** [1] - 38:21

**reduce** [3] - 46:6, 112:11, 112:16

**reduced** [3] - 59:17, 59:19, 59:22

**REDUCED** [1] - 183:12

**reducing** [1] - 62:23

**reduction** [1] - 34:11

**redundant** [3] - 123:6, 123:7, 123:9

**refer** [2] - 116:11, 140:6

**reference** [2] - 21:1, 50:19

**referring** [5] - 16:13,

44:8, 48:14, 48:20, 51:15

**refers** [1] - 157:15

**reflect** [5] - 52:4, 67:11, 98:23, 100:23, 101:8

**reflected** [1] - 99:5

**reflects** [5] - 28:19, 29:5, 46:18, 49:21, 52:12

**refresh** [1] - 48:2

**refreshed** [2] - 48:6, 48:8

**refreshes** [2] - 47:20, 47:22

**refurbish** [1] - 98:18

**refurbishment** [1] - 98:16

**regard** [1] - 91:7

**regarding** [7] - 71:8, 71:16, 136:23, 157:24, 178:5, 178:8, 179:2

**regardless** [5] - 50:7, 50:8, 62:2, 62:6, 100:5

**reimburse** [1] - 51:7

**Reiss** [1] - 8:11

**relate** [1] - 18:13

**related** [29] - 7:22, 28:12, 29:6, 30:4, 34:1, 37:25, 38:3, 41:22, 42:5, 43:10, 45:10, 46:2, 50:17, 53:3, 53:10, 54:24, 57:6, 61:4, 61:17, 63:6, 63:7, 63:12, 77:21, 78:5, 98:4, 99:25, 100:8, 100:16, 130:18

**relates** [3] - 38:22, 50:21, 86:6, 89:15, 99:1

**relating** [1] - 46:10

**relationship** [10] - 122:3, 127:15, 140:5, 150:16, 151:10, 160:17, 162:21, 163:10, 164:6, 164:14

**relative** [3] - 34:13, 52:21, 162:19

**relatively** [4] - 150:2, 151:9, 152:5, 152:14, 152:16, 158:4, 158:5, 158:15

**release** [28] - 15:7, 16:8, 16:13, 16:20, 16:22, 33:20, 58:19, 58:23, 61:14, 64:6,

64:9, 90:12, 94:16, 95:2, 95:4, 138:8, 138:10, 138:15, 138:23, 139:16, 142:6, 143:7, 143:24, 143:25, 144:7, 144:10, 146:2

**released** [30] - 14:16, 16:15, 16:17, 16:22, 58:14, 94:13, 94:19, 133:24, 136:17, 141:1, 142:17, 142:21, 143:6, 143:22, 144:2, 155:18, 156:2, 156:3, 156:12, 156:14, 156:15, 156:17, 156:20, 156:25, 157:16, 161:24, 167:20, 167:22, 168:13, 168:14

**releases** [3] - 139:21, 141:4, 157:13

**releasing** [1] - 97:7

**relevant** [1] - 72:11

**reliable** [1] - 25:11

**relied** [1] - 58:12

**relies** [1] - 25:7

**remain** [1] - 178:9

**remember** [5] - 67:13, 123:24, 136:6, 146:14, 168:12

**remind** [1] - 103:18

**remove** [7] - 162:25, 163:17, 164:2, 164:8, 164:9, 166:9, 166:10

**removed** [3] - 63:1, 163:19, 164:8

**removing** [1] - 166:3

**render** [1] - 132:7

**rent** [8] - 59:2, 60:24, 61:16, 61:17, 61:19, 62:5, 93:9

**rented** [1] - 155:3

**reopen** [2] - 67:9, 69:17

**repeat** [3] - 37:10, 53:24, 115:8

**repeated** [1] - 146:1

**repeats** [1] - 110:10

**repertoire** [1] - 79:2

**rephrase** [6] - 22:11, 76:3, 162:10, 163:24, 165:25, 167:13

**replace** [1] - 163:20

**replicator** [1] - 52:1

**report** [44] - 36:2,

36:6, 65:23, 66:3, 66:13, 66:14, 66:15, 66:20, 67:21, 67:25, 70:1, 70:3, 70:4, 70:10, 70:14, 70:17, 70:21, 70:23, 105:19, 105:23, 106:8, 106:22, 108:3, 110:24, 121:6, 121:12, 121:14, 121:24, 122:2, 123:20, 123:21, 123:25, 124:3, 124:8, 124:9, 160:4, 160:7, 162:11, 162:15, 166:22, 168:17, 171:23

**REPORTED** [1] - 183:10

**reported** [1] - 84:7

**reporter** [3] - 63:17, 63:19, 177:12

**REPORTER** [14] - 1:22, 18:21, 21:23, 22:2, 22:4, 22:6, 39:22, 53:15, 53:18, 53:22, 158:20, 183:2, 183:8, 183:22

**reporter's** [1] - 136:5

**REPORTER'S** [1] - 1:14

**reporting** [2] - 77:19, 85:12

**reports** [7] - 19:24, 69:23, 131:17, 136:22, 160:5, 160:8, 182:4

**represent** [3] - 18:18, 24:16, 113:19

**representation** [1] - 119:21

**representations** [1] - 122:18

**representative** [3] - 11:25, 13:10, 60:6

**represented** [3] - 58:22, 84:4, 115:25

**represents** [8] - 21:16, 22:15, 24:4, 63:6, 85:6, 93:23, 119:16, 119:18

**reputation** [1] - 138:2

**reputations** [1] - 138:4

**request** [1] - 61:7

**requested** [1] - 27:13

**require** [1] - 58:24

**required** [2] - 78:18, 94:20

**requires** [1] - 17:12

**research** [19] - 8:2, 128:10, 128:14, 128:19, 133:15, 133:18, 134:4, 134:7, 134:9, 135:1, 135:2, 136:18, 166:23, 172:7, 173:1, 173:16, 173:25, 175:14

**Research** [1] - 128:3

**Reservations** [1] - 8:11

**reserve** [1] - 103:7

**resonate** [2] - 17:9, 17:14

**resources** [7] - 141:13, 141:14, 143:3, 143:9, 154:4

**respect** [9] - 52:8, 69:10, 114:20, 115:6, 121:12, 121:14, 152:20, 182:13

**respectfully** [2] - 67:11, 68:1

**respective** [2] - 61:13, 180:11

**respond** [1] - 7:14

**response** [2] - 15:19, 112:20

**responsibilities** [1] - 76:24

**responsible** [2] - 51:1, 126:3

**rest** [4] - 111:16, 113:5, 113:22, 177:4

**restate** [1] - 53:19

**rests** [1] - 102:11

**result** [8] - 27:14, 30:20, 61:23, 62:12, 101:8, 112:7, 117:14, 148:15

**results** [2] - 176:4

**ret** [1] - 41:5

**retail** [1] - 31:6

**retailer** [1] - 99:11

**retained** [1] - 6:18

**retroactively** [1] - 133:4

**return** [8] - 64:15, 83:11, 98:5, 98:15, 99:12, 99:17, 181:21, 182:5

**returned** [2] - 99:3, 178:3

**returns** [6] - 45:16, 77:24, 98:4, 98:14, 99:1, 99:11

**retweet** [1] - 155:8

Revenue [1] - 31:19
revenue [73] - 27:14, 28:22, 30:6, 30:9, 30:13, 30:19, 30:24, 31:20, 32:3, 32:13, 32:19, 32:22, 33:1, 33:15, 33:25, 34:7, 34:9, 35:1, 36:3, 37:5, 37:8, 37:14, 38:2, 38:21, 40:21, 41:3, 41:5, 41:8, 42:25, 43:6, 43:12, 43:16, 45:4, 45:7, 45:10, 45:12, 45:13, 45:14, 45:15, 45:25, 46:15, 53:9, 57:6, 61:17, 64:5, 64:7, 73:21, 75:11, 75:15, 76:9, 77:6, 77:20, 81:5, 81:14, 84:8, 84:11, 86:15, 87:16, 88:20, 89:21, 96:18, 96:19, 96:21, 96:23, 99:3, 99:7, 179:12, 179:17, 179:21, 179:24, 180:5, 180:9
revenues [19] - 14:25, 29:13, 29:25, 30:5, 43:19, 44:11, 44:25, 45:22, 46:5, 74:4, 75:5, 87:22, 88:23, 93:22, 95:13, 96:11, 101:4, 179:22
review [5] - 5:8, 76:25, 136:11, 160:9, 160:23
reviewed [12] - 18:15, 25:15, 27:20, 77:2, 105:5, 105:7, 130:3, 136:12, 159:22, 160:4, 160:5, 160:8
rhythm [1] - 119:17
rights [1] - 88:14
rise [4] - 11:20, 64:17, 159:8, 182:8
ROAD [1] - 2:11
Roar [9] - 18:19, 23:12, 23:21, 156:1, 156:6, 156:19, 156:25, 157:5, 167:21
robust [2] - 76:12, 76:23
rock [2] - 129:5, 130:11
role [4] - 19:23, 126:13, 127:2, 174:15
roles [1] - 13:23
Rolling [1] - 126:9

romance [2] - 150:10, 150:11
ROOM [1] - 1:23
room [3] - 178:14, 178:15, 182:2
roster [1] - 64:10
roughly [4] - 45:9, 59:12, 59:16, 59:21
royalties [26] - 46:23, 47:3, 47:4, 48:16, 48:23, 48:25, 49:2, 49:10, 49:11, 49:14, 78:4, 78:6, 78:8, 84:12, 87:10, 88:4, 88:6, 88:10, 88:19, 89:1, 89:5, 89:8, 89:16, 89:22, 95:24
royalty [14] - 46:18, 46:21, 49:4, 76:8, 78:3, 78:5, 78:11, 87:14, 87:17, 87:24, 88:16, 88:20, 89:11, 89:23
rule [1] - 71:7
Rule [2] - 176:25, 182:13
rules [2] - 76:24, 129:10
ruling [2] - 9:19, 72:4
run [3] - 67:22, 78:18, 85:4

**S**

salaries [4] - 60:24, 61:21, 62:2, 90:19
salary [6] - 61:21, 61:23, 63:10, 63:15, 79:13, 79:15
sale [24] - 15:8, 16:2, 31:20, 31:23, 33:1, 33:7, 35:21, 37:14, 38:22, 39:5, 39:7, 39:10, 40:21, 40:25, 41:23, 42:25, 43:6, 45:18, 77:15, 83:19, 87:19, 167:14, 179:25, 180:14
sales [66] - 30:8, 30:9, 30:16, 30:20, 32:14, 34:1, 34:12, 35:19, 35:21, 35:24, 36:7, 36:12, 36:18, 36:19, 37:5, 37:18, 38:1, 38:2, 38:18, 40:2, 40:3, 40:20, 40:24, 41:3, 41:4, 41:5, 41:9, 41:11, 42:15, 43:10, 45:11, 47:5, 57:24, 58:1, 58:3,

58:4, 58:12, 59:7, 59:9, 59:11, 59:14, 60:1, 61:8, 75:5, 75:6, 81:15, 83:21, 85:5, 85:11, 85:22, 86:15, 87:6, 93:24, 94:2, 95:19, 96:5, 96:6, 96:7, 96:10, 96:24, 96:25, 97:5, 101:1, 138:6, 155:10
SAME [1] - 183:12
sampling [1] - 95:15
SAP [1] - 76:10
Sarah [2] - 161:17, 161:18
satellite [1] - 44:12
scale [4] - 62:9, 82:12, 115:8, 115:9
scared [1] - 134:21
scenes [1] - 154:13
schedule [1] - 123:22
schedules [1] - 177:21
scheduling [2] - 5:4, 7:12
scholar [1] - 135:20
scholars [2] - 128:20, 171:9
scholarship [1] - 128:19
School [4] - 125:6, 125:10, 126:17, 128:3
school [1] - 125:22
schools [1] - 171:21
science [1] - 170:15
score [2] - 120:16, 120:19
screen [2] - 54:10, 106:24
screenshots [1] - 66:21
seated [6] - 11:22, 12:8, 64:19, 124:20, 159:10, 182:10
second [18] - 6:15, 18:17, 38:17, 52:9, 53:15, 56:10, 118:4, 127:16, 128:14, 137:23, 138:18, 138:23, 152:19, 153:24, 156:11, 156:24, 167:21, 178:9
secondary [25] - 137:8, 145:16, 145:19, 146:17, 147:6, 147:7, 148:4, 148:5, 150:25, 151:14, 151:25,

152:25, 162:17, 162:18, 163:8, 164:11, 165:4, 170:24, 172:22, 173:22, 174:7, 174:8, 174:18, 176:7, 176:11
seconds [12] - 43:4, 113:10, 113:23, 115:21, 115:24, 117:17, 117:18, 117:20, 118:3, 118:4, 118:12
section [5] - 78:3, 107:11, 117:23, 122:2, 151:14
seduction [1] - 150:10
see [61] - 4:9, 20:20, 20:24, 20:25, 21:7, 23:1, 23:4, 23:6, 23:21, 23:25, 24:4, 24:9, 24:22, 25:2, 25:3, 32:3, 33:11, 46:12, 47:13, 47:19, 47:22, 49:22, 54:11, 54:13, 54:20, 55:4, 55:7, 55:10, 55:15, 55:19, 55:21, 55:24, 56:3, 56:14, 56:17, 56:19, 56:23, 59:13, 62:22, 63:22, 68:7, 79:19, 79:20, 101:11, 107:11, 107:13, 109:8, 109:16, 112:24, 113:4, 113:9, 113:14, 113:24, 119:24, 120:18, 136:17, 151:13, 154:23, 158:22, 159:6, 162:23
seek [1] - 38:21
seeking [1] - 5:1
selected [1] - 167:11
sell [2] - 15:2, 98:17
selling [2] - 78:13, 125:12
sells [1] - 14:21
semester [2] - 127:22, 129:13
sends [1] - 84:2
Senior [1] - 12:21
sense [8] - 135:4, 152:12, 166:7, 170:8, 170:14, 171:3, 171:8, 171:19
sent [4] - 5:23, 178:13, 178:15, 182:1
separate [9] - 10:22, 55:18, 81:19, 81:23,

81:25, 82:2, 84:18, 88:14, 95:25
separately [4] - 38:15, 82:4, 84:24, 179:14
series [3] - 116:21, 116:23, 173:2
serve [5] - 85:3, 114:13, 130:18, 130:25, 181:1
served [2] - 130:20, 180:23
service [9] - 36:6, 51:12, 55:5, 74:25, 84:2, 84:5, 84:9, 93:10, 131:7
serviced [2] - 157:1, 168:24
services [11] - 36:2, 36:4, 44:12, 51:15, 51:18, 57:13, 83:4, 84:13, 85:10, 85:14, 85:18
Services [2] - 84:17, 85:13
SET [1] - 183:11
set [3] - 4:11, 51:19, 80:23
setting [1] - 102:19
seven [1] - 162:5
several [6] - 31:2, 74:22, 75:3, 82:8, 141:1, 148:22
severance [2] - 60:24, 62:11
shall [2] - 73:5, 181:3
shared [1] - 159:18
sheet [5] - 34:23, 53:8, 54:11, 147:17, 147:18
ship [2] - 77:25, 83:23
shipping [2] - 83:20, 98:13
short [1] - 158:18
Show [1] - 145:6
show [17] - 9:16, 17:20, 25:8, 30:13, 30:19, 36:19, 38:18, 67:6, 68:8, 68:18, 69:17, 69:23, 90:5, 105:17, 122:25, 154:12
showed [2] - 68:14, 179:11
showing [9] - 9:13, 17:17, 18:10, 27:14, 33:25, 38:2, 45:25, 48:16, 68:15
shown [6] - 29:3, 31:17, 52:10, 52:11, 98:3, 179:15

**shows** [17] - 19:18, 25:4, 31:11, 33:11, 41:22, 42:14, 46:11, 46:14, 49:25, 52:10, 75:4, 75:6, 87:14, 90:6, 91:2, 92:8, 99:17

**side** [3] - 20:22, 155:4, 177:10

**sided** [1] - 68:5

**sides** [4] - 9:5, 9:14, 18:7, 69:11

**sift** [1] - 134:9

**sign** [2] - 140:7, 181:20

**signed** [1] - 126:4

**significant** [6] - 115:10, 125:25, 139:17, 145:7, 148:19, 165:19

**SILBERBERG** [1] - 2:15

**similar** [5] - 15:23, 36:1, 78:11, 88:19, 152:11

**similarities** [2] - 115:3, 115:4

**similarity** [1] - 116:8

**simple** [3] - 152:5, 162:23, 163:4

**simplify** [1] - 66:22

**simply** [12] - 32:25, 37:13, 38:1, 75:18, 97:9, 111:21, 117:12, 124:4, 151:16, 170:15, 181:14, 181:16

**simultaneous** [2] - 118:19, 119:8

**simultaneously** [2] - 113:15, 119:1

**sing** [1] - 146:14

**singer** [3] - 120:8, 130:11, 130:24

**singing** [2] - 120:12, 144:19

**single** [73] - 15:21, 15:24, 15:25, 16:12, 16:14, 16:16, 16:17, 23:12, 24:5, 24:16, 24:19, 24:23, 25:16, 25:22, 38:16, 39:20, 73:11, 74:18, 132:15, 132:18, 132:20, 133:1, 133:3, 133:17, 134:2, 134:24, 135:6, 135:16, 137:2, 137:15, 137:18, 138:19,

139:4, 139:15, 142:16, 142:21, 143:1, 143:3, 143:7, 143:8, 143:10, 143:13, 143:24, 144:11, 144:12, 144:16, 144:17, 146:20, 146:25, 153:9, 153:12, 153:13, 153:17, 156:1, 156:7, 156:11, 156:14, 156:15, 156:20, 156:25, 157:2, 157:22, 161:24, 163:7, 165:13, 167:23, 168:7, 168:11, 168:24, 169:22, 171:7, 174:1

**singles** [42] - 15:12, 15:15, 15:17, 16:8, 16:12, 17:21, 18:13, 25:17, 26:22, 27:8, 35:7, 90:3, 133:5, 135:14, 138:18, 138:25, 139:1, 139:8, 141:15, 141:17, 142:1, 142:13, 154:2, 154:20, 155:24, 156:8, 156:9, 156:16, 156:20, 156:23, 157:4, 157:8, 157:11, 157:17, 157:20, 167:17, 167:18, 167:19, 167:20, 168:4

**site** [1] - 160:21

**six** [2] - 115:6, 115:7

**size** [4] - 61:15, 64:4, 64:5, 176:2

**skills** [1] - 135:3

**skip** [1] - 56:1

**sleek** [2] - 148:14, 149:9

**slide** [1] - 65:23

**slides** [6] - 66:22, 67:20, 67:24, 68:2, 70:2, 70:8

**slow** [1] - 136:6

**Sly** [1] - 126:6

**small** [2] - 92:5, 107:3

**smaller** [4] - 60:4, 64:11, 83:3, 118:6

**smart** [1] - 142:14

**snare** [1] - 109:9

**snippets** [2] - 70:3, 142:15

**SNL** [2] - 56:3, 56:6

**SNYDER** [1] - 1:4

**social** [8] - 90:10, 97:13, 128:13, 139:20, 139:23, 140:1, 168:5, 170:22

**Social** [1] - 128:3

**Society** [1] - 105:7

**software** [1] - 103:17

**SOKOL** [1] - 2:5

**sold** [15] - 14:16, 31:3, 31:5, 31:14, 32:5, 32:7, 36:9, 36:15, 36:24, 38:6, 38:15, 38:16, 39:1, 39:3, 87:16

**sole** [1] - 67:5

**solely** [2] - 72:10, 178:22

**solo** [1] - 140:25

**someone** [3] - 74:19, 88:9, 164:15

**sometimes** [7] - 16:8, 97:13, 101:21, 104:3, 111:21, 134:21

**somewhere** [2] - 112:3, 177:12

**song** [72] - 14:13, 14:17, 16:24, 17:5, 21:11, 21:17, 22:16, 26:8, 34:22, 35:3, 40:4, 44:14, 45:2, 78:6, 88:9, 111:22, 115:21, 116:17, 119:13, 119:22, 119:25, 121:16, 122:7, 140:15, 140:23, 142:11, 143:8, 144:6, 144:19, 145:9, 145:21, 145:25, 146:1, 146:3, 146:8, 146:11, 146:12, 146:13, 147:16, 148:20, 149:1, 150:19, 151:5, 151:6, 152:9, 154:14, 158:13, 160:10, 160:12, 160:15, 160:25, 161:6, 161:8, 161:11, 162:2, 162:6, 163:19, 164:25, 165:2, 165:21, 166:5, 166:9, 166:10, 169:7, 169:9, 174:4, 175:9, 175:10, 175:11, 175:14

**Song** [1] - 156:6

**songs** [24] - 17:9, 17:17, 34:18, 35:10, 42:8, 58:13, 59:8, 59:9, 59:11, 140:14, 141:8, 142:15, 154:12, 154:13, 154:16, 157:10, 157:12, 157:15, 161:23, 167:8, 167:11, 168:9, 175:1, 175:23

**songwriter** [2] - 78:7, 88:7

**songwriters** [1] - 88:14

**songwriting** [1] - 125:16

**Sony** [1] - 126:11

**sophisticated** [1] - 152:12

**sorry** [25] - 18:21, 22:3, 22:4, 23:16, 27:5, 39:22, 43:14, 45:20, 50:19, 53:17, 53:18, 53:22, 56:8, 58:5, 81:10, 89:4, 92:5, 93:2, 98:7, 100:15, 116:18, 136:7, 156:2, 178:14, 180:1

**sort** [7] - 70:19, 80:2, 80:10, 90:1, 92:25, 93:7, 141:23

**sought** [1] - 66:18

**sound** [15] - 14:10, 44:4, 44:19, 48:13, 88:22, 132:4, 148:11, 148:12, 148:14, 148:18, 150:4, 150:5, 152:9, 169:4, 171:8

**sounded** [1] - 148:21

**sounding** [3] - 112:25, 118:19, 119:8

**sounds** [9] - 57:2, 119:5, 119:6, 119:13, 122:6, 122:9, 147:4, 148:13, 152:15

**source** [3] - 17:25, 76:13, 88:20

**space** [1] - 117:4

**spaces** [1] - 109:7

**speaking** [4] - 28:18, 50:25, 62:9, 132:23

**speaks** [1] - 72:13

**special** [2] - 103:3, 168:13

**specific** [14] - 6:25, 30:1, 36:12, 64:9,

82:9, 108:5, 147:2, 160:17, 160:19, 165:7, 172:4, 175:10, 175:11, 175:12

**specifically** [23] - 16:13, 34:15, 47:7, 50:9, 50:20, 51:16, 52:1, 61:12, 61:24, 67:12, 73:5, 77:21, 85:25, 87:9, 92:6, 99:8, 100:1, 100:16, 109:11, 126:17, 161:3, 161:7, 174:6

**specificity** [2] - 176:1, 176:3

**specifics** [1] - 124:5

**speculated** [1] - 150:15

**speculation** [9] - 16:4, 17:13, 22:9, 22:17, 25:24, 26:5, 26:18, 26:25, 150:12

**speedier** [1] - 65:9

**spell** [2] - 12:9, 124:22

**spelled** [1] - 12:13

**spend** [4] - 62:1, 123:19, 141:25, 154:5

**spending** [3] - 60:13, 95:14, 174:1

**spends** [2] - 141:21, 167:2

**spent** [6] - 92:14, 123:24, 143:12, 143:15, 154:19, 168:23

**spin** [1] - 22:16

**spins** [14] - 18:18, 21:3, 21:6, 23:1, 23:2, 23:3, 23:21, 24:4, 24:9, 24:16, 24:22, 24:23, 96:25, 154:18

**spokesperson** [1] - 181:2

**Spotify** [5] - 35:25, 74:25, 75:1, 84:3, 131:7

**Springsteen** [1] - 126:7

**SS** [1] - 183:5

**ST** [1] - 2:8

**staff** [3] - 108:7, 109:6, 113:25

**stage** [2] - 105:19, 122:22

**stamp** [1] - 20:4

**stand** [9] - 12:5, 16:5, 66:13, 67:1, 67:2,

68:18, 69:13, 70:18,
182:5
**standard** [6] - 47:3,
49:8, 51:10, 73:25,
98:21, 100:20
**star** [26] - 130:5,
130:11, 135:23,
135:25, 137:23,
137:25, 138:14,
140:13, 145:15,
153:19, 158:6,
164:9, 164:21,
164:22, 164:24,
166:14, 167:1,
168:20, 170:20,
171:2, 173:7,
173:14, 173:16,
174:11, 175:4
**Star** [1] - 128:19
**stardom** [8] - 128:18,
128:21, 128:22,
129:20, 130:9,
130:14, 133:8,
134:11
**stars** [5] - 126:5,
128:21, 128:22,
135:21, 175:17
**start** [8] - 47:17, 54:2,
91:25, 92:3, 93:16,
94:12, 142:5, 177:15
**started** [1] - 126:21
**starting** [3] - 47:13,
91:18, 109:11
**starts** [3] - 63:5,
91:17, 118:23
**STATE** [1] - 183:6
**state** [6] - 4:6, 6:6,
12:9, 102:13,
121:24, 124:21
**statement** [14] - 8:19,
41:16, 43:23, 46:16,
49:2, 71:8, 73:11,
75:21, 77:5, 98:1,
99:6, 99:7, 99:15,
162:14
**statements** [3] -
28:11, 73:13, 136:20
**STATES** [4] - 1:1, 1:1,
1:4, 183:9
**stating** [1] - 9:2
**stations** [1] - 90:9
**statistics** [1] - 25:8
**stay** [2] - 46:9, 79:5
**staying** [1] - 95:14
**stays** [1] - 101:12
**STENOGRAPHIC** [1] -
183:15
**STENOGRAPHICAL
LY** [1] - 183:10
**step** [6] - 66:16, 102:9,

105:10, 110:4,
110:5, 110:16
**Steve** [1] - 11:25
**STEVEN** [1] - 3:5
**Steven** [2] - 10:25,
12:12
**still** [9] - 12:21, 20:9,
69:22, 100:6,
103:18, 118:6,
141:8, 175:16, 182:5
**stipulate** [1] - 39:3
**stipulated** [1] - 179:21
**stipulation** [4] - 4:11,
4:16, 10:17
**Stone** [2] - 126:6,
126:9
**stops** [1] - 155:21
**store** [4] - 76:8, 77:15,
83:19, 83:20
**storm** [2] - 146:9
**story** [1] - 177:8
**straight** [4] - 34:16,
175:3, 175:5
**strands** [1] - 172:9
**strategic** [1] - 144:22
**strategies** [1] - 155:1
**strategy** [2] - 7:19,
72:11
**stream** [9] - 35:22,
36:1, 39:4, 40:4,
40:21, 74:24, 74:25,
84:9, 153:11
**streamed** [1] - 38:16
**streaming** [4] - 35:25,
36:13, 131:7
**streams** [3] - 36:2,
40:3, 75:6
**Street** [1] - 130:12
**STREET** [1] - 1:23
**street** [1] - 154:23
**strike** [1] - 120:25
**strive** [1] - 181:3
**strong** [1] - 146:16
**structure** [2] - 14:24,
93:20
**structured** [1] -
148:25
**struggle** [1] - 172:11
**struggling** [1] - 53:13
**student** [1] - 166:21
**students** [12] - 125:11,
125:15, 127:19,
127:20, 129:9,
129:14, 129:18,
134:18, 154:7,
166:17, 167:4, 172:7
**studies** [4] - 166:2,
166:6, 170:20
**Studies** [5] - 127:11,
127:17, 128:5,

128:19, 172:1
**studio** [3] - 62:14,
79:3, 148:7
**Studio's** [2] - 62:22,
63:1
**Studios** [1] - 93:18
**study** [10] - 125:15,
125:16, 125:17,
125:20, 127:20,
127:22, 128:8,
128:9, 133:8
**studying** [1] - 172:1
**style** [2] - 151:20,
151:21
**styles** [6] - 133:10,
134:10, 148:23,
150:1, 175:19,
175:23
**styling** [4] - 54:19,
54:24, 55:2, 55:17
**stylist** [2] - 56:19,
56:22
**sub** [5] - 107:16,
109:15, 113:7,
113:17, 113:22
**subject** [4] - 114:3,
138:22, 158:17,
175:21
**subjects** [1] - 150:12
**submitted** [4] - 70:1,
120:21, 123:22,
124:3
**subscription** [1] -
74:25
**subsidiaries** [1] -
12:25
**substantive** [2] -
160:22, 172:6
**subtotal** [2] - 31:21,
32:13
**subtotals** [1] - 31:23
**subtract** [1] - 29:11
**subtracted** [3] - 59:8,
59:9, 59:11
**succeed** [2] - 15:18,
129:19
**success** [55] - 129:15,
132:3, 132:6,
132:15, 133:3,
133:5, 133:17,
133:22, 134:2,
135:6, 135:10,
135:16, 137:2,
137:10, 137:20,
138:6, 139:5,
139:15, 144:17,
144:21, 145:9,
145:12, 145:15,
145:20, 146:20,
146:21, 146:25,

150:7, 150:18,
151:15, 152:9,
152:17, 152:23,
153:2, 153:19,
153:22, 153:25,
155:12, 157:25,
163:1, 163:6, 164:3,
164:13, 165:9,
166:4, 166:18,
171:6, 173:2,
173:10, 173:17,
173:20, 174:3,
174:10, 174:15,
175:11
**successful** [13] -
79:19, 132:19,
134:25, 135:11,
135:13, 140:21,
154:4, 161:6, 161:8,
161:23, 164:16,
164:20
**suddenly** [1] - 148:7
**suggest** [2] - 112:13,
121:17
**suggesting** [1] -
110:22
**SUITE** [2] - 2:11, 2:23
**summarize** [1] - 35:18
**summarizes** [1] -
21:10
**summarizing** [1] -
21:3
**sung** [4] - 107:11,
111:24, 112:22,
113:2
**Super** [3] - 122:13,
145:6, 145:8
**super** [1] - 152:12
**supplier** [1] - 56:22
**supplies** [1] - 93:11
**supply** [4] - 77:16,
77:23, 83:25, 85:10
**support** [2] - 59:2,
80:4
**supporting** [1] - 82:8
**supports** [1] - 166:3
**surge** [1] - 149:20
**surges** [1] - 146:1
**surging** [3] - 146:7,
149:3, 149:19
**surmise** [1] - 168:18
**survey** [2] - 160:10,
160:11
**surveying** [1] - 160:12
**surveys** [2] - 160:9,
160:13
**sustain** [3] - 22:10,
22:18, 172:17
**sustained** [2] - 162:8,
165:24

**swear** [1] - 12:4
**sworn** [3] - 12:7,
124:19, 176:19
**sympathy** [1] - 178:22
**synchronization** [2] -
44:8, 88:23
**synth** [1] - 109:8
**synthesized** [1] -
109:13
**synthesizers** [1] -
147:12
**synths** [1] - 109:9
**system** [7] - 17:24,
76:7, 76:8, 76:9,
76:10, 77:16, 87:17
**Systems** [1] - 76:6

## T

**Tab** [11] - 30:17,
41:18, 49:18, 52:23,
57:15, 75:4, 81:7,
85:24, 89:14, 91:17,
93:13
**tab** [2] - 43:24, 93:12
**talent** [2] - 79:16,
79:21
**tallies** [1] - 31:19
**task** [2] - 136:11,
152:19
**tasked** [2] - 133:25,
152:22
**taught** [6] - 129:5,
129:8, 129:17,
129:20, 129:21,
129:22
**Taylor** [1] - 141:2
**teach** [6] - 127:8,
128:24, 128:25,
129:3, 129:9, 134:18
**teaching** [7] - 129:1,
129:3, 129:11,
132:12, 166:16,
172:3, 172:4
**team** [5] - 82:2, 82:13,
84:22, 90:8, 95:6
**technology** [4] -
107:3, 127:14,
127:15, 148:11
**Teddy** [1] - 130:23
**Teenage** [4] - 138:24,
139:1, 139:5
**telephone** [2] - 80:5,
93:10
**television** [2] - 97:13,
154:25
**tempo** [2] - 156:5
**term** [3] - 39:3, 111:20
**terms** [7] - 27:10,
91:8, 109:5, 119:8,

126:19, 153:17,
168:18
**tertiary** [17] - 137:8,
150:8, 150:9,
150:20, 150:21,
151:5, 152:25,
162:18, 163:9,
164:11, 165:4,
165:18, 170:24,
172:22, 173:23,
174:7, 174:17
**test** [1] - 169:24
**testable** [2] - 117:13,
170:14
**tested** [1] - 120:20
**testified** [18] - 6:16,
6:17, 6:18, 8:21,
16:7, 19:11, 20:10,
25:10, 34:8, 62:25,
72:18, 82:15, 98:2,
104:6, 114:18,
121:11, 122:24,
123:16
**testify** [3] - 5:11, 7:24,
48:4
**testimony** [36] - 5:9,
5:23, 6:4, 7:25, 8:9,
8:10, 8:21, 9:4, 11:8,
11:9, 11:11, 13:17,
13:18, 20:12, 65:5,
67:9, 67:21, 68:3,
69:11, 71:15, 71:16,
72:17, 81:21, 90:22,
102:14, 111:19,
116:2, 116:4,
121:22, 122:4,
123:9, 123:17,
159:21, 161:22,
163:18, 171:24
**text** [5] - 65:22, 67:20,
70:3, 70:4, 70:18
**texture** [6] - 118:16,
118:18, 118:21,
118:22, 118:23
**THAN** [1] - 2:13
**THAT** [3] - 183:10,
183:12, 183:14
**THE** [198] - 2:20, 3:3,
3:7, 4:3, 4:8, 4:17,
4:22, 5:13, 5:18, 7:2,
8:1, 8:7, 8:17, 9:18,
9:25, 10:3, 10:6,
10:12, 10:13, 10:14,
10:19, 10:22, 11:1,
11:6, 11:10, 11:15,
11:17, 11:20, 11:22,
11:23, 12:2, 12:3,
12:8, 12:12, 14:1,
14:3, 16:5, 17:12,
18:21, 18:22, 18:24,

19:4, 19:8, 19:21,
19:22, 20:8, 20:12,
21:21, 21:23, 21:24,
22:1, 22:2, 22:4,
22:6, 22:10, 22:18,
26:4, 26:10, 26:11,
26:19, 27:4, 27:5,
28:7, 28:25, 29:1,
39:22, 39:23, 39:25,
40:1, 47:16, 47:19,
47:24, 47:25, 48:5,
48:9, 53:13, 53:15,
53:17, 53:18, 53:19,
53:22, 53:24, 63:16,
63:22, 64:13, 64:17,
64:19, 64:20, 64:23,
65:2, 65:5, 65:9,
65:12, 65:15, 66:5,
66:16, 66:17, 66:24,
67:13, 68:7, 68:12,
68:17, 68:22, 69:1,
69:6, 69:13, 69:20,
69:21, 69:22, 70:12,
70:21, 71:1, 71:3,
71:24, 72:2, 72:5,
72:15, 72:20, 72:24,
76:3, 80:21, 97:18,
101:14, 102:7,
102:9, 102:12,
102:16, 102:21,
102:22, 102:24,
103:5, 103:7,
103:10, 103:13,
103:15, 103:18,
103:20, 105:20,
106:15, 106:18,
106:20, 106:25,
108:20, 108:21,
109:1, 114:5,
114:14, 114:16,
115:14, 121:3,
122:21, 123:7,
123:12, 124:11,
124:14, 124:15,
124:17, 124:20,
124:23, 158:18,
158:20, 158:21,
158:25, 159:3,
159:6, 159:8,
159:10, 159:11,
162:8, 163:23,
164:19, 164:20,
165:24, 169:17,
169:19, 172:16,
172:24, 172:25,
174:21, 176:14,
176:16, 176:21,
176:23, 177:2,
177:5, 177:7, 178:2,
182:8, 182:10,
182:15, 182:18,

182:20, 182:22,
183:8, 183:9,
183:10, 183:11,
183:12
**theater** [2] - 128:2,
128:4
**themselves** [13] -
82:23, 82:24, 91:9,
93:3, 129:10, 135:9,
135:11, 140:6,
140:11, 146:19,
148:13, 173:12,
173:15
**THEREAFTER** [1] -
183:12
**thereby** [1] - 112:11
**therefore** [3] - 6:13,
111:6, 180:21
**therein** [1] - 105:23
**they've** [2] - 6:23, 7:22
**thicker** [2] - 118:24
**Thinking** [1] - 138:19
**thinking** [2] - 74:17,
155:25
**thinks** [1] - 181:14
**thinly** [1] - 118:24
**third** [15] - 17:25, 51:1,
51:4, 51:18, 51:23,
82:16, 82:20, 82:22,
83:1, 84:14, 84:15,
85:14, 85:17,
128:17, 167:22
**THIS** [1] - 183:14
**Thornton** [1] - 120:9
**thoughts** [1] - 161:19
**three** [6] - 4:10, 6:17,
62:23, 128:9, 157:4,
157:8
**Three** [1] - 140:20
**three-page** [1] - 4:10
**throughout** [5] - 59:5,
92:21, 110:11,
113:14, 115:20
**tied** [1] - 139:5
**TIME** [1] - 183:11
**timing** [3] - 7:8, 66:3,
115:19
**tired** [1] - 66:5
**Tisch** [3] - 125:6,
125:10, 126:16
**title** [4] - 22:14, 59:5,
127:16, 139:1
**Title** [1] - 31:1
**titled** [1] - 38:25
**titles** [3] - 31:1, 58:23,
127:10
**TMZ** [1] - 160:20
**TO** [1] - 183:12
**today** [6] - 65:7, 92:21,
102:4, 114:22,

159:16, 177:17
**today's** [2] - 159:21,
161:22
**together** [10] - 82:10,
119:18, 122:8,
122:11, 141:5,
148:9, 164:23,
165:14, 170:11,
176:8
**tomorrow** [4] -
177:15, 177:18,
178:1, 182:6
**tonight** [1] - 178:1
**took** [6] - 50:22,
57:23, 96:18,
144:13, 155:7,
178:23
**tool** [1] - 97:12
**tools** [1] - 133:13
**top** [9] - 28:18, 30:4,
49:21, 76:14, 77:6,
98:10, 108:7, 109:6,
153:18
**total** [46] - 21:10,
21:14, 22:15, 22:21,
23:2, 23:22, 24:9,
24:12, 24:23, 25:1,
29:12, 29:13, 30:6,
30:24, 31:20, 32:2,
32:7, 32:22, 33:1,
33:2, 33:6, 33:10,
33:14, 33:25, 34:11,
34:25, 35:1, 37:5,
37:14, 37:15, 38:2,
41:3, 41:5, 41:8,
42:14, 42:22, 45:4,
45:25, 59:6, 81:8,
87:4, 92:14, 93:16,
93:24, 100:12, 154:5
**Total** [7] - 23:6, 23:24,
25:4, 31:10, 31:19,
32:3, 38:25
**totaled** [3] - 31:24,
36:20, 38:19
**totality** [3] - 104:23,
110:8, 111:7
**touch** [1] - 97:24
**touched** [2] - 61:15,
97:22
**Tour** [1] - 41:23, 42:4,
42:7
**tour** [5] - 42:4, 42:9,
155:16, 155:19,
155:20
**tours** [1] - 155:17
**track** [67] - 25:21,
26:7, 26:12, 30:22,
31:16, 32:11, 33:8,
35:19, 35:21, 36:10,
36:14, 36:15, 38:10,

38:12, 38:13, 38:19,
39:2, 39:4, 39:20,
40:2, 40:3, 40:7,
40:14, 40:22, 41:3,
41:6, 41:11, 43:10,
45:11, 50:11, 53:14,
61:6, 61:11, 73:11,
74:18, 74:24, 75:7,
75:19, 77:11, 77:17,
78:7, 78:13, 81:4,
81:11, 84:1, 86:4,
88:7, 88:12, 92:16,
93:23, 95:18, 97:6,
100:4, 139:2,
145:24, 146:23,
147:3, 148:24,
148:25, 149:2,
149:7, 149:12,
153:4, 156:5, 175:24
**tracking** [1] - 95:12
**tracks** [31] - 15:7,
17:13, 25:16, 31:11,
31:14, 33:2, 33:10,
33:11, 37:1, 37:2,
37:15, 50:9, 73:23,
74:9, 74:15, 75:2,
76:10, 86:13, 89:19,
90:9, 92:19, 93:5,
153:4, 153:5, 153:6,
157:13, 158:9,
169:12
**Tracks** [1] - 31:10
**tractor** [3] - 155:3,
155:4, 155:7
**tractor-trailer** [3] -
155:3, 155:4, 155:7
**trailer** [3] - 155:3,
155:4, 155:7
**train** [1] - 177:13
**trained** [1] - 125:11
**training** [1] - 125:13
**Trainor's** [1] - 161:25
**transaction** [2] - 39:5,
40:6
**transcribed** [1] -
105:14
**transcribing** [1] -
104:17
**transcript** [1] - 72:17
**TRANSCRIPT** [1] -
1:14
**transcription** [21] -
104:18, 105:15,
106:4, 106:8,
106:11, 106:12,
106:22, 107:4,
109:20, 109:25,
110:11, 112:9,
115:25, 118:20,
119:7, 119:10,

119:11, 119:15,
119:20, 119:21,
124:1
**TRANSCRIPTION** [2] -
183:13, 183:14
**transcriptions** [1] -
112:22
**transcripts** [1] - 7:16
**trap** [10] - 149:7,
149:8, 149:11,
150:1, 151:20,
152:1, 152:3,
152:11, 152:15,
169:7
**trap-influenced** [2] -
150:1, 152:3
**TRAURIG** [1] - 2:21
**travel** [1] - 91:13
**treat** [1] - 180:21
**trial** [6] - 5:11, 7:20,
8:10, 72:10, 131:18,
180:24
**tried** [2] - 4:10, 96:24
**trite** [1] - 115:11
**true** [41] - 12:18, 13:7,
13:24, 14:10, 14:22,
15:4, 15:6, 17:5,
17:8, 17:16, 25:16,
27:18, 29:18, 30:25,
31:16, 34:11, 34:14,
34:25, 36:9, 37:2,
37:22, 38:6, 38:9,
39:1, 40:20, 41:4,
41:9, 43:9, 44:3,
46:18, 46:22, 57:21,
59:10, 61:2, 74:14,
98:20, 99:1, 99:11,
100:19, 102:3,
167:10
**TRUE** [1] - 183:14
**try** [4] - 6:7, 57:19,
80:21, 163:24
**trying** [12] - 8:25, 9:16,
40:8, 74:4, 80:9,
80:19, 85:7, 90:9,
94:8, 116:10,
117:15, 136:7
**Tunes** [1] - 131:10
**turn** [27] - 18:3, 22:23,
23:8, 23:14, 24:2,
24:14, 30:17, 35:13,
47:11, 53:6, 55:13,
73:4, 73:6, 75:5,
80:14, 81:7, 87:9,
91:18, 91:24, 92:7,
92:12, 105:22,
107:23, 120:2,
143:9, 162:18, 167:6
**turned** [1] - 166:18
**turning** [1] - 106:5

**TV** [1] - 155:13
**tweet** [1] - 168:9
**tweeted** [1] - 155:6
**tweeting** [1] - 168:10
**twice** [2] - 117:8,
117:24
**Twitter** [1] - 140:2
**two** [25] - 6:3, 6:25,
10:20, 35:14, 40:23,
46:1, 56:2, 58:14,
70:24, 77:12, 78:4,
78:8, 95:25, 107:11,
113:2, 127:10,
133:14, 137:21,
142:7, 145:11,
156:20, 164:23,
167:16, 168:3
**two-page** [1] - 35:14
**type** [3] - 40:17, 93:6,
98:11
**types** [3] - 36:3, 93:4,
175:17
**TYPEWRITTEN** [1] -
183:12
**typically** [3] - 50:25,
51:4, 76:7

## U

**U.S** [1] - 88:11
**ultimately** [6] - 71:14,
74:3, 84:11, 87:18,
87:23, 142:17
**UMG** [1] - 71:17
**UML** [13] - 50:19,
50:23, 51:1, 51:4,
51:7, 51:11, 51:22,
82:6, 82:15, 82:20,
82:21, 83:4
**unanimous** [3] -
181:5, 181:10,
181:18
**unavailable** [1] - 7:5
**unbiased** [1] - 74:3
**Unconditionally** [7] -
24:17, 24:19, 24:23,
156:24, 157:2,
157:6, 167:21
**unconditionally** [1] -
156:11
**under** [10] - 6:14, 35:3,
71:20, 74:25, 78:11,
83:24, 103:19,
117:7, 118:5, 120:2
**undergraduate** [3] -
125:9, 125:10, 128:2
**underlying** [4] - 76:16,
147:14, 147:16,
148:2
**underneath** [1] -

109:13
**understood** [5] -
40:11, 40:18, 152:2,
163:9, 167:4
**undertook** [1] - 155:2
**unfair** [3] - 66:7, 68:5,
68:7
**unfavorable** [1] -
72:16
**unfortunately** [1] -
107:2
**union** [6] - 95:24,
96:5, 99:22, 100:4,
100:6
**unions** [5] - 78:19,
78:21, 95:25, 96:1
**unique** [1] - 157:6
**uniquely** [1] - 98:12
**unit** [10] - 38:16,
40:17, 50:13, 81:1,
83:20, 87:16, 88:10
**UNITED** [4] - 1:1, 1:1,
1:4, 183:8
**Units** [2] - 32:3, 38:25
**units** [9] - 38:6, 38:9,
39:1, 39:6, 39:15,
40:13, 40:14, 40:15,
51:10
**Universal** [24] - 6:18,
8:22, 12:18, 12:22,
12:24, 13:2, 13:23,
50:17, 50:20, 50:22,
51:13, 51:17, 51:19,
51:22, 57:12, 76:6,
81:20, 82:8, 82:10,
83:2, 83:4, 85:14,
99:18, 162:3
**University** [5] - 125:5,
126:16, 126:22,
128:5, 129:2
**university** [2] -
126:13, 171:21
**unknown** [3] - 139:18,
163:12, 163:15
**unless** [2] - 72:21,
160:20
**unlike** [1] - 7:21
**unlock** [2] - 168:10,
168:11
**unofficially** [1] - 157:3
**unprorated** [2] - 81:8,
87:1
**unrecouped** [1] -
48:14
**unremarkable** [1] -
115:11
**unusual** [2] - 77:24,
142:18
**unwilling** [1] - 181:12
**up** [46] - 4:21, 8:2,

9:22, 11:4, 15:8,
16:1, 29:13, 33:15,
41:2, 42:21, 43:12,
46:14, 47:10, 52:5,
52:18, 55:1, 58:1,
58:8, 59:7, 61:7,
63:23, 63:25, 64:15,
65:5, 70:12, 70:15,
78:16, 81:17, 85:5,
90:5, 91:14, 97:25,
99:17, 101:21,
102:19, 116:12,
118:15, 119:12,
120:5, 133:18,
149:17, 152:6,
152:24, 154:12,
156:5, 173:1
**Up** [1] - 138:20
**up-tempo** [1] - 156:5
**uses** [7] - 17:25, 25:7,
39:15, 81:19, 82:6,
82:16, 82:20
**utilization** [1] - 61:25

## V

**vague** [2] - 13:25,
17:11
**validated** [3] - 47:7,
49:6, 49:9
**valuable** [2] - 74:13,
157:23
**value** [41] - 74:11,
104:13, 104:24,
105:22, 111:10,
111:11, 111:14,
112:2, 112:10,
112:12, 112:15,
117:12, 121:7,
121:9, 121:10,
121:14, 121:15,
132:2, 132:5, 133:4,
134:23, 137:15,
137:17, 138:4,
138:5, 138:7,
138:12, 147:25,
148:14, 151:9,
151:10, 152:22,
153:20, 153:21,
158:3, 158:11,
158:14, 162:13,
162:19, 162:21
**values** [1] - 34:17
**variance** [1] - 101:22
**variant** [1] - 149:8
**variety** [4] - 44:19,
50:16, 129:4, 137:3
**various** [9] - 13:23,
14:17, 32:14, 36:20,
36:22, 51:15, 107:9,

129:23, 131:6
**Vegas** [2] - 138:20,
145:1
**verbiage** [1] - 70:17
**verdict** [7] - 103:3,
178:4, 181:4,
181:10, 181:16,
181:17, 181:19
**verifiable** [1] - 117:14
**verifications** [1] - 31:2
**verse** [11] - 107:11,
108:9, 108:10,
108:11, 108:12,
109:10, 109:12,
112:6, 112:23,
112:24, 113:14
**verses** [3] - 109:17,
149:1, 149:17
**version** [2] - 74:14,
120:7
**versus** [4] - 4:5, 40:25,
173:22
**VIA** [1] - 3:13
**Vice** [1] - 12:21
**Vice-President** [1] -
12:21
**video** [22] - 16:25,
17:2, 17:6, 17:10,
41:23, 44:7, 97:12,
102:19, 102:22,
103:17, 104:2,
107:3, 143:11,
143:21, 144:3,
144:12, 154:11,
154:17, 154:19,
168:24, 168:25,
176:19
**Video** [1] - 176:22
**videos** [2] - 90:3,
154:18
**videotape** [1] - 122:16
**VIDEOTAPE** [1] - 3:13
**view** [2] - 84:5, 151:20
**viewed** [1] - 120:20
**viewers** [1] - 145:8
**viewership** [1] - 145:7
**views** [1] - 181:9
**VINCENT** [1] - 2:22
**vinyl** [1] - 80:24
**visibility** [7] - 141:23,
142:20, 144:19,
144:20, 144:24,
157:7, 173:20
**visual** [1] - 108:6
**visuals** [1] - 67:25
**VMA** [1] - 54:20
**VMAs** [3] - 55:5,
55:14, 55:21
**vocal** [14] - 107:16,
109:16, 111:24,

113:16, 117:10, 146:19, 146:23, 146:24, 147:1, 147:2, 147:3, 147:22, 147:23, 147:24
**vocals** [5] - 113:2, 113:3, 113:21, 146:21, 146:23
**volume** [2] - 83:1, 83:3
**volumes** [1] - 18:6
**vote** [4] - 142:15, 168:6, 169:13, 169:21
**voted** [1] - 169:19
**VS** [1] - 1:8

## W

**WAIS** [40] - 2:16, 3:6, 13:25, 16:4, 17:11, 18:20, 18:23, 18:25, 19:7, 19:20, 20:9, 20:15, 21:20, 21:22, 22:3, 22:5, 22:8, 22:17, 25:24, 26:3, 26:9, 26:18, 26:24, 28:6, 28:20, 28:24, 39:21, 39:24, 47:15, 47:18, 53:11, 64:22, 73:1, 76:4, 80:19, 80:22, 97:16, 101:16, 102:6, 102:13
**Wais** [4] - 72:24, 97:23, 100:9, 101:14
**wait** [11] - 19:3, 22:1, 47:16, 48:5, 108:15, 122:22
**Waking** [1] - 138:20
**walk** [4] - 77:9, 88:17, 89:25, 93:14
**walked** [1] - 90:21
**Walking** [14] - 142:12, 142:16, 156:9, 156:21, 167:18, 167:25, 168:7, 168:15, 168:17, 168:18, 168:21, 168:25, 169:3, 169:9
**Walter** [2] - 161:10, 161:12
**wants** [1] - 15:1
**wardrobe** [2] - 54:25, 55:1
**Warner** [2] - 4:15, 10:15
**WAS** [1] - 183:12
**watch** [1] - 122:13

**watched** [1] - 122:16
**ways** [10] - 35:23, 74:23, 75:3, 97:11, 143:20, 149:15, 149:16, 155:17, 173:21, 175:10
**web** [1] - 140:1
**webcasting** [1] - 44:12
**website** [1] - 154:25
**WEDNESDAY** [2] - 1:15, 4:1
**week** [6] - 111:19, 113:6, 114:18, 121:22, 122:4, 123:16
**weigh** [2] - 162:16, 169:25
**weight** [2] - 115:4, 181:15
**welcome** [2] - 114:24, 182:19
**well-documented** [1] - 77:1
**well-known** [3] - 140:18, 141:3, 145:1
**WEST** [2] - 1:23, 2:18
**WESTERN** [1] - 1:2
**whatsoever** [1] - 116:8
**whereas** [2] - 40:5, 66:2
**white** [1] - 27:24
**Whitney** [1] - 126:7
**whole** [12] - 40:22, 68:13, 91:14, 107:5, 118:15, 153:11, 153:12, 153:16, 154:1, 157:19, 157:22
**wide** [1] - 129:4
**widespread** [1] - 141:11
**wildfire** [1] - 138:17
**win** [1] - 132:20
**Wind** [1] - 126:7
**window** [1] - 59:4
**winning** [1] - 170:10
**wise** [1] - 158:23
**withdrawn** [2] - 5:22, 6:1
**withdrew** [4] - 5:25, 7:4, 8:15, 8:16
**witness** [27] - 5:11, 5:15, 6:10, 7:4, 10:8, 12:7, 64:21, 65:19, 65:25, 66:12, 66:19, 67:1, 67:7, 68:9, 68:14, 68:16, 69:18, 71:13, 102:17,

102:22, 103:15, 122:19, 124:19, 136:22, 160:8, 163:22, 178:11
**WITNESS** [22] - 12:12, 14:3, 17:12, 19:22, 21:21, 21:24, 26:11, 27:5, 29:1, 40:1, 47:25, 53:13, 53:17, 53:24, 103:20, 114:16, 124:15, 124:23, 164:20, 169:19, 172:25, 174:21
**WITNESSES** [2] - 3:2, 3:7
**Wiz** [1] - 141:2
**WL** [1] - 8:12
**won** [1] - 140:21
**word** [4] - 116:3, 155:4, 157:14, 170:5
**words** [8] - 34:21, 43:11, 107:11, 134:22, 141:24, 148:7, 163:11, 175:8
**works** [3] - 9:17, 74:12, 131:9
**world** [7] - 125:14, 125:19, 126:5, 126:10, 127:19, 139:20, 155:16
**World** [4] - 41:23, 42:4, 42:7, 139:11
**wrap** [1] - 53:14
**wrap-around** [1] - 53:14
**write** [4] - 11:5, 11:6, 110:24, 135:20
**writer** [1] - 135:20
**writers** [1] - 78:9
**Writing** [1] - 127:11
**writing** [2] - 125:17, 127:15
**written** [1] - 123:21, 123:24, 130:8, 130:13, 130:15, 147:19, 182:14

## Y

**Year** [1] - 156:6
**year** [4] - 101:22, 125:10, 139:22, 140:2
**years** [12] - 6:17, 19:17, 58:14, 126:25, 127:6, 129:2, 129:12, 129:24, 130:14, 130:17, 171:25,

172:3
**yesterday** [4] - 66:8, 67:5, 69:6, 69:14
**York** [7] - 125:5, 126:16, 126:22, 128:1, 128:4, 128:5, 129:1
**yourself** [4] - 40:5, 47:24, 165:20, 181:6
**YouTube** [4] - 36:2, 70:6, 75:1, 84:3

# EXHIBIT 10

EXHIBIT  10
PAGE  1583

1          UNITED STATES OF AMERICA
           UNITED STATES DISTRICT COURT
2          CENTRAL DISTRICT OF CALIFORNIA
              WESTERN DIVISION
3
                   - - -
4          HONORABLE CHRISTINA A. SNYDER
        UNITED STATES DISTRICT JUDGE PRESIDING
5                  - - -

6
     MARCUS GRAY; ET AL.,              )
7                                      )
              PLAINTIFF,               )
8                                      )   CASE NO.:
     VS.                               )   CV 15-5642-CAS
9                                      )
     KATY PERRY; ET AL.,               )
10                                     )
              DEFENDANT.               )
11   _____)

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15           THURSDAY, AUGUST 1, 2019

16           LOS ANGELES, CALIFORNIA

17

18

19

20

21

22        LAURA MILLER ELIAS, CSR 10019
        FEDERAL OFFICIAL COURT REPORTER
23      350 WEST FIRST STREET, ROOM 4455
         LOS ANGELES, CALIFORNIA 90012
24          PH:  (213)894-0374

25

EXHIBIT 10
PAGE 1584

```
1

2
        APPEARANCES OF COUNSEL:
3
        ON BEHALF OF PLAINTIFF:
4

5                CAPES SOKOL
                 BY: MICHAEL A. KAHN, ESQ.
6                    LAUREN COHEN, ESQ.

7                7701 FORSYTH BOULEVARD
                 12TH FLOOR
8                ST. LOUIS, MO 63105

9
                 KAYIRA LAW, LLC
10               BY:  ERIC KAYIRA, ESQ.

11               2100 HANLEY ROAD, SUITE 208
                 CLAYTON, MO 63105
12

13
        ON BEHALF OF DEFENDANTS OTHER THAN MS. PERRY:
14

15               MITCHELL SILBERBERG & KNUPP
                 BY: CHRISTINE LEPERA, ESQ.
16                   AARON M. WAIS, ESQ.
                     JEFFREY MOVIT, ESQ.
17                   GABRIELLA NOURAFCHAN, ESQ.
                     JACOB ALBERTSON, ESQ.
18
                 11377 WEST OLYMPIC BOULEVARD
19               LOS ANGELES, CA 90064

20
        ON BEHALF OF THE PERRY DEFENDANTS:
21
                 GREENBERG TRAURIG
22               BY:  VINCENT H. CHIEFFO, ESQ.

23               1840 CENTURY PARK EAST
                 SUITE 1900
24               LOS ANGELES, CA 90067

25
```

EXHIBIT 10
PAGE 1585

```
1                              INDEX
2
3      PROCEEDINGS                              PAGE
4
       CLOSING ARGUMENTS
5
       BY:  MR. KAHN                            4, 34
6
       BY:  MR. WAIS                            14
7
8
9      VERDICT                                  37
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1    LOS ANGELES, CALIFORNIA; THURSDAY, AUGUST 1, 2019; 9:45 A.M.

 2                            - - -

 3              THE CLERK:  Calling Calendar Item No. 1.

 4              Case No. CV 15-5642.

 5              Marcus Gray versus Katy Perry et al.

 6              Counsel, please state your appearances.

 7                (Appearances as heretofore noted.)

 8              THE COURT:  Good morning.

 9              Okay.  Are we ready for the jury?

10              MS. COHEN:  Yes.

11                        (Jury present.)

12              THE COURT:  Shall we go to closing argument?

13    Mr. Kahn.

14              MR. KAHN:  So you've now heard evidence these last

15    two days that these defendants have made millions and

16    millions of dollars from their infringement of the

17    plaintiff's song.  And the final question before you, ladies

18    and gentlemen of the jury is what is the fair compensation

19    for that unlawful taking?

20              Before I get into the specifics, I want to go over

21    a couple of general principals.  As I told you at the outset,

22    Marcus Gray and his two fellow songwriters, they've come here

23    seeking justice.  They're not seeking punishment.  They seek

24    a fair portion of defendants' profits.  They don't seek all

25    of their profits.  And how do you calculate a fair portion?
```

EXHIBIT 10
PAGE 1587

```
1         Well, we look to the one the fact that no one
2    disputes.  That the Joyful Noise instrumental beat plays
3    through 95 seconds of Dark Horse, a little bit over a
4    minute-and-a-half which when you calculate with the full song
5    is about 45 percent of the song.  And they come today seeking
6    45 percent of the defendants' profits.
7         And this is a fair amount for two separate reasons.
8    Number one, the defendants would still keep over half of the
9    profits that they have earned from this infringement and
10   number two, today is the plaintiffs' last day for justice.
11   Tomorrow, next week, next month, next year the defendants
12   will be able to continue to exploit and make money from
13   Dark Horse and they'll be keeping 100 percent of the profits
14   for every day after today.  So this is the one day for these
15   plaintiffs.
16        So where do we start?  As you probably recall from
17   the Judge's jury instructions yesterday and you'll see them
18   when you go into the jury room, the plaintiffs have one
19   burden of proof.  Our burden today on the issue of damages is
20   to prove the gross revenues that these defendants made from
21   their exploitation of Dark Horse.  Our evidence has shown and
22   I'll review it that that number is slightly above
23   $40 million.
24        Part of those numbers have already been quantified
25   to the penny.  And you'll see the stipulation.  And when you
```

```
1   get your jury verdict form, you will see right in the jury
2   verdict that each of those defendants, all but Capitol
3   Records, the gross revenues are there in front of you as are
4   the costs that the defendants claim they incurred.
5           And we do not contest the numbers in those costs.
6   It will be up to you to decide how to handle those costs, but
7   we agree to the accuracy of those costs.  So that's for the
8   other defendants, everyone except for Capitol Records.
9           When it comes to Capitol Records, we had as you
10  heard from yesterday's examination of the Capitol Records'
11  witness, we have a disagreement with the way they calculated
12  those profits.  If you recall from Exhibit 116, that second
13  page which is where the -- Capitol Records put together this
14  special spreadsheet just for this lawsuit.  And you'll see
15  that they calculate their gross revenues at $12,402,000.
16          But as it became clear yesterday during the
17  examination of the Capitol Records witness, what they haven't
18  included was the full revenues from their sale of the CD and
19  the digital version of the album.  The CD was $11.5 million
20  and the digital version was about $9.1 million.  So it's a
21  little bit over $20 million is missing from that number.  And
22  it comes up, actually, it's a little bit under 32 million,
23  about $31.5 million.
24          Now, Capitol Records reduced that number by
25  dividing the revenue they got from the CD and from the album
```

 1    by 13 or by 16 depending on whether it was the premium album

 2    or the one with 13 tracks.  We submit to you and we believe

 3    we met our burden that that's not proper.

 4         The CD is a CD.  You can't break it up into pieces.

 5    And every album that was sold had an infringing element to

 6    it.  Every album had the infringing song on it and it wasn't

 7    just any song.  It was by far and away the most popular song

 8    on the album.  It is an infringing album and that number

 9    should be included.

10         Now, the other reason if we can back up a little

11    bit just to show the full document, you'll see that the

12    actual date is June of 2018 for this.  And that is what these

13    records take us through just June of 2018.  So presumably

14    there were album sales after that, but we're only looking at

15    the album sales that were through June of 2018.

16         Now, if you go back to the costs now, as the Judge

17    told you, our only burden was to prove the gross revenues and

18    then the burden shifts.  And the defendants then need to come

19    forward and they need to prove to you by a preponderance of

20    the evidence, the appropriate costs, the appropriate costs

21    that they incurred in order to generate and produce revenues

22    for Dark Horse.

23         Did Capitol Records incur costs and expenses in

24    producing that album?  Absolutely.  We don't contest that.

25    They did incur costs, they did incur expenses.  They paid

```
 1    rent and they paid other items, but did they meet their
 2    burden?
 3              We went through this yesterday.  I'll give you a
 4    couple of examples where they failed to meet their burden.
 5    You'll see there are two categories.  One is called accrued
 6    artist producer royalties.  The other is accrued copyright
 7    royalties.  Those two items total over $4.5 million.
 8              Remember, this spreadsheet was prepared in June of
 9    2018, and yet when the Capitol Records witness was on the
10    stand yesterday and asked by Ms. Cohen if those amounts -- if
11    he could confirm those amounts had been paid, he was unable
12    to do so.  So these are -- until they are actually paid and
13    there's some evidence that they've met their burden of proof,
14    these shouldn't be counted against costs.
15              Another item here is marketing expense which is
16    almost a million dollars.  Now, if you recall, defense
17    counsel in his opening told you we all incur costs, each of
18    us, to earn our money.  And he used the example of car
19    payments and gas and we agree.  We all have car payments, we
20    all have gas.  But do you recall some of the marketing
21    expenses that were included in this $900,000?
22              There were the flashing ice cubes which were almost
23    $2,000.  There was the manicure for $821.  There was the hair
24    styling more than once for over $3,000 each.  There was the
25    car service $6500.  And instead of taking -- buying an
```

```
 1   airplane ticket to fly where Ms. Perry wanted to fly, Capitol
 2   went ahead and chartered a jet for $73,000.
 3         Now, the Capitol witness said hey, this is Katy
 4   Perry.  This is what it costs to have her help promote this
 5   product.  That may be so, but our clients shouldn't be asked
 6   to absorb those kind of costs.  $1979 for flashing ice cubes
 7   and an $821 manicure so there are issues in the marketing
 8   expenses as well.  I'm sure there are some valid ones, but
 9   there are many that our clients shouldn't be asked to bear.
10         One other category is overhead.  The overhead
11   expense, it's over $5 million that they deducted from these
12   gross revenues.  Yes, we agree there are overhead expenses.
13   You need to pay rent, you got electric bills, you may have
14   gas bills, but this was just as you heard, this was just a
15   mathematical assumption.
16         The Capitol Records witness admitted he couldn't
17   tie any category of overhead expense whether it was rent or
18   electricity or whatever to any revenue that was actually
19   generated for Dark Horse.  All these expenses are fixed.
20   They're put into some calculation and they run the
21   calculation through the system, and Dark Horse gets assigned
22   a certain amount for rent and a certain amount for
23   electricity and all these other various categories.
24         It's sort of Voodo economics, but they haven't
25   proven which of these overhead expenses contributed, directly
```

 1    contributed to the money they made from Dark Horse.  So do

 2    they have expenses?  Yes, of course, they do.  Have they met

 3    their burden of proof that there were $11,772,913 in

 4    expenses?  No.

 5          And finally yesterday as you recall, the defendants

 6    put on two high-priced expert witnesses whose purpose was to

 7    try to minimize the significance of their unlawful

 8    infringement.  One of them was Dr. Ferrara who we had seen

 9    back in the liability phase and he came back in the damages

10    phase.  And it was the same strategy he used in the liability

11    phase which was to not have you listen with your ears, but to

12    look at notes and look at his calculations on a piece of

13    paper.

14          This time it was what he called noteheads.  If you

15    remember he had this elaborate music score, and then he went

16    through the music score and he counted up every notehead,

17    which to begin with is a biased approach.  Because he

18    confirmed what he calls Ostinato No. 1, for those of you who

19    can read music, consisted of 16th notes (singing) which means

20    in one measure there will be 16 noteheads.

21          Whereas, the Joyful Noise instrumental, what he

22    calls Ostinato No. 2, is 8th notes.  So in that same measure

23    there will only be eight notes.  So when you start counting

24    noteheads, already even though they all last the same amount

25    of time and we hear them differently, if it's put into paper,

```
 1    it comes out favoring Ostinato No. 1 unfairly.

 2              I don't need to tell you when, you know, I know

 3    people don't count noteheads when they hear a song.  You

 4    don't listen for noteheads.  You listen to music.  You do

 5    what Dr. Decker said we all need to do which is to listen

 6    with your ears not to sit there and calculate how many

 7    noteheads.

 8              You found on the basis of the facts that the

 9    concept that -- of your own listening that the total concept

10    and feel of Dark Horse included Joyful Noise's instrumental

11    beat.  And you came to that conclusion without counting

12    noteheads.

13              The other expert that they put on the stand

14    yesterday was Dr. King.  Ironically, Dr. King is probably a

15    better witness for us than he was for the defendant because

16    there are two huge holes in his opinion that you may have

17    spotted.

18              If you recall, he had this ranking of what were the

19    most important factors, and then the secondary factors and

20    the tertiary factors.  And you probably all remember what he

21    said were the two most important factors in the success of

22    Dark Horse.  One of them was Katy Perry and the other was

23    marketing.

24              Okay.  Katy Perry.  The Prism album has 13 songs on

25    it.  The deluxe album has 16 songs on it.  Guess who sings
```

 1   every one of those songs?  Katy Perry.  So if Katy Perry was

 2   the principal factor in the success of Dark Horse, why

 3   weren't all 16 of those songs number one hits?  So there was

 4   something else going on besides Ms. Perry who's enormously

 5   talented, but she can't be one of the driving forces because

 6   she sang all the songs.

 7        He said the other primary factor, if you remember,

 8   was marketing.  Well, think back to even what he explained.

 9   That marketing began after they had that, um, competition

10   before the album was released between those two songs; right?

11   They put out Dark Horse and they put out Walking on Air and

12   they let people vote.

13        And as Dr. King explained, the people

14   overwhelmingly voted for Dark Horse which was a pretty good

15   cue to Capitol Records that maybe we ought to put some

16   marketing money behind Dark Horse and that's what they did.

17        So yes, Katy Perry sang the song as she sang the

18   other 15.  And Capitol Records found out that Dark Horse,

19   something about Dark Horse was making it extremely popular

20   and that's when they put all that marketing money into it.

21        But what made Dark Horse win that competition and

22   what made it the number one song on the album?  Even Dr. King

23   said if you go to the next level, his first item was the

24   music.  It was the music and it wasn't even the lyrics.  It

25   was the music.  And you've already listened to that music and

1    you've concluded with the total concept and feel that

2    infringes the instrumental in Joyful Noise.

3         And the importance of that instrumental, you've

4    already heard evidence of.  It all began when Mr. Walter and

5    Mr. Gottwald brought a group of those instrumental beds as

6    they called them up to Santa Barbara to play for Ms. Perry.

7    She listened to all those instrumentals and she immediately

8    picked out the one that included the Joyful Noise

9    instrumental beat.

10        And as Dr. Decker explained, that instrumental beat

11   is like the railroad tracks.  It became the building blocks

12   for the entire song.  Ms. Perry picked that song.  Remember,

13   she contacted Sarah Hudson, said you've got to get out here.

14   We're gonna write the lyrics.  They wrote the lyrics off of

15   that instrumental.

16        And even though Dr. Ferrara keeps talking about

17   Ostinato No. 1, we've heard the song.  The lyrics start after

18   that introduction.  The lyrics start with what Dr. Ferrara

19   calls Ostinato No. 2.  Max Martin, Mr. Sandberg, he helps

20   write the melody.  Where does the melody start?  It doesn't

21   start in that opening introduction up and down and up and

22   down and up and down.  It starts with what he calls Ostinato

23   No. 2.

24        And then when the song is sent to Mr. Houston,

25   Juicy J and he does his rap lyrics, what does he do his rap

1    lyrics over?  Not Ostinato No. 1.  He does them over the

2    Joyful Noise beat which even Dr. Decker explained is a

3    classic hip hop beat.  So if you go back to the origins and

4    that instrumental beat, there is no Dark Horse without Joyful

5    Noise.

6            It has been, as I said at the outset, a long five

7    years for Mr. Gray and his two songwriters.  They brought

8    this lawsuit seeking justice, seeking fair compensation for

9    this unlawful taking of their creation.  They're not seeking

10   punishment.  It's not part of who they are.  And that's why

11   45 percent of these defendants' profit is fair.

12           It's the bare minimum.  You may decide to award

13   more, but they're seeking the 45 percent.  And as I

14   mentioned, that means the defendants will keep more than half

15   of their profits.  And beginning tomorrow, they'll keep a

16   hundred percent of their profits going forward.

17           Today is the day of reckoning for the defendants

18   and for Mr. Gray and his two songwriters.  And we look to you

19   for that justice.  Thank you.

20           THE COURT:  Okay.  Mr. Wais.

21           MR. WAIS:  Good morning, ladies and gentlemen of

22   the jury.  Let's start by talking about this fairness that

23   Mr. Kahn keeps saying his clients are seeking.  He keeps

24   saying they're seeking justice and that they're seeking fair

25   compensation, but we submit they are not.  They are seeking

 1    to obtain as much money as they can without regard to

 2    fairness.

 3          In 2007 Mr. Gray bought a beat from Mr. Ojukwu for

 4    $150.  That beat included the ostinato at issue here that

 5    they are saying is being used in a single part of the many

 6    other parts of Dark Horse, Ostinato No. 2.  And they claim

 7    now that Ostinato No. 2 is more important than anything else

 8    in the song and was solely responsible for the success of

 9    Dark Horse and solely responsible for the success of the

10    Prism album.

11          Based on that they should get 45 percent of the

12    profit earned by the defendants.  But to get there, they

13    completely discount and disregard the reasons why Dark Horse

14    sold and why Prism sold.  They completely discount the

15    efforts of the artists and the songwriters who worked on Dark

16    Horse to make it what it is.

17          They completely discount the efforts and the money

18    spent by Capitol to market and sell the Prism album and Dark

19    Horse itself.  This was all issues and facts that were

20    presented to you by witnesses on behalf of the defense.

21          In response what do plaintiffs do?  Do they present

22    any witnesses to rebut that testimony?  No, they just

23    denigrate it and attack it in argument.  Well, I submit to

24    you that's not fair, that's not justice and that's not how

25    the law works.  It's punishment and you cannot use the

1    Copyright Act to punish.

2         As we go through today about the evidence that you

3    heard over the past couple days, I want you to bear in mind

4    what you'll see in the jury instructions and the verdict form

5    that will be presented to you in the jury room.  Because

6    again instead of evidence, their lawyers simply argue for you

7    to ignore the evidence.

8         They keep calling our experts hired guns

9    essentially.  Ignoring their own hired guns that they paid.

10   Dr. Decker was a paid expert and they also had a damage

11   expert, Michael Einhorn who you heard testimony from through

12   us when we played his video.

13        Again, Jury Instruction No. 1 will you tell what

14   you need to do to decide this case which is to decide it

15   solely based on the evidence before you.  Argument is not

16   evidence.  So let's start with the verdict form that you're

17   going to be seeing in the jury room.  When you deliberate

18   you'll receive a verdict form.

19        And plaintiffs, as you heard, contend that all they

20   have to do is prove the amount of defendants' gross revenue.

21   They say that's their sole burden, but that skips a step.

22   Because if you look at Question 1 when it comes up, it says

23   did plaintiff show that there's a causal nexus between the

24   infringement and defendants' gross revenue?  It's only if you

25   answer yes that you move on.

EXHIBIT 10
PAGE 1599

1          Well, let's look at the evidence.  They haven't

2    presented evidence that the infringement, the use of Joyful

3    Noise in Ostinato No. 2 lead to the success of Dark Horse,

4    lead to people buying Dark Horse.  They certainly didn't

5    present any evidence that the ostinato caused anyone to buy

6    Prism.  In fact, Dr. King testified based on his experience

7    and background that it did not happen and that you could swap

8    out Ostinato No. 2 for another ostinato.

9          Did plaintiffs present anyone to rebut that

10   testimony?  No.  So we submit your answer to Question No. 1

11   should be no.

12         Assuming you reach the next question, again, the

13   jury instructions will guide your way.  Jury Instruction

14   No. 3 instructs you on how to determine the potential damages

15   based on a defendant's profits.  It walks you through how to

16   do that.

17         And the important point here is that after you

18   determined the net profit, you need to determine also only --

19   and award only that portion of the profit from the sale of a

20   work containing copyrighted work from Joyful Noise that is

21   attributable to factors other than the use of Ostinato No. 2

22   in Dark Horse.  So all you can award is that portion of the

23   profit that is attributable to the use of Ostinato No. 2 in

24   Dark Horse.

25         And that's gonna be a two-step process.  First,

```
1    you're gonna have to determine the profit from the

2    exploitation of Dark Horse, and then determine what

3    percentage of that is attributable to the use of Ostinato

4    No. 2 in Dark Horse.

5           And I'd like to start with net profit.  And, again,

6    there's a jury instruction to guide you here.  It's the same

7    jury instruction, Jury Instruction No. 3.  And it makes clear

8    that profit is gross revenue minus expenses.  And expenses is

9    defined as all appropriate costs including, but not

10   necessarily limited to, appropriate operating costs, overhead

11   costs, and production costs incurred in producing a

12   defendant's gross revenue.

13          And as we previously discussed and Mr. Khan agrees,

14   for every defendant but Capitol Records, we know the net

15   profit.  The parties have agreed to it.  So we'll come back

16   to that in a minute, but let's start with Capitol.

17          Plaintiffs say that it's our burden to prove costs.

18   Well, we sustained that burden.  We presented you with a

19   profit and loss statement.  We presented you with the backup

20   for all the expenses that are set forth in that profit and

21   loss statement.  Mr. Drellishak explained that, thoroughly

22   explained all the revenue that came in and all the costs that

23   were incurred.

24          He testified that the facts -- costs were in fact

25   incurred.  He testified that the numbers came from financial
```

```
 1   systems that are being constantly validated and audited.  So
 2   all the information in front of you, plaintiffs don't
 3   challenge those numbers.
 4          They don't challenge, for example, when they talk
 5   about these marketing expenses for Ms. Perry, uh, were paid,
 6   they were paid.  All that is is an attack on Ms. Perry.  It
 7   has nothing to do with the facts before you.  Those were
 8   costs that were incurred to promote the album and they were
 9   costs that were paid.  There's no dispute about that so
10   there's no relevance to even bringing those up.
11          And in calculating the net profit of Dark Horse,
12   Mr. Drellishak started with the revenue and he allocated that
13   both for Dark Horse and for the Prism album.  And he did so
14   fairly and he did so consistently with Capitol's practice in
15   all litigations.
16          He did not ignore the Prism album.  He attributed
17   the revenue earned from it in equal proportion to every other
18   track on the album which is consistent with his testimony and
19   the testimony of Dr. King that when someone buys an album,
20   they buy it cause they want to own that artist's entire
21   catalog not a single track.
22          If someone wanted to listen to Dark Horse, they
23   could have streamed it online.  If someone wanted to own Dark
24   Horse, they could have bought it on its own.  People buying
25   the Prism album were doing so for a separate reason.
```

UNITED STATES DISTRICT COURT

EXHIBIT 10
PAGE 1602

1          And in addition, there's other singles that were on

2     the radio on that album as well.  So to say that the revenue

3     from Prism should be allocated solely to Dark Horse just

4     ignores the facts.  Plaintiffs presented no witness to rebut

5     the testimony of Mr. Drellishak or Dr. King.  They presented

6     no evidence whatsoever.  They just argue it here before you

7     today.  They take pot shots at our witnesses and, again,

8     those pot shots and those argument are not facts.  We need to

9     focus on the facts.

10          To that end let's talk about the royalties.  He

11     said that Mr. Drellishak couldn't say that the royalties were

12     paid.  But he said it is the normal course and practice of

13     Capitol to pay those royalties.  He testified that there's

14     sometimes a delay between the royalties coming in and the

15     royalties being paid, but the royalties are in fact paid.

16          In fact we've seen from the stipulation that the

17     artists and the songwriters did in fact receive royalties.

18     Those were the ones paid by Capitol.  So there's no dispute

19     those were paid.  Again, he attacks those marketing costs,

20     but once again he does not dispute those costs was paid.

21          Whether Mr. Kahn thinks those are too much is

22     irrelevant.  They were paid to promote the Prism album and

23     paid to promote the Dark Horse song and therefore, they must

24     be deducted from the revenue.

25          He talks about the overhead and how Mr. Drellishak

1    couldn't tie any of the overhead directly to Dark Horse, but

2    again that ignores the Prism album.  It ignores how a record

3    label works and Mr. Drellishak walked you through

4    step-by-step how a record label works.  And how for a song

5    like Dark Horse and an album like Prism and an artist like

6    Katy Perry all the resources that are expended from before

7    the album is released including the 18-month period that he

8    cut off the overhead.

9         Again, he did a fair and equal allocation for

10   overhead.  He didn't wrap in all the work that was before and

11   he cut it off at 18 months consistent with industry practice.

12   The response there was no witness to say that was a wrong

13   allocation.  There was no one to rebut that testimony.  It

14   was all unrebutted.  Plaintiffs simply now argue for you to

15   disregard it, but you need to make your decision based on the

16   evidence and the facts.

17        In fact plaintiffs own expert that we played for

18   you Michael Einhorn agreed with defendants and admitted those

19   costs.  And I'd like to you read to you his testimony again

20   because it makes it clear that these costs were incurred and

21   were paid.

22        "Q.  Isn't it true that Capitol Records incurred

23   some amount of expenses in connection with the exploitation

24   of the song Dark Horse and the album Prism.

25        "A.  Yes.

UNITED STATES DISTRICT COURT

EXHIBIT 10
PAGE 1604

1          "Q.  Isn't it true that it cost money to

2     manufacture and distribute an album?

3          "A.  Yes.

4          "Q.  Isn't it true that Capitol Records would have

5     had to pay someone to manufacture and distribute the album

6     whether a related corporate entity or an unrelated entity?

7          "A.  Correct.

8          "Q.  And if Capitol Records does pay a related

9     entity to manufacture and distribute the album, isn't it

10    correct that related entity incurs costs in doing so?

11         "A.  Correct.

12         "Q.  Is it your testimony that Capitol Records

13    should be penalized for engaging a related entity to

14    manufacture and distribute the product instead of paying an

15    unrelated entity to do so?

16         "A.  That is not my testimony."

17         And he goes on and on and on in those respects.  He

18    even he admits that artist royalties and producer royalties

19    are paid.  He admits it cost money to create the Dark Horse

20    music video, and he admits that it costs money to promote

21    Dark Horse on the radio.

22         We can't just ignore these costs which were proven

23    and validated by our witnesses.  We can't ignore the

24    testimony of Michael Einhorn that admits those costs were

25    paid.  You have to deduct the costs that were proven by

EXHIBIT 10
PAGE 1605

```
1    defendants to get to a net profit number.  Absent evidence to
2    the contrary and there is none, the $629,750 net profit
3    stated by Capitol is both supported and unrebutted.
4            If you return to the individual defendants,
5    plaintiffs admit that their costs are what are stated there,
6    but they basically tell you it's up to you as to whether you
7    should ignore them or not.  Somewhat insinuating that you
8    can.  If you look at Exhibit 125, the stipulation, it shows
9    the parties agreed on two things.  They agreed that the gross
10   profit, gross revenue earned by each defendant other than
11   Capitol for the exploitation of Dark Horse is what is stated.
12           And they also state that the costs attributable to
13   the aforementioned exploitation of Dark Horse is in the
14   amount stated as well.  And it says that for every defendant
15   but Capitol.  So if you follow the Judge's instructions, this
16   means that the expenses are admitted to be true and proven
17   and must be deducted.
18           With that you can go from the net profit to the
19   next question, Question 2 and we can subtract.  And we're
20   gonna do the math for you up here real quickly, but as we do
21   it, I want to go through every defendant's, um, every
22   defendant's contribution to Dark Horse, the work they put in
23   because I want to make clear that we need to keep in mind the
24   fairness that the plaintiffs keep talking about.
25           So if we start with Jordan Houston, what did he do?
```

1    He wrote and recorded a rap verse with Dark Horse.  He did

2    not have any involvement in creating the instrumental, but he

3    wrote and recorded a rap verse and provided it for the song.

4    For that he received gross revenues $631,448 and costs of

5    $119,343.  Plaintiffs would tell you he's not entitled to

6    that money.  It should go to them.  Is that fair?  I don't

7    think that's fair.

8          If you go to Karl Sandberg, Max Martin, he shows

9    gross revenues of $1.265 million and costs of approximately

10   $138,000.  And what did he do on the track?  He spent a lot

11   of time in the studio with Katy Perry, with Lukasz Gottwald

12   with Mr. Walter and Ms. Hudson to work on lyrics, to work on

13   the vocal melodies and for that he earned a profit.

14         Plaintiffs would again tell you just to disregard

15   all the work he did and award them those profits.  Is that

16   fair?  I don't think so.

17         The same is true for all the other defendants.  For

18   Mr. Gottwald, he helped create the instrumental after

19   Mr. Walter initially created it and he collaborated on those

20   lyrics.  He collaborated on those vocal melodies.  He spent a

21   lot of time in the studio to turn, uh, Dark Horse into what

22   it was.

23         Keep in mind that Dark Horse isn't just the

24   Ostinato No. 2.  It's far more than that.  It has lyrics on

25   top.  It has Katy Perry singing vocal melodies.  It has many,

EXHIBIT 10
PAGE 1607

1   many other layers of music on top of that ostinato.  I mean,

2   frankly, if you just heard a song that went (singing) and

3   that was it, no one would buy it.

4        It has to be part of a larger whole and the larger

5   whole is what the all the artists worked to create.  And the

6   larger whole is what Capitol Records promoted to the public

7   and sold to the public and you can't simply discount all that

8   stuff.

9        So if you walk through for Mr. Walter and the money

10  he earned, and if you walk through for Ms. Hudson who wrote

11  the lyrics with Ms. Perry in Santa Barbara and what she

12  earned, and if you look at Ms. Hudson, Katy Perry, and what

13  she earned not just for writing Dark Horse, but for putting

14  together an album, the Prism album that became a huge hit.  A

15  Prism album that came out only after she had worked hard for

16  many years to become the pop star that she was.

17       Those are all the profits that those defendants

18  earned.  And they would simply tell you to discount that and

19  ignore it.  And they would do the same for the corporate

20  defendants for Kobalt Music Publishing America who received

21  profits from their services.  WB Music who received profits

22  from their contributions.  It's simply not fair to discount

23  all this and to provide it to defendants (sic).

24       In fact, we would submit it's grossly unfair and

25  manifestly unjust.  Why should plaintiffs be entitled to

EXHIBIT 10
PAGE 1608

```
1    amounts more than those earned by the other writers who

2    contributed thus far?  Indeed, if you looked at those numbers

3    and add up the net profit, as I said we'll do that for you,

4    it will show that for each individual the net profits for

5    Juicy, for example, are $512,104.  Max is $1,125,923.

6    Mr. Gottwald is $270,218.  Mr. Walter is $620,028.

7    Ms. Hudson is $588,721 and Ms. Perry is $2,445,586.

8            And for Kobalt you need to look no further than the

9    stipulation which shows that's $132,476.  WB is $130,450 and

10   Capitol Records as we discussed is $629,725.  Those are the

11   numbers of the net profits that you should find here today.

12           This brings us to the next step, the apportionment.

13   Again, the next step is to look at what portion of any profit

14   was attributable to Ostinato No. 2 in Dark Horse.  Plaintiff

15   stated and it's correct that it's our burden to show that

16   there's other factors that contributed to the success of Dark

17   Horse and contributed to the success of Prism, but we've done

18   that.

19           We've met that burden and made clear through

20   testimony of two witnesses including Dr. King and Dr. Ferrara

21   that any apportionment should be very small.  That testimony

22   too is unrebutted.  Again, argument is not evidence.

23           First, we presented evidence of the musicological

24   value of Ostinato No. 2 to the composition as a whole and how

25   Ostinato No. 2 embodies 207 noteheads out of over 3,000
```

```
 1    noteheads on the score of the Dark Horse composition.  It was
 2    hard for you to see on the screen, but I would certainly
 3    encourage you to take a look at Dr. Ferrara's transcription
 4    when you get to the jury room.
 5            Now, as you heard, plaintiffs would have you ignore
 6    this and have you focus solely on the fact you can hear
 7    Ostinato No. 2 in 95 seconds of the song.  But what that
 8    ignores and what the transcription shows and what Mr. Kahn
 9    said you can hear during those 95 seconds is not just
10    Ostinato No. 2.
11            There's many other layers of music during that
12    time.  There's notes, there's elements, there's a bass line,
13    there's a drum beat and there's Katy Perry singing over it or
14    Juicy J rapping over it.  So to say that Ostinato No. 2 is
15    45 percent of the song is just plain wrong.
16            In fact, after Dr. Ferrara, we talked with Dr. King
17    and he talked about the reasons for the commercial success of
18    Dark Horse and also the commercial success of Prism.  And I'm
19    gonna use what we call an Elmo to just walk you through very
20    quickly what his testimony was.  I always wanted to use one
21    of these.
22            So first we have the primary factors.  And Dr. King
23    testified that the primary factors are the celebrity of Katy
24    Perry and marketing.  Now, Mr. Kahn said that you should just
25    remove the celebrity of Ms. Perry which to me frankly is
```

```
 1   ridiculous.  Again, we talked about this in the opening about
 2   the reason people buy a Katy Perry song, the reason why they
 3   buy a Katy Perry album is because it's Katy Perry.
 4           Sure, Katy Perry may have sang on all 13 or all 16
 5   of those songs on the albums, but it was always Katy Perry.
 6   Can you swap her out with someone else who is unknown?  What
 7   happens to the commercial success to that album?  According
 8   to Dr. King, again, whose testimony is unrebutted it becomes
 9   much, much substantially less.
10           And as for the marketing, again, Mr. Kahn talked
11   about the fact that Dark Horse became popular before any
12   marketing because of this competition.  But keep in mind,
13   even the competition was marketing.  It was a competition put
14   on by Pepsi.  It was part of the promotion of the Prism
15   album.
16           It was part of the promotion of the entire project.
17   And that also ignores all the other marketing that went on
18   over the course of the months and years that continued both
19   through music videos, radio play, a truck traversing the
20   entire country to bring attention to the project.
21           It was a music video, for example, for Dark Horse
22   that was so enthralling that Mr. Lambert you may recall
23   testified he didn't even hear the music initially he was so
24   mesmerized by the video.  So all these things went into it
25   and they all contributed heavily and primarily as Dr. King
```

```
 1    testified to the success of Prism and to the success of Dark
 2    Horse.
 3            Which brings us to the secondary factors.  And here
 4    you have the music.  And Dr. King testified about what makes
 5    up the music.  And he testified that the hook is the most
 6    important part and itself constitutes one of the secondary
 7    factors alone.  Because the hook is what you remember.  It's
 8    that the ear wig, it's that part that you sing in the shower.
 9            And next is the vocal performances.  And, again,
10    here as Dr. King testified, he talked about Katy Perry's
11    vocals and Juicy J's vocals.  And how no one buys a Katy
12    Perry track if she's not performing on it.  And how Juicy J
13    contributed a very important verse that made it a more
14    popular and unique song than it might have otherwise been.
15            And next he talked about the instrumental
16    compositional elements.  Because, again, you can't just focus
17    on a single element in isolation.  You have to look at it all
18    in totality because that's what Dark Horse is.  It's numerous
19    instrumental elements combined together.  It's not simply
20    Ostinato No. 2.  It's not simply Ostinato No. 1.  It's all
21    these things.
22            And when Mr. Kahn talked about the fact that people
23    when they first showed up in Santa Barbara really liked that
24    song, it was not just Ostinato No. 2 that was played over and
25    over again.  Again, there was Ostinato No. 1, there was the
```

EXHIBIT 10
PAGE 1612

 1    drums, there were other elements even at that point in time.

 2    You can't just simply ignore those.

 3          And finally he talked about the production and

 4    arrangement.  And the production and the arrangement is

 5    basically all the hard work that everyone put into it from

 6    start to finish to make it what it was.  Because if it was

 7    unrefined, if it wasn't mixed properly, if it didn't have the

 8    sound that caught people's ears, then it wouldn't have been

 9    commercially successful.  The song is only as successful as

10    what it becomes and what has been created.

11          So third we have the tertiary factors that the

12    Dr. King talked about.  And there he talked about the lyrics

13    being one tertiary factor and he talked about any isolated

14    musical element.  And that was when Dr. King talked about

15    Ostinato No. 2 specifically.

16          And talked about what would happen if you replaced

17    it with another ostinato.  What would happen to the

18    commercial success of Dark Horse?  And he testified about how

19    he could simply replace it with another ostinato.

20          In sum what he testified is that Ostinato No. 2

21    alone is relatively minor in comparison to all the other

22    factors that contributed to the commercial success and that

23    testimony was unrebutted.  And that's true both for Dark

24    Horse and for the Prism album.

25          Cause if you think of the Prism album, for example,

```
 1    as a movie just think of it this way.  Why do people go to

 2    see a movie?  They go because of the stars in it.  A consumer

 3    also similarly buys an album because of the artist.  They may

 4    go because of the genre.  They like dramas.  Similarly here,

 5    they may buy an album because they like pop music.  They see

 6    it because they know it exists because it's been marketed to

 7    them and they know and they want to see it.

 8            They also go for the movie itself and that's when

 9    you get to the secondary factors.  But as it relates to the

10    Prism album, they don't go to see the movie for one

11    individual scene.  Just like people don't buy an album for

12    one song.  You can buy it in other ways if you just want that

13    one song.

14            They don't go to a movie to see a line of dialogue

15    in that one scene.  Just like people don't buy an album

16    because of a specific phrase, as specific piece of music

17    within that song.

18            So, again, when get into the jury room and

19    deliberate, I would ask you to talk about the testimony of

20    Dr. King and Dr. Ferrara which again are unrebutted and not

21    the arguments and the attacks on those witnesses by

22    plaintiffs' counsel.

23            And that brings us to the allocation which is the

24    final part.  How do you break down what that allocation

25    should be?  Well, we would submit that it's not that
```

1    difficult.  You start at a hundred percent and look at the

2    primary factors, the main reasons for commercial success.

3    Those two celebrity and marketing are responsible for at

4    least 50 percent of the success of the song.  So it would be

5    25 percent each.

6         Then next you would go to the secondary factors and

7    therefore and you can value those no more than ten percent

8    each which leaves the tertiary factors which comprise the

9    remaining amount.  And you can write five percent next to

10   lyrics and five percent next to any individual part in

11   isolation including Ostinato No. 2.

12        Having done that, you can turn to the final page of

13   the verdict form.  You can calculate the amount of damages

14   you should award as to each defendant.  And, again, we've

15   done the math for you here.  Take the net profit that we've

16   previously showed you and multiply it by five percent.  You

17   can see each of the amounts that even if you accept those

18   numbers would be awarded against any individual defendant.

19        You would see that for Juicy J it's 25,000.  For

20   Mr. Sandberg it's 56,000.  For Mr. Gottwald it's 13,000.  For

21   Mr. Walter it's 31,000.  For Ms. Hudson it's 29,000.  For

22   Ms. Perry it's 122,000.  For KMI it would be 41,000.  For

23   Warner it would be 6,000.  For Kobalt it would be 6,000.  For

24   Capitol it would be $31,000.

25        And these are numbers that are based on the

```
 1    evidence and based on giving plaintiffs' contribution which

 2    is Ostinato No. 2 in Dark Horse the full value of what the

 3    witnesses testified it should constitute.  The full value of

 4    what the evidence thinks it should be.  We think that's more

 5    than fair and more than justice for what their contribution

 6    was to a song.

 7              I guess in sum I would say even if you disagree

 8    with that and believe that plaintiffs are entitled to

 9    something more, then, again, going back to fairness, what

10    should that be?  Again, there were six songwriters of Dark

11    Horse who contributed much work, much time, much effort.

12    They created lyrics, they created musical elements, they

13    created a whole host of things that went into what Dark Horse

14    was.

15              And if we're talking about fairness and if you want

16    to treat plaintiffs equally with them, then you can simply

17    take what those five, six individuals earned in total which

18    you can easily figure out from the net profit before.  It

19    totals approximately $5,562,000.

20              If you divide that number by seven and treat

21    plaintiffs equally, that would be $794,654.  From our point

22    of view, nothing more than that could be possibly fair.  And

23    again it's overstated given the actual contribution of

24    Ostinato No. 2 to the Dark Horse track.

25              So in closing I've been thinking about the
```

EXHIBIT 10
PAGE 1616

1    liability phase.  I've been thinking about this damage phase

2    and Mr. Kahn's closing both today and last time and how life

3    will go for the defendants.  Don't worry about them, but he

4    can't say that.

5           There's tremendous harm to these individuals and

6    the damages that they seek.  The numbers that they put in

7    front of you punish them for that and that's not how this

8    works.  It's gonna impact them financially far more than

9    Mr. Kahn says.

10          So as you go and deliberate, remember fairness is

11   not one-sided.  It should not ignore the hard work of the

12   writers of Dark Horse.  It should not ignore the hard work

13   and efforts of Capitol Records to market and exploit that

14   song.  It should be fair and just on both sides and make

15   that -- take all that into account.  Thank you.

16          THE COURT:  Okay.

17          MR. KAHN:  It was fascinating how defense counsel

18   came up with his five percent number.  I don't know where he

19   came up with that.  One thing Dr. King did not do was place

20   any percentage values on any of these items and yet somehow

21   after warning us that lawyers shouldn't testify, we come up

22   with a five percent number.

23          The fair number is reflected in what you've heard

24   in the music.  It's 45 percent of the song.  These

25   defendants, their hard work will be acknowledged.  They'll

EXHIBIT 10
PAGE 1617

```
 1   each get to keep more than half of the profits they've earned
 2   from this song and they'll get to keep a hundred percent of
 3   the profits going forward.
 4            Just a couple points to make sure there's no
 5   confusion.  This first question that you're gonna be asked in
 6   the verdict director which is whether we showed there's a
 7   causal nexus, a connection, between the infringement and the
 8   defendants' gross revenue.  And that's been more than
 9   adequately shown because those gross revenues all come from
10   the sale of an infringing song.
11            You found Dark Horse to infringe Joyful Noise and
12   therefore every penny of gross revenue from the sale is only
13   the sale of those songs or an album with those songs on it so
14   there is a causal nexus.
15            Just to clarify Mr. Wais read from Dr. Einhorn's
16   deposition.  Dr. Einhorn wasn't asked to confirm any of the
17   specific numbers.  He simply confirmed what we've already
18   conceded.
19            MR. WAIS:  Object to evidence that's not in the
20   record.
21            THE COURT:  Um, I think that's right.  You can only
22   talk about what he testified to.
23            MR. KAHN:  All he confirmed was that there were
24   costs, that there were payments.  He wasn't asked --
25            MR. WAIS:  Object to what he wasn't asked.  It's
```

1    not in the record.

2         THE COURT:  He just said, though, what he

3    confirmed.  Obviously, you can't say he wasn't asked this and

4    he wasn't asked that because we only know what he was asked.

5         MR. KAHN:  Right.  And he was asked whether there

6    were costs incurred, he was asked whether there were

7    royalties paid and he said yes.  We don't contest that.

8         What we contest is whether the specific numbers

9    that Capitol Records included in their 2018 balance sheet

10   whether they met their burden of proof on all of those

11   numbers and we submit they haven't.

12        And just to reiterate what I said earlier, the

13   attempt to push the value of Joyful Noise's instrumental beat

14   down to five percent simply ignores the evidence.  The entire

15   song was built on that beat.  And everything that was done

16   after Ms. Perry said yes, I like that beat was built on that

17   beat.  Without that beat there would not have been a song.

18   There would not have been these millions and millions of

19   dollars.

20        The lawyers can argue with you all day about what

21   is and isn't fair.  We've given you what we believe is the

22   fair calculation which is the 45 percent which is how much

23   that ostinato appears in the song.  But at the end of the

24   day, it will be the law and what the Judge has instructed you

25   on in calculating fair damages.  And the law simply requires

```
1    each side and each party to satisfy their burdens of proof.
2           We come to you today not seeking punishment.  We
3    come to you today not seeking to take aware more than half of
4    these defendants' profits.  We come today seeking fair
5    compensation for the hard work that these plaintiffs provided
6    in creating what become a key part of Dark Horse.  Thank you.
7           THE COURT:  Okay.  All right.
8           THE CLERK:  This court's in recess.
9                  (Jury Deliberates)
10          THE COURT:  Good afternoon.
11          THE CLERK:  Are we ready for the jury?
12          MR. KAHN:  Yes.
13                  (Jury present.)
14          THE COURT:  All right.  ███████████, I
15   understand that the jury has reached a verdict?
16          ██████████:  We have, Your Honor.
17          THE COURT:  Okay.  Would you hand it to my
18   courtroom deputy.  As in the past, I'm gonna read it to
19   myself and read it a loud, and then ask each of you if in
20   fact that is your verdict.  All right.
21          1.  Did plaintiffs show that there is a causal
22   nexus between the infringement and defendants' gross revenue?
23          Answer:  Yes.
24          I'm not gonna read all the amounts at the beginning
25   of Question 2.  I'm gonna read the verdict only if that's
```

1    agreeable.

2           2.   Please state the amount of net profits, if any,

3    earned by each defendant from Dark Horse:

4           Jordan Houston:  $512,104.71.

5           Karl Martin Sandberg:  $1,125,923.89.

6           Lukasz Gottwald:  $270,218.15.

7           Kasz Money, Inc.:  $838,487.99.

8           Henry Russell Walter:  $620,028.06.

9           Sara Hudson: $588,721.59.

10          Katheryn Elizabeth Hudson:  $2,445,586.56.

11          Kobalt Music Publishing America, Inc.:

12          $132,476.14.

13          WB Music Corp.:  130,450.36.

14          Capitol Records:  $5,732,938.

15          3.   What percent, if any, of the net profits earned

16   by defendants from Dark Horse is attributable to the use of

17   the Joyful Noise musical composition in Ostinato No. 2 in

18   Dark Horse as opposed to other factors:

19          Answer:  22.5 percent.

20          4.   Please multiply the amount of net profits

21   earned by each defendant identified in Question 2 by the

22   percentage you determined in Question 3, and state the

23   resulting amount for each defendant below.

24          Jordan Houston:  $115,223.56.

25          Karl Martin Sandberg:  $253,332.88.

```
 1              Lukasz Gottwald:  $60,799.08.

 2              Kasz Money, Inc.:  $188,659.80.

 3              Henry Russell Walter:  $139,506.31.

 4              Sarah Hudson:  $132,462.36.

 5              Katheryn Elizabeth Hudson:  $550,256.98.

 6              Kobalt Music Publishing America, Inc.:  $29,807.13.

 7              WB Music, Corp.: $29,351.33.

 8              Capitol Records:  $1,289,911.05.

 9              It's dated August 1, 2019.  It is signed by the

10    presiding juror███████████████████  and that is the

11    situation.

12              So let me ask each of you if that is your verdict.

13              Let's start with you,████████████████, is that

14    your verdict?

15    ████████████████████:  It is, Your Honor.

16              THE COURT:  ███████████, is that your verdict?

17    ████████████:  It is, Your Honor.

18              THE COURT:  ████████████, is that your verdict?

19    ████████████:  It is, Your Honor.

20              THE COURT:  ██████████████, is that your verdict?

21    █████████████████:  Yes, it is, Your Honor.

22              THE COURT:  Okay.  And then, ████████████, is that

23    your verdict?

24    ████████████:  Yes, Your Honor.

25              THE COURT:  And ███████████████, is that your
```

UNITED STATES DISTRICT COURT

EXHIBIT 10
PAGE 1622

```
 1   verdict?
 2              ███████████ :  Yes, it is, Your Honor.
 3         THE COURT:  ██████████ , is that your verdict?
 4              ██████████ :  Yes, it is, Your Honor.
 5         THE COURT:  █████████████ , is that your
 6   verdict?
 7              █████████████ :  Yes, it is, Your Honor.
 8         THE COURT:  ███████████ , is that your verdict?
 9              ██████████ :  Yes, it is, Your Honor.
10         THE COURT:  Okay.  Ladies and gentlemen, at this
11   juncture I'm going to excuse all of you.  The lawyers may
12   wish to speak with you.  If so, it's entirely up to you as to
13   whether you speak with them or not.  But you may now speak
14   about the case.
15              And before you go, though, I do want to thank you
16   because this has been a long and arduous process.  We know
17   that you've worked very, very hard and you have performed
18   great public service in doing this.  So on behalf of counsel
19   and I'm sure the parties, we want to thank you for your
20   public service.
21              If any of you wishes to speak with me, of course,
22   I'm available, too now or at some time in the future.  I'm
23   gonna permit you to go at this stage.  As I said, the lawyers
24   may want to speak with you.  It's up to you, though.  If you
25   want to go, just go or tell you'll speak at a later point in
```

```
 1    time.

 2              Okay?  Thank you very much.

 3                   (Jury discharged.)

 4         THE COURT:  Okay.  Folks, I don't know if you wish

 5    to head out and speak with the them or alternatively, whether

 6    you want to do scheduling now.  We can do it either way.

 7         MS. LEPERA:  Prefer to do the scheduling after if

 8    that's acceptable.

 9         THE COURT:  That's fine, that's fine.

10         Okay.  Then we'll make a copy of all of this for

11    you.

12         Thank you all for your time, your effort and they

13    will be coming out at that end.

14         MS. LEPERA:  And just to be clear, the scheduling

15    is on the Rule 50, et cetera?

16         THE COURT:  It's only on Rule 50.

17         MS. LEPERA:  Thank you, Your Honor.

18         MR. MOVIT:  Thank you, Your Honor.

19         THE COURT:  Thank you.

20         THE CLERK:  This court's adjourned.

21              (Proceedings were concluded at 4:00 p.m.)

22

23

24

25
```

UNITED STATES DISTRICT COURT

EXHIBIT 10
PAGE 1624

1

2                              CERTIFICATE OF REPORTER

3

4    COUNTY OF LOS ANGELES        )

5                                 )  SS.

6    STATE OF CALIFORNIA          )

7

8    I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

9    STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

10   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

11   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

12   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

13   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

14   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

15   OF MY STENOGRAPHIC NOTES.

16

17

18   DATE:  AUGUST 8, 2019_____

19

20        /s/  LAURA MILLER ELIAS

21   LAURA MILLER ELIAS, CSR 10019

22   FEDERAL OFFICIAL COURT REPORTER

23

24

25

## $

**$1,125,923** [1] - 26:5
**$1,125,923.89** [1] - 38:5
**$1,289,911.05** [1] - 39:8
**$1.265** [1] - 24:9
**$11,772,913** [1] - 10:3
**$115,223.56** [1] - 38:24
**$119,343** [1] - 24:5
**$12,402,000** [1] - 6:15
**$130,450** [1] - 26:9
**$132,462.36** [1] - 39:4
**$132,476** [1] - 26:9
**$132,476.14** [1] - 38:12
**$138,000** [1] - 24:10
**$139,506.31** [1] - 39:3
**$150** [1] - 15:4
**$188,659.80** [1] - 9:6
**$1979** [1] - 9:6
**$2,000** [1] - 8:23
**$2,445,586** [1] - 26:7
**$2,445,586.56** [1] - 38:10
**$20** [1] - 6:21
**$253,332.88** [1] - 38:25
**$270,218** [1] - 26:6
**$270,218.15** [1] - 38:6
**$29,351.33** [1] - 39:7
**$29,807.13** [1] - 39:6
**$3,000** [1] - 8:24
**$31,000** [1] - 32:24
**$40** [1] - 5:23
**$5,562,000** [1] - 33:19
**$5,732,938** [1] - 38:14
**$512,104** [1] - 26:5
**$512,104.71** [1] - 38:4
**$550,256.98** [1] - 39:5
**$588,721** [1] - 26:7
**$588,721.59** [1] - 38:9
**$60,799.08** [1] - 39:1
**$620,028** [1] - 26:6
**$620,028.06** [1] - 38:8
**$629,725** [1] - 26:10
**$629,750** [1] - 23:2
**$631,448** [1] - 24:4
**$6500** [1] - 8:25
**$73,000** [1] - 9:2
**$794,654** [1] - 33:21
**$821** [2] - 8:23, 9:7
**$838,487.99** [1] - 38:7
**$900,000** [1] - 8:21

## /

**/s** [1] - 42:20

## 1

**1** [14] - 1:15, 4:1, 4:3, 10:18, 11:1, 13:17, 14:1, 16:13, 16:22, 17:10, 29:20, 29:25, 37:21, 39:9
**100** [1] - 5:13
**10019** [2] - 1:22, 42:21
**11.5** [1] - 6:19
**11377** [1] - 2:18
**116** [1] - 6:12
**122,000** [1] - 32:22
**125** [1] - 23:8
**12TH** [1] - 2:7
**13** [4] - 7:1, 7:2, 11:24, 28:4
**13,000** [1] - 32:20
**130,450.36** [1] - 38:13
**14** [1] - 3:6
**15** [1] - 12:18
**15-5642** [1] - 4:4
**15-5642-CAS** [1] - 1:8
**16** [5] - 7:1, 10:20, 11:25, 12:3, 28:4
**16th** [1] - 10:19
**18** [1] - 21:11
**18-month** [1] - 21:7
**1840** [1] - 2:23
**1900** [1] - 2:23

## 2

**2** [29] - 10:22, 13:19, 13:23, 15:6, 15:7, 17:3, 17:8, 17:21, 17:23, 18:4, 23:19, 24:24, 26:14, 26:24, 26:25, 27:7, 27:10, 27:14, 29:20, 29:24, 30:15, 30:20, 32:11, 33:2, 33:24, 37:25, 38:2, 38:17, 38:21
**2007** [1] - 15:3
**2018** [5] - 7:12, 7:13, 7:15, 8:9, 36:9
**2019** [4] - 1:15, 4:1, 39:9, 42:18
**207** [1] - 26:25
**208** [1] - 2:11
**2100** [1] - 2:11
**213)894-0374** [1] - 1:24
**22.5** [1] - 38:19
**25** [1] - 32:5
**25,000** [1] - 32:19

## 29,000 [1] - 32:21

## 3

**3** [4] - 17:14, 18:7, 38:15, 38:22
**3,000** [1] - 26:25
**31,000** [1] - 32:21
**31.5** [1] - 6:23
**32** [1] - 6:22
**34** [1] - 3:5
**350** [1] - 1:23
**37** [1] - 3:9

## 4

**4** [2] - 3:5, 38:20
**4.5** [1] - 8:7
**41,000** [1] - 32:22
**4455** [1] - 1:23
**45** [8] - 5:5, 5:6, 14:11, 14:13, 15:11, 27:15, 34:24, 36:22
**4:00** [1] - 41:21

## 5

**5** [1] - 9:11
**50** [3] - 32:4, 41:15, 41:16
**56,000** [1] - 32:20

## 6

**6,000** [2] - 32:23
**63105** [2] - 2:8, 2:11

## 7

**7701** [1] - 2:7

## 8

**8** [1] - 42:18
**8th** [1] - 10:22

## 9

**9.1** [1] - 6:20
**90012** [1] - 1:23
**90064** [1] - 2:19
**90067** [1] - 2:24
**95** [3] - 5:3, 27:7, 27:9
**9:45** [1] - 4:1

## A

**A.M** [1] - 4:1
**AARON** [1] - 2:16
**able** [1] - 5:12

**absent** [1] - 23:1
**absolutely** [1] - 7:24
**absorb** [1] - 9:6
**accept** [1] - 32:17
**acceptable** [1] - 41:8
**according** [1] - 28:7
**account** [1] - 34:15
**accrued** [2] - 8:5, 8:6
**accuracy** [1] - 6:7
**acknowledged** [1] - 34:25
**Act** [1] - 16:1
**actual** [2] - 7:12, 33:23
**add** [1] - 26:3
**addition** [1] - 20:1
**adequately** [1] - 35:9
**adjourned** [1] - 41:20
**admit** [1] - 23:5
**admits** [4] - 22:18, 22:19, 22:20, 22:24
**admitted** [4] - 9:16, 21:18, 23:16
**aforementioned** [1] - 23:13
**afternoon** [1] - 37:10
**agree** [3] - 6:7, 8:19, 9:12
**agreeable** [1] - 38:1
**agreed** [4] - 18:15, 21:18, 23:9
**agrees** [1] - 18:13
**ahead** [1] - 9:2
**AIDED** [1] - 42:13
**Air** [1] - 12:11
**airplane** [1] - 9:1
**al** [1] - 4:5
**AL** [2] - 1:6, 1:9
**ALBERTSON** [1] - 2:17
**album** [45] - 6:19, 6:25, 7:1, 7:5, 7:6, 7:8, 7:14, 7:15, 7:24, 11:24, 11:25, 12:10, 12:22, 15:10, 15:18, 19:8, 19:13, 19:16, 19:18, 19:19, 19:25, 20:2, 20:22, 21:2, 21:5, 21:7, 21:24, 22:2, 22:5, 22:9, 25:14, 25:15, 28:3, 28:7, 28:15, 30:24, 30:25, 31:3, 31:5, 31:10, 31:11, 31:15, 35:13
**albums** [1] - 28:5
**allocated** [2] - 19:12, 20:3
**allocation** [4] - 21:9, 21:13, 31:23, 31:24
**almost** [2] - 8:16, 8:22

**alone** [2] - 29:7, 30:21
**alternatively** [1] - 41:5
**America** [3] - 25:20, 38:11, 39:6
**AMERICA** [1] - 1:1
**amount** [12] - 5:7, 9:22, 10:24, 16:20, 21:23, 23:14, 32:9, 32:13, 38:2, 38:20, 38:23
**amounts** [5] - 8:10, 8:11, 26:1, 32:17, 37:24
**AND** [4] - 42:8, 42:11, 42:13, 42:14
**ANGELES** [6] - 1:16, 1:23, 2:19, 2:24, 4:1, 42:4
**answer** [3] - 16:25, 17:10, 37:23
**Answer** [1] - 38:19
**APPEARANCES** [1] - 2:2
**appearances** [2] - 4:6, 4:7
**apportionment** [2] - 26:12, 26:21
**approach** [1] - 10:17
**appropriate** [4] - 7:20, 18:9, 18:10
**arduous** [1] - 40:16
**argue** [4] - 16:6, 20:6, 21:14, 36:20
**argument** [5] - 4:12, 15:23, 16:15, 20:8, 26:22
**arguments** [1] - 31:21
**ARGUMENTS** [1] - 3:4
**arrangement** [2] - 30:4
**artist** [4] - 8:6, 21:5, 22:18, 31:3
**artist's** [1] - 19:20
**artists** [3] - 15:15, 20:17, 25:5
**assigned** [1] - 9:21
**assuming** [1] - 17:12
**assumption** [1] - 9:15
**AT** [1] - 42:11
**attack** [2] - 15:23, 19:6
**attacks** [2] - 20:19, 31:21
**attempt** [1] - 36:13
**attention** [1] - 28:20
**attributable** [6] - 17:21, 17:23, 18:3, 23:12, 26:14, 38:16
**attributed** [1] - 19:16
**audited** [1] - 19:1
**August** [1] - 39:9

**AUGUST** [3] - 1:15, 4:1, 42:18
**available** [1] - 40:22
**award** [5] - 14:12, 17:19, 17:22, 24:15, 32:14
**awarded** [1] - 32:18
**aware** [1] - 37:3

**B**

**background** [1] - 17:7
**backup** [1] - 18:19
**balance** [1] - 36:9
**Barbara** [3] - 13:6, 25:11, 29:23
**bare** [1] - 14:12
**based** [7] - 15:11, 16:15, 17:6, 17:15, 21:15, 32:25, 33:1
**basis** [1] - 11:8
**bass** [1] - 27:12
**bear** [2] - 9:9, 16:3
**beat** [15] - 5:2, 11:11, 13:9, 13:10, 14:2, 14:3, 14:4, 15:3, 15:4, 27:13, 36:13, 36:15, 36:16, 36:17
**became** [4] - 6:16, 13:11, 25:14, 28:11
**become** [2] - 25:16, 37:6
**becomes** [2] - 28:8, 30:10
**beds** [1] - 13:5
**began** [2] - 12:9, 13:4
**begin** [1] - 10:17
**beginning** [2] - 14:15, 37:24
**BEHALF** [3] - 2:3, 2:13, 2:20
**behalf** [2] - 15:20, 40:18
**behind** [1] - 12:16
**below** [1] - 38:23
**better** [1] - 11:15
**between** [5] - 12:10, 16:23, 20:14, 35:7, 37:22
**biased** [1] - 10:17
**bills** [2] - 9:13, 9:14
**bit** [4] - 5:3, 6:21, 6:22, 7:11
**blocks** [1] - 13:11
**bought** [2] - 15:3, 19:24
**BOULEVARD** [2] - 2:7, 2:18
**break** [2] - 7:4, 31:24
**bring** [1] - 28:20

**bringing** [1] - 19:10
**brings** [3] - 26:12, 29:3, 31:23
**brought** [2] - 13:5, 14:7
**building** [1] - 13:11
**built** [2] - 36:15, 36:16
**burden** [15] - 5:19, 7:3, 7:17, 7:18, 8:2, 8:4, 8:13, 10:3, 16:21, 18:17, 18:18, 26:15, 26:19, 36:10
**burdens** [1] - 37:1
**buy** [9] - 17:5, 19:20, 25:3, 28:2, 28:3, 31:5, 31:11, 31:12, 31:15
**buying** [3] - 8:25, 17:4, 19:24
**buys** [3] - 19:19, 29:11, 31:3
**BY** [7] - 2:5, 2:10, 2:15, 2:22, 3:5, 3:6, 42:13

**C**

**CA** [2] - 2:19, 2:24
**calculate** [5] - 4:25, 5:4, 6:15, 11:6, 32:13
**calculated** [1] - 6:11
**calculating** [2] - 19:11, 36:25
**calculation** [3] - 9:20, 9:21, 36:22
**calculations** [1] - 10:12
**Calendar** [1] - 4:3
**CALIFORNIA** [6] - 1:2, 1:16, 1:23, 4:1, 42:6, 42:9
**cannot** [1] - 15:25
**CAPES** [1] - 2:5
**Capitol** [33] - 6:2, 6:8, 6:9, 6:10, 6:13, 6:17, 6:24, 7:23, 8:9, 9:1, 9:3, 9:16, 12:15, 12:18, 15:18, 18:14, 18:16, 20:13, 20:18, 21:22, 22:4, 22:8, 22:12, 23:3, 23:11, 23:15, 25:6, 26:10, 32:24, 34:13, 36:9, 38:14, 39:8
**Capitol's** [1] - 19:14
**car** [3] - 8:18, 8:19, 8:25
**case** [2] - 16:14, 40:14
**Case** [1] - 4:4

**CASE** [1] - 1:8
**catalog** [1] - 19:21
**categories** [2] - 8:5, 9:23
**category** [2] - 9:10, 9:17
**caught** [1] - 30:8
**causal** [4] - 16:23, 35:7, 35:14, 37:21
**caused** [1] - 17:5
**CD** [5] - 6:18, 6:19, 6:25, 7:4
**celebrity** [3] - 27:23, 27:25, 32:3
**CENTRAL** [2] - 1:2, 42:9
**CENTURY** [1] - 2:23
**certain** [2] - 9:22
**certainly** [2] - 17:4, 27:2
**CERTIFICATE** [1] - 42:2
**CERTIFY** [2] - 42:10, 42:14
**cetera** [1] - 41:15
**challenge** [2] - 19:3, 19:4
**▋** [1] - 39:22
**▋** [1] - 39:24
**chartered** [1] - 9:2
**CHIEFFO** [1] - 2:22
**CHRISTINA** [1] - 1:4
**CHRISTINE** [1] - 2:15
**claim** [2] - 6:4, 15:6
**clarify** [1] - 35:15
**classic** [1] - 14:3
**CLAYTON** [1] - 2:11
**clear** [6] - 6:16, 18:7, 21:20, 23:23, 26:19, 41:14
**CLERK** [4] - 4:3, 37:8, 37:11, 41:20
**clients** [3] - 9:5, 9:9, 14:23
**CLOSING** [1] - 3:4
**closing** [3] - 4:12, 33:25, 34:2
**Cohen** [1] - 8:10
**COHEN** [2] - 2:6, 4:10
**collaborated** [2] - 24:19, 24:20
**combined** [1] - 29:19
**coming** [2] - 20:14, 41:13
**commercial** [6] - 27:17, 27:18, 28:7, 30:18, 30:22, 32:2
**commercially** [1] - 30:9
**comparison** [1] -

30:21
**compensation** [4] - 4:18, 14:8, 14:25, 37:5
**competition** [5] - 12:9, 12:21, 28:12, 28:13
**completely** [3] - 15:13, 15:14, 15:17
**composition** [3] - 26:24, 27:1, 38:17
**compositional** [1] - 29:16
**comprise** [1] - 32:8
**COMPUTER** [1] - 42:13
**COMPUTER-AIDED** [1] - 42:13
**conceded** [1] - 35:18
**concept** [3] - 11:9, 13:1
**concluded** [2] - 13:1, 41:21
**conclusion** [1] - 11:11
**confirm** [2] - 8:11, 35:16
**confirmed** [4] - 10:18, 35:17, 35:23, 36:3
**confusion** [1] - 35:5
**connection** [2] - 21:23, 35:7
**consisted** [1] - 10:19
**consistent** [2] - 19:18, 21:11
**consistently** [1] - 19:14
**constantly** [1] - 19:1
**constitute** [1] - 33:3
**constitutes** [1] - 29:6
**consumer** [1] - 31:2
**contacted** [1] - 13:13
**containing** [1] - 17:20
**contend** [1] - 16:19
**contest** [4] - 6:5, 7:24, 36:7, 36:8
**continue** [1] - 5:12
**continued** [1] - 28:18
**contrary** [1] - 23:2
**contributed** [9] - 9:25, 10:1, 26:2, 26:16, 26:17, 28:25, 29:13, 30:22, 33:11
**contribution** [4] - 23:22, 33:1, 33:5, 33:23
**contributions** [1] - 25:22
**copy** [1] - 41:10
**Copyright** [1] - 16:1
**copyright** [1] - 8:6
**copyrighted** [1] -

17:20
**Corp** [2] - 38:13, 39:7
**corporate** [2] - 22:6, 25:19
**CORRECT** [1] - 42:14
**correct** [4] - 22:7, 22:10, 22:11, 26:15
**cost** [2] - 22:1, 22:19
**costs** [37] - 6:4, 6:5, 6:6, 6:7, 7:16, 7:20, 7:23, 7:25, 8:4, 8:17, 9:4, 9:6, 18:9, 18:10, 18:11, 18:17, 18:22, 18:24, 19:8, 19:9, 20:19, 20:20, 21:19, 21:20, 22:10, 22:20, 22:22, 22:24, 22:25, 23:5, 23:12, 24:4, 24:9, 35:24, 36:6
**counsel** [5] - 4:6, 8:17, 31:22, 34:17, 40:18
**COUNSEL** [1] - 2:2
**count** [1] - 11:3
**counted** [2] - 8:14, 10:16
**counting** [2] - 10:23, 11:11
**country** [1] - 28:20
**COUNTY** [1] - 42:4
**couple** [4] - 4:21, 8:4, 16:3, 35:4
**course** [4] - 10:2, 20:12, 28:18, 40:21
**COURT** [27] - 1:1, 1:22, 4:8, 4:12, 14:20, 34:16, 35:21, 36:2, 37:7, 37:10, 37:14, 37:17, 39:16, 39:18, 39:20, 39:22, 39:25, 40:3, 40:5, 40:8, 40:10, 41:4, 41:9, 41:16, 41:19, 42:9, 42:22
**court's** [2] - 37:8, 41:20
**courtroom** [1] - 37:18
**create** [3] - 22:19, 24:18, 25:5
**created** [5] - 24:19, 30:10, 33:12, 33:13
**creating** [2] - 24:2, 37:6
**creation** [1] - 14:9
**CSR** [2] - 1:22, 42:21
**cubes** [2] - 8:22, 9:6
**cue** [1] - 12:15
**cut** [2] - 21:8, 21:11
**CV** [2] - 1:8, 4:4

## D

damage [2] - 16:10, 34:1
damages [6] - 5:19, 10:9, 17:14, 32:13, 34:6, 36:25
Dark [66] - 5:3, 5:13, 5:21, 7:22, 9:19, 9:21, 10:1, 11:10, 11:22, 12:2, 12:11, 12:14, 12:16, 12:18, 12:19, 12:21, 14:4, 15:6, 15:9, 15:13, 15:15, 15:18, 17:3, 17:4, 17:22, 17:24, 18:2, 18:4, 19:11, 19:13, 19:22, 19:23, 20:3, 20:23, 21:1, 21:5, 21:24, 22:19, 22:21, 23:11, 23:13, 23:22, 24:1, 24:21, 24:23, 25:13, 26:14, 26:16, 27:1, 27:18, 28:11, 28:21, 29:1, 29:18, 30:18, 30:23, 33:2, 33:10, 33:13, 33:24, 34:12, 35:11, 37:6, 38:3, 38:16, 38:18
date [1] - 7:12
DATE [1] - 42:18
dated [1] - 39:9
days [2] - 4:15, 16:3
decide [4] - 6:6, 14:12, 16:14
decision [1] - 21:15
Decker [4] - 11:5, 13:10, 14:2, 16:10
deduct [1] - 22:25
deducted [3] - 9:11, 20:24, 23:17
DEFENDANT [1] - 1:10
defendant [9] - 11:15, 18:14, 23:10, 23:14, 32:14, 32:18, 38:3, 38:21, 38:23
defendant's [4] - 17:15, 18:12, 23:21, 23:22
defendants [22] - 4:15, 5:8, 5:11, 5:20, 6:2, 6:4, 6:8, 7:18, 10:5, 14:14, 14:17, 15:12, 21:18, 23:1, 23:4, 24:17, 25:17, 25:20, 25:23, 34:3, 34:25, 38:16
DEFENDANTS [2] -

2:13, 2:20
defendants' [8] - 4:24, 5:6, 14:11, 16:20, 16:24, 35:8, 37:4, 37:22
defense [3] - 8:16, 15:20, 34:17
defined [1] - 18:9
delay [1] - 20:14
deliberate [3] - 16:17, 31:19, 34:10
Deliberates [1] - 37:9
deluxe [1] - 11:25
denigrate [1] - 15:23
deposition [1] - 35:16
deputy [1] - 37:18
determine [4] - 17:14, 17:18, 18:1, 18:2
determined [2] - 17:18, 38:22
dialogue [1] - 31:14
differently [1] - 10:25
difficult [1] - 32:1
digital [2] - 6:19, 6:20
directly [2] - 9:25, 21:1
director [1] - 35:6
disagree [1] - 33:7
disagreement [1] - 6:11
discharged [1] - 41:3
discount [6] - 15:13, 15:14, 15:17, 25:7, 25:18, 25:22
discussed [2] - 18:13, 26:10
dispute [3] - 19:9, 20:18, 20:20
disputes [1] - 5:2
disregard [3] - 15:13, 21:15, 24:14
distribute [4] - 22:2, 22:5, 22:9, 22:14
DISTRICT [5] - 1:1, 1:2, 1:4, 42:9
divide [1] - 33:20
dividing [1] - 6:25
DIVISION [1] - 1:2
DO [2] - 42:10, 42:13
document [1] - 7:11
dollars [3] - 4:16, 8:16, 36:19
done [4] - 26:17, 32:12, 32:15, 36:15
down [5] - 13:21, 13:22, 31:24, 36:14
Dr [31] - 10:8, 11:5, 11:14, 12:13, 12:22, 13:10, 13:16, 13:18, 14:2, 16:10, 17:6,

19:19, 20:5, 26:20, 27:3, 27:16, 27:22, 28:8, 28:25, 29:4, 29:10, 30:12, 30:14, 31:20, 34:19, 35:15, 35:16
dramas [1] - 31:4
Drellishak [6] - 18:21, 19:12, 20:5, 20:11, 20:25, 21:3
driving [1] - 12:5
drum [1] - 27:13
drums [1] - 30:1
during [3] - 6:16, 27:9, 27:11

## E

ear [1] - 29:8
earn [1] - 8:18
earned [15] - 5:9, 15:12, 19:17, 23:10, 24:13, 25:10, 25:12, 25:13, 25:18, 26:1, 33:17, 35:1, 38:3, 38:15, 38:21
ears [3] - 10:11, 11:6, 30:8
easily [1] - 33:18
EAST [1] - 2:23
economics [1] - 9:24
effort [2] - 33:11, 41:12
efforts [3] - 15:15, 15:17, 34:13
eight [1] - 10:23
Einhorn [4] - 16:11, 21:18, 22:24, 35:16
Einhorn's [1] - 35:15
either [1] - 41:6
elaborate [1] - 10:15
electric [1] - 9:13
electricity [2] - 9:18, 9:23
element [3] - 7:5, 29:17, 30:14
elements [5] - 27:12, 29:16, 29:19, 30:1, 33:12
ELIAS [4] - 1:22, 42:8, 42:20, 42:21
Elizabeth [2] - 38:10, 39:5
Elmo [1] - 27:19
embodies [1] - 26:25
encourage [1] - 27:3
end [3] - 20:10, 36:23, 41:13
engaging [1] - 22:13
enormously [1] - 12:4

enthralling [1] - 28:22
entire [5] - 13:12, 19:20, 28:16, 28:20, 36:14
entirely [1] - 40:12
entitled [3] - 24:5, 25:25, 33:8
entity [4] - 22:6, 22:9, 22:10, 22:13, 22:15
equal [2] - 19:17, 21:9
equally [2] - 33:16, 33:21
ERIC [1] - 2:10
ESQ [9] - 2:5, 2:6, 2:10, 2:15, 2:16, 2:16, 2:17, 2:17, 2:22
essentially [1] - 16:9
ET [2] - 1:6, 1:9
et [2] - 4:5, 41:15
evidence [22] - 4:14, 5:21, 7:20, 8:13, 13:4, 16:2, 16:6, 16:7, 16:15, 16:16, 17:1, 17:2, 17:5, 20:6, 21:16, 23:1, 26:22, 26:23, 33:1, 33:4, 35:19, 36:14
examination [2] - 6:10, 6:17
example [5] - 8:18, 19:4, 26:5, 28:21, 30:25
examples [1] - 8:4
except [1] - 6:8
excuse [1] - 40:11
Exhibit [2] - 6:12, 23:8
exists [1] - 31:6
expended [1] - 21:6
expense [3] - 8:15, 9:11, 9:17
expenses [15] - 7:23, 7:25, 8:21, 9:8, 9:12, 9:19, 9:25, 10:2, 10:4, 18:8, 18:20, 19:5, 21:23, 23:16
experience [1] - 17:6
expert [5] - 10:6, 11:13, 16:10, 16:11, 21:17
experts [1] - 16:8
explained [6] - 12:8, 12:13, 13:10, 14:2, 18:21, 18:22
exploit [2] - 5:12, 34:13
exploitation [5] - 5:21, 18:2, 21:23, 23:11, 23:13
extremely [1] - 12:19

## F

fact [13] - 5:1, 17:6, 18:24, 20:15, 20:16, 20:17, 21:17, 25:24, 27:6, 27:16, 28:11, 29:22, 37:20
factor [3] - 12:2, 12:7, 30:13
factors [17] - 11:19, 11:20, 11:21, 17:21, 26:16, 27:22, 27:23, 29:3, 29:7, 30:11, 30:22, 31:9, 32:2, 32:6, 32:8, 38:18
facts [8] - 11:8, 15:19, 18:24, 19:7, 20:4, 20:8, 20:9, 21:16
failed [1] - 8:4
fair [21] - 4:18, 4:24, 4:25, 5:7, 14:8, 14:11, 14:24, 15:24, 21:9, 24:6, 24:7, 24:16, 25:22, 33:5, 33:22, 34:14, 34:23, 36:21, 36:22, 36:25, 37:4
fairly [1] - 19:14
fairness [6] - 14:22, 15:2, 23:24, 33:9, 33:15, 34:10
far [4] - 7:7, 24:24, 26:2, 34:8
fascinating [1] - 34:17
favoring [1] - 11:1
FEDERAL [2] - 1:22, 42:22
fellow [1] - 4:22
Ferrara [6] - 10:8, 13:16, 13:18, 26:20, 27:16, 31:20
Ferrara's [1] - 27:3
figure [1] - 33:18
final [3] - 4:17, 31:24, 32:12
finally [2] - 10:5, 30:3
financial [1] - 18:25
financially [1] - 34:8
fine [2] - 41:9
finish [1] - 30:6
FIRST [1] - 1:23
first [6] - 12:23, 17:25, 26:23, 27:22, 29:23, 35:5
five [8] - 14:6, 32:9, 32:10, 32:16, 33:17, 34:18, 34:22, 36:14
fixed [1] - 9:19
flashing [2] - 8:22, 9:6
FLOOR [1] - 2:7

**fly** [2] - 9:1
**focus** [3] - 20:9, 27:6, 29:16
**folks** [1] - 41:4
**follow** [1] - 23:15
**FOR** [2] - 42:8, 42:9
**forces** [1] - 12:5
**FOREGOING** [1] - 42:11
**form** [5] - 6:1, 16:4, 16:16, 16:18, 32:13
**FORM** [1] - 42:13
**FORSYTH** [1] - 2:7
**forth** [1] - 18:20
**FORTH** [1] - 42:12
**forward** [3] - 7:19, 14:16, 35:3
**frankly** [2] - 25:2, 27:25
**front** [3] - 6:3, 19:2, 34:7
**full** [5] - 5:4, 6:18, 7:11, 33:2, 33:3
▮▮▮▮ [1] - 39:20
▮▮▮▮ [1] - 39:21
**FURTHER** [1] - 42:14
**future** [1] - 40:22

**G**

**GABRIELLA** [1] - 2:17
**gas** [3] - 8:19, 8:20, 9:14
**general** [1] - 4:21
**generate** [1] - 7:21
**generated** [1] - 9:19
**genre** [1] - 31:4
**gentlemen** [3] - 4:18, 14:21, 40:10
**given** [2] - 33:23, 36:21
**gonna** [11] - 13:14, 17:25, 18:1, 23:20, 27:19, 34:8, 35:5, 37:18, 37:24, 37:25, 40:23
**Gottwald** [7] - 13:5, 24:11, 24:18, 26:6, 32:20, 38:6, 39:1
**GRAY** [1] - 1:6
**Gray** [5] - 4:5, 4:22, 14:7, 14:18, 15:3
**great** [1] - 40:18
**GREENBERG** [1] - 2:21
**gross** [17] - 5:20, 6:3, 6:15, 7:17, 9:12, 16:20, 16:24, 18:8,

18:12, 23:9, 23:10, 24:4, 24:9, 35:8, 35:9, 35:12, 37:22
**grossly** [1] - 25:24
**group** [1] - 13:5
**guess** [2] - 11:25, 33:7
**guide** [2] - 17:13, 18:6
**guns** [2] - 16:8, 16:9

**H**

**hair** [1] - 8:23
**half** [5] - 5:4, 5:8, 14:14, 35:1, 37:3
**hand** [1] - 37:17
**handle** [1] - 6:6
**HANLEY** [1] - 2:11
**hard** [8] - 25:15, 27:2, 30:5, 34:11, 34:12, 34:25, 37:5, 40:17
**harm** [1] - 34:5
**head** [1] - 41:5
**hear** [5] - 10:25, 11:3, 27:6, 27:9, 28:23
**heard** [11] - 4:14, 6:10, 9:14, 13:4, 13:17, 16:3, 16:11, 16:19, 25:2, 27:5, 34:23
**heavily** [1] - 28:25
**help** [1] - 9:4
**helped** [1] - 24:18
**helps** [1] - 13:19
**Henry** [2] - 38:8, 39:3
**HEREBY** [1] - 42:10
**HEREINBEFORE** [1] - 42:11
**heretofore** [1] - 4:7
▮▮▮▮ [3] - 37:14, 39:10, 39:13
▮▮▮▮ [2] - 37:16, 39:15
**high** [1] - 10:6
**high-priced** [1] - 10:6
**hip** [1] - 14:3
**hired** [2] - 16:8, 16:9
**hit** [1] - 25:14
**hits** [1] - 12:3
**holes** [1] - 11:16
**Honor** [12] - 37:16, 39:15, 39:17, 39:19, 39:21, 39:24, 40:2, 40:4, 40:7, 40:9, 41:17, 41:18
**HONORABLE** [1] - 1:4
**hook** [2] - 29:5, 29:7
**hop** [1] - 14:3
**Horse** [66] - 5:3, 5:13, 5:21, 7:22, 9:19, 9:21, 10:1, 11:10, 11:22, 12:2, 12:11,

12:14, 12:16, 12:18, 12:19, 12:21, 14:4, 15:6, 15:9, 15:13, 15:16, 15:19, 17:3, 17:4, 17:22, 17:24, 18:2, 18:4, 19:11, 19:13, 19:22, 19:24, 20:3, 20:23, 21:1, 21:5, 21:24, 22:19, 22:21, 23:11, 23:13, 23:22, 24:1, 24:21, 24:23, 25:13, 26:14, 26:17, 27:1, 27:18, 28:11, 28:21, 29:2, 29:18, 30:18, 30:24, 33:2, 33:11, 33:13, 33:24, 34:12, 35:11, 37:6, 38:3, 38:16, 38:18
**host** [1] - 33:13
**Houston** [5] - 13:24, 23:25, 38:4, 38:24
**Hudson** [10] - 13:13, 24:12, 25:10, 25:12, 26:7, 32:21, 38:9, 38:10, 39:4, 39:5
**huge** [2] - 11:16, 25:14
**hundred** [3] - 14:16, 32:1, 35:2

**I**

**ice** [2] - 8:22, 9:6
**identified** [1] - 38:21
**ignore** [10] - 16:7, 19:16, 22:22, 22:23, 23:7, 25:19, 27:5, 30:2, 34:11, 34:12
**ignores** [6] - 20:4, 21:2, 27:8, 28:17, 36:14
**ignoring** [1] - 16:9
**immediately** [1] - 13:7
**impact** [1] - 34:8
**importance** [1] - 13:3
**important** [6] - 11:19, 11:21, 15:17, 17:17, 29:6, 29:13
**IN** [1] - 42:8
**Inc** [4] - 38:7, 38:11, 39:2, 39:6
**included** [6] - 6:18, 7:9, 8:21, 11:10, 13:8, 15:4, 36:9
**including** [4] - 18:9, 21:7, 26:20, 32:11
**incur** [4] - 7:23, 7:25, 8:17
**incurred** [9] - 6:4,

7:21, 18:11, 18:23, 18:25, 19:8, 21:20, 21:22, 36:6
**incurs** [1] - 22:10
**indeed** [1] - 26:2
**INDEX** [1] - 3:1
**individual** [5] - 23:4, 26:4, 31:11, 32:10, 32:18
**individuals** [2] - 33:17, 34:5
**industry** [1] - 21:11
**information** [1] - 19:2
**infringe** [1] - 35:11
**infringement** [7] - 4:16, 5:9, 10:8, 16:24, 17:2, 35:7, 37:22
**infringes** [1] - 13:2
**infringing** [4] - 7:5, 7:6, 7:8, 35:10
**insinuating** [1] - 23:7
**instead** [3] - 8:25, 16:6, 22:14
**instructed** [1] - 36:24
**Instruction** [3] - 16:13, 17:13, 18:7
**instruction** [2] - 18:6, 18:7
**instructions** [4] - 5:17, 16:4, 17:13, 23:15
**instructs** [1] - 17:14
**instrumental** [15] - 5:2, 10:21, 11:10, 13:2, 13:3, 13:5, 13:9, 13:10, 13:15, 14:4, 24:2, 24:18, 29:15, 29:19, 36:13
**instrumentals** [1] - 13:7
**introduction** [2] - 13:18, 13:21
**involvement** [1] - 24:2
**ironically** [1] - 11:14
**irrelevant** [1] - 20:22
**IS** [1] - 42:14
**isolated** [1] - 30:13
**isolation** [2] - 29:17, 32:11
**issue** [2] - 5:19, 15:4
**issues** [2] - 9:7, 15:19
**item** [2] - 8:15, 12:23
**Item** [1] - 4:3
**items** [3] - 8:1, 8:7, 34:20
**itself** [3] - 15:19, 29:6, 31:8

**J**

**J's** [1] - 29:11
**JACOB** [1] - 2:17
**JEFFREY** [1] - 2:16
**jet** [1] - 9:2
**Jordan** [3] - 23:25, 38:4, 38:24
**Joyful** [12] - 5:2, 10:21, 11:10, 13:2, 13:8, 14:2, 14:4, 17:2, 17:20, 35:11, 36:13, 38:17
**JUDGE** [1] - 1:4
**Judge** [2] - 7:16, 36:24
**Judge's** [2] - 5:17, 23:15
**Juicy** [6] - 13:25, 26:5, 27:14, 29:11, 29:12, 32:19
**juncture** [1] - 40:11
**June** [5] - 7:12, 7:13, 7:15, 8:8
**juror** [1] - 39:10
**Jury** [5] - 16:13, 18:7, 37:9
**jury** [21] - 4:9, 4:11, 4:18, 5:17, 5:18, 6:1, 14:22, 16:4, 16:5, 16:17, 17:13, 18:6, 18:7, 27:4, 31:18, 37:11, 37:13, 37:15, 41:3
**justice** [7] - 4:23, 5:10, 14:8, 14:19, 14:24, 15:24, 33:5

**K**

**KAHN** [7] - 2:5, 3:5, 4:14, 34:17, 35:23, 36:5, 37:12
**Kahn** [8] - 4:13, 14:23, 20:21, 27:8, 27:24, 28:10, 29:22, 34:9
**Kahn's** [1] - 34:2
**Karl** [3] - 24:8, 38:5, 38:25
**Kasz** [2] - 38:7, 39:2
**Katheryn** [2] - 38:10, 39:5
**Katy** [20] - 4:5, 9:3, 11:22, 11:24, 12:1, 12:17, 21:6, 24:11, 24:25, 25:12, 27:13, 27:23, 28:2, 28:3, 28:4, 28:5, 29:10, 29:11
**KATY** [1] - 1:9

**KAYIRA** [2] - 2:9, 2:10
**keep** [10] - 5:8, 14:14, 14:15, 16:8, 23:23, 23:24, 24:23, 28:12, 35:1, 35:2
**keeping** [1] - 5:13
**keeps** [3] - 13:16, 14:23
**key** [1] - 37:6
**Khan** [1] - 18:13
**kind** [1] - 9:6
**King** [18] - 11:14, 12:13, 12:22, 17:6, 19:19, 20:5, 26:20, 27:16, 27:22, 28:8, 28:25, 29:4, 29:10, 30:12, 30:14, 31:20, 34:19
**KMI** [1] - 32:22
**KNUPP** [1] - 2:15
**Kobalt** [5] - 25:20, 26:8, 32:23, 38:11, 39:6

**L**

**label** [2] - 21:3, 21:4
**ladies** [3] - 4:17, 14:21, 40:10
**Lambert** [1] - 28:22
**larger** [3] - 25:4, 25:6
**last** [4] - 4:14, 5:10, 10:24, 34:2
**LAURA** [4] - 1:22, 42:8, 42:20, 42:21
**LAUREN** [1] - 2:6
**law** [3] - 15:25, 36:24, 36:25
**LAW** [1] - 2:9
**lawsuit** [2] - 6:14, 14:8
**lawyers** [5] - 16:6, 34:21, 36:20, 40:11, 40:23
**layers** [2] - 25:1, 27:11
**lead** [2] - 17:3, 17:4
**least** [1] - 32:4
**leaves** [1] - 32:8
**LEPERA** [4] - 2:15, 41:7, 41:14, 41:17
**less** [1] - 28:9
**level** [1] - 12:23
**liability** [3] - 10:9, 10:10, 34:1
**life** [1] - 34:2
**limited** [1] - 18:10
**line** [2] - 27:12, 31:14
**listen** [5] - 10:11, 11:4, 11:5, 19:22
**listened** [2] - 12:25, 13:7

**listening** [1] - 11:9
**litigations** [1] - 19:15
**LLC** [1] - 2:9
**look** [13] - 5:1, 10:12, 14:18, 16:22, 17:1, 23:8, 25:12, 26:8, 26:13, 27:3, 29:17, 32:1
**looked** [1] - 26:2
**looking** [1] - 7:14
[1] - 40:3
[1] - 40:4
**LOS** [6] - 1:16, 1:23, 2:19, 2:24, 4:1, 42:4
**loss** [2] - 18:19, 18:21
**loud** [1] - 37:19
**LOUIS** [1] - 2:8
**Lukasz** [3] - 24:11, 38:6, 39:1
**lyrics** [14] - 12:24, 13:14, 13:17, 13:18, 13:25, 14:1, 24:12, 24:20, 24:24, 25:11, 30:12, 32:10, 33:12

**M**

**main** [1] - 32:2
**manicure** [2] - 8:23, 9:7
**manifestly** [1] - 25:25
**manufacture** [4] - 22:2, 22:5, 22:9, 22:14
**MARCUS** [1] - 1:6
**Marcus** [2] - 4:5, 4:22
**market** [2] - 15:18, 34:13
**marketed** [1] - 31:6
**marketing** [16] - 8:15, 8:20, 9:7, 11:23, 12:8, 12:9, 12:16, 12:20, 19:5, 20:19, 27:24, 28:10, 28:12, 28:13, 28:17, 32:3
**Martin** [4] - 13:19, 24:8, 38:5, 38:25
**math** [2] - 23:20, 32:15
**mathematical** [1] - 9:15
**Max** [3] - 13:19, 24:8, 26:5
**mean** [1] - 25:1
**MEANS** [1] - 42:13
**means** [3] - 10:19, 14:14, 23:16
**measure** [2] - 10:20, 10:22
**meet** [2] - 8:1, 8:4

**melodies** [3] - 24:13, 24:20, 24:25
**melody** [2] - 13:20
**mentioned** [1] - 14:14
**mesmerized** [1] - 28:24
**met** [5] - 7:3, 8:13, 10:2, 26:19, 36:10
**Michael** [3] - 16:11, 21:18, 22:24
**MICHAEL** [1] - 2:5
**might** [1] - 29:14
**MILLER** [3] - 1:22, 42:20, 42:21
**million** [10] - 5:23, 6:19, 6:20, 6:21, 6:22, 6:23, 8:7, 8:16, 9:11, 24:9
**millions** [4] - 4:15, 4:16, 36:18
**mind** [4] - 16:3, 23:23, 24:23, 28:12
**minimize** [1] - 10:7
**minimum** [1] - 14:12
**minor** [1] - 30:21
**minus** [1] - 18:8
**minute** [2] - 5:4, 18:16
**minute-and-a-half** [1] - 5:4
**missing** [1] - 6:21
**MITCHELL** [1] - 2:15
**mixed** [1] - 30:7
**MO** [2] - 2:8, 2:11
**Money** [2] - 38:7, 39:2
**money** [12] - 5:12, 8:18, 10:1, 12:16, 12:20, 15:1, 15:17, 22:1, 22:19, 22:20, 24:6, 25:9
**month** [1] - 5:11
**months** [2] - 21:11, 28:18
[3] - 37:14, 39:10, 39:13
[2] - 37:16, 39:15
**morning** [2] - 4:8, 14:21
**most** [4] - 7:7, 11:19, 11:21, 29:5
**move** [1] - 16:25
**movie** [5] - 31:1, 31:2, 31:8, 31:10, 31:14
**MOVIT** [2] - 2:16, 41:18
**MR** [13] - 3:5, 3:6, 4:14, 14:21, 34:17, 35:19, 35:23, 35:25, 36:5, 37:12, 39:17, 40:7, 40:9

**MS** [12] - 2:13, 4:10, 37:16, 39:15, 39:19, 39:21, 39:24, 40:2, 40:4, 41:7, 41:14, 41:17
**multiply** [2] - 32:16, 38:20
[1] - 39:18
[1] - 39:19
**Music** [6] - 25:20, 25:21, 38:11, 38:13, 39:6, 39:7
**music** [19] - 10:15, 10:16, 10:19, 11:4, 12:24, 12:25, 22:20, 25:1, 27:11, 28:19, 28:21, 28:23, 29:4, 29:5, 31:5, 31:16, 34:24
**musical** [3] - 30:14, 33:12, 38:17
**musicological** [1] - 26:23
**must** [2] - 20:23, 23:17
**MY** [1] - 42:15

**N**

**necessarily** [1] - 18:10
**need** [11] - 7:18, 7:19, 9:13, 11:2, 11:5, 16:14, 17:18, 20:8, 21:15, 23:23, 26:8
[1] - 40:5
[1] - 40:7
**net** [15] - 17:18, 18:5, 18:14, 19:11, 23:1, 23:2, 23:18, 26:3, 26:4, 26:11, 32:15, 33:18, 38:2, 38:15, 38:20
**next** [13] - 5:11, 12:23, 17:12, 23:19, 26:12, 26:13, 29:9, 29:15, 32:6, 32:9, 32:10
**nexus** [4] - 16:23, 35:7, 35:14, 37:22
**NO** [1] - 1:8
**Noise** [10] - 5:2, 10:21, 13:2, 13:8, 14:2, 14:5, 17:3, 17:20, 35:11, 38:17
**Noise's** [2] - 11:10, 36:13
**none** [1] - 23:2
**normal** [1] - 20:12
**noted** [1] - 4:7
**notehead** [1] - 10:16
**noteheads** [9] - 10:14,

10:20, 10:24, 11:3, 11:4, 11:7, 11:12, 26:25, 27:5
**NOTES** [1] - 42:15
**notes** [5] - 10:12, 10:19, 10:22, 10:23, 27:12
**nothing** [2] - 19:7, 33:22
**NOURAFCHAN** [1] - 2:17
**number** [13] - 5:8, 5:10, 5:22, 6:21, 6:24, 7:8, 12:3, 12:22, 23:1, 33:20, 34:18, 34:22, 34:23
**numbers** [5] - 5:24, 6:5, 18:25, 19:3, 26:2, 26:11, 32:18, 32:25, 34:6, 35:17, 36:8, 36:11
**numerous** [1] - 29:18

**O**

**object** [2] - 35:19, 35:25
**obtain** [1] - 15:1
**obviously** [1] - 36:3
**OF** [13] - 1:1, 1:2, 1:14, 2:2, 2:3, 2:13, 2:20, 42:2, 42:4, 42:6, 42:9, 42:13, 42:15
**OFFICIAL** [3] - 1:22, 42:8, 42:22
**Ojukwu** [1] - 15:3
**OLYMPIC** [1] - 2:18
**ON** [3] - 2:3, 2:13, 2:20
**once** [2] - 8:24, 20:20
**one** [28] - 5:1, 5:8, 5:14, 5:18, 7:2, 8:5, 9:10, 10:8, 10:20, 11:22, 12:1, 12:3, 12:5, 12:22, 13:8, 21:13, 25:3, 27:20, 29:6, 29:11, 30:13, 31:10, 31:12, 31:13, 31:15, 34:11, 34:19
**one-sided** [1] - 34:11
**ones** [2] - 9:8, 20:18
**online** [1] - 19:23
**opening** [3] - 8:17, 13:21, 28:1
**operating** [1] - 18:10
**opinion** [1] - 11:16
**opposed** [1] - 38:18
**order** [1] - 7:21
**origins** [1] - 14:3
**Ostinato** [31] - 10:18,

10:22, 11:1, 13:17, 13:19, 13:22, 14:1, 15:6, 15:7, 17:3, 17:8, 17:21, 17:23, 18:3, 24:24, 26:14, 26:24, 26:25, 27:7, 27:10, 27:14, 29:20, 29:24, 29:25, 30:15, 30:20, 32:11, 33:2, 33:24, 38:17
**ostinato** [7] - 15:4, 17:5, 17:8, 25:1, 30:17, 30:19, 36:23
**OTHER** [1] - 2:13
**otherwise** [1] - 29:14
**ought** [1] - 12:15
**outset** [2] - 4:21, 14:6
**overhead** [10] - 9:10, 9:12, 9:17, 9:25, 18:10, 20:25, 21:1, 21:8, 21:10
**overstated** [1] - 33:23
**overwhelmingly** [1] - 12:14
**own** [6] - 11:9, 16:9, 19:20, 19:23, 19:24, 21:17

## P

**p.m** [1] - 41:21
**page** [2] - 6:13, 32:12
**PAGE** [1] - 3:3
**paid** [21] - 7:25, 8:1, 8:11, 8:12, 16:9, 16:10, 19:5, 19:6, 19:9, 20:12, 20:15, 20:18, 20:19, 20:20, 20:22, 20:23, 21:21, 22:19, 22:25, 36:7
**paper** [2] - 10:13, 10:25
**PARK** [1] - 2:23
**part** [11] - 5:24, 14:10, 15:5, 25:4, 28:14, 28:16, 29:6, 29:8, 31:24, 32:10, 37:6
**parties** [3] - 18:15, 23:9, 40:19
**parts** [1] - 15:6
**party** [1] - 37:1
**past** [2] - 16:3, 37:18
**pay** [4] - 9:13, 20:13, 22:5, 22:8
**paying** [1] - 22:14
**payments** [3] - 8:19, 35:24
**penalized** [1] - 22:13
**penny** [2] - 5:25, 35:12
**people** [10] - 11:3,

12:12, 12:13, 17:4, 19:24, 28:2, 29:22, 31:1, 31:11, 31:15
**people's** [1] - 30:8
**Pepsi** [1] - 28:14
**percent** [23] - 5:5, 5:6, 5:13, 14:11, 14:13, 14:16, 15:11, 27:15, 32:1, 32:4, 32:5, 32:7, 32:9, 32:10, 32:16, 34:18, 34:22, 34:24, 35:2, 36:14, 36:22, 38:15, 38:19
**percentage** [3] - 18:3, 34:20, 38:22
██████ [1] - 40:8
██████ [1] - 40:9
**performances** [1] - 29:9
**performed** [1] - 40:17
**performing** [1] - 29:12
**period** [1] - 21:7
**permit** [1] - 40:23
**PERRY** [3] - 1:9, 2:13, 2:20
**Perry** [30] - 4:5, 9:1, 9:4, 11:22, 11:24, 12:1, 12:4, 12:17, 13:6, 13:12, 19:5, 19:6, 21:6, 24:11, 24:25, 25:11, 25:12, 26:7, 27:13, 27:24, 27:25, 28:2, 28:3, 28:4, 28:5, 29:12, 32:22, 36:16
**Perry's** [1] - 29:10
**PH** [1] - 1:24
**phase** [5] - 10:9, 10:10, 10:11, 34:1
**phrase** [1] - 31:16
**picked** [2] - 13:8, 13:12
**piece** [2] - 10:12, 31:16
**pieces** [1] - 7:4
**PLACE** [1] - 42:11
**place** [1] - 34:19
**plain** [1] - 27:15
**plaintiff** [2] - 16:23, 26:14
**PLAINTIFF** [2] - 1:7, 2:3
**plaintiff's** [1] - 4:17
**plaintiffs** [21] - 5:15, 5:18, 15:21, 16:19, 17:9, 18:17, 19:2, 20:4, 21:14, 21:17, 23:5, 23:24, 24:5, 24:14, 25:25, 27:5, 33:8, 33:16, 33:21,

37:5, 37:21
**plaintiffs'** [3] - 5:10, 31:22, 33:1
**play** [2] - 13:6, 28:19
**played** [3] - 16:12, 21:17, 29:24
**plays** [1] - 5:2
**point** [4] - 17:17, 30:1, 33:21, 40:25
**points** [1] - 35:4
**pop** [2] - 25:16, 31:5
**popular** [4] - 7:7, 12:19, 28:11, 29:14
**portion** [5] - 4:24, 4:25, 17:19, 17:22, 23:15
**possibly** [1] - 33:22
**pot** [2] - 20:7, 20:8
**potential** [1] - 17:14
**practice** [3] - 19:14, 20:12, 21:11
**prefer** [1] - 41:7
**premium** [1] - 7:1
**prepared** [1] - 8:8
**preponderance** [1] - 7:19
**present** [5] - 4:11, 15:21, 17:5, 17:9, 37:13
**presented** [8] - 15:20, 16:5, 17:2, 18:18, 18:19, 20:4, 20:5, 26:23
**PRESIDING** [1] - 1:4
**presiding** [1] - 39:10
**presumably** [1] - 7:13
**pretty** [1] - 12:14
**previously** [2] - 18:13, 32:16
**priced** [1] - 10:6
**primarily** [1] - 28:25
**primary** [4] - 12:7, 27:22, 27:23, 32:2
**principal** [1] - 12:2
**principals** [1] - 4:21
**Prism** [22] - 11:24, 15:10, 15:14, 15:18, 17:6, 19:13, 19:16, 19:25, 20:3, 20:22, 21:2, 21:5, 21:24, 25:14, 25:15, 26:17, 27:18, 28:14, 29:1, 30:24, 30:25, 31:10
**PROCEEDINGS** [3] - 1:14, 3:3, 42:11
**proceedings** [1] - 41:21
**process** [2] - 17:25, 40:16
**produce** [1] - 7:21

**producer** [2] - 8:6, 22:18
**producing** [2] - 7:24, 28:11
**product** [2] - 9:5, 22:14
**production** [3] - 18:11, 30:3, 30:4
**profit** [21] - 14:11, 15:12, 17:18, 17:19, 17:23, 18:1, 18:5, 18:8, 18:15, 18:19, 18:20, 19:11, 23:1, 23:2, 23:10, 23:18, 24:13, 26:3, 26:13, 32:15, 33:18
**profits** [21] - 4:24, 4:25, 5:6, 5:9, 5:13, 6:12, 14:15, 14:16, 17:15, 24:15, 25:17, 25:21, 26:4, 26:11, 35:1, 35:3, 37:4, 38:2, 38:15, 38:20
**project** [2] - 28:16, 28:20
**promote** [5] - 9:4, 19:8, 20:22, 20:23, 22:20
**promoted** [1] - 25:6
**promotion** [2] - 28:14, 28:16
**proof** [5] - 5:19, 8:13, 10:3, 36:10, 37:1
**proper** [1] - 7:3
**properly** [1] - 30:7
**proportion** [1] - 19:17
**prove** [5] - 5:20, 7:17, 7:19, 16:20, 18:17
**proven** [4] - 9:25, 22:22, 22:25, 23:16
**provide** [1] - 25:23
**provided** [2] - 24:3, 37:5
**public** [4] - 25:6, 25:7, 40:18, 40:20
**Publishing** [3] - 25:20, 38:11, 39:6
**punish** [2] - 16:1, 34:7
**punishment** [4] - 4:23, 14:10, 15:25, 37:2
**purpose** [1] - 10:6
**push** [1] - 36:13
**put** [12] - 6:13, 9:20, 10:6, 10:25, 11:13, 12:11, 12:15, 12:20, 23:22, 28:13, 30:5, 34:6
**putting** [1] - 25:13

## Q

**quantified** [1] - 5:24
**quickly** [2] - 23:20, 27:20

## R

**radio** [3] - 20:2, 22:21, 28:19
**railroad** [1] - 13:11
**ranking** [1] - 11:18
**rap** [4] - 13:25, 24:1, 24:3
**rapping** [1] - 27:14
**reach** [1] - 17:12
**reached** [1] - 37:15
**read** [7] - 10:19, 21:19, 35:15, 37:18, 37:19, 37:24, 37:25
**ready** [2] - 4:9, 37:11
**real** [1] - 23:20
**really** [1] - 29:23
**reason** [4] - 7:10, 19:25, 28:2
**reasons** [4] - 5:7, 15:13, 27:17, 32:2
**rebut** [4] - 15:22, 17:9, 20:4, 21:13
**receive** [2] - 16:18, 20:17
**received** [3] - 24:4, 25:20, 25:21
**recess** [1] - 37:8
**reckoning** [1] - 14:17
**record** [4] - 21:2, 21:4, 35:20, 36:1
**recorded** [2] - 24:1, 24:3
**records** [1] - 7:13
**Records** [22] - 6:3, 6:8, 6:9, 6:13, 6:17, 6:24, 7:23, 8:9, 9:16, 12:15, 12:18, 18:14, 21:22, 22:4, 22:8, 22:12, 25:6, 26:10, 34:13, 36:9, 38:14, 39:8
**Records'** [1] - 6:10
**REDUCED** [1] - 42:12
**reduced** [1] - 6:24
**reflected** [1] - 34:23
**regard** [1] - 15:1
**reiterate** [1] - 36:12
**related** [4] - 22:6, 22:8, 22:10, 22:13
**relates** [1] - 31:9
**relatively** [1] - 30:21
**released** [2] - 12:10, 21:7

relevance [1] - 19:10
remaining [1] - 32:9
remember [7] - 8:8,
10:15, 11:20, 12:7,
13:12, 29:7, 34:10
remove [1] - 27:25
rent [4] - 8:1, 9:13,
9:17, 9:22
replace [1] - 30:19
replaced [1] - 30:16
REPORTED [1] -
42:10
REPORTER [4] - 1:22,
42:2, 42:8, 42:22
REPORTER'S [1] -
1:14
requires [1] - 36:25
resources [1] - 21:6
respects [1] - 22:17
response [2] - 15:21,
21:12
responsible [3] - 15:8,
15:9, 32:3
resulting [1] - 38:23
return [1] - 23:4
revenue [15] - 6:25,
9:18, 16:20, 16:24,
18:8, 18:12, 18:22,
19:12, 19:17, 20:2,
20:24, 23:10, 35:8,
35:12, 37:22
revenues [10] - 5:20,
6:3, 6:15, 6:18, 7:17,
7:21, 9:12, 24:4,
24:9, 35:9
review [1] - 5:22
ridiculous [1] - 28:1
ROAD [1] - 2:11
■ [1] - 39:16
■ [1] - 39:17
ROOM [1] - 1:23
room [5] - 5:18, 16:5,
16:17, 27:4, 31:18
royalties [12] - 8:6,
8:7, 20:10, 20:11,
20:13, 20:14, 20:15,
20:17, 22:18, 36:7
Rule [2] - 41:15, 41:16
run [1] - 9:20
Russell [2] - 38:8,
39:3
■ [1] - 39:10

S

sale [5] - 6:18, 17:19,
35:10, 35:12, 35:13
sales [2] - 7:14, 7:15
SAME [1] - 42:12
■ [1] - 40:5

■ [1] - 40:7
Sandberg [5] - 13:19,
24:8, 32:20, 38:5,
38:25
sang [4] - 12:6, 12:17,
28:4
Santa [3] - 13:6,
25:11, 29:23
Sara [1] - 38:9
Sarah [2] - 13:13, 39:4
satisfy [1] - 37:1
scene [2] - 31:11,
31:15
scheduling [3] - 41:6,
41:7, 41:14
score [3] - 10:15,
10:16, 27:1
screen [1] - 27:2
second [1] - 6:12
secondary [5] - 11:19,
29:3, 29:6, 31:9,
32:6
seconds [3] - 5:3,
27:7, 27:9
see [15] - 5:17, 5:25,
6:1, 6:14, 7:11, 8:5,
16:4, 27:2, 31:2,
31:5, 31:7, 31:10,
31:14, 32:17, 32:19
seeing [1] - 16:17
seek [3] - 4:23, 4:24,
34:6
seeking [14] - 4:23,
5:5, 14:8, 14:9,
14:13, 14:23, 14:24,
14:25, 37:2, 37:3,
37:4
sell [1] - 15:18
sent [1] - 13:24
separate [2] - 5:7,
19:25
service [3] - 8:25,
40:18, 40:20
services [1] - 25:21
SET [1] - 42:11
set [1] - 18:20
seven [1] - 33:20
shall [1] - 4:12
sheet [1] - 36:9
shifts [1] - 7:18
shots [2] - 20:7, 20:8
show [5] - 7:11, 16:23,
26:4, 26:15, 37:21
showed [1] - 29:23,
32:16, 35:6
shower [1] - 29:8
shown [2] - 5:21, 35:9
shows [4] - 23:8, 24:8,
26:9, 27:8
sic) [1] - 25:23

side [1] - 37:1
sided [1] - 34:11
sides [1] - 34:14
signed [1] - 39:9
significance [1] - 10:7
SILBERBERG [1] -
2:15
similarly [2] - 31:3,
31:4
simply [13] - 16:6,
21:14, 25:7, 25:18,
25:22, 29:19, 29:20,
30:2, 30:19, 33:16,
35:17, 36:14, 36:25
sing [1] - 29:8
singing [4] - 10:19,
24:25, 25:2, 27:13
single [3] - 15:5,
19:21, 29:17
singles [1] - 20:1
sings [1] - 11:25
sit [1] - 11:6
situation [1] - 39:11
six [2] - 33:10, 33:17
skips [1] - 16:21
slightly [1] - 5:22
small [1] - 26:21
SNYDER [1] - 1:4
SOKOL [1] - 2:5
sold [4] - 7:5, 15:14,
25:7
sole [1] - 16:21
solely [5] - 15:8, 15:9,
16:15, 20:3, 27:6
someone [5] - 19:19,
19:22, 19:23, 22:5,
28:6
sometimes [1] - 20:14
somewhat [1] - 23:7
song [37] - 4:17, 5:4,
5:5, 7:6, 7:7, 11:3,
12:17, 12:22, 13:12,
13:17, 13:24, 15:8,
20:23, 21:4, 21:24,
24:3, 25:2, 27:7,
27:15, 28:2, 29:14,
29:24, 30:9, 31:12,
31:13, 31:17, 32:4,
33:6, 34:14, 34:24,
35:2, 35:10, 36:15,
36:17, 36:23
songs [9] - 11:24,
11:25, 12:1, 12:3,
12:6, 12:10, 28:5,
35:13
songwriters [6] - 4:22,
14:7, 14:18, 15:15,
20:17, 33:10
sort [1] - 9:24
sound [1] - 30:8

special [1] - 6:14
specific [4] - 31:16,
35:17, 36:8
specifically [1] - 30:15
specifics [1] - 4:20
spent [5] - 15:18,
24:10, 24:20
spotted [1] - 11:17
spreadsheet [2] -
6:14, 8:8
SS [1] - 42:5
ST [1] - 2:8
stage [1] - 40:23
stand [2] - 8:10, 11:13
star [1] - 25:16
stars [1] - 31:2
start [14] - 5:16, 10:23,
13:17, 13:18, 13:20,
13:21, 14:22, 16:16,
18:5, 18:16, 23:25,
30:6, 32:1, 39:13
started [1] - 19:12
starts [1] - 13:22
STATE [1] - 42:6
state [4] - 4:6, 23:12,
38:2, 38:22
statement [2] - 18:19,
18:21
STATES [4] - 1:1, 1:1,
1:4, 42:9
STENOGRAPHIC [1] -
42:15
STENOGRAPHICAL
LY [1] - 42:10
step [6] - 16:21, 17:25,
21:4, 26:12, 26:13
step-by-step [1] - 21:4
still [1] - 5:8
stipulation [5] - 5:25,
20:16, 23:8, 26:9
strategy [1] - 10:10
streamed [1] - 19:23
STREET [1] - 1:23
studio [2] - 24:11,
24:21
stuff [1] - 25:8
styling [1] - 8:24
submit [7] - 7:2,
14:25, 15:23, 17:10,
25:24, 31:25, 36:11
substantially [1] -
28:9
subtract [1] - 23:19
success [16] - 11:21,
12:2, 15:8, 15:9,
17:3, 26:16, 26:17,
27:17, 27:18, 28:7,
29:1, 30:18, 30:22,
32:2, 32:4
successful [2] - 30:9

SUITE [2] - 2:11, 2:23
sum [2] - 30:20, 33:7
supported [1] - 23:3
sustained [1] - 18:18
swap [2] - 17:7, 28:6
system [1] - 9:21
systems [1] - 19:1

T

talented [1] - 12:5
talks [1] - 20:25
ten [1] - 32:7
tertiary [4] - 11:20,
30:11, 30:13, 32:8
testified [14] - 17:6,
18:24, 18:25, 20:13,
27:23, 28:23, 29:1,
29:4, 29:5, 29:10,
30:18, 30:20, 33:3,
35:22
testify [1] - 34:21
testimony [17] - 15:22,
16:11, 17:10, 19:18,
19:19, 20:5, 21:13,
21:19, 22:12, 22:16,
22:24, 26:20, 26:21,
27:20, 28:8, 30:23,
31:19
THAN [1] - 2:13
THAT [3] - 42:10,
42:12, 42:14
THE [33] - 2:20, 4:3,
4:8, 4:12, 14:20,
34:16, 35:21, 36:2,
37:7, 37:8, 37:10,
37:11, 37:14, 37:17,
39:16, 39:18, 39:20,
39:22, 39:25, 40:3,
40:5, 40:8, 40:10,
41:4, 41:9, 41:16,
41:19, 41:20, 42:8,
42:9, 42:10, 42:11,
42:12
THEREAFTER [1] -
42:12
therefore [3] - 20:23,
32:7, 35:12
they've [3] - 4:22,
8:13, 35:1
thinking [2] - 33:25,
34:1
thinks [2] - 20:21,
33:4
third [1] - 30:11
THIS [1] - 42:14
thoroughly [1] - 18:21
THURSDAY [2] - 1:15,
4:1
ticket [1] - 9:1

tie [2] - 9:17, 21:1
TIME [1] - 42:11
TO [1] - 42:12
today [12] - 5:5, 5:10, 5:14, 5:19, 14:17, 16:2, 20:7, 26:11, 34:2, 37:2, 37:3, 37:4
together [3] - 6:13, 25:14, 29:19
tomorrow [2] - 5:11, 14:15
top [2] - 24:25, 25:1
total [4] - 8:7, 11:9, 13:1, 33:17
totality [1] - 29:18
totals [1] - 33:19
track [5] - 19:18, 19:21, 24:10, 29:12, 33:24
tracks [2] - 7:2, 13:11
TRANSCRIPT [1] - 1:14
transcription [2] - 27:3, 27:8
TRANSCRIPTION [2] - 42:13, 42:14
TRAURIG [1] - 2:21
traversing [1] - 28:19
treat [2] - 33:16, 33:20
tremendous [1] - 34:5
truck [1] - 28:19
true [6] - 21:22, 22:1, 22:4, 23:16, 24:17, 30:23
TRUE [1] - 42:14
try [1] - 10:7
turn [2] - 24:21, 32:12
two [16] - 4:15, 4:22, 5:7, 5:10, 8:5, 8:7, 10:6, 11:16, 11:21, 12:10, 14:7, 14:18, 17:25, 23:9, 26:20, 32:3
two-step [1] - 17:25
TYPEWRITTEN [1] - 42:12

## U

unable [1] - 8:11
under [1] - 6:22
unfair [1] - 25:24
unfairly [1] - 11:1
unique [1] - 29:14
UNITED [4] - 1:1, 1:1, 1:4, 42:8
unjust [1] - 25:25
unknown [1] - 28:6
unlawful [3] - 4:19,

10:7, 14:9
unrebutted [6] - 21:14, 23:3, 26:22, 28:8, 30:23, 31:20
unrefined [1] - 30:7
unrelated [2] - 22:6, 22:15
up [21] - 6:6, 6:22, 7:4, 7:10, 10:16, 13:6, 13:21, 13:22, 16:22, 19:10, 23:6, 23:20, 26:3, 29:5, 29:23, 34:18, 34:19, 34:21, 40:12, 40:24

## V

[1] - 39:25
[1] - 40:2
valid [1] - 9:8
validated [2] - 19:1, 22:23
value [5] - 26:24, 32:7, 33:2, 33:3, 36:13
values [1] - 34:20
various [1] - 9:23
verdict [20] - 6:1, 6:2, 16:4, 16:16, 16:18, 32:13, 35:6, 37:15, 37:20, 37:25, 39:12, 39:14, 39:16, 39:18, 39:20, 39:23, 40:1, 40:3, 40:6, 40:8
VERDICT [1] - 3:9
verse [3] - 24:1, 24:3, 29:13
version [2] - 6:19, 6:20
versus [1] - 4:5
video [4] - 16:12, 22:20, 28:21, 28:24
videos [1] - 28:19
view [1] - 33:22
VINCENT [1] - 2:22
vocal [4] - 24:13, 24:20, 24:25, 29:9
vocals [2] - 29:11
Voodo [1] - 9:24
vote [1] - 12:12
voted [1] - 12:14
VS [1] - 1:8

## W

Wais [2] - 14:20, 35:15
WAIS [5] - 2:16, 3:6, 14:21, 35:19, 35:25
walk [3] - 25:9, 25:10, 27:19

walked [1] - 21:3
Walking [1] - 12:11
walks [1] - 17:15
Walter [8] - 13:4, 24:12, 24:19, 25:9, 26:6, 32:21, 38:8, 39:3
Warner [1] - 32:23
warning [1] - 34:21
WAS [1] - 42:12
ways [1] - 31:12
WB [4] - 25:21, 26:9, 38:13, 39:7
week [1] - 5:11
WEST [2] - 1:23, 2:18
WESTERN [1] - 1:2
whatsoever [1] - 20:6
whereas [1] - 10:21
whole [5] - 25:4, 25:5, 25:6, 26:24, 33:13
wig [1] - 29:8
win [1] - 12:21
wish [2] - 40:12, 41:4
wishes [1] - 40:21
witness [8] - 6:11, 6:17, 8:9, 9:3, 9:16, 11:15, 20:4, 21:12
witnesses [8] - 10:6, 15:20, 15:22, 20:7, 22:23, 26:20, 31:21, 33:3
works [4] - 15:25, 21:3, 21:4, 34:8
worry [1] - 34:3
wrap [1] - 21:10
write [3] - 13:14, 13:20, 32:9
writers [2] - 26:1, 34:12
writing [1] - 25:13
wrote [4] - 13:14, 24:1, 24:3, 25:10

## Y

year [1] - 5:11
years [3] - 14:7, 25:16, 28:18
yesterday [6] - 5:17, 6:16, 8:3, 8:10, 10:5, 11:14
yesterday's [1] - 6:10

# EXHIBIT 11

EXHIBIT  11
PAGE  1634



## Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

Registration Number
PA 1-900-321

Effective date of
registration:
June 3, 2014

**Title** —————————————————————————————————————

Title of Work: Joyful Noise
Title of Larger Work: Flame - Our World Redeemed

**Completion/Publication** ————————————————————————

Year of Completion: 2007
Date of 1st Publication: March 4, 2008        Nation of 1st Publication: United States

**Author** —————————————————————————————————————

■    Author: Chike Ojukwu
Author Created: Lyrics and music

Work made for hire: No
Citizen of: United States        Domiciled in: United States

■    Author: Marcus Gray
Pseudonym: Flame
Author Created: Lyrics and music

Work made for hire: No
Citizen of: United States        Domiciled in: United States
Year Born: 1981
Pseudonymous: Yes

■    Author: Lecrae Moore
Author Created: Lyrics and music

Work made for hire: No
Citizen of: United States        Domiciled in: United States
Year Born: 1979



Page 1 of 2
P000005

EX. 1-1

EXHIBIT 11
PAGE 1635

Author: Emanuel Lambert
Author Created: Lyrics and music

Work made for hire: No
Citizen of: United States          Domiciled in: United States
Year Born: 1977

## Copyright claimant

Copyright Claimant: Chike Ojukwu
200 South Hanley Road, Suite 208, Clayton, MO 63105
Copyright Claimant: Marcus Gray
200 South Hanley Road, Suite 208, Clayton, MO 63105
Copyright Claimant: Lecrae Moore
200 South Hanley Road, Suite 208, Clayton, MO 63105
Copyright Claimant: Emanuel Lambert
200 South Hanley Road, Suite 208, Clayton, MO 63105

## Rights and Permissions

Organization Name: Kayira Law, LLC
Name: Eric Kayira
Email: eric.kayira@kayiralaw.com          Telephone: 314-899-9381
Address: 200 South Hanley Road, Suite 208
Clayton, MO 63105

## Certification

Name: Eric Kayira
Date: June 3, 2014

Correspondence: Yes

# EXHIBIT 12

EXHIBIT  12
PAGE  1637



EXECUTION VERSION: 07-22-2014

### ASSIGNMENT OF COPYRIGHT

For good and valuable consideration, receipt of which is acknowledged, I, LeCrae Moore, as of **July 22, 2014** do hereby transfer, assign and convey to Marcus Gray, Chike Ojukwu, and Emanuel Lambert in undivided equal shares (hereinafter collectively the "**Assignees**") all of my ownership interest (hereinafter the "**Interest**") in the copyright and in all related rights, title and interest in the music and lyrics of the song "**Joyful Noise**," (hereinafter the "**Composition**") created in 2007, published in 2008, and registered with the United States Copyright Office pursuant to the Certificate of Registration No. PA-1-900-321 attached as Exhibit A.

This Assignment of Copyright includes, among other things, any and all claims against third parties for infringement of the copyright in "Joyful Noise," including those in Civil Action No. 4:14-cv-01183-HEA, now pending in the United States District Court for the Eastern District of Missouri and captioned *Marcus Gray, et al. v. Katy Perry, et al.*

For the avoidance of doubt, any and all royalties from the Composition, earned through June 30, 2014, which are attributable to the Interest assigned hereunder (including performance royalties) shall be paid to me.

LeCrae Moore

Date:  7/22/14



P000001

EXHIBIT 12
PAGE 1638

# EXHIBIT 13

EXHIBIT  13
PAGE  1639



## SONG WRITERS' SPLIT ACKNOWLEDGEMENT

This Song Writers' Split Acknowledgement will confirm that our percentage of contribution for the following composition (the **"Composition"**) is as set forth below:

**SONG TITLE:** "Joyful Noise"

| Writer | Publisher (ASCAP/BMI) | Percentage |
| --- | --- | --- |
| 1. Marcus Gray | Clear Sight Music   (ASCAP) | 35% |
| 2. Emanuel Lambert | TruthOnDuty (SESAC) | 15% |
| 3. Chike Ojukwu | Renumind (ASCAP) | 50% |

If any samples are contained in the Composition for which the sampled writer(s)/ publisher(s) are to receive a copyright interest in and to the Composition, then the writers agree that their songwriter and publisher shares in the copyright and/or monies attributable to the Composition will be reduced proportionately. Each of the writers will control his respective share of copyright administration for publishing the Composition.

The parties may execute this Agreement in two or more counterparts (including facsimile copies), any one of which need not contain the signatures of more than one party, but all the counterparts taken together will constitute one and the same agreement.

READ, AGREED and ACCEPTED:


*Marcus Gray*
Marcus Gray (Sep 30, 2014)

Marcus Gray


*emanuel lambert*
emanuel lambert (Nov 8, 2014)

Emanuel Lambert


*Chike Ojukwu*
Chike Ojukwu (Oct 1, 2014)

Chike Ojukwu

EXHIBIT
Gray 5
11/15/17

CONFIDENTIAL

P000260

# EXHIBIT 14

EXHIBIT  14
PAGE  1641



## ASSIGNMENTS OF COPYRIGHT

THIS ASSIGNMENT ("Agreement") is made this 3ʳᵈ day of ~~June~~ *July*, 2014, by and between Marcus Gray for himself and/or his designee or assign (collectively, "Assignee") and Cross Movement Records, Inc., The Project Issachar Publishing (ASCAP), and John Wells (individually and collectively, "Assignor")

In the consideration of good and valuable consideration, the receipt of which is hereby acknowledged, the Assignor does hereby sell, assign, transfer and set over unto Assignee its successors and assigns, all right, title, and interest in the Works listed in the Attached, **Exhibit A** (collectively, the "Works"), together with all renewals and extensions thereof throughout the universe, whether such rights currently exist or hereafter come into effect; any and all versions and derivative works of the Works and any and all universe-wide copyrights and all renewals, extensions and reversions thereof; and any and all causes of action for infringement of the same past, present and future. For avoidance of doubt, this assignment shall not include, nor impair Assignor's interests and ownership in and to the sound recordings or so-called Masters or Master Recordings embodied in the following CMR released albums: "Flame"; "Rewind"; "Our World Fallen"; and "Our World Redeemed". Assignee may exercise any other rights it deems necessary or desirable in connection with the administration, exploitation or protection of the Works.

If any provision of this instrument of transfer shall be held void, invalid or inoperative, no other provisions of this instrument of transfer shall be affected as a result thereof and, accordingly, the remaining provisions of this instrument of transfer shall remain in full force and effect.

IN WITNESS WHEREOF, the undersigned has duly executed this instrument of transfer as of the 3ʳᵈ day of ~~June~~ *July*, 2014.

**ASSIGNEE – MARCUS GRAY**

Date: 7/3/14

By: _Marcus Gray_
Name: _____Marcus Gray_____
Title: _____Individual_____

**ASSIGNOR**

Date:

7/3/14

By: _John K. Wells_

John Wells, individually
and o/b/o Cross Movement Records, Inc., and
The Project Issachar Publishing (ASCAP)

EXHIBIT
Gray 6
4 15 17

P000002

EX. 6-1

EXHIBIT 14
PAGE 1642

**EXHIBIT A**

**FLAME**
1. Intro
2. Truth Travels
3. Godman
4. Like Christ
5. How Long
6. Open My Heart
7. Interlude
8. Give Us The Truth
9. Money
10. L.A.D.I.E.S
11. News Flash
12. Limelight
13. Interlude
14. Videos
15. Real One
16. Way Out
17. True God
18. From The Mid to the East Cypha
19. Righteous

**REWIND**
1. Show Intro
2. No Silence
3. Uh-Oh
4. So Sweet
5. Rewind
6. Gotta Notice
7. We Need You
8. Commercial
9. Context
10. War of the Mind
11. Give Us The Truth Pt. 2
12. The Godhead
13. Let's Go
14. Racial Diversity
15. To My Heart
16. Break Bread
17. Welcome
18. Sola Scriptura
19. Cross Movement
20. Show Outro
21. We Preach Christ
Our World Fallen
1. Our World Fallen

P000003

EX. 6-2

EXHIBIT 14
PAGE 1643

2. Where God Placed You
3. Shinin'
4. Myspace'
5. Fallen World Interlude 1
6. Goodness To Repentance
7. Call Him
8. When You Step
9. World View
10. Fallen World Interlude 2
11. Bad Ain't Good
12. We Apologize
13. Desires in Conflict
14. Heart Stops
15. Come To Christ Interlude 3
16. Goodbye

Our World Redeemed
1. Flash Back
2. Funeral To Birthday
3. Go Buck
4. Who Can Pluck Us
5. It's You
6. Confession Interlude
7. Hold On
8. I Been Redeemed
9. On that Cross
10. See More Him intro
11. See More Him
12. Power In Your Name
13. Drama of Redemption
14. Its All Gon' Pass
15. 2nd Coming
16. Joyful Noise

P000004

EX. 6-3

EXHIBIT 14
PAGE 1644

# EXHIBIT 15

EXHIBIT  15
PAGE  1645





**THE LIBRARY OF CONGRESS**
101 Independence Avenue, SE
WASHINGTON, D.C. 20540-4690

**MOTION PICTURE, BROADCASTING
AND RECORDED SOUND DIVISION**
202-707-5623 (Voice)
202-707-2371 (Fax)

## CERTIFICATION

THIS IS TO CERTIFY that the collections of the Library of Congress contain a

CD digital audio disc entitled **"FLAME - OUR WORLD REDEEMED"; Shelf Number SDC

65301; MAVIS Number 2296623-1-1**, and that the enclosed CD-R is a true representation of

that work.

THIS IS TO CERTIFY FURTHER that the work is marked with the Copyright Office

Barcode label that bears the number **0 044 025 970 4**.

IN WITNESS WHEREOF, the seal of the Library of Congress is affixed hereto on

May 10, 2016.

_____NORTON_____

Robert Norton
Audio Engineer
M/B/RS Division

Date____5-10-2016____

_____

Claire Downey
Operations Manager
M/B/RS Division

Date____5/10/16____

Use of this material is governed by the U.S. copyright law 17 U.S.C. 101 et seq.

EXHIBIT
7
11/15/17





EX. 7-3

EXHIBIT 15
PAGE 1648



EX. 7-4

EXHIBIT  15
PAGE  1649



EX. 7-5

EXHIBIT 15
PAGE 1650



EX. 7-6

EXHIBIT 15
PAGE 1651

# EXHIBIT 16

EXHIBIT  16
PAGE  1652



EXHIBIT  16
PAGE  1653

# EXHIBIT 17

EXHIBIT  17
PAGE  1654



| From: | star@flame314.com |
|---|---|
| To: | star@flame314.com |
| Subject: | FW: 40th Dove Award Nominations |
| Date: | Friday, February 20, 2009 1:31:03 PM |
| Attachments: | 40th Dove Awards Nominations Release and List of Nominations Embargoed Version.doc |

see attached.

**Rebel** in the running for rap/hip hop album and **Joyful Noise** for rap/hip hop song

www.FLAME314.com
www.myspace.com/FLAME314
www.crossmovementrecords.com
www.allstarcommunications.wordpress.com

**JOYFUL NOISE MUSIC VIDEO AVAILABLE AT THE LINKS ABOVE!**

NOTE: Should you wish NOT to be included on our mailing list, please let me know.

Phil 4:6



40th GMA

# DOVE AWARDS

**THIS RELEASE AND LIST IS EMBARGOED UNTIL THE END OF THE PRESS CONFERENCE AT 12 P.M. CT ON FRIDAY, FEB. 20, 2009**

Contact: Tricia Whitehead/Spinhouse PR
615-599-7746 or tricia@thespinhouse.com

## GMA DOVE AWARDS NOMINATIONS ANNOUNCED TODAY

### Chris Tomlin, Natalie Grant, Casting Crowns and Newcomer Francesca Battistelli Emerge as Leading Artist Nominees

### Fans Will Vote For Artist and New Artist of the Year For First Time

NASHVILLE, Tenn. – February 20, 2009 – **Casting Crowns, Steven Curtis Chapman, Fireflight, Marvin Sapp, Third Day, TobyMac** and **Chris Tomlin** have been nominated by the Gospel Music Association (GMA) membership for Artist of the Year at the 40th Annual GMA Dove Awards on April 23, 2009 in Nashville.

Those artists were among the Dove Award nominees announced at a press conference today at the Nashville Convention & Visitors Bureau Visitor Information Center. The GMA Dove Awards, gospel music's biggest night of the year, featuring artists from every style of gospel/Christian music coming together for a night of music and celebration, will be broadcast nationwide live on the Gospel Music Channel from 8 – 10 p.m. (ET/PT) on Thursday, April 23, 2009.

"Christian and gospel music expresses itself in many different ways and we applaud all nominated artists for their unique contributions to the music landscape," said John W. Styll, president of the Gospel Music Association (GMA). "The powerful messages of redemption, hope and joy found in the music of our Dove nominees come during a season in history when our country and the world need inspiration and encouragement."

For the first time, fans will become stakeholders in the Dove Awards with an opportunity to vote for the winner of Artist of the Year along with New Artist of the Year, which includes nominees **Addison Road, Francesca Battistelli, Fee, Jonathan Nelson, Remedy Drive, Chris Sligh** and **Tenth Avenue North**. Fan voting, which will be conducted through the Gospel Music Channel website (www.gospelmusicchannel.com) and at www.doveawards.com, will open on February 26, the same day online voting opens for GMA members. The cumulative fan vote, which will continue through the live Dove Awards broadcast, will account for one-third of the total vote in those two categories.

The 40th Annual GMA Dove Awards will be handed out at Nashville's famed Grand Ole Opry House. Tickets to the 40th Annual GMA Dove Awards are on sale now at www.ticketmaster.com or by calling 615-242-0303.

While the awards are the purpose of the show, music performances will definitely share center stage at the Dove Awards, showcasing some of gospel music's hottest and most diverse artists. In addition to the exclusive live broadcast, Gospel Music Channel will present back-to-back encore broadcasts that night and additional re-airings following. Gospel Music Channel's rapid growth has made it the fastest growing network in television for the past two years and GMC is now available in more than 43 million homes in all major markets on the major cable systems as well as on DIRECTV on Channel 338.

The top artist nominee for Dove Awards is current three-time Male Vocalist of the Year **Chris Tomlin**, whose seven total nominations include Artist of the Year, Male Vocalist of the Year and Song of the Year for "Amazing Grace (My Chains are Gone)." His latest CD *Hello Love* was nominated for Praise & Worship Album, while "Jesus Messiah" from that project earned a nomination for Worship Song of the Year. Tomlin was also included in the Special Event Album category for his participation on the *Passion: God of This City* compilation album and in the Contemporary Gospel Recorded Song category for gospel artist LaRue Howard's recording of Tomlin's "How Great Is Our God," which was the 2006 Song of the Year recipient.

Two female artists have the next biggest impact, with **Natalie Grant** and newcomer **Francesca Battistelli** each receiving five nominations. Grant, the current three-time Female Vocalist of the Year recipient, receives another nomination in the category, along with a nod for Pop/Contemporary Album of the Year for *Relentless*, while the No. 1 radio hit from that record, "I Will Not Be Moved" was nominated for Song of the Year and Pop/Contemporary Recorded Song of the Year. The Grant-penned "Breathe on Me" rounds out her five nominations in the Worship Song of the Year category.

P000114

EX. 21-2

EXHIBIT 17
PAGE 1656

**Battistelli**, the New York-born singer songwriter and now Dove Award Female Vocalist and New Artist of the Year nominee, burst on the Christian music scene with her summer 2008 hit "I'm Letting Go." That song has now received Dove Award nominations for Song of the Year and Pop/Contemporary Song of the Year, and her debut CD *My Paper Heart* was nominated for Pop/Contemporary Album of the Year.

Four-time Group of the Year Dove Award winners **Casting Crowns** will go for five with another Group of the Year nomination in 2009. The worship band's total of five nominations includes Artist of the Year and Christmas Album of the Year for *Peace on Earth*. Casting Crowns also earned nods for Short Form Video for "Slow Fade" and for Long Form Video for "The Altar and the Door Live."

Among the other Artist of the Year nominees, **Steven Curtis Chapman** has previously won this award seven times, the last one in 2000. Chapman, who has been touring with Michael W. Smith on the United Tour, has had renewed spotlight this past year centered on the Song of the Year nominee "Cinderella" which became an anthem for fatherhood not only on Christian radio, but worldwide. "Cinderella" is also nominated for Pop/Contemporary Recorded song and Chapman's co-write of Bart Millard's "You Reign" is another Song of the Year nominee.

**Fireflight** is recognized as Artist of the Year in the first year they have received any Dove Award nominations. The female-fronted (Dawn Richardson) rock band received national exposure as a favorite of TV networks like NBC, ABC and ESPN which have licensed their songs. Fireflight was also named one of the winners of Taco Bell's first "Best of the Beat" fan-voted contest and was named Gospel Music Channel's first "Listen Up Artist" last year. Now, they have four Dove Award nominations including Rock/Contemporary Album of the Year for *Unbreakable*, Rock/Contemporary Recorded Song for "Unbreakable" and Rock Recorded Song of the Year for "The Hunger."

Artist and Male Vocalist of the Year nominee **Marvin Sapp** made history last year when his single "Never Would've Made It," from the gold-selling CD *Thirsty,* became the longest-running No. 1 single ever across all radio formats, spending a staggering 47 weeks at the top of the gospel radio charts. Earlier this year, Sapp was honored with eight Stellar Awards.

**TobyMac**, the current Artist of the Year recipient, finds himself nominated again this year. The headliner of the popular Winter Wonder Slam concert series, TobyMac recently won his first solo GRAMMY Award for Best Rock or Rap Gospel Album with *Alive and Transported.* The concert DVD of that CD is also nominated for a Dove Award for Long Form Video of the Year.

Rounding out the Artist of the Year nominees, **Third Day** earns its nomination after a successful year with the release of *Revelation,* which is nominated for Pop/Contemporary Album of the Year. That CD debuted at No. 6 on The *Billboard* 200 chart in July, landing the band on the cover of *Billboard* magazine. Third Day also toured with Switchfoot, Jars of Clay and Robert Randolph & The Family Band on the "Music Builds Tour" for Habitat for Humanity and performed on "The Tonight Show with Jay Leno."

Other artists receiving four nominations include **Brandon Heath, Mary Mary, Laura Story** and **Michael W. Smith.**

Producers and songwriters also enjoyed big nomination success this year with **Ian Eskelin** (Francesca Battistelli, Remedy Drive) and **Wayne Haun** (Ernie Haase & Signature Sound, HisSong) each receiving eight nods while **Ed Cash** (Chris Tomlin, Laura Story) came in with six and **Jason Ingram** (Brandon Heath, Meredith Andrews) and **Warryn Campbell** (Mary Mary, Kierra Sheard) each received five nominations.

Announcing the nominations today were **Dan and Jackie Evans**, the son and mother team from season of NBC's reality show "The Biggest Loser." Additionally, Dan's debut CD, *Goin' All Out*, bowed at #7 on the *Billboard* Top Country Albums Chart when it was released last fall. They were joined by **Lisa Kimmey**, former member of Out of Eden and currently a host/reporter for Gospel Music Channel.

Dove Awards will be handed out in 43 categories. The Songwriter of the Year nominees were not announced today, but will be revealed prior to the GMA Dove Awards. Dove Awards nominations go to recordings released during the eligibility year November 1, 2007 through October 31, 2008 and voted on by the members of the GMA. The complete nominations list is at www.doveawards.com.

## About GMA:
Founded in 1964, the Gospel Music Association serves as the face and voice for the gospel/Christian music community and is dedicated to exposing, promoting and celebrating the gospel through music of all styles including pop, rock, praise & worship, black gospel, R&B, hip hop, southern gospel, country, and more. The GMA community consists of more than 3,000 members including agents, artists, church leaders, managers, promoters, radio personnel, record company executives, retailers, songwriters and other industry visionaries. The GMA produces the GMA Dove Awards, GMA Music Week and the GMA Academy. For more information, please visit www.gospelmusic.org.

# # #

P000115

EX. 21-3

EXHIBIT 17
PAGE 1657



**40th GMA**
# DOVE
# AWARDS
THURSDAY, APRIL 23, 2009

## *40th Annual GMA Dove Award Nominations*

**SONG OF THE YEAR**
song title; writer; publisher (Dove Award given to the songwriter and publisher)
**"Amazing Grace (My Chains Are Gone)"**; Chris Tomlin, Louie Giglio, Traditional; sixsteps music (ASCAP), worshiptogether.com Songs (ASCAP)

**"Cinderella"**; Steven Curtis Chapman; Sparrow Songs (BMI)

**"Empty Me"**; Chris Sligh, Clint Lagerberg, Tony Wood; Foolish Tool Music (ASCAP), Word Music LLC (ASCAP), Kindacrazy Music (BMI), Row J Seat 9 Songs (ASCAP), New Spring Publishing (ASCAP), Bridge Building Music (BMI)

**"Give Me Your Eyes"**; Brandon Heath, Jason Ingram; Sitka 6 Music (ASCAP), Peertunes Ltd. (SESAC), Grange Hill Music (SESAC), Windsor Way (SESAC)

**"I Will Not Be Moved"**; Natalie Grant; Nat in the Hat (ASCAP)

**"I'm Letting Go"**; Francesca Battistelli, Tony Wood, Ian Eskelin; Designer Music (SESAC), Word Music LLC (ASCAP), Honest & Popular Songs (SESAC), Row J Seat 9 Songs (ASCAP), New Spring Publishing Inc. (ASCAP)

**"Mighty to Save"**; Ben Fielding, Joel Houston; Integrity's Hosanna! Music (ASCAP)

**"Never Going Back to OK"**; Matt Fuqua, Josh Havens, Brad Wigg, Dan Muckala; Smells Like Music (ASCAP), Screaming Mimes Music (ASCAP)

**"Reason Enough"**; Ernie Haase, Wayne Haun, Joel Lindsey; Bridge Building Music (BMI), Psalmsinger Music (BMI), Ernie Sig Sound Music (BMI), Hefton Hill Music (BMI)

**"You Reign"**; Bart Millard, Barry Graul, Steven Curtis Chapman; Simpleville Music (ASCAP), Wet As A Fish Music (ASCAP), Sparrow Songs (BMI)

**ARTIST OF THE YEAR\***
    Casting Crowns
    Steven Curtis Chapman
    Fireflight
    Marvin Sapp
    Third Day
    TobyMac
    Chris Tomlin

**NEW ARTIST OF THE YEAR\***
    Addison Road
    Francesca Battistelli
    Fee
    Jonathan Nelson
    Remedy Drive
    Chris Sligh
    Tenth Avenue North

\*Fans may vote in the Artist of the Year and New Artist of the Year Categories. The cumulative fan vote will count for 1/3 of the total votes for these two categories. GMA member voting will count for 2/3 of the total vote.

P000116

EXHIBIT  17
PAGE  1658

**MALE VOCALIST OF THE YEAR**
Jeremy Camp
Jon Foreman
Ernie Haase
Brandon Heath
David Phelps
Marvin Sapp
Chris Tomlin

**FEMALE VOCALIST OF THE YEAR**
Francesca Battistelli
Brooke Fraser
Karen Peck Gooch
Natalie Grant
Mandisa
Sandi Patty
Laura Story

**GROUP OF THE YEAR**
Casting Crowns
David Crowder*Band
Ernie Haase & Signature Sound
Mary Mary
MercyMe
Skillet
Third Day

**PRODUCER OF THE YEAR**
Brown Bannister
Ed Cash
Ian Eskelin
Wayne Haun
Bernie Herms
Jason Ingram, Rusty Varenkamp

Dove Awards in Recorded Song categories are given to the artist and songwriter (if other than the artist).

**RAP/HIP HOP RECORDED SONG**
song; *album*; artist; writer; label
"**Beautful Morning**"; *Reiterate*; Grits featuring Pigeon John; Teron Carter, Stacy Jones, Mo Henderson, John Duncan; Revolution Art
"**Do Yo Thang**"; *The Yearbook*; KJ-52; Jonah Sorrentino; BEC Recordings/Uprok
"**Joyful Noise**"; *Our World Redeemed*; Flame featuring Lecrae & John Reilly; Marcus T. Williams-Gray, Lecrae Moore, Emanuel Lambert, Jr.; Cross Movement Records
"**Pull Your Pants Up!**"; *Pull Your Pants Up!*; Dooney "Da Priest"; Duwayne Brown; Malaco Records
"**So Beautiful**"; *Citizen Activ*; Manafest featuring Trevor McNevan; Chris Greenwood, Adam Messinger, Trevor McNevan; BEC Recordings

**ROCK RECORDED SONG**
song; *album*; artist; writer; label
"**Better Man**"; *Satisfied*; DecembeRadio; Josh Reedy, Brian Bunn, Eric Miker, Boone Daughdrill, Scotty Wilbanks; Slanted Records
"**For The Love Of The Game**"; *For The Love Of The Game*; Pillar; Rob Beckley, Lester Estelle, Noah Henson, Michael Wittig; Essential Records
"**Lost**"; *End of Silence*; Red; Jasen Rauch, Rob Graves, Chad Cates; Essential Records
"**Shine Like The Stars**"; *Expect The Impossible*; Stellar Kart; Adam Agee, Ian Eskelin; Word Records
"**The Hunger**"; *Unbreakable*; Fireflight; Dawn Richardson, Justin Cox, Glenn Drennen, Wendy Drennen, Phee Shorb, Ben Glover; Flicker Records

**ROCK/CONTEMPORARY RECORDED SONG**

P000117

song; *album*; artist; writer; label
> "**Find You Waiting**"; *Satisfied*; DecembeRadio; Josh Reedy, Brian Bunn, Eric Miker, Boone Daughdrill, Scotty Wilbanks; Slanted Records
>
> "**Keys To The Kingdom**"; *Ordinary Dreamers*; Group 1 Crew; Manwell Reyes, Blanca Reyes, Pablo Villatoro, Andy Anderson, Noe A. Chaparro; Fervent Records
>
> "**Never Going Back To OK**"; *Never Going Back To OK*; The Afters; Matt Fuqua, Josh Havens, Brad Wigg, Dan Muckala; INO Records
>
> "**Unbreakable**"; *Unbreakable*; Fireflight; Dawn Richardson, Justin Cox, Glenn Drennen, Wendy Drennen, Phee Shorb, Rob Hawkins; Flicker Records
>
> "**Washed By The Water**"; *The Heat*; NEEDTOBREATHE; Bear Rinehart, Bo Rinehart; Atlantic Records

## POP/CONTEMPORARY RECORDED SONG

song; *album*; artist; writer; label
> "**Cinderella**"; *This Moment – Cinderella Edition*; Steven Curtis Chapman; Steven Curtis Chapman; Sparrow Records
>
> "**Give Me Your Eyes**"; *What If We*; Brandon Heath; Brandon Heath, Jason Ingram; Reunion Records
>
> "**I Will Not Be Moved**"; *Relentless*; Natalie Grant; Natalie Grant; Curb Records
>
> "**I'm Letting Go**"; *My Paper Heart*; Francesca Battistelli; Francesca Battistelli, Ian Eskelin, Tony Wood; Fervent Records
>
> "**This Is Home**"; *Chronicles Of Narnia:Prince Caspian* ; Switchfoot; Jonathan Foreman, Andy Dodd, Adam Watts; Walt Disney Records

## INSPIRATIONAL RECORDED SONG

song; *album*; artist; writer; label
> "**A New Hallelujah**"; *A New Hallelujah*; Michael W. Smith; Michael W. Smith, Debbie Smith, Paul Baloche; Reunion Records
>
> "**For The Glory Of You**"; *Windows And Walls*; Mark Harris; Mark Harris, John Lemonis, Tony Wood; INO Records
>
> "**Bless The Lord**"; *Great God Who Saves*; Laura Story; Laura Story; INO Records
>
> "**Come Thou Fount**"; *Roots Run Deep*; Jadon Lavik; Public Domain; BEC Recordings
>
> "**Dependence**"; Jamie Slocum; Jamie Slocum; Curb Records

## SOUTHERN GOSPEL RECORDED SONG

song; *album*; artist; writer; label
> "**Big Mighty God**"; *Nothin' But Good*; The Mike LeFevre Quartet; Lee Black, Sue C. Smith, Kenna West; Canaan Records
>
> "**I Believe God**"; *Real Faith*; Brian Free & Assurance; Marty Funderburk, Steve Marshall; Daywind Records
>
> "**Reason Enough**"; *Dream on*; Ernie Haase & Signature Sound; Ernie Haase, Joel Lindsey, Wayne Haun; Gaither Music Group
>
> "**Welcome To The Family**"; *Room For More*; Booth Brothers; Jim Brady, Barry Weeks, Tony Wood; Daywind Records
>
> "**Yahweh**"; *The Ride*; The Hoppers; Paula Stefanovich; Canaan Records

## BLUEGRASS RECORDED SONG

song; *album*; artist; writer; label
> "**Help Is On The Way**"; *Help Is On The Way*; Doyle Lawson & Quicksilver; Michael E. Reed; Horizon Records
>
> "**I See A Crimson Stream**"; *Sounds Like Sunday*; Janet Paschal; Garfield T. Haywood; Vine Records
>
> "**The Old White Flag**"; *You Gotta Love It!*; Triumphant Quartet; Dianne Wilkinson; Daywind Records
>
> "**They're Holding Up The Ladder**"; *We Are Family*; Jeff & Sheri Easter, Lewis Family, Easter Brothers; Russell Easter, James Easter, Edd Easter; Daywind Records
>
> "**What Will I Wear**"; *I Just Wanted You To Know*; Kim Hopper; Deborah Bailey; Canaan Records

## COUNTRY RECORDED SONG

song; *album*; artist; writer; label
> "**Did I Make A Difference**"; *Front Row Seats*; The Oak Ridge Boys; Rob Crosby, Bill Anderson; Spring Hill Music Group
>
> "**Good Side Of Goodbye**"; *Home For Now*; Living Waters Trio; Wayne Haun, Dave Clark; Vine Records
>
> "**I Saw God Today**"; *Troubadour*; George Strait; Rodney Clawson, Monty Criswell, Wade Kirby; MCA Nashville

P000118

"**I Wish**"; *How You Live Deluxe Edition*; Point of Grace; Cindy Morgan, Phil Madeira; Word Records
"**Jesus And John Wayne**"; *Lovin' Life*; Gaither Vocal Band; Gloria Gaither, William J. Gaither, Doug Johnson, Kim Williams, Benjamin Gaither; Gaither Music Group

## URBAN RECORDED SONG
song; *album*; artist; writer; label

"**Declaration (This Is It)**"; *The Fight Of My Life*; Kirk Franklin; Kenneth C. Loggins, Michael H. McDonald; Zomba Gospel
"**Get Up**"; *The Sound*; Mary Mary; Warryn Campbell, Erica Campbell, Tina Campbell, Eric Dawkins; Columbia Records, Integrity Music
"**Love Him Like I Do**"; *Revealed*; Deitrick Haddon with Ruben Studdard and Mary Mary; Warryn Campbell, Erica Campbell, Deitrick Haddon, Lamar Edwards; Zomba Gospel
"**No Looking Back**"; *No Looking Back*; Damita; Damita Haddon; Tyscot Records
"**Not A Slave**"; *Life By Stereo*; J.R.; Courtney Peebles; Cross Movement Records

## TRADITIONAL GOSPEL RECORDED SONG
song; *album*; artist; writer; label

"**Cry Your Last Tear**"; *Cry Your Last Tear*; Bishop Paul S. Morton & the Full Gospel Baptist Church Fellowship Mass Choir; Vashawn Mitchell; Light Records
"**Deliverance**"; *Past And Present*; Lillie Knauls; Teddy Huffman, Lillie Knauls, Wayne Haun; Vine Records
"**Free At Last**"; *Down In New Orleans;* The Blind Boys of Alabama; Traditional; Time Life Music
"**God Is Good**"; *Love Forever Shines*; Regina Belle; Bernard Belle; Pendulum Records, Walker Davis Entertainment
"**Souled Out**"; *Souled Out*; Hezekiah Walker; Estee Bullock, Nate McNair; Zomba Gospel
"**Take It Back**"; *Take It Back*; Dorinda Clark-Cole; Derrick Starks; Zomba Gospel

## CONTEMPORARY GOSPEL RECORDED SONG
song; *album*; artist; writer; label

"**Favor Of God**"; *Change The World*; Martha Munizzi; Aaron Lindsey, John Rowsey; Martha Munizzi Music
"**Great Grace**"; *Overcomer*; Alvin Slaughter; Mary Alessi, Aaron Lindsey; Integrity Music
"**How Great Is Our God**"; *How Great Is Our God*; LaRue Howard; Chris Tomlin, Jesse Reeves, Ed Cash; EMI Gospel
"**My Name Is Victory**"; *Right Now Praise*; Jonathan Nelson; Jonathan Nelson, Justin Savage; Integrity Music
"**Shall We Gather At The River**"; *The Standard*; Take 6; Robert Lowry; Heads Up International
"**Waging War**"; *Thy Kingdom Come*; CeCe Winans; Christopher Capehart, Brannon Tunie, CeCeWinans; PureSprings Gospel

## WORSHIP SONG
song; writer; publisher (Dove Award in the Worship Song category given to the songwriter and publisher.)

"**A New Hallelujah**"; Michael W. Smith, Debbie Smith, Paul Baloche; Word Music LLC, Smittfly Music, This Is Your Time Music, Integrity's Hosanna! Music, Leadworship Songs
"**Breathe On Me**"; Natalie Grant; Nat In The Hat Music
"**Jesus Messiah**"; Chris Tomlin, Daniel Carson, Jesse Reeves, Ed Cash; worshiptogether.com Songs, Alletrop Music, sixsteps Music
"**Mighty To Save**"; Ben Fielding, Joel Houston; Integrity's Hosanna! Music
"**You're Not Alone**"; Meredith Andrews; Word Music LLC

Dove Awards in Album categories are given to the artist and producer (if other than the artist).
## RAP/HIP HOP ALBUM
*album*; artist; producer; label

*Citizen Activ;* Manafest; Adam Messinger, Manafest, Boi-1da, Chris Stacey, Arion, Josh MacIntosh; BEC Recordings
*Ordinary Dreamers*; Group 1 Crew; Andy Anderson, Christopher Stevens, Sam Mizell; Fervent Records
*Pull Your Pants Up!;* Dooney "Da Priest"; Dooney "Da Priest"; Malaco Records
*Rebel;* Lecrae; Joseph Prielozny, G-Styles, Dion Burroughs, Kadence, Devon Burroughs, Teddy P., Bobby Taylor, JR, k-Drama, Sixth Sense Music Productions; Reach Records
*Reiterate;* Grits; Mo Henderson, T-Dogg, Anthony Johnson, Jr.; Revolution Art

## ROCK ALBUM

P000119

EX. 21-7

EXHIBIT  17
PAGE  1661

*album*; artist; producer; label
>   *Comatose Comes Alive*; Skillet; Carl Diebold, Paul Kerby, Zachary Kelm; Ardent Records, INO Records
>   *For The Love Of The Game*; Pillar; Travis Wyrick; Essential Records
>   *Satisfied*; DecembeRadio; Scotty Wilbanks; Slanted Records
>   *Southern Hospitality*; Disciple; Travis Wyrick; INO Records
>   *To Know That You're Alive*; Kutless; Peter Kipley; BEC

## ROCK/CONTEMPORARY ALBUM
*album*; artist; producer; label
>   *Daylight Is Coming*; Remedy Drive; Ian Eskelin; Word Records
>   *Expect The Impossible;* Stellar Kart; Ian Eskelin; Word Records
>   *Hello*; After Edmund; Scotty Wilbanks; Slanted Records
>   *Never Going Back To OK;* The Afters; Dan Muckala; INO Records
>   *Unbreakable*; Fireflight; Rob Hawkins; Flicker Records

## POP/CONTEMPORARY ALBUM
*album*; artist; producer; label
>   *Bebo Norman*; Bebo Norman; Bebo Norman, Jason Ingram, Rusty Varenkamp; BEC
>   *Fall And Winter*; Jon Foreman; Jon Foreman; Credential Recordings, lowercase people records
>   *My Paper Heart;* Francesca Battistelli; Ian Eskelin; Fervent Records
>   *Relentless*; Natalie Grant; Bernie Herms, Shaun Shankel; Curb Records
>   *Revelation*; Third Day; Howard Benson; Essential Records

## INSPIRATIONAL ALBUM
*album*; artist; producer; label
>   *After The Rain*; Aaron & Amanda Crabb; Tre' Corley; Daywind Records
>   *Great God Who Saves*; Laura Story; Ed Cash; INO Records
>   *Infinite Grace*; Women of Faith Worship Team; Chance Scoggins; Myrrh Records
>   *Roots Run Deep*; Jadon Lavik; Jadon Lavik, Zach Hodges, Keith E. Smith, Nic Rodriguez, Fernando Ortega, Tony Guerrero; BEC
>   *Songs For The Journey*; Sandi Patty; David Hamilton; INO Records

## SOUTHERN GOSPEL ALBUM
*album*; artist; producer; label
>   *Ephesians One*; Karen Peck & New River; Bubba Smith; Daywind Records
>   *I Just Wanted You To Know*; Kim Hopper; Dave Clark, Kim Hopper; Canaan Records
>   *Lovin' Life*; Gaither Vocal Band; Bill Gaither, Guy Penrod, Marshall Hall, Wes Hampton; Gaither Music Group
>   *On The Way Up*; HisSong; Wayne Haun; Vine Records
>   *Room For More*; Booth Brothers; Barry Weeks; Daywind Records

## BLUEGRASS ALBUM
*album*; artist; producer; label
>   *Bluegrass Worship;* Various; Steve Ivey; Star Song Music
>   *Help Is On The Way*; Doyle Lawson & Quicksilver; Doyle Lawson; Horizon Records
>   *Hymns From Chigger Hill*; Chigger Hill Boys & Terri; Mike Richards, Terri Argot Gore, Ricky Gore, Mark Dunham, Bobby Strangenberg, Ethan Blair, Justin Kropf; Daywind Records
>   *I Don't Regret A Mile*; Larry Sparks; Larry Sparks; Sparks Music
>   *Pickin', Praisin', & Singin': Hymns From The Mountain*; Cody Shuler & Pine Mountain Railroad; Bill McBee, Dale Thomas, Jerry Cole, Cody Shuler, Matt Flake; Rural Rhythm
>   *We Are Family*; Jeff & Sheri Easter, Lewis Family, Easter Brothers; Jeff Easter, Sheri Easter; Daywind Records
>   *What A Journey*; Paul Williams & The Victory Trio; Paul Williams; Rebel Records

## COUNTRY ALBUM
*album*; artist; producer; label
>   *Around the Bend*; Randy Travis; Kyle Lehning; Warner Bros. Records
>   *Home For Now*; Living Waters Trio; Terry Thompson; Vine Records
>   *Hymned Again*; Bart Millard; Brown Bannister; INO Records
>   *I Turn To You*; Richie McDonald; Frank Myers, Gary Baker, Tommy Lee James; Lucid Entertainment
>   *Runaway Train*; Crabb Revival; Ben Isaacs, Tre' Corley; Daywind Records

P000120

## URBAN ALBUM
*album*; artist; producer; label

*Bold Right Life*; Kierra Sheard; Warryn Campbell, J. Drew Sheard, Asaph Ward, Gerald Haddon, Paul Allen, J Moss; EMI Gospel

*The Fight of My Life*; Kirk Franklin; Kirk Franklin; Zomba Gospel

*Kingdom Business*; Canton Jones; Canton Jones, The Music Doctorz, Carlin Muccular, Antonio Neal, Randy Harrison, Vernon Messam; Arrow Records

*No Looking Back*; Damita; Gerald Haddon, Tim & Bob, Deitrick Haddon, Courtney Horton, David Garcia; Tyscot Records

*Revealed*; Deitrick Haddon; Andre Harris, Vidal Davis, Warryn Campbell, Blaze "The Champ", Deitrick Haddon, Gerald Haddon, David Haddon, Tim & Bob, Percy Bady; Zomba Gospel

## TRADITIONAL GOSPEL ALBUM
*album*; artist; producer; label

*A New Day*; Paul Porter; Paul Porter, David Caton, Tony Homer; Light Records

*After 40 Years...Still Sweeping Through the City*; Shirley Caesar; Bubba Smith; Light Records

*Cry Your Last Tear*; Bishop Paul S. Morton & the Full Gospel Baptist Church Fellowship Mass Choir; L. Trenton Phillips, Elvin Ross; Light Records

*Do It!*; Dottie Peoples; Dottie Peoples; DP Muzik Group

*Down In New Orleans*; The Blind Boys of Alabama; Chris Goldsmith; Time Life Music, Integrity Music

## CONTEMPORARY GOSPEL ALBUM
*album*; artist; producer; label

*Change the World*; Martha Munizzi; Aaron Lindsey, Israel Houghton; Martha Munizzi Music

*Stand Out*; Tye Tribbett & G.A.; Tye Tribbett II, Dana Sorey, Thaddaeus Tribbett; Columbia Records, Integrity Music

*The Sound*; Mary Mary; Warryn Campbell; Columbia Records, Integrity Music

*The Standard*; Take 6; Mark Kibble; Heads Up International

*Thy Kingdom Come*; CeCe Winans; Tommy Sims, Christopher Capehart, Luther Hanes, Percy Bady, Cedric Caldwell, Victor Caldwell, Alvin Love III; PureSprings Gospel

## INSTRUMENTAL ALBUM
*album*; artist; producer; label

*A Treasury of Hymns*; LaDonna; Eric Wyse; Martingale Music

*Always There*; Harold Rayford; Antoine Chamber; Tyscot Records

*Born to Play*; Barry D.; Barry D.; Taqa Records

*Chronicles of Narnia: Prince Caspian*; Various; Harry Gregson-Williams; Walt Disney Records

*Love Beyond All Measure*; Stephen Petrunak; Stephen Petrunak; GIA Publications

*The Breath of Life*; Angella Christie; Angella Christie, Kevin Griffen; ACSM

## CHILDREN'S MUSIC ALBUM
*album*; artist; producer; label

*Absolute Modern Worship for Kids 4*; Phoebe Ebensberger, Emily Ebensberger, Abbie Ebensberger, Joseph O'Brien, Timmy O'Brien, Mikey O'Brien, Abbie Chapman, Meghan O'Brien, Adelaide Bauer, Kristen Bauer, Karissa Selby, Emma Rose Williamson, Tyler Beiden, Garrett Williamson; Chance Scoggins; Fervent Records

*All God's Animals*; TJ McCloud; Brandon Scott Thomas, Eric Wyse; Martingale Music

*David: Shepherd, Psalmist, Soldier, King!*; Bible StorySongs; Paula King, Catherine Walker; Bible StorySongs

*Shout Praises Kids – I Am Free*; Jeff Sandstrom, Kurt Goebel, Stephen Leiweke, Jeremy Redmon; Integrity Music

*Sleepytime Lullabies;* Praise Baby; Matt Huesmann; Big House Kids

*Tell The World*; Hillsong Kids; Julia A'Bell, Gio Galanti, Andrew Crawford, David Wakerley; Hillsong, Integrity Music

## SPANISH LANGUAGE ALBUM
*album*; artist; producer; label

*Abriras Las Puertas*; Malin; Miguel Angel "Malin" Villagran; Integrity Music Latin

*Alabanza Y Adoracion: Del Corazon*; Lucia Parker; Tom Brooks, Dario Navac; 3:16 Media

*Mi Salvacion*; Ingrid Rosario; Christian Cartone; Rejoice Music

P000121

EXHIBIT 17
PAGE 1663

*Refrescate!*; Aline Barros; Juan Salinas; Integrity Music Latin
*Rescatame*; Seventh Day Slumber; Alejandro Allen, Susana Allen; BEC
*Sobrenatural*; Marcos Witt; Marcos Witt; CanZion
*Tengo sed de Ti*; Soraya Moraes; Marco Moraes; Line Records

## SPECIAL EVENT ALBUM
*album*; artist; producer; label

*Billy: The Early Years Official Motion Picture Soundtrack*; Brooks & Dunn, Mac Powell, Sara Evans, Alan Jackson, China Edelman, Patty Griffin, Brandon Heath, Gregory Page, Michael W. Smith, Melinda Doolittle, Roy Orbison, Brad Paisley, Josh Turner, Sierra Hull, John Cowan, Harry Stinson, Ronnie Bowman, Ronnie McCoury, John Wesley Ryles; Anastasia Brown; Arista Nashville, Essential Records

*Country Bluegrass Homecoming Volume One*; Gaither Vocal Band, Marty Stuart & His Fabulous Superlatives, The Grascals, Buddy Greene, The Isaacs, Gordon Mote, Ralph Stanley & The Clinch Mountain Boys, The Booth Brothers, George Jones, Wesley Pritchard, Reggie & Ladye Love Smith, Brittany Allen, Jeff & Sheri Easter, Charlotte Ritchie, Doyle Lawson & Quicksilver, Jimmy Fortune, Dailey & Vincent, Jason Crabb, Rhonda Vincent & The Rage, Ernie Haase & Signature Sound, Cherryholmes, Lisa Daggs-Charette, Vince Gill, Sonya Isaacs, Becky Isaacs Bowman; Bill Gaither; Gaither Music Group

*How Great Thou Art: Gospel Favorites from the Grand Ole Opry*; The Charlie Daniels Band, Mac Powell, Alan Jackson, Patty Loveless, Ronnie Milsap, Ricky Skaggs & The Whites, Sara Evans, Brad Paisley, Trace Adkins, Loretta Lynn, Vince Gill, Dierks Bentley, Carrie Underwood; Steve Gibson; Sony BMG Nashville

*Passion: God of This City*; Chris Tomlin, Charlie Hall, David Crowder*Band, Christy Nockels, Kristian Stanfill, Fee, Matt Redman; Nathan Nockels; Sparrow Records, sixsteps Records

*Your Name*; Joel Auge, Leeland Mooring, Paul Baloche, Aaron Shust, Phil Wickham, Josh Reedy, Ayiesha Woods, Ian Eskelin, Mark Stuart, Vicky Beeching, Jared Anderson, Christy Johnson, Sean Loche, Aaron Boyd, Jason Roy, Wes Willis, Lincoln Brewster, Adam Agee; Ian Eskelin; Integrity Music

## CHRISTMAS ALBUM
*album*; artist; producer; label

*Christmas Gaither Vocal Band Style*; Gaither Vocal Band; Russell Mauldin; Gaither Music Group
*Christmas Songs*; Fernando Ortega; John Andrew Schreiner, Fernando Ortega; Curb Records
*Home for Christmas*; BarlowGirl; Otto Price; Fervent Records, Curb Records
*O Holy Night*; Sara Groves; Ben Shive; INO Records
*Peace on Earth*; Casting Crowns; Mark Hall, Mark A. Miller; Beach Street

## PRAISE & WORSHIP ALBUM
*album*; artist; producer; label

*A New Hallelujah*; Michael W. Smith; Michael W. Smith; Reunion Records
*Great God Who Saves*; Laura Story; Ed Cash; INO Records
*Hello Love*; Chris Tomlin; Ed Cash; Sparrow Records, sixsteps Records
*Opposite Way*, Leeland; Matt Bronleewe; Essential Records
*The Invitation*; Meredith Andrews; Jason Ingram, Rusty Varenkamp; Word Records

Dove Awards in the Musical and Choral categories are given to the creators.
## MUSICAL
*title*; creator; publisher (award given to creator and publisher)

*Child of Wonder*; Lari Goss, Rob Howard; Word Music
*East to West*; Gary Rhodes; Word Music
*God Bless the USA*; Sue C. Smith, Joel Lindsey, Russell Mauldin; Brentwood-Benson Music Publishing
*Savior*; David Moffitt, Sue C. Smith, Travis Cottrell; Brentwood-Benson Music Publishing
*The Risen Christ*; Don Cason, Karla Worley; Clear Call Music

## YOUTH/CHILDREN'S MUSICAL
*title*; creator; publisher

*An Island Christmas*; Wayne Haun, Shelby Haun, Joel Lindsey; Lillenas Publishing Company
*Angels We Have Heard*; Dave Clark, Jayme Thompson; Brentwood-Benson Music Publishing
*It's a Wonder-Full Life*; Pam Andrews, Luke Gambill; Brentwood-Benson Music Publishing
*Lifesong*; Sue C. Smith, Simon Hawkins, Kris Crunk; Brentwood-Benson Music Publishing
*The Christmas County Spelling Bee*; Celeste Clydesdale; Clydesdale & Clydesdale, Word Music

P000122

EXHIBIT 17
PAGE 1664

**CHORAL COLLECTION**

*title*; creator; publisher

*Cradle That Rocked The World*; Geron Davis, Christopher Phillips, Jukka Palonen; Brentwood-Benson Music Publishing

*Glorious Day*; David Moffitt, Sue C. Smith, Travis Cottrell; Brentwood-Benson Music Publishing

*He Still Leads – Christ Church Choir*; Landy Gardner, Joy Gardner, Christopher Phillips; Brentwood-Benson Music Publishing

*I'll Say Yes*; Carol Cymbala; Word Music

*Make a Joyful Noise*; Regi Stone; Word Music

**RECORDED MUSIC PACKAGING**

*product*; art director; graphic artist; illustrator, photographer; label (Dove Award in the Recorded Music Packaging category given to the art director, graphic artist, illustrator and photographer.)

*...Is My Friend* (Hawk Nelson); Invisible Creature; Don Clark; Don Clark; Jeremy Cowart, Neil Visel; BEC Recordings

*Remedy Club Tour Edition* (David Crowder*Band); Shelley Giglio, David Crowder; Gary Dorsey; Brody Harper; Sparrow Records, sixsteps records

*Revelation* (Third Day); Tim Parker, Beka Blackburn; Tim Parker; David Mcalister, RW Sims; Essential Records

*Storm the Gates of Hell Deluxe Edition* (Demon Hunter); Invisible Creature; Ryan Clark; Shane McCauley, David Stuart, Greg Lutze, Ethan Luck; Solid State Records

*The Tide Will Swallow Us Whole* (Trenches); Invisible Creature; Ryan Clark; Solid State Records

Dove Awards in the Video categories are given to the artist, director and producer (if other than the artist).

**SHORT FORM MUSIC VIDEO**

*title*; artist; director; producer; production company; label

*Daylight*; Remedy Drive; John Erwin, Andy Erwin; Erwin Brothers Motion Pictures; Word Records

*Fan Mail*; KJ-52; Sam Sanchez; Sam Sanchez; Difted Productions; BEC

*In the Valley of the Dying Sun*; House of Heroes; Danny Yourd; Steve Hoover; Endeavor Media; Mono vs. Stereo

*Movin'*; Group 1 Crew; John Erwin, Andy Erwin; Dan Atchison; Erwin Brothers Motion Pictures; Fervent Records

*Slow Fade;* Casting Crowns; John Erwin, Andy Erwin; Erwin Brothers Motion Pictures; Beach Street

**LONG FORM MUSIC VIDEO**

*title*; artist; director; producer; production company; label

*Alive and Transported*; tobyMac; Eric Welch; Tameron Hedge, Dan Pitts; Broken Poet Productions; Forefront Records

*Comatose Comes Alive*; Skillet; Carl Diebold; Carl Diebold, Paul Kerby, Zachary Kelm; Atlantic, Lava , Ardent, INO Records

*Country Bluegrass Homecoming Volume One*; Bill & Gloria Gaither; Doug Stuckey; Bill Gaither; Gaither Television Productions; Gaither Music Group

*O Holy Night*; David Phelps; David Phelps, Jimmy Abegg; David Phelps, Jim Chaffee, Jimmy Abegg, Ben Pearson; MG&A; Word Records

*The Altar and the Door Live*; Casting Crowns; Cary Goin; John Erwin, Andy Erwin; Erwin Brothers Motion Pictures; Beach Street

# # #

P000123

# EXHIBIT 18

EXHIBIT  18
PAGE  1666



**From:** Lecrae
**To:** clearsight7@yahoo.com
**Subject:** Re: Joyful Noise!
**Date:** Wednesday, March 26, 2008 1:39:41 AM

I'll tell ben. I don't even know the password or how to do that junk.

LECRAE
Reachrecords.com
Reachlife.org
Myspace.com/lecrae

On Mar 26, 2008, at 12:20 AM, Marcus Williams-Gray <clearsight7@yahoo.com> wrote:

> Hey dude!
> Thanks for the promo of our song on your myspace page. Can you make it say
> "FLAME's Joyful Noise ft. Lecrae" as the song title? People are seeing it say
> "Joyful Noise by Lecrae." If not that then make it say OUR WORLD
> REDEEMED. This would be very kind of you sir.
>
> Thanks a million,
> Flame

---

Never miss a thing. Make Yahoo your homepage.

P000218

EXHIBIT 18
PAGE 1667

# EXHIBIT 19

EXHIBIT  19
PAGE  1668

SHP 1:15-cv-05642-CAS-JC    Document 486    Filed 01/03/20    Page USED OF 1670
Page ID #:9538



JOINT
EXHIBIT
58A

EXHIBIT 19
PAGE 1669



EXHIBIT 19
PAGE 1670