1   Michael A. Kahn (pro hac vice)
    Kahn@capessokol.com
2   Jonathan S. Jones (pro hac vice)
    Jones@capessokol.com
3   CAPES SOKOL
    7701 Forsyth Blvd. 12th Floor
4   St. Louis, MO 63015
    (314) 721-7701
5
    Eric. F. Kayira (pro hac vice)
6   eric.kayira@kayiralaw.com
    KAYIRA LAW, LLC
7   200 S. Hanley Road, Suite 208
    Clayton, Missouri 63105
8   (314) 899-9381
9   Daniel R. Blakey (SBN 143748)
    blakey@capessokol.com
10  CAPES SOKOL
    3601 Oak Avenue
11  Manhattan Beach, CA 90266

12  *Attorneys for Plaintiffs*

13                  UNITED STATES DISTRICT COURT

14                  CENTRAL DISTRICT OF CALIFORNIA

15

16  MARCUS GRAY, et al.,                CASE NO. 2:15-cv-05642-CAS (JCx )

17              Plaintiffs,             Honorable Christina A. Snyder

18      v.                             **PLAINTIFFS' MEMORANDUM IN
                                        OPPOSITION TO DEENDANTS'
19  KATHERYN ELIZABETH                  POST-TRIAL MOTIONS**
    HUDSON, et al.,
20
                Defendants.             Date:  January 27, 2020
21                                      Time: 10:00 a.m.
                                        Ctrm:  8D—8th Floor, First Street
22
23                                      Filed: July 1, 2014
                                        Trial: July 17, 2019
24

25

26

27

28

# **TABLE OF CONTENTS**

I.      INTRODUCTION...................................................................................1

II.     THE COURT SHOULD DENY THE RULE 50(B) MOTION ...............2

A.  Defendants muddy the Rule 50(b) standard, citing to language from other circuits while ignoring governing Ninth Circuit caselaw ..........2

B. Ample evidence supports the Jury's finding that "Joyful Noise" and "Dark Horse" are substantially similar .................................................3

    1. The "extrinsic" substantial similarity test must be applied in a manner consistent with prevailing Ninth Circuit law in music copyright cases.....................................................................................3

        a. The Ninth Circuit accords protection to a wide range of musical elements taken alone or in combination .....................................3

        b. Unlike other art forms, the so-called "thin copyright" doctrine does not apply to distinctive combinations of musical elements ........................................................................................5

        c. A jury following the Court's instructions could reasonably find substantial similarity between the two works.............................6

            i.      The multiple similarities between the two songs are protectable and far from commonplace............................7

            ii.     Dr. Decker determined that several of the two songs' shared elements, even taken alone, were distinctive and significant in determining substantial similarity .............8

            iii.    Dr. Decker identified several other shared elements which, in combination, contriubute to the distinctiveness of the ostinatos..............................................................................12

            iv.    Dr. Decker opined that the few minor differences between the two songs were negligible and, in some instances, represented further points of similarity .........................13

            v.      Proper application of the extrinsic test to these facts reasonably results in a finding of substantial similarity ....................................................................14

C. Ample evidence supports the Jury's finding of widespread dissemination....................................................................................17

D. Contrary to Defendants' contention, no evidence is required to support the Jury's rejection of Defendants' claim of independent creation..........................................................................................19

    1. Defendants' evidence of alleged "independent creation" was not unrebutted and is not supported by a legally sufficient basis........20

2. Even if unrebutted, the Jury's rejection of Defendants' independent creation testimony was reasonable and supported by a legally sufficient basis, including the Jury's determination as to witness credibility ..................................................................................21

E. The Jury's finding that "Joyful Noise" is a "Joint Work" is supported by extensive undisputed evidence.......................................................22

F. The Jury properly found all defendants liable for direct infringement; each had a direct role in the creation and public performance and distribution of the infringing song ....................................................25

III. THE JURY'S APPORTIONMENT DETERMINATION WAS FULLY SUPPORTED BY THE EVIDENCE ........................................................28

IV. THE JURY'S REJECTION OF CAPITOL'S PROFIT CALCULATION WAS NOT ONLY PROPER BUT THOSE PROFITS SHOULD HAVE BEEN EVEN LARGER THAN THE JURY'S RECALCULATION ....32

A. Virtually all of Capitol's overhead expense was not deductible ........33

B. Capitol's profit number should actually have been higher; the Jury should not have deducted nearly $5 million in "royalty expense" in calculating Capitol's profits....................................................................35

V. THERE IS NO SUFFICIENT GROUND FOR A NEW TRIAL............36

A. Rule 59 New Trial and Remittitur Standard .........................................36

B. No new trial on liability is warranted ..................................................37

1. Contrary to Defendants' contention, the clear weight of the evidence fully supports the Jury's findings on liability ..............................37

2. There was no misconduct by either Dr. Decker or Plaintiffs' Counsel.........................................................................................39

a. Dr. Decker's testimony was proper and did not invade the province of the Jury ................................................................39

i. Dr. Decker's testimony relating to borrowing was proper and any objection was waived.........................................39

ii. Dr. Decker did not invade the province of the Jury by testifying as to matters exclusively in the province of the intrinsic test ................................................................41

iii. Dr. Decker did not offer improper opinions as to "striking similarity"; moreover, Defendants were in no way prejudiced by his use of the word "striking" in its plain and ordinary context meaning, especially given that the Jury was not instructed on the "striking similarity" issue ................................................................................44

ii

b. Counsel's reference to future profits was accurate and proper ...................................................................................45

C. The evidence actually demonstrates that the damages awarded by the Jury were insufficient ...........................................................48

VI.    CONCLUSION ........................................................................49

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' POST-TRIAL MOTIONS**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aalmuhammed v. Lee,*
  202 F.3d 1227 (9th Cir. 2000)................................................................24

*Adobe Sys. Inc. v. Blue Source Grp., Inc.,*
  125 F. Supp. 3d 945 (N.D. Cal. 2015)....................................................26

*Aguilar v. Int'l Longshoremen's Union Local No. 10,*
  966 F.2d 443 (9th Cir.1992) ...................................................................39

*In re Aimster Copyright Litig.,*
  334 F.3d 643 (7th Cir. 2003) ..................................................................25

*Allergan USA Inc. v. Imprimis Pharm., Inc.,*
  2019 WL 4546897 (C.D. Cal. Aug. 2, 2019) ...........................................3

*Anderson v. Liberty Lobby, Inc.,*
  447 U.S. 242 (1986) .................................................................................2

*Angle v. Sky Chief, Inc.,*
  535 F2d. 492 (9th Cir. 1976) ..................................................................38

*Anheuser-Busch, Inc. v. Natural Beverage Distributors,*
  69 F.3d 337 (9th Cir. 1995).............................................................46, 47

*Apple Computer, Inc. v. Microsoft Corp.,*
  35 F.3d 1435 (9th Cir. 1994)...................................................................42

*Bates v. Metro. Interpreters & Translators, Inc.,*
  742 F. App'x 268 (9th Cir. 2018) ...........................................................41

*Baxter v. MCA, Inc.,*
  812 F.2d 421 (9th Cir. 1987) ....................................................................5

*Bleinstein v. Donaldson Lithographing Co.,*
  188 U.S. 239 (1903) ..................................................................................5

*City Solutions, Inc. v. Clear Channel Comms.,*
  365 F.3d 835 (9th Cir.2004)....................................................................37

*Dugan v. Nance*,
   2013 WL 6633072 (C.D. Cal. Dec. 16, 2013)..................................................2, 18

*Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*,
   140 F.2d 266 (2nd Cir.1944) ................................................................23

*Fahmy v. Live Nation Entertainment, Inc.*,
   2015 WL 3617040 (C.D. Cal. 2015) (J. Snyder) .........................................25, 27

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*,
   499 U.S. 340 (1991) .........................................................................4, 14

*Ford v. Ray*,
   130 F.Supp. 1358 (W.D. Wash. 2015) .....................................................24

*Gable v. Nat'l Broad. Co.*,
   727 F. Supp. 2d 815 (C.D. Cal. 2010)......................................................42

*Gant v. Vanderpool*,
   350 F. App'x 181 (9th Cir. 2009) ...........................................................40

*Gasperini v. Center for Humanities*,
   518 U.S. 415, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) .................................37

*Gaste v. Kaiserman*,
   863 F.2d 1061 (2d Cir.1988) ................................................................22

*Hall v. Swift*,
   No. 18-55426, 2019 WL 5543864 (9th Cir. Oct. 28, 2019)...............................5

*Harper v. City of Los Angeles*,
   533 F.3d 1010 (9th Cir. 2008) ...............................................................2

*Hoehling v. Universal City Studios, Inc.*,
   618 F.2d 972 (2d Cir.), *cert. denied*, 449 U.S. 841(1980) ...............................40

*Idema v. Dreamworks, Inc.*,
   162 F. Supp. 2d 1129 (C.D. Cal. 2001)....................................................42

*Kaiser Steel Corp. v. Frank Coluccio Constr. Co.*,
   785 F.2d 656 (9th Cir.1986)................................................................48

*Kamar Int'l, Inc. v. Russ Berrie & Co.*,
   752 F.2d 1326 (9th Cir. 1984) ............................................................33, 35

v

*Kamar Intern., Inc. v. Russ Berrie and Co.*,
   657 F.2d 1059 (9th Cir. 1981) ..............................................................4

*Kehr v. Smith Barney, Harris Upham & Co.*,
   736 F.2d 1283 (9th Cir. 1984) ............................................................47

*Landes Constr. Co. v. Royal Bank of Canada*,
   833 F.2d 1365 (9th Cir.1987) ..............................................37, 38, 39

*Loomis v. Cornish*,
   2013 U.S. Dist. LEXIS 162607 (C.D. Cal. Nov. 13, 3013) .........18, 19

*Marbled Murrelet v. Babbitt*,
   83 F.3d 1060 (9th Cir.1996) ...............................................................41

*McEuin v. Crown Equipment Corp.*,
   328 F.3d 1028 (9th Cir. 2003) ............................................................21

*Medina v. Metro. Interpreters & Translators, Inc.*,
   139 F. Supp. 3d 1170 (S.D. Cal. 2015) ..............................................41

*Metcalf v. Bocho*,
   294 F.3d 1069 (9th Cir. 2002) ..............................................................5

*Mitchell v. Black & Decker (USA) Inc.*,
   6 F. App'x 652 (9th Cir. 2001) ...........................................................41

*Nationwide Transp. Fin. v. Cass. Info. Sys., Inc.*,
   523 F.3d 1051 (9th Cir. 2008) ............................................................39

*Polar Bear Productions v. Timex Corp.*,
   384 F.3d 700 (9th Cir. 2004) ..............................................................28

*Range Rd. Music, Inc. v. E. Coast Foods, Inc.*,
   668 F.3d 1148 (9th Cir. 2012) ............................................................25

*Reeves v. Sanderson Plumbing Prod., Inc.*,
   530 U.S. 133 (2000) .........................................................................2, 21

*Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*,
   531 F.3d 962 (9th Cir. 2008) .........................................................23, 24

*Satava v. Lowry*,
   323 F.3d 805(9th Cir. 2003) .............................................4, 6, 15, 16

vi

*Settlegoode v. Portland Pub. Sch.*,
 371 F.3d 503 (9th Cir. 2004) ........................................................................... 47

*Shad v. Dean Witter Reynolds, Inc.*,
 799 F.2d 525 (9th Cir. 1986) ........................................................................... 39

*Siegel v. Time Warner Inc.*,
 496 F. Supp. 2d 1111 (C.D. Cal. 2007) ........................................................... 23

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*,
 251 F.3d 814 (9th Cir. 2001) ........................................................................... 37

*Sony Corp. of Am. v. Universal Studios, Inc.*,
 464 U.S. 417 (1984) ......................................................................................... 27

*Swirsky v. Carey*,
 376 F.3d 841 (9th Cir. 2004) ........................................... 3, 4, 6, 14, 16, 17, 43

*Tennant v. Peoria & Pekin Union Ry.*,
 321 U.S. 29 (1944) ........................................................................................... 39

*Three Boys Music Corp. v. Bolton*,
 212 F.3d 477 (9th Cir. 2000) ................................................................. 3, 22, 42

*Tortu v. Las Vegas Metro. Police Dept.*,
 556 F.3d 1075 (9th Cir.2009) ..................................................................... 37, 38

*Twentieth Century Music Corp. v. Aiken*,
 422 U.S. 151 (1975) ......................................................................................... 28

*Twentieth Century-Fox Film Corp. v. MCA, Inc.*,
 715 F.2d 1327 (9th Cir. 1983) ......................................................................... 40

*UMG Recordings, Inc. v. Sinnott*,
 300 F.Supp.2d 993 (E.D. Cal. 2004) ............................................................... 25

*United States v. Hamilton*,
 583 F.2d 448 (9th Cir. 1978) ............................................................................. 4

*Venura v. Kyle*,
 825 F (8th Cir. 2016) ........................................................................................ 46

*Williams v. Gaye*,
 895 F.3d 1106 (9th Cir. 2018) ...................................................... 5, 6, 16, 26, 29

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' POST-TRIAL MOTIONS

**Statutes**

17 U.S.C. § 102(a) ............................................................................................ 3

17 U.S.C. § 101 ......................................................................................... 23, 26

17 U.S.C. § 106(2) .......................................................................................... 26

17 U.S.C. § 106(3) .......................................................................................... 26

17 U.S.C. § 106(4) .......................................................................................... 26

17 U.S.C. § 201(a) .......................................................................................... 23

**Other Authorities**

11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2806
  (1973) .......................................................................................................... 37

Fed. R. Evid. 702(a) ........................................................................................ 39

Fed. R. Evid. 704(a) ........................................................................................ 39

https://www.merriam-webster.com/dictionary/objective ........................................ 42

Fed. R. Civ. P. 50 ................................................................... 1, 2, 18, 21, 37, 49

Fed. R. Civ. P.  59 ............................................................................ 36, 38, 48, 49

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' POST-TRIAL MOTIONS**

# I.    INTRODUCTION

Within hours of the jury's verdict on damages, Defendants' lead trial counsel issued a widely-disseminated public statement that charitably could be described as immoderate:

> "The writers of Dark Horse view the verdicts as a travesty of justice," begins a statement from attorney Christine Lepera on behalf of the defendants, obtained by ABC News Thursday evening.[1]

What makes this disparagement of the jury (and by implication, this Court) all the more remarkable is that the key jury instructions **and** the unusually detailed special jury verdict forms (for both liability and damages) were drafted by defendants and submitted to the jury largely over plaintiffs' objections.

Nevertheless, Defendants have now filed more than 2,000 pages of documents in connection with their Motion for Judgment as a Matter of Law or, alternatively, for a New Trial (Dkts. 483 through 486-1). Those filings cherry-pick transcript excerpts (ignoring testimony favorable to Plaintiffs, including testimony that directly rebuts the cited excerpts) and avoid Ninth Circuit precedents that undermine their legal arguments. But reams of paper cannot mask the fact that Defendants' arguments are largely a rehash of the same unsuccessful arguments in their summary judgment motion—and must be judged by that same standard of review. In short, Defendants' press release cannot alter the fact that a unanimous nine-person jury found the Defendants and their expert witnesses less credible than the witnesses for the Plaintiffs, and reached a verdict firmly rooted in the evidence presented at trial.

---

[1] http://abcnewsradioonline.com/music-news/2019/8/2/dark-horse-writers-call-jury-verdict-a-travesty-of-justice-p.html. The headline in *Variety.com* was "Katy Perry and Co-Writers Call 'Dark Horse' Decision a 'Travesty of Justice.'" (Variety.com/2019/music/katy-perry-and-co-writers-call-dark-horse-decision-a-travesty-of-justice-12032900101/)

## II.     THE COURT SHOULD DENY THE RULE 50(B) MOTION

### A. Defendants muddy the Rule 50(b) standard, citing to language from other circuits while ignoring governing Ninth Circuit caselaw.

In describing what they deem the appropriate Rule 50(b) legal standard, Defendants offer snippets of quotes from cases in the Eleventh, Fifth, and Seventh Circuits, and then they sprinkle in cites to the Eighth Circuit, the First Circuit, the Second Circuit, and the Northern District of Florida. (Dkt. 485 at 13-14.) But a review of Ninth Circuit law provides far more clarity on the appropriate standard. Indeed, as this Court explained in *Dugan v. Nance*, 2013 WL 6633072, at *5 (C.D. Cal. Dec. 16, 2013):

> It is well-settled that the standard for judgment as a matter of law is the same as the standard for summary judgment. *Reeves* [*v. Sanderson Plumbing Products, Inc.*]*,* 530 U.S. [139] at 150 (citing *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 250-52 (1986).

In reviewing the evidence, this Court continued, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Quoting the Supreme Court's decision in *Anderson,*, 447 U.S. at 255, this Court emphasized: "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* As the Supreme Court instructs, when a district court is evaluating a Rule 50 motion it "must disregard all evidence favorable to the moving party that the jury is not required to believe," including "evidence supporting the moving party that is uncontradicted and unimpeached" if not from a disinterested witness." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 139, 151 (2000).

In recently denying a Rule 50(b) motion, District Judge Carter, cautioned, quoting  *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008), that "a court 'must not weigh the evidence, but should simply ask whether the

2

[nonmoving party] has presented sufficient evidence to support the jury's conclusion.'" *Allergan USA Inc. v. Imprimis Pharm., Inc.,* 2019 WL 4546897, at *2 (C.D. Cal. Aug. 2, 2019). Such is the case here.

**B. Ample evidence supports the Jury's finding that "Joyful Noise" and "Dark Horse" are substantially similar**

**1. The "extrinsic" substantial similarity test must be applied in a manner consistent with prevailing Ninth Circuit law in music copyright cases.**

To determine whether two works are substantially similar, the Ninth Circuit employs a two-part analysis consisting of an objective extrinsic test and a subjective intrinsic test. *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004). Because "the subjective question whether works are intrinsically similar must be left to the jury," only the extrinsic test need be considered under the instant motion. *Id*.

The extrinsic test "requires that the plaintiff identify concrete elements based on objective criteria" and "often requires analytical dissection of a work and expert testimony." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000). Because the extrinsic test examines similarity of only "*protected* elements of the copyrighted work…", *Swirsky*, 376 F.3d at 845 (emphasis in original), application of the test requires distinguishing between the protected and unprotected material in a plaintiff's work. *Id*. The Ninth Circuit has never announced a uniform set of factors for analyzing a musical composition under the extrinsic test. *Swirsky*, at 849. That is because "music is comprised of a large array of elements, some combination of which is protectable by copyright." *Id.*

**a. The Ninth Circuit accords protection to a wide range of musical elements taken alone or in combination.**

"Copyright protection subsists…in original works of authorship fixed in any tangible medium of expression." 17 U.S.C.A. § 102(a) Despite arguing that the

3

constituent elements of the "Joyful Noise" ostinato are commonplace and unprotectable, Defendants provide no authority illustrating when musical elements, alone or in combination, are protectable. Though a truly commonplace musical element, standing alone, is not sufficiently original to warrant protection, in the Ninth Circuit a combination of unprotectable elements is nevertheless protectable if the elements "are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." *Satava v. Lowry*, 323 F.3d 805, 811(9th Cir. 2003); *United States v. Hamilton*, 583 F.2d 448, 451 (9th Cir. 1978) ("[O]riginality may be found in taking the commonplace and making it into a new combination or arrangement").

Though not negligible, "[t]he amount of creative input…required to meet the originality standard is low." *Satava*, 323 F.3d at 810 (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345 (1991)). As the Supreme Court explained, "The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." *Feist*, 499 U.S. at 345. As the Ninth Circuit emphasized in *Swirsky*, *supra,* 376 F.3d at 851, "In this circuit, the definition of originality is broad, and originality means little more than a prohibition of actual copying [of a prior work]." *Accord Three Boys*, 212 F.3d at 489 (holding that originality requires only "something more than a merely trivial variation . . ."); *Kamar Intern., Inc. v. Russ Berrie and Co.*, 657 F.2d 1059, 1061 (9th Cir. 1981) (for originality, "[n]o large measure of novelty is required.").

This originality standard is especially applicable in music cases in this Circuit, where a wide range of musical elements, standing alone and in combination, enjoy protection as original works. As the Court pointed out in *Swirsky*, "It cannot be said as a matter of law that seven notes is too short a length to garner copyright protection." 376 F.3d at 852.  "Although chord progressions may not be

4

individually protected," the Court explained, "if in combination with rhythm and pitch sequence, they show the chorus of [defendant's song] to be substantially similar to the chorus of [plaintiff's song], infringement can be found." *Id.* at 848.[2]

The warning of Justice Oliver Wendell Holmes rings especially true in music cases: "It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits." *Bleinstein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251-52 (1903). Indeed, the Ninth Circuit quoted that very language just last month in reversing a district court's dismissal of a music copyright case based on purported lack of originality, stating that "Justice Holmes century-old warning remains valid." *Hall v. Swift*, No. 18-55426, 2019 WL 5543864, at *1 (9th Cir. Oct. 28, 2019) (also quoting 1 Nimmer on Copyright § 2.05[B] (2017) (noting that originality is established when "the work originates in the author" and "has a spark that goes beyond the banal or trivial")).

### b. Unlike other art forms, the so-called "thin copyright" doctrine does not apply to distinctive combinations of musical elements.

Despite arguing that the doctrine of thin copyright should apply in this case, Defendants' brief does not—and cannot—point to a music copyright case where the doctrine was applied. While the Ninth Circuit has distinguished between "broad" and "thin" copyrights in non-music cases, it rejects the applicability of that distinction in music cases: "Musical compositions are not confined to a narrow range of expression." *Williams v. Gaye*, 895 F.3d 1106, 1120 (9th Cir. 2018). Indeed, as this Court acknowledged in its Order Denying Summary Judgment, "The Ninth Circuit recently distinguished music, which is comprised of a large

---

[2] *Accord: Metcalf v. Bocho*, 294 F.3d 1069, 1074 (9th Cir. 2002) ("Each note in a scale…is not protectable, but a pattern of notes in a tune may earn copyright protection."); *Baxter v. MCA, Inc.*, 812 F.2d 421, 425 (9th Cir. 1987) (noting that sequence of just six notes could be protectable); *Three Boys*, 212 F.3d at 485 (upholding jury's finding of substantial similarity based on combination of five unprotectable elements).

1   array of elements…and declined to deviate from the substantial similarity standard

2   articulated in *Swirsky* in musical infringement suits," thus reaffirming the broad

3   protection for combinations of otherwise unprotectable elements. Dkt. #299, p. 10

4   n. 6 (citing *Williams*, 895 F.3d at 1120).

5       Because each individual element of a song is a product of creative choice

6   between hundreds or even thousands of options—and the final composition is far

7   from an obvious inevitability—musical combinations are not comparable to works

8   this Circuit has accorded only thin protection.[3] Therefore, the doctrine of thin

9   copyright should not apply to cases involving distinctive combinations of musical

10  elements, such as this one.[4]

11          **c.  A jury following the Court's instructions could reasonably find
12          substantial similarity between the two works.**

13      The jury was properly instructed to "[i]nquire only whether the protectable

14  elements, standing alone, are substantially similar, and [ ] filter out and disregard

15  the non-protectable." (Dkt. #441, Jury Instr. 37) Moreover, the Court instructed the

16  jury on Defendants' position that "[t]he ostinato in 'Joyful Noise'…comprise[s]

17  solely of non-original and unprotectable common-place expression." (*Id.*).

18  Critically, the jury was also instructed that an author is "[e]ntitled to prevent others

19  from copying original, protectable expression in the author's work", *id.*, and that

20

21  [3] There is significant choice and variation in creating a melody—just *one* of the many elements
22  that comprise a song. Melodies are built on scales. (Ex. 1, 134:2-3). There are three versions of
    minor mode scales alone, even ignoring other options like major mode scales. (Ex. 1, 133:1-2).
    There are seven pitches in one octave of a scale. (Ex. 1, 132:16-17). Simple math demonstrates
23  that an eight-note melody, using only one octave of pitches in a scale, offers $7^8$ (or 5,764,801)
    potential sequences. In combination with the array of other elements that comprise a song, like
24  rhythm, harmony, and texture, it is clear why thin copyright does not apply to music.

25  [4] In this Circuit, thin copyright protection applies only where the range of expression is limited
    because elements of a work necessarily flow from the underlying idea or nature of the work itself
26  such that substantial similarity with other works is inevitable. For instance, in *Satava* the court
    accorded thin protection to a life-like jellyfish sculpture, which was comprised largely of
27  elements dictated by jellyfish physiology rather than creative choice *Satava*, 323 F.3d at 812.*Id.*
    at 812 (noting, in reaching its conclusion, that, of the many other jellyfish sculptures the court
28  examined, "all of them are substantially similar.").

6

"[o]riginal parts of the plaintiffs' work are the parts created: (1) Independently by the work's author, that is, the author did not *copy it from another work*; and (2) By use of at least some *minimal creativity*. In copyright law, the 'original' part of a work *need not be new or novel*." (*Id.*, Jury Instr. 32 (emphasis added)). Moreover, as Defendants concede and as the jury was instructed, "[a] combination of unprotectable elements may be eligible for copyright protection if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an *original work* of authorship." (*Id.*, Jury Instr. 34).

As discussed above, the originality requirement sets a low bar for protection, and Ninth Circuit law accords broad protection to a wide variety of musical elements, taken alone and in combination. Finally, though instructed on thin copyright protection (perhaps improperly), that instruction limited the jury's application of that doctrine to "when a work embodies only the minimum level of creativity necessary for copyright…" (*Id.*).

Drawing all inferences in favor of the Plaintiffs, a jury properly applying these legal standards could reasonably find the ostinatos in "Joyful Noise" and "Dark Horse" substantially similar in protectable expression. Moreover, given this motion's posture, the Ninth Circuit's prevailing legal standards in music copyright cases support a finding of substantial similarity as a matter of law, as follows:

### i. The multiple similarities between the two songs are protectable and far from commonplace.

This case was about a distinctive *combination* of multiple musical elements in the "Joyful Noise" ostinato, which was substantially replicated by the eight-note ostinato in "Dark Horse" ("Ostinato 2") that played throughout 45% of the song. There was no evidence at trial that this combination of elements was commonplace. Indeed, the evidence, construed most favorably to Plaintiffs, demonstrated that certain elements in the ostinatos, even taken alone, are not commonplace.

7

As this Court recognized in its Order Denying Summary Judgment, "[Plaintiffs' expert] Decker has identified particular features of the works which, taken in combination, could support a finding of substantial similarity by a reasonable jury." (Dkt. #299, p. 11). At trial, Dr. Decker testified about each of the similarities he identified in his report, namely, (1) a melody built in the minor mode; (2) a phrase length of eight notes; (3) a pitch sequence beginning with "3, 3, 3, 3, 2, 2"; (4) a similar resolution to both phrases; (5) a rhythm of eighth notes; (6) a square and even rhythm; (7) the structural use of the phrase as an ostinato; (8) the timbre of the instrumentation; and (9) the notably empty and sparse texture of the compositions. At trial, Dr. Decker further testified as to the insignificance of purported differences between the two works.

Contrary to Defendants' assertion, Dr. Decker **never** conceded that each similarity was individually commonplace. Instead, he testified, without remarking on the ubiquity of any individual element, that "[i]t's the combination of [the elements]" which occur "in a context" that convinced him the works were substantially similar. (Exhibit 1, July 19, 2019 Tr., 214:1-25). He further explained that in his academic field "arguments about musical borrowing require multiple parameters." (Ex. 1, 214:1-6). Thus, while the rigors of musicology required multiple similar elements, Dr. Decker never testified that each individual element was unremarkable or commonplace. In fact, the opposite is true.

### ii. Dr. Decker determined that several of the two songs' shared elements, even taken alone, were distinctive and significant in determining substantial similarity.

Contrary to Defendants' assertion, Dr. Decker testified that the melody found in the ostinato in "Joyful Noise" and Ostinato 2 in "Dark Horse" was distinctive and that the similarities were significant. Among other things, he pointed out to the jury the following:

8

- "[T]he two ostinatos at issue for the first six of their notes are absolutely identical. 3 3 3 3 2 2." (Ex. 1, 141:12-13).

- "[Both ostinatos] insistently sit on the lowered third degree…3 3 3 3…That's completely identical in both ostinatos…And then at exactly the same moment, both ostinatos step down to 2…[I]t's significant that…after four iterations of three…both of these ostinatos step down to two at exactly the same spot. At the fifth note which is the strongest note rhythmically in this ostinato…" (Ex. 1, 140:11-141:10).

- The similarity does not end with the first six notes. "Joyful Noise has two…alternating endings to its ostinato…dropping to 1 and dropping to 6…" (Ex. 1, 147:21-148:1). "Dark Horse uses both of the options offered in Joyful Noise. Joyful Noise models two ways to end this ostinato and Dark Horse uses both in every repetition…[T]he two ostinatos…might end differently in terms of the actual rhythm of the [final two] notes, but they're adopting and sharing similar musical strategies for how to end this ostinato." (Ex. 1, 149:1-19). This also has harmonic implications, as Dr. Decker suggests the sixth scale degree gives "a 5 1 sort of feeling." (Ex. 1, 148:13-16). Thus, the ostinatos share similarities across all eight notes of their melodies.

- Further, this pitch sequence does not "necessarily flow from…writing in the minor mode," as Defendants argue. (Dkt. 485 at 22.) Rather, Dr. Decker, a music historian, testified, "I have not seen another, a third piece that descends in the way these two do." [5] (Ex. 1, 137:24-25). Dr. Decker noted that this

---

[5] Defendants' brief misconstrues Dr. Decker's testimony about the tendencies of scale degrees. In the testimony they reference, Dr. Decker is explaining, generally, to a lay audience what scale degrees represent and why they are useful. "[The first scale degree] 1 is the magnet against which individual notes in the scale are pulling or not. And scale degrees allow us to describe that…energy as it moves through a melody." (Ex. 1, 148:20-23). "Melodies in our musical system want to go to one" by way of the next scale degree. (Ex. 1, 134:4). His testimony illustrated how scales work and how, in this particular instance, energy moved through the melodies in "Joyful Noise" and "Dark Horse" similarly, despite being in keys a half step apart. (Ex. 1, 134:7-11) ("[T]his allows comparison of how notes in comparable melodies do the same sort of work or have the same sort of effect."). Dr. Decker never opined that the pitch sequence in the ostinatos was inevitable or commonplace—in fact, he testified the exact opposite, as detailed above. Indeed, given the universe of music, no prior art was adduced by Defendants showing the same pitch sequence, which proves that this melody is very far from the only option. Moreover, in each ostinato here, the melody continues past the "home note" and leaps again downward, both ostinatos defying resolution to the "1" or "home note" in the same manner.

---

distinctive pitch sequence was "certainly, certainly" significant in his analysis. (Ex. 1, 138:1-2).

Though Defendants' musicologist Dr. Ferrara argued that the first six notes of the ostinatos were commonplace due to the presence of those six notes in the middle of a line in "Jolly Old St. Nicholas," a Christmas carol from 1865, and "Merrily We Roll Along," a children's song from 1934 (the "Prior Art"), Dr. Decker testified that these purported examples were not indicative that the pitch sequence was commonplace or trite. Specifically:

- Dr. Decker stated that the Prior Art were not examples of prior use of the eight-note ostinato from "Joyful Noise." (Ex. 1, 163:17-19, 164:2-5). "Finding these six notes in a tune in the wrong mode does not for me create a connection between these four songs." (Ex. 1, 218:22-24).

- Dr. Decker distinguished the Prior Art, stating that "3, 3, 3, 3, 2, 2" was cherry-picked from the beginning or end of a "tune" or "larger structure" (Ex. 1, 162:16-18). "[The six notes] must be understood in context…" *Id*.[6]

- Neither of these "tunes" resolves similarly or contains a "leap" downward, like in "Joyful Noise" and "Dark Horse," which leap down to the sixth and fifth scale degree, respectively. For instance, Dr. Decker observed that the first line of "Jolly Old St. Nicholas" includes "3 3 3 3 2 2 2 1 1 1 1 3" before continuing to another line, (Ex. 1, 162:8-10, 218:6-8), while "Merrily We Roll Along" actually *ascends* after six notes—"3 3 3 3 2 2 3 2." (Ex. 1, 217:15-16).

- In fact, neither "tune" in the Prior Art is an ostinato or repeating figure, like the phrases in "Joyful Noise" and "Dark Horse." (Ex. 1, 162:15, 164:7). Dr. Decker explained, "[c]ontext is important, so this is extremely significant. It's the ostinato identity that's at issue here." (Ex. 1, 218:21-22).

---

[6] Dr. Decker explains: "In Merrily We Roll Along, this group of six notes happens at the end of the song…[W]hen it uses these six scale degrees it's headed toward a conclusion…It's a part in the middle of the song. Jolly Old Saint Nicholas, these are the opening notes of the tune. So they continue on to end the first line of the tune..." (Ex. 1, 217:25-218:8). By contrast, "[i]n the case of Joyful Noise, it repeats through the whole track. So it starts and it just keeps on rolling." (Ex. 1, 218:12-14).

10

- Moreover, the Prior Art is written in the major mode, while "Joyful Noise" and "Dark Horse" are written in the minor mode. In the major mode, the third scale degree (3) is a different pitch than in the minor mode, which Dr. Decker called the "substantive and unchanging difference" between modes. (Ex. 1, 162:19-163:9). This is significant, because one of the "bedrock" identifying features of the two works at issue is "the repetition pattern of four 3s followed by a step down to 2 *in the minor mode*" on the same strong beat—thus, the musical effect is quite different in the Prior Art. (Ex. 1, 214:10-14).

- No other prior art containing "3, 3, 3, 3, 2, 2" (especially with a leap downward at either notes 7 or 8) was adduced at trial.[7] Rather, a reasonable inference is that the eight-note pitch sequence in "Joyful Noise" is unique. Asked whether "the notes in [ ] Joyful Noise, the 3-3-3-3-2-2 are trite and basic and can be found…in lots of examples of prior art…", Dr. Ferrara replied, "[n]o, that's not what I said" instead claiming the phrase is somehow unprotectable because beginner musicians sometimes play repeated notes in descending scales as practice exercises and referencing the thoroughly rebutted Prior Art. (Exhibit 2, July 24, 2019 Tr., 96:16-97:3).

Beyond the shared pitch sequence in "Joyful Noise" and "Dark Horse," Dr. Decker identified other elements of the two songs as distinctive, even standing alone. While a rhythm of eighth notes itself is not particularly rare, Dr. Decker opined that the way the rhythm unfolds in "Joyful Noise" and "Dark Horse" is unique when viewed in context:

- "What's distinctive here is the rhythm of eight beats is completely even…[T]hey unfold…with no syncopation…[T]hese are squarely on the beat which is unusual. In popular music in America for the last 150 years, syncopation has been the thing that says American music and that's lacking here." (Ex. 1, 138:9-22).

---

[7] Three other examples contained either pitch content of "3, 2, 1, 5" or repeated notes. These fall far short of proving that the ostinato in "Joyful Noise" was commonplace. Discussing the repeated third scale degree and the shift to the second scale degree on the fifth, strongest beat: "[T]hat's the moment that for me is particularly significant and signals to me through several different levels…rhythm, pitch content…and pattern of repetition that these two pieces have a relationship to each other." (Ex. 1, 141:17-142:5). Shared pitch content or repetition alone was unconvincing to Dr. Decker.

- Dr. Decker also called the shared lack of syncopation "noteworthy and I think kind of cool…" (Ex. 1, 139:7-9).

Finally, Dr. Decker testified that the texture[8] of these two songs was distinctive when viewed in context:

- "I often talk about pop records being transparent, but thick. So that they're full of sounds, but they're mixed in a way that we can hear each of those sounds…" (Ex. 1, 144:13-17).

- In the songs at issue: "[B]oth textures [are] remarkably empty…[W]hen we first hear these ostinatos, they are in relative isolation. There's very little else going on…which directs your ear to it. It's the only thing to listen." (Ex. 1, 145:15-25).

- Asked whether the empty texture is "unusual for this kind of music," Dr. Decker responded, "I think it is." (Ex. 1, 147:6-9).

### iii. Dr. Decker identified several other shared elements which, in combination, contribute to the distinctiveness of the ostinatos.

Dr. Decker testified about a number of other similarities, which, though perhaps common when analyzed alone, contribute to an original combination of elements in "Joyful Noise." Specifically, both phrases are written in the minor mode. (Ex. 1, 140:11-12). Both phrases contain eight notes. (Ex. 1, 135:17-21). Both phrases are employed in the pieces as ostinatos, which repeat and give the songs structure. (*Id.*) The rhythm of both ostinatos is the same, consisting of eighth notes (Ex. 1, 138:9-11, 139:10-16). Finally, the timbre of the ostinatos' instrumentation is similar, each consisting of pingy, synthesized tones in the same family of sounds and in the treble voice. (Ex. 1, 142:7-21).

Taken together, Dr. Decker concluded that "[t]he combination of these things is what convinced me [the two works were substantially similar]." (Ex. 1, 214:14-15).

---

[8] While Defendants argue that "texture" is a function of a sound recording's mix, texture is also an element of composition. Dr. Ferrara explained that the texture of a piece is, in fact, captured in written transcriptions. (Ex. 2, 87:4-14).

12

1

**iv. Dr. Decker opined that the few minor differences between the two songs were negligible and, in some instances, represented further points of similarity.**

2

3      Much of the alleged difference between the works is simply disagreement—a

4 clash between two experts. While Defendants argue that the pitches on beats 7 and

5 8 of the ostinatos are not identical, Dr. Decker explained that "Joyful Noise models

6 two ways to end this ostinato and Dark Horse uses both in every repetition,"

7 highlighting the endings as a similarity. (Ex. 1, 149:2-3, 18-19). Though the songs'

8 tempos were not identical, "both of these tracks [are] moderately paced…They are

9 similar in their moderate tempos." (Ex. 1, 152:22-24). Though the respective

10 ostinatos occur throughout "Joyful Noise" and in just the verses and post-chorus of

11 "Dark Horse," Dr. Decker notes the similarity that each is employed in relative

12 isolation as the musical bed for lyrics in the verses. (Ex. 1, 145:15-25).

13      Other differences were negligible. For instance, Dr. Decker explained that the

14 "portamentos" identified by Dr. Ferrara are "[not] part of the structure of the

15 ostinato. They're decorative and…ornamental." (Ex. 1, 165:5-7). [9] With respect to

16 the key of the songs, "[t]hat difference is negligible..." and "two pieces that are a

17 half step apart could not be closer [musically]." (Ex. 1, 150:18-19, 151:6-7). While

18 Dr. Ferrara identified certain differences in harmony and harmonic rhythm in only

19 the songs' choruses, (Ex. 2, 31:16-18), Dr. Decker's objective analysis of the

20 works focused on the remarkable similarities in the *verse sections*—approximately

21 45 percent of "Dark Horse." Moreover, while Dr. Ferrara argues that the "Joyful

22 Noise" ostinato is a 16-note phrase, Dr. Decker understands it as an eight-note

23 repeating figure with alternating endings, a difference of conceptualization. (Ex. 1,

24 129:16-19, 147:21-148:1).

25

26

27 [9]This Circuit has previously acknowledged that an expert's musicological analysis properly disregarded notes where expert "regarded those notes as not structural; they are ornamental."

28 *Swirsky*, 376 F.3d at 846-47.

13

### v. Proper application of the extrinsic test to these facts reasonably results in a finding of substantial similarity.

Despite this Court's earlier ruling on summary judgment and Dr. Decker's clear testimony at trial that "[t]he combination of these [elements] is what convinced me [that the works were substantially similar]" (Ex. 1, 214:1-15), Defendants' argument focuses, almost microscopically, on isolated elements of the two works. Moreover, they largely ignore Ninth Circuit authority on the protectability of musical elements and their combinations. Instead, proper application of Ninth Circuit law urges the conclusion that the most significant elements of "Joyful Noise," in isolation, are distinctive and protectable—and that, at the very least, the total combination of elements is protectable and properly compared in a substantial similarity analysis. Moreover, the many similarities between the ostinatos, detailed above and present in 45 percent of "Dark Horse," provide ample support for a jury's conclusion that the two works are substantially similar in protectable expression.

First, Defendants' brief notably lacks any real exploration of the controlling legal standard for copyright protection. An element is protectable if it constitutes "original" expression. This is not a difficult obstacle for Plaintiffs given the evidence adduced at trial. *Feist*, 499 U.S. at 345 ("The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be.").

Here, Dr. Decker noted the distinctiveness of the two works' similar eight-note pitch sequences (the melody), which descended and repeated in the same uncommon way. While Defendants attempted to prove that the pitch sequence was commonplace through two prior art examples, the Prior Art was dismantled and easily distinguished at trial. Moreover, as this Circuit has stated, "[a] musical measure cannot be 'common-place' by definition if it is shared by only two songs" and, further, that comparing compositions from different genres is a poor measure

14

of whether a musical phrase is commonplace. *Swirsky*, 376 F.3d at 850. Here, the Prior Art included one Christmas carol and one children's song from 1865 and 1934, respectively—hardly proving the pitch sequence is commonplace in hip-hop or pop. *Id.* The only other purported prior art examples lacked the most distinctive parts of the "Joyful Noise" melody altogether—the similar repetition, similar phrase lengths, and melodic descents on the same strong beats. Instead, a reasonable inference is that the pitch sequence is rather distinct and original in modern popular music, even if Defendants accuse it of being crude, humble or obvious. Nor does it matter that this repeated pitch sequence is eight notes long. *Swirsky*, 376 F.3d at 852 ("[i]t cannot be said as a matter of law that seven notes is too short a length to garner copyright protection" and observing that "an arrangement of a limited number of notes can garner copyright protection.").

Though Dr. Decker viewed the shared pitch sequence as the "bedrock" of his analysis, he testified that other musical elements were quite unique when placed in context. Dr. Decker opined that the complete lack of syncopation in the two ostinatos' rhythms was unusual and noteworthy, because syncopation has been "the thing" that defined American music for the last 150 years. Additionally, Dr. Decker testified that the sparse and empty texture of both songs—and their compositional choice to introduce the ostinatos in relative isolation—was, likewise, unusual.

Second, Defendants argue that the entire combination of elements in "Joyful Noise" cannot be accorded protection. Once again, they cite no legal authority and instead rely exclusively on conjecture. To the contrary, the jury instructions and Ninth Circuit law make clear that a combination is protectable if it "constitutes an original work of authorship." *Satava*, 323 F.3d at 811. In addition to the three distinctive elements above, many other elements are similar between the two songs (i.e. both in the minor mode; both eight-note phrases; both function as ostinatos;

both utilize rhythms of eighth notes; both have similar timbres). Even some of Defendants' purported differences can be inferred as relative similarities (i.e. similar resolution of the last two notes; both composed in moderate tempos; in keys only a half-step apart). This entirely distinctive combination easily clears the threshold of "originality" to be accorded protection. *Three Boys*, 212 F.3d at 485 (upholding jury's finding of substantial similarity based on combination of five unprotectable elements); *Swirsky*, 376 F.3d at 848 (stating that an unprotectable chord progression can demonstrate substantial similarity, "if in combination with rhythm and pitch sequence…").

Finally, there is no support that the thin copyright doctrine should apply in this case. As explained above, thin copyright protection does not apply to musical compositions, as recognized just over a year ago by the Ninth Circuit. *Williams*, 895 F.3d at 1120. Regardless, here, the evidence at trial demonstrated that the "Joyful Noise" composition is not analogous to the types of works this Circuit has accorded thin copyright protection. *See Satava*, 323 F.3d at 812 n. 5 (applying doctrine where similarities did not involve creative choice and where, after reviewing dozens prior art examples, "all of them [were] substantially similar."). Here, as a starting point "Joyful Noise" *was not* comprised of unprotectable elements—instead, several elements were quite unique. Additionally, given the wide range of expression involved in music, *Williams*, 895 F.3d at 1120, the distinctive combination of elements in "Joyful Noise" demands broad protection. This combination belies any claim of replication by musical accident. *See Shaw*, 919 F.2d at 1363. At the very least, whether "Joyful Noise" was more than "minimally creative" is properly left to the factfinder, who decided it was, and an inference in Plaintiffs' favor is warranted for this motion.

Because the extrinsic test properly results in a finding of substantial similarity, the jury properly considered the intrinsic test. Moreover, because "the subjective

16

question whether works are intrinsically similar must be left to the jury," only the extrinsic test need be considered under the instant motion. *Swirsky*, 376 F.3d at 845. Given the abundant evidence adduced at trial, the jury's finding of substantial similarity under both the extrinsic and intrinsic tests was proper.

## C. Ample evidence supports the Jury's finding of widespread dissemination.

As the Court explained in its order denying Defendants' motion for summary judgment, the Plaintiffs are required to "set out specific facts showing a genuine issue for trial as to whether there is a reasonable possibility that defendants had the chance to view the protected work." (Dkt. #299, p. 6.) Defendants' arguments here are largely a rehash of their arguments in support of their motion for summary judgment, namely, attempting to denigrate the significance of the evidence adduced at trial, including: (1) more than 6 million views/plays of "Joyful Noise" on YouTube and MySpace (Exhibits 10-11, 13, Jones Decl.), (2) the critical acclaim the song and the album received from important award nominations (including a Grammy nomination) (Exhibit 12, Jones Decl.; Ex. 4, 180:15-183:4), (3) the hundreds of concerts around the nation where the song was performed (Exhibit 16, Jones Decl.; Ex. 4, 186:2-187:16, 188:12-189:2), (4) the various radio and TV interviews that preceded many of the concerts (Ex. 4, 189:3-190:10), and (5) the appearances of the song and the album on the Billboard charts (which Mr. Gottwald and Walter admitted they closely monitor) (Exhibit 14, Jones Decl.; Ex. 2, 167:24-168:22). As the Court explained in denying summary judgment (*id.* at 8):

> [T]he Court is persuaded that plaintiffs have shown more than just mere posting of "Joyful Noise" on the internet. Due to the millions of views and plays of "Joyful Noise" on YouTube and Myspace, both readily accessible websites, and the success and popularity of "Joyful Noise" in the Christian hip-hop/rap industry, a reasonable jury could conclude that there is more than a "bare possibility" that

17

1   defendants—who are experienced professional songwriters—had the
2   opportunity to hear "Joyful Noise."

3   And, as this Court explained in *Dugan v. Nance, supra*, the standard governing

4   Rule 50 motions is the same as the standard governing motions for summary

5   judgment.

6       So, too, Defendants again attempt to disparage the lack of hard sales numbers

7   for Plaintiffs' song and album. However, this Court already dealt with that

8   argument on summary judgment (*Id.* at 8; emphasis added):

9       Although defendants insist that a showing of commercial exploitation
10      is necessary to prove access, such reasoning would make it
11      permissible to infringe on a copyrighted work simply because it was
        never for sale. So while plaintiffs have not shown evidence of
12      commercial success, they have demonstrated a triable issue of fact as
13      to access because "Joyful Noise" achieved critical success, including a
        Grammy nomination, and was readily available and viewed millions
14      of times on YouTube and Myspace. Defendants' concerns about the
15      meaningfulness of the YouTube and Myspace view counts, the
        distinctiveness of the Christian music market, and the lack of
16      commercial activity ***are questions of fact to be resolved by the jury***.
17

18  The jury was asked to resolve those questions of fact, and it did so in favor of a

19  finding of widespread dissemination sufficient to establish reasonable access to

20  "Joyful Noise," especially by professional songwriters.

21      We remain puzzled by Defendants' attempt to dismiss more than 6 million

22  views. By any measurement, 6 million is a huge number—and far greater than

23  other cases finding widespread dissemination. And Defendants' attempt to

24  diminish it by comparing it to billions of plays (in dozens and dozens of languages)

25  of all things on YouTube (from cat videos to comedy routines in Arabic to

26  harpsichord lessons) was, at most, a question for the jury.

27      Defendants again rely heavily upon the rulings in *Loomis v. Cornish*, 2013

28  U.S. Dist. LEXIS 162607 (C.D. Cal. Nov. 13, 3013) *aff'd Loomis v. Cornish*, 836

18

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' POST-TRIAL MOTIONS

F.3d 991 (9th Cir. 2016). This Court previously determined that "the facts in *Loomis* are unhelpful in guiding the instant case. The song at issue in *Loomis* appears to have never gained much popularity outside of a brief spate of airplay in Santa Barbara." (Dkt. #299, p. 7 n. 4)  Indeed, as the District Court in that case pointed out, the plaintiff's evidence of dissemination included just 46 sales of the recording and some sporadic airplay in the Southern California area. *Loomis*, 836 F.3d at 994. Here, while Plaintiffs never received an accounting or other sales information from their label, the fact that the song and album charted on various Billboard charts is evidence of significant sales in addition to the other evidence of widespread dissemination.

### D. Contrary to Defendants' contention, no evidence is required to support the Jury's rejection of Defendants' claim of independent creation.

The Defendants claim to have "carried their burden of proving independent creation." (Dkt. #485, p. 45:13-15). That claim is based solely upon the false premise that an alleged failure to rebut or impeach certain of Defendants' evidence on the issue of independent creation mandates that the fact-finder find in their favor on the issue.[10] (*Id.*, p. 44:18-19). However, Defendants do not cite a single case or other governing legal authority to support their argument that unrebutted evidence compels a finder of fact to accept that evidence and find in favor of the evidence's proponent. Not surprisingly, the actual case law holds otherwise, namely, that the jury, as the fact finder, has wide discretion to accept or reject

---

[10] As discussed below, the Defendants' false premise is itself based upon an unsatisfied preliminary proposition: that Defendants' alleged independent creation evidence was unrebutted. That testimony was rebutted. But, assuming for the sake of argument that any such evidence was unrebutted, the jury was not thereby required to find in favor of Defendants. Rather, the jury, as the finder of fact, was free to reject any or all of such evidence, as it did. (*See* Dkt. #441, Jury Instr. 12).

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' POST-TRIAL MOTIONS

testimony (both challenged and unrebutted), and the Court should exercise great caution in considering whether to set aside such a jury determination.

### 1. Defendants' evidence of alleged "independent creation" was not unrebutted and is not supported by a legally sufficient basis.

Prior to addressing the Defendants' claim to have "carried their burden of proving independent creation," we must first address their remarkable assertion that their evidence on the issue was unrebutted. Quite the contrary.

Defendants rely primarily upon the testimony of Defendant Henry Walter. (Dkt. #485, pp. 40-41). Walter testified—without any of the standard supporting evidence, including computer sessions files and other computer documents that would have been created and saved during the composition process[11]—that he created Ostinato #1 first and then created the infringing Ostinato #2 as a derivative of Ostinato #1. (*Id.*) In direct contravention to Walter's claim regarding the creation of Ostinato #2, Plaintiff's musicology expert Dr. Todd Decker testified that, in his expert opinion based upon his years of training, experience and expertise as both a musician and a music historian, (a) the creation of Ostinato #2 preceded the creation of Ostinato #1, (b) Ostinato #2 served as the inspiration for Ostinato #1 and (c) both "Dark Horse" ostinatos derived from the ostinato in "Joyful Noise." (Ex. 1, 168:14-171:14; 171:23-72:5; 172:19-73:1; 192:2-5; 210:22-211:13). All of this rebuttal testimony came into evidence without objection by Defendants. In short, there could be no clearer or more obvious rebuttal of Defendants' independent creation evidence—rebuttal evidence Defendants chose to ignore. Based upon this disputed evidence in the record on the issue of independent creation, Defendants' renewed motion for JMOL should be denied, since that evidence, construed in the light most favorable to the Plaintiffs, does not

---

[11] As the Court recalls, Defendants aggressively argued and succeeded in prohibiting Plaintiffs from mentioning the Defendants' failure to produce any such evidence. (Ex. 3, 8:19-13:23).

permit only one reasonable conclusion, and that conclusion is contrary to the jury's verdict. *Escriba*, 743 F.3d at 1242. The jury's verdict "must be upheld if it is supported by substantial evidence that is adequate to support the jury's findings, even if contrary findings are also possible." *Id*. (emphasis added).

### 2. Even if unrebutted, the Jury's rejection of Defendants' independent creation testimony was reasonable and supported by a legally sufficient basis, including the Jury's determination as to witness credibility.

Even if, for the sake of argument, we assumed that Mr. Walter's testimony was not rebutted, that still would not compel a finding in Defendants' favor.  This is because, as the Supreme Court explained in *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150-51 (2000) (emphasis added), when considering a Rule 50(b) motion a court "should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least *to the extent that that evidence comes from disinterested witnesses."*

That holding applies full force here. Defendants offered no testimony from a disinterested witness on the issue of independent creation. (Dkt. #485, pp. 40-41). Defendant Walter is the sole witness cited by Defendants, and he was certainly not disinterested. Consequently, even if his self-serving testimony (offered with no supporting sessions files or other evidence of his creation process) is considered uncontradicted and unimpeached, the Court should, as the jury did, give such testimony no credence.[12] Where there is evidence from which a jury could draw reasonable inferences that would justify the verdict, "[t]he district court may not

---

[12] Defendants explicitly recognized that credibility determinations were within the province of the jury when it submitted JOINT [PROPOSED] JURY INSTRUCTION NO. 10 (Dkt. #409 at Page ID #:7347-48, which became given Jury Instruction No. 12 (Dkt. #441, p. 13). That instruction informed the jury that could "believe everything a witness says, or part of it, or none of it." (*Id*.) The instruction further advised the jury that in accessing credibility it could take into account the witness's interest in the outcome of the case and the witness's bias or prejudice. (*Id*.)

21

reject the jury's verdict simply because another appears preferable." *McEuin v. Crown Equipment Corp.*, 328 F.3d 1028, 1037 (9th Cir. 2003).

Moreover, courts reviewing jury verdicts in music copyright cases, due to the nature of the primarily circumstantial evidence required to prove a claim and difficulties in matters of proof, generally give greater deference to a jury's verdict in such cases. The Ninth Circuit in *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000), adopted the Second Circuit's "guiding principle" for an appellate court in reviewing a jury verdict in a music case:

> The guiding principle in deciding whether to overturn a jury verdict for insufficiency of the evidence is whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.

*Id*.( quoting *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir.1988)).

### E.  The Jury's finding that "Joyful Noise" is a "Joint Work" is supported by extensive undisputed evidence.

Question 7 of the Special Verdict Form on liability, included at the insistence of the Defendants, asked:

> "Did Plaintiffs prove, by a preponderance of the evidence, that the inclusion of the instrumental music (i.e., the beat) created by Mr. Ojukwu in 'Joyful Noise' is part of a joint work of authorship with the other Plaintiffs?"

(Dkt. #456). Despite the jury's unanimous answer of "Yes" to that question, Defendants try to argue that the jury's answer is unsupported by the evidence. As with their other arguments, the Defendants ignore the relevant case law and misrepresent the evidence.

The main—indeed, the sole—thrust of Defendants' legal argument is that Mr. Ojukwu created the beat before the rest of the song was created. That fact, while true, is immaterial to the joint work issue. The Copyright Act defines a "joint

22

work" as " a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. That precisely describes the creation of "Joyful Noise." That Mr. Ojukwu created the beat a few months before Plaintiff Gray contacted him to incorporate that beat in a rap song does not affect the finished product's status as a "joint work." That is because it is undisputed that Mr. Ojukwu (1) made that beat (and others) for the purpose having them incorporated into a Christian gospel rap song (Exhibit 4, July 18, 2019 Tr., 112:7-22), (2) posted that beat on MySpace for the purpose of finding songwriting collaborators to create such a song (Ex. 4, 114:6-25), and (3) retained a 50% ownership in the song created with his beat. (Ex. 4, 123:9-125:4).

That he created his portion of the song before the other authors wrote the lyrics is immaterial as a matter of law. As the court explained in *Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111 (C.D. Cal. 2007):

> [C]ontemporaneous and coordinated action between [the creators] is not required. As Judge Learned Hand explained, "it makes no difference whether the authors work in concert, or even whether they know each other; it is enough that they mean their contributions to be complimentary in the sense that they are to be embodied in a single work...."

*Id.* at 1145–46 (citing *Edward B. Marks Music Corp. v. Jerry Vogel Music Co.,* 140 F.2d 266, 267 (2nd Cir.1944)).

Moreover, as joint authors of "Joyful Noise," the authors identified in the registration are *all* deemed authors of the *entire* song, not just their portion. As stated in Section 201(a) of the Copyright Act, "The authors of a joint work are co-owners of copyright in the work."

Nevertheless, ignoring the statute and the case law, Defendants cite *Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 968 (9th Cir. 2008) for the

23

proposition that the "most important" criteria for determining whether a work is jointly authored is whether the alleged author "superintended the work by exercising control." (Dkt. #485, p.42.) Actually, the *Richlin* court, citing to its prior ruling in *Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir. 2000), identified as the first—and ***dispositive***—factor on the joint work question to be "whether the 'putative coauthors ma[de] objective manifestations of a shared intent to be coauthors. A contract evidencing intent to be or not to be coauthors is dispositive.'" *Richlin, supra¸* at 968 (internal quotations omitted). All three of Defendants' purported precedents hinged on the absence of that objective manifestation of shared intent to be co-authors.[13]

Here, in addition to the contract that unequivocally evidences intent to be co-authors (Exhibit 6, Jones Decl.), there is undisputed testimony and documentary evidence of that objective manifestation of intent dating back to the time of creation. In the album liner notes for "Joyful Noise," Mr. Ojukwu is identified as "producer." (Exhibit 8, Jones Decl.). As he testified and Crystal Gray (author of the liner notes) confirmed on the witness stand, in the genre of hip-hop music the "producer" credit is reserved for the ***writer*** of the instrumental portion of the song. (Exhibit 3, July 23, 2019 Tr., 142:22-144:9, 144:16-145:17; Ex. 4, 152:12-20). Indeed, listed in those same liner notes is the name of Mr. Ojukwu's publishing entity, which is the entity that collects ***writer*** royalties, supporting that Mr. Ojukwu, from the beginning, was considered by his fellow authors to be a writer entitled to writer royalties for the song. (*Id.*) Thus, from the outset "Joyful Noise" was a joint work.

Finally, all three of Defendants' purported precedents involved a plaintiff suing the credited authors of the work claiming that he should have been included

---

[13] As Defendants' third precedent—*Ford v. Ray*, 130 F.Supp. 1358 (W.D. Wash. 2015)—stated: "Plaintiff has not alleged that the parties shared a mutual intent that they be coauthors, nor has he identified any objective manifestations of such an intent."

as a joint author. Here, of course, there has never been a dispute among the other authors as to whether Mr. Ojukwu was a co-author of the joint work.

In short, the jury had ample evidence to support its conclusion that Mr. Ojukwu's contribution to "Joyful Noise" is part of a joint work under the Copyright Act.

### F. The Jury properly found all defendants liable for direct infringement; each had a direct role in the creation and public performance and distribution of the infringing song.

Defendants contend that no one other than Mr. Walter and Capitol Records should be held liable. Defendants are simply wrong. None are in the position of indirect infringers, such as concert venues, Internet websites, flea market operators, bars, and other passive parties with no involvement in the creation or distribution of an infringing work.[14] Here, by contrast, every single defendant was involved in and profited handsomely from the creation and distribution of the infringing work.

Under defendants' novel theory—bereft of any citation to caselaw—the other songwriter defendants who created what is undeniably a "joint work" (including Mr. Gottwald and Mr. Martin in their dual roles as songwriters and producers of the song) should somehow be able to extricate themselves from that joint work because their individual contributions did not include portions of the infringing instrumental (even though it is undisputed that all of them created the song around that instrumental). One need look no further than the statute itself to refute defendants' novel argument. The Copyright Act defines a "joint work" as "a work

---

[14] *See, e.g., Fahmy v. Live Nation Entertainment, Inc.*, 2015 WL 3617040 (C.D. Cal. 2015) (J. Snyder) (concert promoter); *Range Rd. Music, Inc. v. E. Coast Foods, Inc.*, 668 F.3d 1148 (9th Cir. 2012) (affirming Judge Snyder's summary judgment order finding owner of liquor license for restaurant and lounge vicariously liable for copyright infringement that had occurred at restaurant and lounge); *UMG Recordings, Inc. v. Sinnott*, 300 F.Supp.2d 993 (E.D. Cal. 2004) (owner and operator of flea market liable for contributory and vicarious infringement due to unauthorized copies of copyrighted sound recordings sold by vendors at the market); *In re Aimster Copyright Litig.*, 334 F.3d 643, 654 (7th Cir. 2003) (explaining that the "canonical illustration" of vicarious infringement "is the owner of a dance hall who hires dance bands that sometimes play copyrighted music without authorization").

25

prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. That precisely describes the creation of "Dark Horse."

As such, each of the songwriters and producers of "Dark Horse" jointly violated the Plaintiffs' exclusive rights in "Joyful Noise" by, among other things

- Creating without authorization a derivative work ("Dark Horse") based upon the copyright work ("Joyful Noise"), 17 U.S.C. § 106(2);

- Authorizing (without permission) Capitol Records to distribute copies of the infringing derivative work "to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3); and

- Authorizing (without permission) Capitol Records and others to publicly perform that infringing derivative work on the radio, Internet, and elsewhere. 17 U.S.C. § 106(4)

Defendants Katheryn Hudson and Jordan Houston committed further acts of infringement for their involvement in the music video (another infringing derivative work) and their public performances of "Dark Horse." 17 U.S.C. § 106(4).[15] See, Dkt. #441, Jury Instr. 23 and 40.

So, too, the other three corporate defendants—again, unlike concert promoters, Internet websites, restaurant owners, and flea market operators—were directly involved in the creation and distribution of the infringing work. In the Ninth Circuit, any member of the distribution chain is jointly and severally liable for copyright infringement. *Adobe Sys. Inc. v. Blue Source Grp., Inc.*, 125 F. Supp. 3d 945, 973 (N.D. Cal. 2015). It is undisputed that Kasz Money Inc. is the production

---

[15] The sole case defendants cite is *Williams v. Gaye*, 895 F.3d 1106 (9th Cir. 2018), where the Court briefly addressed its affirmance of a jury verdict of noninfringement for a rap artist who separately recorded a rap verse that was added to "Blurred Lines" seven months after creation of the song and where neither of the song's creators "expected the later addition of a rap verse or had anything to do with its creation." *Id*. at 1132.

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' POST-TRIAL MOTIONS**

company that provided the services of Defendants Gottwald and Walter for the creation of the "Dark Horse" sound recording and earned significant profits—profits far greater than Walter and Gottwald combined—as a result of those production services. (Exhibit 9, Jones Decl.; Ex. 3, 107:3-7, 192:24-193:1). So, too, Kobalt Music Publishing America, Inc. and WB Music Corp. profited by their role in providing music publishing administrative services for "Dark Horse" for several of the individual defendants. (Exhibit 15, Jones Decl.). As such Kobalt and WB Music were directly involved in the infringing distribution of "Dark Horse." (Ex. 9; Ex. 3, 192:11-193:5).

Defendants conclude by asserting that "Plaintiff did not assert a vicarious liability claim and presented no evidence to support such a claim." (Dkt. #485, p.45). For the reasons explained above, Plaintiffs did not need to add the label "vicarious" to their claims of infringement since every one of the Defendants was directly involved in, directly exploited, and earned profits from the creation, production, distribution, and administration of rights in the infringing work.

Moreover, whether the label "vicarious" appeared in the pleadings is immaterial. The Third Amended Complaint  (Dkt. #172) provided each of these defendants with more than adequate notice that their various acts made them liable for infringement of Plaintiffs' copyright.[16] As this Court previously pointed out, even the Supreme Court has recognized that "the lines between direct infringement, contributory infringement, and vicarious liability are not clearly drawn." *Fahmy, supra at *4* (quoting *Sony Corp. of Am. v. Universal Studios, Inc.,* 464 U.S. 417, 435 n. 17 (1984). Indeed, even in the context of an infringement claim against a restaurant owner who played a radio broadcast of copyrighted

---

[16] For example, paragraph 17 of the Third Amended Complaint alleged that "Kobalt is a music licensing company that administers, licenses, and profits from the music rights" of four of the individual defendants." Paragraph 23 alleged that Kasz Money was "the producer of the *Dark Horse* song and earns royalties from its commercial exploitation."

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' POST-TRIAL MOTIONS

music over the restaurant speakers, the Supreme Court did not feel the need to distinguish between direct and contributory infringement, holding that a business owner who sponsors "a public performance for profit is also an infringer— direct or contributory." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 157 (1975).

## III. THE JURY'S APPORTIONMENT DETERMINATION WAS FULLY SUPPORTED BY THE EVIDENCE.

"In establishing the infringer's profits, the copyright owner is required to present proof *only of the infringer's gross revenue*, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the [infringed work]." *Three Boys*, 895 F.3d at 487 (emphasis added). "Any doubt as to the computation of…profits is to be resolved in favor of the plaintiff…If the infringing defendant does not meet its burden of proving costs, the gross figure stands as the defendant's profits." *Frank Music Corp.*, 772 F.2d at 514 (internal citations omitted).

As a preliminary matter, Plaintiff met its sole burden by demonstrating that the claimed revenues had a causal link to "Dark Horse." *See Polar Bear Productions v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004);[17] *See also* Dkt. #461, Jury Instr. 3 ("gross revenue" means "all of the defendant's receipts from the sale or use of a work containing or using copyrighted work associated with the infringement."). Capitol Records' 30(b)(6) witness testified at trial that the revenue attributable to "Dark Horse" totaled at least $12,402,637. (Exhibit 5, July 31, 2019 Tr., 27:23-29:4). This was also shown in Capitol's P&L, which included detailed sales

---

[17] Any suggestion that Plaintiffs bore some further burden is contrary to the law of the Ninth Circuit. "[A] copyright plaintiff is bound to no more and no less than its statutory obligation…" *Id*. at 712. Section 504(b) requires only that the copyright claimant "first show a causal nexus between the infringement and the gross revenue," the burden then shifting to the defendant. *Id*. at 711.

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' POST-TRIAL MOTIONS**

receipts for "Dark Horse." (Ex. 7, Jones Decl., 116-2). Further, the other Defendants' gross revenues were admitted by stipulation, which income was identified as "from the exploitation of…'Dark Horse'" (Ex. 15)—in fact, Dkt. #461, Jury Instr. 3 instructs that these Defendants' gross revenue had been stipulated.

Moreover, after deducting expenses from the gross revenue, the jury properly determined the percentage of profits attributable to infringement. Contrary to Defendants' argument that Plaintiffs failed to contradict its experts' opinions on profits, there was unrebutted testimony by Dr. Decker that the infringing ostinato plays for 95 seconds (i.e. 45%) of the 212 seconds of "Dark Horse."  (Ex. 1, 154:24-155:6).[18] Based on that testimony, Plaintiffs asked the jury for 45% of the Defendants' profits. This is a logical and fair apportionment—especially given the prominence of the ostinato, which is the only music to listen to in otherwise empty verses. (Ex. 1, 145:15-25). Most importantly, this apportionment is amply supported by Ninth Circuit law. *See Williams*, 895 F.3d at 1129-30 (where plaintiff's expert testified that songs shared some similarity in "nearly every measure," the jury was free to credit that testimony and apportion anything less than 100% of profits to the infringement, despite defendant expert's opinion that the number should be less than 5%). *See also Three Boys*, 895 F.3d at 487 (jury free to disbelieve defendant's experts and, because defendant bears burden of apportionment, "less than 100% of the profits but more than the percentage estimates of [defendant's] experts does not represent clear error."). The jury chose to cut Plaintiff's 45% figure in half, perhaps giving credit to some argument urged by Defendants' experts. But for Defendants to contend that their experts' testimony stood alone is to close their eyes to the evidence.

---

[18] Defendants' musicologist Dr. Ferrara did not challenge this analysis. (Ex. 2, 94:16-95:10).

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' POST-TRIAL MOTIONS**

Additionally, the testimony of Defendants' two experts, far from being unrebutted, was in important respects self-refuting. The best example was Dr. King's attempt to identify as the two preeminent factors in the success of "Dark Horse" (1) the presence of Katy Perry, and (2) the marketing money spent promoting the song. Katy Perry herself is the most powerful rebuttal of the purported importance of that first factor. Yes, she was the performer on "Dark Horse." But she was also the performer on *every single song* on the *Prism* album. While "Dark Horse" topped the charts for several weeks, most of the other fifteen songs did not even make the charts. Thus, at most, Ms. Perry's presence was a neutral factor as to the success of that song over the others on the album. As for the second purported factor—all that marketing expense—Defendants apparently failed to inform Dr. King of the chronology of "Dark Horse," and especially its surprising early success as a promotional single released in advance of the album where it beat out another song in a Pepsi-sponsored competition. (Ex. 4, July 18, 2019 Tr., 78:2-79:2; Ex. 5, Tr. 15:20-16:10, 16:24-17:10, 142:2-144:13). In other words, Capitol Records began spending marketing money on "Dark Horse" *after* the song demonstrated its money-making potential. In short, factors other than Katy Perry made the song much more popular than the other songs on the album, and its early popularity convinced Capitol Records to heavily promote it.

Even under his loose qualitative framework, Dr. King himself assigned the infringing Ostinato #2 some importance in achieving its success. For instance, he acknowledged, "[i]n 2013 we had really never heard a song that sounded exactly like Dark Horse. And the reason for that is because it was a fusion...of several different styles all at once." (Ex. 5, 148:20-23). Dr. King identified "trap elements" as one of four critical components of this musical blend, which he explained "comes by way largely of Ostinato No. 2 in that track." (Ex. 5, 149:7-12, 149:25-150:5) ("[T]hat novelty is one of the things that helped drive Dark Horse...[P]eople

30

were addicted to that sound."). Though Dr. King attempted to minimize the importance of Ostinato #2 by arguing that its important function *could have been* fulfilled by some other non-infringing ostinato, if somehow replaced, (Ex. 5, 152:4-17), "Dark Horse" did not use a non-infringing ostinato—it used the one from "Joyful Noise." Critically, Dr. King never addressed that Ostinato #2 serves its important musical function, repeatedly, for 45% of "Dark Horse," doing so in relative isolation. When Dr. King called attention to other musical elements ("[c]an't imagine Dark Horse without the hook [or chorus]" and "[t]he hook drove Dark Horse"), (Ex. 5, 151:2-3), the jury also likely struggled to imagine "Dark Horse" achieving success without its structural foundation and sole melody in the verse sections—again, 45% of the song. (Ex. 1, 129:15-22)

As for Dr. Ferrara's note-counting exercise, the jury obviously found those quantitative gymnastics as unpersuasive as his testimony in the liability phase of the case. One does not need a Ph.D. in musicology to understand—as the jurors obviously did—that what makes a song memorable cannot be reduced to an arithmetic toting-up of transcribed note heads. Not all notes are equal. (Ex. 1, 172:6-10) (Dr. Decker noting "[t]he musical power, the musical efficacy of [the ostinato's] particular phrase and gesture."). Whether it's the dominant eight-note opening of Beethoven's "Fifth Symphony," the immediately recognizable eight-note ostinato that opens the Rolling Stones' "Satisfaction," or the "Go, Johnny, Go" refrain that audiences sing along during Chuck Berry's "Johnny B Goode," an attempt to explain the power and appeal of those musical works via Dr. Ferrara's notation arithmetic simply fails. Indeed, Dr. Decker testified about the shortcomings of musical notation and that some similarities were not best understood through notation. (Ex. 1, 208:9-14). As discussed above, Dr. Decker disagreed with opinions upon which Dr. Ferrara premised his note-head counting exercise.

31

So while there was plenty of evidence that Ostinato #2 was a key factor in the success of "Dark Horse," it was Ms. Perry who offered perhaps the most persuasive evidence. She confirmed that during the songwriting process for the *Prism* album, Mr. Walter and Mr. Gottwald played her various short instrumental excerpts for possible songs and she immediately selected the instrumental that became "Dark Horse"—an instrumental that contained the infringing ostinato. (Ex. 4, 79:3-82:4). Thus, contrary to the testimony of Defendants' high-priced experts, Ms. Perry herself identified the importance of Ostinato #2 in the success of "Dark Horse," which largely owed its origin to the ostinato that would eventually play through almost half of the song. (Ex. 4, 87:23-88:22). Indeed, the song's music video was also shaped by the beat's dark sound. (Ex. 4, 100:23-101:2, 101:17-20). While Plaintiffs would have preferred a jury verdict attributing profits based on the percentage of the song that contained the infringing ostinato, the 22.5% allocation has its obvious roots in the 45% of the song that contained the ostinato.

## IV. THE JURY'S REJECTION OF CAPITOL'S PROFIT CALCULATION WAS NOT ONLY PROPER BUT THOSE PROFITS SHOULD HAVE BEEN EVEN LARGER THAN THE JURY'S RECALCULATION.

As the jury was instructed, "A defendant's profit is determined by deducting all *appropriate* expenses incurred by that defendant from that defendant's gross revenue." (Dkt. #461, Jury Instr. 3). (emphasis added). This instruction continues, "Expenses are all *appropriate* costs, including…appropriate operating costs, overhead costs, and production costs incurred in producing a defendant's gross revenue. The defendants have the burden of proving their respective expenses by a preponderance of the evidence." *Id.* (emphasis added).

Critically, this instruction establishes qualifiers that expenses are deductible only if they are (1) appropriate and (2) incurred in producing gross revenue. The jury was instructed that "gross revenue" means "all of the defendant's receipts

32

*from the sale or use of a work containing or using copyrighted work associated with the infringement.*" *Id.* (emphasis added).

This Circuit is clear as to Defendants' burden in this realm: "Any doubt as to the computation of costs or profits is to be resolved in favor of the plaintiff…If the infringing defendant does not meet its burden of proving costs, the gross figure stands as the defendant's profits." *Frank Music Corp.*, 772 F.2d at 514 (internal citations omitted). While overhead expenses need not be proven in "minute detail," Capitol bore the burden of demonstrating how each claimed overhead expense "was of actual assistance in the production, distribution or sale of the infringing product." *Id.* at 516 (quoting *Kamar Int'l, Inc. v. Russ Berrie & Co.*, 752 F.2d 1326, 1332 (9th Cir. 1984). In *Frank*, the court found that allocating total overhead costs on "a reasonable basis" alone failed to meet that burden. *Id.* The *Kamar* court stated the additional requirement of proof as follows: "whether any of the overhead expenses were *caused by* the production or sale of the infringing goods, not [just] the proportionate amount of sales of the goods in relation to total sales." *Kamar Int'l,* 752 F.2d at 1332 (emphasis added).

### A. Virtually all of Capitol's overhead expense was not deductible.

As an initial matter, overhead costs were apportioned to "Dark Horse" based on its success—a questionable accounting mechanism employed by Capitol exclusively "for the purpose of this litigation." (Ex. 5, 29:18-30:3). Moreover, the jury had good reason to doubt whether the overhead expenses were appropriately deductible, based on the evidence at trial. Unlike all other expenses at trial, Capitol's overhead expenses were reported as a single lump sum for each month with no detail listed for the 36 broad categories of costs that purportedly comprised the amount. (*See* Exhibit 7, Jones Decl., 116-81, 86-91).

In fact, of those 36 categories, only a handful were addressed by Defendants at trial. This is problematic because the jury had no basis to determine how much of

Capitol's purported overhead was attributable to a category discussed at trial (i.e. rent) versus a category for which no proof was offered. Additionally, many of these categories are vague and cannot be obviously tied to producing gross revenue without further explanation—e.g. Temporary Labor Costs, Other Cost of Fixed Assets – Other, Other Professional Fees, Total Service Fees, Travel and Entertainment, Total Direct Overhead, Other Overhead, Actual Corporate Expenses, Other Music Group Co's, Charges to Other Internal Functions, Allocations In \ (Out), etc. *Id.*; *See Frank Music*, 772 F.2d at 516 (failure to carry burden where defendants offered no evidence of what costs were included in general categories such as "general and administrative expenses," or how these costs contributed to production of the infringing work). Thus, Defendants handed the jury an indecipherable overhead-costs puzzle and now argue that this puzzle carried their burden. Instead, the jury's doubt regarding Defendants' proof was certainly justified, and it was properly resolved in favor of the Plaintiffs. *Id.* at 514.

Further, for the few categories of overhead actually addressed by Mr. Drellishak, none of the undefined costs could be tied to "the production or sale of the infringing good" as required by this Circuit. *Kamar*, 752 F.2d at 1332. Mr. Drellishak was asked at trial whether he was able to identify any categories of overhead expenses "that were directly related to the production of Dark Horse?" (Ex. 5, 61:2-5). He replied, "The way that we track overhead would make it impossible…to fulfill that request." (Ex. 5, 61:6-7). Mr. Drellishak then conceded that the same amounts of overhead costs would have been paid by Capitol for salaries and rent regardless of whether "Dark Horse" was ever made, acknowledging that "Dark Horse" was not the cause of these expenses. (Ex. 5, 62:2-10). He agreed these were "a fixed cost" for Capitol. (Ex. 5, 62:10). This was also true for pensions. (Ex. 5, 63:10-15). Speaking to every category of overhead,

collectively, Mr. Drellishak admitted, "So while not directly…associated with a specific release, [ ] if we didn't have Katy Perry on the roster, Capitol's overhead would be smaller." (Ex. 5, 64:8-11). But Capitol has not met its burden by proving that the amount of claimed overhead was merely associated with one of its musical artists or a broad category of its products. Instead, the question is "whether any of the overhead expenses were caused by the production or sale of *the infringing goods*…" *Kamar*, 752 F.2d at 1332.

Thus Capitol failed to meet its burden of proving that the amount of claimed overhead was specifically associated with one of its musical artists or a broad category of its products. Instead, the question is "whether any of the overhead expenses were caused by the production or sale of *the infringing goods*…" *Kamar*, 752 F.2d at 1332. Regardless, even if Capitol had shown that certain categories had direct connection to "Dark Horse," no amounts were provided for individual categories of expenses. The jury properly determined overhead was not deductible.

**B. Capitol's profit number should actually have been higher; the Jury should not have deducted nearly $5 million of "royalty expense" in calculating Capitol's profits.**

There was no evidence at trial that amounts booked by Capitol as royalties were ever paid. Instead, Mr. Drellishak admitted that "[w]hat we're showing here is accrued royalties which is the expense that we will owe eventually to the artist, but there are…nuances in the recording business that would…limit that payment…" (Ex. 5, 48:16-19). He was asked whether that was "because in your contract with the artist, certain amounts of expenses have to be recouped before the artist gets paid royalties…?" (Ex. 5, 48:21-23). He confirmed and conceded, "[a]n advance may have been made and that's effectively a premium of royalties." (Ex. 5, 48:24-25). While accrued royalties are ordinarily paid, he admitted as for all royalty expenses: "I have not validated that a payment was made as part of the

process of preparing this…I can't say that I validated, and that check was cut." (Ex. 7, 116-2; Ex. 5, 49:1-9). Asked directly, "You accrued royalties, but you don't know for sure if they actually were paid?", he answered, "I don't know for sure." (Ex. 5, 49:14-16). In other words, there was no affirmative evidence in the record that these costs were "incurred" by Capitol or that funds would ever leave Capitol's hands. The jury was only able to speculate that these funds were paid or might someday be paid. For this reason, particularly given this Circuit's law that "*[a]ny doubt* as to the computation of costs or profits is to be resolved in favor of the plaintiff…" *Frank Music Corp.,* 772 F.2d at 514, these royalty costs should not have been deducted from Capitol's gross revenue. As such, Capitol's profits should have been $4,853,551[19] higher, and Plaintiffs' damages award would also have been correspondingly higher.

## V.     THERE IS NO SUFFICIENT GROUND FOR A NEW TRIAL.

### A. <u>Rule 59 New Trial and Remittitur Standard</u>

This Court has the discretion to grant a new trial under Rule 59 "if the verdict appears ... to be against the weight of the evidence." *Gasperini v. Center for Humanities*, 518 U.S. 415, 433, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). "A new trial is warranted where the verdict is contrary to the clear weight of the evidence and the verdict results in the miscarriage of justice." *City Solutions, Inc. v. Clear Channel Comms.*, 365 F.3d 835, 843 (9th Cir.2004). A court should grant a new trial *only* when it "is left with the definite and firm conviction that a mistake has been committed." *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1372 (9th Cir.1987). It "may not grant a new trial simply because it would have arrived at a different verdict." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001).

---

[19] Ex. 7, 116-2 lists Capitol's purported royalty expense as follows: Accrued Artist / Producer Royalties, $3,525,181; Accrued Copyright Royalties, $1,081,855; and Domestic Licensing Royalty Expense, $236,515. The sum of these amounts, which Mr. Drellishak could not confirm were paid or would be paid, totals $4,853,551.

In deciding a motion for new trial, "[t]he judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).  In doing so, however, "[t]he district court cannot substitute its evaluations for those of the jurors." *Tortu v. Las Vegas Metro. Police Dept.*, 556 F.3d 1075, 1084 (9th Cir.2009). In order to avoid the denigration or usurpation of a party's right to a jury trial, the court should take caution to employ "a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system … [and] in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter." *Landes Const. Co., Inc.*, 833 F.2d at 1371–72, quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2806, at 48-49 (1973) (footnotes omitted). If, having given full respect to the jury's findings, the Court is left with the definite and firm conviction that a mistake has been committed based upon on the entire evidence, it may grant a new trial. *Id*.

Finally, the Court should also employ special caution in considering a jury's credibility determinations that are not unreasonable. *Landes Const. Co., Inc.*, 833 F.2d at 1372 ("[I]t was not unreasonable for the jury to believe [Plaintiff's] witnesses instead of Defendant's. . . .Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.").

**B.  No new trial on liability is warranted.**

> **1.  Contrary to Defendants' contention, the clear weight of the evidence fully supports the Jury's findings on liability.**

Defendants rehash here the same erroneous argument advanced in support of their Rule 50 motion as grounds for a new trial. (Dkt. #485, p. 52). For the same reasons explained above in Section II.D.i & ii, *infra,* Defendants' Rule 50

37

argument also fails under Rule 59. The Defendants' evidence was not unimpeached nor uncontradicted. Further, even if it had been, such an evidentiary record does not justify a new trial, as it encroaches upon the Plaintiffs' right to a jury trial and to have the jury determine the issues pertaining their claims, including the resolution of conflicts in the evidence and determinations as to the credibility of witnesses.

The Defendants have had their day in court, the jury has spoken, and that voice should be respected. As the Ninth Circuit instructs, "a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter." *Landes Const. Co.*, 833 F.2d at 1371. This Court should not entertain Defendants' invitation to improperly substitute its evaluations for those of the jurors. *Tortu v. Las Vegas Metro. Police Dept.*, 556 F.3d at 1084. It was not unreasonable for the jury to believe Plaintiffs' witnesses instead of Defendants' witnesses. Doubts about the correctness of the verdict do not warrant a new trial. *Landes Const. Co.* at 1372. Rather, this Court must have a firm conviction that the jury has made a mistake. *Id*. See also, *Tennant v. Peoria & Pekin Union Ry.*, 321 U.S. 29, 35, (1944) ("Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable."). The jury's verdict should be accepted if it is one which the jury reasonably could have reached. *Angle v. Sky Chief, Inc.*, 535 F2d. 492, 494 (9th Cir. 1976). The jury in this case reasonably reached its verdict.[20]

---

[20] Defendants' Rule 50 and 59 motions fail to even address yet another possible reasonable basis of the jury's findings and verdict of infringement, namely, subconscious copying. (See Dkt. #441, Jury Instr. 39).

## 2.  There was no misconduct by either Dr. Decker or Plaintiffs' counsel.

### a.  Dr. Decker's testimony was proper and did not invade the province of the Jury.

Defendants, through a contorted post-trial dissection of Dr. Decker's testimony, seek to create error and prejudice where none exists or was preserved. Defendants make three claims as to allegedly improper and prejudicial testimony by Dr. Decker: (a) testimony relating to "borrowing," (b) testimony that purportedly relates to the intrinsic test, and (c) testimony that the works at issue were "strikingly similar." (Dkt. #485, pp. 52-56). Plaintiffs will address each claim in the order presented by Defendants.

#### i.  Dr. Decker's testimony relating to borrowing was proper and any objection was waived.

Defendants first claim that testimony by Dr. Decker, in particular his use of the word "borrow," constitutes improper legal conclusions and opinions on the ultimate issue of law. Defendants' argument misinterprets and misapplies the law. "An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). "Expert testimony . . . [that is] otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." *Shad v. Dean Witter Reynolds, Inc.*, 799 F.2d 525, 529 (9th Cir. 1986).

Defendants' cite *Nationwide Transp. Fin. v. Cass. Info. Sys., Inc.*, 523 F.3d 1051 (9th Cir. 2008) as authority that testimony by Dr. Decker regarding "borrowing" is improper as "the ultimate legal conclusion." (Dkt. #485, pp. 52-53). *Nationwide* is inapposite and easily distinguished. That case involved an expert seeking to testify to legal opinions regarding the Uniform Commercial Code and its applicability, *i.e.*, legal conclusions as to a *matter of law. Nationwide* at 1058-60. An expert cannot testify to a matter of law amounting to a legal conclusion. Fed. R. Evid. 702(a); *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir.1992) (the reasonableness and foreseeability of workers'

reliance were matters of law and therefore were inappropriate subjects for expert testimony).

Here Dr. Decker testified as to his expert opinions as to musical elements of the two works and how they impacted his expert musical assessment of substantial similarity. Substantial similarity is a question of fact, not a matter of law. *Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1330 n. 6 (9th Cir. 1983), *citing Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir.), *cert. denied*, 449 U.S. 841(1980). Dr. Decker testified that the term "borrowing" as he was using it in his testimony was a musicological term of art, not a legal term. (Ex. 1, 116:19-118:6). Moreover, the Court recognized that the word "borrowed" was being used in musicological, not legal, sense and instructed the jury as such saying, "The witness [Dr. Decker] has described borrowed for you before that he's using it in a musical sense." (Ex. 1, 157:19-158:6; 166:8-20). Dr. Decker's testimony was proper and unobjectionable.

But even assuming, *arguendo*, the "borrowing" testimony by Dr. Decker was objectionable, Defendants waived that claim by failing to timely assert any objection at the first opportunity. Dr. Decker's testified without objection:

> Q. And so we're going to get into the details of your
> opinion, but to summarize based on your expertise and music
> performance, musical history and musical borrowing, do you
> think Joyful Noise and Dark Horse are substantially similar?
> A. I do.
> Q. Do you think Dark Horse borrows from Joyful Noise?
> A. I do.

(Ex. 1, 129:1-7). Defendants' failure to object waived any objection thereto. *Gant v. Vanderpool*, 350 F. App'x 181, 183–84 (9th Cir. 2009) ( citing *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir.1996)). A new trial cannot be

40

required on the basis of this testimony "absent a showing of gross injustice or an explanation of the failure to object." *Mitchell v. Black & Decker (USA) Inc.*, 6 F. App'x 652, 653 (9th Cir. 2001).[21] Defendants have not even attempted to make a showing of gross injustice or to explain the failure to object. Indeed any such attempt would prove futile; gross injustice could not possibly be shown when both parties were allowed to elicit the same expert testimony.

Defendants cannot show prejudice for another reason. When the Court found Dr. Decker's testimony objectionable, it granted all the relief requested by Defendants, including striking testimony and instructing the jury. (Ex. 1, 165:18-166:20). Such actions are sufficient to cure any purported potential prejudice, as the jury is presumed to follow the Court's instructions. *Medina v. Metro. Interpreters & Translators, Inc.*, 139 F. Supp. 3d 1170, 1176–77 (S.D. Cal. 2015), aff'd sub nom. *Bates v. Metro. Interpreters & Translators, Inc.*, 742 F. App'x 268 (9th Cir. 2018) (striking improper testimonial references and promptly providing limiting instructions sufficient to cure any potential prejudice.)

### ii. Dr. Decker did not invade the province of the Jury by testifying as to matters exclusively in the province of the intrinsic test.

Defendants next claim that Dr. Decker's testimony improperly invaded the province of the jury by offering opinions in relation to the intrinsic test, rather than only offering opinions pertaining to the extrinsic test. Defendants' argument conflates "subjective" with "sensory." Defendants take issue with instances when Dr. Decker used words associated with hearing and feeling, which they erroneously label as subjective. (Dkt. #485, pp. 54-55). The true test as to whether the song analysis is extrinsic or intrinsic is whether the analyzer is scrutinizing the

---

[21] Another instance of the use of the term that went without any objection interposed by the Defendants is, somewhat ironically, referred to as remarkable. (Dkt. #485, p. 54, referencing Wais Decl. Ex. 3, p. 524 l. 1-23).

song's musical elements (extrinsic) or the *total sense and* feel of the song *as a whole* (intrinsic).

The "extrinsic" test "objectively considers whether there are substantial similarities in *both* ideas and expression." *Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1177 (C.D. Cal. 2001), aff'd in part, dismissed in part, 90 F. App'x 496 (9th Cir. 2003), as amended on denial of reh'g (Mar. 9, 2004), quoting *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994) (emphasis in original). The extrinsic test requires identification of concrete elements based on objective criteria. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000). The intrinsic component of the substantial similarity test is a subjective test by which the trier of fact decides whether the total concept and feel of the two works is substantially similar. *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 831 (C.D. Cal. 2010), aff'd sub nom. *Gable v. Nat'l Broad. Co.*, 438 F. App'x 587 (9th Cir. 2011)

In the testimony that Defendants complain of, Dr. Decker was appropriately performing extrinsic analysis by examining two elements—key and melody. The Court should not be fooled by Defendants conflation of "subjective" and "sensory." The real issue is whether the expert is addressing a musical element (*e.g.*, rhythm, pitch, key, timber, melodic contour, tempo) (extrinsic) or is examining the *total sense and feel* of the musical work *as a whole*, *i.e.*, unrelated to its constituent musical *elements*) (intrinsic). To accept Defendants' argument that Dr. Decker cannot testify as to anything sensory ("hear" or "feel"), one must ignore both the plain meaning of the word "objective"[22] and also the

---

[22] One definition of the word "objective" is "involving or deriving from sense perception or experience with actual objects, conditions, or phenomena." https://www.merriam-webster.com/dictionary/objective.

methodologies employed by both parties' musicological experts.[23] Musical "expressions" are necessarily sensory in nature, requiring that they be heard and felt. To forbid an expert musicologist from using those terms, as Defendants would have it, when analyzing a musical element or testifying regarding such an analysis is absurd and irrational, and compliance with it virtually impossible.[24]

Extrinsic test analysis of musical compositions properly considers the compositional elements of melody and key (among others). *Swirsky v. Carey*, 376 F.3d 841, 848, 849 (9th Cir. 2004), as amended on denial of reh'g (Aug. 24, 2004) (emphasis added). This is precisely the two elements that Dr. Decker was commenting upon that Defendants claim was improper. In the first instance, Dr. Decker discussed the musical element of key and how he, as an expert, perceived it; he did not perceive the *total sense and feel* of the musical work *as a whole* as a lay observer would perceive it. (Ex. 1, 150:8-151:7). The question may have been awkwardly worded, but it is clear that it calls for an expert's view. [25] Defendants pounce upon the use of the term "layperson" in an attempt to twist the meaning of the question and answer in order to render it an inappropriate invasion into the jury's intrinsic analysis, which it is not. In the second instance, Dr. Decker was testifying regarding the musical element of melody and his expert assessment of that element. Again, he was not addressing the *total sense and feel* of the musical work *as a whole* or how that would be perceived by a lay listener.

---

[23]   Both testified that they analyzed the two songs through, in part, listening to both works innumerable times in order to analyze the works' elements, ideas and expression and assess potential substantial similarity. Ex. 1, 126:23-127:7; 128:12-25; Ex. 2, 21:13-24).

[24] A review of Dr. Ferrara's testimony is illustrative of this point. Dr. Ferrara utilized a form of the word "hear" dozens of times in the course of his testimony – thirty-four (34) to be exact – which does not include the instances where a form of the word was used in a question posed to him. (Ex. 2, 25:13 – 91:2).

[25] The question as posed: "So for a layperson like me is that something that in your expert opinion is a difference that's recognizable audibly?" is the equivalent of asking, "So that I [the questioner] can understand, is that [similarity in key] something that you as an expert recognize in hearing it?"

Finally, Defendants' reliance on the Court's *in limine* ruling (Dkt. #403, pp. 31-32) is also unavailing. The Court's *in limine* ruling made no reference to precluding testimony relating to how an expert "heard" or "felt" the compositional elements of the music at issue in this case. Dr. Decker made no inappropriate comment as to how either of the two works at issue "are aurally perceived by the lay listener," as was precluded by the court (Dkt. #403, pp. 31-32). Dr. Decker's testimony did not improperly infringe upon the jury's intrinsic analysis.

### iii. Dr. Decker did not offer improper opinions as to "striking similarity"; moreover, Defendants were in no way prejudiced by his use of the word "striking" in its plain and ordinary context meaning, especially given that the Jury was not instructed on the "striking similarity" issue.

Finally, Defendants contend that Dr. Decker's inadvertent, sporadic, and colloquial use of the word "striking" during his testimony violated this Court's *in limine* order that "precludes plaintiffs from arguing at trial that the two works are so strikingly similar that they need not prove access." (Dkt. #403, p. 6). Importantly, the order does not preclude the use of the word "striking," whether used in a technical musicological sense or in the ordinary colloquial sense, as Dr. Decker obviously did in his testimony. Further, Plaintiffs' counsel honored the Court's pretrial ruling and never made any "striking similarity" argument or any such claim that they need not prove access, at trial.

Indeed, the word "similarity" was not used in any of the three instances that Defendants claim Dr. Decker's use of the word "striking" so prejudiced them as to mandate a new trial. Nor did Dr. Decker offer any opinion on the subject of "striking similarity." Rather, Dr. Decker used the word while discussing certain musical elements, and his use of that word was clearly in its familiar or ordinary sense. The jury would have no reason to ascribe any significance to or any other technical meaning to the use of that word or to connect it to the legal construct of "striking similarity"—which was foreign and unknown to them—had the issue not

44

been continuously raised by defense counsel. The jury was never instructed on "striking similarity." (Dkt. #441). It was Defendants' repeated highlighting of the innocuous use of a word in its purely colloquial sense that necessitated the Court to instruct the jury as to the basis of Defendants' continuing objections. When Dr. Decker inadvertently used the term "striking" when describing texture, the Court offered the following explanation to the jury:

> THE COURT: Just so the jury understands, this opinion is that the songs are substantially similar and that is the claim in the case. We have a different standard that applies if the opinion were they were strikingly similar. And therefore, we're trying to separate the two because this case is based on substantially similar as is this opinion.

(Ex. 1, 144:10-145:10).

In sum, the Defendants did not violate the Court's *in limine* Order and Defendants have shown no prejudice arising from Dr. Decker's inadvertent, sporadic and colloquial use of the word "striking" during his testimony. Therefore, a new trial is not warranted on this ground.

**b. Counsel's reference to future profits was accurate and proper.**

Defendants contend that Plaintiff's trial counsel's accurate statement that Defendants' ability to exploit "Dark Horse" in the future would continue unimpaired by any award of Defendants' pre-trial profits "falsely contended Defendants would not be financially harmed." (Dkt. #485, p.57.) That contention is a self-refuting non sequitur. Indeed, the case law Defendants cite in purported support of that illogical proposition reveals the hollowness of their argument.

But first we address the accuracy of trial counsel's statement. The *sole* relief sought by Plaintiffs in the damage phase of the trial was a percentage of the Defendants' *pretrial* profits from exploitation of "Dark Horse." There was no request for an award of future profits; nor was there a request for an award of future royalty payments to Plaintiffs from Defendants' exploitation of "Dark

45

Horse." Nor was there a request for an injunction halting all future exploitation of "Dark Horse." As such, the award sought at trial would be the ***sole*** relief available to Plaintiffs. There was nothing inaccurate or in any way prejudicial about that statement—as evidenced by Defendants' failure to object.

The case law Defendants cite underscores the emptiness of their argument. The sole Ninth Circuit case—*Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 346 (9th Cir. 1995)—involved what the Court described as "pervasive improprieties" and  highly prejudicial conduct by the plaintiff, including the repeated presentation of testimony and other evidence in violation of the court's orders concerning such evidence. As the Ninth Circuit explained, the plaintiffs' counsel "repeatedly and impermissibly elicited testimony and made reference to matters previously ruled inadmissible with the sole purpose of bringing to the jury something it should not have heard." *Id.* at 347.

Defendants' other two precedents—one from the Eighth Circuit and the other from the Sixth Circuit—provide examples of the fundamental difference between a proper and a prejudicial statement regarding damages. Both cases involved assertions by plaintiff's counsel that the award of damages would be covered by a third-party insurance company. As the Eighth Circuit explained in *Venura v. Kyle,* 825 F,3d 876, 886 (8th Cir. 2016), "it has been almost universally held that the receipt of such evidence constitutes prejudicial error sufficient to require reversal." Here, of course, there was no such representation.

Defendants' attempt to draw a parallel to those insurance cases by "interpreting" Plaintiff's counsel statement to the jury as a statement "that an adverse verdict would not financially harm the Defendants" (Dkt. #485, 58) is nonsensical. Plaintiffs sought an award of Defendants' prior profits, and it sought that award ***directly*** from the Defendants—and not from some third party. And the

46

jury obviously understood that, as they awarded to Plaintiffs a percentage of each
Defendant's pretrial profits.

But even assuming arguendo that Plaintiff's counsel's accurate and truthful
statement was somehow prejudicial, Defendants' failure to object nullifies their
request. To begin with, the statements at issue were made in closing argument. The
Ninth Circuit has held  "that where 'offending remarks occurred principally during
opening statement and closing argument,' we are less inclined to find the
statements pervaded the trial and thus prejudiced the jury." *Settlegoode v. Portland
Pub. Sch.*, 371 F.3d 503, 518 (9th Cir. 2004) (quoting *Kehr v. Smith Barney,
Harris Upham & Co*., 736 F.2d 1283, 1286 (9th Cir. 1984)). Here, of course, the
jury's award of damages—just half of what Plaintiffs requested—demonstrates the
lack of prejudice

Moreover, Defendants' failure to object further undercuts their position. As the
Ninth Circuit explained in *Settlegoode, supra* at 516-17 (citations omitted), in
reversing the trial court's new trial order:

> There is an even "high[er] threshold" for granting a new trial where,
> as here, defendants failed to object to the alleged misconduct during
> trial.  A higher threshold is necessary for two reasons: "First, raising
> an objection after the closing argument and before the jury begins
> deliberations 'permit[s] the judge to examine the alleged prejudice
> and to admonish ... counsel or issue a curative instruction, if
> warranted.'" Second, "allowing a party to wait to raise the error until
> after the negative verdict encourages that party to sit silent in the face
> of claimed error." *Id.*

Finally, we are disappointed but not surprised by Defendants' attempt to smear
Plaintiffs' counsel with an accusation of lying. The basis for that accusation was
the undersigned's response to an out-of-the-blue email from Defendants' counsel
two months after the verdict quoting his statements to the jury. Not realizing the
actual motive for that email (not disclosed until Defendants' motion), he responded

47

by confirming those statements and adding a standard reservation of rights regarding damages. (Dkt. #485, 57.)  That reservation of rights was solely to protect the Plaintiffs' rights in the event of some unknown or unexpected future occurrence. None has yet occurred. As such, that reservation of rights is no different than the many times Defendants have asserted similar reservations of rights. But to try to distort that vanilla reservation into nefarious subterfuge underscores the emptiness of Defendants' argument. As the Court can confirm, the Plaintiffs have not sought any future profits. In short, the statement by Plaintiffs' counsel was true, accurate, and in no way prejudicial.

### C. The evidence actually demonstrates that the damages awarded by the Jury were insufficient.

Defendants argument for remitting the damage award exhibits, if nothing else, a healthy dose of chutzpah. As discussed above, the evidence supports a much larger damages amount than what the Jury awarded. Among other things:

- Despite uncontested evidence that the infringing ostinato comprised 45% of the song, the Jury decided to award just half of that percentage.

- Despite evidence that Capitol's expenses included close to $5 million in hypothetical "royalty expenses" that might never be paid, the Jury deducted that amount from Capitol's gross revenues, thus reducing Plaintiffs' damage award by more than $1 million (calculated at the 22.5% used by the Jury).

We do note, however, that even here—at page 59 of their brief—Defendants continue to distort the evidence, stating that "Plaintiffs' counsel's(sic) simply argued—without a scintilla of evidence by expert testimony or otherwise, that Ostinato 2 appears in 45% of 'Dark Horse.'" (Dkt. #485, p.59.) We respectfully direct Defendants to the ***unrebutted*** testimony of Professor Decker, offered without objection, that the infringing ostinato plays throughout 95 seconds of "Dark Horse" (Ex. 1, 154:24-155:6), which equals 45% of the 212 seconds of the

48

song. That same time calculation is in Dr. Decker's original Expert Report dated April 6, 2017—submitted more than two years before trial. (Dkt. #282, p.29) In other words, Plaintiffs had far more than a scintilla of evidence to support their allocation argument.

## VI.    CONCLUSION

Accordingly, Plaintiffs respectfully request that the Court deny the relief sought by Defendants pursuant to their Rule 50(b) and Rule 59 Motions.

Respectfully submitted,

/s/ Michael A. Kahn
Michael A. Kahn (pro hac vice)
Kahn@capessokol.com
Jonathan S. Jones (pro hac vice)
Jones@capessokol.com
Capes Sokol Goodman Sarachan PC
7701 Forsyth Blvd., 12th Floor
St. Louis, MO 63105
Telephone: (314) 721-7701

Eric F. Kayira (pro hac vice)
Kayira Law, LLC

Daniel R. Blakey (SBN 143748)
blakey@capessokol.com
CAPES SOKOL
3601 Oak Avenue
Manhattan Beach, CA 90266

***Attorneys for Plaintiffs***

49