# Exhibit 3

1

1  UNITED STATES OF AMERICA
   UNITED STATES DISTRICT COURT
2  CENTRAL DISTRICT OF CALIFORNIA
   WESTERN DIVISION
3
                    - - -
4     HONORABLE CHRISTINA A. SNYDER
   UNITED STATES DISTRICT JUDGE PRESIDING
5                   - - -

6
   MARCUS GRAY; ET AL.,              )
7                                    )
          PLAINTIFF,                 )
8                                    )   CASE NO.:
   VS.                               )   CV 15-5642-CAS
9                                    )
   KATY PERRY; ET AL.,               )
10                                   )
          DEFENDANT.                 )
11 _____  )

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15            TUESDAY, JULY 23, 2019

16            LOS ANGELES, CALIFORNIA

17

18

19

20

21

22        LAURA MILLER ELIAS, CSR 10019
        FEDERAL OFFICIAL COURT REPORTER
23     350 WEST FIRST STREET, ROOM 4455
        LOS ANGELES, CALIFORNIA 90012
24            PH:  (213)894-0374

25

                UNITED STATES DISTRICT COURT

2

```
 1

 2
        APPEARANCES OF COUNSEL:
 3
        ON BEHALF OF PLAINTIFF:
 4

 5              CAPES SOKOL
                BY: MICHAEL A. KAHN, ESQ.
 6                  LAUREN COHEN, ESQ.

 7              7701 FORSYTH BOULEVARD
                12TH FLOOR
 8              ST. LOUIS, MO 63105

 9
                KAYIRA LAW, LLC
10              BY:  ERIC KAYIRA, ESQ.

11              2100 HANLEY ROAD, SUITE 208
                CLAYTON, MO 63105
12

13
        ON BEHALF OF DEFENDANTS OTHER THAN MS. PERRY:
14

15              MITCHELL SILBERBERG & KNUPP
                BY: CHRISTINE LEPERA, ESQ.
16                  AARON M. WAIS, ESQ.
                    JEFFREY MOVIT, ESQ.
17                  GABRIELLA NOURAFCHAN, ESQ.
                    JACOB ALBERTSON, ESQ.
18
                11377 WEST OLYMPIC BOULEVARD
19              LOS ANGELES, CA 90064

20
        ON BEHALF OF THE PERRY DEFENDANTS:
21
                GREENBERG TRAURIG
22              BY:  VINCENT H. CHIEFFO, ESQ.

23              1840 CENTURY PARK EAST
                SUITE 1900
24              LOS ANGELES, CA 90067

25
```

3

INDEX

WITNESSES FOR
THE PLAINTIFF:

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WALTER, HENRY | | | | |
| BY:  MR. KAHN | 34 | | 80 | |
| BY:  MR. WAIS | | 53 | | 86 |
| | | | | |
| GOTTWALD, LUKASZ | | | | |
| BY:  MS. COHEN | 87 | | 136 | |
| BY:  MS. MOVIT | | 107 | | 136 |
| | | | | |
| GRAY, CRYSTAL | | | | |
| BY:  MR. KAHN | 137 | | 178 | |
| BY:  MR. WAIS | | 161 | | 182 |

WITNESSES FOR
THE DEFENSE:

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SANDBERG, KARL | | | | |
| BY:  MR. MOVIT | 15 | | 31 | |
| BY:  MR. KAHN | | 28 | | 32 |
| | | | | |
| HUDSON, SARA | | | | |
| BY:  MS. NOURAFCHAN | 199 | | | |
| BY:  MR. KAHN | | 209 | | |
| | | | | |
| ST.MARTIN, ZACHARY | | | | |
| BY:  MR. ALBERTSON | 213 | | 233 | |
| BY:  MR. KAHN | | 229 | | 234 |

EXHIBITS                    RECEIVED

(NONE OFFERED)

UNITED STATES DISTRICT COURT

4

```
 1        LOS ANGELES, CALIFORNIA; TUESDAY, JULY 23, 2019; 9:15 A.M.

 2                              - - -

 3              THE CLERK:  Calling Calendar Item 1.

 4              Case CV-15-5642.

 5              Marcus Gray versus Katy Perry.

 6              Counsel, please state your appearances.

 7              (Appearances heretofore noted.)

 8              THE COURT:  All right.  Good morning.

 9              Okay.  So I gather we have a video witness first.

10              MR. MOVIT:  Yes, Your Honor.

11              He's being taken out of order, Your Honor.  By

12    defendants.

13              THE COURT:  Okay.  And then who's next after that?

14              Just out of idle curiosity from the plaintiff's

15    side.  Yes?

16              MS. COHEN:  Mr. Walter.

17              THE COURT:  Okay.

18              MS. COHEN:  And then Mr. Gottwald.

19              THE COURT:  Okay.  So --

20              THE CLERK:  Counsel, I understand you have

21    something to bring up.

22              MR. WAIS:  Yes, Your Honor.  We have a couple

23    issues.

24              THE COURT:  Sure.

25              MR. WAIS:  So Your Honor, just really quickly, we
```

8

```
 1    or no.  If the answer is no, who's got a quick.  If the

 2    answer is yes, then I'm not sure what you intend to do about

 3    that.  Are you gonna make any argument?  That he has files?

 4              MR. KAHN:  I don't believe so.

 5              THE COURT:  Well, why do you care if he has them.

 6              MR. KAHN:  Well, we don't know what their evidence

 7    will be of independent creation.  And maybe it is, you know,

 8    he's -- we started working six months before.  We did this,

 9    this, this and this.  Because by the time this music file is

10    produced to us, it's -- it's sort of a dark hole.  We just

11    don't know what happened before that, and we want to be able

12    to ask him what was done before that.  But we're not gonna --

13              THE COURT:  Well --

14              MR. KAHN:  -- seek some negative inference from it.

15    I mean, Mr. Kayira could probably better address this.  He's

16    gonna be asking the questions, and he understands what these

17    files are.

18              THE COURT:  Okay, let's try again.  Mr. Kayira?

19              MR. KAYIRA:  Good morning again, Your Honor.

20              First of all, it's their burden to prove the

21    independent creation, and for them to do that, they need to

22    produce or prove up these additional files we believe which

23    are called session files.  So there's an audio file which is

24    what we listened to, and then an audio file is rendered from

25    session files.
```

1       This entire case on both sides has also electronic

2  music production which means these things are does in an

3  audio -- a Digital Audio Work station format, and every time

4  they save what they've created, it's called a session file.

5       An audio file is rendered from that file, and so

6  the creation process necessarily implicates the discussion of

7  did you save after you did this?  When you collaborated with

8  so-and-so, did you do that?  It is a natural discussion of

9  the creation process no different than discussing, uh,

10  someone writing Chapter 1 and another person writing Chapter

11  2.  Who is the scribner matters.

12       THE COURT:  Okay.  The response?

13       MS. LEPERA:  Yes, Your Honor.

14       Let me briefly say the file that is Exhibit 74 is,

15  in fact, the file that demonstrates the independent creation.

16  It is the culmination of everything to create that.  That was

17  produced to them.  They made a motion to compel.  Once we

18  produced that, they obviated the motion to compel, and we

19  agreed that that was if they sought no further discovery.

20  They were satisfied and effectively made no further efforts

21  to get anything additional.

22       To come in now and suggest, well, maybe I want to

23  now go back and ask for more discovery or contend there

24  should have been more discovery or contend there was a

25  failure to produce, and therefore, there's inferences negates

1    completely what was done in the discovery process whereby we

2    demonstrated unequivocally through 74.

3              This is the fallout, and Mr. Kayira's trying to

4    slice this salami between the audio file and the session file

5    when the audio file is the actual culmination of that

6    produced to them to demonstrate both the prior creation, the

7    independent creation and the timing thereof.

8              So this is another one of the attempted, um,

9    efforts to back step into the discovery process which has

10   been rectified and resolved and to try to create a spectra

11   that does not exist, Your Honor.

12             THE COURT:  Okay.  Mr. Kayira, what do you say?

13             MR. KAYIRA:  I say we're entitled to at least

14   understand who all contributed to the creation of the session

15   file for which the audio file was rendered because, um, there

16   is testimony that demonstrates that more than one producer

17   contributed to the creation of the instrumental music.

18   Number two, uh, that instrumental music production file that

19   was rendered to us in the form of a wave file does not

20   contain the iterations leading up to its creation.

21             THE COURT:  So why didn't you move to compel

22   discovery?  Why did you agree that they produced whatever

23   they were gonna produce?

24             MR. KAYIRA:  Your Honor, um, what they had to

25   produce, first of all, was always compelled under Rule 26,

1   but secondarily, there was a discussion, uh, on a motion to

2   compel in which my co-counsel was involved with discussions

3   with one of the attorneys on the other side.

4           What they produced, uh, to my co-counsel was an

5   audio wave file.  They're saying that it was the earliest,

6   uh, audio file.  The distinction between the audio file and a

7   session file is something that the -- it's the difference

8   between having the product and having the process, and we

9   should have a right to pursue the process in which the song

10  was created.

11          THE COURT:  Well, not if you've agreed that they

12  didn't have to produce anything further.  I don't understand.

13          MR. KAYIRA:  We -- we don't believe that we agreed

14  that they didn't have to produce anything.  They had the

15  burden to come forward with -- with that information.

16          THE COURT:  Who -- who made -- who made the

17  agreement?  Who made the agreement for your side?  I -- you

18  know, this is not something we should be doing in the middle

19  of the trial.

20          MR. KAHN:  Right.  It -- it was my agreement,

21  Your Honor.  And as I said, we're not seeking any negative

22  inference.  We just don't want to be finding out whatever the

23  process was --

24          THE COURT:  But --

25          MR. KAHN:  We -- I mean, we understand that the --

1    the two gentlemen . . .

2             THE COURT:  But, you know, it's like when did you

3    stop beating your wife.  I mean, it's that kind of question,

4    you know.  Are there files that haven't been produced to us?

5    That's where he's going, and they haven't had the opportunity

6    because they relied upon apparently an agreement that you

7    weren't gonna further prosecute the motion to compel.

8             MR. KAHN:  And -- and we aren't, Your Honor.  It

9    was simply asking them about the creation process.  That's

10   all.

11            THE COURT:  Well, I would suggest strongly that if

12   you're gonna ask about the creation process we not leave the

13   implication that somehow, there's an unproduced file

14   because --

15            MR. KAHN:  I understand.

16            THE COURT:  -- I don't think that is fair, and I

17   don't care what Mr. Kayira thinks.  He -- he can't say, well,

18   my co-counsel did it, and I'm not bound which is what I hear

19   happening.

20            MR. KAHN:  No.  I -- we -- we understand,

21   Your Honor.

22            THE COURT:  I . . .

23            MR. KAHN:  We'll ask general questions about the

24   creation without getting into computer files.

25            THE COURT:  I think that that's what you need to

1    do.

2          MS. LEPERA:  And we have no problem.  The witnesses

3    intend to speak to verbally how they created it and then

4    ultimately culminated in this but not the inference with

5    respect to this missing session files is exactly what we were

6    concerned about, Your Honor.

7          And I think that that -- they made the motion.

8    They drafted the motion under the rules, they gave us the

9    motion, and we resolved the motion.  This concept of, well,

10   okay, you still have an obligation under 26 when there's been

11   essentially an agreement on this issue, uh, is -- is not

12   availing.

13         THE COURT:  Well, I'm not -- I'm not saying they

14   aren't entitled to ask how things are recorded in files.

15   Because --

16         MS. LEPERA:  That is not a problem, Your Honor.

17   It's the question of where are these, and they're not here,

18   et cetera.

19         THE COURT:  Well --

20         MR. KAHN:  We're not getting into that, Judge.

21         Not where are these and why aren't they here.

22         THE COURT:  Okay.  I hope, uh, I hope not, but

23   we'll see.  So that's that issue.

24         The other issue, I guess, we can defer to the

25   afternoon.

```
1     Kasz Money publishing listed?

2     A.    Yes, I do.

3     Q.    Okay.  And what is Kasz Money?

4     A.    I believe that's my first publishing company.

5     Q.    And was Kasz Money, um, a publisher of the song Dark

6     Horse?

7     A.    For my share.  Yes.

8              MS. COHEN:  That's all I have for now.  Thank you.

9              THE COURT:  Okay.  Any . . .

10             MR. MOVIT:  Your Honor, if we're taking a 12:30

11    lunch, um . . .

12             THE COURT:  How long are you gonna have?

13             MR. MOVIT:  I -- I anticipate it could be over an

14    hour.  I am not sure.

15             THE COURT:  Why don't you get started.

16             MR. MOVIT:  Yes, Your Honor.

17                   CROSS-EXAMINATION

18    MR. MOVIT:

19    Q.    Mr. Gottwald, how would you describe your profession?

20    A.    I'd say I'm a profess -- I'm a musician, songwriter and

21    producer.

22    Q.    Okay.  Before we talk about you and your music, let's

23    discuss the plaintiffs.  One of the plaintiffs is Marcus Gray

24    professionally known as Flame.  Um, have you ever met him

25    before this trial?
```

UNITED STATES DISTRICT COURT

1    Q.    Okay.  And as the Clear Sight marketing person, does

2    Clear Sight do any advertising on any of these digital sites?

3    A.    Yes.  It's my job and responsibility to secure ad space

4    on the, for example, on the home page of iTunes Rap.

5    Q.    I think you mentioned the album entitled The Sixth which

6    came out in 2012?

7    A.    Correct.

8    Q.    So just by way of example with that album, can you just

9    describe the marketing efforts with advertising?

10   A.    Yes.  So for that album The Sixth, I believe I was able

11   to secure the largest banner on the home page of the

12   mainstream rap hip hop site on iTunes and our banner Flame

13   The Sixth rotated between young --

14          MR. WAIS:  Object to the content of those

15   advertisements as hearsay.

16          THE COURT:  I think it is.  I'm going to strike the

17   answer.

18   BY MR. KAHN:

19   Q.    You manage the music page for Clear Sight on iTunes;

20   correct?

21   A.    Yes.

22   Q.    I want to turn now to go back in time to Our World

23   Redeemed.

24   A.    Okay.

25   Q.    We've heard an album came out we've heard in 2008?

UNITED STATES DISTRICT COURT

143

1    A.    Okay.

2    Q.    Are you familiar with that album?

3    A.    Yes.

4    Q.    There are what are known as liner notes with that album;

5    correct?

6    A.    Correct.

7    Q.    Can you tell the jury what is a liner note?

8    A.    So it's -- the way I say it, it's the CD booklet with

9    all the credits inside of it.

10   Q.    So that's where the different people involved in the

11   song get credits?

12   A.    Correct.

13   Q.    And were you involved at all in the creation of the

14   liner notes for the album Our World Redeemed?

15   A.    Yes, I was.

16   Q.    What was your involvement?

17   A.    I edited the notes that my husband wrote and I did the

18   formatting.

19   Q.    Let me -- we've already seen this in evidence,

20   Exhibit 58, which it's probably easier for you to look on the

21   screen because it's in very small print in your exhibit book.

22   So what are we looking at here?

23   A.    Those are the credits of the liner notes, the inside CD

24   insert.

25   Q.    And maybe we can focus in on Joyful Noise which is the

1   song at issue here.  So these are the notes that you reviewed

2   and edited for the 2008 album; correct?

3   A.   Correct.

4   Q.   And there's a line called written by and who are the

5   three names that were given credit as written by?

6   A.   Marcus Gray, my husband, Lecrae Moore, Emanuel Lambert.

7   Q.   And then the next credit on there is produced.  Who was

8   given credit for that?

9   A.   Chike Ojukwu.

10  Q.   And back when you were doing these liner notes,

11  Mrs. Gray, what was your understanding of the producer credit

12  on a rap album?

13          MR. WAIS:  Objection.  No foundation.

14          THE COURT:  Sustained.

15  BY MR. KAHN:

16  Q.   What was your understanding of what Mr. Ojukwu did on

17  Joyful Noise?

18          MR. WAIS:  Objection.

19          THE COURT:  She can testify to what she believes he

20  did.

21          THE WITNESS:  He wrote the music.

22  BY MR. KAHN:

23  Q.   So under the written by, are those for the lyrics?

24  A.   Yes.

25  Q.   And as we look further down that liner note for Joyful

1    Noise, I see Clear Sight Music.  What is Clear Sight Music?

2    A.    The publishing company.

3    Q.    Whose publishing company is that?

4    A.    My husband, Mr. Gray.

5    Q.    What does the publishing company do to your

6    understanding?

7    A.    They collect revenue for writers.

8    Q.    They collect revenues for writers.  And there's another

9    one there at the very end, what is that?

10   A.    Renew Mind.

11   Q.    And that's another publisher?

12   A.    Yes.

13   Q.    And whose publisher is that?

14   A.    Chike Ojukwu.

15   Q.    Okay.  And they would collect writer revenues for

16   Mr. Ojukwu?

17   A.    That's correct.

18   Q.    Now, back in 2008 did you know Mr. Ojukwu?

19   A.    Yes.  He was --

20   Q.    How did the two of you meet?

21   A.    I met him at my husband's bible study that he was

22   teaching.

23   Q.    And that was in 2008, 2007, some time in there?

24   A.    Yeah.

25   Q.    And you said you had been married 11 years?

1    of 293,956.

2              27.   As of March 11, 2012, Video 2 had a view count

3    of 483,981.

4              28.   As of March 11, 2012, Video 3 had a view count

5    of 7,283.

6              29.   As of March 11, 2012, Video 4 had a view count

7    of 18,153.

8              30.   And as of March 11, 2012, Video 5 had a view

9    count of 561,718.  And that was part of the joint

10   Exhibit 122.

11             I'll read a few paragraphs from joint Exhibit 123

12   regarding certain of the corporate defendants.

13             Defendant Capital Records, LLC owns the copyright

14   in sound recording Dark Horse and is the company that

15   marketed and distributed the Prism album and the Dark Horse

16   sound recording.

17             Defendant Kobalt Music Publishing America, Inc.

18   provides music publishing administrative services for

19   Defendant Gottwald, Sandberg, Walter and Sarah Hudson with

20   respect to the musical composition Dark Horse.

21             Defendant Kitty Purry, Inc. is a California

22   corporation owned and/or controlled by Defendant Katheryn

23   Hudson, performer known as Katy Perry.

24             Defendant Kasz Money, Inc. furnished the production

25   services of Defendants Walter and Gottwald for the Dark Horse

1    sound recording.

2           And finally, Defendant WB Music Corporation

3    provides music publishing and administrative services for the

4    ownership interest of Katheryn Hudson in the Dark Horse

5    composition.  And that was Exhibit 123.

6           THE COURT:  Okay.  Ms. Lepera.

7           MS. LEPERA:  We have some counter statements to

8    read to that stipulation, Your Honor, and my colleague Jacob

9    Albertson will take care of that.

10          THE COURT:  Very good.

11          MR. ALBERTSON:  By 2010, users were uploading more

12   than 50,000 hours of video content to YouTube each day and

13   there were more than two billion views of YouTube video each

14   day.

15          By 2012, users were uploading more than

16   85,000 hours of video content to YouTube each day and there

17   were more four billion views of YouTube videos each day.

18          Today, YouTube has over a billion users and there

19   are more than 576,000 hours of video content being uploaded

20   to YouTube and each day users watch a billion hours of video

21   generating billions of views each day.

22          A view count does not identify any one person in

23   particular as having watched a particular video.

24          Moreover, a view does not necessarily mean that a

25   human actually watched or listened to the video while it was