# Exhibit 4

1                        UNITED STATES OF AMERICA
                       UNITED STATES DISTRICT COURT
2                    CENTRAL DISTRICT OF CALIFORNIA
                             WESTERN DIVISION
3
                                  - - -
4                    HONORABLE CHRISTINA A. SNYDER
              UNITED STATES DISTRICT JUDGE PRESIDING
5                                 - - -

6

MARCUS GRAY; ET AL.,                    )
7                                       )
              PLAINTIFF,                )
8                                       )   CASE NO.:
VS.                                     )   CV 15-5642-CAS
9                                       )
KATY PERRY; ET AL.,                     )
10                                      )
              DEFENDANT.                )
11    _____)

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                   THURSDAY, JULY 18, 2019

16                   LOS ANGELES, CALIFORNIA

17

18

19

20

21

22             LAURA MILLER ELIAS, CSR 10019
             FEDERAL OFFICIAL COURT REPORTER
23           350 WEST FIRST STREET, ROOM 4455
              LOS ANGELES, CALIFORNIA 90012
24                 PH:  (213)894-0374

25

```
 1

 2
          APPEARANCES OF COUNSEL:
 3
          ON BEHALF OF PLAINTIFF:
 4

 5                CAPES SOKOL
                  BY: MICHAEL A. KAHN, ESQ.
 6                    LAUREN COHEN, ESQ.

 7                7701 FORSYTH BOULEVARD
                  12TH FLOOR
 8                ST. LOUIS, MO 63105

 9
                  KAYIRA LAW, LLC
10                BY:  ERIC KAYIRA, ESQ.

11                2100 HANLEY ROAD, SUITE 208
                  CLAYTON, MO 63105
12

13
          ON BEHALF OF DEFENDANTS OTHER THAN MS. PERRY:
14

15                MITCHELL SILBERBERG & KNUPP
                  BY: CHRISTINE LEPERA, ESQ.
16                    AARON M. WAIS, ESQ.
                      JEFFREY MOVIT, ESQ.
17
                  11377 WEST OLYMPIC BOULEVARD
18                LOS ANGELES, CA 90064

19
          ON BEHALF OF THE PERRY DEFENDANTS:
20

21                GREENBERG TRAURIG
                  BY:  VINCENT H. CHIEFFO, ESQ.
22
                  1840 CENTURY PARK EAST
23                SUITE 1900
                  LOS ANGELES, CA 90067
24

25
```

UNITED STATES DISTRICT COURT

```
 1                              INDEX
 2     OPENING STATEMENTS                               PAGE
 3     BY:  MR. KAHN                                      4
 4     BY:  MS. LEPERA                                   18
 5
 6     WITNESSES FOR
       THE PLAINTIFF:
 7
                            DIRECT    CROSS    REDIRECT    RECROSS
 8     LAMBERT, EMANUEL
       BY:  MR. KAHN          35                 67
 9     BY:  MR. MOVIT                   44                    72
10     HUDSON, KATHERYN
       (VIA DEPOSITION)       75
11
       OJUKWO, CHIKE
12     BY:  MR. KAHN         110                151
       BY:  MS. LEPERA                 135                   154
13
       HUDSON, SARAH
14     (VIA DEPOSITION)      164
15     GRAY, MARCUS
       BY:  MR. KAHN         169
16
17     WITNESSES FOR
       THE DEFENSE:
18
       HUDSON, KATHERYN
19     BY:  MR. CHIEFFO       87
       BY:  MR. KAHN                   99
20
21          EXHIBITS               RECEIVED
22             16                      40
               77                     101
23              7                     193
24              1                     193
                4                     194
25              6                     197
```

```
 1        LOS ANGELES, CALIFORNIA; THURSDAY, JULY 18, 2019; 9:18 A.M.

 2                               - - -

 3                THE CLERK:  Calling Calendar Item No. 1.

 4                Case No. CV 15-5642.  Marcus Gray versus Katy

 5     Perry.

 6                Counsel, please state your appearances.

 7                  (Appearances as heretofore noted.)

 8                THE COURT:  All right.  Are we ready to proceed?

 9                MR. KAHN:  Yes, Your Honor.

10                THE COURT:  Fine.  So why don't we bring the jury

11     in.

12                           (Jury present.)

13                THE COURT:  Good morning, ladies and gentlemen.

14                We're going to proceed to opening statement.  As I

15     indicated yesterday, opening statement is not evidence.  It

16     is what each side anticipates will be proved in the course of

17     the trial.  So we're gonna begin with plaintiff's counsel.

18     Thank you.

19                Mr. Kahn.

20                MR. KAHN:  Thank you, Your Honor.

21                Ladies and gentlemen of the jury, my name is Mike

22     Kahn and I'm one of the three lawyers here for the

23     plaintiffs.  With me today is Lauren Cohen and Eric Kayira.

24                This is a case about taking.  About taking

25     someone's valuable creation without their permission.  And
```

1    A.    Yes.

2    Q.    That's your understanding.   The third paragraph it talks

3    about different release dates.   It mentions that Roar was

4    released on August 10, 2013 as the album's lead single.

5    Unconditionally debuted on October 16th as the record's

6    second single.   It says in between the release of these two

7    tracks were the releases of the promotional singles Dark

8    Horse on September 17th and Walking on Air on September 30th.

9    And then it says Dark Horse was released as the album's third

10   single three months later on December 17, 2013.

11            As far as you know is that accurate?

12   A.    Correct.

13   Q.    And what is your understanding of a release of a

14   promotional single?

15   A.    Well, I guess it would be like, uh, it's not really -- I

16   don't think that that would be something I would define it

17   as.   It was more of a teaser to the record.

18   Q.    So to try to encourage record sales when the record got

19   released?

20   A.    Yes, excitement.

21   Q.    Do you know who makes the decision as to when to release

22   a single or a promotional single?

23   A.    Yes, it's me and my team.

24   Q.    So it's not Capital Record?

25   A.    They're part of the team.

1    Q.    Okay.   So you were consulted on these release dates?

2    A.    Yes.

3    Q.    All right.   I'm gonna read you a quote from an article.

4    So you can read along with me, I'll have it marked as Perry

5    Exhibit 4.   We mark this -- this is from an October 14th,

6    2013 issue of the New Yorker.   It was a profile of

7    Mr. Gottwald written by John Seabrook and there's a quote

8    here about the creation of these songs.

9              I suppose all of the songs you've identified with

10   Dr. Luke.   It's a quotation from you and I'll read it into

11   the record.   I just want to ask you a couple questions about

12   it.

13             "Luke and Max came to Santa Barbara, Perry told me

14   and we'd hang out.   Go to the ocean.   Have nice dinners.

15   There's this really amazing studio we like to work at called

16   the Secret Garden and it's in the woods of Montecito.   We go

17   there and listen to music.   We do a lot of YouTubing.   We

18   drink some Chablis.   Luke and his protege Cirkut make these

19   little beds of music for me to listen to.   Not too long.

20   Just kind of appetizer size, and then they'll do the full

21   entrees if I like them."

22             Is that a fairly accurate description of the

23   creation process?

24   A.    Yes.

25   Q.    And I love your description little beds of music

1    appetizer size.  Roughly, how many of these appetizers do you

2    recall them playing for you?

3    A.   I don't recall.

4    Q.   Would it have been more than seven or eight?

5    A.   Yes.

6    Q.   In other words, they played for you more of these

7    instrumental beds that ultimately became songs in the album.

8    Is that fair to say?

9    A.   Possibly.

10   Q.   Okay.  So an appetizer size instrumental, how long would

11   that be?

12   A.   It could be anything from a drum beat to, you know,

13   eight bars of music.

14   Q.   Okay.  Now, I'm gonna play for you an instrumental track

15   that we received from Mr. Walter, Cirkut's lawyer which is

16   actually much longer than eight bars.  The lawyer and I quote

17   says, "This contains the earliest version of the audio file

18   containing the instrumental track that became Dark Horse."  I

19   will play 30 seconds of it.

20   A.   Sure.

21        MR. KAHN:  And then, Your Honor, we have an

22   agreement with counsel we can play the 30 seconds that we

23   played during Ms. Hudson's deposition.

24        THE COURT:  All right.

25                    (Music played.)

1    BY MR. KAHN:

2    Q.    Obviously you recognize the instrumental because that is

3    what became the instrumental for the song.  Do you recognize

4    either part of something that was played for you when they

5    had these -- these appetizer size beds?

6    A.    Yes, but I don't recall if that was in that shape.

7    Q.    What do you recall?

8    A.    I mean, it could have been less bare bones like with

9    less structure to it.

10   Q.    Okay.  And that would have been not unusual at that

11   point?

12   A.    Yes.

13   Q.    Okay.  So the first 12 or 13 seconds is this arpeggio of

14   four notes going up and down.  Should we call that part one,

15   theme one?  I mean, what would you call that as a musician?

16   A.    Which part?

17   Q.    The first.  Those first 13 seconds?

18   A.    Right.  Well, I don't read music and I don't know how to

19   reference music.  We'll just call it the intro.

20   Q.    Okay.  Got the intro.  And then we'll call the next

21   part, what should we call that?

22   A.    The beginning of the verse.

23   Q.    Okay.  So we have the intro, and then we have the

24   beginning of the verse.  As you sit here today, can you

25   recall whether in that session with the bed where you heard

1    the intro or you heard the beginning of the verse?

2    A.   I don't recall.

3    Q.   Do you recall what appealed to you when they played it?

4    A.   The kind of dark feeling with it.  I'm sorry.  About it.

5    Q.   Page 40.  Ms. Hudson, I'm going to show you what's been

6    marked as Perry Exhibit 5 which is a document I printed off

7    of a website just to make sure I understand all the lyrics.

8    It's not from your website.  I would ask you if you wouldn't

9    mind reading through it and telling me if this appears to be

10   an accurate transcription of the lyrics for Dark Horse?

11   A.   Yes.

12   Q.   I'm gonna ask the court reporter to mark as the next

13   exhibit Perry Exhibit 6, a homemade document that lists what

14   I believe, and you can correct me if I'm wrong, are the five

15   music videos from the Prism album.

16          According to this exhibit that we made, by we I

17   mean myself, there were five music videos from the songs on

18   the Prism album.  Namely, Roar, Birthday, Unconditionally,

19   Dark Horse and This Is How We Do.

20   A.   Correct.

21   Q.   Is that correct, Ms. Hudson?

22   A.   Correct, correct.

23   Q.   Okay.  To your knowledge, who was involved in the

24   decision to make a song into a music video?

25   A.   Me and my team.  My team and I.

```
 1              THE CLERK:  Please raise your right hand.
 2                        (Witness sworn.)
 3              THE CLERK:  Please be seated.
 4              Please state your full name and spell your last
 5    name for the record.
 6              THE WITNESS:  My name is Katheryn Elizabeth Hudson.
 7    My last name is spelled H-u-d-s-o-n.
 8              THE CLERK:  Thank you.
 9                        DIRECT EXAMINATION
10    BY MR. CHIEFFO:
11    Q.   I guess it's still good morning.  We'll proceed.
12              You've just listened to the reading of a portion of
13    your deposition transcript from a deposition was taken
14    earlier.  Yes?
15    A.   Yes, correct.
16    Q.   So I'm gonna ask you some questions that sort of arise
17    out of that testimony.  And let me just start cause this
18    lawsuit seems to be about this, the creation of Dark Horse.
19              Now, I think the deposition portion ended with you
20    explaining how the instrumental bed that you were listening
21    to had a dark feeling.  Do you recall that testimony?
22    A.   Correct.
23    Q.   All right.  So I'd like, if you can, sort of in a
24    narrative way to explain to the jury how the ultimate song
25    Dark Horse came into existence co-written by you and
```

1    performed by you ultimately starting from that time in

2    Santa Barbara when you first heard what the other two

3    defendants had created.  So what generally happened next

4    after you listened to that?

5    A.   After I listened to the small portion that was

6    presented?

7    Q.   Right.

8    A.   After I heard the sounds that were presented, um, by

9    Luke and Henry, um, which were presented in a medley of

10   files, in many different files.  And so we would hear the

11   different files or I would hear different files and if

12   something sparked my interest, I'd go hmm, I have some ideas

13   or themes or, um, titles that I think would fit well on this

14   type of sound.

15        And so I heard the sound and I actually called one

16   of my friends who was in Los Angeles and we were in

17   Santa Barbara which is where I go to make most of my music.

18   Um, and I called her up.  And I said, we had never written

19   together before, but I knew she was an up and coming song

20   writer.  And I said you've got to get here.  I think that you

21   would love this sound, and I have this idea or metaphor about

22   what the song should be.

23        Um, so she came and we collaborated with lyrics.

24   Um, my strengths are lyrics and melody.  And what we

25   typically do is we volley kind of lyrics.  It's like a game

1    Q.    Okay.  And did you stop listening to Christian music

2    after 2001?

3    A.    Basically.

4    Q.    And why is that?

5    A.    Because I was mostly always listening to what they call

6    secular music any ways.

7    Q.    Did you read anything or hear anything about the size of

8    the audience, the TV audience, for your Super Bowl

9    performance?

10   A.    Yes, sir.

11   Q.    How big was it?

12        MR. CHIEFFO:  I just want to check.  That was your

13   sustained.

14        THE COURT:  The sustained hearsay objection.  It

15   calls for hearsay, but she may know independently.  Although,

16   I doubt without hearsay.

17   BY MR. KAHN:

18   Q.    It was a large audience; correct?

19   A.    Very.

20   Q.    And as far as copyright filings, registrations and

21   stuff, you don't do that personally, do you?

22   A.    I have a team that manages all the logistics.

23   Q.    And the last question I have goes to an interesting

24   comment of yours.  That when you are writing a song, you're

25   actually visualizing not just the song, but how it would look

UNITED STATES DISTRICT COURT

1    in a music video; correct?

2    A.    Correct.

3              MR. KAHN:  If Mr. Chieffo, doesn't object since

4    Ms. Perry will not be with us, can we show the music video

5    and let Ms. Perry identify it of Dark Horse?

6              MR. CHIEFFO:  No objection, Your Honor.

7              MR. KAHN:  Okay.  We will show this and that will

8    probably be it.

9                   (Exhibit 77 played for the jury.)

10             MR. KAHN:  That was Exhibit 77, Your Honor.  May we

11   offer Exhibit 77 into evidence?

12             THE COURT:  I think so.  There's no objection;

13   correct?

14             MR. CHIEFFO:  No objection.

15                  (Exhibit 77 admitted.)

16   BY MR. KAHN:

17   Q.    You said that when you heard the instrumental way back

18   in Santa Barbara, it had a dark -- that what appealed to you

19   was the darkness of it?

20   A.    Correct.

21   Q.    And this sort of a vision you had as you're writing this

22   song as captured in the music video?

23   A.    Not every vision that I have when creating out the song

24   turns out to be the music video so I wouldn't say it was the

25   exact vision necessarily.

1    A.    Uh, in 2007.

2    Q.    Okay.  And were you able to make a living back in 2007

3    creating beats?

4    A.    Yes.

5    Q.    How old were you back then?

6    A.    Uh, like 20, 21?

7    Q.    Okay.  And when you would create a beat, how would you

8    let potential, um, collaborators know about your beat?

9    A.    Um, I would, um, post my beat on MySpace, uh, or, you

10   know, I might have contacted somebody directly, maybe, you

11   know, worked on beats like that.

12   Q.    And what was MySpace from your perspective like back in

13   2007 for a producer?

14   A.    Yeah.  Um, as a producer, it was an easy way for me to

15   post, uh, beats, uh, for people to see, uh, online and then

16   contact me as well.

17   Q.    Okay.  And when you would post a beat online, um, did

18   you have in mind some goal for what was gonna happen?

19   A.    Yeah.  Uh, it was the hope that, you know, somebody

20   would hear my beat, they would like it, uh, and they would

21   contact me, and then from that point, you know, we might work

22   together on a song.

23   Q.    Mm-mm.  And did you -- on some of these beats, did you

24   sometimes just sell them outright and keep no rights in the

25   song?

1   that particular program, um, uh, with the beat contained that

2   I created.

3   Q.   Okay.  And, um . . .  with -- would it be more than

4   file?

5   A.   Um, it would be one file at a time, but I have many.

6   Q.   And when you posted something up on MySpace to try to

7   market that beat, is that -- are those session files what you

8   posted on MySpace?

9   A.   No.  Um, from that session file, I could -- uh, I could

10  render out an MVV -- an MP3 file.  Uh, from there, I could

11  post it onto MySpace so people could hear it.

12  Q.   And your goal, I understand, was to hope some rap

13  artists would like the file and create a song.

14  A.   Yes.

15  Q.   And you said that you would keep a 50 percent interest

16  in the song?

17  A.   Yes.

18          MS. LEPERA:  Objection.  Vague.  Asked and

19  answered.

20          THE COURT:  Overruled.

21          You may answer.

22  BY MR. KAHN:

23  Q.   And when you say the song, you mean you keep a

24  50 percent interest in the music and the lyric?

25  A.   Yes.

1    beat for his song.

2    Q.    Okay.  And just to be clear, Flame is the performing

3    name of Marcus Gray; correct?

4    A.    Yes.

5    Q.    Do you call him Flame or do you call him Marcus?

6    A.    I do call him Flame.

7    Q.    Okay.

8    A.    Yeah.

9    Q.    Um, and when you were contacted by Mr. Gray, did you

10   already know him or was he somebody you never met?

11   A.    I did.  Um, uh, before that, I -- we had bible classes

12   together, uh, we had bible study, um, and so we talked about

13   the bible, of course.  We also had conversations about music

14   as well.  He was actually working on, um, uh, some albums.

15   Um, and, uh, I got, um, one song in there, and he said that

16   he liked this -- uh, he liked the beat that I -- that I

17   created.  And, um -- and then from there, he actually then

18   contacted me about that second beat which is -- which became,

19   uh, Joyful Noise.

20   Q.    And did he pay you any money for that beat?

21   A.    He did, yes.

22   Q.    What did he pay you?

23   A.    Uh, $300.

24   Q.    Okay.  And at the time that he acquired the beat and

25   paid you the $300, did you have any discussion about

UNITED STATES DISTRICT COURT

```
 1   ownership rights?

 2   A.   We did, yes.

 3   Q.   Tell me what that discussion was.

 4   A.   Um, he told me that I would own half of the song, uh,

 5   and that would be 50 percent.

 6   Q.   Okay.  So you'd own half of the song itself.

 7   A.   Yes.

 8   Q.   The music and the lyrics.

 9   A.   Yes.

10   Q.   Okay.  And was there a written agreement back then?

11   A.   No, there was not.

12   Q.   Was that your practice back then when you were 21 or

13   whatever to have written agreements or just oral agreements?

14   A.   I didn't really have like agreements, um, uh, by

15   definition, but in that case, yeah, it was -- it was

16   something we spoke about so that could be considered an oral

17   agreement, yes.

18   Q.   Okay.  And since then, we've seen an actual written

19   agreement.  It was marked as Exhibit 5.  It was the sound,

20   the songwriter split agreement?

21   A.   Yes.

22   Q.   Um, and that's an agreement you signed?

23   A.   Yes.

24   Q.   And what percentage of the song do you own in that

25   agreement?
```

UNITED STATES DISTRICT COURT

1    A.    It's 50 percent.

2    Q.    And has that been, uh, your ownership throughout from

3    2007 as far as you understood through today?

4    A.    Yes.

5    Q.    Now, you're contacted by Mr. Gray.  He likes the beat.

6    He wants to use it in creating a rap song.  And, um, so I

7    assume at some point, you'd have to deliver to Mr. Gray

8    something with your beat on it; correct?

9    A.    Yes.

10              MR. KAHN:  It should be up there, maybe not,

11   Exhibit 17?

12              THE CLERK:  The book.

13              MR. KAHN:  And Ms. Cohen -- Mrs. Cohen can bring it

14   up to you.

15              THE CLERK:  It's not within the book?

16              MR. KAHN:  It is within the book.

17              THE CLERK:  Do you want to use this one?

18              MR. KAHN:  No, it was in the list of all the stuff

19   that was included.

20              MS. LEPERA:  I'm talking about 17.

21              Could we have a side bar, Your Honor?

22              THE COURT:  Yes, if we have to.

23              MS. LEPERA:  Never mind.

24   BY MR. KAHN:

25   Q.    So we're not gonna to do the exhibit.

```
 1    Q.   And, um, do you receive a credit on those liner notes?

 2    A.   I do.

 3    Q.   And what is that credit?

 4    A.   It says produced by Chike Ojukwu.

 5    Q.   Okay.  And in the world of hip hop, what does it mean to

 6    be a producer?

 7              MR. CHIEFFO:  Objection, Your Honor.

 8              Calls for speculation, no foundation.

 9              THE COURT:  Uh, I think that he can answer the

10    question based on his personal knowledge.

11    BY MR. KAHN:

12    Q.   Based on your personal knowledge, what does it mean to

13    be a producer --

14    A.   Uh --

15    Q.   -- in liner notes?

16    A.   Yeah.  So as the producer, uh, in this particular liner

17    note, I, uh, created this song.  It's labeled that I created

18    the song which would, uh, note me as the producer.

19    Q.   Okay.

20    A.   And/Or created the musical part of that song.

21    Q.   And as the producer, was it your understanding that you

22    would have a share of that song?

23    A.   I did, yes.

24              MR. CHIEFFO:  Same objection, Your Honor.

25              THE COURT:  Uh, I'm going to strike the answer and,
```

1   was able to hear the lyrics, and I thought a very brief

2   summary of the theme of the song --

3           THE COURT:  Well, he can tell us what the theme is,

4   but he can't summarize the lyrics.

5           MR. KAHN:  Okay.

6   Q.   So what is the theme in your view of the song you

7   created Joyful Noise?

8   A.   It's in the title.  The song is called Joyful Noise so

9   we wanted the theme to be joy.  We wanted people to hear this

10  collection of sounds that would bring joy, hope, grace, and

11  that type of message from the, uh, Christian world view

12  paradigm.

13  Q.   So the song we've seen gets released in 2008.

14  A.   Yes.

15  Q.   Within the music community and industry, was either the

16  album or the song nominated for any awards?

17  A.   Yes, it was.

18  Q.   So which awards was -- let's first do the album.  Which

19  awards was the album nominated for?

20  A.   So Our World Redeem which had the song Joyful Noise on

21  it was nominated for a Grammy.  Uh, also, it was nominated

22  for a Stella award for best album, uh, which the Stella

23  awards is the highest, it's the peak of gospel music.  And

24  then the song Joyful Noise was also nominated for best rap

25  song which the Dove awards is the peak of Christian

UNITED STATES DISTRICT COURT

1   contemporary music.

2   Q.    Okay.  So let's start with the Grammy.  What was it

3   nominated for again?

4   A.    The album was nominated for best gospel/rock album of

5   the year.

6   Q.    And did you attend the Grammy's ceremony?

7   A.    Yes, I did.  I did.

8   Q.    Did you go alone or with your wife?

9   A.    Took my wife and my sister-in-law and, uh, it was fun.

10  Good experience.

11  Q.    And this was in 2009?

12  A.    2009, correct.  Yes.

13  Q.    And then you mentioned the Stellar awards?

14  A.    Yes.

15  Q.    And what -- the top of the gospel community?

16  A.    Yes.  It's -- it's the -- the zenith of the gospel

17  community's recognition of great contributions to gospel

18  music.  So it's the -- it's the peak.  It's what you want to

19  accomplish.

20  Q.    And where was that award ceremony held?

21  A.    It was held in, uh, Nashville, Tennessee.

22  Q.    Okay.  And it was also in 2009?

23  A.    Yes.

24  Q.    And did you attend that --

25  A.    Yes, I did.

UNITED STATES DISTRICT COURT

```
1    Q.   -- ceremony?

2    A.   I did.

3    Q.   Alone or with anyone?

4    A.   With my wife as well.

5    Q.   Okay.  And then you also mentioned the Dove awards?

6    A.   Correct.

7    Q.   What are the Dove awards?

8    A.   The Dove awards, it's -- it's similar to the -- the

9    Stellar awards, but it's just -- a collection of more so

10   Christian contemporary music and they have a separate

11   celebration, but it's also highest award you can receive in

12   that Christian contemporary market so my song was nominated

13   for best song of the year there.

14   Q.   And did you attend that ceremony?

15   A.   Yes, I did.

16   Q.   Where was that ceremony?

17   A.   That was also in Nashville, Tennessee.

18   Q.   Now, back to the Grammy's.  Um, to your knowledge was

19   that ceremony televised that year?

20   A.   The Grammy ceremony was televised.

21   Q.   What about the Stellar awards?

22   A.   The Stellar awards was also televised.

23   Q.   And the Dove awards?

24   A.   The Dove awards, yes, it's televised.

25   Q.   But if I understand it, your -- the actual song was not
```

UNITED STATES DISTRICT COURT

```
 1    played during any of those award ceremonies?

 2    A.    Neither of the televised portions.

 3    Q.    But it was listed as the nominee?

 4    A.    Correct, correct.

 5    Q.    Now, in addition to the song and the album, Mr. Gray,

 6    was there also a music video created?

 7    A.    Yes, there was.

 8    Q.    And what was your involvement in the creation of the

 9    music video?

10    A.    My portion was performance element.  So going over the

11    treatment, kind of giving it the thumb's up.  The treatment

12    is just really the concept of the music video.  Sing it.

13    Saying I think this would be a great depiction of the song,

14    and then performing in front of the camera bringing the

15    visuals to the audio.

16    Q.    And was there an official version, an official video?

17    A.    Yes, absolutely.

18              MR. KAHN:  Your Honor, we don't want to show the

19    entire video cause it's the same as the song, but if we could

20    be allowed, maybe show 45 seconds of the music video?

21              THE COURT:  That's fine.

22              MR. KAHN:  And that is Exhibit 68.

23              And I just want you to watch.  We'll play about 45

24    seconds, and you can tell us if this is the music video.

25                      (Exhibit 68 played.)
```

1    A.    Okay.

2    Q.    And let's now turn to your concerts.  Okay?  So you are

3    a performer; correct?

4    A.    Correct, I am a performer.

5    Q.    And you perform at concerts?

6    A.    Yes, I do.

7    Q.    And you've already told the jury the different types of

8    venues you perform at.

9    A.    Yes.

10   Q.    And were you doing that from 2008 through 2012?

11   A.    Yes, absolutely.

12   Q.    And, uh, since your deposition, have you had a chance to

13   try to refresh your recollection as to, um, where all these

14   concerts were?

15   A.    Yes.  Yes, I have.

16   Q.    And how did you do that?

17   A.    Uh, just looking at, uh, booking forms and -- and

18   digging up archives and revisiting that time period.

19   Q.    Did you have a chance to talk to your manager?

20   A.    Yes, I did.

21   Q.    And who is your manager?

22   A.    My lovely wife, Crystal Gray.

23   Q.    So without appearing to give me an actual number, but

24   during those four, um, to five years, roughly how many

25   concerts did you perform?

```
 1    A.    Surely over 100 --

 2    Q.    Okay.

 3    A.    -- shows.

 4    Q.    And was it in any particular geographic area or around

 5    the country?

 6    A.    It was around the country.

 7    Q.    Okay.  And you talked about the venues.  A lot of

 8    churches you performed in?

 9    A.    True.

10    Q.    But there's these other venues you mentioned?

11    A.    Absolutely.

12    Q.    And at those concerts, did you ever perform Joyful

13    Noise?

14    A.    Each one, every one.

15    Q.    You said you performed at every concert Joyful Noise?

16    A.    Every concert I performed Joyful Noise.

17    Q.    And as an entertainer, based on the audience response,

18    was Joyful Noise a popular song?

19    A.    It's -- it's the song you have to do.  So even if I

20    didn't want to do it because of I'm always doing it, I know I

21    have to perform it.  So at each one, I performed it.  It's a

22    fan favorite.

23    Q.    Okay.  And we've heard the underlying beats so obviously

24    there's not a band behind you playing; correct?

25    A.    Correct.
```

1   Q.   So was that recording being played and you would be

2   rapping over it?

3   A.   Yeah.  So I record over the -- the track, actually, uh,

4   and -- and my wife was functioning as my DJ.

5   Q.   So she would play the --

6   A.   Yeah.

7   Q.   -- the recording and you would rap over it?

8   A.   Correct.  She was literally hit play for me.

9   Q.   And, um, you mentioned earlier there was a MySpace page

10   for Mr. Moore.

11   A.   Correct.

12   Q.   Um, and did you ever perform with Mr. Moore in a

13   concert?

14   A.   Yes, we did.  We -- we toured together in fact, and, uh,

15   that would be the song that would be like the grand finale.

16   You know, we would perform it together as well as the other

17   artists on the tour would come out and we would celebrate

18   that way.

19   Q.   And you said you were on a tour together with him?

20   A.   Yes.

21   Q.   Do you recall what cities you went to?

22   A.   Uh, it was all over the states, east and west coast,

23   mid-West, southern region.

24   Q.   Okay.

25   A.   Up north, down south.

1    Q.    And at every concert, you performed Joyful Noise?

2    A.    Yes, every single one.

3    Q.    Now, as you traveled around the country on these concert

4    tours, um, were you ever interviewed on a radio program?

5    A.    Yeah.

6    Q.    Um, in advance of that particular night's concert?

7    A.    Yes.  So typically when you land, um, there may be a

8    short promo run where you go visit local radio stations,

9    university radio stations, news stations, and you'll promote

10   the concert and just raise awareness.  Hey, I'm here in town.

11   Come check out the concert.

12   Q.    You would go on to some radio program?

13   A.    Yes.  Yeah.

14   Q.    And sometimes a TV program?

15   A.    Correct.

16   Q.    And who actually set up those interviews?  Do you know?

17   A.    So most of the time, it's the venue.  They'll reach out

18   to their -- they'll do their due diligence and reach out to

19   the local radio stations, university stations, local news or

20   television stations there.  Other times it would be my wife

21   planning to liaison between, you know, our label and the

22   venue.

23   Q.    And one of these typical radio interviews, how long

24   would they last?

25   A.    They would be quick.

```
 1    Q.   Five minutes?  20 minutes?  10 minutes?

 2    A.   Couple of minutes, yeah.

 3    Q.   And during those interviews or at some point during the

 4    interview, did they ever play one of your songs?

 5    A.   Yes, they would play Joyful Noise.  It was a hit.  Flame

 6    is in town.  Come hear the song that resonates.  So they

 7    would have a bed of music underneath, you know, my talking

 8    portion of the interview and that's how people would hear it.

 9    Q.   So they wouldn't play the entire song, would they?

10    A.   No, just a snippet, a song byte.

11    Q.   Let me turn to your record label back then.  Um, what

12    was the record company that your album Our World Redeemed was

13    released on?

14    A.   It was released under, um, in print record label Cross

15    Movement Records.

16    Q.   And for those of us who are not musicians, what -- how

17    would you describe the record label?

18    A.   Yeah.  So my understanding of a record label is just a

19    company that foots the bill that provides distribution, um,

20    and money so you can record, mix master, and then mash

21    publish -- mass publish the product so the people can see it,

22    hear it in stores, online.  Marketing promo.  Things of that

23    nature.

24    Q.   Um, and are you still with Cross Movements Records?

25    A.   I am not.  My wife and I own our own company Clear Site
```