# Exhibit 5

1                UNITED STATES OF AMERICA
                UNITED STATES DISTRICT COURT
2            CENTRAL DISTRICT OF CALIFORNIA
                  WESTERN DIVISION
3
                    -  -  -
4           HONORABLE CHRISTINA A. SNYDER
        UNITED STATES DISTRICT JUDGE PRESIDING
5                    -  -  -

6

7  MARCUS GRAY; ET AL.,          )
                        )
8         PLAINTIFF,      )
                        )  CASE NO.:
    VS.                   )  CV 15-5642-CAS
9                        )
    KATY PERRY; ET AL.,          )
10                       )
         DEFENDANT.      )
11  _____)

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15          WEDNESDAY, JULY 31, 2019

16          LOS ANGELES, CALIFORNIA

17

18

19

20

21

22        LAURA MILLER ELIAS, CSR 10019
        FEDERAL OFFICIAL COURT REPORTER
23      350 WEST FIRST STREET, ROOM 4455
        LOS ANGELES, CALIFORNIA 90012
24          PH:  (213)894-0374

25

```
 1

 2
       APPEARANCES OF COUNSEL:
 3
       ON BEHALF OF PLAINTIFF:
 4

 5             CAPES SOKOL
               BY: MICHAEL A. KAHN, ESQ.
 6                 LAUREN COHEN, ESQ.

 7             7701 FORSYTH BOULEVARD
               12TH FLOOR
 8             ST. LOUIS, MO 63105

 9
               KAYIRA LAW, LLC
10             BY:  ERIC KAYIRA, ESQ.

11             2100 HANLEY ROAD, SUITE 208
               CLAYTON, MO 63105
12

13
       ON BEHALF OF DEFENDANTS OTHER THAN MS. PERRY:
14

15             MITCHELL SILBERBERG & KNUPP
               BY: CHRISTINE LEPERA, ESQ.
16                 AARON M. WAIS, ESQ.
                   JEFFREY MOVIT, ESQ.
17                 GABRIELLA NOURAFCHAN, ESQ.
                   JACOB ALBERTSON, ESQ.
18
               11377 WEST OLYMPIC BOULEVARD
19             LOS ANGELES, CA 90064

20
       ON BEHALF OF THE PERRY DEFENDANTS:
21
               GREENBERG TRAURIG
22             BY:  VINCENT H. CHIEFFO, ESQ.

23             1840 CENTURY PARK EAST
               SUITE 1900
24             LOS ANGELES, CA 90067

25
```

```
 1                            INDEX

 2    WITNESSES FOR
 3    THE PLAINTIFF:
                           DIRECT    CROSS     REDIRECT   RECROSS
 4

 5    DRELLISHAK, STEVEN
      BY:  MS. COHEN           12                97
 6    BY:  MR. WAIS                     72                   101

 7    WITNESSES FOR
      THE DEFENDANT:
 8
 9    FERRARA, LAWRENCE
      BY:  MR. MOVIT          103
      BY:  MR. KAHN                   114
10
      KING, JASON
11    BY:  MR. ALBERTSON      124               174
      BY:  MR. KAYIRA                 159
12

13    EINHORN, MICHAEL
      (VIA VIDEOTAPE DEPOSITION) 176
14

15            EXHIBITS           RECEIVED

16             111                 20
               116                 28
17
               117 PG. 1          106
18             89 PG. 59          108

19
         JURY INSTRUCTIONS                     177
20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1    LOS ANGELES, CALIFORNIA; WEDNESDAY, JULY 31, 2019; 10:00 A.M.

 2                          - - -

 3              THE CLERK:  Calling Calendar Item 1.

 4              Case No. CV 15-5642.

 5              Marcus Gray versus Katy Perry, et al.

 6              Counsel, please state your appearances.

 7              (Appearances as heretofore stated.)

 8              THE COURT:  Okay.  I don't want to get into a

 9    discussion given the time and everything, but as you can see,

10    I tried with my law clerks to not have a three-page

11    stipulation but to set forth what is in your stipulation in a

12    more economical way.  You can double-check it.  I think we're

13    right but . . .

14              MS. LEPERA:  For the record, Your Honor, the

15    numbers for Kobalt & Warner Brothers were stated in the

16    stipulation to be a net number, not a gross number.

17              THE COURT:  Okay.  So we'll correct that.

18              If you would just -- you can interlineate or

19    something.

20              MS. COHEN:  Your Honor, we have one issue to take

21    up with the Court.

22              THE COURT:  Yes.

23              MS. COHEN:  As Your Honor is aware, the plaintiffs

24    previously designated Dr. Michael Einhorn, primarily on the

25    issue of actual damages, and plaintiffs announced Monday that
```

1    Q.   And so you would agree that Capitol Records wants to

2    sell as many records as possible; right?

3    A.   Yes.

4    Q.   And that was true for the Prism album; correct?

5    A.   Correct.

6    Q.   And isn't it true that in general, the label will

7    release certain tracks from an album at certain times to

8    generate momentum or to keep up momentum for the sale of an

9    album?

10   A.   That's correct.

11   Q.   And we've heard evidence in this case that Dark Horse

12   was one of five singles from the Prism album.  Do you have

13   any reason to disagree with that?

14   A.   No.

15   Q.   And the singles from an album are the ones that are

16   played on the radio; is that right?

17   A.   Uh, they would -- you would designate singles that you

18   would want to succeed and be on the radio.  It doesn't

19   necessarily mean you will get that response.

20   Q.   And are you aware that Dark Horse was a promotional

21   single?

22   A.   Uh, how would you define that?

23   Q.   Um, similar to the . . .

24   A.   It would fall in the category of a single?

25   Q.   Yes.  It would fall in a category of single, but it was

UNITED STATES DISTRICT COURT

1    intended to generate momentum or keep up momentum for the

2    sale of the album; is that right?

3    A.   Yes, that's correct.

4           MR. WAIS:  Calls for speculation.

5           THE COURT:  Overruled.  The answer will stand.

6    BY MS. COHEN:

7    Q.   And you testified previously that Capitol Records puts

8    out singles sometimes ahead of the primary release of the

9    album to generate interest; right?

10   A.   Yes.

11   Q.   Okay.  And so that's really what we mean by promotional

12   single, that Dark Horse was one of those promotional singles.

13   A.   Are you specifically referring to release ahead of the

14   record or just the fact that it was a promotional single?

15   Q.   Well, was it released before the record?

16   A.   I believe it was not.  It was not the first single.

17   Q.   It wasn't the first single, but was it released before

18   the record?

19   A.   I think it was.  I'm not absolutely sure, but I think we

20   do have release dates in the documentation.

21   Q.   You're not sure.

22   A.   I believe it was released after the release date of the

23   album.

24   Q.   Are you aware, sir, that the song Dark Horse had a

25   promotional music video?

1    A.    Yes.

2    Q.    And are you aware that the budget for the music video

3    was over a million dollars?

4    A.    Yes.

5    Q.    And it's true that not every song on the Prism album had

6    a video; is that right?

7    A.    That's correct.

8    Q.    And is it true that Capitol Records -- that only the

9    songs that Capitol Records believes will resonate most with

10   consumers is chosen for a video?

11             MR. WAIS:  Objection, vague and ambiguous.

12             THE WITNESS:  I mean, that -- that requires

13   speculation.  Yeah, the intent is to find tracks that would

14   resonate with the fans.

15   BY MS. COHEN:

16   Q.    And it's true that Capital Records maintains records

17   showing radio play of songs; is that right?

18   A.    Yes.

19   Q.    And, in fact, Capitol Records produced business records

20   in this case which show radio play of all -- um, well, of

21   four of the singles from the Prism album; is that correct?

22   A.    That's correct.

23   Q.    And these were documents that were queried from the

24   Capitol Records system.

25   A.    Well, it uses a third party, uh, information source, but

```
 1   BY MS. COHEN:

 2   Q.    If you know based on your understanding of this

 3   document?

 4               THE COURT:  Okay.  You can answer that.

 5               THE WITNESS:  I'm sorry, ask it again.

 6   BY MS. COHEN:

 7   Q.    I believe I asked if you know whether the popularity of

 8   all of the singles from the Prism album were equal as far as

 9   radio plays were concerned.

10   A.    They were not equal in terms of radio play.

11   Q.    Okay.  I'm gonna move on now to discuss some of the

12   financial documents that were produced by Capitol Records.

13   Um, in this litigation, the plaintiffs requested documents

14   showing revenue received by Capitol Records as a result of

15   its exploitation of Dark Horse.  Do you recall that?

16   A.    Yes.

17   Q.    And you oversaw the production of those documents.  Is

18   that true?

19   A.    That's correct.

20   Q.    And you reviewed the documents to insure their accuracy;

21   is that right?

22   A.    Yes.

23   Q.    And the parties have marked the joint Exhibit No. 116

24   which is in the white binder in front of you.  Can you take a

25   look at it and let me know if you recognize that as the
```

1    production of financial documents produced by Capitol

2    Records?

3    A.   Yes, this is what we produced.

4              MS. COHEN:  Your Honor, I'd like to move for the

5    admission of Exhibit 116.

6              MR. WAIS:  No objection.

7              THE COURT:  Okay.

8                   (Exhibit 116 admitted.)

9    BY MS. COHEN:

10   Q.   So, sir, first, I'm going to ask you to take a look at

11   116-2.  Do you recognize this as profit and loss statements

12   Capitol Records prepared in this litigation related to Dark

13   Horse?

14   A.   Yes.

15   Q.   And you said before that you helped prepare this

16   document; is that right?

17   A.   Yes.

18   Q.   And so, generally speaking, the top portion of the

19   document reflects what Capitol Records --

20             MR. WAIS:  Objection.

21   BY MS. COHEN:

22   Q.   -- claims as revenue attributable to Dark Horse; is that

23   right?

24             MR. WAIS:  Argumentative.

25             THE COURT:  Overruled.

```
 1              THE WITNESS:  Yes.
 2   BY MS. COHEN:
 3   Q.    Okay.  And that's shown in the figure 12,402,637.
 4   A.    That's correct.
 5   Q.    And the bottom portion of this document reflects what
 6   Capitol Records claims as costs and expenses related to Dark
 7   Horse; is that right?
 8   A.    That's correct.
 9   Q.    And that amount is $11,772,912; is that right?
10   A.    That's correct.
11   Q.    And then what you do to compute profits is you subtract
12   the total claimed costs and expenses from the claimed
13   revenues, and you come up with a total profit of $629,725.
14   A.    That's correct.
15   Q.    And so $629,725 is all the profits that Capitol Records
16   claims it made from the exploitation of Dark Horse; correct?
17   A.    That's correct.
18   Q.    And is it true that Capitol Records prepared this
19   document and the calculation contained within it exclusively
20   for the purpose of this litigation?
21   A.    That's correct.
22   Q.    Prior to this litigation, this document did not exist;
23   right?
24   A.    Right.
25   Q.    Capitol Records had not allocated revenues or costs
```

1   specific to Dark Horse in this manner prior to the

2   litigation; right?

3   A.   That's correct.

4   Q.   So looking back at the top of the document related to

5   revenues, Capitol Records identified four categories

6   contributing to total net revenue; is that correct?

7   A.   Yes.

8   Q.   And those are domestic net physical sales, domestic

9   digital sales revenue, domestic licensing income and

10  ancillary income; is that right?

11  A.   Correct.

12  Q.   And Capitol produced backup documents that purport to

13  show the revenue received in each of these categories; is

14  that right?

15  A.   That's right.

16  Q.   Okay.  Let's talk about the net physical sales first.

17  I'm gonna ask you to turn to Tab 2 in your binder,

18  Exhibit 116, page 3.  Sir, is this one-page document, does

19  this one-page document, uh, purport to show the revenue that

20  Capitol Records received as a result of physical sales of the

21  Prism album?

22  A.   Of the Prism album or the Dark Horse track?

23  Q.   Well, the Prism album.

24  A.   Yes, it does have total revenue for the Prism album.

25  Q.   And is it true, sir, that, um, in -- in the column

```
 1    BY MS. COHEN:

 2    Q.   Does that refresh your recollection, sir?

 3    A.   Yes.

 4    Q.   Okay.  And did you previously testify that --

 5              THE COURT:  Wait, wait, wait.  Wait.

 6              The question is having refreshed your recollection.

 7    BY MS. COHEN:

 8    Q.   Having refreshed your recollection, sir . . .

 9              THE COURT:  Does -- does that . . .

10    BY MS. COHEN:

11    Q.   Does that change your answer to my previous question?

12    A.   I -- I think I'm saying the same thing, but it might

13    sound different, but this is -- in this comment, I was

14    referring to whether or not should we recoup our unrecouped

15    and whether or not a payment was made.

16         What we're showing here is accrued royalties which

17    is the expense that we will owe eventually to the artist, but

18    there are -- you know, there's nuances in the recording

19    business that would, uh, limit that payment if there was a

20    previous advance made so that's what I was referring to here.

21    Q.   And that's because in your contract with the artist,

22    certain amounts of expenses have to be recouped before the

23    artist gets paid royalties; is that right?

24    A.   That's correct, because an advance may have been made

25    and that's effectively a premium of royalties.
```

1   Q.   Okay.  And so in the document, Exhibit 116, page 2 in

2   the profit and loss statement, all the royalties that are

3   listed there, the ones we just talked about were domestic

4   licensing royalty expenses.  You don't know for sure that

5   those were actually paid to the artist; right?

6   A.   I have not validated that a payment was made as part of

7   the process of preparing this, but it would be -- it would be

8   standard procedure to do that.  I -- I can't say that I

9   validated, and that check was cut.

10  Q.   And same thing for the accrued artist producer royalties

11  and the accrued copyright royalties which account for over

12  $4 million; is that right?

13  A.   That's correct.

14  Q.   You accrued royalties, but you don't know for sure if

15  they actually were paid.

16  A.   I don't know for sure.

17  Q.   Now, let's talk about manufacturing costs.  This is

18  Tab 4 in your binder.  Exhibit 116, page 9.  DO you recognize

19  this document, sir?

20  A.   Yes.

21  Q.   And this document says -- at the top, IT reflects

22  manufacturing costs, says Katy Perry Dark Horse.  Do you see

23  that?

24  A.   Yes.

25  Q.   Okay.  And the amount listed at the bottom here shows

```
1    A.    That's correct.
2    Q.    And isn't it true that at your deposition, we went
3    through each of these categories of expenses, and you were
4    not able to identify any that were directly related to the
5    production of Dark Horse?
6    A.    The way that we track overhead would make it impossible
7    to -- to fulfill that request.  So that's why I've come up
8    with the -- the approach to allocate overhead based on sales
9    which is an indicator of how much the label was working on
10   that product.  Um, we don't --
11              Like a law firm, we don't track hours so we would
12   not be able to specifically say what each person did in -- in
13   working in their respective job on that -- on that, uh,
14   release, but I can assure you that with a -- with a release
15   of this size, it touched everyone's label.
16   Q.    So rent, for instance.  Did Capitol Records have to pay
17   more rent in order to generate the revenue related to Dark
18   Horse?
19   A.    No, they had to pay rent to house the people that were
20   doing the work.
21   Q.    Same question with salary.  Salaries are fixed; correct?
22   A.    Yes.
23   Q.    So there was no increase salary payment as a result of
24   Dark Horse specifically; is that right?
25   A.    No, it -- it's utilization of their time, not
```

 1   incremental spend per full-time employee.

 2   Q.   So these salaries would have been paid regardless of

 3   whether Dark Horse was produced; is that right?

 4   A.   That's correct.

 5   Q.   Same with the rent.  The rent was going to be paid

 6   regardless of whether Dark Horse was produced.

 7   A.   I mean, if we didn't have Katy Perry on the label, we

 8   might not have the same amount of overhead.  We'd probably

 9   have to scale back.  But generally speaking, I -- you know, I

10   understand your question.  It's a fixed cost so yes.

11   Q.   And you have severance included here.  Do you know

12   whether any employee was let go or fired as a result of the

13   production of Dark Horse?

14   A.   Well, I think you're looking at the studio overhead

15   which is something we deducted.  So everything you're looking

16   at here was taken out of the overhead for, um, the Capitol

17   operations.  Part of -- part of Capitol is a logistic deal,

18   but I've taken that out of the overhead cause that was not

19   attributable to Katy Perry.  So this is actually a deduction

20   from overhead that you're looking at.

21   Q.   Where does it say that this is . . .

22   A.   On the first page, you'll see Capitol Studio's overhead

23   is a negative, minus five million three.  I'm reducing

24   overhead by that amount.

25   Q.   And you testified at your deposition then that the

1    Capital Studio's overhead was removed because you couldn't

2    connect it directly to Dark Horse; is that right?

3    A.    That's correct.

4    Q.    And so in looking at Exhibit 116, the exhibit that

5    starts 116, page 81, can you point me to which document

6    related to overhead expenses represents the categories of

7    overhead that you are claiming related to Dark Horse?

8    A.    I think it would be the previous page.  Um, 116-91, for

9    instance.

10    Q.    Pension, in general, is a salary insofar as it's a fixed

11    cost?

12    A.    An employee-related cost, yes.

13    Q.    And so those pensions were not paid because of the

14    creation of Dark Horse; is that right?

15    A.    No, it's a component of the employee salary package.

16                THE COURT:  Ms. Cohen, how much longer do you have

17    to go?  The reporter needs a break.  I have a noon

18    proceeding.  So if we take a break at this point -- I'd

19    rather go another 15 minutes and then give the reporter a

20    break before noon.

21                MS. COHEN:  I'm very close to finishing.

22                THE COURT:  Yeah, let's see if we can get you

23    finished up.

24    BY MS. COHEN:

25    Q.    So just -- just to finish up here, Mr. Drellishak, is

1    there any category that you're able to identify as far as

2    overhead goes that would not exist as an expense but for

3    Capitol Records' creation -- production of Dark Horse?

4    A.   As I said before, the -- the size of the -- the label

5    would have to be appropriate with the size of the revenue

6    that we derive.  A release like this was a big part of the

7    revenue.  If we didn't have an artist like Katy Perry, we

8    wouldn't have as many people employed.  So while not

9    directly, um, associated with a specific release, uh, if we

10   didn't have Katy Perry on the roster, Capitol's overhead

11   would be smaller.

12              MS. COHEN:  That's all the questions I have.

13              THE COURT:  Okay.  Why don't we take our break now.

14              Um, ladies and gentlemen, why don't you plan to

15   return, uh, at quarter to 1:00, and we'll pick up at that

16   point in time.

17              THE CLERK:  All rise.

18                    (Jury not present.)

19              THE CLERK:  Please be seated.

20              THE COURT:  Just for planning purposes, what do you

21   think is a good time for your cross of the witness?

22              MR. WAIS:  Um, probably like 45 minutes to an hour.

23              THE COURT:  Okay.  And then the experts, how long

24   are they gonna be?

25              MR. MOVIT:  Uh, Dr. Lawrence Ferrara should be

| | |
|---|---|
| 1 | Ostinato No. 2.  And you further informed us that you |
| 2 | identified those in red, those notes which are Ostinato |
| 3 | No. 2. |
| 4 | What was the next step of your methodology? |
| 5 | A.   The next step was to provide a quantification, to |
| 6 | quantify the number of those highlighted notes.  That is all |
| 7 | of the notes that Dr. Decker has put in issue as a percentage |
| 8 | of the totality.  I counted all of those notes. |
| 9 | There are 207 notes Dr. Decker has placed in issue |
| 10 | which includes all of the repeats of Ostinato No. 2 |
| 11 | throughout Dark Horse.  The entirety of this transcription is |
| 12 | that there are 2,865 notes in all in Dark Horse.  And so in |
| 13 | keeping with the methodology that I just described, 207 notes |
| 14 | at issue is 7.2 percent of all of the notes in the Dark Horse |
| 15 | composition. |
| 16 | Q.   And what was the next step in your methodology, |
| 17 | Dr. Ferrara? |
| 18 | A.   To the extent that the lyrics are not at issue and the |
| 19 | lyrics in my working in the music industry in this capacity |
| 20 | over the last quarter century, the lyrics have been presented |
| 21 | to me as 50 percent of the composition and the music |
| 22 | 50 percent of the composition.  Not suggesting that that is |
| 23 | the way it must be. |
| 24 | What I write in my assessment report is if the |
| 25 | lyrics are 50 percent of the composition and the music is |

1    50 percent of the overall Dark Horse composition, the first

2    point is that a 7.2 percent of the notes at issue is

3    7.2 percent of the music which is 50 percent if one accepts

4    that division of the overall Dark Horse composition.

5            To the extent that one does accept that it's 7.2

6    percent of 50 percent of Dark Horse, then therefore it is, of

7    course, 30.6 percent of the totality of the Dark Horse

8    composition.

9    Q.   Okay.  Thank you, Dr. Ferrara.

10           Now that you've described your quantitative value

11   assessment, could you please your qualitative value

12   assessment?

13   A.   Yes.  One of the factors in implementing a qualitative

14   value assessment is to identify what I consider to be the

15   hook, the most memorable part of the music at issue that is

16   in Dark Horse and all of the rest of the music that is in

17   Dark Horse.  And in my opinion, the hook, the most memorable

18   part of Dark Horse is in the chorus.

19           I mentioned in my direct testimony last week that

20   the term hook is often interchanged with the term chorus.  In

21   fact, sometimes they're conjoined and we simply call it the

22   hook chorus because most of the time, the hook of a song is

23   in the chorus.  In my opinion the hook in Dark Horse is very

24   clearly in the sung vocal melody by Katy Perry and the lyrics

25   in the choruses of Dark Horse.

1    money.  What drives singles are marketing efforts.

2    Q.   And so what were some of the marketing efforts for Dark

3    Horse?

4    A.   The marketing efforts for Dark Horse were enormous.

5            So we can start, if you look at this time line

6    here, in August of 2013 months before the official release of

7    Dark Horse, Katy Perry partnered with two brands, two major

8    brands, Pepsi and MTV to, um, produce an innovative marketing

9    campaign that would introduce Dark Horse to her fans.

10           So this campaign was an interactive campaign in

11   which Dark Horse and another song from the album Prism

12   Walking on Air were considered to be, uh, promotional

13   singles.  People had not heard them yet, but what fans could

14   do is use their smart phones, enter a hashtags and hear

15   snippets of those songs, and they could vote on whether they

16   wanted Dark Horse or Walking on Air to be the single of

17   choice that would ultimately be released.

18           This is very unusual in the industry.  Fans don't

19   often have that kind of level of choice and access, but it

20   was an interesting branding idea to generate visibility

21   around the single.  So Dark Horse was not officially released

22   by the label Capitol until December of 2013, but it had been

23   circulating in the marketplace.

24           Fans had heard it since August of 2013 because of

25   this Pepsi MTV marketing campaign.  So that helped really

```
 1   drive the single to have that branding effort happening so
 2   many months earlier.
 3   Q.   And did Capitol expend resources on getting the single
 4   out?
 5   A.   Sure.  So we move forward in the time line to
 6   December of 2013 and Dark Horse is now officially released as
 7   a single by Capitol.  And by official release when you move
 8   from a song to a single, what that means is a record label
 9   has decided to invest money and resources to turn into it a
10   single and to promote it to radio and perhaps even to make a
11   video.
12           So Capitol spent about $1.1 million to market Dark
13   Horse as a single and I can assure you that is a great deal
14   of money at any time whether we're talking about 2013 or now
15   that's a lot of money spent, but they wanted to make it a
16   hit.  It had already been circulating in the marketplace, but
17   now they wanted to make it a number one hit which it did
18   become a number one hit, um, about a month or a
19   month-and-a-half later.
20           And one of the ways they did this was they made a
21   music video for Dark Horse which was quite expensive, um,
22   lavish and quite talked about as well.  And that was released
23   in February 2014.
24   Q.   And with the official release of the single of Dark
25   Horse, where that fit in the time line of the release of the
```

1    Prism album?

2    A.    Um, so the Prism album was released in the fall of 2013

3    and Dark Horse came out many months -- the video for Dark

4    Horse came many months after that.  It came out in

5    February of 2014.  So Dark Horse, again, had been circulating

6    as a song.  It had been played on radio, but it was not an

7    official release.

8              It was only because of the Pepsi and MTV campaign

9    that Dark Horse had that kind of circulation.  They decided

10   in December, Capitol decided to release it as an official

11   single, and then about a month-and-a-half later once it had

12   gone to number one, they made a video of the single.  That

13   took it even further so that's the time line.

14   Q.    And are public performances considered part of

15   marketing?

16   A.    Sure.  So live performances of a single can also help

17   drive the success of that single.  Again, what we're talking

18   about in marketing is generating consumer awareness and

19   visibility.  So if you have Katy Perry singing the song,

20   that's gonna generate visibility, awareness and help lead to

21   success.

22             Um, so here are some strategic performances that

23   Katy Perry did in conjunction with her label and others to

24   generate that kind of visibility for Dark Horse.  She

25   performed at the iHeart Radio Music Festival in the fall of

```
 1   considered all of those instrumental musical elements, the
 2   actual instrumental of Dark Horse looking at its underlying
 3   compositional elements.
 4   Q.   And any other factors that you considered secondary?
 5   A.   The final factor that I would consider to be a secondary
 6   factor is the production and arrangement of Dark Horse.  So
 7   in other words, people don't just go in a studio and suddenly
 8   magic happens.  It needs to be produced and producing is an
 9   artistic practice in which people pull together all these
10   compositional elements and realize them in the context of
11   technology as sound.
12        All right.  So we're talking about the actual sound
13   and the sounds in Dark Horse themselves which also provide
14   value.  It's a very sleek, um, fascinating sound that you
15   hear in Dark Horse and that's the result of producers'
16   intervention, also the mixing and the mastering of Dark Horse
17   as well.
18   Q.   Was there anything in particular about the sound of Dark
19   Horse that was significant at the time?
20   A.   Sure.  In 2013 we had really never heard a song that
21   sounded exactly like Dark Horse.  And the reason for that is
22   because it was a fusion and a merger of several different
23   styles all at once.
24        On one hand, it's a pop track.  And the reason that
25   you can call it a pop track is because it's structured like a
```

```
 1    pop song with verses and choruses and a bridge.  And the
 2    chorus in particular defines it as a pop track because it has
 3    a kind of surging chorus that you often hear in contemporary
 4    pop music.
 5         It also has a hip hop element.  So besides pop, you
 6    now have hip hop and that's primarily by way of Juicy J on
 7    the track as a feature.  You also have trap elements, and
 8    trap is a variant of hip hop that is minimalist, pared down,
 9    often kind of sleek, often in a kind of minor key melodic
10    mode.  It's quite a popular genre of music.  It has been
11    since the 2000s at least.  And the trap in Dark Horse comes
12    by way largely of Ostinato No. 2 in that track.
13         And, um, finally, you also have EDM and EDM means
14    electronic dance music.  Another very popular contemporary
15    genre of music.  One of the ways you can hear, um, one of the
16    ways that defines EDM, and it has defined EDM for a long
17    time, is that often there will be a build-up from verses to
18    chorus and there's what you call a drop in EDM.  So after the
19    surging chorus, there's this moment where it continues to
20    surge, but it's called a drop and it's usually instrumental.
21         You hear this in a lot of contemporary EDM and
22    EDM-influenced pop music like David Guetta and Calvin Harris
23    and others.  And Dark Horse has an EDM component because
24    there is a drop that happens after the chorus.
25         So what you have is you have the merger of these
```

1   different styles pop, hip hop, trap-influenced hip hop and

2   EDM.  And that was a relatively novel fusion in 2013 and that

3   novelty is one of the things that helped drive Dark Horse.

4   It just didn't sound like anything and people were addicted

5   to that sound.

6   Q.   Are there other factors that you identified that

7   contributed to Dark Horse's success?

8   A.   Sure.  So I've identified also tertiary factors.  I've

9   put lyrics as a tertiary factor.  Um, the lyrics in

10  Dark Horse are fun.  They're about romance and seduction.

11  They're using magic as a metaphor for romance one of pop

12  music's oldest subjects.  There was some speculation at the

13  time on the part of the fans and also journalists that Katy

14  Perry had come through a divorce was now dating pop musician

15  John Mayer and so some speculated the lyrics might be about

16  John Mayer or their relationship.  Whatever the case, it

17  provided intrigue, controversy.  That intrigue, that

18  controversy helps drive, um, success, but you can't imagine

19  the song without any lyrics at all.  Nonetheless, the lyrics

20  I considered to be a tertiary factor.

21  Q.   And any other factors that you considered tertiary?

22  A.   Sure.  So what I did here is I isolated music elements,

23  musical elements in Dark Horse.  So what I mean by this is if

24  you take any one musical element other than the hook because

25  I do think the hook is a secondary driving factor.  It's

 1   quite important.

 2            Can't imagine Dark Horse without the hook.  The

 3   hook drove Dark Horse.  However, any other musical element

 4   other than the hook, if you just kind of hypothetically pull

 5   it out of the song, it matters, but it's a tertiary factor

 6   because it doesn't drive the song in and of itself.

 7            And so if you pull out Ostinato No. 2 which is at

 8   the heart of this case, you pull out Ostinato No. 2 of

 9   Dark Horse, while Ostinato No. 2 has value, it's a relatively

10   insignificant value in relationship to these other much more

11   important driving factors.

12            So I've included Ostinato No. 2 as part of the

13   collected musical and production elements as you see in

14   section -- in the secondary factors.  But if you isolated it

15   alone, I don't think it would drive the success of Dark

16   Horse.  In fact I'm sure nobody bought Dark Horse simply

17   because of Ostinato No. 2 alone so that's what I mean by

18   isolated musical elements.

19   Q.   Well, you mentioned Ostinato No. 2 as being part of what

20   makes Dark Horse have a trap style component.  In your view

21   is it a necessary component of that style that was part of

22   the fusion you mentioned?

23   A.   So Ostinato No. 2 does matter because, again, it's part

24   of those collected musical production elements that I

25   identified as secondary factors.  And, again, Ostinato No. 2

```
 1   does help provide the trap quality of Dark Horse that allows

 2   Dark Horse to be understood as a fusion between pop, hip hop,

 3   trap-influenced hip hop and EDM.

 4           However, to my ears, Ostinato No. 2 is such a

 5   relatively simple and kind of basic ostinato pattern.  If you

 6   gave me a keyboard right now, I could probably come up with

 7   another ostinato pattern that could fit in Dark Horse

 8   interchangeably and it wouldn't make a great deal of

 9   difference to the sound or the success of that song.

10           Um, I think there are a lot of ostinato patterns

11   that are similar in the context of trap music.  It's not a

12   super sophisticated genre in the sense of its musicality.

13   We're talking about just a few notes.  So I can think of

14   Ostinato No. 2 as relatively interchangeably with other kinds

15   of sounds that you hear in the context of trap.  And for that

16   reason, I only consider it to be a relatively insignificant

17   or minor part of the success of Dark Horse.

18   Q.    Okay.  And so you mentioned at the beginning there was a

19   second task that you worked on for this case, uh, with

20   respect to the album Prism.  What did you do with respect to

21   Prism?

22   A.    Sure.  So I was tasked also to assess the value of

23   Ostinato No. 2 to the success of Prism as an album, and I

24   came up with more factors as well and ranked them as primary

25   factors, secondary factors and tertiary factors.
```