Kenneth D. Freundlich (SBN 119806)
FREUNDLICH LAW
16133 Ventura Boulevard, Suite 645
Encino, CA 91436
P: (310) 275-5350
F: (310) 275-5351
E-Mail: ken@freundlichlaw.com

Attorneys for Amici Curiae Musicologists

FILED
CLERK, U.S. DISTRICT COURT

January 9, 2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ___CMJ___ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCUS GRAY (p/k/a FLAME), et al.,<br><br>Plaintiffs,<br><br>v.<br><br>KATHERYN ELIZABETH HUDSON (p/k/a KATY PERRY), an individual, et al., Defendants, and DOES 1 through 10,<br><br>Defendants. | Case No. 2:15-cv-05642-CAS (JCx)<br><br>Assigned to: Hon. Christina A. Snyder<br><br>**BRIEF OF *AMICUS CURIAE* MUSICOLOGISTS IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR A NEW TRIAL**<br><br>Date: January 27, 2020<br>Time: 10:00 a.m.<br>Ctrm: 8D—8th Fl., First Street<br><br>Filed: July 1, 2014<br><br>Trial: July 17, 2019 |

1

BRIEF OF AMICUS CURIAE MUSICOLOGISTS IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR
FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR A NEW TRIAL

## I. INTRODUCTION

During the trial in this matter, testimony established that there existed only trivial, non-identical similarities between plaintiff's "Joyful Noise" and defendant's "Dark Horse". Despite this fact, the jury, ignoring the Court's instructions concerning determinations of "extrinsic similarity," rendered a $2.78 million infringement verdict against Perry for her use of a brief ostinato comprised of a few notes. If the Court were to allow this verdict to stand, it will only worsen the rampant confusion and uncertainty about the application of current copyright jurisprudence to musical works. This confusion and uncertainty, in turn, is inhibiting the work of songwriters and the American music industry at large, whose vigorous output of innovative expression has always depended upon access to, and unchecked use of, generic musical conventions and ideas. Accordingly, Amici Musicologists respectfully urge the Court to grant Defendants' Motion and overturn this erroneous verdict based on an improper finding of infringement.

## II. INTEREST OF AMICI CURIAE

Amici are musicologists[1] who research, teach and write about history, composition, analysis, and perception of musical works. In music copyright infringement cases musicologists provide testimony about similarities between contested musical works, and whether they are musically significant. Such testimony informs judges and jurors evaluating allegations of copyright infringement involving musical works.

Defendants rely on judges to screen out speculative infringement cases where there is no extrinsic similarity between musical works. Judges do so by gauging the significance of originality of expression in two musical compositions and, based on this information, reversing errant jury verdicts of infringement.[2] Amici have a strong interest in Courts correcting obvious errors in juries'

---

[1] A complete list of Amici Musicologists and their affiliations is attached hereto as **Exhibit 1**.

[2] A similar group of Amici musicologists submitted briefs in the Ninth Circuit appeals of District Court rulings in: (i) the so-called *Blurred Lines* case, *Williams v. Gaye*, Case No. 15-56880, Nos. 16-55089 and 16-55626 (consolidated), Dckt. No. 20, and the Petition for en banc review, Dckt. No. 99 (arguing that judges should seize upon their role as "gatekeeper" to prevent cases from

**BRIEF OF AMICUS CURIAE MUSICOLOGISTS IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR A NEW TRIAL**

understanding of evidence relating to extrinsic similarity. If Courts do not overturn verdicts, like that in question here -- improperly tainted by the jury's application of the subsequent "intrinsic test" – there will be expanding precedent of grossly inequitable determinations of infringement that will ultimately compromise the robust public domain that has fostered unparalleled creativity and innovation by American popular composers.

### III. ARGUMENT

To find actionable infringement, a jury must find that two works are both "extrinsically" *and* "intrinsically" substantially similar. *Swirsky v. Carey*, 376 F.3d 841 (9th Cir. 2004). The "extrinsic test" asks whether two works share a similarity of ideas and expression based on external, objective criteria." *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996) (emphasis added), requiring the analytical dissection of a work and expert testimony" to "break[] the works down into their constituent elements, and compar[e] those elements for proof of copying" *Swirsky,* 376 F. 3d at 845**.** The intrinsic test is left to the trier of fact and "examines an ordinary person's subjective impressions of the similarities between two works." *Funky Films v. Time Warner Entertainment Co.*, 462 F. 3d 1072, 1077.

The jury as fact finder only reaches the question of intrinsic similarity after it has been established that the defendant's work is extrinsically substantially similar to the plaintiff's protectable expression. *See generally Swirsky, supra.* If a jury finds that there is no extrinsic similarity, as it should have here, it may not evaluate the works for intrinsic similarity. Jurors aurally perceive music differently and, where there is no objective similarity between two pieces of music, their intrinsic evaluations, produce uneven and unpredictable results.

The District Court correctly instructed the jury in its application of the "extrinsic test" first to filter out non-protectable elements of the two compositions (Dckt. 441, Jury Instr. 37). It also

---

going to a jury based on claims that should not survive the extrinsic test as a matter of law); and (ii) *Skidmore v. Led Zeppelin, et al.,* Case Nos. 16-56057 (L), 16-56287 (appeal pending) (arguing for the "virtual identity" jury instruction in cases involving "selection and arrangement" of non-protectible elements as a basis for infringement).

3

**BRIEF OF AMICUS CURIAE MUSICOLOGISTS IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR A NEW TRIAL**

correctly instructed the jury on copyright protection based on "selection and arrangement" that "[a] combination of unprotectable elements may be eligible for copyright protection if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship. Trivial elements of compilation and arrangement are not copyrightable." *Id.*, Jury Instr. 34. The Court further advised the jury "when a work embodies only the minimum level of creativity necessary for copyright, it is said to have 'thin' copyright protection. A thin copyright only protects against virtually identical copying." *Id.*

The sole issue at trial was whether "Ostinato 2" in "Dark Horse" infringed the ostinato in "Joyful Noise". Declaration of Aaron Wais (ECF No. 486) ("Wais Dec."), Ex. 8, p. 1349:24-1350:3.

Plaintiff's expert, Dr. Todd Decker, testified at trial based his findings of musical similarity entirely on a combination of five commonplace and unremarkable musical elements he alleged were shared by "Dark Horse" and "Joyful Noise":

(i)   A pitch sequence of scale degrees 3-3-3-3-2-2;

(ii)  The temporal spacing of the notes (i.e., rhythm);

(iii) Timbre (in the form of a "pingy" synthesizer sound);

(iv)  A purported phrase length of eight notes; and

(v)   The "placement" of the ostinato in the sound recording's mix.

Wais Dec., Ex. 3, p. 445:17-446:3.[3]

Dr. Decker' testimony also establishes that these alleged similarities are commonplace elements and unremarkable, Wais Dec., Exh. 3, 524:9-23, which was a viewpoint shared by Defendants' expert Dr. Lawrence Ferrara.

Dr. Decker also testified as to the numerous differences between the two musical phrases at issue. Wais Dec., *see e.g.* Exh. 3, pages 460, 462, 495, 499-501, 504-505.

---

[3] Plaintiffs argued at trial that these same elements purportedly constituted seven similarities. However organized, these are the only similarities at issue.

4

**BRIEF OF AMICUS CURIAE MUSICOLOGISTS IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR A NEW TRIAL**

Despite the clarity of the evidence, and the Court's correct instructions requiring virtual identity of these commonplace elements of the "thin" copyright in question, the jury found infringement. In other words, the jury found infringement even though there was no similarity of protectable expression, and even though the selection and arrangement of the commonplace elements was not virtually identical.

Musical works, like works of expression in other fields such as literature and visual arts, are comprised of unprotectable elements that are the building blocks for original creative expression. All copyrightable musical expression uses a limited number of pitches, rhythms, harmonies, key signatures, tempos, genres, etc., which may be monopolized by any musician. Using these basic elements, composers build more complex structures like chords and melodic and rhythmic motifs, which they further develop and combine to create the rhythmically structured melodies and underlying harmonic progressions that constitute the original backbone of a musical work.

If allowed to stand, this verdict will encourage similar speculative claims bolstered by spurious evidence of similarity of protectable musical expression based upon an expert's cherry-picking an array of commonplace unprotectable musical elements and unprotectable sonic attributes, between two works in an attempt to manipulate musically untrained juries into findings of substantial musical similarity.

### B. The Alleged Similarities Between the Ostinatos in Question Are Not of Original Expression

#### 1. Fundamental Elements of Music

Musical works are built from a common vocabulary of fundamental elements like pitch, duration, meter, key and timbre[4]. It has been demonstrated that non-musicians are particularly

---

[4] "Pitch" refers to one of the twelve notes in the standard chromatic scale of sound frequencies used in most Western music.
"Duration" refers to the length for which a note is sounded (*e.g.*, quarter note and half note).
"Meter" refers to the grouping of beats, as indicated by a time signature (*e.g.*, 4/4 refers to 4 equally spaced quarter-note beats per bar).
"Key" refers to a work's harmonic home base.

5

**BRIEF OF AMICUS CURIAE MUSICOLOGISTS IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR A NEW TRIAL**

susceptible to finding musical works to be similar based on a particular timbre or performance style they share. *See* Jamie Lund, *An Empirical Examination of the Lay Listener Test in Music Composition Copyright Infringement*, 11 Va. Sports Ent. L.J. 137 (2012). Accordingly, the unprotectable *sounds* of particular instruments, or vocal styles, which an author selects for the performance of a work can have an outsized effect on a jury's perception of *musical* similarity between the works. This subtle risk not readily understood by a jury of "lay audience" members, underscores the reason why the "extrinsic test" must be rigorously applied. Otherwise, juries will be charged with applying the highly subjective intrinsic test to songs sharing merely a few unoriginal musical elements.

The most important elements of a musical composition are *melody, harmony and rhythm*. *Melody* comprises a linear succession of pitches, each sounded for an assigned duration. It is typically the most distinctive and memorable musical aspect of a popular song and of musical works in general because melody is what listeners most readily comprehend, recall and replicate[5]. In popular songs, the sung vocal line is the most identifiable and hummable part of a composition, and substantial similarity analysis between two popular songs almost invariably results in a question of melodic similarity.[6]

*Harmony* is the relationship between two or more pitches that are sounded simultaneously or in close succession (*e.g.*, arpeggios). These pitches are commonly said to constitute a "chord."

---

"Timbre" refers to the character or quality of a sound, e.g. "shrill", "percussive", "reverberant", etc.

[5] *See* "Melody" in Glossary, MUSIC COPYRIGHT INFRINGEMENT RESOURCE, https://blogs.law.gwu.edu/mcir/.

[6] *See* Fishman, J. P., *Music as a Matter of Law*, Harvard Law Review, Vol. 131, pp. 1861–1923 (2018). Melody is the only musical element mentioned in the U.S. Copyright and foreign copyright statutes.

6

**BRIEF OF AMICUS CURIAE MUSICOLOGISTS IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR A NEW TRIAL**

The harmonic progression of a composition is the sequence of chords that typically support melodies.[7]

*Rhythm* is the pattern of sounds and silences in a piece of music as determined by the sequence and duration of the notes being performed or the beats of a percussion instrument.[8]

In addition to the primary components of melody, harmony, and rhythm, there are, of course, myriad other elements available to composers. These include, for example, tempo, instrumentation, genre, dynamics, articulation, and phrasing.[9] While combinations and deployments of these secondary elements may enhance the appeal of a musical work, these are essentially embellishments of the primary melodies, harmonies, and rhythm.

Describing a musical work merely by its a constellation of elements like ostinato, key, meter, dynamic markings, and timbre is meaningless. All songwriters draw upon these commonplace elements in forging their original musical expression. The fact that two or more composers may choose to employ some of the same common musical elements, however, has no bearing on the question whether their works contain substantially similar musical *expression*.

Amici believe that, as is the case here, when there is no significant similarity of melody, harmony or rhythm, there can be no possibility of actionable similarity between two musical compositions.

---

[7] *See* "Harmony" in Glossary, MUSIC COPYRIGHT INFRINGEMENT RESOURCE, https://blogs.law.gwu.edu/mcir/.

[8] *See* "Rhythm" in Glossary, MUSIC COPYRIGHT INFRINGEMENT RESOURCE, https://blogs.law.gwu.edu/mcir/.

[9] "Tempo" refers to the pace of the beat (expressed as beats per minute measured on a metronome for example)
"Instrumentation" refers to Guitars, drums, piano, trumpet, trombone, etc.
"Genre" refers to Hip hop, rock, country, rhythm and blues, classical, etc.
"Dynamics" refers to the relative volume of the notes
"Articulation" refers to the attack, duration and decay of a given note, e.g., staccato, legato and slurred.
"Phrasing" refers to how groups of notes are played.

**BRIEF OF AMICUS CURIAE MUSICOLOGISTS IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR A NEW TRIAL**

### 2. There Are No Protectible Similarities Between The Ostinatos In "Dark Horse" And "Joyful Noise"

The only evidence of alleged similarity the jury considered in this case was limited to five characteristics of the two ostinatos, none of which is original. Indeed, Dr. Decker acknowledged that similarity in any one of these elements would be an insufficient basis for infringement, but that it was their "combination" that was significant. Wais Dec., Exhibit 3, page 524:9-23.

The following illustration prepared by Amici Musicologists, is derived from the undisputed transcriptions of the two phrases at issue and shows the two phrases transposed into the same key of A Minor.[10]



#### a. The pitch sequence is not original

The sequence of pitches comprising the ostinato is so trite, and found in myriad pre-existing and public domain works, that it merits no copyright protection whatever. Significantly, Amici Musicologists inputted CCCCBB into the Themefinder.org database and there were 6 if one stays in the same key; 26 in transposed versions that preserve the shape/sequence. *See* Themefinder.org, Center for Computer Assisted Research in the Humanities at Stanford University.[11] Further, Amici

---

[10] The "Dark Horse" ostinato in this transcription is repeated simply to align it with the relevant ostinato in "Joyful Noise", which is twice the length of that of "Dark Horse". These adjustments are commonplace and accepted ways to compare two pieces of music.

[11] Themefinder supports searches of song beginnings with a mixture of classical, Renaissance, and folk music, all of it in the public domain. In large measure, it is based on printed sources. Melodies can be searched on a 5-point continuum.

**BRIEF OF AMICUS CURIAE MUSICOLOGISTS IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR A NEW TRIAL**

Musicologists inputted CCCCBB into the RISM database and there were more than two thousand (2000) matches in all keys with the bulk coming from 18th and 19th century works. *See* Repertoire International des Sources Musicales (RISM), rism.info[12].

### b. The Rhythm is not original

The rhythm in question is a pattern of repeating evenly spaced notes of equivalent length notes, an utterly commonplace sequence found in innumerable musical compositions. It is ubiquitous throughout all genres of Western Music and is entitled to no copyright protection.

### c. The "pingy" sound of the synthesizer and placement of the ostinato in the "mix" are not compositional elements of the music, but rather elements of the sound recording

The sound of the recordings should not bear on the analysis to determine whether these two pieces of music share any original musical compositional elements. Indeed, in evaluating two pieces of music under the "extrinsic test" the fact finder must not consider the sound of the recording. The selection of a particular sound is not a protectable element of a musical work and should have been considered by the jury in this case.

### d. The phrase length of the ostinato at issue is not original

The ostinatos do not simply repeat – their iterations are different. According to Dr. Decker, the ostinato in "Joyful Noise" takes 16 beats for all of the melodic content in that ostinato to be expressed before it repeats. According to Dr. Decker, in contrast, it only takes 8 beats for all the melodic content in ostinato 2 in "Dark Horse" to be expressed.

The implication that even if the phrase length was the same in "Dark Horse" and "Joyful Noise", it would be significant on the matter of musical similarity signals the extraordinarily attenuated nature of plaintiff's allegation of copying. This is immediately obvious to musicians, given the ubiquitous and long-standing use of four-bar phrases in virtually every genre of Western

---

[12] RISM, founded in Paris in 1952, is the largest and only global operation that documents written musical sources.

9

**BRIEF OF AMICUS CURIAE MUSICOLOGISTS IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR A NEW TRIAL**

music. To imply that this commonality has any relevance to the issue of copying is akin to suggesting that the fact that two books are written in the same language bears on the question whether one is a copy of the other.

### 3. The "combination" of these unoriginal elements is not original

Because none of the allegedly similar elements between "Joyful Noise" and "Dark Horse" are separately original and protectable, Plaintiff resorts to the extravagant suggestion that because he selected and deployed these particular elements, he could legally prevent others from using a similar combination. Even if Plaintiff's compilation of elements acquired a modicum of protection, there are critical differences between the two ostinatos and no rational and reasonable jury could have found them to be "virtually identical," per the Court's instruction.

*First*, the "Joyful Noise" ostinato is significantly different from that of "Dark Horse" because, it contains six instances[13] of "portamento"[14]. These portamentos, which are significant to the "Joyful Noise" composition appear nowhere in "Dark Horse".

*Second*, the first, fifth, eighth, ninth, thirteenth, and sixteenth pitches of "Dark Horse" occur before the corresponding pitches in 'Joyful Noise".

*Third*, the "Joyful Noise" ostinato is twice as long as the "Dark Horse" ostinato.

*Finally*, the resolution of the "Dark Horse" ostinato to the pitch at an interval of a sixth degree below the starting note is fundamentally different from the "Joyful Noise" ostinato, which resolves to the pitch a fifth degree below its primary starting pitch. This is apparent from a visual inspection of the final notes of the notated ostinatos (see above). In fact, there is not one note in common between the ostinatos in the fourth beat, nor even in any of the measures in question.

---

[13] The first to second, sixth to seventh, tenth to eleventh, twelfth to thirteen, seventeenth to eighteenth and twenty-first to twenty-second pitches in the example.

[14] "Portamento" is a technique by which performers slide between frequencies of the notes they sing or play.

**BRIEF OF AMICUS CURIAE MUSICOLOGISTS IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR A NEW TRIAL**

## IV. CONCLUSION

The jury verdict of infringement in this case threatens to constrict the public domain and contributes to a spreading paralyzing uncertainty for songwriters and composers in general. If juries may find infringement, as here, when the musical similarities between works are trivial, commonplace, and not virtually identical, songwriters will be unable to determine what the law deems original – and thereby copyrightable – expression. Given the limited number of common elements, or "building blocks" available to songwriters, they have become anxious as to their freedom to use these, fearing unwarranted and frivolous copyright lawsuits based on their use of them.

It is well established that judges are responsible for ensuring that the "extrinsic test", among other copyright doctrine, is carefully applied to prevent specious jury verdicts in music infringement cases based, in large part, on jurors' perception of similar and unprotectable *sounds* between two musical compositions.

Composers must be able to freely borrow from the rich musical public domain to maintain the vibrancy and innovation that has long characterized the sphere of popular music in America.

Amici urge this Court to intervene and overturn this errant jury verdict or at a minimum order a new trial in this case.

Dated: December __, 2019

Respectfully submitted,

        FREUNDLICH LAW
        BY: /s Kenneth D. Freundlich
        KENNETH D. FREUNDLICH

        Attorneys for Amici Curiae Musicologists
        E-Mail: ken@freundlichlaw.com

**BRIEF OF AMICUS CURIAE MUSICOLOGISTS IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR A NEW TRIAL**

# EXHIBIT 1
## AMICI MUSICOLOGISTS

**BRIEF OF AMICUS CURIAE MUSICOLOGISTS IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR A NEW TRIAL**

| | |
|---|---|
| **Nicole Biamonte, PhD**<br><br>**Associate Professor of Music Theory**<br><br>**Schulich School of Music**<br>**McGill University** | **Charles Cronin, PhD**<br><br>**B.M., J.D., M.A., Ph.D. (musicology)**<br><br>**M.I.M.S. (Masters, Information Management & Systems)**<br><br>**Lecturer in Law, University of Southern California Law School** |
| **Dr. Gerald Eskelin**<br><br>**Doctor of Music Education**<br>**Indiana University**<br><br>**Formerly of:**<br>**University of Southern California music faculty; Pierce College, Music chairman and teacher of music theory** | **Andrew F. Farina, PhD**<br><br>**Visiting Assistant Professor of Music Theory**<br><br>**Butler University School of Music** |
| **Robert Fink, PhD**<br><br>**Professor IV**<br>**Director of Undergraduate Studies**<br>**Department of Musicology**<br>**Chair, Music Industry Program**<br><br>**UCLA Herb Alpert School of Music**<br>**Professor in Humanities** | **Klaus Frieler, PhD**<br><br>**Doctor of Systematic Musicology with a doctoral dissertation on mathematical methods in melody cognition.**<br><br>**University of Hamburg** |
| **Michael Harrington, D.M.A.**<br><br>**Professor and Course Author**<br>**Berklee College of Music / Berklee Online**<br>**Music Business Program Faculty Chair** | **Katherine M. Leo, Ph.D., J.D.**<br><br>**Assistant Professor of Music**<br>**Millikin University** |
| **Dr. Daniel Müllensiefen**<br>**Professor in Music Psychology,**<br>**MA (Musicology), PhD (Musicology)**<br><br>**Co-Director of the MSc programme in Music, Mind and Brain,**<br><br>**Goldsmiths, University of London** | **André O. Redwood, PhD**<br><br>**Assistant Professor of Music Theory**<br><br>**University at Albany – SUNY** |
| | |

| | |
|---|---|
| **Anthony Ricigliano**<br><br>**Former Chairman of the Music Theory Department**<br>**Manhattan School of Music**<br><br>**Testifying Musicologist**<br>**Donato Music Services, Inc.** | **Dr. Patrick Savage**<br><br>**Associate Professor**<br>**Faculty of Environment and Information Studies**<br><br>**Keio University SFC (Shonan Fujisawa Campus)** |
| **Eleanor Selfridge-Field, PhD**<br><br>**Consulting Professor, Music**<br><br>**Stanford University** | **Mark Spicer, Ph.D.**<br><br>**Professor of Music**<br><br>**Hunter College and the Graduate Center**<br>**City University of New York** |
| **Robert Walser, PhD.**<br><br>**Professor of Music**<br><br>**Case Western Reserve University** | |